```
                         AFFIDAVIT
```

I, Andrew Nambu, a Special Agent of the Federal Bureau of Investigation ("FBI"), in Boston, Massachusetts, being duly sworn, depose and state:

1. I am employed by the FBI as a Special Agent and am assigned to the Joint Terrorism Task Force ("JTTF"). I have been a Special Agent of the FBI for approximately nine years, and have been assigned to the JTTF for approximately six years.

2. This Affidavit is being filed in support of a motion by the United States to detain TAREK MEHANNA pending trial for violation of Title 18, United States Code, Section 1001(a)(2), by making materially false, fictitious and fraudulent statements concerning a matter within the jurisdiction of the executive branch of government, that is, an investigation by the Federal Bureau of Investigation involving international terrorism, as that phrase is defined in Title 18, United States Code, Section 2331(1). MEHANNA lied to the FBI in order to protect the activities of a friend and associate who was then fighting with, and receiving training from, Al Qa'ida. MEHANNA's false statements obstructed an investigation of, and involved and were intended to promote, a federal crime of terrorism as defined in Title 18, United States Code, Section 2332b(g)(5). MEHANNA should be detained because he is a risk of flight, and poses a risk that he will further obstruct justice, or threaten or intimidate prospective witnesses, or attempt to do so. MEHANNA

has previously stated an intention to emigrate from the United States, and seek employment and residence in the Middle East, for the foreseeable future. On November 8, 2008, he was arrested as he attempted to fulfill that goal, that is, he was arrested as he attempted to board a flight at Logan Airport, to begin a one-way flight to Saudi Arabia, where he had obtained employment. In addition, in arguing that he is likely to flee, I rely, in part, on the strength of the evidence against MEHANNA that is set forth in my Affidavit in support of the Complaint in the case; the evidence against MEHANNA is overwhelming and he faces the strong likelihood of a sentence of 8 years' imprisonment.

**Summary of the Evidence**

3. The evidence against the defendant is direct, straightforward and irrefutable:

    a. Toll records of MEHANNA's cell phone confirm that, on December 12, 2006, MEHANNA received telephone calls from Somalia.

    b. The next day, on December 13, 2006, during a consensually recorded conversation, MEHANNA told two individuals that Daniel Maldonado had called MEHANNA from Somalia, and that Maldonado moved to Somalia with his entire family.

    c. On December 16, 2006, MEHANNA told two members of the FBI's Joint Terrorism Task Force that he (MEHANNA) last heard that Maldonado was in Egypt, that he (MEHANNA) had last heard from Maldonado approximately two weeks earlier, and that

Maldonado was living in a suburb of Alexandria, Egypt, and working for a website.

        d.   On February 25, 2007, during a consensually recorded conversation, MEHANNA gave some details about his conversation with Maldonado (that had occurred on December 12, 2006). The February 25, 2007 conversation occurred after publicity surrounding the capture of Maldonado, including reports in the press that Maldonado had called a friend in the United States while he (Maldonado) was in Somalia. MEHANNA admitted that he (MEHANNA) was that unnamed person. MEHANNA further admitted that Maldonado told him (using codes) that "I'm here fighting." MEHANNA also stated that Maldonado had invited MEHANNA to come join him. Finally, MEHANNA acknowledged concern that he was caught in a lie by the FBI. In essence, the Defendant described and admitted to the offense alleged in the instant Complaint. MEHANNA is recorded stating that, when asked by the FBI about MALDONADO (on December 16, 2006), he said MALDONADO was in Egypt. MEHANNA admitted that he told this to the FBI shortly after MALDONADO had called him from Somalia (on December 12, 2006). MEHANNA stated that lying to the FBI was a problem, and he wasn't sure how he was going to explain that. MEHANNA stated, "My other problem is this, that when the FBI asked me where Dan was ... I told them he was still in Egypt ... and he had called me the day before that from Somalia ... That's very bad. I don't know how the heck I'm gonna explain that one."

MEHANNA continued, "I don't ever remember if he said the word Somalia on the phone or not, but that's a problem because like lying to them in and of itself is a crime."

      e.   Finally, in statements to the FBI, Daniel Maldonado has confirmed his telephonic contact with MEHANNA, and the fact that he called MEHANNA to encourage MEHANNA and other of their mutual friends in the Boston area to come join him in fighting jihad in Somalia.

**Recorded Statements Concerning Intent to Leave the United States**

    4.   More than once, TAREK MEHANNA told cooperating witnesses and others that he does not intend to continue living in the United States.  For example:

      a.   On January 12, 2007, in a conversation that was recorded, MEHANNA stated that "I'm gonna finish my degree, Inshallah, and if it's possible I'm gonna move overseas."  The person with MEHANNA asked MEHANNA if he intended to move to Saudi Arabia, to which MEHANNA responded "Yeah, the Gulf, that's the ideal place to go."  In May 2008, MEHANNA completed his studies and obtained his degree in pharmacy from the New England College of Pharmacy.  As discussed below, he was able to obtain employment in Saudi Arabia, and took the steps necessary to move there.

      b.   On February 25, 2007, in addition to again stating his intention to leave, MEHANNA advised a cooperating witness to leave as well.  MEHANNA stated the following: "[I]f I were you

man, I would.  The only thing preventing me from leaving right now is the fact that I still have to finish school.  I think, I mean, if you, if you're looking for in the long run and you wannna save yourself a lot of trouble, I think you should."  I believe that MEHANNA was encouraging his friend to flee as well, because of law enforcement interest in them and the potential that Maldonado was providing law enforcement with evidence of their criminal activity.

**Evidence in the Possession of the Defendant and Statements at the Airport that Demonstrate Intent to Leave the United States**

5.   On November 8, 2008, at approximately 8:45 a.m., MEHANNA was arrested at Boston's Logan Airport as he was boarding a Delta flight to JFK Airport in New York.  MEHANNA had on his person an itinerary which indicated that he was connecting to a Saudi Air flight from JFK to King Khaled International Airport in Saudi Arabia, that was leaving JFK at 2:00 p.m. on the same day.  It was a one-way ticket.  Upon arrival at Logan, he checked his luggage through to Riyadh, Saudi Arabia.

6.   While checking-in at the Delta counter, he told airline personnel that he had a one-way ticket to Saudi Arabia.  Airline personnel informed MEHANNA that country imposed restrictions and rules pertaining to travel between the United States and Saudi Arabia do not allow travel with a one-way ticket.  MEHANNA stated that the reason he was traveling with a one-way ticket was because he had accepted an assignment with King Fahad Hospital where he was to be employed as a pharmacist.  Upon request,

MEHANNA produced a thick packet of paperwork from the hospital documenting his employment status.

7.   The Defendant MEHANNA was going to Saudi Arabia to begin employment as a "clinical pharmacist consultant" at the King Fahad Medical City in Riyadh, Saudi Arabia.  He had in his luggage a copy of a contract with the Kingdom of Saudi Arabia, Ministry of Health.  The contract was for one year, and was to be automatically renewed.  The contract began upon MEHANNA's arrival in Saudi Arabia.

8.   The Defendant had received a three month visa from Saudi Arabia - which is the probation period set forth in his contract with the Saudi Ministry of Health.  The visa was not a tourist visa, but was specifically to work at the Ministry of Health in Riyadh.  I have been able to determine that the Kingdom of Saudi Arabia will issue a work permit for a period of one to three months.  After the expiration of the initial work permit, MEHANNA could apply for a formal work permit that is good for one year.  The Kingdom of Saudi Arabia does not have an extradition treaty with the United States.

9.  Also on his person or in his luggage was other evidence that indicates that MEHANNA intended to move to Saudi Arabia, and this was not just a vacation.  For example, he had with him an original of his U.S. birth certificate, as well as an original of an Egyptian birth certificate.  A person born of an Egyptian father is considered an Egyptian citizen by the Government of

Egypt, and can obtain an Egyptian birth certificate.

### Other Statements by the Defendant and Others that Demonstrate Intent to Leave the United States

10. While being booked, the Defendant identified his employment as the King Fahad Medical Center. He provided his address as: "Saudi Arabia." He identified his family's residence in Sudbury as his **previous** address.

11. The Defendant's father stated that the Defendant was leaving to work in Saudi Arabia.

12. Another cooperating witness told the FBI that the Defendant was shipping some of his things, and he was retrieving some of his things that he had loaned to friends. MEHANNA was going to Saudi Arabia to work as a pharmacist, with no intent of leaving Saudi Arabia or returning to the United States for the foreseeable future.

### CONCLUSION

13. I believe that, prior to the issuance of the complaint in this matter, TAREK MEHANNA intended to leave the United States and reside elsewhere. Prior to his planned departure on November 8, he made plans and took steps that indicate a plan to permanently leave the United States (or at least leave for the foreseeable future). The instant charges have simply given him another reason to leave, and never return. The strength of the evidence and likelihood of conviction negate any reason to stay and fight the charges. I therefore believe that there are no

conditions or combination of conditions that could ensure the appearance of the defendant at proceedings and trial.

Sworn to this ___ day of November 2008, under the pains and penalties of perjury, at Boston, Massachusetts.

_____
Andrew Nambu
Special Agent
Federal Bureau of Investigation