UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) ) | |
| v. | ) ) | No. 09-cr-10017-GAO |
| TAREK MEHANNA, | ) ) ) | |
| Defendant. | ) ) | |

MEMORANDUM AND ORDER ON GOVERNMENT'S MOTION FOR DETENTION

November 18, 2009

SOROKIN, M.J.

The United States has moved to detain the Defendant on the grounds of danger to the community pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence) and (f)(1)(B) (maximum punishment of life), risk of flight pursuant to subsection (f)(2)(A) and obstruction of justice pursuant to subsection (f)(2)(B). The Defendant may be detained only if the Government establishes, by clear and convincing evidence, that the Defendant is a danger to the community under either (f)(1) subsection or, by a preponderance of evidence, that he poses a serious risk of flight or obstruction under the (f)(2) subsections. 18 U.S.C. § 3142; United States v. Salerno, 481 U.S. 739 (1987); United States v. Patriarca, 948 F.2d 789 (1st Cir. 1991).

The Superceding Indictment charges that from sometime in 2001 until about the return of

the Indictment in November, 2009, Mehanna conspired with Ahmad Abousamra and others to provide material support and resources to terrorists, knowing and intending that the material support and resources were to be used in preparation for and in carrying out violations of 18 U.S.C. § 956 (conspiracy to kill, kidnap, maim, or injury persons or damage property in a foreign country) and § 2332 (extraterritorial homicide of a U.S. national), all in violation of 18 U.S.C. § 2339A.  The Superceding Indictment also alleges that Mehanna provided and attempted to provide material support to terrorists, conspired to kill in a foreign country, conspired to violate the laws of the United States, and made false statements to FBI agents.

## FACTS[1]

In November of 2008, a criminal complaint issued charging Mehanna with making a false statement in 2006 to the FBI.  In December of 2008, the Court released Mehanna on conditions. Docket #15, Order on Government's Motion for Detention.  Now, there are new charges and new evidence against Mehanna, none of which was brought before the Court last year:  Mehanna has been charged with crimes of terrorism and violence; the Government now seeks his detention of Mehanna on grounds of danger to the community; the Bail Reform Act's statutory presumption of detention applies; and a large amount of evidence of Mehanna's activities and statements are before the Court.

---

[1]The record before the Court consists of the Pretrial Services Report, the affidavits submitted in support of the criminal complaint and search warrant, the Government's Proffer and Memorandum in Support of Detention (Docket #41-2), the Affidavit of Special Agent Nambu in support of detention in this case, the Nambu affidavit filed in support of detention at the time of the 2008 bail hearing, the Defendant's Motion for Release, and the letters submitted in support of release both at the time of Mehanna's bail hearing in 2008 and now.

     I.     The Government's Evidence in Support of Detention

<u>The Trip to Yemen</u>

Government records establish that, in early 2004, Mehanna traveled to Yemen along with Abousamra and another person now serving as a Government informant.  Visiting religious schools was the stated reason for the trip.  In fact, according to a confidential informant, Mehanna, along with the informant and Abousamra, traveled to Yemen to enroll in a terrorist training camp.

Years after the trip to Yemen, on January 12, 2007, Mehanna told an informant that the trip to Yemen was a failure, in large measure, because no one was around  - they were on a religious pilgrimage or in jail.  According to Mehanna, he and Abousamra spent their time in Yemen looking for people they had been told would connect them with terrorist training.  Mehanna also told the informant that while they were hasty and immature in the way they did the trip, the trip was not wrong; rather it was the best two weeks of his Mehanna's life.   Mehanna made these statements to an informant in a conversation recorded by the Government with the informant's assistance.

<u>Discussions Among Alleged Conspirators</u>

According to Daniel Maldonado, Mehanna talked about the glory of dying for Allah, about how wonderful it would be to die on the battlefield, and debated the legality of suicide bombings that resulted in the death of innocent civilians. Ultimately, Mehanna agreed such acts were permissible if the benefit was greater than the loss.

According to a confidential witness, Mehanna, (along with the confidential witness and co-Defendant Abousamra), prior to September 11, 2001, discussed going to terrorist training

camps in Pakistan and conducted logistical research on the internet into such a trip, but no concrete plans ever developed. In the post-9/11 period, again according to confidential witnesses, Mehanna expressed support for the 9/11 attacks, and watched jihadi movies mostly belonging to Mehanna glorifying either Muslim fighters and/or the killing of American soldiers. The confidential witness also reports that the three men discussed their desire to take action in furtherance of jihad, but they did not know how.

In 2003, the men discussed the feasibility of assassinating a specific member of the executive branch of the United States Government. In a separate conversation they discussed targeting a second such official for assassination.

In the second half of 2003, the men discussed a plan to obtain automatic weapons, go to a shopping mall, and randomly shoot people. They discussed the logistics of this type of suicide attack, including the number of participants, coordination of the attack from different entrances, the attack of first responders, and the type of weapons needed. To further this plan, the confidential witness went to New Hampshire to meet with Daniel Maldonado from whom he sought help in obtaining automatic weapons. Maldonado indicated he could provide only handguns, thus the plan was abandoned.

<u>The Lie to the FBI</u>

On December 16, 2006, two FBI agents interviewed Mehanna. The evidence, at this stage, shows Mehanna lied to the agents. Mehanna told the agents that his last contact with Maldonado was a phone call two weeks earlier in which Maldonado told him he was in Egypt working for a website. In fact, the two men had spoken a few days before when Maldonado, in code, said he was in Somalia receiving military type training for a terrorist organization. In later

recorded conversations with a confidential informant, Mehanna said that Maldonado's words meant in general "I'm here [in Somalia] fighting" and admitted that he had lied to the FBI. Mehanna also said: "The only thing preventing me from leaving right now is the fact that I still have to finish school.  I think, I mean, if you, if you're looking for in the long run and you wanna save yourself a lot of trouble, I think you should."

Internet Activities

Mehanna translated into English the publication "39 Ways to Serve and Participate in Jihad," made efforts to have the translation published on the Internet, and requested publication occur without using his own name.  Mehanna's sixty-five page translation begins by stating that the "entire world has announced its war on terrorism – or rather on Jihad."  "39 Ways," Docket #42 at 5.  Mehanna's translation makes plain that, among others, the United States is the object of this jihad: "American and Britain are behind the fight against *Jihad*." "39 Ways", Docket #42 at 52 (italics in original).   In addition, a few sentences later, the text directs that the reader "Do away with the Americas."  Id. at 53.  In many chapters, the book goes on to instruct the reader to: go for jihad yourself, make jihad with your wealth, help prepare the fighter going for jihad, expose the hypocrites and traitors, train with weapons and learn how to shoot, have enmity toward the disbelievers and hate them, and engage in electronic jihad (including hacking). Mehanna's translation and distribution of this text occurred in 2006.   His translation was distributed by Tibyan Publications.  It is the most widely distributed version and is acknowledged as the most accurate. Docket # 41-2 at 69.  In addition, Mehanna's version is the basis for translations into other languages.  Id.  Mehanna had this to say about the publication and his own

efforts: "I hope . . . the book makes an impact." Mehanna performed other translations as well. When an associate of Mehanna's suggested that they were Al Qaida's media wing in Iraq, Mehanna responded that "I don't think . .. we deserve that title . . . maybe . . . if we are lucky . . . we get to clean their toilets." Mehanna also discussed his desire to be the "media wing" for "aqs [al Qa'ida]" in Iraq and the hope that this would bear fruit.

Mehanna expressed a hatred of living in the United States and a desire to leave. For example, he said: "I really hate to live in the country longer . . . I wish to go back to arabia . . . or some other place where I don't see these filthy kuffar." Docket #41-2 at 36. Regarding moderate Muslims leaders, of one he said "[s]he needs to be raped" and of another he said "I wish I could meet [the person] . . . and cut off his testicles."

Mehanna helped Abousamra download an encryption program, discussed a concern about "being watched," Docket #41-2 at 48, and instructed another person how to mask his internet location to make surveillance "much harder." Id. at 49. He also tried to recruit others to jihad through "one-on-one efforts like, befriend a person slip stuff in here and there." Id. at 58. He also encouraged others to download jihad recruiting videos. Id. at 59.

A computer search revealed Mehanna's support of violent jihad. In a communication recorded on the computer Mehanna used, he suggested asking for "Allah's [] mercy on just the buildings[,] [destroyed on 9/11] not the sinners that were in it [,] as at least the buildings weren't sinners[.]"

In other online conversations, Mehanna encouraged a specific individual to "go study in Yemen." Mehanna also described his school in Yemen as "more like a camp" where people walk around "with camo jackets and AK-47s." Docket #41-2 at 45-46. In short, Mehanna encouraged

this person to travel to Yemen to enroll in terrorist training.

When Mehanna learned that Egyptian intelligence agents questioned someone in Egypt about him, Mehanna thought he "should be careful," indicated he would not "stop the franchise," and thought he should stop until he "figure[d] out . . . what the deal is."

Approximately a year ago, when the FBI arrested Mehanna on the false statements charge, the FBI searched a computer that Mehanna used at his parents' home. A forensic analysis found that large volumes of data related to jihad had been stripped or removed from the computer before it was seized.

Superceding Indictment

The Superceding Indictment returned on November 5, 2009, lodges very serious charges against Mehanna, including conspiracy to provide material support to terrorists, providing or attempting to provide the same and conspiracy to kill in a foreign country as well as the false statement charge. These new charges carry very heavy penalties. Mehanna faces a possible term of imprisonment of life and a suggested sentence, according to the Sentencing Guidelines, of somewhere between twenty and thirty-four years. Mehanna is 27 years old.

II.     Mehanna and His Conduct Since December 2008

Mehanna's personal background was reviewed in this Court's prior opinion. Docket #15. The Court considers those facts again without repeating them here.

The conditions of Mehanna's 2008 release included, among other requirements, that he live with his parents and that he observe an 8:00 p.m. to 8:00 a.m. curfew. Mehanna's parents posted their home and substantial amounts of their savings to secure his release and his

compliance with conditions. At the time of his October, 2009, arrest on the charges now before the Court, Mehanna's original case remained pending; the new charges were added to the original false statement charge.

As he did in 2008, Mehanna has submitted many letters of support. Since his release in 2008, Mehanna has taught math, science and religion at a private school. Many of his students have submitted letters describing Mehanna as a "great teacher," as "kind, [and] thoughtful," as teaching in "religion class . . . against terrorism" and as having a good sense of humor. His employer also wrote of the positive contribution Mehanna made in his teaching.

Neither during the period of Mehanna's release nor to date has either Pretrial Services or the Government requested the revocation of Mehanna's release due to failure to comply with the conditions of his release. In addition, none of the evidence submitted to the Court concerns the time period since Mehanna's release. Although at oral argument counsel for the Government asserted Mehanna has violated his release conditions and pointed to documents recently obtained from Mehanna's web site,[2] neither those documents nor the web site have been submitted to the Court.

## LAW

The Defendant may be detained on danger grounds only if the Government establishes, by clear and convincing evidence, that there is a serious risk that Mehanna poses a danger to the safety of another person or the community and that no condition or combination of conditions

---

[2] The Superceding Indictment does allege a conspiracy that extends through the date of the return of the Superceding Indictment in November, 2009, however, neither the overt acts listed in the charging document nor the evidence before the Court reveals specific criminal activity after Mehanna's release on conditions.

will reasonably assure such safety. The Defendant may be detained on flight or obstruction grounds only if the Government establishes, by a preponderance of the evidence, that there is a serious risk that Mehanna will not appear or that he will obstruct justice.

In making the determination whether "any condition or combination of conditions will reasonably assure the appearance of the [Defendant] as required and the safety of any other person and the community", the governing law directs the Court to consider the following factors:

    (1)    the nature and circumstances of the offense charges, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

    (2)    the weight of the evidence against the person;

    (3)    the history and characteristics of the person, including

        (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

        (B)    whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law;

    (4)    the nature and seriousness of the danger to any other person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g).

A rebuttable presumption of detention aids the Government's motion. Title 18 U.S.C. § 3142(e)(3)(B) & (c) provides:

    Subject to rebuttal by the person, it shall be presumed that no condition or

> combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officers finds that there is probable cause to believe that the person committed--
>
> . . .
>
> (B) an offense under section 924(c), 956(a), or 2332b of this title;
>
> (C) an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of ten years or more is prescribed.

The specific charges brought against Mehanna by the grand jury in the Superceding Indictment, Counts I - III, make this presumption applicable to the Government's motion.

## FURTHER FINDINGS OF FACT AND CONCLUSIONS OF LAW

Many people have spoken on behalf of Mehanna. They describe him as kind, religious, and gentle in his behavior and dedicated to his community. They describe Mehanna's parents and family in similar or even more glowing terms. The Court credits this evidence. However, the Court has before it evidence that there is another side to Mehanna. In one conversation Mehanna stated "I'm not trying to arouse suspiciion[sic] . . . I'm just syaing [sic] be smart." In the same conversation thread he went on to say "the only ppl I trust . . . r u and Ahmad [Abousamra] . . . period." Docket #41-2 at 49. Similarly, he did not want to associate his own name with his translation of the "39 Ways" book.

This evidence of another side to Mehanna, in the form of his own recorded words and deeds, shows Mehanna promoted terrorist activities, encouraged others to engage in terrorism, recruited others to participate in terrorism, and protected, or attempted to protect, a terrorist from law enforcement scrutiny. The evidence of the foregoing comes both in the form of one-on-one communications with others and the substantial effort Mehanna invested to translate Al Qaida

materials for dissemination, including the "39 Ways" book.  This evidence also reveals a strong allegiance to terrorists and Al Qaida, as well as a strong desire to leave the United States.

Mennaha raises several points.  First, he contends his record of compliance with the Court's release conditions over the past eleven months coupled with the fact that the Government did not put any of the present evidence of danger before the Court last year rebuts the presumption of detention applicable in this case and warrants release on conditions.  Second, he suggests release on all previously imposed conditions plus a condition of no internet access at the home subject to verification by agents of the Government (as well as any other conditions deemed appropriate by the Court).  The Court has carefully considered the force of both of these arguments.  There are, however, countervailing considerations – the evidence described above and the statutory presumption in favor of detention.

Mehanna poses a serious risk of flight, no condition or combination of conditions will reasonably assure his appearance as required and the Government has met its burden of proof to detain Mehanna on this basis.  Mehanna faces a very lengthy prison sentence that may well exceed in years his present age of 27.  He has expressed both a strong desire to leave the United States and a strong desire to live in a different part of the world.  He poses a serious risk of flight which is unmitigated even by his parents' substantial financial and emotional commitment.  The new charges, new evidence, much longer sentence and statutory presumption change the risk of flight analysis that applied in 2008.

Mehanna poses a serious risk of danger to the safety of any other person or the community, no condition or combination of conditions will reasonably assure the safety of any other person or the community, and the Government has met its burden of proof to detain

Mehanna on this basis.  Mehanna joined a conspiracy to commit a violent act of terrorism aimed at killing both civilians at a shopping mall and the first responders.  Mehanna traveled to Yemen in an effort to enroll in a terrorist training camp and to prepare to attack United States soldiers overseas.  In both cases Mehanna was preparing to participate, personally, in violent acts of terrorism.  Over a sustained period of time, Mehanna has demonstrated his ongoing support of terrorism both by his own recorded statements and by investing his time and effort in promoting terrorism.  No condition or combination of conditions mitigates the serious risk of danger Mehanna poses.

Mehanna argued that detention would violate his constitutional rights under the First Amendment. This is incorrect.  The Court has detained Mehanna because the evidence establishes that he poses both a risk of flight and that he poses a danger to the community.  This ruling presents no First Amendment concerns.[3]

In addition, based upon the evidence before the Court, Mehanna poses a serious risk that

---

[3] The Government has also argued for detention on the ground that Mehanna's writings pose a danger of causing others to engage in violence (separate from any danger posed by Mehanna engaging in an act of violence) and are sufficient in themselves to warrant detention. The Court has not relied on this type of danger in its decision, thus, the Court need not address the possible First Amendment implications of that argument.  See Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."); Stewart v McCoy, 537 U.S. 993, 123 S.Ct. 468, 470 (2002) (Stevens, J. statement respecting denial of petition for writ of certiorari)(stating that Supreme Court's "cases have not yet considered whether, and if so to what extent, the First Amendment protects [] instructional speech."); Curley v. NAMBLA, 2001 WL 1822730 (September 27, 2001 D.Mass.)(noting categories of speech that are and are not protected by the First Amendment).  Similarly, the Court does not order Mehanna detained because of the movies he watched, however offensive the movies may be.

he will obstruct or attempt to obstruct justice notwithstanding any condition or combination of conditions and the Government has met its burden of proof to detain Mehanna on this basis.

For the foregoing reasons, the Government's Motion for Detention (Docket #41 filed in 09cr10017-GAO) is ALLOWED and the Defendant's Motion for Release (Docket #10 filed in 09mj119-LTS) is DENIED.

## ORDER OF DETENTION PENDING TRIAL

In accordance with the foregoing memorandum, IT IS ORDERED:

1. That Tarek Mehanna be committed to the custody of the Attorney General or his designated representative, for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. That Tarek Mehanna be afforded a reasonable opportunity for private consultation with counsel; and

3. That on order of a court of the United States or on request by an attorney for the Government, the person in charge of the corrections facility in which Tarek Mehanna is detained and confined shall deliver Tarek Mehanna to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

## RIGHT OF APPEAL

THE PERSON DETAINED BY THIS ORDER MAY FILE A MOTION FOR REVOCATION OR AMENDMENT OF THE ORDER PURSUANT TO 18 U.S.C. § 3145(b).

/s/ Leo T. Sorokin  
LEO T. SOROKIN  
United States Magistrate Judge