UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA       )
                               )
V.                             )          NO. 09-CR-10017-GAO
                               )
TAREK MEHANNA                  )
_____)
```

## DEFENDANT'S RENEWED MOTION FOR RELEASE ON BAIL

The defendant, Tarek Mehanna, respectfully requests that this Court order his release on bail pending trial. In support of this motion, the defendant has attached a memorandum that puts forth his argument for release and responds to the government's lengthy Proffer and Memorandum in Support of Detention.

The defendant requests a hearing on this motion.

Respectfully submitted,

Tarek Mehanna
By His Attorneys

CARNEY & BASSIL

*Janice Bassil*

Janice Bassil
B.B.O. #033100
J. W. Carney, Jr.
B.B.O. # 074760
20 Park Plaza, Suite 1405
Boston, Ma. 02116
617-338-5566

Dated: December 16, 2010

**TABLE OF CONTENTS**

Introduction. . . . . . . . . . . . . . . . . . . . . . .4

I.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . 5

II.   BACKGROUND OF TAREK MEHANNA. . . . . . . . . . . . .10

      A.    Family and Professional Background. . . . . . .10

      B.    Religious Background. . . . . . . . . . . . . .11

      C.    Background of the Investigation . . . . . . . .14

III.  DISCUSSION OF THE GOVERNMENT'S PROFFER. . . . . . . .19

      A.    "Material support" by providing translation services
            and distributing material intended to inspire others
            to participate in violent jihad. (Proffer, pp. 9-10) .
            . . . . . . . . . . . . . . . . . . . . . . . .20

            1.    *39 Ways to Serve and Participate in
                  Jihad*. . . . . . . . . . . . . . . . . .20

            2.    The Media Wing of al Qa'ida. . . . . . . .24

            3.    Other translations and productions . . . .26

            4.    Recognizing the importance of their
                  Efforts. . . . . . . . . . . . . . . . . .27

      B.    Support for successes of the terrorists and setback
            for the American and other westerners, and rejection
            of moderation, and desire to leave the U.S. and not
            live amongst the "kuffars" . . . . . . . . . . 28

            1.    Admiration for al Qa'ida leadership and their
                  acts . . . . . . . . . . . . . . . . . . .28

            2.    Admiration for the 9-11 hijackers . . . . 32

            3.    Hatred of the United States and Americans, and
                  desire to leave, the United States . . . .35

       4.   Taking pleasure in injuries to U.S. Servicemen . . . . . . . . . . . . . . . . . . . . . .38

       5.   Rejection of moderation and cooperation. 42

   C.   Mehanna's experience in Yemen . . . . . . . 45

   D.   Mehanna's concern about law enforcement  scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

   E.   Mehanna's continuing interest in participating in violent jihad, and additional efforts to convince and radicalize others . . . . . . . . . . . . . . 54

   F.   Additional Conversation re: support for bin Laden Mehanna: "my real father" . . . . . . . . . . 64

   G.   The lessons of *39 Ways to Serve and Participate in Jihad.* . . . . . . . . . . . . . . . . . . . . . .65

   H.   The government's conclusion . . . . . . . . . 67

IV.   INEFFECTIVE ASSISTANCE OF COUNSEL . . . . . . . . .69

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . 70

<u>I</u>NTRODUCTION

The defendant, Dr. Tarek Mehanna, PhD respectfully requests
that this Court order his release on bail pending trial. In
October 2009, the government sought and obtained Tarek's
detention based on its Proffer and Memorandum in Support of
Detention.[1] This Proffer cited almost exclusively instant
messages (IMs) that the government had obtained during a search
of Tarek's computer in 2006. When the Proffer was filed, the
government had not yet provided these instant messages in
discovery, leaving counsel unable to adequately respond to its
proffer. After a careful review of the instant messages as well
as other discovery, Tarek Mehanna renews his motion for release
on bail.

The government claimed the need for detention based on
allegations that Tarek is a danger to the community and will
flee if released. These claims are contradicted both by Tarek's
background and his behavior throughout this case. A careful
reading of the instant messages, put in context and not "cherry
picked" in the fashion presented in the government's proffer,
demonstrates that Tarek is not dangerous and does not intend to
and will not flee. It is clear based on the government's proffer
and a review of the evidence provided that the prosecution is

---

[1] The government submitted a copy of this Proffer on November 5,
2009.

based on speech, specifically political comments made by Tarek in 2006. These statements are the essence of free and protected speech under our constitution. The government has yet to answer the major question in this case: What did Tarek Mehanna **_do_**? Speech alone should not be used to detain someone under the onerous conditions that Tarek is subject to. Tarek has proposed conditions of release, described below, and is prepared to abide by whatever conditions the Court concludes are appropriate.

## I. SUMMARY OF ARGUMENT

The government relied virtually entirely in its proffer on instant messages written by Tarek and others in 2006. The instant messages reveal that Tarek exercised his right as an American to oppose U.S. military operations in the Middle East and to criticize what he viewed as oppression of Muslims in the United States. He considered Muslims the world over to be his brothers and sisters, and he was hurt when they were hurt by the United States and other armed forces. But this is not the issue before this Court.

The questions before this Court are: (1) whether Tarek Mehanna is a danger to the community and (2) whether he would flee because of the charges that have been brought against him. The conduct of both Tarek and the government leaves no doubt that the answers must be "no." It must be emphasized that in its proffer for detention, the government relied entirely on conduct

<u>that Tarek engaged in in 2006</u>. Knowing what Tarek was saying then, the government allowed this so-called dangerous man to remain free to "flee" or "harm" for over two years, arresting him only in November 2008. Despite this knowledge, the government's 2008 motion for detention alleged only a risk of flight, not danger. The government chose not to allege that Tarek was a danger to the community and instead facilitated the release of someone they now claim is "dedicated to violent jihad" and "part of the worldwide terrorist conspiracy."

The government first approached Tarek in 2006 and asked him to become an informant or face the very charges he faces now. When he refused to do so, he was arrested and charged with making false statements. Thereafter, Tarek remained free for almost a year after his release on bail until his second arrest. During that time, he asked to be temporarily relieved of his bail conditions numerous times, and the government never voiced any opposition to the relaxation of his bail conditions, despite their present claim that he is a threat and a risk of flight. In fact, Tarek assiduously abided by the terms of his bail conditions, as acknowledged by Pretrial Services. During his release prior to his second arrest, a period of approximately one year, Tarek twice asked to temporarily suspend his nightly curfew and eventually the curfew was permanently altered to allow him to work. Pretrial services supported Tarek's proposed

changes, and the United States Attorney either assented to them or requested — not demanded — nominal assurances that Tarek would follow his proposed conditions.[2] The court never denied Tarek's motions to amend his conditions of bail, and he always complied with the terms set by the court.

The reason is simple: Tarek Mehanna is a law-abiding citizen who respects the rule of law. He has always done so, and, if released, will continue to do so.

A second and increasingly urgent reason for releasing Tarek is his inability to meaningfully review the discovery and discuss his defense with counsel.

If Tarek Mehanna is not released on bail, his counsel will not be able to provide him with the effective assistance of counsel.

The discovery seen in this case to date includes over two thousand pages of instant messages, thousands of documents of all sizes, hundreds of hours of audio recordings, hundreds of

---

[2] At his second arraignment and detention hearing, on November 12, 2009, the court asked whether Tarek Mehanna had complied with the conditions of his release. The Assistant United States Attorney said that he had not, and had committed a federal offense including continuation of his crime. This crime, stated the attorney, was posting religious and other documents on his website. The Assistant United States Attorney submitted no evidence of this continuing crime to the court, and the government has not charged Tarek Mehanna with any continuing conduct. A transcript of this hearing is attached as Exhibit 1.

still images, video files, and emails, and six hard drives
containing immense amounts of data.

Some of this discovery is in English, but much is in
Arabic. In addition, the style of conversation that Tarek
Mehanna and his friends used in instant messages, emails, and
audio recordings contain informal speech that often
characterizes communication between people who are young and
very close. Tarek must be available to help counsel understand
and explain this speech. Finally, all this discovery exists in
the context of religious literature and the politics and history
of the Middle East and Islam. The context of discovery in this
case does not lend itself to objective evaluation. For example,
terms such as "jihad" and "martyr" can mean different things; to
some, they indicate terrorism, to others, they indicate
completely non-violent and traditional aspects of Islam.

Counsel desperately needs Tarek readily available to review
this data and explain his context and meaning. If kept in
custody, Tarek and his counsel are limited to sporadic visits
and mail correspondence to review the huge quantity of
discovery. Tarek is limited to two inches of documents sent by
mail. Telephone calls between attorney and client are recorded
and not confidential. Even bringing in a laptop to meet with
Tarek requires advanced written permission and the hope that the
letter will be provided to the front desk – something that does

not always happen. Tarek is shackled when he meets with counsel, making writing and note taking exceedingly difficult.

If Tarek remains in custody, it will be impossible to review all the discovery and provide his analysis of it to counsel. This is particularly true for the discovery that exists only on computer storage devices like CDs and DVDs. Although the Court allowed Tarek to use a computer while in custody in order to review electronic discovery, and counsel received approval from the detention facility and US Marshals, *this did not occur until December 3, 2010.*

The need for daily, personal meetings in this case cannot be understated.

Counsel for Tarek cannot evaluate this discovery without Tarek's active participation. Tarek will need to review all of this discovery and discuss it with his counsel. He will have to explain the import of documents such as religious texts in Arabic, instant message conversations about mujahedeen in Iraq, and certain websites that he visited or on which he posted comments.

If Tarek is released, counsel envisions him spending many days every single week at counsel's office, reviewing discovery, taking notes, and speaking with his counsel for two to three hours a day. Tarek's release will allow his counsel to adequately prepare his defense. If Tarek remains in custody, his

counsel believe that they will not be able to provide effective assistance. They will have to begin trial not fully aware of all the evidence provided in discovery or its meaning.

## II. BACKGROUND OF TAREK MEHANNA

A.    Family and Professional Background

Tarek Mehanna is a United States citizen who was born in Pittsburgh, Pennsylvania in 1982. His family moved to Massachusetts when he was seven years old. He grew up in Sudbury, and graduated from Lincoln-Sudbury High School in 2000. Tarek graduated from the Massachusetts College of Pharmacy and Health Sciences with a doctorate in pharmacy on May 16, 2008. His younger brother, Tamer Mehanna, later graduated from the same school. Tarek's father, Ahmed Mehanna, is a professor of medicinal chemistry at the School of Pharmacy, and his mother, Souad Mehanna, operated a childcare business in her home.[3]

Tarek is close to his parents and he lives with them in their home in Sudbury. Since his detention, his parents have visited him as often as the jail permits. If released on bail, Tarek would continue to live with his parents in Sudbury as he always has. His parents posted their house when he was first arrested and released, and would readily do so again.

---

[3] In the fall of 2009, the Commonwealth ordered her to stop caring for children, apparently in response to her son's arrest.

In addition to his academic and personal studies, Tarek worked as a pharmacy intern at Children's Hospital in Boston through 2005 and at Walgreens Pharmacy in Marlborough, Massachusetts, from December 2006 through 2009. He also worked at rotating medical sites at various hospitals, retail pharmacies and research facilities, as part of his course of study.

B.   Religious Background

Tarek is a religious person and a respected member of the local Muslim community. In 2001, when he was 18 years old, he took a greater interest in his faith and history and began to seriously dedicate himself to study of religious and historical texts. As a young man who felt called to be a better Muslim in every aspect of his life: he took to reading, studying, and discussion with great interest.

As the instant messages found on his computer reflect, Tarek spent countless hours reading, pondering, and discussing classical and modern religious texts. The majority of the instant messages deal with such topics.

Just as Tarek was renewing his faith, the terrorist attacks of September 11, 2001, took place. Shortly thereafter, the United States invaded the Muslim countries of Afghanistan and Iraq. At home in the United States, many Muslims began to feel that suspicion was being cast upon their communities due to

their religion and ethnic background.[4] In this crucible of renewed faith and the United States' response to 9/11, Tarek worked to find his way religiously, professionally, and politically.

As the instant messages reveal, Tarek was particularly upset at the United States' invasion of Iraq. Like many Americans, he felt that the invasion was not justified and innocent lives were being lost to American military operations.

At the same time, Tarek continued to explore Islamic texts, searching for a greater spiritual life. While many of these texts involved traditional and mainstream subjects in Islam, Tarek also read works by many contemporary scholars who were re-examining ancient texts in light of current events. These scholars expressed their concern that Islam as a culture and a religion was being threatened, and they argued that Muslims should respond by defending themselves.

There is a complicated modern history in the Muslim world that begins with European colonization, the carving up of the Middle East after World War II by Western powers and the creation of new countries. The occupation of Afghanistan by the Soviets in the 1980's and the Soviet defeat by an indigenous

---

[4]Dawinder S. Sidhu, *The Chilling Effect of Government Surveillance Programs on The Use of the Internet by Muslim-Americans*, 7 U. Md. L.J. Race, Religion, Gender & Class 375, 376 (2007).

Muslim fighting force, supplied with American arms, resulted in great pride by many Muslims. The invasion of Kuwait, which resulted in the establishment of American military bases in Saudi Arabia, offended many Muslims, including mainstream scholars. Mainstream Arab media, including Al Jazeera,[5] emphasized the death of children and civilians from the American embargo of Iraq after Desert Storm.[6] Suffice it to say, there are hundreds of books written on these subjects.[7] Like many Muslims, Tarek read and studied these subjects. As someone who took pride in his faith, culture and history, he joined online discussion forums where he could discuss these issues with others who were searching for answers as well.

C.   Background of the Investigation

---

[5] Al Jazeera is an Arabic-language international news channel.

[6] In 1995, the United Nations imposed an embargo on trade with Iraq until it allowed inspection for weapons of mass destruction and accepted monitoring. A number of scientific studies were undertaken, the most reliable showed child mortality doubled during the embargo, THE NATION, "A Hard Look at Iraq Sanctions," December 3, 2001. Several documentaries which showed widespread suffering of children were widely publicized in both Arab and American media. Andrew K. Andrew K. Fishman, *Between Iraq and a Hard Place: The Use of Economic Sanctions and Threats to International Peace and Security*, 13 EMORY INT'L L. REV. 687, 687, 691 (1999) (Two million men, women, and children died from the economic sanctions "designed to destroy an entire social system.").

[7] See, e.g., Yasmin Husein Al-jawaheri, Women in Iraq: The Gender Impact of International Sanctions (2008); Anthony Arnove, Iraq Under Seige, Updated Edition: The Deadly Impact of Sanctions and War (2003); Ramsey Clark, Impacts of Sanctions on Iraq: The Children Are Dying (2002).

Tarek has been under investigation by the Federal Bureau of Investigation, to his knowledge, since approximately 2005. FBI agents interviewed him multiple times during that period, beginning in October 2005[8]. The FBI has monitored a large amount of Internet-based text conversations that involved Tarek. The instant messages reveal that Tarek was aware of the monitoring activities, or at least believed that they were occurring. Despite this awareness, he did not cease speaking online. He discussed the monitoring activities with his friends and correspondents, and he was repeatedly clear as to why he would not stop his online activities: he was breaking no laws.

In April 2008, Tarek was nearing graduation from college and had obtained a prestigious position as a clinical pharmacist in Saudi Arabia at the King Fahd Medical City.[9] At that time, the FBI approached him and offered an ultimatum: he would be charged with supporting terrorists and making false statements to a federal officer - unless he worked as an FBI informant. Tarek was specifically told that if he declined to do so, he would have to handle the matter "the hard way" in court. He refused this ultimatum and despite expecting an arrest for many months, he took no steps to flee. Instead, he immediately sought counsel in order to defend himself against any possible charges and

---

[8] For simplicity, a brief chronology is attached as Exhibit 2.
[9] The King Fahd Medical City is the largest hospital in the Middle East.

offered to turn himself in.[10] The government refused his offer of surrender, leaving him free for the next seven months.

Many months later, in November 2008, with no further contact by the FBI, Tarek decided to continue with his plans to work at the King Fahd Medical City in Saudi Arabia. As he was boarding a plane with his parents, Tarek was arrested by FBI agents, and he was charged with violating the federal False Statements Act, 18 U.S.C. § 1001(a)(2), for statements he allegedly made two years earlier. He was held in custody until December 19, 2008, when he was released. At that time United States Magistrate Judge Leo T. Sorokin noted that the defendant was not a risk of flight and concluded:

> He appreciated his exposure to criminal prosecution at least as early as February 2007, yet he remained in the United States. In April, 2008, when confronted by FBI agents, he sought counsel and did not flee. Although he subsequently made preparations to leave the United States, he did not do so in secret.

Judge Sorokin released Tarek with the following conditions:

1. Tarek's parents posted their home in Sudbury, his father's retirement account, and $100,000.

2. Tarek surrendered his United States passport and all copies of his Egyptian identity documentation.

---

[10] This was not the first time Tarek sought legal counsel. In 2006, Tarek became aware that the government was investigating him. Instead of fleeing, Tarek spoke with a Boston attorney. Alh… [510145], February 21, 2006. Instant messages are referred to in this motion by the computer file name. Each instant message is attached and labeled by its corresponding footnote number

3.   Tarek was not allowed to apply for, request, or
     receive a United States passport, an Egyptian
     birth certificate, an Egyptian passport or travel
     documents from any country.

4.   Tarek resided in his parents' home and was
     ordered to comply with an 8:00 p.m. to 8:00 a.m.
     curfew, to be enforced by whatever means selected
     by Pretrial Services.

5.   Tarek's travel was restricted to the District of
     Massachusetts.

6.   Tarek's parents agreed not to assist Tarek in any
     way to leave Massachusetts at any time for any
     purpose.

7.   Tarek's parents served as Third Party Custodians.

8.   Tarek was ordered not to contact any witness,
     victim, informant or officer involved in his case
     or any potential witness.

9.   The standard and statutory conditions of release
     were applied.

The FBI arrested Tarek a second time on October 21, 2009,

and an indictment was returned on November 5, 2009, all based on

alleged offenses that occurred prior to his first arrest. The

government filed its Proffer and Memorandum in Support of

Detention on November 5, 2009. Tarek filed his Motion for

Release on Bail on November 10, 2009. The government's Proffer

relied almost exclusively on instant messages that its agents

obtained from Tarek's computer, seized in 2006.[11] All of the

instant messages were created in 2006.

---

[11] The government's proffer also relied on, *inter alia*, a poem

A complete review of <u>all</u> of the instant messages reveal that the government's presentation and interpretation of them is often distorted, highly selective, and out of context. They do show that Tarek was upset at the United States' invasion of Iraq and sympathetic to the Muslim resistance there. They also show that as a twenty-something college student, Tarek sometimes made comments that could be considered crude, insensitive, and careless. The instant messages, however, do not give the slightest hint that Tarek intended or planned harm to anyone. In the 2,111 pages of instant messages, there is no message by Tarek which urges anyone to commit an act of violence. To the contrary, he was blocked from a web forum because his views were considered too moderate. In most of the messages, Tarek and his correspondents discussed different scholars, and shared news links to CNN, the BBC, and other mainstream forums such as Islamic Network.

The instant messages also show that Tarek had numerous opportunities to leave the United States and move to a number of Muslim countries across the Middle East or Africa. Instead of leaving the United States, he stayed in Sudbury, lived with his parents, and patiently worked to obtain his doctoral degree in Pharmacy. He traveled to Egypt with his parents in August, 2006,

---

authored by Tarek and various electronic files taken from Tarek's computer hard drive.

for vacation, and returned after the summer to continue school. It was only after he graduated from pharmacy school that he decided to move to Saudi Arabia - not to become a terrorist but a pharmacist. He obtained a position as a clinical pharmacist at the King Fahd Medical City.

### III. DISCUSSION OF THE GOVERNMENT'S PROFFER

In its Proffer, the government relied almost exclusively on the instant messages it retrieved from Tarek's computer covering a period from January to August 2006. The government also references video files, audio files, images, documents, and cached web pages, which were found on Tarek's computer in 2006. With the exception of one DVD that Tarek allegedly gave to a cooperating witness on April 23, 2007, the government does not offer any evidence regarding Tarek's conduct after 2006. The bottom line is that Tarek is being detained because of opinions he expressed in 2006 – opinions legally protected by the First Amendment.

The government's proffer consists of a number of serious allegations regarding Tarek through its use of the 2006 instant messages. A discussion of the instant messages that the government referenced show that the government's use of the instant messages was selective and disingenuous, often rendering conclusions that are exaggerated, distorted or simply wrong.

Tarek has chosen to respond to many of the allegations. To respond to each and everyone one would require a memorandum at least twice the length of the present one. The following response is based on the structure used by the government in its argument to detain Tarek Mehanna.

A.  <u>"Material support" by providing translation services and distributing material intended to inspire others to participate in violent jihad</u>. (Proffer, pp. 9-10)

1.  *39 Ways to Serve and Participate in Jihad*

The government alleged that Tarek materially supported Al-Qaeda and "other terrorist groups" by translating and distributing texts and videos intended to inspire others to participate in jihad. (Proffer, pp. 9-10). The government, however, provided no evidence that Tarek communicated with members of Al-Qaeda, provided translations to members of Al-Qaeda, or otherwise had contact with or took direction from any members of Al-Qaeda. Further, the government provided no evidence as to the identity of the "other terrorist groups" or their supposed connection to Tarek.

In <u>Holder v. Humanitarian Law Project</u>, 130 S. Ct. 2705 (2010), decided after the defendant was detained, the Supreme Court made clear that agreeing with a terrorist organization – and even advocating for its goals - was not illegal. The Court defined material support as follows:

Providing material support that constitutes "personnel" is defined as knowingly providing a person 'to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.' § 2339B(h). The statute makes clear that "personnel" does not cover *independent* advocacy: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *Ibid.*

"[S]ervice" similarly refers to concerted activity, not independent advocacy. See Webster's Third New International Dictionary 2075 (1993) (defining "service" to mean "the performance of work commanded or paid for by another: a servant's duty: attendance on a superior"; or "an act done for the benefit or at the command of another"). Context confirms that ordinary meaning here. The statute prohibits providing a service "*to* a foreign terrorist organization." §2339B(a)(1) (emphasis added). The use of the word "to" indicates a connection between the service and the foreign group. We think a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause.

Id. at 2721-2722.

The government focused on Tarek's alleged translation of *39 Ways to Serve and Participate in Jihad* (hereinafter "*39 Ways*"), (Proffer, p. 10). It is a publicly-available text which was written in 2003 and has been translated by many others. The government's own proffer suggests that Tarek was uncomfortable with aspects of the text. He told a correspondent who was assisting with the translation that he would prefer not to translate the more "touchy" portions. (Proffer, p. 12).

Tarek stated that he hoped the *39 Ways* translation would
make an impact. (Proffer, p. 14). He also said he hoped it would
lead to "some real 'amal.'" (Proffer, p. 13). The Arabic word
"amal" means "hope" in English. Many of Tarek's instant messages
indicate what this hope was. Only days after the translation was
published, Tarek and his correspondents speak of "dawah," or the
preaching of Islam, of doing a "weekly dawah table... call
people to tawheed [monotheism]...EZ...table...books...
posters...3 bros...for 2 hours."[12] Tarek wrote, "I am in the
process...of putting together a flyer...with the purpose of
calling people to Islam. . .I was wondering if. . .when I'm done
with it...I can email it to you...to print out...and hand out at
ur university."[13] On May 15, 2006, Tarek expressed to another
correspondent that he had "put together a flyer...about Tawhid
[monotheism], and wala and bara [the concept of loyalty in
Islam]...and print it out...and hand it out at jum'ah [Friday]
prayers all over the area...just as a form of dawah
[education]."[14] He showed the flyer to his codefendant, Ahmad
Abousamra. Tarek's interaction with Abousamra is telling.
Abousamra criticized the flyer as a waste of time.[15] Abousamra
was upset that Tarek was focused on spiritual matters and

---

[12] Nus… [510190] Apr. 15, 2006..
[13] Abu… [509974] Apr. 28, 2006.
[14] Bas…[510184]May 15, 2006.
[15] Id.

education about Islam. Tarek felt that Abousamra's approach was "just turning people either away from us...or turning them into these psycho-Jihadis...who have this very very narrow minded view of the world."[16] It is clear that Tarek's main preoccupation was to teach others about his faith.

As <u>Holder</u> makes clear, mere speech, even translations, do not meet the definition of material support:

> Rather, Congress has prohibited "material support," which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.

Id. at 2723.

2.   <u>The Media Wing of "al Qa'ida"</u>

The government alleges that Tarek Mehanna was part of Al-Qaeda's media wing. Its evidence for this is nothing more than ambiguous statements made not by Tarek, but a correspondent in instant messages. (Proffer, p. 15). The government never alleged Tarek's participation in any violent acts, but instead argued the potential impact of his translation, posted publicly on the Internet. (Proffer, p. 15).

The government supports its allegation of Tarek's association with Al-Qaeda through an instant message in which, once again, someone other than Tarek tells Tarek that "one guy

---

[16] Id.

[in an online forum] said...we are aqs in raafidayn [Al Qaeda in Iraq]...media wing." (Proffer, p. 15). In essence, the government relies on a boastful comment made by someone online who has never met or spoken with the defendant as evidence of the truth of that comment. There is no response by Tarek agreeing with this and no evidence that these bloggers had contact or direction from any member of Al-Qaeda. This patent unreliability is the quintessential example of why hearsay is inadmissible.

In a report filed by the United States Senate Committee on Homeland Security and Governmental Affairs, entitled "Violent Islamist Extremism, the Internet, and the Homegrown Terrorist Threat", May 8, 2008, the Committee stated that al-Qaeda maintains its own on-line media operations using clearinghouses, icons, and logs that ensure a message's authenticity and strictly control the message transmitted. At no time has the Government presented any evidence that Tarek's alleged translations were sought by, contracted for or approved of by al-Qaeda.

Aware that these statements are unreliable, the government accused Tarek of wanting to inspire an "armed wing." (Proffer, p. 17). Its only evidence is a conversation that supposedly took place between two others, neither of whom is Tarek. An online correspondent told Tarek Mehanna of his conversation with

another, saying, "me and khubayb...were talking about we just
need...armed...wing now hehe." (Proffer, p. 17). Instead of
"inspiring" an armed wing, the correspondent's comment suggests
that he wanted to start an armed wing of his own. In any case,
his final comment, "hehe," indicates the fact that he offers
this statement as a joke. The fact that Tarek did not respond to
this statement amplifies the fact that they both knew it was a
joke and not worth a response.

   3.   Other translations and productions

   The government has implied that Tarek was involved in
translating and producing a number of videos for Al-Qaeda.
(Proffer, pp. 17-25). In fact, the single act that the
government actually alleges Tarek performed was to provide
English subtitles for part of one video. (Proffer, p. 18).

   The government alleged that Tarek "was involved in
translating and distributing other videos...." (Proffer, p. 22).
As evidence, the government cites instant messages in which a
correspondent suggests that Tarek work on two other videos.
Tarek, however, never performed any work on these videos.

   The instant messages reveal that Tarek's so called
"distribution" of audio and video files consisted of pasting
links to Internet sites where these files were located. These
sites include popular Islam-oriented sites as well as popular

sites such as myspace.com, cnn.com, bbc.co.uk, and
news.yahoo.com.

Tarek never accessed the forums where Al-Qaeda was known to
post videos and statements. The United States Senate Committee
Report referenced above states that there are a number of "pre-
approved web forums like al-Ekhlass, al-Hesbah, al-Burq, or al-
firdaws that include some of the most exclusive violent Islamist
websites- where access is tightly controlled." Id. at page 6.

4.   Recognizing the importance of their efforts

The government alleged that Tarek knew his "work" was so
important that he wouldn't stop doing it, even though the
Egyptian Intelligence Service had questioned his family overseas
about him. (Proffer, pp. 25-26). Although Tarek was, in fact,
aware that the FBI and Egyptian officials made inquiries about
him, he continued messaging and emailing with correspondents and
posting on forums because, as he stated at every turn, he had
done nothing wrong.[17]

The government acknowledged that when Tarek learned of law
enforcement's interest in him in 2006, he did not alter his
conduct. Despite their current claim that Tarek has been a
danger to the community as far back as 2004 (when he traveled to
Yemen to, the government claims, attend a terrorist training

---

[17] Alh…[510145] February 21, 2006; alt… [510218] April 23, 2006;
dms… [510040], June 30, 2006; sbu… [510126], February 24, 2006.

camp), the government left him untouched for over two years. During that time, the government left him free to interact with the public, to work at hospitals and pharmacies, to attend school surrounded by thousands of fellow students at his college, to teach grade school children, and significantly to board domestic and international flights. He was arrested only when he was leaving the country for legitimate employment abroad. This was reflected at his first detention hearing in 2008, when the government never argued he was a danger to the community. Their evidence and their confidential informants existed in 2006, long before his first arrest and subsequent detention hearing. Tarek's response to his awareness of government scrutiny points also to his lack of intent to flee. Instead of running, he stayed put, consulted a lawyer, and lived the life he always had, even though he had been told he would be charged with the same charges he now faces today.[18]

B.   Support for successes of the terrorists and setback for the American and other westerners, rejection of moderation, and desire to leave the U.S. and not live amongst the "kuffars"

1.   Admiration for al Qa'ida leadership and their acts

The government alleged that Tarek demonstrated his admiration for Al-Qaeda's leadership and their acts by pointing to still images that were found on Tarek's computer and off-

_____

[18] A letter from Attorney Norman Zalkind in April 2008 offering to have Tarek surrender at any time is attached as Exhibit 3.

color jokes Tarek allegedly exchanged with correspondents about events in Iraq.

For example, the government alleged that Tarek's computer contained two still images of the beheading of Nicholas Berg, a contractor who was killed in Iraq. (Proffer, p. 28). Tarek did not download these images, and never intended to do so. A forensic computer expert has reviewed these images and has filed an affidavit attached to this motion. He was able to determine that the images were not downloaded by Tarek. One image was in a deleted state, located in a Firefox cache folder[19] the result of the defendant's computer automatically saving the picture from web browsing. The other picture was found in an icon folder of the defendant's instant messaging application (Trillian). This picture was saved during the normal course of using Trillian,

---

[19] "Web-browsing programs such as Microsoft Internet Explorer, Mozilla Firefox, and Netscape Navigator are generally configured to automatically save parts of visited web pages, including pictures on those pages, in a directory on the user's hard drive known as a "cache." Such "caching" of files is a technical feature that speeds up web browsing, and it occurs without any user intervention, and often without the user's knowledge." *U.S. v. Cain*, No. 0:08-CR-0036, 2008 WL 5382005 at *2 (D.Minn. Nov. 18, 2008). Indictments for possession of child pornography have been dismissed when it was determined that the images existed in defendants' cached space. Because they were cached, and not downloaded, the government had been unable to prove that the images were knowingly or willfully possessed. U.S. v. Stulock, 308 F.3d 922 (8th Cir. 2002); U.S. v. Johnson, 2006 WL 2548913 *3 (N.D. Iowa).

and was not a result of the defendant deliberately saving the file onto his computer.[20]

However the images ended up on Tarek Mehanna's computer, hundreds of other photos found on the computer reveal the true course of Tarek Mehanna's life. These images include the following:

- An image of a flyer, "terrorist suicide bombers: perpetrators of evil";

- Photograph of Vladimir Putin;

- Photograph of the character Kevin from the television show, The Office;

- Photograph of a dog riding a bicycle;

- Boston Red Sox logo;

- Photograph of Mel Gibson;

- Photograph of Maria Sharapova;

- Photograph of Brad Pitt and Angelina Jolie;

- Countless images of Arabic text banner ads (commercial advertisements posted on websites to bring in revenue for the websites);

- Many images of Arab or Muslim men, some wearing traditional garb, some wearing suits;

- Photograph of a major league baseball player;

- Photograph of President Bush;

---

[20] Affidavit of Mark Spencer is attached as Exhibit 4.

- Photograph of rescuers in a flood;

- Photograph of men in a demolished building;

- Photograph of Osama bin Laden;

- Photograph of U.S. flag and Capitol Building;

- Photograph of Paris Hilton;

- Photo of tanks and an explosion, "another day in the empire";

- Countless images of Arabic books;

- Photograph of an Arabic cookbook;

- Photograph of Jessica Alba;

- Photograph of a missile or rocket;

- Photograph of an F-15;

- Photograph of the 2006 Italian World Cup soccer team;

- Photograph of a monkey in a shirt and tie;

- Image of the cover of *Enemy Aliens*, a book by Georgetown Law Center professor David Cole;

- Photograph of Queen Elizabeth;

- Photograph of explosion, "Gaza violence";

- Photographs of Saddam Hussein on trial;

- Photograph of basketball player Dwayne Wade;

- Humorous photo of a cartoon camel falling onto a New York City street, with a caption, "A New Wave of Terror Hits NY";

- Photograph of Tarek Mehanna's father in his younger years;

- Photograph of cowboy boots and an American flag beside the Vietnam Memorial;

- Photograph of a funeral in the Middle East;

- Countless screenshots from online video games World of Warcraft and Eve Online;

- Countless banner ads and spam images.

Tarek never intended to download spam, photos of celebrities, or screen shots from video games onto his computer. Similarly, when he was visiting news sites, he never intended to download photographs of President Bush, Abu Mu'sab al-Zarkawi, Ayman Zawahiri, or Nicholas Berg.

2.   <u>Admiration for the 9-11 hijackers</u>

The government alleges that the distasteful comments that Tarek and his correspondents made about 9/11 mean that Tarek is prepared to carry out violent acts himself.

The government cited as an example that Tarek referred to the nineteen hijackers as the "19 martyrs." (Proffer, p. 32). In the thousands of instant messages, Tarek used this phrase twice, on only one day. He referred to the video entitled "19 Martyrs" that is widely available on the Internet.[21] As widely available as it was, Tarek didn't even know where it was online. He had to

---

[21] A Google search for the term "19 Martyrs" returned over four million hits. The first website listed, liveleak.com, has a direct link to the video.

ask two correspondents if they knew where to get it. He and his correspondents appeared to view the video as an object of curiosity rather than adoration.

As another example, the government described a conversation between Tarek and a correspondent in which they discuss the possibility of having seen Mohammed Atta (one of the 9/11 hijackers) at the Islamic Society of Boston. (Proffer, p. 34). The government suggested that they were thrilled at this possibility. The actual instant message, however, reveals that they were joking about the possibility of seeing Atta at such a moderate place as the Islamic Society of Boston. The instant message reads:

AAB:       wait so mohammad atta was in boston?

MEHANNA:   YES

AAB:       no...waay...

MEHANNA:   heheh way

AAB:       dude maybe we saw him at the isb or
           something...haha

MEHANNA:   bwahahah...yeah he gave the khutbah [sermon]
           when Basyuni[22] wasn't there

AAB:       haha

_____

[22] Imam Basyuni is a religious leader at ISB, which promotes a "path of moderation, free from extremism," and supports "regulators and authorities in their efforts to promote the public good." ttp://islamicsocietyofboston.org/?page_id=83. Tarek Mehanna and his friends often attended ISB for services and other events.

The government also noted that Tarek had approximately thirty photographs of the World Trade Center after the two planes struck the towers on 9/11. (Proffer, p. 35). As noted above, Tarek had thousands of images of various types on his computer. The saturation of images from that one tragic day found online cannot be exaggerated. Most of the world has seen countless images of the towers being destroyed, and most of the world's computer users probably have multiple images cached on their computers. The presence of such images is evidence only that Tarek visited websites containing these images.

Counsel for Tarek thoroughly reviewed all of the images found on Tarek's computer provided in discovery and found <u>no</u> images of the World Trade Center. The government also alleged that it found an image of Mohammad Atta's U.S. visa on Tarek Mehanna's computer. Counsel for Tarek Mehanna also did not find this image when reviewing discovery.[23]

The government argued that two pictures taken of Tarek and friends near Ground Zero indicated Tarek's danger to the community. The government noted that Tarek is smiling and pointing his index finger in the air. (Proffer, p. 35). Despite the location, this was a photograph taken with friends. It is

---

[23] Certain files produced by the government on disk were corrupted and unable to be opened. The manner in which the government provided the discovery, haphazard and poorly organized, make it very difficult to review.

the habit of most Americans to smile at such times. As for
Tarek's index finger, he explained it in an instant message to a
correspondent.

When people use instant messages, they often attach an
image or graphic, a "buddy icon," which is something that
expresses who they are and allows their online correspondents to
easily recognize them. Tarek's icon was an index finger pointing
up. This image didn't mean that Tarek celebrated the 9/11
attacks or considered the terrorists to be, in sports parlance,
"number one." Tarek explained that the buddy icon indicated
simply that he worshipped one God – the essence of Islam.[24]

3.   Hatred of the United States and Americans, and desire
     to leave the United States

To support its contention that Tarek hated the United
States, the government once again cited instant messages in
which people other than Tarek made anti-American statements. At
best, Tarek went along with these statements by saying, "yeah,"
or by offering the opinion that the Americans feared Osama bin
Laden (various government institutions were "pissing their
diapers."). (Proffer, pp. 36-37).[25]

---

[24] MOH… [509992], April 14, 2006.

[25] In 2001, Ward Churchill, a professor at the University of
Colorado wrote a controversial essay in which he labeled those
killed at the World trade Center as "little Eichmans." Churchill
compared the American public to the "good Germans" of Nazi
Germany for ignoring civilian suffering caused by sanctions
imposed on Iraq in the 1990's. Churchill was fired from his

The proffer is, in fact, based in large part on statements
made by people other than Tarek and Tarek's half-hearted
acknowledgement of such statements. Attributing the feelings
associated with one person's statements to another person is
often unreliable in the best of circumstances. In the informal,
frenetic context of instant messaging between friends,
attribution is particularly unreliable. Not only can the
messages be received in a jumbled fashion, but the conversations
via instant message are characterized by informality, slang,
irony, and posturing. It is important to remember that the
participants in these conversations are in their <u>late teens or
early 20's</u>.[26] In addition, simply to acknowledge that one person

position after an investigation revealed plagiarism. He sued and
won reinstatement arguing that his firing was a pretextual
assault on his rights under the First Amendment. The jury found
in his favor but the trial judge overturned the jury's verdict.
The case is on appeal.

[26] In an article in Business Week, March 2006, the dangers of
internet bragadoccio were discussed: "Schools are warning
parents about Google's danger to the MySpace generation, for
whom the Internet functions as a virtual diary-meets-barstool
confessional. Adolescents try on identities and new behaviors
like sweaters. Only now they are trying them on in front of the
world. A Pew Research survey found that more than half of all
online teenagers are ripping, mixing, and burning their own
content, usually placing their creations right alongside their
names and photos. The teenagers on the 'companies and co-
workers' section of MySpace who are talking smack about
employers like Blockbuster, Target and Gap are clearly unaware
of the implications. 'People need to realize that this is like
putting stuff up on the 6 o'clock news,' says employment lawyer
Garry G. Mathiason, a partner at San Francisco's Littler
Mendelson. 'Once you've opened the drapes, people can see
everything. They can see your past life.'"

received and read another person's message, the recipient will often type a short "yeah," "hehe," "lol," and so forth. Tarek regularly did this with correspondents.

Attribution of others' statements to Tarek is particularly unreliable because Tarek regularly spoke with multiple people at once via instant message. Each conversation had its own window on Tarek's computer screen dedicated to it, and each correspondent was not aware that Tarek was speaking with others. This means that Tarek had to quickly shift his attention among about three or four different conversations occurring simultaneously.[27] In this context, statements made by Tarek's friends should be viewed with skepticism when offered as evidence of Tarek's own state of mind.

The instant messages do make clear that Tarek wanted to live in a Muslim country after graduating from college. He indicated to a number of correspondents his desire to attend Madinah University in Saudi Arabia for religious studies.[28]

---

[27] Counsel for the defendant examined the instant message conversations from four random dates—January 30, 2006; February 28, 2006; March 30, 2006; and April 30, 2006—and discovered that Tarek held separate conversations with as many as three or four people simultaneously.

[28] Als…[510009], May 19, 2006; Xix…[509967], May 11, 2006; Taa…[509989], April 21, 2006; als…[510009], April 9, 2006; thz…[509996], April 3, 2006; sla…[510024], March 27, 2006; thz…[509996], March 24, 2006; xix…[509967], March 19, 2006; aaz…, [510158], March 18, 2006; xix…[509967], March 7, 2006; thz…[509996], March 7, 2006; March 6, 2006; abu… [510079], March 5, 2006; cal… [510139], March 3, 2006; Tal…[509989], February 6,

When Tarek finished school, he put together a résumé, applied for a job and was hired to work as a pharmacist at the King Fahd Medical City. A document found on Tarek's computer revealed that he had researched pharmacist positions around the Gulf region, in Saudi Arabia, Qatar, the United Arab Emirates, and Kuwait – all Arab countries considered friendly to the United States.[29] Because Tarek is a devout Muslim and dedicated pharmacist, he wanted to combine his two passions by working in a Muslim country and helping to heal those he considers to be his people.

### 4.   Taking pleasure in injuries to U.S. Servicemen

The government alleged that Tarek took pleasure in injuries to U.S. Servicemen operating in Iraq. (Proffer, p. 38). As evidence, it cited comments that Tarek and his correspondents made about various videos circulating the Internet that purported to show deaths and attacks on U.S. soldiers.

The government argued that Tarek and another individual "shared a laugh" about two videos. (Proffer, p. 40). This characterization that they "shared a laugh" is inaccurate. Rather, they come across as two young men engaged in casual, meaningless conversation, making childish jokes.

---

2006.
[29] A copy of Tarek's employment contract is attached as Exhibit 5.

The government argued that Tarek sent another video to the same "individual," the so-called "Hanes" video because underwear tag of the American soldier depicted in the video was visible. (Proffer, p. 40). The government alleged that this video "was a propaganda tool for Al-Qaeda in Iraq." (Proffer, p. 40). The government's description of this video is not based on investigation but is a direct quote from the Nightly News with Brian Williams and is still available on the MSNBC website.[30]

The government particularly emphasized that Tarek seemed to celebrate the mutilation of two American soldiers — what Tarek allegedly called "Texas BBQ."[31] (Proffer, p. 42-43). The government argued that "[t]here can be no stronger evidence of the defendant's character than his reaction to the horrific video of the mutilation of the bodies of American servicemen ('I want...more BBQ sauce videos.')." (Proffer, pp. 71-72).[32]

---

[30] http://www.msnbc.msn.com/id/12165495/.

[31] Texas BBQ referred to the idea that Texas in popular image is perceived as a place where settlers defended their land and themselves at gun point. It is not a reference to burned bodies. In a New York Times interview with Ali Abudullah Saleh, the leader of Yemen, he "disdainfully" referred to Americans as "cowboys". See Robert F. Worth, *Is Yemen the Next Afghanistan*, New York Times Magazine, July 6, 2010.

[32] "One of the prerogatives of American citizenship is the right to criticize public men and measures-and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation.' Baumgartner v. United States, 322 U.S. 665, 673-674, 64 S.Ct. 1240, 1245, 88 L.Ed. 1525 (1944).

The government hinted at, but did not clearly acknowledge, the events that were behind these statements. Tarek was responding specifically to a story about the rape and murder of an Iraqi girl and the subsequent murder of her family and burning of their home to cover up the crime by U.S. Servicemen. The New York Times reported the story on February 22, 2007:

## Soldier Weeps Describing Role In Rape and Killings in Iraq

A soldier broke down and wept at his court-martial here on Wednesday as he described how he and others had planned the rape of a 14-year-old Iraqi girl, who was murdered along with her family.

Sgt. Paul E. Cortez, 24, was the second American soldier to plead guilty to raping the girl and killing her and her family in Mahmudiya, south of Baghdad, in March 2006, then burning the bodies to cover up the crime.

The confession, which he read, described how he, Specialist James P. Barker and Steven D. Green, a private who was later discharged after a psychiatric evaluation, had planned the attack.

"While we were playing cards Barker and Green started talking about having sex with an Iraqi female. Barker and Green had already known," Sergeant Cortez said before breaking down. He bowed his head and remained silent, sniffling occasionally, for a full minute before continuing.

"Barker and Green had already known what, um, house they wanted to go to. They had been there before and knew only one male was in the house, and knew it would be an easy target," he said.

The sergeant went on to describe how the men, before heading to the house, changed their clothes so they would not be recognized as American soldiers.

Once at the house, Private Green, the suspected ringleader, took the girl's mother, father and 7-year-old sister into a bedroom, Sergeant Cortez said, while he and Specialist Barker took the teenager to the living room, where they took turns raping

her.

"She kept squirming and trying to keep her legs closed and saying stuff in Arabic," said Sergeant Cortez, who was flanked by his civilian and military lawyers.

He said that during the rape, "I hear five or six gunshots that came from the bedroom. After Barker was done, Green came out of the bedroom and said that he had killed them all, that all of them were dead," Sergeant Cortez said.

When he began crying again, one of his lawyers asked the court for a recess, which was granted.

Sergeant Cortez could face life in prison without possibility of parole for the rape and four counts of murder. In all, four soldiers as well as the former soldier, Mr. Green, were charged in the case, which outraged Iraqis and heightened tensions in the war zone. The infantrymen were members of Company B of the First Battalion, 502nd Infantry, 101st Airborne Division and were assigned to a checkpoint considered one of the most dangerous in Iraq.

Specialist Barker pleaded guilty in November and was sentenced to 90 years   in a military prison. Mr. Green was discharged from the Army for a "personality disorder" and is in a Kentucky prison awaiting civilian trial.

Specialist Barker and Sergeant Cortez both avoided the death penalty by pleading guilty and are expected to testify against Mr. Green and others charged in the crime.

Sergeant Cortez also pleaded guilty to arson and breaking into the girl's house and to obstruction of justice for helping get rid of the murder weapon, an AK- 47, which was thrown into a canal. In addition, he admitted to drinking whiskey before the attack, a violation of Army rules against alcohol in that area of Iraq.

The other soldiers charged in the case are Pvt. Jesse V. Spielman and Pvt. Bryan L. Howard.

The government is correct about one thing: Tarek's reaction to the murderous nightmare that these U.S. Servicemen visited on

the girl and her family absolutely reflects his character. He naturally was upset when he saw people he considers to be brothers and sisters beaten, raped, murdered, and burned. His response to these egregious acts reflected his choice of action: he responded through words and by speaking out against what he saw as oppression. The choice of words was admittedly crude, but not illegal.

   5.   Rejection of moderation and cooperation

   The government alleged that Tarek despised U.S. leaders and "any Muslim leader who advocates moderation and rejection of the extremists." (Proffer, p. 43). To support its claim, the government cited four instant messages, two of which merely contain insensitive comments. (Proffer, p. 44).

   In the third instant message, the government alleged that Tarek intended to influence moderate Muslim youths with a baseball bat. (Proffer, p. 45). With this instant message, the government took one of Tarek's offhand and sardonic comments to suggest he is a danger to the community. A closer look at this instant message shows that Tarek would absolutely *not* engage in violence of any kind. Rather, his approach was to invite people to hear about Islam. For example there was much controversy over a Danish newspaper carrying cartoons depicting the Prophet Muhammad wearing a turban that was a bomb. The cartoons' content

was perceived as an insult to Islam. Tarek's correspondent

stated:

Dan:        Their intent was to mock and slander, to
            show their hatred for Islaam...The kuffar
            make very clear their hatred and animosity
            for us...So why are these groups so hesitent
            to respond in kind?...That is what the
            Qur'an and Sunnah tell us to do...I just
            think of the ayah: "deaf, dumb, blind..."...
            just a few words...but it sums everything up

MEHANNA:    Yeah

Dan:        In light of all of this...how should we
            respond...what should our daw'ah[33] be?...Any
            thoughts or words of advice in this aspect?

MEHANNA:    Well...as for anything that can gain us
            practical results...I honestly think...that
            our only option...is to take advantage in
            the upped interest in the Prophet.

Dan:        No, I mean to the MAS-influenced youth

MEHANNA:    Oh, I believe it's called...a baseball bat

Dan:        Honestly akhee...I would really like
            to...May Allaah protect me from that...It is
            so frustrating...It wouldn't be such a big
            deal if there was only a few of these type
            of people...but unfortunately they have a
            monopoly on the youth in the Greater Boston
            area...So no immediate suggestions come to
            mind?

**MEHANNA:    Besides da'wah...what else can u do to them**

Dan:        Is there like a few open brothers that we
            can work on?...Some who haven't totally been
            brainwashed?...Just like we've been working
            on A A-D and H P...Or are we at a virtual
            dead end?...All right akhee...I think I've

---

[33] Daw'ah means "making an invitation" and generally denotes the
preaching or teaching of Islam.

> vented on you enough...It is getting
> late...so I'm going to let you go

MEHANNA:   OK bro...take care.

Dan:       you too.[34]

The Danish cartoons were castigated by Muslims worldwide. Many reacted to them through violent street protests and torching of embassies abroad. The Court should note that Tarek did not cite his approval of these actions. His proposed reaction was to instead educate people about Islam.

Finally, the government suggested that Tarek rejected moderation and cooperation because he referred to one who cooperated with the government as an infidel. (Proffer, p. 45). Tarek in fact never said the person was an infidel.[35] Rather, he and his correspondent were discussing whether the person committed an act of apostasy in the Islamic religion by spying on fellow Muslims. Instead of labeling this person an infidel and recommending some severe punishment, Tarek's correspondent stated that "perhaps there are unknown parts of the story to us." Alternatively, "perhaps he was forced to do all of that." Tarek agreed that that was possible but not likely. In the end, Tarek offered what his friend agreed was the best response: "Allahu A'lam," meaning "Allah knows best."[36]

---

[34] Bro… [510133], February 12, 2006.
[35] Sam… [510230], July 19, 2006.
[36] This is said when someone is not sure about something, or

C.   Mehanna's experience in Yemen

In 2004, Tarek and his co-defendant Ahmad Abousamra traveled to Yemen. Tarek often spoke of Yemen as a place where one can freely learn and practice Islam.[37] It is the location of the biblical Kingdom of the Queen of Sheba. "Two thousand years ago, the area east of Sana [capital of Yemen] held one of the earth's most prosperous kingdoms, a lush agricultural region of spices and fruits, fed by irrigation canals from a vast man-made dam. The Romans called Yemen 'Arabai Felix,' or Happy Arabia."[38] Yemen is a country where there was little contact with the outside world and the language spoken and religious study were thought to be "purer" and closer to the original Islamic way of life.

Tarek and Abousamra went to Yemen looking for religious scholars who would further their knowledge about Islam. They located a couple of schools, but the scholars were away making pilgrimage and the facilities were primitive and harsh. The amenities were not what he was used to as an American.

The government alleged that Tarek traveled to Yemen to find and enter a terrorist training camp. It should be noted that the Arabic word for such a school is "mu'asker," which also means

---

simply doesn't know.
http://arabic.speak7.com/islamic_expressions.htm.
[37] See qutuz_hotmail.co.uk [510193], June 26, 2006.
[38] Robert F. Worth, *Is Yemen the Next Afghanistan*, NEW YORK TIMES MAGAZINE, July 6, 2010.

camp.[39] In an instant message exchange Tarek wrote about going to study in Yemen when his correspondent finished his undergraduate studies (even though at other times he deplored the living conditions in Yemen). He told his correspondent that there was a very well-run school there, led by a scholar Abul-Hasan. Tarek stated he met Abul-Hasan's son but that Abul-Hasan was away on pilgrimage when Tarek was there. He stated: "but, they all walk around the camp with camo jackets and AK-47s...Its more a camp than it is a school u basically live with like, 300 other brothers, eat, pray, study, with them."[40] In other words, Tarek confirmed once again that his purpose in going to Yemen in 2004 was to study and pray and his goal, should he have decided to go back, would be the same.

In support of its allegation, the government noted that Tarek was yelled at by his father for "going to Yemen to train for jihad." (Proffer, p. 46). This was not meant to be an accurate comment but a sarcastic response. Tarek told Abousamra that his father was upset about his trip to Yemen. He did not tell his parents that he was going; they were out of the United

---

[39] Als… [510009], June 10, 2006, "see man...I want to go and just live in a mu'asker [gathering or convention]...of 'ilm [knowledge]...like in Yemen or something."

[40] Abu… [509974], February 6, 2006. "Once you're out of Sana province, there are virtually no signs of the Yemeni state. Every able-bodied man seems to carry an AK-47 rifle over his shoulder; it's not uncommon to see rocket-propelled-grenade launchers." Robert F. Worth, *Is Yemen the Next Afghanistan*, NEW YORK TIMES MAGAZINE, July 6, 2010.

States on vacation, and his parents knew Yemen was a primitive
and unsafe country. They were upset as any parents would be if
their child took a trip half way around the world without
telling them. Tarek added the comment about "train for jihad" as
a sarcastic commentary on his father's concerns. In addition,
Abousamra messaged Tarek that Tarek's father was upset with
Tarek because Tarek's parents "want [him] to do it again." The
actual instant message reveals not only that Abousamra's
statement is a joke,[41] but that Tarek is positively not part of
any criminal conspiracy. The message reads:

> MEHANNA:    [Regarding his trip to Yemen] I mean...why
>             keep...bringing up something...that happened
>             over 2 yrs ago
>
> Abousamra: They are disappointed in you...they want
>             you to do it again
>
> MEHANNA:    hah...yeah...I bet
>
> ....
>
> MEHANNA:    I think...my dad thinks...I'm part of a
>             jama'ah [organization]
>
> Dan S.:    seriously?
>
> MEHANNA:    yes
>
> Dan S.:    I wish

---

[41] It is worth noting that the government suggested that
Abousamra's statement meant that Tarek's parents wanted Tarek to
go back to Yemen to train for jihad. During the November 12,
2009, detention hearing, the Assistant United States Attorneys
acknowledged that these same parents were an "admirable,
upstanding family." (Hearing Trans. p. 17).

MEHANNA:   that is what he told me

Dan S.:    -my father sometimes thinks that too, when i
           look nervous

MEHANNA:   I mean...if I was actually doing something
           suspicious...then I'd understand...but...I
           mean, come on...aha...man[42]

The government, in short, attempted to turn a conversation

in which Tarek *denies* being a part of any criminal conspiracy

into evidence that he is, in fact, part of a conspiracy.

In this section entitled "Mehanna's experience in Yemen,"

the government avoided using the many instant messages in which

Tarek warned people against going to Yemen and rebuffed others'

invitations to Tarek to join them there. Tarek warned them of

ringworm in the water[43] and the harsh lifestyle.[44] He even told

Daniel Maldonado (an alleged co-conspirator) to stay away from

Yemen. On April 17, 2006, Tarek messaged the following with

Maldonado:

Dan:       I may...mind you I said may...go to Yemen

MEHANNA:   ya...ok...hehehe...in sha' Allah

Dan:       I know you are like anti Yemen[45]

Another messaging session followed:

Dan:       so...you still think Egypt is better...huh

---

[42] Bro… [510133], April 1, 2006.
[43] Edg… [510128], March 22, 2006.
[44] Aaz… [510158], March 30, 2006.
[45] Dan…[510149], April 17, 2006.

```
MEHANNA:     well akhi...u gotta weight the benefits and
             harms...Egypt is better in some
             things...Yemen is better in some things

Dan:         well you know about both...let me know...I
             trust you

MEHANNA:     I'm saying...as a father of 3...stay where u
             are [Egypt]...Yemen = Afghanistan...in terms
             of commodities...the point is...LIFE...like,
             day to day...if u think Egypt is rough
             compared to the US...then...hehe...well[46]
```

One of Tarek's correspondents wanted to migrate to Yemen to start a business. On numerous occasions, he invited Tarek to join him, and Tarek invariably rejected his invitation, saying he had to finish school first.[47] Of course, when Tarek did graduate, his actual plans were to move to Saudi Arabia to be a pharmacist.

There is every indication that Tarek did not think highly of Yemen. Although Yemen represented a mythical center of learning, when it came down to it, Tarek preferred to work as a pharmacist in a Muslim country where he could still enjoy the modern amenities he had in America.

Most importantly, the government produced <u>no evidence</u> that there were training camps in Yemen in 2004.

D.   <u>Mehanna's concern about law enforcement scrutiny</u>

Tarek knew the FBI was investigating him, as FBI agents had visited him on multiple occasions. In response to this, Tarek

---

[46] Bas… [510184], April 17, 2006.
[47] Aaz… [510158], May 20, 2006, May 22, 2006

continued to do *exactly* what he had always done: engage in legal speech about religious, political, and otherwise mundane topics, and at worst, on occasion make obnoxious and distasteful jokes. Unlike an actual criminal who knows the FBI is onto him, Tarek didn't change his behavior at all. Ironically, the government attempts to use Tarek's openness to suggest that he has something to hide. If someone expressed concern about law enforcement scrutiny when they had no reason to believe law enforcement was actually investigating them, it would make sense that the government would use such concern to implicate them. This case is different.

Beyond being merely open with his speech, Tarek preserved a large amount of data on his computer, despite knowing that the government wanted to search it.[48] One correspondent suggested Tarek use stenography, which is a highly complex method of data encryption, or transfer his hard drive to a friend's house, in order to hide documents.[49] In response, Tarek did *not* use stenography, and he *did not* transfer any files or hard drives to friends. The only thing he did do was download legal and publicly available encryption programs to protect his privacy and even then, only used them briefly.

---

[48] Alt… [510218], April 23, 2006.
[49] Sbu… [510126], February 17, 2006.

Despite knowing that the government wanted his computer, Tarek kept using it as he always had, because he knew that he was doing nothing illegal. Not only did Tarek continue his conduct, but he also took steps to preserve the very evidence that the government would later use in its proffer for detention. Tarek used a third party instant messaging program, called Trillian, to communicate with his correspondents. Trillian is a publicly available and commonly used instant messaging program.[50] Tarek chose this program over other programs such as Windows Live Messenger, because Trillian automatically records and saves every line from every instant message that is sent or received. Tarek wanted this function so that if a correspondent wanted to recall something from a prior conversation with him, Tarek would be able to retrieve the conversation. Despite knowing that the government hoped to seize and search his computer, Tarek did what any true criminal would *not* do: he fastidiously saved every single word that the government wanted - because he knew he had nothing to hide.

The government argued that Tarek "warned some of his friends about what they said online" as evidence of his guilty intent. (Proffer, p. 48). Once again, the government used statements made by Tarek's correspondents to support their vision of Tarek's mindset. The fact that Tarek reminded his

---

[50] http://www.trillian.im/.

correspondents to watch what they said indicated that he did not

fully agree with their more outlandish statements.

For example, in one messaging session, Tarek tried to show

a correspondent that his views were too extreme. The

correspondent had been working for a non-Muslim who was hostile

to Islam and made unkind remarks. The correspondent was

concerned that he had smiled at his co-worker. The instant

message follows:

| | |
|---|---|
| Mu'awiyah : | ...im feeling worried about myself, i smile to a muhareb [one hostile to Islam] |
| Mehanna: | akhi [brother] |
| Mu'awiyah : | in my previous job |
| Mehanna: | smiling to a muhareb...is not kufr [forbidden, not allowed]...come on |
| Mu'awiyah : | and i feel i apostate |
| Mehanna: | akhi...that is too extreme...who gave u this idea |

Tarek was concerned about law enforcement scrutiny because

he believed that Muslim-Americans were being particularly

targeted by the government since 9/11 because of their religion.

This is a sentiment that is shared by many Muslim-Americans.[51]

This has caused a number of Muslim-Americans to alter their

---

[51] Dawinder S. Sidhu, *The Chilling Effect of Government Surveillance Programs on The Use of the Internet by Muslim-Americans*, 7 U. MD. L.J. RACE, RELIGION, GENDER & CLASS 375, 376 (2007).

behavior. Because Tarek did not want to discuss controversial topics online, the government falsely concluded that he had something to hide.

E.   <u>Mehanna's continuing interest in participating in violent jihad, and additional efforts to convince and radicalize others</u>

The government alleged that Tarek continued to be inspired by Osama bin Laden and others to join Al-Qaeda. (Proffer, p. 50). It provided voluminous but unpersuasive support for this claim, most of which is distorted, inaccurate, or taken out of context.

An example of this distortion can be seen in an instant messaging session about traffic lights. The government highlighted that Tarek and a correspondent were talking about "pictures of the martyrdom operation" in which "some brave mujaahid destroyed that traffic light." Tarek's correspondent stated, "[i]f only we had such courage...alas we are cowards...why do we say what we do not do?" (Proffer, p. 52). The government used this clearly sarcastic remark as proof of Tarek's desire to engage in "homicidal terrorism operations."

From numerous other instant messages, it is clear that Tarek and his correspondents joked about the media's constant reporting on Muslims as martyrs and suicide bombers. They joked that when a traffic light wasn't working that someone had destroyed it – this wasn't true and there was no indication of a

"martyrdom operation" concerning the flow of traffic in the Metrowest area. They were making fun of the view that every Muslim is a terrorist.[52] There is no indication that there was a "martyrdom operation" or that "some brave mujaahid" actually destroyed any traffic light.

On another occasion, the correspondent with whom Tarek had been jokingly conversing called Tarek "the sl[e]dge hammer on the glass jaw of traffic laws."[53] On another occasion, the correspondent called Tarek "the [thorn] in the throat of the Department of Transportation...the crusher of the traffic tawagheet[54]."[55] At another point, Tarek suggested that the correspondent pray at a certain location and "avoid any potential traffic lights."[56] The government, once again, used an obviously sarcastic comment to accuse Tarek of horrendous crimes.

The government dramatically alleged that Tarek was trying to decide whether his future plans "were in pharmacy or in

---

[52] During the last presidential campaign, a woman at a John McCain rally said Barack Obama "was an Arab." John McCain responded by saying "No ma'am, no ma'am, he's a decent family man." Christian Science Monitor, October 11, 2008.
[53] Bro… [510133], July 17, 2006.
[54] "tawagheet" means "idols." http://inthenameofallah.org/Tawagheet%20OR%20Idols.html.
[55] Bro…[510133], July 16, 2006.
[56] Bro… [510133], April 21, 2006.

Islam." (Proffer, p. 52). Contrary to the government's insinuation, this does not mean that Tarek was trying to decide whether to be a pharmacist or a terrorist. Rather, the instant message in its full context shows that Tarek was simply trying to decide between continuing in school to earn a doctorate in pharmacy or going to Madinah University to study Islam. The instant message quoted by the government clearly showed that Tarek told his correspondent he was applying to the University of Madinah in Saudi Arabia, and asked him about any connections or letters of recommendation that could help him get accepted.[57] The correspondent asked whether Tarek had consulted the Saudi embassy and if his parents would accept Tarek studying at Madinah. Tarek responded that they would accept it, provided he earned his pharmacy degree.[58]

In another example, the government dramatized an instant message about Abu Musab al Zarqawi's death to show that Tarek "berate[d] himself for not doing enough to further the violent jihad conspiracy." (Proffer, p. 53). This assertion is contradicted by the actual instant message, in which it is clear that Tarek said the opposite: "to be honest...I wasn't thinking

---

[57] For Tarek Mehanna's desire to study at Madinah, see also abo…[510079], March 5, 2006.
[58] Sla… [510024], March 6, 2006.

about [Zarkawi] too much...I was thinking about me...and what I am doing...for this Din[59]...and those around me."[60]

On pages 54 and 56 of the proffer the government describes the defendant's alleged love of "terrorist leaders" or "pro-jihad scholars." As an example of their distortion, the government's list of scholars included includes Shaykh Bin Baz as one such terrorist leader. In reality Bin Baz, as the official mufti [religious leader] of Saudi Arabia, authorized 500,000 US troops on Saudi soil during the Gulf War and was condemned by Bin Laden for his support of the Oslo peace accords between Israel and the Palestine Liberation Organization.

The government referred to instant messages and alleged that Tarek suggested following only those "who have knowledge as well as zeal." (Proffer, p. 57). The text of the instant message indicated that Tarek was actually criticizing people who do not have knowledge and relied only on zeal. He pasted a link to his correspondent of a video or audio file, and complained, "read the whole thing...and laugh ur beard off...no knowledge, man...just emotion and zeal...this has become our manhaj [methodology]."[61] The government alleged that this instant

---

[59] "Din" means a number of things, including "faith," "obedience to God," "religion," the path that righteous Muslims follow, and a complete way of life. It certainly does *not* mean violent jihad. http://en.wikipedia.org/wiki/Dīn.
[60] Alb…[510224], June 8, 2006.
[61] Nus…[510190], July 8, 2006.

message is evidence of Tarek's extremism. On the contrary, this instant message shows that Tarek believed in an academic approach grounded in knowledge as opposed to mindless emotion and zeal as a means to deal with world events.

During another instant message, Tarek agreed with his correspondent that "we are people who don't return evil for evil...we return evil with [kindness]...and we treat those who treat us bad with good."[62] This instant message also illustrated Tarek's views on the "jihadi videos" the government alleged he was involved in producing or distributing. He said, "I stopped watching them...all it does...is make you feel either like u did something...or like ur a pile of -----." Tarek then asked his correspondent, "U saw the Umar hadid vid." (which the government alleges Tarek Mehanna translated for Al-Qaeda). When the correspondent responded that he had not seen it, Tarek responded, "good."

The government alleged that Tarek was messaging with a correspondent in New York about spreading the faith. The government quoted words and terms in the conversation such as "recruit," "brainwash," "hardcore," and "march forth" to show that Tarek was interested in recruiting impressionable people for violent jihad. (Proffer, p. 57-58). The actual instant message is not remotely related to violence but rather shows

---

[62] Abd…[510200], July 19, 2006.

once again Tarek's preoccupation with publicizing the Islamic
faith through dialogue and education. The message follows:

    Nusrah:   so how is the Dawah up there...any public
               movements?

    Mehanna:  the da'wah?...haha...don't make me
               la[u]gh...dude...there a total of like...3
               bros up here...who even know what wala and
               bara is[63]...and ur speaking to one of
               them...but...we're working on it...

    Nusrah:   alhamduillah

    Mehanna:  at this point...we are doing

    Nusrah:   if u need help, we r here

    Mehanna:  one-on-one efforts...like, befriend a
               person...slip stuff in...here and there

    Nusrah:   recruit...brainwash

    Mehanna:  brainwash...ahaha...yeah exactly

    Nusrah:   when u get #'s...then u march forth

    Mehanna:  Yeah...but at this point...we're still
               faaaaaaar from that point

    Nusrah:   akh...we are only 6 bros here man...and only
               4 actually make the plans and
               everything...so numbers dont matter

    Mehanna:  ma sha' Allah

    Nusrah:   if u have 3 hardcore bros...then ur set

    Mehanna:  but like...what can we do man

    Nusrah:   it's the quality not the quantity

    Mehanna:  set to do what...that is the ??

---

[63] "wala and bara" refers to loyalty to fellow Muslims and
opposition to enemies that wish them harm.

Nusrah:    the dawah...what use r we here if we dont at
           least forbid the munkar to escape allah's
           wrath when it comes Insha'Allah

**Mehanna:   no but...I mean...specifically...like...u
           mean demos?**

**Nusrah:    not just that...a weekly dawah table...call
           people to
           tawheed...EZ...table...books...posters...3
           bros...for 2 hours**

Mehanna:   how long have u bros been doing this

Nusrah:    i have been doing it for like 5
           years...others like for 8...and one bro for
           15 yrs...and we were always the same
           number...people come and go...cause they
           can't handle it...

Mehanna:   heh

Nusrah:    it requires time and $$$

Mehanna:   may Allah keep us firm[64]

This instant message clearly showed that Tarek's efforts
were in peacefully proselytizing for his religion, not taking
violent action. As is evident from the context, "hardcore"
brothers were those who dedicated time and money to spreading
the word of Islam, and "demos" were something even milder than
setting up a table with books and posters. "Marching forth"
simply meant taking one's beliefs and going public with them in
hopes that others will be inspired to learn about Islam.

---

[64] Nus…[510190], April 15, 2006.

The government alleged that Tarek messaged with a
correspondent concerning "an incident where one of their
acolytes questioned whether there were any pre-conditions to
engaging in jihad, and was summarily excoriated by Abousamra,
who said that it was a duty to engage in it without delay."
(Proffer, p. 59). Leaving aside, once again, the government's
claim that what others said suggested Tarek's mindset, Tarek's
many comments about suggest Tarek's rejection of violence and
prejudiced and hateful beliefs about others. For example, in a
message with Daniel Maldonado, Tarek stated:

> I know u aren't on Tibyan...but...lately...
> Ahmad [Abousamra]...has been going nuts...he goes
> to the extent...of saying [certain moderate scholars] were
> evil...and I really am ticked off about that...it really
> pisses me off...REALLY.[65]

Maldonado suggested that someone talk with Abousamra, and
that Abousamra "needs to be told by someone that he respects at
a level higher than his own." Tarek responded:

> [m]an...it's tough...cause...Ahmad and Dan
> [Spaulding]...are at the point now...where it's
> basically like...'We read the books, we are on the
> manhaj...why isn't everyone thinking like
> us?'...they've put themselves into this tiny cocoon of
> whatever u want to call it...and it's driven them over
> the edge...like...EVERY single conversation we
> have...is...the khan this, MAS that...Bin Baz
> this...Uthaymin that...we NEVER just sit and raise our
> iman [faith]...read Qur'an...or anything...it's just:
> let's point out what's wrong w/ everyone around
> us...and even...when we are around these ppl...and we

---

[65] Bas…[510184], May 15, 2006.

have the chance to clarify things for them...[Ahmad and Dan's] mentality destroys the change.[66]

Abousamra and another also criticized Tarek, as "all talk...and no action." Tarek emailed Maldonado that he tried "not to be around [Ahmad and Dan] too much more than necessary...b/c I don't want to become like them...and just go around...turning ppl away...and making them fulfill their stereotypes of Sunni brothers."

Tarek described Abousamra's criticism of his beliefs and stated:

> I am trying to revive some awareness of the correct Islam here...and I can't do it alon[e]...the only ppl who think like me...are Ahmad and Dan...but, they are not interested...like...last week...I had an idea...to put together a flyer...about Tawhid, and wala and bara...and print it out...and hand it out at jum'ah prayers all over the area...just as a form of da'wah...so...I sent it to Ahmad...to proofread...and add his input...do u know what his response was?..."This flyer is redundant and badly [p]ut together. Did you put it together in a hurry or something?"[67]

Tarek was very concerned at the impact Abousamra's actions were having. He wrote Maldonado:

> [T]he problem is...not just me...it is...that his attitude...is causing damage...both locally...and on the net...just turning people either away from us...or turning them into these psycho-Jihadis ...who have this very very narrow minded view of the world...and who themselves have no 'ilm [knowledge] in the din [faith]...they just, like I said before, want to feel big...by putting ppl down, esp. respected scholars.[68]

---

[66] Id.
[67] Id.
[68] Id.

F.     Additional Conversation re: support for bin Laden –
       Mehanna: "my real father"

The government selected one instant message and alleged
that Tarek believed that Osama bin Laden was "my real father, in
a sense." (Proffer, p. 62). The government failed to acknowledge
that this single comment was made during a number of instant
messages between Tarek and his correspondent in which both young
men were complaining about their own fathers and his
correspondent's estrangement from his father.[69]

A number of books about Osama bin Laden, written by
westerners wholly unsympathetic to Al-Qaeda, illustrate how and
why many Muslims see Osama bin Laden in a different light than
Westerners might understand. There is a strong mythic belief in
Bin Laden as a mujahedeen fighter who drove the Soviets from
Afghanistan, abandoned a life of wealth and ease and became a
holy warrior committed to saving Muslims throughout the world.[70]
The 9/11 Commission Report explained this as follows:

> The history, culture, and body of beliefs from which
> Bin Laden has shaped and spread his message are
> largely unknown to many Americans. Seizing on symbols
> of Islam's past greatness, he promises to restore
> pride to people who consider themselves the victims of
> successive foreign masters. He uses cultural and

---

[69] Abu…[509974], February 22, 2006.

[70] Peter L. Bergen, Holy War, Inc.: Inside the Secret World of Osama bin
Laden 136 (2001); Peter L. Bergen, The Osama bin Laden I know: An Oral
History of al Qaeda's Leader (2006); Lawrence Wright, The Looming Tower: Al-
Qaeda and the Road to 9/11 (2007). Michael Scheuer, Imperial Hubris: Why the
West is Losing the War on Terror (2004).

religious allusions to the holy Qur'an and some of its
interpreters. He appeals to people disoriented by
cyclonic change as they confront modernity and
globalization. His rhetoric selectively draws from
multiple sources – Islam, history, and the region's
political and economic malaise. He also stresses
grievances against the United States widely shared in
the Muslim world. He inveighed against the presence of
U.S. troops in Saudi Arabia, the home of Islam's
holiest sites. He spoke of the suffering of the Iraqi
people as a result of sanctions imposed after the Gulf
War, and he protested U.S. support of Israel.[71]

In other words, while Bin Laden is an anathema to most

Americans, he remains a mythical figure to others. Regardless of

the content, their comments about him remain protected by the

First Amendment.

G.    The lessons of *39 Ways to Serve and Participate in
      Jihad*

The government alleged that Tarek followed "many of the

'Steps' set forth in *39 Ways*, and was thus "serving jihad."

(Proffer, p. 64). In doing so, the government adopts an overly

and extraordinarily broad definition of the term "serving

jihad," and seems to allege that much patently legal conduct is

now considered to be illegal action amounting to material

support for terrorism.

For example, the government alleged that Tarek was

following step two by asking Allah for martyrdom. This alone is

not illegal, and the instant messages indicate that "martyrdom,"

in the Muslim religion, can mean any number of things. For

---

[71] THE 9/11 COMMISSION REPORT, 48-49 (2004).

example, one is a martyr if he falls from a cliff, drowns in water, is hit by a plague, or dies of stomach disease.[72] One is martyred if a wall collapses on him.[73] The term martyrdom has a very broad meaning and its use is not a link to terrorism.

The government alleged that Tarek's messages about working out meant that he was following step twenty-five, which admonished people to "become physically fit." (Proffer, p. 65). The government's implication is that Tarek planned to use his physical fitness so that he could thrive as a terrorist. There is no evidence of this and furthermore, Tarek never made a concentrated effort to become physically fit. The fact that he did not work out regularly indicates that he was not generally dedicated to physical fitness, let alone for the purpose of terrorism as the government alleges.

The government alleged that Tarek followed step seventeen by advising "the Muslims and the Mujahidin," and speaking out for the mujahidin and defending them. (Proffer, pp. 66-67).[74] This is contradicted by the fact that the instant messages simply did not show that Tarek incited anyone anywhere to commit a single act of violence. On the contrary, the instant messages

---

[72] Aaz…[510158], April 3, 2006; brother_mujahid_hotmail[510133], February 8, 2006; thz786[509996], July 26, 2006.
[73] Bro…[510133], February 8, 2006.
[74] See "Ronald Reagan glorified the Afghan mujahideen...." Thomas L. Friedman, *1977 vs. 1979*, New York Times, Op-Ed, February 13, 2010.

show that Tarek, however upset he was at U.S. military operations in the Middle East, consistently utilized speech as his form of protest. There is absolutely no evidence that Tarek ever advised anyone who could realistically be considered a mujahid. Moreover, the "advice" that Tarek allegedly provided was a review and citation of conservative religious texts that concerned the application of Islamic values to daily life.

None of the above examples cited by the government offer any proof that Tarek encouraged anyone to be violent or said anything that was not protected by law.

H.    The government's conclusion

The government's final word in support of Tarek's detention summarized its selective approach to demonizing him. The government noted that Tarek "fully intends to leave the United States permanently." (Proffer, p. 70). The government failed to acknowledge, however, that Tarek remained in the United States for years after being made aware of the FBI's interest in him. He made open preparations to leave only after obtaining his doctorate in pharmacy and obtaining a prestigious job as a pharmacist in Saudi Arabia. Even when threatened with the very criminal charges he now faces, he remained for nearly a year, completing his education and working part time. Certainly, this is not consistent with the inclination to flee prosecution. Magistrate Sorokin recognized this in his order releasing Tarek

in 2008 when he concluded: "Nothing in the record suggests that Mehanna sought or obtained the employment overseas secretly". (p. 4, Court Order, December 9, 2008).

The government noted that "[t]his is not a case in which a government agent or cooperating witness assisted the Defendant in an attempt to commit a crime." (Proffer, p. 70). The presence or absence of government agents is irrelevant to this issue. It is more important to note what is lacking: ***any evidence a crime was ever committed.*** The bottom line is that the government took publicly available videos that were sent by and to Tarek and his correspondents and claimed they are "an important component of the worldwide terrorist conspiracy." (Proffer, p. 71). Nowhere does the government define this ambiguous conspiracy, establish Tarek's relationship to it, or explain how Tarek's speech furthered it.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In order for counsel to be ineffective, counsel's performance must (1) be "so objectively deficient, with errors so serious, that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment," and (2) prejudice "the defense so as to deprive the defendant of a fair trial." Haberek v Maloney, 81 F.Supp.2d 202, 216 (D.Mass 2000). Overall, ineffective assistance of counsel arises when "counsel's conduct so undermine[s] the proper functioning of the adversarial

process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984).

The government has alleged that "[t]he weapons [Tarek Mehanna] used included a keyboard and computer." (Proffer, p. 72). This case indeed rests entirely on Tarek Mehanna's speech. To date, the government has not disclosed what precise speech it intends to use against Tarek Mehanna and what speech it will not use. Tarek's counsel must, therefore, assume that all of the discovery may be used. In order to prepare for trial, counsel must be ready to use and counter the government's use of all discovery.

If counsel is unable to do so, the government will be able to use evidence that counsel did not see, did not discuss with their client, and was not ready to challenge at trial. It cannot be gainsaid that any conviction that followed could not be relied upon to be just. Counsel's inability to prepare would render their assistance impotent, and counsel would have ensured only that Tarek Mehanna received a trial in which only the government knows the evidence. This would surely deprive Tarek Mehanna of a fair trial.

## V. CONCLUSION

For the above reasons, Tarek Mehanna requests that this Court order his release on bail pending trial.

Tarek Mehanna is prepared to abide by whatever conditions of release this Court deems appropriate. He does, however, suggest the following:

- Residence at his parents' home in Sudbury, Massachusetts;

- Posting of his parents' home and other funds as was done earlier;

- Placement of a GPS monitoring bracelet on Tarek Mehanna or, in the alternative, reinstitution of automated calls by Pretrial Probation;

- Any other conditions deemed necessary by the Court and/or Pretrial Probation.

The defendant further requests a hearing before the Court on this matter.

Respectfully submitted,

Tarek Mehanna
By His Attorneys

CARNEY & BASSIL

*Janice Bassil*

Janice Bassil
B.B.O. #033100
J. W. Carney, Jr.
B.B.O. # 074760
20 Park Plaza, Suite 1405
Boston, Ma. 02116
617-338-5566

Dated: December 16, 2010

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or before the above date.

*J. W. Carney, Jr.*

J. W. Carney, Jr.