**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA    )
    )
    )
        v.            )     Criminal No. 09-10017-GAO
    )
    )
TAREK MEHANNA    )

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**RENEWED MOTION FOR RELEASE ON BAIL**

The United States of America, by and through United States Attorney Carmen M. Ortiz, and Assistant United States Attorneys ("AUSA") Jeffrey Auerhahn and Aloke S. Chakravarty, for the District of Massachusetts files this opposition to Defendant Tarek Mehanna's ("Defendant" or "Mehanna") motion for release. The Defendant poses a significant threat to individuals and the community, will likely continue to attempt to obstruct justice, and will most certainly flee if not detained.

**I.   The Findings of the Magistrate Judge**

In November 2009, the government filed a detailed Proffer in Support of Detention with a number of attachments and exhibits. Based, in part, on these proffers, the Magistrate Judge found that the government had met its burden and established:

> Mehanna poses a serious risk of flight, no conditions or combination of conditions will reasonably assure his appearance ...
>
> Mehanna poses a serious risk of danger to the safety of any other person or the community, no conditions or combination of conditions will reasonably assure the safety of any person or the community ...

Mehanna poses a serious risk that he will obstruct or attempt to obstruct justice notwithstanding any conditions or combinat

Magistrate Judge's Order, dated November 18, 2009, at 11-13.

## II. Government Submissions and Exhibits

In asking this Court to affirm the detention order of the

Magistrate Judge, the Government relies on the following[1]:

Memorandum and Order on Government's Motion for Detention, dated November 18, 2009. Docket Entry #47.

Government's Proffer and Memorandum in Support of Detention, filed November 5, 2009 (and attachments and exhibits) ("Proffer"). Docket Entry #41, Exhibit #1.

Affidavit of Special Agent Andrew Nambu, in support of detention in this case, filed in November 2009, with the aforementioned Proffer ("Nambu Indictment Detention Affidavit"). Docket Entry #41, Exhibit #2.

The Affidavit of Special Andrew Nambu, in support of detention, filed in November, 2008, and attachments, in Criminal Number 08-148-LTS ("Nambu Complaint Detention Affidavit"). Docket Entry #6 (in this case).

Criminal Complaint and Affidavit in Support of Complaint of Special Agent Heidi L. Williams, filed October 20, 2009. Case Number 09-0119-LTS ("Williams Affidavit"). Docket Entry #1 (in 09-0119-LTS).

Proffer concerning additional evidence discussed herein.[2]

## III. Statement of the Law

Pursuant to 18 U.S.C. §3142(f)(1)(A) and (B), the United

---

[1]The Proffer, the two affidavits of Special Agent Nambu and the Complaint and Affidavit of Special Agent Williams were all submitted to the Magistrate Judge in support of the government's motion to detain the Defendant.

[2]See discussion concerning use of proffer in lieu of testimony at pages 7-9 of Proffer.

States moved to detain the defendant pending trial based on dangerousness and risk of flight.  In addition, pursuant to 18 U.S.C. §3142(f)(2), the United States moved for detention because the Defendant was a flight risk and this case involved "a serious risk that [the defendant] ... will obstruct or attempt to obstruct justice[3], or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."

Because of the nature of the charges against the defendant, pursuant to 18 U.S.C. §3142(e)(3)(B) and (C), the government has the benefit of a presumption on both risk of flight and dangerousness.  The presumption has been established in this case because the Magistrate Judge issued a Complaint alleging a conspiracy in violation of 18 U.S.C. §2339A, finding probable cause to believe that the defendant conspired to provide material support to terrorists.  <u>See</u> Complaint issued in Criminal Number 09-0119-LTS.  The presumption is further established because the grand jury found probable cause to believe that the defendant committed the offense charged in 09-0119-LTS, as well as a substantive violation of §2339A and separate violations of 18 U.S.C. §2339B, and 18 U.S.C. §956.  <u>See</u> Counts One through Four.  Thus, there are presumptions under both 18 U.S.C. §3142(e)(3)(B) and (C), that the

---

[3]The Defendant is charged with conspiracy to provide false information to law enforcement, as well as a number of separate counts alleging lies to law enforcement.  <u>See</u> Counts Five, Six and Seven.

Defendant should be detained because he poses a danger and is a risk of flight.

Because there is a presumption that the defendant should be detained (on both risk of flight and dangerousness), the burden shifts to the defendant to produce contrary evidence.  United States v. O'Brien, 895 F.2d 810, 815 (1st Cir. 1990).

Even when the Defendant Mehanna was only charged with making a false statement in violation of 18 U.S.C. §1001 in Criminal Number 09-10017-GAO and Criminal Number 08-0148-LTS, and there were no presumptions, it was a close question as to whether he should be detained as a risk of flight.[4]  The Magistrate Judge ordered very restrictive terms of release and required his family to secure his appearance with essentially all their assets.  Given the changed circumstances of the new charges and legal impact of these new charges, including the fact that he now faces the potential of life imprisonment, and relying on the presumptions (that were not applicable to the false statement charge) it is clear that this Court should order the continued detention of the defendant pending

---

[4]Defendant tries to make much of the fact that in 2008, although the government already knew much of the evidence against the Defendant, the government "chose not to allege that Tarek [Mehanna] was a danger to the community."  Defendant's Memorandum at 6.  The government's decision was not by choice, but rather was restricted by caselaw; given the charge at that time, the government could not move to detain on dangerousness grounds.  See, e.g., United States v. Ploof, 851 F.2d 7, 11 (1st Cir. 1988).  Therefore, the only issue, at the time, was risk of flight.

trial.

**IV.  Factors**

It is not the intention of the government to review all the factors enumerated in 18 U.S.C. §3142(g) that the Court should consider in making a detention determination, and how, in this case, each and every one of them support the Magistrate Judge's Order.  However, one of the defendant's principal arguments, that is, an alleged need to be released in order to assist in the preparation of his own defense, is *not* a factor listed and is not relevant to the decision whether the defendant poses a risk of flight or is dangerous.  <u>See</u> 18 U.S.C. §3142 (g)(1) through (4).

This issue arises, if at all, only in connection with a detention order; 18 U.S.C. §3142(i) (Contents of detention order), provides as follows:

> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

There is very little caselaw on this provision and the few (mostly unreported) cases that have discussed a request for "temporary" release based on an alleged need to assist in reviewing discovery, provide little support for the Defendant's argument.

In <u>United States v. Peters</u>, 2009 WL 205188 (D. Minn. 2009) (unreported), as in this case, the defendant argued that "[i]t is

not possible to accomplish this task [of reviewing discovery] while
[the defendant] ... is in custody."   2009 WL 205188, at 2.   In
denying the defendant's motion for release, the district judge held
that "the difficulties Defendant might encounter in preparing for
trial have absolutely nothing to do with whether he is a risk of
flight or a danger to the community."   Id.   The judge noted that no
cases  support  the  argument  "that  due  process  might  require  a
defendant to be released if pre-trial detention impairs his ability
to  prepare  for  trial."   2009 WL 205188, at 3.   Notwithstanding
3142(i),

> [w]hile this case may, in fact, be complicated and require
> Defendant to review hundreds if not thousands of documents and
> meet with his lawyers for dozens of hours, that fact, standing
> alone,  simply  does  not  justify  Defendant's  release. ...
> Indeed, accepting such an argument would mean that the more
> complicated the crime, the more likely a defendant should be
> released prior to trial.   This is clearly and absurd result.

(citations omitted) 2009 WL 205188 at 3.   Although the Peters case
is not binding on this Court, the logic is inescapable.   The point
the  Peters  court  made  can  be  restated  as  follows:  the  more  the
volume of the evidence there is against a defendant (as there is in
this  case)  and,  therefore,  the  more  evidence  the  defense  team  will
need  to  review,  the  stronger  the  argument  for  release  of  the
defendant.   Obviously that is absurd and turns on its head the
factor of "the weight of the evidence against" the defendant, which
militates in favor of detention.   18 U.S.C. §3142(g)(2).

     In a number of other cases, district judges have come to the

6

same conclusion.   See e.g., United States v. Birbragher, 2008 WL 2246913 (N.D. Iowa 2008) (wherein the court also noted that a "Defendant does not have an absolute right to personally inspect or copy ... documents before trial"[5]); United States v. Stanford, 722 F.Supp.2d 803 (S.D. Texas 2010).   The undersigned failed to find any cases (reported or unreported) where the court granted bail on these grounds.

In addition, it must be noted that in addition to the fact that the defendant need not review all the discovery personally (and he now has four attorneys who have filed appearances on his behalf), much of the most significant discovery, e.g., a copy of the hard drive of his laptop, was given to him in December of 2009; thus, by the time this case goes to trial, he and his counsel will have had almost two years to review it.   In addition, the hard drive is *his* hard drive and although he cannot be expected to remember all his hundreds of chats saved thereon, he begins at an advantage over the government which must also review all of its contents.   See, e.g., United States v. Birbragher, 2008 WL 2246913 at 2 ("Presumably, Defendant is familiar with at least some of the documents because they came from his own company.")

Furthermore, if the Defendant is not being allowed sufficient

---

[5]On this point, see also United States v. Deering, 179 F.3d 592 (8th Cir. 1999) (not an abuse of discretion to permit inspection of discovery by stand-by counsel instead of defendant).

time to review the discovery materials that have been provided, rather than seeking release, in the first instance, the defense should try and work with the institution where he is being held to grant him more time.  The prosecution has been active and vocal in trying to encourage the federal agencies involved to allow the Defendant the computer he now has and to allow him proper access to the discovery material.  If the institution is acting unfairly (when balancing the security issues and the rights of the Defendant), the Defendant can seek Court intervention with reference to the actions of the institution.  Releasing a defendant in a case such as this where the evidence supporting continued detention is so overwhelming is not the course to take when other alternatives are available and have not been fully pursued. Finally, "[i]f they [the defense] had insufficient time to sort things out, they should ... ask for a continuance." United States v. Jordan, 316 F.3d 1215, 1253 (11th Cir. 2003).

## V.   Evidence of Defendant's Crimes

The Defendant's submission presents this case as if it were totally based on the stored information found on the hard drive of the Defendant's laptop computer when it was mirrored in August 2006 (that admittedly was a large part of the Proffer[6]).  By focusing

---

[6]However, the government's submissions in support of detention did not rely exclusively on the contents of the Proffer that were derived from the hard drive.  Evidence from other sources, including anticipated testimony of cooperating witnesses, recordings of the Defendant and public records were

predominantly on the stored chats, the defense offers an alternative interpretation to a small sample of the evidence presented.   First, the defense argument seeks to get the Court to focus on the details of each leaf (and only some of the leaves[7]), so that the Court will not see the forest.   Second, the government expects to present testimony from some of the participants in these electronic conversations; their statements concerning what was said and meant will be consistent with what the government has presented and not the distortions offered by the defense.   Third, the Defendant purposefully ignores the information obtained from cooperating witnesses, not just as it relates to the meaning and context of the electronic conversations, but also more general knowledge of the activity, statements and intention of the defendant(s).   In addition to the cooperating witnesses discussed in both Special Agent Williams Affidavit in support of the Complaint (09-0119-LTS), as well as Special Agent Nambu's Affidavits in support of detention, the government has revealed to

---

also summarized in the attachments and exhibits.

[7]The defense tries to explain some of the statements of the Defendant as a "twenty-something [who] ... sometimes made comments that could be considered crude, insensitive, and careless," (Defendant's Memorandum at 17), or by emphasizing that "the participants in these conversations are in their late teens or early 20s" (emphasis deleted) (Defendant's memorandum at 34) (while at the same time touting the fact that he is a scholar and a successful professional).   The government continues to rely on over 70 pages of quotes from the Defendant (and anticipated testimony of cooperating witnesses) to establish the true nature of the Defendant and his criminal activity.

the defense in discovery letters (that were not filed publicly[8])
the names of four additional cooperating witnesses.

### A.   Trip to Yemen

The Defendant seeks to maintain the fiction that he and Ahmad
Abousamra went to Yemen to receive religious training[9] and not to
further their aim to participate in armed jihad against the United
States.  See Defendant's Memorandum at 43.  A detention hearing is
not intended to be a mini-trial of the allegations in the
indictment.[10]  However, beyond the bald assertion, the Defendant has
offered nothing to support his false assertion or to rebut the
evidence from several witnesses who will testify that Mehanna and
Abousamra went to Yemen to find a terrorist training camp to
receive military training.  The defendants intended to then use
that training to kill Americans in Iraq.  In fact, although they
were unsuccessful in obtaining the training, nevertheless,
Abousamra continued on to Fallujah, Iraq[11], in order to fulfill the

---

[8]Discovery was provided pursuant to a protective order.

[9]The grand jury found probable cause to believe that this
stated reason for the defendant's trip to Yemen was false.  <u>See</u>
Count Seven (Mehanna) and Counts Eight, Nine and Eleven
(Abousamra).

[10]<u>See</u> <u>also</u> <u>United States v. Hussain,</u> 2001 WL 420480 (1st Cir.
2001), at n.2 (unreported)(the Court of Appeals for the First
Circuit noted that "[i]t is equally well-established that bail
hearings are not intended to serve as discovery expeditions").

[11]There is documentary evidence to support the anticipated
testimony of witnesses and evidence from consensually recorded
conversations.  <u>See</u>, <u>e.g.</u>, Williams Affidavit at ¶¶ 13-15, 17-19.

intended original objective to participate in armed jihad and kill American soldiers.  In addition to several witnesses (some of whom are unindicted coconspirators) who were told this by Mehanna and Abousamra (both before and after the fact), the government will offer the testimony of the third individual who accompanied Mehanna and Abousamra on their journey, and will admit to the overall objectives of the trip.

B.    **Connection to *al Qa'ida***

The defense alleges that there is no evidence of a connection to *al Qa'ida*.  First, the defense memorandum focuses on only some of the charges and only some of the elements of the charged offenses.  Only three counts in the indictment concern "material support" to terrorism.  The Defendant is charged with providing and attempting to provide material support to terrorists in violation of 18 U.S.C. §2339A.  See Count Three.  He is also charged with a conspiracy to violate the same section.  See Count Two.  Further, he is charged with a conspiracy to provide material to support to *al Qa'ida* in violation of 18 U.S.C. §2339B.  See Count One.  The only material support charge that requires any evidence concerning *al Qa'ida* is this latter charge, that is, Count One of the second superceding indictment.  And these are just the terrorism charges. The other charged offenses require no proof that his actions were

11

on behalf of or motivated by a desire to help *al Qa'ida*.[12]

Further, the Defendant misreads or misrepresents the requirements for proving a violation of 2339B and the requisite proof concerning a connection to *al Qa'ida*.

For the purpose of both Section 2339A and 2339B, the definition of "material support," found in 2339A, includes, <u>inter alia</u>, "personnel (1 or more individuals who may be or include onself)[13]" and "expert advice or assistance," which is further defined as "advice or assistance derived from scientific, technical or other specialized knowledge."  To obtain a conviction on the charge of conspiracy to violate 2339B, the government may prove that the object of the conspiracy was to either provide "personnel" or "expert advice or assistance" to *al Qa'ida*.  It is not necessary to prove that the Defendant had any contact with *al Qa'ida*, actually worked under any *al Qa'ida* member's direction, or that his efforts actually advanced the objectives of *al Qa'ida*, but simply that the Defendant *agreed* to do so.

_____

[12]The Defendant's memorandum also ignores the strength of the evidence on some of these other charges; for example, with reference to some of the false statement charges, the government has proffered evidence in the form of consensual recordings wherein the Defendant admits that he lied to the FBI and expresses concern for having knowingly violated the law.  This is in addition to the direct evidence that established the lies.

[13]Section 2339B adds an additional limitation on "personnel" to exclude the individual who, while working to advance the "goals or objectives" of a terrorist organization, does not provide personnel "to work under the terrorist organization's direction or control."

In any event, the Defendant both utilized the tools provided by *al Qa'ida* in order to try and convince others to join the fight against Americans[14], and also sought to produce, translate and distribute media that would convince others to do the same, that is, he produced tools that *al Qa'ida* could use, which he believed would advance *al Qa'ida*'s objectives, and which he intended to be used in this manner and for these purposes.

For example, Mehanna, Abousamra and their conspirators watched the *State of the Ummah*, an *al Qa'ida* video that helped inspire them to take action. This video was a specific direction from *al*

---

[14]The Defendant "bookmarked" in his Firefox *al Qa'ida* and radical jihadist websites, some that were specifically dedicated to disseminating *al Qa'ida* material. His Firefox Profile also indicates visits and downloads from sites dedicated to the distribution of *al Qa'ida* propaganda. His RealPlayer history showed that he viewed many videos from sites of this nature. Defendant's statement to the contrary (Defendant's Memorandum at page 25) is simply wrong. Other statements are similarly incorrect. For example, the Defendant claims there was no picture of the visa of 9-11 hijacker Mohammed Atta on the Defendant's computer. Defendant's Memorandum at page 32. Although not a major point, on this date, the government provided to the defense a cd containing the image of the visa that was found on the Defendant's computer. In addition, the defense claimed they found no images of the World Trade Center under attack on 9-11. On this date, the government provided a cd containing many of the photographs of the World Trade Center in flames that the defense stated they could not find, that were found on the Defendant's computer. Unlike child pornography, possessing and viewing these images is not a crime; however, they are indicative of the Defendant's intent and motivations. Therefore, these photographs and images have probative value whether they were saved or merely viewed. It would be like proving a defendant has an interest in pornography by showing that he saved images on his computer and visited websites that depicted such images.

*Qa'ida*, that the defendants watched prior to the defendants'
formulation of the specifics of how they would actually get
training or provide services to *al Qa'ida*. It is anticipated that
an expert witness will testify to the widespread significance of
this video, in which Usama Bin Laden personally solicits youth to
join *al Qa'ida*. Mehanna later used the *State of the Ummah*[15] and
other videos to try and radicalize several associates.[16]

This backdrop also sheds important light on why, over the next
several years, Mehanna and Abousamra tried to receive terrorist
training, why they tried to facilitate others' terrorist training
(including each others'), and why they translated and digitally-
edited media which were designed to inspire others to assist *al
Qa'ida*. Watching these videos had its desired effect on them and
they wished to radicalize and inspire others. In addition, it is
anticipated that a cooperating witness will testify that Mehanna
and Abousamra believed that they were advancing the cause of *al
Qa'ida* by translating videos and texts.

One of the videos that Mehanna proudly discussed was the
*Expedition of Umar Hadith*. See, e.g., Proffer at pages 17-22. In

---

[15]On May 28, 2006, Mehanna told "DS" about having a "movie
night." DS responded: "*State of the Ummah*?" See Proffer at page
29.

[16]Daniel Maldonado and CW2 described watching jihadi videos
with the defendants. See, e.g., Williams Affidavit at ¶28 and
¶42. It is anticipated that several cooperating witnesses will
testify concerning Mehanna's use of the *State of the Ummah* (and
other videos).

an online conversation, Mehanna admitted that he translated the
video, added subtitles, and added some computer graphics.   The
defense's attempt to distort the evidence of Mehanna's description
of *himself* as part of *al Qa'ida*'s media wing is rebutted by (a
great deal of evidence, including) this video in which Mehanna
describes himself and those who helped produce and release the
video as "*Your Brothers in the Media department ... Al-Qa'idah in
the Land of the Two Rivers*."   The evidence at trial will be that
this video was originally released by *al Qa'ida* through an
unindicted co-conspirator, who was convicted of terrorism in the
United Kingdom.   Evidence will be presented that some of the
tasking of Mehanna came through unindicted coconspirators in the
United Kingdom, Canada and the United States, who directly or
indirectly communicated with *al Qa'ida*.

In any event, as stated above, the charges against the
Defendant do not require proof that the defendants received any
direction from *al Qa'ida*.   In summary, the three conspiracy charges
(18 U.S.C. §§2339A, 2339B and 956), require an agreement to do
something with the requisite intent.   To the extent that the
material support they agreed to provide was personnel, the
agreement to receive training at a terrorist training (whether or
not they were successful) satisfies the requirement that they
*agreed* to put themselves under the direction and control of
terrorists.   Similarly, the substantive violation of an attempt

15

under section 2339A is proven by the evidence of their travel to Yemen and search for a training camp, with the intent to use that training to kill Americans.[17]   As discussed in the section that follows, the evidence of their views concerning *al Qa'ida* and their efforts to advance *al Qa'ida*'s objectives are probative of *inter alia* their intent and motivations.

## VI.   The Defendant's First Amendment Argument

It is not the intention of the government to respond to a motion that has not yet been filed, that is a motion to dismiss based on a First Amendment argument.  However, the Defendant raises this issue in the context of an attack on the strength of the government's case and, therefore, the government will respond in a limited way with some basic caselaw.

Statements of the Defendant concerning his inspiration, objectives and intent, in the stored chats and to associates who will now testify against him, establish his intent (, attempt and agreement) to provide material support to terrorist and to *al Qa'ida*.  Even statements that would otherwise be core First Amendment protected speech, while not criminal, can be used to establish a defendant's intent and state of mind.  The mere fact

_____

[17]This summary should not be taken as a suggestion that this is the limit of the government's proof concerning how the defendants violated the statutes discussed; it is simply a shorthand summary to demonstrate how the defense argument is erroneous and citation to and reliance on <u>Holder v. Humanitarian Law Project</u>, 130 S.Ct. 2705 (2010) is misplaced.

that speech is used to carry out a crime does not prohibit prosecution.  <u>See</u> <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 489 (1993) ("The First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.")

With reference to two of the charges alleging conspiracies[18] to provide material (Counts One and Two), two theories[19] *inter alia* will sustain convictions: 1) an agreement to provide support in the form of personnel and 2) an agreement to provide support in the form of expert advice and assistance.  Each of these (among others) are alternative and listed means of providing material support under both Sections 2339A and 2339B.  With regard to the second means of support, translation of speeches and other media and text, creating computer graphics and editing videos and computer media by inserting segments and subtitles (collectively "internet

_____

[18]Statutes such as Sections 2339A and 2339B of Title 18, that include conspiracies that do not require overt acts, criminalize an agreement which by its nature involves speech and speech alone, when accompanied by the requisite intent.

[19]This summary should not be taken as a suggestion that this is the limit of the government's proof concerning how the defendants violated the statutes discussed.  The indictment alleges additional forms of "material support" that the defendants agreed (or, in connection with the attempt under section 2339A, attempted) to provide.  The two forms discussed herein are used for discussion purposes, and should not be seen as a limit on the government's evidence, it is simply a shorthand summary to demonstrate how the defense argument is erroneous and citation to and reliance on <u>Holder v. Humanitarian Law Project</u>, 130 S.Ct. 2705 (2010) is misplaced.

activity"), qualifies as "assistance derived from ... technical or
other specialized knowledge."

It is difficult to see how First Amendment concerns would be
implicated under the first theory of liability, that is, by
providing personnel, if the objective of the agreement is to for
example, provide themselves (and a cooperating witness who traveled
with them in 2004 on their trip to Yemen) to train under and fight
with *al Qa'ida*.  Since the object of the conspiracy is to provide
personnel, even if the defendant's words and beliefs are presented
at trial as evidence of the various elements of the offense, the
defendants' speech and beliefs are not being punished.  The First
Amendment is similarly not implicated under the second theory of
liability.  Again, since the object of the conspiracy is to provide
"expert advice and assistance" to *al Qa'ida*, the defendants' speech
and beliefs are not being punished, even though they utilized that
speech in order to provide expert assistance through their
"internet activity."[17]  The beliefs and speech which are going to

---

[17]Aiding *al Qa'ida* by providing personnel and expert advice
or assistance, were clearly the objects of the agreement amongst
the conspirators.  Even if there were no evidence of a direct
link to *al Qa'ida* (<u>i.e.</u>, if there were no evidence that, *inter
alia,* the Defendants translated and produced *al Qa'ida* videos,
text and media), that would not affect the sufficiency of the
proof that the Defendants *intended and agreed* to provide support
to *al Qa'ida*; in a conspiracy, the proof required is from the
point of view of the Defendants as conspirators and not whether
*al Qa'ida* reached out to the defendants or accepted or embraced
the defendants' agreement. <u>See</u>, <u>e.g.</u> <u>United States v. Kassir</u>,
2009 WL 2913651, at 9 (S.D.N.Y. 2009).  In any event, in this
case there will be evidence, for example, that the Defendants

be at issue in this case are not bases of criminal liability, but rather are evidence of the defendants' intent and understanding. Speech is often the best evidence of intent, and will be used extensively to demonstrate why and what the defendants had agreed (or attempted) to do.

To the extent that the latter theory of liability is that they produced, altered and disseminated materials over the internet in order to materially assist *al Qa'ida*, the content of those materials is largely irrelevant.  The content is only relevant to determining whether it was expert advice or assistance, and whether it was done with the requisite intent.  This is no restraint on speech -- only on supporting designated terrorist organizations.[18]

Courts faced with First Amendment challenges in material

---

worked on items originally released by *al Qa'ida*.

[18]When Section 2339B was amended in 2004, in the context of provision of defendants as "personnel", Congress clarified that pure advocacy of lawful activities was protected under the statute only if it was done entirely independent of the terrorist organization.  18 U.S.C. section 2339B(h).  See also Humanitarian Law Project.  Consequently, if advocacy was done as part of a tasked propaganda mission, there would be no question that Congress believed it to be within the scope of the statute.  See U.S. v. Taleb-Jedi, 566 F.Supp.2d 157 (E.D.N.Y. 2008)(denial of motion to dismiss 2339B indictment in case involving public affairs officer of designated terrorist organization).  First, as stated above, the government expects to present evidence that Mehanna was tasked (directly or indirectly) by individuals with direct and indirect connection to *al Qa'ida*.  In addition, in this case, the reasons are even stronger, if for no other reason that the charge (that involves *al Qa'ida*) is a conspiracy; therefore, the government needs to show only that the *agreement* was to engage in the activity to support *al Qa'ida*.

support cases have similarly looked at whether the defendant was advocating (or agreeing to advocate) for terrorist acts and whether they were intentionally providing one of the listed means of material support.  "The First Amendment provides no protection for the conduct of providing resources knowing and intending that they be used for crimes of violence." <u>United States v. Jayyousi</u>, 2007 WL 781373, at 2 (S.D. Fla. 2007) (citing <u>United States v. Sattar</u>, 314 F. Supp. 2d 279 (S.D.N.Y. 2004)).  In <u>Jayyousi</u>, a district court denied the defendants' motion to dismiss based on a claim that the indictment violated the First Amendment.  The court found that the defendants' use of a pro-Islamic newsletter "to recruit individuals to engage in jihad and ... facilitate the provision of aid and materials for terrorist and support groups" was not protected by the First Amendment in a case alleging that the defendant's were providing personnel (in the form of others) to engage in acts of terror.  <u>Id.</u> at 2.  Since there was abundant evidence as to the purpose and intended beneficiaries of their publication, the evidence of publication was admissible to demonstrate the defendant's intent, and the purpose of their activities (to provide personnel). <u>Id.  See also</u> <u>U.S. v. Mubayyid</u>, 476 F.Supp.2d. 46 (2007)(D.Ma. March 8, 2007)(Saylor, D.J.)(holding that publications and other expression can be overt acts in a conspiracy without Constitutional scrutiny)(<u>citing</u> <u>U.S. v. Rahman</u>, 189 F.3d 88, 117 (2nd Cir. 1999)("Notwithstanding that political

speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for ... speech-based offenses merely because one commits them through the medium of political speech or religious preaching").

In U.S. v. Hashmi, the Southern District of New York reinforced the government's position that provision of material support to a terrorist organization, by definition, could not implicate First Amendment rights of association and advocacy. 2009 WL 4042841 (S.D.N.Y. November 18, 2009). Citing to laws prohibiting associations for non-expressive conduct, i.e. anti-prostitution law, that court recognized that material support prosecutions serve purposes unrelated to the content of the messages which a defendant expresses. Hashmi, Id. at 9 (citing Arcara v. Cloud Books, Inc., 478 U.S. 697 (1989)). The Court rejected a Brandenburg claim in that case, stating, "the facilitation of terrorism is not protected by the First Amendment." Id.

In U.S. v. Taleb-Jedi, 566 F. Supp. 2d 157 (E.D.N.Y. 2008), the Eastern District of New York denied the defendant's motion to dismiss an indictment charging her with providing material support to Mujahedin-e Khalq (MEK) for her work serving as an admitted "press officer" for the organization in the United States. The court rejected the defendant's argument that the defendant's work

teaching English classes, translating documents, and "assisting in the dissemination of press releases and the furnishing of information to the media" was merely "legitimate political advocacy."  The court reasoned that her work was not unlike giving monetary support because there is "fungibility to service for a terrorist organization just like there is a fungibility to the funding of a terrorist organization." Taleb-Jedi, 566 F. Supp. 2d at 161-168.  The defendant's propaganda work provided important services to the MEK which "free[d] up others in a terrorist organization to engage in violence and other acts of terrorism." Taleb-Jedi, 566 F. Supp. 2d at 168.

Similarly, a defendant's use of the internet to support a designated organization does not change this analysis.  A District Court in New York found that the distribution of training manuals through a defendant's website was "firmly under the definition of providing "training" or "expert advice or assistance" under the [statute]." Kassir, 2009 WL 2913651, at 9 (also a Section 2339B case, *inter alia*, charged under a conspiracy theory).

## VII. Risk of Flight

It is worth repeating: the Defendant was arrested as he boarded a plane at Logan Airport with the intent to leave the United States for a job in Saudi Arabia.  Although he was born and raised in the United States, he is a dual citizen and he has stated

his intention to permanently leave the United States.[19]  See, e.g.,
Proffer at pages 36[20] and 38.[20]

Although the Defendant's parents reside and own a home in
Massachusetts, the Defendant's brother recently stated that the
Defendant's entire family is "quite eager to leave this country" as
a result of these criminal proceedings involving Tarek Mehanna.[21]

In this case, risk of flight is more than likely – flight is
a certainty.

## VIII.    Conclusion

The Defendant Tarek Mehanna, who agreed and attempted to aid

---

[19]Codefendant Abousamra essentially fled the country after
being interviewed by the FBI in 2006, and now lives beyond the
reach of U.S. law enforcement.  On February 25, 2007, the
Defendant discussed Abousamra's flight in a consensual recordings
with a cooperating witness.  Williams Affidavit at ¶77.

[20]On March 30, 2006, the Defendant wrote: 'join the club,
akhi ...the "I want to get out of here [the United States]"
club.'

[20]On May 12, 2006, Mehanna wrote: "as soon as I'm done w/
school ... I'm planning something called hijrah ... cause I don't
want to be offering my services ... to kuffar ... while Muslims
... are more in need of them ... esp. since ... these kuffar ...
many of them ... are at war w/ the Muslim countries ... so ...
it's on my mind 24-7."

[21]At a meeting in New York in or about December 2010, while
discussing his brother's criminal case, Tamer Mehanna stated:
"Personally, like, I know my family and I are very disappointed
in this country.  It's not like we didn't realize these things
happened before, but after this, I think my family's quite eager
to leave this country."  The entire statement can be viewed at
http://www.youtube.com/watch?v=r3kvn7UP2Bq.  The quoted excerpt
can be found at approximately 4:35.

those wishing to harm the United States and kill our soldiers overseas, who discussed committing acts of violence here in the United States[22], who conspired and attempted to obstruct terrorism investigations of the FBI, who has stated an intention to permanently leave the United States, should be detained pending trial because no conditions or combination of conditions will reasonably assure the appearance of the defendant or the safety of individuals and the community.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: /s/ Jeffrey Auerhahn
Jeffrey Auerhahn
Aloke S. Chakravarty
Assistant U.S. Attorneys

Date:      January 10, 2011

## CERTIFICATE OF SERVICE

I hereby certify that I have discussed this matter with counsel, and this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jeffrey Auerhahn
Jeffrey Auerhahn
Assistant U.S. Attorney

---

[22]Plans were abandoned *not* because they were wrong, but because they were not feasible.  See, e.g., Williams Affidavit at ¶¶43-47.