# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA      . CRIMINAL NO. 09-10017-GAO
                              .
          V.                  . BOSTON, MASSACHUSETTS
                              . NOVEMBER 18, 2008
 TAREK MEHANNA                .
      Defendant               .
. . . . . . . . . . . . . . . .
```

### TRANSCRIPT OF DETENTION HEARING
#### BEFORE THE HONORABLE LEO T. SOROKIN
#### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the government:    UNITED STATES ATTORNEY'S OFFICE
                       BY: Aloke Chakravarty, Esq.
                       Jeffrey Auerhahn, Esq.
                       One Courthouse Way, Suite 9200
                       Boston, MA  02210
                       617-748-3658
                       aloke.chakravarty@usdoj.gov
                       jeffrey.auerhahn@usdoj.gov


For the defendant:     J. W. Carney , Jr., Esq.
                       Carney & Bassil
                       20 Park Plaza
                       Suite 1405
                       Boston, MA 02116
                       617-338-5566
                       jcarney@carneybassil.com

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1                          **I N D E X**

2   **WITNESSES**        **DIRECT**     **CROSS**       **REDIRECT**        **RECROSS**

3   **Government's:**

4   Andy Nambu          9          13

5

6   **EXHIBITS**                **DESCRIPTION**                **IN EVIDENCE**

7      1              Affidavit in support of Complaint          11

8      2              Affidavit in support of detention          13

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    <u>P R O C E E D I N G S</u>

2        CASE CALLED INTO SESSION

3        THE CLERK:  Today is November 18th.  The case of

4    United States v. Mehanna, Docket Entry No. 08-148 will now be

5    heard before this Court.  Counsel; please identify themselves

6    for the record.

7        MR. AUERHAHN:  Good afternoon, Your Honor, Jeffrey

8    Auerhahn and Al Chakravarty for the United States.

9        THE COURT:  Good afternoon.

10       MR. CHAKRAVARTY:  Good afternoon.

11       MR. CARNEY:  Good afternoon, Your Honor, J.W. Carney

12   Jr.  With me is my colleague Steven Morrison for the defendant.

13       THE COURT:  Good afternoon.  Good afternoon,

14   Mr. Mehanna.  I have a couple questions cause I wasn't here at

15   the initial appearance.  Was Mr. Mehanna arraigned – oh, it's

16   on a complaint, right?

17       MR. AUERHAHN:  It's on a complaint, Your Honor.

18       THE COURT:  So you completed the initial appearance?

19       MR. CHAKRAVARTY:  Clearly a Rule 5, Your Honor.

20       THE COURT:  All right.  Mr. Carney, are you here by

21   appointment under the CJA Act or are you retained?  Or is

22   that--

23       MR. CARNEY:  By appointment, Your Honor.

24       THE COURT:  What'd you say?

25       MR. CARNEY:  By appointment, Your Honor.

4

1          THE COURT:  All right.  And did Judge Dein already

2   review a financial affidavit and formally appoint you or was

3   that deferred to today?

4          MR. CARNEY:  That was done before that, Your Honor.

5          THE COURT:  Oh.  All right.  You have a, either a –

6   you can provide after, Mr. Carney, that's fine.

7          MR. CARNEY:  Thank you, Your Honor.

8          THE COURT:  Just so I'm familiar with it either the,

9   isn't it under the docket number of the matter when that was

10  done.

11          MR. CARNEY:  I will, Your Honor.  Thank you.

12          THE COURT:  Okay.  Fine.

13          MR. CARNEY:  If I could just have one moment.

14          THE COURT:  Yup.

15      PAUSE

16          MR. CARNEY:  Thank you, Your Honor.

17          THE COURT:  All right.  Next, I got – I'm not sure if

18  this was, somebody submitted to me, one of the two of you, a

19  two page order.

20          MR. AUERHAHN:  It's a culmination, Your Honor.

21          THE COURT:  All right.

22          MR. AUERHAHN:  There was an assented to motion and I

23  believe Mr. Carney submitted--

24          THE COURT:  And Mr. Carney and Mr. Morrison signed

25  it.  There's a spot for your client to sign it, Mr. Carney.  If

1    he signs it I'm happy to sign it.

2           MR. CARNEY:  If it please the Court, I have another

3    copy of the protective order that has the defendant's signature

4    as well as the signatures of my secretary and legal assistant.

5    I would ask that the protective order be submitted under seal—

6           THE COURT:  All right.

7           MR. CARNEY:  --rather than have their names be

8    publicly available on the record.

9           MR. AUERHAHN:  We have no objection, Your Honor.

10           THE COURT:  Fine.

11           MR. CARNEY:  Thank you.

12           THE COURT:  I'll seal the protective order.

13           MR. CARNEY:  Your Honor, I'm handing you the

14    protective order.

15           THE COURT:  All right.  And, Mr. Mehanna, this

16    document that Mr. Carney just gave me you signed?

17           THE DEFENDANT:  Yes, that's correct.

18           THE COURT:  All right.

19           Mr. Carney, you've got to sign.

20           MR. CARNEY:  Oh.

21           THE COURT:  There's a place for your signature.

22           MR. CARNEY:  Actually the previous document that had

23    been submitted--

24           THE COURT:  Has your signature.

25           MR. CARNEY:  --has my original signature--

1          THE COURT:  And these are the same?

2          MR. CARNEY:  --and Mr. Morrison's.  Yes, they're

3   identical documents with simply the addition of other names.

4          THE COURT:  I understand.

5          MR. CARNEY:  For example if another lawyer in my

6   office becomes involved in the case I will have him or her sign

7   an identical copy--

8          THE COURT:  Right.

9          MR. CARNEY:  --of the protective order.

10          THE COURT:  All right.  The protective order is

11   entered and sealed and there are the two originals with all the

12   signatures.

13          All right, somebody, Mr. Chakravarty or Mr. Auerhahn,

14   one of you filed an envelope of documents.  Was that envelope

15   of documents for me to read or just to have on file?

16          MR. AUERHAHN:  Well we provided a copy of the

17   discovery that was provided to the defense.

18          THE COURT:  Okay.

19          MR. AUERHAHN:  But Your Honor should get a courtesy

20   of the same discovery.

21          THE COURT:  Okay. Fine.  All right.

22          MR. AUERHAHN:  Just one other thing, Your Honor.  I

23   did file electronically yesterday Agent Nambu's affidavit in

24   support of detention.

25          THE COURT:  I got that.

1          MR. AUERHAHN:  Okay.

2          THE COURT:  I've read that.

3          MR. AUERHAHN:  And we will introduce the original as

4     an exhibit today both a copy of the affidavit in support of the

5     complaint which is already in the record, but we'll mark it as

6     two exhibits for the purpose of detention and probable cause.

7          THE COURT:  All right.  I mean I'm happy to take

8     judicial notice of the complaint and have it serve as direct

9     testimony subject to cross examination.  If you want to

10     introduce another copy to complete the record in some fashion

11     that's fine but for my own purposes I don't need that.

12          MR. AUERHAHN:  Okay.

13          THE COURT:  All right, so we – anything else,

14     Mr. Carney, before we proceed to the detention hearing?

15          MR. CARNEY:  Yes, Your Honor.  I had submitted a

16     motion to the Court for release on bail.

17          THE COURT:  I've got that.

18          MR. CARNEY:  With attachments.

19          THE COURT:  I just read it--

20          MR. CARNEY:  And--

21          THE COURT:  This.

22          MR. CARNEY:  --what – what I would, yes, Your Honor.

23     What I was not able to include were letters of support in the

24     form of character letters.  I have provided them to the

25     government and I would like to offer the originals to Your

8

1    Honor.

2            THE COURT:  Fine.  I'll take them.

3            You guys can – we're going to pause one minute in

4    this case.  You can all stay right there and just, Ms. Sullivan

5    and Mr. Dempsey, why don't you come forward and we'll just take

6    care of that status conference so you can be on your way.

7        PAUSE

8            THE CLERK:  The Mehanna session is back in session.

9            THE COURT:  Okay, so I have those letters, Mr.

10   Carney.  I will read them.  Mr. Chakravarty or Mr. Auerhahn,

11   could you remind me cause I wasn't at the initial appearance,

12   what were the bases that you are moving on for detention?

13           MR. AUERHAHN:  Under 3142(f)(2)(A) and (f)(2)(B).

14           THE COURT:  All right.

15           MR. AUERHAHN:  The risk of flight as well as risk

16   of--

17           THE COURT:  And under (f)(2)(A) which subsection

18   would this be?

19           MR. AUERHAHN:  Which subsection--

20           THE COURT:  It is, in other words—

21           MR. AUERHAHN:  (A) is the subsection of a serious

22   risk that a person will flee.  (f)(2)(B) is a serious--

23           THE COURT:  Oh, just flight.  I'm sorry.

24           MR. AUERHAHN:  Right.  Right, I'm sorry, yes, the

25   statutory presumes--

1        THE COURT:  You're moving on just flight and

2  obstruction?  Okay, I got it.  Okay.  Go ahead.

3        MR. AUERHAHN:  The United States calls Special Agent

4  Andy Nambu.

5        GOVERNMENT WITNESS, ANDREW NAMBU, SWORN

6                    DIRECT EXAMINATION

7  BY MR. AUERHAHN:

8  Q.   Sir, can you please identify yourself for the record

9  giving us your full name and spelling your last name?

10  A.   Andrew B. Nambu, N-A-M-B-U.

11  Q.   And how are you employed, sir?

12  A.   Yes, I am.

13  Q.   How are you employed?

14  A.   With the FBI.

15  Q.   And just very generally what's the general investigative

16  jurisdiction of the FBI?

17  A.   Covers federal violations under Title 18.

18  Q.   And are you assigned to the JTTF?

19  A.   I am.

20  Q.   And again generally what's the investigative jurisdiction

21  of JTTF?

22  A.   Generally we investigate persons who may be involved in

23  terrorist organizations and things of that nature.

24  Q.   Does that include crimes committed overseas by both U.S.

25  citizens and others?

10

1  A.   Yes.

2  Q.   Now specifically with reference to an individual named

3  Daniel Maldonado, is he the target of an FBI investigation?

4  A.   He was.

5  Q.   And was it an FBI investigation by the JTTF?

6  A.   Yes.

7  Q.   Here or elsewhere?

8  A.   It was not in Boston.  It was elsewhere?

9  Q.   Now in connection with the investigation that resulted in

10  the arrest of Tarek Mehanna were you the case agent on that

11  investigation?

12  A.   No.

13  Q.   But were you on the same squad that, out of which that

14  investigation was conducted?

15  A.   Yes.

16  Q.   Now sir, you weren't the case agent but were you the

17  affiant in support of the complaint in this matter?

18  A.   Yes, I was.

19        MR. AUERHAHN:  And if I can approach, Your Honor?

20        THE COURT:  You may.  You don't have to ask again?

21        MR. AUERHAHN:  Thank you.

22  BY MR. AUERHAHN:

23  Q.   I've placed before you Exhibit 1 and did you recognize

24  what that is?

25  A.   Yes.

11

1    Q.   And is that your affidavit in support of a complaint in

2    this matter?

3    A.   Yes, it is.

4    Q.   And sir, I had, in the affidavit in support of a complaint

5    you talk about an interview with the defendant on December 16,

6    2006; is that correct?

7    A.   Yes.

8    Q.   And as of that day was Daniel Maldonado the target of the

9    investigation you earlier referred to?

10   A.   Yes.

11   Q.   Okay.

12        MR. AUERHAHN:  And, Your Honor, although you stated

13   earlier you take judicial notice just for the record--

14        THE COURT:  You'd offer.  Any objection?

15        MR. CARNEY:  No, Your Honor.  Thank you.

16        THE COURT:  All right, Exhibit 1 is in evidence.

17        GOVERNMENT EXHIBIT NO. 1, ADMITTED

18   BY MR. AUERHAHN:

19   Q.   Now in connection with the warrant that was issued as a

20   result of the issuance of the complaint in this matter, was an

21   individual arrested on Saturday November 8, 2008?

22   A.   Yes.

23   Q.   And who was that individual?

24   A.   Tarek Mehanna.

25   Q.   And is he in the courtroom today?

12

1   A.   Yes.

2   Q.   Can you identify him to the Court and the record, please?

3   A.   He's the gentleman sitting in the green shirt.

4        MR. AUERHAHN:  May the record reflect he's identified

5   the defendant?

6        THE COURT:  Yes.

7   BY MR. AUERHAHN:

8   Q.   Now, sir, let me place before you Exhibit 2.  And do you

9   recognize what that is?

10  A.   Yes.

11  Q.   What is that?

12  A.   This is the affidavit that we filed today for detention.

13  Q.   Okay.  And that one is the signed original signed by you?

14  A.   Yes.

15  Q.   And it's based on information you received some of which

16  came to your possession during the day of the arrest and

17  subsequent information?

18  A.   Yes.

19  Q.   As well as information before the arrest?

20  A.   Correct.

21       MR. AUERHAHN:  Your Honor, I would move into evidence

22  Exhibit 2.

23       THE COURT:  Any objection?

24       MR. CARNEY:  No objection, Your Honor.  Thank you.

25       THE COURT:  All right, it's in evidence.

13

1       GOVERNMENT EXHIBIT NO. 2, ADMITTED

2            MR. AUERHAHN:  And, Your Honor, for these purposes I

3   rely on the submissions and Mr. Carney can cross examine.

4            THE COURT:  All right.  Go ahead, Mr. Carney.

5            MR. CARNEY:  May I have one second please, Your

6   Honor?

7            THE COURT:  You may.

8       PAUSE

9                        CROSS EXAMINATION

10  BY MR. CARNEY:

11  Q.   Good afternoon, Agent Nambu.

12  A.   Good afternoon, sir.

13  Q.   You have discussed the case and the investigation with the

14  case agent in this matter, haven't you?

15  A.   I have.

16  Q.   I have a few questions concerning the investigation.  You

17  related both orally today, sir, and in your affidavit that

18  colleagues of yours in the JTTF made a decision to seek out

19  Mr. Mehanna and question him; is that correct?

20  A.   Yes.

21  Q.   When was that decision made to go see Mr. Mehanna?

22  A.   Precisely I'm not sure.

23  Q.   To the best of your knowledge how many hours or days

24  before December 16th was it, the decision made?

25  A.   I don't know the answer to that.

14

1   Q.   Do you know--

2           THE COURT:  I'm sorry, December 16th of which year?

3           MR. CARNEY:  2006, Your Honor.

4           THE COURT:  That's the date of the – oh, that's the

5   interview of the FBI after the phone call?

6           MR. AUERHAHN:  Correct, Your Honor.

7           THE COURT:  A couple days after the phone call?

8           MR. CARNEY:  Yes, Your Honor.

9           THE COURT:  Okay.  Go ahead.

10          MR. CARNEY:  The statements made allegedly by Mr.

11  Mehanna on December 16th--

12          THE COURT:  That form the basis--

13          MR. CARNEY:  --2006 that form the basis of the

14  complaint.

15  BY MR. CARNEY:

16  Q.   Do you know approximately how early or before December 16th

17  the decision was made?

18  A.   I don't.

19  Q.   What was the reason why the agent wanted to speak to

20  Mr. Mehanna?

21          MR. AUERHAHN:  Objection.

22          THE COURT:  Why is that relevant, Mr. Carney?

23          MR. CARNEY:  Because it may put in context the

24  materiality of the interview.

25          THE COURT:  I'm – maybe I'm just missing it.  In –

1    how?

2          MR. CARNEY:  Maybe the materiality will be more

3    apparent as I continue with my questions.

4          THE COURT:  All right.

5          MR. CARNEY:  So if I may hold off on this one--

6          THE COURT:  Fine.

7          MR. CARNEY:  --and proceed down the path I might

8    illuminate it--

9          THE COURT:  Sure.

10          MR. CARNEY:  --more.

11          THE COURT:  All right.

12   BY MR. CARNEY:

13   Q.   When the agents made the decision to go and see

14   Mr. Mehanna what did they want to ask him about?

15   A.   As I--

16          MR. AUERHAHN:  Objection.  The issue is what they

17   asked him, actually more important really than what they asked

18   him the issue is what he said to them and whether he knew it

19   was untrue.  What their state of mind with reference to why

20   they asked certain questions or what they were asking him

21   doesn't seem to go to the issue of materiality of his false

22   statement.

23          THE COURT:  Is the materiality argument basically

24   that they already knew everything that--

25          MR. AUERHAHN:  I'm sorry, Your Honor?

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

16

1          THE COURT:  I'm asking Mr. Carney, is the

2   materiality argument that they already knew those things that

3   he didn't tell him, that he did not tell them but presumably

4   would have told them if in fact this is a true charge and if in

5   fact he were telling the truth and therefore--

6          MR. CARNEY:  Yes, sir.

7          THE COURT:  --it's not material?

8          MR. CARNEY:  Yes, sir.  And the only way that I can

9   establish that is what did they want to ask him and what did

10  they know before they did.

11         THE COURT:  Well presumably what they wanted to ask

12  him is what they did ask him, right?

13         MR. CARNEY:  Well, I guess I'm just trying to lay the

14  foundation.  I can skip this question too and we'll go to the

15  next one.

16         The COURT:  Why not just ask him what they did ask

17  him and if they asked him or if they already knew what,

18  whatever it is that would render it not material?  I think

19  their state of – I understand why you were going to their state

20  of mind but maybe you can get there more directly and--

21         MR. CARNEY:  All right.

22  BY MR. CARNEY:

23  Q.   The agent asked him about his trip to Yemen on that

24  occasion?

25  A.   Yes.

1   Q.   And what was the reason they wanted to ask those

2   questions?

3            MR. AUERHAHN:   Objection.   Again, Your Honor, he's

4   charged with lying with reference to Daniel Maldonado.   The

5   issue is what he said and whether or not it was true and

6   whether he knew it was untrue not--

7            THE COURT:   Well is there a materiality element in

8   1001?

9            MR. AUERHAHN:   I'm sorry?

10            THE COURT:   Is there a materiality element in 1001?

11            MR. AUERHAHN:   Yes, but I think Mr. Car – well first

12   of all he's asking about questions other than the Maldonado lie

13   which is relevant to this case.   So that's my first objection

14   to this particular question.   But secondly in terms of would it

15   have affected their investigation, that's an obstruction

16   question.   That's not a materiality question.   The question is

17   whether or not the false information he provided--

18            THE COURT:   But that would go to whether or not he

19   should be detained for obstruction, wouldn't it?

20            MR. AUERHAHN:   But, well whether or not – in terms of

21   the objection prong we're alleging is that there's a danger

22   that he might try to influence or intimidate witnesses in this

23   case and since there are cooperating witnesses who are, who

24   have the potential of being intimidated or otherwise obstructed

25   that's a different question than whether or not in fact by his

18

1    false answer he completely obstructed the FBI.

2         THE COURT:  So you're not making any detention

3    argument that he had any intent to obstruct at that time?

4         MR. AUERHAHN:  Well he had, he provided false

5    information because he intended to protect his friend who was

6    in Somalia fighting on behalf of al-Qaeda and aligned forces.

7    So, but what I'm saying is we don't have to prove that he in

8    fact obstructed the investigation which is what Mr. Carney's

9    arguing.  We do believe he had the intent to do so but we don't

10   have to prove that he in fact obstructed the investigation

11   which is what Mr. Carney's saying.  In other words he's saying

12   well if they already knew everything then he didn't obstruct

13   their investigation but that's a different--

14        THE COURT:  Is that what you're saying?

15        MR. CARNEY:  No.

16        THE COURT:  What are you saying?

17        MR. CARNEY:  I don't have those words put in my

18   mouth.  What I do want to say is the government thought all of

19   these areas were relevant enough to put in their affidavit

20   before you.  They discussed or they put in the affidavit that

21   they discussed with my client his travels to Yemen.  So that

22   the government says that's relevant to put in direct

23   examination, but when I ask about it on cross examination it

24   suddenly is irrelevant?  I submit that just because the

25   government wants to limit the cross examination to a particular

1   area that's not proper if they have opened up that area on

2   direct examination which they've done by submission of the

3   affidavit.

4           MR. AUERHAHN:  Your Honor, I apologize but I don't

5   believe we addressed the other aspects of the interview on

6   December 16th in any of the affidavits.  I think we've very

7   narrowly focused on the information with reference to

8   Mr. Maldonado.  Perhaps Mr. Carney can point to a sentence or

9   paragraph that I've overlooked.

10          THE COURT:  What about that?

11          MR. CARNEY:  Well if that's true then I stand

12   corrected.

13          MR. AUERHAHN:  Your Honor, in fact on paragraph eight

14   of the affidavit--

15          THE COURT:  This is the complaint affidavit?

16          MR. AUERHAHN:  Of the complaint affidavit we

17   specifically say although much of the interview concerned a

18   trip by Mehanna and two other individuals to Yemen in 2004

19   Maldonado was asked, also asked about Daniel Maldonado.  So we

20   clearly are focusing directly on the false information about

21   Maldonado and not on anything he was asked or answered with

22   reference to the Yemen trip.

23          MR. CARNEY:  Then I, I'm correct, they did mention

24   that they asked him a lot of questions about Yemen.

25          The COURT:  Right, but that parenthetical doesn't

20

1   really – if I struck that from the complaint affidavit it

2   would make no difference to any of the analysis here.  What I

3   understood that to be when I read it was simply we talked to

4   him about a lot of other things and what we really want to tell

5   you about is this and in the way that they say in the

6   affidavit, I think they say it in this one, if not it's said in

7   almost all of them, there's a lot of other evidence but we're

8   not telling you all of it, we're only telling you what we want

9   to rely on.  The other evidence they didn't tell me about is

10  not before me.

11        MR. CARNEY:  I respectfully submit that if this

12  criminal case is based on a single conversation at, with my

13  client on December 16, 2006 and the government adverts to that

14  conversation in its affidavit I should at least be given the

15  leeway to ask questions about that very conversation between

16  the agent and the defendant.

17        THE COURT:  So what's the question again?

18        MR. CARNEY:  Did you discuss with him the subject of

19  his recent trip to Yemen.  Answer, yes.  Why did you talk to

20  him about his trip to Yemen?

21        THE COURT:  I guess the, the what would be more – I'm

22  just wondering about the why.  Why do I care what, no

23  disrespect to the agent but what difference does it make to me

24  what was in the agent's mind?

25        MR. CARNEY:  Because that might have had a material

1  relation to an investigation.  And if all of that information

2  were true--

3          THE COURT:  I mean if they'd asked him about Yemen

4  and--

5          MR. CARNEY:  --then it may suggest Maldonado was a

6  throw away.

7          THE COURT:  Well I mean they had another

8  investigation.  They had other things they were investigating.

9  They asked him about those other things and he told the truth

10  about them.  The inference is cause it's not in the complaint

11  affidavit and otherwise not charged and that--

12          MR. CARNEY:  And Maldonado was a throw away question.

13  That was not really material.

14          THE COURT:  All right, I see the argument.

15          MR. CARNEY:  I'm not going to do a search and destroy

16  mission on Yemen.

17          THE COURT:  Right.

18          MR. CARNEY:  I'm just trying to set the stage for

19  what was discussed.

20          THE COURT:  There seems to be some relevance to that.

21  It might not be, I'm not saying that I rely on it or not but

22  it's an argument that has some relevance.  Why can't he do

23  that?

24          MR. AUERHAHN:  Again, Your Honor, I think the issue

25  is was the statement he made, even if it was they were walking

22

1    out the door and oh by the way one more question.  I'm not

2    saying that's what happened.

3              THE COURT:  No, I understand.

4              MR. AUERHAHN:  But even if it were the issue is what

5    did he tell them?  Was it true?  Did he know it was a lie?

6    That's point number one.  Point number two, the agent has

7    testified that Daniel Maldonado on December 16, 2006 was the

8    subject of a JTTF investigation by Houston FBI.  So whether it

9    was a throwaway line because it wasn't the principle focus of

10   the--

11             THE COURT:  Why don't you do this--

12             MR. AUERHAHN:  --questioning or not is irrelevant.

13             THE COURT:  Mr. Carney, I mean I guess the first

14   instance will be more it seems to me to that argument you're

15   making more relevant to me is, you know, how much of the time

16   was – those kinds of questions rather than just what was in

17   his, what was in their head.  I'm assuming that everything they

18   asked him about related to some investigation or investigations

19   that they were undertaking.  I assume they did not ask him any

20   questions that were in their mind unrelated to something they

21   were investigating at all.

22             MR. CARNEY:  May I test that assumption?

23             THE COURT:  Yes.

24   BY MR. CARNEY:

25   Q.   Was the fact that Mr. Mehanna had gone to Yemen part of an

23

1    active investigation by TTF?

2    A.    The JTTF, sir?

3    Q.    JTTF, I'm sorry.

4    A.    Not being the case agent I'm not sure what the focus was

5    other than--

6    Q.    To the best of your knowledge about this entire case was

7    Mr. Mehanna under investigation because of his trip to Yemen?

8              MR. AUERHAHN:  Objection, Your Honor.

9              THE COURT:  All right, what's the objection?

10             MR. AUERHAHN:  The objection is it's irrelevant to

11   even the issue of – it goes back to what Your Honor suggested

12   which is the purpose of their questions isn't relevant to

13   whether the statement that's before you that's the subject of

14   the complaint, whether that was material.  If Mr. Carney wants

15   to ask in an artful way whether the statements made by the

16   defendant were material to the FBI that's--

17             THE COURT:  Well but he's entitled to test the

18   material is he not, right, not just ask the ultimate question,

19   right.  Right, I mean in the end materiality is some sort of

20   legal factual determination and he doesn't only have to ask

21   the--

22             MR. AUERHAHN:  Correct, but the materiality of other

23   statements in an interview conducted by the FBI which clearly

24   spanned more than just the questions about Mr. Maldonado I

25   can't see how that would either impeach the witness and/or

24

1    impeach the materiality of the Maldonado statements which is

2    really what's at issue here.  The danger here is that we're

3    attracting the Court with and discussing other aspects of this

4    case which have nothing to do and it's very much focusing on

5    the relevancy to this case which is that the question of

6    whether there's probable cause and whether any of this goes to

7    the detention decision.

8            THE COURT:  All right.

9            MR. AUERHAHN:  And I cannot see how--

10           THE COURT:  I'll sustain that objection.  Go to the

11   next question, Mr. Carney.

12           MR. CARNEY:  So I'm not able to ask if what Your

13   Honor said was an assumption was indeed true which is all I'm

14   trying to ask.  Your Honor said well I assume that blah, blah,

15   blah and I said let's test it.

16           THE COURT:  I'm no longer assuming.

17           MR. CARNEY:  And I will ask him.

18           THE COURT:  I'm no longer assuming that.  I think I

19   assumed too quickly.

20   BY MR. CARNEY:

21   Q.   What did the defendant say about his trip to Yemen?

22   A.   As I recall from the report I believe it was a trip to

23   study for education purposes.

24   Q.   And what questions did the agent ask him in follow up to

25   that?

25

1  A.   I don't know.

2  Q.   Have you read the report regarding--

3  A.   I did.

4  Q.   --the interview with Mr. Mehanna?

5  A.   I did.

6  Q.   Did it include information about Yemen?

7  A.   It did.

8  Q.   That was a subject that they were questioning him about,

9  correct?

10 A.   Yes.

11 Q.   Do you know if that was because that subject was under

12 active investigation by your unit?

13         MR. AUERHAHN:   Objection.

14         THE COURT:   Just remind me again, Mr. Carney, despite

15 all this back and forth with everybody why would it matter if

16 it is or is not under an active investigation if he knows?

17         MR. CARNEY:   Because if the focus of questioning Mr.

18 Mehanna--

19         THE COURT:   Was something other than--

20         MR. CARNEY:   --were about Yemen and that's what the

21 majority of the time was spent talking about with Mr. Mehanna

22 and the question about Mr. Maldonado was simply almost an off

23 the cuff question then it would tend to show that the Maldonado

24 question whether the question or the answer was not material to

25 whatever investigation was going on in that regard.

26

1      MR. AUERHAHN:  Your Honor--

2      MR. CARNEY:  Whereas if Yemen was a ruse to distract

3  the defendant and the real focus was on Maldonado then that

4  would be different and I'm trying to establish that by

5  reviewing the only conversation that is critical in this entire

6  case.

7      THE COURT:  I think you can review whatever you want

8  in terms of what was asked, what was discussed, how much time

9  they spent, how they asked the question, what other questions

10 they asked.  The - as to whether they were investigating other

11 things in terms of probable cause I don't see that that

12 matters.  They've averred that this matter was under

13 investigation and I understand the larger argument that you're-

14     MR. CARNEY:  I mean Your Honor is talking about

15 whether my questions are material to this hearing.  The way a

16 determination is made about whether these questions are

17 material to this hearing is based on, respectfully, what's in

18 Your Honor's head, what you're thinking is.  If you think it's

19 material, it's material.  If you don't think it's material,

20 it's not material.  So as to whether--

21     THE COURT:  I don't need to know about the other

22 investigations.

23     MR. CARNEY:  I understand, Your Honor.  But my point

24 is that it's not based on what I say and what the answer is

25 solely.  It's based on what are you looking for in the context

27

1    of this hearing.  Well, it's the same analogy when you're

2    talking about these agents.

3              THE COURT:  Mmm-hmm.

4              MR. CARNEY:  It's not just what was said and what was

5    the question, what was the answer.  If you're going to explore

6    materiality then what was in your head?  What were you focused

7    on in this conversation?  What was going to be material to your

8    conversation?  For example, was it material if they asked

9    about--

10             THE COURT:  I don't think of materiality as a measure

11   of how material it was to what they were thinking at that

12   moment in their head as much as was it material to an

13   investigation they were undertaking.  They have averred that

14   they were undertaking an investigation into this matter that

15   was the subject of at least one or two questions of your client

16   according to the complaint affidavit.  So that's how I would be

17   thinking about materiality in terms of this hearing.  So--

18             MR. CARNEY:  I would agree.  And so in order to

19   explore that I should have some limited leeway on cross

20   examination to ask them about this conversation not just--

21             The COURT:  I think you can ask him about the

22   conversation but I'm not that interested in to the extent that

23   other things were asked and you can ask him about the other

24   things that were asked but I'm not that interested in whether

25   those were the subject of active investigations or not.  Or

1    became, I don't know if they were at the, before, during or

2    after.

3              MR. CARNEY:  If they were the focus of the

4    investigation and they took up nine-tenths of the conversations

5    and the question about Maldonado took up one one-hundredth of

6    the conversation does that raise a question about how

7    material--

8              THE COURT:  You can ask that.  I haven't overruled

9    you from asking that.

10             MR. CARNEY:  All right.

11   BY MR. CARNEY:

12   Q.   What percentage of the conversation focused on his travel

13   to Yemen?

14   A.   I don't know.

15   Q.   What percentage of the conversation focused on his

16   knowledge of Maldonado?

17   A.   I don't know.

18   Q.   What were the questions asked of Mr. Mehanna regarding

19   Yemen?

20   A.   I believe the question was if he had traveled and the

21   purpose of that travel.

22   Q.   Was that the only one or two questions?

23   A.   Umm, if I looked at the report that would refresh my

24   memory.  I don't know.

25             MR. CARNEY:  Fine by me with Your Honor's permission?

29

1              THE COURT:  No problem.  Does--

2              MR. AUERHAHN:  Your Honor, the witness stated that he

3    read the report.  He did not state that he read the report for

4    the preparation of this hearing or to these affidavits.  Asking

5    him to read the report and then disclose what's in the report

6    would be simply a vehicle for discovery for Mr. Carney of the

7    report and--

8              THE COURT:  The report hasn't been turned over?

9              MR. AUERHAHN:  No.

10             THE COURT:  Oh.  Oh, I assumed that it had but I'm

11   sorry.

12             MR. AUERHAHN:  So I don't--

13             MR. CARNEY:  He would've answered the question--

14             THE COURT:  So I'm confused as to the status.  The

15   report of the interview has not been turned – none of it's been

16   turned, no portion of the reports been turned over or?

17             MR. AUERHAHN:  The report of the interview of--

18             THE COURT:  Of the defendant.

19             MR. AUERHAHN:  No, it has not been turned over.

20             THE COURT:  Okay.  And was he the, he's not the

21   affiant on the affidavit?

22             MR. AUERHAHN:  Yes, he is.

23             THE COURT:  In the complaint,--

24             MR. AUERHAHN:  Yes.

25             THE COURT:  --he is?  What's the source of his

30

1  knowledge of the information regarding the information in the

2  complaint?

3          MR. AUERHAHN:  We can certainly ask him but it's my

4  understanding that it's a conversation with the case agents.

5  And as indicated in terms some of the other items sometimes

6  he's looking at, for example, excerpts of transcripts of

7  consensual recordings and such.

8          THE COURT:  In terms of the interview were you

9  present at the interview of the defendant?

10          THE WITNESS:  No, Your Honor.

11          THE COURT:  On December 16th, you were not?

12          THE WITNESS:  No, Your Honor.

13          THE COURT:  And have you reviewed the, have you ever

14  seen the report?  Let me put it this way, in terms of preparing

15  this and the statements you made in the complaint affidavit to

16  the extent that you made statements regarding what happened in

17  the interview what was the basis for those statements?

18          THE WITNESS:  That would be based upon portions of

19  the 302 or the results of interview transcripts of consensual

20  recordings.

21          THE COURT:  In terms of what he said to the two

22  agents or however many agents it was that interviewed him on

23  that day, December 16th--

24          THE WITNESS:  Yes.

25          THE COURT:  --what was the basis for your statements

1    in the affidavit about that?

2            THE WITNESS:  That would be the written report, Your

3    Honor.

4            THE COURT:  I see.  All right.

5            MR. AUERHAHN:  I apologize, Your Honor.  I stand

6    correct.  It was my understanding that he did not read the 302,

7    the report.

8            THE COURT:  All right.  Does that, is that the only

9    basis or did you also talk to the agents about what happened in

10   the interview?

11           THE WITNESS:  Your Honor, I stand corrected.  I'm

12   thinking of another report.  It was not that of Tarek Mehanna.

13           THE COURT:  What report, what did you base your

14   statements in the affidavit on about the interview of

15   Mr. Mehanna?

16           THE WITNESS:  For that interview that would have been

17   discussions with the case agents.  I apologize, I stand

18   corrected.  It was another report that I read.

19           THE COURT:  And not the 302?

20           THE WITNESS:  Not the 302 of Tarek Mehanna.

21           MR. AUERHAHN:  Your Honor, I'm glad for that

22   clarification because I believe the 302 he's referring to that

23   he actually read and relied on is excerpts of the 302 of an

24   interview with Maldonado.  Those excerpts are part of the

25   discovery in this case.  We did turn over that because even

1    though I don't suggest we're necessarily required to under the

2    rules but since he relied on excerpts of 302s of Maldonado as

3    part of, in advance of preparing the affidavit, we did turn

4    over those excerpts and provided them in discovery both to the

5    Court and the defense.  The 302 of the interview of Mehanna was

6    not reviewed by this agent.

7            MR. CARNEY:  It's a little shocking where the

8    defendant is charged with this federal crime and has been held

9    in custody since his arrest based on a conversation that he had

10   with these agents that I'm not permitted to get leeway to ask

11   about that conversation.  And this idea that we'll give you a

12   sentence from here and a sentence from there and therefore deny

13   me the ability to ask this agent just the basic facts of the

14   conversation that occurred indeed I'm taking--

15           THE COURT:  What about--

16           MR. CARNEY:  --my advice from Your Honor when you

17   said why don't I ask him about it.  And so I'm asking about it

18   and I think that cross examination would have been done a half

19   an hour ago if I could just ask this agent the questions about

20   this conversation.

21           THE COURT:  What about that.  Now we're talking about

22   what was – I mean he's charged with the crime of making a false

23   statement in the course of an interview with one or more FBI

24   agents for not just a detention hearing but a probable cause

25   hearing.  It would seem in the ordinary course that the context

1    of those statements, that is not just the question and answer

2    that would form the basis for the charging instrument but the

3    entire conversation, the entire interview, would at least be

4    subject to cross examination and available.  It might be

5    meaningful if it was a two and a half hour interview, I don't

6    know if it was, of the two and a half hour interview none of

7    which focused on Mr. Maldonado and literally be, oh by the way

8    one question.  It may well support the charge but it would be a

9    different context then if it was a 20 minute interview and

10   somebody walked in and said this is what we're going to talk to

11   you about, this is the topic, here's this, boom, ask these

12   questions.  You understand.  I mean this isn't rocket science.

13        MR. AUERHAHN:  But, Your Honor, you know as we say in

14   the affidavit in support of the complaint or as the agent says,

15   much of the interview concerned something else.  I mean that

16   is--

17        THE COURT:  Yeah.  No, I understand that.

18        MR. AUERHAHN:  And then there, you know, he was shown

19   a photograph.  He acknowledged how long he knew him, when he

20   had last seen him, when he had last spoken to him, what he was

21   doing, the nature of their contact and when they last spoke on

22   the telephone, where he was living.  So the, you know, the

23   context in terms it wasn't, oh by the way where's Daniel

24   Maldonado, is set forth that that was not what--

25        THE COURT:  But that's the - right.  Yes, I

34

1   understand but that's, but that's one side context and that

2   might be at the end of the day the context that I rely upon.

3   But he wants to test that.

4          MR. AUERHAHN:  But that's point number one.  Point

5   number two, again, I mean if it were a 200 page transcript of

6   testimony in the grand jury and on page 75 the witness asked

7   and answered a question untruthfully and we could prove they

8   knew it was untruthful, it would still be the basis of a

9   perjury count even though it was only on page 70 whatever of a

10  100 page transcript.

11         THE COURT:  But it might be a basis for cross

12  examination that would enter into the process before somebody

13  came to the conclusion that the statement was made with all the

14  requisite requirements necessary to support the charge.  And

15  for that they might want to see the rest of the transcript and

16  might be entitled to ask about that.

17         MR. AUERHAHN:  Your Honor, most respectfully, not at

18  a probable cause hearing.  Certainly at trial, you know,

19  there's different factors, different circumstances, different

20  issues of discovery but this is a probable cause hearing as to

21  whether or not the statements he made about Maldonado in fact

22  were untrue and whether he knew they were untrue.  Limit it to

23  that.

24         MR. CARNEY:  I submit that it's not limited to that.

25  If the statements were not material to the investigation then

35

1   they don't meet the criteria for a false statement.  If he

2   asked my client did the Red Sox win last night and my client

3   says, yes, they did and it turns out that they didn't, I don't

4   think he'd be sitting here because it would not be material to

5   the federal investigation.  In order for me to put this into

6   context I'm just trying to elaborate on the conversation so

7   that we can see if it was the focus of the investigation or if

8   a hour and a half interview preceded the one minute of

9   questioning that the government has just elicited, has just

10  pointed to in the transcript.

11          MR. AUERHAHN:  But again materially--

12          MR. CARNEY:  You can ask the questions and get the

13  answers that he just referred to in less than a minute.  Indeed

14  he just recounted them to Your Honor in probably 15 seconds so

15  let's hear about the rest of the interview.

16          MR. AUERHAHN:  Again, he wants the discovery of the

17  rest of the interview.  He's not focusing on the answers to the

18  questions about Maldonado.  And let's not forget this is an

19  individual, you have further information from Maldonado who

20  subsequently pled guilty to receiving terrorist training from

21  al-Qaeda.  So the issue of materiality as to the fact that he

22  was in Somalia fighting Jihad at the time--

23          THE COURT:  Is the discovery issue one that is a

24  question of timing?  Or is this an issue that I'm going to see

25  again and let's suppose that he is indicted at some point in

1   time, and let's suppose then we're in the ordinary discovery

2   phase of the case am I--

3          MR. AUERHAHN:  Ordinary discovery is statement to

4   the, by the defendant to people known to him to be law

5   enforcement is part of automatic discovery so the entirety of

6   the 302 would then be turned over.  But at this stage of the

7   proceeding--

8          THE COURT:  So it's a timing question?

9          MR. AUERHAHN:  Yeah.  At this stage--

10          THE COURT:  So in other words you don't anticipate

11   seeking as would potentially be your right in some

12   circumstances under Rule 16 to not disclose the statements of

13   the defendant?

14          MR. AUERHAHN:  Not with reference to this 302.  But I

15   do want to say again, at this stage of the proceedings, 1) I

16   don't believe any of the Rules of Discovery or Rules of

17   Evidence that might otherwise require discovery--

18          The COURT:  No--

19          MR. AUERHAHN:  --of limited portions of documents

20   would apply.  But even if they would apply as we, without being

21   required to do so turned over excerpts of other 302s, it would

22   only be the excerpt of the conversation about Maldonado that we

23   would turn over.  If we were to follow - if he had read it, if

24   he had relied on it, if we followed the same discovery rule

25   that we imposed on ourselves, we would only turn over the

1   portions that related to Maldonado, not the rest of the 302

2   cause that's not the subject matter of his direct testimony.

3        MR. CHAKRAVARTY:  Your Honor, I basically second that

4   proposition.  This is a probable cause hearing.  Of course at

5   trial where the materiality, that statement, the context of the

6   statement is much more at issue--

7        THE COURT:  I guess the thing that, the analogy I

8   sort of think of, if you said he committed perjury at a trial,

9   you said question, answer, and the defense attorney then said

10  well I'd like to examine him as to why he was testifying, what

11  the trial was about, what court it was in.  Those would seem to

12  be potentially, even at the much lower standard of a probable

13  cause hearing, relevant questions.  And so – they might not be

14  the most probative.  They might not be as probative as the

15  ones, as the points that you suggest, Mr. Auerhahn, about what

16  was the question, what was the answer, was it truthful or not?

17  But they would be--

18       MR. CHAKRAVARTY:  They're relevant in that

19  circumstance, if I may just finish that thought--

20       THE COURT:  Yes.

21       MR. CHAKRAVARTY:  --because they go to the ultimate

22  issue of materiality, whether it was proof beyond reasonable

23  doubt that those statements made to the government agent were

24  made in court were material to the proceeding or whatever.

25  Here the question for you is whether there was sufficient

38

1   probable cause.  And anything that negates that probable

2   cause, you know, to the extent that it does negate the probable

3   cause there is an argument to be made along the lines you're

4   suggesting.

5           The confusion here I think, Your Honor, and the

6   reason why we've now been spending some time on this I think

7   has been the discovery questions.  And I think Agent Nambu had

8   testified because we gave a volume of discovery to the defense

9   and it was selective, it had certain excerpts of 302s, it had

10  the material that essentially the witness read and prepared for

11  before preparation for this proceeding.  There may be an

12  appearance that we've been a little fast and cute with what

13  we've produced because we have not produced the very substance

14  of the statement.  I'd suggest that one of the reasons for that

15  is because we understand how important that statement, which is

16  the subject of this criminal case, is going to be at trial.

17  This witness did not participate in that interview.  He is

18  armed with only very limited knowledge of that interview.  To

19  go down Mr. Carney's line of questioning and explore the very

20  context which Your Honor's suggesting may be relevant or

21  material is a fool's errand here.  The agent doesn't know.  He

22  wasn't there and I think as may be elaborated and if the

23  foundational questions are necessary he can go there--

24          THE COURT:  This is what I'm going to do--

25          MR. CHAKRAVARTY:  --he would be able to say he hadn't

39

1   discussed them.

2   　　　　THE COURT:  I'm going to for now reserve on thinking

3   about these issues and where they go and ask you for now,

4   Mr. Carney, to move on.  I want to think about these issues a

5   little more.  They raise issues that don't ordinarily, that I

6   don't ordinarily, I'm not ordinarily forced to confront in a

7   probable cause hearing.  So I want to think about them a little

8   more.  So--

9   　　　　MR. CARNEY:  When they say they were fast and cute I

10  agree they were fast.

11  　　　　THE COURT:  Why don't you move on to other areas and

12  I'll note that you're pressing that issue and think about it

13  and we'll revisit it appropriately or after I think about it

14  some more.

15  BY MR. CARNEY:

16  Q.   What have you reviewed, sir, in regard to the questioning

17  of my client that concerned Mr. Maldonado?

18  A.   With regard to the questioning of your client to that

19  interview - that pertain directly or indirectly?

20  Q.   Both, please?

21  A.   Indirectly I reviewed excerpts of transcripts of recorded

22  conversations.  And the portions that I read pertain to the

23  statement he made regarding Daniel Maldonado, where he was at

24  that time.

25  Q.   And have you spoken to the agents about that as well?

40

1    A.    Yes.

2    Q.    You note in your affidavit, sir, that the conversation

3    between the agent and the defendant occurred on December 16,

4    2006; is that correct?

5    A.    Yes.

6    Q.    And you also refer to a consensually recorded conversation

7    between a cooperating witness and Mr. Mehanna that occurred on

8    December 13, 2006; is that correct?

9    A.    Yes.

10   Q.    Was that conversation being simultaneously monitored by

11   the agent?

12   A.    I don't understand your question.

13   Q.    At the time that conversation between the cooperating

14   witness and Mr. Mehanna was going on, on December 13 of 2006

15   were the agents simultaneously listening to the conversation?

16   A.    I'm not sure.  I don't know.  Whether they were hearing it

17   at the time or if the device, if they listened to it on the

18   device at a later time I'm not sure.

19   Q.    When were the agents first told about that conversation?

20   A.    I don't know.

21   Q.    Were you selected as the affiant based on your knowledge

22   of this case or your ignorance of this case?  I'll withdraw the

23   question.

24        When did the agent learn of the content of the

25   conversation of December 13?

1   A.   I'm not sure of that either.

2   Q.   Did they know it before they spoke to Mr. Mehanna?

3   A.   I'm not certain, I'm not certain if they did or not.

4   Q.   Why did they decide to ask Mr. Mehanna about Daniel

5   Maldonado when they questioned him on December 16?

6           MR. AUERHAHN:  Objection, Your Honor.  In light of

7   our previous discussion about the reasons for the asking of the

8   question I think we've gone over this.

9           THE COURT:  For now I'm going to sustain that.

10          MR. CARNEY:  I don't want to delay the detention

11   hearing of my client, but I am considering asking the Court to

12   suspend the probable cause portion of this hearing so I can

13   call the agents who were directly involved--

14          THE COURT:  I'm going to--

15          MR. CARNEY:  --in this--

16          THE COURT:  What I want to do--

17          MR. CARNEY:  --who might have some relevant

18   information.

19          THE COURT:  --Mr. Carney, is why don't we proceed - I

20   don't want to cut you off on the probable cause portion if you

21   have other things you want, but as to this area which we spent

22   a fair bit of time discussing I think you should move on

23   because I want to, I understand the nature of your argument, I

24   understand the nature of the government's objection.  So far I

25   haven't permitted you to inquire further into it but I want to

42

1    think about it a little more carefully, and so why don't we

2    proceed to - if you have other areas of probable cause that

3    don't raise those issues feel free to go into them otherwise

4    let's proceed to the detention issues.

5            MR. CARNEY:  May I just have a few more questions and

6    then I can suspend.

7            THE COURT:  Fine.

8    BY MR. CARNEY:

9    Q.   When the agents went to see Mr. Mehanna, what did they

10   know about where Daniel Maldonado was located?

11           MR. AUERHAHN:  Objection.

12           THE COURT:  Same basis, Mr. Auerhahn?

13           MR. AUERHAHN:  Yes, Your Honor.

14           THE COURT:  All right.  For now, Mr. Carney, I'm

15   going to sustain that too.  I want to think about all these

16   issues.

17   BY MR. CARNEY:

18   Q.   As a result of the interview on December 16, 2006 with

19   Mr. Mehanna, what did the task force do in regard to which

20   investigation of Mr. Maldonado?

21           MR. AUERHAHN:  Objection, Your Honor.  That's a

22   pretty wide open question in terms of the what happened in the

23   investigation, everything that happened after December 16,

24   2006.

25           MR. CARNEY:  No, I qualified the question and I'll

43

1   repeat it if I may.

2           THE COURT:   Mmm-hmm.

3   BY MR, CARNEY:

4   Q.   What did the task force do as a result of the information

5   obtained on December 16th from Mr. Mehanna in regard to your

6   investigation of Mr. Maldonado?

7   A.   The investigation was--

8           THE COURT:   Wait, wait, wait, wait, wait, wait.

9   There's an objection.

10          MR. AUERHAHN:   I object, Your Honor, in terms of what

11  the investigators did as a result of the information they

12  received.   Again it's an effort to get into the investigative

13  steps of and focusing away from the issue--

14          THE COURT:   Well does that go to materiality, whether

15  they did something, what they did, if anything or no?

16          MR. AUERHAHN:   Well again, my view of materiality,

17  Your Honor, is that the kind of information that is, could have

18  affected the investigation.   So again, lying about the

19  whereabouts of someone who's in Somalia who's fighting Jihad

20  who subsequently pleads to receiving training from al-Qaeda in

21  my view establishes materiality.   Now whether or not--

22          THE COURT:   Wouldn't that depend on what the

23  investigation is?   It wouldn't be material to investigation of

24  the robbery at the bank in Braintree the other day.

25          MR. AUERHAHN:   But it's the, the requirement is that

44

1  the material within the – essentially in the case of the lying

2  to the FBI within the investigative jurisdiction of the FBI.  I

3  mean even if there--

4          THE COURT:  Okay.  I see.

5          MR. AUERHAHN:  --hadn't been an open investigation of

6  Maldonado at that point but if he had at that point--

7          THE COURT:  It would be material even if there were

8  no investigation?

9          MR. AUERHAHN:  Right.

10          THE COURT:  I see.

11          MR. AUERHAHN:  And that's why for example, you know,

12  a false statement to the FBI about someone--

13          THE COURT:  All right, I'll sustain the objection.

14          MR. CARNEY:  May I be heard?

15          THE COURT:  Yes.

16          MR. CARNEY:  I disagree with the framework that the

17  government has tried to set out here.  If the task force knows

18  for a fact that Daniel Maldonado is in Somalia, they know for a

19  fact, and they ask someone do you know where Maldonado is and

20  the person says I think he's in Egypt and the agents don't do a

21  thing because they know where Maldonado is, then that answer

22  would be viewed as not material to their investigation because

23  they know – if their investigation is to determine where so and

24  so is and they know absolutely where he is then there's another

25  reason why they're asking the defendant these questions.  For

1  example, if I walked out of this courtroom and someone walked

2  up to me who knew Your Honor was on the bench, had seen Your

3  Honor on the bench and asked me where you were and I said I

4  don't know, well that person would know where you are.  If he

5  was trying to find you he would walk in this courtroom and

6  there you would be.  So would my false statement to him have

7  affected what he was going to do when he already knew the

8  answer?  No.

9          So what I'm trying to ask here by this question is

10  based on what Mr. Mehanna asked you did you do anything--

11          THE COURT:  I--

12          MR. CARNEY:  And if the answer is no, we didn't do a

13  blessed thing because we knew it was inaccurate.  We have--

14          THE COURT:  It may - I understand.

15          MR. CARNEY:  We have Maldonado--

16          THE COURT:  I understand.

17          MR. CARNEY:  --under surveillance in Somalia.

18          THE COURT:  I'm going to sustain that objection.  It

19  may well be that that is relevant and significant in the case

20  at a later stage and if in fact it was as clear to the agents

21  who asked him the question as it is to the people in the room

22  at this moment that I'm sitting here that might be something

23  but for purposes of probable cause I don't, I think I'm going

24  to sustain the objection.

25  BY MR. CARNEY:

46

1    Q.   Did the task force make any decisions based explicitly on

2    what Mr. Mehanna said that related to the investigation or that

3    were material to the investigation of Daniel Maldonado?

4              MR. AUERHAHN:  Same objection, Your Honor.

5              THE COURT:  I'll sustain it for the same reason.

6              MR. CARNEY:  I have no further questions.

7              THE COURT:  All right.

8              MR. AUERHAHN:  No redirect, Your Honor.

9              THE COURT:  All right, you can step down, agent.

10   Thank you very much for your testimony.

11       WITNESS EXCUSED

12             MR. AUERHAHN:  No further evidence from the

13   government, Your Honor.

14             THE COURT:  All right.  Anything, Mr. Carney?

15             MR. CARNEY:  Yes, I would ask to suspend so that I

16   can call the two agents directly involved in the questioning of

17   Mr. Mehanna so that I can ask them the questions of what they

18   asked during the interview.

19             THE COURT:  I'm going to reserve on that for the same

20   reason on some of the objections I reserved on.

21             MR. CARNEY:  I understand, Your Honor.

22             THE COURT:  Do you have anything you want to offer

23   on, beyond what you have offered in writing with respect to the

24   detention question?

25             MR. CARNEY:  I don't want to belabor what I've

1  submitted and I won't be redundant, but the most important

2  fact here is that we are dealing with a person who is a United

3  States citizen, no prior criminal record, no activities

4  involving violence or threats of violence whatsoever, who lives

5  in Sudbury with his parents who are also United States

6  citizens.  He just gradu--

7  　　　　　THE COURT:  Let me ask you this, not to cut you

8  short.

9  　　　　　MR. CARNEY:  Too late.  Too late, you are, but go

10  ahead.

11  　　　　　THE COURT:  Do Mr. Mehanna's parents own the home

12  they live in in Sudbury?

13  　　　　　MR. CARNEY:  Yes, they do, Your Honor.

14  　　　　　THE COURT:  And--

15  　　　　　MR. CARNEY:  And they are prepared to post a portion

16  of it that's suggested by the pretrial services.

17  　　　　　THE COURT:  They are prepared?

18  　　　　　MR. CARNEY:  Yes, Your Honor.

19  　　　　　THE COURT:  Are they here today?

20  　　　　　MR. CARNEY:  Yes, Your Honor, they are.  Mr. Mehanna?

21  　　　　　THE COURT:  All right.  So, Mr. and Mrs. Mehanna, do

22  you own the home together?  Is it in both your names?

23  　　　　　MR. MEHANNA:  Yes.

24  　　　　　MRS. MEHANNA:  Yes.

25  　　　　　THE COURT:  It's in both your names, all right.  Then

48

1   I'll direct these questions to both of you.  Let me ask you

2   this, you've heard the charge that's been lodged against your

3   son?

4           MR. MEHANNA:  Yes.

5           THE COURT:  All right, you understand he's charged

6   with making a false statement to agents of the Federal Bureau

7   of Investigation?

8           MRS. MEHANNA:  Mmm-hmm.

9           THE COURT:  And you understand that it relates to an

10  investigation the FBI was conducting into another individual

11  and that person's involvement with terrorism activities; isn't

12  that fair to say, Mr. Auerhahn?

13          MR. AUERHAHN:  Yes, Your Honor.

14          THE COURT:  All right.  You heard all that, right?

15          MR. MEHANNA:  We did.

16          MRS. MEHANNA:  We have.

17          THE COURT:  And you understand that?  What's the

18  maximum punishment, Mr. Auerhahn or Mr. Chakravarty, that

19  Mr. Mehanna faces?

20          MR. AUERHAHN:  Eight years imprisonment, a $250,000

21  fine, three years supervised release and a $100 special

22  assessment.

23          THE COURT:  All right.  And that's the statutory

24  maximum?

25          MR. AUERHAHN:  Yes.

49

1          THE COURT:  All right.  So he faces up to eight

2    years in prison as well as a quarter million dollar fine or

3    both as punishment for this.  And the question I ask of you is

4    it has been suggested to me by pretrial services, which is an

5    arm of the court, that if your son were to be released he

6    should be released on, part of the condition be that you post

7    your home to secure or guarantee his appearance and possibly it

8    might be to also guarantee his compliance with any conditions

9    that I impose.  Let me explain what that means.  It would mean

10   if you do it that as long as, if he were to be released, if you

11   did it and if he were to be released, and I'm not suggesting I

12   am yet,  I haven't even heard from the government, but it would

13   mean that if he appeared throughout the case and if he complied

14   with all his conditions and did everything that was required of

15   him and did nothing of those things that were prohibited to

16   him, at the end of the case whether he was convicted or

17   acquitted, whether he went to jail or not, the house would be

18   yours.

19          MR. CARNEY:  May I interrupt briefly, please?

20          THE COURT:  Yup.

21          MR. CARNEY:  I believe pretrial services is seeking a

22   secured bond--

23          THE COURT:  Bail only but I'm asking about--

24          MR. CARNEY:  --in the amount of 100,000.

25          THE COURT:  Oh, as to the amount you mean?

50

1        MR. CARNEY:  Yeah, it's 100,000 secured bond.

2        THE COURT:  How much equity is in the house?

3        MR. CARNEY:  Probably seven figures, Your Honor.

4   It's owned free and clear.  It is assessed; I have an

5   assessment of the house as approximately 900,000.

6        THE COURT:  All right.  Well I'll start at the top

7   notwithstanding their suggestion.

8        So if you were to post the home, as long as he did

9   what was required and didn't violate any of the conditions at

10  the end the lien, the government's lien on the house would be

11  returned and ripped up.  But if he violated the conditions

12  then, or did not appear as required, then you could lose the

13  home, maybe just $100,000 of it, maybe all of it, maybe

14  somewhere in between.  Do you understand that?

15       MRS. MEHANNA:  Yeah.

16       MR. MEHANNA:  We do, yes.

17       THE COURT:  Okay.  And is that something you'd be

18  prepared to do?

19       MR. MEHANNA:  Yes.

20       MRS. MEHANNA:  Yes.

21       THE COURT:  You would, all right.  Who lives in the

22  home?

23       MR. MEHANNA:  The two of us and Tarek.

24       MRS. MEHANNA:  And my son.

25       THE COURT:  And your son, this son?

51

1          MRS. MEHANNA:  Yes.

2          THE COURT:  All right.  How many children do you

3   have?

4          MRS. MEHANNA:  We have two children.

5          THE COURT:  And where is your other child?

6      PAUSE

7          THE COURT:  I see.  And does he live in the United

8   States with you or in Sudbury?

9          MR. MEHANNA:  In Boston.

10         MRS. MEHANNA:  Yes, here.  In Boston.

11         THE COURT:  But not in your home?

12         MR. MEHANNA:  In Boston, yes.

13         MR. MEHANNA'S BROTHER:  I live in Boston.

14         THE COURT:  All right.  You have your own apartment?

15         MR. MEHANNA's BROTHER:  Yes.

16         THE COURT:  Okay.  Do you own any other real estate,

17   Mr. and Mrs. Mehanna?

18         MR. MEHANNA:  No.

19         THE COURT:  No other real estate?

20         MRS. MEHANNA:  No.

21         MR. MEHANNA:  No.

22         THE COURT:  All right.  How long have you lived in

23   this home?

24         MRS. MEHANNA:  Seven years.

25         MR. MEHANNA:  Nine years.

52

1           MRS. MEHANNA:  Oh, nine years.

2           THE COURT:  Nine years.

3           MR. MEHANNA:  Since `99.

4           THE COURT:  Since `99, all right.  And you're not

5    concerned, you're confident your son would do whatever's

6    necessary?

7           MR. MEHANNA:  We are.

8           MRS. MEHANNA:  We are.

9           THE COURT:  It's a big, a big risk, right?  You put

10   your house in the hands of the Court and the government and in

11   your son.  What if he, you know, doesn't honor that?  Do you

12   think he'll honor what you do for him?

13          MRS. MEHANNA:  Yes.

14          MR. MEHANNA:  We think he will honor but if that's

15   what it takes to have him out I have no hesitation and his

16   mother have no hesitation.

17          THE COURT:  All right.

18          MR. CARNEY:  I believe what they mean is they think

19   Your Honor could release him on unsecured bond and they are

20   confident that he would come back and there is no need to have

21   a secured bond represented by their home, but if that's what

22   the Court wants them to do they are prepared to do that.

23          THE COURT:  All right.

24          MR. CARNEY:  I interpret their statement in that

25   regard.

53

1          THE COURT:  All right.

2          MRS. MEHANNA:  Exactly.

3          MR. CARNEY:  Did I say that correctly?

4          MR. MEHANNA:  Yes.

5          MRS. MEHANNA:  Yes, exactly.

6          THE COURT:  All right.  Are there any other things

7   that you think I should inquire of them, Mr. Auerhahn or

8   Mr. Chakravarty?

9          MR. AUERHAHN:  Excuse me one moment, Your Honor.

10      PAUSE

11         MR. AUERHAHN:  Not at this time, Your Honor.

12         THE COURT:  Okay.  All right, thank you very much.

13  You can sit down.

14         All right, so essentially I understand then,

15  Mr. Carney, what you're proposing him to be released on is an

16  unsecured bond conditioning live and stay here.  You'll agree

17  to the conditions that pretrial proposes in which case the

18  security would come from the parents and in the form of the

19  house, is that how they would meet the security?

20         MR. CARNEY:  Yes, Your Honor.

21         THE COURT:  And--

22         MR. CARNEY:  I discussed it with Mr. Gladden.  He was

23  aware of my position of a $50,000 unsecured bond.  When he

24  indicated he was recommending a 100,000 secured bond I told him

25  that I would tell Your Honor that would be acceptable.

54

1          THE COURT:  All right.  Okay.  What about, you know,

2    I understand – and I'll give you a chance in a minute

3    Mr. Auerhahn and Mr. Chakravarty, but I understand, you know,

4    that as I'm sure will be an essential part of the government's

5    argument or an important part of their argument is the fact

6    that he had a one way ticket to Saudi Arabia, that he was going

7    to relocate and you don't really dispute that.  He was going

8    there.  He was going to relocate his life there.  What about

9    that in terms of risk here?

10          MR. CARNEY:  Well it has to be put in the context of

11   the fact that first the conversation occurred in December of

12   2006.  My client if the phone calls are to be believed realized

13   he may have made an error in judgment pretty promptly.  That

14   was not the last time the agent went to see him.  They went to

15   see him again as recently as April of 2008 and they put a lot

16   of pressure on him in April of 2008.  Certainly enough pressure

17   so that if a person was going to flee he had just been told

18   enough by the agent to give him every incentive in the world to

19   flee.  What did he do?  He obtained counsel instead.

20          THE COURT:  Did they tell him he was going to be

21   arrested?

22          MR. CARNEY:  They told him that he, that if he did

23   not become a cooperating witness for the FBI he would be

24   charged and they said that in no uncertain terms.  He retained

25   counsel.  Counsel communicated with the United States

1   Attorney's Office and he communicated that if they were going

2   to charge Mr. Mehanna he will surrender.  That was in April.

3   May went by, nothing.  June, nothing.  July, nothing.  At some

4   point he has to get on with his life.  He's a graduate of a

5   college of pharmacy and he obtained a position at a prestigious

6   medical facility.

7             THE COURT:  What would he do if he were released?

8             MR. CARNEY:  He would see if he could go back to work

9   at Walgreens where he's worked as a pharmacist or CVS where he

10  interned as a pharmacist or Children's Hospital where he

11  interned as a pharmacist.  The fact that his father has

12  probably taught, I daresay the majority of pharmacists in the

13  Commonwealth given his position and length of service as a

14  professor at Mass College of Pharmacy, I suspect my client can

15  get a job as a pharmacist.

16            THE COURT:  All right.

17            MR. MEHANNA:  And that's what he would want to go

18  back to do.  He would remain living at home with his family.

19  The medical center in Saudi Arabia has already been notified

20  that don't expect him and so he would live at home, work at a

21  pharmacy if he could in Massachusetts.  If he can't do that he

22  will get other gainful employment.  He's been employed

23  consistently since he was a teenager.

24            THE COURT:  All right.  What about that, Mr. Auerhahn

25  or Mr. Chakravarty, I'll hear you?

1    MR. CHAKRAVARTY:  With regard to his employment?

2    THE COURT:  Well the whole--

3    MR. CHAKRAVARTY:  The whole argument?

4    THE COURT:  The whole argument of detention.

5    MR. CHAKRAVARTY:  Your Honor, there has been a, in

6  pointing to Mr. Mehanna's family who obviously this case is not

7  about and there is nothing derogatory, and nothing but

8  indications that they're upstanding, successful, everything

9  that you would ask for in a surety for purposes of a, this

10  decision.  There's a danger here that we're confusing in their

11  analysis of their stability with the defendant.  The defendant

12  is the one who knew that his friend had made the journey from

13  Massachusetts to a terrorist training camp.  It happened to be

14  in Somalia no less training with al-Qaeda, knew all these

15  details and affirmatively lied about that to the FBI,

16  acknowledged that he had done something that was irreparable in

17  the sense of he had, he was already in trouble purely from

18  lying to the FBI.  And in the face of that knowledge and then

19  as Mr. Carney suggests even after he was told by the government

20  that, yes, we know that you lied about this and that's very

21  serious, he took the steps anyway – I didn't get a phone call,

22  Your Honor, the FBI didn't get a phone call, he took the steps

23  anyway to secure a one way ticket to the Kingdom of Saudi

24  Arabia where the defendant had never lived where--

25    THE COURT:  Here's my question, okay, it doesn't

1   strike me, tell me if I'm wrong, but it doesn't strike me that

2   what you have is someone who prepared to flee from prosecution

3   in the sense that what I see in the record is he had a

4   conversation two years ago.  And the record before me he had an

5   awareness that he had lied in that conversation.  That

6   awareness may be as Mr. Carney suggests it was, realized it was

7   a lapse of judgment and that awareness may have been I knew

8   what I did and I did it with a purpose behind it and simply

9   acknowledged what he was doing.  There are a variety of ways

10  probably to understand that.  But he was here.  He had that

11  understanding at that time and didn't go.

12          He went on – what it appears that I have before me is

13  he went and he finished his studies.  He graduated in May and

14  he looked for a job.  He clearly looked for a job overseas.  He

15  clearly arranged to move his life to Saudi Arabia.  He had a

16  one way ticket.  Clearly he was intending for at least a

17  substantial period of time, if not possibly the rest of his

18  life to relocate to Saudi Arabia.  And as you point out there's

19  no extradition treaty between Saudi Arabia and the United

20  States.  Plainly creates a risk of flight.  It doesn't strike

21  me that it was a, the situation where someone got a tip

22  government's coming after me, I think I'm buying a one-way

23  ticket to a country that doesn't have an extradition treaty in

24  that sense.  I don't mean to suggest that it doesn't create a

25  risk of flight, it does.  And my question is, in the calculus

58

1   then given what you have on the, on all the different factors,

2   yes, he stands differently than his family.

3        On the other hand family ties are significant

4   especially to risk of flight and they're prepared to post their

5   house as security potentially for both appearance and

6   compliance.  And so I guess my question is what about that?

7   We're no longer in the situation where it's personal

8   recognizance verse all of the evidence.

9        MR. CHAKRAVARTY:  First, while your analysis is

10  obviously accurate with regards to this is not the typical case

11  where somebody's just learning that something's going to happen

12  to them.  But here the motives for the defendant even wanting

13  to go over there and searching for a job over there when here

14  he had, I mean he's working at Walgreens I believe,

15  significantly different job then the one according to the

16  contract which the defense has put into evidence, which he was

17  going to be making the equivalent of, you know, almost $100,000

18  or something thereabouts over there, a lucrative job where he

19  can actually--

20        THE COURT:  He'd make a lot more money there than

21  here.

22        MR. CHAKRAVARTY:  Exactly.

23        THE COURT:  Cause he makes more money there?

24        MR. CHAKRAVARTY:  Much more over there.

25        THE COURT:  I see.

59

1      MR. CHAKRAVARTY:  And I don't know what he makes

2  here, Your Honor, but I can't imagine it would be on that

3  order.

4      THE COURT:  All right.

5      MR. CHAKRAVARTY:  I'd suggest that it's important

6  when you're getting back down to what are the defendant's ties,

7  what's keeping him here?  He's not married.  He has no kids.

8  He's not a child.  He's 26 years old.  Clearly has a doctorate,

9  very well educated.  According to public sources, on the

10  internet, he has a very robust network of individuals with whom

11  he communicates regularly on the internet.  I think--

12      THE COURT:  How do I know that?

13      MR. CHAKRAVARTY:  I'm proffering that in terms of--

14      THE COURT:  All right.

15      MR. CHAKRAVARTY:  --just things I've seen on the

16  internet on public sources.  Just plugged in the defendant's

17  name frankly and a number of sources came up indicating, take

18  it with whatever grain of salt you would wish, but I'd suggest

19  to you the fact that we have a full courtroom here is also

20  testament to the fact that his network, his network although

21  not necessarily the network here locally, is broad.  The fact

22  that he knew--

23      THE COURT:  Ordinarily though when I see a full

24  courtroom full of people supporting a defendant if I weigh that

25  against the government, I weigh it in favor of the defendant--

60

1          MR. CHAKRAVARTY:  Sure.  Absolutely.

2          THE COURT:  --there are a lot of people who care

3   about him, a lot of connection to the community, lot of people

4   willing to take the time out of their day.  I mean we all work

5   here but they all had to take time out from making money or

6   working or going to school or taking care of their children,

7   whatever they do in their life to come here.

8          MR. CHAKRAVARTY:  And I would say--

9          MR. CARNEY:  I'm going to quote Mr. Chakravarty the

10  next time I'm sitting in court with a CJA client who has no one

11  in the back of the courtroom and use that as an argument as to

12  why he's not a risk of flight because nobody cares about him.

13  He's got no friends.  No one would come to court so please

14  release him on his personal recognizance.

15         MR. CHAKRAVARTY:  I would suggest to you, Your Honor,

16  your observations are accurate in the vast majority of the

17  case, and I'd suggest to you it's the context for which these

18  people are here today, and I don't know, and I don't know that

19  we need to waste the time in asking each of them but which is

20  very different than in the typical case where it's people in

21  the community suggesting this is a person who we are vouching

22  for in terms of their stability.

23          In this context I'm suggesting to you that it's a

24  broader network such that his virtual world is really where,

25  what is his anchor?  Not the fact that he's making money and he

1  needs to stay with his parents to survive.  This is a person

2  who was going to pick up, leave, take his worldly belongings

3  including I emphasize the fact that he is, he has his Egyptian

4  birth certificate.  He's an Egyptian citizen for all intents

5  and purposes.  He could leave through our porous borders at any

6  time.  And I'd suggest to you that at 26 years old, and I don't

7  know what--

8          THE COURT:  You guys haven't made the borders

9  unporous?

10          MR. CHAKRAVARTY:  We're working on that, Your Honor.

11  But – and his parents, with all due respect to their efforts,

12  simply cannot control a 26 year old man of the defendant's

13  intelligence who has such a broad network.  And at whim--

14          THE COURT:  Isn't in part the question whether given

15  that they're willing to take their house and move it to the

16  middle of the table whether he would walk out on that and leave

17  them without their house.

18          MR. CHAKRAVARTY:  And this is where I think the

19  defendant is having his cake and eating it too, Your Honor.

20  This is a person who apparently has CJA appointed counsel

21  suggesting that he doesn't have the means to be able to do

22  anything.  Somebody who has at least up till now had his

23  parents even accompany him for his flight to New York so that

24  they could leave.  So they clearly knew that he was intending

25  to leave and they have been kind of--

1           THE COURT:  Sure.

2           MR. CHAKRAVARTY:  --implicit in that.  I'd suggest to

3    Your Honor as any loving parents would do, they want to do

4    whatever they can to support their son.  And in this case they

5    felt that it was in his interest, I'd suggest to you the

6    evidence suggests, that it was in his interest to leave the

7    country rather than to stay here and confront whatever, try to

8    make his way in this country and confront whatever issues he

9    had with the government.  I only suggest that because we simply

10   can't rely on their word, their faith in their son to be the

11   measure.  It's not that I doubt their word that they're willing

12   to put up the house.  It's their faith in their son is not a

13   measure of whether this man who is willing to pack up and leave

14   everything he had behind.  Frankly, it wasn't much except for

15   his contacts, and grant it compromise his parents' position but

16   that would come down to whether that, whether he perceived

17   whether the Court would really forfeit their property.

18           THE COURT:  One quick question, Mr. Carney.  I don't

19   want to cut you off, Mr. Chakravarty--

20           MR. CHAKRAVARTY:  No.

21           THE COURT:  Okay.  What – not many people come into

22   this courthouse and offer a house in Sudbury to post or have it

23   available to them to post security and own it free and clear.

24   That raises a question that I don't usually ask at these kind

25   of proceedings which is how significant is the house to them?

63

1    In other words there are some individuals, I have never seen

2    them in here, who if they posted the house, they posted a house

3    it means nothing to them.  I don't know that that's the

4    position they're in but what, how do I know what their

5    financial position is and what else they have?  They don't own

6    any other real estate they told me but how do I know how

7    significant this home is to them in terms of a financial, a

8    financial payment if something happened if they lost it?

9            MR. CARNEY:  I guess by the same way that any parent

10   knows about the home he or she lives in that you raised your

11   children in and that you live in.  Because of thrift, because

12   of not devoting your money to frivolous pursuits you are able

13   to pay down the mortgage that you obtain.  My client's mother

14   takes children in to take care of them in her home.  My

15   client's father is a college professor.  It is possible if you

16   devote your income to paying off the one major debt you have

17   that you are able to do so in a career and my client's father

18   has been a professor throughout his entire career.  Now even

19   without speaking to them I know that there may be other factors

20   that go into not wanting to owe money and be paying interest on

21   money but I can't speak knowledgeably if those factors affected

22   this particular family.

23           THE COURT:  I see.  All right.

24           MR. CARNEY:  But they, this is their asset.

25           THE COURT:  This is what I'm going to do, I'm going

64

1    to take the matter under advisement for a couple reasons.

2    First, I want to read the letters that Mr. Carney submitted and

3    I haven't had the opportunity to read them, and so I know all

4    the information that I have available and I want to have the

5    opportunity to read with a little more care the pretrial

6    services report which I just received as the hearing started.

7    I want to think about the issues that the parties raised.  I

8    will do one of a couple things.  I'll either issue an order

9    detaining the defendant.  I'll issue an order setting out

10   conditions of release either which I'll do fairly promptly or

11   I'll set it down for another hearing very soon to, if I have

12   something else I want to address with either or both or you.

13   And at that point in time I'll address, have thought about it

14   and address what the issues you've reserved on or I've reserved

15   on with respect to what you've raised, Mr. Carney.

16          If I were to release the defendant I would give you

17   an opportunity notwithstanding your objection to that to weigh

18   in on what the conditions ought to be and if you – and then

19   there would be a release hearing in any event to set the

20   conditions and so I would hear you then about that.

21          MR. CHAKRAVARTY:  Thank you.  That was one of the

22   reasons I rose.  The other was because I didn't have a chance

23   to emphasize and Your Honor may not be aware, I believe it is

24   in the papers but the potential exposure the defendant has here

25   Mr. Auerhahn mentioned isn't a felony but the guidelines

65

1   calculation also suggests that it would be under the advisory

2   system, the eight year sentence--

3           THE COURT:  Okay.  So--

4           MR. CHAKRAVARTY:  --would max out.  So that's--

5           THE COURT:  --the guideline range is--

6           MR. CHAKRAVARTY:  Is the same.

7           THE COURT:  The guidelines would suggest the eight

8   years?

9           MR. CHAKRAVARTY:  Correct.

10          THE COURT:  Okay.  All right.  All right, thank you

11  very much.

12          MR. CARNEY:  May I have one other matter, Your Honor?

13          THE COURT:  Yup.

14          MR. CARNEY:  Your Honor, I have three additional

15  letters that I received too late to make a copy of.  I'll make

16  a copy of them for the government and--

17          THE COURT:  Give them to Ms. Simeone.

18          MR. CARNEY:  --may I deliver them to your clerk?

19          THE COURT:  Yes.

20          MR. CARNEY:  Thank you.

21          MR. CHAKRAVARTY:  Thank you, Your Honor.

22          MR. AUERHAHN:  Thank you.

23          THE COURT:  Okay.  We're adjourned.

24          MR. CARNEY:  May I approach the sidebar please?

25          THE COURT:  For something other than those three

66

1    letters?

2              MR. CARNEY:  Yes, Your Honor.

3              THE COURT:  Sure.

4              MR. CARNEY:  And I would ask to do so ex parte.

5              THE COURT:  All right.

6                            SIDEBAR CONFERENCE - INAUDIBLE

7              THE COURT:  All right, we're adjourned.

8              THE CLERK:  All rise, this matter's adjourned.

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25                        CERTIFICATION

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

67

1          I, Maryann V. Young, court approved transcriber, certify

2     that the foregoing is a correct transcript from the official

3     digital sound recording of the proceedings in the

4     above-entitled matter.

5

6     /s/ Maryann V. Young                March 7, 2011

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**