UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 09-CR-10017-GAO |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| TAREK MEHANNA. | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

**GOVERNMENT'S UNCLASSIFIED, REDACTED MEMORANDUM
IN OPPOSITION TO DEFENDANT TAREK MEHANNA'S MOTIONS
RELATING TO THE FOREIGN INTELLIGENCE SURVEILLANCE ACT**

## **TABLE OF CONTENTS**

I. Introduction ........................................................................................................1

    A. Background ............................................................................................2

    B. Overview of the FISA Collections at Issue ..........................................4

II. The FISA Process.................................................................................................5

    A. Overview of FISA ................................................................................5

    B. The FISA Application ...........................................................................6
        1. The Certification .............................................................................8
        2. Minimization Procedures................................................................9
        3. Attorney General's Approval........................................................10

    C. The FISC's Orders .............................................................................10

III. District Court Review of FISC Orders................................................................13

    A. The Review is to be Conducted <u>In Camera</u> and <u>Ex Parte</u> ......................14

    B. <u>In Camera</u>, <u>Ex Parte</u> Review is Constitutional .......................................19

    C. The District Court's Substantive Review...............................................20
        1. Certifications are Subject to Only Minimal Scrutiny ..................21
        2. FISA's "Significant Purpose" Standard is Constitutional .........22
        3. Probable Cause.............................................................................24
            a. The Fourth Amendment ........................................................25
            b. FISA Collection is Subject to the "Good-Faith"
                Exception ...........................................................................26

IV. The FISA Collections Were Lawfully Authorized and Conducted ................27

    A. The FISA Collections Were Lawfully Authorized ...............................28
        **1. [CLASSIFIED MATERIAL REDACTED]** ..........................28
            a. Foreign Intelligence Information ...................................28
            b. "A Significant Purpose".................................................28
            c. Information Not Reasonably Obtainable Through Normal
               Investigative Techniques ..............................................28
            d. Argument ......................................................................29
        2. All Statutory Requirements Were Met.........................................29
        3. The FISA Collections Met FISA's Probable Cause Standard ....29
            a. **[CLASSIFIED MATERIAL REDACTED]**................29

b. **[CLASSIFIED MATERIAL REDACTED]** ...............................30
(1) **[CLASSIFIED MATERIAL REDACTED]**.......................30
(A) **[CLASSIFIED MATERIAL REDACTED]**.................30
(B) Argument ............................................................30
(2) **[CLASSIFIED MATERIAL REDACTED]**.......................30
(A) **[CLASSIFIED MATERIAL REDACTED]**.................30
(B) **[CLASSIFIED MATERIAL REDACTED]** .................31
1. **[CLASSIFIED MATERIAL REDACTED]** .............31
2. **[CLASSIFIED MATERIAL REDACTED]** .............31
3. **[CLASSIFIED MATERIAL REDACTED]** .............31
4. **[CLASSIFIED MATERIAL REDACTED]** .............31
(C) **[CLASSIFIED MATERIAL REDACTED]** .................31
1. **[CLASSIFIED MATERIAL REDACTED]** .............31
2. **[CLASSIFIED MATERIAL REDACTED]** .............31
(D) Argument ...........................................................32
(3) **[CLASSIFIED MATERIAL REDACTED]**.......................32
(A) **[CLASSIFIED MATERIAL REDACTED]**.................32
1. **[CLASSIFIED MATERIAL REDACTED]** .............32
2. **[CLASSIFIED MATERIAL REDACTED]** .............32
(i) **[CLASSIFIED MATERIAL REDACTED]**.......32
(ii) **[CLASSIFIED MATERIAL REDACTED]** ......32
(iii) **[CLASSIFIED MATERIAL REDACTED]** ....33
(iv) **[CLASSIFIED MATERIAL REDACTED]**.....33
(v) **[CLASSIFIED MATERIAL REDACTED]**......33
3. **[CLASSIFIED MATERIAL REDACTED]** .............33
(B) **[CLASSIFIED MATERIAL REDACTED]** .................33
1. **[CLASSIFIED MATERIAL REDACTED]** .............33
2. **[CLASSIFIED MATERIAL REDACTED]** .............33
(C) Argument ...........................................................34

B. The FISA Collections were Lawfully Conducted ...............................34
1. Minimization .............................................................34
2. The FISA Collections Were Appropriately Minimized .............38
3. **[CLASSIFIED MATERIAL REDACTED]** ...........................38
4. Argument ...................................................................38

V. Analysis of Mehanna's Specific Arguments ..................................39

VI. Conclusion .........................................................................41

## I.  <u>INTRODUCTION</u>

The Government submits this Unclassified Memorandum in Opposition both to Defendant Tarek Mehanna's ("Mehanna's") Motion for Production of All FISA Applications, Orders, and Related Materials, and for Disclosure of All Other Electronic Surveillance of Defendant and to Mehanna's Motion to Suppress Illegally Obtained FISA Evidence.  Mehanna's motions collectively seek:  (1) the Court's review of all of the relevant applications under the Foreign Intelligence Surveillance Act, as amended ("FISA");[1] (2) disclosure of such applications, orders and related materials; (3) disclosure of electronic intercepts of Mehanna conducted by a United States agent or agency of which Mehanna might be unaware;[2] (4) a hearing under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978); and, (5) the suppression of information obtained or derived pursuant to FISA.

**[CLASSIFIED MATERIAL REDACTED]**[3] For the reasons set forth herein, this Court must conduct an <u>in camera</u> and <u>ex parte</u> review of the documents relevant to Mehanna's motions, in accordance with the provisions of 50 U.S.C. §§ 1806(f) and 1825(g).

**[CLASSIFIED MATERIAL REDACTED]**  For the reasons set forth below, the Court should deny Mehanna's motions.[4]

---

[1] Electronic surveillance under FISA is governed by 50 U.S.C. §§ 1801-1812, while physical search is regulated by 50 U.S.C. §§ 1821-1829.  The two sets of provisions are in many respects parallel and almost identical.  Citations herein are generally to the two sets of provisions in parallel, with the first citation being to the relevant electronic surveillance provision, and the second citation being to the relevant physical search provision.
**[CLASSIFIED MATERIAL REDACTED]**

[2] **[CLASSIFIED MATERIAL REDACTED]**

[3] [Ahmad] Abousamra is charged along with Mehanna.  He has not made an initial appearance.

[4] **[CLASSIFIED MATERIAL REDACTED]**

### A.  Background

Mehanna and Abousamra are currently charged with, among other offenses, Conspiracy to Provide Material Support or Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A; Providing and Attempting to Provide Material Support to Terrorists, in violation of 18 U.S.C.  § 2339A; Conspiracy to Kill in a Foreign Country, in violation of 18 U.S.C. § 956; Conspiracy, in violation of 18 U.S.C. § 371; and False Statements, in violation of 18 U.S.C. § 1001(a)(2) or (3).  The indictment is based upon Mehanna's and Abousamra's activities in preparation for violent jihad such as military-type training and overseas travel, provision of expertise and services to Al Qaeda, their making material false, fictitious, or fraudulent statements to federal law enforcement agents or officers, and conspiracies to do the same.

### [CLASSIFIED MATERIAL REDACTED][5][6][7][8][9]

Initially, on June 8, 2009, by letter to defense counsel and production of FISA-obtained or -derived materials, and through repeated, subsequent letters to defense counsel for purposes of discovery, the Government provided written notice to Mehanna pursuant to 50 U.S.C. §§ 1806(c) and 1825(d), that the United States intended to offer into evidence or otherwise use or disclose in any proceedings in the above-captioned matter, information obtained and derived from electronic surveillance and physical search conducted pursuant to FISA.  The Court was provided similar

---

[5] **[CLASSIFIED MATERIAL REDACTED]**

[6] **[CLASSIFIED MATERIAL REDACTED]**

[7] **[CLASSIFIED MATERIAL REDACTED]**

[8] **[CLASSIFIED MATERIAL REDACTED]**

[9] **[CLASSIFIED MATERIAL REDACTED]**

notice in filings and proceedings under CIPA, including the Government's April 5, 2010, motion

for a protective order, the litigation related to discovery, and the public status conferences in this

matter.

On December 23, 2010, Mehanna filed his motion for disclosure under FISA.  On or about

April 21, 2011, Mehanna filed his motion for suppression under FISA.[10]  In his suppression

motion, Mehanna argues for relief on the following grounds: (1) the FISA applications at issue

may lack probable cause; (2) the FISA applications at issue may contain intentional or reckless

material falsehoods or omissions, and the surveillance and searches therefore may violate the

principles of Franks, 438 U.S. 154; (3) the primary purpose of the electronic surveillance and

searches was to obtain evidence of domestic criminal activity and not foreign intelligence

information; (4) the government may not have made the required certifications in the FISA

applications, or may have failed to obtain necessary extensions of prior FISA orders; and (5) the

government may not have established the appropriate minimization procedures required by FISA.

(Def. FISA Supp. Mot., at 2.)

### [CLASSIFIED MATERIAL REDACTED][11]

The Government's response and the supporting FISA materials are submitted to oppose

Mehanna's motions and aid the Court in its statutorily mandated in camera and ex parte review of

the FISA materials, required by Title 50, United States Code, Sections 1806(f) and 1825(g),

where, as here, the Attorney General has filed a Declaration and Claim of Privilege.  These

---

[10]   At the Government's request, the Court permitted the Government to respond to both motions collectively by July 20, 2011.

[11]   [This unclassified, redacted filing is a copy of the classified memorandum filed ex parte, in camera, and under seal in response to Mehanna's motions, with all classified information having been redacted from this document.]  As a result of the redactions, the pagination and footnote numbering of the classified memorandum and the unclassified memorandum are different.

materials are also filed to support the United States' request, pursuant to FISA, that this Court: (1)
find that the FISA collections at issue were lawfully authorized and conducted; and (2) order that
none of the classified documents, nor any of the classified information contained therein, be
disclosed to the defense, and instead, that they be maintained by the United States under seal.  As
the discussion below will demonstrate, all of Mehanna's arguments are without merit, and his
requests for relief should be denied.

### B.  Overview of the FISA Collections at Issue

[CLASSIFIED MATERIAL REDACTED][12] [13] [14] [15] [16] [17] [18] [19] [20] [21] [22] [23] [24] [25] [26] [27] [28] [29] [30]
[31] [32]

---

[12] [CLASSIFIED MATERIAL REDACTED]

[13] [CLASSIFIED MATERIAL REDACTED]

[14] [CLASSIFIED MATERIAL REDACTED]

[15] [CLASSIFIED MATERIAL REDACTED]

[16] [CLASSIFIED MATERIAL REDACTED]

[17] [CLASSIFIED MATERIAL REDACTED]

[18] [CLASSIFIED MATERIAL REDACTED]

[19] [CLASSIFIED MATERIAL REDACTED]

[20] [CLASSIFIED MATERIAL REDACTED]

[21] [CLASSIFIED MATERIAL REDACTED]

[22] [CLASSIFIED MATERIAL REDACTED]

[23] [CLASSIFIED MATERIAL REDACTED]

[24] [CLASSIFIED MATERIAL REDACTED]

[25] [CLASSIFIED MATERIAL REDACTED]

[26] [CLASSIFIED MATERIAL REDACTED]

[27] [CLASSIFIED MATERIAL REDACTED]

[28] [CLASSIFIED MATERIAL REDACTED]

[29] [CLASSIFIED MATERIAL REDACTED]

[30] [CLASSIFIED MATERIAL REDACTED]

[31] [CLASSIFIED MATERIAL REDACTED]

## II.  THE FISA PROCESS

### A.  Overview of FISA

Enacted in 1978, and subsequently amended, FISA authorizes the Chief Justice of the

United States to designate eleven United States District Court Judges to sit as judges of the FISC.

50 U.S.C. § 1803(a)(1).  The FISC judges are empowered to consider ex parte applications

submitted by the Executive Branch for electronic surveillance and physical search when a

significant purpose of the application is to obtain foreign intelligence information, as defined in

FISA.  Rulings of the FISC are subject to review by the Foreign Intelligence Surveillance Court

of Review ("FISC of Review"), which is composed of three United States District Court or

Circuit Court judges designated by the Chief Justice of the United States Supreme Court.  50

U.S.C. § 1803(b).  As discussed below, a District Court also has jurisdiction to determine the

legality of electronic surveillance and physical searches authorized by the FISC when the fruits of

that collection are used against an "aggrieved person." [33]  See 50 U.S.C. §§ 1806(f), 1825(g).

As originally enacted, FISA required that a high-ranking member of the Executive Branch

certify that "the purpose" of the FISA application was to obtain foreign intelligence information.

In 2001, FISA was amended as part of the Uniting and Strengthening America by Providing

Appropriate Tools Required to Intercept and Obstruct Terrorism Act (PATRIOT Act).[34]  One

change to FISA accomplished by the PATRIOT Act was the abrogation of the requirement that

---

[32] **[CLASSIFIED MATERIAL REDACTED]**

[33] An "aggrieved person" is defined as the target of electronic surveillance or "any other person whose communications or activities were subject to electronic surveillance," 50 U.S.C. § 1801(k), as well as "a person whose premises, property, information, or material is the target of physical search" or "whose premises, property, information, or material was subject to physical search.  50 U.S.C. § 1821(2). Mehanna is an "aggrieved person" under FISA, and as noted above, he was provided with notice of his status as such and of the Government's intent to use FISA-obtained or -derived information against him at trial.

[34] Pub. L. No. 107-56, 115 Stat. 271 (2001).

the primary purpose of the requested FISA surveillance be the gathering of foreign intelligence information; instead, a high-ranking official is now required to certify that the acquisition of foreign intelligence information is "a significant purpose" of the requested surveillance.  18 U.S.C. § 1804(a)6)(B).  As discussed in detail in later sections of this memorandum, the "significant purpose" standard is constitutional.

### B.  The FISA Application

FISA provides a statutory procedure whereby the Executive Branch may obtain a judicial order or warrant authorizing the use of electronic surveillance and/or physical search within the United States where a significant purpose is the collection of foreign intelligence information. United States v. Johnson, 952 F.2d 565, 571 (1st Cir. 1992); United States v. Abu-Jihaad, 630 F.3d 102, 117-118 (2d Cir. 2010); 50 U.S.C. §§ 1804(a)(6)(B), 1823(a)(6)(B).  Under FISA, "[f]oreign intelligence information" includes information that "relates to, and if concerning a United States person[35] is necessary to, the ability of the United States to protect against . . . actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power [and/or] sabotage or international terrorism by a foreign power or an agent of a foreign power." 50 U.S.C. §§ 1801(e), 1821(1).  "Foreign intelligence information" also includes information with respect to a "foreign power or foreign territory that relates to, and if concerning a United States person is necessary to – (A) the national defense or the security of the United States; or (B) the conduct of the foreign affairs of the United States."  50 U.S.C. §§ 1801(e)(2), 1821(1).  With the

---

[35] Under FISA, a "United States person" means a citizen of the United States; an alien lawfully admitted for permanent residence as defined in Section 101(a)(20) of the Immigration and Nationality Act; an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence; or a corporation which is incorporated in the United States, but does not include a corporation or association which is a foreign power, as defined in 50 U.S.C. §§ 8801(a)(1), (2), or (3).  50 U.S.C. § 1801(i), 50 U.S.C. § 1821(1).  All of the FISA Targets are United States persons.

exception of emergency authorizations, FISA requires that a court order be obtained before any electronic surveillance or physical search may be conducted.

FISA provides that in emergency situations the Attorney General may authorize electronic surveillance and physical search without an order from the FISC.  See 50 U.S.C. §§ 1805(f), 1824(e) (effective April 21, 2005, to March 8, 2006).[36]  Before doing so, the Attorney General must reasonably determine that "an emergency situation exists" requiring the use of electronic surveillance or physical search to obtain foreign intelligence information before a FISC order can be obtained; and, that the factual basis for a FISC order authorizing surveillance or search exists. 50 U.S.C. §§ 1805(f)(1)-(2), 1824(e)(1)(B) (effective April 21, 2005, to March 8, 2006); Global Relief Foundation v. O'Neill, 207 F. Supp. 2d 779, 790 (N.D. Ill. 2002).  The Attorney General or a designee must also inform the judge of the FISC having jurisdiction at the time of the authorization and apply for a FISC order authorizing electronic surveillance or physical search "as soon as practicable" but not more than 72 hours after issuing emergency authorization.  50 U.S.C. §§ 1805(f), 1824(e)(1)(A) (effective April 21, 2005, to March 8, 2006).  Emergency electronic surveillance or physical search must comport with FISA's minimization requirements, discussed below.  See 50 U.S.C. §§ 1805(f), 1824(e)(2) (effective April 21, 2005, to March 8, 2006).[37]

---

[36] **[CLASSIFIED MATERIAL REDACTED]**

[37] If no FISC order authorizing the electronic surveillance or physical search is issued, emergency surveillance must stop when the information sought is obtained, when the FISC denies an application for an order, or after the expiration of 72 hours from the time of the emergency authorization, whichever is earliest.  See 50 U.S.C. §§ 1805(f), 1824(e)(3) (effective April 21, 2005, to March 8, 2006).  In addition, if no FISC order is issued, neither information obtained nor evidence derived from the emergency electronic surveillance or physical search may be disclosed in any court or other proceeding, and no information concerning a United States person acquired from the electronic surveillance or physical search may be used in any other manner by Federal officers or employees without the person's consent, except with the approval of the Attorney General if the information indicates a threat of death or serious bodily harm.  See 50 U.S.C. §§ 1805(f), 1824(e)(4) (effective April 21, 2005, to March 8, 2006).

An application to conduct electronic surveillance pursuant to FISA must contain, among other things: (1) the identity of the Federal officer making the application; (2) the identity, if known, or a description of the specific target of the electronic surveillance; (3) a statement of the facts and circumstances supporting probable cause to believe that the target is a foreign power or an agent of a foreign power, and that each facility or place at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power; (4) a statement of the proposed minimization procedures to be followed; (5) a detailed description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance; (6) a certification, discussed below, of a high-ranking official; (7) the manner or means by which the electronic surveillance or physical search will be effected and a statement whether physical entry is required to effect the electronic surveillance; (8) the facts concerning and the action taken on all previous FISA applications involving any of the persons, facilities, places, premises or property specified in the application; and (9) the proposed duration of the electronic surveillance or physical search.  See 50 U.S.C. § 1804(a)(1)-(9).

An application to conduct a physical search pursuant to FISA must contain similar information.  *See* 50 U.S.C. § 1823(a)(1)-(8).  The primary difference is that an application to conduct a physical search must also contain a statement of the facts and circumstances supporting probable cause to believe that "the premises or property to be searched contains foreign intelligence information" and that "each premises or property to be searched is owned, used, possessed by, or is in transit to or from" the target.  *See* 50 U.S.C. §§ 1823(a)(3)(B), (C).

1. <u>**The Certification**</u>

An application to the FISC for a FISA order or warrant must include a certification from a high-ranking Executive Branch official with national security responsibilities that:

(A) the certifying official deems the information sought to be foreign intelligence information;

(B) a significant purpose of the surveillance is to obtain foreign intelligence information;

(C) such information cannot reasonably be obtained by normal investigative techniques;

(D) designates the type of foreign intelligence information being sought according to the categories described in 50 U.S.C. § 1801(e); and

(E) includes a statement of the basis for the certification that –

    (i) the information sought is the type of foreign intelligence information designated; and

    (ii) such information cannot reasonably be obtained by normal investigative techniques.

50 U.S.C. § 1804(a).  See also 50 U.S.C. § 1823(a).

## 2. Minimization Procedures

The Attorney General has adopted, and the FISC has approved, minimization procedures that regulate the acquisition, retention, and dissemination of information obtained through FISA collection about United States persons, including persons who are not the targets of the FISA collection.  FISA requires that such minimization procedures must be:

> reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.

50 U.S.C. § 1801(h)(1); see also 50 U.S.C. § 1821(4)(A) (same regarding physical search).

In addition, minimization procedures also include "procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about

to be committed and that is to be retained or disseminated for law enforcement purposes." 50

U.S.C. § 1801(h)(3); see also 50 U.S.C. § 1821(4)(c) (same regarding physical search).

In order to fulfill the statutory requirements discussed above, the Attorney General has

adopted standard minimization procedures ("SMPs") for FISC-authorized electronic surveillance

and physical search that are on file with the FISC and are incorporated by reference into every

FISA application that is submitted to the FISC.  As a result, the FISC judges who issued the

orders authorizing the FISA collection at issue here found that the standard minimization

procedures, as well as any supplemental minimization procedures that may have been proposed,

met FISA's statutory requirements.  The FISC orders in the dockets at issue here directed the

Government to follow the approved minimization procedures in conducting the FISA collection.

### 3.  Attorney General's Approval

 FISA further requires that the Attorney General[38] approve applications for electronic

surveillance and/or physical search before they are presented to the FISC.  Id.

### C.  The FISC's Orders

Once approved by the Attorney General, the application is submitted to the FISC and

assigned to one of its judges.  The FISC may approve the requested electronic surveillance or

physical search only upon finding, among other things, that: (1) the application has been made by

a "Federal officer" and has been approved by the Attorney General; (2) there is probable cause to

believe that (a) the target of the electronic surveillance and/or physical search is a foreign power

or an agent of a foreign power, and that (b) the facilities or places at which the electronic

---

[38]  As noted above, "Attorney General" means the Attorney General of the United States (or
Acting Attorney General), the Deputy Attorney General, or, upon the designation of the Attorney General,
the Assistant Attorney General designated as the Assistant Attorney General for National Security.  See 50
U.S.C. § 1801(g).

surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a

foreign power [or that the premises or property to be searched is owned, used, possessed by, or is

in transit to or from a foreign power or an agent of a foreign power]; (3) the proposed

minimization procedures meet the statutory requirements set forth in 50 U.S.C. § 1801(h)

(electronic surveillance) and/or 50 U.S.C. § 1821(4) (physical search); (4) the application contains

all of the statements and certifications required by Section 104 or Section 303;[39] and (5) if the

target is a United States person – as defined above – that the certifications are not clearly

erroneous.  50 U.S.C. §§ 1805(a)(1)-(4), 1824(a)(1)-(4).

FISA defines "foreign power" to include "a group engaged in international terrorism or

activities in preparation therefore."  50 U.S.C. §§ 1801(a)(4), 1821(1).  As it relates to United

States persons, "agent of a foreign power" includes any person who:

> (C) knowingly engages in sabotage or international terrorism, or
> activities that are in preparation therefore, for or on behalf of a
> foreign power;
>
> \*       \*       \*       \*       \*       \*       \*
> or
>
> (E)  knowingly aids or abets any person in the conduct of activities
> described in [the subparagraphs above] . . . or knowingly conspires
> with any person to engage in activities described in [the
> subparagraphs above.]

50 U.S.C. §§ 1801(b)(2) (electronic surveillance), 1821(1) (physical search).

FISA specifies that no United States person may be considered a foreign power or an

agent of a foreign power solely on the basis of activities protected by the First Amendment to the

---

[39]   The provisions of FISA relating to electronic surveillance begin with FISA Section 101, 50
U.S.C. § 1801, and end with FISA section 112, 50 U.S.C. § 1812.  For ease of reference herein, when
referring to a "FISA Section", we will simply refer to the citation (1801) versus the Section number (101).
The same mode of reference will be used for those provisions of FISA relating to physical search, which
begin with FISA Section 301, 50 U.S.C. § 1821, and end with FISA Section 309, 50 U.S.C. § 1829.

Constitution of the United States.  50 U.S.C. §§ 1805(a)(2)(A), 1824(a)(2)(A).  Although

protected First Amendment activities cannot form the sole basis for FISC-authorized electronic

surveillance or physical search, they may be considered by the FISC if there is other activity

indicative that the target is an agent of a foreign power.  United States v. Rosen, 447 F.Supp.2d

538, 549-50 (E.D. Va. 2006); United States v. Rahman, 861 F.Supp. 247, 252 (S.D.N.Y. 1994),

aff'd 189 F.3d 88 (2nd Cir. 1999).  Additionally, FISA provides that "[i]n determining whether or

not probable cause exists …  a judge may consider past activities of the target, as well as facts and

circumstances relating to current or future activities of the target."  50 U.S.C. §§ 1805(b),

1824(b).

   If the FISC is satisfied that the FISA application has met the statutory provisions and has

made all of the necessary findings, the FISC issues an ex parte order[40] authorizing the electronic

surveillance and/or physical search requested in the application.  50 U.S.C. §§ 1805(a), 1824(a).

The order must specify: (1) the identity (or a description of) the specific target of the collection;

(2) the nature and location of each facility or place at which the electronic surveillance will be

directed or of each of the premises or properties to be searched; (3) the type of information sought

to be acquired and the type of communications or activities to be subjected to the electronic

surveillance, or the type of information, material, or property to be seized, altered, or reproduced

through the physical search; (4) the means by which electronic surveillance will be effected and

whether physical entry will be necessary to effect the surveillance, or a statement of the manner in

which the physical search will be conducted; (5) the period of time during which electronic

surveillance is approved and/or the authorized scope of each physical search; and (6) the

applicable minimization procedures.  50 U.S.C.  §§ 1805(c)(1), 1824(c)(1).  The FISC also retains

---

[40] **[CLASSIFIED MATERIAL REDACTED]**

the authority to review, before the end of the authorized period of electronic surveillance or physical search, the United States' compliance with the requisite minimization procedures. 50 U.S.C. §§ 1805(d)(3), 1824(d)(3).

Under FISA, electronic surveillance and/or physical searches targeting a United States person may be approved for up to ninety days. 50 U.S.C. §§ 1805(d)(1), 1824(d)(1). Extensions may be granted, but only if the United States submits another application in compliance with FISA. 50 U.S.C. §§ 1805(e)(2), 1824(d)(2).

## III.   DISTRICT COURT REVIEW OF FISC ORDERS

FISA authorizes the use in a criminal prosecution of information obtained or derived from any FISC-authorized electronic surveillance and/or physical search, provided that advance authorization is obtained from the Attorney General, see 50 U.S.C. §§ 1806(b), 1825(c), and that proper notice is given to the court and to each aggrieved person against whom the information is to be used. See 50 U.S.C. §§ 1806(c), (d), and 1825(d), (e). Upon receiving notice, an aggrieved person may then move to suppress the use of FISA information on two grounds: (1) that the information was unlawfully acquired under FISA; or (2) that the electronic surveillance or physical search was not conducted in conformity with the FISC's order(s). 50 U.S.C. §§ 1806(e), 1825(f). Accordingly, as discussed in detail in later sections, suppression motions are evaluated using FISA's probable cause standard, not the probable cause standard for criminal warrants. See, e.g., United States v. Pelton, 835 F.2d 1067, 1075 (4th Cir. 1987).

When the Government has served notice on an aggrieved person of its intent to use FISA-obtained or -derived information against that person, he or she has standing to challenge the lawfulness of the FISA surveillance and/or search. See United States v. Johnson, Crim. No. 89-221-MA, 1990 U.S. Dist. LEXIS 11011, at *6 (D. Mass. April 13, 1990) (citing 50 U.S.C. §

13

1806(e)), aff'd, Johnson, 925 F.2d at 565.  In that event, the district court in which the matter is

pending has jurisdiction to determine the legality of the electronic surveillance and/or physical

search.  See 50 U.S.C. §§ 1806(f), 1825(g).

### A.   The Review is to be Conducted In Camera and Ex Parte

In assessing the legality of challenged FISA surveillance or searches, the district court,

"shall, notwithstanding any other law, if the Attorney General files [as he has here] an affidavit or

declaration under oath that disclosure or an adversary hearing would harm the national security of

the United States, review in camera and ex parte the application, order, and such other materials

relating to the surveillance as may be necessary to determine whether the surveillance of the

aggrieved person was lawfully authorized and conducted."  50 U.S.C. §§ 1806(f), 1825(g).  On

the filing of the Attorney General's affidavit or declaration, the court "may disclose to the

aggrieved person, under appropriate security procedures and protective orders, portions of the

application, order or other materials relating to the surveillance [or physical search] *only where*

*such disclosure is necessary* to make an accurate determination of the legality of the surveillance

[or search]."[41] 50 U.S.C. §§ 1806(f), 1825(g) (emphasis added).  Thus, given the Attorney

General's Claim of Privilege in this case, the propriety of the disclosure of any FISA application

or order to Mehanna cannot even be considered, unless and until the Court has first concluded that

it is unable to make an accurate determination of the legality of the collections after reviewing the

Government's submissions (and any supplemental pleadings that the Court may request) in

camera and ex parte.  See Abu-Jihaad, 630 F.3d at 129; United States v. Belfield, 692 F.2d 141,

---

[41] In United States v. Warsame, 547 F.Supp.2d 982, 987 (D. Minn. 2008), the court addressed the
meaning of "necessary": "[t]he legislative history explains that such disclosure is 'necessary' only where
the court's initial review indicates that the question of legality may be complicated" by factual
misrepresentations, insufficient identification of the target, or failure to comply with the minimization
standards in the order.

147 (D.C. Cir. 1982); United States v. Islamic American Relief Agency ("IARA"), Case No. 07-00087-CR-W-NKL, 2009 WL 5169536, 2009 U.S. Dist. LEXIS 118505, at *10-11 (W.D. Mo. December 21, 2009); U.S. v. Nicholson, Case No. 09-CR-40-BR, 2010 WL 1641167, 2010 U.S. Dist. LEXIS 45126, at *9-10 (D. Or. April 21, 2010) ("After an *in-camera* review, the court 'has the discretion to disclose portions of the documents, under appropriate protective orders, *only if [the court] decides that such disclosure is necessary to make an accurate determination of the legality of the surveillance*.'") (quoting  U.S. v. Duggan, 743 F.2d 59, 78 (2d Cir. 1984) (emphasis added)"); United States v. Kashmiri, Case No. 09-CR-830-4, 2010 WL 4705159, 2010 U.S. Dist. LEXIS 119470, at *6 (N.D. Ill., Nov. 10, 2010).

If the district court is able to make an accurate determination of the legality of the surveillance based on its in camera, ex parte review of the materials submitted by the United States, then the court *may not* order disclosure of any of the FISA materials to the defense, unless otherwise required by due process.  Duggan, 743 F.2d at 78 (affirming district court's refusal to disclose FISA materials where the court was able to determine the legality of the surveillance without assistance from to the defense); Kashmiri, 2010 U.S. Dist. LEXIS 119470, at *6 ("If disclosure of the FISA materials is not necessary for the district court to make an accurate determination of the legality of the collection, disclosure *may not be ordered*" [emphasis in original]).  Likewise, if this Court is able to determine the legality of the FISA collection, then there will be no hearing.  "The demand for an adversary hearing must fall with the demand for disclosure of the *in camera* Exhibit.  They are inextricably linked.  [When] disclosure is not necessary, no purpose would be served by an evidentiary hearing." Belfield, 692 F.2d at 147.

Federal courts have repeatedly and consistently held that FISA "anticipates that an in camera, ex parte determination is to be the rule," with disclosure and an adversarial hearing being

the "exception, occurring *only* when necessary." Belfield, 692 F.2d at 147 (emphasis in original);

Abu-Jihaad, 630 F.3d at 129 ("[m]indful of these provisions, we have concluded that disclosure of

FISA materials 'is the exception and ex parte, in camera determination is the rule.'") (quoting

United States v. Stewart, 590 F.3d 93, 129 (2nd Cir. 2009); Duggan, 743 F.2d at 78; Rosen, 447

F.Supp.2d at 546; Nicholson, U.S. Dist. LEXIS at *2 ("disclosure of FISA materials to defense

counsel is not the rule"); United States v. Spanjol, 720 F.Supp. 55, 59 (E.D. Pa 1989), aff'd 958

F.2d 365 (3rd Cir. 1992) (noting that the in camera, ex parte procedure has been "uniformly

followed by all Courts which have reviewed the legality of electronic surveillances authorized by

the [FISC]").  Indeed, no court has ever found it necessary to disclose FISA materials to a

criminal defendant to assist the court's determination of the lawfulness of either electronic

surveillance or physical search under FISA.  See United States v. Mubayyid, 521 F.Supp.2d 125,

130 (D. Mass. 2007) (collecting cases); Rosen, 447 F.Supp.2d at 546 (same); United States v.

Gowadia, No. 05-00486, 2009 WL 1649714, 2009 U.S. Dist. LEXIS 47833, at *6 (D. Hawaii

June 8, 2009) ("to date, no court has held that disclosure of the FISA application papers was

necessary in order to determine the lawfulness of a search authorized under FISA"); Kashmiri,

2010 U.S. Dist. LEXIS 119470, at *7 ("A court has never permitted defense counsel to review

FISA materials"); In re Grand Jury Proceedings of the Special April 2002 Grand Jury ("In re

Grand Jury Proceedings"), 347 F.3d 197, 203 (7th Cir. 2003) (noting that no court has ever

ordered disclosure of FISA materials).

Every court that has addressed a motion to disclose FISA dockets or to suppress FISA

materials has been able to reach a conclusion as to the legality of the FISA collection at issue

based on an in camera and ex parte review.  See e.g., Spanjol, 720 F.Supp. 58-59 ("The Court's

ex parte, in camera review of the Sealed Appendix submitted by the Attorney General is proper.

It is well established that the legality of foreign intelligence surveillance should be determined on an in camera, ex parte basis"); United States v. Nicholson, 955 F.Supp. 588, 592 n. 11 (E.D. Va. 1997) ("this court knows of no instance in which a court has required an adversary hearing or disclosure in determining the legality of a FISA surveillance") (collecting cases); Thomson, 752 F.Supp. 75, 79 (W.D.N.Y. 1990) (same); United States v. Abu-Jihaad, 531 F.Supp.2d 299, 310 (D. Conn. 2008) (noting that courts have uniformly held that such review procedures do not deprive a defendant of due process) aff'd, 630 F.3d at 102; Mubayyid, 521 F.Supp.2d at 130; Rosen, 447 F.Supp.2d at 546; United States v. Isa, 923 F.2d 1300, 1307 (8th Cir. 1991) (FISA's review procedures do not violate a defendant's Sixth Amendment confrontation rights).

**[CLASSIFIED MATERIAL REDACTED]**

Confidentiality is critical to national security. "If potentially valuable intelligence sources" believe that the United States will be "unable to maintain the confidentiality of its relationship to them," then those sources "could well refuse to supply information." CIA v. Sims, 471 U.S. 159, 174 (1985); see also Phillippi v. CIA, 655 F.2d 1325, 1332-33 (D.C. Cir. 1981) (noting that a disclosure order relating to other highly sensitive and classified sources could chill the willingness of such sources to share information with the United States in the future). When a question is raised as to whether the disclosure of classified sources, methods, techniques, or information would harm the national security, Federal courts have expressed a great reluctance to replace the considered judgment of Executive Branch officials charged with the responsibility of weighing a variety of subtle and complex factors in determining whether the disclosure of information may lead to an unacceptable risk of compromising the intelligence gathering process, and determining whether foreign agents, spies, and terrorists are capable of piecing together a mosaic of information that, when revealed, could reasonably be expected to harm the national

security of the United States.  See Sims, 471 U.S. at 180; U.S. v. Yunis, 867 F.2d 617, 623 (D.C.

Cir. 1989) ("Things that did not make sense to the District Judge would make all too much sense

to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-

gathering capabilities from what these documents revealed about sources and methods.");

Halperin v. CIA, 629 F.2d 144, 150 (D.C. Cir. 1980) ("[E]ach individual piece of intelligence

information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of

information even when the individual piece is not of obvious importance in itself.").  An

adversary hearing is not only entirely unnecessary to aid the Court in the straightforward task

before it, but such a hearing would *create* potential dangers that courts have consistently sought to

avoid.

> As the Belfield court explained:

>> Congress recognized the need for the Executive to engage in and employ the fruits of clandestine surveillance without being constantly hamstrung by disclosure requirements. The statute is meant to "reconcile national intelligence and counterintelligence needs with constitutional principles in a way that is consistent with both national security and individual rights." In FISA the privacy rights of individuals are ensured not through mandatory disclosure, but through its provisions for in- depth oversight of FISA surveillance by all three branches of government and by a statutory scheme that to a large degree centers on an expanded conception of minimization that differs from that which governs law enforcement surveillance.

692 F.2d at 148 (footnotes and citations omitted); see also ACLU Foundation of So. Cal. v. Barr

("ACLU Foundation"), 952 F.2d 457, 465 (D.C. Cir. 1991) (citing Belfield for the proposition

that Section 1806(f) "is an acceptable means of adjudicating the constitutional rights of persons

who have been subjected to FISA surveillance").

B.     In Camera, Ex Parte Review is Constitutional

The constitutionality of FISA's in camera, ex parte review provisions has been affirmed

by every Federal court that has considered the matter.  See, e.g., Abu-Jihaad, 530 F.3d at 117;

Spanjol, 720 F.Supp. at 58; United States v. Damrah, 412 F.3d 618, 624 (6th Cir. 2005) ("FISA's

requirement that the district court conduct an ex parte, in camera review of FISA materials does

not deprive a defendant of due process."); United States v. Ott, 827 F.2d 473, 476-77 (9th Cir.

1987) (FISA's review procedures do not deprive a defendant of due process); Gowadia, 2009 U.S.

Dist. LEXIS 47833, at *6; United States v. Jayyousi, No. 04-60001, 2007 WL 851278, at *7 (S.D.

Fla. Mar. 15, 2007);[42] United States v. Benkahla, 437 F.Supp.2d 541, 554 (E.D. Va. 2006);

ACLU Foundation, 952 F.2d at 465; United States v. Megahey, 553 F.Supp. 1180, 1194

(E.D.N.Y. 1982) ("ex parte, in camera procedures provided in 50 U.S.C. § 1806(f) are

constitutionally sufficient to determine the lawfulness of the electronic surveillance at issue while

safeguarding defendants' fourth amendment rights"); United States v. Falvey, 540 F.Supp. 1306,

1315-16 (E.D.N.Y. 1982) (a "massive body of pre-FISA case law of the Supreme Court, [the

Second] Circuit and others" supports the conclusion that the legality of electronic surveillance

should be determined on an in camera, ex parte basis); Belfield, 692 F.2d at 148-49; Nicholson,

U.S. Dist. LEXIS 45126 at *8-9.

There remains an unbroken history of Federal court holdings that FISA's in camera, ex

parte review provisions are entirely compatible with the requirements and protections of the

Constitution.  As stated by the United States District Court for the Northern District of Georgia,

---

[42] All Jayyousi citations herein are to Westlaw because they are from a Magistrate Judge's Report
and Recommendation that was adopted and incorporated.  Westlaw, but not Lexis, includes the Report and
Recommendation with the court's opinion; however, the Lexis report of the case may be found at 2007
U.S. Dist. LEXIS 18310.

"[t]he defendants do not cite to any authority for [the proposition that FISA is unconstitutional] because there is none.  Every court that has considered FISA's constitutionality has upheld the statute from challenges under the Fourth, Fifth, and Sixth Amendments."  United States v. Ahmed, Case No. 1:06-CR-147-WSD-CGB, 2009 U.S. Dist. Lexis 120007, at *30 (N.D. Ga. March 19, 2009) (order denying defendants' motion to disclose and suppress FISA materials).[43]

In summary, FISA mandates a process by which the district court must conduct an initial in camera and ex parte review of FISA applications, orders, and related materials in order to determine whether the FISA collection was lawfully authorized and lawfully conducted.  Such in camera, ex parte review is the rule in such cases and that procedure is Constitutional.  In this case, the Attorney General has filed the required declaration invoking that procedure, and has declared that disclosure or an adversary hearing would harm national security.[44]  Accordingly, an in camera, ex parte review by this Court is the appropriate venue in which to determine whether the FISA collection was lawfully authorized and conducted pursuant to FISA.

## C.   The District Court's Substantive Review

Although federal courts are not in agreement as to whether the probable cause determinations of the FISC should be reviewed de novo or accorded deference, the materials under review would clear either standard.  See Abu-Jihaad, 630 F.3d at 130 ("Although the established standard of judicial review applicable to FISA warrants is deferential, the government's detailed and complete submission in this case would easily allow it to clear a higher standard of review.").  The Government respectfully submits that it is appropriate to accord due deference to the findings of the FISC, but notes that several courts, including this Court, in

---

[43] **[CLASSIFIED MATERIAL REDACTED]**
[44] **[CLASSIFIED MATERIAL REDACTED]**

<u>Mubayyid</u>, have instead reviewed the FISC's probable cause determination <u>de novo</u>.  <u>See</u> <u>Mubayyid</u>, 521 F.Supp.2d at 131 (quoting <u>Rosen</u>, 447 F.Supp.2d at 545) (citing <u>United States v. Hammoud</u>, 381 F.3d 316, 332 (4th Cir. 2004), <u>rev'd on other grounds</u>, 543 U.S. 1097 (2005), <u>op. reinstated in pertinent part</u>, 405 F.3d 1034 (4th Cir. 2005)) ("In essence, th[e] Court is required to conduct the same review of the FISA materials that the FISC itself conducted."); <u>Warsame</u>, 547 F.Supp.2d at 990.[45]

Regardless of the standard employed, the district court's review should determine:  (1) whether the certifications submitted by the Executive Branch in support of each FISA application were properly made; (2) whether probable cause existed to authorize the electronic surveillance and/or physical search at issue; and (3) whether the collections were properly minimized.  <u>See</u> <u>Abu-Jihaad</u>, 630 F.3d at 130-31.

### 1.   <u>Certifications are Subject to Only Minimal Scrutiny</u>

Certifications submitted in support of a FISA application should be "subjected to only minimal scrutiny by the courts," <u>United States v. Badia</u>, 827 F.2d 1458, 1463 (11th Cir. 1987), and should be "presumed valid."  <u>Duggan</u>, 743 F.2d at 77 & n.6 (citing <u>Franks</u>, 438 U.S. at 171).  <u>See also</u> <u>Mubayyid</u>, 521 F.Supp.2d at 131 (stating that the Court reviewed the FISA materials "with a presumption of validity accorded to the certifications"); <u>Nicholson</u>, U.S. Dist. LEXIS 45126 at *13; <u>United States v. Campa</u>, 529 F.3d 980, 993 (1lth Cir. 2008); <u>Warsame</u>, 547 F.Supp.2d at 990.  When a FISA application is presented to the FISC, "[t]he FISA Judge, in

---

[45] <u>Hammoud</u> says nothing about the proper scope of the district court's review of the FISC's probable cause determinations.  Rather, it states, without discussion, that the court of appeals conducted a <u>de novo</u> review.  <u>See</u> <u>Hammoud</u>, 381 F.3d at 332 (citing <u>United States v. Squillacote</u>, 221 F.3d 542, 554 (4th Cir.) (same)).  Thus, the <u>de novo</u> review referred to in <u>Hammoud</u> may be nothing more than the court's reference to the accepted standard of review of a trial court's probable cause determination on appeal from denial of a motion to suppress.  <u>See</u> <u>United States v. Blake</u>, 571 F.3d 331, 338 (4th Cir. 3009).

reviewing the application, is not to second-guess the executive branch official's certification that the objective of the surveillance is foreign intelligence information." Duggan, 743 F.2d at 77. Likewise, Congress intended that "'a reviewing [district] court is to have no greater authority to second-guess the executive branch's certifications than has the FISA Judge.'" Mubayyid, 521 F.Supp.2d at 131 (quoting Duggan, 743 F.2d at 77 (citing H.R. Rep. No. 95-1283, 95th Cong., 2d Sess., Pt. 1, at 92-93 (1978) ("House Report"))). See also, In re Grand Jury Proceedings, 347 F.3d at 204-05; Badia, 827 F.2d at 1463; Rahman, 861 F.Supp. at 250; IARA, 2009 U.S. Dist. LEXIS 118505, at *13; Kashmiri, 2010 U.S. Dist. LEXIS 119470, at *4.

The district court's review should determine whether the certifications were made in accordance with FISA's requirements. See Ahmed, 2009 U.S. Dist. LEXIS 120007, at *20 ("the [c]ourt is not to second-guess whether the certifications were correct, but merely to ensure they were properly made"). If the target is a United States person, then the district court should also ensure that each certification is not "clearly erroneous." Id. at 994; Duggan, 743 F.2d at 77; Kashmiri, 2010 U.S. Dist. LEXIS 119470, at *6. A certification is clearly erroneous only when "the reviewing court on the [basis of the] entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948); see United States v. Garcia, 413 F.3d 201, 222 (2d Cir. 2005); IARA, 2009 U.S. Dist. LEXIS 118505, at *12.

## 2.   FISA's "Significant Purpose" Standard is Constitutional

As noted above, FISA originally required that a high-ranking member of the Executive Branch certify that "the purpose" of the FISA application was to obtain foreign intelligence information. In 2001, FISA was amended by the PATRIOT Act, which *inter alia* deleted "the purpose" language, and instead substituted the requirement that the official certify that "a

significant purpose" of the requested surveillance is to obtain foreign intelligence information.  18 U.S.C. § 1804(a)6)(B).

The primary purpose test was originally derived from consideration of warrantless searches that were conducted pursuant to the Executive's Article II foreign-affairs powers prior to the enactment of FISA.  See e.g., Abu-Jihaad, 630 F.3d at 121.  In that context, warrantless surveillance would be conducted as an exception to the Fourth Amendment, and would therefore be limited to the scope of the Constitution's grant of authority to the Executive to conduct foreign affairs.  Prior to the PATRIOT Act's amendment of FISA, several courts imported the primary-purpose test from warrantless surveillance into the statutory interpretation of FISA's certification requirement.  See, Duggan, 743 F.2d at 77; Pelton, 835 F.2d at 1075-76; Badia, 827 F.2d at 1464; Johnson, 952 F.2d at 572.[46]  However, none of those cases held that the primary-purpose test was constitutionally mandated.[47]  The United States Court of Appeals for the Second Circuit explicitly stated, "we note that when, in Duggan, we construed FISA's original reference to electronic surveillance for 'the purpose' of obtaining foreign intelligence information, as a 'requirement that foreign intelligence information be the *primary* objective . . . we were identifying Congress's intent in enacting FISA, not a constitutional mandate. . . . In short, nothing in Duggan erected a constitutional bar to Congress reconsidering and reframing the purpose requirement of FISA".  Abu-Jihaad, 630 F.3d at 123.

---

[46] In Johnson, the United States Court of Appeals for the First Circuit actually construed the purpose requirement in the negative, holding that "the investigation of criminal activity cannot be the primary purpose" of FISA surveillance.  Id.

[47] The United States Court of Appeals for the Ninth Circuit took a contrary view and hesitated to define FISA's purpose requirement "to draw too fine a distinction between criminal and intelligence investigations," because by definition international terrorism requires the investigation of some activities that also constitute crimes.  United States v. Sarkissian, 841 F.2d 959, 965 (9th Cir. 1988).

With the exception of the now-vacated and legally null <u>Mayfield v. United States</u>, 504 F.Supp.2d 1023 (D. Or. 2007),[48] each court to have considered the PATRIOT Act amendment setting forth the significant-purpose test has held this test to be Constitutional, including the District of Massachusetts, in <u>Mubayyid</u>, 521 F.Supp.2d at 139-40.  <u>See also</u>, <u>In re Sealed Case</u>, 310 F.3d 717, 746 (FISC of Rev. 2002);[49] <u>Abu-Jihaad</u>, 630 F.3d at 128 ("We conclude simply that FISA's 'significant purpose' requirement . . . is sufficient to ensure that the executive may only use FISA to obtain a warrant when it is in good faith pursuing foreign intelligence gathering [and the] fact that the government may also be pursuing other purposes, including gathering evidence for criminal prosecution, compels no different conclusion"); <u>United States v. Ning Wen</u>, 477 F.3d 896, 897 (7th Cir. 2007); <u>Warsame</u>, 547 F.Supp.2d at 992-97; <u>United States v. Marzook</u>, 435 F.Supp.2d 778, 786 (N.D. Ill. 2006); <u>Benkhala</u>, 437 F.Supp.2d at 554; <u>Jayyousi</u>, 2007 WL 851278, at *1.

### 3.  **Probable Cause**

FISA requires a finding of probable cause that the target is a foreign power or an agent of a foreign power and that each facility or property at which the electronic surveillance and/or physical search is directed is being used, owned, and/or possessed, or is about to be used, owned, and/or possessed, by a foreign power or an agent of a foreign power.  It is this standard, not the standard applicable to a criminal search warrant, that this Court must apply.  <u>See</u> <u>Mubayyid</u>, 521

---

[48] FISA's "significant purpose" standard was held unconstitutional in <u>Mayfield</u>, a civil case, which no other court followed and the United States Court of Appeals for the Ninth Circuit eventually vacated on the ground that the plaintiff lacked standing.  <u>See</u> <u>Mayfield v. U.S.</u>, 588 F.3d 1252 (9th Cir. 2009).  And, as is the case for the lower court's decision in <u>Mayfield</u>, when a judgment is vacated by a higher court "it deprives the [lower] court's opinion of precedential effect."  <u>Los Angeles County v. Davis</u>, 440 U.S. 625, 634 n. 6 (1979).  Moreover, the district court's rational in <u>Mayfield</u> was specifically rejected in <u>Kashmiri</u>, 2010 U.S. Dist. LEXIS 119470, at *8.

[49] "FISC of Rev." refers to the Foreign Intelligence Surveillance Court of Review, which is the specialized federal appellate court that Congress established to hear appeals from the FISC.

F.Supp.2d at 137; Abu-Jihaad, 630 F.3d at 130-31; Cavanagh, 807 F.2d 787, 790 (9th Cir. 1987)

(citing United States v. U.S. District Court ("Keith"), 407 U.S. 297, 322 (1972)). This "different,

and arguably lower, probable cause standard . . . reflects the purpose for which FISA search

orders are issued." Ahmed, 2009 U.S. Dist. LEXIS 120007, at *22.

**[CLASSIFIED MATERIAL REDACTED]**

### a.   The Fourth Amendment

Courts have universally agreed that FISA's probable cause standard comports with the

Fourth Amendment. See, e.g., Mubayyid, 521 F.Supp.2d at 137-38; Ning Wen, 477 F.3d at 898

(holding that FISA is constitutional despite using "a definition of 'probable cause' that does not

depend on whether a domestic crime has been committed"); Damrah, 412 F.3d at 624 (denying as

meritless defendant's claim that FISA's procedures violate the Fourth Amendment); Pelton, 835

F.2d at 1075 (finding FISA's procedures compatible with the Fourth Amendment); Cavanagh,

807 F.2d at 790-91 (holding that FISA satisfies the Fourth Amendment requirements of probable

cause and particularity); Isa, 923 F.2d at 1302 (affirming district court's conclusion that FISA

collection did not violate the Fourth Amendment and rejecting defendant's challenge to FISA's

lower probable cause threshold); Warsame, 547 F.Supp.2d at 993-94 (holding that FISA's

probable cause and particularity requirements satisfy the reasonableness requirement of the

Fourth Amendment); Falvey, 540 F.Supp. at 1311-14 (finding that FISA procedures satisfy the

Fourth Amendment's warrant requirement).

The Supreme Court has stated that "[d]ifferent standards may be compatible with the

Fourth Amendment if they are reasonable both in relation to the legitimate need of Government

for intelligence information and the protected rights of our citizens." Keith, 407 U.S. at 322-23

(recognizing that domestic security surveillance "may involve different policy and practical

considerations than the surveillance of 'ordinary crime'").[50]  FISA's probable cause requirement

was crafted by Congress with an eye towards the Fourth Amendment and in recognition of the

unique nature and important purpose served by FISA's intelligence function.  See, e.g., Kashmiri,

2010 U.S. Dist. LEXIS 119470, at *9 ("No requirement exists to show probable cause of

presently occurring or past criminal activity").  "While the two probable cause standards differ,

'the differences appear reasonably adapted to the peculiarities of foreign intelligence gathering . .

. including the interests of national security that are at stake, the appropriate roles of the executive

and the judiciary in the area of foreign policy, and the extraordinary complexities of the field in

which the information is to be acquired.'"  Mubayyid, 521 F.Supp.2d at 137 (quoting Megahey,

553 F.Supp. at 1192).

### b.   FISA Collection is Subject to the "Good-Faith" Exception

Even assuming _arguendo_ that this Court determines that a particular FISC order was not

supported by probable cause, or that one or more of the FISA certification requirements were not

---

[50] In Keith, the Supreme Court acknowledged that: (1) the "focus of . . . surveillance [in domestic security investigations] may be less precise than that directed against more conventional types of crime;" (2) unlike ordinary criminal investigations, "the gathering of security intelligence is often long range and involves the interrelation of various sources and types of information;" and (3) the "exact targets of such surveillance may be more difficult to identify" than in surveillance operations of ordinary crimes under Title III.  Id.  Although Keith was decided before FISA's enactment and addressed purely domestic security surveillance, the rationale underlying Keith applies _a fortiori_ to foreign intelligence surveillance, where the Government's interest, at least from a national security perspective, would typically be more pronounced.

FISA was enacted partly in response to Keith.  In constructing FISA's framework, Congress addressed Keith's question whether departures from traditional Fourth Amendment procedures "are reasonable, both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens," and "concluded that such departures are reasonable." See S. Rep. No. 95-701, 95th Cong., 2d Sess., at 11, (quoting Keith at 323), reprinted in 1978 U.S.C.C.A.N. 3973, 3980 (1978) ("Senate Report").  Similarly, many courts – including the Foreign Intelligence Surveillance Court of Review – have relied on Keith in holding that FISA collection conducted pursuant to a FISC order is reasonable under the Fourth Amendment.  See In re Sealed Case, 310 F.3d at 746 (finding that while many of FISA's requirements differ from those in Title III, few of those differences have constitutional relevance); Duggan, 743 F.2d at 73-74 (holding that FISA does not violate the Fourth Amendment).

in fact met, the Government respectfully submits that the FISA materials – and the evidence

obtained or derived from the FISA collection – are, nonetheless, admissible under the "good

faith" exception to the exclusionary rule articulated in <u>United States v. Leon</u>, 468 U.S. 897

(1984).  The United States Court of Appeals for the Seventh Circuit, relying on <u>Leon</u>, held that

Federal officers were entitled to rely in good faith on a FISA warrant.   <u>Ning Wen,</u> 477 F.3d at

897.  As the court noted:

> [T]he exclusionary rule must not be applied to evidence seized on
> the authority of a warrant, even if the warrant turns out to be
> defective, unless the affidavit supporting the warrant was false or
> misleading, or probable cause was so transparently missing that "no
> reasonably well trained officer [would] rely on the warrant."

<u>Id.</u> (quoting <u>Leon</u>) (alteration in original); <u>see also</u> <u>Mubayyid</u>, 521 F.Supp.2d at 141 n. 12 (noting

that the exclusionary rule would not apply under <u>Leon</u>); <u>Duggan</u>, 743 F.2d at 77 n.6 (opining that

<u>Franks</u> principles apply to review of FISA orders); <u>Ahmed</u>, 2009 U.S. Dist. LEXIS 120007, at

*25 n.8 ("[t]he FISA evidence obtained. . . .would be admissible under <u>Leon</u>'s 'good faith'

exception to the exclusionary rule were it not otherwise admissible under a valid warrant").

   **[CLASSIFIED MATERIAL REDACTED]**[51] [52]

**IV.    THE FISA COLLECTIONS WERE LAWFULLY AUTHORIZED AND
        CONDUCTED**

   **[CLASSIFIED MATERIAL REDACTED]**

---

[51] **[CLASSIFIED MATERIAL REDACTED]**

[52] The good-faith exception to the exclusionary rule precludes the suppression of evidence
obtained or derived from FISA electronic surveillance and/or physical search even if FISA "were deemed
unconstitutional" where "there appears to be no issue as to whether the government proceeded in good
faith and in reasonable reliance on the FISA orders [because] [t]he exclusionary rule would . . . not . . .
apply under the [<u>Leon</u>] rule."  The good-faith exception "applies when an officer conducts a search in
objectively reasonable reliance on the constitutionality of a statute that subsequently is declared
unconstitutional."  <u>Ariz. v. Evans</u>, 514 U.S. 1, 13 (1995).

**A.  The FISA Collections Were Lawfully Authorized**

[CLASSIFIED MATERIAL REDACTED]

    **1.  [CLASSIFIED MATERIAL REDACTED]**

CLASSIFIED MATERIAL REDACTED]

        **a.  Foreign Intelligence Information**

[CLASSIFIED MATERIAL REDACTED][53][54][55][56][57][58][59][60]

        **b.  "A Significant Purpose"**

[CLASSIFIED MATERIAL REDACTED][61][62][63][64][65][66]

        **c.  Information Not Reasonably Obtainable Through Normal
            Investigative Techniques**

[CLASSIFIED MATERIAL REDACTED][67][68][69]

---

[53] **[CLASSIFIED MATERIAL REDACTED]**

[54] **[CLASSIFIED MATERIAL REDACTED]**

[55] **[CLASSIFIED MATERIAL REDACTED]**

[56] **[CLASSIFIED MATERIAL REDACTED]**

[57] **[CLASSIFIED MATERIAL REDACTED]**

[58] **[CLASSIFIED MATERIAL REDACTED]**

[59] **[CLASSIFIED MATERIAL REDACTED]**

[60] **[CLASSIFIED MATERIAL REDACTED]**

[61] **[CLASSIFIED MATERIAL REDACTED]**

[62] **[CLASSIFIED MATERIAL REDACTED]**

[63] **[CLASSIFIED MATERIAL REDACTED]**

[64] **[CLASSIFIED MATERIAL REDACTED]**

[65] **[CLASSIFIED MATERIAL REDACTED]**

[66] **[CLASSIFIED MATERIAL REDACTED]**

[67] **[CLASSIFIED MATERIAL REDACTED]**

[68] **[CLASSIFIED MATERIAL REDACTED]**

[69] **[CLASSIFIED MATERIAL REDACTED]**

### d.   Argument

As detailed above, each of the certifications at issue met the statutory requirements of

FISA Sections 1804(a)(6) and 1823(a)(6).  Namely, they each were certified by an appropriate

individual who deemed the information sought to be foreign intelligence information and certified

that a significant purpose of the collections was to obtain foreign intelligence information.  See 50

U.S.C. §§ 1804(a)(6), 1825(a)(6).  In addition, each certification described how the information

sought could not reasonably be obtained by normal investigative techniques; that the type of

information sought was designated in accordance with Section 1801(e); and provided statements

of the bases for the certifications that the information sought was the type of foreign intelligence

information designated, and that such information could not reasonably be obtained through

normal investigative techniques.  For these reasons, the FISC properly found that the

certifications were not clearly erroneous.  Further, the certifications demonstrate that the

defendant's contention that the required certifications may not have been made is without merit.

### 2.   All Statutory Requirements Were Met

**[CLASSIFIED MATERIAL REDACTED]**

### 3.   The FISA Collections Met FISA's Probable Cause Standard

**[CLASSIFIED MATERIAL REDACTED]**[70] [71]

### a.   [CLASSIFIED MATERIAL REDACTED]

**[CLASSIFIED MATERIAL REDACTED]**[72] [73] [74] [75] [76] [77]

---

[70] **[CLASSIFIED MATERIAL REDACTED]**

[71] **[CLASSIFIED MATERIAL REDACTED]**

[72] **[CLASSIFIED MATERIAL REDACTED]**

[73] **[CLASSIFIED MATERIAL REDACTED]**

[74] **[CLASSIFIED MATERIAL REDACTED]**

### b.  [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED][78]

#### (1)  [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED]

##### (A)  [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED][79] [80] [81] [82]

##### (B)  Argument

[CLASSIFIED MATERIAL REDACTED][83]

#### (2)  [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED][84] [85] [86]

##### (A)  [CLASSIFIED MATERIAL REDACTED]

[CLASSIFIED MATERIAL REDACTED][87] [88]

---

[75] [CLASSIFIED MATERIAL REDACTED]

[76] [CLASSIFIED MATERIAL REDACTED]

[77] [CLASSIFIED MATERIAL REDACTED]

[78] [CLASSIFIED MATERIAL REDACTED]

[79] [CLASSIFIED MATERIAL REDACTED]

[80] [CLASSIFIED MATERIAL REDACTED]

[81] [CLASSIFIED MATERIAL REDACTED]

[82] [CLASSIFIED MATERIAL REDACTED]

[83] [CLASSIFIED MATERIAL REDACTED]

[84] [CLASSIFIED MATERIAL REDACTED]

[85] [CLASSIFIED MATERIAL REDACTED]

[86] [CLASSIFIED MATERIAL REDACTED]

[87] [CLASSIFIED MATERIAL REDACTED]

[88] [CLASSIFIED MATERIAL REDACTED]

**(B)  [CLASSIFIED MATERIAL REDACTED]**

**1.   [CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**[89][90]

**2.  [CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**[91][92]

**3.  [CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**

**4.  [CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**[93][94]

**(C)  [CLASSIFIED MATERIAL REDACTED]**

**1.   [CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**

**2.  [CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**[95][96][97][98][99][100][101][102][103][104]

---

[89] **[CLASSIFIED MATERIAL REDACTED]**

[90] **[CLASSIFIED MATERIAL REDACTED]**

[91] **[CLASSIFIED MATERIAL REDACTED]**

[92] **[CLASSIFIED MATERIAL REDACTED]**

[93] **[CLASSIFIED MATERIAL REDACTED]**

[94] **[CLASSIFIED MATERIAL REDACTED]**

[95] **[CLASSIFIED MATERIAL REDACTED]**

[96] **[CLASSIFIED MATERIAL REDACTED]**

[97] **[CLASSIFIED MATERIAL REDACTED]**

[98] **[CLASSIFIED MATERIAL REDACTED]**

[99] **[CLASSIFIED MATERIAL REDACTED]**

[100] **[CLASSIFIED MATERIAL REDACTED]**

**(D)** **Argument**

[CLASSIFIED MATERIAL REDACTED]

**(3)** **[CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][105] [106] [107]

**(A)** **[CLASSIFIED MATERIAL REDACTED]**

**1.** **[CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED]

**2.** **[CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED]

**(i)** **[CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][108] [109] [110]

**(ii)** **[CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][111]

---

[101] **[CLASSIFIED MATERIAL REDACTED]**

[102] **[CLASSIFIED MATERIAL REDACTED]**

[103] **[CLASSIFIED MATERIAL REDACTED]**

[104] **[CLASSIFIED MATERIAL REDACTED]**

[105] **[CLASSIFIED MATERIAL REDACTED]**

[106] **[CLASSIFIED MATERIAL REDACTED]**

[107] **[CLASSIFIED MATERIAL REDACTED]**

[108] **[CLASSIFIED MATERIAL REDACTED]**

[109] **[CLASSIFIED MATERIAL REDACTED]**

[110] **[CLASSIFIED MATERIAL REDACTED]**

[111] **[CLASSIFIED MATERIAL REDACTED]**

           **(iii)**  **[CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**[112]

           **(iv)**  **[CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**

           **(v)**  **[CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**[113] [114]

           **3.**  **[CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**[115]

           **(B)**  **[CLASSIFIED MATERIAL REDACTED]**[116]

           **1.** [CLASSIFIED MATERIAL REDACTED]**[117]

**[CLASSIFIED MATERIAL REDACTED]**[118] [119] [120] [121] [122]

           **2.**  **[CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**[123] [124] [125] [126]

---

[112] **[CLASSIFIED MATERIAL REDACTED]**

[113] **[CLASSIFIED MATERIAL REDACTED]**

[114] **[CLASSIFIED MATERIAL REDACTED]**

[115] **[CLASSIFIED MATERIAL REDACTED]**

[116] **[CLASSIFIED MATERIAL REDACTED]**

[117] **[CLASSIFIED MATERIAL REDACTED]**

[118] **[CLASSIFIED MATERIAL REDACTED]**

[119] **[CLASSIFIED MATERIAL REDACTED]**

[120] **[CLASSIFIED MATERIAL REDACTED]**

[121] **[CLASSIFIED MATERIAL REDACTED]**

[122] **[CLASSIFIED MATERIAL REDACTED]**

(C)  <u>Argument</u>

**[CLASSIFIED MATERIAL REDACTED]**[127]

**B.    <u>The FISA Collections Were Lawfully Conducted</u>**

This Court's <u>in camera</u> and <u>ex parte</u> review of the FISA materials will demonstrate not only that the FISA collection was lawfully authorized, but also that it was lawfully conducted. That is, the FISA-obtained and -derived information that will be offered into evidence in this case was acquired and retained by the FBI in accordance with FISA's minimization requirements, and the implementing standard minimization procedures ("SMPs adopted by the Attorney General and approved by the FISC.

1.  <u>Minimization</u>

**[CLASSIFIED MATERIAL REDACTED]**[128] [129] [130] [131] [132]

The degree to which information is required to be minimized varies somewhat given the specifics of a particular investigation, such that less minimization at acquisition and retention is justified when "the investigation is focusing on what is thought to be a widespread conspiracy" and more extensive surveillance is necessary "to determine the precise scope of the enterprise." <u>In</u>

---

[123] **[CLASSIFIED MATERIAL REDACTED]**

[124] **[CLASSIFIED MATERIAL REDACTED]**

[125] **[CLASSIFIED MATERIAL REDACTED]**

[126] **[CLASSIFIED MATERIAL REDACTED]**

[127] **[CLASSIFIED MATERIAL REDACTED]**

[128] **[CLASSIFIED MATERIAL REDACTED]**

[129] **[CLASSIFIED MATERIAL REDACTED]**

[130] **[CLASSIFIED MATERIAL REDACTED]**

[131] **[CLASSIFIED MATERIAL REDACTED]**

[132] <u>See</u> House Report at 58, noting that minimization can occur by rendering the information "not retrievable by the name of the innocent person."

34

re Sealed Case, 310 F.3d at 741; United States v. Bin Laden, 126 F.Supp.2d at 286 ("[m]ore

extensive monitoring and 'greater leeway' in minimization efforts are permitted in a case

[involving] . . . [a] 'world-wide, covert and diffuse . . . international terrorist group.'").

Furthermore, the activities of foreign powers and their agents are often not obvious from an initial

or cursory overhear of conversations. To the contrary, agents of foreign powers frequently engage

in coded communications, compartmentalized operations, the use of false identities and other

practices designed to conceal the breadth and aim of their operations, their organization, activities

and plans.  See, e.g., United States v. Salameh,152 F.3d 88, 154 (2d Cir. 1998) (noting that two

conspirators involved in the 1993 bombing of the World Trade Center in New York referred to

the bomb plot as the "study" and to terrorist materials as "university papers").  As one court

explained, "[i]nnocuous-sounding conversations may in fact be signals of important activity [and]

information on its face innocent when analyzed or considered with other information may become

critical."  Kevork, 634 F.Supp. at 1017 (quoting House Report at 55); see also In re Sealed Case,

310 F.3d at 740-41; Bin Laden, 126 F.Supp.2d at 286.  Likewise, "individual items of

information, not apparently significant when taken in isolation, may become highly significant

when considered together over time."  Kevork, 634 F.Supp. at 1017; Rahman, 861 F.Supp. at

252-53 (rejecting the notion that the "wheat" could be separated from the "chaff" while the

"stalks were still growing").  This is especially true where the individuals involved use codes or

cryptic language.  See, e.g., Hammoud, 381 F.3d at 334 ("[a] conversation that seems innocuous

on one day may later turn out to be of great significance, particularly if the individuals involved

are talking in code"); Bin Laden, 126 F.Supp. 25 at 286; Kevork, 634 F.Supp. at 1017; Thomson,

752 F.Supp. at 81 (permissible to retain and disseminate "bits and pieces" of information until

their "full significance becomes apparent").  As a result, "courts have construed 'foreign

intelligence information' broadly and sensibly allowed the government latitude in its determination of what is foreign intelligence information."  Rosen, 447 F.Supp.2d at 551; IARA, 2009 U.S. Dist. LEXIS 118505, at *18.

**[CLASSIFIED MATERIAL REDACTED]**

The nature of the foreign intelligence information sought also impacts the amount of information regarding a United States person that can properly be retained and disseminated.  As Congress explained, there is a legitimate need to conduct a thorough post-acquisition review of FISA information that involves a United States person who is acting as an agent of a foreign power:

> It is "necessary" to identify anyone working with him in this network, feeding him information, or to whom he reports. Therefore, it is necessary to acquire, retain and disseminate information concerning all his contacts and acquaintances and his movements. Among his contacts and acquaintances, however, there are likely to be a large number of innocent persons. Yet, information concerning these persons must be retained at least until it is determined that they are not involved in the clandestine intelligence activities and may have to be disseminated in order to determine their innocence.

House Report at 58.  Indeed, courts have cautioned that, when a United States person communicates with an agent of a foreign power, the Government would be "remiss in meeting its foreign counterintelligence responsibilities" if it did not thoroughly "investigate such contacts and gather information to determine the nature of those activities."  Thomson, 752 F.Supp. at 82.

Congress also recognized that agents of a foreign power are often very sophisticated and skilled at hiding their activities.  See Thomson, 752 F.Supp. at 81 (quoting House Report at 58). Accordingly, to pursue leads, Congress intended that the Government be given "a significant

degree of latitude" with respect to the "retention of information and the dissemination of information between and among counterintelligence components of the Government." Id.

In light of these realities, Congress recognized that minimization efforts by the Government can never be free of mistake, because "no electronic surveillance can be so conducted that innocent conversations can be totally eliminated." Senate Report at 39. The Fourth Circuit reached the same conclusion in Hammoud, 381 F.3d at 334, stating that the "mere fact that innocent conversations were recorded, without more, does not establish that the government failed to appropriately minimize surveillance."[133] Accordingly, in reviewing the adequacy of minimization efforts, the test to be applied is neither whether innocent conversations were intercepted, nor whether mistakes were made with respect to particular communications. Rather, as the United States Supreme Court stated in the context of Title III surveillance, there should be an "objective assessment of the [agents'] actions in light of the facts and circumstances confronting [them] at the time." Scott v. United States, 436 U.S. 128, 136 (1978). The test of compliance is whether a good faith effort to minimize was made. Hammoud, 381 F.3d at 334 ("[t]he minimization requirement obligates the Government to make a good faith effort to minimize the acquisition and retention of irrelevant information"); see also Senate Report at 39-40 (stating that the court's role is to determine whether "on the whole, the agents have shown a high regard for the right of privacy and have done all they reasonably could do to avoid unnecessary intrusion"); IARA, 2009 U.S. Dist. LEXIS 118505, *18-19 (quoting Senate Report at 39-40).

---

[133] The reason is that although "the minimization requirement obligates the Government to make a good faith effort to minimize . . . it is not always immediately clear into which category a particular conversation falls. A conversation that seems innocuous on one day may later turn out to be of great significance, particularly, if the individuals involved are talking in code." Hammoud, 381 F.3d at 334, citing Senate Report at 39-40.

Moreover, absent evidence that there has been a complete disregard for the minimization procedures, suppression is not the appropriate remedy with respect to those communications that were properly obtained and retained.  Indeed, Congress intended that any suppression remedy should apply only to the "evidence which was obtained unlawfully."  House Report at 93.  FISA's legislative history reflects that Congress intended only this limited sanction for errors of minimization:

> As the language of the bill makes clear, only that evidence which was obtained unlawfully or derived from information obtained unlawfully would be suppressed. If, for example, some information should have been minimized but was not, only that information should be suppressed; the other information obtained lawfully should not be suppressed.

Id.; accord IARA, 2009 U.S. Dist. LEXIS 118505, at *20-21 ("this Court declines to suppress evidence obtained through FISA warrants properly issued and conducted"); see also United States v. Falcone, 364 F.Supp. 877, 886-87 (D.N.J. 1973), aff'd 500 F.2d 1401 (3rd Cir. 1974) (Title III).

## 2.   **The FISA Collections Were Appropriately Minimized**

[CLASSIFIED MATERIAL REDACTED][134] [135] [136]

## 3.  **[CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][137] [138]

## 4.  **Argument**

[CLASSIFIED MATERIAL REDACTED]

---

[134] **[CLASSIFIED MATERIAL REDACTED]**

[135] **[CLASSIFIED MATERIAL REDACTED]**

[136] **[CLASSIFIED MATERIAL REDACTED]**

[137] **[CLASSIFIED MATERIAL REDACTED]**

[138] **[CLASSIFIED MATERIAL REDACTED]**

## V.   ANALYSIS OF MEHANNA'S SPECIFIC ARGUMENTS

The Attorney General has filed a declaration in this case stating that disclosure or an adversary hearing would harm the national security of the United States.  Therefore, FISA mandates that this Court conduct an in camera and ex parte review of the challenged FISA materials to determine whether the collection was both lawfully authorized and conducted.  In conducting that review, the Court may disclose the FISA materials "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance [or search]."  See 50 U.S.C. §§ 1806(f), 1825(g).  Congress, in enacting FISA's procedures for in camera, ex parte judicial review, has balanced and accommodated the competing interests of the Government and criminal defendants, and has articulated the proper standard for disclosure; that is, only where the Court finds that disclosure is necessary to the Court's accurate determination of the legality of the FISA collection.  See id.  The Court will be able to render a determination based on its in camera, ex parte review, and Mehanna has failed to present any colorable basis for supplanting Congress' reasoned judgment with a different proposed standard of review.

The Court can make this determination without disclosing the classified and highly-sensitive FISA materials to Mehanna.  Every federal court that has been asked to determine the legality of a FISC-authorized collection has been able to do so in camera and ex parte and without the assistance of defense counsel.  The FISA materials at issue here are organized and readily understood, and an overview of them is presented hereinafter as a frame of reference.

As stated above, in his FISA suppression motion, Mehanna argues for relief on the following grounds: (1) the FISA applications at issue may lack probable cause; (2) the FISA applications at issue may contain intentional or reckless material falsehoods or omissions, and the surveillance and searches therefore may violate the principles of Franks, 438 U.S. at 154; (3) the

primary purpose of the electronic surveillance and searches was to obtain evidence of domestic

criminal activity and not foreign intelligence information; (4) the government may not have made

the required certifications in the FISA applications, or may have failed to obtain necessary

extensions of prior FISA orders; and (5) the government may not have established the appropriate

minimization procedures required by FISA.  (Def. FISA Supp. Mot., at 2.)  As detailed above,

none of these grounds have merit.

**[CLASSIFIED MATERIAL REDACTED]**

Second, Mehanna contends that the FISA applications may contain errors, and that

disclosure is necessary in order to aid the Court in evaluating the legality of the collections, as the

defense cannot assist the Court in identifying how the applications are lacking without access to

such materials.  The Court can make any determination necessary without obtaining assistance

from the defense.  In addition, we again note that all of the courts faced with a motion such as

Mehanna's have ruled against disclosure.  See Mubayyid, 521 F.Supp.2d at 130 (collecting

cases).

**[CLASSIFIED MATERIAL REDACTED]**

If a defendant could force disclosure of FISA materials and obtain an adversarial hearing

merely by speculating that there *might* be a Franks violation somewhere in an application, the

disclosure of FISA materials and adversarial hearings would be the rule and not the exception.

Such a result would violate Congress' clear intent that FISA material should be reviewed in

camera and ex parte, and in a manner consistent with the realities of intelligence needs and

investigative techniques.  In keeping with the well-established principle in the search warrant

context that a defendant may only obtain a Franks hearing after making a "concrete and

substantial preliminary showing,"  Mehanna should be required to make such a showing before

any disclosure is ordered or an adversarial hearing on Franks grounds can be contemplated.

Accord Kashmiri, 2010 U.S. Dist. LEXIS 119470, at *16 (the Defendant "has not made any

showing – let alone a substantial one – that an Executive Branch officer knowingly and

intentionally, or recklessly, included a false statement in the FISA application [and w]ithout such

a showing, he is foreclosed from obtaining a hearing"); Duggan, 743 F.2d at 77 n.6.[139]

**[CLASSIFIED MATERIAL REDACTED]**

For the reasons discussed above, we therefore respectfully submit that the FISA

collections at issue were lawfully authorized and conducted, and that the Court can make such a

finding without the disclosure of the FISA materials.

**[CLASSIFIED MATERIAL REDACTED]**

**IV.    CONCLUSION**

Based on the foregoing analysis and a review of the materials submitted in camera and ex

parte, the Government respectfully submits that the Court should, following its statutorily

mandated in camera and ex parte review of the FISA materials: (1) find that the FISA collections

at issue were lawfully authorized and lawfully conducted; (2) hold that disclosure of the FISA

materials to the defense is not required because the Court is able to make an accurate

determination of the legality of the FISA collections without disclosing the FISA materials or any

portions thereof; (3) order that the FISA materials and the Government's classified submissions

---

[139]    We note that several courts have rejected defense attempts to force a Franks hearing
challenging the validity of FISA orders when the defense could offer no evidence to support their claims
that the underlying applications were deficient.  See Abu-Jihaad, 531 F.Supp.2d at 311 (noting defense
could "only speculate" about the FISA applications' contents); Hassoun, 2007 WL 1069127, *4 (denying
request for a Franks hearing to challenge FISA applications where defendants' allegations were "purely
speculative"); Mubayyid, 521 F. Supp.2d at 130-31 (denying defendants' request for a Franks hearing to
challenge FISA applications); Kashmiri, 2010 U.S. Dist. LEXIS 119470, at * 17 (denying defendant's
request for a Franks hearing and noting that the court "has already undertaken a process akin to a Franks
hearing through its ex parte, in camera review").

be maintained under seal by the Court Security Officer or his/her designee; and (5) deny

Mehanna's FISA-related motions.[140]


Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney


By:     /s/ Aloke Chakravarty
ALOKE CHAKRAVARTY
JEFFREY AUERHAHN
Assistants United States Attorney



    /s/ Jeffrey Groharing
JEFFREY GROHARING
Trial Attorney
Counterterrorism Section
National Security Division
U.S. Department of Justice


Dated:  July 20, 2011

---

[140] A district court order requiring the disclosure of FISA materials is a final order for purposes of appeal.  See 50 U.S.C. §§ 1806(h), 1825(h).  In the unlikely event that the Court concludes that disclosure of any item within any of the FISA materials may be required, given the significant national security consequences that would result from such disclosure, the Government would expect to pursue an appeal. Accordingly, the Government respectfully requests that the Court indicate its intent to do so before issuing any order, or that any such order be issued in such a manner that the United States has sufficient notice to file an appeal prior to any actual disclosure.