UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA       )
                               )
                               )
          v.                   )      Criminal No. 09-10017-GAO
                               )
                               )
TAREK MEHANNA                  )

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PORTIONS OF COUNTS ONE THROUGH THREE OF THE SECOND SUPERCEDING INDICTMENT

The United States of America, by and through United States Attorney Carmen M. Ortiz, and Assistant United States Attorneys ("AUSA") Jeffrey Auerhahn and Aloke S. Chakravarty, for the District of Massachusetts, and Jeffrey D. Groharing, Trial Attorney, Counterterrorism Section, National Security Division, United States Department of Justice, hereby responds to the Defendants' motion to dismiss dated July 15, 2011. For the reasons stated herein and supported by the allegations in the record[1], the Government respectfully requests that the Defendants' Motion be denied.

## INTRODUCTION

Information expected to be tendered at trial and previewed to the court previously through the Indictment, Complaint

---

[1] See Second Superseding Indictment ("Indictment"), Complaint Affidavit of Agent Nambu and Detention Proffer for a non-exhaustive summary of evidence which, along with supplemental evidence is likely to be elicited at trial as relates to the instant motion.

1

Affidavit, Detention Proffer and other pleadings reveals the
following:

A group of young men from the suburbs of Boston radicalized
themselves to justify, plan, and take action to conduct violence
based on their religious beliefs.  Among other materials, the men
consumed terrorist propaganda materials from Al Qa'ida, reveled
in the acts of September 11, 2001. and ultimately desired to
answer the call of Osama bin Laden to engage in violent jihad Two
members of the group, defendants Tarek Mehanna and Ahmad
Abousamra agreed with others that violent jihad was their
obligation and that they should find a way to act.  Through
numerous occasions of studying and discussing materials which
justified violent jihad, seeking supportive materials on-line,
and by watching and discussing videos depicting violent jihad,
they concluded that they too should take up arms in defense of
their beliefs.  In furtherance of their objective, they
ultimately planned violence, sought military-type training at
terrorist training camps, and agreed to help provide
personnel(including themselves) to engage in jihad, as well as
provide services and expertise through translation and computer
skills to help recruit others to do what they aspired to do,
support terrorists and al Qa'ida.

In 2002, in furtherance of their conspiracy, Abousamra
traveled to Pakistan for the purpose of receiving military

2

training at a terrorist camp, so that he could then enter
Afghanistan to fight and kill Americans.  Having failed in his
efforts, he returned to Boston and rejoined the group.

The men discussed their desire to die as martyrs to their
faith on the field of battle.  Together, they watched and
distributed jihadi videos and other media as a source of
inspiration.  Influenced in part by Abousamra's failure in
Pakistan, three of the men discussed potential alternative acts
of violence which could be committed in the United States,
including the assassinations and terror shootings as means of
participating in jihad.  Some plans were abandoned as impractical
and some because of a high probability of failure.

In 2004, the defendant and two of his associates left the
United States with the intention of traveling to Yemen, where
they sought military training at a terrorist camp.  Once properly
trained, they intended to train with other 'mujahideen' and enter
Iraq to fight and kill American soldiers.  Mehanna and Abousamra
made it to Yemen, but were apparently unsuccessful in finding the
terrorist training camp they expected.  Abousamra continued to
Iraq in order to fight and kill Americans without any further
training.

All three of the group ultimately returned to the United
States.  Defendants Mehanna and Abousamra continued to consider
additional ways by which they could serve and participate in

3

jihad.  Capitalizing on their language and computer skills, Mehanna and Abousamra translated jihad materials for the purpose of assisting, inspiring and encouraging others to provide support to terrorists and to Al Qa'ida.  They became online recruiters for violent jihad, and relished their perceived role as serving a valuable function for Al Qa'ida and others who encouraged young Muslim men to take up arms in violent jihad.  Among Mehanna's translated publications is a manual entitled "39 Ways to Serve and Participate in Jihad".  At trial, evidence will be presented demonstrating how influential this publication is and how it has been used to train and recruit terrorists and would-be terrorists around the world.  Moreover, one of Mehanna's translated video productions, released as a production of Al Qa'ida in the land of the two rivers, served as an influential recruiting device for Al Qa'ida in Iraq.  Mehanna hoped that the translation and digital editing of items like these would make an impact and bring people to the support of terrorists whom he idolized.

In 2006, years removed from their own attempt to personally take up arms in the name of the faith, one of the beneficiaries of Mehanna and Abousamra's promotion of radical jihad, Daniel Maldonado, traveled to Somalia and did what the others had failed to do.  Maldonado received training at a Jihadi training camp, and called Mehanna from Somalia to invite him and Abousamra to join him with the militants who he had joined.

4

At various times between 2004 and 2006, the defendants were questioned by federal law enforcement about their activities and the activities of their friends and associates, including Maldonado.  As part of a conspiracy to provide false information about their objectives, they lied.  Mehanna, Abousamra and others, continued to take steps to conceal their conspiracy from their families, their communities, and law enforcement, even as they continued to search for valuable ways to participate in jihad and to assist Al Qa'ida over the internet.

In essence, the material support charges subject to this motion involve the following: Count One charges the defendant with conspiring to provide material support to Al Qa'ida.  Count Two charges the defendant with conspiring to provide material support to acts which constitute terrorism.  Count Three charges the defendant with attempting to provide and providing material support to acts of terrorism.

The theories of liability on each of these counts are essentially that (1) the defendants conspired and attempted to provide themselves and each other as personnel in the form of personally participating in terrorist training and combat, and (2) the defendants conspired and attempted to provide other material support and resources, including services, expert advice and assistance, training, and personnel in the form of their online activities of translating, editing and distributing

certain pro-jihadi materials for terrorists and Al Qa'ida.  While
some overt acts in furtherance of the conspiracy are listed in
the Indictment, they are neither required under the charging
statutes, nor are they exhaustive of the overt acts that the
defendant and other conspirators will be shown at trial to have
taken in order to further their criminal objectives.

**ARGUMENT**

**I.    THE FIRST AMENDMENT IS NOT IMPLICATED IN THIS INDICTMENT**

   **A.    STANDARD OF REVIEW**

   The Federal Rules of Criminal Procedure permit a defendant
to "raise by pretrial motion any defenses, objection, or request
that the court can determine without a trial of the general
issues." Fed.R.Crim.P. 12(b)(2). When considering a motion to
dismiss an indictment, a court assumes all facts in the
indictment are true and must view all facts in the light most
favorable to the government. United States v. Sampson, 371 U.S.
75, 78-79 (1962).  Consequently, arguments raised in a motion to
dismiss that rely on disputed facts should be denied.  United
States v. Covington, 395 U.S. 58, 60 (1969).  Because the
allegations contained in an indictment are considered to be true
for purposes of a motion to dismiss, factual issues involving
varying interpretations must be resolved at trial.  See United
States v. Sattar, 314 F. Supp. 2d 279 (S.D.N.Y. 2004)(refusing to
strike indictment's definition of jihad and related terms);

United States v. Goba, 220 F. Supp. 2d 182 (W.D.N.Y.
2002)(admitting evidence of defendants' interpretation of jihad
such as publications and recordings); United States v. Benkahla,
2000 WL 35455044 (E.D.Va. 2000)(same).  Applying this standard of
review to this case it becomes apparent that the defendant's
motion cannot succeed pre-trial.  However, to the extent that the
issues raised by the defendant's motion may be raised again at
the end of trial in this matter, the government addresses the
legal issues to be considered below.

    **B.   THE RELIEF REQUESTED IS NOT AVAILABLE**

    Although captioned as a Motion to Dismiss, the instant
motion seeks the relief of excluding the defendant's statements,
expressions, actions and associations from being permitted to
form the basis of liability under the Indictment.  In essence,
the defendant claims that he was free to say whatever he wants,
even in the course of a conspiracy, and therefore he is entitled
to relief.  The defendant does not offer a legal framework
through which to arrive at this conclusion, but rather, rests on
bedrock rhetoric of our democracy, memorialized and re-iterated
in our First Amendment.  The problem with this approach is that
it does not reconcile that protection with a legal claim for
relief, especially in a pre-trial posture.

    In the face of this problem, to the extent that the
Defendant's motion can be seen as seeking some pre-trial relief,

it could be characterized as a motion to strike specific overt acts or to narrow the indictment to excise those acts which are a manifestation of the defendant's expressions and beliefs, from the Indictment.   There is no basis in law or fact for such a motion to succeed.   If the overt act is neither irrelevant nor unfairly prejudicial, a motion to strike it is without merit. Fed. R. Cr. P. 7(d); <u>see</u> <u>United States v. Dimasi</u>, 2011 WL 468213 (09-10166-MLW); <u>see</u> <u>United States v. Hedgepeth</u>, 434 F.3d 609, 612 (3d Cir. 2006).   To the extent that the defendant claims that the evidence will be insufficient to overcome the Section 2339B(h) protection of pure independent advocacy pertaining to the provision of 'personnel', the "issue must be decided at trial, based on the evidence presented, before the case is submitted to the jury for decision." <u>Id.</u>; <u>see</u> <u>United States v. Williams</u>, 809 F.2d 75, 80-81 (1st Cir. 1986).

   **C.   THE DEFENDANT'S WORDS AND EXPRESSIVE CONDUCT AS IMPLICATED IN THIS CASE ARE NOT PROTECTED UNDER THE FIRST AMENDMENT**

   The defendant is not being prosecuted for his dissidence or his unpopular beliefs, he is being prosecuted because he engaged in dangerous conduct which violates federal criminal law. Neither the charges, nor the evidence of his statements and actions should be limited on First Amendment grounds, because they were integral to and used to commit serious crimes.   <u>See</u> <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 489 (1993)("The First

Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."). The defendant argues for the absurd conclusion that any crime should be immune from prosecution if done through the medium of speech. In fact, however, he has no more Constitutional right to engage in counts One through Three then he did to lie to the federal officials as charged in counts Six and Seven of the Indictment (which are being challenged on other grounds). See Boim v. Quranic Literacy Foundation for Relief and Development, 291 F.3d 1000, 1026 (7th Cir. 2002)("There is no constitutional right to provide weapons and explosives to terrorists, nor is there any right to provide the resources with which the terrorists can purchase weapons and explosives . . . Rather, such a [conspiracy charge] is aimed at prohibiting the funding of violent acts that these organizations wish to carry out.") Where, as here, the defendant's conspiracy[2] involved actions which transcended First Amendment protected activity, a motion to dismiss on these grounds cannot lie.

It is well-settled that not all speech is protected under

---

[2] The Indictment also details many of the defendant's and co-conspirators' activities which do not implicate any expressive conduct in furtherance of the charged conspiracies. For example, members of the conspiracy traveled to Pakistan and Yemen to receive terrorist training, attempted to procure firearms for a domestic assault, traveled to obtain advice on how to obtain terrorist training, provided money to those who might be able to assist, and other activities within the scope of their criminal conspiracies.

the First Amendment, particularly when it is used to commit a
crime.  Such is the case here.  The classic language of Justice
Douglas' dissent in <u>Dennis</u> foreshadowed the enactment of the
material support statutes:

> If this were a case where those who claimed protection under
> the First Amendment were teaching the techniques of
> sabotage…the art of street warfare and the like, I would
> have no doubts.  The freedom to speak is not absolute; the
> teaching of methods of terror and other seditious conduct
> should be beyond the pale.

<u>Dennis v. United States</u>, 341 U.S. 494, 581 (1950).

It is axiomatic that several crimes are committed through
speech. Conspiracies are characteristically committed through
speech, whether they are to commit violence, narcotics
trafficking, or to violate the tax laws.  <u>See</u>, <u>e.g.</u>, 18 U.S.C. §§
371, 373(a); 21 U.S.C. § 846; <u>United States v. Dwinnells</u>, 508
F.3d 63, 71 (1st Cir. 2007); <u>United States v. Rahman</u>, 189 F.3d
88, 117 (2nd Cir. 1999)(defendant's speech and religious conduct
did not immunize him from prosecution);[3] <u>United States v. Rowlee</u>,

---

[3] In denying Sheikh Omar Abdel Rahman's motion to dismiss,
District Court Judge Mukasey stated quite aptly:
> To be sure, [the crimes charged], like most others, may have
> a component of speech in the course of their commission.
> Indeed, it is the rare offense, particularly the rare
> conspiracy or aiding and abetting offense, that is committed
> entirely in pantomime.  However, that speech – even speech
> that includes reference to religion – may play a part in the
> commission of a crime does not insulate such crime from
> prosecution. '[S]peech is not protected by the First
> Amendment when it is the very vehicle of the crime itself.'
1994 WL 388927 at *1-2 (S.D.N.Y. July 22, 1994)(Mukasey,
D.J.)(denying motion to dismiss based on First Amendment claims).

899 F.2d 1275, 1278 (2nd Cir. 1990)(First Amendment inapplicable to tax protester).  First Amendment analysis is also not implicated in speech-related prosecutions if the evidence showed that the speech crosses the line into criminal solicitation, procurement of criminal activity, or conspiracy to violate the laws.  See United States v. Spock, 416 F.2d 165, 169-171 (1st Cir. 1969); McConnell v. Fed'l Election Comm'n, 540 U.S. 93 (2003)(holding that soliciting and donating funds is more like expressive conduct than pure speech); Buckley v. Valeo, 424 U.S. 1, 20-21 (1976).

Particularly in conspiracy charges, a defendant is not immunized by the First Amendment.  A conspiracy statute "punishes the act of conspiracy and does not implicate speech."  Rowlee, 899 F.2d at 1277 (noting that the "district court did not err in instructing the jury that a First Amendment defense was not applicable to the charge of violating this statute [18 U.S.C. § 371]"); United States v. Varani, 435 F.2d 758, 762 (6th Cir. 1970) ("speech is not protected by the First Amendment when it is the very vehicle of the crime itself."); United States v. Sattar, 395 F. Supp. 2d 79, 102 (S.D.N.Y. 2005) ("even if Abdel Rahman's words were protected speech, it is not his words but his agreement that is criminalized in the Count Two conspiracy").

Nor does the First Amendment preclude alleging and proving overt acts which focus on a defendant's expressive conduct. One

11

of the overarching frailties of the defendant's motion is the misconstruction that overt acts in a conspiracy must themselves form the basis of criminal liability.  "An overt act does not need to be a crime so long as it is "knowingly done in furtherance of some object or purpose of the conspiracy." <u>United States v. Richardson</u>, 14 F.3d 666, 670 (1st Cir.1994); <u>see</u> <u>United States v. Medina</u>, 761 F.2d 12, 15 (1st Cir.1985); <u>see</u> <u>United States v. Donner</u>, 497 F.2d 184, 192 (7th Cir. 1974);  <u>United States ex rel. Epton v. Nenna</u>, 446 F.2d 363, 368 (2nd Cir. 1971) ("it is not the 'speech' that is made criminal, but rather the agreement, and whether the overt act is constitutionally protected speech would be irrelevant" in riot conspiracy conviction); <u>United States v. Al-Arian</u>, 308 F. Supp. 2d 1322, 1342 (M.D. Fla. 2004) ("The fact that Defendants' speech is contained in the overt act section of the Indictment [charging conspiracy to provide material support] is of little consequence"). In fact, not only are overt acts not required to be proven in a conspiracy to violate the material support laws, but they also need not be criminal in any conspiracy prosecution. <u>See</u> 18 U.S.C. §§ 2339A, 2339B; <u>United States v. Lanier</u>, 920 F.2d 887, 893 (11th Cir. 1991)("an overt act need not be criminal, and may indeed by otherwise innocent"); <u>United States v. Al-Arian</u>, 308 F. Supp. 2d 1322, 1342 ("The reason that an overt act can include even protected speech is that it is the agreement that is

punishable in a conspiracy charge and not the overt act itself.")

## III. THE INDICTMENT SATISFIES FIRST AMENDMENT SCRUTINY EVEN IF APPLIED

### A.   FIRST AMENDMENT LAW APPLIED IN MATERIAL SUPPORT CASES

Criminal conduct is not shielded by the First Amendment, whether the conduct relates to unpopular views or not.   The constitutional freedom for speech and press does not extend its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.   United States v. Kassir, 2009 WL 2913651, *9 (S.D.N.Y. 2009) citing Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 499 (1949)(Kassir was convicted of conspiring under Section 2339B, inter alia, to operate websites which distributed jihadi propaganda as well as manuals which would be of assistance to al Qa'ida).

Courts faced with First Amendment challenges in material support cases have similarly looked at whether the defendant was advocating (or agreeing to advocate) for terrorist acts and whether they were intentionally providing one of the listed means of material support.   "The First Amendment provides no protection for the conduct of providing resources knowing and intending that they be used for crimes of violence." United States v. Jayyousi, 2007 WL 781373, *2 (S.D. Fla. 2007) (citing United States v. Sattar, 314 F. Supp. 2d 279 (S.D.N.Y. 2004)).   In Jayyousi, a district court denied the defendants' motion to dismiss based on a claim that the indictment violated the First Amendment.   The

court found that the defendants' use of a pro-Islamic newsletter
"to recruit individuals to engage in jihad and ... facilitate the
provision of aid and materials for terrorist and support groups"
was not protected by the First Amendment in a case alleging that
the defendant's were providing personnel (in the form of others)
to engage in acts of terror.  Id. at *2.  The court stated
"[u]ndoubtedly, to the extent that [the newsletter] merely
advocated terrorism in general, or jihad at some indefinite time,
the action of publishing or distributing the report would be
protected."  Id. at *6.  However, since there was abundant
evidence as to the purpose and intended beneficiaries of their
publication, the evidence of publication was admissible to
demonstrate the defendant's intent, and the purpose of their
activities (to provide personnel). Id.  See also U.S. v.
Mubayyid, 476 F.Supp.2d. 46 (2007)(D.Ma. March 8, 2007)(Saylor,
D.J.)(holding that publications and other expression can be overt
acts in a conspiracy without Constitutional scrutiny)(citing U.S.
v. Rahman, 189 F.3d 88, 117 (2nd Cir. 1999)("Notwithstanding that
political speech and religious exercise are among the activities
most jealously guarded by the First Amendment, one is not
immunized from prosecution for ... speech-based offenses merely
because one commits them through the medium of political speech
or religious preaching").

A defendant's speech is also not protected if he goes beyond

mere words so that they have significance as actions independently or coupled with other non-verbal actions.[4]  See Rowlee, 899 F.2d at 1279-80; United States v. Freeman, 761 F.2d 549, 552 (9th Cir. 1985)(holding First Amendment question was for jury to decide).  Consequently, the defendant's speech-related activities should not be viewed in a vacuum.  The defendant and his co-conspirators engaged in other non-speech related activities, such as preparatory steps to engage in violent jihad here and abroad on multiple occasions, none of which implicates First Amendment concerns, and which provides context to their speech-related activities.

When a prosecution does implicate the First Amendment, such as when an individual intends to advocate on behalf of a Foreign Terrorist Organization ("FTO"), the Supreme Court applies strict Constitutional scrutiny.  Holder v. Humanitarian Law Project ("HLP"), 130 S.Ct. 2705, 2724-2728 (2011).  However, application of such standard affords no comfort to the defendant, since the Court in HLP found that Congress had precisely satisfied that standard in enacting Section 2339B given the compelling state interest at stake, and in this case, the defendant conspired to

---

[4] "Speech is not protected by the First Amendment when it is the very vehicle of the crime itself . . . The gist of the crime of conspiracy is agreement to violate the law . . . Thus it is both possible and permissible to charge that criminal statutes were violated entirely by means of speech."  United States v. Rahman, 1994 WL 388927,*1 S.D.N.Y. 1994).

provide material support to an FTO. Id.

Neither can the defendant find relief in Brandenburg v. Ohio, 395 U.S. 444 (1969). See also United States v. Johnson, 952 F.2d 565 (1st Cir. 1991)(holding First Amendment does not protect conduct contrary to public policy or inciteful of imminent lawless action).  In Brandenburg, the Supreme Court articulated a test to determine the constitutionality of the regulation of content-specific advocacy which was directed at inciting lawless acts.  Brandenburg, 395 U.S. 444.  Brandenburg pertains to situations where the content and circumstances of one's statement becomes contraband, itself the basis of liability.[5]  To the contrary, here, the defendant's expressive conduct is not alleged to have been inherently criminal, rather the nature and purpose of the conduct is what explicates that it endeavored to achieve the criminal objectives of providing material support to terrorists and killing Americans.  See United States v. Al-Arian, 308 F. Supp. 2d 1322 (M.D. Fl. 2004); see also United States v. Lindh, 212 F. Supp. 2d at 569 ("Those who choose to furnish such material support to terrorists cannot hide or shield their conduct behind the First Amendment.").  Consequently, Brandenburg's restrictions of imminency are inapplicable because the criminal conduct here, conspiracy, attempt, and provision of

_____

[5]See United States v. Fleschner, 98 F.3d 155 (4th Cir. 1996), cert. denied, 117 S.Ct. 2484 (1997); Colten v. Kentucky, 407 U.S. 104 (1972).

material support are themselves crimes which only incidentally involve speech. In citing to laws prohibiting associations for non-expressive conduct, i.e. anti-prostitution law, the Southern District of New York recognized that material support prosecutions serve purposes unrelated to the content of the messages which a defendant expresses. U.S. v. Hashmi, 2009 WL 4042841 at *9 (S.D.N.Y. November 18, 2009)(Preska, D.J.)(citing Arcara v. Cloud Books, Inc., 478 U.S. 697 (1989)).  The Court rejected a Brandenburg claim in that case, stating, "the facilitation of terrorism is not protected by the First Amendment." Id.;  United States v. Sattar, 395 F. Supp. 2d 79, 102 (S.D.N.Y. 2005) ("Brandenburg analysis does not apply to unlawful speech-acts such as conspiracy or aiding and abetting"; discussing § 956 conspiracy charge) (citation omitted); see New York v. Ferber, 458 U.S. 747, 761-762 (1982)("It rarely has been suggested that the constitutional freedom for speech ... extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490 (1949).).  Even if Brandenburg were to apply, the defendant's intentions and efforts to support a designated FTO recruit other individuals would satisfy the stringent standard.  See Scales v. United States, 367 U.S. 203 (1961)(holding that while criminalizing membership in an organization may violate the First Amendment,

*active* membership in an illicit/designated organization does not). The defendant's conspiracy and attempt to provide material support and acts he and his co-conspirators took in furtherance of those illegal objectives therefore clearly satisfy the most rigorous First Amendment analysis.

The defendant's reference to Snyder v. Phelps, is even more misplaced. 131 S.Ct. 1207 (2011). That tort case, which was expressly "limited by the particular facts before [the Court][]" neither involved a crime or the use of speech-related activities to commit a crime, and simply reinforced the well-known First Amendment right to publicly protest. 131 S.Ct. at 1220. The case basically involved whether an individual could say anything they want about an issue of public concern when the context of what they say is not otherwise prohibited as a crime or otherwise restricted. Id. Provision of material support to an FTO is something other than public protest.

### B.   HLP REINFORCES THE CONSTITUTIONALITY OF THE INDICTMENT

The Supreme Court in HLP reaffirmed the broad scope of Congress's permissible proscription in the material support to designated FTOs, 18 U.S.C. § 2339B. HLP, 130 S.Ct. at 2728. As relevant here, the Court in HLP made clear that the Congressional and Executive authority to restrict conduct is broad in this arena, up to the limits of the First Amendment. HLP, 130 S. Ct. at 2730; see also 18 U.S.C. § 2339B(i). The Court stated:

18

> We also find it significant that Congress has been
> conscious of its own responsibility to consider how its
> actions may implicate constitutional concerns. . . .
> [I]n effectuating its stated intent not to abridge
> First Amendment rights, see § 2339B(i), Congress has
> also displayed a careful balancing of interests in
> creating limited exceptions to the ban on material
> support. . . . In this area perhaps more than any
> other, the Legislature's superior capacity for weighing
> competing interests means that "we must be particularly
> careful not to substitute our judgment of what is
> desirable for that of Congress."

130 S. Ct. at 2728 (quoting Rostker v. Goldberg, 453 U.S. 57, 68

(1981)).

The Court essentially found that the scope of the

independent advocacy exception to Section 2339B as articulated in

the provision of personnel section 2339B(h), is coextensive with

the First Amendment. HLP, 130 S. Ct. at 2730.  As relevant to the

defendant's motion, the Court in HLP held that while wholly

independent advocacy by someone who advocates for the objectives

of a designated terrorist organization remains protected, any

provision of material support to such an organization, even if

purely speech-related conduct such as the archetypal advocacy in

that case, had been legitimately criminalized.  HLP, 130 S. Ct.

at 2728.  Therefore, the HLP decision only further clarified that

the defendant's conduct in this case as charged would withstand

the strictest Constitutional scrutiny.  It did so in many ways.

Firstly, the Court in HLP concluded that advocacy on behalf

of a terrorist group could violate the substantive charge under

Section 2339B. HLP, 130 S. Ct. at 2725.  By contrast, this case

19

involves the inchoate conspiracy provision of the statute where the crime is in the agreement. Consequently, while a substantive 2339B charge might require evidence of some tie between an FTO and a defendant, a conspiracy is based on the understanding and intent of the conspirators and can be satisfied exclusively through evidence of that state of mind. Whether the FTO ever knew that the defendants agreed to support them through these means is irrelevant in a conspiracy analysis; what matters is the intent and understanding of the conspirators. See, e.g. Kassir, 2009 WL 2913651, *9.

Secondly, to the extent that speech-related conduct is part of one of the theories of liability in this case, it is not based on the content of the defendant's political beliefs, but rather, based on the fungible value of the services and expertise which the defendant and co-conspirators had conspired to provide to Al Qa'ida. See, e.g. HLP, 130 S. Ct. at 2725. Through this lens, there is no advocacy implicated, let alone independent advocacy. Even the defendant makes the point that this is an "act" which does not reflect the defendant's expression, but rather the authors' of the materials that he translated, edited and disseminated. The contents of these materials which are going to be at issue in this case are not contraband, but rather are manifestations of the defendants' intent and understanding to support Al Qa'ida.

20

Thirdly, even if viewed as a content-based prosecution, <u>HLP</u>
makes clear that even exclusively speech-related activities, when
done for the purpose of supporting a FTO can be prosecuted.  <u>See</u>
<u>also</u> <u>U.S. v. Taleb-Jedi</u>, 566 F.Supp.2d 157 (E.D.N.Y. 2008)(denial
of motion to dismiss 2339B indictment in case involving public
affairs officer of an FTO).  There is abundant evidence that the
conspirators were not acting to independently advocate for the
interests of Al Qa'ida -- rather, they specifically agreed to
provide support which they believed was needed and would benefit
Al Qa'ida.[6] <u>HLP</u>, 130 S. Ct. at 2722 ("The use of the word "to"
indicates a connection between the service and the foreign group.
We think a person of ordinary intelligence would understand that
independently advocating for a cause is different from provising
a service to a group that is advocating for that cause.").  The
Court in <u>HLP</u> indicated that such specificity of purpose overcomes
any First Amendment challenge when it said Section 2339B

---

[6]On this point, the defendant erroneously cites to Section
2339B(h) as requiring that all forms of material support must be
accompanied by evidence that the defendants submitted to the
'direction and control' of the FTO.  In fact, only the provision
of the 'personnel' form of material support so requires. 18
U.S.C. 2339B(h); <u>HLP</u>, 130 S.Ct. at 2721 (recognizing that some
connection still is required with respect to the provision of
'services').  Submission to training at a terrorist training
camp, as a combatant fighting with terrorists, and even through
service as the media wing of an organization would all clearly
satisfy this requirement of conspiring to submit to the
'direction and control'.  However, such a requirement does not
apply to all the other forms of provision of material support
such as expert advice or assistance, training, and services.

"avoid[s] any restriction on independent advocacy, or indeed any activities not *directed to, coordinated with*, or controlled by foreign terrorist groups." <u>HLP</u>, 130 S.Ct. at 2728 (emphasis added).  In some instances in this case, the co-conspirators considered themselves active participants with Al Qa'ida, such as in their discussions of being the 'media wing', or via the media they released proclaiming to be from Al Qa'ida in the land of the two rivers.

Fourthly, even if <u>HLP</u> were read to require evidence of direct contact between the defendant and Al Qa'ida, which it does not, in a conspiracy context, the conspirator's belief and intent would be the operative lens through which to assess this.  Since the evidence at trial will show at least that the defendant (a) believed that he was responding to a public call of Al Qa'ida for specific types of assistance, and (b) the defendant and his co-conspirators believed that their assistance would be consumed by and supportive to Al Qa'ida, Al Qa'ida operatives and would-be Al Qa'ida recruits.[7]  Each of these avenues constitute direct one-way contact between the conspirators and the FTO.   The defendant

--------

[7]Significantly, the Court in <u>HLP</u> made clear that the ordinary meaning of other means of support such as 'lodging' and 'explosives' inherently were done in coordination with the FTO. <u>HLP</u>, 130 S.Ct. at 2722.  In this case, theories of liability such as 'expert advice and assistance' and 'training' necessarily satisfy the coordination necessary to overcome the 'independent advocacy' doctrine because they too inherently require coordination with the FTO.

intended to and did specifically provide resources and services designed to satisfy a perceived and stated need of the organization. <u>See</u>, <u>e.g.</u> <u>HLP</u>, 130 S. Ct. at 2722.  For example, Usama bin Laden and Ayman al Zawahiri solicited support for their cause, propagating these calls through media which the defendant and his co-conspirators consumed and acted upon.  In addition, the defendant collaborated with individuals on-line from around the world who shared the objective of supporting Al Qa'ida in the decentralized manner in which the modern terrorist organization operates.  In some cases, the defendant collaborated with these individuals in order to give Al Qa'ida what he perceived they were seeking from his network of associates.  Even on the limited theory of providing personnel under Section 2339B(h) which contains the 'independent advocacy', the evidence will overcome such an exception by showing that the defendant agreed to and believed he was supporting Al Qa'ida.

As the <u>HLP</u> analysis points out, the First Amendment is uniquely implicated in Section 2339B charges involving speech-related conduct. <u>HLP</u>, 130 S. Ct. at 2718. The charges under Section 2339A, Counts Two and Three, do not remotely implicate the independent-advocacy issue since they allege the support was in furtherance crimes not based on the designation of an FTO. Because the indictment alleges that the defendants knowingly conspired to and provided or attempted to engage in the

preparatory steps to constitute a federal crime of terrorism, the heightened requirement of those charges precludes the speech-related conduct in this case as being Constitutionally protected advocacy. See United States v. Sattar, 314 F. Supp. 2d at 301; see also United States v. Awan, 2006 WL 3050887, at *6 (E.D.N.Y. Oct. 26, 2006) (explaining that § 2339A charge was not unconstitutionally vague because its scienter requirement was higher than that of § 2339B).

## CONCLUSION

Accordingly, for the reasons stated herein, the defendant's motion to dismiss Counts One through Three in part should be denied.

                                        Respectfully submitted,
                                        CARMEN M. ORTIZ
                                        United States Attorney

                                        By: /s/ Aloke Chakravarty

                                        Aloke S. Chakravarty
                                        Jeffrey Auerhahn
                                        Assistant U.S. Attorneys

                                        Jeffrey D. Groharing
                                        Trial Attorney
                                        Counterterrorism Section
                                        National Security Division
                                        U.S. Department of Justice

Date:      July 29, 2011

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have discussed this matter with counsel, and this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ Aloke Chakravarty</u>
Aloke Chakravarty
Assistant U.S. Attorney
