UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RECEIVED IN CLERK'S OFFICE
DATE  $8-1-11$

_____

UNITED STATES OF AMERICA

v.                                    NO. 09-CR-10017-GAO

TAREK MEHANNA,
Defendant.

_____

### [PROPOSED] MEMORANDUM OF LAW AMICUS CURIAE OF THE AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PORTIONS OF THE SECOND SUPERSEDING INDICTMENT

_____

#### Introduction and Factual Background

This memorandum is submitted in support of the Defendant's Motion to Dismiss. The ACLU of Massachusetts as *amicus curiae* urges this Court to exercise great care to prevent protected speech alone from constituting the basis for charges of providing, or conspiring to provide, material support to terrorist organizations. The defendant, Tarek Mehanna, is charged with, *inter alia*, conspiracy to provide material support or resources to Al-Qaeda (Count One), conspiracy to provide material support to terrorists (Count Two), and the provision and attempted provision of material support to terrorists (Count Three). Within each of these counts the government alleges acts that are protected expressive activities under the First Amendment. The government's implicit view that such speech could alone support conviction threatens to render the material support statute a vehicle for the suppression of unpopular ideas, contrary to the dictates of the First Amendment and fundamental American values. We therefore support the Defendant's motion to dismiss these counts to the extent they are based on the Defendant's protected speech.

## ARGUMENT

In each count of the indictment, the government has alleged acts that are protected under the First Amendment. Those acts include: the Defendant watched "jihadi videos" with friends; lent compact discs to people in the Boston area to "create like-minded youth"; discussed with friends his views of suicide bombings, the killing of civilians, and dying on the battlefield for Allah; translated texts that were freely available on the internet; looked for information online about the nineteen 9/11 hijackers; and inquired into how to transfer files from one computer to another and to keep translated files anonymous. Second Superseding Indictment, ECF No. 83, Count One, ¶¶ 4-6, 16-23, 26; Count Two, ¶¶ 6-7, 17-19, 21-24, 28; *see* Count Three (presumably incorporating the prior allegations). However unpopular these acts may be, they fall well within the boundaries of First Amendment protection. This protection prevents the government from prosecuting or obtaining a conviction of the Defendant based on the speech alleged in the indictment and requires this Court to take care to prevent such speech from being utilized in support of conspiracy charges.

## I.     The Alleged Acts Constitute Core Political Speech Protected By The First Amendment.

Read with the commands of the First Amendment in mind, it is striking the extent to which the government's indictment recites alleged acts that constitute core political speech entitled to the utmost protection. The Defendant is alleged to have engaged in discussions and watched and translated readily available media on the topics of global politics, wars, and religion, all of which are topics of public concern. That the Defendant's particular views on these topics may be offensive or disagreeable, or that they may "create like-minded youth," is of no consequence to the heightened protection to which his expression is entitled as a result of its

2

status as core political speech. To suggest otherwise is to allow precisely the folly against which

the First Amendment seeks to protect.

Each of these alleged acts falls within the First Amendment's scope. *See, e.g.*, *Kaplan v.

California*, 413 U.S. 115, 119-20 (1973) (films are protected speech); *Board of Educ., Island

Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (dissemination of

information and ideas is protected); *Consolidated Edison Co. v. Public Service Comm'n*, 447

U.S. 530, 537 (1980) (discussions are protected); *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923),

*construed in Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (study of foreign language

protected); *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (collecting cases) (receiving

information and ideas is protected); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342

(1995) (anonymity in expression is protected). Moreover, that speech, which touches upon issues

of global politics, wars, and religion, is core political speech that lies at the heart of First

Amendment protection. *See Texas v. Johnson*, 491 U.S. 397, 411 (1989) ("[E]xpression of

dissatisfaction with the policies of the country [is] situated at the core of our First Amendment

values.); *Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("[P]olitical belief and association constitute

the core of those activities protected by the First Amendment."); *Hill v. Colorado*, 530 U.S. 703,

787 (2000) (Kennedy, J., dissenting) ("Laws punishing speech which protests the lawfulness or

morality of government's own policy are the essence of the tyrannical power the First

Amendment guards against.").

The Supreme Court has long recognized our national commitment to the principle that

"debate on public issues should be uninhibited, robust, and wide-open," and that speech in

opposition to the government is protected despite being "vehement, caustic, and sometimes

unpleasantly sharp." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).[1] The Court recently reaffirmed that speech touching upon matters of public concern cannot be restricted simply because it is upsetting or arouses contempt, declaring that "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 131 S.Ct. 1207, 1219 (2011) (quoting *Texas v. Johnson*, 491 U.S. at 414). In *Phelps*, statements such as "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank GOD for IEDS," and "Thank God for Dead Soldiers" were found to touch upon matters of public concern, as messages dealing with "the political and moral conduct of the United States and its citizens," and were therefore entitled to the highest level of protection under the First Amendment. *Id.* at 1215-1217. Whether Defendant's alleged speech is more or less offensive or unpopular than that discussed in *Phelps* is open to debate; the fact that the Defendant's alleged speech is equally protected by the First Amendment is not.

By suggesting that the Defendant's constitutionally protected speech could alone support conviction, the United States has taken the dangerous and unconstitutional position that it may prosecute a man based on the unpopularity of his views. The ideas, texts, and videos the Defendant is alleged to have created, translated, or shared are extreme; they criticize the United States and the way of life of many of its citizens, to the point of calling for their downfall. To many, his alleged speech appears insulting, hateful, and even dangerous, in that it questions the desirability of the continued existence of the United States. To the government, it might seem

---

[1] The government does not argue that the Defendant's speech constitutes incitement, nor could it credibly do so under the standards set forth in *Brandenburg v. Ohio*, 395 U.S. 444 (1969). We therefore adopt without further discussion the arguments made by Defendant on this point. *See* Defendant's Memorandum of Law in Support of His Motion to Dismiss Portions of Counts One Through Three of the Second Superseding Indictment, pp.14-16.

both unpopular and risky to accept the protected status of this speech, since to permit such speech without punishment allows for the possibility that this speech may persuade or motivate others, and that animus against fundamental American institutions could grow. But the acceptance of this risk, and the decision to embrace the benefits of a nation built upon freedom of speech and expression, is at the heart of the First Amendment and is one of the core American values most deserving and needful of protection. This truth was best expressed by Justice Brandeis in his concurrence in *Whitney v. California*:

> Those who won our independence believed...that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth....They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction...that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

274 U.S. 357, 375-76 (1927).

To criminalize the Defendant's speech is an attempt to preserve stable government by coercing the silence of the governed. Such a misguided effort ignores the dictates of the First Amendment and tramples on a fundamental, defining American value that the Constitution is designed to protect. As extreme as the statements may be that the Defendant is alleged to have made or been associated with, they are far less dangerous to the United States than the step towards tyranny his prosecution on the basis of unpopular speech would represent.

## II.     The Defendant's Independent Advocacy Does Not Constitute Material Support.

The Supreme Court's recent decision in *Holder v. Humanitarian Law Project*, 561 U.S. _, 130 S.Ct. 2705 (2010), does not call into question but rather affirms the protected character of the Defendant's speech. The Supreme Court made clear in *Holder* that the material support

statute does not, and consistent with the First Amendment cannot, restrict independent advocacy or expression of any kind. Only expressive activity that is coordinated with or under the direction of foreign groups that the speaker knows to be terrorist organizations may be constitutionally prohibited. *Id.* at 2723. Because the government has not alleged a credible connection between the Defendant's speech and a foreign terrorist group, that speech cannot provide the basis for charges of material support.

In *Holder v. Humanitarian Law Project*, two domestic organizations wishing to provide support for the lawful, nonviolent activities of foreign terrorist groups sought an injunction to prohibit enforcement of the material support statute on the grounds that it violated, *inter alia*, their rights to freedom of speech and association. Applying strict scrutiny, the Court held that the First Amendment was not violated where the government sought to prevent the organizations from training terrorist groups "to use humanitarian and internal law to peacefully resolve disputes" and "to petition various representative bodies such as the United Nations for relief." *Id.* at 2729. In such cases, where the intended activities were to be carried out *in coordination with* the terrorist groups, the burden on the plaintiffs' First Amendment rights was justified.

The same result does not flow from the application of the material support statute to *independent* speech or advocacy. The Court was careful to note that, "Congress has not...sought to suppress ideas or opinions in the form of 'pure political speech.'" *Id.* at 2722-23. Rather,

> Congress has prohibited 'material support,' which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.

*Id.* at 2723. The distinction between independent speech and speech that is coordinated with or directed by terrorist groups is not only statutory, but also likely constitutionally compelled. The Court found the "expected level of coordination with the [terrorist groups]" was relevant to

assessing the plaintiffs' First Amendment claims, *id.* at 2729, and further warned that its decision validating regulation of the particular activities at issue in *Holder* "in no way suggest[s] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations." *Id.* at 2730.

The government's suggestion here that the Defendant could be convicted of providing material support on the basis of his wholly independent speech runs directly counter to the express language of the *Holder* decision. Nothing in the indictment or subsequent filings indicates that there is any evidence that Defendant was acting in coordination with or under the control of a terrorist group when engaging in the alleged expressive activity. Indeed, the government has gone so far as to argue that it need not prove any such connection, asserting that the Defendant would be guilty of providing material support if he provided translations that he believed a terrorist group "could use" or that advanced their objective. *See* Gov't Opp'n to Def.'s Renewed Mot. for Release on Bail, ECF No. 119, at 13. This position threatens to transform the material support statute into a general license to punish the Defendant for his protected beliefs, expressions, and associations, contrary to the *Holder* decision and the dictates of the First Amendment that underlie it. We therefore urge this Court to dismiss those portions of the indictment that allege independent advocacy to be a crime.

### III.     The Defendant's Protected Advocacy Does Not Support A Charge Of Conspiracy To Provide Material Support.

Equally troubling is the government's extensive and near-exclusive reliance on First Amendment protected activity in support of its allegation that the Defendant conspired to provide material support. It goes without saying that the government's apparent attempt to allege that the Defendant undertook such activity in furtherance of a conspiracy to engage in independent advocacy—neither the means nor objective of which are illegal—must fail.

Moreover, even assuming that the government has credibly alleged an illegal objective in the form of other material support, its extensive reliance on First Amendment protected activity in support of those charges merits the exercise of caution by this Court. The Court should not only require a clear linkage between First Amendment protected activity and the alleged illegal objective, but also dismiss any charge of conspiracy where the vast majority of the overt acts alleged are protected.

We recognize that constitutionally protected activity, including speech, may be included among the overt acts in a conspiracy charge. *See, e.g.*, *United States v. Mubayyid*, 476 F. Supp. 2d 46, 55 (D. Mass. 2007) (citing *United States v. Donner*, 497 F.2d 184, 192 (7th Cir. 1974)); *United States v. Rahman*, 189 F.3d 88, 177 (2nd Cir. 1999). Courts have justified this use of protected activity on the grounds that "[i]t is the agreement that is punishable in a conspiracy charge and not the overt act itself." *Mubayyid*, 476 F. Supp. 2d at 55 (quoting *United States v. Al-Arian*, 308 F. Supp. 2d 1322, 1342 (M.D. Fla. 2004)). In so doing, however, they have not been blind to the dangers that the use of protected activity in support of conspiracy charges may pose. To ensure that defendants are punished for their illegal agreements and not for their constitutionally protected activities, courts have required clear evidence of the defendants' specific illegal intent and have carefully scrutinized the alleged link between that intent and First Amendment protected activity. *See, e.g.*, *United States v. Spock*, 416 F.2d 165, 172-74 (1st Cir. 1969) (discussing courts' obligations when confronted with alleged "bifarious undertakings" involving both legal and illegal conduct). Particularly where, as here, a bill of particulars is lacking, it is incumbent upon the Court to engage in such scrutiny and strike from the indictment protected activity that is insufficiently linked to the alleged illegal objective.

8

Moreover, this Court should be hesitant to permit any charge for conspiracy that is based solely or largely on overt acts protected by the First Amendment. The questionable constitutionality of permitting a conspiracy conviction on the basis of protected overt acts was raised by Justices Black and Douglas in their dissent in *Yates v. United States*, 354 U.S. 298 (1957) (holding that attendance at public meetings could, standing alone, constitute overt acts), and later reiterated by Justices Douglas and Stewart in response to the Supreme Court's denial of certiorari in an appeal on the same ground, *Epton v. New York*, 390 U.S. 29, 32 (1968). As Justice Douglas explained, "the use of constitutionally protected activities to provide the overt acts for conspiracy convictions might well stifle dissent and cool the fervor of those with whom society does not agree at the moment." *Id.* at 32 (Douglas, J., dissenting); *see also id.* at 30 n* (Stewart, J., concurring) (expressing doubt as to whether constitutionally protected acts can in fact serve as the sole overt acts upon which to base a conspiracy conviction). Countless commentators have echoed these concerns and noted that they have often been borne out in practice, particularly in times of perceived threats to national security. *See, e.g.*, David B. Filvaroff, *Conspiracy and the First Amendment*, 121 U. Pa. L. Rev. 189, 200 (1972) ("Not surprisingly, most of the American speech-crime conspiracy law has been developed in times of national tension. Each of the key decisions involved dissenters whose political deviance tended to magnify their perceived threat to national security, thereby probably helping to propel the courts to pro-government results"); Note, *Conspiracy and the First Amendment*, 79 Yale L.J. 872, 872 (1970) (indicating that, during periods of collective paranoia, conspiracy law has been one of the primary governmental tools employed to deter individuals from joining controversial political causes and groups); *see also* Marie E. Siessger, Note, *Conspiracy Theory: The Use of the Conspiracy Doctrine in Times of National Crisis*, 46 Wm. & Mary L. Rev. 1177, 1178

(2004) (arguing that conspiracy doctrine "has the potential to become perverted and unduly expanded when political and social stresses are placed upon it.").

This Court must be cognizant of this historical context and its similarities with the current political climate. It should carefully scrutinize the overt acts alleged here and dismiss any conspiracy charge based solely or largely on protected overt acts.

### Conclusion

For the foregoing reasons, the Court should grant Defendant's motion to dismiss those portions of the second superseding indictment to the extent that they are based on Defendant's protected speech.

Respectfully submitted,
ACLU of Massachusetts
By its attorneys,

Alexia De Vincentis, BBO #679397
Sarah R. Wunsch, BBO # 548767
ACLU of Massachusetts
211 Congress Street
Boston, MA 02110
(617) 482-3170
adevincentis@aclum.org
swunsch@aclum.org

Dated:  July 29, 2011

### CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was served by first class mail this 29th day of July, 2011, on each of the following counsel by depositing it in a U.S. postal box addressed to:

J. W. Carney, Jr.
Janice Bassil
Carney & Bassil
20 Park Plaza, Suite 1405
Boston, MA 02116

Joshua L. Dratel
Dratel & Mystiwiec, P.C.

10

2 Wall Street, 3rd Flr.
New York, NY 10005

Jeffrey Auerhahn
Aloke Chakravarty
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210

Jeffrey D. Groharing
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Sejal H. Patel
Law Office of Sejal H. Patel, LLC
101 Tremont Street, Suite 800
Boston, MA 02108

Sarah Wunsch

Sarah R. Wunsch