```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Plaintiff,              )
                                  )   Criminal Action
v.                                )   No. 09-10017-GAO
                                  )
TAREK MEHANNA,                    )
                                  )
          Defendant.              )
                                  )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**TRANSCRIPT OF MOTION HEARING**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, August 3, 2011
2:04 p.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
 3        Assistant U.S. Attorneys
          One Courthouse Way
 4        Boston, Massachusetts  02210
          - and -
 5        UNITED STATES DEPARTMENT OF JUSTICE
          By: Jeffrey D. Groharing, Esq.
 6        950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
 7        On Behalf of the Government

 8        CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
 9            Janice Bassil, Esq.
              John E. Oh, Esq.
10        20 Park Plaza, Suite 1405
          Boston, Massachusetts  02116
11        On Behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.
 3            (The Court enters the courtroom at 2:04 p.m.)
 4            THE CLERK:  United States District Court for the
 5     District of Massachusetts.  Court is now in session.  Please be
 6     seated.
 7            For a motion hearing in the case of United States of
 8     America versus Tarek Mehanna, 09-10017.  Would counsel identify
 9     yourselves for the record.
10            MR. CHAKRAVARTY:  Good afternoon, your Honor.  For the
11     government, assistant U.S. attorneys Aloke Chakravarty and
12     Jeffrey Auerhahn, and counter-terrorism section trial attorney
13     Jeffrey Groharing.
14            MR. CARNEY:  Good afternoon, your Honor.  J.W. Carney
15     representing Tarek Mehanna, and with me is co-counsel Janice
16     Bassil.
17            THE COURT:  Good afternoon, everyone.
18            We have a number of pending motions brought by the
19     defense.  Let me address first the motions related to -- I
20     think there are two.  Maybe they're two combined in one --
21     related to the FISA search products.  The statute provides that
22     when there's a certification by the attorney general of the
23     United States supported by -- well, with supporting materials
24     submitted, that the Court is at least in the first instance to
25     conduct an in-camera ex-parte review of those materials
```

00:02 (line 10)
00:03 (line 20)

1    containing classified information.

2           There has been a certification by Attorney General

3    Holder in this case filed, and materials have been submitted

4    under seal that are classified.  I am in the process of

5    reviewing those materials.  I have begun it, but because of my

6    trial schedule have not completed it yet.  I don't think

7    there's -- it's appropriate to address those motions at this

8    point until I've completed that review.

9           So while that had originally been my intention, I

00:04 10   think we have to take that off the table for this hearing.  I

11   expect that to be done soon, but I don't think it's -- because,

12   frankly, one outcome may be when I've completed the review is

13   that there will be no hearing, and if there is a hearing, it

14   will be on various conditions that will have to be established

15   as a consequence of the review.  So it's premature, I think, to

16   do.  I think setting the date has nonetheless had the

17   constructive effect of getting it all submitted and even soon

18   to be finished of the review.

19          So let me turn to the other motions --

00:04 20          MR. CARNEY:  Is there any way the Court would benefit

21   from just some general comments by me?

22          THE COURT:  I don't think so.  I mean, I think the

23   general law is fairly anodyne, frankly, and the briefing is

24   attentive and thorough.  And I don't think that a general

25   commentary on the FISA scheme would be particularly helpful.

1      MR. CARNEY:  All right, your Honor.

2      THE COURT:  I think maybe we could address the other

3  issues in the order in which they were filed, which was -- so

4  that would bring up the motion addressed, I think, to Counts 1

5  and 3 raising First Amendment arguments.  Let me just say

6  before I hear you with respect to that -- let me just explain

7  why I denied the motion by the American Civil Liberties Union

8  of Massachusetts to file an amicus brief.

9      The denial was not made on substantive -- for

00:06  10  substantive reasons but procedural reasons.  Amicus submissions

11  are a rather common occurrence at appellate levels, but

12  they're -- in my experience, anyway -- very rare at a trial

13  level, and I think particularly rare, if they have ever

14  occurred, in the process of an ongoing criminal prosecution.

15      The defendant here is ably represented by counsel who

16  have filed a very sophisticated First Amendment argument.

17  There's no reason to look to supplement that argument on

18  grounds of fairness to the defendant or any such matter.  And

19  so I think there's no reason specific to this case why briefing

00:06  20  from nonparties would be particularly helpful or advance any

21  important interest that are not already well represented.

22      This is more or less parenthetical, I guess, but it

23  explains the reasoning behind my decision.  It may be that in

24  many criminal prosecutions there are persons who are not

25  parties who would like to weigh in on an issue that exists in

1  the prosecution.  If that were to happen on the defense side,

2  you'd have to consider whether or not to happen on the

3  government's side as well.  And I think opening that door would

4  allow the potential for a very unusual alteration of the

5  customary and time-proven procedures that apply to criminal

6  trials, and I think with a danger of some distraction from the

7  main events and no necessarily valuable addition to the

8  process.

9       So I think this is -- this is not directed to this

00:08 10  case or this issue particularly.  I just think an amicus brief

11  in a criminal prosecution should not be filed.  Maybe there

12  would be a case someday years from now in the future when this

13  arises again that I would reconsider that.  I just don't think

14  it's an important procedural approach.  So that's -- it has

15  nothing to do with the merits of the argument.

16       All right.  Then if you want to turn to that motion,

17  Mr. Carney.

18       MR. CARNEY:  I do, your Honor.  Thank you very much.

19       In focusing on the counts related to Section 2339A and

00:08 20  B, we're focusing on the law that prohibits a person from

21  providing material support to a foreign terrorist organization.

22  The statute precludes various services including financial

23  documents or financial services, lodging, training, expert

24  assistance, safe houses, false documentation, communications

25  equipment, legal substances, explosives, personnel,

1  transportation and things related to that.

2        Now, that doesn't mean that everything a person does

3  that could provide in any way some assistance to an FTO comes

4  within the statute.  The leading case of *Holder versus*

5  *Humanitarian Law Project* makes it clear, explicitly clear, that

6  a person can have an association with a so-called terrorist

7  organization.  He can be explicitly a member of a terrorist

8  organization.  In other words, the United States Supreme Court

9  explicitly said that a person who is a citizen of the United

00:10 10  States can be a member of al-Qaida.  The person can also

11  advocate in favor of the goals of an alleged terrorist

12  organization provided that this advocacy is independent of the

13  organization.

14        What the United States Supreme Court stated in *Holder*

15  is that in order for this statute, or these statutes, to

16  comport with the First Amendment, then a person must be free to

17  say anything he wishes on an important topic, especially on a

18  political topic, but he cannot provide any of the services

19  reflected in the statute if he is doing so either at the

00:11 20  direction of the terrorist organization or in coordination with

21  the terrorist organization.

22        When the Court focuses on the indictment and on the

23  first three counts, there are a number of allegations that we

24  are not challenging by this motion.  They are reflected in

25  footnote 1 on page 2 of our motion; for example, allegations

1   that the codefendant traveled to Pakistan, that the codefendant

2   traveled to California, that the codefendant gave money to

3   someone, that the codefendant entered Iraq, that the

4   codefendant and the defendant allegedly traveled to Yemen, and

5   that the defendant allegedly gave false information.  None of

6   that is the focus of this motion.

7          Beginning on the top of page 3 and carrying over to

8   page 4 are the overt acts that we say cannot be the basis for

9   providing material support in this case.  Some of these acts,

00:12 10  as enumerated beginning on the top of page 3, are that

11  Mr. Mehanna watched jihadi videos with friends.  The indictment

12  says he lent compact disks to people in the Boston area to,

13  quote, create like-minded youth; he discussed with friends

14  their view of suicide bombings, the killing of civilians and

15  dying on the battlefield for Allah; he translated texts that

16  were and remain freely available on the Internet; he looked for

17  information online about the 19 9/11 highjackers; he asked a

18  friend for information on how to transfer files from one

19  computer to another; and finally, he asked the codefendant how

00:13 20  to shield his identity when he is putting translations on the

21  public website.

22          All of these activities, I submit, are protected by

23  the First Amendment and cannot be the basis for a material

24  support indictment, and so we are asking the Court to strike

25  them from the indictment or rule that they cannot be evidence

1    that constitutes overt acts in support of the indictment.

2         Let me address two issues briefly:  *Holder* says that a

3    defendant or a citizen of the United States can say anything he

4    wishes on any political topic.  Our client does not dispute

5    that he tried to persuade people of his views.  Mr. Mehanna

6    believes that United States soldiers should not be in a Muslim

7    country killing Muslims who are in that country.  He believes

8    that.  I can recall many people 40 years ago who believed that

9    U.S. soldiers should not be in the Republic of Vietnam killing

00:14 10   citizens of that country.  That's directly comparable to the

11   beliefs that Mr. Mehanna holds.  I submit that this is core

12   political speech.  This is advocating for, or against, a United

13   States policy and is entitled to the greatest protection

14   available under the First Amendment.

15        I'll speak about one area in particular because the

16   government has put so much emphasis on it, both in its

17   indictment and in its argument on bail to this Court and in its

18   written submissions, and that is, that Tarek Mehanna has

19   translated documents.  All of the documents that he translated

00:15 20   were and remain freely available on the Internet.  He is

21   translating them from Arabic to English.

22        If a United States citizen spoke Arabic, he or she

23   could freely go onto the Internet and read these documents.

24   The documents contain political views regarding the conflict in

25   Afghanistan or in Iraq, and the view of the people who believe

1    that the United States should not be in those countries and

2    that United States soldiers should not be killing Muslims in

3    those countries.  And they would read the powerful, eloquent

4    statements by people in other parts of this planet who support

5    that.  That's what he translated.

6          What the United States is trying to do in this case,

7    your Honor, is control the speech that is available to United

8    States citizens on the Internet.  If a person could read it in

9    Arabic, there's no problem, but if Tarek Mehanna translates it

00:16 10  into English, then he finds himself indicted for providing

11   material support to a foreign terrorist organization.  By the

12   United States' efforts to control the ability of United States

13   citizens to read the views of other people around the world is

14   engaging in the type of censorship that is directly comparable

15   to what China is trying to do to the Internet.

16         China, it's well reported, is trying to prevent

17   Chinese citizens from reading items on the Internet that

18   perhaps were prepared in the United States.  The secretary of

19   state has blasted Chinese authorities repeatedly, as has the

00:16 20  president himself, because of this effort to control speech, to

21   sensor speech.  I respectfully submit that is exactly what the

22   United States is doing.  They don't want citizens in the United

23   States to read these publications, and they are hoping that

24   because the citizens don't speak Arabic they will not be able

25   to do so.  These documents are purely political and cannot be

1   the basis of this criminal case.

2         *Snyder*, which was cited in my brief, gave instances of

3   speech that is incredibly offensive that arouses contempt, as

4   Chief Justice Roberts put it.  These were people who were

5   carrying signs outside the funerals of United States soldiers.

6   The signs read, "Thank God for 9/11"; "Thank God for IEDs";

7   "Thank God for dead United States soldiers."  The United States

8   Supreme Court said that as offensive or upsetting as these

9   statements are, a person is entitled to say them.

00:18 10       What Tarek Mehanna put in his publications, whether on

11  a blog, whether translating a document, whether making a

12  comment to friends, whether advocating for a position, it is

13  the core political speech protected by the First Amendment, and

14  I would ask the Court to repudiate the United States' effort to

15  suppress political speech protected by the First Amendment.

16  We're asking that these allegations either be stricken from the

17  indictment, or the Court rule that they cannot be the basis for

18  the government to proceed against him under those first three

19  indictments.

00:18 20       Thank you.

21       THE COURT:  Mr. Chakravarty?

22       MR. CHAKRAVARTY:  Thank you.  Your Honor, as a

23  procedural matter, the motion to dismiss the count charged in

24  the indictment, your Honor knows the standard view is accepting

25  the facts as they appear in the indictment and the inferences

1    that can be drawn therefrom in order to determine whether as a

2    matter of law the case can proceed.  And I submit at this stage

3    nothing the defense has said changes the proper frame of

4    reference which is the indictment states a valid claim that the

5    defendant unlawfully and knowingly conspired to and, in Counts

6    2 and 3, attempted to provide and provided material support to

7    terrorists and to a designated foreign terrorist organization.

8         That is what the defendant is charged with, a crime

9    under federal law, not for the substance of what he believes;

00:19 10   not for his political descent; not for perhaps his motivations

11   for why he chose to unlawfully and knowingly provide support to

12   an entity and individuals who are actually acting against U.S.

13   interests.  But that provision of support is what is being

14   criminalized, the conspiracy to provide that support, not the

15   motivations for why he provided that support, which I think

16   goes to counsel's argument as to his political expressions.

17        And it's through that frame of reference that there

18   was a crime committed here.  The crime involved a conspiracy,

19   and the defendant used each of these instances of speech acts,

00:20 20   verbal conduct to demonstrate the existence of the conspiracy.

21   That is what an overt act is, an act in furtherance of the

22   conspiracy.  It helps a jury, it helps the Court understand the

23   circumstantial evidence, what the nature of the agreement was

24   that was criminal.

25        And it's ultimately for the jury to decide whether

1    each of those acts, and the others that will be presented at

2    trial that are not delineated in the indictment -- whether

3    those sufficiently provide the jury with enough information to

4    determine whether, in fact, this was, as the defendant argues,

5    purely an independent expression of advocacy for the objectives

6    of al-Qaida and other terrorists, or whether he wanted to help

7    them.

8         And it was his state of mind, his understanding that

9    by doing things like translating documents, making them

00:21 10   available, making them accessible to American-born youth who

11   may not know Arabic, by being able to have them make an impact,

12   whether that was actually going to provide assistance to the

13   organization that he idolized and he revered, that ultimately

14   is a jury question.  That's a question which we may deal with

15   at a Rule 29.  But at this stage your Honor, as a matter of

16   law, simply needs to determine whether a defendant can violate

17   the terms of conspiracy to violate 2339A and 2339B, or the

18   substantive charge of 2339A, on the basis of expressive

19   conduct.  And if that is the question at this stage, then

00:22 20   *Holder* definitively answers that question.

21        In *Holder*, as your Honor knows, the advocacy could not

22   be more classic advocacy, representation before international

23   bodies, provision of assistance in terms of educating an

24   organization how to better represent themselves.  That was

25   advocacy.  Attempting to go to Pakistan to join a terrorist

1    training camp, hoping to go to Afghanistan to join terrorists

2    who are actively involved against American troops, going to

3    Yemen to get terrorist training, hoping to go on to Iraq to

4    help fight American soldiers who were actively engaged there,

5    providing translation assistance to people on the Internet who

6    were producing mass propaganda and al-Qaida media full with the

7    al-Qaida label emblazoned on the media itself, these are types

8    of activities which are something very definitively other than

9    advocacy.

00:23  10        These were attempts for the defendant and his

11   coconspirators to actually join the fight, to actually provide

12   assistance in any way they could either through their own

13   personal -- them, themselves, as personnel, through others that

14   they knew who they could help recruit, or through the services,

15   expert advice and assistance or training that they were trying

16   to provide to would-be al-Qaida recruits, would-be terrorists

17   who could go and do what they were unsuccessful in doing.

18   Those are the reasons why these overt acts are germane to

19   characterizing what the conspiracy was about, about what the

00:23  20   illegal agreement was.

21        Through that lens it becomes clear that if you're

22   engaging in speech in order to commit a crime, whether it's to

23   hand a bank teller a note saying "I'm robbing the bank" or

24   whether it's lying to the FBI or whether it's to commit a

25   conspiracy to provide material support to terrorists is not

1    protected speech.  The Constitution is not a suicide pact, and

2    you are not allowed to commit a crime through your verbal

3    conduct if that conduct constitutes a crime.

4         So this red herring about *Brandenburg* and *Snyder* and

5    the other cases which talk about perfectly innocent conduct

6    being prosecuted because the government just doesn't like it is

7    simply in apposite in this scenario.  If there were no

8    conspiracy to provide material support to terrorists and to the

9    FTO charges, then perhaps we would have a different posture.

00:24 10   But when the defendant engaged in this conduct he had a

11   purpose, his coconspirators had a purpose, and he wanted to see

12   that come to fruition.  And that was ultimately to provide

13   support to these terrorist organizations.  That's the criminal

14   conduct that's at issue here.  And I think it's hardly

15   debatable that engaging in speech to perpetrate a crime is not

16   protected conduct and the First Amendment analysis doesn't

17   apply at all.  We need not go do the strict constitutional

18   scrutiny analysis that the *Holder versus Humanitarian Law*

19   *Project* court did.

00:25 20        But even if we had to go that far, even if the Court

21   had lingering concerns as to whether the particular type of

22   conduct, the particular type of speech that the defendant

23   engaged in, which the government would argue here was not

24   advocacy, there was never a representation that's charged in

25   the indictment that the defendant was going to represent the

1    interest of al-Qaida and an international forum or some other

2    peaceable solution.  And I would suggest that the charging of

3    the 2339A charge, which specifically has a scienter requirement

4    that the defendant knew the services that he was providing, or

5    conspired and agreed that the services that he would be

6    providing would be provided for a crime of terrorism, not just

7    for a peaceable purpose, as was the case in *Humanitarian Law*

8    *Project*, that that scienter requirement as indictment as

9    expected to be proved at trial clearly would overcome even the

00:26 10    limited facts of *Holder versus Humanitarian Law Project*.

11         But if the Court were to engage in a strict

12    constitutional scrutiny analysis under *Humanitarian Law*

13    *Project*, then what the court made clear in that case was that

14    the compelling state interest here no less than national

15    security is sufficiently compelling that the designation of a

16    foreign terrorist organization and the prohibition of providing

17    any type of support, including advocacy to that organization,

18    was narrowly tailored to that state interest.

19         So through that constitutional lens, even if the Court

00:26 20    were not to agree that engaging in verbal acts could constitute

21    violation of the statute -- could independently constitute

22    crimes, keeping in mind that, of course, overt acts need not be

23    criminal at all, in this case the government is now arguing

24    that they were criminal but for the fact that they were in the

25    course of a conspiracy to provide material support to

1    terrorists.

2         But through that lens the defendant's conduct clearly

3    would pass the strict constitutional scrutiny that providing

4    support to a designated terrorist organization through the

5    means that are alleged in the indictment is something that

6    Congress specifically prohibited, and along with the executive

7    when the power of that -- the elimination is at its zenith was

8    not appropriate for the Court to invade.

9         So consequently, even if the Court were to engage in

00:27 10   that constitutional analysis, and as I suggest and say in the

11   papers perhaps not at this stage but down the road that the

12   Court should find that the case should be submitted to the jury

13   and a valid conviction could stand if all that existed in this

14   case were speech-related conduct.  But as the defendant

15   concedes, that's not all we have in this case.

16        And the defendant characterizes some of the physical

17   acts that the defendant and his coconspirators engaged in, as

18   described in the indictment.  But simply having one of those

19   means that this motion has to be fatally flawed because if the

00:28 20   First Amendment is not implicated in conduct that would give

21   rise to satisfying the elements of the offense, then this

22   motion must fail at this stage.

23        To the extent that this issue comes up at trial when

24   there is a full record and there are specific facts that have

25   been presented to the Court related to whether a certain aspect

1    of the *Holder* finding such as whether the defendant's conduct

2    was done sufficiently coordinated with al-Qaida in the case of

3    the 2339B charge, then that is a case -- that is a situation

4    that we should address at that juncture.

5            I'd submit to you that *Holder* makes clear that the

6    defendant's intent and his understanding is what is operative,

7    especially in a conspiracy case where sometimes that's all that

8    there is.  And his intent and his understanding and providing

9    the very dangerous services which to this day are being

00:29 10   consumed by people around the world, that that was provision of

11   material support under several of the delimited ways that the

12   statute provides for including, just to clarify, property;

13   services; training; money, which includes currency and monetary

14   instruments; expert advice assistance and personnel, all of

15   which are properly alleged in the indictment.

16           Consequently, the motion should fail, your Honor.

17           THE COURT:  Reply?  No.

18           MR. CARNEY:  Your Honor, thank you.  Unless you have

19   questions.

00:29 20           THE COURT:  I do.  Would you respond to the argument

21   that Mr. Chakravarty made a little bit ago -- well, I guess he

22   returned to it in the end, that the matter is really more

23   appropriately considered, at least in the first instance, a

24   Rule 29 occasion at the close of the government's case.

25           MR. CARNEY:  The remark is not without some weight.

1    And we thought about how to handle this before the Court.  This

2    is how we concluded the motion to dismiss was the most

3    appropriate vehicle to bring before your Honor:  If this

4    indictment only contained the allegations that we say are

5    protected speech, then I believe a motion to dismiss could be

6    brought and our exact argument could be made, and in the

7    absence of any other allegations, if the Court concluded that

8    all of the overt acts were protected by the First Amendment,

9    then it would be appropriate at this stage to dismiss the

00:30 10    indictment, I would submit.  It would be as if an indictment

11    were based on the fact that a defendant walked on a sidewalk

12    across the street from this courthouse and said, "I think

13    President Obama is wrong and Osama bin Laden was right."  And

14    that's the only thing alleged that the defendant did.  It was

15    the basis for an indictment before this Court.  We would move

16    to dismiss, and I submit the Court would most likely grant that

17    motion.

18        If you've got an indictment that has properly alleged

19    overt acts and improperly alleged overt acts because they're

00:31 20    protected by the First Amendment, is there a way to alert the

21    Court that the second category should not be allowed to remain

22    in the indictment or should be dismissed?  We thought a motion

23    to dismiss would be the proper way to do it.  I concede that

24    there are other ways and the Court would have other

25    opportunities to address this motion, but it was important

1   enough to bring it to your attention.

2        THE COURT:  With respect to overt acts, is it your

3   position that an act of speech that is, let's say,

4   unquestionably protected under the First Amendment cannot be an

5   overt act?

6        MR. CARNEY:  Yes, that is my position.

7        THE COURT:  How is that different from other innocent

8   overt acts?

9        MR. CARNEY:  I don't understand the question.

00:32 10        THE COURT:  Well, if innocent acts can be overt acts

11   in support of the proof of a conspiracy, assuming other

12   adequate proof of the conspiracy -- buying a map, for example,

13   before you execute a bank robbery -- why couldn't an innocent

14   act that is innocent because of the First Amendment protection

15   similarly serve as not a basis by itself for conviction but as

16   an overt act that satisfies that element of the conspiracy

17   charge?

18        MR. CARNEY:  Certainly there are a number of acts

19   alleged in many indictments that are connected by the

00:33 20   government to their indictment.  I'm not sure I would agree

21   that buying a mask --

22        THE COURT:  Map.

23        MR. CARNEY:  Oh, map.

24        THE COURT:  Mask is dicier.  I agree.

25        MR. CARNEY:  Okay, gotcha.

1          THE COURT:  Map.

2          MR. CARNEY:  Map.  Buying a map doesn't implicate a

3    First Amendment protection.

4          THE COURT:  How about one conspirator tells the other

5    where the bank is located in speech?

6          MR. CARNEY:  That's not the type of speech that would

7    be characterized as political speech commenting on an important

8    government policy.  And I think that what makes this situation

9    different is every one of these actions pointed to by the

00:33 10   government that I've laid out and I repeated earlier to your

11   Honor is political speech.  It's saying to his friend, "I think

12   you should watch this video.  It's very powerful."  It's saying

13   to the world that speaks English, "I think you should read this

14   document called '39 Ways.'"  It's saying to someone who is

15   trolling on the Internet and comes across a video that "Here is

16   the translation so you know what is being said."  It is when

17   the speech is protected by the First Amendment, especially the

18   core value of the First Amendment which is the discussion of

19   political speech, that it's not enough to say it can be an

00:34 20   innocent act.

21          In this case, unlike your Honor's example, the

22   government was not saying that buying a map constituted an act

23   that was the equivalent of the crime, it was an act done before

24   the crime.  What they're saying and pointing to these things

25   are that each of them is independently a crime in and of

1    itself; in other words, in the armed robbery -- or bank robbery

2    case, if the only allegation that the government made were that

3    the defendant bought a map, well, that case is going nowhere.

4    But in this case if the only allegation in the indictment, the

5    only thing the government alleged were that -- excuse me a

6    moment, your Honor.

7             (Pause.)

8             MR. CARNEY:  If the only thing that the government

9    alleged was that Tarek Mehanna translated texts that were and

00:35 10   remain freely available on the Internet, then under the

11   government's argument that allegation alone would be permitted

12   under this indictment.  I disagree.

13            And so that where each and every one of these things

14   is contended to be an independent crime of providing material

15   support, that's what makes this different along with the First

16   Amendment from a situation where there's an allegation of

17   buying a map in a bank robbery case.

18            That's how I would distinguish it, your Honor.

19            THE COURT:  Okay.

00:36 20       MR. CHAKRAVARTY:  Just to clarify so there's no

21   misapprehension, the government is not alleging that each overt

22   act would independently constitute a crime.  The overt acts, in

23   fact, as your Honor may know, the 2339A and B statutes do not

24   require, unlike a 371 conspiracy, an overt act at all.  These

25   overt acts are listed for a variety of reasons.  Some of them

1    are the vehicles through which the defense -- the defendant is

2    alleged to have tried to provide material support to al-Qaida

3    and to other terrorists.

4         But taking for a moment the defendant's hypothetical

5    that if the only allegation -- only listed overt act in a

6    criminal charge for conspiracy to provide material support,

7    which again is the appropriate lens, the crime is providing

8    material support or conspiring to provide material support.

9    And if the only act that the defendant took in order to further

00:37 10   that objective was to do translation for the purpose of

11   providing material support, then *Holder* has responded to this

12   question and it says that that is illegal, your Honor.

13        THE COURT:  Okay.  Well, I think the matter is

14   premature.  I'm going to deny the motion without prejudice to

15   the merits of the arguments being raised for an appropriate

16   time at trial, that probably being a Rule 29 motion, or very

17   likely being, or perhaps we'll have arguments over the

18   admission of evidence.  I'm not sure.  But I think as a

19   pretrial matter it's premature.

00:38 20        The next, I think, is the materiality issue with

21   respect to the false statements.

22        MR. CARNEY:  Yes, your Honor.

23        THE COURT:  I think.

24        MR. CARNEY:  I will focus my oral argument on Count 6

25   and rest on my written submission regarding Count 7.

1          THE COURT:  All right.

2          MR. CARNEY:  Count 6 alleges a false statement in

3    regard to Daniel Maldonado.  If I may briefly rehearse the

4    facts.

5          On December 12, 2006, the government has asserted that

6    my client received a telephone call from Daniel Maldonado.

7    That telephone call was recorded by the government.  Four days

8    later an FBI agent approached my client and asked him three

9    questions:  When did you last speak to Daniel Maldonado?  Where

00:39 10    was he located?  And what was he doing?  My client responded,

11    according to the FBI, that he last spoke to Mr. Maldonado

12    approximately two weeks earlier, that Mr. Maldonado had been in

13    Egypt, and that Mr. Maldonado was working on a website.  The

14    government alleges that these were false statements.

15          Conceding for the purposes of argument only that they

16    were false statements, the critical issue before the Court is

17    were these false statements material.  When Congress enacted

18    1001, the false statements statute, it was greatly concerned

19    that it could be abused by federal agents.  Some commentaries

00:39 20    even called it the potential for a, quote, gotcha crime, which

21    I would spell G-O-T-C-H-A.  And what they meant by that is they

22    did not want the FBI going up to people and asking them a

23    question that could elicit a false answer and bring the person

24    before this Court on a false statement charge.

25          And so focusing on the materiality, the U.S. Supreme

1    Court has made it clear that for a statement made to an FBI

2    agent, even a false statement to be a crime, it must be

3    material to an investigation.  And the materiality term is

4    defined as a statement that has a natural tendency to influence

5    or is capable of influencing the decision of a decision-making

6    body to which it was addressed.

7          Now, that's kind of an odd definition, but it reflects

8    the fact that when this statute was created it was clear from

9    the intent of the Congress that it was meant to apply to

00:41 10    someone who approached the government, often for a benefit, and

11    made a false statement.  For example, if you wanted to apply

12    for a Social Security benefit and you did so and lied to the

13    person taking the application about what your age was, what

14    your income was, what your personal situation might have been,

15    then you would be prosecuted for doing that.  It's been

16    extended to other contexts but the focus remains:  Was the

17    false statement material to an investigation that the

18    government was doing?  So let's revisit the question:  Where is

19    Daniel Maldonado?  So the government, by this question, is

00:42 20    interested in knowing where is Daniel Maldonado.  And

21    presumably, that is the investigation.

22          Well, the FBI and the government knew exactly where

23    Daniel Maldonado was on December 12th, 2006.  We've made this

24    assertion many times, and the government has never denied it.

25    They knew with 100 percent certainty that Daniel Maldonado was

1    in Somalia.  There was absolutely no possibility that what

2    Mr. Mehanna said to an FBI agent about where Daniel Maldonado

3    was would in any way affect the investigation of where Daniel

4    Maldonado was because they knew where he was.  They not only

5    knew where he was, they were recording the telephone call

6    between Maldonado and the defendant.

7        If a false statement cannot possibly influence an

8    investigation, as is the case here, then it is not material.

9    If a federal agent asked me in this courtroom, "Where's Al

00:43 10    Chakravarty?" and I said, "Oh, he's over at the Barking Crab

11   having a cocktail," and that agent is looking over at this

12   table, no matter what comes out of my mouth it's not going to

13   change his knowledge that Attorney Chakravarty is sitting at

14   that table right there.  That's the same situation we have

15   here.

16       I mentioned that the statute is not meant to be a

17   gotcha crime.  My client was interviewed for a significant

18   amount of time by the FBI that afternoon.  It was only at the

19   end of their conversation in what I would call a Columbo moment

00:43 20   where, as the agent is walking away, he turns back and says,

21   "Oh, I have one other question.  Do you know where Danny

22   Maldonado might be?" in order to try to get a false statement

23   from the defendant and thereby be able to put pressure on him

24   to become a cooperating witness by threatening him with a

25   charge of making a false statement.

1          That's not what this statute was designed to do.  And

2     in order to manufacture a crime in this instance, the FBI had

3     to engage in that kind of gotcha approach, the same way they

4     would have if they walked up to someone and said, "Hey, was

5     I" -- "did I see you with your best friend's wife at the

6     Holiday Inn last night?"  The person says, "No, that's not me."

7     "Okay.  Well, we have a photo of you and her.  Here it is.

8     Okay.  You've just made a false statement to the FBI.  Now we

9     want you to be a cooperating witness against your corporation

00:45 10    and surreptitiously record what's said at the next board

11    meeting."  That's a gotcha.  This is a gotcha.  The answer

12    could not have been material to the investigation of where is

13    Daniel Maldonado and, therefore, this indictment should be

14    dismissed.

15          Thank you, your Honor.

16          THE COURT:  Mr. Auerhahn?

17          MR. AUERHAHN:  Thank you, your Honor.

18          Very briefly, with all due respect to Mr. Carney, he

19    talks about a statute which isn't, in fact, the way it's been

00:45 20    enforced, the way it's been interpreted.  He also, again, with

21    all due respect, does not give the accurate description or

22    definition of materiality.  It's not that it actually

23    influenced the course of an investigation, but it is the kind

24    of information that the FBI conducting an investigation would

25    rely on in the course of an investigation and is capable of

influencing.  It's clear from a number of the cases that we've

cited, a couple that are on all fours of this, where the FBI

knew the true story when they came to interview someone, and

numerous cases have held that it's not the fact that the FBI

knew the information was inaccurate, does not affect

materiality because looking at it from the point of view of the

person making the statement, is he providing information that

is capable of influencing, and we're not looking at actually in

this particular case did it influence.  And even the First

Circuit in the case in where this decision had already been

made with reference to benefits so the false application

submitted by the individual obviously in that particular case

could not have influenced, nevertheless, it was a false

statement we're looking at from the point of view of the person

making the statement.

And, you know, you have a case here where the

defendant clearly knew that what he said was a crime.  There

was no ambiguity in his mind.  I attached an exhibit where he

talks about the fact that I know I lied to the FBI and

essentially I know it's a crime.

But even if we were to look at it from the point of

view of the FBI, which I suggest we don't have to, if he had

told the truth, then it would have affected the course of the

investigation.  They would have asked follow-up questions.

Yes, I know he's in Somalia.  "Well, do you know who he is

1    with?"  The defendant did know who he was with.  He knew he was

2    with Omar Hammami.  "Did you speak with him before he went to

3    Somalia?  Did you know that he was going?"  "Yes, I did.  I met

4    him in Egypt with Mr. Hammami," and they talked about going to

5    Somalia.

6           So the evidence that we'll be presenting at trial is

7    that it did, in fact, affect the investigation.  But again, for

8    the purpose of the motion -- I'm not sure that this is, as with

9    the other case, appropriate for a motion to dismiss.  But even

00:47 10   if it were, we look at it from the point of view of the kind of

11   information that the FBI is seeking when they're conducting an

12   investigation:  Mr. Maldonado was in Somalia; he was receiving

13   training from al-Qaida; he was involved in fighting.  The

14   defendant knew some of that, he may not have known all of that,

15   and ultimately, Mr. Maldonado pled guilty to receiving military

16   training from al-Qaida, clearly a matter within the

17   jurisdiction and investigation of the FBI.  And his answers

18   were the kind of information the FBI was seeking and is the

19   kind that they normally rely on in the course of their

00:48 20   investigation.

21          Again, I'm focusing just on what Mr. Carney focused on

22   in his argument.  For the rest of it, I just rely on the

23   submissions.

24          THE COURT:  Okay.  Well, again, this motion is also

25   denied.  Mr. Carney proposes an interesting and perhaps even

1    appealing definition of materiality.  It's not the ones that

2    the courts have adopted, and that's the short answer.  The law,

3    unfortunately, is against him on this.  It's sufficient to at

4    least withstand a motion to dismiss.  Ultimately, the question

5    of materiality will be one for the jury to decide.  So all

6    right.  That motion is also denied.

7           That brings us to the motion for exculpatory evidence.

8    Ms. Bassil?  No?  You wrote it, why is he arguing it?

9           MS. BASSIL:  Why not?

00:49 10          THE COURT:  Go ahead.

11          MR. CARNEY:  All right, your Honor.  In the past we've

12   brought broad-based motions for exculpatory evidence.  In this

13   one we have targeted five specific areas that we are interested

14   in.  This is Document 188.

15          THE COURT:  Right.

16          MR. CARNEY:  I'm informed by the government that

17   exculpatory -- potentially exculpatory evidence sought by

18   Number 1 may be arriving next week.  I will withhold argument

19   on Number 1 and revisit it with the Court at a later date if

00:49 20   it's necessary, but I know that this type of material is very

21   important as exculpatory evidence under Category No. 1.  Two

22   and 3 --

23          THE COURT:  Let me just ask -- I note that there has

24   been a lot of discovery, and a lot of it has been as a result

25   of seizures, intercepts, and so on.  This addresses

1    particularly -- well, agent notes, I guess, 302s and so on.

2    Have there been any 302s disclosed yet?

3            MR. CARNEY:  They began being disclosed last week,

4    your Honor.

5            THE COURT:  Okay.  What's the --

6            MR. CARNEY:  As well as grand jury transcripts.  So --

7            THE COURT:  In what volume?  Maybe I should ask the

8    government:  What's the volume anticipated for 302s and grand

9    jury...

00:50 10         MR. CHAKRAVARTY:  So we have produced the main

11   cooperating witnesses, the 302s which reflect their initial

12   proffer with the government, as well as grand jury minutes.  We

13   expect more of those in the order of a handful, including

14   there's actually a DVD which I'll hand to counsel at the end of

15   this hearing, along those lines.  In total, and in deference to

16   counsel in terms of what to expect in terms of these materials,

17   which the government does not concede are *Brady* material but

18   they are *Jencks* or they are otherwise things that we intend to

19   produce, *Giglio*, we expect somewhere on the order of 100-plus

00:51 20  302s to be produced, most of which are related to chain of

21   custody, seizing agents' recording of memorialization of some

22   kind of evidence.  In terms of substantive actual witness

23   interviews, actually, civilian witness interviews, I expect

24   less than 20 more, and those --

25           THE COURT:  Twenty more, is that what you said?

1          MR. CHAKRAVARTY:  Twenty more, yes.  We've probably

2     given maybe ten now.

3          THE COURT:  Okay.

4          MR. CARNEY:  May I return to the motion?

5          THE COURT:  Yes.  Yes.

6          MR. CARNEY:  We have asked the government if they did

7     two things in particular:  First, did they try to determine if

8     there had been any direct communication between our client and

9     al-Qaida.  We submit that if they did that specific

00:52 10    investigation to determine if any member of al-Qaida or

11    representative of al-Qaida had a communication with our client

12    and they turned up a negative result, we would like to know

13    that fact.

14          It can't be gainsaid that if they did investigate that

15    and there were conversations between a member of al-Qaida and

16    our client, that would become the centerpiece of their case.

17    The fact that they looked for it and didn't find it, especially

18    given the resources that they have to do this kind of search

19    that we have no ability to do, the ability for the NSA or the

00:53 20    CIA or the FBI or other agencies that maybe none of us even

21    know about, and they can conduct these investigations, and if

22    they did such an investigation and it came up negative, I

23    submit that's exculpatory and we should find out about it.

24          In a similar vein, the government has alleged that our

25    client in 2004 went to Yemen to train at a military camp.  Our

client has asserted that he went to Yemen to study at a
religious school.  We have asked the government if they have
searched in their databases to learn whether there was, in
fact, any military training camp in Yemen in 2004, and that if
that search produced a negative result, that we need to be told
about it.

I would compare it to this, your Honor:  If the
defendant were accused to have gone to Vermont in order to ride
a giant Ferris wheel that was the tallest Ferris wheel in the
country, and the government did an investigation to corroborate
that and our client said, "I didn't go to Vermont to ride on a
Ferris wheel.  I went to Vermont because I wanted to spend the
weekend at an inn," if the government did an investigation and
through all of its resources determined there isn't a single
Ferris wheel in Vermont, then I submit that would be supportive
of my client's assertion that he did not go to Vermont to ride
a nonexistent Ferris wheel but that he indeed went to spend
time at an inn.

So we have asked them:  Did you use your resources to
look and see if there's any training camp in Yemen in 2004 that
the defendant could have gone to?  They don't have to tell us
if they've looked, or if they did look, they found nothing.  We
submit that's exculpatory and we should be told that.

Under Number 4, we have received information, albeit
at this point through the media, that our client was approached

1    by a counterterrorism agent or cooperating witness and asked to

2    engage in criminal terrorism conduct and that our client turned

3    the offer down.  We're aware, according to media, that this

4    allegation has been confirmed by two sources who would have

5    firsthand knowledge of this within the counterterrorism agency.

6    We're told that a person representing that agency came to this

7    district to meet with the United States Attorney, who

8    apologized for having stepped on the investigation going on in

9    this district.

00:56 10         The critical point for us is that if someone came up

11   to Mr. Mehanna and suggested that he was supportive of

12   Mr. Mehanna's views and tried to get Mr. Mehanna to engage in

13   conduct that would be criminal and Mr. Mehanna said, "No, I'm

14   not going to do that," we submit that's exculpatory evidence.

15        In my discussions with a member of the prosecution

16   team I was told that he does not think this would be --

17        THE COURT:  I'm sorry?

18        MR. CARNEY:  He does not think that this would be

19   exculpatory evidence; and, therefore, it would not have to be

00:57 20  turned over.  We disagree and we ask your Honor to make a

21   ruling.

22        Finally, your Honor, in Number 5, we have asked for

23   information that would verify that the government knew that

24   Daniel Maldonado was in Somalia on December 12th, 2006, whether

25   by a person who was present there, a person who was cooperating

1    or employed by the U.S. government who was there, even a person

2    who was standing right beside Mr. Maldonado when he was making

3    that telephone call, it was being recorded by the government.

4    We submit that this evidence would be exculpatory in our

5    argument that any false statements made by my client would not

6    be material.

7            The government has responded that they've already

8    notified us of the name of Omar Hammami.  We are looking for

9    the other person's name and the other evidence the government

00:58 10   knew on December 16, 2006, that Danny Maldonado was in Somalia

11   and what he was doing.

12           Those are the five targeted areas of exculpatory

13   evidence we're seeking, if your Honor please.

14           MR. CHAKRAVARTY:  Your Honor, with regard to the first

15   category that arose earlier, is that this is not classic *Brady*

16   or *Giglio* information, although to the extent this is obviously

17   information that the government intends to produce, we're in

18   the process of doing that.  We will continue to produce that.

19   And I know the defense is not pressing that right now, but to

00:58 20   the extent that there was something that was impeaching of a

21   witness or something that was exculpatory in a witness

22   statement, then obviously any of that information will be

23   produced in those 302s and grand jury minutes.

24           In regards to the Requests 2 and 3 for these

25   descriptions of the government's investigative steps and then

1   whether a negative response was elicited from it, I think

2   there's a fundamental misunderstanding about how a government

3   conducts an investigation.  The government does not in a

4   regular manner in cases say, "Let me go look for evidence of

5   communication between a defendant and al-Qaida or whoever

6   else"; instead, they say, "Let's look at the information that

7   is in the government's possession and determine what other

8   investigative steps we can take."

9          What that -- the reason I pose it in that sense is the

00:59 10   prospect that the government would specifically look for a

11   piece of information in order to be responsive to a discovery

12   request is pretty farfetched, but more to the point, what's

13   discoverable under *Brady* and *Giglio* is the information itself,

14   not whether the government has not found something that

15   otherwise you would expect to have.

16          This isn't a rape case or a murder case where DNA

17   evidence in a specific place at a specific time would

18   inherently be inculpatory or exculpatory and, if the government

19   chose not to engage in an investigative step, then that might

01:00 20   be able to be used to impeach government agents.  This is not

21   that circumstance.  This is simply a bootstrapped attempt to

22   scour the government's files and somehow elicit a response, a

23   negative response, presumably, that the government did not find

24   inculpatory evidence demonstrating that the defendant had some

25   contact with al-Qaida or whether there was a terrorist training

1   camp in Yemen.

2        And I'd suggest to your Honor those facts, whether

3   there was a terrorist training camp in Yemen and whether the

4   defendant had contact with a member of al-Qaida, each of those

5   facts are not exculpatory even if they were in the negative.

6   And I'd suggest that because as the indictment, as it's

7   charged, does not allege either of those facts, that the

8   defendant actually attended terrorist training in a Yemenis'

9   terrorist training camp; it's rather that it was the

01:01 10  defendant's intent -- it was the understanding of the purpose

11  of the 2004 trip going to Yemen was to obtain military-type

12  training.

13        Consequently, whether there was or there wasn't is

14  not -- it's not probative of an issue in the case, which we've

15  made clear to the defense.  But more importantly, this is an

16  interrogatory in the classic sense.  They're asking, "What did

17  you do?  How did you go about your investigation?  Because if

18  you didn't find evidence where you expected to find evidence,

19  that we're entitled to that."

01:02 20        But that's not how the rules of discovery work.  If we

21  found inculpatory evidence, we're under no obligation to

22  produce that to the defense unless it's required by rule, but

23  certainly not under *Giglio* and *Brady*; and conversely, if there

24  was exculpatory evidence and there was evidence that

25  demonstrated that the defendant did not go for the purpose of

1   finding a terrorist training camp, then that would be

2   exculpatory.

3        But that's not what the request is for.  The request

4   is for whether there was a terrorist training camp in Yemen,

5   which is not before the Court and it's not in the indictment.

6   Similarly, it's whether the defendant had any contact with an

7   al-Qaida representative, which is not before the Court.  If the

8   government chose to introduce that evidence, it would be

9   inculpatory rather than exculpatory.

01:02 10        With regard to the fourth request -- sorry, I hasten

11   to add, the subject of the motion -- this isn't a request --

12   the information that the defense had made -- has made clear to

13   the Court is also relayed to counsel through a letter, so we

14   had the opportunity to respond in letter form to the defense.

15   But it is important for the Court to know that regardless of

16   the characterizations of what the prosecution team would think

17   is exculpatory or is not, that the premise of the defense

18   request for information related to an investigative attempt to

19   obtain inculpatory information from the defendant after his

01:03 20   indictment is inaccurate.  The press reporting, the media

21   reporting, whatever it was that triggered that is incorrect

22   information.

23        We've looked into it.  What's telling is that that's

24   the only substantiation for the request to the Court, whereas

25   the defendant himself would be best suited to know whether he

was asked to do something in pursuit of terrorism.  And I would

suggest that it would be relatively easy to proffer to the

Court as a basis for this request such facts, and I'd submit to

you they can't do that because this misinformation which

entities in the media have propagated has led to a

misapprehension by the defense that the government possesses

some information that is discoverable or demonstrates that

there was an attempt to get inculpatory information from Tarek

Mehanna.  Specifically, I would suggest that the request was

for information related to the New York Police Department

attempt to obtain inculpatory information from the defense, and

the short answer is:  There is no such exculpatory information.

The final request related to information about who

else knew about who was near Daniel Maldonado during this phone

call.  The government did mention, you know, now a few times --

we've identified that Omar Hammami was the person who the

defendant was sending his salaams to, to Daniel Maldonado,

because he knew he was there with him.

Evidence of another person, which we're hearing for

the first time today, is not within the ken of the government's

information.  We've produced a telephone call -- a recording of

the telephone call, as well as the transcript now of the

telephone call, depicting the parties on the telephone call,

depicting the overheard voice of Omar Hammami who, just for

your Honor's benefit, was designated last week as a specially

1    designated terrorist by the Treasury Department, which is just

2    as a point of suggesting he is not going to be a cooperating

3    witness of the government in this case.

4         There's no more that we have that we can say about

5    this, you know, mysterious third person which -- fourth person,

6    I should say, that the defense is asking for at this point.

7         THE COURT:  So let me just be clear on that.  Does the

8    government believe there was a fourth person?

9         MR. CHAKRAVARTY:  The government is not aware that

01:06 10    there ever was a fourth person.  This is the first time we're

11    hearing about it today.

12         THE COURT:  The government's position is if there

13    were, it doesn't know?

14         MR. CHAKRAVARTY:  Correct.  That's more precise, your

15    Honor.  We weren't in Somalia; we don't know who else...

16         THE COURT:  So that -- I'm just trying to understand

17    exactly where everybody is on this.  It's not necessarily the

18    government's position because I guess it doesn't get to that

19    point, that it does not have to tell, if it knew.

01:06 20         MR. CHAKRAVARTY:  Correct.  We're not --

21         THE COURT:  The factual premise is lacking, is what

22    you're saying.

23         MR. CHAKRAVARTY:  Right.  To the extent that -- yes,

24    that's correct, your Honor.

25         THE COURT:  So if the government were to discover that

1    there was a fourth person and who it was, the government will

2    concede that it would be disclosable as Hammami was disclosed?

3         MR. CHAKRAVARTY:  No, we don't go that far, your

4    Honor.  But that being said -- that being said --

5         THE COURT:  It's a baby step.

6         MR. CARNEY:  A little cross-examination never hurts

7    the oral argument.

8         MR. CHAKRAVARTY:  It depends on the context -- I mean,

9    we're talking really an attenuated hypothetical here.  Right

01:07 10   now we don't know if there was another person there.  To the

11   extent we have an obligation to find out whether there was

12   another person there and the identity of another person somehow

13   is exculpatory, I'm not sure we would concede that.  That being

14   said, I don't see --

15        THE COURT:  No, my question wasn't whether you had to

16   go find out, my question is whether you learned.

17        MR. CHAKRAVARTY:  I wouldn't go so far as to say we

18   should be obligated to do that, but unless there's a reason not

19   to produce that name, we would produce that name.

01:07 20        THE COURT:  Okay.  You just want to reserve a

21   footnote?

22        MR. CHAKRAVARTY:  Yes.

23        THE COURT:  And let me come back to Number 2 -- I'm

24   sorry, not Number 2 -- Number 4, which is that a similar

25   situation that your position -- I guess maybe again you're

1    being cautious, you don't reach whether you would have to

2    disclose it as exculpatory; your position is the facts are not

3    true and, therefore, there is nothing to be disclosed, is

4    that --

5            MR. CHAKRAVARTY:  That is exactly right, your Honor.

6            MR. CARNEY:  Let me make my request as specific as I

7    can in each of these areas.  In regard to an exculpatory

8    negative, what I'm referring to is if the government searches

9    for something specifically --

01:08 10         THE COURT:  You're talking about 2 and 3 now?

11           MR. CARNEY:  Yes, I am, your Honor.

12           If the government searches for something specific and

13   doesn't find it, I consider that exculpatory.  I'm not asking

14   them to do a search today.  I'm not asking them to do anything

15   that they haven't already done.  It's the equivalent of this:

16   Let's say in a murder case a crime-scene team goes into the

17   house.  One of them is looking for fingerprints, and he dusts

18   the entire house and does not find any fingerprints.  I would

19   say that's a fact that the defense is entitled to know because

01:09 20  the defense would be in a position to argue that they did not

21   find the defendant's fingerprints at the scene.

22           In this instance if the government tried to determine

23   if there were military training camps in Yemen and asked some

24   of the allied investigative agencies like the NSA whether they

25   have any information that there were military training camps in

1  Yemen in 2004, and the response they get back is, "No, to the

2  best of our knowledge there were no training camps in Yemen in

3  2004," we would consider that exculpatory.

4       The government does not consider it exculpatory, and

5  that's why I'm pressing that if a specific search were done and

6  it came up negative in these two areas, we'd like to know that

7  it did come up negative.  All we would need to know is the one

8  word:  "We made the search and the answer is, no, we found no

9  evidence of a military training camp in Yemen in 2004."

01:10  10       THE COURT:  When you use the term "government

11  investigation," are you referring to the criminal

12  investigation?

13       MR. CARNEY:  Yes, I am, your Honor.

14       THE COURT:  So you're not inquiring whether unrelated

15  to the criminal investigation or this prosecution some agency

16  of the government, including perhaps the military, sought or

17  required information on the existence of camps in Yemen, for

18  example?

19       MR. CARNEY:  No, I'm not, your Honor.

01:10  20       THE COURT:  You're asking whether someone connected

21  with this investigation made that effort.

22       MR. CARNEY:  Yes, your Honor.

23       THE COURT:  Is that the way you've understood it?  We

24  had this discussion generally I think once before.

25       MR. CHAKRAVARTY:  We did.

1          THE COURT:  And I thought it was couched in terms of

2     the entire government.  This is a little bit narrower than I

3     had focused on it before.

4          MR. CARNEY:  Your Honor's correct.

5          MR. CHAKRAVARTY:  Even if that were the case, your

6     Honor, I think what's operative here is -- maybe kind of to

7     elaborate a little bit more, or kind of reiterate, I guess, why

8     we think that as a -- as a matter of relevance why we don't

9     think it's --

01:11 10          THE COURT:  I understand that argument.  That's a

11     different argument.

12          MR. CHAKRAVARTY:  But in terms of the focus of the

13     search, if the government -- again, I reiterate that that's not

14     how the government operates.  And I can assure -- maybe this

15     will take the issue off the table.  The government -- the

16     prosecution team has not asked whether there were any terrorist

17     training camps in Mehanna *[sic]* at the time that he was alleged

18     to have visited because it's irrelevant, arguably, to the

19     indictment.

01:12 20          THE COURT:  Well, I understand the

21     relevance/materiality aspect of it.  I'm just trying to focus

22     on the other -- in a sense -- well, one -- I agree with

23     Mr. Carney on the fingerprint example.  That could be

24     characterized as a scientific experiment or something of that

25     sort.  It was different from a general investigation.

1          Are you aware of any cases where the kind of

2     non-information that you're referring to here has been required

3     to be disclosed?

4          MR. CARNEY:  It's usually in the context of where the

5     government investigators look for something, they don't find

6     it.  And the Court has held that absence of corroboration is

7     viewed broadly as exculpatory.

8          THE COURT:  I guess the problem I have is that there

9     can be a wide spectrum of "look for something."  There can be a

01:13 10     specific scientific test; there can be a general scene

11     examination; there can be the scope of the entire four-year

12     investigation.  And the broader it gets, the harder it is, it

13     seems to me, to characterize that as "look for something."

14     You're investigating.  Generally you want to learn as much as

15     you can about circumstances.  I think at that end of the

16     spectrum there's no requirement to disclose.  At the other end,

17     the more specific the test or inquiry, there is.

18          So I guess for now, anyway, I'm inclined to think that

19     it's not discoverable.  It doesn't fit closely enough to the

01:14 20     analogy that you, yourself, raised.  So I think as to that for

21     now it will be denied.  As to 4 and 5, I accept the

22     representations until they're contradicted that the factual

23     predicate is inadequate.

24          MR. CARNEY:  I would accept their representations.  I

25     just wondered if I could narrow it down even more.  As I listen

1    to Mr. Chakravarty, he said he's unaware of any instance where

2    this happened after the defendant was initially indicted.  I'd

3    like to know if any representative of a counterterrorism

4    agency, specifically in New York, sent someone to meet with

5    Mr. Mehanna to try to engage him in terrorist-related

6    activities and Mr. Mehanna declined.

7         So I'm narrowing it down to a government organization

8    in New York with a counterterrorism unit sending a person to

9    meet with my client before he was indicted and my client

01:15 10    rejecting the offer.  And I'll be further specific that an

11    individual then traveled from New York and met with people here

12    in Boston to explain what was going on from their end.

13         If that happened and my client was approached by

14    either an undercover agent or a cooperating witness and asked

15    to engage in a crime of violence or any other crime related to

16    terrorism and he said, "No, I'm not interested in doing that,"

17    I believe that's exculpatory.  That's as specific as I can get

18    with the one exception of giving you the name of the person who

19    came from New York --

01:16 20         THE COURT:  Right.

21         MR. CARNEY:  -- to Boston.  I'm not trying to

22    embarrass anybody.

23         THE COURT:  Okay.

24         MR. CHAKRAVARTY:  Again, I mean, regardless of the

25    timing, it seems like the operative facts here are that the

1    defendant was pitched to engage in an act of terrorism and he

2    apparently declined.  Shouldn't the defendant be the person

3    best situated to be able to represent those facts instead of

4    having the government go canvas, you know, various

5    counterterrorism agencies which are not involved with this

6    investigation?  It seems like they have not met merely the

7    factual predicate to necessitate the government to go on some

8    fishing expedition.

9        All that being said, the government having looked into

01:16 10   the defendant's request, does not have any information that

11   would reflect those facts at all.

12       THE COURT:  Without the qualification "after

13   indictment"?

14       MR. CHAKRAVARTY:  Yes, your Honor.  And that being

15   said, the government is not omniscient; the government does not

16   know -- you know, to borrow the phrase of a former defense

17   secretary, it doesn't know what it doesn't know.  To the

18   government's knowledge, having done due diligence in terms of

19   determining whether such contact occurred, we are not aware of

01:17 20   any such contact.

21       MR. CARNEY:  So I assume the government is saying that

22   no representative of the New York City Police Counterterrorism

23   Unit, in fact, the head of the counterterrorism unit, did not

24   come here and meet with senior people in the U.S. Attorney's

25   Office in Boston to discuss their sending someone to meet with

1    Tarek Mehanna and pitch radical ideas to him of jihad and

2    otherwise, and apologize for sending someone from New York to

3    this district to make that contact?  If that's what the

4    government is saying, then I'll accept it.

5         MR. CHAKRAVARTY:  That's not what the government is

6    saying.  Neither is the government -- should the government be

7    compelled to talk about something that is -- would not be

8    exculpatory in any sense.

9         MR. CARNEY:  See, the problem I have, your Honor,

01:18 10    frankly, is when I have this discussion with the government,

11    and Attorney Auerhahn and I batted it back and forth for 30

12    minutes, I couldn't get beyond an acknowledgment that this

13    could be exculpatory evidence.  And where Mr. Chakravarty again

14    says, you know, they don't have to go searching all over and

15    this isn't exculpatory evidence, I suggest the seventh floor of

16    this building is the pond where they go fishing.

17         THE COURT:  Yeah.  Okay.  I think we'll explore this

18    further in camera with both counsel.

19         So I think that leaves Number 4 unresolved.  Number 1,

01:19 20    I guess, is in progress, and we'll monitor the progress of

21    Number 1.  Two and 3 are denied, and 5 is denied on the

22    government's representation regarding the presence of another

23    person in Somalia.  Okay.  Let's -- so I think that disposes of

24    the motion except for this last matter.

25         How about a general overview now of where trial

1    preparation materials stand, and so on?  We've heard now about

2    witness statements being provided, and so on.  Where do we

3    stand with respect to this?

4         MR. CHAKRAVARTY:  So these witness statements

5    hopefully will be provided.  We plan to do it in a rolling

6    fashion.  There are a number of administrative hoops that the

7    prosecution has to go through to be able to produce them, which

8    we're undergoing, and then to digitize them and put them on CDs

9    and get them over to the defense.  But we are working on that,

01:20 10   and I think every week our hope is that we'll be able to be

11   making more progress so that close to the end of this month we

12   shall have, if not all, then the vast majority of materials

13   which we feel that we need to produce either under *Jencks* or

14   *Giglio* have been produced.

15        We have made contact at your Honor's suggestion with

16   the tech people in light of the trial presentation system, the

17   JERS system that your Honor uses.

18        THE COURT:  Do you both know about that?

19        MR. CARNEY:  Yes, your Honor.

01:20 20        THE COURT:  Okay.  We're using it for the first time

21   in the trial that's ongoing.

22        MR. CHAKRAVARTY:  I'll confer with our office to see

23   if there are any issues we need to work on.

24        The government has given notice of expert disclosures

25   but has not elaborated on full and complete 702 and 703

1    disclosures which, again, the government intends to do both

2    through an expert report for substantive experts on terrorism

3    and on radicalization and significance of certain things.

4              THE COURT:  That's by correspondence?

5              MR. CHAKRAVARTY:  That's by correspondence.

6              THE COURT:  Could I have a copy of that?

7              MR. CHAKRAVARTY:  I would be happy to copy you on

8    that, your Honor.

9              To the extent we don't have the final report, you

01:21  10    know, in the next couple of weeks, then we can give a summary

11    by attorney letter so that the defense is more prepared than

12    they are even now.  Although they have some idea, we could give

13    them a better idea.  And our hope is, as with all discovery, to

14    further narrow, further identify exhibits.

15             We've gotten -- we've started to identify the universe

16    of the discovery materials that we intend to use as --

17    presently intend to use as exhibits.  Some we had noticed to

18    defense a couple of months ago, but the real cumbersome ones

19    are the computer files that are on a computer, the actual path

01:22  20    name of each individual file that we intend to offer.  That's

21    taking some logistics.  It's taking some work with computer

22    forensic examiners.  We've got the first kind of response to a

23    first salvo of those files which I received today and I'll turn

24    over to the defense.  I'll be able to e-mail that to them later

25    this week, if not tonight.

1    So in short, we hope that by 21 days -- you know, I'll

2    give myself a week or two leeway, 21 days -- we should have an

3    ultimate exhibit list, witness list, and the rest of the

4    discovery will be done, you know, subject to modifications as

5    we get closer to trial.

6         MR. CARNEY:  I'd just like to comment on one aspect of

7    that, your Honor.  I would encourage the Court to ask the

8    government to give us their notice regarding the substance of

9    expert testimony as soon as they can.  Because we have not been

01:23 10    provided that up to now, we've got a lot of balls in the air,

11    if I could put it that way, with more being tossed up.  And

12    what we're trying to do, in part, is anticipate what the

13    government experts will say and then have someone who can speak

14    on the same subject matter.

15         The longer it takes for us to get what the

16    government's expert is going to say in this case, or experts

17    are going to say, the longer it's going to take us to identify

18    people that we would want to offer in rebuttal.

19         THE COURT:  Well, okay.  Mr. Chakravarty just

01:23 20    mentioned 21 days.  That's -- three weeks from today would be

21    August 24th.  If we set that as a deadline, is that enough?  Do

22    you want to squeeze in more?

23         MR. CARNEY:  No.  Well, if I could, yes.

24         MR. CHAKRAVARTY:  Your Honor, we can respond with a

25    summary in attorney words as to what their testimony is going

1    to be before that, your Honor.

2         MR. CARNEY:  That would be helpful.

3         THE COURT:  That would be fine.

4         MR. CARNEY:  And then in 21 days, if the government

5    could ask their expert to present the final report within

6    this -- at the end of this 21 days, then that allows us to

7    immediately start narrowing down who we need and give notice.

8         THE COURT:  Right.  But I think an intelligible

9    summary, in lay terms, would be very helpful because then, at

01:24 10  least, the fields of expertise could be appropriately

11   appreciated, and so on.  And even if the actual expert reports

12   weren't yet seen, that could advance the process of getting

13   defense experts prepared, so...

14        MR. CARNEY:  Also, in fairness, it will ensure that

15   the government gets notice of our experts at the earliest

16   opportunity as well.

17        THE COURT:  Okay.  So I'm looking for a conference

18   date, and I'd like to do it the first week of September, right

19   after Labor Day, if we could, just to take stock of where

01:25 20  everything is.

21        MR. CHAKRAVARTY:  Not a final pretrial, just a status?

22        THE COURT:  Just a status.

23        MR. CARNEY:  Does your Honor have a suggested --

24        THE COURT:  Well, I'm looking at the 7th.  Wednesday,

25   the 7th, about three o'clock.

1          MR. CARNEY:  That's good for the defense, your Honor.

2    Thank you.

3          THE CLERK:  So we'll set up a status on Wednesday,

4    September 7th, at 3 p.m.

5          MR. CARNEY:  I also have four housekeeping motions

6    that we'd like to --

7          THE COURT:  Yes.  I want to talk to you about those.

8    That's on my agenda after this hearing is concluded.

9          MR. CARNEY:  Yes, your Honor.

01:25 10          THE COURT:  I would like to see counsel on both

11   sides -- we'll adjourn the hearing, but I would like to

12   continue the discussion about the last motion briefly, probably

13   in chambers, and then we could take up those other matters.

14          MR. CARNEY:  Thank you, your Honor.

15          THE COURT:  Okay?  So we'll be in recess.

16          THE CLERK:  All rise.  Court is in recess.

17          (The Court exits the courtroom and the proceedings

18   concluded at 3:28 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No. 09-10017-GAO,

8    United States of America v. Tarek Mehanna.

9    /s/ Marcia G. Patrisso
10   MARCIA G. PATRISSO, RMR, CRR
     Official Court Reporter
11
     Date:  August 10, 2011
12

13

14

15

16

17

18

19

20

21

22

23

24

25