UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,      )
                              )
         Plaintiff,            )
                              )   Criminal Action
v.                            )   No. 09-10017-GAO
                              )
TAREK MEHANNA,                 )
                              )
         Defendant.            )
                              )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**TRANSCRIPT OF STATUS CONFERENCE**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, February 23, 2011
2:01 p.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
3         Assistant U.S. Attorneys
          One Courthouse Way
4         Boston, Massachusetts  02210
          - and -
5         UNITED STATES DEPARTMENT OF JUSTICE
          By: Jeffrey D. Groharing, Esq.
6         950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
7         On Behalf of the Government

8         CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
9              Janice Bassil, Esq.
               John E. Oh, Esq.
10             Sejal H. Patel, Esq.
          20 Park Plaza, Suite 1405
11        Boston, Massachusetts  02116
          On Behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2            THE CLERK:  All rise.

3            (The Court enters the courtroom at 2:01 p.m.)

4            THE CLERK:  The United States District Court for the

5     District of Massachusetts.  Court is in session.  Please be

6     seated.

7            For a case conference in the case of United States of

8     America versus Tarek Mehanna, which is Docket 09-10017.  Would

9     counsel identify yourselves for the record.

10           MR. CHAKRAVARTY:  Good afternoon, your Honor.  For the

11    government, assistant U.S. attorneys Aloke Chakravarty and

12    Jeffrey Auerhahn.  And with us is DOJ counterterrorism section

13    trial attorney Jeffrey Groharing.

14           MR. GROHARING:  Good afternoon, your Honor.

15           THE COURT:  Good afternoon.

16           MR. CARNEY:  Your Honor, I'm J.W. Carney, Jr.  With me

17    is Janet Bassil.  We are co-counsel representing the defendant.

18    In addition, behind us, Sejal Patel and John Oh, associates in

19    our law firm working with us as well.  Good afternoon.

20           THE COURT:  Good afternoon to you all.

21           There are several motions to be addressed, and I

22    thought we would do them in the following order:  We'd first

23    deal with the motion directed at the detention order, followed

24    by a motion for a bill of particulars, followed by a discussion

25    of a variety of discovery issues.

1          These are all defense motions, so who's arguing the

2     detention?  Ms. Bassil?

3          MS. BASSIL:  I am, your Honor.  Thank you.

4          Your Honor, as a matter -- a couple of housekeeping

5     things.  First of all, we had filed a reply to the government's

6     response, and we'd also filed a motion for leave to file that

7     response.  So I would ask you to grant that leave to file.

8          THE COURT:  Yes.

9          MS. BASSIL:  And the second issue is we had filed a

10    motion to impound the instant messages that were part of our

11    motion for renewing the issue on detention, and I would ask you

12    to impound those as well.

13         THE COURT:  I believe they have, in fact, been.  If

14    there's an administrative matter of allowing the motion, that's

15    allowed.

16         MS. BASSIL:  Thank you.

17         Your Honor, this is our motion to have Tarek Mehanna

18    released.  We have now had the opportunity to review in full

19    the government's proffer of evidence which resulted in his

20    detention in October 2009.  That proffer that the government

21    made in October 2009 was based almost entirely on instant

22    messages that were seized from Mr. Mehanna's computer in August

23    of 2006.  They reflected instant messages that were written

24    five years previously.

25         There was some other evidence alluded to in the

1   government's proffer, but it was not shown, essentially, to the

2   Court.  There was an affidavit by agents; there was, I believe,

3   a couple of photographs; and there was, I believe, a poem the

4   defendant had written when he was 16 or 17 years old.

5       A review of the evidence presented showed to us that

6   the government singled out approximately 60 instant messages,

7   pulled out of context, distorted, and for lack of a better

8   term, cherry-picked.  There were a total of 2,767 pages of

9   instant messages.  I have read all of them.  I know that the

10  government has not had one person read all of them.  When you

11  read all of them, you begin to understand the context and the

12  flow of these instant messages.  And I have been able to go

13  through approximately 730 pages of those instant messages with

14  my client.

15      The government's request for detention was based on

16  two ideas: that he was a risk of flight and that he was a

17  danger to the community.  Both are refuted by his background,

18  his behavior in the last six years, and by the government's own

19  actions and inactions.  And I think what's very important here

20  is to keep asking:  What is he charged with and what did he do?

21  Not what he said, what did he do, because what he did is very

22  little.

23      There is a presumption because of the charges that the

24  defendant would be detained, but that does not shift the burden

25  from the government.  It's their burden to show that there are

1 no set of circumstances which will protect the community or

2 ensure his presence.  And what I would like to do, your Honor,

3 is walk the Court through a chronology.  And I have a timeline

4 which I provided to the government, I would provide it to you,

5 and I have a copy for your clerks as well.

6 　　　　　Your Honor, as you can see from this timeline, in

7 October 2005 the government became interested in Tarek

8 Mehanna -- we're not sure why -- but they visited his home.  He

9 had gone back and forth to Yemen in 2004.  He had been stopped

10 at Customs, but he had never been put on any kind of no-fly

11 zone or any kind of terrorist warning zone.  He was a college

12 student at the Massachusetts College of Pharmacy where his

13 father was a professor.

14 　　　　　So from October 2005 until January 2006 there appeared

15 to be no action.  In January of 2006 the government obtained

16 his e-mails, apparently through a service provider.  In August

17 of 2006, Mr. Mehanna and his parents went to Egypt.  They went

18 to visit family in Alexandria.  They were not detained either

19 going or coming.  And at that time the government obtained a

20 secret warrant.  They went into his house and they took a copy

21 of his hard drive, his Dell 2006 computer, which contained the

22 instant messages that the government used for the proffer.

23 　　　　　It was also at that time in 2006 that a cooperating

24 witness began to cooperate with the government.  This

25 cooperating witness, who I've labeled "CW2," was the third

1    person who was going to go on this trip to Yemen.  Three people

2    were scheduled to go to Yemen:  Mr. Mehanna; Mr. Abousamra, who

3    is his codefendant who is now apparently living in Syria; and

4    CW2.  CW2 backed out at the last minute, and he apparently is a

5    witness for the government.

6           In December of 2006 the government recorded a phone

7    call from Daniel Maldonado in Somalia.  And the government, I

8    believe, provided a transcript of that call.  In that call,

9    Mr. Maldonado states that he is in Somalia.  This is the time

10   when the Islamic Courts Union came into Somalia -- the Islamic

11   Courts Union at that time was not designated as a foreign

12   terrorist organization -- and they had taken over Somalia.  It

13   was shortly invaded by Ethiopia.  And Mr. Maldonado was

14   eventually arrested in Kenya.  But the government had that

15   recording in 2006.  Four days later the government interviewed

16   Mr. Mehanna at work, and it is from that interview that they

17   say that he made false statements.

18          No arrest; no action by him; no desire to detain him.

19   In December 26, 2006, Mr. Abousamra, his codefendant, simply

20   left the country and moved.  And he lives, as I understand it,

21   in Syria today with his family.  In January of 2007

22   Mr. Maldonado was arrested.  And he apparently is listed as a

23   potential witness here.

24          And so what I'm trying to show the Court is that if

25   all these steps of the way the government could have arrested

1  my client, did not seek to.  For a man they now claim is so

2  dangerous that he cannot be free in the community, they did

3  nothing.

4        In April of 2008 they met with Mr. Mehanna and told

5  him, "Cooperate with us or you will face charges.  Not just

6  charges of false statements, you will face charges of

7  supporting terrorism.  You will face charges.  You will do it

8  the hard way."  Our client chose not to become an informant or

9  a cooperating witness; in fact, a couple of weeks later, he

10  went to see Attorney Norman Zalkind who wrote a letter, which

11  is attached to our motion, to turn himself in.  If you're

12  looking at me, if you're looking for me, if you want to arrest

13  me, here I am.  The government declined.

14        Our client at that point was finishing college -- he

15  had also obtained a Ph.D. in a joint program -- and he was

16  looking for work.  He obtained a job at the King Fahd Hospital

17  in Saudi Arabia; in fact, a dream job with a high salary,

18  housing, all kinds of benefits.  He was arrested as he and his

19  parents were going on the plane for him to start his work

20  there, and he was charged with false statements at that point.

21  The FBI searched his home.

22        On December 19, 2008, he was finally released.  His

23  parents posted their home and their other assets, and

24  restrictions were on him.  And over time the restrictions were

25  lifted.  He was allowed to go to the mosque, he was allowed to

1    teach, he was allowed to go to work.  He never violated the

2    conditions of his release.  And then in October of 2009 he was

3    arrested, and he was charged with the charges that are before

4    you today with the government using those messages that they

5    seized back in August of 2006 to justify that he's too

6    dangerous to be in the community.

7         Now, when the FBI became interested in Mr. Mehanna,

8    they visited him.  He spoke to them without a lawyer.  He

9    answered their questions.  He didn't change his behavior, he

10   didn't delete topics in his computers; he continued to live as

11   he has always lived.  There are occasions in these instant

12   messages where he says, "It's not a good idea to talk about

13   these things," but all that shows is some concern; it doesn't

14   show efforts to hide a secret terrorist organization.

15        As I was saying, Mr. Mehanna, when he was arrested for

16   false statements and he was brought before Magistrate Sorokin,

17   he was released.  Magistrate Sorokin rightly pointed out that

18   he did not flee the United States in secret.  He had a job --

19   he had announced it -- and the job provided him with income of

20   $70,000 a year, housing, health insurance, a paid trip home

21   once a year, and it would allow him to live in a country, a

22   Muslim country, marry and raise a family.  That's what he

23   wanted to do.

24        All the evidence that the government has used to hang

25   him was available in 2006, and yet they waited and waited.

1   Now, they can say that they were keeping an eye on him.  That's

2   a little -- that sort of doesn't fly if you realize that

3   Abousamra -- who was supposedly perhaps as dangerous as

4   Mr. Mehanna, or perhaps even more, according to the government,

5   he actually took him to Pakistan and Iraq -- he was able to

6   just walk right out.

7         I think it's important to look at what Tarek Mehanna

8   is charged with, as I said, and what did he do.  Well, he went

9   to Yemen in 2004.  We have maintained, and we continue to

10  maintain, that he went there for religious study.  Al-Qaeda was

11  not in Yemen at that time.  Al-Qaeda had been driven out of

12  Yemen by the president of Yemen after September 11th.  There

13  was no such thing as al-Qaeda in the Arabian peninsula as it

14  exists today.  It was and is a very ancient land; it has

15  limited access to the outside world.  And so the religious

16  schools carry a level of sort of purity of the language and of

17  the religion that really sort of didn't exist anywhere else.

18  There were primitive accommodations.  The schools were little

19  more than camps; in fact, they used the same Arabic name.

20        My client was 19 years old -- 20 years old.  He had a

21  round-trip ticket.  He went when his parents were away.  He

22  went over school vacation.  It was an adventure.  And the

23  government, as cagey as they have been -- and we have asked

24  them over and over again, "What terrorist training camps did he

25  go to?"  They say he went to Yemen to look for a terrorist

1    training camp.  We've asked them over and over again, "Where

2    were the terrorist training camps?  What camp did he go to?"

3    And all they will answer is, "Well, it's not about what he did;

4    it's about what he wanted to do."  They even say in their

5    response that "We've only the naked assertion that he was went

6    there for school."  Well, I was taught that "naked assertion"

7    is the presumption of innocence, and it's their burden to prove

8    that he did something wrong.

9         Their evidence comes from this third boy who did not

10   go, CW2, and who is now a cooperating witness, someone who

11   appears to have been in the thick of terrorist activity.  He

12   himself apparently -- or claims -- that he traveled to obtain

13   guns for an attack on a mall, which I'm going to talk about in

14   a minute.  He allegedly was going to Yemen to join jihad and

15   not return, and he allegedly left a video saying good-bye to

16   his family.

17        The one piece of evidence I've gotten from the

18   government is that that video doesn't exist.  There is little

19   corroboration of this CW2.  And his attempts to entrap my

20   client into saying things in wired conversations are, frankly,

21   ambiguous and open to interpretation.  I know you have seen

22   many, many cases with cooperating witnesses.  It's the stock

23   and trade of the government.  Mr. Carney and I have spent over

24   30 years showing jurors that cooperating witnesses will say

25   just about anything to avoid sitting next to me and in the

1    chair next to their counsel.

2           So what is he charged with and what did he do besides

3    going to Yemen?  They allege he translated.  He translated many

4    things; he's fluent in Arabic.  He translated text from Arabic

5    to English.  Many of these are classical texts of scholars:

6    7th century scholars, 11th century scholars, 14th century

7    scholars.  Topics on things from marriage to children.  Mundane

8    topics.  Detailed topics.  And, yes, they allege he translated

9    other things.

10          He translated something called "39 Ways to Jihad."  He

11   did not write it.  He did not write it and it was available on

12   the Internet.  The government would like to say that many of

13   the things that he translated were available only through

14   terrorist groups.  It's simply not true.  They are available

15   through different forums.  At one time, apparently, al-Qaeda

16   had specific websites.  It's not clear if those are gone.  But

17   he did not access those websites.  Accessing an Islamic forum

18   or an Arabic forum could link you to videos or to text.

19          But he translated the "39 Ways."  And at the time that

20   he translated it, and even today, it was not done for a foreign

21   terrorist organization, it was not done in coordination with a

22   foreign terrorist organization, nor was it done at the command

23   of a foreign terrorist organization, all of the things that are

24   required for support of a terrorist organization.

25          And he didn't follow any of these steps.  The

1    government would like to say whenever he talked about working

2    out -- that one of the 39 ways is to get yourself physically

3    fit.  And they claim that because he might have talked about

4    working out, that he was performing one of these steps.  Well,

5    do you know what?  I talk to my sister every afternoon about

6    going to the gym.  I don't think I'm exactly getting ready for

7    jihad.  The translation was to spark a discussion; not a

8    roadmap.

9          And I looked at these 39 ways again today, and one of

10    the things I realized as I counted them is that in the 1980s

11    when the United States supported the Afghanistan fighters

12    against the Soviet Union, the United States fulfilled -- I

13    counted -- 24 of the 39 ways.  We supplied ammunition, we

14    supplied support.  We supplied everything that the fighters

15    needed to throw out the Soviet Union.  And that is part of the

16    history of all of this.

17          They also say my client translated a video.  It was

18    called the expedition of Umar Hadid, who was an insurgent

19    fighter in Iraq.  This video is available on the Internet.  It

20    is available through Islamic forums.  It was not sent to my

21    client by al-Qaeda.  And it was one video, not videos, plural,

22    as the government suggests.  He did not create graphics or

23    subtitles.  Translations, I would suggest to the Court,

24    writings are protected by the First Amendment.

25          They also point to a poem he wrote when he was 16 or

1    17, "Make Martyrdom What You Seek."  Well, I was curious about

2    that.  And if you like, I have poems here by Sylvia Plath and

3    Bob Dillon that talk about death in a far more romantic way

4    than this did.

5         What else did he do?  What else did he say?  He said

6    things in instant messages that were crass, crude, and

7    sometimes just plain stupid.  He did.  And those, too, are

8    protected by the First Amendment.  This is a quote from the

9    Supreme Court:  "One of the prerogatives of American

10   citizenship is the freedom to speak foolishly and without

11   moderation."

12        I think the Court -- and I want to look at *Holder v.*

13   *Humanitarian Law Project* which the government seems to want to

14   pretend does not exist.  They just sort of push it to one side

15   in all of their responses.  *Holder* is very clear.  "Providing

16   material support constitutes providing a person to work

17   under" -- under -- "a terrorist organization, direction or

18   control," all right?  Independent advocacy:  "Individuals who

19   act entirely independently to advance its goals or objectives

20   shall not be considered to be working under a foreign terrorist

21   organization, direction and control.  It is only advocacy

22   performed in coordination with or the direction of a foreign

23   terrorist organization that is illegal."

24        The government seems to want to say that merely

25   wanting to do these kinds of things is enough.  In fact, the

1   government, as I understand it, wants to use these instant

2   messages in its e-mails to show his intent.  But I think what

3   they really want to do is bolster their lack of hard evidence

4   with as many inflammatory statements as they could make.  And

5   that brings me to what the statements do not show.

6           They do not show that he planned to kill anyone; they

7   did not show that he planned to blow anything up; they did not

8   show that he wanted or learned how to build a bomb or fire a

9   gun or change a gun or modify a gun.  What was interesting to

10  me, and I looked at this last night -- and I have a copy of

11  this for you and a cite to the website -- is that at his

12  arraignment the government held a press conference.

13          And the entire press conference, which was on YouTube

14  -- and I have a copy of it for you -- was all about him wanting

15  to attack a mall with guns.  We have seen absolutely no

16  evidence of that.  We have been given almost 3,000 pages of

17  instant messages, 90 CDs, seven hard drives, and we have not

18  seen anything about this, but yet, this is the inflammatory

19  language that the government wants to use.  And it's as though

20  if they say "al-Qaeda" enough, "Osama bin Laden" enough, then

21  everyone -- the Court, everyone will just say, "Oh, oh, we must

22  lock this person up because those words are very bad."  And I

23  would provide the Court with a copy of that press conference.

24  And this is the cite on YouTube.

25          In fact, the Boston Herald on Sunday and on Monday had

1   articles about Mr. Mehanna.  And quite interestingly enough,

2   they talked about two pieces of evidence that we don't know

3   where they got that information.  We had to sign protective

4   orders.  We didn't leak information.  I don't know who did.

5          Our client was blocked from web forums because he

6   talked about moderation; he talked about Islamic history; he

7   talked about being better Muslims; he talked about, with

8   disdain, people caught up in jihadi fever and sort of being

9   pseudo jihadis.  He was ashamed, he said, that they all knew

10  more about, sort of, jihadist heros than they did about ancient

11  scholars.  He wrote brochures about Islam and passed them out

12  at demonstrations.  He talked about preaching and teaching

13  Islam.  He wanted to get married.

14         He talked -- in all of these instant messages, the

15  other thing you can see is that he's talking to many people at

16  the same time.  And if you read all of these, which I have, and

17  I wouldn't suggest that the Court do -- it's tedious and it's

18  long -- I've started to sort them by topic.  And these are the

19  topics in descending order of importance:  First, Islamic

20  scholars.  Sometimes to links with the YouTube where there are

21  lectures by Islamic scholars; secondly, Islamic thought and

22  jurisprudence.  Esoteric and lengthy discussions about what

23  scholars say; thirdly, marriage.  Lots of instant messages

24  about marriage.  Potential mates wanting to get married.

25  Discussions of other people they know, plans to meet up and

```
 1    study.  And lastly, in the smallest portion of these instant
 2    messages, are political thoughts and news of the day.
 3          Our motion goes through many, many of these e-mails
 4    and -- instant messages.  And I'm not going to go through all
 5    of them, but I would like to talk about a couple.  One is that
 6    the government says he's the media wing of al-Qaeda as though
 7    that means that he is working under the direction or in
 8    coordination with al-Qaeda.  In fact, it is a person he's
 9    messaging with who jokes, "Somebody called us 'the media wing
10    of al-Qaeda.'"  He doesn't even respond to that.  This is
11    hearsay upon hearsay upon hearsay.  No evidence.  We have seen
12    no evidence and we will see no evidence that al-Qaeda or any
13    foreign terrorist organization hired, contracted or approved of
14    our client translating anything.
15          They pull an instant message out of context and say
16    that he wanted to be an armed wing of al-Qaeda.  Well, someone
17    instant messaging him says, "Let's be an armed wing," followed
18    by two words, H-E H-E, "he-he," which is the same as a joke --
19    it's a joke in sort of Internet shorthand -- and no response by
20    our client.
21          They talk about -- and this is so ridiculous.  They
22    talk about -- they pull out of context a whole sort of series
23    of instant messages about traffic lights and about a martyrdom
24    operation.  In fact, it was a series of jokes about a friend
25    who kept getting speeding tickets, and they talked about
```

1    traffic lights and they talked about the way in which, you

2    know, they would strike a blow against traffic lights.  I mean,

3    it's obviously a joke.  Even I got it was a joke without

4    talking to my client.

5           They also pull out of context and talk a lot about

6    Osama bin Laden.  And as I said, you know, it's sort of like if

7    you can drape everything in Osama bin Laden and al-Qaeda, it's

8    as though you shouldn't listen.  And there is a series of

9    instant messages in which they discuss -- he discusses Osama

10   bin Laden with another young man, and they talk about their

11   admiration of him.  And when I read that, I started to do some

12   research, and I looked at this because that sounds pretty

13   inflammatory.

14          But the fact is that across the Arab world -- and not

15   only the Arab world -- Osama bin Laden is a mythical figure.  I

16   am putting aside September 11th.  But he is seen as someone who

17   drove a world power, the Soviets, out of Afghanistan.  He is

18   seen as someone who came from enormous wealth and gave it up in

19   order to fight for fellow Muslims.  His father built Mecca and

20   Medina, the holiest of places.  And in 2006 49.9 percent of

21   Aljazeera readers supported Osama bin Laden.

22          Now, I'm not saying I agree with this, but I was

23   thinking about this, and I was trying to think of a way to

24   analogize this to the Court.  And one of the things I

25   remembered is the Six-Day War, all right?  I remember it was a

1   Jewish holiday, and I remember when it was announced in
2   synagogue that the Israelis had taken Jerusalem and the Sinai.
3   And everyone was thrilled.  I had friends whose older brothers
4   and sisters moved to Israel.

5       And while I don't necessarily -- I don't agree about
6   Osama bin Laden, I can understand it.  I have enormous
7   admiration for the people who started Israel.  Menachem Begin
8   was considered a terrorist; the British were looking to hang
9   him.  So I get this.  I get the fact that although we don't
10  agree with it, there can be something in which people admire
11  someone who sacrifices their wealth and their well-being for
12  their own beliefs.

13      The government also talks about my client posting what
14  they call pro-jihad scholars.  Now, this is a little difficult
15  because there are scholars, there are many, many texts --
16  thousands of texts of scholars.  And what has happened is, for
17  example, a 7th century scholar will write about repelling the
18  Mongols from what is a Muslim land in central Asia, and other
19  people will take that 7th century scholar and say, "Well, that
20  justifies fighting the United States in Afghanistan."  But
21  those scholars are always mixed.  One scholar authorized -- and
22  asked the United States to come onto Saudi soil to defend
23  Kuwait; one scholar approved of the Oslo Peace Accord with
24  Israel, and yet he also had other things to say that have been
25  interpreted by other people.

1          What is my client charged with and what did he do?

2     They talk about photographs.  And this is important.  One of

3     the things they talked about is that they said he had two

4     photographs of Nicholas Berg who was an American contractor in

5     New York who was kidnapped by terrorists and was decapitated.

6     And they said he had photographs of him and of his

7     decapitation.

8          Well, in fact, when we were actually able to go

9     through the pathway in which those photographs were on his

10    computer -- and we have our expert in the front row, Mark

11    Spencer.  He's given you an affidavit -- that was not

12    downloaded by our client, all right?  There are ways in which

13    if you go to a website it will cache photographs, it will put

14    them in -- will them into space in your computer and you don't

15    need to download it.  The same for their claim that he had

16    hundreds of pictures of the World Trade Center.  When you look

17    at the pathways, there's no evidence that he downloaded it.  My

18    client had many other photographs on his computer, from a dog

19    riding a bicycle to a funeral in the Mideast.

20         Finally, your Honor, we have argued in our motion, and

21    I very much press the Court today, we desperately -- we

22    desperately -- need our client out of custody.  In all of the

23    work that we have, and in all of the information the government

24    has given us, our expert has determined that there are

25    approximately 650,000 pieces of data.  One CD alone contains

1    40,000 posts.  Our client can't even look at that CD in jail

2    because of the way in which it's configured.  I've spent

3    Saturdays with my client going through these instant messages.

4    I have spent to date 16 hours, and we're on page 730 of 2800

5    pages.

6            It is not just that there's a lot of documentation,

7    but it's also the uniqueness of this documentation.  Some of

8    these documents, some of the audio is in Arabic.  Some of it is

9    in English, but it's Arabic literation.  And a great deal of it

10   is slang.  It's not only slang, it's sort of inside jokes with

11   my clients and the people he might be messaging with or

12   e-mailing.

13           It also is important, as I go through these things and

14   as we look at them, to understand certain aspects of history,

15   of the scholars that might be referred to, to understand who

16   they are.  Are they people that are used to support terrorist

17   activity?  Are they innocuous, you know, historical figures?

18           I would also tell the Court that it's been virtually

19   impossible -- he is in Plymouth.  He is in 23-hour lockdown.

20   Even though -- I mean, our calls with him are recorded.

21   There's no question about it.  They're not supposed to be, but

22   they are.  I have seen so many transcripts of telephone calls

23   between attorneys and clients out of Plymouth County.  So I'm

24   reluctant to talk about anything serious with him.

25           He's allowed two inches of paperwork at a time and

1  then it can be switched out, but it can take as long as a week

2  to get that switched.  And when guards decide that they're just

3  going to clean out his cell, they just grab it, and he doesn't

4  know if he's gone through it or not.  This is what he's allowed

5  to use as a pen: the inside of a pen.  Try to write with the

6  inside of a pen.  We have been fortunate in allowing him access

7  to a laptop.  He's allowed access between 11 p.m. and 6 a.m.

8  He is, however, shackled and handcuffed when he uses the

9  laptop.

10        So between being shackled and handcuffed and a pen

11  that looks like this, it's virtually impossible for him to do

12  anything of a serious nature.  The government responds to our

13  request in this way by referencing white collar cases that

14  aren't even -- they're district court cases and they don't even

15  apply here.

16        Who is our client and why should he be released?  Your

17  Honor, he was born here.  He's a United States citizen.  He

18  moved to Massachusetts when he was seven.  He grew up in

19  Lincoln-Sudbury.  He graduated that high school in 2000.  He

20  attended pharmacy school and graduated with a Ph.D.  He lived

21  with his mother, father and brother who are there today.  They

22  are devoted and loyal to him.  They posted their house and all

23  their assets, and they would easily do so again.  He's worked

24  all around this area.  He worked as a pharmacist and a pharmacy

25  intern at Children's Hospital, Walgreens, Beth Israel, and

1  other Longwood area medical facilities.

2       He grew up as a typical suburban kid.  He used to

3  listen to heavy metal; he used to read comic books.  When he

4  was 18 he became more interested in his religion and he began

5  to read and study.  He began to memorize long passages of the

6  Koran and study commentary; he began to pray.  At about that

7  time September 11th happened.  His father gave a speech at the

8  local high school explaining this is not what Muslims believed

9  in.  Our client was there and proud of his father and supported

10  him.  He didn't even know who Osama bin Laden was, as most

11  Americans did not.

12       Post September 11th did he begin to have different

13  thoughts?  Yes, he did.  But so did many hundreds, if not

14  hundreds of thousands, of Americans.  Muslim people were being

15  rounded up in secret and held as material witnesses; there were

16  secret searches; there were FISA courts; there was the Patriot

17  Act; there was the United States' invasion of Iraq which many

18  people feel was not warranted or justified.  Did he question

19  the United States' involvement in the Mideast?  Yes, he did.

20  Did he feel it was a war against Muslims?  He did.  But these

21  views are all legal, all protected by the First Amendment.

22       He has the support of his parents and of his

23  community.  I have here, your Honor, and I would like to

24  provide these to you -- we've given a copy to the government --

25  letters from people who are here and people who were not able

1  to be here, who state that they support him, that they do not

2  feel he's a danger to the community or that he will flee.  A

3  GPS would solve any issue of fleeing; turning in a passport

4  would solve any issue of fleeing.  He did not make any attempts

5  to be out of order when he was released before.

6          The government's position at the arraignment and at

7  the bail hearing that they did, and I've read the transcript,

8  is to get very emotional, hop up and down, scream about

9  terrorism and shooting at malls which, by the way, he's not

10  charged with; terrorist training which, by the way, he's not

11  done; talking about bin Laden, naming him as a codefendant who,

12  by the way, he's never met, has never spoke to; talking about

13  al-Qaeda, who he has no connection to; talking about the World

14  Trade Center which he lived here in Massachusetts and had

15  nothing to do with.  And at the same time, they continue to

16  hold press conferences and leak information to make this as

17  hysterical as they possibly can.

18          The fact is, your Honor, this is a man who needs to be

19  out.  We're fighting, for the most part, about words:  What

20  they say the words mean, what we say the words mean.  We accuse

21  them of distorting instant messages, they accuse us of

22  distorting them in our response.  When we're talking about

23  words, that's when somebody should be out.  What is he charged

24  with and what did he do?  There is very little that they are

25  accusing him of what he did.  They will fall back on the issue

1    of conspiracy.  That's what they always fall back to.  "We

2    don't have to prove this, we don't have to prove that."  But

3    the fact is, your Honor, our client is a young man who has

4    certain beliefs, beliefs that are allowed in this country,

5    beliefs that are encouraged in this country, beliefs that

6    everyone can have freely and speak with freely, and it doesn't

7    mean that he's a terrorist and it doesn't mean that he's under

8    the direction or support or control or in coordination with a

9    foreign terrorist organization.

10          This case is paper thin, all right?  In the end, this

11   case turns on the run-of-the-mill drug case: cooperating

12   witnesses, informants.  That's about it.  They can dress it up

13   all they want with FISA courts and classified information, but

14   in the end, it's about cross-examination of people who faced a

15   lot, who were scared or who had lots to lose.  We know how to

16   handle that.  And I think in the end, your Honor, it just

17   simply is not fair to hold him any longer.

18          THE COURT:  Okay.  Mr. Chakravarty?

19          MR. CHAKRAVARTY:  Thank you, your Honor.

20          Your Honor, let's step back a moment and remember why

21   we're here.  We're here pursuant to the defendant's motion for

22   bail in a bit of an unorthodox procedural posture.  A detention

23   hearing was held.  Short of presenting new evidence to the

24   Court, the basis for reopening, or revisiting, this issue

25   before your Honor is basically the fact that after 16 months of

1    having discovery, of having -- the defendants having the

2    ability to review a publicly filed proffer and other documents,

3    that now there is a significant and characteristic change in

4    the quantum of evidence to demonstrate that the defendant is

5    both a flight risk and a danger to the community and that he is

6    at risk of obstructing justice.

7         I'd suggest to your Honor everything that counsel has

8    said today and in their papers does not detract from both the

9    quantum of evidence produced to the Court demonstrating those

10   things, as well as overcoming the very high burden of

11   production which the defense has in overcoming the rebuttal

12   presumption by virtue of the probable cause having been found

13   both by complaint affidavit as well as by indictment.  And

14   actually, since that detention hearing, by a superseding

15   indictment charging the defendant with conspiring to provide

16   materials to al-Qaeda; in particular, the 2339B charge.

17        It's through that lens that we're here, basically,

18   because the defense wants access, face-to-face, with the

19   defendant so that they could more adequately prepare for a

20   trial without having demonstrated that there is a need, to the

21   extent that there hasn't been one case cited that suggests that

22   3142(i), which is the provision which suggests that under

23   certain circumstances a defendant may be temporarily released

24   even though there's a detention order in place -- hasn't cited

25   one case where that has ever happened because a case has -- is

1    too strong against the defendant for him to be able to defend

2    while he's in jail or there's too much evidence.

3          In fact, it would lead to that very absurd result,

4    that the more evidence that is produced by the government to a

5    defendant, the more likely it is that the defendant would not

6    be detained.  And that is precisely what the court has said in

7    the one case which we could find that kind of addresses the

8    confines of 3142(i).  I believe it's the *Peters* case out of the

9    District Court of Minnesota.

10         So remembering that procedural posture, there are two

11   reasons why the defendant -- primarily why the defendant should

12   remain in detention, and that is because he remains a risk of

13   flight, not only because of the rebuttal presumption, but lest

14   us forget, the defendant after being told he is going to be

15   charged with very serious offenses related to his trip to

16   Yemen, related to his activities involving violent jihad, his

17   response was to get on a plane at Logan Airport -- he was

18   arrested going to Saudi Arabia.  And that is one thing that we

19   can agree on:  He was seeking to leave the country to go to

20   Saudi Arabia, to live in a Muslim country and not here.

21         And the reasons for that, I would suggest to your

22   Honor, as borne out in both our detention proffer, in the

23   complaint affidavit and the detention affidavit, is because he

24   knew that it was too dangerous for him to stay in the United

25   States because he was going to have to confront these charges,

1    these allegations.  And his desire was, like his codefendant,

2    to flee the country and not to return.

3          In that context he specifically said as much.  Some of

4    that is captured in some of the material we presented before

5    Judge Sorokin, and you'll have access to, where he says, "This

6    is not a hospitable place for me anymore.  I want to go to a

7    Muslim country.  I want to go somewhere" -- where he can feel

8    like he can practice his faith freely and he doesn't have to

9    worry about law enforcement surveillance and law enforcement

10   consciousness.  So it was his objective to leave.

11         Given the fact that he now faces at least one life

12   felony, several terrorism offenses, both because of the general

13   program as well as because, frankly, the practical reality that

14   he is facing, even under the Sentencing Guidelines, decades in

15   a federal penitentiary, his motive to flee the country today is

16   much greater than it was back in '08 when the rest of these

17   charges had not yet been brought.

18         On dangerousness, again, no circumstances have

19   changed.  The fact that the defendant has strained mightily to

20   find plausible explanations for cherry-picked conversations

21   that were stored on his computer back in 2006, it's strange

22   congruity to believe that when he's praising Osama bin Laden

23   and saying that his hair on his arms stand on end when he

24   thinks about him, and that Osama bin Laden brought him back to

25   the faith six years ago, and that he treats him -- he

1    believes -- he considers him like his own father -- his real

2    father, I should say, not his own father -- that it's strange

3    congruity to believe that this is simply a historic admiration

4    for somebody who led the Mujahideen in 1980.

5           In fact, he specifically says otherwise.  He says that

6    it was those -- when those towers went down, that's when he

7    started to believe that this man who gave up so much for what

8    he perceived the faith -- that that's why he deserves

9    admiration.  And that can be proven to no greater graphic

10   reminder than -- and this is on the record -- Document 41-5.

11   This is the defendant after having a conversation with somebody

12   who's in -- in the proffer, in May of 2006, describing about

13   how much they admire what happened on September 11, 2011, and

14   that -- their desire to visit Ground Zero.  And it's the

15   defendant with a grin from one side of his ear to the other --

16   to the other side of his face -- with one finger handing up at

17   Ground Zero.

18          He may have just been a tourist there, your Honor.

19   And I'm sure with the strained reading of these instant

20   messages, that's exactly what the defense would have you

21   believe.  But your common sense and a jury's common sense would

22   believe otherwise, your Honor.  This is somebody who

23   ideologically was disposed to al-Qaeda and Osama bin Laden's

24   mission.  And that's not a crime, and we will champion the

25   defendant's right to say and believe and want to wish well upon

1  al-Qaeda and Osama bin Laden.  We find it despicable, but

2  absolutely protected speech and belief.

3        The defendant is not charged with those beliefs, your

4  Honor.  The defendant is charged with conspiring and engaging

5  in a series of offenses in order to support that organization.

6  And let's get down to brass tacks.  What is this case about?

7  This case is about a sad and real truth about how youth in this

8  country are being radicalized by predominantly foreign

9  elements.  And that's the defendant's story.

10        The defendant's response to that was to continuously

11  and persistently try to find ways where he, as many youth do,

12  have a lot of zeal, often misguided, often misapprehend what

13  religion or other motives might dictate, that he took a path

14  where if he couldn't succeed at one thing, then he would

15  immediately go to another.

16        It started around the time of September 11th, as we've

17  been talking.  And he and his small cadre of like-minded

18  individuals, which he freely admits as reflected in his

19  communications, that he, Ahmad Abousamra, and a few others were

20  the only people he really trusted.  And that highlights this

21  distinction -- this very public face of a young, intelligent

22  man who has every privilege and luxury in the world, versus a

23  very private, angst-ridden person who's confused and struggling

24  to find his identity in a world where he sees his fellow

25  Muslims around the world being, what he perceives, as

1    persecuted and mistreated.  And he construed that the U.S. and

2    other aligned countries and entities were responsible for that.

3         And after September 11th he finally looked up to

4    someone, and an organization and a philosophy -- a jihadi

5    philosophy -- that might give him some measure of satisfaction,

6    and he would cloak that somehow in somehow protecting or

7    standing up for the rights of Muslims around the world.  And it

8    was this misguided apprehension that led him to contemplate --

9    him and his compatriots to contemplate, "What can we do?  We've

10   got to do something."

11        Around that same time Osama bin Laden and al-Qaeda

12   released a video called the "State of the Ummah" -- "Ummah"

13   means the Muslim world -- and it depicted, amongst other

14   things, the horrors that were befalling Muslims around the

15   world.  And that was inspirational to the defendant, to his

16   compatriots.  And he later used that to inspire others to say,

17   "Look at what is happening to your people."  And based on that

18   inspiration they thought, "What can we do?"

19        The first thing that they thought they could do is

20   what many youth think that they can do, which is, "Let's pick

21   up a gun and try to do something ourselves."  And after talking

22   about it and after discussing it and after even researching how

23   to do it, the codefendant, Mr. Abousamra, actually travels --

24   he's a Syrian gentleman -- travels to Pakistan in order to join

25   a terrorist training camp.

1           After making a number of connections, he's ultimately

2     rejected -- in a post 9/11 environment, a Syrian walking in, a

3     Pakistan would raise eyebrows -- he returns, but not before

4     obtaining some crucial information about a contact who might

5     facilitate getting him or others into a terrorist training camp

6     in the future.  Later that same year, in 2002, he returns,

7     again after discussions with the defendant and others, trying

8     to get into a terrorist training camp.  Again, he appears to be

9     unsuccessful.

10          He comes back in 2002.  They regroup, they consider

11    "What else can we do?"  And they think, "Well, let's think of

12    what we can do domestically."  And what counsel mentions as not

13    being charged in the case -- the contemplation of domestic

14    terrorist attacks is not charged as a separate offense in this

15    case, but it certainly is indicative of the purpose of what the

16    defendant was doing and how he was engaging in this conspiracy

17    and the existence of the conspiracy, the agreement to support

18    al-Qaeda and other terrorist groups that pervaded.  And one of

19    the ways that they could do that is to engage in a terrorist

20    attack.

21          And witnesses will testify that they considered it.

22    They actually, at least in one case, took steps to advance it.

23    They explored potentially getting firearms in order to engage

24    in the so-called shopping mall plot.  And that was only

25    dismissed because it was impractical, your Honor.  They

1    regrouped again.  They decided not to embark on those things.

2         In '04, when the defendant was firmly entrenched in an

3    academic program -- in a doctoral program at the Mass. School

4    of Pharmacy where his father is a professor, he, without

5    telling his parents, Mr. Abousamra and one of the cooperators,

6    as Ms. Bassil had stated, they decide on Super Bowl Sunday to

7    get up and go to Yemen.  But it's not in a vacuum.  Before they

8    did, they sought advice on where to go to find terrorist

9    training.  And at the time they were obsessed with Abu Musab al

10   Zarqawi -- excuse me -- obsessed with the American military

11   involvement in Iraq which later would be opposed, in large

12   part, by Abu Musab al Zarqawi.  And they treated him as a hero.

13        And it was in that context that they then went to

14   Yemen.  And in the defendant's words, they didn't go there to

15   graze goats.  Unlike the defendant's pleadings, they didn't go

16   there to find the queen of Sheeba either.  They went there for

17   one purpose, one purpose alone, and that was to get the

18   terrorist training and then to move on to fight those infidel

19   invaders who happened to be at the time in Iraq.  And, in fact,

20   we know for sure that that's what they meant because the

21   codefendant, Mr. Abousamra, went and continued on.  He went to

22   Iraq.  He went to Fallujah where the U.S. Marines had just

23   embarked on a campaign to pacify that town.

24        It's through that lens that when the defendant returns

25   from Yemen, it wasn't -- we know for sure that it wasn't for

1    purposes of a religious training or to go on a vacation.  This

2    was something which he had -- was part of the broader

3    conspiracy to provide support, and that would be providing

4    himself -- his personnel as support -- providing others in

5    terms of the coconspirators in the case.  But for the

6    defendant, he was unsuccessful.  He described going to camps,

7    he describes people walking around with AK-47s.  But at the end

8    of the day he didn't find what it was that he was looking for.

9    The defendant's charged with conspiring to go there; not that

10   he successfully obtained terrorist training, unlike some of his

11   coconspirators.

12        So upon returning, he considered what else can we do,

13   after having failed at getting training overseas several times,

14   after dismissed contemplation of domestic attacks?  And that's

15   where, your Honor, the defendants -- the defendant found -- and

16   his coconspirators found -- a bastion where he could succeed:

17   something he was good at; something that could employ his

18   intelligence; his reading and his familiarity with scholars,

19   especially Muslim salafi jihadi scholars; to motivate a plan of

20   conduct that would help the Mujahideen, the holy warriors who

21   were doing what he either wasn't courageous, intelligent or

22   resourceful enough to do himself, which is actually fight on a

23   battlefield against infidels.

24        And one of the first things he did is translate a

25   document called "39 Ways to Serve and Participate in Jihad."

1   And he did this through painstaking detail.  He did it very

2   precisely.  The House Senate -- the House Select Committee on

3   Homeland Security acknowledges it was one of the most

4   influential texts related to violent jihad that contemporarily

5   exists.  And he spent the time to translate this for one

6   purpose:  Because this document, especially for someone who the

7   defendant calls a house slave, the American Muslim, somebody

8   who doesn't have the courage to stand up to the oppressor

9   tyrant -- that for that person, for somebody who is growing up

10  here who hadn't yet been radicalized as the defendant had

11  been -- for that person, this would provide a means -- a

12  roadmap on how to assist the Mujahideen.

13       And so the defendant didn't just translate this

14  document, make it pretty, distribute the document so it's

15  easily accessible, he tried to follow the document.  He lived

16  it, your Honor.  If you go to the table of contents on this

17  document -- and these are the things that the defendant

18  actually succeeded in doing, that he said these are ways that

19  you can support the terrorists -- the Mujahideen who we know

20  from the defendant's context he was talking about terrorist

21  organizations, particularly al-Qaeda.

22       "Make your intention for jihad."  We know he did that.

23  "Truthfully ask Allah for martyrdom."  One of the ways he did

24  that is in his poem "Make Martyrdom What you Seek," which

25  counsel had mentioned, which cannot be more explicit that when

1    he talks about martyrdom, he's talking about fighting in the

2    context of violent jihad.  "Go for jihad yourself."  Well, he

3    tried that and failed.  "Help prepare the fighter who's going

4    for jihad."  That includes both the people he went with as well

5    as his people like his friend Daniel Maldonado, who was later

6    convicted of terrorism-related offenses.

7           "Take care of the family left behind by the fighter."

8    There's no doubt that the defendant has been very vocal and

9    supportive of people like Daniel Maldonado's family, like Aafia

10   Siddiqui's family and other terrorists who have been convicted

11   around the world, provide for the families of the martyrs.

12   "Provide for the families of the martyrs."  A permutation on a

13   theme.  "Praise the Mujahideen and mention their accounts and

14   call the people to follow in their footsteps."

15          The defendant -- for hours, as counsel correctly

16   identifies -- for hours and hours, would spend time on the

17   Internet doing nothing but that, praising the Mujahideen, which

18   by itself is not illegal, but it evidences that his objectives

19   had not changed.  He was still trying to support these

20   terrorist organizations regardless of the fact that some of his

21   physical activities had not succeeded.  And he continued to do

22   so very successfully.

23          "Encourage the Mujahideen and incite them to

24   continue"; "Speak out for the Mujahideen and defend them";

25   "Expose the hypocrites and traitors," which means to criticize

1    those organizations, both domestically and abroad, which were

2    trying to peaceably, democratically engage in regime change,

3    engage in political enfranchisement, he viewed those people as

4    the only way to influence them, the only way to get those

5    people to appreciate what their faith demands of them, is with

6    a baseball bat.

7         When organizations -- advocacy organizations which

8    were trying -- were advocating get-out-the-vote campaigns and

9    were advocating peaceful overthrow of governments, they were

10   wrongheaded.  That is precisely al-Qaeda's agenda, and it is

11   somewhat redeeming to see that in today's day and age, the

12   defendant can recognize that it actually is activism, it is

13   peaceable change, it is peaceable organization that leads to a

14   change in the defendant's native country where he also shares

15   citizenship, in Egypt.  I hesitate to say "native."  He was

16   born here, but he has Egyptian citizenship.

17        Some of the other 39 ways:  "Follow and spread the

18   news for jihad"; "Advise the Muslims and the Mujahideen."  Some

19   of the ways he did that was to be a student of the scholars,

20   particularly of a certain brand of scholars; people like

21   Abdullah Azzam, people like Sayyid Qutb, people who created the

22   notion of an offensive jihad, a way to take this Muslim

23   precept, a pillar of the faith, and to pervert that into a tool

24   to encourage violence.  To "Supplicate for the Mujahideen"; to

25   hide the secrets for the Mujahideen so that the enemy can

1    benefit from them and -- so it cannot benefit from them.

2         To "Stay connected with the scholars and preachers and

3    inform them of the situation of the Mujahideen"; "Become

4    physically fit," which, you know, while Ms. Bassil may not be

5    preparing for jihad, given the context of when the defendant

6    was doing something at this time, his intention is not going to

7    be the same as Ms. Bassil's.

8         "Train with weapons and learn how to shoot," the

9    reasons for going to a terrorist training camp.  "Learn first

10   aid."  The defendant is a pharmacist.  "Learn the fiqh of

11   jihad," the jurisprudence of jihad; "Give shelter to the

12   Mujahideen and honor them"; "Have enmity toward the

13   disbelievers and hate them."  And this is where the defendant,

14   to this day, has not withdrawn from the conspiracy, has not

15   renounced this philosophy.  He is still engaging in some of

16   these 39 steps.

17        "Expend efforts to free our captives."  I think now

18   the defendant, based on his websites or his family's website,

19   the freetarek.com website, is clearly trying to portray the

20   defendant as some sort of martyr for all Muslims; whereas, in

21   fact, he's just perpetuating steps where he can continue the

22   wrongheaded ideologically that al-Qaeda has fostered in order

23   to keep these people who have supported them in the past in the

24   public consciousness.

25        To "Spread the news about the captives and to be

1    concerned with their affairs"; to "Engage in electronic jihad,"

2    which is precisely what the defendant had done, and then to

3    "Stand in opposition to the disbelievers," which the defendant

4    continues to do.

5        The fact that the defendant was not instructed by

6    al-Qaeda to engage in all these activities does not change the

7    fact that it was his objective as part of the conspiracy with

8    his fellow coconspirators to support al-Qaeda; and thereby, by

9    doing so would be in coordination with al-Qaeda.  But even

10   without any of this Internet activity, it wasn't until one

11   witness came forward, and then another witness came forward,

12   and then another witness came forward, and then another witness

13   came forward that the government was able -- without any of

14   these new electronic communications -- was able to tell the

15   story which the defense accuses the government of resting its

16   haunches on and not charging the defendant fast enough.

17       That doesn't change the fact that the other people in

18   the community came forward and told the government the truth

19   about what the defendant had done, doesn't change the fact that

20   the defendant was not entrapped in engaging in any of these

21   activities.  As your Honor well knows, in criminal cases it is

22   routine to solicit information about somebody who they know has

23   committed some criminal conduct, to investigate them, to try to

24   obtain their own statements related to their past criminal

25   conduct, all of which occurred in this case, some of which are

1  recorded.  And then it's also routine to confront a defendant

2  in certain cases with the fact that he is going to be charged

3  with an offense and that he could help himself.

4      The government needn't apologize for offering the

5  defendant an opportunity to help himself.  But as he stated in

6  the "39 Ways to Serve and Participate in Jihad," that would not

7  be consistent with his belief system, which was that of

8  al-Qaeda and that of supporting a broader and a different goal.

9  That goal continues today.  And while it may not have been at

10 the direction of al-Qaeda, it certainly is appreciated by

11 al-Qaeda.

12     As recently as last summer, al-Qaeda and the Arabian

13 Peninsula, which is based in Yemen, amongst others, and one of

14 the -- the leader of that organization, Anwar al-Awlaki -- it's

15 a subsection of the al-Qaeda broader organization.  Anwar

16 al-Awlaki -- who your Honor may know has been in the news

17 recently, and who the defendant has encouraged others to read

18 and listen to his teachings including, for example, Daniel

19 Maldonado -- they have -- they certainly consider that the

20 defendant is somebody worthy of praise.  They ask for his -- "O

21 Allah, free the brother Tarek Mehanna"; "free the brother

22 Daniel Maldonado"; free the brother Irhabi 007," which is a

23 euphemism for another coconspirator in this case, the person

24 who obtained one of the videos which counsel refers to which

25 the defendant both translated, digitally edited, and along with

1    the banner of, produced by the brothers in the media wing of

2    al-Qaeda in Rafidain, or Iraq, the defendant was well aware

3    that what the activities that he was engaging in online by

4    spending the meticulous time to translate these documents and

5    to produce them and to make them palatable and easy to consume

6    by Muslims here and elsewhere, was going to serve -- and was

7    for the purpose of serving -- the interests of terrorist

8    organizations, and ultimately to engage in -- ultimately for

9    al-Qaeda.

10          Some of the documents to that end, and this has been

11   produced in discovery, have been communications between the

12   defendant and yet another convicted terrorist, Abu Khubayb al

13   Muwahhid, who's Ehsanul Sadequee, convicted out of the Northern

14   District of Georgia recently.  One of the documents that he

15   translated and then sent back to Mr. Sadequee as part of their

16   conspiracy specifically praises Osama bin Laden, and says, "I

17   will not forget here to send my greetings to our sheikh and

18   leader, Sheikh Mujahid Abu Abdallah, Osama bin Laden.  May

19   Allah preserve and protect him."  It goes on to say, "I am with

20   Osama, where he places his wealth, as long as he carries a

21   banner on the front lines.  I am with him if he is given a

22   quick victory or if he is given the status of the martyrs."

23          Again, this is not somebody who is waxing philosophic

24   about something that occurred in the 1980s or the Soviet jihad,

25   this is about today.  This is about the defendant having been

1  radicalized and always trying to be persistent and adaptable to

2  find a creative way to support these terrorist organizations.

3       It's the conspiracy that he's charged with, your

4  Honor.  It's the agreement and it's the attempt to engage in

5  those acts.  Those acts are not diminished by any of these

6  alternative interpretations which the defense presents with

7  regards to individual instant messaging conversations.  It

8  doesn't detract from the rebuttal presumption in this case, and

9  it certainly -- even without the rebuttal presumption, I'd

10 suggest, your Honor, that the gravity of the events that the

11 defendant is accused of doing -- the probable cause end found

12 for them, and the fact that he has never once withdrawn from

13 that conspiracy suggests that if he is released he will

14 continue to engage in these acts.

15      In fact, one of the very letters of support, which

16 have been presented to the Court today, is from one of the

17 individuals with whom he has some instant message

18 communications that are in the detention proffer in which the

19 defendant sends that individual videos depicting, amongst other

20 things, mortar attacks on U.S. bases.  His objective was clear:

21 it's to fight the Americans, the military, overseas as part of

22 his broader support for terrorist organizations.  That hasn't

23 changed, and if he's released, he'll continue to do that.

24      Under the standard of review at this juncture, and

25 certainly because there's been no contrary evidence or anything

1   to rebut that presumption, the government strongly urges that

2   the defendant remain in custody for the pendency of the

3   proceedings.

4          With regards to the final point, and I know I've

5   gone -- we have other motions.  The final point of the

6   defendant's need to be out -- counsels' need for the defendant

7   to be out to review this material, I think counsel cited to,

8   like, 2800 instant message communications which counsel has

9   reviewed already -- cites that it would take a gross amount of

10  time in order for the defendant to go through that while he's

11  in custody.

12         By our calculations, and it sounds like they've made

13  some progress since, it will take almost 12 days to go through

14  that process.  That is not an ordinary amount of time, your

15  Honor, given the fact that we have an August -- excuse me -- an

16  October trial date.  It's another eight months.  Nobody says

17  it's going to be convenient, but that's not a reason to release

18  a defendant, for purposes of helping his defense.  He'll have

19  access -- he has access to those materials.  It is painstaking,

20  but it can be done probably with greater efficiency when

21  there's a concerted effort while he's in custody.

22         The government has nothing to do with the conditions

23  or the circumstances of his custody, besides from the fact that

24  we've moved for his detention, in terms of his physical -- what

25  we have done is taken every step that we've been able to do in

1  order to facilitate his access to discovery materials, in order

2  to facilitate counsels' access to him.

3       We want him and counsel to have the meaningful

4  opportunity to consult and to be able to be prepared for trial.

5  And we think that he's capable of doing that, and there's

6  nothing that has been presented in the papers or in today's

7  argument that would contravene that except for the patent

8  inconvenience.

9       Excuse me one moment.

10      (Pause.)

11      MR. CHAKRAVARTY:  Two final points:  One is -- and

12  doesn't bear much elaboration, but the First Amendment issue,

13  your Honor, is a red herring at this proceeding.  To the extent

14  there's going to be a motion to dismiss or some other basis of

15  arguing that there's no basis for liability and that the jury

16  was not permitted to find liability for a certain offense, a

17  motion to dismiss can be filed and we could deal with that at a

18  later stage.

19      As Judge Sorokin correctly found in his very well

20  reasoned and thoughtful detention order, which I would suggest

21  to you, is both valid in its logic today as much as it was back

22  then, the First Amendment is simply not implicated in the

23  decisions which the -- your court -- the Court has to find --

24  the facts which the Court has to find for purposes of

25  determining the detention decision.

1          And then finally, the fact that the defendant wasn't

2     arrested when the government had learned of certain

3     information, the government's strategy of -- in terms of when

4     to -- when it's able to arrest or act on a criminal procedure

5     is certainly not reason to not detain a defendant.

6          A final point is there's an implication that the U.S.

7     Attorney's Office somehow was leaking information to the press.

8     And I can assure your Honor that that did not happen; in fact,

9     the only instance that I can recall where information protected

10    by the protective order would be released was when the defense

11    had filed something that was inappropriately on the public

12    forum as opposed to under seal or just between the parties.

13         So with that, your Honor, the government would ask

14    that the conditions of detention remain.

15         THE COURT:  All right.  I'll reserve the matter.  We

16    have to move on to other -- I fully understand the parties'

17    positions on this.  I'll take it under advisement.

18         Let's move to the motion for a bill of particulars as

19    well.

20         MS. BASSIL:  Your Honor, Ms. Patel is going to address

21    this.

22         THE COURT:  Oh, Ms. Patel?  All right.

23         MS. PATEL:  Good afternoon, your Honor.

24         THE COURT:  Good afternoon.

25         MS. PATEL:  Your Honor, the second issue before you,

1     as you well know, is our motion for bill of particulars.  And I

2     want to start by just repeating the question presented by my

3     co-counsel:  What is our client charged with and what did he

4     do?  And the problem is, we just don't know.

5            The function of the bill of particulars, we agree, is

6     not that we're asking the government to disgorge their trial

7     strategy or get some sort of unfair advantage or have them

8     limit their evidence at trial.  The indictment here is, as the

9     U.S. Supreme Court said in the 1962 communism case of *Russell*

10    *v. United States*, a cryptic form of indictment in which

11    Mr. Mehanna would go to trial without the chief issues defined.

12    We seek a bill of particulars here in the interest of

13    expediency and efficiency so that we may adequately prepare for

14    trial.

15           As the cases cite in the First Circuit, and I think we

16    agree with the government, there are three functions of a bill

17    of particulars:  The first is that in the absence of a more

18    detailed specification that we, the defense, would be hindered

19    in preparing a defense at trial; the second is that we would be

20    caught with unfair surprise at trial; and the third is the

21    double jeopardy issues it presents when you have an indictment

22    that's as vague and conclusory as this one.

23           Now, what we're asking for is enumerated at great

24    length over the some 30 pages in the actual motion, but it

25    falls neatly into five categories.  The first is the names of

1  all the unindicted coconspirators and others that are

2  referenced in the indictment as "others known and unknown to

3  the grand jury"; the second is a definition of what "material

4  support" constitutes, which under the statute can be one of 17

5  different options; the third is information about the purposes

6  of various trips that are alleged in the indictment, including

7  trips that AUSA Chakravarty referenced to Yemen, to Pakistan,

8  among other places; the fourth are summary allegations that

9  Mr. Mehanna supported jihad, or murder, words that we would say

10  are certainly incendiary and achieve the purpose of getting

11  somebody's attention.  But beyond just saying that he supported

12  them, there's no information that puts defense counsel on

13  notice of how he supported these two endeavors; and the fifth

14  is who are these terrorists that Mr. Mehanna purportedly

15  supported.

16          Now, we need to look no further than just what the

17  title of the statutes are to say why we need this information.

18  2339A says "conspiracy to provide material support to

19  terrorists."  We don't know what material support is, we don't

20  know who the terrorists are.  2339B says "conspiracy to provide

21  material support or resources to a designated foreign terrorist

22  organization."  We don't know what material support or

23  resources are, as the government is charging in this case, and

24  the designated FTO we believe is al-Qaeda, but we don't know

25  who, within al-Qaeda, they're alleging Mr. Mehanna had any

```
 1  relationship or contact with.

 2          What is interesting about the government's

 3  opposition -- and, again, as your Honor knows, both of these

 4  have been briefed extensively both by the defense and the

 5  government -- the defense goes to great length to spell out a

 6  series of factual reasons why this case, in particular,

 7  requires a bill of particulars.  The government states general

 8  propositions about when bill of particulars are and are not

 9  appropriate, but they don't delineate between our case and

10  other cases.

11          In particular, there are three cases that we would ask

12  your Honor to consider -- and I have copies of all of them --

13  United States v. Bin Laden, United States v. Davidoff and

14  United States v. Bortnovsky.  All three cases -- two of them

15  come from the Second Circuit, and Bin Laden comes from the

16  Southern District of New York.  And the reason why these cases

17  are significant is because the factual predicate of the cases

18  and the reason why the courts granted the bill of particulars

19  are virtually identical to the reasons why we're asking for the

20  particulars in this case.

21          That breaks down to a series of particular

22  circumstances.  Geographic scope:  In our case we're talking

23  about six different countries: the United States, Yemen, the

24  United Arab Emirates, Pakistan, Iraq and Somalia; we have in

25  our case at least nine identified participants/coconspirators,
```

1    and then however many other people fall under the bucket of

2    "others known and unknown to the grand jury"; we have a

3    nine-year window of activity with alleged activities beginning

4    in about 2001 up to roughly 2010; the evidence in this case is

5    largely oral and written, modern and classical Arabic which

6    none of us speak or read; the discovery in this case is clearly

7    voluminous.  And that also, your Honor, has seen the motions

8    that we'll discuss later that talk about the nature and the

9    volume of discovery.  But when I talk for a moment about

10   *Davidoff*, *Bortnovsky* and *Bin Laden*, I'd like to note that the

11   volume of evidence that we're talking about in this case is

12   many multiples, exponentially more than what those courts are

13   even defining as voluminous discovery.

14        The sixth issue affects a complexity.  So in a case

15   like this, if you were to read the indictment and look at overt

16   act by overt act, anything that Mr. Mehanna is charged with,

17   they're innocent acts in nature.  Mr. Abousamra is a different

18   story.  There are some things in there that you would say --

19   you know, that things like when he took trips, what were the

20   purpose of the trips?  Mr. Mehanna is not charged with any of

21   those activities.  It's not charged that he had any knowledge

22   of them.  He wrote e-mails, he wrote instant messages, he

23   looked at websites.  Those are all innocent overt acts

24   protected by the First Amendment.  The offense itself is

25   something that's complex that goes over various continents and

1  across different people.

2       The seventh, and one that I would star, is that the

3  codefendant, who's responsible for the majority of the

4  activities that are alleged in the indictment, isn't here.  We

5  have no contact with him; we don't know where he is; we have no

6  information about what he did or didn't do and to what extent

7  Mr. Mehanna was or was not involved with him.  And finally,

8  material support goes completely undefined.

9       Now, looking closely at the three cases in particular,

10  but there are many others where a bill of particulars are

11  granted, I want to just highlight the differences between our

12  cases and theirs so that we have a legal reason as to why

13  particulars in this case is warranted.

14       The *United States v. Bin Laden* was in the Southern

15  District of New York in 2000.  And in that case the court

16  granted the bill of particulars, and the reason for that was

17  specifically because of the facts of the case:  broad

18  geographic scope, wide range of conduct over a long period of

19  time, voluminous discovery.  The court said that using words

20  like "travel" or "conducting business" as overt acts provided

21  too little information for defense counsel to focus on trial

22  preparation.

23       *United States v. Bortnovsky* was a 1987 case in the

24  Second Circuit.  That was a RICO matter in which the defendant

25  was charged with submitting false insurance claims.  In this

1  case, the court found that 4,000 pages of discovery, which

2  again is a drop in the bucket compared to what we have in this

3  case, that that was too much information for the court -- for

4  the defense counsel to have to look through because the

5  government had charged the defendant was filing false claims

6  for burglary losses and theft, but without identifying which

7  claims were the ones that were actually fraudulent.

8        And in that case the court said that the government

9  had failed its burden by identifying with specificity what

10  offense, what conduct, the defendants were actually charged

11  with.  In effect, the Second Circuit held the government

12  shifted the burden of proof to the defendant, forced us to look

13  through the evidence and determine what in that evidence

14  constituted criminal conduct.

15        *United States v. Davidoff* is another case.  And all

16  three of these cases, by the way, go unrebutted and completely

17  unaddressed in the government's opposition.  The *Davidoff* case

18  was also a Second Circuit case in 1988, also a RICO matter.

19  The defendant there was charged with extorting money and

20  contractual rights from air freight businesses: a seven-year

21  conspiracy, various extortion offenses, high volume of

22  discovery, complex offense.  Bill of particulars:  Warranted.

23        There are other cases in the Southern District of New

24  York and the Northern District of Illinois, *United States v.*

25  *Nachamie* and *United States v. Vasquez-Ruiz*, also big cases that

1   allege large conspiracies, multiple participants, lots of

2   discovery, complex offenses.  Bill of particulars:  Granted.

3        The cases that the government cites are three matters

4   which are wholly different from what we're referencing here.

5   *United States v. Afshari*, which is the most recent case -- that

6   was in the Central District of California in 2009 -- that was

7   the case in which defendants were charged with soliciting

8   donations in an airport from people who didn't know that the

9   donations were going to end up going to a foreign terrorist

10  organization.  Limited in scope, small number of participants,

11  small amount of discovery, only in the United States, in the

12  Central District of California.

13       *United States v. Sattar* is another case they rely on,

14  Southern District of New York, 2004.  This case specifically

15  references *Bin Laden*, and says *Bin Laden* is good law; that the

16  *Bin Laden* reasons and justification for granting the bill of

17  particulars do not apply in *Sattar*, because *Sattar* was a much

18  more narrowly construed offense.  That case involved an

19  attorney, and others, going to meet Abdul Sheik Rahman in jail

20  and transmitting communications from him to the outside world.

21  Again, limited scope in geography, limited number of

22  participants, smaller volume of discovery.  It doesn't apply in

23  a case like this.

24       And finally, *United States v. Abdi* was also a recent

25  case in the Southern District of Ohio in 2007.  That was a case

1    that also dealt with a relationship that an individual claimed

2    to have with a member -- known member of al-Qaeda for them to

3    go bomb up a shopping mall.  This individual was charged with

4    fraud and the misuse of immigration documents also.  Much more

5    narrow in scope.

6         The facts in those three cases, and every other case

7    cited in the government's brief, do not comport with the

8    situation we have here.  We don't know what Mr. Mehanna did.

9    What he is charged with goes undefined with generic, incendiary

10   words and language.  And from a practical standpoint for this

11   Court's measure, between going through the evidence, lack of

12   access to a client, and having undefined terms in an

13   indictment, we don't know what they mean and we don't know what

14   he did, an October trial date is a difficult measure for us to

15   reach.

16        We would ask this Court for the interest of

17   efficiency, time and money, to please grant the bill of

18   particulars so that we know what charges we're defending

19   against.

20        THE COURT:  All right.  Mr. Chakravarty?

21        MR. CHAKRAVARTY:  Ms. Patel just correctly identified,

22   right at the end, what the purpose of the bill of particulars

23   is.  It's not so that a large volume of discovery can be

24   whittled down by virtue of identifying which pieces of evidence

25   are going to be used against the defendant and which are not,

1  it rather, is so that the defendant is on notice of what he is

2  charged with.

3       In this case, in addition to the volume of discovery

4  which points that out, we've laid it out in a very detailed and

5  speaking indictment in a proffer affidavit and a detention memo

6  which describes in greater detail some of the contours of the

7  vision of material support, in complaint affidavit, in several

8  search warrant affidavits, and I think I mentioned the

9  detention affidavit already.

10       The idea of what the defendant is charged with and

11  what the elements of the offense are, are not in question here.

12  What the defense does is they point to cases which are

13  characteristically different, where there was less clarity with

14  regards to specifically what -- not what facts were charged but

15  what the allegations -- what the wrongful conduct was charged.

16  Here the defendant is charged with conspiring with.  It varies

17  with different charges, but with regards to the terrorism

18  charges, conspiring with others to provide material support

19  services to a terrorist organization, in this case al-Qaeda;

20  provide -- conspiring and attempting to provide material

21  support to terrorists; conspiring to kill U.S. -- American

22  servicemen overseas; conspiring to obstruct a lawful

23  investigation by lying to the FBI and other federal government

24  agencies; for 1001 offenses, of actually lying to the FBI with

25  regard to an international terrorist investigation.

1      These are very clear.  Time, place, manner and means

2   of those offenses has been laid out, your Honor.  The duration,

3   what he did in the course of that conspiracy, are all laid out

4   in the -- as overt acts.  Are there more that the government

5   may -- more overt acts that the government may seek to

6   introduce at trial?  Of course.  Many of those have already

7   been noticed in the discovery materials, have been particularly

8   highlighted in our detention proffer, even today.

9      So the idea that the defendant doesn't know what he's

10   charged with, which is the purpose of a bill of particulars, is

11   specious.  I think where it gets the defense is, it puts

12   pressure on the government to provide further clarity as to

13   which specific exhibits the government may seek to introduce,

14   which particular events the government is going to focus its

15   attention on.  That would alleviate some of the time and the

16   energy necessary, and the expense necessary for the defense to

17   go through that material.  The government is certainly willing

18   to work with the defense on those issues, but the means to do

19   that is not through a bill of particulars.

20      If one looks at the defense motion for a bill of

21   particulars, it's 32 pages long and is not nearly as succinct

22   as Ms. Patel was just now, which -- not to say she's

23   meritorious, but this is 130 specific statements -- specific

24   requests, most of which start, "State with specificity the

25   time, place, manner and means in which" -- and then would

 1 | isolate a specific line in the indictment.  So they want to
 2 | know, "You say" -- "the government alleges that the defendant
 3 | engaged in a certain act.  When, where was that act?"  If the
 4 | information isn't in the indictment, it's elsewhere in the
 5 | discovery materials that we've already pointed out to the
 6 | defense.

 7 | When the defense asks for definitions that are in the
 8 | indictment, the appropriate means for that is not through a
 9 | bill of particulars, it's through trial.  The way to litigate
10 | whether the defendant meant some kind of peaceful exercise of
11 | his faith when he described violent jihad -- when he described
12 | jihad, the time to litigate that is at trial, not through a
13 | bill of particulars where the government is forced and bound to
14 | the manner of proof at trial.

15 | But most of the defendant's requests are, "State the
16 | factual basis for alleging" something.  By definition, that is,
17 | what evidence are you going to produce or present at trial to
18 | prove a certain statement in the indictment?  That is not the
19 | means -- that's not the purpose of a bill of particulars, and
20 | that pervades their entire motion.

21 | The government has agreed to provide certain of their
22 | requests, things like -- things that would allow them to
23 | understand who coconspirators are; the identity of individuals
24 | whose names are protected from public view; other kinds of
25 | practical issues so that they are on notice of what the issues

1    are in the case and who the individuals are and what the events

2    are that they're going to have to focus on.  The kind of

3    broad-ranging definitions and confining the manner of proof and

4    the means by which the government is going to present the

5    evidence at trial, that's not the purpose of the bill of

6    particulars.  And *Davidoff* and *Bin Laden*, those -- and the

7    other case that counsel mentioned -- are in apposite to what

8    the defense construes as a bill of particulars.

9         And those cases are factually very distinct.  There

10   was some confusion with regards to narrow elements of the

11   drafting of those indictments.  Here, that's not been alleged.

12   They just want carte blanche.  "We need further specificity

13   with regard to everything because we have a lot of work to do

14   and we need your help to do it."  The government is willing to

15   help them in certain ways, but not through laying out our

16   manner of proof and further constraining and binding the

17   government to definitions and other elements which it's not

18   required to be bound to at this stage.

19        THE COURT:  Okay.  I'll reserve this motion as well.

20        Now let's turn to discovery issues which are raised by

21   two motions, Docket Nos. 108 and 112.  And I think they can be

22   considered together.  I'd like -- one topic we can get -- there

23   are a number of, perhaps, subtopics we can deal with.

24   Organization is one topic I would like to have addressed.

25        MR. CARNEY:  Your Honor, we filed that emergency

1    motion regarding discovery because we were so struggling with

2    coming up with a common labeling system, and our efforts to

3    engage the government in that process had been unsuccessful.

4         I'm pleased to report that we had a lengthy meeting

5    yesterday to discuss this issue in particular, and we made

6    great progress in moving toward an agreement on how we will

7    label the discovery in a manner where both parties can talk to

8    each other very easily about what documents or other evidence

9    we're talking about.

10        So for today's purpose, the motion I was going to

11   argue, the emergency motion regarding labeling of discovery, we

12   would ask that the Court not act on that motion today.  The

13   parties hope to reach a memorandum of understanding regarding

14   how the documents will be labeled, and we expect to present

15   that to the Court so that your Honor will be aware of what

16   we're doing in this area to handle the unprecedented amount of

17   discovery.

18        We wish to go forward on the motion for --

19        THE COURT:  Let me just ask about that.  The

20   government's response to your motion included a draft of a

21   schedule, and so on.  Is that the direction you're working, is

22   off that document?

23        MR. CARNEY:  That's part of it, but we're trying to be

24   more specific about identifying the evidence and also alerting

25   us to various aspects of the evidence; for example, we

1    discussed yesterday the government notifying us of the evidence

2    that it is likely to use at trial.  The government would also

3    notify us of the evidence it is confident at this time that it

4    will not use at trial.  The government would identify,

5    specifically --

6              THE COURT:  This is by categories, or identifying

7    people, for example, who are either potential witnesses or

8    non-witnesses, that sort of thing?

9              MR. CARNEY:  That's one example.  Another might be a

10   hard drive.  The amount of time it takes us to review a hard

11   drive so that we are eyeballing every item on that hard drive

12   is incredible.  If the government informs us that they do not

13   expect to present any evidence that is obtained from that hard

14   drive, then it assists us greatly in organizing the discovery

15   and preparing for trial.

16             I was very explicit with the prosecutors when we met

17   yesterday.  I told them that we are trial lawyers and we know

18   that things come up in preparation for trial or even during

19   trial.  So that our agreement will make it crystal clear that

20   nothing that the government designates as likely to be used at

21   trial is in stone; nothing that the government designates is

22   highly unlikely to be used at trial would be irreparable.  If

23   their strategy changes, if their needs for producing evidence

24   evolve, if it becomes apparent they do want to use something

25   that they had previously alerted us they were not going to use,

1    then we're not going to use this agreement as a basis for

2    coming to your Honor and saying, "Hey, they said they weren't

3    going to use it and now they say they are."

4         This whole agreement that we're attempting to reach is

5    based on good faith; is based on our ability to work with them

6    as attorneys, and acting in good faith on these discovery

7    agreements.  And in that way if something does come up, I'm

8    prepared for it.  And if they change about a witness they want

9    to use that they decide not to use, I'm prepared for that as

10   well.

11        So we expect to be able to reduce this to a memorandum

12   of understanding, share it with your Honor so that you'll have

13   an awareness of what the parties are doing to organize this

14   massive amount of discovery.  Indeed, we're requesting that the

15   Court schedule regular status dates so that we could keep your

16   Honor apprised, and rather than let problems fester, they could

17   be dealt with more --

18        THE COURT:  I agree entirely with that.  That was a

19   matter I was going to bring up, and we can talk about the

20   schedule.  But I think from here on out, we will do that.

21        MR. CARNEY:  We were going to propose -- I hope I'm

22   not premature -- we were going to propose a date in the second

23   week of March.  And by then we're confident we'll have this

24   discovery agreement worked out, or if there are problems

25   related to it, and if they are only a few, then we can bring

1    them to your Honor's attention at that time.

2         THE COURT:  Okay.  Anything you want to say about

3    that?

4         MR. CHAKRAVARTY:  The exact timing of that date we

5    would -- we might need to work with counsel and the Court on

6    just in order to maintain that we have enough representation on

7    our side.  But Mr. Carney could not have stated more accurately

8    and eloquently the shared understanding.  And the fact is that

9    the government does want to facilitate the defense's narrowing

10    of the extensive amount of discovery.  We don't want to do it

11    in a way that would bind us such as the bill of particular

12    requests, and we don't want to be hoisted on our own petard

13    down the line by our good faith in trying to assist the defense

14    at an early stage like this.

15         MR. CARNEY:  And I'm going to put that in writing so

16    that the government would --

17         THE COURT:  Well, that sounds like a very good plan,

18    and we'll stay close to it.

19         MR. CARNEY:  Thank you, your Honor.

20         In terms of the motion for discovery itself, we are

21    prepared to address that, your Honor.  My motion was the

22    emergency discovery.

23         THE COURT:  Right.

24         MR. CARNEY:  I'm now out of the picture, and we'll

25    return to Attorney Bassil.

1              THE COURT:  Okay.

2              MR. CARNEY:  Thank you.

3              THE COURT:  This -- no.  Her, not you.

4              MR. CARNEY:  Sorry.

5              THE COURT:  This looks like a shadow bill of

6    particulars motion in some respects.

7              MS. BASSIL:  Not entirely.  I mean, it's a request for

8    specific items of discovery.  And, again, you know, it has to

9    do with the fact that, you know, receiving as much electronic

10   discovery as we've had is, in a way, like receiving no

11   discovery because it's such a massive amount.  So the discovery

12   requests are not just a bill of particulars, but they also

13   request information about exculpatory evidence which the

14   government doesn't seem to address.

15             I do want to say one thing, your Honor.  The issues

16   related to FISA and CEPA, we have agreed that we would not be

17   arguing those today.  We have asked the Court for help with

18   someone who really knows this kind of law, which we don't, and

19   that it would be more efficient to schedule a hearing on those

20   specific issues.

21             THE COURT:  I want to come back to that after we've

22   talked about this discovery.  I understand you on that.

23             MS. BASSIL:  Do you want me to start or...

24             THE COURT:  Yes.

25             MS. BASSIL:  Your Honor, let me start with --

1          THE COURT:  I don't know that -- you know, there's an

2     extended presentation in the papers.  I don't think we have to

3     go through every paragraph, necessarily.

4          MS. BASSIL:  That's right.  Let me start with --

5          THE COURT:  Let me suggest this:  There are

6     some -- again, there are some recurring categories.  I mean,

7     you already mentioned exculpatory evidence.  So there's *Brady*

8     issues.

9          MS. BASSIL:  Yes.

10         THE COURT:  There are issues about impeachment-

11    potential evidence --

12         MS. BASSIL:  Uh-huh.

13         THE COURT:  -- and about experts, about *Jencks*

14    material, and so on and so forth.  Those are the

15    things -- talking about them in that way rather than about

16    particular known or identified or imagined concrete pieces of

17    evidence might be more difficult, I guess.

18         MS. BASSIL:  All right.  I won't go through it one by

19    one.  I think I understand what you're referring to, your

20    Honor.  I'll try to do this in groups because we have listed

21    them all.

22         Let me start with the issue of *Brady* material and

23    exculpatory material.  As I've said before, our expert has

24    determined there are about 650,000 pieces of data on these hard

25    drives, there are 90 CDs.  The government has answered there is

1   no exculpatory evidence.  I kind of find that hard to believe.

2   I find it hard to believe that they've reviewed all of this

3   information, although they've had it far longer than we have.

4        And one of the things I am concerned about is how they

5   define exculpatory evidence.  And I'm going to ask the Court to

6   actually ask them.  So as an example, if an individual was sent

7   by the government to the defendant to encourage him to do

8   something that was illegal -- and that's very common in these

9   cases and we have reason to believe that occurred here -- and

10  the defendant either refused to do so and/or cut all ties to

11  that person, we believe that's exculpatory.  We believe we

12  should have information about that person, that action,

13  reports, whatever, and that that is exculpatory evidence.

14        Another example is we are well aware that the

15  government fanned out across the entire Muslim community and

16  spoke to many, many, many people.  Their comment that people

17  came forward is not quite what happened.  But, for example, we

18  are aware that if the government interviewed someone and wanted

19  that person to say the defendant was encouraging them in an

20  illegal act, and the person refused to do so and said, "That's

21  not true," I consider that to be exculpatory and I believe we

22  should get the information on that.  And I consider that to be

23  *Brady* material, not impeachment, not *Giglio*.  So that's the

24  kind of *Brady* material we're looking for.

25        By the same point, we have asked -- for example,

1    information concerning -- you know, documents showing that --

2    and this goes back to *Holder* -- the defendant translated

3    documents at the direction or in coordination with al-Qaeda or

4    a foreign terrorist organization.  And the government says,

5    "Well, you're not entitled to inculpatory evidence."  They miss

6    the point.  If there are no such documents, that's exculpatory;

7    if there are no such persons that link the defendant to

8    al-Qaeda or documents or e-mails or instant messages, that is

9    exculpatory.

10           We asked, for example -- you know, they list Osama bin

11   Laden as a codefendant -- or an unindicted coconspirator.  And

12   I'm sure that's to be able to put in hearsay, all right?  But I

13   asked, "Do you have documents that show that Osama bin Laden

14   referred to the defendant or codefendant?"  Well, we got kind

15   of a sarcastic and snarky response.  They said, "If the

16   defendant could arrange such interviews, the government would

17   be interested."  But they miss the point.  It's not

18   inculpatory; the lack of that evidence is exculpatory.

19           So those are the kinds of exculpatory *Brady* material

20   we were referring to.  It's not impeachment and it's not

21   rewards and promises, and so forth, but clearly, information

22   that would show that the defendant is not involved in terrorist

23   activity.  Even in their bail argument, what I heard was "the

24   defendant is involved" in words.  We're back to what has been a

25   theme all through today:  What is he charged with and what did

1    he do?  So that's what I'm trying to drive at through these

2    discovery responses.  So that's the first one.

3          We also asked for information concerning Yemen.  And

4    this is an issue in which the government has been really quite

5    cagey about it.  We keep saying that defendant did not go to

6    Yemen for terrorist training and would you tell us either where

7    their camps are or where he went.  They had information -- or

8    we asked for information about a particular school that was

9    given to Customs agents about where they had been or where they

10   were going.  And the government will not provide that

11   information.  They say either "It's classified" or "You don't

12   need to know it."  Or, they said, "It doesn't matter what he

13   did; it's what he wanted to do."  Again, I believe that we are

14   entitled to that information.

15         We have asked for information concerning other law

16   enforcement agencies and the information that they might have.

17   We are well aware that -- actually, I saw this on television,

18   there are now these things called "fusion centers" in which

19   state police, local police, provide suspicious activity reports

20   specifically related to terrorism or suspicion of terrorism,

21   and these are -- there is one located in Massachusetts, and

22   that these are all computerized and organized.  And we asked

23   for information -- or a search of particular drives on FBI

24   computers.  It is no secret that the history in this district

25   is of the FBI not turning over information, or having things on

1    one computer that don't show up on another computer.

2           We did ask specifically for things like rewards and

3    promises.  And part of rewards and promises which, frankly, I

4    find that prosecutors often miss is it's not just rewards and

5    promises, it's the carrot and the stick.  We won't prosecute

6    you if you cooperate, we won't charge you with X, Y, Z if you

7    cooperate.  So we're also looking for that information.

8           We did ask for things, you know, information that they

9    would rely on and exhibits they would rely on.  And that, in

10   part, too, is the same thing: the effort to try to whittle down

11   what this world of discovery is going to look like.

12          And that's basically, I would say, the gist of the

13   discovery we were looking for, your Honor.  And the

14   government -- we had 86 requests.  The government answered 12,

15   all right?  And when they did answer 12, of the 12, many of

16   them were either "We don't have to" --

17          THE COURT:  When you say "answer," you mean gave

18   additional information?

19          MS. BASSIL:  Gave an answer like, "We don't have to

20   tell" --

21          THE COURT:  They answered by saying "go away" on some

22   of these.

23          MS. BASSIL:  Some of them they just sort of said, "Go

24   away," but at least on some of them they said, "We don't have

25   to tell you" or "it's classified" or "it's classified to tell

1    you whether it's classified or not."

2          And what that also brings up, by the way, your Honor,

3    is I have no idea where we stand on the issue of whether we're

4    getting security clearance or not.  I have no idea where we are

5    on that.  That has come up before.  And I remember raising it

6    with them at one of our very early meetings.

7          So without going through this bit by bit by bit,

8    that's what I'm looking for, your Honor.  I would like to know

9    what the government perceives as *Brady* material because, as I

10   said, I'm shocked that in 650,000 pieces of information there's

11   not one piece that's exculpatory.  I find that impossible to

12   believe.

13         THE COURT:  Mr. Chakravarty?

14         MR. CHAKRAVARTY:  Your Honor, most of the defendant's

15   requests are specific requests for information, which as the

16   government lays out in its repeated denials, or declinations,

17   to produce information, which they're not entitled to, just

18   under the rules of evidence -- excuse me, rules of criminal

19   procedural, under *Brady* and its progeny, under *Giglio*.  And

20   some of it is *Jencks* material, which there is a time for that.

21   And the government -- as we say, we're willing to work on what

22   that time is.  There is not going to be a dump of thousands of

23   pages of documents on the eve of trial; there's going to be a

24   meaningful opportunity to review that stuff.  But the timing of

25   those things doesn't affect, you know, whether they're entitled

1  to that stuff now.

2        Things like witness -- interviews that the FBI or

3  others have conducted of individuals in the community or

4  elsewhere -- in this community or elsewhere -- where those

5  individuals did not say anything that was discoverable about

6  the defendant, either that the defendant did not -- you know,

7  for shorthand, did not rob the bank that he is alleged to have

8  robbed, that clearly would be exculpatory and there would be a

9  reason to produce that.  But if somebody who was not going to

10 be testifying in this case said, "I don't know anything about

11 the defendant robbing a bank," that kind of tree falling in the

12 forest has nothing to do with discovery or production in this

13 case.  And again, there's no rule of criminal procedure that

14 would entitle that.

15       With regards to Yemen, it bears some conversation on a

16 repeated theme here which is that somehow the government's

17 reluctance to specify exactly where the defendant received his

18 terrorist training in Yemen.  And as the defense correctly

19 pointed out, the defendant is charged with conspiring to

20 receive training in Yemen and attempting to receive training in

21 Yemen.

22       The fact that there may or may not have been training

23 camps -- terrorist training camps in Yemen at that time has

24 very little to do with what the defendant believed at the time

25 for why he went to Yemen.  And that's the operative inquiry.

1    So if there is evidence somewhere in some government back file,

2    you know, back office somewhere that says that "I don't

3    believe" -- hypothetically, "I don't believe there were

4    terrorist training camps in Yemen in February of 2004 when the

5    defendant is alleged to have gone there," unless there's

6    further evidence that the defendant somehow was on notice of

7    that, and he knew that at the time he went to Yemen, that is

8    not relevant to a conspiracy or an attempt to attend a

9    terrorist training camp in Yemen, as the defendant is accused

10   of doing.

11        And it's this notion that -- the crime here is the

12   agreement and the attempt; it's not the success.  It's not the

13   success of any domestic aspect of it, and it's not the success

14   of the overseas aspect of it, which means what is going to be

15   relevant at trial is similarly going to be colored by that.

16        If the government wanted to come into trial and

17   present evidence that there were hundreds of terrorist training

18   camps in Yemen, unless there was a basis to impute that part or

19   all of that information to the defendant, it's really in

20   apposite to the question of why was the defendant going to

21   Yemen.  The factual accuracy of whether there was or wasn't is

22   immaterial to that ultimate inquiry.

23        And the reason why that's instructional is because

24   counsel makes repeated requests for information about things

25   that did not occur; for example, the characterization of *Brady*

1     information as if a witness told the government that "I don't

2     think that the defendant did anything wrong," if the witness

3     was not in any position to know what the defendant did, or said

4     that, "Oh, I didn't see the defendant rob a bank on Tuesday but

5     I saw him rob a bank on Wednesday," that's not exculpatory with

6     regards to the indictment which alleges very specific crimes

7     that the defendant is accused of committing.  And it doesn't

8     mean that every potentially pro-jihad statement or sentiment or

9     terrorist act that the defendant denied subscribing to, or that

10    he opposed, it doesn't mean that that becomes somehow

11    exculpatory information, because, truthfully, he's not charged

12    with those acts.  And that's, I think, a theme -- another theme

13    throughout the number of requests.

14          The somewhat facetious references, and partially

15    accurate references, to the government's refusal to provide

16    information about surveillance techniques or other information

17    which may be classified with respect to the discovery request,

18    frequently is -- upon specific requests for publicly identified

19    surveillance programs and other kinds of things which are kind

20    of drawn from a variety of public sources and specific requests

21    as to whether there were any communications captured through

22    these sources and they -- the fact that the defense wants

23    access to those things.

24          Clearly, the government knows what its discovery

25    obligations -- its obligations under *Kyles* to search for such

1    information.  If such information existed, then the government

2    is duty bound to search through that.  And to the extent that

3    there is a procedure with regards to if they -- if the

4    government cannot produce that, it will follow that procedure.

5    And in this case as the government -- as the defendant has

6    already recognized, the government has produced thousands and

7    thousands of pages -- or pages equivalent -- of information to

8    the defense.

9         So the government -- the nature of the defendant's

10   requests are basically to expose what does the government know

11   about the defendant, not whether a search has been done, as the

12   government is obligated to do, for discoverable information,

13   which it has and it is doing, but rather, the defense wants to

14   know that, presumably, so that they know what strategies they

15   should not employ at trial.

16        And to that, and I think this might be helpful both

17   for counsel as well as the Court, the government has no

18   intention of kind of bringing out some secret evidence and

19   presenting that against the defendant at trial.  There's no

20   classified information that the government is going to whip out

21   at trial and cross-examine the defendant with if he ever takes

22   the stand.  The evidence that the government is going to use is

23   going to be witness testimony and it's going to be documents

24   and other materials which the government has produced in

25   discovery.

1      To the extent that we owe the defense anything, then

2   we welcome that discussion.  We welcome them to identify some

3   specific category of evidence which, under the rules of

4   criminal procedure or, you know, case law, that we are

5   obligated to produce to the defense, that we haven't and they

6   know exists.  The defendant is the person best situated to know

7   that.  If they make those specific requests, we'll entertain

8   those.  We can't guarantee -- based on prior practice, as well

9   as, you know, where we are today we can't guarantee -- that

10   we're going to agree that it's legitimate, but that is the

11   procedure that we should employ there.

12      THE COURT:  Well, what can you say about the scope of

13   the government's inquiries; that is, in a sort of mind run

14   criminal case here -- if we had a drug case, for example -- the

15   prosecution would inquire -- if it was a joint task force,

16   would inquire not only of the DEA agents, but also the Boston

17   police, perhaps the FBI, and so on, but probably would not

18   inquire of the environmental police because it was beyond what

19   you would expect, okay?

20      So what -- how do those lines look in this case?

21      MR. CHAKRAVARTY:  As your Honor knows, it is typically

22   the prosecution team.  It's those agencies which participated

23   in the investigation -- in this investigation which is

24   predominantly an FBI investigation -- it is an FBI

25   investigation.  Of course, there are partners both on the Joint

1    Terrorism Task Force and others.  For example, evidence was

2    obtained at the border when the defendant and the codefendants

3    and others traveled to and from the United States.

4         While there may not have been investigative

5    involvement as part of the kind of deliberate investigation of

6    the defendant and others, the fact that they have records

7    related to the case meant that the government has searched

8    those records for anything.  With regards to, you know, the

9    albatross, what about the intelligence agencies?  What about

10   the vast military and industrial complex?  And the government

11   has taken steps to do what we call prudential searches to

12   determine whether the government has -- the government at large

13   has responsive information that would otherwise be within the

14   government's discovery obligations, Rule 16, *Brady* information,

15   those kinds of things.

16        THE COURT:  Including making inquiries of places like

17   the National Security Administration and defense intelligence,

18   and so on?

19        MR. CHAKRAVARTY:  Such as, yes.

20        THE COURT:  Those are examples.

21        MR. CHAKRAVARTY:  Such as, exactly.  Correct.  Yes,

22   your Honor.  And multiple agencies, your Honor.  Any which the

23   government felt that even if --

24        THE COURT:  But not the EPA, I gather?

25        MR. CHAKRAVARTY:  Not unless there's something that we

1    don't know, your Honor.

2         THE COURT:  All right.  The other question, then,

3    is -- well, I don't know whether -- I mean -- okay.

4         Has the government described its searches in some way

5    that the defense can understand it?  Just the way you've

6    identified it today, for example.

7         MS. BASSIL:  No.

8         MR. CHAKRAVARTY:  No.  No.  And largely because to do

9    so would be to expose two things:  One, the government may know

10   that there are specific repositories of information.  And what

11   we have told the defense is that we have been, and we continue

12   to this -- you know, once we get out of court, to endeavor in

13   those searches.  Not -- anything we know about, we've reviewed,

14   but there are still repositories where we are still conducting

15   review, not for Rule 16 and *Brady* information, per se, but

16   perhaps for *Jencks* material or *Giglio* material.  Because, you

17   know, there are witnesses that we're always contemplating and

18   we're always continuing to do those searches.  And I hasten to

19   add it includes impeachment material as well as exculpatory

20   material.

21        THE COURT:  Okay.

22        MR. CHAKRAVARTY:  I mean, your Honor, we address each

23   of the specific requests in -- I needn't belabor that.  But I

24   think there are some themes here where -- the government

25   obviously understands what *Brady* information is for case law,

1    for its progeny.  But what it is in any specific case is based

2    on that context.  We may disagree whether it be the -- I think

3    there's one request which specifically enumerates what the

4    defense perceives as exculpatory information in their discovery

5    motion -- one request -- and I think that is the type of

6    request, which I think is a meaningful request, because it

7    brings to a head where the differences may lie in terms of

8    information which the government may not have produced.

9         The government has addressed why we don't think that

10   these specific requests are requests for information which

11   would tend to cast doubt on the culpability of the defendant or

12   his exposure in this case, but that is a meaningful discussion

13   which we will continue -- and as we discussed yesterday

14   informally, that we will continue.

15        But they haven't made the case here that this

16   information is -- we are searching for those obligations.  The

17   defendant is the person who is most able to say, "I know that I

18   told one of the government's" -- hypothetically, "one of the

19   government's witnesses that I did not want to go to Yemen to

20   join a terrorist training camp so I could fight in Iraq," or

21   "so I could repel the invaders."  You know, "I know I didn't

22   translate "39 Ways to Serve and Participate in Jihad" to

23   support people and support the Mujahideen and support

24   al-Qaeda."

25        If he knows those people, and the defense makes a

1    specific request for specific information, then I think the

2    government is duty bound to search for that piece of

3    information if we agree that it's exculpatory and if --

4    depending on wherever that source is, we will then take

5    whatever the next step is.  That may mean going to your Honor.

6    It may mean attempting, in some form, to produce that

7    information to the defense.

8           But back to the -- you know, Ms. Bassil's question of

9    the discussion about security clearances.  Giving the defense a

10   security clearance will not resolve any of that.  The

11   government's not opposed to that, but there has to be a need

12   for it, and not just legally there has to be a need for it, but

13   there should be a need for it in terms of -- within the rules

14   of criminal procedure in terms of discovery.  Why do they need

15   to -- we can't have the government, the defense rummaging

16   through government files randomly looking for anything that

17   might be helpful -- that they might be able to use, I should

18   say, in a trial.

19          The government knows its obligation.  It's discharged

20   those obligations, and continues to discharge those

21   obligations, and we're happy to talk about it further.

22          THE COURT:  To come back to the question to whom the

23   inquiries are directed.  I wonder if one approach might be to

24   have the government identify in an in camera submission the

25   scope of the inquiry so at least I would know, even if you

1    think the defense shouldn't know all that.  It might help me

2    assess various claims that something is or is not exculpatory

3    or that there's been a thorough *Kyles* search, and so on and so

4    forth.

5         MR. CHAKRAVARTY:  We don't see any problem with that,

6    your Honor.

7         THE COURT:  Go ahead.

8         MS. BASSIL:  Your Honor, I remain troubled because

9    after all of everything Mr. Chakravarty said, I still haven't

10   heard what they consider to be exculpatory except suddenly it's

11   become our burden.  And it's our burden to come to them with

12   people we think they maybe interviewed that might have

13   exculpatory evidence, and they'll decide whether it's

14   exculpatory or not.

15        THE COURT:  I think all he was saying was that things

16   that might be neutral on their face might be understood by

17   somebody else as being exculpatory but not understood by the

18   government as being exculpatory.

19        MS. BASSIL:  I think that's being a little

20   disingenuous.  I think knowing whether or not, for example,

21   there were no terrorist training camps in Yemen absolutely

22   supports our claim that our client went there for religious

23   studies.  And I think that an individual who has been pushed by

24   the government, or asked by the government, to try to get the

25   defendant to do something illegal and they have refused -- the

1    defendant has refused to do so, they know that's exculpatory.

2    I don't think there's any big mystery.

3        What I'm hearing is a lot of dancing around this and a

4    shifting of burdens.  And if they know their obligations --

5    that would presume there's no law on *Brady* violations.  And of

6    course there's thousands of cases on *Brady* violations, and

7    particularly in this district.  So I would ask that they define

8    what exculpatory is.

9        THE COURT:  All right.  That raises, a little bit, the

10   subject of timing.  And the *Brady* obligation is ongoing.  It's

11   already begun and it's ongoing.

12       MS. BASSIL:  Right.  It's 28 days from arraignment.

13       THE COURT:  And the *Giglio* and the other promises,

14   inducements, and so on, is -- under our local rules there's a

15   time frame for that.  We don't necessarily have to live by the

16   time frame that is customary for most cases, but that's

17   something that we can discuss.  But I think we can probably

18   agree, or at least recognize, that that's typically closer to

19   trial than other things, as would be the identification of

20   trial evidence, whether witnesses or exhibits.

21       One specific -- and maybe these are things we can talk

22   about in coming case conferences about discovery, but one thing

23   that I noticed was referred to in the papers was the subject of

24   experts, and maybe -- I guess it may be likely that both sides

25   will have experts, and we'll have to have some provisions for

1   that, and time frame.

2        So I don't know if that's something you want to

3   address now or postpone until we've made a little more progress

4   on the documentary productions.

5        MR. CARNEY:  We spoke about that exact subject

6   concerning experts, your Honor.  What we requested of the

7   government yesterday is that they inform us of just the names

8   of people that they are likely to call as experts or people

9   that they are considering calling as experts.

10        We're not asking for the exact opinions that the

11   experts would offer, nor the basis for any opinion, nor any

12   documents that the experts have reviewed, but rather, just who

13   are these people.  Because it will take us so much time to look

14   into their backgrounds, prepare for cross-examination, that if

15   we just know who they are, we will begin to have an idea of

16   what areas they'll be testifying to.

17        The government was receptive to this idea.  We also

18   talked about it being reciprocal.  And that way, instead of

19   scrambling close in time to the trial regarding experts, we can

20   do it in a more measured way.

21        THE COURT:  Well, generally what you can agree to will

22   be helpful.  The only sort of instant reaction I have to that

23   is with respect to people who might be called, it might be a

24   little premature to be spending time analyzing somebody who's

25   never actually going to be in the case.  This could be a waste

```
 1   of resources on both sides.

 2         MR. CHAKRAVARTY:  That's the government's concern,

 3   especially in light of the fact that counsel is appointed.  If

 4   we give too many names too early, there might be a sense that

 5   they --

 6         THE COURT:  I think it would be more practical to go

 7   from "might" to "probably will," or something like that, or

 8   "likely."

 9         MR. CARNEY:  I understand.

10         THE COURT:  There are alternate possibilities that are

11   fairly likely.  But just "we've been thinking of the following

12   thing" seems, to me, to be a waste of time.

13         MR. CHAKRAVARTY:  I think in the spirit of candor, we

14   would put whatever adjective, you know, precedes the certainty,

15   and I think that that should color how much -- how many

16   resources both sides should spend on doing their due diligence.

17   And the idea is that as we get closer to trial, then obviously

18   the disclosures will be more in conformity with 702 and 703.

19         THE COURT:  I think it's actually an adverb.

20         MR. CARNEY:  I didn't hear that, your Honor.  Oh, an

21   adverb?

22         THE COURT:  So with respect to clearances, it doesn't

23   appear yet to me that it will be necessary.  There is a time

24   component to that as well, and so we should have that resolved

25   sooner rather than later if it's going to be necessary.  I
```

1    understand the government's position to be that the government

2    doesn't intend to employ or offer classified information as

3    part of its evidence, so it may be that it's not necessary.

4    But if that changes and it would become necessary, we want to

5    get the process started so it could be done, all of which is in

6    support of my view that October is real and firm.

7              Finally, let's talk about the FISA issues.  The

8    government, I think, has suggested a time -- somebody did.  I

9    think it was the government.

10             MR. CHAKRAVARTY:  I think we agreed --

11             THE COURT:  I think it related -- maybe it's an

12   agreement -- related to a potential motion to suppress?

13             MR. CHAKRAVARTY:  There's an agreement that -- about

14   the 90 days after the filing of a motion to suppress,

15   FISA-related materials that -- as counsel articulated today, I

16   think they need some time in order to obtain the resources to

17   file that motion.

18             The only thing I would ask is that whatever

19   that -- some date be set, or some kind of ballpark be set for a

20   deadline for that, so that we don't let it slip too far.

21             THE COURT:  What's the defense view on that?

22             MR. CARNEY:  Well, your Honor, in terms of the FISA

23   motion, we've got it ready to go.  And I'm told this is the way

24   it's done:  We file a motion to suppress without having any

25   information about the application in our motion, which we

1    drafted.  We've tried to alert your Honor as to certain

2    benchmarks that the Court might want to look at to see if these

3    benchmarks are met in the application for the FISA warrant.

4    And if they are not met, then that may be a basis for us to

5    gain access to those documents so that we could litigate

6    whether the search warrants were properly authorized.

7            THE COURT:  So does that mean you're ready to file a

8    motion?

9            MR. CARNEY:  Yes, your Honor.

10           THE COURT:  And so the government wants 90 days to

11   respond, is that it?

12           MR. CHAKRAVARTY:  Yeah, from whenever they file.

13   That's fine --

14           MR. CARNEY:  We've agreed to that.

15           THE COURT:  That's May.

16           MR. CARNEY:  Pardon me, your Honor?

17           THE COURT:  That's May.

18           MR. CARNEY:  May?  It would be June.

19           THE COURT:  Well, whatever.

20           MR. CARNEY:  Okay.  May.

21           THE COURT:  I guess that's right.  We're at the end of

22   February, aren't we?  I'm living in the past.  I guess, yeah,

23   you may be right.  So I'd like to get that process going, then,

24   if we have to do that.

25           Okay.  I'm going to reserve this present discovery

1  motion, as the other motions.  And I hope to have all of these

2  motions resolved in short order.

3          MS. BASSIL:  Is it possible to get a status date from

4  you?

5          THE COURT:  Yes.

6          MS. BASSIL:  In mid-March?

7          MR. GROHARING:  The government would prefer the end of

8  the week of the 16th, if that's convenient for counsel.

9          MS. BASSIL:  As long as it's not Wednesday.

10          THE COURT:  Well, the March -- the week is the 14th,

11  and the 16th is the Wednesday.

12          MS. BASSIL:  Right.  I teach on Wednesdays.  I had to

13  move my class today, so...

14          MR. CHAKRAVARTY:  There's St. Patrick's Day, which is

15  Friday of that week, which would work.

16          MR. CARNEY:  The 17th?

17          MR. CHAKRAVARTY:  If it's convenient for you.

18          MR. CARNEY:  I have a sentencing before Judge Zobel at

19  two o'clock.

20          THE COURT:  Would you expect to be done by three?

21          MR. CARNEY:  Yes, your Honor.

22          THE COURT:  On the 17th?  Why don't we say that.

23          MR. CARNEY:  We're scheduled for two.  There's not

24  likely to be any witnesses, nor extensive allocution, nor

25  argument by counsel.

```
1              THE COURT:  All right.  Why don't we say --

2              MR. CHAKRAVARTY:  The hearing or your sentencing?

3              MR. CARNEY:  My sentencing.  We have plenty of

4     allocution ready for this.

5              THE COURT:  Three o'clock on March 17th?

6              MR. CARNEY:  Three o'clock would be fine, your Honor.

7              THE COURT:  Okay.  Three o'clock for a case

8     conference.

9              MR. CARNEY:  May the defendant be brought in for that

10    hearing, please?

11             THE COURT:  If he would like.

12             MS. BASSIL:  Yes.

13             MR. CARNEY:  Thank you.

14             THE COURT:  All right.  Thank you, all.  We'll be in

15    recess.

16             COUNSEL IN UNISON:  Thank you, your Honor.

17             THE CLERK:  All rise.

18             (The Court exits the courtroom at 4:06 p.m.)

19             THE CLERK:  Court is in recess.

20             (The proceedings adjourned at 4:06 p.m.)

21

22

23

24

25
```

```
 1                  C E R T I F I C A T E

 2

 3           I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

 4     the United States District Court, do hereby certify that the

 5     foregoing transcript constitutes, to the best of my skill and

 6     ability, a true and accurate transcription of my stenotype

 7     notes taken in the matter of Criminal Action No. 07-10017-GAO,

 8     United States of America v. Tarek Mehanna.

 9

10     /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR
11     Official Court Reporter

12
       Date: April 12, 2011
13

14

15

16

17

18

19

20

21

22

23

24

25
```