```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS



                                      )
UNITED STATES OF AMERICA,             )
                                      )
          Plaintiff,                  )
                                      ) Criminal Action
v.                                    ) No. 09-10017-GAO
                                      )
TAREK MEHANNA,                        )
                                      )
          Defendant.                  )
                                      )




          BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                 UNITED STATES DISTRICT JUDGE


                      HEARING TRANSCRIPT



             John J. Moakley United States Courthouse
                        Courtroom No. 9
                       One Courthouse Way
                   Boston, Massachusetts  02210
                   Wednesday, October 26, 2011
                           12:12 p.m.



                 Marcia G. Patrisso, RMR, CRR
                  Cheryl Dahlstrom, RMR, CRR
                   Official Court Reporters
               John J. Moakley U.S. Courthouse
                One Courthouse Way, Room 3510
                 Boston, Massachusetts  02210
                        (617) 737-8728

            Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2       OFFICE OF THE UNITED STATES ATTORNEY
         By: Aloke Chakravarty and Jeffrey Auerhahn,
 3           Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
 4       Suite 9200
         Boston, Massachusetts  02210
 5       - and -
         UNITED STATES DEPARTMENT OF JUSTICE
 6       By: Jeffrey D. Groharing, Trial Attorney
             National Security Division
 7       950 Pennsylvania Avenue, NW
         Washington, D.C.  20530
 8       On Behalf of the Government

 9       CARNEY & BASSIL
         By: J.W. Carney, Jr., Esq.
10           Janice Bassil, Esq.
             John E. Oh, Esq.
11       20 Park Plaza
         Suite 1405
12       Boston, Massachusetts  02216
         - and -
13       LAW OFFICE OF SEJAL H. PATEL, LLC
         By: Sejal H. Patel, Esq.
14       101 Tremont Street
         Suite 800
15       Boston, Massachusetts  02108
         On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

```
 1              (The following proceedings were held in open court
 2    before the Honorable George A. O'Toole, Jr., United States
 3    District Judge, United States District Court, District of
 4    Massachusetts, at the John J. Moakley United States Courthouse,
 5    One Courthouse Way, Boston, Massachusetts, on ^ Date.
 6              The defendant, Tarek Mehanna, is present with counsel.
 7    Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn
 8    are present, along with Jeffrey D. Groharing, Trial Attorney,
 9    U.S. Department of Justice, National Security Division.)
10              THE CLERK:  All rise.
11              (The Court enters the courtroom at 12:12 p.m.)
12              THE CLERK:  United States District Court for the
13    District of Massachusetts.
14              Court is now in session.  Please be seated.
15              For a hearing in the case of United States of America
16    versus Tarek Mehanna, 09-10017.  Will counsel identify
17    yourselves for the record.
18              MR. CHAKRAVARTY:  Good afternoon, your Honor.  For the
19    government, Assistant U.S. Attorneys Aloke Chakravarty and
20    Jeffrey Auerhahn, and counterterrorism section attorney,
21    Jeffrey Groharing.
22              MR. AUERHAHN:  Good afternoon, your Honor.
23              MR. GROHARING:  Good afternoon, your Honor.
24              MR. CARNEY:  Your Honor, I'm J.W. Carney, Jr.  With me
25    is Janice Bassil, Sejal Patel and John Oh.
```

00:08 (line 20)

1          MS. BASSIL:  Good morning, your Honor.

2          THE COURT:  The main order of business is to talk

3   about what may or may not be said during the openings.  We've

4   gotten new filings today that I've been trying to absorb, but

5   before we turn to that let's deal with a couple of the older

6   issues.  With respect to what has been referred to as the U.K.

7   hard drives, the defendant's motion to exclude those is denied.

8   I think that there's an insufficient demonstration of

9   prejudice.

00:09  10          The next category is experts, but the field seems to

11   be changing on who is being offered.  The government, as I

12   understand it, is relying not only on -- for its case-in-chief

13   only on Kohlmann.  And I don't know what that does in terms of

14   the defense side without Vidino being in the case-in-chief.

15   Even the summaries are extended, not to mention Kohlmann's

16   report itself.

17          So I guess I'm not clear what you want to say about

18   some of these people.  My impression is -- and this is -- by

19   the way, I'm addressing only the issue of the opening

00:10  20   statements and not the ultimate admissibility.  Obviously, the

21   easiest case is something that's clearly admissible and can be

22   used.  So my general disposition is if there's a substantial

23   doubt whether the objection would be sustained or not, it

24   should not be mentioned.

25          Now, with respect to the government's Kohlmann expert,

1    I understand from the government they're not going to offer any

2    expert opinion from that witness that would involve an opinion

3    about the defendant particularly.  Am I right about that?  That

4    is, about what the defendant knew or understood or thought or

5    whatever.

6         If that's not right, maybe you can restate what it is

7    you said you would not offer.

8         MR. CHAKRAVARTY:  So in terms of what the defendant's

9    state of mind is, that's accurate, your Honor.  So the idea

00:11 10  that he was a homegrown terrorist that was on some path to

11   blowing something up or committing a terrorist attack, that is

12   not going to be the scope of his testimony.  The reason I

13   hesitate to adopt it wholesale is it is the theory of the case,

14   and it is intended to be elicited, that the behaviors that the

15   defendant exhibited in terms of going to Yemen and the

16   translations, all of these, that these were consistent with

17   answering the call that al Qa'ida had to him and others for the

18   types of support that they needed.

19        So it's not going to be -- I don't think the ultimate

00:12 20  question of did the defendant support al Qa'ida by doing -- was

21   that the intent of the defendant's activities, but did those

22   activities actually support al Qa'ida or were they helpful to

23   al Qa'ida I think is something that -- he's going to be

24   testifying from the lens of al Qa'ida, but the jury can easily,

25   you know, infer from that, and that's certainly the intention,

1    that they would infer that the defendant, you know, did it with

2    that purpose.

3          THE COURT:  Yeah.  And that's the relevant line:  What

4    may be a conclusion drawn by the jury on its evaluation of all

5    the evidence is one thing, but in some circumstances, at least,

6    it would be inappropriate for an expert on either side to

7    express an opinion about that ultimate conclusion.

8          So again trying to talk about all the experts as a

9    category, I think it's appropriate for people who have studied

00:13 10    in a particular field and have the appropriate qualifications

11    to, in a sense, educate the lay jury that will not have that

12    expertise about the development of movements, even the

13    development of ideas, so long as the opinions qualify, you

14    know, under the proper rubric, which I think they probably

15    will, in large part, for those matters.

16          What you might call -- I'm not sure what you'd call

17    it.  I would say general background but it may actually be more

18    in the foreground than the background, but it's not focused on

19    the defendant but it's focused on the structure of al Qa'ida;

00:14 20    for example, the principles of Islamic law and thinking,

21    there's things of that sort, I would think that there will

22    probably be experts on both sides that can address those.

23          Where it gets more doubtful is when it gets to an

24    opinion about this case and so on.  And because there may be

25    some substantial *Daubert* issues, I'm just reluctant to have

1    crossed the Rubicon on this ruling.  Having in mind that the

2    opening is not the same as the closing, it is simply to

3    prepare the -- so I guess without getting really into the weeds

4    of each person and every subsidiary opinion -- because many of

5    them have half a dozen or a few dozen subsidiary opinions, I'm

6    not sure it's fair to do that.

7         I mean, can you -- is what I've said so far enough

8    guidance for people or do we have to get more specific?

9         MR. CARNEY:  Well, I might have missed one point, and

00:15 10    I'd ask the Court to clarify.  I would view an opinion by the

11    expert that Tarek Mehanna was answering the call of what

12    al Qa'ida needed to be an opinion that's excluded because it's

13    directly related to the defendant and, in fact, opining that

14    the defendant, in fact, committed the crime of material

15    support.

16         THE COURT:  I think phrased that way -- and I'm not

17    sure it was a studied phrase the way Mr. Chakravarty said it --

18    I think you're right.  I think the difficult question is, and

19    we have in the past used drug cases as an analogy, whether the

00:16 20    possession of certain paraphernalia is consistent with an

21    intent to distribute, and that "consistent with" question, we

22    generally permit it.  So I think to the extent an expert wants

23    to give a "consistent with" opinion, they probably can.

24         It may only be a formulation difference, but to the

25    extent they say, "In my opinion he is a homegrown terrorist,"

1    then that would be out, or he is not, whichever way it goes.

2    You have people on both sides doing that.

3           So I think both with respect to -- so, I mean, is

4    that --

5           MR. CARNEY:  The ruling that an expert cannot directly

6    talk about the defendant is one that we will honor in the

7    opening.

8           THE COURT:  Okay.

9           MR. CARNEY:  I have --

00:17 10           THE COURT:  With respect to some of the defense

11    experts, there are some other issues of -- just on germaneness,

12    I think, and overgeneralization, which I'm not sure are

13    appropriate.  Things like Professor Williams' testimony about

14    people trying out identities, I think that's a serious doubtful

15    admissibility, frankly.  As a matter of fact, I might say

16    having just looked at the summary without any further hearing,

17    I have a doubt that Professor Williams says anything useful,

18    admissible to say.  But we can cross that bridge.

19           Some of the others, though -- I think

00:18 20    Professor Johnson outlining what happened in his -- I think

21    this is a particular government objection which I do not agree

22    with.  I think that his expertise about the history of Yemen is

23    admissible.  But again, in the history part and not what

24    anybody particularly thought about that history.

25           The reason I think it's admissible is that whether

1    there were training camps or not may have a tendency to affect

2    a juror's assessment of whether the defendant believed it or

3    not.  If it was something that did not exist, in fact, it might

4    make the jurors more reluctant to accept the fact that he

5    believed the nonexistent fact existed.  So I think it's

6    admissible.

7         Anyway, with respect to one of the other major ones,

8    the doctor, I guess, Sageman, I have serious doubt about the

9    indicators and social blob theory.  We don't have to resolve it

00:19 10  now.  It's across the line that I draw for openings, though,

11    because I think there is enough doubt about it, enough

12    substantial question about it, that you should not get into it

13    in opening.

14         MS. BASSIL:  Well, we plan to tailor his testimony to

15    what Mr. Kohlmann is allowed to testify to and what, indeed, he

16    does testify to.

17         THE COURT:  Right.  Right.  And I think that's a fair

18    match.  I don't have any problem with that.  I don't think the

19    indicators -- right now I don't think the indicators of the

00:19 20  social blob theories are going to get in, but we'll address

21    that more specifically as we go on.

22         MS. BASSIL:  Your Honor, as long as we're talking

23    about experts, I, frankly, would like you to ask the government

24    directly if they were ever going to call Mr. Vidino because,

25    quite frankly, I don't want to spend 20 to 30 hours preparing

1    for cross-examination of him on rebuttal if that's never going

2    to happen.

3            THE COURT:  Well, I don't know -- well, I don't know

4    if you want to respond.

5            MR. CHAKRAVARTY:  Yeah.  The whole point of a rebuttal

6    witness is to see what the defense proffers.

7            THE COURT:  Yeah, you just can't --

8            MS. BASSIL:  They know what we're going to proffer.

9            THE COURT:  You can't say in advance you're not going

00:20 10   to call somebody in rebuttal.  So then the answer will be,

11   "Yes, we plan to," and then you'll have to do the work anyway.

12   It's not going to get you anywhere.

13           Well, so is that enough guidance for both sides on

14   experts?

15           MR. CARNEY:  I think so, your Honor.  At least I feel

16   I understand clearly what your Honor has said, which is if an

17   expert is going to be talking about a historical fact, about a

18   country or history --

19           THE COURT:  Culture, that sort of thing in general

00:20 20   terms.

21           MR. CARNEY:  Exactly.  Yes, your Honor.

22           -- and stop there, then that's certainly a very bright

23   line that I will recognize.

24           MR. CHAKRAVARTY:  That's clear to me, your Honor.

25           THE COURT:  Okay.

1          MR. CARNEY:  I did have one word I'd like to discuss

2    with your Honor.  This is an unusual case because the term

3    "material support" is critical to three of the indictments.

4    What I worry about is the government, perhaps unintentionally,

5    often talks about the defendant's support for al Qa'ida, or

6    support for the ideals and goals of al Qa'ida.  And in this

7    particular case it runs the risk of confusing the jury because

8    the word "support" in that context is not the equivalent of the

9    "material support" language that you're going to define.

00:21 10          And I would just ask that the government use a

11   different word than "support" because otherwise, it's going to

12   engender an objection from me so that the Court can clarify

13   "support" is not "material support," et cetera.  And I think to

14   avoid the confusion, the government should not say Mr. Mehanna

15   supports it.  If they want to say he agrees with the goals of

16   al Qa'ida, he agrees that there should be armed resistance

17   against American soldiers -- any other word or phrase is fine.

18   But it's that word "support" that is just going to be

19   mischievous in this trial.

00:22 20          MR. CHAKRAVARTY:  Your Honor, I mean, first,

21   "support" -- you know, either construct is relevant to the

22   facts of the case.  It's an English word that means the thing

23   that the government, or even the defense, will have someone

24   say.

25          Your Honor will instruct the jury on what "material

1   support" means.  There are a lot of circumstances in this

2   courtroom where there is a qualifier to a word, which the jury

3   ultimately has to determine whether it meets that definition.

4   And to restrict us like that --

5          THE COURT:  Yeah, I don't think it's necessary.  I

6   guess all material support is support but all support is not

7   necessarily material support.  But that's something the jurors

8   will sort out.  I don't think it's necessary to restrict the

9   language.

00:23 10          MR. CARNEY:  May I note on the record our objection to

11   your initial ruling regarding the U.K. hard drives?  As we

12   predicted when we filed the motion, we have not been able to

13   study these U.K. hard drives.  We have not been able to study

14   the people whose hard drives these belong to.  We have not been

15   able to investigate these other cases that were involved in

16   Chechnya, in Bosnia, in England.

17          The fact that we got the equivalent of 14 hard drives

18   of material within the last month was so overwhelming to us

19   with everything else that we did that we have not been able to

00:24 20   prepare for that U.K. hard drive evidence.  And your Honor will

21   expect me to object when any evidence from that is offered

22   because we have not been able to look -- or investigate the

23   material because of the late notice and the unbelievably

24   overwhelming nature of the material on those documents.

25          THE COURT:  Okay.

1          MR. CARNEY:  And I'm not just offering it because

2     we'll be ineffective; we just can't respond to that.

3          THE COURT:  I doubt that that means ineffectiveness.

4          Anyway, I don't know if you want to respond or not or

5     just leave it as it is.

6          MR. CHAKRAVARTY:  No, I don't think so, your Honor.

7          MR. GROHARING:  Your Honor -- I'm sorry to interrupt,

8     your Honor.  If I could just go back to the experts issue.  I

9     do want to comment on some particular language that was

00:24 10  included in the defense filing last night.  And particularly on

11    page 3 of their filing, the defense indicated that, and I

12    quote, "The government disingenuously represents that it

13    elected not to use Mr. Vidino in its case-in-chief," suggesting

14    that we failed to operate with an appropriate duty of candor to

15    the Court, and later it goes on to say they believe this is a

16    *Brady* violation.

17         That's completely incorrect, and I can proffer to the

18    Court that the decision not to call Mr. Vidino was made with

19    myself, Mr. Chakravarty, Mr. Auerhahn alone.  Mr. Vidino was

00:25 20  not consulted.  At no point has Mr. Vidino suggested that his

21    testimony is different, or would be different, than what he's

22    provided in his report that the defense has.  This allegation

23    is completely baseless, and I would ask that the Court require

24    the defense to proffer what information they had to even put

25    this in a filing.

1          Unfortunately, this is not the first instance where

2     the defense has made statements like this, perhaps attempting

3     to invoke a reaction from the judge.  You'll recall, your

4     Honor, a few weeks ago comments about the government

5     sandbagging, suggesting that we intentionally held back

6     discovery or dumped large volumes of discovery on them to seek

7     some kind of advantage.  And your Honor will recall that that

8     was unfounded as well.

9          Our concern is that this is -- a pattern is appearing

00:26 10     here, and they're putting unsupported allegations in filings,

11     making them in the record.  And we would like your Honor to

12     address that.

13          THE COURT:  Well, I think your position is stated.  I

14     think that's all we have to do at this stage.

15          There was also, I guess, filed yesterday a motion to

16     exclude various exhibits from the government's opening.  The

17     government, I gather, identified the exhibits they intended to

18     use.  And I've only, you know, sort of looked at that within

19     the last hour or so, so I haven't studied it.

00:26 20          My impression, though, was most of it didn't present a

21     problem.  I was concerned about the cumulative nature of

22     photographs.  And it seems to me that multiple photographs of

23     similar themes is probably not necessary, again, having in mind

24     that this is an opening and not a closing.

25          MR. CHAKRAVARTY:  Yeah.  I don't want the

1    government -- the government overproduced, as it has in several

2    circumstances, and sent the defense a list of all of the

3    exhibits that it intended to make a reference to, not

4    necessarily that they were actually going to publish to the

5    jury.  And, in fact, the number of exhibits, including, for

6    example, the attacks on the World Trade September on September

7    11th, the government's present intent is not to even display

8    one of those, but to put context into when the defendant was

9    standing at Ground Zero there was, you know, some desire to put

00:27 10   one -- I think you'll find that the government's intended

11   photographs, maybe a handful, won't cover -- certainly won't

12   implicate the cumulative aspect of it, but they are all

13   exhibits that we intend to introduce and we think we have a

14   good-faith basis of introducing them.

15            THE COURT:  Okay.

16            MS. BASSIL:  I don't know what that means.

17            THE COURT:  It means he's not going to use very many.

18            MS. BASSIL:  We object to even one, your Honor, of the

19   World Trade Center.  We object to --

00:28 20            THE COURT:  No.  No.  I think the objection was

21   relevance -- or 403, anyway.  I think it's admissible.  I do

22   think cumulativeness is the problem.  And, you know, if there's

23   a choice among several, there might be an avoidance of undue

24   prejudice as you choose which of the several is the right one.

25            MS. BASSIL:  I'm a little unclear, because there also

1    were some highly inflammatory and far more prejudicial and

2    probative photographs of wounded U.S. soldiers, of coffins --

3           THE COURT:  That was another area, the funeral photos

4    and so on.

5           MR. CHAKRAVARTY:  The government does not intend to

6    use it in the opening.  I guess that -- but for your Honor's

7    benefit, when this issue comes up again, as I'm sure it will,

8    in an e-mail that the defendant sent to himself and then to

9    other people, he sent this e-mail with these photographs of

00:29 10   wounded soldiers.

11          THE COURT:  All right.  Okay.  We'll see how the

12   evidence develops.

13          MS. BASSIL:  Your Honor, by the same token, I'm

14   unclear if they're going to submit 12 photographs of

15   Osama bin Laden and Zarqawi.

16          MR. CHAKRAVARTY:  No.

17          MS. BASSIL:  How many?

18          MR. CHAKRAVARTY:  Zero.

19          MS. BASSIL:  All right.

00:29 20          And, your Honor, finally -- and I don't know if you

21   want me to go through this -- but they have two summary charts,

22   one of which is inaccurate, and I don't think summary charts

23   should be used in an opening, and the other is a reference to

24   the online identities the defendant used.  And it's -- I mean,

25   it looks like one of those charts they use in organized crime

1   cases.  We don't object to a list what we may have used on

2   one -- you know, AOL, and what he might have used on another --

3          THE COURT:  Those look like chalks to me rather than

4   exhibits, right?

5          MR. CHAKRAVARTY:  That's right, your Honor.

6          MS. BASSIL:  And I object to them at this point.

7          THE COURT:  Maybe the way to handle it is to let me

8   see them in the morning -- or this afternoon if you have

9   them -- and I'll assess them.

00:30 10        MS. BASSIL:  May I say, your Honor, they have a chalk

11   of people he spoke to in instant messages and they only list 18

12   people and I counted over 29.  And so it's a misleading chalk

13   and it's not even accurate.

14          THE COURT:  Well, is it 29 names for 18 people or

15   something?

16          MS. BASSIL:  No.  No.  I was very careful not to

17   double-count names.  There are 29 different individuals; they

18   only refer to 18 in their diagram.

19          MR. CHAKRAVARTY:  Again, the defense presumes to

00:30 20   suggest what that chalk would be indicative of.  In 1006, your

21   Honor, the witness who will be talking about that chalk will

22   talk about the actual items that are in evidence.  Not all of

23   the chats that may exist on the defendant's hard drive but,

24   rather, those relative chats that the government is introducing

25   as the defendant's statements.  That is that universe of 18

1    chalks.

2         But with regards to the other issues in terms of what

3    chalks are going to be shown, I will have those chalks -- I'll

4    have them on foam board probably later today and I'll bring

5    them down, and if the defense has any objections to anything

6    that the government intends to show...

7         There is one clarification I wanted to make.  There

8    was one video clip that the government intends to play.  It's

9    about a minute and 15 seconds long.  It was the "Expedition of

00:31 10   Umar Hadeed" video that the defendant translated.  And a

11   portion of that includes a short speech by Osama bin Laden that

12   was subtitled.  That we do intend to play.  We expect it to

13   come in.  We don't expect it to be particularly inflammatory.

14   But we've given the timestamps to the defense.

15        THE COURT:  Is it the government's position that the

16   subtitling was the defendant's?

17        MR. CHAKRAVARTY:  On that video, yes.  I can't

18   say -- now, the video -- for theology sake, there was an Arabic

19   version of the video that had been produced.  I don't know

00:32 20   what -- I guess we have that as well.  But then the defendant

21   further edited that, further put subtitling on it, and it's in

22   English.  So, I mean, that's the inference.

23        THE COURT:  Okay.  Other matters?

24        MS. BASSIL:  Well, your Honor, again, there are

25   photographs of, you know, insurgent fighters, I assume.

1    They're masked; they're carrying RPG's, rocket-propelled

2    grenade launchers; they're carrying bazookas.  Again, I would

3    like to know if they're going to use these.  I think they're

4    far more prejudicial than probative.

5           THE COURT:  Let me ask:  Perhaps -- you've indicated,

6    Mr. Chakravarty, that you intend to use a significantly smaller

7    set of exhibits than were identified.

8           MR. CHAKRAVARTY:  Right.  They will actually be

9    published to the jury, your Honor.  I think there will be a

00:32 10   handful.

11          THE COURT:  Right.  Can you have them available in

12   advance of the opening so that defense counsel has the

13   specifics?

14          MS. BASSIL:  All we need are the numbers.  If he could

15   just send me the numbers I can look them up.  By e-mail, that's

16   fine.

17          MR. CHAKRAVARTY:  I can do that, your Honor.

18          THE COURT:  And then if a controversy remains, I can

19   look at them and decide.

00:33 20          MR. CHAKRAVARTY:  As long as we're talking about

21   photos, before we leave the topic -- and maybe this is a

22   transitional electronic, but counsel has -- last night sent

23   over the few photos that they intended to publish to the jury

24   in their opening.  One is a copy of the Constitution; one is a

25   copy of some photos that were involved in *Snyder*, a First

1    Amendment case that the Supreme Court recently decided; and

2    some, I think seven, are a set of the defendant's Christmas

3    photos, amongst other photos.

4         The government obviously objects to all of these, but

5    it raises the issue of the First Amendment, the defense

6    intention to -- further corroborated by this -- to ask the jury

7    to define the parameters of the First Amendment as opposed to

8    your Honor or a three-judge panel or the Supreme Court.  I

9    mean, this is not Dewey Square and Occupy Boston; this is a

00:34 10    courtroom where there are certain facts that the jury has to

11    find.  And the government wants to make sure that that's what

12    this trial stays about.

13         THE COURT:  Right.  Go ahead.

14         MR. CARNEY:  This case is squarely focused on who this

15    man is.  And as every trial lawyer does, I want to humanize him

16    by talking about his upbringing.  The photographs I use will

17    just show different periods of his life leading up to the point

18    where the relevant conduct begins in this case.  And I think

19    that it's appropriate and permissible for me to show the jury a

00:34 20    photo when I'm describing my client at a particular point in

21    his life.

22         THE COURT:  That's the Santa Claus photo?

23         MR. CARNEY:  Yes.  And --

24         THE COURT:  I'm not as worried about that as the

25    Constitution and the *Snyder* demonstrators.

1          MR. CARNEY:  I'm prepared to address that.

2          When I read the government's trial memo -- I forget

3     how many dozens of pages it was -- it was notable to me that

4     the government never once mentioned the case of *Holder versus*

5     *Humanitarian Law Project*.  That is the seminal case that

6     interprets the lead indictment here, about providing material

7     support to a terrorist organization.

8          The input of that case is that certain conduct is

9     illegal if that conduct is done at the direction of al Qa'ida,

00:35 10    in our case, directly coordinated with a specific act of

11    al Qa'ida, or as a service to al Qa'ida that al Qa'ida has

12    sought and compensated the person for.  *Holder* makes it clear

13    that there has to be that direct connection between the

14    defendant and the terrorist organization for *Holder* -- for the

15    statute 2339 to apply.

16         And what the court goes on and on is separate

17    independent advocacy.  And the court said in order for this

18    statute to be constitutional, a defendant has to be allowed to

19    engage in independent advocacy because that is the heart of the

00:36 20    First Amendment.  The court went on to say that it's possible

21    for a defendant to be a member of al Qa'ida and not break the

22    law.  He can be a member of al Qa'ida and share the same goals

23    and beliefs that they have.  He, himself, can speak publicly in

24    support of the goals and beliefs of the terrorist organization.

25    He can do all this because it's protected by the First

1   Amendment.

2          The government wants to introduce hundreds of videos

3   and e-mails and instant messages.  Some of them undoubtedly are

4   going to be shocking; some may even be horrifying to the

5   jurors.  Some may outrage them.  And unless your Honor from the

6   very outset of this trial explains to the jury that possession

7   of those videos, possession of those books, independently

8   advocating these points of view are things that are fully

9   protected by the First Amendment -- unless the Court in a

00:37 10   preliminary instruction -- and I submitted one this morning.  I

11   don't know if your Honor has seen it.

12          THE COURT:  I haven't seen it.

13          MR. CARNEY:  All right.  And I wasn't expecting to ask

14   for action on it today.  It's very short.  It's a preliminary

15   instruction on the First Amendment and the fact that

16   independent advocacy is permitted.  I used a jury instruction

17   from Judge Saylor's case in the so-called *Care* case on First

18   Amendment and how that applies to this statute.  I also quoted

19   directly from *Snyder*, a 2011 case, where the U.S. Supreme Court

00:38 20   specifically talked about things that people can say or do that

21   are horrifying, they're hurtful, the majority of the people

22   strongly, strongly object to it, but the court, in an

23   eight-to-one decision, said the First Amendment allows people

24   to say that.

25          And what I wanted to do was use a single photo from

1    that case that shows people standing opposite a church during a

2    funeral for a soldier killed in Iraq, and the sign says things

3    like "Thank God for IEDs," "I'm glad your son is dead,"

4    horrifying things that the U.S. Supreme Court said are

5    protected by the First Amendment.

6          Laypeople, regular jurors, do not understand these

7    principles of law in the dry language of either the

8    Constitution or simply quotations from cases.  A single photo

9    will speak 10,000 words and show the jurors what our Supreme

00:39 10   Court says is protected freedom of speech.  And if they can see

11   just that -- I'm not introducing it or would not be offering it

12   as an exhibit, but as a demonstrative aid.  So if they can see

13   an example by this Supreme Court, this year, that this is

14   protected First Amendment speech, then it will just help them

15   to keep in context the parade of horribles that they will see

16   thereafter.

17         In regard to the Constitution, I'm not asking to

18   introduce it as an exhibit either, but just hold it up as a

19   demonstrative aid to just say, "Our Constitution was amended

00:40 20   with the First Amendment to provide for freedom of speech, and

21   that the evidence in this case will show that all of these

22   instances being presented by the government were instances of

23   the defendant exercising his freedom of speech."

24         THE COURT:  Well, I don't think it's appropriate for

25   demonstratives to illustrate judicial instructions in the law,

1   so I think that the photos of the Constitution and the *Snyder*

2   demonstrators are not appropriate.  The other photo of some

3   event in the defendant's life is perfectly all right.

4        MR. CHAKRAVARTY:  Your Honor, the related question is:

5   Will the defendant be able to argue what he just argued to the

6   Court?  It's one thing to argue the fact that this was not done

7   in coordination with --

8        THE COURT:  No.  The question that the jury will

9   ultimately decide is whether the criteria of the statute have

00:40 10   been proved by the government beyond a reasonable doubt.

11   That's the precise question the jury will answer.  They will

12   not decide whether the First Amendment protects something.

13   They may be given some instructions about case law, including

14   *Holder*, as they determine the fact issue, but they won't be

15   deciding the parameters of the First Amendment.

16        MR. CARNEY:  I'm going to --

17        THE COURT:  They will be deciding how those principles

18   may be considered in the light of the charges that are made and

19   the facts that have been proved by the evidence.

00:41 20        MR. CARNEY:  I would like to tell the jury that your

21   Honor will give them guidance on what is protected by the First

22   Amendment or not because there will be certain items of

23   evidence here that I'm going to be -- if I can just finish?

24        THE COURT:  Go ahead.

25        MR. CARNEY:  There are going to be certain exhibits

1    here where I'm going to ask your Honor to make a ruling of law

2    that that act by the defendant is protected by the First

3    Amendment and cannot be considered material support.  Because

4    what the government wants is for your Honor to make a decision

5    if something's protected by the First Amendment or not.  I join

6    with that.  I don't want the jury to decide whether something's

7    protected.  But if the evidence is before them, they need to

8    know if it's protected, and the only way they're going to know

9    is if the Court tells them that possession of these videos is

00:42 10   not a crime.

11        THE COURT:  Well, the speech may be protected if it is

12   not material support as defined by the statute.  If it is

13   material support as defined by the statute, it is not

14   protected.  I think that's what the holding in *Holder* says.  So

15   the question whether or not it's protected is one that turns on

16   the question whether it amounts to what the statute condemns or

17   not.  And if it does amount to it, then it's not protected and

18   it can be punished, and if it is -- if it does not meet the

19   criterion of the statute, then the statute cannot forbid it.

00:43 20        And it's protected in two ways:  One, it's not covered

21   by the statute.  It falls outside it; and, second, the reason

22   it's not covered is because Congress probably was conscious

23   that it had to respect that boundary in light of the First

24   Amendment.  So the statute is still the primary focus, and what

25   the evidence is in light of the statutory standard will

1    determine the other issue, it seems to me.

2          So I don't envision at this point -- I haven't heard

3    the evidence.  I don't envision at this point any extended

4    address of the First Amendment specifically to the -- as a

5    proposition of law to the jury.

6          To the extent that talking about First Amendment

7    rights and free speech is a proxy for talking about the

8    defendant's intentions, it may be part of the factual scenario

9    that the jury considers.

00:44 10         MR. CARNEY:  I'd ask your Honor to reconsider this.

11   This isn't a law school class that's able to cabin things so

12   easily.  On the one hand, evidence could prove that the

13   defendant committed material support or provided material

14   support; on the other hand, if it is speech protected by the

15   First Amendment, he didn't.  And it's just too dry to say he

16   either broke the statute or he didn't when the jurors are going

17   to be left with all these horrible statements and videos and

18   remarks that were made.  And for them not to know that the

19   reason that a person can do that with impunity is because of

00:45 20   the First Amendment basically guts the defense here.

21         THE COURT:  I don't think that's a proper reading of

22   the *Holder* case, to say that it can violate the standard of the

23   statute and still be protected by the First Amendment.

24         MR. CARNEY:  No.  No.

25         THE COURT:  *Holder* decided otherwise.

1        MR. CARNEY:  No.  No, I don't contend that at all.

2   What I'm saying is that certain conduct which someone might

3   otherwise think is providing material support to al Qa'ida is,

4   in fact, not coming within the statute because it is protected

5   speech under the First Amendment.

6        THE COURT:  Okay.  All right.  I have nothing further

7   to say on it.

8        MR. CHAKRAVARTY:  Your Honor, if this is a preview --

9   and I don't mean to belabor this, but should there be some

00:46 10   skirting of that bound, it's certainly not the government's

11   custom to object during opening, but after an opening from

12   either party -- the government has no recourse if something

13   like that comes out.  I guess I'm seeking guidance.  Is an

14   appropriate curative instruction something we should prepare in

15   advance which --

16        THE COURT:  Depending on circumstances it might be

17   something appropriate.  I don't know.

18        Okay.  Any other matters today?

19        MR. CARNEY:  No, your Honor.

00:46 20        THE COURT:  Okay.  So we'll assemble first tomorrow to

21   finish the empanelment process and then we'll --

22        MR. CHAKRAVARTY:  Your Honor, sorry.  There is one

23   other relatively minor issue, but the issue of sequestration of

24   witnesses.  It's particularly germane to tomorrow because the

25   defendant has noticed several of his family members as

1    witnesses.  You know, the rules obviously should apply to both

2    sides.  With a customary carveout the government would be

3    asking for the case agents in the case who --

4              THE COURT:  Plural?

5              MR. CHAKRAVARTY:  Excuse me?

6              THE COURT:  Plural?

7              MR. CHAKRAVARTY:  There are two.  The government will

8    take what it can get.  But it's not the present intention to

9    have either of them testify.  The reason they would have to

00:47 10    testify, in the government's estimation, is as a

11    chain-of-custody-type intermediary, which the government

12    doesn't anticipate doing.

13              So that's where it takes -- it's not the typical case

14    agent who is actually instrumental and is a testifying witness

15    and will have the leverage of absorbing everything that is

16    happening and then testify.  Here they will not.

17              So either way, the government is willing to pare that

18    down if that's the Court's preference.  But the rule should go

19    to the other side as well.  If the defense witnesses get a

00:47 20    preview of all the government witnesses and then testify, then

21    their testimony will be tainted.

22              MS. BASSIL:  Your Honor, we don't have a problem with

23    sequestration, but we are looking for a carveout for -- and

24    we're not certain we'd put these people on -- as an abundance

25    of caution the defendant's parents and his brother.  What they

1    would have to testify to would have very little to do with the

2    government's case-in-chief.

3            The other person we would like to be able to sit down

4    is our technical expert.  And the reason for that is I believe

5    they are going to have cart people talk about things that,

6    quite frankly --

7            THE COURT:  Spencer?  Is that what --

8            MS. BASSIL:  Yes.  Quite frankly, we don't understand

9    this without him interpreting it for us.  And it has to do with

00:48 10   cached documents, unallocated space --

11           MR. CHAKRAVARTY:  I have no objection to an expert

12   being present if that's what the subject of their testimony is

13   going to be.

14           MS. BASSIL:  Right.  So we need his help on that.

15           It is unlikely that any of our other experts are going

16   to be available, but we would have no problem if Mr. Kohlmann

17   sat in on our experts and if our experts sat in with them.  I

18   doubt they'll have the time, you know.

19           THE COURT:  It's fairly customary.  I think that

00:49 20   making an exception for the three family members you've

21   identified is not a problem.

22           MS. BASSIL:  Thank you.

23           THE COURT:  I don't think this is the kind of case

24   where a family member sitting through the litany is going to

25   have an opportunity to tailor testimony in the way they might

1    expect in some other kind of circumstance.  So I think that's

2    harmless.

3            MS. BASSIL:  And I think --

4            THE COURT:  Then, of course, if there is some issue

5    that arises, it can be pointed out to the jury on

6    cross-examination.

7            MS. BASSIL:  And potentially we may need the person

8    we've used for translation.  We may need her to be here on a

9    couple of days.

00:49 10           MR. CHAKRAVARTY:  That's fine, your Honor.

11           MS. BASSIL:  So...

12           MR. CHAKRAVARTY:  Your Honor, just in my notes of

13   things to raise, to clarify, is it okay, then, if the case

14   agents are allowed to stay in for the openings?

15           THE COURT:  Yes, I think so.

16           MR. CHAKRAVARTY:  The final subject of the

17   government's motions in limine which I don't think your Honor

18   has addressed that the government's concerned about is the use

19   of the defendant's statements that may not be admissible

00:49 20   because they're being offered by the defendant and the comments

21   that have been made throughout the case about the reasons for

22   the government's prosecution of the defendant, the alleged

23   reasons that it is some kind of vindictive or retaliatory

24   prosecution which, of course, it is not.

25           The concern is this may be an opportunity to advance

1    that theory without, again, much recourse, even though it's

2    inadmissible.

3           THE COURT:  Who's making the opening?  Mr. Carney,

4    you're making the opening?

5           MR. CARNEY:  Yes.  I think that is a solid basis in

6    admissible evidence to infer, that the defendant is being

7    punished because he would not become an informant.  He was told

8    so much by an agent who was interviewing him.  And if that's,

9    you know, the motivation, then that's properly something to be

00:50 10  considered.

11           THE COURT:  You expect it in evidence?

12           MR. CARNEY:  Yes, your Honor.

13           MR. CHAKRAVARTY:  Your Honor, I would just raise under

14    *Armstrong* and its progeny, selective prosecution is an

15    illegal --

16           THE COURT:  Actually, let me think about that.  I'll

17    reserve that.  The opinion of a single agent may not be fairly

18    attributed to the government's prosecution-charging decision.

19    It's not like -- it's not -- I'm not sure it's probative, I

00:51 20  guess is the thought.  I'm not sure it's probative.

21           MR. CARNEY:  I bet a jury would find it probative.

22           THE COURT:  I don't know.

23           MR. CARNEY:  And I know that the government says that,

24    of course, that's not why Mr. Mehanna is here.  All the

25    cooperating witnesses who did far more the allegations of

1   Mr. Mehanna, they're walking in the back door; Mr. Mehanna, who

2   refused to become an informant, is walking in the side door.

3          THE COURT:  Okay.  I'll take a closer look at it.  On

4   brief reflection, I'm not sure it's proper.

5          There was another issue?

6          MR. CHAKRAVARTY:  That was it, your Honor.

7          Sorry.  The defendant's own statements.  Sorry.  I

8   raised it --

9          THE COURT:  Yeah.  I guess they're hearsay if they're

00:52 10   offered for the truth; if there's a non-hearsay purpose, then

11   they could be used.

12          MR. CARNEY:  That's how I view it.

13          THE COURT:  Okay.  We'll recess until tomorrow

14   morning.

15          THE CLERK:  All rise for the Court.  The Court is in

16   recess.

17          (The Court exits the courtroom and the proceedings

18   adjourned at 12:56 p.m.)

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3           I, Marcia G. Patrisso, RMR, CRR, Official Reporters of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No.

8    09-10017-GAO-1, United States of America v. Tarek Mehanna.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  10/26/11
13

14

15

16

17

18

19

20

21

22

23

24

25