UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     ) Criminal Action
      v.                             ) No. 09-10017-GAO
                                     )
TAREK MEHANNA,                       )
                                     )
            Defendant.               )
                                     )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY THREE
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, October 27, 2011
10:19 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Aloke Chakravarty and Jeffrey Auerhahn,
3            Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Jeffrey D. Groharing, Trial Attorney
             National Security Division
7        950 Pennsylvania Avenue, NW
         Washington, D.C.  20530
8        On Behalf of the Government

9        CARNEY & BASSIL
         By: J.W. Carney, Jr., Esq.
10           Janice Bassil, Esq.
             John E. Oh, Esq.
11       20 Park Plaza
         Suite 1405
12       Boston, Massachusetts  02216
         - and -
13       LAW OFFICE OF SEJAL H. PATEL, LLC
         Sejal H. Patel, Esq.
14       101 Tremont Street
         Suite 800
15       Boston, Massachusetts  02108
         On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    Opening Statement                              Page

3      By Mr. Chakravarty                            27

4      By Mr. Carney                                 61

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (The following proceedings were held in open court

2       before the Honorable George A. O'Toole, Jr., United States

3       District Judge, United States District Court, District of

4       Massachusetts, at the John J. Moakley United States Courthouse,

5       One Courthouse Way, Boston, Massachusetts, on October 27, 2011.

6              The defendant, Tarek Mehanna, is present with counsel.

7       Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8       are present, along with Jeffrey D. Groharing, Trial Attorney,

9       U.S. Department of Justice, National Security Division.)

01:37 10  (LOBBY CONFERENCE AS FOLLOWS:

11              THE COURT:  Not unexpectedly, we have a couple of

12       jurors who have thought over things and have a couple of

13       issues.  They are three in number.  I think -- let me give you

14       my take on it and then see what you think.  Without paying any

15       attention to who they are or anything, my suggestion was, in

16       effect, they would become court peremptories without inquiring.

17              What my concern is, if I inquire either at a sidebar,

18       in front of everybody else, or by ostentatiously bringing the

19       juror back here and then going back, it may suggest to other

01:37 20  jurors that they should take this second opportunity as well.

21              My thought was we have enough numbers.  We just excuse

22       them as part of the peremptory process in a sense so they get

23       washed away along with others getting washed away and nobody

24       knows the difference.  If you want, I can be more specific

25       about the issues they raised, and I can tell you who they are.

1    They're No. 2, Wanda Chiaraluce; No. 12, Jacqueline Vangel; and

2    No. -- I think it was 71, John Murphy, who's not in the box.

3         Ms. Chiaraluce -- Paul can tell us -- she remembers

4    that some relative of hers had a -- went to high school with

5    Mehanna.

6         THE CLERK:  She's the one who works for Verizon.  Her

7    coworker -- her coworkers went to high school with Mehanna, and

8    so she thought that might be a problem that she can't be

9    impartial -- fair.  That was her thing.

01:37 10         THE COURT:  I think she may have told you that she

11   didn't think it was a problem, but she wanted to bring it to

12   our attention.

13         THE CLERK:  No, no.

14         THE COURT:  She thinks that is a problem?

15         THE CLERK:  That was Vangel.  That's the one with the

16   cousin.  Jacqueline Vangel has two reasons.  And she apologized

17   for not bringing them up on Tuesday, but she thought about them

18   afterwards.  First is, she has an out-of-state trip planned on

19   December 9th to Pennsylvania for several days.  Secondly, her

01:37 20   company is not going to pay her.  I looked up to see her

21   company.  It's Dartmouth Medical.  So I spoke with the jury

22   room.  Chances are, they probably won't pay her.  It's going to

23   be a financial hardship for her.

24         And then John Murphy is -- he cannot be impartial.

25   He's been --

1          THE COURT:  Let me -- he is -- I think he was an

2     insurance --

3          THE CLERK:  Bright yellow sweater with the moustache,

4     nice guy, reddish hair.  He's got a couple of problems.  Number

5     1, he's been reading a lot in the press since Monday, and he

6     can't be fair and impartial.  Number 2, he has a problem with

7     not being able to use the word "our troops."  It makes his

8     blood boil.  And, therefore, he does not want to sit.

9          THE COURT:  Which apparently he learned about by

01:37 10     reading the newspapers.

11          THE CLERK:  Sounds like everything came after the

12     fact.

13          My proposal is just to bounce them all, do it

14     unobtrusively.  You'll come up and do your first round of

15     strikes.  We'll just include the other 2 and 12.  We'll fill

16     those seats as normal.  Those people will be fair game.  It

17     doesn't give them a clue --

18          THE CLERK:  Like, when we call Murphy, have him come

19     up to the box and treat him as a peremptory there?

01:37 20          THE COURT:  Just wash him out without --

21          MR. CARNEY:  Speaking for the defendant, that

22     procedure is acceptable, your Honor.

23          THE COURT:  Thank you.

24          I think we're about to get started.

25          MR. CARNEY:  While we're here, I would like to renew

1    one objection to an exhibit of the government, and I bring it

2    to your attention because it's being used in the opening.  It

3    is the photo of my client and two other men at Ground Zero,

4    where my client is smiling and holding the number -- the index

5    finger skyward.

6         The reason for my objection is that the prejudicial

7    impact so far outweighs any probative value that it should be

8    excluded from this trial.  I'll leave it to the government to

9    say why there is probative value there, but if it's to reflect

01:37 10   the defendant's state of mind, I submit there's going to be so

11   much state-of-mind evidence offered by the government without

12   objection by us.  Indeed, I'm going to concede the defendant's

13   state of mind in my opening statement.  And the emotions that

14   -- having someone at Ground Zero, smiling, is so prejudicial

15   compared to the minimal, if any, probative value for the

16   defendant's state of mind that I would ask your Honor to

17   reconsider and exclude it.

18        THE COURT:  What is the date that the photograph was

19   taken?

01:37 20   MS. BASSIL:  It's in 2006 at some point.

21        MR. CHAKRAVARTY:  I think that's right, 2005, yes.

22        The government's position obviously is it does go to

23   the defendant's state of mind.  Defendant chose to go there and

24   pose in that position.  This isn't a situation where it's just

25   a random kind of place and it's just one of many types of

1    expressions of his state of mind.  This is squarely the fact

2    that he was responding to this call from al Qa'ida and trying

3    to be supportive of al Qa'ida.

4         THE COURT:  Do you have intercepted conversations in

5    which he expresses support for the events of 9/11?

6         MR. CHAKRAVARTY:  Yes.

7         THE COURT:  Why isn't that enough?

8         MR. CHAKRAVARTY:  Compared -- the standard is unfair

9    prejudice.

01:37 10        THE COURT:  I understand.

11        MR. AUERHAHN:  Substantially outweighs.

12        MR. CHAKRAVARTY:  I know your Honor knows.  But just

13   because we have so much evidence that he supported 9/11 doesn't

14   mean that one of our best pieces of evidence that speaks

15   volumes -- the defendant would receive this in an email.  He

16   had it on his computer.  He talked about --

17        THE COURT:  Did he talk about the photograph?

18        MR. CHAKRAVARTY:  Yes.  He had numerous pilgrimages to

19   Ground Zero.  This is the one photo we have of him actually

01:37 20   there with this particular group, both of whom are cooperators.

21        MS. BASSIL:  I don't believe there's any conversation

22   about the photograph.  There's conversations about going to New

23   York and Ali Abubakr says, Can we go to Ground Zero?

24        MR. CHAKRAVARTY:  There are conversations as well, as

25   well as the cooperators.

1          THE COURT:  I think they can use it.  The reason I

2     asked about the date, I wanted to be sure it's relevant to the

3     scope of the Indictment; and if it's in 2006, then I think it

4     is.  Okay.  Thank you.  We'll be out ourselves as soon as we

5     can.

6     .  .  .  END OF LOBBY CONFERENCE.)

7     (The venire entered the room at 10:20 a.m.)

8     (The Court entered the room at 10:24 a.m.)

9          THE CLERK:  United States vs. Tarek Mehanna,

01:43 10    continuation of jury selection.  Please be seated.

11          THE COURT:  Good morning, everyone.  Sorry for the

12    delay.  It's partly logistics, partly the weather.  We're

13    finally ready to continue and, I think, conclude the process of

14    jury selection.

15          Let me ask if counsel are ready to approach the

16    sidebar.  Are you?

17          MR. CHAKRAVARTY:  We are, your Honor.

18          MR. CARNEY:  Yes, your Honor.  Thank you.

19          THE COURT:  Okay.  I'll see you at the side.

01:43 20    (SIDEBAR CONFERENCE AS FOLLOWS:

21          MR. CHAKRAVARTY:  Your Honor, can we just confirm that

22    we do one; they do two; and then we do --

23          THE COURT:  No, no.  You do all yours for this round.

24    If you have three, you do three.  If they have four, they do

25    four.  Then that's the round.  Those seats get filled.  And

1    that's -- the newcomers are the --

2          MS. BASSIL:  Just -- your Honor, Seat No. 2 is Wanda

3    Chiaraluce.  I just wanted to make sure I've got the right seat

4    numbers.

5          MR. CHAKRAVARTY:  18.

6          MR. AUERHAHN:  Seat No. 1.

7          MR. CHAKRAVARTY:  Seat No. 1.

8          THE CLERK:  18.

9          MR. CHAKRAVARTY:  10, it's conveniently 10; 31, Seat

01:45 10   13.

11         THE CLERK:  31, that's Jacqueline, right?

12         MR. CHAKRAVARTY:  Yes.  And 14, also 14.

13         THE CLERK:  Let me just pull their card out first

14   before you guys --

15         THE COURT:  That's it?  That's four?

16         MR. CHAKRAVARTY:  That's four.

17         MR. AUERHAHN:  Can we just have one second?

18         THE CLERK:  Garcia, Nugent, Alex, Fredette.

19         THE COURT:  Ready?

01:48 20         MS. BASSIL:  Juror No. 4, Michele Azevedo; Seat No. 6,

21   Raymond Croteau, Jr., that's Juror No. 21; Seat No. 9, Juror

22   No. 9, Stephen Smith; Seat No. 15, Juror No. 33, Kevin

23   Zambruno; Seat No. 16, Juror No. 36, Brian Ferreira.

24         THE CLERK:  After Zambruno was who?

25         MS. BASSIL:  Seat No. 16, Juror No. 36.

1          THE COURT:  A total of five?

2          MS. BASSIL:  Yes.

3          THE CLERK:  Ferreira, Zambruno, Smith, Croteau, and

4     Azevedo.

5          THE COURT:  You're including --

6          THE CLERK:  I already took care of that.

7          THE COURT:  That will be a total of 11 people excused.

8     Okay.

9     .  .  .  END OF SIDEBAR CONFERENCE.)

01:49 10          THE CLERK:  The following jurors can be excused:  Mr.

11    Ferreira; Mr. Zambruno; Mr. Smith; Mr. Croteau; Michele

12    Azevedo; Miss Vangel; Miss Chiaraluce; Miss Garcia; Miss

13    Nugent; Mr. Alex; and Miss Fredette.  Just go back to the jury

14    room.  Thank you very much.

15          Rosaby Sepulveda-Makumbi, will you take the first seat

16    in the first row, please.

17          MR. AUERHAHN:  Mr. Lyons, could you give us the

18    numbers?

19          THE CLERK:  I'm sorry.  It's No. 38.  Excuse me.

01:51 20    Leslie Wing is No. 40.  You're going to be in Seat 2, next to

21    Rosaby.  In Seat 4 will be No. 41, Joao Mendes.  And in Seat 6

22    will be No. 42, Caroline Lawton.  In Seat 9, No. 43, Michelle

23    Yuille; in Seat No. 10, No. 45, Margaret Fitzgerald; in Seat --

24    10, go right after Miss Yuille.  In Seat No. 12, No. 46, Philip

25    Bernstein.  In Seat 13 will be No. 48, Celia Oppedisano.  In

1    Seat 14 will be No. 49, Leeann Ali.  In Seat 15, No. 55,

2    Katherine Philips; and in Seat 16, No. 57, Sarah Richards.

3    (SIDEBAR CONFERENCE AS FOLLOWS:

4              THE COURT:  Defense ready?

5              MR. CARNEY:  No, your Honor.

6              MR. CHAKRAVARTY:  Your Honor, for the record, just

7    because we haven't introduced him, behind our table, it's Paul

8    Bruemmer from our office, who's going to be running the

9    computer.

01:58 10              THE COURT:  For technical reasons, he's No. 3.

11              MR. CHAKRAVARTY:  Sorry.  I don't --

12              THE COURT:  There are different ports.

13              MR. CHAKRAVARTY:  I understand.

14              THE COURT:  All set?

15              MS. BASSIL:  In Seat No. 2, Juror No. 40, Leslie Wing;

16    in Seat No. 6, Juror No. 42, Caroline Lawton; in Seat No. 9,

17    Juror No. 43, Michelle Yuille; in Seat No. 13, Juror No. 48,

18    Celia Oppedisano.  That's it.

19              MR. AUERHAHN:  Seat 2, Seat 6, Seat 9 and Seat 13?

01:59 20              THE COURT:  Right.

21              MR. AUERHAHN:  Thank you.

22              MR. CHAKRAVARTY:  For the government, Seat 1, Juror

23    38; and the juror in Seat 16.

24              THE COURT:  I don't think he got the first one.

25              THE CLERK:  Rosaby, 38.  I got her.

1          MR. CHAKRAVARTY:  Juror No. 57.  That's it.

2          THE COURT:  Just -- you've used six.  You have two

3      remaining.  You have used nine.  You have three remaining.

4          MS. BASSIL:  Correct.

5      . . .  END OF SIDEBAR CONFERENCE.)

6          THE CLERK:  The following jurors may be excused:  Miss

7      Richards; Rosaby.  Go back down to the jury room.  Miss Lawton;

8      Miss Wing; Miss Yuille; and Miss Oppedisano.

9          In Seat 1 will be No. 59, Michelle Pless-Joseph.  In

02:01  10      Seat 2 will be No. 60, Jeffrey Earl.  In Seat 6 will be No. 61,

11      Robert Colombo.  In Seat 9 will be No. 62, Genna Fitzgerald.

12      In Seat 13 will be No. 63, Rachel Reagan.  And in Seat 16 will

13      be Sheldon Ramdhanie, No. 64.

14      (SIDEBAR CONFERENCE AS FOLLOWS:

15          MR. CHAKRAVARTY:  Can we have one minute?

16          Your Honor, the juror in Seat 6, No. 61.  That's it.

17          MS. BASSIL:  Okay.  Juror No. 1 in Seat -- Juror No.

18      59, I think, in Seat 1.  Is that Pless-Joseph?

19          THE CLERK:  Yes.

02:06  20          MS. BASSIL:  Seat No. 2, I think it's Juror 60,

21      Jeffrey Earl, correct?  And Seat No. 9, Juror 62, it should be

22      Genna Fitzgerald.

23          THE COURT:  So you're done.  You've exhausted.  You

24      have one.

25      . . .  END OF SIDEBAR CONFERENCE.)

1        THE CLERK:  The following jurors will be excused:

2   Miss Fitzgerald, Mr. Earl, Miss Pless-Joseph, Mr. Colombo.

3        In Seat 1 will be No. 70, Frederick Lendall.  In Seat

4   2 will be No. 71, John Murphy.  In Seat 6 will be No. 73,

5   Patricia Wong.  And in Seat 9 will be No. 78, Frank Pennacchio.

6        MS. BASSIL:  I'm sorry.  What was the last one you

7   called?

8        THE COURT:  Number 78.

9        THE CLERK:  Seat No. 9.

02:10 10        MR. CHAKRAVARTY:  Your Honor, Juror No. 78 in Seat 9.

11        THE COURT:  That's Frank -- No. 78, Frank Pennacchio.

12   That's your last one.  So we will vacate those two seats, 2 and

13   9, and they will be filled with people, and we will have a

14   jury.

15   .  .  .  END OF SIDEBAR CONFERENCE.)

16        THE CLERK:  The following jurors will be excused:  Mr.

17   Murphy and Mr. Pennacchio.  Go back down to the jury room.

18   Thank you very much.

19        In Seat 2 will be Juror No. 79, Susan Sorrento.  And

02:11 20   in Seat 9 will be No. 80, Rupert McBean.

21   (SIDEBAR CONFERENCE AS FOLLOWS:

22        THE COURT:  We'll take a break now, get rid of the old

23   ones, non-used ones.  Paul will take a few minutes just to

24   give -- looks like we won't get to witnesses today.

25        MR. CARNEY:  Will we have a break after Paul speaks

 1   to --

 2          THE COURT:  That is the break.  I don't think we'll

 3   need a break between openings.

 4          MR. CARNEY:  No.

 5          THE COURT:  We'll just go straight through.

 6   .  .  .  END OF SIDEBAR CONFERENCE.)

 7          THE COURT:  Okay.  We have completed the process, and

 8   the 16 jurors now in the box will be the trial jury.  The

 9   remaining jurors who have not been fortunate enough to be

02:12 10   chosen will go back to the jury assembly room.  We thank you

 11   for your presence.

 12          Now, to the members of the jury newly chosen, we're

 13   going to take a -- we've finished the selection process.  We're

 14   going to take a short break now.  The clerk will take you into

 15   the back, into the jury room, where you will be spending a good

 16   bit of time in the next few weeks.  He'll give you a kind of

 17   orientation of logistics that you may need to know as now

 18   active, sitting jurors.  It will take 15 or 20 minutes, I would

 19   say, roughly.  You'll have an opportunity to visit the

02:13 20   facilities and so on.  Then we'll come back, and we'll begin

 21   the presentation of the case to you.  So we'll take a recess.

 22   (Recess taken at 10:55 a.m.)

 23          THE CLERK:  All rise for the Court and the jury.

 24          (The Court and jury enter the courtroom at 11:20 a.m.)

 25          THE CLERK:  Will the jurors remain standing; everyone

1    else be seated.

2              (Jury panel sworn.)

3              THE CLERK:  Please be seated.

4              THE COURT:  All right, jurors.  We've had a lot of

5    proceedings involved in selecting you to be the trial jury in

6    this case.  With the administration of the oath of office as it

7    were, you are now officially a jury and the trial has

8    officially begun.  I'm going to give you a brief overview of

9    how we're going to proceed in the course of the case just to

02:40 10   now focus you a little bit on what the mechanics of the case

11   will be and some of the concerns you'll have, and then we'll

12   proceed with the beginning of the presentation of the case to

13   you by the lawyers.

14              As I'm sure you can appreciate, this is a very

15   important occasion for the parties to this case, both the

16   prosecution and the defense.  They have been preparing for this

17   moment for some time, and they are now prepared to set before

18   you respectively their evidence bearing on the issues that are

19   presented.  And we know that you will give it that very utmost

02:41 20   serious consideration and evaluation.

21              As you know, this is a criminal prosecution.  The

22   government, by means of the indictment -- the indictment being

23   the document that sets out the charges in any criminal case --

24   presents a number of criminal charges against the defendant,

25   Mr. Tarek Mehanna.  And I'm going to just review them for you.

1    It's not necessary for you to absorb all this precisely at this

2    point.  At the end of the case, as you prepare to deliberate, I

3    will give you some very detailed instructions about the law and

4    the principles that have to be applied in a case like this

5    including specifically what we call the elements of any

6    offense, what the government must prove in order to establish

7    what the offense is that has been committed.

8         I remind you of something I told the group generally,

9    and that is, of course, this is a federal court and it arises

02:41 10   under federal criminal law, that being laws enacted by the

11   Congress to address particular issues the Congress has deemed

12   appropriate for criminal sanction.  So they are, in a sense,

13   all artificial rules in the sense that they are created because

14   Congress saw a particular need for a statute to punish behavior

15   as described in the statute, so...

16        There are seven separate counts, or individual

17   charges, made against the defendant in this case.  And as I

18   think I told you, they kind of fall into two groups.  The first

19   four counts of the indictment pertain generally to what we

02:42 20   might call "providing material support to terrorists or

21   terrorism activities."  And I'll come back to that.  And the

22   last three counts relate to providing false information to law

23   enforcement personnel acting within the scope of their

24   responsibilities in the executive branch of the government.

25        So let me talk about the first group first.  There are

1    four counts.  That means there are four separate charges that

2    are made under different statutes.  And some of this gets a

3    little involved, and as I say, I'll untangle it more precisely

4    at the end of the case, but just to give you the overview.

5           And before I get to the particular statutes let me

6    remind you again that some counts charge particular crimes;

7    that is, that the charge is that the defendant committed or

8    attempted to commit himself a particular crime.  And in legal

9    parlance we call those "substantive offenses."  Some of the

02:43 10   counts charge an illegal conspiracy with others to perform

11   illegal acts.  And as I told you, and I remind you again, a

12   conspiracy is an agreement among people that they will act

13   together intentionally in order to bring about an unlawful

14   objective, often, the commission of a crime.  So there can be

15   both a substantive crime committed and a conspiracy to commit a

16   substantive crime, and a defendant could be convicted of either

17   or both.

18          A quick illustration and a completely different

19   context:  Someone might rob a bank.  That would be a

02:44 20   substantive offense.  Someone might get together with a couple

21   of his buddies and agree to go ahead and try to rob the bank.

22   That could be a conspiracy to rob the bank.  That's the rough

23   distinction.  So several of these counts allege conspiracy and

24   some allege other substantive offenses.

25          So Count 1 alleges a conspiracy to provide material

1    support or resources to a designated foreign terrorist

2    organization, particularly, al Qa'ida.  The statute at issue --

3    I'll just read you the pertinent language of the statute so you

4    have an idea of what is prohibited.  "Whoever knowingly

5    provides material support or resources to a foreign terrorist

6    organization or attempts or conspires to do so commits an

7    offense.  To violate this paragraph, a person must have

8    knowledge that the organization is a designated terrorist

9    organization or that the organization has engaged in or engages

02:45 10    in terrorism."

11         For the purposes of that statute, "material support or

12    resources" means any property, tangible or intangible, or

13    service, including currency or monetary instruments or

14    financial securities, financial services, lodging, training,

15    expert advice or assistance, safe houses, false documentation

16    or identification, communications equipment, facilities,

17    weapons, lethal substances, explosives, personnel -- one or

18    more individuals who may be or include oneself -- and

19    transportation, but excepting medicine or religious materials.

02:46 20         As used in this definition the term "training" means

21    instruction or teaching designed to impart a specific skill as

22    opposed to knowledge, and the term "expert advice or

23    assistance" means advice or assistance derived from scientific,

24    technical or other specialized knowledge.

25         So this statute, which is Section 2339(b) of Title 18,

1    reaches only that material support for terrorist activity that

2    is coordinated with or under the direction of a designated

3    foreign terrorist organization.  Independent advocacy of

4    policies or activities independent of the foreign terrorist

5    organization, even advocacy that might promote the group's

6    legitimacy, is not covered.  The material support must be

7    support provided to, coordinated with or directed by the

8    foreign terrorist organization.  That's the charge in Count 1.

9        I'm going to skip a couple of counts and come back to

02:47 10   them.  There's another conspiracy alleged in Count 4 which is a

11   conspiracy to kill, kidnap or maim persons in a foreign

12   country.  And the relevant statute here provides:  "Whoever,

13   within the jurisdiction of the United States, conspires with

14   one or more persons, regardless of where such other person or

15   persons are located, to commit at anyplace outside the United

16   States an act that would constitute murder, kidnapping or

17   maiming if committed within the United States."  So conspiring

18   in the United States with people to commit acts elsewhere

19   which, if committed here, would amount to murder, kidnapping

02:48 20   and maiming, that's a conspiracy count charged in Count 4.

21       There's one other statute that I want to call to your

22   attention -- two others, actually.  But first I want to

23   call -- and this is not the subject of a -- well, let me come

24   back to it.

25       Section 2332 of Title 18 makes it an offense to kill a

1    national of the United States while such national is outside

2    the United States, and makes it a crime as well to attempt or

3    to conspire to kill a national of the United States outside the

4    United States.

5         So now moving back to Count 2.  Count 2 alleges a

6    conspiracy -- let me get the right language -- in violation of

7    18 U.S. Code Section 2339(a).  That statute provides, "Whoever

8    provides material support or resources" -- that's the same

9    phrase we heard before, "material support or resources" -- "or

02:49 10   conceals or disguises the nature, location, source or ownership

11   of material support or resources, knowing that they are

12   intended to be used in preparation for or in carrying out a

13   violation of a number of statutes" -- including the last two I

14   mentioned to you:  conspiring in the United States to commit a

15   crime of murder, kidnapping and maiming under Section 956, or

16   attempting to kill -- or killing a person of the United

17   States -- who is a United States national outside of the

18   country.  Those two are part of the statutes that are the

19   object of Count 2 and 3.

02:50 20        If a person provides material support and resources to

21   those kinds of conspiracies, to kill outside the United States,

22   or to kill a U.S. national outside the United States, that

23   itself is a separate crime, okay?  The conspiracy is charged in

24   Count 2; an attempt to do so is charged in Count 3.  So they're

25   very intertwined issues and we'll sort them out in more detail,

1   but those are the sort of material support that terrorism

2   charges in the case.

3          Counts 5, 6 and 7 relate to a different statute, which

4   prohibits a person from giving false information to officials

5   who are acting within the jurisdiction of the executive,

6   legislative or judicial branch of the government.  Basically,

7   lying to federal agents is the summary of it.  There are two

8   specific occasions when that's charged against Mr. Mehanna,

9   that he gave false information to an FBI agent, and there's

02:51 10   also a conspiracy charge, that he conspired with others to do

11   that.  That's the range of criminal charges that are made.

12          Now, the defendant has pled not guilty to these counts

13   and he stands not guilty at this point.  The trial will

14   determine whether the government's evidence is sufficient to

15   convince you people beyond a reasonable doubt that he has

16   committed any or all of the offenses he's charged with.  And

17   that's what the evidence will be about.

18          Let me just say a word about how we're going to

19   proceed in the course of the case.  When I finish this

02:51 20   introduction we'll begin with what we call the opening

21   statements by the lawyers.  Each side has an opportunity to

22   stand in the well before you and give you an overview of what

23   they expect the evidence will be in the course of the case.

24          One of the principal purposes of the opening statement

25   is to give you kind of the big picture, so that as you hear

1    individual pieces of evidence come in in perhaps a somewhat

2    fragmented or disjointed way, you might have some bigger

3    picture that you can associate it with and it may have some

4    greater meaning to you why you're hearing this information.

5            The illustration I like to use for jurors is:  The

6    opening statement is like the picture on the outside of the

7    jigsaw puzzle box.  They get to say what it's supposed to look

8    like when you put all the pieces together.  They will have very

9    different pictures, and it will be up to you to put whatever

02:52 10    pieces you think are reliable together and see what picture

11    emerges or doesn't emerge from that.  But that's the general

12    purpose of opening statements, to give you the kind of overview

13    or context so it will help you understand the context of the

14    evidence as you hear it.

15            The openings by the lawyers are not part of the

16    evidence.  If we stopped at the end of that, there would be

17    nothing to decide because we would have no evidence.  The

18    evidence will come in the presentation through witnesses and so

19    on.  And that will happen after the opening statements.  I

02:52 20    expect we won't get any farther than opening statements today,

21    so probably tomorrow we'll begin with the first witness in the

22    case.

23            There will be testimony from witnesses who will come

24    to the courtroom.  They'll take the witness stand right across

25    from you.  They'll be questioned or examined by the lawyers,

1    each side taking turns with each witness.  It's a rather formal

2    way of presenting information, and one aspect of the formality

3    is the question-and-answer format.  We don't just have

4    witnesses come in and talk to you and say what they think you

5    ought to know; rather, their attention and their testimony is

6    directed by the questions put to them by the lawyers.

7          And there are a number of reasons for that.  One is

8    simple efficiency.  The lawyers can keep the witnesses on track

9    and get the information that pertains to these issues and not

02:53 10  have them wander off into things that don't matter.  Another

11   reason is that we do exercise some controls over the kinds of

12   information that are properly put before a jury like yourselves

13   to make the decisions that you are required to make.  We sum up

14   all those principles in the phrase "the rules of evidence," the

15   rules that govern the quality of evidence that is properly

16   presented in the case.

17         One of my functions in presiding over the trial is to

18   make whatever rulings about evidence if the need should arise,

19   and it usually does in a case.  You've probably seen it.  If a

02:54 20  lawyer thinks a question put to a witness calls for an answer

21   that would be something that should not be in evidence because

22   of one of the rules, the lawyer will object to the question and

23   object to the witness's answering it.

24         You should understand that that is not in any sense an

25   interference or an obstruction to the process; it is exactly

1   the opposite.  The lawyer, by making an objection, is raising a

2   legitimate question about rules of evidence and asking that the

3   case be kept on track with those rules.  And that's something

4   that we're all committed to.  So it's not something to hold

5   against somebody who makes an objection; they're actually

6   helping us stay within the bounds that we're supposed to be

7   staying.

8          So when an objection is made, I will rule on it.  I

9   may sustain the objection, meaning I agree that the evidence

02:55 10   called for should not be given.  If that happens, the witness

11   won't answer the question.  If that should be the case, don't

12   try to answer it yourselves.  Don't try to guess what the

13   answer might have been if the witness had been allowed to go

14   ahead and answer it.  Just take it that for whatever reason

15   there's no answer to that question, the question is now

16   irrelevant.  Wait for the next question and the answer to that

17   because it's the witness's answers that supply evidence, not

18   the lawyer's questions.

19          I may, on the other hand, overrule the objection and

02:55 20   the witness will go ahead and answer the question.  That answer

21   then comes into evidence.  It's part of all the evidence you'll

22   have.  It doesn't have any special meaning or significance

23   because it was an answer after an objection.  In other words,

24   the objection isn't a little flag or a clue to you that, "Oh, I

25   should pay attention to that.  They didn't want that to be

1    heard."  That's not the case at all because the considerations,

2    the principles, the ideas that underlie the rules of evidence

3    have nothing to do with the merits of the case that you'll be

4    deciding.  There's just no logical or other connection with

5    them, so don't look for any.

6           Occasionally, we may have to go to the sidebar to deal

7    with an objection or a point of law.  We'll try to keep that to

8    a minimum.  We ask you to bear with us if we have to do that.

9    The reason for it is sometimes I want to hear what the witness

02:56 10    would say if the question were answered.  And if it might get

11    excluded and you wouldn't hear it, it's pointless to have you

12    hear it in the first instance and then have to go -- so I might

13    hear that to help me make a decision on the ruling.  So we'll

14    do it at the side.

15           When we go to the side generally from here on, if we

16    do, we will probably play a little music to distract you so you

17    can't be eavesdropping on us.  And so if you're all of a sudden

18    surprised by some piano music, that's part of the -- we have a

19    courtroom that has excellent acoustics and we just have to be

02:57 20    careful that we're protecting that.

21           So both sides get a chance to present whatever

22    evidence is relevant to the issues at hand.  That will happen.

23    That will take some time, obviously.  We've talked about that

24    in the selection process.  At the end of all that the lawyers

25    get another chance to appear before you.  Now you've heard all

1   the evidence and now they're going to sum it up for you and ask

2   you to consider it in various ways.  Obviously, they're going

3   to ask you to consider it in a way that favors their point of

4   view in the case.  At that point I'll give you some very

5   detailed instructions about the legal issues that I've kind of

6   given you an overview of today and then we'll ask you to

7   deliberate.  So that's the format that we'll follow.

8          During the course of the presentation of evidence we

9   will permit you to take notes.  We'll supply you with notebooks

02:57 10   and pens, and you can take whatever notes you think will be

11   helpful to you as an individual juror.  It's not a requirement.

12   You don't have to take notes if you don't want to.  My

13   experience in observing jurors is that some are very active in

14   jotting things down, some put the notebook on the floor and

15   don't use it.  It is intended only as an assist to you

16   personally, so don't feel you have to do what your neighbor is

17   doing.  But if you think it would help you to jot some things

18   down, we will give you the notes to do it.  You only have the

19   notebooks for the evidence so you don't have them today because

02:58 20   we are only going to have, probably, opening statements at this

21   point.

22          So, with that, I think we'll ask the government -- the

23   order is the government will go first, followed by the defense.

24   And Mr. Chakravarty can have his chart back.

25          MR. CHAKRAVARTY:  Thank you.

1          About ten years ago Osama bin Laden issued a call to

2     arms.  Around the world he wanted Muslims to stand up and fight

3     Americans and their allies.  He did so in many ways.  He issued

4     videos, propaganda.  You may have seen him on TV.  There was a

5     particular video called "State of the Ummah."  "Ummah," you'll

6     learn, means the Muslim world.  And you'll hear in that video

7     he proposed the solution to the oppression and persecution of

8     Muslims as he and al Qa'ida perceived it to be about ten years

9     ago.  And his solution was something called "Jihad."

02:59 10          You'll hear when Osama bin Laden used it, and later

11    when the defendant used that term, he was talking about

12    fighting and killing American soldiers, fighting and killing

13    Americans.  And that call that Osama bin Laden issued about ten

14    years ago was one that resonated with the defendant.  This case

15    is about how this man answered that call, and over the course

16    of the next ten years he tried and tried again to provide, as

17    the judge just told you, what's called material support to

18    al Qa'ida and other terrorists who were killing U.S. soldiers.

19    Simply agreeing to do that is against the law in this country.

03:00 20          My name is Aloke Chakravarty.  I represent the United

21    States.  With me is Jeff Groharing and Jeffrey Auerhahn.  We're

22    the prosecutors.  We're just lawyers.  Seated behind us you'll

23    see Paul Bruemmer.  He's also from my office.  And throughout

24    the trial he'll be presenting some of the evidence on the

25    screens in front of you and helping us with the trial.

1          Seated in the front row of the gallery about halfway

2     in there's Heidi Williams and Tom Daly.  They're FBI task force

3     agents.  You'll hear that they investigated this matter.

4     Because when the defendant agreed to answer this call, he

5     didn't go to the media.  This was a secret agreement.  That's

6     what a conspiracy is and that's what the defendant did.

7          There were two principal ways in which the defendant

8     conspired to and tried to provide material support to the

9     terrorists.  The first is easy to understand.  The defendant

03:01 10   got on a plane; he went over to Yemen for the purposes of

11    getting terrorist training so that he could then personally --

12    him and two of his friends -- go on to fight U.S. soldiers

13    primarily in Iraq, because that's where U.S. soldiers were

14    principally engaged at that time.  It was Super Bowl Sunday

15    2004.  He wasn't interested in the game; instead, secretly,

16    without even his parents knowing, they went to Logan Airport,

17    lied to the people to get on the plane, and then flew off to go

18    to Yemen.

19         You'll hear, though, that about two weeks later the

03:02 20   defendant returned.  He later said, in his own words, he didn't

21    find what he was looking for.  He didn't find the terrorist

22    training camps that he was looking for.  But he wasn't done.

23    About 2005 and 2006 he found something that he was capable of

24    doing that would provide material support to these

25    organizations, all from the comfort of his cushy bedroom in

1    Sudbury, Massachusetts.  Because in today's day and age, ladies

2    and gentlemen, the Internet is everywhere.  And in the same way

3    that Osama bin Laden was able to issue that call some five

4    years before, the defendant kept that call alive and he kept it

5    flourishing, and he started acting to help al Qa'ida on the

6    Internet.

7         How did he do that?  Osama bin Laden speaks in Arabic.

8    When you're an American or you're somebody in the Western

9    world, you don't understand the words that he says.  And so it

03:03 10   was the vital skill of translating complex Arabic, sometimes

11   not-so-complex Arabic, into English that the defendant

12   embraced.  And what he then did was, along with others --

13   because that's what you need in a conspiracy.  You can't just

14   do it yourself; you have to be working with others.  You have

15   to have people of the same mind -- he then began translating

16   over and over again Jihad materials, for lack of a better

17   phrase, materials that would encourage people to participate in

18   Jihad which, by itself, was a service to al Qa'ida.

19        But even more so, when the defendant translated these

03:04 20   things and he published them and he distributed them and he

21   collected them all through the Internet, they had the label

22   "This is a production of al Qa'ida."  He knew what he was

23   doing.  He agreed to do it.  As soon as he did, that became a

24   crime under the laws of the United States.

25        This case is not about what the defendant believed,

1    whether he was against the war or whether he didn't like

2    America.  All of those things you can do in this country.  What

3    you can't do is agree to do something that the law forbids.

4    And providing material support to terrorists and to al Qa'ida

5    is and was something that the law forbids, and that's why he's

6    in this courtroom today.

7         You'll hear, as the judge told you, that there are

8    essentially three sets of crimes here.  There are crimes

9    related to the facts about the defendant's trip to Yemen, about

03:05 10   his desire to provide himself as what we call "personnel."  You

11   may recall the judge said that when you provide yourself as

12   personnel to a terrorist organization or to terrorists, then

13   that is a form of providing material support.

14        You'll hear that also includes his two companions who

15   went with him to go to Yemen.  And when they were helping each

16   other and had agreed to help each other get the terrorist

17   training that they were looking for, that's providing personnel

18   in the form of each other.  That's also personnel.  And those

19   are the criminal statutes that you're going to be considering

03:06 20   as you hear the evidence of the defendant's 2004 trip to Yemen.

21        The second set of facts that you should be listening

22   for during the trial is this translation service that he

23   offered.  You'll hear that with a separate group of

24   individuals -- some of them overlapping -- later in time after

25   2004 the defendant, along with people that he had met primarily

1    on the Internet -- not all.  Some of them were right here in

2    Massachusetts -- but with people he had met on the Internet,

3    people who also wanted to support the objectives and the goals

4    of al Qa'ida and the terrorists, to kill Americans, to get them

5    out of Iraq and Afghanistan -- it's one thing to want American

6    troops back home; it's another thing to actually help those who

7    are killing them when they're overseas.  And that's what they

8    agreed to do on the Internet.

9         One of the things that the defendant did was he

03:06 10   translated a document called "39 Ways to Serve and Participate

11   in Jihad."  This is essentially a training manual on how

12   somebody can get ready to personally get into the fight.

13   That's what the defendant was interested in doing.  And after

14   he failed in being able to do that himself over in Yemen, he

15   wanted other people to do what he could not.

16        The final set of charges, the factual basis of the set

17   of charges, is lying to the government.  In the defendant's own

18   words you will hear that lying to the FBI in a material

19   investigation, especially a terrorism investigation, about a

03:07 20   material thing is itself a crime.  That's what the defendant

21   did not once but several times.  It stands to reason if you go

22   to Yemen to get terrorist training, it's not something that you

23   would be eager to tell your family or to tell the FBI when they

24   come asking, and so he naturally lied about it.

25        But most of the case is going to be about the

1    conspiracy:  what his intent was in getting involved in the

2    conspiracy; what the other conspirators, the people who

3    participated with him in the conspiracy -- what the objective

4    was, what they had actually agreed to do.  And that's why the

5    government will be presenting evidence of what the defendant

6    and the other conspirators' intent was.  What, in fact, they

7    had agreed to do.

8         You'll hear that they agreed to provide material

9    support to al Qa'ida.  That's one of the charges.  The second

03:08 10   charge, as the judge mentioned, is that they agreed to provide

11   material support to those who were killing American soldiers

12   overseas.  Now, some of them could have been al Qa'ida, but

13   even if it wasn't al Qa'ida, if they were participating in the

14   killing of American soldiers, then that's what's captured under

15   the second count.  They had agreed to provide material support

16   to those people.

17        You'll also hear that in their trip over to Yemen and

18   in their translation materials that they distributed, that was

19   actually an attempt to provide the material support.  These are

03:09 20   actions that the defendant took to try to provide material

21   support to these organizations.

22        And then finally, they had agreed to lie.  They agreed

23   to conceal the information about what they had tried to do to

24   provide material support.  Each one of those is a conspiracy

25   charge which means you're not going to be asked to find

1   whether, in fact, they did provide the support to al Qa'ida,

2   whether there was a check in the mail saying, "Thank you for

3   your support."  That's not the question here.  The question is

4   whether there is sufficient evidence to prove that they had

5   agreed to do that.  And I'd suggest to you the evidence will be

6   much stronger than that.  There will be a lot more evidence

7   that they actually carried through with what they had intended

8   to do.

9        So what is material support?  We talked about it a

03:09 10   little bit.  One way to provide material support is providing

11   yourself as personnel.  Another way to provide material support

12   is to provide your friends as personnel, or people who might

13   read the translations, might read the propaganda that you put

14   out on the Internet that you want to go fight.  You're

15   recruiting them to go fight in your stead.  That is also a form

16   of personnel.

17        In terms of his translation work and the things that

18   he did on the Internet to spread this propaganda, to encourage

19   people to go fight in Iraq and Afghanistan and against the U.S.

03:10 20   soldiers and its allies, there are other forms.  One of those

21   ways, as I mentioned, is personnel because you're encouraging

22   people to go fight.  But the other way is that it's a service

23   to al Qa'ida when you're performing translations for them.

24   When you're making their material, their recruiting material,

25   their terrorism material -- when you're making it more

1  accessible to people all around the world, that is a vital

2  service that you are offering to al Qa'ida, and that is exactly

3  what the defendant did.  And he was proud of it, the evidence

4  will show.  But it's also a function of his expertise in

5  knowing Arabic so well that he was capable of translating

6  voluminous documents sometimes, sometimes videos where people

7  are speaking in tongues that are not familiar to most people.

8          Now, you may ask yourself in relation to the

9  translations, how can simply providing a translation of

03:11 10  something -- which is not inherently criminal.  If you know

11  another language, then you can clearly translate something into

12  another language.  You're not breaking the law.  But it's when

13  you're providing a translation in coordination with a terrorist

14  organization, in this case al Qa'ida, or the terrorists who

15  were actually killing American soldiers, when you're doing it

16  for that purpose, then it is against the law.

17          This case is not about what the law should be, it's

18  about what the law is.  And you're not allowed to provide

19  material support whether it's through your words, through your

03:12 20  guns, through your personnel.  You're not allowed to provide

21  material support to those organizations or those individuals.

22  And that's what the defendant did.

23          The final set of charges, I explained to you, are

24  about the defendant's lies.  And I'm going to tell you a little

25  bit more specifically about what those lies were.  The first

1    set of lies, you'll hear, involve when the defendant went to

2    Yemen, he had agreed with some of his friends to come up with a

3    cover story, a story that if anyone asked, especially at the

4    border when he's coming in and out of the country, "This is the

5    reason why we are going."  Of course, if he said, "We're going

6    to a terrorist training camp," he may not have been able to

7    board that plane, so he didn't.  He lied.  When he came back,

8    he lied.  He said he went to try to go get some -- some kind of

9    school.

03:13 10          When the FBI approached him in December of 2006 and

11   said, "Hey, we noticed you went to Yemen.  Why did you go?" he

12   came up with the same lie that he had agreed with his friends

13   to give.  And again, that was against the law.  But the other

14   lie, and this one will start to get into the precise facts of

15   the case, involve one of his very close associates.  He had a

16   friend, somebody who he later called his best friend, named

17   Daniel Moldanado.  And in December of 2006 when the FBI came to

18   talk to the defendant and they had finally uncovered this

19   secret conspiracy that for a long time the defendant was able

03:13 20   to participate in without the government being aware of, and

21   the FBI started to ask him questions about it, one of the

22   people the FBI asked about was if the defendant knew where his

23   friend Daniel Moldanado was.  And, of course, the defendant

24   said that his friend Daniel Moldanado was over in Egypt and he

25   was working at an Internet company and he hadn't spoken to him

1    in a few weeks.

2         Now, the FBI knew that that was a lie.  The defendant

3    knew that that was a lie.  Because at that time

4    Daniel Maldonado was in Somalia with a man named Omar Hammami.

5    And they were receiving training from al Qa'ida so that they

6    could fight in Jihad, the very thing that the defendant and

7    Mr. Maldonado had talked about for years before that as they

8    were answering the call that Osama bin Laden had issued them.

9         And you'll know that that was a lie, ladies and

03:14 10   gentlemen, because three days before this conversation with the

11   FBI where the defendant lied to the FBI about Mr. Maldonado,

12   Mr. Maldonado called the defendant from Somalia inviting the

13   defendant to come join him to do what they had talked about

14   doing for so many years.  He used the phrase, "I am making

15   peanut butter and jelly," which, ladies and gentlemen, did not

16   mean making sandwiches; that was a not-so-coded reference to

17   something the defendant used over and over again.  "Peanut

18   butter and jelly" was a reference to fighting in Jihad.  The

19   defendant later -- and you'll hear some of the evidence of

03:15 20   that -- acknowledged, not to the FBI, but he acknowledged to

21   his friends, that he had a problem because he knew he had lied

22   to the FBI about that conversation with Daniel Maldonado.

23         You'll hear that those lies were material, which is an

24   element of the offense which I'm going to tell you about now

25   because it's going to be a while before we're able to talk

1    again.  "Materiality" means was it something that could have

2    made a difference to the FBI as they were investigating this

3    matter.  And the evidence will show that it could have made a

4    difference, both to the FBI agents who were investigating the

5    defendant, his trip to Yemen and anything else that he was

6    involved in intentionally related to terrorism, as well as the

7    investigation of Mr. Maldonado who was over in Somalia at that

8    time, as well as the investigation of Mr. Hammami who was over

9    in Somalia at that time, as well as others, but by the

03:16 10   defendant lying to the FBI, they were unable to ask those next

11   questions.

12         Now, most of this case, ladies and gentlemen, will

13   focus on what the defendant's intent was because the evidence

14   will come in that the defendant went to Yemen, that he

15   translated these materials.  So most of the dates in this case

16   will revolve around:  What was the defendant thinking?  What

17   was his coconspirator thinking?  And for that reason you're

18   going to see, and you're going to hear, a lot of the evidence

19   about what the defendant was saying out of his own mouth, but

03:17 20   also what the defendant was consuming, what he was reading,

21   what he was watching.  Because that all goes into what he was

22   thinking at that time.  This case is not about -- it's not

23   illegal to watch something on the television.  It is illegal,

24   however, to watch something in order to cultivate your desire,

25   your ideology, your plots to kill American soldiers, or to help

1    those, as in this case, who were.

2         One of the ways the defendant did that was he harkened

3    back to those successes where al Qa'ida was successful in doing

4    what it is that he wanted to do.  This is one example -- one of

5    the things that's going to be offered to you simply to show

6    what the defendant was thinking.

7         The defendant, you'll hear, had dozens of photographs

8    about Jihad, about September 11th, about Osama bin Laden, about

9    other things related to fighting Americans on his computer and

03:18 10  in other places.  One of the things you'll see that was found

11   on his computer and also in his email was this picture of the

12   defendant at Ground Zero in New York where the Twin Towers

13   fell.  This is the defendant on the left with an ear-to-ear

14   grin holding his finger up.

15        When the defendant visited Ground Zero, which he did

16   repeatedly, he wasn't going for the reasons why you might

17   think.  He was going to celebrate what happened on that day.

18   And that's important for you to know not because he's charged

19   with committing some offense related to 9/11, but because you

03:18 20  know what he was thinking when he committed the crimes that he

21   did do in this case:  why he went to Yemen, why he was

22   translating these things, why he penned the phrase, "On that

23   morning you became our hero, the day you turned Twin Towers

24   into Ground Zero."

25        That is the defendant before you.  And the reason why

1    it's going to be offered is not to appeal to your sympathies or

2    to say, "Well, if he's anti-American then he must be guilty."

3    We don't want you to do that.  This is a court of law, and it's

4    the law and it's the facts that should decide.  Your sympathies

5    for the defendant, for the government has no place.  What

6    you're going to be tasked to do at the end of this case is to

7    decide what was the defendant and his coconspirators thinking

8    when they committed the acts, when they did the deeds in this

9    case.

03:19 10         Because it's federal court, ladies and gentlemen, this

11   isn't about what the law should be.  You're not going to

12   determine what the law should be.  We're not politicians; we're

13   lawyers.  Our role is simply to present evidence to you.  And

14   it's that evidence that is going to determine whether you find

15   facts sufficient to find the defendant guilty beyond a

16   reasonable doubt on the charges.

17         So I want to map out what that evidence will be, what

18   kinds of sources of evidence and what it will look like, as you

19   assess what was the defendant thinking as he engaged in the

03:20 20  conduct to support al Qa'ida and the terrorists when he was

21   answering that call for support.

22         Now, one of the things you'll hear about is what we

23   call physical or documentary evidence.  This is essentially

24   evidence that you typically can feel or touch, but in this

25   modern electronic courtroom you might have to see it on the

1    computer; but nevertheless, these are exhibits.  These are

2    things that you can see that will help you assess both what the

3    defendant personally did as well as what was in his state of

4    mind, what he was thinking as he was engaging in this conduct.

5         Many of those things will be the defendant's own

6    statements.  We call that direct evidence of what the defendant

7    was thinking.  A lot of it will be what we call circumstantial

8    evidence.  It's no less powerful; it's just less direct.  It's

9    not necessarily what the defendant was personally saying, but

03:21 10   it's based on his actions or it's based on what someone was

11   saying with him that you're able to figure out what they were

12   talking about.  There will also be items like this and other

13   things that show what this defendant was obsessed with at that

14   time.  In this case, ladies and gentlemen, that was

15   participating in Jihad, something that he felt was a duty,

16   something that was obligatory, to take up arms against the

17   United States.

18        So the first source of that evidence that you're going

19   to hear about, I'd say probably tomorrow, is a court-authorized

03:22 20   search of the defendant's own room.  I mentioned to you before

21   when the defendant was engaged in this conspiracy -- or these

22   conspiracies -- he wasn't doing it openly; he was doing it

23   secretly.  The FBI didn't know all of these things as it was

24   occurring.  But they caught on.  And by 2006, in August, you'll

25   hear when the defendant and his family went over to Egypt where

1    he has family, the house was vacant, the FBI got a court order,

2    and they went in and they searched the defendant's room.

3         And it was at that time, ladies and gentlemen, that

4    you'll hear that they were able to make an exact copy of the

5    defendant's computer, they were able to photograph a number of

6    pieces of evidence that were in the defendant's room, and they

7    put it all back so the defendant wouldn't know that they had

8    actually searched the room.

9         At that time, in August of 2006, you'll hear the

03:22 10   defendant was over in Egypt.  He wasn't just there with his

11   family, though, ladies and gentlemen.  That man I mentioned a

12   little while earlier, Daniel Maldonado?  He met with

13   Daniel Maldonado in Egypt.  He met with Omar Hammami, the other

14   guy who went to Somalia to go fight, in Egypt.  They told him

15   they were interested in going over to Somalia at that time.

16   The defendant ultimately came back from his trip to Egypt and

17   he continued his activities.

18        The second source of evidence that you'll hear about

19   is the computer that was seized on that day was a treasure

03:23 20   trove, invariable library of information about Jihad.  You'll

21   see he had Jihad videos.  Some very graphic, disturbing scenes

22   of the objective of what the defendant was trying to do in his

23   conspiracy, which is to kill Americans.  You'll see a lot of

24   al Qa'ida propaganda.  You'll see photographs like this, or

25   like these, which are symbols of al Qa'ida which are the

1   symbols that he used in the propaganda that he later

2   translated, that he later published and disseminated across the

3   world.  These are the symbols of al Qa'ida and Iraq, and you'll

4   see they were on some of his very own translations.

5        But in addition to just images and videos and

6   articles, you'll hear that that computer had stored

7   communications.  Modern al Qa'ida and modern society is built

8   on the Internet.  It's the function of E-commerce.  It's how a

9   lot of these organizations operate.  It's no less true for

03:24 10  either al Qa'ida -- it's no less true for all of us.  And

11  there's a function on the Internet called "instant messaging,"

12  or "chatting," it's frequently called.  You may have heard of

13  email.  It's similar to email except it's real-time.

14       Those instant message communications are not always

15  stored.  But the defendant did, in fact, store those

16  communications.  Not every one, but for a six-month window

17  there were hundreds of communications that the defendant

18  engaged in conversations with the coconspirators in this case

19  and others around the world talking about the things that are

03:25 20  relevant to what your inquiry is going to be:  Why did he go to

21  Yemen?  Why was he conducting these translations?  How was he

22  trying to support al Qa'ida?

23       And those hundreds of communications we're going to go

24  through.  We're not going to read the entirety, although you'll

25  have them, but we're going to focus in on the relevant portions

1   of those communications, juxtapose those with other relevant

2   information evidence that has been obtained in this case so

3   that you can understand that when the defendant was engaging in

4   these activities, in his own words he's talking about the

5   activities, the crimes that he was committing.

6           Fourth, you'll hear about the emails of the defendant.

7   Just like those stored instant message chats, you'll hear that

8   there were emails.  Now, the emails were obtained through

9   what's called a court-authorized interception and search of

03:26 10   emails.  What that means is that around the same time that the

11   FBI was able to search his room, they also obtained

12   authority -- legal authority -- to intercept the defendant's

13   emails.  And you'll see several of those emails, again, saying

14   in the defendant's own words what he was thinking.

15           One of the themes as you go through all of these

16   stored communications you'll see is that the defendant was

17   worried about what law enforcement might have found out, what

18   they may have known about his activities.  And so he was cagey.

19   So he was a little cautious in his words.  He would use coded

03:27 20   phrases sometimes like "peanut butter and jelly," for example,

21   in case somebody who was listening on the other end of the

22   email or the instant message might be working for the

23   government.

24           You'll hear another source of the evidence were

25   court-authorized wiretaps of the defendant's telephone calls.

1    You're not going to hear very many calls, but you're going to

2    hear that same kind of caution, that same concern that somebody

3    from the FBI was listening to his phone calls.  So he was

4    always talking around things, but he didn't talk around things

5    enough that the FBI wasn't able to determine what he was

6    talking about, get the evidence, and now we're presenting it to

7    you.

8         A theme throughout the case is you are the judges of

9    the facts.  You are going to be assessing this evidence.  It's

03:27 10   not what I say about it; it's not what the FBI agents say about

11   it; it's not what the media; it's not what the public says

12   about it.  You are the only ones who are going to have the rare

13   window into what the defendant was thinking, what he was saying

14   and what he did that's going to be presented over the next

15   several weeks here in this courtroom.

16        Another source of evidence you're going to hear about

17   in this case, ladies and gentlemen, is the activity that the

18   defendant did on the Internet itself.  In addition to his own

19   communications you're going to hear that search warrants were

03:28 20   executed on a website.  The website was called "At-Tibyan

21   Publications."  And that was the website through which the

22   defendant distributed many of the things that he translated for

23   al Qa'ida.  You'll hear that this was an extreme website where

24   they believed that Jihad against American soldiers was the

25   solution.  You're going to hear that it was password-protected

1   so it wasn't that everybody could get on this website; you had

2   to be selected.  You're going to hear that the defendant was a

3   moderator on that website.  He actually sometimes would select

4   who gets to be on the website.  And you're going to see some of

5   the things that he published and distributed through that

6   website.

7        The website became a virtual conference room where he

8   and others who had agreed to help support al Qa'ida and

9   terrorists could gather on the Internet.  And that's why you're

03:29 10  going to be seeing some of that evidence.  Some of that

11  evidence is, as I mentioned before, things like the "39 Ways to

12  Serve and Participate in Jihad."  You'll see at the bottom it

13  says -- you can't see it from here but you will later.  It says

14  "At-Tibyan Publication."  It was published by these people.

15       Another thing you'll see that he published on the

16  Internet is some of the Jihad translations themselves.  And for

17  this we have a little bit of video which I'm going to ask

18  Mr. Bruemmer to cue up.

19       THE COURT:  Before he does that let me just say,

03:30 20  jurors, you all have monitors.  You'll see them in the front

21  row.  In the back row, between every other seat or so, there's

22  a console.  And if you lift the top you can rotate up and out a

23  monitor and turn it on.  So you can see if -- the on/off

24  switches should be in the lower right-hand corner.  They should

25  be on.

1          MR. CHAKRAVARTY:  Ladies and gentlemen, what you're

2    about to watch is one of the things -- I'll wait for you to get

3    situated.  I'm sorry.

4          THE COURT:  Make sure everybody has them up.  You're

5    not getting an image yet because I haven't cued you yet.

6          MS. BASSIL:  Can we get it?

7          THE COURT:  I haven't done it yet.  I want to make

8    sure they're all in place first.

9          Are you getting a little track?  Okay.

03:30  10          MR. CHAKRAVARTY:  One of the items that the defendant

11    translated for al Qa'ida was a document -- or excuse me -- a

12    Jihad video, a video that was designed to inspire people to

13    help participate in Jihad, a video specifically called the

14    "Expedition of Shaykh Umar Hadeed."  The name is not important

15    except to know that it's about this person who was a terrorist

16    leader in Iraq at that time.

17          The defendant translated what was an Arabic-language

18    video encouraging support for the people who were killing

19    American soldiers, specifically in Iraq at that time, and he

03:31  20    translated -- he put subtitles in it so that they would be in

21    English.  They also did some video editing so it would have

22    some graphics at the beginning, and they would have -- it would

23    make it pretty and easy to digest, again, making it more

24    accessible.  He's providing a service to the terrorists who are

25    trying to get this video out.

1          And in that context the defendant, along with some

2     other people from this At-Tibyan Publication website, around

3     the world, they put this thing together.  And you'll see some

4     of the evidence that not only was this video on his computer

5     when his room was searched in August of 2006, but he also had

6     the Arabic version, the original version, on his computer at

7     the time.  And you'll also see that his note, his translations

8     in document form were also found later on his computer.

9          So with that I wanted to play -- it's about an

03:32 10    hour-some-odd-long video.  We're not going to spend that time

11     today watching it, probably not for the rest of the trial, but

12     we tried to select specific clips.  And with that, let me play

13     this one.

14          (Video published to the Court and jury.)

15          MR. CHAKRAVARTY:  Ladies and gentlemen, that was the

16     beginning, a portion in the middle and the end of that video.

17     You'll see very clearly in the defendant's own translation that

18     he was producing things for al Qa'ida, that he viewed himself

19     as part of the media department of al Qa'ida.  When he did

03:34 20    this -- imagine reading that without any subtitles.  By putting

21     those subtitles in, by translating it, he was providing a

22     service to al Qa'ida.  And Osama bin Laden told you what that

23     service was:  It's for Jihad which, to them, meant killing; it

24     meant bullets; it meant martyrdom.  That's what the defendant

25     wanted to do.  And when he agreed with others to do it, he

1   broke the law.

2           Specifically with regard to his work on At-Tibyan

3   Publications doing this translation, you're going to see more

4   evidence.  Another source of evidence you're going to hear

5   about is evidence from the United Kingdom, from England.

6   You're going to hear that a few of his collaborators on several

7   of the translation projects were from the United Kingdom.  And

8   you're going to hear that in August of '05 those individuals

9   received communications from al Qa'ida asking to have certain

03:35 10   things translated by the brothers at At-Tibyan Publications,

11   which you just saw from.  A month later there was a specific

12   request to translate one of these types of Jihad videos.

13           A month after that the defendant was personally

14   solicited by what was called "the cloud people."  Now, "the

15   cloud people" may not mean much unless you know that in Arabic

16   "cloud" means "Sahab."  And that word, "Sahab," is important

17   because *Sahab* is the media wing of al Qa'ida.  "The Cloud

18   People" are those people who were the media wing of al Qa'ida,

19   and they asked the defendant to translate something.

03:35 20   Specifically, at that time they asked him to translate a

21   message from the number-two person -- at the time number-two

22   person of al Qa'ida, Dr. Ayman al-Zawahiri.  And he had issued

23   a message to the people of Pakistan which the defendant was

24   asked to translate into English.

25           So he knew not only because it's in the videos that he

1   translated himself, but he was personally being solicited to

2   translate things for al Qa'ida.  *Al Sahab*, by the way, it was

3   also the publisher of that video which, back ten years ago that

4   the defendant watched that he was answering this call about,

5   that when Osama bin Laden says the solution is to fight, they

6   also produced that video.  So he personally knew the

7   effectiveness, the importance of engaging in this kind of

8   material support for al Qa'ida.  After getting that request

9   from *Al Sahab*, you'll hear that the defendant, then, began

03:36 10   translating a number of projects, including discussing the

11   specific project about this message to Pakistan.

12        The final source of the exhibits that you're going to

13   see are the defendant's own recorded statements.  And there are

14   two ways that you're going to hear the defendant's own voice

15   aside from the telephone calls which I mentioned to you before.

16   One is that during the FBI investigation, as they were

17   developing more evidence about the defendant, they were able

18   to, with a court order, put a bug, which is a colloquial phrase

19   for a recording device, into a location where they knew the

03:37 20   defendant was going to be.  And they only activated it once,

21   and it was for a very brief time, but it happened to be the day

22   after the defendant called his friend -- or excuse me --

23   received a call from his friend from Somalia, Daniel Maldonado.

24        The day after that he met with another one of his

25   local friends, one of the people that he talked about Jihad

1   with on a regular basis.  Not in open.  The community may not

2   have been aware that that's what these guys were talking about.

3   But the few -- secret few -- who were a member of that

4   conspiracy, this is what they talked about when they got

5   together.  And that bears out in a recording.  A very poor

6   recording, I should add, that you're not going to be able to

7   make out much about, but you're going to be able to follow

8   along with a transcript.  And the important thing is that the

9   defendant confirmed to the person he was with, one of his

03:38 10   coconspirators which I'll tell you about in a second, that he

11   just received a call from his friend Daniel Maldonado who was

12   over in Somalia with his friend Hammami, who he knew by his

13   nickname of al-Mizzi.  And that's going to be the type of

14   evidence that will corroborate for you the fact that the

15   defendant had been lying to the FBI about what he

16   knew -- sorry -- he actually lied three days later to the FBI

17   about that telephone call.

18        The other source of the defendant's own words, own

19   recordings that you're going to be able to hear and follow

03:38 20   along with are that there were three people who went on that

21   trip to go to Yemen back in 2004:  There was the defendant, one

22   of his friends named Ahmad Abousamra, and one of his friends

23   named Kareem Abuzahra.  The names are very similar.  I'm going

24   to put them up on the easel in a second.

25        But Kareem Abuzahra, a few months before that

1    recording, was approached by the FBI.  And you're going to hear

2    that consistent with the plan they had agreed to, they were

3    going to lie to the FBI about why they went to Yemen.  And

4    that's what Abuzahra did.  But Abuzahra didn't just stop there.

5    Eventually he came in -- he got a lawyer, he came in, and he

6    said, "I want to tell the FBI, the prosecutor, what happened."

7    And so we gave him what's called immunity.  You're going to

8    hear immunity means, at least in his case, that if you tell us

9    the truth, we're not going to prosecute you.  And that's what

03:40 10    we did.  As part of a condition of that immunity, you'll hear

11    that Mr. Abuzahra agreed, because he had to for the immunity,

12    to wear one of those bugs, one of those recording devices, on

13    his person when he then went to go talk to the defendant.

14         Now, keep in mind, ladies and gentlemen, this is

15    December of 2006 when Abuzahra goes to talk to the defendant.

16    Abuzahra had not had conversations with the defendant --

17    substantial conversations with the defendant -- much between

18    when they went to Yemen -- on their trip to Yemen until this

19    time.  And very few people had open conversations about their

03:40 20    trip to Yemen.

21         And so in 2006 the defendant had already committed his

22    crimes; he had already conspired to provide himself as

23    personnel; he had already done this translation work on the

24    Internet.

25         After the fact Abuzahra went to talk to the defendant

1    and Abousamra, the third member of that trip, about what had

2    happened in the past.  And you'll hear in the defendant's own

3    words, and you can follow along in the transcript, how he

4    acknowledged many of the events that we talked about today:

5    about the trip to Yemen, about lying to the FBI, about his

6    conversation with Daniel Maldonado.

7         And that's, in a broad overview, the types of exhibits

8    that you will see.  They all go to what the defendant was

9    thinking and what he did when he engaged in his trip to Yemen

03:41 10    when he did his translation work.  They will establish the

11    facts that he provided material support to terrorists.

12         Ladies and gentlemen, you can disregard virtually all

13    of the documentary and physical evidence in this case because

14    you will still have what's equally important, perhaps even more

15    important:  testimony of witnesses.  Testimony of witnesses is

16    evidence.  And it's powerful evidence about what the defendant

17    was thinking because they will tell you what he said, they will

18    tell you what they agreed upon, they will tell you what they

19    did together.  And that is evidence that you should consider

03:42 20    with equal weight.

21         So with that, I want to introduce you to some of these

22    witnesses.  Ladies and gentlemen, this is the defendant and his

23    personally selected associates.  These were the people, most of

24    whom grew up in the suburbs of Boston, who, over a period of

25    about ten years, were secretly planning and plotting to attack

1    U.S. interests, American soldiers and their allies.  They were

2    figuring, "How can we help those people who are killing?"

3         The defendant, Ahmad Abousamra and Kareem Abuzahra,

4    agreed to go to Yemen.  They wanted to get that terrorist

5    training back in 2004.  But that wasn't the first step.  That

6    wasn't their first attempt at trying to do something together.

7    You're going to hear that after that call to arms by al Qa'ida

8    they resolved that they wanted to do something to participate

9    in Jihad, that they needed to do something.  It was obligatory

03:44 10   on them to fight.  There were Muslims dying around the world

11   and they felt it was their job to exact revenge.

12        So one of the things they did after September 11th,

13   after the United States went into Afghanistan, they wanted to

14   go fight the Americans where they were.  Abousamra, you'll

15   learn, in 2002, with the support of the defendant Abuzahra,

16   personally went to Pakistan in order to get the terrorist

17   training that they later went to Yemen to try to get.

18        Before they went, you'll hear that they met with one

19   of their other close confederates, this man, Hassan Masood.

03:44 20   You'll hear Mr. Masood has relatives in Pakistan who run

21   terrorist organizations.  And so they naturally asked him, "How

22   do we get to the terrorist training camps in Pakistan?"

23        Abousamra went and he returned.  He told them that he

24   had failed, he was unable to get in, but he had a lead.  He had

25   met somebody.  He had met somebody named something like

1  Abdul Majeed or Abd-al Majeed.  They affectionately called him

2  "John" in case somebody was potentially listening to their

3  conversations.  And they kept in touch with John who was over

4  in Pakistan in case there was an opportunity to go back and get

5  the training that they were seeking.  And that's exactly what

6  Abousamra did again later on that year.  He went back to

7  Pakistan.

8        Now, Abousamra is not Pakistani.  Abousamra, you'll

9  learn, is Syrian.  And he's the one person on this chart that

03:46 10  you're not going to hear from.  You're not going to hear from

11  him because after the FBI started asking him questions about

12  what he had done in Yemen, two weeks later he left the country

13  for Syria.  He hasn't been back since.  So you're not going to

14  hear from him.  But he went again to Pakistan; he again came

15  back and said, "They wouldn't take me because I'm not

16  Pakistani."  There was just too much attention at these

17  terrorist training camps over in Pakistan at the time.  You'll

18  hear, though, that that didn't deter them.  Even though they

19  had tried and failed, they then turned to what else they might

03:46 20  be able to do to engage to provide material support.

21        You'll hear that in 2003 they actually considered

22  engaging in domestic terrorist attacks.  You'll hear that they

23  considered the logistics and the practicality of attacking a

24  shopping mall.  You'll hear that they took steps to actually

25  act on that.  You'll hear that they planned to attack Hanscom

1   Air Force Base, a military target, a more appropriate target.

2   You're going to hear that they even talked about other things

3   that they ruled out as not viable.

4          It was only after that -- it was after the U.S.

5   invaded Iraq that they finally said, "We need to go over there.

6   We need to fight.  We need to get the training."  And they met

7   another contact online, this man, Abu Omar.  You're going to

8   hear that Abu Omar, also named Jason Pippin -- he uses the name

9   Abu Omar, you'll hear is -- "Abu" is a common nickname -- or

03:47 10   "kunya," they call it, which is an alternate way of identifying

11   themselves.

12          And Abousamra, with the help of the defendant and

13   Abuzahra, went out to meet with Abu Omar to get direction on

14   where they should go in Yemen to get the terrorist training.

15   Abu Omar by then had distanced himself from Jihad.  And he

16   said, "I can't tell you where the terrorist training is, but I

17   can tell you who to talk to."

18          Abousamra came back and they began preparing.  They

19   began hiking.  They bought stuff like backpacks.  They made

03:48 20   arrangements to meet at the defendant's house on February 1st,

21   or the day of the Super Bowl, without telling his parents,

22   without telling anybody else.  And they met with Hassan Masood

23   on that day.  And then in silence, quiet, the defendant gave

24   his brother, who's seated in the courtroom -- he gave his

25   brother a bag of Jihad materials, he gave him a note, they got

1    in the car and they went to Logan Airport, and then they headed

2    off to Yemen.

3         You'll hear in the defendant's words what happened in

4    Yemen.  You're going to hear what he told Abousamra, you're

5    going hear what he told others, you're going to see his

6    communications on the Internet, and then you're going to hear

7    the recorded conversations.  But you're going to hear that

8    Abuzahra didn't make it all the way to Yemen with Abousamra and

9    the defendant.  Abuzahra got an email when they were laying

03:49 10   over in the United Arab Emirates.  And it was from his family.

11   And he had a wife and a child and he had a good job.  And the

12   email said, "Please come home.  Your father is sick."  And

13   that's what he did.  And he returned.  He didn't go on with the

14   defendant and Abousamra.  He didn't go on to Yemen; he came

15   back.  And then, as I explained earlier, he started to distance

16   himself from the defendant and Abousamra.

17        You'll hear that as he began to distance himself these

18   other people began to -- the defendant brought these other

19   people closer to him.  You're going to hear that that's when

03:49 20   the defendant began his translation work.  That's when he

21   started using people on the Internet.  That's when he started

22   talking to younger people like Ali Aboubakr, to converts of

23   Islam like Daniel Spaulding and Daniel Maldonado, and he tried

24   to sway them as to what the real path was:  the path toward

25   Jihad.

 1          You're going to hear that, for example, when he talked

 2    to Ali Aboubakr one time -- he had just picked up a book in the

 3    Harvard Coop about Osama bin Laden.  And in talking to Ali

 4    Aboubakr he described Osama bin Laden as, "I look to him as

 5    being my real father.  I love him more than I did before

 6    without exception.  I have been following him for six years.

 7    From the moment I saw him, the hair on my arms stood on end

 8    without even knowing who he was.  He's the reason I started

 9    practicing."  That's what he's telling this young man, Ali

03:50 10    Aboubakr, the man you're going to hear from.

 11          Every one of these defendants, except Maldonado, has

 12    received some sort of assurance that the government will not

 13    prosecute them.  You're going to hear from Mr. Maldonado

 14    because eventually he was attacked when he was in Somalia

 15    because he was fighting in Jihad.  He was captured.  He was

 16    brought back to the United States.  He pled guilty to obtaining

 17    military-type training from a terrorist organization,

 18    al Qa'ida.  And he's serving ten years in jail right now.  And

 19    as part of the condition of that agreement that he's serving

03:51 20    ten years in jail for is that he will come in to this courtroom

 21    and testify truthfully about his communications with the

 22    defendant, Tarek Mehanna.  And one of the things he'll tell you

 23    is about that phone call that he made from Somalia to the

 24    defendant himself.

 25          Now, at the risk of belaboring time and speed up a

1    little bit here.  Now, the defense, I expect, will do their job

2    to zealously advocate for their client.  And in doing so, they

3    will cross-examine each of these witnesses and they will

4    vigorously try to poke holes in their story.  And as they do,

5    ladies and gentlemen, I want you to stay focused on the

6    important facts that these witnesses say.  Not what the fringes

7    are, not what their biases might be, but the fact that they are

8    coming in here and what they're telling you about what the

9    defendant actually did, what he actually said.

03:52 10         And I submit to you that together they will paint a

11   picture about someone who even then, after he had already

12   committed the crimes with which he's charged here, that he

13   continued to support the objectives that he had supported for

14   the last ten years, to support al Qa'ida, to answer that call

15   that Osama bin Laden issued.

16         Now, the sequence of the trial, to map that out for

17   you a little bit, will be -- the beginning of the trial, over

18   the next few days we're going to go through and explain to you

19   what each of these sources of evidence are that I've just

03:52 20   described generally, where they are from, so that you can have

21   confidence that these are reliable sources of evidence.  And

22   you're going to hear about his computer; you're going to hear

23   about the search in his house; you're going to hear about the

24   emails; you're going to hear about the telephone calls.  And

25   we're going to lay that foundation.  After that foundation is

1    in, then you will start being able to actually see some of

2    these communications, see some of the materials that were on

3    his computer, see some of the things that he translated, and

4    you'll hear from these witnesses who will tell you what he did

5    and why he did it.

6          Intermixed you'll hear from FBI agents and others who

7    will read some of the communications of the defendant.  They'll

8    put -- juxtapose the communications of the defendant in along

9    with some of the other evidence.  And throughout the trial you

03:53 10  will be able to make the assessment of what the defendant was

11   doing and why he was doing it.  And I submit to you, ladies and

12   gentlemen, that when you do, you'll find that this case is not

13   about the defendant being un-American, of having unpopular

14   thoughts, but it's about what he tried to do to support the

15   people who were actually killing Americans.  That's why we're

16   in this courtroom.

17         Now, everyone in this courtroom thanks you for your

18   time, the time you're about to give up in your lives, the

19   attention you're going to spend on each of the witnesses, on

03:54 20  the lawyers.  Even though what we're saying is not evidence,

21   we're presenting it to you and we appreciate your attention

22   because it's not something you typically deal with, that you're

23   dealing with over the next several weeks, so it's important

24   that you stay focused.

25         But as you do, ladies and gentlemen, I ask you to

1    consider the charges in the indictment, not some extraneous

2    factors about what the law should be or what actually the

3    defendant was able to do for al Qa'ida.  It's about his

4    conspiracy and his agreement to try to do those things for

5    al Qa'ida and lying to the FBI about it that's at the core of

6    this case.  It's his actions, and the intent of those actions

7    is what we're going to be presenting to you over this time.

8         I'd submit to you that at the end of this case when

9    we've presented all the evidence the defendant will no longer

03:55 10   be sitting there as an innocent man; he will then be guilty.

11   Because the evidence will show that he committed these acts.

12   He did it with the requisite intent and that will make him

13   guilty of each of the crimes with which he's charged.  And I

14   ask you to spend time deliberating on that, and at the end of

15   the trial come back to you and ask you to return that verdict.

16         THE COURT:  Mr. Carney?

17         MR. CARNEY:  If we could stretch for a moment?

18         THE COURT:  All right.  The jury in particular.

19         Jurors, you've been sitting there for a while.  If you

03:56 20   want to stand up and stretch or take a deep breath, that's

21   fine.  You don't have to if you don't want to, but I want you

22   to feel comfortable.

23         MR. CARNEY:  Thank you.

24         Good afternoon.  My name again is J. Carney, and this

25   is my law partner, Janice Bassil.  And now, of course, you've

1    met our client, Tarek Mehanna.  John Oh and Segal Patel are

2    also attorneys with our office.

3          I want to begin by thanking you for the sacrifice

4    you're making to be a juror in this case.  You saw how many

5    jurors were able to avoid serving.  And you had the

6    opportunity, if you wanted, to say things that would have let

7    you get off this jury.  But each of you agreed to do it, giving

8    up the time in your life away from work, away from family, away

9    from your own interests.  And I just want to tell you how

03:57 10   grateful we are that you've done that.

11          When Janice and I were appointed to represent

12   Tarek Mehanna we knew this would be a challenging case.  I can

13   tell you that this isn't the usual kind of case that lawyers in

14   Boston handle.  We knew it would be challenging, all the Arab

15   names, all the words.  I'd be less than honest if I told you

16   that I have every single name completely straight -- even after

17   all the time I've spent preparing -- so you can probably have

18   the same experience, if not -- memorizing every single name.

19   And the words are not words that we're used to.

03:58 20         But I'll also be honest and tell you that when we saw

21   the charges, it was scary.  When you read that someone is

22   charged with being a terrorist, when the person allegedly

23   conspired to kill people, when he is alleged to do all these

24   terrifying things, it's intimidating.  It's scary.  And so if

25   you're feeling that way, you can know that you're not the first

1    people in this case to kind of feel that way looking at this

2    case.

3         But what we did is we met with Tarek Mehanna.  We got

4    to know him.  We got to meet his parents.  We looked at what

5    the law is that's involved in this case.  We read what our

6    Constitution says.  We looked at the evidence, what the real

7    evidence will be that's presented before you at this trial.

8    And I submit to you that at the end of this trial the evidence

9    will show that Tarek Mehanna did not commit the crimes that the

03:59 10   government has charged him with.

11        Now, let me tell you a little bit about this young

12   man, Tarek Mehanna.  He was born in the United States, so he is

13   a United States citizen.  His parents were born in Egypt.

14   They're sitting here in the courtroom, in the front.  And

15   they're of Muslim background.

16        His parents came to the United States from Egypt and

17   became United States citizens and raised their family.  They

18   came to this country because they wanted to be able to practice

19   their religion and because they wanted to speak their beliefs

04:00 20   without fear.  And that's why they came to this country.

21        Now, I know the government has got a lot of posters

22   and diagrams and things such as that.  Well, in order to tell

23   you a little bit about Tarek's upbringing, I asked his mom to

24   give me some photos.  I'll show you some of them so that you

25   can see the normal American upbringing that this young man had;

1   for example, he sat on Santa's lap and told him what he wanted;

2   he learned to hit a baseball, or at least how to try to hit a

3   baseball.  He was going to school in Lexington.  This is his

4   school picture.  I call this "Tarek Mehanna:  The chubby

5   years."  Who am I to talk?

6        The family often went on vacation, and Tarek was the

7   child who loved to have the video camera and take pictures of

8   everybody.  They moved to Sudbury.  Tarek became a

9   rock-and-roll guitarist.  I don't know if he had much of a

04:02 10   future, but he's certainly enthusiastic.  And he grew into a

11   young man that his mom could be very proud of.

12        Tarek lived with his parents and his younger brother

13   most of his life.  He went to school, as I mentioned, in

14   Lexington and then Sudbury, where he went to Sudbury High

15   School.  While he was in high school, especially as a senior,

16   he talked with friends about what their future would be.  "What

17   did you want to do when you grow up?"  And who among us at some

18   point in our life didn't talk to someone about what we wanted

19   to do when we were a teenager?

04:03 20        Tarek decided he wanted a career in the medical field.

21   He decided he was going to go to pharmacy college, an

22   eight-year program that would end up granting him a Ph.D. after

23   he had attended and completed all of the requirements.  You'll

24   also hear that Tarek often spoke with his friends about what he

25   was going to do with his life, where he wanted to live, what

1  kind of career he wanted to have, what kind of woman he wanted

2  to marry.  And they had these conversations.

3       And what also he began to talk about when he was a

4  senior in high school was about his own background, the fact

5  that he was a Muslim in a country where Muslims are a

6  significant minority.  And he talked to his friends about this.

7  He became more curious about his Muslim background; about the

8  religion that he had grown up with, Islam; and he tried to

9  learn more and more about it.  And he'd meet with his friends

04:04 10  and he would talk to them.  He had been someone who went to the

11  mosque once a week but wasn't really a committed person.  But

12  as he was getting more mature, he wanted to learn about his

13  background, about his religion.

14       You'll hear that he would get together with his

15  friends most every weekend.  They'd go to the mosque; they'd do

16  their prayers.  Then afterwards, they'd play basketball.  And

17  after playing basketball they'd go to a pizza joint or Outback

18  Steakhouse and spend hours talking about their background and

19  what it means to be a Muslim in America, and talk about issues

04:05 20  that they were having such as:  How do you pray five times a

21  day if you're going to high school?  How do you find a girl to

22  marry if dating is completely awkward and you can't even kiss a

23  woman until you're married?  And they wanted to know about how

24  to deal with regular problems that kids deal with, but also

25  recognizing that they are Muslim and from an Islamic

1    perspective.

2           So they would have these conversations and they would

3    talk.  Tarek, in particular, became interested about his

4    background.  He would buy books on Islam.  He would read these

5    texts.  He'd bring them to the meetings with his friends.  They

6    would spend hours talking about it, the way other people might

7    talk about the Bible or other people might talk about the

8    Torah.  And he wanted to know more and more about his faith.

9           He began, on his own, translating classical texts of

04:06 10   scholars from the 15th century so that he could translate their

11   works from Arabic to English.  He kept wanting to study more

12   about Arabic so that he could speak it better and, in

13   particular, read it better.  And as a young man learning more

14   about his background, he also learned that historically Muslims

15   had been oppressed all over the world.  Historically that it

16   happened.  Throughout the centuries, Muslims had been the

17   victims of all kinds of activities trying to wipe them out.

18          He became aware of the invasion of Muslim countries;

19   for example, you'll hear how the Soviet Union invaded

04:07 20   Afghanistan, which is a Muslim country.  And the Soviet Union

21   occupied that country until the Muslims of that country could

22   get them out.  And you'll hear that the Muslims of Afghanistan

23   were able to get the United -- able to get the Soviet Union out

24   of Afghanistan because of the very significant help that the

25   United States gave those people to get that army out of their

1    land.

2         He learned that this continues on to this day, that

3    there have been instances in the country of Bosnia where the

4    majority group tried to commit a genocide of Muslims, which

5    means wipe them out, the way the Nazis tried to wipe out the

6    Jews.  You'll hear that people in Chechnya were being driven

7    from their homes, driven from their villages, simply because

8    they were Muslim.  You'll hear how Muslims were and are

9    oppressed in countries in the Middle East by dictators such as

04:09 10   in Egypt, in Libya, in Syria, things that are changing finally

11   for those first two countries.  As Tarek learned more about

12   this, he was learning about his own background, his own

13   history, his own heritage.

14        When 9/11 occurred, Tarek was shocked and confused.

15   He could not understand why Muslims would attack the United

16   States.  When the United States went into Afghanistan to seek

17   justice, he understood it.  He understood it and accepted it

18   because that's where the planning for the 9/11 attack had taken

19   place.

04:10 20        But you'll hear that when the United States invaded

21   another Muslim country, Iraq, he couldn't understand that.  He

22   couldn't accept that.  He believed that the justification for

23   the United States to go in to Iraq and overthrow the government

24   there was bogus; that it was some kind of a payback reason, and

25   that there was no justification for the United States to be in

1    Iraq, and that Tarek believed with all his sincerity that the

2    United States should get out of Iraq.

3         Now, I'm not going to be asking you to necessarily

4    agree with that.  I'm not here to try to convince you that his

5    view, or the view of millions of others, was the correct view.

6    I am asking you to accept that in this country, in the United

7    States of America, you can hold that view and not be punished

8    for it even if the federal government doesn't want you to hold

9    that view.  Here we are different, and it's a bedrock principle

04:11 10   that we can hold those types of views.

11         Tarek was outspoken about it.  Yes, the prosecutor is

12   correct.  Tarek spoke frequently to his friends about it; he

13   sent instant messages about it; he sent emails about it; he got

14   on the Internet, on forums, and talked about it.  Make no

15   mistake about it:  Tarek believed that the United States should

16   get out of Iraq.  He also believed that the Muslim people of

17   Iraq had a right to do whatever they could to get the United

18   States out of that country.

19         In my generation, to kind of show my age, there were a

04:12 20   lot of people who believed that about Vietnam:  that the United

21   States went into Vietnam on bogus reasons, that we didn't

22   belong there, we should get out of Vietnam, and that the people

23   in Vietnam were legitimate in trying to get the United States

24   out of their country.  Again, I'm not asking you to agree with

25   that, but in this country you could hold that view.  You could

1    sincerely say, "I love America, but we don't belong in

2    Vietnam," just like you can say, "I love America, but we don't

3    belong in Iraq."

4         Now, as Tarek went through college he thought about

5    what he wanted to do in his life.  He decided that after he

6    finished college and got his Ph.D. in pharmacy, he would move

7    to a Middle Eastern country, a Muslim country.  That was his

8    plan.  He would work in the medical field there as a

9    pharmacist, look for a job in a medical center.  He would look

04:13 10   for a woman to marry, have children with.  And he also would

11   look for the opportunity to continue his study of classical

12   Arabic and Islamic law.

13        What you will see is that Tarek was obsessed with

14   historical documents about Islamic law.  That frequently on

15   these forums they would discuss these ins and outs of the

16   teachings of the Koran or the sayings of the prophet.  I know

17   people who do that in regard to the Torah and try to discuss

18   various aspects of it and "What does this mean?" and "What does

19   that mean?"

04:14 20        Tarek was studying Arabic almost every single day.

21   You'll see a picture of his bedroom.  Normally, you would see

22   people at his age with maybe posters on the wall.  Maybe it

23   would be of a rock star, maybe it would be one of those funny

24   posters of a professional athlete.  But what you'll see in

25   Tarek's bedroom are these tall bookcases with Islamic book

1    after book, treatises, series -- 15-volume series on Islamic

2    law in the 15th century.  He was known among everyone as a

3    scholar, someone who really studied this material and collected

4    it, who discussed it online with other people.  And he had said

5    that he would like the opportunity someday to go to Yemen.

6         Now, why go to Yemen?  It's one of the poorest

7    countries in the world.  People there live in mud huts.  But

8    there are two things that Yemen is known for.  The first is the

9    study of what's called "pure Arabic."  The reason the Arabic in

04:16 10   Yemen is so pure is because the country is so poor and so

11   backward that it just doesn't have the influences to pollute

12   the classical language.  There aren't a lot of colloquialisms

13   that come in from other dialects or other languages; there

14   isn't an Internet presence in Yemen; people aren't watching TV

15   every night.  They're just living a subsistence life.  It's

16   almost like those Indian tribes that you read about in Brazil

17   that are discovered that are completely the same as the way

18   they lived 300, 400 years ago.  And you'll hear from experts

19   that Yemen is known worldwide as a source for studying

04:17 20   classical Arabic.

21        And the second thing that Yemen is known for is the

22   study of Islamic law.  The government of Yemen funds these

23   schools.  People can attend by just showing up.  They're not

24   political at all; they are simply religious schools.  And Tarek

25   had talked to people that at some point in his life he would

1    like to go to Yemen and study at these schools:  study Arabic

2    and study Islamic law.  And the experts, the academic experts

3    who have studied this also, will confirm for you that this is

4    exactly where you go if you wanted to study these subjects.

5         Now, Tarek had mentioned this many times to his

6    friends, about his desire to go do this sometime in Yemen.  And

7    two of the friends he was talking about are two of the people

8    that were on that chart shown by the government to you:

9    Abousamra and Kareem.  They were interested in going to Yemen

04:18 10   but for different reasons.  They wanted to go to Yemen for

11   military training with the intention of going from Yemen on to

12   Iraq and fight.  That was not why Tarek wanted to go.  The

13   reason Tarek wanted to go was to visit the schools that he

14   hoped at some point in the future to be able to attend.

15        But he knew he couldn't go for one reason:  His

16   parents probably wouldn't allow it right then, and he had no

17   money to go.  But Kareem said he'd pay for the plane ticket for

18   Tarek so Tarek could go.  Abousamra, Kareem and Tarek flew to

19   London, then to the United Arab Emirates, and then Kareem got a

04:19 20   message he should return home, and he did.

21        Tarek and Abousamra went on to Yemen.  And while

22   there, Tarek toured three different schools.  You'll hear how

23   he met with the teachers, sat in on the classes and talked to

24   the fellow students.  He spent a week there doing that.  While

25   he was doing that, Abousamra was trying to find out if there

1    was any military camp that he could get training at.

2         There were no military camps in Yemen in 2004 or 2003.

3    You'll hear from the foremost expert in the United States on

4    the country of Yemen.  He has lived in Yemen; he has visited

5    Yemen dozens of times; he has written constantly about Yemen.

6    He's the foremost expert on that country.  He speaks the

7    language; he knows the government; he knows the people; he

8    knows of these schools.  He's at Princeton University, and he

9    will come here and confirm every single thing I'm saying.

04:20 10         After Tarek had visited the schools he returned to the

11   United States.  The timing had been good for him.  His parents

12   were away, so Tarek could just leave while they were away and

13   get back before they were back.  The timing was also perfect

14   for Tarek because he could do it during the semester break.

15   And so after going to Yemen and visiting these schools, he

16   returned to the United States and resumed his education when

17   the semester began shortly after he came back, because he was

18   going there for that very purpose.

19        Abousamra, on the other hand, decided to go on to Iraq

04:21 20   and try to fight, and he did so.  He went to Jordan and then on

21   to Iraq and attempted to fight.  The reason he went to Yemen

22   was different than the reason Tarek went, and the evidence will

23   show that.

24        Upon Tarek's return from Yemen, he became even more

25   outspoken about his views that the United States should not be

1  in Iraq.  He held those views.  Indeed, many people have held

2  those views.  And he advocated those views independently of

3  al Qa'ida.  And that is probably the most important point that

4  I want to say to you.

5       In the United States Tarek Mehanna believed that he

6  could express these views of his because he felt he was doing

7  so under the freedom granted him by the First Amendment, and

8  that he was permitted to say these things.  And that's why he

9  did it so openly with his friends, in emails, in instant

04:22 10  messages.  The government makes it seem like he was doing

11  things secretly.  Tarek was on the Internet -- on these

12  Internet forums -- constantly, putting out his views and saying

13  what he believed.

14       His independent advocacy of these views is perfectly

15  legal, because for it to be a crime it would only be if you are

16  doing something directly because al Qa'ida is telling you or

17  you're hired by al Qa'ida to do it or you're ordered by

18  al Qa'ida to do it or you're paid by al Qa'ida to do it.  If

19  you are doing it because that's what you sincerely believe,

04:23 20  then recall -- the judge read a portion of the statute that

21  said independent advocacy of these beliefs, even if they're the

22  same beliefs that a terrorist organization holds, is not a

23  crime in the United States.

24       Congress put that right in the law.  And when the U.S.

25  Supreme Court reviewed this law, it affirmed that and said that

1    is completely true.  Unless you are doing something directly

2    working for al Qa'ida, it's not a crime.  And so that's what

3    I'd ask you to focus on in this evidence.

4         Tarek was not shy about his views.  Yes, he expressed

5    admiration for Osama bin Laden.  He did that.  Osama bin Laden

6    was someone who was a billionaire in a Muslim country and gave

7    up his money and went to Afghanistan to fight the Soviet Union.

8    He committed all of his resources to get the Soviet Union out

9    of the Muslim country.

04:25 10         We not only supported that effort, but we praised the

11   Muslims involved in that as freedom fighters.  There's a great

12   movie called "Charlie Wilson's War."  It's got clips of people

13   like President Reagan standing next to the Muslims and calling

14   them freedom fighters for getting the Soviet Union out of their

15   Muslim country.  And Tarek respected bin Laden for having done

16   that.  He didn't hide his beliefs; he wore them on his sleeve.

17         Tarek downloaded a lot of videos.  Like most people of

18   his generation, he lives almost on the Internet looking at

19   videos, looking at documents.  And he downloaded them.  He

04:25 20   downloaded dozens of videos, dozens of books.  He was reading,

21   he was trying to understand the other point of view.  He wanted

22   other people to understand the other point of view, so he would

23   often translate documents.

24         I expect that Judge O'Toole will tell you just what

25   the prosecutor said:  It is not illegal to download these

1    videos; it is not illegal to download these documents; it's not

2    illegal to collect all this on your computer.  You can do this

3    because we are the United States.  We're not afraid of what

4    other people say, or at least we're not supposed to be.  And

5    Tarek downloaded a lot of graphic war videos:  people shooting

6    at each other, of people being killed, of bombs going off,

7    bodies of dead soldiers, dead people.

8         He was upset about a lot of things.  He was upset when

9    he read that soldiers from a United States unit had raped a

04:27 10    14-year-old Muslim girl and then killed her and her family.  He

11    was upset when he saw the degrading pictures that came out of

12    Abu Ghraib prison, about making Muslims walk along with a leash

13    on or do things that were humiliating that I believe that all

14    good Americans were outraged about.

15         I'd ask you to look closely at the evidence, as I know

16    you will.  The government has certainly made, you know, a lot

17    of assertions.  They said that Tarek Mehanna wanted people to

18    be able to read these documents that were placed on the

19    Internet or understand these videos.  You're right.  What did

04:28 20    Libya do when the revolt against Qaddafi started?  They shut

21    down the Internet so people couldn't see it.  What does China

22    do to prevent its people from reading articles about democracy?

23    They censor the Internet.

24         If you can read something, either a document or a

25    caption to a video, you can learn what another side is

1    thinking.  If it's perfectly legal to read it, then translating

2    it so more people can read it shouldn't frighten this country

3    and shouldn't frighten us.

4         Now, the government keeps trying to make this

5    connection of Tarek to al Qa'ida.  And they made some

6    assertions here.  I'd ask you just to remember what the

7    government said when the actual evidence comes in; for example,

8    what was the climatic point that the prosecutor said about

9    tying Tarek Mehanna to al Qa'ida?  That "You will see that a

04:29 10   representative of al Qa'ida contacted the defendant and asked

11   him to translate a document, a video.  You'll see that they

12   asked him directly."  Oh, they didn't mention he didn't do it.

13   If someone wrote you a letter and asked you to do something and

14   you didn't do it, is that the same as if you did?  It will be

15   for you to decide if you accept how the government wants to

16   present this evidence.

17        Just another example:  The prosecutor said something

18   scary about plotting to shoot up a shopping mall.  Horrifying.

19   But they didn't mention that when someone said that, Tarek's

04:30 20   response was, "Oh, come on.  That's ridiculous."  Does that

21   make a difference to you?

22        What I'm asking you to look at is not just the first

23   half of what the prosecutor tells you, look at the whole

24   picture and see if that's an honest presentation of what the

25   evidence in this case really, truly is.

1          Now, what you will see in this case is that

2     Tarek Mehanna didn't do anything.  It's not a coincidence that

3     the government keeps saying, "Oh, it doesn't matter that the

4     defendant didn't do anything," "Oh, and you might not like the

5     law but, you know, if he didn't do anything, especially amidst

6     all these other people who did do things, if he talked about

7     it, made an agreement, that's enough."

8          Take a look closely at what he talked about and what

9     his positions were, because they were consistent.  What he was

04:32 10    doing is advocating that the United States get out of Iraq.  He

11    was not doing it because al Qa'ida told him to or paid him to

12    or directed him to or hired him to.  Just like millions of

13    other people have wanted the United States to get out of Iraq,

14    which we are finally apparently doing this year, and just like

15    those millions of people, he had a right to express his

16    beliefs.  He had a right to advocate for this opinion.

17         His Honor will explain what the U.S. Supreme Court

18    said about this.  The U.S. Supreme Court said you can even be a

19    member of al Qa'ida.  You can advocate for exactly the same

04:32 20    things that al Qa'ida is advocating for.  But if you are doing

21    your position -- and by the way, there's no suggestion

22    whatsoever that Tarek was ever any member of al Qa'ida.  If the

23    evidence shows that Tarek Mehanna was independently advocating

24    his own views because that's what he believed, then he is not

25    guilty of the charges against him.

1          There will be individuals who will come in and talk

2      about conversations they had with Tarek, the people on that

3      chart the government presented.  What you'll find interesting,

4      I suspect, is that every one of those people did do something.

5      They did go to a training camp or they did go to a foreign

6      country and fight or they did have direct contact with

7      al Qa'ida.  All of those people did that.  Or gave money to

8      those organizations.  All of those people on that list did

9      something, and they're going to come in and tell you about how

04:34  10     Tarek talked.  And they all have immunity now so that nothing

11     will happen to them.

12          In 2008 Tarek graduated from college with his Ph.D.

13     He looked to find a job and he was offered an excellent

14     position at a medical center in Saudi Arabia.  He made plans to

15     go there and take that job to work in a pharmacy.  He bought

16     airplane tickets to go over.  It was no secret.  Everybody that

17     he knew, he told about what he was going to be doing, and he'd

18     be going there.

19          One of the interesting facts:  The only country in the

04:35  20     world that al Qa'ida hates more than Israel and the United

21     States is Saudi Arabia.  That's where Tarek was going to live.

22     And what does the government chart say when this young man is

23     at the airport saying good-bye to his family, you know, and

24     "Keep in touch," "Write often," you know, hugging, kissing at

25     the airport as he's about to get on a plane?  The FBI comes

 1    over and places him under arrest.  How does the government

 2    characterize that?  "Mehanna attempts to leave the United

 3    States," as if that's part of the government's, you know,

 4    allegations that this was all part of his plan.

 5         Do you remember when the government told you that

 6    Tarek Mehanna was on the Tibyan website as an administrator

 7    where so much of this discourse, this interchange occurred?  I

 8    feel like, sometimes, Paul Harvey, that news broadcaster.

 9    Well, here's the rest of the story that the government didn't

04:36 10    mention:  Tarek was kicked off Tibyan and not allowed to engage

11    in any of the discussions on the forum on Tibyan because he was

12    viewed as being too moderate in his views.  And they kicked him

13    off and wouldn't let him even participate.

14         You don't have to agree with any belief that

15    Tarek Mehanna had; you don't have to agree with other beliefs

16    that people have, whether it's that the United States should

17    not be in Iraq, whether the United States should do one thing

18    or another around this country.  You don't have to believe it.

19    I'm not even asking you to believe it any more than I'm asking

04:37 20    anyone to believe what you hold true.

21         As Americans we have that freedom.  We can hold on to

22    these beliefs and we can speak them even if it upsets the

23    federal government.  It's what makes the United States so

24    great, so strong and so free.

25         Thank you very much.

1              THE COURT:  Okay, jurors.  We went a little bit over

2     what we would normally do, but I wanted to be sure we got

3     through this phase of -- the beginning phase of the case were

4     the opening statements.  We'll recess now and come back and

5     start in the morning with the actual presentation of the

6     evidence.

7              Now, I have some important things to say to you.

8     There will be a lot of occasions like this, the end of the

9     day's worth of evidence -- or not quite evidence yet, I guess,

04:38 10    today -- and we'll be breaking and be going off with what

11    you've heard during the day sort of fresh in your mind.  I want

12    you please to avoid any discussion of the evidence in the case

13    among yourselves as a jury and, particularly, with anybody

14    outside -- folks at home.  You could tell them what's -- the

15    general outline of what's going on, but don't get into the

16    details of the evidence.  It is very important that at the end

17    of the case when you're deliberating on the evidence, you're

18    all focused on exactly the same body of information that you've

19    heard collectively here in the courtroom and not on something

04:39 20    somebody might by chance say over dinner as you're talking

21    about something in the case, okay?  So please stay away from

22    the details of the evidence in the case with any discussion

23    with anybody here or at home.

24              We talked a little bit in the selection process about

25    the fact that there will be media coverage of this event.  I'm

1    sure that's the case and there will be stories in the papers

2    and on TV.  Please avoid them.  It's part of your duty now as

3    sworn jurors to keep your minds focused on, again, the common

4    body of evidence that you will have from being here in the

5    courtroom and seeing it.  And so we ask you to do that, and I'm

6    sure you will.

7         In this modern age we now have a new caution.  We have

8    to ask jurors to avoid any independent research on the

9    Internet.  It is so easy to do.  We all do it.  And you may

04:40 10   hear things -- maybe you'll hear a name, maybe you'll hear a

11   place -- and you're just kind of curious about it.  Please

12   avoid it.  Again, it would give you, as an individual,

13   something that the rest of the jury didn't have, and that would

14   be inappropriate.

15        When the case is all over you can do all of those

16   things:  talk to your friends about what you've heard in the

17   case, go online and see what you can find out further.  But for

18   the time being while you're serving in the office of juror,

19   please abide by those restrictions, all right?

04:40 20        Thank you, again, for your service.  As both counsel

21   have said to you, we do appreciate it deeply.  And we'll recess

22   now and see you tomorrow morning to begin the evidence in the

23   case.

24              THE CLERK:  All rise for the Court and jury.

25              (The Court and jury exit the courtroom at 1:23 p.m.)

1          THE CLERK:  Court will be in recess.

2          (The proceedings adjourned at 1:23 p.m.)

3

4              C E R T I F I C A T E

5

6          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

7  Dahlstrom, RMR, CRR, Official Reporters of the United States

8  District Court, do hereby certify that the foregoing transcript

9  constitutes, to the best of our skill and ability, a true and

10 accurate transcription of our stenotype notes taken in the

11 matter of Criminal Action No. 09-10017-GAO-1, United States of

12 America v. Tarek Mehanna.

13

14 /s/ Marcia G. Patrisso
   MARCIA G. PATRISSO, RMR, CRR
15 Official Court Reporter

16 /s/ Cheryl Dahlstrom
   CHERYL DAHLSTROM, RMR, CRR
17 Official Court Reporter

18

19 Date:  10/27/11

20

21

22

23

24

25