UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )
         Plaintiff,           )
                              ) Criminal Action
v.                            ) No. 09-10017-GAO
                              )
TAREK MEHANNA,                )
                              )
         Defendant.           )
                              )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY FOUR
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, October 28, 2011
9:01 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
 3            Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Jeffrey D. Groharing, Trial Attorney
              National Security Division
 7        950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
10            Janice Bassil, Esq.
              John E. Oh, Esq.
11        20 Park Plaza
          Suite 1405
12        Boston, Massachusetts  02216
          - and -
13        LAW OFFICE OF SEJAL H. PATEL, LLC
          By: Sejal H. Patel, Esq.
14        101 Tremont Street
          Suite 800
15        Boston, Massachusetts  02108
          On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2                     DIRECT   CROSS   REDIRECT   RECROSS
       WITNESSES FOR THE
 3       GOVERNMENT:

 4     THOMAS KAHLIL SARROUF

 5          By Mr. Chakravarty      11                58
            By Ms. Bassil                   29                62
 6
       KEVIN SWINDON
 7
            By Mr. Chakravarty      63               125
 8          By Ms. Patel                    99               131

 9     PAUL S. MUELLER

10          By Mr. Groharing       134

11     NICHOLAS MUELLER

12          By Mr. Chakravarty     141

13                        E X H I B I T S

14

15     GOVERNMENT'S        DESCRIPTION              FOR ID   IN EVD.

16     No. 10        Photograph of room                       18

17     Nos. 1 - 18   (Premarked)                               20

18     No. 766       FISA authorization information form      137

19     DEFENDANT'S

20     No. 1070      Photograph                                40

21     No. 1071      Photograph                                54

22     No. 1072      Photograph                                56

23     No. 1073      Chain of custody form created by Swindon 118

24

25
```

1              (The following proceedings were held in open court

2      before the Honorable George A. O'Toole, Jr., United States

3      District Judge, United States District Court, District of

4      Massachusetts, at the John J. Moakley United States Courthouse,

5      One Courthouse Way, Boston, Massachusetts, on October 28, 2011.

6              The defendant, Tarek Mehanna, is present with counsel.

7      Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8      are present, along with Jeffrey D. Groharing, Trial Attorney,

9      U.S. Department of Justice, National Security Division.)

10             THE CLERK:  All rise.

11             (The Court enters the courtroom at 9:01 a.m.)

12             THE CLERK:  For a continuation of the Mehanna trial.

13     Please be seated.

14             THE COURT:  Good morning.  We're still waiting on one

15     juror.  So I understood there's some things that we can discuss

16     before that, and I want to get that done while we wait for the

17     juror.  Transportation problems with the juror.

18             MS. BASSIL:  Your Honor, I had a motion in limine on

19     the first witness that's going to be called.  I have an

00:18 20     objection to a number of the government's exhibits -- or

21     potential exhibits.

22             THE COURT:  Go ahead.

23             MS. BASSIL:  And it may be that the government wasn't

24     intending to do this, but the first witness is, I understand

25     it, a Massachusetts state trooper who has had extensive

```
 1   military service.  And I requested that his military service
 2   not be part of the introduction to him.
 3           MR. CHAKRAVARTY:  The first thing I just wanted to
 4   point out is that Mr. Sarrouf is in the courtroom so --
 5           MS. BASSIL:  I don't care.
 6           MR. CHAKRAVARTY:  -- it doesn't matter for this
 7   prospect of it, but the government does intend to establish
 8   that he is in the military; but more importantly, that the
 9   particular experiences that he's had in the military are
00:18 10  relevant to his search for both information as well as what is
11   typically evidence of a crime, something that he has
12   proficiency in both through his military experience as well as
13   through his law enforcement experience.
14           THE COURT:  Why?  Why does he have the experience --
15           MR. CHAKRAVARTY:  He's a special forces officer in the
16   military and he has been trained and has participated in
17   exploitation of information in the past.
18           MS. BASSIL:  First of all, I don't know if he speaks
19   Arabic or not, and many of the items he seized were Arabic.
00:19 20  There's not a single report or a single piece of paper that
21   he's written.  And I think that his military experience is
22   irrelevant.  He's being introduced pursuant -- concerning the
23   2006 search of the defendant's home and what was seized.
24           THE COURT:  My reaction is that we typically allow
25   some background of witnesses to introduce them to the jury.
```

1    This may be even more relevant than usual.  I mean, it's the

2    kind of thing we normally would not pause on.  I guess my only

3    question would be if -- I mean, if he were truly simply a

4    record-keeper bringing in the phone company records or

5    something, then I'd say it's beside the point.  If there's

6    going to be some contest to what he did and how he did it, I

7    think the government's entitled to boost his credentials in

8    advance.

9              MS. BASSIL:  I mean, we have received -- as I said

00:19 10   there's not one piece of paper.  If he wrote notes, if he wrote

11   a report, we have received nothing.

12             THE COURT:  Well, I don't -- yeah, I don't know why

13   that matters.  But anyway.  I think they can do it.  If it gets

14   excessive we'll tamp it down, but...

15             MS. BASSIL:  Your Honor, I have objections to many of

16   the exhibits.  And let me just do it by category.

17             THE COURT:  These would come in through this witness?

18             MS. BASSIL:  Yes.

19             THE COURT:  All right.

00:20 20             MS. BASSIL:  So there are a number of exhibits that

21   are in Arabic, all right, a couple of -- two emails -- and

22   these are photographs, by the way.  They weren't -- what they

23   did is when they went in, they pulled documents out and took

24   pictures of them.

25             THE COURT:  All right.

1          MS. BASSIL:  So a number of them are in Arabic.  The

2     government translation of these documents into English is not a

3     translation; it's a summary opinion of what the translator

4     thought the documents were about.  They're not word-for-word

5     translations.  And as such, it seems to me putting in Arabic

6     documents are irrelevant and they make no sense at all unless

7     there is accurate translation of them.

8          It's hearsay to have a summary opinion of a

9     translator.  You could give ten translators ten documents and

00:21 10    they're going to have different opinions about what's

11    important.  We have, like, 20-page documents with a half-a-page

12    summary.

13         MR. CHAKRAVARTY:  In the first instance, your Honor,

14    just so you know it's ripe, the witness is not anticipated to

15    testify to the accuracy of any translation; it will just be the

16    documents that were found in the defendant's room at this

17    point.  The issue is will it at some point be ripe as to

18    whether an Arabic-language document go to the jury without any

19    basis aside from testimony to assess it.  And for that reason,

00:21 20    the government will be offering those summary translations as a

21    guide for the jury so that -- not today, but...

22         THE COURT:  That was going to be my question.  This

23    witness will simply identify them as something found in the

24    possession of the defendant or something like that?

25         MR. CHAKRAVARTY:  True.

1          THE COURT:  And then you won't offer them yet until
2     you have --
3          MR. CHAKRAVARTY:  I will offer the found documents but
4     not the translations of those found documents.
5          THE COURT:  Okay.
6          MS. BASSIL:  Well, what's the point of --
7          THE COURT:  Found documents will be -- to a jury that
8     doesn't read or write Arabic will be obscure, right?
9          MR. CHAKRAVARTY:  Correct.
00:22 10          MS. BASSIL:  And there are no translations.
11          THE COURT:  It's like putting a thing in evidence.  I
12     think it's okay.
13          MS. BASSIL:  Right.  But what's the point of putting
14     the thing in if there's no translations of it?
15          THE COURT:  Well, we'll see.  If they can connect,
16     they can; if they can't, they can't.
17          MS. BASSIL:  Well, my objection is --
18          THE COURT:  As I understand, the general point is to
19     describe what was found in the search.
00:22 20          MS. BASSIL:  Well, yes and no.  It's not as though
21     they're putting everything in; they're putting specific
22     documents in.  And as you said, they make no sense to the jury
23     unless there is an accurate translation, and there is no
24     translation.
25          THE COURT:  Well, it's a two-step process, and I think

1    the first step can be taken.

2            MS. BASSIL:  The remainder of my objections, your

3    Honor, have to do with simply these documents -- the documents

4    that are in English are basically hearsay.

5            THE COURT:  We'll have to take those one by one, I

6    would imagine.

7            MS. BASSIL:  Okay.  That's fine.  That's fine.

8            THE COURT:  And it depends upon the purpose for which

9    they're offered.

00:23 10            MS. BASSIL:  All right.  And that's all I have.

11            Oh, also, your Honor, the government has a request for

12    curative instructions.

13            THE COURT:  Oh, yes.

14            MS. BASSIL:  We would ask --

15            THE COURT:  I'm not going to give it now.

16            MS. BASSIL:  We would ask to defer it till Monday.

17            THE COURT:  I want the jury concentrating on evidence

18    right now.  The time will come.  Let me just say I agree

19    entirely with the government's point in the motion.  As a

00:23 20    matter of fact, I agree with it because the government's motion

21    quotes me.  But they are correct.  And I will reemphasize that

22    the First Amendment is in the background, but it is not the

23    primary point of decision because it is entirely congruent as a

24    result of the *Holder* case with the statutory exclusion from the

25    offense of independent advocacy.

1          So the statute itself, as interpreted by the Supreme

2    Court, excludes independent advocacy, and the question is

3    focused on the statute and whether the government can prove the

4    culpability under the First Amendment-approved sanction of

5    providing material support.

6          But I expect we're not going to hear about those

7    issues until the end when I have to instruct the jury about the

8    elements.  And if we do start to hear about it I may change my

9    mind, but I think it's not necessary now.  We heard enough of

00:24 10   that yesterday, okay?

11          So we'll take a break.  As soon as the last juror is

12   here, we'll come out and begin.

13          Oh, let me just ask the government:  Will this witness

14   take the whole morning?

15          MR. CHAKRAVARTY:  We don't think so.

16          THE COURT:  Who else do you have?

17          MR. CHAKRAVARTY:  We have a computer forensic

18   specialist who will describe computer forensics generally and

19   the acquisition of a hard drive that was obtained that day.

00:24 20          THE CLERK:  All rise for the Court.  Court will be in

21   recess.

22          (The Court exits the courtroom and there is a recess

23   in the proceedings at 9:09 a.m.)

24          THE CLERK:  All rise for the Court and the jury.

25          (The Court and jury enter the courtroom at 9:17 a.m.)

1           THE COURT:  Good morning, jurors.

2           THE JURORS:  Good morning.

3           THE CLERK:  Everyone be seated.

4           THE COURT:  Mr. Chakravarty, you may proceed.

5           MR. CHAKRAVARTY:  Thank you, your Honor.  The

6    government calls Thomas Sarrouf.

7                     THOMAS SARROUF, duly sworn

8           THE CLERK:  Please be seated.  State your name and

9    spell your last name for the record.

00:33 10           THE WITNESS:  Thomas Kahlil Sarrouf, S-A-R-R-O-U-F.

11           THE CLERK:  Thank you very much.

12                     DIRECT EXAMINATION

13   BY MR. CHAKRAVARTY:

14   Q.   Good morning, Mr. Sarrouf.

15   A.   Good morning.

16   Q.   How are you currently employed?

17   A.   I am a Massachusetts State Trooper.

18   Q.   How long have you been a state trooper?

19   A.   For 15 years.

00:33 20   Q.   In what capacities have you been a trooper?

21   A.   I served in the division of field services for eight years

22   in uniform working out of a barracks, and since 2004 I've been

23   assigned to the division of investigative services and assigned

24   to the FBI Joint Terrorism Task Force.

25   Q.   And is the investigative services essentially the

1    detective portion of the state police?

2    A.   Yes, it is.

3    Q.   Before becoming a state trooper, what did you do?

4    A.   I've been in the United States military.  Directly before

5    being on the state police I owned a business.

6    Q.   In what capacity were you in the military?

7    A.   I've been in the service for a combination of 24 years,

8    active duty and reserve, in the capacities of infantry officer,

9    and for the last 12 years as a special forces officer.

00:35 10   Q.   Have you had specialized training in special forces in a

11   variety of different topics?

12   A.   Yes, I have.

13   Q.   Specifically with regard to intelligence, do you have any

14   experience?

15   A.   Yes, I do.

16   Q.   Describe generally what your experience has been in

17   intelligence.

18   A.   In intelligence, special forces, teams are collectors of

19   intelligence both in technical collection and human collection.

00:35 20   Q.   "Human" meaning human intelligence?

21   A.   Human intelligence.

22   Q.   All right.  Drawing your attention back to August of 2006,

23   where were you assigned at that time?

24   A.   I was assigned to the Joint Terrorism Task Force.

25   Q.   Can you describe to the jury what the Joint Terrorism Task

1    Force is?

2    A.    The Joint Terrorism Task Force is a task force under the

3    control of the FBI where multiple law enforcement agencies come

4    together for the objective of conducting terrorism

5    investigations.

6    Q.    And is the state police one of the participants on the

7    Joint Terrorism Task Force?

8    A.    Yes, it is.

9    Q.    When a state police trooper is assigned to the Joint

00:36 10   Terrorism Task Force, who do they answer to?

11   A.    They report to the FBI supervisor.

12   Q.    And are you called a task force officer?

13   A.    Yes, I am.

14   Q.    Do you receive any special federalization, because

15   normally you're a state trooper and now you're acting in the

16   federal capacity?

17   A.    Yes.   We're deputized as special federal marshals.

18   Q.    In the course of your experience on the Joint Terrorism

19   Task Force -- I should add, is there an abbreviation for the

00:36 20   Joint Terrorism Task Force?

21   A.    The JTTF.

22   Q.    I may slip into saying "JTTF."

23        Did you participate in any JTTF investigations?

24   A.    Yes, I have.

25   Q.    And were there several different investigations that you

1    participated in?

2    A.   Yes, there have been.

3    Q.   I'm going to draw your attention specifically to one back

4    in August of 2006.  Did you have occasion to participate in the

5    JTTF investigation involving the defendant?

6    A.   Yes, I did.

7    Q.   In what capacity?

8    A.   I was asked to triage and participate in a

9    court-authorized search of the home of Tarek Mehanna.

00:37 10   Q.   And was there an operational planning meeting before that

11   search?

12   A.   Yes, there was.

13   Q.   Okay.  Describe generally what was discussed at that

14   meeting.

15           MS. BASSIL:  Objection.

16           THE COURT:  Overruled.

17           THE WITNESS:  There was a discussion on the breakup of

18   the personnel and what each task for those personnel would be;

19   the location of where the search would be; what the contingency

00:37 20   plan for this -- if anything occurred during the search; and

21   then what exactly we were doing at the search site.

22   BY MR. CHAKRAVARTY:

23   Q.   You were assigned your role?

24   A.   Yes, I was.

25   Q.   Now, you mentioned this was a court-authorized search.

1   Was it an overt search as you would do with a typical search

2   warrant?

3   A.   No, it was not.

4   Q.   Describe how it was going to be executed.

5   A.   It was a clandestine search.

6   Q.   What does that mean?

7   A.   It means you hide the fact that the actual search occurred

8   so nobody knows that anything took place at that time.

9   Q.   And so I'm going to draw your attention to August 10,

00:38 10   2006.  Describe what you did on that day.

11   A.   I took part in the search.  I was -- when called to go to

12   the residence, I went to the residence to identify items of

13   intelligence that had intelligence potential, then to gather

14   information in order to determine a nexus to terrorism or

15   evidence of a crime.

16   Q.   And where did you go?

17   A.   I went to the address at 6 Fairhaven Circle in Sudbury.

18   Q.   Is that the defendant's address?

19   A.   Yes, it is.

00:39 20   Q.   Around what time did you get there?

21   A.   We started the operation in the early evening.

22   Q.   Approximately how many agents, ballpark?

23   A.   There were over a dozen agents.

24   Q.   Describe the neighborhood the defendant lived in.

25   A.   It's a typical upper-middle-class neighborhood, nice

```
 1  neighborhood in Sudbury.
 2  Q.   Can you describe the house?
 3  A.    It's a two-story colonial house, center entrance, lamppost
 4  on the outside front lawn -- I remember the garage being off to
 5  the left-hand side of the home -- at the end of a cul-de-sac.
 6  Q.   Now, did you know whether anyone was home when you got
 7  there?
 8  A.   No, nobody was home.
 9  Q.   So you knew that nobody was home?
10  A.   Yes, I did.
11  Q.   What did you know about where the occupants were?
12  A.   I knew they were overseas.
13  Q.   You mentioned that there were some precaution -- you
14  mentioned that there was a clandestine search.  Were there any
15  precautions taken to ensure that people wouldn't detect that
16  you were going to be searching this house?
17  A.   Yes, there were.
18  Q.   Describe generally what you remember.
19  A.   They knew there was a key-holder to the residence.  There
20  was a surveillance unit that was assigned to monitor where that
21  key-holder was to ensure that nobody came to the residence.
22  They also had positions in a perimeter set up to ensure that
23  nobody entered the area where this search could be seen.
24  Q.   At some point did you enter the house?
25  A.   Yes, I did.
```

00:40 (at line 10)

00:40 (at line 20)

```
 1   Q.   And what were your observations generally of the house?

 2   A.   The house is a well-kept house, very orderly and neat.

 3   Q.   And did you make it to the defendant's room?

 4   A.   Yes, I did.

 5   Q.   And describe what you saw there.

 6   A.   I saw a bookcase with multiple books, a bed, a desk -- you

 7   know, a desk and some other items that were there.

 8        MR. CHAKRAVARTY:  At this point I'd ask you to call up

 9   Exhibit 10, please.

10        THE COURT:  Jurors, again particularly in the back

11   row, you may want to get your monitors ready.  They're going to

12   display some...

13        Okay?  All set?

14        MR. CHAKRAVARTY:  At this point, your Honor, I don't

15   know whether we do want to publish it to the jury.

16        THE COURT:  All right.  I thought you did.  The jury's

17   now excluded.  The witness has it.

18        MR. CHAKRAVARTY:  Thank you.

19   BY MR. CHAKRAVARTY:

20   Q.   Trooper Sarroug, I just projected what is Exhibit 10.  Do

21   you recognize that?

22   A.   Yes, I do.

23   Q.   And what does that appear to be?

24   A.   Tarek Mehanna's bedroom.

25   Q.   Is this how it looked to you the day you entered on
```

1    October 10th *[sic]*?

2    A.    Yes, it is.

3    Q.    And is it a fair and accurate depiction of that room?

4    A.    Yes, it is.

5           MR. CHAKRAVARTY:   I'll ask now at this point this

6    exhibit be entered into evidence and be published to the jury.

7           THE COURT:   Okay.   What number is it?

8           MR. CHAKRAVARTY:   Exhibit 10.

9           MS. BASSIL:   No objection.

00:43 10          (Government Exhibit No. 10 received into evidence.)

11   BY MR. CHAKRAVARTY:

12   Q.    Trooper Sarroug, this photograph:   Was this taken by the

13   search team that day?

14   A.    Yes, it was.

15   Q.    And were there other photographs taken that day?

16   A.    Yes, there were.

17   Q.    Describe the process for conducting the search of the

18   defendant's room on August 10th.

19   A.    When an object was identified as having intelligence

00:43 20   potential or a potential nexus to terrorism, the object would

21   be photographed and then put back into the position exactly as

22   it was before it was touched in order to make sure nobody knew

23   that anybody had been in the home.

24   Q.    So you weren't actually taking documents or materials from

25   the defendant's room.   Is that right?

1  A.   No, we did not take them.

2  Q.   So the way you memorialized what was there is the

3  photographs?

4  A.   Yes.

5  Q.   What happened to those photographs?

6  A.   Those photographs were taken and placed onto compact disk,

7  logged and placed into evidence.

8  Q.   And at some point after the search did you have an

9  opportunity to review those photographs?

00:44 10  A.   Yes, I did.

11  Q.   And do they fairly and accurately depict the materials

12  that were in the defendant's room that day?

13  A.   Yes, they were.

14  Q.   And before you came in to testify today, did you again

15  review the CDs to determine whether those photographs were a

16  fair and accurate depiction of the defendant's room?

17  A.   Yes, I did.

18       MR. CHAKRAVARTY:  May I approach, your Honor?

19       THE COURT:  You may.

00:44 20  BY MR. CHAKRAVARTY:

21  Q.   I'm going to show you an evidence envelope and ask you if

22  you recognize this.

23  A.   Yes, I do.

24  Q.   What is that?

25  A.   That's 14B.  That is the envelope in which the compact

1    disk with the images of the photos taken on that day are

2    enclosed in.

3    Q.    Just for the record, it's emblazoned with 1B4.

4    A.    1B4.

5    Q.    Did you also have an opportunity to review what we've

6    premarked Exhibits 1 through 18 in this case?

7    A.    Yes, I did.

8    Q.    And were all of those exhibits found on those CDs that you

9    just described in 1B4?

00:45 10    A.    Yes, they were.

11    Q.    And do they fairly and accurately depict some of the

12    materials that were found in the defendant's room that day?

13    A.    Yes, they did.

14          MR. CHAKRAVARTY:  I'd ask for the convenience of the

15    Court to introduce Exhibits 1 through 18 without the A.  So

16    some of the exhibits have -- like 5A, we're not introducing the

17    A portions, just the -- which are translations.  So we're just

18    introducing the 1 through 18.

19          MS. BASSIL:  My objection was stated earlier, your

00:45 20    Honor.

21          THE COURT:  Yes.  Okay.  Overruled.  It may be

22    admitted.

23          This is 1 through 18, you say?

24          MR. CHAKRAVARTY:  Yes, your Honor.

25          (Government Exhibit Nos. 1 through 18 received into

1    evidence.)

2            MR. CHAKRAVARTY:   Bring up Exhibit 11, please.

3    BY MR. CHAKRAVARTY:

4    Q.    Trooper Sarrouf, what is this?

5    A.    This is another photo of inside of Tarek Mehanna's

6    bedroom.

7    Q.    And is this how it appeared on that day?

8    A.    Yes, it is.

9    Q.    And there's a laptop in between the two bookcases?

00:46 10   A.    Yes, that's correct.

11   Q.    Is that how it appeared?

12   A.    Yes, it was.

13   Q.    It's very orderly.  Is that how it appeared?

14   A.    Yes, it was.

15   Q.    And can you describe how the search was conducted?

16   A.    Items would be identified methodically and photographed.

17   The search team would take those items, photograph them, log

18   them and then place them back into the positions that -- where

19   they had originally been taken from.

00:46 20   Q.    Okay.  And specifically that laptop computer that's

21   sitting there, do you know what happened to that?

22   A.    That was searched.

23   Q.    Okay.  How was it searched, to the best of your knowledge?

24   Not technically, I understand --

25   A.    Another agent conducted the search on that.

1    Q.    Do you know who that agent was?

2    A.    Yes.  Kevin Swindon.  Special Agent Kevin Swindon.

3    Q.    And approximately how long did the search last?

4    A.    Approximately 10 to 12 hours.

5    Q.    And what was your primary role during the search?

6    A.    To identify items or to gather information in order to

7    determine a nexus to terrorism or evidence of a crime.

8    Q.    Were there Arabic-language documents found?

9    A.    Yes, there were.

00:47 10    Q.    What did you do with Arabic-language documents?

11    A.    We identified -- I identified things of intelligence

12    value.  And if I did not know what it was, we catalogued and

13    photographed it to be looked at by a translator.

14         MR. CHAKRAVARTY:  I'm going to ask to publish Exhibit

15    12, please.

16    Q.    Do you recognize what this is?

17    A.    Yes, I do.

18    Q.    What is that?

19    A.    It is a bag of video cassettes that was in the room.

00:48 20    Q.    Do you know what happened to that bag?

21    A.    Yes, I do.

22    Q.    Describe what happened to that bag.

23    A.    We took the bag out of the room and brought it to the

24    command post outside the house for viewing and cataloguing.

25    Q.    Okay.  And did you see what the -- what was in the bag?

1    A.    Yes, I did.

2    Q.    Describe what was in the bag.

3    A.    There was a series of multiple videotapes that I remember.

4    There was a videotape on Bosnia.  There's videotapes on

5    Chechnya.  There's videotapes of Iraq.  There was a videotape

6    that was titled "State of the Ummah."  That's what I remember.

7    Q.    Okay.  And did you watch any of the videos?

8    A.    Yes, I did.

9    Q.    And what generally did they depict?

00:49 10          MS. BASSIL:  Objection.

11          THE COURT:  Overruled.

12          THE WITNESS:  They depicted jihadist scenes, combat

13    scenes in areas of conflict around the globe.

14          THE COURT:  Trooper Sarrouf, just a housekeeping

15    matter.  There was an objection briefly by the defense lawyer.

16    Would you just pause so that we can deal with that before you

17    go ahead and answer?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Thank you.

00:49 20    BY MR. CHAKRAVARTY:

21    Q.    After you viewed those videos, what did you do with the

22    videos?

23    A.    After they were viewed they were catalogued, photographed,

24    and then the videos were taken back to the home.

25    Q.    And like the other items that you described, were they

1    placed back where they were found?

2    A.   Yes, they were.

3    Q.   Okay.  I'm going to ask you now to focus in on some of the

4    specific documents that you saw on that day.

5         MR. CHAKRAVARTY:  Can you bring up Exhibit 2, please.

6    Q.   Do you recognize what this is?

7    A.   Yes, I do.

8    Q.   And what is that?

9    A.   That's Tarek Mehanna's address book.

00:50 10   Q.   It obviously says "Tarek Mehanna" on the top?

11   A.   Yes.

12   Q.   Was this a multipage book?

13   A.   Yes, it is.

14        MR. CHAKRAVARTY:  Can you just go to page 5, just a

15   random page.

16   Q.   All right.  So is this essentially what would appear,

17   different names and addresses, inside the book?

18   A.   Yes.  That is correct.

19   Q.   Drawing your attention to Exhibit 5.

00:50 20        MR. CHAKRAVARTY:  Pull that up, please.

21   Q.   Can you see that?

22   A.   Can you make it larger?

23   Q.   I guess I can enlarge it.

24   A.   Yes, that is a -- it is an English document from Azzam

25   Publications.

```
 1   Q.    Now, I'm just going to use --

 2         MR. CHAKRAVARTY:  Scroll to the last page, please.

 3   Q.    Is there a date on that?

 4   A.    Yes.  November 2001.

 5   Q.    I'm going to draw your attention to specifically a portion

 6   of that document.

 7         MR. CHAKRAVARTY:  Go to page 8, please.

 8         Sorry.  Just one moment.  It's hard to read.

 9         (Pause.)
```
00:53
```
10         MR. CHAKRAVARTY:  I'm sorry.  The next page.  Page 9.

11   Q.    I'll highlight one portion.  Can you read that?

12   A.    Yes.  "Whether you are employed or unemployed, student or

13   working, married or unmarried, the time has come for you to

14   make a decision regarding your faith.  If you are at college or

15   university, you can easily take a year out of your studies to

16   travel the world.  Likewise, if you are working, either resign

17   from your job and take a year out or request unpaid leave from

18   your employer.  Many large companies offer unpaid leave to

19   their employees for periods ranging from two months to one
```
00:54
```
20   year.  That way you can fulfill your obligations and not have

21   to give up your job."

22   Q.    Now, I'm going to highlight this paragraph and ask you to

23   read this.

24   A.    "The situation has reached that of an emergency and fresh

25   manpower is desperately needed in order to defend against the
```

1    Jewish-backed Northern Alliance and the dark forces of the

2    crusaders themselves.  It is expected that the crusaders will

3    carry out their attacks using the Northern Alliance and cannon

4    fodder, and that is why more manpower is required defeating

5    this unholy alliance than against the crusaders themselves who

6    are only expected to bomb from high up the sky or drop small

7    numbers of troops for a few hours at a time."

8    Q.    Are you familiar to what theater the Northern Alliance

9    existed in in 2001?

00:55 10    A.    Yes, I am.

11    Q.    Where is that?

12    A.    That's Afghanistan.

13    Q.    I draw your attention now to Exhibit 6, please.  Do you

14    recognize what this is?  I'm just highlighting the top caption.

15    A.    It is a printout from Azzam Publications titled "For Jihad

16    and Mujahideen."

17    Q.    And is this a website?

18    A.    It is from the Azzam Publications website.

19    Q.    I just highlighted the bottom banner, the footer.  Can you

00:55 20    just read the date on that?

21    A.    It is October 20, 2000.

22    Q.    I'd ask you to read this paragraph.

23    A.    "As for the Muslims, they must bear" --

24          MS. BASSIL:  Can you give me a page?

25          MR. CHAKRAVARTY:  It's the first page.

1           THE WITNESS:  "As for the Muslims, they must bear the

2     following things in mind:  No amount of demonstrations,

3     protests, flag burnings, effigy burnings, speeches and

4     conferences will defend the Palestinian Muslims from the

5     Israeli barbarians."

6     BY MR. CHAKRAVARTY:

7     Q.    That's fine.  The rest is there, but I'd rather you read

8     another portion.

9           MR. CHAKRAVARTY:  And can we now go to the last page.

00:56 10     I'm sorry, it's three pages, so the second page.

11    Q.    And I'm just going to highlight the last paragraph.  This

12    is page 2.  Can you read that?

13    A.    "In conclusion, it is time the Muslims put an end to

14    demonstrations, protests, petitions, signatures, speeches,

15    conferences, letters, shouting and screaming and direct their

16    efforts into something that will practically defend Muslim

17    blood and land.  In this, they should actually take some

18    lessons from the Israelis, because no matter what one says,

19    Israel is very effective in defending its citizens and people.

00:57 20    If military preparation does not stop the bloodshed today, then

21    at least it will tomorrow, with the help of Allah."

22          MR. CHAKRAVARTY:  Pull up Exhibit 7, please.

23    Q.    Can you tell what this is?

24    A.    Yes.  It is a printout of a Yahoo News article.

25    Q.    And can you read the title?

1    A.   Yes.   "Philippine Camps are Training al Qa'ida Allies,

2    Officials Say."

3    Q.   Can you read the date, please?

4    A.   It is June 1, 2003.

5         MR. CHAKRAVARTY:  Call up Exhibit 9, please.

6    Q.   Can you describe what this is?

7    A.   It is an English document titled "The Yemenis Scholars

8    Reinforce the Call for Jihad."

9    Q.   And is this also a multipage document?

00:58 10   A.   It is.

11        MR. CHAKRAVARTY:  Would you call up Exhibit 4, please.

12   Q.   Can you describe what this is?

13   A.   This is the unreleased interview of Osama bin Laden.

14   Q.   Is this a multipage document as well?

15   A.   It is.

16   Q.   Does it appear to be an interview with Osama bin Laden?

17   A.   It is.

18        MR. CHAKRAVARTY:  Just to give the jury a sense of

19   some of the Arabic-language materials, even though we're not

00:59 20   going to read it, so they can see what it looks like, would you

21   just mind calling up Exhibit 1?

22   Q.   Is this one of the emails that were located that day?

23   A.   Yes, they were -- yes, it is.

24   Q.   Again, is this in the Arabic language?

25   A.   It is an Arabic-language email.

```
 1    Q.   And are you aware of whether the Arabic-language materials
 2    were later translated?
 3    A.   Yes, they were.
 4         MS. BASSIL:  Objection.
 5         THE COURT:  No, that may stand.
 6    BY MR. CHAKRAVARTY:
 7    Q.   The date of this first email -- I'm just highlighting the
 8    header information.  Can you see the date?
 9    A.   Tuesday, October 23rd, 2001.
10    Q.   Again, this was printed out in the room on that day?
11    A.   Yes, it was.
12    Q.   So you photographed the printout?
13    A.   That's correct.
14         MR. CHAKRAVARTY:  That's all the questions I have at
15    this time.
16                        CROSS-EXAMINATION
17    BY MS. BASSIL:
18    Q.   Good morning, Trooper Sarrouf.  My name is Janice Bassil.
19    I represent Tarek Mehanna.
20    A.   Good morning, ma'am.
21    Q.   I wanted to ask you a few questions about this search.
22    You said that you went to Mr. Mehanna's home.  Is that right?
23    A.   That's correct.
24    Q.   And that's the home that he lives in with his parents and
25    brother?
```

```
 1    A.    Yes, that's correct.

 2    Q.    This is not his individual residence?

 3    A.    No, it is not.

 4    Q.    And is this --

 5          THE COURT:  Well, I can give you the camera.  Do you

 6    want it displayed just to the witness or --

 7          MS. BASSIL:  I would like to display that.  I've given

 8    a copy to the government.  I would like it displayed to

 9    everyone.

10          THE COURT:  Is there any objection to that?

11          MR. CHAKRAVARTY:  No objection, your Honor.

12          THE COURT:  All right.

13          Jurors, you may have inferred already I control who

14    sees what, so sometimes we have different exposure depending on

15    what the matter is.

16    BY MS. BASSIL:

17    Q.    And is this an accurate picture of Mr. Mehanna's home?

18    A.    Yes, it is.

19    Q.    Okay.  You hesitated for a while.  Is that because this

20    picture wasn't on the CD that you reviewed?

21    A.    I don't recall that that was on the CD.

22    Q.    All right.  And you said, I think, you went at night.  Is

23    that correct?

24    A.    It was in the early evening.

25    Q.    Early evening.  Was it dark out?
```

| | | |
|---|---|---|
| 1 | A. | Not when we started the search. |
| 2 | Q. | But it was dark by the time you ended? |
| 3 | A. | It became light when it ended again. |
| 4 | Q. | So you went through the night? |
| 5 | A. | Yes. |
| 6 | Q. | What time did you get there to search? |
| 7 | A. | Early in the evening. |
| 8 | Q. | What time is that? |
| 9 | A. | Approximately six o'clock, seven o'clock. |

01:03 10  Q.   All right.  Trooper Sarrouf, do you read Arabic?

11  A.   Some.

12  Q.   All right.  And when you say "some," are you referring to

13  modern Arabic?

14  A.   Modern Arabic.

15  Q.   Okay.  Now, you said that -- I think Mr. Chakravarty

16  brought up that this was an ability to go into the home without

17  anybody knowing.  Is that correct?

18  A.   That's correct.

19  Q.   All right.  And you knew that they -- the family was away

01:03 20  visiting relatives in Egypt, correct?

21  A.   That's correct.

22  Q.   Now, the doors were locked, were they not?

23  A.   I'm assuming it was.

24  Q.   And the windows were locked?

25  A.   I don't know.

1    Q.   All right.  Now, you said there was a key-holder.  That

2    was a neighbor.  Is that correct?

3    A.   I do not know who the key-holder was.

4    Q.   All right.  And you said the key-holder was kept under

5    observation?

6    A.   That is my understanding.

7    Q.   And what does that mean?

8    A.   Surveillance was observing where the key-holder was.

9    Q.   All right.  And, now, in this neighborhood were you

01:04 10    concerned that a neighbor might see people at the house?

11    A.   That was not my role.

12    Q.   All right.  Were the lights turned on inside the house?

13    A.   There was low light, use of flashlights and such.

14    Q.   So flashlights were used?

15    A.   Yes.

16    Q.   Now, I noticed that when you had -- when a picture was

17    shown of Mr. Mehanna's bedroom, there was a light on.  Do you

18    recall that?

19    A.   Yes.

01:04 20         MS. BASSIL:  If we could pull up -- that would be

21    Exhibit 9, I believe -- 10.  That's correct.  If we could

22    publish that, your Honor.

23    Q.   Now, I just want to ask you about some of that picture.

24    You're aware that the banner on the wall is the flag of Saudi

25    Arabia, are you not?

| | | |
|---|---|---|
| 1 | A. | I'm not aware.  I don't know. |
| 2 | Q. | Can you read the Arabic? |
| 3 | A. | No, I can't. |
| 4 | Q. | Are you aware that it says "Allah is the one God and |
| 5 | | Mohammad is his messenger"? |
| 6 | A. | I don't know that. |
| 7 | Q. | Have you ever been to Saudi Arabia? |
| 8 | A. | No, I haven't. |
| 9 | Q. | And have you ever seen the Saudi Arabian flag? |
| 01:06 10 | A. | I have. |
| 11 | Q. | And you don't recognize that? |
| 12 | A. | No, I don't. |
| 13 | Q. | Now, the light -- did your task force turn on that light? |
| 14 | A. | I was not the one that turned on any light. |
| 15 | Q. | All right.  When you went into his bedroom, were you the |
| 16 | | first person in the bedroom? |
| 17 | A. | No, I was not. |
| 18 | Q. | Was the light already on when you went in? |
| 19 | A. | I don't remember. |
| 01:06 20 | Q. | Now, next to the light -- do you see a stand next to the |
| 21 | | light, sort of a crosspiece there? |
| 22 | A. | Yes. |
| 23 | Q. | And there was a Qur'an on that? |
| 24 | A. | I do not know. |
| 25 | Q. | You don't know? |

```
 1    A.   I don't know.

 2    Q.   Did you look at it?

 3    A.   I don't remember if I did.

 4    Q.   All right.  Do you know what the Qur'an looks like?

 5    A.   Yes, I do.

 6    Q.   Now -- so, how did -- do you know how you gained entry

 7    into the house?

 8    A.   I did not gain entry into the house.

 9    Q.   Well, was there any discussion of how entry would be

10    gained?

11    A.   I don't know how entry was gained into the house.

12    Q.   But somehow the door was unlocked?

13    A.   I know it was a court-authorized entry into the house.

14    Q.   I understand that.  But I'm asking you if the door was,

15    itself, unlocked and how it was unlocked.

16    A.   I don't know.

17    Q.   And was it locked when you left?

18    A.   I do not know.

19    Q.   Now, you said it was court-authorized.  That is a special

20    court that authorizes it, correct?

21    A.   Yes, it is.

22    Q.   It's a secret court, correct?

23              MR. CHAKRAVARTY:  Objection.

24              THE WITNESS:  No, it is not.

25              THE COURT:  Well, yeah, I'll sustain the objection to
```

1    the question.

2    BY MS. BASSIL:

3    Q.    It was not Judge O'Toole, correct?

4    A.    That is correct.

5    Q.    Now, in getting that court authorization, Mr. Mehanna's

6    lawyers are not aware of it.  Is that correct?

7    A.    That's correct.

8    Q.    And Mr. Mehanna or his parents are not aware of it ahead

9    of time.  Is that correct?

01:08 10    A.    That's correct.

11    Q.    Now, you said the idea was not to let anybody know that

12    you had been in there, correct?

13    A.    That's correct.

14    Q.    All right.  And is there a euphemism or term that's used

15    for these kinds of searches?

16    A.    It is a clandestine search.

17    Q.    Have you ever heard the term "sneak and peek"?

18    A.    It is a court-authorized-and-approved search of the home.

19    Q.    I understand that, Trooper Sarrouf.  But have you ever

01:08 20    heard the term "sneak-and-peek"?

21    A.    I have heard of the term.

22    Q.    And that is used to describe these searches, is it not?

23    A.    No; it is a clandestine search.

24    Q.    Well, I understand officially it's a clandestine search,

25    but you have heard the term "sneak-and-peek" used about these

1    searches, have you not?

2    A.    I have.

3    Q.    Thank you.  Now, when this search was done -- I'm sorry.

4    You also said there was a contingency plan?

5    A.    That's correct.

6    Q.    And what was the contingency plan?

7    A.    If somebody was coming in the vicinity of the search area

8    down the road, that that person would be stopped before getting

9    to the location where the search was taking place.

01:09 10   Q.    I see.  Were there police cars or trooper cars or some

11   kind of car that sort of cut off the cul-de-sac?

12   A.    I do not know.

13   Q.    Okay.  Now, did you wear -- did you and your team wear

14   gloves?

15   A.    Yes, I did.

16   Q.    Now, you said that documents -- certain documents that

17   Mr. Chakravarty put up on the screen -- were photographed.  Is

18   that correct?

19   A.    That's correct.

01:09 20   Q.    Now, I noticed on these photographs that there's sort of a

21   gray metal background.  Was there something that the

22   photographs were put on -- I'm sorry.  Was there something that

23   the documents were put on to take a picture of them?

24   A.    I do not remember.

25   Q.    Okay.  And do you know who took the pictures?

```
 1   A.   A search team.

 2   Q.   All right.  More than one person?

 3   A.   Yes.

 4   Q.   And was a flash used for these pictures?

 5   A.   I do not remember.

 6   Q.   Okay.  Now, do you know where these documents came from,

 7   the ones that Mr. Chakravarty showed?

 8   A.   They came from the room of Tarek Mehanna.

 9   Q.   Do you know where in the room?

10   A.   From -- mostly from the desk and the desk area of his

11   room.

12   Q.   Were you --

13              MS. BASSIL:  If I may, I'm going to publish -- I'm

14   going to show a photograph.  I provided the government with

15   this.

16              MR. CHAKRAVARTY:  My concern is that if it's being

17   shown to the jury, then the process is that they're admitted

18   into evidence.

19              MS. BASSIL:  I'm sorry.  I can't hear.

20              MR. CHAKRAVARTY:  The typical process is that things

21   that are shown to the jury --

22              MS. BASSIL:  I'll put it into evidence.

23              THE COURT:  Is there any objection to it being put in

24   evidence?

25              MR. CHAKRAVARTY:  No, your Honor.  If the witness can
```

1    authenticate it.

2              THE COURT:  All right.  Well, show it to the witness

3    first.

4              MS. BASSIL:  You can do that, correct?

5              THE COURT:  I can.

6    BY MS. BASSIL:

7    Q.   Trooper Sarrouf, are you familiar with that photograph?

8    A.   No.

9    Q.   Okay.  Do you know if any document -- you're not familiar

01:11 10   with that?  But there was, in fact -- did you look in

11   Mr. Mehanna's closet?

12   A.   Yes, I did look in Mr. Mehanna's closet.

13   Q.   And did you see in his closet a box with various

14   documents?

15   A.   I do not remember.

16   Q.   Okay.  Well --

17             MS. BASSIL:  If I may show the witness something, your

18   Honor?

19             THE COURT:  Okay.

01:11 20   BY MS. BASSIL:

21   Q.   Now, first of all, Trooper Sarrouf, can you look on the

22   top left-hand corner?  Do you see that?  There is what appears

23   to be a metal object with screws?

24   A.   Yes.

25   Q.   All right.  And are you familiar with that being the

```
 1   background against which these documents were photographed?
 2   A.   Some of them were, yes.
 3   Q.   All right.  And next to this is a wooden box.  Is that
 4   correct?
 5   A.   That's correct.
 6   Q.   With what appears to be a number of papers?
 7   A.   Yes.
 8   Q.   And, in fact, some of these papers -- that is where some
 9   of the papers came from.  That's where the papers came from
10   that Mr. Chakravarty showed.  Isn't that correct?
11   A.   They may have.  I do not know.
12        MS. BASSIL:  Your Honor, may I publish this photograph
13   to the jury and put it into evidence?
14        MR. CHAKRAVARTY:  I'm just trying to recall what the
15   defense's answers were about authenticating.  No objection,
16   your Honor.
17        THE COURT:  Now, has this been premarked or is this in
18   addition?
19        MS. BASSIL:  No, your Honor.  I assumed what I would
20   do is anything that went into evidence today, I would provide
21   Mr. Lyness a disk the next day with the exhibits.
22        THE COURT:  All right.  So for additional
23   non-premarked exhibits, we'll just go sequentially where the
24   numbering left off?
25        MS. BASSIL:  Correct.  Correct.
```

1          THE COURT:  Do you know where that is?  I mean, it's

2     from the list, right?  What's the last number on the list?

3          THE CLERK:  1069.

4          MS. BASSIL:  This will be 1070.

5          THE COURT:  So the photo is admitted as Exhibit 1070.

6          (Defense Exhibit No. 1070 received into evidence.)

7          THE COURT:  And it is now being displayed to the jury,

8     hopefully.  The connection is pretty slow.

9     BY MS. BASSIL:

01:13 10   Q.   So, Trooper Sarrouf, not to be mysterious with the jury,

11     this was the piece we were referring to that was used as a

12     background to photograph documents, correct?

13     A.   I don't know that.

14     Q.   I'm sorry?

15     A.   I don't -- I don't know what that particular object is.

16     Q.   Well, could we -- and this is the box I referred to

17     with -- there are documents here, papers here, correct?

18     A.   That is a box with documents in it.

19          MS. BASSIL:  All right.  Now, if we could go back, I'd

01:14 20   like to pull up Exhibit 4, if we may.  It's not on that one;

21     that's why I didn't know if the jury has it.

22          THE COURT:  We were having trouble with the time.

23     Sometimes there's a significant delay.  Usually it comes, but

24     there is a delay.

25     BY MS. BASSIL:

1    Q.   Now, Trooper Sarrouf, Exhibit 4 is one of the documents

2    that was photographed and Mr. Chakravarty referred to.  Is that

3    right?

4    A.   That's correct.

5    Q.   And this is an interview from 2001.  Is that correct?

6    A.   You'd have to show me the last page.

7    Q.   Well, actually, I could show you the very first two lines.

8    "The following interview is approximately one hour long and has

9    been conducted outdoors on October 21st, 2001, in a tent by the

01:15 10   Kabul correspondent of Al-Jazeera," correct?

11   A.   That's correct.

12   Q.   Now, Mr. Sarrouf, you have no evidence whether Mr. Mehanna

13   ever read that document, do you?

14   A.   No, I do not.

15   Q.   Now, there were no highlightings on the document with a

16   yellow highlighter, correct?

17   A.   That's correct.

18   Q.   There were no notes in the margins, correct?

19   A.   That's correct.

01:16 20   Q.   The document was not folded or rolled up, correct?

21   A.   I do not know that.

22   Q.   Well, were you there when the document was photographed?

23   A.   Yes, I was.

24   Q.   Were you there when it was found?

25   A.   Yes, I was.

1  Q.   All right.  And if you'd look at the corners of the

2  document, all right, do you see -- do you see the corners of

3  the document?

4  A.   Yes.

5  Q.   All right.  Would you describe those as pretty crisp

6  corners?

7  A.   Yes, I would.

8  Q.   They don't appear to be torn or worn?

9  A.   That's correct.

01:16 10  Q.   Okay.  And, Trooper Sarrouf, do you ever have books next

11  to your bed that you haven't read yet?

12  A.   Yes.

13  Q.   And documents in your office that you haven't read yet?

14  A.   Yes.

15  Q.   Stacks of them?

16  A.   Yes.

17  Q.   Me too.

18       Now, let's take a look at Exhibit 5, if we could.

19            MS. BASSIL:  Is that Exhibit 5?  My things stay up

01:17 20  there?

21            THE COURT:  No, I'll clear it, but you could clear

22  them as well.  I just cleared them, but you could clear it as

23  well.

24            MS. BASSIL:  How do I clear it?

25            THE COURT:  It's done.

```
 1              MS. BASSIL:  Okay.  If we could go to page 8 of that
 2     exhibit.  All right.  And if we could go -- let me see.  If we
 3     could go to right here.  Yes, please.
 4     BY MS. BASSIL:
 5     Q.  All right.  This was -- this that you read about, about
 6     coming and fighting and so forth, this was an appeal to
 7     Pakistanis all over the world, correct?
 8     A.  I don't know.
 9     Q.  Did you read the document?
01:18 10   A.  I read part of the document.
 11    Q.  Would you agree with me that that's in the document?
 12    A.  That's in the document.
 13    Q.  Thank you.
 14             MS. BASSIL:  And, again, if we could go to the first
 15    page of the document, please?
 16    Q.  And, again, the first page of this document, you don't
 17    know for a fact whether or not Mr. Mehanna read it?
 18    A.  I do not know.
 19    Q.  The corners are pretty crisp just like before?
01:18 20   A.  Yes.
 21    Q.  There's no highlighting?
 22    A.  No.
 23    Q.  There's no notations or notes on the side?
 24    A.  No, there's not.
 25    Q.  It's not wrinkled?
```

1    A.   No, it is not.

2    Q.   Or torn or worn?

3    A.   That's correct.

4         MS. BASSIL:  I'm sorry.  If we could go back to

5    Exhibit 10, which was Mr. Mehanna's bedroom.  Yes.

6    Q.   All right.  I noticed over here there appear to be a lot

7    of cassette tapes neatly placed, correct?

8    A.   That's correct, yes.

9    Q.   And were the tapes taken down?  Were the boxes examined?

01:19 10   A.   I recall the cassettes photographed and some of them taken

11   down, yes.

12   Q.   Some, not all?

13   A.   I do not remember.

14   Q.   All right.  And, again, there are books here and books

15   here, correct?

16   A.   Yes.

17   Q.   And some of those books were in Arabic?

18   A.   Yes.

19   Q.   And some of those books were in English?

01:20 20   A.   That's correct.

21   Q.   All right.

22        MS. BASSIL:  And if we could go to Exhibit 11, please.

23   Q.   Now, this was also Mr. Mehanna's bedroom.  Is that

24   correct?

25   A.   That's correct.

```
 1   Q.   And this was his bookcase.  Is that correct?

 2   A.   That's correct.

 3   Q.   Now, you see these books right here --

 4   A.   Yes.

 5   Q.   -- that I've underlined?

 6        Those appear to be matched.  Is that correct?  A set?

 7   A.   Yes.

 8   Q.   And the same thing over here.  These look like a set?

 9   A.   Yes.

10   Q.   And these look like a set?

11   A.   Ma'am, I can't see those.

12   Q.   Okay.  Can you see these, that these look like a matched

13   set of books?

14   A.   Yes.

15   Q.   All right.  And were you able to read the covers on the

16   books?

17   A.   I don't remember.

18   Q.   All right.  Do you remember whether they were books in

19   Arabic on theology and law?

20   A.   I do not remember.

21   Q.   All right.  Now, who made the decision as to what would be

22   photographed?

23   A.   Either myself or the other special agent in the room.

24   Q.   Who was the other special agent in the room?

25   A.   Special Agent Heidi Williams.
```

1    Q.   And do you know if she speaks Arabic?

2    A.   I do not know.

3    Q.   And were books taken down and random pictures taken of

4    pages in books in Arabic?

5    A.   I do not remember.

6    Q.   All right.  Did you, yourself, take any of these documents

7    or books or anything and place them on a location to be

8    photographed?

9    A.   No, I did not.

01:21 10    Q.   Okay.  Did you just point to areas and say, "This is what

11   you should take"?

12   A.   I identified what I felt was -- had intelligence value.

13   Q.   All right.  And you identified certain documents in Arabic

14   even though you didn't know what they were, but you felt they

15   had intelligence value?

16   A.   I read some Arabic.

17   Q.   Not enough to read the Saudi Arabian flag, right?

18   A.   That's in calligraphy.

19   Q.   Oh, it's in calligraphy?

01:22 20    A.   Yes, it is.

21   Q.   Calligraphy is, in fact, much of the way classical Arabic

22   is written.  Isn't that correct?

23   A.   No.

24   Q.   Now, you said that -- you showed us you took a photograph

25   of Mr. Mehanna's address book.  Is that correct?

    1   A.   I did not take the photograph.

    2   Q.   Someone took the photograph?

    3   A.   Yes, that's correct.

    4   Q.   And do you have any idea how old the address book is?

    5   A.   I do not know.

    6        MS. BASSIL:  Now, if we could go to Exhibit 6.

    7   Q.   And Exhibit 6, I notice that it says on the top "page 2 of

    8   4."  Do you see that?

    9   A.   Yes.

01:23  10   Q.   All right.  And there was no page 1 that was photographed.

   11   Is that correct?

   12   A.   I do not know.

   13   Q.   All right.  Well, it appears that this is the first page

   14   of that exhibit.  Is that correct?

   15   A.   That's correct.

   16   Q.   And that states Azzam Publications.  Is that correct?

   17   A.   That's correct.

   18   Q.   And I believe you said it was from October 20th of 2000?

   19   A.   That's correct.

01:23  20   Q.   And, again, looking at this, there is a little fold right

   21   here, correct?  A little fold down of the paper?

   22   A.   Yes.

   23   Q.   All right.  But page 1 appears to be missing --

   24   A.   Yes.

   25   Q.   -- correct?

1      And the other corners on this document, on the sides,

2  they're pretty neat and clean, are they not?

3  A.   Yes.

4  Q.   There's no highlighting, no notations?

5  A.   No.

6  Q.   It's clean; it's not wrinkled; it's not folded; it's not

7  torn?

8  A.   No.

9           MS. BASSIL:  And if we could go to Exhibit 7.

01:24 10  Q.   So, again, on Exhibit 6, you have no knowledge whether

11  Mr. Mehanna read that or not, correct?

12  A.   I do not know.

13           MS. BASSIL:  All right.  Exhibit 7.

14  Q.   And this is a -- this appears to be a printout from Yahoo

15  News.  Is that correct?

16  A.   That's correct.

17  Q.   And I believe the date on that -- you can actually see

18  that, but I believe it's -- let me see if I've got it -- May

19  30th -- I'm sorry.  I think it's June 1, 2003, on the bottom.

01:25 20  That's where I saw it.  Do you see that?

21  A.   Yes.

22  Q.   And the same thing:  You have no knowledge whether

23  Mr. Mehanna read this?

24  A.   No, I do not.

25  Q.   And, again, it's not folded or torn, correct?

```
 1   A.   No, it doesn't appear to be.

 2   Q.   It's not highlighted, no notes on it?

 3   A.   No.

 4   Q.   Thank you.

 5        MS. BASSIL:  If we could go to Exhibit H.  Pull up

 6   Exhibit H.

 7   Q.   This is in Arabic, correct?

 8   A.   That's correct.

 9   Q.   And, again, you have no knowledge whether Mr. Mehanna read

10   that?

11   A.   No, I do not.

12   Q.   And certainly there are no notations of words that were

13   translated into English?

14   A.   There's --

15   Q.   On this page.

16   A.   There's nothing on that page.

17   Q.   And, again, the page is pretty clean and neat, correct?

18   A.   That's correct.

19   Q.   Now, do you know in looking at these documents in what

20   order -- in what order they were?  Were they stacked on top of

21   each other?

22   A.   I do not remember.

23   Q.   Did you take any notes?

24   A.   No, I did not.

25   Q.   Did you write a report?
```

```
 1   A.   No, I did not.
 2   Q.   This is -- we are now, what, five years away from this
 3   search, correct?
 4   A.   That's correct.
 5   Q.   It will be six years in August.  Is that correct?
 6   A.   That's correct, yes.
 7   Q.   And you were relying on what to refresh your memory,
 8   looking at the actual pictures?
 9   A.   That's correct.
10   Q.   Do you normally write reports when you are involved in a
11   case?
12   A.   Not when I'm doing what my role was in this case.
13   Q.   I see.  But you normally do write reports as a state
14   trooper, correct?
15   A.   That's correct.
16   Q.   And one of the reasons you write reports is in order to
17   have an accurate memory of what you saw and heard when a
18   particular event occurred?
19   A.   My role in this case was not to write a report.
20   Q.   I understand that.  But you write reports normally so that
21   you have an accurate memory of what occurred, how it occurred,
22   when it occurred and so forth, don't you?
23   A.   On my cases I do, yes.
24   Q.   Yes.  And, in fact, you get a lot of training when you
25   first become a state trooper about writing reports, don't you?
```

1   A.   Yes.

2   Q.   And those reports are considered to be very important, are

3   they not?

4   A.   My role in this case was to look and identify an object or

5   an item of intelligence -- potential intelligence value, and

6   that is it.

7   Q.   I understand that.  But I am asking you that typically as

8   a state trooper you write reports.

9   A.   I do.

01:27 10   Q.   And, in fact, isn't it a basic tenet of the state trooper

11   report writing that if it isn't in the report, it didn't

12   happen?

13   A.   I'm not under the obligation of the state police policy

14   and procedures.

15   Q.   I understand that.

16   A.   I'm following attorney general guidelines as a task force

17   officer.

18   Q.   And as a task force officer, the guidelines are don't take

19   any notes, don't write any reports?

01:28 20   A.   In this case I was not obligated to write a note or a

21   report.

22   Q.   You're not obligated.  Could you have done so?

23   A.   I could have.

24   Q.   You chose not to?

25   A.   That was not my role in this case.

1    Q.   I see.  Well, I'm asking you today do you know

2    whether -- where a particular document was and you don't

3    recall, right?

4    A.   It is in the -- no, I do not recall.

5    Q.   And I'm asking you what location the document was in and

6    you don't recall, correct?

7    A.   It was in the bedroom of Tarek Mehanna.

8    Q.   I understand that.  But in the bedroom there were -- there

9    was a location where there were stacks of documents, correct?

01:28 10  A.   That's correct.

11   Q.   Now, you said that -- I think we looked at a bag that

12   had -- there was a bag, and you said that there were videos in

13   it.  Is that correct?

14   A.   That's correct.

15   Q.   And you said that you -- where did you view the videos?

16   A.   At the command post where the operation was run from.

17   Q.   So was there a van parked nearby that had the capability

18   of looking at videos?

19   A.   No.  It was in a building.

01:29 20  Q.   A building?

21   A.   Yes.

22   Q.   All right.  And how far away were you from the home when

23   you looked at the videos?

24   A.   Maybe a mile, a half mile.  I'm not sure.

25   Q.   Now, you didn't take any notes of the videos that you

```
 1  watched?

 2  A.    No, I did not.

 3  Q.    You didn't summarize any of them?

 4  A.    No, I did not.

 5  Q.    There's no report of them?

 6  A.    No, there is not.

 7  Q.    Now, do you recall that you also searched the attic of

 8  Mr. Mehanna's home?

 9  A.    I don't remember.

01:30 10        MS. BASSIL:  Well, if I may, I'd like to show a

11  picture.  If the witness can look at it first, your Honor?

12              THE COURT:  Uh-huh.

13  BY MS. BASSIL:

14  Q.    Is this familiar to you?

15  A.    No, it is not.

16  Q.    All right.  Is this familiar to you?

17  A.    I was not at that location.

18  Q.    Were you aware whether the attic was searched?

19  A.    I do not know.

01:30 20        MS. BASSIL:  Now, if we could go back to Exhibit 10

21  for a moment again, please?  Thank you.  And if the witness can

22  just be shown this, your Honor?

23              THE COURT:  Well, okay.

24              MS. BASSIL:  You can't do it if one's up there?

25              THE COURT:  I can't do both at the same time.
```

```
 1              MS. BASSIL:  All right.  If we could pull that one

 2    down, and if the witness can be shown this picture?  Thank you.

 3    BY MS. BASSIL:

 4    Q.   And are you familiar with that picture at that location?

 5    A.   That was in the bedroom of Tarek Mehanna.

 6    Q.   Was that his closet?

 7    A.   Yes, it was.

 8              MS. BASSIL:  And, your Honor, I would ask to admit

 9    this as Exhibit 1071.

01:31 10              MR. CHAKRAVARTY:  No objection.

11              THE COURT:  Okay.  Admitted as 1071.

12              (Defense Exhibit No. 1071 received into evidence.)

13              MS. BASSIL:  And if it could be published to the jury?

14    I think the jury has it even though -- I think they get it

15    before there.

16              THE COURT:  Yeah, it's a technical issue.

17    BY MS. BASSIL:

18    Q.   And if you see here, Trooper Sarrouf -- do you see this

19    box right here?

01:31 20    A.   Yes.

21    Q.   And there's documents in there?  Do you see that?  There's

22    two notebooks?

23    A.   Yes.

24    Q.   And do you know if the documents that were pulled out,

25    that some of them came from there?
```

```
 1   A.   I don't remember.
 2        MS. BASSIL:  And, I'm sorry, if we could go back
 3   again -- actually, I believe it's Exhibit 11 of the desk area.
 4   Yes, that's right.
 5   Q.   Right here is -- this was a bulletin board.  Do you see
 6   that?
 7   A.   Yes, I do.
 8   Q.   And did you take any documents from that bulletin board?
 9   A.   I do not remember.
10        MS. BASSIL:  And, your Honor, I want to show the
11   witness a photograph, so I would take that down.
12   Q.   And do you recognize that photograph?
13   A.   No, I don't.
14   Q.   Did it appear -- does it appear to you to look like the
15   bulletin board that was next to the desk?
16   A.   I don't remember.
17   Q.   Do you see on the bottom here what appears to be a poster
18   of some sort?
19   A.   I don't know what you're referring to, ma'am.
20   Q.   Okay.  Do you see on the side there appears to be a lamp?
21   I'm sorry.  I think you didn't -- I cut it off.
22        Do you see right here there appears to be a lamp?
23   A.   A lamp?
24   Q.   Well, I don't know what you would call it, but there's
25   something hanging there.
```

```
 1   A.   Like a keychain?

 2   Q.   Call it a keychain.  Yes?

 3   A.   Yes.

 4        MS. BASSIL:  All right.  And if we could go back to

 5   Exhibit 11.

 6   Q.   And do you see that keychain right there?

 7   A.   Yes.

 8   Q.   All right.  And do you see the bottom of that poster that

 9   we just looked at in that picture before?

10   A.   Yes.

11   Q.   All right.  So would you agree with me --

12        MS. BASSIL:  Your Honor, if I could just go back to

13   the picture that was just shown to the witness?

14   Q.   Would you agree with me that this was a close-up of that

15   bulletin board?

16   A.   Yes.

17        MS. BASSIL:  Your Honor, may I enter this into

18   evidence as Exhibit 172?

19        MR. CHAKRAVARTY:  No objection.

20        THE COURT:  Okay.  1072.

21        MS. BASSIL:  1,072.  I'm sorry.

22        (Defense Exhibit No. 1072 received into evidence.)

23   BY MS. BASSIL:

24   Q.   And, in fact, what is on his bulletin board, if you can

25   see it, it says, "Ponder these verses from the Qur'an,"
```

1    correct?

2    A.    That's correct.

3    Q.    And there's Arabic, correct?

4    A.    That's correct.

5    Q.    And then there's English?

6    A.    That's correct.

7    Q.    And this is verse 22.  Chapter 10, verse 22, of the

8    Qur'an, correct?

9    A.    Yes.

01:35 10    Q.    "It is he, Allah, who enables you to travel throughout the

11    land and sea"?

12    A.    That is correct.

13    Q.    And this is what the defendant -- this is what Mr. Mehanna

14    had on his bulletin board when he sat at his desk, correct?

15    A.    I do not know that.

16    Q.    Okay.  Well, it was next to his desk and it was a bulletin

17    board, correct?

18    A.    That's correct.

19    Q.    All right.  And there was a chair at his desk, was there

01:36 20    not?

21    A.    That's correct.

22    Q.    And are you saying you don't know if he sat in the chair?

23    A.    I don't know what was there when he sat at his desk.

24    Q.    All right.  But he was gone from his home when you went

25    in, correct?

```
  1    A.   That's correct.

  2    Q.   He didn't know you were coming?

  3    A.   That's correct.

  4    Q.   Trooper Sarrouf, was every book --

  5         MS. BASSIL:  Could we get Exhibit 11 back up again?

  6    Thank you.

  7    Q.   Was every book in that bookcase taken down and

  8    photographed?

  9    A.   Not that I remember.

01:37 10    Q.   Was every page of every book taken down and photographed?

 11    A.   No.

 12    Q.   And are you familiar with what this picture is?

 13    A.   Yes, I do.

 14    Q.   What is it?

 15    A.   It is Mecca.

 16    Q.   It's Mecca.  It's a picture of people praying at Mecca.

 17    Is that correct?

 18    A.   That's correct.

 19         MS. BASSIL:  If I may just have one moment.

01:37 20         (Pause.)

 21         MS. BASSIL:  I have no further questions, your Honor.

 22         MR. CHAKRAVARTY:  Briefly on redirect, your Honor?

 23         THE COURT:  Go ahead.

 24                    REDIRECT EXAMINATION

 25    BY MR. CHAKRAVARTY:
```

1    Q.    Trooper Sarrouf, you were asked about whether this was a

2    clandestine search.  Why was this search a clandestine search

3    as opposed to a regular search that you normally participate

4    in?

5              MS. BASSIL:  Objection.

6              THE COURT:  You may answer it.

7              THE WITNESS:  It was a national security

8    investigation.

9    BY MR. CHAKRAVARTY:

01:38 10   Q.    In your experience when you conduct an overt search of a

11   target, are you able to continue your investigation of that

12   target after you conduct that search?

13   A.    Not generally after, no.

14   Q.    Because they know you're looking at them?

15   A.    That's correct.

16   Q.    You were asked about some specific exhibits.

17             MR. CHAKRAVARTY:  I'd ask to call up Exhibit 4,

18   please.

19   Q.    This was that interview with Osama bin Laden.  Is that

01:38 20   right?

21   A.    That's correct.

22   Q.    Do you see -- I just want to get to who the person was who

23   conducted this interview.

24   A.    It appears a correspondent from Al-Jazeera.

25   Q.    Can you read the name?

```
 1   A.    Tayseer Allouni.

 2   Q.    And I would ask you to read some of the things that were

 3   in that interview.  Can you read that, please?

 4   A.    Yes.  "The battle has moved to inside America.  We will

 5   continue this battle, God permitting, until victory or we meet

 6   God."

 7   Q.    Can you read that line?

 8   A.    "If inciting people to do that is terrorism, and if

 9   killing those who kill our sons is terrorism, then let history

01:39 10   be witness that we are terrorists."

11   Q.    You were asked about Exhibit 8.

12         MR. CHAKRAVARTY:  Would you call that up?

13   Q.    This is an Arabic-language document?

14   A.    Yes, that's correct.

15   Q.    I'm just going to highlight the footer on the bottom.  Can

16   you read that, please?

17   A.    Yes.  This is the Dar al-Mustafa website in Yemen.

18   Q.    And you see the date on that printout?

19   A.    Yes.  It's from January 30, 2004.

01:40 20   Q.    Does that appear to be the date that this was printed?

21         MS. BASSIL:  Objection.

22         THE COURT:  A little foundation.

23         MR. CHAKRAVARTY:  Sure.

24   BY MR. CHAKRAVARTY:

25   Q.    Have you printed items off of the internet before?
```

1   A.   Yes, I have.

2   Q.   In most browsers does it put the http address as well as

3   the date of the printing?

4   A.   Yes, it does.

5   Q.   Based on your lay experience, do you have an assessment as

6   to when this was printed?

7   A.   It was printed on January 30, 2004.

8   Q.   You were asked about Exhibit 5.

9        MR. CHAKRAVARTY:   Call that up?  And go to page 8 --

01:41 10   excuse me -- go to page 9.  I'm mixing them up.

11   Q.   And you were asked about whether this was to Pakistanis or

12   not.  Can you read this --

13        MS. BASSIL:   Well, objection, your Honor.

14        THE COURT:   No, overruled.

15   BY MR. CHAKRAVARTY:

16   Q.   Just read this, please?

17   A.   "Why is this appeal being made to Pakistanis alone?

18   Because it is likely that they are the only ones able to travel

19   to Pakistan without any immigration difficulties, or to obtain

01:41 20   visas at worldwide Pakistani consulates if they do not hold

21   Pakistani passports.  I have given some instructions below for

22   obtaining Pakistani visas for Pakistanis who do not hold

23   Pakistani passport are given below."  *[sic]*

24        MR. CHAKRAVARTY:   That's all the questions I have,

25   your Honor.

```
 1          MS. BASSIL:  I just have two, your Honor.

 2          THE COURT:  Okay.

 3                         RECROSS-EXAMINATION

 4   BY MS. BASSIL:

 5   Q.   The Exhibit 4 that Mr. Chakravarty just referred to, it

 6   was an interview with Osama bin Laden by an Al Jazeera

 7   correspondent.  Is that correct?

 8   A.   That's correct.

 9   Q.   And Al Jazeera is a news satellite network in the Arab

10   world, is it not?

11   A.   That's correct.

12   Q.   It is the largest news satellite network in the Arab

13   world?

14   A.   That is correct.

15   Q.   And, in fact, many of the interviews and information and

16   news on Al Jazeera ends up on things like CNN and CBS News and

17   ABC News, does it not?

18   A.   That's correct.

19   Q.   And, again, you don't know if Mr. Mehanna read that

20   interview, correct?

21   A.   I do not know.

22   Q.   And the exhibit that Mr. Chakravarty referred to, the

23   Dar al-Mustafa, that says pages -- it said that it's a document

24   page 1 of 2, correct?

25   A.   I'd have to refer back to it.
```

01:42 at line 10
01:43 at line 20

1           MS. BASSIL:  If you could put that up, please?  It's

2    8.

3    Q.   All right.  Page 1 of 2, do you know if there were two

4    pages?

5    A.   I do not know.

6           MS. BASSIL:  I have no further questions.

7           THE COURT:  All right, Trooper Sarrouf.  You may step

8    down.  Thank you.

9           (The witness is excused.)

01:43 10           MR. CHAKRAVARTY:  The government calls Kevin Swindon.

11           Your Honor, just for the record, can witnesses, once

12    they've testified, if not subject to recall, stay in the room?

13           THE COURT:  Yes.

14           MS. BASSIL:  No objection.  No objection, your Honor.

15                   KEVIN SWINDON, duly sworn

16           THE CLERK:  Please state your name and spell your last

17    name for the record.

18           THE WITNESS:  First name is Kevin; last name is

19    Swindon, S-W-I-N-D-O-N.

01:44 20           THE CLERK:  You may have a seat.

21           THE WITNESS:  Thanks.

22                     DIRECT EXAMINATION

23    BY MR. CHAKRAVARTY:

24    Q.   Good morning.

25    A.   Good morning.

1    Q.    Can you please tell the jury where you work.

2    A.    I work at the Federal Bureau of Investigation.  I'm

3    assigned to the Boston division here in Boston, Mass.

4    Q.    And do you have a particular role?

5    A.    I do.  I'm the supervisory special agent over the cyber

6    national security squad and also handle the computer forensics

7    program and the photography program for the Boston division.

8    Q.    How long have you been an FBI special agent?

9    A.    I've been an agent in the FBI just a little over 14 years.

01:45 10    Q.    And have you had a variety of different roles at the FBI?

11    A.    I have.  My original office was in the Newark division

12    where I was a special agent investigating financial crime and

13    computer crime, and then was transferred to Boston in 1999.

14    Q.    And in Boston, at some point did you join the Computer

15    Analysis Response Team?

16    A.    Actually, I joined the computer forensics team in Newark

17    first, prior to my transfer here to Boston, and then when I

18    transferred here to Boston it was a specialty transfer, which I

19    was able to apply those skills here, and was assigned to the

01:46 20    team here in Boston.

21    Q.    Can you describe to the jury what the Computer Analysis

22    Response Team is?

23    A.    The Computer Analysis Response Team for the FBI is

24    responsible for the acquisition of all digital evidence for the

25    bureau or for any investigative matter.  If you're conducting a

1    search warrant, if you need to collect data or collect digital

2    evidence, we would provide the technical ability to be able to

3    image and process digital evidence.

4    Q.    And are there -- is there specialized training necessary

5    to that?

6    A.    There is a significant amount of specialized training.  In

7    order to get into the program you have to have a science

8    background.  They require a minimum number of college credits

9    in a science background.  And then there's a particular

01:46 10   training -- there's some industry-available training which

11   anybody -- is available to anybody such as -- it's called A+,

12   or PC hardware training, and Net+, which is a network security

13   training.  And then there's several courses that are provided

14   by the FBI itself in the acquisition of digital evidence.

15        The process takes about a year and a half, and it includes

16   a written exam; it includes sort of an oral board exam.  And

17   then in order to maintain your certification, you have to do a

18   proficiency exam each year to show that you're still proficient

19   in the tasks.

01:47 20   Q.    And so in the Newark division you became certified as a --

21   A.    I did.  I became certified in the Newark division in 1998.

22   Q.    Okay.  And to be certified you have to go through that

23   process you just described?

24   A.    Yes, sir.

25   Q.    After you're certified you continue to be trained?

A.   There is.  There's a requirement of an outside training
per year, and then an inside, or bureau-sponsored, training per
year.  And then they instituted a proficiency exam, I want to
say, probably around 1999 -- they instituted a required
proficiency exam once a year to maintain your -- or to prove
you've maintained your skill level.

Q.   And before you became an FBI agent, did you also have any
experience in the industry?

A.   I did.  I came out of the technical industry and worked
for a company that provided network consulting to the
hospitality industry.

Q.   And what's your level of education?

A.   I went to undergrad -- actually, went to vocational high
school here in Massachusetts for electronics, which is where I
started my computer aptitude, or computer background, went to
the University of Lowell for undergrad and then Northeastern
for grad school and then Boston College for grad school.

Q.   Have you had any specialized computer training
specifically with regards to the acquisition and preservation
of --

A.   As a part of the certification process to be a forensic
examiner for the CART team, we're required to complete a basic
data recovery and advanced data recovery classes and -- with a
test, and prove proficiency through either a written exam or a
practical exam.

1    Q.    So who rates you to see whether you're good enough?

2    A.    Well, it's a team at headquarters that handles all the

3    training and validation for the computer analysis response

4    program within the bureau.

5    Q.    Have you performed forensic computer analysis?

6    A.    I have.  I probably have done countless -- or hundreds of

7    searches and numerous exams over the ten years that I actually,

8    you know, did the forensics before being promoted to supervisor

9    and overseeing the program in Boston.

01:49 10   Q.    With regards to your performance of computer analysis, are

11   you familiar with a variety of different techniques that you

12   have using different tools?

13             THE COURT:  Try to stay close to the microphone,

14   Mr. Chakravarty.

15             THE WITNESS:  There are -- if it's appropriate, I'll

16   start with what our job entails and then I can kind of work

17   tools in.  Is that okay?

18   BY MR. CHAKRAVARTY:

19   Q.    Let me ask that question.  What does your job entail?

01:50 20   A.    The job entails -- we basically break up the forensic

21   process into three distinct areas.  We have the acquisition,

22   which is probably the most important part of the process that

23   we do, where we acquire the image or acquire the evidence

24   through several means.  And there's a variety of different

25   tools that we can use to do that:  We can use software-based

1    tools to acquire an image of a hard drive or a thumb drive or

2    something that -- a digital media or think of the CD or thumb

3    drive; there's also hardware on tools that we can use to

4    acquire images.  And it depends on a variety of factors of what

5    tool we'll use.  Depending on how much time we have, depending

6    on the situation that we're in will determine what sorts of

7    tools we use.

8         The second part of the process would be the actual

9    processing of this image that we're able to collect.  We would

01:50 10   then utilize -- typically, the primary tool that we use is a

11   commercially available tool called a forensic toolkit, or FTK.

12   And that application will process the image and allow a

13   non-technical person the ability to be able to look at

14   that -- or look at what was on that piece of evidence, whether

15   it be to do a text-string search, a keyword search, maybe

16   recover deleted files or recover a file that may have been

17   deleted by the user of that evidence.

18        And then the last phase is sort of the analytical or

19   analysis phase where that -- that does not have to be typically

01:51 20   done by a forensic examiner, but maybe somebody with a little

21   computer aptitude that's able to interpret the results of what

22   we would provide from the processing.

23   Q.   And what you just described, that happens in every

24   acquisition of digital data?

25   A.   It is.  Typically that happens -- over the course of a

1    case, those are sort of the three steps that the digital media

2    would follow.  We would acquire it through whichever means we

3    felt was, you know, appropriate, or based on the circumstances

4    or resources that we would have; it would then come in and be

5    brought into the lab for processing.  Whereas most imaging is

6    typically down out in the field on-site, the processing would

7    be done in the laboratory environment, a little bit more

8    controlled; and then the analytical phase would be done by

9    either the forensic examiner or maybe somebody else assigned to

01:52 10   the case.

11   Q.   And with regards to the different tools, are you trained

12   in the different tools?

13   A.   We are.  As a part of the advanced -- as part of the basic

14   data recovery and the advanced data recovery classes, part of

15   the requirements are -- there's a list of tools that are

16   provided to us that we use as a part of our sort of standard

17   operating procedure.  The tools have been tested and validated

18   at the headquarter level and they're provided to us, the

19   different tools to use, based on the scenario or the resources

01:52 20   that we have at that search scene.

21   Q.   Are you a member of any professional affiliations?

22   A.   I am a member of the HTCIA, which is the High Technology

23   Crime Investigative Association, for the past several years.

24   Q.   So how long have you been employing this computer forensic

25   process?  It's been since Newark?

1    A.    It has.   Since -- my first class I took was the spring of

2    1998.

3    Q.    So in laymen's terms, what is computer forensics in

4    general?

5    A.    In general, it's the ability to be able to take a piece

6    of -- acquire a piece of digital evidence in a manner and way

7    that you can validate what you've acquired, process it to make

8    sure somebody else has the ability to be able to look at it and

9    be able to do numerous things to it like we said, a text-string

01:53 10   search or a keyword search or find images or documents that

11   might be on that digital evidence, and then provide it for

12   analysis or analytical phase.

13   Q.    Is the integrity of the evidence important?

14   A.    Extremely important.   Especially in our line of work it's

15   extremely important.   And it all starts with the acquisition

16   phase.   The acquisition phase, what we say of the three phases,

17   is probably the most critical.   Acquiring the evidence, or the

18   digital media, is the most important of the three.

19   Q.    And what is -- when -- describe what you do -- what the

01:54 20   options are generally in terms of the acquisition process.

21   A.    Okay.   In the acquisition process typically, depending

22   again on the circumstances of the search scene, we do

23   have -- we've done everything from like a small house to major

24   corporations or businesses, so it really runs the spectrum of

25   what our tools are available to us.   But essentially, the

1    hardware acquisition would be a separate piece of hardware that

2    we have that we would plug in, and then we would take the

3    source drive from either the computer, the shelf or wherever we

4    would find it, plug it into this device, and there would be a

5    repository that would be in the device.  And the device itself,

6    standalone, would then image the drive, do a physical image of

7    the drive, and put that on the repository.

8         And the "physical image" meaning you ignore -- for

9    example, it ignores your file system on your computer.  So

01:54 10   whether it's an Apple or a regular IBM or if you're running

11   Windows, it doesn't really matter.  It goes to the physical

12   level of a disk and it creates an encapsulated image of

13   everything on that disk and writes it to the repository drive

14   that's in that device.

15   Q.   So beside from a hardware solution, is there also a

16   software --

17   A.   There is.  There are also software solutions.  Depending

18   on how much time you have, it tends to -- or what equipment

19   that you have, sometimes the software solution may be quicker.

01:55 20   And the software would run typically on a laptop or a

21   standalone computer, and you would then, again, take the source

22   drive out of either a computer or someplace, and then connect

23   it through a write-protect to that computer.

24        So if we back up one second, the write-protect is a device

25   that sits in between the computer and the source hard drive so

1    that nothing gets changed on that source hard drive while the

2    collection is happening.  That image then -- the operating

3    system on the laptop is what actually performs the image, and

4    then that gets written to a repository or another drive that

5    may be connected to that laptop.

6    Q.    Okay.  So maybe breaking it down, depending on different

7    levels of proficiency, would you just explain when you're

8    copying a computer, what it is that you're actually copying

9    from a computer?

01:56 10   A.    Yeah.  Again, if we -- when we're making an image of

11   digital media, and we use the example of the hard drive, what

12   we're interested in getting is everything off of that hard

13   drive.  So what we're going to do is do a physical collection

14   or physical image.  So again, it ignores the operating system.

15   It ignores what files you have on there, both the software and

16   the hardware.  It doesn't care whether or not you have, you

17   know, a hundred pictures or songs or music or WordPerfect

18   files, but what it does is it goes down to the physical layer

19   of the disk and it collects all of the ones and zeros right

01:56 20   down to the physical level, and then it creates an encapsulated

21   image of that.

22   Q.    And so from a laptop, you're actually copying the hard

23   drive in that way?

24   A.    Sure.  Yeah, that would be appropriate.

25   Q.    Is there anywhere else where data would be stored on a

1  laptop?

2  A.   Typically not if it was in an off-state.  No, most of the

3  data would be residing on the hard drive.

4  Q.   How do you verify that what you copied during an

5  acquisition process is successful?

6  A.   One of the processes we use as a part of the

7  acquisition -- if we say that the acquisition is the most

8  important piece, we need a way to validate or verify that

9  acquisition happened properly at the scene being that we may

01:57 10  not have access to that drive -- or hard drive -- again

11  depending on the circumstances.

12       So we use the process -- there's a process out there

13  called an "MD5 hash value."  And the MD5 hash value is a

14  mathematical algorithm that can be run -- or a program or

15  software that can be run against a thumb drive.  It can be run

16  against a file, a folder or a drive.  And what it does is

17  basically creates a 16-character alphanumeric number which is

18  typical -- similar to like the thumbprint, right?  So what they

19  say is that if you can create this MD5 hash value for a piece

01:57 20  of evidence, whether it be a file, a folder or a drive, and you

21  run it against the original, you then -- no matter what you do

22  to that image down the line, you should be able to match or

23  verify that MD5 value so you know nothing has changed on that

24  acquisition in that original evidence.

25  Q.   And how are you able to detect whether that MD5 hash value

1    is the same as the original piece of evidence?

2    A.   Well, you can run that algorithm or program against that

3    piece of evidence at any point in time in the process.  You can

4    do it while you're collecting it; you can do it while you're

5    processing it.  And typically we do it clearly at the end of

6    the process to make sure that nothing has changed throughout

7    the different three phases of the process.

8    Q.   So if those numbers did change and the MD5 hash value

9    stayed the same, what does that tell you as a computer forensic

01:58 10    examiner?

11   A.   It tells us that nothing was changed in that encapsulated

12   image.  There's been no additions or changes to that data that

13   resides in that image.

14   Q.   So can you describe how data could be changed on a

15   computer if it wasn't an encapsulated image?

16   A.   There's a number of ways.  If I were to take that -- if I

17   were to collect that image at the scene or collect a computer

18   at the scene, and then I went back and didn't use like the

19   standard operating procedures that we have, and say I plugged

01:59 20   it in and turned it on, even just by turning on a computer

21   you're changing date file times, you're changing files on the

22   computer.  And then if we recollected it, you would see that

23   there were changes to that MD5 value which would tell you that

24   there were changes to the image.

25        Or if you were to take that image, and take the image that

we made and process it, maybe improperly, or maybe take the

image and restore it back to another hard drive to look at, as

soon as we plug in that additional hard drive there are changes

made to the certain files on that drive which would then change

the MD5 which would then show you that there were changes to

the actual image.

Q.   So even if you turn on the computer, that would change the

MD5 hash value?

A.   If you had collected it prior to turning on the computer

and then turned on the computer and then recollected it, yeah,

there would be changes.  The MD5 would be different.

Q.   How is data recovered or utilized by the FBI?

A.   One of the part of the processes -- after we process it,

the third-party software allows us to do a number of things.

It allows us to -- it will categorize all the files on the

drive:  It will put all the documents together; it will put all

the graphics together; it will give somebody, a non-computer

person, the ability to go into this application and be able to

understand what's there.

     And then another process that the application software

does is it recovers deleted files.  So, for example, if you had

a drive or a file in your computer that you deleted and the

computer did not overwrite those places on the hard drive, the

data from that file is still there.  For example, if you had a

Word document on your computer and say, for example, you typed

1    your resumé and then you deleted the resumé off of the

2    computer, if the computer did not reuse that hard drive space,

3    that data or that Word document is typically -- or the data

4    that was on -- that was within that document is still on the

5    hard drive and can be recovered.

6          For example, if you think about it as a table of contents

7    in a book.  You can erase the entry in the table of contents so

8    it appears that it's not in the book anymore, but unless you

9    were to take out the pages or erase the words on the page, the

02:01 10   actual data is still there.

11   Q.   And how is data stored on a computer hard drive?

12   A.   Well, data is stored on the physical level at a

13   ones-and-zeros level, but it's stored typically -- so typically

14   the hard drive is -- the data is stored on the hard drive in a

15   fashion in which if you think about a hard drive as being a

16   blank slate or an empty street, we have to format that drive to

17   be able to give it an address or tell the computer where to

18   store things.

19         So if you took a hard drive home from the store and --

02:01 20   took a complete blank hard drive -- there's nothing on it -- if

21   you plugged it in you wouldn't be able to write anything to it

22   because it needs to be formatted.  So once the drive is then

23   formatted, or once you take a step to format the drive -- you

24   can almost think of it as giving it an address -- giving it

25   street names and addresses and allows the computer to know

1    where to write things on the drive and where to access them.

2        Sometimes the computer will then -- the computer has

3    limited processing power.  So if you've got multiple things

4    going on on your drive, for example, if you have the Word

5    document up, you're surfing the internet and you're viewing an

6    Excel spreadsheet, the computer sometimes uses space on the

7    computer as, like, sort of a short-term-memory place to write

8    things to then access to bring them back when you need them

9    again.  And typically, we'll find data in those areas of the

02:02 10   hard drive also.

11   Q.    Are you familiar with what's called a registry?

12   A.    I am.

13   Q.    What is that?

14   A.    If you have -- if you're running the Windows operating

15   system, whether you're running Windows XP or 2000 or 7, the

16   Windows has files associated with that called the registry

17   files.  And what the registry files do is they store all of

18   your settings.  So when you bring up your computer and your

19   desktop always looks the same, or if you change your theme like

02:03 20   maybe you want a different color background or your screen

21   saver, all those informations are your settings for the

22   computer, they are stored in your registry, or any changes you

23   make to that are stored in the registry.

24   Q.    And how does the computer know where on the disk drive,

25   the hard drive, to look for a specific document or file?

A.   Well, that information is going to be stored in the master
table where all of the -- for example, its directory structure,
right?  If you create a directory structure -- if you were to
go to your home computer and bring up the C drive, you'll see a
directory structure with a number of different folders on it,
one of them being your document and settings folder if you're
using a Windows machine.

     If you were to go home and turn on your Windows machine
and create a document and store that document and you're using
a Microsoft Word application or another word-processing, it's
going to be stored in that document and settings folder.

Q.   So if you deleted a file, you can delete it on your
computer, what happens to that kind of master profile?

A.   Well, typically what happens when you delete a file,
all -- there's the file name, which is in the table that allows
you to access or allows the computer to know where to access
that file and the file allocation table.  And what happens is
the first entry, or the first letter of that file, will be
changed which makes it transparent to any of the directory
structure in your computer.

     So if you were to delete the file, the computer changes
the first character of that file name.  And then if you were to
look at your directory listing you don't see that file anymore,
but the data for the file is still actually on the hard drive
at that point.

1   Q.   So when you do the recovery aspect of your job, what type

2   of information generally are you available to access?

3   A.   Well, what will happen is the third-party software will

4   look for those entries where that first character changed, and

5   it will be a clue and will say -- the third-party software will

6   say, "Okay.  I know this file was deleted at one point."  It

7   then goes back to the hard drive and looks for the locations

8   where that data was and tries to re-create that file based on

9   the file name.  It will change the pieces of the file that were

02:05 10   on that hard drive back together if they were available on the

11   drive -- still available on the drive.

12        And in some cases you might get partial recovery.  For

13   example, if we used the example of your resumé again, if you

14   had, you know, four pages of your resumé and you deleted it and

15   some of the pages got overwritten in that memory, the

16   application -- the third-party applications will go back and

17   recover that file.  And sometimes it recovers partial so you're

18   able to see what was there, but maybe not the entire -- the

19   entire document itself.

02:05 20   Q.   And that's for deleted files.  What if there's just the

21   regular documents and settings folder or My Documents that

22   people have on their computer?  How would the FBI agents have

23   access to that?

24   A.   Well, with the third-party software what's going to happen

25   is -- typically we use -- FTK is usually the primary tool that

1    we use.  The software will -- after processing the image,

2    again, it will categorize all of the different types of files

3    and put them in different places; for example, it will put all

4    the documents in one place, the graphics in one place and the

5    spreadsheets in one place, and allow an analyst and/or another

6    agent who may not be as technically proficient to be able to

7    look at the files that were on that computer.

8    Q.    And when an agent or an analyst is looking at that data

9    through the FTK software, is there any risk that the original

02:06 10   data is going to be changed?

11   A.    No, absolutely not.  Once the image is acquired and then

12   the image is processed by the FTK software, there are no

13   changes made to the original at all.

14   Q.    And how do you confirm that?

15   A.    Again, going back to the MD5 -- the MD5 example, we take

16   that fingerprint, or the MD5, at the beginning when we make it;

17   we take the MD5 at the end when the process is complete.

18   Q.    And you mentioned the FTK software.  Is this an

19   industry-standard software?

02:06 20   A.    FTK is an industry standard.  There are several others,

21   but FTK is an industry standard.

22   Q.    And it's been vetted by the FBI and you use it regularly?

23   A.    It's been tested and validated at our headquarter level,

24   yeah.

25   Q.    Let me draw your attention now specifically to August of

1    2006.  What was your role at that time?

2    A.    If the FBI -- I'm sorry.  August of 2006 I was assigned to

3    the cyber squad as a special agent and was assigned to the

4    Computer Analysis Response Team.

5    Q.    Okay.  And particularly, on August 10th and August 11th of

6    2006, did you participate in a mission?

7    A.    I did.  There was a search that was conducted August 10th

8    into August 11th.

9    Q.    Okay.  And describe what you did that day.

02:07 10   A.    I was the CART examiner that was assigned to that search

11   to be on-site, or on-scene, to acquire any digital media that

12   may have been identified as a part of the search.

13   Q.    Okay.  And where did you go?

14   A.    We went to Sudbury, Mass.

15   Q.    And was there a residence there that you went to?

16   A.    There was a residence, yes.

17   Q.    Was that the defendant's residence?

18   A.    I believe so, yes.

19   Q.    And where did you go when you went inside the house?

02:08 20   A.    I entered the residence.  And basically, I have a

21   tremendous amount of equipment with me, so I need a place to

22   set up the equipment to be able to do -- not knowing what we

23   had to do at that point, I had to bring all the pieces of

24   equipment.  So I brought it all in and I set up on the floor of

25   the dining room.

```
 1   Q.   And describe what happened after you had your equipment
 2   set up.
 3   A.   Essentially what happens in that type of scenario, I would
 4   set up all my equipment -- not knowing what I was going to have
 5   to image at that point, set up all the different pieces of
 6   equipment that I would bring with me -- and then wait for other
 7   search team members to bring the digital media to me to be able
 8   to image.
 9   Q.   And were you aware that this was a court-authorized
10   clandestine search?
11   A.   I was.
12   Q.   Did that play a role in terms of your decision-making in
13   terms of what type of tools to use?
14   A.   Not -- going into those types of searches, we never really
15   know what the scenario is going to be so we have to be prepared
16   to do everything.  So typically, we would bring a majority
17   of -- most of our tools to be able to do just about everything
18   that we may have to do or anything we would be faced with.
19       Sometimes the resources are limited.  Maybe power might be
20   limited, maybe time might be limited, so depending on what the
21   circumstances are at the time will help us, guide us through
22   what decisions we'll make as to how we'll image the digital
23   media that's available.
24   Q.   Does it make a difference in terms of the product that you
25   extract?  Do you use different tools?
```

1    A.    The end product is all the same.  The end product

2    is -- can be verified and is the same -- can be verified as the

3    same as the original.  The variables there, again, are time and

4    available power resources and such.

5    Q.    Okay.  So after you set up, what happens?

6    A.    I set up all of my equipment.  And there was a period of

7    time where I had nothing to do for a few minutes so I set up

8    the equipment, verified I had everything available to me to do

9    what I thought I needed to do at that point, and then was

02:10 10   waiting for other agents to bring me materials from the search.

11   Q.    And did that happen?

12   A.    It did.

13   Q.    Describe what the agents brought to you.

14   A.    A number of different items that evening.  There were two

15   desktops, a laptop and several CD-ROMs.

16   Q.    Do you know what they brought you from the defendant's

17   room?

18   A.    I believe that that night we kept everything -- as they

19   bring stuff down, we keep it all segregated so that we're

02:10 20   making sure that when we'd get it back to the lab we'd know --

21   from the processing phase we'd know where it came from.  So the

22   materials that came from the bedroom were a laptop, and I

23   believe it was nine CD-ROMs or CDs/DVDs.

24   Q.    So what did you do with the laptop?

25   A.    The laptop -- again, based on the decision that I've had

1    in my experience, I made the decision that the best way to

2    image the laptop was to use the software way that we used.  So

3    I had my own laptop hooked up, I removed the hard drive from

4    the laptop and then connected it through a write-block, and

5    then used the software on the laptop to image the laptop drive.

6    Q.    And, again, is that an industry-standard technique?

7    A.    It is an industry-standard technique, yes.

8    Q.    Do you remember how long it took to copy the laptop?

9    A.    I don't have a recollection of how long.  There was a lot

02:11 10   going on and there were other processes that I was managing at

11   the time.

12   Q.    So typically what is the range of time that it might take

13   to copy a laptop?

14   A.    You know, sometimes that's hard to say.  I mean, it

15   can -- typically we say, you know, usually it's -- back in '06

16   it was usually like -- for each gigabyte of the size of the

17   drive it would take a minute plus verification time.  So that's

18   typically what we would say.  Now, like, today, in modern

19   technology, there's a lot quicker ways to do it, but in '06

02:11 20   that was kind of the standard we would use.

21   Q.    So the smaller the hard drive, the shorter --

22   A.    Absolutely.  The smaller the hard drive, the shorter the

23   time.

24   Q.    And you just mentioned that there was a verification

25   process.  Explain what the verification process is.

1   A.   Well, to go back to the MD5 example, what happens is as

2   the image is collected, there's an MD5 that's done on the

3   image.

4   Q.   So that you check to see whether the MD5 hash --

5   A.   Well, the MD5 is written from the original onto that

6   collection there, yes.

7   Q.   And did you employ such a technique in this case?

8   A.   Yes.  The software that we utilized to image the laptop is

9   also an FTK product.  It's called FTK Imager, which, again, is

02:12 10   commercially available.  And that actually makes the image of

11   the hard drive and then does the verification, or the MD5 of

12   the image.

13   Q.   And is that a reliable system?

14   A.   Very reliable.

15   Q.   Had you used that before?

16   A.   I've used that numerous times before.

17   Q.   And have you had errors with that?

18   A.   I've not had any errors with the actual application

19   software.  Sometimes there are errors with the -- you know,

02:13 20   with the media that you're trying to acquire.  For example,

21   sometimes, you know, if you have a hard drive at home that

22   doesn't work anymore, if we were trying to image that, the

23   software would produce errors.  But it's not the application

24   that's producing the errors; it's the actual piece of hardware

25   that would.

1    Q.    The hardware might be corrupted?

2    A.    It might be corrupted or there might be a bad file on the

3    drive.

4    Q.    So in this case was there such an error?

5    A.    In this case, the imaging process -- I don't recall any

6    errors that happened during the imaging process.

7    Q.    And was there an MD5 hash value that was --

8    A.    There was.  It was on the report that the FTK Imager

9    creates at the end of the image.

02:13 10   Q.    Once you created the image, where did the image -- where

11   did you store the image?

12   A.    If we go back to the example of, you know, there's the

13   source and the repository, I had a drive -- a repository drive

14   that I had brought with me from the lab that was connected to

15   the laptop.  And that image was collected from the original

16   utilizing the FTK Imager software on the laptop and then

17   written to the repository drive.

18   Q.    And then was the repository drive, you know, clean of any

19   preexisting data?

02:14 20   A.    It is.  One of the requirements that we have in our lab --

21   or one of the standard operating procedures requirements that

22   we have is that we wipe all media that we use for repository

23   purposes when we purchase them.

24   Q.    When you say "wipe," what does that mean?

25   A.    "Wipe" means -- if you were to buy a drive from the store

1    and we would take the drive into the lab, connect it to a

2    computer and then make sure zeros have been written to the

3    entire drive so there's no other data on that drive except

4    zeros, or we would call that the "wiping process."

5    Q.   And is there commercially available software to do that?

6    A.   There are a number of commercially available products,

7    yeah.

8    Q.   What precautions did you take to ensure that there would

9    be no record of your mirroring this hard drive on the donor

02:15 10    hard drive?

11    A.   When the hard drive was removed from the laptop, we would

12    connect that hard drive utilizing a piece of hardware called --

13    the name of -- the trade name is called the WiebeTech.  And

14    that WiebeTech is a forensically write-protected piece of

15    equipment.  So if I connect any piece of digital media to that

16    WiebeTech, and that's connected to, then, the laptop, there's

17    no possible way -- or physical possible way to write back to

18    that original drive or the source drive or make any changes.

19    Q.   Were you given any other digital media from the

02:15 20    defendant's room?

21    A.   Based on my recollection, I was given a number of CDs and

22    DVDs.

23    Q.   Okay.  And what did you do with those?

24    A.   I utilized FTK Imager to image those also.

25    Q.   Okay.  And how do you -- how do you image a CD or --

A.    It's essentially the same process.  But in the laptop that

I had or the -- the laptop that I had with me had the FTK

Imager software on it.  After I was done utilizing it to image

the laptop, I then -- it has a CD-ROM drive that's built into

the laptop that I was utilizing to image the CDs/DVDs that were

brought to me.

Q.    And were there any errors in the CD/DVD copying process?

A.    Not that I recall.

Q.    Did you put anything else on this hard drive that you

brought to the residence?

A.    On the night of the search after the imaging was done of

the laptop and the imaging was done of the CDs, I had some

extra time, so what I did was, in order -- thinking that it

might be a little easier for the analytical piece or the

processing piece, I made a logical copy of the documents and

settings folder from the original source drive and wrote it to

the repository drive.

Q.    What's a "logical copy" mean?

A.    If we remember back, we talked about a physical copy goes

down to the physical drive and takes the ones and zeros and

makes an image of everything that's on that drive.  A logical

copy would be something like you could do at home.  If you went

to "My Computer," went to your C drive and then wanted to copy

a file to a thumb drive or someplace else, you would then take

that drive and just drag and drop it over to that repository

1    drive.

2    Q.    So using the operating system itself?

3    A.    Exactly.  Using the operating system.

4    Q.    What happened to --

5          THE COURT:  Mr. Chakravarty, it's just a little after

6    eleven.  Maybe this is an appropriate time to take the morning

7    recess, okay?  We'll take the morning recess.

8          Jurors, let me remind you, this is the first time

9    we've broken since the evidence has actually begun.  Please, no

02:17 10   discussion among yourselves, even of what you've heard in the

11   evidence this morning.  The time will come for that.

12         THE CLERK:  All rise for the Court and the jury.  The

13   Court will take the morning recess.

14         (The Court and jury exit the courtroom and there is a

15   recess in the proceedings at 11:02 a.m.)

16         (Court and jury in at 11:20 a.m.)

17         THE COURT:  Go ahead.

18   BY MR. CHAKRAVARTY:

19   Q.    Agent Swindon, when we broke, we were talking about what

02:37 20   you just put on this computer hard drive that you had brought

21   to the defendant's residence.  After you created that hard

22   drive, what did you do with it?

23   A.    After the hard drive was created, I kept it in my

24   possession.  I left the scene and then provided it to one of

25   the case agents outside of the search scene.

```
 1   Q.   When I say "create," after you put the data on the --

 2   A.   Yes, yes.

 3   Q.   Then what happened to the hard drive?

 4   A.   Actually, once the chain of custody was started, I

 5   provided the hard drive to the case agents.  At that point, I

 6   don't have any knowledge of what happened after that.

 7   Q.   What typically happens to --

 8   A.   What typically --

 9   Q.   -- collected as evidence?

10   A.   Typically, after that a chain of custody would be started

11   of who created it, and then each person that has the evidence

12   after that would go on the chain, and then that would go into

13   our evidence -- secure evidence area.

14   Q.   Are items of evidence numbered by the FBI?

15   A.   Yes, they are.

16        MR. CHAKRAVARTY:  May I approach, your Honor?

17        THE COURT:  You may.

18   Q.   Handing you a folder, can you familiarize yourself with

19   the outside of the folder and then look at what's inside.

20   A.   It's a red accordion file containing one hard drive in a

21   plastic protective shell.

22   Q.   Do you recognize that?

23   A.   I do.

24   Q.   What is it?

25   A.   This is the hard drive that includes the images that were
```

1    made from the laptop and the CD-ROMs that evening.

2    Q.    Is there a number associated -- an evidence number

3    associated with that hard drive?

4    A.    There is.  There's actually two numbers.  There's a 1B1

5    number, which that number designates it's the first piece of

6    bulky, as we call it, evidence that was entered into the case.

7    And then associated with that is a separate E number, or the

8    evidence number, which is an eight-digit number associated with

9    it.

02:39 10   Q.    You described earlier that there's an MD5 hash for every

11   piece of digital data.  Is there an MD5 hash somewhere in that

12   envelope?

13   A.    There's an MD5 hash for the images that were made for the

14   hard drive, yes.

15   Q.    What is that?

16   A.    Yes.  That's actually going to be contained on this hard

17   drive, also.  As a part of that imaging process, the log file,

18   as we would call it, was stored also on that drive.

19   Q.    Now, once data such as this is collected and brought back

02:40 20   to the FBI, you describe that it's made available for agents

21   for analysis?

22   A.    Well, the next step in the process is:  After the

23   collection and it goes into the evidence, the case agents would

24   make a request to our programmer, to the CART team, to process

25   that evidence.  It's not reviewable by a non-technical person

1    in this state.  So the processing part of it would be the

2    request made by the case agent for our programmer to then

3    process it and make it available for them to be able to review.

4    Q.   Do you know whether this particular hard drive was

5    processed?

6    A.   I believe it was, yes.

7    Q.   Did you do that processing?

8    A.   I did not do that processing.

9    Q.   So if someone later wanted to examine that hard drive, how

02:41 10   would they know that the data has not been altered since you

11   collected it in August of 2006?

12   A.   Along with the image on the drive, there's that log, or

13   audit file, that accompanies the image.  In that audit file

14   will then give you basically a log of what happened or a log of

15   the image that was made, and included in that log would be the

16   MD5 value or that fingerprint value, the MD5 value for that

17   image.

18   Q.   Based on your training and experience, I'm going to ask

19   you a few questions about certain computer applications that

02:41 20   you may have some familiarity with.  Are you familiar with a

21   computer program called Trillian?

22   A.   I'm familiar with what Trillian is, yes.

23   Q.   What is it?

24   A.   Trillian is a -- Trillian is an application software that

25   allows you to manage multiple chat platforms.  For example, in

1    this -- with all the social networking out there, there's a

2    number of different sites that you go on or different

3    applications you can use for chat, whether it be Yahoo

4    Messenger, MSN chat.  There's a number of different platforms

5    that you can use for chat.

6         Trillian would be a software application that would allow

7    you to consolidate all of those chat forms or chats in one

8    application.

9    Q.   So from the user experience perspective, what does it

02:42 10   allow a user to do?

11   A.   It eases the process.  If you have multiple people on

12   multiple different chat -- maybe you have some friends that are

13   on MSN chat.  Maybe you have some friends that are on Yahoo.

14   Trillian is an application.  It would allow you to be able to

15   access all of that, no matter what platform it was on, from one

16   application.

17   Q.   Do you know whether Trillian also has a function that

18   would allow you to store chats?

19   A.   I believe there's a part of the application that Trillian

02:43 20   does, it allows you to store, keep a record of chat.  I'm not

21   sure if it's turned on by default, but it is a part of the

22   software.

23   Q.   Are you familiar with a software that's related to

24   file-sharing?

25   A.   Well, there's numerous, different types of file-sharing

software out there.  I think the earliest example of it was

Napster.  That was a file-sharing software.  There are several

others now.  Is there one specific that --

Q.    Are you familiar with something called Tor, T-o-r?

A.    Tor.  Tor is sort of the latest iteration of a

file-sharing software.  It allows users to share files,

different kinds of files, whether it be movies, music or Word

documents.  It's a program that allows different people to

share files.

Q.    In addition to computer applications on somebody's

computer itself, are there internet-based, file-sharing

solutions?

A.    Sure.  There are internet-based -- for example -- I'm

trying to think of one here.  Again, Napster would probably be

the best example of that.  It's an application that you would

download to your desktop that would then allow you to store

files and then make those available to other users who also

have stored files in that same format or utilizing that

application.

Q.    Are you familiar with compression software?

A.    I am; I am.

Q.    What is that?

A.    Compression software would be something, if you had a file

that would be -- that's a large file that you needed to send

over the internet or send -- maybe provide to somebody but the

1       file was so large that it didn't fit on a thumb drive or didn't

2       fit on a CD.  There's software out there that allows you to

3       compress that file and make it smaller to be able to store it

4       temporarily on something else and then provide that file to

5       somebody who then will use the application to uncompress it.

6       Q.    And then are you familiar with WinRAR?

7       A.    WinRAR, Win R-A-R, is an example of that software.

8       Q.    How about WinZIP?

9       A.    WinZIP is also -- probably more commercially known.

02:45 10    WinZIP is probably the most commercially known type of

11      compression software.

12      Q.    Are you familiar with a program called Window Washer?

13      A.    I'm familiar with what program -- what Window Washer is

14      and programs like it do.  Window Washer is a program -- for

15      example, if you were surfing the internet and you had a lot of

16      temporary internet files and cookies and evidence of surfing

17      the internet or all the different files that get written onto

18      your computer as a part of surfing the internet, a program like

19      Window Washer would then go in and delete.  Then you can also

02:45 20    set it to delete and wipe any of the traces of your internet

21      activity.

22      Q.    Can you explain the difference between deleting and

23      wiping?

24      A.    Wiping, it would be an additional process from deleting.

25      The software would go in -- it has the ability to go in and

delete, again, your cookies and temporary internet files and

then also take the space where it was deleted and wipe -- as we

talked about before, wiping, it would write zeros to the space

of where that or some character other than what was there to

that space of where that data resided so it would be

unrecoverable.

Q.    Are you familiar with a program called RegPower Clean?

A.    I'm, again, familiar with programs like it, and they're

typically used for, again, wiping, wiping files or wiping areas

of the drive.  Also, RegClean has an application or part of the

application that also goes into the registry and would clean

out artifacts that were in the registry that would show maybe

the last website that you went to or maybe the applications

that you have downloaded on your computer.

Q.    Are you familiar with something called CCleaner?

A.    CCleaner I think falls into that same category as

RegCleaner and Window Washer.

Q.    Are you familiar with anonymizers?

A.    Yes.  Anonymizers come in a variety of different -- what

is the word I'm looking for -- a variety of different things.

Anonymizers typically would allow you to surf the internet

anonymously to the websites that you're going to or the --

maybe the people that you're interacting with.

Q.    Are you familiar with one of the ways that occurs through

proxies?

A.   Yes.  There are -- typically what will happen is, if I was
on the internet and I didn't want somebody to know what IP
address I was coming from, I would use sort of a proxy website
where I would go to that website first, put the address of
where I wanted to go to, and then that site would then send me
to that site.

So, for example, I wanted to maybe check my email on
Yahoo.  I could go to that proxy website first, type in "Yahoo"
on their site.  It would then send me to Yahoo, but Yahoo would
not know where I was actually coming from because it would be
-- basically provide you with autonomy on the internet.

Q.   Anonymity?

A.   Anonymity, yes.  I'm sorry.

Q.   You mentioned IP address.  What is an IP address?

A.   An IP address is an internet protocol address, which is
essentially the number that's provided to the computer that you
are on on the internet so that the other sites' browsers can
know where to connect to your computer or send information to
your computer.

Q.   Are those unique from a particular access point to the
internet?

A.   They are unique in that, for example, if you have an
internet access at your house, typically your provider will
assign an IP address to your router at your house that allows
you to access the internet.  So anybody trying to connect or

1    send information back to you would then send it back to that IP

2    address, which is essentially like your street address, per se,

3    on the internet.

4    Q.    Are you familiar with a program called IPHider?

5    A.    IPHider, I believe, falls into the same category as that

6    anonymizer or proxy -- the proxy that we spoke about.

7    Q.    And how about IPPrivacy?

8    A.    IPPrivacy also falls within that category of being able to

9    go to their site first, put your website in, and it would

02:49 10    direct you to where you wanted to go without that site -- the

11    end site knowing where you're coming from.

12    Q.    On that point, what do you mean when you say the end site,

13    meaning site on the internet that you're surfing to, them

14    knowing where you're coming from?

15    A.    For example, if I wanted to -- if I wanted to send an

16    email, typically -- or if I wanted to check my email, but I

17    didn't want my web-based email client or company to know where

18    I was coming from, I could go to one of those websites first,

19    put then my Yahoo, Hotmail or Gmail website into, and it would

02:50 20    direct me to Hotmail, Gmail, but the Gmail or Hotmail would not

21    know where I was coming from because that middle person, the

22    middleman, would be the one that would be obscuring the IP

23    address from where I was actually coming from.

24    Q.    What impact does that have on computer analysis?

25    A.    It makes it difficult sometimes because sometimes the

1   proxy websites don't keep the best logs.  So it makes it

2   sometimes difficult to trace back to the source or the

3   origination.

4   Q.   So you wouldn't be able to determine where somebody was

5   accessing the internet from?

6   A.   In some cases, yes.

7        MR. CHAKRAVARTY:  Those are all the questions I have,

8   your Honor.

9   CROSS-EXAMINATION BY MS. PATEL:

02:51 10   Q.   Good morning, Agent Swindon.  My name is Segal Patel, and

11   I represent Tarek Mehanna.

12        I want to start by assessing first your credentials.  You

13   are a supervisor, are you not?

14   A.   Yes.  I'm the supervisors of the Cyber National Security

15   Squad.

16   Q.   How long have you been a supervisor?

17   A.   Since September of 2008.

18   Q.   How many people do you supervise in that capacity?

19   A.   I currently supervise approximately nine people.  That's

02:51 20   always changing, though.

21   Q.   So it's your job to oversee the forensic process, its

22   integrity, is that right?

23   A.   At this point, from a supervisory standpoint, I'm

24   overseeing sort of the operational process:  the funding, the

25   staffing.

```
 1    Q.   Is it also your job to make sure that the agents are doing
 2    the right job and collecting data?
 3    A.   As a -- typically, we don't manage the process because the
 4    process is standard operating procedures that are provided by
 5    our headquarters, guidance from headquarters.  But day-to-day
 6    operationally -- hours, payroll, resources -- yes, I would
 7    manage that process.
 8    Q.   Surely, as a supervisor, you have some quality control
 9    responsibilities, is that right?
02:52 10    A.   I think my responsibility is to make sure that they have
11    all -- that their certifications are current and up to date and
12    they've attended all of the certifications, yes.
13    Q.   And that when they're capturing information, the hash
14    value matches?
15    A.   From a supervisory standpoint, I may not necessarily have
16    that granular information when they're out on a search from a
17    supervisory standpoint.  The standard operating procedures are
18    such that they're provided by headquarters so they're fairly
19    stringent.  And as long as they're following those SOPs --
02:53 20    Q.   So you're making sure they're following standard operating
21    procedures; and sometimes, like in this case, you will go on
22    the scene, and you will participate yourself?
23    A.   Actually, in this case, I was not a supervisor yet.  So I
24    was still -- I was assigned as an examiner, as a field examiner
25    at that time.
```

```
 1   Q.   Okay.  So let's talk about the three steps that you said
 2   that you used for computer forensics work.  You said
 3   acquisition was first, right?
 4   A.   Yes.
 5   Q.   The second you said was processing?
 6   A.   Yes.
 7   Q.   And the third was analytical?
 8   A.   Yes.
 9   Q.   I'm not a computer specialist, so I'm going to take it
02:53 10   slow and fairly easy so we can maybe understand.
11        Starting with acquisition, in this case, in 2006, you went
12   to Tarek Mehanna's family home in Sudbury, is that right?
13   A.   Yes.
14   Q.   About how many other people from the FBI or part of that
15   task force were with you when you went?
16   A.   You know, I could not even guess how many people were
17   there with us that evening.
18   Q.   Would you say it was 15?
19   A.   It could have been 15 potentially.
02:54 20   Q.   Thirty?
21   A.   Probably wasn't 30, no.
22   Q.   So somewhere between 15 and 30 people?
23   A.   Possibly, yes.
24   Q.   About how many of those were associated with you, meaning
25   in capturing the electronic evidence?
```

1    A.    Just me.

2    Q.    It was just you?

3    A.    Just me.

4    Q.    You testified that you brought a lot of equipment with you

5    when you came, is that right?

6    A.    Yes.

7    Q.    What do you mean by "a lot of equipment"?

8    A.    Well, I think in any computer trade you're going to have

9    equipment to be able to do your job, right?  I mean, everything

02:54 10   from simply a screwdriver to a cable or connector.

11   Q.    Did you have --

12   A.    Or to a power cable.

13   Q.    Did you have a screwdriver?

14   A.    I absolutely did.

15   Q.    Did you have a cable connector?

16   A.    Absolutely did, yes.

17   Q.    Did you have a laptop?

18   A.    Absolutely did, yes.

19   Q.    Did you have anything that was larger that you had to

02:54 20   carry in with you?

21   A.    I probably had three bags that evening, yes.

22   Q.    Three bags that were heavy that you were holding on your

23   own?

24   A.    I wouldn't consider them heavy but, sure, there were three

25   bags, yes.

```
 1   Q.   Maybe you're stronger than I am.
 2        So you come in.  Can you tell me what you were wearing
 3   that night?
 4   A.   I probably couldn't, no.
 5   Q.   Was there a protocol to wear dark-colored clothing when
 6   you were clandestine entering someone's home?
 7   A.   I'm not aware of any requirements, no.
 8   Q.   Did you come in through the front door or the back door?
 9   A.   I don't recall.  I believe it might have been through
10   maybe a side door.  I'm not sure.  Again, I'm not responsible
11   for that part of the search.  I strictly have my equipment and
12   my objective, and that's really all that I'm concerned with in
13   that type of situation.
14   Q.   Who was the person among those 15 to 30 agents who was in
15   charge of telling people where to go?
16   A.   There are a number -- that's a good question.  That
17   evening, I don't know who it was.
18   Q.   So who told you where to go?
19   A.   I was following the direction of the -- we have a -- I
20   believe it's the supervisor -- or the supervisor that was the
21   supervisor of the squad at the time was where we were staging.
22   Q.   Who was that?
23   A.   I believe it was Pete Gomez.
24   Q.   So Pete Gomez instructs you to go into the dining room of
25   the Mehanna family home?
```

```
 1   A.   No, he doesn't.  He instructs me to get my stuff ready and
 2   to stage and to make sure that I'm ready to do my job.  And
 3   then at that point he -- I was at the off-site, or the rally
 4   point.  We were sitting there, ready.  We got picked up, driven
 5   over and entered the house.
 6   Q.   When you go inside, you made the decision to go set up in
 7   the dining room, is that right?
 8   A.   Yes.
 9   Q.   And you testified that agents that were upstairs in the
10   bedroom and in other parts of the house would bring you
11   computers, hard drives, CDs?
12   A.   They would bring me digital media that they did not have
13   the ability to do anything with, yes.
14   Q.   Digital media here we're talking about hard drives,
15   laptops, and CDs and DVDs, right?
16   A.   Yes.
17   Q.   As you're sitting there, it's your job to copy this
18   information?
19   A.   Right.  That's my only job, yes.
20   Q.   And it's also your job -- I would say -- is it fair to say
21   the most important part of your job is to copy it in a way that
22   it has integrity so it's an actual copy?
23   A.   Oh, absolutely, yes.
24   Q.   And in that process, everything that is on the original
25   item has to be on this mirrored item?
```

1    A.    Well, that's a little bit more of a complicated question

2    because this drive, as a repository, contains multiple items

3    from that one location.  On the drive contains the image of the

4    laptop.  If we can -- are we referring specifically to 1B1?

5    Q.    Sure.

6    A.    Referring specifically to 1B1, on this drive contains the

7    image of the laptop, contains the images that were provided to

8    me of the CDs or DVDs, and then any -- the logical copies of

9    the files that I made from that laptop to this drive.

02:57 10   Q.    Okay.

11   A.    All from a particular location.

12   Q.    Okay.  But it's important, in terms of the evidence

13   integrity, that it is an exact duplicate, is that right, or are

14   you saying that you can't make an exact duplicate?

15   A.    No.  I'm saying that as a part of the acquisition process

16   that's the most important part of the acquisition process, yes.

17   Q.    Do you feel that day that you achieved that objective,

18   that it was an exact copy?

19   A.    I believe that that evening, with the resources that we

02:58 20   had available to us and the tools that I had available to me,

21   yes, we made the best available copy that we had.

22   Q.    Any reason for the caveat?  Is there any -- do you have

23   any concern that you were lacking something that would have

24   been --

25   A.    No, no.  I think that it being on scene at a search is

1    different than being in a laboratory; and if you're in a

2    laboratory, it's a controlled environment.  Being on scene at a

3    search scene there's a lot of things that are variable.  And I

4    believe that the tools and my training and experience and what

5    I have here is what we have for the medium.

6    Q.   Let's leave for a moment aside the CDs and the DVDs and

7    talk just about the laptops and the computers that you looked

8    at, okay?

9    A.   That I imaged?

02:59 10   Q.   That you imaged.

11   A.   Thank you.

12   Q.   When you turned those -- you know, like a normal user

13   would just push a button and the computer turns on.  Did it

14   show you who the user was?

15   A.   I actually didn't turn them on.  They were delivered to me

16   in an off state.

17   Q.   Was there any way that you would know, from your work

18   then, who those computers belonged to?

19   A.   At that time, at the time of the search, no.

02:59 20   Q.   You don't know whether they belonged necessarily to Tarek

21   Mehanna?

22   A.   No.

23   Q.   Or his brother, Tamer Mehanna?

24   A.   No.

25   Q.   Or his father?

```
         1   A.   No.

         2   Q.   Or his mother?

         3   A.   No.

         4   Q.   Or a friend who came and might have left the computer

         5   there?

         6   A.   No.

         7   Q.   I want to move to the second part, and I'm going to use my

         8   elementary school drawing techniques.  Tell me to keep my day

         9   job.

02:59   10        MS. PATEL:  If you can turn the ELMO on, please.

        11   Q.   In talking about the second part of the process,

        12   processing --

        13   A.   Yup.

        14   Q.   -- would you say that the processing piece of it is once

        15   you've -- the acquisition piece is finished when you make the

        16   copy, is that right?

        17   A.   Yes.  If we're breaking -- if we want to stay with the

        18   model of the three-step process, yes.  Once the acquisition is

        19   complete, the image is then typically put into evidence and

03:00   20   then awaiting to be further processed.

        21   Q.   So the processing piece of it is then what's actually

        22   inside that mirror, the mirrored copy, right?

        23   A.   It does.  The processing allows a non-technical or

        24   non-computer person to be able to look and see what we captured

        25   as a part of that image.
```

1    Q.    When you say "a non-technical person," you mean a person

2    who doesn't have your background and training in computers?

3    A.    Yes.

4    Q.    And specifically forensics computer science, right?

5    A.    Or anybody who has technical training, but forensics, yes.

6    Q.    Because it takes special expertise to be able to review

7    this stuff?

8    A.    It takes expertise to do the processes on the evidence or

9    on the collection that allows people to look at it, yes.

03:01 10   Q.    Okay.  I'll toggle back and forth here so you can hear me.

11   That is a computer.

12   A.    Gotcha.

13   Q.    Would it be a very basic but fair statement for me to say

14   that a computer has two parts to it:  one is live and allocated

15   images, and the other is deleted stuff?

16   A.    Not to be contrary, but I wouldn't describe it that way.

17   Q.    Be contrary.

18   A.    The hard drive itself, if you're talking about the

19   computer as a whole, it's got multiple facets of places to

03:01 20   store things.  It has RAM, which is short-term memory, which is

21   only on -- that kind of helps your computer faster, makes your

22   computer faster.  That, when you shut it off or unplug it or

23   interrupt power to it, any of that storage is gone.  If you're

24   talking strictly storage on the hard drive, there are a number

25   of places that data can be stored.  But, sure, yeah, there's

1    logical -- there's the logical file system, and then there may

2    be stuff that may have been deleted.

3    Q.    With the caveat that it's very basic, on the hard drive we

4    can say that there is the live, what I'll call allocated

5    images, and then there's deleted images.  As a user, I would

6    take my resume, for example, and either I would save it, or I

7    would drag it into the trash and delete it?

8    A.    Sure.  I would want to caution of using the word "live"

9    because that kind of goes back to implicate that the computer

03:02 10   is on.  Really, what we're talking about is stuff that is

11   stored on the hard drive where the computer is not on.

12   Q.    Allocated?

13   A.    I would say active and I would say deleted or free, or

14   slack would be the other way to describe the other.

15   Q.    So for the record, I drew a box, and I wrote at the top of

16   the box "computer."  And I divided the box in half, and half is

17   "active" and the other is "deleted"?

18   A.    I can't say that that's an accurate representation of what

19   was on this drive.

03:03 20   Q.    Sure.

21   A.    I couldn't say that half of a drive is always active and

22   half of a drive is always deleted.  But if you wanted --

23   Q.    The proportions may vary, is that fair?

24   A.    Absolutely.

25   Q.    Within this space, to me this seems fairly

1    straightforward.  Is it fair to say that if I'm working on a

2    resume, in the example that you used on direct -- that if I'm

3    working on a resume and I save -- click to save that resume,

4    that saves in the active space?

5    A.   That's going to be saved as an active file in a logical

6    active file, yes.

7    Q.   If I don't like it and I want to delete it, I would move

8    it into the delete bin, and it would go into this space, is

9    that right?

03:03 10   A.   It doesn't move.  What happens is, basically, as the

11   example I had used, it takes it out of the table of contents.

12   It takes it out of the directory structure.  So the actual data

13   doesn't physical move anywhere on the hard drive.  It's just

14   that it's not accessible by the actual operating system or the

15   application.

16   Q.   Is the way that it's not accessible that the file name

17   changes?

18   A.   Yes.

19   Q.   I think you said there was a letter --

03:04 20   A.   Yes.  It was the first character of the file -- of the

21   file name typically changes.

22   Q.   Bear with me because we're going to come back to that in a

23   minute.

24        There's a third character here that I want to introduce,

25   which is called cache.  Can you explain what the cache is?

```
 1   A.   Cache can be a number of things.  Cache -- caching is more

 2   of a term of -- it describes a process more than it is an

 3   actual thing.  When we talk about cache, for example, when

 4   you're surfing the internet and you're surfing a number of

 5   different pages and you have your temporary internet files,

 6   that would be considered cache.

 7   Q.   Can I just stop you there for a minute.  That means --

 8        MR. CHAKRAVARTY:  It was an open-ended question about

 9   describe what cache is.

10        THE COURT:  That's all right.  The interruption is

11   okay.

12   Q.   To use an example, if someone is on CNN reading an

13   article, an image that is on that page could be saved to a

14   computer's cache?

15   A.   It could be saved in multiple places, but, yes, it could

16   be saved as a part of temporary internet files.  There could be

17   an entry made into your cookies file that makes reference to

18   CNN.

19   Q.   Sure.  But one place it could be saved is in the cache?

20   A.   Again, cache -- I want to be careful of how we define

21   cache because cache is not a physical place.  Cache is more of

22   a process.  If you're saying that it was stored in temporary

23   internet files or if it was stored -- or if there was a

24   reference to it in the cookie or if there was a -- in your

25   internet history, that would be a more appropriate usage of the
```

1    word cache.

2    Q.   So for our purposes, would it be fair to say that this

3    cache, whatever it is -- I know you don't want to call it a

4    space, but whatever part of a computer it occupies -- there's

5    part of it that sort of stays active.  So would it be right if

6    I were to say, if I go to New York Times all the time, the

7    computer is going to save some of that -- the logo, things like

8    that -- in its cache so that the image will load faster knowing

9    that I frequent the New York Times?

03:06 10   A.   Depending on your settings, that is possible.

11   Q.   It's a possibility?

12   A.   It's a possibility, yes.

13   Q.   It's also possible that if you visit something one time

14   and then you don't go back for four months that that will

15   automatically move into what's called the deleted space?

16   A.   Not necessarily because unless -- you'd have to take an

17   extra step to clear out your temporary internet files, clear

18   out your cookies, clear out your internet history, then

19   anything from that, whether it was one time or twenty times,

03:06 20   would be then in that deleted space, yes.

21   Q.   Isn't it standard computer protocol, when someone's

22   internet is working slowly, to empty the cache?

23   A.   I don't know if I -- I don't know standard computer

24   protocol.  But, I mean, I can tell you that, yeah, you'd

25   probably want to recommend to clear out your temporary internet

        1   files from time to time, yes.

        2   Q.   That would be for anybody?

        3   A.   Sure.

        4   Q.   It would help your computer run -- your internet --

        5   A.   I don't necessarily know if it would run faster, but it

        6   certainly -- it's not necessarily to maintain all those files,

        7   you know.  It's just taking up space for no application.

        8   Q.   So I didn't draw it in a geometric way because it doesn't

        9   have any real space.  But would it be fair for me to say that

03:07  10   that blob of a thing, which is the cache, is partly in the

       11   active and partly in the deleted space?

       12   A.   Again, I want to be careful of how we define cache because

       13   cache is more of a process.  Caching is a description of how

       14   the computer handles different files.  There's internet cache.

       15   There's caching at the chip level, at the physical chip level.

       16   There's a number of different things.  And so if you're asking

       17   me how a computer or a browser handles, like, how you browse

       18   the internet, it's different than -- caching is more of a

       19   process than it is --

03:08  20   Q.   Let's limit it to browsing the internet.

       21   A.   Okay.

       22   Q.   There are images that come from the internet that you may

       23   not download that may end on your computer, is that right?

       24   A.   Well, if you access a website and the website is pushed to

       25   you, then, yeah, it's going to be downloaded.  If you're

1    accessing the website, you're going to get that information on

2    your computer.

3    Q.   The answer is yes?

4    A.   The answer is:  If you go to CNN.com, and CNN is going to

5    push to what is currently on their website, it will show up on

6    your computer, yes.

7    Q.   The answer is:  A user may not actively download an image,

8    but that image may show up on their computer?

9    A.   If it was a part of a website, sure.

03:08 10    Q.   If it was part of a website?

11    A.   Yes.

12    Q.   They would have taken no active steps.  They wouldn't have

13    saved it, is that right?

14    A.   I don't know.  You're just saying, if I'm browsing the

15    internet and I go simply to CNN.com and bring up CNN.com's

16    website, the picture, in and of itself may -- you could

17    potentially find it in temporary internet files, yes.

18    Q.   "You could potentially" means you could find it?

19    A.   You could find it.

03:09 20    Q.   So there's another process that you undertook called data

21    carving, is that right?

22    A.   I did not, no, but --

23    Q.   You did --

24    A.   -- it's common practice in forensics.

25    Q.   Would that be a part of that processing piece?

1    A.    Yes.  It would be a part of the processing piece, yes.

2    Q.    And since we spoke about a lot of sort of general things

3    to establish your expertise before, I'm just going to ask you:

4    Is data carving a process by which you're trying to figure out

5    information about a document?

6    A.    Typically, no.

7    Q.    No.  Are you not trying to find out what the file name

8    was?

9    A.    No.  Typically, data carving would be utilized to -- if we

03:09 10    used the example of your internet usage because we're -- that

11    seems to be where we're at.

12    Q.    Let's --

13             MR. CHAKRAVARTY:  Your Honor.

14             THE COURT:  No.  Let him finish the answer.

15    A.    Thank you.  So if we're going to continue to use the

16    example of the internet, if I did a -- say, a month's worth of

17    browsing on the internet, and then I decided one day to delete

18    my temporary internet files, my cookies, and my internet

19    history, okay, that stuff all is in deleted space.  The

03:10 20    information still may be there, but it's in deleted space.

21        I would use a -- data carving, again, describes a process.

22    The data carving process would then go out to that deleted

23    space or the free space of the computer and then try and find

24    remnants of different types of things that may be there.  You

25    may data carve for documents.  You may data carve for images.

1    And you may data carve for whatever you're looking for.  As

2    long as you know the file type, you would then be able to take

3    that nonactive part of the hard drive and attempt to identify

4    things that are there.

5    Q.   In here?

6    A.   Sure.

7    Q.   So you said that you would look for remnants, is that

8    right?

9    A.   It's a term that's commonly used, yeah.

03:10 10   Q.   So could it be, in the example you just set out, that you

11   would file -- you would find the entire image from the internet

12   just as it was when the user saw it?

13   A.   Potentially, yes.

14   Q.   Could you potentially find 50 percent of the image?

15   A.   You could -- typically, it could -- yeah, maybe the data

16   carve would only get back maybe 50 percent of the image.  Image

17   might be a bad example because, with images, if you're unable

18   to recover the entire file, typically the image becomes corrupt

19   and you're not able to see it, and it's the best data that it

03:11 20   was in its original state.

21   Q.   When it's in the deleted space, generally, we could have a

22   lot less information about the material that's in there than

23   what's in active space, is that right?

24   A.   Well, yeah.  The file name would be different, clearly,

25   because it was moved over.  The file name was changed.  And

1    then depending on how much you were able to recover of that

2    file would give you an idea of whether or not how much -- what

3    you would have for the file.

4    Q.   So there's more investigatory work required on that side

5    of the fence, right?

6    A.   Yeah, typically.  That's where that cooperation between

7    the process and the analyst would come, yes.

8    Q.   So as part of that, you said in this case you were not

9    involved in the processing, is that right?

03:12 10    A.   That's correct.

11   Q.   So the third stage that you described, which is the

12   analytical piece --

13   A.   Yup.

14   Q.   -- that's something that other agents, in Mr. Mehanna's

15   case, were in charge of analyzing what information you

16   processed or someone processed?

17   A.   I was describing the process.  I was not involved in that,

18   so I don't have direct knowledge of who that was specifically.

19   But that analysis phase is typically a cooperation between the

03:12 20   forensic examiner and typically a case agent or somebody that's

21   assigned to the case.

22   Q.   Are the case agents in this case who reviewed this

23   material forensics certified?

24   A.   I don't know all of the people that reviewed the evidence,

25   but the ones that I have are not -- the one -- two agents that

```
         1    I'm aware that reviewed it are not forensically certified.

         2         MS. PATEL:  May I place some -- just for the witness,

         3    your Honor.

         4    Q.   Showing you here a document that I may have to move.  Do

         5    you recognize this document?

         6    A.   I do.

         7    Q.   Can you describe it?

         8    A.   It's a chain-of-custody form that's commonly used in our

         9    job.

03:13   10    Q.   Is that your name at the top?

        11    A.   Yes, it is.

        12    Q.   What date did you say that you had received Item 1B1?

        13    A.   Well, I created 1B1, so I didn't really receive it.  I

        14    created it, it looks like, August 11, 2006, at 3:30 a.m.

        15    Q.   And then who received it after you?

        16    A.   Heidi Williams.

        17         MS. PATEL:  May we enter this into evidence, your

        18    Honor, show it to the jury?

        19         THE COURT:  Any objection?

03:13   20         MR. CHAKRAVARTY:  None, your Honor.

        21         THE COURT:  No.  Is this a new exhibit with one of

        22    those sequential numbers?

        23         MS. PATEL:  Number 1073.

        24    (Exhibit No. 1073 received into evidence.)

        25         THE COURT:  It's being displayed now.
```

```
  1            MS. PATEL:  Is it possible to unzoom it?
  2            THE COURT:  There is a zoom at the top of the machine.
  3   Q.   All right.  So after you, Heidi Williams.  Who is Heidi
  4   Williams?
  5   A.   She was one of the case agents on the case.
  6   Q.   Is she forensic certified?
  7   A.   I believe not, no.
  8   Q.   Is she part of what's called the CART team?
  9   A.   No, ma'am.
03:14 10   Q.   Can you tell us again what the CART team?
 11   A.   CART is the terminology we use for the Computer Analysis
 12   Response Team.  It's the group of employees -- because they're
 13   made up of professional support employees and agents -- that
 14   are tasked with collecting digital media and evidence for FBI
 15   investigations.
 16   Q.   It's fair to say those folks are trained to look at
 17   digital evidence?
 18   A.   Yes.
 19   Q.   I just want to take a look down here.  Heidi Williams then
03:15 20   appears, does she not, a few sections down under "review"?  We
 21   have some folks doing storage.  Do you know Nicholas Nathans?
 22   A.   Nick Nathans, I do.
 23   Q.   It says here that he performed a CART exam on 1B1, is that
 24   right?
 25   A.   I don't know that.  I mean, I see his name on here and it
```

 1   says, "CART reason."  Typically, the -- Nick Nathans was a

 2   certified CART examiner in the program at the time.

 3   Q.    Can you just tell us what a CART exam entails?

 4   A.    Again, the terminology is used -- we have to put a reason

 5   of why we're taking the evidence out.  Again, I don't know if

 6   the exam was not done or done by Nick Nathans.  But the term

 7   "CART exam" would be that process part of the forensic process.

 8   Q.    The other item I wanted to note here then, it says,

 9   "Thomas Daly, Jr."  It says, "Review for discovery," is that

03:15 10   right?

11   A.    Right.

12   Q.    Is Thomas Daly, Jr., another case agent?

13   A.    No.

14   Q.    He's not?

15   A.    I'm sorry.  He is a case agent.  I thought forensic

16   examiner.  He is a case agent.  I'm sorry.

17   Q.    Is he a forensics examiner?

18   A.    He is not.

19   Q.    Is he part of the CART team?

03:16 20   A.    He is not.

21   Q.    Do you know if there was any communication between Nick

22   Nathans or anyone who did the analytical piece of this and

23   Thomas Daly or Heidi Williams?

24   A.    I'm not familiar with that.

25   Q.    Did you personally have any interaction with them to

1    explain the meaning of some of the evidence that came in, the

2    analysis?

3    A.   Over the course of the last five years, there could have

4    been conversations that happened, but it was more on what I did

5    that evening, what I collected, what I remember, more than it

6    was, you know, what any of the evidence meant or an

7    interpretation of the evidence.

8    Q.   Are you aware that some 153 photos that were recovered

9    from 1B1 come from deleted space?

03:16 10   A.   I wasn't -- or I'm not.  I'm sorry.

11    Q.   Did you take notes in this -- when you went over in August

12    of 2006?

13    A.   2006, the only notes that exist are the ones that are

14    written on the front of the hard drive, and the FTK imager log

15    file is created automatically by the software.

16    Q.   You spoke with Mr. Chakravarty towards the end about a

17    series of programs and whether you knew them or didn't know, is

18    that right?

19    A.   Yup.

03:17 20   Q.   One of them was Trillian, is that right?

21    A.   Yup.

22    Q.   You were familiar with Trillian?

23    A.   I'm aware of what it is.  I'm not intimately familiar with

24    how it works.

25    Q.   You worked -- prior to being a supervisor, you were

1    working on computer crimes issues, right?

2    A.    Yes.

3    Q.    Is Trillian an illegal program?

4    A.    No, ma'am.

5    Q.    What about file-sharing, you are familiar with the

6    file-sharing program?

7    A.    The one that was asked about?  Tor?

8    Q.    Tor.

9    A.    Yes.  I am familiar --

03:17 10   Q.    Is that right?

11         Is that an illegal program?

12   A.    No, ma'am.

13   Q.    What about Napster?

14   A.    Napster, in its current state, no.  It's a commercial

15   product, yes.

16   Q.    But Napster wasn't one of the programs that was on Mr.

17   Mehanna's computer, was it?

18   A.    No.

19   Q.    Window Washer was another program you said that you were

03:18 20   familiar with, right?

21   A.    Yes.

22   Q.    You said that it was like RegPowerClean and CCleaner?

23   A.    Yeah.  I would categorize them from my knowledge of --

24   they do typical similar things.

25   Q.    Which is that they wipe traces of things on computers,

          1  right?

          2  A.    They could, yeah.  That's one application that they would

          3  have, yes.

          4  Q.    Are those commercially available products?

          5  A.    Yes, they are.

          6  Q.    Do businesses buy those products?

          7  A.    I would think so.  I'm not sure but possibly.

          8  Q.    I mean, individuals buy that product?  Do you know people

          9  who have that product?

03:18  10  A.    I don't know any individuals that have that product, but

         11  they're commercially available.

         12  Q.    Is one reason why people use that product, to your

         13  knowledge, that it makes computers run faster?

         14  A.    I don't know if I would want to go out on a stretch and

         15  say they make computers run faster.  It may not affect the

         16  performance of the computer at all.

         17  Q.    Would it be partly for efficiency reasons, that there's

         18  just garbage in the computer that needs to go?

         19  A.    Well, typically they're used to clean out unneeded or

03:19  20  unwanted information on the computer.

         21  Q.    What about if a company has an employee who's leaving,

         22  would that be a reason why you might want to clean out their

         23  computer?

         24  A.    I mean, I don't know.  Maybe, sure.

         25  Q.    We also -- you talked about anonymizers and proxies, is

1    that right?

2    A.    Yup.

3    Q.    And those are when you "hide" an IP address, right?

4    A.    Well, I don't know if it necessarily hides your IP

5    address.  It typically would obfuscate where you're coming

6    from.

7    Q.    Someone goes into a public space where there's wireless

8    internet, is -- someone else who's savvy, can they hack into

9    that -- into someone's computer or into their email?

03:19 10   A.    Again, like the word cache, hack is a big word.

11   Q.    Can someone invade their privacy and gain access to

12   private information?

13   A.    If the wireless was unsecured, it's possible that somebody

14   could access that unsecured wireless, yes.

15         MS. PATEL:  May I have one moment?

16   Q.    The Window Washer's program that we just spoke about, do

17   you know whether they advertise that they make computers run

18   faster?

19   A.    I am not aware of that.

03:20 20   Q.    Thank you very much.

21   A.    Thank you.

22         MR. CHAKRAVARTY:  Briefly, your Honor.

23         First, just to clarify, your Honor, with regard to the

24   chain-of-custody form that was introduced, I assume that the

25   entire chain-of-custody form is going to be introduced as

1    opposed to just that one page?  There's another page or two.

2    We can deal with that later.

3    REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

4    Q.   Agent Swindon, you were asked about this simple construct

5    of a computer or a digital storage medium that had active space

6    and then inactive space, is that true?

7    A.   Right, yes.

8    Q.   With regards to -- specifically the example given of

9    taking a file and deleting it, putting it into the recycling

03:21 10  bin or right click and hitting delete, at that point, is that

11   file recoverable by the user?

12   A.   Yes.  If the file has not been overwritten by the

13   operating system or that drive space has not been taken -- or

14   taken control of by another application or if it hasn't been

15   wiped, yes, that file would be able to be recovered.

16   Q.   So its inactive space does not include then just the

17   deleted file that can be recovered by the user, is that right?

18   A.   Right.  The stuff that's not in sort of logically tied to

19   a file system, there's a lot of things that can be in there.

03:22 20  There's a lot of different types of data or files, stuff that

21   can be in there, yes.

22   Q.   It's only when the operating system is no longer able to

23   access data that had been accessible on the computer that it

24   would go into that inactive box of that computer?

25   A.   Again, at the expense of getting a little more technical,

1   it's really not that simple to just say delete it in active.

2   Q.   How would you explain it?

3   A.   How I would explain it, if you think of your hard drive as

4   being this big, empty space, right, and the operating system is

5   going to utilize only a portion of it, there's a number of

6   reasons why the unused space will have data in it.  One of

7   those reasons may be, for example, if you're doing a lot of

8   things on the computer and the computer needs some temporary

9   memory to write something somewhere, it will utilize that free

03:23 10   space to write it.

11        Also, if you had a file that you didn't need anymore and

12   you deleted it, that typically would be considered in that free

13   space, also.  So that deleted area can mean a number of

14   different things.  We refer to it more as free space than we do

15   actually deleted space.

16   Q.   Deleted is not the right word to describe?

17   A.   Right.  A deleted file's data would be in that free space.

18   Q.   And so are there ways to get data into free space without

19   it having initially been in active space?

03:23 20   A.   Can you repeat the question, please?

21   Q.   Sure.  Are there ways in which data can appear in free

22   space if that data was not at one time in active space?

23   A.   Typically, if it's a clean install of the operating system

24   and that free space, say, is a blank slate, activity on that

25   computer would have -- the data or the data that was in that

1    free space would have to correspond to some activity on that

2    computer, whether it had been some application or whether it

3    had been internet browsing or whether it had been some activity

4    on that computer would correspond or correlate to that stuff

5    that you found in free space.

6    Q.   You were asked about going to CNN and what happens to the

7    images on CNN or one of the media outlets in the courtroom

8    today.

9    A.   Sorry.  I didn't mean to --

03:24 10  Q.   When you go to a website and images appear on the website,

11   a user is able to view them on their own personal computer.

12   Describe how that process works.

13   A.   What would happen is, first you type in -- we would all go

14   to the address bar and type the website that you want to go to.

15   Your computer would then go out to the web host or the web

16   server where that website was and request that web page and

17   pick one.  It can go to the web page.

18       That -- where that web host or wherever that website was

19   would then send that web page and all of its contents to your

03:25 20  computer, which would include any words, documents, banners,

21   and all those annoying advertisers.  You will get all that from

22   that website to your computer, yes.

23   Q.   When you go to the website, that information is downloaded

24   to your computer, is that right?

25   A.   Yes.

1    Q.   It doesn't get to your computer without you going to that

2    website?

3    A.   Right.  Well, yes.  In this scenario that we're talking

4    about, if you manually typed in a web address or clicked on a

5    link that would send you to a web address, yes, there would

6    have to be some action that would push that content to your

7    computer.

8    Q.   So when your computer is on, unless you have some kind of

9    virus or something, information is not being streamed to your

03:25 10   computer unless you actively go to a website?

11   A.   Yeah, yes.  But there are applications that you can set up

12   that will -- third-party applications that you can set up that

13   can do different things.  But, yes, in this case, unless you're

14   actively going out and typing in something in an address bar or

15   clicking on a link, yes.

16   Q.   Some of those third-party applications might be like an

17   antivirus program?

18   A.   Exactly, that automatically updates itself, yes.

19   Q.   Once something is downloaded by going to a web page,

03:26 20   downloaded to your computer, you described it goes into the

21   temporary internet files.  Is that file repository a file

22   that's accessible by the user?

23   A.   Yes.  You can go into your temporary internet files.  Any

24   user can go into their temporary internet files and see how

25   much data is there and what is there.

1  Q.   Does it matter what internet browser that you use to do

2  that?

3  A.   There are a number of different browsers out there.

4  Typically, they all function basically in the same way.

5  Q.   When you described earlier about deleting things like

6  cookies or temporary internet files, that means that that data

7  from the folder that has that information is then purged?

8  A.   Yes.

9  Q.   Yet, as you described earlier, does that computer -- does

03:27 10  that computer still retain that data that was purged?

11  A.   The data, again, is still in that free space until it

12  either gets overwritten or it gets wiped or it gets reused

13  again for another application on the computer.

14  Q.   Are you aware of any viruses or computer programs that

15  push Jihad information to somebody's computer?

16          MS. PATEL:  Objection.

17          THE COURT:  Sustained.

18  Q.   Are you aware of any programs that selectively push

19  information to somebody's computer where they haven't gone to a

03:27 20  website?

21  A.   Without user intervention, is that --

22  Q.   Correct.

23  A.   Can you rephrase the question?  I'm sorry.

24  Q.   Without any kind of computer application on the computer,

25  where a user specifically denoting that they're going to a

1    certain website to download images or other information onto

2    the computer, are you aware of any program out there or

3    application or something that automatically pulls that

4    information to a computer?

5    A.    I'm trying to think -- that's an extensive library of

6    viruses.  I'm not familiar with how all viruses would work.

7    That would push internet content, like web pages, without

8    intervention, through the browser, I'm not aware of.

9    Q.    Now, you were asked earlier about the legality of some of

03:28  10   these program applications that I talked -- that I asked you

11   about originally.  And you described how anonymization impedes

12   a computer forensic specialist's ability to determine the IP

13   address that may have accessed something, is that right?

14   A.    It's -- more importantly, it's going to impede, like, the

15   cyber investigator that's trying to do the backtracking of

16   where a file came from or where a user was originated from.

17   Q.    So what impact would some of the other applications that

18   you described, like the cleaners or the proxies or the

19   file-sharing -- what impact would that have on a cyber

03:29  20   investigator?

21   A.    If they were configured properly -- I say properly.  If

22   they were configured in such a way, they typically would remove

23   all traces of any internet browsing or internet activity from

24   the computer.

25        MR. CHAKRAVARTY:  That's all I have, your Honor.

1           THE COURT:  Miss Patel, anything else?

2           MS. PATEL:  Sure.

3    RECROSS-EXAMINATION BY MS. PATEL:

4    Q.   Thank you for being patient with me.  It's not easy stuff.

5    A.   I had to slow down, so --

6    Q.   I just have a few follow-up questions for you.  Okay.

7         Is it fair to say -- we're just trying to figure out

8    whether computers can do things on their own.  Can computers do

9    things on their own?

03:30 10  A.   That's a big question.

11   Q.   It is a big question.

12   A.   Can they do things on their own?

13   Q.   When I turn on -- I'm sorry.  Go ahead.

14   A.   I was going to say that, typically, to make that blanket

15   statement is probably inaccurate.  They don't do completely

16   things on their own.  They're an inanimate object.  They don't

17   turn on by themselves.  Yes, there needs to be some interaction

18   with them for them to do processes.

19   Q.   Let me refine it.  When I turn on my commuter in the

03:30 20  morning, sometimes, every month or so, it tells me I have to

21   update it.  I, as the buyer, never told the computer to tell me

22   that.  Did the computer tell me it's time to update it without

23   my prompting it?

24   A.   Well, your operating system typically is what would tell

25   you to update it, yes.

```
 1    Q.   And that's an inanimate object?

 2    A.   Yeah.  There is some interaction.  You had to have

 3    purchased the computer, turned it on and plugged it into the

 4    wall, yes.

 5    Q.   And that's just an example.

 6         Now, you obviously have been, for over a decade, working

 7    with computer crime investigation, right?

 8    A.   Yes.

 9    Q.   Would you agree with me that it matters where images and

10    files on the computer come from?

11    A.   Maybe, sure.  I'm not sure -- yes.  Depending on where

12    they come from, meaning what?  Whether they come from the

13    internet or not the internet or whether they come from

14    different places on the internet?

15    Q.   Or whether they come from an operating system or me, is

16    that important?

17    A.   Yeah, it's significantly important, yeah.

18    Q.   It's very important, right?

19    A.   Yeah.

20    Q.   If you go to CNN or one of the media outfits here, as Mr.

21    Chakravarty pointed out, and you don't read everything but you

22    just read the first page, right when you load it up, blank.com,

23    does the rest of it download by itself?  Does it appear on your

24    computer, or could it appear on your computer?

25    A.   The rest of the front page or -- because there's going to
```

1  be multiple levels of the page.  There are going to be multiple

2  links.

3  Q.   Yes, the links, the pictures, the logo.  Do those things

4  save in your computer in a temporary place?

5  A.   They save on your computer not in a -- they're permanently

6  on your computer until you clear them out of those temporary

7  files, yes.

8  Q.   It's not necessary for a user to save it in order for a

9  user to view it, is that right?

03:32 10  A.   A web page?

11  Q.   Yes.

12  A.   Yes.

13  Q.   Yes.  Last few questions.  Is it illegal if I lock my car?

14  A.   Is it illegal if you lock your car?

15  Q.   Yes.

16  A.   I don't think so, no.

17  Q.   Is it illegal if I lock the front door of my house because

18  there's private information or personal things in my house?

19  A.   No.

03:32 20  Q.   When you have a anonymizing program, it protects you from

21  other people knowing where you are, right?

22  A.   It would obfuscate to the end person you're getting to of

23  where you're coming from.

24  Q.   That would mean that law enforcement wouldn't know, is

25  that right?

1    A.   I wouldn't just characterize law enforcement.  I would say

2    that nobody would know where you are.

3    Q.   Nobody would know.  A hacker wouldn't know, right?

4    Someone's ex-spouse doesn't know, is that right?

5    A.   I would say that nobody would know.

6    Q.   Nobody would know.

7              MS. PATEL:  Thank you.

8              THE COURT:  All right.  Thank you.  You may step down.

9              MR. GROHARING:  Your Honor, we'll call Special Agent

03:33 10   Paul Mueller.

11             THE CLERK:  Sir, you want to step up here, please, up

12   to the box, if you would.  Remain standing.

13             PAUL S. MUELLER, Sworn

14             THE CLERK:  Please state your name and spell your last

15   name for the record.

16             THE WITNESS:  Paul S. Mueller.  It's M-u-e-l-l-e-r.

17   DIRECT EXAMINATION BY MR. GROHARING:

18   Q.   Mr. Mueller, you're a special agent with the FBI, is that

19   correct?

03:34 20   A.   Yes, I am.

21   Q.   How long have you been with the Bureau?

22   A.   For 14 years.

23   Q.   What is your current position?

24   A.   My current position, I am a supervisory special agent at

25   the Operational Technology Division.

1    Q.    What is the Operational Technology Division in broad

2    terms?

3    A.    Our responsibility in the Operational Technology Division

4    is to support lawful intercepts, interceptions of digital

5    information, in support of FBI operations.

6    Q.    You indicated you're a supervisory special agent, is that

7    correct?

8    A.    Yes.

9    Q.    What are your duties and responsibilities in that

03:35 10    position?

11    A.    We manage the infrastructure of delivering data from a

12    provider to an end application for the FBI for the case agents

13    to review.

14    Q.    How long have you been in that position?

15    A.    Four years.

16    Q.    Prior to taking that position, what did you do with the

17    FBI?

18    A.    I was in the Portland Division where I worked on violent

19    crimes, bank robberies, computer-type crimes, and I was also a

03:35 20    certified computer forensics examiner.

21    Q.    In your duties with the Operational Technology Division,

22    are you familiar with the procedures that the FBI follows in

23    order to conduct electronic surveillance on email accounts

24    pursuant to FISA authorizations?

25    A.    Yes.

```
 1   Q.   What involvement do you have with processing a FISA
 2   application?
 3   A.   What happens is, when the FISA is signed by the court, one
 4   order is sent to us at OTD, and another order is also sent to
 5   the local field office wherever the ISP resides.  In this
 6   instance, it would be San Francisco.
 7   Q.   Let me back you up just one second.
 8           THE COURT:  It's the witness only, without the jury.
 9           MR. GROHARING:  Yes, sir.
10   Q.   You recognize the exhibit on your screen?
11   A.   Yes, I do.
12   Q.   What is that?
13   A.   It gives a representation of what the provider does when
14   they're authorized a court order.  And in this instance, down
15   at the bottom, this is a cloned email account.  Generally, what
16   the provider does is they will give us -- pursuant to a court
17   order, they will give us either the search information or the
18   electronic information.
19   Q.   Let me just back you up for one second.  Is it fair to say
20   this is an accurate representation of the process that the FBI
21   follows when a FISA authorization is issued?
22   A.   Yes.
23   Q.   Would this exhibit help you explain your testimony today?
24   A.   Yes, it would.
25           MR. GROHARING:  Your Honor, I'd like permission to
```

1    publish the exhibit to the jury.

2         THE COURT:  Whose witness?

3         MS. PATEL:  No objection.

4         THE COURT:  So when you say publish to the jury, you

5    mean admit in evidence and publish to the jury?

6         MR. GROHARING:  Eventually, yes, your Honor, I'll ask

7    that it be admitted.

8         THE COURT:  I just want to be clear.  That's all.  No

9    objection to it being admitted?

03:37 10      MS. PATEL:  No objection.

11        THE COURT:  And it's what number?

12        THE CLERK:  766, Judge.

13   (Exhibit No. 766 received into evidence.)

14   Q.   So, Special Agent Mueller, using the exhibit when

15   appropriate, please explain to the jury what happens at the FBI

16   after the FISA Court issues an order authorizing a search of an

17   email account?

18   A.   At that point, it is served to the provider, and also we

19   get a copy and the Data Intercept Technology Unit.  When that

03:38 20  order is served to the provider, we coordinate our unit at --

21   the FBI coordinates with the provider, and we coordinate to

22   determine how we're going to receive the data.  This

23   representation that you see on the screen explains how we

24   receive that information.  The cloned email account, that is

25   how the provider generally gives us the information.

1   Q.   When that search is initiated, you indicated there's a

2   cloned email account.  Is there also a search conducted at that

3   point?

4   A.   Yes.  Generally, there's a search as well if that's

5   authorized by the order.  What happens on a search is

6   everything -- once the court order is served on the provider,

7   anything that is historical in that email account is delivered

8   to us in what we call a search package.  Basically what that is

9   is the company will take all those emails, all that information

03:39 10   that's in that email account, and, as a reference, they would

11   put it -- just as a representation, they would put that into a

12   box.  Then they would tape up that box and deliver it to us via

13   this cloned email account.  Although I use a box, what I mean

14   is using -- it's done all electronically.

15        For electronic surveillance, what happens is everything

16   that's not collected via that search, any historical type

17   information, anything that's occurred after, they also deliver

18   that information to us via this cloned email account as well.

19   Q.   You mentioned previously DITU.  What does DITU stand for?

03:40 20   A.   The Data Intercept Technology Unit.

21   Q.   That's where the information goes from the ISP, is that

22   correct?

23   A.   Yes.  What we do is we manage the infrastructure going

24   from Point A -- in this instance, the cloned email account --

25   to Point B, an application where the case agent can review the

1    information.

2    Q.   You manage the infrastructure.  What do you mean when you

3    say you "manage the infrastructure"?

4    A.   We don't look at any of the data.  We just make sure the

5    data gets from Point A -- in this instance would be the cloned

6    email account -- that it's properly routed to the location

7    where the case agent can review it.

8    Q.   What is the location where they can review this

9    information?

03:40 10  A.   That application is called the Data Warehouse System, or

11   DWS.

12   Q.   Does DITU manipulate that information on its way to the

13   Data Warehouse System?

14   A.   No, we don't.

15   Q.   Is any information added to the information coming from

16   the Internet Service Provider before it gets to the Data

17   Warehouse System?

18   A.   Yes.  Once we get the information in that cloned email

19   account, there's a couple things that we add to that.  Once

03:41 20  again, I'll call -- consider that email sort of like a Manila

21   folder.  You'll have the initial email in there.  But we also

22   place in there information such as when we received the

23   information from the provider, the size of that particular

24   email, and generally the email account as well.  That way we

25   have some sort of tracking information of what is contained in

1    that -- in this instance, the Manila folder.

2    Q.   When you say "we" do this, are people physically doing

3    this, or is it an automated process?

4    A.   No.  This is an automated process.

5    Q.   How many people work at DITU and are involved in this

6    process?

7    A.   There's about five system administrators who have access

8    to the system.

9    Q.   What are their responsibilities?

03:42 10   A.   Just to make sure that data continues to be routed to the

11   proper location.

12   Q.   Are they able to view the emails and do any analysis on

13   the emails?

14   A.   No.

15   Q.   Are you aware of any instances when DITU employees have

16   attempted to view emails while they've been en route through

17   the computer system to the DWS system?

18   A.   No.

19   Q.   Throughout your involvement with the FISA process, were

03:42 20   you aware of any email text that has ever been manipulated in

21   the process of being transmitted from an ISP and also into the

22   DWS system?

23   A.   None that I'm aware of, no.

24        MR. GROHARING:  Thank you.  That's all the questions I

25   have.

1          MS. PATEL:  I have no questions, your Honor.

2          THE COURT:  No questions, all right.  Thank you, Mr.

3    Mueller.  You may step down.

4          MR. CHAKRAVARTY:  Nicholas Nathans, your Honor.

5          THE CLERK:  Sir, you want to step up here, please.

6    Remain standing.  Raise your right hand.

7          NICHOLAS NATHANS, Sworn

8          THE CLERK:  Please state your name.  Spell your last

9    name for the record.

03:44 10          THE WITNESS:  Nicholas Nathans, last name

11    N-a-t-h-a-n-s.

12    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

13    Q.   Where are you currently employed?

14    A.   I'm currently employed with the FBI at Quantico, Virginia.

15    Q.   What do you do there?

16    A.   I'm currently a computer forensic examiner for the FBI as

17    well as a program manager for the Forensic Analysis Unit within

18    the Computer Forensic Program.

19    Q.   How long have you been down at Quantico?

03:45 20    A.   I've been at Quantico, in this current position, for about

21    four months.  And then prior to that, for the last year and a

22    half, I've been with the WMD Response Operations Branch at

23    Quantico as well.

24    Q.   Before that, where were you?

25    A.   I was stationed here in Boston from February of 2003

 1   through March of 2010.

 2   Q.   What were your duties in Boston?

 3   A.   In Boston, I was one of the computer forensic examiners

 4   here and conducted forensic examinations of any computer

 5   evidence that was seized.

 6   Q.   Now, even though you work at the FBI, are you a special

 7   agent?

 8   A.   No.  I'm a computer forensic examiner.

 9   Q.   I know you said that.  I just wanted to clarify.

03:46 10      So are there both special agent computer forensic

11   examiners as well as civilian computer forensic examiners?

12   A.   Yes, there are.  In the FBI, roughly 50 percent of the

13   computer forensic examiners are non-agent personnel.

14   Q.   Before becoming a computer forensic examiner, did you have

15   any experience with computers?

16   A.   Before I was an examiner with the FBI, I was a systems

17   administrator and systems analyst for the State of Florida as

18   well as at the Florida State University in Tallahassee,

19   Florida.

03:46 20   Q.   What level of education do you have?

21   A.   I have a bachelor's in Management Information Systems as

22   well as a master's in Computer Information Systems.

23   Q.   In order to become a computer forensics examiner, did you

24   receive any specialized training?

25   A.   Yes.  With the FBI, we're required to take approximately

```
 1   500 hours or more of training.  It includes both
 2   classroom-based training, practical training, as well as
 3   on-the-job training.  And we're supervised the entire time by
 4   another certified computer forensic examiner.
 5   Q.   Are you familiar with a Supervisory Special Agent Kevin
 6   Swindon?
 7   A.   Yes, I am.
 8   Q.   Did you work with him when you were here in Boston?
 9   A.   Yes.  He was my mentor and my coach.
10   Q.   Is there a peer-review process at the FBI for computer
11   forensic examinations?
12   A.   Yes, there is.  All examinations, when they're concluded
13   and a report is written, there's a peer-review process, and the
14   peer-review process includes having another certified examiner
15   go over your report as well as any other work that you did and
16   verify that it is in compliance with our SOPs.
17   Q.   SOP means?
18   A.   Standard operating procedures.
19   Q.   That's standardized throughout the FBI?
20   A.   Yes, it is.
21   Q.   You had described how much training you needed to have
22   before you were certified.  After you were certified, did you
23   have any training?
24   A.   Once you're certified, there's a requirement that you
25   attend one classroom-based training every year annually, plus
```

1    there's also an either computer-based training or a self-paced

2    training packet that's delivered that takes approximately

3    another 32 man-hours to complete.  So, in all, you get roughly

4    two weeks of annual training every year.

5    Q.   What is that training in, subject matter?

6    A.   It will be focused around trends in digital forensics or

7    computer forensics.  So it could be about a new version of a

8    particular software application that we're using.  It could be

9    about new methods to find some type of particular evidence,

03:48 10   whether it's internet-related evidence or if it's

11   cellphone-related evidence, things of that nature.

12   Q.   So like most technology, things change over time?

13   A.   Yes.

14   Q.   Back in 2006, were you a certified forensic examiner?

15   A.   Yes, I was.

16   Q.   How long had you been a certified forensic examiner?

17   A.   A little over two years at that point.

18   Q.   Approximately how many pieces of digital media, if you can

19   venture a guess, had you processed or acquired or analyzed in

03:49 20   August of 2006?

21   A.   I would say it would be somewhere in the neighborhood of

22   30 to 70 pieces of evidence.

23   Q.   How about, again, to venture a guess, by November of 2008,

24   how many pieces would you analyze?

25   A.   I would say in the neighborhood of between 100 and 150

1  pieces of evidence by then.

2  Q.   Now, moving forward to October of 2009, how many would you

3  estimate?

4  A.   In the neighborhood of 200 to 230.

5  Q.   Before your testimony, there was testimony about the

6  computer forensics process.  So I'm not going to belabor that.

7     But can you just go through the phases of the computer

8  forensics process just to describe what those are to the jury,

9  at least in your words?

03:50 10  A.   In the computer forensics process, we start with -- first

11  and foremast, we make a duplicate of the original evidence so

12  that way we're not actually working on the original.  So we do

13  not ever alter or damage the original evidence because it may

14  not be in a perfect working condition.  So we'll make a

15  forensic duplicate and verify that duplicate using what's

16  called an MD5 hash.

17     Once we make that duplicate, we'll then take that

18  duplicate and perform a processing on it or an initial

19  examination and make the content of that duplicate viewable for

03:50 20  the case agent or case agents.

21     And then the next step will be the review and analysis

22  process, which is where the case agent and the examiner will go

23  through the data.  Primarily, the case agent will go through

24  the data and determine what is relevant to their investigation.

25  And then when they're done making their determination, we then

1    export the relevant data and write that to CD or DVD, whatever

2    piece of output we need to.  And then when that's completed, we

3    write our report.

4    Q.   In an investigation involving the defendant, did you

5    participate in processing several pieces of digital media?

6    A.   Yes, I did.

7    Q.   Let me draw your attention -- first, before I move on up,

8    are you a member of any -- do you have any professional

9    affiliations in the field of computer forensics?

03:51 10   A.   No, I do not, not outside the FBI.

11   Q.   How about any special trainings or associations?

12   A.   I've had training from Cisco and an organization called

13   CompTIA, which is for A+/Net+, as well as certifications

14   through an organization known as Sands, which is an IT security

15   organization.

16   Q.   These are different certifications that you have from

17   third parties?

18   A.   Yes, yes, sir.

19   Q.   In August of 2006, did you have occasion to check out of

03:52 20   evidence a piece of evidence called 1B1?

21   A.   Yes.

22   Q.   Can you tell the jury what that is?

23   A.   1B1 would have been a computer hard drive containing image

24   files of another computer, I believe a Dell laptop.

25   Q.   What did you do to that piece of evidence?

A.   Once I obtained that piece of evidence from evidence

control, I would have brought it into our laboratory and then

attached it to what's called a write blocker so we do not alter

the contents of the drive; copied the image files so the

forensic duplicate that's on that hard drive, copy those files

out onto a working hard drive and verify that the copy that I

made matches the original that was checked out of evidence and

then began to process that copy to make it available for

case-agent review.

Q.   After you rendered it available for case-agent review,

what happens to the original data?

A.   The original evidence will -- once I'm done with the

initial phase of copying it, I'll take the original evidence.

It will be then placed in a locked cabinet within the CART lab

that only I have access to in our laboratory.  Once it's

deemed, during the course of the examination, that the original

is no longer needed to continue on, the original will be

returned to evidence control.

Q.   Is that what happened in the case of 1B1?

A.   Yes.

Q.   To move forward now to November of 2008, did you have some

other role in this investigation?

A.   Yes.  In 2008, I was notified by the case agents that

there would be an arrest of the subject at the airport and that

they would need my assistance if they found any digital media

1    on his person or in his bags.  I was -- made myself available

2    at the airport.  They found no media on his person at that

3    time.  They then informed me that they were able to obtain

4    consent to search the residence in Sudbury, Massachusetts, and

5    then asked that I go to the residence in Sudbury and attempt to

6    duplicate the laptop computer that was believed to be there.

7    Q.   Did you do that?

8    A.   I then traveled out to Sudbury, Mass., and went ahead and

9    made a duplicate of the Dell laptop that was at the residence.

03:54 10   Q.   Could you describe what happened when you got to the

11   residence?

12   A.   When I showed up, there were two agents, Lorraine Johnson

13   and Andrew Nambu, that were already there.  When I showed up, I

14   met with them.  I then met with the subject's father, and he

15   handed me the laptop computer.  We then went into what I

16   believed to be the living room.  It was the first room off the

17   foyer to the left.  And I took the laptop apart, pulled the

18   hard drive out.  I attached it to a forensic duplicator.  So

19   it's a piece of equipment that makes a perfect forensic

03:55 20   duplicate of a hard drive.  And so I wrote that duplicate onto

21   a hard drive that we brought with us.  And as we read the data

22   off, we calculate a MD5 hash of each and every piece of data

23   that we read, and then we verify that data by then

24   double-checking that the MD5 hash matches all the data that we

25   wrote to our hard drive.  Once completed, the output hard drive

1  was then handed to Lorraine Johnson, as she was the seizing

2  agent at the search team.

3  Q.   Breaking it down just a little bit, just to clarify the

4  date, is this November 8, 2008?

5  A.   I believe so.

6  Q.   You first went to Logan Airport?

7  A.   Correct.

8  Q.   And then at some time you were told to go to Sudbury,

9  Mass.?

03:55 10  A.   Yes.

11  Q.   When you got to Sudbury, Mass., who was present then,

12  generally speaking?

13  A.   I saw Lorraine Johnson, Andrew Nambu, the subject's

14  father.  I believe his brother was there as well.

15  Q.   Are Lorraine Johnson and Andrew Nambu FBI special agents?

16  A.   Yes, they are.

17  Q.   You chose a hardware form of duplication?

18  A.   Yes.

19  Q.   Why did you choose that?

03:56 20  A.   It traditionally is the fastest way for us to make a

21  duplicate on-site or even back in a laboratory.  It takes 45

22  minutes to an hour to make a duplicate, on average, for a hard

23  drive.

24  Q.   Why was there an interest in doing this quickly?

25  A.   Just wanted to not disturb the family as much as we could.

1    We had received their consent, which they could have revoked at

2    any time, and we just wanted to get in and get out and not

3    cause any more problems.

4    Q.   So you said that you verified the data that you were

5    collecting.  How did you do that?

6    A.   The forensic duplicator calculates an MD5 hash, which is

7    like a fingerprint, as it reads the data from the source hard

8    drive.  Once it is completed, it then goes back and reads all

9    the data off of the destination hard drive and verifies that it

03:57 10   matches the MD5 hash, the fingerprint, that it already

11   generated.

12   Q.   And did that verification occur on that day?

13   A.   Verification occurred and it was successful, meaning that

14   the two MD5 hashes matched for the source and destination.

15         MR. CHAKRAVARTY:  May I approach, your Honor?

16         THE COURT:  You may.

17   Q.   I'm handing you an envelope with some writing on it.

18   Would you take a moment and familiarize yourself with that and

19   open it.

03:57 20        Do you recognize that?

21   A.   Yes, I do.

22   Q.   What do you recognize that to be?

23   A.   This would be the destination hard drive that I used to

24   copy the laptop when I was at the residence in 2008.  My

25   initials are clearly on the bottom with the date in which it

 1   occurred, November 8, 2008.

 2   Q.   Is there an evidence number that goes along with that hard

 3   drive?

 4   A.   Yes.  It is checked into evidence as 1B16.

 5   Q.   So if I wanted to view the contents of that, how would I

 6   know that the contents have not changed since you collected it

 7   back in November of 2008?

 8   A.   The forensic duplicator saves all the information as far

 9   as the MD5 hash value and any errors reported to a log file

03:58 10   that's also recorded on this hard drive.  So there's a log file

11   here that we would use to tell us what the MD5 hash is.  And

12   then we would use another tool to read all the data and

13   calculate the MD5 hash and see if it matches that log file's

14   MD5 hash.

15   Q.   In fact, in this case, like you did in 2006, did you make

16   this available for the case agents to review?

17   A.   Yes.  I followed almost the exact same process.  I

18   attached this to a computer, copied all of the data out of it

19   onto a working hard drive, verified that data that I copied to

03:59 20   make sure that it matched the original data using the log file.

21   Then I processed it and made it available for case-agent review

22   and also verified it one more time to make sure that it had not

23   been altered during that processing phase.

24   Q.   Again, that was using MD5 hash values?

25   A.   Yup, using MD5 hash values.

1    Q.   I draw your attention now to 2009.  In October of 2009,

2    did you have some additional investigative role in this case?

3    A.   In October 2009, the case agents had notified me that they

4    would be serving an arrest and search warrant on the subject

5    and that they would specifically be seizing the laptop.  As far

6    as digital evidence was concerned, it was the only item that

7    they knew of at the time that they knew for sure they would be

8    seizing and that the laptop, once seized, they would like to

9    again have a duplicate made and have it made available for

04:00 10   review.

11   Q.   So what did you do then -- sorry, on October 21, 2009?

12   A.   I had been in contact with the case agents and instructed

13   them that once they seized the laptop to go ahead and bring it

14   back to the Boston field office and bring it to the lab where I

15   work and to provide it to me.  I will sign the chain of custody

16   and begin the process of making a duplicate in the lab and

17   copying that duplicate to a working temporary hard drive and

18   then to begin the processing phase to make it available for

19   review.

04:00 20   Q.   So unlike the 2008 copy, this one you actually made in the

21   laboratory?

22   A.   Correct.

23   Q.   Did that change how you chose to make the copy?

24   A.   Yes.  As we were in the laboratory and I had a more

25   controlled environment where I could use different tools and

1    more computers at my disposal, instead of using the hardware

2    duplicator, I used a computer with a hardware write blocker

3    that prevents any writes to the laptop computer hard drive.

4    And I then used a piece of software that we refer to as our

5    Linux boot CD to make a forensic duplicate in very much the

6    same manner as our hardware duplicator does.  It reads every

7    single piece of data off of there, bite by bite, calculates an

8    MD5 hash as it reads the data off, and then calculates an MD5

9    hash of the data that it had written and verify that they

04:01 10   match.

11   Q.   Are those industry standard processes?

12   A.   Yes, they are.

13   Q.   Both for the 2009 as well as for the -- what you did for

14   the 2008 processing?

15   A.   Yes, they are.

16   Q.   In addition to the computer hard drive, was there any

17   other digital media that you were given in October of 2009?

18   A.   With the laptop was also one, three-and-a-half-inch floppy

19   disk that was there.  And so with the floppy disk, using a

04:01 20   similar method on floppy disks, in order to make it read only,

21   there's actually a small, plastic switch in the top corner.  I

22   flipped the switch to the read-only setting and then made a

23   forensic duplicate using the Linux boot CD of the floppy disk

24   and then made that available for case-agent review.

25        I was able to verify that the duplicate I made matched the

1     original floppy disk due to the fact that the floppy disk was

2     in good condition.  On some removable media, it doesn't always

3     work that way.

4     Q.   Some people on the jury may not be familiar with how

5     floppy disks are different than CDs or some other digital

6     media.

7     A.   A floppy disk, if you were to ever take one apart, inside

8     of it is a very thin piece of film that's very flexible.  So it

9     can be affected by changes in temperature or, as it's spinning,

04:02 10   if it's not perfectly level, when it gets spun around to be

11    read, it kind of -- it develops a wave, like a wave in the

12    water.  So we may not be able to verify that the data we read

13    is accurate.

14         But in this case, we received no read errors from the

15    utility that I used, and so we were able to verify the MD5 hash

16    matched the original and the copy we made.

17    Q.   Is that an accepted process to confirm that you made an

18    accurate copy?

19    A.   Yes, it is.

04:03 20   Q.   Are floppy disks -- do they contain a lot less data?

21    A.   Significantly less.

22    Q.   That's probably why we don't use them very much anymore.

23    A.   Yeah.  They contain -- it's 1.4 megabytes.  To give you an

24    idea, the average computer hard drive now would be somewhere in

25    the neighborhood of 300 gigabytes.  So it would be 300,000

1   floppy disks, give or take.

2          MR. CHAKRAVARTY:  May I approach, your Honor?

3          THE COURT:  You may.

4   Q.   Handing you a cellophane bag that contains some evidence,

5   would you take a moment and then describe what that is.

6   A.   This bag contains a Dell laptop that was seized from the

7   residence in 2009, and it also has a loose floppy disk in the

8   bag and a wireless card sticking out of the side and the power

9   supply as well for the laptop.

04:04 10   Q.   Is there an FBI evidence number associated with this?

11   A.   Yes.  Written on the bag is Evidence No. 1B37.

12   Q.   Do you recognize this?

13   A.   Yes, I do.  There is my handwritten initials and evidence

14   number information written on it in silver permanent marker.

15   Q.   Right on the computer itself?

16   A.   Directly on the evidence itself.

17   Q.   So, now, did you remove the hard drive from this computer?

18   A.   Yes, I did.

19   Q.   Then that's what you copied using the processing --

04:04 20   A.   Yes.  We remove the hard drive from the computer, attach

21   it to a hardware write blocker.  It's a small piece of hardware

22   that prevents any writes to the hard drive so we cannot

23   possibly change it and use that to then read the data out and

24   use our Linux boot CD to make the copy.

25   Q.   Do you know if this is the same computer that you

1    encountered the year before?

2    A.   Yes.  Based upon the information that was in 1B16, there's

3    a small set of notes in there that has the serial number for

4    the laptop.  The laptop seral number ends in GL11.  And the

5    laptop here in front of me, its serial number ends in GL11 as

6    well.

7    Q.   If I handed you 1B1, would you be able to compare whether

8    the 1B1 was also from that same computer?

9    A.   I believe so.  I would have to see if it's written on the

04:05 10   hard drive.

11        On this hard drive labeled 1B1, it is handwritten that it

12   is a -- contains a Dell, Serial No. GL11.  It says it's an

13   Inspiron 2650, which is the same laptop that's sitting in front

14   of me.

15   Q.   So that describes the actual computer which contains a

16   hard drive, is that right?

17   A.   Correct.

18   Q.   So the fact that the computer was the same computer that

19   was searched on three separate occasions, does that mean that

04:06 20   the hard drive was the same hard drive?

21   A.   Not necessarily.  The hard drive is user accessible.  It

22   can be changed at any time buy the user of the computer.

23   Q.   So how would you go about the process of determining

24   whether it was the same hard drive?

25   A.   We would have to take a look at the audit logs that are

1    contained within 1B1 and 1B16 and then the hard drive that's

2    contained within 1B37 to see if they actually list the same

3    manufacturer and serial number as the source.

4    Q.   Now, after you collected and -- collected and processed

5    the evidence in 1B37 in 2009, what did you do with the original

6    evidence?

7    A.   The original evidence was then secured in a locked cabinet

8    within the CART lab until such time as we reached a point in

9    the review phase and the examination that the original was no

04:07 10    longer needed.  Once the original was no longer needed, we then

11    return it -- or in this case I returned it to the evidence

12    control room, where it was locked in evidence control.

13    Q.   Then so, again, if I wanted to look at what you had

14    collected and acquired from that hard drive from 2009, how

15    would I know that I was looking at the same data that you

16    collected that day?

17    A.   We created a -- or generated an MD5 hash value of the

18    original hard drive, and we verify that the copy that we made

19    matches it.  And then if we wanted to look at it again, we have

04:08 20    that copy available to then verify one more time against the

21    audit log that it's still the same, with the same MD5 hash

22    value.

23    Q.   Ultimately, where is digital data stored for long-term

24    storage?

25    A.   Long-term storage, we will take -- at the conclusion of

1    the examination, we would take all the data and write it out to

2    a single hard drive, or in this case I wrote it to a large

3    tape, looks like half of a VHS cassette but has a very high

4    capacity, and it has a very long shelf life.  And then that

5    tape is logged into evidence control as well.

6    Q.   With regards to the floppy disk that you mentioned that's

7    in front of you, did you process that for case-agent review as

8    well?

9    A.   Yes.  It was processed in a slightly different manner in

04:08 10   this instance because of the data set's so small that all the

11   data was exported out and provided directly for the case agent

12   to review versus having to use our third-party tool, a forensic

13   tool.  They can just look at the individual files in Windows.

14   Q.   And the third-party tool is typically Forensic Toolkit?

15   A.   Yes, from AccessData.

16   Q.   So what was the tool that you did use?

17   A.   Used two different tools.  I used Forensic Toolkit's

18   imager product to do the initial extraction and then did a more

19   thorough extraction using a tool called X-Ways Forensics from a

04:09 20   company called WinHex out of Germany.

21   Q.   As you would for a computer hard drive, does that analysis

22   also give you access to unallocated or carved or deleted space

23   as well?

24   A.   Yes.

25        MR. CHAKRAVARTY:  That's all I have, your Honor.

1            MS. PATEL:  No cross.

2            THE COURT:  No cross-examination?  All right.  Thank

3     you, Mr. Nathans.  You may step down.  Leave those items right

4     there.  Mr. Chakravarty will collect them.

5            I think we probably should not start a new witness at

6     five minutes of one.  We'll pause here, jurors.  As I will

7     constantly do, avoid any discussion or any private

8     investigation of any matter.  You hear some intriguing things

9     here.  There's a temptation to go find out about them.  Please

04:10 10    don't.

11           You know, I didn't think I would have to do this this

12    early in the trial, but I have to tell you what our policy is

13    with respect to snow delays.  We try to be as easy about it for

14    the jurors because you live in all different parts of Eastern

15    Massachusetts.  So the signal is, whatever the Boston schools

16    do.  If the Boston Public Schools are delayed or closed during

17    snow, we will not sit.  If the Boston schools are proceeding as

18    normal, we will be here.  Okay.  It's just a very bright line

19    way of testing it.  I hope we won't have to resort to it, but

04:11 20    there it is because of some of the weather reports.

21           Other than that, my final instruction is enjoy your

22    weekend, and we'll see you on Monday morning.

23           Counsel have anything before we break?  Any other

24    issues?

25           MR. CARNEY:  No, your Honor.  Your Honor, there is one

```
 1    thing.
 2            THE COURT:  Okay.  I'll see you at the side.
 3    (SIDEBAR CONFERENCE AS FOLLOWS:
 4            MR. CARNEY:  Did your Honor --
 5            THE COURT:  Just you?  I'm sorry.
 6            MR. CARNEY:  Did your Honor receive that motion for
 7    filing?
 8            THE COURT:  I have received it.  I haven't read it in
 9    detail.  I plan to do that soon.
10            MR. CARNEY:  Fine.
11            THE COURT:  Probably talk about it on Monday.
12            MR. CARNEY:  That would be great.
13    .  .  .  END OF SIDEBAR CONFERENCE.)
14    (Whereupon, at 12:56 p.m. the trial recessed.)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

 4    Dahlstrom, RMR, CRR, Official Reporters of the United States

 5    District Court, do hereby certify that the foregoing transcript

 6    constitutes, to the best of our skill and ability, a true and

 7    accurate transcription of our stenotype notes taken in the

 8    matter of Criminal Action No. 09-10017-GAO-1, United States of

 9    America v. Tarek Mehanna.

10

11    /s/ Marcia G. Patrisso_____
      MARCIA G. PATRISSO, RMR, CRR
12    Official Court Reporter

13    /s/ Cheryl Dahlstrom_____
      CHERYL DAHLSTROM, RMR, CRR
14    Official Court Reporter

15

16    Date:  October 28, 2011

17

18

19

20

21

22

23

24

25
```