UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                               )
                               )
        Plaintiff,       )
                               ) Criminal Action
v.                         ) No. 09-10017-GAO
                               )
TAREK MEHANNA,           )
                               )
        Defendant.       )
                               )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY FIVE
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, October 31, 2011
9:04 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
3              Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6         By: Jeffrey D. Groharing, Trial Attorney
               National Security Division
7         950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
8         On Behalf of the Government

9         CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
10             Janice Bassil, Esq.
               John E. Oh, Esq.
11        20 Park Plaza
          Suite 1405
12        Boston, Massachusetts  02216
          - and -
13        LAW OFFICE OF SEJAL H. PATEL, LLC
          By: Sejal H. Patel, Esq.
14        101 Tremont Street
          Suite 800
15        Boston, Massachusetts  02108
          On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

WITNESSES FOR THE
 GOVERNMENT:

KEVIN SWINDON

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| by Mr. Chakravarty | 17 | | | |
| by Ms. Patel | | 18 | | |

LORRAINE JOHNSON

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| by Mr. Chakravarty | 19 | | | |
| by Mr. Carney | | 31 | | |

JAMES E. SCRIPTURE, JR.

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| by Mr. Chakravarty | 38 | | 108, 121 | |
| by Ms. Patel | | 83 | | 115 |

MARTIN KERSTENS

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| by Mr. Chakravarty | 123 | | | |
| by Ms. Bassil | | 127 | | |

JOHN SCHWARTZ

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| by Mr. Chakravarty | 131 | | | |

E X H I B I T S

| GOVT'S | DESCRIPTION | FOR ID | IN EVD. |
|---|---|---|---|
| 327 | Four photographs of Tarek Mehanna's bedroom | | 29 |
| 748 | Certificate of Authenticity of business records | | 127 |
| 429-440 | (Premarked) | | 137 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (The following proceedings were held in open court

2    before the Honorable George A. O'Toole, Jr., United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Boston, Massachusetts, on October 31, 2011.

6           The defendant, Tarek Mehanna, is present with counsel.

7    Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8    are present, along with Jeffrey D. Groharing, Trial Attorney,

9    U.S. Department of Justice, National Security Division.)

10          THE COURT:  Good morning.  The clerk tells me that

11   somebody had a legal issue.

12          MR. CARNEY:  Yes.  I had an issue I wanted to bring to

13   your Honor's attention if I could, please.  As your Honor

14   knows, the government is going to continue to present witnesses

15   who will identify where certain items came from.  At some

16   point, the government may begin offering those items, and

17   that's what I wanted to focus your Honor on.

18          I don't expect the government is offering them en

19   masse because I think that the Court has to look at each

00:00 20   individual exhibit that the government is offering to consider

21   the objections that we will be interposing.  The objections

22   will include whether that specific document is relevant.  And

23   the question follows:  Why is this particular document being

24   offered?

25          I would then ask the Court to do an analysis of

1    whether the prejudice of that document outweighs the probative

2    value and also consider whether the document is cumulative of

3    other exhibits because we've been given notice that the

4    government is intending to offer up to 800 of these items.

5         In addition, your Honor, the Court has now heard

6    testimony regarding how these documents end up on a person's

7    computer, and I'll just review that again very briefly.  If an

8    individual looks on the internet and sees a page -- and I'll

9    use the example of this morning's Globe.  If one went to

00:01 10   bostonglobe.com to see what the weather is going to be today,

11   then you will see a number of other things on that page in

12   addition to the weather.

13        If you read the weather report and then navigate away,

14   that entire screen is saved in your temporary internet file,

15   also known as the web folder cache.  You have not downloaded

16   anything.  All you've done is looked at the picture on the

17   screen for five seconds and then navigated away.  It's now into

18   your temporary internet file.

19        Every browser operates in a way that that temporary

00:02 20   internet file will be shifted into the deleted space in order

21   to make more room in the temporary internet file.  When a

22   forensic computer analyst looks at that computer and looks at

23   the deleted space, there will be items there that the computer

24   operator literally never looked at.  There will also be many,

25   many things that it is clear that the computer operator never

1    intentionally downloaded.  They will eventually end up in the

2    deleted space.

3        In a case like this, where the government has trawled

4    through the deleted space to pick out thumbnail pictures or

5    documents or stories, I submit that it's incumbent upon the

6    government to show somehow that the defendant actually

7    interacted with that particular item.  For example, if it shows

8    that he intentionally downloaded it or that he opened it to be

9    able to read it, so that if there's a story on that first page

00:04 10   of boston.com, he opened that story, read it and then navigated

11   away.  A computer forensic analyst can determine this.

12       It's inappropriate and lacks foundation for the

13   government to be able to offer a document simply because it

14   happens to be in the deleted space without more analysis and

15   explanation by its specialists.  Our expert has done that

16   analysis and has been able to show that so many of these

17   documents were never looked at, never opened by the defendant,

18   but, at most, were present on a screen when the defendant

19   looked at a site and navigated away.

00:04 20       I'm going to be interposing objections to these

21   documents, and I don't know if the government will try to offer

22   them today.  I indicated to the prosecutor that if, through

23   these witnesses today, the government wants to authenticate the

24   fact that they were found in the deleted space or the active

25   space of the defendant's computer that I certainly have no

1      objection to they being marked for identification.

2           But until the Court is able to rule on whether each of

3      these documents, videos, instant messages can meet the

4      preliminary evidence standard that the Court has to do for any

5      document, I will object to its being marked as an exhibit and

6      coming before the jury.

7           What might be a useful way -- and I discussed this

8      with the prosecutor -- is if all of these exhibits can come in

9      marked for identification.  Then at a later point, even this

00:05 10      week perhaps, the Court can excuse the jury or hold a hearing

11      in the afternoon so that your Honor has a chance to make

12      rulings on these pieces of evidence and determine whether

13      they're going to come in rather than having to do it exhibit by

14      exhibit at the sidebar while the jury is sitting in the box.

15      And I'd ask your Honor to consider that.  Thank you.

16           MR. CHAKRAVARTY:  Your Honor, the government does

17      intend to offer today exhibits from the defendant's computer.

18      As we've described in our trial brief, these are things found

19      on the defendant's computer.  And like other things that are

00:06 20      found on something associated with the defendant, the nexus is

21      made with regards to the defendant.

22           The government does not want to waste the jury's time

23      if there is an objection, obviously, on each one on 403 or some

24      other grounds.  However, the reason they're being offered is

25      because the government certainly has made a proffer that they

1    are relevant.

2         This witness who's going to -- is a computer forensic

3    expert, he's not going to -- our desire was not for him to go

4    through each one of these things in a vacuum without saying --

5    all he's going to say is I found these on the computers.  He

6    can certainly be cross-examined on where on the computer the

7    materials were found, and, as counsel has made known to the

8    Court, counsel is free to present their own testimony as to

9    where something was found on the computer and make that

00:07 10   argument to the jury.

11        By not allowing the witness to say I found this in the

12   defendant's possession, then we won't be able to get to the

13   next stage of having something in evidence where a reader or

14   some other witness will be able to actually describe what is on

15   that piece of evidence.  That's the concern with -- if it's

16   just marked for identification at this stage.

17        It is reasonable, your Honor, again, not to waste the

18   jury's time, to preliminarily introduce them or have all of the

19   rest of the authentication litany gone through, and if your

00:07 20   Honor wants to see each piece of evidence, there will be, off

21   the computer, hazard a guess of over 200 exhibits, your Honor.

22   So that would take you some time.  Those exhibits are all not

23   going to be published to the jury, you know, in the next week.

24   These are going to happen over the course of the trial.

25        So to the extent that the defendant has an objection

1    on cumulative grounds or something else, then that can be

2    raised at the time that the particular piece of evidence is

3    being published to the jury.  And for that reason, the

4    government would say they should be conditionally admitted,

5    reserving the right for the defense to object on 403 grounds,

6    essentially.

7         MR. CARNEY:  If I can clarify, your Honor, I won't

8    object if a witness says I found these 150 photographs on the

9    defendant's computer.  I don't object to that and those

00:08 10   exhibits being marked for identification.  What I'm focusing

11   on --

12        THE COURT:  I think --

13        MR. CARNEY:  -- when a witness wants --

14        THE COURT:  I understand the objection.

15        MR. CARNEY:  Yes, your Honor.

16        THE COURT:  I think it puts too much significance on

17   the admissibility question as opposed to the inferences that

18   might be drawn from various evidence.  I think the fact that

19   the images are found in the computer satisfies the relevancy as

00:09 20   a general matter.

21        You say you have contrary evidence that would lead the

22   jury to doubt whether a further proposition, that it was viewed

23   actively by the defendant, is also true.  But that's not

24   unusual that the meaning of evidence depends on multiple pieces

25   of evidence and not just those that are sufficient for

1    admitting each individual piece.

2         By way of analogy, go back to our template of drug

3    cases, there might be evidence that illegal drugs were found in

4    the top drawer of the defendant's dresser.  You would need

5    additional evidence to know for sure perhaps that he had any

6    contact with those particular things.  But the datum that they

7    were where they were is one step in a process of proof which

8    might lead a jury ultimately to conclude that in that case the

9    defendant knowingly possessed the items.

00:10 10        There might be contrary evidence to show that the

11   inference was not warranted or to affirmatively support a

12   different inference, but it doesn't -- we wouldn't pause on the

13   admission of the drugs because the whole case hadn't been

14   proved yet.

15        So I think, for most of these, the fact that it is

16   where it is is sufficient for admission.  It may or may not be

17   sufficient for a conclusion that is central to the government's

18   case.

19        MR. CARNEY:  May I respond?  Using your Honor's

00:10 20   analogy, if, in that dresser drawer, in addition to cocaine,

21   there was found pornography, would the pornography be relevant

22   to be introduced at that trial, or would the Court's answer

23   merely be, if it's in his dresser, it comes in?

24        Instead, I suggest the Court would look and determine

25   is this particular item relevant to this case.

1         THE COURT:  I would agree with that.

2         MR. CARNEY:  Your Honor can't do that unless you see

3    the item.  Even if you do see the item and it has some

4    tangential relevance, the Court also has to make a

5    determination at that point that is the prejudice of this

6    particular document --

7         THE COURT:  Okay.

8         MR. CARNEY:  -- so outweighing the minor probative

9    value.

00:11 10         THE COURT:  Okay.  That hasn't -- I was focusing on

11    your sort of computer technical aspect of your objection rather

12    than an objection such as the one you've just outlined that

13    would be true regardless of whether it was a computer evidence

14    or not, in other words, something that was wholly unrelated to

15    the events of drug possession.  Whether it was something

16    recoverable from deleted space or whether it was a magazine or

17    a newspaper article or whatever would be -- that's a different

18    matter.  So --

19         MR. CHAKRAVARTY:  The government would agree with

00:12 20    that, your Honor.  The exhibits that the government is offering

21    are related to the charges.  Defense has had our exhibits, has

22    had our exhibit list, has specific objections with regards to a

23    pornography-type question, then now is the time to raise that

24    and we can deal with it.

25         THE COURT:  That's a different matter.  So it will

1    depend on the evidence, the particular pieces that are objected

2    to, I guess, on 403 grounds.

3         As a general matter, I would say images that could

4    arguably support the government's case, the fact that they're

5    found there is enough relevance to be admitted in evidence.  If

6    there are other things that are so clearly -- well, I don't

7    know how clearly, but that are not related to the government's

8    case or that are so ambiguously connected that the relevance is

9    not established, then that's a different matter.  I don't know

00:13 10   what the breakout is when those things are put on the table.

11        MR. CARNEY:  If I may make clear why this is such an

12   important issue in this trial.  The more the government

13   introduces evidence of what the defendant read or a video that

14   he saw, it inevitably suggests to the jury that there's

15   something wrong with the fact that he saw this video or he

16   saved it or that he saw this posting and he downloaded it.

17   They're going to believe that this is critical evidence that

18   supports the charges when, in fact, this is evidence that I

19   think everyone agrees was legal for the defendant to see, legal

00:14 20   for the defendant to download, and legal for the defendant to

21   keep.

22        I've given your Honor a proposed instruction on this

23   that is based substantially on the instruction given by Judge

24   Saylor in a similar case.  I believe that that instruction is

25   appropriate to be given to the jury before these documents and

1    videos come in so that the jury is clear that this was not

2    contraband.  This isn't something illegal to see or illegal to

3    possess.

4         The government is not saying that it's illegal but

5    that it is only being offered for a limited purpose, as I

6    understand it, which is to show the defendant's state of mind,

7    i.e., or e.g., he wanted the United States to get out of Iraq.

8         At some point, where I have conceded that fact in the

9    opening and the government has offered several exhibits on

00:15 10   this, it's enough.  And to allow 200 of them to come in makes

11   the jury think this is illegal to do this.  And unless your

12   Honor gives that limiting instruction and gives an instruction

13   of law about the obtaining and possession of this, the jury is

14   not going to know the context of this evidence.  And I would

15   urge the Court to consider giving both a correcting instruction

16   and a limiting instruction.

17        In addition, quite a number of the items that the

18   government will be offering are in Arabic.  These are documents

19   that the government has not provided us with a full

00:15 20   translation.  In many, many instances they've provided a

21   summary translation.  If you took a ten-page transcript in

22   Arabic and gave it to ten different translators and asked each

23   of them to come up with a one-paragraph summary of that

24   ten-page document, each one would be different.  Each one, in

25   fact, would be hearsay and inadmissible.

1          So if the government has a document in Arabic and they

2     don't intend to offer a complete translation of that document,

3     then I submit that document is inadmissible for that reason as

4     well.  There are 53 of those documents that the government has

5     informed us they wish to offer without a complete translation

6     but rather include instead a hearsay document of what someone

7     else thinks is a summary of that translation.

8          THE COURT:  There are a couple of issues there.  I'm

9     not going to give any instructions in the law at this point, as

00:16 10     I declined on Friday to give one the government suggested.

11     We're going to leave that, I think, until the end of the case

12     unless some need arises that I don't foresee.  I don't want to

13     have a daily battle on what the law is about the crime here.

14          I'd like to hear the government's response to the last

15     point about the summaries of --

16          MR. CHAKRAVARTY:  It's not ripe.  The government is

17     not going to offer it today.  Likely to do it tomorrow.  The

18     government would introduce the things found on the computer

19     today and then have a linguist come on later, tomorrow

00:17 20     probably, and say, I translated these 50 documents, for

21     example, 50 files.  Some of them are hour-long videos.  So they

22     created a paragraph.

23          They can testify to that by saying, I watched this

24     video and this is what I saw.  But for the jury to have any

25     kind of tangibility to that when they're deliberating, we also

1    prepared these summary translations, which the government would

2    offer understanding that the defense could either impeach that

3    translation; they could present contrary testimony.  And purely

4    for the benefit of the jury, the government had prepared that

5    for purposes of tendering.

6             THE COURT:  Under what rule of evidence would you

7    offer that?

8             MR. CHAKRAVARTY:  As a summary.

9             THE COURT:  Under 1006?

00:18 10             MR. CHAKRAVARTY:  Yes, your Honor.  As something

11   that's in evidence.  It's corroborated by testimony of a

12   summary witness, and it should go to the jury.  It's in

13   English.

14             THE COURT:  Do you have any cases where summaries of

15   documents of the contents of -- I guess, further, the narrative

16   contents of documents have been admitted under 1006?

17             MR. CHAKRAVARTY:  Not on hand, your Honor.  I'll have

18   them by tomorrow.

19             THE COURT:  There are documents that summarize

00:18 20   accounting records and so on and so forth, which are numbers

21   and things.  But summarizing the narrative of a narrative

22   document strikes me as a little unusual as an exhibit, not as

23   testimony.  Testimony might be a different matter.

24             MR. CHAKRAVARTY:  We've done some research, your

25   Honor, but I don't have that with me right now to be able to

1    report.

2           MR. CARNEY:  I've done some research.  I've got it

3    with me.  It would be unprecedented.

4           THE COURT:  Tomorrow they'll offer it.  We can -- if

5    you want to each submit whatever you have, I'll take a look at

6    it.

7           MR. CARNEY:  Two cases from the First Circuit that are

8    relatively recent on the use of a summary witness, and I think

9    they address your Honor's points directly that --

00:19 10           THE COURT:  All right.

11           MR. CARNEY:  -- there are significant limitations on

12    what a summary witness does.  I view a summary witness

13    summarizing a video has the same infirmity.  That person is not

14    testifying as an expert.  If they're introducing the video,

15    then the jury sees the video, not what a witness says, This is

16    what I thought was important on this video.  The rule of verbal

17    completeness would apply to the entire video coming in.

18           THE COURT:  Maybe.  We'll deal with it as it arises.

19           MR. CHAKRAVARTY:  Final point, your Honor.  I'm not

00:20 20    going to address the curative instruction issue, as your Honor

21    doesn't want to hear about that now.  But the first witness the

22    government intends to call is actually a re-call from Friday.

23    Kevin Swindon, one the CART examiners, did not authenticate an

24    exhibit, which he didn't talk about on Friday.  It should take

25    about five minutes for him just to say this is one other piece

1    of evidence that he had culled.  I wanted to alert the Court to

2    that.

3            MR. CARNEY:  No objection, your Honor.

4            THE COURT:  So we'll get the jury.

5    (Jury in at 9:27 a.m.)

6            THE COURT:  Good morning, jurors.  I appreciate your

7    patience.  The lawyers had a couple things to discuss before we

8    called you out.  We've finished now.  We're ready to proceed

9    again with the evidence.  I understand the first witness is

00:22 10   someone who was testifying on Friday and will be re-called

11   briefly.

12           MR. CHAKRAVARTY:  Very briefly, your Honor.  Kevin

13   Swindon.

14           THE COURT:  You remain sworn from Friday, Mr. Swindon.

15   DIRECT EXAMINATION BY MR. CHAKRAVARTY:

16   Q.   Agent Swindon, I just have a couple of follow-up questions

17   from your description of your search back in August of 2006 in

18   the defendant's house.  Are you also familiar with an FBI item

19   number called 1B2?

00:23 20   A.   I am familiar with 1B2, yes.

21   Q.   What is that?

22   A.   1B2 is also a hard drive containing material that was

23   imaged that evening of the search.

24           MR. CHAKRAVARTY:  May I approach, your Honor?

25           THE COURT:  You may.

1    Q.    Agent, I'm handing you an envelope labeled 1B2.  Can you

2    open that and describe what that is.

3    A.    1B2 is a hard drive in a plastic cover clamshell.

4    Q.    Where did -- did you create this hard drive?

5    A.    I did.  This is one of the hard drives I used as a

6    repository that evening of the search.

7    Q.    Okay.  What did you put on that hard drive?

8    A.    On this hard drive is an image of a Dell Dimension desktop

9    and numerous CDs and DVDs.

00:24 10   Q.    The 1B1 exhibit that you described on Friday --

11   A.    Yes, sir.

12   Q.    -- what did that contain?

13   A.    That contained an image of a Dell laptop and numerous CDs

14   and DVDs.

15   Q.    Do you know where the CDs and other removable media were

16   found?

17   A.    That evening, all the materials were brought to me by

18   other agents that were doing the search, the search at the

19   house.  But I'm aware that they came from Tarek's bedroom.

00:25 20   Q.    1B2, was that ultimately placed into evidence at the FBI?

21   A.    Yes, it was.

22        MR. CHAKRAVARTY:  Thank you, your Honor.  That's all I

23   have.

24   CROSS-EXAMINATION BY MS. PATEL:

25   Q.    Good morning.

1    A.    Good morning.

2    Q.    Just a quick question for you.  The 1B2 that you just

3    verified, the copy that you made was the best available copy,

4    is that right?

5    A.    Well, yes.  This contains the images that were made that

6    evening of the search, yes, ma'am.

7             MS. PATEL:  Thank you.

8             THE COURT:  Okay, sir.  Thank you.  You may step down.

9             MR. CHAKRAVARTY:  The government calls Lorraine

00:25 10   Johnson.

11            LORRAINE JOHNSON, Sworn

12            THE CLERK:  Have a seat.  Please state your name and

13   spell your name for the record.

14            THE WITNESS:  Lorraine Johnson, J-o-h-n-s-o-n.

15            THE CLERK:  And your first name, the spelling.

16            THE JUROR:  Lorraine is L-o-r-r-a-i-n-e.

17   DIRECT EXAMINATION BY MR. CHAKRAVARTY:

18   Q.    Good morning, Miss Johnson.

19   A.    Good morning.

00:27 20   Q.    Where do you work?

21   A.    I work at the Boston office of the -- I did work at the

22   Boston office of the FBI, and now I'm at headquarters in

23   Washington, D.C.

24   Q.    Are you a special agent?

25   A.    I am.

1    Q.    How long have you been a special agent?

2    A.    Twenty-eight years.

3    Q.    Where have you been assigned over that time?

4    A.    My first office was St. Louis.  Then I was assigned to the

5    Richmond, Virginia, division and then the New York and then the

6    Boston division.  And at present, I'm at FBI headquarters in

7    Washington, D.C.

8    Q.    How long were you in the Boston Field Division?

9    A.    I arrived in Boston in 1998, and I was there for 13 years.

00:27 10   Q.    In fact, do you live in the area still?

11   A.    Yes.  I'm only temporarily assigned down in Washington.

12   Q.    When you were assigned in Boston, in what capacity were

13   you an agent?

14   A.    I was a special agent assigned to the Joint Terrorism Task

15   Force working counterterrorism matters.

16   Q.    With regard to this investigation, did you have some role

17   in it back in November of 2008?

18   A.    Yes, I did.

19   Q.    What was that role?

00:28 20   A.    I was assigned, along with Special Agent Andrew Nambu, to

21   participate in a search.

22   Q.    Where was that search going to be?

23   A.    The search was going to be at the residence of Tarek

24   Mehanna's parents.

25   Q.    So what was the plan that morning?

1    A.   The plan was, we had information that they were leaving

2    the area.  They were taking a flight.  So along with the arrest

3    team, we assembled at the Delta terminal, which is Terminal A

4    at Logan International Airport.  And our assignment was to wait

5    until Tarek Mehanna was approached and taken off to a separate

6    area, and then at that point we were to approach Mr. and Mrs.

7    Mehanna.

8    Q.   And did you do that?

9    A.   Yes, we did.

00:28 10   Q.   When you approached Mr. and Mrs. Mehanna, what was the

11   general substance of the conversation?

12   A.   We identified ourselves as special agents with the FBI,

13   and then we asked to see some ID from them.  And then we also

14   asked what their travel plans were for that day.

15   Q.   Did they tell you?

16   A.   Yes, they did.  They showed us their ID.  I believe they

17   showed us their Massachusetts driver's license.  They said they

18   were accompanying their son Tarek to New York where he was

19   going to fly on from there out to Saudi Arabia.

00:29 20   Q.   Did you ask the defendant's father to do anything?  Did

21   you ask anything of the defendant's father?

22   A.   Yes.  Also we asked if we could have permission and his

23   authority to search Tarek's room back at the house.

24   Q.   And, ultimately, did he agree to that?

25   A.   Yes, he did.  He gave his consent.

1   Q.   So what did you do?

2   A.   At that point, we explained to him what the circumstances

3   were regarding -- that his son had been arrested in regards to

4   false statements in regards to a terrorism investigation.  He

5   was concerned, of course, and we explained that --

6           THE WITNESS:  I'm sorry?

7           MR. CARNEY:  I object, your Honor.

8           THE COURT:  Sustained.

9   Q.   I'll move on.  Without going into the substance of your

00:30 10   conversation beyond asking to go back to the house, what did

11   you actually do at that point?

12   A.   We said that we would arrange to have his -- Mr. and Mrs.

13   Mehanna's luggage retrieved and also to try to arrange a refund

14   to their tickets.  And so that's what we did at that point.

15   Q.   Okay.  And after that, what did you do?

16   A.   We went back off.  We took care of that task, and we

17   offered them -- if they would like us to drive them home to

18   their house.

19   Q.   Did you, in fact, do that?

00:30 20   A.   Yes.

21   Q.   When you got to the home, what happened?

22   A.   Once again, we discussed his consent to search, and we

23   asked him to sign the actual consent-to-search form.

24   Q.   Did you explain anything about the scope of his consent to

25   search?

1    A.    We were only interested in searching his son's bedroom.

2    Q.    Did you tell him that he can withdraw that consent?

3    A.    Yes.  We explained that it was up to him to decide whether

4    or not we could do the search and that, if he gave his

5    authority, he also had the right to stop the search at any

6    point in time and ask us to leave.

7    Q.    Did he agree?

8    A.    Yes, he did.

9    Q.    So what happened after that?

00:31 10    A.    We gave him the form, and we asked him to sign it and he

11   did sign it.

12   Q.    Did you collect a computer?

13   A.    We also asked, before we entered the room, if there was a

14   computer in the bedroom.  He said that, yes, there was a

15   computer and it was his computer.  And we asked also --

16             MR. CARNEY:  I object, your Honor.

17             THE COURT:  I'll strike that.

18             MR. CARNEY:  Thank you.

19             THE COURT:  What Mr. Mehanna said is stricken.  The

00:31 20   jurors will disregard it.

21   Q.    Aside from going into what he said, what actually

22   happened?

23   A.    We asked authority or consent to search his computer.

24   Q.    And so were you given a computer?

25             MR. CARNEY:  If your Honor please, may the witness

          1    designate what computer she is speaking of?

          2              THE COURT:  Well, maybe you can clarify it, Mr.

          3    Chakravarty.

          4    Q.   Did you tell Mr. Mehanna what -- specifically what

          5    computer you were interested in?

          6    A.   No, not that I recall.

          7    Q.   Okay.  Did you at some point obtain a computer?

          8    A.   Yes.

          9    Q.   Where did you get that computer?

00:32    10    A.   It was eventually brought to the house by the other son,

         11    Tamer.

         12    Q.   What did you believe that computer to be?

         13              MR. CARNEY:  I object.

         14              THE COURT:  Sustained.

         15    Q.   Did you have a conversation about what computer you were

         16    asking for for consent to search?

         17    A.   It was the computer that was --

         18              MR. CARNEY:  I object, your Honor.

         19              THE COURT:  No, overruled.

00:32    20    A.   The computer that was also used by Tarek Mehanna and his

         21    --

         22    Q.   How did you ask for that computer?

         23    A.   How -- I'm not sure what you're asking.

         24    Q.   There may be many computers in a household.  How did

         25    you --

1    A.   Specifically, we asked if there was a computer in the

2    bedroom.  And during that part of the conversation, Mr. Mehanna

3    said, yes, there is a computer, and that's when he said it was

4    his computer.

5    Q.   When you say "the bedroom," you're talking about the

6    defendant's bedroom?

7    A.   That's correct.

8    Q.   So at some point a computer was brought to you?

9    A.   The computer was brought to the house.  What happened next

00:33 10  was that he realized -- he gave his consent, and then he

11   realized the computer was not in the room, that actually his

12   other son, Tamer, had the computer.  And he offered to call the

13   son have him bring it to the house, which did happen.

14   Q.   Did you see the defendant's brother?

15   A.   Yes, I did.

16   Q.   He brought the computer?

17   A.   Yes.

18   Q.   Once the computer was at the house, what happened?

19   A.   It was brought to the IT specialist.

00:33 20  Q.   The computer forensic specialist?

21   A.   Yes.

22   Q.   Was his name Nick Nathans?

23   A.   Yes, it is.

24   Q.   What did Nick Nathans appear to do to the computer?

25   A.   It was my knowledge that he imaged the computer.  So he

1    extracted the information from inside the computer onto a hard

2    drive.

3    Q.   I'm sorry.  I just stepped on your last sentence.  What

4    did you do after -- while the computer was being imaged?

5    A.   We conducted the search of the bedroom.

6    Q.   Did you collect anything from the defendant's bedroom?

7    A.   Yes.

8    Q.   What was that?

9    A.   It was a red spiral notebook.

00:34 10   Q.   How long were you at the house?

11   A.   No more than -- maybe just slightly over an hour.

12   Q.   And that was because of the computer processing?

13   A.   Yes.

14   Q.   After the computer was imaged, what happened?

15   A.   The processing -- the imaging is put onto a hard drive.

16   The hard drive is brought to me, and I enter it onto the

17   evidence log.

18   Q.   Do you recall whether that was 1B16?

19   A.   I believe so.

00:35 20   Q.   FBI item number.

21        What did you do with the hard drive after you received

22   it?

23   A.   Then it was given back to Nicholas Nathans, and then it

24   was brought back to the Boston division office where it was

25   entered into evidence.

```
 1    Q.   I draw your attention now to October of 2009.  Did you
 2   have some additional role in this investigation?
 3    A.   Yes, I did.
 4    Q.   What was that?
 5    A.   It was once again to conduct a search of Tarek Mehanna's
 6   bedroom.
 7    Q.   In 2008, you were given consent.  In 2009, what was your
 8   authority to search his room?
 9    A.   The authority was granted through a federal search
10   warrant.
11    Q.   Did you go to the home again that day?
12    A.   Yes.
13    Q.   I'm sorry.  What date was that?
14    A.   That was October 21, 2009.
15    Q.   Was there a team of agents that went with you?
16    A.   Yes.
17    Q.   This time, what was the target of your search?
18    A.   Once again, it was the -- find the computer and seize
19   it.
20    Q.   This is the same computer?
21    A.   Yes.
22    Q.   Did you enter the home that day?
23    A.   Yes.  We entered after the arrest of Tarek Mehanna was
24   completed.
25    Q.   Was that for charges related to this Indictment?
```

1    A.   Yes.

2    Q.   When you entered the home, did you encounter any of the

3    family?

4    A.   Yes.

5    Q.   Describe the demeanor and the relations that you had with

6    the family.

7    A.   I seemed to recall that it was early in the morning, and

8    the family was preparing to pray.  And they were visibly upset,

9    but they were cooperative.

00:37 10   Q.   Did you give them an opportunity to pray?

11   A.   I'm sorry?

12   Q.   Did you give them an opportunity to pray?

13   A.   Yes.

14   Q.   After that was done, did you conduct a search?

15   A.   Yes.

16   Q.   Did you locate the computer you were looking for?

17   A.   Yes.  The computer was located in the upstairs bedroom.

18        MR. CHAKRAVARTY:  I'd ask for Exhibit 327, to the

19   witness, your Honor.

00:37 20   Q.   I just put up on your screen Exhibit 327.  Do you

21   recognize that?

22   A.   Yes, I do.

23   Q.   What is that?

24   A.   It's the computer that we seized that day.  It's a Dell

25   Inspiron.

1    Q.    This photograph is one of four, Exhibit 327.

2          MR. CHAKRAVARTY:  Mr. Bruemmer, if you would just page

3    to 2, 3, and 4 for the witness.

4    Q.    Do you recognize these photographs?

5    A.    Yes, I do.

6    Q.    What are they?

7    A.    They are the photographs that were taken before the

8    computer was seized.

9    Q.    Are they fair an accurate depictions of the defendant's

00:38 10   room that day?

11   A.    Yes.

12         MR. CHAKRAVARTY:  I'd move 327 into evidence, your

13   Honor.

14         MR. CARNEY:  Are all four photographs being marked as

15   one, your Honor?

16         THE COURT:  That's what it sounds like to me.

17         MR. CHAKRAVARTY:  They are.  I'd break them up, but

18   they're separated by page number.

19         THE COURT:  Sounds like it's a four-page exhibit.

00:38 20         MR. CARNEY:  No objection, your Honor.

21         THE COURT:  Okay.

22   (Exhibit No. 327 received into evidence.)

23         MR. CHAKRAVARTY:  Going back to Page 1.

24         THE COURT:  It's being now exhibited to the jury.

25         MR. CHAKRAVARTY:  Thank you, your Honor.  I was just

1    going to ask.

2    Q.   Agent Johnson, is this the photograph of the defendant's

3    room as it appeared when you entered it?

4    A.   Yes.

5    Q.   So the computer -- the laptop was open?

6    A.   Yes.

7    Q.   And there appears to be a floppy disk in the disk drive?

8    A.   Yes.  That's how it was found.

9    Q.   Then there appears to be some kind of a wireless card or

00:39 10   device in the back?

11   A.   Yes.

12   Q.   Did you ultimately seize that piece of evidence?

13   A.   Yes.

14   Q.   What did you do with it after you seized it?

15   A.   We labeled it, packaged it, and it was once again brought

16   back to the office and entered into the evidence.

17          MR. CHAKRAVARTY:  May I approach, your Honor?

18          THE COURT:  You may.

19   Q.   Handing you what's previously been identified as 1B37, do

00:39 20   you recognize that?

21   A.   Yes.

22   Q.   What do you recognize that to be?

23   A.   This is the computer that is pictured, and this is the

24   computer that we seized that day.  And I also have my initials

25   here on the packaging.

1    Q.   Agent Johnson, I just want to make sure that -- clarify

2    one thing.  When you seized this piece of evidence, did you

3    seize everything as it exists in the photograph?

4    A.   Yes, that's right.

5    Q.   So, specifically, that floppy disk, was that seized and

6    also in that cellophane package?

7    A.   Yes.

8         MR. CHAKRAVARTY:  Those are all the questions I have,

9    your Honor.

00:41 10         THE COURT:  Mr. Carney.

11         MR. CARNEY:  Thank you.

12   CROSS-EXAMINATION BY MR. CARNEY:

13   Q.   Good morning, Agent Johnson.

14   A.   Good morning.

15   Q.   My name is J. Carney.

16        Your first involvement of this case occurred in

17   2008 --

18   A.   Yes.

19   Q.   -- is that right?

00:41 20   A.   That's right.

21   Q.   And that was when you went to the airport?

22   A.   Yes.

23   Q.   You informed Mr. and Mrs. Mehanna who you were, right?

24   A.   That's correct.

25   Q.   And are these the people that you met at the airport,

1   sitting right here?

2   A.   Yes.

3   Q.   Did they give you any trouble?

4   A.   No.

5   Q.   Did they try to be as cooperative as possible?

6   A.   Yes, absolutely.

7   Q.   You informed them that their son was being arrested?

8   A.   That's correct.

9   Q.   And you told them that he was being arrested for a federal

00:42 10   crime, is that right?

11   A.   Yes, that's right.

12   Q.   Is it fair to say that Mrs. Mehanna collapsed on the floor

13   at that news?

14   A.   Yes.

15   Q.   She was obviously in great distress at that point by this

16   news?

17   A.   She was visibly upset, yes.

18   Q.   In fact, to be moved from that area, it was necessary to

19   get a wheelchair for her, wasn't it?

00:42 20   A.   Yes.  We brought a wheelchair.

21   Q.   Was it necessary to get a wheelchair?

22   A.   We brought a wheelchair, yes, for her.

23   Q.   Now, you asked Mr. Mehanna if he would consent to a search

24   back at his house, is that right?

25   A.   That's correct.

```
 1   Q.   You told him he didn't have to?

 2   A.   That's correct.

 3   Q.   You told him that he could withdraw any consent at any

 4   time, right?

 5   A.   Yes.

 6   Q.   And he indicated to you that he would consent to the

 7   search, right?

 8   A.   Yes.

 9   Q.   Including of his son's bedroom --

10   A.   Yes.

11   Q.   -- is that right?

12        He signed a written document to that effect, isn't

13   that true?

14   A.   Yes, he did.

15   Q.   So then you proceeded to the house.

16   A.   He did not sign the consent until we got to the house.

17   Q.   When you did get to the house and he had a chance to read

18   it carefully, he did sign it, didn't he?

19   A.   Yes.

20   Q.   And he signed it without limitation, right?  He signed the

21   form exactly as you had drafted it?

22   A.   Yes.

23   Q.   Now, you told the members of the jury that you were

24   looking for a computer, is that right?

25   A.   Yes.
```

1    Q.   You asked him if there was a computer in the house, and he

2    indicated that there was, isn't that right?

3    A.   We asked if the computer was in the bedroom.

4    Q.   And he indicated that he would give you permission to

5    search that computer, correct?

6    A.   Yes.

7    Q.   And he indicated to you that it, indeed, was his computer,

8    correct?

9    A.   Yes.

00:43 10   Q.   When he gave you the consent, he was giving you the

11   consent to search his computer, correct?

12   A.   Yes.

13   Q.   When you got to the house, in fact, the computer wasn't

14   physically located there, right?

15   A.   Yes.

16   Q.   The computer was actually in the possession of Tarek

17   Mehanna's younger brother, correct?

18   A.   That's correct.

19   Q.   Do you recall his name being Tamer?

00:44 20   A.   Yes.

21   Q.   And the father called this second son and asked him to

22   come to the house and bring the father's computer with him,

23   correct?

24   A.   Yes.

25   Q.   And did he do so, the son?

1    A.    Yes, he did.

2    Q.    Is this Tarek's younger brother?

3    A.    I believe so.

4    Q.    And he is the person who physically brought you the

5    computer?

6    A.    Right.

7    Q.    One more area I'd like to ask you about, please, Special

8    Agent.  You said you were in Tarek Mehanna's bedroom in 2009,

9    correct?

00:45 10    A.    Yes.

11    Q.    And you were looking for that computer to seize it,

12    correct?

13    A.    Yes.

14    Q.    And you did seize it?

15    A.    Yes.

16    Q.    While you were there, there were photos taken of Tarek

17    Mehanna's bedroom, is that right?

18    A.    Yes.

19    Q.    And we've obviously seen a couple of those photos.

00:45 20          MR. CARNEY:  I'd like to ask the Court if we could

21    return to Exhibit 327, Page 1, please, for everyone to see.

22    Q.    Now, that's a close-up of the computer on the desk, is

23    that right?

24    A.    Yes.

25          MR. CARNEY:  Could we go to Page 2, please, your

1    Honor.  I'm sorry.  Could we go to Page 3.

2    Q.   Now, that basically is an accurate photograph of Tarek

3    Mehanna's bedroom wall, correct?

4    A.   That's correct.

5    Q.   That's the wall that has the desk and his metal chair, his

6    light, his computer, correct?

7    A.   Yes.

8    Q.   There are also dozens and dozens of books in the bookcase,

9    correct?

00:46 10   A.   Yes, there are books on the bookcase.

11   Q.   And as part of the search of his room, you looked through

12   the room to determine, for example, if there was any contraband

13   in the room, correct?

14   A.   I don't recall.  I just recall focusing on the computer

15   because that was the scope of the search.

16   Q.   Do you remember agents looking at the books on the

17   bookcases?

18   A.   You mean -- I can't recall.

19   Q.   Well, did you look at the books that were on the

00:47 20   bookcases?

21   A.   Honestly, I don't remember looking at the books on the

22   bookcases.

23   Q.   Was there anything illegal found in his bedroom?

24   A.   We --

25           MR. CHAKRAVARTY:  Objection, your Honor.

          1              THE COURT:  Sustained.

          2    Q.   Did you seize anything as being contraband in that room?

          3    A.   The only thing that we took that day was the computer.

          4    Q.   My question is:  Did you see anything that would be

          5    considered illegal, like cocaine or pornography?

          6              MR. CHAKRAVARTY:  Objection, your Honor.

          7              THE COURT:  Sustained.  Legal conclusion.

          8    Q.   Did you see any pictures of young children engaged in sex

          9    with an adult?

00:48    10              MR. CHAKRAVARTY:  Objection, your Honor.

         11              THE COURT:  Sustained.

         12    Q.   Do you know what child pornography is?

         13    A.   Yes.

         14    Q.   Did you see any child pornography in that room?

         15    A.   No.

         16              MR. CHAKRAVARTY:  Objection, your Honor.

         17              THE COURT:  Well, the answer may stand.

         18    Q.   Do you know what cocaine looks like?

         19    A.   I'm not --

00:48    20              MR. CHAKRAVARTY:  Objection, your Honor.

         21              THE COURT:  Sustained.

         22              MR. CHAKRAVARTY:  Relevance here.

         23    Q.   Was there anything among any of those books or DVDs or VHS

         24    movies or cassette tapes that you saw to be illegal for Mr.

         25    Mehanna to possess?

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  Sustained.

3          MR. CARNEY:  May I make an offer of proof?

4          THE COURT:  Later.

5          MR. CARNEY:  Thank you.

6          MR. CHAKRAVARTY:  Nothing further, your Honor.

7          THE COURT:  All right, Agent.  Thank you.  You may

8    step down.

9          MR. CHAKRAVARTY:  James Scripture, your Honor.  He may

00:49 10   be in the adjoining room, your Honor.

11          JAMES E. SCRIPTURE, JR., Sworn

12          THE CLERK:  Please be seated.  State your name and

13   spell your full name for the record, please.

14          THE WITNESS:  My name is James E. Scripture, Jr.  My

15   last name is S-c-r-i-p-t-u-r-e.

16   DIRECT EXAMINATION BY MR. CHAKRAVARTY:

17   Q.   Good morning.

18   A.   Good morning.

19   Q.   Can you please state where you work?

00:51 20   A.   I'm a special agent with the Federal Bureau of

21   Investigations.

22   Q.   How long have you been a special agent?

23   A.   Thirty-one years.

24   Q.   Where have you been assigned over those 31 years?

25   A.   Boston, Massachusetts, and Springfield, Massachusetts.

1   Q.   Where are you currently assigned?

2   A.   Springfield.

3   Q.   Before you became an FBI agent, what did you do?

4   A.   I was a police officer.

5   Q.   For how long was that?

6   A.   A short time, about 11 months total.

7   Q.   What's your level of education?

8   A.   I have degrees in accounting; computer science, with a

9   minor in mathematics; and a master's in criminal justice.

00:51 10   Q.   Specifically, your role in the Springfield office of the

11   FBI, do you have a specialized role?

12   A.   I do.

13   Q.   What is that?

14   A.   Computer forensic examiner.

15   Q.   How long have you been a computer forensic examiner?

16   A.   Fifteen years.

17   Q.   Before that, did you run the gamut of being an FBI agent?

18   A.   I was a street agent, correct.

19   Q.   When you became a computer forensic examiner, did you

00:52 20   receive any specialized training?

21   A.   I did, and I continue to do so.  The Bureau provides

22   in-house training, annual certifications, and we attend private

23   computer training as well.

24   Q.   Have you been certified by the FBI?

25   A.   I have.

1    Q.   Have you received any outside certifications as well?

2    A.   I have.

3    Q.   Describe what those are.

4    A.   I hold a certification from Net+ and A+, and I completed a

5    CelleBrite, forensic cellphone training class.

6    Q.   Are you a member of any professional associations?

7    A.   I am.

8    Q.   What professional --

9    A.   The International Association of Computer Investigative

00:53 10   Specialists.

11   Q.   In the course of 15 years, have you had the opportunity to

12   complete forensic examinations?

13   A.   Many, yes.

14   Q.   Approximately how many, just to give the jury a ballpark,

15   or frequency of --

16   A.   Approximately at least 25 a year, and that could entail

17   anywhere from 25 to 75 computers, plus other related media.

18   Q.   Specifically, with regards to computer forensics, can you

19   describe in your words the phases of computer forensic

00:53 20   analysis?

21   A.   The first phase would be the acquisition or the obtaining

22   of an exact image of the evidence in question.  The second

23   phase would be the processing of that image, and the third

24   phase would be analysis with a follow-up review.  Usually the

25   case agent or the investigator would be provided the results of

1    the processing and would look that over and tell the forensic

2    examiner what it is he or she would desire as a final exhibit.

3    Q.   And with regards to this case, did you have a specific

4    role?

5    A.   I did.

6    Q.   What was that?

7    A.   I was primarily asked at the beginning to compare

8    differences between the image of a hard drive that was obtained

9    in 2006 and compare that with what was on the hard drive in

00:54 10   2008 and 2009.  And I was subsequently asked to identify

11   certain types of software as well as obtain copies of certain

12   files.

13   Q.   And those files, was it your understanding that those

14   would be exhibits in this case?

15   A.   I did, yes.

16   Q.   So now, before you began your -- this examination and

17   extraction process, did you do anything to verify that what you

18   were looking at was authentic?

19   A.   I obtained MD5 hash values of the image files at certain

00:55 20   parts of the examination, whether it was at the very beginning

21   -- or usually it was at various stages during the examination,

22   including at the very end.

23   Q.   Again, just to remind the jury what an MD5 hash value is.

24   A.   A hash is a mathematical one-way function that provides a

25   unique sequence of characters based upon a certain input.  And

1   if any time anything within that input or that copy of the hard

2   drive or that copy of the CD changes, then that result is

3   changed.

4   Q.   So it's essentially a fingerprint for digital media?

5   A.   It is.

6   Q.   Did you have at your disposal evidence that had been

7   seized and was in the evidence control in Boston?

8   A.   I had image copies of the evidence, yes.

9   Q.   And how do you know that these imaged copies were exact

00:56 10   copies of what was seized?

11   A.   I was able to match the hard drives and the floppy disk by

12   MD5 value.  And with respect to CDs that I reviewed, the CD

13   files that were selected for exhibits, I ran my own hash values

14   against each of the 12 or 13 files with the hash values that

15   were obtained during the processing.

16   Q.   So each of the files on the CDs you matched up the hash

17   value?

18   A.   The files of interest, not every file, yes.

19   Q.   With regards to the other media that you examined, it was

00:57 20   the media itself that you matched?

21   A.   It was the entire media, correct.

22   Q.   Can you tell the jury which pieces of FBI evidence and

23   provide the FBI item that you examined?

24   A.   I dealt with an image copy of a hard drive, and that image

25   was originally obtained during 2006.  It was 1B1.  I reviewed

1    some CDs that -- copies of CDs that were obtained during the

2    same time, in 2006, and those were obtained from 1B2.  I had

3    opportunity to review the contents of an image that was

4    obtained in 2008 of a hard drive as well as an image of a hard

5    drive that was obtained in 2009.  The 2008 image was 1B16.  The

6    2009 hard drive image was 1B37.  And there was an image of a

7    floppy diskette that was obtained along with the 2009 hard

8    drive image in 2009, and that was 1B37 as well.

9    Q.   Now, by the time you were doing this examination and

00:58 10   extraction process, had those pieces of media already been

11   examined previously by the FBI?

12   A.   They had.  They had been imaged and processed.

13   Q.   So you had a specific task here with regards to trial, is

14   that right?

15   A.   Mostly a review and a limited amount of processing,

16   correct.

17   Q.   In the first instance, did you, in fact, compare whether

18   the hard drives collected in 2006, 2008, and 2009 -- any

19   differences between those?

00:58 20   A.   The MD5 values, or hashes, that I conducted for each of

21   those hard drives at various points at the exam, including at

22   the very end of the examination or review, matched the original

23   MD5 values that were obtained during the obtaining of the

24   original image.

25   Q.   With regards to the particular hard drive itself that was

1    being examined, between 2006 and 2008, did you notice any

2    differences?

3    A.   I did.  In examining or reviewing the results of the

4    processing from 2006 and 2008 and 2009, it appeared that the

5    hard drive that was in the computer in question -- I believe it

6    was a laptop -- was a Hitachi hard drive in 2006, whereas in

7    2008, 2009, it was Seagate.

8    Q.   You're referring to the manufacturer of the hard drive?

9    A.   Correct.

00:59 10   Q.   Can you describe to the jury how you change a computer

11   hard drive, how difficult it is?

12   A.   On a laptop computer, it's not uncommon to be able to

13   loosen a screw or two and just slide the hard drive out of the

14   machine and then replace it with a new one.  There's a slot

15   that would accept the configuration for the connection in that

16   particular sleeve or drawer; and then you'd put the cover back

17   on, tighten up the screws and fire it up.

18   Q.   What software tools did you use to extract information off

19   of this digital media?

01:00 20   A.   I used Forensic Toolkit, and I used Forensic Toolkit

21   Imager, and I used Forensic Toolkit Registry Viewer.

22   Q.   Are those standard software in the field?

23   A.   They're commercial products that have been vetted and

24   approved by the FBI CART, Computer Analysis Response Team, yes.

25   Q.   With regards to your analysis, did you create any

1    derivative product?

2    A.    I did.

3    Q.    What did you create?

4    A.    I wrote to CD or DVD the selected files that were

5    requested as well as any other notable observations during my

6    reviews.

7    Q.    Did you create a separate CD for each of the digital media

8    that you had examined?

9    A.    I did.

01:01 10          MR. CHAKRAVARTY:  May I approach, your Honor?

11          THE COURT:  You may.

12   Q.    Handing you an envelope marked 1B66, can you open that and

13   describe what's in there?

14   A.    These are disks that I prepared containing the results of

15   my review.

16   Q.    I'm also handing you an envelope I just opened, marked

17   1B72.  Would you describe that?

18   A.    This is a disk that I prepared concerning the results of

19   the review of the 2006 image of the hard drive.

01:03 20   Q.    Is a copy of an analysis of the 2006 hard drive also

21   contained in the 1B66?

22   A.    It is.  I made some corrections on the more recent disk

23   because some of the video, it only copied one segment of the

24   files.  And I also had enhanced some of the files that were in

25   foreign languages.  The translators had provided English

1    translations, which I incorporated into the file listings.

2    Q.   So you just created a separate exhibit?

3    A.   I did, an updated exhibit.

4         MS. PATEL:  Objection.

5         THE COURT:  Overruled.

6    Q.   With regards to those CDs that you created, what did you

7    put onto those CDs?

8    A.   In general, I copied files that were requested either by

9    the prosecution or the investigators, and pretty much there

01:04 10   would be videos, audios, picture files.  There may be some

11   registry or system information as well.

12   Q.   Again, for each CD, did you correlate it to a piece of

13   digital media that you had seized?

14   A.   Yes.  I didn't mix and match.  Each CD would only contain

15   results from one particular item.

16   Q.   So there's one CD for the 2006, one CD for 2008, one CD

17   for the 2006 CDs, and one CD for the 2009 hard drive and then

18   the fifth CD for the 2009 floppy drive, is that right?

19   A.   Correct.

01:04 20   Q.   Now, in addition to the actual files that you extracted,

21   you described some settings and other information that you had

22   extracted?

23   A.   Yes.  I obtained complete file listings which listed

24   various items of metadata or descriptive information for each

25   file.  And, in addition, the operating system and the file

1   system maintains information of files in certain configuration

2   settings, and there was a number of those that I saved to the

3   disk as well.

4   Q.   You mentioned the word "metadata."  Can you describe what

5   that is for the jury?

6   A.   Metadata is information pertaining to a file.  It wouldn't

7   contain the actual code or the actual text normally within a

8   file, but it would be information such as file name, the folder

9   that it might be contained in on the computer, the creation

01:05 10   date, the size of the file, and whether the file had been

11   deleted or not.

12   Q.   Is that type of information available for every file

13   that's on a computer?

14   A.   There are many pieces of metadata information available

15   for files.  Not every piece of metadata information is

16   available for every file.  To the extent it was available, I

17   included it in the file listing database.

18   Q.   So if you couldn't find it in the file listing database,

19   then you wouldn't obviously export it to a CD, is that right?

01:06 20   A.   Correct.

21   Q.   How many fields of different metadata did you put into

22   your file listing?

23   A.   Whatever FTK had for its complete metadata component is

24   what I would include.  I didn't leave any columns out.  I'm

25   guessing it was probably 20.

1    Q.   And that would make --

2    A.   It could have been 30.  It could have been 18.  It's not

3    guessing.  I'm estimating, I guess.

4    Q.   You're describing a large database populated by a lot of

5    different information?

6    A.   Exactly.

7    Q.   Have you had the opportunity to review Government Exhibits

8    342 through Government Exhibit 346?

9    A.   I'd have to see what those exhibits were.

01:07 10          MR. CHAKRAVARTY:  Just for the witness, your Honor,

11   I'd call up 342.

12   A.   I have.

13   Q.   343, please.

14   A.   Yes, I have.

15   Q.   344.

16   A.   Yes.

17   Q.   And 345.

18   A.   Yes, I have.

19   Q.   And 346.

01:08 20   A.   I have.

21   Q.   What are those?

22   A.   Those are snippets or redacted versions of the complete

23   database file listings that I would have made for each piece of

24   media.

25   Q.   Are those fair and accurate depictions of files that were

1    extracted for purposes of giving to the jury?

2    A.    They appear to be, yes.

3    Q.    Would these be helpful in explaining your testimony as

4    well?

5    A.    Yes.

6              MR. CHAKRAVARTY:  I would ask that 342 to 346 be

7    introduced.

8              MS. PATEL:  We object, your Honor.  First of all,

9    Exhibit 342 is barely legible.  As to all four of them, as the

01:08 10   witness testified, they're snippets, redacted, of the

11   database --

12             THE COURT:  Do you have a paper copy?

13             MR. CHAKRAVARTY:  We have one upstairs, your Honor.

14             MS. PATEL:  We would simply ask that if the government

15   wants to introduce these, the table of contents, as it were,

16   that they introduce the entire document and not just a clipped

17   version of each of these databases.

18             MR. CHAKRAVARTY:  The difficulty with that, the entire

19   document, because of the 30 fields, is some hundreds pages

01:09 20   long.

21             THE COURT:  Let me see you at the side.

22   (SIDEBAR CONFERENCE AS FOLLOWS:

23             THE COURT:  First of all, I can barely read it.  I

24   can't tell what it is.  But I'm not sure I understand what it

25   is either.

1          MR. CHAKRAVARTY:  It's essentially a table of contents

2     for materials --

3          THE COURT:  For the CDs?

4          MR. CHAKRAVARTY:  For the CDs that are created from --

5     he put it on the CDs of -- it's a subset of all the files that

6     were on the computer.  So the CDs create a complete file

7     listing.

8          THE COURT:  He selected some things from the universe?

9          MR. CHAKRAVARTY:  Right.

01:10 10          THE COURT:  Saved them to a CD?

11          MR. CHAKRAVARTY:  Yup.

12          THE COURT:  Now this is an index or a table of

13     contents of those CDs?

14          MR. CHAKRAVARTY:  Correct, where each of the files was

15     found on the computer.

16          THE COURT:  Okay.

17          MR. CHAKRAVARTY:  It shows where each of the files is.

18          THE COURT:  It is all or some of the metadata?

19          MR. CHAKRAVARTY:  It is not all of the metadata on the

01:10 20     computer.

21          THE COURT:  No, no, but for any given file.

22          MR. CHAKRAVARTY:  It's a sum.  It's about five fields

23     as opposed to the thirty.

24          MS. PATEL:  Your Honor, first of all, we can't read

25     it.  But we don't have a problem if it's hundreds of pages

1    long.  We should see, though, the completeness of what's on

2    each of those.  If they want to select out, identify Page 45 as

3    the page of the sub-selected item, that's fine but --

4            THE COURT:  You have a paper file that's a hundred

5    pages.  You don't have to -- necessarily.  I don't know.

6    Completeness may be an issue.  I think they can start by

7    selecting what's relevant.  I do have a problem with the

8    legibility.  It's useless like this.  Nobody can see it.

9            MR. CHAKRAVARTY:  I have two options.  One, I can

01:11 10   increase the font or just bring the paper copies.

11           MS. BASSIL:  I tried to increase the font.  That won't

12   work.

13           MR. CHAKRAVARTY:  I'll bring in paper copies at the

14   break.

15   .  .  .  END OF SIDEBAR CONFERENCE.)

16           MR. CHAKRAVARTY:  May I proceed, your Honor?

17           THE COURT:  Go ahead.

18           MR. CHAKRAVARTY:  Before I ask the next question, in

19   terms of clarifying, the items will not be admitted until we

01:11 20   bring down the paper copies?

21           THE COURT:  Not yet, no.

22   Q.   Agent Scripture, in addition to file listing that you

23   created and you just described, were there other sorts of

24   so-called metadata found on the computer?

25   A.   There was.

1    Q.    Describe generally what other sources there were.

2    A.    There would have been metadata maintained by the registry

3    files of the computer system, and some applications would have

4    contained metadata in the form of link files and possibly

5    recent files, third-party applications.

6    Q.    Now, the metadata that you were able to recover, is that

7    exhaustive of all the metadata that ever existed on that

8    computer?

9    A.    No.

01:12 10    Q.    Why wouldn't you be able to recover everything?

11    A.    There's just so much information contained on a hard drive

12    that you would have to be selective as to what you review.

13    Q.    Does some metadata exist temporarily on a computer?

14    A.    Correct.

15    Q.    What would be reasons why that metadata would be removed

16    from a computer?

17    A.    Either the user or the operating system might have deleted

18    it at some point in time.

19    Q.    How would the operating system delete it?

01:13 20    A.    It could have been used for temporary purposes, or it

21    could have been converted to another format and then deleted.

22    Q.    Are there commercial programs that also purge different

23    pieces of information off of a computer?

24    A.    Absolutely.

25    Q.    Are you familiar with the disk clean-up function on a

1    Windows laptop?

2    A.    I am.

3    Q.    What is that?

4    A.    That allows a user to rid a computer of files that are no

5    longer needed or no longer wanted.

6    Q.    Going back to the CDs that you created, how did you

7    organize information on those CDs?

8    A.    I believe that there was approximately 12 files that were

9    selected.

01:14 10    Q.    Strike that.  I may have miscommunicated or I didn't give

11    you -- on the CDs that you created, these five CDs that you

12    created, how did you put the information in there so it would

13    be viewable if I were to put it into a laptop?

14    A.    I created a hyperlink to a report so you could select a

15    tab, and it would take you directly to the files in question.

16    Q.    So what specific files did you put on there?  In addition

17    to the files that you were asked to extract for the jury, what

18    types of registry information or other types of information did

19    you put on there?

01:14 20    A.    For the CDs?

21    Q.    Yeah.  For all of the exhibits that you examined.

22    A.    For all the items?  I would put registry information,

23    complete file listings.  On one hard drive in particular, I

24    believe there was a selected link option.  I would have put

25    browser information, deleted files on one CD.  There was an

1    inactive category that could be selected.

2    Q.    What is an inactive category?

3    A.    That was a term that I was asked to use to describe carved

4    or salvaged files.

5    Q.    What are carved or salvaged files?

6    A.    They're files that exist on the computer -- on the hard

7    drive or the media, but they were no longer tracked by the file

8    system.

9    Q.    So the operating system wouldn't access it?

01:15 10    A.    Right.  You usually would need third-party software to

11    recover those.

12    Q.    Was each file that you identified given a unique number?

13    A.    The Forensic Toolkit program assigns a unique item number

14    to each file that's processed, yes.

15    Q.    Did you find chat logs on one of the computers?

16    A.    I did.

17    Q.    Which computer was that?

18    A.    The 2006 hard drive.

19    Q.    What is a chat log?

01:16 20    A.    It's a recording of online conversation.

21    Q.    What does it appear -- in terms of computer file type,

22    what does it appear to be?

23    A.    They're usually text files.

24    Q.    Are there dates and times of communications within those

25    log files?

1   A.   To the best of my memory, all of them had them, yes.

2   Q.   With regards to how those chat log files were segregated,

3   could you make any assessment of that?

4   A.   I did.  I broke them down into Microsoft Network, MSN;

5   America Online Instant Messenger, which would be AIM; and

6   Yahoo.

7   Q.   For each individual conversation, how were they separated?

8   Strike that.

9        Each individual participant to a conversation, how

01:17 10  were they separated?

11  A.   On my CD?

12  Q.   On the CD.

13  A.   Again, they were hyperlinked.  You would select it by

14  clicking the button for the item that you were interested in.

15  Q.   The log files, were they unique to different email

16  addresses?

17  A.   Yes, they were.

18  Q.   So each person who had a conversation with the user of the

19  computer would have a separate email or separate file?

01:18 20  A.   Each user name, I believe, would be separate.  I couldn't

21  tell if the user was using multiple names or not.

22  Q.   Thank you for clarifying.

23       How many of these chat logs were there on the

24  computer?

25  A.   I extracted approximately 104 logs with the log extension.

1    Q.   Again, that doesn't mean necessarily 104 different

2    individuals, but it means 104 different email addresses which

3    corresponded with the user of the computer?

4    A.   104 different logs, right, log files.

5    Q.   Were there Arabic language documents on the computer?

6    A.   There were.

7    Q.   How did you identify and extract them?

8    A.   Well, when I could, by FTK number as well as size and

9    other metadata, and I had to use a -- employ the services of a

01:19 10   translator to read to file name in the foreign language and

11   convert it to an English equivalent.

12   Q.   With regard to -- again, to the 2006 hard drive, were

13   there any folders that were in Arabic language?

14   A.   Yes.

15   Q.   Describe what they were.

16   A.   Well, I was told by the translator that one was named

17   "Iraq" and --

18          MS. PATEL:  Objection, hearsay.

19          THE COURT:  Sustained.

01:19 20   Q.   How many folders do you remember being in Arabic?

21   A.   At least two.

22   Q.   With regards to the volume of information that you took

23   off of the five sets of digital media and put onto those CDs,

24   where was the majority of the data from?

25   A.   The 2006 hard drive.

1   Q.   Where on the 2006 hard drive was the majority of the data

2   stored?

3   A.   The majority of it would have been stored in a subfolder

4   of the user Tarek's document and settings folder.  And I don't

5   know the exact chain of subfolders contained within it right

6   off the top of my head.

7   Q.   So there's a -- in the Windows operating system, if

8   there's a user who's logged on to Windows operating system,

9   there would be subfolders corresponding to that user?

01:20 10   A.   Correct.

11   Q.   For example, if I were to go onto my computer, I would

12   have a "My Documents" folder, is that right?

13   A.   Yes.

14   Q.   And sometimes that would have -- if I had a user name, say

15   it was Mr. Chakravarty, there would be a -- "My Documents"

16   folder called "Mr. Chakravarty's documents," is that right?

17   A.   Yes.

18   Q.   Did you do any analysis to determine what you could learn

19   about the identity of the user of that laptop?

01:20 20   A.   I did.

21   Q.   What did you look at?

22   A.   Well, I looked at the user account names that were

23   included within the documents and settings folder, and I looked

24   into the registry.

25   Q.   What did you learn?

1    A.   In the registry, one of the registry files, it was just

2    called the SAM file, the Security Account Management file.  One

3    of the user names was Tarek, and that appeared, according to

4    FTK registry reviewer, the only account that had logged into

5    that computer.  In addition, one of the user names under

6    documents and settings was Tarek, and the computer name was

7    Tarek with a different spelling.

8    Q.   Was that spelling T-a-r-e-k?

9    A.   The computer name would have been, yes.

01:21 10   Q.   And then the names in the Security Account Manager and the

11   registry was T-a-r-i-q?

12   A.   Correct.

13   Q.   In addition to that registry-type information, did you

14   look at any of the chat logs that you just described?

15   A.   I did.  I looked at them to make sure that they copied

16   over correctly and they were readable.

17   Q.   So you didn't read the content of each of those chats?

18   A.   A small portion.

19   Q.   Was there a common email address on each of the chats that

01:22 20   you looked at?

21   A.   There was, yes.

22   Q.   What was that email address?

23   A.   There were actually two.  For the AIM sessions, I believe

24   it was sayfmaslool; and for the MSN and Yahoo sessions, I

25   believe it was ibnul_khattab82@yahoo.com.

1  Q.   For the benefit of the jury and the stenographer, is Sayf

2  Maslool, S-a-y-f, M-a-s-l-o-o-l?

3  A.   Correct.

4  Q.   Is ibnul_khattab82 I-b-n-u-l, K-h-a-t-t-a-b-8-2,

5  @yahoo.com?

6  A.   Correct.

7  Q.   In addition, did you look through the registry information

8  for identifying information of any of the folders on the

9  computer?

01:23 10  A.   I did.

11  Q.   Did you see -- did you locate a folder that had some

12  identifying information?

13  A.   There was a folder in one of the folder configuration

14  settings that was named ibnul_khattab82@yahoo.com.

15  Q.   In addition, in the registry settings, did you look for

16  auto complete information?

17  A.   I did.

18  Q.   Specifically with regard to auto complete information

19  corresponding to web forums, did you find any identifying

01:24 20  information?

21  A.   I did.

22  Q.   What did you find?

23  A.   There was a log-in reference in one of the registry

24  settings, and it appeared that the name Abu Sabaayaa had been

25  entered into that forum online.

```
 1    Q.   Would that be Abu Sabaayaa?

 2    A.   Correct.

 3    Q.   You're not familiar with the Arabic language, are you?

 4    A.   I have enough trouble with English.

 5    Q.   I'm just going to spell that again for the record.  Is

 6    that Abu Sabaayaa A-b-u, S-a-b-a-a-y-a-a?

 7    A.   That sounds right, yes.

 8    Q.   Agent Scripture, were you able to locate certain bookmarks

 9    from the browser that was used on the computer?

01:24 10    A.   Yes.

11    Q.   Was that browser the Mozilla Firefox browser?

12    A.   Correct.

13    Q.   Did you notice any specific web forums that were on the

14    bookmarks of that Firefox browser?

15    A.   I believe there was a discussion board that was

16    hyperlinked to Tibya.

17    Q.   Did it have an email -- excuse me, a web address of

18    www.at-tawheed.com?

19    A.   Correct.

01:25 20    Q.   Again, continuing with your examination of the 2006 hard

21    drive, did you also look at the recent docs registry settings?

22    A.   I did.

23    Q.   Explain what that is to the jury.

24    A.   In a Windows environment, when a document is opened,

25    especially using the Windows Explorer window, a link file is
```

1   created in order to be able to access that file quickly if one

2   would like to access that file in the near future.

3   Q.   How long do those link files remain in the metadata?

4   A.   Well, they can remain a long time.  A limited number --

5   and I believe the default number is 15 for the start menu.  But

6   in the registry, it's many more, and I don't know the exact

7   number.

8   Q.   Again, like the other metadata that you described earlier,

9   are there reasons why that data wouldn't be on the computer?

01:26 10   A.   It can be deleted by the operator, some of it through the

11   operating system and some of it through third-party

12   applications.

13   Q.   Specifically, do you remember any files that you were

14   asked to later extract from the computer that you saw in the

15   recent documents folder?

16   A.   Recent.  Yes.  I remember 39 Ways -- it might not have

17   been in the recent documents folder.  I believe I saw it at

18   least in the registry under "recent."

19   Q.   That's what I meant, "recent."

01:27 20   A.   39 Ways.doc, 39 Ways.pdf.  I mean, there were a lot of

21   files.  I'm going just by memory.  I know there was

22   Juthath.rmvb.

23   Q.   Is that Juthath J-u-t-h-a-t-h?

24   A.   Yes.

25   Q.   Were there a number of rmvb files?

1    A.    There were.

2    Q.    Did you find many of those files on the defendant's

3    computer later?

4    A.    I did.

5    Q.    Did you see any -- find any links files related to various

6    rmvb and Windows Media Player files?

7    A.    I did.

8    Q.    Can you explain to the jury what a rmvb file is?

9    A.    An rmvb, I believe it stands for real media variable bit

01:28 10   rate.  And it's viewable primarily through RealPlayer, and

11   RealPlayer is a program that you can play files that are stored

12   on your computer.  You can play files and view them as they're

13   being downloaded as well.

14   Q.    Were there any link files or registry files related to

15   something called Ghazwat Umar Hadeed?

16   A.    I remember a link file, and I believe it may have been

17   created by RealPlayer to the best of my memory.

18   Q.    Did you also look through the registry settings for common

19   dialogue boxes?

01:29 20   A.    I did.

21   Q.    Did you notice any files that were accessed in the common

22   dialogues boxes?

23   A.    I did.  Going from memory, I think there was

24   19 Martyrs.mpeg.  And I believe Juthath, or Juthath, may have

25   been accessed through the common dialogue box.

1   Q.   The 19 Martyrs, do you remember what disk drive that was

2   accessed by?

3   A.   To the best of my memory, it was from the 2006 hard drive.

4   Q.   Is your memory exhausted with regards to precisely what

5   drive was being accessed by the 19 Martyrs?

6   A.   I can't, with a hundred percent certainty, say.  I'm

7   assuming that -- I believe, to the best I can recall, that's

8   where it was from.

9   Q.   Would something refresh your memory?

01:30 10   A.   Yes.

11        MR. CHAKRAVARTY:  May I approach, your Honor?

12        THE COURT:  You may.

13   Q.   I've just handed you a document from the registry

14   settings.  Take a moment.  Don't read from it but just refresh

15   your memory.

16        MS. PATEL:  Your Honor, before the witness testifies,

17   may we please see the document?

18        THE COURT:  All right.

19   Q.   Agent Scripture, having seen that document, do you have

01:31 20   any more information about what part of the computer was the

21   19 Martyrs.mpeg stored on or was being accessed?

22   A.   After reviewing that document, it would indicate that it

23   was most likely from a CD or DVD drive.

24   Q.   So it wasn't the documents and settings folder?

25   A.   No.

1    Q.   You mentioned earlier that there was a 39 Ways.doc file

2    that was recently accessed.  Are you aware of any pdf versions

3    of that file?

4    A.   I am.

5    Q.   Were those also accessed -- or was that also accessed?

6    A.   I believe there were link files pointing to the hard

7    drive, the 2006 hard drive, as well as to what appears to be a

8    floppy diskette, at least for the doc.  The pdf, I believe, was

9    only on the hard drive.

01:32 10   Q.   The floppy diskette, you're talking about the 2009 floppy

11   diskette?

12   A.   Correct.

13   Q.   Again, I'm not going to go through every particular recent

14   link file to the media that you later located.  But is it fair

15   to say that there was -- were a lot of the things that you

16   found on the computer had been accessed by the computer?

17   A.   Correct.

18   Q.   Were you also asked to identify whether there was specific

19   programs of interest on the various pieces of digital media?

01:33 20   A.   I was.

21   Q.   With regards to the 2006 hard drive, were there particular

22   computer programs that you located?

23   A.   I was asked to identify if there were any privacy and, I

24   believe, encryption programs.  And with 2006 in particular, I

25   remember Privoxy; the communication program Trillian; and there

1    was one other program beginning with a "P," and I can't recall

2    it right now.

3    Q.   Was there any file-sharing programs?

4    A.   TOR, TOR.  It began with a "T."

5    Q.   What does TOR stand for?

6    A.   TOR is an acronym for the onion router.

7    Q.   Why do they call it that?

8    A.   An onion has many layer, and if a person uses the TOR

9    program, he's able to access websites by using intermediary

01:34 10   computers to do so, and he's able to hide -- he or she is able

11   to hide their computer address.  It promotes anonymity while

12   conducting business on the internet.

13   Q.   With regards to the 2008 hard drive, did you detect any

14   files of interest -- programs of interest?

15   A.   There was IPHider, IPPrivacy, Trillian, and I believe

16   Webroot Window Washer was installed on that hard drive.

17   Q.   And in 2009?

18   A.   2009, to the best of my memory, Windows -- Webroot Window

19   Washer, IPHider, IPPrivacy, Trillian, and CCleaner.  I found

01:35 20   references to those -- at least references to all those

21   programs.  Some were still installed.  Some had been

22   uninstalled, I believe.

23   Q.   Going back now to the 2006 hard drive, were there various

24   different folders within the "my documents" folder of the user?

25   A.   There were.  I can't remember how many but there were.

1    Q.   Did you create screen captures of those folders and put

2    those on the CDs as well?

3    A.   I did.

4    Q.   Was there a particular folder called "My Work"?

5    A.   Yes.

6    Q.   Was there a subfolder called "Translations" underneath

7    that?

8    A.   There was.

9    Q.   Was there a subfolder for "39 Ways"?

01:36 10   A.   I can't remember if there was a specific folder on "39

11   Ways."  The only thing I can remember is a specific file named

12   "39 Ways."

13   Q.   Is your memory exhausted on that point?

14   A.   Yes.

15        MR. CHAKRAVARTY:  May I approach, your Honor?

16        THE COURT:  You may.

17   Q.   Having looked at that document, do you have a memory of a

18   folder related to 39?

19   A.   That document indicates that there was a folder named

01:37 20   "39," correct.

21   Q.   Which -- was that also in the "My Work" folder?

22   A.   Yes.

23   Q.   Was there a separate folder related to videos?

24   A.   I recall a folder named "Videos."  I believe there were

25   other folders that contained videos as well.

1    Q.    Were there subfolders within the folder you described

2    called "Videos"?

3    A.    Yes.

4    Q.    Were some of those subfolders in Arabic?

5    A.    Yes.

6    Q.    With regards to the internet browser that was on the

7    computer, was there a file related to the downloads from that

8    internet browser?

9    A.    There was a Downloads.rdf file that was maintained by the

01:38 10   Mozilla Firefox browser, correct.

11   Q.    This is very small print, but do you recognize this

12   document?

13   A.    Barely.  The print is very small.

14   Q.    We'll have a hard copy.

15         What is it?

16   A.    It looks to be a copy of the Downloads.rdf file.

17   Q.    What is the Downloads.rdf file?

18   A.    It's a record maintained by Firefox for files that are

19   downloaded using the Firefox browser.

01:39 20   Q.    Is there a date and time and a website from which an item

21   is downloaded?

22   A.    It shows a date and time of beginning and end of download.

23   It shows whether or not the file successfully downloaded.  It

24   shows where it was downloaded to.  And it shows the source of

25   the download.

1          THE COURT:  What exhibit number was that, Mr.

2    Chakravarty?

3          MR. CHAKRAVARTY:  793.

4          THE COURT:  Thank you.

5    Q.   In addition to this file, back on the 2006 hard drive, did

6    you locate a number of other files that the government asked

7    you to extract for purposes of the jury?

8    A.   I did.

9    Q.   Did you extract every file that was on the computer?

01:39 10   A.   No.

11   Q.   Just the ones that we asked you to?

12   A.   Correct.  Well, I'm sure I extracted additional ones, but

13   by no means did I extract every file.

14   Q.   Have you had an opportunity to look at the government's

15   exhibit list in this case?

16   A.   I have.

17   Q.   Is that inclusive of every file that you had extracted?

18   A.   No.

19   Q.   Were there some files that didn't make it onto the exhibit

01:40 20   list?

21   A.   There were.

22   Q.   Describe the general types of what those files were.

23   A.   They were files that were very graphic, maybe even

24   horrific in nature.

25          MS. PATEL:  Objection, your Honor.

1      THE COURT:  It may stand.

2  Q.  With regards to the 2006 hard drive, did you locate

3  Exhibits 19 through 215 and 768 through 793 on that hard drive,

4  with the exception of Exhibits 23, 150, 245, and the

5  translations?

6  A.  If I could see that exhibit list, I would have a better --

7      MR. CHAKRAVARTY:  May I approach, your Honor?

8      THE COURT:  You may.

9  Q.  I've handed you just an exhibit list.

01:42 10  A.  And the numbers that you wanted me to key in on?

11  Q.  The first set, 19 through 246, with the exceptions of

12  Exhibit 23, 150, 245, and the translations which appear as "A"

13  on the exhibit list.

14  A.  Through 246, would include everything through the 2008

15  hard drive.

16  Q.  So everything from 2006 would have been up to 246?

17  A.  Contained within there, yes.

18  Q.  That includes both the hard-drive information as well as

19  information from CDs that were located in 2006?

01:43 20  A.  Yes, it does.

21  Q.  And for each of those exhibits, is there a unique -- the

22  FTK number, is that on there as well?

23  A.  It appears to be, yes.

24  Q.  With regards to that unique FTK item number, is that also

25  contained on that file listing that you had printed out -- that

1    you had identified in 342 through 346?

2    A.   On all of the file listings, the mdb, or the database file

3    listings I prepared, there's an item number, or unique item

4    number column.

5    Q.   Just to clarify, Exhibit 23 is not -- there is no Exhibit

6    23 in that first 19 through --

7    A.   It was one of the ones intentionally left out.

8    Q.   As well as 150?

9    A.   Correct.

01:44 10  Q.   And 245?

11   A.   216 and 245, yes.

12   Q.   216.

13        In addition, are there the translations, which are

14   listed as a number followed by the "A"?

15   A.   There are translations where, sir?

16   Q.   Are there translations on that exhibit list, 19 through

17   346?

18   A.   There's a final translation column, yes.

19   Q.   In terms of actual exhibits, were any of the exhibits that

01:45 20  you just described not extracted from the computer?

21   A.   They were extracted.  They just weren't always included as

22   exhibits.

23   Q.   Right.  But my -- what I'm trying to get at is, of the

24   exhibits that the jury is going to get, were all of these

25   extracted from the computer or are some of them -- I'm asking

1    you not to authenticate translations or things you didn't

2    create yourself or didn't extract.  Are any of these exhibits

3    within that range not from the computer?  For example, 217A,

4    what is that?

5    A.    It would be a translation of a file that I extracted.

6    Q.    So Exhibit 217 is a file you extracted from the computer?

7    A.    Right.

8    Q.    And 217A is a translation created by somebody else?

9    A.    Correct.

01:46 10   Q.    So we're not seeking to admit 217A at this time.  But for

11    the rest of those exhibits between 19 and 246, were those items

12    that you found on the 2006 hard drive and the 2006 CDs?

13    A.    You also have items from the 2008 hard drive included

14    within 246.

15    Q.    Are those Exhibits 239 through -- 229 through 246?

16    A.    Correct.

17    Q.    With the exception of 245?

18    A.    Correct.

19    Q.    Just to clarify for the record, Exhibits 217 through 228

01:47 20   were from the compact disks seized in 2006, is that right?

21    A.    Yes.

22    Q.    Moving on to Exhibits 328 through 346, where are those

23    from?

24    A.    328 to 346?

25    Q.    Yeah.  Sorry.  I'll break that down.  328 to 338.

1    A.    Those were from the 2009 computer.

2    Q.    And 339 to 341?

3    A.    Those were from the 2009 floppy diskette.

4    Q.    And then 342 to 346, those were the charts, the file

5    listings, is that right?

6    A.    File listings that I prepared, correct.

7    Q.    I'm just handing you paper copies of these.

8          MR. CHAKRAVARTY:  May I approach, your Honor?

9          THE COURT:  You may.

01:49 10   Q.    Are those the same as the file listings that you described

11   on the computer screen earlier?

12   A.    They are.  They're redactions of the complete listings

13   that I prepared.

14   Q.    Are these a little bit more legible?

15   A.    A little bit more, yes.

16   Q.    So all of those items that you just described were taken

17   from the five pieces of media that you described earlier?

18   A.    Yes.

19         MR. CHAKRAVARTY:  At this point, your Honor, I would

01:50 20   move these into evidence.  It's Exhibit 19 through 246, with

21   the exception of 23, 150, 216, and 245; none of the

22   translations; then Exhibits 328 to 346; and 768 through 793.

23         MS. PATEL:  Objection.

24         THE COURT:  Let me see you at the side.

25   (SIDEBAR CONFERENCE AS FOLLOWS:

1        THE COURT:  Can I look at something?

2        MR. CHAKRAVARTY:  The paper copies of --

3        THE COURT:  Yes.

4        MR. AUERHAHN:  Judge, while Mr. Chakravarty is getting

5   that, if they have objections based on legibility, we provided

6   them in advance what each exhibit we're going to use with each

7   witness.  It seems to me that's something we can discuss in

8   advance of the witness taking the stand.

9        MS. BASSIL:  These are chalks anyways.  They're charts

01:51 10   created by the witness.  They're not exhibits.

11        MR. CHAKRAVARTY:  I think we can make a better

12   photocopy, obviously.

13        THE COURT:  Okay.  And the several -- each one is a

14   different source?

15        MR. CHAKRAVARTY:  Correct.  And the source is labeled

16   on the top.  It says --

17        THE COURT:  Yup.

18        MS. PATEL:  This is just as to the chalks.  The

19   exhibits Mr. Chakravarty wants to admit includes -- so the --

01:52 20   of the large number of exhibits Mr. Chakravarty wants to

21   introduce, that includes images, videos, and then a bunch of

22   documents from three different computers, the images -- and I

23   have the numbers -- many of them -- we can't even see what it

24   is.  They're pixillated or half the image is cut off.  We would

25   first object to all of those, the ones we can't make out what

1    the picture even is.  Mr. Carney had earlier alluded to we may

2    have to go sort of exhibit by exhibit.  That's sort of Problem

3    No. 1.

4         With the videos, we would say -- just renew our

5    objection that because they belong on the computer we can't

6    show any other association with the defendant.  Second of all,

7    they're all in Arabic.  We would ask that until the translator

8    can come and testify and say what the videos say, they

9    shouldn't be admitted yet.

01:53 10         MR. CHAKRAVARTY:  These were found on the computer.

11   Independent of the translation, they're significant just based

12   on the images that are betrayed.  The same goes for images that

13   were -- that may have been partially obscured because they were

14   recovered from carved space.  Just because the defense can't

15   understand what it means, that doesn't mean that the item

16   wasn't found on the computer.  They can argue that it's

17   something else.

18         THE COURT:  Okay.  Let me just come back to this for a

19   minute.  This is -- I guess you're offering others, too.  Let's

01:53 20   talk about this.  Somebody made an objection that this is work

21   product.

22         MS. BASSIL:  It's a chalk.  It doesn't go in as

23   evidence.

24         MR. CHAKRAVARTY:  I think the testimony was that this

25   is something that the FTK software generates to show where each

1    file is found on the computer.  At worst, it's a reliable

2    system or process to document what the actual data is on the

3    computer.

4            MS. BASSIL:  He has --

5            THE COURT:  On the computer or on his CD?

6            MR. CHAKRAVARTY:  It was on the computer, which he

7    exported onto the CD.

8            THE COURT:  Right.  But this is a record of what the

9    CD is, post-selection, right?

01:54 10         MS. BASSIL:  Correct.

11           MR. CHAKRAVARTY:  It is post-selection, yes.

12           MS. BASSIL:  Right.  It's not everything --

13           THE COURT:  Why isn't it admitted as a process -- the

14   product of a regular process?

15           MS. BASSIL:  Because it's his creation of a chart of

16   how and where he found particular exhibits.

17           THE COURT:  It would be the same if you asked for the

18   sales figure for the third quarter.

19           MR. CARNEY:  May I offer a different objection?  It

01:54 20   reflects things that your Honor may not admit into evidence.

21   So it would be signaling to the jury that there might be

22   something on here that they're not going to see.  And that --

23   because you excluded it as either being irrelevant or

24   prejudicial than probative or cumulative.  So I would ask that

25   this be marked for identification at this point and that your

1    Honor revisit the issue once you have decided what on that list

2    will come in.

3            THE COURT:  Well, I think that would alter the list.

4    Okay.  I think this is admissible as the product of a regular

5    process, as he's described it.

6            And as to the others, I think this presumptive

7    relevance from the testimony, if there's a particular 403

8    objection to something, let's consider that.  But we'll have

9    time with the jury to consider that I think as a motion to

01:55 10   strike or reconsider, just for the convenience of moving on.  I

11   think I would admit them subject to particularized motions to

12   strike individual exhibits.

13           MR. CARNEY:  We move to strike them all.

14           THE COURT:  Denied.

15           MR. CARNEY:  It would be unprecedented in my

16   experience that a justice of this court or any court that would

17   allow evidence to come rolling in where we're saying that it's

18   more prejudicial than probative and you haven't seen it.

19           THE COURT:  You haven't said why it's prejudicial.

01:56 20   That's what I want to focus on.

21           MR. CARNEY:  Then let's go through each one so you can

22   see it.

23           THE COURT:  I think the government has put enough in

24   as being a source.  I think you can move to strike and we'll

25   consider it.

1          MR. CARNEY:  All right.  I'd move to strike the first

2     one.

3          THE COURT:  We'll do it on another occasion.  They're

4     not going to see it, I don't think --

5          MR. CHAKRAVARTY:  They're not going to see it today.

6          MR. CARNEY:  Your Honor, I respectfully submit that we

7     have particular objections to each of these documents.  And

8     where we are saying it's cumulative, how can the Court make a

9     determination if something is cumulative without seeing it?  If

01:57 10   you were admitting 150 photos and I say they're cumulative, I

11    respectfully submit the ruling can't be, well, I'll let 150 in,

12    and then you can specify which ones are cumulative.  2 through

13    150 are cumulative.

14         THE COURT:  If the jury was going to see them right

15    away, I guess that would be --

16         MR. CARNEY:  Let's say your Honor excludes all of the

17    exhibits on that page, how can the jury get a copy of that page

18    simply because it's a document created by the government to

19    show everything that's on a CD?  It would be like allowing the

01:58 20   government's list of 800 prospective exhibits to go to the jury

21    when the exhibits themselves are not going to the jury.

22         MR. CHAKRAVARTY:  There's no restriction on a witness

23    being able to describe what he found without introducing every

24    single thing that he found.

25         MR. CARNEY:  Of course, there is.

1       MR. CHAKRAVARTY:  The fact that he found something?

2       MR. CARNEY:  Yes.  If it's ruled inadmissible because

3   it's too prejudicial, then the probative value, he's not able

4   to describe it.

5       MR. CHAKRAVARTY:  The chances that he found something

6   is not going to be prejudicial.  The summary that he found --

7       THE COURT:  All right.

8       MR. CARNEY:  How is it relevant that he can describe

9   something he found if the Court is not going to allow it to be

01:58 10   admitted?  If it's not coming into evidence, then it's not

11   relevant for a witness to describe.

12       MR. CHAKRAVARTY:  I disagree with you.

13       THE COURT:  Well, all right.  I think the documents

14   are admissible subject to a cumulation or undue prejudice

15   objection.  So we can arrange, I guess, for a review of them.

16   If you say every single one is subject to the --

17       MR. CARNEY:  I am, your Honor.

18       THE COURT:  -- to that, I doubt that that's a

19   sustainable objection, but I will look at them.  But then once

01:59 20   that has been answered one way or the other, or multiple ways,

21   they will be in.  So it's a sort of conditional -- condition

22   subsequent.  We're at the break.

23       MR. CARNEY:  All right, your Honor.

24       THE COURT:  What more -- how much?

25       MR. CHAKRAVARTY:  Probably five more minutes with him.

1          THE COURT:  Do the five minutes then.

2     .  .  .  END OF SIDEBAR CONFERENCE.)

3     Q.    Have you enjoyed the music, Agent Scripture?

4          Just a few more questions.  Specifically with regards

5     to digital images that were found in this case, pictures or

6     photographs, where were the majority of those found?

7     A.    On the 2006 hard drive, in unallocated space or drive-free

8     space.

9     Q.    Did you find less, if any, metadata with regards to those

02:00 10    pieces of information?

11    A.    Because they're no longer tracked by the file system,

12    there's less information to be obtained about them.

13    Q.    With regards to the video files, where were the majority

14    of those found?

15    A.    In active folders.  They were active files.

16    Q.    You described that you found this various different

17    versions of a 39 Ways document?

18    A.    Correct.

19    Q.    With regards to the 39 Ways.pdf, did you have an

02:01 20    opportunity to open that file?

21    A.    I did.

22    Q.    Describe what that file was.

23    A.    39 Ways to -- do you want me to continue with the title?

24    Q.    To Serve and Participate in Jihad?

25    A.    Correct.

1    Q.   But the pdf version of that, can you explain for the jury

2    what the difference is between a pdf and a word processing

3    document?

4    A.   A pdf is a portable document format.  It is essentially a

5    picture of a text file, and you can -- just like a Word

6    document or WordPerfect document, you can write protect it.

7    You can password protect it.  And in this particular instance,

8    I was able to view it; I was able to print it, copy it in its

9    entirety, but it was password protected for altering it or for

02:02 10   extracting just a piece of it or a few pages of it.

11   Q.   Did you find other versions of the 39 Ways.doc?

12   A.   I did.

13   Q.   Specifically, were there Microsoft Word versions?

14   A.   Yes, Microsoft Word 8, I believe.

15   Q.   With regards to the floppy disk that was found in the 2009

16   hard drive --

17   A.   Yes.

18   Q.   -- 1B37, did you make any observations of what was on that

19   disk?

02:02 20   A.   It appeared to be made into an emergency boot disk, but I

21   found a number of deleted files as well.

22   Q.   All of the files that are listed on Exhibit 346, were

23   those found in the deleted space on that computer?

24   A.   The forensic software indicated that they had been

25   deleted, yes.

1  Q.   And so the files that are going to be presented to the

2  jury, are those the recoverable files?

3  A.   Right.   Those that have content were recoverable.   Some I

4  could not recover.

5  Q.   Do you remember any of the names of the files on that

6  computer that had been deleted -- on that floppy disk, excuse

7  me?

8  A.   39 Ways.doc; Bay'ah for Death, I believe, was another one.

9  Q.   Would it assist if I just showed you 346?

02:03 10  A.   It sure would.

11         MR. CHAKRAVARTY:  May I approach, your Honor?

12         THE COURT:  You may.

13         MS. PATEL:  Your Honor, may we approach sidebar,

14  please?

15         THE COURT:  On whether he can have it refreshed?

16         MS. PATEL:  Yes, your Honor.

17         THE COURT:  No.

18         MR. CHAKRAVARTY:  Just to clarify, your Honor, is this

19  document in evidence now?

02:04 20         THE COURT:  No.

21         MR. CHAKRAVARTY:  No, it's not.

22  Q.   After looking at that document, does that refresh your

23  memory with regards to the other file names on that computer --

24  on that floppy disk?

25  A.   It does.

1  Q.   Without reading from that, what were the other file names
2  on the floppy disk?
3           MS. PATEL:  Objection, your Honor.
4           THE COURT:  Overruled.
5  A.   Without reading from it?
6  Q.   Yeah, without reading it.  Just -- you can use it to
7  refresh your memory, but you can't read from it.
8           THE COURT:  If you're not able to answer the question
9  without reading from it, I guess you can't answer the question.
02:04 10  Q.   What --
11  A.   If I can't read from it, then I --
12           THE COURT:  Apparently, it does not refresh his
13  recollection.
14  Q.   This might be a confusion here.  So do you -- without
15  looking down, Agent Scripture, do you remember what files --
16  file names were on that floppy disk?
17  A.   Not all of them, no.
18  Q.   Which ones do you remember?
19  A.   39 Ways.doc, Bay'ah for Death.  There was a folder, a
02:05 20  deleted folder, "Umar Hadeed."  There were some files that
21  contained the word "English" in them.  There was some files
22  that contained the name "Arabic," and there were numbers 1, 2
23  and 3.
24  Q.   Your memory is pretty good.
25           MR. CHAKRAVARTY:  That's all I have, your Honor.

1          THE COURT:  We'll take the morning recess at this

2     point.

3     (Recess taken at 11:10 a.m.)

4          (After recess:)

5          THE CLERK:   All rise for the Court and the jury.

6          (The Court and jury enter the courtroom at 11:41 a.m.)

7          THE CLERK:  Please be seated.

8          THE COURT:  All right.  Cross-examination?

9                    CROSS-EXAMINATION

02:37 10    BY MS. PATEL:

11    Q.   Good morning, Special Agent Scripture.  My name is Segal

12    Patel, and I represent Tarek Mehanna.

13    A.   Good morning.

14    Q.   Good morning.  In your direct examination you stated that

15    you have been working in computer forensics or as a special

16    agent for 25 years.  Is that right?

17    A.   No.  I've been a special agent for 31 years and I've been

18    working in computer forensics for 15.

19    Q.   For 15.  And of these 15, you said that you do

02:37 20    approximately 25 computer forensic examinations a year?

21    A.   Approximately, yes.

22    Q.   And you also stated that in this case it was you that

23    decided what pieces of evidence were evidence-worthy to give to

24    the case agents.  Is that right?

25    A.   No, not necessarily.  The case agent and the prosecutor

1  would choose which files, for the most part, were worthy of

2  inclusion.

3  Q.   But you provided them a CD.  Is that right?

4  A.   Yes.  Or DVD.

5  Q.   Or DVD.  And that CD or DVD contained a selection of

6  images that came from a computer or laptop?

7  A.   Or a floppy or a CD, yes.

8  Q.   Okay.  So it came from one piece of media, you made a

9  selection, and then you put it on a different piece of media?

02:38 10  A.   I didn't usually make the selection; I was told which

11  files to include.

12  Q.   Okay.  So then is it your testimony that the case agent

13  saw a list of everything that was on the computer?  Is that

14  right?

15  A.   A listing would have been made and they would have saw the

16  list.  Whether they would have reviewed every file that was on

17  that list, it would be unlikely.

18  Q.   So you're saying that you worked with their guidance as to

19  what they wanted to see on those original computers, right?

02:39 20  A.   For the most part, yes.

21  Q.   How long would you say it took you to review all of the

22  evidence in this case that you were responsible for?

23  A.   Hours.  I have no idea.  It was a long time.

24  Q.   Can you approximate how many months you were working on

25  this project?

1    A.   Well, I wasn't called in to help work with this until

2    June, so at most --

3    Q.   I'm sorry.  Would that be June of 2009?

4    A.   Of this year.  2011.

5    Q.   So you began your work in June of 2011?

6    A.   Correct.

7    Q.   And can you approximate how many hours you might have

8    spent between then and now conducting your analysis?

9    A.   It would be difficult.  It would have been -- all's I can

02:40 10   say is that it would have been numerous.

11   Q.   In the hundreds?

12   A.   Possibly.

13   Q.   Did you take notes as you were reviewing?

14   A.   Electronic notes, yes.

15   Q.   And did you give all those notes to the prosecutors?

16   A.   Yes.

17   Q.   There were some -- I want to first talk about this idea of

18   metadata which you defined on direct.  You stated that every

19   document has something called "metadata."  Is that right?

02:40 20   A.   Most would, yes.

21   Q.   Most do.  So not all files that you would find on a

22   computer have metadata.  Is that fair?

23   A.   It may be fair to say some don't have any -- some -- all

24   files usually will have something.

25   Q.   So all files will have some amount of metadata?

1    A.    Right.  It would be varying amounts.

2    Q.    And some files have a lot.  Is that right?

3    A.    Correct.

4    Q.    Some files have very little?

5    A.    Correct.

6    Q.    And does the correlation of how much metadata there

7    is -- does it relate to where a file may be on a computer?

8    A.    Possibly, yes.

9    Q.    Some of the examples of metadata that you stated were file

02:41 10   name.  Would that be an example of a piece of metadata?

11   A.    I would consider it metadata, yes.

12   Q.    A folder maybe that a document came from or a piece of

13   data came from?

14   A.    A location, correct.

15   Q.    Date created.  Is that another type of metadata?

16   A.    Yes.

17   Q.    Size is another type of metadata?

18   A.    Yes.

19   Q.    And then finally, you testified that when something is

02:41 20   deleted, that is also metadata, correct?

21   A.    It is information about the file, correct.

22   Q.    So all of these things, as you say, are all pieces of

23   information about the file, right?

24   A.    Correct.

25   Q.    And as a forensics examiner, when you're reviewing

1    evidence it helps you figure out more about what that evidence

2    is?

3    A.    Yes.

4    Q.    And that "more" is underlying information, correct?

5    A.    Right.

6    Q.    Okay.  I drew for one of your colleagues a very, very

7    basic picture of a computer to help us understand where some of

8    this evidence comes from.  And I want to replicate that for

9    you, if I may use the ELMO.

02:42 10        Let's say this box represents a computer.  Would it be

11   fair for me to say that a computer, broadly speaking, has two

12   spaces:  One is live and the other is deleted?

13   A.    Generally, yes.

14   Q.    Generally.  So when we're talking about data that's on a

15   computer, would it be fair to say that all data on the

16   computers in this case or other computers you review come

17   either from live or from deleted space?

18   A.    Deleted or unallocated, yes.

19   Q.    So I'm going to add to this "unallocated."  Is "deleted"

02:43 20   and "unallocated" -- are those synonymous?

21   A.    "Deleted" is available space to be written to.  They're

22   similar.

23   Q.    They're similar?  Okay.

24        So would it be fair to say that every piece of

25   electronic data lives either in live or in deleted/unallocated

1    space?

2    A.    Every piece that's on the drive, correct.

3    Q.    Every piece that is on the drive, correct.

4    A.    Right.

5    Q.    Okay.  Would it also be fair to say that there's another

6    little piece of this called "temporary internet files"?  Are

7    you familiar with that phrase?

8    A.    I am.

9    Q.    Okay.  So may I draw a circle in the "live" box of

02:44 10   "temporary internet files"?  Would that be accurate?

11    A.    The folder "temporary internet files" would be active.

12    The files within the temporary folder may be active or they may

13    be deleted.

14    Q.    Okay.  So let's say -- would I be able to put the folder,

15    the temporary internet folder, in the live space?

16    A.    If it hasn't been deleted, correct.

17    Q.    If it hasn't been deleted.  Okay.

18          So I've drawn a little folder in "live" that says

19    "temporary internet files" and an arrow into the deleted or

02:44 20   unallocated -- would that be fair?  Because some of the data in

21    that temporary internet file space ends up in deleted space?

22    A.    It's possible.

23    Q.    It's possible.  Okay.

24          So let's talk about how it is that something would be

25    in live space and then end up in deleted or unallocated space.

1    It was your testimony on direct that there are three ways that

2    a file can be deleted.  Is that right?

3    A.    I can't remember if there were just three ways or -- if

4    you can refresh my memory?

5    Q.    Sure.  So "deleted."  Would you say that one way that a

6    file or a piece of data could be deleted on the computer is by

7    the user himself or herself?

8    A.    Correct.

9    Q.    Okay.  And this is an obvious question, but would a user

02:45 10   be a person?

11   A.    Most likely.

12   Q.    Would a second way that a piece of data could be in

13   deleted or in unallocated space would be that the operating

14   system on its own deletes it or puts it into deleted space?

15   A.    Either the operating system or the file system, yes.

16   Q.    Okay.  So operating system or file system.  And is that a

17   person?  Is that a person?

18   A.    No.

19   Q.    No.

02:46 20        And the third way would be that a program or a piece

21   of software could move data into deleted space.  Is that right?

22   A.    A person could use a program to rid a file from active

23   space, correct.

24   Q.    So a person could command a program to move that document.

25   Is that right?

1    A.    Right.

2    Q.    But the actual moving of the data happens --

3    A.    Or the file in the data.

4    Q.    Would happen by the software program, right?

5    A.    There are third-party programs within operating systems

6    that allow an operator to do that, correct.

7    Q.    So "third-party program," I could say?  Would that be

8    accurate?

9    A.    Third-party programs?

02:47 10   Q.    Yes.

11   A.    Yes.  But it might almost be the same as the user

12   category.

13   Q.    Well, in the third category, the actual moving of the data

14   from "live" into "deleted" happens by the program, right?

15   That's the program's function?

16   A.    Some programs have that functionality, correct.

17   Q.    Okay.  So let's say "some."  Some third-party program.

18   And that's obviously software.  So would it be fair to say that

19   that's not a person?

02:48 20   A.    Software is not a person, correct.

21   Q.    Okay.  Let's talk for a moment about some of the privacy

22   and encryption software that we had spoken about.  You

23   testified that you had found some programs on Mr. Mehanna's '06

24   computer.  Is that right?

25   A.    Correct.

1    Q.    And then you checked it in '08 to see if those programs

2    were still there?

3    A.    Correct.

4    Q.    Is the Privoxy program commercially available?

5    A.    The what program, ma'am?

6    Q.    Privoxy, I believe?

7    A.    Privoxy?  I believe that's a commercial program, yes.

8    Q.    And is it illegal?  Is it contraband?

9    A.    Not that I'm aware of.

02:48 10   Q.    Do you know from your memory whether that program was

11   installed on Mr. Mehanna's computer?

12   A.    I believe there were registry entries that indicate that

13   it was either installed or used, correct.

14   Q.    Trillian:  Is that a commercially available product?

15   A.    It is, yes.

16   Q.    By "commercially available," I mean anybody could buy it,

17   right?

18   A.    Yes.

19   Q.    And is it contraband?  Is it illegal?

02:49 20   A.    No.

21   Q.    Do you remember whether the Trillian program was installed

22   on Mr. Mehanna's computer?

23   A.    It was.

24   Q.    And do you know if it was uninstalled?

25   A.    I can't remember.

1    Q.   What about IPPrivacy?  Is that a product that anybody

2    could buy?

3    A.   I don't know if that's for sale or whether it's free, but

4    it's available to anyone.

5    Q.   It's available for anyone to download onto their

6    computers?

7    A.   Correct.

8    Q.   Is it contraband or illegal?

9    A.   Not that I'm aware of.

02:49 10   Q.   Do you know whether Mr. Mehanna had installed that program

11   on the '06 hard drive?

12   A.   On the '06 hard drive, IPPrivacy, I do not believe so.  I

13   think that was just 2008/2009.

14   Q.   So as of 2006 there was no IPPrivacy program on

15   Mr. Mehanna's computer?

16   A.   To the best of my memory, yes.

17   Q.   IPHider:  Is that a program that anybody could purchase or

18   download?

19   A.   Right.  I don't know if you have to pay for it or whether

02:50 20   that's free, but that's readily available.

21   Q.   And is that contraband or illegal?

22   A.   Not that I'm aware of.

23   Q.   Do you know whether Mr. Mehanna had installed that program

24   in 2006?

25   A.   In 2006, I do not believe he did.

1    Q.   Okay.  And Tor, is that a commercially available product

2    for purchase or for free?

3    A.   I believe it's for free.

4    Q.   And so someone could just go to the internet, download it?

5    A.   Yes.

6    Q.   Is that illegal or contraband?

7    A.   No.

8    Q.   To your knowledge has the website for Tor been shut down?

9    A.   I'm not aware of it, no.

02:51 10   Q.   And do you know whether Mr. Mehanna had installed that

11   program on his computer in 2006?

12   A.   2006?  I believe he had, yes.

13   Q.   Do you know whether he ever uninstalled that program?

14   A.   In 2006?

15   Q.   Correct.

16   A.   I can't remember.

17   Q.   2008, the machines that you saw, do you remember whether

18   you obtained that from the consent of Mr. Mehanna's father?

19   A.   I did not physically obtain the machine from anyone.  I

02:51 20   worked specifically with images.

21   Q.   When you received the computer, were you aware whether it

22   was seized without Mr. Mehanna's consent?

23   A.   I believe I had heard that it was -- the imaging of that

24   computer was done per consent.

25   Q.   Per consent?  All right.

 1           We're going to talk for a moment about the cache which

 2    we had put -- as it relates to this temporary internet folders

 3    page.  I'm going to show you what we've already discussed with

 4    the government, today's copy of the *Boston Globe*, okay?  If a

 5    person were to go onto the internet, they obviously wouldn't

 6    see the paper but they would see these stories.  Is that right?

 7    A.    If they went to the *Boston Globe* website?

 8    Q.    That's right.

 9    A.    I would believe so, yes.

02:52 10    Q.    And it would be different, obviously, because you would

11    have images, pictures, script.  Is that right?

12    A.    It would be the same content, but it would not be

13    physical; it would be on the screen, if that's what you're

14    driving at, yes.

15    Q.    Okay.  So would you say that one difference between a

16    physical copy of the *Globe* and the internet is that the user

17    can click to look at different articles.  Is that right?

18    A.    Sure.

19    Q.    So on the front page you might see, for example, there was

02:53 20    a storm over the weekend, as we all know.  So if I were to look

21    at this and I were to click on the storm picture, or the storm

22    link on the internet version, would it be fair to say that some

23    of these other articles about Northeastern or the mayor of

24    D.C., they would also come up on the home page for the *Boston

25    Globe*?

1    A.    They would be displayed on the same page as the item of

2    interest, yes.

3    Q.    And along with the article being displayed, the pictures

4    might also be displayed, right?

5    A.    Correct.

6    Q.    And the name of who wrote the article.  Is that right?

7    A.    Correct.

8    Q.    And then a little button for me to be able to click it and

9    read the entire article, correct?

02:53 10    A.    Correct.

11    Q.    Okay.  Now, when we're talking not about this piece of

12    paper but about the computer, would the computer operating

13    system make an image of that bostonglobe.com front page in its

14    entirety?

15    A.    It would make copies of the different items on that web

16    page, correct.

17    Q.    And those different items would include the storm article

18    that I'm interested in, right?

19    A.    The ones that were displayed, correct, yes.

02:54 20    Q.    Correct.  And also the other articles that I'm not as

21    interested in.  Is that right?

22    A.    As long as they are displaying on that page, yes.

23    Q.    Okay.  So it's fair to say that everything that displays

24    on the home page somehow is saved onto a computer in some

25    capacity?

1    A.   Usually it is unless the user has disabled certain

2    settings.  But for the most part, yes.

3    Q.   And if you know, did Mr. Mehanna disable any settings on

4    his browser?

5    A.   I didn't check; no.

6    Q.   So to your knowledge, no?

7    A.   To the best of my knowledge, I don't know.

8    Q.   So if later you're looking at my computer, hypothetically,

9    would it be possible that you would find this picture of this

02:55 10   very nice man shoveling the snow in the cache folder of my

11   computer?

12   A.   If you're using Internet Explorer, it would be in a cache

13   folder in temporary internet files; if you're using Firefox, it

14   would be in a cache folder, yes.

15   Q.   Okay.  And here, if I remember Exhibit 793, we're largely

16   talking about Firefox, right?

17   A.   Correct.

18   Q.   Okay.  So in Firefox, you're saying that that image of the

19   snowblower would be saved in the temporary internet files

02:55 20   folder, right?

21   A.   Internet Explorer uses temporary internet files.  Mozilla

22   Firefox would use folders actually called "cache."

23   Q.   Called "cache"?  Okay.  So let me just change that.

24        But that sits in the live portion of the computer,

25   correct?

1    A.    Correct.

2    Q.    And is it also fair to say that in addition to that photo,

3    this picture of Mayor Lisa Wong may also go into the cache

4    folder?

5    A.    If it's being displayed on that web page, yes.

6    Q.    Okay.  So if it's displayed on the web page, this picture

7    of an article that I didn't read would still be in the cache?

8    A.    Correct.

9    Q.    Okay.  So that's the picture that we're talking about,

02:56 10    that I may not click onto the site, but the picture may save in

11    the cache?

12    A.    Correct.

13    Q.    Okay.  Do those cache images sometimes then go into

14    deleted or unallocated space?

15    A.    They can be deleted, yes.

16    Q.    They can.  And they could be deleted by me, the user,

17    who's a person.  Is that right?

18    A.    Correct.

19    Q.    They could be deleted by the operating system or file

02:56 20    system itself, right?

21    A.    A user would have to clear the cache, correct, and then

22    the operating system or the file system would clear it out.

23    Q.    Okay.  Would clear it out.  If the cache gets full, does

24    sometimes automatically files -- do they sometimes go into

25    deleted space?

1    A.    That's possible.  Sometimes the operating system could

2    create more cache folders.  I don't know how this was set up.

3    Q.    Okay.  And then, of course, there could be a third-party

4    program that might move those cached images into deleted space.

5    Is that right?

6    A.    If it had been installed and configured to do so, yes.

7    Q.    In asking you a lot of these questions, I note that

8    there's a lot of "probably" on your part and mine.  Is that

9    right?

02:57 10    A.    Yes.

11    Q.    And that's because there is no simple explanation of why

12    cached images end up on different parts of the computer.  Is

13    that right?

14    A.    Sometimes it's hard to determine, and you can't determine

15    with 100 percent specificity.

16    Q.    When you say "sometimes you can't determine with 100

17    percent specificity," is that specificity the metadata?  Would

18    that help us determine where it came from?

19    A.    I guess it could sometimes.  If you could give me an

02:58 20    example of what you're...

21    Q.    Sure.  Let's look at this picture again.  If that

22    photograph ends up in deleted space and it's there for two

23    years, would it be fair to say that over that two-year time we

24    would know less about where that photo came from?

25    A.    That's very true, yes.

1    Q.   So the more time that goes by and the longer an image sits

2    there, the less we know about the file name.   Is that right?

3    Possibly?

4    A.   Possibly, yes.

5    Q.   Possibly the less we know about when it went into that

6    deleted space?

7    A.   Possibly.

8    Q.   Possibly we would know less about how big the file is?

9    A.   Possibly.

02:58 10    Q.   And possibly, we would know less about whether or how it

11    ended up in deleted space?

12    A.   Or unallocated space.

13    Q.   Or unallocated space.   Okay.

14         Exhibit -- oh, I'm sorry.   No.

15         You testified on direct that to your knowledge and

16    based on your work that Mr. Mehanna, as in Tarek Mehanna, was

17    the user of the Dell 2006 computer.   Is that right?

18    A.   Not entirely.   The computer user name that was chosen was

19    Tariq, T-A-R-I-Q, and the computer name was T-A-R-E-K.   I had

02:59 20    no knowledge of this case or the individuals when it was

21    assigned to me.   I just went with what was already assigned in

22    the computer.   So I didn't know if that was an individual

23    or -- I didn't know that individual, I should say.   I'm

24    assuming it was a person.

25    Q.   Did you see Ahmed as a user?

1  A.   Not as a user.  I think I saw that name in some metadata

2  on some Word documents.

3  Q.   Okay.  And that metadata could be that Ahmed Mehanna, who

4  is Tarek Mehanna's father, could have written a Word document?

5  A.   That's possible, sure.

6  Q.   Or he could have maybe edited a Word document?

7  A.   It's possible.

8  Q.   Did you see Tamer Mehanna's name on that computer, who is

9  Tarek Mehanna's younger brother?

03:00 10  A.   I may have.  I can't remember.

11  Q.   And if you did see his name, is it possible that Tamer

12  Mehanna may have created a document on Tarek Mehanna's

13  computer?

14  A.   Yes.

15  Q.   And it's possible he may have edited it?

16  A.   Yes.

17  Q.   And would it also be fair to say he might have gone on the

18  internet when he was on his brother's computer?

19  A.   Yes.

03:01 20  Q.   Would you know by looking at the internet history who was

21  sitting at the keyboard when people visited various sites?

22  A.   No, I would just know the user name that was logged in at

23  that time.

24  Q.   Okay.  Do you know Exhibits -- there were a number of

25  exhibits -- I think about 40 exhibits that were videos.  Is

1    that right?  About 40, so I won't hold you to the number.

2    A.    There were a number.  I don't know the exact...

3    Q.    Those are exhibits that you testified you found on the

4    Dell 2006 and '08 hard drives.  Is that right?  And some on CDs

5    also, correct?

6    A.    Correct.

7    Q.    Okay.  Do you know who put those images or videos on

8    Mr. Mehanna's computer?

9    A.    I do not.

03:02 10    Q.    And in your work -- in your forensics work, would you ever

11    be able to tell who was sitting at a computer when a certain

12    video appears or is downloaded on a person's computer?

13    A.    There may be certain situations that would allow us to do

14    that.

15    Q.    Would surveillance --

16    A.    Based upon the lateness that I was called in to perform my

17    work, I was not able to do that.

18    Q.    Before you joined in June of 2011 -- which was only four

19    months ago?

03:02 20    A.    Correct.

21    Q.    -- was there a CART team examiner assigned to this case?

22    A.    Yes.

23    Q.    Who was that individual?

24    A.    His name is Nicholas Nathans.

25    Q.    And did Mr. Nathans perform the processing piece of work

1    on these computers?

2    A.   He did the lion's share of it, yes.

3    Q.   Did he do any analysis with respect to the evidence?

4    A.   I can't speak for him.  I don't know.

5    Q.   Did you get a file from him when you inherited the

6    computer, so to speak, in June?

7    A.   I just received the copies of the images and copies of the

8    processing and was told to pick out files and programs.

9    Q.   So there was no transference of information from Special

03:03 10   Agent Nathans to you.  Is that right?

11   A.   Not directly, no.

12   Q.   Indirectly were there any notes that you received from him

13   about what he saw on the computer?

14   A.   No.  There were just logs from the imaging that he had

15   performed.

16   Q.   With respect to all of the images, which there are some

17   200 images that you put in your log, can you say whether

18   Mr. Mehanna took these pictures, like, with a camera?

19   A.   No.

03:03 20   Q.   Did he take those pictures?  Could you tell by looking at

21   them?

22   A.   I didn't do any analysis with photographs taken by digital

23   camera, so I can't say who took them.

24   Q.   Can you say whether it was Tarek Mehanna who downloaded

25   those pictures?

1    A.    No.

2    Q.    Similarly, the other documents that we have.  We've done

3    images and videos.  There's a third set of documents that you

4    pulled, PDFs, Word documents, from Dell '06, '08 and '09.  Is

5    that right?

6    A.    Yes.

7    Q.    Can you tell by looking at those documents -- other than

8    who logged in, can you tell who interacted with those

9    documents?

03:04 10    A.    Not with certainty, no.

11    Q.    So it could have been Tarek Mehanna, right?

12    A.    Possibly.

13    Q.    It could have been his father.  Is that possible?

14    A.    Possibly.

15    Q.    Could it possibly have been his brother?

16    A.    Possibly.

17    Q.    Could it have been a friend who borrowed his computer?

18    A.    Possibly.

19    Q.    Could he have lost the computer at the library and someone

03:05 20    saw his log-in and they could have seen it?

21    A.    Yes.

22    Q.    I want to just ask you what a thumbnail image is.  I'm

23    going to show you again this newspaper.  At the very bottom

24    there's a picture of Ron Paul looking grim.  It's a small

25    photo, right?

1    A.   I see it.

2    Q.   And in scale, it's smaller than the picture above of Mayor

3    Lisa Wong, right?

4    A.   Correct.

5    Q.   Is the bottom photo of Ron Paul what you would call a

6    thumbnail image?

7    A.   I can't say for sure, no.

8    Q.   Would you agree with me that a thumbnail image

9    conventionally is a small image?

03:05 10   A.   Yes.

11   Q.   And were you to put that on a piece of paper the way it

12   is, it would look fine, right?  It would look just as it is

13   with the amount of clarity that you see here.  Is that right?

14   A.   Yes.

15   Q.   Were you to blow that picture up it would be pixelated,

16   right, meaning grainy looking?

17   A.   It would lose some detail.

18   Q.   It would lose detail.

19        And depending upon how big you were to blow up that

03:06 20   image, is it possible that you may not even know whose picture

21   that is?

22   A.   Anything's possible if it was blown up large enough.

23        MS. PATEL:  One moment, please.

24        (Counsel confer off the record.)

25        MS. PATEL:  Just a few more questions, your Honor.

Q.   You were saying when you performed your forensics analysis
you went into the deleted space to find documents.  Is that
right?

A.   Well, the software that we use automatically processes and
tries to recover deleted files, and so the software did it.  I
did very little work manually aside from going into the
physical space on the computer for a certain number of those
documents just to confirm that I could find them.

Q.   And when you were able to recover some of those deleted
documents, was there less information about them than the ones
that were not in the deleted space?

A.   Sometimes, yes.

Q.   Did you indicate anywhere what was available -- what
information was available about those deleted documents?

A.   It would have been contained within the complete file
listing, the Microsoft access database file listing for each of
the specimens that was reviewed.

Q.   Now, you had testified that if you could not find metadata
on a particular file, you did not export it to the CD that you
gave to the case agents.  Is that right?

A.   If I could not?  No, I don't believe that's accurate.

Q.   If you had found a piece of evidence in Dell '06 that had
no metadata associated with it, or very little metadata, would
you have burned it to that CD for the case agents?

A.   I may have.

1    Q.   Would you have explained to them that there was less

2    information about where that file came from than other images?

3    A.   For each individual file?

4    Q.   Yes.

5    A.   I can't remember doing that for any one file in

6    particular.

7    Q.   And are the two case agents here -- the two case agents

8    here are Heidi Williams and Tom Daly.  Is that right?

9    A.   Correct.

03:08 10   Q.   And Special Agent Williams and Special Agent Daly are not

11   CART forensics examiners.  Is that right?

12   A.   That's correct.

13   Q.   At any point did you communicate to them the difference in

14   how much descriptive information you have about this data?

15   A.   I talked about the differences in active files, in card

16   files and in deleted files in a general way.  Obviously, I

17   didn't explain everything I knew about it.

18   Q.   And did they ever come back from an analytical standpoint

19   and ask why certain images, you just couldn't make out what was

03:09 20   in them?

21   A.   I can't remember that, no.

22   Q.   Do you remember why -- if they ever asked you why certain

23   images were cut off, or half of them were cut off?

24   A.   I can't remember.

25   Q.   Do you ever remember them asking you why certain images

1    were only portions of a document as opposed to the entire

2    document?

3    A.   They may have asked something like that, yes.

4         (Counsel confer off the record.)

5    Q.   Just one last -- sorry.  One last question just to

6    clarify.  The thumbnails that we're talking about, okay?  Just

7    to be clear, those thumbnails could end up beginning in the

8    live cache.  So, again, if I'm looking at this newspaper and

9    this article is on the *Globe* -- the bottom article with the

03:10 10   thumbnail image is on the *Globe* front page, would we agree that

11   this small photo of Ron Paul would go into the live cache

12   folder -- could go into the live cache folder?

13   A.   Could go, yes.

14   Q.   And that over time that cache folder or this image could

15   end up here in the deleted space?

16   A.   Correct.

17   Q.   And as more time goes by, would you agree with me that if

18   I went back and looking at my computer, or if someone else

19   looked at my computer, you wouldn't be able to tell as much

03:10 20   data a year or two years from now about where that photo came

21   from as you would have if you had looked at it ten days later?

22   A.   You may be able to ascertain as much but certainly not

23   more.

24   Q.   As much.  But it's possible that you may not be able to

25   ascertain anything or very little?

1    A.    Correct.  Correct.

2              MS. PATEL:  Thank you very much.

3              MR. CHAKRAVARTY:  Redirect?

4              THE COURT:  Redirect?

5                         REDIRECT EXAMINATION

6    BY MR. CHAKRAVARTY:

7    Q.    Agent Scripture, just to close the loop on this cache

8    issue, Ms. Patel kept describing the movement of a file from

9    her graphic from the live or active space into the deleted or

03:11 10   unallocated space.  Does the data on a digital piece of media

11   actually move on a computer?

12   A.    The data remains -- or the file remains in the same

13   physical location on the hard drive or the CD with a thumb

14   drive, or whatever the media happens to be, but the file system

15   no longer tracks it as an active file and it makes that area on

16   the hard drive available to be overwritten at that point.  So

17   unless that data has been overwritten by another file, it's

18   still retrievable.

19   Q.    And so one of the types of data that gets purged

03:12 20   periodically, or by a user or by a program, as Ms. Patel

21   suggested, is the internet cache.  Is that right?

22   A.    Correct.

23   Q.    And so is the internet cache a record of where someone has

24   gone on the internet?

25   A.    Internet cache can indicate where somebody has gone

1    because it would indicate, oftentimes in an index.dat file for

2    Internet Explorer, the website or the web page from which that

3    item was pulled or was copied.

4    Q.   Okay.  But it's not necessarily a conclusive history of

5    where somebody has surfed on the net?

6    A.   No, it -- "cache" generally refers to the pulling of

7    objects or the copying of objects from a website so that the

8    next time you visit that website your computer doesn't have to

9    pull that information across the internet; it can pull it up

03:13 10   from your hard drive, and it's much quicker.

11   Q.   So if, hypothetically, we were to go to the *Boston Globe*

12   website and look at the *Boston Globe* with some drama, then if

13   they were to go back to that page the next time, maybe a minute

14   later, maybe the next day, some of the graphics that they've

15   viewed would still be on their computer so they would come up

16   much faster on their computer?

17   A.   Most likely, yes.

18   Q.   Is the point of that essentially to enhance the user

19   experience?

03:14 20   A.   It's to increase the speed.

21   Q.   That's because downloading voluminous documents -- or

22   large, I should say, documents -- takes a lot of time on the

23   computer?

24   A.   It can take a lot of time.  It's a lot more time-consuming

25   than pulling it from the hard drive.

1    Q.    Okay.  So the larger the document, the more time it takes?

2    A.    Yes.

3    Q.    So if there were a small, compressed version of a document

4    on the computer that they could call up faster, it would be

5    almost instantaneous on somebody's computer when they're

6    surfing?

7    A.    Correct.

8    Q.    And a thumbnail of an image is an image that can be

9    expanded or decreased depending upon the resolution of the

03:14 10    image.  Is that right?

11   A.    A thumbnail refers to a small version of an image.

12   Technically, there are thumbnail cache files in Windows

13   Explorer -- or Windows XP system, and they contain very small

14   replicas of pictures that have been viewed in thumbnail view

15   for that particular folder.

16   Q.    So --

17   A.    But the thumbnails generally can't -- aren't increased in

18   size; they're usually a small size to begin with.  They have to

19   be linked to a larger size of that same picture.

03:15 20   Q.    I see.  So a thumbnail is literally a smaller version of

21   another picture --

22   A.    It can be a smaller version or another picture, or I

23   believe the defense attorney was describing it as just a small

24   version of a picture.

25   Q.    And, in fact, in the cache -- excuse me -- in the deleted

1    space of the 2006 hard drive, were there a number of these

2    smaller versions of pictures?

3    A.    Yes.

4    Q.    And some of them, if you expanded them, they actually

5    depict a larger image?

6    A.    Correct.

7    Q.    For example, there were some documents on that -- in that

8    Internet Explorer -- excuse me.  Strike that -- in that deleted

9    space, inactive space?

03:16 10   A.    Inactive space, yes.

11   Q.    There were documents which were captured in a photographic

12   file type, like a GIF file or JPG file?

13   A.    Right.  Those are image file formats.

14   Q.    Okay.  And did you also notice repetition of the subject

15   matter in those -- in the inactive space, these deleted

16   pictures?

17   A.    Yes.

18   Q.    And were there any common threads that you observed?

19   A.    There was a number of pictures of --

03:17 20         MS. PATEL:  Objection.

21         THE COURT:  Sustained.  I think it's beyond the scope.

22   BY MR. CHAKRAVARTY:

23   Q.    With regards to the differences between the 2006 computer

24   hard drive and the 2008 and 2009 computer hard drive, Ms. Patel

25   suggested that one of many people could have used this

1    computer.  Is that true in every case that you do a computer

2    forensics examination?  You don't know who actually used the

3    computer, do you?

4    A.   Usually, I don't.

5    Q.   You're examining -- forensically examining the piece of

6    hardware that stored information?

7    A.   Correct.

8    Q.   But as you explained to Ms. Patel, there was some

9    identifying information on each of the pieces of hardware.  Is

03:17 10   that right?

11   A.   Yes.

12   Q.   And in 2006 you described earlier that there was a

13   computer name and a user name associated with the computer?

14   A.   Yes.

15   Q.   And I think you said "Tariq" and "Tarek" spelled a little

16   differently.  Is that right?

17   A.   Correct.

18   Q.   Do you recall whether in 2008 for what you described as

19   being a new hard drive, whether there was a new operating

03:18 20   system on that computer?

21   A.   I believe Windows XP was the same operating system but it

22   was a different install date and it was a different hard drive.

23   Q.   And was there a different listed owner as well?

24   A.   There was.

25   Q.   Do you remember what that was?

1    A.    "Mehanna."

2    Q.    So it was no longer "Tarek"; it was now "Mehanna"?

3    A.    Correct.

4    Q.    Was that the same for the 2009 hard drive?

5    A.    Correct.

6    Q.    Do you recall when the install date was?

7    A.    I do not.  Not off my memory, no.

8    Q.    You described to Ms. Patel that you had some notes.  Is

9    that in the form of report of examination that you created?

03:18 10  A.    I would have created that report by referring to my

11   electronic notes, yes.

12   Q.    Okay.  And is this what you provided to me?

13   A.    Yes.

14   Q.    All right.  And would this help refresh your memory with

15   regards to the install date of the 2008 operating system?

16   A.    It would.

17         MR. CHAKRAVARTY:  May I approach, your Honor?

18         THE COURT:  You may.

19   BY MR. CHAKRAVARTY:

03:19 20  Q.    Does that refresh your memory with regards to the 2008

21   operating system?

22   A.    It did.

23   Q.    When was the operating system installed for 2008?

24   A.    June 11, 2008.

25   Q.    And was that the same operating system for the 2009?

1    A.    I believe so, yes.  The same install date, same volume

2    serial number.

3    Q.    And the documents that you remember referencing, Ahmed

4    Mehanna and Tamer Mehanna, do you recall on what version of the

5    computer you observed those on?

6    A.    I do not.

7    Q.    But you don't recall whether they were on the 2006 hard

8    drive?

9    A.    I can't remember.

03:20 10    Q.    You were asked about some 40-odd exhibits which are

11    videos.  Do you recall extracting each of those?

12    A.    I recall extracting a number of videos, yes.

13    Q.    Okay.  And where were those videos located on the

14    computer?

15    A.    In active space.

16    Q.    In what year hard drive?

17    A.    2006.

18    Q.    So those were not related to this cache or anything?

19    A.    No.

03:20 20    Q.    And the "39 Ways" documents, were those related in any way

21    to the cache?

22    A.    Not that I remember, no.

23         MR. CHAKRAVARTY:  That's all I have, your Honor.

24         THE COURT:  Anything else?

25         MS. PATEL:  Just a few questions.

1                        RECROSS-EXAMINATION

2       BY MS. PATEL:

3       Q.   You testified that the 2006 hard drive -- that you didn't

4       get through all of it, right, in your review?

5       A.   It's impossible to review every last piece of information

6       on a hard drive.  It's just too overwhelming.

7       Q.   Is it overwhelming because the computer saves so much

8       information?

9       A.   Either it saves -- in one way or another there's a lot of

03:22 10   information, and it would be extremely time-consuming to review

11      everything that was on it.

12      Q.   Would you say it's impossible to review all of it?

13      A.   Manually it would be.  That's why we have the forensic

14      software provide most of the work for us.

15      Q.   And is that forensic software an aid?  It doesn't review

16      itself, right?

17      A.   A person has to review it, correct.

18      Q.   That's correct.  So could a human being review all of Dell

19      2006?

03:22 20   A.   Every little piece of information that's on it?

21      Q.   Correct.

22      A.   Unlikely.

23      Q.   How about if we're talking, instead of a computer, about a

24      garbage can.  If you saw a garbage can, could a human being

25      review everything in that garbage can?

1    A.    Probably.

2              MR. CHAKRAVARTY:  Objection, your Honor.  Scope.

3              THE COURT:  No, overruled.

4              Go ahead.  You may have it.

5              THE WITNESS:  Probably.

6    BY MS. PATEL:

7    Q.    And you would be able to inventory all of it.  Is that

8    right?

9    A.    That's correct.

03:23 10    Q.    But you can't do that with a computer?

11    A.    Well, the file listing pretty much does, plus the forensic

12    software has the capability of indexing every piece of

13    information on the hard drive, and I believe every sequence of

14    characters that are three characters or more is indexed by FTK.

15    That's what makes the searches so quick.

16    Q.    But would you agree with me that as data moves from "live"

17    to "deleted," it starts to lose some of that integrity and that

18    information, right?

19    A.    It may.

03:23 20    Q.    It may.  So it would not be possible to review everything

21    on a computer because there simply isn't enough information to

22    find it.  Is that right?

23    A.    It may not be possible.

24    Q.    I want to ask you about -- just to clarify on thumbnails.

25    Would you describe a social networking site like Facebook -- if

I put a picture of my kids trick-or-treating today as my

photograph, is that a thumbnail image?

A.   People often refer to small images as thumbnails, correct.

Forensically when we talk about thumbnail images, we talk about

small images within a thumbnail file.

Q.   Okay.

A.   And that file is created when a folder is viewed in

Explorer in thumbnail view.  But in either case, it would refer

to a small image.

Q.   It would refer to a small -- and by "small," you mean by

its dimensions, like the picture that we had seen before?

A.   Correct.

Q.   And if a friend of mine wanted to take that picture of my

kid as Alice in Wonderland and wanted to expand that from that

thumbnail-size image, it would be grainy if it were an

8-1/2-by-11 piece of paper, right?

A.   If all they had was a very small image and they blew it up

to a much larger size, it would lose detail, correct.

Q.   And could it lose detail such that you may not be able to

make out that it's even a child?

A.   It's possible.

Q.   Are you familiar with what avatars are?

A.   I believe they're icons.

Q.   Okay.  So would it be fair to say that an avatar is

something, say, like on Yahoo, where someone chooses an icon or

1    some image to represent their identity online?

2    A.    Correct.

3    Q.    In your review of the 2006/2008 hard drives, you recovered

4    a number of images, right?

5    A.    Yes.

6    Q.    Were you able to determine forensically how many of those

7    images were avatars?

8    A.    I didn't attempt to do so, no.

9    Q.    And some of those, would you agree with me, could have

03:26 10   been avatars, right?

11   A.    It's possible.

12   Q.    And they could have belonged to people other than

13   Tarek Mehanna, right?

14   A.    It's possible.

15   Q.    And in all of the instant messages and chats that you

16   reviewed -- Mr. Mehanna had many correspondents.  Is that

17   right?

18   A.    Correct.

19   Q.    So it's possible that those images could have belonged to

03:26 20   one of those correspondents?

21   A.    It's possible.

22   Q.    Is there any way to forensically determine where those

23   potential avatar exhibits may have come from?

24   A.    It may be possible but I -- it probably would be beyond my

25   expertise.

1   Q.   And you're pretty experienced?

2   A.   Only in certain things.

3   Q.   If a file is compressed -- now, let me see if I understand

4   this.  A file could -- would you agree with me that a file

5   could be compressed because it's really big, right, size-wise?

6   A.   Correct.

7   Q.   So it gets zipped.  Is that fair to say?

8   A.   Well, no.  Zip can be done without compression.  It would

9   have to be done in a compression --

03:27 10   Q.   Okay.

11   A.   -- function.

12   Q.   So a large file could be compressed to reduce its size so

13   that you can transmit it.  Is that fair?

14   A.   It's possible.

15   Q.   It's possible.  When you do your forensic analysis --

16   again, Dell '06 and Dell '08, did you find files on

17   Mr. Mehanna's computer that were of this compressed variety?

18   A.   I believe I can recall some that had been compressed, yes.

19   Q.   Can you tell whether somebody ever opened a compressed

03:27 20   file?

21   A.   Sometimes.

22   Q.   Can you tell if they did not open it?

23   A.   Usually not.

24   Q.   So you can't always determine whether a compressed file

25   was opened.  Is that right?

1    A.   Not always.

2    Q.   Can you tell if a video was ever viewed?

3    A.   Sometimes.

4    Q.   Can you always tell if someone watched it?

5    A.   If it was played?

6    Q.   Correct.

7    A.   In order to play it, you have to be at the computer.  I

8    don't know if I understand your question.

9    Q.   If -- so of the 40-some videos -- you found about 40

03:28 10    videos on the computer between --

11    A.   That sounds correct, yes.

12    Q.   Okay.  So let's say approximately, somewhere in that

13    range, between the hard drives and the CDs, about 40.  Would

14    that be fair?

15    A.   In 2006?

16    Q.   2006 and 2008.

17    A.   It could have been, yes.

18    Q.   Were you able to tell when you reviewed these videos

19    whether the user of that computer ever saw them?

03:28 20    A.   I was able to tell for some of them that they had been

21    played using certain software.  Who was viewing them, I have no

22    idea.

23    Q.   And then there's -- there were also those videos that

24    weren't played by that software program.  Is that right?

25    A.   They may have been played, but there was no evidence of

1    them having been played.  RealPlayer only tracks the last seven

2    files it reviewed in video.  So if there had been more than

3    seven played, the eighth one would have dropped off and only

4    the most recent seven would have been tracked.

5    Q.   Okay.  So you wouldn't have had evidence of whether

6    certain files were played, is that right, beyond the seven set?

7    A.   Sometimes I don't.  That's correct.

8            MS. PATEL:  Thank you very much.

9            MR. CHAKRAVARTY:  Your Honor, briefly?

03:29 10         THE COURT:  Go ahead.

11                      REDIRECT EXAMINATION

12    BY MR. CHAKRAVARTY:

13    Q.   You were asked about compressed files on the computer.  Is

14    .rar a file type associated with a compressed file?

15    A.   It's an archived file and it may be compressed, yes.

16    Q.   Okay.  And did you find a couple of those on the 2006 hard

17    drive?

18    A.   There were some raw files on the hard drive, yes.

19    Q.   Are you familiar with a .chm file format?

03:30 20    A.   I'm familiar with that format, correct.

21    Q.   And with regards to Exhibits 779 and 780, is there a

22    screen capture of those -- of two files under that format?

23    A.   Correct.

24    Q.   And is that -- describe what that is for the jury.

25    A.   A .chm file is a format that is used by Microsoft for

1    their help function.  And when you open a .chm file, it shows

2    up on your screen -- on the left-hand side there will be topics

3    of interest.  You can click on any of them, and then on the

4    right-hand of your screen the help information, or the resource

5    information, will show up, and you can educate yourself as to

6    the problem that you're having difficulty with.

7    Q.   And the particular files that were -- that you extracted

8    in this case, were those Microsoft help files?

9    A.   They were contained within the raw files, yes.

03:31 10   Q.   What was the content, like what subject matter was the

11   content?

12   A.   I couldn't read it.  It was in Arabic.

13   Q.   You were asked about videos that you found.  Where were

14   all the videos found?

15   A.   The ones on the -- that I copied to the CD or the DVD,

16   they were all found in active space.

17   Q.   On which hard drives?

18   A.   2006.

19        MR. CHAKRAVARTY:  That's all I have, your Honor.

03:31 20        THE COURT:  Okay, sir.  Thank you.  You may step down.

21        (The witness is excused.)

22        MR. CHAKRAVARTY:  Martin Kerstens.

23        Your Honor, during the transition, just for the

24   benefit of the jury, the exhibits that have been offered we're

25   going to deal with after court today?

         1              THE COURT:  Yes.

         2                   MARTIN KERSTENS, duly sworn

         3              THE CLERK:  Please be seated.  State your name and

         4    spell your last name for the record.

         5              THE WITNESS:  Okay.  My name is Martin Kerstens --

         6    it's K-E-R-S-T-E-N-S -- and I'm a special agent with the FBI.

         7              THE CLERK:  Thank you.

         8                        DIRECT EXAMINATION

         9    BY MR. CHAKRAVARTY:

03:32   10    Q.   Good afternoon.  How long have you been with the FBI?

        11    A.   It will be 21 years next month.

        12    Q.   And where have you been assigned over those 21 years?

        13    A.   My first office was the Washington Field Office, and now

        14    I'm up in Detroit at the Ann Arbor Resident Agency.

        15    Q.   And before becoming a special agent did you have any

        16    experience?

        17    A.   I was -- right out of college I went into the Marine

        18    Corps, so I was an aviator with the Marine Corps for eight

        19    years and I did defense contracting for three years and then

03:33   20    came into the bureau.

        21    Q.   Where are you currently assigned?

        22    A.   I'm sorry?

        23    Q.   Where are you currently assigned?

        24    A.   At the Ann Arbor Resident Agency just outside Detroit.

        25    Q.   How long have you been in Detroit?

1    A.    I've been in Ann Arbor now about five years.

2    Q.    All right.  And what squad are you on up there?

3    A.    Well, the RA, it's just basically compilation of several

4    agencies.  I work counterterrorism at the RA.  That's my

5    specialty.

6    Q.    In August of this year did you get involved in some way in

7    this case?

8    A.    Yes.

9    Q.    In what capacity?

03:34  10    A.    I was told to serve a search warrant on Enzu,

11    Incorporated.

12            MS. BASSIL:  I'm sorry.  I didn't hear the last part.

13            THE WITNESS:  I served a search warrant on a company

14    name Enzu, Incorporated.

15            THE COURT:  Can you spell that?

16            THE WITNESS:  E-N-Z-U.

17    BY MR. CHAKRAVARTY:

18    Q.    And what kind of company is that?

19    A.    It's a web-hosting company.

03:34  20    Q.    And what was the search warrant for; what type of

21    information?

22    A.    It was basically for a CD that the owner had archived, and

23    I was to collect this CD from him.

24    Q.    And did he, in fact, provide you with a CD?

25    A.    Yes.  Yes.

1          MR. CHAKRAVARTY:  May I approach, your Honor?

2          THE COURT:  You may.

3     BY MR. CHAKRAVARTY:

4     Q.   I hand you an envelope that you brought in with you today.

5     Would you describe what that is?

6     A.   Okay.  This is a CD marked for the Washington Field

7     Office, and basically it says, "Case agent copy of a digital

8     video" -- should be disk, I guess -- "with verified copy of

9     QWF1," which basically is 1B1.  "1B1" was the designation that

03:35 10    we gave the disk that I got from Enzu, Incorporated before it

11    was sent down to the Washington Field Office.

12    Q.   And you actually put that "1B1" label on that.  Is that

13    right?

14    A.   Yes.  Our evidence technician actually did, but what we

15    were told is 1B1 would be this piece of evidence that I

16    collected from Enzu.

17    Q.   And 1B2, then, is a copy of that?

18    A.   Yes.  To my knowledge this a copy of a disk that I picked

19    up from Enzu, Incorporated.

03:36 20         MR. CHAKRAVARTY:  I'm going to call up just for the

21    witness Exhibit 748.

22    Q.   Do you recognize this?

23    A.   Yes.  That's a -- yes, a certificate of authenticity

24    from -- Mr. Empie, I guess, executed that.

25    Q.   Okay.  And was this sometime after he had provided you

1    with the disk?

2    A.   Yes.  I think maybe a week after or something like that, I

3    think.

4    Q.   So once you obtained the disk from him, what did you do

5    with it?

6    A.   Once I obtained the disk from him, I took it back to our

7    office in Ann Arbor and filled out the proper paperwork.  And I

8    was actually off to a school -- this was a Saturday that I

9    collected it from him, which was August 27th.  And then August

03:36 10   29th I had -- our senior agent in our office took it down to

11   Detroit and actually logged it into evidence down there for me.

12   Q.   And then how did it get down to WFO?

13   A.   It was mailed to them -- or FedEx'd to them, you know, by

14   traceable means.  But the paperwork and that, to have it

15   transferred from Detroit to the Washington Field Office, it was

16   all completed ahead of time by me, so...

17   Q.   And what was your understanding of the data -- what data

18   was on this disk that you --

19   A.   As far as I know, it was a copy of a website.  That's

03:37 20   what --

21   Q.   Do you remember what the website was?

22   A.   I think it was at www.at-tawheed.com.

23   Q.   If I spell it for you, is it w-w-w.a-t-t-a-w-h-e-e-d.com?

24   A.   That's my understanding, yes.

25            MR. CHAKRAVARTY:  Your Honor, I don't know what your

1  Honor's preference is, but we would offer 748 for your

2  Honor's -- as an exhibit.  I don't know whether you want it to

3  go to the jury or not.

4        MS. BASSIL:  Well, I would object for the same reasons

5  we had discussed earlier, your Honor.

6        THE COURT:  Well, 748 is just the certificate.

7        MS. BASSIL:  Oh, I have no objection to the

8  certificate.

9        MR. CHAKRAVARTY:  Thank you, your Honor.

03:38 10        THE COURT:  That will be admitted.

11        (Government Exhibit No. 748 received into evidence.)

12        MR. CHAKRAVARTY:  That's all I have.

13                    CROSS-EXAMINATION

14  BY MS. BASSIL:

15  Q.   Good afternoon.

16  A.   Good afternoon.

17  Q.   Agent, I have a question.  You refer to yourself as a

18  "special agent."  Does that mean you, like, have a special

19  expertise within the FBI?

03:38 20  A.   No, ma'am.  We're all special agents.

21  Q.   You're all special?

22  A.   Yes.

23  Q.   So am I.

24        Now, I have a question for you.  You said that you got

25  this -- it says "Certificate of Authenticity of Business

1    Records" --

2              MS. BASSIL:  And this can go back up.

3              THE COURT:  Do you want to display it?  Is that it?

4              MS. BASSIL:  Sure.  Thank you, your Honor.

5    BY MS. BASSIL:

6    Q.   This is just sort of pro forma, that you want to make sure

7    that all of your ducks are in a row.  And this is an official

8    record, correct?

9    A.   Yes, that's my understanding.

03:39 10   Q.   And it's signed by, I believe -- is it the owner of the

11   web-hosting company?

12   A.   Yes.

13   Q.   And do you know who drafted this certificate of

14   authenticity of business records?

15   A.   I don't know specifically.  I'm not sure if -- it was the

16   U.S. Attorney's Office, I believe.

17   Q.   Okay.  And did you send it to him?

18   A.   No, I did not.

19   Q.   And when you got the CDs, were they mailed -- they were

03:39 20   mailed to you?

21   A.   No, I actually took them.  I met Mr. Empie for coffee and

22   we exchanged -- I showed him the search warrant; he provided me

23   with the CD.

24   Q.   All right.  And is it your understanding that they

25   normally -- that he -- strike that.

1          He produced this CD based on what you requested?

2    A.   Yes, that's my understanding.

3    Q.   And my understanding is that, then, you turned this over

4    to another person on 8/27/2011, correct?

5    A.   I didn't actually turn it over to them at that time.  It

6    was locked in our office on 8/27, and on 8/29, like I said, our

7    senior agent in the office took the material down to our

8    downtown office.  We're about -- RA is about 40 miles outside

9    of Detroit, so...

03:40 10   Q.   Are you familiar with an evidence chain of custody form

11   for the Federal Bureau?

12   A.   I am, yeah.  Exactly what number it is, I don't...

13          MS. BASSIL:  I just want to show it to him.

14   Q.   If you would -- and I don't know.  Can you see it?

15   A.   Well, I might.  Okay.  There it is.

16   Q.   And is that your signature and your printed name on the

17   top line?

18   A.   It is.

19   Q.   And then is that -- and that indicates that you got the

03:41 20   initial receipt of it, correct?

21   A.   Correct.

22   Q.   And then if you look on the next line to the left, it says

23   "relinquish custody"?

24   A.   Okay.  Correct.

25   Q.   And then you gave it to Special Agent Brennan?

1    A.   Correct.  Yeah, James Brennan.

2    Q.   James Brennan.

3         And that's the last you saw of it, is that right,

4    until today?

5    A.   Yes.

6    Q.   And you didn't look through this CD or examine it in any

7    way yourself?

8    A.   No.  My job was just to collect it from Enzu,

9    Incorporated, and Mr. Empie, and get it to the Washington Field

03:41 10   Office, and that's what I did.

11   Q.   So get it, deliver it, and that's it?

12   A.   Yes.

13        MS. BASSIL:  Thank you.

14        THE COURT:  Anything else?

15        MR. CHAKRAVARTY:  Nothing further, your Honor.

16        THE COURT:  All right, Agent.  Thank you.  You may

17   step down.

18        (The witness is excused.)

19        MR. CHAKRAVARTY:  Agent John Schwartz.

03:43 20              JOHN SCHWARTZ, duly sworn

21        THE CLERK:  Please be seated.  State your name and

22   spell your last name for the record.

23        THE WITNESS:  John Schwartz.  The spelling is

24   S-C-H-W-A-R-T-Z.

25                    DIRECT EXAMINATION

BY MR. CHAKRAVARTY:

Q.    Good afternoon.

A.    Good afternoon.

Q.    Agent Schwartz, where do you work?

A.    Washington Field Office, FBI.

Q.    Okay.  You are an FBI special agent?

A.    Yes.

Q.    How long have you been an agent?

A.    Approximately 15 years.

Q.    And where have you been stationed over that time?

A.    The entire time's been at the Washington Field Office.

Q.    And what squad do you work on now?

A.    I work on CT9.

Q.    And what is that?

A.    That is counterterrorism internet use of -- the internet
terrorism unit.

Q.    And do you have experience with internet web forums?

A.    Yes.

Q.    Okay.  Can you describe what an internet web forum is for
the jury?

A.    Yes.  An internet web forum is a website that you can log
onto.  It has administrators.  Some require passwords; some
don't.  But once you go onto it in a forum using your user ID
that you're issued through the administrator, then you can
conduct chats, you can post private messages.  It's a form of

1   communication.

2   Q.   How is a web forum different than a typical website that's

3   on the internet?

4   A.   In my experience, a web forum's different because it does

5   require a password.  So you're invited onto the web forum.

6   Q.   And the content of a web forum, who creates the content?

7   A.   The members.

8   Q.   So in August of 2011 did you have a role in the

9   investigation that implicates this case?

03:45 10   A.   Yes, I did.

11   Q.   Okay.  What was that?

12   A.   To conduct a search of the Tibyan web forum.

13   Q.   The "Tibyan web forum," is that shorthand for the Tibyan

14   Publications forum?

15   A.   Yes, it is.

16   Q.   Do you recall the internet address at the time for the

17   Tibyan Publications forum?

18   A.   Yes, I do.  I believe in -- correct me with the spelling

19   but tawheed, w-w-w.t-a-w-h-e-e-d.

03:45 20   Q.   Is that -- again the spelling --

21   w-w-w.a-t-t-a-w-h-e-e-d.com?

22   A.   Yes.

23   Q.   And was there a search warrant for that site?

24   A.   Yes, there was.

25   Q.   And was that executed?

1    A.    Yes.

2    Q.    Do you know where it was executed?

3    A.    In Detroit.

4    Q.    Okay.  And after it was executed, did the Washington Field

5    Office receive the data from that search?

6    A.    That's right.

7    Q.    I'm handing you --

8            MR. CHAKRAVARTY:  May I approach, your Honor?

9            THE COURT:  You may.

03:46 10   BY MR. CHAKRAVARTY:

11   Q.    I'm handing you what's been marked as 1B2 and ask if you

12   recognize this.

13   A.    Okay.  And I'm going to open it?

14   Q.    Yes, please.

15   A.    Yes, I do recognize it.

16   Q.    And what is it?

17   A.    It is a copy of a disk from the Washington Field Office

18   Computer Analyst and Response Team, or CART -- that we do have

19   a team at the Washington Field Office.  And this is a copy of

03:46 20   the web forum.

21   Q.    Okay.  And have you had an opportunity to look to the data

22   that's on that?

23   A.    Yes.

24   Q.    Okay.  And how did you look at it?

25   A.    I looked on the data -- we -- the Washington Field Office

1    received a copy of the web forum from the Detroit office that

2    conducted the search.  Once Washington Field Office CT9

3    received a copy of this, we gave it to our parent unit, CITU,

4    who then inserted it into a standalone machine, and we were

5    able to conduct our search of that web forum from that

6    standalone machine.

7    Q.   And what types of information can you search for?

8    A.   You can look for any post, you can look for any private

9    messages.  And the posts can be a singular post or a post

03:47 10    within a thread.

11   Q.   Okay.  And for this case were you asked by the prosecution

12   and the agents in this case to locate specific posts and

13   messages?

14   A.   We were asked to conduct a search of the forum using user

15   IDs and keywords.

16   Q.   And were those results made available to Boston?

17   A.   Yes, they were, in --

18   Q.   Go ahead.

19   A.   We made them available -- once we were given the keywords

03:47 20    and the user IDs to search and we discovered them, we were able

21   to export them to a Word document.  We took those Word

22   documents and put them into a shared drive, and then we were

23   able to make them available to the Boston Field Office.

24   Q.   Okay.  Have you had the opportunity to review Exhibits 429

25   through 440?

1    A.   Yes.

2    Q.   And what are those?

3    A.   Those are posts and a private message that were found on

4    the forum.

5    Q.   And is there a date and time for each of those posts or

6    messages?

7    A.   Yes.

8    Q.   And there are also user names on that -- the posts and

9    messages?

03:48 10   A.   Yes.

11   Q.   Is there any commonality to all of those messages in terms

12   of the user name?

13   A.   Yes.

14   Q.   What is that?

15   A.   Correct my spelling, but Abu Sabaayaa?

16   Q.   Is that Abu Sabaayaa?

17   A.   Abu Sabaayaa.

18   Q.   Sorry.  Is that A-B-U S-A-B-A-A-Y-A-A?

19   A.   Yes.

03:49 20   Q.   And you described that there was one private message.  Can

21   I show you Exhibit 430, please?  Do you recognize this?

22   A.   Yes, I do.

23   Q.   And what is that?

24   A.   That is a PM from Ibn Umar called "39 Ways to Serve

25   and Participate" --

1          MS. BASSIL:  Objection.

2          THE COURT:  I think he's sufficiently identified it.

3     BY MR. CHAKRAVARTY:

4     Q.   So --

5     A.   Okay.

6     Q.   -- this is a private message?

7     A.   Yes.

8     Q.   Okay.  And how does a private message differ from a post

9     on a web forum?

03:49 10    A.   A private message is a form of communication between two

11    individuals on the forum that is exactly what it says:  It's

12    private.  So it can't be seen by the other members of the

13    forum.

14    Q.   So essentially like an email being sent between two

15    people?

16    A.   Yes.

17    Q.   Specifically with regards to this exhibit, is there an

18    email address associated with the user name to whom this

19    message is being sent?

03:50 20    A.   Yes, there's a to --

21          MS. BASSIL:  Objection after "yes."

22          THE COURT:  Okay.  Yes?

23          THE WITNESS:  Yes.

24    BY MR. CHAKRAVARTY:

25    Q.   When a private message is sent on a forum, is there also

1    an accompanying email that goes to the listed user's email

2    address?

3    A.   I don't know.

4    Q.   But in any event, with regard to this exhibit, there's

5    both the user name as well as the email address?

6    A.   Yes.

7    Q.   With regards to --

8             MR. CHAKRAVARTY:  Can we go to 440, please?

9    Q.   And what is this?

03:50 10   A.   A message.

11   Q.   Okay.  So this is a public post, not a private message?

12   A.   Correct.

13   Q.   Okay.  And, again, there's a date and time on this --

14   A.   Yes.

15   Q.   -- as well as a user name?

16   A.   Yes.

17   Q.   Okay.  And so all of the private messages and posts have

18   the user name Abu-Sabaayaa.  Is that right?

19   A.   Yes.

03:51 20        MR. CHAKRAVARTY:  At this point I would offer Exhibits

21   429 through 440.

22             MS. BASSIL:  Objection.

23             THE COURT:  Overruled.  They'll be admitted.

24             (Government Exhibit Nos. 429 through 440 received into

25   evidence.)

BY MR. CHAKRAVARTY:

Q.   With regards to 430 --

THE COURT:  Do you want these now displayed?

MR. CHAKRAVARTY:  Yes, please.  Thank you.

BY MR. CHAKRAVARTY:

Q.   Do you see that private message that we were talking about

before?

A.   Yes.

Q.   This is just the header information.  Is this provided by

03:51 the software that you used to generate the result?

A.   Yes.

Q.   This email address, this is from the person who sent the

message.  Is that right?

A.   I don't know.

Q.   Okay.  Well, can you read that part of the header

information?

A.   The email address "from"?

Q.   Yes.

A.   It's webmaster@at-tawheed.com.

03:52 Q.   That correlates to the "from" email address, right?

A.   Correct.

Q.   And then the "to" email address, I'd ask you to read that.

A.   Ibnul_khattab82@yahoo.com.

Q.   And the date of this message?

A.   Yes.  The date is Tuesday, April 18, 2006, 1351 Eastern

1    Standard Time.

2    Q.    And can you just read the message subject?

3    A.    "'39 Ways to Serve and Participate in Jihad' in Arabic."

4    Q.    Now, this user name "to," the person to whom this is sent?

5    A.    Abu-Sabaayaa.

6    Q.    And is this that common name for all of these exhibits?

7    A.    Yes.

8    Q.    Can you just read the English portion of this message?

9    A.    "Could you send me '39 Ways' in Arabic"?

03:53 10   Q.    All right.  And this is an example of a private message

11    that was captured on the Tibyan Publications website?

12    A.    Correct.

13              MR. CHAKRAVARTY:  Can we go to Exhibit 431, please.

14    Q.    And is this an example of a post that was available on

15    Tibyan Publications?

16    A.    Yes, it is.

17    Q.    And, again, there's no "from" or "to" on a post, is there?

18    A.    No.

19    Q.    And the user name portion, does this reflect who's the

03:54 20   person who sent this message or posted this message?

21    A.    Yes.

22    Q.    Are you familiar with what's called a thread?

23    A.    Yes.

24    Q.    What's a thread?

25    A.    A thread is a series of messages pertaining to a certain

1    topic to where there's two or more messages that create a

2    conversation pertaining to that subject.

3    Q.   And the posts that you have offered into evidence don't

4    necessarily contain that entire thread.  Is that right?

5    A.   Correct.

6    Q.   Does the software that you used to generate these posts --

7    does that allow you to do that, to reconstruct each of the

8    threads?

9    A.   Yes, it does.

03:54 10   Q.   Okay.  But you didn't do that in this case?

11   A.   No.

12   Q.   Okay.  Did you confirm that each of these messages was on

13   that -- the results of that search of the Tibyan Publications

14   website?

15   A.   Yes.

16          MR. CHAKRAVARTY:  That's all I have, your Honor.

17          THE COURT:  Let me just ask Ms. Bassil whether this

18   will be -- time-wise --

19          MS. BASSIL:  I think we should begin tomorrow, your

03:55 20   Honor.  I have a rather lengthy cross.

21          THE COURT:  -- rather than get into it.

22          So we'll recess now, jurors, for the day, and we'll

23   resume tomorrow at 9 a.m.

24          Do we need to discuss anything?

25          MR. CHAKRAVARTY:  Just one brief matter from the

1    government's perspective.

2              THE COURT:  We'll stay in session.

3              THE CLERK:  All rise for the Court and jury.

4              (The jury exits the courtroom at 1:01 p.m.)

5              THE CLERK:  Please be seated.

6              MR. CHAKRAVARTY:  A very brief matter, your Honor.  By

7    our calculations the government's response to the defendant's

8    *Daubert* motion is due today, and we were asking for more time

9    in light of the fact that Mr. Kohlmann is not expected to

03:56 10   testify for at least -- it wouldn't be in the next seven days

11   and we're expecting probably closer to 14 days, that we were

12   hoping to get another seven days.

13             MR. CARNEY:  We assent, your Honor, to the additional

14   time.

15             THE COURT:  Fine.  So that will make it next Monday.

16   We'll have to figure out a time to hear those motions, but

17   okay.

18             MR. CHAKRAVARTY:  Thank you, your Honor.

19             MR. CARNEY:  Oh --

03:56 20             THE COURT:  Yeah, go ahead.

21             MR. CARNEY:  -- on Friday Attorney Bassil referenced

22   an exhibit.  It's now been marked as Exhibit 1074.  It's the

23   photograph of the defendant's home that she used in the initial

24   cross-examination.  I'm just alerting your Honor so the record

25   will reflect it.

```
 1              THE COURT:  Okay.  Thank you.
 2              MR. CARNEY:  Also --
 3              THE COURT:  And what?  Remind me of the circumstance.
 4     Why wasn't it identified and marked then?
 5              MS. BASSIL:  It was.
 6              MR. CHAKRAVARTY:  It was identified but not marked, is
 7     my recollection, but published to the jury, and it's now
 8     marked.
 9              THE COURT:  So it's 1074.  Have you got it?  I got it.
03:57  10              MR. CARNEY:  I wondered if I can make an offer of
11     proof regarding Special Agent Johnson.
12              THE COURT:  Yes, I said you could do that.
13              MR. CARNEY:  I would expect if Special Agent Johnson
14     had been permitted to answer the question, she would say that
15     she saw no contraband and nothing illegal in Tarek's bedroom at
16     all.
17              THE COURT:  Okay.
18              MR. CARNEY:  Then we have one ex parte matter to
19     discuss with your Honor.
03:58  20              MR. CHAKRAVARTY:  Your Honor, just a matter of
21     scheduling.  What is the Court's intention with regards to the
22     computer exhibits that the government has tendered?  Should we
23     make them available to you?
24              THE COURT:  I think I have them available in the
25     system.
```

1          MR. CHAKRAVARTY:  So it's just a matter of you going

2     through them?

3          MR. CHAKRAVARTY:  I have paper copies as well if that

4     would be of assistance.

5          THE COURT:  Well, if we need them, we'll summon them.

6          MR. CHAKRAVARTY:  Thank you.

7          THE COURT:  But I have the -- I think everything's on

8     the system.

9          THE CLERK:  Two CDs.

03:58 10        MR. CARNEY:  Your Honor, we intend to go through the

11    exhibits and indicate to your Honor why specifically we think

12    each one should be excluded.

13         THE COURT:  Okay.  All right.  We'll be in recess.

14         THE CLERK:  All rise for the Court.  Court's in

15    recess.

16         (The Court exited the courtroom and the proceedings

17    adjourned at 1:04 p.m.)

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15
     Date:  October 31, 2011
16

17

18

19

20

21

22

23

24

25