UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    ) Criminal Action
v.                                  ) No. 09-10017-GAO
                                    )
TAREK MEHANNA,                      )
                                    )
          Defendant.                )
                                    )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY SEVEN
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, November 2, 2011
9:08 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Aloke Chakravarty and Jeffrey Auerhahn,
 3             Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Jeffrey D. Groharing, Trial Attorney
               National Security Division
 7         950 Pennsylvania Avenue, NW
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         CARNEY & BASSIL
           By: J.W. Carney, Jr., Esq.
10             Janice Bassil, Esq.
               John E. Oh, Esq.
11         20 Park Plaza
           Suite 1405
12         Boston, Massachusetts  02216
           - and -
13         LAW OFFICE OF SEJAL H. PATEL, LLC
           By: Sejal H. Patel, Esq.
14         101 Tremont Street
           Suite 800
15         Boston, Massachusetts  02108
           On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

I N D E X

| WITNESSES FOR THE GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| VEERA BOONYASAIT, resumed | | | | |
| By Mr. Chakravarty | | | 6 | |
| By Mr. Carney | | | | 14 |
| LISA A. CLINE | | | | |
| By Mr. Auerhahn | 18 | | | |
| GREGORY J. MAJOR | | | | |
| By Mr. Groharing | 25 | | | |
| WILLIAM T. VIA | | | | |
| By Mr. Groharing | 33 | | | |
| MEREDITH D. SPARANO | | | | |
| By Mr. Auerhahn | 43 | | 49 | |
| By Ms. Bassil | | 48 | | |
| ROBERT GEMME | | | | |
| By Mr. Chakravarty | 50 | | | |
| GREGORY HUGHES | | | | |
| By Mr. Groharing | 68 | | 101 | |
| By Ms. Bassil | | 93 | | 102 |
| LEAH VALLEE | | | | |
| By Mr. Chakravarty | 105 | | | |
| ANN MARIE DOURSOUNIAN | | | | |
| By Mr. Chakravarty | 117 | | | |

E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | FOR ID | IN EVD. |
|---|---|---|---|
| No. 298 | One-Page document | | 38 |
| No. 794 | Combined exhibits from S.A. Hughes | 68 | |
| No. 739A | Certificate of Authenticity | | 74 |
| No. 739 | Yahoo records | | 74 |
| No. 390 | AA:TM | | 77 |
| No. 738A | Certificate of Authenticity from Pakistan International Airlines | | 81 |
| No. 738 | Pakistan Internation Airlines records | | 81 |
| No. 740A | Certificate of Authenticity from Comcast | | 89 |
| No. 740 | Comcast records | | 89 |
| No. 742A | Certificate of Authenticity from AT&T | | 90 |
| No. 742 | AT&T records | | 90 |
| No. 743A | Certificate of Authenticity from Verizon | | 91 |
| No. 743 | Verizon records | | 91 |
| No. 745A | Certificate of Authenticity from Eastern Bank | | 91 |
| No. 745 | Eastern Bank records | | 91 |
| No. 247 | Cover sheet for FISA records | | 92 |

```
 1              (The following proceedings were held in open court
 2   before the Honorable George A. O'Toole, Jr., United States
 3   District Judge, United States District Court, District of
 4   Massachusetts, at the John J. Moakley United States Courthouse,
 5   One Courthouse Way, Boston, Massachusetts, on November 2, 2011.
 6              The defendant, Tarek Mehanna, is present with counsel.
 7   Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn
 8   are present, along with Jeffrey D. Groharing, Trial Attorney,
 9   U.S. Department of Justice, National Security Division.)
10              THE CLERK:  All rise for the Court.
11              (The Court and jury enter the courtroom at 9:08 a.m.)
12              THE CLERK:  For a continuation of the Mehanna trial.
13              THE COURT:  Good morning.
14              COUNSEL IN UNISON:  Good morning.
15              THE COURT:  The clerk told me someone wanted to talk
16   about something before the jury came out?  No?
17              MR. CARNEY:  May I have one second, your Honor,
18   please?
19              THE COURT:  I'd be happy not to.
20              MR. CARNEY:  May we just have 30 seconds?
21              MS. BASSIL:  I think we can delay this for a moment.
22              (Pause.)
23              MR. CARNEY:  We may need to speak to your Honor before
24   the next witness, but before that happens I'll be asking to
25   speak with the prosecutors.
```

00:02 (line 10)
00:25 (line 20)

```
 1            MS. BASSIL:  We may be able to defer this dispute for
 2    the moment.
 3            THE COURT:  Or solve it?
 4            MS. BASSIL:  Maybe.
 5            (Laughter.)
 6            THE COURT:  So, all right, are we ready for the jury,
 7    then?
 8            MS. BASSIL:  Yes.  Yes.
 9            MR. CARNEY:  Please.
00:27 10       (Pause.)
11            THE CLERK:  All rise for the jury.
12            (The jury enters the courtroom at 9:11 a.m.)
13            THE CLERK:  Please be seated.
14            THE COURT:  Good morning, jurors.
15            THE JURORS:  Good morning.
16            THE COURT:  Mr. Chakravarty, you may proceed.
17            MR. CHAKRAVARTY:  Thank you, your Honor.
18                      VEERA BOONYASAIT, resumed
19                      REDIRECT EXAMINATION
00:28 20   BY MR. CHAKRAVARTY:
21    Q.   Good morning, Mr. Boonyasait.
22    A.   Good morning.
23    Q.   When we left we were talking about the Tibyan Publications
24    forum, and I just have a few more questions with regards to
25    following up on Mr. Carney's questions.
```

1        Mr. Boonyasait, you were asked about the diversity views

2    on the Tibyan Publications website.  Did you have an

3    opportunity to review a number of messages on that site?

4    A.   I have.

5    Q.   Were you able to review all of the messages on that site?

6    A.   No, I have not.

7    Q.   Approximately how much content was on there?

8    A.   There were several thousand number of posted messages.

9    Q.   So did you -- in the messages that you saw, how would you

00:29 10   describe, in your words, the diversity views?

11            MR. CARNEY:  I object.

12            THE COURT:  No, overruled.

13            You may have it.

14            THE WITNESS:  I thought they were mostly pro jihad and

15   talked.

16            MR. CARNEY:  Motion to strike.  The messages are in

17   evidence.

18            THE COURT:  No, it was part of the cross-examination.

19            You may have it.

00:29 20          MR. CHAKRAVARTY:  Can we call up Exhibit 426, please?

21   This is one of the exhibits in evidence.

22   BY MR. CHAKRAVARTY:

23   Q.   I'm sorry, can you read this?  Just can you tell us what

24   it is?

25   A.   Yes.  It's a private message.

Q.   And I'm just going to focus on this one raised.  "But
still exercise relative safety when sending anything."  Did I
read that correctly?

A.   Yes, you did.

Q.   And on a web forum what does that mean to you?

A.   It means that this person should be aware that he is
sending some things sensitive.

Q.   And is the sender of that message Abu Sabaayaa?

A.   Yes.

00:30

Q.   You were asked several questions about whether the
defendant disagreed with certain content.

          MR. CHAKRAVARTY:  I'm going to ask you to call up
Exhibit 420, please.  If we could go to page 2.  Highlight this
first sentence.

Q.   And the "I" is on the previous page.  Does this sentence
say, "I used to believe this but after long reflection and
thought, I have come to the conclusion (and Allah knows best)
that this is an incorrect concept"?  Have I read that
correctly?

00:31

A.   Yes.

          MR. CHAKRAVARTY:  I'm sorry.  Can you go back to the
previous page?

Q.   And again, this is a post by Abu Sabaayaa?

A.   Yes.

          MR. CHAKRAVARTY:  Next page, please.

1  Q.   And in that same -- Abu Sabaayaa continues:  "Every

2  American in the world, civilian or military, can be killed on

3  the spot."  He's disagreeing with that.  And he says, "No,

4  rather, those who fight us should be fought.  Those who" -- in

5  bold -- "fight us, not those who carry the same nationality as

6  those who fight us."  Did I read that correctly?

7  A.   Yes.

8  Q.   You were asked some questions about some of the religious

9  language in some of the posts that the defendant had made.

00:32 10      MR. CHAKRAVARTY:  Can we call up Exhibit 412?  Second

11  page, please?  Sorry.  Page 4.  Sorry.

12  Q.   And you were asked about emboldened language and whether

13  those were Koranic verses.  Do you recall that?

14  A.   Yes.

15  Q.   And is this an example of what you were talking about?

16  A.   Yes.

17  Q.   And there's a bracket to suggest that this is from some

18  Hadith or some religious piece of literature?

19  A.   Yes.

00:33 20  Q.   But then there's other emboldened language which is not

21  necessarily accompanied by that bracket.  Isn't that right?

22  A.   Yes.

23  Q.   And does this last paragraph read, "And because of the

24  word, the battalions of suicide fighters will remain, and

25  because of it, the word of disbelief will fall underneath the

1    feet of the mujahideen, as Allah has made the word of those who

2    disbelieve the lowest, and the word of Allah the highest, until

3    the day of judgment, and this is the significance of the word."

4    Did I read that correctly?

5    A.   Yes.

6    Q.   You were asked questions about the spectrum of views on

7    the Tibyan Publications where al Qa'ida was the most extreme.

8    Do you remember that?

9    A.   Yes.

00:33 10         MR. CHAKRAVARTY:  I'd ask to call up Exhibit 423,

11   please.  Can we go to page 2?

12   Q.   Again, this is a post by Abu Sabaayaa?

13   A.   Yes.

14   Q.   In one paragraph he says, "If the majority of the victims

15   of the Riyadh attacks were involved in fighting or plotting

16   against the Muslims, then I have no problem with those

17   particular attacks.  If they were school teachers, civil

18   engineers and whatnot, or otherwise not having been proven to

19   be fighting in one way or the other by weapons, opinions,

00:34 20   words, then I don't see any clear justification from the

21   Sharee'ah for killing them."  Did I read that correctly?

22   A.   Yes.

23         MR. CHAKRAVARTY:  Go to the next page, please?

24   Q.   Again, is this a post by Abu Sabaayaa?

25   A.   Yes.

```
 1   Q.   And does he say, "My beloved brother Abu Dujanah and I
 2   just had a related conversation and we agreed to post it here
 3   for its clarity, and (inshaa-Allaah) it being an example of an
 4   effort to have a polite and respectful debate without any hard
 5   feelings."
 6        And below that does this appear to be a stored instant
 7   messaging chat?
 8   A.   Yes.
 9   Q.   And this is something that appears to be cut and pasted
10   into Tibyan Publications web forum.  Is that right?
11   A.   Correct.
12   Q.   Now I'm going to direct your attention to about halfway
13   down in this chat.  And I'll just read this and ask if I read
14   it correctly.  Abu Dujanah said, "What about Usaamah's
15   requests?"  And a person in Arabic script who, because this is
16   a post by Abu Sabaayaa, it's presumably Abu Sabaayaa, says,
17   "This is understood by many to mean the military, not school
18   teachers, et cetera.  In fact, this is what his words are, that
19   the presence of the military is disposed, but he never
20   mentioned your average Joe Kaafir working at an oil firm."  And
21   then Abu Dujanah says, "I think I can find statements where he
22   generalizes and means them all."
23        Did I read that correctly?
24   A.   Yes.
25             MR. CHAKRAVARTY:  Go to the next page?
```

00:35  (line 10)
00:36  (line 20)

1   Q.   And this chat continues.  Is that right?

2   A.   Yes.

3   Q.   And then Abu Sabaayaa continues:  "I may be wrong, of

4   course, but I had the other opinion for years, so I'm not

5   disagreeing out of bigoted blindness.  It just seems to me that

6   when I look at the actions of the Prophet and try to apply it

7   to today, I don't see a similarity between what he did and what

8   I'm arguing against.  Technically speaking, yes, the blood of

9   all of these kuffaar is, in its mubaah, but we need to look at

00:37 10   how the messenger applied this ruling even when he did Jihaad

11   at-Talab.  He generally didn't invade the kuffaar without any

12   warning and start killing randomly, as far as I know.  So there

13   was a process."

14       Then it goes down.  Abu Dujanah says, "He chose the best

15   targets, not any old target, et cetera.

16       "I agree.  This is from the figh and the wisdom gained."

17       And then Abu Sabaayaa says, "Right.  So this is why I said

18   if the targets were involved in fighting the Muslims in any

19   way, then I am all for what happened."

00:38 20       Did I read that correctly?

21   A.   Yes.

22   Q.   You were asked about Exhibit 419.

23       MR. CHAKRAVARTY:  Can you pull that up, page 2,

24   please?

25   Q.   Just to clarify again, is this a post by Abu Sabaayaa?

```
      1            MR. CHAKRAVARTY:  Can we go back to the previous page?
      2   A.    Yes, it is.
      3            MR. CHAKRAVARTY:  Next page?
      4   Q.    Does he say, "If we are speaking about the American
      5   military presence in the peninsula" -- when he says
      6   "peninsula," do you know what he's referring to?
      7   A.    The Arabian peninsula, presumably.
      8   Q.    And is that where Saudi Arabia is?
      9   A.    Yes, it is.
00:38 10   Q.    And Riyadh is the capital of Saudi Arabia.  Is that right?
     11   A.    Yes.
     12   Q.    "If we're speaking about the American military presence in
     13   the peninsula, or any other hostile forces or people, then I
     14   wholeheartedly agree with applying the above."  Did I read that
     15   properly?
     16   A.    Yes.
     17   Q.    And then the last paragraph does he say:  "There is a
     18   contrast between these recent Riyadh attacks, which did not
     19   cause the deaths of any known American military personnel, and,
00:39 20   for example, the killing of Paul Johnson - who was admittedly
     21   working on Apache helicopter repairs."  Did I read that
     22   correctly?
     23   A.    Yes.
     24   Q.    So is he contrasting the killing of non-military personnel
     25   with military personnel?
```

1    A.    Yes.

2    Q.    And is he including somebody who is --

3              MR. CARNEY:  I object, your Honor.

4              THE COURT:  Sustained.

5              MR. CARNEY:  Leading the witness.

6              THE COURT:  Sustained.

7    BY MR. CHAKRAVARTY:

8    Q.    Mr. Boonyasait, do you know how Paul Johnson was killed?

9    A.    No, I do not.

00:39 10              MR. CHAKRAVARTY:  That's all I have, your Honor.

11              THE COURT:  Mr. Carney?

12              MR. CARNEY:  Thank you.

13                             RECROSS-EXAMINATION

14    BY MR. CARNEY:

15    Q.    Good morning again, sir.

16    A.    Good morning.

17    Q.    You stated that there were 7,000 postings on Tibyan?

18    A.    I said there were several thousands.

19    Q.    I'm sorry.  Several thousands.

00:40 20          The ones you looked at were the ones that the prosecutors

21    selected for you to look at.  Is that right?

22    A.    Not all of them.  I looked at some of the others.

23    Q.    About how many others did you look at?

24    A.    Maybe five, ten.

25    Q.    Okay.

```
 1    A.    As continuations --
 2    Q.    So out of several thousand, except for the five or ten
 3    thousand that you looked at, all of them were selected by the
 4    prosecutors for you to look at, right?
 5    A.    Yes.
 6    Q.    And you don't, therefore, have information about the rest
 7    of what was on that web forum, do you?
 8    A.    No.
 9    Q.    Now, the prosecutor just went over, again today, some of
00:41 10   the things that we had gone over yesterday and asked you some
11    questions about them.  Is that right?
12    A.    Yes.
13    Q.    Would you agree, based on the documents that you read this
14    morning again for the jurors, that it's clear that
15    Tarek Mehanna's view was that Muslims in a Muslim country had
16    the right to fight invading soldiers or other military whether
17    from the United States or another country?  Isn't that fair to
18    say?
19    A.    That's fair to say.
00:41 20   Q.    This is comparable to Muslims in Afghanistan fighting the
21    Soviet Union when they invaded, isn't it?
22              MR. CHAKRAVARTY:  Objection.
23              THE COURT:  Sustained.  Argumentative.
24              MR. CARNEY:  Pardon me?
25              THE COURT:  Argumentative.
```

BY MR. CARNEY:

Q.   But Mr. Mehanna always drew a distinction about people who
were not in the military based on those emails that you read
this morning and have read.

          MR. CHAKRAVARTY:  Objection, your Honor.

          THE COURT:  You may answer that.

          THE WITNESS:  Could you repeat that, please?

BY MR. CARNEY:

Q.   Yes, sir.  But based on reading what Mr. Mehanna wrote, he
consistently made a distinction with people who were not part
of the military invading a Muslim country, didn't he?

A.   Somewhat, yes.

Q.   For example, he specified teachers and said they're not
part of the invading force and, therefore, they're not subject
to being fought against or killed.  Isn't that right?

A.   Yes.

Q.   He mentioned an oil engineer working in a Muslim country
who's not part of the military is not subject to being killed
because he's not part of the invading army in that Muslim
country like Iraq, right?

A.   Yes.

Q.   Didn't he specifically use the phrase, and correct me if
I'm wrong, "oil engineer"?

A.   Yes.

Q.   And, of course, these Muslim countries are the source of

1    so much oil that the United States uses, right?

2            MR. CHAKRAVARTY:  Objection.

3            MR. CARNEY:  I'll withdraw the question before I ask

4    the Court to take judicial notice.

5    BY MR. CARNEY:

6    Q.   And so that the bottom line is in the face of other people

7    on these web forums -- on this web forum saying anybody who is

8    from a non-Muslim country can be killed, Mr. Mehanna

9    consistently pushed back against that view and said it's only

00:44 10   appropriate to fight the military.  Isn't that true?

11   A.   For that one thread, yes.

12   Q.   When threatened by something like being invaded by the

13   United States?

14           MR. CHAKRAVARTY:  Objection.

15   BY MR. CARNEY:

16   Q.   Is that right?  Is that what you mean?

17           THE COURT:  I think you misheard the witness.

18           MR. CARNEY:  Oh, okay.

19           THE COURT:  He said "in the thread," not "the threat."

00:44 20   BY MR. CARNEY:

21   Q.   You didn't say "threat"?

22   A.   No.

23   Q.   My mistake.  So he would say this in the thread?

24   A.   Thread.

25   Q.   Thread?

1    A.    T-H-R-E-A-D.

2    Q.    My fault.  Okay.  And that's clear throughout all of these

3    postings that you went over that Mr. Chakravarty, the

4    prosecutor, asked you to go through again today, right?

5    A.    That's fair to say.

6              MR. CARNEY:  Okay.  That's all I have.

7              Thank you, your Honor.

8              MR. CHAKRAVARTY:  Nothing else.

9              THE COURT:  All right.  Thank you, sir.  You may step

00:45 10    down.

11             (The witness is excused.)

12             MR. AUERHAHN:  Lisa Cline, please.

13                    LISA A. CLINE, duly sworn

14             THE CLERK:  Please be seated.

15             State your name and spell your last name for the

16    record.

17             THE WITNESS:  Lisa Cline, C-L-I-N-E.

18                    DIRECT EXAMINATION

19    BY MR. AUERHAHN:

00:46 20    Q.    Good morning.

21    A.    Good morning.

22    Q.    How are you employed?

23    A.    I'm employed by the FBI as a special agent.

24    Q.    And how long have you been so employed?

25    A.    I've been employed with the FBI since 1999.

```
 1  Q.   Where are you currently assigned?

 2  A.   I'm assigned to the Lakeville resident agency.

 3  Q.   And just generally, what are your duties?

 4  A.   In the resident agency we cover all criminal aspects.

 5  Right now I'm working counterintelligence, and I previously

 6  worked counterterrorism.

 7  Q.   You have a tendency to talk very fast.

 8  A.   I'm sorry.

 9  Q.   If you could slow down just a little bit.

10       Were you there in 2006?

11  A.   I was.

12  Q.   I want to draw your attention specifically to December 13,

13  2006.  Do you recall where you went that day?

14  A.   I do.  I went to 16 Eric Road, Number 11, in Mansfield,

15  Massachusetts.

16  Q.   And what kind of building or building complex was that?

17  A.   It's an apartment complex.

18  Q.   So there were other --

19  A.   There were several buildings in that complex.

20  Q.   And just generally, what was your purpose in going there

21  that day?

22  A.   In the Lakeville resident agency we cover Mansfield --

23            MR. CARNEY:  Your Honor, I have to reiterate what

24  Mr. Auerhahn said.  Could she please talk --

25            THE COURT:  Please slow down.  It's going to be
```

1    difficult for the jury, I think, as well as the counsel to

2    absorb it if you go that fast.

3              THE WITNESS:  Sorry.

4              THE COURT:  Take a breath.

5              THE WITNESS:  In the Lakeville resident agency we

6    cover -- our territory includes the town of Mansfield.  And the

7    Boston office had asked me to assist in an electronic

8    monitoring in Mansfield, which is part of our territory.

9    BY MR. AUERHAHN:

00:47 10   Q.   And you mentioned earlier you went to Apartment 11.  Was

11   that the target of the interception?

12   A.   Correct.

13   Q.   The electronic interception?

14        And who lived in that apartment?

15   A.   Insaf Masood.

16   Q.   And where was Mr. Masood at the time?

17   A.   He was overseas.

18   Q.   Was someone else living there at the time?

19   A.   Tarek Mehanna was living there.

00:47 20   Q.   And do you -- the Tarek Mehanna who was living there, is

21   he in the courtroom today?

22   A.   He is.

23   Q.   Can you identify him for the record, please?

24   A.   He's sitting over at that table.

25   Q.   In a gray suit?

```
 1   A.   Yes.  Gray suit and beard.
 2        MR. AUERHAHN:  May the record reflect she's identified
 3   the defendant.
 4        THE COURT:  Yes.
 5        MR. AUERHAHN:  Thank you, your Honor.
 6   BY MR. AUERHAHN:
 7   Q.   Now, were you there alone or with other agents?
 8   A.   I was with a technical agent.
 9   Q.   And were there other agents in the area?
10   A.   There were agents conducting surveillance at the time.
11   Q.   Now, what were the -- and again in general terms, what
12   were the duties of the technical agent and what were your
13   duties on that day?
14   A.   I was really there just to assist if they needed anything.
15   I actually started the recording, stopped the recording; the
16   technical agent handled all the installation.
17   Q.   And who was responsible for turning the tape on, turning
18   the tape off?
19   A.   I did.
20   Q.   And during the actual period of the interception, did you
21   have anything so you could listen to the conversations being
22   recorded?
23   A.   I had headphones.
24   Q.   And were you -- at the time you arrived and were in place,
25   was Mr. Mehanna already in the apartment?
```

1    A.    I don't recall if he was there when we arrived.  I believe

2    we arrived before him.  He did arrive approximately one hour

3    prior to us beginning the recording, but I believe we were

4    actually on-site before he was.

5    Q.    And did the recording begin after someone else arrived?

6    A.    Daniel Spaulding had arrived, and at that time we had

7    initiated the recording.

8    Q.    And during the actual recording of the conversation you

9    said you had headphones on?

00:49 10    A.    I did.

11    Q.    So could you hear the conversation that was taking place?

12    A.    Unfortunately, the recording, it was very difficult to

13    hear, so I could hear voices, but I couldn't really make out

14    the conversation.

15    Q.    So you could tell there was conversation but you couldn't

16    discern the words?

17    A.    Correct.

18    Q.    And was all the recording done on one tape or on two

19    tapes?

00:49 20    A.    The recording was done on two tapes.  After approximately

21    one hour I switched the tapes so it wouldn't run out.

22    Q.    Do you recall approximately what time you turned the first

23    tape on and what time you turned the first tape off?

24    A.    I turned the first tape on at approximately 6:34 p.m.,

25    which is the time Mr. Spaulding arrived, and then I switched

1    the tapes at approximately 7:30 p.m., before it would run out.

2    Q.   And then you put a second tape in the recorder?

3    A.   At 7:30 p.m.  And I turned that tape off at 8:22 p.m.,

4    approximately.

5    Q.   And did you stay in your location after that period of

6    time?

7    A.   I did.

8    Q.   Now, at some point did you renew the second tape from the

9    recording device?

00:50 10    A.   We turned the tape off at approximately 8:22 p.m., and

11    then we didn't remove it until approximately 10:34 p.m.

12    Q.   And what did you do with each of the tapes after you

13    removed them?

14    A.   I took both of the tapes and turned them over to the case

15    agent, Tom Daly, at approximately 11:30 p.m.

16          MR. AUERHAHN:  May I approach, your Honor?

17          THE COURT:  You may.

18    BY MR. AUERHAHN:

19    Q.   I'm going to place before you two light brown envelopes,

00:51 20    one marked 1D34 and one 1D35.  Do you recognize what those are?

21    A.   I do.  These are the two envelopes that I placed the tapes

22    in that evening.

23    Q.   And do you recognize your handwriting on the outside of

24    the envelope?

25    A.   I do.

1   Q.   Okay.  And are those called custody envelopes?

2   A.   They are.

3   Q.   Okay.  And are they specifically for electronic

4   interceptions?

5   A.   They are.

6   Q.   And so there was a part at the top that you filled out?

7   A.   Correct.

8   Q.   And what, just sort of, general information do you put on

9   the top of that envelope?

00:51 10   A.   I just put my name, the authority, who the case agent is,

11   what type of tape it is, who was actually intercepted during

12   the conversation, what time I removed it from the equipment.

13   Q.   And I don't know if you said so, but the date, I assume,

14   correct?

15   A.   Correct.  And the date and the location of the recording.

16   Q.   And you put each tape in a separate envelope?

17   A.   Correct.

18   Q.   And what did you do with those envelopes?

19   A.   Then I turned these envelopes over to Tom Daly.

00:52 20   Q.   And who's Tom Daly?

21   A.   Tom Daly is the case agent.

22   Q.   Did you indicate on the outside of the envelope that you

23   had done that?

24   A.   I did.

25   Q.   And did Mr. Daly then sign it indicating he had received

1    it?

2    A.    He did.

3    Q.    And did the chain of custody continue after you

4    relinquished custody of those tapes?

5    A.    It does.

6    Q.    Now, the interception you conducted on that day, was that

7    pursuant to a court order?

8    A.    It was.

9         MR. AUERHAHN:  Thank you.  Nothing further.

00:52 10         MR. CARNEY:  I have no questions, your Honor.  Thank

11   you.

12        THE COURT:  All right, Ms. Cline.  Thank you.  You may

13   step down.

14        THE WITNESS:  Thank you.

15        (The witness is excused.)

16        MR. GROHARING:  The government will call Greg Major.

17             GREGORY J. MAJOR, duly sworn

18        THE CLERK:  Please be seated.

19        State your name and spell your last name for the

00:53 20   record, please.

21        THE WITNESS:  Gregory J. Major, M-A-J-O-R.

22                    DIRECT EXAMINATION

23   BY MR. GROHARING:

24   Q.    Good morning, sir.

25   A.    Good morning.

1    Q.    Where do you work?

2    A.    I work for the Federal Bureau of Investigation.

3    Q.    How long have you worked for the FBI?

4    A.    I've worked for the FBI for the last 37 years.

5    Q.    And what is your current assignment with the FBI?

6    A.    I'm assigned with the Forensic Audio/Video Imaging

7    Analysis Unit, part of the Operation and Technology Division,

8    part of FBI headquarters located at the engineering research

9    facility located in Quantico, Virginia.

00:54 10   Q.    How long have you held that position?

11   A.    I've held that position for the last 27 years.

12   Q.    Sir, what is your educational background?

13   A.    I have a bachelor's degree from St. Edwards University

14   located in Austin, Texas.  I graduated with honors; and other

15   post-technical courses.

16   Q.    And have you received any training related to your work?

17   A.    Yes, I have.  I've received some four years of extensive

18   training doing this kind of work.  During those four years of

19   extensive training I was given a number of things.  The first

00:55 20   thing that I was given as a trainee was what I call

21   "administrative training."  I was given training how to make

22   notes and write reports.

23        I was encouraged by the examiners that were training me to

24   take a number of courses.  I call it "academic training."  I

25   took a number of courses in the Washington, D.C., area while I

1    was in training.  One of the classes that I took was in

2    Rockville, Maryland.  I took a number of courses in

3    electronics, math, physics, from a community college.  That

4    college was Montgomery College.

5        I took another course in Rockville, Maryland, in

6    electroacoustics.  Another course that I took, I had to travel

7    to Pittsburgh, Pennsylvania.  The name of the company was

8    called AVNC.  It was a signal processing course.

9    Q.   Excuse me for interrupting, sir, but is it fair to say

00:56 10   you've had a number of courses throughout your career?

11   A.   Yes, I have.

12       Another part of the training that was given to me was what

13   I call hands-on training.  I did some 200 enhancement

14   examinations while I was in training.

15       Another thing that I did was I was given technical

16   training in the use of the various equipment we had in the

17   laboratory.  The technical training we're talking about is the

18   various recorders we had.  They may have been microcassettes,

19   audio cassettes, open reels.  Also, I was given technical

00:56 20   training of the various audio filters we had and the computers

21   we use.

22   Q.   Sir, throughout the course of your career how many tapes

23   would you estimate that you've examined?

24   A.   I've examined well over 3,000 audio recordings.

25   Q.   Have you also instructed FBI personnel as well as

1    personnel of other federal and state agencies regarding the

2    analysis of audio recordings?

3    A.   Yes, I have.  I've given training to state, local, federal

4    and even international law enforcement personnel.  These are

5    law enforcement personnel that regularly tour through the

6    national academy located at the FBI training division located

7    at Quantico, Virginia.

8         I've given also some training to some federal prosecutors,

9    and on one occasion given training to some physics students

00:57 10   that were visiting our facility from Mary Washington College

11   located in Fredericksburg, Virginia.

12   Q.   And, sir, have you been qualified to testify as an expert

13   in court before?

14   A.   Yes, I have.

15   Q.   On approximately how many occasions?

16   A.   I have been qualified some 45 times.

17   Q.   And at some point were you asked to assist in the

18   investigation of this case?

19   A.   Yes, I was.

00:58 20   Q.   What were you asked to do?

21   A.   Number one, I received two audio cassettes from the FBI.

22   A special agent, Heidi Williams, had sent a letter asking that

23   I analyze, or examine, two audio cassettes to determine whether

24   I could make enhanced copies of each one.

25           MR. GROHARING:  May I approach, your Honor?

1            THE COURT:  You may.

2    BY MR. GROHARING:

3    Q.   Sir, do you recognize those two envelopes?

4    A.   Yes, I do.

5    Q.   What are they?

6    A.   These are the chain-of-custody envelopes that I received

7    from Special Agent Heidi Williams.

8    Q.   How do you know that they are those envelopes?

9    A.   They have my name on the chain of custody.  When I sign

00:59 10   the chain of custody, I go ahead and take custody over the

11   evidence at that point.

12   Q.   And what did you do once you received those envelopes and

13   those tapes?

14   A.   The first thing I did after I signed the chain-of-custody

15   envelope, I took the cassette out and I marked the -- each

16   cassette with a laboratory number, a specimen number, my

17   initials and date.

18   Q.   And what did you do after that?

19   A.   From there, after I went ahead and I marked the evidence,

00:59 20   I played the tape back for the first time and I noted the audio

21   characteristics in the problem areas on the tape.

22        The next thing I did was I went ahead and I viewed the

23   audio signal.  We use a spectral analyzer to actually

24   physically see the signal.

25   Q.   Sir, can you please just explain briefly and in laymen's

 1  term what a spectral analyzer is?

 2  A.   A spectral analyzer is a monitor that displays the audio

 3  signal.  I like to compare that to much like an electronic

 4  technician would use an oscilloscope to see the various

 5  component parts.  Also, I would equate it to a heart-monitoring

 6  device that a doctor may use.

 7       What the spectral analyzer does, it enables the examiner

 8  to see various parts of the audio signal.  As the tape is being

 9  played, it shows up as what I call a dancing line.  It's very

01:00 10  important that the examiner see that because he can identify

 11  the various background noises from it.  He can see on the

 12  vertical scaling the amplitude, or how loud it is; he can see

 13  the bandwidth; he can see the various component parts of the

 14  background noise.

 15       The background noise may be on one end of the spectrum

 16  like you would see from some bassiness, it might be in the

 17  center of the spectrum where it might be some hum, or it might

 18  on the other end of the spectrum where there would be audio

 19  hiss.

01:01 20  Q.   So after you conducted this analysis, what did you do with

 21  the cassettes?

 22  A.   After I went ahead and I did the enhancement, I went ahead

 23  and I reviewed the enhanced copies.  I marked the enhanced

 24  copies with the same corresponding information as on the

 25  original cassettes, and I sent both the original audio

1    cassettes and enhanced copies back to Special Agent Heidi

2    Williams in the Boston office.

3    Q.   And you mentioned an enhanced copy.  What exactly was the

4    enhancement that you conducted?

5    A.   What I did was I made three enhanced audio copies, each of

6    which were on a compact disk.  The enhancement was what I call

7    an improvement over the original recording, and it was a much

8    clearer and more understandable recording.

9              MR. GROHARING:  May I approach, your Honor?

01:02 10              THE COURT:  You may.

11    BY MR. GROHARING:

12    Q.   Sir, do you recognize the envelope that I've just handed

13    you?

14    A.   Yes, I do.

15    Q.   What is it?

16    A.   It's a chain-of-custody envelope.

17    Q.   And what is -- do you recognize your name on that

18    envelope?

19    A.   No, I do not.

01:02 20    Q.   Do you recognize the contents of the envelope?

21    A.   Yes, I do.

22    Q.   What are they?

23    A.   The contents of the envelope contain the two CD copies

24    that I made that were enhanced copies of each one of the

25    original audio cassettes.  They have my initials, date,

1    corresponding laboratory number and specimen number.

2    Q.   And how did you send those copies back to the FBI?

3    A.   I sent them back via FedEx back to Special Agent Heidi

4    Williams.

5    Q.   And then they were placed in the chain-of-custody envelope

6    at that point.  Is that your understanding?

7    A.   No, they were not.  What I did was I sent them back in

8    this plastic envelope.

9    Q.   And then when they got back to the FBI is when they were

01:03 10   placed in the chain-of-custody envelope.  Is that your

11   understanding?

12   A.   I assume they were.

13   Q.   Now, throughout the course of your analysis and the

14   enhancement you just described, did you alter the substance of

15   any of the words of the speakers that were contained on that

16   recording?

17   A.   No, I did not.

18            MR. GROHARING:  That's all the questions I have, your

19   Honor.

01:03 20            MR. CARNEY:  I have nothing.  Thank you, your Honor.

21            THE COURT:  All right, Mr. Major.  Thank you.  You may

22   step down.

23            THE WITNESS:  Thank you.

24            (The witness is excused.)

25            MR. GROHARING:  The next witness is Tyrone Via.

1                    TYRONE T. VIA, duly sworn

2              THE CLERK:  Please be seated.

3              State your name and spell your last name for the

4    record.

5              THE WITNESS:  My name is William T. Via.  The last

6    name is spelled V-I-A.

7              THE CLERK:  Thank you.

8                         DIRECT EXAMINATION

9    BY MR. GROHARING:

01:05 10   Q.   Good morning, sir.

11   A.   Good morning.

12   Q.   Where do you work?

13   A.   I work for the FBI.

14   Q.   And how long have you been employed with the FBI?

15   A.   For 23 years.

16   Q.   What is your current position?

17   A.   Currently I am assigned to the Operation Technology

18   Division as a unit chief of the Telecommunications, Intercept

19   and Collection Technology Unit.

01:05 20   Q.   And what are your responsibilities in that position?

21   A.   As unit chief of TICT-2, which is the acronym for the name

22   of the unit, I'm responsible for providing electronic

23   surveillance equipment to the entire FBI.  And that equipment

24   can be for Title 3, which is criminal collection, or for Title

25   50, which is the FISA collection equipment.

1    Q.   And do you have other responsibilities in that office as
2    well?
3    A.   Yes, sir.  I'm responsible for seven other programs within
4    the unit.
5        Also with the collection equipment that I am responsible
6    for, we do the purchasing of equipment; we provide the
7    equipment to the field office; we install the equipment; we do
8    training to the technical training agents in the field; we do
9    lifecycle support of that equipment; and also we're responsible
01:06 10   for the 24-7 helpdesk to ensure that equipment stays up and
11   running at all times.
12   Q.   What did you do before joining the Operational Technology
13   Division?
14   A.   I spent six years in a Los Angeles field office, from 1993
15   to 2000 -- 1993 to 1998 in the Los Angeles division.  And from
16   1988 to 1993 I was assigned to the Pittsburgh field office.
17   Q.   You mentioned before the term "technically trained agent."
18   What is a "technically trained agent"?
19   A.   A technically trained agent is a special agent of the FBI
01:07 20   who has chosen to go into the technical aspect of being an
21   agent.  This person would work in a central monitoring plant,
22   at a field office, working with the collection equipment as
23   well as other type of assistance to case agents doing
24   investigations.
25   Q.   And, sir, in your duties with the operational technology

1    division, are you familiar with the procedures the FBI follows

2    to intercept telephone calls?

3    A.    Yes, I am.

4    Q.    And are you familiar with the procedures that the FBI

5    follows to intercept calls pursuant to authorization from the

6    Foreign Intelligence Surveillance Court?

7    A.    Yes, I am.

8    Q.    How much training have you had in that regard?

9    A.    I became a technical training agent 20 years ago.  And so

01:08 10   I did this type of work in the Los Angeles field office, and

11    from the Los Angeles field office I transferred to the unit

12    which is called TICT-2 where I was a supervisor doing the same

13    type of work, working with the FISA collection equipment.  And

14    then I became the unit chief of the same unit where I became

15    responsible for the entire unit.

16         MR. GROHARING:  Could I have the exhibit displayed for

17    the witness, please?

18    Q.    Sir, I want to ask you some questions about the intercept

19    of wireless telephone calls.  Do you recognize the document

01:08 20   that appears on your screen?

21    A.    Yes, I do.

22    Q.    This document?

23    A.    Yes, sir, I do.

24    Q.    What is it?

25    A.    This would be a good example of how a wireless CALEA

1    intercept would be done.  And CALEA is known as a

2    Communications Assistance to Law Enforcement Act intercept.

3    Q.   And that's a congressional act that you're referring to?

4    A.   No, it's the Communications Assistance to Law Enforcement

5    Act.

6    Q.   The act, it's a congressional act, correct?

7    A.   Yes, sir.

8    Q.   And is this an accurate representation of the process the

9    FBI uses to intercept cellular telephone calls?

01:09 10   A.   Yes, sir, it is.

11   Q.   Will this chart help you explain your testimony?

12   A.   Yes, sir, it will.

13           MR. GROHARING:  Your Honor, I would ask that the

14   exhibit be admitted, page 2 specifically of this exhibit, and

15   that it be published to the jury.

16           MR. CARNEY:  No objection, your Honor.

17           THE CLERK:  Counsel, what's the number?

18           MR. GROHARING:  I'm sorry.  298.

19           THE COURT:  It's a two-page document?

01:09 20           MR. GROHARING:  I believe it's a four-page document.

21   I only want page 2 admitted and displayed to the jury.  We

22   won't be using the other three pages.

23           THE COURT:  Okay.  So it's a one-page document?  All

24   right.

25           MR. CARNEY:  No objection.

1          THE COURT:  Without objection?

2          MR. CARNEY:  Without.

3          (Government Exhibit No. 298 received into evidence.)

4    BY MR. GROHARING:

5    Q.   Special Agent Via, would you please explain to the jury

6    what procedures the FBI follows once a valid court order is

7    entered to intercept wireless telephone communications?

8    A.   Yes, sir.  In this particular diagram, I would ask you to

9    look to the far right where it says "FBI office."  It's

01:10 10   important to understand that we have technically trained agents

11   in each one of the field offices that will work with the FISA

12   equipment once the court order has been provisioned by the

13   telephone company.  So I work in the Operation Technology

14   Division which is located in Quantico, Virginia.  So it's

15   important to understand that the field office plays a big role

16   in this.

17          If you go down to the lower right side where it says

18   "carrier provisioning function," in a CALEA-type intercept, the

19   telephone company would do all the provisioning -- or we call

01:11 20   it setup -- of the actual court order.  All of that is done by

21   the carrier.  So you see the person sitting there at a monitor,

22   sits with a sole monitor with technology today, that person can

23   provision that line sitting right at a terminal.

24          The telephone switch company is in the middle which that

25   box would rise back up to.  In a CALEA-type intercept, the

1    intercept is done in two parts.  If you see the dotted line, it

2    says "call content channel."  That's a telephone term.  "Call

3    content" is the actual audio that you would be hearing in a

4    full-blown FISA case.  The yellow dotted line above it says

5    "call data channel."  That's the actual digits that are dialed.

6    Those digits could be incoming or outgoing.  That information

7    would control the start time of the call, the end time of the

8    call, and then the duration of the call.

9    Q.   And this information that's collected, the call data and

01:12 10   the call content, where does it go?

11   A.   Okay.  The call data, part of the two parts, that data

12   would go to my unit at Quantico.  And we have a server farm

13   right inside of our labs.  Once that data reaches Quantico, we

14   have our own internal network that we would go out to all of

15   the field offices that have the collection equipment.

16        Internally we program -- we're able to use software so

17   that the data will know what field office to go to and also

18   what port it would go to once it landed to the field office.

19   So the data comes from the telephone company to Quantico, and

01:13 20   at Quantico we have a network where we send it out to the

21   office.

22        On the other hand, the audio, or the call content channel,

23   it will go directly to the field office from the closest

24   central office.  That could be done through a dedicated circuit

25   or that could be done through what is known as a ring-down

1   line.  Whenever the person of interest goes off-hook or raises

2   his telephone receiver, it would ring down to the switch at the

3   field office.  The data and the audio are mixed together and

4   it's delivered to the linguist or the case agent.  And that

5   person would hear both parts of the conversation.

6   Q.   And how does a linguist or a case agent review those

7   materials?

8   A.   They would be inside of a room, and they would only have

9   privileges for the certain case that they're working.  And when

01:14 10   the phone goes off-hook, the equipment automatically cuts on

11   and they're able to listen to that audio and view from a screen

12   the information called the data:  meaning the time of the call,

13   the duration of the call, and how long the call actually was.

14   Q.   And what is the name of the system that they would review

15   that material on?

16   A.   The system is known as the Red Wolf Digital Collection

17   System.

18   Q.   Is there also a system called the Red Tiger System?

19   A.   That version is a newer system, but it was not there

01:14 20   during 2006, is when this case --

21   Q.   Is it fair to say in 2006 someone would have reviewed

22   these materials with Red Wolf; in 2011 they would now use Red

23   Tiger?

24   A.   Yes, sir.

25   Q.   How is this information stored on the Red Wolf System?

1    A.    On the Red Wolf System we have what is known as "magneto

2    optical disk."  It's a disk that has a -- basically a CD inside

3    of it, but encased in a protective cover.  And those disks are

4    imported into what is known as a jukebox.  And that disk would

5    be assigned by an administrator to that particular case.

6    Q.    How long would the material remain on that Red Wolf

7    System?

8    A.    Okay.  That audio and data can stay on the system based on

9    what is agreed upon from the case agent and the administrator,

01:15 10   the administrator of the system.  Basically, we will allow the

11   audio and data to stay on the system three months, or 90 days,

12   after it has been put on an MO, or magneto optical disk.

13       Also, it's important to say that if a -- we can check

14   boxes on the Red Wolf System, that if an audio session or a

15   phone call had not been reviewed, it could be checked as

16   unreviewed.  So when 90 days would go by, the audio and data

17   that would drop off the system would be the information that

18   has already been previewed or marked as being non-pertinent.

19       So what has not been reviewed would be the last part that

01:16 20   would fall off the system; however, please understand that it's

21   all captured on the magneto optical disk, so no audio or data

22   is ever lost.

23   Q.    So after the 90-day period, then, where does that

24   information go?

25   A.    If it's on the system, it just is deleted.

1    Q.    Is it -- you mentioned before it was saved on magneto

2    optical disk?

3    A.    Yes, it is.

4    Q.    At that point what is done with those disks?

5    A.    Okay.  The magneto optical disk, once it's full, the

6    system would notify the administrator that the tape is full.

7    At that time the case agent or his designee would come to the

8    central monitoring plant, would pull that MO off the system,

9    would put it in an evidence envelope and take it down to the

01:17 10   evidence for storage.

11   Q.    You mentioned earlier that, then, with the Red Wolf

12   System, an agent or linguist is able to review the calls.  Are

13   they able to manipulate particular calls or data on that

14   system?

15   A.    No, they're not.  If they are reviewing the audio or the

16   data, they are doing it from a separate room.  The system is

17   locked down away from anyone else other than the

18   administrators.  So they would be in a room set aside for that

19   particular case, and they would only have privileges to review

01:18 20   and also decide which sessions they want to put on a CD to

21   listen to later, but not manipulate the system.

22   Q.    What procedures are used to ensure that these systems are

23   working properly?

24   A.    From the start, again, I would share with you that the

25   telephone company does all the provisioning, so they would be

1    the first step.  But we continue to work with the couriers

2    throughout the year.  And everything is already prewired.  So

3    this has been done since 1994.  So we have that in place, that

4    once the provision is done, we can test continually with the

5    telephone company to make sure that everything is working.

6         We have a 24-7 helpdesk that can monitor the system.  We

7    have electronic equipment in the central monitoring plant to

8    watch the heat, to watch the electricity, and also to watch the

9    cards on the system to ensure they're working properly.  And if

01:19 10   we get what we consider to be a red light, then something could

11   be going on in a field office where we would notify them from

12   Quantico to go check a part of the system.

13   Q.   Throughout your career are you aware of any instances when

14   data or content of these captured calls pursuant to a FISA

15   authorization have been manipulated?

16   A.   No, I have not.

17        MR. GROHARING:  That's all I have, your Honor.

18        MR. CARNEY:  A man has to know his limitations.  I

19   have no questions.

01:19 20        THE COURT:  Thank you, Mr. Via.  You may step down.

21        THE WITNESS:  Thank you.

22        (The witness is excused.)

23        MR. AUERHAHN:  Meredith D. Sparano.

24             MEREDITH SPARANO, duly sworn

25        THE CLERK:  Please be seated.  State your name and

1    spell your last name for the record.

2          THE WITNESS:  Meredith Diana Sparano, S-P-A-R-A-N-O.

3                      DIRECT EXAMINATION

4    BY MR. AUERHAHN:

5    Q.   Good morning, ma'am.

6    A.   Good morning.

7    Q.   How are you employed?

8    A.   I am employed with the Federal Bureau of Investigation.

9    Q.   In what capacity?

01:21 10   A.   I work in the ELSUR Unit, which is electronic

11   surveillance, as an ELSUR operations technician.

12   Q.   How long have you been so employed?

13   A.   I've been employed for two years and a little over seven

14   months.

15   Q.   Could you generally describe your duties as the ELSUR

16   clerk?

17   A.   I ensure the proper handling and storage of all ELSUR

18   media that comes in for the Boston division.

19   Q.   And maybe a little bit more detail can describe what that

01:21 20   entails?

21   A.   Sure.  Agents bring in evidence that they have collected

22   in the ELSUR capacity and they release the custody to us.  We

23   make sure that the chain of custody has been signed as

24   collected and then released to an ELSUR tech, and from there we

25   enter it into our automatic case support system, which is a

1    digital backup for the chain of custody in which we issue it a

2    1D number to be specific with that bar code, and then we store

3    it in our ELSUR vault.

4    Q.   So let's break it down a little.  First of all, when you

5    talk about "ELSUR," you said that means electronic

6    surveillance?

7    A.   That's correct.

8    Q.   Is it both electronic surveillance that's generated as a

9    result of consensual recordings where someone consents to be

01:22 10    recorded as well as court-authorized?

11    A.   That is correct.  We accept both consensual monitorings

12    and court-authorized media.

13    Q.   And do you receive -- does the chain of custody begin with

14    the agent who takes custody of the original tape-recording, if

15    we're talking about a tape?

16    A.   Yes.  Every piece of evidence is entered on a 504B

17    envelope which has two sides of a chain of custody:  One is

18    where it was collected, which the agent signs, and the date in

19    which it was collected; and then on the other side the agent

01:22 20    releases it to the ELSUR tech.  Upon releasing it, we write

21    down the date and time in which they give it to us, so those

22    times should be the exact date and time.  And then when we

23    store it we put that date and time.

24    Q.   Okay.

25         MR. AUERHAHN:  May I approach, your Honor?

```
 1            THE COURT:  You may.
 2    BY MR. AUERHAHN:
 3    Q.   I'm going to place in front of you --
 4            MR. AUERHAHN:  For the record, I'll identify them as
 5    1D34.
 6    Q.   Is that correct?
 7    A.   Yes.
 8    Q.   1D35?
 9    A.   Yes.
10    Q.   1D58?
11    A.   Yup.
12    Q.   1D63, 1D8 and -9.  Did I read that correctly?
13    A.   -8, -9, -63.  Yes.
14    Q.   Okay.  And these are each the custody envelopes that you
15    just described?
16    A.   Yes, they're each the 504B envelope.
17    Q.   Okay.  And there's a top half of the form, and that's the
18    part that's filled out by the agent?
19    A.   Yes.  The ELSUR tech is able to assist the agent if they
20    are unaware of how to fill it out, but the agent does that upon
21    collecting the evidence.
22    Q.   And when the original agent relinquished custody, is there
23    a notation on the front of the envelope?
24    A.   Yes.  There's an "accepted custody" column on the left and
25    "release custody."  When they accept it, they sign their name
```

1    and the date, and then when they release it, they sign the

2    right-hand side, in which the ELSUR tech underneath signs when

3    they received the evidence and puts "evidence control," and

4    then they store it in their release custody side.

5    Q.   And do you always receive these envelopes directly from a

6    human being?

7    A.   Not always.  The Boston division has resident agencies in

8    New Hampshire, Maine, Rhode Island, as well as Massachusetts,

9    so those would be sent via FedEx.  Upon release and custody the

01:24 10   agent would say "FedEx," so...  In the reasoning, they would

11   say "to ELSUR" and include the FedEx number.  Upon receiving

12   it, which will usually be the day later, or the Monday after

13   the Friday if they send it on a Friday, we also put the FedEx

14   number to track that it was being sent through that same

15   number.  And then we will accept it when we receive it in our

16   mail collection that day.

17   Q.   Okay.  And as a matter of fact, one of those custody

18   envelopes, does it indicate -- or actually three of them,

19   indicate that they went through FedEx?

01:25 20        MR. AUERHAHN:  If I may approach?

21        THE COURT:  Go ahead.

22        THE WITNESS:  Yes.  1D34 and -35 were sent to be

23   enhanced, which is the 1D58 copy, and so those include the

24   FedEx number in the chain of custody.

25   BY MR. AUERHAHN:

1    Q.    Okay.  And when received either the original chain of

2    custody or the return from the enhancement, what do you do with

3    the contents and the envelope?

4    A.    We make sure that the evidence has been resealed.  That

5    date and time should correlate when the agent either returns it

6    to us or the ELSUR tech can seal it and sign it.  So that date

7    and time should correlate with the same day that -- we then

8    update the chain of custody in or ACS company and then restore

9    it in our ELSUR vault.

01:26 10   Q.    Okay.  When you say restore it in your ELSUR vault,

11   without too much detail, what do you mean by that?

12   A.    We have two rooms in our ELSUR vault:  one for secret,

13   classified evidence, and the other for unclas-.  The vault is

14   secured with an alarm, a spin-dial lock, and then a key for

15   those of us with restricted access.

16   Q.    And if an agent needs to review the material, wants the

17   custody back or, for example, released to court here, is it

18   self-service or do you have to get the --

19   A.    No, only those with restricted access.  So either myself

01:26 20   or the other EOT will take the request from the agent, and then

21   we will enter the vault and bring out the piece of evidence.

22   We will sign the chain as we took control of the evidence and

23   then release it to the agent, and then the agent will then sign

24   there in person that they maintained custody of it.

25   Q.    Okay.  And you mentioned a backup ACS system.  What is

1    that?

2    A.   The ACS system is an automated case support system in

3    which when we receive any piece of evidence we enter, based on

4    the case, that we collected an item.  Upon doing that, it

5    automatically updates the next 1D number, which correlates to

6    the bar code that we assign each piece.  And in writing a

7    little description, we also update the chain of custody so that

8    it matches each 504B envelope.

9              MR. AUERHAHN:  That's all, your Honor.

01:27 10                        CROSS-EXAMINATION

11   BY MS. BASSIL:

12   Q.   Good morning.

13   A.   Good morning.

14   Q.   I just wanted to ask you a couple of questions.  I was

15   unclear about -- you keep using the name ELSUR?

16   A.   ELSUR, E- --

17   Q.   ELSUR.  And those are E-L-S-U-R?

18   A.   That's correct.

19   Q.   What does that stand for?

01:28 20   A.   Electronic surveillance.

21   Q.   Okay.  So the E-L is "electronic" and then S-U-R is

22   "surveillance"?

23   A.   That's correct.

24   Q.   And you mentioned the phrase EOT.  You and another EOT?

25   A.   It's an ELSUR operations technician.

```
 1    Q.   Okay.  And I had a question.  You said that as things come
 2    in, there is a bar code put on it so it matches to a particular
 3    case?
 4    A.   The bar code -- we have spare bar codes.  We put the bar
 5    code on each 504B envelope.  That bar code correlates to the 1D
 6    number which is specific to that case to which the evidence
 7    pertains.
 8    Q.   All right.  And did you receive any other envelopes in
 9    this case?
10    A.   How do you mean?
11    Q.   Well, you have a number of envelopes there in front of
12    you.  Were there other ones in this case?
13    A.   Yes, that's correct.
14    Q.   All right.
15              MS. BASSIL:  I have no further questions.
16              MR. AUERHAHN:  Your Honor, actually, if I could go
17    beyond the scope of cross because I've been informed that we
18    overlooked one.
19              MS. BASSIL:  Okay.
20              MR. AUERHAHN:  May I approach, your Honor?
21              THE COURT:  Go ahead.
22                        REDIRECT EXAMINATION
23    BY MR. AUERHAHN:
24    Q.   If I can show you 1D106, can you also tell me what that
25    is?
```

1   A.   That was the last piece of evidence that was entered for

2   this case.

3   Q.   All right.  And is that chain-of-custody envelope similar

4   to the ones you've just described?

5   A.   Yes; it is a 504B envelope.

6   Q.   Okay.  And does it describe what it is?

7   A.   It gives a range of intercept dates for court-authorized

8   intercepts listing the subject's name and the intercept date.

9   Q.   Okay.  And these three that you identified previously, do

01:29 10   these contain MOU disks, also range of dates?

11   A.   Yes, they do.  They are -- "FISA" is labeled on the 504B

12   envelope.

13            MR. AUERHAHN:  Thank you, your Honor.

14            Thank you, Ms. Bassil.

15            THE COURT:  Anything else?

16            MS. BASSIL:  No further questions.

17            THE COURT:  All right.  Thank you, Ms. Sparano.  You

18   may step down.

19            THE WITNESS:  Okay.  Thank you.

01:30 20            (The witness is excused.)

21            MR. CHAKRAVARTY:  Robert Gemme.

22                     ROBERT GEMME, duly sworn

23                     DIRECT EXAMINATION

24   BY MR. CHAKRAVARTY:

25   Q.   Good morning.

```
     1   A.    Good morning.

     2   Q.    Can you please state where you work.

     3   A.    I work for the Federal Bureau of Investigation.

     4   Q.    And you go by Robert Gemme?

     5   A.    Yes.

     6   Q.    In what capacity are you employed at the FBI?

     7   A.    I'm an evidence technician.

     8   Q.    In which field office?

     9   A.    The Boston field office.

01:32 10   Q.    How long have you done that?

    11   A.    22 and a half years, approximately.

    12   Q.    What did you do before that?

    13   A.    I was newly hired in 1989, worked at the mail desk for six

    14   months, and then I became an evidence technician.

    15   Q.    Okay.  Are you familiar with the electronic surveillance

    16   custody-and-handling procedures?

    17   A.    Not really, no.

    18   Q.    So is evidence treated differently than electronic

    19   surveillance?

01:32 20   A.    With the chain-of-custody issues, no.

    21   Q.    So in what capacity -- what ways do they differ?

    22   A.    It's basically the paperwork to enter the electronic

    23   evidence into storage, into evidence.

    24   Q.    Okay.  So when you say "paperwork," is it specifically the

    25   forms are different?
```

1   A.   Yes.  Yes.  Some of the forms, not all of them.

2   Q.   But the process for handling and storage is essentially

3   the same?

4   A.   Essentially, yes.

5   Q.   Can you just give an overview of what that

6   evidence-control process is for the jury?

7   A.   When we get evidence, basically what happens is the

8   evidence is entered onto an FD192, which is a control sheet,

9   and I enter it into the computer after verifying what they have

01:33 10   on the sheet is exactly what they're putting in.  And then it

11   receives a bar code number which stays with that piece of

12   evidence through the life of the evidence.  And then once all

13   the paperwork is done, it is stored in the evidence-control

14   room until someone comes to get it for review or disposition.

15   Q.   And then what happens when somebody needs to check

16   something out of evidence?

17   A.   I relinquish it to them on the chain of custody, and they

18   accept it also on the chain of custody at the same time.  Also,

19   the ACS, which is the evidence-control database, is updated to

01:34 20   reflect the same time as the chain of custody.

21   Q.   When evidence is brought to you, what happens for the

22   first item to be checked in?

23   A.   It is checked in, and once it receives the bar code and

24   the chain of custody is signed by me indicating for storage, it

25   is placed in the evidence-control room until, like I said,

1  further review or someone needs it for court or something like

2  that.

3  Q.    Who has access to the evidence-control room?

4  A.    There are two evidence-control technicians and three

5  alternates, and those are the only people that have access.

6  Q.    What types of materials get put into evidence?  Obviously,

7  the universe of FBI investigations is broad, but in terms of

8  physically what types of things go in there?

9  A.    It could be anything except for electronic surveillance

01:35 10  tapes and stuff.  We get everything else but that.

11  Q.    Are you familiar with -- what is the evidence numbering

12  convention in the evidence-control room?

13  A.    The 1B numbers --

14  Q.    Yes.

15  A.    -- you're referring to?

16        Once a piece of evidence comes in, it receives a 1B

17  number.  That is basically just the identifier for the evidence

18  system.  And as an additional piece of evidence comes in, it

19  gets the next 1B number, so they are consecutive.  And that's

01:35 20  throughout the bureau.

21  Q.    Okay.  So does each case have their own series of 1B

22  numbers?

23  A.    Yes.

24  Q.    And that's in addition to the bar code that you mentioned?

25  A.    Correct.

```
 1    Q.   Do you know what 1B signifies, like the B --

 2    A.   No.  No.  We have different signifiers.  1As, 1Bs, 1Cs and

 3    1Ds is the ELSUR.

 4    Q.   So it's the electronic --

 5    A.   Exactly.

 6    Q.   So with regard to this case, were there several items of

 7    evidence which were checked out of evidence for purposes of

 8    this trial?

 9    A.   Yes.

10    Q.   I'm going to direct your attention to the box to your

11    right, and I'm going to ask you, if you wouldn't mind, going

12    through each one of those and pulling out those pieces of

13    evidence that you had custody of in the evidence-control room.

14         MR. CHAKRAVARTY:  While he's doing that, your Honor,

15    may I approach with two others?

16         THE COURT:  Go ahead.

17         (Pause.)

18    BY MR. CHAKRAVARTY:

19    Q.   Mr. Gemme, just for purposes of the record, those items

20    that you took out of that box, were those all at the FBI

21    field -- Boston field division's evidence-control room?

22    A.   Yes.

23    Q.   How do you know that?

24    A.   By the 1B number, and also by the bar code number and the

25    file number.
```

 1   Q.   All right.  And were those checked out for purposes of

 2   this case?

 3   A.   Yes.

 4   Q.   Can you just -- for the purposes of the record, just go

 5   through and read each of those 1B numbers into the record?

 6   A.   This is 1B61.  Would you like me to state the file number

 7   also or --

 8   Q.   No, that's fine.

 9   A.   1B61, 1B2, 1B1, 1B4, 1B71, 1B59, 1B29, 1B72, 1B20, 1B16,

01:38 10   1B66, and 1B1.  This is from a Washington field case.

11   Q.   So let me stop you there.  Is it common that evidence is

12   sent from one field division to another field division?

13   A.   Yes.

14   Q.   And how is it usually sent?

15   A.   It is usually sent via FedEx, and also -- and when it is

16   sent, it is transferred through the computer system and

17   accepted in the field division that is receiving it to show

18   that the evidence was transferred, and it also is also

19   transferred on the manual chain of custody.

01:39 20   Q.   So that piece of evidence, the 1B1 that you just mentioned

21   from the Washington field division, did that follow that

22   procedure that you just described?

23   A.   Yes.

24   Q.   Okay.  So it's temporarily in the custody of the Boston

25   field division?

```
 1    A.    Correct.  Correct.

 2    Q.    Continue.

 3    A.    And also, 1B37.

 4          MR. CHAKRAVARTY:  Thank you, Mr. Gemme.

 5          THE COURT:  You're welcome.

 6          MS. PATEL:  No questions, your Honor.

 7          THE COURT:  All right, Mr. Gemme.  Thank you.  You may

 8    step down.

 9          THE WITNESS:  Thank you.

10          (The witness is excused.)

11          MR. CHAKRAVARTY:  Your Honor, the next witness is

12    Agent Greg Hughes.  And there may be some items -- and I don't

13    know.  We had some discussion with my brothers and sisters as

14    to whether there are going to be any issues we should raise

15    before he testifies.

16          MR. CARNEY:  I think that would be useful, your Honor,

17    please.

18          THE COURT:  All right.  Why don't we excuse the jury

19    for a minute and we'll talk about those.

20          THE CLERK:  All rise for the jury.

21          (The jury exits the courtroom at 10:24 a.m.)

22          THE COURT:  You may be seated.

23          MR. CARNEY:  If I may just have one moment to see if

24    we could resolve it?

25          (Counsel confer off the record.)
```

1          THE COURT:  If this is going to take a while, maybe we

2     should take a break.

3          MR. CARNEY:  We're this close.  Honestly.

4          THE COURT:  All right.

5          MR. AUERHAHN:  I think we can say we're ready.

6          MR. CARNEY:  Your Honor, the matter that we requested

7     some time on, we have now resolved.  Prior to this witness, we

8     were going to interpose some objections to the admissibility of

9     certain documents.  We're prepared to alert your Honor as to

01:46 10     what those objections are before the witness comes out, and

11     that way, if your Honor rules, our objections will be noted if

12     you overrule them; if they're sustained, the government will

13     know not to offer the documents.

14          THE COURT:  Okay.  I'm not sure I entirely follow

15     that.  This fellow is from Yahoo?

16          MR. CHAKRAVARTY:  No, your Honor.  This is an FBI

17     agent who extracted from a variety of different sources of

18     evidence.

19          So the preview to your Honor, though, is all of the

01:46 20     FBI kind of interception techniques and the other things that

21     we've heard about the last few days, this witness is going to

22     describe all of those being extracted, and then we'll offer

23     those into evidence.  So to the extent that there's relevancy

24     and 403-type concerns, I suspect that defense has objections

25     with regards to that.

1          THE COURT:  Well, this is like the one issue we had

2     the other day which is when there's a batch offer, in a sense.

3          MS. BASSIL:  Right.

4          THE COURT:  And thinking back on that, and it may

5     apply to this as well, it seems to me there's a kind of

6     two-step process between 402 and 403.  The proponent has the

7     obligation to satisfy 402 by showing that there's enough

8     relevance for admissibility.  Then I think it's the opponent

9     who has the obligation under 403 to show why, notwithstanding

01:47 10     its relevancy, it should be excluded.

11          MS. BASSIL:  Well, if I could --

12          THE COURT:  And so that's the general framework.

13          Then it becomes an efficiency conduct-of-trial issue

14     as to how to make those assessments which may vary within the

15     batch.

16          MR. CARNEY:  Yes.

17          MS. BASSIL:  That's correct.

18          THE COURT:  The thought I had with respect to the

19     other matters, which I think were mostly photographs which we

01:47 20     kind of put aside because of other matters, was that we could

21     figure out some out-of-session way for me to review that with

22     the objections.  And that would probably take some time, given

23     the volume, but that if there were an exhibit that somebody

24     wanted to show during examination to the jury, we could

25     consider those -- I was assuming for these thoughts that that

1   would be a smaller number, and we might be able to just do that

2   as we went along.  Now, I don't know whether that rubric would

3   apply here as well.

4           MR. CARNEY:  Your Honor, that process is entirely

5   acceptable to us.  There might even be -- I'm sorry.

6           MR. CHAKRAVARTY:  I'm sorry.  No.  This witness is not

7   expected to publish any of these materials to the jury at this

8   point.

9           MS. BASSIL:  So we have sort of a general objection,

01:48 10   which I could make now, about the slew of instant messages that

11   they're going to use.  But as to more specific objections, we

12   can give those to you at a later time and give them to you as a

13   group or a list.

14           THE COURT:  Yes.  I think it will be necessary

15   because --

16           MS. BASSIL:  Yes.

17           THE COURT:  Well, let me just leave it at that.  I

18   think it will be necessary to do that because I think the 403

19   kinds of objections are more likely to be particular whereas it

01:49 20   may be that the relevance threshold may be more general.  And

21   so that it may be easier to talk about a group in 402 terms,

22   but you have to talk about individuals in 403 terms.  And

23   that's the difference.

24           MS. BASSIL:  Correct.  Some things are a group and

25   some things are very specific.

1        THE COURT:  Right.

2        MR. CARNEY:  Your Honor, I think the record is clear

3    that even if you put in -- or overrule our initial objection so

4    that the exhibits are admitted, we have preserved our right to

5    revisit the issue with your Honor to focus on individual

6    exhibits.  And since the government has informed me that they

7    don't intend to publish the content of these exhibits to the

8    jury, I believe we're going to be able to move quite quickly

9    through this.

01:50 10        MR. CHAKRAVARTY:  Your Honor, there is one exception.

11    With regard to the stored instant messages communications,

12    Mr. Hughes would describe one of them and how he compared them

13    to what was on the computer and how he extracted it.

14        MR. CARNEY:  Mr. Groharing...

15        MR. CHAKRAVARTY:  The other aspects of this, which

16    hopefully it will streamline it, and we regret we weren't able

17    to arrive at some type of agreement before trial, but the

18    government, in principle, has no objection to the

19    authentication of additional stored communications which the

01:50 20    government is not introducing but were collected from the same

21    source; however, we need to deal with each of those like we're

22    dealing with the government's exhibits because amongst other

23    reasons, those were not finalized in terms of translations.  So

24    we would have to, you know, re-check each of the ones that the

25    defense was --

```
 1              THE COURT:  What's the number of those, do you know?

 2              MS. BASSIL:  Well, for example, your Honor, what I've

 3     done is -- so, for example, the first civilian witness that I'm

 4     going to cross-examine, I went through the exhibits that the

 5     government was going to use in terms of instant messages, and I

 6     have, I think -- I have 11 additional instant messages.

 7              THE COURT:  That's manageable.

 8              MS. BASSIL:  Okay.  And I used -- you have to

 9     understand there were two versions of these instant messages.

01:51 10    So these correspond to the very last version which included

11     translations, all right?

12              And then the other issue was -- and I don't know

13     whether we can take this as each one comes up or not, but in

14     our exhibits that we had sent in ahead of time, all right,

15     there are -- as I call these in a group, there are a number of

16     instant messages; there are four transcripts and telephone

17     calls the government gave us from a witness who is in prison

18     and they recorded his prison phone calls; and then the third

19     group are emails which also the government -- these are

01:52 20    everything the government gave us.  These are not sources that

21     we carved out or we found.

22              THE COURT:  Okay.  So --

23              MR. CARNEY:  The issue that Mr. Chakravarty raised has

24     been satisfied to our satisfaction.

25              THE COURT:  Okay.
```

 1          MS. BASSIL:  And I will give them the ones we're going

 2  to use.

 3          THE COURT:  But that's not for a while anyway.

 4          MS. BASSIL:  Yeah.  Well, it's coming up --

 5          THE COURT:  Let me just understand, so Mr. Hughes is

 6  going to put in a bunch subject to the procedure we've talked

 7  about.  The list that I have now, the linguists are next?

 8          MR. CHAKRAVARTY:  Yes, your Honor.

 9          THE COURT:  Is that going to bring us to the summary

01:52 10  issue that the defendants have briefed?

11          MR. CHAKRAVARTY:  It will in part.

12          MS. BASSIL:  Yes.

13          MR. CHAKRAVARTY:  We've taken some of the issue off of

14  the table in order to expedite today's session, understanding

15  that the linguist will be recalled at some later date when your

16  Honor has come --

17          THE COURT:  I haven't had anything from the government

18  yet, that's why -- at some point we'll have to have an argument

19  about those --

01:53 20          MR. CHAKRAVARTY:  For purposes of today, largely they

21  will be authenticating what they did -- verbatim translations

22  without reading from those.  But there will be about -- for

23  each of them about eight exhibits which they -- the summary

24  translations were prepared but we're not going to be preparing

25  those into evidence, but they will be describing what those

```
 1    substances were.

 2              THE COURT:  Fine.  Fine.

 3              MR. CARNEY:  Excuse me.

 4              (Counsel confer off the record.)

 5              MR. CARNEY:  We're all set, your Honor.  Thank you.

 6              THE COURT:  Now, just to be clear, we have sort of a

 7    scrivener's problem with respect to these batches, whether

 8    to -- because of our system here things get entered as admitted

 9    or not.  I guess my thought was -- and this is what I was

01:54 10    saying the other day, was that they could be provisionally

11    admitted subject to reevaluation on 403 grounds, the thought

12    being that once you pass 402 -- so if that's the case, then the

13    clerk will enter them, but that's a reversible process in the

14    system and we can take them out as appropriate.

15              MS. BASSIL:  I have a suggestion, your Honor.

16              THE COURT:  We want to be sure that the accounting is

17    done well.

18              MS. BASSIL:  Right.  Perhaps we could take a Friday

19    afternoon after the jury leaves -- not this Friday, but -- and

01:55 20    next Friday's a holiday -- but take a Friday after they leave

21    and just do that, go through them.

22              THE COURT:  Well, no.  He'll do it contemporaneously

23    because there's actually time-stamping.

24              MS. BASSIL:  I know I'm not supposed to give away his

25    Friday afternoons.  I'm sorry.
```

 1          THE COURT:  There's time-stamping anyway, so I think

 2   we'll have to do it -- and I don't want to lose the accounting.

 3          MR. CARNEY:  It's necessary for both defense counsel

 4   to consult before next Friday.

 5          THE COURT:  Let's get the jury.

 6          MR. CARNEY:  Can I bring up one issue?

 7          THE COURT:  Oh, with him?

 8          MR. CARNEY:  There was a document marked yesterday,

 9   and I take -- I just want to make clear that that document came

01:55 10   into evidence.

11          MS. BASSIL:  It was an exhibit.  And then we can

12   discuss --

13          THE COURT:  Well, yeah.  Let me find it.

14          MR. CARNEY:  It might be 1076, your Honor.

15          THE CLERK:  1075 is the one that -- I think you had

16   mentioned yesterday.

17          MS. BASSIL:  1075.  It should be a post from the

18   Tibyan Publications, I believe.

19          THE COURT:  Yes, 1075 is in evidence.  You then had

01:56 20   some others you wanted to get in and I think I excluded, and I

21   thought you were going to mark those for identification.

22          MS. BASSIL:  Oh, all right.  I misunderstood.  I

23   marked them as exhibits with the idea they might get excluded

24   later.

25          THE COURT:  No, I think I excluded them at the side,

1    but I suggested they be marked for identification, so those...

2         MS. BASSIL:  We could redo that.  We'll fix that.

3         THE COURT:  I don't know, that was four, five

4    documents, something like that.  We just need the sequence, 76,

5    77, 78.

6         MS. BASSIL:  It was things they gave us; it's just the

7    form was different based on the disk.

8         THE COURT:  Anyway, those should be marked for

9    identification.  And then the next admitted number that's an

01:56 10   add-on should follow those.

11        MS. BASSIL:  Fine.

12        THE COURT:  All right.

13        MR. GROHARING:  Your Honor, we prepared lists of the

14   exhibits that Special Agent Hughes will be offered.

15        THE COURT:  Paul, you go.  You go.

16        MR. GROHARING:  It might be helpful just to have those

17   marked as exhibits not for the jury but for the Court.  What

18   we're going to do is have Special Agent Hughes look at the

19   list, confirm that the items on the list came from a particular

01:57 20   location, and authenticate the individual piece of evidence

21   that way.

22        THE COURT:  Well, it sounds like a summary.  It might

23   be admitted as a summary.

24        MR. GROHARING:  We could admit it the same way.

25        MS. BASSIL:  It would be confusion, your Honor,

frankly, because it's only some exhibits but not others, I

think, to admit it.

THE COURT:  Well, for the time being we could mark it

for identification as the next available government number.

MR. CHAKRAVARTY:  Yes.

THE COURT:  Wherever that left off.

MR. GROHARING:  Is it the Court's preference if I list

on the record the individual exhibits or just provide this

exhibit, if that makes sense?

01:57   THE COURT:  As they're offered, you mean?  I don't

think we have to go through a hundred exhibits by name.

MS. BASSIL:  Why don't we mark that -- I would suggest

marking it for identification just because I think it could be

confusing to the jury because it's not going to be every

exhibit.

THE COURT:  I don't know whether it will or won't.

But, yeah, we'll mark it for the next -- so what is the next

government's number?

MR. CHAKRAVARTY:  794.

01:58   MS. BASSIL:  These are already exhibits, your Honor, I

believe.  These aren't new.  These are already exhibits.

MR. CHAKRAVARTY:  The communications are exhibits, but

the chart from the exhibit list are extractions.  794 would be

the first one.

THE COURT:  Okay.  We're ready for the jury.

```
 1              THE CLERK:  All rise for the jury.

 2              (The jury enters the courtroom at 10:42 a.m.)

 3              THE CLERK:  Please be seated.

 4              THE COURT:  Jurors, thanks for your patience.  We've

 5    solved a couple of things.

 6              Just for the record, now, we'll mark for

 7    identification government's 794, which is a list.

 8              (Government Exhibit No. 794 marked for

 9    identification.)

01:59 10        MR. GROHARING:  Your Honor, we call Greg Hughes.

11                    GREGORY HUGHES, duly sworn

12              THE CLERK:  Please be seated.  State your name, and

13    spell your last name for the record.

14              THE WITNESS:  Gregory Hughes, H-U-G-H-E-S.

15              THE COURT:  Okay, Mr. Groharing, before you begin, do

16    you have an extra copy of that 794 which I could have?

17              MR. GROHARING:  I do, your Honor.

18              (Pause.)

19              MR. GROHARING:  There are actually five separate

02:01 20   exhibits, your Honor, by the different categories of

21    information.

22              THE COURT:  Marked as one for identification?

23              MR. CARNEY:  Yes, your Honor.

24              THE COURT:  Five lists?

25              MR. GROHARING:  Yes, your Honor.
```

```
 1            THE COURT:  Five lists, one exhibit?

 2            MR. CARNEY:  I stapled mine together.

 3            THE COURT:  Yeah, okay.  Thank you.

 4                       DIRECT EXAMINATION

 5   BY MR. GROHARING:

 6   Q.    Good morning, Special Agent Hughes.

 7   A.    Good morning.

 8   Q.    What do you do for a living?

 9   A.    I'm a special agent with the Federal Bureau of

02:02 10  Investigation.

11   Q.    And how long have you been with the FBI?

12   A.    A little less than ten years.

13   Q.    What is your current position?

14   A.    Currently I'm assigned to the Joint Terrorism Task Force

15   conducting international terrorism investigations.

16   Q.    And how long have you been with the Boston Field Office?

17   A.    In total, a little less than ten years.  I did have

18   another assignment for about two years of that time down

19   in -- as a supervisory special agent assigned to our

02:02 20  counterterrorism division at FBI headquarters in Washington,

21   D.C.

22   Q.    Throughout the course of your career, how many

23   investigations have you participated in?

24   A.    Several dozen.

25   Q.    And are you familiar with the investigation in this case?
```

 1  A.   Yes, I am.

 2  Q.   Have you had the opportunity to review certain materials

 3  as a result of your involvement in this case?

 4  A.   Yes, I have.

 5  Q.   I want to ask you about, in particular, intercepted

 6  emails.  Are you familiar with the process that the FBI follows

 7  to obtain authorization and to ultimately intercept emails and

 8  review them?

 9  A.   Yes.

02:03 10  Q.   From an agent at the JTTF's perspective, how does the FBI

11  do that and how do you ultimately review the materials?

12  A.   An agent would submit an application to the court.  And

13  once the court approves the warrant, certain technical

14  connections would be made and the intercepted emails would be

15  collected on a central storage system.  We call it data

16  warehouse system, or DWS.  And we would access those for

17  retrieval and review from our field office.

18  Q.   I want to hand you what's been marked as -- the first two

19  pages of Government Exhibit 794.

02:04 20  A.   (Nonverbal response.)

21  Q.   Are you familiar with the documents that are contained on

22  that list?

23  A.   Yes, I am.

24  Q.   What are they?

25  A.   These are emails that were intercepted that I reviewed on

1    the Data Warehouse System.

2    Q.    How did you confirm that the emails on that list were

3    actually contained on the Data Warehouse System?

4    A.    I reviewed each of the exhibit numbers and items for each

5    exhibit, and compared it to the items that matched it on DWS.

6    So I know that each of the items there were, in fact, the same

7    items on the Data Warehouse System.

8            MR. GROHARING:  Your Honor, at this point I would ask

9    that the items contained on the first two pages of the exhibit

02:05 10   be admitted.

11           THE COURT:  Subject to the procedure we discussed

12   during our recent conference.

13           MS. BASSIL:  Fine.

14           MR. GROHARING:  May I approach, your Honor?

15           THE COURT:  You may.

16           MR. GROHARING:  I have handed the witness the third

17   page of Exhibit 794.

18   BY MR. GROHARING:

19   Q.    Do you recognize that document?

02:05 20   A.    Yes, I do.

21   Q.    What is that document?

22   A.    These are listed items that I also viewed on the Data

23   Warehouse System.  These are -- when the court authorizes the

24   FBI to intercept emails at the initial process, it goes in and

25   basically conducts a search of items that were already on the

1    computer.  And these are emails that were present at the

2    initiation of the interception.

3    Q.   And how did you confirm that those exhibits were on the

4    DWS system?

5    A.   Through the same process.  I opened each of these exhibit

6    items and compared it to the items on the DWS system.

7         MR. GROHARING:  Your Honor, I would ask that these

8    items be admitted as well.

9         THE COURT:  Subject to the same --

02:07 10     MS. BASSIL:  The same here.

11        THE COURT:  May I just be clear?  These are matters

12   that were present on the target computer or something?  He said

13   "present."  I wasn't sure what "present" meant.  Maybe you

14   could clarify.

15   BY MR. GROHARING:

16   Q.   Special Agent Hughes, these particular emails that are on

17   that list, how did those come to be on the DWS system?

18   A.   Sir, again, at the time that interception begins, it

19   takes -- the court authorizes a search, essentially, of

02:07 20  existing items, items that are already on the -- associated

21   with that account that are then collected as well and put onto

22   the system.  So all those items throughout that process are

23   still stored on the DWS system.

24   Q.   And those materials were provided by Yahoo, correct?

25   A.   Yes.

1    Q.    Special Agent Hughes, I want to ask you about a 2009

2    search warrant that was issued on Yahoo.  Are you familiar with

3    that search warrant?

4    A.    Yes, I am.

5          MR. GROHARING:  Your Honor, could I please display the

6    Exhibit 739A for the witness?

7          THE COURT:  All right.

8    BY MR. GROHARING:

9    Q.    Special Agent Hughes, are you familiar with this document?

02:08  10    A.    Yes.

11    Q.    What is it?

12    A.    This is a certification that the records provided by Yahoo

13    are correct and the actual records requested.  So it's

14    basically a confirmation provided by Yahoo in the process.

15    Q.    And this certification came from Yahoo in response to the

16    2009 search warrant you previously discussed?

17    A.    Yes.

18          MR. GROHARING:  Would you please display 739?

19    Q.    Special Agent Hughes, are you familiar with the exhibit

02:09  20    that's currently on the screen in front of you?

21    A.    Yes, I am.

22    Q.    What is that?

23    A.    This is another document that's provided by Yahoo in

24    conjunction with the search warrant.  You could think of it as

25    a cover sheet to the records that were provided.  It provides

1    subscriber information, IP addresses, information associated

2    with that log-in name.

3    Q.   And based on that document, are you able to tell who the

4    owner of that account was?

5    A.   Yes.  It was Tarek Mehanna.

6         MR. GROHARING:  Your Honor, I would ask that Exhibit

7    739 and 739A be admitted.

8         MS. BASSIL:  No objection, your Honor.

9         THE COURT:  All right.  739 and 739A.

02:10 10         (Government Exhibit Nos. 739A and 739 received into

11   evidence.)

12         MR. GROHARING:  May I approach, your Honor?

13         THE COURT:  You may.

14         MR. GROHARING:  I've provided the witness the next

15   page of Exhibit 794.

16         THE COURT:  Okay.

17   BY MR. GROHARING:

18   Q.   Special Agent Hughes, do you recognize that document?

19   A.   Yes, I do.

02:10 20   Q.   What is it?

21   A.   It's the exhibit list of the items that were collected

22   pursuant to the 2009 search warrant on Yahoo.

23   Q.   Okay.  And how did you determine that those items were, in

24   fact, taken from the return of that warrant?

25   A.   So these items weren't stored.  They came from a different

1   process so they weren't stored on the DWS system, but I

2   reviewed the items that were obtained through the search

3   warrant and compared it to the items presented on the exhibits

4   and made sure they were the same.

5           MR. GROHARING:  May I approach, your Honor?

6           THE COURT:  You may.

7   BY MR. GROHARING:

8   Q.   Do you recognize that compact disk?

9   A.   I do.

02:11 10   Q.   What is it?

11   A.   This is the -- items I used -- this is the item -- this

12   contains the items that I used to compare the items on the

13   exhibit list.  So this is a collection of the items that were

14   taken in the 2009 Yahoo search provided by Yahoo.  And it was

15   the point of comparison I used to make sure the exhibits

16   matched those items.

17   Q.   And were you able to determine that the items that are on

18   the page of Exhibit 794 in front of you, in fact, came from

19   that disk?

02:12 20   A.   Yes.

21           MR. GROHARING:  Your Honor, I would also ask now that

22   those exhibits be admitted into evidence.

23           THE CLERK:  What's the number?

24           THE COURT:  Let me just see you at the side for a

25   minute.  I'm not sure I'm following.  Maybe my copy is...

```
 1            (Discussion at sidebar and out of the hearing of the
 2    jury:)
 3            THE COURT:  The fourth page.  You just asked him
 4    whether the fourth page was the product of a search.  The
 5    fourth page I have is intercepted telephone calls.
 6            MR. GROHARING:  It should be --
 7            MS. BASSIL:  It should be --
 8            THE COURT:  I don't have that one.  So here's -- I
 9    have 1 and 2.  We just did those.  That goes up to 297.  And my
02:13 10   next page, it was emails.  This is what he said was stored, I
11    guess, right, at the time they began the interception?
12            MR. GROHARING:  You're missing the stored page, your
13    Honor.  This is from Yahoo.
14            THE COURT:  Okay.
15            MR. AUERHAHN:  Maybe they're just out of order.
16            THE COURT:  Yeah, I think there's just some other
17    order.
18            MS. BASSIL:  That's the fourth page.
19            MR. GROHARING:  FISA was the third page.
02:13 20        THE COURT:  FISA was third and this is the fourth?
21    Okay.  I don't have the FISA page.
22            MR. CHAKRAVARTY:  Why don't you give him that?
23            THE COURT:  Well, I don't need it right now.  I will
24    need it, but now I'm with you.
25            So this is actually page 4, right?  So...
```

```
 1              MR. GROHARING:  The Yahoo server is page 4.
 2              (In open court:)
 3    BY MR. GROHARING:
 4    Q.   So just to be clear, Special Agent Hughes, when you're
 5    referring to items that were seized pursuant to a search
 6    warrant, could you please list the exhibit on the top of that
 7    page that you're referring to, the first exhibit?
 8    A.   Exhibit 390.
 9    Q.   And I believe that is page 4 of the exhibit, your Honor.
02:15 10            THE COURT:  Yes.
11              MR. GROHARING:  At this point, your Honor, I would ask
12    that the documents be admitted.
13              THE COURT:  Yes, subject to the same rule.
14              (Government Exhibit No. 390 received into evidence.)
15    BY MR. GROHARING:
16    Q.   Special Agent Hughes, are you also familiar with the
17    process the FBI uses to review telephone calls that are
18    intercepted pursuant to FISA authorization?
19    A.   Yes, I am.
02:15 20   Q.   And how does a local agent review those types of
21    intercepted calls?
22    A.   The process is different than we would use for an
23    intercepted email, but essentially it starts off the same.
24    Agents apply for -- apply through the court; the court
25    authorizes the warrant.  Once the warrant is approved,
```

1    technical connections are made and the intercepted telephone

2    calls are directed to a device at the field office as opposed

3    to a central repository with emails.  And agents then retrieve

4    those phone calls for review at the field office.

5              MR. GROHARING:  May I approach, your Honor?

6              THE COURT:  You may.

7              MR. GROHARING:  I've handed the witness what's been

8    marked as the fifth page in that Exhibit 794.

9    Q.   Special Agent Hughes, do you recognize that exhibit?

02:16 10   A.   Yes, I do.

11   Q.   Could you please read from the top of that page and

12   describe it for the Court, please?

13   A.   So this is a collection of -- this lists the exhibits of

14   intercepted telephone calls.  It also lists the transcripts of

15   those telephone calls.

16   Q.   And did you confirm that those telephone calls listed on

17   that document were, in fact, taken from the Red Wolf System you

18   previously described?

19   A.   I did.  I took it -- I went to that system, the telephone

02:17 20   collection platform, and created a CD of those telephone calls

21   which were then used to generate this exhibit list.

22   Q.   And I've also handed you a CD.  Is that the CD you just

23   referenced?

24   A.   Yes.  This is the CD I created.

25   Q.   And did you then take those documents that are included as

1   exhibits and compare those calls to the calls on the Red Wolf

2   System to ensure they were the same?

3   A.   Yes.  So I compared -- I created this disk, which I

4   created from the Red Wolf System, which is the name we give to

5   the telephone collection platform.  I compared the calls that

6   were presented as exhibits to the calls on the CD to ensure

7   that they were the same.

8            MR. GROHARING:  Your Honor, I would ask that the list

9   of exhibits contained on page 5 of Exhibit 794 also be

02:18 10  admitted.

11           THE COURT:  On the same condition.

12   BY MR. GROHARING:

13   Q.   Special Agent Hughes, did you also review stored chat

14   sessions as part of your assistance in this investigation?

15   A.   Yes, I did.

16           MR. GROHARING:  May I approach, your Honor?

17           THE COURT:  You may.

18           MR. GROHARING:  I've handed the witness a compact

19   disk.

02:19 20   BY MR. GROHARING:

21   Q.   Special Agent Hughes, do you recognize that disk?

22   A.   I do.

23   Q.   What is that disk?

24   A.   This disk contains items that were downloaded from a

25   computer during an authorized search.

```
 1              MR. GROHARING:  I'm sorry, your Honor.  May I approach
 2     again?  I have one more document to show him.
 3              THE COURT:  Go ahead.
 4     BY MR. GROHARING:
 5     Q.   Special Agent Hughes, on that disk, is it fair to say
 6     that's labeled as Exhibit 1B72?
 7     A.   It's labeled as "1B1" but it's also referred to as "1B72."
 8     Q.   Okay.  And why would it be referred to as both?
 9     A.   Just nomenclature.
02:20 10     Q.   Two separate designations within the FBI file?
11     A.   Right.
12     Q.   You're familiar with the items are on that disk, though,
13     correct?
14     A.   Yes.
15              MR. GROHARING:  I've provided the witness I believe
16     what's pages 6 through 8 of Government Exhibit 794.
17     Q.   Are there three pages to that exhibit, Special Agent
18     Hughes?
19     A.   There's seven.  There might be --
02:20 20     Q.   I'm not even close.  So that's pages 6 through 13 of
21     Exhibit 794.  Is that correct?
22              THE COURT:  Twelve, actually.  Six through 12,
23     inclusive.
24              Just for clarity, could you give the first exhibit
25     number and the last exhibit number?  That might --
```

BY MR. GROHARING:

Q.   If you could, Special Agent Hughes, just read the first

exhibit number on that list.

A.   Yes.  The first exhibit number is 495.

Q.   And what is the last exhibit number?

A.   The last exhibit number is 737.

Q.   Are you familiar with those exhibits?

A.   Yes, I am.

Q.   And have you had the opportunity to review those exhibits

02:21 and compare them to what's found on the disk that you

previously talked about?

A.   Yes.  So on this disk contains some of the chats that were

downloaded from the computer, and this exhibit list is some of

those chats that are contained on this disk.  And what I did

was compared the chats on the disk to the chats listed in the

exhibit list to ensure they are the same.

        MR. GROHARING:  Your Honor, at this point I'd offer

the exhibits.

        THE COURT:  All right.  On the same conditions.

02:22        MR. GROHARING:  Your Honor, I would like to display

Exhibit 738A for the witness only.

BY MR. GROHARING:

Q.   Special Agent Hughes, are you familiar with this exhibit?

A.   Yes, I am.

Q.   What is it?

1    A.   It's a certification that accompanies the return of

2    records request.  In this case it accompanies the return of

3    records requested from Pakistan International Airlines

4    certifying that the records provided are accurate.

5           MR. GROHARING:  Okay.  Could I please have Exhibit

6    738?

7    Q.   Do you recognize Exhibit 738?

8    A.   Yes.  So these are the actual records provided by

9    Pakistani Airlines.

02:23 10          MR. GROHARING:  Your Honor, I would ask that Exhibit

11   738A and 738 be admitted into evidence.

12          MS. BASSIL:  Same, your Honor.

13          THE COURT:  Same?

14          MS. BASSIL:  With the same provisions we had discussed

15   earlier, your Honor.

16          (Government Exhibit Nos. 738A and 738 received into

17   evidence.)

18          THE COURT:  All right.  We've gone past 11.  I think

19   we'll take the morning recess at this point.

02:23 20          THE CLERK:  All rise for the Court and jury.  The

21   Court will take the mornings recess.

22          (The Court and jury exit the courtroom and there is a

23   recess in the proceedings at 11:07 a.m.)

24   (Court in at 11:34 a.m.)

25          MR. CARNEY:  Your Honor, I asked if we could see you

       1    prior to the jury coming out in the interests of efficiency.

       2          I can alert your Honor that I believe the government

       3    is virtually done with this witness, and our cross-examination

       4    will be very brief.  And then we would be asking to raise an

       5    important legal issue before your Honor.

       6          Just to set it up, the government intends to call

       7    translators who have translated documents.  We're not

       8    contending that the verbatim translation of a full document is

       9    inaccurate.  Therefore, if the document is admissible, the

02:52 10    translation is admissible.

      11          Where we have a problem is the government has certain

      12    documents that it has not fully translated, and they will

      13    attempt to have a translator explain what the document is

      14    about.  And we object to that on a number of grounds.  When

      15    they were going to offer it in writing, we submitted to your

      16    Honor a memorandum of law indicating what the objections were.

      17    And just to revisit them very briefly, the Rule of Verbal

      18    Completeness; the Best Evidence Rule; the summary witness

      19    limitations; the right of the defendant to confront the

02:53 20    evidence against him, meaning if it's an Arab document that

      21    they're offering, he has a right to confront by seeing what the

      22    translation of it is.  The jury should be able to look at it,

      23    also.

      24          Finally, and certainly not least, is the fact that

      25    someone may be able to translate a document from one language

1    to another, but that doesn't give that witness an expertise to

2    explain that.  For example, if a witness could translate the

3    play Henry V from English to French, then that would be the

4    skill.  But would that witness be allowed to say that her

5    summary of what this play is about is that an English king goes

6    to France.  France valiantly defends their country.  They

7    spectacularly perform with integrity and bravery.  And through

8    mere luck, the king gets to win, and then when he returns to

9    England, he gets married, as opposed to people reading the

02:54 10   actual words of the Shakespeare play.

11        Any other context that we could put it in this court

12    would illustrate that no witness would be allowed to take a

13    written document in English and tell the jury what they think

14    the important things are.  Let me give you a specific example

15    to compare the verbatim translation with the summary.  In one

16    of the summaries, the translator contends that a portion of the

17    document says, "It is spreading the call to Islam."  The Arabic

18    text is actually so much more elaborate and says, "This is

19    spreading the call of God, the Glorious, and the message of his

02:55 20   religion, his book, and following in the path of his chosen

21    prophet in the terms of mercy, truthfulness, generosity,

22    fellowship, patience, and endurance, steadfastness and the

23    pursuit of Islamic works."

24        There is a huge difference between those two.  And

25    just as I would object if written summaries would come in, I

1    submit that a translator cannot be permitted to give his or her

2    impression of what a document is about.  Thank you.

3            THE COURT:  Mr. Chakravarty.

4            MR. CHAKRAVARTY:  Thank you, your Honor.  Your Honor,

5    the first item I'd want to address is to clarify that summary

6    translation documents were created by these linguists.  We've

7    provided those to defense.  We have marked them for

8    identification as exhibits.

9            We are not seeking to introduce those summary

02:56 10    translation exhibits into evidence largely persuaded by counsel

11    that there is some risk, although the government's case

12    research evidences that there is some support, also.  But we

13    think that's unnecessary to kind of cross that bridge.

14            What we're talking about here, then, is not a summary

15    exhibit, and that's not the proper lens through which to look

16    at this.  Rather, this is an item of evidence, which is in

17    evidence, which the jury doesn't know what it is.  And the

18    witness is simply going to tell the jury what that witness'

19    assessment is of what the thing is.

02:57 20            If it was a lay witness, the government would offer

21    that that would be sufficient.  If you go into somebody's

22    house, you see a book, you seize the book.  You say, I found a

23    book, and this is what the book was.  But in this case, we

24    actually have an expertise of these witnesses that is outside

25    the kin of the jury so that they can further go on to say, I've

1    looked at that book.  I've read that book, and I know what that

2    book is, not the interpretation, not the liturgical -- in a

3    teleological sense of what the book purports to say and where

4    it's from but, rather, this is what the book is.  And, you

5    know, that can be a paragraph long description.  It can be a

6    couple of sentences long description, which is the government's

7    intention certainly for purposes of today.

8            The exhibits, there are about -- I think I intimated

9    earlier, about eight to ten exhibits which the government would

02:57  10    have -- which were seized -- the first set were seized in the

11    defendant's room in 2006.  They've been admitted into evidence

12    as Arabic language documents, which the jury doesn't -- can't

13    understand.  The witness is simply going to say, I read this

14    document.  This is what that document is.  That is something

15    that's not only helpful.  It's essential for the jury to get

16    the benefits of that expertise.

17            And addressing Mr. Carney's concerns, they can dispute

18    that.  They can present contrary evidence.  They can -- they

19    have the right to confront.  They have the ability and the

02:58  20    resources to create a verbatim translation if they so choose if

21    they feel like there has been some misapprehension conveyed to

22    the jury.

23            So through that lens of reference, whether it be 703

24    or just, I guess, 402, that this is relevant information that

25    the jury needs in order to assess the evidence.  For that

1    reason, this is not a summary exhibit, which was essentially

2    the case law that counsel put forward.

3             THE COURT:  I agree with the defense objection.  I

4    don't see a difference between written summaries and oral

5    summaries.  So I think a translation of all or part -- I mean,

6    I don't think it's necessary that the entire document be

7    translated if the government intends only to point to some part

8    of it.  I think it would be sufficient for an excerpt to be

9    faithfully translated.  It would have to be -- there would be

02:59 10  an opportunity to contextualize it, but I think that would

11   shift back to the defendant to do that.  So one possibility is

12   literal translation.

13             I would agree that a 702 expert could comment on the

14   substance, in summary form, of an extended document, but the

15   relevant expertise would be, as Mr. Carney points out, in the

16   subject matter, not in the translation.  So that if you had a

17   -- to use his example, if you had a French translator who was

18   also a Shakespearean scholar, then you could do both:  vouch

19   for the translation and vouch for the interpretation.

03:00 20            But that's because of the latitude that we give to

21   Rule 702 witnesses, that their opinions must be soundly based.

22   But the subject -- the reasons for the opinion don't

23   necessarily have to be independently admissible, and so we give

24   wider latitude.

25             I don't know if these linguists could qualify in that

1    way.  If they could, then I would be receptive to that kind of

2    testimony.  But I think, as linguists only, as translators

3    only, they don't have the expertise to summarize.

4         I think the government has conceded they're not

5    summary in the 1006 sense, and I think that's true because,

6    unlike the summary, which is the product of simply compilation,

7    commonly mathematical, where you can be satisfied as to the

8    validity of the summary because of the methodology applied,

9    such as addition.  With respect to the summary of a narrative,

03:01 10   there's an intellectual intercession by the summarizer, and

11   that can be permitted in 702 context, but I don't think,

12   outside of 702, it would be proper.

13        MR. CHAKRAVARTY:  That's clear, your Honor.  For

14   purposes of today, then, those witnesses obviously will not be

15   talking about each of those exhibits until a verbatim

16   translation can be prepared for portions of those exhibits.

17   And as we will do then -- thank you for that guidance because

18   with regards to videos and other pieces of evidence for which

19   we now have summaries, we will do portions of verbatim

03:01 20   translations that may affect -- for purposes of notice, it may

21   affect the specific clips that have been marked for

22   identification with regards to portions of those videos.

23        THE COURT:  All right.  It may necessitate re-calling

24   the witnesses.

25        MR. CHAKRAVARTY:  Correct, your Honor.

1          MS. BASSIL:  Your Honor, just so it's clear, there's a

2     civilian witness tomorrow -- I think I counted five videos that

3     are in Arabic.  And so -- that had translation after them and

4     they are summary translations.  So what does that mean?

5          MR. AUERHAHN:  Your Honor, I advised Miss Bassil that

6     we're not going to use the translations with the witness.  For

7     her convenience, I put it on the list.

8          MS. BASSIL:  That was before we had the discussion.  I

9     know that.

03:02 10          MR. AUERHAHN:  We're not going to seek to introduce

11     the translations of the videos.  Some segments of the video

12     clips we'll play.  One is the Umar Hadeed, which has subtitles.

13     The others, the image is all you need.  You don't need, for the

14     purpose of the witness tomorrow, the translation.

15          MS. BASSIL:  Okay.  I may raise that tomorrow.

16          THE COURT:  Okay.  Ready for the jury?

17          MR. CARNEY:  Yes, your Honor.

18     (The jury entered the room at 11:47 a.m.)

19          MR. GROHARING:  Your Honor, I'd ask for permission to

03:04 20     display Exhibit 740A for the witness.

21          THE COURT:  Okay.

22     Q.    Special Agent Hughes, do you recognize that document?

23     A.    Yes, I do.

24     Q.    What is it?

25     A.    This is a Certificate of Authenticity pursuant to a

1    request of records from Comcast.

2            MR. GROHARING:  Permission to display Exhibit 740.

3    Q.   Do you recognize that exhibit, Special Agent Hughes?

4    A.   Yes.  That's the actual records that were provided by

5    Comcast.

6            MR. GROHARING:  Your Honor, I would ask to admit those

7    records, Exhibit 740A and Exhibit 740.

8            MS. BASSIL:  No objection, your Honor.

9            THE COURT:  Okay, 740 and 740A are admitted.

03:05 10    (Exhibit No. 740A received into evidence.)

11    (Exhibit No. 740 received into evidence.)

12            MR. GROHARING:  Your Honor, permission to display

13    Exhibit 742A for the witness.

14    Q.   Special Agent Hughes, do you recognize that exhibit?

15    A.   Yes, I do.

16    Q.   What is it?

17    A.   It's a Certificate of Authenticity for records provided by

18    AT&T.

19            MR. GROHARING:  Permission to display Exhibit 742.

03:05 20            THE COURT:  Okay.

21    Q.   Special Agent Hughes, do you recognize that exhibit?

22    A.   Yes, I do.  These are the actual records provided by AT&T.

23            MR. GROHARING:  Thank you.  Your Honor, permission to

24    admit Exhibits 742A and 742.

25            MS. BASSIL:  Your Honor, 742 is subject to what we had

```
 1   spoken about before.
 2           THE COURT:  Is that a multipage?
 3           MS. BASSIL:  It's multipage, yes.
 4           THE COURT:  Okay.  We'll admit it under those
 5   conditions.
 6   (Exhibit No. 742A received into evidence.)
 7   (Exhibit No. 742 received into evidence.)
 8   Q.   Just to be clear, when I ask you, Special Agent Hughes --
 9   if I ask you about an exhibit, I'm asking you about all pages
10   contained within that exhibit.
11   A.   Yes, I understand.
12           MR. GROHARING:  Your Honor, permission to display
13   Exhibit 743A.
14           THE COURT:  Okay.
15   Q.   Special Agent Hughes, are you familiar with that exhibit?
16   A.   Yes.  This is a Certificate of Authenticity certifying
17   that the records provided by Verizon are authentic.
18           MR. GROHARING:  Permission to display Exhibit 743,
19   your Honor.
20           THE COURT:  Okay.
21   Q.   Special Agent Hughes, are you familiar with that exhibit?
22   A.   Yes.  These are the actual records provided by Verizon.
23           MR. GROHARING:  Your Honor, the government offers
24   Exhibit 743 and 743A.
25           MS. BASSIL:  Your Honor, again, subject to the same
```

1     provisions.

2            THE COURT:  Okay.

3     (Exhibit No. 743A received into evidence.)

4     (Exhibit No. 743 received into evidence.)

5            MR. GROHARING:  Your Honor, permission to display

6     745A.

7     Q.   Special Agent Hughes, are you familiar with that exhibit?

8     A.   Yes.  This is a Certificate of Authenticity that

9     accompanied records provided by Eastern Bank.

03:07 10           MR. GROHARING:  Permission to display Exhibit 745.

11            THE COURT:  Yup.

12    Q.   Special Agent Hughes are you familiar with that exhibit?

13    A.   Yes.  These are records that were provided by Eastern

14    Bank.

15            MR. GROHARING:  Your Honor, the government would offer

16    Exhibits 745 and 745A.

17            MS. BASSIL:  Your Honor, 745, subject to the same

18    provision.  745A, no objection.

19            THE COURT:  Well, is there any need for that on this?

03:08 20   I don't know what's in them.  This is a little different from

21    some of the communication ones.

22            MS. BASSIL:  Yes, there is.

23            THE COURT:  There is, okay.

24    (Exhibit No. 745A received into evidence.)

25    (Exhibit No. 745 received into evidence.)

1          MR. GROHARING:  Your Honor, permission to display

2    Exhibit 247.

3          THE COURT:  247?

4          MR. GROHARING:  Yes, your Honor.

5          THE COURT:  Okay.

6    Q.   Special Agent Hughes, earlier I asked you about a number

7    of exhibits -- a number of emails that were obtained pursuant

8    to a FISA search.  Are you familiar with the exhibit that's

9    contained on the screen?

03:08 10   A.   Yes.  As in other searches, this is the -- again, you can

11   think of it as the cover sheet to the records.  It identifies

12   the subscriber information and other information that was

13   entered associated with the screen name or login name.  So it

14   accompanied the return of the search warrant.

15         MR. GROHARING:  Your Honor, the government offers

16   Exhibit 247.

17         MS. BASSIL:  No objection.

18         THE COURT:  Okay.  That's admitted.

19   (Exhibit No. 247 received into evidence.)

03:09 20   Q.   Special Agent Hughes, earlier you talked about a CD that

21   you still have at the witness stand with you.  You described it

22   as 1B1 markings on it.  Could you please explain for the jury

23   where that CD came from?

24   A.   So this CD is a -- evidence that was collected pursuant to

25   a search warrant in 2006.  And there was a bigger piece of

1    evidence collected.  This CD represents a section of that

2    evidence.  So it's -- we would call it a derivative evidence

3    from a larger piece, almost like a chapter of a book.

4    Q.   What is that larger piece?

5    A.   So the larger piece was a review of the hard drive of a

6    computer, and these are -- this CD, among other things,

7    contains chats that were stored on the hard drive.

8    Q.   Are you familiar with the particular hard drive that

9    you're referring to?

03:10 10   A.   Yes.

11   Q.   Whose hard drive was that?

12   A.   That was Tarek Mehanna's.

13        MR. GROHARING:  One second, please, your Honor.

14        No further questions, your Honor.

15   CROSS-EXAMINATION BY MS. BASSIL:

16   Q.   Good afternoon.

17   A.   Good afternoon.

18   Q.   Agent Hughes, I wanted to ask you a question about a few

19   things.  First, you talked about emails that you received from

03:11 20   a search warrant served on Yahoo in 2009?

21   A.   Yes.

22        MS. BASSIL:  If we could have Exhibit 439 come back up

23   and if we could scroll down.

24   Q.   Agent, from this, this was -- this told you what Yahoo

25   sent to you, is that right?

1    A.    Yes.  In the course of the request, Yahoo provides all of

2    the information associated with that screen-in name or login

3    name.

4    Q.    And so -- I just want to be clear.  You took -- he

5    reviewed certain emails, correct?

6    A.    Yes.

7    Q.    And those emails were on your system, this system that you

8    talked about?

9    A.    Yes.  Well, from -- is this the 2009 search?

03:12 10   Q.    Yes.

11   A.    So no.  Those emails weren't listed on our DWS storage

12   system.  Those -- emails from this search warrant were stored

13   in evidence, and then it's from the items in evidence that I

14   looked at the emails.

15   Q.    Did you look at all the emails?

16   A.    No.

17   Q.    You only looked at certain emails?

18   A.    Yes.

19   Q.    How did you determine which emails you looked at?

03:12 20   A.    I compared the emails that were going to be presented on

21   exhibits to emails on the disk.  So the emails I looked at were

22   only the ones that were going to be presented in court.

23   Q.    And do you know who selected those emails?

24   A.    The case agents.

25   Q.    The case agents.  That would be Heidi Williams and Tom

1  Daly?

2  A.   Yes.

3  Q.   Now, what I -- so on the -- you had a number of

4  intercepted -- you had a number of emails and a number of

5  people, is that correct, that you matched to make sure that

6  these emails were the ones that they had given you?

7  A.   Yes.  I compared -- I made sure that they were the same

8  ones.

9  Q.   If you would look at Exhibit 739, it says, "Messenger

03:13 10  friend list."  Do you see that?

11  A.   I do.

12  Q.   There are far more people on that -- far more email

13  addresses on that then you compared for exhibits, correct?

14  A.   I didn't -- yes.  There's more email addresses on that

15  than I looked at.

16  Q.   Do you know how many emails were received from Yahoo

17  pursuant to this 2009 search warrant?

18  A.   I don't.

19  Q.   Do you know how many people -- different people -- like,

03:14 20  one person could send more than one email.  Do you know how

21  many separate people sent emails pursuant to that 2009 search?

22  A.   I do not.

23  Q.   Now, the same thing I wanted to ask you about were these

24  intercepted telephone calls.  And I believe you examined, I

25  would say, about 25 intercepted telephone calls.  If you want

```
 1   to look at your chart, you could.
 2   A.   I don't have the list in front of me.  It was -- I can't
 3   remember the exact number, but it was --
 4   Q.   I'm sorry.  About 12, actually?
 5   A.   About a dozen, yes.
 6   Q.   About 12 or so?
 7   A.   That sounds right.
 8   Q.   Were you aware of how many telephone calls in total were
 9   intercepted?
10   A.   I was not aware.
11   Q.   So you were given -- again, who gave you the telephone
12   calls that you matched against the evidence that you had?
13   A.   The case agents.
14   Q.   Did you have any discussion with the case agents about how
15   they selected certain telephone calls?
16   A.   No, I didn't.
17   Q.   Now, turning to the instant messages, you had matched --
18   let me ask you about this.  All right.  So instant messages or
19   chat, this is when two people are on a computer in different
20   places, right?  Are you familiar with this?
21   A.   With the process of instant messaging?
22   Q.   Yes.
23   A.   Yes.
24   Q.   So two people are in two different locations on computers,
25   correct?  And one person types some message, and the other
```

1   person responds, correct?

2   A.   Okay.  Yes.

3   Q.   So it's kind of like -- it's almost like a telephone call

4   except you're using a computer; would that be fair to say?

5   A.   I don't know if I'm the right one to ask.  You could

6   expand it out for an email.  So, no, I wouldn't say that.  I

7   would say it's different.

8   Q.   But it is someone who is using -- two people who are using

9   their computer to sort of have a conversation at the same time?

03:16 10   A.   Okay.  Yeah.  It's two people exchanging information, yes.

11   Q.   So like an email, for example, I might send you an email

12   in the morning, and you might get back to your office and

13   respond to me in the afternoon?

14   A.   Okay.

15   Q.   That's different than these chats?

16   A.   As far as time?

17   Q.   Yes.

18   A.   From your example, yes.

19   Q.   Now, do you know how many chats -- and the chats were

03:17 20   received pursuant to what?  That was from the computer, the

21   2006 computer?

22   A.   Yes.

23   Q.   From the hard drive?

24   A.   That's correct.

25   Q.   And are you familiar with -- are you familiar with whether

1    or not chats -- a company that provides your computer service,

2    can they access your chats, do you know?

3    A.    I do not know.

4    Q.    Okay.  But these chats were stored on the hard drive?

5    A.    Correct.

6    Q.    And do you know how many chats there were in total?

7    A.    I don't.

8    Q.    Do you know there were over 3,000 pages of chats once they

9    were transcribed?

03:17 10    A.    I didn't view every chat, so I don't know an exact number.

11    Q.    You only knew the chats that you were given a list of, is

12    that correct?

13    A.    Yes.

14    Q.    Do you know who chose what chats?

15    A.    Case agents.

16    Q.    Did you have any discussion with the case agents about

17    what chats they chose?

18    A.    No, I didn't.

19    Q.    And, again, if I can ask you, on the emails that you

03:18 20    received from Yahoo --

21        MS. BASSIL:  If you could pull up 247 just for the

22    witness.

23    Q.    This is the Yahoo account management tool, correct?

24    A.    Yes.

25    Q.    And do you know for what length of time emails were

1  obtained?  Was it from what date to what date?

2  A.   I don't.

3  Q.   Do you know how many emails were received from Yahoo?

4  A.   I don't.

5  Q.   And, again, all you did -- what you did was -- strike

6  that.

7      The agents gave you the emails, and you made sure they

8  were the same emails they gave you?

9  A.   No.  I made sure that the ones that were going to be

03:18 10  submitted as evidence were -- I verified the source of the

11  information so that it came from either -- whatever search

12  generated the evidence.

13  Q.   So when Yahoo sent the emails, I assume they sent it on a

14  CD?

15  A.   It depends which one.

16  Q.   Okay.

17  A.   Sometimes it was electronic.  Sometimes it was on a CD.

18  Q.   Were some of the emails on a CD, for example?

19  A.   I don't know how it was received.  The ones I viewed were

03:19 20  on a CD.  And some of them were viewed on the central system.

21  Q.   How did Yahoo send it, do you know?

22  A.   I don't.

23  Q.   And how -- who made the CD that you looked at?

24  A.   On one of them -- depending on which one.  It was

25  different agents in the process and through -- you know,

1    submitted into evidence and then pulled back out for my review.

2    Q.   And you don't know -- do you know where the agents got

3    that information?

4    A.   Yeah.  They would list it.  When the evidence is received,

5    we have procedures where it's -- the source of the evidence is

6    documented, and then it's put into, you know, an evidence

7    control area that has limited access.  And then as it's

8    necessary to review that evidence, we would go check it out,

9    document that it was checked out, for what purpose, review it

03:20 10   as necessary, and then resubmit it back into the evidence

11   control.

12   Q.   Okay.  But what you reviewed, for example, was not all of

13   the emails sent or received by Tarek Mehanna?

14   A.   Correct.  I didn't review all of them.

15   Q.   And you did not review all of the instant messages that

16   were exchanged back and forth between Tarek Mehanna and another

17   person?

18   A.   No, I did not.

19   Q.   And you did not review all of the telephone calls that

03:20 20   went back and forth between Tarek Mehanna?

21   A.   No, I did not.

22        MS. BASSIL:  Thank you.  I have no other questions.

23        THE COURT:  In my role as chief accountant, I just

24   want to be sure that -- there was reference to 739.  My notes

25   don't indicate that that was offered, even under the conditions

1    that we've been admitting these.  I don't know whether that was

2    intentional or not.  Maybe my notes are wrong.  That's the

3    Yahoo certification.

4           MS. BASSIL:  Right.  I just want to see it, and then I

5    will be able to say.  If it wasn't, I have no objection to it

6    being an exhibit.

7           THE COURT:  Okay.  It may have been my error.

8           MS. BASSIL:  It was?

9           THE COURT:  That's what the clerk says.

03:21 10        Mr. Groharing.

11   REDIRECT EXAMINATION BY MR. GROHARING:

12   Q.   Special Agent Hughes, I just want to clarify a couple

13   points about the various searches that you were involved

14   reviewing in this case.  You testified about some emails that

15   were intercepted pursuant to FISA authorization.  Now, when you

16   reviewed those emails, how did you do that?

17   A.   Those emails would be stored on our central system.  So we

18   would review them through the computer, through accessing the

19   Data Warehouse System.

03:22 20   Q.   Is it fair to say that when an email is intercepted

21   pursuant to FISA, it comes to the FBI electronically and then

22   into that system?

23   A.   Yes.

24   Q.   Now, you also testified about some emails that were

25   provided by Yahoo pursuant to a search warrant?

     1   A.    Yes.

     2   Q.    When emails are provided pursuant to a search warrant, how

     3   are those provided to the FBI?

     4   A.    It depends.  It could be on a CD, or it could be --

     5   records could be provided electronically.  So it really depends

     6   on the amount and everything.

     7   Q.    In this case, regarding the 2009 Yahoo search that you

     8   referenced, do you know how those emails were provided to the

     9   FBI?

03:23 10   A.    Yes.  These are provided on a compact disk, a CD.

    11   Q.    Is it correct to say that you then reviewed a CD that was

    12   made from that CD with a subset of the emails provided by

    13   Yahoo?

    14   A.    Right.  There were -- I reviewed the CD that was the

    15   subset of the total records returned by Yahoo.  Because there

    16   were certain conversations that maybe were relevant to

    17   attorney-client privilege relationships that were not

    18   necessary, and in order to maintain that relationship, those

    19   were walled off and not made available for review.  So the only

03:23 20   ones that I could review were the ones pertinent.

    21          MR. GROHARING:  Nothing further, your Honor.

    22          MS. BASSIL:  Just one question.

    23   RECROSS-EXAMINATION BY MS. BASSIL:

    24   Q.    You said that -- so did you review -- other than those

    25   emails that might have been between my client and his attorney,

1    you did or did not review all of the 2009 emails from Yahoo?

2    A.    So there was -- I don't know exactly how many were

3    provided by Yahoo, but I reviewed a disk that was created that

4    I know was a subset of the actual disk provided by Yahoo.   So

5    there was -- whatever percentage of that total amount was on

6    the disk that I reviewed because of certain reasons.   There's

7    certain information, like attorney-client privilege.

8    Q.    I understand.

9    A.    So the CD that I reviewed contained all the emails -- it

03:24 10   was in a pdf format.   So it was a very large format.   In

11   identifying and locating the ones specifically for

12   identification, you know, I'd scroll through multiple,

13   multiple, you know, emails.   So there might be ones that I

14   didn't pay attention to that -- but I would, in the process of

15   scrolling through this big, long document, you know, I might

16   have seen.

17   Q.    So how many emails did you scroll through in this big,

18   long document?

19   A.    The total number, I don't know.   I was -- I was

03:25 20   concentrating on just identifying the specific ones to make

21   sure to verify the source.

22   Q.    Did you identify them -- you identified them by date?

23   A.    Yes.

24   Q.    Or by number?

25   A.    By date and by body, you know, to the text of the email to

1    make sure it was an actual -- the actual copy.

2    Q.   And paid no attention to the other emails?  That was not

3    your job?

4    A.   Yeah.  If I did, it was peripheral as I scrolled by, but I

5    didn't pay detailed attention to, oh, this email was sent on

6    this date, no.

7    Q.   How long do you think this document was that you had to

8    scroll through?

9    A.   I don't know.  I don't know how to describe it.  It was

03:26 10   extensive, so printed out, it would be several pages, maybe

11   hundreds of pages.

12   Q.   Not the -- the emails themselves would be hundreds of

13   pages or the names of the emails would be hundreds of pages?

14   A.   Oh, no, the emails themselves because the format that I

15   reviewed it was a pdf of the document.  So all the emails were

16   listed in their entirety with header information, and I would

17   scroll through those in order to identify it to the one that I

18   needed.  So I couldn't guess how many pages it would be.

19              MS. BASSIL:  Thank you.

03:26 20         THE COURT:  All right, Mr. Hughes.  You may step down.

21              MR. CHAKRAVARTY:  The government calls Leah Vallee.

22              THE CLERK:  Ma'am, want to step up here, please.

23   Remain standing.  Raise your right hand.

24              LEAH VALLEE, Sworn

25              THE CLERK:  Please be seated.  State your name.

```
 1              THE WITNESS:  Leah Vallee.

 2              THE CLERK:  And spell it for the record, please.

 3              THE WITNESS:  L-e-a-h; last name, V-a-l-l-e-e.

 4    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

 5    Q.   Good afternoon, Miss Vallee.

 6    A.   Hello.

 7    Q.   Where do you work?

 8    A.   I work for the FBI.

 9    Q.   What do you do there?

10    A.   I'm a translator.

11    Q.   What language do you translate?

12    A.   English into Arabic and Arabic into English.

13    Q.   How long have you worked at the FBI?

14    A.   Ten years.

15    Q.   Is Arabic your native tongue?

16    A.   Yes.

17    Q.   How long have you worked as a translator in any capacity?

18    A.   The entire ten years with the Bureau, and prior to that, I

19    did some tutoring and a little work here and there.

20    Q.   What language were you educated in?

21    A.   French and Arabic.

22    Q.   When did you learn English?  When did you begin to learn?

23    A.   Sixth grade, I think, fifth grade.

24    Q.   What was the medium of study through high school for you?

25    A.   Just general course of studies.
```

```
 1   Q.   In terms of what language was your course of studies?
 2   A.   All three at that point, all three languages.
 3   Q.   Did you receive education after high school?
 4   A.   Yes.  I went to college.
 5   Q.   Did you get a degree?
 6   A.   Yes, political science and international relations.
 7   Q.   Where was that from?
 8   A.   At UMass Boston.
 9   Q.   You mentioned you did tutoring in Arabic.  What did that
10   entail?
11   A.   Yeah, with little kids during summertime.
12   Q.   What language do you use in your personal life?
13   A.   Both Arabic and English.
14   Q.   Do you have family overseas?
15   A.   Yes.
16   Q.   In an Arabic-speaking country?
17   A.   Yes.
18   Q.   What language do you use when you go there?
19   A.   Arabic.
20   Q.   How frequently do you go back?
21   A.   Every couple of years.
22   Q.   Do you speak and write Arabic fluently?
23   A.   Yes.
24   Q.   How about English?
25   A.   Yes.
```

```
 1    Q.   To become a translator at the FBI -- excuse me, a linguist
 2    at the FBI, do you have to demonstrate some proficiency?
 3    A.   Of course.
 4    Q.   Describe what that entails.
 5    A.   We have to take a series of tests.  I think we begin with
 6    the written exam.  And that's -- I think that's two parts or
 7    three parts.  I can't remember.  It's been awhile now.  It's
 8    been about 12 years maybe.  I think it's two or three parts.
 9    You pass the first phase.  You move on to the next one.  That's
10    the written one.  When you pass all two or three parts of the
11    written test, you move on to the oral test.
12    Q.   Who determines whether you're proficient enough to
13    translate for the FBI?
14    A.   Not sure where the written test goes, but I know we're
15    tested by a board of two or three people doing the oral test.
16    So --
17    Q.   But they're FBI?
18    A.   They're testers, yes; they're FBI testers.
19    Q.   Is that across the FBI in the various different languages,
20    in the various different field offices?
21    A.   Yes.
22    Q.   Before you became employed by the FBI, did you have to
23    undergo that procedure?
24    A.   Yes.
25    Q.   Okay.  Obviously, you passed?
```

A.    Yes.

Q.    You mentioned that you had been -- you took it maybe 12

years ago.  Is that before you actually were employed by the

FBI?

A.    Yes.  The application process takes awhile, so I think the

first part of the application process is the test itself.  And

that takes few months between the written and the oral, and

then they do your background and everything else.  So it takes

awhile.  And I started with the Bureau in 2001, so probably

took the test in 1999 or 2000.  I'm not exactly sure.

Q.    Then after you -- I assume you were hired.  And then was

there periodic testing, or was there a way to determine whether

you were still proficient?

A.    Well, we go through a lot of training.  There's a number

of mandatory credits that we have to take every year for

training purposes.  And then we have internal quality control

process.  And there's also the operational review process that

we do.  The operational review process takes place pretty much

every time we translate a product.  The quality control is a

percentage of the work we do.  And it goes out of the office,

and there's qualified reviewers who would review your work and

decide if it's satisfactory or not.

Q.    Is it fair to say there are a variety of different types

of translations that you're asked to do?

A.    Yes.

1    Q.   Verbatim translation is one way that you translate items?

2    A.   Yes.

3    Q.   Describe what verbatim translation is.

4    A.   It's not a summary.  You take the whole product from one

5    language and you produce it in another language.

6    Q.   So it's like word for word, essentially?

7    A.   Yes.  Well, I --

8    Q.   You hesitate.  Why wouldn't it be word for word?

9    A.   Because it's tricky, word for word, because there are

03:33 10   expressions that you can't produce word for word in a different

11   language.  So you have to find the equivalent.  So it may not

12   be word for word, but it's the complete sense or expression

13   that you transform into the other language.

14   Q.   And that -- you're taking the equivalent words from Arabic

15   and translating into English or vice versa?

16   A.   Or the other way around, correct.

17   Q.   In the course of your work at the FBI, have you had

18   occasion to translate all sorts of documents and other media?

19   A.   Oh, yes.

03:33 20   Q.   Could you venture a guess on how many items that you have

21   translated?

22   A.   Throughout the years?

23   Q.   Yes.

24   A.   Tens of thousands of pages at this point, hundreds of

25   hours of audio material.

1    Q.    Is your work reviewed by other FBI linguists?

2    A.    Yes.

3    Q.    You mentioned there was an operational review.  Describe

4    what that entails.

5    A.    It's a little informal process where the original linguist

6    would translate the work, and you'd give it to your colleague

7    to quickly look at and see -- think of it as editing in a

8    sense.  And they, you know, provide feedback.  Could be oral,

9    too.  You know, you go back and forth.  I think this could be

03:34  10   this.  This means that.  And then you share thoughts on it.

11   And then you decide what's the best way to put it.  So that's

12   the operational review process.

13   Q.    Do you consult other sources such as dictionaries?

14   A.    Absolutely, yeah, dictionaries, the internet, other people

15   and other places.

16   Q.    And to what end?  What are you trying to do by consulting

17   these sources?

18   A.    Till you get it right.

19   Q.    You mentioned that there was a certain percentage of your

03:34  20   translations that go for quality control review?

21   A.    Yes.

22   Q.    What is that?

23   A.    That's 30 percent of -- of the project you're working on,

24   of the material presented to you in that particular project.

25   Thirty percent of the material would have to be translated.

| | |
|---|---|
| 1 | Q.   What does quality control mean?  What happens to that? |
| 2 | A.   They take it and they look at it, and they decide if the |
| 3 | product is satisfactory or not. |
| 4 | Q.   Who is "they"? |
| 5 | A.   The qualified -- well, the quality control qualified |
| 6 | people, I guess.  I mean, they go through a process.  They go |
| 7 | through a training class to become qualified reviewers. |
| 8 | Q.   Are there quality control people here in Boston? |
| 9 | A.   Yeah.  I'm myself a quality control reviewer. |

03:35 10   Q.   So you review other people's work?

11   A.   Yes.

12   Q.   Is that the process that you undergo for every translation

13   for which you ultimately present to a court?

14        MR. CARNEY:  I object, your Honor.

15        THE COURT:  Overruled.

16        MR. CARNEY:  May I approach, please?

17        THE COURT:  All right.

18   (SIDEBAR CONFERENCE AS FOLLOWS:

19        MR. CARNEY:  Your Honor, I object based on the

03:36 20   defendant's right of confrontation.  If this witness testifies

21   that she did work and translated it, I have no objection.  If

22   she says that someone else reviewed my work and approved my

23   work, then I am denied my right to confront that second

24   witness, and I would submit that she should not be able to say

25   somebody else reviewed and approved my work in this case.

1          THE COURT:  Well --

2          MR. CHAKRAVARTY:  She's a translator.  She's just

3     saying --

4          THE COURT:  We'll hear what the evidence is.  If she

5     says it's her work, then that would be one thing.  If she says

6     I'm just repeating somebody else's work, that would be another

7     thing.

8          MR. CARNEY:  Maybe.

9          THE COURT:  I understand you have an embed point.  You

03:37 10    think it's embedded.  To that extent, I think I would overrule

11    the objection.

12         MR. CARNEY:  If I could just make it clear, my

13    objection is not if she says I translated this work.  My

14    objection is if she either states or implies that someone else

15    reviewed my work and said my work was correct.  It's that

16    second person who I'm not getting a chance to confront, and

17    that's the confrontation objection.

18         THE COURT:  Okay.  On the present evidence, the

19    objection is overruled.

03:37 20    .  .  .  END OF SIDEBAR CONFERENCE.)

21    Q.   Miss Vallee, that process that you were describing, is

22    that the quality control review process at the FBI?

23    A.   Yes.

24    Q.   Have you previously testified in court about translations?

25    A.   Yes.

1    Q.    In fact, have you testified before this court before?

2    A.    Yes.

3    Q.    Again, the language was Arabic to English?

4    A.    Correct.

5    Q.    Or English to Arabic?

6    A.    Correct.

7    Q.    With that, I'm going to ask you about this particular

8    case.  Did the prosecution team, meaning the prosecutors and

9    the agents involved with this case, did they present to you a

03:39 10   number of documents and other media to have translated for

11   court?

12   A.    Right.

13   Q.    Did you divide that load with your colleague, and Marie

14   Doursounian?

15   A.    Correct.

16   Q.    So I'm going to ask you now about specifically the items

17   that you translated.

18   A.    Okay.

19   Q.    In addition, I should add, as part of your role as a

03:39 20   linguist at the FBI, have you had occasion to translate

21   telephone communications?

22   A.    Yes, many of them.

23   Q.    You smile because there's many.  I think you said there's

24   several hundred hours worth of audio communications?

25   A.    At least.

```
 1   Q.    You have a lot of experience in transcribing

 2   communications, is that right?

 3   A.    Yes.

 4   Q.    As part of your role in this case, even though they're not

 5   always in Arabic, did you transcribe telephone calls?

 6   A.    Yes.

 7   Q.    Before coming to court today, did you become familiar with

 8   Exhibits 300, 302, 304, 308, 312, 314, 316, 318, and 320 as

 9   intercepted telephone calls that you did the transcriptions

03:40 10   for?

11   A.    Yes.

12   Q.    Were those transcriptions fair and accurate to the best of

13   your ability?

14   A.    Yes.

15   Q.    In addition, did you -- were you asked to translate

16   particular stored instant message communications?

17   A.    Yes.

18   Q.    These are what we colloquially call chat logs, correct?

19   A.    Correct.

03:40 20   Q.    Did you -- like the telephone calls, did you divide that

21   load with your colleague?

22   A.    Yes.

23   Q.    Specifically with regards to Exhibit 497 to 532, 607

24   through 636, 643 through 670, 679 through 682, 685 and 687, 689

25   through 725, do those reflect your translations of any Arabic
```

1   language materials?

2   A.   Yes.

3   Q.   Again, are those fair and accurate translations to the

4   best of your ability?

5   A.   Yes.

6   Q.   Were there some emails for which you did verbatim

7   translations as well?

8   A.   Yes.

9   Q.   Specifically, I draw your attention to Exhibits 267 and

03:41 10   297, which were emails containing a chat log.  Do you recall

11   translating the chat log that was an attachment to that email?

12   A.   Yes.

13   Q.   Like the other chat logs, was that a fair and accurate

14   translation of the Arabic language that appeared in those chat

15   logs?

16   A.   Yes.

17   Q.   Finally, was there another email, which I recently asked

18   you to confirm whether it was a verbatim translation, Exhibit

19   292?  Did you confirm whether that was an email containing a

03:42 20   verbatim English translation?

21   A.   Yes.

22   Q.   Again, was that a fair and accurate translation?

23   A.   Yes.

24        MR. CHAKRAVARTY:  Your Honor, I don't know if each of

25   those exhibits has been introduced.  To the extent it hasn't,

         1    the government would ask that each of those exhibits to be

         2    introduced.

         3            THE COURT:  Who's --

         4            MR. CARNEY:  No objection, subject to the process we

         5    discussed earlier, your Honor.

         6            THE COURT:  These are in the list that we marked as

         7    794, right?

         8            MR. CHAKRAVARTY:  Correct, correct.  It's just they

         9    have Arabic in it so just authenticate --

03:42 10            THE COURT:  They would all be subsumed within that

        11    list?

        12            MR. CARNEY:  Yes, your Honor.  That's my belief.

        13    Q.   Agent Vallee, those are the questions I have for you now.

        14    We'll re-call you later in the case.

        15            MR. CARNEY:  Your Honor, I have no questions.  Thank

        16    you.

        17            THE COURT:  Thank you, Miss Vallee.  You may step

        18    down.

        19            THE CLERK:  Ma'am, step up here, please.  Step up to

03:43 20    the box.  Remain standing and raise your right hand.

        21            ANN MARIE DOURSOUNIAN, Sworn

        22            THE CLERK:  Have a seat, please.  State your name and

        23    spell your last name for the record.

        24            THE WITNESS:  Ann Marie Doursounian,

        25    D-o-u-r-s-o-u-n-i-a-n.

```
 1              THE CLERK:  Great.  Thank you.

 2     DIRECT EXAMINATION BY MR. CHAKRAVARTY:

 3     Q.   Good afternoon.

 4     A.   Hello.

 5     Q.   Where do you currently work?

 6     A.   I work for the Federal Bureau of Investigation, the FBI.

 7     Q.   What do you do there?

 8     A.   I'm a linguist, a language analyst.

 9     Q.   Do you work with Leah Vallee who just left?

03:44 10  A.   I do.

11     Q.   Do you basically have the same job as her?

12     A.   Yes.

13     Q.   How long have you been with the FBI?

14     A.   Six years.

15     Q.   Before the FBI, what did you do?

16     A.   I was a tutor of languages and mathematics at a college.

17     And I -- before that I worked at a bank as well.

18     Q.   What level of education do you have?

19     A.   Bachelor's.

03:45 20  Q.   Did you attend schooling overseas?

21     A.   Yes, I did.

22     Q.   To what level of schooling did you attend?

23     A.   I have a Lebanese baccalaureate, and I also have two years

24     of college in Lebanon.

25     Q.   What's the language of study there?
```

1    A.    Arabic, French and English.

2    Q.    Is that through grammar school and high school as well?

3    A.    Throughout.

4    Q.    Are you -- is Arabic one of your native tongues?

5    A.    Yes.

6    Q.    Do you have any other native tongues or something that you

7    would consider native?

8    A.    I'm certified in French as well and I speak Armenian.

9    Q.    With regards to your Arabic language skills, are you

03:46 10   fluent in Arabic?

11   A.    Yes.

12   Q.    Do you speak and write?

13   A.    Yes.

14   Q.    And the same in English?

15   A.    Yes.

16   Q.    With regards to your use of the Arabic language, do you

17   use that in your personal contacts as well?

18   A.    Yes.

19   Q.    And at work, do you work with a group of other linguists?

03:46 20   A.    Yes.

21   Q.    And they speak Arabic as well?

22   A.    Absolutely, yes.

23   Q.    And do you -- are you familiar with the operational review

24   process?

25   A.    Yes.

```
 1   Q.   What is that?

 2   A.   Operational review is when a second linguist other than

 3   the linguist who did the translation of a work looks and

 4   reviews the material translated into English, let's say, into

 5   the target language.

 6   Q.   Are you also familiar with quality control?

 7   A.   Yes.

 8   Q.   What is that?

 9   A.   Quality control is more of a -- maybe a formal process of

10   the operational review.  And that comes after the operational

11   review -- well, for court preparation purposes, it comes after

12   the operational review.

13   Q.   But, ultimately, each linguist has to vouch for their own

14   translation?

15   A.   Absolutely.

16   Q.   Did you have to take any proficiency exams before you

17   became a linguist?

18   A.   Yes.

19   Q.   Did you pass those exams?

20   A.   Yes.

21   Q.   Is that standard across the FBI?

22   A.   Yes.

23   Q.   Approximately how many documents would you say you've

24   translated over your career, roughly?

25   A.   I don't know how many.
```

| | |
|---|---|
| 1 | Q.   In the hundreds? |
| 2 | A.   Probably more. |
| 3 | Q.   Thousands maybe? |
| 4 | A.   Probably, yes. |
| 5 | Q.   How about audio materials in terms of, like, telephone |
| 6 | calls and audiotapes, videotapes? |
| 7 | A.   I would say same, maybe even more. |
| 8 | Q.   Hundreds of hours, maybe even -- |
| 9 | A.   Right. |
| 03:47 10 | Q.   I draw your attention now to this specific case.  Were you |
| 11 | asked in this case to translate specific items for purposes of |
| 12 | court? |
| 13 | A.   Yes. |
| 14 | Q.   Did you and Miss Vallee divide the workload with regards |
| 15 | to those materials? |
| 16 | A.   Yes. |
| 17 | Q.   If we have a translation, one of the two of you did it? |
| 18 | A.   Uh-huh. |
| 19 | Q.   In addition to your translation duties, did you also |
| 03:48 20 | transcribe some documents? |
| 21 | A.   Yes. |
| 22 | Q.   Specifically some telephone calls which may not have been |
| 23 | in Arabic but -- or may have had some Arabic within an English |
| 24 | language phone call? |
| 25 | A.   Right, I did. |

```
 1    Q.   Did you translate Exhibits 306, 310, 322, and 324?  Would

 2    it help if I gave you an exhibit list?

 3    A.   Yes.

 4         MR. CHAKRAVARTY:  May I approach, your Honor?

 5         THE COURT:  You may.

 6    Q.   Just for the record, I've handed you an exhibit list, and

 7    I've directed you to the intercepted telephone calls portion of

 8    that list.

 9    A.   Yes.

10    Q.   You translated essentially all of the exhibits on that

11    list -- all of the transcriptions of telephone calls that Ms.

12    Vallee did not translate, is that right?

13    A.   Right.

14    Q.   Were those fair and accurate transcriptions and

15    translations to the best of your ability?

16    A.   Yes, they were.

17    Q.   Were there also some emails for which you did verbatim

18    translations?

19    A.   I did.

20    Q.   I direct you to Exhibits 349, 357, and 358.  Were those

21    translations that you did?

22    A.   I honestly can't see them.  It's too little.  I can't see

23    them.

24    Q.   Perhaps I can project it.

25    A.   Yeah.
```

```
 1            MR. CHAKRAVARTY:  Your Honor, can I have the ELMO just
 2    for the witness?
 3    Q.   Is that a little bit better?  Can you see that?
 4    A.   Yes, I can see that.
 5    Q.   Again, Exhibits 349?
 6    A.   Yes.
 7    Q.   357?
 8    A.   Right.
 9    Q.   And 358?
10    A.   Yes.
11    Q.   Are those all your translations?
12    A.   Uh-huh.
13    Q.   Again, like the other ones, are those fair and accurate to
14    the best of your ability?
15    A.   They are.
16    Q.   Finally, were there a series of stored instant message
17    communications for which you did a portion of the verbatim
18    translations?
19    A.   I did.
20    Q.   Specifically, did you translate 495, 496, 533 to 606, 637
21    to 642, 671 through 678, 683 and 684, 687 and 688, and 726 and
22    737?  Again, I'll --
23            MR. CARNEY:  May I have a moment, your Honor, please?
24    (Discussion held off the record.)
25    Q.   Just to clarify for the record -- there were a lot of
```

1    numbers.  I know for you to look at each one might take some

2    time.  Before you came to court today, did you tell me or have

3    communicated to me which ones you had translated?

4    A.   Yes.

5    Q.   Did you translate all of the instant message

6    communications -- stored instant message communications that

7    Miss Vallee did not?

8    A.   Yes, I did.

9         MR. CHAKRAVARTY:  With that and with a conversation

03:53 10   with counsel, I think -- I'm sorry.

11   Q.   Let me just qualify.  Are those also fair and accurate

12   translations to the best of your ability?

13   A.   They are.

14        MR. CHAKRAVARTY:  Given that those items, I believe,

15   are already in evidence, subject to the provisos, those are all

16   the questions I have.

17        MR. CARNEY:  I indicated to Mr. Chakravarty that I

18   would stipulate that she translated the numbers that he read

19   off, your Honor.

03:53 20        THE COURT:  Okay.  Any cross-examination?

21        MR. CARNEY:  Excuse me.  No, your Honor.  Thank you.

22        THE COURT:  Thank you, Miss Doursounian.  You may step

23   down.

24        MR. CHAKRAVARTY:  Your Honor, we're in the ignominious

25   but welcome position of having exhausted our witnesses for

1    today.  Things went a little bit faster than yesterday.

2         THE COURT:  Well, I guess that brings us to a close a

3    little earlier than expected.  But we'll resume tomorrow at 9

4    and continue making some good progress.  Enjoy the rest of the

5    day, jurors.  We'll see you tomorrow morning.  We're in recess.

6         As long as we have some time, why don't I just stay in

7    session with the lawyers.

8    (The jury left the room at 12:37 a.m.)

9         THE COURT:  I just wanted to talk about the schedule

03:54 10    for the process that we were talking about with these bulk

11    exhibits, if I can call it that, because -- well, frankly, we

12    should get started on it, I guess.  What do you -- the next

13    step I think is for defense objections.  Give me a reasonable

14    time frame.

15         MR. CARNEY:  The day before your Honor selects for the

16    hearing we would deliver to you specifically what objections.

17         THE COURT:  I'm not sure there will be a hearing.  In

18    other words, there may be with respect to some matters.  But my

19    thought is that what would be given me would be enough to

03:55 20    identify the objections, and I think from that, mostly I would

21    understand the scope of the objection.  So to the extent there

22    was argument, it would be a subset.

23         So I don't think that timetable is practical, then,

24    because I'd like to go through them.  And then whatever we need

25    to talk about, we can do so.  So there should be some review

1    time.  I just want to be sure it fits appropriately in the flow

2    of the case.  I know everybody has lots to do, but --

3              MR. CARNEY:  May I inquire?  How many --

4              THE COURT:  Why don't I do this:  Why don't we just go

5    this far with it.  Why don't the parties talk about that, a

6    time frame for -- well, because I guess on the -- what I'm

7    suggesting is, if it's going to be a first cut on paper, then I

8    guess the government would have the opportunity to submit

9    something, too.  And then it would be whatever I thought we

03:56 10   needed additional argument on.

11             MR. AUERHAHN:  And I did give a list of the ones we

12   expect to use tomorrow with the witness.  So if there's any

13   specific objections to any of those specific chats --

14             MS. BASSIL:  There will be.

15             MR. AUERHAHN:  -- we should probably deal with it

16   before I show it to the witness.

17             MS. BASSIL:  There will be.

18             THE COURT:  What's the scope of that, Mr. Auerhahn?

19             MR. AUERHAHN:  I didn't -- there are probably over two

03:56 20   dozen.  Is that correct?  Ms. Bassil is holding the list I gave

21   her.

22             MS. BASSIL:  Well, what I can tell you is -- okay.

23   The sum total, which doesn't mean that necessarily it's all of

24   them, but the total number of instant messages on the witness

25   tomorrow is 245 pages, approximately.  That doesn't mean all --

```
 1   we're going to be using all 245 or that there will be
 2   objections to all of them.  But that's the sum total of his
 3   instant messages.
 4          MR. AUERHAHN:  We're not using all of his.
 5          MS. BASSIL:  I'm not using all of them.
 6          MR. AUERHAHN:  And, certainly, he's not going to read
 7   all 245 pages or we're not going to read in questioning.  We're
 8   just going to excerpt from the list that I gave counsel.
 9          THE COURT:  And how many individual chats?
10          MS. BASSIL:  Well --
11          MR. AUERHAHN:  If I can have the list I gave --
12          THE COURT:  Just an estimate, a ballpark.
13          MR. AUERHAHN:  May I have the list?
14          MS. BASSIL:  Sure.
15          THE COURT:  Let me ask it this way:  Each chat is
16   separately identified by an exhibit number?
17          MR. AUERHAHN:  Yes.
18          MS. BASSIL:  Yes.
19          THE COURT:  How many exhibit numbers?
20          MR. AUERHAHN:  About -- when I say two dozen, looks
21   like I was off a little.  It's between two and three dozen so
22   somewhere under 30.
23          MS. BASSIL:  And I had 11 chats I might refer to,
24   which might just mean impeachment with a line or two.
25          THE COURT:  Well, I don't know about the government's
```

1  objections to yours.  We've been focusing on your objections to

2  the government's.

3           MS. BASSIL:  All right.

4           THE COURT:  Well, I guess, can you email that list to

5  Paul?

6           MR. AUERHAHN:  Yes.

7           THE COURT:  And at least I will be some degree

8  familiar with it.  And then we can take it from there.

9           MS. BASSIL:  Well, what I can tell you is there will

03:59 10  be some photographs that I will be objecting to.  And there are

11  at least two videos, I think, that are problematic in terms of

12  summary translations that are heavy in Arabic.

13           MR. AUERHAHN:  With reference to that, as I said, I

14  included them on the list just for counsel's convenience but

15  indicated we're not going to introduce the summary translation.

16  The Court has already ruled on that.  But we will play a short

17  segment -- these are videos that were actually sent by the

18  defendant to the witness embedded in a chat.  So we're going to

19  play a short excerpt so the jury knows what it is they're

03:59 20  talking about on that particular chat.  And no beheading

21  videos.

22           THE COURT:  Okay.  Well, if you want to identify some

23  of the image exhibits you expect to use, maybe I'll have a

24  chance to be familiar.

25           MR. AUERHAHN:  I'll -- the list I provided to counsel

1    included both the videos that I'm going to show while the

2    witness is on the stand as well as the chats as well as the

3    emails as well as the telephone calls.  I'll make sure Mr.

4    Lyness has the same list.

5         THE COURT:  I think we talked about the government's

6    exhibits on paper so I could -- I have the disks from the JERS

7    system.  They're a little clunky to use, particularly the

8    documents as opposed to the media, because you have to go back

9    out as far as I know.  You have to keep going back out to find

04:00 10   the next index number.  So I don't know.

11        MR. CHAKRAVARTY:  We have them here.  Do you want

12   binders sequentially numbered, or would you prefer just the

13   exhibits for a particular witness?

14        THE COURT:  I think it's useful to get them all.

15        MR. CHAKRAVARTY:  We'll leave this here, your Honor.

16        THE COURT:  Okay.  And you'll talk about the schedule

17   on -- going out so we can get through the mass of the rest of

18   it.

19        MS. BASSIL:  So in terms, your Honor, of the things

04:01 20   that I might use, do you want a hard copy of those?

21        THE COURT:  I don't know whether there's going to be

22   objections to them.  It's a different -- it may be a different

23   issue.  What we're dealing with is your 403 objections.

24        MS. BASSIL:  Right.

25        THE COURT:  I don't know whether the government is

1    going to have 403 objections.  They might have other

2    objections, but they may just be dealt with in the course of

3    proceedings.

4              MS. BASSIL:  That's fine.  All right.

5              THE COURT:  Okay.  We'll be in recess.  Thanks.

6    (Whereupon, at 12:45 p.m. the trial recessed.)

1              C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  November 2, 2011

17

18

19

20

21

22

23

24

25