1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2

3

4                                      )
      UNITED STATES OF AMERICA,        )
5                                      )
              Plaintiff,               )
6                                      ) Criminal Action
      v.                               ) No. 09-10017-GAO
7                                      )
      TAREK MEHANNA,                   )
8                                      )
              Defendant.               )
9                                      )

10

11

12              BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                     UNITED STATES DISTRICT JUDGE

13                             DAY TEN
                             JURY TRIAL
14

15

16            John J. Moakley United States Courthouse
                         Courtroom No. 9
17                      One Courthouse Way
                   Boston, Massachusetts  02210
18                   Monday, November 7, 2011
                           9:07 a.m.
19

20               Marcia G. Patrisso, RMR, CRR
                  Cheryl Dahlstrom, RMR, CRR
21                  Official Court Reporters
                John J. Moakley U.S. Courthouse
22               One Courthouse Way, Room 3510
                 Boston, Massachusetts  02210
23                     (617) 737-8728

24        Mechanical Steno - Computer-Aided Transcript

25

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Aloke Chakravarty and Jeffrey Auerhahn,
 3             Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Jeffrey D. Groharing, Trial Attorney
               National Security Division
 7         950 Pennsylvania Avenue, NW
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         CARNEY & BASSIL
           By: J.W. Carney, Jr., Esq.
10             Janice Bassil, Esq.
               John E. Oh, Esq.
11         20 Park Plaza
           Suite 1405
12         Boston, Massachusetts  02216
           - and -
13         LAW OFFICE OF SEJAL H. PATEL, LLC
           By: Sejal H. Patel, Esq.
14         101 Tremont Street
           Suite 800
15         Boston, Massachusetts  02108
           On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

1

I N D E X

2
                          DIRECT   CROSS   REDIRECT   RECROSS

WITNESSES FOR THE
3     GOVERNMENT:

4   ALI ABOUBAKR, resumed

5        By Mr. Auerhahn                          14
         By Ms. Bassil                                        37
6
    ANDRE KHOURY
7
         By Mr. Chakravarty           63
8

9
                          E X H I B I T S
10

11   GOVERNMENT'S        DESCRIPTION                FOR ID   IN EVD.

12   749       Map of area of Yemen                          69

13   751       Map of area of Pakistan                       76

14   750       Map of area of Iraq                           77

15   754       Map of area of Saudi Arabia                   79

16   449-      State of the Ummah video                      81
     450
17
     92        Photocopy of symbol                           96
18

19

20

21

22

23

24

25

1              (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on November 7, 2011.

6              The defendant, Tarek Mehanna, is present with counsel.

7     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8     are present, along with Jeffrey D. Groharing, Trial Attorney,

9     U.S. Department of Justice, National Security Division.)

10             THE CLERK:  All rise.

11             (The Court enters the courtroom at 9:07 a.m.)

12             THE COURT:  Good morning.  Mr. Carney, you have a

13     motion?

14             MR. CARNEY:  Yes.  I was wondering if the Court had a

15     chance to review it?

16             THE COURT:  I have.

17             MR. CARNEY:  If I may be heard briefly on it?

18             As I see the list of witnesses that the government

19     will be calling this week, and the dozens -- indeed, hundreds

20     of documents that the government intends to further offer in

21     this trial, I must object to this further, quote, state-of-mind

22     evidence.  The defendant's state of mind, as I said in my

23     opening statement, was, is, and will be that Muslims have an

24     obligation to defend Muslim countries from invasion by armies

25     or oppression by others.  This applies whether the invaders are

1    the Mongols, the Serbs, the Russians, or the Americans.  He's

2    been outspoken in his view.

3            I know the Court will be instructing the jury, in

4    part, based on *Holder versus Humanitarian Law Project*.  The

5    language in *Holder* of the United States Supreme Court last year

6    was unmistakably clear in stating that an American has a right

7    to vigorously promote -- to promote -- and I'm paraphrasing --

8    to promote and support the goals of a foreign designated

9    terrorist agency.  The whole concept of independent advocacy

10   flows from this.

11           What we are seeing in this trial is a parade of

12   instant messages, chats, emails, conversations with the

13   defendant where he is expressing his support for getting -- for

14   defending a Muslim country like Iraq, as well as a Muslim

15   country like Saudi Arabia or a Muslim country like Afghanistan.

16           What the government has to prove in this case, I

17   submit, is that the defendant, in order to violate 2339 in

18   either respect, has to show that he was under the direction,

19   acting at the direction of or directly in coordination with the

20   foreign terrorist organization in regard to one of the

21   statutes, and that he's being basically under their control.

22   And the court uses language that clearly would apply to an

23   employee, to someone who is taking direct orders, who is being

24   told, "You do this and you do that."  There has been zero

25   evidence of this.  The state-of-mind avalanche of evidence that

1    the government is putting in is prejudicial at this point

2    because the state of mind of the defendant is not at issue in

3    this material support case.

4         The flow of the government's view, I would submit, is

5    that it believes that every person who agrees with

6    Mr. Mehanna's view is part of a worldwide conspiracy, whether

7    that person is in Bosnia, whether that person is in London,

8    whether that person is in Chechnya, whether that person is in

9    South America our another part of this country, a person the

10   defendant has not heard of, has never met, that all of these

11   people are part of a single conspiracy to assist al Qa'ida and

12   provide material support at al Qa'ida's direction or at their

13   direct coordination.

14        *Dellasantos* made clear that when the government

15   alleges a particular conspiracy in an indictment, the evidence

16   must hold true to that allegation and not expand beyond all

17   recognizable boundaries.  That's what the government is doing

18   here.  That's why they can name as coconspirators, in their

19   view, people that Mr. Mehanna never had any contact with, never

20   spoke to, never had any emails with and say, "Osama bin Laden,

21   he was a coconspirator with Mr. Mehanna."

22        The prejudice to the jury is overwhelming.  Today the

23   government intends to offer a number of conversations between

24   Tarek and a friend that touch occasionally on Islam,

25   occasionally on the obligation to defend a Muslim country,

1    occasionally on, "Do you think you can set me up with a woman

2    that I might want to marry?" occasionally on movies,

3    occasionally on things kids his age talk about.

4          There is no relevance to the conspiracy to have this

5    come in.  And at some point the jury is going to get the

6    impression that the only thing that really matters here is does

7    he support Muslims defending a Muslim country.  Because they

8    will have seen so many days of this trial dedicated to that

9    evidence that it's impossible for them not to think, "Well, the

10   Court would not allow in this evidence if this didn't go to

11   prove this case."

12         I respectfully submit, your Honor, that at this point

13   this type of evidence should stop.  If they have evidence that

14   Mr. Mehanna was acting under the direction or in direct

15   coordination with al Qa'ida, bring it on.  But if we're just

16   going to have a parade of witnesses who will say:  This is a

17   video showing warfare in Bosnia that was possessed by

18   Mr. Mehanna or seen by Mr. Mehanna or shared by Mr. Mehanna

19   with others; or this is a book he had; or this is something

20   that's a document that he had in his possession; or this is

21   what people said to Mr. Mehanna whom he was speaking to in

22   person or on the internet in a web forum; or this, again, is

23   what Mr. Mehanna believes, at some point I submit, your Honor,

24   the prejudice will so outweigh the minimal probative value that

25   the defendant will be denied a fair trial.  And I respectfully

1    submit we are at that point today.

2              THE COURT:  Mr. Chakravarty?

3              MR. CHAKRAVARTY:  Your Honor, as you know, just in

4    terms of logistics, we received notice last night of the filing

5    of this motion.  We would ask for until the end of the business

6    day to file something in response specifically regarding the

7    legal issues of cumulativeness and where the Court

8    should -- how the Court should review whether an item of

9    evidence is cumulative and the unfair prejudice substantially

10   outweighs the probative value.

11             But just in short rejoinder, your Honor, the state of

12   mind of the defendant is squarely at issue in this case.  The

13   defense has placed it at issue in this case.  The elements of

14   the offenses have placed it before the jury to determine what

15   the defendant was thinking when he intentionally -- allegedly

16   intentionally provided and conspired to provide material

17   support to a designated terrorist organization and to those

18   engaged in acts of terror.  And then, with regards to the

19   connectedness component with regards to the *Holder* finding, to

20   be able to demonstrate that the motivation, the purpose for his

21   actions, was to provide support to that organization or to

22   others engaged in that.

23             So the fact that there is an overwhelming volume of

24   that type of evidence that the defendant himself generated,

25   collected, disseminated, is squarely at issue in this case.

1    It's unfortunate for the defense that there is so much of this

2    evidence.  And it's not the typical case where you have this

3    much of evidence in so many different forums, but just because

4    we have it where each conversation is different, each video is

5    different, each image with some small exceptions are different,

6    these are not cumulative; they, rather, demonstrate to the jury

7    the fact that this defendant is not like the overwhelming

8    majority of Muslims around the world who do not obsess with

9    this notion of engaging in physical and violent jihad against

10   Americans in particular.  That's what this case is about and

11   the government should have the ability to present that evidence

12   to the jury.

13          THE COURT:  All right.  It may well be, as Mr. Carney

14   says, that at some point the evidence becomes so cumulative

15   that unfair prejudice outweighs probative value, but we're not

16   at that point.  We're very early in the evidence.  And a

17   cumulative argument is just not a convincing one at this point.

18   So the motion is denied.

19          Anything else before we get the jury?

20          We're going to resume, I guess, with redirect of

21   Mr. Aboubakr?

22          MR. AUERHAHN:  Yes, your Honor.

23          MR. CHAKRAVARTY:  We are.

24          Your Honor, just one other housekeeping matter.  And

25   Mr. Carney's motion kind of brings it to mind.  I've noticed

1    that Mr. Lyness was kind enough to generate a list of the

2    exhibits as of Friday -- or Mr. Gross -- somebody in the

3    clerk's office was.  Mr. Lyness, I'm sorry.

4           And my understanding with regards to the different

5    bulk evidence that has been admitted is that they've been

6    admitted as 401 relevant and then pending a motion to strike,

7    essentially.

8           THE COURT:  Do you have the list, Paul?

9           Yeah, go ahead.

10          MR. CHAKRAVARTY:  And that's reflected on the list

11   with regards to the communications that Mr. Hughes -- or that

12   Agent Hughes had authenticated but those exhibits, primarily

13   from the computer which were introduced through Mr. Scripture,

14   are not so reflected.  And it's possible because the Court

15   hadn't issued its ruling before then.  And I guess the

16   government's wondering whether they should be in the same vein

17   or not.

18          THE COURT:  I think they are on the same rule of

19   proceeding; that is, before any is shown to the jury, we can

20   address it specifically.  At some point they will all have to

21   be addressed, I guess, or those to which there is an objection

22   will have to be addressed.  There are a number of them.

23          These are mostly photographs, I think?

24          MR. CHAKRAVARTY:  And videos, your Honor.

25          THE COURT:  Yeah, a very large bulk of them.  So I'll

1   have to go through them.  I hadn't yet done that.  I thought we

2   still had time to do it.  So you're right, the list should

3   reflect that, and we're catching up a little bit on that.

4          So I guess as a way of proceeding, how about if the

5   government tells the defense and the Court what you think is in

6   under your offer.

7          MR. CARNEY:  I'm sorry.  Could you say that again,

8   your Honor, please?

9          THE COURT:  This goes back to the first or second day

10  of trial, right?  What exhibits were offered by the government?

11  We later crystalized the rule of procedure after that, I think;

12  that's why they didn't get formally entered.  We can just do

13  the accounting and check to see whether that's a complete or

14  accurate list both from the defense point of view and from our

15  point of view from our own notes.  If it is, then we'll put

16  those in under the same provisions, subject to strike.  If it

17  isn't, we'll try to figure out what the discrepancy is and how

18  to solve it.

19         MR. CHAKRAVARTY:  So for purposes of today, there are

20  a few which we've given notice of to the defense and to the

21  Court that we would be referencing to the extent that --

22         THE COURT:  Okay.  I have not had a chance -- I saw

23  the email this morning, I guess, of the new lineup, but I

24  haven't had a chance to look at the exhibits that are

25  referenced there, so we'll have to see how --

```
 1            MR. CARNEY:  May I ask a point of clarification, your

 2   Honor?  I understand that the government will be calling a

 3   witness to read these exhibits or show these exhibits, and we

 4   will have objections to those.  So if that's the proposed

 5   procedure, which I understand it is for the government, are

 6   they going to be offering a particular exhibit and then we get

 7   to interpose our objection and the grounds for it before it is

 8   either read to the jury or played for the jury as a video?

 9            THE COURT:  Yes.  A 403 objection?

10            MR. CARNEY:  Yes, your Honor.

11            THE COURT:  I think any others would be.  That's my

12   understanding.

13            Now, let me look at the lineup here.  After

14   Mr. Aboubakr is finished there's an Andrew Khoury?

15            MR. CHAKRAVARTY:  He's an FBI agent who will be

16   reading and playing some videos.

17            THE COURT:  Okay.  And all it says here is "videos."

18   It doesn't identify particular numbers.

19            MR. CHAKRAVARTY:  I'm sorry, your Honor.  449, 450,

20   41, 33, and 58.

21            THE CLERK:  Mr. Chakravarty, could you repeat those?

22   I'm sorry.

23            MR. CHAKRAVARTY:  Certainly.  449 and 450 -- there's

24   two parts of the same video -- 41, 33 and 58.

25            THE CLERK:  Okay.
```

```
 1              THE COURT:  Looking at 33, there are 33A, -B, -C and
 2    -D.
 3              MR. CHAKRAVARTY:  Those are various clips of one
 4    video.  Before playing that video, your Honor, the government
 5    did intend to approach because one of the clips contains a
 6    depiction of planes going into the World Trade Center on
 7    September 11th.  Given the context, we don't feel it is
 8    unfairly prejudicial, but just to alert the Court and counsel
 9    that --
10              THE COURT:  What's the running time of all the videos?
11              MR. CHAKRAVARTY:  All of them total?  I don't have it
12    right in front of me, but less than ten minutes.  Probably
13    closer to five, your Honor.
14              THE COURT:  Total of all?
15              MR. CHAKRAVARTY:  Yes.  That's what we pared them down
16    into.
17              THE COURT:  I think what we should do, then, is finish
18    with Mr. Aboubakr, and then we could take a break and I'll look
19    at the videos, and then we can entertain any objection to them.
20    Now, that's videos.
21              So you said there are also chats or IMs or something?
22              MR. CHAKRAVARTY:  Yes, there are chats that go along
23    with each of the videos.
24              THE COURT:  That go with the videos?  Okay.  Okay.
25              Are those within the group of what you think was
```

1  all --

2          MR. CHAKRAVARTY:  Yes, all save 449 and 450, which

3  would be introduced for the first time today.

4          THE COURT:  So 41, 33 and 58 are part of the previous

5  marking --

6          MR. CHAKRAVARTY:  Correct.

7          THE COURT:  -- we haven't added to the list yet?

8          MR. CHAKRAVARTY:  That's correct.

9          THE COURT:  All right.

10         Okay.  So in short, we'll break after the completion

11  of Mr. Aboubakr.

12         All right.  Let's get the jury.

13         THE CLERK:  All rise for the jury.

14         (The jury enters the courtroom at 9:32 a.m.)

15         THE CLERK:  Please be seated.

16         THE COURT:  Good morning, jurors.

17         THE JURORS:  Good morning.

18         THE COURT:  We appreciate your patience.  The lawyers

19  and I had a couple of things to talk about.  We are ready to

20  resume with the witness.

21         MR. AUERHAHN:  Thank you, your Honor.

22                      ALI ABOUBAKR, resumed

23                      REDIRECT EXAMINATION

24  BY MR. AUERHAHN:

25  Q.  Good morning, sir.

1    A.    Good morning.

2    Q.    Now, you were asked a lot of questions on cross about what

3    you said and didn't say in the grand jury.  Do you recall that?

4    A.    Yes.

5    Q.    Do you recall when you testified in the grand jury?

6    A.    October 2009, I believe.

7    Q.    Okay.  And before you testified -- and you also testified

8    both on direct and cross about having spent some time with

9    government counsel to prepare for your testimony here today and

10   last Thursday.  Is that correct?

11   A.    Yes.

12   Q.    Before you testified in the grand jury, was there any

13   preparation at all?

14   A.    No.

15   Q.    Were you interviewed or questioned at all before you went

16   in the grand jury?

17   A.    No.

18   Q.    Did you have an opportunity to review any of the chats or

19   emails or telephone calls that we used on Thursday before you

20   testified in the grand jury?

21   A.    Just what was available publicly through the affidavit.

22   Q.    Okay.  But the various chats that you talked about on

23   Thursday, you hadn't seen those before?

24   A.    No.

25   Q.    The telephone call that we played, you hadn't heard that

1    before?

2    A.    No.

3    Q.    And, sir, you've been -- I believe you testified on direct

4    and cross that you were close friends with Mr. Mehanna since

5    you were in middle school?

6    A.    I became acquainted with him -- or reacquainted with him

7    late middle school.

8    Q.    Late middle school?

9          And I believe you testified that you were a freshman in

10   high school in September 2001, correct?

11   A.    Yes.

12   Q.    So approximately how long before that did you become

13   reacquainted with him, in your words?

14   A.    A year to two years, roughly, I believe.

15   Q.    So either around '99?

16   A.    '99-2000, yeah.

17   Q.    So when you testified in the grand jury in late 2009, you

18   were testifying about events that covered almost a decade?

19   A.    Yes.

20   Q.    And went in cold?

21   A.    I'm sorry?

22   Q.    And went in cold?

23          MS. BASSIL:  Objection.  This is all leading, your

24   Honor.

25          THE COURT:  Sustained.

1    BY MR. AUERHAHN:

2    Q.   Now, were you asked things in the grand jury -- excuse me.

3         Were you asked things on Thursday and Friday that you were

4    not asked in the grand jury?

5    A.   I can't be certain.  I don't remember exactly.

6    Q.   Okay.  Defense counsel asked you about the first time you

7    said that you gave -- excuse me -- that the defendant gave you

8    the "9/11 Tribute" CD.  Were you asked about that in the grand

9    jury as to who gave you that video?

10   A.   I believe so.

11   Q.   Okay.  Let me show you --

12             MR. AUERHAHN:  May I approach, your Honor?

13             THE COURT:  You may.

14             MS. BASSIL:  Well, I believe we have the electronic

15   means to use this, your Honor.

16             And could I have the page number, please?

17             MR. AUERHAHN:  Yes.  38 and 39.

18   BY MR. AUERHAHN:

19   Q.   Sir, were you asked in the grand jury about the "9/11

20   Tribute" video?

21   A.   Yes, I was.

22   Q.   Were you asked who gave it to you?

23   A.   I can't tell conclusively from the transcript here.

24   Q.   Okay.  When --

25             MR. AUERHAHN:  Can we bring up Exhibit 628, please?

1   Page 4, please.

2   Q.   Okay.  Sir, do you recall this chat?  You were asked about

3   it on direct and cross.

4   A.   Yes.

5   Q.   Okay.  You were talking about the 9/11 hijackers?

6   A.   Yes.

7   Q.   Where Mr. Mehanna says, "Remember that thing I gave you

8   when I came to visit?" and you say, "Yeah, it says on that???"

9   What's the "on that" that you're referring to?

10  A.   The tribute video.

11  Q.   That Mr. Mehanna gave you?

12  A.   Yes.

13  Q.   Now, sir, counsel asked you about your testimony that some

14  of the things that you said in the chats were not true but were

15  intended to enhance your relationship with Mr. Mehanna.

16        MS. BASSIL:  Objection.  I don't believe he said that,

17  your Honor.

18        THE COURT:  Well, just ask a question.

19  BY MR. AUERHAHN:

20  Q.   Were you asked about that in the grand jury, whether or

21  not some of the statements you made in the chats were untrue?

22        MS. BASSIL:  Objection, your Honor.  He never

23  testified the chats were untrue.

24        THE COURT:  You may have the question.

25  BY MR. AUERHAHN:

 1    Q.   Were you asked in the grand jury as to whether or not some

 2    of the statements that you made to Mr. Mehanna that are

 3    recorded on the chats were not true?

 4    A.   I don't recall that as a question.

 5    Q.   Okay.  Were you shown any chats in the grand jury?

 6    A.   No.

 7    Q.   Now, you were asked whether or not you testified in the

 8    grand jury about beheading videos.  Do you remember that?

 9    A.   Yes.

10    Q.   Do you recall specifically whether you were asked about

11    beheading videos in the grand jury?

12    A.   I can't recall.

13    Q.   Okay.  Can you look at the same pages I just gave you

14    where you're testifying about the videos?  Is there a specific

15    question about beheading videos?

16    A.   I don't see it here.

17    Q.   So did you provide information in preparation and in

18    testimony about which you were not asked in the grand jury?

19    A.   Yes.

20         MR. AUERHAHN:  If you could bring up Exhibit 633.

21    Q.   Now, sir, do you remember this particular chat where you

22    were talking about a particular nashid that was your favorite?

23    A.   Yes.

24    Q.   Now, do you recall who gave you that, the CD, or gave you

25    that nashid?

1    A.    Ahmed.

2    Q.    Ahmed who?

3    A.    Ahmed Abousamra.

4    Q.    And do you recall what Mr. Mehanna said his feelings are

5    about that particular nashid?

6    A.    He called it a classic.

7    Q.    Okay.  And this is the one that is "Oh, mother, oh,

8    mother, give me my machine gun"?

9    A.    Yes.

10         MS. BASSIL:  Your Honor, I believe this was all gone

11   into in direct.

12         MR. AUERHAHN:  She covered it in cross.

13         THE COURT:  Well, it was touched on.  Go ahead.  You

14   may have it.

15         MR. AUERHAHN:  Thank you.

16   BY MR. AUERHAHN:

17   Q.    And what else did he say besides "It's a classic"?  Did he

18   say, "I love that one too"?

19   A.    Yes.

20   Q.    Okay.  Now, do you recall being asked about the poem that

21   you read, "Make Death what you Seek"?

22   A.    Yes.

23         MR. AUERHAHN:  Could you pull up Exhibit 441, please?

24   Q.    And counsel asked you whether or not someone who drowns

25   might also under certain circumstances be considered a martyr?

1  A.    Yes.

2  Q.    Is the first line of this, "The bullets hit your heart

3  like the sting of a bee," is this about someone who drowns?

4  A.    No.

5  Q.    Now, defense counsel asked you a lot of questions about

6  the Qur'an and the Sunnah and the Hadith and the Companions.

7  Are you an Islamic scholar?

8  A.    No.

9  Q.    And in terms of Islamic jurisprudence, history,

10 traditions, writings, how would you compare your level of

11 knowledge to Mr. Abousamra's?

12 A.    Far inferior.

13 Q.    And how about to Mr. Mehanna's?

14 A.    Far inferior.

15 Q.    And counsel asked you about whether or not the study of

16 these could be a lifelong study.  Do you remember that?

17 A.    Yes.

18 Q.    And that the rules include marriage, divorce, and when

19 it's legitimate, to fight.  Do you recall those questions?

20 A.    I do.

21 Q.    Now, was the study of, for example, these rules -- was it

22 purely a study of history and the study of historical writings

23 and important people in the history of Islam or was it for the

24 purpose of applying this to your current life?

25         MS. BASSIL:  Objection.

 1          THE COURT:  You may answer that.

 2          THE WITNESS:  The purpose of applying it.

 3    BY MR. AUERHAHN:

 4    Q.   To your current life?

 5    A.   Yes.

 6    Q.   And did you feel you were receiving instructions from

 7    Mr. Mehanna on these issues?

 8          MS. BASSIL:  Objection to the leading nature of the

 9    redirect.

10          THE COURT:  Rephrase it.

11    BY MR. AUERHAHN:

12    Q.   And in terms of your discussions with Mr. Mehanna, did you

13    learn things that you did not know?

14    A.   Yes.

15    Q.   Now, when 9/11 happened, you were about how old?

16    A.   Fifteen.

17    Q.   And Mr. Mehanna was?

18    A.   Nineteen, I believe.

19    Q.   Did you look up to him?

20    A.   Yes.

21    Q.   Did you look to him for guidance?

22          MS. BASSIL:  Objection.  Leading nature.

23          THE COURT:  Overruled.

24          You may answer it.

25          THE WITNESS:  Yes.

1   BY MR. AUERHAHN:

2   Q.   Now, is it fair to say that there are a lot of obligations

3   placed on a Muslim man?

4   A.   Yes.

5   Q.   Now, among the obligations that Ms. -- that defense

6   counsel asked you about concern jihad, correct?

7   A.   I don't recall exactly.

8   Q.   Okay.  Did she mention -- do you recall her mentioning

9   that jihad is in the Qur'an and in the Hadith?

10  A.   Yes.

11  Q.   And the concept of protecting Muslims?

12  A.   Yes.

13  Q.   Now, did you -- did your discussions with Mr. Mehanna

14  include how you should view current conflicts around the world

15  involving Muslims?

16  A.   Yes.

17  Q.   And did it include discussions about obligations to fight

18  jihad?

19  A.   Yes.

20  Q.   Now, what did Mr. Mehanna say not in terms of historical

21  jihad involving Mohammad and his companions but with reference

22  to current conflicts?

23  A.   It's tough to recall specific conversations, but I know

24  one of the views expressed was that he was extremely angry over

25  the presence of American troops in Saudi Arabia, for example.

1    I'm sorry, can you ask the question again?

2         MR. AUERHAHN:  Can the question be read back to him,

3    if possible?

4         (The reporter reads the pending question.)

5         (Pause.)

6         THE WITNESS:  I can't recall a specific.

7    BY MR. AUERHAHN:

8    Q.   You started saying about anger over U.S. troops in

9    Saudi Arabia?

10   A.   Yes.  That was...

11   Q.   What did he say about that?

12   A.   That it was the presence of American troops on -- in that

13   land is -- it's an unfathomable phenomenon -- and I'm

14   paraphrasing -- but that the presence of American troops there

15   should not -- I mean, they should not exist on those lands.

16   Q.   And how did the U.S. troops get to Saudi Arabia?

17        MS. BASSIL:  Objection.

18        THE COURT:  Sustained.

19   BY MR. AUERHAHN:

20   Q.   Now, jihad was -- in cross-examination was talked about in

21   terms of obligation to defend Muslim land from invasion by

22   outsiders, correct?

23   A.   Yes.

24   Q.   Now, did Mr. Mehanna indicate that the U.S. had invaded

25   Saudi Arabia?

1   A.   No.

2   Q.   And weren't U.S. troops asked to come to Saudi Arabia by

3   the government of Saudi Arabia?

4   A.   Yes.

5   Q.   In 1991?

6   A.   During the Cold War, I believe.

7   Q.   Yet expelling them was an obligation?

8        MS. BASSIL:  Objection.

9        THE COURT:  Sustained.

10  BY MR. AUERHAHN:

11  Q.   Now, sir --

12       MR. AUERHAHN:  Can you pull up 623, please?  Page 8,

13  please.

14  Q.   -- do you recall this chat?

15       There's a reference on the previous page to the "Messages

16  to the World" book?

17  A.   Yes.

18  Q.   Now, Mr. Mehanna says, "And I have been following him for

19  over six years now."  And this conversation took place April

20  2006.  So would that be before or after 9/11?

21  A.   After.

22  Q.   Six years going back -- well, this was after 9/11.  But I

23  mean, when you tack back over six years, is that --

24  A.   Oh, before.

25  Q.   And do you recall when the Soviets left Afghanistan?

1    A.   Mid to late '80s, I believe?

2    Q.   Okay.  And do you recall when the first al Qa'ida attack

3    on the United States or U.S. interests was?

4           MS. BASSIL:  Objection.

5           THE COURT:  You may answer if you know.

6           THE WITNESS:  I'm not 100 percent sure.  I would say

7    early '90s, but I'm not 100 percent sure.

8    BY MR. AUERHAHN:

9    Q.   9/11 wasn't the first?

10   A.   No.

11          MR. AUERHAHN:  Can you pull up Exhibit 635, please.

12   Q.   Now, do you recall that this was the one where you were

13   talking about a screen name for yourself?

14   A.   Yes.

15   Q.   And counsel asked you about wanting to choose Abul-Hassan

16   or Abu-Usama.  Do you see that there?

17   A.   Yes.

18   Q.   "Usama" being --

19   A.   Well, it wasn't after -- well, the motivation for that

20   name was obviously after Osama bin Laden, but there's a

21   historical figure as well -- with the name "Usama" as well.

22   Q.   And he suggested perhaps "Abu WTC," as in World Trade

23   Center?

24   A.   Yes.

25   Q.   Now, when counsel asked you about whether or not, when

1    watching videos, anyone said, "We have to get up and do

2    something," do you remember that question?

3    A.   Yes.

4    Q.   And you answered, "I can't recall if those words were used

5    but," and then counsel interrupted and asked you some questions

6    to the grand jury?

7    A.   Yes.

8    Q.   What was the "but"?

9    A.   It was not explicitly said or worded in that way, but the

10   implication was there.

11   Q.   And when you and Mr. Mehanna and Mr. Abousamra spoke about

12   conflict in the Middle East today, was it just a geopolitical

13   discussion or was it grounded in the things that you enumerated

14   earlier, the Qur'an, the Hadith, Islamic jurisprudence?

15             MS. BASSIL:  Objection.

16             THE COURT:  Overruled.

17             You may answer it.

18             THE WITNESS:  I'm not sure I understand the question.

19   BY MR. AUERHAHN:

20   Q.   In other words, when you talked about the conflict in the

21   Middle East, was it just a geopolitical discussion in terms of

22   oil and battle between different powers or was it grounded in

23   the Hadith and the Qur'an and Islamic jurisprudence?

24             MS. BASSIL:  Objection.

25             THE COURT:  You may answer it if you understand it.

1        THE WITNESS:  It was grounded in the -- from the

2    Qur'an as well, but it was not -- I would not describe it as a

3    geopolitical issue; I would describe it as a -- attaining a

4    certain religious status.

5    BY MR. AUERHAHN:

6    Q.   Okay.  So when you spoke of the Hadith and then suddenly

7    start talking about leaders of al Qa'ida, were you changing the

8    subject or was it the same subject?

9        MS. BASSIL:  Objection.

10       THE COURT:  Overruled.

11       You may answer.

12       THE WITNESS:  I don't understand the question.

13   BY MR. AUERHAHN:

14   Q.   In other words, you just said that the discussion about

15   current conflicts in the Middle East were grounded in Hadith

16   and Qur'an and jurisprudence?

17   A.   Uh-huh.

18   Q.   So when you were talking about the Hadiths and

19   jurisprudence and the Qur'an and then about current al Qa'ida

20   leaders, were you changing the subject or was it the same

21   subject?

22       MS. BASSIL:  Objection.

23       THE COURT:  You may answer it if you understand it.

24       THE WITNESS:  It was the same subject as -- I'm not

25   sure what subject you're referring to.

1          MR. AUERHAHN:  Maybe it's an awkward question.  I'll

2     try one last time.

3     BY MR. AUERHAHN:

4     Q.   You said that discussions of conflicts in the Middle East

5     today were grounded in the Hadith and the Qur'an and such?

6     A.   The discussions?

7     Q.   Right.

8     A.   Yes.

9     Q.   And so when you were talking about those issues, the

10    Hadith and the Qur'an and then talking about leaders of

11    al Qa'ida, were you changing to a new topic or was it the same

12    topic?

13    A.   Same topic.

14    Q.   And you've already said that with reference to the Qur'an

15    and the Hadith and such, Mr. Mehanna and Abousamra were more

16    knowledgeable than you?

17    A.   Yes.

18    Q.   What about on issues of the identity and backgrounds of

19    the leaders of al Qa'ida?

20    A.   More knowledgeable.

21    Q.   Now, you testified on cross that Abousamra was more

22    severe; in fact, brought a level of insanity to his

23    personality?

24    A.   Yes.

25    Q.   Was there a level of insanity to his views or just his

1   personality?

2   A.   Both.

3   Q.   Okay.  And what of his views would you describe brought a

4   level of insanity?

5   A.   The way -- I mean, the way he discussed this topic, it

6   almost seemed as if there was no -- it was as if there were no

7   limits in the things that he said or the views that he could

8   have.

9   Q.   And you also said he talked a great deal about fighting

10  jihad.  When you said that, did you mean jihad in the time of

11  Mohammad or jihad today?

12  A.   Who are you referring to?

13  Q.   Abousamra again.

14  A.   No, today.

15  Q.   Now, would that be one on one with you or in discussions

16  with the other members of the crew, Mehanna and Spaulding and

17  Masood?

18  A.   Both.

19  Q.   Now, when Mr. Abousamra made these statements in

20  gatherings where Mr. Mehanna was also present, did he ever get

21  up and say --

22       MS. BASSIL:  Oh, objection, your Honor.  I'm not sure

23  he said that.  It assumes facts not in evidence.

24       THE COURT:  No, I think he did.

25       Go ahead.

```
 1              I think the predicate was just laid.
 2   BY MR. AUERHAHN:
 3   Q.   So in those discussions when Mr. Mehanna was present where
 4   Abousamra was making those statements about jihad today --
 5              MS. BASSIL:  Objection.  It's a compound question.
 6              THE COURT:  Overruled.
 7   BY MR. AUERHAHN:
 8   Q.   -- did Mehanna ever get up and say, "No, Ahmed, you're
 9   wrong"?
10   A.   No; not that I recall.
11   Q.   Do you recall when you said -- you were asked about the
12   chat where you said, "I miss the Ahmed from a few years ago"?
13   A.   Yes.
14   Q.   Do you remember that one?
15        Do you remember what Mr. Mehanna said?
16   A.   He said something like he was still a good brother and
17   that everyone in the group had their strengths.
18   Q.   Did you ever hear Mr. Mehanna disagree with Mr. Abousamra
19   on his views of the obligations of Muslims to fight the United
20   States in Iraq?
21   A.   I don't recall, but at the same time those sort of,
22   quote/unquote, scholarly discussions didn't really -- I don't
23   really recall them having those discussions in front of me.  I
24   was sort of -- I heard sort of the secondary stuff.
25   Q.   What do you mean by "the secondary stuff"?
```

1    A.   Just like the religious -- sort of the stuff in the nature

2    of the things that we would talk about in these chats as well.

3    But, like, actual discussions like that where I felt that they

4    were sort of more scholarly, I don't remember -- in sort of

5    like a debate forum, is what I'm talking about.  I don't

6    remember that occurring.

7    Q.   Now, Ms. -- defense counsel asked you about -- in the same

8    conversation where you were talking about Ahmed, you were

9    talking about giving a sermon and Mr. Mehanna was suggesting

10   various Hadiths.  Do you recall that chat?

11   A.   Yes.

12   Q.   Do you recall who brought up Osama bin Laden during that

13   discussion?

14   A.   No.

15   Q.   Okay.

16        MR. AUERHAHN:  623, please.  And if you could just,

17   Mr. Bruemmer, scroll through the pages so Mr. -- the witness

18   can see what we're talking about.  Just -- okay.

19   Q.   So the bottom here, there's a quote from the Messenger of

20   Allah.  Do you see that?

21   A.   Yes.

22   Q.   Okay.  On the next page the quote continues?

23        MR. AUERHAHN:  You don't have to increase that.

24   That's all right.  Okay.

25        The next page, please?  Next page?

1    Q.   And this is where you talk about, "I miss the Ahmed of a

2    few years ago."  Do you see that?

3    A.   Yes.

4         MR. AUERHAHN:  Okay.  Next page, please?  And then

5    next page, please.

6    Q.   So does this refresh your recollection as to who brought

7    up Osama bin Laden after you were talking about these Hadiths?

8    A.   Tarek.

9    Q.   And similarly, do you recall counsel asking you about the

10   video showing some explosion around some Marines?

11   A.   Yes.

12   Q.   And do you remember what you were talking about before he

13   sent you that link?

14   A.   No.

15        MR. AUERHAHN:  Can we pull up 624, please?  And,

16   again, could you just scroll through the pages?

17   Q.   There's a long quote at the bottom of that page onto the

18   top of the next page.

19        MR. AUERHAHN:  Next page, please.  Okay.  Next page,

20   please.  Next page.  Till we get to the ones that aren't

21   redacted.  And next page.

22   Q.   So you were talking about Hadiths, and then Mr. Mehanna

23   sent you a link.  And do you see that there?

24   A.   Yes.

25   Q.   And says, "Check this out."

1          MR. AUERHAHN:  Go on to the next page, please.

2     Q.   And this is where you're talking about the explosion,

3     correct?

4     A.   Yes.

5     Q.   Down here at the bottom, "A group of Marines seeing a

6     weird object on the ground"?

7     A.   Yes.

8     Q.   So does this refresh your recollection as to what you were

9     talking about before he sent you this link?

10    A.   Yes.

11    Q.   What was it?

12    A.   What was going to be playing in the link.

13    Q.   And before that?

14    A.   How to download it.

15    Q.   And then before that the Hadiths, correct?

16    A.   Correct.

17         MR. AUERHAHN:  And if we can back up a couple of pages

18    on this one.

19    Q.   Now, do you remember counsel asking you about the quote:

20    "You're left with looking to examples of the past because the

21    present is devoid of them" -- do you remember her asking you

22    about that?

23    A.   Yes.

24    Q.   But left out the next sentence:  -- "at least on a local

25    level"?  Do you see that?

1    A.   Yes.

2    Q.   Now, who were the people Mr. Mehanna told you he looked up

3    to like the examples of the past who were not on the local

4    level?

5             MS. BASSIL:  Objection.

6             THE COURT:  Overruled.

7             THE WITNESS:  Certainly, Osama bin Laden being one of

8    them.

9    BY MR. AUERHAHN:

10   Q.   Now, you testified that you were embarrassed by some of

11   your beliefs that you held back in 2006?

12   A.   Yes.

13   Q.   And you were asked, "Is it your testimony that those

14   beliefs were taught to you by Mehanna?"  And you said, "There

15   was certainly help along the way."  Do you remember that?

16   A.   Yes.

17   Q.   On what beliefs did you feel there was help from Mehanna

18   of which you are now embarrassed?

19   A.   The beliefs that are contained within all of the

20   conversations that we saw.

21   Q.   And these chats reflect the fact that you spent a lot of

22   time talking to him?

23   A.   Yes.

24   Q.   Did you confide in him?

25   A.   Yes.

1  Q.  Did you feel he confided in you?

2  A.  Perhaps.

3  Q.  Well, he told you a little bit about his relationship with

4  his father?

5  A.  Right.

6  Q.  And you testified that his father was concerned about his

7  trip to Yemen and his relationship with Mr. Abousamra?

8  A.  Yes.

9  Q.  Did he tell you why his father was concerned about these

10  things?

11  A.  No, but it was understood.

12        MR. AUERHAHN:  And pull Exhibit 617 up, please, page

13  8.

14  Q.  Now, defense counsel asked you about -- several questions

15  about this particular chat, and you said that different phrases

16  have different meanings in different contexts?

17  A.  Yes.

18  Q.  In this context when you said, "Yo, let's go donate blood

19  over the summer," what did that mean?

20  A.  Fight.

21  Q.  I'm sorry?

22  A.  To fight.

23  Q.  Now, after Mr. Mehanna says, "So your mom would kill me,"

24  and you say, "Actually, my dad would be more pissed but they

25  don't have to know about it.  I want to go, man."  He says,

1    "Well, they found out about it so it's not easy to keep them

2    out of the picture."

3        You use the word "it" and he uses the word "it."  What did

4    you mean by "it"?  When you said, "But they don't have to know

5    about it," what is "it"?

6    A.   Referring to the, quote/unquote, blood donation, which

7    referred to fighting.

8    Q.   And counsel asked you -- or said to you, "Lots of people

9    go to Yemen to study," and you said, "Well, I don't know

10   anyone.  I can't think of anyone"?

11   A.   Yes.

12   Q.   And what was your understanding as to why Mr. Mehanna went

13   to Yemen in 2004?

14           MS. BASSIL:  Objection.

15           THE COURT:  Sustained as asked.

16   BY MR. AUERHAHN:

17   Q.   Now, see at the bottom where Mr. Mehanna says, "But

18   seriously, if I try to go again, would you come?"  And then the

19   next line you say, "Yes, dude.  I'm dead serious."  What were

20   you agreeing to do?

21   A.   Go fight.

22           MR. AUERHAHN:  No further questions, your Honor.

23                         RECROSS-EXAMINATION

24   BY MS. BASSIL:

25   Q.   Good morning.

1   A.   Good morning.

2   Q.   Let me go right back to what you just talked about just

3   this -- a minute ago.

4        MS. BASSIL:   Could we have Exhibit 617 back up,

5   please?   And if we could have the second page, please.

6   Q.   Can you see this?   Do you need it bigger?

7   A.   Please.

8        MS. BASSIL:   Please, could you make it bigger?

9   Q.   This conversation -- can you see it?

10  A.   Yes.

11  Q.   This conversation -- this conversation with Mr. Mehanna

12  was about the book "The Oath" that you had bought, right --

13  A.   Yes.

14  Q.   -- and you had read?

15       And it was about an insurgent in Chechnya?

16  A.   That's correct.

17  Q.   And, in fact, you said --

18       MS. BASSIL:   If we could have page 3.   And if we could

19  have just the very top there.   Thank you.   If we could have

20  that bigger.

21  Q.   You said, "I want to go there after reading this, man."

22  That was your comment, correct?

23  A.   That's correct.

24       MS. BASSIL:   Now, if we could go, then, to page 8 -- I

25  believe if we could have page 9 of the same exhibit, please.

1    Thank you.

2    Q.   Mr. Auerhahn just went over with you about going to Yemen

3    with Mr. Mehanna, and you said, "Yes, dude.  I'm dead serious."

4    But on the next page you talk about needing three grand for an

5    apartment for a wife and that it was costly, correct?

6    A.   I believe that was Tarek that said that, yes.

7    Q.   All right.  But you said, "I need 3,000, is probably how

8    much I'd need," correct?

9    A.   Right.

10   Q.   Now, did you meet with the U.S. Attorney after your

11   cross-examination on Friday?

12   A.   No, I did not.

13   Q.   Okay.  Did you talk to him?

14   A.   No.

15   Q.   Now, you were asked -- when Mr. Auerhahn came up here to

16   redirect you, you were asked about things that you didn't say

17   in the grand jury and that you had not met with them -- with

18   him before you went into the grand jury.  Do you

19   remember -- these are just what we started off with this

20   morning, correct?

21   A.   Yes.

22   Q.   And, in fact, there are at least two occasions in the

23   grand jury in which Mr. Auerhahn was not happy with your lack

24   of memory, correct?

25           MR. AUERHAHN:  Objection, your Honor.

1           THE COURT:  Sustained.

2   BY MS. BASSIL:

3   Q.   Do you remember in the grand jury you were asked -- when

4   you were testifying you were told --

5           MR. AUERHAHN:  Objection, your Honor.  She seems to be

6   reading the same thing to which you just sustained an

7   objection.

8           THE COURT:  Well, the objection was sustained as to

9   the form of the question.

10          MS. BASSIL:  Correct.

11          MR. AUERHAHN:  May I take this back from the witness?

12          THE COURT:  Yeah.

13          MR. AUERHAHN:  Thank you, your Honor.

14  BY MS. BASSIL:

15  Q.   On one occasion in the grand jury you were told by

16  Mr. Auerhahn, "You're still under oath, which means a false

17  statement, you can find yourself prosecuted for perjury or

18  obstruction of justice or both."  He said that to you, didn't

19  he?

20  A.   Yes.

21  Q.   And on another occasion in the grand jury -- actually, in

22  the grand jury do you recall asking for some kind of memory

23  refresher from the government?

24  A.   Yes, I did.

25  Q.   All right.  And did you -- were you aware that there were

1    these instant messages that you had had back and forth with

2    Tarek?

3    A.    Before going in or --

4    Q.    Yes.

5    A.    Yes, I was.

6    Q.    Did you know if the government had them?

7    A.    No.

8    Q.    Did you have occasional emails with Tarek?

9    A.    Like I said yesterday, it was more the articles or things

10   that he had written that he sent me.

11   Q.    All right.  But you asked the government for a memory

12   refresher, did you not?

13   A.    Yes, I did.

14   Q.    Okay.  And that's because you were afraid of saying

15   something wrong, correct?

16   A.    Yes.

17   Q.    And you said that you wanted -- you said, "I honestly

18   don't remember details for that -- for that conversation.

19   Anything to refresh my memory?"  And they did not give you

20   anything to refresh your memory.  Is that correct?

21   A.    No, I believe there were some tidbits that were read to me

22   to...

23   Q.    Okay.  They certainly didn't give you a package of these

24   instant messages for you to read before you went into the grand

25   jury?

1   A.    No.

2   Q.    Okay.  Now, Mr. Auerhahn brought up this CD of September

3   11th, and he asked you if you were asked who gave it to you.

4   You were asked in the grand jury who gave it to you and you

5   said no, you were not asked that.

6   A.    I can't recall.

7   Q.    Okay.  Let me go step by step.

8         This morning when Mr. Auerhahn asked you about the

9   September 11th CD, he asked you if you were asked in the grand

10  jury who had given it to you.

11  A.    No.  No, he showed me a conversation --

12  Q.    About that CD?

13  A.    Yes.  And I said I didn't recall or I couldn't tell

14  conclusively from the conversation I was shown.

15  Q.    Okay.  And from the conversation you were shown or the

16  testimony in the grand jury, you didn't know if you were asked

17  who gave it to you?

18  A.    Right.

19  Q.    Okay.  That's what I wanted to be clear about.

20  A.    Okay.

21  Q.    But you knew that you were in the grand jury, your

22  subpoena was -- you knew you were in there to testify about

23  Tarek Mehanna, correct?

24  A.    Yes.

25  Q.    Now, Mr. Auerhahn said you were not an Islamic scholar.

1    He asked you that this morning, correct?

2    A.    Yes.

3    Q.    But the questions I was asking you on Friday, they were

4    pretty basic, were they not?

5    A.    Yes.

6    Q.    I mean, I'm not an Islamic scholar.  I was asking you

7    pretty fundamental stuff, right?

8    A.    Right.

9    Q.    Did I get most of it right?

10   A.    For the most part.

11   Q.    Okay.  And you were interested in this.  You studied this.

12   A.    Yes.

13   Q.    Do you continue to study it?

14   A.    Not as much.

15   Q.    Okay.  Now, Mr. Auerhahn also asked you if Mr. Mehanna was

16   angry about -- I'm sorry -- what he said in reference to

17   current conflicts.  And I think you said he was angry over U.S.

18   troops.  Do you recall that?

19   A.    Yes, I do.

20   Q.    Okay.  Do you recall where you were when these

21   conversations occurred about U.S. troops?

22   A.    No.

23   Q.    When they occurred?

24   A.    Not specifically, no.

25   Q.    Who else was there?

1    A.   No, not off the top of my head.

2    Q.   Now -- and, in fact, on Friday you testified that when

3    there were conversations about U.S. troops or the plight of the

4    Muslims or videos, it was clear to you -- that no one ever

5    said, "We have to get up and do something," correct?

6    A.   It was not said explicitly.

7    Q.   All right.  And, in fact, Tarek said he would talk about,

8    "We're living our comfortable lives and look what's happening

9    to Muslims overseas," correct?

10   A.   Yes.

11   Q.   Now, Mr. Auerhahn --

12        MS. BASSIL:  If we could have Exhibit 635.

13   Q.   And I'll just describe it for you rather than have you

14   scroll through.  This was about choosing a name for your

15   password that we just talked about?

16   A.   Yes.

17   Q.   And it was -- you were looking at Abul-Hassan or

18   Abu-Usama, correct?

19   A.   Yes.

20   Q.   And Mr. Mehanna suggested Abu WTC.  That was a joke, was

21   it not?

22   A.   Yes.

23   Q.   Now, Mr. Auerhahn asked you if Tarek Mehanna and

24   Ahmed Abousamra -- I'm sorry.  I might have that wrong.  Let me

25   just apply it to Tarek because I don't remember -- but that he

1    knew more about the leaders of al Qa'ida than you did, correct?

2    A.    Yes.

3    Q.    But, in fact, you wanted to learn more, did you not?

4    A.    Yes.

5    Q.    You said, I think, in one of the messages, "I want to know

6    as much of them as I know about the Ten Companions"?

7    A.    I said that with regards to the hijackers.

8    Q.    Right.

9    A.    Yes.

10   Q.    Now, Mr. Auerhahn asked you when Ahmad Abousamra -- and

11   I'm paraphrasing here -- was sort of going on and on about

12   things, did Tarek Mehanna ever get up and argue with him?  Now,

13   that was not Tarek's way, to argue with people, was it?

14   A.    No.

15   Q.    He would just get quiet?

16   A.    That's reasonable, yes.

17   Q.    And when the two of you, you and Tarek, in that instant

18   message talked about how you miss the old Ahmed and Tarek said,

19   "He's still a good brother," you felt that way too?

20   A.    Certainly.

21   Q.    Now, although both of you seemed -- well, strike that.

22        You were sort of concerned about the level of Ahmed's sort

23   of accusations, diatribes, correct?

24   A.    I don't understand the question.

25   Q.    Okay.  Bad question.

1    Ahmed's going on and on about things made you

2    uncomfortable, did it not?

3    A.   Sure.

4    Q.   And, in fact, Tarek was agreeing with you that he was

5    constantly bringing things up like Jewish conspiracies and

6    things like that?

7    A.   Right.

8    Q.   All right.  And both of you were saying you kind of missed

9    him before he got like that?

10   A.   Right.

11   Q.   Now, you said that -- and I think you clarified it, but I

12   just want to be clear.  You saw -- you would see Tarek every

13   two or three months, I think you said on Friday?

14   A.   Well, you asked me and I said, yeah, that's about right.

15   Q.   All right.  And sometimes -- many of the times you met

16   with him or with a group of people, it would be about religious

17   things that you were talking about, correct?

18   A.   Yes.

19   Q.   Like when you were -- when you would meet down in Quincy,

20   you would have dinner and you'd talk about a particular passage

21   of the Qur'an or a Hadith?

22   A.   Yeah, this occurred frequently, yes.

23   Q.   And, in fact, when Mr. Auerhahn went over that long

24   instant message about a sermon you were going to give where

25   Tarek made some suggestions, correct?

1    A.    Yes.

2    Q.    And he made -- he gave you a Hadith about how to get a

3    million good deeds, he quoted the Messenger, correct?

4    A.    Yes.

5    Q.    He talked about building a wall of honor for Islam, right?

6    A.    I believe so.

7    Q.    And then he did bring up Osama bin Laden, correct?

8    A.    Yes.

9    Q.    And in these messages you and Tarek would go back and

10   forth.  Sometimes you would bring up Osama bin Laden.

11   A.    Yes.

12   Q.    All right.  And do you recall --

13          MS. BASSIL:  If we could have Exhibit 626, please?

14   I'm sorry, 624.  I apologize.

15          (Pause.)

16   Q.    I don't seem to have the correct number, but let me ask

17   you about this:  Do you remember on Friday I asked you about

18   Tarek talked to you about a man named Yusuf Estes who was going

19   to be giving a talk in Worcester?

20   A.    Yes.

21   Q.    And he was a convert to Islam?

22   A.    Yes.

23   Q.    And immediately after Tarek talked about wanting to see

24   him, you brought up information about Zarqawi?

25   A.    Yes.

```
1   Q.   And I think Mr. Auerhahn brought up that at times -- he
2   asked you if Mr. Mehanna confided in you.  Do you recall that?
3   A.   Yes.
4   Q.   And wasn't also one of the topics of conversation about
5   him finding someone to get married to?
6   A.   Yes.
7   Q.   And that came up pretty often, didn't it?
8   A.   Yeah.
9            MS. BASSIL:  I have no further questions.
10            THE COURT:  All right, Mr. Aboubakr.  Thank you.  You
11   may step down.
12            (The witness is excused.)
13            THE COURT:  Jurors, we have a little bit of an issue
14   we have to resolve before we proceed with further evidence, so
15   we're going to ask you to step out and we're going to take a
16   short recess.
17            THE CLERK:  All rise for the Court and the jury.  The
18   Court will take a recess.
19            (The Court and jury exit the courtroom and there is a
20   recess in the proceedings at 10:24 a.m.)
21   (Court in at 11:17 a.m.)
22            THE COURT:  That took longer than I thought
23   partly because --
24            MR. CHAKRAVARTY:  Sorry, your Honor.
25            THE COURT:  -- the clips were not as short as
```

1   predicted.

2          MR. CHAKRAVARTY:  That's my negligence, your Honor.  I

3   apologize.

4          THE COURT:  I have looked at them.  So if there's an

5   objection, I'll entertain it.

6          MR. CARNEY:  Yes.  May we go video by video?  Or how

7   do you want to do this for this witness?  I'm not sure what

8   ones your Honor's looked at.

9          THE COURT:  I looked at the ones that were identified.

10          MR. CARNEY:  If you'll give me the number, I'll be

11   able to address them.

12          THE COURT:  33, there were three different clips; 41;

13   58.  I did not look at 449 and 450 because that's the whole

14   Umar Hadeed video, isn't it?

15          MR. CHAKRAVARTY:  It is.  We would play the first two

16   minutes, fifteen seconds of one and one minute, fifteen seconds

17   of the next.

18          THE COURT:  I guess start with the lowest number,

19   which is 33.  Is that the Qahtani?

20          MR. CHAKRAVARTY:  It is, your Honor.

21          MR. CARNEY:  Your Honor, the fact that the defendant

22   had possession of this video adds nothing probative to this

23   case, but the prejudice of what's contained on this video can

24   be so intimidating, appalling, to the jurors, both the

25   statements made, the manner in which they are stated.  It

1    doesn't show that he was part of a conspiracy and acting at the

2    direction of al Qa'ida or that he was in direct coordination

3    with al Qa'ida.  The prejudicial value is enormous to have this

4    video be played.  And for that reason, we object to it.

5           MR. CHAKRAVARTY:  Very briefly, in addition to the

6    defendant having possession of this video, the government would

7    offer two chats where the defendant is discussing the contents

8    of the video.  One of them, I believe, Mr. Aboubakr has already

9    testified about.

10          There is a gap -- the government is intending to play

11   this without sound.  The translation is -- can be done at some

12   later time to be able to clarify what the defendant is asking

13   his counterparts on -- in the chat sessions where he discusses

14   particular time stamps.  The contents can be elaborated on

15   later, but the -- in terms of explaining the fact that this

16   defendant was encouraging other people to watch certain parts

17   of this video for a particular purpose, I think is important to

18   the case.

19          With regards to the prejudicial aspects of it, there

20   are two which the government flags.  One is something that your

21   Honor did not view.  Between the first clip and the second

22   clip, there were two beheadings on this video.  The witness

23   would say, between those two clips, there were two beheadings

24   on this video, to shield the jury from that.

25          The clip involving the World Trade Center getting

1    struck is important to convey to the jury that the purpose of

2    this video is to talk about attacking Americans.  And the

3    picture speaks a thousand words in that sense.  It's not

4    particularly graphic.  It's the same news footage and clips

5    that we've all seen, granted, some ten years ago.  So the

6    government would offer each of the clips.

7              MR. CARNEY:  May I respond briefly, please?  The mere

8    mention of beheadings would strike such shock and fear and

9    distaste and emotions in the jury.  What does the beheading

10   have to do with this case?  Does it show that the defendant was

11   under the direction of al Qa'ida?  No.  Does it say that the

12   defendant's point of view is that Muslims, in a Muslim country,

13   can defend their country?  It might.  But we've already had 50

14   exhibits, conversations, videos, and emails about that.

15             How does a beheading add to that instead of -- instead

16   of simply raising the emotional ire of the jury?  You can't say

17   beheadings in this context.  It's primitive.  It's barbaric.

18   It's every word that everyone would think of.  But the fact

19   that the defendant had that in his possession does not mean

20   that it should be admitted in this trial if it doesn't go to

21   the core issue of whether he's acting at the direction of al

22   Qa'ida.

23             In regard to photos of 9/11, it's impossible at this

24   point not to see those and be inflamed about them once again.

25   And the prejudice is unable to be curtailed by any instruction

1  the Court could ever give, any jury selection process that the

2  Court ever went through.  And it is just unnecessary to prove

3  the defendant's state of mind.  And it does not show that he's

4  involved in a conspiracy.  And I would ask that it be excluded.

5        THE COURT:  All right.  The objection is overruled.  I

6  think the clips that I saw do have probative value, and they're

7  not outweighed by prejudice.

8        I would note that the beheadings, as Mr. Chakravarty

9  pointed out, are not shown.  And the footage of the World Trade

10  Center struck me as things we see in retrospectives on national

11  TV.  It's actually an image I think people are inured to at

12  this point.

13        MR. CARNEY:  But would you allow it in a trial to show

14  as evidence against this man?

15        THE COURT:  Yes.

16        So, now, let me just ask about the beheadings, though,

17  because one of the other clips I saw went right up to the point

18  of beheading.

19        MR. CHAKRAVARTY:  Right.  But it, importantly, did not

20  cross that threshold.

21        THE COURT:  I think that's part of 41.  Am I correct

22  about that?

23        MR. CHAKRAVARTY:  Yes.  That's 41, your Honor.

24  There's another video, not that we're going to present with

25  this witness, which also gets right up to that point put then

1    does not --

2         THE COURT:  Is it your intention to show the -- 41, as

3    I recall, is ten minutes long.

4         MR. CHAKRAVARTY:  We were going to play about five

5    minutes.  That's where the five minutes came to my mind, your

6    Honor.  I apologize.  We were going to play five minutes of

7    that.  I think that does include that scene, which is nested,

8    where it shows a captive, and they were preparing to behead.

9         MR. CARNEY:  Any mention of beheadings creates a

10   picture in the jurors' minds that is horrific and graphic.

11   What does the fact that the defendant legally possessed a

12   video, available on the internet, of beheadings have any

13   probative value in this case?  It has none.  It's just designed

14   to shock and appall the jurors, as any of us would be appalled.

15        I respectfully submit that this is exactly the

16   gatekeeper function that your Honor is hold to play here so

17   that just because the government wants to show stuff, doesn't

18   mean it gets shown to the jury.  I mean, this is -- this is

19   material that's coming in in this case that I don't think has

20   come in or I don't know has come in at any of these comparable

21   cases.

22        The reason the government keeps showing all this stuff

23   is to shock and overwhelm the jury because they don't have

24   direct evidence that he was at the direction of al Qa'ida.  So

25   their theory is:  We will show as much as we possibly can to

1    prejudice this jury against Tarek Mehanna so they cannot reach

2    a reasoned verdict no matter what careful instruction your

3    Honor gives.  It's denying this man a fair trial.  This is

4    America.  This is not how these trials should be run,

5    respectfully, your Honor.  The government has got to stop

6    trying to poison this jury.

7              MR. CHAKRAVARTY:  This is a video the defendant was

8    asked to translate.  He had a translation on his computer.  The

9    defendant -- the material is a production of al Qa'ida and goes

10   directly to the issue of whether the defendant conspired to

11   provide material support to al Qa'ida.

12             MR. CARNEY:  Your Honor, they know he did not

13   translate that document.  That document was translated when it

14   was sent to the defendant.  And they know he was asked to edit

15   the document, and they know he did not edit it.

16             MR. CHAKRAVARTY:  I don't know about the last point,

17   but I know that he was asked to edit the document.

18             MR. CARNEY:  They have no evidence that he translated

19   it.

20             THE COURT:  Did he forward it; did he disseminate it?

21             MS. BASSIL:  No.

22             MR. CHAKRAVARTY:  As to whether he disseminated this

23   video?

24             THE COURT:  Yeah.

25             MR. CHAKRAVARTY:  We don't know whether he

1    disseminated the video, your Honor.

2         MR. CARNEY:  So he didn't create it.  He didn't

3    translate it.  He didn't edit it, even though he was asked to

4    do it, and he didn't send it to anybody.  It basically is the

5    equivalent of something that arrives in your mailbox, and based

6    on that, the government wants to introduce it, no matter how

7    horrific it is.

8         MR. CHAKRAVARTY:  Something arrives in your mailbox

9    because you're working with others who are in the business of

10   translating materials for al Qa'ida and one of your

11   coconspirators says, Hey, do you mind doing this because it

12   needs heavy editing.  A brother has already done the

13   translation, but it needs heavy editing.  Since you are one of

14   our translators, will you do this?  And the defendant says yes.

15        MS. BASSIL:  He didn't say yes.

16        MR. CARNEY:  I would ask the government to show --

17        MR. CHAKRAVARTY:  Exhibit 512, last paragraph.

18        MR. CARNEY:  Your Honor, he did not edit this

19   document, and the government knows it.

20        THE COURT:  Mr. Groharing handed it to the wrong

21   people.  I assumed that you had a copy of it.  I don't, at

22   least handy.

23        MS. BASSIL:  That's what they gave us.  We're looking

24   at a different copy.

25        MR. CHAKRAVARTY:  Your Honor, the government would

```
 1   also offer 502 in connection with this --
 2           THE COURT:  This says "502" and this one says "512."
 3           THE CLERK:  Is this 502?
 4           MR. GROHARING:  Yes.
 5           THE COURT:  Okay.  I think the chats are probative to
 6   the existence of a conspiracy, and I think the video can be
 7   used in conjunction with that.
 8           MR. CARNEY:  Your Honor, I move for a mistrial.
 9           THE COURT:  Denied.
10           MR. CARNEY:  Is -- what is the next number your Honor
11   has?
12           THE COURT:  Next number was 58.
13           MR. CARNEY:  This is probably the most prejudicial
14   video in the possession of the government, and I'm talking
15   about it exceeding videos of Humvees blowing up.  It exceeds
16   video of the World Trade Center.  The images depicted on this
17   video are graphic and horrific, in the video that I've been
18   provided.
19           THE COURT:  Is it --
20           MR. CHAKRAVARTY:  Just to clarify, so this is about a
21   five-minute video which the government has pared down to the
22   first 40 seconds which does not depict -- this was the subject
23   of one of the defendant's motions in limine.
24           THE COURT:  One of them began with some Russian, or is
25   that -- is that 41?
```

1           MR. CARNEY:  Are you talking about 58?

2           THE COURT:  Maybe that was one we miss-hit it, I

3    think.  I think that was a different one.  We were on the wrong

4    clip.

5           MR. CHAKRAVARTY:  This one, it's in Arabic.  There's a

6    depiction of Osama bin Laden between the seconds ten through

7    about forty, at which point the clip cuts off.  After forty

8    seconds, the witness would describe that what is depicted is

9    the mutilated remains of two American servicemen.  Those

10   remains are not going to be shown to the jury.  But the

11   defendant, on repeated occasions, distributes and discusses

12   this video with several of his -- the other participants in the

13   instant messages.

14          THE COURT:  Is this witness Arabic speaking?

15          MR. CHAKRAVARTY:  He is.

16          THE COURT:  Will he translate some of the matters?

17          MR. CHAKRAVARTY:  On Friday, pursuant to the Court's

18   instruction, we had done a verbatim translation of the first

19   several scenes, including the speech of Osama bin Laden, which

20   leads up to the depiction of the corpses.  This witness would

21   describe simply what he observes without translating anything

22   else from the forty seconds on.

23          MR. CARNEY:  I have an objection to that if he's

24   describing what he -- if he's translating --

25          THE COURT:  It's a substitute for showing it.

1          MR. CARNEY:  It's -- so that instead of it being the

2     horrific graphic, he's able to describe the horrific graphic

3     and so, therefore, it's nonprejudicial?

4          THE COURT:  If he weren't allowed to describe it, then

5     we would confront the question whether the graphic was

6     probative enough to be in evidence.  That's the problem.  I

7     think you're better off with the description.

8          MR. CARNEY:  The description has no probative value to

9     the case.  It doesn't go to prove the defendant's state of

10    mind.

11         THE COURT:  Let me just ask the link to issues in the

12    case.  With the last one -- I'm looking at the chats -- it

13    appeared to me that it was -- it was probative at least on the

14    question of the existence of a conspiracy.

15         MR. CHAKRAVARTY:  So this one is the so-called Texas

16    Barbecue video, your Honor.  The defendant discusses, what the

17    government alleges, is the appropriate solution, the

18    appropriate response to American transgressions, especially in

19    Iraq, by taking matters into their own hands and this graphic

20    -- this image --

21         THE COURT:  Discusses where?

22         MR. CHAKRAVARTY:  In chats, in chat sessions, your

23    Honor, in several -- the government was going to highlight

24    about four of them.

25         THE COURT:  With whom?

1          MR. CHAKRAVARTY:  With various individuals.  One is

2     with a person named Tauqir.  One is with a person named Ihab;

3     one is with one of the Tibyan Publications participants named

4     Abu Saqr -- two of them are with Abu Saqr.  There are others as

5     well, but the government was only going to refer to these four

6     at this time.

7          MR. CARNEY:  So the defendant spoke to an acquaintance

8     and said, You ought to see this video that I have.

9          THE COURT:  On that proffer, I don't think there's

10    enough for this one.  I don't think it, as with the other one,

11    suggested conspiracy as opposed to discussion.

12         MR. CHAKRAVARTY:  Your Honor --

13         THE COURT:  For the time being.  Maybe you can come

14    back to it.  I don't know.  Just from the state of the

15    evidence.

16         MR. CARNEY:  Is the next one 449, your Honor?

17         THE COURT:  So that was 58.

18         MR. CHAKRAVARTY:  Your Honor --

19         MR. CARNEY:  Is the next one 449?

20         MR. CHAKRAVARTY:  -- if I may, for reasons other than

21    the existence of a conspiracy but, rather, what the objective

22    of the conspiracy is, specifically here, that attacks or

23    killing U.S. soldiers is an appropriate response.  There is a

24    conspiracy to kill here.

25         THE COURT:  I'm not sure, for that point, it's not

1    cumulative.  There might be other matters, but for now, I would

2    sustain the objection to that.

3              MR. CHAKRAVARTY:  All right.

4              MR. CARNEY:  Does the next one your Honor --

5              THE COURT:  Well, the next two that were referenced

6    were 449 and 450, which is the entire Umar Hadeed videos.

7              MR. CHAKRAVARTY:  It's the State of the Ummah video.

8              THE COURT:  Sorry.  The State of the Ummah video.  I

9    didn't actually look at the whole thing because it's an hour

10   and a half.

11             MR. CHAKRAVARTY:  The first two minutes, fifteen

12   seconds is largely a speech, which has subtitles from Osama bin

13   Laden.  Explains that the video is from Alashaab Media

14   Production, which is relevant to the fact that the defendant

15   was translating, therefore.  The second one minute, fifteen

16   seconds from Exhibit 450 depicts, again, Osama bin Laden

17   calling youth to come engage in fighting, and it depicts a

18   training camp.

19             MR. CARNEY:  This video was shown on Al-Jazeera, your

20   Honor, which, as you know, is comparable to CNN.  The fact that

21   it is a publicly available document for anybody to see suggests

22   that it somehow is a crime to be listening to the words of

23   Osama bin Laden.

24             Once again, one of the goals of the prosecution is to

25   mention Osama bin Laden's name as much as possible and to show

1    the Twin Towers as often as possible.  Where is the direct

2    connection that shows that there is a conspiracy with the

3    defendant?  Because he went on Al-Jazeera and looked at a video

4    there?  The defendant looked at Al-Jazeera and then he would

5    look at CNN and then look at Al-Jazeera and look at CNN.  And

6    at their websites, they have an ability to download things, and

7    he downloaded them.  That neither shows a conspiracy, nor does

8    it show the defendant's state of mind that he would look at

9    this and download it.

10           THE COURT:  Well, the objection is overruled as to

11   this.  I mean, the defense is sort of suggesting that every

12   piece of evidence has to prove the entire case, and that's

13   certainly not the way things --

14           MR. CARNEY:  No.  What I'm suggesting, your Honor, is,

15   if the government is trying to make a point, for example, in

16   the example I gave this morning.  If a defendant is charged

17   with killing a black man, and he says, I had nothing to do with

18   it, and the defendant is a racist and he says, Yeah, I am a

19   racist.  I don't like black people.  And the government puts in

20   a couple of exhibits confirming he doesn't like black people.

21   He said some crude things, some appalling things.  He's got

22   some crude videos.  He speaks in chats all the time.

23           And if the defense counsel at the outset said, My

24   client's a racist, but that doesn't mean that he killed the

25   person, then the government should focus on establishing that

```
 1   he's a racist.  The government in this case has established
 2   that Mr. Mehanna believes Muslims have the right to defend
 3   their countries against invading armies.  They've proved it
 4   over and over and over again.
 5          I'm not suggesting that they have to prove their whole
 6   case in one video.  But if this snippet is designed to show
 7   state of mind, I don't know how much more I can concede it than
 8   what I did in my opening.  If it's designed to show conspiracy,
 9   it doesn't show conspiracy.  It shows the exercise of the First
10   Amendment to read something.
11          THE COURT:  Okay.  The objection is overruled.  That
12   can be used.
13          MR. CARNEY:  I move for a mistrial, your Honor, if
14   you're going to permit that.
15          THE COURT:  Denied.
16          Are we ready for the jury?
17   (Jury in at 11:39 a.m.)
18          THE COURT:  Jurors, again, thank you for your
19   patience.  It took us a little longer than I thought to resolve
20   the question.  But we're ready to move on now.  Mr.
21   Chakravarty.
22          MR. CHAKRAVARTY:  Thank you, your Honor.  The
23   government calls Andre Khoury.
24          MR. CARNEY:  May I have a continuing objection to the
25   matters we discussed?
```

1          THE COURT:  Yes, of course.

2          ANDRE KHOURY, Sworn

3          THE CLERK:  Please be seated.  State your name and

4    spell your last name for the record.

5          THE WITNESS:  It's Special Agent Andre Khoury,

6    K-H-O-U-R-Y.

7    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

8    Q.   Good morning, Mr. Khoury.  Where do you work?

9    A.   At the FBI office in Boston.

10   Q.   Okay.  What position do you have there?

11   A.   I'm a special agent.

12   Q.   How long have you been a special agent?

13   A.   For 15 years.

14   Q.   What is your -- what squad are you on?

15   A.   Right now, I work on the Field Intelligence Group Squad.

16   Q.   In the 15 years that you've been with the FBI, what has

17   been your subject matter?

18   A.   I have worked terrorism for my entire career.

19   Q.   When did you first start at the FBI?

20   A.   I joined the FBI in 1996.

21   Q.   Where were you assigned at that point?

22   A.   I was assigned to the Washington field office on the

23   Extra-Territorial Squad.

24   Q.   What did that involve?

25   A.   It involved investigating overseas cases of terrorism.

1    Q.   And after that, where were you assigned?

2    A.   Then I was assigned to Boston for a brief period before I

3    was transferred overseas.

4    Q.   What was your first overseas assignment?

5    A.   I was one of the FBI representatives in Egypt.

6    Q.   How long were you there?

7    A.   I was there from 2002 to 2004.

8    Q.   And after, where did you go?

9    A.   Amman, Jordan.

10   Q.   How long were you in Jordan?

11   A.   I was in Jordan from 2004 to 2007.

12   Q.   What was your assignment in Jordan?

13   A.   I was the FBI representative in their country.  I'm sorry.

14   It was the end of 2006.

15   Q.   And after Jordan, where did you go?

16   A.   Rabat, Morocco.

17   Q.   Again, were you assigned to the Moroccan -- to be the

18   attache in Morocco?

19   A.   Exactly.  I was the FBI representative in Morocco until

20   the end of 2007.

21   Q.   After Morocco, where did you go?

22   A.   After Morocco, I left the FBI briefly, for a period of a

23   year and a half, and I worked for Goldman Sachs in the United

24   Arab Emirates based in Dubai.

25   Q.   At some point, you rejoined the FBI?

1    A.    That's correct.  In 1999, I came back to Boston.

2    Q.    2009?

3    A.    I'm sorry, 2009.

4    Q.    And you returned to Boston under which squad?

5    A.    The Field Intelligence Group.

6    Q.    In addition to these assignments that you've had, have you

7    also, on special projects, have you also had occasion to travel

8    around the world?

9    A.    Yes, I have.

10   Q.    Again, in what capacity?

11   A.    As an investigator in terrorism cases.

12   Q.    More recently, last year, did you have an overseas

13   assignment?

14   A.    I did.

15   Q.    Where was that?

16   A.    That was in Jerusalem, working with the Palestinian

17   Authority in the West Bank.

18   Q.    And now you're back here in Boston, at least for now?

19   A.    For now.

20   Q.    In addition to these assignment overseas, did you have

21   particular projects in other countries?  And let me -- I'll

22   walk you through some of them.  Did you serve in Yemen?

23   A.    Yes, I have.

24   Q.    When was that?

25   A.    That was in 2000, after the USS Cole bombing.

1    Q.   Again, was that in an investigative capacity?

2    A.   That's correct.

3    Q.   Did you serve in Saudi Arabia?

4    A.   Yes, I have.

5    Q.   When was that?

6    A.   I served in Saudi Arabia multiple times:  1996 or early

7    1997, I was there investigating the Khobal Tower bombing.  Then

8    I worked in establishing the office of the legal attache, the

9    FBI office in Saudi Arabia, for a couple of years.  And then in

10   2003, I was there during --

11        MR. CARNEY:  I object, please.

12        THE COURT:  Overruled.  Go ahead.

13   A.   And in 2003, I was there for a period of nine months, ten

14   months, investigating the bombings of the compounds in Saudi

15   Arabia.

16   Q.   Was that in Riyadh?

17   A.   That's correct.

18   Q.   Did you serve in Pakistan?

19   A.   Yes, I have.

20   Q.   Approximately when?

21   A.   I wouldn't say serving in Pakistan.  Pakistan was more of

22   flying in to do some investigations with the Pakistani

23   counterparts, trying to target some high-level al Qa'ida

24   individuals after the 9/11 attacks.

25   Q.   Were you in East Africa at some point?

1          MR. CARNEY:  I object.  May we approach, please?

2          THE COURT:  All right.

3     (SIDEBAR CONFERENCE AS FOLLOWS:

4          MR. CARNEY:  Your Honor, this witness has no direct

5     connection to this case whatsoever as an investigator, to my

6     knowledge.  He is simply going to be the person who sits on the

7     stand and reads documents.  What we're hearing is a tour of the

8     world of terrorist activity, and I just don't think that's

9     necessary when someone is just going to be reading.

10          MR. CHAKRAVARTY:  He's also going to be presenting

11    maps and orienting the jury as to where certain places are.

12          MS. BASSIL:  No one told us --

13          MR. CARNEY:  My daughter could present maps to the

14    jury.  And it does not need to have a recitation of I went to

15    this terrorist site and that terrorist site.  It's not

16    necessary.  I'd ask that we move to the reading.

17          MR. CHAKRAVARTY:  The fact that he's familiar with

18    this place helps shed light in terms of --

19          THE COURT:  Is there more?

20          MR. CHAKRAVARTY:  Not much more of his background.

21    He's going to establish that he's an Arabic speaker, and then

22    we're going to get into the maps.

23          THE COURT:  What about this travel?  Anymore of his

24    travels?  I mean, I tend to think we do have enough.

25          MR. CHAKRAVARTY:  I'm not trying to sugarcoat it, your

 1   Honor.  Some of those places are going to be relevant to what

 2   his description is of things he's going to later discuss.

 3            MR. CARNEY:  If you don't think this is sugarcoating,

 4   then you think cotton candy is a dietary supplement.

 5            THE COURT:  Let's move on.  If at some point he wants

 6   to talk about something that he needs more background, we can

 7   get the background.

 8   .  .  .  END OF SIDEBAR CONFERENCE.)

 9   Q.   Agent Khoury, just one final geography question about your

10   service.  At some point, did you serve in Iraq as well?

11   A.   Yes, I did.

12   Q.   What is your background?

13   A.   I'm originally Lebanese.  I was born and raised in

14   Lebanon.

15   Q.   Attended college here and joined the FBI several years

16   ago?

17   A.   Correct.  I moved to the United States in 1988, and I

18   attended college here in the Boston area.

19   Q.   Do you speak and understand other languages?

20   A.   Yes, I do.

21   Q.   Specifically which languages?

22   A.   Arabic and French.

23   Q.   Did you grow up speaking in Arabic?

24   A.   That's right.  That's the primary language in Lebanon.

25   Q.   Have you used your Arabic language skills in the course of

1    your duties in the FBI?

2    A.    Throughout my career.

3    Q.    Have you, in fact, been asked to translate documents

4    before even though that's not your job?

5    A.    Yeah, when need to.

6    Q.    You described that you had been to Yemen.

7          MR. CHAKRAVARTY:  And I'm going to call up, just for

8    the witness at this point, Exhibit 749.

9    Q.    Do you recognize what this is?

10   A.    It's a map of Yemen and Saudi Arabia with Somalia and

11   Djibouti below.

12   Q.    Does it appear to be a fair and accurate depiction of that

13   area?

14   A.    Yeah.

15         MR. CHAKRAVARTY:  May I ask that this be introduced

16   and published as Exhibit 749?

17         MR. CARNEY:  No objection.  Thank you.

18   (Exhibit No. 749 received into evidence.)

19   Q.    Agent Khoury, if you can -- and tell me if you can't read

20   any of the writing if it's relevant to your testimony.  You

21   said at some point you were assigned in Yemen?

22   A.    That's correct.

23   Q.    And you mentioned that you were investigating the USS

24   Cole?

25   A.    That's right.

1    Q.    When was that?

2    A.    That was in 2000.  The USS Cole was -- if I'm not

3    mistaken, it was October of 2000.  And after that is when I was

4    in Yemen.

5    Q.    Can you just tell the jury what the USS Cole investigation

6    was?

7            MR. CARNEY:  I object, your Honor.

8            THE COURT:  Overruled.

9    A.    The USS Cole was the suicide bombing that took place

10   against one of the U.S. ships that was docked in aid in Yemen

11   in October of 2000 where 19 sailors were killed.

12   Q.    Who was responsible for that attack?

13   A.    Al Qa'ida was.

14   Q.    When you were there, was there an al Qa'ida presence?

15           MR. CARNEY:  I object and move to strike.

16           THE COURT:  I'll strike that answer.  That may be his

17   conclusion, if that's the case.  But I'll strike it, and the

18   jury will disregard it.

19           MR. CARNEY:  May the jury be instructed of what effect

20   your Honor's striking --

21           THE COURT:  I did.  I just said the jurors will

22   disregard it.

23           MR. CARNEY:  Excuse me.

24   Q.    When you were in Yemen, was there an al Qa'ida presence in

25   Yemen?

1    A.    A very big presence.

2    Q.    Did you have the opportunity to travel throughout Yemen?

3    A.    Yes, I have.

4    Q.    Are you familiar with the area called Ma'rib?

5    A.    Yes, I am.

6    Q.    What is that?

7    A.    It's --

8          MR. CARNEY:  I object, and I'm sorry, but we need to

9    approach.

10         THE COURT:  Okay.

11   (SIDEBAR CONFERENCE AS FOLLOWS:

12         MR. CARNEY:  Your Honor, we were informed that this

13   person would be reading documents and, I expect, similarly to

14   how a previous person would read one end of a chat and this

15   witness would read another or read a document that is contained

16   below a video.  We were given no notice whatsoever that he

17   would be offered as an expert in Yemen.  And now we're hearing

18   he's talking about Cole, the presence of al Qa'ida, the

19   investigation of these things.  Respectfully, that's far beyond

20   a reader.  And we should have been given notice that he's a

21   Yemeni expert, and we have not been.

22         MS. BASSIL:  We were not given any notice of his

23   background either or where he had been, that he had been in

24   Yemen or any of these places.

25         MR. CHAKRAVARTY:  He's not a Yemeni expert.  He's

1    explaining his basis of knowledge of explaining what this map

2    is and that he's familiar with this area.

3           THE COURT:  What's Ma'rib?

4           MR. CHAKRAVARTY:  Ma'rib is a place where the

5    defendant later -- the evidence will show, the defendant

6    allegedly went to.  I'm honing in for the jury these locations

7    which they're going to hear about in this case.  And he happens

8    to have been there.

9           THE COURT:  Is he doing anything more than pointing to

10   it on the map?

11          MR. CHAKRAVARTY:  No.

12          MR. CARNEY:  Then I withdraw the objection.

13          MS. BASSIL:  If all he's going to do is point to where

14   all these things are on the map, then I don't think we need to

15   know whether al Qa'ida had a presence or investigation or

16   anything of that nature.  It's really unfair.

17          THE COURT:  I agree.  If he's starting to describe his

18   experience or knowledge about Yemen particularly because he's

19   acquired some specialized knowledge, then I think it would

20   probably put him in an expert category.

21          MS. BASSIL:  We're not going to ask him the basis of

22   how do you know where Ma'rib is.

23          THE COURT:  All he's going to do is point because he's

24   familiar with the geography.

25          MR. CARNEY:  Then I would move to strike his testimony

1    about al Qa'ida and Yemen.

2             THE COURT:  I did strike the testimony about al

3    Qa'ida.

4             MS. BASSIL:  And the USS Cole.

5             MR. CARNEY:  Well, the Cole, we can live with.

6             THE COURT:  We'll leave it as is.

7             MR. CHAKRAVARTY:  He's going to talk about going to

8    Iraq.  I'm going to put an Iraq map up there.  In some of the

9    chats that he's going to be reading, there are particular

10   events related to the background that he just described.  For

11   example, when Abu Murab al-Zarqawi dies in 2006, he was

12   personally aware of it.  I'm going to ask him, do you --

13            MR. CARNEY:  I can get your Honor the email that was

14   sent to us regarding this witness, which is the only notice we

15   got about this witness because he never wrote a report.  And

16   the one word says "reader."  Reader is, he's supposed to be

17   reading.

18            THE COURT:  Well, I think the line that I would draw

19   is where it becomes expert as opposed to personal experience.

20            MR. CHAKRAVARTY:  That's always been the government's

21   intention.

22            THE COURT:  Because that's what the notice -- you need

23   notice of an expert.  I don't know that you need notice of

24   everything that a non-expert is going to say.

25            MS. BASSIL:  That's -- your Honor, we have no notice

1  that he's ever been in Iraq, that he's ever been in Yemen.

2  He's going to talk about what was going on in Iraq, and we have

3  no --

4        THE COURT:  Well, it depends on the questions.  If

5  it's specialized knowledge --

6        MR. CHAKRAVARTY:  He's a lay witness.

7        MS. BASSIL:  He's a lay witness?

8        THE COURT:  -- it will be excluded.

9        MS. BASSIL:  Lay witnesses --

10        THE COURT:  Okay.  That's the line.

11        MS. BASSIL:  That is specialized knowledge.

12  .  .  .  END OF SIDEBAR CONFERENCE.)

13  Q.   Agent Khoury, on the map in front of you, if you can --

14  the screen in front of you is actually touch sensitive.  Can

15  you just circle the area that you know as called Ma'rib?

16  A.   (Indicating).  It didn't circle it exactly, but --

17  Q.   Go ahead.

18  A.   (Indicating.)

19  Q.   I guess I've moved your circle.  What's depicted on the

20  screen is the area called Ma'rib, is that right?

21  A.   Correct.

22  Q.   This is around the area that you circled?

23  A.   That's right.

24  Q.   And the capital of Yemen, would you identify that for the

25  jury?

1    A.   It's Sanaa, right here (indicating).

2    Q.   And then are there two main port areas, one down here,

3    around Aden?

4    A.   Correct.

5    Q.   And then one up here called Al Mukalla?

6    A.   Al Mukalla.

7    Q.   Agent Khoury, you described that you had been to Pakistan,

8    is that right?

9    A.   That's right.

10         MR. CHAKRAVARTY:  I'm going to call up Exhibit 751,

11   just for the witness, please.

12   Q.   Does this appear to be a fair and accurate map of the

13   Pakistan area?

14   A.   It's Pakistan, Afghanistan, and India all together.

15   Q.   So the -- the area between Afghanistan and India, does

16   that appear to be Pakistan?

17   A.   Correct.

18   Q.   Would this help in your testimony today?

19   A.   Could you please repeat that?

20   Q.   Yes.  Will this help in your testimony -- present your

21   testimony?

22   A.   I can't really see it clearly.

23   Q.   I'll blow it up for you.

24   A.   Okay, yup.

25         MR. CHAKRAVARTY:  I would ask that this be introduced

1   as Exhibit 751.

2          MR. CARNEY:  No objection, your Honor.

3          THE COURT:  All right.

4   (Exhibit No. 751 received into evidence.)

5   Q.   I think you said that you were in Pakistan right after

6   9/11, around then?

7   A.   (Nodding.)

8   Q.   Is there a particular area which is known as the Khyber

9   Pass in Pakistan?

10  A.   Well, it touches on the Peshawar area of Pakistan, which

11  is close to Afghanistan.

12  Q.   Is that -- is that Peshawar in pixillated graphics?

13  A.   Yeah, right.  I see it.

14  Q.   I'll make it a little bigger.  So if this is Peshawar --

15  that's a city in Pakistan, is that correct?

16  A.   That's correct.

17  Q.   This is Jalalabad, which is in Afghanistan, is that right?

18  A.   That's right.

19  Q.   And this line here, this marks the border between the two

20  countries?

21  A.   That's correct.

22  Q.   You said that you had been to Afghanistan as well, is that

23  right?

24  A.   That is not true.

25  Q.   I'm sorry.  I didn't -- thank you.  So you had not been to

1   Afghanistan?

2   A.   That's "not."

3   Q.   You said you had been to Iraq, correct?

4   A.   That's correct.

5        MR. CHAKRAVARTY:  I ask to call up Exhibit 750 for the

6   witness.

7   Q.   Does that appear to be a fair and accurate depiction of

8   the borders of -- and then the map of Iraq?

9   A.   Yup.

10       MR. CHAKRAVARTY:  I'd ask that this be introduced as

11  Exhibit 750.

12       MR. CARNEY:  No objection, your Honor.  Thank you.

13       THE COURT:  Okay.

14  (Exhibit No. 750 received into evidence.)

15  Q.   I draw your attention to a few of the cities here.  You're

16  familiar with Baghdad, the capital?

17  A.   Yes, I am.

18  Q.   Is that right here?  Did I accurately circle that?

19  A.   You did.

20  Q.   Are you familiar with Fallujah?

21  A.   I am familiar with Fallujah, yes.

22  Q.   Is this Fallujah here?

23  A.   That's the right circle.

24  Q.   Approximately what time were you in Iraq?

25  A.   April of 2003 to August of 2003.

1    Q.    Are you also familiar with Ramadi?

2    A.    I am familiar with Ramadi.

3    Q.    Did I accurately circle the area of Ramadi?

4    A.    Yes, you did.

5    Q.    Finally, just for -- to orient the jurors, are you

6    familiar with the city of Basrah?

7    A.    I am.

8           MR. CHAKRAVARTY:  I'm sorry, your Honor.  Can I

9    introduce Exhibit 750 and publish it to the jury?  I don't know

10   if they have it.  Thank you.

11   Q.    So, again, this is Baghdad; this is Fallujah; and this is

12   Ramadi, all in Iraq?

13   A.    Yeah.

14   Q.    And then is the city of Basrah down here in the south?

15   A.    It is one of the southern cities, and it's right down

16   here, yeah.

17   Q.    Agent Khoury, have you been to Saudi Arabia?

18   A.    Yes, I have.

19          MR. CHAKRAVARTY:  I'd ask to call up Exhibit 754,

20   again, initially, just for the witness.

21   Q.    Agent Khoury, is this a broader view of the Arabian

22   Peninsula than the map of Yemen that we saw earlier?

23   A.    That is correct.

24   Q.    Okay.  Does this fairly and accurately depict Saudi

25   Arabia?

1  A.   Yes, it did.

2       MR. CHAKRAVARTY:  I'd ask that this be published and

3  introduced.

4       MR. CARNEY:  No objection, your Honor.  Thank you.

5  (Exhibit No. 754 received into evidence.)

6  Q.   All right.  Agent Khoury, you said that at one point you

7  went to investigate some bombings in Riyadh.  Can you show us

8  where Riyadh was -- is?

9  A.   Riyadh is a gap of Saudi Arabia, and it's right here

10  (indicating).

11  Q.   All right.  Are there other significant cities in Saudi

12  Arabia, or is that the principal place of commerce?

13  A.   There's a lot of principal cities in Saudi Arabia.

14  Obviously, they have Mecca and Medina.  You have the eastern

15  province of Saudi Arabia where the Khobal Tower bombing was.

16  You've got Riyadh.  I would say those possibly are the most

17  significant.

18  Q.   I'm going to move on now to -- I'll ask you about your

19  relevant background if it comes up in the course of some of the

20  things we're going to talk about in a moment.

21       I'll move on to some of the media that you were asked to

22  view for purposes of testimony in this case.

23  A.   Okay.

24  Q.   Just to orient the jury, did you have a role in the

25  investigation of this case?

1    A.   I did not investigate the case itself, but I sit next to

2    the squad that investigates the case, and we confer about it

3    every once in a while.

4    Q.   So in this case, you were asked to review some media for

5    purposes of presenting that to the jury, is that right?

6    A.   Right.

7    Q.   Are you familiar with a film called State of the Ummah?

8    A.   Yes, I am.

9    Q.   What is that?

10   A.   It's a compilation of different clips that are -- I have

11   seen on YouTube, and I also saw on a disk that was provided to

12   me.  But it -- State of the Ummah is just a tape about

13   different clips that were aired on Al-Jazeera or the Saudi

14   Arabian TV or the Egyptian TV about different events that

15   happened in the world.

16   Q.   This is a publicly available video?

17   A.   Yes, it is.

18   Q.   You said that you watched this video on YouTube.  Is it

19   available on YouTube?

20   A.   Yes, it is.

21          MR. CHAKRAVARTY:  May I approach, your Honor?

22          THE COURT:  You may.

23   Q.   I'm handing you a disk.  You mentioned that you also saw a

24   compact disk version of this video.  Is what I've handed you a

25   copy of that disk?

1    A.    That is correct.

2    Q.    Have you had an opportunity to view clips of Exhibits 449

3    and 450 as they've been marked in this case?

4    A.    Would this be the State of the Ummah CD you're talking

5    about?

6    Q.    Yeah.  Is this the video?

7    A.    This is that CD that I've watched.

8    Q.    So with regards to Exhibits 449 and 450, which were drawn

9    from that CD, are those the State of the Ummah video that you

10   watched?

11   A.    Yes.

12         MR. CHAKRAVARTY:  At this point, your Honor, I move to

13   introduce Exhibits 449 and 450 and then play it.

14         THE COURT:  All right.

15   (Exhibit Nos. 449-450 received into evidence.)

16         MR. CHAKRAVARTY:  Play the first two minutes and

17   fifteen seconds.

18   (Video played.)

19   Q.    At the end of that first clip is a depiction of an

20   explosion, and there's a screen shot that says, "The

21   Destruction of the American Destroyer, the USS Cole."  Is that

22   what you were referring to earlier?

23   A.    Yes, I was.

24         MR. CHAKRAVARTY:  And then I'm going to turn to Part 2

25   of this video, Exhibit 450, and I'll ask to publish minutes --

1    the first one minute and fifteen seconds.

2    (Video played.)

3    Q.    Agent Khoury, I'm going to turn your attention now to some

4    of the defendant's stored instant message communications.

5            MR. CHAKRAVARTY:  Can you call up Exhibit 657, which

6    should in evidence, your Honor.  Go to Page 3.  Actually, can

7    you just go back to Page 2, just the last line first.

8    Q.    Agent Khoury, if we can read through this portion of this

9    chat.  If you'd just start with this last line.  And there's

10   something written in Arabic there.  Do you know what that says?

11   A.    It says, "Al Faqir Ila-Allah," which is the poor to God.

12   Q.    The poor to God?

13   A.    That's right.

14           MR. CHAKRAVARTY:  If we could go back to Page 1 just

15   to orient the jury.

16   Q.    Is the header information for that

17   ibnulkhattab82@yahoo.com and a conversation with a person named

18   Dan Spaulding on May 28 of 2006?

19   A.    Correct.

20   Q.    If you could just read that last line, then we'll -- I'll

21   take the role of Dan Spalding if you take the role of the

22   defendant, and we'll just read the next portion.

23   A.    "I was thinking of having all us bro over my house."

24           MR. CHAKRAVARTY:  Next page, please.

25   Q.    "When?"

1    A.    "You, Ahmad, Ahmad al-Farsi, etc, sometime at the start of

2    June."

3    Q.    "Oh."

4    A.    "Maybe the week after Abdil Majid's thing."

5    Q.    "Sure, inshaa-'Allaah, Allah willing."

6    A.    "We can have a movie night."

7    Q.    "What movie?  State of the Ummah?"

8    A.    "No.  Heads up."

9    Q.    Laugh out loud.  "Heads up?"

10   A.    Laughing, "joke."

11   Q.    "Does it star Mr. Z?"

12   A.    "Yes."

13   Q.    "It should be heads off."

14         Did we accurately read that portion of that chat?

15   A.    Yes.

16         MR. CHAKRAVARTY:  I'm going to call up Exhibit 556,

17   please.

18   Q.    Again, if -- sorry, just to orient the jury, is this a

19   chat that occurred on March 17, 2006, between the defendant and

20   a person named Ahmad Rashad?

21   A.    That's correct.

22   Q.    All right.  If we could read through this chat.  Ahmad

23   Rashad says, "Okay, akhi."

24   A.    "The kid.  At the beginning of the Afghan nasheed chant is

25   the shaykh's son."

1    Q.    "Yeah?"

2    A.    "Hamza."

3    Q.    "Yeah, that's him.  I don't know how many he has."

4    A.    "He has 23 kids."

5    Q.    "Oh, God bless."

6    A.    "Yeah, he is the one in the State of the Ummah."

7    Q.    That should be -- Rashad says, "Yeah, he is the one in the

8    State of the Ummah vid."

9    A.    "Four wives, man, yeah."

10   Q.    "We don't hear too much about them."

11   A.    "Who?"

12   Q.    "The kids."

13   A.    "Yeah, well, hehe.  He sent some of them out of

14   Afghanistan for protection."

15   Q.    "I see."

16         Is that an accurate read of that portion of that Exhibit

17   556?

18   A.    Yes.

19   Q.    Agent Khoury, did you have an opportunity to view a video

20   called Wa Yakoon?

21   A.    Yes, I have.

22   Q.    I draw your attention to Exhibit 502.  Is this a chat

23   dated February 5 of 2006 between the defendant and Abu Mundhir?

24   A.    That's correct.

25             MR. CHAKRAVARTY:  Let me go to Page 2, please.

1          MR. CARNEY:  I object to this, your Honor, please, and

2     I'd ask to be heard.

3          THE COURT:  All right.  I'll see you at the side.

4     (SIDEBAR CONFERENCE AS FOLLOWS:

5          MR. CARNEY:  Could I have one second?  You all can

6     stay here.

7          THE COURT:  Would it profit me to look at it or not?

8     Unless you're going to keep me out of it?

9          MR. CARNEY:  I might be confused.  This does not

10     relate to the one that his Honor excluded?

11          MR. CHAKRAVARTY:  Correct.  That was the Juthath video

12     which we're not going to --

13          MR. CARNEY:  Okay.  Thank you.  Sorry for the

14     interruption.

15          Your Honor, I withdraw the objection.

16          THE COURT:  Okay.

17     .  .  .  END OF SIDEBAR CONFERENCE.)

18     Q.   I'm going to start with this portion, and we'll go on to

19     the next page.  Abu Mundhir says, "So I was thinking, Abu Anas

20     is pretty inspirational cause he talks himself instead of

21     people talking for him."

22     A.   "And it shows him making du'ah."

23     Q.   "Yeah."

24     A.   "Before he was taken."

25     Q.   "Yeah."

1    A.   "Good idea, bro.  Excellent next project."

2         MR. CHAKRAVARTY:  Next page.

3    Q.   "Yeah, cause I know a bro has already done Wa Yakoon, and

4    it will be in English, and he gave it to us but requires heavy

5    editing so if we do the Abu Anas, it's as if we did all three

6    videos with the exception of Riyah al Nasr, or Winds of

7    Victory."

8    A.   "Okay.  I think that one takes precedence because Wa

9    Yakoon, and it will be very similar to GUH."

10   Q.   "Yeah."

11   A.   "So can a bro transcribe it?"

12   Q.   "Yeah.  I will get someone to, inshaa-'Allaah, Allah

13   willing."

14   A.   "Awesome."

15   Q.   The reference to "GUH," are you aware of what that is?

16   A.   Yes.

17   Q.   What is that?

18   A.   It's Ghazwah Umar Hadeed.

19   Q.   What does "Ghazwah" mean essentially?

20   A.   Taken over or attack or something like that.

21   Q.   I draw your attention to Exhibit 512, please.  Is this a

22   chat that occurred on March 8, 2006, between the defendant and,

23   again, Abu Mundhir at approximately 10:15?

24   A.   Yes.

25   Q.   Abu Mundhir says, "As Salam Alaykum, peace be upon you."

1   A.   Are you reading from the top?

2   Q.   I'm sorry.  I'll focus in here.

3        "Do you have the Hollywood film Wa Yakoon Ad Deen and the

4   Religion Will Be?"

5   A.   "Yes."

6   Q.   "Ok."

7   A.   "Starring the Slicer."

8   Q.   "Can you just go through that and edit what needs to be

9   edited?"

10  A.   "What do you mean?"

11  Q.   "Press accept.  You'll see."

12  A.   "Accept what?"

13  Q.   And then there's Abu Mundhir sending the defendant a file?

14  A.   Correct.

15  Q.   Is that file called Wa Yakoon.doc?

16  A.   That's right.

17  Q.   And then they continue to talk about the sending of the

18  video -- of the file, excuse me.  "You're not getting it?"

19  A.   "Nothing man."

20  Q.   "Now?  Okay, one sec.  Now?"

21       MR. CHAKRAVARTY:  Go to the next page, please.

22  Q.   Abu Mundhir sends another link and then asks, "Did you get

23  it?"

24  A.   "Yes."

25  Q.   "K."

1         Now, Agent Khoury, have you seen a translation of a video

2    called Wa Yakoon?

3    A.   Yes, I have.

4         MR. CHAKRAVARTY:  I call up Exhibit 782.  Again, this

5    should also be in, your Honor.

6         THE COURT:  It's already in?

7         MR. CHAKRAVARTY:  It should be, yes.

8    Q.   Are you familiar with this document?

9    A.   Yes.

10   Q.   What does it appear to be?

11   A.   It is a translation of the Wa Yakoon Ad Deen video.

12        THE COURT:  I don't have it as in.

13        MR. CHAKRAVARTY:  782.  Your Honor, this is one of

14   those items from the computer.

15        THE COURT:  Is this from the first or second day?

16        MR. CHAKRAVARTY:  Yes.

17        THE COURT:  All right.  I'll treat it as in.  It's

18   being exhibited.

19   Q.   Agent Khoury, can you just read that?

20   A.   "Dear brother" --

21        MR. CARNEY:  I object, your Honor.

22        THE COURT:  To the question?

23        MR. CARNEY:  To 782.

24        THE COURT:  Let me see you at the side.

25   (SIDEBAR CONFERENCE AS FOLLOWS:

1          MR. CARNEY:  Would it help if I showed it to you?

2          THE COURT:  Yeah.  Just so I'm clear, this is a

3     transcript of the oral narration that goes on the video; is

4     that what it is?

5          MR. CHAKRAVARTY:  I think that's right.  It's the

6     translation of the video.  For the purposes of subtitles,

7     that's what that says.

8          MR. CARNEY:  I object because this was simply a

9     document sent to the defendant.  He didn't write it.  He didn't

10    translate it.  And it's laced with prejudicial comments such as

11    "take not the Jews and Christians for allies because they are

12    allies to each other" and other statements in here disparaging

13    people.

14         The fact that it was sent to the defendant, I submit,

15    should not make it admissible just because it was sent to him

16    and it's in his possession.  I would ask the government to make

17    a proffer about why this is not cumulative of other evidence

18    that's been introduced, including evidence that we now object

19    to, and what the probative value is that's supplied by this

20    that's not supplied by other documents.

21         MR. CHAKRAVARTY:  The person who sends the document to

22    the defendant is the same person who sends him GUH, who sends

23    him 39 Ways.

24         THE COURT:  Who is he?

25         MR. CHAKRAVARTY:  A guy named Abu Mundhir.

```
 1          THE COURT:  Is he on Tibyan?

 2          MR. CHAKRAVARTY:  He's on Tibyan.  The fact that he's

 3   sending him another project and they went through where they

 4   should prioritize the projects, it's highly probative of

 5   whether the defendant is part of the conspiracy, whether he

 6   translated it or not, that it was part of his role.  The fact

 7   that it was from Iraq furthers as to why he's engaging in these

 8   translation projects.

 9          THE COURT:  The objection is overruled.

10   .  .  .  END OF SIDEBAR CONFERENCE.)

11   Q.   Agent Khoury, can you just read that, the zoomed-in

12   portion?

13   A.   "Dear brother, I have translated the full video of Wa

14   Yakoon Ad Deen Kulouhu Lil'ah.  Some sentences will not be

15   grammatically correct.  This is due to the fact that the

16   translation is the translation of speech and not text and so

17   the grammatical errors will be negligible when the translation

18   is turned into subtitles."

19   Q.   Can you read the part that I enlarged there?

20   A.   "The Organization of al Qa'ida in the Land of Iraq, The

21   Media Front Presents."

22          MR. CHAKRAVARTY:  Can we go to the last page, Page 10,

23   I believe.

24   Q.   Can you read that?

25   A.   "Do not forget us from the finest of your Du'ah.  Your
```

1   Brothers in the Media Branch.  The Organization of al Qa'ida in

2   the Land of Iraq."

3          MR. CHAKRAVARTY:  Call up Exhibit 41.  Can we play the

4   first five minutes, please.

5   (Video played.)

6   Q.   Agent Khoury, is this -- that's about the first five

7   minutes.  Does it match up roughly with the translation that

8   you were reading from before?

9   A.   Yes.

10  Q.   Now, there's a symbol in the upper right-hand corner, up

11  here.  Do you recognize that?

12  A.   This is a media department for the al Qa'ida in the Land

13  of Two Rivers, which is Iraq.

14         MR. CHAKRAVARTY:  Call up Exhibit 92.

15  Q.   Does that appear to be the same symbol?

16  A.   Yes.

17         MR. CHAKRAVARTY:  Call up Exhibit 153.

18  Q.   Are you aware of what that symbol is?

19         MR. CARNEY:  I object, your Honor.

20         THE COURT:  Let me see you.

21  (SIDEBAR CONFERENCE AS FOLLOWS:

22         MR. CARNEY:  Your Honor, I object to this question,

23  and I move to strike the previous question and answer.  There's

24  no way that a layperson would recognize that as a symbol of al

25  Qa'ida media wing.  In fact, according to our expert, that

 1 would be a false statement and so this is not --

 2         MR. CHAKRAVARTY:  He was personally there.  He's

 3 familiar with the symbol.  He's giving you his assessment of

 4 what that symbol means.

 5         MR. CARNEY:  That's coming in as an expert's testimony

 6 because there's no other person on this side of the bar who

 7 would recognize that as a symbol of al Qa'ida media wing.

 8         MS. BASSIL:  Your Honor.

 9         MR. CARNEY:  It's expert testimony.

10         THE COURT:  I'm not sure it is.  It's recognizing

11 something you're familiar with from your travels.

12         MS. BASSIL:  If I may, your Honor.

13         THE COURT:  I mean, for example, recognize the Chechen

14 flag.  I wouldn't recognize the Chechen flag, but somebody

15 who's been there might.

16         MR. CARNEY:  Yes, but this is specifically, according

17 to the witness, a symbol of al Qa'ida media.

18         MS. BASSIL:  Which is wrong.

19         MR. CARNEY:  It's wrong.  It's not a symbol of al

20 Qa'ida media.  It may be a symbol of al Qa'ida but not of al

21 Qa'ida media.  The reason he gets it wrong is because he

22 doesn't have expertise in this area.  And he should not be

23 allowed to be testifying to this.

24         MS. BASSIL:  Your Honor, I also want to add one more

25 thing he got wrong.  He listed the GUH, which is the Umar

 1   Hadeed video.  He described it as being called the Attack of

 2   Umar Hadeed, which it has never been called that.  Every

 3   witness, every expert, has said it's referred to as the

 4   Expedition of Umar Hadeed.  He's gotten some other Arabic words

 5   wrong as well.

 6        THE COURT:  I don't think it's necessarily expert, but

 7   perhaps you should lay some foundation for a lay testimony.

 8   The fact that he's wrong --

 9        MS. BASSIL:  The government is well aware that that's

10   the al Qa'ida logo, and there's no separate logo for an al

11   Qa'ida media wing, and they're just putting things in that are

12   simply not true.

13        THE COURT:  You can have it perhaps after more

14   foundation.

15   .  .  .  END OF SIDEBAR CONFERENCE.)

16   Q.   Agent Khoury, what was the time frame that you were in

17   Iraq again?

18   A.   It was April 2003 to August of 2003.

19   Q.   The American forces had invaded Iraq by that time, is that

20   right?

21   A.   Correct.

22   Q.   And has the -- have the events of Iraq influenced -- and

23   don't go into detail on how, but have they influenced your

24   activities as a counterterrorism agent over the last several

25   years?

1    A.    Of course.

2    Q.    Are you familiar with the symbols used by al Qa'ida?

3    A.    Yes, I am.

4    Q.    Okay.  Is that part of your professional -- kind of the

5    scope of your employment as well as your personal experiences

6    through your travels?

7    A.    Yes.  I mean, you have to.  If you're going to be working

8    on certain groups, you need to know what some of their logos

9    are.

10   Q.    So the exhibit in 153, are you familiar with that logo?

11   A.    This logo that is on the screen right now?

12   Q.    That's on the screen right now.

13   A.    I have seen it in the clips that we were watching.

14   Q.    That includes some of the videos that we've been watching?

15   A.    Correct.

16   Q.    What is that logo of?

17         MR. CARNEY:  May I inquire on voir dire?

18         THE COURT:  No.  You may make an objection.

19         MR. CARNEY:  Objection.

20         THE COURT:  Sustained.

21   Q.    Where have you seen this logo before?

22   A.    On some of the videos that we have watched and some of the

23   media that is out there about al Qa'ida and Iraq.

24   Q.    So not -- aside from the videos that you watched for

25   purposes of this case, have you seen it before?

1    A.    No.

2    Q.    Okay.  Then that will answer my question.

3    A.    We're talking about this one on the screen?

4    Q.    On the screen right now.

5    A.    No.

6         MR. CARNEY:  May I renew my motion to strike, your

7    Honor?

8         THE COURT:  With reference to the previous --

9         MR. CARNEY:  Yes, your Honor.

10        THE COURT:  I think we should revisit it, yes.  I'll

11   strike it, but you may try again.

12        MR. CHAKRAVARTY:  Can we call up Exhibit 92, please.

13   Q.    This is the earlier image that I showed you.  We're trying

14   to establish how you know what these symbols are.  What is your

15   basis of knowledge of knowing what this symbol is?

16   A.    I know this one is -- it represents al Qa'ida in the Land

17   of the Two Rivers, and I have seen this one on the videos and

18   outside of the videos.

19   Q.    Where outside of the videos?

20   A.    During some of the investigations and some of the papers

21   that came out of Iraq, some of these were -- some of the logos

22   were on it.

23   Q.    In fact, it was on the very videos that we just watched?

24   A.    Correct.

25   Q.    With that, I would again ask you the question:  What is

1    this a symbol of?

2            MR. CARNEY:  I object.

3            THE COURT:  Overruled.

4    A.   It's a symbol of the media department of al Qa'ida in the

5    Land of the Two Rivers, which is Iraq.

6    Q.   And that's based on your experience, as you just

7    described?

8    A.   Correct.

9            MR. CARNEY:  May I voir dire the witness?

10           THE COURT:  No.  I think it will come on

11   cross-examination.

12   Q.   Were you also asked, Agent Khoury, to watch a video called

13   Abu Nasir al-Qahtani?

14   A.   Yes.

15           THE COURT:  Let me just back up for a minute because

16   of the back and forth.  That was 92, the last one?

17           MR. CHAKRAVARTY:  Yes.

18           THE COURT:  I think the state of events was it was

19   admitted, then there was an objection and a move to strike it.

20   I don't think it's been shown to the jury.  Since the objection

21   is overruled and it is admitted --

22   (Exhibit No. 92 received into evidence.)

23           MR. CHAKRAVARTY:  Thank you, your Honor.  Just to

24   clarify, it wasn't clear to me whether the exhibit was being

25   stricken or the testimony about the defendant's description of

1    what it symbolized.

2            THE COURT:  Whatever was stricken just laid -- opened

3    the last series of questions, which now stands.  92 is in

4    evidence and is being displayed to the jury now.  Now, if you

5    want to move on --

6    Q.   Did you watch a film called Abu Nasir al-Qahtani?

7    A.   Yes, I did.

8    Q.   Was this, like the previous video clip, something that was

9    found on the defendant's computer?

10   A.   I saw it on a CD that was provided to me.

11   Q.   Was that CD Item No. 1B72, a -- would it help if I showed

12   you this?

13   A.   Please.

14           MR. CHAKRAVARTY:  May I approach, your Honor?

15           THE COURT:  You may.

16   Q.   Do you recognize that?

17   A.   Yup.

18   Q.   Is that the CD containing the materials that were found on

19   the defendant's computer?

20   A.   Yes.

21   Q.   And, particularly, you watched Abu Nasir al-Qahtani, is

22   that correct?

23   A.   Correct.

24   Q.   I'll first, again, draw your attention to a few of the

25   stored chat communications.

1           MR. CHAKRAVARTY:  Can we call up Exhibit 695.

2    Q.   This is a chat that occurred on May 4, 2006, between the

3    defendant and a person named Mu'awiyah?

4    A.   Correct.

5    Q.   If you could read the defendant's words?

6    A.   "Alaykum as-Salam.  Check this out."  And there's a link

7    that was sent.

8    Q.   "What is it about?"

9    A.   "Abu Nasir al-Qahtani, Bagram escapee, leaving his first

10   post escape attack on uluj infidels."

11   Q.   "Unfortunately my sound system is in sham.  It is breaking

12   up."

13   A.   "It's okay.  There are subtitles.  Go to 10:35 and see

14   what he says.  It's awesome."

15   Q.   "How is everything else, dear brother?  How are the

16   brothers?  Do you know dear brother an American" --

17          MR. CARNEY:  I object, your Honor.

18          THE COURT:  All right.  I'll see you.

19   (SIDEBAR CONFERENCE AS FOLLOWS:

20          MR. CARNEY:  This is where he stopped, and I object to

21   the balance.

22          THE COURT:  It's also -- where am I?  "The pirate ship

23   of aal salool"?

24          MR. CHAKRAVARTY:  I'm not sure.

25          THE COURT:  What's the objection?

1      MR. CARNEY:  The probative value of this is minimal to

2  just go over again that he's glorifying in the death of an

3  American soldier killed in Iraq.  After all that we've had so

4  far, I respectfully suggest there is no further probative value

5  to videos or chats that make the same point over and over and

6  over, that he's in favor of soldiers being killed in Iraq.  I

7  object on that basis.

8      MR. CHAKRAVARTY:  I don't think anything has changed,

9  your Honor.  This is a different video.  You just watched it.

10  It shows that the defendant is the one who's actually

11  encouraging that this be done to American soldiers, which is an

12  important part of the case.  We should be able to present

13  different types of evidence to show it.

14      THE COURT:  You can have it.

15      MR. CARNEY:  I move for a mistrial.

16      THE COURT:  Okay.  Denied.

17  .  .  .  END OF SIDEBAR CONFERENCE.)

18  Q.   Mu'awiyah asks, "How are the brothers?  Do you know dear

19  brother an American soldier does not need visa for entry to the

20  pirate ship of aal salool."  What does the defendant say?

21  A.   "Hey, yeah.  He gets red carpet.  Text."

22      MR. CHAKRAVARTY:  Can we call up Exhibit 731, Page 11,

23  please.  I'm sorry.  Go back to Page 1 to situate the --

24  Q.   Is this a chat on May 9, 2006, between the defendant and

25  Tauqir?

```
 1    A.    Correct.

 2              MR. CHAKRAVARTY:  Go back to Page 11.

 3              MR. CARNEY:  Mr. Chakravarty, can you just tell me the

 4    number in the bottom right, please.

 5              MR. CHAKRAVARTY:  2650.

 6              MR. CARNEY:  I'm sorry.  I'm referring to Page 11.

 7              MR. CHAKRAVARTY:  Page 11.  The page number of the

 8    document is 141, SFT02650.

 9              MR. CARNEY:  Right.  That's Page 1.  Are you going to

10    Page 11?

11              MR. CHAKRAVARTY:  Yes, 2660, so Page 11, yeah.

12              MR. CARNEY:  Thank you.

13    Q.    Again, if you'll read what the defendant said, and I'll

14    say what Tauqir said.

15    A.    "Dude, check this out."  And then he sends a link.  "Open

16    this link and go to the time slot 10:30 in the video."

17    Q.    "It's called GM, right, al shaba, or al shaba media?"

18    A.    "Yeah.  Go to 10:30."

19    Q.    "Yeah, I'm watching.  They speak Arabic, not Pashto?"

20    A.    "This bro is from Saudi."

21    Q.    "Oh, okay."

22    A.    "He was arrested by the Americans in jail.  Then he

23    escaped.  This is his first video after escaping."

24    Q.    "Where is he educated from?  Seems very smart."

25    A.    "No clue.  But did you see what he said about the pigs?"
```

1   Q.   "What did he say?"

2   A.   "Go to 10:30 and see, hehe."

3   Q.   "I'm trying to understand him without the subtitles.  Ohh,

4   I'm at 5."

5   A.   "You see it?"

6   Q.   "Hahaha, ameen, amen."

7   A.   "That's a real Muslim."

8   Q.   "You see his eyes, brother?"

9   A.   "Yeah.  He means what he says," smiley face.

10   Q.   Now, at one point Tauqir asks, "They speak Arabic, not

11   Pashto?"  Are you familiar with what Pashto is?

12   A.   It's a language.  It's spoken in Pakistan and Afghanistan.

13          MR. CHAKRAVARTY:  With that, I'd call up Exhibit 33,

14   and we'll play the first clip.

15   (Video played.)

16   Q.   Agent Khoury, that was the first portion of that film, is

17   that right?

18   A.   Correct.

19   Q.   And then after that first portion, in a part that we're

20   not showing to the jury, what does the video depict?

21   A.   It shows the brutal beheading of --

22          MR. CARNEY:  I object, your Honor.

23   A.   -- of two individuals by al Qa'ida members in Iraq.

24          THE COURT:  Overruled.

25          MR. CHAKRAVARTY:  I think the objection may have

```
 1   occurred over --

 2          MR. CARNEY:  May the witness be instructed, if I stand

 3   and say, "I object," he should stop speaking?

 4          THE COURT:  Yes, all right.

 5   Q.   Agent Khoury.

 6          THE WITNESS:  I apologize.

 7          THE COURT:  The objection is overruled.

 8          MR. CARNEY:  Accepted.

 9          THE COURT:  He can have the question.

10   Q.   Can you just state -- because I think that what you were

11   saying was -- because you kept talking over the objection, the

12   jury may not have heard.  What was depicted after the beginning

13   of that video?

14   A.   It was the brutal beheading of two individuals by members

15   of al Qa'ida in Iraq.

16   Q.   And then did the video continue to do other scenes?

17   A.   Correct.

18          MR. CHAKRAVARTY:  I'm going to ask to play video clip

19   B.

20          THE COURT:  Can you identify, for the record, where it

21   begins?

22          MR. CHAKRAVARTY:  Sure, exactly.  I was just going to

23   say that.

24   Q.   Does the video clip B begin at approximately the

25   four-minute mark and go to the five minutes, thirty seconds?
```

1   A.   Are you asking me about where the beheading video is?

2   Q.   No.  I'm asking you about the second clip as opposed to

3   where the beheading videos are.  After the beheading videos --

4   A.   Then it's this clip.

5   Q.   This is the second clip?

6   A.   Correct.

7   Q.   Is that at about the four minutes to five minutes, thirty

8   seconds?

9   A.   I don't really recall exact -- the exact time of that

10  clip.

11         THE COURT:  Well, Mr. Chakravarty, we'll accept your

12  representation.  I just want the record to reflect about where

13  it is.

14         MR. CHAKRAVARTY:  Sure.  Four minutes to five minutes,

15  thirty, your Honor.

16  Q.   And then the last clip will be from the ten minutes to

17  eleven minutes, is that right?

18  A.   Right.

19  Q.   In fact, you watched the entire video, is that right?

20  A.   I have.

21  Q.   This portion is in Arabic, is that right?

22  A.   Correct.

23  Q.   So I'm not going to ask you to translate what he said, but

24  I'll ask if the video clip is an accurate rendition of the

25  video that you saw.

1          MR. CHAKRAVARTY:  Go ahead.  Play.

2    (Video played.)

3    Q.   Agent Khoury, after that -- that clip, by the way, being

4    from four minutes to five minutes, thirty seconds includes the

5    time stamp around five minutes, is that right?

6    A.   That's right.

7    Q.   So now we'll go to the last clip.  And this includes the

8    ten minutes, thirty seconds time stamp that you just read in

9    some of the other chats, is that right?

10   A.   That's correct.

11         MR. CHAKRAVARTY:  Can we play this.

12   (Video played.)

13         MR. CHAKRAVARTY:  One moment, your Honor.

14         Those are all the questions I have for the witness,

15   your Honor.

16         THE COURT:  It's just before one.  I'll give you the

17   option.  Do you want to start now or do you want to reserve?

18         MR. CARNEY:  Reserve, please.

19         THE COURT:  Okay.  Rather than begin and stop

20   immediately with cross-examination, we'll take that up

21   tomorrow.  So, jurors, thank you for your attention.  Enjoy the

22   rest of the day.  We'll see you tomorrow at 9.

23   (The jury was excused.)

24   (SIDEBAR CONFERENCE AS FOLLOWS:

25         MR. AUERHAHN:  It's actually sort of a procedural

1   issue.  This is the first time I'm trying in front of you, so I

2   don't know your practice.  It's been my experience in front of

3   a lot of judges that once a witness is done with the

4   cross-examination we are allowed to prep him before redirect.

5   I didn't know your practice, so I didn't do it with Aboubakr.

6   I've learned that judges have different practices.

7           THE COURT:  I think, while he is a continuing witness,

8   you should not be speaking with him.

9           MR. AUERHAHN:  Even after cross is finished?

10          THE COURT:  Right.

11          MR. AUERHAHN:  Then I'm glad I didn't.

12          MS. BASSIL:  As long as we're here, we apparently have

13  witnesses from the U.K. tomorrow.  And other than knowing

14  there's exhibits and there's a list of a lot more, we have no

15  idea what each one is going to be talking about.  We have not a

16  clue.

17          THE COURT:  Are they chain-of-custody people?

18          MR. AUERHAHN:  One is a forensic computer individual

19  who analyzed the computers seized and pulled the exhibits that

20  we've produced.  And we've produced the report.  The other two

21  were involved in investigations in both the seizure of evidence

22  and some of the analysis of the evidence.

23          We provided -- two of them testified in Atlanta

24  trials.  We provided the transcripts of their testimony.  We

25  provided -- some of the search documents that they gave us, we

1  provided to the defense.

2          THE COURT:  In the Atlanta trials, was their testimony

3  substantially similar to what you expect it will be here?

4          MR. AUERHAHN:  Yeah, substantially similar.  But one

5  of the differences is the -- like, in this trial so far, there

6  have been no stipulations to chain of custody and things like

7  that.  In Atlanta, there was some testimony, not from firsthand

8  knowledge, because there weren't any objections to that kind of

9  evidence.

10          So in terms of exactly who's going to go first, who's

11  going to go second, how that's going to be divided, it may be

12  different than Atlanta but cover the same ground.

13          THE COURT:  What I was getting at was, the Atlanta

14  defendants -- the purpose in the Atlanta cases was to show the

15  Atlanta defendants were connected somehow with the UK people

16  and the hard drives.

17          MS. BASSIL:  He was also pro se.  A lot of stuff came

18  rolling in that shouldn't have.

19          MR. AUERHAHN:  We did identify the specific exhibits

20  which --

21          THE COURT:  No, but in terms of the scope of the

22  recorded testimony, it's going to be somewhat similar to what

23  we offered here.

24          MS. BASSIL:  I don't believe those reports are signed

25  by anybody.  In other words, I don't know who was responsible

 1    for what report.

 2            THE COURT:  Are you talking about the attachments that

 3    were to the government's response?

 4            MS. BASSIL:  Yes.

 5            THE COURT:  I think there were authors identified, but

 6    I'm not sure.

 7            MS. BASSIL:  One had it on the front, but the others

 8    didn't.

 9            MR. AUERHAHN:  We gave the reports.  We gave the --

10            MS. BASSIL:  Can I know who wrote what report?

11            MR. AUERHAHN:  As I said, one of the witnesses will be

12    the forensic computer individual who did the analysis as well

13    as was present at one of the searches, and one of the witnesses

14    was present in one of the searches and pulled some of the --

15    also discussed some of the analysis.

16            THE COURT:  And the forensic person who will be here,

17    his name?

18            MR. AUERHAHN:  Graeme Burridge.

19            MS. BASSIL:  Did he write any of the reports?

20            MR. AUERHAHN:  We turned over --

21            MS. BASSIL:  Why can't I get an answer whether he

22    wrote the report or not?  We're entitled to know.

23            MR. AUERHAHN:  We turned over the reports of the

24    witnesses.  Part of the problem I think we've been having with

25    this case is the defense thinks we have to summarize all the

1   witnesses' testimony in advance of their testifying.  We have

2   an obligation to provide discovery.  We identify in advance

3   what exhibits we're going to use, and we give a general

4   information about the subject matter of the testimony.  But I

5   don't know that we're required to give a summary of everyone's

6   testimony in advance of them taking the stand.

7         THE COURT:  Unless they are experts.

8         MS. BASSIL:  And they are treating them as experts.

9   If somebody has a statement, I'm entitled to know which

10   statement goes with which witness.  I have never heard of

11   anything like that.

12         THE COURT:  If there are statements, they would be

13   Jencks material.

14         MS. BASSIL:  That's right.  So I want them identified.

15         THE COURT:  Technically, you don't have to do it till

16   the end of direct --

17         MS. BASSIL:  I just want to know who wrote it.  Is

18   this so hard?

19         THE COURT:  I think it has to be identified to the

20   witness if it's either expert or Jencks.

21         MR. AUERHAHN:  Everything we've gotten from the Brits

22   we turned over.

23         THE COURT:  Have you identified the witness?

24         MS. BASSIL:  Thank you.

25   .  .  .  END OF SIDEBAR CONFERENCE.)

1          MR. CARNEY:  May I see your Honor about an ex parte

2      matter?

3          THE COURT:  Is it the pending motion?

4          MR. CARNEY:  Yes, your Honor.

5          THE COURT:  You'll have an order this afternoon.

6          MR. CARNEY:  All right, your Honor.  Thank you.

7      (Whereupon, at 12:59 p.m. the trial recessed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3         We, Marcia G. Patrisso, RMR, CRR, and Cheryl

 4    Dahlstrom, RMR, CRR, Official Reporters of the United States

 5    District Court, do hereby certify that the foregoing transcript

 6    constitutes, to the best of our skill and ability, a true and

 7    accurate transcription of our stenotype notes taken in the

 8    matter of Criminal Action No. 09-10017-GAO-1, United States of

 9    America v. Tarek Mehanna.

10

11    /s/ Marcia G. Patrisso.
      MARCIA G. PATRISSO, RMR, CRR
12    Official Court Reporter

13    /s/ Cheryl Dahlstrom
      CHERYL DAHLSTROM, RMR, CRR
14    Official Court Reporter

15

16    Date:  November 7, 2011

17

18

19

20

21

22

23

24

25
```