UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,     )
                              )
                              )
        Plaintiff,       )
                              ) Criminal Action
v.                         ) No. 09-10017-GAO
                              )
TAREK MEHANNA,             )
                              )
        Defendant.       )
                              )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY ELEVEN
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, November 8, 2011
9:08 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Aloke Chakravarty and Jeffrey Auerhahn,
 3              Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Jeffrey D. Groharing, Trial Attorney
                National Security Division
 7         950 Pennsylvania Avenue, NW
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         CARNEY & BASSIL
           By: J.W. Carney, Jr., Esq.
10              Janice Bassil, Esq.
                John E. Oh, Esq.
11         20 Park Plaza
           Suite 1405
12         Boston, Massachusetts  02216
           - and -
13         LAW OFFICE OF SEJAL H. PATEL, LLC
           By: Sejal H. Patel, Esq.
14         101 Tremont Street
           Suite 800
15         Boston, Massachusetts  02108
           On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                          DIRECT   CROSS   REDIRECT   RECROSS
    WITNESSES FOR THE
3     GOVERNMENT:

4   ANDRE KHOURY (Cont'd)

5     by Mr. Chakravarty                      38
      by Mr. Carney               12                    45
6
    PAUL RYAN
7
     by Mr. Auerhahn      50
8
    TODD EMERY
9
     by Mr. Groharing     60              72
10    by Ms. Bassil               65                    72

11  MICHAEL BONNER

12   by Mr. Auerhahn      74
     by Mr. Carney               84
13
    PETER MAILLOUX
14
     by Mr. Auerhahn      90
15    by Ms. Bassil              102

16  KENNETH W. HAIMILA, JR.

17   by Mr. Auerhahn      112             123
     by Ms. Bassil              119                    124
18
    CHRISTIAN FIERABEND
19
     by Mr. Chakravarty   125
20

21

22

23

24

25

E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | FOR ID | IN EVD. |
|---|---|---|---|
| 795 | Stipulation re travel | | 49 |
| 474 | Form 6059B for Tarek Mehanna | | 79 |
| 473 | Form 6059B for Ahmad Abousamra | | 94 |
| 480 | Passport of Ahmad Abousamra | | 94 |
| 476 | Image of Ahmad Abousamra's passport | | 97 |
| 479 | Ahmad Abousamra return materials 9/2/06 | | 115 |

1          (The following proceedings were held in open court

2   before the Honorable George A. O'Toole, Jr., United States

3   District Judge, United States District Court, District of

4   Massachusetts, at the John J. Moakley United States Courthouse,

5   One Courthouse Way, Boston, Massachusetts, on November 8, 2011.

6          The defendant, Tarek Mehanna, is present with counsel.

7   Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8   are present, along with Jeffrey D. Groharing, Trial Attorney,

9   U.S. Department of Justice, National Security Division.)

00:16 10          MR. CHAKRAVARTY:  There was one issue.  We understand

11   that the jurors are --

12          THE COURT:  We're waiting for a juror.  If there was

13   some issue that we had to resolve --

14          MR. CHAKRAVARTY:  The one that the government has is,

15   Mr. Carney was kind enough to forward to us last night a couple

16   of exhibits in the form of short video clips that he intends to

17   use with the witness on the stand, Agent Khoury.

18          The video clips depict two short speeches, or sound

19   bites, of the Great Communicator, one President Reagan,

00:17 20   discussing the Afghan mujahideen.  The government would object

21   on both relevancy grounds as well as the fact that this witness

22   has no familiarity with those clips.  I think the testimony was

23   that the defendant -- excuse me, the witness had not been to

24   Afghanistan.  And while he may be familiar with what happened

25   during the Soviet-Afghan conflict and even the U.S.

1   Government's support, ostensibly, for the mujahideen, the

2   government would argue that it's both irrelevant as well as

3   outside the kin of this witness' -- at least as far as it's

4   been laid out by the Court -- his purview.  So the government

5   would object to those exhibits.

6        MR. CARNEY:  First of all, your Honor, I would deem it

7   to be an admission against a party opponent.  President Ronald

8   Reagan is certainly authorized to speak on behalf of the United

9   States, which is the party opponent.  So in terms of the

00:18 10   admissibility of the document -- the videos, they're an

11   admission.  And I can provide --

12        THE COURT:  I don't think hearsay is the issue.

13        MR. CARNEY:  I understand.  But we have a witness who

14   has had a lot of experience and was talking about the events in

15   that part of the world, and I'd like to ask him if he's

16   familiar with the fact that President Ronald Reagan invited the

17   mujahideen to the White House to honor them for their

18   protection of their Muslim country, the defense of their Muslim

19   country.  And the second clip shows that he is honoring them by

00:18 20   dedicating a lift-off of the Challenger spaceship in honor of

21   the Afghan people and the mujahideen.

22        These clips are very short, and I think, before your

23   Honor rules on them, you should see them.  Certainly, they will

24   be again offered through our experts.  But since we have a

25   delay, it might be useful if the Court were to view them now.

1            THE COURT:  Are you ready to show them?

2            MR. CARNEY:  Yes, your Honor.  There's no need to

3    screen the clips from anyone since the jury is not here.

4    (Video clips played for The Court.)

5            MR. CARNEY:  Here we have the President of the United

6    States, in two separate instances, saluting the Muslim

7    mujahideen for their effort to defend their country.  The only

8    difference in the present case is that when the Muslims were

9    defending their countries against the Mongols when they were

00:21 10   invading, against the Serbs when they were slaughtering and

11   committing genocide in Bosnia, when the Soviets were invading

12   Chechnya and Afghanistan.  In this instance, it was the United

13   States and coalition forces that were invading a Muslim

14   country.

15           The theory is the same.  The standard is the same.

16   The Muslims believe that they can defend their country from

17   invading forces.  There is no more persuasive evidence of this

18   fact than the two clips we have just seen with President

19   Reagan.  And I want to ask the expert, Mr. Khoury, whether he

00:22 20   is familiar with these.

21           THE COURT:  Well, he's not an expert, I don't think.

22           MR. CARNEY:  He's sort of -- he comes in and out of

23   being an expert.

24           THE COURT:  He has personal experience, but I'm not

25   sure it's Rule 702 expertise.

1          Anyway, the relevance objection is sustained.  They

2    are not relevant to the issues in the case.

3          MR. CARNEY:  I'm alerting your Honor, respectfully,

4    that I expect my experts will be relying on this as part of the

5    history.

6          THE COURT:  Probably not.  Well, maybe as part of the

7    history background -- that might be true -- but certainly not

8    in the same way.

9          Anyway, they should be preserved for the record.  So I

00:22 10    don't know if you have -- I guess they should be marked and, I

11    guess, put into the JERS system as identified but not admitted.

12          MR. CARNEY:  Yes, your Honor, at this time.

13          THE COURT:  The next couple of numbers.  Maybe Mr. Oh

14    knows where we are.

15          MR. OH:  Yes, your Honor.  They will be 1097 and 1098.

16          THE COURT:  And you'll get a medium to the JERS

17    system?

18          Anything else?

19          MR. CARNEY:  No, your Honor.

00:23 20          THE COURT:  The juror had said about 15 minutes late

21    was her estimate.  If she's here, we'll bring them in.  If not,

22    we'll take a break.

23          MR. CHAKRAVARTY:  Your Honor, to avoid a reprise of my

24    miscalculation yesterday in terms of the duration of videos

25    that we may introduce later, hopefully, today, Agent Christian

1   Fierabend, is going to be a reader, who, after some Customs and

2   Border Protection witnesses, would venture to talk about a few

3   chats and then introduce the corresponding videos with regards

4   to those chats.

5           There are, all together, about ten minutes of those

6   videos.  I say that conservatively.  It's actually less than

7   that, which, at your convenience, if you wanted to prescreen, I

8   can give you the exhibit numbers and the clips.

9           THE COURT:  Well, okay.  Perhaps when we break.

00:23 10           MR. CHAKRAVARTY:  Very well.

11           THE COURT:  I guess you've been emailing back and

12   forth the lists and so on and so forth.  So I have, Agent

13   Khoury, some Customs and Border Patrol people, is that right?

14           MR. CHAKRAVARTY:  Correct, about four of them, your

15   Honor.  We'll do a stipulation, which we've arrived at with

16   regards to border crossings, which we would ask that Mr.

17   Groharing is able to read to the jury and then we'll introduce

18   as Exhibit 795 and then call -- 796, excuse me -- and then

19   call, I think, approximately four or five Border Protection

00:24 20   individuals who will discuss interactions with the defendant

21   and some of the coconspirators as they came in and out of the

22   country.

23           THE COURT:  And then Fierabend?

24           MR. CHAKRAVARTY:  Then Fierabend.

25           THE COURT:  The U.K. witnesses when?

1          MR. CHAKRAVARTY:  Hopefully, if things go faster than

2     yesterday, by the end of the day, the first --

3          THE COURT:  Really?

4          MR. CHAKRAVARTY:  Yes.

5          THE COURT:  All right.  We'll break until the --

6          MR. CARNEY:  Can I make a request to the Court?  When

7     the government sent us the original videos, I have looked at

8     those videos in whole.  I personally have not seen the edited

9     versions.  And if your Honor is going to look at it, I wondered

00:25 10    if there's any way that I could look at it at the same time

11    perhaps with one of the prosecutors with me.

12         THE COURT:  Absolutely.

13         MR. CARNEY:  Just so that I can see what you're seeing

14    and I won't be objecting to something --

15         THE COURT:  Well, is it possible to email a file that

16    has the -- that is the excerpt?

17         MR. CHAKRAVARTY:  They get very large in terms of -- I

18    think there's a limit of, I think, ten megabytes on our ability

19    to send.  But they should be in JERS.  I don't know if your

00:25 20   Honor has access.

21         THE COURT:  The reduced version?

22         MR. CHAKRAVARTY:  The reduced version.

23         THE COURT:  I don't think so.  I think only the --

24    this is a hard-drive issue, I think.  Maybe it's not.  I'll ask

25    about that.

 1          MR. CHAKRAVARTY:  We can burn a CD with those clips,

 2     your Honor.

 3          THE COURT:  I have sympathy with Mr. Carney's position

 4     because that was my problem yesterday when we just have the

 5     whole, and we don't know what piece -- so I ended up looking at

 6     the whole thing.  That would save time if we could --

 7          MR. CARNEY:  I think there may have been at least one

 8     occasion when I objected to something not realizing it was not

 9     going to come in.  Since we have a break, if possible, put it

00:26 10     on a flash drive where I can look at it at the computer.

11          THE COURT:  That's what I was thinking.  If you can't

12     email it, maybe a flash would work.  Just put the excerpts

13     down.

14          MR. CHAKRAVARTY:  We just have very draconian

15     restrictions on what goes into our government-issued laptop.

16          THE COURT:  I see.

17          MR. CHAKRAVARTY:  We'll find a CD or something.

18          THE CLERK:  All rise for the Court.  Court will take a

19     short recess.

00:27 20     (Recess taken at 9:20 a.m.)

21     (Court and jury in at 9:34 a.m.)

22          THE COURT:  Good morning, jurors.  May we have the

23     witness.

24          MR. AUERHAHN:  Andre Khoury.

25          THE COURT:  All right, Mr. Carney.

1          MR. CARNEY:  Thank you, your Honor.

2     CROSS-EXAMINATION BY MR. CARNEY:

3     Q.   Good morning, Special Agent Khoury.

4     A.   Good morning.

5     Q.   Yesterday you identified a map of the country of Yemen,

6     which I believe was Exhibit 745.  Do you recall that?

7     A.   Yes, I do.

8          MR. CARNEY:  Could we see that, please, Mr. Bruemmer,

9     745.  Did I get that right?  Maybe 749.  749, I'm sorry.

00:42 10          I believe this is an exhibit.  May the jury see it

11     also, your Honor?

12          THE COURT:  Yes.

13     Q.   And you indicated yesterday you're familiar with this

14     country?

15     A.   Yes, I am.

16     Q.   Can you be point out, please, where on this map is the

17     city of Sunnah?

18     A.   (Indicating).  I guess -- I can't do the circle, but it's

19     right here.

00:43 20     Q.   Thank you.  And that's a location of a noted Arabic

21     Islamic law school in Yemen, isn't it?

22          MR. CHAKRAVARTY:  Objection, your Honor.  The

23     government wasn't permitted to ask questions about what the

24     witness knows about specific aspects of Yemen.

25          THE COURT:  Well, it was a little bit.  If it's within

1    his personal knowledge, you may answer the question.

2    A.   I'm sorry.  Could you repeat the question again?

3    Q.   Yes.  And do you know that Sunnah is the location of a

4    famous Yemeni school that teaches classical Arabic and Islamic

5    law?

6    A.   All Arabic countries have --

7    Q.   Are you familiar with the one in Yemen, located at Sunnah?

8    A.   I'm not sure which one you're referring to.  There is more

9    than one.

00:43 10   Q.   Special Agent Khoury, how long have you been an agent?

11   A.   Since 1996, with the exception of those two years.

12   Q.   When you were working for Goldman Sachs?

13   A.   Correct.

14        THE COURT:  Agent Khoury, would you pull the

15   microphone a little closer to you so we make sure it's picking

16   up your voice.

17   Q.   You've had training testifying as a witness?

18   A.   Yes, I have.

19   Q.   You've actually testified as a witness several times?

00:44 20   A.   Yes, I have.

21   Q.   If I ask a question that you can answer yes or no, would

22   you do that?

23   A.   Absolutely.  But -- if I may.

24   Q.   Why don't we start with this question.

25   A.   Okay.  Go ahead.

1    Q.   If I ask you a question that you can answer yes or no,

2    will you do that?

3    A.   Yes.

4    Q.   If I ask a question that you don't understand, would you

5    just let me know that?

6    A.   Absolutely.

7    Q.   And if you don't know the answer to the question, will you

8    just indicate that?

9    A.   Absolutely.

00:44 10   Q.   Are you aware that there is a noted school in Sunnah,

11   Yemen, that teaches classical Arabic and Islamic law?

12   A.   Yes.

13   Q.   Are you familiar in Yemen with the city of Tarin,

14   T-a-r-i-n?

15   A.   No.

16   Q.   Would you look on the map, please?

17   A.   Sure.

18   Q.   And you've identified this as an accurate map?

19   A.   That's correct.

00:45 20   Q.   I just put a little pink dot on the map in the eastern

21   part of the country.  Do you see that?

22   A.   Yes, I do.

23   Q.   Above that, do you see what town there is?

24   A.   Yes, I do.

25   Q.   What town is that, sir?

```
 1   A.   It's Tarin.

 2   Q.   And are you aware that there is a noted religious school

 3   in that location, also?

 4   A.   No.

 5   Q.   Okay.  Finally, are you familiar with the town of Ma'rib?

 6   A.   Yes, I am.

 7   Q.   Can you see it on the map, sir?

 8   A.   Yes, I can.

 9   Q.   And can you put an arrow, please?

10   A.   (Indicating).  It's -- it's above the dot.

11   Q.   Would you agree that there also is a very noted religious

12   school that teaches Arabic and Islamic law in Ma'rib?  Do you

13   know that, sir?

14   A.   I am not aware of any religious schools in Ma'rib.

15        MR. CARNEY:  Can we have 754, please, Mr. Bruemmer.

16   Q.   You testified yesterday this was an accurate map of Saudi

17   Arabia?

18   A.   That's correct.

19   Q.   Are you familiar where Riyadh is?

20   A.   Yes, I am.

21   Q.   Could you point to where it is, please?

22   A.   (Indicating.)

23   Q.   Are you familiar with the King Fouad Medical City?

24   A.   I'm sorry.  What is that?

25   Q.   Are you familiar, sir, with the King Fouad Medical City?
```

```
 1    A.    It's King Fouad.

 2    Q.    Pardon me?

 3    A.    Is it King Fouad Medical City?

 4    Q.    I may have mispronounced it.  Yes, that's correct.

 5    A.    Then, yes, I do.

 6    Q.    Is it fair to say that that's the most notable medical

 7    center in the entire Middle East?

 8    A.    One of, yes.

 9    Q.    Are you aware that that's where Tarek Mehanna was going to

10    work as a pharmacist?

11    A.    I'm not aware of that.

12    Q.    Now, we played a couple of videos during your testimony

13    yesterday; do you recall that?

14    A.    Yes.

15    Q.    One of them was the State of the Ummah?

16    A.    Correct.

17    Q.    Ummah, rather.  Correct?

18    A.    Correct.

19    Q.    What that refers to is the condition of the Muslim

20    community; is that a fair meaning of the title?

21    A.    That is the title, yes.

22    Q.    "Ummah" means the Muslim community, does it not?

23    A.    "Ummah" means community.

24    Q.    Well, when they talk about the Muslim community, they

25    refer to it as "Ummah," don't they?
```

1    A.    That's right.

2    Q.    In many speeches, in many broadcasts, in many government

3    publications, they talk about the Ummah, referring to the

4    Muslim community?

5    A.    Correct.

6    Q.    So this video was prepared about the condition or the

7    state of the Muslim community, correct?

8    A.    I can't answer if it's correct or not.  I can tell you

9    that State of the Ummah is what you refer to, but I cannot tell

00:48 10   you if that video was prepared for that specific reason or not.

11   Q.    The video is based on clips, you told us, from various

12   sources, correct?

13   A.    Correct.

14   Q.    They're clips -- by "clips," I mean broadcasts on Al

15   Jazeera, correct?

16   A.    Correct.

17   Q.    And that is the Arab world's equivalent of CNN, correct?

18   A.    Yeah, you can say that.

19   Q.    Can you say that?

00:48 20   A.    I could say it's one of the channels.

21   Q.    Is that the most prominent news source in the Middle East?

22   A.    Yes.

23   Q.    Would you agree then it's comparable to CNN in the Middle

24   East?

25   A.    Yes.

1   Q.   They also showed clips from various TV channels located in

2   the Middle East, such as Egypt, isn't that right?

3   A.   Correct.

4   Q.   Now, these clips showed instances of hardships that the

5   Muslim people were suffering because of the wars going on and

6   the oppression going on in Muslim communities, correct?

7   A.   Some of the clips are exactly that.

8   Q.   So your answer is yes?

9   A.   To what?

00:49 10   Q.   Part of this video shows some of the hardships going on in

11   the Muslim community because of the wars and oppressions?

12   A.   Yes.  Okay.

13   Q.   They showed the impact of an embargo, for example, on

14   Iraq, correct?

15   A.   I don't exactly remember every single clip in that video.

16   Q.   Well, do you remember they showed scenes from a hospital

17   in Bagdad where children were dying because medicine was not

18   being able to be brought into the country?

19   A.   I remember there was videos of children dying in Palestine

00:50 20   and --

21   Q.   And do you remember it being --

22   A.   -- Iraq.

23   Q.   -- in Iraq, it was because of the embargo that was put on

24   the country?

25   A.   If it is in the video, then, yes, because I watched the

1    video.  But I cannot recall that specific instance that you're

2    referring to.

3    Q.   How many times did you watch the video?

4    A.   I've seen it once or twice.

5    Q.   So based on seeing it once or twice, though, that was

6    enough for you to testify about the video yesterday, right?

7    A.   Sir, it's a video that I've seen once or twice, yes.  I

8    could testify on the video.  I just don't remember every single

9    instance in that video.  It's a pretty lengthy video.

00:51 10  Q.   Another part of the video talked about the victims of the

11   war in Iraq, including innocent women and children, correct?

12   A.   Sure, sure.

13   Q.   Correct?

14        And, basically, the beginning part of that video was

15   designed to show the suffering of the Muslim people that they

16   were enduring because of the war in Iraq and wars and

17   oppression elsewhere of the Muslim people; isn't that fair to

18   say?

19   A.   Yes.

00:51 20  Q.   This video also had excerpts or quotations from the

21   Qur'an, did it not?

22   A.   It did.

23   Q.   And it talked about passages from the Qur'an that showed

24   what the video asserted was the obligation of Muslims

25   worldwide, to respond to these sufferings and come to the

1    assistance of these Muslim people, right?

2    A.    Correct.

3    Q.    Would it be fair to say that a lot of the video was

4    graphic in its depictions of suffering?

5    A.    Sure.

6    Q.    It was intended to move people to action?

7    A.    Sure.

8    Q.    Now, the government continued to play the video, and

9    that's where we began to hear at least one speaker's view of

00:52 10  what should be the reaction of the Muslim people to defend

11   their country, correct?

12   A.    I don't understand.  Whose government?

13   Q.    I'll rephrase the question.  Part of the video had a

14   speaker who then was telling the audience on how the Muslims

15   should react to the suffering of the Muslim people in these

16   countries, is that right?

17   A.    If I may correct you, there was more than one speaker --

18   Q.    All right.

19   A.    -- that was doing that.

00:53 20  Q.    All right.  Then there were more than one speaker --

21   A.    Correct.

22   Q.    -- who was urging people on how they could help the Muslim

23   people who were engaged in this suffering, correct?

24   A.    Sure.

25   Q.    And they included depictions of engaging in military

         1    actions in the defense of these Muslim countries, correct?

         2    A.    Yes.  They were asking to conduct --

         3    Q.    Is that correct, sir?

         4    A.    Correct, correct.

         5    Q.    Now, part of the video that was played by the prosecutor

         6    was supposedly a video clip of an attack on the USS Cole in

         7    Aden, is that right?

         8    A.    Correct.

         9    Q.    Now, you're aware that that was not actual footage of the

00:53   10    explosion on that ship, right?

        11    A.    I think I'm pretty aware of that.

        12    Q.    Did you mention that yesterday?

        13    A.    Actually, the prosecution said that this is a depiction of

        14    the attack.  So I didn't have to mention it.

        15    Q.    And you didn't say, well, that's actually not actual

        16    footage of what happened?

        17    A.    I wasn't asked that question.

        18    Q.    But you didn't see fit to mention it as a -- as the expert

        19    on this video?

00:54   20    A.    If I was asked a question -- I'm not an expert on the

        21    video, No. 1.  But if I was asked, I would have said that.

        22    Q.    This was a photo of a side of a ship, not the Cole, with a

        23    superimposed explosion on it, right?

        24    A.    I'm very well aware of that.  I already said that.

        25    Q.    Well, I just want to make sure that you're not the only

         1    one in this courtroom aware of that.

         2         Now, this video itself, that we saw excerpts from

         3    yesterday, has actually been played on Al Jazeera?

         4    A.    Yes, it has.

         5    Q.    And it has actually been played on legitimate TV channels

         6    in countries like Egypt, hasn't it?

         7    A.    Sure.

         8    Q.    And if someone wanted to see this video for themselves,

         9    what's the easiest way that they can see this video, in your

00:55 10    opinion?

        11    A.    You can go on YouTube.  I said that yesterday.

        12    Q.    I know you said it yesterday.  Today I'm asking you if

        13    that's the easiest way to look -- to see the video, and you

        14    told me today it's on YouTube?

        15    A.    Sure.

        16    Q.    It's fair to say, based on your knowledge, that it has

        17    probably been seen by millions of people?

        18    A.    No doubt, yes.

        19    Q.    And, no doubt, including Tarek Mehanna, right?

00:55 20    A.    Sure.

        21    Q.    And his friends, right?

        22    A.    Yeah.

        23    Q.    Tarek had nothing to do with making the video, did he?

        24    A.    No.

        25    Q.    He had nothing to do with creating the audio for the

1   video, right?

2   A.   No.

3   Q.   He had nothing to do with translating it from Arabic to

4   English, right?

5   A.   No.

6   Q.   Nothing to do with putting subtitles on it, right?

7   A.   No.  I'm sorry.  Excuse me.  We are still talking about

8   State of the Ummah, correct?

9   Q.   Yes.

00:56 10   A.   No.

11   Q.   He didn't edit it?

12   A.   No.

13   Q.   What Mr. Mehanna did is he downloaded it?

14   A.   That's right.

15   Q.   He watched it?

16   A.   That's right.

17   Q.   And he saw it with his friends?

18   A.   That's right.

19   Q.   And then they talked about it?

00:56 20   A.   Correct.

21   Q.   Now, yesterday there was another video, No. 782.  Do you

22   recall that?

23   A.   Could you remind me with the name?

24   Q.   Yes, sir.  Wa Yakoon.

25   A.   Wa Yakoon Ad Deen.

1   Q.   I believe that's an abbreviated part of the title, those

2   three words?

3   A.   Correct.

4   Q.   Now, this was another video that focused on what was going

5   on in Iraq, correct?

6   A.   Correct.

7   Q.   And a lot of the focus was on the suffering, once again,

8   of the people in Iraq as a result of the war, correct?

9   A.   Yes.

00:57 10   Q.   And, once again, the person who made this video -- and we

11   have the transcript of the audio of the video -- was calling

12   out to Muslims to come and defend the Muslim country, correct?

13   A.   Correct.

14   Q.   And in that video, and in the translation, he compared it

15   to when Muslims had defended themselves in Bosnia, is that

16   right?

17   A.   Yeah.  I mean, he talked about Bosnia in one of the --

18   Q.   Did they talk about Bosnia?

19   A.   I think they talk about Bosnia in one of the tapes or

00:58 20   during that tape.

21   Q.   You're not sure?

22   A.   Again, you know, you've got to remember, I watched these

23   tapes -- if you put it in front of me, I can tell you exactly

24   what it is.

25          MR. CARNEY:  Your Honor, may I put it in front of him

1      the old-fashioned way?

2              THE COURT:  That's the transcript?

3              MR. CARNEY:  Yes, your Honor.

4              THE COURT:  Go ahead.

5      Q.   Mr. Khoury -- and I'm on Page 3, the third paragraph.

6      Will you just read the first two lines of that paragraph, sir,

7      to yourself?

8      A.   To myself?

9      Q.   Please.

00:58 10    A.   (Reading).  Okay.

11     Q.   So in this video, the person is comparing what's going on

12     in Iraq to what had gone on in Bosnia, right?

13     A.   Correct, and Chechnya.

14     Q.   And in Bosnia, what was going on was a genocide of the

15     Bosnian people, right?

16     A.   Correct.

17     Q.   And would you explain to the members of the jury who might

18     not know what a genocide is?

19             MR. CHAKRAVARTY:  Objection, your Honor.

00:59 20    THE COURT:  Sustained.

21     Q.   Well, when you just indicated that a genocide was going on

22     in Bosnia, what did you mean when you used the word "genocide"?

23     A.   I meant there was killing of people.

24     Q.   But it was killing people simply because their background

25     was Muslim, right?

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  You may answer that.

3     Q.   That's what's meant by genocide.  You're being killed just

4     because you're a Jew, or you're being killed just because

5     you're an Armenian or just because you're a Muslim; isn't that

6     what a genocide is?

7     A.   It's a killing of a race.

8     Q.   And in Bosnia, that race being killed was Muslims, right?

9     A.   In Bosnia there was, yes.

01:00 10   Q.   And in this video, they compare what's going on in Iraq to

11    what was going on in Bosnia, right?

12    A.   Correct.

13    Q.   They also talked about what was going on in Chechnya,

14    correct?

15    A.   Correct.

16    Q.   And in Chechnya, once again, there was what might be

17    called ethnic cleansing of killing Muslim people because they

18    are Muslim, right?

19    A.   It was a war.

01:00 20   Q.   And the Muslims were defending themselves from the

21    Russians, right, who wanted to wipe them out, is that right?

22    A.   Correct.

23    Q.   I didn't hear you, sir.

24    A.   Correct.

25    Q.   They compared it to what had happened in Afghanistan,

1    correct?

2    A.    Correct.

3    Q.    When the Soviets had invaded Afghanistan and were trying

4    to take over the country and the Muslims fought back, correct?

5    A.    Correct.

6    Q.    And an essential reason why the Muslims in Afghanistan

7    were able to resist and ultimately expel the Soviet invaders

8    was because of the help given by the United States of America,

9    isn't that right?

01:01 10            MR. CHAKRAVARTY:  Objection, your Honor.

11            THE COURT:  Sustained.

12   Q.    And he said in this video, "Our Jihad in Iraq has been as

13   it was in Afghanistan, Kashmir" -- Kashmir was another country

14   of conflict involving Muslims, right?

15   A.    Correct.

16   Q.    "...was in Afghanistan, Kashmir, Chechnya, and Bosnia,"

17   correct?

18   A.    That's right.

19   Q.    In the video -- and you can see it in the transcript -- he

01:02 20   also cited an organization called the Human Rights Watch

21   Organization; do you remember that?

22   A.    Not specifically.

23   Q.    All right.

24            MR. CARNEY:  For the witness only, your Honor, please.

25            THE COURT:  He has it.

1        MR. CARNEY:  What's that?

2        THE COURT:  He has it.

3        MR. CARNEY:  Yes, your Honor.  Could we go to Page 5,

4    please.

5        May I have one moment.  My mouse scurried away.

6    A.   I found it, so --

7    Q.   So in this video, the authors are specifically

8    representing -- or referencing the Human Rights Watch

9    Organization, correct?

01:03 10   A.   Correct.

11   Q.   And it notes that this organization is no one -- is an

12   organization that no one can say it biased in favor of what the

13   mujahideen normally say, right?

14   A.   That's right.

15   Q.   And they go on to talk about the report that was put out

16   by this organization, correct?

17   A.   Correct.

18   Q.   And their point is this is an international human rights

19   organization, correct?

01:03 20   A.   Correct.

21   Q.   And in this video trying to show what the situation was in

22   Iraq, it notes that "the Human Rights Watch Organization has

23   stated that torture in Iraqi prisons is done under the

24   supervision of the New Iraqi State, and it has exceeded that

25   which was present at the time of Saddam Hussein."  And it goes

1    on to note, "Ill treatment and torture has become one of the

2    normal procedures that are undertaken by the secret police and

3    these regular torture techniques are:  hitting the body with

4    different instruments and tools including electric wires,

5    cables, crowbars, metal pipes and other things; hanging people

6    from the wrist for long periods of time while hands are tied

7    behind the back; exposing sensitive parts of the body to

8    electrical shock; blindfolding the eyes and tying the hands for

9    a number of days."  Correct?

01:04 10    A.   Correct.

11    Q.   Now, Tarek Mehanna did not make this video, did he?

12    A.   He didn't make it.

13    Q.   Tarek Mehanna did not write the dialogue to this video,

14    did he?

15         MR. CHAKRAVARTY:  Objection, your Honor.

16         THE COURT:  Briefly.

17         MR. CHAKRAVARTY:  This witness doesn't know what the

18    defendant did.

19         THE COURT:  Sustained.  Personal knowledge.

01:05 20    Q.   Do you have any personal knowledge that Tarek Mehanna

21    wrote anything in this video?

22    A.   No, I'm not aware -- I mean, I don't know if he did or

23    not.

24    Q.   Do you have any personal knowledge of whether he

25    translated it from Arabic to English?

1   A.   I know from what I read from the chats that he was --

2   Q.   What about personal knowledge?

3        THE COURT:  Let the witness finish the answer.

4        MR. CARNEY:  Well, he's not being responsive to the

5   question.

6        THE COURT:  I think that's debatable.  I think it was

7   responsive.  Go ahead.  You can complete the answer.

8        MR. CARNEY:  May I repeat the question?

9        THE COURT:  Go ahead.

01:05 10   Q.   Do you have any personal knowledge that Tarek Mehanna

11   translated this video from English -- I mean, from Arabic to

12   English?

13   A.   No, not personal knowledge, no.

14   Q.   Now, you were asked to read a video -- I mean a chat,

15   where Tarek Mehanna was asked by someone if he would edit,

16   correct?

17   A.   Correct.

18   Q.   You have no personal knowledge that Mr. Mehanna ever

19   edited that document, do you?

01:06 20   A.   Not personally.

21   Q.   Would you edit that document if I asked you?

22        MR. CHAKRAVARTY:  Objection, your Honor.

23        THE COURT:  Sustained.

24   A.   Would I?

25   Q.   Yes.

1    A.   Absolutely not.

2            THE COURT:  The objection is sustained.

3    Q.   If I asked you to do something and you didn't do it, would

4    you, as an agent, treat that as evidence that you did do it?

5            MR. CHAKRAVARTY:  Objection, your Honor.

6            THE COURT:  Sustained.

7    Q.   Now, yesterday, when you went through all of this evidence

8    that you offered with the government, you were asked to read

9    from a number of chats, isn't that right?

01:06 10   A.   That's right.

11   Q.   But the prosecutor would only ask you to read a little

12   portion of a chat, right?

13   A.   I was reading what I was told to read.

14   Q.   So in no instances were you ever asked to read, for

15   example, an entire chat, isn't that right?

16   A.   Correct.

17   Q.   It was always the little excerpt that the government

18   wanted you to read, correct?

19   A.   Correct.

01:07 20   Q.   One of those chats was Exhibit 731.  Do you recall that?

21   A.   Not top of my head, no.

22           MR. CARNEY:  May I have one moment, please, your

23   Honor.

24   Q.   You were asked also yesterday about a logo that appeared

25   on a video; do you recall that?

1    A.    I do recall that.

2          MR. CARNEY:  We can take this one down.

3    Q.    And you said it was the symbol of the media department of

4    al Qa'ida in the Land of the Two Rivers of Iraq -- meaning

5    Iraq, right?

6    A.    That's right.

7    Q.    Are you an expert in logos?

8    A.    No, I'm not.

9    Q.    And, basically, you expressed that opinion based on the

01:08 10   videos that the government had had you look at, right?

11   A.    That's not true.

12   Q.    Didn't you say that?

13   A.    No, that's not what I said.

14   Q.    Did you say that you hadn't seen it before you looked at

15   the videos that the government had showed you?

16   A.    No.  I said there was two logos.  One I had not seen and

17   one I had seen on the videos and on other stuff.

18   Q.    And that other stuff was not videos, was it?

19   A.    No.

01:08 20   Q.    So you don't know if that's a symbol or a logo of

21   al Qa'ida in general?

22   A.    No, actually, I do.

23   Q.    Was it?

24   A.    Yes, it is.

25   Q.    Now, we played an excerpt from a video, No. 33, yesterday.

1    Do you recall that?

2    A.    Which one was that?

3    Q.    This one was photos of Muslims fighting against the Soviet

4    Union.  Do you recall that?

5    A.    If I could see it, it would be good.

6    Q.    All right.

7          MR. CARNEY:  May he, your Honor, please?  I think

8    everyone could.

9          THE COURT:  You want the same clip that was played

01:09 10   yesterday?

11          MR. CARNEY:  Please, your Honor.

12          MR. BRUEMMER:  There were three of them.

13          THE COURT:  That's right, A, B, and C, if I recall.

14    Do you know which one?

15          MR. CARNEY:  If I may check a list, please.

16          We'll play the beginning, your Honor, please.

17          THE COURT:  It's 33A then, for the record.

18    (Video played.)

19    Q.    Do you recognize this as footage of the mujahideen

01:11 20   fighting against the Soviet Union with the support of the

21    United States?

22    A.    I can't say if this was against the Soviet Union.  How

23    could you say that this was against the Soviet Union?

24    Q.    By knowing where the video came from.

25    A.    I can't say that.  All I can tell you is what's in the

1    video if you would like me to explain that.  But I cannot tell

2    you if this was --

3    Q.    That is shooting down Russian helicopters --

4    A.    I can't tell if that's a Russian helicopter from watching

5    the video.  I'm not a helicopter expert.  But I cannot say

6    that's a Russian helicopter.  If you say it is, then you're

7    better than me.  But I can't say that.

8    Q.    I'm not better than anybody.

9    A.    No.  I'm just saying that I cannot say -- you're telling

01:11 10  me that this is a Russian helicopter, and I'm responding that I

11   don't know.  I can tell you that there was a helicopter being

12   shot by the mujahideen, but I cannot tell you which helicopter

13   was this.

14   Q.    Did the mujahideen shoot down Russian helicopters --

15   A.    They also shot down American helicopters.

16   Q.    Did they shoot down Russian helicopters with Stinger

17   missiles provided by the United States?

18   A.    During the time of the Jihad?  Yes, they did.

19   Q.    And you can't --

01:12 20          THE COURT:  Wait, wait.

21          MR. CHAKRAVARTY:  Objection to the reference to what

22   happened with the Soviet Union -- Soviet occupation of

23   Afghanistan.

24          THE COURT:  Yeah, sustained.

25          MR. CARNEY:  He answered the question with knowledge.

1        THE COURT:  Stricken.

2    Q.   So you can't tell us that that video is not from that war?

3    A.   No, I can't.  All I can tell you is that there was a

4    helicopter being shot by a missile, but I cannot tell you where

5    this came from.

6        MR. CARNEY:  Finally, can we see 449, please.  Can you

7    go to one minute and twenty seconds, please.

8    (Video played.)

9        MR. CARNEY:  You can stop there.

01:13 10   Q.   Now, this is the Alashaab Foundation for Islamic Media

11    Publications, is that right?

12   A.   Correct.

13   Q.   And this was one of the videos you played yesterday,

14    right?

15   A.   It was played for me.

16   Q.   Played for you yesterday.

17        Whose voice is speaking?

18   A.   I really can't tell.

19   Q.   Okay.

01:13 20        MR. CARNEY:  Could you continue to play it, please.

21    (Video played.)

22   Q.   Whose voice is speaking?

23   A.   That's Usama bin Laden.

24   Q.   I'm sorry?

25   A.   Usama bin Laden.

1    Q.   Whose picture is that?

2    A.   It's his picture.

3    Q.   Whose picture?

4    A.   Usama bin Laden.

5         MR. CARNEY:  Could we go to 450, please.  I'm sorry,

6    Exhibit 450.  At the start, please.

7    (Video played.)

8         MR. CARNEY:  Can we stop.

9    Q.   This was another video the government played for you

01:14 10   yesterday, right?

11   A.   Correct.

12   Q.   Whose voice are we listening to again?

13   A.   Usama bin Laden.

14   Q.   Whose picture are we looking at again?

15   A.   The picture of Usama bin Laden.

16   Q.   How do you spell that name?

17   A.   The whole name?

18   Q.   Yes.

19   A.   U-s-m-a, b-i-n, L-a-d-e-n.

01:15 20        MR. CARNEY:  Could we have the Exhibit 754, please.

21   Q.   Who was born in Saudi Arabia?

22   A.   Correct.

23   Q.   Who?

24   A.   Usama bin Laden.

25   Q.   I'm sorry.  Say it one more time.

```
 1    A.    Usama bin Laden.

 2          MR. CARNEY:  Then if we can please go to 751.

 3    Q.    What's represented there?  Is the country of Pakistan

 4    there?

 5    A.    Pakistan, India, Afghanistan, Baluchistan.

 6    Q.    Who was killed a couple of months ago in Pakistan?

 7    A.    Yes, he was.

 8    Q.    Who was killed?

 9    A.    Usama bin Laden.

01:15 10   Q.    Please say his name once more.

11          MR. CHAKRAVARTY:  Objection, your Honor.

12          THE COURT:  Sustained.

13          MR. CARNEY:  May I be heard?

14          THE COURT:  No.  You can put something on the record

15    at the break.

16    Q.    It's Osama bin Laden, right?

17    A.    Right.

18    Q.    Do you want to say that name any more times in front of

19    this jury?

01:16 20         MR. CHAKRAVARTY:  Objection, your Honor.

21          THE COURT:  Sustained.

22    Q.    Osama bin Laden.

23          THE COURT:  Question, please.

24          MR. CARNEY:  I'm just trying to help the government.

25    They want to get that name in front of the jury to scare these
```

1    people, and so I'm going to try to help them.

2            THE COURT:  If you have a question, ask the question.

3    If not, sit down.

4            MR. CARNEY:  I have no further questions.  Thank you.

5            MR. CHAKRAVARTY:  Brief redirect, your Honor.

6    REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

7    Q.   Mr. Khoury, you were asked about -- specifically some

8    questions about locations in Yemen.  One of the questions you

9    were asked was about your familiarity with a school in the area

01:16 10    of Ma'rib; do you remember that?

11   A.   Yes, I do.

12   Q.   What do you know -- what do you have personal knowledge

13   about -- with regards to Ma'rib?

14   A.   I know Ma'rib is a lawless area outside of the capital.

15   The government does not have a lot of control over -- or any

16   control, for that fact.  It's an area controlled by the tribes,

17   and al Qa'ida members always seek refuge there because they

18   knew that the government wasn't able to get them.

19   Q.   You were just shown some video clips from the State of the

01:17 20   Ummah video.  And you just saw a screen that said Alashaab

21   Media Productions.  Are you familiar with Alashaab Media

22   Productions?

23   A.   It's a media production for al Qa'ida.

24           MR. CARNEY:  I object and move to strike.

25           THE COURT:  It may stand.  Overruled.

1     MR. CARNEY:  He has no expertise in this.

2     THE COURT:  It may stand.

3  Q.   You were asked about several of the horrors that were --

4  had befallen to the Muslim world that were depicted in that

5  video; do you recall that?

6  A.   Yes.

7  Q.   Was there a proposed solution to those problems on the

8  video?

9  A.   Yes, there was.

01:18 10  Q.   What was that solution?

11  A.   To fight and kill Americans.

12  Q.   You described that there were additional speakers aside

13  from Mr. bin Laden, the head of al Qa'ida.  Describe the types

14  of speakers that were on that video.

15     MR. CARNEY:  I object to the characterization, "types

16  of speakers."

17     THE COURT:  Overruled.

18  A.   There were very inflammatory speakers like the Blind

19  Sheikh --

01:18 20     MR. CARNEY:  I object and move to strike.

21  A.   -- Omar Abdel-Rahman, for example.

22     THE COURT:  Begin the answer again.

23  Q.   You can answer.

24  A.   I can answer?

25  Q.   Yes, please.

1    A.    There was inflammatory speakers --

2          MR. CARNEY:  I object.

3          THE COURT:  Overruled.

4    A.    -- that were -- such like the Blind Sheikh, Omar

5    Abdel-Rahman, who was jailed --

6          MR. CARNEY:  I object, your Honor.

7          THE COURT:  Overruled.

8    A.    There was -- there were other speakers, like Abu Hafs

9    al-Masri, who was the No. 2 in al Qa'ida before he was killed,

01:18 10   and Ayman al-Zawahiri took over.  Ayman al-Zawahiri spoke

11   himself.  Those are the type of the speakers that were in that

12   video.

13   Q.    Is Ayman al-Zawahiri, is he a doctor?

14   A.    Yes, he is.

15   Q.    Just for the benefit of the court reporter, is it

16   A-y-m-a-n, a-l, hyphen, Z-a-w-a-h-i-r-i?

17   A.    Correct.

18   Q.    You were asked about Exhibit 782, the transcript to the Wa

19   Yakoon Ad Deen video.  Do you recall that?

01:19 20   A.    That's right.

21         MR. CHAKRAVARTY:  Can we bring that up for the witness

22   and the jury, please.  And can we go to Page 3 which defense

23   showed.

24   Q.    Mr. Khoury, at the top of this page there's a name and

25   then a statement followed by -- after the name.  Are you

1    familiar with that name, Shaykh Abu Musab al-Zarqawi?

2    A.    Absolutely.

3    Q.    Who was he?

4    A.    He was the al Qa'ida leader in Iraq.

5    Q.    Was he killed in 2006?

6    A.    June of 2006 he was killed.

7    Q.    And then after some of his statements, does the video --

8    this is the transcript of the video.  Does it then go on to

9    describe martyrdom operations?

01:20 10    A.    Correct.

11    Q.    And, specifically, who was killed in these martyrdom

12    operations?

13    A.    U.S. soldiers.

14    Q.    Are there multiple instances of this?

15    A.    Very, very, very, too many instances.

16          MR. CHAKRAVARTY:  Could we go back to Page 1.

17    Q.    Again, was this a production of -- can you read that

18    again?

19    A.    "The Organization of Al Qa'ida in the Land of Iraq, The

01:21 20    Media Front Presents."

21          MR. CHAKRAVARTY:  Your Honor, I believe the defense

22    did object.

23          THE COURT:  I didn't hear it.

24          MR. CARNEY:  I withdrew it.

25          THE COURT:  I'm sorry?

1        MR. CARNEY:  I withdrew it, your Honor.

2   Q.   You were finally asked about, say, a shoulder-fired

3   missile that struck an aircraft on a video.  Do you recall

4   that?

5   A.   I do.

6   Q.   Without describing -- you explained why you couldn't

7   determine what incident that was in terms of chronologically.

8   Were there other clues as to when that video was made that were

9   depicted later in that film?

01:21 10  A.   I'm not aware -- I'm not sure what you're --

11  Q.   Do you recall the second video clip depicting the

12  airplanes going into the World Trade Center in New York?

13       MR. CARNEY:  I object.  Beyond the scope.

14       THE COURT:  Sustained.

15  Q.   In terms of placing a chronological time on that video, do

16  you know whether that video was created back in the 1980s or

17  sometime in the 2000s?

18  A.   I really can't tell from when the video was made.  All I

19  can say, it was mujahideen firing a missile at an airplane.

01:22 20  Q.   I'm saying the later clips of the video --

21  A.   The later clips, yes.

22  Q.   So that was a collection of video clips, is that right?

23  A.   Exactly.

24  Q.   There were later clips that were more contemporary, as far

25  as you could tell?

```
 1    A.    That's right.

 2    Q.    Or had some time stamp -- some way to indicate it was more

 3    recent, is that fair?

 4    A.    Correct.

 5    Q.    You described that there were some portions of that video

 6    that we weren't able to show to the jury, is that right?

 7          MR. CARNEY:  I object.

 8    A.    In which video was that again?

 9          THE COURT:  Sustained.

01:23 10    Q.    Was the name of that video the Abu Nasir al-Qahtani video?

11          THE COURT:  This is a different question.

12          MR. CARNEY:  Objection.

13          THE COURT:  The objection is overruled to this

14    question.

15    A.    Yes.

16          MR. CARNEY:  May he repeat the question?

17          THE COURT:  Repeat the question.

18    Q.    Was the title of that video the Abu Nasir al-Qahtani

19    video?

01:23 20    A.    Yes.

21          MR. CARNEY:  I object.

22          THE COURT:  Overruled.

23    Q.    And there were two --

24          MR. CARNEY:  May I approach then?

25          THE COURT:  All right.
```

1    (SIDEBAR CONFERENCE AS FOLLOWS:

2         MR. CARNEY:  Your Honor, he asked was there a video we

3    couldn't show the jury.  I said "objection."  You said

4    "sustained."  Then he says, What's the name of the video?

5         THE COURT:  I thought he was talking about the video

6    we just saw.

7         MR. CHAKRAVARTY:  There was a video clip that we

8    sanitized and he had described because it was inflammatory.

9    But --

01:23 10        THE COURT:  Is this the beheading?

11        MR. CHAKRAVARTY:  Right.

12        THE COURT:  I don't think the record is clear as to

13   which video you're talking about.

14        MR. CHAKRAVARTY:  I'll clarify that there were three

15   clips from that video.

16        THE COURT:  It's not proper to refer to a ruling that

17   I made in characterizing.

18        MR. CHAKRAVARTY:  Okay.

19        MR. CARNEY:  I'm going to object to any further

01:24 20   reference to the beheadings.

21        MR. CHAKRAVARTY:  I wasn't going to elicit that.  I

22   was just trying to familiarize the witness with what the

23   question was.  It seemed that he wasn't sure what I was asking.

24        THE COURT:  I think the moment has passed.

25        MR. CARNEY:  I think it's suggesting what you wouldn't

1    let them see.

2              THE COURT:  We'll move on.

3              MR. CARNEY:  Thank you.

4    .  .  .  END OF SIDEBAR CONFERENCE.)

5    Q.   Finally, Agent Khoury, you were asked about things that

6    the defendant did or -- and things that he discussed.  What is

7    the universe of knowledge that you have with regards to what

8    the defendant did in this case?

9    A.   Are you asking me what do I know about the defendant's

01:25 10   case?

11   Q.   No.  What were you -- in terms of what were you asked to

12   come in here and present to the jury?

13   A.   Some of the videos and the chats that the defendant was

14   involved with.

15   Q.   Are those the things that we discussed before you

16   testified yesterday?

17   A.   Yes.

18              MR. CHAKRAVARTY:  That's all I have, your Honor.

19   RECROSS-EXAMINATION BY MR. CARNEY:

01:25 20   Q.   You said on those videos that there were a lot of

21   inflammatory speakers, right?

22   A.   Correct.

23   Q.   That means impassioned speakers, doesn't it?

24   A.   English is my third language.  I'm not really

25   understanding what you're trying to ask me here.  So could you

```
 1   please -- what is impassioned?  What are you trying to say to
 2   me?
 3   Q.   Sincere, compelling, wanting to get their point across
 4   with rhetoric and hyperbole if necessary.
 5   A.   I would say they wanted to get their point across with
 6   rhetoric, yes, but I wouldn't say the other two.
 7   Q.   You wouldn't think they were sincere?
 8   A.   They were sincere to the people that watched these videos.
 9   Q.   Were they themselves sincere in what they said?
10   A.   I don't know if somebody is sincere when they're talking.
11   Q.   Would you say someone who is compelling as a speaker?
12   A.   I would say it's somebody that's trying to get people to
13   do what they want them to do.
14   Q.   And in this case, it was:  Come and defend a Muslim
15   country, right?
16   A.   Not really.
17   Q.   Are you an expert in Yemen?
18   A.   I'm not an expert.  I've spent time there.
19   Q.   Have you spent time in Ma'rib?
20   A.   I never spend a lot of time in Ma'rib.  I worked in Yemen
21   for a year and a half.
22   Q.   So you didn't spend any time in Ma'rib?
23   A.   No.
24   Q.   Not personally?
25   A.   No.
```

1    Q.   So your comments about Yemen and Ma'rib were not based on

2    your personal knowledge going there?

3    A.   They were based on my investigative knowledge.

4    Q.   Was it based on your personal knowledge of being in the

5    area?

6    A.   Well --

7    Q.   You weren't in the area, were you?

8    A.   I was not in Ma'rib, no.  But when you say "personal," can

9    you just --

01:27 10   Q.   "Personal," I mean something that you see with your own

11   eyes, hear with your own ears, so that you can say, I was there

12   and this is what I saw.

13   A.   Well, no.  I was not there and this is what I saw.

14   Q.   Remember you were going to answer my questions yes or no?

15           THE WITNESS:  If I may, your Honor?

16           THE COURT:  Go ahead.

17   A.   You said to me --

18           MR. CARNEY:  Should we have an argument?

19   Q.   I'm asking you a question.

01:27 20          THE COURT:  Mr. Carney.

21           Agent, wait a minute.

22           MR. CARNEY:  May I put a question to him?

23           THE COURT:  You may.  And he may answer it yes or no

24   if it's a truthful and full answer by answering yes or no.  If

25   he needs to say more than that, he may say more than that.

1    Q.   You've never laid eyes on Ma'rib?

2    A.   I've never been to Ma'rib.

3    Q.   And so you don't know from your own personal knowledge of

4    having been there what goes on in Ma'rib?

5    A.   I already said I have not been to Ma'rib.

6    Q.   Okay.  Thank you.

7              MR. CHAKRAVARTY:  Nothing further, your Honor.

8              THE COURT:  Thank you, Agent Khoury.  You may step

9    down.

01:28 10             MR. GROHARING:  Your Honor, at this point we'd like to

11   read a stipulation that the parties have entered into.

12             THE COURT:  I'll just tell the jury.  Sometimes a

13   stipulation, as it's called, is offered in evidence.  It is

14   simply an agreement between the parties that you may take the

15   facts agreed to or stipulated to as established and not in

16   controversy.  Go ahead.

17             MR. GROHARING:  The parties have stipulated as

18   follows:  On April 4, 2002, Ahmed Abousamra traveled from

19   Boston, Massachusetts, to Islamabad, Pakistan, via New York.

01:29 20   He returned to the United States on May 1, 2002.

21             On November 17, 2002, Ahmed Abousamra again traveled

22   from Boston, Massachusetts, to Islamabad, Pakistan.  He

23   returned to the United States on December 12, 2002.

24             On February 1, 2004, Ahmed Abousamra, Tarek Mehanna,

25   and Kareem Abuzahra departed Boston, Massachusetts, and

1    traveled to Dubai, United Arab Emirates.

2            On February 4, 2004, Tarek Mehanna and Ahmed Abousamra

3    continued on to Yemen, entering Yemen on February 4, 2004.

4            On February 11, 2004, Tarek Mehanna and Ahmed

5    Abousamra departed Yemen.

6            On February 6, 2004, Kareem Abuzahra returned to

7    Boston, Massachusetts, traveling from Dubai, via London.

8            On February 15, 2004, Tarek Mehanna returned to

9    Boston, Massachusetts, traveling from Sunaa, Yemen, via London.

01:30 10         On August 12, 2004, Ahmed Abousamra returned to

11   Boston, Massachusetts, traveling from Syrie, via Milan, Italy.

12           On July 31, 2006, Tarek Mehanna traveled from Boston,

13   Massachusetts, to Egypt via Frankfurt, Germany.  He returned to

14   Boston, Massachusetts, from Egypt via Frankfurt on August 26,

15   2006.

16           On December 26, 2006, Ahmed Abousamra traveled from

17   Boston, Massachusetts, to Syria via London.

18           Your Honor, we'll also offer the exhibit as evidence.

19           MR. CARNEY:  No objection, your Honor.

01:30 20         THE COURT:  What number is it?

21           MR. GROHARING:  Number 795, your Honor.

22   (Exhibit No. 795 received into evidence.)

23           MR. AUERHAHN:  The United States calls Paul J. Ryan.

24           THE CLERK:  Sir, you want to step up here, please.

25   Step up to the box.  Remain standing.

|   |   |
|---|---|
| 1 | PAUL RYAN, Sworn |
| 2 | THE CLERK:  Have a seat.  State your name and spell |
| 3 | your last name for the record. |
| 4 | THE WITNESS:  My name is Paul Ryan, R-y-a-n. |
| 5 | THE CLERK:  Thank you. |
| 6 | DIRECT EXAMINATION BY MR. AUERHAHN: |
| 7 | Q.   Good morning, sir. |
| 8 | A.   Good morning. |
| 9 | Q.   How are you employed? |
| 01:32 10 | A.   I'm employed as a Customs and Border Protection officer |
| 11 | with the U.S. Department of Homeland Security. |
| 12 | Q.   How long have you been a Customs and Border Protection |
| 13 | officer? |
| 14 | A.   Since the creation of the agency in 2003; and then prior |
| 15 | to that, I was a Customs inspector with the Department of |
| 16 | Treasury since 1986. |
| 17 | Q.   So the Customs and Border Protection was reorganized and |
| 18 | merged -- excuse me, Customs Service was reorganized and merged |
| 19 | into the new Homeland Security? |
| 01:32 20 | A.   Yeah.  We were merged with Immigration in 2003. |
| 21 | Q.   Just in general terms, what are your duties at the CBP; |
| 22 | that would be the initials, correct? |
| 23 | A.   The inspection of people arriving and departing in the |
| 24 | U.S. and the enforcement of Customs and Immigration law. |
| 25 | Q.   Do you recall what your assignment was in 2004? |

1    A.    I was assigned to an outbound enforcement team.

2    Q.    When you say the "outbound enforcement team," what

3    generally are your duties as part of that team?

4    A.    Inspecting cargo departing the U.S. and also talking to

5    people as they leave the U.S.

6    Q.    I want to draw your attention to February 1 of 2004.  Do

7    you recall what your assignment was on that day?

8    A.    Yes.  I was at Terminal B, Logan Airport.  I was on a

9    jetway.  We were advising people of the Title 31 reporting

01:33 10    requirements.

11    Q.    Okay.  What is the Title 31 reporting requirement?

12    A.    If you depart the U.S. with more than $10,000 in currency

13    or negotiable instruments, you're required to report it.

14    Q.    It's not illegal to do so, but you just have to report it?

15    A.    Correct.

16    Q.    You said you were on the jetway.  At what point in the

17    departure of the passengers do you meet passengers?

18    A.    It's after they hand in their boarding pass and they're

19    actually walking towards the plane.

01:33 20    Q.    And this is -- is this for domestic flights or

21    international flights?

22    A.    International only.

23    Q.    Do you speak to every passenger departing?

24    A.    No, we do not.

25    Q.    When you approach the passenger, what, if anything, do you

1    ask the passenger to produce to you?

2    A.    Normally, their passport and their boarding pass or their

3    ticket.

4    Q.    With reference to the passport, do you confirm the

5    identity of the person to whom you are speaking?

6    A.    Yes, we do.

7    Q.    I assume you do or have done hundreds of these over the

8    course of the years?

9    A.    Yes.

01:34 10   Q.    Do you have a specific memory of speaking to an individual

11   named Tarek Mehanna on February 1, 2004?

12   A.    No, I don't.

13   Q.    Did you have an opportunity -- well, strike that.

14          When you speak to a passenger, if you have a

15   conversation with him, do you take some notes?

16   A.    If it's just a conversation, no.

17   Q.    If you have more than just a brief conversation, do you

18   take --

19   A.    If it involves a baggage search or money verification,

01:34 20   then we would take notes of that.

21   Q.    When you say "money verification," what's that?

22   A.    If somebody says that they have $5,000, then sometimes

23   we'll ask them to produce it, and we'll actually count it.

24   Q.    When you take notes, what do you do with the notes at the

25   end of the interview or at the end of the day?

1    A.   We go back to our office and enter that information into

2    the computer.

3    Q.   With reference to a meeting on February 1, 2004, with an

4    individual named Tarek Mehanna, did you do that?

5    A.   Yes, I did.

6    Q.   Did you generate then a computer report?

7    A.   Yes, I did.

8    Q.   Do you have that with you?

9    A.   Yes, I do.

01:35 10   Q.   Is it fair to say, for the purpose of testifying here

11   today, you're relying on that report --

12   A.   Yes.

13   Q.   -- for details?

14   A.   I have no recollection of the encounter.

15   Q.   Okay.  Now, what I'd like you to do first, is -- on the

16   report you have, in addition to the name, did you note any

17   other identifying information?

18   A.   The other identifying information would be gender, race,

19   passport number, that sort of thing.

01:36 20   Q.   Okay.  And date of birth?

21   A.   Yes.

22        MR. AUERHAHN:  May I approach the witness, your Honor?

23        THE COURT:  You may.

24   Q.   Let me place before you what has been marked Exhibit 477,

25   but unlike the exhibit, it's unredacted.  Could you look at the

1    name, date of birth, and the passport number on Exhibit 477 as

2    well as your report of the person you interviewed, and tell me

3    if that's the person you interviewed on February 1, 2004?

4    A.   Yes, it is.

5    Q.   Can you look at Page 10 of that exhibit.  Is that a more

6    current picture or then-current picture of the individual you

7    spoke to?

8    A.   Yes, it is.

9         MR. AUERHAHN:  Can we bring up Exhibit 755, please,

01:37 10   for the witness only.

11   Q.   Is that a photograph of the person you spoke to on

12   February 1, 2004?

13   A.   Yes.  It matches the picture on the visa, yes.

14        MR. AUERHAHN:  Your Honor, I would move into evidence

15   the redacted copy of the passport, Exhibit -- what did I say?

16   -- 477, and the photograph of Mr. Mehanna, 755.

17        MR. CARNEY:  May we approach, please?

18        THE COURT:  All right.

19   (SIDEBAR CONFERENCE AS FOLLOWS:

01:38 20        MR. CARNEY:  Your Honor, I have no objection to the

21   passport coming in, but this individual has absolutely no

22   memory of the person who went through that gate, and now he's

23   just offering an opinion of what Tarek Mehanna looks like now.

24        I don't have a problem with the passport coming in and

25   the passport photo and all of that, but he acknowledges he has

1    no memory whatsoever --

2         THE COURT:  Is the passport photo the same as the

3    other one?

4         MR. AUERHAHN:  Your Honor, the passport photo --

5    obviously, he's a lot younger.  That's why I asked him to look

6    at the visa.  I have the original passport where it's a better

7    picture.  So all he's doing is saying the photo in the visa is

8    the photo of the same person in the photograph of Mr. Mehanna.

9    He's not commenting on what Mehanna looks like now.  He's

01:39 10    simply saying that the person whose passport I got is the same

11    person as Exhibit 755.  I have the original passport, which is

12    a clearer picture, which the witness had an opportunity to look

13    at on a previous occasion.

14         MR. CARNEY:  If I may see that, please.

15         THE COURT:  The original?

16         MR. CARNEY:  This, your Honor.

17         THE COURT:  Somebody have 755?

18         MR. CARNEY:  Yes, your Honor.

19         THE COURT:  Looks to me like the same picture.  I

01:40 20    think it's the same picture.

21         MR. CARNEY:  I think so, too.  I withdraw my

22    objection.

23         THE COURT:  Okay.

24         MR. CARNEY:  It was based on the fact that on my copy

25    I just couldn't see it.

 1          THE COURT:  I'm not sure the point is clear with the

 2     jury, though, as to what he was comparing.  Maybe you should

 3     make that clearer.

 4          MR. CARNEY:  Thank you.

 5     .  .  .  END OF SIDEBAR CONFERENCE.)

 6          MR. AUERHAHN:  I can ask a few more questions.

 7     Perhaps standing here might be easier?

 8          THE COURT:  Yes.

 9     Q.   Sir, is this an original of the passport that you were

01:40 10     looking at, Exhibit 477?

11     A.   Yes, it is.

12     Q.   And turn to this page and tell us what that is.

13     A.   That's a Saudi visa.

14     Q.   Is there a photograph as part -- embedded in the Saudi

15     visa?

16     A.   Yes, there is.

17     Q.   Is the photograph in the Saudi visa that's in the

18     passport, Exhibit 477, the same photograph that's displayed --

19     or appears to be the same photograph that was displayed -- can

01:41 20     you see that?

21     A.   Not yet.

22          Yes, looks the same.

23     Q.   Okay.  So the individual we're looking at on the screen,

24     that's who you were talking to on February 1, 2004?

25     A.   Yes.

1          MR. CARNEY:  No objection to either photo.

2          THE COURT:  That's now admitted and displayed for the

3     jury.  Eventually.

4     Q.   Sir, you said that part of the process was advising the

5     people, as they were boarding the plane, of the Title 31

6     requirements?

7     A.   Yes.

8     Q.   Did you do that with Mr. Mehanna on that day?

9     A.   Yes, I did.

01:41 10    Q.   Did he indicate how much cash he had with him?

11    A.   He said that he had $3,100.

12    Q.   Did he say what his final destination was?

13    A.   He said he was going to Yemen.

14    Q.   Is that where his bags were checked to?

15    A.   No.  They were checked to the United Arab Emirates.

16    Q.   Did he say why he was going to Yemen?

17    A.   Based on what I wrote here, was to check out schools.

18    Q.   Now, did you confirm whether or not Mr. Mehanna was

19    traveling alone or with anyone else?

01:42 20    A.   He was traveling with another individual.

21    Q.   And did you speak to that other individual as well?

22    A.   Yes, I did.

23    Q.   Did you speak to Mr. Mehanna and the other individual at

24    the same time?

25    A.   Yes, I did.

```
 1    Q.   So they -- you were speaking to both of them at the same
 2    time?
 3    A.   Yes.
 4    Q.   So the other person could hear what Mr. Mehanna was
 5    saying?
 6    A.   Yes.
 7    Q.   And vice versa?
 8    A.   Uh-huh.
 9    Q.   So in Mr. Mehanna's presence, did you identify the
10    individual who was traveling with him?
11    A.   Yes, I did.
12    Q.   What was his name?
13    A.   Kareem Abuzahra.
14    Q.   Did Mr. Abuzahra, in Mr. Mehanna's presence, say anything
15    about where they were going?
16    A.   He said they were going to check out schools.
17    Q.   Did Mr. -- excuse me.  Did Mr. Abuzahra say with whom they
18    were traveling?
19    A.   I don't recall.
20    Q.   Did he say how many people were going along?
21    A.   I only spoke with two people.  I believe there were
22    others, but I didn't record that information, so --
23    Q.   Well, did Mr. Abuzahra say he was traveling with his two
24    friends to Yemen?
25    A.   Yes, he did.
```

1    Q.    So a total of three?

2    A.    Yes.

3    Q.    And for the purpose of what?

4    A.    To check out schools.

5    Q.    Now, at any time did Mr. Mehanna correct anything Mr.

6    Abuzahra had said?

7    A.    I don't recall.

8    Q.    Now, if Mr. Mehanna or Mr. Abuzahra had told you that they

9    were traveling for a different purpose, to visit a terrorist

01:43 10   training camp, how would the course of the interview proceeded

11   differently?

12             MR. CARNEY:  I object.

13             THE COURT:  Sustained.

14             MR. AUERHAHN:  A materiality issue?

15             THE COURT:  No.  Let me see you.

16   (SIDEBAR CONFERENCE AS FOLLOWS:

17             THE COURT:  It's too suggestive a question.  If you

18   want to ask what his procedures are more generally or something

19   like that, but -- I guess it has a tinge of argumentative to

01:44 20   it, I guess it is.

21   .  .  .  END OF SIDEBAR CONFERENCE.)

22   Q.    Now, sir, as part of the outbound passenger interview, you

23   said your principal purpose is to identify -- to tell them of

24   the Title 31 requirements?

25   A.    Correct.

1    Q.   Why do you ask these other questions about where are you

2    going and what's the purpose of your trip?

3    A.   It's just -- it's part of the inspection process.

4    Q.   What do you do with the information --

5    A.   The information --

6    Q.   -- that you receive?

7    A.   It's entered into the computer, into the comments.

8    Q.   If you receive information that's useful to other federal

9    law enforcement, what do you do with that?

01:45 10   A.   I would also enter that into the computer and then notify

11   them separately.

12   Q.   Would you notify other law enforcement and detain a

13   passenger for any reason?

14   A.   It is possible, yes.

15   Q.   Under what circumstances?

16            MR. CARNEY:  I object.

17            THE COURT:  Overruled.  You may answer.

18   Q.   You can answer.

19   A.   If I believe the person was about to commit a crime or has

01:46 20   committed a crime.

21            MR. AUERHAHN:  No further questions, your Honor.

22            MR. CARNEY:  I have no cross, your Honor.  Thank you.

23            THE COURT:  All right, Mr. Ryan.  Thank you.  You may

24   step down.

25            MR. GROHARING:  Todd Emery, your Honor.

1        THE CLERK:  Sir, up here, please.  Step up to the box.

2        TODD EMERY, Sworn

3        THE CLERK:  Please be seated.  State your name and

4    spell your last name for the record.

5        THE WITNESS:  Todd Emery, E-m-e-r-y.

6    DIRECT EXAMINATION BY MR. GROHARING:

7    Q.   Good morning, sir.

8    A.   Morning.

9    Q.   Where do you work?

01:47 10   A.   I work with -- a special agent with Immigration and

11   Customs Enforcement, Homeland Security investigations.

12   Q.   What do you do as an agent with the Immigration and

13   Customs Enforcement?

14   A.   I enforce Immigration law, Customs law.

15   Q.   How long have you done that?

16   A.   I've done that for approximately two and a half years.

17   Q.   Prior to joining the Immigration and Customs Enforcement

18   Agency, where did you work?

19   A.   Prior to that, I was employed with the U.S. Border Patrol

01:48 20   in Nogales, Arizona.

21   Q.   In what capacity with the U.S. Border Patrol?

22   A.   As a Border Patrol agent.

23   Q.   How long did you work in Nogales with the Customs and

24   Border Protection?

25   A.   Approximately three years.

1    Q.    Prior to that job, what did you do?

2    A.    I worked with Customs and Border Protection at Logan

3    Airport as a Customs and Border Protection officer.

4    Q.    That's Logan Airport here in Boston?

5    A.    Yes, sir.

6    Q.    How long did you serve in that capacity?

7    A.    Approximately four years.

8    Q.    What were your duties in that job?

9    A.    I was to enforce Immigration, Customs laws, and to conduct

01:49 10   inspections of incoming travelers from foreign.

11   Q.    When did you join that organization?

12   A.    September 2002.

13   Q.    What did you do prior to joining CBP?

14   A.    Prior to joining CBP, I was attending school.

15   Q.    Where was that school?

16   A.    Hofstra University, Long Island, New York.

17   Q.    Now I want to ask you about your work at CBP.  You

18   indicated you worked as an agent at CBP, is that correct?

19   A.    I was a CBP officer at CBP, yes.

01:49 20   Q.    What does a CBP officer do in general terms?

21   A.    CBP officer conducts inspections at the airport, conducts

22   inspections of incoming passengers and outgoing passengers from

23   foreign travel for contraband or any possible Immigration

24   violation.

25   Q.    Were you working in that capacity on February 6, 2004?

1    A.    Yes.

2    Q.    Do you recall screening an individual named Kareem

3    Abuzahra on that day?

4    A.    No, I do not.

5          MR. GROHARING:  Your Honor, I'd like permission to

6    display Exhibit 767 to the witness.

7    Q.    Do you recognize that document, sir?

8    A.    Yes.

9    Q.    What is it?

01:50 10   A.    It's an IO-25.  It's a record of secondary inspection

11   conducted.

12   Q.    How do you know that?

13   A.    I know that -- I'm familiar with the TECS system and that

14   screen.

15   Q.    You reference a "TECS system."  What is a TECS system?

16   A.    It's a database which allows us to document secondary

17   inspection results.

18   Q.    So information that you collect during an inspection, it's

19   -- you put that information into the database?

01:51 20   A.    Yes, that's correct.

21   Q.    How do you know whether or not you are responsible for

22   this report?

23   A.    Each officer is issued a unique user ID and password.  And

24   once you're in the system, anything you enter is attached to

25   your name and social security number.

1    Q.   Have you confirmed that you are, in fact, responsible for

2    the information in this report?

3    A.   Yes.

4    Q.   Now that you've had an opportunity to review this report,

5    does that refresh your memory as far as your interaction with

6    Kareem Abuzahra on February 6, 2004?

7    A.   No.

8    Q.   Is it fair to say you still don't have a recollection of

9    that interview?

01:52 10  A.   No, sir.

11   Q.   But did you, in fact, produce this report?

12   A.   Yes.

13   Q.   Was this report made at a time when the information

14   contained in the report was fresh in your memory?

15   A.   Yes.

16        MR. GROHARING:  Your Honor, I would ask that the

17   witness be permitted to read portions of the report.

18        THE COURT:  All right.

19   Q.   Sir, could you please state who the name is on this

01:52 20  report, who's the subject of the report?

21   A.   Kareem Said Abuzahra.

22        THE COURT:  Agent Emery, would you bend the microphone

23   towards you a little bit.  We're not quite picking you up well

24   enough.

25   Q.   I'm sorry.  You indicated Kareem Said Abuzahra, is that

```
 1  correct?
 2  A.   Yes, sir.
 3  Q.   Sir, could you please also indicate what the date of this
 4  report is?
 5  A.   February 6, 2004.
 6  Q.   Sir, could you also read the remarks section of the
 7  report?
 8  A.   "Pax states he was on trip to Daralmostafa, an Islamic
 9  school in UAE.  Pax plan on three week trip to visit school but
01:54 10  trip was cut short to six days as his father was sick.  Pax
11  also states he works for UMass."
12  Q.   Sir, is that information that you put into that report?
13  A.   Yes.
14         MR. GROHARING:  Thank you, your Honor.  I have no
15  further questions.
16  CROSS-EXAMINATION BY MS. BASSIL:
17  Q.   Good morning, sir.
18  A.   Good morning.
19  Q.   I just have a few questions.  First of all, do you
01:54 20  remember whether there were a large number of people that came
21  off that plane?  That plane came from London, is that correct?
22  A.   I think it --
23  Q.   You see a depart destination, "London Heathrow
24  International"?
25         THE COURT:  Can you put it back up for the witness?
```

1        MR. BRUEMMER:  Yes, sir.

2   A.   Yes.

3   Q.   See "Heathrow," right?

4        Do you remember whether that plane was full?

5   A.   I do not recall.

6   Q.   Did you stop anyone besides Mr. Abuzahra?

7   A.   I do not recall.

8   Q.   Let me ask you:  In terms of writing this report, do you

9   take notes?  Do you enter things on a computer as you interview

01:55 10   someone?  How do you do it?

11   A.   Normally, I'd take notes and then enter it in the computer

12   immediately after, following.

13   Q.   These are handwritten notes?

14   A.   Usually, I think I would have.  I don't remember what I

15   did that day.

16   Q.   But was it your practice to take handwritten notes?

17   A.   Usually.

18   Q.   Was it your practice to write the report the same day or

19   later in the next day, or what was your practice?

01:55 20   A.   Immediately following the inspection.

21   Q.   Immediately following it.  Then would you throw away your

22   notes after you wrote this, wrote the report?

23   A.   I don't know what I did with the notes to be honest with

24   you.

25   Q.   Did you save your notes?

1    A.    No.

2    Q.    Now, I want to ask you -- I understand that you don't have

3    a memory, but I do want to ask you about some things on this.

4    On the remarks on this that we looked at before --

5          MS. BASSIL:  If we could -- okay.

6    Q.    P-a-x stands for what?

7    A.    Passenger.

8    Q.    Passenger.  "Passenger states he was on trip to

9    Daralmostafa, an Islamic school in UAE."  UAE is the United

01:56 10   Arab Emirates?

11   A.    Yes, ma'am.

12   Q.    When you wrote that name, "Daralmostafa," did you ask him

13   to spell it, or was that your best interpretation of what he

14   said?

15   A.    I don't remember.

16   Q.    But you definitely wrote down that the Islamic school was

17   in the United Arab Emirates, right?

18   A.    Yes.

19   Q.    Then he says, "trip was cut short as his father was sick,"

01:56 20   correct?

21   A.    Yes.

22   Q.    If he had something like I didn't sign my daughter's

23   passport, you would have put that down as well, correct?

24   A.    Whatever I felt that was relevant at that time.

25   Q.    Well, what you wanted to put down as relevant was his

1    excuse for cutting his trip short, correct?

2    A.    Yes.

3    Q.    So if he had given you another explanation for cutting his

4    trip short, more than one explanation, you would have put that

5    down as well --

6    A.    Yes.

7    Q.    -- correct?

8          Did he show you any kind of paper from a school, Dar

9    al-Mustafa, any kind of computer printout or a paper?

01:57 10   A.    I don't remember.

11   Q.    If he had shown you some kind of document, a paper from

12   the school, a description from the school, would you have noted

13   that?

14   A.    Yes.

15   Q.    Would you have saved it?

16   A.    Probably not.

17   Q.    Made a copy of it, for example?

18   A.    I don't -- probably not.

19   Q.    Okay.  When you get this information, do you do any

01:57 20   checking on it?

21   A.    Any checking on whether he's --

22   Q.    Well, for example, any checking on whether there is a Dar

23   al-Mustafa school in the United Arab Emirates, would you check

24   that?

25   A.    I may have.

1    Q.   Obviously, you didn't write down -- was there a further

2    report in which you wrote down what you had checked?

3    A.   No.

4    Q.   And did you check, for example, that he worked at UMass?

5    A.   No.

6    Q.   Now --

7         MS. BASSIL:  If we could go back to the original

8    screen.

9    Q.   Now, I notice here it says, "Bag exam?  Yes, bags

01:58 10  X-rayed," correct?  You see that?

11   A.   Yes.

12   Q.   All right.  And on occasion, have you or someone with you

13   in -- when you worked there, taken pictures of what's the

14   content of someone's bags?

15   A.   I never have done that.

16   Q.   You have not done that?

17   A.   No.

18   Q.   All right.  And a personal search was not done, correct?

19   A.   No, no personal search.

01:58 20  Q.   No personal search was done.  And can you tell me why you

21   questioned him?

22   A.   I don't remember.

23   Q.   Is there some kind of --

24        MR. CHAKRAVARTY:  Your Honor, can we see you at

25   sidebar quickly.

1    (SIDEBAR CONFERENCE AS FOLLOWS:

2         MR. CHAKRAVARTY:  Your Honor, I apologize.  It was an

3    related issue which I'm not sure is necessarily specific with

4    this witness.  But not knowing where the defense is going, when

5    we discussed our stipulation on the border crossings, we also

6    discussed the fact that neither party would elicit whether

7    somebody is on a list.  I don't know if that's where you're

8    going.  I just want to make the Court understand.

9         MR. CARNEY:  Well, Mr. Chakravarty accurately states

02:00 10   what I discussed with him.  There's an issue of

11   miscommunication between Miss Bassil and me, and we just had

12   that communication, which I had forgotten to tell her about our

13   conversation.  So I just told her walking over here.  I don't

14   think we're going to go down that path.

15        THE COURT:  Are you going to explore secondary

16   interviews, inspection, at all?

17        MS. BASSIL:  In terms of?

18        THE COURT:  Are you done with it?

19        MS. BASSIL:  Secondary inspection?

02:00 20        THE COURT:  Well, this is a second inspection.  That's

21   when -- first inspection -- first inspection is a cursory one.

22   If they see something, then they put somebody aside for a

23   secondary one.  There could be a range of reasons why they do

24   that.  I don't know if you're going into that.

25        MS. BASSIL:  No.

1    .   .   .   END OF SIDEBAR CONFERENCE.)

2    Q.   Mr. Emery, in the very top line where it says, "Entry

3    date."

4    A.   Yes, ma'am.

5    Q.   So it says, "2/06/2004, 14:18:04"?

6    A.   Yes, ma'am.

7    Q.   Is that when you wrote the report, or is that when you

8    first started the interview?

9    A.   That's when I first -- that's when I first started the

02:01 10   report.

11   Q.   The report?

12   A.   Yes, ma'am.

13   Q.   So that 14:18:04 has nothing to do with how long you

14   interviewed Mr. Abuzahra for?

15   A.   No, ma'am.

16   Q.   Do you know how long you interviewed him for?

17   A.   I believe -- I'd say, based on the referral time and a

18   completion time, I'd say in between ten minutes, approximately

19   ten minutes.

02:02 20   Q.   I see that.  Referral time says "14:00," is that it?

21   A.   Yes, ma'am.

22   Q.   Referral time means when you started the interview

23   basically?

24   A.   When he was referred over to me or when I started the

25   interview.

1   Q.   And completion time is "14:16."  Does that mean 16 minutes

2   later?

3   A.   Yes, ma'am.

4   Q.   Then he was sent on his way, correct?

5   A.   Yes, ma'am.

6   Q.   And his suitcases went with him?

7   A.   Yes, ma'am.

8           MS. BASSIL:  I have no further questions.

9           MR. GROHARING:  Very briefly, your Honor.

02:02 10           THE COURT:  Okay.

11   REDIRECT EXAMINATION BY MR. GROHARING:

12   Q.   Sir, what's the purpose of this report?

13   A.   The purpose of this report is to document the secondary

14   inspection.

15   Q.   In the remarks section specifically, are you required to

16   produce a verbatim transcript of anything said by someone

17   during an inspection?

18   A.   No.

19   Q.   What is the purpose of that section?

02:02 20   A.   To document what the passenger said to me.

21   Q.   So it's particular things the passenger said that you

22   might find interesting or someone else might find interesting?

23   A.   Yes.

24           MR. GROHARING:  That's all I have, your Honor.

25           MS. BASSIL:  If I can have a follow-up.

RECROSS-EXAMINATION BY MS. BASSIL:

1

2    Q.   When you said that it's not verbatim, you certainly put

3    down anything that you thought was significant about what this

4    person told you, correct?

5    A.   Yes.

6    Q.   You wanted to know why he had been in the United Arab

7    Emirates, correct?

8    A.   Yes.

9    Q.   And he gave you an explanation that you wrote down,

02:03 10   correct?

11   A.   Yes.

12   Q.   And you wanted to know why he had a three-week trip but it

13   was cut short to six days, correct?

14   A.   I don't know if I asked him that or he volunteered it.  I

15   don't remember.

16   Q.   If he volunteered it or you asked it, even if he

17   volunteered it, it was significant enough information for you

18   to put down?

19   A.   Yes.

02:03 20   Q.   Then you wanted to know -- and once he said that -- or

21   maybe he volunteered it -- that he cut short his trip because

22   his father was sick, correct?

23   A.   Yes.

24   Q.   You thought that was important to put down as well?

25   A.   Yes.

1    Q.   If he had given any other reasons for why he cut his trip

2    short, you would have put that down as well?

3    A.   Yes.

4              MS. BASSIL:  Thank you.

5              THE COURT:  All right, Agent.  Thank you.  You may

6    step down.  We'll take the morning recess at this stage.

7    (Recess taken at 10:57 a.m.)

8              (After recess:)

9              THE CLERK:  All rise for the Court and jury.

02:33 10              (The Court and jury enter the courtroom at 11:28 a.m.)

11             THE CLERK:  Please be seated.

12             MR. AUERHAHN:  The United States calls Michael Bonner,

13   please.

14                  MICHAEL BONNER, duly sworn

15             THE CLERK:  Please be seated.

16             State your name and spell your last name for the

17   record.

18             THE WITNESS:  Michael Bonner, B-O-N-N-E-R.

19             THE CLERK:  Thank you.

02:35 20                    DIRECT EXAMINATION

21   BY MR. AUERHAHN:

22   Q.   Good morning, sir.

23   A.   Good morning.

24   Q.   How are you employed?

25   A.   I work for the U.S. Customs and Border Protection.

1    Q.    That's the Department of Homeland Security?

2    A.    Department of Homeland Security.

3    Q.    And how long have you been with CBP?

4    A.    I've been with CBP since the establishment of Customs and

5    Border Protection 2003.

6    Q.    And before that how were you employed?

7    A.    I worked for the U.S. Customs Service.

8    Q.    And U.S. Department of Treasury?

9    A.    That was the Department of Treasury.

02:35 10    Q.    And where are you currently assigned?

11    A.    I'm assigned to Castle Island, South Boston.  Conley

12    Terminal.

13    Q.    And what are your duties there?

14    A.    There I deal with maritime, import and export of vessels,

15    containers.  Anything that's coming in or out of the country,

16    we deal with the maritime aspect.

17    Q.    How about in 2004, where were you assigned?

18    A.    Logan Airport.

19    Q.    Okay.  For incoming or outgoing passengers?

02:36 20    A.    Incoming.

21    Q.    And could you, just in general terms, describe the contact

22    that an incoming international passenger would have with

23    Customs and Border Protection?

24    A.    Well, at first every passenger coming into the country is

25    going to be inspected.  They come in -- the plane comes in,

1    they're funneled down a Jetway into the federal inspection

2    where there's about -- I believe at Logan there's 25 to 40

3    booths.  There, it's a bottleneck.  From there each passenger's

4    called up as the vacancy happens and then they're inspected on

5    primary.

6              At Logan it's two tiers.  So downstairs is baggage

7    secondary.  So once they're through with the primary

8    inspection, which is usually the passport, they go downstairs

9    to collect their bags.

02:37 10   Q.   So at primary inspection, the Customs and Border

11   Protection officer receives the passport of the incoming

12   passenger?

13   A.   Yes.

14   Q.   Whether they're a U.S. citizen returning or a foreigner

15   visiting the country, correct?

16   A.   Correct.

17   Q.   Now, is there another form that every arriving passenger

18   has to fill out?

19   A.   Yeah.  I believe it's a 6051B, and that's a customs

02:37 20   declaration.

21   Q.   And you indicated that then they go downstairs, and

22   sometimes there's a secondary downstairs?

23   A.   Yeah.  Downstairs is where the carousels and the baggage

24   come in, so they usually pick up their baggage, then they

25   exit -- then they get funneled again to another -- we'll call

1    it a chokepoint -- bottleneck.  There they're passing the deck.

2    And if they're usually good to go, they're exiting -- or

3    sometimes they'll be funneled to agriculture or customs

4    baggage secondary.

5    Q.   And on February 15th of 2004 were you involved in a

6    secondary inspection of a passenger?

7    A.   Yes.

8    Q.   And when you do a secondary, is there at times a special

9    agent with Immigration and Customs Enforcement involved with

02:38 10   you?

11   A.   At times.

12   Q.   But you take the lead on questioning?

13   A.   Yes.

14        MR. AUERHAHN:  May I approach the witness, your Honor?

15        THE COURT:  You may.

16        MR. AUERHAHN:  And if we could bring up Exhibit 474 at

17   this point just for the witness.

18   BY MR. AUERHAHN:

19   Q.   Sir, let me place before you what appears to be an

02:39 20   original of a form.  And is that the same form that's displayed

21   on the screen but the one on the screen has certain redactions?

22   A.   Yes.

23   Q.   Okay.  And is that a Form 6059B of which you were speaking

24   earlier?

25   A.   I might have said 6051, but yes, it's 6059B.

1    Q.   And were you involved in the secondary inspection of that

2    individual?

3    A.   Yes.

4    Q.   Now, when you receive this Form 6059B, do you also receive

5    the passport of the individual?

6    A.   Yes.

7         MR. AUERHAHN:  And, again, may I approach, your Honor?

8         THE COURT:  You may.

9    BY MR. AUERHAHN:

02:39 10   Q.   I'm going to place before you the original of a passport,

11   and first ask you a few questions.  On the 6059B what kind of

12   information is the passenger required to enter?

13   A.   He's required to enter name, birth date, where he lives,

14   who he's traveling with, passport number, what country it was

15   issued by, and where he was -- what countries he visited on his

16   trip.  They're also asked certain questions:  how much money

17   they're bringing in, whether they're bringing in commercial

18   items, any agriculture issues.

19   Q.   Now, if you could look at Exhibit 474, but the original of

02:40 20   Exhibit 474, which is the customs form, as well as the original

21   of what is, for the record, Exhibit 477, the passport, can you

22   tell us whether or not the passport -- the original passport is

23   of the individual on Exhibit 474?

24   A.   Yes.

25   Q.   Same date of birth, same passport number, et cetera --

```
 1    A.    Yes.
 2    Q.    -- same name?
 3          And what is the name on the Form 6059B?
 4    A.    The first name is Tarek, last name Mehanna.
 5    Q.    And if you could look at page 16 of the original passport,
 6    is there a photograph?
 7    A.    Yes.
 8          MR. AUERHAHN:  And can we bring up Exhibit 755 in
 9    evidence, please?
02:41 10    Q.    Okay.  Is that a photograph of the individual whose
11    passport you're holding in your hand?
12    A.    Yes.
13          MR. AUERHAHN:  Your Honor, I would move into evidence
14    the 6059B form, 474.
15          MR. CARNEY:  No objection, your Honor.
16          THE COURT:  Okay.  Admitted.
17          (Government Exhibit No. 474 received into evidence.)
18          MR. AUERHAHN:  If that could be displayed, your Honor?
19    BY MR. AUERHAHN:
02:41 20    Q.    And does it indicate what countries Mr. Mehanna visited
21    prior to his arrival into the United States on February 15,
22    2004?
23    A.    Yes.
24    Q.    United Arab Emirates and Yemen, correct?
25    A.    Yes.
```

```
 1   Q.   Now, this interview was some time ago?

 2   A.   Yes.

 3   Q.   When you conducted the interview, did you take notes?

 4   A.   Yes.

 5   Q.   And did you preserve those notes?

 6   A.   Yes.

 7   Q.   And did you also transpose the notes into a report?

 8   A.   Yes.

 9   Q.   Is it fair to say that your memory is substantially based

10   on a review of your notes and your report?

11   A.   Yes.

12   Q.   Based on that, was there a special agent -- ICE involved

13   in participating in this particular inspection?

14   A.   Yes.

15   Q.   What was his name?

16   A.   I believe that was -- I was advised that was law

17   enforcement sensitive.

18   Q.   Let me --

19        MR. AUERHAHN:  May I approach, your Honor?

20   Q.   Do your notes indicate the name of the special agent?

21   A.   Yes.

22   Q.   What was the special agent's last name?

23   A.   Argue.

24   Q.   Okay.  Did you take the principal role in the questioning

25   of the witness -- of the individual arriving?
```

1   A.   Yes.

2   Q.   Okay.  Now, did Mr. Mehanna, upon arrival, tell you how

3   long he had been in either the Emirates or Yemen?

4   A.   Yes.

5   Q.   What did he tell you?

6   A.   He stated two days in the Emirates and then the rest of

7   the time -- it was two weeks total, but two days in Emirates

8   and the rest of the time, I believe, was in Yemen.

9   Q.   Did he tell you why he went to Yemen?

02:43 10   A.   To visits schools, Islamic schools.

11   Q.   Did he give you the names of any schools he visited?

12   A.   Yes.

13   Q.   Can you tell us what those names were?

14   A.   Dar al-Mustafa and Dar al-Ahqaf.

15   Q.   And, sir, with reference to Yemen, could you look at --

16        MR. AUERHAHN:  If you could bring up page 7 of the

17   passport, which I believe was 477.

18   Q.   And if you could look at page 11 of the original passport

19   you have in front of you.

02:44 20   A.   Yup.

21   Q.   Now, on the screen it appears to be upside-down, but is

22   that a Republic of Yemen -- appear to be a Republic of Yemen

23   visa?

24   A.   Yes.

25   Q.   Okay.  And we're rotating it.  Well, while we're doing

1    that, can you read from the original where and when it was

2    issued?

3    A.    I believe it was issued at Washington, D.C., and that was

4    on January 26, 2004.

5    Q.    Okay.  And does it say when it expires?

6    A.    Yes.  And that would be April 25, 2004.

7    Q.    Okay.  Now, it says 25/4/2004 because they transpose the

8    month and date, or perhaps, they say, we do?

9    A.    Yeah, that's exactly right.

02:45 10   Q.    Okay.  And did Mr. Mehanna say with whom he had been

11    traveling?

12    A.    Yes.

13    Q.    What did he tell you?

14    A.    Kareem Abuzahra and Ahmad Abousamra.

15    Q.    Did he tell you what had happened to his companions?

16    A.    He stated that Kareem Abuzahra had returned early and that

17    Ahmad Abousamra was still over in Yemen.

18    Q.    Now, did you ask him about what he had done -- everything

19    he had done while he was outside the United States?

02:46 20   A.    Yes.

21    Q.    And other than what you've just related to us about being

22    in the Emirates for a couple of days and total trip two weeks,

23    did he tell you anything else about what he had done while he

24    was outside the United States?

25    A.    No.

1    Q.   And what was the purpose of your questioning him about

2    everything he had done?

3    A.   Well, usually when people travel to certain countries,

4    when they come back in, that's what we do.  We question on the

5    nature of the trip, you know, why they were over there, what

6    they were doing.  That's...

7    Q.   And if you receive certain kind of information, do you

8    pass that on to other law enforcement agencies?

9              MR. CARNEY:  I object.

02:46 10             THE COURT:  Overruled.

11   BY MR. AUERHAHN:

12   Q.   If you receive certain kind of information, do you turn

13   that over to other law enforcement agencies?

14   A.   Yes.

15   Q.   What kind of other information?

16   A.   Any information that would be deemed to be either criminal

17   or anything else that would proceed to -- you know, down the

18   line be criminal, we'd pass that on.  We only -- from our

19   inspections, we only take it so far.  After that, we'll turn it

02:47 20   over to investigators.

21   Q.   And you said that Mr. Mehanna said that Abousamra was

22   still in Yemen?

23   A.   Yes.

24   Q.   So he never mentioned to you Mr. Abousamra had gone on to

25   Iraq?

1    A.    No.

2    Q.    If he had told you that, would you have inquired about

3    that issue?

4    A.    Yes.

5    Q.    And what would you have done with the information you

6    would have received if Mr. -- he told you Mr. Abousamra was in

7    Iraq?

8    A.    I would have asked, you know, how -- more questions.  My

9    questions would have been further.  I would have questioned

02:47 10    further then, you know, passed it on to FBI more than likely.

11    Q.    Okay.

12          MR. AUERHAHN:  Thank you, your Honor.  No further

13    questions.

14          MR. CARNEY:  May I have a moment, please, your Honor?

15          (Pause.)

16                        CROSS-EXAMINATION

17    BY MR. CARNEY:

18    Q.    Good morning, Mr. Bonner.

19    A.    Good morning.

02:49 20    Q.    It's fair to say that you go through these inspections,

21    when you were working there, hundreds of times a day?

22    A.    At the time, yes.  I've been away from the airport for

23    some time now.

24    Q.    How long were you in this position that you're describing?

25    A.    Airport inspections I believe was probably a year and a

1    half.

2    Q.   So in that time period, it's clear you would have done

3    thousands of these interviews?

4    A.   Yes.

5    Q.   And based on the questions asked of you by Mr. Auerhahn,

6    you have no present-day memory of anything, do you?

7    A.   I remember -- I don't remember specifics.  I have no

8    present-day memory.

9    Q.   And it's fair to say what you do remember is -- or what

02:49 10   you believe is accurate is what's written down in your notes?

11   A.   Yes.

12   Q.   So that if it's in your notes, you're confident it's

13   something that happened?

14   A.   Yes.

15   Q.   Now, if the person being questioned, Mr. Mehanna, was

16   uncooperative, would that be noteworthy to you?

17   A.   Yes.

18   Q.   If he was hostile to you, would that be noteworthy to you?

19   A.   Hostile?  Yes.  Uncooperative -- we do have uncooperative

02:50 20   a lot.  But hostile, yes.

21   Q.   Based on all of your notes and records, did he answer

22   every single question you asked him?

23   A.   Yes.

24   Q.   Was there any question that he was trying to be evasive

25   about or uncooperative about or refusing to answer?

1    A.   I can't remember specifics.

2    Q.   Well, is there any indication in any of your notes that

3    that happened?

4    A.   No.  No.

5    Q.   So you asked him where he had traveled to?

6    A.   Yes.

7    Q.   And he reported to you the United Arab Emirates and the

8    country of Yemen?

9    A.   Yes.

02:51 10   Q.   Now, United Arab Emirates is a country in the Middle East,

11   isn't it?

12   A.   Yes.

13   Q.   And it's -- if you know from your experience, it's often a

14   country that you pass through in order to go to Yemen?

15   A.   I'm not sure -- I can't really answer that.

16   Q.   Does it say in your notes how much time was spent in UAE

17   and how much time was spent in Yemen?

18   A.   I believe I stated that he was in -- a total of two weeks.

19   So if it's two days in the UAE, I believe in my notes, then --

02:51 20   Q.   Does it say that in your notes?

21   A.   I'd have to take a look at them.

22   Q.   Are those your notes in front of you?

23   A.   Not on these notes.  I believe I noted them in my report.

24   Q.   Do you have your report with you?

25   A.   I don't have it with me.

1    Q.   Does the prosecutor have your report?

2    A.   I believe so.

3         MR. CARNEY:  May I have a moment, please, your Honor?

4         (Counsel confer off the record.)

5    Q.   So is it fair to say that he indicated that when he was in

6    the United Arab Emirates, he basically did some sightseeing

7    with the other two people?

8    A.   I believe so.  I don't know exactly what he was doing.  I

9    mean, it's --

02:53 10   Q.   Do you recall what your notes say?

11   A.   Yeah.  "To visit schools."  So I just assume that's what

12   he was doing throughout the whole trip.

13   Q.   That when they went to Abu Dhabi, that's a city in the

14   United Arab Emirates?

15   A.   Yes.

16   Q.   And drove around the city and went sightseeing?

17   A.   Yes.

18   Q.   You asked him specifically about what his reason was for

19   going to Yemen, right?

02:54 20   A.   Yeah.  On the 6059B, the primary purpose of the trip, it's

21   a yes-or-no question, so usually we try to go a little bit more

22   with -- after that.  It's a yes/no, and then we go a little bit

23   further with the question after that.

24   Q.   And he told you that he was --

25   A.   It wasn't on business.  So we usually ask, "What was the

1    reason for your trip?"

2    Q.   And so he told you he was going to visit Islamic schools?

3    A.   Yes.

4    Q.   And you asked him the names of the schools he had visited?

5    A.   Yes.

6    Q.   And he gave you the names of two.  Is that right?

7    A.   Yes.

8    Q.   The first was Dar al-Mustafa?

9    A.   Yes.

02:54 10   Q.   Now, do you speak Arabic?

11   A.   No.

12   Q.   Do you know how to write it?

13   A.   No.

14   Q.   He told you the second one was Dar al-Hadith?

15   A.   Ahqaf, I believe, if --

16   Q.   Would you have written it down phonetically?

17   A.   Yes.  I would have probably asked him specifically to

18   spell it for me.

19   Q.   And then from your notes you transfer that to something

02:54 20   else?

21   A.   Yeah.

22   Q.   And so the notes here say "Dar A-L A-H-Q-A-F"?

23   A.   Yes.

24   Q.   Are you familiar with the school Dar al-Hadith?

25   A.   No.

1   Q.   Okay.  He asked you -- you asked him who he went with and

2   he gave you the names of his two companions?

3   A.   Yes.

4   Q.   And those names are spelled correctly, right, to your

5   knowledge?

6   A.   To my knowledge, yes.

7   Q.   He asked you where the two persons were, correct?

8   A.   I asked him.

9   Q.   I'm sorry.  You asked him.

02:55 10        And he told you one had returned early?

11   A.   Yes.

12   Q.   And he told you the other had remained behind?

13   A.   Yes.

14   Q.   Now, he also gave you some other information, did he not;

15   for example, did he tell you that he was a senior at the Mass.

16   College of Pharmacy?

17   A.   Yes.

18   Q.   And did you recognize that as a school in Massachusetts?

19   A.   Yes.

02:55 20   Q.   And he told you that his father, Ahmed Mehanna -- and he

21   gave you his date of birth -- was a professor at that school?

22   A.   Yes.

23   Q.   And you took down that information?

24   A.   Yes.

25   Q.   Now, when you use the word "derogatory" in a report, what

1    does that word mean to you?  Bad, concerning?

2    A.   At the time that's -- at the time that's -- as far as we

3    take our inspection, yeah, it basically means we don't have

4    anything else that's --

5    Q.   Nothing that indicates anything is amiss, right?

6    A.   No.  As far as --

7    Q.   That's what it means -- forgive me for interrupting.

8    A.   Yeah.  Yes.

9    Q.   Is this a word that people in your line of work use or is

02:56 10   this just a word you use personally?

11   A.   Yeah.

12   Q.   So it's basically saying after answering all of your

13   questions and providing all the information, not a thing seemed

14   amiss.  Is that right?

15   A.   From our inspection, yes.

16        MR. CARNEY:  Okay.  Thank you very much, sir.

17        MR. AUERHAHN:  No redirect, your Honor.

18        THE COURT:  Nothing else?  All right, Mr. Bonner.

19   Thank you.  You may step down.

02:57 20        (The witness is excused.)

21        MR. AUERHAHN:  Peter Mailloux.

22              PETER MAILLOUX, duly sworn

23        THE CLERK:  Please be seated.  State your name and

24   spell your last name for the record.

25        THE WITNESS:  My name is Peter Mailloux,

1    M-A-I-L-L-O-U-X.

2                       DIRECT EXAMINATION

3    BY MR. AUERHAHN:

4    Q.   Sir, good morning.  Or -- yes, still good morning.

5    A.   Good morning.

6    Q.   How are you employed?

7    A.   I'm currently employed by Immigration and Customs

8    Enforcement as a deportation officer.

9    Q.   Okay.  Can you pull the microphone a little closer to you?

02:58 10   You're very soft-spoken.

11   A.   Absolutely.

12   Q.   Say again, please?

13   A.   I'm currently employed by Immigration and Customs

14   Enforcement as a deportation officer.

15   Q.   And how long have you been doing that?

16   A.   Since 2006.

17   Q.   And what were you doing before that?

18   A.   Prior to that I worked with Customs and Border Protection

19   since 2002.

02:58 20   Q.   And is that part of Homeland Security?

21   A.   Yes, it is.

22   Q.   And where were you assigned in 2004?

23   A.   In 2004 I was assigned to the Counterterrorism Response

24   Team.

25   Q.   Where?

```
 1    A.    At Logan International Airport.

 2    Q.    And just in general terms, what were your duties?

 3    A.    My duties included interviewing high-risk passengers,

 4    passengers with -- traveling in high-risk countries, things of

 5    that nature.

 6    Q.    And on August 12th, 2004, do you recall where you -- if

 7    you were working that day?

 8    A.    Yes, I believe so.

 9    Q.    And were you involved in an inspection of an individual on

02:59 10   that day?

11    A.    Yes, I was.

12          MR. AUERHAHN:  Now, may I approach, your Honor?

13          THE COURT:  You may.

14    BY MR. AUERHAHN:

15    Q.    Let me show you an original Form 6059B.  Do you recognize

16    that particular form?

17    A.    Yes, I do.

18          MR. AUERHAHN:  Okay.  And for the record, this is

19    Exhibit 473.  If we can just show it to the witness first?

03:00 20   Q.    Now, is the original document you're looking at the same

21    as Exhibit 473?

22    A.    Yes, it is.

23    Q.    Okay.  And the difference is there's certain information,

24    for example, the specific date of birth of the individual,

25    redacted from Exhibit 473?
```

    1   A.   That's correct.

    2   Q.   And how do you recognize that you were involved in that

    3   particular inspection of that individual on that date?

    4   A.   My handwriting's on the back of the form.

    5   Q.   Now, when you question an individual, do you verify the

    6   identity of the individual?

    7   A.   Yes, we do.

    8   Q.   And is the individual required to give you a passport?

    9   A.   Yes.

03:00 10        MR. AUERHAHN:  Can we bring up Exhibit 480, please?

   11   Okay.

   12   Q.   Now, is that a copy of a passport?  I know it's a bad

   13   copy.

   14        MR. AUERHAHN:  May I approach, your Honor?

   15        THE COURT:  You may.

   16   BY MR. AUERHAHN:

   17   Q.   Is this a copy of the same passport you're looking at?

   18   A.   Yes, it appears to be.

   19   Q.   Okay.  And is that a passport of the individual who gave

03:01 20   you that Form 6059B?

   21   A.   Yes; that's correct.

   22        MR. AUERHAHN:  Okay.  And if we could bring up Exhibit

   23   741, please, which is in evidence.

   24        THE COURT:  Do you want it displayed?

   25        MR. AUERHAHN:  Yes, please.

1    BY MR. AUERHAHN:

2    Q.   Is that a photograph of the individual who gave you that

3    Form 6059B?

4    A.   Yes, it is.

5    Q.   Okay.

6           MR. AUERHAHN:  Your Honor, I would move into evidence

7    Exhibit 480 as well as 473, the original Form 6059B.

8           THE COURT:  No objection?  Okay.

9           MS. BASSIL:  I'm sorry, your Honor.  I didn't catch

03:02 10   what was 480.

11          MR. AUERHAHN:  A copy of the passport.

12          MS. BASSIL:  All right.  I have no objection.

13          THE COURT:  All right.

14          (Government Exhibit Nos. 473 and 480 received into

15   evidence.)

16   BY MR. AUERHAHN:

17   Q.   Now, sir, could you tell us the name of the individual you

18   interviewed in connection with this Form 6059B on August 12,

19   2004?

03:02 20   A.   Yes; it's Ahmad Abousamra.

21   Q.   And can you tell us -- strike that.

22          Again, are you testifying from memory or based on a

23   review of the notes on the back of the form?

24   A.   Based on a review of my notes.

25   Q.   Okay.  Can you tell us as much as you can about the

1   interview conducted with Mr. Abousamra on August 12, 2004?

2   A.   Absolutely.  It appears the inspection started at 12:50 in

3   the afternoon.  He was asked about his travel:  where he had

4   been outside the United States, the length of time he was

5   outside, any business or pleasure he had outside the United

6   States.  And questions relating to his travel outside the

7   States.

8   Q.   Okay.  And can you tell us what he said about what

9   countries he had visited?

03:03 10   A.   Yes.  According to my notes, it shows that he was outside

11   the country for five months.  It looks like he spent between

12   four and four and a half weeks in Syria, two weeks in Jordan,

13   and one week in Yemen.

14   Q.   And did he visit any other countries?

15   A.   It appears he also had a brief stay in the United Arab

16   Emirates as well.

17   Q.   And was it for four and a half weeks or for four and a

18   half months in Syria?

19   A.   Four to four and a half months in Syria.

03:04 20         MR. AUERHAHN:  Now, can we have Exhibit 480, please?

21   Page 2, please.  Wrong exhibit.  I'm sorry.  Exhibit --

22         MS. BASSIL:  It's 476.

23         MR. AUERHAHN:  Oh, 476?

24         MS. BASSIL:  I believe so.

25         MR. AUERHAHN:  Page 2.

1          THE COURT:  Well, just for clarity, 476 is not in

2     evidence?  It may be part of 480?

3          MR. AUERHAHN:  476 -- if we can approach sidebar, your

4     Honor?

5          THE COURT:  All right.

6          (Discussion at sidebar and out of the hearing of the

7     jury:)

8          THE COURT:  The list says that 476 is the passport and

9     480 is return materials.

03:05 10          MS. BASSIL:  That's what I have.

11          MR. AUERHAHN:  What we did is the -- when the FBI

12    received the original copy and we had trouble -- as you can

13    see, when you make copies it deteriorates.  So 476 is from the

14    original copy, so it's a cleaner copy and it doesn't contain a

15    lot of the other return material.

16          So I used the wrong copy and Ms. Bassil was trying to

17    correct me.  So it's the same passport.  It's a cleaner copy of

18    the same passport.

19          MS. BASSIL:  476 is.  Right.  Right.  It's more

03:05 20    legible.  Is that the one we're using?

21          MR. AUERHAHN:  Yes.

22          THE COURT:  So the picky point was:  I don't think

23    that one had been offered yet.

24          THE CLERK:  It hadn't.

25          MS. BASSIL:  I have no objection.

1          MR. AUERHAHN:  Then I will offer it.  And I apologize,

2     your Honor.

3               (In open court:)

4               THE COURT:  All right.  476 is admitted.

5               (Government Exhibit No. 476 received into evidence.)

6               THE COURT:  And is now displayed.

7               MR. AUERHAHN:  Thank you, your Honor.

8     BY MR. AUERHAHN:

9     Q.   Now, sir, can you look at page 2 of this document, which

03:06 10    is displayed.  It's probably hard for you to read it on the

11    screen.  And can you read to us the information on what appears

12    to be a Yemen visa?

13    A.   Yes.  The name is listed as Ahmad Abousamra, with an

14    expiration date of April 25th of 2004 and issue date of

15    January 26, 2004, issued in Washington, D.C.  And it also has

16    his United States passport number.

17          MR. AUERHAHN:  If we can display side by side page 7

18    of Exhibit 477.

19          May I approach the witness again, your Honor?

03:08 20          THE COURT:  You may.

21    BY MR. AUERHAHN:

22    Q.   Now, this is an original of Exhibit 477.  Can you compare

23    those two Yemenese visas?  The issue date?

24    A.   The issue date is the same.

25    Q.   Okay.  Location of where it was issued?

1    A.    Also Washington, D.C.

2    Q.    Expiration date?

3    A.    Expiration date is the same.

4    Q.    Okay.  And both entered Yemen on 2/4/04, which would

5    appear as 4/02/04.  Is that correct?

6    A.    Yes.  Both in the bottom right, yes.

7    Q.    And both exited 11/2, which would be February 11, 2004,

8    correct?

9                 MS. BASSIL:  Well, objection, your Honor.  I'd ask

03:09 10    that the witness testify, not that it be leading, and that we

11    be shown where.

12                THE COURT:  Okay.  The objection to leading is

13    sustained.

14                MR. AUERHAHN:  Okay.

15    BY MR. AUERHAHN:

16    Q.   Now, can you read that on the original in terms of

17    the -- we were just talking about the exit date on the two?

18    A.    Yes.

19    Q.    What is the exit date on both of them?

03:09 20    A.    Both of the exit dates appear to be -- they're

21    upside-down, but it appears February 11, 2004.

22    Q.    And the entry dates?

23    A.    Also the same, February 4, 2004.

24    Q.    Now --

25                MR. AUERHAHN:  May I approach again, your Honor?

1              THE COURT:  Okay.

2     BY MR. AUERHAHN:

3     Q.   Let me ask you to turn to this page, page 3.  Did you

4     notice an Iraqi stamp on his passport when he came through?

5     A.   When he came through I did not.

6     Q.   Did he list on the 6059B either Yemen or Iraq?

7              MR. AUERHAHN:  Can we go back to Exhibit 473, please?

8     A.   No, he did not.

9     Q.   Now, while talking about Yemen, did he mention what town

03:11 10     in Yemen he visited based on a review of the notes?

11    A.   Yes.  It appears he visited Mukalla, Yemen.

12    Q.   Did he mention any other cities in Yemen?

13    A.   No, he did not.

14    Q.   Did he mention what cities he visited in Jordan and in

15    Syria?

16    A.   Yes.  It was -- he visited Amman, Jordan, and Aleppo,

17    Syria.

18    Q.   Now, if he had said he had also been to Iraq, what would

19    you have asked him?

03:12 20            MS. BASSIL:  Objection.

21              THE COURT:  Overruled.

22              You may answer that.

23              THE WITNESS:  There would have been questions to

24    include why he didn't initially disclose his travel to Iraq as

25    well as why he would visit a country during a war time --

1   wartime status.

2   BY MR. AUERHAHN:

3   Q.   And were you familiar with what was going on in Iraq at

4   this point in time, in February --

5          MS. BASSIL:  Objection.

6   BY MR. AUERHAHN:

7   Q.   Excuse me.  In August of 2004?

8          MS. BASSIL:  Objection.

9          THE COURT:  Overruled.

03:12 10          THE WITNESS:  Yes.

11   BY MR. AUERHAHN:

12   Q.   And no specifics, just generally?

13   A.   It was definitely during the initial rise of the

14   insurgency where --

15          MS. BASSIL:  Objection.  Move to strike.  He was asked

16   for a general comment, not a specific.

17          THE COURT:  I don't think that was general enough.

18          MR. AUERHAHN:  Okay.

19   BY MR. AUERHAHN:

03:12 20   Q.   Just in general terms, what was going on in Iraq at this

21   point?

22   A.   It was -- obviously, the United States was at war with

23   Iraq.

24   Q.   And you said a rise of insurgency?

25          MS. BASSIL:  Objection.

1          THE COURT:  Sustained.

2     BY MR. AUERHAHN:

3     Q.   So if he had told you he had gone to Iraq, what would you

4     have asked him?

5          MS. BASSIL:  Objection.

6          THE COURT:  Overruled.

7          You may answer that.

8          THE WITNESS:  I would have definitely asked what his

9     business was there, if he had any family or anybody who's

03:13 10    visiting there.  Basically, in detail what his business was

11    visiting that country.

12    BY MR. AUERHAHN:

13    Q.   Did he -- and if he had mentioned he had been to Fallujah,

14    Iraq, what would you have asked him?

15         MS. BASSIL:  Objection.

16         THE COURT:  Overruled.

17         THE WITNESS:  I would have asked details about why he

18    was there, knowing that there was a lot of violence going on at

19    that time.

03:13 20       MS. BASSIL:  Move to strike, your Honor.

21         THE COURT:  No, it may stand.

22    BY MR. AUERHAHN:

23    Q.   And what would you have done with any answers he would

24    have given you?

25    A.   We would have reported it.

1    Q.    To?

2    A.    As well as our reports, we definitely would have reached

3    out to other law enforcement agencies to include Immigration

4    and Customs Enforcement, the Federal Bureau of Investigation.

5    Q.    And with reference to the Immigration and Customs

6    Enforcement, do your notes indicate there was an ICE special

7    agent involved in the interview?

8    A.    It appears so.  It's not in my handwriting but, yes,

9    she -- an agent did respond.

03:14 10    Q.    Okay.  Whose handwriting is it?

11    A.    I believe it's Officer Bill Corbin's writing.

12    Q.    Do you recognize his handwriting in the bottom?

13    A.    I do.

14          MR. AUERHAHN:  No further questions, your Honor.

15                    CROSS-EXAMINATION

16    BY MS. BASSIL:

17    Q.    Mr. Mailloux, as I understand it you were the person who

18    interviewed Ahmad Abousamra in August of 2004, correct?

19    A.    That's correct.

03:15 20    Q.    And that was after this Immigration and Customs

21    Enforcement agent interviewed him.  She interviewed him first?

22    A.    That's not correct.

23    Q.    Well, she interviewed him after you interviewed him?

24    A.    I believe so, yes.

25    Q.    Did you see her there?

1    A.    I believe so.

2    Q.    All right.  Now, when you interviewed Mr. Abousamra, are

3    the only notes you made of that interview what you scratched on

4    that particular form?

5    A.    To the best of my recollection, yes.

6    Q.    You did not write up any kind of separate report?

7    A.    I did not, no.

8    Q.    Okay.  Or keep any separate notes?

9    A.    I did not, no.

03:15 10            MS. BASSIL:  Now, if we could have Exhibit 473 up,

11    please?  I think I have it right.  Yeah, that's what I wanted.

12    Can we make that a little bigger, please?

13    Q.    Agent, can you see that?

14    A.    Yes, I can.

15    Q.    Now, on this form, as I understand it, it asks what

16    countries visited on this trip prior to U.S. arrival.  Do you

17    see that?

18    A.    Yes.

19    Q.    And I assume Mr. Abousamra filled this out?

03:16 20    A.    Yes.

21    Q.    The person is required to fill it out individually, are

22    they not?

23    A.    That's correct.

24    Q.    All right.  And he wrote "Syria," correct?

25    A.    That's correct.

1    Q.   Now, the form doesn't ask what cities in what countries

2    you visited, correct?

3    A.   No, it does not.

4         MS. BASSIL:  And if we could go to the next page on

5    that, please.

6    Q.   All right.  Now, I take it that the items in black are

7    your notes, correct?

8    A.   That's correct.

9    Q.   All right.  And as I understand it, you asked him where he

03:17 10   had been, and he said he had been in Syria, Jordan and Yemen.

11   Is that correct?

12   A.   That's correct.

13   Q.   And did he tell you, or did you ask him, when he had

14   entered and left Yemen?

15   A.   As far as dates?

16   Q.   Yes.

17   A.   It doesn't appear that I did.

18   Q.   Did you ask him when he had entered and left Jordan?

19   A.   It does not appear that I did.

03:17 20   Q.   Did he ask you when he had entered and left Syria?

21   A.   No, it does not appear so.

22   Q.   Now, you made reference to Aleppo, Syria.  Did you ask him

23   where he had been in Syria or did he just volunteer that?

24   A.   I don't recall.

25   Q.   All right.  And somewhere on this form -- is Aleppo on

1    there?  I just couldn't quite read it.

2    A.    Yes.  It's probably three-quarters of the way down the

3    page, right above where the description of articles are.  Right

4    to the right of the description of articles.

5    Q.    Oh, I see.  Right here?

6    A.    Correct.

7    Q.    Okay.  And you did not ask him what cities he had been in

8    in Jordan, correct?

9    A.    It doesn't appear so.

03:18 10   Q.    And did you ask him what cities he had been in in Yemen?

11    A.    It appears he was in Mukalla, Yemen, according to my

12    notes.

13    Q.    Can you just show me where that might be, or describe it

14    for me so I can see it?

15    A.    Yeah.  Again, three-quarters of the way down the page,

16    right above where it says "Description of articles."

17    Q.    Oh, this?

18    A.    Yes.

19    Q.    And could you spell for me what you had written?  I just

03:18 20   can't see it.

21    A.    It appears it says -- spelled M-U-K-A-L-L-A.  I'm sure

22    that's...

23    Q.    Now, if you would look --

24         MS. BASSIL:  If we could go to Exhibit 476?  And could

25    we make that a little bigger?  Thank you.  Too big.

1    Q.   The picture that you see here, do you recognize that as

2    the person you interviewed in August of 2004?

3    A.   Do I recognize him specifically?  No, I don't recall.

4    Q.   All right.  All right.  But you did look at his passport,

5    correct?

6    A.   Yes; that's correct.

7         MS. BASSIL:  All right.  And if we could go to page 3.

8    Q.   Are you familiar with the stamps of entry and exit from

9    different countries?

03:19 10   A.   As far as my experience, yes.

11   Q.   All right.  And are you familiar with the fact that this

12   is a stamp for Iraq?

13   A.   Offhand it doesn't look familiar, no.

14   Q.   Okay.  And are you able to see any dates on there as to

15   entry or exit?

16   A.   No.

17   Q.   All right.  Do you see any stamps for the United Arab

18   Emirates?

19   A.   Yes, there appears to be numerous ones from there.

03:20 20   Q.   All right.  And is this one right here?

21   A.   Yes.

22   Q.   All right.  And where would the second one be?  You said

23   there were numerous.  Do you think all of these ovals that look

24   alike --

25   A.   Yeah, they're consistent with stamps from the UAE.

1    Q.   So these three?

2    A.   I would say so, yes.

3    Q.   All right.  And are you able to tell when, according to

4    these stamps, Mr. Abousamra entered the UAE or left the UAE?

5    A.   I cannot see any dates on there.  I cannot see if it's the

6    copy of it or -- I definitely don't see any dates there.

7    Q.   Now, did you just that day miss the stamp for Iraq in his

8    passport?

9    A.   It's possible.

03:20 10   Q.   Okay.

11        MS. BASSIL:  Now, if we could go back to Exhibit 473,

12   please, and the second page.

13   Q.   And he indicated he had --

14        MS. BASSIL:  It's not clear.  Is it clear?  Never

15   mind.

16   Q.   It indicated that he had language books on him?  I didn't

17   mean to make that big scratch, but that indicates language

18   books?

19   A.   Yes; that's correct.

03:21 20   Q.   All right.  That was something he would have filled out?

21   A.   Yes; that's correct.

22   Q.   And if you had found other items other than what he said,

23   I mean, aside from clothing and things like that, you would

24   have noted it, correct?

25   A.   If it was something of significance, it would have been

1    noted.  If it was gifts or something like that, that didn't

2    come to the threshold of collecting duty, then probably not.

3    Q.    Okay.  So if it was things like clothes or other things,

4    you just -- you wouldn't have bothered to write that down?

5    A.    No, they're not responsible for listing everything that

6    they have.

7         MS. BASSIL:  All right.  Now, if we could go, please,

8    to Exhibit 477.  And if we could go to page 6.  Is there any

9    way to take these things off?  I'm sorry.  If we could go to

03:22 10   the next page after that, and if we could blow up this bottom

11   one.  All right.

12   Q.    This was what Mr. Auerhahn had showed you earlier.  Do you

13   see this?

14   A.    Yes.

15   Q.    And this is a stamp for the Republic of Yemen, correct?

16   A.    Yes.

17   Q.    And that would show that Tarek Mehanna entered on

18   2/4/2004?

19   A.    That's correct.

03:23 20   Q.    And left on 2000 -- I'm sorry -- February 11, 2004,

21   correct?

22   A.    That's correct.

23   Q.    And is there any timestamp on that indicating when he left

24   Yemen, what time he left?

25   A.    It doesn't appear so.

1    Q.   All right.  And are you familiar with the United Arab

2    Emirates as a sort of layover to get to Yemen?

3    A.   Yes.  It's a very common transit point.

4    Q.   All right.  And do you see any United Arab --

5         MS. BASSIL:  If we could go to the next page.

6    Q.   And you see this stamp.  That would be United Arab

7    Emirates?

8    A.   Yes.

9    Q.   And it would indicate arrival 3 February 2004.  Is that

03:24 10   correct?

11   A.   That's correct.

12   Q.   All right.  And that would make sense, that it was United

13   Arab Emirates, February 3rd; Yemen on February 4th, correct?

14   A.   That's correct.

15        MS. BASSIL:  All right.  And if we could go to the

16   next page, please.  All right.

17   Q.   And it indicates that he'd left -- this would indicate

18   entry into the United Arab Emirates on February 11, 2004,

19   correct?

03:24 20   A.   That's correct.

21   Q.   And leaving it on February 15, 2004.  Is that correct?

22   A.   That's correct.

23   Q.   Now --

24        MS. BASSIL:  And if we could go back to Exhibit 476,

25   please?  And if we could go to the third page, please.

```
 1   Q.   And are you able, sir, to tell from any of these stamps --
 2   this is Mr. Abousamra's passport -- when he left the United
 3   Arab Emirates?
 4   A.   On this copy, no.
 5   Q.   Now, you noted that you asked Mr. -- you told us that you
 6   asked, apparently, Mr. Abousamra about -- well, let me strike
 7   that.
 8        You asked him about going to Jordan and Yemen in your
 9   interview?
10   A.   Yes, it appears so.
11   Q.   And did you ask him that because you saw those stamps in
12   his passport?
13   A.   They're very -- it's a very common question.  Usually
14   within the first couple questions of an interview we would ask
15   where they were and see if they can state specifics of where
16   they were.
17   Q.   Okay.  So I'm a little unclear --
18   A.   We don't necessarily ask the questions based on a stamp in
19   the passport.
20   Q.   So if he said "Syria," you might have said, "Did you go
21   anywhere else?"
22   A.   Correct.
23   Q.   I see.  And then the person volunteers, or doesn't
24   volunteer, where else they might have been?
25   A.   Correct.
```

Q.   And you have no way of knowing if you asked him whether he

had been in Jordan or Yemen or the United Arab Emirates based

on looking at his passport or just based on what he said?

A.   Could you repeat that question?

Q.   Well, you don't know.  It could have been based on looking

through his passport that you asked those questions, correct?

A.   Correct.

Q.   Or it could have been just asking him, "Have you been

anywhere else?"

A.   That's correct.

Q.   And you don't know which way -- how it went?

A.   No.

Q.   It's too long ago?

A.   It was a long time ago, yes.

Q.   And by the way, did you see any other stamps for Iraq on

Mr. Abousamra's passport?  I think you have a copy -- do you

have a copy in front of you?  I think you do.  If you want to

just look through that.

A.   It appears it was only that one stamp.

Q.   So just that one stamp.  And you don't know whether that

was an entry or an exit?

A.   No, I do not.

Q.   All right.  And you don't know what date it was or what

time on that date, correct?

A.   No.

1           MS. BASSIL:  Thank you.  I have no further questions.

2           MR. AUERHAHN:  No redirect, your Honor.

3           THE COURT:  No redirect?

4           All right.  Thank you, sir.  You may step down,

5     Mr. Mailloux.

6                (The witness is excused.)

7           MR. AUERHAHN:  The United States calls Wayne Haimila.

8     Haimila.

9                KENNETH W. HAIMILA, JR., duly sworn

03:28 10          THE CLERK:  Please be seated.

11          State your name and spell your last name for the

12    record.

13          THE WITNESS:  My name is Kenneth W. Haimila, Jr.,

14    spelled H-A-I-M-I-L-A.

15                        DIRECT EXAMINATION

16    BY MR. AUERHAHN:

17    Q.   Good afternoon, sir.

18    A.   Good afternoon.

19    Q.   How are you currently employed?

03:28 20    A.   I'm employed by United States Customs and Border

21    Protection as an enforcement officer.

22    Q.   And what is an enforcement officer?

23    A.   An enforcement officer investigates and prosecutes

24    criminal activity that occurs within and around ports of entry,

25    and I also locate and arrest fugitive aliens that are of

1    interest to my agency.

2    Q.   How long have you been with CBP, Customs and Border

3    Protection?

4    A.   I've been with CBP since the creation of the agency.

5    Q.   And prior to being an enforcement officer, what were your

6    duties with the CBP?

7    A.   I was a Customs and Border Protection officer with U.S.

8    Customs and Border Protection.

9    Q.   Okay.  I want to draw your attention to September 2, 2006.

03:29 10   Where were you assigned on that day?

11   A.   At that time I was assigned at Boston Logan Airport to the

12   Counterterrorism Response Team.

13   Q.   And were you involved in a secondary inspection of an

14   individual on that date?

15   A.   Yes, sir, I was.

16         MR. AUERHAHN:  Can we please display to the witness

17   only Exhibit 479, please.

18   Q.   And first, do you recognize what that form is?

19   A.   Yeah, that's a customs declaration.

03:30 20   Q.   And when you conduct a secondary interview, do you receive

21   the declaration of that kind from the passenger?

22   A.   Yes, sir.  All arriving passengers of family groups fill

23   out that declaration form.

24   Q.   And in addition to the declaration form, what else do you

25   receive from the passenger?

1    A.    They would also have their travel documents with them,

2    generally a passport, and then any suitcases, luggage,

3    carry-ons that they may have with them.

4    Q.    So you talk to them after they've retrieved their luggage?

5    A.    Yes, sir.

6    Q.    Now, do you compare the information on a passport to the

7    information on the CBP -- excuse me -- the Form 6059?

8    A.    Yes, sir, I do.  Sorry.

9    Q.    And do you -- does the form require -- the one you're

03:31 10   looking at in front of you, it's been redacted, but does it

11   require a date of birth, passport number and that kind of

12   information?

13   A.    That's correct.  First name, last name, date of birth,

14   passport number, citizenship and the declaration statements.

15         MR. AUERHAHN:  Can we put side by side Exhibit 476 to

16   this, please?

17         Actually, your Honor, may I approach so he may see

18   unredacted copies?

19         THE COURT:  Okay.

03:31 20   BY MR. AUERHAHN:

21   Q.    I place before -- the documents you're looking at have

22   specifics of date of birth redacted, correct?

23   A.    That is correct, sir.

24   Q.    Now, I'm placing in front of you the same exhibits without

25   the redactions.  And can you tell us whether or not the

1   inspection you conducted on September 2, 2006, was of the

2   individual whose passport we're looking at, Exhibit 476?

3   A.   Yes, sir, that is the individual.

4        MR. AUERHAHN:  Okay.  Your Honor, I would move into

5   evidence Exhibit 479.

6        MS. BASSIL:  No objection.

7        THE COURT:  Okay.

8        (Government Exhibit No. 479 received into evidence.)

9        MR. AUERHAHN:  And if they could be displayed.

03:32 10  BY MR. AUERHAHN:

11  Q.   So the person you were speaking to on that date was Ahmad

12  Abousamra?

13  A.   That is correct.

14  Q.   Now, did you question Mr. Abousamra concerning where he

15  was -- where he had been on this particular trip?

16  A.   Yes.  I asked him how long he was outside of the country

17  and what country or countries he visited while he was gone.

18  Q.   And what did he say?

19  A.   He replied that he was outside of the United States for

03:32 20  two months in Aleppo, Syria; and he took a two-day trip to

21  Slenfeh, which I hope I pronounced that correctly, Syria, with

22  his wife to visit cousins.

23  Q.   Now, as you were talking to him, were you doing anything

24  with his passport?

25  A.   Yes.  I compared the photo on the document to the

1   individual in front of me.  It's a common practice that we have

2   to make sure that the rightful bearer of the document and the

3   document has not been altered.

4   Q.   Okay.  And did you also look through the stamps in the

5   passport?

6   A.   Yes, I did.  I perused the stamps, and contained within

7   that passport I found two stamps that I had asked further

8   questions of.  One stamp was from Yemen and the other was from

9   Iraq.

03:33 10   Q.   And did you recognize those -- for example, the Iraq

11   stamp?

12   A.   Absolutely.  At that time the new Iraqi government had

13   just been stood up and built up, and these stamps were newly

14   issued by the Iraqi government.  So I had a professional and

15   personal interest in it because it was part of history.

16   Q.   Now, did you ask him about his travels to -- and you said

17   you noticed a second one that had caught your attention.  What

18   was the other one?

19   A.   Yemen.  Visa entry and exit stamps.

03:33 20   Q.   And did you ask him about his travels to the Middle East

21   in connection with those two, the visa and the stamp?

22   A.   Yeah.  I asked him when he went to these countries, and he

23   replied he was there in 2004.  He said that he was in Yemen for

24   one week and he left because it was too poor and he had stomach

25   issues with the food.  And then he told me that he went to

1   Bagdad, Iraq, for two weeks to seek employment as a translator,

2   and he got a lung infection and he had to leave.

3   Q.   Okay.  Did he say whether or not he traveled with anyone

4   else?

5   A.   I do not recall him making any statements to that effect.

6   Q.   And did anything change about his demeanor when you were

7   talking to him about Yemen and Iraq?

8   A.   He definitely -- he displayed physical characteristics

9   that he was not comfortable discussing these trips.  In my

03:35 10   report I put that he appeared uncomfortable making statements

11   about these trips.  I got the feeling that --

12          MS. BASSIL:  Objection.

13          THE COURT:  I think he's gone far enough with the

14   answer.

15          MR. AUERHAHN:  Thank you, your Honor.

16   BY MR. AUERHAHN:

17   Q.   And you said he had gone to -- he told you he had gone to

18   Bagdad, Iraq, to work as a translator?

19   A.   To seek employment as a translator, he told me.

03:35 20   Q.   And did he tell you any particular details about that

21   effort?

22   A.   Well, I had asked him why he didn't seek that employment

23   in the U.S. through various contractors at that time, Titan,

24   DynCorp.  There were a large number of contractors that were

25   looking to hire linguists, security personnel.  And I asked him

1    why he didn't apply for those positions while in the U.S., and

2    he told me that he thought it would be better and easier to

3    find a job while he was there.  He didn't know about those

4    contractors.  And that after the divorce from his first wife,

5    he needed to get out of the U.S. for a little bit.

6    Q.    Did he indicate whether he visited any other cities in

7    Iraq besides Bagdad?

8    A.    No, sir.

9    Q.    Did he mention anything about going to Fallujah?

03:36 10    A.    No, sir, he did not.

11    Q.    Now, sir, if he had told you he had gone to Fallujah,

12    Iraq, what would you have asked him?

13              MS. BASSIL:  Objection.

14              THE COURT:  Overruled.

15              You may answer.

16              THE WITNESS:  I would have had quite a few questions

17    for him.  At that time Fallujah, Iraq, was what would be

18    considered a hot spot for any resistance factions within Iraq.

19              MS. BASSIL:  Objection.  It's nonresponsive to the

03:36 20    question.

21              THE COURT:  No, it may stand.  Go ahead.

22    BY MR. AUERHAHN:

23    Q.    You may continue.

24    A.    And I definitely would have notified other law enforcement

25    entities of the fact that we had this individual that had been

1    there, to have them come for follow-up questions.

2            MR. AUERHAHN:  No further questions, your Honor.

3                        CROSS-EXAMINATION

4    BY MS. BASSIL:

5    Q.    Good morning.

6    A.    Good morning.

7    Q.    Mr. -- is it Haimila?

8    A.    It's Haimila.

9    Q.    Haimila.  Sorry if I get it wrong.

03:37 10   A.    Not a problem.

11   Q.    I'll try.

12            Was there a customs enforcement agent present with you

13   when you did this interview?

14   A.    There was an Immigration and Customs Enforcement special

15   agent that was on-site during the interview, yes.

16   Q.    With you when you did the interview?

17   A.    He was in the immediate area, yes.

18   Q.    Well, immediate area or was he standing next to you when

19   you asked these questions?

03:38 20   A.    Well, in baggage control there's a baggage search area,

21   and I guess it would be equivalent maybe to double the length

22   of this.  And there's a podium which would probably be right

23   where the audience is standing.  And that's generally where the

24   special agents are.

25   Q.    Okay.  So the special agent was not standing next to you

1    when you did this interview?

2    A.    No.

3    Q.    And the special agent did not participate in this

4    interview?

5    A.    No.

6    Q.    Okay.  And did you call over the special agent during the

7    interview?

8    A.    No.

9    Q.    Now, did you ask Mr. Abousamra if anyone had traveled with

03:38 10   him?

11   A.    I don't recall.  On which trip?

12   Q.    Well, you were asking him -- first of all, he was coming

13   in from Syria.  Is that correct?

14   A.    That's correct.

15   Q.    And his passport indicated that he was coming in from

16   Syria?

17   A.    Yes.

18   Q.    All right.  And did you ask him if anyone traveled with

19   him when he -- to or from Syria?

03:38 20   A.    I did not ask him if anyone traveled with him to Syria.

21   Q.    All right.

22   A.    I did ask him if he was returning with anyone.

23   Q.    All right.  And what was his response?

24   A.    No, he was traveling alone that day.

25   Q.    All right.  And did you ask him if anyone had traveled

1    with him to Yemen?

2    A.    In 2004?

3    Q.    Yes.

4    A.    No, I do not recall.

5    Q.    And did you ask him if anyone had traveled with him to

6    Iraq?

7    A.    I do not recall asking him that.

8    Q.    Okay.

9          MS. BASSIL:  Now, if we could pull up and look at this

03:39 10   again, it would be Exhibit 476.  And if we could have the third

11   page, please.

12   Q.    Now, Agent, do you see the stamp for Iraq?

13   A.    Yeah.  It's a low-quality image of it, yes.

14   Q.    Okay.  Is this it?

15   A.    Yes.

16   Q.    And are you -- you said you were familiar with that stamp?

17   A.    Well, I was aware of the newly issued stamp, yes.

18   Q.    And are you able to tell whether that stamp indicates an

19   entry or an exit to Iraq?

03:40 20   A.    Based on the writing on it, no, I cannot read it.

21   Q.    And can you tell what the date is on that stamp?

22   A.    No.  That's why I asked Mr. Abousamra when it was.

23   Q.    All right.  And were you able to find any other stamps

24   from Iraq in his passport?

25   A.    Nope, I don't recall seeing any other stamps from Iraq in

1    his passport.

2    Q.   All right.  Now, typically do you see two stamps per

3    country, entry and exit?

4    A.   It depends on the country.

5    Q.   All right.  Now, did you ask him what city he -- you said

6    that he told you he had been in Bagdad.  Is that correct?

7    A.   That's what he told me, yes.

8    Q.   And how did that come out?  Did you say to him, "Where

9    were you in Iraq?"

03:41 10   A.   Yes.

11   Q.   All right.  And did you ask him if he went any other place

12   in Iraq?

13   A.   Based on my recollection, I believe he left it clear that

14   there was no follow-up question to be asked when he said "I was

15   in Bagdad for two weeks."

16   Q.   Okay.  So you didn't say to him:  Well, were you in

17   Fallujah?  Were you in this place?  Were you in that place?

18   A.   Well, I knew for a fact -- I didn't ask him if he was in

19   Fallujah.  I can tell you that.

03:41 20   Q.   Okay.

21   A.   I don't know if I asked him if he had visited any other

22   cities, though.

23   Q.   All right.  So pretty much what you recall is you asked

24   him where he had been, and he said Bagdad, and that was the end

25   of it?

1  A.   Yeah.  He said he was seeking employment while in

2  Bagdad --

3  Q.   I understand that.  But as far as places, that was the end

4  of it?

5  A.   That's correct.

6  Q.   And he was allowed to leave after this?

7  A.   Yes, ma'am.

8          MS. BASSIL:  I have no further questions.

9          MR. AUERHAHN:  I have just a couple, your Honor.

03:42 10          Could you leave up that same page, please?  That won't

11  work.

12          May I approach, your Honor?

13          THE COURT:  All right.

14                    REDIRECT EXAMINATION

15  BY MR. AUERHAHN:

16  Q.   Is this, in fact, a copy of the same page but a little bit

17  more legible?

18  A.   Yes, sir.

19  Q.   Do you recognize this stamp here in the lower left-hand

03:42 20  corner?

21  A.   It's a --

22  Q.   Over here?

23  A.   -- United Arab Emirates stamp.

24  Q.   And what's the date?

25  A.   February 11, 2004.

1    Q.   Okay.  I want you to look at the original passport of

2    Tarek Mehanna.  And can you look at this stamp here?  That one

3    right there.

4    A.   Yes, sir.  That's also United Arab Emirates stamp dated

5    February 11, 2004.

6    Q.   The same date as the one we just looked at on

7    Mr. Abousamra's?

8    A.   That's correct, sir.

9         MR. AUERHAHN:  All right.  No further questions, your

03:43 10   Honor.

11        MS. BASSIL:  Just a couple.

12                      RECROSS-EXAMINATION

13   BY MS. BASSIL:

14   Q.   Do you see -- I'm sorry.  Do you still have that in front

15   of you, the copy of Mr. Abousamra's passport?

16   A.   Yes, ma'am.

17   Q.   And do you see other stamps for the United Arab

18   Emirates --

19   A.   Yes, ma'am.

03:43 20   Q.   -- on that same page?

21        And do they indicate what dates those were stamped?

22   A.   One is dated 12th of February 2004, and the other one is

23   the 3rd of February 2004.

24   Q.   Okay.  So one is the 12th of February 2004?

25   A.   That's correct.

1    Q.   And I think you just said, and correct me if I'm wrong,

2    the one that you looked at on Mr. Mehanna's passport was

3    February 11th, 2004?

4    A.   There's two stamps on there.  One of them is February 11,

5    2004, on this page.

6    Q.   Thank you.  And I think the other one is, what, like

7    February 3rd, something like that?

8    A.   It's February 15, 2004.  That's on page 15.

9            MS. BASSIL:  Thank you.  I have no further questions.

03:44 10         MR. AUERHAHN:  Nothing further, your Honor.

11           THE COURT:  All right, sir.  Thank you.  You may step

12   down.

13           (The witness is excused.)

14           MR. CHAKRAVARTY:  Christian Fierabend.

15                CHRISTIAN FIERABEND, duly sworn

16           THE CLERK:  Please be seated.

17           State your name and spell your last name for the

18   record.

19           THE WITNESS:  My name is Christian Fierabend.  That's

03:45 20  C-H-R-I-S-T-I-A-N; last name F, as in "Frank," I-E-R-A-B-E-N-D.

21                       DIRECT EXAMINATION

22   BY MR. CHAKRAVARTY:

23   Q.   Good afternoon.  Please tell the jury where you work.

24   A.   I'm a special agent with the FBI Joint Terrorism Task

25   Force in Boston.

1    Q.   How long have you been an FBI special agent?

2    A.   I've been in the FBI since 2006.

3    Q.   And before you joined the FBI, what did you do?

4    A.   I was a field artillery officer in the Army, the U.S.

5    Army.  I was a captain for about five and a half years.

6    Q.   And did you have any overseas deployments?

7    A.   I did.  I was deployed to Operation Iraqi Freedom from

8    April 2004 to March 2003 *[sic]*.

9    Q.   All right.  And with regard to your role at the FBI, have

03:46 10   you been on the Joint Terrorism Task Force your entire time?

11   A.   Yes, I have.

12   Q.   Now, for purposes of this case, were you asked to review

13   certain exhibits?

14   A.   Yes.

15   Q.   And are you going to be reading some of those with me to

16   the jury today?  Just acknowledge --

17   A.   Yes.

18   Q.   All right.  So I'm going to first call your attention to

19   Exhibit 247.

03:46 20        MR. CHAKRAVARTY:  If we could bring that up.

21        Your Honor, I believe these -- each of these

22   communications are in evidence, so I would ask that they be

23   published to the jury.

24   Q.   With regard to these first few exhibits, can you just read

25   the email addresses and the associated name that's depicted on

1    this exhibit?

2    A.   It says "Yahoo Mail Name:  Ibnul_khattab82@yahoo.com."

3    Q.   And does it indicate a location?

4    A.   Sudbury, Massachusetts, United States  01776.

5    Q.   Does this appear to be the account information from Yahoo?

6    A.   Yes.

7         MR. CHAKRAVARTY:  If you would go to 261, please.

8    BY MR. CHAKRAVARTY:

9    Q.   Does this appear to be an email from that account,

03:47 10   ibnul_khattab82@yahoo.com?

11   A.   Yes.

12   Q.   Can you read those, please?

13   A.   It says, "Here are my screen names:  MSN:

14   Ibnul_khattab82@yahoo.com; Yahoo Messenger:

15   Ibnul_khattab82@yahoo.com; AOL Instant Messenger:

16   Sayf Maslool."

17   Q.   And is there a name at the end?

18   A.   It says, "Your brother, Tariq."

19        MR. CHAKRAVARTY:  Exhibit 393, please.

03:48 20   Q.   There appears to be some message from Amazon.com.  Can we

21   go to page 2, please?  Is there an address on this?

22   A.   Yes.  It says, "Your shipping address:  Tariq Mehanna, 6

23   Fairhaven Circle, Sudbury, Massachusetts  01776-2041."

24   Q.   And, again, is there an email address associated with that

25   purchase?

1    A.   Ibnul_khattab82@yahoo.com.

2         MR. AUERHAHN:  Exhibit 401, please.

3    Q.   Is there a phone number associated with that person?

4    A.   Yes.  It's (978) 760-0658.

5    Q.   Again, is that signed "Tariq"?

6    A.   "Tariq."

7         MR. CHAKRAVARTY:  Exhibit 403, please?

8    Q.   Does this appear to be a message from

9    webmaster@islamicawakening.com?

03:49 10  A.   Yes.  Yes, it is.

11   Q.   I'm sorry.  Can you read who it's addressed to?

12   A.   "Dear Abu Sabaayaa."

13   Q.   And again, the email address to whom it's sent?

14   A.   Ibnul_khattab82@yahoo.com.

15        MR. CHAKRAVARTY:  Exhibit 405, please.

16   Q.   Is there a -- can you just read that, please?

17   A.   "I have recently put up a blog collecting the works I have

18   translated over the years.  Please distribute anything you feel

19   may be of benefit to yourself or others.  Check it out here:

03:49 20  http://iskandrani.wordpress.com.  Was-Salam, Tariq."

21   Q.   Okay.  Now shifting gears, go to Exhibit 692, please.  Is

22   this a chat session dated April 3rd of 2006, between the

23   defendant and a person with the screen name of Mu'awiyah?

24   A.   Yes.

25        MR. CHAKRAVARTY:  Second page, please?

1    Q.   If you can read the portion -- the defendant's statements

2    and I'll read the other side -- the other party.

3    A.   "It's nothing that Allah hasn't explained to us how to

4    deal with.  Just stick to the truth and stay firm upon it until

5    you die."

6    Q.   "Yes, brother.  May our end be in martyrdom."

7    A.   "Brother."

8    Q.   "This world is accursed."

9    A.   "Remember, I am being watched," wink.

03:51 10   Q.   "Oh, laugh out loud."

11   A.   "And I know that for a fact."

12   Q.   "It is nothing of these line to harm the FBI," and a wink.

13   A.   "Allah willing."

14   Q.   "Or any other goons in CIA."

15   A.   "Yeah.  But nowadays, simply having this creed" --

16        MR. CHAKRAVARTY:  Next page, please.

17   A.   -- "is considered a crime."

18   Q.   "Or those who are spying at us..."

19   A.   "Regardless of whether or not you do anything."

03:51 20   Q.   "Yes, brother.  You are right, man."

21   A.   "You are considered a sympathizer."

22   Q.   "Are you aware that martyrdom also comes in the form of

23   falling from a cliff or getting drowned or being hit by a

24   plague or dying of a stomach disease?"  Wink.

25   A.   "Yeah, well."

1    Q.    "Dying."

2    A.    "That's what I'm referring to whenever I mention it."

3    Q.    "Yes, me too," wink, smiley face.

4          "So the Fat Boy Inc. (FBI) should not worry," laugh

5    out loud.

6    A.    "A/k/a frequently bringing incest."

7    Q.    "May Allah curse them.  Brothers, the spirits of the

8    disbelievers [sic], are they allowed to roam anywhere they wish

9    in the skies?"

03:52 10   A.    "I am not sure."

11         MR. CHAKRAVARTY:  Exhibit 693, please?

12   Q.    Agent, is this another conversation between these same two

13   individuals on April 15, 2006?

14   A.    Yes.

15         MR. CHAKRAVARTY:  Second page, please?

16   Q.    If you could read this portion?

17   A.    "It's like, 'This was Mu'awiyah before al Qa'ida.'  Then

18   they show a pic of you all clean-shaven and smiling.  'This is

19   him after al Qa'ida.'"

03:52 20   Q.    "Laugh out loud.  Ahahhaha."

21   A.    "Wearing like a golf shirt."

22   Q.    "Laugh out loud.  I was never clean-shaven.  Brother, did

23   you hear what happened in Egypt?  The copts man."

24   A.    "Yeah," smiley face.

25   Q.    "There should be genocide of them.  Such news makes me

1   happy."

2   A.   "...being watched...  But, yeah, I know."

3   Q.   "Laugh out loud.  FBI doesn't mind if it is non-American

4   related."

5   A.   "Well, remember, I'm famous now all over the world."

6   Q.   "Laugh out loud.  Oh, any news from the mukhabarat," the

7   intelligence?

8   A.   "Nope.  Punks."

9        MR. CHAKRAVARTY:  Can we go to the next page, please?

03:53 10  The end of this.

11  Q.   Mu'awiyah says, "Are you aware of our collective heijra,"

12  or migration plan?  "Praise be to Allah this week it took many

13  positive turns.  I was wondering if you wish to join us as

14  well."

15  A.   "Brother, one sec.  Brb."

16  Q.   "We are planning to move out from this country together

17  with our families.

18       "Sure, dear brother."

19  A.   "Brother.  Back.  Peace."

03:54 20       MR. CHAKRAVARTY:  Exhibit 530, please.

21  Q.   Is this a conversation that occurred on May 17, 2006,

22  between the defendant and a person named because Abu Mu'ndhir?

23  A.   Yes.

24  Q.   I'm going to read this entire chat, so I'm going to try to

25  blow it up and highlight which I'm told makes it more visible.

|       |                                                                         |
|-------|-------------------------------------------------------------------------|
| 1     |       Abu Mu'ndhir says, "There?"          |

1          Abu Mu'ndhir says, "There?"

2     A.   "Yes."

3     Q.   "Okay, dude.  There's a rat on the engine.  You need to

4     get rid of it before it causes oil leaks or tell IU too."

5     A.   "Which rat?"

6     Q.   "He is someone local they planted to be a friend."

7     A.   "Local to me?"

8     Q.   "No, to me."

9     A.   "Okay.  Name?"

03:54 10   Q.   "I just found it.  He is on there.  Is father of cow04 in

11    Arabic.  He is on the quiz thing that IU started.  Tell him to

12    get rid of it and not to ask.  Just trust me on this one."

13    A.   "Okay.  One sec."

14    Q.   "Okay."

15    A.   "You sure about this?  How do you know?"

16    Q.   "Yes.  He said some stuff to me that nobody would know but

17    me about myself."

18    A.   "...."

19    Q.   "And he wanted names of the shabab," young men.

03:55 20   A.   "You know him personally?"

21    Q.   "Yes.  We met at the masjid" -- or the mosque --

22         MR. CHAKRAVARTY:  Next page, please?

23    Q.   -- "after Ramadhaan.  He hangs out with us on Fridays to

24    play ball and stuff."

25    A.   "Okay.  PMing now."

1    Q.   "K, dude.  Tell him to suspend, not delete, so that it

2    doesn't appear awkward.  I don't want him to know that I know

3    he is a spy."

4    A.   "Hehe, dude.  Won't he like wonder why his account is

5    suspended?"

6    Q.   "No, because from time to time the accounts get

7    deactivated if they're not active, right?"

8    A.   "Yeah.  But he has been active."

9    Q.   "Yeah, I know.  Don't worry.  He is not really computer

03:56 10   smart."

11            MR. CHAKRAVARTY:  Exhibit 531, please.

12   Q.   And, Agent, is this another conversation between the same

13   two individuals on May 18, 2006?

14   A.   Yes.

15   Q.   Again, if we can read through this portion of the chat?

16   A.   "Peace be upon you."

17   Q.   "Peace be upon you."

18   A.   "IU deactivated the account but he asks you what he should

19   say if the bro asks why this happened."

03:56 20   Q.   "Tell him not to reply because like is aid dude is one of

21   them.  After a few weeks just delete it because by then I'll

22   have cut him off slowly like I plan to."

23   A.   "Okay."

24   Q.   "Dude" --

25            MR. CHAKRAVARTY:  Next page, please.

1    Q.    Sorry.  Go ahead.

2    A.    "But tell what exactly was he asking."

3    Q.    "Okay.  Do you remember about the article?  It said there

4    was three that are under invest?"

5    A.    "Yes."

6    Q.    "Okay.  He asks me for the names."

7    A.    "Randomly" --

8    Q.    "And remember" --

9    A.    -- "or mid conversation?"

03:57 10    Q.    -- "I told you about my situation" --

11    A.    "Yes."

12    Q.    -- "with the girl and that guy.  He knew the girl's name.

13    Only those people know the name.  I never told him.  And he

14    said that was set up like all that happened the fitnah, et

15    cetera" -- "the tumult" -- excuse me -- "et cetera.

16         "He also said how we met was not a coincidence.

17    Yaani, I mean, meeting him" --

18    A.    "Meeting...Abu Cow?"

19    Q.    "Yeah.  Now, if he is really the other guys, not spies,

03:57 20    why would they care about someone like me and my ordeals?  How

21    does that help with the call to Islam?  So it's only one thing,

22    that he is a spy."

23    A.    "He is Arab, this kid?"

24    Q.    "He is not a kid.  He is older than you.  Yeah, he is."

25    A.    "How long you known him?"

1        MR. CHAKRAVARTY:  Just go to the next page, please.

2    I'm skipping a few lines.

3    Q.   Abu Mu'ndhir says --

4        MR. CARNEY:  Objection.  I would ask, rather than

5    skipping lines, that the rule of verbal completeness apply and

6    that he continue reading sequentially.

7        MR. CHAKRAVARTY:  It's fine if it will expedite the

8    exam, your Honor.  It was purely to cut out --

9        THE COURT:  This is a small passage.  If it's to this

03:58 10   particular one, why don't you go ahead and include it.

11       MR. CHAKRAVARTY:  Go back to the last page, please?

12   Q.   I'll just continue reading.  "He is Arab" -- you asked,

13   "He is Arab, this kid?"  And Abu Mu'ndhir says, "No, he is not

14   a kid.  He is older than you.  Yeah, he is."

15   A.   "How long you known him?"

16   Q.   "Just before Ramadhaan.  He approached me while in the

17   mosque, started talking to me.  So he said that" --

18       MR. CHAKRAVARTY:  Next page, please?

19   Q.   -- "was not a coincidence.  Now" --

03:59 20   A.   "Hum.  Why would he tell you it wasn't a coincidence and

21   if he is supposed to be undercover?"

22   Q.   "I don't know.  Like everything he told me was shady."

23   A.   "Kind of dumb."

24   Q.   "When I was leaving he is like, 'Give me the name.  Give

25   me the name.'  I'm like I gtg" -- or got to go.  "So why would

1   the brothers care about some guy?"

2   A.   "Hmm."

3   Q.   "Only those spies care, right?"

4   A.   "Yeah, weird, man."

5   Q.   "Plus we don't even know where he works.  He claims he has

6   contract jobs but we don't even know about that."

7   A.   "Yeah, people here whom we suspect say the same thing."

8   Q.   "Yeah."

9   A.   "Punks."

03:59 10   Q.   "Hopefully I didn't say too much to incriminate myself."

11   A.   "Well, you have nothing to incriminate yourself for

12   anyways, brother.  No need to be nervous."

13   Q.   "Yeah."

14   A.   "Brother, I got to pray.  Brb," be right back.

15   Q.   And then he sends him a link to something.  Is that right?

16   A.   Can you point to that?

17   Q.   I'm sorry.  It says, "700 pound gator" and then there's a

18   link?

19   A.   Yes.

04:00 20        MR. CHAKRAVARTY:  Exhibit 532, please.

21   Q.   This is another conversation between the same two

22   individuals on May 26th of 2006?

23   A.   Yes.

24        MR. CHAKRAVARTY:  Go to page 2, please?

25   Q.   Read this portion.

 1   A.   "How's the other stuff, family life, things in general?"

 2   Q.   "Good Alhamdulillah," praise be to Allah.  "As for the spy

 3   thing, don't know.  You never know with these things."

 4   A.   "Hehe.  Me neither.  But I'm still not letting it get to

 5   me.  I still go out for Indian food, do my groceries, watch

 6   baseball, et cetera."

 7   Q.   "LOL same."

 8   A.   "You see that Abu Cow dude?"

 9   Q.   "No, his car surprisingly disappeared after the long

04:01 10   weekend here."

11   A.   "Hmm.  Maybe he moved over here hah."

12   Q.   "Laugh out loud."

13   A.   "I'll be sure to welcome him with some broken bones."

14   Q.   "Laugh out loud."

15   A.   "Okay, bro.  I be out."

16        MR. CHAKRAVARTY:  Exhibit 558, please.

17   Q.   This is a chat session that occurred on April 3rd of 2006,

18   between the defendant and Ahmad Rashad?

19   A.   Yes.

04:01 20   Q.   I'll start down at the bottom.  Ahmad Rashad says, "Hey,

21   bro.  Did he fight in Algeria?"

22   A.   "Yeah."

23        MR. CHAKRAVARTY:  Next page, please?

24   A.   "Well, he didn't actually physically fight there himself.

25   He helped transport equipment to them."

1   Q.   "Oh, yeah.  From span, right?"

2   A.   "And was arrested there.  Yeah."

3        MR. CHAKRAVARTY:  We'll just continue reading to avoid

4   the interruption.

5   Q.   "A man they talk about that in the nashid," or chant,

6   "man, this guy's life is like a movie, man.  He went

7   everywhere."  And then he appears to send a file.

8   "Subhanallah," praise be to Allah.  "Man, nobody knows anything

9   about these people.  It's really sad.

04:02 10        "Hey, man, Omar finally called me."

11  A.   "Nice."

12  Q.   "He works six days a week, he says."

13  A.   "Hey, man, I want to tell you again about that Spanish

14  guy.  Please, man, be very cautious and don't believe

15  everything you hear."

16  Q.   "Oh, yeah.  I don't call him or anything, man."

17  A.   "These guys nowadays are very, very good at acting this

18  stuff out, like Shaykh Umar Abdur Rahman, he had this guy

19  serving him for ten years.  He knew all his secrets.  In the

04:03 20  end, he turned out to be from the intelligence."

21  Q.   "Yeah, I feel you.  I was not planning on calling him or

22  anything, and he did not want me to.  He only talked to me" --

23  in Arabic translation, "He only talked to me like he did not

24  talk to Ahmed or anyone else.  He didn't even know that Abo

25  Hafss died."

1    A.    "Yeah, I mean, praise be to Allah."

2    Q.    "I'll be careful, in any case."

3          MR. CHAKRAVARTY:  Now go to page 4 of this chat,

4    please?

5    Q.    And the defendant sends a link?

6    A.    Yes.

7    Q.    Now, Agent Fierabend, did you have an opportunity to

8    attempt to access that link?

9    A.    I did, actually.

04:03 10   Q.    What is that link of or to?

11   A.    It's a site called --

12         MR. CARNEY:  Objection.

13         THE COURT:  Let me see you at the side briefly.

14         (Discussion at sidebar and out of the hearing of the

15   jury:)

16         MR. CARNEY:  I don't know what's coming in by this

17   answer.

18         MR. CHAKRAVARTY:  The link is of a website which

19   depicts a failed suicide vehicle improvised explosive device,

04:04 20   an SVIED.  It appears to be shot from the perspective of

21   American soldiers.  I think he's going to say it's a website

22   which depicts a video linked to -- I guess I could lead him to

23   get anything out that's not prejudicial.

24         I think it is important and probative.  The fact that

25   that that link is still available on the internet -- most are

1   not.  This one is still available on the internet.  It's

2   something that the defendant said to Mr. Rashad so it lays the

3   foundation for what the conversation was about.

4        MR. CARNEY:  I object.  This is just one more instance

5   where the government is showing that my client sends a video

6   about the war in Iraq, and the probative value of the fact that

7   he's sending it is so minimal at this point with everything

8   else that's come in that the prejudice outweighs it.  And

9   that's the standard that I suggest my objection is sound.

04:05 10        THE COURT:  So your objection is under Rule 403, to be

11   precise?

12        MR. CARNEY:  Yes, your Honor.

13        MS. BASSIL:  Also, I think we should get notice that

14   suddenly they're going to be talking about a video.  You have

15   to understand that most of these links are gone, and when you

16   do go to these links, I got more viruses in my computer than I

17   ever had before.  So it's not as though I'm going to

18   automatically click on these links.  And they should give us

19   notice.

04:06 20        THE COURT:  All right.  The objection is overruled and

21   then we'll start.  I want to finish this --

22        MR. CHAKRAVARTY:  Yes.  I was ambitious.

23        (In open court:)

24        MR. CHAKRAVARTY:  Let me lead briefly on this topic,

25   your Honor?

1          THE COURT:  Go ahead.

2    BY MR. CHAKRAVARTY:

3    Q.   Agent Fierabend, with regards to the link that you

4    accessed, did it depict a web page?

5    A.   Yes, it did.

6    Q.   And was there a video on that web page that was accessible

7    to you?

8    A.   I read -- the computer I used didn't actually show the

9    video, but I was able to access the web page from the

04:06 10   government computer I used.

11   Q.   And with regards to what the video depicted, was it

12   essentially an attack?

13          MR. CARNEY:  I object.

14          THE COURT:  Sustained on the foundation laid.

15          MR. CARNEY:  Well, the foundation is hearsay.

16          MS. BASSIL:  No, he said "sustained."

17          MR. CARNEY:  Oh, did you say "sustained"?

18          THE COURT:  I did.

19          MR. CARNEY:  I should have known that right away.

04:07 20          (Laughter.)

21   BY MR. CHAKRAVARTY:

22   Q.   Were you able to watch the video at some point?

23   A.   If it's the video I think I watched, the way they

24   described it on the website --

25   Q.   Without going into how it was described, in terms of what

1    the actual video itself was.

2    A.    I believe it's a video of a man in the street surrounded

3    by U.S. Army, and he was in a vehicle and the vehicle blows up,

4    if it's the video that I'm thinking of.

5    Q.    Okay.  So we'll then continue to read this portion of the

6    chat.

7         After the defendant sends the link, you can go on.

8    A.    "What happened in this vid is explained here."

9    Q.    And Rashad shows what appears to be a sad face.  "Wasn't

04:08 10   he a martyr to be?"

11   A.    "No.  He had gotten into a car accident.  Just a regular

12   kid."

13   Q.    "Yeah, he doesn't look like martyr to be.  They usually

14   don't wear tank tops.  The dogs are making fun of the Muslims."

15        And then that session closes.  Is that -- that's the

16   end of that session?

17   A.    Yes.

18        MR. CHAKRAVARTY:  All right.  Your Honor, with that --

19        THE COURT:  We've gone a little past one o'clock.

04:08 20   That's as far as we'll go today.

21        Jurors, again, enjoy the rest of the day.  We'll see

22   you tomorrow at nine and continue with the evidence.

23        THE CLERK:  All rise for the Court and the jury.

24        The Court will be in recess.

25        (The Court and jury exit the courtroom and the

1    proceedings adjourned at 1:02 p.m.)

2

3                    C E R T I F I C A T E

4

5            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

6    Dahlstrom, RMR, CRR, Official Reporters of the United States

7    District Court, do hereby certify that the foregoing transcript

8    constitutes, to the best of our skill and ability, a true and

9    accurate transcription of our stenotype notes taken in the

10   matter of Criminal Action No. 09-10017-GAO-1, United States of

11   America v. Tarek Mehanna.

12

13   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
14   Official Court Reporter

15   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
16   Official Court Reporter

17

18   Date:  November 8, 2011

19

20

21

22

23

24

25