UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                            )
UNITED STATES OF AMERICA,   )
                            )
        Plaintiff,          )
                            ) Criminal Action
v.                          ) No. 09-10017-GAO
                            )
TAREK MEHANNA,              )
                            )
        Defendant.          )
                            )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWELVE
JURY TRIAL



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, November 9, 2011
9:33 a.m.



Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2       OFFICE OF THE UNITED STATES ATTORNEY
        By: Aloke Chakravarty and Jeffrey Auerhahn,
3           Assistant U.S. Attorneys
        John Joseph Moakley Federal Courthouse
4       Suite 9200
        Boston, Massachusetts  02210
5       - and -
        UNITED STATES DEPARTMENT OF JUSTICE
6       By: Jeffrey D. Groharing, Trial Attorney
            National Security Division
7       950 Pennsylvania Avenue, NW
        Washington, D.C.  20530
8       On Behalf of the Government

9       CARNEY & BASSIL
        By: J.W. Carney, Jr., Esq.
10          Janice Bassil, Esq.
            John E. Oh, Esq.
11      20 Park Plaza
        Suite 1405
12      Boston, Massachusetts  02216
        - and -
13      LAW OFFICE OF SEJAL H. PATEL, LLC
        By: Sejal H. Patel, Esq.
14      101 Tremont Street
        Suite 800
15      Boston, Massachusetts  02108
        On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

WITNESSES FOR THE
 GOVERNMENT:

CHRISTIAN FIERABEND, resumed

    By Mr. Chakravarty          24

GRAEME BURRIDGE

    By Mr. Chakravarty          84                    114
    By Ms. Bassil                      101

RICHARD DEARSLEY

    By Mr. Auerbach             116


                    E X H I B I T S


| GOVERNMENT'S | DESCRIPTION | FOR ID | IN EVD. |
|---|---|---|---|

796  CD of material described by Burridge          115

369, Items seized and described by Burridge                    115
370,
371,
373,
374,
376,
377,
378,
382

1              (The following proceedings were held in open court

2    before the Honorable George A. O'Toole, Jr., United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Boston, Massachusetts, on November 9, 2011.

6              The defendant, Tarek Mehanna, is present with counsel.

7    Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8    are present, along with Jeffrey D. Groharing, Trial Attorney,

9    U.S. Department of Justice, National Security Division.)

10             THE CLERK:  All rise for the Court.

11             (The Court enters the courtroom at 9:33 a.m.)

12             THE CLERK:  For a continuation of the Mehanna trial.

13   Please be seated.

14             THE COURT:  Good morning.

15             COUNSEL IN UNISON:  Good morning.

16             THE COURT:  The clerk told me that there will be a

17   number of, I guess, chats, and I guess also some photographs,

18   and gave me a list that I guess came from Mr. Carney.

19             MR. CARNEY:  That's correct, your Honor.

00:21 20         THE COURT:  So I've looked at those.

21             MR. CARNEY:  And I showed the list to the prosecutor

22   before I gave it to Mr. Lyness.

23             THE COURT:  I took the time to look at those.

24             MR. CARNEY:  I thought that since I have objections to

25   nine of the proposed exhibits, if I move to strike them now --

1          THE COURT:  Yeah.

2          MR. CARNEY:  -- and the Court rules, then when the

3    witness is on the stand with the jury present, it will flow

4    pretty smoothly.

5          THE COURT:  Okay.

6          MR. CARNEY:  Do you wish to hear from me?

7          THE COURT:  Go ahead.

8          MR. CARNEY:  All right.

9          THE COURT:  I think -- I guess probably the best way

00:21 10   to go is to go back and forth, exhibit by exhibit.

11          MR. CARNEY:  Certainly, your Honor.

12          The first objection is to 367.  This is a series of

13    photographs of wounded soldiers or coffins with American flags

14    on them.  The probative value of that is minimal, if

15    nonexistent, whereas the prejudice is enormous.  And I'm asking

16    the Court to exclude them.

17          MR. CHAKRAVARTY:  The government offers this to show

18    both the contours of what the conspiracy was, the fact that

19    this defendant -- in addition to the photos of wounded American

00:22 20   soldiers, it shows pictures of mujahideen carrying

21    rocket-propelled grenades.  It's an email that he sends to

22    himself and he blind-copies additional people which further

23    suggests that the defendant's intention was to encourage others

24    to do what it was that he was doing, which was supporting those

25    people who are causing American soldiers to be in that way.

1        The other germane point of this is it goes to

2   defendant's mindset back in 2004, which is the operative time

3   as to when he went to Yemen.  And so it's additionally

4   probative as to the purpose of that trip, your Honor.

5        MR. CARNEY:  The points the government is trying to

6   make have been made day after day after day, and to put in

7   photos of wounded soldiers through a veteran of that very

8   action just connects with the -- to the jury to, quote, "our

9   army" and "our soldiers."

00:23  10        THE COURT:  I assume the government will abide by the

11   pretrial ruling with respect to the pronoun.

12        The objection's overruled.  I think the items are

13   probative of the government's case and are admissible.

14        MR. CARNEY:  The next objection is 368, your Honor.  I

15   object on that because of 403 grounds.  The probative value is

16   minimal; the prejudice is significant.

17        MR. CHAKRAVARTY:  Your Honor, again, it's an email

18   that the defendant sends in November of 2003 when the

19   government's evidence is and will be that that's when he was

00:24  20   most eager to engage in some kind of action.  The photo is of

21   the Pentagon, which is a military target, which again plays

22   into the objective of the defendant's trip, particularly to

23   Yemen.

24        THE COURT:  Who is the recipient?

25        MR. CHAKRAVARTY:  This is an individual whose name is

1   associated with somebody from Tibyan Publications, but I don't

2   know his true identity, your Honor.

3          THE COURT:  Well, I think the presence of the -- these

4   are from the defendant's computer, I take it?

5          MR. CHAKRAVARTY:  His email account, your Honor.

6          THE COURT:  His email account.

7          I think the presence of the image there is

8   probative -- has probative value for the government's case and,

9   therefore, the objection --

00:25 10       MR. CARNEY:  I don't think that's --

11          THE COURT:  Well, it outweighs any unfair prejudice.

12   I mean, as the government has pointed out and has often been

13   repeated generally by people, probative evidence is, by its

14   nature, prejudicial.  The question is unfair prejudice.  And

15   that's not the case here.

16          MR. CARNEY:  There's absolutely no suggestion that any

17   part of the conspiracy alleged against the defendant had any

18   involvement with the Pentagon.

19          THE COURT:  But one of the themes of the government's

00:25 20   case is the defendant's alignment with terrorist -- a specific

21   terrorist organization, and terrorist activities more broadly.

22   So I think it's probative of that and not unfair.

23          MR. CARNEY:  The next objection is Number 390, your

24   Honor.  This is an 18-page speech that is laced with criticisms

25   of the Jewish people calling them the lords of usury, the

leaders of treachery.  It's just replete with these references.

This case is not about Jews.  There's no suggestion in the

government's allegations or in the allegations of a conspiracy

that this involved Jews; what it involved was Muslims and

Muslim lands.  Specifically, Iraq coming to the defense of

Muslims in that country to exclude invading soldiers.  There's

no suggestion, to my knowledge, that Israel played any part in

the occupying armies in Iraq or other Muslim lands, Muslim

countries.  And so to permit this to go to the jury is just

going to inspire bias and prejudice by the jurors against the

defendant because he's making these comments about Jews.

In addition, the fact that someone sends him this

document does not mean he agrees with everything.  We all get

magazines in the mail; we all get documents; we all read

things.  The fact that we read them and send them to people

does not mean we agree with them.

THE COURT:  Well, this indicates that the defendant

sent it to Abousamra.  Is that correct?

MR. CHAKRAVARTY:  That's correct, your Honor.

MR. CARNEY:  Yes.  And they discussed it.

THE COURT:  Right.  But it wasn't just passive receipt

by the defendant.

MR. CARNEY:  But the point is the fact that he would

say comments about this that have nothing to do with this trial

is simply going to inflame or incite or lead to emotions of

1  prejudice against the defendant because of the statements he's

2  making or that are being made in here concerning Jews.

3       And I stand corrected.  It was not discussed in any

4  further chat.

5       MR. CHAKRAVARTY:  Your Honor, this was -- as you

6  pointed out, this is between two of the defendants in this

7  case.  It's the defendant sending Abousamra a message before

8  even the American involvement in Iraq began, February of 2003.

9  The government was going to highlight three paragraphs in this.

00:28 10  They do mention Jew and Zionist, but it's in the context of the

11  stated objectives and the stated call to action that al Qa'ida

12  had already sent out, specifically.  And just to read from

13  page -- it looks like 1, 2, 3, 4, 5, 7 --

14       THE COURT:  Give me the Bates number.

15       MR. CHAKRAVARTY:  Page 7, your Honor.  Bates number?

16  I'm sorry.  TY00043.  Second full paragraph:  "Then in 1999 the

17  mujahideen warned America to cease their support to the Jews

18  and leave the land of the two holy sanctuaries."

19       There's been extensive discussion already at trial

00:29 20  about the American presence on the Arabian Peninsular.  And

21  then it goes on to describe specific acts that al Qa'ida had

22  engaged in.  Two paragraphs later there's a reference to the

23  blessed Tuesday, 11 September 2001.  Again, this is a

24  supportive email of the modus operandi of al Qa'ida as well as

25  the objectives.

1          So the government would suggest that this furthers the

2     fact that it's the defendant -- it wasn't Abousamra who was

3     implanting these ideas into the defendant and he was just

4     passively going along, but it was the defendant who was

5     actually participating in and encouraging this conspiracy.

6               THE COURT:  I think it's admissible.

7               MR. CARNEY:  Number 543, your Honor.

8               THE COURT:  Let me change books.

9               MR. CARNEY:  Oh, I'm sorry.  I might have written

00:30 10     "537."  Did I write --

11               THE COURT:  No, 543 is what I have.

12               MR. CARNEY:  I meant also 537, your Honor.

13               THE COURT:  I haven't looked at that.  Let me look at

14     that.

15               (Pause.)

16               THE COURT:  All right.  537.

17               MR. CARNEY:  It's a short one.

18               THE COURT:  Yeah.

19               MR. CARNEY:  He's talking about items that he did not

00:31 20     download.  He talks about the debate between monotheism

21     soldiers and the polytheism soldiers and criticisms.  That's

22     the person he's chatting with.  And then Mr. Mehanna notes, "I

23     erased all those stored books off my hard drive since, you

24     know."

25               That's speculative about what would be the reason he

```
 1    erased those books from his hard drive, especially when he's

 2    looking to download them again.

 3              MR. CHAKRAVARTY:  This is in the series of chats that

 4    we were just reading about the defendant's security

 5    consciousness and the fact that he's erasing books which

 6    evidence his consciousness of guilt.

 7              THE COURT:  Yeah, I think it's admissible.

 8              MR. CARNEY:  543, your Honor.

 9              THE COURT:  Okay.

10              MR. CARNEY:  We may have already talked about this

11    earlier, but defendant's comments about women in the context of

12    a friend's --

13              THE COURT:  It's in the context of a divorce.  Whose

14    divorce?

15              MR. CARNEY:  A friend's divorce.

16              THE COURT:  Yeah.  There are a couple, I think, as I

17    recall.

18              MR. CARNEY:  Yes, your Honor.

19              THE COURT:  Both alleged coconspirators, right?

20              MR. CARNEY:  Yes, your Honor.

21              THE COURT:  Well, I think that context makes it

22    admissible -- it's not general -- it's talking about his

23    particular personal situation.  I don't know how relevant the

24    divorce is, but I've seen other matters where there's been

25    reference to people's decision-making in the wake of a divorce;
```

1    where to go, for example, and --

2           MR. CARNEY:  Yes.  But this is talking and

3    characterizing women in very --

4           THE COURT:  It's characterizing a particular woman's

5    activity in divorce proceedings.

6           MR. CARNEY:  Well, so that am I to interpret the

7    Court's ruling that any crude thing the defendant said is

8    admissible because he said it?

9           THE COURT:  No.

00:33 10          MR. CARNEY:  Any disparaging comment he made about

11   anybody on the planet is admissible because he said it?

12          THE COURT:  No.

13          MR. CARNEY:  This is about two guys talking about

14   women in the context of a divorce.  And it's not even with

15   Abousamra -- or rather, it's not Abousamra's divorce he's

16   talking about.  Guys talk about women.  And when it's in the

17   context of a divorce it's unflattering.  And how on earth can

18   that be relevant to a conspiracy to commit terrorist acts?

19   It's just not.

00:33 20          THE COURT:  Mr. Chakravarty?

21          MR. CHAKRAVARTY:  Your Honor, the government is not

22   intending to read the misogynistic portions of this chat.  I

23   think there's a risk that by redacting big chunks of space,

24   especially somewhat innocuous and not being highlighted to the

25   jury, actually raises a greater concern both for the

 1    government's case in terms of the continuity of a conversation

 2    as well as potentially to the defendant.

 3             MR. CARNEY:  A buried page.

 4             MR. CHAKRAVARTY:  I didn't mean to presume, but my

 5    point is one page buried within a thousand that go to the jury

 6    is not going to have a prejudicial effect.

 7             THE COURT:  I don't think this is particularly

 8    unfairly prejudicial.  In contrast, I will agree with you -- if

 9    we can skip one -- on 572 I think there is a passage at the

00:34 10   bottom of what is numbered page 238 in 572.

11             MR. CARNEY:  You may be looking at page 1217, your

12    Honor.

13             THE COURT:  Correct.  And the last half dozen lines or

14    so there seem irrelevant and prejudicial --

15             MR. CHAKRAVARTY:  No objection, your Honor.

16             THE COURT:  -- and I would exclude those.

17             MR. CHAKRAVARTY:  In terms of logistics, the

18    government doesn't have a redacted copy right now, and

19    obviously we're not going to highlight that portion.  We'll do

00:35 20   a replacement.

21             THE COURT:  Okay.  Let's go back -- I think that was

22    the most offensive passage in that chat, 572?

23             MR. CARNEY:  Yes, your Honor.

24             THE COURT:  Let's go back to 552, then.

25             MR. CARNEY:  In 552 the defendant refers to Christians

1    as dogs.

2              THE COURT:  Mr. Chakravarty?

3              MR. CHAKRAVARTY:  Your Honor, the fact that the

4    defendant perceived non-Muslims, particularly, Americans -- and

5    not to say, of course, that Christians are equivalent to

6    Americans -- but it's the fundamental world view that this

7    defendant had in terms of it was Muslims against the world.

8    And the fact that he's identifying somebody as being a

9    non-Muslim either as an infidel or by as a Jew or as a

00:36 10   Christian is an important distinction which the defendant draws

11   in terms of his perception of the class for civilizations.

12             For that reason, we think it is probative to allow the

13   jury to kind of get that sense of both the defendant and what

14   would be motivating somebody to provide military support, or to

15   provide support to those who are engaging in military actions

16   against those people.  The equivalent is to say "crusaders,"

17   your Honor.

18             THE COURT:  Yeah.  Yeah, I think it could

19   be -- it's --

00:36 20         MR. CARNEY:  Then why did the Congress pass Rule 403?

21   Why did the Court say --

22             THE COURT:  Well, I have applied it in some

23   circumstances.  It's a balancing test, obviously.  And I think

24   that this is not sufficient -- it has some value for the

25   government's case and I don't think it's unfair.

 1          MR. CARNEY:  You'll hear this again today.  We had

 2    hoped when we heard your Honor say that this case will be tried

 3    within the four corners of the indictment --

 4          THE COURT:  Correct.

 5          MR. CARNEY:  -- allowing in statements that the

 6    defendant said bad things about women, said bad things about

 7    Jews, said bad things about Christians, it's just character

 8    assassination of this person and it's deflecting the jury's

 9    attention from what the real evidence is.

00:37 10          The primary issue in this case is not what the

11    defendant thought or what the defendant said, but whether the

12    defendant did provide material support at the direction of

13    al Qa'ida.  And what we're doing by --

14          THE COURT:  That's not exactly the issue, but --

15          MR. CARNEY:  Well, I'm suggesting it's certainly a

16    very important issue.

17          THE COURT:  It's part of the issues, I guess.

18          MR. CARNEY:  But to be honest, I've never seen a trial

19    where this much derogatory character assassination is being

00:38 20    allowed in against a defendant under the theory that he

21    shows -- it shows that he hates the world and he's in favor of

22    Muslims.

23          You might recall in my 403 motion I pointed out that

24    if it were a case where a defendant was alleged to have

25    committed a murder and he denied having anything to do with the

1    action, the victim was African-American and the defendant,

2    without hiding the fact, said, "I don't like

3    African-Americans," would the Court ever allow evidence after

4    evidence that the person doesn't like black people?  And in

5    addition, he doesn't like Mexican people?  And in addition, he

6    doesn't like Hispanic people?  And in addition, he doesn't like

7    Indian people?  He doesn't like anybody except white people.

8         And so we're going to put in hundreds of exhibits that

9    shows he hates everybody in the world except white people

00:39 10   because that will give him a motivation to kill somebody who's

11   not white?

12        THE COURT:  Well, I would say argument by analogy has

13   its limits, but it would depend on the case, frankly.  If it

14   were a hate-crimes prosecution, it might well be relevant.

15   So --

16        MR. CARNEY:  Even if I conceded that point, the Court

17   would not, I submit, allow in, in that hate-crimes case, the

18   amount of evidence that we're talking about here, especially if

19   the defendant, through his lawyer, in the opening says, "The

00:39 20   defendant doesn't like black people.  It's just the way he is."

21        THE COURT:  I understand the argument.  As to 552, the

22   objection's overruled.

23        MR. CARNEY:  I believe the next one, your Honor, is --

24        THE COURT:  578, I think.

25        MR. CARNEY:  Yes, your Honor.  That's what I have.

1          Okay.  Now we can add to the pot gays and lesbians,

2    okay?  We've got Jews; we've got women; we've got Christians.

3    Now he's making derogatory comments about the FBI, referring to

4    them as "homos."

5          MR. CHAKRAVARTY:  Your Honor, the defendant chose to

6    use that as an analogy.  But the fact that they're talking

7    about what to say to the FBI when they come knocking on the

8    door is an element of the offenses in this case.  He equates

9    the FBI, in his pejorative terms, to homosexuals.  But this is

00:40 10   yet another case where the defendant has created this

11   memorialization of what he was thinking at the relevant time

12   periods in the indictment, and that's why we have the luxury in

13   this case of being able to present that evidence to the jury.

14          What's probative here is -- you know, is that whatever

15   he is calling the FBI, it's something that he perceives as

16   pejorative, and that's why it's okay to lie to them, it's

17   okay -- that they're trying to frame him, they're trying to set

18   him up.  This is all in the context of whether the FBI is

19   visiting the three participants in the Yemen trip:  Abousamra,

00:41 20   the defendant and Abuzahra.

21          THE COURT:  This is on page 14, or Bates 960, I think?

22          MR. CARNEY:  Yes, your Honor.

23          THE COURT:  What's the reference to MAS?

24          MR. CHAKRAVARTY:  The Muslim American Society.  The

25   defendant and Mr. Abousamra did not think very highly of the

 1   Muslim American Society.

 2         THE COURT:  Well, the lines aren't numbered, but I

 3   think if the government went through -- it's about the top

 4   third where Ahmad says, "Not with you," and then excise until

 5   Ahmad, three lines from the bottom, "You have to be like."  I

 6   think that would not do much harm to the government...

 7         MR. CHAKRAVARTY:  Okay.  I agree, your Honor.

 8         MR. CARNEY:  Finally, 596, your Honor.

 9         THE COURT:  Okay.

00:45 10         MR. CARNEY:  Focusing in on --

11         THE COURT:  Yes.  I can shorten this.  I think the

12   last line attributed to Ahmad should be excised.

13         MR. CARNEY:  And the reference to "Give them a

14   playgirl"?

15         THE COURT:  No, I think that can stay.

16         MR. CHAKRAVARTY:  I'm sorry, your Honor.  We lost our

17   place.

18         THE COURT:  This is page 39, Bates 408.

19         MR. CARNEY:  So even obvious jokes come in, bad jokes

00:45 20   that suggest --

21         THE COURT:  So it will end with "infidel."  Ahmad's

22   response would be omitted.

23         MR. CARNEY:  Your Honor, of course I will honor all of

24   your Honor's rulings.  I would just ask that my objections be

25   continuing so that I don't interrupt the witness.

```
 1              THE COURT:  Fine.

 2              MR. CARNEY:  Thank you.

 3              THE COURT:  I just want to be sure the government

 4    followed that.

 5              MR. CHAKRAVARTY:  Your Honor, I'm a little confused

 6    on -- I'm sorry.  I had moved on --

 7              THE COURT:  This is 596.

 8              MR. CHAKRAVARTY:  596.  And which portions?

 9              THE COURT:  Basically, the last line just before

00:46 10    session close.

11              MR. CHAKRAVARTY:  In terms of what Mr. Abousamra says?

12              THE COURT:  Hmm?

13              MR. CHAKRAVARTY:  In terms of what Mr. Abousamra says?

14              THE COURT:  Correct.  It will end with "infidel."

15              MR. CHAKRAVARTY:  Okay.  So the defendant's statement

16    of "hmm, me too" --

17              THE COURT:  Where is that?

18              MR. CHAKRAVARTY:  A few seconds later.  Five seconds

19    later they continue --

00:46 20              THE COURT:  Okay.  I didn't realize.  Yes, that should

21    be stricken just because it's out of context at that point.

22              MR. CHAKRAVARTY:  Okay.  Your Honor, again a logistics

23    issue.  I can try to zoom in on just the relevant portion, but

24    the jury may get a glimpse of those words.

25              THE COURT:  Can't somebody go make a redacted copy
```

```
 1   now?  Just white it out?
 2              MR. CHAKRAVARTY:  Sure.
 3              I'll can put it on the ELMO.
 4              MR. AUERHAHN:  Put it on the ELMO instead of pulling
 5   it up.
 6              THE COURT:  There was one, 726, I think we skipped?
 7              MR. CARNEY:  Oh, I'm sorry.  Yes.  Thank you for
 8   bringing that to my attention, your Honor.
 9              These are videos, I believe.
00:47 10        THE COURT:  I'm sorry?
11              MR. CARNEY:  These are the videos, I believe.
12   "Diverse Operations."
13              THE COURT:  Well, that's -- the email text itself I
14   didn't find anything offensive in.  I couldn't tell whether
15   there was a video about to be played with it.  If that's the
16   case, I haven't looked at the video.
17              MR. CHAKRAVARTY:  Your Honor, is this the video that
18   goes along with 726?
19              THE COURT:  That's what I guess --
00:48 20        MR. CHAKRAVARTY:  The government --
21              THE COURT:  Were you going to play a video at 726?
22              MR. CHAKRAVARTY:  Yeah.  There's a video described,
23   which I think has already been played for the jury.  We're not
24   going to play it again.
25              THE COURT:  Okay.  The text itself I don't think is
```

```
 1    offensive.
 2              MR. CARNEY:  All right, your Honor.
 3              THE COURT:  Okay.  So we'll resume with Mr. Fierabend
 4    on the stand.  Can we get him in the room?
 5              MR. CHAKRAVARTY:  Can we get Christian Fierabend,
 6    please?
 7              MR. CARNEY:  May I raise one issue with your Honor,
 8    please, regarding this witness?
 9              THE COURT:  Go ahead.
10            MR. CARNEY:  He's been characterized to us as a
11    reader.  The way I interpret the word "reader" is it's the
12    equivalent of getting somebody who's walking by the courthouse
13    who's going to come in, sit in the seat and read.
14              I object to his going beyond that and interpreting
15    things or adding information -- that's not how he's been
16    characterized to us -- even if he has personal knowledge on a
17    subject.  "Reader" means simply this person will read.
18            MR. CHAKRAVARTY:  The issue is if the witness has
19    personal knowledge, and it's not expert testimony but it's
20    something that he personally experienced, then he should be
21    able to say something that's going to be helpful to the jury as
22    to explaining what something is.
23            THE COURT:  Yeah, I think the question precisely is
24    whether a person's testimony is limited by a characterization
25    that had been given to them, and I don't think that's the case.
```

00:48  10
00:49  20

He would not be allowed to interpret in the sense of an

expert's interpretation, if that's what it is, but personal

knowledge of a witness is admissible, generally.

MR. CARNEY:  This is very unfair.

THE COURT:  Hold on just a minute, Paul.  Hold on just

a minute.

MR. CARNEY:  This is very unfair because when we get

presented a fact that this person will be called as a reader,

then we don't investigate his background, we don't look into

anything about him.  And the fact that they would call someone

who has a particular background to be, quote, a reader, who

then can add personal-knowledge comments about evidence is

blindsiding us.

When a person is characterized as a "reader" so that

when one prosecutor reads one line, the next person reads the

next line, we've had no notice or no expectation that that

reader will say:  Oh, and by the way, I can add a personal

comment about that.  It's just unfair to be putting it in in

this form where all we knew about this witness when he appeared

on the witness list is he was just going to be reading.

It's really a matter of fair notice to us about what's

coming.  And we can't possibly anticipate what this witness is

going to say because we've been given no clue whatsoever.  He's

just supposed to be reading things.

MR. CHAKRAVARTY:  Your Honor, first, I think the

1    occasions where the witness will offer anything but what's on

2    the paper are going to be very few.  But sometimes, for

3    example, yesterday when there was a link that was still active,

4    the defense has those links, and that is the universe of

5    material that the witness would be commenting on based on

6    personal knowledge; for example, in that case a link.

7         In this -- the only circumstances where I anticipate

8    that coming in -- and I'm mindful of the fact the witness is

9    now in the room and I don't want to overstate it -- but if --

00:51 10   this witness happens to have been in Iraq.  So to the extent

11   that there's a reference to -- in one case to the city of

12   Ramadi, he would say, "Yes, I know where that is.  I was

13   there."

14        THE COURT:  Well, we'll deal with whatever questions

15   are asked.  But in general, unless the government has not

16   fulfilled its discovery obligations with respect to prior

17   statements and other such matters and what the rules provide

18   for, the summary designation of someone as -- for example, as a

19   reader, is not limiting by itself as a matter of evidence.

00:52 20        MR. CARNEY:  So that when I present a chat on the

21   defense case, it's permissible for me to have a woman be a

22   reader.  And when I get to the point of someone commenting on

23   rape, she'll be able to say, "Oh, and I was raped by American

24   soldiers in Iraq when I was there."

25        THE COURT:  As I say, it will depend on the exact

1    questions that are asked, and we'll deal with them as they

2    come.

3            MR. CARNEY:  Why is it relevant this man was in

4    Ramadi?

5            THE COURT:  Well, I don't know.  Let's wait for the

6    questions that you think are offensive.

7            MR. CARNEY:  Well, can the prosecutor make an offer of

8    what is the relevance of this --

9            THE COURT:  We'll take it in course.  We'll take it as

00:52 10    it comes.

11            Okay.  Jury.

12            THE CLERK:  All rise for the jury.

13            (The jury enters the courtroom at 10:05 a.m.)

14            THE CLERK:  Please be seated.

15            THE COURT:  Good morning, jurors.

16            THE JURORS:  Good morning.

17            THE COURT:  You remain under oath, of course, from

18    yesterday.

19                    CHRISTIAN FIERABEND, resumed

00:53 20                        DIRECT EXAMINATION

21    BY MR. CHAKRAVARTY:

22    Q.   Good morning, Mr. Fierabend.

23            MR. CHAKRAVARTY:  Can we call up the next exhibit?

24    This is actually 739.

25            THE COURT:  All of these exhibits you're intending to

 1    use are in evidence?

 2              MR. CHAKRAVARTY:  Yes, they should be in, your Honor.

 3              THE COURT:  All right.  Are the jurors getting an

 4    image?

 5    BY MR. CHAKRAVARTY:

 6    Q.   And, Mr. Fierabend, is this another -- other information

 7    from Yahoo?

 8    A.   Yes.

 9    Q.   And then I just wanted to highlight.  Can you just read

00:54 10   those?

11    A.   It says, "Other identities:  Ibnul_Khattab82," in

12    parentheses it says "Yahoo! Mail:  Tariq.Mehanna,"

13    full name --

14    Q.   Can you read that?

15    A.   Full name:  Mr. Tariq Mehanna.

16    Q.   All right.

17              MR. CHAKRAVARTY:  Could we go to Exhibit 572, please.

18    Q.   Is this a chat on June 22nd of 2006 --

19    A.   Yes.

00:55 20   Q.   -- between the defendant of Ahmad Rashad?

21    A.   Yes.

22    Q.   And Ahmad Rashad said, "Did you see the doctor?"

23              MR. CHAKRAVARTY:  Next page, please?

24    Q.   "It was a short one.  He is coming with another one for

25    blue man.

1         "How is the reading going?"

2    A.   "100 percent."

3         MR. CHAKRAVARTY:  Can we go to page 4, please?  Can we

4    highlight that as we read?

5    Q.   And then Rashad said, "I found the 'Book of Muj' by

6    Basayav," and then he is attempting to send a link?

7    A.   "Link, man.  I don't want it saved on my comp."

8    Q.   "Sorry, man.  The written.  I don't have a link to it."

9    A.   "It's on Maqdisi's site, I think.  I'll open it from

00:56 10  there.  I'm trying to keep my comp free from any stuff," wink.

11   Q.   "Laugh out loud.  I deleted a lot."

12   A.   "Yeah, you don't know when they might come."

13        MR. CHAKRAVARTY:  All right.  Go back to Exhibit 537,

14   please?

15   Q.   Is this a chat session between the defendant and Abu-Saqr

16   on April 8, 2006?

17   A.   Yes.

18        MR. CHAKRAVARTY:  Next page, please?  Can we highlight

19   that and read that?

00:56 20  Q.   "Peace be upon you.  Do you have this book?"  And

21   translated, "The Researcher of the Ruling on the Killing of the

22   State Intelligence Members and Officers?"

23   A.   "And peace be upon you.  Ah-ha, no.  It was on Maqdisis

24   but I never dloaded it."

25   Q.   "Okay.  This?  The debate between the monotheism soldiers

1  and the polytheism soldiers and criticism?"

2  A.   "No, not that either.  I erased all of those stored books

3  off my hard drive since, you know."

4  Q.   "Okay.  One of the guys had downloaded the whole site.  It

5  would be good to do that again."

6  A.   "Yeah, when it comes up, Allah willing."

7          MR. CHAKRAVARTY:  Exhibit 578, please?

8  Q.   Is this a stored chat session between the defendant and

9  Ahmad AS on February 21, 2006?

00:57 10  A.   Yes.

11          MR. CHAKRAVARTY:  If we could go to page 2, please?

12  Can we highlight that?

13  Q.   There's a link sent, and then Ahmad AS says, "Do you have

14  the Umar Al Hadeed vid?"

15  A.   "Not for long."

16  Q.   "Can you send it to me?  Wait.  In AIM."

17  A.   "Just get it from online."

18  Q.   "Can you send me the link?"

19  A.   "Brother, come on.  Did you like" --

00:58 20  Q.   "Laugh out loud.  What's wrong?"

21  A.   -- "not hear anything I told you last week?"

22  Q.   "Yeah, but you're silly anyway.  You'd probably just email

23  it to Bri directly."

24  A.   "Yeah, but this is a bit more serious.  Haha.  I called a

25  lawyer today."

```
 1   Q.   "And?"

 2   A.   "She was, like, so tell me, have you been involved in

 3   anything?"

 4   Q.   "Laugh out loud.  What did you say?"

 5   A.   "The truth:  No."

 6   Q.   "I know.  But you could have said something funny.  'It

 7   depends.  Are you cute?  If so, then yes.'  Why did you talk to

 8   the lawyer?  Maybe they won't bother again, Allah willing."

 9   A.   "What are you talking about?  They told me they will call

 10  to arrange another meeting this week."

 11  Q.   "What did you say?"

 12  A.   "Actually, it wasn't me who spoke to them.  It was my

 13  mother."

 14  Q.   "Hmm.  I wonder why they want to talk to you?"

 15  A.   "Cause they want young captured women.  In any case, I

 16  don't think it's a good idea to meet them again without a

 17  lawyer present."

 18        MR. CHAKRAVARTY:  Next page.

 19  Q.   Read that portion?

 20  A.   "Cause so far, they've been nice and calm.  Allah knows

 21  what else they have up their sleeves."

 22  Q.   "I wonder if they visited kzz."

 23  A.   "I really, really doubt it."

 24  Q.   "Why?  They don't know if someone has 'changed.'"

 25  A.   "They'd probably go to offer him a job."
```

```
 1  Q.   "I wonder if they want to talk to you cause they want to

 2  ask you about someone so they want to scare you into saying

 3  false things."

 4  A.   "I doubt it."

 5  Q.   "Well, they've done it in the past."

 6  A.   "I really don't know what they want."

 7  Q.   "(Not with you.)"

 8       MR. CHAKRAVARTY:  Go to Exhibit 722, please.

 9  Q.   Is this a chat session between the defendant and Taimur on

10  April 24, 2006?

11  A.   Yes.

12       MR. CHAKRAVARTY:  Next page, please.  Would you

13  highlight that?

14  Q.   "Can you delete this thread?  It's not needed anymore."

15  And then Taimur sends a thread that's

16  http://www.at-tawheed.com/forums, and then some more part of

17  the thread.

18  A.   "Peace be upon you.  Sure.  Any reason?"

19  Q.   "I got the list of speakers already."

20  A.   "Brother, it is better not to state where you live on the

21  boards," wink.

22  Q.   "Oh, did I state that?"

23  A.   "USA.  Don't give any hints."

24  Q.   Oh, snap.  My bad.  I totally didn't raelize that.

25  Realize*.  Quick.  Burn that thread."
```

00:59 (line 10)
01:00 (line 20)

```
 1    A.   "It's off.  Also, if you can use a proxy server when
 2    accessing T, it would be better."
 3    Q.   I'm sorry.
 4         MR. CHAKRAVARTY:  How do we extend that?
 5    Q.   Can you just read that line again?
 6    A.   "If you can access a proxy server when accessing TP, it
 7    would be better."
 8    Q.   "I used to have a proxy server.  I just gotta set it up
 9    again."
10    A.   "It's not necessary" --
11    Q.   "Bro, before I used to be madd anony" --
12    A.   -- "but it helps."
13    Q.   -- "and then my motherboard crashed and chaos began.  I
14    used to have this program which could tell incoming IPs on your
15    PC.  You would be surprised.  You have any good proxy servers
16    you use?"
17    A.   "I use a program called Tor which basically finds you a
18    working proxy and replaces it instantly with another one as
19    soon as it is expired."
20    Q.   "I used to have a lot of good ones.  I backed all my
21    previous software up.  Also, for the brothers what have 'stuff'
22    on their comp" --
23         MR. CHAKRAVARTY:  Next page, please?
24    Q.   -- "I would recommend them to back it up on DVDs or buy an
25    external hard drive and delete it from the comp perm."
```

1    A.   "Yeah."

2    Q.   "I'm doing it this week, inshallah.  Do you have configure

3    [sic] anything?"

4              MR. CHAKRAVARTY:  Exhibit 508, please?

5    Q.   Is this a chat session between the defendant and Abu

6    Mundhir?

7    A.   Yes.

8    Q.   And this is dated Tuesday, February 21, 2006?

9    A.   Yes.

01:02 10          MR. CHAKRAVARTY:  Can we highlight that, please?

11   Q.   "As-Salamu 'alaykum."  Sorry.  "Peace be upon you."

12   A.   "Peace be upon you, bro."

13   Q.   "Brother, can you get this program?"

14   A.   "What program?"

15   Q.   And Abu Mundhir sends him a link to www.secway.fr, and

16   then there's more.

17   A.   "What does it do?"

18   Q.   "Encrypts your MSN."

19   A.   "Okay.  But I'm using MSN through Trillian."

01:02 20   Q.   "It's okay."

21   A.   "Will it still work?"

22   Q.   "It will still do it, just select, when you install, MSN

23   Windows Messenger, in Trillian."

24   A.   "Okay."

25   Q.   "Then I will get you some other programs."

  1   A.   "What the heck is this cipher selection stuff?"

  2   Q.   "Cipher selection?"

  3        Then the chat ends, and then it starts up about a minute

  4   later.

  5   A.   "So it's now automatically on Trillian?"

  6   Q.   "You have to log on to the simp program.  Did you log into

  7   it?  It asks you for a password."

  8   A.   "I installed it.  Hmm."

  9   Q.   "You have to log in" -- excuse me.  "You have to log in to

01:03 10   it."

 11   A.   "Is that at the cipher selection screen, step 2?"

 12   Q.   "Yeah.  I think you have to go through the steps."

 13        MR. CHAKRAVARTY:  The next page, please?

 14   Q.   "It asks you to put in a password, then it asks you to

 15   move your mouse to make a key.  After you have done all that

 16   then you log into it.  We all have it.  Aboo has it also."

 17   A.   "If you don't want a password just don't put one."

 18   Q.   "No, you have to.  Just put any password."

 19        Then the chat ends and starts later.  Less than a minute

01:03 20   later Abu Mundhir states, "Test.  Accept my key.  Cool.  You

 21   got it now."

 22   A.   "So it is only applicable to those with the program or

 23   what?"

 24        MR. CHAKRAVARTY:  Can we have this highlighted as

 25   well?

```
 1   Q.    "Well, it's best if they have it, then they don't get

 2   anything.  It's 128-bit encryption both ways.  Like if you

 3   invite someone into this conversation who doesn't have it, he

 4   won't see anything.  You can test by inviting anyone who

 5   doesn't have it and see."

 6   A.    "Anyway, how have you been, man?"

 7   Q.    "Praise be to Allah."

 8   A.    "I swear, I miss you guys."

 9   Q.    "Yeah, me too, man.  Was worried.  Asked Aboo S if he had

01:04 10   seen you."

11   A.    "Did you see the PDF I sent you?"

12   Q.    "PDF or the article about those shabab," or young men?

13   A.    "I sent you a PDF afterwards" --

14             MR. CHAKRAVARTY:  Next page, please?

15   Q.    Continue?

16   A.    -- "of the charges.  You didn't see it?"

17   Q.    "No, I don't want any PDF, laugh out loud, right now.  I

18   know about them cause" --

19   A.    There appears to be a link that was sent,

01:05 20   www.msnbc.msn.com.

21   Q.    "I saw it on CNN with the attorney" --

22   A.    "Oh, okay."

23   Q.    -- "general live when he was giving them out."

24   A.    "That is their pic."

25   Q.    "Yeah.  Anyway, what about them?"
```

```
        1    A.   "Is this prog applicable to AIM as well?"

        2    Q.   "I'm not sure.  I think they have a version for AIM on

        3    their site."

        4    A.   "Rats.  For those young men."

        5    Q.   "Yeah.  Let's get you some more programs.  You have

        6    Firefox, right?  Sorry" -- then he signs off and signs right

        7    back on.  "Sorry.  If you didn't get my last message, I asked

        8    if you have Firefox."

        9    A.   "Yes."

01:05  10    Q.   "Okay.  Download this program," and then there's a link to

       11    tor.eff.org/download.

       12    A.   "What is it?"

       13    Q.   "It's a good proxy encryption program."

       14    A.   "Auto proxy?"

       15    Q.   "Better.  It goes through multiple servers with ssl

       16    encryption."

       17         MR. CHAKRAVARTY:  I'm sorry.  Next page.

       18    Q.   "Encryption."  Then he signs off and he signs back on.

       19         MR. CHAKRAVARTY:  Can you highlight this, please?

01:06  20    A.   "Is it fast, though?"

       21    Q.   "Sorry.  I'm using it on MSN now.  Same program."  And

       22    then an emoticon of some sort.

       23         "Brother, it's about safety right now, laugh out loud.

       24    It's not that fast.  It's normal."

       25    A.   "Just dl the first one."
```

```
 1    Q.   "Yeah.  Then I'll show you what to do."

 2    A.   "Which, the 17 or 14?"

 3         MR. CHAKRAVARTY:  All right.  I'm going to skip the

 4    next page and go to the next page, page 5, please.  I'm sorry.

 5    Can I have page 5?  Highlight this and continue reading.

 6    Q.   "Click add then select first option, not anonymous."

 7    A.   "Okay."

 8    Q.   "Okay?  "Name it tor, small letters, and in all the fields

 9    except the last one write 'localhost port 8118.'"

01:07 10   A.   "Just write out 'localhost'?"

11    Q.   "Yes."

12    A.   "Okay.  Done."

13    Q.   "Okay.  Press okay.  Beside proxy is the pull down menu.

14    Select tor."

15    A.   "Okay."

16    Q.   "Then press apply.  The P in your task bar should go

17    green."

18    A.   "Yeah, yo."

19    Q.   "Okay.  Cool.  Now go here to see if it's working," and

01:07 20   then there's a link to something called iplocator.htm.

21    A.   "We are unable to locate the address 1" -- series of

22    dashes -- "8 at this time."

23    Q.   "Cool."  And then "Y."  "No more searching for proxies.

24    Okay.  A tip."

25    A.   "Wait.  I refreshed and it says the address."
```

       1    Q.   "Your local one or another one?"  I'm sorry.

       2    A.   I didn't see where we left off here.  It's unhighlighted.

       3         MR. CHAKRAVARTY:  Can you go back quickly to the last

       4    page?  I'm sorry.

       5    Q.   The last two lines, "Your local one or another one?"

       6         MR. CHAKRAVARTY:  Now page 6, please.

       7    A.   "Mine."

       8    Q.   "Maybe it's off."

       9    A.   "No."

01:08  10    Q.   "Make sure the tor is selected and press apply."

      11    A.   "It is.  One sec."

      12    Q.   "Do it again, okay?"

      13    A.   "What the heck."

      14    Q.   "?"

      15    A.   "What the -- not working."

      16    Q.   "Weird.  Remove it.  Do you see delete there?  And re-put

      17    in the info again."

      18    A.   "Okay.  It works."

      19    Q.   "Cool."

01:08  20    A.   "Ah, well.  Good-bye fast net."

      21    Q.   "Laugh out loud."

      22    A.   "Bye-bye."

      23    Q.   "Use download manager" --

      24    A.   "Hey, you hero."

      25    Q.   -- "to download.  Okay.  For sensitive sites add this in

```
     1   front of the site.  So use that.  And then go here also," and

     2   there's a link to anonymouse.org, "and put in the address.

     3        "Some more programs?"

     4   A.   "What else is there?"

     5   Q.   "Which firewall do you use?"

     6   A.   "I don't know."

     7   Q.   "Maybe you don't have any.  So let's get you a firewall

     8   and a good anti-virus and anti-key logger."

     9            MR. CHAKRAVARTY:  Next page, please.

01:09 10   A.   "I already have anti-virus."

    11   Q.   "Okay.  Which one?"

    12   A.   "Norton."

    13   Q.   "That sucks."

    14   A.   "Hehe.  Okay."

    15   Q.   "It doesn't detect anything."

    16   A.   "I use this site."

    17   Q.   "Home, whatever."

    18   A.   "Trendmicro."

    19   Q.   "Yeah.  I'll get you a good program.  I'll upload them on

01:09 20   yousendit."

    21   A.   "Okay.  May Allah reward you for it."

    22            MR. CHAKRAVARTY:  Exhibit 587 now?

    23   Q.   This conversation is between the defendant and Ahmad AS on

    24   April '06 -- April 6, 2006?

    25   A.   Yes.
```

```
 1  Q.   "You there?  Do I have to register it?"

 2  A.   "No."

 3  Q.   "What is this cipher selection stuff?"

 4  A.   "You have to go through steps, put in a password, et.

 5  It's at step 2, right?"

 6  Q.   "Yup.  I mean" --

 7  A.   "Okay.  So go through all the steps, then test the key."

 8  Q.   "So what do I put in for RSA, 2048?"

 9  A.   "Any password."

10  Q.   "Do I have to remember it?"

11  A.   "Yeah..."

12        MR. CHAKRAVARTY:  Next page, please.

13  Q.   Then the session closes and starts right back up less than

14  a minute later.

15        MR. CHAKRAVARTY:  Would you enbolden that, please?

16  I'm sorry.  Highlight.

17  A.   "Okay.  Worked now.  For the autoproxy link:

18  Http://tor.eff.org/download.  Dl the 17."

19  Q.   "Does the simp window always stay open?"

20  A.   "No, when you put your password in it goes away."

21  Q.   "Is this for MSN or for surfing?"

22  A.   "The last link is for surfing.  Did you dl it?"

23  Q.   "Do you use a proxy with MSN?"

24  A.   "No, just that encryption.  Sorry.  That tor is also for

25  MSN as well as surfing."
```

```
 1   Q.   "I'm trying to dl it.  It's taking forever."

 2   A.   "Make your new email adhdhabbah@yahoo.com."

 3   Q.   "Laugh out loud.  It doesn't look like it's working right

 4   now."

 5   A.   "Hmm."

 6   Q.   "Which one do I need?  Tor and Privoxy and TorCP Bundle or

 7   Windows just Tor (for experts)?"

 8   A.   "First one with proxy."

 9   Q.   "Maybe a lot of downloads right now.  I guess you'll have

10   to teach me this at another time."

11   A.   "Hmm.  Okay.  The Jews..."

12   Q.   "I was thinking the same thing.  So this autoproxy will

13   automatically set up a proxy for my web browser and MSN?"

14         MR. CHAKRAVARTY:  Next page, please?

15   A.   "Yes.  And it constantly changes it."

16   Q.   "Which web browser?"

17   A.   "Firefo."

18   Q.   "Constantly changes it?  But that isn't really good

19   because for a proxy to be good, it has to be from a country

20   that the infidels are not at peace with."

21   A.   "Yeah, every few hours it's in China, then Vietnam, then

22   Israel, sometimes New York."

23   Q.   "Are you serious?"

24   A.   "Ya."

25   Q.   "Well, is there a way to limit it to just China, for
```

```
 1    example?"

 2    A.   "Not that I'm aware of."

 3    Q.   "Then it's better just to set up a default proxy" --

 4    A.   "Yeah, but are there any that are permanent?"

 5    Q.   -- "because what is the point of a proxy in Israel?"

 6    A.   "Brother, as long as it isn't here, that's the whole

 7    point."

 8    Q.   "No, because they just make a phone call.  'Hello,

 9    yeah...'"

01:12 10    A.   "Well."

11    Q.   "In three seconds they got the original IP.  No effort.

12    Did that bro, the third with Abu DJ, recommend this software?"

13    A.   "Not sure.  Abu Sul uses it, as does Abu Mahm."

14    Q.   "I'll install it now.  It just downloaded."

15    A.   "Okay."

16    Q.   "TorCP also?"

17    A.   "Do you see the P and the onion in your task bar?"

18         MR. CHAKRAVARTY:  Next page, please?

19    Q.   "Yeah."

01:13 20    A.   "Okay.  Now" -- and then there's a link

21    addons.mozilla.org/extensions/moreinfo.

22         "Tell me what that installs (last one)."

23    Q.   "Stumbleupon?  What last one?"

24    A.   "One sec.  No.  This one."  And he sends another link

25    add-ons.mozilla.org/Firefox/125.
```

```
      1    Q.   Then does it continue?  I'm sorry.  He says, "Done."

      2    A.   "Okay.  Now close all Firefox windows and open them

      3    again."

      4    Q.   "I did that."

      5    A.   "You should see a new option below url 'add...' et

      6    cetera."

      7    Q.   "Yup."

      8    A.   "Click add, select first option, NOT anonymous."

      9    Q.   "Then?"

01:13 10    A.   "Name it tor, small letters, and in all the fields except

     11    the last one write out localhost port 8118."

     12    Q.   "You mean localhost in the first box, 8118 in the second

     13    box?"

     14    A.   "Ya."

     15    Q.   "Except the last one?  Which last one?"

     16    A.   "Yup."

     17    Q.   "Socks proxy?"

     18    A.   "Ya.  Don't write in there.  Then press okay.  Select tor

     19    in the pull down menu.  Press apply."

01:14 20         MR. CHAKRAVARTY:  Okay.  Can we go to page 6, please?

     21    Sorry, go back to the last -- end of page 5.

     22    Q.   Ahmad AS says, "How do I set up the tor to work with MSN

     23    now?"

     24         MR. CHAKRAVARTY:  And then page 6.

     25    A.   "Go here to make sure it works."  It's a link:
```

1    Geobytes.com/Iplocator.htm.

2    Q.    "It says unable to locate."

3    A.    "Okay.  Excellent."

4    Q.    "Okay.  Now the MSN?"

5    A.    "Okay.  One sec."

6    Q.    "How do I set it up?"

7    A.    "The thing is it only works with the old version.  So what

8    version do you have?"

9    Q.    "0.1.0.17."

01:14 10    A.    "Is it an old one?"

11    Q.    "The latest stable release is 0.1.0.17 from their

12    website."

13    A.    "Well, then the simp secway encry should be good enough

14    unless you can somehow use the old one."

15    Q.    "No, cause that only hides what you said, not who said

16    it."

17    A.    "Yeah, I'm saying if you want to use the old version, then

18    it will work with tor, otherwise, the new doesn't."

19    Q.    "Well, what were you supposed to do?  This could be newer

01:15 20    than the new version you are talking about cause they've fixed

21    bugs, they say."

22    A.    "MSN?  Try going to options privacy then put in the same

23    port info you did for the switch proxy, localhost 8118, et

24    cetera."

25    Q.    "On the tor website, it says to fill that last box with

1    localhost 9050," and then he sends a link to tor.eff.org.

2    A.   "Hmm.  Try it.  See if it makes any difference."

3    Q.   "Oh, you meant the new version of MSN" --

4         MR. CHAKRAVARTY:  Sorry, the next page.

5    Q.   -- "not the new version of tor?"

6    A.   "Yeah."

7    Q.   "Because the new version of MSN does not have anyplace for

8    proxy settings."

9    A.   "Yeah."

01:15 10  Q.   "I think I got it to work with the tor."

11   A.   "MSN?"

12   Q.   "Yeah."

13   A.   A link is sent, www.break.com/index/nin64kid.html.

14        "How do you know if it works?"

15        MR. CHAKRAVARTY:  Next exhibit, 591, please?

16   Q.   Same two individuals, Ahmad AS and the defendant.  And

17   this was on April 24, 2006?

18   A.   Yes.

19        "Peace be upon you.  New tape from shaykh."  It's a link:

01:16 20  CNN.com/2006/world/meast/04/23/binLaden.tape.

21   Q.   "You there?"

22   A.   "Yeah, my brother.  Can you link me to the audio?"

23   Q.   "Is there a reason the secway is on but I don't see our

24   conversation there under authenticated?"

25   A.   "Hmm."

1   Q.   "Do you see it authenticated on your side?"

2   A.   "No."

3   Q.   "Do you see it at all?"

4   A.   "Yes, under unencrypted."

5   Q.   "Hmm.  Let me log out and re log in."

6        MR. CHAKRAVARTY:  Exhibit 673, please.

7   Q.   This is a chat between the defendant and Edgar on February

8   27, 2006?

9   A.   Yes.

01:17 10       MR. CHAKRAVARTY:  Would you highlight that?

11  A.   "Can I ask you a favor?  The computer games I gave your

12  roommate, get them back from him ASAP."

13  Q.   "What?  I didn't get that.  Brother, gotta shut down for a

14  sec.  Be right back.  Do you need to speak to me ASAP?"

15  A.   "No, I need the stuff I gave him, anything I gave him to

16  not be with him."

17  Q.   "I told him way back.  I think it's been disposed of."

18  A.   "Any way you can verify this?"

19  Q.   "But I'll ask him when he gets home."

01:17 20       MR. CHAKRAVARTY:  Next page, please?

21  A.   "Actually, my problem is not that it is disposed of.  I

22  just don't want it with him."

23  Q.   "Well, it's gone, I believe.  I made a big point of not

24  having it in the house."

25  A.   "Okay.  When he gets home tonight."

1    Q.   "I shall."

2    A.   "Wait.  Just try to find out for certain it's been X-ed.

3    If not, I want it back from him."

4    Q.   "Okay."

5    A.   "This is important."

6    Q.   "I know.  Listen, I gotta shut down for a second.  I'll be

7    back soon, Allah willing."

8    A.   "All right."

9         MR. CHAKRAVARTY:  All right.  Let's shift gears now to

01:18 10   Exhibit 596, please.

11        And, your Honor, can I use the ELMO for this one?

12   Q.   This is a chat on May 11, 2006, with Ahmad AS?

13   A.   Yes.  "Hey, dude.  You want to see that movie 'Flight

14   93'?"

15   Q.   And the chat shuts down and starts up again.

16        "No, I don't want to see that movie.  I'd rather watch

17   Baywatch.  (I'd never watch that show, obviously) but at least

18   there is more truth to that than 'Flight 93.'"

19   A.   "Ali Abu Bakr saw it."

01:19 20   Q.   "A story of a bunch of fabricated American martyrs."

21   A.   "He said it was the funniest movie he'd ever seen."

22   Q.   "Laugh out loud.  What did he say?  Why?"

23   A.   "Just the whole drama, hehe."

24   Q.   "So do you think migration is possible?"

25   A.   "You tell me."

```
 1   Q.   And then there's a conversation which I'm skipping, down
 2   to the highlighted portion?
 3   A.   "I want to get into a fight with some infidel."
 4          MR. CHAKRAVARTY:  Okay.  The next exhibit, 531,
 5   please.
 6          Back on the monitor, your Honor.
 7          I'm sorry, 351.
 8   Q.   Was this another conversation between -- an email between
 9   the defendant and Ahmad Abousamra?
10   A.   Yes.
11   Q.   Is the date of this February 21, 2003?
12   A.   Yes.
13   Q.   And is the email to -- it appears to be some websites, and
14   Abousamra was blind carbon-copied on it?
15   A.   Yes.
16          MR. CHAKRAVARTY:  Would you highlight this?
17   Q.   Can you just read this email, please?
18   A.   "Assalaamu 'alaykum.
19      "I noticed that your sites are filled with fataawa
20   forbidding the use of 'amaliyyat istishhaadiyyah (martyrdom
21   operations) or what is commonly referred to as 'suicide
22   bombings.'
23      "However, in Volume 2, page 119, Saheeh Mawaarid
24   ath-Thimaan, after explaining the popular hadeeth of Abee
25   Ayyoob al-Ansaari, regarding the saying of Allaah Tabaaraka wa
```

01:20 at line 10
01:20 at line 20

1   Ta'aala" --

2   Q.   Is that something else in Arabic?

3   A.   He said something else in Arabic.

4   -- "said:  'And in this popular story is evidence for what

5   is known today as "suicide operations," which some of the youth

6   of Islaam go about doing to the enemies of Allaah, but for this

7   act (to be permissible) are certain conditions, and they are:

8   For this action to be solely done for the face of Allah and to

9   give victory to the religion of Allah, not for showing off, or

01:21 10   reputation, or bravery, or being depressed from life.'

11   "And this book was published after his death.

12   "Is it possible that you could include this on your site,

13   or at least in the next editions of 'Terrorism, Suicide

14   Bombings and Hijackings in Islaamic Law' or 'In Defence of

15   Islaam'?"

16   Arabic saying, "and please let me know if you will do

17   this.

18   "Your brother, Tariq."

19   MR. CHAKRAVARTY:  Exhibit 555, please.

01:22 20   Q.   Was this a chat session between the defendant and Ahmad

21   Rashad again on March 13, 2006?

22   A.   Yes.

23   MR. CHAKRAVARTY:  If you would go to page 2, please.

24   Can we highlight this and read this?

25   Q.   Ahmad Rashad said, "Oh, did you read what they wanted to

1   do?"

2   A.   "I can't remember, man.  What?"

3   Q.   "Like jihad camps."

4   A.   "Yeah.  But keep in mind they also arrested some of the

5   mujahideen a few years ago on behalf of the U.S."

6   Q.   "Yeah, but I guess time *[sic]* if they are next they would

7   not do that."

8   A.   "Hehe.  Yeah.  I swear, man, we are living in crazy

9   times."

01:22 10   Q.   "Yeah, man.  I wish people would wake up."

11   A.   "But you know that website, islammemo?  Don't trust

12   everything you read on it."

13   Q.   "Yeah, I know.  I heard this from different websites.

14   Hey, man, 15 infidels died today."

15   A.   "Hehe.  Yeah, yesterday.  Four in Afghanistan."

16   Q.   "Yeah, man.  It's crazy."

17   A.   "Workers."

18   Q.   "Praise be to Allah.  Ten al chech."

19   A.   "Yeah.  God bless, it's like a combined effort."

01:23 20        MR. CHAKRAVARTY:  Go to 36 -- excuse me.  575, please.

21        MR. CARNEY:  Your Honor, I would ask in regard to the

22   last exhibit that they continue reading to the bottom of the

23   next page under the rule of verbal completeness of what these

24   people were talking about.

25        MR. CHAKRAVARTY:  Your Honor, I have no problem with

1   that.

2           THE COURT:  All right.  Go ahead.  The bottom of the

3   next page, is that what you said?

4           MR. CARNEY:  1029 would be the Bates number in the

5   bottom right where I think he stopped.

6           THE COURT:  All right.  All right.

7   BY MR. CHAKRAVARTY:

8   Q.   I'm sorry.  Can you see that?

9   A.   Yes.

01:24 10   Q.   Would you keep reading?

11   A.   "Hey, man.  You still interested in that prison program?"

12   Q.   "Yeah, man."

13   A.   "There is a prison in Shirley which is near you that is in

14   desperate need of help.  This is the guy's email:

15   GMcCann@doc.state.ma.us, who is to be contacted to tell you

16   what the deal is."

17   Q.   "Are you going to teach converts or what exactly?"

18   A.   "Sorry.  This guy:  WTMilhomme@doc.state.ma.us."

19   Q.   Go to the next page and finish the defendant's statements.

01:24 20   Go on.

21   A.   "Yeah, you just teach them about Islam, how to pray,

22   doctrine, et cetera.  Whatever they want to know, you teach

23   them.  They don't have anybody."

24           MR. CHAKRAVARTY:  The next exhibit, 575, please?

25   Q.   Is this another chat between the same two individuals on

1    March 4th --

2            MR. CARNEY:  I thought the prosecutor would read to

3    the bottom of that page to complete the chats, that portion of

4    the chat.

5            MR. CHAKRAVARTY:  I'm happy to read as much as we

6    cannot do on cross.  I'm happy to do it now, your Honor.

7            THE COURT:  Okay.

8            MR. CHAKRAVARTY:  You want me to read the whole thing?

9            MR. CARNEY:  Please.

01:25 10  BY MR. CHAKRAVARTY:

11   Q.   "Is Shirley close to Lowell or close to what?"

12   A.   "Just send that guy Bill an email and he'll tell you

13   what's the closest to you and what you can do to help."

14   Q.   "The second email is the right one?"

15   A.   "Yes.  His name is William.  Just tell him you know me and

16   that you wanna join us."

17   Q.   "Okay.  I just sent them an email.  I went to this

18   Muslim/Jew comedy show in Boston with MIT MSA students and

19   Ahmed on Sunday."

01:26 20  A.   "Hehe he.  What was that about?"

21   Q.   "It was okay.  Kind of funny but I did not like that the

22   fact that the Muslim comedian made fun of the prophets Moses

23   and Jesus and the day of judgment.  Other than that it was

24   okay."

25   A.   "What the.  Made fun of them?  How?  Man, now you're

1    making me mad.  Please explain."

2    Q.    "Yeah, man.  I don't care that he makes fun of Muslims and

3    Arabs, but he was like, 'Moses was talking to God through the

4    burning plant a/k/a weed,' stuff like that.  I did not see the

5    need of it.  The Jewish guy did not talk about any of that but

6    the Muslim guy did.  And he knew that would offend Muslims

7    because he said, 'I probably offended the Muslims now.'"

8    A.    "I seek refuge in Allah.  Man, this is infidelity.  Bigger

9    infidelity.  Like whoever said that is not a Muslim.  What the

01:26 10    heck?"

11   Q.    "He did not seem like much of one."

12   A.    "Who was this piece of filth?"

13            MR. CARNEY:  Do the next page, please?

14   BY MR. CHAKRAVARTY:

15   Q.    "He was masry," Egyptian.  "I thought that was sad."

16   A.    "May the lord take him.  I can't believe that.  The Jew

17   stinking had enough respect not to say it, but a Muslim went

18   ahead and did?  What did he say about Isa?"

19   Q.    "Yeah, man.  We were like he was funny.  Why would he go

01:27 20   there?  I forgot exceptly [sic] but it's a joke like two Jew go

21   to each other, one goes my son become Christian and the other

22   was like me too.  So they were like, let's talk to God and ask

23   him for help.  And God said, you know what, my son turned

24   Christian too."

25   A.    "I seek refuge in Allah.  What filth.  What utter filth."

```
 1   Q.   "Yeah, Achman.  I was set up."

 2   A.   "This was sponsored by MIT MSA?"

 3   Q.   "No, but they helped with it."

 4   A.   "Was Suhayl there?"

 5   Q.   "Now, it was like at Berkley Center.  Like the other

 6   Muslim comedian I saw before we [sic] fine.  But this one I

 7   don't know why he would go there.  And he knew too."

 8   A.   "Because he is Satan in disguide.  Disguide.  Disguise."

 9   Q.   "They all want money."

10        MR. CARNEY:  Thank you.

11        MR. CHAKRAVARTY:  Exhibit 575, please.

12   BY MR. CHAKRAVARTY:

13   Q.   This is a chat again with these same two individuals on

14   March 4th of 2006?

15   A.   Yes.

16        MR. CHAKRAVARTY:  Could we highlight that?

17   Q.   Rashad sends a link to a Islammemo.cc.

18   A.   "Yeah.  This is the problem with politics."

19   Q.   "Yeah.  Some people say they have no their way [sic] since

20   the Arab gov don't wanna help.  I don't know, man.  It's not

21   easy.  Four infidels died today."

22   A.   "Not enough."

23   Q.   "I know."

24        And then is there something sent to Rashad?

25   A.   Yes.
```

1   Q.   "Oh, that's a good one."

2        And then does Rashad try to send something to the

3   defendant?

4   A.   Yes.

5   Q.   And is that "Let's go to Jihad - Special Collection.zip"?

6   A.   Yes.

7   Q.   "This is eight full tapes volume of nasheeds called 'Let's

8   go to Jihad.'  It's real good."  Sorry.

9        MR. CARNEY:  Your Honor, the translated word of what

01:29 10   "nashid" means is in the text.  I would -- I think that

11   Mr. Chakravarty inadvertently skipped it.

12        MR. CHAKRAVARTY:  That's right, your Honor.  Nashids

13   are chants, called "Let's go to Jihad."

14        MR. CARNEY:  May the line just be read again with that

15   word substituted?

16   BY MR. CHAKRAVARTY:

17   Q.   "This is eight full tapes volume of chants called 'Let's

18   go to Jihad.'  It's real good."  And is that received by -- in

19   the C:\documents and settings\Tariq\my documents\

01:30 20   nashid\collection?

21   A.   Yes.

22        MR. CHAKRAVARTY:  Next exhibit?  367, please.

23   Q.   Is this an email from the defendant to the defendant's own

24   email address with a blind carbon copy to three additional

25   email addresses?

```
 1   A.   Yes.
 2   Q.   And is the date of this November 10th of 2004?
 3   A.   Yes.
 4   Q.   And does it appear to contain a forwarded message, which
 5   itself is an email from the defendant to the defendant's own
 6   email account on November 10, 2004?
 7   A.   Yes.
 8   Q.   And are there a series of attachments to this email?
 9   A.   Yes.
01:31 10   Q.   I'd just read these, and ask if I read them correctly.
11   Ex- --
12   A.   Explos1.jpg, mujahid1.jpg, masjid1.jpg.
13        MR. CHAKRAVARTY:  Next page, please?
14   A.   Arrest1.jpg, mujahid2.jpg, mujahid3.jpg, injured0.5.jpg,
15   injured1.jpg, injured2.jpg, dead1.jpg.
16        MR. CHAKRAVARTY:  Next page, please?
17   A.   Dead2.jpg, crying.jpg, sign.jpg.
18   Q.   And then are the next several -- are those attachments,
19   those jpg image files -- are those attached as 367A through
01:32 20   367M?
21   A.   I still see the --
22   Q.   Okay.  It's still there?  Is sorry.
23        MR. CHAKRAVARTY:  Can we go to 367A, please?
24   A.   Do you want me to describe the photo?
25   Q.   No.  I think it speaks for itself.
```

1        The uniform on the right, do you recognize that uniform?

2   A.   Yes.

3   Q.   What is that uniform?

4   A.   That appears to be an American soldier.

5        MR. CHAKRAVARTY:  367B, please?  367C, please?  367D,

6   please?  367E, please?  367F?  -G, please?  -H, please?  -I?

7   -J?  -K?  -L?  And -M, please?

8            (Exhibits published to the Court and jury.)

9            MR. CHAKRAVARTY:  I believe that's the last one.

01:34 10  Exhibit 368, please.

11  Q.   Agent Fierabend, is this an email from the defendant to

12  someone named Abu Kufta, and there's an email address there at

13  anas003@yahoo.com?

14  A.   Yes.

15  Q.   And is this dated November 5th of 2003?

16  A.   Yes.

17  Q.   And as in the last case, does this contain an attachment?

18  A.   It says "siwak.jpg."

19  Q.   So there doesn't appear to be any other content to this

01:35 20  message?

21  A.   I don't see anything else.

22  Q.   I'm sorry.  Except for the -- I guess the boilerplate that

23  Yahoo puts on their emails.

24  A.   Yes.

25            MR. CHAKRAVARTY:  Can we go to that image, 368A,

1   please?

2   Q.   Do you recognize that area on the map?

3   A.   Yes.

4   Q.   What does it appear to be?

5   A.   It appears to be the Pentagon in Washington, D.C.

6        MR. CHAKRAVARTY:  Exhibit 390, please.

7   Q.   Does this appear to be an email from the defendant to

8   Ahmad Abousamra dated February 20, 2003?

9   A.   Yes.

01:36 10   Q.   And does this appear to be a forward of something named

11   Jamal Badawi's 'Eed khutbah?

12   A.   Yes.

13        MR. CHAKRAVARTY:  And I'm going to ask you to turn to

14   page 7, please, and highlight this paragraph and ask you to

15   read it.

16   A.   "Then in 1998, the mujahideen warned America to cease

17   their support to the Jews and to leave the land of the Two Holy

18   Sanctuaries, but the enemy refused to heed this warning, so the

19   mujahideen, with the ability from Allah, smashed them with two

01:36 20   mighty smashes in East Africa.  Then again America was warned,

21   but she refused to pay attention to the warnings, so the

22   mujahideen destroyed the American destroyer, the USS Cole, in

23   Aden, in a martyrdom operation, striking a solid blow to the

24   face of the American military, and at the same time exposing

25   the Yemeni government as American agents, similar to all the

1    countries in the region."

2    Q.   And this is a several-page document.  Is that right?

3    A.   Yes, I believe so.

4    Q.   I'll highlight that paragraph and ask you to keep reading.

5    A.   "On the blessed Tuesday 11 September 2001, while the

6    Zionist-American alliance was targeting our children and our

7    people" --

8            THE COURT:  Just a minute.

9            MR. CARNEY:  I would ask that the paragraph between

01:37 10   the previously read one and that one be read so the context can

11   be clear, please.

12           MR. CHAKRAVARTY:  That's fine, your Honor.

13           THE COURT:  Okay.  Go back one paragraph.

14           THE WITNESS:  "Following that, the mujahideen saw the

15   black gang of thugs in the White House hiding the truth, and

16   their stupid and foolish leader, who is elected and supported

17   by his people, denying reality and proclaiming that we (the

18   mujahideen) were striking them because we are jealous of them

19   (the Americans), whereas the reality is that we are striking

01:38 20   them because of their evil and injustice in the whole of

21   Islamic world, especially in Iraq and Palestine and their

22   occupation of the land of the Two Holy Sanctuaries.  Upon

23   seeing this, the mujahideen decided to teach them a lesson and

24   to take the war to their heartland.

25           "And on the blessed Tuesday 11 September 2001, while

         1    the Zionist-American alliance was targeting our children and
         2    our people in the blessed land of Al-Aqsa, with American tanks
         3    and planes in the hand of the Jews, and our people in Iraq were
         4    suffering from the America's sanctions upon them, and the
         5    Islamic world was very far away from establishing Islam
         6    properly.  While all of this was taking place and the Muslims
         7    were in a very miserable and disheartened state -- except those
         8    upon whom Allah had mercy -- and from their injustice, darkness
         9    and aggression being carried out by the Zionist-American
01:38   10    alliance.  While the nation of Uncle Sam was carrying out all
        11    this without any care or" --
        12              MR. CHAKRAVARTY:  Next page.
        13    BY MR. CHAKRAVARTY:
        14    Q.   Read the first sentence?
        15    A.   -- "consideration, then came the youths with disheveled
        16    hair and dusty feet, those who were wanted and pursued all over
        17    the world."
        18              MR. CHAKRAVARTY:  Go to the next page.
        19    Q.   Can you read that?
01:39   20    A.   "By the grace of Allah, there are many examples of these
        21    champions in the Muslim Ummah, but most of them have been
        22    restrained, so we have to cooperate together to release these
        23    difficulties and restrictions so that they march towards jihad
        24    in the path of Allah because jihad is the way to honor this
        25    Ummah and provide it security."

1            MR. CHAKRAVARTY:  Exhibit 721, please.

2      Q.    Is this a chat session between the defendant and Taimur on

3      April 19th of 2006?

4      A.    Yes.

5            MR. CHAKRAVARTY:  Let's go to page 4, please.

6      A.    "Opening... Nice, man.  From Pakistan, I assume.  Hehe."

7      Q.    "Yeah.  Most likely."

8      A.    "The 'My Faith is Perfect' gives it away."

9      Q.    "Laugh out loud."

01:40 10   A.    "Did you download 39?"

11     Q.    "Yeah.  I haven't read it yet though.  I actually want to

12     read the one by Shaykh Abu Q regarding the democracy."

13     A.    "Yes.  It's not a book though.  It's a recording."

14     Q.    "Oh, even better."

15     A.    "He did it for TP personally."

16     Q.    "Nice.  There's another one about security or something."

17     And then Taimur sends a link to at-tawheed.com?

18     A.    Yeah.

19     Q.    "How was that?"

01:40 20   A.    "Here are all the TP releases," and it's a link to

21     muwahhideen.com/articles/books.html.

22     Q.    "Bro, where did those shaykhs graduate from?"

23     A.    "Many of them are self-taught."

24           MR. CHAKRAVARTY:  Next page, please.

25     A.    "Like these guys are all considered to be scholars of the

1   mujahideen."

2   Q.   "Yeah, man.  Since no one else wants to do it.

3        "Yo, man.  This kid in my school, Muslim kid, is joining

4   the Navy.  I explained to him nicely and then we got into

5   debates."

6   A.   "Oh, great."

7   Q.   "And I asked him why.  He said, 'I'm saving the Ummah,'

8   the nation, 'from terrorists.'"

9   A.   "Punch his teeth out."

01:41 10   Q.   "I was about to, man.  I don't know what to say to him.

11   I'm like, 'Bro, you're going to go kill your own brothers?'"

12           MR. CHAKRAVARTY:  Go to the next exhibit.  Exhibit

13   688, please.

14   Q.   Is this a chat session between the defendant and Insaf on

15   May 12, 2006?

16   A.   Yes.

17   Q.   And Insaf says, "I have been offered a job with this

18   company."

19           MR. CHAKRAVARTY:  Next page, please?  Highlight that.

01:42 20   Q.   "Not related to government or anything like that."

21   A.   "Aha."

22   Q.   "Not working for the government or anything like that."

23   A.   "But it's that company itself?"

24   Q.   "But the fact that one of their clients is the taghut," or

25   idol.

```
 1   A.   "Yeah."

 2   Q.   "A idol."

 3   A.   "I am not going to give you a legal opinion (Islamic

 4   religion) but" --

 5   Q.   "Do you think that's an issue?"

 6   A.   -- "if I were you" --

 7   Q.   "Right."

 8   A.   -- "I would not work for them.  But that's me."

 9   Q.   "Right."

01:42 10   A.   "And Allah knows best.  The companions of the prophet

11   would avoid doubtful issues."

12   Q.   "I'm about to pray, ask for guidance from Allah.  I know a

13   brother who works there.  Allah says, 'And do not help each

14   other in sin and transgression.'"

15   A.   "Yes, exactly.  Even if your work indirectly helps them to

16   help the government, then stay away from it."

17        MR. CHAKRAVARTY:  And then the next page?

18   Q.   The chat ends but then it starts right back up again.

19   A.   "Hehe.  Well, like I said" --

01:43 20   Q.   "Allah knows.  Screw the temptation."

21   A.   -- "you might want to do a little research" --

22   Q.   "Destroy it before it even gets to you."

23   A.   -- "into exactly how your work is related to the

24   government stuff.  Ask the company."

25   Q.   "I don't deal with them at all."
```

```
 1   A.   "I know you don't deal with them but maybe your work" --

 2   Q.   "I spoke to the brother yesterday."

 3   A.   -- "somehow benefits them.  So find that out."

 4   Q.   "Yeah, that probably will.  I mean, I'm supporting the

 5   company."

 6   A.   "Yeah.  Heh."

 7   Q.   "The resources that they need to help their clients" --

 8   A.   "Right.  See" --

 9   Q.   -- "is what I'm responsible for."

10   A.   -- "that is an indirect form of assistance.  But,

11   brother" --

12   Q.   "But then again" --

13   A.   -- "I think" --

14        MR. CHAKRAVARTY:  Next page, please?  Highlight that,

15   please.

16   Q.   -- "same thing with almost everything gere."

17   A.   -- "you already have your answer.  You didn't need to ask

18   me.  You already feel uneasy about it."

19   Q.   "My taxes, et cetera, all go to the taghut," idol.  "Yea,

20   o."

21   A.   "Yeah, but there is a difference between something

22   inwillingly" --

23   Q.   "That is in your hands."

24   A.   -- "and something that isn't, right?"

25   Q.   "Yeah.  But even selling prescription drubs for ex presc*
```

```
 1    in your case, you would kind of be helping the bigger companies

 2    by selling their product."

 3    A.    "Yeah, dude."

 4    Q.    "And heng banking."

 5    A.    "See, that's why" --

 6    Q.    "Blah blah blah.  No sense."

 7    A.    -- "as soon as I'm done with school" --

 8    Q.    "Non*."

 9    A.    -- "I'm planning something called emigration" --

01:45 10    Q.    "Unh."

11    A.    -- "because I don't want to be offering my services to

12    infidels while Muslims" --

13    Q.    "Fo sho."

14    A.    -- "are more in need of them.  Especially since" --

15    Q.    "Yea."

16    A.    -- "the infidels, many of them are at war with Muslim

17    countries."

18    Q.    "Yea."

19    A.    "So it's on my mind 24-7."

01:45 20         MR. CHAKRAVARTY:  Okay.  Next exhibit, please?  691.

21         MR. CARNEY:  I'd ask that the last of that previous

22    chat be completed.  It's only about a paragraph.

23         MR. CHAKRAVARTY:  Fine, your Honor.

24    BY MR. CHAKRAVARTY:

25    Q.    It continues, "They need a dose of Mah 9."
```

```
 1              MR. CHAKRAVARTY:  Next page?
 2   A.   "Trust me."
 3   Q.   "Inshallah.  Yea yo."
 4   A.   "UNH!  And ya don't stop."
 5   Q.   "Yea yo."
 6   A.   "Brother, I'm about to be reading the Cave Surah since
 7   it's Friday, so I be out" --
 8   Q.   "Yeah.  Got 50-plus ayah left."
 9   A.   -- "for about half an hour or so.  Peace."
01:46 10   Q.   "Read em on the train.  Wasak."
11   A.   "Yea, unh.  Niggaz be playing."
12   Q.   "See you in Sharon."
13   A.   "Allah willing."
14              MR. CHAKRAVARTY:  691, please.
15   Q.   This is a chat between the defendant and Mu'awiyah on
16   April 1, 2006?
17   A.   Yes.
18              MR. CHAKRAVARTY:  Can we go to page 3, please?
19              MR. CARNEY:  Sorry, may I just have one moment,
01:46 20   please?  What number is this, please?
21              MR. CHAKRAVARTY:  I'm sorry.  This is 691, third page.
22              MR. CARNEY:  Would it be possible to take the break?
23   I think I have the wrong document.
24              THE COURT:  Fine.  We'll take the morning recess at
25   this point.
```

1          THE CLERK:  All rise for the Court and the jury.

2          The Court will take the morning recess.

3          (The Court and jury exit the courtroom and there is a

4     recess in the proceedings at 11:00 a.m.)

5          (After recess:)

6     (Court in at 11:26 a.m.)

7          MR. CHAKRAVARTY:  Your Honor, in the presence of the

8     jury, the government will have -- will say we'll have no other

9     questions for the witness at this time in the interests of

02:15 10     scheduling.  We'll re-call him to complete the rest of the

11     chats that we were going to.

12          THE COURT:  Did you want to get somebody in?

13          MR. CHAKRAVARTY:  We have the U.K. witnesses who are

14     going to follow this witness.

15          THE COURT:  You're trying to get them done?

16          MR. CARNEY:  I'm going to indicate, your Honor, when

17     the government has no further questions today, that I have no

18     cross today.

19          THE COURT:  Because you expect him back, and you'll be

02:16 20     able to ask them later?

21          MR. CARNEY:  Yes, your Honor.  Plus, that would allow

22     you to hear from us about the U.K. witnesses in the absence of

23     the jury.  After you consider that, when they come back,

24     everything will roll pretty smoothly.

25          THE COURT:  Let me just ask the government about the

```
 1    U.K. witnesses.  What do you expect from them?
 2              MR. CHAKRAVARTY:  We have three witnesses.  The first
 3    will be the computer forensic specialist from the U.K. who
 4    participated in the search of one residence, the residence of
 5    Waseem Mughal, that the computer data was taken back to
 6    Scotland Yard, and he did the computer forensic analysis and
 7    extracted specific items, Exhibits 369, 370, 371, and 373, 374,
 8    376, 377, 378, and 382 from both the computers that he
 9    participated in the search of -- I'm sorry.
02:17 10              MS. BASSIL:  I believe 382 is wrong.
11              MR. CHAKRAVARTY:  382, there were two sets of
12    computers, one belonging to Waseem Mughal and the other
13    belonging to Younis Tsouli.  382 corresponds to Younis
14    Tsouli's --
15              MS. BASSIL:  That's not in the documents I got.
16              THE COURT:  But through the forensic person, are you
17    offering those documents, or are you just identifying them and
18    --
19              MR. CHAKRAVARTY:  He's going to authenticate that he
02:17 20    extracted them.  With regards to those that were collected from
21    the site that he had actually entered the residence of for
22    purpose of collecting them, we would also be offering them.
23    Depending on what your Honor's preference is, we would
24    authenticate them and then have somebody who went into Younis
25    Tsouli's house, would describe the seizure of those materials
```

1  then to offer the balance of the exhibits.

2          It may be easier to offer them all de bene with

3  regards to the ones for which there was no foundation yet tied

4  to the residence, but we'll go with whatever your Honor prefers

5  in terms of the document -- those computer media which were not

6  seized in the presence of the defendant -- of the witness.

7          THE COURT:  All right.  It's now gone off my screen.

8  There's about ten of them, something like that?

9          MR. CHAKRAVARTY:  I think -- less than ten.  I think

02:18 10  there's eight, your Honor.

11          THE COURT:  Okay.

12          MR. CHAKRAVARTY:  Nine, your Honor.

13          THE COURT:  Okay.  So --

14          MR. CHAKRAVARTY:  That's it.  The first witness is

15  going to talk about just the extraction.  The next two

16  witnesses will talk about both the search as well as they will

17  be reading some of these materials, representing some of these

18  materials.

19          In terms of actual videos -- several of these exhibits

02:19 20  are videos, your Honor.  We're not playing any of the videos

21  with the exception of doing a screen -- kind of pausing it on a

22  screen.  One of the videos is the Note to Pakistan, which we've

23  previously seen a message to the defendant about, and it will

24  be a screen shot of that screen.  There's a picture of Ayman

25  al-Zawahiri on that and the Alashaab logo.

1          MS. BASSIL:  Your Honor, I want to address these

2     generally, and then I want to address the exhibits

3     specifically.  But what I want to talk about is sort of the

4     timing of all of this as well as the relevancy of these U.K.

5     drives.  I know we've objected before, but having reviewed as

6     carefully as I could what they've given us, which is not

7     reviewing much of this, I want to address these issues.

8          In February of 2010, we received three hard drives

9     from the United Kingdom.  In December, we were told, I wouldn't

02:20 10     waste your time on them.  They didn't even know who two --

11     actually, they didn't know who any of them belonged to.  We

12     were able to kind of figure out and guess that one of them

13     belonged to one of these three men that they're talking about.

14          We heard nothing more about it.  Then, as you know,

15     one week before trial they suddenly produced more of these

16     United Kingdom hard drives.  At this point, they produced --

17     the hard drives contain -- one of the hard drives contains

18     within it 11 hard drives.  So they produced three hard

19     drives -- one contains 11 -- plus CDs, flash drives, five

02:20 20     floppy disks, and something that has been referred to as an

21     unknown device.  Obviously, we don't even know what it is.

22          THE COURT:  Let me just -- I think your objection to

23     this, on a general lateness grounds and the volume grounds, is

24     well documented in the record.  If you just want to preserve

25     that, I'll note that that objection is preserved.  I don't

1   think we have to reargue it.

2        MS. BASSIL:  But there's a couple more things I want

3   to add about this specifically.  Five of the exhibits, your

4   Honor, were on a hard drive that they didn't give us, all

5   right.  Some of the exhibits they want to introduce today, they

6   admitted they didn't even given us the hard drive.  So we

7   haven't even been able to ascertain where that came from, what

8   that's about.

9        I would also point out -- first of all, we waited for

02:21 10   almost three weeks before you said that these would be

11   included.  So that really put us behind.  And then after that,

12   we moved for funds, as you know, and we did move for them ex

13   parte, but I'll open it now that we moved for funds to be able

14   to open these up to have people review them.  And you only

15   denied that yesterday.  So we've really been -- it's been --

16   all I can tell you is that it's been extremely unfair.  Our

17   ability to cross-examine these witnesses is really, really

18   limited, and it's limited to the limited amount of evidence

19   that the government has actually produced.

02:21 20        The government has never said there's exculpatory

21   evidence.  We have no idea.  According to one of the things I

22   read in one of these United Kingdom reports, Tsouli's computer

23   had over two million documents.  So we have no idea what was in

24   that.  I know at one point you said, Well, what's exculpatory?

25   We don't know, and we can't know because of the position we

 1    were put in.

 2            As to the explicit issues, the explicit exhibits,

 3    three of these -- 369, 370, and 374 are a video,

 4    Harbalmostadafin.  Our client --

 5            THE COURT:  Same video?

 6            MS. BASSIL:  It's a video -- it's all the same video.

 7            MR. CHAKRAVARTY:  Different formats, your Honor.

 8            MS. BASSIL:  Our client did not translate it.  He did

 9    not edit it.  He did not disseminate it.  The only chat the

02:22 10    government -- or the only connection to it is Ahmad Rashad

11    tried to send it to the defendant, and he said, Remember, we

12    saw this in Egypt.  He may have watched it but that's it.  That

13    doesn't make this a relevant exhibit.

14            371 is all in Arabic with no translation.  It is part

15    of that hard drive they did not give to us.

16            372 is a chat between two of these people, Tsouli and

17    Mughal, in which they reference that Alashaab, which is the

18    media wing, is disappointed.  We didn't do a good job.

19            MR. AUERHAHN:  I don't want to interrupt, but --

02:23 20            THE COURT:  372 is not offered?

21            MR. AUERHAHN:  Exactly.

22            MS. BASSIL:  Okay.  Let me scratch that.

23            373 is an internet address, and it's sort of an http

24    address, and it's ansaarnet.info.  And, again, this has nothing

25    to do with our client.  I don't believe there's any reference

```
 1    that this was ever on any computer that our client had or sent

 2    to him as a link whatsoever.

 3            375 is a chat -- I'm sorry.  I don't think you're

 4    going to offer 375, am I correct?

 5            MR. AUERHAHN:  Correct.

 6            MS. BASSIL:  I'll skip that.

 7            This video, Note to Pakistan, 376, again, our client

 8    never translated it, never edited it, never disseminated it.

 9    In fact, never even saw it.  It apparently is, as I understand

02:24  10    it, just Zawahiri talking.  And this was referenced -- it was a

11    message that the government has put in, sent to the defendant,

12    something about, Will you help with the doctor and curryland.

13    But, again, our client never responded, never did anything.

14            There is also -- and 377, are you putting that in?

15            MR. AUERHAHN:  Yes.

16            MS. BASSIL:  All right.  377 is the -- is a video, and

17    it apparently is the Umar Hadied video in Arabic with no

18    translations.  It is my understanding that the Arabic version

19    is somewhat different, both in the introduction and in the

02:25  20    ending, than the English version.  Again, this is on the hard

21    drive they never gave us.

22            378 -- are you putting that in?  I was given a list of

23    what's being put in, so that's why I did it this way.

24            MR. AUERHAHN:  Yes.

25            MS. BASSIL:  378, again, is a chat between these two
```

         1    people, and this is al Qa'ida in Iraq -- I'm paraphrasing --

         2    has asked me to contact people at Tibyan for help in

         3    translations.  Again, although our client was on Tibyan, there

         4    is no evidence that he helped in any of these translations.

         5              And then, finally, 379 and 380 and 381 are --

         6              MR. AUERHAHN:  We're not using, your Honor.

         7              MS. BASSIL:  You're not using, all right.

         8              And I have to say, 382, based on what I read, refers

         9    to the Qureshi investigation, that it was MID301.  So if the

02:26   10    government could check that, I have that as not related to

        11    these specific U.K. people.

        12              What I also want to say, your Honor, is that aside

        13    from the general objections that I've made, I would hope the

        14    government would not be having these people testify to anything

        15    related to people in Bosnia since they certainly were not

        16    present personally at those arrests or at those searches or

        17    anything of that nature.  That would be absolute hearsay and

        18    certainly well beyond this conspiracy, especially given

        19    Dellasantos and what we've discussed before.

02:26   20              This evidence is never mentioned in the Indictment.

        21    Tsouli, Mughal, and al-Daour are not mentioned in the

        22    Indictment, but we've already objected to that.  And certainly

        23    this issue of the person in Bosnia is never mentioned in the

        24    Indictment.  We are now trying a case that we were not indicted

        25    on.

1        THE COURT:  Mr. Auerhahn.

2        MR. AUERHAHN:  Very briefly, and I'm not going to go

3   over what we already talked about more than once in terms of

4   disclosures.  But I do want the record to be clear that with

5   reference to any exhibit we're using, it's on a hard drive that

6   we did give to the defendant.  As a matter of fact, we had

7   intended to use some additional exhibits.  When we discovered

8   that -- it's a long story, but a particular hard drive was not

9   turned over, we excluded that from the evidence even though I'm

02:27 10   in the sure we had to, but we took the position, if we didn't

11   turn over the hard drive, we're not trying to use the evidence.

12   So all these exhibits come from hard drives that were turned

13   over.

14        And with reference, for example, this Note to

15   Pakistan, I mean, it's not just that the defendant is asked to

16   become a translator for Tibyan, is introduced as a translator

17   on Tibyan, is asked to translate this particular project,

18   there's also discussions in chat sessions involving the

19   defendant and some of the same people who were the

02:28 20   administrators on Tibyan about this particular project.

21        Now, whether he did it or not, it's like arguing that

22   a discussion about a drug deal which is never consummated isn't

23   relevant to a charge of a conspiracy to distribute drugs.

24   Certainly, a conversation about a drug deal that, for some

25   reason or another, wasn't consummated is relevant to this

1    conspiracy.  Whether or not he actually did it or just agreed

2    to do it or discussed doing it and discussed various ideas

3    about how to put it together, it seems to me those

4    conversations are directly relevant.

5           And, similarly, with reference to that chat session

6    about AQ in Iraq asked me to contact TP, that conversation took

7    place after -- it's like -- I'm dating myself, but let's send

8    something to the steno pool and the defendant is in that steno

9    pool.  The defendant had already, again, joined Tibyan as a

02:28 10   translator, agreed to be a translator, and now these

11   individuals are stating, Let's ask the TP translators to

12   translate a particular project.  So it's relevant, again, to

13   the conspiracy which the defendant joined.

14          In terms of the different variations of

15   Harbalmostadafin, part of the evidence is that Tsouli was

16   creating different versions of videos so that they could be

17   more easily downloaded from the internet.  For example, the

18   Exhibit 373, the html address, there are links on that address

19   that one can click to download different versions of the same

02:29 20   video that have different sizes depending on what kind of

21   internet access you have.

22          And 374 is a text document that has that address so

23   that, if he wanted to go to that site, all he had to do was cut

24   and paste into his search engine.  So that's a text document,

25   having that address where those different versions of that

particular video could be found.  This was something that was
on Tsouli's computer.

So it just seems to me, that with reference to all the
evidence, it's both relevant and probative and, as I do want to
emphasize, on hard drives that were provided to the defense.

THE COURT:  Well, okay.  I don't think I can, without
hearing the witnesses and the foundation, make the relevance
rulings in gross, as it were.

MS. BASSIL:  Perhaps we should voir dire them.

02:30  THE COURT:  Well, no.  I think we'll just go in the
normal course and see what it is.  I mean, I think we'll just
have to -- I guess --

MR. CHAKRAVARTY:  The concern is some of the relevance
will be extrapolated upon first with witnesses who are going to
come in after the authentication witness.  But then also the
expert witness --

THE COURT:  Why can't he authenticate them, and then
after the relevance is shown through another witness, they can
be offered?

02:31  MR. CHAKRAVARTY:  Part of that, the government, at
least with regard to each of these, we think that the other
U.K. witnesses will demonstrate some of that, if not all of
that, relevance with regards to each of the exhibits.

THE COURT:  Right.

MR. CHAKRAVARTY:  If we get past that threshold at

that point, then I understand.  And if we can't, then I guess

we will have to -- I guess we will then introduce it through

somebody else if we can't today.  I guess that's the answer.

In our preparation with the witnesses, we thought that we would

get over that hurdle for purposes of today.

MS. BASSIL:  Your Honor -- I'm sorry.

THE COURT:  I'm not -- okay.

MS. BASSIL:  I want to be clear about something.  I am

holding the chart the government sent us that indicated the

02:31 source of particular exhibits.  And quite clearly, a number of

these exhibits, they say CJC/7, which is a particular hard

drive that they did not give us.  And I am looking at their

chart they sent us.  This is the hard drive they did not give

us.

THE COURT:  Which particular exhibits are you talking

about?

MS. BASSIL:  I will tell you what they are.  They are

371, 377, 378, 379, and 380.  I do want to indicate that 382 on

their chart indicates that it is the Qureshi computer.

02:32 MR. AUERHAHN:  Your Honor, if I could point counsel's

attention to the Operation Mazhar review report, which is

approximately a seven-, eight-page document which identifies

the source of each -- many of the exhibits that she just read

off.  And DRH/1 is the source of 369, 370, 371, 373, and 374.

CJ/7, which we're not using, was the source of 372.

1        MS. BASSIL:  It's not what they wrote on the document

2   they provided to us, your Honor.

3        MR. CHAKRAVARTY:  My thought is it's probably an older

4   document, your Honor.

5        MS. BASSIL:  Can we not rely on what they do?  We're

6   sent lists of exhibits that are going to go in the next day.

7   Half of them won't come in.  They send us where documents are,

8   and then they tell us, oh, it's wrong.  I mean, we are

9   inundated with over 800 exhibits that came in four days late

02:33 10   before trial.  And now it's, like, Well, you should have looked

11   at five other documents because maybe it's an old chart.  Are

12   they not held to any level of responsibility here?

13        THE COURT:  The only overlap seems to be 377 and 378.

14        MR. AUERHAHN:  Your Honor, 377 is DRH/1, which is the

15   Tsouli computer.  And 378 is CJG/10, which is a Mughal

16   computer, which was turned over.

17        MR. CHAKRAVARTY:  And these reports, we should add,

18   were also turned over over a month ago, your Honor, which show

19   from the computer forensic analysis as to where these are from.

02:33 20        MR. AUERHAHN:  The report I mentioned was turned over

21   in August.

22        MS. BASSIL:  Yes.  And this chart was turned over to

23   us after August.  This chart was turned over -- I believe it

24   was the Thursday before we were going to start the trial, after

25   those documents were sent to us.  So, of course, I would rely

1    on what the government sent us.

2            Your Honor, we are printing out that clean section of

3    the chart.  I want to mark it for identification, please, just

4    the part about the U.K. drives.

5            MR. CHAKRAVARTY:  Your Honor, if it's going to be

6    marked for something, we should at least know what it is.

7            MS. BASSIL:  I'm printing out the chart the government

8    gave us that indicated the source of the information that was

9    sent to us to have the Thursday before this trial started, and

02:34 10   I am printing out the portion that refers to the U.K. drives.

11   Perhaps you're familiar with that.

12           MR. CHAKRAVARTY:  Possibly.  We can deal with that out

13   of court, your Honor.

14           MS. PATEL:  If I may add, your Honor.  For four

15   consecutive days, I approached Mr. Chakravarty very politely

16   and asked him if he could correct the mistake on the chart, and

17   every day he told me, I'm looking into it.  I'll let you know.

18   So we gave him ample opportunity by email and in person to let

19   us know if there was a mistake on the chart.  He never

02:35 20   indicated there was.

21           MR. CHAKRAVARTY:  Frankly, that's not true.  We then

22   looked into it.  We identified -- defense identified the

23   problem, that we had not discovered one of the hard drives, and

24   we said we are not using anything -- we're striking those

25   exhibits from our exhibit list.  We're not going to use those

1  things.

2          MS. BASSIL:  That's what was on the chart, those

3  exhibits.

4          THE COURT:  Let me come back to relevance.  In the

5  most general sense, these are all potentially relevant because

6  of the subject matter.  But if there's some specific quality to

7  it that might change that assessment, I guess I won't know

8  unless I hear the foundation for it.  That was my point.

9          Now, if the first witness can only say that he

02:35 10  extracted them from some place and can't say anything about the

11  content that would make relevance, foundation, is there -- are

12  there other witnesses who can do that?  Or is it simply that a

13  proffer of the exhibit itself will establish its relevance?

14          MS. BASSIL:  No, it won't.

15          MR. CHAKRAVARTY:  Well, first, there's one set of

16  communications, your Honor.  There's this -- Exhibit 378 is a

17  chat session, which the four corners of the chat session and

18  the witnesses who will identify who the participants are in

19  that chat session should suffice for purposes of --

02:36 20          THE COURT:  I understand.  That's where the content of

21  the exhibit itself will be the way you can judge whether it's

22  relevant.

23          MR. CHAKRAVARTY:  Correct.  With regards to the Note

24  to Pakistan, I think there's evidence already in the record

25  that this file was sent -- link to the file was sent to the

1    defendant, and that's the -- the government feels that there's

2    sufficient relevance in that.

3           The Hadied_NEW_303 -- this is Exhibit 377 -- is the

4    Umar Hadied video prior to translation, which, again, the

5    government feels that the relevance standard has already been

6    met.

7           With regards to the 373, the new text document, the

8    website that Mr. Auerhahn referred to, these witnesses will

9    describe what that document was in terms of the fact that it's

02:37 10   an internet link.

11          382 is the Arabic version of 39 Ways, so that's the

12    proffer of relevance there.

13          And so it's the Harbalmostadafin, three versions --

14    yes, three versions, which is the one piece of evidence that we

15    haven't heard about yet.  But the evidence will be from these

16    -- the U.K. witnesses that there were various iterations of a

17    Jihad video, for lack of a better phrase, that Younis Tsouli

18    was producing.

19          The government's proffer is that that sheds light on

02:37 20   the connectivity, as demonstrated through that chat session,

21    that Younis Tsouli was this facilitator who would take videos

22    and make it accessible and ultimately get it to, as Mr.

23    Auerhahn says, to the steno pool, the translation pool.  So

24    that's the first demonstration of relevance that the government

25    would offer.

1        Later in the trial, through the expert witness, the

2   government would offer additional evidence that that particular

3   video is something which is part of a -- it's in Evan Kohlman's

4   expert report, as being part of a significant piece of al

5   Qa'ida media that the defendant had on his own computer.

6        MS. BASSIL:  I don't believe he did, your Honor.  I'm

7   not aware that he --

8        THE COURT:  Let me just ask that.

9        MR. CHAKRAVARTY:  This particular file,

02:38 10  Harbalmostadafin is part of, I guess, a two-part video which is

11  on the defendant's computer as Qahir Assaleeb (ph).  I don't

12  know that it's identical overlap between the images on the

13  film, but apparently they were released at the same time.  I

14  don't have the report in front of me to tell you exactly what

15  Mr. Kohlman said about it.  But the Qahir Assaleeb video that

16  is on his computer apparently -- it's called Crusaders of the

17  Cross, I think -- that's what -- this Harbalmostadafin video is

18  a portion of that.

19        MS. BASSIL:  Your Honor, frankly, this is getting a

02:39 20  little crazy.  There is no evidence, as I understand it, that

21  Note to Pakistan was ever on the defendant's hard drive.

22  There's no evidence that he had anything to do with it.  The

23  analogy to the steno pool is completely wrong, and the reason

24  for that is that the government wants to assume that if the

25  defendant did some translations for Tibyan he was under orders

```
 1    to do anything they said, which was not true.

 2              THE COURT:  Not necessarily.

 3              MS. BASSIL:  Right.  It's not true.

 4              THE COURT:  No, no.  That's not necessarily what the

 5    government has to prove.

 6              MS. BASSIL:  Well, but -- no.  I understand.  But

 7    their analogy is, if someone is asked to do something, somehow

 8    that's relevant.  If they agree to do it, of course, it's

 9    relevant.

02:39 10          THE COURT:  I think, in context, it can be relevant.

11    By itself, with nothing else, it might not be.  But, in

12    context, it might well be, and I think it probably is

13    sufficient.  Let me just go -- I think --

14              MS. BASSIL:  There's no evidence he linked himself to

15    that web address.

16              THE COURT:  Well --

17              MS. BASSIL:  None.  There's no evidence he's involved

18    in any of these chats or that he's referenced in these chats.

19              THE COURT:  Okay.  I guess I think that the general

02:40 20  relevance has been proffered enough that they are likely

21    admissible.  That's a revisitable ruling if it appears that the

22    foundation is not there.  But I think, to move on, we'll

23    operate on that basis.

24              So we're ready to call the jury?

25              MR. CHAKRAVARTY:  Ready to call the jury and we'll
```

```
 1    excuse this witness.

 2             THE COURT:  But in their presence.

 3             MR. CHAKRAVARTY:  Yes, I'm sorry.  That's what I

 4    meant.

 5    ( Jury in at 11:54 a.m.)

 6             THE COURT:  Your Honor, at this time the government

 7    has no further questions for Agent Fierabend.  We'll re-call

 8    him at a later time.

 9             MR. CARNEY:  No questions at this time, your Honor.

02:42 10   Thank you.

11             THE COURT:  By agreement with counsel, for logistical

12    reasons, we're going to suspend effectively with this witness.

13    He will be back, but we're not finished with him.  We're going

14    to take another witness now for, as I said, reasons of

15    logistics.

16             Mr. Fierabend, you may step down.  Thank you.

17             MR. CHAKRAVARTY:  The government calls Graeme

18    Burridge.

19             THE CLERK:  Sir, step up here, please.  Step up to the

02:43 20   box, if you would.

21             GRAEME BURRIDGE, Sworn

22             THE CLERK:  Please be seated.  State your name and

23    spell your last name for the record.

24             THE WITNESS:  My name is Graeme, B-u-r-r-i-d-g-e.

25             THE CLERK:  Thank you.
```

|   |   |
|---|---|
| 1 | DIRECT EXAMINATION BY MR. CHAKRAVARTY: |
| 2 | Q.   Good almost afternoon, Mr. Burridge.  Are you currently |
| 3 | employed? |
| 4 | A.   Yes, I am. |
| 5 | Q.   How so? |
| 6 | A.   I'm a computer forensics manager with the Metropolitan |
| 7 | Police, New Scotland Yard. |
| 8 | Q.   Is that in a civilian capacity? |
| 9 | A.   I am a civilian, yes. |
| 02:44 10 | Q.   Prior to becoming a civilian, were you a uniformed |
| 11 | officer, or were you an officer? |
| 12 | A.   For 30 years, I was a police officer with the Metropolitan |
| 13 | Police. |
| 14 | Q.   And in what capacities were you employed at the |
| 15 | Metropolitan Police? |
| 16 | A.   Initially, a uniform officer, till 1983.  From there, I |
| 17 | was a detective, throughout my service, until 2010. |
| 18 | Q.   Is that when you retired as an officer? |
| 19 | A.   It is. |
| 02:44 20 | Q.   What was your last assignment? |
| 21 | A.   My last assignment was the counterterrorism command as a |
| 22 | forensic investigator. |
| 23 | Q.   That's computer forensics? |
| 24 | A.   Computer forensic investigator, yes. |
| 25 | Q.   How long had you been a computer forensic examiner or |

investigator?

A.    Since 2003.  Prior to that, I worked in Internal Affairs.

Q.    Before you became a computer forensic examiner in the

U.K., what training did you receive?

A.    Police training?

Q.    Training in computer -- sorry.  I should clarify.

Training specifically in computer forensics?

A.    I attended a number of training courses, your Honor,

particularly with IACIS, which is an international organization

02:45 based in the United States, a number of training courses for

them.  And the major software products I've been trained on:

AccessData, Guidance Software, X-Ways, BlackBag.

Q.    And those are all different private, third-party products?

A.    They all -- yes.

Q.    Did you receive certification in the Metropolitan Police

as a computer forensic examiner?

A.    Via IACIS, I'm a certified forensic computer examiner.

Q.    Is IACIS -- do you remember what the acronym stands for?

A.    International Association of Computer Investigative

02:46 Specialists.

Q.    Did you receive that training, IACIS training, here in the

States?

A.    I did, yes.

Q.    Is there any requirement in the Metropolitan Police for a

level of certification?

         1    A.   Our department uses the CFC, the computer forensic -- the

         2    IACIS training as part of our -- part of what we do in our

         3    department.  To be in our department, you need to do that.  And

         4    all our investigators are trained to CFC level.

         5    Q.   Have you had occasion to conduct computer forensic

         6    examinations?

         7    A.   Yes, I have, your Honor.

         8    Q.   Okay.  Approximately how many?

         9    A.   At least a hundred examinations.

02:47   10    Q.   These are all in your capacity at Scotland Yard?

        11    A.   Yes, your Honor.

        12    Q.   I should clarify.  Is the Metropolitan Police headquarters

        13    called Scotland Yard?

        14    A.   Yes.  New Scotland Yard is where the department is, yes.

        15    Q.   Has your -- have you conducted your computer forensic

        16    analysis on the job at New Scotland Yard?

        17    A.   On which --

        18    Q.   I'm sorry.

        19    A.   Which job?  This particular investigation?

02:47   20    Q.   No.  Prior to this investigation --

        21    A.   Yes.

        22    Q.   -- during the course of your training.

        23    A.   I've done a number of jobs with New Scotland Yard, yes.

        24    Q.   When we're talking about jobs, I'm trying to break down.

        25    Does that include the acquisition in -- computer forensically

```
 1  of digital data?
 2  A.    Yes.
 3  Q.    As well as --
 4  A.    The examination.
 5  Q.    -- examination?
 6  A.    Examination of the computer data, yes.
 7  Q.    Are you familiar with the verification process in computer
 8  forensics?
 9  A.    Yes, I am.
10  Q.    Can you explain what you do in the U.K. with regards to
11  computer verification?
12  A.    We -- I'll have to go back a little bit.  When a computer
13  comes in, we create a forensic image of that computer or
14  electronic media.  That media -- before the imaging process
15  starts, a hash value -- an algorithm is run across the drive,
16  and you have a mathematical algorithm.  When the imaging
17  process completes, that -- it creates a -- it does another
18  mathematical algorithm, and the two should match.
19        So the next time that you then go and use that image, you
20  verify that image.  So using software, you ask the software to
21  verify the image.  It will then check the MD5 and run through
22  the image and make sure that the two MD5 algorithms match.
23  Q.    The MD5 is the product of that algorithm that's run?
24  A.    That MD5 hash, it's a hash value.
25  Q.    Have you worked before with computer forensic
```

1    investigators from the States?

2    A.    Yes.

3    Q.    You mentioned certification under IACIS.  Are there any

4    other certifications or any other associations with which you

5    are affiliated?

6    A.    Not associations, no, only IACIS.  I have attended

7    Cranfield University, forensics courses.

8    Q.    Any other kind of ongoing training -- have you received

9    any other ongoing training after you were originally certified?

02:49 10   A.    Yeah.  We -- this discipline changes so often that we just

11   carry on doing our courses and our updated courses as new

12   software comes out, new operating systems.  And, yes, I've been

13   continually educated in the new systems as they come along.

14   Q.    Now to draw your attention to this particular case, were

15   you asked to extract certain files in this case?

16   A.    Yes, your Honor, I was.

17   Q.    Are you familiar with an operation that occurred in the

18   United Kingdom called Operation Mazhar?

19   A.    Yes, your Honor.

02:50 20   Q.    As part of that, were various search warrants executed on

21   various locations?

22   A.    Yes, your Honor.

23   Q.    Did you participate in any of those searches?

24   A.    I did.  Yes, I did.

25   Q.    Where did you participate in a search?

```
 1   A.   I did a search of a subject named Waseem Mughal, which was

 2   in 33 Railway Street, Chatham in Kent.

 3   Q.   Is that W-a-s-e-e-m, M-u-g-h-a-l?

 4   A.   It is.

 5   Q.   Were there digital media seized at that location?

 6   A.   Yes, your Honor.

 7   Q.   Were those computers forensically preserved?

 8   A.   Yes, your Honor.

 9   Q.   Were those stored back in New Scotland Yard on a secure

10   location?

11   A.   Yes, your Honor.

12   Q.   Were MD5 hash values made of that digital data?

13   A.   Yes, your Honor.

14   Q.   And then, for purposes of your testimony in this court,

15   did you go back into that data and extract certain files?

16        MS. BASSIL:  Your Honor, could we have less leading?

17        THE COURT:  I think he's just trying to get through

18   it.  But if you want it that way, we'll do it.  More direct

19   questions.

20        MS. BASSIL:  Thank you.

21   Q.   What did you do with regards to the data that was

22   collected from Waseem Mughal's residence?

23   A.   It was brought back to our office in London.  We

24   forensically imaged the data.  It was then stored on our secure

25   server system and then examined in due course.  And I was asked
```

1  to reexamine those images again at the request of the U.S.

2  authorities, in particular, three exhibits.  I then verified

3  that the data was still correct, that the image was still a

4  sound image and then carried on and did an examination of each

5  of the exhibits.

6          THE COURT:  Mr. Burridge, could I ask you just to move

7  the microphone a little closer to you so it picks up your voice

8  a little better.

9          THE WITNESS:  Sorry, your Honor.

02:52 10  Q.   In addition to the exhibits that you examined with regards

11  to the residence of Waseem Mughal, was there another location

12  from which digital data was seized?

13  A.   Yes, your Honor.

14  Q.   Where was that digital data seized from?

15  A.   That was from another address.  I can't recall.  I can

16  recall the exhibit number, but I can't recall the address.

17  DRH/1 was the exhibit number that was given to it.

18  Q.   Was that 7 Richmond Way?

19  A.   7 Richmond Way, that's right, your Honor.

02:53 20  Q.   Was that the residence of Younis Tsouli?

21  A.   Younis Tsouli.

22  Q.   You didn't personally participate in that search, is that

23  right?

24  A.   I didn't, your Honor.

25  Q.   What happened to the digital data that was seized at that

1    location?

2    A.    It was brought back to our office, forensically imaged and

3    stored on our server and then examined in due course.

4    Q.    Then with regards to that piece of media, what did you

5    perform on that?

6    A.    Exactly the same as the other exhibits I've described.  I

7    recovered it from -- I brought it down from the server,

8    verified it, and then I did my examination.

9    Q.    So when were these pieces of evidence seized?

02:54 10    A.    2005, October 2005.

11    Q.    I'll fast-forward to 2011.  For purposes of your testimony

12    here in court, were you asked to extract specific files from

13    some of this media?

14    A.    Yes, your Honor.

15    Q.    I'm going to draw your attention first to DRH/1.  This is

16    something you just mentioned.  Is DRH/1 the U.K. convention for

17    naming an exhibit?

18    A.    The U.K. convention is that when you seize an exhibit you

19    give the three initials of your name.  Like, for example, for

02:54 20    me, my exhibits are GFB, which -- Graeme Frederick Burridge.

21    So each exhibit would have a GFB and the corresponding number.

22    So DRH/1 was seized by an officer with the initials DRH.

23    Q.    So before you came in to testify today, did you review

24    with the government, the U.S. Government, the particular

25    exhibits that we were going to be talking about today?

1    A.   Yes, your Honor.

2    Q.   I'm going to draw your attention first to Exhibit 36 --

3              MS. BASSIL:  Objection.  Well --

4              THE COURT:  Finish the exhibit number.

5              MR. CHAKRAVARTY:  369.

6              MS. BASSIL:  Objection.

7              THE COURT:  It's the renewed objection?

8              MS. BASSIL:  Well, there's no foundation here.

9              THE COURT:  Well, overruled.  Go ahead.

02:55 10   Q.   Did you have an opportunity to -- before you came to

11   testify, did you actually draft a report describing where you

12   found each of the files that you were asked to testify about on

13   these computers?

14   A.   Yes, your Honor.

15   Q.   Does that describe where on the computers each of these

16   files were found?

17   A.   Yes, your Honor.

18   Q.   Were these files that you were asked to extract, were they

19   found in the active space or the so-called free space or slack

02:56 20   space?

21   A.   They were found in the live space, yeah, the active space,

22   if you want to describe it that way.

23   Q.   With regards to Exhibits 369, 370, 371, 373, 374, 376, and

24   377, were those files that were found on DRH/1, or Younis

25   Tsouli's computer?

```
 1    A.   Yes, your Honor.

 2    Q.   Were the files 378 and 382 found on digital media found at

 3    Waseem Mughal's house?

 4    A.   Yes, your Honor.

 5    Q.   So with regards to Exhibits 369, was this a video file

 6    called harbalmostadafin.mpg?

 7    A.   Yes.

 8    Q.   Is .mpg a type of a video file?

 9    A.   Yes.

02:57 10  Q.   For Exhibit 370, was that also called

 11   harbalmostadafin.rmvb?

 12   A.   Yes, your Honor.

 13   Q.   Is rmvb also another file type of a video?

 14   A.   Another file type, yes.

 15   Q.   Exhibit 374, was that also called harbalmostadafin.rm?

 16   A.   Yes, your Honor.

 17   Q.   And, again, is .rm a file type associated with video

 18   files?

 19   A.   Yes, your Honor.

02:57 20  Q.   Particularly, is that Real Media?

 21   A.   Yes.

 22   Q.   With regards to Exhibit 371, was that called

 23   7rb-mostadafeen[168910].html?

 24   A.   Yes, your Honor.

 25   Q.   Is html --
```

```
 1   A.   A web page.

 2   Q.   -- a web page?

 3   A.   Yes, your Honor.

 4   Q.   Exhibit 373, was that called New Text Document(6).txt?

 5   A.   Yes, your Honor.

 6   Q.   Is that just a text file?

 7   A.   It's just a text file, yes.

 8   Q.   With regards to Exhibit 376, called note.to.pakistan.mpg,

 9   was that also found on DRH/1?

10   A.   Yes, your Honor.

11   Q.   377, called Hadied New 303MB(194713).rmvb_01, was that

12   also found on that computer?

13   A.   Yes, your Honor.

14   Q.   Is that rmvb file another video file?

15   A.   Yes, your Honor.

16   Q.   With regards to the two files on Mughal's computer, was

17   one a stored chat session?

18   A.   Yes, your Honor.

19   Q.   Do you know the date of that stored chat session, as best

20   you can tell?

21   A.   Not -- if I refer to my report, I can give you that date.

22        MR. CHAKRAVARTY:  May I approach, your Honor?

23        THE COURT:  You may.

24        MS. BASSIL:  Which report would this be?

25        MR. CHAKRAVARTY:  This is Operation Mazhar.
```

```
 1          MS. BASSIL:  There are two reports.  Could I have the
 2   right one, please?  One is titled "Initial" and then the other
 3   one is "Examination."
 4          MR. CHAKRAVARTY:  Examination.
 5          MS. BASSIL:  Thank you.
 6   A.   Can you remind me where I'm looking, please?
 7   Q.   Yes, I'm sorry.  Exhibit 378.  This would be a chat
 8   session.
 9   A.   Thank you.  The created date is the 3rd of August 2005.
10   Q.   Okay.  That's the date that that chat log was created
11   according to the metadata on the file?
12   A.   According to -- yes.
13   Q.   Thank you.  With regards to the creation date for the
14   other exhibits, with regards to the Harbalmostadafin files,
15   first 367 and 370, was there a creation date associated with
16   those two?
17          THE COURT:  You said "367."  I think you meant 369.
18          MR. CHAKRAVARTY:  Excuse me, 369.
19   Q.   369, 370, found on DRH/1, these are harbalmostadafeen.mpg
20   and .rmvb?
21          Just for the record, are you refreshing your memory based
22   on the report that you wrote?
23   A.   I'm refreshing my memory from the report I did, yes, your
24   Honor.
25          The first file that you mentioned is -- the create date is
```

03:00 (line 10)
03:01 (line 20)

1   26th of August 2005.

2   Q.   And the Real Media version of that file?

3   A.   Again, the Real Media file is the 26th of August 2005, an

4   hour and thirty-eight minutes later.

5   Q.   The html, Exhibit 371, creation date for that?

6   A.   Creation date for that was the 5th of September 2005.

7   Q.   Exhibit 374, which is another Real Media version of that?

8   A.   I'm sorry.  I'm getting confused with your numbers and my

9   exhibit numbers.  So can you give me the name again, please?

03:02 10   Q.   File called harbalmostadafin.rm.

11   A.   That's the file that we just -- we've just mentioned that

12   file.  Am I correct?  That's the 26th of August 2005 at 19:48?

13   So we did the first one at 18:10, which was mpg, and then the

14   second one we just mentioned is the rmvb.

15   Q.   Right.  So there's the rmvb, Real Media video, I guess,

16   file.  And is there another one with just .rm, Real Media?  I

17   direct you to the downloads folder of DRH/1.

18   A.   Yes, your Honor.  That's the 7th of September 2005.

19   Q.   With regards to the text document, where on the computer

03:04 20   was that found?

21   A.   The text document was on the desktop of the DRH/1.

22   Q.   When was that file created?

23   A.   That file was created on the 7th of September 2005.

24   Q.   I'm sorry.  The text document was Exhibit 373.

25       Exhibit 376 was note.to.pakistan.mpg.  When was that

1  created?

2  A.   That was created on the 10th of the 10th 2005.

3  Q.   Were there other versions of this note.to.pakistan found

4  on that computer?

5  A.   Yes.  There was another version that was dated the 16th of

6  the 10th 2005.

7  Q.   Were there other -- different formats of that video?

8  A.   Yes, there was.

9  Q.   What other formats was that video in?

03:06 10  A.   I don't understand.  I think we're talking about another

11  file that was part of this.

12  Q.   Okay.  Let me -- were there --

13  A.   There was a rar file.

14  Q.   What is a rar file?

15  A.   A rar file is an archive file.  It's a zip file.  You can

16  put a number of files together and compress them, and it will

17  take the size down.

18  Q.   And there was a file called notetopakistan.rar on that?

19  A.   There was, yes, your Honor.

03:07 20  Q.   Was there also a notetopakistan.wmv?

21  A.   I'm having difficulty with that.

22  Q.   I have another document.  Your memory is exhausted on

23  that?  Can I show you something else?

24  A.   Yes.  Thank you, your Honor.

25         MR. CHAKRAVARTY:  May I approach?

```
 1              THE COURT:  You may.
 2   Q.    Appears to be a summary of that document?
 3              MS. BASSIL:  I'm sorry.  Could I know what he's
 4   looking at?
 5              MR. CHAKRAVARTY:  This is the report from August.
 6   A.    Yes, it is another one, wmv.
 7   Q.    You weren't asked to extract that file?
 8   A.    I wasn't asked to exact that file, no, your Honor.
 9   Q.    I apologize for asking you a question that you did no
10   research for.
11         With regard to the file Hadied_NEW_303MB, Exhibit 377, was
12   there a creation date for that file?
13   A.    Can you repeat the file name again, please?
14   Q.    Umar Hadied -- strike that.  Hadeed, no Umar.
15   Hadied_NEW_303MB.rmvb.  There's also a number associated with
16   that.
17   A.    Yes, your Honor.  The create date was the 2nd of October
18   2005.
19   Q.    Where was that file found?
20   A.    I'm sorry.  I missed --
21   Q.    Where was that file found?
22   A.    That file was found in -- on DRH/1, in the downloads
23   folder.
24   Q.    The chat session that you described earlier, the 378, chat
25   on August 3, 2005, that was -- creation date was August 3,
```

1  2005, where was that found?

2  A.   Can you repeat the file name again, please?  I do

3  apologize.

4  Q.   It's a stored chat session between Younis Tsouli and

5  Waseem Mughal.  You said the creation date was August 3.

6  A.   The 3rd of August 2005, yes.

7  Q.   Where on the computer was that found?  I'm sorry.  This

8  was on Mr. Mughal's computer, you said?

9  A.   This was on CJG/10.  CJG/10 is a Sony thumb drive, so it

03:12 10  was just in the route of the drive.

11  Q.   So to clarify, there were two pieces of media from the

12  Mughal residence that you extracted data from?

13  A.   There was.

14  Q.   One was a thumb drive?

15  A.   One was -- CJG/10 was a Sony thumb drive.

16  Q.   That's where this chat session was stored?

17  A.   That's where this chat session was stored, yes, your

18  Honor.

19  Q.   And then, finally, Exhibit 382, this was a -- the file

03:12 20  name was 39 wasilah li-khidmat al-Jihad.  Do you remember

21  extracting that?

22  A.   Yes, I do.

23  Q.   If you have it in front of you, can you read the path or

24  where on the computer that was found?

25  A.   I do apologize.

1    Q.    It should be the last exhibit on your --

2    A.    I know it.  Yeah.  You want to know the path that that

3    file was found?

4    Q.    Yes, please.

5    A.    Yeah.  It was in a file -- in a folder called "Backup, CG

6    stuff."  Attic/abuqutaybah/www.e-prism.org/images and then the

7    file.  You have to work your way down the tree to find it.  So

8    you have to click on each of the folders to get into the next

9    part of the folder, to the next folder, to the next folder,

03:15 10   until eventually you get to the document.

11   Q.    With regards to each of the documents you just described,

12   did you extract those and provide those to the U.S. Government?

13   A.    Yes, I did, your Honor.

14   Q.    Did you create a compact disk that also contained those

15   documents?

16   A.    Contains the documents and my report, yes, your Honor.

17   Q.    With regards to the extraction process, did you do the

18   verification of the MD5 hash that you described earlier in the

19   extraction process?

03:15 20   A.    I did the MD5 hash, yes, before I started the examination

21   so that I knew that the image I was working on was the correct

22   image, and there was no alterations from when we imaged it in

23   2005.

24   Q.    With regards to DRH/1, this was Younis Tsouli's computer,

25   you described that there were various media in different forms

1    on the computer.  Did you see any video editing software on

2    that computer?

3    A.    There is some video editing software on that, yes.

4          MR. CHAKRAVARTY:  That's all I have, your Honor.

5    CROSS-EXAMINATION BY MS. BASSIL:

6    Q.    Ready?  Good afternoon.

7    A.    Good afternoon, ma'am.

8    Q.    I don't get your Honor?

9    A.    Your Honor.

03:16 10   Q.    I was waiting for you to call me that.

11   A.    No.  I was calling the judge "your Honor."  I was

12   addressing the judge.

13   Q.    That's fine, then.

14         Mr. Burridge, as I understand it, there were arrests of

15   three men and seizures of computer and other data in and around

16   London on October 21, 2005?

17   A.    Correct.

18   Q.    And that you were present at one of these arrests and

19   seizures, correct?

03:17 20   A.    Yes, your Honor.

21   Q.    Oh, okay.

22         Which one were you present at?

23   A.    I was present at Waseem Mughal's address, 33 Railway

24   Street, Chatham in Kent.

25   Q.    As I understand it, when you went in there -- let me see

1    if I have that -- there was quite a bit of electronic data, was

2    there not?

3    A.    There was quite a bit, yes.

4    Q.    If you want to look at your report this is fine, because

5    I'm going to ask you about the amount of data.  If you need to

6    look at it, please do.

7          As I understand it, there was a computer tower?

8    A.    Yes.

9    Q.    And when you call it a "computer tower," what do you mean

03:18 10   by that?

11   A.    I mean a tower.

12   Q.    Like that (indicating)?

13   A.    Like that one that's there on the desk.

14   Q.    And so there was a Sony laptop?

15   A.    There was.

16   Q.    And there was a notebook computer?

17   A.    There was.

18   Q.    There was a hard drive?

19   A.    There were a number of hard drives.

03:18 20   Q.    When you wrote "a number of hard drives," does that mean

21   that's sort of the inside of the computer, pulled out?

22   A.    To put it in perspective, there was a lot of computer

23   equipment.  They were running all sorts of things from that

24   address.  The computer that we're looking at it didn't even

25   have a side on it, and the hard drive wasn't even in place.  It

1    was hanging from the connections.

2    Q.    All right.

3    A.    So there was a lot of computer stuff there.

4    Q.    And there were a lot of CDs?

5    A.    There were CDs, yes.

6    Q.    Those were CDs, not music CDs but CDs on which documents

7    would be found?

8    A.    I can't recall that now, but there were a number of CDs.

9    Q.    I counted 106 CDs.  Does that sound about right?

03:19 10    A.    I can't recall, your Honor.

11    Q.    There were also disks, both mini and floppy disks?

12    A.    Yes.

13    Q.    There was also what you called a memory stick.  Is this

14    what you meant by a memory stick (indicating)?

15    A.    Yeah, a thumb drive, yes.

16    Q.    A thumb drive, flash drive, memory stick?

17    A.    Yeah.

18    Q.    All right.  And that was copied, correct?

19    A.    That was imaged.

03:19 20    Q.    Imaged?

21    A.    Yeah.

22    Q.    When you say "imaged," is that an exact copy of what's on

23    it?

24    A.    It's a forensic image.  It's a byte-for-byte image, a

25    byte-for-byte copy if you like.

```
 1   Q.   I didn't hear the last part.

 2   A.   It's a byte-for-byte, for want of a better word, copy, but

 3   it's not a copy, actually.  The term "copy" is not right.  It

 4   is an image.  So it's exactly what's on that drive is exactly

 5   how we create a forensic image.  So nothing is lost from that

 6   drive when we forensically image.

 7   Q.   Now, you were first contacted -- when were you first

 8   contacted by the United States concerning this information or

 9   this request?

10   A.   From memory, around about 18 months ago.

11   Q.   And you wrote a report about this, correct, about

12   everything that you did or that has been referred to here in

13   court?

14   A.   Yes, I did.

15   Q.   And the -- and you first started out by defining what the

16   scope of what you were looking for was, correct?

17   A.   Correct.

18   Q.   And, in fact, that's part of sort of how you're trained

19   and part of the guidelines in being a forensic computer

20   examiner?

21   A.   It's being professional and writing a report --

22   Q.   All right.

23   A.   -- which is what I was doing.

24   Q.   I agree.  You certainly wanted to be clear about what the

25   scope was that you were doing?
```

1   A.   I was asked to do a thing, a particular thing, and that

2   was the scope of my examination.

3   Q.   All right.  As I understand it, your scope -- actually,

4   you used the word "brief," "my brief."  That's sort of a --

5   A.   Brief.

6   Q.   That's a British term for assignment, kind of?

7   A.   Yeah, yeah, a brief.  Yes, it is.

8   Q.   So your brief was to review the digital evidence for links

9   between Ahmed Abousamra, Tarek Mehanna, and the three people

03:21 10   who had been -- whose computers you had -- people you had

11   arrested and computers you had seized, correct?

12   A.   Yes, your Honor.

13   Q.   And also to look for anything about 39 Ways to Serve and

14   Participate in Jihad?

15   A.   Yes.

16   Q.   Emails and chat logs, correct?

17   A.   Correct.

18   Q.   Now, let me start with -- you were asked -- you provided

19   information -- I think you said ultimately you put these

03:22 20   exhibits on a CD?

21   A.   I did.

22   Q.   And so one of the -- the first exhibit that we discussed

23   was this Harbalmostadafin, correct?

24   A.   Yes, your Honor.

25   Q.   I'm just going to write that out.  (Writing).  That's how

1   it's spelled, am I right?  Did I get that right?

2   A.   Correct.

3   Q.   And that was a movie -- or a video, I'm sorry.  It was a

4   video, correct?

5   A.   Yeah.

6   Q.   When you looked at that -- I'm going to write out a couple

7   of (writing) -- did you see any links between that movie -- or

8   that video and those two names?

9   A.   I was asked to recover the video, and I recovered the

03:23 10   video.

11   Q.   And that's all you were asked to do?

12   A.   That's all I was asked to do.

13   Q.   You were not asked to see if that video was linked to

14   either of these two names?

15   A.   I wasn't.

16   Q.   Let me just add a third one.  (Writing).  You were not

17   asked to look for that name?

18   A.   I was just asked to recover the video.

19   Q.   You had -- I think there were three exhibits that were the

03:24 20   same video, correct, in different formats --

21   A.   Correct.

22   Q.   -- as I understand it?

23       And that would -- and the fact that there were three

24   different versions would indicate what to you?

25   A.   That the video was made in a number of formats possibly

1    because of size.  If these videos are then stored on a website

2    where you can download them, depending on how quick your

3    internet is, size may matter.  And you may want the file to

4    come down that's a smaller file which takes less time to

5    download.

6    Q.   Were you asked to see if this video was connected to any

7    particular website or link to a particular website?

8    A.   No, I wasn't.

9    Q.   Now, I think you, in fact, mentioned something about a

03:25 10   zip; do you recall that?  This was a later video.  I think that

11   it referred -- let me get to that.  I'm going to try to be

12   methodical here.

13        Now, you were also asked, I think, about an internet

14   address, is that correct?

15   A.   Can you be --

16   Q.   You put on that CD an internet address.  And let me just

17   write that out.  (Writing).  Is that -- that's the address?

18   There was more to the address, but that was the first part of

19   the address?

03:26 20   A.   There's nothing --

21   Q.   If you'd like to look at your report -- let me find the

22   right page.

23             THE COURT:  He has the image now.  There was a delay.

24             MS. BASSIL:  All right.  I didn't understand that.

25   Q.   That was an internet site of some sort?

```
 1   A.   Ansaar.net, yeah.

 2   Q.   Is that a website, do you know, from that address?

 3   A.   From recollection, that was one of the sites that we

 4   looked at back in 2005.

 5   Q.   Did you look for those names that I had suggested to you

 6   before?  Were you asked to look for these names in connection

 7   with that website?

 8   A.   Those names, I did -- I did searches on those names as

 9   part of my investigation because I knew of those names prior to

10   the request for --

11   Q.   If I may, please, sir.  Let me put a question in front of

12   you.

13          MR. CHAKRAVARTY:  I thought there was a question in

14   front of him.

15          THE COURT:  Well, I'm not sure it was entirely

16   responsive.  I'm not sure it was understood on both sides of

17   the question and answer.

18          MS. BASSIL:  Right.  Let me rephrase.

19   Q.   Now, Mr. Burridge, there was another video that you looked

20   at, Note to Pakistan?

21   A.   Correct.

22   Q.   And, again, did you find any link to Note to Pakistan to

23   any of these names?

24   A.   I wasn't -- I wasn't asked to do that.

25   Q.   I understand.  I understand.
```

```
 1   A.   I know the names because I've been asked to --

 2   Q.   Mr. Burridge, please.  I asked you --

 3        THE COURT:  Wait for the next question.

 4   Q.   Please wait for the next question.  You were not asked to

 5   look for those names, correct?

 6   A.   No.

 7        THE COURT:  I think a source of the perhaps confusion

 8   is that the witness may be thinking that there were two

 9   different investigations.  You're focusing on the extraction

10   investigation.

11        MS. BASSIL:  I am, I am.

12        THE COURT:  The witness may be thinking of a different

13   investigation.  So let's focus him on the one you want.

14        MS. BASSIL:  All right.

15   Q.   Now, there was also, I think, a third video.  And this was

16   called -- I'm going to spell it -- H-a-d-i-e-d?

17   A.   Yup, yes, your Honor.

18   Q.   Were you familiar with whether or not there was any

19   English on this video or whether it was all in Arabic or some

20   other language than English?

21   A.   I cannot recall --

22   Q.   Okay.

23   A.   -- looking at the video.

24   Q.   Finally, you went through -- and I was looking at -- I

25   think it was Page 14 through -- I'm sorry -- what we have
```

1    referred to as Exhibit 382 and which I believe was -- let me

2    find it.  I'm looking for -- perhaps you can help me.  I'm

3    looking for the reference to -- you said that you found

4    something that referenced 39 Ways.

5    A.   Yeah.  39 Ways.  If you go to 4.15, GFB/11, it's the end

6    of my report.

7    Q.   That's what I was --

8    A.   Page 31.

9    Q.   That's what I was looking for.  Thank you.

03:30 10        And on that, it indicates -- it says "39" and -- the

11   number 39 is there, but the rest of it is sort of an English

12   alliteration of Arabic?

13   A.   If you say so.

14   Q.   All right.  You don't -- it certainly isn't English you

15   recognize?

16   A.   No.

17   Q.   Okay.  And this is -- I think you said this was October

18   20, 2003, is that correct?

19   A.   Created date is the 14th of -- the created date is the

03:31 20   14th of May 2004.

21   Q.   I noticed on that same 4.15, all right, it says, "Modified

22   date, 10/20/03."

23   A.   "Modified date" and "access date."  If you looking in

24   there, 20th of the 10th 2003.  Is that what you're saying about

25   the modified date?

1    Q.   Yes.   If it was created in 2004, how did it get modified

2    in 2003?   That's what I don't understand.

3    A.   If you move a document from one media to another, it takes

4    the -- it gives it a new create date, but the modified date it

5    carries with it from the previous media.   So if you move

6    something from a thumb drive that's on there, when it goes onto

7    a computer, it will get a created date.   But that's the date

8    that it's created on the computer.   The modified date, you

9    could say the modified date was some time when it has been

03:32 10   created and then somebody's done a modification to that file,

11   then it will get a change in the modified date.

12   Q.   So the indication would be that this document was at some

13   point created before -- on or before October 20, 2003?

14   A.   If you look at 4.15, that's the metadata, which is the

15   data about the data, is a way to describe metadata.   And you'll

16   see that there, there is a create date of 10/8/03.

17   Q.   I see that.   It also says, "Last printed 7/7/2003.  "

18   A.   Yeah.

19   Q.   Would that indicate that it might have been on some other

03:33 20   form as well as July of 2003?

21   A.   Yes.

22   Q.   So that this document, this 39 and the rest in Arabic, was

23   something that looks to have been created at least as early as

24   July 7, 2003?

25   A.   39 Ways to Jihad is a document that has been on the

 1    internet.

 2    Q.   Mr. Burridge, please.  I'm asking you about the metadata.

 3    This particular 39 Ways, right, on this person's electronic

 4    devices, indicates that it at least was created at least on or

 5    before July of 2003.

 6    A.   This is why I answered your question that it has been on

 7    the internet; the 39 Ways has been out there.

 8    Q.   And it's been out there since at least 2003?

 9    A.   Yes.

03:34 10    Q.   I'm sorry.  I misunderstood you.  I'm sorry.  I didn't

11    mean to cut you off.

12         And there was yet another video.  I'm looking, I think, at

13    Page 23 of your report.  And that's the one that says,

14    "Hadied," and it says, "NEW," correct?

15    A.   Yes, correct.

16    Q.   And it says, "Downloads."  That's the first section that

17    you wrote about.  Does that mean someone downloaded it from the

18    internet?

19    A.   No, not necessarily.  What that says is in -- in a folder

03:35 20    on that computer, the folder was called "Downloads."

21    Q.   And then this video was --

22    A.   And that file was in that folder called "Downloads."

23    Q.   And then it says, "File details for zip archive."  Within

24    that computer, was there something -- were there zip files?

25    A.   This is a zip file.  So the file we're talking about is a

1  zip file.

2  Q.   It is a zip file?

3  A.   Yeah.

4  Q.   As a forensic computer examiner, are you able to tell when

5  a zip file has been opened or not opened by someone?

6  A.   Yes and no.

7  Q.   Okay.

8  A.   Depending on -- again, there's a different place that you

9  go looking for that information, and it could be there or it

03:36 10  couldn't be there.  Some cases it is possible.

11  Q.   So in some cases it's possible to determine whether the

12  person ever opened the zip file or not?

13  A.   Yes.

14  Q.   And in this particular case, though, there were three

15  different locations for this video?

16  A.   So if you look at 4.10.3, the zip file has been opened.

17  Q.   Okay.  And you were able to tell that from the information

18  that you saw on that computer?

19  A.   From -- you can tell it from looking at the file details

03:36 20  because what happens with a zip is you can open it to a number

21  of locations.  And I would say that what's happened here is the

22  zip file has been opened back into the downloads.  So when you

23  start the zip program, you extract it from the zip.  And I

24  think it's been extracted back into the downloads folder.

25  Q.   So as I understand it, Mr. Burridge, based on

1    conversations with the prosecutors in this case, you identified

2    specific items and put them on a specific CD?

3    A.   I did, your Honor.

4    Q.   All right.  And that CD -- and you're comfortable and

5    you've talked to us about hash marks -- that that CD matches

6    what you saw on that computer?

7    A.   I have produced the exhibits I extracted from the

8    computers as my -- so, yes, they are the files that I was asked

9    to extract, and they're on that CD.

03:38 10          MS. BASSIL:  I have no further questions.

11   REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

12   Q.   Just for the record, I don't think I marked this for

13   identification purposes, a CD that I showed you before that was

14   described.  Is this the CD that you were talking about?  I'm

15   showing you a CD labeled with your name and Metropolitan Police

16   on it.

17   A.   Yes, your Honor.  This is my CD.

18          MR. CHAKRAVARTY:  Your Honor, I don't know what the

19   Court's preference is, but the exhibits that the witness has

03:38 20   authenticated, I think the foundation has been laid with

21   regards to admission.  So the government would just offer

22   those.

23          THE COURT:  I think that's what we said before, that,

24   subject to revisiting if the evidence changes, but on the basis

25   of this, there's sufficient relevance established to admit

```
 1   them.
 2            MS. BASSIL:  Your Honor, I refer to my earlier
 3   statements to the Court.
 4            THE COURT:  Okay.
 5            MR. CHAKRAVARTY:  Thank you.  No other questions, your
 6   Honor.
 7            THE COURT:  Does it have a number?
 8            MR. CHAKRAVARTY:  This one -- for identification, we
 9   should mark it 796.
10            THE COURT:  That's premarked?
11            MR. CHAKRAVARTY:  It's not premarked.
12            THE COURT:  That's the end of the --
13            MR. CHAKRAVARTY:  Right.
14            THE COURT:  796 for ID.
15   (Exhibit No. 796 marked for identification.)
16            MR. CHAKRAVARTY:  Then we move into evidence 369
17   through 371, 373, 374, 376 through 378, and 382.
18   (Exhibit No. 369, 370, 371, 373, 374, 376, 377, 378, 382
19   received into evidence.)
20            THE COURT:  All right.
21            MS. BASSIL:  Your Honor, I would object on relevance
22   grounds.
23            THE COURT:  Noted.  Overruled.  As I say, it's subject
24   to revisit.
25            No further questions then?  Thank you, Mr. Burridge.
```

```
 1    You may step down.
 2              MS. BASSIL:  No questions.
 3              THE COURT:  You may step down.
 4              THE WITNESS:  Thank you, sir.
 5              MR. AUERHAHN:  The United States calls Richard
 6    Dearsley.
 7              THE COURT:  We have about eight minutes.  I'm happy to
 8    be as efficient as everybody else is.
 9              MR. AUERHAHN:  I suspect I won't finish, but at least
03:39 10   we will get started.
11              THE COURT:  We'll start with him.  Good.
12              MR. AUERHAHN:  Richard Dearsley.
13              Your Honor, if you could just signal when you want me
14    to stop.
15              THE CLERK:  Sir, you want to step up here, please,
16    over to the box, up here.
17              RICHARD DEARSLEY, Sworn
18              THE CLERK:  Have a seat, please.  State your name and
19    spell your last name for the record.
03:41 20             THE WITNESS:  My name is Richard Dearsley, and it's
21    spelled D-e-a-r-s-l-e-y.
22    DIRECT EXAMINATION BY MR. AUERHAHN:
23    Q.   Good afternoon, sir.  How are you employed?
24    A.   I'm a detective sergeant with the Metropolitan Police
25    Service in London.
```

| | |
|---|---|
| 1 | Q.   How long have you been with the police service in London? |
| 2 | A.   Just coming up 24 years. |
| 3 | Q.   Just in general terms, could you describe your background |
| 4 | and experience with the Metropolitan Police? |
| 5 | A.   Yes.  I joined in 1989, spent two, three years as a |
| 6 | uniformed officer.  I then specialized as a detective on the |
| 7 | divisional level, dealing with street robbery type things. |
| 8 | After seven years doing that, I then moved on to the Central |
| 9 | Drug Squad, did that for two or three years.  And then in 2001, |
| 03:42 10 | I transferred to the counterterrorism arm where I spent several |
| 11 | years investigating terrorist offenses. |
| 12 | Q.   Is that where you were employed in 2005? |
| 13 | A.   That is correct, yes. |
| 14 | Q.   Did you have a role to play in connection with an |
| 15 | operation called Operation Mazhar? |
| 16 | A.   That is correct, yes. |
| 17 | Q.   In connection with that operation, were there three |
| 18 | individuals specifically targeted? |
| 19 | A.   In the U.K., there were three individuals that we arrested |
| 03:42 20 | in October 2001. |
| 21 | Q.   Could you identify -- |
| 22 | A.   2005, sorry. |
| 23 | Q.   I'm sorry? |
| 24 | A.   In October 2005. |
| 25 | Q.   Do you remember the specific date in October? |

```
 1   A.   21st of October.

 2   Q.   Can you identify the names of the three individuals?

 3   A.   Yes.   The first was a Younis Tsouli; the second is Tariq

 4   al-Daour; and the third is Waseem Mughal.

 5   Q.   Can you spell Tsouli?

 6   A.   T-s-o-u-l-i.

 7   Q.   And Tariq al-Daour?

 8   A.   A-l, D-a-o-u-r.

 9   Q.   On that date, October 21, 2005, what was your role on that

03:43 10  date in this particular investigation?

11   A.   On that particular day, I was the detective sergeant in

12   charge of the search which took place at Younis Tsouli's home

13   address.

14   Q.   Where was that?

15   A.   That was at No. 9 Richmond Way, which is a just slightly

16   west of Central London.

17   Q.   When you -- did you enter the premises on that day?

18   A.   I did, sir, yes.

19   Q.   With reference to all three locations that were searched,

03:43 20  were those pursuant to court authorization?

21   A.   That is correct, yes.   Warrants had been obtained from the

22   courts to search those addresses under the Terrorism Act.

23   Q.   Can you describe what happened when you personally entered

24   the location?

25   A.   Okay.   Mr. Tsouli's address was a top-floor flat on a
```

1    converted Victorian house.  The -- we have uniformed officers

2    who are especially trained to gain access to addresses quickly,

3    riot squad type officers.  They forced the various doors to get

4    into the address.

5              MS. PATEL:  Objection, your Honor.  Relevance.

6              THE COURT:  Overruled.  Go ahead.

7    A.   Officers under my command forced entry to the address,

8    securing the address, entering all the rooms in the flat.  I

9    followed immediately, moments after these officers, where I

03:44 10   found Younis Tsouli actually on the floor in his bedroom with

11   the uniformed officers holding him down, detaining him.

12   Q.   Approximately how old was Mr. Tsouli at the time of his

13   arrest?

14   A.   Oh, 22, 21, 22, that sort of age.

15   Q.   When you entered Mr. Tsouli's apartment, or flat, as I

16   think you've called it, was he alone or was there anyone else?

17   A.   He was alone.

18   Q.   Did you notice, at the time of your entry, whether or not

19   there were any computers or computer media in the flat?

03:45 20   A.   Well, there's -- there was a Toshiba laptop computer on

21   the desk in the bedroom.  The computer was open and it was on,

22   and it was live online at that particular time.  He had a Dell

23   tower unit, which was unplugged, to the side and numerous DVDs

24   and CDs and whatever scattered around the room.

25   Q.   You said the laptop computer was actually on and live?

```
 1   A.   It was, yes.
 2   Q.   Did you have an opportunity to view the screen of the
 3   computer before any forensic examiners took over?
 4   A.   I did.
 5   Q.   Can you describe, in general terms, what you saw on the
 6   screen?
 7   A.   Well, on the screen here was -- the recent documents are
 8   open.  There's a document called You Bomb It (ph) was being --
 9           MS. PATEL:  Objection.  Hearsay.
03:46 10          THE COURT:  Overruled.
11   A.   A document called You Bomb It was being worked on.
12   There's chat sessions taking place.  He was in a chat session
13   using a program called GAIM, and he was chatting to someone
14   called Mastadrak.
15   Q.   Did you learn who Mastadrak is?
16   A.   Yes.  It's a guy called Ensahnal Sadeeqe.  He lives in
17   Atlanta.
18   Q.   Could you spell both of Ensahnal Sadeeqe as well as
19   Mastadrak?
03:46 20   A.   I believe it's E-n-s --
21           MS. PATEL:  Objection.  Relevance.
22           THE COURT:  Overruled.
23   A.   I believe it's E-n-s-a-h-n-a-l, S-a-d-e-e-q-e.  That's as
24   best I can remember it being spelled.
25   Q.   How about the screen name he was using?  You said
```

 1    something like Mastadrak?

 2    A.    Mastadrak, M-a-s-t-a-d-r-a-k.

 3    Q.    With reference to the Toshiba laptop, was there a

 4    particular designation given to that as part of the search and

 5    seizure?

 6    A.    There was, yes.  In the U.K., we -- we designate an

 7    officer to be the exhibit officer.  And the exhibits that get

 8    found, that officer will be responsible for ensuring they're

 9    securely looked after, seized correctly.  And each individual

03:47 10    exhibit will be given a specific unique identifying number.

11    And on this occasion, that would be DRH/ and then the

12    sequential number of the exhibit that gets seized.  The DRH,

13    that comes from -- like, my name is Richard Mark Dearsley; and

14    should I have been the exhibit officer, my exhibits would have

15    been RMD/ whatever.  On this occasion, it was -- a Dave Harris

16    were our exhibit officer, and those are his initials, and he

17    was the seizing officer.

18    Q.    And what specific number in the DRH sequence was the

19    laptop given as a designation?

03:48 20    A.    It was the No. 1 exhibit, the first exhibit seized.  It

21    was DRH/1.

22         THE COURT:  Mr. Auerhahn, I think that's probably an

23    appropriate place to pause.  We'll resume tomorrow.

24         Jurors, I remind you of the caution again.  Time to

25    give you a reminder of no discussion of the matter.  Enjoy the

 1    rest of the day.  I'll see you tomorrow.

 2    (The jury was excused at 1:00 p.m.)

 3            MR. CHAKRAVARTY:  Your Honor, maybe we should

 4    approach.  There might be one logistics issue.

 5    (SIDEBAR CONFERENCE AS FOLLOWS:

 6            MR. CHAKRAVARTY:  Your Honor, I don't mean to speak

 7    for the defense.  I know it may not seem that way all the time.

 8    We understand --

 9            MS. BASSIL:  They speak for us all the time.

03:49 10            MR. CHAKRAVARTY:  Miss Bassil has had some tragedy in

11    the family.

12            THE COURT:  I'm sorry to hear about that.

13            MR. CHAKRAVARTY:  For the record, if the schedule

14    needs to be modified to accommodate that --

15            THE COURT:  What is your situation?

16            MS. BASSIL:  I don't know yet because they did organ

17    transplants last -- they did organ recovery last night and the

18    body would be released to the medical examiner and the question

19    is when he releases it.  Right now, it's tentatively scheduled

03:50 20    for 1:00 tomorrow, but it's in Randolph.  So I've got to leave

21    here earlier than that, but I really don't know yet.

22            What I can do is email Mr. Lyness as soon as I find

23    out.  I've been checking my iPad to see what's been going on,

24    but I don't have any information yet.  I'm sorry.

25            THE COURT:  The service, or whatever it will be, would

1    be at 1:00; is that what you're saying?

2            MS. BASSIL:  It will be at 1:00, but I need time to

3    get there and so forth.  Plus his mother is 90 years old.  I

4    need to be with her before it starts.

5            THE COURT:  How much time do you need?

6            MS. BASSIL:  I think 11:00 will be fine by the time I

7    pack up and so forth.  I'm going to get picked up here.  So,

8    you know -- but that's what I would say.

9            THE COURT:  Okay.  So that -- you still don't know

03:51 10  the --

11           MS. BASSIL:  I still don't know.

12           THE COURT:  That's one contingency.  The other is that

13   it's some other day, and then you --

14           MS. BASSIL:  It's Friday, and then I just don't know.

15   .  .  .  END OF SIDEBAR CONFERENCE.)

16   (Whereupon, at 1:04 p.m. the trial recessed.)

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  November 9, 2011

17

18

19

20

21

22

23

24

25