UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

)
UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   ) Criminal Action
v.                                 ) No. 09-10017-GAO
                                   )
TAREK MEHANNA,                     )
                                   )
          Defendant.               )
                                   )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY THIRTEEN
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, November 10, 2011
9:04 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
 3            Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Jeffrey D. Groharing, Trial Attorney
              National Security Division
 7        950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
10            Janice Bassil, Esq.
              John E. Oh, Esq.
11        20 Park Plaza
          Suite 1405
12        Boston, Massachusetts  02216
          - and -
13        LAW OFFICE OF SEJAL H. PATEL, LLC
          By: Sejal H. Patel, Esq.
14        101 Tremont Street
          Suite 800
15        Boston, Massachusetts  02108
          On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

<u>I N D E X</u>

<u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

WITNESSES FOR THE
 <u>GOVERNMENT:</u>

RICHARD DEARSLEY, resumed

     By Mr. Auerhahn          4

<u>E X H I B I T S</u>

<u>GOVERNMENT'S</u>      <u>DESCRIPTION</u>                <u>FOR ID</u>   <u>IN EVD.</u>

 (There were no exhibits marked.)

1              (The following proceedings were held in open court

2      before the Honorable George A. O'Toole, Jr., United States

3      District Judge, United States District Court, District of

4      Massachusetts, at the John J. Moakley United States Courthouse,

5      One Courthouse Way, Boston, Massachusetts, on November 10,

6      2011.

7              The defendant, Tarek Mehanna, is present with counsel.

8      Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

9      are present, along with Jeffrey D. Groharing, Trial Attorney,

10     U.S. Department of Justice, National Security Division.)

11             THE CLERK:  All rise for the Court and the jury.

12             (The Court and jury enter the courtroom at 9:04 a.m.)

13             THE CLERK:  Please be seated.

14             MR. AUERHAHN:  May we resume, your Honor?

15             THE COURT:  Yes.

16             MR. AUERHAHN:  Mr. Dearsley, have a seat.

17                     RICHARD DEARSLEY, resumed

18                 CONTINUED DIRECT EXAMINATION

19     BY MR. AUERHAHN:

00:10 20    Q.   Good morning, sir.  Now, I think you testified yesterday

21     that when you arrived at Mr. Tsouli's flat, the computer was on

22     and some programs were running, correct?

23     A.   That is correct, yes.

24     Q.   Now, was any forensic examination done at the scene?

25     A.   The technical guy came out, and because the machine was

running, did some basic stuff just to try and ensure he didn't

lose anything by turning the machine off, took some photographs

of the screen as it was there then, and then closed the machine

down.  It was then taken away to our high-tech unit where they

performed their -- things they have to do to perform the

technical examination of it.

Q.   Okay.  Could you pull the microphone a little closer to

you?  Yesterday you had a much louder voice.

And when you examined this -- this computer, were you

examining the -- from the computer itself or from the imaged

copy that had been made by the forensics people?

A.   From the imaged copy.

Q.   And did you have an opportunity to examine additional

media and computers seized in the course of this investigation

from the other search locations?

A.   I reviewed all of the material received during the

investigation.

Q.   Now, you testified that when you walked in, on the screen

was a website being built called "YouBombIt"?

A.   That is correct, yes.

Q.   And based on your subsequent analysis, what kind of

website was this?

A.   On the computer, on the DRH/1, Mr. Tsouli's computer --

MS. PATEL:  Objection, your Honor.  Outside the scope.

Not relevant.

1           THE COURT:  I'm sorry?

2           MS. PATEL:  Not relevant.

3           THE COURT:  Overruled.

4           THE WITNESS:  On Mr. Tsouli's computer you've got

5     this -- the web page called "YouBombIt," and you've also got

6     the same web page but called "YouSendIt."  And from my

7     examination -- and it's my assessment the YouSendIt was an

8     original website and it's been cloned, copied, a bit like a

9     Word document, and find and replace -- and find and replace

00:12 10    they've changed YouSendIt to YouBombIt.  So wherever YouSendIt

11    was, you now find YouBombIt.

12    BY MR. AUERHAHN:

13    Q.   And what kind of website is YouSendIt that was being

14    cloned?

15    A.   YouSendIt is a website, if one's got a large file that you

16    need to send to someone, you upload it to YouSendIt.  You then

17    get a unique reference number from YouSendIt.  And then you can

18    pass that unique reference number to anyone you like.  They can

19    then go to the YouSendIt website, enter that reference number,

00:13 20    and then they can download that document, video, whatever.

21    Q.   So it's generally called a file-sharing site?

22    A.   That is correct, yes.

23    Q.   Now, how long did the search take at Mr. Tsouli's

24    location, at his flat?

25    A.   Oh, several days.

1           MR. AUERHAHN:  Can we pull up, your Honor, Exhibit
2      371, please --
3           THE COURT:  In evidence?
4           MR. AUERHAHN:  Yes.
5           THE COURT:  That was one of yesterday's?
6           MR. AUERHAHN:  Yes, that was one of yesterday's.  All
7      of the ones we will use today -- I'll alert the Court if I use
8      something else.
9           MS. PATEL:  Your Honor, objection.  May we approach?
00:14 10        THE COURT:  Fine.
11          (Discussion at sidebar and out of the hearing of the
12     jury:)
13          MS. PATEL:  Sorry.  I know we want to move things
14     along, but there's no translation for this document.
15          MR. AUERHAHN:  Yes, your Honor.  At this point in time
16     he will simply testify it was an html page, which essentially
17     is a web page that had the same files in various -- this is a
18     web-sharing page.
19          This is the Harb al-Mostadafeen we talked about
00:15 20     yesterday.  It will be translated later.  But for the purpose
21     of now it's just going to be -- we're going to introduce the
22     fact that it was different files with different file names and
23     sizes for the purpose of web-sharing.  And if you -- on the
24     original he looked at, if you move the mouse across some of
25     these links, it shows where you're being rerouted to.

1          THE COURT:  You can tell that in English rather than

2   Arabic?

3          MR. AUERHAHN:  Yes.  Yes.

4          THE COURT:  Okay.

5          MS. PATEL:  We would ask for it to be held until

6   there's a translation.  We don't know what it says.

7          THE COURT:  Well, it's in.  It was admitted yesterday.

8          MS. BASSIL:  Over our objection.

9          THE COURT:  It's a thing.

00:15 10          MS. BASSIL:  Yes, but he doesn't speak Arabic, to my

11   knowledge, this guy.

12          THE COURT:  But he's not going to be purporting to.

13   He's not going to translate it.

14          MS. PATEL:  Nor will he testify about what it says.

15          MR. AUERHAHN:  He's going to testify, as I said --

16   should I respond, your Honor?

17          THE COURT:  Well, no.  I mean, I think it's -- do you

18   expect this witness to be done by ten?

19          MR. AUERHAHN:  Yes.

00:16 20          THE COURT:  Okay.

21          MR. AUERHAHN:  Unless we approach sidebar a lot.

22          (In open court:)

23   BY MR. AUERHAHN:

24   Q.   Now, sir, you don't speak Arabic?

25   A.   No, sir.

1    Q.    You don't read Arabic?

2    A.    No, sir.

3    Q.    Okay.  So we're not going to ask you to translate the

4    Arabic on this page, but can you tell us what this is?

5    A.    This particular page is a -- when you take your cursor and

6    you place your cursor over the top of the various numbers you

7    can see, it starts at the top where you see "598," and then

8    below it you've got "150," then below it "65.6."

9           From my examination of the computers, this page in

00:17 10   particular, when you hover over each of those numbers, it will

11   then show you the location -- there's a hyperlink that sits

12   behind that.  And a hyperlink is basically a location elsewhere

13   on the internet, or elsewhere on your computer, where the

14   actual document, or in this case the video clip, is.

15          So if you go back to what I was talking about shortly -- a

16   few minutes ago, the YouSendIt, you could put that link to

17   YouSendIt, the thing you've uploaded in there, for instance.

18   So on this single document you could just click on this

19   document and it would actually take you to that YouSendIt link

00:17 20   and download the video.

21   Q.    And in this case did you identify the -- as you said, the

22   locations where each of these links would take you?

23   A.    Yes.  On the html page, when you hover you can actually

24   see the location.

25   Q.    Okay.  And did you click any of the links to then view the

 1  contents?

 2  A.   The links will only be opened when you're actually live

 3  and on the internet.  So obviously, if you click it, your

 4  Internet Explorer, perhaps, will open up.  And because you're

 5  not connected to the internet it won't go anywhere, but it will

 6  pull up the -- whatever the website address is into that

 7  location.

 8  Q.   Okay.

 9       MR. AUERHAHN:  And can you pull up Exhibit 373,

00:18 10  please?

11  Q.   And, now, there was testimony yesterday that this was

12  found on Mr. Tsouli's desktop?

13  A.   Yes.

14  Q.   Can you tell us what that is?

15  A.   Okay.  Mr. Tsouli had taken a video film called

16  "Harb al-Mostadafeen."  That video film was on his computer in

17  numerous sizes from, you know, several hundred megabytes down

18  to 50 megabytes.  Then a web page was constructed giving the

19  location of these various video films, where they're going to

00:19 20  be located.

21       This is just a text document on Tsouli's desktop where he

22  basically just copied and pasted the actual location onto a

23  piece of paper, effectively, and then saved it.  So it's just

24  literally a short note.

25       Where you can see the gobbledygook underneath, if you look

1    at this particular page, and perhaps you've got set up on your

2    Windows computer Arabic, you will read that -- that will be an

3    Arabic word.

4    Q.    Now, sir --

5          MR. AUERHAHN:  You can shut that down.

6    Q.    -- are you familiar with something called Irhaby007?

7    A.    I am, sir.

8    Q.    And what is Irhaby007?

9    A.    Irhaby007 is a pseudonym and nickname that Younis Tsouli

00:20 10   had adopted.  Consequently, numerous websites have been set up,

11   email addresses have been set up, with that as the moniker.

12   Q.    And carrying forth on that point, are you familiar with

13   irhaby007.ca?

14   A.    I am, sir, yes.

15   Q.    And what is that?

16   A.    Tsouli had set up a domain name called irhaby007.ca.  That

17   domain name was set up on the internet.  The person who set it

18   up gave their email address as a contact address for it, and

19   that was one of the email addresses that Younis Tsouli used.

00:21 20         Having set up the domain of irhaby007.ca, what's happened

21   then is a chunk of web space gets purchased.  Basically, that's

22   his name.  He's paid for the use of that name.  To run a

23   website, he actually needs to have his product somewhere in the

24   internet.  And on this occasion, a chunk of web space was

25   purchased from a server -- service provider called SurfSpeedy

1  in the United States.

2      And a chunk of space was purchased and a chunk of

3  bandwidth -- if you upload something to a website and download

4  it, it uses up bandwidth.  So when you actually purchase this

5  chunk of space, you have to stipulate how much bandwidth you

6  want associated with it because, obviously, the company -- if

7  you're going to need to be uploading and downloading large

8  amounts of data, then obviously that company would charge you a

9  lot of money for it.  If all you're going to do is perhaps

00:22 10  store your own personal stuff on it and not touch it, then

11  obviously your bandwidth will be very limited, so, therefore,

12  it will be cheaper, so...

13  Q.   Did you find items on Mr. Tsouli's computer that connected

14  him specifically to irhaby007.ca?

15  A.   I did, sir, yes.

16  Q.   Can you enumerate those, please?

17  A.   Oh, first things first.  When you look -- when you've got

18  your computer running, you can do what's called "screen shots,"

19  which is you use the Control and one of the F numbers at the

00:22 20  top, you'll have a screen print.  And that's an exact image of

21  what you're looking at.

22      Well, Mr. Tsouli had a program called ScreenHunter on his

23  computer which does a better job than taking a screen shot, and

24  on his computer there was an image -- there was an image called

25  ScreenHunter Free.  And when you looked at that image, that was

1    a screen shot of this -- Mr. Tsouli's computer, DRH/1

2    physically in the control panel for irhaby007.ca.  As mentioned

3    before, when you purchase this chunk of web space, you can

4    then, obviously, administer your chunk of web space.  And the

5    way you do that is by a tall cord to the control panel.  So

6    that's what that screen shot was.

7        Also in Mr. Tsouli's computer there's a chunk of space

8    called pagefile.sys.  And when you -- the way I understand it

9    is when you're working on your computer, if you're not actually

00:23 10    saving it as a Word document, you're just typing away, that has

11    to go somewhere.  And this piece of -- chunk of space called

12    the pagefile.sys is just where that sits, just a temporary

13    space.

14        When I examined the pagefile.sys I found the remnants of

15    the YouBombIt page.  At the same time with that YouBombIt page

16    is the logiton@irhaby007.ca in the admin, and the IP address

17    that Mr. Tsouli -- Mr. Tsouli had set his computer up to

18    maintain the same IP address.  And that IP address was all over

19    the place on the computer and on various other bits and pieces.

00:24 20    And basically, that IP address showed it was connected to the

21    irhaby007.ca with this YouBombIt banner.

22    Q.   And did you also find any passwords to this site,

23    irhaby007.ca?

24    A.   Yes.  As I mentioned, when we searched Mr. Tsouli's

25    address, he had his computer and it was sitting on a

1   desktop -- sitting on the desk in his bedroom.  But also there

2   was a piece of paper that we called Exhibit DRH-10.  And that

3   was just a piece of paper with dozens of internet site names

4   and email address names with the passwords with it.  And on

5   that piece of paper was a irhaby007.ca and his administration

6   password.

7           MR. AUERHAHN:  Okay.  Can you pull up Exhibit 293,

8   please?

9   Q.   Does this appear to be an email address to

00:25 10  ibnul_khattab82@yahoo?

11  A.   That is correct, yes.

12  Q.   From at-TibyI'n Publications Forums, admin@at-tawheed.com?

13  A.   Yes, sir.

14  Q.   On the 14th of April, 2006?

15  A.   Yes, sir.  That's correct.

16  Q.   And it is addressed to Abu Sabaayaa.  "You have received a

17  new private message at At-TibyI'n Publications from

18  nasrullahiqareeb.  Please click here to log in and read it."

19  A.   Yes, sir.

00:26 20  Q.   Now, did you have an opportunity to review items seized

21  pursuant to a search warrant in the United States relating to

22  at-Tibyan Publications?

23  A.   I did, sir.

24  Q.   And did you become familiar with emails such as this?

25  A.   I did, sir.

1     Q.   Okay.  And was that -- could you explain to us this "you

2     have received a new private message"?

3     A.   Okay.  On this chunk of web space purchased from

4     Tibyan -- I'm sorry -- purchased at SurfSpeedy, that's his

5     chunk of web space.  He could run what websites he likes from

6     there and do what he likes in that chunk of space.  In 2005

7     when we did our investigation, running in that chunk of web

8     space was the answernet, internet forum, and the Tibyan

9     Publications forum.

00:27 10       Now, these forums are a chat forum and you -- basically,

11    when you log onto the internet you can go to a forum, you can

12    register as a user on a forum, and then you can exchange your

13    points of view with various people and you can also set up

14    private messages between people.  So if my friend is on that

15    particular forum and I want to send him a private message, like

16    an email which is based within the forum, I can just send him a

17    message.

18         Now, if his settings set up so that -- when he receives a

19    private message he can set it up so that he receives it and it

00:27 20   then generates an email from the forum to his private email

21    address to say, "You've got a private message."  And this is

22    what I can see here, a private message from the forum telling

23    Ibnul Khattab that he has a private message waiting for him in

24    the forum.

25    Q.   Okay.  And I want to draw your attention to this,

1    irhaby007.ca.  Is that the chunk of web space you were talking

2    about, or the domain name that you were talking about?

3    A.    That's the domain name that Tsouli purchased.

4          MR. AUERHAHN:  Can we bring up 576, please?  Second

5    page.

6    Q.    Actually, before I go to the second page, is this a chat

7    session between ibnul_khattab82@yahoo.com and Ahmad AS on

8    February 2, 2006?

9    A.    That's correct; yes.

00:28 10        MR. AUERHAHN:  Next page, please.

11   Q.    Can you read the Ahmad AS?

12   A.    "Hey.  Hey, do you still only go to anamuslim for Arabic

13   boards?"

14   Q.    "For Arabic?  Yes."

15   A.    "What about English?"

16   Q.    "TP.  Tampon pubs."

17   A.    "Laugh out loud."

18   Q.    Go on.

19   A.    "What's their link?"

00:29 20   Q.    "Their link is set at http://www.at-tawheed.com."

21   A.    "What's their article site" --

22   Q.    Continue.

23   A.    -- "where they put up the stuff they finished publishing?"

24   Q.    "Still being revamped.  It all got erased when Ismiyy got

25   taken.  So they are redoing it.

1          "Mu'awiyah called me yesterday."

2     A.    "The third bro who got arrested.  Dan said his name was

3     'Worshipper of Allah' or something like that.  I can't

4     remember, but I saw him post on some of the forums."

5     Q.    Now, before we move to the next page, TP and tawheed.com,

6     do you recognize those references?

7     A.    Tibyan -- "TP" is -- they -- quite often, from

8     observations during the course of my investigation, they

9     abbreviate "Tibyan Publications" to TP.

00:30 10     Q.    Okay.  And when it says "When Ismiyy got taken," do you

11     know an individual who used the moniker "Ismiyy"?

12     A.    "Ismiyy" is one of the monikers that Waseem Mughal used.

13             MR. AUERHAHN:  Okay.  Can we go to the next page,

14     please?

15     Q.    And he said, "I hope they have female guards.  You should

16     still have your account."

17             MR. AUERHAHN:  Can we go to Exhibit 689, please?

18     Q.    All right.  Can you start reading what's indicated in

19     Mu'awiyah?

00:31 20     A.    "Akhi," brother.  "Any news from our brothers Abu Dujanah

21     and Ismiyy?"

22     Q.    Before I read, are you familiar with the moniker

23     "Abu Dujanah"?

24     A.    "Abu Dujanah" is the name moniker that Tariq al-Dour used.

25     Q.    And that was the third location?

A.   That was -- Tariq al-Dour, his address that we searched

was in Queens Court in Queensway, West London.

Q.   And you already identified Ismiyy as Mughal?

A.   Ismiyy is Mughal, yes.

Q.   "Nothing, but I suspect they are okay but simply cannot

communicate.  Like, possibly have been released.  Allah knows

best."

A.   "Are you sure, akhi," brother?

Q.   "No.  I'm just suspecting."

A.   "Lastly I have heard, and it was in haganah that they have

been accused as associates of irhabi007."

Q.   And you've already identified irhabi007 as Tsouli?

A.   Mr. Tsouli, yes.

Q.   "Yeah, cause" --

A.   "I guess you know irhabi007."

Q.   -- "he was the bro arrested with them.

     "Hehe.  Who doesn't?"

A.   "Yes.  And they are still being held from what it appears.

I'm feeling sad for our brothers and sad for the situation of

us ahlas sunnah."  Then it says, "People of the Sunnah in

totality."

     "Akhi," brother --

Q.   I'm sorry.  Go ahead.

A.   "Akhi," brother, "I'm feeling very depressed.  We are so

weak, and so much persecuted, and we are stateless and

homeless.  Persecuted mentally, spiritually, physically and

economically.  May Allah's curse be upon the U.N., the

crusaders and bearers of democratic capitalism."

Q.   "Brother, this is an honor for us."

          MR. AUERHAHN:  Can you bring up Exhibit 414, please?

Q.   Sir, do you recognize what this is?

A.   This is a private message in Tibyan Publications, and it

is from -- it's in Abu Sabaayaa's account and it's --

Q.   Over here?

A.   That's correct.  Yes.  And it is a message from Khubayb

al-Muwahhid.

Q.   Is that a moniker that's familiar to you?

A.   It is an Ensahnal Sadeeqe's moniker.

Q.   The individual you identified as Sadeeqe who was on line

with Mr. Tsouli when --

A.   That's correct, yes.

Q.   All right.  And if you could just -- "I hope this reaches

you in all good health and Eemaan.

     "Noble brother:  I have noticed on this forum many of your

beneficial translations which you have done.  I asked the other

brothers of at-Tibyan Publications, and we wanted to ask you if

you would be willing to join our Da'wah efforts and help us

translate books.

     "Here are some of the projects we are currently working

on:" and then he lists some projects and says, "We hope you

```
 1   will be interested.  Inshaa'Allah."  Is that correct?
 2   A.   That's correct, sir.
 3         MR. AUERHAHN:  Can we bring up Exhibit 378, please?
 4   Q.   And this was previously identified as coming from Mughal's
 5   thumb drive?
 6   A.   Yes, sir.
 7   Q.   And you recognize -- actually, you already testified more
 8   than once who Irhaby007 is.
 9   A.   Yes.
10   Q.   How about the moniker "yesyes"?
11   A.   "Yesyes" was identified as being Waseem Mughal.  When
12   you're in these chat forums, it normally shows your email
13   address that you're locked in at, your name, but you can also
14   put a friendly name.  So you could change your email address
15   and then have a name after it, Mickey Mouse, and then in the
16   chat forum "Mickey Mouse" would be the person talking.
17   Q.   I'll read Irhabi if you would read the Yesyes.
18        "Al salaam alaykum."
19   A.   "Wa alaikum as salaam."
20   Q.   "I received audio and video of 'Abu Layth al-Libby.'"
21   A.   "Really?  Wicked.  LOL.  What is he saying?"
22   Q.   Then there are four links.  Do those appear to be video
23   files?
24   A.   That's correct, sir.
25   Q.   The first two appear to be the same?
```

```
 1   A.   Yes.  You've got a Real Media video file.  It's just

 2   called a number which ends 1426H.rm, and then from

 3   ansary.info/files you've got another file which is

 4   20-5-1426H_video.rm; and the next one has actually got a name

 5   now in this one, layth_20-5-26.wmv, Windows media file --

 6   Windows media video; and then the final one is bashto.wmv.

 7   Q.   And continuing:  "They haven't yet released, I think."

 8   A.   "I see."

 9   Q.   "They have their website and thing but it's hidden."

10   A.   "Coolness.  Jazak Allahkhiar."

11   Q.   "So you get the files and put them somewhere else."

12   A.   "You don't know how much I love his talks.  Shall I put

13   them on YouSendIt" --

14   Q.   "I put them on ansar cos unmetred."

15   A.   -- "or upload them somewhere else?"

16   Q.   "Just distribute those links, if you want.  Would be

17   better though to wait till they post them."

18   A.   "Do you want me to distribute these ones?  Ahh, okay.  I

19   will wait insha'Allah."

20   Q.   "Yeah, but wait get them."  [Sic]

21   A.   "Okay."

22   Q.   "First insha'Allah would be good to translate though,

23   laugh out loud, AQ in Iraq asked me to contact TP and ask you

24   guys to work on translating 'Thurwat al-Sanaam,' their official

25   online ebook."
```

00:36  (line 10)
00:37  (line 20)

1    Sir, "AQ in Iraq," do you have a belief as to what that

2    refers to?

3    A.   Yes.  Al Qa'ida in Iraq was -- well, they say Abu Musab

4    al-Zarqawi, he was the leader of al Qa'ida in Iraq, and they

5    then joined up with al Qa'ida.

6    Q.   And you already said "TP" is "Tibyan Publications"?

7    A.   Correct.

8    Q.   Do you know what "Thurwat al-Sanaam is," their online

9    ebook?

00:38 10    A.   "Thurwat al-Sanaam" is a booklet of al Qa'ida in Iraq,

11    sir, propaganda, in respect to what they're doing in Iraq.

12        MR. AUERHAHN:  May we have Exhibit 427, please?

13    Q.   Now, do you recognize what this is?

14    A.   Yes, we're looking at another private message from

15    Aboo Mahmoud al-Muraabit.  And it's from him and it's in the

16    account of Abu Sabaayaa.

17    Q.   Did you identify whether or not Mr. Muraabit had a role in

18    at-Tibyan based on your review of the Tibyan website?

19    A.   Yes.  He was one of the administrators and moderators on

00:38 20    the website.

21    Q.   And does it say, "The ikhwaan from the cloud people are

22    asking us if we translate this message from the al doctoor

23    regarding curryland," and then there's a link to a

24    note.to.pakistan.mpg?

25    A.   Yes, sir.

1          MR. AUERHAHN:  Can we bring up Exhibit 376, please?

2    This is an exhibit identified as "note.to.pakistan" on

3    Mr. Tsouli's computer.  And if you could go to about 20 seconds

4    and then if you could move -- that's good.  Hit "play" there.

5          Okay.  Can you pause that, please?

6    Q.   Sir, do you recognize the person depicted in the

7    photograph?

8    A.   That's Dr. Ayman al-Zawahiri.

9    Q.   Is he sometimes referred to as "al doctoor"?

00:40 10   A.   Yes, sir.

11   Q.   And it says "As-Sahaab" underneath him to the right?

12   A.   Yes.

13   Q.   Do you know what that is?

14   A.   That's the media wing for al Qa'ida in Iraq.

15   Q.   And do you know what "sahaab" means?

16   A.   The cloud.

17         MR. AUERHAHN:  Can we bring up --

18   Q.   And this was incident -- I'm sorry, a private message from

19   Mr. Muraabit, correct, the one we just read before?

00:40 20   A.   Yes, sir.

21         MR. AUERHAHN:  Can we bring up Exhibit 590, please?

22   And go to page 2, please.  I'm sorry.  It's not page 2.  Page

23   5.  I apologize.  Okay.

24   Q.   First, is this a chat that ends April 19th between

25   Ahmad AS and Arabic characters which you can't read but which

1    you previously identified as the defendant?

2    A.    Yes, sir.

3    Q.    Does Ahmad AS say, "Is al-Muraabit on your buddy list?"

4    A.    "On msn?  Yeah."

5    Q.    "Do you know if he uses tor?"

6    A.    "Yes, he does."

7    Q.    "Can you give me his msn messenger?"

8    A.    "Sbualy@gmail.com."

9    Q.    Sir, in preparation for your testimony, did you have an

00:41 10   opportunity to review some evidence seized in the United States

11   in connection with the Mehanna investigation?

12   A.    I did, sir.

13          MR. AUERHAHN:  And may I approach, your Honor?

14          THE COURT:  All right.

15   BY MR. AUERHAHN:

16   Q.    And did you have an opportunity to examine 1B72?

17   A.    Yes, sir.

18   Q.    And just take it out and look at the disk.  And does it

19   indicate that's a FTK disk of 1B1, which was identified as the

00:42 20   defendant's computer?

21   A.    Yes, sir.

22   Q.    Did you have an opportunity to review some chat logs on

23   that particular disk?

24   A.    I have done so, sir.

25   Q.    And is one of the chat logs sbualy@gmail.com?

1   A.   Correct, sir.

2   Q.   Now, do you recall the screen names that you saw, or the

3   monikers you saw, in the chat log entitled sbualy@gmail.com?

4   A.   It's -- perhaps if I could see the actual document, sir,

5   just to remind me of the actual names.

6   Q.   Well, would it refresh your recollection, Saleh al-Bualy?

7   A.   Yes, sir.

8   Q.   Is that one of them?

9   A.   That's one of them, yes, sir.

00:42 10   Q.   And was Abu Mundhir one of them?

11   A.   Yes, sir.

12   Q.   And sbualy, the file name, was as we see up on the screen,

13   sbualy@gmail.com?

14   A.   Yes, sir.

15        MR. AUERHAHN:  Can we bring up Exhibit 526, please?

16   Q.   And is this a chat session between Abu Mundhir, one of the

17   names you just mentioned, and ibnul_khattab82 on April 20th?

18   A.   Yes, sir.

19   Q.   They exchange greetings, "Peace be upon you," "Peace be

00:43 20   upon you," and then Mr. Mundhir says, "Brother, do you

21   know" --

22        MR. AUERHAHN:  Next page, please.

23   Q.   -- "anyone with the email ahmadas19 al faris al masloob?"

24   A.   "Al-Fudayl."

25   Q.   "Oh, he tried adding me and I blocked it."

1    A.   "He asked me for your msn."

2    Q.   "Laugh out loud.  I didn't know who it was.  Okay.  If

3    added it, it's Yahoo, right?"  *[Sic]*

4    A.   "Ya."

5    Q.   "K."

6         MR. AUERHAHN:  Could you bring up Exhibit 415, please?

7    Q.   And, sir, do you recognize what this is?

8    A.   This is one of Abu Sabaayaa's private messages from Aboo

9    Mahmoud Al Muraabit, and it's from irhaby007.ca, which is the

00:44 10   actual domain name purchased by Tsouli, and it's the Omar Hadid

11   video, sir.

12   Q.   And that's what you're reading here?

13   A.   That's correct.  It's a link to that particular video,

14   sir.

15   Q.   And does Mr. Muraabit say, "Don't share until released on

16   TP officially or I'll get in trouble, laugh out loud"?

17   A.   Yes, sir.

18        MR. AUERHAHN:  Can you bring up 529, please?

19   Q.   And is this a chat between Mr. Mundhir and the defendant

00:45 20   on April 24th, 2006?

21   A.   Yes, sir.

22   Q.   Does Mr. Mundhir say, "Akhee, I need a favor"?

23   A.   Yes.

24   Q.   "If you could post in the board on my behalf saying I

25   don't think it's a good idea to do since it will make it so

1   obvious that who we are, et cetera.  The idea that they had to

2   shut it down."

3   A.   "Oh, yeah.  Okay."

4   Q.   "Please tell them that's like the dumbest thing they can

5   do."

6   A.   "So tell them al-Mbt says so?"

7   Q.   "Yeah.  Tell them to just cancel the driver accounts, like

8   suspend them.  That's enough."

9   A.   "I happen to agree w/u, so I'll say that.  But why aren't

00:45 10   you posting yourself?  Any reason?"

11   Q.   "I don't want to go on.  If you read the articles about

12   them, you'll understand."

13   A.   "About who?"

14   Q.   "Them."

15   A.   "Mashi, okay."

16        MR. AUERHAHN:  Next page, please?

17   Q.   "Kb and them" --

18   A.   "Yeah.  Ah.  Yes.  I understand."

19   Q.   -- "K?"

00:46 20   A.   "Any prbls since then?"

21   Q.   "No.  But I don't know.  Supplication, please," smiley

22   face.

23   A.   "Yes, as always."

24   Q.   "Yeah."

25   A.   "I'm a little slow, but tell me which driver accounts."

        1   Q.   "Kbs and mur."

        2   A.   "Just those?  Okay."

        3   Q.   "Yeah."

        4   A.   "Ibn U already did that for Khbs yesterday."

        5   Q.   "Yeah.  So for mine too just in case.  Not ban, but just

        6   susp, okay?  Me out.  Talk to you later."

        7            MR. AUERHAHN:  Can you bring up 592, please?

        8   Q.   And is this a chat between Ahmad AS and the defendant on

        9   April 24th, 2006?

00:47  10   A.   Yes, it's from -- yes, sir.

       11   Q.   Okay.  "Dude, I'm thinking if hnn thing for learning

       12   works, we might as well study.  Even if work is not

       13   guaranteed."

       14   A.   "Hnn?"

       15   Q.   "At least we can find some over there.  Hsn's uncle."

       16   A.   "Oh, no.  I'd rather not.  Unless something is relatively

       17   certain, it's not worth it."

       18   Q.   "One thing I think is relatively certain...dj, ism, khub,

       19   then...then?"

00:47  20   A.   "And over there, that's out of the question."

       21   Q.   "Hey, what did you mean about murabit's driver account?"

       22   A.   "Dude, murbt is one of the C NDA 3."

       23   Q.   "Yeah, who are the others?"

       24   A.   "Don't know."

       25   Q.   "But what is a 'driver account'?"

1  A.   "Oh, just his account like, to have it suspended but not

2  permanently deleted."

3  Q.   "Laugh out loud, but Y?"

4  A.   "He asked me to ask.  He's paranoid."

5  Q.   "Oh, laugh out loud.  Well, I think he's justified."

6  A.   "Yeah, so do I."

7       MR. AUERHAHN:  Next page, please.

8  Q.   "Remember, just because you're paranoid don't mean they're

9  not after you."

00:48 10       MR. AUERHAHN:  Can you bring up Exhibit 382, please?

11  Q.   And this was already identified as being found on Mughal's

12  computer, correct?

13  A.   Yes, sir.

14  Q.   And, again, you don't read Arabic?

15  A.   No.

16  Q.   Okay.

17       MR. AUERHAHN:  Can you bring up Exhibit 296, please?

18  Q.   Now, does this appear to be an email?

19  A.   That seems so to me, sir.

00:48 20  Q.   Okay.  April 2, 2007, from a Henry Miller to Tariq

21  Mehanna, ibnul_khattab82.  Do you know a Henry Miller?

22  A.   Yes, sir.

23  Q.   And who was Henry Miller?

24  A.   Henry Miller is the -- he was the attorney for

25  Tariq al-Dour.  Henry Miller works at Birnberg Peirce,

1    solicitors in London.

2    Q.   And were stored chats found on Mr. al-Dour's computer?

3    A.   Yes, sir.

4    Q.   And have you had a chance to look at the attachments to

5    this particular email?

6    A.   Yes, sir.

7    Q.   And what do you recognize them to be?

8    A.   I recognize them to be some of those emails -- some of

9    those chat sessions from Mr. al-Dour's computer media.

00:49 10        MR. AUERHAHN:  Okay.  Can we go to page 28, please?

11   Q.   And does this appear to be a chat session between

12   Abu Dujanah and ibnul_khattab82?

13   A.   Yes.

14   Q.   And, again, Abu Dujanah, that's Mr. al-Dour?

15   A.   Yes, sir.

16   Q.   And I'll read what's identified as Abul-Hasan.

17        "Did your thing with the cc work?"

18   A.   "I haven't done anything with it.  Hey."

19   Q.   "Hmm.  Why not, man?"

00:50 20   A.   "I haven't really done anything."

21   Q.   "Yanee.  You haven't got the fuloos or you haven't done

22   anything with the fuloos?"

23   A.   "Naa."

24        MR. AUERHAHN:  Next page, please?

25   Q.   Continue, please?

1    A.    "I haven't done anything with it.  Isn't still there as it

2    was."

3    Q.    "Hmm.  Use it, dude, or let me use it."

4    A.    "How do you use it?"

5    Q.    "That's for me to decide.  And for you to assume the best

6    about.  Heh, feed the poor, among other things."

7    A.    "I can give you all the details."

8    Q.    "Okay."

9    A.    "On Tuesday I can."

00:50 10    Q.    "Okay, man."

11    A.    "One thing you can do.  Actually, it's up to you, it's a

12    discover C."

13    Q.    "How much is in it?"

14    A.    "10K yabni.  Listen, go to" --

15    Q.    "Masha'Allah."

16    A.    -- "www.DiscoverCard.com, user name:  Scotch; password:

17    Sshoudt.  Logged?"

18    Q.    "Nope.  Not working."

19    A.    "Hmmmmm."

00:51 20    Q.    "One sec.  Sorry.  SS" -- no, I'm sorry.  I'm reading your

21    part.  Go on.

22    A.    "One sec.  Sorry.  Sshoudt and password:  Scotch."

23    Q.    "Damn.  It says I've exceeded the maximum number of

24    attempts."

25    A.    "Ooooooo.  Yaadilneela" -- I can't pronounce the word,

1    unfortunately.  "Haha.  Delete the cookies and wait ten minutes

2    or so."

3    Q.   "Damn."

4    A.   "Check in four minutes.  Heh."

5    Q.   Go on.

6    A.   "But that's the correct log-in info."

7    Q.   Okay.  On the previous page when I talked about "cc" and

8    "Discover," what do you believe that's a reference to?

9    A.   Credit cards, basically, sir.  I understand Discover is an

00:52 10   American-type credit card.  And Mr. al-Dour was very much into

11   compromised credit cards, sir.

12        MS. PATEL:  Objection, your Honor.  Move to strike the

13   last part of that.

14        THE COURT:  Sustained.  That last answer will be

15   stricken.

16        MR. AUERHAHN:  Can we go to page 31, please?

17   BY MR. AUERHAHN:

18   Q.   And is this a chat session June 28, 2004, again, between

19   Ibnul Khattab and Abu Dujanah?

00:53 20   A.   Yes, sir.

21   Q.   Again, Abul-Hasan -- Ibnul Khattab says, "Asalamu alaikum.

22   What's the log-in info again, man?"

23   A.   "Wa'alaykum assalam wa" -- I can't pronounce the word,

24   sir -- "em.  Sshoudt scotch."

25   Q.   "Okay.  It's a go."

```
 1   A.   "Go?"

 2   Q.   "It logged in."

 3   A.   "Oh, okay.  Look at it heh."

 4        MR. AUERHAHN:  Next page.

 5   Q.   Continue.

 6   A.   "Look at his recent purchases."

 7   Q.   "Okay, dude.  Who does this belong to?"

 8   A.   "This belongs to an American policeman who lives in Ohio.

 9   Old guy.  Sheriff."

10   Q.   "Okay.  Maybe I should log out cause I'm on my school

11   account."

12   A.   "Naa, I think that's fine."

13   Q.   "Habibi," and then an Arabic word?

14   A.   "Yeah, it should be dbe fine."

15   Q.   "Okay.  Now, how do I benefit from this experience?"

16   A.   "If you wanna use it, and wanna make the most of it, the

17   most guaranteed approach would be to change the address and

18   phone to one you own.  Okay" -- sorry -- "ouy can do that

19   online.  Then order" -- I can't read the word, unfortunately,

20   sir, it's small.  "Then order (change the addy to somewhere you

21   rent)."

22   Q.   "I think" --

23   A.   "It's great."

24   Q.   -- "I'll start with the cash-back bonus award.  Why didn't

25   you use this?"
```

00:53 (line 10)
00:54 (line 20)

```
    1   A.   "What's that?  Cause Discovers are hard to use in the

    2   U.K., man.  They don't exist here."

    3   Q.   "Hmm.  So this is an active account?  This is a credit

    4   account of this family in Ohio?"

    5   A.   "Yeah, man.  Yeah."

    6   Q.   "So" --

    7   A.   "You want the full details, I can give you, but not now."

    8   Q.   -- "if I take out all the money, they'll be broke?"

    9   A.   "Aha.  Hmm.  Temporary, yeah, unless they have other

00:55 10   accounts, which is likely too."

   11   Q.   "Hehe.  Okay.  And if they track it to me, I'm toast."

   12        Go to page 38, please.  And in the middle there's a chat

   13   session, July 6, 2004, between the same two parties:

   14   Abul-Hasan -- Ibnul Khattab says, "What's your favorite video?"

   15   A.   "Erm.  I don't know."

   16   Q.   "Okay."

   17   A.   "You?"

   18   Q.   "Uhh, 'State of the Ummah,' man.  That's what started it

   19   all."

00:55 20        MR. AUERHAHN:  Can we go to page 68, please?

   21   Q.   And is this a chat between the same two parties March 30,

   22   2004?

   23   A.   Yes, sir.

   24   Q.   I'll start again, Mr. Ibnul Khattab, "You know man the

   25   people of Fallujah" --
```

```
 1   A.   "Yeah."

 2   Q.   -- "never cease to amaze me," and then an Arabic word.

 3   A.   "Heh."

 4   Q.   "Did you see a pic of the bodies hanging from the bridge?"

 5   A.   "Yeah."

 6   Q.   "Heh.  Amazing."

 7        MR. AUERHAHN:  And finally, if we could go to page 88,

 8   please.

 9   Q.   Now, on the bottom, is this a chat session January 31,

10   2004 --

11        MR. AUERHAHN:  Can we go to the next page?

12   Q.   -- between Mr. Dujanah and the same individual, correct?

13   A.   Yes, sir.

14   Q.   Okay.  Here he's referred to as "Abu Sabaayaa"?

15   A.   Yes, sir.

16   Q.   "Assalaamu 'alaykum."

17   A.   "Wa'alaykum assalam," Arabics word, sir, also.

18   Q.   "Aki, how far do you live min al-mataar?"

19   A.   "Not very far.  Around..."

20   Q.   "Okay.  Yumkin?"

21   A.   "23 mins away with a car."

22   Q.   Arabic words.

23        And then now before we go on, how far was Mr. al-Dour from

24   Heathrow Airport?

25   A.   Fourteen, 15 miles, sir.
```

00:56 (line 10)
00:57 (line 20)

```
 1   Q.   And if you could continue reading, please?
 2   A.   "Yeah, we could link if you want, but it's a huge place so
 3   I'm not sure where.  Which platform."
 4   Q.   "Look, I don't know yet but I need to ask you for masaari.
 5   It's important."
 6   A.   "Ooooo.  How much, man?  Broke."
 7   Q.   "It's one of those things that Allah will give you rizq
 8   for.  Trust me."
 9   A.   "I hardly have any, but how much do you need?  I could try
00:58 10   and sort it out."
11   Q.   "Alfain," or three.
12   A.   "Uff.  By tomorrow?"
13   Q.   "Yes."
14   A.   "That's almost impossible by tomorrow, man."
15   Q.   "Okay.  Forget about it.  But if y still wanna come by,
16   that would be nice."
17   A.   "Yeah, I could."
18            MR. AUERHAHN:  Next page, please?
19   Q.   Continue reading.
00:58 20   A.   "What time you coming down?"
21   Q.   Arabic words, and then you continue, "Yeah, I could come
22   around seven."  "Okay.  Stay online for a while."
23   A.   "You gonna be alone?  Do you know the save draft thing?
24   Save draft?"
25   Q.   Actually, I was supposed to read that.
```

```
 1          "Do you know the save draft thing?"
 2     A.   "Save draft?  Between -- do you need 2k in dollars or
 3     pounds?"
 4     Q.   "Abu Sabaayaa is now offline."
 5          And then let's go down to here.
 6     A.   "Save draft?  2k in dollars or pounds?"
 7     Q.   "Okay.  So wait.  So I can tell you dollars.  Sorry, I
 8     keep getting disconnected."
 9     A.   "Okay.  Here???"
10     Q.   "Yeah."
11     A.   "Okay.  Talk."
12     Q.   "I'll pm you the user name stuff.  It's
13     mail.islamway.com."
14     A.   "Mail.islamway.com doesn't work."
15     Q.   "No.  Mail.islamway.net."
16     A.   "Okay.  There."
17     Q.   "Okay.  I see.  Akhee, it works."
18     A.   "Yeah."
19     Q.   "Mail.islamway.net."
20     A.   "Mail.islamway.net.  Yeah.  Send me your details."
21     Q.   "Sent."
22          MR. AUERHAHN:  Next page, please?
23     Q.   "Tell me when you've read it."
24     A.   "Okay.  Read it."
25     Q.   "K.  By the way, do we have to leave the place to see you
```

00:59 (line 10)
00:59 (line 20)

1    or do they let you in?"

2    A.   "I can come in but it depends on where you are between.

3    It says 2/2 here, not 1/2."  *[Sic]*

4    Q.   "Huh?"

5    A.   "2nd feb."

6    Q.   "Oh."

7    A.   "Not 1st, which is tomorrow."

8    Q.   "Yeah, it arrives 2nd."

9    A.   "Ooo.  Yeah, I could still meet up, I guess."

01:00 10   Q.   "Do you want me to call you on your cell?"

11   A.   "Yeah.  Got my no, right?"

12   Q.   "You gave it to me before but it's not with me now.  Can

13   you give it to me the way you dial it over there?"

14   A.   "0774 88 55 720."

15   Q.   Okay.  Do you recognize that number, or the format of that

16   number?

17   A.   Yes, sir.

18   Q.   What is that?

19   A.   Well, it's a U.K. mobile cell telephone and that is

01:01 20   Tariq al-Dour's telephone.

21   Q.   Okay.  Abu Dujanah says, "K."

22   A.   "So you're not coming tomorrow, after tomorrow."

23   Q.   "Yup.  Leaving on 'eed in Shaa' Allah.  You like the

24   username/password?  Laugh out loud.  It was Abuzahra."

25   A.   "Laugh out loud.  Yeah.  You didn't explain what it's for

1    between."

2    Q.   And then there's Arabic words down to, "You know which

3    one?"

4    A.   "Mmm."

5    Q.   "You know which one?"  And you say, "Yes, I do."

6         MR. AUERHAHN:  Next page, please?

7    Q.   Can you continue, please?

8    A.   "In Ahmad."

9    Q.   "Yeah."

01:01 10   A.   "2k dollars...mm.  I'll try and see, bro.  I'll ask around

11   and see, etc."

12        MR. AUERHAHN:  Okay.  Page 100, please.

13   Q.   Then between Abul Hassan and Abu Dujanah, Abul Hassan

14   being Ibnul Khattab.  "Japan:  No plans to quit Iraq."

15   A.   "Hahaha.  Maashi.  When they see mashwi soldiers, they'll

16   say something else."

17   Q.   "Bar b q time.  Yeah, we should call the bros and tell

18   them to skewer them over the grill on live TV for added

19   effect."

01:02 20        MR. AUERHAHN:  No further questions, your Honor.

21        THE COURT:  Let me see counsel.

22        (Discussion at sidebar and out of the hearing of the

23   jury:)

24        THE COURT:  Timing.

25        MS. BASSIL:  I have to go.

```
 1                THE COURT:  You have --

 2                MS. PATEL:  I have some questions.

 3                THE COURT:  Okay.  So we'll just break here and then

 4      do cross on Monday.

 5                MS. BASSIL:  Thank you.

 6                THE COURT:  All right.

 7                MR. CARNEY:  Thank you.

 8                MR. AUERHAHN:  He's from the U.K.

 9                MS. PATEL:  And I didn't do any sidebars.

01:03 10                MR. AUERHAHN:  So we're leaving at 11, not 12?

11                THE COURT:  No.  I don't know if you've been -- they

12      know -- the time of the service changed to noontime, so...

13                MR. CHAKRAVARTY:  So it was moved up.

14                THE COURT:  So I thought -- I didn't know whether we

15      might finish with the witness and he could return, but I

16      just -- I'm juggling different things.

17                MR. CHAKRAVARTY:  Okay.

18                (In open court:)

19                THE COURT:  Jurors, for logistical reasons this is as

01:04 20      far as we can go today in terms of time, so we're going to have

21      a little bit of an early day.  It's the day before a holiday.

22      You get a little extra bonus, I guess.  We'll resume on Monday

23      at 9 a.m.  So I appreciate your understanding.

24                Have a good weekend, and we'll see you on Monday.

25                We'll be in recess.
```

 1          THE CLERK:  All rise for the Court and the jury.

 2  Court will be in recess.

 3          (The Court and jury exit the courtroom at 9:59 a.m.)

 4          (Lobby conference as follows:

 5          MR. CHAKRAVARTY:  Your Honor, thank you for seeing us.

 6  And being mindful of Mr. Carney's schedule, Mr. Carney served

 7  upon the U.S. Attorney's Office, and then also to immigration,

 8  subpoenas related to certain immigration records of

 9  Hassan Masood, who's expected to be a government witness.  He's

01:14 10  a cooperating witness.  We were hoping to get to him today, but

11  he'll probably testify on Monday.

12          The subpoenas were for three categories of records:

13  the witness's alien file or immigration file; there was a

14  National Special Entry/Exit Registration System, NSEERS, that

15  had been in place, so they were seeking records from that file

16  as well; and then the third was any deportation proceedings

17  against that individual.  They wanted the entire file of the

18  deportation proceedings.  All of those are in the custody of

19  various immigration agencies.

01:15 20          The subpoena was served on DHS, and we have in our

21  presence counsel for Immigration and Customs Enforcement,

22  Mr. Richard Neville.

23          MR. NEVILLE:  Good morning, your Honor.

24          MR. CHAKRAVARTY:  And from Citizenship and Immigration

25  Services, Mr. Bill Richards.

1           MR. RICHARDS:  Good morning, your Honor.

2           MR. CHAKRAVARTY:  And the subpoenas were returnable

3    today with those records.  It was served, I think, yesterday or

4    the day before upon them.  They are assembling some of the

5    records they have.  Some are not in the area; they have to go

6    get them from other areas.

7           The government's interest is both to make sure that

8    the equities that the DHS has; specifically, the fact that the

9    witness has filed, apparently, a claim for asylum, which is

01:16 10   protected by certain regulations of confidentiality.  That

11   restricts some of what these agencies are able to do in terms

12   of not just -- not assembling it, but publicly disclosing it

13   and giving it to defense absent a court order or absent notice

14   to the witness.

15          If the government has standing, and we think we do, we

16   would move to quash based on the fact this is -- it seems to be

17   a discovery tool here as opposed to knowing that there is

18   certain discoverable information.  The issue of whether the

19   witness has a deportation proceeding has been disclosed and can

01:17 20   be used against the witness.  The fact that there has been no

21   promise, reward or inducement by the government in exchange for

22   his testimony has also been disclosed.

23          And as well as there was one -- what we believe to be

24   a false statement that the witness had made in the deportation

25   proceeding.  The tape of that proceeding has been produced, as

```
 1   well as a transcript.  And counsel has had the ability to
 2   transcribe the entire tape.
 3         So counsel has the ability to impeach the witness both
 4   on the fact that there was a deportation proceeding as well as
 5   the fact that he gave false statements in that deportation
 6   proceeding.
 7         So the government feels that this is too far
 8   collateral from the government's --
 9         THE COURT:  Is the witness represented by counsel?
10   MR. CHAKRAVARTY:  He is.
11         THE COURT:  For the purposes of his being a witness in
12   this case?
13         MR. CHAKRAVARTY:  Yes.
14         THE COURT:  Is he represented by counsel in the
15   deportation proceeding?
16         MR. NEVILLE:  He is, your Honor.
17         THE COURT:  Is it the same person?
18         MR. CHAKRAVARTY:  Different counsel.
19         MR. AUERHAHN:  No, it's not the same counsel.  In a
20   deportation it's a lawyer whose expertise is immigration, and
21   the lawyer here is -- does more criminal.
22         THE COURT:  Who is the lawyer here in this case?
23         MR. AUERHAHN:  Jeff Harris from Salsberg & Schneider.
24         THE COURT:  And who is the lawyer in the immigration
25   proceedings?
```

01:17 (line 10)
01:18 (line 20)

1          MR. NEVILLE:  William Joyce, your Honor.

2          MR. CHAKRAVARTY:  I should add, the witness may not

3     know that these records have been subpoenaed.

4          MR. CARNEY:  Thank you, your Honor.

5          This witness's credibility is critical in this case.

6     In 2007, I believe, he and his father were arrested regarding

7     immigration irregularities.  The proceedings went forward.  I

8     believe Attorney Neville represented the government in those

9     proceedings.  Ultimately, the father left the United States as

01:19 10   part of an agreement with the government.

11          In 2009 there was a hearing adverted to by

12     Mr. Chakravarty where the government sought to have this

13     witness deported and made allegations that he had lied on an

14     immigration document, and that there was no basis for him to

15     remain in the United States.  That occurred in September of

16     2009.

17          In October of 2009 the witness met with the

18     prosecutors here, Mr. Chakravarty and Mr. Auerhahn, at their

19     office.  I'm unaware of any further steps that have been taken

01:19 20   to continue with the deportation effort against this witness

21     since 2009, and I believe that the records that are in the file

22     will likely lead to evidence that a jury could suggest that at

23     least in the mind of this witness he has not been deported

24     because he is cooperating in this case with the government.

25          As the Court knows, there need not be an explicit

agreement between the prosecutor and the witness; it's enough
if the witness believes that something he is doing is getting
him this benefit.  The fact that the proceedings started
against him and his father on the same day, and the proceedings
against the father ended quite a while ago and he's still here,
and the meeting occurred one month after this deportation
hearing, I submit makes those deportation records relevant and
I should have access to them.

THE COURT:  Now, is the asylum -- in general, is an
asylum claim made in the course of deportation proceedings?

MR. NEVILLE:  If I may, your Honor, it certainly is.
And I can clarify a little bit about counsel's representation.

Following the hearings in September of 2009, the
immigration judge made a decision.  And this is the transcript
to which Mr. Chakravarty referred to.  That decision was
adverse to Mr. Masood, indicating that he would not be granted
asylum and that he would be allowed to leave the United States
voluntarily.

THE COURT:  This is the son?

MR. NEVILLE:  This is the son.  The father had already
been removed from the United States by that time.

THE COURT:  All right.

MR. NEVILLE:  There is a 30-day period after that
decision in which Mr. Masood, the son, could file an appeal.
He applied, along with his entire family -- the entire family

that remained in the United States.  They filed an appeal with
the Board of Immigration Appeals, and their appeal has been
briefed to the Board of Immigration Appeals.  It is presently
pending before the Board of Immigration Appeals.  The
government has filed a brief in support of the immigration
judge's denial of his application for asylum.

So the case has been proceeding.  A case before the
Board of Immigration Appeals could take several years, and this
is not abnormal.  The only time they become more compressed is
if the person is in detention, and then they have a more rapid
docket.

THE COURT:  Is the docket of that proceeding
available?

MR. NEVILLE:  I believe it is.  I could get it for the
Court, your Honor.

MR. AUERHAHN:  Can I just add one fact?  Mr. Carney
compared, I think -- and Mr. Neville certainly can explain why
it is with reference to the son, but I want to add the fact
that the proceedings with reference to the father moved forward
quickly, but it was a very, very different case.  The father
was indicted for false statements and prosecuted and pled
guilty.  And it was part of those proceedings as well that he
agreed to deportation, so a vastly different schedule of events
in terms of how these cases proceed, while the son is pursuing
appeals through the Board of Immigration Appeals.

 1          MR. CARNEY:  It's notable, your Honor, that during the

 2     hearing Mr. Neville suggested that the son had made similar

 3     false statements in the application for remaining in the United

 4     States that would be almost identical to the allegations made

 5     against the father and prosecuted against the father

 6     successfully.  So the cases between son and father are

 7     certainly different, but you could raise a question about why

 8     they went so aggressively against the father and why on an

 9     identical basis they did not move against the son.

01:23  10          THE COURT:  Well, I don't know that that impeaches the

 11     son's testimony, though.

 12          MR. CARNEY:  It goes to his state of mind.

 13          THE COURT:  Well, it depends on what he knows, I

 14     guess.

 15          MR. CARNEY:  Yes, sir, your Honor.

 16          THE COURT:  Or thinks.

 17          MR. CARNEY:  He knows the father.

 18          THE COURT:  You can ask him what he knows and thinks.

 19          MR. CARNEY:  Yes.  That's exactly what I would do,

01:24  20     your Honor.

 21          But in terms of these records, I believe there will be

 22     information in there that could prove very important to the

 23     son's credibility.

 24          MR. AUERHAHN:  During the --

 25          MR. CARNEY:  One other matter --

 1            MR. AUERHAHN:  Sorry.

 2            MR. CARNEY:  -- Mr. Neville referenced that a claim of

 3     asylum was made.  It was made.  And the -- I do not know what

 4     the witness put in his application to justify remaining in the

 5     United States because of asylum, but that's another factor that

 6     would go to his credibility; in other words, add to his

 7     motivation to want to do everything he can to remain in the

 8     United States if he claims to have a legitimate fear of being

 9     persecuted if he were to be deported to Pakistan; therefore, he

01:24 10     has an even greater motive, I would suggest, to please the

11     prosecution.

12            MR. AUERHAHN:  During the testimony that we've been

13     referencing, there was obviously questioning by Mr. Neville and

14     his counsel about the alleged false statements, about his

15     asylum claim.  So Mr. Carney has discovery of that.  And with

16     reference to the --

17            THE COURT:  Which is what, the transcript?

18            MR. AUERHAHN:  The transcript.

19            THE COURT:  You have the transcript?

01:25 20            MR. AUERHAHN:  He has the entire tape.

21            MR. CARNEY:  I received the transcript yesterday and

22     provided it to the government last night.

23            MR. AUERHAHN:  We had previously provided a CD and

24     only transcribed a few pages, and Mr. Carney has since

25     transcribed the whole thing.  And again, Mr. Carney's

1    representations about it was the same case against the father

2    and son, very different alleged false statements.  The father

3    had years of false statements on multiple issues and that's why

4    he was prosecuted.  The son was cross-examined about his false

5    statements by Mr. Neville, and he testified that essentially,

6    you know, "I was a minor.  My father puts papers in front of me

7    and tells me to sign, I signed them.  I admit I didn't read

8    everything."  I think that was a good deal of his testimony

9    about false statements.  A very different case.

01:26 10        MR. CARNEY:  It's interesting because in the hearing

11   it seems very clear -- well, I don't want to speak for

12   Mr. Neville, but he was a very effective cross-examiner,

13   suggesting whether that was accurate.

14        MR. NEVILLE:  Your Honor, just for the Court's

15   information, the immigration judge did make a finding.

16   Obviously, in asylum cases a lot has to do with credibility of

17   the witness.  The immigration judge did not make an adverse

18   credibility finding against Mr. Masood; however, there's an

19   indication that she wouldn't go -- the judge wouldn't go that

01:26 20  far, but there were perhaps some questions in her mind about

21   his testimony.  But she did not make an adverse --

22        THE COURT:  What's the burden of proof in an asylum

23   claim?

24        MR. NEVILLE:  It's a question -- in this case it

25   actually turns out to be a holding case, so it's more probable

1  than not at that point.

2          THE COURT:  The burden on the immigrant or --

3          MR. NEVILLE:  Yes.

4          MR. CARNEY:  So he didn't meet that burden, according

5  to the judge.

6          MR. NEVILLE:  According to the judge.

7          And, your Honor, perhaps -- it may be possible if the

8  Court would -- and counsel would agree -- to limit it with a

9  court order to the testimony along with the immigration judge's

01:27 10  decision, and I don't know whether counsel will be interested

11  in the briefs of counsel up to the Board of Immigration

12  Appeals, that may take care of it rather than this other stuff

13  that tends not to be...

14          MR. CARNEY:  Excuse me.  I was going to offer another

15  alternative.  I certainly would be willing to receive all of

16  this documentation pursuant to a protective order.  I would not

17  share it with anybody.  I see no reason why I need to share it

18  with my client, even, and I would not do that.

19          And I would further agree that I would bring to the

01:27 20  Court's attention if I wanted to use anything in that file

21  either directly or indirectly in the cross-examination.  And

22  finally, at the conclusion of the witness's testimony, I would

23  agree to return the original document of the file to

24  Mr. Neville or whomever and not keep a copy of it.

25          MR. NEVILLE:  Your Honor, I think there's one issue,

1   and this again --

2            THE COURT:  Let me just say an alternative would be to

3   deliver it in camera and I could screen it for something.  Now,

4   I'm, you know, certainly hearing all this for the first time.

5   I'm not as knowledgeable about the background as defense

6   counsel, so there's some disadvantage.  But there might be some

7   things that are obviously not pertinent.

8            MR. CARNEY:  And nothing of it really could be --

9            THE COURT:  Minimization.

01:28 10         MR. CARNEY:  And nothing of it is in the guise of

11   attorney-client privilege or any other type of privilege.  So

12   that if I were to have access to it, look at it, make sure that

13   if -- that the Court explicitly approved if I were going to

14   either use a document or use a piece of information that I

15   learned from it, and then immediately afterwards return the

16   entire document to you.

17            And the only thing I would ask is if you just handle

18   it in such a way that if in the future anyone else wanted to

19   see what I saw, you'd at least be able to approve it if a

01:29 20   judge -- or produce it if a judge so ordered.

21            THE COURT:  What is the volume of the materials

22   responsive to the subpoena?

23            MR. NEVILLE:  It's probably a file about two inches

24   thick, I would say, perhaps a little thicker.

25            THE COURT:  This is one file?  In other words --

```
 1            MR. NEVILLE:  I was beginning to say, your Honor,
 2    there is -- the witness and his sisters and mother all had a
 3    hearing before the immigration judge at the same time.  So
 4    there are files relating to each one of them and they're kind
 5    of commingled, because their claims for asylum were
 6    based -- were similar.  And so the judge heard this whole
 7    thing.
 8            So that's another issue as far as, you know, what
 9    their rights are, their rights to --
01:30 10            MR. CARNEY:  I can short-circuit that, sir.  I have no
11    interest in seeing any other person's portion of the file.
12            MR. NEVILLE:  But by showing counsel Hassan's file,
13    there's information there.  Because the hearing was all
14    together with the other family members, their information is
15    contained in the same file as Hassan.  And then if
16    there's -- if I may, the issue of bringing this forward in open
17    court.
18            Part of the concern of the family, and Mr. Hassan
19    himself, is that if he's returned to Pakistan, he would be
01:30 20    persecuted there.  And if this information was reported in the
21    newspaper, you know, it may affect his -- if he is returned to
22    Pakistan.
23            MR. CARNEY:  My memory of the transcript is -- to
24    Mr. -- to Attorney Neville's credit -- it is Attorney Neville?
25            MR. NEVILLE:  It is.
```

1          MR. CARNEY:  To Attorney Neville's credit, he brought

2     this issue to the attention of the immigration judge, or the

3     immigration judge sua sponte raised it, and the attorney

4     representing the entire family said they were not asking for a

5     closed hearing and they said they were aware that a reporter

6     was present in the courtroom, and so if the information was

7     publicized either in the United States or in Pakistan, they

8     would prefer to have that happen than not have a closed

9     hearing.

01:31 10          MR. NEVILLE:  And you're right, Counsel.  Thank you

11     for reminding me.  It was two years ago and I forgot entirely

12     about that.  That is correct.  That did happen, your Honor.

13          MR. CARNEY:  While I'm not looking for any part of the

14     file, in particular, it has no interest to me, nor would I

15     question him about anything other than, you know, things that

16     are obvious, which is he's got his mom and his family here.

17          THE COURT:  Why don't you have what you need already,

18     I guess?

19          MR. CARNEY:  Because I only have the transcript of

01:32 20     that hearing; I don't have any other document related to it.

21          THE COURT:  Right --

22          MR. CARNEY:  So the government gave me a transcript of

23     a single --

24          THE COURT:  Having heard the reason why there's been

25     no action to remove him, which is the appeal is pending, that's

1    a neutral explanation that would not affect the witness's

2    credibility.

3         MR. CARNEY:  First of all, I'm not -- I have not read

4    what the judge wrote, which could be a significant factor to

5    the witness; I've not read the government's brief on the

6    appeal, which could also be a significant factor to the

7    witness; and I have not seen if anything else has been filed by

8    the witness in that court either related to the appeal or at

9    the trial court level which could be important to his

01:33 10  credibility, such as what he actually submitted as the basis

11   for why he does not want to go back to Pakistan.

12        That clearly would give him a very powerful motivation

13   to testify in favor of the United States in the hope that after

14   testifying as a witness in this case --

15        THE COURT:  Right.  Even without inducement -- I

16   understand that -- but you have the material.  I mean, you know

17   the proceeding exists, it hasn't been terminated yet against

18   him, and there is some hope that he might gain some advantage

19   with the government in that proceeding by being extra

01:33 20  cooperative in this one.  You have all that already.

21        MR. CARNEY:  Well, when the government supplied me

22   with an excerpt of the transcript, I ordered the entire

23   transcript, and I found some significant things that I view as

24   exculpatory at different parts of that transcript.  I

25   don't think -- I'm not in any way suggesting bad faith on the

part of the government.  Not in the slightest.  But what I am

saying is that if you're a defense counsel who's going to

cross-examine a witness about his bias, you may see things in a

record that indicate to you bias that maybe the other side

looking at doesn't see.

And in this case all I'm asking is for access to the

documents.  And I could even come here to this court and look

at the documents so that they don't even remain in my

possession.  But if there's a letter in there, if there's a

statement submitted by the defendant -- or by the witness,

rather -- rather directly or through his lawyer that I find to

be powerfully impacting his credibility, then I will ask your

Honor for permission to use it.

THE COURT:  Well, why don't we do this:  Why don't you

deliver the documents here and I'll take a look at them and --

because there may be things that are so far away from it that

it's not even worth it.  And if there are things that are in

that category -- and I appreciate the perspective of defense

counsel may be different from how others may see things.  Then

we'll have them here, and we can take it a step at a time.

MR. CARNEY:  If I could identify for the Court and for

my colleagues what I'm particularly interested in, it would be

submissions on behalf of this witness in particular regarding

why he so desperately wants to remain in the United States.

I'm interested in the decision by the immigration judge --

1          I believe it's Robin Feder?

2          MR. NEVILLE:  That's correct.

3          MR. CARNEY:  -- the brief filed by the government and

4     the brief filed by --

5          THE COURT:  On appeal or in the trial?

6          MR. CARNEY:  The brief filed on appeal, although I do

7     believe a brief was also filed in the trial court.  There was a

8     suggestion that that was going to be filed.

9          MR. NEVILLE:  And there was one filed.

01:36 10         MR. CARNEY:  And so those are the documents that I

11    think would be sufficient for me to look at, unless your Honor

12    saw something that was notable.  For example, if ever there

13    were a letter from the prosecutors adverting to anything

14    relating to this case, I would want to see it.  But I'm

15    confident if there were, I would have gotten it from

16    Mr. Auerhahn and Mr. Chakravarty in advance.

17         MR. NEVILLE:  Can we agree, then, to narrow the

18    subpoena just to those documents?  Because some of the other

19    documents you've requested -- the NSEERS is a separate database

01:36 20    that we don't normally keep documents for.  I know there are

21    some NSEERS which --

22         THE REPORTER:  What is that?

23         MR. NEVILLE:  NSEERS.

24         THE COURT:  Say that again.

25         MR. NEVILLE:  NSEERS, National Special Entry/Exit

1   Registration System.

2           -- when people were -- after 2001, persons of certain

3   countries are required to come in and register with immigration

4   at that time.  And so there is -- Mr. Masood did, in fact, come

5   in and register.  This was going back into, I believe,

6   2002-2003, perhaps.

7           MR. CARNEY:  I'll waive that.  I'll waive that.

8           MR. NEVILLE:  So if we could limit it to the documents

9   of the briefs; his application for local asylum and supporting

01:37 10   documents -- and there is an affidavit by him in support of his

11   application; along with the immigration judge's decision and

12   the briefs on appeal, and then the Court can determine what is

13   relevant, that would be acceptable to us.

14           MR. CARNEY:  There is one other area that I'd be

15   interested in.  I have a document that suggests that he was

16   arrested on an earlier occasion.

17           MR. NEVILLE:  He was.  He was arrested along with his

18   father.  And the background of that is he was a beneficiary on

19   his father's application to get permanent residence.  And

01:38 20   because the son at that time was an adult, he was required to

21   come in with his father for an interview.  And during the

22   course of that interview the father made false statements that

23   were the result of this prosecution.  And at that time the

24   father was arrested along with the son.  They were kept in

25   custody, I think, for two or three weeks and then they were

          1    released.

          2            MR. CARNEY:  I would want that record as well because

          3    it gives the witness an additional incentive never to have to

          4    go through that again.

          5            MR. NEVILLE:  There may be --

          6            MR. CARNEY:  Was that in 2003, perhaps?

          7            MR. NEVILLE:  Do you recall?  2003?

          8            MR. CHAKRAVARTY:  2006 is when he was arrested with

          9    his father.  I'm not sure whether -- if he was arrested

01:39    10    previously.

         11            MR. NEVILLE:  I don't think he was arrested

         12    originally; I think he was --

         13            MR. AUERHAHN:  I believe we provided the records of

         14    the arrest as part of discovery.  So if you have the *Jencks* we

         15    provided, or the arrest records.  I believe I saw that in the

         16    discovery provided.

         17            MR. CHAKRAVARTY:  There's other information there too.

         18            MR. AUERHAHN:  Right.  There's other information there

         19    too, but the defendant chats about the fact that he's arrested.

01:39    20            THE COURT:  It's in the exhibits?

         21            MR. CHAKRAVARTY:  It's in the exhibits.

         22            MR. NEVILLE:  Your Honor, that wouldn't be an

         23    additional -- a problem for us to get.  So if you want us to

         24    get all that stuff and present it to Court, we would be happy

         25    to.

    1            MR. CARNEY:  I'm sorry for the delay, your Honor.  It

    2    will just take me a moment, I think.

    3            (Pause.)

    4            MR. CARNEY:  Your Honor, I'm holding a document

    5    entitled "Criminal History Record" --

    6            MR. AUERHAHN:  Right.

    7            MR. CARNEY:  -- that was provided to me by the

    8    government in regard to this defendant.

    9            On page 2 of the document -- I'll -- I'm showing

01:40 10    Attorney Neville --

    11           Pardon me for my back.

    12           -- that this is a record related to Hassan Masood, the

    13    subject here.  On page 2 it says, "Arrest date:  February 13,

    14    2003.  Non-immigrant.  Status:  Violator."  Then the next entry

    15    indicates "Arrest date:  November 15, 2006.  Deportable alien."

    16    The 2006 arrest date, as indicated here, is what led to the

    17    current proceeding.

    18           Is that right, Mr. Neville?

    19           MR. NEVILLE:  No, in fact, to be a little bit more

01:41 20    clear, the 2003 -- which it's indicated as an arrest date on

    21    February 13, 2003, this is when he came in to register under

    22    the NSEERS program.  And at that time he was placed in

    23    immigration proceedings.  I don't believe he was actually

    24    arrested; he was processed.  He was referred to the

    25    investigation section.

1        They took his informations, drafted charges against

2   him for being in the country as an overstay, took his

3   fingerprints and they would go off to the FBI.  And at that

4   point he was processed and released on his own recognizance.

5        During that time period, from the time period -- that

6   that would have started the deportation process, or the removal

7   process, against him, he had this application along with his

8   father that was still pending.  He had appeared before an

9   immigration judge and those cases were held in abeyance until a

01:42 10   decision could be made at that time on that application, and

11   then in 2006 when the father came back in, that's what occurred

12   at that time.

13        MR. CARNEY:  Okay.  So I would be seeking the 2003 as

14   well.

15        MR. NEVILLE:  We can obtain that.

16        MR. CARNEY:  And with that limitation -- those

17   limitations, I think we could reach agreement on that.

18        MR. NEVILLE:  As long as the Court would order it,

19   then we would be --

01:42 20        THE COURT:  Okay.  So why don't we -- when can

21   you -- let me talk about schedule.  You say he was going to

22   testify on Monday?  First of all, we have to finish this

23   current witness and another U.K. witness?

24        MR. AUERHAHN:  No.  We -- we were hoping to get

25   them -- the U.K. guys out of here.  So he testified to what the

1  second witness was going to testify to.  So cross-examination

2  of him, and that's it in terms of the witnesses before Masood.

3          THE COURT:  Okay.  And then who?  Then Masood?

4          MR. AUERHAHN:  Then Masood.

5          THE COURT:  Oh, so he'll be relatively early on

6  Monday?

7          MR. AUERHAHN:  Monday morning.

8          THE COURT:  So is it possible to get those this

9  afternoon here?

01:43 10          MR. NEVILLE:  I believe so, your Honor.

11          THE COURT:  So I could at least look at them before

12  Monday --

13          MR. CARNEY:  All right, your Honor.

14          THE COURT:  -- and we'll just take it from there.

15          MR. CARNEY:  Would I be --

16          THE COURT:  What is your schedule today after --

17          MR. CARNEY:  I'm going to be going to the service

18  right now.

19          THE COURT:  Right.  And then you're going to be back

01:43 20  in the office later?

21          MR. CARNEY:  I can be here later in the day.

22          THE COURT:  I just don't know.  I mean, I have

23  sentencings and things this afternoon.  So I won't get to look

24  at them until mid to late afternoon.

25          MR. CARNEY:  I'm at the Court's convenience.  I'd be

1   on 20-minute call, meaning I could be in your courtroom --

2           THE COURT:  Yeah.  You expect to be back in the office

3   later in the afternoon?

4           MR. CARNEY:  I will be, your Honor, yes.  I don't know

5   how long it's going to go this afternoon.  It starts in one

6   place and goes to another.

7           MR. CHAKRAVARTY:  In terms of our access to it, I

8   would assume it would be that same -- whatever the Court gets

9   as opposed to trying to get a duplicate copy?

01:44 10         THE COURT:  Yeah.  Yeah.  Yeah.

11          Okay.  So Masood will take a little while, I imagine?

12  So will that be the rest of the day Monday?  He'll fill the

13  day?

14          MR. AUERHAHN:  Yes.  Certainly between direct and

15  cross.  I'm not sure direct will take the whole time, but

16  certainly --

17          THE COURT:  Then where do we go?

18          MR. AUERHAHN:  I didn't bring the list with me.

19          THE COURT:  Are we going into other coconspirators?

01:44 20         MR. CHAKRAVARTY:  Yes, there may be a so-called filler

21  witness, a brief witness.  I've been overoptimistic on that,

22  but then we'd probably go into Mr. Pippin, another cooperator.

23          MR. AUERHAHN:  Maldonado is also scheduled for this

24  week.  Again, we're not going to go cooperator to cooperator to

25  cooperator, but -- for example, Brad Davis will probably

testify after Mr. Pippin, before Mr. Maldonado.  And he

interviewed Mr. Abousamra, Mr. Mehanna and Mr. Abuzahra.

MR. AUERHAHN:  But the hope is to do three cooperators

next week.  And if we go past that, we'll be pushing it.

MR. CARNEY:  So that would be Masood, Pippin and

Maldonado?

MR. AUERHAHN:  Right.

And we'll try to, this afternoon, draft out a schedule

for the week just to give loosely -- I mean, it changes every

day because we haven't been very good at estimating things.

THE COURT:  Right.  Right.

MR. AUERHAHN:  But we'll try before the close of

business today to get a schedule that will at least lay out

what we hope to accomplish this week.

MR. CHAKRAVARTY:  And another point of notice to both

the Court and counsel, depending on how cross-examination goes

on Monday, it's likely we will not be calling -- we have three

other witnesses from the U.K. that we had anticipated calling

next week.  It's likely we will forgo calling them altogether

and those exhibits will not come in.

THE COURT:  Okay.  Big picture?

MR. CHAKRAVARTY:  I think we're still two days -- a

day and a half, two days behind schedule.

MR. AUERHAHN:  So we were hoping to finish by

Thanksgiving with the government's case.  I think it's going to

1    pretty clearly slide into Monday, Tuesday, maybe even Wednesday

2    of the week after.  But, again, depending on how long the

3    crosses are and how long some of our directs are.

4         THE COURT:  Okay.  I have a judicial conference

5    committee meeting out of state on the 8th and 9th of December.

6    And because of the distance, I will have to travel on the 7th.

7    So that really is a Monday-and-Tuesday week.  My concern is

8    that it may be coming right at the time the case may be going

9    to the jury but -- so we'll watch that.  I mean it's --

01:46 10         MR. CHAKRAVARTY:  So the alternative there is then

11   we'll suspend for --

12        THE COURT:  I don't know.  It's something --

13        MR. CHAKRAVARTY:  We'll talk faster.

14        THE COURT:  No.  No.  No, I don't say it for that.

15   No, I don't know what we'll do.  Including depending -- I mean,

16   this case is more important than the committee meeting.  If I

17   could do both, that would be good.  But if the case requires

18   it, then I'll have to make adjustments.  So just so you know

19   there's that block of -- that may affect the defense-witness

01:47 20  situation more than the government if the defense is going.  So

21   we'll see how that goes.

22        I think -- oh, the other thing was -- I don't want to

23   hold you, and we don't have to do this now, but just to trigger

24   it, there are a couple of motions to quash defense subpoenas

25   filed by witnesses.  So I guess we should set up a hearing on

```
 1   those at some point.
 2          Have you been in touch with the lawyers at all who
 3   filed those?
 4          MR. CARNEY:  I have not, your Honor.  Perhaps I could
 5   report to the Court on Monday what position we're going to take
 6   on those?
 7          THE COURT:  Okay.  All right.
 8          MR. NEVILLE:  Your Honor, just to clarify, we should
 9   deliver the documents to the courtroom clerk?
10          THE COURT:  Yes.
11          MR. NEVILLE:  And will the Court require either of us
12   to be on call or just to deliver the documents?
13          THE COURT:  No, I think you just need to deliver the
14   documents.
15          MR. RICHARDS:  You'll accept a copy, your Honor?
16          MR. CARNEY:  Yes.
17          THE COURT:  Yes.
18          MR. CARNEY:  Although if you want to bring the
19   original, that's okay too.
20          THE COURT:  Okay.
21          MR. CHAKRAVARTY:  Thank you.
22          ...End of sidebar conference.)
23          (The proceedings adjourned at 10:43 a.m.)
24
25
```

1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Criminal Action No.

8    09-10017-GAO-1, United States of America v. Tarek Mehanna.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  November 10, 2011
13

14

15

16

17

18

19

20

21

22

23

24

25