UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    ) Criminal Action
v.                                  ) No. 09-10017-GAO
                                    )
TAREK MEHANNA,                      )
                                    )
         Defendant.                 )
                                    )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY FIFTEEN
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, November 15, 2011
9:13 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2          OFFICE OF THE UNITED STATES ATTORNEY
            By: Aloke Chakravarty and Jeffrey Auerhahn,
 3              Assistant U.S. Attorneys
            John Joseph Moakley Federal Courthouse
 4          Suite 9200
            Boston, Massachusetts  02210
 5          - and -
            UNITED STATES DEPARTMENT OF JUSTICE
 6          By: Jeffrey D. Groharing, Trial Attorney
                National Security Division
 7          950 Pennsylvania Avenue, NW
            Washington, D.C.  20530
 8          On Behalf of the Government

 9          CARNEY & BASSIL
            By: J.W. Carney, Jr., Esq.
10              Janice Bassil, Esq.
                John E. Oh, Esq.
11          20 Park Plaza
            Suite 1405
12          Boston, Massachusetts  02216
            - and -
13          LAW OFFICE OF SEJAL H. PATEL, LLC
            By: Sejal H. Patel, Esq.
14          101 Tremont Street
            Suite 800
15          Boston, Massachusetts  02108
            On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2                          DIRECT   CROSS   REDIRECT   RECROSS
   WITNESSES FOR THE
3    GOVERNMENT:

4  JAMES BAILEY
     by Mr. Groharing          9
5    by Ms. Bassil                     24

6  JAMES P. PIPPIN
     by Mr. Chakravarty       30
7    by Mr. Carney                    127

8

9                          E X H I B I T S

10

   GOVERNMENT'S          DESCRIPTION              FOR ID   IN EVD.
11
   492      Proffer letter for Pippin                      44
12
   758      Photograph of Jason Pippin                     66
13
   443-447  Clear Guidance posts                           82
14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on November 15,

6     2011.

7          The defendant, Tarek Mehanna, is present with counsel.

8     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

9     are present, along with Jeffrey D. Groharing, Trial Attorney,

00:18 10     U.S. Department of Justice, National Security Division.)

11          MR. CHAKRAVARTY:  Good morning, your Honor.  There was

12     one issue that I don't know whether your Honor has had the

13     opportunity to engage on.  The government had filed in limine a

14     motion regarding a polygraph with regards to the second witness

15     on this morning.  We filed it under seal.  If your Honor does

16     not have a copy, I can pass it up.  The government is seeking

17     to preclude the line of questioning that would elicit reference

18     to a polygraph examination which the witness was administered

19     by the FBI back in 2005.

00:19 20          THE COURT:  You say it was filed this morning?

21          MR. CHAKRAVARTY:  No.  It was filed in limine before

22     trial.

23          THE COURT:  I'm sorry.

24          MR. CHAKRAVARTY:  It was one of the issues we

25     anticipated could come up during opening, your Honor.

1          THE COURT:  I misunderstood your reference to "this

2    morning."

3          MR. CHAKRAVARTY:  We should deal with it probably

4    outside the presence of the jury, before the witness testifies.

5          THE COURT:  Yeah.  All right.

6          MR. CARNEY:  Your Honor, I filed an opposition to the

7    motion.  I don't know if you've read it.

8          THE COURT:  I have, rather brief.

9          MR. CARNEY:  I can summarize it.  Well, your Honor, I

00:21 10   think the point is pretty straightforward.  I'll put it in

11   context.  Mr. Pippin, the witness, was directed to come to the

12   United States Embassy in Finland.  He did so.  He was

13   interviewed over the course of two days.  On the second day, he

14   was given a polygraph.  He was told that he failed the

15   polygraph, and they wanted to continue the examination the

16   following day.  He called the following day and said he would

17   not be returning.

18          I'm not offering this evidence to show that he

19   actually failed the polygraph.  Frankly, I don't even have

00:22 20   enough information so that I or an expert could ever determine

21   whether or not he failed the polygraph.  The reason I'm

22   offering it is for the impact on the state of mind of the

23   witness being told that he failed a polygraph and his reaction

24   to that and the fact that he declined to come back the

25   following day.  I think it's important to go to his state of

1   mind and illustrate the dealings that he had with the FBI as a

2   witness.

3        It's ironic that the FBI would administer this

4   polygraph to the witness in order to influence his state of

5   mind, and then when it does, the government precludes me from

6   putting that into evidence.  I think it goes directly to his

7   credibility, and I would ask the Court to deny the motion.

8   Thank you.

9        MR. CHAKRAVARTY:  It seems what's probative here is

00:23 10   the fact that the FBI told him that they did not believe he was

11   being candid with them.  That can be very vigorously explored

12   on cross-examination without the very explosive reference to a

13   polygraph, which gives this imprimatur of accuracy, which, as

14   counsel suggests, we have no idea whether that is, in fact, the

15   case.  It seems to me, on a sufficiently collateral matter,

16   that this witness' answer can be further explored based on

17   other statements that he has given throughout the course of the

18   relationship with the government.

19        By mentioning the polygraph, this jury is thinking,

00:23 20   well, first, why don't we see what the results are, and why are

21   we relying exclusively on an attorney's question to the witness

22   about it.  And, second, this witness doesn't have competency to

23   know what the results of the polygraph are.  All he knows is

24   what the FBI told him about whether they believed what he was

25   telling them in perhaps a tactical move.  I don't know what the

1    circumstances are but perhaps a tactical move to get him to be

2    more expressive about what his involvement was in a training

3    camp back in the mid-'90s.

4         MR. CARNEY:  I adopt the government's word of

5    explosive, but where the explosion went off was in Mr. Pippin's

6    head.  There's a big difference between an FBI agent saying, I

7    don't believe you, and an FBI agent saying, You didn't pass the

8    polygraph.  We want you back here tomorrow to talk to you.

9         Just as the government says that is significant, I

00:24 10   agree completely because it would be extraordinarily

11   significant to the witness and affect his state of mind.  I

12   don't intend to explore whether he actually did it.

13        THE COURT:  I guess I'm not clear on the state of

14   mind.  When?  What's the relevant time for the state of mind?

15   The day he left or today when he testifies?

16        MR. CARNEY:  Both, your Honor.  And he had --

17        THE COURT:  What's the latter?  I get the former.

18   Address the latter.

19        MR. CARNEY:  Because the FBI has tried to intimidate

00:25 20   him, in my opinion, by telling him that he failed the polygraph

21   test.  That is said to a witness in order to intimidate a

22   witness.  And it had its desired effect.  And I submit that

23   that desired effect has carried on right to today.  And the

24   jury's entitled to know the approach that the FBI used with

25   this witness in getting him to become a witness.

1          THE COURT:  When was the event?

2          MR. CARNEY:  2005, your Honor.

3          THE COURT:  I think I want to see what the context is

4    at the time.  I'll reserve.  Before the question gets asked,

5    you'll ask to approach, and we'll see what it looks like at

6    that stage.

7          MR. CARNEY:  Does your Honor want me to set the

8    context?

9          THE COURT:  Well, yeah.

00:26 10          MR. CARNEY:  I certainly can ask the witness --

11          THE COURT:  I guess what I'm thinking of is other

12   impeaching questions of a more general sort that seek what his

13   answers are.  In other words, if he, hypothetically, were to

14   acknowledge, in response to more general questions, that he

15   feels pressured by the FBI, it might not be necessary to go any

16   further.  If he denies it and you think you have to press

17   further, that might be a different circumstance.  I think I'd

18   like to see where we are at the time, how necessary it may be.

19          MR. CARNEY:  If he did ask, I felt really pressured by

00:26 20   the FBI, I will stop because my next question would be:  Why?

21          THE COURT:  Well, I mean, we'll -- at that point, I

22   think we'll have both his direct, and now we will be in his

23   cross.  And we'll have some basis for assessing the import for

24   this jury and the usefulness of it.

25          MR. CARNEY:  All right, your Honor.  Thank you.

 1          MR. CHAKRAVARTY:  Your Honor, can/should I advise the

 2    witness not to answer until the Court rules on that for fear

 3    that he may --

 4          MR. CARNEY:  I have no problem with that, your Honor.

 5          THE COURT:  Okay.

 6          MR. CHAKRAVARTY:  Thank you.

 7          MR. CARNEY:  I think it's necessary to ensure your

 8    Honor's ruling is complied with.

 9          THE COURT:  All right.  Ready for the jury.

00:27 10    (Jury in at 9:23 a.m.)

11          THE COURT:  Good morning, jurors.

12          THE JURY:  Good morning.

13          THE COURT:  Mr. Groharing.

14          MR. GROHARING:  The government calls Jim Bailey.

15          THE CLERK:  Sir, want to step up here, please.  Step

16    up to the box.  Remain standing.

17          JAMES BAILEY, Sworn

18          THE CLERK:  Please be seated.  State your name and

19    spell your last name for the record.

00:30 20          THE WITNESS:  James Bailey, B-a-i-l-e-y.

21    DIRECT EXAMINATION BY MR. GROHARING:

22    Q.   Good morning, sir.

23    A.   Good morning, sir.

24    Q.   Sir, how are you currently employed?

25    A.   I'm currently employed as a chief Customs and Border

         1    Protection officer for the Department of Homeland Security.

         2    Q.   How long have you been employed by the Customs and Border

         3    Protection agency?

         4    A.   I've been employed by -- originally, it was U.S. Customs

         5    back since 1997, so about 14 years.  And then we merged in

         6    2003.  Since then, it's been Customs and Border Protection.

         7    Q.   What are your current duties?

         8    A.   Currently, I'm assigned to the Joint Terrorism Task Force

         9    with the Boston FBI.

00:30   10    Q.   How long have you been with the Joint Terrorism Task

        11    Force?

        12    A.   Approximately four years.

        13         MR. GROHARING:  Your Honor, I'd ask that 738A be

        14    displayed for the witness as well as the jury.  It's been

        15    admitted.

        16         THE COURT:  It is admitted.  All right.

        17         MR. GROHARING:  On that note, your Honor, all the

        18    exhibits we'll reference today have been admitted into

        19    evidence.

00:31   20    Q.   Sir, do you recognize this exhibit?

        21    A.   Yes, sir.

        22    Q.   What is it?

        23    A.   It's a certification from Pakistani International

        24    Airlines, certified from JFK New York location.

        25         MR. GROHARING:  Could you pull up 738, please.

1    Q.   Sir, do you recognize this exhibit?

2    A.   Yes, sir.

3    Q.   What is it?

4    A.   It is a passenger name record for Pakistani International

5    Airlines, for a Mr. Ahmad Abousamra.

6    Q.   What is a passenger name record?

7    A.   A passenger name record is information provided by a

8    traveler or passenger to either the airline or a travel agency,

9    depending on how they book their ticket.

00:31 10    Q.   What types of information is included in a passenger name

11    record?

12    A.   There's a variety of information.  A lot of it is

13    airline-generated information.  What's most important on most

14    of them for people would be their itinerary, which describes

15    where they're traveling from, where they're traveling to.

16    There's contact information regarding emergency contact in the

17    event you were traveling and something happened; personal

18    information, to include home phone numbers, passports or

19    documents you're traveling on; along with a lot of other

00:32 20    airline-type information with -- the routing, check baggage

21    information, et cetera.

22    Q.   Do you review PNRs in the course of your regular duties?

23    A.   Yes, sir.  With Customs and Border Protection, we deal

24    with international travelers on a daily basis.  We come in

25    contact with passenger name records literally daily.

1    Q.   You indicated that this was a passenger name record for

2    Ahmad Abousamra?

3    A.   Yes, sir.

4    Q.   What does this information here indicate?

5    A.   This section here would be the itinerary section for Mr.

6    Abousamra on his travel.  As indicated here, he would have

7    traveled on April 4th from Boston to JFK; once again, on April

8    4th, from JFK to Islamabad; and then returning April 30th from

9    Islamabad to Karachi; and then on May 1st, Karachi to JFK and

00:33 10    JFK on to Boston.

11    Q.   When you're referring to Islamabad and Karachi, are you

12    referring to Islamabad, Pakistan, and Karachi, Pakistan?

13    A.   Yes, sir, both locations in Pakistan.

14    Q.   Have you had the opportunity to review this PNR prior to

15    your testimony today?

16    A.   Yes, sir.

17    Q.   Were you able to determine whether at the time of the

18    reservation whether there was point of contact information

19    included in the reservation?

00:33 20    A.   Yes.  These reservations, they're -- they're kind of --

21    each airline are different.  This one reads from the bottom up.

22    Starting at the bottom of the reservation, there was not

23    contact information until about on Page 2, about three-quarters

24    of the way down, there was some information.

25    Q.   You indicated on Page 2, three-quarters of the way down.

1    Is that in this area here?

2    A.   Yes, sir, yup.  It appears, on 4/29/02, Mr. Abousamra

3    changed his reservation, for whatever reason, to return to the

4    United States.

5    Q.   What changes did he make at that time?

6    A.   It looks like he rebooks his ticket to return on the May

7    1st trip.  And at that time, he also adds some contact

8    information and some personal identifiable information, such as

9    his passport number, date of birth, and name.

00:35 10    Q.   I've highlighted a particular line.  What does that

11    information reflect?

12    A.   That would be a contact provided by Mr. Abousamra in

13    Peshawar, Pakistan, for the phone number, 850758, and an

14    individual named Abdul Majid in Peshawar, Pakistan.

15    Q.   Is it accurate to say that that information was added

16    after Mr. Abousamra had already traveled to Pakistan?

17    A.   Yes.  Reading it, it appears it would have been added on

18    4/29/02, at 02:41 hours.

19    Q.   Are you able to determine where that information was

00:35 20    added?

21    A.   As far as the contact itself?  The section above that

22    entry would be what was added.

23    Q.   I've highlighted another section on Page 1.  That same

24    name is included on Page 1.  Does that reflect the fact that

25    that contact information was added to the reservation?

1   A.   Yes, yes.  Above -- down below, it says the word

2   "history."  Below that is the history of the reservation.

3   Above that is the current status of the reservation.  And that

4   Abdul Majid contact would have been added by the traveler to

5   ensure, if there were any changes to the flight, any

6   difficulties with the flight, that's how they would have

7   contacted Mr. Abousamra to advise him of those changes.

8   Q.   Again, the 850785, that's a phone number associated with

9   that name?

00:36 10   A.   Yes.  And "PEW" preceding the "850" indicates it's from

11   Peshawar, Pakistan.

12   Q.   Thank you.  Mr. Bailey, I'm going to ask you to read

13   portions of a chat that's included on your screen now.

14   A.   Yes, sir.

15   Q.   Are you familiar with the email address

16   ibnul_khattab28@yahoo.com?

17   A.   Yes, sir.  "82" there.

18   Q.   Now, does this chat session -- did it take place on April

19   1, 2006?

00:37 20   A.   Yes, sir.

21   Q.   Now, I'll read the portions that are identified with Ahmad

22   AS.  If you could read those other portions.

23   A.   Yes, sir.

24   Q.   "I was thinking about calling Abdil-M from Ptown."

25   A.   "Yeah."

1  Q.  "I just need to get his number."

2  A.  "I was thinking the same thing.  But how?"

3  Q.  "Maybe get it from Verizon, my old records."

4  A.  "Is it possible?"

5  Q.  "Dunno."

6  A.  "Try it man."

7  Q.  "Yeah.  Make supplication."

8  A.  "Hmmm."

9  Q.  "I'm sick of being surrounded by Muslim Brotherhood and

00:38 10  compromisers of the Foundations of the Religion."

11       Can you please read that section?

12  A.  Yes, sir.  "I am almost done with 39 but honestly, the

13  more I do of it the more I fear.  Why do you say that which you

14  do not do?"

15  Q.  "I am very disappointed.  You know, it's been five years

16  and still we are in the toilet.  I understand two years maybe,

17  maybe three, but five?  Wow.  I feel like such a loser, loser,

18  loser."

19  A.  "Yeah, no kidding.  You know, I was thinking that

00:39 20  refutation of the apostasy issue.  I was thinking.  You should

21  go ahead and write it out."

22  Q.  "Why?  For who?  Masood?"

23  A.  "Well, him and others.  Just spread it around the net.

24  Send to MAS, CAIR, etc."

25  Q.  "Okay.  I'll try."

1    A.    "But make it concise and easy to read so that your average

2    Muslim can understand it."

3    Q.    "I can't stand this though.  I mean, we didn't learn the

4    truth very late on.  The same day, and we were already

5    convinced."

6    A.    "Praise be to Allah."

7    Q.    "But we're still in the toilet."

8    A.    "But just be patient.  Inshaa-'Allaah, Allah willing.

9    When I go to my cousin's wedding" --

00:40 10        MS. BASSIL:  Objection.  May we be heard at sidebar,

11   your Honor?

12             THE COURT:  Okay.

13   (SIDEBAR CONFERENCE AS FOLLOWS:

14             MS. BASSIL:  One of the problems with these instant

15   messages is that they really call for speculation as to

16   somewhat of what the meaning is.  Sometimes things can have

17   dual meetings.  He talks about -- at this point, Abousamra is

18   divorced, and the next set of lines are about Tarek going to

19   his cousin's wedding in Egypt.  He would go every other summer

00:41 20   to Egypt.  It's not positive, but I believe that the government

21   wants to imply that the wedding meant Jihad, which it didn't.

22   And where there's speculation here, I think it's unfair to be

23   reading that.

24             MR. GROHARING:  I think that's a matter for the jury

25   to decide, your Honor.

1          MS. BASSIL:  How are they going to decide?  They're

2     not going to be able to decide.  It's not fair for Evan Kohlman

3     to come in and say this is what this word means and that.  If

4     this is -- let me just finish.  If there's explicit language in

5     some other instant message that says, you know, when I talk

6     about weddings, I'm talking about battle or when I'm talking

7     about weddings, I'm talking about this.  But there isn't.

8          So what I've started to notice that a great deal of

9     these instant messages -- and this is an example of it -- have

00:42 10   a lot of speculation.  And I don't think it's fair for the

11    government to stand up in closing argument and says this is

12    what this means because nobody knows what this means.

13         MR. GROHARING:  Your Honor, that's for the jury to

14    decide.  We've had a lot of testimony about coded

15    communications.  We're going to have additional cooperating

16    witnesses talking about coded communications.  This particular

17    communication, I believe he actually was going to a wedding in

18    Egypt based on the information we have.  But there are other

19    references that are important about other things he was going

00:42 20   to do while in Egypt:  talks about looking for hot babes,

21    which, you know, with the background with the other witnesses'

22    background, that's not what they're doing in Egypt.

23         THE COURT:  I do think in the end it is a matter for

24    the jury.  This is not going to be controversial because it

25    was, in fact, a wedding.

1        MS. BASSIL:  Here's the problem.  He wasn't looking

2   for hot babes.  He was looking for this or that.  They're not

3   calling the person who was on the other half of the

4   conversation.  If they were and this person said, I understood

5   that this is what it meant.  They've had people who've said, I

6   explicitly knew what peanut butter and jelly is.  I explicitly

7   knew.  They don't have somebody to say that.

8        THE COURT:  If this is not going to be -- this

9   particular communication is not going to be argued as a

00:43 10   coded --

11        MS. BASSIL:  Well, that's up --

12        THE COURT:  -- wedding, then I don't think it's a

13   major point.

14        MR. GROHARING:  That portion.

15        THE COURT:  There may be other expressions of the word

16   where they will make that argument, and that can be focused on.

17        MS. BASSIL:  Well, here's the problem.  I've seen in

18   Evan Kohlman's testimony that he says the word "wedding" means

19   Jihad.  I don't think he can testify to that in this case.

00:44 20        MR. GROHARING:  That's certainly something that

21   counsel can draw out on cross-examination.

22        THE COURT:  The government is not going to argue this

23   particular conversation.

24        MS. BASSIL:  They're going to let Evan Kohlman do it.

25        MR. GROHARING:  Evan Kohlman is not going to testify

1  about this particular conversation versus, when the defendant

2  was referring to a wedding, he was referring to a terrorist

3  operation.

4           MS. BASSIL:  I assume he's not going to testify that

5  any use of the word "wedding" means this is a terrorist

6  operation because this is the only way other than the defendant

7  trying to get married.

8           MR. GROHARING:  In this conversation.  There are other

9  conversations where he used the term "wedding" and it's not for

00:44 10  a wedding.

11           THE COURT:  I think in the end, it's just a matter for

12  the jury to figure out.

13           MS. BASSIL:  Well, note my objection.

14           THE COURT:  Okay.

15  .  .  .  END OF SIDEBAR CONFERENCE.)

16  Q.   "But we're still in the toilet."

17  A.   "But just be patient.  Inshaa-'Allaah, Allah willing.

18  When I go to my cousin's wedding in Egypt, we'll get some hot

19  babes?

00:45 20  Q.   "When is that?"

21  A.   "July."

22  Q.   "During the summer?"

23  A.   "Yeah.  They got a visit from the intelligence there, the

24  -- so."

25  Q.   "Who?"

        1    A.    "I haven't been seeing him online."

        2    Q.    "So" --

        3           MS. BASSIL:   That was incorrectly read.

        4           MR. GROHARING:   I'm sorry.

        5    Q.    "By who?"

        6    A.    "I haven't been seeing them online."

        7    Q.    "So what makes you think they still do anything?"

        8    A.    "They are, trust me.  They wouldn't let that stop them."

        9    Q.    "Yup."

00:46  10    A.    "How about we go back to Abdullah's dad."

       11    Q.    "You better be kidding."

       12    A.    "The Egyptian."

       13    Q.    "That's crazy."

       14    A.    "Well, Abdul M's wife told me that's where he did his

       15    homework."

       16    Q.    "Yeah.  But that's her guess, I think."

       17    A.    "No.  She told me with certainty that was the last she

       18    heard of -- that was the last she heard of him."

       19    Q.    "Yeah.  That city but that person?"

00:47  20    A.    "Yes.  She mentioned the fragrance."

       21    Q.    "I dunno.  Hadn't he divorced her before that?  Would he

       22    let her know?"  I'm sorry.  "Why would he let her know?"

       23    A.    "Could he have -- could he have not done it on the phone

       24    since he knew he was going for the Ph.D.?"

       25    Q.    "That's a guess.  I think you should base things like that

1    on real proofs.  Plus that's a wild step to take."

2    A.   "All I am saying is she told me that he got accepted from

3    there."

4    Q.   "Remember what happened last time over there before we

5    even left?"

6    A.   "Yeah, just a suggestion."

7    Q.   "I don't think it's a good idea unless we can somehow talk

8    to him.  Maybe he'll call Abu Sab's cell.  Peace be upon you.

9    I called the two phone companies.  They said there is no

00:48 10   records that I can get.  I'm sure there is a way to get them,

11   but I imagine you have to be a lawyer to get very old records

12   (more than three years ago).  They said they don't keep records

13   once the balance is cleared and number closed."

14   A.   "Peace be upon you.  Great.  Hmmm.  Why don't you just

15   call Hamid and ask him for the number."

16   Q.   "Yeah, right."

17   A.   "Did you ever call the number from your house line?"

18   Q.   "I did a few times but usually I used a card."

19   A.   "Yo, man."

00:49 20   Q.   "Dude, I'm thinking if the HNN thing for learning works,

21   we might as well study even if work is not guaranteed."

22   A.   "HNN?"

23   Q.   "At least we can find some over there.  Hassan's uncle."

24   A.   "Oh, no, I'd rather not.  Unless something is relatively

25   certain, it's not worth it."

1   Q.   "One thing I think is relatively certain,... DJ, ISM,

2   KHUB...then."

3   A.   "And...over there, that's out of the question."

4        MR. GROHARING:   Just one moment, your Honor.

5   Q.   Do you recognize this exhibit, sir?

6   A.   Yes, sir.  It's a Certificate of Authenticity of business

7   records from Verizon.

8   Q.   Sir, have you had a chance to review these records prior

9   to your testimony today?

00:51 10   A.   Yes, sir.

11   Q.   Whose account is this?

12   A.   This account would be for telephone number 978-682-2665,

13   for Mr. Ahmad Abousamra.

14   Q.   Are you familiar with that telephone number?

15   A.   Yes, sir.  That same telephone number appears on Mr.

16   Abousamra's reservation from Pakistani Airlines.

17   Q.   And on the PNR records you discussed a few moments ago?

18   A.   Yes, sir.

19   Q.   Now, what does Line 7 on that document reflect?

00:53 20   A.   On Line 7, it would be a phone call from 978-682-2665 on

21   8/16, at 1:05 a.m., Pakistan, to a phone number, 9291850785.

22   Q.   Now, do you recognize the telephone number 850785?

23   A.   Yes.  850785 would be the same phone number provided on

24   Mr. Abousamra's passenger name reservation record, PNR, for an

25   Abdul Majid in Peshawar.

1    Q.    I notice there are numbers in front of the 850785:   a 92

2    and 91.   What are those numbers?

3    A.    Yes, sir.   92 would be the country code for Pakistan, and

4    91 would be the local area code for Peshawar, Pakistan.

5    Q.    So on Line 7 of this record, it reflects a telephone call

6    made to the same phone number for Abdul Majid that was on the

7    PNR record you talked about before?

8    A.    Yes, sir.

9    Q.    I want you to look at Lines 8 through 12.   Are these

00:54 10    similar telephone calls?

11    A.    Yes.   It's similar telephone calls to the same phone

12    number, on different dates:   on August 16th, August 18th, and

13    then again on August 19th.

14    Q.    Again, those are for the number associated with Abdul

15    Majid from the PNR request?

16    A.    Yes, sir.

17        MR. GROHARING:   Next page, please.   Okay.

18    Q.    On Line 2, there's another phone call.   Could you please

19    explain where that call was made from and to whom it was made?

00:55 20    A.    Once again, it's made on August 4th to the 9291850785

21    phone number, from 978-682-2665.

22    Q.    Are there similar calls that are listed on Lines 6 through

23    10?

24    A.    Yes, sir, a call on August 13th, two on August 14th, and

25    two on August 15th to the same number.

1    Q.   I notice that these calls only have a date and a month.

2    In this report, are you able to determine what year these calls

3    were made as well?

4    A.   It has a -- you can highlight that.  It has a bill date on

5    it which says "12/16/02."

6    Q.   Is that December 16 of 2002?

7    A.   Yes, sir.

8    Q.   So these calls were all made in 2002 then?

9    A.   Yes, sir.

00:56 10          MR. GROHARING:  Thank you, your Honor.  That's all I

11   have.

12   CROSS-EXAMINATION BY MS. BASSIL:

13   Q.   Good morning, Mr. Bailey.

14   A.   Good morning, ma'am.

15   Q.   Now, did you yourself obtain these records from the

16   Pakistan airlines?

17   A.   The certified record from Pakistani Airlines?

18   Q.   Yes.

19   A.   I did not get it myself, no.

00:56 20  Q.   So these are records only -- these are records of Mr.

21   Abousamra traveling to Pakistan?

22   A.   Yes, ma'am.

23   Q.   And you were not given any records that indicated that Mr.

24   Mehanna traveled to Pakistan?

25   A.   No.  The record there was just for Mr. Abousamra.

1    Q.   Looking -- when we were talking about those instant

2    messages, have you read any other instant messages from this

3    case?

4    A.   No, ma'am.

5    Q.   So, in fact, when the prosecutor asked you if you were

6    familiar with them, you were familiar because they gave you

7    these to read?

8    A.   Yes, ma'am.

9    Q.   These three instant messages?

00:57 10   A.   Yes, ma'am.

11   Q.   And when -- and if we could look at -- by the way, do you

12   know who these people are in the instant messages?

13   A.   Do I know -- I know the email and I know Mr. -- do I know

14   Mr. Abousamra?

15   Q.   You knew the name?

16   A.   Do I know of him?

17   Q.   Yes.

18   A.   Yes.

19   Q.   And the other people in the instant messages, were you

00:58 20   familiar -- strike that.

21          Now, in the first instant message you read --

22          MS. BASSIL:  Let me have the first one.  I think that

23   was -- I believe that was Exhibit 583.  I'm sorry.  And it was

24   the second page if you have that, please.  And if we could blow

25   up just the first half.

1    Q.   Looking at this, sir, it says -- the person that -- you

2    understand Ahmad AS to be Ahmad Abousamra?

3    A.   Yes, ma'am.

4    Q.   The Arabic there, do you know who that is?

5    A.   I believe it to be Mr. Tarek Mehanna.

6    Q.   Mr. Abousamra is the one who says, "I'm sick of being

7    surrounded by Ikhwaanees," meaning Muslim Brotherhood, correct?

8    A.   Yes, ma'am.

9    Q.   And Mr. Mehanna does not respond to that, correct?

00:59 10    A.   No.  The next line is from Mr. Abousamra, and then Mr.

11   Mehanna responds at the end.

12   Q.   "Did you see Masood?"

13   A.   Yes, ma'am.

14   Q.   He does not respond to this idea of "I'm sick of being

15   surrounded"?

16   A.   Not that I can see there.

17         MS. BASSIL:  And then if we could go to the next page,

18   please, on that exhibit.  If we could go to the bottom, please.

19   Q.   It's Mr. Abousamra who says, "I feel like such a loser,

01:00 20   loser, loser."  Do you see that?

21   A.   Yes, ma'am.

22   Q.   And the person that you've identified as Mr. Mehanna says,

23   "Yeah, no kidding."  And he immediately starts talking about,

24   "I was thinking that refutation of the riddah issue, I was

25   thinking you should go ahead and write it out."  So he doesn't

1    say, "I feel like such as loser, loser, loser."  This is Mr.

2    Abousamra?

3    A.   Mr. Abousamra says "loser, loser."  I don't see the ending

4    that you had there but -- you said, "I was thinking," and then

5    you added some more.

6    Q.   "...that refutation," if you look at the next line.

7    A.   Yup.  "... of the apostasy issue."

8    Q.   Right.  And then if you could go to the next page.

9    A.   Okay.  It's on there.

01:01 10  Q.   Yeah, it is.

11        And he said, "...you should go ahead and write it

12   out."  Do you see that on the top?

13   A.   "...you should go ahead and write it out," yes, ma'am.

14   Q.   As far as you understood this to mean, Mr. Mehanna is

15   suggesting that he work on some writing project?

16   A.   Mr. Mehanna suggesting to Mr. Abousamra?

17   Q.   Yes.

18   A.   Yes.

19   Q.   Now, if we could go down further, this was the

01:01 20  conversation, the instant message, in which Mr. Mehanna is

21   talking about going to his cousin's wedding in Egypt, in July,

22   correct?

23   A.   Yes.

24   Q.   And at that time, when this message was sent between the

25   two of them, were you aware that Mr. Mehanna was unmarried?

1    A.   I wouldn't know if Mr. Mehanna was married or not.

2    Q.   Were you aware that Mr. Abousamra was divorced?

3    A.   At this time, I am, yes.

4    Q.   Okay.  And meaning in 2006 when this message took place?

5    A.   Would I have known he was divorced?

6    Q.   Yes.

7    A.   No.

8    Q.   Okay.

9         MS. BASSIL:  If we could go to Exhibit 592, please.

01:02 10   And that would be great, right there.  If we could go a little

11   lower.

12   Q.   You read something about "I'm thinking" -- or it was read,

13   "I'm thinking if the HNN thing for learning works"; do you see

14   that?

15   A.   Yes, ma'am.

16   Q.   You have no knowledge of what "HNN thing" is?

17   A.   No, ma'am.

18        MS. BASSIL:  If we could go down a little further,

19   please.  I think we went down too far.  Here it is.

01:03 20   Q.   Mr. Abousamra says, "One thing I think is relatively

21   certain, DJ, ISM, KHUB," you have no idea what that means

22   either?

23   A.   No, ma'am.

24   Q.   Or what he's referring to?

25   A.   No.

1    Q.   Were you -- did you obtain Mr. Mehanna's phone records?

2    A.   Did I?

3    Q.   Yes.

4    A.   Me personally, no, ma'am.

5         MS. BASSIL:  And if we could go to the phone records

6    for a moment, I believe that's Exhibit 743.  And if we could go

7    to Page 3.  And if we could just blow up this bottom, from No.

8    7 on, right there.  That would be great.  Thank you.

9    Q.   Do you see a number there, No. 13?

01:04 10   A.   Yes, ma'am.

11   Q.   And that number is -- 92 is, as you said, the country

12   code?

13   A.   Uh-huh.

14   Q.   Right?  And 3205203766.  Do you know whose telephone

15   number that is?

16   A.   No, ma'am.

17   Q.   And that appears again as No. 15, is that right?

18   A.   Yes.

19        MS. BASSIL:  If we could go to the next page, and if

01:04 20   we could have this blown up, the second quarter, that would be

21   great.

22   Q.   Again, this same number appears as No. 3, 4, and 5,

23   correct?

24   A.   Yes.

25   Q.   Again, you don't know whose number that is?

```
 1    A.    No, ma'am.

 2    Q.    Again, these phone records were from 2002, as I understand

 3    it?

 4    A.    Yes.  That's what the certification was.

 5    Q.    And the instant messages that you read were from 2006?

 6    A.    Yes.  We can pull the date up on there, but I'm fairly

 7    sure that's what it was, yes.

 8              MS. BASSIL:  Thank you.  I have no further questions.

 9              MR. GROHARING:  Nothing further, your Honor.

01:05 10          THE COURT:  All right.  Thank you, Mr. Bailey.

11              THE WITNESS:  Thank you, sir.

12              MR. CHAKRAVARTY:  The United States calls Jason

13    Pippin.

14              THE CLERK:  Sir, you want to step up here, please.

15    Step up to the box there.

16              JASON PIPPIN, Sworn

17              THE CLERK:  Please be seated.  State your name and

18    spell your last name for the record.

19              THE WITNESS:  Jason Pippin, J-a-s-o-n, P-i-p-p-i-n.

01:06 20    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

21    Q.    Good morning.

22    A.    Morning.

23    Q.    Where do you currently live?

24    A.    Toronto, Canada.

25    Q.    How long have you lived there?
```

1    A.    Almost three years.

2    Q.    Did you come down here to testify in this case?

3    A.    Yes.

4    Q.    How old are you?

5    A.    Thirty-four.

6    Q.    Where were you born?

7    A.    Atlanta, Georgia.

8    Q.    Where did you grow up?

9    A.    Around Atlanta, Metro Atlanta area.

01:06 10    Q.    Do you have a family?

11    A.    Yes.

12    Q.    Describe your family.

13    A.    Wife and two children.

14    Q.    Do they live with you in Canada?

15    A.    Yes.

16    Q.    Where did you go to high school?

17    A.    Henry County High School.

18    Q.    Did you graduate?

19    A.    No.

01:06 20    Q.    Did you get an equivalency degree at some point?

21    A.    Yes.

22    Q.    So did you drop out of school then?

23    A.    Yes.

24    Q.    What did you do after you dropped out?

25    A.    I went to Pakistan.

1    Q.   Approximately when?

2    A.   1996.

3    Q.   Before you went to Pakistan, did you become a Muslim?

4    A.   Yes.

5    Q.   Approximately when?

6    A.   1991, 1992.

7    Q.   Why did you go to Pakistan?

8    A.   For military training.

9    Q.   What prompted you to get military training in Pakistan?

01:07 10   A.   Due to the general obligation, as I saw it at the time, to

11   receive military training as a part of preparation for Jihad as

12   there was a conflict going on in Kashmir at the time, and they

13   had a place for people to learn military skills.

14   Q.   Did somebody approach you in the United States to ask you

15   to go there?

16   A.   Yes.

17   Q.   We'll come back to that in a little bit, but I want to get

18   through your travel.

19        Did you return from Pakistan?

01:08 20   A.   Uh-huh, yes.

21   Q.   Obviously.  You're here.

22        Approximately how long were you there?

23   A.   Five months the first time.

24   Q.   Did you return at some point?

25   A.   Yes.

1   Q.   When?

2   A.   Returned to the States you mean?

3   Q.   Yes.  Did you return to Pakistan after?

4   A.   Yes.  I returned a second time, in 1997.

5   Q.   How long were you there the second time?

6   A.   Five months.

7   Q.   Again, did you come back to the United States?

8   A.   Yes.

9   Q.   On your way back, did you go to Saudi Arabia?

01:08 10   A.   Yes.

11   Q.   What for?

12   A.   To perform the Minor Hajj, Al-Umra.

13   Q.   Is that a tenet of Islam to try to participate in a minor

14   pilgrimage?

15   A.   Yes.

16   Q.   Where did you go when you came back to the United States?

17   A.   I went to Columbus, Ohio.

18   Q.   What was in Columbus?

19   A.   A friend of mine whom I met in Pakistan was living there.

01:08 20   Q.   How long were you in Columbus?

21   A.   Approximately six months, seven months.

22   Q.   Did you leave?

23   A.   Yes.

24   Q.   Where did you go?

25   A.   From there I went to Yemen.

1    Q.   When was that?

2    A.   This was in early 1998.

3    Q.   What was the purpose of your going to Yemen?

4    A.   To study.

5    Q.   To study what?

6    A.   To study Arabic and Islamic studies.

7    Q.   How long were you in Yemen?

8    A.   About a year and a half.

9    Q.   Again, did you return to the United States?

01:09 10   A.   Yes.

11   Q.   Where did you go?

12   A.   Came back to Georgia, to Atlanta.

13   Q.   What year was that?

14   A.   This was 1999, summer of 1999.

15   Q.   What did you do when you returned to Georgia?

16   A.   I was working in a mosque as an Imam.

17   Q.   Describe what an Imam is.

18   A.   An Imam is a prayer leader, the one who leads the five

19   daily prayers and who perhaps conducts classes and listens.

01:09 20   Q.   By this time, did you become fluent in Arabic?

21   A.   Yes.

22   Q.   Approximately when did you become fluent in Arabic?

23   A.   Well, I started in about 1996, 1997.  But going to Yemen,

24   that solidified it, so around the time I went to Yemen.

25   Q.   Were you already conversant in Arabic before going to

1  Yemen?

2  A.   Basic conversations, not the grammar, not anything like

3  that.

4  Q.   Which, immersed in Yemen for a year and a half, you

5  improved?

6  A.   Yes.

7  Q.   What did you do after you came back to Atlanta?

8  A.   I stayed there for a while as an Imam and then eventually

9  traveled to Morocco for a visit with a friend.

01:10 10  Q.   How long were you in Morocco?

11  A.   Just -- I mean, I went there three times, different

12  occasions, sometimes two weeks, sometimes three months.

13  Q.   Were you working there or just visiting?

14  A.   Just visiting.

15  Q.   From Morocco, did you go anywhere else?

16  A.   I came back to the United States, and then after that, I

17  went to Mauritania.

18  Q.   What was in Mauritania?

19  A.   For Islamic studies in Arabic.

01:11 20  Q.   Did you -- how long were you in Mauritania?

21  A.   I was there for three months.

22  Q.   You returned back to the United States?

23  A.   I returned to Morocco after that.

24  Q.   And then from there, you returned to --

25  A.   Yea.  From there, I came back.

1    Q.    Thank you for clarifying.

2          Where did you go when you returned to the United

3    States?

4    A.    When I returned to the United States from Mauritania, I

5    went to Columbus, Ohio, again.

6    Q.    What did you do in Columbus at that point?

7    A.    Working.

8    Q.    What kind of work?

9    A.    Odd jobs.

01:11 10   Q.    Were you active online at this point?

11   A.    Yes.

12   Q.    Did you meet a woman online?

13   A.    Yes.

14   Q.    Did you meet a woman that you wanted to settle down with?

15   A.    Yes.

16   Q.    What happened?

17   A.    Well, we talked online, and then we met in person, and

18   then we decided that we wanted to get married.  Then I applied

19   for a teaching position at a school where she taught.  I got

01:11 20   the job.  We got married in the summer and then I moved there.

21   Q.    Where was the teaching position?

22   A.    College Park, Maryland.

23   Q.    Where did you get married?

24   A.    In the Philippines.

25   Q.    When was that?

        1    A.    This was summer of 2001.

        2    Q.    After your marriage, did you return to Maryland?

        3    A.    Yes.

        4    Q.    How long were you in Maryland?

        5    A.    On and off, for about two and a half years.

        6    Q.    What was your next international travel?

        7    A.    Back to Malaysia where her family was residing for a

        8    vacation.

        9    Q.    Was that in 2003?

01:12  10    A.    2003, yes.

       11    Q.    Then did you return to the United States again?

       12    A.    Yes.

       13    Q.    Around that time, did you look to move to another location

       14    within the United States?

       15    A.    Yes.

       16    Q.    Why?

       17    A.    I did not renew my teaching contract, and my wife -- my

       18    ex-wife -- she fell very ill, and she had allergic reaction

       19    based on the environment in Maryland.  So we decided it was

01:12  20    best to move to California where she grew up because of the

       21    weather for her health.  So I applied for a job there at a

       22    school affiliated with the school I taught at, and I got the

       23    job, and I moved there in the summer.

       24    Q.    Where in California was that?

       25    A.    Sacramento.

1    Q.   At some point in your time in -- you both moved to

2    Sacramento?

3    A.   Yes.

4    Q.   At some point, did you separate from your wife?

5    A.   Yes.

6    Q.   Approximately when was that?

7    A.   2004.

8    Q.   Did you go anywhere?

9    A.   Yes.

01:13 10    Q.   Where did you go?

11    A.   I went to the United Arab Emirates and Oman.

12    Q.   Was that in the late summer of 2004?

13    A.   Yes.

14    Q.   What was the purpose of your going back overseas?

15    A.   It was my intention to try to go to Yemen for studies, to

16    go to either Dar al-Mustafa or another school that I was

17    looking into.

18    Q.   Were you able to go to Yemen?

19    A.   No.

01:13 20    Q.   Why not?

21    A.   I had visa difficulties when I was still in the States,

22    and I'd already bought a ticket.  So instead of wasting the

23    ticket while waiting to sort out the visa issue, I decided to

24    give it a try and go to Emirates and apply for the visa there.

25    That wasn't successful ultimately.  So I traveled to Oman, the

1    neighboring country, to apply for a visa there, also

2    unsuccessful.

3    Q.    From Oman, where did you go?

4    A.    From Oman, I returned to the United Arab Emirates for a

5    few days to a week and there was talking with friends of mine

6    living in Finland.  And then I traveled there.

7    Q.    What was the purpose of your traveling to Finland?

8    A.    First, it was just to visit them and to see what was there

9    in Finland.  I wanted a change.  I didn't renew my teaching

01:14 10    contract.  So I didn't have any obligations.  I was no longer

11    married.  So I was single and alone and just to see what was

12    there and to visit my old friends.

13    Q.    When did you arrive in Finland?

14    A.    September of 2004.

15    Q.    How long did you remain residing in Finland?

16    A.    Five years.

17    Q.    Did you get married again?

18    A.    Yes.

19    Q.    Did you have a child?

01:15 20    A.    Yes.

21    Q.    Did you get a job?

22    A.    Yes.

23    Q.    What was your job?

24    A.    First, it was teaching English.  Then it was software --

25    as a software engineer and translator.

1    Q.   During that five years, did, again, you separate from your

2    second wife?

3    A.   Yes.

4    Q.   Did you get remarried?

5    A.   Yes.

6    Q.   Was your -- did you get remarried to your current wife?

7    A.   Yes.

8    Q.   Is she Canadian?

9    A.   Yes.

01:15 10    Q.   Did you have another child?

11    A.   Yes.

12    Q.   Did she sponsor you for Immigration paperwork in Canada?

13    A.   Yes.

14    Q.   And that's what prompted your return to Canada?

15    A.   Well, we returned because she was pregnant with our child

16    and to take advantage of the healthcare situation there.  And

17    also, because of the language barrier in Finland, we decided it

18    would be better to have the child there.  So we ended up

19    staying.

01:15 20    Q.   Do you work now in Canada?

21    A.   Yes.

22    Q.   What do you do?

23    A.   I'm self-employed, work as a translator and editor.

24    Q.   Is that Arabic to English and English to Arabic

25    translation?

1    A.    Arabic to English only.

2    Q.    Arabic to English.  I'm sorry.

3          What does an editing involve?

4    A.    Editing involves taking books written by other authors and

5    correcting the English grammar and diction and making sure that

6    it's consistent with a set style guide and so on.

7    Q.    Is there a level of proficiency required for that type of

8    work?

9    A.    Yes.

01:16 10   Q.    Would you have been able to do this when you first learned

11   Arabic?

12   A.    No.

13   Q.    What types of things do you translate?

14   A.    Primarily religious texts.

15   Q.    Has the subject of what you have translated, has that

16   changed over the years?

17   A.    Yes.

18   Q.    Most recently, have you edited or translated a document by

19   Doctor Tahir al-Qadri?

01:16 20   A.    Yes.

21   Q.    What document is that?

22   A.    It's a large, 600-page book, a legal verdict on terrorism

23   and suicide bombings.

24   Q.    What is that legal verdict?

25   A.    This legal verdict --

1           MR. CARNEY:  I object.

2           THE COURT:  Excuse me just a minute.  If there is an

3   objection, just wait a minute, and we'll deal with it.

4           MR. CARNEY:  Hearsay.

5           THE COURT:  Overruled.

6   Q.   Go ahead.  Now you may answer.

7   A.   It's a legal verdict that explains that terrorism

8   targeting non-combatant civilians is absolutely and

9   unconditionally prohibited in Islam as well as suicide

01:17 10   bombings.

11   Q.   Now, is that type of document that you would not have

12   translated eight years ago?

13   A.   Absolutely not.  I wouldn't have translated it.

14   Q.   Is that because you had different views eight years ago

15   than you do today?

16   A.   Yes.

17   Q.   In the course of your travels and based on your

18   associations, have you been interviewed by the FBI on numerous

19   occasions?

01:17 20   A.   A few occasions.

21   Q.   Did they interview you back in 2005?

22   A.   Yes.

23   Q.   Were you living in Finland at that time?

24   A.   Yes.

25   Q.   Sometime after that, did you meet with investigators in

1    this case, in 2008?

2    A.   Yes.

3    Q.   In fact, you met myself, some of the other prosecutors,

4    and the agents in this case?

5    A.   Yes.

6    Q.   Was that interview in Finland, was that actually recorded

7    as well?

8    A.   The meeting that I had the second time, in 2008, was.

9    Q.   And that was pursuant to a mutual legal assistance

01:18 10  request?

11   A.   Yes.

12        MR. CHAKRAVARTY:  Call up Exhibit 492 for the witness.

13   This is not in evidence, your Honor.

14   Q.   Mr. Pippin, have you seen this document before?

15   A.   Yes, I have.

16   Q.   What is it?

17   A.   This is a proffer letter that I received when I first met

18   the prosecutors in 2008.

19   Q.   Okay.  Did we bring this with us when we came to visit

01:18 20  you?

21   A.   Yes.

22        MR. CHAKRAVARTY:  I'm just going to ask to go to the

23   second page, please.

24   Q.   Is this your signature at the end?

25   A.   Yes, it is.

1              MR. CHAKRAVARTY:  I'd ask to introduce 492, your

2      Honor.

3              MR. CARNEY:  No objection, your Honor.

4              THE COURT:  Okay.  492 is in.

5      (Exhibit No. 492 received into evidence.)

6              MR. CHAKRAVARTY:  First page, please.

7      Q.   I'll read this first paragraph.  "No statements made or

8      other information provided by you will be used by the United

9      States Attorney directly against you, except for purposes of

01:19 10   cross-examination and/or impeachment should you offer in any

11     proceeding statements or information different from statements

12     made or information provided by you during the proffer, or in a

13     prosecution of you based on false statements made or false

14     information provided by you."  Did I read that correctly?

15     A.   Yes.

16     Q.   What do you understand this letter to obligate you to do?

17     A.   Speak the truth.

18     Q.   Aside from this letter, were you promised anything in

19     connection with your testimony here today?

01:19 20   A.   No.

21     Q.   Let's go back to your travel overseas.  You mentioned, in

22     1996, you went to Pakistan?

23     A.   Yes.

24             MR. CHAKRAVARTY:  Call up 751, please.

25             THE COURT:  In evidence?

1          MR. CHAKRAVARTY:  Yes, I'm sorry.  751 is in evidence.

2     Q.   Is this a map essentially of Pakistan and neighboring

3     countries?

4     A.   Yes.

5     Q.   You mentioned that you received military training in

6     Pakistan in 1996.  Through whom?  How did you receive that

7     training?

8     A.   I received it through a group called Lashkar Tayba.

9     Q.   Can you spell that for the court stenographer?

01:20 10    A.   L-a-s-h-k-a-r, T-a-y-b-a.

11    Q.   At the time in 1996, do you know whether this was a

12    designated terrorist organization in the United States?

13    A.   It was not.

14    Q.   At some point later, after 2011, do you know whether it

15    became so?

16    A.   As far as I recall, I think it was December 2001.

17    Q.   Excuse me.  I misspoke.  2001.

18         Are you familiar with an association between this

19    organization, Lashkar Tayba and kind of a parent organization?

01:21 20    A.   Yeah.  It's the parent organization which runs schools and

21    other facilities.  It's called Markaz Dawah Al Irshad.

22    Q.   Can you spell that for the court stenographer?

23    A.   M-a-r-k-a-z-a, D-a-w-a-h, W-a-l-i-r-s-h-a-d.

24    Q.   Is Lashkar Tayba essentially the military aspect of that

25    organization?

1   A.   Yes, it is.

2   Q.   You mentioned earlier Kashmir.  What is the -- what was

3   the -- at the time that you went to the training camp, what was

4   the mission of Lashkar Tayba?

5   A.   In 1996 when I went, their objective was to cross over

6   into Indian occupied Kashmir and engage in military -- or

7   combat against the Indian Army.

8   Q.   Can you just describe for the jury what the conflict -- in

9   very brief terms, what the conflict was in Kashmir?

01:22 10   A.   After the partition of Pakistan and India, this was

11   disputed territory.  And there was a few wars that were fought

12   over in the '60s and '70s resulting in a stalemate.  So Kashmir

13   was divided into what is known as Free Kashmir on the Pakistani

14   side and what is now known as Occupied Kashmir on the Indian

15   side.  So there was fighting in Kashmir, fighting to wrest

16   control of Kashmir, and put it back into Pakistani territory

17   control.

18   Q.   Was there any U.S. involvement in the fighting or the

19   conflict there?

01:22 20   A.   You mean official -- I don't know.

21   Q.   Did you ever engage in fighting?

22   A.   No.

23   Q.   What type of military training did you receive?

24   A.   Small arms, basic tactics.

25   Q.   Was this part of a camp?

1    A.    Yes.

2    Q.    Was it organized by the Lashkar Tayba?

3    A.    Yes.

4    Q.    Now, can you just show us on the map where approximately

5    you were in Pakistan in 1996?

6    A.    Most of my time was spent in a place called Muzaffarabad.

7    Q.    I'm circling this area of Muzaffarabad.

8    A.    Yes.

9    Q.    Is that the accurate area?

01:23 10    A.    That's it.

11    Q.    On the right it's written "Kashmir."  Is that the area

12    you're referring to?

13    A.    Yes.  Muzaffarabad is the capital of the government of

14    Azad Kashmir and Pakistan.

15    Q.    Did I circle Peshawar here?

16    A.    Uh-huh.

17    Q.    And then this is the Afghanistan border?

18    A.    Yes.

19    Q.    Now, you said that you had returned to Pakistan in 1997.

01:24 20    Where did you go in 1997?

21    A.    I went to a school that was affiliated with Markaz Dawah

22    Al Irshad in another city.

23    Q.    Did you receive military training the second time?

24    A.    No.

25    Q.    What city was your training in?

1    A.    It's called Kotli, K-o-t-l-i.

2    Q.    Thank you.  Now, after you returned from your experience

3    in Pakistan, you mentioned that two years later you went to

4    Yemen?

5    A.    Yes.

6    Q.    Was the purpose of your trip to Yemen to get military

7    training?

8    A.    No.

9    Q.    What kind of education were you seeking in Yemen?

01:24 10    A.    To learn Arabic, grammar, and the Islamic sciences.

11    Q.    What prompted you to go to Yemen?

12    A.    Well, at that time, the school that I wanted to go to was

13    known to be a very good school.  They had a very solid

14    curriculum, and the environment was still very austere.

15    Q.    Did you have other options to study Islamic studies

16    elsewhere in the world?

17    A.    Yes.

18    Q.    Where else did you have an opportunity to go?

19    A.    Well, I had been accepted to study at the University of

01:25 20    Medina the summer before when I went to Saudi Arabia, but I

21    decided to change my plans and go to Yemen.

22    Q.    Why would you prefer to go to Yemen?

23    A.    I wasn't that impressed with the student facilities and

24    the level of education, the way the daily life was in the

25    University of Medina.  So I decided I wanted to go to Yemen

1      instead since it was more austere and seemingly more thorough.

2              MR. CHAKRAVARTY:  Can we call up Exhibit 749, also in

3      evidence, your Honor.

4      Q.    Is this a map of Yemen?

5      A.    Yes.

6      Q.    Does it also depict Oman over on the right-hand side of

7      the screen?

8      A.    Yes.

9      Q.    That's the country that you went to in 2004 when you

01:26 10   couldn't get into Yemen?

11     A.    Right.

12     Q.    Approximately where was your school that you attended in

13     1999 in Yemen?

14     A.    I attended two schools.  The first one was in Ma'rib.

15     Q.    This area, Ma'rib?

16     A.    Yes.

17     Q.    What school was that?

18     A.    The school was called Dar-ul-Hadith.

19     Q.    What kind of curriculum did you study under?

01:26 20   A.    It was a traditional curriculum and basic Arabic grammar,

21     jurisprudence, Hadith, things of this nature.

22     Q.    Was there any military training there?

23     A.    No.

24     Q.    What kind of area was Ma'rib?

25     A.    Ma'rib is basically a tribal area.  So most of the people

1    there live in relative isolation and freedom from government

2    control.

3    Q.    At some point, you left your school in Ma'rib?

4    A.    Yes.

5    Q.    Where did you go?

6    A.    I went to a school called Dammaj outside of the city of

7    Sadah.

8    Q.    Is that up in this area?

9    A.    Yes.

01:27 10   Q.    Northwest area.  What school was that?

11   A.    It was a sister school of Dar-ul-Hadith Ma'rib, called

12   Dar-ul-Hadith Dammaj.

13   Q.    When you say "sister school," what does that mean?

14   A.    Meaning that the Dar-ul-Hadith schools located in Yemen

15   were under the auspices of the head teacher there in Dammaj,

16   and the other schools, the sister schools, were by former

17   students of him.

18   Q.    Who was that teacher?

19   A.    The one in Dammaj, his name was Shaykh Muqbil.

01:28 20   Q.    Who's the teacher in Ma'rib?

21   A.    His name was Abul Hasan al-Maribi.

22   Q.    Was he Egyptian?

23   A.    Yes.

24   Q.    Is the appellation in Arabic for somebody from Egypt

25   al-Masri?

1    A.    Yes.

2    Q.    Why did you leave Dar-ul-Hadith in Ma'rib?

3    A.    The teacher, Abul Hasan, left to go on a speaking tour in

4    some neighboring countries, and after he left, the curriculum

5    wasn't as robust as it was when he was there.  It was becoming

6    a bit disorganized.  So a large group of students decided that

7    we would go to Dammaj instead to further our studies because

8    there was no longer anything active going on during that break.

9    Q.    Was Shaykh Muqbil there when you went to this school in

01:29 10  Dammaj?

11   A.    Yes.

12   Q.    How long did you study under him?

13   A.    About a year, a little over a year.

14   Q.    Did you ultimately leave the school?

15   A.    Yes.

16   Q.    Why did you leave?

17   A.    I had really pursued what I wanted to pursue there and was

18   just ready to leave.  There was nothing any longer I wanted to

19   get there.

01:29 20  Q.    Did you return to the United States from there?

21   A.    Yes.

22   Q.    Do you know what happened to Shaykh Muqbil?

23   A.    He passed away a couple years later.

24   Q.    After you left Yemen in 199 -- sorry.  When exactly did

25   you leave Yemen?

1  A.   Summer of 1999.

2  Q.   Did you -- have you been back since then?

3  A.   No.

4  Q.   Did your basis of knowledge as to the availability of

5  education, did that change from when you were there?

6  A.   The situation in Yemen had changed, but, you know, my

7  knowledge from that point after wasn't updated.  I didn't

8  really know a lot of details what was going on after I left.

9  Q.   You indicated that while you were there you did not

01:30 10  receive military training.  Were you aware of where such

11  training could be obtained in Yemen?

12  A.   Not in exact locations but possible contacts of people who

13  would know.

14  Q.   Were you aware, while you were there, of any al Qa'ida

15  presence in Yemen?

16  A.   No.

17  Q.   Did the USS Cole attack occur after you had left Yemen?

18  A.   Yes.

19  Q.   And all of your experiences in Yemen were pre-9/11, is

01:30 20  that right?

21  A.   Yes.

22  Q.   Let's bring you now to 9/11.  How would you describe your

23  religious views with regards to the concept of Jihad around the

24  time of 9/11?

25  A.   Well, pre-9/11 my views regarding Jihad were fairly

1    standard, fairly normative in believing in the concept of Jihad

2    as a means of defending -- as Muslims defending themselves

3    against aggressors if aggressors invade their land.  After

4    9/11, those views transformed greatly.

5    Q.   How so?

6    A.   They became more extreme.  Seeing the events of 9/11 and

7    then seeing the invasions of Afghanistan and seeing these

8    traumatic images on the news media and then reading different

9    books in Arabic, seeing different videos, that solidified my

01:31 10   views and made my views a little more radical regarding the

11   scope of Jihad or who would be considered legitimate targets in

12   Jihad.

13   Q.   Those are different views that you had when you went to

14   Pakistan and to Yemen?

15   A.   Yes.

16   Q.   You mentioned some of the resources.  How did your views

17   transform?  What did you consume?

18   A.   Well, at that time you had several websites in Arabic that

19   had books and audios and even videos of some of the main

01:32 20   ideologs (ph) of al Qa'ida or those who provided the

21   theological underpinnings for the actions of al Qa'ida and

22   those who sought or had their world view.  So after 9/11, it

23   was basically reading these books, listening to these tapes.

24   Q.   You mentioned participating online as well?

25   A.   Yes.

```
 1    Q.   Were discussion forums part of that, or forums?

 2    A.   Yes.

 3    Q.   How long did you hold these what you called extremist

 4    views?

 5    A.   I would say that -- we could say post-9/11, up until

 6    probably late 2004, early 2005.

 7    Q.   Is it fair to say that you no longer believe those ideas?

 8    A.   No.  Yes, that's fair to say.

 9    Q.   How did you withdraw from those ideas?

01:33 10   A.   Well, I think, in hindsight, for me, it was -- it was a

11    reaction to all the traumatic images that I saw and wanting to

12    do something, wanting to have the appropriate attitude towards

13    those things that were taking place in the world.  And my views

14    became more radicalized over time because of the things that I

15    was reading.

16         And, you know, as time went by and I started to, you

17    know, distance myself from online activities, distance myself

18    from all of the people that I associated with online, off-line,

19    I began to think more, went through my own kind of spiritual

01:34 20   crisis regarding these things and ultimately questioned a lot

21    of those beliefs and reassessed my views eventually leading me

22    to where I am today.

23    Q.   Are you familiar with the term "Salafi-Jihadi"?

24    A.   Yes.

25    Q.   What is that?
```

1    A.    It's in one of the several varieties of the Salafi

2    movement, it being probably the more radical off-shoot.

3    Q.    What does that off-shoot -- what tenets does it hold?

4    A.    Roughly speaking, the Salafi-Jihadi ideology basically

5    believes that physical Jihad is an individual obligation on the

6    Ummah, on the Muslim community, and that -- roughly speaking,

7    that the rulers in the Muslim countries are virtually all

8    apostates and that those regimes need to be changed by force

9    and that it's legitimate to target civilians or to target

01:35 10   people who are not directly involved in combat.  I say roughly

11   speaking because you have several arguments within that

12   movement with different levels of nuance.

13   Q.    Back after 9/11, would you describe yourself as a

14   Salafi-Jihadi?

15   A.    Yes, I would.

16   Q.    Was there a Salafi-Jihadi view regarding the events of

17   9/11?

18   A.    Yes.

19   Q.    What was that view?

01:35 20   A.    That 9/11 was a legitimate action and that it was a

21   legitimate operation and legitimate attack.

22   Q.    Was there a rationale as to why it was legitimate?

23   A.    Yes.  Some articulated the view that since it was an

24   economic strong point of the United States that to target it is

25   to target the American economy, to weaken America, and that

1   those who perished in the World Trade Center were but

2   collateral damage.  Therefore, the targeting of this financial

3   symbol was legitimate and justified and praiseworthy.

4   Q.   Did you share that view back then?

5   A.   Yes.

6   Q.   Did you associate with other people who shared this world

7   view, the Salafi-Jihadi?

8   A.   Yes.

9   Q.   Where did you associate with them?

01:36 10   A.   A few people off-line and several people online.

11   Q.   Were there particular forums or sites where you would

12   congregate?

13   A.   Yes.

14   Q.   Can you say what they are?

15   A.   Well, there's three basic sites.  The first one was

16   pre-9/11.  That one was called salafiyoon.com.  The second one

17   was Clear Guidance forum.  And the third one was Tibyan forum.

18   Q.   Did you have a presence on all of these?

19   A.   Yes.

01:37 20   Q.   Did you use different screen names or handles when you

21   were on these sites?

22   A.   Yes.

23   Q.   What were your online monikers?

24   A.   For Salafi Yoon, it was Abu Umar.  For Clear Guidance, it

25   was Abul Muthanna.  And for Tibyan, I don't remember.

1    Q.    The first one you said was Abu Umar?

2    A.    Yes.

3    Q.    Can you spell that?

4    A.    A-b-u, U-m-a-r.

5    Q.    And then you described Abul Muthanna.  Can you spell that?

6    A.    A-b-u-l, M-u-t-h-a-n-n-a.

7    Q.    You described that at different periods of time you used

8    different identities.  Did you frequent them at different

9    periods of time?

01:38 10    A.    Pardon?

11    Q.    Did you frequent each of these sites at a different period

12    in time?

13    A.    Yes.

14    Q.    Did these sites -- were they -- did they frequently go up

15    and come back down?

16    A.    I'm not too sure about salafiyoon.  I think it was

17    eventually just pulled down by the owner.  Clear Guidance was

18    also pulled down by the owner by his own choice.  Tibyan went

19    down from time to time for various reasons.

01:38 20    Q.    Was there a relationship between Clear Guidance and

21    Tibyan?

22    A.    Yes.

23    Q.    What was that relationship?

24    A.    Well, Tibyan represented a grouping of people who were

25    previously posting on Clear Guidance forum.  The site was

1  established as a means of putting up translations of different

2  documents that articulate the Salafi-Jihadi world view.

3  Q.   What was the focus of Clear Guidance?

4  A.   Clear Guidance at the time was basically a gathering point

5  for "Muslim youth."  So you had a variety of views there,

6  although you could say that the dominant viewpoint was either

7  kind of standard Salafi to Jihadi Salafi.

8  Q.   And had you been on Clear Guidance over a period of time?

9  A.   Yes.

01:39 10  Q.   What was the focus of Tibyan Publications -- or Tibyan?

11  Excuse me.

12  A.   Yes.  Tibyan Publications and the forum was basically, as

13  I said, a point where translations could be put up of documents

14  that articulated the Salafi-Jihadi world view.

15  Q.   Were you on this site for some period of time?

16  A.   Yes.

17  Q.   Was it a shorter period of time than you were on Clear

18  Guidance?

19  A.   Yes.

01:40 20  Q.   Approximately when were you on Tibyan Publications?

21  A.   Probably 2002, 2003.  Last I remember is perhaps 2004 or

22  early, early 2005, just briefly.

23  Q.   How did Tibyan operate?

24  A.   From my knowledge, it was a volunteer effort of people

25  coming together translating different texts.  Those texts would

1    be put together in a pdf form and then posted online.  And then

2    it eventually grew.

3    Q.    You eventually withdrew from the site?

4    A.    Yes.

5    Q.    Do you remember whether the site was open to everyone?

6    A.    I remember it being open for general readers but not open

7    for posting without having permission or without having a

8    connection with someone on the site.

9    Q.    So you could access the content without being able to post

01:41 10   on the site?

11   A.    Yes.

12   Q.    Unless you were a member?

13   A.    Yeah.  If you're a member, you can post.  Without being a

14   member, you can just access the content.

15   Q.    What types of translations appeared on the site?

16   A.    Texts that articulate the theological arguments in support

17   of the Salafi-Jihadi world view; issues regarding declaring the

18   rulers of the Muslim countries as apostates and disbelievers;

19   articles or booklets justifying targeting non-combatants; and

01:41 20   other theological issues that are not directly related to Jihad

21   but related to that world view.

22   Q.    Did you translate anything for the Tibyan site?

23   A.    Yes.

24   Q.    What did you translate?

25   A.    I translated a book called, in Arabic, "Al-Tibyan Fi Kufri

1    Man A'an Al-Amrikan," translated as, "The Exposition Regarding

2    the Disbelief of Those Who Assist the Americans."

3    Q.   I think -- I'm not going to ask you to spell that whole

4    thing in Arabic.  We'll try to get it afterward.

5         At the time you translated that, did you agree with

6    the message of that article?

7    A.   The book, you mean?  Yes.

8    Q.   Excuse me.  What was that message?

9    A.   The basic thesis of the book is that anyone who offers any

01:42 10   assistance, whether it be physical or moral, verbal or

11   financial assistance to the Americans in their war against the

12   Muslims in Iraq and elsewhere, that person becomes, through

13   that action, an apostate, who has left the fold of Islam.

14   Q.   Did you spend considerable time on that?

15   A.   Yes.

16   Q.   About how long?

17   A.   Approximately six months, maybe longer.

18   Q.   Did that test your Arabic skills?

19   A.   I suppose so, yes.

01:42 20   Q.   Were you familiar with other translations that appeared on

21   that site?

22   A.   A few.

23   Q.   Do you know whether Tibyan Publications distributed

24   al Qa'ida propaganda materials?

25   A.   Most of the materials that they were translating were

1    coming from one or two websites that were like the

2    clearinghouses for all sorts of literature either coming

3    directly from people who were affiliated with al Qa'ida or

4    idealogs (ph) who supported the ideology of al Qa'ida.

5    Q.   Are you familiar with a document called "39 Ways To Serve

6    and Participate in Jihad"?

7    A.   Yes.

8         MR. CHAKRAVARTY:   I call up Exhibit 25 and 32 in split

9    screen.  Both of these are in, your Honor.  382, excuse me.

01:43 10  Q.   Do you recognize the document on the left of the screen,

11   Exhibit 25?

12   A.   The English one, no.  I don't recall seeing the cover like

13   this.

14   Q.   Okay.  Do you see where it says "Tibyan Publications" on

15   the bottom?

16   A.   Yes.

17   Q.   What is the document on the right?

18   A.   This is the Arabic version of the same document.

19   Q.   Is this --

01:44 20  A.   Although there's a slight difference.  No, that's -- no.

21   There's a discrepancy between the two, just with the name of

22   the person in the parentheses.  The name of the author is the

23   same.  The name of the book is the same.

24   Q.   I'm going to ask you about some of the people you're

25   familiar with from the forums, these online forums that you

1   were just describing.  Are you familiar with a person who used

2   the screen name Abu Fudayl?

3   A.   Yes.

4   Q.   Did you know any other online identities that that person

5   used?

6   A.   Yes.

7   Q.   What were they?

8   A.   There was Abu Hurairah; there was Sinaan; Abu Hamood; and

9   Abu Usayd, I think.

01:45 10   Q.   Are you familiar with somebody that used the online

11   identity of Ibn Abi Shaybah?

12   A.   Yes.

13   Q.   Again, for the stenographer, can you try to spell what I

14   just said?

15   A.   I'm not sure how you spelled it but probably I-b-n, A-b-i,

16   S-h-a-y-b-a-h.

17   Q.   Are you familiar with a person called Abu Dujanah?

18   A.   Yes.

19   Q.   Did you later learn Abu Dujanah's true identity?

01:45 20   A.   Yes.

21   Q.   Do you know his real name?

22   A.   Tariq Dur (ph), something like that.

23   Q.   Are you familiar with somebody named Abu Khubayb

24   al-Muwahhid?

25   A.   I've seen the name.

1    Q.   Are you familiar with that being online --

2    A.   Yes.

3    Q.   -- but not knowing who that person is?

4         Are you familiar with Abu Sabaayaa?

5    A.   Yes.

6    Q.   Were all of these names people that you saw online on

7    these various sites?

8    A.   Yes.

9    Q.   Did you have interaction with them online?

01:46 10   A.   Not with all of them, mostly with Abu Fudayl and all of

11   his other associated names, as well as Abu Dujanah.

12   Q.   I bring you now to Abu Fudayl.  Do you know who Abu Fudayl

13   is in -- not in the virtual world but in reality?

14   A.   Yes.

15   Q.   Who is he?

16   A.   Ahmad Abousamra.

17   Q.   How did you know him?

18   A.   We met in person.

19   Q.   Before you met him in person, how did you know him online?

01:46 20   A.   We used to talk online from time to time.

21   Q.   About what?

22   A.   All sorts of issues, many of them related to, like,

23   Salafi-Jihadi stuff.  Other times other topics.

24   Q.   Was that his mindset as well?

25   A.   Pardon?

1   Q.   Was that his mindset as well?

2   A.   Yes.

3   Q.   Approximately when was this?

4   A.   Well, my first initial contact with him was on the Salafi

5   Yoon forum in 2001, and our contacts continued on words with

6   Clear Guidance and Tibyan.

7   Q.   How frequently would you talk?

8   A.   Off and on.  Sometimes quite frequently.  Sometimes there

9   would be stretches of time where we didn't speak.

01:47 10   Q.   You mentioned that you would speak in connection with the

11   forums.  Were there any other means that you would communicate?

12   A.   We would speak on MSN Messenger.

13   Q.   Is that instant messaging?

14   A.   Instant messaging, yeah.

15   Q.   You've formed views about his mindset, as you just said.

16   What was the basis of your assessment of his views?

17   A.   Synonymous with mine, give or take a few details.

18   Basically, Salafi-Jihadi.

19   Q.   How did you conclude that?

01:48 20   A.   From all of our discussions.

21   Q.   Are you familiar with a concept called takfir?

22   A.   Yes.

23   Q.   What is that?

24   A.   Takfir is basically when a Muslim is declared to be a

25   non-Muslim, an apostate.  It's a legal ruling.

1    Q.   Did he express to you his views on takfir?

2    A.   Yes.

3    Q.   What were they?

4    A.   His views on takfir were basically like that of mine, what

5    I now see as extreme.  Basically, very easygoing and very

6    simplistic when it comes to declaring Muslims to be non-Muslims

7    for various offenses that were construed as acts or deeds or

8    statements that would take them outside of the fold of Islam.

9    Q.   Are you aware of whether he did any translation activities

01:49 10   online?

11   A.   I'm aware of a few snippets here and there, samples of

12   different things, nothing very extensive that I recall.

13   Q.   You were aware that he spoke and was able to translate in

14   Arabic?

15   A.   Yes.

16   Q.   You described a second ago that you actually met him?

17   A.   Yes.

18   Q.   When did you meet him?

19   A.   We met in the early fall of 2003.

01:49 20        MR. CHAKRAVARTY:  Call up Exhibit 741, please.  It's

21   also in evidence, your Honor.

22   Q.   Do you recognize the person depicted in this?

23   A.   Yes.

24   Q.   Which of the photos do you recognize as --

25   A.   The bottom left.

1    Q.    Who do you recognize that to be?

2    A.    Ahmad Abousamra.

3    Q.    Where did you meet him?

4    A.    In Sacramento.

5    Q.    So he came to visit you in the fall of 2003?

6    A.    Yes.

7          MR. CHAKRAVARTY:  Call up Exhibit 758, please.  Excuse

8    me, your Honor.  This may not be in yet.

9    Q.    Do you recognize that photo?

01:50 10   A.    Yes.

11   Q.    Who is that?

12   A.    Yours truly, me.

13   Q.    Approximately when?

14   A.    I would say 2003, around the same time period.

15         MR. CHAKRAVARTY:  I ask to introduce 758, your Honor,

16   and publish it.

17         THE COURT:  All right.

18         MR. CARNEY:  No objection, your Honor.

19   (Exhibit No. 758 received into evidence.)

01:50 20   Q.    So is this a fair and accurate depiction of how you

21   appeared when you met with Ahmad Abousamra?

22   A.    Yes.

23   Q.    How would you characterize any difference between your

24   physical appearance back then versus now?

25   A.    I mean, at that time I was -- I took the position that

1    it's forbidden to shave the beard.  Now I don't have that

2    position anymore.

3    Q.    Is that a Salafi position?

4    A.    Not exclusively, no.

5    Q.    What prompted your meeting with Ahmad Abousamra in the

6    fall of 2003?

7    A.    We were talking on MSN, and in the course of our

8    discussion, the topic of Yemen came up as a possible place to

9    travel to.

01:51 10    Q.    In what context?

11    A.    Well, the context was to go to Yemen for training for

12    Jihad, but the conversation was basically cut short on MSN

13    preferring instead that he travel to Sacramento to discuss it

14    further.

15    Q.    Did he suggest that?

16    A.    Yes.

17    Q.    Why did you cut the conversation short on the instant

18    message chat?

19    A.    He wished to discuss the topic further but not on MSN for

01:51 20    fear that it could be monitored.

21    Q.    Did you make arrangements to meet?

22    A.    Yes.

23    Q.    What were those arrangements?

24    A.    He flew out to Sacramento, and I picked him up from the

25    airport and arranged a place for him to stay for a couple of

```
 1   days.

 2   Q.    Did he have your phone number?

 3   A.    Yes.

 4   Q.    Did you make arrangements to pick him up from the airport?

 5   A.    Yes.

 6   Q.    Did you do that?

 7   A.    Yes.

 8   Q.    Do you recall what day of the week he was arriving?

 9   A.    I believe it was a Friday.

01:52 10   Q.    How long was he going to stay?

11   A.    I think until Sunday.

12   Q.    Before he came out, what was your understanding about what

13   Abousamra had been told about your experience in Yemen?

14   A.    Well, he was -- he was under the impression, as he learned

15   from me directly, that I had studied there with Shaykh Muqbil

16   and Abul Hasan al-Ma'ribi.

17   Q.    What did you tell him about your experience in Pakistan

18   before he came to visit you?

19   A.    That I had been involved with Lashkar Tayba and I had

01:53 20   visited them and received training with them.

21   Q.    When he arrived, why did he say he came to see you?

22   A.    To discuss the details about how he could go about

23   traveling to Yemen to receive training for Jihad.

24   Q.    What was the objective of his training?

25   A.    Ultimately, to receive the training that he would need to
```

1    participate in Jihad.

2    Q.    Did he say where he wanted to go to train in Jihad?

3    A.    Well, Iraq was the topic of discussion.

4    Q.    Did he bring up the issue of going to Yemen?

5    A.    In our MSN conversation, you mean?

6    Q.    Yeah, before he came out.

7    A.    I don't recall whether it was just both of us talking and

8    the topic came up, whether it was through his prompting.  But

9    we got on the topic.  It was broached and we talked further.

01:54 10   Q.    What was the connection between Yemen and Iraq?

11   A.    Well, at that time, there was no real connection other

12   than the fact that there were still in Yemen at that time many

13   Afghan Arabs, meaning veterans from the previous Afghan war in

14   the '80s, from Arab countries who were unable to return to

15   their home countries and instead settled in Yemen under the

16   protection, under the agreement, of the president of Yemen.

17            MR. CHAKRAVARTY:  Can we call up Exhibit 9, please.

18            THE COURT:  Is this in?

19            MR. CHAKRAVARTY:  This is in, your Honor, Exhibit 9.

01:54 20   It's something from the defendant's residence.

21   Q.    Before you came and testified today, did I show you this

22   document yesterday?

23   A.    Yes, or you showed it to me this morning.

24   Q.    This morning, excuse me.  Are you familiar with this name?

25   A.    Yes.

1    Q.    Who is that person?

2    A.    Aqeel Walker.  He's an American translator.

3    Q.    Where did you know him from?

4    A.    I know him from Georgia.

5    Q.    Is the title of this document, "Yemeni Scholars Reinforce

6    the Call For Jihad"?

7    A.    Yes.

8              MR. CHAKRAVARTY:  Can we go to Page 3, please.  Again,

9    this is appended to the same document.

01:55 10              MR. CARNEY:  I object.  May we approach, please?

11              THE COURT:  All right.

12    (SIDEBAR CONFERENCE AS FOLLOWS:

13              MR. CARNEY:  Your Honor, I object to these as hearsay.

14    Just putting a post on that someone said something like Yemeni

15    scholars support Jihad.

16              MR. CHAKRAVARTY:  I'm not offering it for the truth of

17    the matter.  I'm just offering it as something in the

18    defendant's residence.  It's consistent with why Abousamra

19    would be asking for guidance on Yemen or direction on Yemen,

01:56 20    and it ties to the defendant.

21              THE COURT:  Yeah, so first -- okay.  What portions do

22    you want to use here?

23              MR. CHAKRAVARTY:  I don't have it in front of me.

24    There's one portion where it's explicit.  There's a call to

25    engage in Jihad.

1          THE COURT:  I'm not sure what the truth statement is.

2          MR. CARNEY:  Well, this was a document -- do you know

3     when it was written?  Was it 2001?

4          MR. CHAKRAVARTY:  I think he says it's around 2001.

5          MR. CARNEY:  So the fact that he has in his possession

6     a document that says that really just shows that in a room full

7     of books and papers, he has things.

8          THE COURT:  Well, that's a probative value issue.  I'm

9     trying to get to the hearsay issue.  I don't know that it's

01:57 10    offered as an assertion for the jury to treat as true or false

11    but just as a fact of its existence.  Now, then you get to what

12    does it mean that it existed.  I think that's part of the

13    circumstantial case, so --

14         MS. BASSIL:  It is being offered for the truth.  Why

15    else would he put it up there?  Yemeni scholars talk about

16    Jihad.  That's why he put it up there.  It's misleading

17    because, as of 2004, that's no longer true.

18         THE COURT:  I think it's -- okay.  Objection

19    overruled.

01:57 20    .  .  .  END OF SIDEBAR CONFERENCE.)

21    Q.   Mr. Pippin, are you familiar with this document?

22    A.   Yes.

23    Q.   What is it?

24    A.   It's an excerpt of a statement made by one of the teachers

25    in Yemen affiliated with Shaykh Muqbil.

1    Q.   Again, was this also translated by Aqeel Walker, the

2    person that you're aware of?

3    A.   Yes.

4        MR. CHAKRAVARTY:  Can we go to the next page, please.

5    Q.   "We ask Allah to make the Muslims firm in the East of the

6    land and the West of the land upon the Deen, Islam.  We ask

7    Allah to help the mujahideen who make Jihad in his path and

8    that he helps them against his enemies.  Oh, Allah, help your

9    worshippers."  Did I read that portion correctly?

01:59 10   A.   Yes.

11   Q.   "Thus, Jihad in the way of Allah, is that which its time

12   is coming.  I mean the Jihad of attacking, aggressing, and

13   conquering lands offensive Jihad.  However, it is obligatory

14   upon you, O, people to help the Muslims at least by making

15   du'aa, supplications to Allah.  If we are not able to help with

16   wealth and if we are not able to help with men, i.e., soldiers,

17   then let us help them with du'aa.  And du'aa contains an

18   abundance of good by the permission of Allah and the Lord of

19   all the worlds."  Did I read that correctly?

01:59 20   A.   Yes.

21   Q.   Are you familiar with approximately when this document --

22   or this opinion came out?

23   A.   I believe it was around the time when the Americans

24   invaded Afghanistan.

25   Q.   Was that Americans invaded Afghanistan?

1    A.    Yeah.  That would be 2001, 2002.

2          MR. CHAKRAVARTY:  You can clear this.

3    Q.    When Mr. Abousamra came to visit you, did he mention his

4    Boston crew?

5    A.    Yes.

6    Q.    What did he say about them?

7    A.    Well, he mentioned that he had a few friends of like mind

8    who were basically Salafi-Jihadis as well that he spent time

9    with.  I don't recall him mentioning the exact names, but I do

02:00 10   recall mentioning -- like, I remember something like IT guy,

11   which I think later on was -- either he told me directly or I

12   heard it from him later on, the name Kareem came up and Abu

13   Sabaayaa.

14   Q.    At the time that he was talking about the IT guy and Abu

15   Sabaayaa, you didn't know their real names?

16   A.    No.

17   Q.    What did he say about them?

18   A.    Well, basically, that they also share the same viewpoints.

19   Q.    Were you familiar -- I think you said you were -- with the

02:01 20   name Abu Sabaayaa?

21   A.    Yes.

22   Q.    How were you familiar with him?

23   A.    I was already familiar with the name because of the

24   postings on Clear Guidance.

25   Q.    And this was one of those websites that you had mentioned

1    earlier?

2    A.    Yes.

3    Q.    Did you recognize him as somebody who posted on that site?

4    A.    Yes.

5    Q.    When were you on that site?

6    A.    Probably late 2001 through 2002.

7    Q.    Did you become familiar with his posts during that period?

8    A.    Yes.

9    Q.    Were you familiar with the format of Clear Guidance?

02:01 10    A.    Yes.

11    Q.    How did the pages appear?

12    A.    Well, you have the post with the avatars, the avatars

13    being the pictures that identify the poster, on the left side.

14    Q.    And then are you familiar with what's called a thread?

15    A.    The thread, yeah.  You have a topic under discussion, and

16    then you have responses to it that are under it.

17    Q.    Before you came in to testify today, yesterday, did I show

18    you Exhibits 443 to 447?

19         MR. CHAKRAVARTY:  Can you call up 443 just for the

02:02 20    witness.  This is not in evidence.

21         THE COURT:  Actually, we're at 11:00.  Before you get

22    into the exhibit, why don't we take the recess.

23    (Recess taken at 10:56 a.m.)

24         (After the recess:)

25         THE CLERK:  All rise for the Court and the jury.

1            (The Court and jury enter the courtroom at 11:31 a.m.)

2            THE CLERK:  Please be seated.

3    BY MR. CHAKRAVARTY:

4    Q.   Mr. Pippin, when we broke I was starting to ask you about

5    some posts on ClearGuidance.com.  Yesterday, did you have an

6    opportunity to review Exhibits 443 to 447?

7            MR. CHAKRAVARTY:  And for your benefit, your Honor,

8    could we have the projection of 443 just for the witness?

9            MR. CHAKRAVARTY:  All right.

02:38 10            MR. CARNEY:  May we be seen at sidebar, please?

11            THE COURT:  Okay.

12            (Discussion at sidebar and out of the hearing of the

13    jury:)

14            MR. CARNEY:  I object to these postings on Clear

15    Guidance, your Honor.  I believe he's going to offer a series

16    of them.

17            THE COURT:  What's the objection?

18            MR. CARNEY:  Any possible minimal relevance is far

19    exceeded by the prejudicial value.  All this is, is a young man

02:39 20    making comments on a website.  And they have no relevance to

21    this trial, no insight into his state of mind, no -- nothing

22    but just making him look like a snarky kid.

23            THE COURT:  What are the dates?

24            MR. CHAKRAVARTY:  They go from the end of November

25    2003 up to the week before they went to Yemen.

         1              THE COURT:  So the end of '03 into '04?  And what is
         2     the substance?
         3              MR. CHAKRAVARTY:  There's three different sets.  One
         4     of them discuss both what -- he's going to identify
         5     individuals, the defendant and some of the other participants,
         6     including Abousamra and Abu Dujana, who was one of the people
         7     were on the sites; he's going to talk about the defendant's
         8     reference to "join the caravan," which is this document that
         9     was posted which was found in the defendant's house.  He would
02:39   10     say this is the document that he was referring to.
        11              THE COURT:  What's the defendant's moniker here?
        12              MR. CHAKRAVARTY:  Abu Sabaayaa.
        13              MR. CARNEY:  Which one is the first one you're going
        14     to offer?
        15              MR. CHAKRAVARTY:  I'm going to offer all of them.  I'm
        16     going to talk about --
        17              MR. CARNEY:  Which is the first one, because I could
        18     hand the Court --
        19              MR. CHAKRAVARTY:  443.
02:40   20              THE COURT:  Why are these different from the instant
        21     messages?
        22              MR. CARNEY:  Because of the content, your Honor.
        23     Here's what happens on Clear Guidance:  There will be a post by
        24     an individual -- the first one, 443, involves what a person
        25     should do if his parents are sick and oppose the idea of the

1    person going to jihad, and what happens thereafter is that

2    people offer comments about that.  And I can direct your Honor

3    to the page where he would offer the comment.  If I may kind of

4    direct you on this, your Honor.  This is Post No. 2 by someone

5    called "editor," and he makes a comment.

6              THE COURT:  All right.

7              MR. CARNEY:  And there is post No. 3 by someone who

8    says, "If the child feels it would lead to the death of his

9    parents, he shouldn't go."  Here we get to Number 4.  This is

02:41 10   the defendant.  His comment begins right here.

11             THE COURT:  Are there any others?

12             MR. CARNEY:  Yes, your Honor.  We would have Post 5 by

13   someone else, and 6, and 7.  Eight and 9 he reappears --

14             THE COURT:  Yeah.

15             MR. CARNEY:  -- and he comments on a previous post and

16   notes it's also found in "Join the Caravan" as a clarification

17   section --

18             THE COURT:  That's what Mr. Chakravarty was just

19   referring to?

02:42 20             MR. CARNEY:  Correct.

21             MR. CHAKRAVARTY:  Your Honor, those rulings are why

22   certain excuses are not permissible reasons, why someone should

23   not go.  And that seems to be squarely -- the mindset here is

24   before he's going on that trip what was his mindset?  And he's

25   trying to remove the barriers.

```
 1              MR. CARNEY:  I'll remove my objection to this one,

 2      your Honor.

 3              What's the second one, please?

 4              MR. CHAKRAVARTY:  446.

 5              THE COURT:  They're in sequence.

 6              MR. CARNEY:  All right.

 7              THE COURT:  Maybe it will help if I just flip through

 8      it because the point is to find his post, right?

 9              MR. CARNEY:  Yes, your Honor.  And there are also some

02:43 10    by Abousamra.

11              MR. CHAKRAVARTY:  And there are coconspirators as

12      well, but the ones we would read would be his.

13              (Pause.)

14              THE COURT:  Well, I guess I come back to where I

15      started:  This seems very much like the particular instant

16      message chats.  I mean, it's conversations among people who are

17      said to be participants.  As a general matter, that seems

18      germane and admissible.  And if there's some particular

19      offensive matter, we can focus on that.  But it shows -- you

02:44 20    know, the fact of the relationships as well as whatever it was

21      they were talking about, it seems germane.

22              MR. CARNEY:  Is the next one mentioning Colin Powell?

23              THE COURT:  That one did.

24              MR. CARNEY:  That's one of the things that I think

25      should be excluded.  I mean, he says that he hopes Colin Powell
```

1    has his cancer return and that President Bush and Defense

2    Secretary Rumsfeld get AIDS and transfer it to their wives and

3    daughters.

4            THE COURT:  Who says that?

5            MR. CARNEY:  The defendant.  Making a comment on that

6    online and saying something crude and demeaning of people is

7    typical behavior of kids this age, and to --

8            THE COURT:  That's a matter, again, for an ultimate

9    judgment of -- they're entitled to claim the other side of

02:45 10    that.

11            MR. CARNEY:  But his state of mind is clear beyond any

12    discussion and now he's saying "I think someone should get

13    cancer and someone should get AIDS"?  The prejudice of his

14    saying that as a young man on a forum so far outweighs any

15    probative value; in fact, I challenge the prosecutor:  What is

16    the probative value of those statements compared to the

17    avalanche that's come in already?

18            MR. CHAKRAVARTY:  You are saying that he did not go

19    there, to Yemen, for the purposes that he's alleged to have

02:45 20    gone there.

21            MR. CARNEY:  And so if he says that --

22            THE COURT:  I think it's admissible.

23            MR. CARNEY:  This about politicians?

24            THE COURT:  Yes.  I overrule the 403 objection.

25            MR. CARNEY:  I move for a mistrial.

1          THE COURT:  Okay.

2          MR. CARNEY:  I think if this evidence is going to come

3     in -- I want to make it clear on the record.

4          THE COURT:  Okay.

5          MR. CARNEY:  If this evidence is coming in, all it is

6     doing, your Honor, is poisoning the jury about the character of

7     this young man.  It has nothing to do with state of mind.  It

8     has nothing to do with interest in going to Yemen.  It has got

9     nothing to do with supporting jihad.  It's just saying:  I

02:46 10    think this politician should get cancer and this other

11    politician should get AIDS.  That is so inflammatory and

12    irrelevant to the issues here that it's just pure and simply

13    character assassination, poisoning the jury.

14         The prejudice is overwhelming.  There is no limiting

15    instruction that could possibly be given now or in the final

16    instructions to ameliorate this extreme prejudice.

17    Mr. Mehanna, like everybody his age, would say stupid, profane,

18    crude, immature things.  To have it introduced against him in a

19    criminal trial of this magnitude, I respectfully suggest -- and

02:47 20    I don't say this lightly -- is abusing the discretion that your

21    Honor has to control the evidence.  And I don't say that in any

22    way disrespectful.

23         THE COURT:  I understand.

24         MR. CARNEY:  I hope you know that.

25         THE COURT:  I understand that's the legal standard.

1          MR. CARNEY:  And that's the basis for my moving for a

2     mistrial with the admission of this evidence.

3          MR. CHAKRAVARTY:  Just for the record, I would

4     disagree with that characterization.  It's not character

5     evidence; it directly goes to what the defendant's state of

6     mind was at relevant periods of time:  the fact that he's

7     wishing death upon his enemies go to the elements of the

8     offense.  He was distinguishing himself from the Americans of

9     whom he was conspiring to kill.

02:47 10        THE COURT:  I think it's relevant and probative to the

11    government's theory and, therefore, admissible, as I said.  So

12    the motion for mistrial is denied.

13         MR. CARNEY:  Yes, your Honor.

14         (In open court:)

15    BY MR. CHAKRAVARTY:

16    Q.   Mr. Pippin, do you recognize this 443 as one of -- 443,

17    444, -45, -46 and -47 to be Clear Guidance posts?

18    A.   Yes.

19    Q.   And describe how you recognize them as Clear Guidance

02:48 20   posts.

21    A.   The Clear Guidance font is the same; the location -- even

22    where it says "location"; knowing who ran the site; as well as

23    just the overall format.

24    Q.   And does it, in fact, say it's an archived version of the

25    Clear Guidance forum?

1    A.   Yes.

2    Q.   And do you recognize some of the names of the individuals

3    who were on the posts?

4    A.   Yes.

5         MR. CHAKRAVARTY:  At this point I would offer exhibits

6    443 through 447.

7         THE COURT:  Okay.  Subject to our sidebar discussion,

8    they are admitted.

9         (Government Exhibit Nos. 443 through 447 received into

02:49 10   evidence.)

11        MR. CHAKRAVARTY:  Could we go to Exhibit 445, fourth

12   page, please?

13        MR. CARNEY:  Your Honor, may these be published to the

14   jury, please?

15        THE COURT:  Yes, they are.

16        MR. CARNEY:  Being read to the jury in total rather

17   than isolated?

18        MR. CHAKRAVARTY:  I'm not prepared to read the entire

19   contents of all of the posts.  Specific posts, I'll be happy to

02:49 20   read the whole post, not the entire thread.  I mean --

21        THE COURT:  Yeah, I don't think it's necessary to read

22   the entire thread.  Again, if there's something relevant, you

23   can offer it on cross.

24        MR. CARNEY:  I submit in order to understand the

25   thread --

           1         THE COURT:  Well, it depends on the length and number

           2    of topics in the thread.  It's hard to make a general judgment

           3    without seeing each one.

           4         MR. CARNEY:  Well, I'd move that 443 be read because

           5    it's impossible to understand these in context as a thread

           6    unless you see what was said before you.  It's like a

           7    conversation.

           8         THE COURT:  Right now I think Mr. Chakravarty was

           9    addressing the witness's attention to Number 445, if I heard it

02:50     10    correctly.

          11         MR. CARNEY:  Right.

          12         THE COURT:  So let's focus on that.  If there's more

          13    than what he needs to show --

          14         MR. CHAKRAVARTY:  Go to page 1, please.

          15         MR. CARNEY:  The argument is based on the rule of

          16    verbal completeness, your Honor.

          17         THE COURT:  I understand.

          18    BY MR. CHAKRAVARTY:

          19    Q.   Is the date of this thread Tuesday, November 18, 2003?

02:50     20    A.   Pardon?

          21    Q.   Is the date of this thread November 18, 2003?

          22    A.   Yes.

          23    Q.   And there's a quote at the beginning of this thread in

          24    bold.  Do you recognize that?

          25    A.   Yes.

1    Q.   What do you recognize that to be?

2    A.   A translation of a verse from the Qur'an.

3    Q.   And what does it refer to?

4    A.   Well, it refers to the ratio of Muslims to non-Muslims in

5    battle.

6    Q.   And is there the identity of the poster?

7    A.   Yes.

8    Q.   Is that Abu Sabaayaa?

9    A.   Yes.

02:51 10    Q.   Is this the person you knew online?

11    A.   Yes.

12    Q.   And then underneath it says, "Chasing the caravan."  Do

13    you understand that to be a reference to anything?

14    A.   Yes.  It appears to be a euphemism referring to a phrase

15    used by an author.  Abdullah Azzam wrote a book called, "Join

16    the Caravan."

17    Q.   That's Abdullah Azzam, A-Z-Z-A-M?

18    A.   Yes.

19         MR. CHAKRAVARTY:  Now, can we go to page -- if you

02:51 20    wouldn't mind going to page 2, 3 and then 4.

21    Q.   And can we read this post by Abu Sabaayaa?  If you

22    wouldn't mind just reading the content portion of this post.

23    A.   Sure.  "No, it means that the minimum required Muslim to

24    Kaafir ratio on the battlefield was reduced from 1:10 to 1:2.

25    That is, before the abrogation of the verse, a Muslim was

1     required to take up to ten of the disbelievers on the

2     battlefield for himself.  But, Allah replaced this with an

3     easier ratio; that is, the ruling is that the Muslim is only

4     required to take up to two disbelievers on the battlefield for

5     himself to fight."

6     Q.   And it goes on to page 2.  Can you read that portion

7     that's already in bold?

8     A.   "But it is still possible that a small group of Muslims

9     can defeat a much larger group of the kuffaar (for example, the

02:52 10   battles of New York and Washington, in which the odds were

11    around 1:150)."

12    Q.   What does "kuffaar" mean?

13    A.   Disbeliever.

14    Q.   "Disbeliever" means a non-Muslim?

15    A.   Yes.

16    Q.   Now, this post occurred in November of 2003.  How long

17    after Abousamra came to visit you?

18    A.   This appears to be a few months after -- or not too long

19    after because I think he came around October, I believe.  So it

02:53 20   would be not too long after?

21         MR. CHAKRAVARTY:  Can we go to Exhibit 446, please.

22    Q.   Again, is this a Clear Guidance post starting with January

23    25, 2004?

24    A.   Yes.

25         MR. CHAKRAVARTY:  Can we go to page 4, please.  Again,

1    can we do page 1, 2, 3, 4, just so that the jury can see the

2    context?

3    Q.   On January 23, 2004, was there a post by Abu Dujanah?

4    A.   Yes.

5    Q.   And you mentioned earlier this person you knew as

6    Tarek al-Daour?

7    A.   Yes.

8    Q.   Do you know where he lived?

9    A.   In London.

02:54 10   Q.   Okay.  And did you have contact with him at some point?

11   A.   Yes.

12   Q.   And then right after that, same day, there's a post by

13   Abu Sabaayaa again?

14   A.   Yes.

15   Q.   Can you read this portion?

16   A.   "Ibn Hazm sees it impermissible if the child fears the

17   halaak (death, et cetera) of his parents."

18   Q.   And in the context of this thread, what was -- "sees it

19   impermissible."  What was the "it" they're referring to?

02:54 20   A.   It appears they're speaking about going for jihad without

21   the permission of one's parents.  When does that permission --

22   when is it required, when is it not required.

23   Q.   Go to the next page, please.  Please continue reading.

24   A.   "Well, we have two different cases of the parents

25   dying/becoming severely ill because of the son's leaving:  as a

1    result of nobody being there to care for them (which is more

2    certain) and as a result of the distress caused by the son's

3    leaving them (which is, wallaahu a'lam, much less certain).

4        "Which of the two cases is Ibn Hazm referring to?"

5    Q.   So are you familiar with this nuance within Salafi

6    ideology that you had mentioned earlier?

7    A.   Yes.

8    Q.   Can you explain it to the jury?

9    A.   Well, in a situation in which it would be determined that

02:55 10   jihad is individually obligatory on a community, they mention

11   that there is no permission needed from one's parents in order

12   to go and defend against invaders.  So this discussion of

13   Ibn Hazm -- he's an ancient jurist -- appears to be talking

14   about if permission will be needed or not if the parents are

15   severely ill and they need the son to take care of them.  So

16   it's speaking about a case when jihad will be seen as

17   individually obligatory.

18   Q.   And does it draw a distinction between if the son is

19   needed to take care of a severely ill parent versus if just the

02:56 20   leaving is causing that parent distress?

21   A.   Yes, that is a distinction it makes.

22   Q.   The following post is by Sinaan.  Do you know who that is?

23   A.   Yes.

24   Q.   Who is that?

25   A.   Ahmad Abousamra.

```
 1   Q.   Does he contribute to the conversation?
 2   A.   Yes.
 3        MR. CHAKRAVARTY:  Can we go to page 8 by going to 6,
 4   7, 8, please?
 5   Q.   Then is there another post by Abu Dujanah, still the same
 6   day, January 23, 2004?
 7   A.   Yes.
 8   Q.   And then another post by Abu Sabaayaa, correct?
 9   A.   Yes.
02:57 10       MR. CHAKRAVARTY:  Can we go to the next page, please?
11   Q.   Can you read one?
12   A.   "It is also found in 'Join the Caravan' in the
13   'Clarifications' section at the end.  Go here" -- then there's
14   a link -- "and scroll down to the section regarding excuses.
15   Q.   Now, you mentioned earlier a book by Abdullah Azzam?
16   A.   Yes.
17   Q.   Are you pretty familiar with "Join the Caravan"?
18   A.   Yes.
19   Q.   What is that?
02:57 20   A.   It was a seminal work that was produced by Abu Azzam, who
21   was responsible for motivating a lot of the Arab world to
22   volunteer and travel to Afghanistan to take part in the jihad
23   against the Soviet Union.  So "Join the Caravan" essentially
24   argues that it is individually obligatory upon the entire
25   Muslim ummah, nation, to participate in jihad.  So he outlines
```

1    the legal arguments establishing that.

2    Q.   And are you familiar with a section regarding excuses?

3    A.   Yes.  There's an appendix at the end where he mentions

4    various excuses, and arguments against them.

5         MR. CHAKRAVARTY:  I would call up Exhibit 221, please.

6         This is in evidence, your Honor, in the native Arabic.

7    Q.   Are you familiar with this document?

8    A.   Yes.

9    Q.   What do you recognize this to be?

02:58 10   A.   This is the Arabic version of "Join the Caravan."

11   Q.   Is this what you were just referring to?

12   A.   Yes.

13   Q.   And is the subject of that Clear Guidance post?

14   A.   Yes.

15   Q.   So how would you describe Abu Sabaayaa's views at the time

16   on Clear Guidance?

17   A.   I didn't have a great deal of interaction with

18   Abu Sabaayaa, Tariq, on Clear Guidance.  I don't recall us

19   actually ever engaging in any conversation.  But what I learned

02:59 20  about him was --

21        MR. CARNEY:  I object.

22        THE COURT:  Sustained.

23        MR. CHAKRAVARTY:  I'll ask another question.

24   BY MR. CHAKRAVARTY:

25   Q.   Did you have interaction with him on -- in any other

1    capacity?

2    A.    I don't recall speaking to him.

3    Q.    Did you know his true identity at that time?

4    A.    At the time of this posting?

5    Q.    Yes.

6    A.    I didn't know -- I don't recall knowing the name "Tariq,"

7    but I do know Abu Sabaayaa was this person in Boston who was

8    friends with Ahmad Abousamra.

9    Q.    Are you familiar with something called "Thawabit 'ala Darb

02:59 10   al-Jihad"?

11   A.    Yes.

12   Q.    What is that?

13   A.    "Thawabit 'ala Darb al-Jihad" is a book written by the

14   former leader of what was then known as al Qa'ida in the

15   Arabian Peninsula by the name of Yusuf 'Uyayri.  And it was a

16   small treatise he wrote about the constants of jihad and things

17   that are not subject to variables of time and place.

18   Q.    So when you say "constants," it's C-O-N-S-T-A-N-T-S?

19   A.    Yes.

03:00 20   Q.    And did you have any interaction with that short treatise?

21   A.    Yes.

22   Q.    What did you do?

23   A.    I basically wrote down some of its major points and

24   translated it online through an audio.

25   Q.    Are you aware of whether that audio was recorded at any

1    point?

2    A.   Yes.

3         MR. CHAKRAVARTY:  Could we call up Exhibit 793, which

4    is also in evidence, something -- a list of downloads from the

5    defendant's computer?

6         If you would go to page 10, please?

7    Q.   Can you read the file name of what I just highlighted?

8    A.   "Thawaabit Ala Darb Al Jihad Abul-Muthanna (Part 1) mp3."

9    Q.   And who was Abul-Muthanna?

03:01 10   A.   That was my user name on Clear Guidance.

11   Q.   And does this appear to be the audio file of that lecture

12   that you gave?

13   A.   Yes.

14   Q.   Do you know whether anyone else did a version of this

15   lecture?

16   A.   I learned later on that there was a recorded lecture

17   series on the same book done by Anwar al-Awlaqi.

18   Q.   Can you spell Anwar al-Awlaqi?

19   A.   Yes.  First name:  A-N-W-A-R, then A-L - A-W-L-A-Q-I, I

03:02 20   believe.

21   Q.   Do you know who he was?

22   A.   He was formerly an imam at a mosque in Virginia, then

23   later left the United States and became very well known in the

24   online community for giving talks on jihad and encouraging

25   jihad and these things.

```
 1    Q.    Do you know whether there was affiliation he had with

 2    al Qa'ida?

 3              MR. CARNEY:  I object, your Honor.

 4              THE COURT:  Sustained at this point.

 5              MR. CHAKRAVARTY:  Can we call up Exhibit 348, please.

 6              This is also in evidence as an email, your Honor.

 7    BY MR. CHAKRAVARTY:

 8    Q.    Is the subject of this email "Anwar al-'Awalqi sharh of

 9    Thawabit"?
```
03:02 10    A.    Yes.
```
11    Q.    And what does "sharh" mean?

12    A.    Commentary.

13    Q.    And is this from Tarek Mehanna ibnul_Khattab82@yahoo.com?

14    A.    Yes.

15    Q.    And is it to several people, including the first, Ahmad

16    Abousamra, ahmadas81@yahoo.com?

17    A.    Uh-huh.

18    Q.    I'm sorry.  Just for the record, can you answer "yes" or

19    "no"?
```
03:03 20    A.    Yes.
```
21    Q.    And does it lead with "Anwar al-Awlaqi does a six-part

22    explanation of Shaykh Yusuf al-'Uyayri's 'Thawabit 'Ala Darb

23    al-Jihad"?  Is that the same series you had done a sharh on?

24    A.    Yes.

25              MR. CHAKRAVARTY:  Can we go to Exhibit 574, please?
```

1    Q.   Does this appear to be a stored instant message chat

2    session between a person named Sayf Maslool and Ahmad Rashad on

3    February 28th of 2006?

4    A.   Yes.

5         MR. CHAKRAVARTY:  Would you go to the next page,

6    please?  Next page?  Next page?

7    Q.   Does Sayf Maslool --

8         MR. CARNEY:  I object, your Honor.

9         THE COURT:  Let me see you.

03:04 10      MR. CARNEY:  I would ask that the whole chat be read

11   rather than taking three lines on a multipage chat.

12        MR. CHAKRAVARTY:  This is really offered for two

13   lines, your Honor, just to explain the transposition of one

14   word.

15        MR. CARNEY:  I submit that it's necessary to put this

16   in context --

17        THE COURT:  Let me see you at the side.

18        (Discussion at sidebar and out of the hearing of the

19   jury:)

03:05 20      THE COURT:  Do you have the document?

21        MR. CHAKRAVARTY:  I don't.  I'm sorry.

22        MR. CARNEY:  Exhibit 574?

23        MR. CHAKRAVARTY:  574.

24        The purpose for reading this chat is going to be those

25   few lines where the defendant describes the document where he's

1    talking about as "thawabit 'ala darb al-peanut butter."  And

2    it's simply to clarify beyond any doubt that he uses "peanut

3    butter" as a transposition for the word "jihad."

4          (Pause.)

5          THE COURT:  So where is the passage you want?

6          MR. CHAKRAVARTY:  Right here.

7          (Pause.)

8          THE COURT:  Well, the whole thing isn't necessary to

9    make that complete -- or understood in context.  It seems to be

03:07 10    a different topic.  But there may be something more --

11          MR. CARNEY:  What I object to, your Honor, is what the

12    government is doing with the Clear Channel -- or Clear

13    Guidance, rather -- where there was a long thread of

14    conversations that the defendant is reacting and responding to,

15    and the government pulls out a couple of sentences and says,

16    "Well, look what that says," instead of putting it in its

17    entire context.  Similarly, here the person is in the context

18    of having a chat with a friend.  It's the exact equivalent of a

19    conversation.  He gets to something, and they want to point out

03:07 20    he used this one line.  The jury doesn't have the context of

21    the whole conversation of what they're talking about unless

22    they hear it.

23          The whole thing is coming into evidence --

24          THE COURT:  Well --

25          MR. CARNEY:  -- and they should hear the whole thing.

1          THE COURT:  -- I don't think that's the rule of verbal

2    completeness.  I think that is a different matter, which is to

3    put in context what might be, in itself, a complete topic.

4          MR. CARNEY:  Your Honor is correct.  You're correct.

5          THE COURT:  But I think that's really something that

6    can be pointed out on cross.  You can point out that this is a

7    seven-page 256-line chat and they've selected only three lines,

8    and the jury should --

9          MR. CARNEY:  So your Honor would permit the entire

03:08 10   chat to be read, then, during cross-examination?

11         THE COURT:  If you want to do it.

12         MR. CARNEY:  Okay.  That's what we'll do.

13         MR. CHAKRAVARTY:  Your Honor, just in the interest of

14   logistics --

15         MR. CARNEY:  I'm happy to do that.  You play

16   three -- you read two lines and I'll read ten pages.

17         MR. CHAKRAVARTY:  As we have done, we are more than

18   willing, in context, to read extra lines if it will facilitate.

19   But when we're offering literally the transposition of one

03:08 20   word, to read the entire chat for that reason seems to be,

21   frankly, wasteful.

22         MR. CARNEY:  Good point.  My solution is:  Don't offer

23   it.

24         MR. CHAKRAVARTY:  Then we wouldn't have a trial.

25         THE COURT:  The whole exhibit is in evidence itself.

1          MR. CARNEY:  Yes, it is, your Honor.

2          THE COURT:  Okay.

3          MR. CARNEY:  Thank you.

4          (In open court:)

5    BY MR. CHAKRAVARTY:

6    Q.   Mr. Pippin, we were just talking about this thawabit

7    document that you had translated.  In this chat section

8    Sayf Maslool says, "Have you heard the explanation of 'Thawabit

9    'ala Darb al-Constants of the Path to Peanut Butter by Shaykh

03:09 10   Yusuf?"

11          And then the participant in the conversation said,

12   "No, only one of the tapes worked," and then Sayf Maslool says,

13   "Okay."  Did I read that correctly?

14   A.   Yes.

15   Q.   Is there such a document?

16   A.   It's Thawabit 'ala Darb al-Jihad, not 'ala Darb al-peanut

17   butter.

18   Q.   So "peanut butter" is being used here as a transposition,

19   a substitute for "jihad"?

03:10 20   A.   Yes.

21   Q.   Okay.  Now, I'm going to bring you back to your meeting

22   with Ahmad Abousamra in 2003.  Did he tell you anything about

23   his personal life?

24   A.   Yes.

25   Q.   What did he tell you?

1    A.   He mentioned to me that he was married to a woman from

2    Iran and that he eventually -- he divorced her.

3    Q.   Were there things that he didn't want to talk about

4    online?  Sorry, again, you have to --

5    A.   Yes.

6    Q.   -- articulate "yes" or "no."

7         And did he tell you precisely what they were?

8    A.   The issues regarding his personal life?

9    Q.   No.  I'm sorry.  The purpose for his trip.

03:11 10   A.   Well, the intention, again, was to get more details about

11   finding out the contacts in Yemen that could help him find a

12   place where he could train for jihad.

13   Q.   What language was your conversation in?

14   A.   Mostly in English but sometimes in Arabic.

15   Q.   Did he appear to be proficient in Arabic?

16   A.   Yes.

17   Q.   Did you receive the type of training that he was seeking?

18   A.   Yes.

19   Q.   Did you receive the type of training that he was asking

03:11 20   you for contacts for?

21   A.   Yes.

22   Q.   Okay.  What type of training was that?

23   A.   Basic paramilitary training.

24   Q.   Where did you receive your training?

25   A.   Pakistan.

1    Q.    In Yemen had you received that training?

2    A.    No.

3    Q.    So did you have the contacts to provide him with regards

4    to obtaining that training in Yemen?

5    A.    One possible contact, yes.

6    Q.    Okay.  And what was that one possible contact?

7    A.    Essentially, I had a contact from the United States for

8    getting to the school in Ma'rib where I studied, and on my way

9    there I was given a ride and stayed briefly at the house of a

03:12 10   relative of the teacher at that school.  And that relative,

11   being he's an Egyptian who migrated to Yemen after the

12   Afghanistan war, was still -- he was presumably a Jihadi Salafi

13   based on the relationship between him and Abul Hasan

14   al-Ma'ribi, the head of the school, who was not a

15   Salafi-Jihadi.  So he had, presumably, contacts because he

16   still had affiliations with the salafi jihadis in Yemen.

17   Q.    So you didn't know anybody who could provide military

18   training yourself, but you thought that this person might?

19   A.    No.  The way things work in the Arab world, and especially

03:13 20   Yemen, is that you have to have contacts for everything.  So if

21   you have a contact with this man, given his experiences in

22   earnest and given his contacts in Yemen among the Afghan

23   veterans, among the Arabs who migrated to Yemen, he was the

24   best bet for finding people and places to go for that type of

25   training.

1    Q.    Did you ever tell Abousamra that you personally knew where

2    he can find a terrorist training camp in Yemen?

3    A.    No, I just mentioned to him this possible contact who

4    would know.

5    Q.    And how did you describe this person?

6    A.    He was an older Egyptian man in his 40s, a veteran of the

7    Afghan jihad in the '80s, and he was either -- well, he was the

8    brother-in-law of the teacher in the school in Ma'rib, of Hasan

9    al-Ma'ribi.

03:13 10    Q.    And did you describe anything about his physical

11    description?

12    A.    Yes.  Very tall, large Egyptian man.

13    Q.    Did you tell him about what the person did for a living?

14    A.    Yes.  I mentioned that he ran a perfume shop selling

15    perfumes and honey and odds and ends like that.

16    Q.    Did you give Abousamra any other advice?

17    A.    I gave him basic advice about the best way to go about

18    entering Yemen and how to avoid having problems in the airport.

19    Q.    Okay.  Before we move on to that, aside from referring him

03:14 20    to this potential Egyptian man, did you also give him another

21    contact?

22    A.    Yes.  I mentioned the name of one teacher in another part

23    of Yemen, named Abdullah al-Ahdal, as a possible contact.

24    Q.    And was this somebody you had met?

25    A.    No.

1    Q.   So as unlike the first person you had met, this was just

2    somebody you knew of?

3    A.   Right.

4    Q.   What did you know of this person?

5    A.   This was someone that I knew just from online as a teacher

6    in another part of Yemen who had -- was salafi jihadi in his

7    inclinations and his beliefs.  And it was thought that if the

8    other contact was not successful, then given his inclinations

9    and his beliefs, and him being a teacher and having contacts in

03:15 10   society, he would possibly be of help.

11   Q.   Okay.  And can you spell his name?

12   A.   A-B-D-U-L-L-A-H; second name:  A-L - A-H-D-A-L.

13   Q.   Al-Ahdal?

14   A.   Yes.

15   Q.   While Abousamra was meeting with you, did he tell you

16   about prior attempts that he had made to obtain this type of

17   training?

18   A.   Yes.

19   Q.   What did he say?

03:15 20   A.   He mentioned that he traveled not long after 9/11 to

21   Peshawar, Pakistan, and was attempting to go to Afghanistan

22   from there, but he was turned back because he didn't have

23   training.

24   Q.   Did he say where he went in -- not just what town, but

25   from whom he attempted to get this training?

1    A.   Well, he mentioned -- he mentioned that he went to

2    Peshawar.  He mentioned that he had sought some contacts out

3    there, and presumably, from the Arab Afghan veterans that were

4    still there, in Peshawar at the time.

5    Q.   Did you tell him about your experience?

6    A.   Yes.

7    Q.   What did you tell him?

8    A.   I mentioned to him about Lashkar-e-Tayyiba and the nature

9    of their training and the ins and outs of daily life there and

03:16 10   how they do things.

11   Q.   And did he respond to that?

12   A.   Yes.

13   Q.   What did he say?

14   A.   Well, he mentioned that because he was turned away from

15   Peshawar, and -- from going to Afghanistan because of his lack

16   of training, that he then went subsequently to

17   Lashkar-e-Tayyiba seeking training out from them, but they also

18   turned him back because he was an Arab.  And at that time in

19   Pakistan the Arabs were being rounded up, so it was not safe

03:17 20   for them, so they turned away.

21   Q.   Did you tell him that you had met with the leader of

22   Markaz Da'wah al-Irshad?

23   A.   Yes.

24   Q.   Did he tell you anything about his relationship with that

25   person's nephew?

```
 1    A.   I vaguely recall, but I don't remember anything.
 2    Q.   Why was -- why were you discussing Yemen as an alternative
 3    to getting training?
 4    A.   Well, because, for one, it was next to impossible for
 5    someone of Arab descent to get training in a place like
 6    Pakistan or Afghanistan or those regions because Arabs stick
 7    out.  So Yemen was the logical alternative given the nature of
 8    society, and Yemen being generally lawless in the tribal areas
 9    and given the presence of many Afghan veterans from different
03:18 10   Arab countries that were still living there, and also given its
11    proximity to Iraq.
12    Q.   Now, at the time of this conversation what was your
13    mindset with regards to fighting in jihad yourself?
14    A.   I believed, as he did, that it was an individual
15    obligation.
16    Q.   Did he ask you to join him?
17    A.   Yes.
18    Q.   Did you say whether you would go with him?
19    A.   I declined.  I said no.
03:18 20   Q.   Why?
21    A.   I cited to him family reasons and job reasons, things like
22    this.
23    Q.   Did he say what he intended to do with the training he
24    got?
25    A.   He wanted to get the training to go to Iraq.
```

1    Q.    Did you discuss why Iraq was the appropriate place to

2    engage in jihad?

3    A.    Yes, we discussed this.  Basically, for two reasons:

4    Number one, he's Arab, and because he wouldn't have an easy

5    time going around Pakistan giving his Arabic descent, it will

6    be easier for him to train in Yemen and then go to Iraq as an

7    Arab who would blend in the society and not arouse suspicion or

8    give attention.  That's the first reason.

9         The second reason is because of just the nature of the

03:19 10   fighting at the time because of the forces in Afghanistan and

11   the American forces in Iraq.  Ahmad Abousamra was under the

12   view that it was more virtuous to fight against the Americans

13   in Iraq as opposed to fighting the Afghan forces that were

14   under the Americans in Afghanistan who were doing the bulk of

15   the fighting against the fighters there.  He believed that it

16   was more virtuous to fight against the Americans because they

17   were, as he termed, kaffir osli (ph), someone who is a

18   disbeliever from his birth -- just raised as a disbeliever, is

19   a non-Muslim -- as opposed to someone like an Afghan fighter

03:19 20   who would be an apostate.

21   Q.    Were you drawing a distinction in 2003 between the new

22   Afghan National Army --

23   A.    Yes.

24   Q.    -- versus the American soldiers who were in Iraq?

25   A.    Yes.

1    Q.   What are your views about you personally going to Iraq?

2    A.   No, I never entertained the idea because of the fact that

3    I'm white.  I'd stick out like a sore thumb.  I'd have more

4    chance of being in a beheading video rather than actually

5    successfully getting there.  So I never entertained the idea

6    because it seemed simply impossible.

7    Q.   Did he tell you about any plans that he had to go with

8    other people?

9    A.   It was very vague.  He wanted me to go with him, but it

03:20 10    wasn't entirely clear what his exact plans were in terms of who

11    he was going with or dates and things like that.

12    Q.   So did he tell you when he planned to go?

13    A.   He gave me like a general time when he was going, and he

14    was encouraging me to hurry up and try to go with him, which I

15    declined on numerous occasions.

16    Q.   While he was meeting with you, did he describe his

17    relationship with Abu Sabaayaa?

18    A.   Yes.

19    Q.   How did he describe it?

03:21 20    A.   He described him as a friend, as a part of a circle of

21    friends, of like-minded individuals, who shared the same

22    beliefs regarding these issues.

23    Q.   Did Abousamra indicate -- or give any indication that he

24    was going to Yemen for reasons other than obtaining military

25    training?

1    A.   No.

2    Q.   Did he mention learning Arabic?

3    A.   No.

4    Q.   Did he mention programs in Islamic studies?

5         MR. CARNEY:  I object, your Honor.

6         THE COURT:  Overruled.

7         THE WITNESS:  Can you repeat your question?

8    BY MR. CHAKRAVARTY:

9    Q.   Did he mention any programs in Islamic studies?

03:21 10   A.   No.

11   Q.   Did he mention --

12        MR. CARNEY:  I object, your Honor.  If he wants to ask

13   the question, "What did he mention," that's fine, but leading

14   the witness in this way?

15        THE COURT:  Overruled.

16   BY MR. CHAKRAVARTY:

17   Q.   Did he mention looking for a wife or searching for women?

18   A.   No.

19   Q.   You mentioned earlier that you had a conversation about

03:22 20   helping him to avoid hassles or detection.  Describe what that

21   was.

22   A.   Basically, I had advised him to travel to Yemen through

23   the airport in Sayun, on the eastern part of Yemen, as opposed

24   to traveling directly through Sana'a, given the difficulties

25   many foreigners have when they come through Sana'a, and also,

1   advised him to say that -- if they're asking him about where

2   he's going, what he's doing, to say that he's visiting Dar

3   al-Mustafa School.

4   Q.    Okay.  So is that a cover story?

5   A.    Essentially.

6   Q.    Dar al-Mustafa, can you spell that?

7   A.    D-A-R A-L - M-U-S-T-A-F-A.

8   Q.    And why did you tell him to offer that as a cover story?

9   A.    Because Dar al-Mustafa was recognized as being apolitical

03:23 10   and diametrically opposed to the ideology of the Salafi-Jihadis

11   in general, and they were not seen as against the government or

12   opposing the government.

13   Q.    What ideology was prevalent at Dar al-Mustafa?

14   A.    Well, others will say that they're Sufis, but we would

15   just say that they're classical Sunnis.

16   Q.    Okay.  And Sufi is a sect of Islam?

17   A.    I wouldn't say it's a sect, but it's a stream.

18   Q.    Based on what you knew of Abousamra at the time, is it

19   possible he could have genuinely wanted to go to Dar

03:24 20   al-Mustafa?

21   A.    No.

22   Q.    Why not?

23   A.    Because he believed that the people involved in Dar

24   al-Mustafa were not Muslims to begin with; they were apostates

25   because they were grave-worshippers, worshipping other than

```
 1    God.
 2    Q.   At the time were you aware of what kind of a program of
 3    study there was at Dar al-Mustafa?
 4    A.   Yes.
 5    Q.   What was that?
 6    A.   At that time there was a ten-year program, the detailed
 7    program, and then they also had other programs of varying
 8    lengths.
 9    Q.   Why were you familiar with Dar al-Mustafa at that time?
10    A.   Well, I've known some people who had connections there,
11    who had studied there or who had family who was there.
12          MR. CHAKRAVARTY:  Call up Exhibit 8, which is also in
13    evidence from the defendant's residence.
14    Q.   Do you recognize this?
15    A.   Yes.
16    Q.   I'll zoom in a little bit here.  What is this document?
17    A.   It appears to be a frequently asked questions page on
18    their website defining the goals and objectives of Dar
19    al-Mustafa and their curriculum.
20    Q.   And is this the Dar al-Mustafa that you were referring to
21    to Ahmad Abousamra?
22    A.   Yes.
23    Q.   And, again, in English is there a web address as well as a
24    date on this document?
25    A.   Yes.
```

```
 1   Q.   The date is January 30, 2004?

 2   A.   Yes.

 3             MR. CHAKRAVARTY:  You can clear that.

 4   Q.   Where was Dar al-Mustafa located?

 5   A.   It's located in a city called Tarim in Hadramawt province.

 6             MR. CHAKRAVARTY:  Can we bring up 749 again?

 7   Q.   Is that in this area on 749?

 8   A.   Yes.

 9   Q.   Did you tell Abousamra about your experiences in Yemen?

03:26 10   A.   Yes.

11   Q.   What did you tell him?

12   A.   I told him about my studies in hadith and various

13   experiences in Yemen.

14   Q.   Did that include any military experiences?

15   A.   No.

16   Q.   Why were you providing this assistance to Abousamra?

17   A.   It was my understanding that he wanted to pursue training

18   and go for jihad.  So seeing that at the time I believed it was

19   an individual duty, it was my way of pointing out to him the

03:26 20   way that he could fulfill that.

21   Q.   Now, as the weekend wore on, did you go out to eat with

22   him?  Did you travel around a little bit with him?

23   A.   Yes.

24   Q.   And did you talk about other things aside from just the

25   contacts in Yemen?
```

1    A.    Yes.

2    Q.    And were they similar to the conversations that you had

3    online?

4    A.    Yes.

5    Q.    At the end of the weekend did he give you anything?

6    A.    Yes.

7    Q.    What did he give you?

8    A.    He gave me money, $5,000.

9    Q.    Why did he give you money?

03:27 10    A.    Well, it was unsolicited.  And he mentioned it was for me,

11    to help me and to take care of my needs if I was going to go

12    with him, at which I said that I'm not taking this money with

13    that understanding because I'm not able to go, I'm not in a

14    position right now.  But he demanded that I keep the money.

15    Q.    You just mentioned that he had asked you to go.  What was

16    your response to him in terms of his asking you to accompany

17    him?

18    A.    Oh, I said that I can't.  I have family issues.  I have

19    work.  And besides, I didn't need any training because I

03:27 20    already received it in Pakistan.

21    Q.    Okay.  I guess what I'm trying to clarify is:  Were you

22    clear about that you weren't going to go with him or was there

23    some hope that you left that you would?

24    A.    There was encouragement from him, constant calling and

25    trying to encourage me, and me telling him, "I'm going to go at

1    a later time.  I'm going to leave whenever I get my things

2    straight."  But he was eventually convinced that I'm not going

3    to go and that I'm not leaving with him.

4    Q.   Did he tell you from whom this $5,000 was from?

5    A.   Well, he mentioned -- I don't recall whether he mentioned

6    the person's name directly at that time or his kunya online,

7    but it was Ibn Abishaiba.

8    Q.   And was this one of the people in the Boston crew?

9    A.   Yes.

03:28 10   Q.   Did you tell him what the purpose of your planned trip to

11   Yemen was going to be?

12   A.   I didn't go into a lot of detail.  It was understood that

13   either I would go to Dar al-Mustafa or I would go to the school

14   Abdullah al-Aqel, but I didn't really discuss the Dar

15   al-Mustafa issue with him, but I discussed going to Abdullah

16   al-Aqel school upon arrival in Yemen.

17   Q.   If you did mention that you were going to go to Dar

18   al-Mustafa, how would that have affected your relationship with

19   him?

03:29 20   A.   Well, I didn't, at the time, see eye to eye with him

21   either, but I had contacts there through family members of

22   people who were studying, so there was an interest based on

23   the -- there was an interest to go there even if for a short

24   time.  But had I mentioned that, it probably would have

25   resulted in an argument of some sort.

```
 1    Q.   Because that was contrary to your views at the time?
 2    A.   Yes, it was contrary to my views at the time as well as
 3    his.
 4    Q.   Okay.  He left you in Sacramento?
 5    A.   Yes.
 6    Q.   And then did you have contact with him after that?
 7    A.   Yes.
 8    Q.   How did he contact you?
 9    A.   Through the phone.
03:29 10    Q.   And, again, you had exchanged phone numbers or he had your
11    phone number?
12    A.   We exchanged phone numbers.
13    Q.   How many times did you have contact with him after he left
14    you?
15    A.   I would say a dozen times.
16    Q.   Was he asking you for something when he called you?
17    A.   Yes.
18    Q.   What?
19    A.   He was asking me about any further contacts that I might
03:30 20    find out about that I can give him, or people whose names and
21    addresses I could provide for him when he goes to the airport,
22    to mention that he has people that he would be staying with
23    when he arrives.  So he would call about that from time to time
24    asking if there was any progress, and I would, at times, look
25    into the issue and ask around about anyone who's living in that
```

1    area who he might be able to use as a name or address for when

2    he goes to the airport.

3    Q.   Did you ultimately follow up with people to give him

4    contacts?

5    A.   From time to time.  I didn't make a great effort out of

6    it, but some.

7    Q.   And did you provide him with any additional information?

8    A.   I told him -- I contacted someone I knew from Yemen who

9    was living in the United States who was from Hadramawt, from

03:31 10    that region, and I asked him about any contact we could use

11    from his family to use in the airport.

12    Q.   Is there a term for when somebody is from the area of

13    Hadramawt in Yemen?

14    A.   Yeah, you call that person a Hadrami.

15    Q.   Hadrami, H-A-D-R-A-M-I?

16    A.   H-A-D-R-A-M-I, yes.

17    Q.   Now, between the time he left you in Sacramento, did you

18    learn whether he actually left to go to Yemen?

19    A.   Yes.

03:31 20    Q.   Did you learn before he returned from Yemen?

21    A.   Yes.

22    Q.   Okay.  How?

23    A.   It was online, through an online chat with someone, from

24    what I recall.  I was told that he left for Yemen.

25    Q.   Did you know with whom he had left?

1    A.   It wasn't clear to me.

2    Q.   At some point did you resume contact with Abousamra?

3    A.   Yes.

4    Q.   When?

5    A.   This was in the spring of 2004.

6    Q.   And what kind of contact did you have?

7    A.   Yeah, I was at school.  And there was a planning period,

8    so I opened up the computer to check my emails and stuff, and

9    he appeared on the instant messenger -- on the instant

03:32 10   messaging -- and I was taken by surprise.  So we got to talking

11   and he informed me.

12   Q.   Why were you surprised?  I'm sorry.

13   A.   Because it had been such a long time since I had last

14   heard from him, and then I thought that he had traveled.  So to

15   hear from him like that all of a sudden was a bit of a shock.

16   Q.   Continue.

17   A.   Yes.  So he informed me that he had ventured to Yemen and

18   was unsuccessful in finding contacts.  That the Egyptian man

19   that I recommended him to said that there's basically nothing

03:33 20   there anymore, all of that is done, finished with, in terms of

21   finding training and anything of the sort, and that he went to

22   Abdullah al-Aqel school, or mosque, in the eastern part of

23   Yemen, and that was also unsuccessful in finding any -- using

24   him for any contact.

25        And then he mentioned that he had then traveled to

1    Iran.  Then he mentioned the details of some of the people that

2    he was associating with there and how he and they did not see

3    eye to eye and they didn't really get along, so he ultimately

4    left.

5    Q.   So he left the area?  He didn't go to -- strike that.

6             When you say "he left," what do you mean?

7    A.   He left from Iran and returned to America.

8    Q.   Did he tell you about any travel he made to Iraq?

9    A.   No.

03:33 10   Q.   Did he tell you about anywhere else in the Middle East

11   that he traveled to?

12   A.   No.

13   Q.   How many times did you have a conversation with Abousamra

14   after he returned from Yemen about Yemen?

15   A.   I believe that was the only time.

16   Q.   At some point after that conversation, as you alluded to,

17   did you try to go to Yemen?

18   A.   Yes.

19   Q.   When?

03:34 20   A.   In August of 2004.

21   Q.   And for what purpose?

22   A.   To go for studying.

23   Q.   And particularly, where?

24   A.   Oh, either I was looking at Dar al-Mustafa or preferably

25   the school of Abdullah al-Aqel.

1    Q.   Which is the same place you had referred Abousamra to?

2    A.   Yes.

3    Q.   And at the time were you still a Salafi-Jihadi?

4    A.   Yes.

5    Q.   What happened when you tried to go?

6    A.   Well, there was a bit of a delay in getting my visa due to

7    some technicalities, but I'd already purchased a plane ticket

8    to go.  So in the last minute I decided that instead of waiting

9    for my contact, Dar al-Mustafa, to receive my passport and to

03:35 10   send back the stamp to get the invitation, that I would just go

11   and try to get the visa myself.  So I flew to the Emirates

12   directly with that ticket and tried to get the visa there from

13   the Yemen Embassy and was ultimately unsuccessful, so then I

14   traveled to neighboring Amman, took a bus there and tried the

15   embassy there, and was also unsuccessful.

16   Q.   You didn't try to just go across the border?

17   A.   No.  No.

18   Q.   What did you do?

19   A.   Well, I was exploring other means.  I was looking into

03:35 20   whether it was possible to cross at the land border, but then I

21   found out that that was not possible so I didn't even bother

22   trying.  And at that point I was considering my options.

23   Seeing that I did not bring in my teaching contract, and then I

24   was no longer married and had no other responsibilities, so I

25   was talking to some old friends of mine that had moved to

1    Finland, and we got to talking and I decided I would come pay

2    them a visit during that time.

3    Q.    And you stayed there for the next five years?

4    A.    Yes.

5    Q.    Now, after your conversations with Abousamra back in 2003

6    and 2004, did you have contact with Abu Sabaayaa again?

7    A.    Yes.

8    Q.    Did you ever meet the real person who was Abu Sabaayaa in

9    person?

03:36 10   A.    No.

11   Q.    But you had online contact?

12   A.    Yes.

13   Q.    In what capacity?

14   A.    What I recall, there was someone else, a third party, who

15   had started a small, little, miniature forum, private forum,

16   through emails, so there was just discussions about different

17   topics.  Because I'd undergone, like, my own changes, my own

18   reassessment.  And I was talking with a third party about these

19   things.  So we started doing this as a small, little forum

03:37 20   through email.  So I received some questions from Abu Sabaayaa

21   from other issues.

22   Q.    And was that when you associated the name "Abu Sabaayaa"

23   with Tarek?

24   A.    Yes.

25   Q.    Now, aside from what we've discussed today, did you have

 1    any reason to believe that Tarek had met you if you had not

 2    knowingly met him?

 3    A.   No.

 4         MR. CHAKRAVARTY:  Can we call up Exhibit 717, which is

 5    in evidence, your Honor.  Again, this is one of these stored

 6    chat sessions, the participants Sayf Maslool and Taimur.  This

 7    one happens to be April 9, 2006.

 8    Q.   If we can just read through this chat.  I will adopt the

 9    first speaker, in this case, Taimur; if you'd read the verbiage

03:38 10   after Sayf Maslool?

11         MR. CARNEY:  I object and ask to approach, please?

12         THE COURT:  Okay.

13         (Discussion at sidebar and out of the hearing of the

14    jury:)

15         MR. CARNEY:  I object, your Honor, because the

16    prejudice of this chat is more -- is far outweighing the

17    minimal probative value.  This is describing a video that

18    includes a helicopter being shot down and the bodies of the

19    pilots being dragged through streets.

03:39 20        MR. CHAKRAVARTY:  He's going to describe this witness,

21    and it will stop right before that.  It's the blonde-haired

22    blue-eyed guy from Georgia who went to Kashmir.

23         THE COURT:  You're picking up from the first page?

24    Let me see that.

25         MR. CARNEY:  Yes, your Honor.

1          (Pause.)

2          MR. CARNEY:  Well, maybe I'm confused.  If this chat

3    has been marked as 717 and he's only reading a portion of it,

4    I'm under the impression the entire chat goes to the jury.

5          MR. CHAKRAVARTY:  You're right to be under that

6    impression.  I just wouldn't be highlighting the rest of the

7    chat.

8          MR. CARNEY:  So that the jurors will have this

9    language about dragged the pilots through the street?

03:40 10          MR. CHAKRAVARTY:  Yes.

11          MR. CARNEY:  Well, that's not --

12          MR. CHAKRAVARTY:  That's the subject of what the

13    indictment is:  He conspired to kill Americans.

14          MR. CARNEY:  No.  No, that's acting underhanded.

15          I would ask that that be excluded.  If the government

16    only wants the witness to read something not including that,

17    then what the witness is reading should be the only part that

18    goes into evidence with the jury --

19          MR. CHAKRAVARTY:  I don't think that's appropriate,

03:41 20    your Honor.

21          MR. CARNEY:  -- which is the impression I had.

22          THE COURT:  Well, I think this is probably one of

23    those exhibits that was admitted as generally relevant and then

24    if we needed to address specific 403 issues.

25          MR. CARNEY:  Which I'm raising.

1          THE COURT:  Right.  I get that.  But the fault

2     position is that they're in unless they're out.

3          MR. CARNEY:  Right, your Honor.

4          THE COURT:  So this is in, and now the question is

5     should it come out.

6          MR. CARNEY:  I apologize for making that comment.

7          Your Honor is correct about that.  I just

8     misinterpreted when the government said "we only want this part

9     to come before the jury."

03:41 10          THE COURT:  Who's Taimur?

11          MR. CHAKRAVARTY:  Taimur is one of his contacts from

12     Jersey who -- the evidence has been that he tried to

13     indoctrinate him.  He's a young guy.  That they tried to

14     indoctrinate.

15          THE COURT:  Yeah, I've seen that.

16          Well, since it's been raised -- we don't have to

17     necessarily interrupt the examination if it's not going to be

18     part of the witness's testimony, so...

19          MR. CHAKRAVARTY:  It's the government's position that

03:42 20     the portion where the defendant is encouraging, in this case

21     Taimur, to view -- and he's describing with some happiness the

22     fact of killing American soldiers, is relevant to the purpose

23     for -- or the objectives for the conspiracy and what he's

24     encouraging this person, Taimur, to think and act upon.

25          THE COURT:  I think this is like a lot of the other

 1     things.  I think it's relevant to the government's theory.

 2             MR. CARNEY:  Your Honor, I also think it's like a lot

 3     of the other things, and it's called "piling on."

 4             THE COURT:  Okay.  Well, I won't strike it.

 5             MR. CARNEY:  May I have one moment, your Honor,

 6     please?

 7             THE COURT:  Yeah.

 8             (Counsel confer off the record.)

 9             MR. CARNEY:  Thank you, your Honor.

03:43 10        (In open court:)

11     BY MR. CHAKRAVARTY:

12     Q.   If we could just read through this communication.  Taimur

13     says, "There is another speaker who gives a discussion on

14     Thawabit.  This brother posted on Uponsunnah.  I have it.  It's

15     by Abul Muthanna."

16             Before you continue to read, who is Abul Muthanna?

17     A.   That's my user name for Clear Guidance.

18     Q.   And Thawabit, is that that document you were referring to

19     earlier?

03:43 20     A.   Yes.

21     Q.   If you could continue?

22     A.   "Hehe.  Yes.  Good brother."

23     Q.   "Laugh out loud.  So you know him?"

24     A.   "Hehe.  Yeah.  He isn't around anymore."

25     Q.   And then there's a bit of a wink?

```
 1    A.   Yeah.

 2    Q.   "Shahid" -- and does that mean martyr?

 3    A.   Yes.

 4    Q.   -- "locked up?"

 5    A.   "On his way to being shahid in sha Allah."

 6    Q.   "In sha Allah" means "Allah willing"?

 7    A.   Yes.

 8    Q.   "Word."

 9    A.   "He's a white American."

03:44 10    Q.   "From U.S., U.K.?"

11    A.   "From U.S., Georgia."

12         MR. CHAKRAVARTY:  Next page, please?

13    Q.   "MashAllah," or God bless, "laugh out loud, nice."

14    A.   "Blonde haired."

15    Q.   "Brother."

16    A.   "Blue-eyed."

17    Q.   "Subhan'Allah."

18    A.   "Studied like everywhere, Pakistan, et cetera."

19    Q.   "Yeah.  Nice."

03:45 20    A.   "Did some stuff in Kashmir."

21    Q.   "Cool.  I finished milestones."

22         Who are they discussing in this conversation?

23    A.   Me.

24    Q.   Had you ever met the defendant?

25    A.   No.
```

1    Q.   Did you ever tell him that you went to Pakistan and

2    Kashmir?

3    A.   No.

4    Q.   Did you tell him that you translated this document

5    "Constants"?

6    A.   No.

7         MR. CHAKRAVARTY:  If you would go to Exhibit 583,

8    please.

9         Mr. Groharing just -- I'm sorry.  For the benefit of

03:45 10   the Court, Mr. Groharing had emphasized certain parts of this

11   communication earlier this morning.

12   Q.   This is a chat session on ibnul_khattab82@yahoo.com and

13   Ahmad AS on April 1, 2006.  I'm going to ask you about a

14   different portion right up here.

15        Ahmad AS -- Ahmad Abousamra -- said, "Since Abul M

16   started the whole TP thing" -- and then what's written in

17   Arabic after that?

18   A.   Al-aqil illah (ph).

19   Q.   What does that mean?

03:46 20   A.   One who lives impoverished, or poor, unto his lord, or

21   unto God.

22   Q.   And what does he say?

23   A.   "Oh, no.  I asked them.  They don't."

24   Q.   "What about Abul M's ex-wife?"

25   A.   "She told me that the last she heard he had graduated."

1   Q.   "I'm just wondering if there is a way he can help us study

2   fiqh," or jurisprudence.

3   A.   "He didn't get his degree, he just graduated.  But she has

4   no idea from what college.  But it was somewhere near Qat,

5   like, exactly."

6   Q.   So it says "Abul M."  Who is that?

7   A.   That would refer to Abul-Muthanna, my user name.

8   Q.   And it says "Abul M's ex-wife"?

9   A.   Yes.

03:47 10   Q.   Are you aware of whether your ex-wife had any contact with

11   Abu Sabaayaa or Ahmad Abousamra?

12   A.   No.

13   Q.   Was she of the same mindset as you when you were married?

14   A.   Yes.

15   Q.   Did you attend a school between 2004 and 2006 at where you

16   graduated?

17   A.   Not in Yemen.

18   Q.   And the last time you talked to Ahmad Abousamra, he

19   thought you were going to Yemen, right?

03:47 20   A.   Yes.

21   Q.   It says, "Somewhere near Qat," Q-A-T.  Do you know what

22   "Qat" is?

23   A.   Qat is, like, a narcotic widely consumed in Yemen and East

24   Africa.  It would be a euphemism for Yemen.

25          MR. CHAKRAVARTY:  Could we go to page 4, please?

1    Please 5, please.  Sorry.

2    Q.   To clarify it says, "Do you think Abul M gave him that

3    idea?"  In this portion is, again, Abul M referring to you?

4    A.   Yes.

5    Q.   And then it refers to Anwar.  Do you know who that's

6    referring to?

7    A.   Anwar al-Awlaqi.

8         MR. CHAKRAVARTY:  Next page, please?  Okay.  That's

9    it.  Thank you.

03:49 10   Q.   Now, you mentioned that there was a smaller kind of a

11   forum or discussion group that you were privately participating

12   with the defendant on?

13   A.   Yes.

14   Q.   What was the subject matter of that?

15   A.   On various topics, but our discussion revolved around the

16   issue of voting in democratic elections.

17   Q.   And specifically, what was the discussion?

18   A.   Whether or not voting in a democratic election constitutes

19   an act of disbelief that will take one outside of the fold of

03:49 20   Islam, or whether one can or cannot do it.  It's the fairly

21   standard view among many of those of us of the Salafi-Jihadi

22   ideology that it's absolutely forbidden to vote in any

23   democratic election; in fact, it's considered an act of

24   polytheism that will expel one from Islam.

25   Q.   And did you and Tarek Mehanna share views?

1    A.    Yes.

2    Q.    What was your view?

3    A.    Well, my view was that it was not an act of disbelief and

4    that it was permissible.

5    Q.    And this is in approximately 2006?

6    A.    Yes.

7    Q.    And what was Tarek Mehanna's view at that time?

8    A.    He seemed to share the same view.

9    Q.    Did he describe the consequence of him having that view?

03:50 10   A.    Yes.  He mentioned that he shared that view on Tibyan

11   forums and was subsequently banned from the site.

12   Q.    Based on this voting idea?

13   A.    Yes.

14   Q.    When you separated or divorced from your ex-wife, do you

15   know whether the FBI went to go speak with her?

16   A.    I was informed later on, I think in 2005.

17   Q.    And in 2005, did you meet with the FBI?

18   A.    Yes.

19   Q.    Did you enjoy that meeting?

03:50 20   A.    No.

21   Q.    Why not?

22   A.    Well, it was held in the American Embassy in Finland.  And

23   once I was inside, I was not under the -- I did not have the

24   ability to just get up and leave on my own free will, so I was

25   sitting there basically coerced through the whole thing until

1    they were satisfied and I was able to go.

2    Q.   And when we met with you in 2008, did you remind us of

3    that bad experience?

4    A.   Yes.

5    Q.   And was it different in 2008?

6    A.   Yes.

7    Q.   Now, in 2001 through 2003 what were your wife's views with

8    regards to the idea of fighting in jihad?

9              MR. CARNEY:   I object, your Honor.

03:51 10              THE COURT:   Sustained.

11   BY MR. CHAKRAVARTY:

12   Q.   Did you discuss fighting in jihad with your wife?

13   A.   Yes.

14   Q.   And were you supportive of engaging in fighting with U.S.

15   troops at that time?

16   A.   Yes.

17   Q.   And has your thinking evolved today?

18   A.   Yes.

19   Q.   How has it evolved?

03:52 20   A.   Well, a lot more nuance to these types of issues and a lot

21   more appreciation of our classical Islamic tradition, not just

22   haphazard rulings based on events but grounded in sound

23   scholarship, legal maxims, understanding the situation.

24   Q.   Are you also older?

25   A.   Yes.

```
 1    Q.   Do you have more responsibilities now?

 2    A.   Yes.

 3              MR. AUERHAHN:  No further questions, your Honor.

 4                          CROSS-EXAMINATION

 5    BY MR. CARNEY:

 6    Q.   Good afternoon, Mr. Pippin.

 7    A.   Good afternoon, sir.

 8    Q.   I want to begin at an area where the prosecutor ended.

 9    Not exactly where he ended, but about how your views have

10    evolved.

11    A.   Uh-huh.

12    Q.   How old are you today?

13    A.   Thirty-four.

14    Q.   So you're about five years older than Tarek --

15    A.   Yes.

16    Q.   -- if he's 29?

17    A.   Yes.

18    Q.   You were born in the United States?

19    A.   Yes.

20    Q.   You became a convert to Islam when you were about 16 years

21    old?

22    A.   Fourteen.

23    Q.   I'm sorry.  This would have been when you were in high

24    school?

25    A.   Yes.
```

1    Q.   And you embraced Islam as the religion of your life?

2    A.   Yes.

3    Q.   It's fair to say that you had a desire to be a good

4    Muslim, right?

5    A.   Yes.

6    Q.   To learn and follow the teachings of the Qur'an, right?

7    A.   Yes.

8    Q.   You wanted to get to know the prophet Mohammad?

9    A.   Yes.

03:54 10   Q.   You also wanted to read what people who were the

11   companions of the prophet said about --

12   A.   Yes.

13   Q.   -- what the prophet told people during his life?

14   A.   Yes.

15   Q.   There are essays called Hadiths that contain statements by

16   the prophet.  Is that right?

17   A.   Yes.

18   Q.   But it's unclear whether all of the Hadiths are accurate

19   so there's a great deal of study to determine --

03:55 20   A.   Yes.

21   Q.   -- if they are accurate or not?

22        You've been a teacher for a lot of your adult life,

23   haven't you?

24   A.   Yes.

25   Q.   You've taught classes in schools, haven't you?

1    A.   Yes.

2    Q.   And these have been Islamic schools --

3    A.   Yes.

4    Q.   -- on occasion?

5    A.   Yes.

6    Q.   You've also done tutoring of people on occasion?

7    A.   Touring?

8    Q.   Tutoring.

9    A.   Tutoring?  Yes.

03:55 10   Q.   Forgive my not making that clear.  I did mean tutoring of

11   individual people.

12        So you've gotten to know a lot of young Muslims in

13   your life, right?

14   A.   Yes.

15   Q.   Sometimes people become a Muslim, as you did, as a convert

16   from a different religion or no religion to Islam, right?

17   A.   Yes.

18   Q.   In other instances there may have been people born into a

19   family that's Muslim and technically grow up Muslim but don't

03:56 20   really become interested in their faith until their teenage

21   years.  Isn't that right?

22   A.   Correct.

23   Q.   And it's not uncommon for children of Muslims in their

24   late or high school years to begin to explore their Muslim

25   faith.  Isn't that right?

1   A.   Yes.

2   Q.   In your experience is it common for a convert or for

3   someone coming to his faith in his teenage years to initially

4   embrace the Salafi view of Islam?

5   A.   I would say it's true for converts and born Muslims alike.

6   They're the same, especially in the 1990s.

7   Q.   And the Salafi view -- did I pronounce that correctly?

8   A.   Salafi, yeah.

9   Q.   Salafi.

03:56 10       The Salafi view is a more conservative view of Islam,

11   isn't it, in many respects?

12   A.   Well, it's framed that way but there's other alternative

13   viewpoints that are also conservative, or just as conservative.

14   But, yes, it is conservative in its approach.

15   Q.   My question is:  Is Salafi conservative?

16   A.   Yes, indeed.

17   Q.   And people who are embracing that form of Islam often look

18   to the literal words of the Qur'an for guidance, don't they?

19   A.   Yes.

03:57 20   Q.   And look for what scholars say historically the Qur'an

21   meant.  Is that right?

22   A.   Give or take.  There's some debate on that issue but, yes,

23   generally speaking.

24   Q.   And people embracing this will often put greater stock

25   into the literal words of the Qur'an in trying to figure out

1    how to live their lives as a good Muslim, right?

2    A.   Yes.

3    Q.   There's no question that the phrase or word "jihad"

4    certainly appears in the Qur'an, does it not?

5    A.   True.

6    Q.   It appears many, many times, doesn't it?

7    A.   Yes.

8    Q.   And one of the ways that it appears is that a Muslim has

9    an obligation to defend a Muslim country against an invading

03:58 10    army, correct?

11   A.   Yes.

12   Q.   And that was true whether the invaders were Mongols

13   centuries ago, right?

14   A.   Yes.

15   Q.   Whether the invaders were Serbs into Bosnia, right?

16   A.   Yes.

17   Q.   Whether the invaders were the Russians into Afghanistan,

18   correct?

19   A.   Yes.

03:58 20    Q.   Every Muslim had a personal obligation in the view of this

21   interpretation of Islam to defend that country and help repel

22   the invaders.  Is that right?

23   A.   Yes.

24   Q.   Even India was viewed as an invader in Kashmir, correct?

25   A.   Yes.

1    Q.   Now, you mentioned that it was particularly difficult in

2    the '90s for young Muslims.  Is that right?

3    A.   I don't think I said "difficult," but you'd asked --

4    Q.   Challenges?

5    A.   Well, you had asked about converts versus born Muslims and

6    then embracing the faith.  They're virtually synonymous, but I

7    mentioned that in the 1990s that was -- the default assumption

8    is that if you become a Muslim, or you newly embrace your

9    faith, then you're probably going to probably be with the

03:59 10   Salafis because that was the dominant paradigm in the time.

11   Q.   Now, the 1990s were a particularly difficult time for

12   young Muslims or converts to Islam.  Would that be fair to say?

13   A.   Yes.  Yes.

14   Q.   There was a great deal of suffering in the Muslim world,

15   was there not?

16   A.   Yes.

17   Q.   There were armies attacking Muslims in various parts of

18   the world, right?

19   A.   Yes.

04:00 20   Q.   There was genocide going on of Muslims where entire areas

21   of Muslim people were being wiped out simply because these

22   people were Muslims.  Is that right?

23   A.   Yes.

24   Q.   A country as large as Russia was invading a Muslim country

25   to attempt to dominate it.  Is that right?

1    A.    Correct.

2    Q.    And the pain of the suffering that these young Muslims saw

3    in the Muslim communities generated a great deal of interest in

4    doing something.  Isn't that right?

5    A.    Yes.

6    Q.    And have I accurately conveyed that the sense was:  "We've

7    got to do something to help our Muslim brothers and sisters"?

8    A.    Yes, that would be accurate.

9    Q.    And that would flow directly from what a person is reading

04:01 10    and understanding that the Qur'an itself is saying, right?

11    A.    Yes.

12    Q.    And the Qur'an is a source of wisdom in a holy book in

13    Islam that's compatible to the Torah for the Jewish faith or

14    the Bible in the Christian faith for many people.  Isn't that

15    accurate?

16    A.    Yes.

17    Q.    Now, as they're trying to figure out what to do, it's easy

18    in your experience for these young people and converts in the

19    '90s to look at the world in kind of a black and white way.

04:01 20    Isn't that true?

21    A.    Yes.

22    Q.    And they are trying to figure out what will be their role

23    as a Muslim to be true to their faith.  Isn't that a correct

24    way to say it?

25    A.    Yes.

1    Q.   Now, you, yourself, held these feelings also, didn't you?

2    A.   Yeah.

3    Q.   You, yourself, answered what you thought and believed was

4    the call of Islam and traveled to Pakistan?

5    A.   Yes.

6    Q.   And you've been very open with the jurors about the fact

7    that you were going there to get military training, correct?

8    A.   (Nonverbal response).

9    Q.   Is that right?

04:02 10    A.   Yes.

11    Q.   You have to say "yes" for our court reporter.

12    A.   Okay.

13    Q.   And then engage in fighting.  And fighting included

14    killing in order to defend the Muslim country of Kashmir.  Is

15    that right?

16    A.   That would be correct.

17    Q.   Now, this occurred prior to 9/11, correct?

18    A.   Correct.

19    Q.   And the invading army in Kashmir was viewed as India,

04:02 20    right?

21    A.   Yes.

22    Q.   Just as the invading army in Afghanistan had been viewed

23    as the Soviet Union or Russia?

24    A.   Yes.

25    Q.   After 9/11 your views changed, didn't they?

```
 1    A.    Yes.

 2    Q.    And your views became what you characterized as more

 3    extreme?

 4    A.    Yes.

 5    Q.    What had happened was your country, the United States, had

 6    been attacked by Muslims, your faith.  Is that right?

 7    A.    Yes.

 8    Q.    And did you look into the background of why this was done?

 9    A.    Yes.

04:03 10    Q.    And what the justification was, at least from the Muslim

11    perspective, for doing that attack on 9/11?

12    A.    The perspective of those who claimed responsibility, yes.

13    Q.    And you accepted it?

14    A.    Yes.

15    Q.    You embraced it?

16    A.    Yes.

17    Q.    Now, we're going to get to this later, but today you don't

18    accept it, do you?

19    A.    No.

04:03 20    Q.    Today you don't embrace it, do you?

21    A.    No.

22    Q.    Today your views are quite different --

23    A.    Yes.

24    Q.    -- than they had been back then?

25    A.    Yes.
```

1   Q.   And in your experience, there are millions of people who

2   are Muslims who held your views the same as you after 9/11.

3   Isn't that right?

4   A.   Perhaps.  I don't know about millions, but indeed a large

5   number of people it did.

6   Q.   Worldwide?

7   A.   Yes.

8   Q.   And a large number of those people have changed their

9   views just like you?

04:04 10   A.   Yes.

11          THE COURT:  Mr. Carney, if this is a place to take a

12   pause, we're at one o'clock.

13          MR. CARNEY:  Yes, it is, your Honor.  Thank you.

14          THE COURT:  Okay.

15          We'll recess, jurors.  Enjoy the rest of the day.

16   We'll see you tomorrow at nine and continue with the case.

17          THE CLERK:  All rise for the Court and jury.

18          The Court will be in recess.

19          (The Court and jury exit the courtroom and the

20   proceedings adjourned at 12:59 p.m.)

21

22

23

24

25

1                     C E R T I F I C A T E

2

3           We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  November 15, 2011

17

18

19

20

21

22

23

24

25