UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   ) Criminal Action
v.                                 ) No. 09-10017-GAO
                                   )
TAREK MEHANNA,                     )
                                   )
          Defendant.               )
                                   )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY SIXTEEN
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, November 16, 2011
9:14 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Aloke Chakravarty and Jeffrey Auerhahn,
 3             Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Jeffrey D. Groharing, Trial Attorney
               National Security Division
 7         950 Pennsylvania Avenue, NW
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         CARNEY & BASSIL
           By: J.W. Carney, Jr., Esq.
10             Janice Bassil, Esq.
               John E. Oh, Esq.
11         20 Park Plaza
           Suite 1405
12         Boston, Massachusetts  02216
           - and -
13         LAW OFFICE OF SEJAL H. PATEL, LLC
           By: Sejal H. Patel, Esq.
14         101 Tremont Street
           Suite 800
15         Boston, Massachusetts  02108
           On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                    DIRECT  CROSS  REDIRECT  RECROSS

   WITNESSES FOR THE
3    GOVERNMENT:

4  JASON PIPPIN, resumed

5       By Mr. Carney (cont'd)        5              85
        By Mr. Chakravarty                  69, 90
6
   BRADLEY DAVIS
7
        By Mr. Auerhahn          93
8       By Ms. Bassil                 124

9
                          E X H I B I T S
10

11  GOVERNMENT'S        DESCRIPTION              FOR ID   IN EVD.

12  No. 752      Photograph of Daniel Maldonado            117

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on November 16,

6     2011.

7          The defendant, Tarek Mehanna, is present with counsel.

8     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

9     are present, along with Jeffrey D. Groharing, Trial Attorney,

10    U.S. Department of Justice, National Security Division.)

11          THE CLERK:  All rise for the Court.

12          (The Court enters the courtroom at 9:14 a.m.)

13          THE CLERK:  For a continuation of the Mehanna trial.

14    Please be seated.

15          THE COURT:  Good morning.  Mr. Carney?

16          MR. CARNEY:  Can we see you at sidebar just briefly?

17          THE COURT:  All right.  Do you want music or not?

18          (Laughter.)

19          (Discussion at sidebar and out of the hearing of the

00:02 20   jury:)

21          MR. CARNEY:  I just want to reiterate something that I

22    said very briefly yesterday.  I accused Mr. Chakravarty of

23    doing something underhanded.  Upon reflection, I had no basis

24    whatsoever to say that, and I want to make it crystal clear

25    that what he did was completely appropriate and proper under

```
 1   the way we were handling the evidence in this case.

 2        I have no excuse.  I am not used to having the

 3   evidence come in en masse and then have to move to strike it.

 4   And I had forgotten that point.  But I just want to make it

 5   absolutely clear there was no basis whatsoever for me to ever

 6   use the word "underhanded," and I apologize to the Court, but I

 7   particularly apologize to Mr. Chakravarty.  And I want to say

 8   that.

 9        MR. CHAKRAVARTY:  Thank you very much.

10   (In open court:)

11        THE CLERK:  All rise for the jury.

12   (The jury enters the courtroom at 9:16 a.m.)

13        THE CLERK:  Please be seated.

14        THE COURT:  Good morning, jurors.

15        THE JURORS:  Good morning.

16        THE COURT:  All right.  Mr. Carney, you may resume.

17        MR. CARNEY:  Thank you, your Honor.

18                    JASON PIPPIN, resumed

19                 CONTINUED CROSS-EXAMINATION

20   BY MR. CARNEY:

21   Q.   Good morning, Mr. Pippin.

22   A.   Good morning, sir.

23   Q.   I would like to pick up where I left off yesterday

24   afternoon, please.  Following 9/11, you told us that you had

25   done research and study about the reason that the attacks
```

1    occurred according to the people who brought them or were

2    behind them.  Is that right?

3    A.    Yes.

4    Q.    And you told us yesterday that you personally believed

5    after this that the 9/11 attack on the Twin Towers and

6    Washington and then Pennsylvania was a justified attack against

7    Muslims -- against the United States, correct?

8    A.    Yes.

9    Q.    You personally believe that the killing of 3,000 people

00:06 10   was justified, right?

11   A.    Not immediately, but eventually, yes.

12   Q.    You personally supported Osama bin Laden, right?

13   A.    In what way?

14   Q.    That he had been a heroic person in resisting the Russians

15   in Afghanistan -- in the Afghanistan war --

16   A.    Yes.

17   Q.    -- correct?

18        Now, in March of 2003 was when the United States invaded

19   Iraq.  Is that accurate?

00:07 20   A.    Yes.

21   Q.    And Iraq, of course, is a Muslim country, is it not?

22   A.    Yes.

23   Q.    And this invasion was unrelated to the attack of 9/11, in

24   your mind.  Isn't that right?

25   A.    Yes.

1    Q.    This was an invasion of a Muslim country to achieve a

2    change in the government; in other words, to depose Saddam

3    Hussein, correct?

4    A.    Yes.

5    Q.    And whether you support or not support Saddam Hussein,

6    this was, nonetheless, an invasion of a Muslim country to

7    topple the government, right?

8    A.    Yes.

9    Q.    You personally believed that American Muslims had an

00:08 10    individual duty to support the defense of Iraq against the

11    United States.  Is that correct?

12    A.    Not necessarily physically, but generally speaking, yes.

13    Q.    There would be a variety of ways, in your mind, that a

14    person could be supportive, correct?

15    A.    Yes.

16    Q.    For example, a person could go to Iraq and engage in

17    fighting.  Is that right?

18    A.    Correct.

19    Q.    Or he or she could express support for Iraq against the

00:08 20    invading army by publicly making comments to friends, for

21    example.  Did you believe that?

22    A.    Yes.

23    Q.    They could post support for Iraq against the United States

24    on a web forum or on other types of websites, right?

25    A.    Yes.

```
     1   Q.   And the reason why Muslims had an obligation to do

     2   something came ultimately from the interpretation of the

     3   Qur'an.  Is that correct?

     4   A.   Yes.

     5   Q.   Someone could also do translations to be supportive.  Is

     6   that right?

     7   A.   Yes.

     8   Q.   You, yourself, spent about six months translating a book

     9   that would appear on the Tibyan website.  Is that right?

00:09 10   A.   Correct.

    11   Q.   And that book had, as its central premise, that if a

    12   Muslim supported the United States in its invasion of Iraq,

    13   that that person was an apostate, correct?

    14   A.   Correct.

    15   Q.   Could you explain, please, for the members of the jury

    16   what the word "apostate" means to you?

    17   A.   An apostate is someone who leaves a religion after having

    18   embraced it either through a statement or an action or a deed

    19   that would necessitate them exiting the religion.

00:10 20   Q.   Would it be comparable to being excommunicated --

    21   A.   Yes, that would be trans- --

    22   Q.   I don't if other faiths do, but are you familiar with in

    23   the Catholic faith --

    24   A.   Yes.  Excommunication would be synonymous with the word

    25   "takfir," meaning to take someone outside of the faith, to
```

1   do -- to impute disbelief upon them and say, "You're no longer

2   a Muslim" or whatever.

3   Q.   And that's what the book put forward --

4   A.   Yes.

5   Q.   -- that you were translating?

6        And you indicated that you translated that book in part

7   because you agreed with that concept, right?

8   A.   Yes.

9   Q.   Now, you translated this so it could be posted on the

00:10 10  Tibyan website.  Is that right?

11   A.   Correct.

12   Q.   Now, that was a voluntary action by you, wasn't it?

13   A.   Yes.

14   Q.   You were not doing that at the direction of al Qa'ida,

15   were you, like pursuant to an order by al Qa'ida to you?

16   A.   No.

17   Q.   You were not doing it in coordination with al Qa'ida, that

18   you received contact from them and coordinating with things

19   they're doing?

00:11 20  A.   No.

21   Q.   This was a voluntary act by you?

22   A.   Yes.

23   Q.   And there were many people, to your knowledge, who would

24   translate things and put them on Tibyan, right?

25   A.   Yes.

```
 1   Q.   Is it fair to say that a lot of the people who visited the
 2   Tibyan website did not speak Arabic, or did not speak it
 3   fluently?
 4   A.   That's the reason why those books were translated in the
 5   first place, for that exact audience, yes.
 6   Q.   And so the point was for people to read this book and read
 7   these views, it could not be posted on Tibyan in Arabic because
 8   people couldn't read it, right?
 9   A.   Correct.
10   Q.   And so by translating it into English, the words, the
11   ideas, the views of other people could be read by
12   English-speaking people who have access to the internet.  Is
13   that right?
14   A.   Yes.
15   Q.   And by being able to read what other people in the world
16   might think about, then people might consider -- or reconsider
17   their own views, right?
18   A.   Correct.
19   Q.   These Arabic texts would have been available for people to
20   read in Arabic on the internet, in most instances.  Isn't that
21   correct?
22   A.   Yes.
23   Q.   So that if you were a person in Boston who happened to
24   learn Arabic growing up or studying it in college, or maybe
25   through work had learned Arabic, you could sit in your bedroom
```

00:11 (line 10)
00:12 (line 20)

1    at home, get on the internet and read these things in Arabic,

2    correct?

3    A.    Yes.

4    Q.    Because, of course, as I believe we all know, the

5    Arabic -- I mean, the internet streams uncensored into the

6    United States, is that right, in your experience?

7    A.    Yes.

8    Q.    And you're familiar with some countries, when they don't

9    want someone to hear an opposing view, they shut down

00:13 10    international internet access, right?

11    A.    Yes.

12    Q.    For example, if the country of Iran doesn't want people in

13    Iran to read about things posted in the United States that

14    oppose their views, in your experience as a teacher and a

15    poster and as an internet user, what Iran does is shut down

16    access to the internet.  Correct?

17          MR. CHAKRAVARTY:  Objection, your Honor.

18          THE COURT:  Sustained to that question.

19    BY MR. CARNEY:

00:13 20    Q.    Do you have knowledge in this area?

21    A.    I'm familiar.

22    Q.    How are you familiar?

23    A.    It's well known that many countries have internet blocks

24    where they block certain sites that don't agree with the

25    general propaganda of the government.

```
 1    Q.    Is China one of them?

 2    A.    Yes.

 3          MR. CHAKRAVARTY:  Your Honor, I object to the line

 4    of -- relevance, not the foundation.

 5          THE COURT:  Overruled.

 6    BY MR. CARNEY:

 7    Q.    And Iran is another one?

 8    A.    As far as I know, yes.

 9    Q.    But that's not how the United States handles it, to your

10    knowledge, is it?

11    A.    Correct.

12    Q.    So these people would have access to read all of this

13    Arabic work if they could read Arabic?

14    A.    Yes.

15    Q.    And if you and others on Tibyan translated to English,

16    then now Americans who only speak English can now read it,

17    right?

18    A.    Correct.

19    Q.    It was possible for you to be in support of jihad without

20    being in support of al Qa'ida.  Isn't that true?

21    A.    Correct.

22    Q.    Islam, as a religion, doesn't have the equivalent of a

23    pope, does it?

24    A.    Correct.

25    Q.    There are many religions that have someone who is
```

1  designated the head of the religion.  Is that right?

2  A.   Correct.

3  Q.   But in Islam there's no comparable single figure in the

4  religion, is there?

5  A.   Correct.

6  Q.   There's no one who makes a definitive pronouncement on

7  something such as abortion?

8  A.   Correct.

9  Q.   There are imams, scholars, writers, even schools of

00:15 10  thought that exist in Islam that can be disagreeing with one

11  another.  Isn't that true?

12  A.   Yes.

13  Q.   Now, some of those imams and scholars and writers and

14  schools of thought did support your extreme views concerning

15  the obligation to engage in jihad and repel the American

16  soldiers from Iraq, right?

17  A.   Yes.

18  Q.   Didn't you believe, Mr. Pippin, that under the First

19  Amendment of the United States Constitution, you had the

00:16 20  freedom of religion to believe these views?

21           MR. CHAKRAVARTY:  Objection, your Honor.

22           THE COURT:  Sustained.

23           THE WITNESS:  Yes.

24           THE COURT:  The answer is stricken.

25           MR. CHAKRAVARTY:  Thank you.

1          MR. CARNEY:  May I be heard?  I'm going to his intent.

2          THE COURT:  I'll see you.

3          (Discussion at sidebar and out of the hearing of the

4     jury:)

5          MR. CARNEY:  The government has highlighted that the

6     defendant's state of mind is an important issue.  This witness,

7     who has admitted and will continue to admit that he did the

8     same thing that the defendant allegedly did, makes this

9     witness's state of mind relevant for why he thought he could do

00:17 10    it.  Because the defendant, if he testifies, will say the exact

11    same thing:  that he felt that under the First Amendment he had

12    the freedom to express his religious views or to hold those

13    religious views and the freedom under the First Amendment to

14    express these views to others.

15         And so while we're exploring this witness's state of

16    mind, I believe as, indeed, he just, albeit improperly, said

17    that he did believe -- his state of mind was he did have that

18    freedom.  And he should be allowed to state it since state of

19    mind is such a central issue in this case.

00:18 20         MR. CHAKRAVARTY:  The defendant's state of mind is the

21    central issue.  He's comparing apples to oranges.  He's

22    basically saying -- imputing what this witness's state of mind

23    is and activities are.  Understandably, strategically he's

24    trying to make a proxy for the defendant, but the only way for

25    that argument is to have the defendant take the stand and make

```
 1   that allegation.  To the extent that then this witness will

 2   corroborate him based on his own experience, that's one thing;

 3   but what he was thinking, especially about a legal issue,

 4   especially about a very -- frankly, I think, inappropriate

 5   legal defense and something that shouldn't be recharacterized

 6   for the jury to impute this defendant's understanding of the

 7   law as, you know, some kind of proxy for defendant's

 8   understanding.

 9           MR. CARNEY:  I'm not advancing this as a legal defense

10   and I'm not trying to bring in the question of law.  I'm asking

11   a simple question:  Was the witness's state of mind that he was

12   free to believe this and to state it.

13           THE COURT:  I don't see why this witness's state of

14   mind matters, correct or incorrect.

15           MR. CARNEY:  Because he has done exactly what the

16   defendant did in one respect.

17           THE COURT:  But different individuals can do the same

18   act with different states of mind, and what the focus is on is

19   whether the defendant did an act with the required state of

20   mind, not whether someone else would have done that act without

21   the state of mind.  I don't think it's relevant.

22           MR. CARNEY:  If he had said his motivation was

23   because -- to do something improper, then I --

24           THE COURT:  I think that would be equally irrelevant.

25           MR. CARNEY:  I couldn't bring out his state of mind
```

1  was to commit a crime?

2          THE COURT:  I don't -- I don't think so.

3          MR. CARNEY:  Knowing that this person -- what I'm

4  trying to show here is that in this community, in part, it was

5  generally accepted that you could believe it and you could

6  express it.  And the two questions that I want him to answer

7  are:  Did you feel in the United States that you had the

8  freedom of religion to believe this?  And I would expect he'll

9  say "yes."  And I will ask him the second question:  Did you

00:20 10  feel you had the freedom to express it?  And I expect he would

11  say, "Yes, and that's why I was open in expressing these

12  things."

13          It's not going to a defense; it's going to this

14  witness's state of mind why he was acting and what he was

15  thinking.

16          THE COURT:  No.  The objection will be sustained.

17          (In open court:)

18          MR. CARNEY:  May I assume that the second question I

19  was going to ask is excluded as well?

00:21 20          THE COURT:  Yes.

21          MR. CARNEY:  Please note my objection.

22          THE COURT:  Noted.

23          MR. CARNEY:  May I just have one moment, please?

24          (Counsel confer off the record.)

25  BY MR. CARNEY:

1   Q.   Yesterday the prosecutor asked you about a book entitled

2   "Join the Caravan"?

3   A.   Yes.

4   Q.   Are you familiar with that book?

5   A.   Yes.

6   Q.   The author is Abdullah Azzam.  Is that right?

7   A.   Yes.

8          MR. CARNEY:  Pardon me, your Honor.

9   Q.   The author is Abdullah Azzam, right?

00:22 10   A.   Yes.

11   Q.   And the prosecutor brought out that this book was found in

12   Tarek Mehanna's bedroom -- or in his possession.  Is that

13   right?

14   A.   I don't remember hearing that but...

15   Q.   Okay.

16   A.   I was asked about it, to identify it, but...

17   Q.   You don't know where it came from?

18   A.   I don't recall.

19   Q.   All right.  And you told us you're familiar with this book

00:22 20   and familiar with this man, right?

21   A.   Yes.

22   Q.   The book was published in approximately 1987, wasn't it?

23   A.   Yes, I believe so.

24   Q.   And what this book did is it urged Muslims to come to

25   Afghanistan to assist the Afghani people in expelling the

1    Russians who had invaded their Muslim country.  Is that right?

2    A.    Yes.

3    Q.    And Mr. Azzam quoted extensively from the Qur'an as a

4    reason why Muslims should go there and try to expel the

5    Russians, correct?

6    A.    Yes.

7    Q.    He also quoted extensively from Hadiths, and cited those

8    in support of a Muslim obligation to defend the Muslim country,

9    right?

00:23 10    A.    Yes.

11    Q.    Can you tell us in your words, please, what a Hadith is?

12    A.    Yes.   A Hadith is a recorded statement that's quoting the

13    prophet Mohammed, peace be upon him, or describing an action

14    that he did or some other description of what was going on

15    during his lifetime.

16    Q.    And Azzam would quote this in his book as a reason for why

17    individuals had a duty to do this, right?

18    A.    Yes.

19    Q.    And what he was asking them to do is to go to Afghanistan

00:24 20    and join the mujahideen, right?

21    A.    Yes.

22    Q.    The mujahideen are people who are considered the holy

23    warriors, if they're mujahideen, right?

24    A.    Yes.

25    Q.    But that's really just a name for the soldiers who were

1    fighting against the Russians, correct?

2    A.    Correct.

3    Q.    And these were people who often wore -- or always wore

4    tribal dress and usually turbans.  And it was not a very

5    sophisticated military, was it?

6    A.    No.

7    Q.    He was granted -- Mr. Azzam was granted a visa to come to

8    the United States so he could tour the United States and give

9    speeches based on his book.  Isn't that right?

00:25 10    A.    Yes.

11    Q.    And that's what he did.  He appeared in all kinds of

12    settings in the United States, with the complete knowledge of

13    the United States government, saying Muslims should come to

14    Afghanistan and support the mujahideen, right?

15    A.    Yes.

16    Q.    And are you aware that President Ronald Reagan welcomed

17    the mujahideen at the White House and said that he supported

18    them?

19              MR. CHAKRAVARTY:  Objection, your Honor.

00:25 20              THE COURT:  You may have it.

21    BY MR. CARNEY:

22    Q.    Did you read about that at some point?

23    A.    I think I had seen a picture, yes.

24    Q.    And that at one point he actually dedicated the launch of

25    a space shuttle to the mujahideen and Afghan people?

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  Sustained.

3          MR. CARNEY:  Your Honor, at this time I would like to

4   show a 30-second video clip of --

5          THE COURT:  Haven't we -- didn't we discuss this?

6          MR. CHAKRAVARTY:  We did on a prior circumstance.

7          THE COURT:  Same one?

8          MR. CHAKRAVARTY:  The government would have the same

9   objection.

00:26 10          THE COURT:  And I think I sustained the objection at

11   that time.  Is there --

12          MR. CARNEY:  That was lack of foundation.  This

13   witness is aware of it.

14          THE COURT:  Let me see you at the side.

15          MR. CARNEY:  And I would like to show the jury this.

16          THE COURT:  Let me see you at the side.

17          (Discussion at sidebar and out of the hearing of the

18   jury:)

19          MR. CARNEY:  Your Honor, I am urging your Honor to let

00:26 20   me show this 30-second clip.  The --

21          THE COURT:  This is the launch clip?

22          MR. CARNEY:  This is President Reagan sitting in the

23   White House surrounded by mujahideen and saying, "I want to

24   support these people in their efforts."

25          THE COURT:  There were two.  That's what I'm trying to

1    remember.

2           MR. CARNEY:  Yes, the first one was President Reagan

3    sitting in --

4           THE COURT:  Right.  The second was the launch?

5           MR. CARNEY:  The second was the launch.

6           THE COURT:  You're talking about the first one?

7           MR. CARNEY:  Yes, your Honor, just of President

8    Reagan.

9           The government has put in video after video of people

00:27 10   saying, "You support this" and making it seem like it's just

11   crazy wild men.  This is the President of the United States

12   supporting the effort of the mujahideen.  It's brief.  It's

13   supported by the witness's testimony.  And I hate to use the

14   word "big," but this is important just to show the jury that it

15   was not just -- I shouldn't have called it "crazy."

16          THE COURT:  I know that this is of great controversy.

17   Anybody old enough will remember that the United States

18   supported the mujahideen.

19          MR. CARNEY:  Yes, I know.  But it wasn't enough for

00:27 20   witnesses to say it.  You put in video after video.  And this

21   just provides the tiniest bit of balances.

22          MR. CHAKRAVARTY:  The laws that are at the core of the

23   case were not even in effect through 1996-1997.

24          THE COURT:  Let me ask this:  Do you know who the

25   people are with him?

         1              MR. CARNEY:  Yes.  He says who they are, the

         2     mujahideen from Afghanistan.  In fact, let's hope they look

         3     like it.

         4              THE COURT:  Yeah, but I don't know if that's a unitary

         5     description or whether that's --

         6              MR. CARNEY:  Oh, no.  He made it very clear.

         7              THE COURT:  Yeah.  I mean, there may be mujahideen and

         8     mujahideen.  That's what I don't know.

         9              MR. CARNEY:  No, these are the Afghans.

00:28   10              THE COURT:  But you don't know that Azzam was one of

        11     them, do you?

        12              MR. CHAKRAVARTY:  He definitely was not one of them.

        13              MR. CARNEY:  I don't know that answer.

        14              MR. AUERHAHN:  What's the relevance of the U.S.

        15     support against the Soviets?

        16              THE COURT:  I'll let you show it.

        17              MR. CARNEY:  Okay.  Thank you.

        18              (In open court:)

        19              MR. CARNEY:  Your Honor, if we may play the video for

00:28   20     our jurors, please?

        21              THE COURT:  Wait a minute.  Let me get it cued up

        22     here.

        23              MR. CARNEY:  Can you play it without sound?

        24     BY MR. CARNEY:

        25     Q.   Do you recognize that as President Ronald Reagan?

```
 1   A.   Yes.
 2   Q.   Contrary to the picture, he's not asleep; it's just we're
 3   freezing the video.
 4            MR. CARNEY:  Okay.  Can you play it from the beginning
 5   with sound?
 6            MR. OH:  Sure.
 7            (Video is published for the Court and jury.)
 8   BY MR. CARNEY:
 9   Q.   Did you recognize those as appearing to be mujahideen from
10   Afghanistan?
11   A.   Yes.
12   Q.   And you've already said that was President Ronald Reagan?
13   A.   Yes.
14   Q.   Mr. Pippin, how old were you in 2005?
15   A.   I don't remember.
16   Q.   Well, I'll give you a minute.  How old are you today?
17   A.   Thirty-four.
18   Q.   Okay.  Six years ago?
19   A.   Yeah, I was 28.
20   Q.   Twenty-eight?  Okay.  You were 28 years old in 2005.  And
21   that's the period, you told us yesterday, when your extreme
22   views began to start to change, right?
23   A.   Yes.
24   Q.   2005 to 2006 was the general period, right?
25   A.   Yes.
```

1    Q.   So if you were 28 years old in 2005, you would have been

2    five years older than someone who would have been just 23,

3    right?

4    A.   Yes.

5    Q.   Now, after your views changed or evolved, for example, in

6    2006, did you think that it was okay in Iraq for the Iraqis to

7    kill anyone from America who was in Iraq?

8            MR. CHAKRAVARTY:  Objection, your Honor.

9            THE COURT:  Overruled.

00:31 10         You may have it.

11           THE WITNESS:  Can you repeat the question?

12   BY MR. CARNEY:

13   Q.   Yes.  In 2005 and 2006 after your views changed and

14   evolved, did you now believe that it was okay for people

15   fighting against the military in Iraq, the U.S. soldiers, to

16   actually kill anybody from the United States who was working in

17   Iraq indiscriminately?

18   A.   I did not believe that at the time, no.  Only combatants.

19   Q.   Only the military combatants?

00:32 20   A.   Yes.

21           MR. CARNEY:  Could I have called up Exhibit 420,

22   please, your Honor?  It's in evidence.

23           THE COURT:  From -- that would be from the

24   prosecution's computer?

25   BY MR. CARNEY:

1    Q.    Now, I'm going to read you from a posting on Tibyan that

2    is already in evidence and has been identified as a posting by

3    the defendant responding to someone.  "Any American or other

4    Westerner in the peninsula doing any type of work that is not

5    contributing to the war effort against Muslims, such as

6    maintainers of oil fields, civil engineers, et cetera, and I do

7    not agree with targeting them and killing them simply because

8    they are Americans.  I support their expulsion but not their

9    killing."  He goes on to contrast someone who was working for

00:33 10    the military.

11        Then there is a posting by someone else.  I'll first do

12    this.  This was, the evidence showed, a response by someone to

13    Tarek's posting.  Can you read that --

14    A.    "But when" --

15    Q.    -- to yourself?

16    A.    Yes.

17    Q.    Were you able to read that?

18    A.    Yes.

19            MR. CARNEY:  How do we bring it back?

00:33 20            MR. BRUEMMER:  Double click on that space.

21            MR. CARNEY:  Okay.

22    BY MR. CARNEY:

23    Q.    And then this was Tarek's response -- oh, I'm sorry.  This

24    is the last thing that the person said in response to Tarek.

25    "Doesn't the rule of retaliation apply here?"

1          MR. CARNEY:  Could we go to the second page, please?

2     Q.   And continuing from the previous page -- I'll just read

3     you the bottom that got cut off on the other page.  "Right.

4     The Americans live in a democracy.  This is a common argument

5     that is used to justify things like this, and this is what I

6     have a problem with, that simply because a person is an

7     American, and America is at war with Muslims, then that means

8     that you and I can kill him.  I used to believe this, but after

9     long reflection and thought" -- I'm now on the top of what

00:34 10    you're reading -- "I have come to the conclusion, and Allah

11    knows best, that this is an incorrect concept.

12         "I am not a scholar, so it is useless for me to go through

13    and present to you all of the Sharee'ah evidences" -- what does

14    "Sharee'ah" mean in this context?

15    A.   Islamic legal, or legal evidences.

16    Q.   Legal evidences?

17    A.   Legal evidences in Islamic law.

18    Q.   Okay.  "So it is useless for me to go through and present

19    to you all of the Sharee'ah evidences that I have analyzed

00:35 20    after coming to this conclusion, but I will argue it here from

21    a logical point of view:  The argument that they live in a

22    democracy, their government is fighting the Muslims, so

23    therefore, each and every American is responsible for the

24    actions of their government can easily be refuted.

25         "Remember when the war in Iraq first started?  Was there a

1   single country on earth, Western or otherwise, in which there

2   were not massive anti-war demonstrations condemning the war as

3   well as the Bush administration?  Some of the biggest anti-war

4   demonstrations took place right here in the U.S. itself, as

5   well as the other countries that are part of the U.S.

6   Coalition:  Spain, the U.K., Italy, et cetera.  Also, if you

7   look at this past U.S. election, almost half of Americans voted

8   for Kerry which, in U.S. politics, translates as anti-war.

9       "So after looking at these two realities with a just mind,

00:36 10   one can no longer use the argument that the Americans live in a

11   democracy (which they don't), therefore, every single American

12   in the world, civilian or military, can be killed on the spot.

13   No, rather, those who fight us should be fought.  Those who

14   fight us," in bold, "not those who carry the same nationality

15   as those who fight us.

16       "Things are no longer as simple as the fataawa" -- what is

17   a fataawa?

18   A.   A legal Islamic verdict.

19   Q.   And what does that mean?

00:37 20   A.   It's a formal verdict coming from a qualified scholar

21   about a certain issue in Islamic law.

22   Q.   Is it expressing that scholar's opinion of what needs to

23   be done?

24   A.   It's an expression of his opinion; it's not binding.

25   Q.   Were there Islamic scholars who issued fataawas that said

        1   it's okay to kill any American on the spot because they were

        2   part of the war effort?

        3   A.    In hindsight, I wouldn't qualify them as scholars.

        4   They're capable of giving fataawa, but at the time, yes, I

        5   would say that there were, quote/unquote, fataawas who could

        6   give those types of rulings.

        7   Q.    So let me go back to this.  "Things are not as simple as

        8   the fataawa that use the democracy argument as a justification

        9   make them out to be.  We need to combine the knowledge of the

00:37  10   Sharee'ah evidence with the understand *[sic]* and knowledge of

       11   world events and realities.  If we do so in the case mentioned

       12   above, we will see that your argument no longer applies, simply

       13   because it has been unquestionably proven that not all

       14   Americans and Westerners support the wars that their

       15   governments have initiated against the Muslims.

       16        "And, your statement that Americans are leaders of

       17   kufr" -- did I pronounce that right?

       18   A.    The first word is "kufr," disbelief.

       19   Q.    Kufr?

00:38  20   A.    Yes.

       21   Q.    And this refers to disbelief of Islam?

       22   A.    As a concept, disbelief.

       23   Q.    -- "this is a very general statement.  I agree with you

       24   that all non-Muslim Americans are kuffaar" -- that means

       25   they're not Muslim?

1    A.    Non-Muslims.

2    Q.    They're not Muslim?

3    A.    Or disbelievers.

4    Q.    It's like saying "I agree with you that all non-Muslims

5    are non-Muslims."  Is that --

6    A.    It's a little more than that.

7    Q.    All right.  Well, it's in the same area code or...

8    A.    Well, "kuffaar" has more connotation than that.  It means

9    "to deny."

00:38 10   Q.    Let me keep going.  "But are all of them the leaders of

11   kuffaar?  I don't think so.  There are many kind and just

12   people amongst them.  And as I mentioned to you above, not all

13   of them support the fight against Muslims.  One American that I

14   know personally was practically begging me to come to an

15   anti-war rally with him.  Since I don't agree with

16   demonstrations of this type, I didn't go.  But you see my

17   point:  I cannot label this American as one of the leaders of

18   kuffaar, nor do I think I should kill him.  He's an American,

19   yes, but he is clearly against the wars being perpetrated

00:39 20   against the Muslims.  Rather, I think that a more useful way to

21   deal with someone like this would be to call him to Islam

22   through words and actions.

23        "If you reflect off the verses of the Qur'an and the

24   statements of the Messenger of Allah, you will find that, as

25   they say, every situation has its proper way of being dealt

1   with.  But to just put a blanket ruling on people simply

2   because of their nationality - maybe that was applicable at a

3   certain point in history, but I don't think it is applicable

4   anymore.

5        "And Allah knows best."

6        Did you agree in 2005 when this was posted by

7   Tarek Mehanna with the views he expressed in this?

8   A.   Yes.

9   Q.   Are you familiar with the concept of Aman?

00:40 10  A.   Yes.

11  Q.   A-M-A-N?

12  A.   Yes.

13  Q.   What is that concept in Islamic law?

14  A.   "Aman" is either a spoken, or written or nonverbalized,

15  implied covenant between a person residing in a country --

16  between himself or herself and the host country, that that

17  person will respect and obey the laws and will live in that

18  country in peace.

19  Q.   And is that based on if the country allows him to practice

00:40 20  his religion?

21  A.   Yes.

22  Q.   And so that if the country you're living in allows you to

23  practice the Muslim religion, then there is a covenant with

24  that country that you will live in peace in that country,

25  right?

```
 1  A.    Yes.

 2  Q.    And not attack that country from within the country,

 3  right?

 4  A.    Yes.

 5  Q.    Now, you mentioned in response to questions by the

 6  prosecutor that you had this evolution or transformation of

 7  your views in approximately 2005 and 2006.  Is that right?

 8  A.    A little earlier, but mostly 2005, yes.

 9  Q.    Okay.  And you went from the very extreme radical jihadi

10  view that you had before that to the more moderate views that

11  you hold now to this day?

12  A.    Yes.

13  Q.    Could you help the jury understand how you went

14  through -- you personally went through that transformation?

15  What was the process for you personally, Mr. Pippin?

16  A.    It's a long answer.

17  Q.    Well, give us the Reader's Digest version.

18  A.    Well, basically --

19  Q.    And I mean no disrespect to Reader's Digest, but you know

20  what I meant, right?

21  A.    Yes.  From early on, since I embraced Islam, I had always

22  been one to read from a variety of sources and always kept a

23  somewhat open mind to other viewpoints, even if I had embraced

24  a certain viewpoint --

25  Q.    Please tell them.
```

A.    -- and believed that it was the strongest and the soundest

viewpoint, I still at the same time gave myself the opportunity

to read other viewpoints so that I would know what's out there.

So through the years of reading and researching from a

variety of authors those other viewpoints -- and those other

authors are always in the back of my mind, even if I

entertained views that were opposed to the viewpoints that I

read about previously.

So around the year 2004, like the summer of 2004, 2005,

although I had the viewpoints that could be described as

Salafi-Jihadi, at the same time I was reading from other

sources, at the same time I was wrestling with other issues,

spiritual issues, feeling spiritually dry due to the -- I guess

you could say the lack of spiritual depth in the literature

that I was reading that represented the Salafi-Jihadi

viewpoint.

So after leaving the United States and settling in

Finland, being away from everyone, being by myself except with

a couple of friends, having the time to sit and reflect and to

read more, I began to challenge my own views and look at them

more critically, and then I came to where I am today.

Q.    That's not -- that kind of transformation isn't unique to

you as a young Muslim, is it?

A.    I think it's universal for most people, whatever religion.

Q.    And certainly in your teaching of people you've seen that

1   many young Muslims follow that path that you did.  Is that

2   right?

3   A.   Yeah, hopefully so, yes.

4   Q.   I'm sorry.  Someone was coughing.

5   A.   Yes, hopefully so.  I've seen it, yes.

6   Q.   Okay.  I'd like to return with you to your speaking about

7   Ahmad Abousamra.  You told us yesterday that you first met him

8   on an internet web forum in the late '90s or early 2000s.  Is

9   that approximately right?

00:44 10   A.   In 2001.

11   Q.   In 2001?

12   A.   Yes.

13   Q.   You immediately saw that he appeared to be pretty fluent

14   in Arabic, right?

15   A.   Yes.

16   Q.   In fact, most of his postings were in Arabic, weren't

17   they?

18   A.   Most of them on the Salafi forum were in English, but he

19   demonstrated a familiarity with Arabic books and authors and

00:45 20   the material in those books.

21   Q.   Would he ever provide translations from Arabic to English

22   in his posts?

23   A.   I recall a few, yes.

24   Q.   Is it fair to say that he did show a lot of knowledge of

25   Arabic?

1   A.   Yes, I would say so.

2   Q.   And when Abousamra in 2001 would post things on these web

3   forums that you would read, the discussions would focus on

4   general issues related to Islamic law or jurisprudence?

5   A.   Mostly theology but sometimes jurisprudence.

6   Q.   How do you define the word "jurisprudence"?

7   A.   "Jurisprudence" would be synonymous with the word in

8   Arabic "fiqh," which means in Islamic law, how you engage in

9   the actual rights of worship, whereas theology deals with the

00:45 10   beliefs and the doctrine.

11   Q.   When he was on that first website, he had a particular web

12   name or posting name?

13   A.   Yes.

14   Q.   Do you recall offhand what it was?

15   A.   I recall his name at the time was Abu Hurarah.

16   Q.   Is it unusual that people use a name like that when they

17   post on a web forum?

18   A.   No.

19   Q.   Is it, in fact, the most common way that people post:

00:46 20   They don't use their actual name; they use an adoptive name?

21   A.   Yes.

22   Q.   And has this been your experience across a wide variety of

23   websites?

24   A.   Yes.

25   Q.   Now, approximately two years later, in 2003, you were on a

1   different website and you read a posting that you believed you

2   recognized as being Abousamra, right?

3   A.   Yes.

4   Q.   Or the same person who had been using the name Abousamra

5   had been using, right?

6   A.   A different name but a similar writing style and similar

7   topics that he was talking about.

8   Q.   His writing style was pretty distinctive, wasn't it?

9   A.   I would say so, yes.

00:46 10  Q.   In fact, his writing style was that he was, in effect,

11  very arrogant about his personal views being correct.  Is that

12  right?

13  A.   Yeah, overconfident.

14  Q.   Overconfident to the point of being arrogant?

15  A.   Yeah.

16  Q.   Have you, yourself, used the word to describe his writings

17  as being arrogant?

18  A.   Perhaps I have, yes.

19  Q.   And also, you noticed that his views were much more

00:47 20  extreme than they had ever been before.  Is that correct?

21  A.   Yes.

22  Q.   He was asserting that these new views were absolutely

23  correct, and indeed, that people who didn't support them were

24  takfir in many instances, right?

25  A.   In varying levels.  Either he would consider people who

```
 1   didn't agree with him to be, you know, heretics -- and not
 2   apostates, outside of their religion, but heretics.
 3   Q.   How do you define the word "heretic"?
 4   A.   Oh, a person -- we would call the person an innovator.  A
 5   person who adopts a belief or a viewpoint that is against Islam
 6   but they're propagating it as being from Islam.  So he would
 7   consider people like that to be innovators.  And then for some
 8   people, yes, he would describe them as disbelievers.
 9   Q.   And disbelievers would be takfir?
10   A.   Takfir is the term for the act of excommunication, but to
11   do takfir means to call someone a kuffaar.
12   Q.   A what?
13   A.   A kuffaar, a disbeliever.
14   Q.   I'm sorry.  I thought you said "Catholic."  A kuffaar.
15   Okay.
16        Now, based on the postings or internet messages, he
17   appeared to be aware that you had been to Yemen in your life?
18   A.   Yes.  Well, we had talked about it.
19   Q.   Had you talked about it in instant messages?
20   A.   In what year are you asking?
21   Q.   2003.
22   A.   Yes.  2003 we communicated through instant messages or --
23   Q.   Did you also communicate by both posting --
24   A.   Private messages on the forum.
25   Q.   I'm sorry?
```

1    A.    Private messages on the forum, on the internet forum.

2    Q.    And he knew you had received military training, right?

3    A.    Yes.

4    Q.    And then had gone on to -- well, you didn't receive

5    military training in Yemen.

6    A.    No.

7    Q.    You had received military training in Pakistan.

8    A.    Yes.

9    Q.    And that after that, you had attempted to go to Kashmir

00:49 10   and engage in the fight to expel the country of India from

11   Kashmir?

12   A.    Yeah, you could say that.

13   Q.    Okay.  He indicated that he wanted to speak to you

14   privately, correct?

15   A.    Yes.

16   Q.    And that he was going to fly to California so that he

17   could meet with you.  Isn't that right?

18   A.    Yes.

19   Q.    When he met with you, he was quite open and explicit about

00:49 20   what he was looking to do, wasn't he?

21   A.    Yes.

22   Q.    He told you that he wanted to go to Iraq and fight against

23   U.S. soldiers, right?

24   A.    Basically, yes.

25   Q.    He also said he wanted to go to Iraq to fight against

1 apostates, didn't he?

2 A.   To Iraq to fight against apostates?

3 Q.   What did I say?

4 A.   To fight apostates in Iraq?

5 Q.   Yes.

6 A.   I don't recall him saying that exactly at this moment, but

7 he did mention the fact that the American forces in Iraq are

8 considered kuffaar, original disbelievers, as he called it;

9 therefore, being more virtuous when fighting apostates in

00:50 10 Afghanistan.

11        MR. CARNEY:  Okay.  If I may have a moment, please,

12 your Honor?

13        (Pause.)

14        MR. CARNEY:  May I approach the witness, please?

15        For the witness and the Court and the parties, this is

16 the transcript of an interview.

17        MR. CHAKRAVARTY:  Perhaps we should approach on this,

18 your Honor?

19        THE COURT:  All right.

00:51 20        (Discussion at sidebar and out of the hearing of the

21 jury:)

22        MR. CHAKRAVARTY:  Is this the Finland interview?

23        MR. CARNEY:  Yes.

24        MR. CHAKRAVARTY:  I don't know what counsel has in

25 front of him, but back in 2008 when we went to Finland and we

1    interviewed -- it was videotaped, and we provided a preliminary

2    transcript to the defense in August, because they asked for it,

3    with the proviso that it was not finalized and had not been

4    edited and not prepared with the scrutiny of what we would do

5    for a grand jury transcript or something else.

6         The concern is, given the fact that it is only a

7    preliminary transcript, that the witness should not be

8    impeached by that.  We may have done a different transcript,

9    but we have not had an opportunity to compare that or for

00:52 10   accuracy.

11        THE COURT:  Well, how much of the transcript do you

12   propose to use?

13        MR. CARNEY:  The transcript says, in regard to

14   Abousamra, quote, "Did he specifically say what he wanted to do

15   there?"  The witness answers, "Of course."  "Well, what did he

16   say about that?"  "He wanted to go join up with mujahideen,

17   fight the Americans and the apostate Iraqis."

18        MR. CHAKRAVARTY:  We don't have a problem with him

19   asking the question; the issue is going to be reading from the

00:52 20   transcript to say that --

21        THE COURT:  This is to refresh his recollection?

22        MR. CARNEY:  I'll start to refresh his recollection.

23   He's expressed some uncertainty, and I'm going to ask him to

24   read this to himself.  But this is the transcript that I have

25   of --

1          THE COURT:  What else would it be besides refreshing?

2     You said you would start by that.  What else -- what could you

3     progress to?

4          MR. CARNEY:  If he says this doesn't refresh his

5     memory, then I don't believe I'm allowed to impeach him.

6          THE COURT:  Yeah.

7          MR. CARNEY:  So that's why I'm trying to refresh his

8     memory.

9          THE COURT:  So it's only refreshing his memory.

00:53 10          MR. CARNEY:  Yes.

11          THE COURT:  You had indicated you had a second theory.

12     I was just trying to get at that.

13          MR. CARNEY:  I'm sorry.

14          If it doesn't refresh his memory, my understanding of

15     the law is that I can't impeach him, so I will not try to do

16     that.

17          THE COURT:  So we'll see.  If it refreshes his memory,

18     then go ahead.

19          MR. CARNEY:  Okay.

00:53 20          (In open court:)

21          MR. CARNEY:  May I show it to the witness?

22          THE COURT:  You may show it to the witness.

23     BY MR. CARNEY:

24     Q.   I'm showing you a document that I'm going to ask you to

25     read to yourself.  Have you ever seen this document, by the

1  way?

2  A.   Not this version.

3  Q.   A different version?

4  A.   Yes.  Well, it's the same, just the names of the people

5  are initials instead of fully written out.

6  Q.   Do you see what I'm pointing to?

7  A.   Yes.

8  Q.   And I'd like you to read to yourself, please, from the top

9  line down to the end of this sentence.  And just read it to

00:54 10  yourself and look up at me when you're done, please.

11  A.   Okay.

12        (Pause.)

13  A.   Yes?

14  Q.   Having read that document, Mr. Pippin, to yourself, does

15  that refresh your recollection of what Mr. Abousamra told you

16  was his reason for wanting to go to Iraq?

17  A.   Yes, it does.

18  Q.   Okay.  With your memory refreshed, what were the reasons

19  why he wanted to go to Iraq?

00:55 20  A.   Well, primarily to fight against the American forces.

21  Mentioning apostates is kind of -- it's implied because they're

22  a company of the American troops, but primarily because of the

23  American troops.

24  Q.   Did he make specific reference to fighting U.S. and

25  apostate Iraqis?

1    A.   Well, the American troops were the main focus; the

2    apostate Iraqis are just on the side and implied because of

3    their presence.

4    Q.   What I'm asking you is:  What did Mr. Abousamra tell you

5    was the reason?

6             MR. CHAKRAVARTY:  This has been asked and answered,

7    your Honor.

8             THE COURT:  Overruled.

9             THE WITNESS:  Can you repeat the question?

00:55 10   BY MR. CARNEY:

11   Q.   What did Mr. Abousamra himself tell you was the reason?

12   A.   To go to Iraq to fight against the American forces.  And I

13   mentioned there in the interview apostates as well.  This is

14   what I recall him saying as well, but that was not the main

15   focus.

16   Q.   Can you remind us who or what apostates are?

17   A.   In this context it would refer to those Iraqis who were

18   part of the forces supporting or being along with the Americans

19   in Iraq.

00:56 20   Q.   Now, he needed military training in order to be able to do

21   this, he told you.  Is that right?

22   A.   Yes.

23   Q.   So he wanted to know if you knew of a military training

24   camp where he could get training, right?

25   A.   Yes.

```
 1   Q.   And he mentioned that you had been in Yemen, right?

 2   A.   Yes.

 3   Q.   And he asked you do you know of any training camps in

 4   Yemen, didn't he?

 5   A.   Well, it came up in discussion on MSN -- I don't know if

 6   it was a statement or a question -- through the ensuing

 7   discussion.  But we talked about the possible presence of those

 8   types of facilities or camps in Yemen.

 9   Q.   And you personally did not know where there was a military

10   camp in Yemen, right?

11   A.   No.

12   Q.   But you wanted to try to help him as part of your

13   obligation that you felt at that time of your life, right?

14   A.   Yes.

15   Q.   So you suggested the names of -- well, let me -- you

16   suggested one name of someone who had been a former mujahideen

17   who was now living in Yemen, right?

18   A.   Yes.

19   Q.   And you thought that because he was a former mujahideen,

20   that he might know where there would be a training camp, right?

21   A.   Yes.

22   Q.   You also gave him the name of a second person who had the

23   same -- who had similar views as Abousamra, and that he might

24   be a person who could tell Abousamra where a training camp was,

25   right?
```

1    A.    Yes.

2    Q.    So what you were doing was trying to provide help to

3    Abousamra to receive military training in order for him to go

4    to Iraq and fight and kill U.S. soldiers.  Is that a fair

5    statement?

6    A.    Yes.

7    Q.    Do you know that's one of the charges against Mr. Mehanna?

8    A.    Yes.

9    Q.    Do you know the penalty that you would face if you were

00:58 10   charged with that?

11              MR. CHAKRAVARTY:  Objection, your Honor.

12              THE COURT:  Sustained.

13   BY MR. CARNEY:

14   Q.    You, yourself, had last been in Yemen in 1998.  Am I right

15   on the date?

16   A.    1999.

17   Q.    1999.  Were you aware that after 9/11 there were no more

18   military training camps in Yemen?  Were you personally aware of

19   that?

00:58 20   A.    No.

21   Q.    Now, this conversation with him about Yemen continued, and

22   you mentioned to him that you were thinking, and had been

23   thinking for quite a while, of going back to Yemen yourself,

24   right?

25   A.    Yes.

1    Q.   Your intention was when the school year finished, because

2    you were a teacher at that time, you had plans and hopes to go

3    back to Yemen to continue your studies that you had done on a

4    previous occasion, right?

5    A.   Yes.

6    Q.   And you even asked Mr. Abousamra if he'd want to go with

7    you when you went to Yemen, right?

8    A.   I don't recall.

9    Q.   Okay.

00:59 10    A.   I recall him mentioning that he wants to go and he was

11    asking me to go.

12    Q.   Okay.

13    A.   And I was telling him I wasn't able to go at that time.

14    Q.   Right.  You said you couldn't go at that time because,

15    among other things, you had a teaching contract.

16    A.   Yes.

17    Q.   And he said he didn't want to wait to go; he was

18    interested in going right away?

19    A.   Correct.

01:00 20    Q.   But there was some discussion between the two of you

21    that -- wondering if he might want to go with you or you might

22    want to go with him together?

23    A.   Yeah, there was some discussion.

24    Q.   But the timing didn't work out?

25    A.   Correct.

```
 1   Q.   And if you two had gone together, you would have gone to a
 2   school to study and he would have gone to find a military camp
 3   to train?
 4            MR. CHAKRAVARTY:  Objection, your Honor.
 5            THE COURT:  Overruled.
 6            You may answer.
 7   BY MR. CARNEY:
 8   Q.   Right?
 9   A.   Repeat the question, please?
10   Q.   Certainly.  If you two had been able to go together, then
11   when you got to Yemen you were going to go to a school where
12   you were going to study and Abousamra was going to try to find
13   a military training camp to get military training, right?
14   A.   More than likely I would have traveled with him to the
15   individual that I told him about to introduce him.  Seeing that
16   I knew the guy and he didn't know him, that probably would have
17   been my course of action.
18   Q.   Would you have gone to a military training camp and
19   received training?
20   A.   No.
21   Q.   Would you have gone to school?
22   A.   Yes.
23   Q.   Did Mr. Abousamra at any time indicate an interest in
24   studying Arabic in Yemen?
25   A.   No.
```

```
 1   Q.   Did he ever indicate any interest in studying at a school
 2   to learn more about Islamic jurisprudence?
 3   A.   No.  We discussed schools but not in the context of
 4   actively...
 5   Q.   Not in the context of why he wanted to go to Yemen?
 6   A.   Right.
 7   Q.   As compared to why you wanted to go to Yemen, right?
 8   A.   The only discussion of schools was using them as covers or
 9   places to mention upon arrival in a country.
10   Q.   So that Abousamra could have cover --
11   A.   Yes.
12   Q.   -- right?
13        Now, you knew that Abousamra was from Boston, correct?
14   A.   Yes.
15   Q.   And you knew someone from Boston from the online postings,
16   right?
17   A.   Yes.
18   Q.   And you said that person's name was Abu Sabaayaa because
19   that's how you knew him, right?
20   A.   Yes.
21   Q.   And Abousamra said he knew Abu Sabaayaa, correct?
22   A.   Yes.
23   Q.   And that's how the two of you referred to him as,
24   Abu Sabaayaa, the person you knew from the posting on the web
25   forums, correct?
```

1   A.   Yes, from what I recall.

2   Q.   The person that Mr. Abousamra spoke about with the

3   greatest specificity was someone he called the "IT guy," or

4   someone involved in IT?

5   A.   Yes.  This is what I recall, mentioning the IT guy who,

6   you know, worked, and I think he said stayed with his parents.

7   Q.   And had money?

8   A.   And had money.

9   Q.   In fact, the IT guy who had money had given Abousamra

01:02 10   $5,000 to give to you, correct?

11   A.   Yes.

12   Q.   And you were free to spend that money on anything, right?

13   A.   Yes.

14   Q.   And, in fact, you used it to pay some debts that you had

15   from your family, right?

16   A.   Yes.

17   Q.   And Abousamra was cool with that, wasn't he?

18   A.   Yes.

19   Q.   Now, you told this to an FBI agent or a related

01:03 20   investigator when you were interviewed, right?

21   A.   Yes.

22   Q.   And you talked about the IT guy who had money and who gave

23   the money to you through Abousamra?

24   A.   Yes.

25   Q.   And when you were interviewed, the agent asked you,

1    "Wasn't that Kareem Abuzahra?"  Do you remember him asking you

2    that name?

3    A.   My memory is vague on this.  If it's in the transcript,

4    then I should see it.

5    Q.   All right.

6         MR. CARNEY:  Could we go to the transcript, please,

7    for the witness and the parties, please?

8         May I approach the witness, please?

9         THE COURT:  All right.

01:04 10    BY MR. CARNEY:

11   Q.   I'd ask you, please, to read from about halfway down the

12   page.  I'll give you the whole thing.

13   A.   Sure.

14   Q.   You can just start from where your name appears, and read

15   to the bottom to yourself, please.

16   A.   (Witness complies.)

17         THE COURT:  Excuse me, Mr. Carney, we seem to have a

18   little technical problem with the court reporter.  Just give us

19   a minute to fix it.

01:07 20         MR. CARNEY:  Sure.

21         (There is an interruption in the proceedings.)

22   BY MR. CARNEY:

23   Q.   So when you were being interviewed, people were asking you

24   if Abousamra mentioned a name, right?

25   A.   Yes.

1   Q.   And you indicated to them that if they could figure out a

2   guy who works in the IT field who lived with his parents at the

3   time who had substantial, you know, money, that that would be

4   the guy, right?

5   A.   Yes.

6   Q.   And then one of the investigators asked you, "Does

7   'Kareem' sound familiar, or 'Kareem Abuzahra,'" correct?

8   A.   Yes.

9   Q.   And you said no.  Is that right?

01:08 10   A.   Correct.

11   Q.   Okay.  Now, Abousamra mentioned that there were people

12   that he wanted to go -- who he wanted to have accompany him to

13   go to a training camp, right?

14   A.   Yes.

15   Q.   But he then told you, "But they're not in a position to go

16   and train and to fight," right?

17   A.   That's what I recall, yes.

18   Q.   He said, "They're more in a position to offer either

19   financial support or moral support," didn't he?

01:08 20   A.   Yes.

21   Q.   And Abousamra said the person who was in a position to

22   offer financial support was this IT guy he had mentioned

23   earlier, right?

24   A.   Yes.

25   Q.   Now, you were asked by the interviewer if Abousamra said

1  that Abu Sabaayaa, who was Tarek Mehanna, was going to go

2  to -- was going to go with Abousamra to a military training

3  camp, and you said that you thought Abousamra said that

4  Abu Sabaayaa was just moral support, right?

5  A.   If that's what's in the transcript.  I don't remember it,

6  but...

7  Q.   Okay.

8        MR. CARNEY:  If I may approach, please?

9        THE COURT:  All right.

01:09 10  BY MR. CARNEY:

11  Q.   Page 39.  Would you read this question and this answer?

12  A.   (Witness complies.)

13  Q.   So the question was to you by the investigator:  "Did you

14  believe that Tarek Mehanna was going to go with Abousamra to a

15  training camp or that he was going to just supply support?" and

16  you said, "Just support," right?

17  A.   Correct.

18  Q.   After returning from Iraq or Iran or wherever Abousamra

19  went, you had a conversation with him, right?

01:10 20  A.   Yes.

21  Q.   He told you that he had been unable to find any military

22  training camp in Yemen, correct?

23  A.   Correct.

24  Q.   He had, nonetheless, gone on to another country, correct?

25  A.   Correct.

1    Q.   But no one could help him find one, right?

2    A.   Correct.

3    Q.   And he said all you could do in Yemen is study, right?

4    A.   The conversation was vague.  I don't remember it, but...

5         MR. CARNEY:  May I have a moment, please, your Honor?

6         Page 68, gentlemen.

7         (Pause.)

8         MR. CARNEY:  I'll move on.

9         THE COURT:  All right.

01:12 10   BY MR. CARNEY:

11   Q.   I would like to ask you about some other information about

12   the Yemen schools that you talked about yesterday with the

13   prosecutor.

14   A.   Okay.

15   Q.   Now, you've told us you're a professional teacher of

16   Arabic.  Is that right?

17   A.   I'm a teacher of Arabic, yes.

18   Q.   Well, do you do that as a profession?

19   A.   In a very limited capacity these days, but previously,

01:13 20   yes, on and off.

21   Q.   And when you did it regularly, was it your job?

22   A.   Yes.

23   Q.   And certainly it's how you earned a living, primarily,

24   wasn't it?

25   A.   Yes.

```
 1   Q.   And certainly by this point in 2004 you considered
 2   yourself to be very knowledgeable about Arabic?
 3   A.   I should be modest.
 4   Q.   In a humble way.  In a humble way.  Okay.  We know you're
 5   a humble guy, but...
 6   A.   Well, to say "humble" is not humble, right?
 7        No, but I knew Arabic.  I was fluent and I could read and
 8   understand.
 9   Q.   And you could translate?
10   A.   And I could translate.
11   Q.   Okay.  But you wanted to improve your knowledge of Arabic,
12   right?
13   A.   Well, not just Arabic as the language, but just the other
14   disciplines in Islamic studies and Islamic sciences.
15   Q.   But learning, for example, more about Arabic grammar was
16   something that you would learn in Yemen, right?
17   A.   Yes.
18   Q.   And that was why in 2004 you attempted to return to Yemen
19   to study, correct?
20   A.   Yes.
21   Q.   That was why initially you had gone to Yemen to study at
22   schools, to improve your Arabic and to improve your knowledge
23   of other Islamic disciplines or law or jurisprudence.  Is that
24   fair to say?
25   A.   Correct.
```

1    Q.   Now, Yemen is a very poor country, isn't it?

2    A.   Yes.

3    Q.   It's probably the poorest country in the Middle East.  Is

4    that fair to say?

5    A.   It is.

6    Q.   Many people in Yemen live in mud huts without electricity,

7    correct?

8    A.   Yes.

9    Q.   Outside of the cities there are few government services

01:14 10   that are available to people.  Is that right?

11   A.   True.

12   Q.   One thing you noticed when you were in Yemen was that most

13   residents of these villages carry guns around, don't they?

14   A.   Yes.

15   Q.   I mean, it's fair to say sometimes these are big guns,

16   machine guns, right?

17   A.   Usually AK-47s.

18   Q.   Do you consider that a big gun?

19   A.   I'm from Georgia.

01:15 20          (Laughter.)

21   Q.   All right.  But even 12-year-old children would walk

22   around carrying these guns, right?

23   A.   Yes.

24   Q.   So the fact that someone would describe seeing everybody

25   walking around with guns would relate to the fact that he

```
 1  probably had been in a village in Yemen seeing this.

 2  A.   Yes.

 3  Q.   Because it was so obvious, wasn't it?

 4  A.   Yes.

 5  Q.   But with all of these deficiencies, the one thing that the

 6  country of Yemen does have is excellent schools for Arabic and

 7  jurisprudence.  Isn't that correct?

 8  A.   Yes.

 9  Q.   Now, the Arabic that it deals with concentrates on what's

10  considered a pure form of Arabic.

11  A.   Yes.

12  Q.   Is that fair to say?

13       What do you mean when you use the phrase "a pure form of

14  Arabic"?

15  A.   Essentially, the Arabic we would describe as Qur'anic

16  Arabic.  It is the style of Arabic and the grammar of Arabic

17  that you would find in the Qur'an and in early Islamic

18  literature.

19  Q.   So if you wanted to be able to read the Qur'an with

20  greater nuance, or read some of the ancient texts, it would be

21  important to know this pure form of Arabic?

22  A.   Yes.

23  Q.   Because that's different from the modern form that might

24  be spoken, say, in Cairo or Damascus.  Is that right?

25  A.   Yes.
```

```
 1   Q.   And when you would go there you would study grammar and
 2   words and structure of Arabic, correct?
 3   A.   Yes.
 4   Q.   And even though you were fluent in Arabic and you've been
 5   a teacher in Arabic and probably speak Arabic at a pretty high
 6   level, it was still valuable to you in 2004 to go back to Yemen
 7   to continue your studies of this.  Is that right?
 8   A.   Well, my intention in 2004 was not really to focus on
 9   grammar.  But, yes, as a subject of study it would be something
10   to be learned in further detail.
11   Q.   Now, you had considered going to the University of
12   Medina --
13   A.   Yes.
14   Q.   -- when you originally were planning to go make these
15   studies in the late '90s, right?
16   A.   Yes.
17   Q.   And where was the University of Medina located?
18   A.   In Saudi Arabia.
19   Q.   And is it in a modern city?
20   A.   Yes.
21   Q.   Is the campus a modern campus?
22   A.   Yes.
23   Q.   Can you describe for us what the University of Medina
24   would look like if we went to see it?
25   A.   A campus having many buildings, dormitories, cafeteria.
```

1    Very standard.

2    Q.    Saudi Arabia is quite a wealthy country?

3    A.    Yes.

4    Q.    Now, you had to apply to go to the University of Medina,

5    correct?

6    A.    Yes.

7    Q.    And it's a fairly selective process, isn't it?

8    A.    Yes.

9    Q.    And you were admitted to that program, correct?

01:18 10   A.    I applied in person when I visited, and they accepted,

11   waiting for me to give them some other documentation when I

12   returned, or to mail to them when I returned to the States.

13   Q.    But instead of going to the modern University of Medina to

14   do these studies, you elected to go to Yemen to do the studies,

15   correct?

16   A.    Yes.

17   Q.    One of the reasons was the Arabic that you would be taught

18   was going to be more authentic or pure, right?

19   A.    I didn't factor that as a specific reason.  There were

01:18 20   other reasons as well.

21   Q.    Was it that the study would be more like how the study

22   would have been in the time of the prophet Mohammed?

23   A.    Even that method is different.  But it was more rigorous

24   and the life was more austere, lending itself for deep study

25   and contemplation and not being distracted by other things.

```
 1    Q.   You told us the name of the first school you went to was
 2    Dar al-Hadith?
 3    A.   Yes.
 4    Q.   You described for us what the University of Medina looked
 5    like.  How did the school in Yemen, Dar al-Hadith, look?
 6    Describe for the jurors what one would see if you went to that
 7    school in the time you went.
 8    A.   Basically, it was located in a tribal area of houses, and
 9    it was basically fenced in as a large school with a large
10    mosque in the middle and dorms and a library situated around
11    it.
12    Q.   Who made up the faculty?
13    A.   Teachers, most of them hailing from Egypt, and a couple
14    from Yemen.
15    Q.   How many students, approximately, were at the first
16    school?
17    A.   Depending on the time of the year, between 100 to 200.
18    Q.   And what was the college campus environment like?
19    A.   Rigorous, focused.
20    Q.   Was the school taught exclusively in Arabic?
21    A.   Yes.
22    Q.   By that I mean the classes.
23    A.   Yes.
24    Q.   How many hours a day would you study, or participate in
25    classes?
```

1    A.    Between study and review, 12 hours a day.

2    Q.    Was it fair to say that people who attended these schools

3    in Yemen were very serious students?

4    A.    Overall, yes.

5    Q.    Is there anything comparable to that study of Arabic and

6    that study of Islamic law and jurisprudence in the United

7    States?

8    A.    Not that I'm aware of.

9    Q.    How expensive is it to attend this school?

01:20 10   A.    It's free.

11   Q.    Is there any party scene at night?

12   A.    No.

13   Q.    As a parent of a college student, do they accept

14   transfers?

15         (Laughter.)

16   Q.    I'll withdraw that question.

17         Where did you live when you attended that school?

18   A.    I lived in one of the student dormitories.

19   Q.    At any time did you reside in a building other than a

01:21 20   dormitory?

21   A.    Not in that school, no.

22   Q.    Okay.  And you said it was conducive to concentration, or

23   no distractions?

24   A.    Yes.

25   Q.    Can you elaborate on what you mean by that?

A.   Well, everyone has a very rigorous schedule from around

five in the morning up until about eleven o'clock at night.

And there's many classes.  And there's expectations of certain

classes you have to attend, and certain extra classes that you

should attend, and time in between for review.

Q.   Were foreigners allowed to attend the school?

A.   Yes, in a limited capacity.

Q.   Were non-Muslims allowed to attend the school?

A.   No.

Q.   Why not?

A.   Well, I don't think it was ever a thought that came to

their minds, that a non-Muslim would want to attend the school,

but...  It's so remote and so far away from everything, that

it's just inconceivable that a non-Muslim would go there to

study Arabic or anything else.

Q.   You told us you were at the first school for seven or

eight months.  Was that the time frame?

A.   Six or seven months.

Q.   And then you transferred to a second school?

A.   Yes.

Q.   Tell us why, please.

A.   Essentially, the main teacher of the school, Abul Hasan

al-Ma'ribi, had traveled to the UAE and other neighboring

countries on a speaking tour.  And since he had left, the

program and the lessons had diminished greatly, and there was a

1    lot of in-between time where there was nothing going on.  So a

2    group of students, most of them foreign, had decided to move on

3    and go to Dammaj -- the main school affiliated with Dar

4    al-Hadith Dammaj -- to continue their studies.

5    Q.   Was this to get a better educational experience?

6    A.   Yes.

7    Q.   And did you go to that school?

8    A.   Yes.

9    Q.   And how long did you spend at the second school?

01:23 10    A.   A little over a year.

11    Q.   Did you learn a lot?

12    A.   Yes.

13    Q.   Now, these schools are not political schools, are they?

14    A.   No.

15    Q.   These schools are not in any way associated with

16    al Qa'ida, are they?

17    A.   No.

18    Q.   These schools are not associated with Osama bin Laden, are

19    they?

01:23 20    A.   No.

21    Q.   In fact, did you learn that when you were at one of the

22    schools that Osama bin Laden had attempted to give money to the

23    school?

24    A.   Yes.

25    Q.   Could you tell the jurors that story?

1   A.   The head of the school in Dammaj, Shaykh Muqbil, had

2   actually written about it in one of his books, about how he was

3   contacted, either directly or through some other person, by

4   Osama bin Laden in, I believe, the early '90s, in which

5   Osama bin Laden had offered to provide him with a lot of money

6   in return for setting up some facilities for training, at which

7   Shaykh Muqbil refused and said, "I won't take your money.  And

8   if you give money, it has to be without any strings attached or

9   without any conditions."  And then that was that.

01:24 10   Q.   Did he use the phrase, in your memory, "This is a place

11   for learning"?

12   A.   Yes.

13   Q.   Is that a quote that I just gave from Shaykh Muqbil -- but

14   pretty close?

15   A.   Perhaps.

16   Q.   Does it sound like --

17   A.   Yes, it's consistent with his viewpoints.

18   Q.   Were these schools viewed as a recruiting tool for

19   al Qa'ida?

01:24 20   A.   No.

21   Q.   When you went back in 2004, the only reason you did not

22   return to a school in Yemen was you were not able to secure a

23   visa in a timely manner?

24   A.   Correct.

25   Q.   Either from United Arab Emirates or from Oman?

1    A.   Yes.

2    Q.   I would like to now turn to another area and talk about

3    Tarek Mehanna.  You first learned about Tarek on a web forum or

4    web posting.  Is that fair to say?

5    A.   Yes.

6    Q.   Do you remember what was the name you used on the postings

7    that you put on?

8    A.   It was on Clear Guidance forum, and my user name was Abul

9    Muthanna.

01:25 10   Q.   Could you spell that for our court reporter?

11   A.   Yes.  A-B-U-L M-U-T-H-A-N-N-A.

12   Q.   Did that name have any special significance to you?

13   A.   Well, it was the name of one of the Muslims of the second

14   generation after the companions of the prophet.

15   Q.   Okay.  And you saw that Tarek would post regularly on

16   forums --

17   A.   Yes.

18   Q.   -- such as Clear Guidance and other ones that discussed

19   Islamic-related issues.  Is that right?

01:26 20   A.   Yes.

21   Q.   Now, some people on these forums that you were on and he

22   was on might just rant political views.  Isn't that correct?

23   A.   Yes.

24   Q.   When you saw Tarek's postings, is it fair to say that he

25   often tried to bring a scholarly view to his postings?

1   A.   I mean, to be honest, I don't really recall much of his

2   postings.  I was -- you know, for certain people who post on

3   these forums are more active than others, and then there are

4   certain people that you look out for and read what they have to

5   say more than others.  And I have to say that I didn't really

6   pay a lot of attention or read with any -- I wasn't very avid

7   in reading his posts so I don't -- I can't recall one way or

8   the other.

9   Q.   Sometimes on these posts, for example, on Clear Guidance,

01:27 10   people can say things that are immature or crude or stupid.  Is

11   that fair to say?

12   A.   Absolutely.

13   Q.   And the prosecutor showed you a Clear Guidance post

14   yesterday.  Do you remember that?

15   A.   Yes.

16   Q.   And did he show you the post where the thread concerned

17   whether Colin Powell had prostate cancer?

18   A.   Yeah, I vaguely remember that.

19   Q.   And Tarek posted something and said it would have been

01:27 20   more appropriate if he had colon cancer?

21   A.   Yes, I remember this one.

22   Q.   Kind of a stupid, immature thing to say?

23   A.   Yes.

24   Q.   Would you agree?

25        Now, you mentioned that you saw a post that Tarek was on,

1    a thread that he was on, concerning voting.  Do you remember

2    that?

3    A.    Yes.

4    Q.    And there was a significant group who would post on the

5    forum who was of the belief that voting in a democratic

6    election was unIslamic, right?

7    A.    Well, I was getting the snippets, or the quotes, from

8    those postings.  The actual discussion was on a private email

9    group.

01:28 10   Q.    And the position was that if you vote in a democratic

11   society, that is the equivalent of polytheism?

12   A.    Yes.

13   Q.    Could you explain what that word means to the jurors,

14   "polytheism"?

15   A.    Essentially, it means to worship other than God.

16   Q.    And how could voting be worshipping other than God, in

17   their view?

18   A.    Well, because of the belief that -- as a Muslim there's

19   the belief that God is the only one who has the right of

01:28 20   legislation, of making things lawful and unlawful.  And for

21   that reason, if you vote to put someone in power, you're voting

22   that person in power to legislate laws, and, therefore, you are

23   appointing someone to do what is tantamount to polytheism;

24   therefore, you are contributing to that.

25   Q.    Is it fair to say that that was a Salafi-Jihadi extremist

1   view?

2   A.   Yeah, there are many factions within -- and fractures and

3   different views regarding this issue in the Salafi-Jihadi

4   community, but this was probably the most dominant view, or at

5   least the loudest view.

6   Q.   And this was a view that was being discussed on a forum,

7   correct?

8   A.   Yes.

9   Q.   And you learned that Tarek had opposed that view and

01:29 10   provided a scholarly context and references that he said showed

11   you could vote in a democratic society, right?

12   A.   Or showing that it's not tantamount to polytheism, yes.

13   Q.   He cited classical texts, as he normally did, in support

14   of his view, right?

15   A.   Yes.

16   Q.   And Abousamra actually posted on that thread a response to

17   Tarek that was ridiculing him for his view, right?

18   A.   Yes.

19   Q.   And then Tarek sent something to you and said, "Well, I

01:30 20   guess that makes me an innovator."  Do you remember that?

21   A.   Yes.

22   Q.   And remind us what a person means by saying, "Well, I

23   guess that makes me an innovator"?

24   A.   When someone says that a fellow Muslim is an innovator, it

25   falls short of calling that person an apostate, but it still

1  means that that person is headed to hell, or they're going to

2  be in trouble on the day of judgment because of their incorrect

3  beliefs.

4  Q.   This was just one instance, to your knowledge, of how

5  Tarek disputed some of the extreme views that were on these

6  forums, right?

7  A.   Yes.

8  Q.   As a result of Tarek's not supporting the extreme radical

9  views on the Tibyan website, you told us he was kicked off,

01:31 10  right?

11  A.   I'm not sure if I would used that word, but that's what

12  was expressed in the emails, yes.

13  Q.   So he had gone from being a moderator on the website to

14  now not even being able to post his opinion on the website,

15  right?

16  A.   Yes.

17  Q.   So in order to get on that website, you needed to have an

18  approved password, right?

19  A.   As far as I recall, yes.

01:31 20  Q.   And by denying Tarek an ability to use his password on

21  that site, they basically silenced him from disputing the

22  extreme views that were on those websites in around 2005-2006,

23  right?

24  A.   Yes.

25  Q.   Now, Tarek continued to post on other sites, to your

1    knowledge, didn't he?

2    A.   I believe he posted -- I think one in particular.

3    Q.   Do you remember that as late as 2008 you would read

4    postings by Tarek on other sites?

5    A.   Yes, from time to time.

6    Q.   And the FBI and the prosecutors, when they met with you,

7    asked you to describe what Tarek's postings were like.  Do you

8    remember that?

9    A.   Yes.

01:32 10   Q.   And you said he was a moderating presence on the site.  Do

11   you remember that?

12   A.   Yes.

13   Q.   Would you explain to the jurors what you mean by that

14   Tarek was a moderating presence on the site?

15   A.   Well, the site in question is frequented by a bunch of

16   hotheads, for the most part, very, you know, bad tempers and

17   very -- people who are given to using very vicious invectives

18   against people they don't agree with.  And I had noticed in

19   Tarek's posts that when those discussions would come up, that

01:33 20   he would be a moderating voice giving some nuance or clarifying

21   things, in a sense, calming the rhetoric down in those

22   discussions.

23   Q.   At any time did you see him trying to incite people?

24   A.   No; not that I recall.

25   Q.   It appears that he followed a similar evolution that you

```
 1   described in your own life, right?
 2            MR. CHAKRAVARTY:  Objection, your Honor.
 3            THE COURT:  Sustained to that.
 4   BY MR. CARNEY:
 5   Q.   When you were seeing these posts -- how old were you in
 6   2008?
 7   A.   I don't remember.  I don't keep up with my age.
 8   Q.   This is the second-to-last math question.
 9   A.   Yeah.  I'm horrible with math.  So 28 -- no, I was in my
10   30s, so...
11   Q.   And so someone five years younger would still be in his
12   20s?
13   A.   Yes.
14            MR. CARNEY:  Thank you, Mr. Pippin.
15            Your Honor, that's all I have.
16            THE COURT:  All right.
17                          REDIRECT EXAMINATION
18   BY MR. CHAKRAVARTY:
19   Q.   First things first.  Mr. Pippin, when you met with
20   Abousamra in California when he came out to visit you in 2003,
21   was he asking you to accompany him or were you asking him to
22   accompany you in an upcoming trip to Yemen?
23   A.   He was asking me.
24   Q.   And you didn't necessarily want to go with him.  Is that
25   right?
```

01:33 (line 10)
01:34 (line 20)

```
  1    A.    No.

  2    Q.    Why not?

  3    A.    We entertained the idea and discussed it, but I had

  4    business to take care of.  I had a job.  I had a contract.  I

  5    had family at the time.  I had other responsibilities.

  6    Q.    And the purpose of your trip was different, wasn't it?

  7    A.    Yes.

  8    Q.    You wanted to go to get schooling at some of the schools

  9    that you just described, right?

01:35 10    A.    Yes.

 11    Q.    You said that if you had -- by some fluke had -- if you

 12    had, in fact, traveled with him, you would have gone and

 13    introduced him to the person that you had suggested --

 14    A.    Yes.

 15    Q.    -- right?

 16         MR. CHAKRAVARTY:  Can we call up Exhibit 749, please?

 17         THE COURT:  This is the map?

 18         MR. CHAKRAVARTY:  Yes, I'm sorry.  This is in

 19    evidence.  If you would publish it.

01:35 20    BY MR. CHAKRAVARTY:

 21    Q.   Now, the person that you would have introduced him

 22    to -- you gave him two choices as to people who may have been

 23    able to facilitate his getting military training.  Is that

 24    right?

 25    A.    Yes.
```

1    Q.    The first was an Egyptian guy in Ma'rib.  Is that right?

2    A.    Yes.

3    Q.    And that's here.  I'm just circling it on the map.  Is

4    that right?

5    A.    Yes.

6    Q.    And that's someplace that you had been familiar with in

7    your prior experience in Yemen?

8    A.    Yes.

9    Q.    And you had met this Egyptian guy yourself?

01:36 10    A.    Yes.

11    Q.    Were you aware of his background as a mujahid?

12    A.    Yes.

13    Q.    And mujahid is the actual -- the singular form of

14    mujahideen.  Is that right?

15    A.    Mujahids, yes.

16    Q.    Mujahids.  Excuse me.

17         And do you know whether he was affiliated with any groups

18    that had been engaged in fighting in the past?

19    A.    Yes.

01:36 20    Q.    What group was he engaged with?

21    A.    Jama'at al-Islamiyah.

22    Q.    Is that the Army of God?

23    A.    Well, Jama'at al-Islamiyah was an Egyptian group in the

24    '70s and '80s.  Many of them had traveled to Afghanistan to

25    escape persecution, as well as volunteer for the jihad there.

```
  1   Q.   Are you aware of the fact that after al Qa'ida came into
  2   being, that it kind of combined with al Qa'ida?
  3   A.   Yes.
  4   Q.   When you recommended going to Ma'rib, did you give him any
  5   specifics as to where he could find this Egyptian man?
  6   A.   Yes.
  7   Q.   What did you tell him?
  8   A.   I told him to go to the old marketplace, the old silk, and
  9   to find a perfume shop located there ran by a very large
 10   Egyptian man.
 11   Q.   And that's somewhere that you had gone before, right?
 12   A.   Yes.
 13   Q.   And you had met the man, as well as his son.  Is that
 14   right?
 15   A.   Yes.
 16   Q.   How old was his son?
 17   A.   Well, his sons, I think they were in their early 20s.
 18   Q.   And that's where you would have gone with --
 19             MR. CARNEY:  I object, your Honor.
 20   BY MR. CHAKRAVARTY:
 21   Q.   -- Ahmad Abousamra?
 22             MR. CARNEY:  It's redirect, and he's just leading the
 23   witness all over the place.
 24             THE COURT:  The questions have been --
 25             MR. CHAKRAVARTY:  I'll rephrase it.
```

BY MR. CHAKRAVARTY:

Q.   You were asked several questions about what you would have

done had you gone with Ahmad Abousamra.  In addition to going

to Ma'rib, you said you also would have gone -- you said the

other place you would have recommended that he go to was

Abdullah al-Ahdal's school.  Is that right?

A.   Yes.

Q.   And where was that?

A.   I don't remember exactly but it was either in the city of

Mukalla or Shihr.

Q.   And that's all the way over here, right?

A.   Yes.

Q.   Now, you were asked several questions about how poor Yemen

is.  How easy is it to travel from the middle of the country

all the way to the east coast?

A.   It's fairly easy.

Q.   In terms of how long will it take?  What does it entail to

travel?

A.   I'm not sure about those distances between Mukalla and

Shihr, but when I traveled from Ma'rib to Dammaj, which is near

Nisab, this took about over a day and a half.

Q.   So is it by bus?  Is that -- by road?

A.   By, like, these off-road vehicles.

Q.   So it's a long drive, essentially?

A.   It depends on the roads.  If you take the government

```
 1   roads, they'll be faster; if you take the off-track roads,
 2   there are shortcuts.
 3   Q.   All right.  And which airport did you advise him to enter
 4   into?
 5   A.   Sayun.
 6   Q.   Is that right up here by Tarim?
 7   A.   Yes.
 8   Q.   And the other school that you had attended, the Dar
 9   al-Hadith, where did you say that was?
10   A.   The first one is in Ma'rib; the other is in Dammaj near
11   Sana.
12   Q.   That's all the way over here.  And where is Hadramawt?
13   A.   Hadramawt is the province, the eastern province there,
14   boarding --
15   Q.   All the way over here?
16   A.   Including Terim and Hajarain and these other areas as
17   well.
18   Q.   All the way over here.  That's Hadramawt, right?
19   A.   Yes.
20   Q.   So, again, if you had gone with somebody who was not going
21   for the same reason you were going, would you have gone to all
22   of these places?
23   A.   Can you repeat the question?
24   Q.   If you had traveled with Mr. Abousamra, would you have
25   gone to each of these places with him?
```

1    A.    Yes.

2    Q.    In order to find military training?

3    A.    Or to find contacts.

4    Q.    Okay.  So you would have actually accompanied him to find

5    those contacts?

6    A.    I would have traveled with him perhaps to Sahar and to

7    Mukalla, but most definitely to Ma'rib to introduce him.

8    Q.    Okay.  Because that's a contact that you were vouching for

9    him for purposes of this guy?

01:40 10    A.    Yes.

11    Q.    And you were vouching for him as someone who both knew the

12    person as well as someone who had gone through terrorist

13    training before?

14    A.    Yes.

15    Q.    Okay.  Now, describe the terrorist training that you

16    received.  What was the curriculum like?

17    A.    Well, at the time I wouldn't have described it as

18    terrorist training, but the training was basic paramilitary

19    training.

01:41 20    Q.    Okay.  And prior to receiving the physical training and

21    the arms training, did you have any theological training?

22    A.    Yes.

23    Q.    What kind of training was that?

24    A.    Reading Qur'an, how to properly pronounce the Qur'an,

25    basic theology, jurisprudence of worship, jurisprudence related

1    to jihad, things like this.

2    Q.   And that was to make you a better Muslim and kind of

3    understand the principles of jihad?

4    A.   Yes.

5    Q.   You were asked about Abdullah Azzam.  Can you describe his

6    role in modern jihadist thought?

7    A.   Well, he was a seminal figure, known for reviving jihad in

8    the 20th century.  He was a Palestinian who eventually traveled

9    to Afghanistan and volunteered his efforts there and was

01:42 10   responsible for rousing a large number of people from the Arab

11   world and beyond to go to Afghanistan to volunteer and support

12   the Afghan mujahideen.

13   Q.   And after the Soviets left Afghanistan and the Afghan

14   jihad, as it existed then, was over, did he still carry some

15   weight?

16   A.   Yes.

17   Q.   How so?

18   A.   Well, he was seen as a thalamic figure in the movement and

19   was respected far and wide by most people who subscribed to

01:42 20   jihadi thoughts.

21   Q.   Did he later collaborate with Osama bin Laden?

22   A.   I don't know the details.

23   Q.   You're familiar with a lot of his writings.  Is that fair

24   to say?

25   A.   Yes, sir.

1  Q.   You were asked several questions about online

2  communications.

3        MR. CHAKRAVARTY:  Can we go to Exhibit 420.

4  Q.   Which is, I think, the one Mr. Carney showed you.

5        This was that Tibyan Publications posting that you were

6  asked to read portions of.

7        Now, in 2005 were you on Tibyan Publications?

8  A.   Probably very early 2005.

9  Q.   All right.  Mr. Carney read some of this post to you to

01:43 10  describe that Abu Sabaayaa believed in the expulsion but not

11  the killing of Americans if they weren't engaged in combat.  Do

12  you remember that?

13  A.   Yes.

14  Q.   Did he continue to say, in contrast, "A man such as Paul

15  Johnson who was helping in the maintenance and repair of

16  American Apache helicopters, this is to anyone who has sight

17  with which they can see or a brain with which they can think, a

18  totally different story."

19        Was that in the context of who it was permissible to

01:44 20  target?

21  A.   Yes.

22  Q.   And do you know who Paul Johnson was?

23  A.   I've heard the name, but I don't know.

24        MR. CHAKRAVARTY:  Can we go to page 2, please.

25  Q.   And, again, Abu Sabaayaa makes clear that "Those who fight

1    us should be fought.  Those who fight us -- fight us -- not

2    those who carry the same nationality as those who fight us."

3        Was that your view at the time as well?

4    A.   Yes.

5            MR. CHAKRAVARTY:  Go to page 8, please.

6    Q.   He continued to say, "Actually, most of the Muslims I know

7    had no problem with his killing, they just disagreed with the

8    manner in which he was killed.  He was directly involved with

9    the American military by fixing their Apaches, so that attack

01:45 10  can clearly be justified for those searching for the truth."

11       Is that consistent with that view that we just read?

12   A.   Yes.

13   Q.   Now, did you know approximately a month after this --

14           MR. CHAKRAVARTY:  Can we bring up Exhibit 411.

15   Q.   This is on Tibyan Publications.

16       Did you know that he was introduced as a translator for

17   that website?

18   A.   No, I don't recall reading that post.

19   Q.   Okay.  So Exhibit 411.  Are you familiar with Aboo Khubayb

01:46 20  al-Muwahhid?

21   A.   I've heard the name, yes.

22   Q.   And what do you know about that person?

23   A.   I just recall him writing, posting on Tibyan.

24   Q.   Okay.  So on April 8, 2005, he said, "To everyone, let me

25   introduce you to" --

1          MR. CARNEY:  I object, your Honor.  Beyond the scope

2    of the cross-examination.

3          THE COURT:  Overruled.

4    BY MR. CHAKRAVARTY:

5    Q.    -- "Aboo Sabaayaa.  He is going to be one of our

6    translators from now on, until when Allah wills.  May Allah

7    bless everyone who helps spread the Da'wah of Islam and may he

8    assist us in accomplishing this task and keep us firm upon the

9    straight path until we meet him."

01:46 10      Now, the spelling of "Aboo Sabaayaa," is there any

11   significance to that spelling?

12   A.    It looks like it's a somewhat standard transliteration

13   used by certain segments of Salafis.

14   Q.    What segments of Salafis?

15   A.    Well, this style of transliteration was popularized by one

16   writer who decided that it would be better to write OOs and AAs

17   and EEs for the long vowels in Arabic, and it became sort of an

18   identifying mark for Salafis -- or those who -- Salafis who

19   write in this manner.

01:47 20   Q.    Okay.  What does "Aboo" mean?

21   A.    Father.

22   Q.    What does "Sabaayaa" mean?

23   A.    "Sabaayaa" is the plural of a word meaning concubine.

24   Q.    So father of concubines?

25   A.    Yes.

1    Q.   Yesterday I read some stored instant message chats with

2    you and there was the phrase "Sayf Maslool."  What does that

3    mean?

4    A.   "Sayf Maslool" means unsheathed sword.

5    Q.   With regards to your online name, you were asked whether

6    you were Abul Muthanna.  Did you use the online moniker of

7    Abu Umar as well?

8    A.   Early.  Early on.

9    Q.   So it was earlier, before you were on Clear Guidance?

01:48 10    A.   Yes.

11    Q.   What -- approximately when did you use that, at what

12    point?

13    A.   That was 2001.

14         MR. CHAKRAVARTY:  Could we go to Exhibit 414.

15    Q.   And, again, is this after that post that you were asked to

16    read portions of with Mr. Carney?

17    A.   Yes.

18    Q.   And, again, this is a message from Aboo Khubayb

19    al-Muwahhid.

01:48 20         Look at the screen for a second.  And do you recognize any

21    of these texts which were being asked to be translated?

22    A.   Yes.

23    Q.   Which ones?

24    A.   All of them but one or two.

25    Q.   Okay.  Was there a link between these threads -- these

1    books?  Excuse me.

2    A.   These books were standard literature in the Salafi-Jihadi

3    movement articulating different views regarding jihad or takfir

4    and things related to jihad.

5    Q.   And were these the theological underpinnings to any

6    movement?

7    A.   Yes.

8    Q.   What?

9    A.   Pardon?

01:49 10   Q.   To what?  To what movement?

11   A.   These books serve as the theological underpinnings to the

12   Jihadi Salafi ideology:  justifying their understanding of

13   jihad and takfir; excommunicating other people; understanding

14   leadership and understanding democracy and things like that.

15   Q.   And this last one, who is this Dr. Ayman author?

16   A.   I don't know.  I would presume Dr. Ayman Ath-Thawahiri,

17   but that would be a guess on my part.

18   Q.   You have no personal knowledge of that?  Okay.

19       You were asked some questions about whether -- first you

01:50 20  were -- your memory was refreshed with looking at something.

21   Was that ostensibly a transcript of the conversation you had

22   with us when we met with you in Finland?

23   A.   Yes.

24   Q.   And you mentioned earlier that you had seen it before.

25   Had you studied, had you read that transcript before?

1    A.    No.

2    Q.    You were just seeing it --

3    A.    I was seeing it at a distance.

4    Q.    So what you're testifying today is from your memory as to

5    what Abousamra told you -- and your memory -- online.  Is that

6    fair to say?

7    A.    Yes.

8    Q.    You don't know the accuracy of that transcript or the

9    sequence that happened there?

01:51 10   A.    My memory might be a little sharper on certain details

11   back then since I'm getting older, but I don't know.

12   Q.    There was one point where you were asked questions about

13   the name Kareem Abuzahra --

14   A.    Yes.

15         MR. CHAKRAVARTY:  Can we call up Exhibit 492.

16   Q.    -- and where you heard that name.

17         This is the proffer letter that we talked about yesterday

18   that we brought with us when we came to see you.  And this, in

19   fact, lists three individuals about whom we would be asking you

01:51 20   questions.  And is Kareem Abuzahra listed as one of those

21   people?

22   A.    Yes.

23   Q.    In addition to Ahmad Abousamra and Tarek Mehanna?

24   A.    Yes.

25   Q.    Finally, you were asked questions about this voting issue.

1    Just to clarify for the jury, was this discussion thread that

2    Mr. Carney asked you about -- did that occur on Tibyan

3    Publications or did that occur on a subgroup that somebody

4    had -- was sending you these posts?

5    A.   No, the discussion that we had was on a private email

6    group.

7    Q.   So this wasn't on the Tibyan Publications website?

8    A.   No.

9    Q.   All right.  And with regards to what you learned about the

01:52 10   defendant no longer using Tibyan Publications, how did you

11   learn that?

12   A.   Through the same email group.

13   Q.   Okay.  So there were a few people who were communicating

14   to you about that?

15   A.   Yes.

16   Q.   Did you discuss jihad in that group?

17   A.   I don't remember.

18   Q.   So it was just this voting issue, right?

19   A.   As far as I remember.

01:53 20   Q.   And in that voting discussion, Tarek Mehanna had no

21   difficulty in disagreeing with --

22            MR. CARNEY:  I object.

23   Q.   -- Ahmad Abousamra?

24            THE COURT:  Sustained to the form of the question.

25            MR. CARNEY:  Yes, your Honor.  That's what I'm trying

     1    to say.

     2    BY MR. CHAKRAVARTY:

     3    Q.   You were asked about a specific post that Ahmad Abousamra

     4    had said criticizing Tarek Mehanna on.  Do you remember that?

     5    A.   Yes.

     6    Q.   What was Tarek Mehanna's response to that?

     7    A.   I don't remember exactly what he said.

     8    Q.   It doesn't have to be verbatim but --

     9    A.   He basically articulated some of the stuff that we were

01:53 10   talking about in the private email group.

    11    Q.   And he posted that?

    12    A.   I don't know if he posted it verbatim or he discussed it

    13    in his own words.

    14    Q.   Okay.  But he communicated that back to Ahmad Abousamra?

    15    A.   Yes.

    16    Q.   Was there any -- was he a shrinking violet in that?

    17    A.   Pardon?

    18    Q.   Did he mince his words in terms of his response to that?

    19    A.   Ahmad Abousamra?

01:54 20   Q.   No, Tarek Mehanna.

    21    A.   I'd have to read it again to see.  I don't know.

    22    Q.   But in any event, he expressed to Ahmad Abousamra that he

    23    disagreed with him --

    24    A.   Yes.

    25    Q.   -- on that issue of voting?

```
 1   A.   Correct.
 2            MR. CHAKRAVARTY:  That's all I have, your Honor.
 3            MR. CARNEY:  Very briefly?  Thank you.
 4                        RECROSS-EXAMINATION
 5   BY MR. CARNEY:
 6   Q.   The prosecutor brought up the fact that you were
 7   interviewed in Helsinki.  Is that right?
 8   A.   Yes.
 9   Q.   And you were interviewed on two occasions, or two -- once
10   in 2005 and once in 2008, right?
11   A.   Yes.
12   Q.   Tell us a little more about the 2005 interview, what the
13   circumstances were.
14            MR. CHAKRAVARTY:  Beyond the scope, your Honor.
15            THE COURT:  Sustained.
16            MR. CARNEY:  May I approach, your Honor?
17            THE COURT:  Yes.  Approach him or me?
18            MR. CARNEY:  You, your Honor.
19            THE COURT:  Thank you.
20            (Discussion at sidebar and out of the hearing of the
21   jury:)
22            MR. CARNEY:  I had a note in my cross that said "Speak
23   to judge," and it was about that issue that we had decided.  I
24   would like to ask the witness just a couple of questions about
25   that 2005, but I will forgo any discussion of the polygraph.
```

```
 1   It will be very brief.
 2          MR. CHAKRAVARTY:  I still think it's beyond the scope,
 3   your Honor.
 4          MR. CARNEY:  Well, I had thought I was going to come
 5   up and talk to you about it at the break but --
 6          THE COURT:  If you avoid the polygraph issue.
 7          MR. CARNEY:  All right.  It will be brief.  Thank you.
 8          (In open court:)
 9   BY MR. CARNEY:
10   Q.   Tell us briefly about the interview process in 2005.
11   Where did it occur?  How did it occur?
12   A.   Yes.  In October of 2005 I received a call from the FBI
13   when I was there in Helsinki asking about participating in an
14   interview, to which I agreed, and it was held in the American
15   Embassy, so then I went there.  And it took place over two
16   days.  In that interview --
17   Q.   Oh --
18          MR. CARNEY:  May I lead a little?
19          THE COURT:  You may.  It's cross anyway, so go ahead.
20   BY MR. CARNEY:
21   Q.   Please just answer my questions directly.  You were
22   interviewed for about eight hours the first day?
23   A.   Yes.
24   Q.   And about eight hours the second day?
25   A.   Yes.
```

         1    Q.   During these interviews, were you in a small room --

         2    A.   Yes.

         3    Q.   -- for these?

         4         Did you feel that you would be able to leave?

         5    A.   That I wouldn't be able to leave?

         6    Q.   That you were free to leave if you wanted to.

         7    A.   No, I wasn't free to leave.

         8    Q.   Was there someone standing outside the door?

         9    A.   Yes.

01:57   10    Q.   Is it fair to say that the people who interviewed you

        11    accused you of being a driver for the 9/11 hijackers?

        12    A.   I don't know if it was an accusation, but at the end of

        13    the interview on Day 1 they said, "Well, someone mentioned this

        14    to us and we had to check it out."

        15    Q.   Okay.  Did they also accuse you of being in Afghanistan?

        16    A.   Yes.

        17    Q.   At some point did the FBI say to you something regarding

        18    if you didn't work for them?

        19    A.   Yeah, they made allusions to that.

01:57   20    Q.   Did they make allusions to the no-fly zone?

        21    A.   No-fly list, yes.

        22    Q.   No-fly list?  What did they say to you?

        23         MR. CHAKRAVARTY:  Objection, your Honor.

        24         THE COURT:  Sustained.

        25    BY MR. CARNEY:

```
 1   Q.   Was there a specific statement that an FBI agent made to

 2   you about what would happen if you did not work for them?

 3           MR. CHAKRAVARTY:  Objection, your Honor.

 4           THE COURT:  Sustained.

 5           MR. CARNEY:  May I make an offer of proof?

 6           THE COURT:  At the recess you may.

 7   BY MR. CARNEY:

 8   Q.   Did the FBI make a threat to you?

 9   A.   Yes.

10   Q.   Would you tell the jurors what the threat was?

11   A.   Basically -- well, they didn't go into any detail, but

12   just to make my life difficult.

13   Q.   Did they use the word "difficult" or did they use the

14   phrase "living hell"?

15           MR. CHAKRAVARTY:  Objection, your Honor.

16           THE COURT:  You may answer it.

17   BY MR. CARNEY:

18   Q.   Did they say, "We can make your life a living hell or you

19   can work for us"?

20   A.   I don't remember exactly.

21           MR. CARNEY:  May I approach the witness?

22           THE COURT:  Go ahead.

23   BY MR. CARNEY:

24   Q.   Would you read where I've just pointed?  Just to yourself.

25   A.   Is this a transcript?
```

1  Q.   No.  I'm just asking you if that refreshes your

2  recollection of the exact words they used.

3  A.   I don't remember the exact words.  It was a very stressful

4  situation.  I don't remember the exact words.

5  Q.   Was the phrase "no-fly list" brought up?

6          MR. CHAKRAVARTY:  Objection, your Honor.

7          THE COURT:  Overruled.

8          You may answer.

9          THE WITNESS:  Yes.

02:00 10  BY MR. CARNEY:

11  Q.   What is the no-fly list?

12  A.   Essentially, it's a list that prevents people from flying

13  to the United States.

14  Q.   Did the FBI bring that up with you?

15  A.   Yes.

16  Q.   Did you have any relatives in the United States at the

17  time?

18          MR. CHAKRAVARTY:  Objection, your Honor.

19          THE COURT:  Yeah, sustained.  I think it's enough.

02:00 20          MR. CARNEY:  Let me get my notes, please.

21  BY MR. CARNEY:

22  Q.   The prosecutor showed you a list of documents in his

23  redirect examination of items that were in an email to Tarek

24  about whether he'd be willing to translate.  Do you remember

25  that list?

```
 1   A.   Yes.

 2   Q.   Are you aware that Tarek did not translate a single one of

 3   those items?

 4   A.   No, I'm only aware of his translating one thing.

 5   Q.   On that list or a separate thing?

 6   A.   Something separate.

 7   Q.   But nothing on that list that he was asked that was the

 8   extreme Salafi-Jihadi list, right?

 9   A.   Right.

10        MR. CARNEY:  Thank you.  That's all I have, your

11   Honor.

12        MR. CHAKRAVARTY:  Just briefly?

13                    REDIRECT EXAMINATION

14   BY MR. CHAKRAVARTY:

15   Q.   First to clarify this 2005 interview issue.  When we came

16   to visit you in 2008, did we threaten you at all?

17   A.   No.

18   Q.   And just to clarify who was present, it was myself,

19   Mr. Auerhahn and Agent Williams and Agent Daly, correct?

20   A.   Yes.

21   Q.   And was that a relaxed setting, that conversation?

22   A.   It was.

23   Q.   The fact that you had that prior bad experience with the

24   FBI, did that change the truthfulness of your testimony?

25   A.   Pardon?
```

```
 1   Q.   The fact that you had that bad experience back in 2005

 2   with the FBI, did it change what -- how you answered those

 3   questions to us?

 4   A.   Well, I was completely forthcoming on both occasions, just

 5   the first occasion I couldn't retain counsel, I couldn't leave,

 6   so I was just trying to wait things out to get out of there;

 7   whereas the second occasion I had signed the document, but I

 8   was just as forthcoming.

 9   Q.   Right.  And the circumstances of that 2005 when you're in

10   Finland and you're under Finnish law, right?

11   A.   Yes.

12   Q.   And you didn't know all the information that the FBI had

13   that they were asking you questions about?

14   A.   Correct.

15   Q.   With regards to the last issue, this translation issue,

16   were you aware that the defendant translated "39 Ways to Serve

17   and Participate in Jihad"?

18   A.   Yes.

19   Q.   Were you also aware that he translated al Qa'ida videos

20   for Tibyan Publications?

21              MR. CARNEY:  I object, your Honor.

22              THE COURT:  Sustained.

23              MR. CARNEY:  I'd move to strike the question or ask

24   for an instruction if --

25              THE COURT:  Well, questions are not evidence.  I'll
```

02:02 10

02:02 20

        1   tell the jury that.  And the answer is not permitted.

        2           MR. CARNEY:  Thank you.

        3   BY MR. CHAKRAVARTY:

        4   Q.   The conversation you had with Ahmad Abousamra about

        5   schools when he came out to visit you, was the reason for that

        6   conversation to provide a cover story?

        7   A.   Yes.

        8   Q.   It wasn't so that he or his companions would go to a

        9   school.  Is that fair?

02:03  10   A.   Correct.

       11           MR. CHAKRAVARTY:  That's all I have, your Honor.

       12           MR. CARNEY:  Nothing further.

       13           THE COURT:  Thank you, Mr. Pippin.  You're excused.

       14   You may step down.

       15           We'll take the morning recess at this point.

       16           THE CLERK:  All rise for the Court and jury.  The

       17   Court will take the morning recess.

       18           (The Court and jury exit the courtroom and there is a

       19   recess in the proceedings at 11:16 a.m.)

02:28  20           (After recess:)

       21           MR. AUERHAHN:  Ready to proceed, your Honor?

       22           THE COURT:  Yes.

       23           MR. AUERHAHN:  The United States calls Bradley Davis.

       24           BRADLEY DAVIS, Sworn

       25           THE CLERK:  State your name and spell your last name

 1    for the record.

 2           THE WITNESS:  Bradley Davis, D-a-v-i-s.

 3    DIRECT EXAMINATION BY MR. AUERHAHN:

 4    Q.   Good morning, sir.

 5    A.   Good morning.

 6    Q.   How are you employed?

 7    A.   I'm employed as a special agent of the FBI.

 8    Q.   What's your current assignment?

 9    A.   My current assignment is a supervisory special agent of

02:28 10    the Joint Terrorism Task Force in Boston.  I supervise a

11    Domestic Terrorism Squad.

12    Q.   How long have you been supervisor of the Domestic

13    Terrorism Squad?

14    A.   Approximately two years.

15    Q.   Where were you assigned before that?

16    A.   I was assigned on an International Terrorism Squad on the

17    JTTF in Boston.

18    Q.   JTTF is Joint Terrorism Task Force?

19    A.   Correct.

02:29 20    Q.   Just in very brief outline, what is the Joint Terrorism

21    Task Force?

22    A.   Joint Terrorism Task Force is a collection of state,

23    federal, and local agencies, mostly law enforcement agencies,

24    or intelligence agencies, whose business it is to conduct

25    investigations into terrorism matters.

```
       1   Q.   And in 2006, were you on that particular squad?

       2   A.   I was, yes.

       3   Q.   In approximately -- on approximately August 23, 2006, did

       4   you have occasion to conduct an interview in connection with

       5   the international terrorism investigation that you were

       6   involved in?

       7   A.   I did, yes.

       8   Q.   Who did you seek to interview on that date?

       9   A.   Kareem Abuzahra.

02:29 10        MR. AUERHAHN:  Can we bring up Exhibit 757, which I

      11   believe is into evidence already.

      12   Q.   Are those photographs of the individual you interviewed on

      13   August 23, 2006?

      14   A.   They are.

      15   Q.   Where did you first encounter Mr. Abuzahra on that day?

      16   A.   He was at his parents' home in Wakefield.  He was out in

      17   front of the house, in the driveway, changing the oil in his

      18   truck.

      19   Q.   Did you approach him?

02:30 20   A.   We did.

      21   Q.   And did you identify yourself?

      22   A.   Yes.  Myself and Special Agent Chris Gianakura, also from

      23   the Terrorism Task Force, introduced ourselves to him at that

      24   time.

      25   Q.   What, if anything, did you tell him at that time?
```

1    A.   We indicated we wanted to talk -- discuss and talk to him

2    about some international travel he had had in the past.

3    Q.   At that time, did you identify the specific international

4    travel or just generally international travel?

5    A.   At the time we approached him in his parents' driveway, we

6    didn't.  It was just a general request.  And he indicated to us

7    that he would talk to us, but he preferred that he clean up

8    after changing the oil of his vehicle and meet him later.

9    Q.   Meet him later where?

02:31 10   A.   At his home in Lynnfield.

11   Q.   Sometime later, did you go to his home?

12   A.   We did.  About an hour or so after that meeting with him

13   at his parents' house, we saw him at his residence.

14   Q.   When you approached the house, who met you at the door?

15   A.   He did.

16   Q.   Did you have any conversation with him before you entered

17   his home?

18   A.   Yeah.  He had concerns that by him allowing us to enter

19   his home and conduct an interview of him in his home, he also

02:31 20   gave us privilege to conduct a search of his home.  We

21   indicated to him that that wasn't the case.  We had no

22   intentions, nor authority, to do that just by him inviting us

23   into his home.  So we -- again, trying to allay those fears for

24   him, we indicated we could interview him outside of his house

25   if he desired that.  But he invited us in, and we conducted the

1    interview inside his house.

2    Q.   Did you indicate to him in any way that he was obligated

3    to answer your questions?

4    A.   No.  It was a voluntary interview.

5    Q.   Did you tell him that?

6    A.   Yes.

7    Q.   Can you describe the interview, as best you can recall it,

8    what you said and his responses?

9    A.   Yeah.  We initiated it by trying to discuss some

02:32 10   biographical information about himself.  He discussed how he

11   was now married with two children, and he told us of his

12   parents and his siblings, two brothers.  And he was currently a

13   student at the University of Massachusetts, in the Lowell

14   campus.

15   Q.   Did he give some personal information about himself --

16   A.   That --

17   Q.   -- besides what you've just said?

18   A.   He indicated that he was an individual who -- as part of

19   the ongoing part of the interview -- I don't know if it was at

02:33 20   the outset of the interview, but he indicated he was an

21   individual who tended to move from one thing to the next during

22   his life but that -- I think that was about it.

23   Q.   Did he indicate any change with reference to becoming a

24   better Muslim at some point?

25   A.   Yes.  I mean, he indicated to us that prior to 2001 -- or

1    prior to 2004, he attended a college in New York in about 1997,

2    and he was a partier at that point in time.  He smoked

3    marijuana and so forth.  So he dropped out of that school and

4    then enrolled in University of Massachusetts after leaving New

5    York.  But sometime after 2001 and before 2004, he tried to --

6    wanted to improve his Islamic standing and become more

7    scholarly in Islamic matters.  So he ceased smoking marijuana

8    and partying.

9    Q.    Did he describe to you some of his international travels?

02:34 10   A.    Yeah.  Again, we generally asked him about international

11   travel, and he retrieved his passport for reference for both

12   himself and for us so he could recall what his travel had been.

13        As I remember, he had traveled in the year 2000 to

14   Amsterdam.  As part of his partying years, he wanted to have

15   fun.  He traveled in Amsterdam.  Then in 2001 he traveled to

16   Jordan -- in and out of Jordan, once to get engaged and then

17   once to be married to his current wife, at which time he stayed

18   in Jordan into 2002.

19        I believe it was March of 2002 or so, he traveled to Doha,

02:34 20   Qatar, for employment in the computer -- I guess computer

21   programming industry.  He stayed there for a brief period of

22   time, was unsatisfied with that job, returned to Jordan again

23   to work in the computer industry.  And then sometime in the

24   fall of 2002, he returned to the United States.

25   Q.    Now, at some point, did more detailed questions focus on a

1  particular trip in 2004?

2  A.   Yes.  We asked him more information -- if he could provide

3  more information regarding a trip that he took in February of

4  2004.

5  Q.   Can you tell us what you asked him and what he said about

6  that particular trip?

7  A.   Yeah.  We basically said we'd like to know the details of

8  his trip in 2004.  We were aware that he had made a trip to

9  Yemen or overseas into the Middle East.  And he basically said

02:35 10  that, yes, in 2004, he and a couple friends, who he did not

11  name, planned a trip into Yemen.  As he recalled it, that it

12  was a trip for him -- for them to attend Islamic religious

13  schools in Yemen and that one of the friends that he wouldn't

14  name did most of the research and planning from internet

15  searches and so forth.

16  Q.   Did he identify any particular city in Yemen that was the

17  intended destination?

18  A.   Yeah.  He said that the intended destination was Sayoun,

19  Yemen.

02:36 20  Q.   Sayoun?

21  A.   Sayoun.

22  Q.   Did he indicate how long they had first intended to stay

23  in Yemen?

24  A.   Yeah.  He indicated that they had planned to stay in Yemen

25  for approximately a month in search of a school to attend, and

then after that month and, you know, getting the appropriate

information together of which school they wanted to attend,

they would return to the United States to process paperwork and

so forth so that they could attend that school and then at some

time later return to Yemen to attend school for about a year.

Q.   By the way, when you were interviewing Mr. Abuzahra, was

anyone else present during any part of the interview?

A.   Yeah.  The initial stages of the interview, his mother was

present in the room.

Q.   Now, you indicated that one of his companions did some

research about the school?

A.   Correct.

Q.   What did he say about that?

A.   That most of the research conducted was via the internet

and that they chose a school in Yemen because that Yemeni

schools, apparently, according to Abuzahra, provided more --

flexibility of curriculum.  They accepted foreigners more

easily into the schools there and that they only required a

short -- a shorter-term duration at the school than other

countries might offer.

Q.   Did he indicate whether or not he made it to Yemen?

A.   He did.  He did indicate that to us.  He did not make it

to Yemen.  When they left Boston, they first landed in the

United Arab Emirates.  Upon arriving in the United Arab

Emirates, Abuzahra indicated to us that he received information

1    from his family that his father was sick or ill, possibly with

2    some heart problem, and, therefore, he returned immediately to

3    the States.  He didn't go any further than the United Arab

4    Emirates.

5    Q.   Did he say what happened to his two traveling companions?

6    A.   He indicated that they continued on to Yemen.  I think he

7    said that he didn't believe, though, that they had made it to a

8    school there, to his knowledge.

9    Q.   Did he describe his relationship with these two traveling

02:38 10   companions after he returned?

11   A.   Yes.  He said that after he returned, Abuzahra returned,

12   to the United States, he lost interest in becoming an Islamic

13   scholar and so forth.  He had a full-time job.  He had a

14   family.  He was attending school still and that his two friends

15   were more -- they observed the religion more strictly than he

16   did.  And so it made it difficult for him to associate socially

17   with them because of those reasons.  So he then no longer

18   really associated with them after returning to the United

19   States.

02:39 20   Q.   Did he identify his two traveling companions?

21   A.   He did not.

22   Q.   Now, in connection with this investigation, did you

23   conduct another series of interviews in December of 2006?

24   A.   Yes.

25   Q.   Focusing your attention specifically on December 12, 2006,

1    do you recall going somewhere in that afternoon?

2    A.   Yes.  On December 12, 2006, myself and Task Force Officer

3    Thomas Daly from the Joint Terrorism Task Force went to the

4    University of Massachusetts Boston campus to interview Ahmad

5    Abousamra.

6              MR. AUERHAHN:  Can we pull up Exhibit 741, please.

7    Q.   Are these photographs of Ahmad Abousamra who you

8    interviewed on December 12, 2006?

9    A.   Yes, they are.

02:40 10   Q.   Which one better depicts what he looked like when you

11   interviewed him?

12   A.   The photograph in the top right corner with less beard.

13   Q.   You said you went to UMass Boston to interview him?

14   A.   Yes, that's correct.

15   Q.   How did you come in contact with him at that location on

16   that date?

17   A.   We knew his routine at school, when he had classes and

18   when he didn't and that he would typically, during certain

19   parts of the day, go to the cafeteria area of the campus.  So

02:40 20   we enlisted the assistance of the University of Massachusetts

21   Police Department there.  One of the officers assisted us.

22   And, you know, keep kind of a lower profile, we indicated that

23   we'd like the police officer to go approach Mr. Abousamra while

24   in the cafeteria and indicate to him that there were people who

25   would like to talk to him.  And then the police officer then --

1    he complied and came with the police officer who then brought

2    Mr. Abousamra up to an empty cafeteria where the task force

3    officer and myself were seated.  It was an empty cafeteria, and

4    he sat down and we conducted the interview.

5    Q.   Was there any other FBI agent involved in this process of

6    bringing him to the cafeteria where you were -- where the

7    interview was conducted?

8    A.   Yes.  It was Chris Gianakura.  After Mr. Abousamra was

9    escorted from the cafeteria area to another location, Agent

02:41 10    Gianakura then meant with the officer and Abousamra, and then

11    Agent Gianakura escorted him up to where we were in the

12    cafeteria.

13    Q.   Did you identify yourselves, you and Task Force Officer

14    Daly to Mr. Abousamra?

15    A.   Yes, we did.

16    Q.   How did you do so?

17    A.   We introduced ourselves, indicated to him similarly as we

18    had to Mr. Abuzahra, that we were interested in discussing with

19    him some previous foreign travel that he had conducted.  You

02:42 20    know, we advised him he wasn't being detained for any reason

21    and that any interview he conducted with us was totally

22    voluntary on his part but that when he spoke to us he should be

23    truthful in responding to our questions.

24    Q.   And you identified yourselves as with the JTTF of the FBI?

25    A.   Yes.

```
 1   Q.    Now, did you ask him specifically about a trip to Yemen in

 2   2004?

 3   A.    Yes, we did.  He had indicated that in 2004 he had had a

 4   divorce.  He was recently divorced and that due to the divorce

 5   and I guess a depression, or whatever, that he had felt --

 6   because of that, he decided he needed to -- he wanted to leave

 7   the country and attend an Arabic language school overseas.

 8   Q.    Did he indicate whether or not he was working before he

 9   left?

10   A.    He said that he had had a job, but he quit the job before

11   leaving.

12   Q.    What about talking to his family before he went, did he

13   say anything about that?

14   A.    He said that he had given last-minute notification to his

15   family that he was going overseas.  We also asked him how he

16   paid for the trip, and he couldn't recall how he had paid for

17   the trip.

18   Q.    Was there any conversation about why specifically Yemen as

19   opposed to other places?

20   A.    Mr. Abousamra indicated that Yemen was, again, I believe,

21   more easily attained than other -- than Islamic schools or

22   Arabic language schools in other Middle Eastern countries.

23   Q.    Did he give you the name of any schools which he had

24   intended to attend in Yemen?

25   A.    Yeah.  Initially, he couldn't remember, but then he came
```

1    up with the name.  The Dar al-Mustafa School in Mukalla, Yemen,

2    is what he told us.

3    Q.   Did you ask him whether or not there were any

4    prearrangements made with anyone before he went to Yemen?

5    A.   We did.  We asked him if he had and if he knew anybody in

6    Yemen or anybody else that assisted him in seeking a school in

7    Yemen.  He said, no, he did not.

8    Q.   Now, did he describe to you any of his experiences while

9    in Yemen?

02:44 10   A.   Yeah, I mean, very briefly.  He said that they went to the

11   school and found that Yemen basically was sort of a dirty, poor

12   place, disgusting place, and that it wasn't all he had expected

13   in Yemen or to encounter in Yemen to attend the school there.

14   Q.   Did he actually attend the school, according to him?

15   A.   According to him, he did not.

16   Q.   Did he tell you what he did next after spending some time

17   in Yemen?

18   A.   Yes.  After not finding what he was looking for -- what

19   they were -- he was looking for in Yemen and, again, because of

02:45 20   his, I guess, depression over his divorce, he wanted to remain

21   in the Middle East.  So he decided to leave Yemen and fly to

22   Jordan and seek out a college in Jordan.  He didn't give any

23   more specifics on what college or what type of college, as I

24   recall, and also to try and find a Syrian consulate there to

25   obtain waivers -- he was a dual citizen for Syrian/U.S.

citizen.  And he believed he needed a waiver because Syrian

citizens serve in the military.  So before entering Syria, he

wanted to get this waiver form.  They instructed him that he

needed to go return to the United States to do any of that.

So not finding a college in Jordan, as he said he hadn't,

he decided then, from Jordan, to go to Iraq.  He indicated that

he entered Iraq through some overland border point, border

crossing point.  And his purpose for going to Iraq, as he

stated to us, was to maybe volunteer as an Arabic-English

translator in Iraq.  But apparently he was unsuccessful at that

as well.

Then he claimed he caught a stomach virus while he was in

Iraq, spent some time in a hospital there.  And then following

that, he entered into Syria.

Q.   Did you ask him any other questions during this interview

in December 2006?

A.   Yes.  The last question we asked him, after he sort of

discussed his 2004 travel to Yemen and throughout those

countries, was, as an adult, had he traveled to any other

Middle Eastern countries that he had yet to indicate to us.

And at that point in the interview, he said that he didn't want

to answer any further questions and that he'd prefer to have an

attorney present if we were to question him any further.

Q.   At some point around this time of the interview, did he

receive a phone call?

A.   Yeah, he did.   He received a phone call.   And from hearing the one-sided conversation, it was his father calling him.   And he was -- really very shortly after, he said he didn't want to answer any further questions.

Q.   Did you hear at least his part of the conversation?   Did he indicate something to his father?

A.   Yeah.   He told his father that he was here with some very nice men from the FBI.   I don't recall much else from the conversation.

Q.   Now, in your description of this particular interview, you didn't mention whether he mentioned that he traveled to Yemen with anyone else.   Did he?

A.   He didn't.

Q.   Okay.   Did you show him any photographs or ask him any further questions at this point?

A.   At the point where he said he didn't want to answer any further questions, we didn't ask him any further questions. However, what we did do is we showed him a photograph of Kareem Abuzahra and of Tarek Mehanna and just said -- basically indicated to him that this matter wasn't ending here.   We would continue to pursue whatever investigation was required.   And then we gave him some brief explanation as to what -- the processes of a federal grand jury that might be engaged to solicit any other information from him.   And at that point, the interview -- or the meeting was over with him.

1    Q.    Do you remember approximately what time that was?

2    A.    I think it was -- it was evening, late afternoon, 4 -- it

3    was after 4 p.m.  I don't know, 4:30 or something like that,

4    p.m.

5              MR. AUERHAHN:  Your Honor, at this time we would like

6    to play Exhibit 321.  We do have transcripts.  And rather than

7    scroll through the transcript on the screen, we have hard

8    copies of the transcript, if I could ask Mr. Lyness to

9    distribute them.

02:49 10              MS. BASSIL:  No objection, your Honor.  I've seen

11   them.

12              THE COURT:  This is a recorded conversation; is that

13   what it is?

14              MR. AUERHAHN:  Yes.

15              THE COURT:  In English, I take it?

16              MR. AUERHAHN:  Yes.

17              MS. BASSIL:  Can I ask for the date?

18              MR. AUERHAHN:  There will be two from December 12,

19   2006.  The first one, at 17:02 or, for Ms. Bassil, 5:02 p.m.

02:49 20   The second one is December 12th at 9:02 p.m.

21              THE COURT:  These are in English?

22              MR. AUERHAHN:  Well, where there might be a few words

23   in Arabic, they're translated.  Most of the telephone call is

24   in English.

25              THE COURT:  The usual rule about transcripts will

1    apply, or are the transcripts themselves evidence as well?

2         MR. AUERHAHN:  There is a minimal amount of Arabic in

3    most of them.  The third one we'll play is mostly Arabic.

4         THE COURT:  I want to indicate for the record what the

5    exhibits are.

6         MS. BASSIL:  I would object to the transcripts going

7    on.  I know for sure on this transcript, the Arabic is mostly

8    sort of greetings.  It's not significant Arabic as to the

9    conversation.

02:50 10        MR. AUERHAHN:  Your Honor, these were all

11   authenticated by the translators when they testified.  Perhaps

12   after -- you can rule on whether they're just an aid for the

13   jury or in evidence after you hear the tape and decide whether

14   or not they need the transcript.

15        THE COURT:  All right.  Could we have, for the record,

16   what the exhibit numbers are that are the transcripts?

17        MR. AUERHAHN:  Yes, your Honor.  The first tape we'll

18   play -- the tape is Exhibit 321.  The transcript is 322.  And

19   then the second one will be, tape is 317; the exhibit is 318.

02:51 20        THE COURT:  Just so the jurors understand what's going

21   to happen, I guess, one exhibit, which is an audio recording,

22   will be played for you, and you'll listen to it.  A transcript

23   has been prepared of the audio recording, which you have as an

24   aid to your understanding of what you're listening to.

25        MR. AUERHAHN:  If everyone is ready, we can play the

1    first, which is, again, Exhibit 321, please.

2    (Recording played.)

3    Q.   Sir, do you recognize the voices of the two people on this

4    particular conversation?

5    A.   Yes, I do.

6    Q.   As whom?

7    A.   Ahmad Abousamra and Tarek Mehanna.

8    Q.   Identified as "TM" -- Ahmad Abousamra is "AA" and "TM" is

9    Tarek Mehanna?

02:57 10   A.   Correct.

11        MR. AUERHAHN:  Your Honor, if we could move on to the

12   transcript.  The tape of the conversation is Exhibit 317.  The

13   transcript is 318.  This is at 9:02 p.m.

14   (Recording played.)

15   Q.   Now, sir, I want to draw your attention to December 16 of

16   2006, just a few days later.  Did you conduct another interview

17   in connection with this terrorism investigation you were

18   conducting?

19   A.   Yes, we did.  It was, again, myself and Task Force Officer

03:07 20   Daly.

21   Q.   Where did this interview take place?

22   A.   The interview took place at a Walgreens, a place of

23   employment of Mr. Mehanna.

24   Q.   So you were there to interview Tarek Mehanna?

25   A.   Yes.

1    Q.   Did you see him there at the Walgreens that day?

2    A.   We did.

3    Q.   Is he in the courtroom today?

4    A.   Yes, he is.

5    Q.   Can you identify him for the record, please?

6    A.   Yes.  He's sitting at the defendant's table.

7         MR. AUERHAHN:  May the record so reflect?  Thank you.

8    Q.   When you approached Mr. Mehanna, again, where did you say

9    the interview took place specifically?

03:07 10  A.   It was in a Walgreens where he was employed or working on

11   an internship or something.  And when myself and the task force

12   officer went into the Walgreens, we asked for the manager and

13   said that we would like to talk to Mr. Mehanna about something.

14   He wasn't in trouble.  We just needed to see if he could assist

15   us in something we were looking into.  He directed -- and we

16   asked for a location that was, you know, out of the way.  He

17   directed us to the break -- the employee break room in the back

18   of the Walgreens.  And so we went into the break room, and then

19   I guess he went and got Mr. Mehanna, and Mr. Mehanna came into

03:08 20  the room.

21   Q.   Was it just the three of you in the room during the

22   interview?

23   A.   Yes.

24   Q.   Did you again identify yourselves --

25   A.   Yes, we did.

1    Q.    -- to Mr. Mehanna?

2    A.    Yes.

3    Q.    How did you identify yourselves?

4    A.    Again, we just basically said we were members of the FBI

5    Joint Terrorism Task Force and we had some questions regarding

6    his international travel.

7    Q.    What happened next?

8    A.    We -- I guess we began the interview by showing him a

9    photograph of Kareem Abuzahra, the one that we've already seen

03:09 10   here, and asked him if he could identify that individual.  And

11   he positively identified the photograph as Kareem Abuzahra.  He

12   indicated that the Mehanna family and the Abuzahra family had

13   known each other for 10 or 12 years or so and that they saw

14   each other off and on during that period of time.

15   Q.    Did he identify Mr. Abuzahra as a friend?

16   A.    Yes, he did.

17   Q.    Now, did you ask him about any specific travel with Mr.

18   Abuzahra and anyone else in February of 2004?

19   A.    Yeah.  We then asked about a trip in February of 2004.

03:09 20   Mr. Mehanna indicated to us that himself, Abuzahra, and

21   Abousamra all had planned a trip to Yemen to seek an Arabic

22   language school or Islamic religious schools and that they

23   proceeded from Boston to the UAE but that Kareem Abuzahra, once

24   arriving in the UAE, was notified that his father was ill or

25   had a heart condition and that Mr. Abuzahra did not continue on

1  to Yemen with he and Mr. Abousamra.

2  Q.   You started by saying that he said that he and Mr.

3  Abuzahra and Mr. Abousamra planned a trip to Yemen together?

4  A.   Correct.

5  Q.   Did he indicate whether or not they were all going for the

6  same purpose?

7  A.   Yes.  It was the purpose of finding an Arabic language

8  school and/or Islamic religious schools.

9  Q.   All three men?

03:10 10  A.   All three of them, yeah.

11  Q.   You started saying that Mr. Abuzahra cut his trip short?

12  A.   Correct.

13  Q.   Did Mr. Mehanna indicate who or how the trip was paid for?

14  A.   Yes.  He indicated that Mr. Abuzahra paid for the airline

15  tickets for all three of them to travel over to Yemen and that

16  Mr. Mehanna and Mr. Abousamra then refunded their portion of

17  the airline tickets once they returned -- to Mr. Abuzahra once

18  they returned to the United States.

19  Q.   Did you discuss how they got to the airport the day they

03:11 20  left for Yemen together?

21  A.   Yeah.  We asked him how they went to the airport.  Mr.

22  Mehanna indicated that they were taken to the airport by a

23  friend, but he couldn't recall who the friend was who took them

24  to the airport.

25  Q.   Did he indicate any involvement or lack thereof of his

1  parents in this particular trip?

2  A.   Yeah.   They weren't involved.   I think he said both he and

3  Abuzahra notified their parents right at the last minute before

4  they traveled overseas.

5  Q.   Now, you indicated that Mr. Abuzahra left them early, that

6  is, the two traveling companions?

7  A.   Correct.

8  Q.   Did you show Mr. Mehanna any additional photographs?

9  A.   Yes.   Then we showed Mr. Mehanna a photograph of Ahmad

03:12 10  Abousamra, which he positively identified and again stated that

11  the Mehanna family and the Abousamra family had been friendly

12  for about the same amount of time, 10 or 12 years or so.   They

13  were friends.

14  Q.   Did he indicate anything about Mr. Abousamra personally

15  that led to him wanting to take this trip?

16  A.   Yeah.   He relayed that Abousamra had recently been

17  divorced and because of the divorce and depression that he

18  wanted to travel overseas and attend schools over in Yemen.

19  Q.   Was there any conversation about why they specifically

03:12 20  chose Yemen as opposed to someplace else?

21  A.   Well, he had indicated, I think, that they taught classic

22  Arabic in Yemen, and that was one of the reasons that they

23  selected Yemen.

24  Q.   Now, did he give you any specific information about where

25  in Yemen he went during the time period that he actually was in

1 Yemen?

2 A. Yeah, fairly detailed information.  I mean, he indicated

3 that they -- after leaving the UAE, he and Abousamra flew into

4 Sayoun, Yemen, or Yemen, from the UAE, then took a bus from the

5 airport in Sayoun to the Dar al-Mustafa School in Tarim, Yemen.

6 And they remained in that school -- he indicated they had

7 remained there for about two days, had some individual that

8 showed them around the school.  And then after two days at the

9 Dar al-Mustafa School, then they took a bus to Sanaa, Yemen, to

03:13 10 look at another school where they met somebody there that

11 showed him around the school in Sanaa.

12 Q. At all times he indicated that he and Abousamra were

13 together for the same purpose?

14 A. Yes.

15 Q. Now, did he indicate to you anything about the conditions

16 and what they ultimately decided about Yemen?

17 A. Yes.  He said, again, it was -- I guess he used the term

18 "prehistoric conditions" in Yemen that they hadn't anticipated

19 through their, I guess, online research of the schools there

03:14 20 and that it was -- you know, they didn't find anything that

21 they were looking for regarding the schools.  And because of

22 the conditions of Yemen and so forth, that after about a week

23 in Yemen, Mr. Mehanna decided to return to the United States.

24 Q. You mentioned online research.  Did you have any

25 discussion about what, if any, advance preparation they made

1    for the purpose of the trip to Yemen?

2    A.   Yeah.   That it was -- as I recall, that he stated it was

3    mostly online research, that they didn't have anyone else

4    assist them in conducting that research as to where to go once

5    in Yemen.

6    Q.   So they had no assistance in advance of going to Yemen

7    from anyone?

8    A.   Mr. Mehanna did not indicate they had any assistance.

9    Q.   Now, you said that after about a week Mr. Mehanna decided

03:15 10   to return to the United States.   Did he describe his return?

11   A.   Yeah.   I mean, he departed Sanaa and flew back to the UAE

12   and then had a layover in London, Heathrow Airport.   We asked

13   him at that point if he had had any contact with anybody while

14   in London.   He indicated he had not and then returned to

15   Boston.

16   Q.   Did he indicate what happened to Mr. Abousamra when they

17   separated?

18   A.   Yes.   He said that Mr. Abousamra went to Jordan and that

19   he was there to, I think, try and get that waiver for military

03:16 20   service in Syria because he couldn't go directly to Syria

21   because of that obligation.   And then after leaving Jordan, he

22   went to Iraq.

23   Q.   Did Mr. Mehanna tell you what Mr. Abousamra did in Iraq,

24   why he went to Iraq?

25   A.   Yeah.   He said that Mr. Abousamra was seeking to be an

1    Arabic-English translator to assist in the reconstruction of

2    Iraq.

3    Q.   Did Mr. Mehanna describe to you any information he

4    received from Abousamra about anything he saw or did while in

5    Iraq other than generally trying to find employment as a

6    translator to help in the reconstruction?

7    A.   I think -- I mean, we questioned whether Mr. Abousamra may

8    have indicated whether he had seen any combat operations or

9    anything of that sort, violent activity or anything.  And Mr.

03:16 10   Mehanna said that Abousamra didn't tell him of anything like

11   that but that he had gotten sick and -- while there and had to

12   return or --

13   Q.   Now, you've already mentioned the photographs of Abuzahra

14   and Abousamra that you showed the defendant Mehanna.  Did you

15   show him any other photographs?

16   A.   Yes.  The next photograph we showed him was Jason Patrick

17   Pippin.  It was, I think, a motor vehicle photo of him.

18            MR. AUERHAHN:  Can we bring up Exhibit 758, please.

19   This is also in evidence, your Honor.

03:17 20           THE COURT:  Sorry.

21            MR. AUERHAHN:  I thought it was --

22            THE COURT:  Asleep at the switch.

23            MR. AUERHAHN:  Thank you.

24   Q.   Is this the photograph of Mr. Pippin that you showed Mr.

25   Mehanna?

```
 1   A.   Yes, it is.

 2   Q.   Did you ask him if he recognized the person depicted in

 3   the photograph?

 4   A.   We did.  We asked him and he said he did not recognize

 5   that person.

 6   Q.   Okay.  Did you ask him anything else about Mr. Pippin?

 7   A.   Not specifically about Mr. Pippin, but we asked him if he

 8   knew anybody from California or in California, and he said he

 9   didn't know anybody from California.

03:18 10   Q.   Did you show him any other photograph?

11   A.   Yes.  And we showed him a photograph of Daniel Maldonado.

12        MR. AUERHAHN:  If we could first show 752 to the

13   witness.

14   Q.   Do you recognize what Exhibit 752 is?

15   A.   Yes.  That's a photograph of Daniel Maldonado.

16   Q.   That you showed to the defendant, Mr. Mehanna?

17   A.   Yes.

18        MR. AUERHAHN:  Your Honor, I would move into evidence

19   752.

03:18 20        MS. BASSIL:  No objection.

21        THE COURT:  Okay.  Admitted.

22   (Exhibit No. 752 received into evidence.)

23   Q.   Did you ask him about Mr. Maldonado?  Did you ask the

24   defendant Mehanna about Maldonado?

25   A.   Yes.  We asked him -- he positively identified the
```

photograph as Daniel Maldonado and indicated that he'd known

him for, I don't know, since, I guess, 2002 or so and that --

we asked him when he had last seen him or spoken to him.  And

he indicated that he understood that Mr. Maldonado and his

family, wife, were in Egypt and had been there since, I guess,

around August of that year.  We asked if he had any recent

communications with him, and he said he rarely had

communications with him and that the last time he had spoken to

him on the telephone was approximately two weeks prior to the

03:19 10   date of our interview.

11   Q.   Did he indicate where Mr. Maldonado was when he spoke to

12   him approximately two weeks before your interview?

13   A.   Yes.  He indicated that he was living in a suburb of

14   Alexandria, Virginia -- Alexandria, Egypt, at the time of the

15   phone call.

16   Q.   Did he indicate what Mr. Maldonado was doing in Egypt for

17   work besides living there with his wife and kids?

18   A.   Yes, that he was -- he maintained a website while working

19   or living in Alexandria.

03:20 20   Q.   Did he give you any other information about what Mr.

21   Maldonado said during this telephone conversation?

22   A.   He just indicated that he -- that Mr. Maldonado indicated

23   to Mr. Mehanna that he was doing fine.  That was basically it.

24   Q.   Now, did you ask Mr. Mehanna for a telephone number for

25   the purpose of -- if you needed to contact him again?

```
 1   A.   Yes.

 2   Q.   And did he give you his telephone number?

 3   A.   Yes.  He provided that to us.

 4   Q.   As you sit there, can you recall what it is?

 5   A.   I cannot.

 6             MR. AUERHAHN:  May I approach the witness, your Honor?

 7             THE COURT:  All right.

 8   A.   Yes.

 9   Q.   Does that refresh your recollection of the number Mr.

10   Mehanna gave you?

11   A.   Yes, it does.

12   Q.   What was the number?

13   A.   978-760-0658.

14   Q.   Approximately when was this interview completed?

15   A.   When was it completed?

16   Q.   Yes.

17   A.   I don't remember exactly the time.

18   Q.   Was it in the afternoon?

19   A.   It was.  It was an afternoon interview, yes.

20             MR. AUERHAHN:  Your Honor, at this point, if I could

21   distribute a transcript, which is Exhibit 324, or Mr. Lyness

22   could.

23             Are we ready?  If we could play Exhibit 323, please.

24   (Recording played.)

25             MR. CHAKRAVARTY:  Your Honor, we're missing a page.
```

1          MS. BASSIL:  This is way beyond this transcript.

2          MR. CHAKRAVARTY:  Page 4 of the transcript appears to

3     be missing.

4          MR. AUERHAHN:  Bring up the -- the copy I have has --

5     if you can bring it up on the -- or I can put it up on the

6     ELMO.  Page 4.

7          THE COURT:  Looks like it's missing in the electronic

8     version.

9          MR. AUERHAHN:  I do have a copy here, your Honor, if

03:27 10    we can put it on the ELMO.

11          THE COURT:  Well, the problem technically with that is

12    that if I switch to the document camera, we lose the computer

13    and, therefore, lose the audio.  Perhaps if I could, with the

14    witness, read Page 4.  And then we could -- the jury can follow

15    along onto Page 5, back on the audio, and just, with the

16    witness, read Page 4 back and forth.

17          MS. BASSIL:  Well, your Honor, the problem with that

18    is that I think it's important to hear the intonation.  This is

19    his mother, and I think it's important to hear.

03:28 20          THE COURT:  How much trouble would it be to get a

21    complete copy of the transcript?

22          MR. AUERHAHN:  Obviously, we couldn't -- I don't know

23    that we could do it for today.  What I could do is skip this

24    particular tape.  We'll come back to it tomorrow.

25          THE COURT:  I think that's a better course.  Let's

1    come back to this tomorrow with a complete copy of the

2    transcript.

3            MR. AUERHAHN:  I'll move on with the questions I was

4    going to ask after the tape.

5            THE COURT:  I guess perhaps another -- to try to be as

6    efficient as we can, if you can get to the place where we do

7    pick up the transcript, I guess you could play the rest of the

8    call.  We'd have to go revisit the missing page.  If you can

9    get to Page 5 in the audio and then people have Page 5 and 6,

03:28 10  if you want to do it.  If you want to skip it and just go to

11   your questions, you can do that, too, whichever.

12           MR. AUERHAHN:  Can you pick up where we stopped?

13           MR. BRUEMMER:  I can.

14   (Recording played.)

15           MR. AUERHAHN:  We're on Page 5 now.

16   (Recording played.)

17           MR. AUERHAHN:  I apologize, your Honor.

18   Q.   Now, sir, if the men had answered the questions you asked

19   differently, would the interviews you conducted and your

03:30 20  investigation have proceeded differently?

21   A.   Yes.  I mean, if the questions had been answered more

22   thoroughly, we certainly would continue to pursue additional

23   questions as to individuals that they associated with or met

24   overseas or in the country here to assist them with their trip

25   planning, types of contacts.

1    Q.   Let me ask you a question about the point you just made

2    about people assisting them.  Both Mr. Abousamra and Mr.

3    Mehanna said no one assisted them in advance of the trip?

4    A.   That's correct.

5    Q.   If they had indicated someone had, what would you have

6    asked them?

7    A.   We would have asked them who that was, where they were

8    located, what type of assistance they provided, any type of

9    methods of communication with that person, email, telephone.

03:31 10   You know, when we conduct investigations or conduct interviews,

11   obviously, we -- it helps us only if we have truthful

12   information that's provided to us so that we can then further

13   our investigation but not only just to localize the

14   investigation, but we also collect information for the

15   intelligence community.  So if there are any amount of

16   information regarding overseas activities or people, associates

17   they've met or places they've been that they could report to

18   us, that's all very valuable to us in the larger scheme of what

19   we do on the Joint Terrorism Task Force.

03:32 20   Q.   And if -- you said that Mr. Mehanna indicated that Mr.

21   Abousamra went to Iraq for the purpose of trying to get a job

22   to help the reconstruction as a translator, if he had told you

23   he had gone there for a different purpose, what would you have

24   asked Mr. Mehanna?

25   A.   If Mr. Mehanna had told us that?

Q.   If he had told you that Mr. Abousamra went for some other

purpose, what would you have asked Mr. Mehanna?

A.   We would have asked him what that purpose was, where he

went, who he met with, what type of activities he may have been

engaged in; again, how he communicated with those individuals

while he was in Iraq.  2004 was a particularly bad time in Iraq

for the United States military.  So we would be interested in

any kind of information that would help us to provide them with

more information as well.

03:32   Q.   Both Mr. Mehanna and Mr. Abousamra mentioned Iraq.  Did

either mention Fallujah?

A.   No.

Q.   What was going on in Fallujah in February of 2004?

A.   The insurgency in Iraq, in Fallujah in particular, was

kicking off at that point.

Q.   Now, Mr. Mehanna said that both he and Mr. Abousamra went

for language schools, is that correct?

A.   Correct.  Mr. Mehanna also said Islamic religious schools

as well as language schools, yes.

03:33   Q.   If he had said to you that Mr. Abousamra went for some

purpose other than the language schools, what would you have

asked him?

A.   What that purpose was, where that location might be, who

he would have met there, what type of instruction was given.

Q.   Now, you mentioned that you asked a series of questions

```
 1    about Mr. Maldonado?

 2    A.   Yes.

 3    Q.   If Mr. Mehanna had told you that his most recent contact

 4    with Mr. Maldonado was while he was in Somalia, what would you

 5    have asked him?

 6    A.   We would have asked him where in Somalia he was located,

 7    who he was with, what they were doing there in Somalia, what

 8    his intentions were, if there were other Americans involved,

 9    you know, what types of communication methods, forms of

10    payment, travel, all information that, again, supports the

11    larger realm of what the Joint Terrorism Task Force gets

12    involved with.

13              MR. AUERHAHN:  No further questions, your Honor.

14    CROSS-EXAMINATION BY MS. BASSIL:

15    Q.   Mr. Davis, as I understand it, the first interview that

16    you did was of Kareem Abuzahra in August of 2006?

17    A.   That's correct.

18    Q.   Is that correct?

19    A.   Yes.

20    Q.   When you interviewed him in August of 2006, it was August

21    23rd?

22    A.   Correct.

23    Q.   Prior -- before August 23rd, you had already gone -- the

24    FBI had already gone into Mr. Mehanna's house, isn't that

25    correct?
```

           1    A.    Gone into Mr. Mehanna's house?

           2    Q.    Uh-huh.

           3    A.    I'm not aware of what the exact date was.

           4    Q.    Are you aware that there was a search warrant and they had

           5    gone into his house and searched his house while he and his

           6    parents were in Egypt?

           7    A.    I'm aware of that, yes.

           8    Q.    In order to get that search warrant, there was certainly

           9    information about him?

03:35  10    A.    In the -- recovered in the search warrant?

          11    Q.    Well, to get the search warrant --

          12    A.    Or in the search?

          13    Q.    -- you would have had to disclose some information?

          14    A.    Oh, yes.

          15    Q.    And when the search was done in his house, his computer

          16    was taken or the hard drive from his computer was taken?

          17    A.    I believe so.

          18    Q.    And certainly documents that he had and other things were

          19    photographed?

03:35  20    A.    I believe so.

          21    Q.    And that was before you spoke to Mr. Abuzahra, right?

          22    A.    Again, I don't know the exact date of the search.  I don't

          23    recall.

          24    Q.    Now, when you -- first of all, you don't record

          25    conversations or interviews, do you?

```
 1   A.   No, we do not.

 2   Q.   The FBI does not, correct?

 3   A.   Typically, we do not.  There have been, but we don't

 4   typically do it.

 5   Q.   You don't do it?

 6   A.   No.

 7   Q.   So the only information that you have or the only record

 8   you have are notes you might have taken, correct?

 9   A.   Correct.

10   Q.   And when those notes are put into a summary or report,

11   correct?

12   A.   Correct.

13   Q.   So that, in fact, what the jury has is your memory based

14   on your review of your report?

15   A.   Of my review of my notes and, yes, what we wrote in the

16   report, yes.

17   Q.   You wrote the report five years ago -- over five years ago

18   for Mr. Abuzahra?

19   A.   Correct.

20   Q.   Now, why don't you record interviews?

21        MR. AUERHAHN:  Objection.

22        THE COURT:  Sustained.

23   Q.   Do you think that would be a better way of keeping track

24   of exactly what witnesses say to you?

25        MR. AUERHAHN:  Objection.
```

        1              THE COURT:  Sustained.

        2    Q.   Now, when you went and interviewed Mr. Abuzahra, you had

        3    information about him before you interviewed him, did you not?

        4    A.   Yes, we did.

        5    Q.   You had information about Tarek Mehanna?

        6    A.   Yes, we did.

        7    Q.   You had information about Ahmad Abousamra?

        8    A.   Yes.

        9    Q.   You already had the information that Mr. Abousamra had

03:37  10    gone to Iraq, correct?

       11    A.   Correct.

       12    Q.   You had already looked at his reports, the reports from

       13    Customs, and his passport that had an Iraq stamp, correct?

       14    A.   Correct.

       15    Q.   Now -- and had you also looked at, at that point, various

       16    of these publications we've heard about in this trial, forums,

       17    internet?

       18    A.   I didn't look at those, no.

       19    Q.   Had other people in the FBI looked at that information by

03:37  20    the time you interviewed Mr. Abuzahra?

       21    A.   Yes.

       22    Q.   So, in fact, when you went to interview Mr. Abuzahra, you

       23    had information -- did you have information about the trip to

       24    Yemen already?

       25    A.   Yes.

1  Q.   And when you went to interview him, was it your belief

2  that Mr. Abuzahra, Mr. Abousamra, and Tarek Mehanna had gone

3  there looking for military training?

4  A.   Yes.

5  Q.   So when you asked Mr. Abuzahra about going to Yemen, you

6  already had an answer in mind, did you not?

7  A.   We believe we knew what the reason was, but we have to ask

8  the questions so that the person can tell us exactly what

9  information they know.

03:38 10  Q.   Right.

11  A.   For confirmation and so forth.

12  Q.   For confirmation.  And, in fact, if Mr. Abuzahra had said

13  to you -- first of all, he didn't have to talk to you, right?

14  A.   That's correct.

15  Q.   Okay.  And it's perfectly legitimate for somebody to say,

16  I would like to have a lawyer before I talk to you again?

17  A.   Absolutely.

18  Q.   In fact, all three of these people that you interviewed,

19  these were interviews which they could stop at any time?

03:38 20  A.   That's correct.

21  Q.   They could stop answering -- they could choose to answer

22  some questions and not others?

23  A.   Correct.

24  Q.   All right.  So, for example, if you said to Mr.

25  Abuzahra -- if you said to him, Why did you go to Yemen, and he

```
 1   said to you, Well, I was looking for military training, you
 2   indicated that your next questions would be sort of who, what,
 3   when, where, basically?
 4   A.   Right.
 5   Q.   He could choose not to answer those questions at all?
 6   A.   Correct.
 7   Q.   So you wouldn't have any further information?
 8   A.   If he chose not to, that's correct.
 9   Q.   That means that your investigation would be where it was
10   before?
11   A.   Basically, yes.
12   Q.   Okay.  And, in fact, when you went to see Mr. Abuzahra
13   with the idea in mind that he went to Yemen to look for
14   military training, you hoped -- not hoped, but once he said,
15   Oh, we went to study, in your mind, you said, Gotcha, didn't
16   you?
17             MR. AUERHAHN:  Objection.
18             THE COURT:  Sustained.
19   Q.   In your mind, you said, That's a lie?
20             MR. AUERHAHN:  Objection.
21             MS. BASSIL:  He already testified to this.
22             THE COURT:  Sustained.  The objection is sustained.
23   Q.   Did you believe he was telling the truth?
24             MR. AUERHAHN:  Objection.
25             THE COURT:  Sustained.
```

```
 1              MS. BASSIL:  May we be heard at sidebar?

 2              THE COURT:  All right.

 3    (SIDEBAR CONFERENCE AS FOLLOWS:

 4              THE COURT:  Let's hear the objection first.

 5              MR. AUERHAHN:  The state of mind of the person asking

 6    the questions, I don't see why that's -- at the time the

 7    questions are being answered, it's a question whether it's the

 8    type of information the FBI agent would rely on in the course

 9    of his investigation.  Whether he believes it or disbelieves

10    the witness doesn't seem to me to be a relevant question.

11              MS. BASSIL:  Okay.  His whole end of his direct

12    examination was about how this witness would have done things

13    differently, implying implicitly, if not explicitly, that these

14    witnesses lied.  That's what I'm exploring, and I think I'm

15    entitled to explore it.  I think it's disingenuous to say, How

16    would you have done things differently, because that clearly

17    implies that there's a lie there.  So I think I'm entitled to

18    bring it out directly.

19              THE COURT:  Okay.

20              MS. BASSIL:  Okay.

21    .  .  .  END OF SIDEBAR CONFERENCE.)

22    Q.   So, Mr. Davis, going back to this, when Mr. Abuzahra told

23    you that they were looking for Islamic schools or Islamic

24    study, you, in your mind, said, Lie?

25    A.   Not entirely.  I mean, at that point, there's more to be
```

```
 1   gained from further interview, so --
 2   Q.   Well, is it not a fact -- at the end of that interview,
 3   did you talk to Mr. Abuzahra about a grand jury?
 4   A.   Not -- no, not after that interview, no.
 5   Q.   Did you tell him he was in trouble?
 6   A.   No.
 7   Q.   Well, in October, two months later, he was signing a
 8   proffer with his attorney to become a witness, wasn't he?
 9   A.   Yes, I believe so.
10   Q.   All right.  So did you interview him between August and
11   October?
12   A.   No.
13   Q.   And so after he decided he would become a witness, he was
14   interviewed, was he not?
15   A.   After he decided to --
16   Q.   Yes.
17   A.   Yes.
18   Q.   And he was interviewed on October 30th?
19   A.   I believe so, yeah.
20   Q.   He was interviewed on November 2nd?
21   A.   I'm not -- I don't know the exact dates, but, yes, he was
22   interviewed.
23   Q.   He was interviewed on November 11th, is that correct?
24   A.   Yes.
25   Q.   These were lengthy interviews, were they not?
```

```
 1    A.    Yes, they were.

 2    Q.    Detailed interviews?

 3    A.    Yes.

 4    Q.    So when you went to interview Mr. Abousamra on December

 5    12, 2006, you already had a great deal of information about

 6    this trip to Yemen, did you not?

 7    A.    We did.

 8    Q.    Okay.  And, by the way, do you know when -- we heard those

 9    recordings.  Do you know when Mr. Mehanna's phone began to be

03:43 10    recorded?

11    A.    I don't.

12    Q.    Do you know when that started?

13               MR. AUERHAHN:  Objection, your Honor.

14               THE COURT:  He may answer whether he knows.

15               MR. AUERHAHN:  Can we approach, your Honor?

16    (SIDEBAR CONFERENCE AS FOLLOWS:

17               MR. AUERHAHN:  I'm going to let Mr. Chakravarty handle

18    this.

19               MR. CHAKRAVARTY:  The basis of his knowledge for

03:43 20    knowing when electronic surveillance occurred in terms of a

21    time period or was targeted would be based on classified

22    information.  That's the only way --

23               THE COURT:  I'm not clear on what you're saying.  The

24    basis of his knowledge is classified?

25               MR. CHAKRAVARTY:  If he looked at unclassified
```

 1    information to do that --

 2            THE COURT:  Is the timing of the recording itself

 3    classified?

 4            MR. CHAKRAVARTY:  As to the duration that we were up

 5    on the target, that would be classified.

 6            MS. BASSIL:  Well, I would ask it be unclassified.  I

 7    think you know where I'm going with this.  My point is the

 8    issue of materiality and all the information they had before

 9    they asked --

03:44 10        MR. CHAKRAVARTY:  There's no dispute that before the

 11    interviews we had those calls --

 12            THE COURT:  I think you can get it generally without

 13    getting specifics, that he had some information about the fact

 14    of a recording.

 15            MS. BASSIL:  What we've heard are three calls.

 16    Actually, two of the -- two of the calls are -- I'm just trying

 17    to remember the date they interviewed him.  Two were before and

 18    one is the same day.  My point is:  If they were recording him

 19    for months and months and months between 2004 and 2006, they

03:45 20    had lots and lots and lots of information.  And so the more

 21    information they had, the less material this false statement

 22    is.

 23            MR. AUERHAHN:  That's not a correct statement of the

 24    law at all.  How much information we had is not the issue of

 25    materiality.

 1          MS. BASSIL:  It goes to whether or not -- they made a

 2     big point how would your investigation have changed if they

 3     knew everything -- and I think they did.  But if they knew a

 4     great deal about the defendant and, in fact, what the questions

 5     were designed to do, for lack of a better phrase, is get a

 6     gotcha on him in order to squeeze him to become a witness.  I'm

 7     not getting into all that, but that's the background to it.

 8          THE COURT:  Well, I think you can get more generally

 9     that they had a great deal of information in the investigation

03:45 10   already at the time they asked relatively elementary questions.

11          MS. BASSIL:  Can I get it at least for a year or so?

12     Would that work?

13          MR. CHAKRAVARTY:  Sometime before --

14          THE COURT:  How about even more general than that,

15     that he knew there had been some recordings of the phone calls

16     and had information from that.  I think that's a compromise.

17          MS. BASSIL:  Note my objection.

18          MR. AUERHAHN:  There is a more fundamental problem.

19     It's not a correct statement of the materiality.

03:46 20        THE COURT:  The jury will be instructed about

21     materiality at the appropriate time.  It is an objective and

22     not a subjective matter, among other things.  But I presume the

23     defense wants to make this an issue on appeal, and they can

24     have a bit of a record to do that if there is an appeal.

25          MR. CARNEY:  We're not expecting that.

1          THE COURT:  Right.  I understand.  You're planning

2     both sides.  So you have just -- and then we'll break?

3          MS. BASSIL:  Why don't we break now so I can rearrange

4     my thoughts on that, okay?

5          THE COURT:  All right, fine.

6     .   .   .   END OF SIDEBAR CONFERENCE.)

7          THE COURT:  We solved that issue, but it's close

8     enough that rather than start a new line of questioning, we'll

9     just take the break at this point, jurors, and resume tomorrow.

03:46 10    Enjoy the rest of the day.  We'll be in recess.

11    (Whereupon, at 12:58 p.m. the trial recessed.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10
     /s/ Marcia G. Patrisso
11   MARCIA G. PATRISSO, RMR, CRR
     Official Court Reporter
12
     /s/ Cheryl Dahlstrom
13   CHERYL DAHLSTROM, RMR, CRR
     Official Court Reporter
14

15   Date:  November 16, 2011

16

17

18

19

20

21

22

23

24

25