UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,                 )
                                   ) Criminal Action
v.                                 ) No. 09-10017-GAO
                                   )
TAREK MEHANNA,                     )
                                   )
        Defendant.                 )
                                   )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY SEVENTEEN
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, November 17, 2011
9:15 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Aloke Chakravarty and Jeffrey Auerhahn,
3            Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Jeffrey D. Groharing, Trial Attorney
             National Security Division
7        950 Pennsylvania Avenue, NW
         Washington, D.C.  20530
8        On Behalf of the Government

9        CARNEY & BASSIL
         By: J.W. Carney, Jr., Esq.
10           Janice Bassil, Esq.
             John E. Oh, Esq.
11       20 Park Plaza
         Suite 1405
12       Boston, Massachusetts  02216
         - and -
13       LAW OFFICE OF SEJAL H. PATEL, LLC
         By: Sejal H. Patel, Esq.
14       101 Tremont Street
         Suite 800
15       Boston, Massachusetts  02108
         On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2                        DIRECT   CROSS   REDIRECT   RECROSS
     WITNESSES FOR THE
3      GOVERNMENT:

4

     BRADLEY DAVIS (Cont'd)
5
       by Mr. Auerhahn                          36
6      by Ms. Bassil                    5              43

7    COLLEEN DOWNEY

8      by Mr. Groharing        44
       by Ms. Bassil                   47
9
     MATTHEW TAYLOR
10
       by Mr. Chakravarty      60
11     by Ms. Bassil                   77

12   DANIEL MALDONADO

13     by Mr. Groharing       108

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on November 17,

6     2011.

7          The defendant, Tarek Mehanna, is present with counsel.

8     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

9     are present, along with Jeffrey D. Groharing, Trial Attorney,

10    U.S. Department of Justice, National Security Division.)

11         THE COURT:  Good morning, jurors.

12         THE JURY:  Good morning.

13         THE COURT:  Jurors, you may recall that we had a

14    little problem with a page missing in one of the transcripts

15    yesterday.  We're going to -- we had proceeded to

16    cross-examination, but I think, with agreement of counsel,

17    we'll revert to the government so they can deal with the full

18    exhibit now that that's been -- then we'll resume with the

19    cross-examination of the witness.

00:00 20         MR. AUERHAHN:  Your Honor, should we distribute the

21    full transcript and play it beginning to end?

22         THE COURT:  I'm sorry?  Yes.  I think that's the best

23    thing to do.

24         MR. AUERHAHN:  I believe Mr. Lyness has the errant

25    page.

1          For the record, your Honor, the tape is Exhibit 323;

2     the transcript, 324.  May I proceed?

3          THE COURT:  You're going to play the tape from the

4     beginning?

5          MR. AUERHAHN:  Yes.

6     (Recording played.)

7          MR. AUERHAHN:  Thank you.

8          THE COURT:  Go ahead.

9     CONTINUED CROSS-EXAMINATION BY MS. BASSIL:

00:07 10    Q.   Good morning, Mr. Davis.

11    A.   Good morning.

12    Q.   Yesterday I had asked you some questions about some dates,

13    and you weren't quite sure.  So I wanted to see if I could sort

14    of refresh your memory.  You had interviewed Kareem Abuzahra on

15    August 23, 2006?

16    A.   Correct.

17    Q.   And I had asked you if you had searched Mr. Mehanna's home

18    before that date, if the FBI had searched, and you said you

19    weren't quite sure of the search?

00:08 20    A.   Correct.

21    Q.   If I might show you something that might refresh your

22    memory?

23          MS. BASSIL:  May I approach, your Honor?

24          THE COURT:  You may.

25    Q.   Looking at that date, does that refresh your memory as to

1   the date of the search?

2   A.   Yes.

3   Q.   What was the date that you searched Mr. Mehanna's home, or

4   the FBI did?

5   A.   The date of the search was August 10, 2006.

6   Q.   So that was almost two weeks before you met with Mr.

7   Abuzahra?

8   A.   That's correct.

9   Q.   Now, after that -- well, you also had -- you personally

00:09 10   had reviewed Customs documents, had you not, from Customs and

11   Border Patrol?

12   A.   Correct.

13   Q.   And you reviewed those documents on November 1, 2004?

14   A.   I believe so, around that time frame.

15   Q.   Would you like to see your report?

16   A.   Yes, please.

17        MS. BASSIL:  If I may, your Honor?

18   Q.   Was this, indeed, the report -- it was a report sent to

19   you, I believe?

00:09 20   A.   Yes, it was sent to me.

21   Q.   All right.  And the date that that was sent to you?

22   A.   The date on the document is November 1, 2004.

23   Q.   And the document sort of reviews the issues of Customs and

24   Border Patrol of Mr. Abuzahra going in and out of the United

25   States, Mr. Mehanna, and Mr. Abousamra, correct?

1    A.   Correct.

2    Q.   So before you spoke to Mr. Mehanna in December, on

3    December 16th of 2006, you knew that Mr. Abousamra had been

4    interviewed by the Customs and Border Patrol in February of

5    2004, correct?

6    A.   Correct.

7    Q.   You knew that Mr. Abuzahra had been interviewed by Customs

8    and Border Patrol on February 6, 2004, correct?

9    A.   Correct.

00:11 10   Q.   And you knew that Mr. Abuzahra had said that he went to

11   the United Arab Emirates and had visited the school Dar

12   al-Mustafa?

13   A.   Correct.

14   Q.   And you also knew that Mr. Mehanna had been interviewed on

15   February 15, 2004, on his way into the United States, correct?

16   A.   Correct.

17   Q.   And he had said that he had been in Yemen, and he named

18   two schools that he had been to?

19   A.   I'd have to again review the report.

00:11 20        MS. BASSIL:  If I may, your Honor?

21        THE COURT:  You may.

22   Q.   Does that refresh your memory?

23   A.   Yes.

24   Q.   And so Mr. Mehanna was interviewed when he came back from

25   Yemen on February 15, 2004, correct?

1    A.    Correct.

2    Q.    He said he had been in Yemen, and he had gone to two

3    schools, correct?

4    A.    Correct.

5    Q.    And his passport stamps indicated that he had been in

6    Yemen and had left on February 11, 2004, is that correct?

7    A.    That's correct.

8    Q.    Now, you also were -- strike that.

9          Now, Mr. Abousamra had a number of flights back and

00:13 10   forth outside of the United States, correct, between 2004 and

11   2006?

12   A.    That's correct.

13   Q.    Again, his inbound and outbound documents were examined by

14   Customs and Border Patrol and by you as well?

15   A.    Correct.

16   Q.    So you had all of that information before you even --

17   before you interviewed Mr. Mehanna, correct?

18   A.    Correct.

19   Q.    I'm sorry if I'm going to repeat a little, but I just want

00:14 20   to put this in context.  The interview with Mr. Abuzahra was on

21   August 23, 2006?

22   A.    Correct.

23   Q.    And by October 26, 2006, he had reached an agreement with

24   the government, correct?

25   A.    I believe that's correct, yes.

1    Q.   Do you want to see the proffer letter to refresh your

2    memory?

3    A.   Yeah, that would be helpful.  Thank you.

4         MS. BASSIL:  If I may, your Honor?

5    Q.   Now, a proffer letter is an agreement between -- if you

6    don't know this, this is fine, but I think you do -- a proffer

7    letter is a letter between the government and a witness' lawyer

8    or a witness that they're going to come in and talk to the

9    government?

00:15 10  A.   Correct.

11   Q.   And that anything they say when they talk to the

12   government will not be used against them?

13   A.   Correct.

14   Q.   That was dated October 26, 2006, this letter?

15   A.   Correct.

16   Q.   And it was signed on October 27, 2006, correct?

17   A.   Correct.

18   Q.   Both by Mr. Abuzahra and his attorney?

19   A.   Correct.

00:15 20  Q.   Now, after that proffer letter, there were several

21   interviews -- there were three interviews with Mr. Abuzahra, is

22   that correct?

23   A.   Correct.

24   Q.   You interviewed him on -- you interviewed him on November

25   2, 2006; do you recall that?

1    A.   Again, I don't know the specific dates.  I'm sorry.

2    Q.   Hold on.  I'll show you the report.

3         Now, looking at this document, does this refresh your

4    memory as to the date of one of the interviews with Mr.

5    Abuzahra?

6    A.   Yes.

7    Q.   What was the date?

8    A.   November 2, 2006.

9    Q.   Who was with you when that interview took place?

00:17 10   A.   United States attorneys -- Assistant United States

11   Attorney Aloke Chakravarty and Kimberly West; obviously,

12   myself; Special Agent Chris Gianakura; Special Agent Heidi

13   Williams; and Task Force Officer Thomas Daly, Jr.

14   Q.   And do you remember how long that interview was?

15   A.   No, not exactly.  It was a lengthy interview.

16   Q.   In fact, that report is 12 pages typed, single-spaced,

17   correct?

18   A.   Correct.

19   Q.   And that would indicate to you that it was a lengthy

00:17 20   interview?

21   A.   Yes.

22   Q.   Now, in that first interview, he talked to you about how

23   he had met Mr. Abousamra?

24   A.   Correct.

25   Q.   And how Mr. Abousamra had very extremist views?

1    A.    Correct.

2    Q.    And that Mr. Abousamra justified his extremist views with

3    Islamic teachings?

4    A.    Correct.

5    Q.    Now, as I understand it, during that interview, did Mr.

6    Abuzahra tell you that he had tried to get military training in

7    Jordan?

8    A.    That Mr. Abuzahra attempted to?

9    Q.    Yes.

00:18 10    A.    I'd have to review the report.

11              MR. AUERHAHN:  Your Honor, may we approach?

12              THE COURT:  All right.

13    (SIDEBAR CONFERENCE AS FOLLOWS:

14              MR. AUERHAHN:  Your Honor, this is, I guess, unrelated

15    but sort of to the issue I raised yesterday about what did you

16    know; when did you know it.  It is not relevant to materiality.

17    Now she's starting to go down the path of going into some

18    detail about what Abuzahra told him on various dates.  It seems

19    to me an improper way to put in information that Mr. Abuzahra

00:19 20    gave in November in cross-examination of this witness when the

21    issue is very different.  This whole line of questioning seems

22    to be inappropriate.

23              MS. BASSIL:  He was there.  He was there at these

24    interviews.

25              THE COURT:  Right.  But, I mean, I do have some

1    concern about the pace of things.  If this is really -- I know

2    you have to protect --

3              MS. BASSIL:  I don't think it's fair to talk about the

4    pace of things when they've been reading endless instant

5    messages.

6              THE COURT:  I know he's talked about what he was told

7    by Abuzahra.  So that's a fair general topic.  On the other

8    hand, if it's cross-examination to elicit things that would

9    cast a light on the reliability of his direct testimony as to

00:20 10    what he was told, perhaps by incompleteness or otherwise,

11    that's one thing.  If it is simply to get him to repeat

12    everything he knew for the materiality issue --

13              MS. BASSIL:  No, no, no.

14              THE COURT:  -- then that's a different issue.

15              MS. BASSIL:  I only have two questions related to this

16    issue.

17              THE COURT:  He did go at length about what he was told

18    by Abuzahra, and so that Abuzahra's narration of things as a

19    general matter is fair game but directed to the substance of --

00:20 20              MS. BASSIL:  I just have two questions.

21              THE COURT:  Okay.

22              MR. AUERHAHN:  I just want to make the point that the

23    length that Abuzahra told the agent was what he told him in

24    August 2006 when he stuck to the story, nothing about what he

25    told him in October and November and December when he started

1    cooperating.

2         THE COURT:  That's sort of what I'm getting at.  If

3    it's simply he repeats "inculpatory" stuff that the witness has

4    already talked about, to repeat that just on the materiality

5    scope --

6         MS. BASSIL:  No, no.

7         THE COURT:  To the extent of whatever inculpatory

8    evidence has come from the witness on direct can now be

9    contradicted and minimized, whatever, by other things that

00:21 10   Abuzahra told him in the interviews that we haven't heard about

11   yet, that's a different story.  The second, I think, is okay.

12   The first is --

13        MS. BASSIL:  Okay.

14   .  .  .  END OF SIDEBAR CONFERENCE.)

15   Q.   Mr. Davis, that gave you a moment to look through the

16   report, didn't it?

17   A.   You did.

18   Q.   So my question is:  Mr. Abuzahra did not tell you he had

19   tried to train in Jordan?

00:21 20   A.   No, not --

21   Q.   He didn't mention giving $5,000 to Mr. Abousamra?

22   A.   He did not or did?

23   Q.   Did not.

24   A.   He did not mention, no.

25   Q.   Now, after -- so this interview was November 2, 2006.  And

1    then there was another interview on November 13, 2006, is that

2    correct?

3    A.   I know there was another interview.  Again, I don't know

4    the specific date.  I don't recall it.

5    Q.   Actually, before that even, there was an interview on

6    October 27, 2006, was there not?  You want to see it?

7    A.   Please, yes.

8    Q.   So there was an interview with Mr. Abuzahra on October 27,

9    2006, correct?

00:23 10   A.   Correct.

11   Q.   And that was at the U.S. Attorney's Office?

12   A.   Yes.

13   Q.   Okay.  Present at that interview were the same people, is

14   that correct, that were there that you mentioned before?

15   A.   Yes.

16   Q.   And then after -- and that interview was a lengthy

17   interview, was it not?

18   A.   Yes.

19   Q.   How many pages is that report?

00:23 20   A.   Ten or eleven pages.

21   Q.   So ten or eleven pages single-spaced.  That would indicate

22   to you that that was a lengthy interview?

23   A.   Yes.

24   Q.   So there was also an interview with Mr. Abuzahra on

25   November 13, 2006, was there not?

| | |
|---|---|
| 1 | A.   Yes, there was. |
| 2 | Q.   And the same people were present:  You, Agent Gianakura, |
| 3 | Heidi Williams, Thomas Daly? |
| 4 | A.   Correct, basically the same. |
| 5 | Q.   And Mr. Abuzahra, his lawyers and a United States |
| 6 | Attorney? |
| 7 | A.   Correct. |
| 8 | Q.   That was also a lengthy interview, was it not? |
| 9 | A.   Yes. |
| 00:24  10 | Q.   And how many pages was that report? |
| 11 | A.   Approximately eight pages. |
| 12 | Q.   Eight pages.  And that would indicate to you, eight pages |
| 13 | single-spaced, that that was also a lengthy meeting? |
| 14 | A.   Yes. |
| 15 | Q.   So in these three lengthy meetings, Mr. Abuzahra related |
| 16 | -- he related facts about Mr. Mehanna? |
| 17 | A.   Correct. |
| 18 | Q.   About Mr. Abousamra? |
| 19 | A.   Yes. |
| 00:24  20 | Q.   And about the trip to Yemen? |
| 21 | A.   Yes. |
| 22 | Q.   Now, so by the time you spoke -- and you spoke to Mr. |
| 23 | Abousamra first, before Mr. Mehanna -- |
| 24 | A.   That's correct. |
| 25 | Q.   -- on December 12th when you went to UMass, correct? |

1   A.   Correct.

2   Q.   And by that time, I think we had left -- where we had left

3   off yesterday was that you were also recording Mr. Mehanna's

4   telephone, correct?

5   A.   Correct.

6   Q.   And you can't tell me when that began?

7   A.   No, I can't.

8   Q.   That's a secret, correct?

9   A.   I just don't know.

00:25 10        MR. AUERHAHN:  Objection.

11             THE COURT:  Sustained.

12   Q.   Now, you had also -- were you aware that Jason Pippin had

13   already been interviewed in 2005 in Finland?

14   A.   Yes, I believe so.

15   Q.   And his ex-wife had also been interviewed?

16   A.   I believe so, yes.

17   Q.   So you had the information from him, and you had the

18   information from his ex-wife, meaning Mr. Pippin?

19   A.   Correct.

00:26 20   Q.   Now, yesterday you said that if Mr. Abousamra had told you

21   that he went to Iraq to fight or that he went to Yemen to find

22   military training, you would have asked more questions?

23   A.   Correct.

24   Q.   And you had no certainty at all that he would answer those

25   questions, correct?

1    A.    That's correct.

2    Q.    In fact, he stopped the interview when he was asked if he

3    had traveled to any other Middle Eastern countries as an adult?

4    A.    That's correct.

5    Q.    And his father called about a minute later, correct?

6    A.    That's correct.

7    Q.    And at that point, Mr. Abuzahra [sic] was very clear he

8    was going to get a lawyer, and he was not going to answer any

9    more questions?

00:26 10   A.    Mr. Abousamra, yes, that's correct.

11   Q.    Yes.  And so the conversation -- the interview ended?

12   A.    That's right.

13   Q.    And you were not going to get any more information out of

14   him at that point?

15   A.    That's correct.

16   Q.    Now, you did talk to him about how there could be a grand

17   jury?

18   A.    Yes, we did.

19   Q.    And when you told him that, you indicated to him, did you

00:27 20   not, that he would be in some significant trouble?

21   A.    I don't remember -- I don't recall the exact words.  I

22   just said we would be continuing the inquiry and possibly a

23   grand jury would meet to -- he may have to -- no, we did not.

24   We didn't mention that.  That he may have to go in front of a

25   grand jury to testify.

1    Q.   And the reason why you told somebody you may have to go in

2    front of a grand jury to testify is because you knew that --

3    you know that intimidates people?

4    A.   Not intimidates them, just advises them of what the

5    procedure is and that they might be approached again.  This was

6    not a matter that was ending at this particular interview.

7    Q.   You don't think it would scare somebody to say you're

8    going to end up in front of a federal grand jury?

9         MR. AUERHAHN:  Objection.

00:27 10        THE COURT:  Sustained.

11   Q.   You also interviewed Mr. Abuzahra -- that was back in

12   August -- and you told him about the grand jury?

13   A.   I don't believe we told him about the grand jury.

14   Q.   Now, when you went to interview Mr. Mehanna, that was on

15   December 16, 2006?

16   A.   Correct.

17   Q.   Correct?  And you at that point had recorded a couple of

18   telephone calls between Mr. Abousamra and Mr. Abuzahra,

19   correct?

00:28 20   A.   Mr. Abuzahra?  I believe so.

21   Q.   Mr. Abuzahra, by December 16th, was wearing a wire or a

22   microphone that would allow him to record conversations?

23   A.   You'd have to refresh my memory if you have a report

24   there, please.

25        MS. BASSIL:  If I may, your Honor?

1         THE COURT:  Go ahead.

2    Q.   Mr. Davis, these are -- you recognize these reports?

3    A.   Can I --

4    Q.   Sure, absolutely.

5    A.   Yes.

6    Q.   The first one indicates that on December 12th, at 6:40

7    p.m., you provided Mr. Abuzahra with a -- I'm sorry.  He

8    provided you with a tape of a consensually monitored telephone

9    call?

00:29 10  A.   Correct.

11   Q.   And when he provided you with the tape, was he -- was a

12   microphone put on him?

13   A.   I think it was a telephone call.  So it was used to record

14   the telephone, yes.

15   Q.   Not on him but on the telephone, is that how it worked?

16   A.   Correct.

17   Q.   And then on December 12th, that same day, at 7:22 p.m., he

18   provided you with another tape of a consensually monitored

19   telephone call?

00:30 20  A.   Correct.

21   Q.   The same day, at 7:34 p.m., there was another tape

22   recording he gave to you?

23   A.   Correct.

24   Q.   And the next day, at 7:15 p.m., on December 13th, he

25   provided you with a tape recording of a telephone conversation

1    between himself and Ahmad Abousamra?

2    A.    Correct.

3    Q.    And then on December 14, 2006, at 4 p.m., he provided you

4    with a tape recording of a telephone call between himself and

5    Ahmad Abousamra, correct?

6    A.    Correct.

7    Q.    And on December 15th --

8    A.    That's not me but these guys.

9    Q.    On December 15th there was also another tape recording

00:30 10    provided to the FBI of a telephone call between Mr. Abuzahra

11    and Mr. Abousamra?

12    A.    Correct.

13    Q.    Correct?  So by the time you interviewed Tarek Mehanna, is

14    it fair to say that you had multiple interviews, a search of

15    his home, recorded telephone calls and interviews with Mr.

16    Pippin, his ex -- and his ex-wife and perhaps others?

17    A.    Correct.

18    Q.    Now, you went to Mr. Mehanna's place of work?  He worked

19    at the Walgreens Pharmacy?

00:31 20    A.    That's correct.

21    Q.    And you went with Tom Daly?

22    A.    Correct.

23    Q.    And when you went in, you announced yourself to his

24    employer as FBI, is that correct?

25    A.    Correct.

1    Q.   And you didn't go to his house to talk to him?

2    A.   No, we did not.

3    Q.   You didn't -- you knew he was a student at the Mass.

4    College of Pharmacy?

5    A.   Yes.

6    Q.   You didn't go to his school to interview him there?

7    A.   No, we did not.

8    Q.   And was the idea to go to his place of employment to

9    embarrass him or shake him up?

00:32 10    A.   No, it was not.

11    Q.   You certainly could have gone to him -- gone to his home?

12    A.   We could have.  Our considerations -- the reason we went

13    to his place of employment is because we didn't want to go to

14    his home where his family lived, same reason we didn't want to

15    go to the school where he was employed.  His father was

16    employed at the school.

17    Q.   But you were willing to go to where he worked and announce

18    yourself as FBI because that wouldn't embarrass him?

19    A.   It wasn't necessarily a reason for not embarrassing or

00:32 20    embarrassing him.

21    Q.   It sounds like you didn't want to embarrass his father by

22    going to his place -- to the place where his father worked.

23    You didn't want to go to his home and upset his family.  But it

24    was okay to go to his place of employment and announce FBI?

25    A.   Yes, we did that.  And as I testified yesterday, we

1    informed the manager that we believed Mr. Mehanna would be able

2    to assist us in an investigation we were conducting.  We didn't

3    mention to the employer or anybody else in that business as to

4    why we were there.

5    Q.   Okay.  You had Mr. Mehanna's phone number?

6    A.   We did.

7    Q.   You could have called him?

8    A.   We could have called him, yes.

9    Q.   Now, when you interviewed Mr. Mehanna, you had him look at

00:33 10   photographs, correct?

11   A.   Correct.

12   Q.   You had him look at a photograph of Kareem Abuzahra?

13   A.   Correct.

14   Q.   Asked him if he knew him?

15   A.   Yes.

16   Q.   How long he knew him?

17   A.   I'm sorry?  Say that --

18   Q.   How long he knew him?

19   A.   Correct.

00:33 20   Q.   How did he know him?

21   A.   Yes.

22   Q.   You asked him when he saw him or had last seen him?

23   A.   Correct.

24   Q.   And you knew all of this information already about Mr.

25   Abuzahra?

     1    A.    Yeah.  We knew about him, yes.

     2    Q.    And you asked him about traveling to Yemen?

     3    A.    Correct.

     4    Q.    He said he went to Arabic schools and religious schools,

     5    correct?

     6    A.    He said that was what they had intended to do, yes.

     7    Q.    And you asked him how he got to the airport, correct?

     8    A.    Correct.

     9    Q.    And you already knew from Mr. Abuzahra how they got to the

00:34 10    airport, didn't you?

    11    A.    Yes.

    12    Q.    You asked him how the trip was paid for, correct?

    13    A.    Yes.

    14    Q.    And you already knew that from Mr. Abuzahra?

    15    A.    Yes, we did.

    16    Q.    You asked him what it cost for the trip, correct?

    17    A.    Yes.

    18    Q.    And you already knew that?

    19    A.    Yes.

00:34 20    Q.    You asked him if Mr. Abuzahra had given them more money?

    21    A.    Yes, I did.

    22    Q.    And you already knew that?

    23    A.    Yes.

    24    Q.    You asked him the itinerary, and you already knew that?

    25    A.    Yes.

1    Q.   You showed him a photograph of Mr. Abousamra, and he

2    identified that, correct?

3    A.   Yes, he did.

4    Q.   You asked him how did he know him, correct?

5    A.   Yes.

6    Q.   How long he knew him?

7    A.   Correct.

8    Q.   And these were questions you already knew the answer to?

9    A.   Correct.

00:35 10   Q.   You asked him what Yemen was like, correct?

11   A.   I don't know that we asked what Yemen was like.  He

12   provided us information about what he felt Yemen was like.

13   Q.   You asked him where he entered Yemen?

14   A.   Yes.

15   Q.   And where he went?

16   A.   Correct.

17   Q.   And you asked him how he planned the trip?

18   A.   Correct.

19   Q.   And you already knew that information, how he planned the

00:35 20   trip?

21   A.   Yes.

22   Q.   You asked him if there were individuals that assisted with

23   plans or contacts, correct?

24   A.   Correct.

25   Q.   You already had that information as well?

1    A.    Yes.

2    Q.    Now, you asked him how long he stayed, correct?

3    A.    It was -- I believe it was discussed, yes.

4    Q.    And you already knew that answer as well?

5    A.    Yes.

6    Q.    Now, you also asked him where Mr. Abousamra went, correct?

7    A.    Correct.

8    Q.    And you already knew that answer as well?

9    A.    Yes.

00:35 10    Q.    You showed him a picture of Jason Pippin, correct?

11    A.    Correct.

12    Q.    And Mr. Mehanna said he did not know him; he had never met

13    him, correct?

14    A.    Correct.

15    Q.    Now, Mr. Mehanna told you he went to study and he went to

16    Yemen, correct?

17    A.    Correct.

18          MS. BASSIL:  If we could have Exhibit 474, please.

19    Q.    And this is Mr. --

00:36 20          MS. BASSIL:  If we -- thank you, your Honor.

21    Q.    This is Mr. Mehanna's Customs Declaration Form, correct?

22    A.    Correct.

23    Q.    And he had said that he went to United Arab Emirates and

24    Yemen?

25    A.    Correct.

1   Q.   And Yemen is circled, correct?

2   A.   Correct.

3        MS. BASSIL:  Could we put Exhibit 473 next to that,

4   please.  Is that possible?

5   Q.   And this is Mr. Abousamra's Customs declaration when he

6   returned in 2004 as well, correct?

7   A.   Correct, yes.

8   Q.   And he only put down that he went to Syria, correct?

9   A.   Correct.

00:37 10   Q.   Unlike Mr. Mehanna, who put down all places he went to,

11   correct?

12   A.   Correct.

13   Q.   Now, Mr. Mehanna told you that he went to some schools,

14   and he left after a week in Yemen, correct?

15   A.   Correct.

16   Q.   And he said he did not meet with any person during his

17   layover in London, correct?

18   A.   Correct.

19   Q.   And he said that Mr. Abousamra stayed, correct?

00:37 20   A.   In the Middle East, yes, correct.

21   Q.   He told you that he went to Iraq?

22   A.   Yes.

23   Q.   Now, the last thing that you did or the last part of this

24   interview was showing Mr. Mehanna a picture of Daniel

25   Maldonado, is that correct?

         1    A.    That's correct.

         2    Q.    And asked how long he knew him?

         3    A.    Correct.

         4    Q.    Where he met him?

         5    A.    Correct.

         6    Q.    And you asked him where was Mr. Maldonado --

         7    A.    Yes.

         8    Q.    -- correct?

         9          Now, at that time, you already knew where Mr.

00:38   10    Maldonado was, did you not?

        11    A.    Yes.

        12    Q.    You had recorded a telephone call between Mr. Maldonado

        13    and Mr. Mehanna?

        14    A.    Yes.

        15    Q.    And the recorded phone call had come from Mr. Maldonado in

        16    Somalia?  You knew he had called from Somalia?

        17    A.    Yes.

        18    Q.    When you asked Mr. Mehanna about where Mr. Maldonado was,

        19    and he said that he was in Egypt, you knew that was not true?

00:38   20    A.    That's correct.

        21    Q.    So -- and, in fact, you did not say to him, We know that's

        22    not true?

        23    A.    No, we did not.

        24    Q.    You've had interviews on occasion where you have said that

        25    to somebody, have you not?  They tell you something, you say,

1    We know that's not true.  You want to correct your answer?

2    A.    I suppose so, yes.

3    Q.    You didn't do that here?

4    A.    No, we did not.

5    Q.    You didn't tell him you knew where Daniel Maldonado was?

6    A.    No.

7    Q.    In fact, when he said that Mr. Maldonado was in Egypt, you

8    knew that you now had Mr. Mehanna in a position where he could

9    be charged with a crime?

00:39 10    A.    Yes.

11    Q.    And that he could be forced to cooperate or face more

12    serious charges?

13              MR. AUERHAHN:  Objection.

14              THE COURT:  Sustained.

15    Q.    Now, at the time of this interview, December 16, 2006, you

16    not only had this telephone call, but the FBI also had a person

17    in Egypt that was reporting on Mr. Maldonado; is that not

18    correct?

19    A.    I believe so.  It --

00:40 20    Q.    In fact, the FBI was aware that as of September 21, 2006,

21    they had been informed that Mr. Maldonado was selling his

22    property or his furnishings and moving to Somalia?

23    A.    I believe so.  I wasn't as intimately involved with that

24    investigation.  So I'd have to review a report.

25    Q.    Now, at the time -- at the time you interviewed Mr.

1    Mehanna, you were aware Mr. Maldonado was in Somalia?  I'm

2    sorry to repeat myself.

3    A.   Yes.

4    Q.   You were also aware, were you not, that Somalia had been

5    taken over by the Islamic Courts Union?

6    A.   Yes.

7    Q.   And that this was a Muslim group, correct?

8    A.   Correct.

9    Q.   In fact, Somalia was and is a Muslim country?

00:41 10   A.   Predominantly, yes.

11   Q.   And that the Islamic Courts Union was not a designated

12   terrorist organization?

13   A.   Correct.

14   Q.   And it has never been designated as such, correct?

15   A.   Not to my knowledge.

16   Q.   Okay.  And, in fact, the president of Somalia today was

17   the head of the Islamic Courts Union when Daniel Maldonado was

18   there in 2006?

19   A.   I don't know that.

00:41 20   Q.   Now, if Mr. Mehanna had told you Daniel Maldonado was in

21   Somalia, right, you already knew that?

22   A.   Yes, we did.

23   Q.   All right.  And what would you have done differently?

24   A.   Again, we would -- we would question him further on how he

25   knows who -- that Maldonado may have relayed to him information

1    that he had met with or been with.

2    Q.   So you had the tape-recorded telephone call, right?

3    A.   We had -- to my knowledge, we had one telephone call.

4    Q.   Right.  And in that telephone call, Maldonado said he was

5    on a beach --

6    A.   Correct.

7    Q.   -- right?

8         In Somalia --

9    A.   Correct.

00:42 10   Q.   -- right?

11        And Somalia has a large coastline, does it not?

12   A.   Yes.

13   Q.   In fact, a beach wouldn't have been given -- a beach

14   didn't give you very much of a specific location, did it?

15   A.   No.

16   Q.   In fact, in that phone call, Mr. Maldonado did not say,

17   I'm in Kismayo or I'm in Mogadishu; he didn't identify where he

18   was?

19   A.   Not to my recollection.

00:42 20   Q.   In fact, at that time -- so that at that time, if Mr. --

21   by the way -- strike that.

22        If Mr. Mehanna had told you he was in Somalia, he

23   couldn't have told you where Mr. Maldonado was?

24   A.   That's a question?

25   Q.   Yeah.

1    A.   I don't know what maybe other communications he may have

2    had with him, so --

3    Q.   You know the FBI got Mr. Mehanna's -- all of his emails,

4    right, from his email server?

5    A.   I believe so, yes.

6    Q.   All of his instant messages?

7    A.   I believe so.

8    Q.   Was recording his telephone?

9    A.   Correct.

00:43 10   Q.   And so any information that Mr. Mehanna was getting, the

11   FBI was getting?

12   A.   If those were the only devices and email addresses he was

13   using that we were aware of, yes.

14   Q.   Well, do you feel -- strike that.

15        In that telephone call, there is no indication that

16   Mr. Mehanna knows anything more than what Mr. Maldonado is

17   telling him, correct?

18   A.   Based on that -- the conversation, that's probably a true

19   statement.

00:44 20   Q.   And, in fact, at that time when you interviewed Mr.

21   Mehanna on December 16, 2006, there were virtually no

22   Westerners in Somalia at that time, correct?

23   A.   I don't know.

24   Q.   There was no FBI in Somalia, was there?

25   A.   Not to my knowledge.   I don't know.

1   Q.   There was no FBI post, correct?

2   A.   No.  In Somalia?

3   Q.   Yeah.

4   A.   No.

5   Q.   So if you had asked him -- if he had told you Daniel was

6   in Somalia, you actually had more information than he did, did

7   you not, about Daniel Maldonado?

8   A.   I personally didn't.

9   Q.   No.  But the FBI did, right?

00:44 10   A.   Probably.  Again, I don't know all of what Mr. Mehanna may

11   have known apart from what he told us and apart from what we've

12   intercepted.

13   Q.   Well, since -- Mr. Maldonado has since been interviewed,

14   correct?

15   A.   Has since been interviewed?

16   Q.   Yes.

17   A.   Yes.

18   Q.   Twenty-six times?

19   A.   I don't know.  I don't know the number.

00:45 20   Q.   You also said that if Mr. Mehanna told you he went to

21   Yemen to study and that Mr. Abuzahra and Abousamra went there

22   for military training, you would have asked him where he went,

23   who he met, what they did, correct?

24   A.   Correct.

25   Q.   And you were questioning him two years after they went to

 1   Yemen, correct?

 2   A.   Correct.

 3   Q.   So that, in fact, you would be getting information, if he

 4   had told you that, that was at least two years old, correct?

 5   A.   Correct.

 6   Q.   You also don't know, in fact, if he would have answered

 7   any further of your questions?  He didn't have to?

 8   A.   That's correct.

 9   Q.   Now, Mr. Abousamra flew out of this country on December

00:46 10   26, 2006, is that correct?

11   A.   Correct.

12   Q.   And he was interviewed by Customs?

13   A.   Correct.

14   Q.   And he was let go?

15   A.   Correct.

16   Q.   Now -- even though you certainly felt he had lied to

17   you --

18   A.   Correct.

19   Q.   -- correct?

00:46 20   A.   Correct.

21   Q.   Felt he had tried to obtain military training in Pakistan?

22   A.   Correct.

23   Q.   Not once but twice --

24   A.   Correct.

25   Q.   -- correct?

1          And that he -- his ideas -- people -- certainly

2     witnesses you had interviewed had indicated his ideas were

3     radical and extremist, correct?

4     A.   Correct.

5     Q.   But he was not arrested or stopped?

6     A.   He was not arrested.

7     Q.   Well, he was stopped and let go --

8     A.   Correct.

9     Q.   -- correct?

00:46 10          Now, were you misled by what Mr. Mehanna told you

11    about, that he went to Yemen to look for schools?

12    A.   Based on what we knew, yes.

13    Q.   Well, was anyone sent to Yemen to look for schools from

14    the FBI?

15    A.   Oh, no, no.

16    Q.   Was an FBI agent in Yemen contacted?

17    A.   I'd have to review the case file to determine that.  There

18    was a station in Yemen at the time.

19    Q.   But off the top of your head, you don't recall calling the

00:47 20   FBI station in Yemen and saying, Can you check this out for me?

21    A.   I don't recall at this point.

22    Q.   And you don't recall -- was the -- was the Yemeni security

23    forces contacted?

24    A.   I don't recall that.

25    Q.   And was the school that you knew of, Dar al-Mustafa, did

1   you contact the school to find out information?

2   A.   No.

3   Q.   Was anyone sent to Somalia to find Daniel Maldonado?

4   A.   Not to my knowledge.

5   Q.   Was the FBI in Egypt contacted after Mr. Mehanna said that

6   Mr. Maldonado was in Egypt?  There is a station in Egypt, is

7   there not?

8   A.   There is.

9   Q.   Or there was.  Is there still?

00:47 10   A.   There is.

11   Q.   Was the FBI in Egypt contacted?

12   A.   I don't have that information.

13   Q.   You didn't contact them?

14   A.   I did not.

15   Q.   Did you contact the Egyptian police or security forces?

16   A.   I did not.  I don't know if it was done.

17   Q.   Now, Mr. Maldonado's mother was contacted on January 10th,

18   is that correct?

19   A.   I don't know that.

00:48 20   Q.   After Mr. Mehanna spoke to you about Daniel Maldonado, did

21   you call any of his family members?

22   A.   Whose family members?

23   Q.   Mr. Maldonado's.

24   A.   I did not.

25   Q.   Now, when you said you would have asked for more

1  information from Mr. Mehanna about Mr. Abousamra going -- Mr.

2  Abousamra going for military training, you said you would have

3  asked for more.  It didn't mean you would get it?

4  A.    Correct.

5  Q.    And when you did get the information about what Mr.

6  Abousamra had done, you let him leave this country?

7  A.    That's correct.  He was allowed to leave.

8  Q.    Allowed to leave.  Mr. Mehanna's the last man left

9  standing, isn't he?  Isn't he?

00:49 10  A.    Left standing from?

11  Q.    On trial in this court.

12  A.    He is on trial in this court, yes.

13  Q.    Thank you.

14        MS. BASSIL:  I have no further questions.

15        THE COURT:  Mr. Auerhahn.

16  REDIRECT EXAMINATION BY MR. AUERHAHN:

17  Q.    Sir, on this last question, is Mr. Abousamra also under

18  Indictment?

19  A.    He is.

00:49 20  Q.    He is, in fact, a fugitive?

21  A.    He is.

22  Q.    Now, sir, Miss -- defense counsel asked you whether or not

23  you believed that Mr. Mehanna, by lying to you, had committed a

24  crime and your answer was yes?

25  A.    Yes.

1        MS. BASSIL:  I don't think I asked about Mr. Mehanna.

2   I think I asked about --

3        THE COURT:  I think the question was whether he could

4   be charged with a crime.

5        MR. AUERHAHN:  I'm sorry.  Okay.

6   Q.   Rephrased that way, your answer is yes?

7   A.   Yes.

8   Q.   Did you advise, well, each of the three men, that they

9   could refuse to answer your questions?

00:50 10  A.   Yes.  It was a voluntary interview.

11  Q.   And refusing to answer questions, is that a crime?

12  A.   No.

13  Q.   Now, defense counsel asked you whether or not there was

14  some level of embarrassment by questioning him at work?

15  A.   Correct.

16  Q.   Do you recall the conversation that we played just earlier

17  this morning with his mother in which he stated, "I mean, it

18  wasn't a big deal, but I just wanted to make them feel guilty."

19  Do you remember that?

00:51 20  A.   I do.

21  Q.   So apparently it was not a source of embarrassment to Mr.

22  Mehanna?

23       MS. BASSIL:  Objection.

24       THE COURT:  Sustained.

25  Q.   Do you recall him stating that to his mother?

1    A.   I do.

2    Q.   Now, with reference to the information you had about Yemen

3    from Mr. Abuzahra, did Mr. Abuzahra tell you that he went to

4    Yemen?

5    A.   He said he did not go to Yemen.

6    Q.   So his information was their intention before they left,

7    in going to Yemen, as opposed to what happened in Yemen?

8    A.   Correct.

9    Q.   So when you asked Mr. Mehanna about specific places he

00:51 10   visited in Yemen, that was not information you had from Mr.

11   Abuzahra?

12   A.   That's correct.

13   Q.   You mentioned that -- some specific towns yesterday where

14   Mr. Mehanna stated he visited, including Sayoun, Sanaa and

15   Tarim; do you remember testifying about that?

16   A.   I do.

17   Q.   Did he mention that he also went to Ma'rib?

18   A.   Not to my recollection.

19   Q.   Did he tell you about a large-sized Egyptian in a perfume

00:52 20   shop that he visited there?

21   A.   No.

22   Q.   If Mr. Abuzahra was not with them in Yemen, was he in a

23   position to tell you about that person and that visit?

24   A.   No, he was not.

25   Q.   Now, defense counsel asked you about questions concerning

1    Mr. Maldonado and that there's a person in Egypt reporting on

2    Maldonado.  Do you remember those questions?

3    A.   Yes.

4    Q.   And at the time of the interview, was Mr. Maldonado in

5    Egypt?

6    A.   At the time of the interview of --

7    Q.   Of Mehanna, I'm sorry.  At the time of the interview of

8    Mehanna, was Mr. Maldonado in Egypt?

9    A.   No.

00:53 10   Q.   Where was he?

11   A.   He was in Somalia.

12   Q.   Would a person in Egypt be in a position to provide any

13   information firsthand about what Mr. Maldonado was doing in

14   Somalia?

15   A.   Not firsthand, no.

16   Q.   Similarly, if Mr. Mehanna had told you that Mr. Maldonado

17   was in Somalia, would you have asked him about whether he knew

18   in advance of Mr. Maldonado's trip to Somalia that he was going

19   there?

00:53 20          MS. BASSIL:  This is all leading.

21          THE COURT:  Form of the question.  Sustained.

22   Q.   You said you would have asked some follow-up questions?

23   A.   Correct.

24   Q.   What kind of questions in terms of Mr. Maldonado's

25   planning of the trip to Somalia?

1          MS. BASSIL:  I believe this was already asked and

2     answered, your Honor.

3          THE COURT:  Well, it was also touched on in cross.  So

4     he can go ahead.

5     A.   Could you repeat the question, please?

6     Q.   If Mr. Mehanna had told you the truth and said he's in

7     Somalia, Maldonado is in Somalia, what would you have asked him

8     about Mr. Maldonado's planning before going to Somalia?

9     A.   Again, I would have asked him if -- who he would have been

00:54 10    in touch with to assist him in getting to Somalia, where he was

11    planning to go in Somalia, what he was planning to do in

12    Somalia, methods of contact for Mr. Maldonado while in Somalia,

13    those types of questions.

14    Q.   Would you have asked him whether Mr. Mehanna knew in

15    advance of Mr. Maldonado's trip that he was, in fact, going to

16    Somalia?

17    A.   Yes.  If he would have responded to those questions, I

18    would have assumed he knew in advance, but yes.

19    Q.   And would you have asked details of that conversation?

00:54 20    A.   Of course.

21    Q.   And whether or not he was with anyone else?

22    A.   If Maldonado was with anyone else?

23    Q.   Yes.

24    A.   Yes.

25    Q.   And you were denied the opportunity to ask those

1    questions?

2    A.    Based on the responses that Mr. Mehanna gave, yes.

3    Q.    Now, I suspect it's often that when you're investigating

4    an event you get different versions of an event from two

5    different witnesses?

6    A.    That's common, yes.

7    Q.    Do you investigate both versions?

8    A.    Yes.

9    Q.    So if you get contradictory information, what do you do?

00:55 10    A.    You have to use other available sources and methods,

11    whether it's witnesses, whether it's human source information,

12    technical source information, and that you use all of that

13    collectively to corroborate one or both stories.

14    Q.    Again, defense counsel asked you questions about what Mr.

15    Mehanna said about what Abousamra did in terms of going to

16    Iraq?

17    A.    Yes.

18    Q.    Do you recall those questions?

19          So you knew that he had gone to Iraq, is that correct?

00:56 20    A.    Yes.

21    Q.    And Abousamra told you he went to Iraq for what purpose?

22    A.    To be an Arabic-English translator.

23    Q.    What did Mr. Mehanna tell you was Mr. Abousamra's purpose

24    in going to Iraq?

25    A.    To be Arabic-English translator in support of the

1    reconstruction efforts in Iraq.

2    Q.    Was Mr. Abuzahra with Mr. Abousamra before he left for

3    Iraq, when they were in Yemen and then left for Iraq?

4    A.    They were together in Yemen, yes, before Abousamra went to

5    Iraq.

6    Q.    I'm sorry.  I may have used the wrong name.  What I meant

7    to say:  Was Mr. Abuzahra with Mr. Abousamra in Yemen before he

8    left to Iraq?

9    A.    No.

00:56 10   Q.    So he was not in a position to provide you with

11   information as to what Mr. Abousamra said before he left for

12   Iraq from Yemen?

13   A.    That's correct.  He was not.

14   Q.    But Mr. Mehanna was?

15   A.    Correct.

16         MR. AUERHAHN:  May I just have one moment, your Honor,

17   please?

18   Q.    You knew -- defense counsel asked you about you knew about

19   a telephone conversation between Mr. Maldonado and Mr. Mehanna

00:57 20   where Mr. Maldonado called from Somalia?

21   A.    Yes.

22   Q.    Did you ask Mr. Mehanna to explain to you the conversation

23   between them or to put in context the conversation between

24   them?

25   A.    No.

1    Q.    Why is that?

2    A.    Because he had indicated he believed that Mr. Maldonado

3    was in Egypt and that he hadn't heard from him in about two

4    weeks, I believe, which would have predated the phone call.

5          MR. AUERHAHN:  Can I have one moment, your Honor?

6          No further questions.

7          MS. BASSIL:  Just a couple, your Honor, if I could do

8    it from here.

9          THE COURT:  If it's really a couple.

00:58 10          MS. BASSIL:  Yes, thank you.

11   RECROSS-EXAMINATION BY MS. BASSIL:

12   Q.    Mr. Davis, why didn't you tell Mr. Mehanna you had a

13   telephone call recorded between Mr. -- himself and Mr.

14   Maldonado?

15          MR. AUERHAHN:  Objection, your Honor.

16          THE COURT:  Sustained.

17   Q.    Now, you stated that Mr. -- I think just now you said that

18   Kareem Abuzahra was not with Mr. Abousamra or Mr. Mehanna in

19   Yemen, correct?

00:58 20   A.    Correct.

21   Q.    And so, in fact, his knowledge about at least Mr.

22   Mehanna's intent in going could have been -- was, in fact, old

23   information, correct?

24   A.    It was information as to the intent as they had discussed

25   their plan to go to Yemen before they actually traveled.

1    Q.   Right.  So, in fact, Mr. Abuzahra had no knowledge of what

2    Mr. Mehanna's intent was in Yemen or otherwise, correct?

3    A.   Well, up until they reached the United Arab Emirates, it

4    was what Mr. Abuzahra had told us.  After they left -- "they"

5    meaning Mr. Mehanna and Mr. Abousamra -- left United Arab

6    Emirates that next day, he wouldn't have known after that point

7    in time.

8    Q.   Correct.  He wouldn't have known.  Thank you.

9         THE COURT:  Okay, Agent Davis.  Thank you.  You may

00:59 10  step down.

11        MR. GROHARING:  We call Colleen Downey.

12        THE CLERK:  Want to step up here, ma'am.  Remain

13   standing.

14        COLLEEN DOWNEY, Sworn

15        THE CLERK:  Please be seated.  State your name and

16   spell your last name for the record.

17        THE WITNESS:  Colleen Downey, D-o-w-n-e-y.

18   DIRECT EXAMINATION BY MR. GROHARING:

19   Q.   Good morning, ma'am.

01:00 20  A.   Good morning.

21   Q.   Ma'am, how are you employed?

22   A.   I'm currently working as a CBP officer for Customs and

23   Border Protection in Boston.

24   Q.   How long have you been a CBP officer?

25   A.   Since the inception of the agency in 2003.

```
 1   Q.   What are your duties as a CBP officer?

 2   A.   I'm currently assigned to the Antiterrorism Contraband

 3   Enforcement Team.  I'm located out of the seaport right now.

 4   So it's more based on cargo and vessels and the inspections of

 5   the goods and commodities leaving and entering the U.S.

 6   Q.   Were you performing those same duties in 2006?

 7   A.   I was not.  I was on the same team, but I was actually

 8   assigned to the outbound team.  So I was working out of the

 9   airport.

10   Q.   In that capacity, what did you do?

11   A.   You conduct examination of passengers and bags exiting the

12   United States.

13   Q.   Okay.

14        MR. GROHARING:  Permission to display Exhibit 741,

15   your Honor.  It's already in evidence.

16        THE COURT:  All right.

17   Q.   Do you recognize this photo?

18   A.   I do.

19   Q.   Who is this?

20   A.   Abousamra.

21   Q.   Ahmad Abousamra?

22   A.   Yes.

23   Q.   Have you met Mr. Abousamra?

24   A.   I have.

25   Q.   When did you meet him?
```

1    A.    I conducted an outbound examination on him in 2006.

2          THE COURT:  Miss Downey, would you pull the microphone

3    closer to you so we can pick up your voice a little bit better.

4    Q.    You indicated you conducted an outbound examination of

5    him?

6    A.    Correct.

7    Q.    And that was in December 2006?

8    A.    Correct.

9    Q.    What do you recall about that interview?

01:02 10   A.    It was a pretty basic interview.  It was standard.  It's

11   an interview, inspection, that we do on a regular basis.

12   Q.    Did he indicate where he was traveling?

13   A.    He did.

14   Q.    Where was that?

15   A.    Syria.

16   Q.    Did he indicate the purpose of his travel?

17   A.    It was for a vacation.  He said he was going to visit his

18   wife.

19   Q.    Do you recall whether or not he had a roundtrip ticket?

01:03 20   A.    He did.  He was due to return -- the examination was

21   conducted the end of December.  It was approximately a

22   one-month trip.  He was due to return back into Boston the end

23   of January.

24   Q.    Do you recall anything else he said about that trip?

25   A.    He just basically stated it was a vacation.  He was going

1    to visit his current wife.

2    Q.   Okay.  Are you aware if Mr. Abousamra ever returned to the

3    United States?

4    A.   He has not.

5    Q.   He has not.  How have you confirmed that?

6    A.   Through routine checks in our system.

7    Q.   When you refer to your system, what are you referring to?

8    A.   Just different databases that show when people enter and

9    exit the United States and how often, like, your passport is

01:04 10   swiped or just crossings.

11   Q.   Is it fair to say that CBP documents all entries and exits

12   in the United States?

13   A.   Yes.

14   Q.   And that information -- and that's contained in the

15   databases you just referenced?

16   A.   It is.

17   Q.   When you checked those databases, you did not find any

18   information for him returning to the United States?

19   A.   I did not.

01:04 20        MR. GROHARING:  That's all I have, your Honor.

21   CROSS-EXAMINATION BY MS. BASSIL:

22   Q.   Good morning.

23   A.   Good morning.

24   Q.   I take it you got married since 2006?

25   A.   I did.

1    Q.    All right.  So you were Colleen McDermott, and now you're

2    Downey?

3    A.    Right.

4    Q.    You said that you inspected or you stopped Mr. Abousamra

5    on his way out of the United States, correct?

6    A.    Correct.

7    Q.    And you don't stop -- when you were working at Logan

8    Airport, you didn't stop everyone going out of the United

9    States, correct?

01:05 10   A.    We attempt to stop as many as we can.  It's actually a --

11   it's a specialized team.  We attempt to do a hundred percent at

12   least on a document check and asking a couple questions.

13   Q.    But, in fact, with Mr. Abousamra, you took -- with the

14   assistance of the FBI, you took the contents of a thumb drive

15   or a flash drive that he had, correct?  Would it help you to

16   look at your report?  Do you have a memory of this?

17   A.    I do.  That's correct.

18   Q.    You took the contents of his thumb drive, correct?

19   A.    Yeah.

01:06 20   Q.    His laptop hard drive, correct?

21   A.    Correct.

22   Q.    His cellular -- the contents of his cellular telephone,

23   correct?

24   A.    Correct.

25   Q.    And a SIM card.  That's the little card that either goes

```
 1   in a phone or it might go -- I guess it goes in a phone, right?
 2   It's the little computer chip card that goes in a phone,
 3   correct?
 4   A.   Uh-huh.
 5   Q.   And a SIM card has the content of what's in the phone,
 6   phone numbers?
 7   A.   Correct.
 8   Q.   Might have -- might have some instant messages maybe or
 9   chats maybe or texting, correct?
10   A.   Correct.
11   Q.   Or emails, correct?
12         You don't do that of everybody who's leaving the
13   United States, correct?
14   A.   I believe a lot of that information is law enforcement
15   sensitive.
16   Q.   It's classified information?
17   A.   I think -- it is law enforcement sensitive as to what's
18   taken.
19   Q.   What do you mean it's law enforcement sensitive?
20         MR. GROHARING:  Maybe we should approach, your Honor.
21         THE COURT:  All right.
22   (SIDEBAR CONFERENCE AS FOLLOWS:
23         MS. BASSIL:  What I'm trying to get at is they
24   obviously stopped him for a reason as opposed to anybody else,
25   and they searched his computer and electronic equipment as
```

1    opposed to anyone else, and then they let him go.  So that's

2    really what I'm getting at.  I assume they either had some kind

3    of asterisk against his name or something on the list or

4    something that popped up obviously.

5           MR. GROHARING:  We've already talked about the list

6    and agreed not to ask about --

7           MR. CARNEY:  Didn't even occur to me.  May I have a

8    moment?

9           MS. BASSIL:  He keeps making deals I don't know

01:07 10    anything about.

11    (Discussion held off the record.)

12           MS. BASSIL:  Okay.  All right.

13           MR. GROHARING:  You've already gotten --

14           MS. BASSIL:  That's fine.  Okay.  I'll withdraw the

15    question.

16    .   .   .   END OF SIDEBAR CONFERENCE.)

17    Q.   Now, Miss McDermott, were you -- did you take -- were you

18    there when photographs were taken of Mr. Abousamra's

19    belongings?

01:08 20    A.   I do not believe there are any images of --

21    Q.   I'm sorry?

22    A.   I do not believe there are any images of the --

23    Q.   Well, I'm going to see if this just refreshes your memory.

24    I'm just going to show you this and ask you to look at it and

25    just see if this refreshes your memory at all.

```
 1   A.   Uh-huh.

 2   Q.   Does that refresh your memory that, in fact, photographs

 3   were taken of Mr. Abousamra's belongings?

 4   A.   Yes.

 5   Q.   And photographs were taken of the thumb drive, the

 6   computer?

 7   A.   Uh-huh.

 8   Q.   You have to answer yes so the stenographer -- the court

 9   reporter can record it.

10   A.   Yes.

11   Q.   Then there were a number of pictures on his computer

12   primarily of what appear to be family, something of that

13   nature?

14   A.   Yes.

15        MS. BASSIL:  I'd like to -- your Honor, if you want to

16   look at this first.

17        MR. GROHARING:  Your Honor, I think we should

18   approach.

19        THE COURT:  Okay.

20   (SIDEBAR CONFERENCE AS FOLLOWS:

21        MR. GROHARING:  This appears to be a wedding photo of

22   Mr. Abousamra.  She didn't see the photos.

23        THE COURT:  She didn't quite say one way or the other.

24        MR. GROHARING:  They were taken --

25        MS. BASSIL:  I'll ask her if she saw it.
```

01:10 (line 10)
01:11 (line 20)

```
 1          THE COURT:  What's the point?

 2          MS. BASSIL:  I just want to say is that what he looked

 3   like when you saw him as opposed to the photos they've been

 4   showing and if this is the type of thing that was on his

 5   computer.  That's all he really had.  He didn't have, like --

 6          THE COURT:  As it goes to his appearance, that's fair.

 7          MS. BASSIL:  Thank you.  I'll ask her if she saw that.

 8   .  .  .  END OF SIDEBAR CONFERENCE.)

 9          MS. BASSIL:  Your Honor, if the witness could -- I can

01:12 10   walk over and give it to her.

11          THE COURT:  I think it is on the monitor.  Miss

12   Downey, do you have it?

13          THE WITNESS:  Yes.

14   Q.   Miss Downey, looking at that picture on your screen, did

15   you see that photograph?

16   A.   I do not recall this particular photograph.

17   Q.   Do you remember seeing a number of photographs like this?

18   A.   There were many photographs in the luggage.

19   Q.   Did this -- do you recognize the man on the left?

01:12 20   A.   I do not.

21   Q.   You do not.  You don't recognize that as Mr. Abousamra?

22   A.   I believe all of the -- I believe all of the photographs

23   were of him and his family.

24          MS. BASSIL:  Your Honor, if we could publish this

25   photograph.
```

```
 1              THE COURT:  All right.  The jury has it.  There's a
 2      delay for the public monitor.
 3              MS. BASSIL:  I keep forgetting that.
 4      Q.   There were many photographs just like this, correct?
 5      A.   Correct.
 6              MS. BASSIL:  Thank you.  I have no further questions.
 7              MR. GROHARING:  Nothing further, your Honor.
 8              THE COURT:  All right.  Miss Downey, thank you.  You
 9      may step down.
01:13 10              MR. CHAKRAVARTY:  Matthew Taylor.
11              MS. BASSIL:  Your Honor, before Mr. Taylor testifies,
12      I'd like to approach sidebar.
13              THE COURT:  All right.
14      (SIDEBAR CONFERENCE AS FOLLOWS:
15              MS. BASSIL:  Your Honor, I didn't have a chance to
16      object to these so -- the exhibits that they have indicated
17      they're going to put in through this witness.  So as I
18      understand it, there are these categories.  There are three
19      emails that --
01:14 20              MR. CHAKRAVARTY:  We are not going to do this with
21      him.
22              MS. BASSIL:  Okay.
23              THE COURT:  Who is this gentleman?
24              MR. CHAKRAVARTY:  He's a FBI agent out of Houston.
25              THE COURT:  All right.
```

1          MS. BASSIL:  He seems more than the others who have

2     been involved in the kind of Maldonado/Egypt as a topic.  He's

3     the one who had the informant in Egypt.  That's his report,

4     okay.

5          Then there are a number of -- I don't know if you're

6     going to use these.  There are a number of emails, I think.  I

7     think these are emails back and forth.  It starts with this

8     British organization called Cage Prisoners.  I think they're

9     kind of like Amnesty International.  They do -- they inquire

01:15 10     into people, Muslim people, who are -- am I wrong?  You were

11     shaking your head.  I shouldn't look at him.  I guess they're

12     kind of the equivalent of Amnesty International.

13          They made inquiry of Mr. Mehanna about if he knew

14     where Omar Hamammi was.  He was missing.  They last knew he was

15     in Somalia.  They didn't know where he was.  Had he heard

16     anything about him.  There was sort of a back and forth.  At

17     that point, Mr. Maldonado was in custody, and so he says he'll

18     ask Mr. Maldonado.  And there's the back and forth about where

19     Hamammi might be.

01:15 20          THE COURT:  What year is this?

21          MS. BASSIL:  This is all 2008.  Yeah, it's 2008,

22     January of 2008.  So it's a year after Maldonado is put in

23     custody.

24          And then it sort of goes back and forth.  There's this

25     person that says -- he lists himself as Alexander Buddy, friend

1    of a friend.  He seemed to be talking about who might have in

2    Somalia informed on Daniel Maldonado.  That's what it sounds

3    like.

4         I really don't know the relevance of this.  To me,

5    this is not part of this conspiracy.  It's never been in the

6    Indictment, and I don't see the relevancy of it at all.

7         MR. CHAKRAVARTY:  That person is Hamammi.  This

8    witness is just going to simply be reading these emails and

9    establish that --

01:16 10        THE COURT:  These are --

11        MR. CHAKRAVARTY:  These are in evidence.

12        THE COURT:  But subject to the proviso?

13        MS. BASSIL:  Right.  If I may just talk about Hamammi

14   actually for a minute.  Omar Hamammi was somebody who went to

15   Somalia, and the defendant met him once when he was in Egypt in

16   the summer of 2006.

17        MR. CHAKRAVARTY:  The defendant.

18        MS. BASSIL:  I said the defendant met him once in the

19   summer of 2006 when he was with Maldonado.  He met him once.

01:17 20  They were not friends.  As far as I know, they didn't

21   correspond on Tibyan or anything of that nature.

22        Hamammi stayed in Somalia after -- nobody quite knows

23   what happened to him, but he was not captured.  He did not show

24   up in Kenya.  And he apparently, I think, is still in Somalia.

25   It's just sort of unclear.  These clips show up on YouTube.

 1   We'll have an objection to those later.

 2          But he's not in the Indictment.  He's not part of this

 3   conspiracy.  And it's really going far afield to say, because

 4   the defendant met him once, that somehow everything Hamammi did

 5   is relevant to this case.

 6          THE COURT:  Okay.  Let me hear what the government --

 7          MR. CHAKRAVARTY:  I'm not saying everything Hamammi

 8   did is relevant.  The fact is that he has a preexisting

 9   relationship with the defendant.  In fact, the evidence will be

01:18 10   the defendant will have claimed to know him.  His online

11   identity was Al Mizzi, and he knew him.  And he says, I know

12   him very well later in the consensual recordings.  And he's

13   engaged in these emails, self-evidently, on him and this other

14   person, whether it's Hamammi or someone else, essentially

15   trying to track down whoever the source was that ratted, for

16   lack of a better phrase, on Daniel Maldonado and hunt him down.

17   And so it evidences that the concealing of the existence of the

18   conspiracy, especially the fact that Maldonado -- that this

19   defendant was aware that both Maldonado and Hamammi were over

01:18 20   training in Somalia at the time.  That somebody who has

21   disclosed that information should be hunted down, I think, is

22   relevant to show that he was trying to conceal this information

23   from the FBI.

24          MS. BASSIL:  This "hunted down" is a big exaggeration.

25   There's nothing in those emails that says, We're going to go

1    hunt him down.  The other part of it is, if our client were a

2    drug dealer in Boston and he was a drug dealer in Los Angeles,

3    the evidence about the drug dealer in Los Angeles doesn't come

4    in.  And he did not have evidence.  He knew Maldonado was in

5    Somalia because of the phone call he made, but he had no

6    evidence that Hamammi was in Somalia.

7              MR. CHAKRAVARTY:  He spoke to him on that known call.

8              THE COURT:  I think, before we get probably to the

9    point of -- well, I'm not sure.  Maybe not.  How does the

01:19 10   government intend to proceed with this witness?  What will I

11   hear if --

12             MR. CHAKRAVARTY:  We'll establish that the lies that

13   the defendant made to Brad Davis, the preceding -- two

14   preceding witnesses, were also material to their investigation

15   of Hamammi and Maldonado.  And then I'll go into start reading

16   these.

17             MS. BASSIL:  How is that relevant to -- I don't see

18   how those emails are relevant to that issue.

19             MR. CHAKRAVARTY:  I'm not saying they are.

01:19 20             THE COURT:  These emails are again?

21             MR. CHAKRAVARTY:  These are -- first, the emails are

22   from the defendant in --

23             THE COURT:  These are from the search of his computer?

24             MS. BASSIL:  No.  They're from the --

25             MR. CHAKRAVARTY:  Some are from the search of the

1   Yahoo account.

2           THE COURT:  But they're captured because it's --

3   whatever was searched, there was a search of the defendant --

4           MR. CHAKRAVARTY:  The defendant's --

5           MS. BASSIL:  Not his computer itself.

6           THE COURT:  But his communications because you're

7   looking for his stuff rather than someone else's.

8           MS. BASSIL:  Where is the identification that this is

9   Hamammi?  No name is used.

01:20 10         THE COURT:  Where is the foundation for his connection

11   with Hamammi?

12          MR. CHAKRAVARTY:  So part of it is just based --

13          THE COURT:  Just the emails themselves?

14          MR. CHAKRAVARTY:  And part of it will be -- there will

15   be evidence later with Maldonado.  Within the emails themselves

16   as well as there's an IP address.  And within the discussion,

17   they use a reference to whether are you the author -- he's

18   using code.  The defendant asks Hamammi --

19          THE COURT:  Is he wanted by the U.K.?

01:21 20         MR. CHAKRAVARTY:  He is personally designated as a --

21          THE COURT:  In the U.S., not --

22          MS. BASSIL:  Long after this.

23          MR. CHAKRAVARTY:  Yeah.  No long after but after.

24          MS. BASSIL:  After this.

25          MR. CHAKRAVARTY:  The defendant says, Are you the

1    author of -- he cites two texts.  The texts are authored by

2    something Al Mizzi.  And the person's response is, Yeah, I like

3    peanut butter and jelly too, which, in the context of those

4    telephone calls with Daniel Maldonado, he's physically present

5    and talking.  You can hear him talking on the phone with the

6    defendant.  The fact that he's present during that call, which

7    will come out with the next witness, Daniel Maldonado, but more

8    importantly, the fact that he says, Yes, I am the author of

9    this --

01:21 10           THE COURT:  Is Maldonado going to testify about

11   Hamammi?

12           MR. CHAKRAVARTY:  Yes.

13           MS. BASSIL:  I'm going to be objecting to that.

14           THE COURT:  Same general objection?

15           MS. BASSIL:  Same general objection and a little bit

16   more specific.  But the other issue is:  Where is the evidence

17   that, No. 1, when he says, Are you the author of, it doesn't

18   saying anything about Al Mizzi.  I don't know that that's

19   written by somebody named Al Mizzi.  Where is the foundation

01:22 20   for that?  This person uses the name friend of a friend or

21   Alexander Buddy.  It doesn't indicate where the email is coming

22   from.

23           MR. CHAKRAVARTY:  IP is just like any other link on

24   the internet.  This agent -- he found they were authored by an

25   Al Mizzi.  There's an internet protocol address which comes

1    with each email.  It's captured.  He plugged that in and it

2    comes up to Somalia.

3           MS. BASSIL:  Wait a minute.  I want to hear how this

4    agent knew that these two classical texts were written by Al

5    Mizzi.  I haven't heard that.  You just told me.

6           MR. CHAKRAVARTY:  Exactly.  I just told you.  He

7    Googled it.  I'm previewing his testimony.

8           THE COURT:  I'm not going to exclude it as a general

9    matter.  We'll take it as it comes, but I think there's enough

01:22 10   relevance for its admission.

11           MS. BASSIL:  Note my objection because we are now way

12    beyond the conspiracy that my client is charged with.

13           THE COURT:  I'm aware of it, and we'll -- if it gets

14    -- if it doesn't pan out --

15           MS. BASSIL:  I don't know how you unring the bell.

16    .  .  .  END OF SIDEBAR CONFERENCE.)

17           MATTHEW TAYLOR, Sworn

18           THE CLERK:  Please be seated.  State your name and

19    spell your last name for the record.

01:23 20           THE WITNESS:  My name is Matthew Taylor.  Last name

21    T-a-y-l-o-r.

22    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

23    Q.    Good morning.

24    A.    Good morning.

25    Q.    Please tell the jury where you work.

1    A.    I work for the FBI currently in Houston, Texas.

2    Q.    How long have you worked for the FBI?

3    A.    Twenty-nine years.

4    Q.    In what capacity are you presently assigned?

5    A.    I work as a source developer in the counterterrorism

6    section.

7    Q.    Which field division are you assigned to?

8    A.    Houston.

9    Q.    How long have you been there?

01:24 10    A.    Since 1991.

11    Q.    How long have you been doing counterterrorism

12    investigations?

13    A.    Twenty-six of the twenty-nine years I've been in the FBI.

14    Q.    Can you describe some of the places that you've been

15    assigned during those investigations?

16    A.    Yes.  I was assigned -- after I returned to Houston, I did

17    -- I've been in New York for six years.  I went back for the

18    original World Trade Center bombing case in 1993.  And then

19    after 2001, I've been to Saudi Arabia four times, once as a

01:24 20    legal attache; been to Afghanistan twice; Jordan, four times;

21    Pakistan; Israel; and some other countries in the Peninsula, in

22    the Gulf/Peninsula.

23    Q.    You mentioned that you were a source coordinator?

24    A.    Well, I develop -- recruit and develop sources.

25    Q.    Sources important to the work of the FBI?

1    A.    Absolutely.

2    Q.    I'm going to draw your attention now to this case.  Mr.

3    Taylor, are you familiar with Mr. Daniel Maldonado and Omar

4    Hamammi?

5    A.    Yes, I am.

6    Q.    How are you familiar with them?

7    A.    I know that Houston had an investigation on Daniel

8    Maldonado, and then there was -- based on relationships with

9    Daniel Maldonado, I believe, there was a case opened up in

01:25 10   Alabama on Omar Hamammi.

11   Q.    Are those terrorism investigations?

12   A.    Yes.

13   Q.    Are you familiar with an interview that occurred of

14   defendant Tarek Mehanna on December 16 of 2006?

15   A.    Yes, I am.

16   Q.    Have you had an opportunity to review the report of that

17   interview?

18   A.    Yes, I have.

19   Q.    Now, at the time of that interview, were you participating

01:26 20   in the investigations of Daniel Maldonado and Omar Hamammi?

21   A.    Tangentially, yes, as -- having some human sources, we

22   were -- sources I had, we were trying to utilize them in those

23   investigations.

24   Q.    The information that Mr. Mehanna gave to the FBI, is that

25   something that was disseminated throughout -- to the relevant

```
 1   agencies -- relevant field offices within the FBI?

 2   A.   Yes.

 3   Q.   Now, at the time of that interview with the defendant, did

 4   you know definitely where Daniel Maldonado and Omar Hamammi

 5   were?

 6   A.   No, I did not.

 7   Q.   Do you know what they were doing?

 8   A.   No.

 9   Q.   Did you know who they were with?

01:26 10   A.   No.

11   Q.   Do you know how they got there?

12   A.   No.

13           MS. BASSIL:  Objection, your Honor.  All leading.

14           THE COURT:  No, overruled.

15   Q.   When interviewing someone who has ties to subjects of

16   terrorism investigation, what types of information generally

17   are you looking for?

18   A.   Well, the basic things of who, where, what, why.  We would

19   want to know where Daniel Maldonado and Omar Hamammi were.

01:27 20   We'd want to know who they were with.  We'd want to know what

21   they were doing.  We would want to know how they got there, how

22   it was financed, their travel was financed.  And, importantly,

23   to the FBI, you know, we would assume that at some point they

24   would be coming back to the United States, and we'd want to

25   know what kind of activities they'd done overseas.  Had they
```

1    obtained indoctrination; had they obtained any type of

2    training; had they actually fought, because when they came back

3    to the United States, that would be very relevant to what would

4    happen and investigations that would ensue once they returned.

5    Q.    So if, in December of 2006, Mr. Mehanna told you that he

6    had just spoken to Maldonado, would that have assisted your

7    investigation?

8    A.    Absolutely.

9    Q.    Specifically, if he said that he was in Somalia and he was

01:28 10   with Omar Hamammi and described his activities there, describe

11   the ways that that would have affected your investigation.

12   A.    Well, it would reinvigorated our investigations on Daniel

13   Maldonado and Omar Hamammi because then we would know

14   definitely where they were.  We would activate human sources to

15   talk to people that they knew back in the States, maybe develop

16   sources that we could send to Somalia, who might make contact

17   with them there.  We would go back and reinterview all of their

18   associates to see if they had heard from Daniel Maldonado and

19   Omar Hamammi and see if they had any additional information

01:29 20   about what they were doing and who they were with while they

21   were in Somalia.

22   Q.    Are you familiar with what a lead is in the FBI?

23   A.    Yes.

24   Q.    Would you have sent leads out in this case?

25   A.    Yes.

1    Q.    Would you explain what those are?

2    A.    We would have sent leads.  Number 1, had the defendant

3    answered those questions truthfully, we would have sent

4    questions to Boston to ask him about Daniel Maldonado and Omar

5    Hamammi.  And we would send leads to our legal attaches

6    overseas that we have good relationships in the region.  We

7    would ask them, had these two guys passed through their

8    countries; did they make contact with anybody that they were

9    concerned about while they went through those countries; do

01:29 10   they know anything about how they traveled specifically to the

11   United Arab Emirates, you know, things about flights, how they

12   purchased their flights; did anybody help him, so on.  There's

13   a lot of questions that we would ask.

14   Q.    All right.  Are you familiar with what's called a

15   technical source in the FBI?

16   A.    Yes.

17   Q.    Describe generally what that is.

18   A.    A technical source is essentially a telephone or some type

19   of electronic interception for email, text or telephone,

01:30 20   whether it be mobile or hard line.

21   Q.    All right.  With respect to this case, are you aware that

22   a few days before this interview there was such an interception

23   of telephone calls between the defendant and Mr. Maldonado and

24   Hamammi?

25   A.    I've been made aware of that, yes.

1    Q.   Regardless of those -- the interceptions of those

2    telephone calls, would it still affect your investigation if

3    you had the opportunity to talk to the defendant?

4    A.   Absolutely, and reason being is that we request for

5    authority for additional technical surveillance, you know, as

6    cases progress.  If we find out a new phone number, a new email

7    address or whatever, we will ask the court for authority to go

8    up on that phone or intercept emails.  And you always want to

9    corroborate in an affidavit the information that's contained in

01:31 10   it.  It's not good enough to say, Well, somebody told us that

11   this guy uses a certain phone number and expect a judge to sign

12   an authority for that.  But if you get corroboration from other

13   sources that that phone number is being used by a subject, it

14   adds to the affidavit, particularly if the information comes

15   from somebody who's been interviewed that is -- has first-hand

16   knowledge of that number and the people that you have the

17   investigation on.

18   Q.   Do you also rely on various sources in order to put

19   context and to explain the meaning of different things?

01:32 20   A.   Absolutely.  People speak in codes.  They use code words

21   and emails and so on.  And we can guess at what they mean, but

22   if you ask the person that's actually using them and they tell

23   you what they mean, well, then, it's much more definitive of

24   what those communications actually -- the meaning of those

25   communications.

1    Q.    Is it also relevant to your investigation as to whether

2    individuals have had prior or post-contact with each other?

3    A.    Can you say that again?

4    Q.    If somebody's had contact outside of some other

5    information that you might have through a technical source, is

6    that relevant to your investigation?

7    A.    Absolutely.  I mean, just because we have some technical

8    coverage of a phone or an email doesn't mean that they're not

9    communicating by other means.  And if one of the people that's

01:33 10   involved in the relationship will tell us the other techniques

11   that they're using to communicate, that forwards our case quite

12   a bit.

13   Q.    What is the effect of an FBI -- to an FBI -- specifically

14   your FBI investigations, when someone lies to you?

15   A.    Well, it thwarts the investigation.  First off, there's --

16   they can put you off in the wrong direction.  Like, in this

17   case, we were -- if we were to believe Mr. Mehanna's statement,

18   Daniel Maldonado was still in Egypt.  But, you know, we know

19   otherwise.  And if we had to believe that, you know, all of our

01:34 20   -- investigation would center on Egypt.  Also, the fact that,

21   having complete information from somebody, truthful

22   information, helps us develop the other avenues of

23   investigation.

24   Q.    With regards to Mr. Maldonado's presence in Egypt, were

25   you aware, at least in September of 2006, that that's where he

        1    was?

        2    A.    Yes.

        3    Q.    How were you aware of that?

        4    A.    From a human source.

        5    Q.    Is this somebody who you were dealing with who was in

        6    Egypt?

        7    A.    Yes.  He was somebody that we asked to go to Egypt.

        8    Q.    Did he have contact with Daniel Maldonado?

        9    A.    Yes.

01:34  10    Q.    Do you know whether -- he told you whether he met with the

       11    defendant?

       12                MS. BASSIL:  Objection, your Honor.  Hearsay.

       13                THE COURT:  Sustained.

       14                MR. CHAKRAVARTY:  I'll move on.

       15    Q.    Mr. Taylor, I'm going to shift gears now a little bit, and

       16    I'm going to ask you to read from some of the emails that are

       17    in evidence in this case --

       18    A.    Okay.

       19    Q.    -- if you wouldn't mind.  And I'll ask you some follow-up

01:35  20    questions.

       21                MR. CHAKRAVARTY:  Can we go to Exhibit 281.

       22                MS. BASSIL:  Your Honor, please note my objection.

       23                THE COURT:  Noted.  These will be displayed because

       24    they're all in evidence.

       25                MR. CHAKRAVARTY:  Yes, your Honor.

1    Q.   Does this appear to be an email from cageprisoners.com,

2    with an email address to Abu Sabaayaa, with an email address of

3    ibnul_khattab82@yahoo.com?

4    A.   Yes, I see that.

5    Q.   Does the date appear to be June 19 of 2007?

6    A.   Yes.

7    Q.   I'm just going down a little bit.  Does the email read:

8    "Did you know Al Mizzi from Islamic Network forum?  His name

9    was Omar Hamammi.  He was living in Alexandria, like Daniel,

01:36 10   half Syrian, half American as far as I know, with a Somali wife

11   and one daughter"?

12          MR. CHAKRAVARTY:  Can we go to 282, please.  I'm

13   sorry.  I should pose the question.

14   Q.   Did I read that correctly?

15   A.   Yes, sir.

16   Q.   Is this an email, also on June 19?  Is this a response

17   from Abu Sabaayaa, ibnul_khattab82, back to the contact at

18   cageprisoners.com?

19   A.   Yes.

01:36 20   Q.   Is the subject, "Re:  Daniel"?

21   A.   Yes.

22   Q.   Did Ibnul Khattab write:  "As for Omar himself, I have no

23   way of telling if he accepted a potential deal with the FBI.  I

24   wanted to personally ask Dan what happened to him but have so

25   far been hesitant to do so due to the sensitivity of the issue.

1    However, what has always seemed most likely to me is that Omar

2    probably broke down and spilled information immediately which

3    probably led to him being never officially taken into custody

4    due to his apparent 'cooperation'  but rather he was

5    temporarily detained separately from the rest until he was able

6    to provide what the FBI wanted to hear about Dan and then let

7    go"?

8    A.    That's right.

9    Q.    Did I read that properly?

01:37 10   A.    Yes.

11   Q.    In June of 2007, did you know where Daniel Maldonado was?

12   A.    June in 2007?  That was -- at that point, we knew he was

13   in Somalia.

14   Q.    Do you remember when he was arrested?

15   A.    He was arrested in, I think, 2008, in January of 2008, is

16   that correct?

17   Q.    Is your memory exhausted with regard to that?

18   A.    Excuse me?

19   Q.    Is your memory exhausted with regards to when he was

01:38 20   actually arrested?

21   A.    Yeah.  I'm not sure.

22          MR. CHAKRAVARTY:  May I approach, your Honor?

23          THE COURT:  You may.

24   Q.    I hand you a document.

25   A.    So Daniel Maldonado was arrested in -- I believe it was

1   January of 2007.

2   Q.   It was 2007?

3   A.   Right, yeah.  Arrested in Kenya, January 21, 2007.

4   Q.   And so by the time of these emails, he was already in U.S.

5   custody, is that right?

6   A.   That's correct.

7   Q.   One more part of this email.  "In terms of information

8   about Omar, I can tell you that he originally lived in the U.S.

9   (somewhere in Alabama, where he attended college).  Afterwards

01:39 10   he traveled to Canada in order to marry his wife."  Did I read

11   that correctly?

12   A.   Yes.

13        MR. CHAKRAVARTY:  Go to Exhibit 284, please.

14   Q.   You see an email from ibnul_khattab82, "Re:  Daniel.  To:

15   Contact at cageprisoners.com."  I cut off the date.  This is a

16   few days later, on July 24, 2007, is that right?

17   A.   Yes, sir.

18   Q.   So the defendant says -- or Ibnul Khattab says, "So I

19   asked Daniel about Omar Hamammi.  He told me he doesn't know

01:40 20   exactly what ended up happening to him but he is 'pretty sure'

21   that Hamammi was the one who gave the FBI all the information

22   that they had on Daniel."  Did I read that correctly?

23   A.   Yes.

24        MR. CHAKRAVARTY:  Exhibit 25, please.  Excuse me.

25   Wrong number.  287, please.

1   Q.   This is a different set of emails.  This is sometime

2   later, in January of 2008, is that right?

3   A.   Yes.

4   Q.   Is this from somebody using the name Alexander Buddy, with

5   the email address friend_of_afriend@hotmail.co.uk, is that

6   right?

7   A.   That's correct.

8   Q.   It's to Tariq Mehanna at tariq.mehanna@yahoo.com.  Again,

9   the subject is "Re:  Daniel."  Does this appear to be a

01:41 10   response to an earlier email between the two?

11   A.   Yes.

12   Q.   Just to go chronologically, let's go to the earlier email.

13   Does Tarek ask:  "Are you the author of Tahdhib al-Kamal and

14   Tuhfah al-Ashraf?"  Did I read that correctly?

15   A.   Yes.

16   Q.   Did you use the internet to search for those two titles?

17   A.   Yes, I did.

18   Q.   Was there an author's name for those two titles?

19   A.   Yes.

01:41 20           MS. BASSIL:  Objection.  Hearsay.

21           THE COURT:  Sustained.

22   Q.   Are you familiar with -- not as for the truth of whether,

23   in fact, this person was the author, but does a name come up

24   when you Google for those two names -- these two titles?

25           MS. BASSIL:  He's waiting for me.  He can answer yes

1   or no, but then I'm going to object.

2   A.   Yes.

3   Q.   What is the name that comes up?

4        MS. BASSIL:  Objection.

5        THE COURT:  No.  You may have that.  You may answer.

6   A.   Al Mizzi.

7        MR. CHAKRAVARTY:  Go back to 281, please.

8   Q.   Does this say, "Did you know Al Mizzi from Islamic Network

9   forum?  His name was Omar Hamammi."

01:42 10   A.   Yes.

11        MR. CHAKRAVARTY:  Back to 287, please.

12   Q.   Is Al Mizzi's response:  "Yeah, I like peanut butter and

13   jelly sandwiches, too"?

14        MS. BASSIL:  Objection, your Honor.  It doesn't say

15   "Al Mizzi."

16   Q.   I'm sorry.  Is Alexander Buddy, the user of this email

17   account, his response, "Yeah, I like peanut butter and jelly

18   sandwiches, too"?

19   A.   That's correct.

01:43 20        MR. CHAKRAVARTY:  288, please.

21   Q.   Again, does this appear to be continuation of this

22   conversation between Alexander Buddy and Tarek Mehanna, this

23   time on January 10 of 2008?

24   A.   Yes, it does.

25   Q.   Again, does this appear to have a -- to be a response --

1    to include a response from the defendant to Alexander Buddy?

2    A.   This looks like part of the one from Alexander Buddy, is

3    that correct?

4    Q.   Right.  I guess I'll rephrase the question.  So this email

5    is an email from Alexander Buddy.  Does it include the prior

6    email to which this email is responding?

7    A.   Yes.

8    Q.   Let's start with that.  Again, to go chronologically, does

9    tariq.mehanna@yahoo.com ask:  "Let me know if there is some way

01:44 10   to chat please"?

11   A.   Yes.

12   Q.   And then the response from Alexander Buddy is, "I think I

13   usually get online around 12 or 1 a.m. your time.  I don't have

14   any other window of opportunity.  But whatever you need you can

15   always email.  Have your people call my people and we'll do

16   lunch, haha."

17   A.   That's correct.

18           MR. CHAKRAVARTY:  Can we go back to 281 for a moment.

19   I'm sorry.  One moment, your Honor.  I'm mindful that we're

01:45 20   near the break.  I'll still try to finish this quickly.

21           We'll go to the next exhibit, 2 -- I think it was 289,

22   please.

23   Q.   Does Tarek Mehanna write -- again, is this another

24   response email?  In this one, Tarek Mehanna writes, "Nah, I

25   know Amir.  It wasn't him.  Yes, he was threatened with torture

1    but I know for a fact that he refused to cooperate with his

2    captors.  Anyways, if anything comes up, you know how to

3    contact me, Tariq."

4    A.    That's correct.

5    Q.    And then this is Alexander Buddy to Tarek Mehanna, January

6    25, 2008.  Mr. Alexander Buddy says, "There was an older white

7    guy from Cali that came and then left and people were

8    suspicious of him but the thing is the only people who would

9    know about everything that happened to him would be the people

01:47 10   from his group.  They were split so no one knew what happened

11   to them.  Even if others knew none of them were caught.  Can

12   you ask him who he suspects and then we could work from there?"

13   Did I read that correctly?

14   A.    Yes.

15        MR. CHAKRAVARTY:  290, please.

16   Q.    Is this January 26, 2008, from Tarek Mehanna to Alexander

17   Buddy, again, "Re:  Daniel."  Does Tarek Mehanna say, "One

18   thing in particular that the FBI mentioned was that this person

19   had told them about Dan calling a friend in the U.S. to tell

01:47 20   him about 'PB and J,' etc.  Also here is a copy of Dan's

21   Indictment"?  There's a link to

22   foxnews.com/projects/pdf/Maldonado_Complaint.pdf.  "On Page 7

23   they mention some other things that this person said to them.

24   Tariq."  Did I read that correctly?

25   A.    Yes.

1          MR. CHAKRAVARTY:  291, please.

2     Q.   So is this from Alexander Buddy to Tarek Mehanna, Re:

3     Daniel, January 27, 2008?  Is that right?

4     A.   Yes.

5     Q.   Above the Alexander Buddy, there's an originating IP and

6     there's an internet protocol address.  Do you see that?

7     A.   Yes, I do.

8     Q.   Are you familiar with Internet Protocol addresses, at

9     least what they are?

01:48 10   A.   Yes, in general terms.

11    Q.   Is it just a location and address on the internet?

12    A.   Yes.

13    Q.   Did you have an opportunity to run the Internet Protocol

14    addresses from Alexander Buddy and put it into the internet?

15    A.   Yes, I did.

16    Q.   Where did it resolve back to?

17    A.   Mogadishu, Somalia.

18    Q.   Does Alexander Buddy say, "Ok that guy was privy to the

19    phone calls and most of the stuff on Page 7 except for one or

01:49 20   two things that could be lies.  Especially the instance of the

21    battery.  I remember him telling Daniel to make something out

22    of it and then he gave it to another brother who caught it on

23    fire.  I got no real doubt that this guy is at least one of the

24    witnesses.  That guy travels a lot but if you call up his

25    masjid in Cali, I think you can hunt him down.  This is a

1   serious lead so you guys work hard to track him down"?  Did I

2   read that correctly?

3   A.   Yes, you did.

4        MR. CHAKRAVARTY:  That's all I have, your Honor.

5        THE COURT:  I think we'll take the break at this point

6   before cross-examination.  We'll take the morning recess.

7   (Recess taken at 11:05 a.m.)

8   (After the recess:)

9        THE CLERK:  All rise for the Court and the jury.

02:13 10        (The Court and jury enter the courtroom at 11:29 a.m.)

11        THE CLERK:  Please be seated.

12        MR. CHAKRAVARTY:  Your Honor, before Ms. Bassil begins

13   her cross, I just wanted to ask the Court's permission to have

14   assisting us -- particularly Mr. Bruemmer -- Ms. Candace Leu

15   will be assisting him for this session, if that's all right

16   with the Court.

17        THE COURT:  Fine.

18        MS. BASSIL:  Is it my turn?

19                      CROSS-EXAMINATION

02:14 20   BY MS. BASSIL:

21   Q.   Good morning.

22   A.   Good morning.

23   Q.   Mr. Taylor, I want to ask you some questions about Somalia

24   and Daniel Maldonado.  When did you review -- well, first of

25   all, let me ask you:  You've traveled extensively, it sounds

1    like, around the Mid-East?

2    A.   Yes, ma'am.

3    Q.   Have you been to Somalia?

4    A.   No, ma'am.

5    Q.   Have you been to Egypt?

6    A.   Very briefly.  Just passing through.

7    Q.   I'm sorry?

8    A.   Just passing through.

9    Q.   Just passing through.  But you've not been stationed there

02:15 10   or anything of that nature?

11   A.   No.

12   Q.   Now, when did you -- you said that you'd been

13   investigating Daniel Maldonado separately from Tarek Mehanna?

14   A.   Well, I was not investigating.  We were investigating out

15   of the Houston division, but it was not my investigation.

16   Q.   Okay.  All right.

17        And you also said that there is an investigation in

18   the FBI on this person Omar Hamammi?

19   A.   Yes, ma'am.

02:16 20   Q.   And the investigation of Omar Hamammi, when did that

21   begin, if you know?

22   A.   I don't know.

23   Q.   Okay.  Now, when did you become aware of this telephone

24   call from Daniel Maldonado in Somalia to Tarek Mehanna?  It was

25   made on December -- I believe December 12th, I think, if I have

 1   that right.  When did you become aware of it?

 2   A.   I became aware of it probably a few weeks after, but

 3   that's me.  It was -- I believe the case agent in Houston was

 4   made aware of it much sooner than that.

 5   Q.   Who was the case agent in Houston?

 6   A.   Loretta Eglen-Anderson.

 7   Q.   All right.  And she was actually someone who went to Kenya

 8   and interviewed Mr. Maldonado after he had turned up there.  Is

 9   that correct?

02:16 10   A.   That's correct.

 11   Q.   And when were you aware of the interview on December 16th,

 12   2006, with Tarek Mehanna?

 13   A.   Personally?  Again, probably a month or so afterwards.

 14   Q.   Do you know if -- do you know if the Houston office

 15   learned of it earlier than you did, or when you learned of it,

 16   is that when everybody else does?

 17   A.   I learned of it later.  Again, for explanation, my

 18   function, since even before that time, is to recruit, develop

 19   and operate human sources to feed substantive cases rather than

02:17 20   me being the case agent on those substantive cases.

 21   Q.   I see.  So if you look at a report or a piece of

 22   information or an email, that might be because it touches on a

 23   case in which you have sources?

 24   A.   Yes, ma'am.  Exactly.

 25   Q.   All right.  Now, you did have a source in Egypt that was

1    reporting on Daniel Maldonado, correct?

2    A.   We had -- to be technical, we had a source that we sent to

3    Egypt.

4    Q.   I'm sorry.  A source that you sent to Egypt.

5    A.   Yes, ma'am.

6    Q.   And, in fact, you wrote a report on September -- I'm

7    sorry.  Yes.  You wrote a report on September 21, 2006, did you

8    not?

9    A.   Yes, ma'am.

02:18 10   Q.   And in that report you relayed -- or you wrote out what

11   information the source had given you about Daniel Maldonado?

12   A.   Yes, ma'am.

13   Q.   And, in fact, the source had informed you that Maldonado

14   had already begun to pack his family's belonging and he was

15   hopeful that Somalia will declare itself an Islamic republic,

16   and if that occurs, Maldonado will permanently relocate to

17   Somalia, correct?

18   A.   Yes.  But he also made other statements, I believe.

19   Q.   Right.  And I hadn't gotten to that yet.  Wait.

02:18 20   A.   Sorry.

21   Q.   Regardless, Maldonado was going to move anyway --

22   A.   Yes, ma'am.

23   Q.   -- right?

24        And it was possible that he -- if he moved, it was

25   still going to be within Egypt?

1   A.   Yes, ma'am.

2   Q.   Okay.  But the mention that he was interested in Somalia

3   and moving to Somalia was given to you by your source by

4   September of 2006?

5   A.   That's correct.

6   Q.   Okay.  Now, at the time that the source reported to

7   you -- and I'm going to use September as the time frame -- were

8   you familiar with what was going on in Somalia?

9   A.   In general terms, yes.  I mean...

02:19 10   Q.   Okay.  So basically -- and correct me if I'm wrong.  I'm

11   just going to run through some background with you --

12   A.   Okay.

13   Q.   -- all right?

14        Now, actually, Somalia was a country that in -- had

15   not had basically a stable government since 1991, correct?

16   A.   Yes, ma'am.

17   Q.   It was a war-torn country?

18   A.   Yes, ma'am.

19   Q.   And, in fact, it was a country that was essentially run by

02:20 20   clans and warlords?

21   A.   I would agree with that, yes.

22   Q.   You were aware of that?

23   A.   Yes.

24   Q.   And in around 2005 or so, or maybe a little earlier, there

25   were courts -- literally, sort of, courts -- that were helping

1    to decide disputes between neighbors in Somalia and between

2    people in Somalia, correct?

3    A.   I believe so.

4    Q.   Yes.  And they were using --

5    A.   I mean, I'm not a historian of Somalia.

6    Q.   I understand you're not an expert, but I'm trying to get

7    some information to the jury so they'll understand the rest of

8    the questions I'm going to ask you.

9    A.   All right.

02:21 10   Q.   And you do read about things in the Mid-East and --

11   A.   Certainly.  Certainly.

12   Q.   All right.  So essentially, these courts, they were

13   running -- the courts used Islamic law, correct?

14   A.   Yes, ma'am.

15   Q.   And, in fact, Somalia is an Islamic country, is it not?

16   A.   I believe so.  Most of them say it is, yes.

17   Q.   All right.  Do you have doubts?

18   A.   Well, I think there are so many factions there, it's hard

19   to say.

02:21 20   Q.   In fact, it is a country with lots of factions, and even

21   within these clans and groups of warlords, there were factions

22   within that, correct?

23   A.   Correct.

24   Q.   In fact, right now it's split into even more factions,

25   correct?

1    A.    Yes, ma'am.

2    Q.    In fact, right now you would call it a mess, wouldn't you?

3    A.    I would call it a failed state.

4    Q.    It is a failed state right now, is it not?

5    A.    Yes, ma'am.

6    Q.    Okay.  And right now there's a tremendous famine there,

7    correct?

8    A.    That's right.  Yes, ma'am.

9    Q.    So in 1990 -- so I'm sorry.

02:22 10          So Somalia was essentially a failed state

11   in -- beginning in the early to mid '90s, was it not?

12   A.    I'd say so.  I would agree with that.

13   Q.    There was no government?  No central government?

14   A.    Yes, ma'am.

15   Q.    All right.  And these courts began to develop.  And they

16   sort of came from the ground up, didn't they?  They weren't

17   imposed by a government?

18   A.    That's my understanding also.

19   Q.    And around 2005-2006 these courts sort of joined together

02:22 20   to essentially form the beginning of a government, correct?

21   A.    I don't know.

22   Q.    All right.  Are you familiar with Islamic Courts Union --

23   A.    I've heard of the Islamic Courts Union, yes.

24   Q.    All right.  And the Islamic Courts Union -- in fact, this

25   is what you understood Daniel Maldonado was talking about, that

1    Somalia was beginning to be run in an Islamic way by -- under

2    Islamic law?

3    A.   Yes, ma'am.

4    Q.   All right.  And that was his desire, to go there and live

5    under that kind of law?

6    A.   Yes, ma'am.

7    Q.   Okay.

8    A.   But it's also my understanding that there's various

9    factions of Islamic law vying for control of Somalia.

02:23 10   Q.   I haven't gotten there yet.  All right.

11           And so within the Islamic Courts Union there was a

12   group that split off.  And are you familiar with the Shabaab?

13   A.   Yes, ma'am.

14   Q.   Okay.  The Shabaab was a group that split off and became a

15   military group, correct?

16   A.   Correct.

17   Q.   And, in fact, they were -- the Shabaab itself was

18   designated as a global terrorist organization in November of

19   2008.  Is that correct?

02:23 20   A.   I don't know exactly, but I know they are at this point.

21   Q.   They are at this point.  The Islamic Courts Union was

22   never designated as a terrorist organization.

23   A.   Okay.

24   Q.   Correct?

25   A.   Not that I'm aware of.

1    Q.   Okay.  Now, when you received the information that

2    Maldonado was thinking about moving to Somalia, did you -- you

3    were talking about human sources and the information that you

4    can get.  Did you look for more information about this other

5    than from your source?

6    A.   Well, again, I wasn't the case agent on the Maldonado

7    investigation, so I couldn't speak to what efforts were made to

8    follow up on that.

9    Q.   Okay.  But there were -- efforts could be made, if you

02:24 10   know, through the Egyptian authorities?

11   A.   Yes.

12   Q.   They could call him in and question him?

13   A.   Well, the Egyptian authorities can do whatever the

14   Egyptian authorities want to do.  We would -- if we wanted them

15   to question him, we would probably ask the Egyptian authorities

16   for authority to have him come to the U.S. Embassy in Cairo

17   where our league office would interview him ourselves.

18   Q.   So that's typically how you've done things, that you don't

19   ask the local authorities to interview, you try to get the

02:25 20   person to the U.S. Embassy where U.S. agents can interview

21   them?

22   A.   That would be best.

23   Q.   That would be best.  Okay.

24        Now -- and sometimes you don't always have that

25   opportunity?  Well, you said, "That would be best."  Are there

1    occasions where local police forces or security forces do

2    interview people or investigate at the request of the FBI in

3    foreign countries?

4    A.   Not if they're U.S. citizens.  If they're U.S. citizens,

5    we have an obligation to protect them even overseas.

6    Q.   Okay.  And do you know whether Daniel Maldonado was ever

7    called or asked or brought to the U.S. Embassy in Cairo to be

8    questioned by U.S. agents?

9    A.   I'm not aware of it.

02:26 10   Q.   Okay.  And would you be aware of it?

11   A.   I probably would have known by now, yes.

12   Q.   Okay.  All right.

13        Now, were you aware that Daniel Maldonado went to

14   Somalia on November 24th, 2006?

15   A.   That Daniel Maldonado went to -- excuse me?

16   Q.   Were you aware that Daniel Maldonado -- I'm sorry -- left

17   for Somalia on November 24, 2006?

18   A.   I eventually found that out, yes.

19   Q.   But not at the time?

02:26 20   A.   No.

21   Q.   Your source did not give you that information?

22   A.   No.

23   Q.   And you were not aware that he was in the airport at Dubai

24   waiting to go to Somalia?

25   A.   No, I was not.

1    Q.   Okay.  Now, from your information -- and -- okay.  Let me

2    go back for a minute.

3         In November -- were you aware that Ethiopia invaded

4    Somalia on December 20, 2006?

5    A.   I know that Ethiopian troops had gone across the border

6    sometime in that period, yes.

7    Q.   All right.  And Daniel Maldonado was -- eventually turned

8    up in Kenya in January of 2007, a couple of weeks later,

9    correct?

02:27 10    A.   Yes, ma'am.

11    Q.   Okay.  Now, to your knowledge was anybody looking for

12    Daniel Maldonado between November 24, 2006, and when he turned

13    up in a Kenyan police station in January of 2007?

14    A.   I don't know what leads might have been sent out to

15    further up -- or further make inquiries about his whereabouts.

16    Q.   Now, you said that -- let me ask you a question:  You said

17    that if -- you said that one of the other things you use are

18    technical sources to provide additional information --

19    A.   Yes, ma'am.

02:28 20    Q.   -- correct?

21         And that would be, as you said, telephone interception

22    or email?

23    A.   Yes, ma'am.

24    Q.   And it seems that certainly there were recordings -- or

25    Mr. Mehanna's telephone call was being recorded.  Is that

1  correct?

2  A.   That's my understanding, yes.

3  Q.   All right.  And are you aware of any human source with

4  Mr. Maldonado when he called Tarek Mehanna on December 12,

5  2006?

6  A.   No.

7  Q.   Now, eventually there was a human source that reported to

8  the FBI after Mr. Maldonado was in custody, correct?

9  A.   That's correct.

02:29 10  Q.   Okay.  Now, I think you also said that one of the reasons

11  it's good to have sources is it helps you decide -- it helps

12  you interpret the meaning of what coded language might be?

13  A.   Yes, ma'am.

14  Q.   And so if you don't have somebody who can tell you what

15  that code means, you said, I think, you are guessing at what

16  they mean, correct?

17  A.   Yeah.  It's a guess, but it's an educated guess.  Yes,

18  ma'am.

19  Q.   Okay.  Some codes are more obvious than others, correct?

02:29 20  A.   That's correct.

21  Q.   All right.  Now, you said that if someone doesn't tell the

22  truth to an investigator, it can put you off in the wrong

23  direction, correct?

24  A.   Yes, ma'am.

25  Q.   And you said, "If we were to believe what Mr. Mehanna had

1    said, it would put us off in the wrong direction," correct?

2    A.    Yes, ma'am.

3    Q.    But it didn't, did it?

4    A.    Well, it did in that I was attempting to develop

5    additional human sources to send back to Egypt.  And then when

6    we found out that he was in Somalia instead, I was trying to

7    find and recruit sources that could go to Somalia.

8    Q.    Well, you already had a source in Egypt, did you not?

9    A.    No.  He was an American -- he was from the United States

02:30 10    that we sent specifically over to meet with --

11    Q.    Right.  But when I say you had a source in Egypt, he was

12    in Egypt?

13    A.    Excuse me?

14    Q.    He was in Egypt that --

15    A.    No; he had only traveled to Egypt at my request.

16    Q.    Oh, I see.

17          But so, in fact, the -- to your knowledge -- did you

18    know that -- the FBI was certainly aware of that telephone call

19    before they interviewed Mr. Mehanna?

02:31 20    A.    I found out about both of them almost at the same time,

21    you know, some weeks later.

22    Q.    All right.  But so, in fact, when you found out about the

23    telephone call, that indicated to you that what Mr. Mehanna had

24    said about him being in Egypt was not true.

25    A.    Yeah, that's correct.

1    Q.    Okay.  So there would be no need to develop sources in

2    Egypt.

3    A.    Well, this was before the telephone call.  We were

4    thinking about making another run at Maldonado in Egypt.

5    Q.    Okay.  But Mr. Mehanna's interview was after the telephone

6    call.

7    A.    Right.

8    Q.    Okay.  So by the time he was interviewed, the FBI was

9    aware of the telephone call that indicated that Mr. Maldonado

02:31 10    was not in Egypt but in Somalia?

11    A.    That's correct.

12    Q.    Okay.  And so you were attempting -- or you tried to

13    develop sources in Somalia.  Is that correct?

14    A.    Well, sources to send to Somalia.

15    Q.    To send to Somalia.

16          At the time Somalia was basically in a failed state

17    and war-torn, was it not?

18    A.    Yes, ma'am.

19    Q.    Okay.  And now, let me ask you, you have -- as someone who

02:32 20    has worked with human sources -- the FBI and the government,

21    the CIA has human sources all over the world, do they not?

22    A.    Yes, ma'am.  But not as many as we would like.

23    Q.    Okay.  I understand that.  But you also have the

24    ability -- and you have the ability to send somebody to a

25    place?

1    A.    Yes, ma'am.

2    Q.    Okay.  And so that, for example, you have the ability to

3    send someone to Yemen, correct?

4    A.    It's difficult, but yes.

5    Q.    Okay.  And is there an FBI presence in Yemen right now?

6    A.    I believe we withdrew our office within the last year.

7    I'm not sure if we've gone back into Yemen yet.

8    Q.    What about in 2004, was there an office in Yemen?

9    A.    I'm not sure when we established our legal attache in

02:33 10   Yemen.  I know that in 2001 and 2002, when I was in Riyadh, we

11   covered Yemen out of Riyadh, but we established a league at

12   some time -- probably about 2004-2005.

13   Q.    There was a dispute between the ambassador to Yemen and

14   the FBI about the FBI being in Yemen?

15   A.    Yeah, I believe as a result of the Cole bombing.

16   Q.    Right.  And there was some dispute about the FBI's

17   presence in Yemen.  And that was settled and resolved by 2004,

18   was it not?

19   A.    I don't know.  I assume so.

02:33 20   Q.    Was there an FBI presence in Yemen in 2006?

21   A.    Yes.

22   Q.    Okay.  And when I -- I want to be clear we're talking

23   about the same thing.  When I say "an FBI presence," does that

24   mean there were actual agents there?

25   A.    Yes.  But that -- just to -- the function of the legal

1    attache's office, we don't do investigations in sovereign

2    countries; their position is to be liaisons with the host

3    country and ask them to provide us with information.  We don't

4    have FBI agents running around Yemen.

5    Q.   That's a fair correction.

6         So at least in -- so in 2006 there were -- there was

7    an FBI presence where the FBI could request of local

8    authorities that they do some investigation?

9    A.   Yes.

02:34 10   Q.   Okay.  And the FBI could request that local authorities,

11   for example, could ask about whether Mr. Mehanna had been at a

12   particular location in Yemen, correct?

13   A.   That's correct.

14   Q.   Or whether he had gone -- they could ask about a

15   particular school in Yemen, correct?

16   A.   That's correct.

17   Q.   All right.  And Yemen, in fact, had, at least in -- has

18   had -- strike that.

19        Yemen has had for a period of time a fairly strong

02:35 20   police or security force, has it not?

21   A.   Yes, ma'am.

22   Q.   I believe the person who runs it is related to the

23   president of Yemen?  Is it his brother or brother-in-law?

24   A.   That's probably likely.

25   Q.   All right.

1    A.    May I make one clarification?

2    Q.    Sure.

3    A.    I know from working in Saudi Arabia that probably -- I

4    think it's easily less than 10 percent of our request to the

5    Yemen authorities do they respond to.

6    Q.    Okay.  But they can be made?

7    A.    Yeah, we make them.  Yes.

8    Q.    And you also -- let me ask a question:  Does the FBI have

9    sources without informing the local authorities?

02:35 10    A.    No, we don't.

11    Q.    Now, Mr. Chakravarty asked you to read a couple of

12    emails -- or a few emails.  Do you recall that?

13    A.    Yes, ma'am.

14    Q.    Or he showed them to you.

15          Had you seen those emails before you came up to Boston

16    to testify?

17    A.    No.

18    Q.    Okay.  And he showed you -- the first email was from June

19    19th, 2007.

02:36 20    A.    Okay.

21    Q.    Do you recall that?

22    A.    Yes, ma'am.

23    Q.    All right.  And, in fact, Daniel Maldonado was in custody

24    by that point, was he not?

25    A.    Yes.

1    Q.   And he had already been interviewed 18 times by the FBI by

2    June 19, 2007.

3    A.   Okay.

4    Q.   Do you know that?

5    A.   I didn't know how many times.

6    Q.   You were aware that he had been interviewed a number of

7    times in Kenya?

8    A.   Yes, ma'am.

9    Q.   And he had also been interviewed a number of times in

02:36 10   Djibouti, in the military base there?

11   A.   I was not aware of any interviews in Djibouti.

12   Q.   Okay.  And were you also aware that he was interviewed a

13   number of times in Houston?

14   A.   Yes.

15   Q.   Okay.  Now, when you were asked -- these emails that you

16   were asked to read, they had -- they really have nothing to do

17   with your providing sources or your role in the investigation

18   of Daniel Maldonado, correct?

19   A.   That's correct.  They don't have anything to do with my

02:37 20   role.

21   Q.   Your role.  All right.

22        MS. BASSIL:  If we could just pull up, for a moment,

23   281.  And if we could just pull up the first part there.

24   Q.   Mr. Taylor, you're able to see this, correct?

25   A.   Yes, ma'am.

1    Q.   Do you see where it says "from," it says from

2    cageprisoners.com?

3    A.   Yes.

4    Q.   Are you familiar with cageprisoners.com?

5    A.   Not really, no.

6    Q.   Are you aware of it to be an organization similar to sort

7    of Amnesty International?

8    A.   Yes, that's what I've been told.

9    Q.   All right.

02:38 10         MS. BASSIL:  And if we could go a little further?  And

11   if we could have the second half.

12   Q.   And this appears to be a request from Cage Prisoners in

13   which they say, "I don't want to say this on the forum but my

14   request is actually about another brother."  And it goes down

15   to talk about this person, and then it says, "His wife posted a

16   distress message in November 2006, and she has never posted

17   since," and they wonder what happened to him.

18         Do you see that?

19   A.   Yes, ma'am.  But I don't know whose wife they're referring

02:39 20   to.

21   Q.   Okay.  All right.

22   A.   But I see that.

23   Q.   All right.  Fair enough.

24         Now, when you talked about how investigations that

25   if -- how, if someone doesn't tell you the truth, it can thwart

1    an investigation, you were talking about -- you were talking

2    about this in general terms, correct?

3    A.   Yes, ma'am.

4    Q.   And you may have been talking about it -- about, perhaps,

5    cases that you had that you were more directly involved with?

6    A.   Yes, ma'am.

7    Q.   But your involvement in this case -- strike that.

8         You have no -- you have no real knowledge of whether

9    or not what Mr. Mehanna said thwarted this investigation,

02:40 10    correct?

11    A.   Well, I know as an investigator with my experience that it

12    thwarted the investigation.

13    Q.   Well, the FBI already knew that Daniel Maldonado was in

14    Somalia --

15    A.   That's correct.

16    Q.   -- all right?

17         They already knew from that telephone call that was

18    before this -- four days before this interview where

19    Mr. Mehanna was, correct?

02:40 20    A.   That's correct.

21    Q.   And so based on that telephone call, if you were to

22    develop sources to go into Somalia, you would certainly do it

23    based on that telephone call, would you not?

24    A.   Yes, ma'am.  And there's a lot of other things we would do

25    as well.

1    Q.   Oh, of course you would.  Of course you would.

2         And, in fact, when Mr. Mehanna was asked where he was

3    and he said he was in Egypt, essentially, the FBI was aware

4    that that was not where Daniel Maldonado was.

5    A.   That's correct.

6         MS. BASSIL:  I have no further questions.

7         MR. CHAKRAVARTY:  Nothing further, your Honor.

8         THE COURT:  Agent Taylor, thank you.  You may step

9    down.

02:41 10        (The witness is excused.)

11        MR. GROHARING:  Our next witness is Daniel Maldonado,

12   your Honor, but I think the defense wants to take up some

13   matters prior to his testimony.

14        THE COURT:  All right.  So we need some time just with

15   the lawyers?

16        MS. BASSIL:  Yes, we do, your Honor.

17        THE COURT:  Jurors, we're going to excuse you just

18   briefly, and we'll get back to you as soon as we can.  We have

19   to solve a couple of things before we bring in this next

02:41 20   witness, okay?

21        THE CLERK:  All rise for the jury.

22        (The jury exits the courtroom at 11:57 a.m.)

23        THE COURT:  Okay.

24        MS. BASSIL:  Partly, this was to be able to

25   accommodate the marshals, your Honor.

1          Your Honor, my objection to the exhibits have to do

2    with the video.  And this is the video of Omar Hamammi who, as

3    I understand it, remained in Somalia.  Just to give you a brief

4    outline, Daniel Maldonado --

5          THE COURT:  Just for the record, the exhibit number

6    is?

7          MS. BASSIL:  Oh...

8          THE COURT:  452?

9          MR. GROHARING:  Yes, your Honor.

02:42 10          MS. BASSIL:  Yes.

11          THE COURT:  Okay.  Go ahead.

12          MS. BASSIL:  It's my understanding -- I think you've

13    kind of got some of the timeline -- that Maldonado left for

14    Somalia at the end of November 2006.  He was there -- he was in

15    different places in Somalia.  On December 20, 2006, Ethiopian

16    forces crossed the border and invaded and Maldonado fled.

17          MR. GROHARING:  My response might --

18          MS. BASSIL:  Yeah, we can go to sidebar.

19          THE COURT:  No, why don't we leave the witness back in

02:43 20    custody for the time being until we finish the discussion.

21          We'll let you know when it's time to bring him out.

22          MS. BASSIL:  So I believe that what occurred was that

23    Hamammi and Maldonado were separated just by forces of

24    everything that was going on and the chaos that was there.  And

25    my understanding is that Hamammi remained there, all right?

1    And so there is a video of him, and I believe it was -- this is

2    a YouTube video.  This was not on the defendant's computer.  It

3    was not in his possession, all right?  This is something that

4    the government has just located.  I know it's on YouTube.  And

5    it's my understanding that this is from 2008.

6           The second video, which I guess they're not going to

7    play, was actually not created until 2009.  But I believe this

8    was created sometime in 2008.  It may have been after that.

9           And so my argument, and what I would say is, first of

02:44 10   all, I think this expands -- you know, Hamammi has nothing to

11   do with this case.  Maldonado, in some ways, his ventures

12   in -- I mean, the government has established and will establish

13   through the telephone call of the defendant and Maldonado the

14   issue of false statements, all right?  Maldonado's adventures

15   in Somalia really have very little to do with that, or proof of

16   that.  And Hamammi's further adventures after Maldonado is in

17   custody have nothing to do with it.

18          Hamammi has continued to be there and continued to

19   fight.  And I would say that this expands the idea of this

02:45 20   conspiracy until it makes no sense whatsoever.  It's not even

21   in the indictment.  It is making -- and, in fact, I looked last

22   night.  It is not even mentioned in Mr. Kohlmann's report.  He

23   mentions Omar Hamammi but says nothing about linking him to the

24   defendant in any significant way.

25          So the only thing you have that links him is that he

1    met him once in the summer of 2006.  Mr. Mehanna went to Egypt

2    with his family and he saw Daniel Maldonado there briefly and

3    met Mr. Hamammi.  Then Maldonado and Hamammi went off on their

4    own adventure in Somalia.  And then the only other issue is

5    these emails.  But other than that, there's nothing that puts

6    Mr. Hamammi in this conspiracy.

7         And I think that this video is far more -- there is

8    essentially no probative value to it other than to say:  Here's

9    a real-life terrorist, all right, and he has been indicted in

02:46 10   absentia in Alabama based on his -- as I understand it, his

11   fighting.

12         And just very briefly, I think you understood that the

13   Islamic Courts Union, this group split off as Shabaab and they

14   became a terrorist organization.  The Islamic Courts Union

15   actually has become an ally of the United States.  And one of

16   the fighters there -- one of the -- a person who was a fighter

17   at the time in 2006 when Maldonado was there is now the

18   president of Somalia.

19         So it really has nothing to do with it.  And I think

02:46 20   to try to link Mr. Mehanna to the Shabaab, which is an

21   organization that kind of became militaristic sometime in 2007,

22   and really became this terrorist organization in November 2008,

23   is way beyond where we should be in this case.

24         We are trying a case -- I'm now -- Mr. Carney and I

25   are now trying a case that has a conspiracy that has nothing to

1    do with our client and not what he was indicted on.  So I think

2    the prejudicial value just is so, so minimal -- I'm sorry.  The

3    probative value is so, so minimal.  And the prejudicial value

4    is enormous, and there's no reason for it.

5            THE COURT:  Mr. Groharing?

6            MR. GROHARING:  Thank you, your Honor.  Omar Hamammi

7    is, in fact, a coconspirator.  We've designated him as such for

8    many months now.  This video is evidence of the ongoing

9    conspiracy.

02:47 10         The defendant did meet with Omar Hamammi, as well as

11   the next witness, Mr. Maldonado, and they did talk about

12   Somalia, in August of 2006.  And Mr. Maldonado will talk about

13   that conversation.  He'll talk about their desire --

14   Mr. Maldonado's and Mr. Hamammi's desire -- to go to Somalia

15   and fight jihad.  He'll talk about -- they talked about the

16   ongoing situation in Somalia at that time.  And in addition to

17   this conversation, there were later conversations with

18   Mr. Maldonado and the defendant about Somalia.  They traded

19   emails back and forth and then ultimately talked from Somalia.

02:48 20         So Mr. Maldonado will testify about what he did once

21   he got to Somalia as well as what Mr. Hamammi did.  They

22   participated in jihad just like they wanted to, just like they

23   had discussed with the defendant in August 2006.  Mr. Maldonado

24   will say that this activity was consistent with the defendant's

25   desire, and his express desire, in 2002, 2003, 2004, during the

1     course of their conversations to fight jihad.

2           He will say that this activity depicted on the video

3     is the type of activity that they wanted to do -- that they

4     kind of wanted to do back in that time frame.  That's why he

5     called the defendant to ask him to come to Somalia.

6           THE COURT:  When is the video made?

7           MR. GROHARING:  It's unclear when it was actually

8     made, your Honor.  I believe it was released in 2008.

9     Mr. Hamammi and others made the video -- I don't know.  There's

02:49 10    no indication of when precisely it was made.  It was released

11    on the internet at some later time.

12          MS. BASSIL:  Your Honor, I will say, just to add to

13    this, the conversation that occurred in Egypt where

14    Mr. Maldonado and Mr. Hamammi talked about going to Somalia is

15    where Mr. Maldonado has said that my client said to him, "Don't

16    do this.  Think about your family," discouraged him from going.

17    He, frankly, was very unhappy with my client for being soft and

18    not wanting to go.

19          And when he called him -- and you'll hear the phone

02:49 20    call -- and he tells him to come, my client came up with a

21    million excuses.  And, in fact, Maldonado has said in various

22    government interviews that he was disgusted with my client for

23    abandoning them.

24          THE COURT:  I just want to come back to the specific

25    piece of evidence that we're talking about and its intended use

1   by the government.  I'm not clear on it.

2         The witness is going to talk about it, I assume, the

3   video?

4         MR. GROHARING:  Yes, your Honor.

5         THE COURT:  What's he going to say about it?

6         MR. GROHARING:  That what's demonstrated on the

7   video -- one, that it is Omar Hamammi, and what's demonstrated

8   is the types of activities that he was engaged in in Somalia.

9         THE COURT:  Who "he"?

02:50 10       MR. GROHARING:  Mr. Maldonado as well as Mr. Hamammi,

11   obviously.

12         He'll testify that that activity was consistent with

13   the types of things that he and the defendant had discussed as

14   wanting to do, to fight jihad, and because of that, that's why

15   he called him and asked him to come to Somalia.

16         THE COURT:  So is it sort of an exemplar?  Is that

17   what -- this is what -- this represents what we wanted to do.

18   Is that the idea?

19         MR. GROHARING:  I think that's fair, your Honor.  It

02:50 20  also demonstrates, to some degree, the materiality of the

21   defendant's false statements.  I mean, here you have

22   Mr. Hamammi, what he's gone on to do since the time the

23   defendant lied about the conversation he had with

24   Mr. Maldonado, where Mr. Hamammi was present with Mr. Maldonado

25   during that call and the defendant knew it.

1          THE COURT:  Yeah.

2          MR. GROHARING:  And Special Agent Taylor has already

3    testified what he would have done with that information if he,

4    in fact, learned that Omar Hamammi was in Somalia at the time,

5    where that could have led --

6          THE COURT:  What's the witness's familiarity with the

7    video itself?

8          MR. GROHARING:  He's familiar with Omar Hamammi,

9    obviously, and, you know, the types of -- the uniform he was

02:51 10   wearing; the equipment he was carrying; and generally, the

11   types of activities that the al-Shabaab, the group he was

12   involved with that was part of the ICU, did, which was

13   consistent with what was on this tape.

14         It shows an ambush of Ethiopian forces.  And Omar

15   Hamammi talks through that process, talks about a martyr.

16   He'll talk about what a martyr is, those types of things as

17   well.

18         MS. BASSIL:  Mr. Maldonado was shown the video, while

19   he was in custody, by an agent.  He had never seen the video

02:51 20   before the FBI showed it to him.  And, in fact, there is no

21   uniform.  These are insurgent forces.  They don't wear

22   uniforms.

23         The other thing I would say is that, frankly, the FBI

24   knew as soon as that phone call was made where Daniel Maldonado

25   was, you know.  And the idea -- you know, I think, yes, Mr.

1   Taylor may have sent in sources, but Somalia was a hellhole at

2   that point and it was war-torn and there were factions and

3   people fighting.

4   Further, Mr. Maldonado never fought.  He -- when the

5   fighting broke out, you know --

6   THE COURT:  I understand.

7   What I'm trying to get at is:  I understand, I guess,

8   what the witness might say about himself and Hamammi and how

9   the video ties to that.  And it relates to the defendant

02:52 10   because -- what will it -- what will Maldonado say about that

11   to make it relevant to the defendant?

12   MR. GROHARING:  The type of activity depicted in the

13   video, which he will describe as jihad.  He'll say this type of

14   activity is consistent with what the defendant and he talked

15   about in their discussions years prior to Mr. Maldonado

16   traveling to Somalia, and then what Mr. Maldonado said he

17   wanted to do in August of 2006 when he met with the defendant

18   and Mr. Hamammi months prior to traveling to Somalia.

19   MS. BASSIL:  They've shown --

02:53 20   MR. GROHARING:  So when he and the defendant talked

21   about fighting jihad, he'll say, "This is an example of what we

22   were talking about.  We're fighting jihad.  It was depicted on

23   jihadi videos we saw at the time."  This is more of a real-time

24   example of what they wanted to do.

25   MS. BASSIL:  They've shown jihadi videos.  They've

1    shown videos that were on his computer.

2          THE COURT:  I'm not sure that's a sufficient

3    foundation; in other words, unless the defendant had seen the

4    video and talked about it specifically --

5          MS. BASSIL:  No.

6          THE COURT:  If it's the witness's assessment that this

7    is a representation of what the defendant was talking about

8    without the defendant being involved in that by explicit or

9    implicit assertion, I don't think it's tied enough to the

02:54 10   defendant.

11          MR. GROHARING:  Your Honor, if we cannot play the

12    video, we do want Mr. Maldonado to at least identify Omar

13    Hamammi.

14          THE COURT:  Well, no.  As to whether the evidence can

15    reach evidence about Mr. Hamammi, I think it can.  On what's

16    been shown so far there is a connection with the defendant.

17    The emails we just saw shows some knowledge.  I don't know

18    where that goes, but it's enough that I'll permit the

19    government -- and I understand the government's assertion that

02:54 20   he could be found to be a coconspirator.  So Hamammi, I

21    think -- to the extent the objection is nothing about Hamammi,

22    I would overrule that objection.  But this particular tape

23    which appears to be made after --

24          MS. BASSIL:  Yes.

25          THE COURT:  -- most of the central events here,

1    anyway, and does not seem to have -- without a foundation that

2    would make -- would tie the precise representations in the

3    video to what the defendant was thinking, I don't think the

4    video itself is useful.

5         Now, we'll see what the -- you know, you can try

6    whatever foundation you want.  We'll see what it looks like.

7    But it doesn't sound like it to me.

8         MR. GROHARING:  Just so I'm clear, your Honor, I can

9    show a screen shot taken from the video where he'll identify

02:55  10  Omar Hamammi?

11         THE COURT:  Yeah, sure.  If you want to say -- like a

12   picture.  You just want to say, "Is this him?"

13         MR. GROHARING:  That's Exhibit 452A.  We made a screen

14   shot just for that purpose.

15         THE COURT:  Okay.  Sure.

16         MS. BASSIL:  I've seen that.  But I object about

17   anything about Omar Hamammi, not that that should be taken from

18   my agreement.

19         THE COURT:  Okay.

02:56  20       Let's bring out the witness, and then why don't

21   you -- well, you can line them up while they're doing that.

22         (Pause.)

23         THE CLERK:  All rise for the jury.

24         (The jury enters the courtroom at 12:12 p.m.)

25         THE CLERK:  Please be seated.

```
  1              DANIEL J. MALDONADO, duly sworn

  2          THE CLERK:  Please be seated.

  3          State your name and spell your last name for the

  4  record.

  5          THE WITNESS:  Daniel Joseph Maldonado,

  6  M-A-L-D-O-N-A-D-O.

  7          THE CLERK:  Thank you.

  8                    DIRECT EXAMINATION

  9  BY MR. GROHARING:

02:58 10  Q.   Sir, can you just move a little closer to the microphone?

 11  Good morning, sir.

 12  A.   Good morning.

 13  Q.   Where do you currently reside?

 14  A.   In a federal institution.

 15  Q.   So you're incarcerated?

 16  A.   I'm incarcerated, yes.

 17  Q.   And what is the sentence that you're serving?

 18  A.   A ten-year sentence for receiving military-type training

 19  from a terrorist organization.

02:59 20  Q.   And when were you sentenced to serve the ten years?

 21  A.   In the very beginning of 2007.

 22          MR. GROHARING:  Could I please have Exhibit 486?  For

 23  the jury as well, your Honor.

 24          THE COURT:  Okay.

 25  BY MR. GROHARING:
```

1    Q.    Do you recognize -- I'm sorry.  Is it on your screen, sir?

2    A.    Yes, it is.

3    Q.    Do you recognize this document?

4    A.    Yes, I do.

5    Q.    What is that?

6    A.    It seems to be my plea agreement.

7    Q.    And that's a plea agreement you entered into with the

8    United States?

9    A.    Yes.

02:59 10   Q.    And that's what resulted in your ten-year sentence?

11   A.    Yes.

12   Q.    Okay.  Would you please read that text, please, Paragraph

13   3 and 3A?

14   A.    "The United States agrees to each of the following:  A, if

15   the defendant pleads guilty to Count 1 of the information and

16   persists in that plea through sentencing, and if the Court

17   accepts this plea agreement, the United States will not charge

18   the defendant with any additional crimes related to the instant

19   offense."

03:00 20   Q.    And so you indicated you had pled guilty to one charge.

21   Were there additional charges pending at the time of your plea?

22   A.    Yes, there were.

23   Q.    And what were those charges?

24   A.    The other charge was conspiring to use a weapon of mass

25   destruction in a foreign country.

1    Q.    Okay.

2          MR. GROHARING:  Page 12, please.

3    Q.    And could you read that paragraph, please?

4    A.    Yup.  "15:  If the defendant should fail in any way to

5    fulfill completely all of the obligations under this plea

6    agreement, the United States will be released from its

7    obligations under the plea agreement, and the defendant's plea

8    and sentence will stand.  If at any time defendant retains,

9    conceals or disposes of assets in violation of this plea

03:01 10   agreement, then:  A, the United States may move the Court to

11   set aside the guilty plea and reinstate prosecution; B, the

12   defendant understands and agrees that if any *[sic]* defendant

13   breaches the plea agreement, as determined by the United States

14   Attorney's Office for the Southern District of Texas or the

15   Counterterrorism Section at the Department of Justice, any

16   district within the United States will be free to charge the

17   defendant with any charges which were not brought in

18   contemplation of this plea agreement."

19         MR. GROHARING:  And now back to page 2, please.

03:02 20   Q.    And can you read that paragraph as well, please?

21   A.    Yes.  "Two:  The defendant understands and agrees that

22   'fully cooperate,' as used herein, includes providing all

23   information relating to any criminal activity known to the

24   defendant, including but not limited to, material support of

25   foreign terrorist organizations or any other criminal violation

1   of the law.  Full cooperation by the..."

2   Q.   If you would, finally, could you read the paragraphs I've

3   highlighted there?

4   A.   "A defendant agrees to fully cooperate during the pendency

5   of his incarceration and during any period of supervised

6   release; B, defendant agrees to testify truthfully as a witness

7   before a grand jury or in any judicial or administrative

8   proceeding when called upon to do so by the United States.

9   Defendant further agrees to waive his Fifth Amendment privilege

03:03 10   against self-incrimination for the purpose of this agreement."

11        MR. GROHARING:  Okay.  Next page, please.

12   Q.   And just two more sections I'd like you to read.  Would

13   you please read these paragraphs on the next page?

14   A.   "C, Defendant agrees to voluntarily attend any interviews

15   and conferences as the United States may request; D, defendant

16   agrees to provide truthful, complete and accurate information

17   and testimony."

18   Q.   And what is your understanding of this plea agreement?

19   A.   My understanding of the plea agreement?  If at any time I

03:04 20   withhold any information or lie about anything that I know, I

21   will go away for life without parole and never see my children

22   again.

23   Q.   So you could be charged for other offenses that you

24   weren't charged pursuant to the plea agreement?

25   A.   Yes.

1    Q.   And that agreement, does it require you to testify here

2    today?

3    A.   Yes.

4    Q.   Now, sir, do you know the defendant --

5         THE COURT:  Excuse me.  Before you move on, I don't

6    think the exhibit has been offered in evidence.  I assumed that

7    that's what you meant.

8         MS. BASSIL:  Your Honor, I have no objection, subject

9    to something Mr. Groharing and I had discussed previously.  And

03:05 10   we'll address it with the Court earlier.

11        THE COURT:  Is there a redaction issue?

12        MS. BASSIL:  Yes.  We'll address it with the Court

13   later.

14        THE COURT:  Okay.  Fine.  I just wanted to -- so --

15        MR. GROHARING:  We won't offer it.  I want to work out

16   the redaction issue first.

17        THE COURT:  Do you want to work that out first?

18        MR. GROHARING:  Yes, your Honor.

19        THE COURT:  All right.  Fair enough.  Fair enough.

03:05 20   MR. GROHARING:  You can take it down now, please.

21   BY MR. GROHARING:

22   Q.   Sir, do you know the defendant in this case?

23   A.   Yes, I do.

24   Q.   Could you please identify him?

25   A.   Tarek Mehanna.

1    Q.   Could you please point to where he's seated?

2    A.   (Witness complies.)

3         MR. GROHARING:  Your Honor, let the record reflect

4    that he's pointed to the defendant and identified him.

5         THE COURT:  All right.

6    BY MR. GROHARING:

7    Q.   How long have you known the defendant?

8    A.   For about -- from now?  I'd say almost eight years.

9    Q.   So you met him around 200- --

03:06 10   A.   Give or take.

11   Q.   -- -2, 2003?

12   A.   Yes.

13   Q.   Do you recall when you met him?

14   A.   Yes.

15   Q.   What do you recall about that?

16   A.   Well, I was already friends with an Ahmad Abousamra, and I

17   had went with him to go visit Mr. Mehanna.

18   Q.   Mr. Abousamra introduced you to the defendant?

19   A.   Yes.

03:06 20   Q.   How would you describe the nature of your relationship

21   with the defendant?

22   A.   Best friend.

23   Q.   And that's the relationship you had with him starting

24   sometime in 2002?

25   A.   It became so.

1   Q.   Has that relationship continued?

2   A.   Yes.

3           MR. GROHARING:  Now, could I have Exhibit 741, please?

4           Your Honor, this exhibit is in evidence.

5           THE COURT:  All right.

6   BY MR. GROHARING:

7   Q.   Do you recognize the person identified in these

8   photographs?

9   A.   Yes.

03:07 10   Q.   And who is that?

11   A.   Ahmad Abousamra.

12   Q.   And he's the individual you indicated introduced you to

13   the defendant?

14   A.   Yes.

15   Q.   When did you meet Mr. Abousamra?

16   A.   In about 2002.

17   Q.   And what is the nature of your relationship with

18   Mr. Abousamra?

19   A.   He was a close friend.

03:07 20   Q.   He's a close friend as well?

21   A.   Yes.

22   Q.   Now, what types of activities did you participate in with

23   Mr. Abousamra and the defendant?

24   A.   Going to the mosque, reading Qur'an, talking Islamic

25   jurisprudence, Islamic subjects.

```
 1   Q.   Okay.  You mentioned that it was Mr. Abousamra that

 2   introduced you to the defendant.  Was anyone else present at

 3   that meeting?

 4   A.   Yes.  It would be Kareem Abuzahra.

 5        MR. GROHARING:  Could I have Exhibit 757, please?

 6   Q.   Do you recognize that photo?

 7   A.   Yes, I do.

 8   Q.   Who is that?

 9   A.   Kareem Abuzahra.

10   Q.   And this meeting with Mr. Abousamra and Mr. Abuzahra,

11   where did it take place?

12   A.   At Tarek's house.

13   Q.   And where is that?

14   A.   In Sudbury, Massachusetts.

15   Q.   If I could ask you, sir, to speak up a little bit for the

16   court reporter's benefit to make sure the microphone picks it

17   up?

18   A.   Correct.  If I may?

19        (The witness adjusts the microphone.)

20   Q.   Now, was -- where was Mr. Mehanna's house?

21   A.   In Sudbury, Massachusetts.

22   Q.   Okay.  Now, who else, if anyone, was present at that

23   meeting?

24   A.   It was me, Abuzahra and Asas Jamal.

25   Q.   Could you please spell that for the court reporter?
```

1    A.    I believe it's A-S-A-S J-A-M-A-L.

2    Q.    Thank you.

3          What do you recall about that meeting at Mr. Mehanna's

4    home?

5    A.    We talked Islamic subjects, jurisprudence, read some

6    Qur'an, like talked about other issues, and we watched some

7    videos.

8    Q.    What types of videos did you watch?

9    A.    Jihadi videos.  Videos of jihad conflict.

03:09 10   Q.    Now, you use the term "jihadi videos."  What's a jihadi

11   video?

12   A.    A video wherein people, Muslim fighters, are fighting on

13   front lines in different areas of the world.

14   Q.    You say "front lines."  Front lines of what type of

15   situation?

16   A.    At the time it would be Chechnya, Palestine, Afghanistan.

17   Q.    And you say "fighting on the front lines."  Did these

18   videos depict violence?

19   A.    Yes.

03:10 20   Q.    And you used the term "jihad."  In this context what does

21   the term "jihad" mean to you?

22   A.    Raising the word of Allah.  Uppermost, defending Islam.

23   Fighting against those who are fighting the Muslims.

24   Q.    So in the context of a jihadi video, am I correct to say

25   that you interpret that to mean that that's Muslims fighting

1    those who are fighting Muslims?

2    A.    Yes.

3    Q.    And did Mr. Mehanna share that view of jihad -- that same

4    view -- based on what he talked about during your friendship

5    with him?

6    A.    Yes.

7    Q.    Now, do you know -- these videos that you saw that day, do

8    you know where they came from?

9    A.    I was unsure.  As far as they were VHS, so really --

03:11 10    Q.    They were played in a VCR?

11    A.    Yes.

12    Q.    Do you know whose videos they were?

13    A.    I would assume they were Mr. Mehanna's.

14    Q.    Now, what is a mujahideen?  What is "mujahideen"?

15    A.    "Mujahideen" is plural of "mujahid."  And that's Muslim

16    fighters; one who performs the act of jihad.

17    Q.    And were those the individuals that were depicted in these

18    videos?

19    A.    Yes.

03:12 20    Q.    Now, did these videos contain images of fighters in Iraq

21    and Afghanistan?

22    A.    In -- yes, in Afghanistan for sure, yeah.

23    Q.    What did you understand was the purpose of these videos?

24    A.    They were inspirational videos, videos for other Muslims,

25    to possibly incite them, maybe.

1    Q.   Did they inspire you?

2    A.   Yes.

3    Q.   What was your reaction to the videos, if you can recall?

4    A.   Pleasurable reaction, you know, like a lot of allahu

5    akbar, meaning God is great.

6    Q.   What would that be in response to?

7    A.   To the clips where it shows the Muslims engaging in

8    battle.

9    Q.   Now, do you recall Mr. Mehanna's reaction to these videos?

03:13 10   A.   Yes.

11   Q.   And how did he react?

12   A.   In a similar manner.

13        MS. BASSIL:  Your Honor, can we have a time frame on

14   this?  I'm a little unclear whether we're talking about that

15   night or --

16        THE COURT:  That's a good point.  We started out as

17   this being the initial meeting.  I don't know if you're still

18   in that time frame or not.

19        MR. GROHARING:  I'll clarify, your Honor.

03:13 20        THE COURT:  All right.

21   BY MR. GROHARING:

22   Q.   Did you watch videos on a number of occasions?

23   A.   Yes.

24   Q.   When you watched these videos, did you observe

25   Mr. Mehanna's reactions?

```
 1    A.    For the most part, yes.

 2    Q.    And how did -- do you recall, how did Mr. Mehanna react to

 3    these videos?

 4    A.    Similar to myself, with an air of pleasure.

 5    Q.    And did you discuss the topic of jihad in the context of

 6    watching these videos?

 7    A.    Yes.

 8    Q.    Did you also discuss that on other occasions?

 9    A.    Yes.

03:13 10    Q.    What do you recall Mr. Mehanna saying about jihad?

11    A.    It's a duty upon a Muslim if he's capable of performing

12    it.

13    Q.    And what does that duty entail the Muslim to do?

14    A.    To defend Islam.

15    Q.    In what way?

16    A.    Whether with speech, money or action, providing oneself,

17    go to the front line wherein there is fighting.

18    Q.    Did that include violence, if necessary?

19    A.    Yes.

03:14 20    Q.    Now, at this time in addition to watching videos and

21    discussing these matters with the defendant, were there other

22    things that were influencing your feelings about jihad, and

23    Islam in general?

24    A.    For myself?

25    Q.    Yes.
```

1    A.    Yeah.  After September 11th I dealt with quite a lot of

2    scrutiny, me and my wife, and due to that I became quite

3    disenfranchised, shall we say?  And I saw a large amount of

4    that kind of propaganda, if you would, on the internet, and I

5    would agree with it for the most part.

6    Q.    And so you -- is it fair to say you used the internet to

7    research Islam at that point?

8    A.    Yes.

9    Q.    And what was your level of understanding when you met the

03:15 10   defendant -- what was your level of understanding of Islam as

11   well as the Arabic language?

12   A.    Quite little.

13   Q.    And are you a convert to Islam?

14   A.    Yes, I am.

15   Q.    And when did you convert?

16   A.    Wow, I always get mixed up on that date.  Around '99, '98,

17   so...

18   Q.    So 2002 you were still in the earlier stages of your

19   conversion to Islam?

03:16 20   A.    Yes.

21   Q.    And how would you compare your level of knowledge of Islam

22   at that point compared to the defendant?

23   A.    Quite minuscule; little to none.

24   Q.    What did he know about Islam?

25   A.    A whole lot.

```
 1    Q.   Did you consider him knowledgeable?

 2    A.   Very much so.

 3    Q.   Did he teach you regarding Islam?

 4    A.   Yes.

 5    Q.   And did his teaching have an impact on you?

 6    A.   Yes.

 7    Q.   Did he ever teach you about jihad?

 8    A.   Yes.

 9    Q.   How so?

10    A.   In conversations, general conversations, about whatever's

11    going on in the world or the concepts that we read about within

12    books.

13    Q.   Okay.  Now, are you familiar with a term "proof"?

14    A.   Yes.

15    Q.   What is a proof?

16    A.   A proof in -- if you're using it in a conversation about

17    Islam, a proof is something wherein you have to find something

18    from the Qur'an, or statements of the prophet, alayhis salam,

19    or his companions, so on and so forth, to prove whatever thing

20    you're discussing or whatever you're trying to prove, so to

21    speak.

22    Q.   Now, did you discuss proofs in the context of jihad with

23    Mr. Mehanna?

24    A.   Yes.

25    Q.   What did he say about that, as you can recall?
```

1    A.    About proofs?

2    Q.    Yes.

3    A.    We would go through subjects and bring proofs from the

4    Qur'an; from al-Hadiths, which is statements of the prophet

5    Mohammad; and from the imams, you know, the leaders of the

6    early Muslims.

7    Q.    Okay.  And these proofs -- I mean, what was their purpose

8    in the context of the jihad you were talking about?

9    A.    I mean, you could say to prove legitimacy.

03:18 10   Q.    They justified why the fighting was necessary?

11   A.    Yes.

12   Q.    And that's in the context of violent jihad?

13   A.    Yes.

14   Q.    Now, what about justification for the attacks on

15   September 11, 2001?  Did you ever discuss those attacks with

16   the defendant?

17   A.    Yes.

18   Q.    And what did he say about that?

19   A.    That they were justified.

03:19 20   Q.    And why were those attacks justified?

21   A.    Because the same thing has happened to the Muslims

22   throughout the world.  It's been happening.

23   Q.    When you say "the same thing has happened to the Muslims,"

24   what are you referring to?

25   A.    Attacks, large-scale attacks, and if the benefit

1    outweighed the loss, then, therefore, it was permissible.

2    Q.    So he said that if the benefit of the attacks outweighed

3    the loss, it was permissible?

4    A.    Yes.

5    Q.    And that was in the context of the attacks on the United

6    States on September 11, 2001?

7    A.    Yes.

8    Q.    Did you agree with that sentiment?

9    A.    Yes.

03:19 10    Q.    Now, did Mr. Mehanna cite any Islamic scholars to support

11    that argument?

12    A.    Yes.

13    Q.    Is that in the -- who are those scholars, if you can

14    recall?

15    A.    Abdul Azzam.

16    Q.    If you could spell it as well for the court reporter.

17          MR. GROHARING:  You've got that one?

18    A.    I'm trying to think of a transliteration.  Abdul Azzam

19    died before the September 11th attacks.  It's just the

03:20 20    philosophy.

21    Q.    Okay.  Well, let's talk a little bit about Abdul Azzam.

22    Who was he?

23    A.    He was a Palestinian scholar and the teacher of

24    Osama bin Laden.

25    Q.    I'm sorry.  The teacher of whom?

```
 1    A.    Osama bin Laden.

 2    Q.    And did you talk about Abdul Azzam with the defendant?

 3    A.    Yes.

 4    Q.    What did he say about him?

 5    A.    He's a good scholar.

 6    Q.    Did you talk about any particular texts that he had

 7    written?

 8    A.    A book -- multiple books, actually, but one in particular,

 9    "Join the Caravan."

03:21 10    Q.    Are you familiar with that book?

11    A.    Yes.  I owned it.

12    Q.    And that was written by Abdul Azzam?

13    A.    Yes.

14    Q.    Did you discuss that book with the defendant?

15    A.    Yes.

16    Q.    What did he say about it?

17    A.    It was a good book.

18    Q.    Why did he think it was a good book?

19             MS. BASSIL:  Objection.

03:21 20             THE COURT:  Rephrase the question.

21    BY MR. GROHARING:

22    Q.    Why did he indicate that he thought it was a good book?

23    A.    It had a lot of proofs in it, as we already -- previously

24    discussed what proofs were.  A lot of proof as for the

25    arguments made in the book.
```

1   Q.   And do you recall in particular what any of those proofs

2   were?

3   A.   One part of the book -- I mean, if I can remember, a lot

4   of it was proofs for joining the jihad overseas, if need be,

5   with oneself, the obligation of jihad in the circumstances one

6   lives in.  And towards the end of the book it had some

7   justifications for suicide bombings.

8   Q.   And did you talk about the justification for suicide

9   bombings with the defendant?

03:22 10   A.   Yes.

11   Q.   What did he say about that?

12   A.   He said if the benefit was greater than the loss, it was

13   permissible.

14   Q.   And so is that the same argument put forth to justify the

15   September 11th attacks?

16   A.   Yes.

17   Q.   And did you talk about who particular targets were of

18   suicide bombings?

19   A.   Military, government, government infrastructure.

03:23 20   Q.   And what did the defendant say, if anything, about those

21   targets?

22   A.   They were permissible.

23   Q.   Did you talk about these matters on more than one

24   occasion?

25   A.   Yes.

1    Q.    How frequently would you talk about these issues?

2    A.    Quite frequently.

3    Q.    When you say "quite frequently," estimate, you know, how

4    many times a week, how many times a month?

5    A.    In a month?  If we seen each other quite a bit, maybe in a

6    month's time, five times, more, maybe ten.

7    Q.    Okay.

8    A.    Depending on the current circumstance of the news and what

9    was going on.

03:23 10   Q.    Is it fair to say some months you talked more than other

11   months?

12   A.    Yes.

13   Q.    And this is over the course of several years?

14   A.    Yes.

15   Q.    Now, do you recall the defendant's reaction when watching

16   jihadi videos that depicted U.S. casualties in Iraq and

17   Afghanistan?

18   A.    Yes.

19   Q.    What was it?

03:24 20   A.    It was the same as I said before.  As of now, jubilant.

21   Q.    Well, you describe it as jubilant.  Do you recall specific

22   things he did?

23   A.    All of us would pretty much, together, say, like, "Allahu

24   Akbar," God is most great, and "al-hamdu li'llah," you know,

25   praise be to God, and watch with a sense of agreement.

1    Q.   Now, at any point did you discuss participating in jihad

2    with the defendant?

3    A.   Yes.

4    Q.   And what did he say, if anything, about his desire to

5    participate in jihad?

6    A.   If we ever had the chance.  And he said that we would make

7    a way to go.

8    Q.   And is this something that was also discussed with

9    Mr. Abousamra?

03:25 10    A.   Yes.

11    Q.   Did you talk about particular locations where you could go

12    and fight jihad?

13    A.   Yes.

14    Q.   What were those locations?

15    A.   Well, I mean, sometimes we'd talk about Afghanistan, and

16    that being an impossibility because everybody was getting

17    arrested if they went to Pakistan --

18    Q.   Why was Afghanistan a likely place to go fight jihad?

19    A.   An unlikely place?

03:25 20    Q.   A likely place.

21    A.   A likely place?  Because there was the U.S. invasion in

22    Afghanistan.

23    Q.   So if you went to fight jihad in Afghanistan, who would

24    you be fighting?

25    A.   America.

1   Q.   And is that the view -- was that view expressed by the

2   defendant?

3   A.   Yes.

4   Q.   In addition to fighting Americans in Afghanistan, did you

5   talk with the defendant about other places where you could go

6   fight the jihad?

7   A.   Yes.

8   Q.   Where was that?

9   A.   Chechnya, Iraq after the Iraq invasion.

03:26 10   Q.   And if you went to fight in Iraq -- to fight the jihad in

11   Iraq, who would you be fighting?

12   A.   American troops.

13   Q.   And do you recall the defendant talking about his interest

14   in fighting American troops in Iraq?

15   A.   Yes.

16   Q.   What did he say?

17   A.   If he had the chance, if there was a way to get there and

18   do so, we would.

19   Q.   I'm sorry?

03:26 20   A.   If there was a chance to get there and do so, we would.

21   Q.   Do you recall any specific efforts by the defendant to

22   research or plan to fight jihad in either Pakistan or -- I'm

23   sorry -- Afghanistan or Iraq?

24   A.   Efforts made?

25   Q.   You mentioned that you discussed it.

1    A.    Yes.

2    Q.    Were there any other efforts made, conducting research or

3    anything of that nature?

4    A.    As far as research, just the internet, looking at recent

5    news on how people had made their way there and whether they

6    got in or not, and such things like that.

7    Q.    You mentioned earlier that it was difficult to get into

8    Afghanistan.

9    A.    Yes.

03:27 10   Q.    Do you recall discussing that with the defendant?

11   A.    Yes.

12   Q.    What did he have to say about that?

13   A.    We concluded that it was not a good idea because Muslims

14   were getting arrested wholesale at the border.  If you're out

15   of -- or American and you go to Pakistan, you're sure enough to

16   get arrested at the airport.

17   Q.    And this was in 2002-2003 time frame?

18   A.    Yes.

19   Q.    Now, are you aware if the defendant or Mr. Abousamra ever

03:28 20   did make plans to go and fight jihad?

21   A.    Yes.

22   Q.    How were you aware of that?

23   A.    To describe it, it was a day when Ahmad Abousamra seen me

24   in the mosque and he pulled me aside, away from people, and

25   told me that he's leaving and don't be jealous because he's

1    going to go and he's never going to come back.  I understood

2    this to mean that you're going to fight and you won't come back

3    after.  Sometime after noticing that he was gone, I noticed

4    that I lost touch with Tarek.

5    Q.   Now, this conversation, when did it take place?

6    A.   I'm very bad with dates.  This was 2004, '5?  I think

7    2004.

8    Q.   And it was, you mentioned, at the mosque?

9    A.   Yes.

03:29 10   Q.   Okay.  And what happened after he told you that he was

11   going away and not to be jealous?

12   A.   He told -- Ahmad Abousamra told me he was leaving, not to

13   be jealous.  I kind of prodded him, asked who -- what was going

14   on.  And he said, you know, "Don't worry about it.  I'm

15   leaving.  Don't be jealous.  Pray for me.  I'm not coming

16   back."  So I understood this to be, you know, what else would I

17   be jealous about him leaving for?  So I understood he was going

18   to fight jihad.

19   Q.   And had you expressed your desire to him to fight jihad?

03:29 20   A.   I had before, yes.

21   Q.   Had the defendant expressed a similar interest in fighting

22   jihad in your presence?

23   A.   Yes.

24   Q.   Now, did you ever learn more about his effort to, in fact,

25   fight jihad?

1    A.    Yes.

2    Q.    What did you learn?

3    A.    Well, after Ahmad left, Tarek was missing as well.  Time

4    went by and I figured -- I kind of concluded that they had --

5    both must have left together.  And then after some time went by

6    they came back, and I had asked him what happened.

7    Q.    When you say you asked him what happened, who are you

8    referring to?

9    A.    Tarek.

03:30 10   Q.    Okay.  And what did the defendant say happened?

11   A.    "Nothing."

12   Q.    What did you take that to mean?

13   A.    They made no headway to finding a place to fight or train

14   or what-have-you.

15   Q.    Did he indicate what he was hoping would happen when he

16   went to Yemen?

17   A.    Indicated, yes, about, you know, hoping that they could

18   connect with somebody to find a headway to make it to somewhere

19   where there was fighting.

03:31 20   Q.    When you say "make it to somewhere," where did he indicate

21   that "somewhere" was?

22   A.    Possibly Iraq.  Iraq.

23   Q.    And so the defendant indicated that he wanted to make a

24   connection in Yemen with someone to get to Iraq?

25   A.    Yes.

1  Q.   And he said he was unsuccessful in that regard?

2  A.   Yes.

3  Q.   Did he ever discuss his desire to travel to Yemen to

4  receive religious instruction or Arabic instruction?

5  A.   Not to my recollection, no.

6  Q.   In the context of his return from Yemen in 2004 when you

7  talked to him about being unsuccessful, did he mention efforts

8  to attempt to receive religious instruction?

9  A.   No, other than visiting a school.  But not...

03:31 10  Q.   Now, did he ever discuss his desire to travel to Iraq to

11  receive religious instruction or Arabic instruction?

12  A.   Not to me, no.

13  Q.   Prior to his departure to Yemen in 2004, did he ever

14  discuss the possibility of traveling to Yemen on his spring

15  break to receive religious or Arabic instruction?

16  A.   No.

17  Q.   Do you recall the defendant ever expressing concern

18  regarding how his parents reacted to his travel to Yemen?

19  A.   Yes.

03:32 20  Q.   What did he say?

21  A.   They were quite mad.

22  Q.   Did he say why?

23  A.   Because him and Ahmad had left abrupt and didn't really

24  tell anybody in the family.  So, therefore, both of their

25  families, their parents, were extremely angry with them and the

1    manner in which they left.

2    Q.   Did he indicate whether they were angry that he was

3    attempting to receive --

4         MS. BASSIL:  Well, objection, your Honor.  The leading

5    nature.

6         THE COURT:  Sustained.

7    BY MR. GROHARING:

8    Q.   Beyond what you've said, did he indicate why they were

9    angry?

03:33 10   A.   Just for the -- really, the -- them just leaving abruptly.

11   I mean, as far as details go, I just know they were extremely

12   angry about them leaving out of nowhere, just without telling

13   anyone.

14   Q.   Now, did you ever see Mr. Abousamra again after that trip?

15   A.   Yes.

16   Q.   Where did you see him?

17   A.   I saw Ahmad at the mosque, and at his house after I seen

18   him at the mosque.

19   Q.   Do you recall how long this was after you had the

03:33 20   conversation about the fact that he was leaving and for you not

21   to be jealous?

22   A.   Do I recall the distance of time between the two?

23   Q.   Approximately how long was it in between those two

24   meetings?

25   A.   In all honesty, I don't even really recall the distance.

1    It wasn't that long.  It mustn't have been even a month's time,

2    I don't think.

3    Q.    Okay.  When you met with him, do you recall what he said

4    about this trip?

5    A.    That it was unsuccessful.

6    Q.    Unsuccessful how?

7    A.    He was not able to find any connection to train or get to

8    the jihad.

9    Q.    And, again, why did he want to receive training?

03:34 10    A.    To fight.

11    Q.    And you said he was -- the training was unsuccessful to

12    get to jihad.  What did he say about what the jihad was that he

13    wanted to get to?

14    A.    Iraq.

15    Q.    And in Iraq, what would his purpose be?

16    A.    To fight.

17    Q.    And to fight against whom?

18    A.    U.S. troops.

19    Q.    Now, after the defendant and Mr. Abousamra returned from

03:35 20    Yemen, did anything change in the way that you communicated?

21    A.    Yes.

22    Q.    What?

23    A.    It was much more strict.

24    Q.    By "strict," what do you mean?

25    A.    More security-minded, mindful of security.  Also, due to

1    restrictions placed on them by the parents -- because they were

2    both living with their parents -- they weren't able to really

3    connect the two together.  They would not be found, rarely,

4    together much.

5    Q.   Now, did you take any precautions when you were

6    communicating with either the defendant or Mr. Abousamra after

7    their trip to Yemen?

8    A.   Yes.

9    Q.   What types of precautions?

03:35 10   A.   If we mentioned something about -- you know, if something

11   unsavory came up in a conversation, use certain words.

12   Q.   And when you say "unsavory," what do you mean?

13   A.   You know, if something -- if I would bring up something

14   about jihad, or either of the brothers would, we would use

15   certain words for that, or for the FBI.

16   Q.   Now, you said when you talked about jihad.  Did you still

17   discuss jihad with the defendant and Mr. Abousamra after this

18   trip?

19   A.   Yes.

03:36 20   Q.   Had their views changed since the views they held prior to

21   traveling on the trip?

22   A.   Not to my knowledge.

23   Q.   Was the defendant still supportive of jihad at that point?

24   A.   Yes.

25   Q.   Now, back to these precautions that you were taking to

1    avoid using certain words.  You mentioned -- I believe you used

2    the term "Brian"?

3    A.    Yes.

4    Q.    What does that term mean?

5    A.    It means the FBI.  That's something I coined myself.

6    Q.    How did you come up with that word for the FBI?

7    A.    I had been visited by the FBI.  One day I had received a

8    phone call, my wife picked up the phone and told me it was the

9    FBI.  I took the phone, and the agent asked to meet me

03:37 10   somewhere, whether it be my house or somewhere else.  I

11   requested that it be somewhere else.  And his name happened to

12   be Brian.

13   Q.    And so you used that moniker --

14   A.    So after telling -- yes, after telling the story of my

15   encounter with Brian; hence, the FBI then would be known as

16   "Brian."

17   Q.    Why did you want to use the term "Brian" instead of "FBI"

18   when you talked to the defendant?

19   A.    Well, openly saying "The FBI might be listening on the

03:38 20   phone" isn't really the smartest of ways of going about things.

21   Q.    Did you use any other terms as code words when talking to

22   the defendant?

23   A.    Yes.

24   Q.    Do you recall any of those terms?

25   A.    "Peanut butter and jelly."

1    Q.    And what did "peanut butter and jelly" mean?

2    A.    Jihad.

3    Q.    And is that a term that the defendant used?

4    A.    Yes.

5    Q.    And that was a term you used in place of "jihad" when

6    talking to the defendant?

7    A.    Yes.

8    Q.    Why did you do that?

9    A.    Well, it wouldn't be in the mindset.  It was not a smart

03:38 10   thing to really get on the phone and say, "Wow, did you hear

11   about the jihad in Iraq?" or something like that.

12   Q.    And were you -- was the defendant conscious of security?

13   A.    Yes.

14   Q.    Were you as conscious as the defendant of security

15   concerns?

16   A.    Not as much.

17   Q.    Were you treated differently because of the different

18   levels of consciousness regarding security?

19   A.    I think so, yes.

03:39 20   Q.    Why do you say that?

21   A.    Later on I would come to find out that -- for instance, an

22   example, the trip made by Tarek and Ahmad, I would find out

23   later that Kareem Abuzahra had happened to go on that trip.  I

24   wasn't informed of the whole group leaving, so I kind of

25   figured that maybe it was for the purpose of my loud mouth that

1    I was not told certain things.

2    Q.   Is that something that the defendant raised with you, the

3    fact that you had a loud mouth, as you say?

4    A.   Yes.  I wouldn't say maybe he used the term "loud mouth,"

5    but just -- I am not putting actual words in his mouth, but,

6    you know, the idea of my being brazen, you know, that I was

7    very outgoing about certain things.  I would say certain things

8    in the mosque and express myself.

9    Q.   And he thought you should be more careful?

03:40 10  A.   Yes.

11            MR. GROHARING:  Can I have Exhibit 757, please?

12   Q.   You just mentioned an individual named Kareem Abuzahra?

13   A.   Yes.

14   Q.   I believe you identified him previously?

15   A.   Yes.

16   Q.   Is this Kareem Abuzahra?

17            (Counsel displays photograph.)

18   A.   Yes, it is.

19   Q.   Now, how often did you meet with him during this time

03:40 20  frame?

21   A.   Not much.

22   Q.   How often in relation to your meetings with the defendant

23   and Mr. Abousamra?

24   A.   In comparison, little to none.

25   Q.   Did he ever come to your home?

```
 1    A.   Yes, he did.

 2    Q.   All right.  When was that?

 3    A.   Oh, an actual date would be --

 4    Q.   In relation to when the defendant went to Yemen, if that

 5    helps.

 6    A.   Yes.  Probably -- I would give maybe some months.  A few

 7    months later.

 8    Q.   A few months after that?

 9    A.   Yeah.

03:41 10    Q.   Now, do you recall the purpose of that visit?

11    A.   Yes.

12    Q.   What was it?

13    A.   Well, I had made my minor pilgrimage to Saudi Arabia.

14    Q.   What's a -- I'm sorry.  What's a minor pilgrimage?

15    A.   A minor pilgrimage.  Well, if everyone in the court knows

16    about the Hajj.

17    Q.   What is the Hajj?

18    A.   The Hajj is when Muslims go to the holy city of Mecca and

19    visit the Ka'ba, the first shrine.

03:42 20    Q.   And could you please spell that for the court reporter?

21    A.   Ka'ba?

22    Q.   Yes.

23    A.   It would be transliteration, so I guess I'll make one up.

24    K-A-B-A-H.

25    Q.   All right.  So the Ka'ba.  I'm sorry to interrupt.  Go
```

1    ahead.

2    A.    The Muslims congregate in the holy city of Mecca and visit

3    the Ka'ba, and go to the mosque of the prophet Mohammad,

4    alayhis salam.  And they stand on Mount Arafat and supplicate

5    to God.  This is the Hajj.  A minor pilgrimage is called Umrah.

6    And you don't have to do it in a specific season; it can be

7    done all year-round.  So I made Umrah.

8    Q.    Okay.  And why was that relevant to his coming to your

9    house?

03:43 10    A.    Because I had met a man on my trip to Saudi Arabia, and he

11    was willing to be my sponsor.  In order to work or study, if

12    not with a visa given by a school, you would need a kifalah, I

13    believe is the word, and that's a sponsor.

14    Q.    Can you spell that word as well, please?

15    A.    K-I-F-A-L-A-H, I believe.

16    Q.    Please continue.

17    A.    And this man was willing to be my sponsor.  So when I came

18    back I was hoping to raise some money for a trip for me and my

19    wife, were things to go through as far as my sponsorship, and

03:43 20    move to Saudi Arabia.  And I had expressed the desire to raise

21    some funds, and Kareem said that he had some money in the

22    amount of maybe a thousand dollars, if I remember, around that

23    amount.  And he told me that he would visit me and give me some

24    money.

25    Q.    Did he, in fact, give you money for that purpose?

1   A.   Yes, he did.

2   Q.   Now, during that visit where Mr. Abuzahra came to your

3   house what, if anything, did you discuss?

4   A.   We talked about my hopes to make the trip, and he had

5   asked to see my firearm, which I had owned legally.

6   Q.   Now, what type of firearm was this?

7   A.   A Glock 9.

8   Q.   Sir, what happened after he asked to see your Glock?

9   A.   He actually -- well, after taking out the magazine and

03:44 10   letting him handle it and showing it to him, he asked if I

11   could get more guns.

12   Q.   Did he indicate what types of guns he wanted?

13   A.   Like automatic weapons or something like this.

14   Q.   Did he say why he wanted the automatic weapons?

15   A.   No, he didn't, 'cause immediately following his mentioning

16   of it I quickly told him a few things about my inability to get

17   automatic weapons.

18   Q.   What did you tell him?

19   A.   Well, I told him that I was unable to get automatic

03:45 20   weapons; I could only get handguns.  And I wouldn't want to get

21   him handguns anyway because on the bottom of my Glock it would

22   have a serial number which would be traced directly back to me,

23   so...

24   Q.   Did you ask him why he wanted automatic weapons?

25   A.   Well, immediately following when I went over how I

1    wouldn't want to give him any guns, I kind of asked -- it was

2    sort of a -- like what would -- it was a very funny little

3    mumbled grumble that we had and like, you know, "Why would

4    you" -- "What would you need guns for?"  And he's just, "Don't

5    worry about it."  I was just kind of asking back and forth, as

6    I recall.

7    Q.   Now --

8             THE COURT:  Mr. Groharing, if you're about to go to a

9    new topic, we're just a little after one o'clock.  I don't know

03:46 10   if you're finished with that line or not.

11            MR. GROHARING:  This might be a good time to break,

12   your Honor.

13            THE COURT:  We'll recess now, jurors.  Enjoy the rest

14   of the day.  We'll see you tomorrow to continue with the case.

15            THE CLERK:  All rise for the Court and jury.  The

16   Court will be in recess.

17            (The Court and jury exit the courtroom and the

18   proceedings adjourned at 1:02 p.m.)

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2

3              We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  November 17, 2011

17

18

19

20

21

22

23

24

25