UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                               )
UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               ) Criminal Action
v.                             ) No. 09-10017-GAO
                               )
TAREK MEHANNA,                 )
                               )
          Defendant.           )
                               )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY NINETEEN
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, November 21, 2011
9:12 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Aloke Chakravarty and Jeffrey Auerhahn,
3            Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Jeffrey D. Groharing, Trial Attorney
             National Security Division
7        950 Pennsylvania Avenue, NW
         Washington, D.C.  20530
8        On Behalf of the Government

9        CARNEY & BASSIL
         By: J.W. Carney, Jr., Esq.
10           Janice Bassil, Esq.
             John E. Oh, Esq.
11       20 Park Plaza
         Suite 1405
12       Boston, Massachusetts  02216
         - and -
13       LAW OFFICE OF SEJAL H. PATEL, LLC
         By: Sejal H. Patel, Esq.
14       101 Tremont Street
         Suite 800
15       Boston, Massachusetts  02108
         On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

1                                    I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

WITNESSES FOR THE
  GOVERNMENT:

DANIEL MALDONADO, resumed

    By Mr. Groharing                              64
    By Ms. Bassil (cont'd)            4                  77

CHRISTIAN FIERABEND, resumed

    By Mr. Chakravarty (Cont'd)  82
    By Mr. Carney                    117

DANIEL SPAULDING

    Voir dire by the Court page 120
    By Mr. Auerhahn              127

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on November 21,

6     2011.

7          The defendant, Tarek Mehanna, is present with counsel.

8     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

9     are present, along with Jeffrey D. Groharing, Trial Attorney,

00:19 10   U.S. Department of Justice, National Security Division.)

11          THE COURT:  Good morning, jurors.  Miss Bassil.

12          MR. CARNEY:  Good morning, your Honor.

13     CONTINUED CROSS-EXAMINATION BY MS. BASSIL:

14     Q.   Good morning, Mr. Maldonado.

15     A.   Good morning.

16     Q.   When we left on Friday, we had left off -- and I'm going

17     to go sort of chronologically through things just so you know

18     and, hopefully, it will make sense.  In 2003, you moved to

19     Derry, New Hampshire, is that correct?

00:19 20   A.   2003, I believe so, yeah.

21     Q.   And in May of 2003, you went for two weeks on the Hajj, or

22     pilgrimage, to Mecca, is that correct?

23     A.    Minor pilgrimage, Umrah.

24     Q.   In 2003, that was the first time that you met Ahmad

25     Abousamra, is that correct?

        1    A.    Yes.

        2    Q.    You saw him at Friday prayer at a mosque in Lowell?

        3    A.    Yes.

        4    Q.    And you observed that he had a long beard, is that

        5    correct?

        6    A.    Yes.

        7    Q.    And to you, that -- you understood that to mean that he

        8    was more traditional, more orthodox, in his beliefs, correct?

        9    A.    An indication thereof, yes.

00:20  10    Q.    It also possibly meant that he was Salafi?

       11    A.    Yes.

       12    Q.    And you -- the two of you -- did you go up to him at the

       13    mosque and introduce yourself?

       14    A.    Yes.

       15    Q.    And you two became friends, did you not?

       16    A.    Yes, we did.

       17    Q.    Your family would socialize?

       18    A.    Yes.

       19    Q.    He was married at the time to his first wife?  He later

00:20  20    remarried, correct?

       21    A.    Correct.

       22    Q.    And his family and your family would get together; his

       23    wife and your wife would talk?

       24    A.    Yes.

       25    Q.    Correct?

1           He had a son, and at that time I think you had two

2    children?

3    A.    Correct.

4    Q.    Now, you met Tarek Mehanna after you met Ahmad Abousamra,

5    is that correct?

6    A.    Correct.

7    Q.    You said you met him, I think for the first time, when Mr.

8    Abousamra brought you to Tarek Mehanna's parents' home, is that

9    correct?

00:21 10   A.    Correct.

11   Q.    And you went there in a car with Sas Jamal and Ahmad

12   Abousamra, is that correct?

13   A.    Correct.

14   Q.    On the way there, you talked about various things, did you

15   not?

16   A.    Yes, we did.

17   Q.    You talked about Islamic jurisprudence?

18   A.    Correct.

19   Q.    You talked about Jihad?

00:21 20   A.    Yes.

21   Q.    You talked about September 11th?

22   A.    Yes.

23   Q.    And you talked about Osama bin Laden, correct?

24   A.    Yes.

25   Q.    And Tarek Mehanna was not in that car ride?

```
 1    A.   No, he was not.

 2    Q.   Now, when you got to Tarek's house, you read the Qur'an,

 3    is that correct?

 4    A.   Correct.

 5    Q.   And, again, you talked about the meaning of the passage

 6    that had been read, correct?

 7    A.   Yes.

 8    Q.   And you talked about some Islamic issues?

 9    A.   Correct.

10    Q.   You also said that there was a video that you saw that

11    night, and I think you said it had Chechnya, Kashmir, and

12    Palestine, is that correct?

13    A.   Yeah.

14    Q.   And you did not see in that video United States soldiers,

15    is that correct?

16    A.   If I'm correct, I don't know if there was Afghanistan in

17    there as well.

18    Q.   I'm sorry?

19    A.   I said there might have been Afghanistan in there as well.

20    Q.   Afghanistan as well?

21    A.   Perhaps.

22    Q.   Now, on Thursday, last week, you said that you assumed the

23    video was Tarek's.  And you assumed that because it was at his

24    house, correct?

25    A.   Correct.
```

1    Q.   But it could have been Ahmad Abousamra's, correct?

2    A.   Possibly.

3    Q.   Or any -- or Kareem Abuzahra?

4    A.   There's a possibility of that, but --

5    Q.   All right.  I want to talk a bit about Mr. Abousamra's

6    influence on you, all right?  He talked to you about Jihad, did

7    he not?

8    A.   Mr. Abousamra?

9    Q.   Yes.

00:23 10    A.   Yes.

11    Q.   And he talked to you about how September 11th was, in his

12    mind, justified?

13    A.   Correct.

14    Q.   And you came to agree with him, did you not?

15    A.   Yes.

16    Q.   He used parts of the Qur'an and Hadiths to justify it?

17    A.   Correct.

18    Q.   And he also talked to you about Abdullah Azzam, correct?

19    A.   Yes.

00:23 20    Q.   And he was -- I'm going to get to that in a minute.  But

21    he showed you or told you about a website called Azzam

22    Publications, is that correct?

23    A.   Yes.

24    Q.   And that was a website out of England, was it not?

25    A.   I don't really remember where it was out of.

1    Q.    But you could order books that had been written about

2    Azzam?

3    A.    From the website?

4    Q.    Yes.

5    A.    I believe so, yes.

6    Q.    You could order books that he had written?

7    A.    Yes.

8    Q.    And did you order anything from Azzam Publications, you

9    yourself?

00:24 10   A.    No.

11   Q.    Now, you also, by that point in 2003, you were -- you had

12   already found the website Clear Guidance, correct?

13   A.    Yes.

14   Q.    And did you ever go on a website Al-Ansar?

15   A.    Al-Ansar?  I ordered books from Al-Ansar, but I don't

16   remember visiting a website called Al-Ansar.

17   Q.    Were you familiar with any websites that were explicitly

18   run by al Qa'ida?

19   A.    I don't -- I never visited it, but I'm pretty sure there's

00:24 20   one, As-Sahab, but at that time I didn't speak Arabic, so --

21   Q.    Now, when you were together with Tarek Mehanna and Ahmad

22   Abousamra, Tarek Mehanna talked far less about violence, isn't

23   that correct?

24   A.    In comparison, yes.

25   Q.    Yes.  In comparison to Abousamra and in comparison to the

1    internet?

2    A.    Of course, in comparison to the internet.

3    Q.    All right.  And, in fact, Tarek was more passionate about

4    strengthening his faith?

5    A.    Than Abousamra?  Yes.

6    Q.    And that was the focus of his translations, was it not?

7    A.    If I were to look at the bulk of them --

8    Q.    I'm sorry?

9    A.    If I were to look at the bulk of them, yes.

00:25 10   Q.    Yes.

11         THE COURT:  Mr. Maldonado, would you try to keep your

12   voice up, please.  We're not hearing you very well.

13         THE WITNESS:  No problem.

14   Q.    Now, the other day you had -- I want to talk a bit about

15   this issue of suicide bombings, all right?  The other day you

16   had said that Mr. Abousamra argued that they were permissible,

17   correct?

18   A.    Correct.

19   Q.    And he provided proofs from the Qur'an and the Hadith --

00:26 20   and Hadiths?

21   A.    Correct.

22   Q.    The proofs he provided from the Qur'an and the Hadiths had

23   to do with essentially comparisons or analogies to fighting

24   that occurred in the time of Mohammed and The Companions,

25   correct?

1    A.    Yes.

2    Q.    Now, do you recall that Tarek Mehanna said suicide

3    bombings were a purely military tactic in a military setting?

4    A.    I don't recall that exact statement, but --

5    Q.    Do you remember discussing -- do you remember in 2005, in

6    July 2005, the London subway system was bombed?

7    A.    Yes.

8    Q.    And do you remember discussing that?

9    A.    Yes.

00:26 10   Q.    Do you remember that Tarek Mehanna said they were not

11   justified?

12   A.    Yes.

13   Q.    And that Abousamra thought they were okay, correct?

14   A.    Actually don't remember if Abousamra believed they were

15   okay or not.

16   Q.    But you do remember Tarek saying, They were not justified;

17   they were not acceptable?

18   A.    Yes.

19   Q.    Now, let me talk a bit about Abdullah Azzam because you

00:27 20   talked about him a little bit the other day.  He was a

21   Palestinian scholar, correct?

22   A.    Yes.

23   Q.    And he taught in Saudi Arabia?

24   A.    Correct.

25   Q.    And he opened what was called a guest house?  He ran guest

1    houses to provide a place for foreigners who came to

2    Afghanistan to fight the Soviets in 1979, correct?

3    A.    Correct.

4    Q.    And bin Laden also ran these guest houses and worked with

5    him at those, correct?

6    A.    Yes.

7    Q.    And Azzam wrote about Jihad, did he not?

8    A.    Yes.

9    Q.    He wrote this book "Joining the Caravan" in 1987?

00:27 10    A.    Yes.

11    Q.    And that was written after the Soviets invaded and before

12    they left, correct?

13    A.    Correct.

14    Q.    And Joining the Caravan is only about Jihad in

15    Afghanistan, isn't that correct?

16    A.    The premise of the book, yes.

17    Q.    And he called for the need for scholars who could help

18    make decisions to people on the battlefield, correct?

19    A.    Yes.

00:28 20    Q.    He called for scholars to come to Afghanistan to perform

21    funeral prayers and help decide how, for example, to treat

22    prisoners, correct?

23    A.    I don't remember the details of that book that much.

24    Q.    All right.  He cited Hadiths and verses in the Qur'an to

25    explain that Jihad is part of the fundamental religion of

1    Islam?

2    A.    Yes.

3    Q.    And that it was a way of life for the prophet and his

4    companions, correct?

5    A.    Correct.

6    Q.    He cited that the prophet participated in 27 military

7    excursions and fought in nine?  You remember those numbers,

8    don't you?

9    A.    The basic premise, yes.

00:28 10   Q.    Abdullah Azzam never said the West should be attacked,

11   isn't that correct?

12   A.    Not to my knowledge.

13   Q.    He said that he had -- he said that when a Muslim land is

14   attacked, it is the individual obligation of the Muslims living

15   in that land to fight, correct?

16   A.    Yes.

17   Q.    And to repel or get out that invader --

18   A.    Correct.

19   Q.    -- correct?

00:29 20         And if they are not enough, if the people who live in

21   that country are not enough to accomplish this, then their

22   neighbors are to come to their aid, correct?

23   A.    Correct.

24   Q.    And that was the idea that, in Afghanistan, the neighbors,

25   being Pakistan, were to come to their aid, correct?

1    A.    Yes, correct.

2    Q.    And if the neighbors were not enough to repel the

3    invaders, then he said we look to the rest of the Muslim

4    community, correct?

5    A.    Correct.

6    Q.    Now, he also listed in Joining the Caravan legitimate

7    excuses not to participate, correct?

8    A.    Yes.

9    Q.    He said that if you are unable to obtain a visa to come to

00:29 10   Pakistan or unable to gain a passport, you don't have to come,

11   correct?

12   A.    Correct.

13   Q.    That if the doors were closed to a particular place, that

14   you could not get there legally, you did not have to come,

15   correct?

16   A.    If the doors were closed?

17   Q.    Yes.

18   A.    As far as, like, that particular comment, I don't recall.

19   Q.    Now, he also said that if you have a wife and children and

00:30 20   they need your support, you don't have to come, correct?

21   A.    Correct.

22   Q.    Now, he was killed in 1989 when a bomb was planted in the

23   road that he took to the mosque on Fridays, correct?

24   A.    Yes.

25   Q.    And he knew nothing about September 11th?

1   A.   Obviously not, no.

2   Q.   Obviously not.  He died before there was even such a thing

3   as al Qa'ida, correct?

4   A.   Correct.

5   Q.   And he knew Osama bin Laden, but they had parted ways

6   after the Soviets withdrew and before he died, correct?

7   A.   Correct.

8   Q.   Now -- and he wrote nothing in Joining the Caravan about

9   suicide bombing, isn't that correct?

00:30 10   A.   I don't know if it was at the end of that book or another

11   one that he wrote, but there is actually a little chapter at

12   the end that does mention suicide bombings.

13   Q.   But the fact is that Abdullah Azzam was about the fight in

14   Afghanistan and fighting the Soviets, was he not?

15   A.   Yes, he was.

16   Q.   Now, I want to ask you a bit about the internet.  In

17   addition to the Clear Guidance that you found on your own, you

18   also found the website of someone named Yusef Khattab, right?

19   A.   Yes.

00:31 20   Q.   I think he was the person you talked about the other day.

21   He had converted; he was a convert?

22   A.   Yes.

23        MS. BASSIL:  Your Honor, I'd just like to show the

24   jury the spelling of this, if I may.

25   Q.   And you found Yusef Khattab on your own, correct?

1    A.   Yes.

2    Q.   You were not steered to his website by Tarek Mehanna?

3    A.   No.

4    Q.   And he had videos on his website which expressed support

5    for suicide bombings in Israel, correct?

6    A.   Correct.

7    Q.   Now, in addition to Yusef Khattab's website, you also

8    found a website called Reviving Islam, correct?

9    A.   Yes.

00:32 10    Q.   And that was run by Abu Layth?

11    A.   Correct.

12    Q.   That's how you spell it, right?

13    A.   I believe so, yeah.

14    Q.   He was from, I believe, Ohio?

15    A.   Yes.

16    Q.   And you developed a friendship with him, did you not?

17    A.   Yes, I did.

18    Q.   You used to talk on the phone?

19    A.   Yup.

00:32 20    Q.   And he had some extremist views, did he not?

21    A.   Yes.

22    Q.   In fact, one set of his extremist views was about

23    declaring that certain people were apostates, correct?

24    A.   Yes.

25    Q.   And this is called -- I think we've heard it before, but

1   just so it's clear, this would be called sort of making takfir

2   on someone?

3   A.   Correct.

4   Q.   You got into an argument with Tarek about Abu Layth, did

5   you not?

6   A.   At this moment, I don't recall.  If you could refresh my

7   memory.

8   Q.   Do you remember Tarek telling you that he was going

9   overboard with this business about making takfir?

00:33 10   A.   Yes.

11   Q.   And that he was, in fact, insane and exceeding all limits?

12   A.   Yes.

13   Q.   I want to talk a little bit more about this.  You

14   mentioned on Friday the concept of Madkhali, correct?

15   A.   First, the "D" and the "K-H," Madkhali.

16   Q.   What did I spell wrong?

17   A.   M-a-d-k-h --

18   Q.   How's that?

19   A.   M-a-d-k-h -- D, as in Daniel -- k-h-a-l-i.

00:34 20   Q.   Okay, Madkhali.  Madkhali refers to people who are

21   apolitical, correct?

22   A.   Yes, it's a derogatory --

23   Q.   I'm sorry?

24   A.   It's a derogatory --

25   Q.   It's a derogatory term.  Does it primarily refer to Salafi

     1   people who are apolitical?

     2   A.   Yes.

     3   Q.   So the idea is:  Why talk to them.  They're Madkhalies;

     4   they're backwards?

     5   A.   Yes.

     6   Q.   They don't get it.  That's the concept, correct?

     7   A.   Yes.

     8   Q.   Now, you are familiar with Shaykh Muqbil, correct?

     9   A.   Muqbil, yes.

00:35 10   Q.   In Yemen?

    11   A.   Yes.

    12   Q.   And he was a Madkhali, was he not?

    13   A.   In -- it depends on how you look at it.

    14   Q.   Okay.

    15   A.   It's kind of difficult.

    16   Q.   And Abul Hasan al-Ma'ribi, in Yemen?

    17   A.   Yes.

    18   Q.   He also was a Madkhali, was he not?

    19   A.   Again, it depends on how you put it.  It's a little more

00:35 20   complicated than one would think it would be.

    21   Q.   Were you familiar with the Resource or Da'wah Center in

    22   Roxbury?

    23   A.   Yes.

    24   Q.   And Tarek used to go there and study, did he not?

    25   A.   Yes.

```
 1    Q.   That was run by a Madkhali, was it not?

 2    A.   Yes.

 3    Q.   Now, we talked a bit about this concept of takfir.  I

 4    think the other day you said that it meant declaring someone is

 5    not a true Muslim?

 6    A.   Correct.

 7    Q.   And they are to be excluded or excommunicated, basically?

 8    A.   The one who is declared not to be Muslim?

 9    Q.   Yes.

10    A.   Yes.

11    Q.   You said that they are even to be killed, correct?

12    A.   Correct.

13    Q.   And this concept came from the idea back in the Eighth

14    Century when Genghis Kahn -- it goes that far back -- Genghis

15    Kahn and the Mongols invaded Saudi Arabia?

16    A.   I don't remember them ever invading Arabia.  I believe

17    that's Egypt and Iraq.

18    Q.   Do you remember the idea that the Mongols were ostensibly

19    Muslims?

20    A.   By name.

21    Q.   By name.  But not really by heart?

22    A.   Correct.

23    Q.   They participated in all kinds of idol worshipping and

24    other things that were not acceptable to Islam, correct?

25    A.   Correct.
```

00:35 (line 10)
00:36 (line 20)

1    Q.   And that is where the concept of apostates came from:

2    Muslims who were not true Muslims, correct?

3    A.   I wouldn't say it came from that particular situation, but

4    it became pretty famous then.

5    Q.   It became famous then, the idea that you could fight

6    against these people because, even though they were fellow

7    Muslims, they weren't true Muslims?

8    A.   Correct.

9    Q.   Now, Abousamra, Ahmad Abousamra, was very quick to make

00:37 10   takfir of people, wasn't he?

11   A.   Yes.

12   Q.   In fact, Tarek was upset with him about this, was he not?

13   A.   Yes.

14        MS. BASSIL:  At this time, your Honor, I'm going to

15   refer to an instant message which is not yet an exhibit.

16        THE COURT:  Okay.  Is this through the electronic, or

17   are you going to use the document camera?

18        MS. BASSIL:  I'm going to use the document camera.

19   And it would be 6SFT1266.  And it's the only one I'm going to

00:37 20   use.

21   Q.   Mr. Maldonado, you used the name in instant messages Umm

22   Muhammad, or your wife did?

23   A.   Umm Muhammad, yes.

24   Q.   But sometimes you would use that; you would use her

25   account?

1   A.    Yeah.  We have a program that would mix up both of our

2   accounts, so sometimes --

3   Q.    And on May 15, 2006, you were already in Egypt, were you

4   not?

5   A.    Yes.

6   Q.    And if you would look to yourself just quickly, does this

7   appear to be an instant message between you and Tarek Mehanna

8   as opposed to Tarek Mehanna and your wife?

9   A.    Me and Tarek.

00:39 10          MS. BASSIL:  Your Honor, if we could -- I don't know.

11   If we could post these to the jury.  I'm just going to read

12   small portions of it.

13          THE COURT:  Is this the same --

14          MS. BASSIL:  Yes.  It's all the same message.

15          MR. GROHARING:  I object, your Honor.  It's hearsay.

16          MS. BASSIL:  It goes to state of mind.

17          THE COURT:  I think I'll have to see it.  So I'll see

18   you at the side.

19   (SIDEBAR CONFERENCE AS FOLLOWS:

00:40 20          MS. BASSIL:  I'm only going to do short portions of

21   it.

22          THE COURT:  How long is it.

23          MS. BASSIL:  It's, like, 12 pages, but I'm only doing

24   probably a page or so.

25          What I wanted to show the jury is, just to set this

1   up, "Ahmad has been going nuts on Bin Baz."  That would be 127

2   -- 67.  And then --

3          THE COURT:  Wait a minute.  I'm going to get this --

4   12 and 13.

5          MS. BASSIL:  1266, 1267.  Then I was going to show --

6   I was going to show the date.  And then what I wanted to show,

7   which is next, is on 1270, we're he says -- this is

8   Maldonado -- "The problem here is Ahmad has a lot of pain and

9   hurt that he is taking out on people he may be a bit aggravated

00:41 10   at.  Daniel respects Ahmad and will most likely follow suit."

11   Then Tarek Mehanna says, "Well, he already has.  I just think"

12   --

13          And he says, "The only person they will listen to is

14   Abdul Majid."  Tarek says, "They've put themselves into this

15   tiny cocoon of whatever you want to call it and it's driven

16   them over the edge like every single conversation we have is

17   the Ikhwan Muslim brotherhood, this MAS, that Bin Baz, this

18   Uthaymin that, we never just sit and raise our Iman faith, read

19   Qur'an or anything.  It's just:  Let's point out what is wrong

00:42 20   with everyone around us and even when we are around these

21   people and we have the chance to clarify things for them, their

22   mentality destroys the chance."

23          Then I was going to skip to the bottom of Page 1271.

24   Maldonado says, "You need to help them by showing them without

25   telling them."  My client says, "Akhi, brother, I do, but their

1    attitude towards me is that I'm all talk and no action.  Even

2    Abdul Majid and Umayr, may Allah forgive them and us, tell them

3    to cool down and not to rush to make takfir claims of

4    disbelief" --  that's the translation -- "of certain people but

5    no effect.  They don't have any concept of getting to people's

6    hearts to convince them of the correct view.  It's just,

7    'Here's the truth.  Take it or leave it.'  And, akhi, brother,

8    it really makes me sad because we have such a chance to call

9    people to this Da'wah and the best brothers for the job are not

00:42 10    really in tune with the reality around them.  Their world is

11    just the internet and what they read."

12            THE COURT:  Okay.  It's all to that effect?

13            MS. BASSIL:  Basically, yes.  It's essentially to that

14    effect, yeah.

15            THE COURT:  So the objection is?

16            MR. GROHARING:  Defendant's statements, it's hearsay,

17    and it's not clear what state of mind the defense is citing to

18    or what state of mind that's relevant to the case they're

19    talking about here.  I mean, what he's going to talk about,

00:43 20    conversations that he and the defendant had with Ahmad

21    Abousamra originally.  But this is just admitting a statement

22    of the defendant's through this witness, and I don't think it's

23    appropriate.  I don't think this is an appropriate exception to

24    the hearsay rule.

25            THE COURT:  Well, is it valuable to the defense only

```
 1    if it's taken as being true statements?

 2            MS. BASSIL:  It's valuable to the defense as to the

 3    defendant's state of mind, not necessarily true statements,

 4    because this issue --

 5            THE COURT:  How does -- that's what I'm trying to get

 6    at.  How does it illuminate his state of mind if the truth is

 7    irrelevant?

 8            MS. BASSIL:  It illuminates his state of mind because

 9    they brought up this issue of takfir, apostates, implying that

10    the defendant was perfectly willing to kill people who were not

11    Muslims.  To me, I think that what I am trying to do is clarify

12    what the defendant's state of mind was and the distinction

13    between Ahmad Abousamra and that -- you know, and that there's

14    further discussion about this.

15            The defendant's intent is critical in this case, and

16    his statements to people in instant messages -- the government

17    has been allowed to bring them in with the idea, I suppose,

18    that these instant messages reveal more truth or more intimate

19    conversations than otherwise.  I think they brought it up.  I'm

20    just trying to clarify it.  I think it does go to his state of

21    mind.

22            THE COURT:  The problem is the rules aren't

23    necessarily symmetrical.  In other words, it's typical that

24    statements that are admissions are admitted, whereas statements

25    that are not admissions may not be, in other words.  So it's
```

1    not every statement of any out-of-court declarant gets in just

2    because some other statements did.  It does seem to me that

3    these are out-of-court statements of a declarant offered for

4    the truth value because, if they're not true, they don't have

5    the -- they don't make the point you want to make.

6            MS. BASSIL:  Well, they make a point as to the

7    defendant's state of mind about the views of apostates and so

8    forth.  There really is no other way to establish his state of

9    mind except through either what he's written or what he's said

00:45 10    to other people.

11            THE COURT:  Well, I think the hearsay objection is

12    well-taken.

13            MS. BASSIL:  All right.  Note my objection.

14    .  .  .  END OF SIDEBAR CONFERENCE.)

15    Q.   Mr. Maldonado, do you recall, once you were in Egypt,

16    talking to Tarek Abousamra -- I'm sorry, talking to Tarek

17    Mehanna about Ahmad Abousamra?

18    A.   More than once, yeah.

19    Q.   More than once.  And Tarek Mehanna was, in fact, concerned

00:46 20    about Ahmad Abousamra's attitude, was he not?

21    A.   Yes.

22    Q.   In fact, you sensed that Tarek was more interested in sort

23    of scholarship and calling people to Islam itself as a

24    religion, correct?

25    A.   Yes.

1    Q.   In fact, you even said to him that he was growing up; he

2    was growing up and growing away from Ahmad Abousamra and his

3    ideas, correct?

4    A.   Yes.

5    Q.   Now, after -- do you remember when you met Tarek in 2003:

6    summer, winter, fall?

7    A.   Winter, I believe.

8    Q.   You moved to Texas, Houston, Texas, in 2005, is that

9    correct?

00:47 10   A.   From my best recollection, yes.

11   Q.   And you moved to Houston, correct?

12   A.   Yes.

13   Q.   That was to run this website, Islamic Network, correct?

14   A.   Correct.

15   Q.   In fact, you weren't -- you were paid $600 per month,

16   correct?

17   A.   Around that figure.

18   Q.   I'm sorry?

19   A.   Around that figure.

00:48 20   Q.   And that was simply just not enough to get by, was it?

21   A.   No.

22   Q.   Was there an Islamic community in Houston?

23   A.   Yes.

24   Q.   At some point, you had some thought about moving to an

25   Islamic country, moving overseas, correct?

 1  A.   Yes.

 2  Q.   That it was -- that if you lived -- you thought about

 3  this, and you talked about it with Mr. Jamal, the person who

 4  was hiring you, correct?

 5  A.   Yes.

 6  Q.   That, for less money, you could live better overseas,

 7  correct?

 8  A.   Correct.

 9  Q.   And you also had a great desire, did you not, to live in

00:48 10  an Islamic country?

11  A.   Correct.

12  Q.   Now, from the time that you were married, you had moved --

13  you moved many times, did you not?

14  A.   Yes.

15  Q.   You moved from New Hampshire to Chicago, correct?

16  A.   Correct.

17  Q.   Back to New Hampshire?

18  A.   Correct.

19  Q.   To other places within New Hampshire?

00:49 20  A.   Yes.

21  Q.   How many places did you live in in New Hampshire?

22  A.   About three.

23  Q.   Three.   Then you moved to Houston, correct?

24  A.   Yes.

25  Q.   And then you moved to Egypt?

```
 1   A.   Yes.

 2   Q.   And you moved a couple of times once you were in Egypt,

 3   correct?

 4   A.   Twice.

 5   Q.   Twice.  And then you moved to Somalia?

 6   A.   Yes.

 7   Q.   Now, you are familiar, are you not, with the concept of

 8   Hijra --

 9   A.   Yes.

10   Q.   -- correct?

11        And that basically means migration?

12   A.   Correct.

13   Q.   It's the idea that the Qur'an tells you to live in a

14   Muslim country whenever possible, correct?

15   A.   Correct.

16   Q.   And your Arabic was not that great when you moved, was it?

17   A.   Not at all.

18   Q.   You wanted to improve it?

19   A.   Yes.

20   Q.   You wanted to be able to pray five times a day?

21   A.   Correct.

22   Q.   You wanted your children to speak fluent Arabic?

23   A.   Correct.

24   Q.   And you wanted your children to be raised in a Muslim

25   country?
```

```
 1   A.   Correct.

 2   Q.   In fact, you did not want your children going to public

 3   school in the United States?

 4   A.   Correct.

 5   Q.   You really didn't want them exposed to the culture in the

 6   United States of television, movies, rap songs, those types of

 7   things, correct?

 8   A.   Correct.

 9   Q.   Your wife agreed with you to give this a try, move to

10   Egypt?

11   A.   Yes.

12   Q.   And she was supportive of it?

13   A.   Yes.

14   Q.   When you arrived in Egypt, that was in November of 2005?

15   A.   Yes.

16   Q.   And you lived -- you moved first to a place called Agamy?

17   A.   Agamy.

18   Q.   Agamy.  Then you moved again to Alexandria?

19   A.   Yes.

20   Q.   Were you set to move a third time?

21   A.   Yes.

22   Q.   Did you know that the FBI had someone watching you and

23   reporting to them?

24   A.   Not to my knowledge.

25   Q.   Now, in 2006, the summer of 2006, Tarek Mehanna visited
```

1      Egypt, correct?

2      A.    Correct.

3      Q.    And I'd like to talk about that.  Tarek's parents were

4      from Alexandria originally, correct?

5      A.    Correct.

6      Q.    They kept an apartment there?

7      A.    Yes.

8      Q.    And he had many relatives there, did he not?

9      A.    Yes.

00:51 10    Q.    Cousins, aunts, uncles?

11     A.    Yes.

12     Q.    And when you saw Tarek that summer, you first met at a

13     place called Dar al-Iman; do you remember that?

14     A.    Not to the best of my recollection.  Bookstore?

15     Q.    Yes.  Do you remember going to a huge bookstore?

16     A.    Yes.

17     Q.    It was more than two stories of Islamic books?

18     A.    Yes.

19     Q.    And you spent many hours there with Tarek, did you not?

00:52 20    A.    Correct.

21     Q.    And he bought books?

22     A.    Yes.

23     Q.    A lot?

24     A.    Yes.

25     Q.    And did you buy some books?

1    A.   I don't think at that store.  It was a little pricey for

2    me.

3    Q.   Then you went to another town.  You went to another

4    bookstore in an area of Alexandria called Miami; do you

5    remember that?

6    A.   I know we went to many bookstores.  As to which particular

7    areas and what their names were, I'm not sure.

8    Q.   Do you remember going with Tarek to an area in Victoria in

9    Alexandria where there was a 30-volume book or biography of the

00:52 10  prophet, The Companions, and others?  Do you remember that?

11   A.   Yes.

12   Q.   And you asked the man how much he would sell it to you

13   for, and he asked for a translation of a particular passage and

14   then you could have it?

15   A.   Yes.

16   Q.   And, in fact, that's what happened, correct?

17   A.   Yes.

18   Q.   Now, you saw Tarek four or five times that summer, didn't

19   you?

00:53 20  A.   About, give or take.

21   Q.   About.  The first time you came to his apartment?

22   A.   Yes.

23   Q.   Hung out, went to the beach, visited bookstores?

24   A.   Yes.

25   Q.   The second time he came to your apartment, correct?

1   A.   Yes.

2   Q.   He was close to your wife, was he not?

3   A.   Yes.

4   Q.   And very happy to see your wife, and your children were

5   happy to see him?  You could see that?

6   A.   Yes.

7   Q.   It was a big and joyous reunion?

8   A.   Correct.

9   Q.   You went out; you ate; you walked around; and, again, you

00:53 10   went to bookstores?

11   A.   Yes.

12   Q.   The third time you met him, you met at the beach.  It was

13   later at night.  And you went to some coffee shops, isn't that

14   right?

15   A.   Yes.

16   Q.   In Alexandria -- strike that.

17        You would not go to a bar.  You would go to a coffee

18   shop, correct?

19   A.   Of course, yes.

00:53 20   Q.   Muslims do not drink alcohol, correct?

21   A.   Correct.

22   Q.   Now, the fourth time that you saw Tarek that summer, Omar

23   Hamammi was with you, is that correct?

24   A.   Yes.  I don't remember if it was the fourth or fifth time.

25   Q.   You introduced Tarek to him for the first time?

|     |     |                                                          |
|-----|-----|----------------------------------------------------------|
| 1   | A.  | Yes.                                                     |
| 2   | Q.  | You thought Tarek had changed significantly, did you not? |
| 3   | A.  | At the time, yes.                                        |
| 4   | Q.  | He seemed preoccupied with obtaining books?              |
| 5   | A.  | Yes.                                                     |
| 6   | Q.  | And specifically preoccupied with obtaining classical    |
| 7   |     | books on the lives of Islamic scholars?                 |
| 8   | A.  | Yes.                                                     |
| 9   | Q.  | Now, in that meeting -- well, when you met up with him and |
| 00:54 10 |  | Omar Hamammi was with you, that was the first time that you |
| 11  |     | talked about Somalia, is that correct?                  |
| 12  | A.  | With Tarek.                                              |
| 13  | Q.  | You and Hamammi may have talked about it earlier?       |
| 14  | A.  | Me and Hamammi had spoken about it earlier.              |
| 15  | Q.  | This was the first time that you had spoken with Tarek   |
| 16  |     | there?                                                   |
| 17  | A.  | Yes.                                                     |
| 18  | Q.  | Hamammi had a wife from Somalia, did he not?            |
| 19  | A.  | Yes.                                                     |
| 00:54 20 | Q. | You talked about that, correct?                        |
| 21  | A.  | Not to my recollection.  I don't remember.              |
| 22  | Q.  | Do you remember Tarek talking to you and saying, Your wife |
| 23  |     | just had a baby.  She's already sick.  Her immune system is |
| 24  |     | down.  Think about this.  Don't take your wife to a place like |
| 25  |     | Somalia right now?                                       |

1    A.    The basic premise of that, yes.

2    Q.    And he said, You should think about your family, and

3    you're living well in Egypt, correct?

4    A.    Yes.

5    Q.    He was discouraging you?

6    A.    Correct.

7    Q.    And you were disappointed in his reaction, weren't you?

8    A.    Yes.

9    Q.    And you sort of just said, Oh, we're just thinking about

00:55 10   it, isn't that right?

11   A.    Yes.

12   Q.    You backed off from whatever your intention might have

13   been and kind of took a step back, didn't you?

14   A.    Yes, in the conversation.

15   Q.    In the conversation.  And you did not tell Tarek, I'm

16   going there.  I'm going to fight.  I'm going to join Jihad?

17   A.    No.

18   Q.    Now, before you went to Somalia, there was -- you sent

19   Tarek an email that talked about the other day -- do you

00:56 20   remember that -- about a friend who had been questioned by the

21   police, and he was putting people in danger?

22   A.    Yes.

23   Q.    Do you recall that email?

24   A.    Yes.

25   Q.    All right.  And later, in one of the telephone calls we

1    listened to, you said that the person -- Abdullah Ali made you

2    say that or made you write that, is that correct?

3    A.   Correct.

4    Q.   Abdullah Ali was an American who had moved to Egypt, is

5    that correct?

6    A.   Yes.

7    Q.   He was very religious?

8    A.   Yes.

9    Q.   He was not at all political?

00:56 10   A.   No.

11   Q.   He was not interested in hearing or talking about Jihad?

12   A.   Not at all.

13   Q.   Or the politics of the world?

14   A.   Correct.

15   Q.   And he was -- he was poor, was he not?

16   A.   Yes.

17   Q.   And he also used to take care of an orphanage, is that

18   correct?

19   A.   Correct.

00:56 20   Q.   And Tarek would bring him, when he came, things like shoes

21   and medicine, things from America, would he not?

22   A.   Yes.

23   Q.   He would help him out whenever he could?

24   A.   Correct.

25   Q.   And in fact, Abdullah Ali, at one point, didn't he help

1  you find an apartment in Egypt?

2  A.   Yes.

3  Q.   And when you wrote in that email, "Take the things out of

4  your closet," you were talking about books and translations,

5  were you not?

6  A.   Not necessarily books and translations.  It was -- it was

7  a double-sided metaphor, one could say.

8  Q.   You'd never seen Tarek's closet; you didn't mean

9  literally?

00:57 10  A.   That's the point.

11  Q.   What you meant is the things he was saying on the

12  internet, the translations he was doing, you felt -- or

13  Abdullah Ali felt was the reason why he was being questioned by

14  the police?

15  A.   Correct.

16  Q.   I want to talk a minute about Somalia.  At the time when

17  you saw Tarek in August of 2006, Somalia was being led by the

18  Islamic Courts Union, was it not?

19  A.   I'm not sure as far as the exact date but around that

00:58 20  time, yes, I believe so.

21  Q.   And the -- and you've seen the initials ICU, and you've

22  also seen it as CIC, correct?

23  A.   Yes.

24  Q.   That still refers to the same group, does it not?

25  A.   I've seen ICU.  As far as CIC, I don't really --

         1    Q.    But it generally refers to the Islamic Courts Union?

         2    A.    Correct.

         3    Q.    I want to talk a bit about who this was.  Somalia had had

         4    no government since 1991, is that correct?

         5    A.    Correct.

         6    Q.    It was just lawless?

         7    A.    Yes.

         8    Q.    It was run by warlords?

         9    A.    Correct.

00:58   10    Q.    You knew all of this?  You understood this before you went

        11    there?

        12    A.    Yes.

        13    Q.    And that after September 11th, the United States was

        14    supporting these warlords, correct?

        15    A.    Some of them, yes.

        16    Q.    And the warlords were, in fact, terrorizing the

        17    population, were they not?

        18    A.    Yes.

        19    Q.    There were a lot of rapes of women?

00:59   20    A.    Many.

        21    Q.    There were beheadings of men?

        22    A.    Yes.

        23    Q.    Torture?

        24    A.    Correct.

        25    Q.    Outright killings?

1    A.   Yes.

2    Q.   And the Islamic courts were actually originally courts of

3    law, were they not?

4    A.   Yes.

5    Q.   They were just simple courts that occurred in villages

6    that were trying to settle disputes between neighbors, correct?

7    A.   As far as the exact beginning of it, it's not so much like

8    that but the basic idea, you could say, I guess.

9    Q.   And the basic idea was that these courts sort of came up

00:59 10   from the people; they weren't imposed by a government?

11   A.   Yes.

12   Q.   And at some point, they joined together to form a union --

13   A.   Yes.

14   Q.   -- correct?

15        And they were going to be the government, the official

16   government, in Somalia if they could?

17   A.   Yes.

18   Q.   In fact, they were being backed by wealthy Somali

19   businessmen; you knew that?

01:00 20   A.   Yes.

21        MR. GROHARING:  Objection, your Honor.  Relevance.

22        THE COURT:  Well, go ahead.  You may have it.

23   Q.   And, in fact, when you thought about going to Somalia, one

24   of the things you did think about was there was actually

25   economic opportunity there?

1   A.   Yes.

2   Q.   That the ports of Mogadishu were being opened for the

3   first time in 15 years?

4   A.   Yes.

5   Q.   The streets were being cleared of debris in Mogadishu and

6   houses were being fixed?

7   A.   Correct.

8   Q.   It appeared that the Islamic Courts Union was actually on

9   their way to becoming a government?

01:01 10   A.   Correct.

11   Q.   And it was a government that would run by Islamic law?

12   A.   Yes.

13   Q.   Which was something that you had always dreamed of?

14   A.   Yes.

15   Q.   And it was never designated as a terrorist organization,

16   correct?

17   A.   Correct.

18   Q.   And, in fact, when you were in Somalia -- you remember the

19   other day, I think you said you were -- you went to a place

01:01 20   that was called The Hotel, I believe?

21   A.   Yes.

22   Q.   Did you meet someone or see someone there named Sheikh

23   Sharif?

24   A.   Sheikh Ahmed Sharif Ahmed, yes.

25   Q.   He was one of the people that was involved in the sort of

```
 1    fighting and governance of the Islamic Courts Union, is that
 2    correct?
 3    A.   He was our leader.
 4    Q.   He was your leader?
 5    A.   Yes.
 6         MS. BASSIL:  Your Honor, at this time I'd like to show
 7    him a picture.
 8    Q.   Do you recognize that picture?
 9    A.   Yes.
01:01 10    Q.   Who is that?
11    A.   That is Sheikh Ahmed Sharif Ahmed.
12    Q.   At the present time, he is now the president of Somalia,
13    is he not?
14    A.   Yes.
15    Q.   He is now the official government?
16    A.   Yes.
17    Q.   And do you recognize those people?
18         MR. GROHARING:  These photos haven't been admitted,
19    your Honor.  They are being displayed to the --
01:02 20         MS. BASSIL:  That's correct.  I have provided them to
21    the government with the request they be admitted.
22         THE COURT:  I think the objection is whether they
23    should be shown to the jury.  I think it's harmless enough and
24    may be -- well, never mind.  We'll leave it at that.
25         MS. BASSIL:  Can that picture be put up, your Honor?
```

1          THE COURT:  Yes.  It just takes a minute.

2     Q.    Do you recognize the two people in that picture?

3     A.    Yes.

4     Q.    Who are they?

5     A.    Secretary of State Hillary Clinton and Sheikh Ahmed Sharif

6     Ahmed.

7     Q.    And at the -- he was, as you said, "our leader," correct?

8     A.    Yes.

9     Q.    And at the present time, is he someone that al Qa'ida is

01:03 10    opposed to?

11    A.    Yes, from my --

12    Q.    I'm sorry?

13    A.    From my knowledge, the knowledge that I have from being

14    locked up.

15    Q.    Now, when you heard about this sort of beginnings of

16    Somalia that it was coming sort of back as a country and as a

17    government, you waited for the fighting to die down before you

18    moved, correct?

19    A.    Yes.

01:03 20    Q.    And when you went there, there were no U.S. soldiers,

21    correct?

22    A.    There were not.

23    Q.    No coalition forces or Westerners?

24    A.    Correct.

25    Q.    No international or peacekeeping troops?

1   A.   Correct.

2   Q.   There were still pockets of fighting between the warlords

3   and the Islamic courts, correct?

4   A.   The warlords, the Islamic courts and the TFG, the

5   Transitional Federal Government.

6   Q.   The TFG, Transitional Federal Government, was a government

7   that did not really govern Somalia, correct?

8   A.   Pretty much powerless.

9   Q.   Powerless.  It was a group of people holed up in an area?

01:04 10   A.   Baidoa.

11   Q.   I'm sorry?

12   A.   In the area of Baidoa.

13   Q.   Baidoa?

14   A.   Correct.

15   Q.   In fact, when you talked about Jihad and Somalia, that's

16   what you were referring to?

17   A.   Yes.

18   Q.   Now, you never went to Somalia to fight, correct?

19   A.   Excuse me?

01:04 20   Q.   You never went to Somalia with the intention to fight?

21   A.   I would say I went for both.

22   Q.   Well, do you recall we read the other day from "My

23   Imprisonment," the story that you wrote of your life?

24   A.   Yes.

25   Q.   By the way, when did you write that?

1    A.    I don't remember the exact date.  When I was in the FDC

2    Houston.

3    Q.    You were in FDC Houston.  This would have been before --

4    before or after you were sentenced, do you know?

5    A.    I don't recall.

6    Q.    All right.

7              THE COURT:  Just for the jury's benefit, FDC --

8              THE WITNESS:  Federal Detention Center.

9              MS. BASSIL:  Federal Detention Center, thank you.

01:05 10   Q.    Federal Detention Center is a place where you wait for

11   trial.  It's not where you serve your sentence?

12   A.    Correct.

13   Q.    When you were in FDC Houston, you didn't know where you

14   would be assigned to, correct?

15   A.    Correct.

16   Q.    Do you recall stating in My Imprisonment:  "I never went

17   to Somalia to fight.  I wouldn't have taken my wife and three

18   small children into a war zone.  The situation just erupted

19   while we were there"?  Is that what you said?

01:05 20   A.    Yes.

21   Q.    When you got to Somalia, as I understand it from what you

22   said the other day, you were in Mogadishu for a few weeks,

23   correct?

24   A.    Correct.

25   Q.    In two different locations in Mogadishu?

1    A.    Correct.

2    Q.    And at some point, you had to leave Mogadishu because you

3    were a foreigner, correct?

4    A.    Wasn't necessarily that.  It was -- my wife stayed in

5    Mogadishu.  I left to receive training in Kismayo.

6    Q.    You were asked to move to Kismayo?

7    A.    Kismayo.

8    Q.    All right.  And you left your wife and your kids in

9    Mogadishu and went there, is that correct?

01:06 10    A.    Correct.

11    Q.    And that's when you got malaria?

12    A.    When I was in Kismayo, sometime after getting there, yes.

13    Q.    This is when you received military training?

14    A.    Yes.

15    Q.    Now, the military training that you received, this was

16    from -- let me ask you this:  Was this from a group called

17    Al-Shabab?

18    A.    Yes.

19         MS. BASSIL:  If I may just show the jury that word,

01:07 20    your Honor.

21    Q.    And that literally translates as "The Youth," correct?

22    A.    Yes.

23    Q.    And this was the military sort of wing of the Islamic

24    Courts Union, correct?

25    A.    Correct.

1   Q.   And they have since split off from the Islamic Courts

2   Union, have they not?

3   A.   Yes.

4   Q.   In fact, they split off, and in 2008, this separate group

5   was designated a terrorist organization, correct?

6   A.   Correct.

7   Q.   But at the time you were there, it was not that; it was

8   part of the Islamic Courts Union?

9   A.   Correct.

01:07 10   Q.   Now, there were different people that came and went in

11   this place where you were, correct?

12   A.   Correct.

13   Q.   And you heard chatter or gossip about whether somebody

14   might be with al Qa'ida or knew somebody in al Qa'ida, correct?

15   A.   Correct.

16   Q.   You met one person who said he was in Afghanistan after

17   the United States invaded, correct?

18   A.   Correct.

19   Q.   Now, I want to talk about your calls to Tarek from

01:08 20   Somalia, okay?  The first call, I think, that we heard

21   yesterday -- and the first call was, in fact, the first call

22   you made to Tarek once you went to Somalia, correct?

23   A.   Yes.

24   Q.   There were three calls that we heard -- I'm sorry, on

25   Friday.  The first one was on December 12, 2006, correct?

1    A.   I believe so.

2    Q.   You were on a beach in Kismayo?

3    A.   Yes.

4    Q.   And you used a cellphone you bought when you got to

5    Somalia?

6    A.   Correct.

7    Q.   Now, when you called Tarek at that date, had you received

8    military training yet?

9    A.   I was in the process of receiving military training at the

01:08 10   time.

11   Q.   And that military training consisted of physical exercise?

12   A.   Yes.

13   Q.   Assembling and disassembling the gun they had given you?

14   A.   Yes.

15   Q.   It did not involve bomb-making?

16   A.   Well, there was a man that made them, but --

17   Q.   Not you?

18   A.   Not me, no.

19   Q.   When you called Tarek the first time, you used the phrase

01:09 20   "culinary school"; do you remember that?

21   A.   Yes.

22   Q.   And you made that up on the spot while you were talking to

23   him, did you not?

24   A.   Yes.

25   Q.   But you wanted him to think you were talking about

1    training?

2    A.    Yes.

3    Q.    You never said that to him?

4    A.    Well --

5    Q.    "I'm training"?

6    A.    That's why I used the "culinary school."

7    Q.    Okay.  You didn't talk about that they gave me a

8    Kalashnikov as soon as I got here.  They gave me clips.  You

9    didn't talk to him about that?

01:09 10   A.    No.

11   Q.    You didn't talk to him about seeing someone making bombs?

12   A.    No, I didn't.

13   Q.    There was nothing in that first conversation with him --

14   there was nothing in any of those conversations in which you

15   hinted at the presence of anyone from al Qa'ida, correct?

16   A.    Correct.

17   Q.    When you said "PB and J," what you meant by that was

18   Jihad, fighting?

19   A.    Correct.

01:10 20   Q.    It didn't mean Jihad fighting with al Qa'ida, correct?

21   A.    Just meant Jihad in general.

22   Q.    Now, when you called Tarek on December 12, 2006, there had

23   been skirmishes between the Transitional Federal Government and

24   the Islamic Courts Union, correct?

25   A.    Correct.

1    Q.    But there were no major hostilities or outright war?

2    A.    There was a front line --

3    Q.    All right.

4    A.    -- in Dinsour, but it wasn't full-fledged, all out war.

5    Q.    In fact, full-fledged outright war happened when Ethiopia

6    invaded?

7    A.    Correct.

8    Q.    Now, in the first call you made to Tarek, you told him to

9    come, come to Somalia.  And you told him to tell others as

01:11 10   well, right?

11   A.    Yes.

12   Q.    And, in fact, he gave you excuses, did he not?

13   A.    Yes.

14   Q.    Now, by the way, you had not called Tarek or emailed him

15   or sent any instant message or any communication that you were,

16   in fact, moving to Somalia, had you?

17   A.    Not to my recollection, no.

18   Q.    So the last time you actually saw him, until you were in

19   this courtroom, was in August of 2006, over five years ago?

01:11 20   A.    Correct.

21   Q.    And you told him in that first phone call, you were making

22   peanut butter and jelly.  And he wanted to know about marriage,

23   correct?

24   A.    Correct.

25   Q.    Then he told you his parents wouldn't like it --

```
 1   A.   Correct.
 2   Q.   -- right?
 3        And he wanted to know if there were books you could
 4   buy?
 5   A.   Correct.
 6   Q.   This wasn't exactly the reaction you were hoping for, was
 7   it?
 8   A.   It wasn't what I expected.
 9   Q.   I was just going to ask you that.  This certainly wasn't
01:12 10   the reaction you expected?
11   A.   No.
12   Q.   In fact, you thought that Tarek was far too obedient to
13   his parents, did you not?
14   A.   Yes.
15   Q.   Now, in the second phone call to Tarek, again, you told
16   him how to sort of get there, where to go, what airline to
17   take, correct?
18   A.   Correct.
19   Q.   Again, he made excuses?
01:12 20   A.   Somewhat.  You heard the phone call.
21   Q.   He was sighing a lot?
22   A.   Yes.
23   Q.   Do you recall him saying, "My only thing is, like I said,
24   I just got to know, like, you know how it is?"  Do you remember
25   him sort of fumbling like that?
```

         1    A.    Yes.

         2    Q.    You knew what he was hesitating about?

         3    A.    Well, it depends which phone call.

         4    Q.    Okay.  Well, let me see if this refreshes your memory.

         5          MS. BASSIL:  If I may, your Honor?

         6          THE COURT:  Go ahead.

         7          MS. BASSIL:  It's 303 or 304.

         8    Q.    Mr. Maldonado, if you could just read this top part to

         9    yourself, please.

01:13   10    A.    (Reading.)

        11    Q.    Do you recall that there was a fair amount of hesitation

        12    on Tarek's part?

        13    A.    Yes.

        14    Q.    In fact, without him even saying it, you said, "Allah will

        15    provide for your parents," right?

        16    A.    Correct.

        17    Q.    And is it fair to say, again, you were disappointed in his

        18    reaction?

        19    A.    Yes.

01:14   20    Q.    You could tell he wasn't serious about this?

        21    A.    I wouldn't say I couldn't tell.  I could tell that he

        22    wasn't completely serious but not really as amped up as I

        23    thought possible.

        24    Q.    And you made a third call to him, right?

        25    A.    Correct.

1    Q.   Again, you were telling him to come, right?

2    A.   Yes.

3    Q.   And instead, he changed the subject.  He wanted to talk

4    about that email you sent from Egypt?

5    A.   Correct.

6    Q.   And is it fair to say at this point, you were not only

7    disappointed in his reaction, you were actually quite disgusted

8    with it?

9    A.   About the email?

01:15 10   Q.   No, about his reaction.

11   A.   The reaction, yes.

12   Q.   You were quite disgusted actually, were you not?

13   A.   Yes.

14   Q.   Now, after you called Tarek -- well, you told Tarek to

15   come to Somalia because you thought he had the same beliefs,

16   correct?

17   A.   Yes.

18   Q.   You thought you knew him?

19   A.   Yes.

01:15 20   Q.   And after you called him in December -- on December 12,

21   2006, you -- you learned the women in Somalia, including your

22   wife, were going to, I think, Jilb?

23   A.   Jilb, yes.

24   Q.   Jilb?

25   A.   You said it right.

1    Q.    I said it right?

2    A.    For lack of better pronunciation.

3          MS. BASSIL:  Your Honor, if we could just post that

4    map.

5    Q.    Do you see the map, Mr. Maldonado?

6    A.    Yes.

7    Q.    This is Kismayo, right?  You see where I circled it?

8    A.    I can't see down there.

9    Q.    I'm sorry.  That's Kismayo, correct?

01:16 10   A.    Yes.

11   Q.    And this is Jilb?

12   A.    Jilb, yes.

13   Q.    Jilb.  And this is Mogadishu, correct?

14   A.    Correct.

15   Q.    And so the women were being moved from Mogadishu to Jilb,

16   correct, this way?

17   A.    Correct.

18   Q.    And you wanted to see your wife, did you not?

19   A.    Yes.

01:16 20   Q.    And you came from Kismayo to Jilb to see her, correct?

21   A.    Well, my reason for going from Kismayo to Jilb wasn't

22   particularly to see her.  We were on our way to go to the front

23   line and fight and bring armaments.  The fighters were turned

24   back.  We happened to be in Jilb.

25   Q.    Where was the front line?

        1    A.    At the time, it was in Dinsour.

        2    Q.    Dinsour?

        3    A.    Dinsour.

        4    Q.    Dinsour?

        5    A.    Dinsour, with a "D."  It's not on there.

        6    Q.    Is it anywhere in this location in the south?

        7    A.    Yes.  It's around -- a little above the "B" in Baydhabo.

        8    Q.    Around here?

        9    A.    Around that area.

01:17  10    Q.    The front line was around here?

       11    A.    Roughly around that area, yes.

       12    Q.    You did see your wife, though, did you not?

       13    A.    Yes, I did.

       14    Q.    She looked bad?

       15    A.    She had dirt and mud on her clothing, and she was very

       16    tired.

       17    Q.    And you asked to travel with the women in order to see

       18    them to a safe location, did you not?

       19    A.    Yes.

01:18  20    Q.    But you were not allowed to do so?

       21    A.    Well, I was allowed to go to -- from Jilb to Kismayo

       22    because there were men that were bringing the women at least

       23    that far.  So I was allowed to go from there, yes.

       24    Q.    Now, you told us, I think, on Friday that you wanted to go

       25    to the front and fight; do you recall that?

```
 1   A.   Yes.
 2   Q.   Do you recall telling the FBI that you began making
 3   excuses during the end of your training so that you would not
 4   have to go to the front?
 5   A.   Yes.
 6   Q.   And you made excuses that your back hurt and that you were
 7   still recovering from malaria?
 8   A.   Yes.
 9   Q.   Now, after you saw your wife in Jilb, you were separated,
01:18 10   and you went by boat to Ras Kamboni, correct?
11   A.   Correct.
12   Q.   And that's way down in the south here?
13   A.   Yes.
14   Q.   At that point, you started going through jungle, is that
15   correct?
16   A.   Yes.
17   Q.   This is when the Ethiopians invaded?
18   A.   Yes.
19   Q.   So you started going through and walking, correct?
01:19 20   A.   Yes.
21   Q.   And this is Kenya right here.  Do you know where you
22   landed on the Kenyan border, where you broke through on the
23   Kenyan border?
24   A.   No idea.
25   Q.   Now, Mr. Maldonado, I want to talk a bit about your
```

```
 1   beliefs, all right?  You believe that Jihad, when it is for the

 2   protection of defending a Muslim land, is acceptable, do you

 3   not?

 4   A.   When it's for the purpose of defending.

 5   Q.   And you still believe that?

 6   A.   Yes.

 7   Q.   And you also -- you also believe that the United States

 8   has created terrorism by targeting individual organizations,

 9   correct?

10   A.   Do I believe that at this moment?

11   Q.   Yes.

12   A.   It depends under which circumstance.

13   Q.   Well, do you recall telling the FBI that in October of

14   2007?

15   A.   I don't know about the date.

16   Q.   Do you recall telling the FBI that?

17   A.   You'd have to refresh my memory with this.  Quite

18   possibly, though.

19   Q.   Well, I can show it to you.

20           MS. BASSIL:  If I may, your Honor, Page 218.

21           MR. GROHARING:  I'd object on relevance, your Honor.

22           THE COURT:  Let me see you.

23   (SIDEBAR CONFERENCE AS FOLLOWS:

24           THE COURT:  What is the relevance?

25           MS. BASSIL:  I think the jury is entitled to know
```

1   where this person -- where he is presently.  The government was

2   allowed to ask each and every person:  Do you still believe the

3   things you used to believe back then?  And each one of them,

4   Oh, no, I don't believe those things anymore.  So I am

5   exploring with this person that he still believes those things.

6          THE COURT:  So as it bears on what?  Credibility?

7          MS. BASSIL:  Yes.

8          MR. GROHARING:  It sounds like the questions were,

9   though, whether the United States is responsible --

01:21 10          MS. BASSIL:  No, I didn't mean it by that.  I can

11   rephrase it.  What I meant was his views.  I'm not making

12   political comments.  It was his views.

13          THE COURT:  How much --

14          MS. BASSIL:  This is my only question on this.

15          THE COURT:  Okay.

16   .  .  .  END OF SIDEBAR CONFERENCE.)

17   Q.   Mr. Maldonado, I'm showing you a document, and I've marked

18   off here just a couple of sentences.  If you would read those

19   to yourself.

01:22 20   A.   (Reading).  Yes.

21   Q.   Does that refresh your memory of what you said?

22   A.   A bit, yes.

23   Q.   Is that your belief today?

24   A.   If I may explain?

25   Q.   Sure.

1   A.   At the current moment, I don't see a difference if a

2   terrorist kills innocent people and a government kills innocent

3   people.   It's just a matter of semantics when somebody uses the

4   word -- what is it again, if I may? -- collateral damage.

5   Innocent people is innocent people.

6   Q.   So if I may understand what you're saying -- and correct

7   me, please, if I'm wrong -- your view is, if a government is

8   bombing people and civilians are killed as what you said as

9   collateral damage, that is as wrong as if a terrorist did such?

01:23 10   A.   Innocent people is innocent people.

11   Q.   By the way, did you ever read any of Tarek's posts later

12   in Tibyan --

13   A.   No.

14   Q.   -- after you had moved to Egypt?

15   A.   I don't recall reading -- actually, if memory serves me

16   correct, I wasn't really aware that some of those translations

17   were even his.

18   Q.   Okay.

19   A.   I know that he posted, but as far as, like, translations

01:24 20   and stuff.

21   Q.   There were some translations that Tarek did that you asked

22   if you could post on Islamic Network, correct?

23   A.   Yes.

24   Q.   He had a post called, "The Twenty Firsts of Islam"?

25   A.   Right.   As I said, I was aware of some but not all.

1  Q.   You asked him, in fact, if you could use some of the

2  religious posts that he had made about Islam, correct?

3  A.   Correct.

4  Q.   I want to talk a bit about your relationship with Tarek.

5  You were closest to him of all the people that you all hung

6  around with, correct?

7  A.   Yes.

8  Q.   In fact, you were married with children.  So you did not

9  have as much free time as Daniel Spaulding or Ahmad Abousamra,

01:24 10  correct?

11  A.   Correct.

12  Q.   And you lived -- when you knew Tarek, you lived where?

13  A.   I lived both in Derry, and then I moved to Methuen, so it

14  depends.

15  Q.   And Tarek was living in Sudbury, correct?

16  A.   Yes.

17  Q.   That was a fair distance away to come and see you?

18  A.   Yes.

19  Q.   You didn't see him that often, did you?

01:25 20  A.   Correct.

21  Q.   In fact, when you moved to Egypt, did you discuss that

22  with him before you moved?

23  A.   Discuss what?

24  Q.   Moving to Egypt with him before you moved.

25  A.   Did I discuss it with him?

1    Q.    Yes.

2    A.    I believe, when I was in Texas, I might have told him

3    about it.  I'm not exactly sure.

4    Q.    Did you discuss moving to Texas with him before you moved?

5    A.    I don't recall.

6    Q.    Now, you liked to study with Tarek, did you not?

7    A.    Yes.

8    Q.    And he would come to your house with books?

9    A.    Correct.

01:25 10   Q.    Religious books?

11   A.    Correct.

12   Q.    Biographies of the Prophet and The Companions?

13   A.    Correct.

14   Q.    Collections of Hadiths?

15   A.    Yes.

16   Q.    Do you remember you also had a book called, "In Defense of

17   Islam"?

18   A.    Yes.

19   Q.    And you gave Tarek your copy?

01:26 20   A.    I don't remember if I gave him the copy or not.

21   Q.    And that book was very much -- spoke out very much against

22   al Qa'ida, did it not?

23   A.    Oh, "In Defense of Islam," yes.

24   Q.    Now you remember?

25   A.    This book, yes.

 1    Q.    That book was very much against al Qa'ida?

 2    A.    Yes.

 3    Q.    And you shared that book with Tarek?

 4    A.    Yes.

 5    Q.    Mostly what you talked with Tarek about was spiritual

 6    things?

 7    A.    Yes.

 8    Q.    Both of you loved to collect books?

 9    A.    Yes.

01:26 10   Q.    And he would -- sometimes he would stay overnight at your

11    house, and the two of you would read books?

12    A.    Correct.

13    Q.    Study together?

14    A.    Yes.

15    Q.    Do you recall that you both went to Al-Magrib conference

16    together?

17    A.    Yes.

18    Q.    That was a conference in New Jersey.  It was two weekends

19    in a row, was it not?

01:26 20   A.    Correct.

21    Q.    It was not political?

22    A.    Right.

23    Q.    Right?

24          It was nothing about Jihad or politics?

25    A.    Correct.

1    Q.   In fact, Tarek was happy that it was such a large group of

2    Muslim men, correct?

3    A.   Yes.

4    Q.   It was about 2 to 300 people?

5    A.   Correct.

6    Q.   And it was very apolitical.  It was about how to pray and

7    so forth, correct?

8    A.   Well, yes.  It was about the belief systems.

9    Q.   It was about the belief system.  Now, you and Tarek would

01:27 10   sit in your son's bedroom or in the living room and study,

11   would you not?

12   A.   Yes.

13   Q.   And the kids would run in and out?

14   A.   Yes.

15   Q.   Your daughter, who was three, liked to sit on Tarek's lap?

16   A.   Yes.

17   Q.   And, in fact, after you were -- after you were detained,

18   Tarek continued to go and see your kids, did he not?

19   A.   Yes.

01:27 20   Q.   And he took pictures of them for you?

21   A.   Yes.

22   Q.   And do you recall when you were detained there was a --

23   there was a radio call-in show?

24   A.   Correct.

25        MR. GROHARING:  Objection, your Honor.  This line of

 1   questioning I don't think is relevant.

 2           THE COURT:  Sustained.

 3           MS. BASSIL:  Your Honor, at this time, I would like to

 4   show the witness something which you can put up in front of him

 5   alone.

 6           MR. GROHARING:  Same objection, your Honor.

 7           THE COURT:  Sustained.

 8   Q.   Mr. Maldonado, after you were detained, Tarek continued to

 9   be a friend to you, did he not?

01:29 10   A.   Yes.

11   Q.   In fact, the studying that you did with Tarek, do you

12   remember that he would pick up food on the way up?

13   A.   Yes.

14           MR. GROHARING:  Object, your Honor.

15           THE COURT:  Sustained.

16   Q.   The heart of your relationship with Tarek was about this,

17   was it not, about studying, about religion, about learning

18   about your faith?

19   A.   The heart of it, yes.

01:29 20   Q.   And you thought -- when you called Tarek Mehanna from

21   Somalia, you thought he was as firm in his beliefs about Jihad

22   as you were?

23   A.   Yes.

24   Q.   You thought he would jump at the chance to join?

25   A.   Yes.

1    Q.   But he didn't?

2    A.   No.

3    Q.   And you had also heard, you knew, that Abousamra had gone

4    on to Iraq in 2004?

5    A.   Yes.

6    Q.   And Tarek didn't do that either?

7    A.   No, he didn't.

8    Q.   Now, finally, Mr. Maldonado, you have been promised that

9    you will see your kids after you testify today, isn't that

01:30 10   correct?

11   A.   I was promised today?  No.

12   Q.   You were promised a visit with your kids?

13   A.   Not for today.

14   Q.   This week?

15   A.   I was hoping.

16   Q.   You were hoping?

17   A.   I wasn't promised anything.  Something I asked for because

18   it was so close.

19   Q.   And it would be -- you asked for a visit with your kids

01:30 20   where you could hold them and not be separated by glass, right?

21   A.   Yes.

22   Q.   Kiss them and hug them?

23   A.   Of course.

24   Q.   And this is what you live for now, isn't it?

25   A.   Yes.

1          MS. BASSIL:  I have no further questions.

2          THE COURT:  Redirect?

3     REDIRECT EXAMINATION BY MR. GROHARING:

4     Q.   Mr. Maldonado, I want to ask you about your initial

5     interviews in Kenya after you were first captured by the

6     Kenyans when you were asked to write that statement that you

7     testified about.

8     A.   Yes.

9     Q.   Do you recall what you were asked to write about?

01:31 10    A.   I was asked by the FBI to write about my reasons for going

11    to Somalia, what my circumstances in Somalia were, and how I

12    ended up with them.

13    Q.   Were you asked anything about what you had done in Boston,

14    in this area, the time you lived in the Boston-New Hampshire

15    area?

16    A.   At the initial, very first, first time with the FBI?

17    Q.   Yes.

18    A.   No, not to my recollection.

19    Q.   Is it fair to say, during those discussions with the FBI,

01:31 20    that they were focused on what you were doing in Somalia?

21    A.   Yes.

22    Q.   How you got to Somalia?

23    A.   Yes.

24    Q.   The training that you took once you were in Somalia?

25    A.   Yes.

1    Q.   Over the course of your time, since you've been in

2    custody, you've talked to a great number of agents as Miss

3    Bassil pointed out on cross-exam?

4    A.   Yes.

5    Q.   How many different agents would you estimate that you've

6    talked to?

7    A.   I couldn't even estimate, really, numbers.

8    Q.   Is it fair to say that it's a large number?

9    A.   Yes.

01:32 10   Q.   Lots of different people?

11   A.   Yes.

12   Q.   Were they coming from lots of different places?

13   A.   Yes.

14   Q.   Different districts in the United States?

15   A.   Yes.

16   Q.   As well as some interest from overseas?

17   A.   Correct.

18   Q.   Were you asked about different United States citizens who

19   might have gone to Somalia?

01:32 20   A.   Yes.

21   Q.   Is it fair to say that when you were asked by a particular

22   agent, they were focused on a subject that was in their

23   district?

24   A.   Yes, this was the case.

25   Q.   I want to ask you specifically about when you indicated

        1    you first met with agents as well as prosecutors from Boston in

        2    April of 2007.

        3    A.   Yeah.

        4    Q.   That was quite a ways into your custody --

        5    A.   Yes, it was.

        6    Q.   -- correct?

        7         And it was after you had a plea agreement?

        8    A.   Yes.

        9    Q.   Prior to that meeting, did you talk to anyone else from

01:33  10    the Boston field office of the FBI or anyone from the U.S.

       11    Attorney's Office in Boston?

       12    A.   No.

       13    Q.   Is it fair to say that that meeting was the first time

       14    that your questioning was really focused on the defendant?

       15    A.   Yes.

       16    Q.   That those agents knew a lot more information about people

       17    in Boston?

       18    A.   Correct.

       19    Q.   And they had a lot more questions for you about people in

01:33  20    the Boston area?

       21         MS. BASSIL:  Your Honor, this is highly leading.

       22         THE COURT:  Form of the question.

       23    Q.   Well, what did those agents ask you about?

       24         MS. BASSIL:  Objection.

       25         THE COURT:  Overruled.

1    A.    The ones from Boston?

2    Q.    Yes.

3    A.    They asked me about Tarek Mehanna, Ahmad Abousamra, what

4    was our history and certain going-ons [sic] that has happened

5    through the time that I've known them.

6    Q.    Did they ask you a lot of questions that you had never

7    been asked before?

8    A.    Yes.

9    Q.    In particular, about the defendant?

01:34 10    A.    Yes.

11    Q.    Was it your understanding that they were responsible for

12    investigating cases out of the District of Massachusetts?

13          MS. BASSIL:  Objection.

14    A.    Yes.

15          THE COURT:  It may stand.

16    Q.    I'm sorry.  Your answer was yes?

17    A.    Yes.

18    Q.    Miss Bassil also asked you about your grand jury

19    testimony.  Do you recall your grand jury testimony?

01:35 20    A.    A good portion of it, yeah.

21    Q.    When you testified before the grand jury, were you asked

22    to testify about everything you knew about the defendant or Mr.

23    Abousamra?

24    A.    Yes.

25    Q.    Now, were those questions targeted -- would you describe

```
 1    them as targeted or kind of open-ended where you had the floor

 2    to talk about whatever you found relevant?

 3              MS. BASSIL:  Objection.

 4              THE COURT:  Overruled.  You may answer.

 5    A.   I really don't understand what you mean by "targeted."

 6    Q.   Well, were you asked to simply tell the grand jury

 7    everything you knew about the defendant, or were you asked more

 8    targeted questions perhaps?

 9    A.   Yeah, more specific, where we met and stuff like that,

01:35 10   yeah.

11    Q.   Did you respond to the questions that were posed to you by

12    the prosecutors?

13    A.   Yes.

14    Q.   Do you remember being asked about whether or not what the

15    defendant's purpose was for traveling to Yemen?  Do you

16    remember specifically being asked that question --

17    A.   Yes.

18    Q.   -- during the grand jury?

19    A.   Yes.

01:36 20   Q.   You mentioned that -- on cross-examination that the

21    defendant was surprised at a sermon that he heard in Yemen?

22    A.   Yes.

23    Q.   Do you recall that question?

24    A.   Yes, I do.

25    Q.   Did he indicate whether or not he was pleased or
```

       1    disappointed by the sermon?

       2    A.    Pleasantly surprised.

       3    Q.    What did he say about that?

       4    A.    I don't remember the exact words, just that it was

       5    incredible that, you know, there was such a sermon given and,

       6    you know, no cops, nothing happened.

       7    Q.    Did he indicate whether or not he agreed with the views of

       8    the individual who gave that sermon?

       9          MS. BASSIL:   Objection.

01:37 10          THE COURT:   Overruled.

      11    A.    Come again?

      12    Q.    Did Mr. Mehanna indicate whether or not he agreed with the

      13    views of the person who gave that sermon that he talked about

      14    in Yemen?

      15    A.    He was pleasantly surprised, so I imagine so.

      16    Q.    You took that as agreement with the views that were

      17    expressed during that sermon?

      18    A.    Yes, I took it so.

      19    Q.    Now, you just talked a little bit about the attacks of

01:37 20    September 11th and how you initially were disappointed in those

      21    attacks --

      22    A.    Initially, yes.

      23    Q.    -- correct?

      24          And the defense had several questions for you about

      25    Mr. Abousamra's opinions and justification for those attacks.

1    I want to talk with you about the defendant's opinions and

2    justifications for those attacks.  Do you recall him providing

3    justifications for those attacks?

4    A.    Yes.

5    Q.    What were those justifications?

6    A.    That if the benefit was greater than the harm, it was

7    permissible.

8    Q.    And those were views expressed by the defendant, not Mr.

9    Abousamra?

01:38 10    A.    Yes.

11    Q.    Or maybe as well as Mr. Abousamra?

12    A.    As well as.

13    Q.    You also just testified about collateral damage?

14    A.    Yes.

15    Q.    Do you recall the defendant using that term?

16    A.    I do not recall, not really sure, if you could refresh my

17    memory possibly, his use of that term.

18    Q.    I'm sorry?

19    A.    I'm not sure if he used the exact term, "collateral

01:38 20    damage."

21    Q.    That concept?

22    A.    But the concept.

23    Q.    Do you recall the defendant talking about suicide

24    bombings?

25    A.    Yes.

```
 1   Q.   What did he say about suicide bombings?
 2   A.   What I just previously had said, that if the benefit was
 3   greater than the harm, it was permissible.
 4   Q.   I believe on cross-exam you indicated that Mr. Abousamra
 5   held those views.  Are you saying that the defendant also
 6   expressed those views?
 7   A.   Yes.
 8   Q.   Is it fair to say, among your group -- yourself, the
 9   defendant, Mr. Abousamra -- that Mr. Abousamra was the most
10   extreme of the group?
11   A.   Yes.
12   Q.   I want to talk a bit about how you define extreme and what
13   that means as far as the views of both yourself and the
14   defendant.  You testified that there was a discussion about the
15   London subway bombings?
16   A.   The London subway bombings?
17   Q.   Yes.
18   A.   Yes.
19   Q.   Do you recall what the defendant said about those
20   bombings?
21   A.   That it wasn't permissible; it wasn't a good thing.
22   Q.   Why was that?
23   A.   Because it just targeted civilians.
24   Q.   Now, in that discussion, was there any mention about
25   targeting military, if targeting civilians might be permissible
```

1   under different circumstances?

2   A.   If the target was military, it would be fighting those who

3   are fighting you.  So it would be permissible.

4   Q.   So this was 2005?

5   A.   Yes.

6   Q.   Is it your testimony that the defendant then said at that

7   time that he didn't agree with those attacks, but if those

8   attacks were targeting the military, he would have agreed with

9   them?

01:40 10   A.   Yes.

11        MR. GROHARING:  Just one moment, your Honor.

12   Q.   Now, on Friday, on cross-examination, Miss Bassil asked

13   you a question about an email that you had sent to the

14   defendant.  It was a rather long email that she quoted to you,

15   and I'll just read you a portion of it.  You had said -- part

16   of it was, "Look, bro, do you really think you or I could prove

17   anything?  Do you really think that they don't know the truth?

18   Akhi, they know.  Heck, they knew.  It's not about that."

19        Miss Bassil asked you if you, indeed, had sent that

01:41 20   email.  Do you remember that question?

21   A.   If you could quote some more of that email, please.

22        MS. BASSIL:  Well, if he could show it to the witness

23   to refresh his memory rather than reading it, your Honor.  I'm

24   sorry.  Could I have what you're refreshing his memory with?

25        THE COURT:  What's the exhibit number?

1          MR. GROHARING:  Page 126, Page 126 of Friday's

2     transcript.

3          THE COURT:  Friday's transcript, okay.

4     A.   Yes.

5     Q.   Do you recall being asked that question?

6     A.   Yes.

7     Q.   You indicated that you wanted to provide a more fulsome

8     answer than "yes."  Do you recall that?

9     A.   Yes.

01:42 10    Q.   What did you want to say about that question?

11    A.   Well, the answer is not -- to that wasn't really a yes or

12    no.  See, I didn't really understand at the time the concept of

13    -- how could you call it? -- a conspiracy.  So when -- I was

14    always told by agents, You know, you did what you did, and, you

15    know, you're going through what you're going through because of

16    it.  I always felt that the conspiring to use a weapon of mass

17    destruction thing was false.  Like, I didn't do that.  I don't

18    know why they keep saying that.  I don't why they keep

19    referring to it.  So I felt I was innocent.

01:43 20         Only until, I would say recently, quite recently, when

21    I started reading more into law books, being I'm in a federal

22    facility, you have access to law books.  I started learning

23    about conspiracy and then realized that, okay, maybe I see

24    where they're coming from.  But at the time of writing that, I

25    always felt that, when I was accused of conspiring to use a

1    weapon of mass destruction and such things like that, I always

2    felt innocent of them because I didn't really understand the

3    concept of conspiracy.

4    Q.   Okay.  He testified both on direct exam as well as

5    cross-exam about an email that you sent with Mr. Ali from

6    Egypt?

7    A.   Correct.

8    Q.   You used the term "things in his closet"?

9    A.   Yes.

01:44 10   Q.   Was one of the things in the defendant's closet his trip

11   to Yemen?

12            MS. BASSIL:  Objection.

13            THE COURT:  Overruled.  He may answer that.

14   A.   Yes.

15   Q.   Why do you say that?

16   A.   Because the whole idea of that email was anything -- how

17   could I say? -- unsavory.  Anything that would be considered

18   possibly criminal, it was -- like I said, it wasn't literally

19   meaning a physical closet.  It was anything that could cause

01:45 20   trouble.

21   Q.   Based on what you knew, why did you think the defendant's

22   trip to Yemen would have caused him trouble?

23   A.   Because, from my knowledge, the trip to Yemen was to

24   connect with some sort of training or some ways to get to the

25   Jihad.

1    Q.   I want to ask you a couple questions about that.  You

2    testified on direct regarding what the defendant said about his

3    trip to Yemen.  Do you recall that?

4    A.   Yes.

5    Q.   And then Miss Bassil asked you a series of questions about

6    what you have said about that either to agents or in grand jury

7    testimony?

8    A.   Correct.

9    Q.   On direct, you indicated that the defendant said that when

01:46 10   he went to Yemen that he indicated they made no headway to

11   finding a place to fight or train or what have you.  Do you

12   recall that?

13   A.   Yes.

14   Q.   And he indicated that he was hoping that they could

15   connect with somebody to find headway?

16        MS. BASSIL:  Objection, your Honor.  He's just reading

17   from the direct examination.

18        THE COURT:  I imagine he's getting to a question, but

19   he can put it in context.

01:46 20        MR. GROHARING:  I am, your Honor.

21   Q.   And you testified that he was hoping that they could

22   connect with somebody to find a headway to make it somewhere

23   where there was fighting.  And I asked you then, "Make it to

24   somewhere?  Where was that somewhere?"  You said, "Possibly to

25   Iraq."  Do you recall that?

1    A.   Yes.

2    Q.   Miss Bassil asked you a series of questions about that as

3    well, correct?

4    A.   Correct.

5    Q.   Just to be clear, as you sit here today, are you

6    testifying about your current memory about what the defendant

7    said about this trip?

8    A.   Yes.

9    Q.   What did the defendant say about his trip to Yemen?

01:47 10        MS. BASSIL:   Objection.   Asked and answered.

11        THE COURT:   Overruled.   He may have it.

12   A.   What did he ask me?

13   Q.   What did he say about his -- the purpose of his trip to

14   Yemen and whether or not he was successful?

15   A.   That it was unsuccessful, that when they went, they didn't

16   really make much of a headway, and an individual told them to

17   go back home and give Da'wah, call people to Islam.

18   Q.   Now, Miss Bassil also asked you a couple questions on

19   Friday about wanting to please the government with your

01:47 20   testimony.   Do you recall those questions?

21   A.   Yes.

22   Q.   We have met a couple times before today, correct?

23   A.   Yes.

24   Q.   And have I ever indicated to you that I want you to

25   testify in a certain manner?

```
  1            MS. BASSIL:  Objection.

  2            THE COURT:  You may answer it.

  3    A.   No.  You've actually always told me just to tell the

  4    truth.

  5    Q.   Have I ever suggested that you provide a particular answer

  6    to any question?

  7    A.   No.

  8    Q.   What have I told you regarding the importance of you

  9    telling the truth when you testify here today?

01:48 10            MS. BASSIL:  Objection.

 11            THE COURT:  Overruled.

 12    A.   You told me that, as long as I tell the truth, it will be

 13    fine.  Just get up, keep a clear mind, tell the truth, and

 14    that's all that you want from me.

 15            MR. GROHARING:  That's all I have, your Honor.

 16            MS. BASSIL:  I just have a few questions, your Honor.

 17    RECROSS-EXAMINATION BY MS. BASSIL:

 18    Q.   Mr. Maldonado, I just want to talk only about your

 19    testimony in the grand jury.  By the time you had testified in

01:48 20    the grand jury in 2008, November of 2008, you had met with the

 21    prosecutors and the agents concerning facts or issues about

 22    Boston, correct?

 23    A.   Correct.

 24    Q.   You had met with them at least twice for lengthy

 25    interviews back in Houston?
```

1    A.    Yes.

2    Q.    All right.  And then you went to the grand jury, correct?

3    A.    Yes.

4    Q.    Before you went to the grand jury, you also sat down with

5    them and talked about what you were going to say in the grand

6    jury, correct?

7    A.    Well, yes.

8    Q.    All right.  And do you recall -- strike that.

9          You were asked in the grand jury, "When you saw him,

01:49 10   describe what happened."

11   A.    Could you repeat that?

12   Q.    You were asked in the grand jury -- let me back it up.

13   "At some point, you saw Tarek Mehanna?"  And your answer was

14   "yes."  "And were you aware of where he had gone?"  Your answer

15   was "no."  Then you were asked, "When you saw him, describe

16   what happened."

17   A.    Yeah.

18         MS. BASSIL:  Your Honor, I'm just going to read this

19   as impeachment.

01:49 20   Q.    You said, "Well, I wasn't aware that Tarek" --

21         MR. GROHARING:  Objection, your Honor.  Perhaps we

22   should approach.

23         THE COURT:  No.  Why don't you show it to him.

24         MS. BASSIL:  I'm not refreshing his recollection, your

25   Honor.

1        THE COURT:  He should still see it even if you're

2   going to ask him about whether he said it.

3   Q.   Mr. Maldonado, I'm going to ask you to just look at that

4   section.  Read it to yourself.

5   A.   (Reading.)

6   Q.   Now, there's nothing in that grand jury in which you

7   testified about looking for training or about looking to

8   connect, correct?

9   A.   Correct.

01:50 10  Q.   All right.  You said, "I wasn't aware that Tarek and Ahmad

11   were even leaving together.  So I was surprised when I asked

12   Tarek where he had been, and he told me he had left with Ahmed.

13   And he said they were in Yemen, and he discussed that going to

14   a mosque and he was surprised that Yemen, being" --

15        MR. GROHARING:  Your Honor.

16        THE COURT:  I'll permit it.

17        MR. GROHARING:  This is a statement, not a question.

18        THE COURT:  There will be one, I think, at the end.

19        MS. BASSIL:  There will be.

01:51 20  Q.   -- "that Yemen, being a police state and definitely not in

21   agreement with violent Jihad, that he heard a sermon from the

22   pulpit speaking of violent Jihad and issues like Iraq, and it

23   was just in the open, freely.  He was just amazed with such,

24   and he told me that he went to Dubai, and they were disgusted

25   with the fact that, you know, Dubai, being a Muslim country,

1    how Westerners would go there and disrespect the culture by

2    wearing miniskirts and they were acting somewhat lewdly.  And

3    then he told me they just came back."  That's what he told you

4    about Yemen, correct, and that's what you told the grand jury?

5    A.   If I may explain?

6    Q.   Let me -- please, I would like an answer.  Is that what

7    you told the grand jury what Tarek said to you about Yemen?

8    A.   That's what I told the grand jury that day.

9    Q.   And then do you remember being asked in the grand jury

01:52 10   what Ahmad Abousamra told you?

11   A.   Yes.

12   Q.   And do you remember that you said -- you asked him what

13   happened, right?  And he said he went to Syria and then to

14   Iraq?

15   A.   Yes.

16   Q.   And there was nothing, nothing, that you said in the grand

17   jury about Tarek Mehanna going for military training or for

18   connecting to someone who could allow him to fight?  There was

19   nothing you said about that in the grand jury, was there?

01:52 20   A.   I don't recall.

21   Q.   Now, Mr. Groharing asked you about what Tarek Mehanna said

22   about September 11th.  This would have been back in 2003 or so?

23   A.   Yes.

24   Q.   And did you -- you agreed with him, did you not?

25   A.   With?

1    Q.    About September 11th.

2    A.    Yes.

3    Q.    Have your views changed on that?

4    A.    Yes.

5    Q.    Have his views changed on that?

6            MR. GROHARING:  Objection, your Honor.

7    Q.    You don't know?

8            THE COURT:  Well, why don't you rephrase it as whether

9    he knows.

01:53 10   Q.    Do you know if his views have changed about what he said

11   in 2003 about September 11th?

12   A.    I don't know.

13           MS. BASSIL:  I have no further questions.

14           MR. GROHARING:  Very brief redirect?

15           THE COURT:  No.  I think we've had enough.

16           We're about quarter of 11.  I think maybe this is an

17   opportune time to take the morning recess a little bit early.

18   So we'll take the morning recess, jurors.

19   (Recess taken at 10:47 a.m.)

02:18 20           (After recess:)

21           THE CLERK:  All rise for the Court and the jury.

22           (The Court and jury enter the courtroom at 11:13 a.m.)

23           THE CLERK:  Please be seated.

24           MR. CHAKRAVARTY:  Your Honor, the government re-calls

25   agent Christian Fierabend.

1          THE COURT:  Okay.

2                    CHRISTIAN FIERABEND, resumed

3                    CONTINUED DIRECT EXAMINATION

4     BY MR. CHAKRAVARTY:

5     Q.   Good morning again, Mr. Fierabend.  You recall you were

6     here probably a couple weeks ago now.  You were reading through

7     some of the evidence that had been introduced in this case.

8               I'm going to draw your attention now to the next set

9     of the stored chat messages.

02:20 10               MR. CHAKRAVARTY:  Can we bring up Exhibit 292, please.

11               THE COURT:  Are these all in evidence?

12               MR. CHAKRAVARTY:  Yes, your Honor.  All of these are

13     in evidence.

14               THE COURT:  All right.  So I can just leave the

15     monitors set.

16     BY MR. CHAKRAVARTY:

17     Q.   Now, does this email message read, "Peace and mercy of

18     Allah be upon you" -- again, this is an English translation.

19     "The new cartoon:  'Invasion of Sheikh About Insh Al Shami'

02:21 20     (invading Abu Ghraib prison)" and a link followed by "I am

21     sorry about the day before yesterday.  I came back late from

22     school and did not catch you.  Your brother, Tarek."

23               Did I read that correctly?

24     A.   That's correct.

25               MR. CHAKRAVARTY:  Go to Exhibit 552, please.

1    Q.    And, again, if we could read this chat.  I will adopt the

2    role of Ahmad Rashad, if you could do Sayf Maslool, the

3    defendant.

4          Is this a chat on February 8th of 2006?

5    A.    Yes, it is.

6    Q.    Ahmad Rashad sends a link.

7    A.    "Sweet."

8    Q.    A wink, smiley face.

9    A.    "Is it good?"

02:21 10   Q.    "Just found it.  Another link."

11   A.    A link is sent:  www.29.megaupload.com/files.

12   Q.    "Oh, the English stuff was good.  I saw it this morning."

13   A.    "Don't forget to fast tomorrow."

14   Q.    "I did today, Alhamdulillah, praise be to Allah, and

15   tomorrow, Allah willing."  I'm sorry.  Rashad continues, "and

16   tomorrow, inshaa'Allah."

17   A.    "God bless.  Yes.  That link I just gave you is to

18   invasion of Shaykh Abu Anas al-Shami.  When they attacked the

19   Abu Ghraib prison."

02:22 20   Q.    "Oh, cool.  I never got to see that."

21   A.    "Just came out."

22   Q.    "Man, I wish I could send those to Masr," or Egypt.

23            MR. CHAKRAVARTY:  Can we go to page 3, please?

24   Q.    Does this appear to be a link to a video entitled

25   "Invasion of the Shaykh Abu Anas al-Shami"?

1    A.    Yes.

2            MR. CHAKRAVARTY:  At this point, your Honor, I would

3    like to publish three clips from that video, Exhibit 38.  We'll

4    do these without sound, your Honor.  There is no translation.

5            THE COURT:  Okay.

6            (Exhibit Nos. 38B, 38C and 38D published to the Court

7    and jury.)

8            MR. CHAKRAVARTY:  Can we go to the next chat, please?

9            MR. CARNEY:  May we approach, please?

02:26 10         (Discussion at sidebar and out of the hearing of the

11   jury:)

12           MR. CARNEY:  Your Honor, the record should reflect

13   that once again we saw videos that depicted the Twin Towers in

14   New York collapsing and the prelude to a beheading of the

15   person sitting there in front of a group of masked people.  And

16   this is a video that will eventually go to a beheading.

17   Although it doesn't go to the beheading, a reasonable person

18   would draw that inference from the entire context.

19           It is just piling on images and emotional events that

02:27 20   are completely unnecessary at this point.  Every witness who

21   was a cooperator for the government said he supported 9/11 and

22   so did the defendant.  It's just unnecessary at this point to

23   remind the jurors again of the most horrific day imaginable.

24           It's not enough to have the oral testimony that they

25   supported it and the defendant supported it, now it's got to be

1    reminded of them -- reminded to the jurors of these horrible

2    images.  And the same with the prelude to a beheading.

3          At some point -- and we've gone past that point -- but

4    at some point the prejudicial value overwhelms any minimal

5    probative value that the evidence has.  And at this point all I

6    can do is -- since your Honor has already overruled my

7    objection previously -- move again for a mistrial because I

8    think the jury is -- it's just impossible not to be affected by

9    this.

02:28  10          MR. CHAKRAVARTY:  I think the key is the nexus to the

11    defendant in regards to this media, your Honor.  In this case

12    we are, as with others, demonstrating that the defendant, five

13    years after those horrible events, is advocating that other

14    people, including coconspirators, should both view these

15    things, as well as to further cement what his purpose is:  He's

16    engaging in translation activities.  In this case, this happens

17    to be a publication of al Qa'ida in Iraq, depicting the events

18    of what happens both on 9/11, linking that to the events in

19    Iraq in terms of the Nick Berg beheading and then him

02:29  20    calling -- you know, describing that this just came out, here

21    it is.

22          And it's something that was stored on his computer.

23    We understand that every piece of evidence, you know, that

24    might depict something horrible might be prejudicial to the

25    defendant, but they're all probative of what the defendant's

1    state of mind is and was during the relevant time of the

2    conspiracy, not harkening back to 9/11 necessarily, but when he

3    was engaged in the acts we're alleging.

4          THE COURT:  Well, I'm overruling the objection.  I've

5    already ruled that the probative value outweighs any unfair

6    prejudice.  And for essentially that same reason your motion

7    for a mistrial is denied.

8          (In open court:)

9          MR. CHAKRAVARTY:  Go to 506, please.

02:30 10   BY MR. CHAKRAVARTY:

11   Q.   Does this appear to be a chat on February 9, 2006?

12   A.   Yes.

13   Q.   And is this between the defendant and Abu Mundhir?

14   A.   Yes.

15   Q.   I guess I'll start with reading the defendant's part.

16   "Did you see the new Jill Carrol video (1)?"

17   A.   "No.  Just read it."

18   Q.   "She is quite calm in it.  May Allah hasten her release

19   into my arms."

02:30 20   A.   "Laugh out loud."

21   Q.   "She said, 'I'm with the mujahideen.'  That's right.  Know

22   your place."

23   A.   "Laugh out loud.  Brother, the group who has her is

24   unknown.  Never heard of it."

25   Q.   "But really, though, that last video kind of blew it.  I

1    mean, showing her all calm and stuff (and still alive.)"

2              MR. CHAKRAVARTY:  Next page, please?

3    Q.   "It's like...how can that threat to be taken seriously

4    anymore?" *[sic]*

5    A.   "Laugh out loud."

6    Q.   "Unless she, uh, enjoyed her stay and doesn't want to come

7    back home."

8              MR. CHAKRAVARTY:  Go to Exhibit 727, please.

9    Q.   Is this a chat between the defendant and his brother

02:31 10   Tamer?

11   A.   Yes.

12   Q.   Does this appear to be on April 2, 2006?

13   A.   Yes.

14   Q.   And does Tamer say, "Jill Carrol is a great American"?

15   A.   Yes.

16              MR. CHAKRAVARTY:  Next page.

17   Q.   Sorry.  Then if you could read the defendant's part?

18   A.   "Yeah, God bless."

19   Q.   "What do you make of that?"

02:32 20   A.   "She's just lucky that her head is still above her

21   shoulders."

22   Q.   And then Tamer sends a link.

23   A.   "Heh."

24   Q.   "20 of 142 sites (clinics), 300 of 425 promised

25   electricity projects, 49 of 136 water and sanitation projects."

1    A.    "No problem.  No surprise."

2    Q.    Agent Fierabend, did you have an opportunity to view a

3    video on the defendant's computer called "Jill Carrol"?

4    A.    I did.

5          MR. CHAKRAVARTY:  May we play Exhibit 54?  It's a

6    one-minute clip, this video.  It's in English.

7          (Exhibit No. 54 published to the Court and jury.)

8          MR. CHAKRAVARTY:  Could we go to Exhibit 543, please.

9    BY MR. CHAKRAVARTY:

02:33 10  Q.    Agent Fierabend, is this a chat between the defendant and

11   Ahmad as-Sarayri?

12   A.    Yes.

13   Q.    On February 11, 2006?

14   A.    Yes.

15   Q.    And does Ahmad as-Sarayri say, "Peace be upon you"?

16   A.    "Peace be upon you, Ahmad."

17   Q.    "U pu s, fawh, peace be upon you."

18   A.    "What's new with you?"

19   Q.    "Sorry, it was Mohamad writing.  May Allah reward you for

02:34 20  the cartoon."

21   A.    "There is another one."

22   Q.    "Of who?"

23   A.    "The Shura Council.  Accept."

24   Q.    "Where is 'accept'?  Oh, I don't have 'accept.'  I will go

25   to the link."

1    A.    Ibnul Khattab sends a link.  It just looks like a link.

2    Q.    Okay.  And does it appear to be of a link to some type of

3    rmvb file?

4    A.    Yes.

5          MR. CHAKRAVARTY:  Next page, please?

6    Q.    "It is downloading."

7    A.    "Short but nice."

8    Q.    "Does it have the latest operations?"

9    A.    "From about last week."

02:35 10    Q.    "There was a dry period and we were worried."

11    A.    "Hahaha.  No, they were just bored.  This is the first

12    movie of the mujahideen Shura Council."

13    Q.    "From what?"

14    A.    "Let me see."

15    Q.    "We are the ones getting bored.  Activate the camera.

16    Downloading here is slow.  Fatima's movies.  I was downloading

17    it before I started talking to you.  Where are you?"

18    A.    "I will get you a smaller copy."  And ibnul_khattab82

19    sends another link.

02:35 20          MR. CHAKRAVARTY:  Go to page 5, please.

21    A.    "The scholar said that it is not permissible to live in

22    infidel countries unless the reason is to call to Allah."

23    Q.    "Or to study."

24    A.    "Or if there is danger to his life and religion in the

25    peaceful country.  It is not even permitted for education

         1    unless the Muslims are in need of this education."

         2    Q.   "When studying is about sciences needed by Muslims?"

         3    A.   "Yes.  Such as making weapons and such."

         4    Q.   "Try to call to Allah as much as possible."

         5         MR. CHAKRAVARTY:  Would you go to Exhibit 671, please.

         6    Q.   Does this appear to be a chat session on March 22, 2006,

         7    with someone named Dawud?

         8    A.   Yes.

         9         MR. CHAKRAVARTY:  Go to page 2.

02:37   10    Q.   Does it appear that a link is sent called "Separate

        11    Operations in Iraq"?

        12    A.   Yes.

        13    Q.   Page 3, please.  Another link is sent called "Toast"?

        14    A.   Yes.

        15    Q.   Okay.  If we could read this?  If you would do

        16    Sayf Maslool.

        17    A.   "..."

        18    Q.   "Oh, my bad."

        19    A.   "Works?"

02:37   20    Q.   "Yeah.  IEDs?"

        21    A.   "Pretty much."

        22    Q.   "I can't really figure out what's going on after the Jeep

        23    blew up."

        24    A.   "The brothers began firing on the rest of the convoy.

        25    Then the kufr called in reinforcement."

1    Q.   "It's hard to make out."

2    A.   "Yeah, the first few seconds were the catch."

3    Q.   "May Allah aid the Muslims in good.  Amen."

4    A.   "And rid us of the Khawarij."

5         MR. CHAKRAVARTY:  Can we go to Exhibit 726, please.

6    Q.   Is this a chat session again between the defendant and his

7    brother Tamer on March 21, 2006?

8    A.   Yes.

9         MR. CHAKRAVARTY:  Next page, please.

02:38 10   Q.   And that same file that was just sent to Dawud, was that

11   sent to Tamer?

12   A.   "Separate Operations in Iraq" was sent to Taimur.

13   Q.   Can we read Taimur says, "Lollacaust."

14   A.   Wink, smiley face.

15   Q.   "Is there more than one explosion in this video?"

16   A.   "No.  This one does, though."

17   Q.   Heh.  And then a file is received by Taimur called

18   "Separate Operations in Iraq, Number 8."  Or "Eight Separate

19   Operations in Iraq."  Excuse me.

02:39 20        Then it continues, "Laugh out loud.  That sucks."

21   A.   "For them."

22   Q.   "Yeah, laugh out loud."

23   A.   "I was telling some brothers before.  They were probably

24   fighting over who gets to press the button."

25   Q.   "Laugh out loud."

1    A.   "Did you pray Isha, night prayer?"

2    Q.   "No, not yet."

3    A.   "Fifteen minutes, okay?"

4    Q.   "Sure."

5         Agent Fierabend, was that file "Eight Separate

6    Operations in Iraq" on the defendant's computer as Exhibit No.

7    48?

8    A.   I believe it was.  I watched a video called "Diverse

9    Operations in Iraq" and was told it was on his computer.

02:39 10        MR. CHAKRAVARTY:  Do you want to call that up?

11   Exhibit 48.

12        MR. CARNEY:  I object and ask to approach, your Honor.

13        THE COURT:  All right.

14        (Discussion at sidebar and out of the hearing of the

15   jury:)

16        MR. CARNEY:  Your Honor, I renew my objection to this

17   video.  This is a video showing numerous explosions of usually

18   IEDs attacking American servicemen.  The government's claim

19   that this will show the defendant's state of mind, I submit, is

02:40 20  not supported by the fact that we've now had weeks and weeks of

21   evidence of the defendant's state of mind.  I can virtually

22   stipulate to the defendant's state of mind.  What we're doing

23   now is just showing videos that are designed to inflame

24   American citizens who will be seeing United States soldiers

25   killed.  There's zero probative value left in this evidence and

1    the prejudice is overwhelming, and I renew my objection to

2    exclude it.

3         MR. CHAKRAVARTY:  For the reasons we've said before,

4    the reason why this one is probative, still, is because, first,

5    it's a video that hasn't been shown to the jury.  It's a short

6    clip showing the relatively -- it's an explosion of a Jeep.

7    There's no graphic images of bodies -- there would not be an

8    image of mutilated bodies or --

9         THE COURT:  Not.  There is not?  I'm trying to hear.

02:41 10      MR. CHAKRAVARTY:  No.  I'm sorry.  I'm just trying to

11   keep my voice down.

12        THE COURT:  So you see vehicles exploding?

13        MR. CHAKRAVARTY:  It's an armored personnel carrier

14   which explodes.  So it's not something that will cause a shock

15   to conscience.

16        But in addition to the reasons that we forwarded

17   already about how each of these explosions -- or each of these

18   images of violence that the defendant is advocating and

19   actively asking other people to watch, in this case his

02:42 20   brother, someone who hadn't previously been part of the mix the

21   jury had heard about, and in the context of that he's talking

22   about prayers and he's talking about some other innocuous

23   facts.  It's important to convey to the jury that he is

24   advocating both personnel -- he's advocating quite a few

25   concerns; most importantly, what his objectives are in terms of

1    his support for Iraq, his translations, why he went to Yemen.

2    It's directly probative to that.

3              THE COURT:  All right.  The objection is overruled.

4              MR. CARNEY:  While I'm here, may I move for a

5    mistrial?  I think, once again, this is destroying the

6    defendant's ability to get a fair trial.

7              THE COURT:  Denied.

8              MR. CARNEY:  Oh, and off the record.

9              (Discussion off the record.)

02:42 10         (In open court:)

11             MR. CHAKRAVARTY:  Mr. Bruemmer, if you could play

12   Exhibit No. 48.

13             (Exhibit No. 48 published to the Court and jury.)

14             MR. CHAKRAVARTY:  Go to Exhibit 525, please.

15   BY MR. CHAKRAVARTY:

16   Q.   Agent Fierabend, is this a chat session between the

17   defendant and Abu Mu'ndhir on April 18, 2006?

18   A.   Yes.

19   Q.   Abu Mundhir says, "Peace be upon you."

02:46 20   A.   "Peace be upon you."

21   Q.   "How are you?"

22   A.   "Good, as always, praise be to Allah."

23   Q.   "Good.  Who's Abu Slicer?"

24   A.   "A bro I know personally.  Young one.  So, trying to

25   doctrin-ize him."

1    Q.   "Ah, okay.  Cool."

2    A.   "Brb."

3         MR. CHAKRAVARTY:  Go to Exhibit 704, please.  Go to

4    page 3.  I'm sorry.  Go to page 1 just to identify the

5    participants.

6    Q.   This is a chat between the defendant and someone named

7    Taimur on February 27 of 2006?

8    A.   Yes.

9         MR. CHAKRAVARTY:  Okay.  Page 3 again, please.

02:47 10   Q.   Taimur says, "I see."

11   A.   "You know, he used to be a bodyguard for UBL."

12   Q.   "Laugh out loud.  Nice.  Yo, brb.  Be right back."

13   A.   "Okay.  Abu be right back."

14   Q.   "Back."

15   A.   "Okay."

16   Q.   "Do you know what the scholars say regarding speaking

17   when, for example, someone asks you a controversial question

18   and you know your answer is going to cause more tension?"

19   A.   "It depends on the situation.  You can never speak what is

02:48 20   false, but if it is necessary, you can conceal some of the

21   truth for a greater benefit.  You see the difference between

22   the two?"

23   Q.   "Give me an example of concealing the truth."

24   A.   "Like, for example, you are speaking to some disbelievers

25   and they ask you about, for example" --

1    Q.   "Yeah, exactly."

2    A.   -- "UBL.  You don't come out saying he's a mujahid scholar

3    blah blah blah" --

4    Q.   "Laugh out loud.  Word."

5    A.   "You can just say, like, 'I can see where he's coming

6    from,' et cetera, 'but I don't agree with everything he does,'

7    which is true.  Every human makes mistakes, so you don't agree

8    with everything that anyone does, so you haven't lied."

9    Q.   "I see."

02:48 10   A.   "But at the same time you haven't said something that

11   might get you in trouble."

12        MR. CHAKRAVARTY:  Next page, please.

13   Q.   "Nice.  If you are with a bunch of people, Muslim, but

14   like not that religious, maybe some, I would say it's better

15   just to stay quiet."

16   A.   "If you think that remaining silent about something will

17   avert a greater trouble, then yes."

18   Q.   "For example, if I'm there for call to Islam," or Da'wah,

19   "trying to encourage brothers to come back to the religion then

02:49 20   I start talking positive about mujahideen and stuff, all the

21   perceptions of me will be ruined, so it's better to say a

22   general statement and be quiet."

23   A.   "Yeah, because you have priorities.  In your call to Islam

24   you don't have to come out with everything at once.  Not

25   everyone is ready for everything.  Like start with stuff that

```
   1   people can easily accept, monotheism, paradise, et cetera."

   2   Q.   "Yeah, what about this" --

   3   A.   "Then when they are comfortable with you" --

   4   Q.   "You see couple of people" --

   5   A.   -- "and listen to you, then move on."

   6   Q.   -- "discussing Afghanistan and Taliban and all that,

   7   pretty much bashing them.  Do you stay quiet or speak?"

   8   A.   "Well, in that case it's different.  You should defend

   9   your brothers against any slander but you can do it in a wise

02:49  10   way.  Don't be like hypocrite.  The Taliban ruled!"

  11   Q.   "Haha."

  12   A.   "Just say" --

  13        MR. CHAKRAVARTY:  Next page.

  14   A.   -- "well, don't believe everything you hear.  Everyone has

  15   their good and bad, et cetera."

  16        MR. CHAKRAVARTY:  Go to Exhibit 699, please.

  17        MR. CARNEY:  I would ask that the chat continue, your

  18   Honor.  In terms of the rule of verbal completeness.

  19        MR. CHAKRAVARTY:  Your Honor, there's about --

02:50  20        THE COURT:  How many lines?

  21        MR. CHAKRAVARTY:  The chat goes on for three more

  22   pages.

  23        THE COURT:  No, I'm just asking Mr. Carney.

  24        MR. CARNEY:  About two-thirds of the way down the

  25   chat, your Honor.
```

1          THE COURT:  Down that page?

2          MR. CARNEY:  If they will keep reading, I will tell

3     them where they can stop.

4          MR. CHAKRAVARTY:  I'm a little concerned with that,

5     your Honor.

6          THE COURT:  Let me take a look.

7          (Pause.)

8          MR. CHAKRAVARTY:  Your Honor, if there are going to be

9     other circumstances, perhaps we should approach sidebar and

02:51 10    discuss it.

11          THE COURT:  All right.

12          (Discussion at sidebar and out of the hearing of the

13    jury:)

14          MR. CHAKRAVARTY:  My concern is, especially given in

15    the past counsel has said that they're concerned with what they

16    say -- they have attempted to read in large portions of this,

17    have someone facilitate getting information to the jury as

18    quickly and seamlessly as possible, but I don't want do be the

19    one wasting your time talking about development aspects of a

02:52 20    chat.  And that's what my concern is.  A couple of lines is one

21    thing, but if on every one there's half a page to go, that's

22    longer than I had intended to read.

23          MR. CARNEY:  First of all, this entire chat, as I

24    understand it, is in evidence and will be before the jury.  And

25    I object when the government just bounces around and picks two

1    lines here, three lines there.  It's so taking the chats out of

2    context.

3         THE COURT:  Well --

4         MR. CARNEY:  And in this instance -- I'm sorry if I

5    interrupted your Honor.

6         THE COURT:  Go ahead.

7         MR. CARNEY:  -- the chat continues with a statement by

8    my client, "Well, maybe some good things they did.  They

9    established hospitals in Afghanistan."  "Yeah, check this out."

02:53 10       The government's theory is Tarek is -- the defendant

11   is trying to indoctrinate this person by just telling him about

12   bad things.  And the rule of verbal completeness will show he's

13   also telling him about good things.  And if it's relevant to be

14   admitted as an exhibit, it's relevant to be read.  I don't

15   think it's wasting people's time because when they go to the

16   jury room, if they have to start reading all of these chats,

17   they're going to be deliberating until next Christmas.

18        THE COURT:  I agree that reading down to the "check

19   this out" line is the same theme as the previous and could be

02:54 20  included in that.  I think it then changes to, "Are you coming

21   on Sunday," or something like that, which is different.

22        So the completeness is judged against the excerpt used

23   and not -- it doesn't mean you get the whole -- when there's

24   multiple topics in the chat, it could be addressed topic by

25   topic, not chat by chat, is what I'm saying.

1          MR. CARNEY:  Well, I would direct your Honor to --

2          THE COURT:  So that the point is -- excuse me.

3          The point of the verbal completeness rule is that an

4    excerpt won't be misunderstood because it omits something which

5    qualifies it or explains it at some length so that what has

6    been heard would be understood differently if something

7    additionally -- it's not an opportunity for cross-examination

8    to be melded with direct examination.  That's the wrong

9    statement.

02:55 10         MR. CARNEY:  I understand, your Honor.  I would direct

11   your attention to the fact that the conversation resumes and

12   he's talking about the administration of --

13         THE COURT:  No, I think at that point it changed, at

14   least as far as the completeness rule.  But if you want to get

15   down through "check this out" --

16         MR. CARNEY:  Okay.

17         (In open court:)

18   BY MR. CHAKRAVARTY:

19   Q.   Agent Fierabend, we'll read the next few lines.  Taimur

02:55 20   then says, "I get you."

21   A.   "And maybe mention some good things they did."

22   Q.   "They established hospitals, right, throughout

23   Afghanistan?"

24   A.   "Check this out."

25   Q.   And then there's a link.

1    A.    There's a link to IslamicAwakening.com/articles.

2           MR. CHAKRAVARTY:  Can we go to 699, please.

3    Q.   Is this a conversation between the defendant and someone

4    using the screen name Nusrah on April 15, 2006?

5    A.    Yes.

6           MR. CHAKRAVARTY:  Go to page 3.

7    Q.   And Nusrah says, "So how is the Da'wah," or the call to

8    Islam, "up there.  Any public movements?"

9    A.    "The call to Islam?  Haha.  Don't make me laugh, dude.

02:56 10   There's a total of like three bros up here who even know what

11   loyalty and enmity is, and you're speaking to one of them.  But

12   we are working on it."

13   Q.   "Praise be to Allah."

14   A.    "At this point we are doing" --

15   Q.   "If you need help, we are here."

16   A.    -- "one-on-one efforts, like befriend a person, slip stuff

17   in here and there."

18   Q.   "Recruit.  Brainwash."

19   A.    "Brainwash.  Ahaha.  Yeah, exactly."

02:57 20   Q.   "When you get numbers, then you march forth."

21   A.    "Yeah, but at this point we are still far from that

22   point."

23   Q.   Go to page 4 and continue reading the defendant's

24   statements.

25   A.    "May Allah keep us firm."

1   Q.   "And patience.  Amen.  Because them kaffirs" -- excuse

2   me -- "them disbelievers and leftists will counter you."

3   A.   "Yeah, well, that's what baseball bats are for."

4   Q.   "Laugh out loud.  Play ball," and smiley face.

5         MR. CHAKRAVARTY:  Next page, please?

6   Q.   Nusrah says, "We met up this week.  All of us" --

7   A.   "Man, that bro."

8   Q.   -- "to discuss hijrah," or migration, "to Yemen."

9   A.   "Aaah, okay.  You are in on this too?"

02:58 10   Q.   "Yes."

11   A.   "Want to go to Ma'rib?"

12   Q.   "Mostly.  All the ITS bros -- nah, that's like Algeria.

13   Nasty."

14   A.   "Yeah, I was there two years ago."

15   Q.   "Sucks there.  Government too harsh."

16   A.   "Dude, on the contrary.  Ma'rib is the most independent of

17   provinces from the government, the tribes."

18         MR. CARNEY:  I think there was an unintentional

19   misreading.

02:58 20         THE COURT:  Could you point to where?

21         MR. CARNEY:  I believe it says "I was there too" as

22   opposed to "two years ago."

23         MR. CHAKRAVARTY:  Actually, I think it --

24         THE COURT:  It's visible.  The jurors can make their

25   own judgment on it now that you've called their attention to

1       it.

2                   MR. CHAKRAVARTY:  Next page, please.

3       BY MR. CHAKRAVARTY:

4       Q.   Continue?

5       A.   "-- fight them" --

6       Q.   "Oh, I was in the city."

7       A.   -- "when they try to meddle in the affairs."

8       Q.   "I don't know about the tribes."

9       A.   "You were there too?"

02:59 10   Q.   "Yeah, Casablanca."

11      A.   "Oh, I thought you meant Yemen."

12      Q.   "Nah.  I wish.  Insha'Allah, Allah willing, three years.

13      That's my goal."

14      A.   "But the problem is outsiders stick out big time, man, in

15      Yemen like."

16      Q.   "Not in remote villages," smiley face.

17      A.   "The bros love you and all.  Hehe.  Well."

18      Q.   "Especially with a wife" --

19      A.   "When we meet" --

03:00 20   Q.   -- "and kid."

21      A.   -- "we will talk, Allah willing.  Yemen is a special

22      case."

23                  MR. CHAKRAVARTY:  Exhibit 711, please.

24      Q.   Is this a chat session between the defendant and Taimur on

25      March 21, 2006?

1    A.    Yes.

2    Q.    "Peace be upon you."

3    A.    "Peace be upon you, bro."

4    Q.    "What up?  Brother, you know any good articles or even

5    lectures on like gender relations or interactions?"

6    A.    "Yeah, one sec."

7    Q.    "These high school kids just don't get it."

8    A.    "First, did you see this?"

9    Q.    "What?"

03:00 10    A.    "Bagdad, Iraq.  About 100 masked gunmen stormed a prison

11    near the Iranian border Tuesday, cutting phone wires, freeing

12    all of the inmates and leaving behind a scene of devastation

13    and carnage.  20 dead policeman, burned out cars and a

14    smoldering jailhouse."

15    Q.    Does this appear to be some type of news article that

16    continues?

17    A.    It says "Advertisement" and "'At least ten attackers were

18    killed in the dawn assault on the...lockup on the eastern

19    fringe of the Sunni Triangle,' police said."

03:01 20          MR. CHAKRAVARTY:  Can we go to the next page?

21    Q.    Does it appear that that article continues?

22    A.    Yes.

23    Q.    Okay.  And then we'll go to here.  Taimur says, "Allah is

24    great.  May Allah reward the masked gunmen/mujahideen."

25    A.    A link is sent:  Qa.sunnipath.com/issue_view.

1    Q.   And Taimur says, "Sunnipath, man.  Glory be to Allah."

2    A.   "Yeah, has some Sufi stuff on it but this article is

3    good."

4    Q.   "Okay.  I'll just copy and paste the article and won't

5    post the link."

6    A.   "Good, yeah."

7    Q.   "I'd rather they not be exposed to this stuff."

8    A.   "Right.  Right."

9    Q.   "I'm listening to Shaykh Anwar on jihad again, Part 1."

03:02 10        MR. CHAKRAVARTY:  Go to the next page.

11   A.   "Yeah, that one is nice, hehe."

12   Q.   "Yeah, it's the best one."

13        Go down a little bit more.  Does it appear that Taimur

14   receives a link called "Diverse Operations in Iraq 3"?

15   A.   Yes.  "Got it."

16        MR. CHAKRAVARTY:  Next page.

17   Q.   "It's crazy.  Yo, man.  Make supplication for me.  I have

18   a six-page paper due Friday and didn't even start yet," and

19   some kind of icon.

03:02 20   A.   "Heh.  What a surprise."

21   Q.   "Haha.  Brother, I'm not always like this.  I have a

22   disease that has no cure.  It's called senioritis.  Laugh out

23   loud.  Yo, what was that video of, U.S. forces, right?"

24   A.   "Yeah.  The bottom says 'Destruction of American Hummer

25   Carrying of U.S. Forces.'"

```
    1   Q.   "I see.  Coo.  You still have to give that video, Allah

    2   willing.  Okay.  Anyways, brother, I gotta get going.  I'll

    3   talk to you later, Allah willing.  Peace be upon you."

    4   A.   "You too.  Take care."

    5        MR. CHAKRAVARTY:  Go to 710.

    6   Q.   Does this appear to be the same two participants, Taimur

    7   and the defendant, this one on March 19, 2006?

    8   A.   Yes.

    9        MR. CHAKRAVARTY:  Go to page 3, please.

03:04 10   Q.   Would you read the defendant's part?

   11   A.   "So."

   12   Q.   "Oh, nice."

   13   A.   "All the bros made copies."

   14   Q.   "Nice.  I posted the links in the YM forums to the

   15   lecture.  After that I'm encouraging everyone to read

   16   Milestone -- Milestones."

   17   A.   "Yeah, good move.  It lays out one's beliefs" --

   18   Q.   "Yup."

   19   A.   -- "in the proper structure."

03:04 20   Q.   "And then after In the Hearts of Green Birds."

   21   A.   "Man."

   22   Q.   "And Under the Shade of Swords."

   23   A.   "You got the brainwashing schedule all worked out."

   24   Q.   "Haha.  Praise be to Allah.  Brother, I finished In the

   25   Hearts of Green Birds.  Glory be to Allah, man.  I can't
```

1  describe it."

2  A.   "Dude, Part 2 is even better."

3  Q.   "Yeah, I know.  I'm on Part 2 right now.  It's great."

4  A.   "Swords?"

5  Q.   "Yeah."

6  A.   "Yeah, man.  It's over 100 minutes long."

7  Q.   "It's the same length as the first one, one hour and 30

8  minutes, and Swords is one hour and 36.  Bro, I'll be right

9  back."

03:04 10  A.   Okay.

11        MR. CHAKRAVARTY:  Next page.

12  Q.   Read what the defendant says there?

13  A.   "These stories were all written by Abdullah Azzam, the

14  Afghanistan ones.  But the Bosnia ones are straight from the

15  apes -- tapes."

16        MR. CHAKRAVARTY:  Next exhibit, 709, please.

17  Q.   Is this the same two individuals, Taimur and the

18  defendant, on March 17, 2006?

19  A.   Yes.

03:05 20        MR. CHAKRAVARTY:  Go to page 5.

21  Q.   Taimur says, "Laugh out loud.  Where can I get the Martyrs

22  of Bosnia video?"

23  A.   "Hehe.  You can't."

24  Q.   "You have it?"

25  A.   "Azzam pubs is out of business."

```
 1   Q.   "No man, online."

 2   A.   "I won't say yes but I won't say no," wink, smiley face.

 3   Q.   "What the heck does that mean?"

 4   A.   "Next time I see you, you will have it in your

 5   possession."

 6   Q.   Now, Agent Fierabend, did you have opportunity before your

 7   testimony to review Exhibit 12 in this case?

 8   A.   Would you show me Exhibit 12?

 9        MR. CHAKRAVARTY:  Can we call up Exhibit 12?

03:06 10  Q.   Can you read the title of that videotape?

11   A.   "The Martyrs of Bosnia - Part 1."

12        MR. CHAKRAVARTY:  Can we go back to Exhibit 709, page

13   5, please?

14   Q.   I'll focus you in on this, where the defendant says "Azzam

15   pubs is out of business."  Do you see that?

16   A.   Yes.

17        MR. CHAKRAVARTY:  Can we call up Exhibit 80, please.

18   Q.   Was this a document off the defendant's computer?  Were

19   there several pages on the defendant's computer that appear to

03:07 20  be pages of an indictment?

21   A.   It looks like an indictment, yes.

22   Q.   Can you read that Paragraph 11?

23   A.   "At all times material to this indictment, Azzam

24   Publications" --

25        MR. CARNEY:  Objection, your Honor.
```

1          THE COURT:  Let me see you.

2          (Discussion at sidebar and out of the hearing of the

3     jury:)

4          MR. CHAKRAVARTY:  It's not offered for the truth of

5     the matter, but there was an indictment found on the

6     defendant's computer and it involves Azzam Publications.  It's

7     being offered to show what the defendant knew about a few

8     things:  One, that he had an awareness of what Azzam

9     Publications was, which there were several pieces of evidence

03:08 10   found from Azzam Publications, so...

11          But what he knew about that is relevant, particularly,

12     because the indictment also shows, amongst other things, that

13     al Qa'ida was designated -- it's not offered for the truth to

14     show that the defendant -- that al Qa'ida was, in fact,

15     designated, but it is offered to show the defendant believed,

16     or was on notice at that time, that al Qa'ida was designated as

17     a terrorist organization.

18          And most probatively, the fact that he is doing

19     research and has an indictment related to the types of

03:08 20   activities, which he's charged, at least in a portion of this

21     indictment, for online activities, recruiting, using jihad

22     videos -- this is what Azzam Publications was doing -- is

23     relevant to why he did this research.  Further is the fact that

24     in these chats he's talking about the video he's gotten,

25     received on the martyrs from Bosnia was --

```
 1              THE COURT:  Where was this indictment?

 2              MR. CHAKRAVARTY:  On his computer.

 3              THE COURT:  No, in what court?

 4              MR. CHAKRAVARTY:  I'm sorry, your Honor.  Connecticut.

 5    The cover page is there.  This was in the deleted space of the

 6    computer.

 7              THE COURT:  And when was it?

 8              MR. CHAKRAVARTY:  2002-2003.

 9              MR. CARNEY:  Your Honor, this has no relevance to the

03:09 10   defendant's state of mind unless this is true, and this is just

11    an allegation in an indictment.  I'm making the same point that

12    was made earlier when evidence was excluded that we wanted to

13    offer to show the state of mind.  That would not be relevant

14    and would indeed be prejudicial if it weren't true.

15              MR. CHAKRAVARTY:  But it goes to show why he was

16    cautious about talking to this guy about some of -- about

17    something that he may have received from Azzam Publications.

18              THE COURT:  So you have two pages there as --

19              MR. CHAKRAVARTY:  Yes, there were four pages that I

03:10 20   wanted to --

21              THE COURT:  You have highlighting.

22              MR. CHAKRAVARTY:  Right.

23              THE COURT:  That's what you want to call their

24    attention to?

25              MR. CHAKRAVARTY:  Right.  This is just the format.
```

1          THE COURT:  This existed on the computer in this form?

2          MR. CHAKRAVARTY:  There may have been a different

3    version but when we --

4          THE COURT:  I mean, the bottom part --

5          MR. CHAKRAVARTY:  Right.  It would have been kind of

6    written over.

7          MR. CARNEY:  It was in deleted space, your Honor.

8          (Pause.)

9          THE COURT:  Well, this is the cover page, right?  One

03:11 10   is the statement that al Qa'ida was designated in 1999 as a

11   foreign terrorist organization.  The truth or falsity of that

12   won't be an issue, will it?

13          MR. CARNEY:  It will not.

14          THE COURT:  So if that has value as notice, there's no

15   creeping assertion there that --

16          MR. CARNEY:  That's correct, your Honor.  Having it

17   put in in the form of an indictment with other allegations is

18   where I have a greater concern and objection.

19          THE COURT:  Well, but the defendant's interest in an

03:12 20   indictment is itself interest, isn't it, from the government's

21   point of view, anyway.

22          MR. CARNEY:  From the government's point of view.

23          THE COURT:  Well, they get to try their case.

24          MR. CHAKRAVARTY:  These were in a separate file, so he

25   had to click on each of these in order to download each page of

```
 1   a 14-page indictment.

 2            MR. CARNEY:  See, the government wants this to come in

 3   for its truth.

 4            THE COURT:  Well, I want to distinguish from that and

 5   the other two, which are government allegations, which may or

 6   may not be true, and so on and so forth.

 7            MR. CHAKRAVARTY:  The fact they were charged with

 8   it --

 9            MR. CARNEY:  They're going to be presenting evidence

03:12 10   that al Qa'ida was designated.  They've already provided the

11   documents to us.  I think it's an excerpt from the federal

12   register.

13            THE COURT:  So your point is that he was on notice

14   that what he was doing was indictable?  Is that the --

15            MR. CHAKRAVARTY:  That he was doing research.  And

16   where that line is -- essentially about what he can do without

17   crossing that line, because Azzam Publications clearly in his

18   mind crossed that line, because he's doing research to see what

19   was --

03:13 20            MR. CARNEY:  What's particularly inappropriate, I

21   think, is that I believe this fellow was acquitted of the main

22   charge.

23            Is this the Connecticut guy who was providing --

24            MR. CHAKRAVARTY:  Yeah.  There were two defendants.  I

25   don't know what happened.
```

1        MR. CARNEY:  One went to trial and was acquitted by

2    the judge of the lead charge.  So to put those allegations

3    before the jury is particularly inappropriate.

4        THE COURT:  Now, these are separate exhibits?

5        MR. CHAKRAVARTY:  Yes, because each one was a separate

6    file that he downloaded on his computer.  So there were several

7    pages of the indictment.  It's a 14-page indictment and I think

8    we have 12 pages.

9        THE COURT:  No, he can have it.  I think it is

03:14 10  probative that he had interest in an indictment, a particular

11    indictment, and then you have to show what the indictment

12    alleges to indicate the nature of the interest.  I think the

13    jury will have to be told they're not to take the statements as

14    true.  They could be false.  It is not because -- they don't

15    have to be true for the probative value.  So I disagree with

16    the point earlier that they're offered for the truth.

17        MR. CARNEY:  Let's take this case out of the terrorism

18    exception to the rules of evidence, okay?  Let's pretend that

19    this is a garden-variety drug case.  If the defendant had

03:15 20  downloaded a news story about someone being charged with

21    distributing drugs, would the government be allowed to put that

22    story in?

23        THE COURT:  If his attempt was to conspire, it might

24    be.

25        MR. CARNEY:  Anything the defendant --

1           THE COURT:  I don't know.  Every piece of evidence is

2     valued on its own.

3           MR. CARNEY:  I think a terrorist case is sui generous,

4     it appears.

5           THE COURT:  So the objection is overruled.  But I

6     will, if you want, caution the jury that it's not offered as a

7     statement of truth and it's just a fact that there was -- that

8     it was in a file on his computer.

9           MR. CARNEY:  I think it will just highlight it even

03:15 10     more, so...

11           THE COURT:  So I'm not to say it?

12           MR. CARNEY:  I don't think it will cure the prejudice,

13     but you might give it a try as a limiting instruction.  Thank

14     you.

15           (In open court:)

16           MR. CHAKRAVARTY:  Your Honor, the next four exhibits

17     that I'm going to make reference to involve what we just

18     discussed at sidebar.

19           THE COURT:  Okay.  Go ahead.

03:16 20           MR. CHAKRAVARTY:  Is the screen on, your Honor?

21           THE COURT:  It should be.  They should have it.  So

22     I'll just -- why don't you start with the cover page.

23           MR. CHAKRAVARTY:  The cover page.

24           THE COURT:  I think that will lead us better.

25           MR. CHAKRAVARTY:  Sure.

1          THE COURT:  Do you have it?

2     BY MR. CHAKRAVARTY:

3     Q.    Agent Fierabend, does this appear to be the cover page or

4     a portion of a cover page of what an indictment, a federal

5     indictment, looks like?

6     A.    It looks like an indictment, yes.

7     Q.    And there's a caption, and typically in a federal

8     indictment the United States of America is one party and then

9     there's a versus and then there's a blank where the defendant

03:17 10     would appear, typically.  Is that right?

11    A.    That's correct.

12    Q.    And then on the right-hand side there are the several

13    charges which are alleged in an indictment.  Is that the

14    typical form?

15    A.    Yes.

16    Q.    And this particular indictment appears to relate to the

17    District of Connecticut, correct?

18    A.    Yes.

19          MR. CHAKRAVARTY:  If we could go to Exhibit 78,

03:18 20    please.

21    Q.    Can you read this line from Paragraph 3 of this

22    indictment.

23    A.    "...Afghanistan.  On October 8, 1999, al Qa'ida was

24    designated by the Secretary of State as a foreign terrorist

25    organization pursuant to Section 219 of the Immigration and

1    Nationality Act and was redesignated as such on or about

2    October 5, 2001, and again in 2003, and remains so designated

3    to date."

4    Q.    And there's more verbiage in different paragraphs.  Can we

5    go to Exhibit 80, please, Paragraph 11.  Can you read that?

6    A.    "At all times material to this indictment, Azzam

7    Publications, which is named but not charged herein, was an

8    entity based in the United Kingdom that was established and

9    operated to recruit individuals to become mujahideen and to

03:19 10   solicit and raise funds and assistance for jihad, including for

11   the Taliban and Chechnya mujahideen identified above."

12   Q.    Then the indictment continues.

13         MR. CHAKRAVARTY:  Can we go to Exhibit 90, please.

14   Q.    Can you read Paragraph 22B?

15   A.    "From in or about 1998 through at least 2002, Babar Ahmad,

16   a/k/a Babar Ahmed, who is named but not charged herein, the

17   defendant, Syed Talha Ahsan, and others, caused the production

18   and distribution of videotapes and compact disks depicting

19   fighters in Bosnia, Chechnya and elsewhere, and eulogizing dead

03:20 20   fighters for the purposes of recruiting individuals and

21   soliciting donations to support the mujahideen in Afghanistan

22   and Chechnya."

23   Q.    Agent Fierabend, you're aware that an indictment is simply

24   an allegation, correct?

25   A.    That's correct.

1           MR. CHAKRAVARTY:  That's all I have.

2           THE COURT:  Let me just, on the last piece of -- these

3     last several exhibits make some assertions of fact that's not

4     evidence that the facts are true.  The significance of this

5     evidence, if it has any, in the government's view is that it

6     was something that may have some illumination as to what the

7     defendant thought or what his state of mind may have been,

8     regardless of the truth of the statements.  So the existence of

9     the document itself may or may not have significance, but

03:21 10    that's the government's view.

11           All right.

12                        CROSS-EXAMINATION

13    BY MR. CARNEY:

14    Q.    Good morning, sir.

15    A.    Good morning.

16    Q.    The government has in its possession thousands of chats

17    between Mr. Mehanna and other people.  Isn't that true to the

18    best of your knowledge?

19    A.    I believe so, yes.

03:21 20    Q.    And basically what we've gone through with your testimony

21    is skipping around various chats, some that might be as long as

22    ten or 12 pages, and picking a couple of lines out here and

23    there.  Is that right?

24    A.    That's true.

25    Q.    So that in order to have the full context of this

conversation, one would have to read the entire chat?

A.    I guess it depends.

Q.    In this one, there were no chats that you read in their

entirety, were there?

A.    I don't know.  There was one we did an extensive reading

on the first day.  I don't know if it was the whole chat.

Q.    It wasn't the entire chat.

A.    I don't know.

MR. CARNEY:  Could I see the last exhibit that went

in?  I believe it was 90.

THE COURT:  90?

MR. CARNEY:  And please leave that part highlighted

that you have, Paul -- Mr. Bruemmer.  Excuse me.  Could we make

that part bigger, please?

BY MR. CARNEY:

Q.    So this allegation is that from 1998 until 2002 an

individual named Babar Ahmad and a person named Syed Ahsan and

others caused the production and distribution of videotapes and

compact disks depicting fighters in Bosnia, Chechnya and

elsewhere and eulogizing dead fighters for the purpose of

recruiting individuals and soliciting donations to support the

mujahideen in Afghanistan and Chechnya.  Is that what it says?

A.    Yes.

Q.    And those battles were against -- in Chechnya -- the

Russians, right?

1    A.    That's correct.

2              MR. CARNEY:  Thank you.  That's all I have.

3              THE COURT:  Anything else?

4              MR. CHAKRAVARTY:  Nothing further, your Honor.

5              THE COURT:  Agent Fierabend, thank you.  You may step

6    down.

7              (The witness is excused.)

8              MR. CHAKRAVARTY:  Your Honor, at this point we might

9    need to do something outside the presence of the jury.

03:24 10           THE COURT:  All right.  We'll excuse the jury for a

11    moment.

12              THE CLERK:  All rise for the jury.

13              (The jury exits the courtroom at 12:18 p.m.)

14              THE COURT:  The purpose, I understand, is to advise

15    the witness of the immunity order.  Is that the idea?

16              MR. AUERHAHN:  Yes, your Honor.  The language of the

17    immunity order is in order for it to come into effect the Fifth

18    Amendment right to refuse to testify must be asserted.

19              THE COURT:  Right.  Do we have a copy of --

03:25 20           MR. AUERHAHN:  We haven't had that issue with any

21    other witness who has been advised, but Mr. Krupp, on behalf of

22    Spaulding, wants to go through that process.

23              THE COURT:  Okay.  Does someone have a copy of the

24    immunity order?

25              MR. AUERHAHN:  He does have it.

1          MR. KRUPP:  I have a copy of it here, your Honor.

2     Peter Krupp on behalf of Daniel Spaulding.

3          THE COURT:  All right.  So I can advise him of it,

4     that's all.  I just wanted to have my own copy.

5          MR. AUERHAHN:  It's Exhibit 488.  We can bring it up

6     on the screen, your Honor.

7          THE COURT:  All right.  If you could bring it up on

8     the screen, that's fine.  Give this back to Mr. Krupp.

9          I think that -- I guess people do it different ways.

03:25 10   I'd have him take the stand and swear him and then advise him

11    of the order.

12         MR. KRUPP:  May I approach the stand, your Honor?

13         THE COURT:  You may.

14              DANIEL SPAULDING, duly sworn

15         THE CLERK:  Please have a seat.

16         State your name and spell your last name for the

17    record.

18         THE WITNESS:  My name is Daniel Spaulding, and the

19    last name is spelled S-P-A-U-L-D-I-N-G.  And it is my intent to

03:26 20   invoke the Fifth Amendment.

21         THE COURT:  All right.  Well, Mr. Spaulding, I have

22    previously entered an order on the application of the United

23    States Attorney's Office that you testify notwithstanding your

24    assertion of your privilege against self-incrimination.  The

25    order gives you immunity from prosecution for anything you may

1    say in your testimony and/or from any other -- well, except for

2    prosecution for perjury, giving a false statement or disobeying

3    the order.  But nothing you say in your testimony can be used

4    in any way as evidence against you in any other proceeding as

5    long as you're testifying truthfully under the order.

6            Do you understand that?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  Okay.  In the light of the order called an

9    immunity order, you may not respond and decline to answer

03:27 10  questions by asserting the Fifth Amendment against

11   self-incrimination because the effect of the order is that you

12   cannot incriminate yourself by the testimony -- by giving

13   immune testimony.

14           Are you clear about that?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Okay.  So under those conditions you will

17   testify?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  Okay.  I guess we can call the jury back

03:27 20  in.

21           MR. KRUPP:  Thank you, your Honor.

22           THE COURT:  For the jury's benefit, we'll re-swear him

23   and have him state his name again just so they don't wonder

24   what's happening.  So we'll just call the jurors back.

25           MR. CARNEY:  Your Honor, among the numerous exhibits

1    being offered through this witness, I have objections to five.

2              THE COURT:  Okay.  Maybe we should --

3              MR. CARNEY:  Maybe it would be easier to deal with

4    them now rather than when the jury is in here.

5              THE COURT:  I think that's a good idea.  Fine.

6              MR. CARNEY:  So I can give you the number, and if you

7    want to --

8              THE COURT:  I have the books here.  I can try to find

9    it.

03:28 10            MR. CARNEY:  Okay.  Number 498, your Honor.

11             THE COURT:  Okay, I see.  If you could bring it up,

12   that's just as easy.

13             MR. CARNEY:  Would it be possible for the witness to

14   step outside during these discussions?

15             THE COURT:  It's a good idea.

16             MR. CARNEY:  Thank you.

17             (The witness is excused.)

18             MR. CARNEY:  This appears to be an instant message

19   conversation between the defendant and Abu Mundhir, and I don't

03:29 20   see any basis for having the witness read this chat or address

21   this chat in any way.

22             THE COURT:  So it's the use with respect to this

23   witness, is what it's related to?

24             MR. CARNEY:  Yes, sir.

25             MR. AUERHAHN:  Your Honor, there's a conversation

between Abu Mundhir and the defendant in which Mundhir asks the

defendant, "You are close to this guy, Brother Mujahid, right?"

And the defendant says, "Talking to him right now."  The

witness is Brother Mujahid.  And then Mundhir goes on to asking

the defendant to ask Brother Mujahid to do something, and then

they talk a little bit about Brother Mujahid.

So it seems to be appropriate to ask the witness

whether or not he had that follow-up conversation with the

defendant, whether he knows Abu Mundhir, and what he knows

about Abu Mundhir.

And we were just going to go down to -- about ten

lines down asking for reference.  "And the post was deleted."

"Can you ask him how come that was?"  "He is correcting it

now."  "Okay."  "He fixed it."  "Cool."

THE COURT:  And so you're going to ask him whether he

did those things, is that it?

MR. AUERHAHN:  Well, whether or not the defendant

asked him to do it, whether he did it, and also I'll ask him if

he knows who Abu Mundhir is because Abu Mundhir seems to know

him as Brother Mujahid, so the reverse question may be asked as

well.

And, your Honor, if I could just let the Court know,

unlike the other cooperating witnesses, Mr. Krupp wouldn't

allow us to prepare Mr. Spaulding to testify here today.  So

don't ask me what his answer to some of these questions may be

 1    because I don't know.

 2              MR. CARNEY:  He certainly can ask the witness if he

 3    knows Abu Mundhir.  I just have a problem bootstrapping this

 4    particular chat with this particular witness.

 5              THE COURT:  Well, it seems like he's related to it in

 6    the sense that he may or may not have been doing something

 7    contemporaneously with the chat.  And if he recalls that, I

 8    guess that's germane.

 9              MR. CARNEY:  The next exhibit is 103, your Honor.

03:32 10             MR. AUERHAHN:  If you have one -- if I can ask

 11   Mr. Carney, 103, 117, 175 I'm not going to use.

 12             MR. CARNEY:  Okay.

 13             MR. AUERHAHN:  Your Honor, I'm not going to use 103.

 14             MR. CARNEY:  He's also informed me he's not going to

 15   use 117 and 175, which I also had objection to.

 16             THE COURT:  Okay.

 17             MR. CARNEY:  The final objection is 657, your Honor.

 18             MR. AUERHAHN:  Judge, perhaps the bottom of page 2,

 19   top of page 3 is the section that I'll be asking him about.  I

03:33 20   don't know if that's the section that Mr. Carney objects to.

 21             MR. CARNEY:  About the beheading?

 22             MR. AUERHAHN:  Yes.

 23             (Pause.)

 24             MR. AUERHAHN:  Your Honor, first of all, this is -- it

 25   seems to me it couldn't be much more direct evidence that movie

1   night in their mind in the first instance was for watching

2   jihadi videos.  And we've already had testimony about "State of

3   the Ummah" as a video put out by As-Sahab as part of the

4   indoctrination tools that the defendant used.  So clearly that

5   part of the conversation is direct evidence of much of what

6   this case has been about.

7        And secondly, with reference to the Mr. Z and heads

8   off, there's also been a lot of questioning, you'll recall,

9   even the first cooperating witness's suggestion, that it wasn't

03:35 10   Mr. Mehanna that used beheading videos as part of these

11   watching jihadi videos but it was Mr. Abousamra, so in order to

12   establish by direct evidence from the defendant's mouth that

13   these kinds of videos was part of the jihadi video nights in

14   which the defendant was not just a participant but one who set

15   these things up.  Again, it's direct evidence from the

16   defendant's own mouth and a coconspirator that these kinds of

17   videos were utilized as part of, as was said in one of the

18   other chats today, the brainwashing effort.

19        MR. CARNEY:  The point is it's not supported by this

03:36 20   chat.  The suggestion that he wants to have some people over

21   sometime at the start of June, we can have a movie night, and

22   then it's Spaulding asking, "What movie, 'State of the Ummah'?"

23   And Tarek says, "No."  And then goes and says, "Heads up?" and

24   is obviously making a joke because he laughs when he says it,

25   and says, "Joke."  It should be, "Heads off," says Spaulding.

1           Please stop me if you've heard this:  It's one more

2     reference of something awful, in this case, beheading, and

3     their joking about a beheading.  We've had three or four

4     references already during the trial about beheading.  We saw a

5     video of someone about to be beheaded this morning.  To just

6     keep putting this in front of the jury when it does not have

7     probative value to show some indoctrination -- this is between

8     two friends joking in a chat.  And at some point a line has to

9     be drawn, I respectfully suggest.

03:37 10           THE COURT:  Well, I think two things:  I think that

11    there is some sort of -- some language that is offensive in

12    multiple directions, is what I might say.  It seems to me the

13    substance, if it is -- the point of the evidence would be that

14    they would get together and watch particular kinds of movies, I

15    think you can ask the witness about that without using this

16    particular transcript.

17           MR. AUERHAHN:  But, your Honor --

18           THE COURT:  Now, if he demurs, then it becomes useful

19    either as a refreshment or perhaps even impeachment of your own

03:38 20    witness.  But I think you can get substantially the substance

21    without putting in this language.

22           MR. AUERHAHN:  But if you'll recall, the

23    cross-examination, as I said, of the first witness, you know,

24    we can't be forced to rely exclusively on the testimony of

25    cooperating witnesses; we should be allowed to use statements

1    of the defendant recorded -- well, not recorded, but written in

2    black and white to corroborate the testimony of each of the

3    cooperators who have been impeached by good cross-examination.

4    And it seems to me that here we have in black and white the

5    words of the defendant suggesting that what the witness will

6    testify to is true.  And it's important corroboration of that

7    fact.

8              THE COURT:  Well, let's see how it goes.  I think for

9    the time being no, but we'll see what the testimony is.

03:39 10              MR. CARNEY:  Those are all my objections, your Honor.

11              THE COURT:  Okay.  That was -- I've forgotten.  The

12    number of that one was?

13              MS. BASSIL:  657.

14              THE COURT:  657?

15              THE CLERK:  All rise for the jury.

16              (The jury enters the courtroom at 12:33 p.m.)

17              THE CLERK:  Please be seated.

18                   DANIEL SPAULDING, duly sworn

19              THE CLERK:  Please be seated.

03:41 20              State your name and spell your last name for the

21    record.

22              THE WITNESS:  My name is Daniel Spaulding.  My last

23    name is spelled S-P-A-U-L-D-I-N-G.

24                        DIRECT EXAMINATION

25    BY MR. AUERHAHN:

```
 1    Q.   Good afternoon, sir.

 2    A.   Good afternoon.

 3         MR. AUERHAHN:  First, if you could please bring up

 4    Exhibit 488, please.

 5    Q.   Now, sir, you've seen this document before?

 6    A.   Yes, sir.

 7    Q.   And this is an order issued in this case, United States

 8    versus Tarek Mehanna and Ahmad Abousamra, involving you,

 9    correct?

10    A.   Yes, sir.

11         MR. AUERHAHN:  If we could go to page 2, please.

12    Q.   And, sir, does this order direct that Daniel J. Spaulding

13    shall give testimony and provide other information as to all

14    matters about which Daniel J. Spaulding may be interrogated

15    during the trial of this matter?

16    A.   Yes, sir.

17    Q.   That forces you to answer the questions correctly?

18    A.   Yes, sir.

19    Q.   And is it further ordered that no testimony or other

20    information compelled under this order, or any information

21    directly or indirectly derived from such testimony or other

22    information, may be used against Daniel J. Spaulding in any

23    criminal case except for prosecution for perjury, giving a

24    false statement or otherwise failing to comply with this order?

25    Do you understand that?
```

```
 1    A.    I do, sir.

 2    Q.    So nothing you say can be used against you?

 3    A.    That is my understanding, yes.

 4    Q.    But you can be prosecuted for perjury, for lying?

 5    A.    Yes, correct.

 6    Q.    And although we call it an immunity order, it doesn't

 7    really immunize you from any crimes, does it?

 8    A.    No, sir.

 9          MR. AUERHAHN:  You can take that down.

03:43 10    Q.    Now, sir, in connection with these proceedings, do you

11    have an attorney?

12    A.    I do, sir.

13    Q.    And was he appointed to represent you?

14    A.    Yes, sir.

15    Q.    Now, in connection with this case, did you testify before

16    the grand jury?

17    A.    I did, sir.

18    Q.    And did you meet with the prosecutors and agents before

19    testifying in the grand jury?

03:43 20    A.    Yes, sir.

21    Q.    And did you meet with agents and prosecutors last year, in

22    2010?

23    A.    Yes, sir.

24    Q.    And you were asked questions and provided answers?

25    A.    Yes, sir.
```

1    Q.   Now, in preparation for testifying here today, did you

2    meet with the prosecutors so that you would know what questions

3    would be asked of you?

4    A.   No, sir.

5    Q.   You refused to meet?

6    A.   I wasn't able to.  No, sir.

7    Q.   Okay.  Did you meet with defense counsel?

8    A.   No, sir.

9    Q.   So you haven't had a chance to go over your testimony

03:44 10   before coming into this courtroom?

11   A.   I have not, sir.  No.

12   Q.   How old are you?

13   A.   I am currently 27 years of age.

14   Q.   In which state do you live?

15   A.   New Hampshire.

16   Q.   What's your level of education?

17   A.   I'm just completing my bachelor's degree, sir.

18   Q.   Are you currently employed?

19   A.   Yes, sir.

03:44 20   Q.   How so?

21   A.   I work at two different jobs.

22   Q.   Doing what?

23   A.   I work in the education field.

24   Q.   Okay.  Are you married?

25   A.   No, sir.

1    Q.   Do you have any children?

2    A.   I do not.

3    Q.   Now, at some point almost ten years ago did you convert to

4    Islam?

5    A.   Approximately ten.  Probably a little less than ten years.

6    Yes, sir.

7    Q.   Approximately when was it?

8    A.   2002, I believe.

9    Q.   And what mosque did you attend shortly after your

03:45 10   conversion?

11   A.   The mosque located in Manchester, New Hampshire.

12   Q.   And did you meet an individual there named Daniel

13   Maldonado?

14   A.   I did, sir, yes.

15        MR. AUERHAHN:  Can we bring up Exhibit 752, please?

16   Q.   Is that Mr. Maldonado?

17   A.   Yes, sir.

18   Q.   And did you develop a relationship with him?

19   A.   I did.

03:45 20   Q.   How would you describe that relationship?

21   A.   We became very close friends.

22   Q.   And was he also a convert?

23   A.   He was.

24   Q.   Now, after you became close friends, did you influence his

25   thinking or did he influence your thinking?

1    A.   I did not influence his thinking at all to my knowledge,

2    and I would say that he did influence mine, yes.

3    Q.   In what way?

4    A.   He introduced a lot of literature to me and ideas to me

5    that I previously did not have access to.

6    Q.   Okay.  And did you speak Arabic?  Did you read Arabic?

7    A.   No, sir.

8    Q.   Now, did -- and when you say he introduced you to things

9    that you were not exposed to before, could you categorize the

03:46 10   school of thought?

11   A.   It's something that's usually termed Salafi thought.

12   Q.   And what about Salafi-Jihadi?

13   A.   Not initially, no.

14   Q.   Okay.  So at first it was just Salafi?

15   A.   Yes, sir.

16   Q.   And just so we make sure we're talking about the same

17   thing, in very brief, can you describe what you mean by Salafi?

18   A.   They're kind of -- it's a movement that wants to sort of

19   purify Islamic theology from what it saw as later influences

03:46 20   that had crept in.  It had sort of returned to the foundational

21   origins.  I suppose you could put it that way.

22   Q.   Now, at some point did you begin to identify his beliefs

23   as Salafi-Jihadi?

24   A.   Yeah, at some point.  I guess I suppose that's the term

25   that's used for it.

1    Q.    When we say "Salafi-Jihadi," what do you mean by that?

2    A.    Well, they're usually -- in terms of their methodology --

3    I mean, because there's different Islamic groups and they each

4    propose different methods for their various goals.  And I guess

5    that which is referred to as "Salafi-Jihadi" see armed conflict

6    as being the primary means of establishing those goals.

7    Q.    Did Mr. Maldonado introduce you to any of his friends?

8    A.    Yes.

9    Q.    Did he introduce you to Ahmad Abousamra?

03:47 10   A.    He did, yes.

11         MR. AUERHAHN:  Can we bring up Exhibit 741, please?

12   Q.    Is that Ahmad Abousamra?

13   A.    Yes, sir.

14   Q.    And did he also introduce you to Tarek Mehanna?

15   A.    Yes, sir.

16   Q.    And is the Tarek Mehanna to whom he introduced you -- is

17   he in the courtroom today?

18   A.    Yes, sir.

19   Q.    Can you identify him for the record, please?

03:48 20   A.    Yes.  He's sitting there.

21   Q.    Okay.  You pointed to the defendant seated to my left?

22   A.    Yes.  Yes.

23         MR. AUERHAHN:  May the record so reflect.

24         THE COURT:  All right.

25         MR. AUERHAHN:  Thank you.

BY MR. AUERHAHN:

Q.   Now, do you remember approximately when Mr. Maldonado introduced you to Mr. Spaulding -- excuse me -- to Mr. Mehanna?

A.   If my recollection serves me correct, probably around 2004.

Q.   And with reference to what you were saying earlier about Salafi and Salafi-Jihadi, did you learn of what Mr. Mehanna's views were?

A.   Yes.

Q.   And how would you describe his views?

A.   They were similar to Mr. Maldonado's at the time.

Q.   Okay.  And in 2004 was Mr. Maldonado still just Salafi or was he a Salafi-Jihadi?

A.   He had taken on a more jihadist slant.

Q.   And did Mr. Mehanna ever give you anything, any videos?

A.   At our initial meeting?

Q.   Or sometime early in your relationship.

A.   Not that I recall.

Q.   Okay.  At some point did he give you some videos?

A.   Nothing that I'm recollecting at the moment, no.

        MR. AUERHAHN:  May I approach the witness, your Honor?

        THE COURT:  You may.

BY MR. AUERHAHN:

Q.   Could you read to yourself just that paragraph right there?

```
 1              MR. AUERHAHN:  I'm sorry.  It's --

 2              MR. CARNEY:  It's okay, Jeff.  It's okay.

 3              MR. AUERHAHN:  All right.

 4              THE WITNESS:  He didn't --

 5    BY MR. AUERHAHN:

 6    Q.   Just to yourself, and then I'm going to ask you a series

 7    of questions.

 8    A.   Okay.

 9    Q.   Just that paragraph.

10    A.   Uh-huh.

11    Q.   Okay.  Are you ready?

12    A.   Yes, sir.

13    Q.   Now, first, does that refresh your recollection as to

14    whether or not Mr. Mehanna made his beliefs clear to you in one

15    of the early meetings with him?

16    A.   Yes.

17    Q.   And what beliefs did he make clear to you during one of

18    the early meetings with him?

19    A.   His support for Osama bin Laden.

20    Q.   Okay.  And during one of the first meetings with Mehanna,

21    did Mehanna give you anything?

22    A.   He did not give anything to me, no.

23    Q.   Did he give something to Mr. Maldonado?

24    A.   He did, sir, yes.

25    Q.   And what was that?
```

1    A.    DVDs.

2    Q.    What were the DVDs?

3    A.    As was told to me, that they were videos that showed the

4    so-called -- the wills of the so-called martyrs of September

5    11th.

6    Q.    And you said that early on Mr. Mehanna made clear to you

7    his views on Osama bin Laden?

8    A.    Yes, sir.

9    Q.    What did he tell you?

03:51 10    A.    I don't remember any specific comments, but just the

11    videos being provided and being told what was on them.

12    Q.    Led you to conclude what?

13    A.    That he was supportive of him.

14    Q.    And you said -- do you recall discussing this CD about the

15    19 martyrs, as you call them, with Mr. Mehanna?

16    A.    At that time?

17    Q.    At any time.

18    A.    Not at any length.  No, I don't recall anything beyond the

19    initial explanation of what was on the DVDs.

03:52 20    Q.    Okay.  And what did Mr. Mehanna explain to you about what

21    was on the DVDs?

22    A.    He had just told us that, like I said, what I had

23    described was on those CDs.

24    Q.    Okay.  And the 19 martyrs were whom?

25    A.    The Arab hijackers on 9/11.

```
 1              MR. AUERHAHN:  Okay.  Can we bring up Exhibit 652,
 2    please.
 3    Q.   And by the way, although you didn't have a chance to learn
 4    what questions I was going to you ask you in advance of coming
 5    here today, did you get a chance to review what appear to be a
 6    number of chats and emails between you and the defendant
 7    Mr. Mehanna?
 8    A.   Could you repeat your question?
 9    Q.   Did you get a chance to review a number of chats and
10    emails that involved you and the defendant Tarek Mehanna?
11    A.   I did, sir, yes.
12    Q.   Okay.  And is this one of such emails?
13    A.   It appears to be, yes.
14    Q.   First, it appears to be a chat session between you and the
15    defendant --
16              Ibnul Khattab is the defendant?
17    A.   Yes, sir.
18    Q.   -- on February 6, 2006.  And I'll ask you to read what's
19    indicated as Dan Spaulding and I'll read what appears to be the
20    words of the defendant.  "Peace be upon you."
21    A.   "Peace be upon you."
22    Q.   "Brother."
23    A.   "Yes?"
24    Q.   "Do you know of any working links to the 'Nineteen
25    Martyrs' vid?"
```

03:52 (line 10)
03:53 (line 20)

1    A.   "LA," which means no in Arabic.  "I have a copy on CD,

2    though."

3    Q.   "Me too."

4         The copy that you have, that's the one that the

5    defendant gave you?

6    A.   I don't recall.  I don't recall that I ever had one, so

7    I'm just reading this.  I don't -- presumably I have one but I

8    don't know where I would have obtained it, though.

9    Q.   Okay.  But you stated to Mr. Mehanna on February 6, 2006,

03:54 10   "I have a copy on CD."  Is that correct?

11   A.   Yes, sir.

12   Q.   And you have no reason to believe you were lying to

13   Mr. Mehanna at the time?

14   A.   No, sir.

15   Q.   So you believe that at that time you did have a copy?

16   A.   Presumably, yes.

17   Q.   And you're saying you just don't recall where you got it?

18   A.   I don't -- I mean, at this point I don't --

19        MR. CARNEY:  May we have direct examination, please?

03:54 20   The form of the question.

21        THE COURT:  I think it was appropriate to clarify the

22   issue, but we'll resume with direct questioning, please.

23        MR. AUERHAHN:  Can we go to the next page, please.

24   BY MR. AUERHAHN:

25   Q.   "But I wanted to send it online."

1    A.    Would you like me to continue reading?

2    Q.    Yes, please.

3    A.    "Ohh.  Do you know who Azzam al-Tamimi is?"

4    Q.    "No."

5    A.    "Ohh."

6    Q.    "You mean Tamim al-Adnani?"

7    A.    "No.  He is a British-based political commentator and

8    researcher for Palestine.  From, not for.  He is a big Hamas

9    supporter and went to school with some of his founders.  I was

03:55 10  surprised because I found an article where he was praising Abu

11   Muhammad al-Maqdisi.  He also praised the Taliban.  I just find

12   that strange.  The Muslim Brotherhood don't usually have those

13   opinions."

14   Q.    Okay.  Who's Abu Muhammad al-Maqdisi?

15   A.    He's a Jordanian Islamic scholar.

16          MR. AUERHAHN:  You can take that down, please.

17   Q.    Now, you mentioned where you met with Mr. Mehanna.  Do you

18   recall where you met Mr. Abousamra?

19   A.    I don't recall where I was, at this point, for the first

03:55 20  time I met him.

21          MR. AUERHAHN:  May I approach, your Honor?

22          THE COURT:  All right.

23   BY MR. AUERHAHN:

24   Q.    Read the next paragraph.

25   A.    Which one?

1    Q.    This one.

2    A.    (Witness complies.)

3    Q.    Now, first, did you meet Mr. Abousamra after meeting

4    Mr. Mehanna?

5    A.    I believe so, yes.

6    Q.    And do you recall where that meeting took place?

7    A.    Again, I'm not confident where the location of the first

8    time I met him was.

9    Q.    Did you, at some point, have a meeting at someone's house?

03:57 10   A.    Presumably, yes.

11   Q.    What do you mean by "presumably"?

12   A.    I mean, I would have met him at people's houses, yes, but

13   I don't recall -- I don't recall if that was the first

14   encounter I had with him or not.

15   Q.    Why don't you describe this meeting at someone's house.

16   What happened there?

17   A.    I don't recall.

18          MR. AUERHAHN:  May I approach, your Honor?

19   Q.    Read this paragraph and see if that refreshes your

03:57 20   recollection.

21   A.    (Witness complies.)

22   Q.    Okay?  Does that refresh your recollection about this

23   meeting at someone's house?

24   A.    Very vaguely.

25   Q.    Okay.  Why don't you describe to us what you vaguely

1 | remember.

2 | A.   I remember being at someone's house with Daniel Maldonado

3 | and I believe we met Ahmad there.

4 | Q.   Okay.  Who else was there?

5 | A.   The host of the house, Ahmad Abousamra's younger brother,

6 | and some other people that I don't recall.

7 | Q.   Okay.  Was Tarek Mehanna there?

8 | A.   Possibly, but I don't recall.

9 | Q.   Okay.

03:58 10 |      MR. AUERHAHN:  May I approach again, your Honor?

11 | Q.   Would you like to reread this paragraph and see if it

12 | refreshes your recollection as to whether Mr. Mehanna was

13 | there?

14 | A.   (Witness complies.)

15 | Q.   Does that refresh your recollection as to whether

16 | Mr. Mehanna was there?

17 | A.   No, sir.

18 | Q.   Did you tell the FBI on June 29, 2010, that Mr. Mehanna

19 | was there?

03:59 20 |      MR. CARNEY:  I object.

21 |      THE COURT:  No, you may have that.

22 |      MR. CARNEY:  May we approach, please?

23 |      THE COURT:  All right.

24 |      (Discussion at sidebar and out of the hearing of the

25 | jury:)

1          MR. CARNEY:  I submit, your Honor, that if the

2     witness's memory is not refreshed, it's improper to ask him if

3     he made a specific statement to the FBI about the exact same

4     thing because it is conveying to the jury that he did, and we

5     know that he's going to say no.

6          THE COURT:  Well --

7          MR. AUERHAHN:  Well, I don't know what he's going to

8     say.  As I explained to you earlier, that's my problem.  I'm

9     not quite at the point where I'm going to ask you to declare

04:00 10     him a hostile witness, but I'm not that far away, so I would

11    just ask for a little latitude.

12         THE COURT:  What were you showing him, a 302?

13         MR. AUERHAHN:  Yes.

14         THE COURT:  Well, I mean, I think there's a difference

15    between your present memory being refreshed and acknowledging

16    you may have said something you don't remember now but -- I

17    don't know.  I guess I thought he might answer that either way,

18    so...  But if you're both confident he won't.

19         MR. AUERHAHN:  I mean, I honestly don't know.

04:00 20         THE COURT:  It could be a predicate to then calling

21    the FBI agent who said he did say that.

22         MR. CARNEY:  The FBI agent --

23         THE COURT:  He has the ability to affirm or deny

24    before he gets ex parte impeachment.

25         MR. CARNEY:  I don't think he could be impeached if

1    you have a failure of memory either by impeaching the witness

2    himself or impeaching him through another witness.  If he says,

3    "I don't remember saying that to them," that's the end of the

4    discussion.

5         MR. AUERHAHN:  If he says that.  But if he says, "I

6    didn't say it to them," then I can impeach my own witness.

7         THE COURT:  I think you can have the answer.

8         (In open court:)

9    BY MR. AUERHAHN:

04:01 10   Q.   Now, sir, I think I just asked you before the sidebar

11   whether or not you recall telling the FBI on June 29, 2010,

12   that Mr. Mehanna was also there.

13   A.   I don't recall telling them that, but...

14        MR. CARNEY:  I would ask that the jury be instructed

15   on the effect of a question being answered in the negative,

16   that the question, therefore, does not have any relevance.

17        THE COURT:  Oh, of course.  Questions do not produce

18   evidence; only answers do.  That's right.

19   BY MR. AUERHAHN:

04:02 20   Q.   Sir, on this particular meeting that we're talking about,

21   did the group watch anything at the end of the meeting?

22   A.   I don't recall, sir.

23        MR. AUERHAHN:  May I approach, your Honor?

24   Q.   Read the last two sentences of that paragraph, please.

25   A.   (Witness complies.)

1    Q.   At the end of the meeting, or the end of the evening, did

2    the group watch anything?

3    A.   I don't recall.

4    Q.   Did you -- on June 29, 2010, did you tell the FBI that you

5    watched the jihadi video?

6    A.   I don't recall.

7    Q.   And engaged in discussion about jihad?

8    A.   I don't recall.

9    Q.   Now, how would you describe -- you were a relatively new

04:03 10   convert.  Is that correct?

11   A.   Specifically when?

12   Q.   In 2002, 2003, 2004.

13   A.   Yes, sir.

14   Q.   How would you describe Mr. Mehanna and Mr. Abousamra's

15   knowledge of Islamic jurisprudence?

16   A.   For non-scholarly figures, fairly extensive.

17   Q.   As compared to other Muslims in which you came in contact?

18   A.   Yes, sir.

19   Q.   And, now, are you familiar with Clear Guidance?

04:03 20   A.   I am, sir.

21   Q.   Okay.  And what was Clear Guidance?

22   A.   It was an Islamic chat forum.

23   Q.   And did it have a particular Islamic philosophy?

24   A.   Most of the -- as I recall, most of the moderators and

25   participants had a jihadist slant, yes.

1    Q.    And were you a member of -- did you go on to Clear

2    Guidance?

3    A.    I did, sir, yes.

4    Q.    How about Mr. Maldonado?

5    A.    I believe he did, yes.

6    Q.    How about Mr. Mehanna?

7    A.    Yes, sir.

8    Q.    And Mr. Abousamra?

9    A.    I believe he did, yes.

04:04 10   Q.    Now, you mentioned earlier that Mr. Mehanna told you he

11   was in support of Osama bin Laden.  Did you discuss with

12   Mr. Abousamra al Qa'ida or any of its leadership?

13   A.    At what time?

14   Q.    At any time.  In 2002, 2003, 2004.

15   A.    I didn't know him prior to 2004.  At some point, yes, we

16   discussed that.

17   Q.    What was his view with reference to al Qa'ida expressed to

18   you?

19   A.    He was an adamant supporter.

04:05 20   Q.    Okay.  Any particular individuals?

21   A.    As I recall, he was very enthusiastic about the late Abu

22   Musab al-Zarqawi.

23   Q.    And who was he?

24   A.    Excuse me?

25   Q.    Who was he?

```
 1    A.    He was the one-time leader of al Qa'ida in Iraq.

 2    Q.    And did Mr. Mehanna express a view about Abu Musab

 3    al-Zarqawi?

 4    A.    Yes.

 5    Q.    And what was his view?

 6    A.    Supportive but not as enthusiastic as Ahmad.

 7    Q.    Now, do you know an individual named Ali Aboubakr?

 8    A.    I do, yes, sir.

 9          MR. AUERHAHN:  Can we bring up Exhibit 761, please?

10    And page 2 as well.

11    Q.    And are these photographs of Ali Aboubakr?

12    A.    Yes, sir.

13    Q.    And who was Ali Aboubakr?

14    A.    He was a young man in the Sharon community.

15    Q.    Okay.  And do you know whether or not there was a

16    relationship between the Aboubakr family and the Abousamras and

17    Mehannas?

18    A.    All the families knew each other.

19    Q.    And did Mr. Abousamra talk about the Muslim Brotherhood?

20    A.    Ahmad, you mean?

21    Q.    Mr. Abousamra.

22    A.    Yes, Ahmad?  He did, yes.

23    Q.    And what did he tell you about the Muslim Brotherhood?

24    A.    He held them in very low regard.

25    Q.    Can you elaborate?  Or did he elaborate on that?
```

1    A.    Yeah, he considered them essentially to be sellouts and

2    weaklings.

3    Q.    And sellouts in what respect?  What do you mean by that?

4    A.    That they compromised their beliefs for the sake of

5    political benefit.

6    Q.    Was any member of his family identified to you as a Muslim

7    Brotherhood?

8    A.    He had told me that he thought his father was a member.

9              MR. AUERHAHN:  Your Honor, I don't know if you want

04:06 10   to --

11             THE COURT:  Yeah, perhaps this is a good place to

12   stop.

13             MR. AUERHAHN:  Thank you.

14             THE COURT:  Okay.  We'll recess now and we'll resume

15   tomorrow.

16             Jurors, enjoy the afternoon.

17             THE CLERK:  All rise for the Court and the jury.

18             The Court will be in recess.

19             (The Court and jury exit the courtroom and the

20   proceedings adjourned at 1:01 p.m.)

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  November 21, 2011

17

18

19

20

21

22

23

24

25