UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 ) Criminal Action
v.                               ) No. 09-10017-GAO
                                 )
TAREK MEHANNA,                   )
                                 )
        Defendant.               )
                                 )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWENTY-ONE
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, November 23, 2011
9:15 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1  APPEARANCES:

2       OFFICE OF THE UNITED STATES ATTORNEY
        By: Aloke Chakravarty and Jeffrey Auerhahn,
3       Assistant U.S. Attorneys
        John Joseph Moakley Federal Courthouse
4       Suite 9200
        Boston, Massachusetts  02210
5       - and -
        UNITED STATES DEPARTMENT OF JUSTICE
6       By: Jeffrey D. Groharing, Trial Attorney
        National Security Division
7       950 Pennsylvania Avenue, NW
        Washington, D.C.  20530
8       On Behalf of the Government

9       CARNEY & BASSIL
        By: J.W. Carney, Jr., Esq.
10      Janice Bassil, Esq.
        John E. Oh, Esq.
11      20 Park Plaza
        Suite 1405
12      Boston, Massachusetts  02216
        - and -
13      LAW OFFICE OF SEJAL H. PATEL, LLC
        By: Sejal H. Patel, Esq.
14      101 Tremont Street
        Suite 800
15      Boston, Massachusetts  02108
        On Behalf of the Defendant
16
        DENNER PELLEGRINO, LLP
17      By: Brad Bailey, Esq.
        4 Longfellow Place, 35th Floor
18      Boston, Massachusetts  02114
        On Behalf of Kareem Abuzahra
19

20

21

22

23

24

25

1                          I N D E X

2
                    DIRECT   CROSS   REDIRECT   RECROSS
3    WITNESSES FOR THE
       GOVERNMENT:
4
     DANIEL SPAULDING (Cont'd)
5
       By Mr. Auerhahn                      48
6      By Mr. Carney              15

7    DANIEL GENCK

8      By Mr. Auerhahn                81

9

10                        E X H I B I T S

11
     DEFENDANT'S         DESCRIPTION              FOR ID   IN EVD.
12
     1123-1127           Photographs of NYC trip           23
13   and
     1133-1134
14
     1144               Posting re Theo van Gogh           34
15
     1143-1146          Chats                              65
16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on November 23,

6     2011.

7          The defendant, Tarek Mehanna, is present with counsel.

8     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

9     are present, along with Jeffrey D. Groharing, Trial Attorney,

00:20 10   U.S. Department of Justice, National Security Division.)

11          THE COURT:  Good morning.  I guess the suggestion is

12    that we address the question of Exhibit 58, which the

13    government filed a paper on yesterday, before we resume the

14    testimony.  I don't think this pertains to Mr. Spaulding's

15    testimony.  He's present in the courtroom.  I don't think that

16    matters to anybody.  Okay.

17          MR. CARNEY:  Well, it would be better if he went

18    outside, please.

19          THE COURT:  Okay.  Mr. Krupp.

00:21 20       Well, I guess it's the government's motion, so we'll

21    start there.

22          MR. CHAKRAVARTY:  Your Honor, previously we had --

23    with -- after reading -- or intending after reading --

24    intending to read one chat, we intended to publish Exhibit 58,

25    58A, which is this video which the defense had filed a motion

1    in limine regarding.  As we explained in the papers, the

2    version of the video that would be shown to the jury has been

3    significantly redacted.  It would be the first forty seconds of

4    a four-and-a-half -- four minutes, thirty-nine seconds, long

5    video.  That forty seconds, if your Honor hasn't seen it

6    recently, is purely some banners that come across the screen

7    and then Osama bin Laden giving -- with a voiceover.

8              THE COURT:  It ends with that?

9              MR. CHAKRAVARTY:  It ends with the voiceover.

00:22 10              THE COURT:  Slide 5, I think, in your papers.

11              MR. CHAKRAVARTY:  That's correct, in terms of the

12    translation.

13              THE COURT:  I looked at it yesterday afternoon.

14              MR. CHAKRAVARTY:  After that ends, the rest of the

15    video, as your Honor knows, depicts these horrible scenes of

16    the mutilated American servicemen.  Over -- the voiceover

17    during that portion of the video, which the video is not going

18    to be shown, neither the audio, not to the jury.  It's in

19    Arabic.  But that part has also been translated.  The

00:22 20    government would intend to read that portion --

21              THE COURT:  That's the Zarqawi speech?

22              MR. CHAKRAVARTY:  That's the Zarqawi speech.  There's

23    also an image of Zarqawi on that as that occurs.  Again, that's

24    not going to be shown to the jury.  Rather, it would be --

25    fortunately, the audio clarifies who the people are.  So the

1    translation really does provide the best evidence to the jury

2    without the inflammatory content.

3         While the probative nature is significant just by

4    virtue of the video itself, your Honor, as we point out by the

5    five chats that we -- one of which I included in the

6    attachments, the others which you have available on the

7    system -- this was a central and important piece of media which

8    the defendant disseminated.  He lauded it.  He made clear that

9    he was in line with the objectives of that video, something

00:23 10   that he took glee in.

11        It's seldom the case that a piece of media to which

12   the defendant ties himself so directly to can be so insightful

13   into what his state of mind is, especially in this case where

14   the defense has repeatedly made the arguments that the

15   defendant was merely a religious scholar, and he didn't have

16   any intentions to participate in fighting, and he certainly

17   didn't believe in the horrible kind of terrorist acts which are

18   alleged in the Indictment and which are depicted in this video.

19        This video is not only contravening the defense's

00:24 20   theory, but it's very probative of the elements of the offense

21   in this case both because of the conspiracy to kill -- these

22   are U.S. soldiers.  The defendant is advocating this response

23   to U.S. soldiers in Iraq -- but also because of the al Qa'ida

24   and the terrorist nexus.  It's not just a random killing.  This

25   is a killing which is being sanctioned by Osama bin Laden and

1   Abu Musab al-Zarqawi, the people who the defendant was reverent

2   of, and this explains why he was reverent of it.  It wasn't

3   just because he considered these people mythical figures within

4   Islam.  It's because of the actions they were doing to repel

5   the invaders from Iraq.

6          So we think those statements of the defendant, his

7   encouraging others to watch it, his sanctioning of the behavior

8   that was in it, is all highly probative; and the unfair

9   prejudicial value, if there was any, is completely muted by the

00:24 10   fact of how we're presenting the evidence.

11          MS. BASSIL:  Yes, your Honor.  I'd like to address

12   this.  I really think we have finally, I would suggest, tipped

13   the balance on prejudicial over probative and cumulative.  To

14   date, we have seen 16 videos.  We have had two oral

15   descriptions of beheadings.  We have seen one video of someone

16   with a bomb.  We have seen three clips of Diverse Operations in

17   Iraq.  We have seen two photographs of the front of a video

18   cassette entitled, "Martyrs of Bosnia."  We have seen, I think,

19   two to three pictures of Osama bin Laden, the same of Zarqawi,

00:25 20   and a picture of Zawahiri.  We've seen two clips of planes

21   crashing into the World Trade Center; three photographs of

22   wounded American soldiers; three photographs of flags, American

23   flags, draped over caskets; and a photo of a United States

24   soldier crying.  We've seen endless photos of mujahideens with

25   guns and rocket-propelled grenade launchers.

1        What I want to say -- and in addition to the 16 videos

2   we've seen, they plan on showing another five.  So a total of

3   21 videos.  And what I would suggest is this, your Honor:

4   There is a case exactly on point.  It's United States vs.

5   Al-Moayad, 545 F.3d 139, Second Circuit New York, in which a

6   case was actually reversed on this issue.  It was a case in

7   which the defendant was charged similarly with providing

8   material support, conspiracy to provide material support.

9        The prosecution, claiming they needed to show not only

00:26 10   his state of mind -- he had raised an entrapment defense -- but

11   his sort of propensity and state of mind to commit such a

12   crime, insisted on showing a videotape of a wedding in which

13   the wedding speaker -- the defendant was at the wedding -- the

14   wedding speaker talked about the success of Hamas in Tel Aviv

15   that day.  In fact, there had been a terrible bus bombing in

16   Tel Aviv that day.  They also called someone to describe the

17   bus bombing.

18        They said that although this rarely happens, rarely,

19   it was reversible error.  They said that the events -- there

00:27 20   could be little doubt that in the wake of the events of

21   September 11th evidence linking a defendant to terrorism in a

22   trial in which he is not charged with terrorism is likely to

23   cause undue prejudice.  And in that case, like this one, where

24   they're charged with a conspiracy to provide material support

25   but not with actual violent acts, not with actually bombing

1   somebody or killing somebody, the highly-charged, inflammatory

2   nature of this kind of evidence and the extensive nature of

3   other similar evidence finally tipped the balance into

4   prejudicial.  And I believe that that is where we are here.

5          In addition, the government, as I have seen throughout

6   this case, not willing to say something once, will say it five

7   times.  So they have five instant messages in which the

8   defendant, regrettably, crudely refers to this video as "Texas

9   Barbecue."  I'm sure you've seen that phrase.

00:28 10       And so not only do I think that nothing should come in

11  with respect to this video, I think we've seen enough videos.

12  And the government says this is so insightful to his state of

13  mind.  We have had over 200 readings only because of his "state

14  of mind."  If the jury doesn't know what they think his state

15  of mind is by now, they should go home.  Yes, we have our own

16  view of his state of mind.  That's why a jury decides this.

17  But I would say to the Court they have proven whatever they

18  want to prove.  It's going to be up to the jury now how they

19  see it.

00:28 20       I think we finally have tipped the balance here.  It's

21  cumulative.  It's a waste of time.  It's a waste of resources.

22  And it is finally something that is overtly prejudicial and

23  inflammatory, and I would request that the Court exclude it.

24          THE COURT:  Okay.  I think it can be admitted and as

25  proposed.  With respect to the case that -- from the Second

1   Circuit, which I have not looked at, but just hearing it,

2   sounds like it's substantially different in that there was no

3   terrorism charge in that case.

4         But in any event, these issues, both at the admission

5   stage and at the review stage, are highly specific as to the

6   particular circumstances of any given case.  And appellate

7   authority is somewhat, but not overwhelmingly, useful.  You

8   have to make a call in the individual case.  I think the

9   proffer is of very probative evidence, and the question is not,

00:29 10   of course, prejudice but unfair prejudice.  And I don't think

11   that exists.

12         Now, I had indicated otherwise previously.  I've

13   reviewed the transcript of that exchange, and it appears to me

14   -- and this is consistent with my memory -- that I was focused

15   at the time on whether the evidence was sufficiently probative

16   of the fact of conspiracy.  There had been some talk about

17   other exhibits and tying people into the conspiracy.

18         I think that focus was too narrow, and thinking about

19   it more broadly, I think that was -- the indication I gave then

00:30 20   that it should be excluded was not correct.  And so I've

21   changed my view with respect to the evidence.

22         I will say that the redaction of the exhibit has gone

23   a great distance to minimizing unfair prejudice.  A description

24   of the contents, as opposed to a display of the contents, is

25   significantly less inflammatory, it seems to me.  But I think

1    the government is entitled to the evidence.

2         MS. BASSIL:  Your Honor, I would ask, however, that if

3    the Court is going to allow it in that if Evan Kohlmann is

4    going to testify concerning this video that he be limited to

5    what has been presented to the jury.

6         THE COURT:  Well, okay.  I think it's too early to

7    make that ruling, but we'll deal with that as it arises.  That

8    may be appropriate.  I can't say for sure at this point.

9         As long as you mention Evan Kohlmann, there was some

00:31 10   talk the other day -- I think it was in our off-the-record

11   conference about schedule and so on -- about the parties

12   getting together on his testimony.  Has that happened yet?

13        MR. CARNEY:  We're scheduled to do it after we recess

14   today, your Honor.

15        THE COURT:  Okay.  Because we're getting to the point

16   where there are some -- there is a motion directed to that from

17   the defense.  There are a couple of other motions that may

18   become more urgent with respect to quashing subpoenas and so on

19   for next week.  My thought was we might, Monday afternoon, next

00:32 20   Monday, deal with whatever miscellaneous issues of that sort

21   that need to be addressed.

22        MR. CHAKRAVARTY:  I just want to highlight one of

23   those, your Honor, which pertains to scheduling Monday.  Kareem

24   Abuzahra is one of the witnesses, depending on how far we get

25   today, might be on Monday.  That motion to quash, which was

1    filed by his counsel, we would ask, if you can, to rule on it

2    -- they've asked for a hearing, and we would obviously be

3    supportive of the motion to quash.

4            THE COURT:  Maybe we should set that for hearing at 9

5    on Monday.

6            MR. CHAKRAVARTY:  Okay.  It involves getting a lot of

7    financial records, which means that if the witness is present,

8    he may not be able to gather --

9            THE COURT:  Have you been in contact with his counsel?

00:32 10         MR. CHAKRAVARTY:  We did originally when we

11   provided --

12           THE COURT:  Do you know his availability today, for

13   example?

14           MR. CHAKRAVARTY:  I was waiting to hear, but I can

15   inquire into that during the trial day.

16           THE COURT:  Mr. Bailey, I believe.

17           MR. CHAKRAVARTY:  Mr. Bailey, correct.

18           THE COURT:  If he's available, then we could hear him

19   today.

00:33 20         MR. CARNEY:  My suggestion is that the witness bring

21   the records with him that are being sought so that if your

22   Honor does not quash the subpoena, he will be prepared to go

23   forward immediately.

24           THE COURT:  Let's see if we can resolve it today,

25   perhaps.  I guess I would prefer, if Mr. Bailey is available,

1    that he be here at 1, and we can deal with it immediately after

2    the trial day.

3          MR. CARNEY:  May I bring one other scheduling matter

4    to your Honor's attention?  As you know, the defense is

5    intending to present several expert witnesses.  Virtually -- or

6    no.  All of these witnesses, except one, are academics, meaning

7    that their day job is normally teaching in classes at Yale or

8    Duke or wherever they might be.

9          They can commit to coming in for one day, but doing

00:33 10   day to day is an extreme hardship.  What we're hoping we can do

11   is ask the Court to consider that we'll start at 9:00 with an

12   expert, and if it's necessary to go into the afternoon a short

13   amount of time to finish the cross-examination that we would be

14   able to do that.  And then the next day, start with the next

15   expert at 9 because we're just not getting people able to

16   commit to consecutive days being here in the court.

17         THE COURT:  I don't know how practical that will be.

18   We have matters scheduled most afternoons.  That's something --

19   I completely agree with the goal of getting people in and out

00:34 20   in one day.  But without knowing how extensive the testimony

21   is, at what point it goes from direct to cross, what the

22   afternoon schedule is, it's -- we'll get -- I'll have to be

23   pretty specific about those judgments.

24         Let me just say -- I was going to bring this up maybe

25   next week rather than this week but since we're at the end of

this week, I guess, I think I had indicated earlier that I had

a meeting -- a Judicial Conference Committee meeting that I had

hoped to go.  It's clear I'm not going to be able to go to it.

A consequence of that the three days I had planned for that has

nothing scheduled.  So we do have afternoons available on those

three days.  I wanted -- I don't think I want to spoil their

holiday with bringing it up to the jurors before they go, but I

will want to suggest to them that those days we might -- not

only for the reason you raised but just for making more

progress in the case, we might do full days, that is, do a

two-hour session on those three days, which would be December

7th, 8th, and 9th.  I expect it will be your case at that

stage.

          MR. CARNEY:  Yes.  That might work great because --

          THE COURT:  Maybe that would solve your experts'

problem.

          MR. CARNEY:  It might, your Honor, because we weren't

thinking about this in terms of next week but, rather, the

following week.

          THE COURT:  And that would be that week, so --

          MR. CARNEY:  Right.  Thank you.

          THE COURT:  All right.  Let's get the jury.

(The jury entered the room at 9:32 a.m.)

          THE COURT:  Good morning, jurors.  Thank you for your

patience.  We had some things to discuss.  We've finished.  Now

1    we're ready to continue with Mr. Spaulding's testimony.  Mr.

2    Carney.

3            MR. CARNEY:  Yes, sir, your Honor.  Thank you.

4            May I proceed, please?

5            THE COURT:  Please.

6    CONTINUED CROSS-EXAMINATION BY MR. CARNEY:

7    Q.   Good morning, Mr. Spaulding.

8    A.   Good morning, Mr. Carney.

9    Q.   Yesterday we ended when I asked you about Tarek's request

00:38 10   to find books concerning the American Revolution period; do you

11   recall that?

12   A.   I believe so, yes, sir.

13   Q.   Today I'd like to return to some other areas that you

14   talked about in your direct examination.  The prosecutor

15   brought out that you downloaded some material that would allow

16   you to encrypt statements or postings that you made so that it

17   would not indicate your IP address, is that right?

18   A.   That is correct, sir.

19   Q.   And I think the program involved was called TOR?

00:39 20   A.   I believe so, yes.

21   Q.   And you did download that and put it on your computer for

22   a while, didn't you?

23   A.   I did, sir.

24   Q.   It made your computer slow down a bit, didn't it?

25   A.   It does, yes.

| | |
|---|---|
| 1 | Q.   And, ultimately, you removed it from your computer? |
| 2 | A.   Yes.  I ceased to use it, yeah. |
| 3 | Q.   And the reason that you took it off your computer is |
| 4 | because you thought that the things you were saying, the |
| 5 | postings and the chats, were protected by the First Amendment, |
| 6 | didn't you? |
| 7 | MR. AUERHAHN:  Object. |
| 8 | THE COURT:  Sustained. |
| 9 | Q.   When you met with the FBI, you told them that by -- you |
| 00:39 10 | weren't afraid by taking down the encryption because you felt |
| 11 | you had not done anything illegal and that anything you said |
| 12 | would be protected by the First Amendment; isn't that a fact? |
| 13 | MR. AUERHAHN:  Objection. |
| 14 | THE COURT:  Sustained. |
| 15 | Q.   Your state of mind was you were doing nothing wrong by |
| 16 | putting these comments of yours on the web, isn't that right? |
| 17 | MR. AUERHAHN:  Objection. |
| 18 | THE COURT:  Sustained. |
| 19 | MR. CARNEY:  Your Honor, the government brought out |
| 00:40 20 | evidence that he took it off his computer.  I'm just asking him |
| 21 | why.  And they opened the door by bringing this up. |
| 22 | THE COURT:  The objection is sustained. |
| 23 | MR. CARNEY:  May I make an offer of proof? |
| 24 | THE COURT:  You can do it at the break. |
| 25 | MR. CARNEY:  If allowed to answer, he would say yes. |

```
 1              MR. AUERHAHN:  Move to strike.

 2              THE COURT:  The jury will disregard the comment.  It's

 3   not evidence.

 4   Q.   The prosecutor asked you about whether Tarek went through

 5   some physical training activity, right?

 6   A.   Yes, sir.

 7   Q.   And it's fair to say that this talk of physical training

 8   activity never made it really beyond the talking stage --

 9   A.   Yes.

10   Q.   -- isn't that right?

11   A.   Yes.

12   Q.   You'll have -- I'm sorry.  You'll have to speak up.

13   A.   I apologize.  Yes, sir.

14   Q.   Best way to do it, I suggest, pretend you're talking to

15   the jurors in the back row because, if they can hear you, we

16   all will hear you.

17        Now, the prosecutor brought out that -- something about a

18   martial arts program, remember?

19   A.   Yes, sir.

20   Q.   And this was a program offered by someone at MIT, correct?

21   A.   Yeah.  That's where he held these martial arts events,

22   yes, sir.

23   Q.   These were open to the public, correct?

24   A.   That was my understanding.

25   Q.   And it was a good physical exercise program, wasn't it?
```

00:41 (line 10)
00:41 (line 20)

 1    A.    I never attended so I don't know, sir.

 2    Q.    You recognize it to be physical exercise, right?

 3    A.    Yes, sir.

 4    Q.    With all due respect to my client, he could afford to lose

 5    a couple of lbs back in the day; would that be fair to say?

 6    A.    We all could have back then, sir.

 7    Q.    But I'm asking about Tarek in particular.

 8    A.    Yes.

 9    Q.    And there also was never any talk that attending a free

00:42 10    martial arts class at MIT was to train for Jihad, isn't that

11    correct?

12    A.    Not in my recollection, sir.

13          MR. CARNEY:  May I approach the witness, please?

14          THE COURT:  You may.

15    Q.    Would you just read from where I'm pointing?

16    A.    Line 20?

17    Q.    Down to the bottom and then just up to the first paragraph

18    on the next page.

19    A.    Yes, sir.  (Reading).

00:43 20    Q.    So it is fair to say that you don't remember ever having a

21    discussion with Tarek about that subject, connecting martial

22    arts to Jihad, isn't that true?

23    A.    Yes.  I don't recollect having a conversation to that

24    effect.

25    Q.    Of ever having a conversation with him about that?

        1   A.   I don't recollect, no, sir.

        2   Q.   Now, we saw some photos that were taken yesterday from a

        3   trip to New York City; do you recall those?

        4   A.   I do, sir.

        5   Q.   Now, that trip to New York City was a trip by you and

        6   Tarek and Ali Abousamra and one other person, right?

        7   A.   Ali Aboubakr, sir.

        8   Q.   Pardon me?

        9   A.   Ali Aboubakr.

00:44  10   Q.   I'm sorry.  You're correct.  Ali Aboubakr.  And the fourth

       11   person was?

       12   A.   I believe, Ibrahim Ismail, sir.

       13   Q.   The purpose of you going to New York was to buy books?

       14   A.   That is correct.

       15   Q.   You were going to go to certain bookstores in New York

       16   City and purchase books, right?

       17   A.   Yes, sir.

       18   Q.   There was no discussion ever during that trip of 9/11, was

       19   there?

00:45  20   A.   I don't recollect, sir.

       21   Q.   There was no discussion on that trip about al Qa'ida,

       22   right?

       23   A.   I have no recollection, sir.

       24   Q.   You went to various locations in New York, right?

       25   A.   Yes, sir.

1    Q.    And at one point, it was suggested, go to see Ground Zero,

2    right?

3    A.    Correct.

4    Q.    Had you ever been there in person --

5    A.    I don't believe so.

6    Q.    -- prior to that?

7    A.    I don't believe so, sir.

8    Q.    And the four of you said, Let's go see that?

9    A.    Yes, sir.

00:45 10   Q.    I mean, as terrible as it might sound, it's something that

11   many, many tourists go to see when they're in New York, right?

12   A.    I believe so, yes.

13   Q.    And that's what you were doing, to go to see it, right?

14   A.    Yes.

15   Q.    The prosecutor asked you yesterday about, one of the

16   photos, you're not smiling, right?

17   A.    Yes, sir, yes.

18   Q.    Well, when you testified before the grand jury, the

19   prosecutor asked you why you weren't smiling, right?

00:46 20   A.    Correct.

21   Q.    Why weren't you smiling?

22   A.    I believe my remark was something about how I didn't

23   appear well in photos or something to that effect, sir.

24   Q.    Would your words be, "I'm not that photogenic"?  Does that

25   sound right?

1    A.    That sounds about right, sir.

2    Q.    Is that the reason you weren't smiling?

3    A.    Probably one of the reasons.  I usually don't smile in

4    pictures, so --

5    Q.    I'd like to show you a couple of other photos from that

6    trip so you can tell us who's in it and what they depict.

7              MR. CARNEY:  Can I have 1123, please?

8              Your Honor, after I lay the foundation, I will be

9    offering them.

00:47 10         THE COURT:  These are not in evidence?  This is --

11   okay.

12             MR. CARNEY:  Not yet.

13             THE COURT:  Is it your computer you want it?

14             MR. OH:  Yes, sir.

15             MR. AUERHAHN:  Your Honor, if these are the

16   photographs that are attached to the email, then they are in

17   evidence as part of the email.  I believe it's 354A through

18   double -- I forget the last letter.  The photographs from the

19   trip are all in evidence as part of the government's case.  I

00:47 20   don't know if we need a duplicate exhibit.

21             MR. CARNEY:  I've got them by these numbers, and these

22   are photos the government did not show the jury.  So I didn't

23   realize they would be considered --

24             THE COURT:  Go ahead.  If they're redundant, that's

25   okay.

1          MR. CARNEY:  Then may these be shown to the jury since

2     they're in evidence in another form?

3          MR. AUERHAHN:  No objection.  I'm pretty sure this one

4     was, the one on the screen.

5          THE COURT:  I think it was, too.  At some point,

6     you'll offer them, and the clerk will make the entry that they

7     have been admitted as the new numbers.

8          MR. CARNEY:  Yes, your Honor.

9          THE COURT:  I gather you want to use the new numbers

00:48 10    for clarity sake?

11         MR. CARNEY:  Yes, your Honor.  Perhaps what -- I'll

12    read off the proposed numbers as I go along.

13         THE COURT:  Fine.

14    Q.   Mr. Spaulding, I'm showing you Exhibit 1123.  Do you

15    recognize that photo?

16    A.   I do, sir.

17    Q.   Who's in that photo?

18    A.   Ali Aboubakr, sir.

19    Q.   Ali Aboubakr?

00:48 20    A.   Yes, sir.

21    Q.   Where was this photo taken during the trip, if you know?

22    A.   I don't recollect at which time it would have been taken,

23    sir.

24         MR. CARNEY:  Photo 1124, please.

25    Q.   I'd like you to look at three photos consecutively:  1125

1    and 1126.  These are three consecutive photos of going over a

2    bridge?

3    A.   Yes, sir.

4    Q.   Are you familiar enough with New York to know what bridge

5    that is?

6    A.   I don't know the proper name for the bridge, sir.

7    Q.   Let's look at 1127.  Who is that?

8    A.   That is Ibrahim Ismail, sir.

9    Q.   He's the fourth person who went with you?

00:49 10   A.   Yes, sir.

11        MR. CARNEY:  1134, please.

12   Q.   Perhaps this relates also to the need for martial arts

13   training.  But can you identify who this person is?

14   A.   That is Mr. Mehanna, sir.

15        MR. CARNEY:  And, finally, 1133, please.

16   Q.   Who is that?

17   A.   That's also Tarek.

18   Q.   And that's during the trip with his friends?

19   A.   Yes, sir.

00:50 20   MR. CARNEY:  Your Honor, I would ask that all of those

21   be admitted, please.

22        THE COURT:  All right.

23   (Exhibit Nos. 1123-1127 and 1133-1134 received into evidence.)

24   Q.   Now, the prosecutor brought out that sometimes you used

25   so-called code words, right?

```
 1  A.   Correct.

 2  Q.   Isn't it fair that these code words were often said in a

 3  joking manner?

 4  A.   Many of them were, yes, sir.

 5  Q.   And that it would cause you to laugh or smile by using

 6  such transparent code words?

 7  A.   Yes, sir.

 8  Q.   The prosecutor brought up the theory of progression

 9  yesterday, remember?

10  A.   I do, sir.

11  Q.   And even that was something Tarek talked about often in a

12  joking manner, right?

13  A.   I don't recollect, sir.

14  Q.   Do you remember him being half-joking when he would talk

15  about that?

16  A.   I don't recall, sir.

17  Q.   All right.

18       MR. CARNEY:  May I approach the witness, please?

19       THE COURT:  You may.

20  Q.   Could you read this paragraph to yourself, sir?

21  A.   Certainly.  (Reading).

22  Q.   Just look up to me when you're done, please.

23       Does that refresh your memory that Tarek appeared to be

24  half-joking at times talking about this?

25       MR. AUERHAHN:  Objection, your Honor.  What's "this"?
```

1          MR. CARNEY:  The term "progression."

2          MR. AUERHAHN:  Your Honor, there's nothing in the

3     paragraph he showed him about progression.

4          THE COURT:  Well, I haven't seen it, but you may have

5     the question whether that refreshes the witness' memory.

6     Q.   Does that refresh your memory?

7     A.   Somewhat, sir.

8     Q.   Is it fair to say that when he would discuss that he may

9     have been half-joking?

00:53 10     A.   Yes, sir.

11     Q.   The prosecutor brought up that occasionally you would have

12     movie nights, right?

13     A.   Yes.

14     Q.   And these movie nights would often involve feature films

15     that would appear at movie theaters, right?

16     A.   Yes, sir.

17     Q.   So that movie night might be an opportunity to watch a Jet

18     Li movie, for example?

19     A.   Yes, sir.

00:53 20     Q.   You and your friends liked Jet Li, apparently, right?

21     A.   Yes, sir, Jet Li and --

22     Q.   Another man named Chan, another actor?

23     A.   I don't recall -- yes, movie -- Jet Li movies and other

24     action movies of that sort, sir.

25     Q.   So that your circle liked watching action movies, right?

```
 1   A.    That is correct.
 2   Q.    Would you say that that's a pretty common thing about
 3   persons your age group at that time?
 4   A.    I would suspect so, yes, sir.
 5   Q.    Guys watching action movies?
 6   A.    Yes.
 7   Q.    Do you remember watching another one, for example, a movie
 8   night where you saw V for Vendetta?
 9   A.    I don't recall watching that movie with him in particular,
00:54 10 but it would have been movies of that nature, sir.
11   Q.    So that when the prosecutor suggested that movie nights
12   were about watching just Jihadi videos, that would be
13   inaccurate, right?
14   A.    Yes, sir.
15   Q.    Tarek often made jokes in many of these chats, didn't he?
16   A.    He did, sir.
17   Q.    For example, he would make jokes about extremist views,
18   wouldn't he?
19   A.    Yes, sir.
00:54 20 Q.    For example, he would joke that if you obeyed a stop sign,
21   well, then you were betraying your faith because you were
22   honoring a manmade law, right?
23   A.    That is correct, sir.
24   Q.    You would exchange photos of something like a traffic
25   light that had been knocked down in an accident, and he would
```

1  say, Here's another example of a person engaging in terrorist

2  activity, right?

3  A.   Yes, sir.

4  Q.   Because by knocking down a traffic light, you were

5  knocking down something related to manmade law, right?

6  A.   That is correct.

7  Q.   Now, as pathetic as the attempts might be at times, there

8  was a lot of joking along and on these instant messages, too,

9  right?

00:55 10  A.   Yes, sir, very much.

11  Q.   Now, all of these chats and postings that you were asked

12  to look at by the prosecutor came from the period of late 2005

13  and into 2006, correct?

14  A.   I believe that's when most of them are from.

15  Q.   And he sent you a great big package of them, right?

16  A.   He did.

17  Q.   And you told us yesterday that you didn't read every

18  single one of them, right?

19  A.   I did look through them, yes, sir.

00:56 20  Q.   Pardon me?

21  A.   I did look through them, yes, sir.

22  Q.   Did you look at them carefully?

23  A.   I didn't get a chance, obviously, to read each page, no,

24  sir.

25  Q.   You had better things to do?

1    A.   Yes.  I have numerous responsibilities.  So I don't have a

2    lot of time to sit down and read and study.

3    Q.   Tell us what some of your responsibilities are.

4    A.   I work two jobs.

5    Q.   Don't tell me.  Tell the members of the jury, please.

6    A.   I work two jobs, ten-hour days, five days a week.  Working

7    in the educational field, I deal with hundreds of students and

8    in different capacities.  I also have numerous other family

9    responsibilities, personal responsibilities, social

00:57 10  responsibilities, et cetera.

11             MR. CARNEY:  May I approach the witness, please?

12   Q.   Would this be a fair approximation of about the stack of

13   material that the prosecutor sent you?

14   A.   Pretty close, yes.

15   Q.   And this contains, if you recognize these, chats and all

16   between you and Tarek?

17   A.   Yes.

18   Q.   Well, I thought I would have them -- have you read them

19   all in full so the jury would know what every single one of

00:57 20  these says.

21   A.   Would you like me to start?

22   Q.   But then I came to my senses.

23   A.   Okay.

24   Q.   But I would want to ask you about a couple things.  These

25   IMs, chats, if you will, or postings that you put on, but I'll

1    focus first on the chats.  These were individual conversations

2    that you would be having with your friend that you thought were

3    private conversations between two guys, right?

4    A.    Yes, sir.

5    Q.    Tarek could sometimes be crude on them, right?

6    A.    Yes, sir.

7    Q.    Tarek would make bad jokes on them, wouldn't he?

8    A.    Correct.

9    Q.    He would insult people, right?

00:58 10   A.    Yes, sir.

11    Q.    He would be gross sometimes, wouldn't he?

12    A.    Yes, sir.

13    Q.    He would say things that at times would be appalling to

14    say publicly, right?

15    A.    That is true.

16    Q.    But in a private conversation between two guys, especially

17    on the internet and the anonymity of looking at a video screen,

18    it was easier to say those things by him and you, right?

19    A.    Yes, sir.

00:59 20   Q.    And as bad as things that Tarek said, you said them

21    equally bad, didn't you?

22    A.    I did, sir.

23    Q.    Stupid guy comments about stuff, right?

24    A.    Yes, sir.

25    Q.    Now, in those postings and chats, you said some things

```
 1  that you sincerely regret making, don't you?
 2  A.    I do, sir.
 3  Q.    They're embarrassing to you that you made them?
 4  A.    Yes, sir.
 5  Q.    For example, you put on a posting that praised the murder
 6  of a filmmaker who had been critical of the treatment of
 7  Islamic women, right?
 8  A.    I don't recollect that, sir.
 9  Q.    Do you know who Theo van Gogh is, sir?
10  A.    I do, sir.
11  Q.    Tell the jury who Theo van Gogh is.
12  A.    He is a Dutch filmmaker who was assassinated by a Moroccan
13  youth, like you said, for producing a film that was perceived
14  as being critical of Islam.
15  Q.    And he was killed by a Muslim, right?
16  A.    Yes, sir.
17  Q.    Do you remember commenting on that killing?
18  A.    I would recall commenting on it, but I don't recall what
19  my specific comments were, sir.
20          MR. CARNEY:  May I approach, your Honor, please?
21          THE COURT:  All right.
22          MR. CARNEY:  1144.
23  Q.    What was your handle or name on the postings?
24  A.    For internet forum?
25  Q.    Yes.
```

1   A.   Brother Mujahid, sir.

2   Q.   I direct you to here.

3   A.   Uh-huh.

4   Q.   You see where I'm pointing?

5   A.   Yes, sir.

6   Q.   And now over to here.  Is that your posting on the murder

7   of this man?

8   A.   It appears to be so, sir, yes.

9   Q.   Would you please read for the jury, in a loud voice so

01:01 10   they can hear you, what your words are that you posted on that

11   web forum?

12   A.   "I was so happy and still am about what these brothers did

13   to Theo van Gogh.  This fat little piggy" --

14   Q.   Not so fast.  Tell you what.  Let me see if I can read it,

15   and you tell me if I'm reading your words exactly.  "I was so

16   happy and still am about what these brothers did to Theo van

17   Gogh.  This fat little piggy got what he had coming to him.  It

18   truly made the last Ramadan a blessed month."  Did I read that

19   correctly?

01:02 20   A.   You did, sir.

21   Q.   Another subject you talked about would be glorifying the

22   maiming and mutilation of American soldiers, isn't that true?

23   A.   Yes, sir.

24   Q.   There were terms used by you and Tarek occasionally,

25   characterizing it as Texas Barbecue, isn't that right?

```
 1   A.    I believe terms of that sort were used, yes.
 2   Q.    And there was a particular incident that happened that
 3   caused you to be very virulent about using the language
 4   glorifying the mutilation and maiming of soldiers; do you
 5   remember that?
 6   A.    Not at the moment, sir.
 7   Q.    Do you remember there was an instance where American
 8   soldiers from a rogue outfit gang-raped a 14-year-old girl,
 9   Muslim girl?
01:03 10   A.    Yes, sir.
11   Q.    And then after gang-raping the Muslim girl, they killed
12   her parents, right?
13   A.    Yes, sir.
14   Q.    And then they set fire to the house to cover up the
15   evidence, right?
16   A.    Yes, sir.
17   Q.    And this became well-known throughout the country of Iraq,
18   that American soldiers had done this atrocity, right?
19   A.    Correct.
01:03 20   Q.    In its aftermath, the unit that had done this horrific
21   crime was identified publicly, right?
22   A.    I believe so, yes.
23   Q.    Two members of that unit were kidnapped and killed, right?
24   A.    Yes.
25   Q.    And that became a source of discussion between you and
```

1   Tarek and others in your circle of friends and also on the

2   internet, these postings, right?

3   A.   Yes, sir.

4   Q.   And the feeling was that for the atrocity committed by the

5   Americans it was justified for an atrocity to be committed

6   against them, right?

7   A.   Correct.

8   Q.   And that was the context in which you were talking, right?

9   A.   Yes.

01:04 10   Q.   Do you remember the words that you said --

11   A.   I don't.

12   Q.   -- when you made a posting?

13   A.   I don't recall, sir, no.

14        MR. CARNEY:  Your Honor, if it didn't go in earlier, I

15   offer the previous exhibit, 1144, into evidence, please.

16        THE COURT:  Any objection to 1144?

17        MR. AUERHAHN:  Your Honor, what appeared on the screen

18   did not appear to be what he was showing the witness.  I don't

19   know if there's a problem with the numbers.  Perhaps Mr. Oh can

01:05 20   correct that.  In terms of the portion that he read, I have no

21   objection, but we just will have to straighten out what the

22   exhibit -- whether it's --

23        MR. CARNEY:  I bet it's my fault.  Can I have one

24   moment to check on the number?

25        THE COURT:  All right.

```
 1              MR. CARNEY:  Are you able to put it only on this
 2      screen, your Honor?
 3              THE COURT:  Yes.  Well --
 4              MR. CARNEY:  Yes.
 5              THE COURT:  All counsel, yes.
 6              MR. CARNEY:  Thank you.  It is 1144, your Honor.  On
 7      Page 1 of 1144, at the very bottom -- could we see the bottom
 8      of 1144?  That's where the post starts, "Message from Brother
 9      Mujahid," and then the posting that he read is the top of the
01:06 10     next page.
11              MR. AUERHAHN:  No objection, your Honor.
12              THE COURT:  For the whole exhibit?
13              MR. AUERHAHN:  Yes.
14              THE COURT:  Okay.  And that is 1144?
15              MR. CARNEY:  Yes, it is, your Honor.
16              THE COURT:  Okay.  So that's admitted.
17      (Exhibit No. 1144 received into evidence.)
18              THE COURT:  Now you have another one?
19              MR. CARNEY:  1145, please.
01:06 20     Q.   Sir, I just ask you to take a look at this, on to the next
21      page, and if you could just read it briefly, please.  No, to
22      yourself.
23      A.   (Reading.)
24      Q.   This is another posting by you as Brother Mujahid, right?
25      A.   Yes, sir.
```

         1    Q.    And this is a posting on Tibyan Publications by you?

         2    A.    It is, sir.

         3    Q.    Tell me if I'm reading this correctly, please.  "Allaahu

         4    Akbar."  What does that phrase mean?

         5    A.    God is great.

         6    Q.    "It is heartwarming to see these American crusaders maimed

         7    and mutilated.  This is what they did to our brothers and

         8    sisters in Afghanistan and Iraq.  Now what they have inflicted

         9    upon the Muslims has returned upon them."  Did I read

01:08   10    accurately your words?

        11    A.    You did, sir.

        12    Q.    Tell the jurors what you meant when you used that

        13    language.

        14    A.    That --

        15    Q.    Not me, the person in the last row.

        16    A.    It would have been within the context of excitement at

        17    seeing some sort of retaliation against America or American

        18    soldiers for perceived injustices that they had committed

        19    against Muslims.

01:08   20    Q.    You also used anti-Semitic language in your postings,

        21    didn't you?

        22    A.    Regrettably, yes.

        23    Q.    For example, there was an Israeli soldier who was

        24    kidnapped, right?

        25    A.    I believe so, yes.

```
 1   Q.   And, in fact, that Israeli soldier was held for years and
 2   was only released a month or two ago in an exchange with
 3   prisoners; did you read that?
 4   A.   I did, sir, yes.
 5        MR. CARNEY:  May I approach again, please?  1146,
 6   please.
 7   Q.   The soldier's name is Gilad Shalit, is that correct?
 8   A.   Yes, sir.
 9   Q.   I'd ask you to read this and tell me -- read it to
10   yourself and tell me if you recognize this as a posting that
11   you made.
12   A.   (Reading).  Yes, sir, it is.
13   Q.   Would you tell me if I'm reading this correctly?  "Here is
14   a picture of the son of a pig, i.e., Jew, that was captured by
15   the Palestinians.  This faggot Jew's name is Gilad Shalit."  Is
16   that what you wrote?
17   A.   It is, sir.
18   Q.   You look back on these statements with horror, don't you?
19   A.   I do, sir.
20   Q.   These were your statements, right?
21   A.   Yes, sir.
22   Q.   Your beliefs, right?
23   A.   Yes, sir.
24   Q.   And there's no way you can express how much you regret
25   speaking like this when you were younger; is that fair to say?
```

```
  1    A.    It is, sir.

  2    Q.    You would never, ever say these things now, would you?

  3    A.    I should certainly hope not, sir.

  4    Q.    You would never say it, whether it was publicly or

  5    privately, would you?

  6    A.    Correct.

  7    Q.    Now, as you got older and more mature, you continued to be

  8    friendly with Tarek, right?

  9    A.    Yes.

01:11 10    Q.    And it's fair to say that your views and his views became

 11    more moderate, right?

 12    A.    They did, sir.

 13    Q.    Became more mainstream, right?

 14    A.    Yes.

 15    Q.    You and Tarek continued to go onto web forums, didn't you?

 16    A.    We did.

 17    Q.    And these web forums allowed you to post your views and

 18    Tarek's views, correct?

 19    A.    Yes, sir.

01:11 20    Q.    And both of you put your new views on the internet, didn't

 21    you?

 22    A.    We did.

 23    Q.    On these web forums with people?

 24    A.    Yes.

 25    Q.    You also discussed these with friends, right?
```

1     A.    Yes.

2     Q.    For example, yesterday afternoon, I believe you talked

3     about how you tried to persuade people that Aman was something

4     that every faithful Muslim had to follow, right?

5     A.    Yes.

6     Q.    And just to remind us, Aman is the principle in Islam that

7     if you are living in a country where you are practicing your

8     religion and are allowed to practice your religion you cannot

9     engage in any attack, right?

01:12  10    A.    Yes, sir.

11    Q.    And so you would go on forums and present these views to

12    convince people, right?

13    A.    Yes, sir.

14    Q.    And these discussions continued beyond just forums but

15    also to friends or meetings at the mosque, right?

16    A.    I don't recollect talking about it outside of the forum,

17    sir.

18    Q.    You certainly talked about it with Tarek?

19    A.    Yes.

01:12  20    Q.    And in the group that you were friends with, right?

21    A.    Yes, yes.

22    Q.    You didn't talk about it with Abousamra much because he

23    was so violently in disagreement with you, right?

24    A.    Yes.

25    Q.    When Tarek would get on these forums, he would try to cite

```
  1    from the Qur'an or Hadiths to show that the extreme views were
  2    unsupported by Islamic jurisprudence, right?
  3    A.   Yes, sir.
  4    Q.   And as we've heard previously, Tarek ultimately was banned
  5    from Tibyan Publications because of his moderate views,
  6    correct?
  7    A.   Yes, sir.
  8    Q.   And the same thing happened to you, didn't it?
  9    A.   It did, sir.
01:13 10   Q.   Tarek was arrested by the FBI in November of 2008,
 11    approximately --
 12    A.   Yes.
 13    Q.   -- is that right?
 14         He was charged with making a false statement to the FBI,
 15    right?
 16    A.   Correct.
 17    Q.   You followed this, didn't you?
 18    A.   Yes, sir.
 19    Q.   The lie was that he said he didn't know Daniel Maldonado
01:13 20   was in Somalia, right?
 21    A.   Yes, sir.
 22    Q.   He was arrested in approximately November of 2008, you
 23    said?
 24    A.   I believe that's when it was, sir.
 25    Q.   And he was released on bail in December of 2008, right?
```

```
 1    A.    Approximately, yes.

 2    Q.    And then in 2009, in November of 2009, he was arrested

 3    again and charged with the offenses that are before this court

 4    now, right?

 5    A.    Yes, I believe that's the time line, sir.

 6    Q.    And then held without bail, right?

 7    A.    Yes, sir.

 8    Q.    Now, you have said that Tarek's arrest in 2008 was a

 9    wake-up call to you, right?

10    A.    Correct.

11          MR. AUERHAHN:  Objection.  Relevance.

12          THE COURT:  Sustained.

13          MR. CARNEY:  May I be heard, please?

14          THE COURT:  All right.

15    (SIDEBAR CONFERENCE AS FOLLOWS:

16          MR. CARNEY:  Your Honor, this evidence will go

17    directly to the witness' credibility.  Indeed, it is my most

18    important evidence related to his credibility.  I expect the

19    witness will say that when Tarek was arrested, the witness will

20    say he saw it as a wake-up call.  He realized that what he and

21    Tarek had been talking about can now lead to prosecution.  And

22    he said that what he wanted to make sure of is that he did not

23    suffer the same fate as Tarek.  And he left the --

24          THE COURT:  I get the drift.

25          MR. CARNEY:  And it's the reason why he's cooperating,
```

```
 1    is what my --
 2              THE COURT:  Right.
 3              MR. AUERHAHN:  It's just another attempt to get in the
 4    questions that the Court sustained, which was his belief in
 5    terms of criminality of certain actions.
 6              THE COURT:  That was slightly different, but if --
 7    this goes to whether he thinks he can curry favor with his
 8    testimony.  So to that extent this --
 9              MR. AUERHAHN:  I don't think there's any basis for the
10    jury to think that he's trying to curry favor with the
11    government.
12              THE COURT:  That's up to them, but you can have it for
13    that purpose.
14              MR. CARNEY:  Thank you.
15    .  .  .  END OF SIDEBAR CONFERENCE.)
16              MR. CARNEY:  If I may have the question?
17              THE COURT:  Go ahead.
18              MR. CARNEY:  Thank you.
19    Q.   You told -- or you said that Tarek's arrest was a wake-up
20    call to you, correct?
21    A.   Yes, sir.
22    Q.   That's the exact phrase you used, "a wake-up call" to you,
23    right?
24    A.   Yes, sir.
25    Q.   And you said that you now realized that the conversations
```

1    you had been having with him apparently were not harmless talk,

2    right?

3    A.   Yes, sir.

4    Q.   That's another phrase you used to characterize what you

5    and Tarek and your friends had been doing, "harmless talk,"

6    right?

7    A.   Yes, sir.

8    Q.   You had posted -- or you posted a comment on the forum in

9    2008, didn't you, about what happens when someone becomes a

01:17 10   target of the FBI who is a Muslim; do you remember that?

11         MR. AUERHAHN:  Objection, your Honor.

12   A.   I don't, sir.

13         MR. CARNEY:  This is a --

14         THE COURT:  Well, let me see you.

15   (SIDEBAR CONFERENCE AS FOLLOWS:

16         MR. AUERHAHN:  I assume it's this exhibit?

17         MR. CARNEY:  Yes.  Here's the exact post I want to

18   offer.  There was a posting about the fact that mosques were

19   under surveillance by the federal government.

01:18 20        THE COURT:  He posted that?

21         MR. CARNEY:  No.  This was -- someone else posted

22   this.  There's going to be a thread, your Honor.

23         THE COURT:  Right.  I just saw it says "Daniel."

24   That's all.

25         MR. CARNEY:  Oh, I believe he did post that, yes.

1    Don't take this the wrong way, but thank you.

2         And then someone else makes a post, and then another

3    person makes a post that says, "So keep your nose clean.  Stay

4    out of trouble."  Then there's another post.  It says -- then

5    we get to Daniel again.

6         THE COURT:  Okay.

7         MR. CARNEY:  And I'm offering it for the exact same

8    reason, that this is reflecting why he would feel that he's got

9    to do everything the government wants him to do.

01:19 10       MR. AUERHAHN:  It seems to me his statement back in

11   response to a post about concern of Muslims under surveillance

12   that that -- criticizing the FBI in a post should not be a

13   proper way to -- I don't understand what the purpose of it is

14   other than to be able to say through the witness that don't

15   trust the FBI.  They manipulate the system.  What this has to

16   do with this witness and this testimony, I mean, it's purely an

17   attempt to make argument through the witness to the jury.

18        MR. CARNEY:  I disagree.  It goes directly to his

19   credibility and bias because it's showing why he is afraid and

01:20 20   why he would be cooperating and why he would be saying it.

21        MR. AUERHAHN:  Why isn't it hearsay?

22        MR. CARNEY:  It's his statement.  It's why he is

23   cooperating.

24        MR. AUERHAHN:  Just because it's his statement doesn't

25   mean he can read something that's an out-of-court statement.

1        MR. CARNEY:  It goes directly to his bias and

2    credibility, and on bias, I believe I've got the --

3        THE COURT:  The bias that is relevant is his present

4    bias.

5        MR. CARNEY:  Yes.  And this is reflecting --

6        THE COURT:  It is something --

7        MR. CARNEY:  This is right before he began

8    cooperating.

9        THE COURT:  Right.  But I think you can ask him --

01:20 10        MR. CARNEY:  We've had dozens --

11        THE COURT:  I'm thinking about the hearsay objection.

12        MR. CARNEY:  It doesn't matter what the truth is.

13        THE COURT:  It goes to state of mind, but the state of

14    mind -- you would have to connect it to a present statement.

15        MR. CARNEY:  All right.

16        MR. AUERHAHN:  Well, you can ask him now, Are you

17    lying because you think, if you don't lie, then the FBI is

18    going to prosecute you?

19        MR. CARNEY:  If that were the case, I could never put

01:21 20    in --

21        THE COURT:  You can use it.

22    .  .  .  END OF SIDEBAR CONFERENCE.)

23        MR. CARNEY:  Number 1143, please.

24    Q.   In 2008, you put a post on this web forum, didn't you?

25    A.   Yes.

1    Q.   And this was about a report that mosques were under

2    federal surveillance, and the Muslim community was concerned

3    and civil rights groups were upset?

4    A.   Yes, sir.

5    Q.   And you basically posted the article itself, correct?

6    A.   Correct.

7    Q.   And then a thread began, correct?

8    A.   Yes.

9    Q.   With other people commenting, is that right?

01:22 10  A.   Yes, sir.

11   Q.   And then one person named Kamals --

12        MR. AUERHAHN:  Your Honor, I object.  I thought it

13   would be just his post, just his -- that last comment.

14        THE COURT:  I think he can set the context.

15   Q.   So the person Kamals, identified as a junior member,

16   posted a response and basically said, So keep your nose clean

17   and stay out of trouble, right?

18   A.   Yes, sir.

19   Q.   And then another person put a post following that, saying,

01:22 20  "Tell that to the hundreds, if not thousands, of Muslims

21   worldwide who have been kidnapped by CIA agents and put in

22   secret prisons where they have been tortured or killed.  Their

23   only crime was that they spoke against the U.S. policy towards

24   Muslims and Islam.  This is no fairytale.  It is reality that

25   has been documented by many.  It has nothing to do with being

1    naughty, but it has everything to do with speaking against

2    injustice and the terror of America and its allies," correct?

3    A.   Yes, sir.

4    Q.   Then you put a post on there, correct?

5    A.   Yes, sir.

6    Q.   And you start the post identifying the name Kamal, right?

7    A.   Yes, sir.

8    Q.   He was the one who said, Oh, just do good, right?

9    A.   Yes.

01:23 10   Q.   And would you read what that post says, please.

11   A.   (Reading.)

12   Q.   Are those your words?

13   A.   Yes, sir.

14   Q.   "Kamal, do you live in the United States or have you ever

15   had to deal with the Feds?  As someone who has, I can tell you

16   it has nothing to do with playing nice and keeping your hands

17   clean.  They are evil and malicious people who will go as far

18   to get people to bear false witness against you if they want to

19   arrest you."  Does that accurately reflect your state of mind

01:24 20   in 2008?

21   A.   Yes, sir.

22   Q.   After that, you were brought in to meet with them,

23   correct?

24   A.   At some point, yes, sir.

25   Q.   And you got a lawyer, right?

```
 1   A.    Yes, sir.

 2   Q.    And you sought an immunity so that you could not be

 3   prosecuted?

 4   A.    That is correct.

 5   Q.    You did not want to face the same fate as Tarek Mehanna,

 6   did you?

 7   A.    No, sir.

 8   Q.    In the following year after this post, you left being a

 9   Muslim, right?

01:25 10   A.    Yes, sir.

11   Q.    You renounced your Muslim beliefs?

12   A.    Yes, sir.

13   Q.    And now you are another faith?

14   A.    Yes, sir.

15   Q.    A Catholic?

16   A.    Yes, sir.

17   Q.    And to your knowledge, you'll never be charged with

18   anything you said or did, right?

19   A.    I still have thoughts about that, sir.

01:25 20   Q.    You still worry about it?

21   A.    Yes, sir.

22   Q.    Do you hope that this will make sure that you don't --

23   that your testimony at this trial will ensure that they don't

24   charge you like they charged Tarek?  Is that what you hope?

25   A.    That's not my intention for being here, no, sir.
```

```
 1   Q.   I understand.  But is that your hope?  You hope you never
 2   get charged?
 3   A.   Well, of course, I hope I don't get charged with it.
 4   Q.   That's the question, Mr. Spaulding.
 5   A.   Yes, yes, sir.
 6        MR. CARNEY:  That's all I have.  Thank you.
 7        THE COURT:  Mr. Auerhahn.
 8        MR. AUERHAHN:  Thank you.
 9   REDIRECT EXAMINATION BY MR. AUERHAHN:
01:26 10   Q.   Sir, let me first start with this concept of Aman, about
11   not attacking a country within its borders if you are living
12   and practicing as a Muslim in that country.  Does it prevent
13   you from engaging in attacks against that country overseas?
14   A.   I don't recall the religious ruling on this specific
15   aspect, sir.
16   Q.   What about if that country is at war with Islam?
17   A.   Would you --
18   Q.   Would you then be free to attack it and its forces
19   overseas?
01:27 20   A.   You have to give me a minute to try to recall the
21   religious -- from what I recall, theoretically, you could, but
22   you would have to renounce your citizenship or any sort of
23   claim of -- of residency or citizenship with that country so
24   that you make clear your opposition to them.  But if you still
25   want to enjoy the rights of your citizenship, then, no.
```

```
 1    Q.   So if that country is at war with Islam, say, the United

 2    States and Iraq, the United States and Afghanistan, then it

 3    would be acceptable to go fight American forces in Iraq and

 4    Afghanistan just as Mr. Abousamra and Mr. Mehanna tried to do?

 5              MR. CARNEY:  I object to the question.

 6              THE COURT:  Sustained to the form of the question.

 7    Q.   So if -- so if I understand you correctly, within the

 8    concept of Aman, if the United States is at war with Islam and

 9    attacking them overseas, it is acceptable within that concept?

01:28 10   A.   Provided you renounce your citizenship.

11    Q.   Just yes or no.  Is it acceptable --

12              MR. CARNEY:  I object, your Honor.

13              THE COURT:  If it's possible to answer it yes or no,

14    you should do that.  If you have to qualify it, you may qualify

15    it.

16    Q.   Is it acceptable within that concept?

17    A.   With that qualification, yes.

18    Q.   Okay.  You met Tarek Mehanna in 2004, correct?

19    A.   Yes, sir.

01:28 20   Q.   So you don't know what his views were in 2003 with

21    reference to domestic attacks in the United States, correct?

22    A.   No, sir.

23    Q.   Mr. Carney asked you a question about --

24              MR. AUERHAHN:  Can we bring up Exhibit 648, please?

25    Maybe the next page.
```

1    Q.   Do you remember he asked you about this, that some website

2    was selling one of Mr. Mehanna's translations?

3    A.   Yes, sir.

4    Q.   And there was discussion about them making money on it.

5    And Mr. Mehanna said something, Well, we're serving God, and

6    it's not about the money; do you recall that?

7    A.   Yes, sir.

8    Q.   Now, did he say something -- and this is the particular

9    chat, correct?  And the product we were talking about is the

01:29 10   Umar Hadeed video, correct?

11   A.   Yes, sir.

12   Q.   Before he said, "Luckily for us, we are doing this for

13   Allah's pleasure," did he say something else?

14   A.   Yes, sir.

15   Q.   Okay.  What he said before that, referring to the Umar

16   Hadeed video, "As long as the message gets out"; do you

17   remember that?

18   A.   I don't recall it apart from reading it now, sir.

19   Q.   Okay.  But you see it, and that's what it says right

01:30 20   there, correct?

21   A.   Yes, it does say that.

22   Q.   What was the message of the Umar Hadeed video?

23   A.   To encourage support for the mujahideen in Iraq, sir.

24   Q.   And so his principle, first concern was that that message

25   get out?

1          MR. CARNEY:  I object, your Honor.  It's just

2     redirect.  The form of the question.

3          THE COURT:  Sustained.

4     Q.   Was that the first reaction he had to your statement

5     concerning somebody making money off this particular video?

6     A.   According to this transcript?

7     Q.   Yes.

8     A.   Yes.

9     Q.   And in addition to supporting the mujahideen in Iraq, what

01:31 10     else do you remember about the GUH video?

11     A.   In terms of content or --

12     Q.   Yes.

13     A.   Just as I believe I explained yesterday, that it depicts

14     sort of different individuals who had either gone to Iraq from

15     other Arab countries or who were already from Iraq committing

16     different attacks against either, I believe, American soldiers

17     and Iraqi security forces.

18     Q.   Many of these individuals were interviewed in advance of

19     going on suicide operations, correct?

01:31 20     A.   I believe some of them were, yes, sir.

21     Q.   Mr. Carney asked you some questions about statements Mr.

22     Mehanna made about al Qa'ida or whether he received any

23     direction from al Qa'ida, things like that; do you remember

24     those questions?

25     A.   Yes, sir.

1           MR. AUERHAHN:  Can we play the clip -- I believe it's

2    17 from the GUH video, please.

3           MR. CARNEY:  I object.  This is beyond the scope of

4    cross.

5           MR. AUERHAHN:  I think it's right --

6           THE COURT:  No.  I think -- overruled.  I think it's

7    within it.  This is something that's in evidence, I take it.

8           MR. AUERHAHN:  Yes, your Honor.

9    Q.   Sir, this is a segment from the GUH video.  Does it

01:32 10   identify itself as "The Organization of Al Qa'ida in Iraq"?

11   A.   It appears so, yes.

12          MR. AUERHAHN:  If we can continue.

13   (Video played.)

14          MR. CARNEY:  Your Honor, I renew my objection.  All I

15   asked on cross was that this witness said to Tarek that the

16   video was being sold and Tarek wasn't getting any money, and

17   Tarek said, I don't care.

18          THE COURT:  I think the line of questioning is

19   legitimate as redirect.

01:33 20        MR. AUERHAHN:  Thank you, your Honor.

21   (Video played.)

22   Q.   Now, "To whoever sees or hears this CD or hears this

23   recording" --

24          MR. AUERHAHN:  Sorry.  Did I do that?

25          MR. BRUEMMER:  It went to the end.

1    Q.   It said to come join the brothers in Iraq.  Was that the

2    central message of the Umar Hadeed video?

3    A.   Again, I haven't seen it for a while apart from what

4    you've just shown me now.  So I don't know how much that

5    particular message plays into it, sir.  I don't recall.

6    Q.   Okay.  By the way, Mr. Carney asked you a lot of questions

7    about Jihad.  And when -- with reference to the 39 Ways to

8    Serve and Participate in Jihad, in 39 Ways, when they talk

9    about Jihad, they're talking about terrorism, isn't that

01:35  10   correct?

11   A.   Can you specify what you mean by "terrorism" here, sir?

12   Q.   Sure.

13          MR. AUERHAHN:  If we can bring up Exhibit 25, please,

14   Page 5.  First the cover, Page 1, please.  First the cover,

15   Page 1.

16   Q.   This is the publication, 39 Ways?

17   A.   Yes, sir.

18          MR. AUERHAHN:  Can we go to Page 5 now, please?

19   Q.   Does it say, "Therefore, the entire world has announced

01:35  20   its war on terrorism or, rather, on Jihad"?

21   A.   It does.

22   Q.   So in the context of this publication, when they talk

23   about Jihad, they're talking about terrorism, correct?

24   A.   It appears to be.

25   Q.   Now, he also asked you some questions about --

```
 1              MR. CARNEY:  I object to that, your Honor.  You can't

 2      take, like, a 60-page document, put one sentence and say, So

 3      this sums up the whole thing.

 4              THE COURT:  The evidence may stand.

 5      Q.   He also asked you questions about overseas-based

 6      individuals; do you remember that?

 7      A.   I don't recollect right now, sir, no.

 8      Q.   He asked you, "There were no overseas-based influences

 9      that you knew of that were directing or coordinating with Tarek

01:36 10    Mehanna, isn't that true?"  And you said, "Not that I'm aware

11      of, no, sir."  Do you remember that?

12      A.   Yes.

13      Q.   Okay.  And, now, many of these -- the Tibyan brothers,

14      were in the United Kingdom?

15      A.   That is correct.

16      Q.   Last time I checked, the United Kingdom was overseas,

17      correct?

18      A.   Yes, sir.

19      Q.   So the answer to that question wasn't entirely accurate?

01:37 20    A.   As I recall the question, it was referring to al

21      Qa'ida-related individuals, sir.

22      Q.   Well, the question specifically said -- the previous

23      question or the following question may have mentioned al

24      Qa'ida, but that was just overseas individuals.  So you want to

25      correct that answer?
```

1    A.    Interpreted in light of that context, yes, sir.

2          MR. AUERHAHN:   Can we go to Exhibit 661, please?

3    Q.    This was the chat about the American activity against the

4    British; do you recall that chat?

5          MR. AUERHAHN:   If we could go to Page 6, please.

6    Q.    Do you remember this one about comparing the Islamic

7    Resistance to the Americans against the British?

8    A.    Yes, sir.   I believe we looked at it yesterday.

9    Q.    He also specifically says, "Yeah, see if they did any

01:38 10   martyrdom operations or anything back then."   And martyrdom

11   operations are suicide bombing, correct?

12   A.    Yes, sir.

13   Q.    Were you able to find any suicide bombing among the

14   American Colonists against the British?

15   A.    Not to my recollection, sir, no.

16   Q.    Now, Mr. Carney today asked you about training as

17   preparation for Jihad, and you said you don't remember any

18   conversation about that?

19   A.    Yes.

01:39 20   Q.    Did you testify differently yesterday?

21   A.    I don't recall what my testimony was yesterday, sir.

22         MR. AUERHAHN:   Okay.   If I could have just a moment,

23   your Honor?

24   Q.    Now, yesterday you were asked whether Mr. Mehanna did

25   anything else to prepare for Jihad.   And you answered, "Just

```
 1    like I said, to be ready, I suppose you could say, but nothing
 2    specifically go here, do that type.
 3         "And what do you mean by 'to be ready'?  Just to be in a
 4    state of physical fitness.
 5         "Okay.  And for the purpose of being in a state of
 6    physical fitness, did he participate in any training?  I
 7    wouldn't use the word 'training' per se, but there was a -- he
 8    did briefly attend a martial arts session put on by someone at
 9    the MIT.
01:40 10   "What did Mr. Mehanna tell you about being ready?  Ready
 11   for what?
 12        "Just in a general sense, be ready in case you need to be
 13   able to do something.
 14        "Something like Jihad?
 15        "We're not talking about just something something.  We're
 16   talking about Jihad, right?"  And you said, "Yeah."  Do you
 17   remember that?
 18   A.    Vaguely.
 19   Q.    Vaguely from yesterday?
01:40 20   A.    Yes, sir.  I was in here four hours.  I was getting a
 21   little fatigued, so --
 22   Q.    So you do recall that training was for the purpose of
 23   preparation for Jihad?
 24   A.    Just to be -- the words I believe I used was "to be
 25   ready."
```

```
 1    Q.   And the person that was teaching at MIT, that was Abu

 2    Dawood, correct?

 3    A.   Yes, sir.

 4    Q.   You talked about the -- this movie night and sometimes you

 5    were there to watch just feature films, not Jihadis, Jihad

 6    videos?

 7    A.   No.  We watched a variety of different movies.

 8              MR. AUERHAHN:  Your Honor, yesterday we discussed a

 9    particular chat, Exhibit 657, which I'd like to renew my

01:41 10   request to show to the witness and read a section based on the

11    line of questioning on --

12              THE COURT:  Why don't you put it on the monitor and

13    I'll look at it.

14              MR. AUERHAHN:  For the Court, I draw your attention to

15    the bottom of Page 2 to the top of Page 3, starting with the

16    last line on the bottom of Page 2.

17              THE COURT:  Let me see you.

18    (SIDEBAR CONFERENCE AS FOLLOWS:

19              MR. AUERHAHN:  Your Honor, it seems to me, in light of

01:42 20   the cross-examination, I ask you to reconsider your ruling

21    yesterday and also in the light of some of the questions on

22    cross-examination, quite frankly, about Texas Barbecue and

23    things like that, I think there's certainly no additional

24    prejudice to this.

25              THE COURT:  What do you want?
```

1          MR. AUERHAHN:  To read that section that I pointed

2     out.

3          THE COURT:  The head's off?

4          MR. AUERHAHN:  Right.

5          MR. CARNEY:  I don't think anything has changed.

6     Yesterday he brought out that they had movie nights.  I asked

7     two questions about you also watched regular movies, too.  It

8     doesn't change yesterday's ruling.  It just expands that, in

9     addition to the movies that you talked about, they also watched

01:43 10    regular features.  It doesn't change in any way the basis for

11    your Honor's ruling yesterday, and I suggest there's no reason

12    to reconsider it today.

13         THE COURT:  Yeah.  I think we should --

14    .  .  .  END OF SIDEBAR CONFERENCE.)

15    Q.   Now, Mr. Carney asked you questions about this kidnapping

16    and mutilation of American servicemen in connection -- or in

17    retaliation for acts against an Iraqi family?

18    A.   Yes, sir.

19    Q.   And the individuals who were kidnapped and mutilated, the

01:44 20    American servicemen, they were not the individuals who were

21    responsible for the attack, isn't that correct?

22    A.   I don't believe they were, sir.

23    Q.   They just happened to be from the same unit or same

24    division as the perpetrators?

25    A.   That's my understanding, sir.

```
 1    Q.    So did you believe that horrific violence against American

 2    servicemen, even those not personally responsible for actions

 3    against Muslims, was an appropriate response?

 4    A.    At the time, yes.

 5    Q.    And Mr. Mehanna believed the same way?

 6    A.    I believe so, yes, sir.

 7    Q.    So you believed that attacks on the United States

 8    servicemen --

 9              MR. CARNEY:  I object.

01:44 10   Q.    Did you believe that attacks --

11              MR. CARNEY:  I object.

12              THE COURT:  Overruled.  You may have it.

13    Q.    Did you believe that attacks on United States servicemen

14    was an appropriate response to their being in Iraq?

15    A.    Yes, sir.

16    Q.    Now, the defense asked you about your being kicked off

17    Tibyan?

18    A.    Yes, sir.

19    Q.    You said it had to do with moderation?

01:45 20   A.    It did, sir.

21    Q.    Okay.  And moderation is a relative term, isn't it?

22    A.    I suppose so.

23    Q.    Okay.  And that, of course, doesn't tell the full story as

24    to why --

25              MR. CARNEY:  I object.  It's supposed to be direct
```

exam, your Honor, please.

THE COURT:  Okay.

Q.   Now, was there another reason why you were kicked off
Tibyan?

A.   Just -- as I recall, our views no longer lined up with the
establishment there, and they decided to kick us off.  That's
as much as I recall of the situation, sir.

MR. AUERHAHN:  May I approach, your Honor?  Actually,
I'd like to offer Exhibit 1136 as an exhibit, if I can first
show it to him and ask him to authenticate it.

Q.   Sir, does this appear to be posts that contain some of
your posts on Tibyan during the same time period as the ones
Mr. Carney showed you?

A.   I don't recall the dates on the ones that he showed me,
sir.

Q.   Okay.  But it does appear to be posts on Tibyan?

A.   Yes, sir.

MR. AUERHAHN:  Your Honor, I would move into evidence
Exhibit 1136.

MR. CARNEY:  May we approach, please?

THE COURT:  All right.

(SIDEBAR CONFERENCE AS FOLLOWS:

MR. AUERHAHN:  I'm sorry.  This is the one I showed
him.  I'm also going to ask him about this one.

THE COURT:  Just this top thing?

```
 1              MR. AUERHAHN:  No.  Actually, there are a number of
 2     chats on there that go to both -- he was kicked off Tibyan for
 3     rudeness and sarcasm.  It also goes to the issue of his alleged
 4     moderation.  Certainly nothing moderate about supporting the
 5     attack on the Khobar Towers, supporting the kidnapping and
 6     beheading of Paul Johnson, which is from a chat actually that
 7     defense already read to the jury earlier.  So they're relevant
 8     to this issue of why he was kicked off Tibyan as well as this
 9     alleged moderation.  And this particular document, 1139, also
01:48 10   contains some similarly relevant chats during the same time
11     period as the one the defendant showed him.  I can identify the
12     specific ones that I intend to use, but it seems to me the
13     entire package of chats, which were provided by the defense as
14     potential defense exhibits, are relevant, and I'd like to use
15     them.
16              THE COURT:  These do not reflect the kicking off?
17              MR. AUERHAHN:  They do talk about -- they do talk
18     about -- this one in particular here, many times there's
19     sarcasm and rudeness.  There are other statements like that.  I
01:48 20   can get my notes to the specific ones.  As I said, they also --
21              THE COURT:  Why can't you just show them to him and
22     see what he says about them?  It seems like a lot of --
23              MR. AUERHAHN:  I think I'd like to introduce the chats
24     as an exhibit so the jury can have the chats, not just the
25     memory of his choppy testimony about them.  They've been
```

1    authenticated in the same way all those other exhibits that

2    we've introduced, that the defense introduced.  These are ones

3    that Mr. Carney identified that he might be introducing in

4    cross, along with the two he did introduce.  But he, for some

5    reason, chose not to do these two.

6         MR. CARNEY:  These are pure hearsay statements with no

7    exception for --

8         THE COURT:  They're not offered for truth.

9         MR. CARNEY:  Sure.  They're offered for the truth.

01:49 10   The government is offering them for the truth.  If they weren't

11   true, then they wouldn't --

12        THE COURT:  No.  They're offering them for the fact

13   that a statement was made, a statement -- the statement's

14   truth.

15        MR. CARNEY:  Why would --

16        THE COURT:  He'd been rude, you mean?

17        MR. CARNEY:  Yeah.  I mean, that's hearsay.

18        MR. AUERHAHN:  But --

19        MR. CARNEY:  I don't get a chance to confront this

01:49 20   witness.  It's pure hearsay.  It doesn't go to the defendant's

21   state of mind on whether he got kicked off for rudeness.  This

22   is a thread where people are putting on their own opinions as

23   to whether he was thrown off.  He was thrown off Tibyan.  And

24   so to introduce what other people think of him is just hearsay.

25        MR. AUERHAHN:  It does impeach his statement that he

1    was kicked off for moderation.  He's not going to find a chat

2    that says, Get out of here, you moderate.

3              MR. CARNEY:  Exactly.

4              MR. AUERHAHN:  So it impeaches his statement that he

5    was kicked off because of moderation.  I will also go into some

6    of the chats that he posted that, as I said earlier, show not

7    moderation but anyone's evaluation of what moderation is.

8              So it's his post.  It's his words about what he

9    supports and why he supports it.  And, again, similar to the

01:50 10   one the defense said more than once about the one that talked

11   about we fight those who fight us, same kind of description of

12   thinking what are appropriate targets of attack and what ones

13   aren't, which was the subject of a lot of cross-examination.

14             MR. CARNEY:  I reiterate this is all hearsay that is

15   only relevant if it's true.  And hearsay that is being offered

16   for its truth is inadmissible.  In the context of this trial,

17   this is just a red herring.  We've got to --

18             MS. BASSIL:  He was kicked off a year later.

19             MR. AUERHAHN:  Your Honor, like I said, there are two

01:52 20   different kinds of posts here.  One is a discussion about --

21   like, for example, this one, this is from Brother Mujahid about

22   the attacks on Khobar.

23             MR. CARNEY:  He was kicked out a year later, your

24   Honor.  He was kicked out a year later.

25             THE COURT:  I think it's a little too collateral, I

1    think, to be helpful to the jury.  You can redirect him on the

2    moderation point, but I don't think we need all of those.

3              MR. AUERHAHN:  Your Honor, what about the -- his

4    statements about the Khobar attacks are halal, which means

5    appropriate and acceptable.  That's been --

6              THE COURT:  I think you can get into what he regards

7    as moderate versus extreme and -- I don't know whether he'll

8    say that he thinks that's a moderate expression or not.

9              MR. CARNEY:  This is from January of 2007.  He was

01:53 10   kicked out in 2008.

11             MS. BASSIL:  August 2007.

12             MR. CARNEY:  August 2007.

13             THE COURT:  Generally, the kicking out is a minor

14   point, certainly with respect to the witness, but even, which

15   is the real point, the defendant.  It's just not central to the

16   issues we have here on either side.

17             MR. AUERHAHN:  I agree.  But, obviously, the term

18   "moderation" doesn't affect whether or not at the relevant time

19   period you're a member of the conspiracy.  However, it is

01:53 20   creating a false impression in the jury's minds.

21             THE COURT:  You can address with the witness the range

22   of expressions that he would classify as moderate, which might

23   surprise the jury or might not.

24             MR. CARNEY:  And these were things considered to be

25   moderate by the people running Tibyan.  That's the essential

```
 1  part.
 2  (Discussion held off the record.)
 3          MR. CARNEY:  I couldn't hear what you said.
 4          THE COURT:  Some of the exhibits that you used, 1144
 5  and 45, you never offered.  I don't know whether you meant to
 6  or not.
 7          MR. CARNEY:  I'd offer them now.
 8          THE COURT:  You do?
 9          MR. CARNEY:  I actually wrote a note to myself because
01:54 10  -- with the idea that --
11          THE COURT:  Are you going to offer any of the ones
12  that you used?
13          MR. CARNEY:  Just the four that I used.
14          THE CLERK:  43, 44, 45 --
15          MR. CARNEY:  And 46.
16  .  .  .  END OF SIDEBAR CONFERENCE.)
17  (Exhibit Nos. 1143-1146 received into evidence.)
18  Q.   Now, sir, do you recall being accused of being sarcastic
19  and rude on Tibyan?
01:55 20  A.   I don't recall, sir, no.
21          MR. AUERHAHN:  May I approach, your Honor?
22          THE COURT:  You may.
23          MR. AUERHAHN:  This is Page 14 of 1136.
24  A.   (Reading.)
25  Q.   Does that refresh your recollection as to whether or not
```

1    you were called -- accused of sarcasm, rudeness, and

2    unnecessary comments which have provoked fitnah?

3    A.   I don't recall that, sir, no.

4         MR. AUERHAHN:  May I approach again, your Honor?  Page

5    20 of the same exhibit.

6    Q.   How about Abu Sabaayaa, the defendant, being accused of

7    sarcasm and harshness towards brothers and sisters?

8    A.   I have no recollection of that, sir.

9    Q.   Could you read that to yourself and see if that refreshes

01:56 10   your recollection?

11   A.   (Reading.)

12   Q.   Does that refresh your recollection?

13   A.   It does not, sir.

14   Q.   Now, in addition to the Umar Hadeed video, did the

15   defendant also translate a Zarqawi Eid tape in its entirety?

16   A.   I don't recall, sir.

17        MR. AUERHAHN:  May I approach, your Honor?

18        THE COURT:  All right.

19        MR. AUERHAHN:  Page 15, same exhibit.

01:57 20       MR. CARNEY:  I object to this path.  I thought this

21   was what we focused on at the sidebar.

22        THE COURT:  We focused on the admission -- no.  I

23   think some questioning is okay, but -- go ahead.

24   A.   Which?

25   Q.   Right here, in the box.

1    A.    (Reading.)

2    Q.    Does that refresh your recollection about a translation of

3    a Zarqawi Eid tape?

4    A.    It does not, sir.

5            MR. AUERHAHN:  Your Honor, we can discuss it later,

6    but I'd move to introduce at least this portion of Exhibit

7    1136, on Page 15.

8            THE COURT:  All right.  We'll discuss it at the break.

9            MR. AUERHAHN:  If I can just have one moment, please,

01:58 10   your Honor?

11   Q.    Now, sir, with reference to this so-called moderation, do

12   you recall the Khobar bombing -- Khobar Towers bombing in Saudi

13   Arabia?

14   A.    Approximately what time, sir, what year?

15   Q.    In the '90s?

16   A.    Yes, sir.

17   Q.    To put it into context, when did the United States invade

18   Afghanistan?

19   A.    Late 2001, I believe.

01:59 20   Q.    And Iraq?

21   A.    March of 2003.

22   Q.    And the Khobar bombing was when?

23   A.    Like you said, in the mid '90s sometime, sir.  I don't

24   remember the exact year.

25   Q.    It took place where?

     1   A.    In Saudi Arabia, sir.

     2   Q.    Did the United States ever invade Saudi Arabia?

     3   A.    No, sir.

     4   Q.    But the Khobar bombing was -- what was the Khobar Towers?

     5            MR. CARNEY:  Your Honor, I object.  This is getting so

     6   far afield.

     7            THE COURT:  Yeah, I think it is.  Sustained.

     8            MR. AUERHAHN:  Well, may we approach, your Honor?

     9            THE COURT:  All right.

02:00 10   (SIDEBAR CONFERENCE AS FOLLOWS:

    11            MR. AUERHAHN:  First of all, it's directly relevant on

    12   two points.  There was all this discussion about coming to the

    13   aid of Muslims whose countries have been invaded.  Khobar

    14   Towers, which he says was an acceptable attack on American

    15   servicemen, took place before Afghanistan, before Iraq, so goes

    16   directly to rebut a lot of the arguments the defense made as

    17   well as -- in cross-examining this particular witness.

    18            Secondly, it goes directly to this issue of moderation

    19   in whose mind.  Certainly, supporting the Khobar attacks is not

02:00 20   moderation.  Supporting the kidnapping and beheading of Paul

    21   Johnson in Saudi Arabia is not moderation.  And so it seems to

    22   me it's not far afield.  It's directly on point, both generally

    23   as well as this witness' statements.

    24            THE COURT:  Well, I think what I had in mind is a

    25   rather concise direction of the witness' attention to

1  particular views such as perhaps the beheading and his

2  assessment that that would qualify as moderate.  We don't need

3  all the details of everything that happened.  This is a Rule

4  403 issue in terms of efficiency and not wasting the jury's

5  time.  You can get to the crux of the moderation, if he thinks

6  that the beheading of Paul Johnson was a moderate -- supporting

7  that was a moderate view.  But we don't need all the

8  circumstances.

9        MR. AUERHAHN:  Okay.

02:01  10       THE COURT:  Just be efficient.

11        MR. AUERHAHN:  Okay.

12  .  .  .  END OF SIDEBAR CONFERENCE.)

13        MR. AUERHAHN:  I'll try to get directly to the point,

14  your Honor.

15  Q.  So the attack on the Khobar Towers, which was a residence

16  of American servicemen in Saudi Arabia in the mid '90s, did you

17  believe that was an appropriate action against U.S. servicemen?

18  A.  At what time, sir?

19  Q.  In 2006, 2007, 2005.

02:02  20  A.  I would say so, sir, yes.

21  Q.  And the defendant, did he agree with you?

22  A.  I would say so, yes, sir.

23  Q.  And with reference -- do you know who Paul Johnson was?

24  A.  Excuse me?

25  Q.  Do you know who Paul Johnson was?

```
 1    A.    Was he someone who was at some point kidnapped and
 2    executed?
 3    Q.    In Saudi Arabia?
 4    A.    I don't recall where it was, sir.
 5    Q.    Would it refresh your recollection:  He was a civilian
 6    contractor who worked on helicopters, kidnapped in 2004?
 7    A.    I recall the name linking with kidnapping, but I don't
 8    recall which country it happened in, sir.
 9    Q.    What happened to Mr. Johnson?
02:03 10  A.    I believe he was killed by his captors, sir.
11    Q.    Beheaded?
12    A.    I don't recall how he was killed, sir.
13    Q.    Did you agree with that as an action against U.S.
14    interests in Saudi Arabia?
15    A.    At that time?
16    Q.    Yes.
17    A.    Yes, sir.
18    Q.    And did the defendant as well?
19    A.    I don't recollect, sir.
02:03 20         MR. AUERHAHN:  May I approach, your Honor?
21         THE COURT:  Go ahead.
22         MR. AUERHAHN:  Actually, I believe this is in
23    evidence.  So perhaps we can just bring it up on the screen,
24    Exhibit 420.
25    Q.    Now, sir, this appears to be quoting a post by Abu
```

1    Sabaayaa; that's the defendant, correct?

2    A.    Yes, sir.

3    Q.    And it says, "In contrast" --

4          MR. CARNEY:  I object.  I would ask that the rule of

5    verbal completeness apply because it's a two-paragraph --

6          THE COURT:  I think you should have both paragraphs.

7          MR. AUERHAHN:  Okay.

8    Q.    "Now, similarly, any American or other Westerner who was

9    in the Peninsula doing any type of work that is not

02:04 10   contributing to the war effort against the Muslims, such as

11   maintainers of oil fields, civil engineers, etc, then I also do

12   not agree with targeting them and killing them simply because

13   they are Americans.  I support their expulsion but not their

14   killing.

15        "In contrast, a man such as Paul Johnson, who was helping

16   in the maintenance and repair of American Apache helicopters,

17   that is, to anyone who has sight with which they can see or a

18   brain with which they can think, a totally different story."

19        Does that refresh your recollection as to whether or not

02:04 20   the defendant supported the kidnapping and beheading of Paul

21   Johnson?

22   A.    No, sir, it does not.

23   Q.    Okay.  But this is the Paul Johnson who was a maintenance

24   and repairman on Apache helicopters that you were referring to?

25   A.    Presumably, yes, sir.

Q.    And he was not even a U.S. servicemen; he was a civilian

contractor?

            MR. CARNEY:  I object, your Honor.

            THE COURT:  Sustained.

Q.    Was he a man in uniform, a military man?

A.    I don't believe so, sir.

Q.    Okay.  With reference to men in uniform, American military

men, was there any doubt in your mind that attacking them and

killing them was acceptable?

02:05            MR. CARNEY:  I object, your Honor.  We've gone over

this and over this and over this.

            THE COURT:  I think we've strayed from the point that

we've been discussing.  Sustained.

            MR. AUERHAHN:  May I have one moment, your Honor?

Q.    Now, Mr. Carney asked you about -- or asked you to read a

segment about bearing false witness.  Do you remember the post

you read at the end of your cross-examination about bearing

false witness?

A.    Can you put it up again, sir?

02:06 Q.    Here it is in hard copy.

A.    Yes, sir.

Q.    Okay.  When you testified that Mr. Abousamra went to

Pakistan for military training, were you bearing false witness?

A.    Against who?

Q.    When you said Mr. Abousamra went to Pakistan for military

```
 1   training, were you bearing false witness?
 2              MR. CARNEY:  I object.
 3              THE COURT:  I've lost the context.  Let me see you at
 4   the side.
 5   (SIDEBAR CONFERENCE AS FOLLOWS:
 6              MR. AUERHAHN:  Can I just have one moment, please?
 7              MS. BASSIL:  Your Honor -- no, no.  It's not for this.
 8   Miss Patel has to leave once we go on the break.  She's going
 9   to Texas for Thanksgiving so she won't be back.  I just wanted
10   to let you know that.
11              THE COURT:  Happy Thanksgiving.
12              MS. PATEL:  Thank you.  You too.
13              MR. CARNEY:  My objection is, in essence, the
14   prosecutor is asking the witness, Were you telling the truth
15   when you testified.  To my knowledge, that's not permitted to,
16   now on redirect, say, Well, were you telling the truth about
17   this?  Were you telling the truth about that?  Were you telling
18   the truth?  He's commenting on his own credibility.
19              THE COURT:  Well, witnesses sometimes get asked that.
20   But I think the question was a little argumentative.  Maybe you
21   can get -- anyway.
22              MR. AUERHAHN:  I'll withdraw the question.  I'm done.
23              THE COURT:  Okay.  Do you have any?
24              MR. CARNEY:  No.  I'm done, too.
25   .  .  .  END OF SIDEBAR CONFERENCE.)
```

```
 1              MR. AUERHAHN:  Your Honor, I'm not going to have any
 2       further questions.  Thank you.
 3              MR. CARNEY:  Your Honor, I have no --
 4              THE COURT:  No recross, okay.
 5              MR. CARNEY:  No recross.
 6              THE COURT:  Thank you.  Mr. Spaulding, thank you.
 7              MR. CARNEY:  In case I said I did.
 8              THE COURT:  Mr. Spaulding, thank you.  Your testimony
 9       is finished.  We'll take the morning recess at this point.
02:08 10 (Recess taken at 11:03 a.m.)
11              (After recess:)
12              THE CLERK:  All rise.
13              (The Court enters the courtroom at 11:34 a.m.)
14              THE CLERK:  Please be seated.
15              THE COURT:  Okay.
16              MS. BASSIL:  Your Honor, I had a couple of specific
17       objections.  The next witness, as I understand it, is a reader,
18       all right?  And specifically, I have two specific objections
19       and then two sort of more general objections.
02:39 20             My specific objections are, first, to Exhibit 503,
21       which is an instant chat -- an instant message.  A chat.
22              THE COURT:  Can we pull that up?
23              MS. BASSIL:  And it would be the second page.  And it
24       would be, I guess, halfway down.  Right.  Okay.
25              What I'm objecting to, your Honor, is what they're
```

discussing in this is sort of -- let me see.  I think they're

basically discussing various forums, and so forth, and Tibyan.

And what Abu Mundhir says, if you see it down towards the

beginning, "Me and Khubayb were talking about how we just need

armed wing now, hehe."  And then the Arabic is the defendant.

And, per usual, he just changes the subject and doesn't respond

to that.  And I feel that it is basically unfair to allow them

to read that section.  It is as though -- and I'm sure they're

going to want to use it to say, "Oh, they're looking for an

02:41 armed wing."

The defendant doesn't respond to that.  And it's said

in a joking manner, and I think it's pulled out of context to

allow that to come in.  So that's my objection to that specific

portion of that chat.  And it would be basically those four

lines.

THE COURT:  Okay.

MR. AUERHAHN:  Your Honor, to put it in context,

they're talking about being popular, their translation

services.  And the defendant says, "Yup, maybe one day there

02:41 will be a Tibyan brigade."  And as you'll recall from the GUH

video -- and I think Mr. Spaulding made some comment about a

Shukri brigade, and referring back to the GUH video, I mean,

that's what these groups of suicide bombers called themselves,

"brigades."

So it seems to me that what Mr. Mundhir says is not,

1    you know, deviating from what the defendant says.  He, as a

2    coconspirator, is adding another point to what they're talking

3    about.  So, I mean, it's clearly a coconspirator statement in

4    context.  If they want to argue to the jury, as they've done

5    with other cases in the past, that there should be a different

6    spin put on it, they're obviously free to do that.  But it is a

7    coconspirator statement, it is a response to what the defendant

8    is saying and it is relevant and the jury can decide whether or

9    not it's probative of anything at all.

02:42 10         MS. BASSIL:  As you can see, your Honor, when the

11   defendant says Mr. Mundhir answers "laugh out loud," this is

12   all in the context of joking and casual chats.  And to turn

13   that into, "Oh, they're planning an armed brigade," is really

14   pulling this out of context in an unfair way, and I think it is

15   more prejudicial than it is probative.

16        MR. AUERHAHN:  And the defendant then goes on to say,

17   "The Slicing Sword to Defend the Messenger," so it's in

18   context --

19        MS. BASSIL:  That is the title of that lecture that he

02:42 20   refers to, your Honor.  He refers to the link Islamway, and it

21   says "lesson"; that's the title.

22        THE COURT:  Well, I don't know how significant it is,

23   but I think it can be used.  The objection is overruled.

24        MS. BASSIL:  The next objection I specifically have,

25   your Honor, is 523, and it would be one, two -- third page,

1   please, Paul.

2          And it would be the bottom half of the third page.

3   Right there.

4          Your Honor, this is Mr. Abu Mundhir -- they're talking

5   about "39 Ways."  He said, "I showed one brother the cover.  He

6   loved it," which I think has been established that it was not

7   the defendant who did the cover.  There's been a lot of chats

8   that it was Ibn Umar who did the cover and the graphics.  And

9   he said, "One brother, he loved it.  He said it reminded him of

02:43 10   like Anarchist Cookbook or Mein Kampf, laugh out loud."

11          And I think that is so inflammatory.  You know, while

12   the jury -- some people may or may not know about "Anarchist

13   Cookbook," certainly the reference to "Mein Kampf" is just so

14   inflammatory and has no bearing in this trial.  And it's not

15   even our client agreeing with him.  And it's not even

16   Mr. Mundhir; it's somebody told Mr. Mundhir who told somebody

17   who he's now reporting it.

18          And I think it's far more prejudicial than probative.

19   It has no probative value whatsoever except to be pulled out of

02:44 20   context by the government.

21          MR. AUERHAHN:  Well, your Honor, again, we're not

22   pulling anything out of context.  In fact, chats that begin and

23   end but within a very short period of time where it's clearly

24   the same conversation where we're continuing the conversation.

25   If you look up above, just above that, the defendant says, in

1    talking about the final production of "39 Ways," "I hope this

2    book makes an impact."

3         So that's Mundhir then responding to what the

4    defendant said, "I hope it had an impact," to like things -- to

5    books and publications like "Anarchist Cookbook" and "Mein

6    Kampf"; that is, books that have had impact, particularly "Mein

7    Kampf," books that have had impact.

8         So again, it would be cutting -- they've been arguing

9    about the rule of completeness.  It would be cutting the

02:45 10   conversation in half to take out that response by Mu'ndhir.

11   After they're cut off, they come back on, Mu'ndhir says, "You

12   there?"  He says, "Yes," and then the conversation continues.

13        MS. BASSIL:  Your Honor, that's exactly

14   what -- Mr. Auerhahn just pulled it out of context.  He said in

15   this, "Somebody told me the cover reminds me of this," not the

16   content, the cover.  And here he is pulling it out of context

17   saying, "Oh, it's a book that has impact like 'Mein Kampf.'"

18        Your Honor, please, I think this is so inflammatory.

19   Nobody wants to hear that and it has absolutely nothing to do

02:45 20   with this.

21        THE COURT:  I think it has little probative value and

22   that can go out.

23        MS. BASSIL:  Thank you.

24        Your Honor, my more general objections are this:

25   There are -- in this person's readings, I counted 15 times he's

1    going to refer to -- read things about "39 Ways."  And it's

2    just a question of economy.  And it's messages like "39 Ways

3    almost done"; "Not done yet"; "Hope to finish it."  I mean, I

4    really don't know what we need 15 instant messages about the

5    same thing.  I don't think there's ever been any dispute that

6    the defendant wrote it.  And -- oh, translated it.  Sorry.

7    There's not been any dispute that he translated it.

8            And also, there appears to be, I believe -- I think

9    there's five more chats, I believe, about encryption.  Or I'm

02:46 10   sorry, I think there's three more chats about encryption, we

11   already had five chats about encryption.  I'm not sure why we

12   have to have even yet more.  And I also counted one, two,

13   three, four, five exhibits that have already been previously

14   shown to the jury.

15           So I think we're getting to the point where -- I don't

16   know.  Maybe I should just let them bore the jury.  They hate

17   it.  But in the interest of getting this case to the jury, I

18   think we can stop repeating things.  And I would ask the Court

19   to exercise some discretion here and limit some of this.

02:47 20           MR. AUERHAHN:  Your Honor, with reference to the "39

21   Ways," we're playing mostly short segments from a number of

22   these.  There's a back-and-forth between the defendant and

23   Abu Mu'ndhir.  At one point the defendant says, "You know, I'm

24   a little concerned about some of these next ones.  They're kind

25   of touchy.  I don't want to be connected to it."  And he says,

1   "Well, don't worry.  What we'll do is you'll create a PDF, send

2   it to this Ibn Umar who's in the United Kingdom and then your

3   connection directly to it will be severed."  I mean, that's

4   some of the conversations that go on.

5         One of the other chats that's in here about 39 is

6   where he sends it in its dot-doc form before it's finalized to

7   someone who asks for it.  So, again, it's relevant.  It's

8   another person he's --

9         THE COURT:  Okay.  Well, I don't think I'm in a

02:48 10   position to make the editing selection.  I have some sympathy

11   with the concern raised about redundancy, and I presume to

12   speak on behalf of the jury when I say that.  So I just ask you

13   to be cognizant of that.  Other than that, go ahead and --

14         MS. BASSIL:  That's all I have.

15         THE COURT:  -- do what you have.

16         Let me just ask, with respect to -- we talked about a

17   possible hearing with the witness.

18         MR. CHAKRAVARTY:  I've been informed by Denner

19   Pellegrino that they will have a representative here at one

02:48 20   o'clock --

21         THE COURT:  All right.

22         MR. CHAKRAVARTY:  -- on the motion to quash.

23         THE COURT:  So let's get the jury.

24         (Pause.)

25         THE CLERK:  All rise for the jury.

```
 1              (The jury enters the courtroom at 11:45 a.m.)

 2              THE CLERK:  Please be seated.

 3              MR. AUERHAHN:  The United States calls Daniel Genck.

 4                         DANIEL GENCK, duly sworn

 5              THE CLERK:  Have a seat, please.

 6              State your name and spell your last name for the

 7   record.

 8              THE WITNESS:  My name is Daniel Genck.  Last name is

 9   spelled G-E-N-C-K.

10              THE CLERK:  Thank you.

11                         DIRECT EXAMINATION

12   BY MR. AUERHAHN:

13   Q.   Sir, how are you employed?

14   A.   I'm employed by the Federal Bureau of Investigation as a

15   special agent.

16   Q.   And how long have you been so employed?

17   A.   A little over two and a half years.

18   Q.   And on what squad are you?

19   A.   I'm on the Joint Terrorism Task Force.

20   Q.   What did you do prior to becoming an FBI agent?

21   A.   I was a high school principal and football and lacrosse

22   coach.

23   Q.   Okay.  And what's your educational background?

24   A.   I have a bachelor's degree from St. John's University in

25   Minnesota and a master's degree from Marist College in
```

1  Poughkeepsie, New York.

2         MR. AUERHAHN:  If we could pull up Exhibit 253,

3  please.

4         THE COURT:  These will all have been admitted, right?

5         MR. AUERHAHN:  Yes.

6  BY MR. AUERHAHN:

7  Q.   Now, sir, does this appear to be an email from

8  Tarek Mehanna to almuwahhid@hotmail.com on April 7, 2005?

9  A.   Yes, it is.

02:52 10  Q.   Okay.  And was there an attachment to this email?

11  A.   Yes, there was.

12         MR. AUERHAHN:  Can I have page 2, please.

13  Q.   And is it a document entitled "The Ruling Regarding

14  Killing One's Self to Protect Information" based on the essays

15  of the Honorable Shaykhs 'Abdul-'Azeez al-Jarboo' and Dr. Ayman

16  al-Thawaahiree, the second volume of the Martyrdom Series?

17  A.   Yes, it is.

18         MR. AUERHAHN:  Could you pull up Exhibit 414, please.

19  Q.   Now, does this appear to be a message from Aboo Khubayb

02:52 20  al-Muwahhid --

21  A.   Yes, it does.

22  Q.   -- to -- I think I cut it off -- to Abu Sabaayaa?

23  A.   Yes, it is.

24  Q.   And the recipient of the previous email was someone named

25  al-Muwahhid?

 1    A.    Correct.

 2    Q.    And does Mr. Muwahhid say, "I have noticed on this forum

 3    many of your beneficial translations which you have done.  I

 4    asked the other brothers at Tibyan Publications and we wanted

 5    to ask if you would be willing to join our Da'wah efforts and

 6    help us translate books.  We are currently working on some

 7    projects"?

 8          MS. BASSIL:  Excuse me, your Honor.  Why doesn't

 9    Mr. Auerhahn just read it straight through and sit in the chair

02:53 10    there?  Could we have a question?

11    BY MR. AUERHAHN:

12    Q.    Was I reading it correctly?

13    A.    Yes, sir.

14    Q.    Thank you.  Is one of the projects that he's asked to work

15    on "Ruling Regarding Killing One's Self to Protect Information"

16    which is based on the works of Shaykh 'Abdul-'Azeez al-Jarboo

17    and Dr. Ayman?

18    A.    Yes.

19    Q.    And that's the attachment to Exhibit 253?

02:53 20    A.    Yes, it was.

21          MR. AUERHAHN:  Can we go back to Exhibit 253, please,

22    page 3.

23    Q.    And could you read that first paragraph, please?

24    A.    Yes.  "It is permissible for a Muslim to kill himself if

25    he is captured and he fears that he will reveal the secrets of

1      the Muslims (mujahideen in particular) due to his weakness and

2      lack of stability during torture given the fact that revealing

3      this information might cause disasters for the Muslims

4      (mujahideen in particular)."

5      Q.   And attached to that answer there's a footnote, correct?

6      Could you read the footnote, please?

7      A.   Sure.  "Some of the quotes in this translation are taken

8      from the book by Shaykh Yoosuf al-'Uyayree entitled 'The

9      Islamic Ruling on the Permissibility of Martyrdom Operations.'"

02:54 10           MR. AUERHAHN:  Okay.  Could we go to page 9, please.

11      Q.   Would you read that paragraph, please.

12      A.   Sure.  "It is known also that the Muslim is forbidden from

13      immersing himself in places where he will be destroyed and

14      killed, but if this is done for the path of Allah, for the

15      benefit of the Din, and to raise the Tawheed of Allah, then

16      this becomes something which is legal, nay, even preferred, and

17      very much beloved as in the Hadeeth of Aboo Hurayrah."

18           MR. AUERHAHN:  Can we bring up Exhibit 68, which was a

19      photograph found on the defendant's computer.

02:55 20      Q.   It may be hard to read.  I don't know if you can read

21      that.

22      A.   Yes.  It says, "The Ruling Regarding Killing One's Self to

23      Preserve Information" -- excuse me -- "to Protect Information."

24      Q.   By at-Tibyan Publications?

25      A.   Yes; that's correct.

 1              MR. AUERHAHN:  Exhibit 251, please.

 2    Q.   And does this appear to be an email from the defendant to

 3    the same individual, Abu Khubayb al-Muwahhid?

 4    A.   Yes, it is.

 5    Q.   May 14, 2005?

 6    A.   Correct.

 7    Q.   And the defendant says, "It's all yours"?

 8    A.   Correct.

 9              MR. AUERHAHN:  Can we go to the next page, please?

02:56 10   Q.   And does this appear to be a lecture given by Shaykh

11    Abdullah Azzam?

12    A.   Yes, it does.

13    Q.   Could you read that paragraph, please.

14    A.   "So the lines of history are not written except with

15    blood, and glory does not build its high peak except upon

16    skulls, and honor and high status cannot be established except

17    upon a foundation of limbs and corpses."

18              MR. AUERHAHN:  Next page, please?

19    Q.   And this paragraph as well, please?

02:56 20   A.   "Verily, those who assume that they are able to change a

21    reality or to transform a society without blood and sacrifices

22    and loss of limbs, and without the loss of innocent lives, then

23    these people do not understand the reality of this religion and

24    they do not know the methodology of the leader of the

25    messengers."

1          MR. AUERHAHN:  Can we go to Exhibit 252, please.

2     Q.   And does this appear to be an email to the same

3     individual, Abu Khubayb al-Muwahhid, June 2, 2005, with an

4     attachment called "Tawheed of Action.doc"?

5     A.   Yes, it does.

6          MR. AUERHAHN:  Can we go to the next page?

7     Q.   Does this read "The Tawhid of Action - Segment of a Speech

8     given by the martyred Shaykh of the Mujahideen, Imam Abdullah

9     Azzam"?

02:57 10    A.   Yes, it does.

11    Q.   Would you read that last paragraph, please?

12    A.   "While living in Afghanistan, I have realized that Tawhid

13    cannot penetrate into the soul of the human being, nor will it

14    intensify and strengthen the way it does in the fields of

15    jihad."

16         MR. AUERHAHN:  Next page, please?

17    Q.   Read that paragraph, please?

18    A.   "So:  The settling of Tawhid in this world is done by the

19    sword...not by reading books, not by studying the books of

02:57 20    Aqidah."

21    Q.   Does it say that "This Tawhid cannot be learned by study

22    lessons.  No, it can only be brought up and raised (through

23    Tarbiyyah) in the souls, through confrontations in battles, and

24    the events which take place from the stances taken in the face

25    of the Tawaghit...through the sacrifices which the soul of the

1   human puts forth"?

2   A.   Yes; that's correct.

3   Q.   And could you read that paragraph, please?

4   A.   "And it is appropriate to mention in this discussion that

5   some of those people who do not understand the reality and

6   nature of this Tawhid - they accuse these people (i.e., the

7   Afghans) whom Allah has honored the Muslims through them,

8   through whom Allah has elevated the significance of every

9   Muslim in the world, through whom Islam is being lifted from a

02:58 10   bottomless pit and placed onto the international platform,

11   contesting against forces whom people call 'super powers' in

12   today's world.  Those who have returned Haybah (inspiration of

13   fear) to Islam, which is absent due to the absence of jihad..."

14        MR. AUERHAHN:  Next page, please?

15   Q.   And does it say, "And this fear and dread which the

16   enemies should have of us can never return to us except by the

17   sword, by fighting and killing"?

18   A.   Yes; that's correct.

19   Q.   And so this was called the "Tawhid of Action"?

02:59 20   A.   Yes.

21        MR. AUERHAHN:  Can we bring up Exhibit 67, a

22   photograph found on the defendant's computer.

23   Q.   Can you see what that is?

24   A.   Yes.

25   Q.   Is that a publication the "Tawhid of Action" by at-Tibyan

 1    Publications?

 2    A.   Yes, it is.

 3         MS. BASSIL:  Objection, your Honor.  It's a

 4    photograph.  That's all it is.

 5         THE COURT:  Okay.  I think that's agreed, right?

 6         MR. AUERHAHN:  Yes.

 7    BY MR. AUERHAHN:

 8    Q.   That says "Tawhid of Action," at the bottom, "at-Tibyan

 9    Publications"?

02:59 10    A.   Yes, that's what it says.

11         MR. AUERHAHN:  Can we bring up Exhibit 250, please.

12    Q.   And does this appear to be also an email from the

13    defendant to the same person with a document attached called

14    lilaaf eng.doc?

15    A.   Yes; that's correct.

16         MR. AUERHAHN:  And can we go to the next page, please?

17    Q.   Does it appear to be an excerpt of a larger document?

18    A.   Yes, it does appear to be.

19         MR. AUERHAHN:  Okay.  Exhibit 255, please.

03:00 20    Q.   Does this appear to be an email on April 10, 2005, from

21    the defendant again to the same man, Abu Khubayb al-Muwahhid?

22    A.   Yes, it is.

23    Q.   And does the defendant say, "This is another article I

24    just translated for Tib-Pubs"?

25    A.   Yes, he does.

```
 1              MR. AUERHAHN:  Next page, please?

 2    Q.   And is the attachment "The Word.doc"?

 3    A.   Yes, it is.

 4              MR. AUERHAHN:  Can we go to 255A, please?

 5    Q.   Is this entitled "The Importance of the Word"?

 6    A.   Yes, it is.

 7    Q.   Can you read that paragraph, please.

 8    A.   "And some others might say:  What importance does the word

 9    have while the wounds of the Ummah are pouring blood?  And what

03:01 10  is the point of the word while the wounds of the Ummah are only

11    building up, and the enemy is only intending to do so for a

12    longer amount of time?"

13    Q.   Does this state, "The prolonged efforts of the enemy

14    against the lands of Islam and their violation of the honor of

15    Islam are a reality that none can deny except one who is

16    heedless and ignorant or a low-lying deceptive agent (and the

17    first is not any less of a danger than the second).  And

18    because of this, the word is necessary; the word that wakes the

19    heedless and teaches the ignorant; the word that embarrasses

03:01 20  the hypocrite and exposes the deceiving deceiver; the word that

21    stirs up the Ummah so that it surprises the internal enemy with

22    the same intensity as the external enemy; the word that

23    identifies the conflict and raises the banner and smashes

24    against the corners of the universe.  And can this stir-up

25    occur except by the word?  The exalted says, 'Therefore openly
```

1    proclaim what you have been commanded with and avoid the

2    ignorant'"?

3    A.   Yes, that's what it says.

4         MR. AUERHAHN:   Page 3, please.

5    Q.   Can you read that paragraph, please?

6    A.   "And because of the word, families were separated and the

7    servants of Allah were torn apart, and because of it the widows

8    cried and the children became orphaned.  And because of the

9    word the swords of jihad were unleashed, so the sword of jihad

03:02 10   was legislated forever so that it is ongoing until the day of

11   resurrection.  And for the sake of the word there are spears

12   and weapons, for the sake of subduing innovation and raising

13   the Sunnah.  And for the sake of the word, blood is spilled,

14   and for the sake of it, the Angel descended from the heavens."

15   Q.   And does it -- this last paragraph say, "And because of

16   the word, the battalions of suicide fighters will remain.  And

17   because of it the word of disbelief will fall underneath the

18   feet of the mujahideen, as Allah has made the word of those who

19   disbelieve the lowest, and the word of Allah the highest until

03:03 20   the day of judgment, and this is the significance of the word"?

21   A.   Yes, it does.

22   Q.   Thank you.

23        MR. AUERHAHN:   Can you bring up Exhibit 412, please.

24   Q.   Now, does this appear to be a posting by Abu Sabaayaa just

25   a few days after the previous email --

1   A.   Yes, it is.

2   Q.   -- of the document we just read, "The Importance of the

3   Word"?

4   A.   Yes; that's correct.

5   Q.   And this is a posting where?

6   A.   It's being posted on the at-Tibyan Publications website.

7        MR. AUERHAHN:  Can you bring up Exhibit 248, please.

8   Q.   Does this appear to be an email from the defendant,

9   Tarek Mehanna, to the same man, Abu Khubayb al-Muwahhid,

03:03 10   Thursday, April 1st, 2005, with an attachment, "Such are the

11   Messengers Tested"?

12   A.   Yes; that's correct.

13        MR. AUERHAHN:  Next page, please?

14   Q.   And, again, this is "Such are the Messengers Tested and

15   the Outcome will be in their Favor" by the Shaykh, the

16   Commander Abu Mus'ab az-Zarqawi (May Allah preserve him and Aid

17   him with his Victory)"?

18   A.   Yes; that's correct.

19        MR. AUERHAHN:  Can you go to page 5, please.

03:04 20   Q.   Does that state, "And Allah, the exalted, has legislated

21   jihad to complete this religion and has raised its status so

22   high that it took the place of the highest task in service of

23   the lord and made it to include hardships and tribulations that

24   are naturally hated and feared"?

25   A.   Yes.

1          MR. AUERHAHN:  Page 8, please?

2     Q.   And Abu Mus'ab az-Zarqawi, could you remind us who he

3     is -- or was?

4     A.   Abu Mus'ab az-Zarqawi was the leader of the al Qa'ida in

5     Iraq branch.

6     Q.   "This is jihad...the pinnacle...and fruits.  It comes

7     after a long period of patience and active dwelling in the land

8     of battle, waiting for the roar of the enemies and enduring

9     their evil; dwelling that lasts continuous months and years.

03:05 10     And if you do not experience these pains, then Allah will not

11     give you victory, because victory comes with patience."

12     A.   Yes; that's correct.

13          MR. AUERHAHN:  Can you go to page 19, please.

14     Q.   Could you read that paragraph, please?

15     A.   "Thirdly, Fallujah opened the battlefield by its

16     destruction, as it caught the attention of the sons of Islam

17     from both inside and outside Iraq, and it paid with much of the

18     pure blood of many of the sons of Islam that was spilled on its

19     land, in order to rise to the responsibility of jihad and to go

03:05 20     forth to resist the global crusader campaign.  So the battles

21     flared up in various corners of the land of Iraq, and the

22     battalions and groups were formed, and the mujahideen stood up

23     and chased the enemy and hunted them wherever they were.  And

24     we saw, by the favor of Allah, huge losses that were handed to

25     the enemy of all of the land of Iraq, so the golden points of

the victory is that the souls of the sons of the jihad became

strengthened while the most modern vehicles of warfare were

moving around in front of them, so they are now free from the

false notion of powerlessness and fear, and have now proceeded

to the plains of bravery and action."

Q.   Does it then read, "Fourthly, the battle of Fallujah

secured an important strategic military victory.  Everyone is

aware of the superiority of the American military equipment and

its army and military structure that depends on striking

targets from far away in order to avoid hand-to-hand combat,

and that protects the American soldier from being engaged in

intense fighting that would cost him his life.  But Fallujah

surrounded these powerful vehicles according to cunning

planning and forced them into a merciless, chaotic street fight

that drained their energy and endurance and equipment.  So the

American soldier came to face death and destruction from where

he never expected, and the Americans were forced to come down

into the" --

          MR. AUERHAHN:  Next page, please?

Q.   -- "alleyways and streets and to enter homes and

buildings, and the enemy became exposed to the fire and bombs

of the mujahideen, and was surprised at their ability to stage

headily hit-and-run attacks.  So they were forced to engage in

skirmishes that they had not planned for in which they suffered

great losses in life and equipment"?

1      Can you read the next paragraph, please?

2   A.   "Fiftly, the American military leadership was forced to

3   experience the great self-defeat.  It was clear from the start

4   to the initiators and planners of this war that the mujahideen

5   would not be discouraged or impeded by anything even if this

6   meant becoming engaged in a massive annihilating fight in which

7   they would all be killed.  So the jihadi logic became the great

8   unbreakable code in the face of the Americans' plans for global

9   war, and what happened in Fallujah of pride and firmness shook

03:07 10   the souls of the leadership of the enemy, and they became

11   afflicted with anxiety and personal anguish and moral turmoil.

12   And what awaits them is more severe and bitter, by the help of

13   Allah, the exalted."

14      MR. AUERHAHN:  Can we go to page 23, please.

15   Q.   And could you read those three paragraphs, please.

16   A.   "On the third day of the battle and after intense and

17   aggressive bombing of the sections of Fallujah, the mujahideen

18   woke up at night from their sleep, so they saw the American

19   vehicles and tanks in the streets and alleyways.  So the

03:08 20   leaders of Islam in the midst of this turmoil stood up under

21   the command of the brother Abu Azzam and Umar Hadid and Abu

22   Nasir al-Libi and Abul-Harith Muhammad Jasim al'Isawi, and

23   other than them from the heros, and expelled the invaders to

24   the outskirts of Fallujah, and the weapons that they used in

25   the battle were the PK and the Kalashnikov.

1    "And the Americans suffered great and massive killing on

2    their part to the point that many of them ran away from the

3    battle and hid in some of the houses of the Muslims.  And the

4    mujahideen were first reluctant to attack these homes out of

5    fear that they would harm the Muslims, but when they made

6    certain that there were American troops present, they entered

7    and found them in hiding, so they killed them as they would

8    kill fleas and insects, and from Allah is the favor and grace.

9         "And after a few days of battle one of the commanders

03:09 10   suggested to the brother Umar Hadid and the brother Abul-Harith

11   Jasim al-'Isawi, that they shave their beards and leave

12   Fallujah after a safe way is found for them to save themselves

13   and continue with their work from outside the city.  So the

14   heros refused this and said, 'By Allah, we will not leave as

15   long as single muhajir *[sic]* remains firm in this city.'  And

16   they fought until they were martyred, may Allah the exalted

17   have mercy on them and accept them from his martyred servants."

18        MR. AUERHAHN:  Can you bring up Exhibit 612, page 7,

19   please.

03:09 20   Q.   Does this appear to be a chat between Mr. Aboubakr and the

21   defendant?

22   A.   Yes, it is.

23   Q.   I'll read Mr. Aboubakr.  "Yo, who was Umar Hadeed

24   exactly?"

25   A.   "He was the commander of the mujahideen in Fallujah.  He

1   was killed last Ramadhaan when the Americans invaded it."

2   Q.   "Oh, okay."

3   A.   "Abu Musaab told him to shave his beard and escape, but he

4   refused and stayed until he was killed."

5   Q.   "Glory be to Allah.  How come they don't show him?"

6   A.   "They did."

7   Q.   "When, dude?"

8   A.   "Did you see the part.  2940:  In the background, that's

9   him."

03:10 10   Q.   "Oh, that's him?  Okay.  I saw that.  God bless.  He's

11   young."

12   A.   "Yeah.  It is reported that he said, 'I will never leave

13   Fallujah as long as there is one single foreign mujahid who has

14   come here to help us.'"

15          MR. AUERHAHN:  Exhibit 249, please?

16   Q.   Does this appear to be an email from the defendant to the

17   same man, Abu Khubayb al-Muwahhid, April 22, 2005, with

18   attachments zar1.jpg and "Subject:  pics to go along with the

19   video"?

03:10 20   A.   Yes, it is.

21   Q.   And does the defendant say, "I thought it would be a good

22   idea to have either of these two pictures of the brother as the

23   display image for the Ibtilaa' video to be playing with the

24   audio"?

25   A.   Yes; that's correct.

```
 1            MR. AUERHAHN:  And could you bring up 249A, please.

 2   Q.   Are these the attached photos to this particular email?

 3   A.   Yes, they are.

 4   Q.   And who are they photos of?

 5   A.   Both photos are of Abu Musaab Al Zarqawi.

 6            MR. AUERHAHN:  Exhibit 577, please.

 7   Q.   Does this appear to be a chat between the defendant and

 8   someone named Ahmad AS, Ahmad Abousamra?

 9   A.   Yes, it is.

03:11 10  Q.   Does Ahmad say, "Yeah.  So can you give Abu Hudhayfah and

11   Abu Sulayman Messenger accounts"?

12   A.   Yes, he does.

13   Q.   "I had them before but I had deleted them.  Also, Edgar,

14   Hamzah Pettelier, Ahmad Alfarsi, et cetera."

15        Would you read the defendant's part?

16   A.   Yes.  "Abu Sulayman:  Calvarnson3@hotmail.com; Abu

17   Hudhayfah:  Abuhuthayfah@hotmail.com; Edgar:

18   Edgareduardo@hotmail.com; Pelletier:  Don't have; Farsi:

19   Doesn't have MSN."

03:12 20  Q.   "Any of the other Tibyan brothers that has a Messenger

21   account?"

22   A.   "Well, Khubayb, but he's MIA."

23   Q.   "I thought he wasn't here anymore.  Yeah, that's all

24   right."

25   A.   "Yeah."
```

```
 1    Q.   Okay.  And the emails that we've been talking about were

 2    from the defendant to a individual named Khubayb?

 3    A.   Yes; that's correct.

 4    Q.   And the defendant says "Khubayb, he's MIA."  What do you

 5    understand "MIA" to mean?

 6    A.   Missing in action.

 7              MR. AUERHAHN:  Exhibit 513, please.

 8    Q.   And does this appear to be an email between -- I'm sorry,

 9    a chat between the defendant and someone named Abu Mu'ndhir?

10    A.   Yes, it is.

11    Q.   Now, after exchanging some greetings, does Abu Mu'ndhir

12    say, "Dude, you hear from Aboo K?"

13    A.   Yes, he does.

14    Q.   Can you read the defendant's part?

15    A.   "?  No, why?"

16    Q.   "I don't know.  Haven't seen him in weeks."

17    A.   "He told me that he would be going soon.  So maybe he made

18    it."

19    Q.   "Okay.  Allah willing."

20    A.   "Allah willing.  I just hope he isn't translating books

21    while he is there."

22    Q.   "LOL.  Why?"

23    A.   It would be funny in the middle of a battle he remembers

24    that he translated a word wrong" --

25    Q.   "LOL."
```

```
 1   A.   -- "and just logs onto TP" --

 2   Q.   "Laugh out loud."

 3   A.   -- "from his laptop."

 4   Q.   "Laugh out loud."

 5        MR. AUERHAHN:  528, please.

 6   Q.   And, again, does this appear to be a chat between Abu

 7   Mu'ndhir and the defendant?

 8   A.   Yes, it does.

 9   Q.   Again, after exchanging some greetings does the defendant

03:13 10   say, "Brother," and send a link to a CNN article about a

11   Bangladesh arrest?

12   A.   Yes, he does.

13   Q.   Okay.  Did you have an opportunity to look at that link

14   and see what it's about?

15   A.   Yes, I did.  It details the arrest of Ensahnal Sadeeqe.

16   Q.   Ensahnal Sadeeqe?

17   A.   Yes.

18   Q.   Where?

19   A.   I believe he was abroad.

03:14 20        MS. BASSIL:  Objection, your Honor.  Hearsay.

21        THE COURT:  I'm sorry?

22        MS. BASSIL:  It's hearsay.

23        MR. AUERHAHN:  He's sending a link.

24        THE COURT:  Well, I'm not sure it's hearsay.  I think

25   it may be personal knowledge.  Foundation.  Sustained.
```

```
 1              MR. AUERHAHN:  I'm sorry, your Honor?
 2              THE COURT:  Personal knowledge.  I don't know the
 3       foundation for his knowledge.
 4              MR. AUERHAHN:  Okay.
 5       BY MR. AUERHAHN:
 6       Q.   How did you determine where this -- what this link is to;
 7       in other words, what's the article on the other side of the
 8       link?
 9       A.   Are you saying how I got to the article?
03:14 10  Q.   Right.
11       A.   I cut and pasted it into an Internet Explorer and viewed
12       it myself.
13       Q.   So the link is still accessible?
14       A.   Yes, it is.
15       Q.   And what is the article about that you found by going to
16       the link that was sent by the defendant?
17              MS. BASSIL:  Objection.
18              THE COURT:  Overruled.
19              THE WITNESS:  The article's about the arrest of
03:14 20  Ensahnal Sadeeqe.
21       BY MR. AUERHAHN:
22       Q.   In Bangladesh?
23       A.   Yes; that's correct.
24       Q.   Okay.  Then if you could read Mr. Mu'ndhir's part after
25       the link.
```

```
 1    A.   He says, "I saw."

 2    Q.   "Is that...?"

 3    A.   "I think so."

 4    Q.   "..."

 5    A.   "Yeah."

 6    Q.   "That's his name?"

 7    A.   "I'm not sure but I think so."

 8    Q.   "....damn."

 9    A.   "Yeah.  I had a feeling."

10         MR. AUERHAHN:  Next page, please?

11    Q.   "What the frig, man."

12    A.   "Yeah."

13    Q.   "He left in August, right?"

14    A.   "I don't remember.  Maybe."

15         MR. AUERHAHN:  Exhibit 687, please.

16    Q.   And does this appear to be a chat between the defendant

17    and Ibn Umar?

18    A.   Yes, it is.

19    Q.   Does Ibn Umar say, "Brother, just wanted to tell you in

20    case you haven't heard it yesterday that most probably our

21    brother, Abu Khubayb, has been abducted and sent back to the

22    U.S. a few days ago"?

23    A.   Yes; that's correct.

24    Q.   And if you could read the defendant's part?

25    A.   Sure.  "Yeah.  Unfortunately, I figured that the moment I
```

1  saw the news on CNN.  Allah is the greatest."

2  Q.   "We seek Allah's help."

3  A.   "Allah is the helper of those who have no helper, and I

4  envy him."

5  Q.   "Yes."

6  A.   "And he has confirmed for himself that he is upon truth,

7  Allah willing."

8  Q.   "Yes.  Praise be to Allah."

9  A.   "When a tape was made by Abu M called 'Such are the

03:16 10  Messengers are Tested,' it wasn't made for no reason."

11  Q.   "Yes.  May Allah help our brother, amen."

12  A.   "Amen, lord."

13  Q.   "I've posted the news in the shoora section."

14  A.   "Dude, do you have any info on exactly what prompted his

15  arrest?"

16  Q.   "Not really.  I asked this brother who informed me to give

17  me more details," and then another link is sent.

18       MR. AUERHAHN:  Can we go to the next page, please?

19  Q.   If you could read the defendant's part?

03:16 20  A.   "He is Ehsan?"

21  Q.   And was that Mr. Sadeeqe's first name?

22  A.   Yes.

23  Q.   "I guess so.  Don't know his real name.  By the way,

24  brother, Dotmaa hasn't been online for almost a week and I'm

25  worried about him too.  He has never been so long away."

1    A.    "Hmm.  PM him.  Have you had any trouble?"

2    Q.    "Nothing so far, praise be to Allah.  How about you,

3    brother?"

4    A.    "Well, yes.  I've had the honor of being visited twice.

5    Second time there was a request to search my laptop."

6    Q.    "Feds?"

7    A.    "The one and only."

8    Q.    "Hmm.  And?"

9    A.    "I told them to screw off.  I got a lawyer and they never

03:17 10   came back."

11   Q.    "Why did they come to you in the first place?"

12   A.    "No clue.  Maybe because I'm so handsome."

13   Q.    "Laugh out loud.  I hope so."

14   A.    "Yeah, I think that was it.  In any case, we got nothing

15   to hide."

16   Q.    "I totally agree."

17   A.    "Like bro Sas Jamal was admining CG, for God's sake."

18   Q.    "Good.  Allah willing.  Brother, it's time for sunset

19   prayer.  See you later, Allah willing.  And inform members of

03:17 20   the shoora if you see them, Allah willing."

21   A.    "Allah willing.  Don't be down.  Remember the story of

22   Fir'awan and Moses and how that turned out."

23            MR. AUERHAHN:  Next page, please?

24   Q.    "I know, brother.  I just feel a little bit sad.  I really

25   loved and still love akhi Abu Khubayb.  May Allah protect you."

A.   "Of course, man.  But Allah willing, it will turn out to

be nothing.  I just hope he keeps his emotions in check."

Q.   "I really hope so, Allah willing.  Take care, brother."

A.   "You too."

     MR. AUERHAHN:  Exhibit 539, please.

Q.   Does this appear to be a chat between the defendant and

someone, screen name, Abu Saqr?

A.   Yes, it is.

Q.   Okay.  And after greetings, if you could read what the

defendant says, starting with "bro"?

A.   "Bro, I was thinking to translate this," and then a link

is shared.

Q.   "Yes.  That's great."

A.   "You don't think it will in any way push people away from

the mujahideen?"

Q.   "No, it should be a reminder.  This is kind of what we

were discussing the other day."

A.   "Right."

Q.   "But if you can, try to add whatever Takhreej possible for

the Hadith.  I don't know how much is available, but it is

always better."

A.   "Which Hadith?"

     MR. AUERHAHN:  Next page, please?

Q.   If you could read the defendant's part?

A.   "Any one specific?"

1    Q.   "Whatever you can find."

2    A.   "Okay.  Should we make it an official release or just

3    another thread?"

4    Q.   "How many pages is it again?"

5    A.   "Five.  Not too long.  We can do both."

6    Q.   "So it would be about ten in English."

7         MR. AUERHAHN:  Exhibit 515, please.

8    Q.   Does this appear to be a chat between the defendant and

9    someone named Abu Mu'ndhir?

03:19 10   A.   Yes.

11   Q.   Does Abu Mu'ndhir start off by saying, "Do you have time

12   to edit a document?  It's translated and everything."

13        MR. AUERHAHN:  Next page, please?

14   A.   Yes, that's correct.

15   Q.   The defendant responds, "Sure," and Mu'ndhir says, "Okay."

16   And then there's a YouSendIt link sent?

17   A.   Yes; that's correct.

18   Q.   Okay.  Can we read at the bottom here?  If you could read

19   the defendant where he starts, "Making some grammar corrects"?

03:20 20   A.   "Making some grammar corrects as well."

21   Q.   "K."

22   A.   Then a link is shared:  YouSendIt.com.

23   Q.   "Let me see."

24   A.   "Not too many corrects."

25   Q.   "K.  This should help the bros over there."

1    A.    "God willing.  May Allah reward you for translating it."

2    Q.    "Not me.  It was a brother.  May Allah reward him."

3    A.    "Amen."

4          MR. AUERHAHN:  Exhibit 504, please.

5    Q.    And down at the bottom here, does this appear to be a chat

6    session again between Mr. Mu'ndhir and the defendant on

7    February 6, 2006?

8    A.    Yes, it is.

9          MR. AUERHAHN:  If he could go to the next page,

03:20 10   please?

11   Q.    And does the defendant say, "Dude, any working links to

12   'Nineteen Martyrs'?"

13   A.    Yes, he does.

14   Q.    Could you read what Mr. Mu'ndhir says?

15   A.    "No, I think archive took it down."

16   Q.    "I have the CD.  Any quick way to get it online?"

17   A.    "Just ask El Swede to upload it for you or upload it

18   yourself on" -- and a link is sent:  Savedspace.com.

19         MR. AUERHAHN:  Okay.  Exhibit 718, please.

03:21 20   Q.    Does this appear to be a chat between the defendant and

21   someone named Taimur on April 10th, 2006?

22   A.    Yes; that's correct.

23         MR. AUERHAHN:  Could you go to page 12, please.

24   Q.    Okay.  I'll read the defendant's part and if you could

25   read Taimur.  "This article's about the Taliban's creed and how

1    they are not Sufis as many claim."

2    A.   "Oh, nice.  Yeah, I was reading about that."

3    Q.   "It's by" --

4    A.   "Like they're hardcore."

5    Q.   -- "Yusuf al-Uyayri."

6    A.   "Hanaifs and stuff."

7    Q.   "The author of Constants."

8    A.   "I know, bro.  What is clearguidance.com or whatever?"

9    Q.   "It's an old discussion board that was a precursor to

03:22 10   Tibyan.  It was the best board online hands down, but it got

11   shut down."

12   A.   "Yeah, sucks."

13   Q.   "I was on it."

14   A.   "Because the lecture I'm listening to, it says 'Brought by

15   Clear Guidance.'"

16   Q.   "The Thawabit one?"

17   A.   "Yeah, with Abul Muthanna."

18   Q.   "Yeah, Abul Muthanna was on it.  He was the one" --

19        MR. AUERHAHN:  Next page, please?

03:22 20   Q.   -- "who started Tibyan before he left."

21   A.   "Nice.  How old is he?"

22   Q.   "Like 28.  Link me to the lecture."

23   A.   "Thawabit?"

24   Q.   "Yeah, Muthanna's one."

25   A.   And Taimur shares a link to uponsunnah.com.  "Hurry up.

1    They will expire soon.  Narrated by Abu Huraira, Allah's

2    messenger who said, 'Whoever dies without participating in an

3    expedition nor having the intention to do so dies on a branch

4    of hypocrisy.'"

5              MR. AUERHAHN:  Okay.  Exhibit 719, please.

6    Q.   And does this appear to be a chat between the defendant

7    and the same Taimur on April 17, 2006?

8    A.   Yes, it is.

9              MR. AUERHAHN:  Can you go to page 7, please.

03:23 10   Q.   Taimur says, "I'm calling myself 'Abu Slicer' from now

11   on."

12   A.   "Yeah, including when you are looking to marry.  So what's

13   your name, Slicer?  Abu Slicer?"

14   Q.   "Indeed, Shaykh of Islam, Abu Slicer.  He slices and dices

15   the best lamb you've ever seen.  Bro, on the Tibyan forums

16   someone posted a video of shaykh feiz, giyc and doc.  You saw

17   it.  He also posted on uponsunnah.  That's how I know."

18   A.   "Ya."

19   Q.   "Cool, eh?  Are you on Reviving Islam forum?"

03:23 20   A.   "Yeah, but I never post."

21   Q.   "Yo.  Can you add me?  I registered but I need validation.

22   Is that like Tib" --

23              MR. AUERHAHN:  Next page, please?

24   Q.   -- "or not as good?"

25   A.   "Hmm.  I'm not an admin but I can ask him when I see him

```
 1    online."

 2    Q.    "Who?  On Tib or Reviving Islam?"

 3    A.    "Revi."

 4    Q.    "Oh, can I join Tib?  That might be too dangerous."

 5    A.    "Sure.  I am an admin on that if you want to join."

 6    Q.    "Yeah."

 7    A.    "Just give me email address and screen name you want" -- I

 8    can't see the edge there.  I'm sorry.

 9    Q.    I'm sorry.

10    A.    "Just give me email address and screen name you want to

11    use."

12    Q.    "Do you give your real email or like a different one?"

13    A.    "Whichever one you want."

14    Q.    "No.  But I'm asking you, which one is preferred?  I don't

15    want some psycho FBI agent hacking into my account."

16    A.    "Well, up to you, shaykh.  Hehe."

17    Q.    "Okay.  Hold up.  I'm gonna make a new email.  Okay.

18    Never mind.  Screen name:  Abu Slicer."

19    A.    "Okay."

20    Q.    And then a link to -- I won't read it, but it's at

21    gmail.com.

22    A.    "Okay."

23    Q.    "Wait.  Hold up."

24    A.    "Okay."

25    Q.    And the link is sent to abuslicer@gmail.com.
```

1    A.    "Oh, God."

2    Q.    "Haha.  Yeah."

3    A.    "Okay.  I'll contact the account supervisor, and as soon

4    as he replies, your account info will be provided, Allah

5    willing."

6    Q.    "K.  Cool."

7          MR. AUERHAHN:  Next page.

8    Q.    "May Allah reward you for it."

9    A.    "You too.  My screen name on it is Abu Sabaayaa."

03:25 10   Q.    "Okay.  Okay.  Okay.  You know, all these forums, Tib, Its

11   and Revi.  They're all safe?"

12   A.    "Well, as long as you say safe things, yes."

13   Q.    "On some forums, it says you have to post at certain times

14   or you'll be kicked off.  Is that the same thing here?"

15   A.    "As long as you post more than zero times, you're all

16   set."

17         MR. AUERHAHN:  Okay.  Exhibit 294, please?

18   Q.    First, does this appear to be an email from the defendant

19   to Ihab Rashad and Ahmad Rashad on June 12, 2006?

03:26 20   A.    Yes, it is.

21   Q.    And does the defendant tell his brothers, "I got your

22   account info today, so here it is:"  Ahmad, a user name and

23   password, and then Ihab, a user name and password.  "After you

24   sign in, activate your accounts here by just posting or request

25   to have your account activated," and there's a link to

```
 1    at-Tawheed.com.  "You have to activate your account within 24
 2    hours or else they will be deleted."
 3         Do you recognize that at-Tawheed?
 4    A.   Yes, I do.
 5    Q.   What's that for?
 6    A.   That's the website for at-Tibyan Publications.
 7              MR. AUERHAHN:  Okay.  Exhibit 510, please.
 8    Q.   Okay.  Does this appear to be an email between the
 9    defendant and Abu Mu'ndhir?
03:27 10   A.   It's a chat, yes.
11    Q.   I'm sorry.  You're right.  It's a chat on March 5, 2006.
12    A.   Yes.
13    Q.   I'll read Mu'ndhir.  "Dude.  There?"
14    A.   "Yes."
15    Q.   "Ready to work on 'Lion of the Arraf'?"
16    A.   "Allah willing.  Dude, I was wondering about the 39."
17    Q.   "Yeah?"
18    A.   "Is there anyone else who can finish it?  I'd rather not
19    continue because the next ones are kind of touchy and I'd
03:27 20   prefer not to do them or..."
21    Q.   "There's no one, dude.  You know that.  Laugh out loud."
22    A.   "If I can do 'em, someone else can post them?"
23    Q.   "That can be arranged."
24    A.   "Just as long as my name isn't associated with it."
25    Q.   "Yeah, just finish it all and release it under a
```

 1  franchise, AC PDF, and delete the thread."

 2  A.   "But, yeah.  Is Asad transcribed?"

 3  Q.   "I think it can be arranged, Allah willing.  You're right.

 4  Tor right."

 5  A.   "Of course.  Can't log on without it."

 6  Q.   "Good."

 7  A.   "I almost feel like a migrant.  One day I'm in Austria,

 8  the next, I'm in Kansas."

 9        MR. AUERHAHN:  Can we bring up Exhibit 416, please.

03:28 10  Q.   And do you recognize this as a posting on the Tibyan

 11  website?

 12  A.   Yes, I do.

 13  Q.   By whom?

 14  A.   Abu Sabaayaa.

 15  Q.   On June 3, 2005?

 16  A.   Yes.

 17  Q.   And does it say, "This thread will consist of chapters

 18  from the forthcoming release from at-Tibyan Publications, '39

 19  Ways to Serve and Participate in Jihad,' written by the

03:28 20  martyred Shaykh 'Isa al-'Awshin, who was one of the main

 21  editors of Sawt al-Jihad magazine, enjoy"?

 22  A.   Yes, that's what it says.

 23        MR. AUERHAHN:  Can we go to Exhibit 514, please.

 24  Q.   Does this appear to be a chat between the defendant and

 25  Abu Mu'ndhir again on March 16, 2006?

```
 1   A.   Yes, it is.
 2   Q.   And after exchanging greetings, the defendant says, "How
 3   are you, bro?"  Would you read Abu Mu'ndhir's response?
 4   A.   "Yes, praise be to Allah."
 5   Q.   "Praise be to Allah.  Good."
 6   A.   "Brother, I got someone to do the transcript for 'Lion of
 7   the Arraf.'"
 8   Q.   "Nice.  Brother, I was also wondering if you wanted to do
 9   another book soon."
03:29 10   A.   "Yeah, I think we should do one by Azzam.  Remember, I
11   told you about being strong in prison, et cetera."
12   Q.   "I was thinking about something about creed, about excuse
13   of ignorance."
14   A.   "Hmm, dude, that could lead to friction because there's
15   differences between some of the young men and Abu H."
16   Q.   "Okay."
17   A.   "And Abu S."
18   Q.   "Forget it, then."
19        MR. AUERHAHN:  Next page, please?
03:30 20   Q.   "What about 39?"
21   A.   "I need to finish 39."
22   Q.   "K."
23   A.   "But no more posts.  I'll just go through till the end."
24   Q.   "Yeah, don't."
25   A.   "And you guys put it out as a PDF."
```

         1    Q.    "PDF it."

         2    A.    "I don't want to risk anything with the forums."

         3    Q.    "Yeah."

         4    A.    "Dude, you know the 'Lions of the Desert' vid in Ramadi?"

         5    Q.    "Yeah."

         6    A.    "You know the second song in it?"

         7    Q.    "I haven't seen it."

         8    A.    "Man."

         9    Q.    "Can't download that stuff right now."

03:30 10      A.    "That vid?"

        11    Q.    "LOL.

        12    A.    "Oh, okay.  You're a wounded soldier.  Hehehe."

        13    Q.    "Man, you don't even know, laugh out loud, like" --

        14    A.    "No, I do know."

        15    Q.    -- "there's videos by the Cloud people and a new one from

        16    the Arabian Peninsula.  I can't see any of them.  Even GUH

        17    which I worked on.  I can't watch it and I want to see it.  I

        18    never get tired of seeing it.  Laugh out loud."

        19          MR. AUERHAHN:  Next page, please?  I'm sorry.  Exhibit

03:30 20      517.

        21    Q.    And does this appear to be a chat again between

        22    Mr. Mu'ndhir and the defendant on March 29, 2006?

        23    A.    Yes, it is.

        24    Q.    And does Abu Mu'ndhir say, "Dude"?

        25    A.    "Yes.  39.  Should be done within the next two to three

1    days, Allah willing."

2         MR. AUERHAHN:  Next page, please?

3    Q.   "Nice.  Allah willing."

4    A.   "I'm on Number 30.  Have like ten pages left."

5    Q.   "Cool."

6         MR. AUERHAHN:  Exhibit 518, please.

7    Q.   Does this appear to be a chat between the same two men on

8    March 29th of 2006?

9    A.   Yes, it is.

03:31 10   Q.   Okay.  Again, I'll read Mr. Mu'ndhir.  "Sorry, was not at

11   home."

12   A.   "Peace be upon you."

13   Q.   "Peace be upon you."

14   A.   "Is there someone who will edit 39 or what?  Who's it

15   going to go through?"

16   Q.   "I could find someone to edit if it's grammatical things,

17   like English-wise."

18   A.   "No, I meant" --

19   Q.   "Not Arabic to English."

03:32 20   A.   -- "like to format it better for the PDF."

21   Q.   "Oh, PM IY -- I mean, IU."

22   A.   "?"

23   Q.   "Ibn U."

24   A.   "Ibn Umar?"

25   Q.   "Yeah."

```
 1    A.    Okay.

 2          MR. AUERHAHN:  Next page, please?

 3    A.    "He does all that stuff."

 4    Q.    "Yeah."

 5          MR. AUERHAHN:  Exhibit 519, please.

 6    Q.    Does this appear again to be a chat between the same two

 7    men on April 2, 2006?

 8    A.    Yes, it is.

 9          MR. AUERHAHN:  Would you go to the next page, please?

03:32 10   Q.    Does the defendant say, "Done with 39.  But Ibn U is never

11    online, man, heh."

12    A.    "No, send him on his PM on there."

13    Q.    "Maashi."

14    A.    "He doesn't come on MSN.  You have to go through there to

15    contact him basically."

16    Q.    "Gotcha."

17          MR. AUERHAHN:  Exhibit 559, please.

18    Q.    And does this appear to be a chat between the defendant

19    and Ahmad Rashad on April 4, 2006?

03:33 20   A.    Yes, it is.

21          MR. AUERHAHN:  Page 2, please.

22    Q.    Okay.  Does Mr. Rashad say, "Hey, send me the 39 when you

23    are done.  I wanna read it"?

24    A.    "One sec."

25    Q.    "Do you remember?"
```

1   A.    "Homework."

2   Q.    "And what happened?"

3   A.    Then it says, "Ahmad Rashad has received 39ways.doc."

4   "Still going to add a cover, make it look nice, and put it in a

5   PDF.  This is just your exclusive copy."

6           MR. AUERHAHN:  Can you bring up Exhibit 20, which is a

7   document that was found on the defendant's computer, a dot-doc

8   file.

9   Q.   And is this a document file entitled "39 Ways to Serve and

03:33 10   Participate in Jihad"?

11   A.    Yes, it is.

12   Q.    And is this similar to the PDF version that you've seen?

13   A.    Yes, it is.

14   Q.    But incomplete?

15   A.    Right.

16           MR. AUERHAHN:  Can we go back to Exhibit 559, please,

17   and page 3.

18   Q.    Okay.  If you could read the defendant's part, please?

19   A.    "So don't send it to anyone."

03:34 20   Q.    "Ooo, mi cool now."

21   A.    Smiley face.

22   Q.    "Do you know have to make graphic covers?"  *[sic]*

23   A.    "No, Tibyan, they do."

24   Q.    "Oh, so you going to ask them to make it for you?"

25   A.    "Well, this is for them.  They are going to release it."

```
 1   Q.   "Yeah.  I wish I could learn how to do that graph stuff.
 2   I wish we could live at a time where JH is like something you
 3   could talk openly about and live, go whenever you want.  Like
 4   the old days."
 5   A.   "Hehe.  Keep dreaming, dear."
 6   Q.   Frown.  "Man, I'm telling you, man, martyrs of today, I
 7   think they are a lot higher level than the time of the
 8   Khelafa."
 9   A.   "Yeah, def."
10   Q.   "Because back then it was like summer vaca."
11   A.   "Hehe.  Yeah, brother.  Be right back.  Nighttime
12   prayers."
13   Q.   "They are like, 'I'm going to JH this summer.'  Laugh out
14   loud.  All right, bro.  Don't forget to talk to the Tibyan guys
15   for me, okay?  Peace be upon you."
16   A.   "Okay, man."
17        MR. AUERHAHN:  Exhibit 520, please.
18   Q.   And does this appear to be back to a chat between
19   Mr. Mu'ndhir and the defendant, April 5, 2006?
20   A.   Yes, it is.
21   Q.   Okay.  Mr. Mu'ndhir says, "Did you get in contact with IU?
22   A.   "Yeah.  He's editing it, making it nice, et cetera."
23   Q.   "Cool."
24   A.   "This should be nice, Allah willing."
25   Q.   "Did you give him cover ideas?"
```

A.   "Hopefully, it will lead to some real action.  No, I let

him take care of that."

Q.   "May Allah permits."  *[sic]*

          MR. AUERHAHN:  Next page, please?

A.   "He's good at that."

Q.   "Yeah."

          MR. AUERHAHN:  Exhibit 538, please.

Q.   Does this appear to be a chat between Abu Saqr and the

defendant, April 9, 2006?

A.   Yes, it is.

Q.   After exchanging greetings does the defendant say,

"Brother, the 39 doc is done.  Praise be to Allah.  Do you need

to check anything in it before Ibn U puts it out"?

A.   Yes, he does say that.

Q.   Sorry?

A.   That's correct.

Q.   What does -- could you read Abu Saqr's part?

A.   "No, just make sure you proofread it and the translation

before you release it."

Q.   "Okay."

A.   "Have you heard from him lately?"

Q.   "He just PM'd me."

          MR. AUERHAHN:  And Exhibit 522, please.

Q.   And does this, again, appear to be a chat session between

Abu Mu'ndhir and the defendant?

```
 1    A.   Yes, it is.

 2    Q.   April 9, 2006?

 3    A.   Correct.

 4    Q.   After exchanging greetings does the defendant say, "Dude,

 5    39 is done and PDF'd.  Do you need to check it before it's

 6    released?"

 7    A.   "No, not really, laugh out loud."

 8    Q.   "Okay.  So Ibn U has the green light?"

 9    A.   "Yeah."

 10   Q.   "Okay."

 11        MR. AUERHAHN:  Exhibit 523, please.

 12   Q.   And does this also appear to be a chat between the same

 13   two men on April 9th?

 14   A.   Yes, it is.

 15   Q.   Does Abu Mu'ndhir, after exchanging greetings, say, "Dude,

 16   I forgot to ask you last time, did he give you a cover?"

 17   A.   "Yup."

 18   Q.   "How was it?"

 19   A.   "Wanna see it?"

 20   Q.   "Hold on.  I think it would be in the gallery.  Sah."

 21   A.   "Yes."

 22   Q.   "Okay.  I had an idea for it but let me see it."

 23        MR. AUERHAHN:  Next page, please?

 24   Q.   And then is a link sent?

 25   A.   Yes.
```

```
  1            MR. AUERHAHN:  Next page, please?

  2   Q.   Is this a continuation of the chat session?  Abu Mu'ndhir

  3   says, "Oh, it's really nice.  God bless."

  4   A.   Winky face.  "I hope the book makes an impact."

  5   Q.   "Allah willing, it does."

  6            MR. AUERHAHN:  And Exhibit 524, please.

  7   Q.   Does this appear to be a chat between the same two men on

  8   April 10, 2006?

  9   A.   Yes, it is.
```

03:38
```
 10            MR. AUERHAHN:  Next page, please?

 11   Q.   "When are you going to release the 39?"

 12   A.   "It's all in Ibn U's court now.  He's just making some

 13   final corrections to the text."

 14   Q.   "K."

 15            MR. AUERHAHN:  And finally, Exhibit 720, please.

 16   Q.   Does this appear to be a chat between the defendant and

 17   Taimur on April 18, 2006?

 18   A.   Yes, it is.

 19            MR. AUERHAHN:  Okay.  Next page, please?
```

03:39
```
 20   Q.   Does the defendant say to Taimur, "The 39.  I translated

 21   that.  I just finished it"?

 22   A.   Yes.

 23            MR. AUERHAHN:  Now, can we bring up Exhibit 25?

 24   Q.   Okay.  And this is the PDF version of "39 Ways"?

 25   A.   Yes; that's correct.
```

```
 1    Q.    Okay.

 2          MR. AUERHAHN:  Can we go to page 5, please.

 3    Q.    Tell me if I'm reading this correctly.  "Introduction:

 4    All praise is for Allah who has obligated jihad upon his

 5    servants and has promised them firm establishment on earth and

 6    dominance over the people of disbelief.  And may prayers and

 7    peace be upon the best of his servants, the one who truly

 8    struggled in the path of Allah until he achieved that which was

 9    certain, death."

03:40  10    A.    Yes, that's correct.

11    Q.    And does it also say in here, "Therefore, the entire world

12    has announced its war on terrorism, or rather, on jihad, and

13    its opposition to it and its various forms from being utilized

14    by Muslims"?

15    A.    Yes; that's correct.

16    Q.    "And there's no doubt that jihad today is from the most

17    virtuous of means of gaining nearness to Allah.  In fact, it is

18    an obligation that Allah has obligated upon us.  And there is

19    nothing more obligatory upon the Muslims after having belief in

03:40  20    Allah than jihad and repelling the invader who has occupied the

21    lands of the Muslims."

22    A.    Yes; that's correct.

23    Q.    And finally on this page, Today -- excuse me.  "Jihad

24    today is the Ummah's only choice, as the enemy today has

25    occupied the lands of the Muslims one by one."
```

```
 1   A.    Correct.

 2         MR. AUERHAHN:  Next page, please?

 3   Q.    Does it also state, "So the Muslims today are left with no

 4   choice but that of jihad and the language of weaponry"?

 5   A.    Correct.

 6         MS. BASSIL:  Your Honor, could we have the next

 7   paragraph read, which completes the thought?

 8         MR. AUERHAHN:  Your Honor, the entire document is an

 9   exhibit.

10         THE COURT:  Well, I can't tell whether it completes

11   it.  Why don't you go ahead.

12   BY MR. AUERHAHN:

13   Q.    "Tell me by your lord:  an invading enemy who has occupied

14   lands, violated honor, made orphans out of children, and widows

15   out of women, has begun to strike at Islam in every valley.

16   After all of this, is there a doubt that the only way to come

17   to an understanding with this enemy is through the language of

18   force and revenge?"

19         Can you read that section, please?

20   A.    "There is no solution except for the greatest jihad.

21   World peace no longer satisfies us.  There is no peace for the

22   enemy.  This is a legislation and belief in every Muslim heart.

23         "From this standpoint, and since jihad is the choice of

24   the Ummah and the necessary and ordained obligation, I decided,

25   after consulting one of the brothers, to write about some steps
```

1  that everyone can take to serve the jihad and its people, and

2  to energize the train of jihad that is moving quickly despite

3  the overwhelming arrogance of the transgressor.  We have titled

4  this document '39 Ways to Serve and Participate in Jihad.'"

5  Q.   And what follows, then, are specific 39 steps?

6  A.   Yes; that's correct.

7  Q.   Okay.  So let's go to the next page, to the first one.

8       "Number one:  Make your intention for jihad.  Having the

9  inner intention to fight, the true inner intention which leads

03:42 10  to one seeking to answer the call of jihad whenever the caller

11  calls."

12  A.   Yes; that's correct.

13  Q.   And does it also say, "So, this is from the perfection of

14  having the true intention to fight, and the grief and regret

15  that the person feels out of what he missed of fighting in the

16  path of Allah"?

17  A.   Correct.

18  Q.   Does it also say, "Whoever dies without having fought in

19  the path of Allah, or does not have the intention to fight,

03:43 20  then he dies upon a branch of hypocrisy"?

21  A.   Correct.

22       MR. AUERHAHN:  Could you go to page 9, please?

23  Q.   And can you tell us what the second step is?

24  A.   "Truthfully ask Allah for martyrdom."

25       MR. AUERHAHN:  Next page, please?

1   Q.   Does it say, "As for ten years passing by of the jihad in

2   Afghanistan, while the way to get there is safe and certain and

3   the borders are open, but he does not make it to Peshawar?  As

4   for him, then, we ask Allah to forgive him if he thinks that he

5   is truthful in seeking martyrdom"?

6   A.   Yes; that's correct.

7        MR. AUERHAHN:  Could we go to page 3 -- I'm sorry --

8   the next page, please?

9   Q.   Is this the third step?

03:44 10   A.   Yes, it is.  It says, "Go for jihad yourself."

11  Q.   And does it say, "And when the word 'jihad' is mentioned,

12  it refers to qital, as Ibn Rushd said:  'And when the word

13  "jihad" is mentioned it means physically fighting the

14  disbelievers with the sword until they submit or give the

15  Jizyah by their hands while they are in a state of

16  humiliation'"?

17  A.   Yes; that's correct.

18  Q.   And next to the word "qital" -- and when the word "jihad"

19  is mentioned it refers to "qital" -- is there a footnote?

03:44 20   A.   Yes, Number 7.

21  Q.   And the footnote defines "qital" as fighting, correct?

22  A.   Correct.

23       MR. AUERHAHN:  Could you go ahead two pages, please?

24  Q.   And is this Step No. 4?

25       MS. BASSIL:  Objection, your Honor.  It never said

1    "step."  The document has referred to "39 Ways."

2            THE COURT:  Rephrase it.

3    BY MR. AUERHAHN:

4    Q.   Okay.  Is this the fourth way?

5    A.   Yes.  It says, "Make jihad with your wealth."

6            MR. AUERHAHN:  Okay.  Next page, please?

7    Q.   And is this the fifth way?

8    A.   Yes.  It says, "Help prepare the fighter who is going for

9    jihad."

03:45 10  Q.   "Whoever prepares a fighter going out in the path of Allah

11   will have the same reward as him, the fighter, without the

12   reward of the fighter being decreased at all."  Does it say

13   that?

14   A.   Yes; correct.

15           MR. AUERHAHN:  Can you go to the next page.

16   Q.   The sixth way.  And could you read the sixth way for us?

17   A.   Number 6:  "Take care of the family left behind by the

18   fighter."

19   Q.   And could you then go to the next page for the seventh?

03:45 20  Would you read that, please?

21   A.   Number 7:  "Provide for the families of the martyrs."

22           MR. AUERHAHN:  And the next page, Number 8, please?

23   A.   Number 8:  "Providing for the families of the injured and

24   imprisoned."

25           MR. AUERHAHN:  And next page for Number 9.

```
 1    Q.   You can probably read that without me --

 2    A.   Yeah.  Number 9:  "Collect funds for the mujahideen."

 3         MR. AUERHAHN:  And go two pages ahead, please.

 4    Q.   And Number 10?

 5    A.   Number 10:  "Pay Zakah to them."

 6         MR. AUERHAHN:  Two pages forward, please.

 7    A.   Number 11:  "Cooperate in treating the wounded."

 8         Number 12 as well?

 9    Q.   Yup.

10    A.   "Praise the mujahideen and mention their accounts and call

11    the people to follow in their footsteps."

12    Q.   "And from the methods of serving the jihad and the

13    mujahideen is to praise the mujahideen and to raise one's head

14    with them and to boast about their actions and mention their

15    stories and what occurs to them of miracles and victories

16    against the enemies of this Din."  Is that what it says?

17    A.   Correct.

18    Q.   "And in mentioning their stories, there is a call for the

19    people to follow in their footsteps by which they walked upon

20    the methodology of the prophet Muhammad, peace be upon him.

21    And what is better than for you to make the examples of the

22    Ummah to be the mujahideen who give their lives?"

23    A.   Correct.

24         MR. AUERHAHN:  Next page, please?

25    Q.   Does it say, "The Ummah should know that the history of
```

```
 1    jihad and the mujahideen and the martyrs is not an individual
 2    disconnected piece"?
 3    A.   Correct.
 4    Q.   Now --
 5         MS. BASSIL:  Can we have the rest of that paragraph,
 6    please, your Honor?
 7         THE COURT:  Yes.
 8    BY MR. AUERHAHN:
 9    Q.   "Rather, it is" --
10         MR. AUERHAHN:  I was just waiting for a ruling, your
11    Honor.  I'm sorry, your Honor.
12         THE COURT:  I thought you were doing it without that.
13         MS. BASSIL:  I thought I was supposed to read it.
14    BY MR. AUERHAHN:
15    Q.   "Rather, it is a continuous series within the history of
16    this persistently noble Ummah that was started by Muhammad
17    (peace be upon him) and his Noble companions and those that
18    followed in their footsteps until today."  And what's on Number
19    13?
20    A.   Number 13:  "Encourage the mujahideen and incite them to
21    continue."
22    Q.   Does it say, "However, it is necessary to encourage the
23    mujahideen and to stand by them and back them up to show them
24    that we are with them against their enemies wherever they may
25    be.  Likewise, we must encourage them to continue their jihad
```

1    and to be patient upon it despite what troubles and turmoils

2    they may face"?

3    A.   Correct.

4         MR. AUERHAHN:  Next page, please?

5    Q.   Number 14?

6    A.   Fourteen is:  "Speak out for the mujahideen and defend

7    them."

8         MR. AUERHAHN:  Next page, please?  I'm sorry.  Two

9    pages forward.

03:48 10   Q.   What's the 15th way?

11   A.   Number 15:  "Expose the hypocrites and traitors."

12   Q.   And 16, which would be two more pages forward?

13   A.   Number 16:  "Call and incite the people to jihad."

14   Q.   And does it say, "And this is from the most important

15   message available to the one who cannot make jihad himself; it

16   is upon him to incite others due to the saying of Allah, the

17   exalted"?

18   A.   Correct.

19   Q.   Does it also say, "So it is an obligation upon the one who

03:49 20   is able to make jihad, the one who is unable to make jihad, and

21   every Muslim to incite his brothers to the fight the

22   disbelievers"?

23   A.   Correct.

24   Q.   What is the 17th way?

25   A.   Seventeen:  "Advise the Muslims and the mujahideen."

1          MR. AUERHAHN:  Next page, please?

2    Q.   Does it say, "So in this verse, there is a warning between

3    the believers and what the disbelievers are planning, and

4    advice to the mujahid in order to assist him in being hidden

5    from his enemy.  And you should help in this as much as you are

6    able if this is needed of you"?

7    A.   Correct.

8    Q.   Now, what's Number 18?

9    A.   Number 18:  "Hide the secrets of the mujahideen that the

03:50 10   enemy can benefit from."

11          MR. AUERHAHN:  Next page, please?

12   Q.   Does it say, "The people of knowledge have said:  'It is

13   absolutely forbidden to betray these mujahideen, stand against

14   them, tarnish their image, assist anyone against them, blow

15   their cover, spread their picture on behalf of authorities, spy

16   on them, et cetera.'  And whoever does this, then in reality,

17   he is assisting the Americans who are exerting all of their

18   efforts in arresting them and helping them reach their goals

19   that they have otherwise failed to reach.  So be warned,

03:50 20   brother Muslim, of being an aider against the crusaders against

21   the mujahideen.  And everyone who has done this in any way has

22   transgressed and oppressed and cooperated upon sin and

23   transgression, and Allah the exalted has said"?

24   A.   Correct.

25   Q.   What is Number 19?

1    A.    Nineteen:  "Supplicate for them."

2    Q.    Twenty?

3    A.    Twenty:  "The supplication of distress."

4          MR. AUERHAHN:  And two pages forward, please?

5    A.    Number 21:  "Follow and spread the news of the jihad."

6          MR. AUERHAHN:  Next page, please?

7    A.    Number 22:  "Participate in spreading their releases of

8    books and publications."

9    Q.    And does it say, "And this is related to the previous

03:51 10   method of spreading their news and distributing it between the

11   Muslims.  So it is necessary for you to think of spreading

12   everything related to the jihad and that which incites and

13   calls to it in order to aid its people, and to make use of the

14   various methods of doing so; for example, collecting heroic

15   accounts involving sacrifice and bravery; Xerox-copying them

16   and distributing them amongst the people and on the internet;

17   also, collecting the letters of the prisoners in Guantanamo and

18   taking the best of them and spread them between the people so

19   that they may increase in their sympathy for them.  Likewise,

03:51 20   everyone should try to prepare some media project regarding

21   mujahideen and their affairs.  And here I will mention a

22   situation of one of the virtuous sisters who took it upon

23   herself to collect the latest news from Chechnya.  She

24   collected the latest interviews with Shamil" --

25         MR. AUERHAHN:  Next page, please?

Q.    -- "Basayev and Khaltab, and she collected some poems and

stories and statements, then she put them all into a single

volume and distributed them between the people.

    "And if you are incapable of releasing something yourself,

then it is upon you to spread anything related to the

mujahideen of publications, books, et cetera, in order to serve

the jihad and the mujahideen."  Is that correct?

A.    Yes; that's correct.

Q.    And what's the next way?

A.    Twenty-three:  "Issue fatawa that aid them."

        MR. AUERHAHN:  Next page, please?

A.    Number 24:  "Stay connected with the scholars and

preachers and inform them of the situation of the mujahideen."

        MR. AUERHAHN:  Next page, please?

A.    Twenty-five:  "Become physically fit."

        MR. AUERHAHN:  And next page, please?

Q.    And does it actually lay out a certain regimen for

physical fitness?

A.    Yes, it does.

        MR. AUERHAHN:  Next page, please?

A.    Number 26:  "Train with weapons and learn how to shoot."

        MR. AUERHAHN:  And next page?

A.    Number 27:  "Learn to swim and ride horses."

        MR. AUERHAHN:  And next?

A.    Number 28:  "Learn first aid"; and Number 29:  "Learn the

1    figh of jihad."

2    Q.    And does this paragraph say, "And from the methods of

3    serving the jihad and the mujahideen is to learn the figh of

4    jihad and to study the rulings of it, and this will benefit the

5    mujahideen on the front lines, as the presence of those who

6    will teach them the affairs of their religion is something that

7    is greatly needed by those on the front lines.  Likewise, this

8    person would be of benefit in speaking out in defense of the

9    jihad and the mujahideen from the attacks of the hypocrites,

03:53 10   and whoever does something upon knowledge is not like the one

11   who does something without knowledge"?

12   A.    Yes; that's correct.

13   Q.    "And included in learning the figh of jihad is reading

14   anything that could increase in one's knowledge of jihad and

15   its methodology, and would clarify any doubts that exist

16   surrounding it.  And this can be established by reading the

17   books that were written by the people of knowledge in this

18   area, examples of which include books by Abdullah Azzam, Yusuf

19   al-Uyayri, Abu Muhammad al-Maqdisi, Abu Qatadah al-Filistini,

03:54 20   Abdil Qadir ibn Abdil Aziz, Sulayman al-Ulwan, Ali al-Khudayr,

21   Nasir al-Fahd, Abdil Aziz al-Jarbu, Abu Jandal al-Azdi, et

22   cetera"?

23   A.    Yes; that's correct.

24          MR. AUERHAHN:  Next page, please?

25   A.    Number 30:  "Giving shelter to the mujahideen and honoring

1    them."

2    Q.    And 31?

3    A.    "Having enmity towards the disbelievers and hate them."

4          MR. AUERHAHN:  Next page, please?

5    A.    Thirty-two:  "Expend effort to free our captives."

6          MR. AUERHAHN:  Next page, please?

7    A.    Number 33, "Spread the news about the captives and be

8    concerned with their affairs."

9          MR. AUERHAHN:  Next page?

03:54 10   A.    Thirty-four:  "Electronic jihad."

11   Q.    Okay.  And could you read this, please?

12   A.    "And this terminology has emerged between those who seek

13   to assist the jihad on the internet, and this is a blessed

14   field which contains much benefit, such as following and

15   spreading of news between the people, in addition to a chance

16   to defend and stand up for the mujahideen and spread their

17   ideas and their requests to the people.  This effort can be

18   divided into two major parts:  Discussion boards and hacking

19   methods.

03:55 20        "As for the discussion boards, then a group of brothers

21   should get together and assign each other from the well-known

22   discussion boards to register in and post messages that fall

23   into the following categories:  Inciting to jihad and

24   mentioning its virtues, especially in our times; defending the

25   mujahideen and protecting their honor from any who speak ill of

1    it; awakening the idea of jihad in the minds of the masses;

2    putting out researches and knowledge-based articles related to

3    jihad; going after those who oppose jihad from amongst the

4    modernists and apostates and exposing their faults.

5         "So the brothers should spread these messages throughout

6    each discussion board on a daily basis so that each subject is

7    posted, and then the other brothers can respond to the postings

8    on each board in order to keep it at the top of each forum."

9    Q.   And is that last sentence, "Let us make jihad even if it

03:56 10   is by way of the internet"?

11   A.   Yes, it is.

12   Q.   And 35?

13   A.   "Stand in opposition to the disbelievers."

14        MR. AUERHAHN:  Next page, please?

15   A.   Number 36:  "Raise your children to love jihad and its

16   people."

17        MR. AUERHAHN:  Next page, please?

18   A.   Thirty-seven:  "Abandon luxury."

19        MR. AUERHAHN:  And next page, please?  I'm sorry.  Two

03:56 20   pages.

21   A.   Number 38:  "Boycott the goods of the enemy."

22        MR. AUERHAHN:  Four pages forward, please?

23   A.   Number 39:  "Do not hire workers from the war wagers."

24        MR. AUERHAHN:  And the next page.

25   Q.   Does it say, "The scholars have always considered the

1    abandonment of jihad to be from the greatest of sins"?

2    A.   Yes; that's correct.

3         MR. AUERHAHN:   Two pages forward, please.

4    Q.   Does it say, "Therefore, abandoning jihad in the path of

5    Allah is a reason for destruction in this world and the next"?

6    A.   Yes, it does.

7         MR. AUERHAHN:   Could you go forward three pages,

8    please?   One more.

9    Q.   And does it say, "And give us honor with jihad, and join

03:57 10   us with the caravan of martyrs and use us in your obedience and

11   pleasure"?

12   A.   Yes, it does.

13   Q.   Okay.

14        MR. AUERHAHN:   Now, could we go to the next page,

15   please?

16   Q.   At the end of the publication does it list at-Tibyan

17   releases?

18   A.   Yes, it does.

19   Q.   Okay.   And the first one, "Such are messengers are

03:58 20   tested"?

21   A.   Yes; that's the second one.

22        MR. AUERHAHN:   Okay.   Could you bring up -- that's

23   this one here.   Could you bring up Exhibit 248, please?

24   Q.   This is the email you read earlier?

25   A.   Yes.

1    Q.    "Such are the messengers" are attached to it?

2    A.    Yes.

3          MR. AUERHAHN:  Could we go back to the previous

4    exhibit, please?

5    Q.    And the next is the "Expedition of Shaykh Umar Hadid,"

6    correct?

7    A.    Correct.

8    Q.    Okay.

9          MR. AUERHAHN:  Next page, please?

03:58 10   Q.    And "The Importance of the Word."  Is that another

11   publication they advertise?

12   A.    Yes.

13         MR. AUERHAHN:  Would you bring up Exhibit 255, please?

14   Q.    And was this the email to which "The Word" was attached?

15   A.    Yes.

16         MR. AUERHAHN:  Go to the second page.

17   A.    Yes.  Yes, it was.

18   Q.    Okay.

19         MR. AUERHAHN:  And if you could go back to "39 Ways"?

03:59 20   Go forward two pages, please?

21   Q.    Is there a publication entitled "Ruling Regarding Killing

22   One's Self to Protect Information"?

23   A.    Yes, there is.

24         MR. AUERHAHN:  Could we go back to Exhibit 253,

25   please?

1  Q.   And was this the email to which that was attached?

2  A.   Yes, it is.

3  Q.   Okay.

4       MR. AUERHAHN:  Could we go back to the "39 Ways,"

5  please?

6  Q.   And has one been called "The Ruling Regarding the Muslim

7  Prisoner"?

8  A.   Yes.

9       MR. AUERHAHN:  Could you bring up Exhibit 69, please,

04:00 10  which is, again, a photograph found on the defendant's

11  computer?

12  Q.   And can you read what that is?

13  A.   It says, "Issues pertaining to the rulings regarding the

14  Muslim prisoner."

15       MR. AUERHAHN:  Okay.  Now, can we bring up Exhibit

16  500, please?

17  Q.   Now, does this appear to be a chat on February 4th between

18  the defendant and the same Abu Mu'ndhir?

19  A.   Yes, it is.

04:00 20  Q.   And after exchanging greetings does Mr. Mu'ndhir say, "How

21  are you"?

22  A.   Yes, he does.

23  Q.   Could you read what the defendant says?

24  A.   "Sup."  I'm sorry.  "How are you, dude?"

25  Q.   "Sup?"

1    A.    "You got a working link to GUH English?"

2    Q.    "I do.  I do."

3    A.    "Pass it on, man."

4    Q.    "K."

5    A.    "I got kids who want to see this."

6    Q.    "Right.  Right.  I just showed the guard of the believers

7    and, likewise, to some," smiley face.

8    A.    "Five star reviews?"

9    Q.    And a link is sent.  "Yeah, they loved it.  Get them from

04:01 10    there.  Plus, you can share it to Sufi," again, smiley face.

11    A.    "Hehe.  Yeah."

12    Q.    Continue down to the --

13    A.    Okay.  "Who read Maqdisi's poem at the start?"

14          MR. AUERHAHN:  Next page, please?

15    Q.    "It's from a tape."

16    A.    "Dude, where's the ten ops in a row?"

17    Q.    "In the beginning after logo."

18    A.    "Hell, yeah.  There we go."

19          MR. AUERHAHN:  735, please.

04:01 20    Q.    Does this appear to be a chat between someone known as

21    Umar Kalil and the defendant on February 7, 2006?

22    A.    Yes, it is.

23    Q.    Okay.  Could you read the defendant's part, please?

24    A.    "Kalil."

25    Q.    "Peace be upon you."

1   A.   "Peace be upon you.  Check this out," and then a link is

2   shared.  "Might take a while but well worth it.  If it's too

3   big, then get the smaller version."

4   Q.   Okay.  Then Kalil signs off and back on again.

5        "Hey, send the smaller one again."

6   A.   A link is shared.  "Working?"

7   Q.   "Yeah, but it stops every two minutes."

8   A.   "Save it.  Don't open it."

9   Q.   "How do you save?"

04:02 10   A.   "Go here," and then a link is shared, maniacmuslim.com,

11   "and go all the way down to the ad that says the 'Expedition of

12   Umar Hadeed.'  At the end there are three links.  Right click

13   on the second one."

14   Q.   "It's going to take about 45 minutes."

15   A.   "How long will the first link take?"

16   Q.   "Three hours."

17   A.   "Haha.  Okay.  Go for the second one.  What about the

18   third one?"

19   Q.   "What about the third one?  About 15 minutes."

04:02 20        MR. AUERHAHN:  Next page, please?

21   A.   "Do that one.  The screen is a bit smaller but still

22   visible.  Works?"

23   Q.   "Awesome.  Papa like it.  Peace be upon you."

24        MR. AUERHAHN:  Exhibit 551, please.

25   Q.   Does this appear to be a chat between Ahmad Rashad

1    February 7, 2006, and the defendant?

2    A.    Yes.

3    Q.    I'll read Ahmad Rashad's part.  "So how did you do in the

4    exam, man?  I'm watching Omar Hadeed video."  And there's a

5    link sent.  "This is from the day I was at his house."

6    A.    "Did you download it?"  Or excuse me.  "Did you download

7    the translated version?"

8    Q.    "MP.  No, I left before it was done."

9    A.    "There is a version that has been translated into English

04:03 10   with new stuff added onto it."

11    Q.    "Do you have it?  When I left it was not open yet" -- "it

12    was not out yet."  I'm sorry.

13    A.    Then a link is shared, maniacmuslim.com, and the second

14    says tinyurl.com.  "Last link."

15    Q.    "That's a big file."

16    A.    "You want a smaller version?" and then another link is

17    shared to tinyurl.com.

18    Q.    "Is it the same amount of stuff or less?"

19    A.    "Same, just worse quality."

04:04 20   Q.    "It's going to take some time to download.  Big file."

21    A.    "Hehe.  Well."

22    Q.    "I downloaded this one and blue, man.  I have not seen any

23    good ones lately.  Just small stuff here and there."

24         MR. AUERHAHN:  Exhibit 505, please.

25    Q.    Does this appear to be a chat between the defendant and

1    Abu Mu'ndhir on February 8th?

2    A.   Yes, it is.

3    Q.   The defendant says, "Another fan.  GUH to English.  Doing

4    great work."

5           MR. AUERHAHN:  Next page, please?

6    A.   "Laugh out loud.  Where?"

7    Q.   "A buddy of mine."

8    A.   "Oh, okay."

9           MR. AUERHAHN:  Exhibit 542, please.

04:04 10   Q.   Does this appear to be a chat between the defendant and

11   someone named Ahmad as-Sarayri on February 5, 2006?

12   A.   Yes, it is.

13   Q.   Does Ahmad say, "What's new"?

14   A.   "The cartoons are making a good job."

15   Q.   "I have a big collection and I am distributing heavily."

16          MR. AUERHAHN:  Next page, please?

17   Q.   Continue?

18   A.   "The most important one is the invasion of Shaykh Omar

19   Hadeed."

04:05 20   Q.   "And participating in nice sites.  Everyone here saw it.

21   Even women.  You saw Badr?"

22   A.   "Of course."

23   Q.   "I have a nice collection, each of its own, about 700.

24   Could I send them?"

25   A.   "700 CD?"

```
 1    Q.    "Yes.  Tell me how to send them."

 2    A.    "CD empty?"

 3    Q.    "I have them stored with me."

 4    A.    "If Allah wills, I can bring them with me."

 5    Q.    "No, I have everything.  Don't bring anything with you."

 6    A.    "Okay.  I understand."

 7    Q.    "I have more than you can imagine."

 8    A.    Smiley face.  "Our lord, praise be to you."

 9    Q.    "I am a participant at all private sites."

10    A.    "Al-Hisbah?"

11    Q.    "Yes."

12          THE COURT:  Mr. Auerhahn, I think that we've reached

13    the closing point for today, so we'll pause now.

14          Jurors, let me just take this opportunity to thank you

15    again for your service in this case.  We know what it means for

16    you to do that.  As we break now for a little bit of rest and

17    relaxation, I hope you enjoy tomorrow and the few days

18    afterwards.

19          I caution you again against any discussion.  There may

20    be some temptation at family gatherings to talk about matters;

21    I, please, urge you not to do that.  Tell your family and

22    friends you'll see them at Christmas, and you can tell them

23    everything you want at that point, but for now you have to keep

24    your counsel, all right?

25          So have a very happy Thanksgiving, and I will see you
```

 1     on Monday and continue with the rest of the case, all right?

 2              Yes, we'll stay in the session with the lawyers.

 3              THE CLERK:  All rise for the jury.

 4              (The jury exits the courtroom at 1:02 p.m.)

 5              THE COURT:  We're going to remain in session for a

 6     motion to quash the subpoena.

 7              MR. CHAKRAVARTY:  Mr. Bailey is here, your Honor.

 8              THE COURT:  Good afternoon, Mr. Bailey.  Thank you for

 9     coming on short notice.

04:07 10              MR. BAILEY:  Thank you, your Honor.

11              THE COURT:  Go ahead.

12              MR. BAILEY:  Yes, your Honor.  If it please the Court,

13     Brad Bailey on behalf of Kareem Abuzahra.

14              I have previously filed a motion to quash a subpoena

15     that was served on Mr. Abuzahra on the 27th of October asking

16     him to comply by both appearing in court and by providing

17     certain documents on October the 24th.

18              What was requested includes, as I've indicated on page

19     2 of my motion, any and all records of payment to the United

04:08 20     States government regarding his purported cooperation; copies

21     of all tax returns filed by him with the federal government

22     from 2002 to the present; his passport; "all bank statements

23     from January 1, 2002, to the present, indicating any deposits

24     or expenditures of money by you or jointly with another on your

25     behalf; all financial statements filed by you for any reason

1    from January 1, 2002, to present; all leases signed by you from

2    January 1, 2002, to present; all cancelled checks written by

3    you or on your behalf from January 1, 2002, to present; all

4    statements of credit cards owned by you which you use from

5    January 1, 2002, to present; all contracts and agreements for

6    purchase, sale and lease of any automobiles from January 1,

7    2002, to present; all brokerage accounts and records of stock

8    accounts owned by you from January 1, 2002, to the present."

9         Your Honor, I've indicated that in my opinion this is

04:09 10   nothing more than harassment of a witness.  This is about as

11   broad based a request or a fishing expedition as I've ever seen

12   as both a former federal prosecutor and now as a federal

13   defense attorney.

14        I've cited the *Bogosian* case about harassment, whether

15   there are other viable means, and really, whether the

16   information is relevant.  As I've conceded, other than perhaps

17   payments to the government, which can be obtained through the

18   government themselves and should have been disclosed, I can't

19   see the relevance in any of this.  And my client has a joint

04:10 20   account with his wife, he has small children.  This is just

21   invasive, burdensome.  And I really ask that it be quashed.

22        MS. BASSIL:  Yes, your Honor.

23        THE COURT:  Ms. Bassil?

24        MS. BASSIL:  Your Honor, we served the subpoena.  And

25   I'm not going to go into the issue because there were many

attempts to serve him and many attempts at avoiding service,
but let me say why we requested this information.  And we
requested 2002 because the critical time around money was
around 2004, as you know, the trip to Yemen.

We requested this information because we feel that
under Rule 608 it concerns the truthfulness or untruthfulness
of Mr. Abuzahra.  Throughout my reading of material in this
case, he seems to have an extraordinary amount of cash.  He
apparently, according to the government's witnesses, gave
$5,000 cash to Mr. Abousamra for Mr. Pippin; he paid for the
tickets of all three people, which I understand was $6,180; I
believe he paid -- or they had cash.  I'm a little -- the
reports kind of vary, but about around 10- to $15,000 cash at
the airport; he gave either $1,500 to $2,500 cash to
Mr. Maldonado when he wanted to travel to Saudi Arabia; he
apparently gave Mr. Abousamra cash to go to Pakistan back in
2002.  He reported a robbery in his home on October 21, 2009,
in which $3,500 cash was missing.

It is my understanding he's a graduate student at
UMass.  He's married with two children.  I find the amount of
cash that seems to be floating around -- floating through this
man to be extraordinary.  It's just an extraordinary amount of
money.  And what I would say is we are looking for where this
cash is coming from.

We asked for his tax returns because, in fact, if

these are gifts, they should be reported as gifts and they

should be taxed.  There's a great deal of cash that flows

through Mr. Abuzahra, and we intend to question him about the

sources of his cash and why he is so freely giving it away.

And so the only way to really get at cash is to ask for the

records that would theoretically -- that would provide you with

that information.

And so that's what we're looking for.  For example,

asking for someone's lease indicates what their cost of living

is.  So if his lease is $5,000 a month and he earns 30,000 a

year, there's some question there that needs to be asked about.

And that is why we -- I have asked for these various requests.

And that's basically it.  We feel that it goes to his

credibility and that it is a concern and that there is a

question as to his truthfulness or untruthfulness.

THE COURT:  Does the government want to be heard on

this?

MR. CHAKRAVARTY:  If we could briefly, your Honor.  We

would join in the motion.  We think this is not a case where

you have an expert witness or, as the defense has also filed a

motion to obtain records from the government, this is not like

those circumstances where there is some method to why a

financial record -- for example, payment to an expert

witness -- could be relevant.  Obviously, we opposed the motion

before and your Honor has dealt with that.

1          But this witness, whose motive to testify has nothing

2    to do with financial incentive, obtaining his bank records or

3    finding out how much money he has says nothing about his

4    credibility with regards to the issues that he's going to be

5    testifying to in this case.  And that seems to be the reason

6    why they're using this Rule 17 subpoena, to impeach the

7    witness, not to further the material fact of guilt or innocence

8    in this case.

9          I would just add just for your Honor's benefit,

04:14 10  whatever government record -- whatever the government had

11   obtained with regards to this witness's bank records have been

12   provided.  A few of them have been marked as exhibits in this

13   case.  The defense is well equipped to make the arguments that

14   Ms. Bassil just made without the need of this very invasive and

15   intrusive fishing expedition for records which nobody is even

16   lawfully required to keep for that long.

17         THE COURT:  Would I be correct in presuming that the

18   government has disclosed any payments the government has made?

19         MS. BASSIL:  Yes.  There was some money for coffee and

04:14 20  doughnuts, I think.

21         MS. BASSIL:  Your Honor, I'm sorry.  I forgot one

22   piece I wanted to add, and I apologize.  The other issue is

23   that if -- Mr. Abousamra seems to have a source of ready cash,

24   and a source of cash beyond what it appears he is earning.  If

25   the source of that cash is illegal or it's not properly

1  reported to the authorities or to tax authorities, certainly

2  that would go to his hope to testify and sort of curry favor

3  with the government, for lack of a better phrase, and it would

4  go towards his bias.

5      MR. BAILEY:  Your Honor, hypothetically it's possible

6  that my client has very wealthy parents, and to be able to

7  probe into that and look into that is highly invasive, as that

8  being the source of the income.  I have not been invited to,

9  nor will I be standing in court, objecting to questions, nor

04:15 10  would that be my place.  The defense certainly, in my humble

11  opinion, can probe on cross-examination.  But to make him

12  produce this huge volume of records which he may not even have,

13  and frankly, not to have limited it to something like -- such

14  as the purported trip to Yemen or something, I just find this

15  way off base.

16      THE COURT:  Well, okay.  The motion is granted.  The

17  subpoena is quashed.  I think from Ms. Bassil's argument it

18  appears that this is, in fact, a discovery subpoena, not a

19  trial subpoena.  I think it's not an appropriate use of Rule

04:16 20  17.  And it is also, in the language of the rule, I think on

21  what's been shown, burdensome and oppressive.  So I will grant

22  the motion and quash the subpoena.

23      MR. BAILEY:  Thank you, your Honor.

24      THE COURT:  While we're on the subject, why don't we

25  address -- there's a government's motion that is parallel.

1       MR. CHAKRAVARTY:  So as I suggested earlier, your

2   Honor, the issue here is, again, the government views this as

3   an end run around discovery; particularly, Rule 16.  They're

4   seeking records; in fact, while there's some suggestion that

5   what they're really looking for are any reports written by the

6   case agents in this case or any reports that might be in the

7   file which reflect interviews of government witnesses, the

8   actual motion is -- excuse me -- the subpoena is actually

9   broader than that.  It says, again, anything in the case file.

04:17 10   Anything that would be responsive to that that is within our

11   Rule 16 obligations, or *Jencks* obligations, we have produced.

12       So it seems here that the defense is trying to get

13   through a subpoena, that which both they could not get on

14   direct -- through the discovery process, Rule 16; and then

15   somehow because now they are calling the witness, they are

16   allowed to obtain any prior kind of impeaching information,

17   what -- the floodgates that they would open by this kind of

18   procedure of simply listing as a defense witness every case

19   agent in every case, and then opening up the files of the FBI

04:17 20   which, in this case, include the classified information, seems

21   to be a far stretch from what Rule 17 was designed to do.

22       There is too much in a case -- in this case file for

23   any witness to be able to memorize.  That does not mean that

24   you cart over, you know, Center Plaza to the federal courthouse

25   so that a witness can refresh their memory with regards to some

1    event that occurred, coupled with the fact that whatever is

2    responsive to a material statement of a government witness, you

3    know, something within the subject matter of their testimony,

4    all of the other criteria, that has already been produced.

5            So this seems like it's -- we don't have a problem

6    with witnesses being able to testify.  Obviously, they have

7    been here every day and they will continue to be.  The issue is

8    the document portion.  It's just not narrow.

9            THE COURT:  Ms. Bassil?

04:18 10          MS. BASSIL:  Yes, your Honor.  Your Honor, we have

11   sent a subpoena to Agent Williams and Daly.  And, quite

12   frankly, both Mr. Carney and myself, and Ms. Patel, who was an

13   Assistant United States Attorney, have never heard of a case

14   where the case agents weren't called.  So we do intend to call

15   them and we do intend -- and what we ask for is statements that

16   they have -- reports they have written or statements that they

17   have made reduced to writing.

18           I find it -- I find it extraordinary that between

19   *Jencks* obligations and exculpatory evidence -- theoretically,

04:19 20   there shouldn't be anything left.  But apparently, there is a

21   wealth of things left, which leads me only to leave what is in

22   there as well.  These are witnesses we're going to call.  We're

23   entitled to the statements that they have made, the reports

24   that they have written.

25           THE COURT:  Well, no.  I agree with the government.

1    Again, you're entitled to what Rule 16 and the related local

2    rules and the *Jencks* act provide, but Rule 17 is not meant to

3    be a general deposition subpoena to find out something.  If you

4    had something particular that you could show the relevance of

5    and the usefulness of, that might be something.  But to say

6    that, We want to see what's there to see if there's anything

7    that could be used, I think that's just not -- I think the case

8    law is clear that Rule 17 is not intended to serve that

9    purpose.

04:20  10         So the government's motion is also granted and that

11   subpoena is quashed.

12         Now, there were a couple of witness subpoenas and --

13         MR. CHAKRAVARTY:  I haven't been in touch with counsel

14   on those.  It's not anticipated the government will call any of

15   those witnesses, so I don't know if --

16         THE COURT:  I don't know whether those are live issues

17   with respect to McCloud and some other person.

18         MS. BASSIL:  No.  I think McCloud is not -- he's not

19   going to be a witness, and so anything related to him --

04:20  20         THE COURT:  And there was a woman named Zachi (ph) or

21   something like that.

22         MS. BASSIL:  That was his wife.  That really is moot

23   at this point.

24         THE COURT:  Those two are moot?  Okay.  All right.

25   Thank you.  We'll be in recess.  Happy Thanksgiving.

1          COUNSEL IN UNISON:  Happy holiday.

2          LAW CLERK:  All rise.  Court will be adjourned.

3          (The Court exits the courtroom and the proceedings

4     adjourned at 1:16 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

 4   Dahlstrom, RMR, CRR, Official Reporters of the United States

 5   District Court, do hereby certify that the foregoing transcript

 6   constitutes, to the best of our skill and ability, a true and

 7   accurate transcription of our stenotype notes taken in the

 8   matter of Criminal Action No. 09-10017-GAO-1, United States of

 9   America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  November 23, 2011

17

18

19

20

21

22

23

24

25
```