UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )
         Plaintiff,           )
                              ) Criminal Action
v.                            ) No. 09-10017-GAO
                              )
TAREK MEHANNA,                )
                              )
         Defendant.           )
                              )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWENTY-TWO
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, November 28, 2011
9:18 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
 3            Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Jeffrey D. Groharing, Trial Attorney
              National Security Division
 7        950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
10            Janice Bassil, Esq.
              John E. Oh, Esq.
11        20 Park Plaza
          Suite 1405
12        Boston, Massachusetts  02216
          - and -
13        LAW OFFICE OF SEJAL H. PATEL, LLC
          By: Sejal H. Patel, Esq.
14        101 Tremont Street
          Suite 800
15        Boston, Massachusetts  02108
          On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2                         DIRECT   CROSS   REDIRECT   RECROSS
     WITNESSES FOR THE
3      GOVERNMENT:

4    DANIEL GENCK, resumed

5         By Mr. Auerhahn (Cont'd)   6
          By Ms. Bassil                    28
6
     LEAH VALLEE, resumed
7
          By Mr. Chakravarty        32
8         By Ms. Bassil                    82

9    ANN MARIE DOURSOUNIAN

10        By Mr. Chakravarty        89
          By Ms. Bassil                    97
11
     KAREEM ABUZAHRA
12
          By Mr. Chakravarty        104
13
                         E X H I B I T S
14

15   GOVERNMENT'S       DESCRIPTION              FOR ID    IN EVD.

16   1A       Translation of portion of Exhibit No. 1       35

17   14A      Translation of portion of Exhibit No. 14      36

18   16A      Translation of Portion of Exhibit No. 16      38

19   17A      Translation of portion of Exhibit No. 17      39

20   18A      Translation of portion of Exhibit No. 18      40

21   32A      Translation of screen shot                    41

22   36A      Translation of video title                    42

23   37A      Translation of screen shot                    43

24   57A      Translation of screen shot                    44

25   218A     Translation                                   44
```

| | GOVERNMENT'S | DESCRIPTION | FOR ID | IN EVD. |
|---|---|---|---|---|
| 1 | | | | |
| 2 | 219 | Translation | | 51 |
| 3 | 211 | Translation | | 53 |
| 4 | 222A | Translation | | 55 |
| 5 | 225A | Translation | | 57 |
| 6 | (Exhibit 225A withdrawn from evidence.) | | | 59 |
| 7 | 768B | Translation | | 60 |
| 8 | 770B | Translation | | 60 |
| 9 | 771B | Translation | | 60 |
| 10 | 773B | Translation | | 60 |
| 11 | 775B | Translation | | 60 |
| 12 | 780A | Translation | | 61 |
| 13 | 362 | Translation | | 66 |
| 14 | 58A | Translation of video | | 74 |
| 15 | 55C | Translated video entitled "The Slaughterer" | | 82 |
| 16 | 15A | Translated document entitled "The Noble Character of the Mujahid" | | 90 |
| 17 18 19 | 217A | Translated document entitled "The Legality of Martyrdom Operations and That it is Not Self Murder" | | 91 |
| 20 21 | 220A | Translation of document entitled "Bestowing the Virtues of Jihad Upon the Worshippers By the Imam, the Martyr, Abdullah Azzam" | | 92 |
| 22 | 226A | Translation of Title: "Martyrdom Operations Peak of the Hump of Martyrdom" | | 92 |
| 23 | 224A | Translation of title: "Slowly Usama" | | 92 |
| 24 25 | 228A | Translation of title:  "Waging Jihad Outside Iraq" | | 93 |

| GOVERNMENT'S | DESCRIPTION | FOR ID | IN EVD. |
|---|---|---|---|
| 330A | Translation of document entitled "Hijra, or migration" | | 94 |
| 371A | Translated web page | | 96 |
| 777A | Translation of transliterated document | | 97 |
| 778A | Translation of transliterated document | | 97 |
| 485 | Immunity letter for Abuzahra | | 113 |

```
 1              (The following proceedings were held in open court

 2    before the Honorable George A. O'Toole, Jr., United States

 3    District Judge, United States District Court, District of

 4    Massachusetts, at the John J. Moakley United States Courthouse,

 5    One Courthouse Way, Boston, Massachusetts, on November 28,

 6    2011.

 7              The defendant, Tarek Mehanna, is present with counsel.

 8    Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

 9    are present, along with Jeffrey D. Groharing, Trial Attorney,

10    U.S. Department of Justice, National Security Division.)

11              THE CLERK:  All rise for the Court and the jury.

12              (The Court and jury enter the courtroom at 9:18 a.m.)

13              THE CLERK:  Please be seated.

14              THE COURT:  Good morning, jurors.

15              THE JURORS:  Good morning.

16              THE COURT:  I hope you had a lovely weekend.

17              Mr. Auerhahn?

18              MR. AUERHAHN:  Thank you, your Honor.

19                        DANIEL GENCK, resumed

20                     CONTINUED DIRECT EXAMINATION

21    BY MR. AUERHAHN:

22    Q.   Good morning, sir.

23    A.   Good morning.

24              MR. AUERHAHN:  Can we bring up Exhibit 502, please?

25    Q.   And, sir, does this appear to be a chat session between
```

1    the defendant and Abu Mu'ndhir on February 5, 2006?

2    A.   Yes, it is.

3    Q.   I'll read the defendant's part; if you could please read

4    Mr. Mu'ndhir's.  And if you could read the translation of the

5    Arabic.  "Peace be upon you, dude."

6    A.   "Peace be upon you."

7    Q.   "What is the link on the Arabic forums for the translated

8    GUH?"

9    A.   "Do you have access to them?"

00:32 10    Q.   And do you recognize GUH as an abbreviation for Ghazwah

11    Umar Hadeed?

12    A.   Yes, I do.

13    Q.   That's the "Expedition of Umar Hadeed"?

14    A.   That's correct.

15    Q.   "Well, no, but a friend does."

16    A.   "Okay, one sec."

17    Q.   "Al Hisbah, et cetera."

18    A.   Then a link is shared to alheasbah.org.  Two of them,

19    rather.

00:32 20    Q.   And then a second link?

21    A.   Correct.

22    Q.   "Do you have any log-in info for me, man?"

23    A.   "The one I'm using on al-Hesbah I can't share.  It's not

24    mine.  Ekhlaas, I can.  It's mine."

25    Q.   "Dag.  Okay."

1    A.   "Abu Mansur al-Azdi.  Toyota is the pass."

2         MR. AUERHAHN:  Next page, please?

3    Q.   Continue, please?

4    A.   "I mean not Toyota, but you know what I mean."

5    Q.   "The bro in Egypt who was in the land of the two flowing

6    rivers.  He was really happy to hear of the translation."

7    A.   "Praise be to Allah," and a smiley face.

8    Q.   And then does the discussion continue a short time later?

9    A.   Yes, it does.

00:33 10   Q.   Can you continue reading, please?

11   A.   "Brother, there?"

12   Q.   "Yea, yo."

13   A.   "What do you think of doing the Abu Anas As Shamee video

14   in English?"

15   Q.   "You mean his bio?"

16   A.   "Yeah, bio video."

17   Q.   "Asad al rafdn, 'The Lion of the Two Flowing Rivers'"?

18   A.   "Yeah."

19   Q.   "Heck yeah, man.  People love biography."

00:33 20   A.   "Exactly.  Because I was showing those guys the videos

21   yesterday and they were like talking about the khattab, how

22   they watched it like ten times.  So I was thinking Abu Anas'

23   one is pretty inspirational 'cause he talks about himself

24   instead of people talking for him."

25   Q.   "And it shows him making supplication."

1    A.    "Yeah."

2    Q.    "Good idea, bro.  Excellent next project."

3          MR. AUERHAHN:  Next page, please?

4    A.    "Yeah, 'cause I know a bro has already done wa yakoon and

5    it will be in English, and he gave it to us but requires heavy

6    editing.  So if we do the Abu Anas, it's as if we did all their

7    videos with the exception of 'Winds of Victory.'"

8    Q.    "Okay.  I think the Abu Anas takes precedence 'cause the

9    wa yakun -- and it will be very similar to GUH."

00:34 10   A.    "Yeah."

11   Q.    "Okay.  So can a bro transcribe it?"

12   A.    "Yeah.  I will get someone to, Allah willing."

13   Q.    "Awesome.  Then we can send it to prof personally."

14   A.    "Laugh out loud."

15   Q.    "Hey, dude, I just sent the bro an audio with Z.  So I

16   told him, 'Here is something with ash-Shaykh al-Dhabbaah,' so

17   he told me that when I called him that he laughed so hard that

18   he cried."

19   A.    "Hehe."

00:35 20   Q.    "He told me to send GUH to CNN."

21   A.    "Haha.  What about Fox?  Get more dramatic coverage on

22   there."

23         MR. AUERHAHN:  Next page, please?

24   Q.    "Hehe.  Yeah.  Friggin' homos."

25   A.    "Laugh out loud."

1    Q.    "O'Reilly would wet his panties."

2    A.    "Hehe."

3    Q.    "'Minutes ago:  Kandahar, Afghanistan.  A land mine ripped

4    through a police vehicle, killing six officers and wounding

5    four in the latest of a wave of attacks that have rocked

6    southern Afghanistan, officials said Sunday.

7         "'The Blast late Saturday in Kandahar province came after

8    48 hours of bloodshed that left 38 people dead as hundreds of

9    Afghan and U.S. forces battled some 200 militants in the

00:35 10   biggest fighting in months.'"

11   A.    "Laugh out loud.  Things are getting nice there.  I read

12   one article that a whole battalion was donated from Z to

13   there."

14   Q.    "Hey, yeah.  I believe it, man.  They like their

15   sacrificed meal a little spicier.

16        "Okay, bro.  I'm going to catch some sleep.  Talk to you

17   soon.  Peace be upon you."

18   A.    "Allah willing.  Peace be upon you."

19        MR. AUERHAHN:  May we have the next exhibit, 503,

00:36 20   please?

21   Q.    And does this appear to be a chat session between the same

22   two men on February 5th -- same day -- 2006?

23   A.    Yes.

24        MR. AUERHAHN:  Go to the next page, please?

25   Q.    If you can read Mr. Mu'ndhir's parts, please?

```
    1   A.   "Still got access to ekhlaas?"

    2   Q.   "With the password you gave me?"

    3   A.   "Yeah."

    4   Q.   "Yeah."

    5   A.   Then a link is shared.

    6        "Check it out.  It's on al-Hesbah also."

    7   Q.   "Damn straight."

    8   A.   "Hehe.  We're pretty popular so we have to continue this,"

    9   smiley face.

00:36 10  Q.   "Yup.  Maybe one day" --

   11   A.   I just --

   12   Q.   -- "there will be" --

   13   A.   -- "hope JUS doesn't see this."

   14   Q.   -- "a Tibyan brigade."

   15   A.   "Laugh out loud.  That's what I was.  Me and Khubayb were

   16   talked about we just need armed wing now.  Hehe."

   17        MR. AUERHAHN:  Can we bring up Exhibit 586, please?

   18   Q.   And does this appear to be a chat session between the

   19   defendant and Ahmad Abousamra on April 4, 2006?

00:37 20  A.   Yes, it is.

   21   Q.   Would you read Mr. Abousamra's?

   22   A.   "Hey, at the end of that song they sing in the uhadid vid,

   23   the one in the Iraqi accent" --

   24   Q.   "Yeah?"

   25   A.   -- "IRA police, et cetera, I can't understand what they
```

1    are saying in the very last line, after the word 'civilian.'

2    Do you know what they are saying?"

3    Q.   "One sec."

4    A.   "I know the first two words, 'Trade Towers'-----rubbles.

5    So it is those two words.  I guessed 'extent' and 'pile.'

6    'Koma' is the slang for 'a lot.'  They use it in parts of Syria

7    and IR."

8    Q.   "Yeah, 'kom' is one of the words" --

9         MR. AUERHAHN:  Next page, please?

00:38 10  Q.   -- "'cause it was translated as 'pile.'  I can't recall

11   the word before it."

12   A.   "Why don't they make a song where they just repeat,

13   'Whoever does not claim the infidel as an infidel is an infidel

14   himself' over and over?"

15   Q.   "Because no one is that cool."

16   A.   "They should make a song where the intro is the sound of

17   women screaming from being raped, and then it goes into a long

18   song about the process, something like ibnulqayyim-ish in

19   wording."

00:38 20  Q.   "Oh, man.  That would be like -- it would lead to AQ's

21   membership increasing one billion fold."

22   A.   "Hahaha.  Laugh out loud.  Ha.  Then Rums would have to

23   come on TV again and say, 'We are losing to AQ's propaganda

24   machine.'"

25        MR. AUERHAHN:  May I have Exhibit 512, please?

1    Q.   And does this appear to be a chat session between

2    Mr. Mu'ndhir and the defendant on March 8, 2006?

3    A.   Yes, it is.

4    Q.   If you could read Mr. Mu'ndhir's parts, please?

5    A.   "Peace be upon you."

6    Q.   "Peace be upon you."

7    A.   "How are you?"

8    Q.   "Y."

9    A.   "Brother, do you have the Hollywood film 'And the Religion

00:39 10   Will Be'?"

11   Q.   And in Arabic that's "wa yakoon ad deen"?

12   A.   Correct.

13   Q.   Okay.  "Yes."

14   A.   Okay.

15   Q.   "Starring 'The Slicer'?"

16   A.   "Can you just go through that and edit what needs to be

17   edited?"

18   Q.   "What do you mean?"

19   A.   "Press 'accept,' you'll see."

00:39 20   Q.   "Accept what?"

21   A.   "Waiting for -- to accept the file."

22   Q.   And the file's name is WaYakoon.doc.  Is that correct?

23   A.   That's correct; yes.

24   Q.   And if you could continue?

25   A.   "You're not getting it?"

```
      1  Q.   "Nothing, man."

      2  A.   "One sec.  Now?"

      3  Q.   "Hehe.  Nothing, man.  Just usendit."

      4  A.   "Okay."

      5       MR. AUERHAHN:  Next page?

      6  A.   And then something is sent on YouSendIt.com.

      7       "Did you get it?"

      8  Q.   "Yes."

      9  A.   "K."

00:39 10  Q.   Now, there was a reference here to a WaYakoon.doc?

     11  A.   Correct.

     12       MR. AUERHAHN:  Can we bring up Exhibit 782, which was

     13  a doc file found on the defendant's computer in 2006?

     14  Q.   And this appears to be Wa Yakon.  Is that correct?

     15  A.   Yes, it is.

     16  Q.   And could you read that part in red?

     17  A.   "Dear brother, I have translated the full video of Wa

     18  Yakon Ad-deen Kulouhu Lil'ah.  Some sentences will not be

     19  grammatically correct.  This is due to the fact that the

00:40 20  translation is the translation of speech and not text, and so

     21  the grammatical errors will be negligible when the translation

     22  is turned into subtitles."

     23  Q.   Okay.  So this appears to be the words of a video?

     24  A.   Yes; that is correct.

     25  Q.   And could you read the part that I've enlarged?
```

A.   "The scholars have agreed that assisting the kuffaar

against the Muslims is an act of major disbelief.  Which takes

one outside the fold of the religion; it is accounted in the

ten nullifiers of Islam.  Without differentiating whether the

kafir allied with is a Roman or Arab, ruling or be-ruled, for

verily assisting America and the apostate government of Allawi

in their killing of Muslims, is an act of major disbelief

talking one outside the fold of the religion.  And in this

alliance come those companies (assisting America and the

government of Iraq) and workers who transport food, fuel,

ammunition, supplies, and any other needs (for the armies of

disbelief).  For all he who helps, aids and assists them in any

form of assistance has become an apostate, and therefore, it

becomes an obligation to fight him.

"The Organization of al Qa'ida in the land of Iraq, the

Media Front presents."

         MR. AUERHAHN:  Next page, please.

Q.   And does this headnote say "Bagdad March 2003"?

A.   Yes, it does.

Q.   Would you read that section, please?

A.   "Ar-Ramadi martyrdom operations:  The operation caused the

death of more than 20 American soldiers.

"Exploding an American vehicle:  As-saqlaawiah, the

brigade of Shaykh Abdul'Jalil Al-Heeit.

"Targeting an American vehicle:  Al-Yusifiyah, the brigade

1    of al-Qasaam.

2         "Destroying an American truck:  Al-Yusifiyah, the brigade

3    of Al-Qasaam.

4         "The mujahideen have ignited the land of Iraq in flames

5    that smoulder the enemy with its blaze and have executed a

6    series of operations that were truly an expand to the

7    magnificent history of the Ummah."

8              MR. AUERHAHN:  Next page, please?

9    Q.   And does this appear to be a quote from Shaykh Abu Musaab

00:42 10   al-Zarqawi?

11   A.   Yes, it is.

12   Q.   And is there a series of references to various martyrdom

13   operations resulting in the death of American soldiers?

14   A.   Yes, there are.

15   Q.   Here's a second one?  And a third one?

16   A.   Correct.

17   Q.   And does this last paragraph state, "To preserve the

18   American blood, expensive in price, dear in value.  The

19   American soldier has proved that he is the weakest and most

00:43 20   cowardly being, becoming an easy target for the swords and the

21   mujahideen which are harvesting from them their heads"?

22   A.   Yes; that's correct.

23             MR. AUERHAHN:  Next page, please?

24   Q.   Could you read that paragraph, please?

25   A.   "America, in her war with Islam in the land of Iraq, has

been dependent on two types of apostates who fight Allah, his

prophet and the believers.  As for the first type, they vary

from truck drivers, contractors and translators for they have

acquainted themselves to be obedient slaves and humiliated

laborers for the Jews and crusaders.  Still, yet they taste

from the chalice of death by the hands of the Mujahideen."

MR. AUERHAHN:  Could you finally go to page 10,

please.

Q.   Could you read that at the end of the document?

A.   "Do not forget us from the finest of your du'ah, your

brothers in the media branch, the organization of al Qa'ida, in

the land of Iraq."

MR. AUERHAHN:  Could we bring up Exhibit 511, please?

Q.   Does this again appear to be a chat session between the

defendant and Abu Mu'ndhir on March 7, 2006?

A.   Yes, it is.

MR. AUERHAHN:  Could we go to the second page, please?

Q.   Can you start reading with "GUH is popular"?

A.   "GUH is popular, hum?  I was thinking about it today, how

popular the English version is, laugh out loud."

Q.   "Praise be to Allah."

MR. AUERHAHN:  Next page, please?

Q.   "I just hope it leads to action."

A.   "Yeah, Allah willing."

Q.   "Not just let's watch it and then go eat some pizza."

```
 1   A.   "Laugh out loud."

 2   Q.   "You know, we haven't done one from Khursan."

 3   A.   "There's nothing though that's good in words.  It's mostly

 4   action-packed except for the speech by lib in shenk 2 when he

 5   talks about there is no God but Allah, that it's a method, et

 6   cetera."

 7   Q.   "Yeah..."

 8   A.   "But I told you that one where he talks about Z should

 9   have been" --

10   Q.   "Found it, nice."

11   A.   -- "cool."

12   Q.   "The 'Messengers Tested' vid was too much effort" --

13   A.   "Laugh out loud."

14   Q.   -- "compared to GUH."

15   A.   "Dude, I think that's mad popular, though, laugh out loud,

16   'cause it's the first vid of him, and it's an original tampon."

17   Q.   "Yeah."

18        MR. AUERHAHN:  Exhibit 536, please?

19   Q.   And does this appear to be a chat between the defendant

20   and someone named Abu Sulayman ash-Shami on March 17, 2006?

21   A.   Yes, it is.

22        MR. AUERHAHN:  Could we go to page 2, please?

23   Q.   I'll read the defendant's part.  "I want to do stuff that

24   is directly related to bros and sis's in the west."

25   A.   "Yeah."
```

1    Q.    "See, brother, I am kind of worried that many brothers

2    read the stuff about over there that we do and then

3    subconsciously think that they've done their part.  Like they

4    read about the ruling on martyrdom operations, then they go eat

5    pizza."

6    A.    "Laugh out loud.  Yeah."

7    Q.    "'Cause they don't see any part of it that they can apply

8    directly.  Well, some might, but you know what I mean.  Hehe."

9    A.    Yeah.

00:46 10          MR. AUERHAHN:  Exhibit 700, please.

11    Q.    And does this appear to be a chat session between the

12    defendant and an individual named Nusrah on July 8, 2006?

13    A.    Yes, it is.

14          MR. AUERHAHN:  Can we go to page 5, please?

15    Q.    "He never answered my question either as to whether or not

16    he had a legitimate excuse for not being in jail or in jihad."

17    A.    "Yeah, he does.  He is in jihad, brother.  You don't know

18    him?  He is a member of Tibyan.  That's jihad's son."

19    Q.    "Oh, yes, the jihad against the innovators.  The jihad

00:47 20    against those who aren't in jihad."

21    A.    "Yeah, in a salafi password forum, laugh out loud.  It's

22    like going to your bathroom and bashing Shi'as.  Just makes no

23    sense.  I don't know, man.  People these days, brother, they

24    think their statue goes up by watching the latest vids from

25    As-Sahab Media."

|     |    |                                                                        |
|-----|----|------------------------------------------------------------------------|
| 1   |    | MR. AUERHAHN:  And can we go to page 7, please?                         |
| 2   | A. | "People that don't watch enough videos.  Man, I swear" --              |
| 3   | Q. | "Ahahhahaha."                                                          |
| 4   | A. | -- "that's their jihad."                                               |
| 5   | Q. | "Those videos" --                                                      |
| 6   | A. | "Downloading" --                                                       |
| 7   | Q. | -- "I stopped watching them."                                          |
| 8   | A. | -- "watching and dreaming about it."                                   |
| 9   | Q. | "All it does" --                                                       |
| 00:48 10 | A. | "Just hype."                                                      |
| 11  | Q. | -- "is make you feel either like you did something" --                 |
| 12  | A. | "Haha.  Bingo, son."                                                   |
| 13  | Q. | -- "or like you're a pile of ----"                                     |
| 14  | A. | "Like you were the one who blew himself up or beheaded the             |
| 15  |    | Jew.  Losers."                                                         |
| 16  | Q. | "You saw the Umar Hadid video?"                                        |
| 17  | A. | "Nope.  Laugh out loud."                                               |
| 18  | Q. | "Good."                                                                |
| 19  | A. | "I just don't have time, man."                                        |
| 00:48 20 | Q. | "No, I'm serious.  Abu Sabaayaa" --                              |
| 21  | A. | "They are all the same."                                              |
| 22  | Q. | -- "translated it.  And after he did it asked himself,                 |
| 23  |    | 'Okay.  Now what?'"                                                    |
| 24  | A. | "Translate more.  Because more Salafi-Jihadis need their               |
| 25  |    | jihadeeeeeeeos," winky face.                                           |

1    Q.    "Hahaha."

2    A.    "All right, brother.  Good speaking to you, man.  Allah

3    willing, next time we can meet and have some good old BBQ."

4    Q.    "Lots of meat.  Only meat."

5    A.    "Laugh out loud."

6    Q.    "No veggies."

7    A.    "Meat juice."

8    Q.    "No soy junk."

9          MR. AUERHAHN:  Next page, please?

00:49 10   Q.    Continue?

11   A.    "Meat, salad, meat, buns, laugh out loud.

12         "All right, brother, I'm out to sleep and dream that I

13   just defeated a whole army because I watched a video and the

14   FBI don't know who I am," smiley face.

15   Q.    "Hehehe haha."

16   A.    "Peace be upon you," smiley face.

17   Q.    "Peace be upon you.  May Allah reward you for watching the

18   video."

19   A.    "You too, brother.  Laugh out loud."

00:49 20   Q.    "You had intentions for martyrdom as soon as you hit

21   'play.'"

22   A.    "And I slow-motioned it too."

23   Q.    "It's amazing you were able to dodge that mortar round" --

24   A.    "I know, man.  I had to rewind it."

25   Q.    -- "considering how close you were to the screen."

1   A.   "So I can see where it will fall.  But praise be to Allah,

2   my speakers were off."

3   Q.   "God bless."

4   A.   "But the bro next to me had it on all the way."

5   Q.   "Allah protects his servants."

6   A.   "May Allah reward his ears."

7   Q.   "Glory be to Allah.  Usama would be proud."

8   A.   "To have a soldier like me."

9   Q.   "Hehe.  Man, make supplication."

00:50 10   A.   "But my AC was off, laugh out loud."

11        MR. AUERHAHN:  Can we bring up Exhibit 604, please?

12   Q.   And does this appear to be a chat session between the

13   defendant and Ahmad Abousamra on June 22, 2006?

14   A.   Yes, it is.

15   Q.   Would you read Mr. Abousamra?

16   A.   "So what happened with your dad?"

17   Q.   "He just said no more khuthabs, sermons.  And I have to

18   pack all my books and put them in the attic, except the

19   Qur'an."

00:50 20   A.   "Don't listen.  This is BS.  I don't think you should

21   listen."

22        MS. BASSIL:  Can we have the rest of that, the next

23   line read, please?

24        MR. AUERHAHN:  Should I read it?

25        THE COURT:  Well, I don't have it in front of me, but

```
 1    it seems like a limited request.

 2    BY MR. AUERHAHN:

 3    Q.   Continue, please.

 4    A.   "Your books?  Your Islamic books?"

 5           MS. BASSIL:  He skipped the line I asked to be read,

 6    your Honor.

 7           MR. AUERHAHN:  I'm sorry.

 8           MS. BASSIL:  If we can start back at "I don't think

 9    you should listen," and then just the next line after that,

10    please?

11           MR. AUERHAHN:  I'm sorry.

12           MS. BASSIL:  Thank you.

13    BY MR. AUERHAHN:

14    Q.   "I must."

15    A.   "Your books?  Your Islamic books?  How will you practice

16    your religion" --

17    Q.   "Yeah."

18    A.   -- "if you have a question, ask your father?"

19    Q.   "Hehe."

20    A.   "Or the imam of going-astray of Sharon?"

21    Q.   "Ask Muhiuddin" --

22    A.   "I mean, that is something you need."

23           MS. BASSIL:  I'm satisfied, your Honor.

24    BY MR. AUERHAHN:

25    Q.   -- "since he knows how to propagate Islam.  I mean, giving
```

1    up."

2    A.   "You need your books.  Dude, this is stupid.  I hate these

3    adults."

4    Q.   "Ah, well, dude."

5    A.   "You can't just give up."

6    Q.   "I'm not."

7    A.   "If your dad said abandon the religion of Ibrahim."

8    Q.   "I'm being smart.  If I resist too much now he'll make it

9    worse."

00:52 10   A.   "By not showing animosity."

11   Q.   "If I pretend to agree, he will cool off" --

12            MR. AUERHAHN:  Next page, please?

13   A.   "You can't just obey it."

14   Q.   -- "and change his mind."

15   A.   "He's asking you to abandon giving sermons."

16   Q.   "I know him."

17   A.   "That means one person who should give sermon in light of

18   the fact that 99 percent of the Muslims here should not,

19   because they are deviant or ignorant."

00:52 20   Q.   "I know.  But like I said, if I argue with him, he'll just

21   get more mad and make it worse.  I will just pretend to agree

22   and he will forget about it.  He does this a lot."

23            MR. AUERHAHN:  Let me have Exhibit 603, please.

24   Q.   Does this appear to be a chat between the same two men on

25   June 12, 2006?

1   A.   Yes, it is.

2        MR. AUERHAHN:  Can we have page 3, please?

3   Q.   "Check out this clip."  Then a link is sent.  "Near the

4   start it has a clip of Hadrami walking.  I've never seen it

5   before.  Just wearing a kufi."

6   A.   "He seems to respect international orgs like the Arab body

7   of whatever."

8   Q.   "No surprise."

9   A.   "'"It's about time Muslims owned up to the fact it's a

00:53 10  Muslim problem," says Farzana Hassan-Shadid of the Canadian

11  Muslim Congress, adding that she believes the community must

12  forcefully denounce extremism.  "We need to be more proactive

13  rather than issue statements of condemnation."'"

14  Q.   "She needs to be raped with a broomstick."

15  A.   "Laugh out loud."

16       MR. AUERHAHN:  Exhibit 705, please?

17  Q.   And does this appear to be a chat between the defendant

18  and someone named Taimur on February 28, 2006?

19  A.   Yes, it is.

00:54 20       MR. AUERHAHN:  Can we go to page 2, please?

21  Q.   Could you start with "I'm listening to heros"?

22  A.   "I'm listening to heros of Islam right now.  I advertised

23  Constants on YM forums, hehe."

24  Q.   "Allah willing, one day me and you can join the victorious

25  sect."

```
 1   A.   "And told all the brothers to listen to it, Allah willing.
 2   Well, I am going to Pakistan this summer, laugh out loud,
 3   joke."
 4   Q.   "Hehe."
 5   A.   "Can there be a political or intellectual jihad?"
 6   Q.   "Yes, but the form that is the highest is, well, you
 7   know."
 8   A.   "You know the Hadith, messenger of Allah, peace and
 9   blessings be upon him, said 'The best of jihad is the one who
10   stands up to the tyrants.'"
11   Q.   "Yes.  Do you know why?  Do you know why this is the
12   best?"
13   A.   "It's the hardest?"
14   Q.   "Because generally when a Muslim stands up to a tyrant
15   like this, the tyrant ends up killing him, so he attains
16   martyrdom."
17   A.   "Yeah, exactly.  Glory be to Allah."
18        MR. AUERHAHN:  Exhibit 712, please?
19   Q.   And does this appear to be a chat session between the same
20   two men on February 24, 2006?
21   A.   March 24, 2006.
22   Q.   I'm sorry.
23   A.   Yes; that's correct.
24   Q.   Thank you for correcting me, March 24th.
25   A.   Any time.
```

1           MR. AUERHAHN:  Next page, please.

2      Q.   Can you read Taimur?

3      A.   "Every day there is another attack on Islam."

4      Q.   "Dude, I really stopped caring about the media and their

5      attacks."

6      A.   "Yeah, true."

7      Q.   "RPGs speak louder than words.  They attack with their

8      words, the mujahideen respond in their own way."

9           Sir, are you familiar with the initials RPG?

00:56 10   A.   Yes, I am.

11     Q.   What is an RPG?

12     A.   It's a rocket-propelled grenade.

13          MR. AUERHAHN:  And can we have Exhibit 685, please?

14     Q.   Does this appear to be a chat between the defendant and

15     someone named Ihab on June 28, 2006?

16     A.   Yes, it is.

17     Q.   Okay.  After greetings are exchanged, if you could read

18     Ihab.

19     A.   "Haha.  Gay dragon.  Big difference."

00:56 20   Q.   "May Allah protect you."

21     A.   "What do you think of the book 'The Truth About the

22     Crusades'"?

23     Q.   "It's a masterpiece."

24     A.   "So you agree with the evidence?"

25     Q.   "I think he presented it in a convincing way.  Yes.  And

 1  nobody has been able to refute it until now."

 2  A.   "Well, why did you speak against it when I asked you

 3  before?"

 4  Q.   "I didn't speak against it, I just didn't speak for it."

 5  A.   Winky face, "Yah, right."

 6  Q.   "Well, at the time I remember saying that it is haram," or

 7  "killing of the innocent is unlawful.  And it is.  But I never

 8  said who is considered innocent," smiley face.

 9             MR. AUERHAHN:  No further questions, your Honor.

00:57 10             MS. BASSIL:  I just have a few questions.

11             Could we have Exhibit 215, please?  And page 61.

12             MR. BRUEMMER:  I'm sorry?

13             MS. BASSIL:  Page 61.  Is that not it?

14             Your Honor, I'm going to use the -- I think I kind of

15  messed that up, but I'm going to use the ELMO on that, your

16  Honor.  I thought this was Exhibit 215.

17                         CROSS-EXAMINATION

18  BY MS. BASSIL:

19  Q.   Good morning, first of all.

00:58 20  A.   Good morning, ma'am.

21  Q.   Yes.  Do you recall that you read a number of

22  documents -- you read something from at-Tibyan.  Do you recall

23  reading that, "39 Ways," and pieces of it?

24  A.   Yes, ma'am.

25  Q.   And at the end of it there were a number of at-Tibyan

1    Publications releases.  Do you remember reading that?

2    A.   Yes; that's correct.

3    Q.   And this is a list of some of the things that were there.

4    Is that right?

5    A.   Yes, I believe it is.

6    Q.   It says "audio," there's one page of articles, a second

7    page of articles, correct?

8    A.   Yes.

9    Q.   And there's nothing on that list that indicates who

00:58 10   translated them, correct?

11   A.   I don't believe so.  No, ma'am.

12   Q.   All right.

13        MS. BASSIL:  Now, if you would go to Exhibit 414,

14   please.

15   Q.   This is -- I think you read this.  This is a message

16   asking about translations, projects you are currently working

17   on. Do you see that?

18   A.   Yes, ma'am.

19   Q.   And again, it doesn't indicate whether Mr. Mehanna

00:59 20   translated any of those or a portion of those or anything of

21   that nature, correct?

22   A.   No, ma'am.  It's just a private message.

23   Q.   It's just a request, correct, or a statement?

24   A.   Yes.

25   Q.   "Here are some of the projects which we are currently

1    working on," and it is sent -- it is a private message,

2    correct?

3    A.   Yes.

4    Q.   All right.  Now, if we could have Exhibit 255.

5              THE COURT:  Well, which do you want?

6              MS. BASSIL:  Either one.  They're both the same.

7    BY MS. BASSIL:

8    Q.   If you would look at --

9              MS. BASSIL:  If we could have the bottom portion blown

00:59 10   up a little bit?  Thank you.

11   Q.   This was a message sent from, I believe, Ibnul Khattab,

12   which you understand to be Tarek Mehanna, correct?

13   A.   Correct.

14   Q.   And in this he says, explicitly, "This is another article

15   I just translated for Tib-Pubs," correct?

16   A.   Yes.  Yes.

17   Q.   And you understand that to be a Tibyan Publications,

18   correct?

19   A.   Yes.

01:00 20   Q.   And you did not read any other instant message in which he

21   explicitly said, "Here is an article I translated for

22   Tib-Pubs," or Tibyan Publications, correct?

23   A.   No, I did not read any other.

24             MS. BASSIL:  All right.  And finally, if we could have

25   Exhibit 782.

```
  1    Q.   This was the Wa Yakon translation.  And it is your

  2    understanding, is it not, that this is not the -- this is not

  3    Mr. Mehanna's translation but something that was sent to him.

  4    Is that correct?

  5    A.   Yes.  I believe it was found on his computer, correct.

  6    Q.   Correct?

  7    A.   Yes.

  8    Q.   And it was sent to him in the previous conversation that

  9    you read today from, I believe, Abu Mu'ndhir?

01:01 10   A.   Yes; I believe that's correct.

 11             MS. BASSIL:  Thank you.  I have no further questions.

 12             MR. AUERHAHN:  No redirect, your Honor.  Thank you.

 13             THE COURT:  All right, Mr. Genck.  You may step down.

 14             THE WITNESS:  Thank you.

 15             (The witness is excused.)

 16             MR. CHAKRAVARTY:  The government calls Leah Vallee.

 17             THE COURT:  Strictly speaking, the government re-calls

 18    Ms. Vallee, correct?

 19             You remain sworn from your previous testimony.  You

01:01 20   may just resume.

 21                          LEAH VALLEE, resumed

 22             THE WITNESS:  Thank you.

 23             THE COURT:  For the record, would you just have the

 24    witness identify herself?

 25                      CONTINUED DIRECT EXAMINATION
```

```
 1   BY MR. CHAKRAVARTY:

 2   Q.   Good morning again.

 3   A.   Good morning.

 4   Q.   Please state and spell your name.

 5   A.   Leah Valle; L-E-A-H, last name V-A-L-L-E-E.

 6   Q.   And you're a linguist at the FBI?

 7   A.   Yes, I am.

 8   Q.   So when we last spoke in the court, I asked you to

 9   identify a number of translations that have been submitted as

01:02 10   evidence.  Today I'm going to focus on certain extensive

11   documents or other media which you did not at the time do a

12   verbatim translation for.  But since that time have you now

13   done certain verbatim translations?

14   A.   Yes.

15   Q.   So I'm going to draw your attention to some of those.

16   Specifically, we'll call up Exhibit 1A, please?

17           MR. CHAKRAVARTY:  Your Honor, since these have not yet

18   been introduced, perhaps just for the witness first?

19           THE COURT:  For the witness?

01:03 20   BY MR. CHAKRAVARTY:

21   Q.   And is this a translation that you did?  A portion of a

22   verbatim translation of Exhibit 1?

23   A.   Yes.

24   Q.   And is it called "A Letter from Mullah 'Umar"?

25   A.   Yes.
```

```
 1   Q.   And is this a fair and accurate translation of a portion
 2   of that letter?
 3   A.   Yes.
 4              MS. BASSIL:  Objection, your Honor.
 5              THE COURT:  Let me see you briefly.
 6              (Discussion at sidebar and out of the hearing of the
 7   jury:)
 8              MS. BASSIL:  I'm just objecting that it's a portion.
 9   I assumed you realized that's what I objected to.  This is a
01:03 10  six- or seven- or ten-page document.
11              THE COURT:  You're going to offer some portions; is
12   that it?
13              MR. CHAKRAVARTY:  Yes.
14              THE COURT:  She -- as I understand it, she has now
15   translated the whole thing?
16              MR. CHAKRAVARTY:  She has -- no.  For some of them
17   she's translated the whole thing; for example, that video.
18              THE COURT:  But she's giving a verbatim --
19              MR. CHAKRAVARTY:  Translation of --
01:04 20              THE COURT:  -- translation of some portions that she's
21   been directed to?
22              MR. CHAKRAVARTY:  Correct.
23              THE COURT:  Okay.
24              MS. BASSIL:  And my objection would be that it's a
25   portion as opposed to the entire document.
```

```
 1            THE COURT:  I don't think that affects its
 2   admissibility, although it can be impeached on
 3   cross-examination.  But I think it should be clear when that's
 4   happened as to opposed to when it has not.
 5            MR. CHAKRAVARTY:  Yes.
 6            (In open court:)
 7   BY MR. CHAKRAVARTY:
 8   Q.   Ms. Vallee, just to clarify, for some of the exhibits that
 9   we're going to talk about today were you able to -- because of
10   the size of the document, able to translate the entire document
11   verbatim?
12            MS. BASSIL:  Objection.
13            THE COURT:  Rephrase it.
14   BY MR. CHAKRAVARTY:
15   Q.   With regards to this specific exhibit, were you able to
16   translate the entire document?
17   A.   Not the specific one, no.
18   Q.   And Exhibit 1 is a multipage document?
19   A.   Yes, it is.
20   Q.   Did you translate a particular paragraph or particular
21   portion of that document?
22   A.   Yes.
23   Q.   Okay.  And is what you see on the screen in front of you
24   that portion that you translated verbatim?
25   A.   Correct.
```

1   Q.   Okay.  And that means that it's exactly what -- the

2   meaning was in that particular paragraph or a particular

3   portion of the document you have turned into English?

4   A.   Correct.

5   Q.   Okay.

6           MR. CHAKRAVARTY:  Okay.  With that, I would ask that

7   this be introduced as Exhibit 1A, your Honor.

8           MS. BASSIL:  Note my objection.

9           THE COURT:  Okay.  It will be admitted, 1A.

01:05 10          (Government Exhibit No. 1A received into evidence.)

11          MR. CHAKRAVARTY:  May it be published, your Honor?

12   BY MR. CHAKRAVARTY:

13   Q.   1A was a letter found at the defendant's

14   apartment -- excuse me -- room.  Does letter 1A read, "Letter

15   from the commander of the faithful Mullah Muhammad 'Umar, may

16   Allah protect him, asking for the help of the Muslims and

17   scholars everywhere"?

18          Then in a subsequent paragraph, "What the Islamic nation

19   and the scholars of the nation have agreed upon is that in a

01:06 20   situation as the one we are in today, jihad becomes an

21   individual duty upon every Muslim against those invaders.

22   There is no need for a son to ask permission from his father,

23   or the slave to ask permission from his master, or a husband to

24   ask permission from his wife, or for someone in debt to ask

25   permission from his creditor.  There is no argument about it

```
 1   among the scholars.
 2        "This is a ruling of jihad against those invaders and the
 3   duty of the Muslims regarding it."
 4        Did I read your translation accurately?
 5   A.   Yes.
 6             MR. CHAKRAVARTY:  If we could go to Exhibit 14A.
 7   Q.   Is this, again, a portion of a document that was found in
 8   the defendant's room, Exhibit 14?
 9   A.   Yes.
10   Q.   And specifically, did you translate the initial part of
11   this document?
12   A.   I think this was the cover page and the last page.
13   Q.   And is this a fair and accurate verbatim translation of
14   the cover page and the last page?
15   A.   Yes.
16             MR. CHAKRAVARTY:  I'd ask that 14A be introduced, your
17   Honor.
18             MS. BASSIL:  Objection.
19             THE COURT:  All right.  Admitted.
20             (Government Exhibit No. 14A received into evidence.)
21   BY MR. CHAKRAVARTY:
22   Q.   And the title is "Loyalty and Enmity, an Inherited
23   Doctrine in a Lost Reality" by Imam Shaykh 'Ayman al-Zawahiri?
24   A.   Yes.
25   Q.   Is that the title?
```

 1    A.    Yes.

 2    Q.    Does it read, "To be patient in bearing the burdens of

 3    religion, especially its glorious peak:  Jihad in the path of

 4    Allah, Allah the most high said, 'O you who have believed, be

 5    patient and forbear.  Stand firm in your faith and fear Allah

 6    so that you may triumph."

 7          Did I read that correctly?

 8    A.    Yes.

 9    Q.    And this is a more extensive document, correct?

01:08 10   A.    Yes.

 11   Q.    And at the bottom does it show that this document was

 12   downloaded from a specific website?

 13   A.    Yes, Minbar al-Jihad -- I'm sorry -- al-Jihad wal Tawhid.

 14   Q.    Okay.  And were there several translations from that

 15   website that you conducted?

 16   A.    Yes.

 17   Q.    And is this by a man Ayman al-Zawahiri December of 2002?

 18   A.    Correct.

 19          MR. CHAKRAVARTY:  Turn to 16A, please.

01:08 20   Q.    Is this another document that you did a partial verbatim

 21   translation for?

 22   A.    Yes, it is.

 23   Q.    And was this an email that was found in the defendant's

 24   residence?

 25   A.    Yes, it is.

1    Q.   And is this a fair and accurate translation of the last

2    portion of that email?

3    A.   Yes, it is.

4          MR. CHAKRAVARTY:  I would ask that this be introduced

5    as 16A, your Honor.

6          MS. BASSIL:  Objection, your Honor.

7          THE COURT:  Same ruling.

8          (Government Exhibit No. 16A received into evidence.)

9    BY MR. CHAKRAVARTY:

01:09 10   Q.   And is the title of this email "A Letter From a Mujahid in

11   Iraq to Anyone Who Asks About Jihad in Iraq"?

12   A.   Yes.

13   Q.   And does the last portion read, "In the end, I will not

14   say good-bye but I will say until we meet again in the eternal

15   paradise if martyrdom was decreed for us.  Or, as the blessed

16   Palestine would say, if victory was decreed for us"?  And then

17   is there a quote from a religious text?

18   A.   Yes.

19   Q.   And at the bottom of the document, the original document,

01:09 20   is there this date of April 7, 2003, along with the address to

21   a website?

22   A.   Yes.

23   Q.   And is the address al-Maqdisi.com?

24   A.   Yes, it is.

25          MR. CHAKRAVARTY:  Go to Exhibit 17A, please.

```
 1   Q.   Is this another document that you did a partial verbatim

 2   translation of?

 3   A.   Yes.

 4   Q.   And is this the last portion of that document?

 5   A.   Yes.

 6   Q.   And is this a fair and accurate translation of that

 7   document?

 8   A.   Yes, it is.

 9        MR. CHAKRAVARTY:  I'd ask that this be introduced as

01:10 10   Exhibit 17A.

11        MS. BASSIL:  Same objection, your Honor.

12        THE COURT:  Same ruling.

13        (Government Exhibit No. 17A received into evidence.)

14   BY MR. CHAKRAVARTY:

15   Q.   And is the title of this "How to Reach the Battlegrounds"

16   and then a subtitle of "The Road to the Battlegrounds"?

17   A.   Yes.

18        MR. CHAKRAVARTY:  And then the last one from the

19   defendant's room, Exhibit 18A, please?

01:10 20   Q.   Is this also a document for which you did -- portions of

21   the document you translated verbatim?

22   A.   Yes.

23   Q.   All right.  And is this a fair and accurate translation?

24   A.   Yes, it is.

25        MR. CHAKRAVARTY:  I would introduce 18A, your Honor.
```

```
 1              THE COURT:  All right.  Same ruling.

 2              MS. BASSIL:  May I have a continuing objection?

 3              THE COURT:  Yes, you may have a continuing objection.

 4              (Government Exhibit No. 18A received into evidence.)

 5     BY MR. CHAKRAVARTY:

 6     Q.   And is this a document that reads "Al-Faruq Battalions'

 7     Information Report - Iraq" issued on Thursday, June 12, 2003?

 8     "Iraq has witnessed in the last few weeks a number of

 9     uprisings, victories and fierce fighting.  Here we detail the

01:11 10    last news of victory and happenings in the land of Caliphates,

11     Allah permitting:

12         "Al-'A'azamiyah - Martyrs Neighborhood.  Al-'A'azamiyah

13     neighborhood witnessed the biggest massacre of Americans.  A

14     number of the al-'A'azamiyah young men found out that a number

15     of American forces decided to search their homes and lands of

16     the neighborhood.  A number of the neighborhood's sons

17     displayed their readiness for martyrdom for the sake of Allah.

18         "The Faruq battalions put together five human bombs and

19     waited for the invaders at the beginning of the neighborhood to

01:11 20    detonate themselves, one after the other, in a magnificent

21     scene to kill over 40 Christian soldiers.  They planted fear in

22     the hearts of the Christians who did not dare entering again

23     fearing additional human bombs."

24         Did I read that portion correctly?

25     A.   Yes.
```

1          MR. CHAKRAVARTY:  Can we go to Exhibit 32A, please.

2    Q.   Now, Ms. Vallee, there are several videos in this case.

3    And for some of the videos did you translate specific portions

4    of those videos?

5    A.   Yes.

6    Q.   And, again, in a verbatim fashion so that it was literally

7    what was either depicted or written on the screen?

8    A.   Correct.

9    Q.   And is 32A an example of that?

01:12 10   A.   Yes.

11   Q.   Okay.  And is this the translation of what is depicted on

12   that screen shot that appears here?

13   A.   Yes, it is.

14   Q.   Okay.  And is it a fair and accurate translation?

15   A.   Yes.

16          MR. CHAKRAVARTY:  I'd ask that this be introduced as

17   Exhibit 32A, your Honor.

18          THE COURT:  Okay.

19          (Government Exhibit No. 32A received into evidence.)

01:12 20   BY MR. CHAKRAVARTY:

21   Q.   Is this video called "Abu al-Layth Video," and does it

22   read, "The videotaped speech of brother Abu al-Layth al-Libi to

23   his mujahideen brothers, the heros of Islam in Iraq," and then

24   there's a date, and it says "hijri"?  Are you familiar with

25   what that means?  There's a number, usually ending with 14

```
 1   something, and then it says "hijri"?

 2   A.    This is the hijri year.  Muslims adhere to a different

 3   calendar than the rest of us do.  This is -- the counting of

 4   the hijri year began when the prophet -- I have to be careful.

 5   I'm not sure.  There was an event that took place, and that's

 6   when the hijri started.  The hijri started.  So this is about

 7   600 years before our calendar.

 8   Q.    Okay.  So that corresponds to a date on the Muslim

 9   calendar which corresponds to a date on the Roman calendar, so

10   to speak?

11   A.    Correct.  And it shows it there.

12   Q.    August 16, 2004?

13   A.    Right.

14         MR. CHAKRAVARTY:  If we could go to Exhibit 36A,

15   please.

16   Q.    Ms. Vallee, is this another example of a partial verbatim

17   translation, in this case the title of this video?

18   A.    Yes.

19   Q.    And is this fair and accurate?

20   A.    Yes, it is.

21         MR. CHAKRAVARTY:  I'd ask that this be introduced as

22   36A, your Honor.

23         (Government Exhibit No. 36A received into evidence.)

24         THE COURT:  Okay.

25   BY MR. CHAKRAVARTY:
```

1    Q.   Does this video -- is that called "Taliban:  Reality and

2    the American Allegations"?

3    A.   Yes.

4         MR. CHAKRAVARTY:  Go to Exhibit 37A.

5    Q.   Is this another partial verbatim translation, in this case

6    the verbatim translation of what's depicted on this screen

7    shot?

8    A.   Yes.

9    Q.   Is this a fair and accurate depiction of that translation?

01:14 10   A.   Yes.

11        MR. CHAKRAVARTY:  I'd introduce Exhibit 37A, your

12   Honor.

13        THE COURT:  All right.

14        (Government Exhibit No. 37A received into evidence.)

15   BY MR. CHAKRAVARTY:

16   Q.   And is this video titled "10.7.01"?

17   A.   Yes.

18   Q.   Does the translated portion read, "In the name of Allah,

19   the merciful and the compassionate?

01:15 20      "Your brothers at Wa'A'ido - and Prepare - Media Institute

21   present to you this piece from the statement of the al Qa'ida

22   leaders in Afghanistan upon America's tyrannical declaration of

23   war on the Emirate of Islam.

24      "We ask the brothers to please upload again what you see

25   and learn production, because jihad will need you in the

```
 1    upcoming days, asking the lord almighty and exalted to bring us

 2    together in the land of glory where we will establish his law

 3    and at the basin with our prophet, peace be upon him.

 4        "Wa'A'ido Media."

 5        Did I read that correctly?

 6    A.   Yes.

 7            MR. CHAKRAVARTY:  Exhibit 57A, please.

 8    Q.   Is this another partial verbatim translation of a video?

 9    A.   Yes.

10    Q.   And specifically, does the translation in front of you

11    depict what is on that screen shot?

12    A.   Yes.

13    Q.   And is it fair and accurate?

14    A.   Yes, it is.

15    Q.   I'd introduce Exhibit 57A, your Honor.

16            THE COURT:  All right.

17            (Government Exhibit No. 57A received into evidence.)

18    BY MR. CHAKRAVARTY:

19    Q.   And is the title of this video, translated, called

20    "Eulogy"?

21    A.   Yes.

22    Q.   And does it read, "Eulogy of the Martyr Abu Musaab

23    al-Zarqawi"?  And is there a picture of Osama bin Laden on the

24    left, Abu Musaab al-Zarqawi on the right, with the Shura

25    Al-Mujahideen logo on Abu Musaab's picture?
```

1   A.   Yes.

2   Q.   And is there a banner under the two pictures "Al-Sahab.

3   Shayikh Usama Bin Muhammad bin Laden, may Allah protect him.

4   Eulogizing the martyr of the nation Abu Mus'ab al-Zarqawi, may

5   Allah bless his soul"?

6   A.   Correct.

7           MR. CHAKRAVARTY:  Go to Exhibit 218A.

8   Q.   Is this a document found on a computer disk in the

9   defendant's room, a partial translation of that?

01:17 10   A.   Yes.

11   Q.   Again, this is a partial translation, not the entire

12   document?

13   A.   Correct.

14   Q.   And is it fair and accurately translated?

15   A.   Yes.

16           MR. CHAKRAVARTY:  I would ask that this be introduced

17   as Exhibit 218A, your Honor.

18           THE COURT:  Okay.

19           (Government Exhibit No. 218A received into evidence.)

01:17 20   BY MR. CHAKRAVARTY:

21   Q.   Is the title of this "How to Confront Interrogators"?

22   A.   Yes.

23   Q.   And does it read, "It defines a collection of concepts and

24   intuitions and a summary of a collection of experiences.  It

25   describes the different techniques the detainees are faced with

```
 1    in the jails of the Zionist enemy and others.  This is in an
 2    attempt to arm those who are resisting against them with prior
 3    and practical knowledge around the interrogation and its
 4    techniques, to help them resist and challenge the
 5    interrogators, and to protect jihad and other mujahideen.  This
 6    is done by making them aware of what awaits them in the
 7    interrogation cellars and by explaining to them the best
 8    methods to deal with the interrogators so that there will not
 9    be any surprises which could lead them to crumble"?
```
01:17 10        Did I read that correctly?
```
11    A.   Correct.
12             MR. CHAKRAVARTY:  Go to 219.
13    Q.   Is this purely the title of another document that was
14    found on a disk in the defendant's computer?
15    A.   Yes, it is.
16    Q.   Is this a fair and accurate translation of that title?
17    A.   Yes, it is.
18             MS. BASSIL:  Your Honor, may we approach sidebar on
19    this?
```
01:18 20             THE COURT:  All right.
```
21             (Discussion at sidebar and out of the hearing of the
22    jury:)
23             MS. BASSIL:  Your Honor, as I understand it, 219,
24    222A, 225A, these -- and I'm not clear of the source of this,
25    but these apparently were screen shots of a website.  And what
```

the government, I believe, has done is just picked out

something, and there's no indication what the

defendant -- there's nothing more to indicate that he clicked

on a link -- you know, it's like a website, and then you would

click on a link if you were going to read a particular article.

But there's no indication in any of the discovery that he

clicked on a particular article, or even what the source of

this screen shot is.

And so I would object to reading the titles of

01:19 particular articles which the government has chosen with no

evidence that the defendant read those.

MR. CHAKRAVARTY:  These were articles that were

downloaded and put onto a CD that the defendant had in his

room.

MS. BASSIL:  That's not the way it reads in the

discovery package.  It reads as a screen shot of the DC

website.

MR. CHAKRAVARTY:  Right.  Because that's what was on

the CD, a number of screen shots.

01:19 MS. BASSIL:  Right.  There's no articles that were

downloaded, just screen shots.

It's -- you know what I mean, you have screen shots of

CNN in your computer but you haven't necessarily clicked on it.

THE COURT:  Right.

MS. BASSIL:  It's --

1        MR. CHAKRAVARTY:  I mean, it's a visible web page.  If

2   we go to 219 you'll see what appears.

3        THE COURT:  But the question is, what is 219, is sort

4   of the question.  You say it is something that the defendant

5   made his own by downloading.

6        MR. CHAKRAVARTY:  Correct.

7        THE COURT:  How do we know that?

8        MR. CHAKRAVARTY:  Well, I don't know that he

9   downloaded; I know that he had it stored on a CD.

01:20 10        MS. BASSIL:  No, that's not correct.

11        THE COURT:  When you use the term "stored," what do

12   you mean by "stored"?

13        MR. CHAKRAVARTY:  It was on a CD that he possessed,

14   amongst others, that he maintained.

15        THE COURT:  On a CD as opposed to a hard drive?

16        MR. CHAKRAVARTY:  Correct.

17        MS. BASSIL:  But it's a screen shot, not any specific

18   article.  That's what I'm objecting to.

19        THE COURT:  Yeah.

01:20 20        MR. CHAKRAVARTY:  Mr. Auerhahn reminds me that in

21   order for something to get on a CD, it has to be --

22        THE COURT:  Right.  I get that.  So that's a step

23   that, you have it on a CD.  Who says it's on a CD?  I mean, are

24   you going to lay that foundation?

25        MR. CHAKRAVARTY:  Right.  Scripture, four weeks ago,

 1    said that these series of documents were on a CD.

 2             MS. BASSIL:  But it's not the documents; it's just a

 3    screen shot of the website.

 4             THE COURT:  Well, I think the contents, whatever they

 5    may be, may be shown for whatever --

 6             MS. BASSIL:  Except there's no evidence that the

 7    defendant downloaded these.  That's not on the CD.  What's on

 8    the CD is the screen shot of, let's say, the first page of the

 9    website.  Like if on my computer there might be a screen shot

01:21  10    of CNN, okay?  What is not on CDs, or in his computer, is a

11    click onto a specific article and downloaded it, just the

12    screen shot.

13             THE COURT:  Right.  But just this, whatever it is,

14    218 --

15             MR. CHAKRAVARTY:  219.

16             THE COURT:  -- 219 --

17             MS. BASSIL:  222A, 225A.

18             THE COURT:  -- is the screen shot?

19             MS. BASSIL:  Yes.

01:21  20             MR. CHAKRAVARTY:  Yes.

21             MS. BASSIL:  But they picked out particular articles

22    to translate even though there's nothing that indicates

23    that -- he didn't download those.

24             MR. CARNEY:  If I could use an analogy.  If you look

25    at the *Boston Globe* in the morning, and as soon as you look at

it, that screen shot will be saved.  It may indicate that there

are a lot of articles there, but then if you navigate away and

go to another site of CNN, that doesn't mean, and there's no

indication, that you looked at any of the articles.

THE COURT:  Except to the extent that it's saved to a

CD.

MS. BASSIL:  Not the articles.

THE COURT:  No, I understand.  Even the screen shot.

It indicates a choice to save the screen shot, so, I mean, I'm

not sure how powerful --

MS. BASSIL:  I don't think they are on CD.  My

understanding is it was on his computer.  I don't think it's on

a CD.

MR. CHAKRAVARTY:  These are on CDs.

MS. BASSIL:  CDs he downloaded or you downloaded?

MR. CHAKRAVARTY:  CDs in his room.

THE COURT:  Found in the original '06 search?

MR. CHAKRAVARTY:  Found in the original '06 search.

THE COURT:  All right.  I think you could have it.

MS. BASSIL:  Your Honor, while we're up here --

THE COURT:  Yeah.

MS. BASSIL:  -- I just wanted -- while we're up here,

there is an exhibit, and I don't know if they're going to

publish it or not, but it's 58A, and it's this video that's

been so controversial.  And I did want to raise this at this

```
 1   point.
 2           MR. CHAKRAVARTY:  I'm going to do it at the end.
 3           MS. BASSIL:  I would object to that.
 4           MR. CHAKRAVARTY:  I'm going to do four chats and then
 5   do the video.
 6           MS. BASSIL:  We now have had, I believe, 17 videos and
 7   now two screen shots of videos, and we just keep going and
 8   going and going.  And I think it's far more prejudicial than
 9   probative and we're far beyond cumulative at this point.
01:23 10         THE COURT:  Okay.  I still think it's admissible.
11           MS. BASSIL:  Do you want to add to it?
12           MR. CARNEY:  Your Honor, we move for a mistrial at
13   this point.  The prejudice is so overwhelming that it's
14   affecting our client's ability to get a fair trial.
15           THE COURT:  Okay.  Motion is denied.
16           (In open court:)
17           THE COURT:  So 219 is admitted after discussion.
18           (Government Exhibit No. 219 received into evidence.)
19           MR. CHAKRAVARTY:  Just to clarify what this is, can we
01:24 20  go to 219, please?
21           THE COURT:  Which is in evidence.
22           MR. CHAKRAVARTY:  It is.  Correct.
23   BY MR. CHAKRAVARTY:
24   Q.   So is this the multipage document for which you translated
25   just the title?
```

```
 1    A.    Yes.

 2          MR. CHAKRAVARTY:  Can we go back to 219 now?

 3    Q.    And is that title "Guiding the Confused on the

 4    Permissibility of Killing the Prisoners"?

 5    A.    Yes.

 6          MR. CHAKRAVARTY:  Can we go to 221A.

 7    Q.    And is this a portion -- a verbatim portion of a multipage

 8    document?

 9    A.    Yes.

01:24 10   Q.    And is this a fair and accurate translation of that

11    portion?

12    A.    Yes.

13    Q.    And that portion here is Part 1, correct?

14    A.    Yes.

15    Q.    All right.

16          MR. CHAKRAVARTY:  I'd introduce 221A.

17          THE WITNESS:  I think there was -- in addition to Part

18    1, I translated an address toward the end of the article.

19          MR. CHAKRAVARTY:  Okay.  Page 2, please.

01:25 20   BY MR. CHAKRAVARTY:

21    Q.    I'm sorry.  Thank you.

22    A.    Yes.

23    Q.    So it's Part 1, and then the ellipsis, and then the last

24    portion?

25    A.    Yes.
```

1    Q.    Is this a fair and accurate translation of those portions

2    of the document?

3    A.    Yes.

4         MR. CHAKRAVARTY:  I'd introduce Exhibit 221, your

5    Honor.

6         THE COURT:  All right.

7         (Government Exhibit No. 211 received into evidence.)

8         MR. CHAKRAVARTY:  Would you go back to page 1?

9    BY MR. CHAKRAVARTY:

01:25  10   Q.    Is this document "Join the Caravan"?

11   A.    Yes.

12   Q.    And is Part 1 titled "The Reasons for Jihad"?

13   A.    Yes.

14   Q.    And so then does it list a number of reasons?  And let me

15   just read it, I guess.  "We then are calling upon the Muslims

16   and urging them to proceed to fight, for many reasons, at the

17   head of which are the following:  One, in order that the

18   disbelievers to not dominate; two, due to the scarcity of men;

19   three, fear of hell fire; four, fulfilling the duty of jihad

01:26  20   and responding to the call of the lord; five, following in the

21   footsteps of the pious predecessors; six, establishing a solid

22   foundation as a base for Islam."

23        MR. CHAKRAVARTY:  Next page, please?

24   Q.    "Seven, protecting those who are oppressed in the land;

25   and, eight, hoping for martyrdom."

1       Are those reasons listed under Part 1?

2   A.   Yes.

3   Q.   And then this document, does it say, "Those who wish to

4   come to Afghanistan should call the following phone numbers in

5   Peshawar"?  And it lists three phone numbers.  "When you arrive

6   at Peshawar, call one of these phone numbers and ask the person

7   to come to you.  Someone will come to you and provide you with

8   the services you need."

9       The address is Peshawar University, PO Box 977, Pakistan,

01:26 10   Peshawar.  Is that the address that was listed there?

11  A.   Yes.

12       MR. CHAKRAVARTY:  Go to 222A.

13  Q.   And is this a partial translation of a multipage document

14  called -- that was found also on that CD in the defendant's

15  room?

16  A.   Yes.

17       MR. CHAKRAVARTY:  And for clarification, can we go to

18  Exhibit 222, please?

19  Q.   Is this that document?

01:27 20  A.   Yes.

21  Q.   And this appears to be a captured website.  Is that right?

22  A.   Yes.

23  Q.   And this is the portion that you translated?

24  A.   Yes.

25       MR. CHAKRAVARTY:  Can we go back to 222A?

1    Q.   And is this a fair and accurate translation of that

2    portion?

3    A.   Yes.

4         MR. CHAKRAVARTY:  I would ask that this be introduced

5    as 222A.

6         THE COURT:  All right.

7         (Government Exhibit No. 222A received into evidence.)

8    BY MR. CHAKRAVARTY:

9    Q.   And is the title of this page "The Necessity of Jihad, the

01:27 10  Virtue of Martyrdom"?

11   A.   Yes, it is.

12        THE COURT:  I think we're confusing the machine here

13   because you're switching back and forth so quickly.

14        MR. CHAKRAVARTY:  I'm sorry, your Honor.

15   BY MR. CHAKRAVARTY:

16   Q.   Is the title "Necessity of Jihad and Virtue of Martyrdom"?

17   A.   Yes, it is.

18   Q.   And does it read, "The first matter:  Suicide operations

19   from a legal perspective"?

01:28 20  A.   Yes.

21   Q.   "In this segment we list the important proofs and what the

22   scholars say about the permissibility of suicide operations.

23   We break it down as follows:  First, permissibility of killing

24   oneself to strengthen the religion and to promote it; second,

25   the scholars agree on the permissibility of plunging into

1   dangerous situations in jihad; third, permissibility for one to

2   embark against a large number of the enemy in jihad even if he

3   is to get himself in danger; fourth, removal of censure from

4   one who kills himself for the sake of the religion; fifth,

5   removal of censure from one who has exposed himself to death

6   for the sake of Allah; sixth, the virtue of patience of the one

7   who knows he will be taken prisoner and chooses to fight to the

8   death and refuses to be taken prisoner; seventh, the virtue of

9   patience to fight for death over blasphemy; eighth, the virtue

01:29 10   of death in the cause of enjoining the good and forbidding the

11   evil; and ninth, permissibility of killing oneself to avoid

12   revealing secrets under torture."

13        Is that what is listed there?

14   A.   Yes.

15        MR. CHAKRAVARTY:  Exhibit 225A, please.

16   Q.   And, again, is this a partial verbatim translation of a

17   website that was on a CD in the defendant's room?

18   A.   Yes.

19        MR. CHAKRAVARTY:  Could we go to 225 just to situate

01:29 20   the jury again?

21   Q.   And is this the document that you translated?

22   A.   Yes.

23        MR. CHAKRAVARTY:  Go back to 225A.

24   Q.   And is this a fair and accurate translation of a portion

25   of that document?

1   A.   Yes.

2          MR. CHAKRAVARTY:  I'd ask that this be introduced as

3   Exhibit 225A.

4          THE WITNESS:  Okay.

5          (Government Exhibit No. 225A received into evidence.)

6   BY MR. CHAKRAVARTY:

7   Q.   And is the website called "Minbar al-Tawhed Wal Jihad"?

8   A.   Yes.

9   Q.   And is the article titled "Lying under Oath to the

01:30 10   Supporters of the Oppressors"?

11   A.   Yes.

12   Q.   "The question is about the ruling on someone being made to

13   swear under oath by the disbelievers.  Al-Maqdisi explains that

14   there are three types of people who would take the oath, and

15   they are:  Those who are oppressors, those who are oppressed,

16   and those who are neither."

17          MR. CHAKRAVARTY:  Skip down to this one.

18   Q.   "If you are oppressed by a tyrant ruler who does not rule

19   by the laws of Allah where there is no fairness, he has the

01:30 20   right to lie under oath.  If lying under oath could save him or

21   save his Muslim brother from the oppression, then it is

22   permissible for him to lie.  If telling the truth would harm

23   him, or harm his Muslim brothers, then it is permissible for

24   him to lie.  If you are neither but you need to lie, then you

25   should use other methods such as concealing the truth instead,

1        or misleading by suggesting something you don't mean."

2            Did I read that correctly?

3        A.   Yes.  Can I just point out that this is not a verbatim?

4        Q.   Yes.  I want you to point that out.

5        A.   Okay.

6        Q.   Which portions are not verbatim?

7        A.   I'm not sure.  I'd have to --

8                MS. BASSIL:  Your Honor, move to strike this.

9        A.   -- look at the original.

01:31 10             MR. CHAKRAVARTY:  I have no objection it to being

11       stricken, your Honor.

12               THE COURT:  All right.  The exhibit will be stricken.

13       225A is stricken.

14               (Exhibit 225A withdrawn from evidence.)

15               MS. BASSIL:  I ask the jury be instructed.

16               THE COURT:  Yeah, the jury will disregard it.  It was

17       exposed to you temporarily.  It's now removed from evidence.

18       It's not part of the evidence.

19               MR. CHAKRAVARTY:  Can we go back to 225, please?

01:31 20             THE WITNESS:  The title is definitely verbatim, but

21       the portions of the document, I'm not so sure.

22       BY MR. CHAKRAVARTY:

23       Q.   Okay.  So -- all right.  So -- well, we may come back and

24       do that verbatim, but we'll move on for now.

25               MR. CHAKRAVARTY:  Can we go to Exhibit 768B, please?

1    Q.   Now, in addition to some of the documents and the videos

2    that you translated portions of, did you also have an

3    opportunity to listen to several nashid, what are called songs,

4    chants?

5    A.   Yes.

6    Q.   And for those nashid, did you just translate the titles of

7    those nashid?

8    A.   Yes.

9    Q.   And is 768B an example of one of those?

01:32 10   A.   Yes.

11   Q.   And is this a fair and accurate translation of that title

12   of that nashid?

13   A.   Yes, it is.

14        MR. CHAKRAVARTY:   I would introduce --

15   Q.   For convenience' sake, were those for nashids 768B, 770B,

16   771B, 773B and 775B?

17   A.   Yes.

18   Q.   And --

19   A.   I'm going to trust you on the numbers.

01:32 20   Q.   If you see an error, please point that out, as you've

21   already done --

22   A.   Okay.

23   Q.   -- as we're going through this.

24        And are those fair and accurate translations of just the

25   titles of those documents, or audio files?

    1    A.    Yes.

    2          MR. CHAKRAVARTY:  I'd introduce 768B, 770B, 771B,

    3    773B, and 775B.  And my apologies.

    4          THE COURT:  Okay.  They're admitted.

    5          (Government Exhibit Nos. 768B, 770B, 771B, 773B, 775B

    6    received into evidence.)

    7    BY MR. CHAKRAVARTY:

    8    Q.    And is the title of 768B -- or the title of the file that

    9    is 768A, "At-Tariq Ila al-Khulud," is that translated "To the

01:33 10   Path to Eternity"?

   11    A.    Yes.

   12          MR. CHAKRAVARTY:  770B, please?

   13    Q.    Is the translation of Exhibit 770A, "Ritha' an-Nasr,"

   14    translated as the "Eulogy of Victory"?

   15    A.    Yes.

   16          MR. CHAKRAVARTY:  771B, please.

   17    Q.    Is File 771A Tadreeb.tadeery translated as "Preparative

   18    Training"?

   19    A.    Yes.

01:34 20         MR. CHAKRAVARTY:  773B, please.

   21    Q.    Is the title of 773A Wayn man yabghi ash-shahada

   22    translated as "Who Wishes for Martyrdom"?

   23    A.    Yes.

   24          MR. CHAKRAVARTY:  775B, please.

   25    Q.    And is the translation for Exhibit 775A, Labbayk.ram,

1  translated as "At your Service"?

2  A.   Yes.

3          MR. CHAKRAVARTY:  If you would go to 780, please.  It

4  may be 780A.  Yes, 780A, please?  780B?  780C?

5  Q.   Is this a screen shot that you translated?

6  A.   Yes.

7  Q.   And is this a file found on the defendant's computer?

8  A.   Yes.

9          MR. CHAKRAVARTY:  Okay.  Can we go to 780A?

01:35 10  Q.   Is this a fair and accurate translation of that screen?

11  A.   Yes.

12          MR. CHAKRAVARTY:  I'd introduce 780A, your Honor.

13          THE COURT:  Okay.

14          (Government Exhibit No. 780A received into evidence.)

15  BY MR. CHAKRAVARTY:

16  Q.   And is that file a "Collection of Shayikh Al-Battar

17  writings by Yusif Bin Salih Al 'Ayyiri, May Allah bless his

18  soul and accept him as a martyr," and then there is a date in

19  the hijri calendar corresponding to July 2, 2004?

01:36 20  A.   Do you know what?  I don't think this is the -- no, this

21  is something different.  The first one you showed me I think

22  was Sawt al-Jihad.

23  Q.   Okay.  I see.  So there were two of these files.

24          MR. CHAKRAVARTY:  Go back to 780C, please.

25  A.   It's hard to see the quality.  It is not really

```
       1   very -- it's not very clear here.  Yeah, this is Sawt al-Jihad
       2   magazine, and the English does not go with this.  It is
       3   something else.
       4         MR. CHAKRAVARTY:  Can we go to 779C, please?  I
       5   apologize for this confusion.
       6   A.   This is the cover for the English that you just showed me.
       7   Q.   And there were two of these files that were found on the
       8   defendant's computer?
       9   A.   Yes.
01:37 10   Q.   You and your colleague, Ms. Anne Marie Doursounian,
      11   translated one of each, or did one of you do both?
      12   A.   I think I did both.
      13   Q.   So you're familiar with this.  Instead of reviewing all of
      14   the side -- all of these individual files, you translated just
      15   the cover page.  Is that correct?
      16   A.   Correct.  Yeah.
      17   Q.   So actually, 779C is -- corresponds to that translation
      18   that we were just looking at.  Is that right?
      19   A.   Yes.
01:37 20         MR. CHAKRAVARTY:  Okay.  So we will correct the
      21   numbering later, your Honor, but I'll have her authenticate the
      22   translation at this point.
      23         So for Exhibit 779C, can we now go to 780A?
      24   Q.   Is this the translation of that?
      25   A.   Yes.
```

1   Q.   And is this that collection of Shayikh Al-Battar writings

2   by Yusif Bin Salih al-'Ayyiri?

3   A.   Yes.

4        MR. CHAKRAVARTY:   So I assume the exhibits were mixed

5   up when they were put in the computer.

6        Can we go to 779A?   Next page, please?   779B, please?

7        (Pause.)

8        MR. CHAKRAVARTY:   One moment, your Honor.   I'm sorry.

9        (Pause.)

01:39 10        MR. CHAKRAVARTY:   Okay.   Go back to 779A.   Next page.

11   Okay.   In the interest of time we're going to move on and try

12   to fix this at the break, maybe.

13   Q.   What I'm showing you now, 779A, to me there does not

14   appear to be a verbatim translation.

15   A.   No.

16   Q.   Okay.   That's why I'm not going to ask you about that.

17        MS. BASSIL:   Your Honor, can we strike that as an

18   exhibit, please?

19        THE COURT:   It was not admitted.

01:40 20        MS. BASSIL:   All right.

21        MR. CHAKRAVARTY:   Can we go to Exhibit 362, please.

22   BY MR. CHAKRAVARTY:

23   Q.   Were there a couple of emails that had a few

24   transliterated Arab words in them?

25   A.   Yes.

```
    1    Q.   And is this one of them?

    2    A.   Yes.

    3              MR. CHAKRAVARTY:  Can we go to page 2?

    4    Q.   And is this another one?

    5    A.   Yes.

    6    Q.   And exactly -- page 2 of this document corresponds to --

    7              MR. CHAKRAVARTY:  Can we go to 361?

    8    Q.   -- this same email but the Arabic words have been

    9    translated?

01:41 10  A.   Yes.

   11              MR. CHAKRAVARTY:  Back to 362.

   12    Q.   Are these two emails fairly and accurately translated

   13    from -- completely verbatim from English to Arabic -- excuse

   14    me -- Arabic to English?

   15    A.   Yes.

   16              MR. CHAKRAVARTY:  I would introduce 362, your Honor.

   17              THE COURT:  I'm not clear on where we are.  362 is a

   18    translation of 361?

   19              MR. CHAKRAVARTY:  It's two documents in one.  So the

01:41 20  second page is -- 362, page 2, is a translation of Exhibit 361,

   21    and Exhibit -- the first page of 362 is a separate document

   22    that has previously been authenticated outside of the Arabic.

   23              THE COURT:  I'm looking at 362, page 1, on the screen.

   24              MR. CHAKRAVARTY:  Right.

   25              THE COURT:  Would you show me 2?
```

1           MR. CHAKRAVARTY:  Yes.

2           (Pause.)

3           MR. CHAKRAVARTY:  Page 2 on the second slide.  Can you

4    do 362, page 2?

5           (Pause.)

6           THE COURT:  Well, I think the numbering is confusing.

7    If 362, page 2, is a translation of 361, page 1 --

8           MR. CHAKRAVARTY:  I apologize for --

9           THE COURT:  -- what is 362, page 1?

01:43 10         MR. CHAKRAVARTY:  362, page 1, was just one of the

11   emails that was in the defendant's --

12          THE COURT:  But it's unrelated to 362 -- in other

13   words, you have page 1 and page 2 of the same document as being

14   unrelated.

15          MR. CHAKRAVARTY:  I apologize.  The documents were

16   uploaded into the JERS system, I think, in a way, and into our

17   system to comport.  Because they were done later, we didn't

18   want to substitute for two documents.  We can do that, your

19   Honor.  And so --

01:43 20         THE COURT:  So I understand the witness's testimony to

21   be that 362-2 -- you have both of these on the screen.

22          THE WITNESS:  Yes.

23          THE COURT:  362-2 on the left is an accurate

24   translation of 361-1 on the right?

25          THE WITNESS:  Yes.

 1          THE COURT:  Okay.  Under those conditions, it's

 2   admitted.

 3          MR. CHAKRAVARTY:  Thank you, your Honor.  And for

 4   documentation so it's easier for the jury to navigate, at the

 5   end on the record we may change that to 361A, which is how

 6   we've been doing things.

 7          THE COURT:  All right.

 8   BY MR. CHAKRAVARTY:

 9   Q.   And the first page of 362, page 1, this -- again, this

01:44 10   is -- you've translated the Arabic words that appear in that

11   document accurately?

12   A.   Yes.

13          MR. CHAKRAVARTY:  So I would introduce 362, your

14   Honor.

15          THE COURT:  Okay.

16          (Government Exhibit No. 362 received into evidence.)

17   BY MR. CHAKRAVARTY:

18   Q.   I'm going to shift gears and go to the next -- in advance

19   of playing a short video clip, I wanted to ask -- read through

01:44 20   a few instant message chat sessions with you.  And in this

21   capacity I'm not asking you to translate; I'm just asking you

22   to read along with me.

23   A.   All right.

24          MR. CHAKRAVARTY:  Can we call up Exhibit 734.

25   Q.   Does this appear to be a chat session between the person

```
    1   named Sayf Maslool and Tauqir dated July 11 -- actually -- I'll

    2   focus on July 12, 2006.  Are you familiar with the words "Sayf

    3   Maslool" in Arabic?

    4   A.   Yes.

    5   Q.   What do they translate to?

    6   A.   "Drawn sword."

    7   Q.   "Drawn sword"?

    8   A.   Yes.

    9   Q.   And so if you wouldn't mind reading the English portion of

01:45 10   what Tauqir says, and I will read the defendant's portion.

   11   A.   In this case I would start with "Wa'alakum asalaam, akhi,"

   12   although it's not English.

   13   Q.   Correct.  So if you wouldn't mind reading the translation,

   14   "Peace be upon you."

   15   A.   Okay.  "Peace be upon you, brother.  How are you, man?"

   16   Q.   "Good, man."  Then there's an auto response.  "And you?"

   17   A.   "Praise be to Allah."

   18   Q.   "Bro, you want to see something?"

   19   A.   "Yeah, sure, man."

01:46 20   Q.   "You remember the rape incident" --

   21   A.   "Yeah."

   22   Q.   -- "with the 14-year-old girl?  You want to see the

   23   response?"

   24        MR. CHAKRAVARTY:  Next page?

   25   A.   "Yeah, I do."
```

```
 1   Q.   "Okay.  Get ready.  And it ain't a statement from CAIR."
 2   A.   I'm sorry.  It's just too small.  I can't see.  Yeah, it
 3   is --
 4   Q.   I'll blow it up.  I'm sorry.
 5   A.   "Yeah, if it was to that, it would make me wanna vomit.
 6   But I know this will put a smile on my face."
 7   Q.   "This is sick.  As in sick."
 8   A.   "Even for the TV show I saw with you.  Abu Hamood and
 9   Tamer came in.  Sicker than those shows?"
10   Q.   "Yes.  Even sicker."
11   A.   "Oh, man."
12   Q.   "But it shows the aftermath, not the actual process."
13   A.   "And it's worse?"
14   Q.   "Yeah.  They go all the way.  You'll see.  And better yet,
15   they do it against hicks, not Shi'ah.  The same baseball team
16   that the rapist was on.  They did it to them."
17   A.   "Oh, the Yankees?  Yeah, man.  I hate that team a lot."
18   Q.   "Let's just say they got torn apart."
19   A.   "I really wanna see this."
20   Q.   "Remember the movie 'Hostel'?"
21   A.   Yeah.
22   Q.   And then there's a link sent with a link called
23   Juthath.rmvb.  In the document it's translated as "corpses."
24   A.   Yes.
25   Q.   That's what "juthath" means?
```

01:47 (line 10)
01:47 (line 20)

```
 1   A.    Yes.

 2         "Okay.  It's done.  What do I play it with?"

 3   Q.    "RealPlayer."

 4   A.    "Wmp does play it?  Oh, damn.  One second.  It's working."

 5   Q.    And then the defendant sends a smiley face.  "They

 6   specifically did this in response to the rape."

 7   A.    "On the street?"

 8   Q.    "Yes.  And they left the corpses there and walked away.

 9   You saw how they dissected the bodies?"

10   A.    "Yeah, it's still playing.  Yeah."

11   Q.    "You can see the ribs, internal organs, et cetera."

12   A.    "What, the show states that it was response?"

13   Q.    "Yeah."

14   A.    "Man.  That was something."

15   Q.    "Heavy, yeah.  Now they'll think twice when they see an

16   Iraqi girl."

17   A.    "What's the deals in the court?"  Or I'm not sure, there's

18   a typo there.  "Are they being tried?"

19   Q.    "They will be.  But who cares.  Texas BBQ is the way to

20   go."

21              MR. CHAKRAVARTY:  Can we go to Exhibit 686, please.

22              MS. BASSIL:  Your Honor, may we approach sidebar?

23              (Discussion at sidebar and out of the hearing of the

24   jury:)

25              MS. BASSIL:  Your Honor, I'm going to object because
```

the video is coming up, but I want to object to the dramatic

intonation by Mr. Chakravarty.  This is a document.  It doesn't

require dramatic readings or intonations, and I think it should

be read in a straightforward manner.

THE COURT:  Yeah, tone it down a little, please.

MS. BASSIL:  Thank you.

(In open court:)

MR. CHAKRAVARTY:  Go to page 2, please.  Sorry, back

to page 1 quickly.

BY MR. CHAKRAVARTY:

Q.   Is this a stored chat session between Sayf Maslool and

Ihab on July 13, 2006?

A.   Yes.

MR. CHAKRAVARTY:  Okay.  Back to page 2.

Q.   And does Sayf Maslool say, "Man, did you see the vid of

the mutilated infidels?"

A.   "No."

Q.   "This was done in revenge for the rape of that girl.

Nice, juicy BBQ."

A.   "I haven't watched it yet.  Don't burn it for me.  But as

long as soccer is on TV, nothing else matters, brother."

Q.   "Yeah, Zinedine Zidan, more important than Palestine."

MR. CHAKRAVARTY:  Then the next page, please.

Q.   And then he sends that file juthath.rmvb.  And "juthath,"

as you stated earlier, translates to "corpses."

```
 1    A.    Corpses, yes.
 2             MR. CHAKRAVARTY:  Exhibit 540.
 3    Q.    Is this a chat session -- it starts between the defendant
 4    and Abu-Saqr on Thursday, July 13th, 2006?
 5    A.    Yes.
 6    Q.    And I'm sorry.  There's an Arabic phrase here, which is
 7    the defendant's screen name.  What does that translate to?
 8    A.    "The one who is in need for Allah."
 9    Q.    So the defendant says, "Man, did you see the vid of the
01:52 10    mutilated infidels?"  And then the chat session closes and then
11    it starts up again 30 seconds later.  And then if you could
12    read Abu-Saqr's part?
13    A.    He just replies "LOL."
14    Q.    No.  I'm sorry.  So here --
15    A.    Oh, so, "No."
16    Q.    And then the defendant says, "Man, it was Texas BBQ sauce
17    all the way."
18    A.    "Laugh out loud."
19             MR. CHAKRAVARTY:  Exhibit 541, please?
01:53 20    Q.    And is this a chat session --
21             THE COURT:  You don't have it?
22             THE JURORS:  No.
23             THE COURT:  I'm sorry.  My bad.  Do you have it now?
24             THE JURORS:  Yes.
25    BY MR. CHAKRAVARTY:
```

```
 1   Q.   Is this chat session between the defendant and the same

 2   Abu-Saqr on July 14, 2006?

 3   A.   Yes.

 4        MR. CHAKRAVARTY:  Go to page 3, please.

 5   Q.   And does the defendant again say, "I want more BBQ sauce

 6   videos"?

 7   A.   Yes.

 8        MR. CHAKRAVARTY:  Go to Exhibit 701, please.

 9   Q.   Is this a chat session between the defendant and Nusrah on

10   July 1, 2006?

11   A.   Yes.

12   Q.   This one we'll read the whole one.  Does the defendant

13   start with "Peace be upon you"?

14   A.   "And upon you, brother.  How you doing, Sheik al-Bostoni?"

15   Q.   And "Y."  "Bro, you remember that story of the 14-year-old

16   raped in Iraq?"

17   A.   "Yeah, by five niggers?"

18   Q.   "You wanna see" --

19   A.   "She was burnt?"

20   Q.   -- "what was done in revenge?"

21   A.   "Yeah, I saw."

22   Q.   "Yeah.  Heh.  Good."

23   A.   "Chop-chop.  To Texas BBQ."

24   Q.   Did you have an opportunity to view Exhibit 58, a video

25   called "Juthath"?
```

01:53 (line 10)
01:54 (line 20)

```
 1   A.    Yes.

 2   Q.    And did you do a verbatim translation of that document?

 3   A.    Yes.

 4          MR. CHAKRAVARTY:  I call up Exhibit 58A, please.  Page

 5   2, please.

 6   Q.    And is this the translation of that document?

 7   A.    Of the video, yes.

 8   Q.    Of the video.  Excuse me.

 9         And it's broken down by different slides on this

10   translation.  Is that because of different portions of the

11   video?

12   A.    Yes.

13   Q.    Is the verbatim translation a translation of the entire

14   video?

15   A.    Yes.

16          MR. CHAKRAVARTY:  So what I think we'll do, your

17   Honor, is play Exhibit 58, which is the first 40 seconds of the

18   video, and then I'll read through the translation with the

19   witness.

20          MS. BASSIL:  May we have one moment, your Honor?  If I

21   may speak with Mr. Chakravarty for one moment?

22          THE COURT:  Go ahead.

23          (Counsel confer off the record.)

24   BY MR. CHAKRAVARTY:

25   Q.    And Ms. Bassil just reminds me that --
```

1          MS. BASSIL:  Thank you.

2     BY MR. CHAKRAVARTY:

3     Q.   -- with the one part, and I don't want to jump ahead,

4     there's a translation in the written reference to the word

5     "Westerner."  Can that have multiple translations, including

6     one of them being Roman?

7     A.   I would have to see the original Arabic.  It's hard.  It

8     could.  But I'd be guessing right here because I need to the

9     see the original.

01:56 10    Q.   So let's play the video and then we'll go through the

11    translation and then we can ask you more details about it.

12    A.   Okay.

13          MR. CHAKRAVARTY:  I would introduce Exhibit 58A as the

14    translation of the video, your Honor.

15          THE COURT:  Okay.

16          (Government Exhibit No. 58A received into evidence.)

17          (Video published to the Court and jury.)

18    BY MR. CHAKRAVARTY:

19    Q.   Okay.  And then the video continues, correct?

01:57 20    A.   Yes.

21    Q.   Okay.  So let's read the translation of the entire video.

22    So the portion that we watched, the part that I've highlighted,

23    does that appear to be the highlighted portion that we watched?

24    A.   Yes.

25    Q.   And begin with, "In the name of Allah, the merciful, the

compassionate," and then there was a symbol that came on the
screen that said, "There is no God but Allah and Muhammad is
his messenger," and the "Mujahideen Shura Council in Iraq."
And then there was written, the "Media Institute."  And then,
again, written on the part that we watched it says, "Presents
the remains of the two American soldiers who were kidnapped
near Yusefiya," and then the image of Osama bin Laden came on.
And it said, "Voice of Osama bin Laden, may Allah protect him."
     Is that all that appeared on the screen?

01:58  A.   Yes.

Q.   And then the audio that we just listened to, did that
translate to, "To our brothers, the mujahideen in Bagdad, the
land of the Caliphs and its environs, your continued courageous
operations against the Americans and their helpers have filled
the Muslims with happiness, joy, delight and exaltation.  You
have raised the heads of the Muslims with your excellent
activity which brings joy to those who are sad and raises a
smile on the face of bereaved mothers.  May Allah reward you as
you deserve"?

01:59       All right.  And then after that portion of the video
there's some scenes depicted in the video.  I'm not going to
ask you to describe them, but along with the scenes depicted in
the video is there audio going on as an overlay to those
images?

A.    Yes.

1  Q.    And then is it written, "The remains of the two American

2  soldiers kidnapped near Yusifiya"?

3  A.    Yes.

4  Q.    And then an audio.  I think you just described it.  There

5  was a song in the background, or audio in the background.  Does

6  it begin with a nashid, one of these songs or chants?

7  A.    Yes.

8  Q.    And as you've translated here, are these the lyrics to

9  that song, essentially?

01:59 10  A.    Yes.

11  Q.    And this is where I was drawing your attention to this

12  reference to westerners in this nashid.  Do you know what word

13  they used in Arabic to -- that translated to the westerners?

14  A.    I can guess.

15  Q.    I don't want you to guess.

16  A.    No, I'm not sure.

17  Q.    Okay.  Have you seen -- in the course of your translations

18  in this case, have you seen reference to Romans as well as

19  westerners?

02:00 20  A.    Yes.

21  Q.    So "Roman" may be a more kind of liturgical way, more

22  historical way to refer to people from Rome?

23  A.    Exactly.  And I think in this case we debated what to use

24  because we don't want to deliver the wrong message and make

25  people think that -- people from Rome in this day and age.  So

1    I think we went with the safe bet of "westerners" as opposed to

2    delivering the wrong message of the word "Roman."

3            MS. BASSIL:  Your Honor, I move to strike this

4    translation.  It doesn't appear to be a translation but a

5    decision and an opinion.

6            THE COURT:  Overruled.  It may stand.

7    BY MR. CHAKRAVARTY:

8    Q.   And so does the song lyrics -- do they go, "Throw the fire

9    to burn the" -- do you know if you go up and down or -- "Throw

02:01 10   the fire to burn the westerners, fight those who deviated to

11   worship the cross, they fed my people their oppression for

12   ages, O people of justice, revolt like a volcano in war"?

13           MR. CHAKRAVARTY:  Next page, please?

14   Q.   Then does it read, "The voice of Shayikh Mus'ab

15   al-Zarqawi, may Allah bless his soul," and then there is audio

16   and this time a speech.  Is that right?

17   A.   Yes.

18   Q.   Okay.  "Who among us is like Ahmad Bin Hanbal, Ibn

19   Taymiya, and 'Iz Bin Abd Al-Salam, carrying the banner of jihad

02:01 20   for the same of Allah and a whip against the enemies of Allah?

21   The scholars left the battleground and withdrew from leading

22   the caravan and from sacrificing the soul for Allah.  This was

23   not enough for them.  They lashed out at the mujahideen and

24   accused them of all faults.  You only hear their voices when

25   they're opposing the mujahideen.  This is all under the pretext

1   of politics and civility.  I don't know when they will abandon

2   the jurisprudence of defeat and the concept of weakness and

3   cowardice.

4        "Did you not hear how they condemned the slaughtering of

5   Berg, the American?  They rushed to condemn it because they

6   previously refrained from killing the infidels and did not

7   smell the winds of glory.  They did not pay attention to the

8   concepts of faith by which the believers rise above ignorance

9   and its people.  And to Allah belongs all honor, and to his

02:02 10  messenger and to the believers, but the hypocrites do not know.

11  It is truly hard for people like them, subservient slaves, to

12  see themselves kill the American master.

13       "Yes, they nursed on disgrace from their mothers' breasts,

14  which now runs through their veins.  It is time they change or

15  transform.  This is the bitter truth that they don't make

16  known; instead, they hide it under the cover of jurisprudence

17  or the present it embellished with the attire of knowledge.

18  They pretended and lied that this matter is damaging to the

19  picture of Islam in the eyes of the westerners, those with the

02:03 20  delicate feelings, and that the world is reacting to the crime

21  of Abu Ghrayb and Guantanamo.  Then came this operation and

22  negatively affected the reaction and the compliance of the

23  people of the world.  Even when the popularity of Bush, the dog

24  of the west, was at its lowest levels, the operation came and

25  raised it up as though the alleged free people of the world

1   have sharpened their swords, mobilized their brigades and

2   stretched out their necks to liberate Iraq and rescue the

3   bereaved mothers and the unwed from the prisons of subdual and

4   oppression.

5       "What is truly unfortunate and scary is that the media of

6   the sinner crusaders, with the help of our fellow citizens, was

7   able to influence the development of the Muslim personality.

8   Through intense broadcasting and the help of Arabic and

9   international stations they successfully brainwashed the

02:04 10  Muslims and influenced their thoughts.  They turned thin minds

11  upside-down and their determination malicious."

12      And then does the video end after showing the scenes that

13  it depicts with just a title page that says, "Don't forget us

14  when you make your supplication.  Media Institute, Mujahideen

15  Shura Council in Iraq"?

16  A.   Yes.

17  Q.   Let's go back for one moment to Exhibit 7 -- the one we

18  don't have a verbatim translation for, the 779A, I believe.

19  I'm sorry.  779C.  And what is this?

02:04 20  A.   This is the cover page of the Selection Shayikh al-Battar.

21  Q.   So this is the one for which we do have the translation

22  that you read earlier?

23  A.   Yes.

24      MR. CHAKRAVARTY:  So go to 780C, please.

25      Your Honor, this is in evidence.  I'm not going to --

1          THE COURT:  I'm sorry.  It is?

2          MR. CHAKRAVARTY:  It is.  It's not the translation;

3     it's just the original Arabic.

4          THE COURT:  All right.  Wait a minute.  I'll display

5     it.

6     BY MR. CHAKRAVARTY:

7     Q.   And what is this document?

8     A.   This is the magazine cover of Sawt al-Jihad.

9     Q.   All right.  Can you spell Sawt al-Jihad?

02:05 10   A.   S-A-W-T A-L-J-I-H-A-D.

11    Q.   And did you go through and did you click on various of

12    those links that are on the left-hand side of the page?

13    A.   Yes.

14    Q.   And does it appear to be some kind of collection of

15    magazines?

16    A.   Yes.

17         MR. CHAKRAVARTY:  That's all I have for this witness,

18    your Honor.

19         THE COURT:  Ms. Bassil, we're almost at eleven

02:06 20   o'clock.  If you prefer, we can take the break now before you

21    begin.

22         MS. BASSIL:  Sure.

23         THE COURT:  All right.  We'll take the morning recess

24    at this point.

25         (The Court and jury exit the courtroom and there is a

```
 1   recess in the proceedings at 10:55 a.m.).
 2   (Court and jury in at 11:27 a.m.)
 3           MR. CHAKRAVARTY:  With permission of the Court, there
 4   was one additional translation which I neglected to
 5   authenticate.
 6           THE COURT:  Okay.  Go ahead.
 7   Q.   Ms. Vallee --
 8           MR. CHAKRAVARTY:  Call up Exhibit 55C.
 9   Q.   Is this a verbatim translation of another video that you
10   translated?
11   A.   I'm looking at the cover page.
12   Q.   I'm sorry.
13           MR. CHAKRAVARTY:  Can we go to Page 2?
14   A.   Yes.
15   Q.   Okay.  Is this a fair and accurate translation -- verbatim
16   translation of that video?  Do you want to scroll through it?
17   A.   Yes, please.
18           MR. CHAKRAVARTY:  Can we go to the next page?
19           MS. BASSIL:  Your Honor --
20           MR. CHAKRAVARTY:  Next page.
21   A.   Yes.  I remember this one now, yeah.
22   Q.   What's the name of this video?
23   A.   "The Slaughterer."
24   Q.   Is that Zabbah?
25   A.   Zabbah, yeah.
```

```
 1    Q.   Is this a fair and accurate verbatim translation of that
 2    video?
 3    A.   Yes.
 4             MR. CHAKRAVARTY:  I'd introduce 55C, your Honor.
 5             MS. BASSIL:  Your Honor, same objection.
 6             THE COURT:  Okay.  It will be admitted.
 7    (Exhibit No. 55C received into evidence.)
 8             MR. CHAKRAVARTY:  Thank you, your Honor.  Thank you,
 9    Miss Bassil.
02:41 10   CROSS-EXAMINATION BY MS. BASSIL:
11    Q.   Good morning.
12    A.   Good morning.
13    Q.   I just want to ask you about a few of the documents, and
14    I'm not going to go over all of them, okay?
15    A.   Okay.
16             MS. BASSIL:  If we could have Document 1 just for the
17    witness, please.
18    Q.   Now, this is -- this is an Arabic document -- this is a
19    document in Arabic that you translated, correct?
02:42 20   A.   Yes.
21    Q.   And this was the one that was referred to as 1A, the
22    letter from Mullah Omar?
23    A.   Yes.
24    Q.   Do you know who Mullah Omar was?
25    A.   Not sure.
```

```
 1   Q.   You know he was in Afghanistan?

 2   A.   Yes.

 3   Q.   Do you know -- this was written in October -- the date on

 4   this was October 2001, is that correct?

 5   A.   Yes.

 6   Q.   Thank you.

 7        MS. BASSIL:  If we could have the witness look at 14

 8   and if we could have 14A, if you could just scroll through it

 9   for the witness, just so the witness can see.

10   Q.   You're familiar with that document?

11   A.   Yes.

12        MS. BASSIL:  If we could have 14A, please, for the

13   jury.

14   Q.   This was the document you translated, and it was about 24

15   pages of Arabic, was it not?

16   A.   Yes.

17   Q.   Let me ask you:  Is there a ratio?  Is it one page of

18   Arabic to one page of English, or is it one page of Arabic

19   equals three pages of English?

20   A.   There's really no numbers.  It's -- you know, it depends

21   on the material you're translating.

22   Q.   Now, on the bottom of this page --

23        MS. BASSIL:  If we could just have that highlighted.

24   Q.   That indicates -- it says this material was downloaded.

25   This is a link, is it not?
```

1   A.   That particular sentence?  I'm not sure.  But the three

2   below it are links.

3   Q.   Right.  And you translated that this material was

4   downloaded from this website?

5   A.   Yes.

6   Q.   I just wanted to be clear about that.

7   A.   Yes.

8        MS. BASSIL:  If we could have 221, please, just for

9   the witness.

02:44 10   Q.   Are you familiar with this?

11        MS. BASSIL:  If you could just scroll through a few of

12   the pages for the witness just so she can see it.

13   Q.   This is "Join the Caravan," correct?

14   A.   Yes.

15        MS. BASSIL:  If we could have 221A and if we could

16   have the last page, please.  I think it's two pages.

17   Q.   This document was about ten pages in Arabic, was it not?

18   A.   I think so.  I think it's a booklet.

19   Q.   It's a booklet?

02:44 20   A.   Yes.

21   Q.   And it was written by Abdullah Azzam about Afghanistan,

22   was it not?

23   A.   Yes.

24   Q.   It was written in 1987, is that correct?

25   A.   If that's what it says on it.  I don't know it off the top

1    of my head.

2         MS. BASSIL:  If we could have 222 for the witness,

3    please.  If we could just actually show 222 to the jury.  Is

4    that acceptable, your Honor?  I think it was shown to them

5    before.

6         THE COURT:  I think it may be in evidence.

7         MS. BASSIL:  That's right.  I just want to show it to

8    the jury.

9    Q.   This is the page of a screen shot of a website, is it not?

02:45 10  A.   Yes.

11   Q.   And it's similar to -- for example, have you ever gone on

12   a website like the Boston Globe or CNN, something like that?

13   A.   Yes.

14   Q.   And then there may be different links that you can click

15   on, correct?

16   A.   Right.

17   Q.   What you were given was this screen shot only to

18   translate, correct?

19   A.   Yes.

02:45 20  Q.   Thank you.

21        MS. BASSIL:  Could we have 701, please?  Now, if we

22   could go up to the date here, if we could highlight that.

23   Q.   This was an instant message that you read with Mr.

24   Chakravarty, and the date is July 11, 2006, is that correct?

25   A.   Yes.

1    Q.    And it's between Nussrah and Mr. Mehanna, is that correct?

2    A.    Yes.

3          MS. BASSIL:  If we could go back to the whole page and

4    if we could go right here.

5    Q.    And it's Mr. Nussrah who uses the term "Texas Barbecue,"

6    is that correct?

7    A.    In this one, yes.

8    Q.    That was on July 11th, correct?

9    A.    Yes.

02:46 10          MS. BASSIL:  Could we have July -- I'm sorry.  Could

11   we have 540, please?  If we could have the very top of 540.

12   Q.    This is a conversation between Abu Saqr and Mr. Mehanna on

13   July 13, 2006, is that correct?

14   A.    Yes.

15          MS. BASSIL:  Could we have the full page, please?

16   Q.    On the bottom of the page, this is where Mr. Mehanna

17   refers to the term -- he uses the term now, two days later,

18   "Texas Barbecue Sauce," correct?

19   A.    Yes.

02:46 20          MS. BASSIL:  If we could have 541, please.  I'm sorry.

21   686.  I want to do these in order.  I'm sorry.  Thank you.  If

22   we could have the top which shows the date.

23   Q.    Again, this is a conversation between Ihab and Sayf

24   Maslool on July 13, 2006.  You read this conversation with Mr.

25   Chakravarty, is that correct?

1  A.   Yes.

2  Q.   And this was a conversation in which the defendant used

3  the term "Texas Barbecue," correct?

4  A.   Yes.

5  Q.   And he used it two days after Mr. Nussrah coined the

6  phrase, correct?

7  A.   Yes.

8       MS. BASSIL:  And if we could have, finally, 541.  If

9  we could do the date.

02:47 10  Q.   This is July 14, 2006.  This is the conversation between

11  Mr. Mehanna and Abu Saqr, correct?

12  A.   Uh-huh.

13  Q.   This was a conversation in which he uses the phrase "Texas

14  Barbecue," correct?

15  A.   Yes.

16  Q.   This is three days after Mr. Nussrah started that term,

17  correct -- or used that term?

18  A.   Yeah.  I don't know who started it, but yes.

19  Q.   That's my point.  You don't know who started it, correct?

02:47 20  A.   No.

21  Q.   The first conversation, in terms of dates, that Mr.

22  Chakravarty asked you to look at was on the July 11th, and that

23  was Mr. Nussrah using the term?

24  A.   Yes.

25  Q.   You had said earlier -- I'm not going to pull up the

1    exhibit, but you had said that you had a discussion whether you

2    should use the term "Westerner" or "Roman," correct?

3    A.   Yes.

4    Q.   In fact, the Arabic word was Ruman, correct?

5    A.   Okay, yes.

6    Q.   The actual literal translation is Roman, correct?

7    A.   Yes.

8    Q.   And you had a discussion about how you were going to use

9    that, how you were going to translate that?

02:48 10   A.   Yes.

11   Q.   Now, in the documents that you translated, or the ones

12   that we went over this morning, you translated portions of

13   those documents, is that correct?

14   A.   The one that had the word Romans in it?

15   Q.   No, no.

16   A.   In general?

17   Q.   I'm referring to the other exhibits.

18   A.   Yes.

19   Q.   You didn't translate the entire document verbatim?

02:49 20   A.   No.

21   Q.   What the jury has seen is just the portion of the document

22   that the U.S. Attorney's Office asked you to translate?

23   A.   Correct.

24        MS. BASSIL:  I have no further questions.

25        MR. CHAKRAVARTY:  Nothing further.

1           THE COURT:  Thank you, Mr. Vallee.  You may step down.

2           MR. CHAKRAVARTY:  Ann Marie Doursounian.

3           THE COURT:  You remain sworn from your previous

4    appearance.

5           THE WITNESS:  Okay.

6           THE COURT:  Go ahead.

7           MR. CHAKRAVARTY:  Thank you, your Honor.

8           ANN MARIE DOURSOUNIAN, Previously Sworn

9    CONTINUED DIRECT EXAMINATION BY MR. CHAKRAVARTY:

02:50 10   Q.   Again, for the record, Miss Doursounian, you're being

11   re-called.  Can you just state and spell your name, please?

12   A.   Ann Marie Doursounian, D-o-u-r-s-o-u-n-i-a-n.

13   Q.   And you're a linguist at the FBI?

14   A.   Yes.

15   Q.   There were some additional translations which, from the

16   last time you testified, you've done, some portions of which

17   you've done as verbatim translations, is that right?

18   A.   Right.

19          MR. CHAKRAVARTY:  I'm going to call up Exhibit 15A for

02:50 20   the witness, your Honor, and Exhibit 15, please.

21   Q.   Is this a document that you translated, Exhibit 15?

22   A.   It's a portion of it, yes.

23   Q.   So what's depicted on the screen is the Arabic language

24   document?

25   A.   Right.

```
 1   Q.   And it's a multipage document?

 2   A.   Right.

 3   Q.   This was found at the defendant's residence.

 4        MR. CHAKRAVARTY:  Can we go to 15A?

 5   Q.   You translated a portion of that?

 6   A.   Right.

 7   Q.   You did a one-page, kind of looks like the beginning

 8   portion of that document --

 9   A.   Yes.

02:51 10  Q.   -- is that fair?

11        Is this a fair and accurate Arabic-to-English translation?

12   A.   It is.

13        MR. CHAKRAVARTY:  I'd introduce 15A, your Honor.

14        THE COURT:  Okay.

15        MR. CHAKRAVARTY:  And ask to publish it.

16   (Exhibit No. 15A received into evidence.)

17   Q.   Is the title of this document, "The Noble Character of the

18   Mujahid"?

19   A.   Right.

02:51 20  Q.   Does it say, "In the name of Allah, the most

21   compassionate, the most merciful.  Introduction.  Praise be to

22   Allah and the prayers and peace be upon Allah's prophet.  This

23   booklet covers the virtues of Jihad and the characters of the

24   mujahideen and the reasons for victory.  It covers what Allah

25   prepared for the mujahideen and the martyrs of valuable bliss
```

```
 1    and the high ranks of paradise.  The book was written to incite

 2    the mujahideen and make them desire Jihad and have them fear of

 3    sitting back from Jihad and relying on the world.  May Allah

 4    pray on our Prophet Muhammad and on all his family and

 5    companions."  Did I read that correctly?

 6    A.   Right.

 7         MR. CHAKRAVARTY:  Go to Exhibit 217A.

 8    Q.   Were there several computer documents that were on a CD

 9    that you translated portions of?

02:52 10   A.   Uh-huh.

11         MR. CHAKRAVARTY:  Page 2, please.

12    Q.   Is this a multipage document that is a verbatim

13    translation of Exhibit 217?

14    A.   It is.

15    Q.   Is this a fair and accurate translation of what's depicted

16    in Arabic on Exhibit 217?

17    A.   It is.

18         MR. CHAKRAVARTY:  I'd introduce 217A, your Honor.

19         THE COURT:  Okay.

02:52 20   (Exhibit No. 217A received into evidence.)

21    Q.   Just the title of this document, is that "The Legality of

22    Martyrdom Operations and That It is Not Self Murder"?

23    A.   Yes.

24         MR. CHAKRAVARTY:  Go to 220A.

25    Q.   Is this another portion of a document that you translated
```

1  verbatim?

2  A.   It is.

3  Q.   Is this a fair and accurate translation of that portion

4  that you translated of Exhibit 220?

5  A.   It is.

6  Q.   It's, again, the English translation from the Arabic?

7  A.   Right.

8       MR. CHAKRAVARTY:  I'd introduce Exhibit 220A.

9       THE COURT:  Okay.

02:53 10  (Exhibit No. 220A received into evidence.)

11  Q.   Is this document entitled, "Bestowing the Virtues of Jihad

12  Upon the Worshippers, By:  The Imam, the Martyr, Abdullah

13  Azzam"?

14  A.   Right.

15       MR. CHAKRAVARTY:  Can we go to Exhibit 226A?

16  Q.   Is this a document for which you translated only the title

17  of the document?

18  A.   Yes.

19  Q.   What's depicted on 226A, that a fair and accurate

02:54 20  translation of that title of Exhibit 226?

21  A.   It is.

22       MR. CHAKRAVARTY:  I'd introduce 226A.

23       THE COURT:  All right.

24  (Exhibit No. 226A received into evidence.)

25  Q.   Is that File 226 -- the file that is in 226, is that

  1   titled, "Martyrdom Operations, Peak of the Hump of Martyrdom"?

  2   A.   Yes.

  3        MR. CHAKRAVARTY:   Go to 224A.

  4   Q.   Is this another translation of the title of one of the

  5   files?

  6   A.   It is.

  7   Q.   Is this a fair and accurate translation?

  8   A.   It is.

  9        MR. CHAKRAVARTY:   I'd introduce 224A, your Honor.

02:54 10        THE COURT:   All right.

 11   (Exhibit No. 224A received into evidence.)

 12   Q.   Is the title of Exhibit 224 "Slowly Usama"?

 13   A.   It is.

 14        MR. CHAKRAVARTY:   Exhibit 228A.

 15   Q.   Is this another translation of the title of one of the

 16   files found on the defendant's -- on a CD on the defendant's

 17   computer?

 18   A.   It is.

 19   Q.   Is this a fair and accurate translation?

02:55 20   A.   It is.

 21        MR. CHAKRAVARTY:   I'd introduce 228A.

 22        THE COURT:   Okay.

 23   (Exhibit No. 228A received into evidence.)

 24   Q.   Is the title of Exhibit 228, "Waging Jihad Outside Iraq"?

 25   A.   It is.

1          MR. CHAKRAVARTY:  Finally, Exhibit 330A.

2    Q.   Is this another file for which you did a partial verbatim

3    translation?

4    A.   I did, yes.

5    Q.   And the parts that you translated, are they fairly and

6    accurately a verbatim translation?

7    A.   They are.

8          MR. CHAKRAVARTY:  I'd introduce Exhibit 330A.

9          THE COURT:  Okay.

02:55 10    (Exhibit No. 330A received into evidence.)

11    Q.   Is the title of this document "Hijra," or Migration?

12    A.   Right.

13    Q.   Does this document read:  "The global Islamic resistance

14    call urges Muslims residing in Western countries and in the

15    lands of infidelity and infidels to do two things:  First,

16    migrate from infidel and polytheist countries to Muslim

17    countries even if this leads to losses of worldly things as

18    well as being subjected to the tyranny of apostate

19    governments."

02:56 20         Then I'll skip down to the second provision.  "Second:

21    The resistance call reminds every Muslim residing in the lands

22    of the West even those who are natives of this land that the

23    duty to fight Jihad against the governments of those infidel

24    invader countries which are part of the American and Jewish

25    alliance is his individual duty, just like every Muslim

1    everywhere.  Fulfilling this duty is easier on them than the

2    mujahideen who are not residents and who visit these countries

3    to prevent the governments from attacking Muslims.  They have

4    to resist these governments, fight Jihad against them and their

5    interests and target their rulers as well as their political

6    and economic powers through the ruling of the Islamic law and

7    the distinction between who deserves to be targeted and who

8    does not."  Did I read that correctly?

9    A.    You did, yes.

02:57 10        MR. CHAKRAVARTY:  Go to Exhibit 371A, Page 2, please.

11   Q.    Is this a translation -- a verbatim translation of what

12   appears in Exhibit 371?

13   A.    It is.

14        MR. CHAKRAVARTY:  Can we go to 371 just to show it's a

15   web page?

16   Q.    This is what you translated?

17   A.    Yes, I did.

18        MR. CHAKRAVARTY:  371A.

19   Q.    Is this a fair and accurate Arabic-to-English

02:57 20   translation --

21   A.    It is.

22   Q.    -- of what we just saw in Exhibit 371?

23   A.    It is.

24        MR. CHAKRAVARTY:  I'd introduce 371A.

25        THE COURT:  All right.

1    (Exhibit No. 371A received into evidence.)

2    Q.   Does this read, "As-Sahab Media presents:  The War of the

3    Oppressed in Kunar Operation.  The War of the Oppressed:  High

4    quality, excellent quality, good quality, or mobile quality.

5    Version distributed by the Al Ansar Islamic Forum."  Did I read

6    that correctly?

7    A.   Right.

8         MR. CHAKRAVARTY:  If we could go to 777A.

9    Q.   These next two documents, they are largely in English, but

02:58 10   there were portions which were transliterated Arabic.  Did you

11   translate the Arabic portions into English?

12   A.   I did.

13   Q.   Are those depicted in blue coloring on the screen?

14   A.   They are, yes.

15   Q.   Is this document a fair and accurate verbatim translation

16   of all of the Arabic that appears on this document?

17   A.   It is, yes.

18   Q.   With regards to 778A, is this, similarly, for those

19   portions that are in Arabic, did you verbatim translate those

02:58 20   into English?

21   A.   I did.

22   Q.   Is this also a fair and accurate translation of the Arabic

23   in this document?

24   A.   It is, yes.

25        MR. CHAKRAVARTY:  I'd introduce 777A and 778A.

1           THE COURT:  Okay.

2    (Exhibit No. 777A received into evidence.)

3    (Exhibit No. 778A received into evidence.)

4           MR. CHAKRAVARTY:  That's all I have, your Honor.

5    CROSS-EXAMINATION BY MS. BASSIL:

6    Q.    Good morning.

7    A.    Good morning.

8           MS. BASSIL:  Could I have Exhibit 15, please, for the

9    witness?

02:59 10   Q.    You translated this into 15A, is that correct?

11   A.    Yes, I did.

12   Q.    Does that indicate that this was written by President of

13   the High Judicial Court of Chechnya?  Do you need it bigger?

14   A.    Yes, it does.  Well --

15   Q.    So this was a document written by someone from Chechnya,

16   is that correct?

17   A.    The name is there, yes.

18           MS. BASSIL:  If I could have Exhibit 220 and if you

19   could just scroll through it so just the witness can take a

03:00 20   look at it.

21   Q.    This was a fairly lengthy Arabic document, was it not?

22   A.    Yes, it was.

23   Q.    You translated just one page from it, is that correct?

24   A.    I only translated the points, the bullet points -- not the

25   bullet points, the head, the numbers, what each one is without

 1    going into the details, yes.

 2    Q.   Okay.  So there were numbers -- numbered paragraphs?

 3    A.   Right.

 4    Q.   And you translated what?  The first sentence of each

 5    numbered paragraph or the title of each numbered paragraph?

 6    A.   The header, right.

 7    Q.   The header.  And not the rest of it?

 8    A.   No.

 9         MS. BASSIL:  And then, finally, if we could have

03:01 10    Exhibit 228.  You can see -- if we could have that go to

11    everyone, your Honor.

12    Q.   This is a website page, is it not?  It's a screen shot of

13    a website?

14    A.   It appears that way, yes.

15    Q.   You selected the heading of an article from -- that was

16    posted on this site, is that correct?

17    A.   Right.

18    Q.   And you did not translate a separate document that

19    indicated exactly what that article was, correct?

03:01 20    A.   No.

21    Q.   All you translated were the lists that were on here?

22    A.   I translated the top in blue.

23    Q.   Okay.

24    A.   All the way to the second word in the second line.

25    Q.   All right.  And so --

```
 1  A.    And the title.

 2  Q.    As I understand it, the documents in blue here are topics

 3  that you could click on on a website?

 4  A.    They are, but I didn't translate that.  Yes, they are.

 5  Q.    You didn't translate the documents themselves?

 6  A.    Right, right.

 7  Q.    So, in fact, what you translated were portions of

 8  documents that -- the United States Attorney's Office has

 9  picked out those portions for you to translate?

03:02 10  A.    I was presented with these documents, and I -- yes, I

11  translated what I was asked, yes.

12  Q.    Which were portions?  You can say it.  They were portions?

13  A.    They were portions.  They were the titles.  This was the

14  title.

15  Q.    Not the full article?

16  A.    No.

17  Q.    Portions?

18  A.    Right.

19  Q.    Thank you.

03:02 20        MS. BASSIL:  I have no further questions.

21        MR. CHAKRAVARTY:  Nothing further.

22        THE COURT:  All right.  Miss Doursounian, thank you.

23  You may step down.

24        MR. CHAKRAVARTY:  The government calls Kareem

25  Abuzahra.
```

```
 1            MR. CARNEY:  May we approach, please?

 2            THE COURT:  All right.

 3  (SIDEBAR CONFERENCE AS FOLLOWS:

 4            MR. CARNEY:  Your Honor, I've been given a number of

 5  exhibits that they wish to introduce through this witness.  I

 6  would like to bring three objections to your attention so that

 7  your Honor has a chance to either rule on them or consider

 8  them.  They're in sequence, your Honor.  I'm presenting them

 9  before you.

10            THE COURT:  This is the number?

11            MR. CARNEY:  Yes, it's 364, 5, and 6.  The basis of

12  the objection is that there are antigay references throughout

13  the three of them, and I just don't believe that the homophobia

14  is a consideration here.  It would only be prejudicing.  All

15  three were sent by the defendant.

16            MR. CHAKRAVARTY:  The reason they're being offered is

17  obviously not for the gay references.  But this is the four

18  people who participated in the planning for the Yemen trip, all

19  having conversations which thematically are anti-American,

20  supportive of Jihad.  And the fact that they chose to use

21  homosexual references and pejorative terms, frankly, is

22  incidental to the fact that what they're talking about is the

23  fact that America is doing bad things in the Muslim world.

24  That is the motivation that goes to the mindset before they

25  walk in there and talk about the terrorist conspiracy.
```

1      THE COURT:  Who's Rabbani?

2      MR. CHAKRAVARTY:  Rabbani was one of the post-Afghan

3  Civil War leaders who we allied with -- the U.S. Government

4  allied with in the alliance.

5      THE COURT:  This is -- the three are from November

6  2001, December 2001, and January 2002.  Is it -- well, okay.

7  Let me hear you.

8      MR. CARNEY:  If the government is offering this

9  evidence to show that the defendant supported Jihad, I think

03:07 10  we're way past any question that he supported Jihad.

11      MR. CHAKRAVARTY:  The important thing about the

12  timing, your Honor, not only is it these particular people but

13  in that period of time when this witness was living in Jordan,

14  overseas, during the -- the fact that they were staying in

15  communication about this very same thing that they had

16  discussed before, and they would continue to discuss, is the

17  germane aspect of it that we're offering it for.  I don't have

18  to read the poems necessarily.  It's the fact that the

19  defendant is sending them.  It's the fact that it's to the

03:08 20  select people, and during that time, post-9/11, when he was not

21  here yet, comes back, and then he immediately strikes up the

22  friendship with them.  So it's that relationship.

23      THE COURT:  I think the probative value outweighs the

24  prejudice.  "Hassan" is Hassan Masood?

25      MR. CHAKRAVARTY:  Yes.

```
 1              THE COURT:  This is the period before the trip, I

 2      guess, right?  This is three months before the trip to Yemen?

 3              MR. CARNEY:  I believe the trip to Yemen --

 4              THE COURT:  February 2002 or February of --

 5              MR. CHAKRAVARTY:  2004.

 6              THE COURT:  I see.  I'm sorry.

 7              MS. BASSIL:  February 2004.

 8              MR. CHAKRAVARTY:  It is right -- before the trip to

 9      Yemen, there were a series of events.  One of them is

03:08 10      Abousamra's trip to Pakistan, which this is before, in fact

11      right before Abousamra goes to Pakistan.  This witness wasn't

12      even in the country yet.  He was still -- the point of this is

13      he was still in the loop.  He's kind of knowing what's going

14      on.  He's not going to say that he knew that Abousamra is going

15      on the first trip.  It's before the domestic -- kind of the

16      conversations about domestic acts of violence.  It's during the

17      conversations about --

18              THE COURT:  I think it's still -- it can be used.  The

19      objection is overruled.

03:09 20              MR. CARNEY:  The government said they're not going to

21      read it, but they're offering it in evidence, right, so that

22      the jury will be able to read it?

23              MR. CHAKRAVARTY:  Yes.  We're not going to read the

24      poem.

25              THE COURT:  I think they're not going to read is not a
```

 1    substantial concession.

 2            MR. CARNEY:  It threw me off one time, and I just

 3    wanted to clarify.

 4            THE COURT:  I don't regard that as a substantial

 5    concession.

 6            MR. CARNEY:  I would say that the basis for my

 7    objection is that the character assassination aspect of it goes

 8    beyond what has occurred already.  We've now had slurs against

 9    Christians, Jews, Indians.  Now we're going into gays.  And I

03:10 10    move for a mistrial on that basis also, please.

 11            THE COURT:  Okay.  That will be denied.  The reason I

 12    think it's probative is that it is, I think, probative of the

 13    existence of the conspiracy that the government alleges among

 14    the principal participants.

 15            MR. CARNEY:  Well, if this is what's going to go in,

 16    they might as well read it because, if they don't read it, I'm

 17    going to.  Thank you.

 18    .  .  .  END OF SIDEBAR CONFERENCE.)

 19            THE CLERK:  Sir, want to step up here, please.  Step

03:11 20    up to the box.  Remain standing and raise your right hand.

 21            KAREEM ABUZAHRA, Sworn

 22            THE CLERK:  Please be seated.  State your name and

 23    spell your last name for the record.

 24            THE WITNESS:  Kareem Abuzahra, A-b-u, dash, z-a-h-r-a.

 25    DIRECT EXAMINATION BY MR. CHAKRAVARTY:

1    Q.    Good afternoon, Mr. Abuzahra.

2    A.    Good afternoon.

3    Q.    I please ask you to keep your voice up.  Speak slowly.  Be

4    mindful of the court reporter.

5          Can you tell the jury where you live?

6    A.    In Lynnfield, Massachusetts.

7    Q.    How long have you lived there?

8    A.    I've lived there since 2002.

9    Q.    Who do you live there with?

03:12 10   A.    With my wife and children.

11   Q.    How old are your kids?

12   A.    Seven and nine.

13   Q.    Where were you born?

14   A.    Born in Salem, Massachusetts.

15   Q.    Where did you grow up?

16   A.    Salem, Massachusetts, and later Wakefield, Massachusetts.

17   Q.    What is your ancestry?

18   A.    Palestinian.

19   Q.    Where did you go to high school?

03:12 20   A.    Saint John's Prep.

21   Q.    When did you graduate?

22   A.    1997.

23   Q.    What did you do after high school?

24   A.    After high school, I went to -- attended college for a

25   year in Long Island, and then I continued in Lowell.

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  | Q. | What school did you go to in Long Island?              |
| 2  | A. | Stony Brook.                                            |
| 3  | Q. | What did you study at UMass?                            |
| 4  | A. | Computer science.                                       |
| 5  | Q. | Did you graduate from UMass?                            |
| 6  | A. | Yes.                                                    |
| 7  | Q. | What year?                                              |
| 8  | A. | 2001.                                                   |
| 9  | Q. | Did you obtain a degree?                                |
| 03:13 10 | A. | I did.                                            |
| 11 | Q. | What in?                                                |
| 12 | A. | A bachelor's in computer science.                      |
| 13 | Q. | Did you continue your studies at UMass?                |
| 14 | A. | I did.                                                  |
| 15 | Q. | In what?                                                |
| 16 | A. | Computer science.  I got a master's in computer science. |
| 17 | Q. | When did you get that?                                  |
| 18 | A. | In 2008.                                                |
| 19 | Q. | Did you work during college?                            |
| 03:13 20 | A. | I did.                                            |
| 21 | Q. | What did you do?                                        |
| 22 | A. | I worked as a programmer for UMass Lowell.             |
| 23 | Q. | Is that throughout your college experience?            |
| 24 | A. | Yes.                                                    |
| 25 | Q. | Including your graduate studies?                        |

```
 1   A.    Yup.

 2   Q.    Did you pursue postgraduate education?

 3   A.    I'm currently working on a Ph.D. in computer science.

 4   Q.    Where?

 5   A.    At UMass Lowell.

 6   Q.    Where do you work?

 7   A.    UMass Lowell.

 8   Q.    What is your job there?

 9   A.    I'm -- it's programming and directing the technical

03:14 10   operations of the website.

11   Q.    You said you're studying for your Ph.D.?

12   A.    Yes.

13   Q.    What is your particular subject matter in your Ph.D.?

14   A.    It's individualization.

15   Q.    What does that mean?

16   A.    It deals with how the -- people interact with programs and

17   different interfaces.  It deals a little bit with the

18   physiology of how people interpret signals and also the

19   psychology of the way people interpret things.

03:14 20   Q.    About the internet web experience?

21   A.    In general, computer interfaces in general.

22   Q.    Now, did you finish your undergraduate studies in 2001?

23   A.    Yes.

24   Q.    At some point, did you leave Massachusetts?

25   A.    I did.
```

```
 1   Q.    When?
 2   A.    I left -- I finished my studies in August of 2001, and I
 3   left in September to go to Jordan.
 4   Q.    What was in Jordan?
 5   A.    I went there -- I went to get married.  So I went to
 6   Jordan looking for a wife.  I spent a month there looking for a
 7   wife.  I found someone.  We got engaged.  I came back to the
 8   States for a month, then I went to Jordan again.
 9   Q.    Did you have family in Jordan as well?
10   A.    I did.
11   Q.    You said you went back to Jordan again?
12   A.    Yes.
13   Q.    With your -- where your wife was?
14   A.    Yes.
15   Q.    What did you do when you went back the second time?
16   A.    I continued to work remotely as a contractor for the
17   university, and then I -- I was also looking for a job there at
18   the same time.
19   Q.    What kind of job?
20   A.    Something dealing with programming computers.
21   Q.    Did you want to live overseas?
22   A.    At the time, yes, I went there for the purpose of living
23   there.
24   Q.    Did you know your wife before you went to Jordan the first
25   time?
```

A.    No.

Q.    So is it customary to make acquaintance in that compressed
time frame?

A.    Yeah.  So it's -- what typically happens is your family
will ask around, seeing who else is -- kind of other people
that have available -- you know, looking -- available --
potential spouses.  My mom had a bunch of people.  She talked
to some relatives over there.  Then I just went and saw -- I
met a few of them until I found someone.  We kind of hit it
off.  We continued more with talking.  Then we decided to get
engaged and continue and to see if that could lead to marriage.

Q.    How long did you intend to live overseas?

A.    I went there with no kind of time frame in mind.

Q.    What types of jobs were you looking for over there?

A.    Programming jobs, something dealing with computers.

Q.    Did you travel anywhere else in the Middle East to find --

A.    I got -- I briefly got a job that was in Jihanakis (ph).
The place was headquartered in Jordan, but they had an office
in Qatar.  So I went there for -- if I went there for -- to
start the job there.  After a week or two, I quit because I
didn't like it.  I spent another few weeks there trying to find
another job there.  I couldn't find another job there.  So I
returned back to Jordan.  So the whole time frame in Qatar was
less than a month.  I think it was 30 days.  At that point, I
decided I couldn't find a job in two different countries there.

```
 1    So I decided to come back.

 2    Q.   Are you fluent in any other languages?

 3    A.   I'm fluent in Arabic.

 4    Q.   Did you use those Arabic language skills while you were

 5    overseas?

 6    A.   Yes.

 7    Q.   Where were you on September 11, 2001?

 8    A.   I was in Jordan.

 9    Q.   So when did you come back?

10    A.   I came back the end of the month.

11    Q.   End of which month?

12    A.   End of September.

13    Q.   So you went the first time to find a wife?

14    A.   Yes.

15    Q.   And you came back at the end of September?

16    A.   At the end of September, the beginning of October.

17    Q.   Then you returned to Jordan?

18    A.   Yes.

19    Q.   For how long?

20    A.   So I returned in, I believe, November, and I was there

21    until July of 2002.

22    Q.   Did you return to your work at UMass when you --

23    A.   Yes.

24    Q.   It's basically that job that you've now continued to do

25    all these years?
```

```
 1   A.   Yes.

 2   Q.   I assume elevated and taken more responsibilities?

 3   A.   Yes.

 4   Q.   Okay.  I draw you now to your involvement in this case.

 5   Back in August of 2006, were you approached by the FBI and

 6   interviewed?

 7   A.   Yes.

 8   Q.   Were you asked about a trip that you took in 2004?

 9   A.   Yes.

10   Q.   Did you tell the FBI the truth about that trip?

11   A.   No.

12   Q.   Why not?

13   A.   It was -- I didn't believe it was in my best interest to

14   tell them the truth of the trip.

15   Q.   What was the truth of the trip?

16        MR. CARNEY:  I object.

17   A.   The truth -- we --

18        THE COURT:  Rephrase the question.

19   Q.   What was that trip for?

20   A.   We went there for the purpose of finding a terrorist

21   training camp.

22   Q.   What did you hope to do getting that training?

23   A.   Eventually to go get into Iraq.

24   Q.   Who did you go with?

25   A.   I went with Tarek Mehanna and Ahmed Abousamra.
```

```
 1   Q.   Did you discuss a cover story?

 2   A.   Yes, we did.

 3   Q.   What was it?

 4   A.   The story was that we'd -- we were going to Yemen to

 5   explore some Islamic schools there, some Arabic language

 6   schools.

 7   Q.   Did you tell the FBI that cover story?

 8   A.   Yes.

 9   Q.   When you came back, did you tell the Customs personnel

10   that cover story?

11   A.   Yes.

12   Q.   Did you tell people in the community that cover story?

13   A.   I didn't talk to anyone in the community about the trip.

14   Q.   After this approach by the FBI in August of 2006, did you

15   get a lawyer?

16   A.   Not initially but soon after.

17   Q.   What happened that prompted you to get a lawyer?

18   A.   So as soon as I spoke with -- the FBI agents approached me

19   in August, somewhere in August.  Soon after, I went with my

20   wife to Canada on a -- just a vacation, small vacation in

21   Canada.  On the way back, I was stopped at the border for four

22   and a half hours, and the -- after a little bit, I was asking

23   the -- the first 20 minutes, half an hour, okay.  After a

24   while, I started asking questions about why I was stopped and

25   detained.  He just kept giving me stories that were obviously
```

```
 1   false.
 2   Q.   And so you got a lawyer after that, sometime after that?
 3   A.   Sometime after that.  I realized that it was -- the
 4   interest in me by the government was more than what I initially
 5   suspected.
 6   Q.   Later that year, a few months later, in October of 2006,
 7   did you come in and meet with the FBI and the U.S. Attorney's
 8   Office?
 9   A.   I don't remember the exact month but soon after, yes.
10   Q.   And did you discuss what happened with your lawyer?  Don't
11   go into the details of what you discussed.  But did you talk to
12   your lawyer before you came in to talk to us?
13   A.   Yes.
14        MR. CHAKRAVARTY:  I call up Exhibit 485.
15   Q.   You recognize this letter?
16   A.   Yes.
17        MR. CHAKRAVARTY:  Can we go to the last page?
18   Q.   You recognize on the last page your signature on the
19   letter?
20   A.   Yes.
21   Q.   What do you recognize this letter to be?
22   A.   The immunity agreement I had with the government.
23   Q.   So you were offered this letter before you told us what
24   happened?
25   A.   Yes.
```

1    Q.   What do you understand your obligation under the letter to

2    be?

3    A.   To cooperate with the government in this case.

4         MR. CHAKRAVARTY:  I'd ask 485 be introduced, your

5    Honor.

6         THE COURT:  All right.

7         MR. CARNEY:  No objection, your Honor.

8    (Exhibit No. 485 received into evidence.)

9         MR. CHAKRAVARTY:  First page, please.

03:23 10         THE COURT:  You want it displayed?

11         MR. CHAKRAVARTY:  Yes, please.  I'm sorry.  Thank you.

12   Q.   Does the first paragraph read:  "Your client agrees to

13   cooperate fully with law enforcement agents and government

14   attorneys.  He must provide complete and truthful information

15   to all law enforcement personnel.  If his testimony is

16   requested, he must testify truthfully and completely before any

17   grand jury and at any hearing and trial.  Your client must

18   answer all questions put to him by any law enforcement agents

19   or government attorneys and must not withhold any information.

03:23 20   He must not attempt to protect any person or entity through

21   false information or omission or to implicate falsely any

22   person or entity.  Upon request, he must furnish all documents,

23   objects and other evidence in his possession, custody or

24   control that are relevant to the government's inquiries."

25         MR. CHAKRAVARTY:  Can we go to Paragraph 3?  Page 2.

1    Q.   "If your client knowingly provides false or misleading

2    testimony or information, commits any crime chargeable as a

3    felony under state or federal law after the date of this

4    agreement, or otherwise violates any term of this agreement,

5    then this agreement shall be null and void.  In such an event,

6    any testimony or other information provided by your client may

7    be used against him without limitation for purpose in any

8    proceedings."

9         You described this as an immunity letter.  What is your

03:24 10   understanding about what the government can do with the

11   information that you have given us?

12   A.   My understanding, that if I -- any information that I

13   provide, any crimes that I may have committed, it will not be

14   held against me as long as I uphold my end of the agreement,

15   based on Paragraph 1 and 3, providing the truth and providing

16   any documents, testifying in grand jury and the trial.  And if

17   I break my agreement, then anything that I've told them can be

18   used against me in any trial against myself or any other

19   purpose.

03:24 20   Q.   I'm going to draw your attention now to Tarek Mehanna.  Do

21   you know him?

22   A.   Yes.

23   Q.   You see him in the courtroom?

24   A.   Yes.

25   Q.   Can you point to him and identify something he's wearing?

           1    A.   He's the gentleman sitting closest to me in the second

           2    table, wearing the gray suit.

           3           MR. CHAKRAVARTY:  Ask that the record reflect he's

           4    identifying the defendant.

           5           THE COURT:  All right.

           6    Q.   How do you know him?

           7    A.   We've known each other for a long time.  Our families were

           8    friends back when we were younger.  So I've known him -- I

           9    can't remember when I first met him.  I've known him since I

03:25 10    was a child.

          11    Q.   What kind of interaction did you have as a kid?

          12    A.   Not too much.  We'd see each other at dinner parties and

          13    played together as kids play together and that's it.

          14    Q.   Did you go about your separate ways as you grew older and

          15    went to college?

          16    A.   Yes.

          17    Q.   At some point, did you reestablish a relationship?

          18    A.   Yes.

          19    Q.   When was that?

03:25 20    A.   In 2000, probably around mid-2000.

          21    Q.   How did you reestablish your relationship?

          22    A.   So at the time, you know, we kind of went our separate

          23    ways.  I don't know what he was doing, but I was not really

          24    that religious.  I was doing my own thing, living my own life.

          25    At some point in early 2000, I kind of found religion again.  I

became more religious.  And I saw him -- one time I saw him

coming out of a mosque, and I was kind of -- I was there, and I

kind of recognized the same kind of symbols of, you know, being

religious and that kind -- we kind of recognized each other as

kind of finding our religion again.  So we kind of rekindled

our relationship after that.

Q.    What were those symbols that indicated to you that the

defendant was also becoming more religious?

A.    Mostly would be having the longer beard.

Q.    So as you rekindled your relationship, how frequently

would you meet with him?

A.    At least once -- on average, once a week.

Q.    What kinds of things would you talk about?

A.    So we talked about religion, obviously.  We'd talk about

small talk, things that -- what happened to me today or

something happened on the highway on your way.  We talked about

current events, anything that -- kind of water-cooler talk.

Q.    What types of activities would you engage in?

A.    It mostly would be just talking.  We'd go to have dinner

sometimes, going to the mosque, that kind of stuff.

Q.    Sort of hanging out?

A.    Yes.

Q.    Where would you hang out?

A.    Hang out at my house, at his house, hang out at the

Wayland mosque, places around that area.

```
 1   Q.   Are you familiar with Ahmad Abousamra?

 2   A.   Yes.

 3   Q.   How are you familiar with him?

 4   A.   I met him in the later part of 2000.

 5             MR. CHAKRAVARTY:  Call up Exhibit 741.

 6             THE COURT:  I'm sorry.

 7   Q.   Is this him?

 8   A.   Yes.

 9   Q.   When you met him, did he have the longer beard or the

10   shorter beard?

11   A.   The longer beard.

12   Q.   Describe how you met Mr. Abousamra.

13   A.   I heard about him before through some of our mutual

14   friends.  And then one time I just -- I don't know if I was

15   specifically invited or not, but he had a dinner party, and I

16   was invited to his -- I went to his house, participated in

17   that.

18   Q.   Would he join you and the defendant in your hanging out?

19   A.   Yeah.  Eventually, we formed a close relationship.

20   Q.   What was the basis of your relationship with him?

21   A.   It formed initially just because we kind of were

22   practicing the religion more than the others in our community.

23   Q.   Is that the same basis of the relationship with the

24   defendant?

25   A.   Yes.
```

1   Q.    How frequently would the three of you get together?

2   A.    Once I made kind of -- hooked up with Ahmad Abousamra, I

3   got to know him better, we would -- it was the same thing,

4   around -- on average, once a week, sometimes more often.

5   Sometimes we'd skip a week but, on average, once a week.

6   Q.    When you first started meeting together, did the topic of

7   Jihad come up?

8   A.    I don't believe it came up initially, no.

9   Q.    So it was just general religious topics?

03:29 10   A.    Yes.

11   Q.    Where did the defendant live?

12   A.    In Sudbury.

13   Q.    Where did Abousamra live?

14   A.    In Stoughton.

15   Q.    Where did you live?

16   A.    In Lynnfield.

17   Q.    So where would you meet?

18   A.    Oftentimes we'd meet somewhere close to where they lived

19   because they were just geographically closer to each other.  So

03:30 20   it made more sense for me to go there.

21   Q.    Do you know what the relationship was between the two of

22   them?

23   A.    Beyond just the same relationship I had with them, I don't

24   know of anything else.

25   Q.    I guess what I was getting at:  Do you know if they had a

```
 1    closer relationship with each other than they did with you?
 2    A.    Initially, I don't believe so, but I think over time
 3    because they were just close together.  They'd tell me stories
 4    about what happened when they were together.  So they would
 5    hang out more often than I would with them.
 6    Q.    Did they know each other for longer?
 7    A.    I believe that Tarek knew him a little bit before I knew
 8    him.
 9    Q.    So at around this time, in addition to the defendant and
10    Mr. Abousamra, did you develop an inner circle of friends?
11    A.    Eventually, over time we did formulate a circle of kind of
12    -- we'd meet with ourselves and discuss certain topics
13    different than with other people.
14    Q.    Who, aside from Abousamra and the defendant, would you
15    consider in -- if anyone, would you consider in your inner
16    circle of friends?
17    A.    Hassan Masood.
18                MR. CHAKRAVARTY:  Can we call up 759?
19    Q.    Is this him?
20    A.    I've never seen him like this, but it looks like it's a
21    good -- it did -- I can sort of recognize it.  If you didn't
22    tell me it was him, I might not recognize him.
23    Q.    How does this picture differ from your memory of this
24    person?
25    A.    The hair and the beard.  He had a longer beard at the
```

03:30  (line 10)
03:31  (line 20)

1    time.

2    Q.   How did you know him?

3    A.   He was -- he lived in Sharon.  He was close to Ahmad, and

4    they were kind of -- the same thing, mutual friends.  We got to

5    know each other just being part of that -- there was a -- the

6    crowd on the South Shore.  So just kind of being involved in

7    that crowd, I met him through them, through Tarek and Ahmad.

8    Q.   Again, just to orient the time line, around what time

9    frame did the four of hang out?

03:32 10   A.   It would be in the later part of -- like, mid to late

11   2000, going on.

12   Q.   Now, you said earlier that you went to Jordan in September

13   of 2001?

14   A.   Yes.

15   Q.   Between the time that you just mentioned, late 2000, to

16   the time that you left to go to Jordan, how would you describe

17   the nature of your relationship with these three?

18   A.   I was closer to Ahmad and Tarek than with Hassan.  We

19   still -- by the time I left, we had developed our, as you

03:32 20   mentioned -- as you described, like, an inner circle of friends

21   where we'd discuss certain topics that we wouldn't discuss with

22   others.

23   Q.   What topics?

24   A.   Namely Jihad would be kind of the separating fact from

25   what we would discuss among ourselves compared to other people.

1    Q.   When you say you discussed Jihad, what do you mean?

2    A.   About the term or the nature of the discussions?

3    Q.   The nature of the discussions.

4    A.   So we discussed it more in depth than with other people.

5    We'd discuss, you know, how people go about participating in

6    Jihad, where the Jihad is going on currently.  We'd discuss the

7    virtues of it and our kind of desire to participate in it,

8    like, on an academic level as well.

9    Q.   And then so to ask the other question, which is:  What did

03:33 10   Jihad mean to you when you were talking about it with the three

11   of these guys?

12   A.   It can be a general term.  But when we were talking about

13   it, we'd mean it in the term of fighting for the sake of God.

14   Q.   That was the context in which you were having those

15   discussions?

16   A.   Yes.

17   Q.   Did you maintain contact with the defendant, Abousamra,

18   and Masood when you went over to Jordan?

19   A.   Only with the defendant and Ahmad Abousamra.

03:34 20   Q.   What kinds of -- what kind of contact did you have with

21   them?

22   A.   Email mostly.  We wouldn't email -- it was infrequently,

23   but I'd email them -- every now and then I'd email them.

24   Q.   And sometimes would they respond?

25   A.   Yes.

```
 1              MR. CHAKRAVARTY:  Call up Exhibit 364.
 2     Q.   Is this an email from Tarek Mehanna to you, Hassan, and
 3     Ahmad Abousamra?
 4     A.   Yes.
 5              THE COURT:  Let me just clarify.  I have listed this
 6     was admitted as part of the bulk admission.  We've considered
 7     the matter and the objection was overruled.  So it will be --
 8     you want it displayed, I assume?
 9              MR. CHAKRAVARTY:  Yes, please.
10              THE COURT:  Okay.
11     Q.   Just to clarify the email addresses, your name, as well as
12     an email address is listed; Hassan, without a last name, as
13     well as an email is listed.  Is that Hassan Masood's email?
14     A.   Yes.
15     Q.   Was it at that time?
16          And then Ahmad Abousamra's name and then an email address
17     is listed.  Do you recognize that to be Ahmad Abousamra's
18     email?
19     A.   Yes.
20     Q.   Is this the type of email that you would receive from the
21     defendant while you were overseas in Jordan?
22     A.   I don't recall these so much.  Every now and then, I'd
23     have -- like, if I had a religious question, I'd email Ahmad
24     and he'd respond.  I know that sometimes we'd share humorous
25     emails between ourselves.  So I don't know if I would classify
```

1    this as typical or not.

2    Q.   So this is more of like a silly type of email between the

3    three -- four -- three of you?

4    A.   It's -- I don't know if "silly" is the right term.   It

5    would have -- the contents would be there, but it would be

6    presented in a kind of humorous fashion.

7         MR. CARNEY:   Your Honor, I'd ask that the jury see the

8    entire email.   It's approximately a paragraph.

9         MR. CHAKRAVARTY:   I'm going to read this first portion

03:36 10   and then --

11        THE COURT:   Go ahead.   I'm sure it will be exposed at

12   some point.   Let the prosecutor do it the way he's planned it.

13   Q.   In this email, does the defendant write:   "Assalaam

14   alaykum.   Once again, I feel compelled by al-Rooh al Quddoos.

15   May Allah accept this and destroy all homosexuals in the U.S.

16   Army or otherwise.   Here goes..."   Then there's a poem written

17   here, and then it's signed by Tariq, is that right?

18   A.   Yes.

19   Q.   I'm not going to go through the -- reading the poem.

03:37 20        MR. CHAKRAVARTY:   Go to 365.

21   Q.   Again, is this another email that, while you were in

22   Jordan, the defendant sent you, Hassan Masood, and Ahmad

23   Abousamra, this one on December 9, 2001, is that right?

24   A.   Yes.

25   Q.   In this one, does the defendant write:   "Assalaam alaykum.

1    Since I have no other options, the only way I can attack and

2    humiliate the enemies of Allah and mine is through writing.  So

3    this is about the real reason behind America's war against the

4    Taliban.  From now on, every time you see or hear Bush on the

5    news, remember this and know the truth behind the war on

6    terrorism."  Then, again, he writes a poem.  Then he signs it

7    "Tariq," is that right?

8    A.   Yes.

9         MR. CHAKRAVARTY:  And then Exhibit 366, please.

03:37 10   Q.   Again, is this another email that the defendant sent you,

11   Masood, and Abousamra while you were in Jordan on November 18,

12   2001?

13   A.   (No response.)

14   Q.   In this one does he write:  "Assalaam alaykum.  Here's a

15   poem I wrote recently about the Northern Alliance.  May Allah

16   reject and humiliate them," and then again another poem, is

17   that right?

18        MR. CARNEY:  Your Honor, excuse me.  I object and ask

19   that under the rule of verbal completeness, since the part read

03:38 20  by the government applies directly to what follows, then I

21   submit that the rule of verbal completeness should lead all

22   three of these to be read so the jury knows right now what it

23   says.

24        MR. CHAKRAVARTY:  Your Honor, I'd rather not waste

25   the --

1          THE COURT:  Okay.  I think it's a matter for

2     cross-examination.

3          MR. CHAKRAVARTY:  They're going to the jury.  They get

4     to read them.

5     Q.   So these emails --

6          MR. CHAKRAVARTY:  You can take it off.

7     Q.   They were not representative of the types of emails that

8     you would -- communications you would have with the defendant?

9     A.   When you say "communications" I would have with him, it's

03:39 10   -- emails regarding specific matters, I wouldn't -- so it

11    wasn't typical of the kind of inner communication between

12    ourselves.

13    Q.   These were --

14    A.   At least from me.  Now that you see these, I recognize

15    them but I don't -- I can't say that I got these all the time

16    and this was a typical thing that we would be emailing each

17    other about.

18    Q.   In the course of your relationship with the defendant,

19    would you receive both personalized emails as well as kind of

03:39 20   mass emails?

21    A.   Can you clarifying what you mean by "personalized"?

22    Q.   I mean emails to you, direct communication about responses

23    to a question that you had or responding to some dialogue that

24    you were having?

25    A.   Which time frame?

1    Q.    In the course of your relationship with him.

2    A.    We didn't communicate too much personally when I was in

3    Jordan.  And when I was -- when I returned back to the United

4    States, we were seeing each other quite often.  There wasn't a

5    need for emails.  Most of the -- if I got anything, it could

6    kind of be part of the mass email and not anything personal.

7    Q.    How would you characterize your mindset with regards to

8    the American military when you went over to Jordan?

9    A.    When I initially went over to Jordan, I didn't really have

03:40 10   an opinion of it.  It wasn't an issue that was brought up at

11   the time.

12   Q.    And then September 11th happened?

13   A.    Yes.

14   Q.    And then America invaded Afghanistan.  And then you

15   returned from Jordan?

16   A.    Yes.

17   Q.    Did you have conversations with the defendant and

18   Abousamra about the American involvement in Afghanistan?

19   A.    Yes.

03:40 20   Q.    Describe generally those conversations.

21   A.    So in -- generally we are talking about how America has

22   invaded a Muslim nation, how the goal wasn't an attack against

23   -- they were kind of not justified in doing that, you know,

24   saying the Taliban offered to -- if they had proof that Osama

25   bin Laden did it, they were offering to try him.  There was no

1   reason for them to just invade.  It was an attack.  We saw it

2   as an unjustified attack against a Muslim nation.

3   Q.   At the same time, did you have any feelings about

4   September 11th?

5   A.   Yes.

6   Q.   What were they?

7   A.   So at the time, we celebrated the attacks.  We saw them as

8   a good thing that happened.  We also looked at it kind of like

9   a David and Goliath thing, saying that the Americans have been

03:41 10   pushing around everybody for so long, finally someone was able

11   to get back at them.  So we would justify them.  We -- in

12   general, that was our feelings.

13   Q.   Now, you mentioned earlier that you had your inner circle

14   of friends and then some people around whom you wouldn't have

15   the same conversations?

16   A.   Correct.

17   Q.   Where was the line?  Around what types of conversations

18   wouldn't you have with a broader group?

19   A.   So with -- we kind of had different, I guess, layers of

03:42 20   friends.  So between ourselves, we'd talk about -- I guess we

21   can -- between ourselves, we'd talk about different things from

22   people on the outside.  In general, we'd try to avoid talking

23   about Jihad and especially the people we weren't sure of,

24   somebody that we'd just know, in general, people that -- it was

25   a touchy subject.  At the time, we had the Patriot Act.  We had

1  people being tried all the time.

2      So we -- we wouldn't just be talking -- we had -- there

3  was a case about -- I think in Virginia people were arrested

4  for playing paint ball.  It's -- people play paint ball in

5  Massachusetts, too.  So we were kind of worried about the

6  general Muslim population.  On the other level, with people we

7  felt a little bit closer to, we felt more comfortable with, we

8  discussed Jihad in an academic sense, in a general sense.  We

9  wouldn't talk about specifically what was going on, you know,

03:42 10  in Iraq or in Afghanistan or we should do this or we should do

11  that.  So we'd talk about it, but we'd leave it less specific,

12  more academic.

13      Then between ourselves, we'd talk more about actually ways

14  that people can participate in Jihad.  We'd talk at length the

15  virtues of it and how we desired to do it.  That's kind of what

16  would kind of separate us from the other types of discussions

17  we would have with other people.

18  Q.   Did you have a particular mindset that the three of you

19  shared?

03:43 20  A.   You could say that.

21  Q.   How would you describe that?

22  A.   In the -- I guess the best way to describe it is -- I'm

23  sure you'll ask me if it hasn't come up or not.  We were kind

24  of the Salafi mindset, the methodology, which is more of

25  literal interpretation, very literal interpretation, and, in

1   general, just seemed more -- everyone should practice, I guess.

2   Just more strict in practicing the religion than kind of people

3   that we'd say are modernist or other people.  So we were kind

4   of that mindset.

5       Then there was -- this is kind of a worldwide type of -- I

6   don't know if you want to call it a movement or a mindset or

7   something.  But at some point, the group itself differed and

8   split off.  I remember Ahmad was kind of describing that we

9   were kind of the Salafi-Jihadis now, which is, like, the same

03:44 10   thing as Salafis.  But there was a group -- we kind of referred

11   to them as the Madkhalis.  We kind of separated them saying

12   that they kind of gave up calling the rulers, making takfir,

13   calling the rulers apostates.  And it kind of gave up the whole

14   Jihad idea.  Since we're a Salafi-Jihad, we believe in the

15   Salafi mindset as well as participating in Jihad.

16   Q.   There was a lot there.  Although the jury has heard some

17   of it, let me try to break it down just a little bit.  You

18   would characterize yourself in 2000, 2001, as a so-called

19   Salafi?

03:44 20   A.   Yes.

21   Q.   Then you also described that, internationally, that term

22   took on different meaning and more subtleties over the last ten

23   years or last eleven years?

24   A.   I don't think the term did but the movement itself.  There

25   was -- people would talk about it, and then at some point

```
 1   they'd kind of split.  Both sides call themselves Salafis, but
 2   then one -- the group we were in would call other people
 3   Madkhalis, referring to kind of the spearhead of the movement
 4   in Saudi Arabia where they -- we saw them not fulfilling the
 5   Jihad obligation.
 6   Q.   So there were subgroups essentially within the Salafi
 7   movement?
 8   A.   I don't know if we call it a subgroup.  It would be more
 9   of a division.
10   Q.   Different perception of what Salafi meant?
11   A.   Yes.
12   Q.   You called that Madkhali?
13   A.   Yes.
14   Q.   If I spell that, M-a-d-h --
15   A.   K-h.
16   Q.   -- k-h-a-l-i?
17   A.   Yes.
18   Q.   And that was more aligned to the scholars in Saudi Arabia?
19   A.   There was one scholar in particular.  His name was
20   Madkhal, so Madkhali.  They'd kind of follow them.  That's why
21   we'd attribute that term to him.  That's kind of a worldwide
22   term as well.
23   Q.   Then there was your mindset, which was the Salafi but
24   still believes in Jihad?
25   A.   Yes.
```

 1    Q.    What would you call yourselves?

 2    A.    Like I said in -- Ahmad at one point said Salafi-Jihadis.

 3    We kind of used that term.  Even on the forum, sometimes I'd --

 4    we've heard of people, if they're an S.J. or not, if they're of

 5    that mindset or not.

 6    Q.    So it's abbreviated as S.J.?

 7    A.    Yes.

 8    Q.    Given what your mindset was, before you went to Jordan,

 9    would you have interactions with and did you have a friend

03:46 10    group that was outside of the Salafi mindset?

11    A.    In what -- like in -- can you repeat the question?

12    Q.    Did you have friends who were not Salafi Muslims?

13    A.    Yes, I did.

14    Q.    When you returned from Jordan, did you also continue to

15    have friends who were non-Salafi Muslims?

16    A.    Yes, but not on the same level as the defendant and Ahmad

17    Abousamra and Hassan.

18    Q.    You had a much stronger relationship with the people in

19    your inner circle?

03:47 20    A.    Yes.

21    Q.    All right.  So right outside of your inner circle, you

22    described that there were some other people who you sometimes

23    would hang out with but wouldn't discuss on a more substantive

24    level issues like Jihad, is that right?

25    A.    Yes.

1    Q.    Who were some of those people?

2    A.    Muhammad Serageldin; Karim Serageldin, his brother.  There

3    was another guy, I think, Tanqir, Tanvir.  I'm not exactly

4    sure.  There were a few -- there were a few other people that

5    -- part of the South Shore community.  I would see them at,

6    like, Tarek's house, but I'm not that familiar with them.

7    Q.    Amongst those people, how would your relationship differ

8    between when you discussed Jihad with the defendant and

9    Abousamra and those people?

03:48 10   A.    I can remember that we -- like, they'd show Jihad videos

11   when the other people were around, but you wouldn't, like,

12   specifically talk about, you know, where someone can go --

13   like, where the camps are, how someone would go to it, how

14   someone would participate in it and kind of voice that desire.

15   That's something that we eventually wanted to aspire to.

16   Q.    Did each of you, the three of you, each manifest that

17   desire?

18   A.    Yes.

19   Q.    I'm going to fast-forward a little bit and go to 2003.  So

03:48 20   you returned from Jordan in the middle of 2002.  But in the

21   next year, do you remember when the U.S. forces went into Iraq?

22   A.    Yes.

23   Q.    Do you remember that was around March of 2003?

24   A.    Yes.

25   Q.    Describe your group, the three of you; describe what you

1    discussed before the Iraq invasion.

2    A.   So prior to the Iraq invasion, we -- at least for the

3    defendant and I, we talked -- I don't know where to start with

4    the story.  We talked about Jihad, like, the different Jihads

5    that were happening around the world:  the one in Kashmir and

6    the one in Chechnya.  But we never really saw them as something

7    that we wanted to do.  I was saying -- this is more for the

8    defendant and me because Ahmad actually went to Pakistan

9    looking for -- trying to join a camp in Pakistan.

03:49 10   Q.   Pause there just to orient the jury.  I skipped over most

11   of 2002.  You just testified that in 2002 you learned that

12   Abousamra actually went to Pakistan, is that correct?

13   A.   Yes.

14   Q.   So continue on.

15   A.   So prior to the Iraq invasion, we were -- we were kind of

16   still -- we had, like, a desire.  I don't know if you call it a

17   remote desire, but we had some kind of desire to participate in

18   Jihad.  But it wasn't, at least for me and I believe the

19   defendant, we didn't really -- we weren't taking active steps

03:50 20   to pursue that.

21   Q.   And then as the war effort began in 2003, did that change?

22   A.   Yes.

23   Q.   How so?

24   A.   So after the war in Iraq -- first of all, I don't say this

25   -- I believe everyone -- I don't want to say too much.  I

1  believe that -- at least I'll say it's my beliefs.  So we saw

2  that the war in Iraq, there wasn't really a purpose for it.

3  There wasn't a reason for it.  There was no -- we didn't see

4  any kind of justification besides it being another war on a

5  Muslim country, just kind of -- just yet another kind of

6  affront to the Muslim nation, that the U.S. is again attacking

7  a Muslim nation without any kind of justification or valid

8  reason.

9       So it got our -- it kind of set it off for us saying that

03:51 10  now -- you know, we need to do something now.  It's obvious

11  that it -- before, you can say that they were trying to -- U.S.

12  was trying to get back at Osama bin Laden in Afghanistan.  But

13  now with this war in Iraq against another Muslim country, okay,

14  this is a war against Islam.  This is something that -- we have

15  to go and defend our faith.

16  Q.   The three of you had those conversations?

17  A.   Yes.

18  Q.   You all agreed with that?

19  A.   Yes.

03:51 20  Q.   When you said, "We have to do something," what did you

21  mean?

22  A.   Participate in Jihad against the U.S.

23  Q.   Now, when you had these types of conversations in 2003,

24  were there ever efforts to shield the conversations from other

25  people?

1    A.    Yes.

2    Q.    Why?

3    A.    It was -- I guess we didn't want to draw more attention to

4    ourselves.

5    Q.    When you were in groups with your outer circle of friends,

6    did you cease talking about these types of plans?

7    A.    We wouldn't discuss the plans at all.

8    Q.    Now, leading up to 2003, how did you know what the

9    defendant and Abousamra's views were on the issue of needing to

03:52 10    do something?

11    A.    It's something we discussed as a group.  We had

12    conversations about it.  We discussed the different ways people

13    could get into Iraq, the different training camps.  We

14    discussed in depth on details like how we would go about doing

15    it.

16    Q.    Did you discuss particular avenues of how you could enter

17    Iraq?

18    A.    Yes.

19    Q.    Do you remember any of those discussions?

03:53 20    A.    Yeah.  I remember in this one particular conversation I

21    had with the defendant that -- I remember it was at a Papa

22    Gino's.  I had -- I looked at the map.  I kind of saw how the

23    layout of Iraq was in terms of the neighboring countries.  We

24    sat down at Papa Gino's.  We were -- I drew up the map.  We

25    were talking about the possible countries people could use to

```
 1  get in there, the pros and cons of going in through Iran, which
 2  is probably not a good idea; Turkey, once again, not a good
 3  idea.  We talked about Jordan as being probably the best
 4  option.  But that was a specific conversation I remember.
 5  Q.   Now, in addition to potentially going to Iraq, were there
 6  other discussions that you had with the defendant and Abousamra
 7  with regards to other things that you could do?
 8  A.   Yes.
 9  Q.   Like what?
10  A.   So the -- we -- to put it in context, after the invasion
11  of Iraq, we were very, I guess, reverent to trying to do
12  something.  We felt our blood boiling.  We wanted to do
13  something.  We weren't seeing any way to get into Iraq or
14  participate on that front.  So we did discuss doing something
15  domestically.
16  Q.   Before we get to that, why couldn't you find any way to
17  get into Iraq?  Why couldn't you think of any way to get into
18  Iraq when you first started talking about it?
19  A.   We didn't know anybody that -- initially, we didn't have
20  any contacts that could help us with that.  It's more kind of
21  -- we didn't know of anybody -- we didn't know how to get to a
22  training camp that could help us get there.  Our only other
23  option was basically crossing a desert and trying to cross over
24  the border and try to find something there.  So we didn't see
25  that as a viable option.
```

03:53 (line 10)
03:54 (line 20)

```
 1   Q.   You mentioned at some point you contemplated domestic
 2   attacks?
 3   A.   Yes.
 4   Q.   Why did you contemplate domestic attacks?
 5   A.   It was a way to kind of fill our duty, I guess, in
 6   defending the Muslims and participating in Jihad.
 7   Q.   Even though it wasn't in Iraq, you still justified it?
 8   A.   It was against the U.S., we kind of saw it, at war with
 9   Islam.
03:55 10   Q.   Did you have discussions about the justifications for it?
11   A.   Yes.  We had discussions about the justification of what
12   specifically?
13   Q.   About potential domestic attacks.
14   A.   Yes.
15   Q.   What was the -- recount those conversations the best you
16   can.
17   A.   I mean, there's -- the September 11th attacks were, you
18   know, against a civilian target.  So kind of leading up to
19   that, we talked about those before and how it was justified
03:55 20   seeing that they're taxpayers.  Theirs dollars are contributing
21   to the things, the democracy, the people they elect.  They're
22   kind of responsible for the same type of -- the actions of
23   their leaders.  And also it's kind of a tit-for-tat thing.
24   They were killing Muslim civilians all over the world.  It's
25   kind of -- it's okay.  It's the same kind of justification.
```

1   Specifically, I remember, when we came down to domestic things,

2   it came up if you're allowed to targets civilians or not.

3   Q.   What was the discussion about that?

4   A.   Well, it was whether we could or not.  I remember Ahmad

5   bringing some examples of how it's okay based on if you have,

6   like, mixed in with the troops or something like that, that

7   it's kind of okay and kind of extrapolating things.  I forget

8   all of the things he said at the time but it was just kind of

9   bringing -- it was a justification, that it's okay to do it.

03:56 10   He justified it.  I mean, I don't remember exactly the

11   evidences that he brought.

12   Q.   Did you and the defendant express reservations about that?

13   A.   The fact that we were having a discussion debating it, we

14   did have some reservations about it.  It required Ahmad to

15   convince us.

16   Q.   Did you ultimately consider specific types of attacks?

17   A.   Yes.

18   Q.   Like what?

19   A.   The specific ones, we considered doing, like, a mall

03:57 20   shooting, and we discussed attacking Hanscom Air Force Base,

21   and we had some very brief conversations on some of the

22   political leaders of the country.

23   Q.   So let me start with those because it doesn't sound like

24   those were much for plans.  What did you discuss -- first,

25   let's situate the time frame.  Is this all in 2003?

```
 1   A.    Yes.

 2   Q.    Start with the political figures, so to speak.  Who did

 3   you discuss as potential justifiable targets?

 4   A.    We discussed the then Attorney General Ashcroft and

 5   Condoleezza Rice.

 6   Q.    Why them?

 7   A.    They were kind of the big mouthpieces for the -- what we

 8   kind of saw as the war on Islam.

 9   Q.    Do you remember who you talked about a potential attack on

10   Attorney Ashcroft with?

11   A.    The defendant and Ahmad Abousamra.

12   Q.    And with Condoleezza Rice, who at the time, do you

13   remember what her position was?

14   A.    With Condoleezza Rice?

15   Q.    Yeah.

16   A.    This was -- the basis of the conversation was just me and

17   Ahmad were waiting for the defendant.  Ahmad just had a piece

18   of paper saying Condoleezza Rice was coming to Boston.  Just

19   imagine if somebody shot her.  And I kind of looked at him and

20   said, Okay.  Imagine it.  And that was the end of that

21   conversation.

22   Q.    So there was no action on that at all?

23   A.    No.

24   Q.    It was just an expression of desire, I guess?

25   A.    Correct.
```

```
 1   Q.   So recount the John Ashcroft conversation.
 2   A.   Once again, I would characterize it the same.  We just
 3   talked about -- I guess, if you want to use the word fantasize.
 4   Just saying -- I think he was a religious man.  We said we
 5   could kind of get him at church and describe how that would be.
 6   But nobody took any action on that either.
 7   Q.   The defendant was part of that conversation?
 8   A.   Yes.
 9   Q.   Now, aside from those conversations, you mentioned a
10   shopping mall.
11   A.   Yes.
12   Q.   So describe your conversations about the shopping mall.
13   A.   We just discussed it as kind of -- as a way to kind of
14   create terror.  That was the goal.  So we discussed how we'd --
15   in general, just, like, how it would go.  We didn't discuss any
16   -- to the best of my knowledge, we didn't discuss any specific
17   locations or anything.  We were just saying, someone would go
18   on one side, and we would have somebody on the other exit.  We
19   discussed possibly who we could possibly recruit for it.
20   Q.   Let me stop you.  So you're actually talking about an
21   attack on a shopping mall -- within a shopping mall, I should
22   say?
23   A.   Yes.
24   Q.   The attack that was designed to create terror?
25   A.   Yes.
```

```
  1    Q.   Was there any reason why you chose that as a target?

  2    A.   I don't recall.

  3    Q.   Just something that the three of you contemplated?

  4    A.   Hassan was involved in at least one of those

  5    conversations.

  6    Q.   How many times did you talk about this?

  7    A.   Two, maybe three times.

  8    Q.   Over how long of a period of time?

  9    A.   It was probably all within a couple of weeks.

04:00 10    Q.   Okay.  You were discussing the potential logistics of the

 11    attack?

 12    A.   Yes.

 13    Q.   Continue.

 14    A.   It was just what I said about how we'd have people going

 15    from one end, maybe have some other people on the other end,

 16    you know, whether we could get guns or not, and what we would

 17    do when the first responders showed up.

 18    Q.   Did you discuss recruiting other people to help you?

 19    A.   Yes.

04:01 20    Q.   Who else did you think of?

 21    A.   The only person I can remember we mentioned, we said we

 22    might be able to talk to Muhammad Serageldin and get him on our

 23    side.  The only people we were sure of were us four.

 24    Q.   How long were these conversations, approximately?

 25    A.   I don't recall exactly.  They weren't -- I don't believe
```

1   we spent hours on it, so --

2   Q.   But it was longer than the conversations you had about the

3   political leaders?

4   A.   Yes.

5   Q.   What did you expect to happen during the attacks?

6   A.   At some point, we expected the police to show up.

7   Q.   And what was your --

8   A.   We kind of discussed if we want to -- we didn't want to

9   spend the rest of our lives in jail.  So we kind of -- I guess,

04:01 10   "go out blazing" would be -- I don't know if we used that exact

11   term, but the idea was to try to get killed in the process.

12   Q.   Was there any significance to dying during an attack?

13   A.   It was just -- dying for the -- while fighting Jihad,

14   you're considered a martyr.

15   Q.   This would be considered as an act of Jihad?

16   A.   Yeah.

17   Q.   Okay.  Now, as part of your discussion about the shopping

18   mall, did you discuss potentially obtaining guns?

19   A.   Yes.

04:02 20   Q.   What kinds of guns did you discuss obtaining?

21   A.   We didn't specifically discuss.  We just knew we wanted

22   guns, but we didn't know much about it.

23   Q.   So did you agree to do something?

24   A.   We agreed to -- the only person we knew that -- from our

25   friends was Dan Maldonado, who we knew was a former gang

1    member.  We knew he had a gun.  He showed it to us before.  So

2    we knew that, if anybody could get us guns, it would be him.

3    So we agreed to check with him to see if he could provide guns.

4    Q.    Do you know where Dan Maldonado lived?

5    A.    He lived in Southern New Hampshire.

6    Q.    You're the only one -- or you were living on the North

7    Shore at that time?

8    A.    Yes.

9    Q.    And so did you agree to go visit Mr. Maldonado?

04:03 10           MR. CARNEY:  I would ask the prosecutor not lead the

11   witness, please.

12           THE COURT:  Sustained.

13   Q.    What happened after that?

14   A.    So someone had to talk to Dan Maldonado.  Like I said

15   before, they were both kind of on the southern part of

16   Massachusetts, what I considered the South Shore, far away from

17   me.  I lived on the North Shore.  I worked in the Merrimack

18   Valley.  I was closer to him.  I suggested to go see him, that

19   I go talk to him, for the reason being closer to him and also

04:04 20  kind of show my -- that I was part -- I was accepting of the

21   plan.

22   Q.    Why did you feel the need to show that you were accepting

23   of the plan?

24   A.    By that time, I knew that Ahmad and Tarek had grown

25   closer.  I was just trying to show that I was as committed as

```
 1    they were.

 2    Q.   So what did you do?

 3    A.   I went and I saw Dan Maldonado.

 4    Q.   Where?

 5    A.   At his house.

 6    Q.   Where was that?

 7    A.   Southern New Hampshire.  I don't remember exactly which

 8    town.

 9              MR. CHAKRAVARTY:  Exhibit 752.

04:04 10    Q.   Do you recognize that person?

11    A.   Yes.  That's Dan Maldonado.

12    Q.   Was this how he looked back then?

13    A.   Yup.

14    Q.   Describe your interaction with Mr. Maldonado.

15    A.   In general or --

16    Q.   Sorry.  Specifically with regards to the shopping mall.

17    A.   I went to see him at his house.

18    Q.   When did you see him at his house?

19    A.   It would have been in 2003, the end of 2003.

04:05 20    Q.   How long after your conversations with the defendant and

21    Abousamra about this plan?

22    A.   I don't recall exactly.  It would have been -- I don't

23    recall exactly.

24    Q.   Okay.  Continue.  So describe the interaction with Mr.

25    Maldonado.
```

1    A.    So I went to him, and I asked him if he could -- I just --

2    asked if he could get us guns.  The way he explained it, he

3    could probably get us some handguns.  He said, You don't want

4    to get caught with them.  They have bodies on them.  When I

5    asked him what that meant, he meant they had been used in a

6    crime previous to that.  So if you get caught with the guns,

7    you're kind of going -- it's not good because they already have

8    been used in a crime.  I told him it wasn't a problem.

9         I asked if he could get us any automatic weapons or -- I

04:05 10  forget exactly how the conversation came up, but he said that

11   he could only get us handguns.  So I asked him how does that --

12   I didn't know anything about guns.  I asked him, How does that

13   work?  How do you load them?  How many bullets do they hold?,

14   and that kind of information.

15   Q.    Did he ask you why you wanted these guns?

16   A.    I forget if he asked me why.  I do remember at some point

17   I told him, It's better that you don't know.  I don't know if

18   it's something I volunteered or it was something that he asked.

19   Q.    How did you know Mr. Maldonado?

04:06 20  A.    He was part of the mosque I went to.  But I forget how I

21   met him, if I met him through someone else or if I met him

22   through a common friend or through the mosque.  I don't recall

23   exactly how I met him.

24   Q.    So in 2003, how frequently would you see him?

25   A.    Not that often.  He was -- he was farther away than we

1   were.  I remember going to his house once for dinner.  I saw

2   him, you know, in total -- prior to 2004, I probably saw him a

3   total of less than ten times.  I'd see him -- sometimes he'd

4   come down to where we were.  We went to his place once.  But,

5   in general, I wouldn't see him that often.

6   Q.   What was his relationship, to your knowledge, with the

7   defendant and Abousamra?

8   A.   He was -- the same kind of relationship that I had with

9   him.  We were friends with him.  We didn't consider him part of

04:07 10   the inner, inner circle.  We kind of -- we trusted him to a

11   certain point.

12   Q.   Why only to a certain point?

13   A.   I remember when I went up to -- when I said I was going to

14   go see him that Ahmad told him, Don't tell him anything.  I

15   said, Why not?  He said that he's still -- he's an American

16   convert.  He hasn't been -- I guess, he's not one of us or --

17   he just said, He's American.  He's a convert so we can't trust

18   him completely.

19   Q.   Do you know what his views were about Jihad at that time?

04:08 20   A.   I believe we -- like I said, he was -- if you wanted to

21   say, in between our inner circle and the next one out, he was

22   very close to it.  But at the time I didn't, and I don't

23   believe we did at all prior to 2004, trust him with all the

24   details.  We wouldn't trust him with all the details, but we

25   believed him to be of kind of the same persuasion.

```
 1   Q.   How long did you meet with Maldonado to get the guns?
 2   A.   Probably 10 minutes, 10, 15 minutes.  It wasn't a long
 3   conversation.
 4   Q.   At some point later, did you regroup with the defendant
 5   and Abousamra?
 6   A.   Yes.
 7   Q.   And discuss what happened?
 8   A.   I just told them that the only guns he could get would be
 9   handguns.  They don't hold any bullets.  It's a pain to reload
10   them.  Probably not going to work.  We collectively said -- we
11   just kind of dropped it.
12   Q.   All three of you agreed that it wasn't going to work?
13   A.   Correct.
14   Q.   You also mentioned Hanscom Air Force Base.
15   A.   Yes.
16   Q.   What did the three of you discuss about Hanscom Air Force
17   Base?
18   A.   We just discussed somewhat of a -- less in detail, but we
19   discussed how we would -- how an attack would take place
20   against the base.  We felt that more of a kind of a legitimate
21   target.  I think it all sat better with us that it was a
22   military installation, not a shopping mall with civilians.  So
23   we just talked about they have a guard shack in the beginning.
24   Then after that, we could kind of get into the base.
25   Q.   Were you familiar -- had you been to the base before?
```

1    A.    Yes.

2    Q.    What was your familiarity with the base?

3    A.    Back in, I believe, 1998, 1999, I took a motorcycle

4    driving course there.

5    Q.    Did you discuss any challenges with regard to this

6    operation like you did with the shopping mall?

7    A.    I believe this was just this one conversation we had.  We

8    just kind of discussed, like I said, not in the same level of

9    detail, but we did discuss that there would be guards in the

04:10 10   beginning, and then after that it's -- you kind of have free

11   access to the base.

12   Q.    With regards to all of these plans, did you -- aside from

13   what you've testified to, did you take it to a higher level

14   where you actually were going to engage in the attack?

15   A.    No.

16          THE COURT:  Mr. Chakravarty, if you're about to move

17   to a different topic, it's 1:00.  I think this is an

18   appropriate place for the break.  We'll recess and resume

19   tomorrow at 9, jurors.

04:11 20   (Whereupon, at 1:00 p.m. the trial recessed.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3            We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  November 28, 2011

17

18

19

20

21

22

23

24

25