UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              ) Criminal Action
v.                            ) No. 09-10017-GAO
                              )
TAREK MEHANNA,                )
                              )
        Defendant.            )
                              )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWENTY-THREE
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, November 29, 2011
9:16 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Aloke Chakravarty and Jeffrey Auerhahn,
 3             Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Jeffrey D. Groharing, Trial Attorney
               National Security Division
 7         950 Pennsylvania Avenue, NW
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         CARNEY & BASSIL
           By: J.W. Carney, Jr., Esq.
10             Janice Bassil, Esq.
               John E. Oh, Esq.
11         20 Park Plaza
           Suite 1405
12         Boston, Massachusetts  02216
           - and -
13         LAW OFFICE OF SEJAL H. PATEL, LLC
           By: Sejal H. Patel, Esq.
14         101 Tremont Street
           Suite 800
15         Boston, Massachusetts  02108
           On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                  DIRECT   CROSS   REDIRECT   RECROSS

   WITNESSES FOR THE
3    GOVERNMENT:

4  KAREEM ABUZAHRA (Cont'd)
     by Mr. Chakravarty          4

5

6

7                       E X H I B I T S

8  GOVERNMENT'S        DESCRIPTION          FOR ID   IN EVD.

9  454            Audio recording                     115

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on November 29,

6     2011.

7          The defendant, Tarek Mehanna, is present with counsel.

8     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

9     are present, along with Jeffrey D. Groharing, Trial Attorney,

00:22 10    U.S. Department of Justice, National Security Division.)

11          THE COURT:  Good morning, jurors.  Okay, Mr.

12     Chakravarty.

13     CONTINUED DIRECT EXAMINATION BY MR. CHAKRAVARTY:

14     Q.   Mr. Abuzahra, when we left, we were talking about 2003,

15     your relationship with the defendant and Mr. Abousamra.  I

16     bring you back to after you had discussed some potential

17     domestic options for Jihad.  Did you continue to have a sense

18     of urgency to do something?

19     A.   Yes.

00:23 20    Q.   And so what did you discuss at that point?

21     A.   Well, we did -- like I mentioned yesterday, we talked

22     about how we could possibly get into Iraq by ourselves but then

23     -- there wasn't anything concrete.  We couldn't find a way to

24     do it.  But then Ahmad Abousamra was able to make a contact

25     with someone in California, who was able -- Ahmad told us that

1    this person would be able to provide us a way to get to a

2    training camp in Yemen.

3    Q.   Was this the first time that you had a contact to help you

4    get training?

5    A.   The first time we as a group did, yes.

6    Q.   Again, we'll get through this part, and then we'll go back

7    to 2002 where Abousamra went to Pakistan.  Do you know if he

8    had a contact in Pakistan?

9    A.   He made a contact there, yes.

00:24 10   Q.   Let's stick with 2003.  Once -- when Mr. Abousamra

11   obtained this contact, did he tell you who this person was?

12   A.   Yes, he did.

13   Q.   Did you know this person?

14   A.   I knew him through an online forum.  I didn't know him

15   personally.

16   Q.   At that point, the three of you, did you discuss following

17   up with this contact?

18   A.   Yes.

19   Q.   At that point, did the three of you have any collective

00:24 20   desire to do something?

21   A.   Yes.

22   Q.   What was that?

23   A.   If the contact came through, we wanted to pursue it and

24   continue to the training camp in Yemen.

25   Q.   So Yemen was a target of opportunity then?

1    A.    Yes.

2    Q.    Once you obtained training, did you come to an agreement

3    as to what you wanted to do with that training?

4    A.    We asked the question of Ahmad, what -- What's the purpose

5    of training?  What can we do afterwards?  He said that the

6    contact -- I forget if this is before or after he went to see

7    him in person.  The end result was, after the training camp,

8    the people in charge of the camp would be able to get us into

9    Iraq.

00:25 10   Q.    Did you all agree to do that?

11   A.    Yes.

12   Q.    You said you knew this person from online --

13   A.    Yes.

14   Q.    -- the contact?

15         What was his name online that you knew him by?

16   A.    His name online was Abul Muthanna.

17   Q.    Can you spell that for the court reporter?

18   A.    A-b-u-l, space, M-u-t-h-a-n-a.  There might be an "n-n" at

19   the end.  I'm not sure.

00:25 20   Q.    Did he have any other online screen names?

21   A.    Not that I'm aware of.

22   Q.    Which website did you know him from?

23   A.    This was on the Clear Guidance forum.

24   Q.    Once Abousamra made this contact, what happened?

25   A.    He told us that he needed to go see him in person to

1    discuss the matter, you know, openly and more freely than he

2    could online.

3    Q.   Why would he have to go meet in person to have that

4    conversation?

5    A.   We were just taking precautionary steps to discuss Jihad.

6    It didn't make sense to talk about that online.

7    Q.   Was that your practice online generally, even outside of

8    this particular conversation, to not talk about --

9              MR. CARNEY:  I object, your Honor.

00:26 10              MR. CHAKRAVARTY:  I'll rephrase, your Honor.

11    Q.   Were you security conscious when you were online?

12    A.   I was.  Just give me a moment.  I'll think back to that

13    time frame because -- at that time frame I was, yes.

14    Q.   Was the defendant and Mr. Abousamra as well?

15    A.   I don't believe to the same degree.

16    Q.   So this person, Abul Muthanna, did Abousamra make plans to

17    go meet him?

18    A.   Yes.

19    Q.   How soon after you discussed this contact did he make

00:27 20    plans to go meet him?

21    A.   I don't remember exactly.  I could say within two to three

22    months.

23    Q.   Where did Abul Muthanna live?

24    A.   In California.

25    Q.   How did Abousamra get there?

1    A.   He took a flight out of Logan Airport.

2    Q.   Did you know that that was going to happen?

3    A.   Yes.

4    Q.   Do you remember approximately when Abousamra went to go

5    visit Abul Muthanna?

6    A.   I don't remember the exact time.  I could say I believe in

7    the end -- near the end of 2003.

8    Q.   Do you recall whether Abul Muthanna had another online

9    name that you had known him by?

00:28 10    A.   No.

11    Q.   Would something refresh your memory?

12    A.   Yes.

13         MR. CARNEY:  I object.  No.  I withdraw the objection.

14         THE COURT:  Okay.

15    Q.   Just take a moment to review that.

16    A.   If I can clarify.  I believe your question was incorrect.

17    I don't believe he used that name online.

18    Q.   Okay.  Did you know Abul Muthanna by any other names?

19    A.   Yes.

00:29 20    Q.   What other names did you know him by?

21    A.   The other name that we would call in Arabic a "kunya,"

22    kind of a nickname, Abu Omar.

23    Q.   When I asked you online screen names, Abu Omar is not

24    necessarily a name he used?

25    A.   I don't know if he ever used that online or not.

1    Q.    You knew him as Abul Muthanna?

2    A.    Abul Muthanna online, and Abu Omar was a name that Ahmad

3    told us was, you know, his kunya.

4    Q.    Could you tell the jury what a kunya is?

5    A.    It's just a -- it's another name that somebody is known

6    by, kind of a nickname.  It's usually Abu something, usually

7    the oldest son or the oldest child.

8    Q.    "Abu" means father?

9    A.    Yes.

00:30 10    Q.    How long was Abousamra gone?

11    A.    I believe only for a couple of days, for a weekend, two to

12    three days.

13    Q.    I'm sorry.  When in 2003 was that, approximately?

14    A.    Near the end.  I have a -- I think around the October time

15    frame, but I can't nail down a month exactly.

16    Q.    When Abousamra returned, did you -- the three of you meet?

17    A.    Yes.

18    Q.    What did he tell you?

19    A.    So he told us -- we asked him a few questions.  First of

00:31 20    all, we wanted to know more about who this guy was because we

21    only knew him online.  Ahmad gave us a little more of his

22    background.  He had studied -- Ahmad had told us that he had

23    studied in Yemen before, not specifically at one of these types

24    of camps, but he had contacts.  He told us where he stayed.  We

25    asked him a few questions in general about the trip.  But that

1  was -- then he told us also how the guy could help us.

2  Q.   What did Abousamra tell you that Abu Omar, or Abul

3  Muthanna -- how could he help you?

4  A.   He said he could provide a contact for us in Yemen that

5  would help us get to a training camp there.

6  Q.   Did he provide a contact to Abousamra?

7  A.   He did.

8  Q.   Do you remember what that contact was?

9  A.   No.

00:31 10  Q.   Do you remember what instructions Abu Omar gave to

11  Abousamra?

12  A.   The instructions were to -- he had a name, and he had a

13  town.  So he said, if you go to this town, you ask for this

14  guy.  He's a popular guy, well known in that area.  Everyone

15  can point you how to get to this guy.  Once you get to him, he

16  will be able to help you further.

17  Q.   Did you express concerns about just having a name and a

18  town?

19  A.   Yes.  We were taking a big step in our lives, leaving our

00:32 20  families, leaving our jobs, leaving our previous life to go

21  through the whole process.  So I said -- I was a little bit

22  concerned where it's just basically a scrap piece of paper that

23  Ahmad had that had a name and a town.  I said, Are you sure

24  this is legit?  I didn't want to risk all that if it wasn't

25  going to, you know, come to fruition.  I also asked, if this

1    guy is of the same mind-set as we are, how come he's not going

2    to come along with us.

3    Q.   What did Abousamra say?

4    A.   He said the guy is -- he has plans to.  He's trying to

5    save a little more money for his wife to kind of set her up,

6    and then his plan was to follow us.

7    Q.   Did the defendant say anything?

8    A.   I don't remember -- we had conversations.  I don't

9    remember anything specific that he said, but we had the

00:33 10   conversations as a group and kind of the same concerns.

11   Q.   So did you agree to ask Abu Omar to do anything

12   additionally at that point?

13   A.   One thing I asked Ahmad, I said, If we can provide him

14   some money now, can he -- save him the time of saving up the

15   money.  If we can give him some money now, is he willing to

16   come with us.

17   Q.   What happened then?

18   A.   Ahmad contacted him.  In the end, the guy said, yeah, if

19   he can get the money earlier, then he'll leave earlier.

00:33 20   Q.   Did the three of you ask Abu Omar to do any additional

21   followup for you?

22   A.   I don't recall anything specific.  If you have anything to

23   refresh my memory, but I don't recall anything specifically.

24   Q.   For purposes of going to Yemen, aside from the name and

25   the city that he gave you, did you have any contact information

1    for anybody there?

2    A.    No.

3    Q.    Did Abu Omar tell Abousamra anything with regards to what

4    to bring to Yemen?

5    A.    Not that I can recall.

6    Q.    Did Abu Omar discuss a potential cover story with

7    Abousamra?

8    A.    Not that I can recall.

9    Q.    The point where Abousamra is telling you what happened --

00:35 10              MR. CARNEY:  I object.  Form of the questions.

11              THE COURT:  Well, we haven't heard the question.  I

12    guess it started that way.  Just be careful of the direct form

13    of the question.

14              MR. CHAKRAVARTY:  Thank you.  Sorry.

15    Q.    At that point where Abousamra is telling you about this,

16    just to situate you, what was your purpose of going to Yemen?

17    A.    Our -- when the -- when Ahmad was telling us about the --

18    we were discussing the trip for the purpose of going there to

19    find one of the training camps.  We did discuss, you know, a

00:35 20    cover story when we -- you know, we have to have -- we need to

21    apply for visas.  So we needed -- the cover story was involving

22    you might get questioned at the airport.

23    Q.    So -- but the purpose of your trip to Yemen, what was

24    that?

25    A.    To find a training camp.

1    Q.   And so what was your cover story?

2    A.   There were, I guess you could say, two.  The first one,

3    when we were applying for the visa, we have to have a reason

4    for applying for a visa to Yemen.  So we -- I'm not exactly

5    sure what they put on their applications.  What I put down was

6    tourism, going for tourism.  The other story that we discussed

7    was we were going there to attend -- I forget if it was a

8    religious school or an Arabic or linguist school or a

9    combination of both but some type of kind of a benign school.

00:36 10   Q.   That benign schooling, did the three of you or any of you

11   have the intent or express the intent to actually attend that

12   kind of school?

13   A.   Not seriously, no.

14   Q.   When Abousamra comes back from meeting with Abu Omar, did

15   he also offer the names of any schools there?

16   A.   I don't recall if -- at some point, the defendant and

17   Ahmad said they went online and they found some schools.  They

18   printed out a school, Dar al-Mustafa, from the Dar al-Mustafa

19   website.  I don't know if that's -- I don't know where they got

00:36 20   that from, if it was done on their own or --

21   Q.   You don't know whether it was Abu Omar who gave that name?

22   A.   Correct.

23   Q.   So after Abousamra said that there was a financial issue

24   with Abu Omar accompanying you, what did you do?

25   A.   I -- well, I asked the question if we could gather the

1   money, and the answer was yes, if we could get him some money,

2   that would be -- that would help him leave earlier, potentially

3   leave with us, which I felt more comfortable with.  At some

4   point soon after I withdrew money from my account, and I

5   provided that to Ahmad.  Ahmad went to see him a second time.

6   Ahmad gave him that money.

7   Q.   Do you remember approximately how much that was?

8   A.   That was a -- I don't remember exactly how much, no.

9   Q.   Was it more than $1,000?

00:37 10   A.   In the -- in reviewing my bank records, I believe I

11   withdrew about 5,000 in that time frame.  I don't believe I

12   gave all that money.  I believe it was over a thousand, might

13   have been, but I can't say exactly how much.

14   Q.   So armed with this information from Abousamra, did the

15   three of you make plans to actually go to Yemen?

16   A.   Yes.

17   Q.   When did you plan to leave?

18   A.   We planned to leave on -- one of the Muslim holidays was

19   coming up.  It was, I believe, February 1st, February 2nd, was

00:38 20   the -- whatever the Super Bowl Sunday was that year, 2004.  We

21   wanted that time frame because we knew our families would all

22   be busy.  They would all be out of the house.  It would be a

23   good opportunity for us to say we're all hanging out together

24   because we always hung out together.  We knew it would be

25   awhile before they realized anything was amiss.

1    Q.   You mentioned there was Eid -- there was a Muslim holiday

2    there as well?

3    A.   Yes.

4    Q.   Around the same time?

5    A.   We went on that day.  It was the same day, Super Bowl

6    Sunday.

7    Q.   That's the first weekend in February?

8    A.   Yes.

9         MR. CHAKRAVARTY:  Call up Exhibit 8.  This is in

00:39 10   evidence, your Honor.  Your Honor, if this could be published

11   -- there it is.

12   Q.   Can you just read the footer information on this exhibit?

13   A.   This was printed out January 30, 2004, from

14   www.daralmustafa.com/profile.asp.

15   Q.   By January 30, 2004, were you familiar with the Dar

16   al-Mustafa school?

17   A.   This is paperwork that the defendant and Ahmad provided.

18   So I wasn't -- it might have been on this day that I found out

19   about it or soon thereafter.

00:39 20   Q.   Shortly before your trip?

21   A.   Yes.

22   Q.   This cover story, who did you agree with the defendant and

23   Abousamra to tell this story to?

24   A.   Everybody.

25   Q.   Does that mean government officials as well as other

1    people that you knew?

2    A.   Yes.

3    Q.   Did the three of you, in the course of your dealings, ever

4    have conversations about the proper way to lie?

5    A.   We did.

6    Q.   Describe those.

7    A.   This was not in a particular -- it wasn't specific to

8    right before we traveled.  We talked about it before.  We read

9    stuff online.  I forget.  Different people read stuff here and

00:40 10   there.  So we all provided our own tips.  We probably did some

11   kind of practice sessions of trying to tell a story and have

12   one person take the role of the interrogator and the other one

13   kind of seeing how they respond and how you can respond.

14   Q.   Was the role a government official or just somebody in the

15   community?

16   A.   No, not in the community, someone -- not even particularly

17   someone from the U.S. Government, just if this kind of -- any

18   kind of someone in authority.

19   Q.   Was that preparation in preparation for your trip?

00:41 20   A.   Not specifically in preparation for the trip.

21   Q.   I asked you some questions about whether the three of you

22   were security conscious, and you said that at the time the

23   defendant and Abousamra were not as much as you.

24   A.   I don't believe so.

25   Q.   Why not?

1          MR. CARNEY:  I object.

2          THE COURT:  Sustained to the question as asked.

3     Q.   What did the defendant and Abousamra express in terms of

4     their security consciousness?

5     A.   I don't remember them expressing anything, but just seeing

6     the types of emails in plain text, it just seemed not -- I

7     don't consider any emails private.  They're all in plain text,

8     usually retrieved.  So I wouldn't put some of the stuff that

9     they had put in emails in plain text.

00:42 10         MR. CARNEY:  I object, your Honor.  I move to strike

11     the answer.  It's not responsive.

12          THE COURT:  Overruled.  It may stand.

13          MR. CARNEY:  The question was:  What did they say?

14          THE COURT:  It did go beyond the question.  You're

15     right.

16          MR. CARNEY:  Now he's giving his opinion about

17     something else.

18          THE COURT:  I think he can have the evidence.  I'll

19     strike it.  We'll start again.  Focus on what was said, and

00:42 20    then you can move on if you need to.

21     Q.   How did the defendant and Abousamra express or not -- or

22     what did they do to express a lack of security consciousness?

23     A.   The only -- in their online dealings, I don't remember

24     them expressing any particular specific ways of being security

25     conscious.  The only kind of security conscious that was

1    expressed, for example, when Ahmad decided to travel to

2    California to speak to Abul Muthanna in person rather than

3    doing it online.

4    Q.   The types of communications that the defendant and

5    Abousamra would engage in just before your trip, did you

6    express concerns about how open they were?

7    A.   I was not -- at the time, I was not aware of what they

8    were expressing online.

9    Q.   Were you careful personally not to have certain types of

00:43 10   communications online?

11   A.   Yes.

12   Q.   What kind of communications?

13   A.   Anything that would -- in general, just discussions about

14   our plans, you know, wouldn't say anything like that, or being

15   very open about Jihad or anything that could draw more

16   attention.  At one point, I brought up that maybe -- we don't

17   know if the FBI is watching us or not.  This was prior to our

18   trip.  So I sent an email to the defendant and Ahmad Abousamra

19   with a link to a server that I could control and see if anybody

00:43 20   else would view the page.  I gave them the link.  Nobody else

21   had that link.  I said, If anybody clicks on it, I know they

22   got it through the email.  I told them don't click on it

23   before, but Ahmad clicked on it.  So I saw the IP address.  It

24   was, Somebody is watching us.  But then Ahmad said he clicked

25   on it by accident.

1    Q.   So it was kind of a test to see if anybody was watching?

2    A.   Yes.

3              MR. CHAKRAVARTY:  Can we call up Exhibit 353, please?

4    Q.   Do you recognize this email address?

5    A.   Yes.

6    Q.   Is that the defendant's email address?

7    A.   Yes.

8    Q.   Is the date of this January 16, 2004?

9    A.   Yes.

00:44 10  Q.   That's approximately two weeks before your trip?

11   A.   Yes.

12   Q.   The subject appears to be "shkhlovehate."

13   A.   That appears to be the subject, yes.

14   Q.   The first couple of lines of this, "The types of people in

15   regards to their love of Shaykh Usaamah and how to know who

16   from the people loves or hates him.

17             "Therefore, the people, dear brothers, in their love

18   or hate of this noble man and those who are with him of the

19   mujahideen are of three types."  And then the email continues,

00:45 20  is that right?

21   A.   Yes.

22   Q.   Did you know about this email?

23   A.   I did not know about it at the time.

24   Q.   This is something that we've shown you before you

25   testified?

1    A.    Yes.

2          MR. CHAKRAVARTY:  Call up Exhibit 446.

3    Q.    Is this an archive of the Clear Guidance site?

4    A.    It appears to be so.  I'm not familiar with the website,

5    but it appears to be an archive.

6    Q.    But you had been on Clear Guidance?

7    A.    Yes.

8    Q.    Were you familiar with this user name?

9    A.    Yes.

00:45 10    Q.    Who is that?

11    A.    Ahmad Abousamra.

12    Q.    And this date is approximately a week before your trip?

13    A.    Correct.

14          MR. CHAKRAVARTY:  Can we go to the next page, please?

15    Q.    Is the question that Abousamra poses:  "If the parents

16    have some degree of sickness (for example blood pressure) and

17    oppose the whole idea of going for Jihad, neigh, it even goes

18    completely against their view of my future, and I think that my

19    leaving for it without their permission will lead to such a

00:46 20    great shock that it will increase their sickness or even lead

21    to their death (heart attack), then is it permissible to go

22    with these possibilities?  Keep in mind that they are

23    self-sufficient and in no need for me material wise

24    (financially or physically).  And my caring for them are very

25    general and typical things meaning it's not necessary care they

1    need to live or survive.  May Allah award you with good..."

2    Did I read that correctly?

3    A.    You did.

4          MR. CHAKRAVARTY:  Can we go to Page 4?

5    Q.    Do you recognize this user name?

6    A.    Yes.

7    Q.    Who is that?

8    A.    He was a brother that we knew in London.  I forget his

9    name exactly.  It might -- I don't want to -- I have something

00:46 10   in my head.  I don't know if it's accurate or not.  He is a

11   brother that we knew from London.

12   Q.    Okay.  You're saying you're not sure of what his real name

13   is?

14   A.    Yes.

15   Q.    Abu Dujanah, we're talking about here?

16   A.    Yes.

17   Q.    Does he write, "Ibn Hazm sees it impermissible if the

18   child fears the halaak (death) of his parents.  Shaykh Abdullah

19   Azzam saw that the child whose parents need, should not go.

00:47 20   I'm not saying that this is the correct opinion or anything,

21   but the above fatwa is quite rash, I must say, with all respect

22   to the Shaykh"?

23          Then do you recognize this user name, Abu Sabaayaa?

24   A.    Yes.

25   Q.    Who is that?

1    A.    That is the defendant.

2    Q.    Again, this is January 23, 2004?

3    A.    Yes.

4    Q.    Does he start, "Ibn Hazm sees it impermissible if the

5    child fears the halaak, (death) of his parents."  By the way,

6    you said you speak Arabic?

7    A.    Yes.

8    Q.    What does "Bilaad al-Burjain" mean?

9    A.    The Land of Two Towers.

00:47 10          MR. CHAKRAVARTY:  Next page, please.

11   Q.    "Well, we have two different cases for the parents

12   dying/becoming severely ill because of the son's leaving.  As a

13   result of nobody being there to care for them (which is more

14   certain), and a result of the distress caused by the son's

15   leaving them (which is wallaahu a'lam, much less certain).

16   Which of the two cases was Ibn Hazm referring to?"  Did I read

17   that correctly?

18   A.    Yes.

19   Q.    And then it appears that Abousamra responds with

00:48 20   something, is that right?

21   A.    Yes.

22   Q.    Now, as you're gearing up for this upcoming trip, did you

23   take any other preparatory steps, the three of you?

24   A.    Yes.

25   Q.    Like what?

1    A.    Mostly just purchasing -- you know, as -- I took some

2    independent stuff on my own, and we took some stuff kind of as

3    a group.  Independently, I moved my finances around.  I

4    withdrew some money to take with me on the trip.  I set aside

5    some for my wife and kids.  I withdrew my name from the

6    account, you know, fearing any type of government -- if they

7    found out, they wanted to freeze my assets, trying to protect

8    my wife and kids.  As a group, we all purchased some -- we're

9    going on a trip.  Everyone purchases a few things to go on a

00:49 10   trip.

11   Q.    What kinds of things?

12   A.    I purchased a backpack, some, you know, belts, not any

13   dress belts but more belts that we -- casual belts you use,

14   toiletries, that kind of stuff.  And the only other thing we

15   did as a group, we went, in trying to prepare ourselves

16   physically, we went on a hike one day.

17   Q.    Where did you go?

18   A.    Blue Hills Reservation.

19   Q.    Is that just to be physically fit?

00:49 20   A.    Yeah.

21   Q.    You mentioned you transferred some money.

22        MR. CHAKRAVARTY:  Can we call up Exhibit 745?

23   Q.    Are these some of your bank records?

24   A.    Yes.

25   Q.    Does it -- is this some of the financial transactions you

1    did on January 31, 2004?

2    A.   Yes.

3         MR. CHAKRAVARTY:  The next page, please.

4    Q.   This -- on Page 2 of this exhibit, there appears to be a

5    check that you wrote out to cash on January 30, 2004, for

6    $6,181.  Do you recall what that was for?

7    A.   I believe that's the price of the plane tickets.

8         MR. CHAKRAVARTY:  Go to the next page.

9    Q.   You mentioned earlier that you withdrew $5,000 before

00:50 10   Abousamra's trip to visit Abul Muthanna?

11   A.   Yes.

12   Q.   Is this a check for -- in October of 2003, for $5,000 in

13   cash?

14   A.   Yes.

15        MR. CHAKRAVARTY:  Next page, please.

16   Q.   Does this appear to be a deposit into another account on

17   January 30, 2004?

18   A.   Yes.

19        MR. CHAKRAVARTY:  Next page.

00:51 20   Q.   Appears to be another deposit into another account on

21   January 31, 2004?

22   A.   Yes.

23   Q.   In addition to your personal arrangements, did the three

24   of you obtain visas to go to Yemen?

25   A.   Yes.

1   Q.   Did you send away for these visas a few weeks before?

2   A.   Yes.

3   Q.   Okay.  Describe that process.

4   A.   The process I took, the defendant's -- the defendant and

5   Ahmad Abousamra did it their own way.  I needed to get a note

6   from a doctor saying I didn't have any contagious diseases.  So

7   I went and saw a doctor, got the requisite note, filled out the

8   application, and mailed it in with my passport to the embassy

9   in -- to the Yemeni embassy, whether in Washington or New York.

00:52 10   Q.   Yemeni embassy?

11   A.   Yeah.

12        MR. CHAKRAVARTY:  Call up Exhibit 476, Page 2, and

13   477.

14   Q.   Does the exhibit on the left appear to be the visa for --

15   if you can see that, step away from the screen -- Ahmad

16   Abousamra?

17   A.   They got the "A" and "D" on the first name, but the last

18   name appears to be Abousamra.

19   Q.   Are these -- do these appear to be Republic of Yemen

00:52 20   visas?

21   A.   It's tough to recognize the one on the left.  It's black

22   and white.  But the one on the right appears to be the Yemeni

23   visa.

24   Q.   Does this number appear to be 00102967?

25   A.   Yes.

1    Q.   The one on the right, does that appear to be Tarek

2    Mehanna's visa?

3    A.   Yes.

4    Q.   Does that number appear to be 00102965?

5    A.   Yes.

6    Q.   Did you apply for these visas around the same time?

7    A.   Yes.

8         MR. CHAKRAVARTY:   Thank you.

9    Q.   You described that you had done some financial work.   Did

00:53 10   you take money out for purposes of the trip?

11   A.   Yes.

12   Q.   Approximately how much?

13   A.   I'm not sure.   I know how much we had going forward, but

14   it's the -- because I withdrew the 5,000.   I don't believe I

15   gave all that to Abul Muthanna.   At some point, I gave some

16   money to Dan Maldonado, and I had withdrawn other money and put

17   other money in.   So I wasn't -- I'm not exactly sure -- at the

18   time of the -- within that week before we left, I'm not sure

19   how much I withdrew for the purpose of going because I had some

00:54 20   money with me already.

21   Q.   To the best of your memory, did you have several thousand

22   dollars with you for purposes of going on this trip?

23   A.   Yes.

24   Q.   At some point before you left, did you, the defendant and

25   Abousamra divide up the money?

 1    A.    Yes.

 2    Q.    Why did you divide up the money?

 3    A.    We knew there was some restrictions on how much you can

 4    carry on a plane without having to declare it.  So we divided

 5    up the money evenly amongst ourselves to keep it under that

 6    limit.

 7    Q.    Did they bring money with them?

 8    A.    Yes.

 9    Q.    Approximately how much total money do you think the three

00:54 10    of you had, to the best of your knowledge?

11    A.    Well, to the -- to the best of my knowledge or to the best

12    of my recollection?

13    Q.    Best of your recollection.

14    A.    To the best of my recollection, it was around 12 to

15    13,000.

16    Q.    You just suggested that you also gave money to Dan

17    Maldonado.

18    A.    Yes.

19    Q.    You described earlier -- yesterday that you knew Dan

00:55 20    Maldonado, and he was just outside of your inner circle of

21    friends?

22    A.    Yes.

23    Q.    When did you give money to Dan Maldonado?

24    A.    Near the end of -- past the October deadline, either the

25    very end of 2003 or the beginning of 2004.

```
 1   Q.   And where did you give him this money?

 2   A.   At his apartment.

 3   Q.   Same apartment you went to when you asked him about the

 4   guns?

 5   A.   Yes.

 6   Q.   Why did you give him this money?

 7   A.   He told me that he -- he was trying to make what we would

 8   call Hijra, which is migration to a Muslim land.  He said he

 9   got a job in Saudi Arabia.  He talked to someone.  He had a job

10   in Saudi Arabia.  He just needed the money for the plane

11   tickets.  He was saving up for that.  I had already had the

12   cash with me in preparation for the trip.  So I gave him some

13   money to help him with the plane tickets for the sole purpose

14   of helping him move to a Muslim country.

15   Q.   Had he asked for the money?

16   A.   I don't believe he asked for the money.

17   Q.   So given your relationship with him, why did you just take

18   that initiative to go give him that money?

19   A.   Just helping somebody in need.

20   Q.   Religiously, is there some reward for that?

21   A.   Yes.

22   Q.   Describe that concept to the jury.

23   A.   You help someone, you get rewarded for it.  I'm not sure

24   -- could you be more specific in --

25   Q.   I think -- that's part of the Islamic concept?
```

1   A.   Yes, helping out the needy, you know, it's giving money.

2   It's a concept that's brought up numerous times in the Qur'an.

3   Q.   All right.  So you planned to leave on the Super Bowl

4   Sunday.  When did you plan to return?

5   A.   We had return -- we had return tickets, I believe, maybe

6   two or three weeks out after our trip.  We had return tickets

7   in part to make it -- it would seem very odd to book a one-way

8   trip to Yemen, to kind of go with our cover story, just

9   exploring the schools, seeing what's going on.  We had a piece

00:57 10   of paper with us with a name scribbled on it so in case it

11   didn't work out, we could return.

12   Q.   You're describing the contact information that you had in

13   Yemen was basically a piece of paper with a name scribbled on

14   it?

15   A.   Yeah.

16   Q.   Was there literally a piece of paper with a name on it?

17   A.   Yeah.  I believe it was actually torn off from a piece of

18   paper.  Ahmad had it the whole time.  I never had it.  So I

19   don't remember the name on it.

00:58 20   Q.   Is this something he brought back from California from

21   visiting with Abu Omar?

22   A.   Yes.

23   Q.   Did you see it?

24   A.   I saw it.

25   Q.   Did you see what was written on it?

1    A.    No.

2    Q.    Do you know if the defendant saw what was written on it?

3    A.    I do not.

4    Q.    You described that you had a return ticket.  Did you have

5    an intention of returning on that ticket?

6    A.    If things didn't work out, yes.

7    Q.    So if the information that you got wasn't accurate?

8    A.    Yes.

9    Q.    You described some of the financial arrangements that you

00:58 10   took for your family.  Why did you take those steps?

11   A.    I knew I was going for a purpose that was contrary to the

12   law of America, and I was worried that my finances would be

13   frozen, my assets would be frozen.  So I wanted to move the

14   money to my wife under an account that was a joint account with

15   my wife and remove my name from it.

16   Q.    At the time, in 2003, were the three of you familiar with

17   the practice of freezing assets?

18   A.    We've all read about the -- what happened with the

19   Japanese in World War II.

00:59 20   Q.    You're referring to rounding up Japanese people of

21   Japanese ancestry after World War II?

22   A.    Yes.

23   Q.    You feared that that would happen to Muslims?

24   A.    No.  I mean, maybe eventually.  But the -- specifically

25   just because, I mean, like I said, this was only something I

1    did individually.  As far as I know, it was -- I'm not sure of

2    the practice of -- I'm not sure of the practice with the FBI or

3    the government would do.  So I was just saying, if they found

4    out that I went for our actual purpose, that they would freeze

5    all my assets, anything that had my name on it.

6    Q.    Did you take any other steps with regards to notifying

7    your family about where you were?

8    A.    Well, we -- when I left -- I think we all handled it

9    slightly differently.  I didn't have an intention of telling my

01:00 10   family before I left.  I made a video partly because I had

11   young kids, and I know they wouldn't remember me at the time.

12   My youngest daughter was two months at the time.  So I wanted

13   something that they'd -- they could see me in case I didn't

14   come back.  So I made a video, and I hid it in my parents'

15   house in a location I knew they wouldn't find unless they were

16   moving, just a very discrete location.  I said, If I go there,

17   if I find something, if it seemed like it's going to work out,

18   then I'll contact them and let them know where the video was.

19   Q.    If you go to Yemen or on to Iraq, then you would call back

01:00 20   and tell them where the video was?

21   A.    Yes.

22   Q.    Why did you think you might not come back?

23   A.    The purpose of us going was to basically fight in a war.

24   People don't always come back from a war.

25   Q.    I'm going to draw your attention to Super Bowl Sunday back

1    in 2004.  What happened that day?

2    A.   So we -- after, like, around -- we made an agreement to

3    meet, I forget exactly what time, around lunchtime or so.

4    After breakfast, after being with our families a little bit, we

5    met at Tarek's house.  We gathered our -- prepared to go, got

6    in the car, went to the airport, continued on.

7    Q.   So you met at the defendant's house in Sudbury?

8    A.   Yes.

9    Q.   Incidentally, you mentioned that you withdrew money to buy

01:01 10   tickets.  Where were those tickets sent?

11   A.   What we discussed is that they would be shipped to Tarek's

12   house.  He said that he could get to his mailbox before his

13   parents were able to get to it.

14   Q.   That was obviously before the trip?

15   A.   Yes.

16   Q.   So at some point, did you make your way to the defendant's

17   house?

18   A.   Yes.

19   Q.   Who was there when you got there?

01:02 20   A.   I know his brother was there, his -- Ahmad Abousamra was

21   there.  Hassan -- I forget if Hassan was there when I got there

22   or if he came a little bit later.

23   Q.   When you say the "defendant's brother," you're referring

24   to Tamer Mehanna?

25   A.   Yes.

1    Q.    Do you see him in the courtroom?

2    A.    Yes.

3    Q.    Can you just point to him and identify him?

4    A.    He's sitting in the middle in the first row.

5    Q.    Ahmad Abousamra was there?

6    A.    Yes.

7    Q.    And Hassan Masood?

8    A.    I believe he was there.

9    Q.    When you got there, what was happening?

01:03 10   A.    When I first got there, nothing.  We just -- getting

11   together.

12   Q.    Okay.  At some point, did you make preparations to go to

13   the airport?

14   A.    Yes.

15   Q.    What were you bringing with you?

16   A.    With me, I was bringing a backpack full of -- with my

17   luggage and all my stuff.

18   Q.    Okay.  So what happened as you were getting ready to go?

19   A.    Well, some -- Ahmad and I kind of already -- I believe --

01:03 20   like I said, I just kind of left my family.  I didn't tell them

21   anything.  I believe Ahmad did the same.  Nobody knew that he

22   was about to leave.  The defendant, having his brother present,

23   I believe he wrote a note for his family.  Told his brother to

24   give it to them afterwards.

25   Q.    You're talking about the defendant?

1   A.    Yes.  He gave his brother a bag, and he also said his

2   good-byes to his brother.  They hugged.  And then we left.

3   Q.    Did you -- you described that you had a family at this

4   point?

5   A.    Yes.

6   Q.    And at that time one --

7   A.    Two children.

8   Q.    Two children.  Do you know what Abousamra's family

9   situation was?

01:04 10   A.    I believe he was divorced at the time.  He had a -- I know

11   he has a child from the first wife.  I think that happened

12   before he left, yes.

13   Q.    You know what the defendant's family situation was?

14   A.    He was not married.

15   Q.    You described that the defendant gave his brother a note?

16   A.    Yes.

17   Q.    Do you remember anything about that note?

18   A.    No.

19   Q.    You described that the defendant gave his brother a bag?

01:04 20   A.    Yes.

21   Q.    What kind of a bag?

22   A.    A bag with, I believe, mostly paperwork.

23   Q.    Did you know what was in that bag?

24   A.    We -- while driving to the airport, or right before we

25   left, we asked the defendant what was -- what did you give him

1    to get rid of?  He told us, you know -- I don't know -- I don't

2    want to say that he used the word "incriminating" but stuff

3    that he didn't want to have laying around.  I believe one thing

4    he said was, you know, something about how to make a bomb.  It

5    might not have been specifically about that, but it was part of

6    the paperwork or maybe part of a larger document.  One of the

7    things I brought up, like, That's not something you give

8    somebody else to get rid of.  It's something you get rid of

9    yourself.

01:05 10   Q.    Did he respond to that?

11   A.    Don't worry about it.

12   Q.    Had you previously discussed bombs with the defendant

13   and/or Abousamra?

14   A.    Jokingly, nothing serious.

15   Q.    Describe that conversation.

16   A.    It was the -- I don't know if you want to bring up Ahmad

17   Abousamra's picture again.  But he had the big beard.  It was

18   really -- some people can't grow it that big.  It was a very

19   big beard.  We said it would be amusing if he went to someplace

01:06 20   and wanted to buy a truckload of fertilizer.  It would be a

21   humorous situation because it would be obvious why.

22   Q.    It would be preposterous that they would sell him the

23   fertilizer?

24   A.    Yes.

25   Q.    Who drove you to the airport?

1   A.   Hassan.

2   Q.   What did the defendant's brother do at that point?

3   A.   What I know he did or --

4   Q.   What you saw him do.

5   A.   I didn't see him.  He stayed at home.

6   Q.   Now, the defendant lived in Sudbury, and you were driving

7   to Logan Airport?

8   A.   Yes.

9   Q.   So who was in the car?

01:06 10   A.   Hassan, me, the defendant, and Ahmad Abousamra.

11   Q.   Describe the atmosphere in the car on your drive to Logan.

12   A.   It was very -- I'm not sure about the other people.  I was

13   kind of -- it was very somber for me.  I was leaving my family,

14   my young kids.  It was just -- the only thing I really remember

15   was staring out the window.

16   Q.   Do you remember anything that was said in the car?

17   A.   Like I said, the -- once we -- might have talked a few

18   minutes after leaving, but as soon as we were on -- after a

19   couple of minutes, I kind of zoned out.

01:07 20   Q.   Did you make it to the airport?

21   A.   Yes.

22   Q.   At this point, who, aside from who was in that car, knew

23   why you were going?

24   A.   As far as I know -- I didn't tell anybody.  Nobody that I

25   knew knew.  Nobody that Ahmad Abousamra knew knew.  The only

1    question I have is -- and I cannot recall right now -- if Tarek

2    told his brother the reason why when he was saying his

3    good-byes.

4    Q.   Did Hassan know as well?

5    A.   Yes.  Can I add to that statement?

6    Q.   How do you know that Hassan knew?

7    A.   No.  The other person that would know would be Abul

8    Muthanna who gave us the contact information.

9    Q.   How did you know that Hassan knew?

01:08 10   A.   We would talk to him openly about it.  He was with us.  He

11   had the same mind-set.  The only reason he couldn't come, he

12   told us he has visa issues.  I don't believe at that time he

13   had a U.S. passport or kind of anything at the time.  So he

14   wasn't able to travel, but we trusted him fully.  He drove us

15   to the airport, and he knew why we were going.

16   Q.   What happened at the airport?

17   A.   We go to check in our luggage, get our tickets.  The lady

18   at the counter told us to hold on.  There seems to be a

19   problem.  After about an hour of waiting, a state trooper, a

01:09 20   sergeant, and a TSA agent came over and said they wanted to ask

21   us a few questions.  They asked for Ahmad Abousamra.  They

22   asked him some questions.  Then Ahmad came back, said, He wants

23   to talk to me, referring to me.  I went over there, spoke with

24   them.  And then after that, the -- I don't know -- asked Ahmad

25   what was said afterwards.  The sergeant said -- he asked me

1    what I do here.  He's, like, I wish you'd stay here.  I kind of

2    got the feeling he knew, but he couldn't stop us.  We got our

3    tickets, and we continued to the airplane.

4    Q.   Did you talk to Abousamra about what he was asked?

5    A.   Yes.

6    Q.   What did he tell you?

7    A.   He asked why we're going.  He wanted to know who paid for

8    the tickets.  That's all I can recall that he asked.

9    Q.   You just said earlier that you paid for the tickets?

01:10 10   A.   Yes.

11   Q.   Were you fronting the money, or were you just paying for

12   everybody?

13   A.   For the tickets, I was paying for the tickets.

14   Q.   Did you tell the trooper and the TSA agent the purpose for

15   your travel?

16   A.   We told him the story that we discussed.

17   Q.   Which was what?

18   A.   Was that we were going to study at a school.

19   Q.   Did you then -- what happened after that?

01:10 20   A.   After that, we went to board the plane.  I boarded.  I was

21   the first one in the plane, but then Ahmad and Tarek followed

22   five to ten minutes afterwards.

23   Q.   Do you know what happened to them?

24   A.   They told me that they were stopped again by another agent

25   who counted the money.  I don't believe he -- I don't think he

1   asked them anything else, but he just -- he counted the money,

2   dollar for dollar, and then they continued.

3   Q.   That's -- do you recall what kind of an agent that was?

4   A.   I believe it was a TSA agent but not the same type that

5   interviewed us.

6   Q.   The itinerary that you had to this trip, do you recall

7   what that path was?

8   A.   It was from Boston to London, then from London to Bahrain

9   as a stopover, Bahrain to Abu Dhabi.  Then we had a few days in

01:11 10   Abu Dhabi before we continued to Yemen.

11   Q.   Did any of you have any conversations about meeting anyone

12   in London?

13   A.   The person you asked me about, Abu Dujanah, we knew he was

14   in London.  He was good friends with Ahmad.  We talked about

15   potentially meeting him.  I believe Ahmad tried calling him

16   while we were going, but he didn't get an answer.

17   Q.   Did you make it to London?

18   A.   Yes.

19   Q.   Did anything happen there?

01:12 20   A.   No.

21   Q.   Did you then go to Bahrain?

22   A.   Yes.

23   Q.   Did anything happen en route to Bahrain?

24   A.   Nothing of note.

25   Q.   Were you seated together, the three of you?

1    A.    On which leg of the flight?

2    Q.    Either flight.

3    A.    You know, we started -- from Boston to Logan [sic], we

4    started sitting next to each other, but the plane was

5    practically empty.  As soon as we took off, we all kind of

6    spread out.

7    Q.    Did you take the opportunity to sleep at some point?

8    A.    Yes, on the flight from Boston to Logan -- sorry, from

9    Boston to London.

01:12 10   Q.    At some point, did you have a conversation with the

11   defendant about the trip?  Did he say anything about the trip?

12   A.    Yes.

13   Q.    When?

14   A.    I believe it was -- it was either in Bahrain or in the

15   UAE.

16   Q.    So from Bahrain you went to the UAE?

17   A.    Yes.

18   Q.    So what did the defendant say about the trip as you were

19   traveling?

01:13 20   A.    I still remember him saying, We're actually doing it, or

21   We're finally doing it.

22   Q.    What did you take that to mean?

23   A.    We talked about -- several years about participating in

24   Jihad, but now we're on our way.  We kind of left our families,

25   and we are in the process of doing it.

1    Q.    Did you make it to UAE?

2    A.    Yes.

3    Q.    Specifically, this is Abu Dhabi?

4    A.    Yes.

5    Q.    And what happened when you got to Abu Dhabi?

6    A.    We got a hotel room.

7              MR. CARNEY:  I object.  May we approach, please?

8              THE COURT:  All right.

9    (SIDEBAR CONFERENCE AS FOLLOWS:

01:13 10              MR. CARNEY:  May I have one moment first, your Honor?

11    (Discussion held off the record.)

12              MR. CARNEY:  I don't recall ever hearing the last

13    statement.  I could be wrong but -- about the defendant saying,

14    We're finally on our way, we're finally doing Jihad.

15              MR. CHAKRAVARTY:  I'm sure he said it before because I

16    wrote it down in my outline, but I'll research it.

17              MR. CARNEY:  I went over the grand jury and the police

18    report last night, and I honestly don't remember ever seeing

19    it.  If we can do this:  I do want to make a request explicitly

01:14 20    that if the witness is going to say anything that hasn't

21    appeared in any other fifteen 302s or the grand jury

22    transcript, I'd like to be alerted to it before the witness

23    says it.  I'm not accusing the prosecutor of any impropriety.

24    I'm just saying this is a notable statement, and I don't ever

25    remember seeing it.

1          MR. CHAKRAVARTY:  It's my recollection it has been

2     documented, but I don't know --

3          THE COURT:  During discovery, was there ever a

4     disclosure -- other than disclosing the raw materials, like the

5     302s, was there ever a disclosure that summarized the

6     defendant's -- statements by the defendant or cataloged them?

7          MR. CHAKRAVARTY:  No.

8          THE COURT:  So there's not a reference document

9     that --

01:15 10          MR. CHAKRAVARTY:  No.  It's just the 302s, the reports

11     that were made to the FBI.  If there was something he said in

12     preparation that we don't -- none of us remember being

13     documented --

14          THE COURT:  Where do you think this was reported?

15          MR. CHAKRAVARTY:  I don't recall.  I'll have to go

16     through and look.  I'll look at the break.

17          MR. CARNEY:  I wouldn't make such a big deal about it

18     if it wasn't such a significant statement that I would have

19     recognized, I think.  I don't know if Attorney Bassil has seen

01:16 20     it either.  I'm just concerned if there's going to be anything

21     that's not in the report.

22          MS. BASSIL:  There were two other instances that were

23     brand-new statements.  If the statement by a witness is

24     different in preparation, we're supposed to be notified.  We've

25     always been notified in writing by other U.S. attorneys.

1          MR. CARNEY:  There were two others, but this was the

2     first one that led me to feel I needed to approach the Court.

3          MR. CHAKRAVARTY:  Your Honor, just to clarify the

4     practice, it's been -- if there's been some new fact that he

5     has said, then I put -- I put quotes here because it was my

6     understanding that this is something that the defendant

7     actually said exactly.  But if it had not been disclosed as a

8     quote but rather a thought that was conveyed -- again, I'll

9     need to look through exactly what --

01:16  10          THE COURT:  A statement is a different animal, so --

11     okay.  Let's see what is discovered at the break.

12          MR. CARNEY:  Yes, your Honor.

13     .  .  .  END OF SIDEBAR CONFERENCE.)

14     Q.   Now, in Abu Dhabi, Mr. Abuzahra, you described that you

15     got a hotel?

16     A.   Yes.

17     Q.   So what did the three of you do?

18     A.   I'm not sure what they did.  I went for a walk, and I kind

19     of explored the area a little bit.  I found an internet cafe

01:17  20     that I planned on using the next day.

21     Q.   Is it customary in the Middle East or in other parts of

22     the world to have internet cafes widely available?

23     A.   I'm not sure right now, but back in the time, internet

24     wasn't as widely available as it was here, back in that time as

25     well.  So internet cafes are -- in the Middle East, it's

1    typical to find them on almost every street corner.

2    Q.    Explain what that is for the jury.

3    A.    They have a bunch of computers hooked up to the net.  You

4    can pay by the hour usually or half hour to use the computer,

5    check your emails, do stuff online.

6    Q.    What did you do on the internet?

7    A.    The next day, we went to the internet cafes and we checked

8    our emails.

9    Q.    All three of you?

01:18 10   A.    Yes.

11   Q.    Do you remember whether you used the same computer or not?

12   A.    I believe we did because we were -- you have to pay per

13   computer.

14   Q.    So did you receive an email?

15   A.    Yes.

16   Q.    What was that email?

17   A.    I received, I believe, two emails from my parents -- from

18   my family.  One of them was stating that my father was sick.  I

19   should return home.  He's really sick, not just a cold or

01:18 20   anything like that.  And another email was saying that I hadn't

21   signed the passport for my youngest -- my newborn was two

22   months old.  And with children, I believe, under 18, they would

23   have to have signatures of both parents to get a passport.

24   Q.    Were they asking you to come home?

25   A.    Yes.

1    Q.   Did you tell them before that you were leaving?

2    A.   No.

3    Q.   What happened after you checked your email?

4    A.   To us as a group or decisions I took or --

5    Q.   Why don't you say what you did first.

6    A.   I made the decision -- after reading the emails, I made a

7    decision to return back to my family.

8    Q.   Then what did the three of you do?

9    A.   We -- so after we talked about it briefly, they seemed

01:19 10   okay with it for me returning back home.  I gave them -- I took

11   back some of the money to return back home.  I left them with

12   the rest of the money.  I exchanged bags with Ahmad Abousamra.

13   I think mine was more suitable for what he was about to go

14   through.  They left.  They continued on, and then I booked a

15   flight back to the States and I returned.

16   Q.   When you say it was "more suitable," why was it more

17   suitable?

18   A.   It was more rugged for what I believe he was about to go

19   through.

01:20 20   Q.   What was their reaction to your telling them that you were

21   going home?

22   A.   He -- they seemed okay with it.  I don't know.  It felt a

23   little bit weird.  I don't know if they -- Ahmad, particularly,

24   I don't know if he believed me or not.  They just said, If you

25   have to go, you have to go.

1  Q.   You mentioned yesterday that you felt that you needed to

2  demonstrate your commitment to them when you talked about the

3  domestic things.  Did you feel like you needed to demonstrate

4  your commitment to them with regard to this trip?

5  A.   No.

6  Q.   Based on your views at the time, was it permissible for

7  you to turn around?

8  A.   I don't know.  I just decided to return back.

9  Q.   Why?

01:21 10  A.   The biggest reason was that I know there was an issue with

11  the passport.  I know that I meant to do it before I left.  I

12  forgot.  I needed to get a passport for my daughter.  My wife

13  is not from this country.  She goes back home often.  I was

14  worried too, if my wife wanted to go and get a passport and

15  they say, okay, where is the father?  There's no record of him

16  not being here.  So then I don't know how she would have

17  explained that.  I just felt it was in the best interests of me

18  and my family for me to return home.

19  Q.   Did you or the defendant or Abousamra communicate to your

01:21 20  families back home?

21  A.   Yes.

22  Q.   Describe how.

23  A.   Over email.  After the -- after we kind of split up and

24  they continued on, I did call my family back home.

25  Q.   You said you also sent email?

```
 1   A.   Yes.

 2        MR. CHAKRAVARTY:  Call up Exhibit 359.

 3   Q.   Is this an email from the defendant's account?

 4   A.   Yes.

 5   Q.   It's to helooly@hotmail.com.  Do you recognize that email

 6   address?

 7   A.   Yes.

 8   Q.   Who is that?

 9   A.   My younger brother.

10   Q.   The date is February 3, 2004?

11   A.   Yes.

12   Q.   Where were you then?

13   A.   In UAE.

14   Q.   Can you read this email?

15   A.   "Hilal, this is Kareem.  Do me a favor.  First of all,

16   don't tell anyone you got this email from me.  Secondly, tell

17   Tamer that Tariq is okay and safe.

18        "Insha' Allah.  I will send you and mom and everyone

19   else an email later today.  Al-Salaamu alaykum."

20   Q.   Why did you tell him not to tell anyone that he got this

21   email from you?

22   A.   I don't recall why.

23   Q.   It says, "Secondly, tell Tamer that Tariq is okay and

24   safe."  Are you talking about the defendant's brother?

25   A.   Yes.
```

1    Q.   Why did you ask him to tell Tamer that Tarek was safe?

2    A.   At that time, and for several years prior, they were very

3    good friends.

4    Q.   Why did you use the defendant's account to send this

5    email?

6    A.   I don't recall.

7         MR. CHAKRAVARTY:  Call up Exhibit 355.

8    Q.   Is this also an email from the defendant's account?

9    A.   Yes.

01:23 10  Q.   Subject is "Tamer"?

11   A.   Yes.

12   Q.   Is this also on February 3, 2004?

13   A.   Yes.

14   Q.   Can you read this email?

15   A.   "As-Salaamu alaykum.  Hilal, can you please send this to

16   my brother or show it to him?

17        "As-Salaamu alaykum.  Teemo, this is Tariq.  I'm just

18   writing to let you know that I'm doing okay and those who are

19   with me.  I just want you to relax and remember that everything

01:24 20  will work out well insha' Allah.  Just keep making du'aa for

21   us.  Remember, when mom and dad call, you know what to say.

22   Don't tell them anything until they're back safely.  I hope

23   you're doing okay at home and school.  I love you.

24        "Also, for whoever found out, don't listen to the

25   stupid things that they tell you.  If they think that what we

did was stupid, I don't really care, and I advise you not to

listen to them.  Our only purpose in life is to please Allah,

only.  I will try to keep in touch as much as possible, but if

you don't hear from me for some time, don't worry.  It's a

little tough to get to a comp or phone.  Talk to you soon,

Tariq."

Q.   There's a reference here to "when mom and dad call, you

know what to say.  Don't tell them anything until they're back

safely."  Does the fact that they are back safely mean anything

to you?

A.   I don't recall exactly at the time if his parents were

traveling or not.  The email would seem to imply they were both

traveling and weren't yet home in the States at that time.

Q.   But you don't know where they were?

A.   Correct.

Q.   They weren't at the house when you went there before you

left?

A.   Correct.

Q.   How long were you in Abu Dhabi?

A.   I believe I was there for three to four days.

Q.   What did you do during that time?

A.   So initially after -- after we split up, I went -- I

booked the plane ticket.  I had some family in Abu Dhabi.  I

went and saw them one night.  And I believe I traveled the next

day after that.

1    Q.   You mentioned that when you split up you exchanged some of

2    your equipment.  Did you also exchange money?

3    A.   We didn't exchange money.  I gave them -- we had split up

4    the money evenly, but since they were continuing on to fight in

5    Jihad, and I believe they needed it more than I did, I could

6    always make more money, I gave them the bulk of the money, and

7    I just took back what I needed to get back home safely.

8    Q.   Giving money for somebody engaged in that, is there a

9    reward for that?

01:26 10   A.   Yes.  In general, it's good to give -- in the mind-set,

11   it's good to give money to help them out doing good deeds.  We

12   saw that as a very good deed.  Also, there's a concept that if

13   you help to do something, whatever happens from that, you keep

14   getting rewarded.  So if you helped to build a mosque, for

15   example, as long as that mosque stands, you're still getting

16   rewarded.  So it's helping them.  In the endeavor, it's not

17   just helping them in that endeavor, but anything they do based

18   on that is also going to come back to your scales.

19   Q.   Did you return to the U.S.?

01:26 20   A.   Yes.

21   Q.   And do you remember being questioned by authorities when

22   you got back?

23   A.   Yes.

24   Q.   Is this the Customs officials at the border?

25   A.   There were two -- I was questioned two times.  At the

1    first time, just at the -- where they do the processing, where

2    you give them the Customs declaration, I was questioned by that

3    officer.  Then when I got my luggage, I was questioned.  I had

4    my baggage searched and I was questioned again.

5    Q.   What did you tell them?

6    A.   I told them that -- the officer, the first one, asked me,

7    you know, what's the purpose of your travel?  Why did you --

8    why did you go?  Why are you coming back early?  Why weren't

9    these other people?  I told them that we went to study.  My

01:27 10    father fell ill.  He's in his late 70s.  So I'm coming back

11   just in case to be with him.

12   Q.   With regard to the second interview, what did you tell

13   them?

14   A.   I was questioned a little bit more thoroughly at that

15   point.  I had the -- I took the paperwork with me from Tarek

16   and Ahmad.  They gave me the paperwork for the Dar al-Mustafa

17   website.

18   Q.   Where did they give you that?

19   A.   Before when we split up and we were exchanging stuff and

01:28 20   preparing to split up.  So I took that saying that I might need

21   that on my way back, and you guys probably aren't coming back.

22   That's why I took that paper with me.

23   Q.   What did you do with that paper?

24   A.   I gave it to the officer, the second one that questioned

25   me.  He asked about the school.  I said, Here it is.  Here's

1    the paper I have.  This is the place where we were going to.  I

2    told him the same thing.  My father is ill.  He's in his 70s.

3    So I'm coming back to be with him.

4    Q.   With regards to your plans in Yemen, where did you intend

5    to go, to the best of your memory, when you got to Yemen?

6    A.   I believe the town was called Mukalla.

7    Q.   Is that where the contact person was that you were trying

8    to reach?

9    A.   I believe so.

01:28 10   Q.   Why did you tell the Customs official that story?

11   A.   If I told them the truth, I felt I would have been

12   arrested on the spot.  I told them a story that I felt

13   plausible that would keep me out of jail and keep the -- keep

14   me out of investigation.

15   Q.   Describe what happened after you got through the airport.

16   A.   After I got through the airport, I returned to my family.

17   A lot of things happened at that point.  So can you --

18   Q.   Sure.  Did you get back to your family?  Did you talk to

19   them about what happened?

01:29 20   A.   No.  When I got back, any time they brought it up, I just

21   told them I went there for studying and that's it.  And I

22   refused to talk about it any further.

23   Q.   Again, why was that?

24   A.   Partly, I know that I didn't want -- I wanted that to be

25   the story, and I wanted to repeat that.  If they were

1    questioned by the FBI or any authorities that they can just

2    say, He told us he went for studying.

3    Q.   Meaning your family could say that?

4    A.   Yes.

5    Q.   Is that also what you discussed with the defendant and

6    Ahmad Abousamra?

7    A.   Yes.

8    Q.   After you got home, were you contacted by someone with

9    regards to the trip?

01:30 10   A.   I was contacted by authorities.  I assume you mean the

11   authorities.

12   Q.   Before that, shortly after, did you have contact with the

13   defendant's father?

14   A.   Yes.

15   Q.   When was that?

16   A.   It would have been -- it was before the defendant

17   returned.

18   Q.   So within a few days after you returned?

19   A.   Within a week or two.

01:30 20   Q.   Describe how that happened to the best of your memory.

21   A.   I forget.

22   Q.   So at some point, did you meet with the defendant's

23   father?

24   A.   Yes.

25   Q.   Where?

```
 1    A.    At his house.

 2    Q.    So you went to his house?

 3    A.    Yes.

 4    Q.    Who was there when you got there?

 5    A.    So we had the -- part of the other thing was the defendant

 6    taking his father's suitcase with him.  He wanted me to return

 7    that to his father.  So I took that with me.  The defendant's

 8    father was there.  The defendant's cousin was there.  I don't

 9    know his name.  There was another person, a family friend, I

10    believe was also present.

11    Q.    So you mentioned that at some point the defendant gave you

12    a suitcase?

13    A.    Yes.

14    Q.    When was that?

15    A.    When we split up.

16    Q.    In Abu Dhabi?

17    A.    Yes.

18    Q.    What did he ask you to do with the suitcase?

19    A.    To return it to his father.

20    Q.    So did you bring the suitcase with you when you went to

21    the defendant's house?

22    A.    Yes.

23    Q.    Do you remember the name of the third person who was

24    there?

25    A.    Yes.
```

1    Q.   What was his name?

2    A.   Naem Assil.

3    Q.   What happened when you got there?

4    A.   They asked me where their son was.  His father asked me

5    where his son was.  I told him he's -- I mean, I honestly

6    didn't have the information with me.  So I just told him his

7    son is in Yemen.  His cousin was very adamant and aggressive,

8    saying, Where is he?  Give us the information.  And I was

9    honest.  I said, I know he's in Mukalla.  That's all I know.

01:32 10   He said, I'm going to go and knock on every single door there.

11   I said, Go.  They were just very aggressive.  They wanted to

12   know where their son was.  I just told them, he's in this town

13   because I knew they weren't going to do anything with that.

14   And just left it at that.

15   Q.   Did they ask you why he was there?

16   A.   No.

17   Q.   You intimated the defendant at some point returned to the

18   United States?

19   A.   Yes.

01:32 20   Q.   Do you know when?

21   A.   I don't recall exactly when.  I believe it was within one

22   to two months.

23   Q.   Do you recall whether the return itinerary was also kind

24   of a reverse of your trip there?

25   A.   I think it was a little bit afterwards.  I don't recall if

1    it was -- I don't think it was on the same itinerary.  I'm not

2    sure.

3    Q.    But that itinerary goes through London?

4    A.    Yes.

5    Q.    You mentioned earlier that Abousamra had mentioned Abu

6    Dujanah from Clear Guidance?

7    A.    Yes.

8         MR. CHAKRAVARTY:  I call up Exhibit 362, please.  Page

9    2, please.  For the record, your Honor, this was marked --

01:33 10   introduced yesterday as 362-2.  We will do a substitution, with

11   the Court's permission, to call this Exhibit 361A just for the

12   record.

13   Q.    Is this an email from the defendant to Abu Dujanah, dated

14   February 18, 2004, with the subject line:  "Where were you?"

15   A.    It appears to be so.

16   Q.    This is something you hadn't seen before?  I showed it to

17   you in preparation for testimony, is that right?

18   A.    Correct.

19   Q.    Does the email read:  "As-Salaamu alaykum," which means

01:33 20   piece be upon you.  "Where were you?  I was at the airport and

21   called you but no answer.  Abu Sab."  And then signed Tariq?

22   A.    Yes.

23        MR. CHAKRAVARTY:  Page 1, please.

24   Q.    There's also an email from the defendant to Abu Dujanah,

25   response to where were you email, dated the next day, February

1    19, 2004.  Does this email read:  "Yeah, it took a while with

2    search and related matters before I could get to a phone.  Not

3    bad though.  Regarding the money, if you happen to get some,

4    then keep it aside for the next time we go to that nightclub

5    again.  Damn, those dancers were smokin."  Then signed Tariq?

6    A.    Yes.

7    Q.    The trip to Yemen, did you plan to go see any dancers?

8    A.    No.

9    Q.    When did you see the defendant again?

01:34 10   A.    I believe it was a few months afterwards.

11   Q.    Where?

12   A.    At a function being held in some hall that was rented out.

13   Q.    Were you surprised to see him?

14   A.    No, because I heard before that he had already returned.

15   Q.    Did you have a chance to talk to him?

16   A.    Briefly.

17   Q.    Now, after he had returned, had you made any efforts to

18   reach out to him?

19   A.    No.

01:35 20   Q.    Why not?

21   A.    Needless to say, my family was very upset with me for what

22   they saw as abandoning them.  And it was kind of -- they didn't

23   know where they were, but when they heard that Tarek came back,

24   they told me explicitly, without mincing any words, that I was

25   completely forbidden to see or talk to Tarek or Ahmad ever

1   again.  It was a big deal with my wife too, kind of dealing

2   with that abandonment thing.  So it wouldn't have been --I

3   didn't have a desire to -- I was focusing on my family at that

4   point.  I didn't want to bring up any more issues.  I already

5   put my family through enough.

6   Q.   Did you talk to him about the trip?

7   A.   Briefly.

8   Q.   What did he tell you?

9   A.   The only thing he told me, we -- I think both of our

01:36 10  parents were -- both of our families wanted to keep us apart,

11   prevent the same thing from happening.  So we kind of stepped

12   aside into a coatroom just for a couple minute.  The only thing

13   he told me at that point was there was nothing there.  What do

14   you mean?  He said, Nothing was there.

15   Q.   What was he referring to?

16         MR. CARNEY:  I object.

17         THE COURT:  Sustained.

18   Q.   Do you know what he was referring to?

19   A.   That the --

01:36 20        MR. CARNEY:  I object.

21         THE COURT:  Sustained.

22   A.   The information --

23   Q.   Hold on.

24   A.   Sorry.

25   Q.   When you talked about the trip with the defendant, did you

1    ask him about what happened in Yemen?

2    A.   Yes.

3    Q.   What did he say?

4    A.   There was nothing there.

5    Q.   Did he say anything about Ahmad Abousamra?

6    A.   I don't recall if I asked him at that meeting where Ahmad

7    was.

8    Q.   You described earlier that you had given him some money in

9    Abu Dhabi?

01:37 10   A.   Yes.

11   Q.   Did you discuss the money at all?

12   A.   I don't recall if it was at that location -- at that time.

13   Q.   At some point later, did you have additional contact with

14   the defendant?

15   A.   Briefly.

16   Q.   What, if anything, happened with regard to the money?

17   A.   He returned back about -- I believe around $1,200 to me.

18   Q.   After that meeting, during that party or that event, did

19   you see him again any time soon, soon after that?

01:37 20   A.   I saw him a handful of times.  I don't recall exactly -- I

21   don't want to say "soon."  It's a relative term anyway.  I

22   don't know if it was soon after that or not, but I saw him a

23   handful of times.

24   Q.   Where would you see him?

25   A.   So I know -- I don't believe he came to my house ever

1  again after that.  One time, I was invited to his house where

2  we had a -- it was just a regular thing.  I was invited for

3  whatever reason.  I went there.  I saw him one time at a mosque

4  for an iftaar, which was, you know, we were fasting, a dinner

5  party.  Those are the types of places I'd see him.

6  Q.   Did you resume the relationship that you had before your

7  trip to Yemen?

8  A.   No.

9  Q.   Did you continue to be online on these forums -- to be

01:39 10  online in chat rooms?

11  A.   Yes.

12  Q.   Specifically, which forums were you on?

13  A.   There was a -- the Clear Guidance shut down soon after we

14  left.  The same person who had started that one up, he started

15  up another one called Islamic Networking or -- I believe it's

16  Islamic Networking.

17  Q.   Do you know if the defendant also continued to be online?

18  A.   Yes.

19  Q.   Did you have any online contact with the defendant after

01:39 20  you returned from the trip?

21  A.   I'd still get emails from him, kind of like -- he'd send

22  out this kind of mass mailings to people.  I'd be cc'd.  I'd

23  get sort of these emails from them.  For a period of time, I

24  had him on my chat list as a buddy.  And I'd see him on the

25  forums.  I'd -- I tried to minimize my contact with him.  And

1   then after a certain point, I tried to cut off all contact.

2   Q.   Did you see some of his posts online after you returned

3   from the trip in 2004?

4   A.   Yes.

5   Q.   What do you remember about those posts?

6   A.   For the most part, they weren't -- the posts that I saw on

7   Islamic Networking were -- I believe they were toned down from

8   the previous types of stuff we would post.

9   Q.   Do you remember him posting anything about Iraq?

01:40 10   A.   Yes.  I remember that there was a particular -- this

11   wasn't on a forum.  It was on the messenger thing.  They can

12   see -- he had status messages.  I don't know if the Court

13   remembers, but there was a particularly gruesome mutilation of

14   the U.S. corpses.  They were, I believe, hung up on power lines

15   or something like that.  The defendant had a status that was

16   very what I felt was inflammatory.  At that point, I decided I

17   didn't want to be associated.  I felt that we -- obviously,

18   just being questioned on the way going and being questioned on

19   the way coming back, I figured that we were under investigation

01:41 20   or we had at least some type of -- I just kind of went under

21   the assumption that my phone and email was all bugged at that

22   point.  I didn't want to be associated with someone that was

23   still posting that type of stuff up.

24   Q.   So this was a status message on the internet, on a chat

25   room?

1    A.    On a messenger, on a chat program.

2    Q.    So when you send somebody a message, there's a status

3    response that you get?

4    A.    When someone is online, they have a status.

5    Q.    Based on that reaction, did you take any action?

6    A.    I blocked him from my messenger list, and I tried to

7    refrain from all contact with him.

8    Q.    Did you see Abousamra again?

9    A.    Yes.

01:41 10   Q.    Approximately when?

11   A.    I don't recall.  It was several months afterwards.

12   Q.    Where do you remember seeing him?

13   A.    He wanted to meet with me.  At that point, I was kind of

14   done with that, but he was insisting on meeting with me.  He

15   drove up to where I work.  So I met with him and a few other

16   people.

17   Q.    You say you were done with that.  What do you mean?

18   A.    I didn't want to be -- like I said, I had the -- at that

19   point, there were a couple things going on.  First, my mind-set

01:42 20   had changed from where it was.  Secondly, I didn't want to be

21   associated -- kind of guilt through association.  I knew what

22   we did.  I didn't think it was wise to draw further attention

23   to ourselves.  I felt that they were drawing too much attention

24   to themselves.  I wanted to stay away from that.  And, like I

25   said, my mind-set had also changed.  But he was insisting on

1    meeting with me.  So I met with him when he came up to my

2    workplace.

3    Q.    Where was that?

4    A.    In UMass Lowell.

5    Q.    Who was with him?

6    A.    Dan Spaulding and Dan Maldonado.

7    Q.    Do you remember approximately when this was?

8    A.    Afternoon, several months afterwards.  I'm not sure when.

9    Q.    Several months, okay.  Where did you meet?

01:43 10    A.    We met in the -- they came here.  We met in the student

11    parking lot.  I believe it was the summertime because the

12    parking lot was rather empty.  Otherwise, it would have been

13    completely full.  I forget, summer 2004, 2005.  We met probably

14    in the summertime soon after.

15    Q.    So you mentioned Dan Maldonado was there?

16    A.    Yes.

17    Q.    You mentioned Dan Spaulding?

18    A.    Yes.

19          MR. CHAKRAVARTY:  Call up Exhibit 760.

01:43 20    Q.    Is that Dan Spaulding?

21    A.    Yes.

22    Q.    What was your relationship with him?

23    A.    I think it might have been the first time I met him.

24    Q.    Was he part of your inner circle before you left for the

25    Yemen trip?

1    A.    I don't think any of us knew him before that.

2    Q.    So what happened when -- what happened when you met with

3    them?

4    A.    We talked --

5              MR. CARNEY:  I object and ask to approach, please.

6              THE COURT:  All right.

7    (SIDEBAR CONFERENCE AS FOLLOWS:

8              MR. CARNEY:  I know this is your bailiwick, but do you

9    think the music is loud enough?  I talk sometimes a little too

01:44 10   loud.

11             THE COURT:  I think, if you whisper like that, it's

12   okay.  It's in bass solo right now.

13             MR. CARNEY:  Actually, it's the only reason I wanted

14   to come up.

15             I'm -- I would like to object and do object to any

16   further conversations that occur between this witness and

17   Abousamra, for example, or other people.  At this point, the

18   conspiracy is complete.  None of the conversations relate to

19   covering up the conspiracy or concealing the conspiracy.  And

01:45 20   the exception to the hearsay rule regarding coconspirator

21   statements means -- or states that the exception only applies

22   if it's a statement made during the pendency of the conspiracy

23   and in furtherance of the conspiracy.  So a witness simply

24   telling someone what happened meets neither criteria, and so I

25   would object to further hearsay.

1          MR. CHAKRAVARTY:  The conspiracy wasn't complete, your

2     Honor.  It wasn't until August of 2006 when the defendant --

3     excuse me, the witness actually continued to lie about the

4     cover story to the FBI.  It wasn't until after that that he

5     came in and he came clean.  Until then, he maintained the same

6     cover story.  He was protecting the defendant as well as

7     Abousamra.  Just because he no longer had -- at the time of

8     this interaction, he's no longer -- they had already taken the

9     overt acts in furtherance of the conspiracy, many of them, not

01:46 10    all of them.  The lie to the FBI in August of 2006 was in

11    furtherance of that conspiracy.  So this is still the scope of

12    the conspiracy and it's during the conspiracy.

13          THE COURT:  What do you anticipate the --

14          MR. CHAKRAVARTY:  He's going to say what happened when

15    he went to Yemen and then when he went on to Iraq.

16          THE COURT:  These are statements by Abousamra?

17          MR. CHAKRAVARTY:  Abousamra.

18          THE COURT:  I think two things.  Even if the

19    conspiracy had ended with respect to this fellow, it hasn't

01:46 20    with respect to Abousamra.  So statements by Abousamra, I would

21    think, would still be in furtherance of the conspiracy even if

22    spoken now to a former conspirator, who has withdrawn, even if

23    that were true.  So I don't know that I have to resolve whether

24    he stayed in through August of 2006 or not.

25          MR. CARNEY:  I submit that the case law is clear that

1    just talking about something is not in furtherance of it.  For

2    example, let's say that people were involved in a conspiracy to

3    rob a bank, and they successfully rob the bank.  They meet up

4    with some acquaintances at a later point, and they're

5    describing how the bank robbery occurred.  Someone is

6    describing it.  That's not in furtherance of the conspiracy nor

7    hiding it.

8            This conversation that I'm expecting is going to be

9    that Abousamra said, to the effect, there was nothing there.

01:47 10    And then he'll say, And then I went on to Iraq in order to

11    fight.  At that point, he's describing what occurred in the

12    past.  The conspiracy is over and this doesn't further it.

13    And, therefore, the prohibition about prior consistent

14    statements comes into play.  I would respectfully direct the

15    Court to the case of -- well, I --

16            THE COURT:  I know the case.

17            MR. CARNEY:  It's not the favorite case, although

18    another judge said to me the same thing about a different case

19    for the same reason that you're mentioning that.  But this now

01:48 20    simply becomes prior consistent statements because the

21    conspiracy is over.  And these particular statements don't

22    advance it.  Now, if the defendant lies about something in the

23    future, that's different.  That's trying to cover up the

24    conspiracy.  But these statements don't further it.

25            MR. AUERHAHN:  There are a number of conspiracies

1    alleged in the Indictment.  Focusing on the 371, conspiracy to

2    lie to law enforcement, as Mr. Chakravarty said, he's still a

3    member of that conspiracy.  And Abousamra telling him about

4    what happened in Yemen is important for him to know because

5    he's also still furthering the cover story, which is the

6    conspiracy, the 371 conspiracy, which clearly continued till

7    August 2006 and continued beyond for the defendant and Mr.

8    Abousamra.  It's also a statement against interest by Mr.

9    Abousamra as well, which would be admissible on an independent

01:49 10    basis.

11            THE COURT:  Well, what do you expect the answers to

12    be?

13            MR. CHAKRAVARTY:  As Mr. Carney said, he'll describe

14    what happened in Yemen to the extent that there was nothing

15    there, and then he'll describe how he got into Iraq and what

16    happened in Iraq.  So it goes to what this witness' state of

17    mind is when, later in August 2006, he is lying to the FBI

18    about the purpose of their trip to Yemen.

19            I should also add, to fast-forward a little bit, at

01:49 20    the end of this witness' testimony, we're going to be playing

21    these consensual recordings, some of which involve

22    conversations with the defendant, some of which also involve a

23    bilateral conversation with Abousamra where he describes in

24    further detail, according to the tape, what happened.  Those

25    are all exposing the contours of the conspiracy.  And even

1   though by then he is cooperating, they are a codefendant's

2   statements against interest as well as to explain the confines

3   of the conspiracy.  We think they're either not hearsay because

4   they -- or they're not hearsay because they're not offered for

5   the truth of the matter.

6           MR. CARNEY:  If I could respond briefly.  Statement

7   against penal interest has absolutely no applicability when

8   you're cooperating with the FBI and doing a recorded

9   conversation.  That statement, if anything, is in your

01:50 10   interest.

11           THE COURT:  We're not talking about the witness'

12   statements.  We're talking about Abousamra's statements.

13           MR. CARNEY:  I understand.

14           THE COURT:  I think they still qualify as statements

15   of a coconspirator, Abousamra's statements.  Are there others?

16   Spaulding or Maldonado?

17           MR. CHAKRAVARTY:  If they're present.  I will ask him

18   what they said.

19           THE COURT:  It would probably apply to them as well.

01:51 20   In other words, that part of the conspiracy seems intact, and

21   statements encouraging its continued secrecy, seem to me,

22   follow the scope of the conspiracy.

23           MR. CARNEY:  I don't want to keep interrupting.  I

24   believe this entire line of questioning, that is, not covering

25   up the conspiracy but rather just describing accurately what

1    happened during the conspiracy, is inadmissible.  And I'm

2    requesting a continuing objection to this line of inquiry.

3         THE COURT:  All right.  You may have a continuing

4    objection.

5         MR. CARNEY:  Thank you, your Honor.

6    .  .  .  END OF SIDEBAR CONFERENCE.)

7    Q.   Mr. Abuzahra, when Mr. Abousamra, Mr. Maldonado, Mr.

8    Spaulding, came to meet with you, describe what happened.

9    A.   We went to the student parking lot to talk privately.

01:52 10   Ahmad, Dan Maldonado, and I got out of the car.  We left Dan

11   Spaulding in the car to kind of talk about what happened.

12   Ahmad gave me some details.  I asked if it's cool -- we left

13   Dan Spaulding in the car because -- I guess not to share with

14   him all the details.  I was a little surprised that Dan

15   Maldonado was there.  I asked Ahmad, Is it cool?  Is it okay

16   we're talking about this in front of him?  Ahmad said yes.

17   Ahmad told me a little bit of the detail of his trip.

18   Q.   Did he tell you about Yemen?

19   A.   He told me about Yemen and his travels afterwards.

01:52 20   Q.   What did he tell you?

21   A.   He told me that there was nothing in Yemen.  That's all I

22   remember from him.  He said there was nothing in Yemen.  He

23   continued on, wanted to get into Iraq.  He told me he spent

24   some time in Jordan.  And then after that he took a -- he just

25   took a bus into Iraq.  So I asked him how he -- how do you do

1    that?  He said he just got on a bus and he went into Iraq.

2    Q.   And this is in 2004 when the American forces were there?

3    A.   Yes.

4    Q.   Did he tell you what happened when he got into Iraq?

5    A.   He said that he found a group of people that were

6    fighting, but they wouldn't let him do anything.  So he stayed

7    in the apartment for two weeks.  After he didn't do anything,

8    they said they wouldn't let him do anything, he said he

9    returned back.

01:53 10   Q.   Did he refer to those people by any name?

11   A.   I think he said they were Sufis or something like that,

12   not any type of mujahideen group or anything like that.  Just a

13   bunch of Sufis fighting.  They wouldn't let him do anything.

14   They didn't trust him so he came back.

15   Q.   What does the term "Sufi" mean?

16   A.   It's just like a group of -- it has various levels, people

17   that follow a more ascetic lifestyle, more spiritual, but

18   sometimes bordering on mysticism and being far out.

19   Q.   Did Mr. Maldonado say anything?

01:54 20   A.   About the --

21   Q.   During this conversation.

22   A.   About Iraq -- about the trip?

23   Q.   About anything.

24   A.   At some point, we were talking about -- Ahmad was talking

25   about his -- the difficulties he was going through with his

```
 1   wife.  Danny mentioned something about his wife.

 2   Q.   You also talked about things other than the trip?

 3   A.   Yes.

 4   Q.   What else did you talk about?

 5   A.   That's the only other --

 6        MR. CARNEY:  I object, your Honor.

 7        THE COURT:  Well, as a topic, you may have a general

 8   answer as to what topics, and then we'll see what the next

 9   question might be.

01:55 10   Q.   Were there any other topics?

11   A.   No, not that I can recall.

12   Q.   Did he say how long he was in Iraq?

13   A.   He told me two weeks.

14   Q.   Did he say why he returned?

15   A.   Yes.

16   Q.   What did he say?

17   A.   He said they weren't letting him fight.  They weren't

18   letting him do anything.  So he just decided to come back.

19   Q.   Did you have contact with Abousamra after that meeting, I

01:55 20   guess, through to the summer of 2006?

21   A.   Not that I can recall.

22   Q.   Now, you described earlier that you were interviewed by

23   the FBI in August of 2006?

24   A.   Yes.

25   Q.   Did your views on Jihad change over that time?
```

1    A.    By that time, yes.

2    Q.    How did they change?

3    A.    Well, the -- I talk about it in two senses.  You have the

4    kind of academic level and the -- talk about it in that sense.

5    That's remained the same.  It's part of religion.  I don't deny

6    anything, the religion.  But being part of the movements that

7    were going on with al Qa'ida and the other groups, they no

8    longer -- seeing it maybe independently or seeing it over time,

9    they didn't seem like the correct way to -- they didn't seem --

01:56 10   they don't seem correct to me.  Over time, I kind of came to

11   that realization.

12   Q.    Okay.  I'm going to bring you back now to the period that

13   we skipped over back when you had a different view of Jihad.

14   Let's do that -- let's bring you back to 2002 when you came

15   back from Jordan.  You mentioned earlier that you had discussed

16   the September 11th attacks with the defendant and Abousamra?

17   A.    Yes.

18   Q.    Do you recall having a specific conversation with the

19   defendant about the September 11th attacks?

01:57 20   A.    Yes.

21   Q.    What do you recall about that conversation?

22   A.    One question that -- people say, Where were you on

23   September 11th?  This was -- How did you react to the news?

24   How did you hear about it?  They described where they were and

25   when they heard about it.

1    Q.   What did they tell you?

2    A.   They told me that they were at a Dunkin' Donuts together.

3    It came on the news.  And that's the time that they heard about

4    it.

5    Q.   What was their reaction?

6    A.   The defendant told me that they were trying to suppress

7    their smiles.

8    Q.   Did you feel the same way?

9    A.   At the time, yes.

01:58 10   Q.   You mentioned the justifications that you had for the

11   attack, yesterday.  Did you share your views with regards to

12   your justifications why those attacks were justified?

13   A.   Yes.

14        MR. CHAKRAVARTY:  Can we call up Exhibit 347?

15   Q.   Does this appear to be an email from the defendant to

16   Abousamra back in February of 2002?

17   A.   Yes.

18   Q.   Entitled, "We Will Never Forget"?

19   A.   Yes.

01:58 20   Q.   And then does it appear to be a poem about September 11th?

21   A.   Yes.

22        MR. CHAKRAVARTY:  Go to Exhibit 352.

23   Q.   Is this an email from the defendant to a number of people

24   on September 11, 2003?

25   A.   Yes.

1    Q.    Is this entitled, "Tribute"?

2    A.    Yes.

3    Q.    Does it say, "September 11th tribute to innocent victims

4    of terrorism"?

5    A.    Yes.

6    Q.    And then does this discuss Muslims who have been killed by

7    American and allied forces?

8              MR. CARNEY:  I object.  If the prosecutor wants to

9    refer to this, it's all a whole, and I would ask that the

01:59 10   entire email be read, please, rather than pick a sentence here,

11   pick a sentence there.

12             MR. CHAKRAVARTY:  Your Honor, I'll withdraw the

13   summary-type question that I give him, and I'll ask him to read

14   specific sentences.

15             MR. CARNEY:  I'm asking that he read --

16             THE COURT:  It's a context question.

17             MR. CARNEY:  It's the rule of --

18             THE COURT:  How long is it?

19             MR. CHAKRAVARTY:  It's two pages long, your Honor.

02:00 20        MR. CARNEY:  He would be reading one page worth, your

21   Honor.

22             MR. CHAKRAVARTY:  Your Honor, we'll skip it.

23             THE COURT:  Not reading it myself, I can't tell

24   whether completeness is necessary or not.  If you want, I'll do

25   it.

1    MR. CHAKRAVARTY:  We'll read it maybe through another

2    witness, your Honor.

3    MR. CARNEY:  I'd like to have it read now because this

4    is when it's brought up.

5    THE COURT:  If the question is withdrawn, then you can

6    address it on cross.

7    Q.   Are you familiar with the concept of collective duty in

8    Islam?

9    A.   Yes.

02:00 10   Q.   You were referring to earlier an academic level.  You

11   still believed in Jihad back in 2006.  What is collective duty

12   in Islam?

13   A.   It's a duty upon the entire Muslim nation as opposed to --

14   it's something that has to be fulfilled by some number -- it

15   has to be fulfilled by the community, which is different than

16   an individual responsibility, which means it has to be

17   fulfilled by each and every individual or somebody

18   specifically.

19   Q.   For an individual duty, is there an Arabic phrase for

02:01 20   that?

21   A.   Yes.

22   Q.   What is that?

23   A.   Fardayn.

24   Q.   F-a-r-d-a-y-n?

25   A.   Yes.

1   Q.   Now, after you returned to the United States from Jordan

2   and after September 11th, did you discuss your collective

3   sentiments with regards to American soldiers?

4   A.   Excuse me.  When I returned back --

5   Q.   I asked you yesterday, before you left for Jordan, did you

6   talk about American soldiers and what your feelings were toward

7   them?  I think you said you didn't?

8   A.   Correct.

9   Q.   When you returned from Jordan, and after September 11th,

02:02 10   after the invasion in Afghanistan, did you have conversations

11   with the defendant and Abousamra about American soldiers?

12   A.   Yes.

13   Q.   What was your collective feeling about that?

14   A.   Well, we had the -- kind of prior to the Iraq invasion,

15   afterwards -- could you clarify the time frame, please?

16   Q.   Between 2002 and 2004 when you left for Yemen.

17   A.   Prior to the Iraq invasion or --

18   Q.   2003 was the Iraq invasion, so -- was there an inflexion

19   point there?

02:02 20   A.   Yes.

21   Q.   When was that?

22   A.   With the invasion of Iraq.

23   Q.   What was your feeling?

24   A.   At what time?

25   Q.   After the invasion of Iraq.

1  A.   After the invasion of Iraq, our feeling was that the --

2  like I said before, that America was at war with Islam, and we

3  saw the soldiers as being valid targets.

4  Q.   Did the internet play a role in developing your world view

5  at that time, between 2002 and 2004?

6  A.   Yes.

7  Q.   How so?

8  A.   I mean, it's difficult to -- I can just point to a

9  specific incident to which -- why I can't answer yes.  It's

02:03 10  tough to say overall with different influences.  But I remember

11  that in one of the pieces that Ahmad brought us, the

12  justifications of 9/11 were something that he had found online.

13  It was shown before in Clear Guidance.  He's bringing stuff

14  from other people online.

15  Q.   Did you participate in those discussions online?

16  A.   Yes.

17  Q.   What was your user name on Clear Guidance?

18  A.   Ibn Abishaiba.

19  Q.   You already mentioned Abu Sabaayaa and Sunaan (ph) and Abu

02:03 20  Muthanna.  Are you familiar with someone named Al Mizzi?

21  A.   The name is familiar.

22  Q.   From Clear Guidance?

23  A.   I believe so.

24  Q.   Now, after you returned from your trip, the planned trip

25  to Yemen, you mentioned that you had continued to stay online.

1    Aside from Islamic Networking, did you frequent other web

2    forums?

3    A.   And I've been on motorcycle forums and --

4    Q.   Other Islamic-based web forums.

5    A.   Not that I can recall.

6    Q.   Are you familiar with a website called Tibyan

7    Publications?

8    A.   Yes.

9    Q.   Back in 2004, 2005, how were you familiar with that

02:04 10   website?

11   A.   My understanding of -- after Clear Guidance shut down and

12   the owner brought it back up as Islamic Networking, there was

13   --

14              MR. CARNEY:  I object, your Honor.

15              THE COURT:  Overruled.

16              MR. CARNEY:  May another question be put to him,

17   please?

18              THE COURT:  The question was -- how was the witness

19   familiar with Tibyan, I think was the question.  I think he

02:04 20   started to explain that.  I think that's permissible.

21              MR. CARNEY:  He said Tibyan was shut down or Clear

22   Guidance was shut down.

23              THE COURT:  Clear Guidance was shut down.  Start

24   again, Mr. Chakravarty.

25              MR. CARNEY:  I apologize.  I withdraw that.

```
 1    Q.   How were you familiar with Tibyan Publications?

 2    A.   The name would be mentioned on the forum that I was part

 3    of, Islamic Networking.  They would be mentioned.  They would

 4    be posting stuff, links back to their forum.  I can -- my

 5    understanding of it was, after Clear Guidance was shut down and

 6    the owner brought it back up as Islamic Networking, it was a

 7    milder -- it had a milder tone to it.  It wasn't, as people

 8    would call it, Jihadi.  So some of the people -- a lot of that

 9    stuff -- Jihadi stuff that was taken out found its home at

02:05  10  Tibyan Pubs.

11    Q.   So the legacy of Clear Guidance was kind of --

12              MR. CARNEY:  I object.

13              MR. CHAKRAVARTY:  I'll rephrase.

14              THE COURT:  Overruled.  You may summarize it.

15              MR. CARNEY:  Summarizing?

16              THE COURT:  In the context, I think it's permissible.

17    Go ahead.

18    Q.   Were there two separate websites that kind of had

19    different audiences?

02:06  20  A.   Yes.

21    Q.   And one was Tibyan Publications?

22              MR. CARNEY:  I object, your Honor.

23              THE COURT:  No.  Go ahead.  You can have it.

24    Q.   One was Tibyan Publications and one was Islamic

25    Networking?
```

```
 1    A.    Yes.

 2    Q.    So you saw links to Tibyan Publications --

 3    A.    Yes.

 4    Q.    -- on Islamic Networking?

 5          Were you a member of Tibyan Publications?

 6    A.    To the best of my knowledge, I was not.

 7    Q.    Is it possible that you were at some point?

 8    A.    It is possible.

 9    Q.    Is that just because you can't remember?

02:06 10    A.    Correct.

11    Q.    Did you watch Jihad videos back in --

12          MR. CARNEY:  Did the witness answer?

13          THE COURT:  Apparently the reporter heard him answer

14    because it showed up on the text.  I didn't hear it.

15    Q.    What was your answer to that?

16    A.    What was the question?

17    Q.    Is it possible that, despite your recollection, that you

18    may have been a member of Tibyan Publications?

19    A.    It's possible for anything to happen.

02:07 20    Q.    Do you think you were a member?

21    A.    I don't believe I was.

22    Q.    Did you have a user name and a password?

23    A.    I don't recall.

24          THE COURT:  Mr. Chakravarty, if you're going to move

25    on to a different topic, we'll take the morning recess at this
```

        1    stage.

        2    (Recess taken at 11:02 a.m.)

        3            (After recess:)

        4            THE CLERK:  All rise for the Court and the jury.

        5            (The Court and jury enter the courtroom at 11:30 a.m.)

        6            THE CLERK:  Please be seated.

        7            MR. CHAKRAVARTY:  Thank you, your Honor.

        8    BY MR. CHAKRAVARTY:

        9    Q.   Mr. Abuzahra, back before your trip in 2004 between the

02:35  10    time -- in the time you had known the defendant and

       11    Mr. Abousamra, did you watch jihad videos?

       12    A.   Yes.

       13    Q.   What is a jihad video?

       14    A.   It's a term that other people use to describe these

       15    videos, usually the content of which shows various speeches by

       16    certain people, scholars or -- I don't know, generals or

       17    something like that.  They show different scenes of -- maybe

       18    scenes of action, scenes of training.  That's generally the

       19    content.

02:36  20    Q.   All in the context of jihad?

       21    A.   Yes.

       22    Q.   And what was your understanding of the purpose of these

       23    videos?

       24    A.   Twofold:  One, for --

       25            MR. CARNEY:  I object.

1          THE COURT:  Sustained.

2     BY MR. CHAKRAVARTY:

3     Q.    What was your reaction to these videos?

4     A.    For me, I didn't -- it wasn't -- my personal reaction

5     wasn't -- I watched them more for the -- the informational

6     value, I mean, they put forth.  Whatever the purposes people

7     put forth for them, a lot of it -- you know, the scenes of

8     action and things like that, they feel like this is the way to

9     get news from the other side and not just, like, a one-sided

02:37 10     report.  So that was my reaction.

11     Q.    Was there an emotional impact on you?

12     A.    Not too much.

13     Q.    Describe the defendant and Abousamra's reactions during

14     these videos.

15     A.    They would sometimes get excited about them.  They would

16     often want to put them on.  At some point there was one that

17     had a person in there that looked like Ahmad.  So they were

18     kind of, "Hey, look at this.  This person looks just like

19     Ahmad."  Another time they -- on the video they saw someone

02:37 20     that kind of looked like me from the back.  And it was, "Hey,

21     Kareem, we saw you on a video.  You didn't tell us."  And they

22     kind of showed me that -- the part where the person marching

23     behind did bear a resemblance to me.

24     Q.    How frequently would you watch these videos with the

25     defendant and Abousamra?

1    A.    Not too often.  Maybe once a month, on average, or less.

2    Q.    And where would you watch these videos?

3    A.    Usually at his house or somebody else's house.

4    Q.    When you say "his," you're talking about the defendant?

5    A.    Yes.

6    Q.    Where would you get the videos?

7    A.    They could be downloaded online.  I know one instance that

8    the defendant told us that he purchased one through mail order,

9    through, I believe, Azzam Publications.

02:38 10    Q.    Azzam Publications?

11    A.    Azzam, yeah.

12    Q.    Did you ever have any of these videos?

13    A.    I watched some -- there were some that are online.

14    Sometimes there's a clip of them on the forums.  I believe it's

15    possible I could have copied one of them to my hard drive.

16    Q.    Do you recall ever downloading or ordering any of these?

17    A.    I never ordered anything online.  That didn't seem like

18    good security, or for any kind of precautionary measure.  I

19    could have downloaded them; I don't recall.

02:38 20    Q.    About how many times do you think you watched videos with

21    the defendant and Abousamra?

22    A.    On average once a month, maybe less.

23    Q.    That's during the course of your relationship up to the

24    time that you went to the -- the trip to Yemen?

25    A.    Probably -- I don't think we watched it that often prior

1    to -- after we returned back from Jordan.

2    Q.    So it was earlier in your relationship?

3    A.    Well, between, like, 2002 to 2004.

4    Q.    How about before you left for Jordan, did you watch these

5    videos?

6    A.    I don't recall.

7    Q.    You mentioned one video that was obtained from Azzam

8    Publications.  What do you know about Azzam Publications?

9    A.    Kind of the word on the forums was they had these

02:39 10   jihadi-type --

11             MR. CARNEY:  Objection, your Honor.

12             MR. CHAKRAVARTY:  Not for the truth, your Honor, just

13   what his understanding was of the forum.

14             THE COURT:  Sustained.  Sustained.

15   BY MR. CHAKRAVARTY:

16   Q.    Did you have some familiarity with what Azzam Publications

17   was, without telling us what that understanding was?

18   A.    Yes.

19   Q.    Did you ever discuss Azzam Publications with the defendant

02:40 20   and Abousamra?

21   A.    Briefly.

22   Q.    What did you -- what was the topic of that discussion?

23   A.    The video issue ordered.

24   Q.    What about that?

25   A.    That it didn't seem like a wise move to purchase things

1    online and have it shipped to your house from that online

2    store, whatever.

3    Q.   Do you remember watching a video with the defendants

4    called "State of the Ummah"?

5    A.   Yes.

6         MR. CHAKRAVARTY:   Your Honor, we prepared a short

7    series of clips of this video which I would like to publish

8    now.

9         Cue up to 450.  Let's play it in sequence.

02:40 10         (Clip of Exhibit No. 450 published to the Court and

11   jury.)

12        MR. CHAKRAVARTY:   Next clip, please.

13        (Clip of Exhibit No. 450 published to the Court and

14   jury.)

15        MR. CHAKRAVARTY:   Next clip.

16        (Clip of Exhibit No. 450 published to the Court and

17   jury.)

18   BY MR. CHAKRAVARTY:

19   Q.   Do you recognize watching this video back then?

02:43 20   A.   Yes.

21   Q.   Did this video have any effect on you?

22   A.   It's tough to recall exactly what things had effect on me.

23   I mean, I remember seeing it.  I can't state that it had an

24   effect on me.  I can't -- I don't recall.

25   Q.   Okay.  And this was all in that period where you were

1    becoming more religious?

2    A.    No.  This was kind of after -- like between 2002 and 2004.

3    Q.    So it was after you were already religious and you were

4    focusing more on jihad?

5    A.    Yes.

6              MR. CHAKRAVARTY:  You could take that down.

7    Q.    When you were discussing jihad with the defendant and

8    Abousamra, did you always agree on everything?

9    A.    No.

02:44 10   Q.    Did you disagree on some things?

11   A.    Yes.

12   Q.    Describe what happened when you would disagree.

13   A.    When we disagreed we'd talk about it sometimes, and

14   sometimes we would voice -- and Ahmad was usually the one who

15   would have the most -- I don't know if the term "extreme" is

16   correct or not, but what I would classify as being the more

17   extreme opinion.  Sometimes we would dissent -- the defendant

18   and I would dissent without discussing with him; sometimes I

19   would have a dissension.  I recall the defendant's opinion

02:44 20   where we talked about it.

21             Ahmad usually had -- he was the most voluble among us.

22   He was usually able to testify to things or bring some evidence

23   that we weren't aware of, but on some things I kind of -- I

24   just stuck to my opinion.

25   Q.    And when you had discussions about jihad, you all were

1    participating in these conversations?

2    A.   Yes.

3    Q.   And did each of you express your own views and ideas?

4    A.   Yes.

5    Q.   If you differed on a justification for a certain act,

6    would you --

7              MR. CARNEY:  I object, your Honor.

8              THE COURT:  Leading?

9              MR. CARNEY:  Yes, your Honor.

02:45 10             THE COURT:  Yes.  Sustained.

11   BY MR. CHAKRAVARTY:

12   Q.   How would you express -- do you remember any specific

13   instances of expressing disagreement on a particular view?

14   A.   Yes.

15   Q.   Describe that.

16   A.   When the topic of jihad and what they're doing are -- what

17   they call martyrdom operations, where someone blows themselves

18   up when they're carrying out an attack, my view is that the

19   person is killing themselves.  Even though they have the

02:45 20   collateral damage, the primary target is themselves and not the

21   enemy.  I remember Ahmad's view was that it is completely

22   allowed and it is an okay operation.

23   Q.   Do you remember what the defendant's view was?

24   A.   I do not.

25             MR. CHAKRAVARTY:  Would you call up Exhibit 349,

```
 1   please.
 2   Q.   Is this an Arabic-language email on November 7, 2003, from
 3   the defendant?
 4            MR. CARNEY:  I object.
 5            May we approach, please?
 6            THE COURT:  All right.
 7            (Discussion at sidebar and out of the hearing of the
 8   jury:)
 9            MR. CARNEY:  I believe the last question was:  "Do you
02:46 10  remember what the defendant's view was?"  "Answer:  No."
11            If the government wants to show him something to
12   refresh his recollection, I don't object to that, but I do
13   object if they're now going to present some independent
14   evidence to say, "Okay.  Well, this was the defendant's view."
15            MR. CHAKRAVARTY:  It's not to refresh his
16   recollection; it's just to read from an exhibit that's in
17   evidence.
18            MR. CARNEY:  But it's not appropriate to put it in
19   through this witness now.
02:47 20           THE COURT:  It is in, right?
21            MR. CHAKRAVARTY:  It's not to refresh his
22   recollection.
23            THE COURT:  And unlike things that are usually used to
24   refresh recollection, they're not in evidence, and so only the
25   witness sees it.  But I don't think you have to hide something
```

 1    that is already in evidence.

 2              MR. CARNEY:  It would be like if this witness said

 3    something, and a previous witness has said something in this

 4    trial, that's in evidence.  So I can take that transcript and

 5    say, "Well, sir, another witness said something different."  I

 6    mean, if that's going to be how it is, then it's okay.

 7              MR. CHAKRAVARTY:  It's to put it in context.

 8              THE COURT:  What do you expect him to say about it?

 9              MR. CHAKRAVARTY:  He's just going to read it.

02:47 10              MR. CARNEY:  That's my point.

11              MR. CHAKRAVARTY:  And I'm going to ask him, "Does this

12    refresh your memory?"  It's something in evidence and it's to

13    put it into context as something he didn't know.

14              MR. CARNEY:  It's already in evidence.

15              THE COURT:  I don't think you can just interpose

16    commentary, which is what it amounts to.  If he was going to be

17    asked about it and say, "Yes, I remember it now," that's a

18    different story.  But if it's just an opportunity to make an

19    argument, basically, to the jury that this is another piece

02:48 20    that would fill the gap --

21              MR. CHAKRAVARTY:  Respectfully, your Honor, this is

22    juxtaposing another piece of evidence.

23              THE COURT:  That's right.  It's addressed to the jury

24    rather than the witness.

25              MR. CHAKRAVARTY:  Isn't that the purpose, to try to --

```
 1            THE COURT:  You get your chance at some point in the

 2       trial but not during the examination of the witness,

 3       necessarily.  I mean, there are situations.  But if that's all

 4       it is, then I think the objection is sustained.

 5            MR. CHAKRAVARTY:  Okay.  I'll just note the objection.

 6       Thank you.

 7            Note my objection.  Please note my objection, I meant

 8       to say.

 9            (In open court:)

02:48 10  BY MR. CHAKRAVARTY:

11       Q.   I'll address this to somebody else, Mr. Abuzahra.

12            MR. CHAKRAVARTY:  Take this off, please.

13       Q.   Do you recall the defendant generally voicing disagreement

14       with either Abousamra or yourself?

15       A.   In general or in a specific --

16       Q.   Generally, not in a specific instance.

17       A.   Based on a specific instance, I would say at times he

18       would voice his dissent if he had it.

19       Q.   How frequently would the three of you hang out back in

02:49 20  2002-2003?

21       A.   About once a week.

22       Q.   And was it primarily just the three of you?

23       A.   Oftentimes Hassan would be there.

24       Q.   I'm sorry.  Hassan would be there?

25            MR. CARNEY:  I'm sorry, your Honor.  I didn't get the
```

1    end of the answer.

2              THE COURT:  I think the next question was to ask that.

3              MR. CHAKRAVARTY:  Right.  I was just trying to clarify

4    that.

5    BY MR. CHAKRAVARTY:

6    Q.    Did you say oftentimes Hassan would also be there?

7    A.    Yes.

8    Q.    Do you recall your -- the first topic of your discussion

9    when you brought up -- when you discussed training camps,

02:49 10   approximately when that was?

11   A.    2001.

12   Q.    Okay.  And in what context?

13   A.    We knew that Hassan, through his extended family, he had

14   some kind of rote contacts.  He knew more about the ones in

15   Pakistan.  So we asked him some questions on, you know, the

16   types of training that they do there.  What type of training

17   they do, how it's compared to the army training.

18   Q.    And did he tell you?

19   A.    Yes.

02:50 20   Q.    What was your understanding about how he knew about that?

21   A.    It was through not immediate family members but through

22   extended family; there were some ties there.

23   Q.    Do you know what those ties were?

24   A.    No.

25   Q.    And what country was that in?

1    A.    Pakistan.

2    Q.    And so what did he tell you about the training there?

3    A.    They do physical training; they get small arms training.

4    Q.    And did you discuss with the defendant, Abousamra, the

5    desire to obtain training there?

6    A.    I don't think we discussed it in a kind of specific

7    actionable sense.

8    Q.    Okay.  So what did you discuss about it?

9    A.    One thing that was brought up was if you wanted to get to

02:51 10   one of the -- to a camp in Pakistan -- get to Pakistan --

11   Americans need visas to get there.  Hassan said that if -- you

12   know, the easiest thing to do is just say you're going to a

13   wedding.  Print out a wedding invitation.  And that's just an

14   easy way to get a visa to get into Pakistan.

15   Q.    What did you perceive as the value of getting that kind of

16   training back then?

17   A.    The end result of being able to get into a place where

18   they were fighting jihad.  So specifically in Pakistan, getting

19   to Kashmir.

02:52 20   Q.    That's back in 2001?

21   A.    Yes.

22   Q.    So this was before September 11th?

23   A.    Yes.

24   Q.    Before Americans were in Afghanistan?

25   A.    Yes.

1    Q.   Aside from your conversations with Mr. Masood, do you know

2    whether there were any other steps taken for purposes of

3    getting training in Pakistan?

4    A.   Could you restate the question?

5    Q.   Sure.  Aside from the conversation with Mr. Masood, were

6    there any other conversations that you had in preparation

7    or -- as a step to go to Pakistan?

8    A.   In 2001?

9    Q.   In 2001.

02:52 10   A.   No.

11   Q.   And you went to Jordan?

12   A.   Yes.

13   Q.   When you returned from Jordan in 2002, did you have

14   conversations with the defendant and Abousamra about Pakistan?

15   A.   Yes.

16   Q.   And describe those conversations.

17   A.   The defendant -- not the defendant -- Ahmad Abousamra --

18   well, in discussions with them, Ahmad Abou- -- I found out that

19   Ahmad Abousamra had gone to Pakistan looking for those --

02:53 20   trying to get to one of those camps.

21   Q.   And did he tell you what happened when he got there?

22   A.   If he -- I don't recall the details of the trip.

23   Q.   Did he tell you about the trip?

24   A.   I don't recall if I spoke with him or the defendant about

25   it.

1   Q.   What information did either the defendant or Abousamra

2   tell you about Abousamra's trip?

3   A.   The only thing I can remember -- and there were two trips

4   that Ahmad took to Pakistan.  I wasn't there for the first one,

5   so I remember mostly the second one.  At one point the

6   defendant told me that he was called to Ahmad's -- Ahmad's

7   father called the defendant to talk to him, but I don't recall

8   if that was after the first trip or the second trip.

9   Q.   And what happened?  What did the defendant tell you about

02:53 10   that interaction?

11   A.   Just that it was uncomfortable.  His father, you know,

12   called him in and said, you know, "Where's my son?"  Kind of

13   the same stuff that I had to deal with when I spoke to his

14   father.  Then -- it had already happened months before I got

15   back so I didn't -- I don't really remember too many details

16   about that.  That's the only thing that I can remember, is that

17   he was asking about his son.  The defendant didn't have any

18   knowledge.  And that's the best I can recall about that.

19   Q.   So between when you got back from Jordan in the summer of

02:54 20   2002 through the end of 2002 did you discuss Pakistan again?

21   A.   I don't recall the exact time frame, but after 2002.

22   Q.   So describe those conversations.

23   A.   Ahmad expressed his desire to go to Pakistan again to

24   again try to get into a camp.

25   Q.   And did you talk about that, the three of you -- four of

1    you?

2    A.   We had discussions -- I don't remember any group

3    discussions prior to his leaving.  I remember bits and pieces.

4    I can't say -- I can't recall exactly we all sat down as a

5    group and talked about it.

6    Q.   So who do you know was aware of this second trip?

7    A.   It would be the defendant, myself, Ahmad Abousamra and

8    Hassan.

9    Q.   So you remember specifically each of them being part of

02:55 10  the conversation; you just don't know whether you were all

11   together?

12   A.   Yes.

13   Q.   Do you recall what Abousamra's family situation was at

14   that time?

15   A.   I'm not [sic].

16   Q.   In preparation for his trip did you give him anything?

17   A.   I gave him some money.

18   Q.   About how much?

19   A.   About $500.

02:55 20  Q.   Why?

21   A.   I would say to help -- I wasn't going with him.  At that

22   time I wasn't prepared to take the stuff myself.  I gave it to

23   him as kind of my way of participating in jihad.  I gave it to

24   him to pass on to any groups he could find.

25   Q.   So it wasn't necessarily for his use but, rather, to give

```
 1   to somebody else over there?

 2   A.   Yes.

 3   Q.   So did he go to Pakistan?

 4   A.   Yes.

 5   Q.   And did he return at some point?

 6   A.   Yes.

 7   Q.   And did you talk to him after he returned?

 8   A.   Yes.

 9   Q.   Was the defendant there as well?

10   A.   Yes.

11   Q.   And what did he tell you?

12   A.   He told us the details of his trip; in fact, that he

13   returned -- that he wasn't successful.  And he gave us the

14   details of his trip and --

15   Q.   So were you and the defendant supportive of his trip?

16   A.   Yes.

17   Q.   Was it consistent with your shared mind-set at that time?

18   A.   Yes.

19   Q.   And what did he tell you happened when he got there?

20   A.   He said that he was -- he didn't give us a narrative.  He

21   gave us some narrative.  We asked questions, but I'm going to

22   present it in narrative form.  So he was taking the bus from

23   one place to another place and he found -- he saw

24   some -- because I asked him, you know, "How do you find" -- he

25   said he had found a contact.  I said, "How do you find a
```

1    contact with a person in a country that you don't even speak

2    the language?"

3         So he said he was driving in a bus and he saw -- he

4    saw some writing on a wall in Arabic that was supportive of

5    jihad, and he wanted to kind of gauge the person sitting next

6    to him to kind of see if this person would help.  So he asked

7    him, you know, "Do you know what that says?  Can you read it?"

8    or something like that.  For whatever reason, this kind of

9    worked.  It helped.  The other person was supportive.

02:57 10       So he -- this person kind of took him around to the

11   various training camps trying to help him get in.  In the end

12   what Ahmad told us was that the training camps -- Ahmad said

13   that after 9/11 -- or after the invasion of Afghanistan, the

14   Pakistani government has been cracking down on the training

15   camps and they are not taking any foreigners at this time.

16   Q.   And just to clarify, they speak some language other than

17   Arabic in Pakistan.  Is that right?

18   A.   Yes.

19   Q.   And what ancestry was Abousamra?

02:58 20  A.   He was Syrian.

21   Q.   So that's an Arabic extraction versus South Asian

22   extraction?

23   A.   Yes.

24   Q.   Did Abousamra tell you the name of this person, this

25   contact that he made there?

1   A.   I believe the name was -- I don't know if it was his name

2   or a kunya, like we were talking about before, but he said his

3   name was Abu Majid.

4   Q.   Abu Majid?  Did he tell you any of the particular

5   organizations whose training camps he went to?

6   A.   We asked him, you know, which groups he found, you know,

7   which place he was able to get to.  The two that I remember was

8   Jamaatil-Islaami and Lashkar-et-Tayyiba.

9   Q.   Do your best to spell those for the court reporter.

02:58 10   A.   Lashkar-et-Tayyiba would be L-A-S-H-K-A-R - E-T -

11   T-A-Y-Y-I-B or E-B *[sic]*; Jamaatul-Islami:  J-A-M-A-A-T-I-L -

12   I-S-L-A-A-M-I.

13   Q.   Did he tell you about any other groups that he may have

14   met with?

15   A.   Yes.  He said that he -- I forget which one, but he said

16   he met with someone from either the Taliban or al Qa'ida.  And

17   he tried to get -- you know, "Take me with you," just kind

18   of -- even without the training, but they said they wouldn't

19   take him without the training.

02:59 20   Q.   And you knew all this information before you went on your

21   trip to Yemen?

22   A.   Yes.

23   Q.   This Abu Majid person, did you come up with a name for

24   him, the three of you?

25   A.   Yes.  We -- I think it started as a joke and then we kind

1    of just stuck with it.  We just called him "John."

2    Q.    Why did you give him this name "John"?

3    A.    Just -- I think -- I guess like we started saying it

4    jokingly.  We didn't want to mention -- you know, for the same

5    reason about -- concern about security, whatever.  We said,

6    "Maybe we should just come up with a name.  We'll just call him

7    'John.'"  So we just kind of -- we started with that and then

8    it just kind of stuck and we just started calling him "John."

9    Q.    So did you discuss John again after Abousamra returned?

03:00 10    A.    Yes.

11    Q.    In what context?

12    A.    So Ahmad told us that he agreed with John -- or Abu

13    Majid -- and that he'd still try to talk to other camps, try to

14    talk to other people, see if he can get -- he can find a way

15    for Ahmad to get in.  So Ahmad was going -- you know, the plan

16    was that Ahmad would periodically call him to see if anything

17    had changed, the situation had changed, in which case he would

18    return to Pakistan.

19    Q.    Did he, in fact, maintain contact with John?

03:00 20    A.    I believe he spoke to him a few times.

21    Q.    How do you know that?

22    A.    He told us.

23    Q.    Based on his conversations with John, was he successful in

24    getting contacts?

25    A.    No.

1    Q.   Shifting gears.  Back to 2006 now.  You returned from your

2    trip that you peeled off on to Yemen, that you peeled off in

3    Abu Dhabi, and you described some changes that you were going

4    through.  Did you continue to maintain an online presence?

5    A.   Yes.

6    Q.   And you described your relationship with the defendant and

7    Abousamra had changed.  Did you continue to post on the

8    internet?

9    A.   I continued to -- I continued to post, yes.

03:01 10   Q.   Which website -- which web forum particularly?

11   A.   Islamic Networking.

12   Q.   Did you have a particular name on Islamic Networking at

13   that time?

14   A.   Yes.

15   Q.   And what was that?

16   A.   Prof, P-R-O-F.

17        MR. CHAKRAVARTY:  Pull up Exhibit 499?  Go to page 5.

18   Q.   In this communication does Mr. Mu'ndhir say, "Did you see

19   Prof deleted the thread again in current affairs?  I feel like

03:02 20   meeting that guy in a street corner, man."  And then the person

21   with the Arabic name -- it translates to something like "Need

22   for Allah" or "The Poor for Allah," "May Allah delete him."

23   And then Abu Mu'ndhir says, "Amen."

24        And then the defendant says, "I mean his evil, not

25   like.  Kill him."  And Abu Mu'ndhir says, "Yeah, brother.  I

1    remember when he was making those sly remarks to those who were

2    saying that they should go out and do their duties.  I swear it

3    was disgusting."  And the defendant says, "Hey, well, hopefully

4    we were mistaken and he was being serious."

5          And Abu Mu'ndhir asks, "Laugh out loud.  Who is this

6    guy anyway?  Like has anyone met him to confirm that he is

7    actually a Muslim?"  And then the defendant says, "Well, I

8    thought that he was a close personal friend of mine at first

9    who used to be J but abandoned the method, but I am not sure."

10   Who are they talking about in this communication?

11   A.   I believe they are talking about me.

12   Q.   What were you doing on Islamic Networking in 2006?

13   A.   I was moderating the forum.

14   Q.   How were you moderating the forum?

15   A.   I'm not sure how aware the jury is, or the Court is of

16   what that entails, but it's kind of keeping order of the forum,

17   enforcing the forum rules.  So part of keeping order, I came up

18   with the guideline of rules to follow, one of which -- or this

19   person and a few other people that I kind of knew were on the

20   Tibyan-Pubs was that -- the rule was not allowing any material

21   that would incite violence or call for anything that would

22   incite violence in any way, shape or form, which meant jihad.

23   We didn't want break any laws.  So any kind of threads that

24   were calling for jihad I would delete right away.

25   Q.   So at the bottom where the defendant says, "I thought that

1    this was a close personal friend of mine at first who used to

2    be J" --

3            What did you understand "J" to mean?

4    A.    Jihadi.

5    Q.    -- "but abandoned the method," the manhaj, what does that

6    mean?

7    A.    Like I was talking about before and I believe yesterday,

8    like the Salafi manhaj.  Like a Salafi-Jihadi.  So I kind of

9    abandoned the jihadi philosophy.

03:04 10         MR. CHAKRAVARTY:  Call up Exhibit 502, page 3, please?

11   Q.    Is this another conversation where the defendant says,

12   "Okay.  I think the Abu Anas takes precedence because the wa

13   yakoon -- and it will be very -- is very similar to GUH."  Abu

14   Mu'ndhir says, "Yeah."  The defendant says, "Okay.  So can a

15   brother transcribe it?"  And Abu Mu'ndhir says, "Yeah, I will

16   get someone to, inshallah."  And then the defendant says,

17   "Awesome.  Then we can send it to Prof personally."  Then Abu

18   Mu'ndhir says, "Laugh out loud."

19           Again, who are they referring to?

03:05 20   A.    Me.

21   Q.    And were you familiar with wa yakoon or GUH or Abu Anas?

22   A.    I don't recall those.

23   Q.    And so what did you understand this conversation to be

24   about?

25           MR. CARNEY:  I object.

1          THE COURT:  Sustained.

2     BY MR. CHAKRAVARTY:

3     Q.   Is this -- so you're not familiar with any of those

4     particular pieces of wa yakoon, GUH and Abu Anas?

5          MR. CARNEY:  Objection.  Asked and answered.

6          THE COURT:  You may answer it.

7     BY MR. CHAKRAVARTY:

8     Q.   Are you familiar with any of those three things?

9     A.   Do you know what the abbreviation "GUH" stands for?

03:06 10          MR. CARNEY:  I object, your Honor.  I think we should

11     have the questions going one way.

12          MR. CHAKRAVARTY:  I would agree with that, but I'll

13     clarify because there seems to be a misunderstanding.

14          THE COURT:  Go ahead.

15     BY MR. CHAKRAVARTY:

16     Q.   The "Expedition of Umar Hadeed."

17     A.   At this time I can't recall.

18     Q.   Okay.  And at the end of this Abu Mu'ndhir laughs out

19     loud, right?

03:06 20     A.   Yes.

21     Q.   "LOL" is an abbreviation for "laugh out loud"?

22     A.   Yes.

23     Q.   So you never received anything from the defendant

24     referring to those three things?

25     A.   Not that I recall.

1        MR. CHAKRAVARTY:  Can we go to Exhibit 661?  Go to

2    page 9, please.

3    Q.   In this conversation did the defendant say, "The brother

4    never responded to me personally.  He changed the subject, as

5    expected"?  And Dan Spaulding says, "He is an ignoramus."

6        MR. CARNEY:  I object, your Honor.

7        THE COURT:  No, go ahead.  I don't know what the

8    question is, but go ahead.

9    BY MR. CHAKRAVARTY:

03:07 10   Q.   "May Allah guide him.  Dan's article on intelligent talk,

11   is it real or for show?  It is pretty funny.  Did you read it?"

12   And the defendant says, "Parts of it.  He's sick of IN.  This

13   guy Prof keeps getting into dumb arguments with him."  And

14   Spaulding says, "Yeah, I had a run-in with Prof before."

15       Do you know who they're referring to as Prof in

16   this --

17       MR. CARNEY:  How would he know?

18       THE COURT:  Go ahead.  You may have it.

19       THE WITNESS:  Yes.  IN was the common abbreviation for

03:07 20   Islamic Networking.

21   BY MR. CHAKRAVARTY:

22   Q.   And were you frequently posting on Islamic Networking?

23   A.   Yes.

24   Q.   And was "Prof" your name on Islamic Networking?

25   A.   Yes.

         1    Q.   Were you familiar with Dan Spaulding on Islamic

         2    Networking?

         3    A.   No.

         4    Q.   You are familiar with Dan Spaulding?

         5    A.   Yes.

         6    Q.   But not necessarily on Islamic Networking?

         7    A.   Correct.

         8    Q.   So you don't know what his user name was?

         9         MR. CARNEY:  I object, your Honor.

03:08   10         THE WITNESS:  Correct.

        11         MR. CHAKRAVARTY:  Just laying the foundation for --

        12         MR. CARNEY:  It's a good cross-examination.

        13         THE COURT:  Well, it is leading but it was -- okay.

        14    Go ahead.

        15         MR. CHAKRAVARTY:  I'm done with that, your Honor.

        16    BY MR. CHAKRAVARTY:

        17    Q.   All right.  Now, so it's safe to say at the time of these

        18    posts you were in a different place than you were back in 2004

        19    and backwards?

03:08   20    A.   Yes.

        21    Q.   So in August of 2006, you mentioned yesterday, the FBI

        22    approached you?

        23    A.   Yes.

        24    Q.   And they interviewed you?

        25    A.   Yes.

Q.   And you told them about your trip to Yemen?

A.   I told them the cover story about our trip to Yemen.

Q.   And did they show you pictures during that interview?

A.   I don't recall if they showed me pictures at that first meeting.

Q.   Did they ask you who went with you?

A.   Yes.

Q.   Did they ask you whether you had coordinated with anyone for purposes of the trip?

A.   They asked me who I went with.

Q.   You mentioned yesterday that at some point you went and you talked to a lawyer --

A.   Yes.

Q.   -- after this meeting?

        After talking to your lawyer, did you come into the U.S. Attorney's Office and meet with us pursuant to the agreement that you're testifying pursuant to?

A.   Eventually.

Q.   Okay.  And after you did come in and you signed that letter, did you interview with the U.S. Attorney's Office and the FBI here with your lawyer?

A.   Yes.

Q.   And was that over a period of days?

A.   Yes.

Q.   After your meetings with the U.S. Attorney's Office and

1    the FBI, a couple of years later did you testify in the grand

2    jury?

3    A.   Yes.

4    Q.   Before you testified in the grand jury, did you meet with

5    us?

6    A.   Yes.

7    Q.   And did we go over the questions that we would be asking

8    you in the grand jury?

9    A.   Yes.

03:10 10   Q.   Did we ask you specific questions in the grand jury?

11   A.   Yes.

12   Q.   For your testimony here at trial, did you meet with us for

13   preparation?

14   A.   Yes.

15   Q.   And how many times would you estimate you met with us?

16   A.   Somewhere between five to ten times.

17   Q.   That's over a period of time?

18   A.   A couple of months.

19   Q.   And did we go over the questions that we would be asking

03:10 20   you yesterday and today?

21   A.   Yes.

22   Q.   Now, in between -- after you had met with the U.S.

23   Attorney's Office back in 2006 -- were you asked to participate

24   cooperatively proactively in this investigation?

25   A.   Yes.

1    Q.   And what did that entail?

2    A.   It entailed wearing a recording device.

3    Q.   And was this pursuant to the regulations of the FBI?

4    A.   I believe so.

5    Q.   Okay.  The procedures, I should say, that the FBI was

6    telling you?

7    A.   Yes.

8    Q.   And when you -- when they asked you to wear this device,

9    did you have some internal struggle about that?

03:11 10           MR. CARNEY:  I object.

11              THE COURT:  Overruled.

12              THE WITNESS:  Yes.

13   BY MR. CHAKRAVARTY:

14   Q.   Why?

15   A.   When I originally signed the immunity deal it was not of

16   my belief that I had to wear a wire.  I had no intention of

17   wearing it initially.  My voice was concerned afterwards to an

18   FBI agent -- sorry -- the ATF officer, and it didn't -- I

19   agreed to tell -- the initial agreement I took was to tell the

03:11 20  truth, and I had no problem telling the truth.  It was

21   difficult to go out and actively gather evidence.

22   Q.   And is that because of your religious beliefs?

23   A.   Religiously and on a personal basis.  We used to be best

24   friends.

25   Q.   Did you understand that it was your obligation to

1    cooperate pursuant to that agreement?

2          MR. CARNEY:  May we approach, please?

3          THE COURT:  All right.

4          (Discussion at sidebar and out of the hearing of the

5    jury:)

6          MR. CARNEY:  To be honest, Mr. Chakravarty is too

7    experienced a federal prosecutor to not know how to directly

8    examine a witness.  He's constantly leading.  He never heard of

9    the question, apparently, "What happened next?" or "What do you

03:12 10   think?" or "What did he say?" the normal direct examination

11   questions that you would see a basic law school team do.

12         And I don't mean to be personal about this, but I'm

13   fed up with all of the leading of the witnesses.

14         MR. CHAKRAVARTY:  Your Honor, I recognize I'm leading,

15   and it's due largely to facilitate the expression of the

16   testimony in a timely fashion.  But I will be more careful

17   about not leading.

18         MR. CARNEY:  That satisfies me.

19         THE COURT:  Okay.

03:13 20   MR. CHAKRAVARTY:  Thank you.

21         (In open court:)

22   BY MR. CHAKRAVARTY:

23   Q.   Did you come to an understanding as to what your

24   obligation was pursuant to the agreement?

25   A.   Yes.

1    Q.   And what was that?

2    A.   I was basically told by the officer at the time that if I

3    didn't go through with it, then everything I said would be used

4    against me.

5    Q.   So what did you do after they -- did you have an initial

6    experience of wearing a recording device?

7    A.   Yes.

8    Q.   And when was that, approximately?

9    A.   It might have been December, or maybe sooner.

03:14 10    Q.   2006?

11    A.   Yes.

12    Q.   How many times did you record meetings with the defendant

13    or Abousamra?

14    A.   I believe four or five times.

15    Q.   In preparation of your testimony, have you reviewed those

16    recordings?

17    A.   I have.  Can I modify the statement?

18    Q.   Sure.

19    A.   I also recorded telephone conversations in preparation to

03:14 20    make the meet -- to meet.

21    Q.   So would you clarify when you had the telephone

22    conversations?

23    A.   It would be prior to the meeting.

24    Q.   It was just to set up the meetings?

25    A.   Correct.

1  Q.   The recordings of the meetings with the defendant and

2  Abousamra, have you reviewed those?

3  A.   Yes.

4  Q.   Have you reviewed the transcripts of those?

5  A.   Yes.

6  Q.   And do those fairly and accurately capture the

7  conversations that occurred on the dates that are listed on

8  those transcripts?

9  A.   Yes.

03:15 10  Q.   I'm going to draw your attention first to December 13th of

11  2006.  Do you recall meeting with the defendant and Ahmad

12  Abousamra on that day?

13  A.   Yes.

14       MR. CHAKRAVARTY:  Your Honor, at this time I think we

15  should -- we would like to distribute transcripts of that, and

16  then we'll play some of the audio and follow along with the

17  transcript.

18       THE COURT:  Okay.

19       (Pause.)

03:16 20       MR. CHAKRAVARTY:  Your Honor, may I approach the

21  witness to give him a copy?

22       THE COURT:  All right.

23  BY MR. CHAKRAVARTY:

24  Q.   Mr. Abuzahra, is this a compilation of clips?

25       MR. CARNEY:  Could we hold one minute?  We haven't

1    received a copy.

2                THE COURT:  Fine.

3                (Counsel confer off the record.)

4                MR. CARNEY:  Apparently, this is selected from a

5    longer recording.  Could the government just identify as it

6    goes along when it's skipping from one section to another, if

7    it's not obvious?

8                THE COURT:  Yeah, I was going to ask about exhibit

9    numbers.  Is this --

03:18 10             MR. CHAKRAVARTY:  So this is Exhibit 454.  I was going

11   to ask to introduce these, your Honor.  454 is the selected

12   audio clips from December 13, 2006; and 455, which has just

13   been distributed, is the corresponding transcript for those

14   clips.

15               THE COURT:  And there seems to be a dividing line

16   periodically.  That denotes the --

17               MR. CHAKRAVARTY:  Those are the separations.

18               MR. CARNEY:  All right.  Thank you.

19               THE COURT:  And so the -- in my list, 454 has subparts

03:19 20   A through T.

21               MR. CHAKRAVARTY:  Correct.

22               THE COURT:  And that would track through in sequence

23   in --

24               MR. CHAKRAVARTY:  In the transcript.

25               THE COURT:  -- 455?

1          MR. CHAKRAVARTY:  Yes.  That's the intention.

2          THE COURT:  Now, as of now these have not been

3    admitted.

4          MR. CHAKRAVARTY:  Right.  I was just going to question

5    that.

6          THE COURT:  All right.  All right.

7    BY MR. CHAKRAVARTY:

8    Q.   Mr. Abuzahra, are these -- in front of you is 455.  Are

9    those selected clips that we've prepared before trial of the

03:19 10   fuller, more complete transcript of the entire December 13,

11   2006, audio that you recorded?

12   A.   I do recognize parts of it.  I haven't gone through every

13   single page and line to see if it's familiar or not.

14   Q.   We're going to do that.  But the 454, the audio itself,

15   is -- we haven't played it yet, but were there clips taken from

16   the longer, more complete audio recording?  Does that appear to

17   be that's what it's a transcript of?

18   A.   Yes, it appears to be.

19   Q.   And the audio recording, was that a fair and accurate

03:20 20   recording -- from what you listened to, that recording before

21   your testimony, was that a fair and accurate recording of the

22   actual meeting with the defendant and others?

23   A.   Yes.

24         MR. CHAKRAVARTY:  Then I'd introduce 454 and 455, your

25   Honor.

1          MR. CARNEY:  I object.  We certainly have no problem

2     with it being used as an aid.

3          THE COURT:  You're talking about 455, the transcript?

4          MR. CARNEY:  Yes.

5          THE COURT:  Yeah.  I think that 454 and its subparts

6     can be admitted as the primary evidence unless there's

7     translations here.

8          MR. CARNEY:  I don't have an objection to 454, the

9     original.

03:21 10          THE COURT:  Right.

11          MR. CARNEY:  The other's a demonstrative.

12          THE COURT:  Unless it's necessary to put in a

13     translation, then I think that we'd follow the normal rule,

14     which is 455, the transcript, is an aid but not evidence.

15          MR. CHAKRAVARTY:  Fine, your Honor.

16          THE COURT:  Okay?

17          Let me just explain that to the jury.  When there's a

18     recording -- audio recording such as will be played -- the

19     audio recording itself is the primary evidence of the

03:21 20     conversation.  Someone tries to prepare a transcript that

21     accurately reflects that, and the witness has testified about

22     that briefly, but it's a secondary piece of evidence because

23     the audio is the primary piece.

24          So we don't admit -- we allow you to look at it

25     because it may help you as you listen, but the audio is the

1    primary evidence.  And to the extent you think there's a

2    difference between what the audio says and what the transcript

3    says, you're to be guided by the audio.  That's why we don't

4    formally admit the transcript as its own exhibit because it's

5    secondary to the audio, all right?  So you can use it as we

6    listen, but it won't be part of the formal exhibits in the

7    case.

8            (Government Exhibit No. 454 received into evidence.)

9    BY MR. CHAKRAVARTY:

03:22 10   Q.   Now, Mr. Abuzahra, looking at the first page of Exhibit

11   455, for the benefit of the jury I want to just try to identify

12   some of the people who are on this recording that you've

13   reviewed before.  Who corresponds -- who's the person that

14   corresponds to the person ABA?

15   A.   Abdul Badi Abousamra, which is Ahmad Abousamra's father.

16   Q.   And was he present there during this meeting?

17   A.   Yes.

18   Q.   A portion of this meeting?

19   A.   Yes.

03:22 20   Q.   And who corresponds to the initials CW?

21   A.   I do.

22   Q.   And what does "CW" stand for?

23   A.   "Cooperating witness."

24   Q.   And who corresponds to the initials AA?

25   A.   Ahmad Abousamra.

```
 1   Q.   And who corresponds to the initials TM?

 2   A.   Tarek Mehanna.

 3   Q.   And having looked at the front cover, do you recall when

 4   this recording was made?

 5   A.   Around the December time frame listed.

 6   Q.   Okay.  And is this December 13, 2006?  Is that --

 7   A.   From my recollection, I don't recall if it was exactly

 8   December 13th when it happened.  I remember there was something

 9   in December.

03:23 10        MR. CHAKRAVARTY:  With that, let's play the first

11   clip.

12            (Clip of Exhibit No. 454 published to the Court and

13   jury.)

14            MR. CHAKRAVARTY:  Your Honor, the volume was a little

15   low.  I don't know if your Honor has the capability of --

16            THE COURT:  It's at max.

17            MR. CHAKRAVARTY:  All right.

18   BY MR. CHAKRAVARTY:

19   Q.   Mr. Abuzahra, where were you when you were having this

03:24 20   conversation?

21   A.   At Ahmad Abousamra's house, in the basement.

22   Q.   Is that where you had arranged to meet that day?

23   A.   Yes.

24   Q.   And who was present during this portion of the

25   conversation?
```

1    A.    The defendant, Ahmad Abousamra, myself, and Abdul Badi

2    Abousamra.

3    Q.    So the person who was doing the primary talking during the

4    clip that we just heard, who was that?

5    A.    That was Ahmad's father, Abdul Badi Abousamra.

6    Q.    And had you previously discussed with him your trip to

7    Yemen?

8    A.    No.  Can I modify slightly?

9    Q.    If it will make it accurate, yes.

03:25 10   A.    I spoke -- when I came back, I spoke with -- I met with

11   him because he was asking about his son, but I didn't speak to

12   him prior to our trip.  Before leaving we did not speak about

13   it.

14   Q.    So let me clarify that.  So you met with Abdul Badi

15   Abousamra at some point prior to this meeting?

16   A.    Yes.

17   Q.    Approximately when was that?

18   A.    Within 2004.

19   Q.    Okay.  And in what circumstances?

03:25 20   A.    Asking about his son.

21   Q.    So was it a similar conversation to the one that the

22   defendant's father had with you?

23   A.    Not to the same level.  Not the same level.

24   Q.    Okay.  When you say "not to the same level," what do you

25   mean?

1    A.   This was the third time his son had disappeared.  Looking

2    at that, I think he came to terms with it.  He didn't

3    seem -- he was asking about it but he didn't seem -- he wasn't

4    as aggressive as the defendant's family.

5         MR. CHAKRAVARTY:  Can we go to Clip 2?

6         (Clip of Exhibit No. 454 published to the Court and

7    jury.)

8    Q.   So was that your voice on the recording that says "That's

9    not a story; that's what happened"?

03:27 10   A.   Yes.

11   Q.   Why did you say that?

12   A.   I was maintaining up till -- even with my own family, I

13   would always tell them, "That's what happened.  That's the

14   story."  Even though I thought that everybody knew the reason

15   why, I never -- so I was just playing that same role during

16   these recordings.

17        MR. CHAKRAVARTY:  Okay.  Go to the next clip, B.

18        (Clip of Exhibit No. 454 published to the Court and

19   jury.)

03:29 20   Q.   Mr. Abuzahra, what prompted this meeting with the

21   defendant and Abousamra on this date?

22   A.   At that point we had all been visited by the FBI.  And the

23   prompting of it was the FBI agents telling me to set up a

24   meeting, you know, call the defendant or call Ahmad Abousamra

25   and try and set up a meeting to talk about what was going on.

1    Q.   And what is Abousamra talking about here when he's

2    describing to you an interaction?

3    A.   He's describing his meeting with the FBI and how they had

4    information that he -- like why he thought that they came to us

5    now, you know, what prompted the investigation and what

6    evidence they might have.

7           MR. CHAKRAVARTY:  Go to the next clip.

8           (Clip of Exhibit No. 454 published to the Court and

9    jury.)

03:32 10           MR. CHAKRAVARTY:  All right.  And would you go to the

11    next clip?

12           (Clip of Exhibit No. 454 published to the Court and

13    jury.)

14    Q.   Mr. Abuzahra, when you're talking about contacts, what was

15    Abousamra referring to?  Or what did you understand it to mean?

16    A.   Something I'd forgotten about, but I still don't recall

17    it.  But apparently on the visa TM you have to put down a

18    contact name, somebody there.  So it sounds like -- like I say,

19    I don't recall that from my memory, but it sounded like based

03:33 20    on this conversation there was a contact name we put on the

21    visa application.

22    Q.   And you -- in this conversation you were asking him about

23    where you got that contact?

24    A.   Yes.

25           MR. CHAKRAVARTY:  Next clip, please.

 1              (Clip of Exhibit No. 454 published to the Court and

 2     jury.)

 3     Q.    Mr. Abuzahra, you mentioned Abu Omar?

 4     A.    Yes.

 5     Q.    Who were you referring to?

 6     A.    Abul Muthanna.

 7     Q.    And why did you say that he was a problem?

 8     A.    It was just one of the person -- because Ahmad was telling

 9     us we don't have to worry about what we say, but I was pointing

03:37 10     out that other people knew about our trip.

 11    Q.    And it's the defendant that said don't worry about him?

 12    A.    Yeah.  They both seemed to know something that I didn't

 13    know about him.

 14              MR. CHAKRAVARTY:  Next clip.

 15              (Clip of Exhibit No. 454 published to the Court and

 16    jury.)

 17              MR. CHAKRAVARTY:  Next clip.

 18              (Clip of Exhibit No. 454 published to the Court and

 19    jury.)

03:39 20    Q.    And, Mr. Abuzahra, is it the defendant who says, "No,

 21    don't say 'I don't know.'"  "Why?"  "Because you're on a trip

 22    with somebody.  You don't know where they're going?  We all

 23    went together"?

 24    A.    Yes.

 25              MR. CHAKRAVARTY:  Next clip, please.

1           (Clip of Exhibit No. 454 published to the Court and

2    jury.)

3    BY MR. CHAKRAVARTY:

4    Q.   Mr. Abuzahra, just to clarify, the volume of your voice is

5    a lot louder on this recording.  Do you know why that is?

6    A.   The device was closest to my mouth.

7           MR. CHAKRAVARTY:  Next clip, please.

8           (Clip of Exhibit No. 454 published to the Court and

9    jury.)

03:41 10   Q.   Mr. Abuzahra, this reference to MSN screen name, is that

11   the thing that you were referring to earlier about the message

12   that the defendant is -- his status message?

13   A.   Yes.

14   Q.   And Azzam Publications, is that the website that you had

15   mentioned earlier?

16   A.   Yes.

17          MR. CHAKRAVARTY:  Next clip, please?

18          (Clip of Exhibit No. 454 published to the Court and

19   jury.)

03:42 20         MR. CHAKRAVARTY:  Next clip, please.

21          (Clip of Exhibit No. 454 published to the Court and

22   jury.)

23   Q.   Mr. Abuzahra, when you asked Abousamra, "Was it worse than

24   uh," what were you asking about?

25   A.   Comparing it to Pakistan.

1    Q.   And you referred to him being sick.  Does that refresh

2    your memory about anything?

3    A.   I have a vague recollection but nothing solid.

4    Q.   Did you ever talk about Abousamra being sick with

5    diarrhea?

6    A.   Are you asking me if I said it?

7    Q.   If you remember it.  If you don't remember, you don't

8    remember.

9    A.   Yeah, I don't remember.

03:44 10         MR. CHAKRAVARTY:  Next clip, please.

11         (Clip of Exhibit No. 454 published to the Court and

12    jury.)

13    Q.   Mr. Abuzahra, when Abousamra says, "Really?  The one that

14    we made fun of," what is he referring to?

15    A.   I don't recall.

16    Q.   In this portion of the conversation who are you talking

17    about?

18    A.   Dan Maldonado.

19    Q.   And at the time of this conversation where was Dan

03:45 20    Maldonado, based on the conversation?

21    A.   Somalia.

22         MR. CHAKRAVARTY:  Next clip, please.

23         (Clip of Exhibit No. 454 published to the Court and

24    jury.)

25    Q.   Mr. Abuzahra, the bag that the defendant's referring to,

1  is that the bag that you were referring to earlier that he gave

2  to his brother?

3  A.   Yes.

4        MR. CHAKRAVARTY:  Next clip, please.

5        (Clip of Exhibit No. 454 published to the Court and

6  jury.)

7  Q.   So who were you referring to when you asked about John?

8  A.   Abu Majid, his contact in Pakistan.

9  Q.   Abousamra's contact in Pakistan?

03:48 10  A.   Yes.

11  Q.   And who do you ask about when Abousamra responds, "He's my

12  brother-in-law"?

13  A.   Dan Spaulding.

14  Q.   And at some times in this conversation the three of you

15  whisper.  Why did you whisper?

16  A.   There's a few places where -- which places are you talking

17  about?

18  Q.   Well, as a general matter why were you whispering?

19  A.   Usually something that I guess was more sensitive than all

03:48 20  the stuff we were talking about, we would kind of whisper.

21  Q.   Do you know whether they were wearing a recording device?

22  A.   I did not know.

23        MR. CHAKRAVARTY:  Next clip, please.

24        (Clip of Exhibit No. 454 published to the Court and

25  jury.)

1    Q.   Mr. Abuzahra, in this portion -- I just want to again

2    situate the jury.  At one point the initials "DS" come up on

3    the transcript.  Who is that?

4    A.   Dan Spaulding.

5    Q.   And did he join this conversation at some point?

6    A.   Yes.

7    Q.   And where were you still?

8    A.   It was still in the same location, in the basement.

9    Q.   And Abousamra's father, was he still with you at that

03:53 10   time?

11   A.   I don't believe so.

12   Q.   So he was there for only a portion of the conversation?

13   A.   Yes.

14   Q.   The beginning of the conversation the defendant says,

15   "Because the brother is old," and you say, "We told him

16   specifically to make sure, right?"  Who are you talking about?

17   A.   I believe this one's the guy in California.

18   Q.   And Abousamra says, "Yeah, it's his fault"?

19   A.   Yes.

03:54 20   Q.   And then you start discussing a -- what appears to be a

21   video.  Do you remember anything about this video?

22   A.   I think you can tell from the conversation things got a

23   little bit crossed when we were talking about different videos

24   at the time.  I can tell you which one I meant.

25   Q.   Which one did you mean?

1   A.   There was a video put out by -- I believe it was Abu Musab

2   al-Zarqawi.  He was the al Qa'ida leader in Iraq.  So there was

3   a video put out, I believe, by the American media kind of

4   showing him fumbling with the gun and, you know, just making

5   some criticisms of it.

6   Q.   At one point in the conversation you ask Abousamra whether

7   he remembers the books he gave you?

8   A.   Yes.

9   Q.   What were you referring to?

03:55 10   A.   At one point he gave me -- I forget where he got the books

11   from, but some books by Abdullah Azzam who was what could be

12   described as a jihadi scholar.

13   Q.   And then you talk about the computer and deleting

14   information?

15   A.   Yes.

16        MR. CHAKRAVARTY:  Next clip, please.

17        (Clip of Exhibit No. 454 published to the Court and

18   jury.)

19        MR. CHAKRAVARTY:  Can you stop there?  I don't know if

03:55 20   we skipped one or whether -- this is P?

21        MR. BRUEMMER:  This is P.

22        MR. CHAKRAVARTY:  Did you call up Q or did you call up

23   P?

24        (Clip of Exhibit No. 454 published to the Court and

25   jury.)

1          MR. CHAKRAVARTY:  Okay.  Next clip?

2          (Clip of Exhibit No. 454 published to the Court and

3     jury.)

4          MR. CHAKRAVARTY:  Next clip?

5          (Clip of Exhibit No. 454 published to the Court and

6     jury.)

7     Q.   Mr. Abuzahra, was it the defendant who said, "Yeah, but

8     I'm going to leave it at the things that are documented, I

9     can't deny"?

04:00 10    A.   Yes.

11          MR. CHAKRAVARTY:  Next clip, please?

12          (Clip of Exhibit No. 454 published to the Court and

13    jury.)

14    Q.   That last reference that the defendant made, how did you

15    understand that?

16    A.   There was a -- like a parody on -- we talked about it

17    before, that this would be ridiculous for us to say, so it was

18    kind of just like a joke.  I don't think we ever intended for

19    this to be a code word or anything like that.  It was just --

04:01 20    it was -- I don't know how to describe it.  It was just a joke.

21    Q.   A joking reference to a code?

22    A.   The joking reference that -- I mean, we were talking about

23    if the FBI came to visit us again, you know, talk on the phone,

24    try to get together again.  So I guess the joke was saying,

25    "Say something ridiculous, like 'The cake got big.'"  It's just

1   such a ridiculous thing to say on the phone, but it's kind of

2   implying that the situation is bigger than we think.  But I

3   understood it to be joking and we all laughed after he said it.

4   Q.   So like "John," for example, that was a joking reference

5   to Abu Majid?

6   A.   Yes.

7   Q.   Were there other types of coded or kind of substitute

8   names that you would give to things?

9   A.   All jokingly.  At one point we said, "If we want to refer

04:02 10   to the FBI, we'll say 'Frank B. Ingelson,' or something" where

11   the initials are FBI.  So it was obviously meant as a joke.

12   Q.   Now, after this meeting did you, a couple of days later,

13   have another meeting, this time with Ahmad Abousamra?

14   A.   If you refresh my memory, I did have a meeting with him

15   afterwards.  I'm not sure how many days afterwards.

16   Q.   And as with this one, did you review the recording and was

17   it fairly and accurately recorded?

18   A.   Yes.

19   Q.   And transcribed.  Was it a fair and accurate transcript?

04:02 20   A.   You're talking about this transcript?

21   Q.   For the next --

22   A.   Yes.

23   Q.   And the portions that we're going to play, like this one,

24   are those from that longer transcript that you reviewed?

25   A.   They were.  I noticed a few typographical errors, but...

1    Q.   Being mindful of the time, before we -- we'll play that, I

2    guess, tomorrow morning, but this last conversation reminded me

3    to ask you a question about when you went on the Yemen trip.

4    Did the three of you have a discussion about if anyone would be

5    a leader of that trip?

6    A.   Yes.

7    Q.   Describe that discussion.

8    A.   In Islam, when you have three or more people traveling,

9    one of them should be elected -- or appointed leader of the

04:03 10   group just so it's easier just in case any discussions -- it's

11   just easier to have one person make the final call rather than

12   have argument.  We elected Ahmad.  He was the most

13   knowledgeable of us.

14   Q.   And that's on any trip?

15   A.   Yes.

16        MR. CHAKRAVARTY:  Your Honor, with that, we're getting

17   into the next --

18        THE COURT:  Yes, I assume that will take a little

19   while so we're just at one o'clock.

04:04 20        Okay, jurors.  Again, we'll recess.  Enjoy the rest of

21   the day.  We'll see you tomorrow at nine and continue with the

22   case.

23        THE CLERK:  All rise for the Court and jury.  The

24   Court will be in recess.

25        (The Court and jury exit the courtroom and the

1    proceedings adjourned at 12:59 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  November 29, 2011

17

18

19

20

21

22

23

24

25