UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   ) Criminal Action
v.                                 ) No. 09-10017-GAO
                                   )
TAREK MEHANNA,                     )
                                   )
          Defendant.               )
                                   )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWENTY-FOUR
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, November 30, 2011
9:16 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
 3             Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Jeffrey D. Groharing, Trial Attorney
               National Security Division
 7        950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
10             Janice Bassil, Esq.
               John E. Oh, Esq.
11        20 Park Plaza
          Suite 1405
12        Boston, Massachusetts  02216
          - and -
13        LAW OFFICE OF SEJAL H. PATEL, LLC
          By: Sejal H. Patel, Esq.
14        101 Tremont Street
          Suite 800
15        Boston, Massachusetts  02108
          On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

1                            I N D E X

2                      DIRECT   CROSS   REDIRECT   RECROSS
    WITNESSES FOR THE
3     GOVERNMENT:

4   KAREEM ABUZAHRA, resumed

5       By Mr. Chakravarty(Cont'd)   4
        By Mr. Carney                      22
6

7

8                        E X H I B I T S

9
    GOVERNMENT'S        DESCRIPTION              FOR ID   IN EVD.
10
    456  Consensual recording of 12/15/06 meeting          6
11
    457  Transcript of excerpts of Exhibit No. 456    6
12
    458  Consensual recording of 1/12/07 meeting           10
13
    459  Transcript of excerpts of Exhibit No. 458    10
14
    460  Consensual recording of 2/25/07 meeting           17
15
    461  Transcript of excerpts of Exhibit No. 460    17
16

17

18

19

20

21

22

23

24

25

```
 1              (The following proceedings were held in open court

 2    before the Honorable George A. O'Toole, Jr., United States

 3    District Judge, United States District Court, District of

 4    Massachusetts, at the John J. Moakley United States Courthouse,

 5    One Courthouse Way, Boston, Massachusetts, on November 30,

 6    2011.

 7              The defendant, Tarek Mehanna, is present with counsel.

 8    Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

 9    are present, along with Jeffrey D. Groharing, Trial Attorney,

10    U.S. Department of Justice, National Security Division.)

11              THE CLERK:  All rise for the Court and the jury.

12              (The Court and jury enter the courtroom at 9:16 a.m.)

13              THE CLERK:  Please be seated.

14              THE COURT:  Good morning, jurors.

15              THE JURORS:  Good morning.

16              THE COURT:  Mr. Chakravarty?

17                        KAREEM ABUZAHRA, resumed

18                      CONTINUED DIRECT EXAMINATION

19    BY MR. CHAKRAVARTY:

20    Q.   Good morning again, Mr. Abuzahra.

21    A.   Good morning.

22    Q.   When we left we were going through the recordings that you

23    assisted the FBI in making of your conversations with the

24    defendant, Abousamra and some others.  In December of 2006,

25    after the recording that we played yesterday, a couple of days
```

00:08

```
     1   later did you have another opportunity at this time to meet
     2   with Ahmad Abousamra?
     3   A.   Yes.
     4   Q.   And have you reviewed before court -- have you reviewed
     5   Exhibit 456 and the accompanying transcript which is -- excuse
     6   me -- 457 -- excuse me -- yeah, 457?  And are those fair and
     7   accurately -- do those fairly and accurately describe the
     8   portions of the -- of that meeting that occurred on that day?
     9   A.   Are these the same transcripts from yesterday?
00:09 10   Q.   This is the next meeting.
    11   A.   I haven't seen those.
    12        MR. CHAKRAVARTY:  May I approach, your Honor?
    13        THE COURT:  You may.
    14        (Pause.)
    15        THE WITNESS:  I believe it's the -- from that
    16   interview.
    17        MR. CHAKRAVARTY:  At this point, your Honor, I would
    18   move into evidence 456, and distribute 457 for -- as an aid to
    19   the jury.
00:10 20        MR. CARNEY:  No objection, your Honor.
    21        THE COURT:  All right.
    22        MR. CARNEY:  It's the same protocol as yesterday?
    23        THE COURT:  Yes, the same explanation of the meaning
    24   of the transcript, it's as an aid for your hearing.
    25        I'll allow them, yeah.
```

1            (Government Exhibit No. 456 received into evidence.)

2            (Government Exhibit No. 457 marked for

3       identification.)

4            (Exhibit No. 457 disseminated to the jury.)

5       BY MR. CHAKRAVARTY:

6       Q.   Mr. Abuzahra, just to set up this meeting, who was this

7       with -- this meeting with?

8       A.   Ahmad Abousamra.

9       Q.   And do you recall where this meeting occurred?

00:11 10     A.   It occurred right outside the mosque in Lowell.

11      Q.   And had you made arrangements to meet with him?

12      A.   Yes.

13           MR. CHAKRAVARTY:  We'll play the first clip.

14           (Clip of Exhibit No. 456 published to the Court and

15      jury.)

16      Q.   Mr. Abousamra, during this portion of the call -- meeting,

17      you mentioned that you were shown a picture, and you asked

18      Abousamra some questions about that.  Do you remember that?

19      A.   Yes.

00:24 20     Q.   Who were you referring to to Abousamra?

21      A.   At this point I don't remember.  I was referring -- asking

22      if it was the person in California, Abu Umar, that gave us

23      information.

24      Q.   That's what you were asking Abousamra?

25      A.   Yes.

```
 1   Q.    And then you later mentioned Abu Umar?

 2   A.    Yes.

 3              MR. CHAKRAVARTY:  Next clip, please?

 4              (Clip of Exhibit No. 456 published to the Court and

 5   jury.)

 6              MR. CHAKRAVARTY:  Next clip, please?

 7              (Clip of Exhibit No. 456 published to the Court and

 8   jury.)

 9              MR. CHAKRAVARTY:  Next clip, please?

10              (Clip of Exhibit No. 456 published to the Court and

11   jury.)

12              MR. CHAKRAVARTY:  Next clip, please?

13              (Clip of Exhibit No. 456 published to the Court and

14   jury.)

15              MR. CHAKRAVARTY:  Next clip, please?

16              (Clip of Exhibit No. 456 published to the Court and

17   jury.)

18   Q.    Mr. Abuzahra, after this meeting did anything significant

19   happen with regards to your contact with Mr. Abousamra?

20   A.    I know at some point he had left the country to go to

21   Syria.

22   Q.    How do you know that?

23   A.    I heard it from his father, from the community.

24   Q.    Did you see him again?

25   A.    Ahmad Abousamra?
```

```
 1   Q.   Yes.

 2   A.   No.

 3   Q.   Sometime in January of 2007 do you remember meeting with

 4   the defendant?

 5   A.   Yes.

 6   Q.   Again, was that recorded?

 7   A.   Yes.

 8   Q.   And you followed the same procedures you did before?

 9   A.   I don't know -- there was one time where the procedure was

10   slightly different.  So I don't know if that was the incident

11   or not.

12   Q.   Was it still in coordination with the FBI?

13   A.   Yes.

14   Q.   Okay.  And you had a device that you used to record that?

15   A.   Yes.

16           MR. CHAKRAVARTY:  At this point, your Honor, we'll

17   turn to Exhibits 458, and 459 would be the demonstrative aid

18   for the jury.

19           THE COURT:  All right.  458 and its subparts will be

20   admitted?

21           MR. CHAKRAVARTY:  Correct, your Honor.

22           And just to clarify, your Honor, what's been uploaded

23   into the JERS system is simply the subparts.  We also have the

24   entirety of the communication which we'll --

25           THE COURT:  I see.  So 458 is unedited.  Is that --
```

```
 1          MR. CHAKRAVARTY:  No, this is edited.

 2          THE COURT:  No.  No.  In other words, the main number,

 3    458, but then 458A, -B, -C, whatever, are the parts that are

 4    in?

 5          MR. CHAKRAVARTY:  The part that I think the witness

 6    has authenticated is the entirety of the communications.

 7          THE COURT:  Right.

 8          MR. CHAKRAVARTY:  So I think that's right, your Honor.

 9          THE COURT:  So for our record-keeping, the number

10    without a letter after it is identified but not admitted, or is

11    it admitted?

12          MR. CHAKRAVARTY:  I think it's been -- to add

13    complication, which maybe we can do later, 458 itself is

14    actually one of the subparts, and it's bifurcated into -- 458

15    is a folder that has two files:  One is the entirety of the

16    communication and one is the first subpart.

17          So it complicates the matter a little bit, but I think

18    that's something that we can clarify later.

19          THE COURT:  All right.  Okay.

20          MR. CHAKRAVARTY:  But we would introduce 458, I guess,

21    in terms of -- with regards to each -- to clarify for the

22    record, each of the recorded communications we're introducing,

23    the entirety of the communication, and we're playing the

24    subparts which are --

25          THE COURT:  Okay.
```

00:30 (line 10)
00:31 (line 20)

```
 1              (Government Exhibit No. 458 received into evidence.)

 2              (Government Exhibit No. 459 marked for

 3       identification.)

 4              MR. CHAKRAVARTY:  So with that, let's distribute 459.

 5              The other caution I give with 459, your Honor, the

 6       pages are not entirely sequential.  There was one portion

 7       which -- page 5 has been redacted from that -- just because of

 8       a scrivener's error on our part.  Page 1, 2, 3, 4, 6.

 9              THE COURT:  Oh, all right.  Okay.

00:32 10              (Exhibit No. 459 disseminated to the jury.)

11       BY MR. CHAKRAVARTY:

12       Q.   Mr. Abuzahra, is 459 a fair and accurate transcription of

13       a portion of that meeting that you had with Mr. Mehanna?

14       A.   I believe so.

15       Q.   And, again, can you describe who was on this recording?

16       A.   Tarek Mehanna and myself.

17       Q.   And where was this recording made?

18       A.   It was made close to the Lowell mosque.

19              MR. CHAKRAVARTY:  Would you play Clip 1, please.

00:34 20              (Clip of Exhibit No. 458 published to the Court and

21       jury.)

22       Q.   Mr. Abuzahra, is this a reference to what you were

23       describing earlier, that Mr. Abousamra had left the country?

24       A.   Yes.

25       Q.   And Dr. Abdul Badee, is that Tarek's father?
```

1    A.    Yes.

2              MR. CHAKRAVARTY:  Next clip, please.

3              (Clip of Exhibit No. 458 published to the Court and

4    jury.)

5              MR. CHAKRAVARTY:  Next clip, please?

6              (Clip of Exhibit No. 458 published to the Court and

7    jury.)

8    Q.    What was the defendant telling you about?

9    A.    The trip to Yemen.

00:41 10  Q.    And during the conversation you say, "The only thing I

11   remember was that Makalla."  What was that in reference to?

12   A.    The information that Abu provided us.

13   Q.    And the defendant then mentioned a few other names and a

14   few other cities.  What were those?

15   A.    Do I read the names to you or --

16   Q.    Do you recognize those names?

17   A.    I don't.  The only one I recognize would have been Abul

18   Hassan, who's a well-known scholar in Yemen.  I don't know if

19   he's still there or not.

00:42 20  Q.    And does the defendant say that he was in Ma'rib?

21   A.    Yeah, he got to where Abul Hassan was located.

22              MR. CHAKRAVARTY:  Next clip, please?

23              (Clip of Exhibit No. 458 published to the Court and

24   jury.)

25   Q.    Mr. Abuzahra, during this portion of the call at one

1    point -- or the meeting -- at one point you challenge the

2    defendant and say, "I didn't see it.  You guys were hiding, or

3    I only saw, like, one name as I remember," and the defendant

4    said, "There were a couple of names."  What were you referring

5    to?

6    A.    The information Abu provided to Ahmad.

7    Q.    At one point you mention -- you ask -- I mean, what Ahmad

8    did on the second leg of his journey, and the defendant said,

9    "That was pure luck.  And it was pure luck."  What were you

00:48 10   referring to?

11   A.    Ahmad's trip to Iraq.

12   Q.    And then right at the end the defendant says, "Yeah, but

13   he's safely tucked away somewhere else.  He's Sufi, you know.

14   Yeah, he's totally changed."  Who was he talking about?

15   A.    Abu Omar.

16           MR. CHAKRAVARTY:  Next clip, please?

17           (Clip of Exhibit No. 458 published to the Court and

18   jury.)

19   Q.    Mr. Abuzahra, whom are you talking about at this point?

00:50 20   A.    Hassan Masood.

21   Q.    And he's the person who drove you to the airport that day?

22   A.    Yes.

23           MR. CHAKRAVARTY:  Next clip, please?

24           (Clip of Exhibit No. 458 published to the Court and

25   jury.)

1    Q.   In this portion of the meeting, Mr. Abuzahra, who were you

2    asking the defendant about?

3    A.   Dan Maldonado and Dan Spaulding.  Yeah, both of them.

4    Q.   And the defendant says, "You really want to know where he

5    is?"  And you say, "I know where he is.  You told me the last

6    time."  What were you referring to?

7    A.   In the first recording you played, we found out that he

8    was in Somalia.

9              MR. CHAKRAVARTY:  Next clip, please?

00:51 10              (Clip of Exhibit No. 458 published to the Court and

11    jury.)

12              MR. CHAKRAVARTY:  Next clip?

13              (Clip of Exhibit No. 458 published to the Court and

14    jury.)

15              MR. CARNEY:  Your Honor, would it be possible to pause

16    for just one moment?  I just need a moment.  I'm trying to

17    correlate two things.

18              THE COURT:  All right.  Okay.

19              (Pause.)

00:53 20              MR. CARNEY:  May I speak to the prosecutor, please?

21              (Counsel confer off the record.)

22              MR. CARNEY:  Sorry for this delay, your Honor.  The

23    numbers don't sync exactly, so that's why I'm trying to do it

24    with two.

25              (Pause.)

1            MR. CARNEY:  Thank you, your Honor.  If I can alert

2    your Honor, the government's going to skip a section and then

3    play another part.  I'm asking Paul Bruemmer to identify the

4    part that's being skipped so we can play it on cross.  And I

5    believe at the break Mr. Bruemmer will be able to locate that.

6            MR. CHAKRAVARTY:  We're going to match it up.  And we

7    can approach.

8            THE COURT:  Is this -- whatever's being skipped, is

9    that something that has been premarked --

00:56 10           MR. CHAKRAVARTY:  No.

11           THE COURT:  -- and is a subset of the 458?

12           MR. CHAKRAVARTY:  It's not.  It's part of the bigger

13    thing.  So we'd have to locate it.

14           THE COURT:  So it's a portion of the tape that the

15    government's not offering that you want to offer on cross?

16           MR. CARNEY:  Yes.

17           THE COURT:  Okay.

18           MR. CARNEY:  Thank you.

19           MR. CHAKRAVARTY:  Can we go to the next clip, please?

00:56 20           (Clip of Exhibit No. 458 published to the Court and

21    jury.)

22    BY MR. CHAKRAVARTY:

23    Q.   Mr. Abuzahra, when you're asking the defendant about all

24    those places where Ahmad went to, what are you asking him

25    about?

```
 1   A.    I was just kind of asking him to recall the various

 2   countries he went to.

 3   Q.    Particularly, which country?

 4   A.    To Pakistan and Yemen.  I mean, if you look at the travel

 5   history -- not that Syria had like -- but it still seems

 6   not -- it's not super -- but it seems like he's traveled to

 7   what America has classified as a bad place but he still hasn't

 8   found what he was looking for.

 9   Q.    And you had -- three years prior to this you had been

10   looking for the same thing?

11   A.    Yes.

12         MR. CHAKRAVARTY:  Next clip, please?

13         (Clip of Exhibit No. 458 published to the Court and

14   jury.)

15   Q.    The defendant says, "The way we did it was wrong, not what

16   we did"?

17   A.    Yes.

18         MR. CHAKRAVARTY:  Next clip, please?

19         (Clip of Exhibit No. 458 published to the Court and

20   jury.)

21   Q.    Mr. Abuzahra, after this meeting did something happen in

22   the news that prompted you to meet with the defendant again?

23   A.    Again, Daniel Maldonado's arrest in Somalia.

24         MR. CHAKRAVARTY:  Would you call up Exhibit 404?

25   Q.    And is this --
```

1          MR. CHAKRAVARTY:  Actually, can we go to 273, please?

2     Q.   Is this an email sent from you to the defendant on

3     February 14th of 2007?

4     A.   Yes.

5     Q.   And it's a response to some email that he had sent you.

6     Is that right?

7     A.   Yes.

8     Q.   And you ask him, "You read the news?"

9     A.   Yes.

01:00 10          MR. CHAKRAVARTY:  274, please?

11    Q.   And does he respond," I certainly have"?

12    A.   Yes.

13         MR. CHAKRAVARTY:  And then 275, please?

14    Q.   And do you say, "I am busy until next week.  Do you think

15    we should get together then?"

16    A.   Yes.

17         MR. CHAKRAVARTY:  Now 404, please.

18    Q.   And about a week later you send him this email?

19    A.   Yes.

01:00 20    Q.   And this appears to be a link to a New York Times article?

21    A.   Yes.

22    Q.   And you say, "You read this?  Can you get together this

23    weekend?"

24    A.   Yes.

25    Q.   All right.  And did you, in fact, get together that

1      weekend?

2      A.    I don't know if it was that weekend or --

3      Q.    Shortly after this email?

4      A.    Yes.

5      Q.    And like the other recordings, did you make a recording of

6      this meeting pursuant to the guidelines that the FBI told you?

7      A.    Yes.

8      Q.    And have you reviewed --

9            MR. CHAKRAVARTY:  If I may approach, your Honor, with

01:01 10     the transcript?

11     Q.    Did you review the recording, and is it a fair and

12     accurate recording of that meeting?

13     A.    Yes.

14           MR. CHAKRAVARTY:  If I may approach?

15     Q.    Mr. Abuzahra, is the transcript I placed in front of you,

16     461, is that a fair and accurate transcription of portions of

17     that meeting?

18     A.    Yes.

19           MR. CHAKRAVARTY:  Again, your Honor, I would introduce

01:02 20     460, and mark 461 as an aid for the jury.

21           THE COURT:  All right.

22           (Government Exhibit No. 460 received into evidence.)

23           (Government Exhibit No. 461 marked for

24     identification.)

25           MR. CHAKRAVARTY:  All right.  Can we go and play the

1  first clip of 460, please?

2  BY MR. CHAKRAVARTY:

3  Q.   I'm sorry.  Just to situate the jury, who is this meeting

4  with?

5  A.   With the defendant and myself.

6  Q.   And where was it?

7  A.   I believe it was outside the Wayland mosque.

8          MR. CHAKRAVARTY:  Now please press "play."

9          (Clip of Exhibit No. 460 published to the Court and

01:03 10  jury.)

11  Q.   Mr. Abuzahra, just in the beginning of this conversation

12  you refer to an Al Mizzi.  Do you know who that person is?

13  A.   I have a vague recollection of seeing the name online.

14  Q.   But you don't know who that person is?  Not in a virtual

15  sense?

16  A.   No.

17          MR. CHAKRAVARTY:  Next clip, please?

18          (Clip of Exhibit No. 460 published to the Court and

19  jury.)

01:10 20          MR. CHAKRAVARTY:  Next clip, please?

21          (Clip of Exhibit No. 460 published to the Court and

22  jury.)

23          MR. CHAKRAVARTY:  All right.  Next clip?

24          (Clip of Exhibit No. 460 published to the Court and

25  jury.)

```
 1    Q.    You're still talking about Daniel Maldonado here?

 2    A.    Yes.

 3              MR. CHAKRAVARTY:  Next clip?

 4              (Clip of Exhibit No. 460 published to the Court and

 5      jury.)

 6              MR. CHAKRAVARTY:  Next clip, please?

 7              (Clip of Exhibit No. 460 published to the Court and

 8      jury.)

 9              MR. CHAKRAVARTY:  Next clip, please?

01:14 10              (Clip of Exhibit No. 460 published to the Court and

11      jury.)

12              MR. CHAKRAVARTY:  Next clip?

13              (Clip of Exhibit No. 460 published to the Court and

14      jury.)

15              MR. CHAKRAVARTY:  Next clip, please?

16              (Clip of Exhibit No. 460 published to the Court and

17      jury.)

18              MR. CHAKRAVARTY:  Next clip?

19              (Clip of Exhibit No. 460 published to the Court and

01:18 20      jury.)

21              MR. CHAKRAVARTY:  Next clip, please?

22              (Clip of Exhibit No. 460 published to the Court and

23      jury.)

24              MR. CHAKRAVARTY:  Next clip?

25              (Clip of Exhibit No. 460 published to the Court and
```

```
 1   jury.)
 2           MR. CHAKRAVARTY:  Next clip, please?
 3           (Clip of Exhibit No. 460 published to the Court and
 4   jury.)
 5           MR. CHAKRAVARTY:  Next clip, please?
 6           (Clip of Exhibit No. 460 published to the Court and
 7   jury.)
 8           MR. CHAKRAVARTY:  Next clip, please?
 9           MR. CARNEY:  Could I have a moment, please, your
10   Honor?
11           (Counsel confer off the record.)
12           MR. CHAKRAVARTY:  Can you just cue up the last 15
13   seconds?
14           (Clip of Exhibit No. 460 published to the Court and
15   jury.)
16   BY MR. CHAKRAVARTY:
17   Q.   Now, Mr. Abuzahra, the person who's talking at the time we
18   paused it, is that you?
19   A.   Yes.
20   Q.   So this transcript actually is missing the "CW" next to
21   that line.  Is that right?
22   A.   I have it on mine.
23   Q.   So to clarify for the jury, Tarek Mehanna says, "Yeah,"
24   and then it's you that says --
25   A.   Yes.
```

```
 1   Q.   -- "So it's just that, you know, that's so people say,

 2   'Yeah, he went to Iraq,' okay?  That's still nothing they can

 3   use against us."  That's you saying that, right?

 4   A.   Yes.

 5           MR. CHAKRAVARTY:  Next clip, please?

 6           (Clip of Exhibit No. 460 published to the Court and

 7   jury.)

 8           MR. CHAKRAVARTY:  Next clip -- sorry.  That is the

 9   next clip.

01:25 10  Q.   Mr. Abuzahra, that was the last recording you made of the

11   defendant?

12   A.   I believe so.

13   Q.   Is that your understanding?

14        This occurred back in February of 2007.  Is that right?

15   A.   Yes.

16   Q.   Now, was your mindset quite different in February of 2007

17   than it was in 2003 and 2004 when you went on this trip?

18   A.   Yes.

19   Q.   And is your mindset different as you sit here today?

01:26 20  A.   Yes.

21   Q.   How did you change?

22   A.   Well, just the -- in part, just part of growing up,

23   getting more mature mentally.  I think part of it was, you

24   know, I was under Ahmad's influence, you know, kind of being

25   away from that and thinking that things just didn't make sense.
```

1    There were certain events that happened.  The bombings in

2    Jordan, one of the hotels that they bombed was a hotel that I

3    stayed at when I was in Jordan.  So seeing all that kind of

4    stuff, it stopped making sense.  Like the al Qa'ida movement

5    and stuff like that, they killed more Muslims than they have

6    non-Muslims.  So it just stopped being something that I wanted

7    to -- I don't want to support them.  I don't think they're

8    correct in what they do.

9    Q.   Who's "they"?

01:26 10   A.   Al Qa'ida and the similar groups.

11        MR. CHAKRAVARTY:  That's all I have, your Honor.

12        MR. CARNEY:  May I proceed, your Honor?

13        THE COURT:  Please.

14                    CROSS-EXAMINATION

15   BY MR. CARNEY:

16   Q.   Good morning.

17   A.   Good morning.

18   Q.   We've never spoken before, have we?

19   A.   I don't believe so.

01:27 20   Q.   My name is J. Carney.  I represent Tarek Mehanna.

21        You've known Tarek since he was a child --

22   A.   Yes.

23   Q.   -- is that right?

24        Your parents and his parents were close friends, weren't

25   they?

```
 1    A.   I don't know if they were close friends.  They were

 2    friends.

 3    Q.   Your mom taught at the local mosque?

 4    A.   Yes.

 5    Q.   Sunday school?

 6    A.   Yes.

 7    Q.   Her name is Jihad?

 8    A.   Yes.

 9    Q.   Tarek was actually more friendly with your younger brother

01:28 10   growing up than he was with you, right?

11    A.   I don't recall how -- what age are you...

12    Q.   When they were in grammar school or middle school or high

13    school, he was friendlier -- or would hang with your brother

14    more than he would hang with you?

15    A.   I don't know who he would hang out with or who my brother

16    would hang out with, but we weren't close friends at that time,

17    no.

18    Q.   You were -- or are -- three years older than Tarek,

19    correct?

01:28 20   A.   I believe so, yes.

21    Q.   You were born in 1979?

22    A.   Yes.

23    Q.   And Tarek was born in 1982?

24    A.   Yes.

25    Q.   So that's a significant age difference, won't you agree,
```

1    in your teens?

2    A.    At that age, yes.

3    Q.    Now, when you re-connected with Tarek, it was when you saw

4    him attending the mosque.  Is that right?

5    A.    When I saw him exiting the mosque.

6    Q.    Exiting the mosque?

7    A.    Yes.

8    Q.    And you recognized him, right?

9    A.    Yes.

01:29 10    Q.    This would have been in the year 2000?

11    A.    Yes.

12    Q.    So Tarek would have been 18 years old, right?

13    A.    Yes.

14    Q.    Still in high school?

15    A.    I'm not sure when he started high school.

16    Q.    Well, at 18 years old in the year 2000 --

17    A.    Yes.

18    Q.    -- he would likely still be a high school student?

19    A.    I graduated high school when I was 17.

01:29 20    Q.    What's that?

21    A.    I graduated high school when I was 17.

22    Q.    Were a lot of people in your class 18?

23    A.    I believe so.

24    Q.    And at that time he was still living at home with his

25    parents?

```
 1   A.   Yes.

 2   Q.   And his younger brother?

 3   A.   Yes.

 4   Q.   His father was a college professor in Boston, right?

 5   A.   Yes.

 6   Q.   His mom provided daycare out of her home?

 7   A.   Yes.

 8   Q.   Now, at that point in 2000 you would have been 21 years

 9   old?

10   A.   Yes.

11   Q.   You were already in college, of course?

12   A.   Yes.

13   Q.   Now, you had first gone to college in Stony Brook in Long

14   Island, right?

15   A.   Yes.

16   Q.   And, of course, when you attended college at Stony Brook,

17   you were living away from home?

18   A.   Yes.

19   Q.   It's fair to say, Mr. Abuzahra, that you did a lot of

20   partying in school, right?

21   A.   Yes.

22   Q.   Used a lot of alcohol?

23   A.   Only in the -- when I was in Stony Brook.

24   Q.   You used marijuana too?

25   A.   Yes.
```

```
 1    Q.    Would go off to Europe, right?

 2    A.    I went there once.

 3    Q.    Did you go to Amsterdam?

 4    A.    Yes.

 5    Q.    Was that because of the marijuana?

 6    A.    Yes.

 7    Q.    And ultimately, because of so much partying, you dropped

 8    out of Stony Brook, right?

 9    A.    I transferred.

01:31 10   Q.    That wasn't completely voluntary, was it?

11              MR. CHAKRAVARTY:  Objection, your Honor.

12              THE COURT:  Overruled.

13              THE WITNESS:  It was a decision that my father kind of

14    pushed me towards.

15    BY MR. CARNEY:

16    Q.    So it wasn't voluntary on your part?

17    A.    In part it was.  I knew it wasn't working out for me

18    there.

19    Q.    Now, you've never known Tarek to use alcohol in his life,

01:31 20   have you?

21    A.    No.

22    Q.    You've never known Tarek to use drugs, have you?

23    A.    No.

24    Q.    You were pretty worldly at that point when you were 21

25    years old, weren't you?
```

1   A.   I wouldn't describe it as that.

2   Q.   Prior to 2000 you were not very interested in your

3   religion, were you?

4   A.   No.

5   Q.   You had been a Muslim your entire life, correct?

6   A.   Yes.

7   Q.   But that was more a function of that's what your parents

8   were, correct?

9   A.   Yes.

01:32 10   Q.   In 2000, you told us yesterday, that -- or the day before

11   that you began to go to the mosque, right?

12   A.   Yes.

13   Q.   And when you went, one of the things you noticed was, when

14   you saw Tarek coming out of the mosque, that he had begun to

15   grow a beard, right?

16   A.   Yes.

17   Q.   And you had a beard at that time too, didn't you?

18   A.   Yes.

19   Q.   And that signifies in the Muslim faith that a person is

01:32 20   likely to be more devout, if he has that.  Isn't that right?

21   A.   It depends which country.

22   Q.   Well, in the United States?

23   A.   Yes.

24   Q.   You also met Ahmad Abousamra at about the same time,

25   right?

```
 1    A.    Months afterwards.

 2    Q.    Well, all right.  Within a few months you met Abousamra,

 3    right?

 4    A.    Yes.

 5    Q.    And he also is someone who is older than Tarek, right?

 6    A.    I believe he was older.

 7    Q.    Now, Tarek would go to prayers on Friday night at the

 8    mosque, right?

 9    A.    I'm not sure of the -- Friday night?

01:33 10   Q.    Yes.

11    A.    I'm not sure.

12    Q.    Well, do you remember the night that you would get

13    together?

14    A.    We'd get together different nights.  It wasn't always the

15    same night.

16    Q.    Was it primarily on Friday?

17    A.    I know that's the -- there were different timeframes.  I

18    mean, there was different events we would go to.  There was

19    like a -- like a Salafi -- like they would call, like, a club

01:33 20   in Quincy, we would go whatever night that was.  I know that

21    the Wayland mosque had a program, it might have been Friday

22    nights.  We would go to that.  If that's -- I'm not sure if

23    that's the one you're referring to but --

24    Q.    That's the one I'm referring to.

25    A.    Yes.
```

```
 1    Q.   So you would go to the program at that mosque, right?

 2    A.   Yes.

 3    Q.   And afterwards you would find yourself speaking to Tarek

 4    because he'd be reacquainting himself with you, right?

 5    A.   Yes.

 6    Q.   And then you and Abousamra began to go out to dinner, and

 7    Tarek went along, right?

 8    A.   We -- all three of us went to dinner.

 9    Q.   And occasionally Hassan Masood would go, right?

01:34 10    A.   Yes.

11    Q.   And the four of you would go out to dinner at a local

12    restaurant, correct?

13    A.   I don't remember us going out to dinner all that often.

14    Q.   Would you go to Papa Gino's?

15    A.   Yes.

16    Q.   Outback Steakhouse?

17    A.   I don't remember if I'd ever been to an Outback.

18    Q.   '99 Restaurant?

19    A.   There's one by my house, but I don't know if we've been to

01:34 20    that one as a group.

21    Q.   Hilltop Steakhouse?

22    A.   I don't recall if I went there with them.

23    Q.   So you didn't discuss this with the prosecutor so you

24    don't have a memory of it?

25         MR. CHAKRAVARTY:  Objection, your Honor.
```

1          THE COURT:  Sustained.

2          MR. CARNEY:  I'll withdraw.

3    BY MR. CARNEY:

4    Q.   And when you'd go out either to a restaurant or meet after

5    the services at the mosque, you'd be talking about the

6    religion, wouldn't you?

7    A.   It would be a topic that would often come up.

8    Q.   It was the primary topic, wasn't it?

9    A.   Yes.

01:35 10   Q.   Didn't you describe at one point that Tarek was trying to

11   find his way?  Do you remember that?

12   A.   We were all reacquainting ourselves with the religion at

13   that time.

14   Q.   Is it accurate that Tarek was trying to find his way,

15   never having really been involved in the Islamic or Muslim

16   religion before?  Isn't that a fair statement?

17   A.   For several years I didn't talk to him and know what was

18   going on with him at that time, so I don't know if this was the

19   first time he was trying to find his way or acquaint himself

01:36 20   with the religion.

21   Q.   Do you remember that Tarek was seriously interested about

22   learning about Islam?

23   A.   Yes.

24   Q.   He was asking questions about, for example, how to pray,

25   correct?

1    A.   I don't know if that would accurately describe it, asking

2    questions on how to pray.  I think he knew how to pray.  But he

3    would be asking questions on -- something would come up, like

4    the specifics or the details of prayer.

5    Q.   There are different ways to pray as a Muslim, aren't

6    there?

7    A.   It depends on how you say it.  There's kind of one way to

8    pray, but there are minor differences in how some people pray,

9    like where you place your hands and that kind of stuff.

01:36 10   Q.   For example, it's significant if you place your hand high

11   or place your hand below the naval, right?

12   A.   I wouldn't call that significant.

13   Q.   Well, it's a distinction, isn't it?

14   A.   It is but --

15   Q.   Some people -- I'll tell you what:  If I ask a question

16   and you can answer it "yes" or "no," would you agree to do

17   that?

18   A.   If I believe it can adequately convey the truth, then yes.

19   Q.   And if you don't believe you can convey the truth, will

01:37 20   you lie?

21   A.   No, I will give you a longer sentence --

22           MR. CHAKRAVARTY:  Objection, your Honor.

23           THE COURT:  Sustained.

24           Go ahead.  You can answer.

25           THE WITNESS:  I will give you a longer answer that

```
 1   will adequately convey the truth.

 2   BY MR. CARNEY:

 3   Q.   Now, Tarek was sincerely interested in learning more about

 4   his faith, wasn't he?

 5   A.   I believe so.

 6   Q.   You would talk about various subgroups in Islam, like

 7   Sunni, Shi'ah, Sufi, Salafi, right?

 8   A.   Yes.

 9   Q.   Now, of the three or four of you, Abousamra, you, Tarek,

10   Hassan, Tarek was the one who was most interested in Islamic

11   jurisprudence, or Islamic law.  Isn't that fair to say?  Out of

12   the four of you.

13   A.   I don't recall exactly who had the most interest for what

14   exact subject.  Ahmad was the most knowledgeable among us in

15   terms of -- he didn't --

16   Q.   Did I ask you that?

17   A.   Excuse me?

18   Q.   I asked you:  Tarek, among the four of you, had the most

19   sincere interest -- or the greatest interest in Islamic

20   jurisprudence.  Would you say that's true or not true?

21   A.   No.

22   Q.   That's not true?

23   A.   I don't believe that was the case.

24   Q.   Well, let me ask you this:  Did Tarek bring books to these

25   meetings?
```

```
 1    A.   I don't recall.

 2    Q.   Do you remember him bringing Hadiths to these meetings to

 3    discuss?

 4    A.   We would --

 5    Q.   Do you remember Tarek bringing Hadiths to these meetings,

 6    Mr. Abuzahra?  If you can say "yes," please do so.

 7    A.   It's difficult for me to answer the question when you

 8    say bring --

 9    Q.   Mr. Abuzahra, you have to follow the court rules.  I'm

01:39 10   asking you a simple question:  Did Tarek bring Hadiths to these

11    meetings to discuss?

12    A.   The semantic issue, when you say "bring Hadith," do you

13    mean on paper or just providing a Hadith to the meeting?

14    Q.   Providing a Hadith or bringing it on paper.

15    A.   Yes.

16    Q.   And he would bring this Hadith in order to discuss it,

17    right?

18    A.   Yes.

19    Q.   And what is a Hadith, if you could remind us?

01:39 20   A.   It is a prophetic saying.

21    Q.   It's what?

22    A.   A prophetic saying.

23    Q.   What does that mean?

24    A.   A saying of the prophet.

25    Q.   Who recorded the saying?
```

```
      1    A.   It would be different scholars over time have collected
      2    them and gathered them.
      3    Q.   Were these people who knew the prophet?
      4    A.   Yes.
      5    Q.   Who lived, obviously, contemporaneously or after or close
      6    in time to him?
      7    A.   Yes.
      8    Q.   And they would put down on paper these statements of the
      9    prophet.  And they're called "Hadiths," correct?
01:40 10   A.   No.
     11    Q.   All right.  They're not prophetic statements?
     12    A.   Your question was multipart.
     13    Q.   Are they prophetic statements, Mr. Abuzahra?
     14    A.   Yes.
     15    Q.   And he would want to go over these statements to try to
     16    interpret them, right?
     17    A.   Yes.
     18    Q.   Try to figure out how these statements would apply to his
     19    life, right?
01:40 20   A.   Or just to get a better understanding of certain aspects
     21    of our religion.
     22    Q.   So that he could apply them to his life?
     23    A.   Yes.
     24    Q.   Tarek took a lot of the lead from Abousamra, didn't he?
     25              MR. CHAKRAVARTY:  Your Honor, I'm not sure I
```

1    understand that question.

2          MR. CARNEY:  All right.  I'll rephrase it.

3    BY MR. CARNEY:

4    Q.   It's fair to say that you and Abousamra were the most

5    forceful speakers at these meetings?

6    A.   That's not fair to say.

7    Q.   You described Abousamra as being knowledgeable, correct?

8    A.   Yes.

9    Q.   And what he was knowledgeable about and the attitude he

01:41 10   has was consistent with a Salafi Muslim.  Is that right?

11   A.   Yes.

12   Q.   And what that means is that this is a branch of Islam

13   where the most important things to study are the Qur'an and the

14   Hadiths.  Is that right?

15   A.   No.

16   Q.   Is it fair to say that it's a very conservative branch of

17   Islam?

18   A.   Depending on the perspective, but yes.

19   Q.   And the Salafi believes that instead of listening to

01:41 20   people talking now about the views of what Islam means, that

21   one must look to the words of Allah as reflected or revealed in

22   the Qur'an and in the words of the prophet Mohammad.  Is that a

23   fair statement?

24   A.   It's an incomplete statement.

25   Q.   The focus, first and foremost, of a Salafi is on the

1    Qur'an and the words of the Qur'an.  Is that correct?

2    A.    Yes.

3    Q.    Because those are the revelations of God.

4    A.    Yes.

5    Q.    And those are the literal words of God as reflected in the

6    Qur'an according to the Salafi, right?

7    A.    Yes.

8    Q.    And then there are statements made by his prophet

9    Mohammad.  Is that right?

01:42 10    A.    Yes.

11    Q.    And Mohammad is the person to whom God, or Allah, made

12    these revelations, right?

13    A.    Sometimes indirectly, but yes.

14    Q.    And the statements of Mohammad and his companions became

15    very important to a Salafi, right?

16    A.    Yes.

17    Q.    And that's what Tarek would focus on:  what is contained

18    in the Qur'an and in these statements of the prophet, right?

19    A.    Yes.

01:43 20    Q.    When Tarek would go to Egypt with his family, he would

21    come back with many books that he would buy on Islam in Egypt,

22    wouldn't he?

23    A.    I'm not sure what he purchased when he was there.

24    Q.    He would show you books at these group meetings, wouldn't

25    he?

1   A.   Yes.

2   Q.   Have you ever been in his house?

3   A.   Yes.

4   Q.   Have you ever been in his bedroom?

5   A.   Yes.

6   Q.   You've seen the bookcases containing dozens of volumes

7   concerning Islam, haven't you?

8   A.   I don't recall exactly how many books he had at that time.

9   Q.   Do you remember how many bookcases he had?

01:43 10   A.   I do not.

11   Q.   Is it fair to say that he had four bookcases filled to the

12   brim with books?

13   A.   I don't recall if that was how many he had.

14   Q.   Tarek, at these meetings, would express an interest in

15   learning how to speak classical Arabic, didn't he?

16   A.   Yes.

17   Q.   And his purpose is he wanted to be able to read these

18   classic texts that were written centuries ago, correct?

19   A.   Yes.

01:44 20   Q.   And it's fair to say that these classic texts are written

21   in an Arabic that is different than the colloquial Arabic now

22   spoken.  Isn't that fair to say?

23   A.   Yes.

24   Q.   Someone who might be able to read Arabic to some degree

25   might not be able to read these classic texts because of the

1   differences.  Isn't that right?

2   A.   Yes.

3   Q.   What Tarek was trying to do at these meetings is determine

4   what under Islam was required of him to do, what was permitted

5   for him to do, and what was forbidden for him to do.  Isn't

6   that a fair way to put it?

7   A.   No.

8   Q.   When he focused on the Qur'an, he tried to apply it to

9   contemporary issues.  Isn't that right?

01:45 10   A.   Yes.

11   Q.   I mean, as a young man Tarek was trying to figure out how

12   to be a good Muslim in the United States.  Isn't that a fair

13   statement?

14   A.   Yes.

15   Q.   And by "a good Muslim," it means a Muslim who is faithful

16   to the Qur'an and faithful to the prophet, right?

17   A.   Yes.

18   Q.   Have you read the Qur'an?

19   A.   Yes.

01:45 20   Q.   And those are the words that are to guide a person's life

21   if you are a Salafi.  Isn't that right?

22   A.   Yes.

23   Q.   Now, you talked about finding a wife many times in this

24   group, correct?

25   A.   Yes.

1   Q.   There's certain restrictions if you're a Muslim, a man, in
2   regard to women, aren't there?
3   A.   Yes.
4   Q.   For example, marriage occurs very quickly, doesn't it?
5   A.   It can.
6   Q.   Well, the time frame between when you meet a woman and
7   when you get married to the woman can often be a month or two,
8   right?
9   A.   It could be.  It could be shorter.  It depends.
01:46 10   Q.   And you don't walk around holding hands or dating, right?
11   A.   It depends.
12   Q.   You're not allowed to kiss, are you?
13   A.   You're not allowed to.
14   Q.   What's that?
15   A.   You're not supposed to, no.
16   Q.   Well, if you are trying to follow these rules of Islam
17   you're not supposed to.
18   A.   Correct.
19   Q.   And Tarek was all about trying to figure out what the
01:46 20   rules were and follow them.  Isn't that right?
21   A.   Yes.
22   Q.   Now, during these discussions Tarek was also interested in
23   finding out about his Muslim heritage, wasn't he?
24   A.   It's difficult for me to answer.  I don't know what you
25   mean by "his Muslim heritage."

1    Q.   Well, the history of Muslims.

2    A.   Yes.

3    Q.   When did God give his revelations to the prophet?

4    A.   Over 1400 years ago.

5    Q.   And Tarek was interested in what had occurred over those

6    1400 years because he hadn't really paid attention to it

7    before, had he?

8    A.   Correct.

9    Q.   And in these groups he learned about the suffering that

01:47 10   Muslims have endured.  Isn't that right?

11   A.   Yes.

12   Q.   Throughout history Muslims in various parts of the world

13   have been oppressed simply because they are Muslim.  Isn't that

14   right?

15   A.   I don't think I would classify every single instance as

16   "simply being because they are Muslim," but it has happened

17   often, the way you've described.

18   Q.   There was a glorious period for Muslims, wasn't there?

19   A.   Yes.

01:48 20   Q.   When they were able to live in peace, right?

21   A.   Yes.

22   Q.   But most of the rest of the time they were oppressed, for

23   example, by the Mongols?

24   A.   Yes.

25   Q.   Who would come in and try to dominate them, correct?

```
 1   A.   Yes.

 2   Q.   And try to prevent them from practicing their religion,

 3   correct?

 4   A.   I'm not sure of the exact history.  I haven't studied it

 5   that much.

 6   Q.   Tarek was very interested in the history, wasn't he?

 7   A.   I think that was part of his interest, yes.

 8   Q.   You also talked about present-day problems that Muslims

 9   were experiencing, didn't you?

10   A.   Yes.

11   Q.   What I would term "recent history," let's say in the

12   last -- in the previous 20 years, right?

13   A.   Yes.

14   Q.   For example, in Iraq -- a country that is Muslim, is it

15   not?

16   A.   (No verbal response.)

17   Q.   Do you consider Iraq to be a Muslim country?

18   A.   Yes.

19   Q.   There was an embargo on Iraq because of Saddam Hussein,

20   right?

21   A.   Yes.

22   Q.   And that embargo was preventing even medicine from coming

23   into the country, correct?

24   A.   Correct.

25   Q.   Children were dying in Iraq because of this embargo,
```

1    correct?

2    A.    Yes.

3    Q.    And this was an embargo fully supported by the United

4    States, right?

5    A.    Yes.

6    Q.    In fact, some would say it was the United States that led

7    to the embargo being imposed on Iraq, right?

8    A.    Correct.

9    Q.    And so this was a subject that you talked about, the

01:49 10   suffering of the children in Iraq, right?

11   A.    Yes.

12   Q.    You also talked about the genocide of Muslims that was

13   occurring in Bosnia --

14   A.    Yes.

15   Q.    -- is that true?

16        And by "genocide," that means that people were being

17   killed simply and solely because they were Muslims.  Is that

18   right?

19   A.    Yes.

01:50 20   Q.    The Serbs would come into Muslim areas and just massacre

21   them.  Isn't that right?

22   A.    Yes.

23   Q.    And the United States wasn't doing anything about it, was

24   it?

25   A.    I'm not involved too much.  I don't know if eventually

they did anything or not.  But initially, no, they didn't do
anything.

Q.   And this was something that you talked about, right?

A.   Yes.

Q.   You talked about what was happening in Chechnya, right?

A.   Yes.

Q.   And it's fair to say that what was going on was ethnic
cleansing.  Isn't that a fair statement?

A.   I heard it described as that.

01:50 Q.   Basically, Russian troops would go into a village and take
Muslims out of the village, even if they had lived there for
generations, so that the village would be pure ethnically.
Isn't that a fair assessment?

A.   I don't know too much about that.

Q.   Tarek would talk about Chechnya, right?

A.   Yes.

Q.   And basically, it seemed like throughout the world there
were efforts to oppress Muslims, correct?

A.   Yes.

01:51 Q.   And Tarek was upset with that, wasn't he?

A.   In what time frame?

Q.   In the time frame when you were having these meetings and
discussing children dying in Iraq and genocide in Bosnia and
ethnic cleansing in Chechnya, these were things that bothered
Tarek.  Isn't that right?

```
 1   A.    Yes.

 2   Q.    Russia invaded Afghanistan, didn't it?

 3   A.    Yes.

 4   Q.    And tried to put Afghanistan under a communist rule,

 5   right?

 6   A.    I'm not sure what their goal was.

 7   Q.    Well, when Russia went into Afghanistan, it precluded

 8   Muslims from practicing their faith, because under communist

 9   rule you're not allowed to practice your faith, right?

01:52 10   A.    Correct.

11   Q.    And the people in Afghanistan sought help to try to

12   respond to this, correct?

13   A.    I'm not too sure of the history.

14   Q.    You weren't as much concerned about history, were you?

15   A.    No.

16   Q.    Now, you've told us that Tarek would send out emails about

17   people -- emails to groups of people, right?

18   A.    Yes.

19   Q.    And Tarek would sometimes focus on this suffering in the

01:52 20   Muslim world.  Is that right?

21   A.    If you have anything else from -- I can't recall a

22   specific email.  If you have something to help me.  I can't

23   recall anything specifically.

24         MR. CARNEY:  Can we have 352, please, Mr. Bruemmer?

25   BY MR. CARNEY:
```

1    Q.    This was an email sent by Tarek Mehanna.  Do you have it

2    in front of you?

3    A.    I see the header information.

4    Q.    And the date was approximately two years after 9/11?

5    A.    Yes.

6    Q.    And this was a group email, wasn't it?

7    A.    Yes.

8    Q.    Please tell me if I'm reading this correctly.

9          (As read:)  September 11 Tribute to innocent victims of

01:54 10   terrorism.

11          As the world gears up to mark the second anniversary of

12    the September 11 attacks, we would like to pay tribute to the

13    innocent victims of terrorism:  Innocent men, women and

14    children who have been brutally murdered without any crime,

15    without any television channel to mention their plight, without

16    any magazine to print their photos, without any newspaper to

17    list their biographies, and without any cotton quilts to carry

18    their name patches.

19          On this day, we remember the over 7,500 Iraqi civilians

01:55 20   killed by the American and British bombing during their

21    invasion of Iraq this year, in addition to the over 1.5 million

22    Iraqi Muslim babies who have previously died, according to

23    World Health Organization statistics, as a direct result of the

24    American -imposed sanctions on Iraq preventing critical child

25    medicines from reaching Iraqi hospitals over the past 12 years.

500 times as many Iraqis have been killed by Americans than
were killed by September 11.

On this day, we remember the 31,202 Afghan Muslim
civilians who have been brutally murdered since October 2001 by
American warplanes indiscriminately bombing their villages,
houses, mosques, hospitals and wedding parties.  Ten times as
many innocent Afghans have been killed by Americans than were
killed in the September 11 attacks.

On this day, we remember the 6,084 Indian Muslims killed
01:56 and burnt in cold-blooded killing orgies organized by the
Indian government in Gujarat.

On this day, we remember the 100,000 Chechen Muslim
civilians --

MR. CARNEY:  Next, Paul?  Thank you.

Q.   Resuming from the previous page.  (Continuing to read:)
On this day, we remember the 100,000 Chechen Muslim civilians
who have been killed by Russian aerial bombing, having been
given a recent green light by the American war on terror.

On this day, we remember the 3,039 Palestinian Muslims who
01:56 have been murdered by Americans via weapons held in the hands
of Israeli soldiers since September 2001.

On this day, we remember the 2,170 Usbek Muslims who have
been taken away from their homes by the American-based Karimov
government in the middle of the night, never to be seen again.

On this day, we remember the 1,473 Chinese Muslims who

1    have been executed in public after having been forced to drink

2    alcohol and the flesh of swine in the east Turkistan Muslim

3    region of China.

4         On this day, we remember the 1,399 Kashmiri Muslims

5    murdered and the 852 gang rapes carried out by Hindu and Sikh

6    soldiers in occupied Kashmir.

7         On this day, we remember the 1,261 Indonesian Muslims

8    massacred by the Christians in the Maluku region of Indonesia,

9    having been supplied by M-16 assault rifles, rocket-launchers

01:58 10   and funds by the Netherlands.

11         On this day, we remember the over 600 Muslim mujahideen

12   prisoners being held in small cages in Guantanamo Bay after

13   their beards were forcibly shaved, their hands and feet were

14   bound, and their eyes and ears covered, and in conditions where

15   they are subject to malaria, heat stroke and other tropical

16   diseases.

17         On this day, we remember the deaths of the hearts of 1.2

18   billion Muslims worldwide who are blind to the above, but awake

19   to these killed on September 11, 2001.

01:58 20        Did I read that accurately?

21   A.   A few minor mistakes, but accurate enough.

22             THE COURT:  Mr. Carney, we're just past eleven

23   o'clock.  I think we'll take the morning recess at this point.

24             THE CLERK:  All rise for the Court and jury.  The

25   Court will take the morning recess.

```
          1              (The Court and jury exit the courtroom and there is a
          2     recess in the proceedings at 11:07 a.m.)
          3     (Court and jury in at 11:30 a.m.)
          4              THE COURT:  Go ahead.
          5              MR. CARNEY:  Thank you, your Honor.
          6     Q.   So you said I was pretty good at reading that document?
          7     A.   Yes.
          8     Q.   I only made a few mistakes?
          9     A.   Just a few, one omission.
02:25    10     Q.   The point is:  It's fair to say that that accurately
         11     reflects the connection Tarek felt to Muslims around the world,
         12     isn't that right?
         13     A.   I wasn't -- I don't believe I was on that email list, and
         14     I don't recall similar emails from them.
         15     Q.   Did I ask you if you were on the email list?
         16     A.   No.
         17     Q.   Okay.  Listen carefully to my question.  Did the
         18     prosecutors tell you to listen very carefully to my question?
         19     A.   Yes.
02:25    20     Q.   Okay.  Did that email, to your knowledge, accurately
         21     reflect Tarek's feelings toward other Muslims in the world?
         22     A.   Yes.
         23     Q.   Tarek would consider them and call them his brothers and
         24     sisters, right?
         25     A.   Yes.
```

```
 1   Q.   And that's actually in keeping with a concept reflected in
 2   the Qur'an, correct?
 3   A.   Yes.
 4   Q.   A Muslim is supposed to feel the suffering of fellow
 5   Muslims in the world, isn't that right?
 6   A.   Yes.
 7   Q.   And at these group meetings, a lot of the discussion
 8   focused on what was the duty or the obligation of a Muslim in
 9   the United States to other Muslims suffering in the rest of the
02:26 10  world, right?
11   A.   Yes.
12   Q.   Especially if one wants to be a good Muslim living in the
13   United States, right?
14   A.   Yes.
15   Q.   And it's fair to say that a lot of these discussions you
16   were having were very common among people who embraced the
17   Salafi -- or Salafi view?  Excuse me for mispronouncing.  Let
18   me ask you:  How do you pronounce it, sir?
19   A.   Salafi.
02:27 20  Q.   Salafi.  This type of discussion is very common among
21   people who follow the Salafi view, isn't it?
22   A.   No.
23   Q.   You don't have discussions at length about how to
24   interpret things that are in the Qur'an?
25   A.   Is that a "you" individual or a collective "you"?
```

```
  1   Q.   What's that?
  2   A.   When you say "you," I don't know if you're talking about
  3   me individually or the collective "you."
  4   Q.   That it's common among Salafi Muslims to engage in these
  5   lengthy discussions about the meaning of a Hadith, for example?
  6   A.   For example, yes.
  7   Q.   Now, you told us that you remember where you were when
  8   9/11 occurred, correct?
  9   A.   Yes.
02:28 10   Q.   And, of course, we're talking about the attack on the
 11   United States, right?
 12   A.   Yes.
 13   Q.   An attack where, of course, planes were flown into the
 14   Trade Center, correct?
 15   A.   Yes.
 16   Q.   A plane was driven into the ground in Pennsylvania, wasn't
 17   it?
 18   A.   A plane crashed in Pennsylvania to the best of my
 19   knowledge.
02:28 20   Q.   You don't believe it was driven into the ground by the
 21   pilots?
 22   A.   I don't know what happened.
 23   Q.   Were you concerned about it?
 24   A.   Am I concerned about it?  I can --
 25   Q.   Were you concerned about it, the plane that went into the
```

```
 1   ground in Pennsylvania?
 2   A.    No.
 3   Q.    Did it bother you that a plane had been flown into the
 4   Pentagon?
 5   A.    No.
 6   Q.    Did it bother you that more than 3,000 innocent Americans
 7   were killed that day?
 8   A.    At the time, no.
 9   Q.    You supported that attack, didn't you?
10   A.    At the time, yes.
11   Q.    All right.  I'll divide the time between, say, the time of
12   the attacks until the time you say you developed a different
13   view.  So at the first period afterwards, you supported it,
14   right?
15   A.    Yes.
16   Q.    You thought it was justified?
17   A.    Yes.
18   Q.    Please tell the jurors why you thought that was justified.
19   A.    The initial reaction was just that it was a -- the U.S.
20   had been bullying the rest of the world, especially Muslims.
21   So we felt like it was a kind of -- like I said before, a David
22   vs. Goliath thing, that they were able to get back at them.
23   That was the initial reaction.  Later, Ahmad --
24   Q.    I'm not asking about later.  I'm talking about initially.
25   A.    The time frame you mentioned was inclusive of what I'm
```

1    discussing.

2    Q.    Until you changed your view.

3    A.    Yes.  Part --

4    Q.    Before you changed your view, you justified those attacks,

5    didn't you?

6          MR. CHAKRAVARTY:  Your Honor, I don't think he

7    finished answering the question of:  At the time, please tell

8    the jury what the --

9          THE COURT:  I'm not sure that the division that's been

02:30 10   suggested is a clear enough one that both sides are on the same

11   page.

12   Q.    All right.  Let's focus on the year after it occurred.

13   Did you continue to believe it was justified?

14   A.    Yes.

15   Q.    Did you believe that the U.S., the United States, deserved

16   to be attacked in this manner?

17   A.    Yes.

18   Q.    Was that a phrase that you yourself used, "the United

19   States deserved what happened"?

02:31 20   A.    I don't know if I ever used that exact phrase, but that

21   was my sentiment at the time.

22   Q.    Did the prosecutor show you your grand jury transcript?

23   A.    I've seen them.

24   Q.    Did you read it?

25   A.    I read parts of it.

```
 1   Q.    How long was it?

 2   A.    I don't recall.

 3   Q.    Was it 64 pages?

 4   A.    I don't know.

 5         MR. CARNEY:  May I approach, please?

 6         THE COURT:  All right.

 7   Q.    Mr. Abuzahra, can you tell me if you recognize that

 8   document, please?

 9   A.    It appears to be the grand jury testimony.

02:32 10   Q.    How many pages is it, please?

11   A.    Sixty-four.

12   Q.    You just said to us that when you met with the prosecutors

13   you only looked at parts of this.  Was that because you only

14   looked at the parts they showed you?

15   A.    Yes.

16   Q.    And so you didn't ask to see the parts -- the pages that

17   they didn't show you?

18   A.    I don't believe I did.

19   Q.    You didn't want to read the whole thing?

02:33 20   A.    I didn't know that it was an option for me to read the

21   whole thing.

22   Q.    Did you ask?

23   A.    No.

24   Q.    So you were satisfied to just read what they cherry-picked

25   for you?
```

```
 1   A.    It was part of the process.
 2   Q.    So you were prepared to read what they cherry-picked for
 3   you?
 4   A.    Yes.
 5            MR. CARNEY:  May I approach again, your Honor, please?
 6            THE COURT:  All right.
 7   Q.    Would you please read to yourself from where I'm pointing,
 8   over to the next page, up to the end of the paragraph, please?
 9            MR. CHAKRAVARTY:  Objection, your Honor.  It's not
02:33 10   refreshing somebody's memory if there's no question.
11            THE COURT:  Well, I don't know.  I guess we'll --
12   right now, he's just being asked to read it.  Let's see what
13   the next question is.
14   A.    (Reading.)
15   Q.    All set?
16   A.    Yes.
17   Q.    When I asked you if the phrase "deserved it" was one used
18   by you, you paused for a few seconds and didn't remember,
19   right?
02:34 20   A.    Correct.
21   Q.    Did you use that phrase, "deserved it," in regard to the
22   United States and the 9/11 attacks?
23   A.    I don't recall my exact statements made during the grand
24   jury testimony.
25   Q.    This doesn't refresh your recollection?
```

```
     1   A.   I can see it, and I will assume it's accurate, but I can't

     2   recall if I specifically used that phrase during the grand jury

     3   testimony.

     4   Q.   It certainly expressed your sentiments if you did use the

     5   phrase, right?

     6   A.   Yes.

     7   Q.   In that regard, you also believed that Osama bin Laden was

     8   a heroic figure, didn't you?

     9   A.   Yes.

02:35 10 Q.   That he was saving or fighting on behalf of Muslims,

    11   right?

    12   A.   Yes.

    13   Q.   And that he deserved to be protected, right?

    14   A.   I didn't -- I didn't think of it like that.

    15   Q.   Well, explain to the jury why you thought he was a hero in

    16   the aftermath of 9/11.

    17   A.   He was the one that was able to kind of attack the giant,

    18   so to say.  He was able to kind of give a black eye to America.

    19   That's how we looked at it.

02:36 20 Q.   And that was a good thing in your mind?

    21   A.   Yes.

    22   Q.   And you made your view very well known at these meetings,

    23   right?

    24   A.   Yes.

    25   Q.   These meetings that Tarek was attending with you, right?
```

```
 1    A.    Yes.
 2    Q.    Let's talk about Ahmad Abousamra for a moment.  He had
 3    been a Muslim who was serious about his faith for a long time,
 4    isn't that right?
 5    A.    Longer than we had been, yes.
 6    Q.    He was certainly hardcore in his beliefs, right?
 7    A.    Yes.
 8    Q.    In fact, his beliefs, it would be fair to say, were
 9    extreme in terms of the view -- his view of being a Muslim,
10    correct?
11    A.    Some would characterize that.
12    Q.    And he was very strict about what needed to be done,
13    correct?
14    A.    Yes.
15    Q.    Now, Abousamra, like you, was a confident man, isn't that
16    right?
17    A.    No.
18    Q.    You don't think you're a confident man?
19    A.    It depends on the topic.
20    Q.    Well, at the meeting that we heard a recording on
21    yesterday afternoon -- do you recall that recording?
22    A.    Yes.
23    Q.    And it took place in the basement of the Abousamra home,
24    right?
25    A.    Yes.
```

```
 1    Q.   Would you agree that the two most predominant speakers
 2    were you and Abousamra?
 3    A.   I believe in the --
 4    Q.   Could you answer the question?
 5    A.   No.
 6    Q.   You don't understand the question?
 7    A.   No.  To answer your question, no.
 8    Q.   You've got a college degree, right?
 9    A.   Yes.
02:38 10    Q.   A master's degree?
11    A.   Yes.
12    Q.   You almost have a Ph.D.?
13    A.   Yes.
14    Q.   And you don't understand my question?
15    A.   My answer to your question is no.
16    Q.   I think you might think about a refund.  I'll withdraw it.
17         It's fair to say, listening to that tape yesterday, you
18    and Abousamra were the dominant voices heard on it; in other
19    words, you two spoke more than anyone else --
02:38 20              MR. CHAKRAVARTY:  Asked and answered, your Honor.
21    Q.   -- is that right?
22              THE COURT:  No.  Overruled.
23    A.   No.
24    Q.   Who spoke most?
25    A.   The portions of the tape that were played, we heard
```

1    Ahmad's father speaking a great deal as well.

2    Q.    Okay.

3            MR. CARNEY:  Sorry, your Honor, for the delay.  May I

4    approach, please?

5            THE COURT:  All right.

6    Q.    Showing you what's been marked Exhibit 455, do you

7    recognize this as the transcript of the meeting?

8    A.    Yes.

9    Q.    It was played yesterday?

02:39 10  A.    Yes.

11   Q.    And how many pages is that document?  You have to count

12   them individually, I'm afraid.

13   A.    Thirty-one pages.

14   Q.    What is the designation of Abousamra's father?

15   A.    "ABA."

16   Q.    How many pages does ABA appear on that document?

17   A.    Two.

18   Q.    So Abousamra's father appears on two pages out of 31, and

19   you say he was the predominant speaker at the meeting?

02:41 20  A.    That is an excerpt of the meeting.

21   Q.    I asked you about what was played yesterday.  And that's

22   what the prosecutor wanted to have heard, correct?

23   A.    Yes.

24   Q.    And he appears on two pages out of 31, isn't that right?

25   A.    Yes.

1   Q.   In the transcript we heard yesterday, there are obviously

2   29 pages where he doesn't say a word, isn't that right?

3   A.   Yes.

4   Q.   Is it fair to say, on those 29 pages, that you and

5   Abousamra are the predominant speakers?

6   A.   I don't know.

7   Q.   Do you remember hearing the tape yesterday?

8   A.   Yes.

9   Q.   Do you remember reading the transcript?

02:42  10   A.   Yes.

11   Q.   Is Abousamra a predominant or dominant speaker on that?

12   A.   I don't know.

13   Q.   Are you?

14   A.   I don't know.

15   Q.   Now, Abousamra had very strong opinions, didn't he?

16   A.   Yes.

17   Q.   And he convinced you of them, didn't he?

18   A.   At times, yes.

19   Q.   And you embraced them, didn't you?

02:43  20   A.   At times, yes.

21   Q.   Abousamra would have a style where he would continue

22   debating people until he wore them down, didn't he?

23   A.   He could continue debating until he felt he won.

24   Q.   And he won when people would be silent or concede?

25   A.   Yes.

1    Q.   Sometimes Tarek would speak to you after these meetings,

2    wouldn't he, privately?

3    A.   I don't recall.

4    Q.   Do you recall Tarek approaching you and saying that

5    Abousamra's extreme views were pretty far out there sometimes?

6    You didn't cover this in the prep session?

7              MR. CHAKRAVARTY:   Objection, your Honor.

8              THE COURT:   Sustained.

9    Q.   Did Tarek speak to you privately and say Abousamra's ideas

02:44 10   are far out there, really far out there?

11   A.   I have a vague recollection of that.

12             MR. CARNEY:   May I approach, please?

13   Q.   Would you read this paragraph to yourself, please?

14   A.   (Reading.)

15   Q.   Does that refresh your memory --

16   A.   I believe --

17   Q.   -- that you and Tarek would occasionally speak after these

18   meetings?

19   A.   The incident I have in mind now and I had in mind then was

02:45 20   not after a specific meeting.

21   Q.   Okay.  Did you talk with Tarek after sessions with Ahmad

22   Abousamra?

23   A.   Can you repeat the question?  I couldn't hear one of the

24   words.

25   Q.   Did you sometimes meet -- let me start over.

1       Did Tarek sometimes approach you to speak to you after a

2  session with Abousamra?

3  A.   Not that I can recall.

4  Q.   Can you recall him talking to you privately --

5  A.   Yes.

6  Q.   -- and saying to you, about Abousamra's views, that

7  they're really far out there?

8  A.   I don't know if that's the exact wording, but I remember

9  we did -- in essence, yes.

02:46 10  Q.   Was that the exact wording you used in front of the grand

11  jury?

12  A.   I don't recall.

13       MR. CARNEY:  Okay.  May I approach again?

14       THE COURT:  All right.

15  Q.   Would you read these four words again, please?

16  A.   (Reading.)

17  Q.   This is your transcript, isn't it?

18  A.   Yes.

19  Q.   These are your answers, aren't they?

02:47 20  A.   Yes.

21  Q.   Given under oath, aren't they?

22  A.   Yes.

23  Q.   Is it your phrase that said Abousamra's views, as

24  expressed by Tarek and you after a meeting, were really far out

25  there, or do you just don't remember?

A.    My understanding -- and you can please correct me if I'm

wrong -- but I have to testify from my recollection, not from

what I testified to previously on a piece of paper.  To the

best of my knowledge, I don't remember using that exact phrase.

Q.    Is that what the prosecutor told you to say --

A.    No.

Q.    -- during the prep?

A.    No.

Q.    You just came up with that on your own?

02:47  A.    He didn't tell me to say that, but he said I have to

testify from my memory.

Q.    If I show you something from the grand jury that's your

exact words, you can say, I don't remember them?

A.    No, he did not say that.

Q.    Abousamra would come up with justifications for all of his

views, wouldn't he?

A.    Yes.

Q.    And he would always have a rebuttal to any moderate view

that was tried to be expressed at these meetings, correct?

02:48  A.    Yes.

Q.    And it was Abousamra's opinion that you adopted also,

isn't that right?

A.    Not all of his views.

Q.    Well, Abousamra, you told us, went to Pakistan on two

occasions, correct?

1   A.   Yes.

2   Q.   And he went there to try to go to a training camp, right?

3   A.   Yes.

4   Q.   And thereafter, go on to fight, right?

5   A.   Yes.

6   Q.   And you were completely a hundred percent supportive of

7   that, weren't you?

8   A.   Yes.

9   Q.   In fact, on one occasion, you gave Abousamra $500,

02:49 10   correct?

11   A.   Yes.

12   Q.   And he was to take that $500 and give it to the

13   organization that was providing the training, correct?

14   A.   No.

15   Q.   He was to give it to the training group, wasn't he?

16   A.   No.

17   Q.   Who was he to give it to?

18   A.   To a group that was fighting in Jihad.

19   Q.   Is it fair to say that the group fighting Jihad was the

02:49 20   group that was offering the training?

21   A.   No.

22   Q.   They were separate?

23   A.   Yes.

24   Q.   And did Abousamra tell you whether he gave the $500 to

25   someone?

1    A.    Yes.

2    Q.    Who did he give it to?

3    A.    I forget if he told me -- one of the two:  al Qa'ida or

4    Taliban.

5    Q.    And did that bother you?

6    A.    No.

7    Q.    You supported that?

8    A.    Yes.

9    Q.    Did you intend that he could do that when you gave him the

02:50 10    money?

11   A.    Yes.

12   Q.    You talked yesterday about videos that were shown, right?

13   A.    Yes.

14   Q.    And you would sometimes watch these videos with a group of

15   acquaintances?

16   A.    Yes.

17   Q.    It often was not just Tarek and Abousamra; there were

18   often other people there, too, right?

19   A.    Yes.

02:50 20   Q.    And the typical video of what you were describing would

21   start with some quotations from the Qur'an usually, right?

22   A.    I don't recall.

23   Q.    They would show some suffering of Muslims somewhere in the

24   world?

25   A.    Oftentimes, yes.

1    Q.    They would often show people training or engaged in
2    battles, right?
3    A.    Yes.
4    Q.    And speeches?
5    A.    Yes.
6    Q.    And presumably things that were portrayed as being
7    victories, right?
8    A.    Yes.
9    Q.    Now, you said yesterday that you yourself downloaded this
02:51 10   so-called Jihadi video from the internet, right?
11   A.    I said I believed I have.
12   Q.    So that way they could be downloaded to your personal
13   computer, whether it's a PC or a laptop?
14   A.    Yes.
15   Q.    So that you would be able to watch it at your convenience?
16   A.    Yes.
17   Q.    Now, you said to us yesterday that watching these videos
18   had two purposes; do you remember that?
19   A.    Yes.
02:51 20   Q.    The first purpose was, in your opinion, a way to get the
21   other side of the story, correct?
22   A.    Yes.
23   Q.    You believed, as did other members of the group, that it
24   was helpful to see what a Muslim perspective would be on what's
25   going on in the world, correct?

```
 1    A.    I don't know about the other people, but for myself, yes.

 2    Q.    And you could even expand it to say an Arab perspective,

 3    correct?

 4    A.    Yes.

 5    Q.    You consider yourself Arab?

 6    A.    Yes.

 7    Q.    And so one purpose for doing this is to see the other side

 8    of the story, right?

 9    A.    Yes.

02:52 10  Q.    Did you feel that it was legal for you to hear the other

11    side of the story?

12            MR. CHAKRAVARTY:  Objection, your Honor.

13            THE COURT:  Sustained.

14    Q.    Did you feel you were committing a crime in looking at

15    this video that you would download?

16            MR. CHAKRAVARTY:  Objection, your Honor.

17            THE COURT:  Sustained.

18    Q.    Did you feel that it was proper and appropriate for you to

19    download a video and watch it?

02:53 20          MR. CHAKRAVARTY:  Objection, your Honor.

21            THE COURT:  Sustained.

22            MR. CARNEY:  May I be heard, please?

23            THE COURT:  All right.

24            MR. CARNEY:  Or is this something I can never change

25    your mind on?
```

1          THE COURT:  Probably not, but I'll hear you if you

2     want.

3          MR. CARNEY:  Okay.

4     (SIDEBAR CONFERENCE AS FOLLOWS:

5          MR. CARNEY:  The reason I think this is relevant, your

6     Honor, is because of its impact that it can have on the

7     defendant's state of mind.  If the defendant is with other

8     fellow Muslims, especially ones who are older and well educated

9     and are watching something and that it's clear to those other

02:53 10   people that they believe what they're watching is a completely

11    legal act as opposed to doing something illegal, then that

12    would affect this defendant's state of mind.

13         For example, a key part of the government's case is

14    that the showing of videos to people was an overt act in

15    support of a crime.  If the people involved in it did not have

16    that belief but rather thought it wasn't a crime, this is

17    completely appropriate and legal for us to do that, then that

18    affects the defendant's state of mind.  And that's why this is

19    being offered, for that limited purpose.

02:54 20        THE COURT:  Okay.

21         MR. CHAKRAVARTY:  I still don't think that overcomes

22    what his state of mind is versus what the defendant's is.

23         MR. CARNEY:  His state of mind is only relevant as it

24    affects Mehanna's state of mind.  They're talking about these.

25    They're watching these.  If he's thinking we're doing something

```
 1   completely appropriate, then that affects the defendant's state
 2   of mind.  The government wants the jury to believe the
 3   defendant had a different state of mind, that he was doing this
 4   in order to commit the crime of conspiracy to provide material
 5   support.
 6              THE COURT:  All right.  The objection is sustained.
 7   .  .  .  END OF SIDEBAR CONFERENCE.)
 8   Q.   Did you hide these videos when you downloaded them?
 9   A.   No.
10   Q.   Did you sometimes show these videos to other people?
11   A.   I do not recall.
12   Q.   Pardon me?
13   A.   I do not recall.
14   Q.   Were you embarrassed to have these videos?
15   A.   It depends on which group.
16   Q.   The group that you downloaded of Jihadi videos, were you
17   embarrassed to be in possession of those?
18   A.   Embarrassed by my group I was friends with?
19   Q.   Embarrassed in any way.
20   A.   Yes.
21   Q.   Why were you embarrassed?
22   A.   Why -- I don't think it -- I wouldn't have shown these to
23   people at work or let them know that that was something I was
24   interested in.
25   Q.   Interested in or believed in?
```

1    A.    I'm talking about being interested in the videos.

2    Q.    So you would have been embarrassed to show them to people

3    outside of your circle?

4    A.    Yes.

5    Q.    Why would that be?

6         MR. CHAKRAVARTY:  Objection, relevance, your Honor.

7         THE COURT:  You may answer that.

8    A.    Because it -- in the U.S. population, they're still --

9    there's still scars from that attack.  So I don't want people

02:56 10   to know that these are the types of videos that I'm interested

11   in, supporting the groups that support the attacks.

12   Q.    Even though one of the reasons you wanted these videos is,

13   as you put it, to get the other side of the story, right?

14   A.    Yes.

15   Q.    And some of these videos were such that they would appear

16   on Al-Jazeera, right?

17   A.    Portions of them.

18   Q.    And you could download them from Al-Jazeera, correct?

19   A.    Portions of them.

02:57 20   Q.    Al-Jazeera is a major communication channel in the world,

21   isn't it?

22   A.    Yes.

23   Q.    It's, indeed, in part of the world, probably the single

24   major news source, isn't that right?

25   A.    Yes.

1    Q.   And you had an ability, by having, I presume, a satellite

2    dish or some other arrangement, that you could watch

3    Al-Jazeera, is that right?

4    A.   No.

5    Q.   You never could watch it?

6    A.   Only at -- I didn't have a satellite dish at my house.

7    Q.   It's not on regular cable in the United States, is it?

8    A.   No.

9    Q.   And your perspective was that American media gave one view

02:57 10   of what was happening in places like Bosnia, Chechnya,

11   Afghanistan, Iraq, and these videos helped you to get a

12   different view, right?

13   A.   Yes.

14   Q.   And was it important to you to get that different view?

15   A.   It was important to some degree, not gravely important in

16   my life.

17   Q.   The second reason that you said you liked watching Jihadi

18   videos is because they were entertaining, right?

19   A.   Yes.

02:58 20   Q.   The guys you were with, and you, liked movies with

21   violence in it, right?

22   A.   I don't know what types of movies they liked, but, yes,

23   for me, I can answer yes.

24   Q.   Well, if you sat watching these movies together, would

25   people talk during it?

A.    Yes.

Q.    Did people often get up and say, This is boring?  I'm
going to go watch a chick flick?

A.    No.

Q.    So it's fair to say that every indication you had was that
these movies were entertaining to guys who liked watching
violent movies?

A.    I can't fairly say that.

Q.    You even had movie nights, right, where guys would get
together to watch movies on TV or cable or whatever?

A.    I don't recall.

Q.    Do you remember seeing movies such as martial arts movies
like Jet Li or V for Vendetta or other movies like that?

A.    I've seen those myself.  I don't remember seeing them in a
group.

Q.    The only time the group ever watched movies, to your
memory today, was Jihadi movies, right, nothing else, no car
crash movies, no Kung Foo movies, no horror movies?

A.    I don't recall.

Q.    There certainly were never any videos about how to build
an IED bomb, right?

A.    Correct.

Q.    And an "IED" means improvised explosive device?

A.    Yes.

Q.    And that's a bomb that can be usually crudely made and put

1    on the side of the road to blow up as a vehicle goes over it or

2    by it?

3    A.    Yes.

4    Q.    And there were none of those videos, how to make those,

5    right?

6    A.    Correct.

7    Q.    There were no videos on how to construct a suicide vest,

8    right?

9    A.    Correct.

03:00 10    Q.    You mentioned that one video that you saw was called

11    "State of the Ummah," right?

12    A.    Yes.

13    Q.    In fact, yesterday the prosecutor played some of that for

14    you, right?

15    A.    Yes.

16    Q.    Did you recognize some of the people in that movie?

17    A.    Yes.

18    Q.    Did you recognize president George Bush, the first one?

19    A.    Yes.

03:00 20    Q.    Did you recognize Osama bin Laden?

21    A.    Yes.

22    Q.    Now, that was a movie that actually was made before 9/11,

23    wasn't it?

24    A.    I -- I don't know when it was made.

25    Q.    Well, who was president on 9/11?

        1   A.    George Bush, Sr. -- Jr.

        2   Q.    And his father preceded him, right?

        3   A.    Yes.

        4   Q.    The movie, "State of the Ummah," was calling people to

        5   come to Muslim countries that were under attack, right?

        6   A.    I don't believe they were specifically calling people.

        7   Q.    They were trying to show the oppression of Muslims in

        8   certain countries going on, correct?

        9   A.    I don't believe that video showed that.

03:01  10   Q.    Most of the videos focused on Bosnia and Chechnya prior to

       11   9/11, isn't that right?

       12   A.    I believe so.

       13   Q.    And as you put it yesterday, these videos never inspired

       14   you to consider doing a terrorist act, did they?

       15   A.    No.

       16   Q.    Now, the invasion of Iraq took place in March of 2003?

       17   A.    Yes.

       18   Q.    And this was a direct invasion of a Muslim country,

       19   correct?

03:02  20   A.    Yes.

       21   Q.    And the intent of the invasion of the Muslim country was

       22   to topple the Muslim government that was in place, correct?

       23   A.    No.

       24   Q.    Is it fair to say that the United States invaded Iraq?

       25   A.    Yes.

```
        1   Q.   Along with other coalition forces?

        2   A.   Yes.

        3   Q.   With the intent of removing Saddam Hussein?

        4   A.   Yes.

        5   Q.   Was Saddam Hussein the head of the government?

        6   A.   Yes.

        7   Q.   So the intent of the invasion of this Muslim country was

        8   to remove the government?

        9   A.   Yes.

03:02  10   Q.   This was completely unrelated to 9/11, isn't that true?

       11   A.   That was our belief at the time.

       12   Q.   Now, before, it was Serbs or Russians that were attacking

       13   a Muslim country, right?

       14   A.   Yes.

       15   Q.   But, in your view, now this was the United States,

       16   correct?

       17   A.   It was the United States attacking Iraq.

       18   Q.   A Muslim country?

       19   A.   Yes.

03:03  20   Q.   Now, the Qur'an directly speaks to what happens when a

       21   Muslim country is under attack, correct?

       22   A.   I don't want to speak without knowledge regarding my

       23   religion.  So if I don't have the exact verse memorized, I

       24   don't feel comfortable answering that.

       25   Q.   Do you know that the word Jihad appears many times in the
```

1    Qur'an?

2    A.   How would you define "many times"?  Do you mean the exact

3    word "Jihad" or different, like -- I don't know the word.

4    Like, the morphology can change.

5    Q.   How do you define the word "many times"?

6    A.   It depends on what we're talking about.

7    Q.   Okay.  We're talking about the appearance of the word

8    "Jihad" in the Qur'an.

9    A.   I don't believe that -- my personal belief is I would not

03:04 10  classify that as appearing many times in the Qur'an.

11   Q.   It's fair to say you don't consider yourself to be a

12   scholar of Islam, do you?

13   A.   No.

14   Q.   You're not someone who would pick up the Qur'an and just

15   read it casually just because it's the most important book in

16   the religion?

17   A.   That's not true.

18   Q.   You wouldn't study a Hadith just to better your knowledge?

19   A.   That's not truth.

03:04 20  Q.   And you can't say that "Jihad" appears many, many times in

21   the Qur'an?

22   A.   Correct.

23   Q.   You know what the word "Jihad" means?

24   A.   Yes.

25   Q.   Is it fair to say it means Islamic resistance and

```
 1   struggle?
 2   A.   I'm not a linguistic scholar.  I would leave it "Islamic
 3   struggle."  I don't know about the "resistance."
 4   Q.   Okay.
 5          MR. CARNEY:  May I approach the witness, please?
 6          THE COURT:  All right.
 7   Q.   Were you asked before the grand jury -- this is Page 8 --
 8   to define the word "Jihadi"?
 9   A.   Yes.
10   Q.   Did you say, "Related to Islamic resistance"?
11   A.   Yes.
12   Q.   "Arms struggle?"  "Yes."
13   A.   Yes.
14   Q.   So were you more of a scholar in 2008 than you are today?
15   A.   They were different questions.
16   Q.   Was the question, "When you say 'Jihadi,' what do you mean
17   by 'Jihadi'?"
18   A.   That was the question, yes.
19   Q.   Now, in the context of discussing the world after the
20   invasion of Iraq, you told Tarek that, We have to defend our
21   faith, right?
22   A.   I don't remember that.
23   Q.   Didn't you say that yesterday, "We have to defend our
24   faith"?
25   A.   That's a different question.
```

1   Q.   Did you say yesterday, "We have to defend our faith"?

2   A.   Yes.

3   Q.   And you said that to Tarek?

4   A.   I don't recall.

5   Q.   Or in Tarek's presence?

6   A.   Did I say it yesterday in his presence?  Yes.

7   Q.   No, no.  When you originally said it, did you say it in

8   Tarek's presence?

9   A.   I don't remember saying that prior to yesterday.

03:07 10   Q.   Yesterday was the first time you came up with that?

11   A.   The concept or the phrasing?

12   Q.   The Qur'an talks about Jihad being a duty or obligation of

13   a Muslim --

14   A.   Yes.

15   Q.   -- is that right?

16        And the Qur'an and the Hadiths also say there are

17   different ways to participate and serve in Jihad, correct?

18   A.   Yes.

19   Q.   And do you accept those principles?

03:07 20   A.   Yes.

21   Q.   The Qur'an and the Hadiths talk about the fact that not

22   everyone can go into battle, for example, to assist a Muslim

23   country that's under attack, correct?

24   A.   Yes.

25   Q.   There are people who, whether for geography or financial

1    reasons or health reasons or age reasons or just personal

2    inclination reasons, won't go onto a battlefield, right?

3    A.    Yes.

4    Q.    But the Qur'an says that there are other ways that a

5    person can support the Muslims' resisting an invading army in a

6    Muslim country, right?

7    A.    Can you resay the question, please?

8    Q.    But the Qur'an and the Hadiths say that there are other

9    ways that a person can serve and participate in defending a

03:08 10   country that is under attack, a Muslim country?  Are you

11   familiar enough with the Qur'an to answer that question?

12   A.    No.

13   Q.    Are you familiar enough with the Hadiths to answer that

14   question?

15   A.    No.

16   Q.    You're aware of the fact that a scholar in Saudi Arabia

17   wrote a document entitled, "39 Ways to Serve and Participate in

18   Jihad," correct?

19   A.    I did not know he was from Saudi Arabia.

03:08 20   Q.    The document was written in Arabic, correct?

21   A.    I don't know.

22   Q.    Did you ever see the original of that document?

23   A.    No.

24   Q.    Did you know it was originally written in Arabic?

25   A.    At what time frame?  You asked me "did you know" so at

1  what time frame?

2  Q.   We'll work backwards.  Do you know today it was originally

3  written in Arabic?

4  A.   Yes.

5  Q.   Do you know today that Tarek translated it into English?

6  A.   That's what I read in the Indictment.

7  Q.   You've read the Indictment in this case?

8  A.   Yes.

9  Q.   And that's when you learned of that?

03:09 10  A.   Yes.

11  Q.   Prior to that, you didn't even know that Tarek had

12  translated it --

13  A.   Correct.

14  Q.   -- you're telling us?

15       Now, have you read this document "39 Ways" in either

16  Arabic or English?

17  A.   No.

18  Q.   Never once?

19  A.   I don't believe so, no.

03:09 20  Q.   Did you identify the document at all in your testimony?

21  A.   No.

22  Q.   Never having seen it?

23  A.   Correct.

24  Q.   Do you know that the document quotes primarily from the

25  Qur'an and Hadiths?

```
      1   A.   I do not know.

      2   Q.   Because, without embarrassment or without trying to

      3   embarrass you, you wouldn't consider yourself a scholar of

      4   Islam, would you?

      5   A.   That's not the reason why.

      6   Q.   Because you wouldn't consider yourself a scholar?

      7   A.   The reason why I wouldn't --

      8   Q.   Mr. Abuzahra, do you consider yourself a scholar on Islam?

      9   A.   No.

03:10 10  Q.   So that you wouldn't be able to tell if things in the "39

     11   Ways," in fact, were direct quotations from the Qur'an?

     12   A.   I haven't seen the document to comment on it.

     13   Q.   Yesterday you talked about discussions about actions

     14   involving Condoleezza Rice, John Ashcroft, a shopping mall, and

     15   Hanscom Air Force Base, right?

     16   A.   Yes.

     17   Q.   And I'd like to have you make one thing crystal clear:  At

     18   no time was there ever an agreement among you and Tarek and

     19   Abousamra to actually carry out any of those things you were

03:11 20  talking about?

     21   A.   Correct.

     22   Q.   There was never at any time an agreement among the three

     23   of you to actually go out and do them, was there?

     24   A.   There was not.

     25   Q.   Now, when you would have these discussions, they were
```

1   often a reaction to anti-Muslim rhetoric that you were reading

2   about or hearing about, isn't that right?

3   A.   Yes.

4   Q.   There was a lot of anti-Muslim rhetoric in the news and

5   elsewhere, right?

6   A.   Yes.

7   Q.   It often came from members of the George Bush

8   Administration, right?

9   A.   Yes.

03:12 10   Q.   And they would say things that you considered to be

11   demeaning and insulting and discriminating against Muslims and

12   were anti-Muslim in your view; is that fair to say?

13   A.   Yes.

14   Q.   And that made you upset, correct?

15   A.   Yes.

16   Q.   And that was often the context in which you and Abousamra

17   would talk about doing something, for example, to Condoleezza

18   Rice, correct?

19   A.   In that example, yes.

03:12 20   Q.   Now, you were asked about this in front of the grand jury,

21   weren't you?

22   A.   Yes.

23   Q.   And you described the mentions of -- or statements

24   regarding Condoleezza Rice or John Ashcroft, who was the

25   Attorney General --

```
 1            MR. CHAKRAVARTY:  Objection, your Honor.
 2  Q.   -- as --
 3            MR. CHAKRAVARTY:  Sorry.
 4            THE COURT:  This is -- let me see you.
 5  (SIDEBAR CONFERENCE AS FOLLOWS:
 6            THE COURT:  Is the objection based on the use of the
 7  grand jury transcript?
 8            MR. CHAKRAVARTY:  Right, not necessarily to impeach or
 9  not necessarily to refresh memory but to recount what was in
10  the grand jury.
11            MR. CARNEY:  Your Honor, I expect to say that when he
12  testified before the grand jury, he likened this to a knee-jerk
13  reaction.  My follow-up question will be:  What did you mean
14  when you said that?
15            MR. CHAKRAVARTY:  That's the cart driving the horse
16  issue.
17            THE COURT:  Yeah.  The usual way would be to ask him
18  did he describe it that way.
19            MR. CARNEY:  That's what I'm trying to do.
20            THE COURT:  Without showing him the transcript.
21            MR. CARNEY:  I wasn't going to show him the
22  transcript.  I don't know if I need to.
23            THE COURT:  Go ahead.
24  .  .  .  END OF SIDEBAR CONFERENCE.)
25  Q.   Do you remember likening these discussions to a knee-jerk
```

1    reaction?

2    A.    Can you read the question again?

3    Q.    Do you remember comparing your reaction to being like a

4    knee-jerk reaction?

5    A.    I don't remember that, but I would classify it as that.

6    Q.    And would you describe it as comparable to, if you're

7    driving down the road and somebody cuts you off, and you get an

8    instantaneous feeling that I should follow that guy or do

9    something to that guy but then a minute later it passes?

03:15 10    A.    Yes.

11    Q.    In fact, that's how you described it at one time, didn't

12    you?

13    A.    Yes.

14    Q.    A discussion that would last maybe a minute or two, right?

15    A.    Yes.

16    Q.    Now, Condoleezza Rice at this time was the Secretary of

17    State?

18    A.    Yes.

19    Q.    And you viewed her as a figurehead of the government who

03:15 20    was justifying suffering by Muslims, right?

21    A.    Yes.

22    Q.    Who was justifying oppression of Muslims?

23    A.    Yes.

24    Q.    And justifying the injustice that you saw to Muslims?

25    A.    Yes.

```
 1   Q.   And so you said, We should take a gun and shoot her?

 2   A.   No.

 3   Q.   This was something that occurred between you and

 4   Abousamra, right?

 5   A.   Yes.

 6   Q.   Tarek wasn't even there, was he?

 7   A.   Nope.

 8   Q.   John Ashcroft was for a time period the Attorney General

 9   under George Bush, is that right?

10   A.   Yes.

11   Q.   He, in particular, in your view, was saying some virulent

12   anti-Muslim things, correct?

13   A.   Yes.

14   Q.   And so at a meeting between you and Abousamra, you

15   discussed that you should shoot the guy when he's walking into

16   church; do you remember that?

17   A.   No.

18   Q.   Do you remember telling the FBI on November 13, 2006, that

19   you and Abousamra discussed shooting John Ashcroft when he is

20   walking into church?

21   A.   I don't remember if that was the exact scenario.

22            MR. CARNEY:  May I approach, please, your Honor?

23            THE COURT:  All right.

24   Q.   Sorry.  I don't have the correct page.  The discussion

25   was, though, between the two of you to shoot John Ashcroft,
```

```
 1   right?
 2   A.    I believe Tarek was there as well.
 3   Q.    Do you remember telling the FBI, on November 13, 2006,
 4   that you had a discussion concerning Hanscom Air Force Base
 5   that included Abousamra and Tarek but that, during Ramadan,
 6   Abousamra and you discussed shooting Secretary of State
 7   Condoleezza Rice and former Attorney General John Ashcroft?
 8   A.    No.
 9         MR. CARNEY:  With your permission, please?
10   Q.    Would you read this to yourself, please?
11   A.    (Reading.)
12   Q.    Does that refresh your memory that you told the FBI that
13   Tarek was present for Hanscom but was not present for Rice or
14   Ashcroft?
15   A.    No.
16   Q.    Now, neither Rice nor Ashcroft were coming to the Boston
17   area, right?
18   A.    No.  That's false.  I mean, your statement is false.
19   Q.    They were coming to the Boston area?
20   A.    The discussion with Ahmad, me and him were waiting in a
21   parking lot.  He had a piece of paper in his pocket.  It said
22   Condoleezza Rice was coming to Boston.  He said, Wouldn't it be
23   great -- I don't remember his exact wording.  But he mentioned
24   somebody shooting her right there on the spot.
25         MR. CARNEY:  If I may approach, please?
```

1   Q.   Would you please read this question and this answer?

2   A.   Can you move your finger so I can read the whole thing?

3   Q.   No.  I'm just pointing to the question and the answer.

4   A.   (Reading.)

5   Q.   When you testified before the grand jury about Condoleezza

6   Rice and John Ashcroft, isn't it a fact that you were asked by

7   the prosecutors, by Mr. Chakravarty in particular, "And for

8   each of those figures, they were coming to the Boston area?"

9   And you answered, "No."  Is that correct?

03:21 10   A.   That is the first part of that answer, yes.

11   Q.   "You refer that there was a paper that Abousamra had, but

12   we just kind of -- because the Israeli rhetoric at the time was

13   really bad," correct?

14   A.   Yes.

15   Q.   So when he specifically asked you if it was because the

16   figures were coming to the Boston area, you said, No, it's

17   because the rhetoric was so bad, right?

18   A.   Yes.

19   Q.   Mr. Abuzahra, you were the person who first suggested

03:21 20   doing something about a shopping mall, right?

21   A.   I do not recall.

22   Q.   You don't recall if you were the person who brought up,

23   shopping mall would be something we should consider doing?

24   A.   What you're saying is correct.  I do not recall.

25   Q.   It was your idea, wasn't it?

1   A.   It was something we discussed as a group.

2   Q.   It was your idea in the first place, wasn't it?

3   A.   I do not recall.

4   Q.   When you described it, you have said, Well, at least I was

5   looking and talking about the idea of a shopping mall, right?

6   A.   I don't recall.

7   Q.   Didn't you say, I don't know about them, but I was looking

8   and talking about a shopping mall?

9   A.   I don't recall that statement.

03:22 10   Q.   Do you remember that you were describing about how the

11   idea of Hanscom Air Force Base came up when you testified

12   before the grand jury?

13   A.   If you have something to refresh my memory.

14   Q.   Did they show you this part of the grand jury transcript?

15   A.   No.

16   Q.   Did they show you anything about the shopping mall or

17   Hanscom?

18   A.   Not that I can remember.

19   Q.   When you were asked about Hanscom Air Force Base, didn't

03:23 20   you say, Well, we kind of -- well, it was a similar context --

21   well, I think, I mean, I don't know about them, but I think the

22   idea about a mall -- we were all kind of a little bit -- at

23   least I was looking and talked about the idea.  But then, you

24   know, Hanscom, it's a military and a more appropriate target.

25   Do you remember saying at that?

```
 1              MR. CHAKRAVARTY:  Objection, your Honor.  Move to

 2    strike.

 3              THE COURT:  No.  You may have the question.

 4    Q.   Do you remember saying that?

 5    A.   I don't remember that.

 6              MR. CARNEY:  If I may approach, please?

 7    Q.   Would you please begin reading to yourself from here and

 8    the answer?

 9    A.   (Reading.)

03:24 10 Q.   Please pay close attention to the words of the answer.

11    A.   (Reading.)

12    Q.   Did I read your words exactly verbatim?

13    A.   Yes.

14    Q.   No mistakes that time?

15    A.   No.

16    Q.   Does this refresh your memory?

17    A.   It does.

18    Q.   The shopping mall was your idea, wasn't it?

19    A.   It was not.

03:25 20 Q.   Whose idea was it?

21    A.   I do not recall.

22    Q.   You had had prior experience at Hanscom Air Force Base,

23    hadn't you?

24    A.   Yes.

25    Q.   You had done a motorcycle training course there, right?
```

```
 1    A.    Yes.

 2    Q.    So you were familiar with the base?

 3    A.    At a very minimal level but, yes, more familiar than --

 4    Q.    Tarek or Abousamra?

 5    A.    Yes.

 6    Q.    You knew how to get into the base --

 7    A.    Yes.

 8    Q.    -- right?

 9          You told them about the guard shack, right?

10    A.    Yes.

11    Q.    You told them about where to go once you drive in the

12    front driveway, right?

13    A.    No.

14    Q.    You talked to them that it was an appropriate military

15    target, right?

16    A.    I don't recall using that as a justification for it.

17    Q.    Do you remember saying it's a more appropriate target

18    because it's a military target?

19    A.    I remember saying that during the grand jury testimony.

20    Q.    You remember saying it today?  Do you have a memory of

21    saying it today or just that you said it before the grand jury?

22    A.    I remember saying it.

23    Q.    And Hanscom was your idea, wasn't it?

24    A.    Yes.

25    Q.    You said, The point of terrorism is to inspire terror,
```

03:25 (line 10)
03:26 (line 20)

1    right?

2    A.    To cause terror.

3    Q.    I didn't hear that.

4    A.    To cause terror, to terrify the people, yes.

5    Q.    To cause fear among people, right?

6    A.    Yes.

7    Q.    Among people who were anti-Muslim, you described, right?

8    A.    No.

9    Q.    You didn't say people who were anti-Muslim?

03:26 10    A.    I don't recall using that term.

11    Q.    And you and Abousamra said it would be justified, right?

12    A.    I don't recall that.

13    Q.    Well, if you were bringing up these ideas, it was

14    obviously because you thought they would be justified, wouldn't

15    you?

16    A.    You used the plural, so, no.

17    Q.    When you brought up Hanscom Air Force Base, you brought it

18    up because you thought it was justified, right?

19    A.    Yes.

03:27 20    Q.    And that if it led to terror and killing, that would be

21    okay?

22    A.    Yes.

23    Q.    Now, you said that Daniel Maldonado was someone that you

24    approached, right?

25    A.    Yes.

1    Q.   And you described him as a former street gang member,

2    right?

3    A.   Yes.

4    Q.   And by that you meant a violent gang, right?

5    A.   Yes.

6    Q.   Someone who was involved in drugs and shootings, right?

7    A.   Most likely.

8    Q.   That was your view, right?

9    A.   I don't know about the drugs but whatever gangs are

03:28 10   typically involved in.

11   Q.   So it's okay to assume that he was involved in drugs as

12   well, right --

13        MR. CHAKRAVARTY:  Objection, your Honor.

14   Q.   -- in your view?

15        THE COURT:  Sustained.

16   Q.   Or you just assumed he was involved in drugs, right?

17        MR. CHAKRAVARTY:  Objection.

18        THE COURT:  Sustained.

19        MR. CARNEY:  I'm just following up what he had

03:28 20   previously said.

21        THE COURT:  The objection is sustained.

22   Q.   So you decided to go see Maldonado and ask him for guns,

23   right?

24   A.   We agreed as a group.

25   Q.   You went to see him, right?

```
 1   A.   Yes.

 2   Q.   And asked if he could get guns?

 3   A.   Yes.

 4   Q.   And you said yesterday that Maldonado told you that the

 5   guns would have bodies on them?

 6   A.   Yes.

 7   Q.   Those are the words that Daniel Maldonado used?

 8   A.   To the best of my recollection, yes.

 9   Q.   You know he testified in this trial?

03:28 10   A.   Yes.

11   Q.   Do you know what words he used?

12   A.   No.

13   Q.   Now, you interpreted the fact that -- according to you,

14   that Maldonado said that these guns would have bodies on them

15   to mean that they had been involved in murders, right?

16   A.   Yes.

17   Q.   And you said that Maldonado said to you, Don't get caught,

18   right?

19   A.   No.

03:29 20   Q.   Did Maldonado say to you, Don't get caught with these

21   guns?

22   A.   "You don't want to be caught with these guns."

23   Q.   That --

24   A.   In essence, the same thing.

25   Q.   So the answer to my question?
```

```
 1   A.   I don't believe he used that exact phrasing.

 2   Q.   Yes?  Was the answer to my question yes?

 3   A.   To the best of my recollection, he did not use that exact

 4   phrasing.

 5   Q.   If I come within the close distance of something, please

 6   let me know.

 7          MR. CHAKRAVARTY:  Objection, your Honor.

 8   Q.   Or if I get a word wrong, please don't say "no."

 9          THE COURT:  Let's just have another question.

10   Q.   And you told Maldonado you weren't expecting to keep the

11   guns for years, right?

12   A.   Correct.

13   Q.   Now, this was bravado on your part, wasn't it?

14   A.   In part, yes.

15   Q.   On your part, when you used those words?

16   A.   Which words?

17   Q.   That "we don't expect to keep these guns for years,"

18   wasn't that bravado on your part?  Do you know what the word

19   "bravado" means?

20   A.   Yes.

21   Q.   What does it mean?

22   A.   Kind of trying to show yourself as being -- more proud

23   than you actually are, more confident that you actually are.

24   Q.   More what?

25   A.   Proud or confident about whatever you're doing, kind of
```

```
 1   boasting in some sense.
 2   Q.   You also said yesterday that you asked Maldonado if he
 3   could get you automatic weapons, right?
 4   A.   Yes.
 5   Q.   And by "automatic weapons," you meant machine guns, right?
 6   A.   Yes.
 7   Q.   And he told you he couldn't get machine guns, right?
 8   A.   Correct.
 9   Q.   But you're definitely sure that, as you sit here today,
03:31 10  that you asked him for automatic weapons, right?
11   A.   Yes.
12   Q.   You testified before the grand jury on October 23, 2008?
13   A.   Yes.
14   Q.   After you had met with the prosecutors, several occasions,
15   and the FBI as well?
16   A.   Yes.
17   Q.   And you were asked about this, weren't you?
18   A.   Yes.
19   Q.   And, specifically, Mr. Chakravarty asked you:  "Did you
03:32 20  ask him about anything more than a handgun, any automatic
21   weapons?"  Remember being asked that question?
22   A.   No.
23          MR. CARNEY:  May I approach, please?
24   Q.   Read that to yourself.
25   A.   (Reading.)
```

```
 1    Q.   Just to the bottom.

 2    A.   Yeah.

 3    Q.   Did Mr. Chakravarty ask you, five years ago:  "Did you ask

 4    him," referring to Maldonado, "about anything more than a

 5    handgun, any automatic weapons?"  Did he ask you that?

 6    A.   Three years ago.

 7    Q.   You're right.  Three years ago.

 8    A.   Yes, he did.

 9    Q.   And what was your answer to him?

10    A.   To the best of my recollection, I did not.

11    Q.   After you got back from seeing Maldonado, the idea was

12    just dropped and never pursued again, right?

13    A.   Yes.

14    Q.   And you don't even remember why it wasn't pursued, do you?

15    It was just dropped?

16    A.   That's not true.

17    Q.   Did you remember why the idea was dropped when you

18    testified before the grand jury?

19    A.   I don't remember.

20    Q.   Remember being asked before the grand jury why the idea

21    was dropped?

22    A.   No.

23    Q.   Would you read that to yourself, please?

24    A.   This section?

25    Q.   Yes.
```

```
 1   A.   (Reading.)

 2   Q.   You didn't remember what was the reason; it just was

 3   dropped, right?

 4   A.   I remember my reason, and I believe the reason of the rest

 5   of us, but that's different than saying what happened.

 6   Q.   You said, when asked about it, that it was a dumb idea,

 7   right?

 8   A.   Yes.

 9   Q.   A stupid idea?

10   A.   In essence, yes.

11   Q.   Nothing that you or anyone else actually agreed to do?

12   A.   Correct.

13   Q.   Are you familiar with the Islamic concept of Aman?

14   A.   Yes.

15   Q.   What is that?

16   A.   It could mean different things, but I assume -- correct me

17   if I'm wrong -- what you're talking about is the trust between

18   you and another party.

19   Q.   No.

20   A.   Okay.

21   Q.   I'm talking about the principle of Islamic law that a

22   Muslim in a country where he is allowed to practice his

23   religion has a pact or covenant with that country.  Does that

24   ring a bell?

25   A.   Yes.
```

```
 1   Q.   While they were under the protection of that law to
 2   practice their religion, in return, they could not break the
 3   law in that country?
 4   A.   I'm not sure of the specifics, if that's how exactly it
 5   would be described.
 6   Q.   And that a Muslim would break that if he committed a crime
 7   in the United States, for example, against someone in the
 8   United States, correct?
 9   A.   I'm not sure of the specifics.  I assume so, yes.
10   Q.   Under the principle of Aman, it would violate Islam for a
11   person to do that unless he renounced his citizenship in that
12   country first, isn't that correct?
13   A.   I'm not sure of the specifics.
14   Q.   You're just not familiar with this principle of --
15   A.   I don't know if it's specifically renouncing citizenship
16   or an overt act.
17   Q.   Pardon me?
18   A.   It may be -- I'm not sure of the specifics of what exactly
19   constitutes violating your side of the -- kind of breaking that
20   Aman before something else.
21   Q.   Would committing a crime against someone in the United
22   States violate that compact?
23   A.   Yes.
24   Q.   Tarek was a strong believer in Aman, wasn't he?
25   A.   I'm not aware.
```

```
  1   Q.   You don't recall ever having a discussion with him?

  2   A.   I do.

  3   Q.   About Aman?

  4   A.   As a group, we discussed it.

  5   Q.   And Tarek firmly believed in it, didn't he?

  6   A.   He believed in the concept you mentioned, yes.

  7   Q.   It was a fundamental precept of Islamic law and

  8   jurisprudence, wasn't it?

  9   A.   I wouldn't call it "fundamental precept," but it is part

03:37 10   of it, yes.

 11   Q.   I'd like to ask you some questions about Yemen.  In late

 12   2003, Abousamra was still desperate to go to a battlefield and

 13   fight, wasn't he?

 14   A.   Yes.

 15   Q.   He had gone two times to Pakistan and both been

 16   unsuccessful, is that right?

 17   A.   Yes.

 18   Q.   He talked about it constantly, didn't he?

 19   A.   Yes.

03:37 20   Q.   And he wanted you to go with him, didn't he?

 21   A.   Yes.

 22   Q.   And you wanted to go with him, didn't you?

 23   A.   After the invasion of Iraq, yes.

 24   Q.   And the plan would be that you would accompany Abousamra

 25   to go and fight in Iraq, is that right?
```

```
 1   A.   Yes.

 2   Q.   This was how you were going to fulfill your duty and

 3   obligation to engage in Jihad, correct?

 4   A.   Yes.

 5   Q.   Now, you learned from speaking to Abousamra that he had

 6   spoken to someone on the internet, correct?

 7   A.   Yes.

 8   Q.   The person's Arab nickname was Abu Omar?

 9   A.   Yes.

10   Q.   You also knew his nickname on Islamic web forums, didn't

11   you?

12   A.   Yes.

13   Q.   And what was that name?

14   A.   Abul Muthanna.

15   Q.   Didn't you know his real name was Jason Pippin?

16   A.   No.

17   Q.   But you recognized his web posting name from having seen

18   it on websites, right?

19   A.   Yes.

20   Q.   Web forums, right?

21   A.   Yes.

22   Q.   You read those web forums closely enough to recognize this

23   name among the hundreds of people who posted, correct?

24   A.   Yes.

25   Q.   Now, you learned from Abousamra that Abu Omar, or Jason
```

1    Pippin, had previously received military training, correct?

2    A.    No.

3    Q.    Did Abousamra tell you that Pippin had been to Yemen

4    before?

5    A.    Yes.

6    Q.    And that he had engaged in fighting, correct?

7    A.    He didn't -- I don't recall him telling me that.

8    Q.    And he told you that Pippin was going back to Yemen; that

9    was his plan, correct?

03:39 10   A.    Yes.

11   Q.    Isn't it fair to say that you believed that Pippin had

12   received military training in Yemen based on what Abousamra

13   told you?

14   A.    No.

15   Q.    Were you aware that the training, in fact, was in

16   Pakistan?

17   A.    What training?

18   Q.    That Pippin had received.

19   A.    I didn't know that he had received training.

03:40 20   Q.    Did Abousamra tell you that Pippin had gone to Yemen to

21   attend the renowned Islamic schools?

22   A.    Yes.

23   Q.    Had you heard about these schools before?

24   A.    Yes.

25   Q.    They were considered the best schools in the world to

1    study classical Arabic, correct?

2    A.    Depends who you ask.

3    Q.    Well, many people believed that, didn't they?

4    A.    The --

5    Q.    Did many people believe that?

6    A.    Which schools?

7    Q.    The Yemen schools for the study of pure Arabic.

8    A.    I'm not -- I don't know.

9    Q.    Were you aware that the Yemen schools are renowned for the

03:40 10   study of Islamic jurisprudence?

11   A.    Yes.

12   Q.    And this involves an intense period of study where you

13   might be studying 12 or 15 hours every day, seven days a week,

14   right?

15   A.    Yes.

16   Q.    In a place that had little diversion, if anything, right?

17   A.    Correct, correct.

18   Q.    And people from around the world, including non-Muslims,

19   attended these schools, isn't that right?

03:41 20   A.    I don't know if non-Muslims attended or not.

21   Q.    It was a place where someone would go to study if he

22   wanted to be a scholar, for example?

23   A.    It was one of the places available, yes.

24   Q.    Someone who wanted to be able to read and translate

25   ancient texts would go to these Yemeni schools to be able to

```
 1    study there, right?
 2    A.   It was one of the options, yes.
 3    Q.   And also learn interpretations of the Qur'an and of the
 4    Hadiths, right?
 5    A.   Yes.
 6    Q.   Now, Abousamra went out to see Pippin in California,
 7    right?
 8    A.   Yes.
 9    Q.   Once or twice, correct?
10    A.   I believe twice.
11    Q.   And Abousamra was hoping that Pippin could direct him to
12    someone who might help Abousamra get to a military training
13    camp, isn't that right?
14    A.   Yes.
15    Q.   And he came back, and he said he's got a name and a town,
16    correct?
17    A.   I don't remember if it was the first or second trip where
18    he got the information from.
19    Q.   All right.  Whether it was the first or the second, he
20    came back and he said, I've got the name of a town and the name
21    of a person, is that correct?
22    A.   Yes.
23    Q.   And Abousamra's intent for going to Yemen was to try to go
24    to this town or try to find this person?
25    A.   Yes.
```

```
 1   Q.   If that was unsuccessful, try to find someone else in

 2   Yemen who might be able to help him find a training camp,

 3   correct?

 4   A.   I believe the intention was we'd find that person.  I

 5   don't believe we thought, saying, What if we don't find this

 6   person.

 7   Q.   The intent was trying to get military training in Yemen

 8   and go on to Iraq and fight, right?

 9   A.   Yes.

10   Q.   You and Abousamra discussed the fact that it would be

11   helpful if Pippin accompanied you, correct?

12   A.   We discussed it as a group.

13   Q.   Did you discuss it with Abousamra?

14   A.   He was present.

15   Q.   The defendant?

16   A.   Both of them were present.

17   Q.   And you hoped that Pippin would accompany you, right?

18   A.   Yes.

19   Q.   You were willing to pay Pippin $5,000 to do that, right?

20   A.   I don't know if that was the sum of the money, but I was

21   willing to give him a large amount of money if he would

22   accompany us.

23   Q.   Would you consider $5,000 a large amount of money?

24   A.   Yes.

25   Q.   Did you cash a check for $5,000?
```

```
 1   A.   Yes.

 2   Q.   Did you give money to Abousamra to take to California?

 3   A.   Yes.

 4   Q.   Are you aware that Pippin testified that he received

 5   $5,000 from Abousamra?

 6   A.   I'm not aware of that.

 7            MR. CHAKRAVARTY:  Objection, your Honor.

 8            THE COURT:  The answer may stand.

 9   Q.   You're not aware of it?

10   A.   No.

11   Q.   But today, you don't have a memory of getting $5,000 in

12   cash?

13   A.   I have a memory of that --

14   Q.   No, to give to Jason Pippin?

15   A.   I remember it was a large amount.  I don't remember if it

16   was the entire 5,000 or not.

17   Q.   Now, Pippin did not say he would be able to go with you,

18   right?

19   A.   Correct.

20   Q.   But he still got the money, right?

21   A.   Yes.

22   Q.   It was a gift to him, if he wasn't going to be able to go,

23   right?

24   A.   He could consider it however he wanted to.

25   Q.   How did you consider it?
```

1    A.    I was upset when I found out, but we didn't want to wait.

2    Q.    It was in gratitude for his help?

3    A.    No.

4    Q.    Abousamra just decided to give him $5,000?

5    A.    No.

6    Q.    The plan was, among you, that even if you could not get

7    military training in Yemen, your intention was to still go on

8    to Iraq?

9    A.    I don't believe we discussed what would happen if we were

03:44 10    not able to get the training there.

11    Q.    Didn't you discuss that if you weren't successful in

12    Yemen, you would go on to Jordan and look for training there?

13    A.    No.

14    Q.    Do you remember talking about how you would get into Iraq?

15    A.    Yes.

16    Q.    And you said, if it was necessary, you'd get a camel and

17    go from Jordan to Iraq?

18    A.    Yes.

19    Q.    There was no intention at that time to join any particular

03:45 20    group but just to engage in fighting in Iraq, isn't that right?

21    A.    Yes.

22    Q.    Now, Abousamra said that he had learned that some schools

23    in Yemen, some of these Islamic schools, might be a way to make

24    a connection to someone who knows how to get to a training

25    camp, correct?

1   A.   No.

2   Q.   Didn't he say that some of these schools had training camp

3   connections or were like training camps or had training camps?

4   A.   Yes.

5   Q.   And some people there do studying and some people there

6   would be able to do training, right?

7   A.   Yes.

8   Q.   So this would be perfect if one person had one reason to

9   go to this location, to see the schools, and another person had

03:46 10   a different reason to go, to do military training, right?

11   A.   If they wanted to stay together, yes.

12   Q.   Yes.  Now, it's fair to say that you never had an interest

13   in studying pure Arabic, did you?

14   A.   That's not true.

15   Q.   Did you ever give some thought to going to a school in

16   Yemen to study?

17   A.   I don't know if I particularly thought of Yemen, but it's

18   crossed my mind before.

19   Q.   But did you ever have a sincere hope that you absolutely

03:46 20   would go and study Arabic in a school in Yemen?

21   A.   No.

22   Q.   Did you have any specific intent ever to go to Yemen to

23   study Islamic jurisprudence, whether then or in the future?

24   A.   No.

25   Q.   Neither did Abousamra, to your knowledge, did he?

```
 1    A.    Correct.
 2    Q.    You didn't realize that there were no training camps in
 3    Yemen after 2001, did you?
 4    A.    I don't -- you're stating it like a fact.  I don't know if
 5    that was the case or not.  We expected there to be training
 6    camps there.
 7    Q.    You didn't know they were eliminated after 9/11?
 8    A.    I'll take your word for it.  I don't know.
 9    Q.    Pippin, in fact, had last been to Yemen in the '90s,
03:47 10    according to Abousamra, isn't that right?
11    A.    Yes.
12    Q.    And Abousamra told you that Pippin wasn't planning to go
13    back to Yemen for military training but, rather, to continue
14    his studies, right?
15    A.    I don't believe so.
16    Q.    Did Abousamra tell you that Pippin wanted to go back to
17    Yemen to study Islamic jurisprudence?
18    A.    I don't believe so.
19    Q.    Now, Tarek did not have money on his own to go to Yemen,
03:48 20    did he?
21    A.    I believe he did have some money.
22    Q.    You believe he had the money to go?
23    A.    He had some money.
24    Q.    But not enough to go to Yemen?
25    A.    I don't know how much he had.
```

1   Q.   You paid his ticket in full, didn't you?

2   A.   Yes.

3   Q.   And you didn't ask him to repay you for that money, did

4   you?

5   A.   No.

6   Q.   So in this way, Tarek, by having his roundtrip ticket

7   paid, would be able to accompany you and Abousamra to Yemen,

8   right?

9   A.   I don't know if he had other expenses paid for, but I paid

03:48 10   for the tickets.

11   Q.   You believed that he did not have enough money to go to

12   Yemen at the time, right?

13   A.   No.

14   Q.   You thought he had the money?

15   A.   I didn't think about it.

16   Q.   He was in school, right?

17   A.   Yes.

18   Q.   Wasn't working, right?

19   A.   I don't know if he had a side job or not.

03:49 20   Q.   Was doing an internship?

21   A.   I don't know what he was -- his work situation.  I don't

22   remember.

23   Q.   He's certainly not himself independently wealthy, right?

24   A.   Correct.

25   Q.   So it's fair to say that because you bought the ticket,

1    the roundtrip ticket, Tarek was able to go with you?

2    A.   I don't know if that's fair or accurate to say.

3    Q.   Now, before you left, you didn't discuss this with your

4    wife, the fact that you were going on this trip to Yemen?

5    A.   Is that a question?

6    Q.   You didn't discuss this with your wife?

7         MR. CHAKRAVARTY:  Objection, your Honor.  There's a

8    privilege here.

9         THE COURT:  Overruled.

03:50 10   A.   No.

11   Q.   You had a two-month-old baby at the time?

12   A.   Yes.

13   Q.   And another child as well?

14   A.   Yes.

15   Q.   And you thought you would be gone for a long time, right?

16   A.   Potentially, yes.

17   Q.   Potentially might not even come back, right?

18   A.   Correct.

19   Q.   And what you left was a video, right?

03:50 20   A.   Yes.

21   Q.   Now, this trip was going to take place in either January

22   or February of 2004, is that right?

23   A.   Yes.

24   Q.   The typical time for semester break in college, correct?

25   A.   Every school is different.

```
 1   Q.   Well, in your experience, that's a pretty consistent

 2   period when there's a break, isn't there?

 3   A.   Not going into February, no.

 4   Q.   Tarek was in school in Boston, correct?

 5   A.   Yes.

 6   Q.   At the Mass. College of Pharmacy?

 7   A.   Yes.

 8   Q.   Now, you gave notice for your job, right?

 9   A.   Yes.

10   Q.   Tarek did not give notice that he was not coming back to

11   school, to your knowledge, did he?

12   A.   No.

13   Q.   At the time of the trip, Tarek's parents happened to be

14   out of the country, you learned, isn't that right?

15   A.   I believe that's the case.

16   Q.   You and Abousamra trimmed your beards, correct, in

17   preparation for this trip?

18   A.   Yes.

19   Q.   Tarek did not?

20   A.   Not as much, no.

21   Q.   And you were upset with that?

22   A.   Yes.

23   Q.   Now, you testified yesterday that Masood drove you to the

24   airport, right?

25   A.   Yes.
```

```
 1    Q.    When you spoke to the FBI, you told them that Tarek's

 2    brother drove you to the airport, right?

 3    A.    That's not true.

 4    Q.    Didn't you tell them on two occasions that Tamer drove you

 5    to the airport?

 6    A.    No.

 7    Q.    On October 27, 2006, did you say to the FBI, quote -- or

 8    say to the FBI, Mehanna's brother Tamer drove the three to the

 9    airport?  Did you say that?

10    A.    No.

11    Q.    On November 2, 2006, did you say to the FBI, Mehanna's

12    brother, Tamer Mehanna, drove the three of them to the airport?

13    A.    I don't believe I said that.

14    Q.    Now, you told the FBI --

15              THE COURT:  Mr. Carney, if you're going to get to a

16    new topic, we're at 1:00.  I think we should suspend here.

17              MR. CARNEY:  I'm hungry, also.

18              THE COURT:  Jurors, let me just raise something for

19    you to think about.  We are more or less on the schedule we've

20    outlined.  We've maybe fallen a little bit behind.  I'd like

21    you to consider being available to have afternoon sessions next

22    Wednesday, Thursday and Friday.  That would be the 7th, 8th,

23    and 9th, if that's possible.  I don't want you to answer now

24    but think about it.  It would help us to maybe pick up a little

25    speed.  If you have particular problems with it, then we'll
```

```
1   consider those matters.  All right.  But that would be --
2          The reason is, I've told you we have typically
3   afternoon business scheduled here, and we can't do two things
4   -- but those happen to be unscheduled afternoons, and we would
5   be able to use them if it were to work out for the jury.  So
6   give that some thought.  See whether it would be feasible.
7   With that, we'll recess now and resume tomorrow at 9.
8   (The jury was excused at 1:02 p.m.)
9          MR. CHAKRAVARTY:  I thought it might be appropriate
03:54 10  certainly to discuss with the Court scheduling for purposes of
11  experts or other things -- other activities that we might need
12  to do outside the presence of the jury.  Specifically after
13  this witness, there will be a -- one witness between now and
14  the first expert witness to be called.  So to kind of resolve
15  whether we're going to have some kind of 702 hearing, whether
16  that will be evidentiary or not.
17         And then before the defense lay and expert witnesses
18  testify, the government would ask for a little bit more
19  specificity, which I think counsel has indicated they're
03:55 20  prepared to give us a batting order.  But we may still need to
21  have further guidance and/or to seek the same type of 702 and
22  scope decisions from the Court to decide whether -- nobody from
23  either side wants to waste time dealing with issues if we don't
24  have to.
25         THE COURT:  With respect to Kohlmann, I spent a good
```

1    bit of yesterday afternoon reviewing again the defendant's

2    motion with respect to his testimony, his report, and the

3    government's response.  My impression is that that is a rather

4    complete exposition of the parties' views and not much more is

5    necessary.  I will say that on the basis of it, taking what is

6    set forth in the government's response to the defense motion as

7    the proffer of his testimony, I think it's admissible.

8         I will give the defense, if they wish, an opportunity

9    for oral argument to try to talk me out of that so they have an

03:56 10   opportunity, but I envision only oral argument but not evidence

11   by way of voir dire or any other 702 proceedings.

12        MR. CHAKRAVARTY:  The government would be fine with

13   that, however just being mindful of the lack of First Circuit

14   precedent with regards to whether the defense insists upon an

15   evidentiary hearing.  If the Court denies that, the government

16   is just concerned about the integrity of what happens.

17        THE COURT:  I guess it depends on what an evidentiary

18   hearing is.  The parties have submitted a number of materials

19   in support of their positions, including transcripts of prior

03:57 20   examinations of Mr. Kohlmann, which I've also reviewed.  And I

21   would, unless somebody can proffer otherwise, assume that he

22   would testify more or less similarly, I think, in particular,

23   of the testimony given before Judge Saylor in the Mubayyid

24   case, if I have the name right.

25        So, I mean, I think on one view, that is evidence.  I

```
 1   don't know that there's anything in Rule 702 which requires any
 2   specific procedure for entertaining the issues raised by 702
 3   admissibility, including necessarily voir dire.  It might be
 4   advisable and necessary perhaps in some cases and maybe not in
 5   others.
 6        MR. CARNEY:  May I ask a clarifying question, please?
 7   Both parties are aware of the limitations that Judge Saylor put
 8   on Kohlmann in that trial you reference because I believe that
 9   the government attorneys were -- certainly Mr. Chakravarty was
10   involved in that case, and I have a transcript.  Is your Honor
11   inclined to put the same limitations on Kohlmann at this trial
12   that Judge Saylor put on him in Mubayyid?
13        THE COURT:  I haven't examined those in detail.  That
14   is, I know that there was a restriction, for example, on the
15   use of the word "terrorism," which I think would not be an
16   appropriate limitation in this case.  There were different
17   charges in the case he was trying, and there was a reason for
18   that ruling.  So that's an example of one that would not apply.
19   I don't know whether there were others that you think of that
20   might --
21        I do think that, in general -- my impression was
22   anyway, and you can -- we can get more specific about this, if
23   necessary, that the government's response sort of -- in
24   agreeing to some limitations as to what the government would
25   seek to offer through Kohlmann, kind of incorporated some of
```

1       the limitations that people talked about in other cases with

2       respect to him.

3               MR. CARNEY:  When would your Honor want to schedule

4       the oral argument?

5               THE COURT:  Tomorrow.

6               MR. CARNEY:  At what time?

7               THE COURT:  I think we can do it at 3:00 tomorrow.  I

8       think that would be before he would be expected.

9               MR. CHAKRAVARTY:  Current pace, yes, your Honor.

03:59 10        THE COURT:  Do you have an estimate of the balance of

11      the cross-examination here?

12              MR. CARNEY:  Maybe to the break, your Honor.

13              MR. CHAKRAVARTY:  We have an another FBI reader, who,

14      as your Honor knows, there are -- we'll still continue to try

15      to cut, but it will probably -- it could take us to close to

16      the end of the day.

17              THE COURT:  Okay.

18              MR. CARNEY:  Perhaps if we ended earlier, the Court

19      could use that time for the oral argument.

03:59 20        THE COURT:  If we did, we could do that, yes.

21              Let me just say, I asked the jurors to think about my

22      proposal to them.  I did get a few winces when I suggested it

23      to them.  I don't know whether it's going to be feasible or

24      not.  I do believe -- this is on casual information -- that in

25      accordance with the way we -- why we have the schedule that we

```
 1    have, in part, I do believe that some of them are going to work

 2    in the afternoons, and so they have adjusted their schedule for

 3    the morning track.  So we'll just have to see what their

 4    response is.  Okay.

 5          MR. CHAKRAVARTY:  Your Honor, on the defense

 6    witness/primarily experts issues?

 7          THE COURT:  Well, I guess that's something we'll have

 8    to talk about.  I think it's probably best to talk about it

 9    after Kohlmann's finished because then the defense will have a

10    better idea of what they need or want to do.  There may be some

11    editorial judgments that they'll make.

12          MS. BASSIL:  That's exactly right, your Honor.

13          THE COURT:  That we could -- it wouldn't be fruitful

14    to discuss before that.

15          MR. CHAKRAVARTY:  With regards to the evidentiary

16    issue and for a Daubert hearing, I'm not suggesting they have

17    to do this, but if the defense is willing to waive such an

18    evidentiary hearing, then, obviously, that would further

19    protect the record.  So I'm just putting it out there to alert

20    the Court as well as to invite counsel to do that if possible.

21          THE COURT:  I think they heard what you said.

22          MR. CARNEY:  I'll R.S.V.P. in due time.

23          THE COURT:  Okay.  Thank you.

24    (Whereupon, at 1:10 p.m. the trial recessed.)

25
```

```
 1                  C E R T I F I C A T E

 2

 3           We, Marcia G. Patrisso, RMR, CRR, and Cheryl

 4    Dahlstrom, RMR, CRR, Official Reporters of the United States

 5    District Court, do hereby certify that the foregoing transcript

 6    constitutes, to the best of our skill and ability, a true and

 7    accurate transcription of our stenotype notes taken in the

 8    matter of Criminal Action No. 09-10017-GAO-1, United States of

 9    America v. Tarek Mehanna.

10

11    /s/ Marcia G. Patrisso.
      MARCIA G. PATRISSO, RMR, CRR
12    Official Court Reporter

13    /s/ Cheryl Dahlstrom
      CHERYL DAHLSTROM, RMR, CRR
14    Official Court Reporter

15

16    Date:  November 30, 2011

17

18

19

20

21

22

23

24

25
```