UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                )
UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                ) Criminal Action
v.                              ) No. 09-10017-GAO
                                )
TAREK MEHANNA,                  )
                                )
          Defendant.            )
                                )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWENTY-FIVE
JURY TRIAL

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, December 1, 2011
9:04 a.m.

Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Aloke Chakravarty and Jeffrey Auerhahn,
3        Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Jeffrey D. Groharing, Trial Attorney
         National Security Division
7        950 Pennsylvania Avenue, NW
         Washington, D.C.  20530
8        On Behalf of the Government

9        CARNEY & BASSIL
         By: J.W. Carney, Jr., Esq.
10       Janice Bassil, Esq.
         John E. Oh, Esq.
11       20 Park Plaza
         Suite 1405
12       Boston, Massachusetts  02216
         - and -
13       LAW OFFICE OF SEJAL H. PATEL, LLC
         By: Sejal H. Patel, Esq.
14       101 Tremont Street
         Suite 800
15       Boston, Massachusetts  02108
         On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2                     DIRECT   CROSS   REDIRECT   RECROSS
   WITNESSES FOR THE
3    GOVERNMENT:

4  KAREEM ABUZAHRA (Cont'd)

5    by Mr. Chakravarty                      72
     by Mr. Carney              4                        97
6
   BRIAN J. SOLECKI
7
     by Mr. Groharing          122
8

9                        E X H I B I T S

10

   GOVERNMENT'S        DESCRIPTION              FOR ID   IN EVD.
11
   55C      Translation of Exhibit Nos. 55A-55B            127
12
   DEFENDANT'S
13
   1147     Mass mailing email sent in 2006               25
14
   1148     Mass mailing email sent in 2004               25
15
   1149     Mass mailing email sent in 2003               25
16
   1150     Mass mailing email sent in 2004               25
17
   459A     Transcript of partial recording              39
18          made on 1/12/07

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on December 1, 2011.

6          The defendant, Tarek Mehanna, is present with counsel.

7     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8     are present, along with Jeffrey D. Groharing, Trial Attorney,

9     U.S. Department of Justice, National Security Division.)

10          THE COURT:  Good morning, jurors.

11          MR. CARNEY:  Mr. Bruemmer had to reboot his computer,

12     your Honor.

13          THE COURT:  All right.

14          MR. CARNEY:  May I proceed, your Honor, please?

15          THE COURT:  All set?  Go ahead.

16     CONTINUED CROSS-EXAMINATION BY MR. CARNEY:

17     Q.   Good morning, Mr. Abuzahra.

18     A.   Good morning.

19     Q.   Yesterday during your testimony, you mentioned that before

00:00 20     leaving the house to go to Yemen, Tarek gave his brother a big

21     garbage bag, is that right?

22     A.   Yes.

23     Q.   And this was a typical garbage bag that's used to bag

24     leaves or garbage or that sort of thing?

25     A.   Yes.

1   Q.   And it was full of items, right?

2   A.   Yes.

3   Q.   And he handed it to his brother, correct?

4   A.   Yes.

5   Q.   And the bag was closed, wasn't it?

6   A.   Yes.

7   Q.   Now, you told the FBI that you thought that the bag

8   possibly contained bomb-making materials, right, or a download

9   regarding bomb-making, correct?

00:01 10   A.   I told the FBI what I believed the defendant told me.

11   Q.   What's that?

12   A.   I told the FBI what the defendant had told me.

13   Q.   So you said that Tarek told you there were bomb-making

14   items in there?

15   A.   Might have been.

16   Q.   When you were testifying before the grand jury and telling

17   the police or the FBI this, you told them that you thought

18   possibly there was something in the bag, right?

19   A.   I don't recall the testimony exactly.

00:02 20   Q.   Do you remember telling them that you didn't look in the

21   bag?

22   A.   I don't remember if I told them or not, but I didn't look

23   in the bag.

24   Q.   And Tarek jokes a lot about things, doesn't he?

25   A.   On occasion.

1    Q.    You told the grand jury that there was one prior occasion

2    when a bomb or bomb-making was discussed, isn't that right?

3    A.    Yes.

4    Q.    And the circumstances of that concerned a discussion about

5    a bag of fertilizer, right?

6    A.    A truckload of fertilizer.

7    Q.    Pardon me?

8    A.    A truckload of fertilizer.

9    Q.    A truckload of fertilizer.  And Tarek joked that, How

00:02 10   funny it would be if Abousamra ever went and bought a bunch of

11   fertilizer, right?

12   A.    I don't recall who made the joke.

13   Q.    And he said -- at the time, of course, Abousamra had a

14   huge beard, didn't he?

15   A.    Yes.

16   Q.    And the joke was, If Abousamra ever went and bought a big

17   bunch of fertilizer that that would be hilarious, right?

18   A.    Yes.

19   Q.    And it was Tarek who was making this joke, correct?

00:03 20   A.    I don't recall who made the joke.

21   Q.    Okay.

22         MR. CARNEY:  May I approach, please?

23         THE COURT:  All right.

24   Q.    Mr. Abuzahra, would you read this question and answer to

25   yourself, please?

```
 1   A.   (Reading.)

 2   Q.   Did you read that?

 3   A.   Yes.

 4   Q.   Was it Tarek who made the joke?

 5   A.   I still don't recall exactly who made the joke.

 6   Q.   Did you say in the past that Tarek jokingly said, Hey,

 7   everybody knows fertilizer and diesel, and was kind of joking

 8   how funny it would be for Ahmad just to buy fertilizer, you

 9   know, how ridiculous that would look, right?  Do you remember

10   Tarek saying that?

11   A.   I don't remember him saying that.

12   Q.   Do you remember you said it?

13   A.   I don't remember saying that.

14   Q.   Do you remember saying then, But that's as far as it went

15   regarding anything about bomb-making?

16   A.   Yes.

17   Q.   Now, you stated that after you arrived at UAE you received

18   an email, and you decided to go back home, correct?

19   A.   Yes.

20   Q.   One of the things that you did when you got back home is

21   you met with Tarek's brother, didn't you?

22   A.   Yes.

23   Q.   And at that point, you didn't know if Tarek knew -- or

24   Tarek's brother knew why Tarek had gone, isn't that right?

25   A.   No.
```

1    Q.   Well, did you say that you didn't know if Tarek's brother

2    knew why Tarek had gone on this trip?  Didn't you say that to

3    the grand jury?

4    A.   I don't recall.

5         MR. CARNEY:  If I may, please?

6         THE COURT:  Go ahead.

7    Q.   Would you read this question and this answer?

8    A.   (Reading.)

9    Q.   Does that refresh your recollection if you knew whether

00:06 10   Tarek told Tamer?  Does this refresh your recollection?

11   A.   Yes, it does.

12   Q.   Isn't it true that you did not know what Tarek told Tamer,

13   and you weren't sure if Tamer, therefore, knew, is that

14   correct?

15   A.   That's a two-part question.  To answer your first part, I

16   do not know.

17   Q.   Let me ask the first part then.  You were asked before the

18   grand jury, "Did Tamer know the reason for the trip," correct?

19   A.   Yes.

00:07 20   Q.   And isn't it true that you replied, "I don't know what

21   Tarek told Tamer, so I'm not sure if Tamer knew"?

22   A.   Yes.

23   Q.   Were you truthful then?

24   A.   To the best of my ability, I was.

25   Q.   So when you returned home, you met with Tamer, right?

1    A.   Yes.

2    Q.   And you explained to him that his brother had gone to

3    Yemen to look at schools, right?

4    A.   I relayed to him what the defendant told me to relay to

5    him.

6    Q.   Was that the question I asked you?

7    A.   No.

8    Q.   Please try to ignore your prep for a moment and just

9    answer my questions.

00:07 10            MR. CHAKRAVARTY:  Objection, your Honor.

11            THE COURT:  Sustained.

12            MR. CARNEY:  May his answer be stricken?

13            THE COURT:  Yes, it will be stricken as nonresponsive.

14    The jury will disregard the answer.

15    Q.   So when you got home, you met with Tarek's brother, Tamer,

16    didn't you?

17    A.   Yes.

18    Q.   And you told Tamer that his brother had gone to Yemen in

19    order to look at schools, correct?

00:08 20    A.   Yes.

21    Q.   When Abousamra returned and you saw him months later, you

22    recorded a conversation with him that was played for us earlier

23    this week; do you recall that?

24    A.   The conversation was recorded years later, not months

25    later.

1  Q.   All right.  And this was the conversation that occurred at

2  Abousamra's house, correct?

3  A.   I'm not sure which one you're referring to.  There were

4  two conversations with Ahmad.

5  Q.   The one at his house where his father was present at the

6  beginning.

7  A.   Yes, I recall that one.

8  Q.   At some point during that conversation, you asked Ahmad,

9  "Did you make it to a school?"  Do you recall that?

00:09 10  A.   If you have something to refresh my memory.  I do not

11  recall it right now.

12  Q.   Do you recall that Ahmad said, "Yes, we visited the

13  school"?

14  A.   If you have something to refresh my memory.  I don't

15  recall right now.

16       MR. CARNEY:  May I, your Honor?

17       THE COURT:  Yes.

18  Q.   Would you read the question and the answer, please?

19  A.   (Reading.)

00:09 20  Q.   Does that refresh your memory?

21  A.   Yes.

22  Q.   Did you ask Abousamra, did he make it to the school?

23  A.   Yes.

24  Q.   And he replied, "Yes, we visited the school.  We didn't

25  like it"?

1   A.   Yes.

2   Q.   And Abousamra did not know that he was being recorded, to

3   the best of your knowledge, at that point, did he?

4   A.   I do not know.

5   Q.   Did he give any indication that he knew that he was being

6   recorded secretly by you?

7   A.   He gave -- not by me, no.

8   Q.   Was it obvious that you were recording him?

9   A.   No.

00:10 10   Q.   Was, to your memory, there any outward manifestation that

11   he would know that he was being recorded?

12   A.   Yes.

13   Q.   What was that?

14   A.   I recall at certain points, we whispered in the

15   conversation indicating that we were afraid the house might

16   have been bugged and there was some way that somebody was

17   listening.

18   Q.   So if you wanted to say something quiet, you could

19   whisper?

00:10 20   A.   Yes.

21   Q.   That's in case the house was bugged?

22   A.   Yes.

23   Q.   But you asked him if he went to the school, correct?

24   A.   Yes.

25   Q.   And he simply said, "Yeah, we visited the school,"

1    correct?

2    A.    Yes.

3    Q.    Abousamra, after his return, reported to you that he was

4    unable to find the person that he was looking for, correct?

5    A.    Yes.

6    Q.    The person whose name had been given to him by Mr. Pippin?

7    A.    Yes.

8    Q.    And afterwards, Abousamra went all over Yemen trying to

9    find a way to get to a military training camp, he told you,

00:11 10   right?

11   A.    He told me that he and the defendant went all over Yemen

12   looking for a training camp.

13   Q.    Did I ask you that?

14   A.    As I mentioned before, I try to relay the answers as

15   truthfully as I can.

16   Q.    My question was:  And after that, Abousamra went all over

17   Yemen looking for someone who could help him get to a military

18   training camp?

19   A.    I don't believe that was the question you asked.  I

00:12 20   believe your question was:  What did he tell me?

21   Q.    Did Abousamra tell you that after he was unable to find

22   the person whose name had been given to him by Pippin that

23   Abousamra -- I mean -- Abousamra traveled all over Yemen trying

24   to find someone who could help him get to a military training

25   camp?  Did he tell you that?

```
 1   A.   I don't recall.  If you have something to refresh my
 2   memory.
 3   Q.   You need to have your memory refreshed?
 4   A.   Yes.
 5   Q.   And didn't he tell you that it was a waste of time because
 6   he never found anyone?
 7   A.   I don't recall.  If you have something to refresh my
 8   memory.
 9   Q.   That there was no one there who could help him get a
10   military training camp in Yemen; didn't he say that?
11   A.   I don't believe he did.
12   Q.   Didn't he tell you there was nothing there?
13   A.   Yes.
14   Q.   And, therefore, he went to Jordan, correct?
15   A.   Yes.
16   Q.   And from Jordan, he went to Iraq to fight?
17   A.   Yes.
18   Q.   Tarek came home, right?
19   A.   Yes.
20   Q.   He didn't go to Jordan?
21   A.   To the best of my knowledge, he did not.
22   Q.   He didn't go to Iraq?
23   A.   To the best of my knowledge, he did not.
24   Q.   He came home and went back to school?
25   A.   Yes.
```

1    Q.   Now, you testified yesterday that your views have evolved

2    over the years; do you recall that?

3    A.   Yes.

4    Q.   And that you stopped believing certain things that you had

5    very strongly espoused earlier in the decade, around 2000,

6    2001, 2003, 2004, is that right?

7    A.   Yes.

8    Q.   Now, during this time when your views were evolving,

9    Abousamra was now out of the United States, right?

00:14 10    A.   At a certain point, yes.

11    Q.   You certainly weren't having regular contact with him

12    anymore, were you?

13    A.   No.

14    Q.   Tarek's views also were getting more moderate, isn't that

15    right?

16    A.   I do not know.

17    Q.   He disagreed with Abousamra's views on a lot of issues,

18    didn't he?

19    A.   I remember a few instances.

00:14 20    Q.   And when you were holding these meetings initially, when

21    Abousamra was convincing Tarek of his point of view, indeed, as

22    he was convincing you, Tarek was pretty immature at that point,

23    wasn't he?

24    A.   I believe so, yes.

25    Q.   The prosecutor asked you to identify three emails that

1    Tarek had sent you personally; do you recall that during the

2    testimony?

3    A.    Yes.

4    Q.    And these were poems that Tarek had written?

5    A.    Yes.

6              MR. CARNEY:  If I may have a moment, your Honor,

7    please?  Could I have 364, please?

8    Q.    Do you remember the prosecutor had you read the heading

9    showing that it was an email to you?

00:16 10    A.    I believe the prosecutor read it.  I don't believe I read

11    the heading.

12    Q.    All right.  Mr. Abuzahra, I'm showing you the first of the

13    poems that he sent to you.  You recognize this as dated January

14    2002?

15    A.    Yes.

16    Q.    Tarek would have been 20 years old at that point?

17    A.    Yes.

18    Q.    Now, we weren't able to have this read when the prosecutor

19    introduced it, but let's take a look at it now.  Is this the

00:16 20    poem -- the first poem he sent you?

21    A.    I don't know if this is the first one he ever sent me.  It

22    was the first one presented by the prosecution.

23    Q.    Could you read it, please, from the top?

24    A.    "Assalaamu alaykum.  Once again, I feel compelled by

25    al-Rooh al-Quddoos."

1    Q.    What does that mean?

2    A.    It's a reference to the archangel Gabriel.

3    Q.    Okay.

4    A.    "May Allah accept this and destroy all homosexuals, in the

5    U.S. Army or otherwise.  Here goes:  We're American soldiers

6    and we're very gay."

7    Q.    Don't read it too fast, please.

8    A.    "We're American soldiers and we're very gay; If you offer

9    us women, we'll tell you no way.  If you ask why we are, we'll

10   just giggle and smile; And admit that we're all addicted

11   pedophiles.  We wear high-heeled shoes and we polish our nails;

12   You see, we all wish that we were really females.  On our days

13   off, we run around the base in pink dresses; Some of us have

14   even started getting our menses.  People say we're defending

15   our country, but those are just lies; The truth is we're

16   fighting for our right to marry other guys.  A friend of ours,

17   Gul Agha" --

18   Q.    Excuse me.  Do you know who Gul Agha is?

19   A.    Not -- it might be one of the -- kind of the -- part of

20   the Afghanistan government that the -- kind of working with the

21   U.S. forces.

22   Q.    Please continue.

23   A.    -- "said he would be our walee."

24   Q.    What is a walee?

25   A.    In Islamic culture, when you get married, a women needs a

00:18

```
 1   walee, a guardianship, to kind of protect her and help her get
 2   married.
 3       "He hooked President Bush up before with some guy named
 4   Rabbani."
 5   Q.   Who's Rabbani?
 6   A.   I believe he -- he might have been the --
 7   Q.   Was he the head of the Afghanistan government?
 8   A.   I don't know.  He might have been the one, like, during
 9   the Soviet invasion.  I'm not sure which -- at what point, but
10   he was definitely -- I believe part of the Afghanistan
11   government working with the U.S. forces.
12   Q.   All right.
13   A.   "If you wear women's clothing and want to be a soldier,
14   too; Then the U.S. Army is the right place for you.  Tariq."
15   Q.   He sent you a second email containing a poem shortly
16   thereafter, did he not?
17   A.   Yes.
18           MR. CARNEY:  Could we have Exhibit 365, please?
19   Q.   Actually, this was before that.  I'm sorry.  This was the
20   second exhibit that the prosecutor introduced yesterday to show
21   Tarek's state of mind.  Do you recognize who the people are
22   that he sent it to?
23   A.   Yes.
24   Q.   Who are they?
25   A.   Me, Hassan, Ahmad Abousamra.
```

1   Q.   And this was sent in December of 2001?

2   A.   Yes.

3   Q.   Can you see that, Mr. Abuzahra?

4   A.   Yes.

5   Q.   Can you first read the part of the message before the poem

6   itself?

7   A.   Read that section right now, just the first part?

8   Q.   The portion above the dotted line, please.

9   A.   "Assalaamu alaykum.  Since I have no other options, the

00:20 10   only way I can attack and humiliate the enemies of Allah and

11   mine is through writing; so this is about the real reason

12   behind America's war against the Taliban.  From now on, every

13   time you see or hear Bush on the news, remember this and know

14   the truth behind the war on terrorism."

15   Q.   So this is a poem he wrote about President Bush?

16   A.   Yes.

17   Q.   Could you read it, please?

18   A.   I am George W. Bush, president of the U.S.A.; As you

19   probably already know, Rabbani and I are gay.  We first met

20   each other a couple of months ago; How I've lived so long

21   without him, I do not really know.  Ever since his old

22   boyfriend A.S." -- I'm not sure who that is -- "Mas'ood was

23   killed, he'd been feeling really sad; So I booked the first

24   flight that I could straight to Jalalabad.  I'd bought him a

25   new dress and say 'Try this on for size'; He looked at it and

1  said nothing as tears rolled down from his eyes.  He then

2  started to cry and" --

3  Q.  Not too fast, please.

4  A.  "He then started to cry and sat down on the floor; And he

5  explained that Mas'ood had given him a similar dress before.  I

6  knelt on the ground and asked him for some useful advice; He

7  leaned over and whispered, 'George, be careful for your wife.'

8  'If she happens to wander into territory controlled by the

9  Taliban; They might beat her for not growing a beard, because

10  she kinda looks like a man.'  So I went around the country in

11  desperate search of her all day; Then I remember that I'm a

12  homo and I don't need her anyway.  I eventually got to a

13  neighborhood where I heard a familiar scream; My two daughters

14  had become the slave-girls of 'Ameer ul-Mu'mineen!  He smiled

15  at me and said that Rabbani had to be taken away; Because under

16  the Shar'iah, it's forbidden to be gay.  He'd been turned over

17  to bin Laden, who'd determine what his punishment would be; So

18  I started this war hoping to bring my dear Rabbani back to me.

19  Tariq."

00:22 20  Q.  Is the prosecutor accurate:  this reflects Tarek's state

21  of mind?

22          MR. CHAKRAVARTY:  Objection, your Honor.

23          THE COURT:  Sustained.

24  Q.  Does this reflect Tarek's state of mind at the time?

25          MR. CHAKRAVARTY:  Objection, your Honor.

1           THE COURT:  Sustained.

2           MR. CARNEY:  May I be heard, please?

3           THE COURT:  No.  You might get the topic with a

4    different question.

5    Q.   This was sent to you, correct?

6    A.   Yes.

7    Q.   And does this reflect Tarek's state of mind at the time he

8    sent it?

9           MR. CHAKRAVARTY:  Same question, your Honor.

00:22 10          THE COURT:  Sustained.

11          MR. CARNEY:  Well, I don't know what I'm supposed to

12   ask.

13          THE COURT:  Foundation.

14   Q.   Were you aware of Tarek's state of mind in 2000 and 2001

15   and 2002 when you were meeting with him once a week?

16   A.   For a portion of 2001, 2002, I was living on a different

17   continent.

18   Q.   What about when you -- when you met up with Tarek, were

19   you aware of his maturity, for example?

00:23 20  A.   Yes.

21   Q.   Does this accurately reflect his maturity at the time?

22          MR. CHAKRAVARTY:  Objection, your Honor.

23          THE COURT:  He may answer that.

24   Q.   This is kind of a silly, immature poem, isn't it?  Or

25   maybe I'm wrong.  Do you think this is a serious piece of

```
 1   literary writing?  You think this is something that might

 2   appear in the New York Review of Books?

 3           MR. CHAKRAVARTY:  Your Honor.

 4   Q.   Maybe in the New Yorker?

 5           THE COURT:  Let's have one question.

 6           MR. CARNEY:  I'm trying to help the witness.

 7           MR. CHAKRAVARTY:  That's why I'm objecting.

 8   Q.   Do you think this would appear in the New Yorker?

 9   A.   Possibly.

10   Q.   You're a subscriber?

11   A.   Well, no.  But there's a book recently, a humorous kind of

12   mockery of children's books.  I forget the beginning part of

13   the title, but it was something, "and Go the (blank) to Sleep."

14   Q.   This would be the type of poem that you would read to a

15   child?

16   A.   It wouldn't be something you'd read to a child, no.

17           MR. CHAKRAVARTY:  Objection to this line of

18   questioning.

19           THE COURT:  I think we've gone far enough with it.

20           MR. CARNEY:  Could we have 366, please, Mr. Bruemmer?

21   Q.   And this is one from 2001 again, correct?

22   A.   Yes.

23   Q.   Sent to you and a couple of others?

24   A.   Yes.

25   Q.   Can you please --
```

1           MR. CARNEY:  Is this as big as it gets, Paul?

2   Q.   Could you read this, please?

3   A.   "Assalaamu alaykum.  Here's a poem I wrote recently about

4   the Northern Alliance, may Allah reject and humiliate them:

5   We're the Northern Alliance and we think we're so strong, If

6   you think that we're Muslims, well then, you're wrong.  People

7   think we are, but the truth is we're not, Some of us are

8   Shi'ah, and all of us smoke pot.  We're just a bunch of smelly

9   losers who have no Imaan, Whose mission is to spread baatil in

10  Afghanistan.  We think we're so cool because America is on our

11  side, But when Mas'ood was killed, like little girls we cried.

12  We hate the Taliban because it's Islam they fight for, On the

13  way to the battlefield, we stop at the liquor store.  You want

14  to know a secret?  Rabbani is gay, He's hoping to get married

15  to George Bush someday.  Or maybe Tony Blair because his accent

16  is so sweet, Oh, no!  Here comes Usama!  He's so masculine,

17  let's go rub his feet!  We're the Northern Alliance, and if you

18  think we're strong, Hopefully, you just realized that you're

19  wrong."

00:26 20  Q.   Is that another poetry compilation candidate?

21          MR. CHAKRAVARTY:  Objection, your Honor.

22          THE COURT:  You may answer it.

23  A.   I don't understand your question.

24  Q.   You think this is something that you'd find in an

25  anthology of great poetry from 2001?  Or is it a silly,

1    immature, juvenile poem written by Tarek?

2    A.   It's difficult to answer.  Sometimes people write in a

3    humorous fashion.  Even if they're 80, they can still write in

4    a humorous fashion to get a point across.  To answer your

5    question, I don't know.

6    Q.   You said, Mr. Abuzahra, in later years Mr. Mehanna would

7    send out emails that would go out to groups, is that right?

8    A.   Yes.

9    Q.   And these emails would cover topics that were serious, is

00:27 10   that right?

11   A.   Yes.

12        MR. CARNEY:  Could we bring up, please, No. 1147?

13        MR. CHAKRAVARTY:  Your Honor, I don't know if these

14   are --

15        MR. CARNEY:  I'm sorry, 1147.

16        MR. CHAKRAVARTY:  I don't know if these are in.  If

17   they're not yet, I'd like to be seen at the side.

18        THE COURT:  These are new?  You want a conference?

19        MR. CHAKRAVARTY:  Yeah.

00:27 20        THE COURT:  See you at the side.

21   (SIDEBAR CONFERENCE AS FOLLOWS:

22        MR. CHAKRAVARTY:  I don't know which ones are which.

23   These appear to be emails from the defendant to -- mass

24   mailings discussing religious topics.  This witness is on, if

25   not all of them, on several -- he is a recipient.

1          To the extent that these are being offered as what the

2    defendant would say, they're hearsay.  I guess that's -- the

3    point is, at best, these are prophetic sayings or descriptions

4    of religious texts.  It's the classic example of he wasn't

5    committing a crime on Tuesday, but he's charged with a crime on

6    Wednesday simply because he's sending religious documentation

7    that neither advances the ball or slides it back with regards

8    to what the Indictment is.

9          It's tantamount to saying, Well, if somebody was

00:28 10   intercepted on a phone, then every interception on the phone,

11   even if it's irrelevant conversation, should come in.  So it's

12   both hearsay as well as the relevancy.

13         MR. CARNEY:  First of all, your Honor, the government

14   opened the door when they brought up testimony that Tarek would

15   send group emails out to people.  Number 2, he said, these

16   group -- he offered that evidence to show that this -- these

17   emails would reflect Tarek's state of mind.  These are not

18   being offered for the truth but merely as they reflect his

19   state of mind during the same relevant time period.  And that's

00:29 20   the basis that I'm offering them.

21         THE COURT:  How many are there?

22         MR. CARNEY:  Four, and they're brief.

23         THE COURT:  You may have them.

24         MR. CARNEY:  Thank you.

25   .  .  .  END OF SIDEBAR CONFERENCE.)

1           THE COURT:  This is on the defense computer?

2           MR. CARNEY:  Yes, it is, your Honor.  The first one is

3      1147, please.

4           THE COURT:  That's admitted, for the record.

5      (Exhibit No. 1147 received into evidence.)

6      (Exhibit No. 1148 received into evidence.)

7      (Exhibit No. 1149 received into evidence.)

8      (Exhibit No. 1150 received into evidence.)

9           MR. CARNEY:  Thank you.  Could I have Page 2, please?

00:30 10     I'm sorry.  Hi, John.  Page 2, please.  We'll start at Page 1.

11     Can you just blow up the heading, please?

12     Q.   This is an email that was sent by Tarek in 2006, is that

13     right?

14     A.   Yes.

15     Q.   Is that what it appears to be?

16     A.   Appears to be.

17          MR. CARNEY:  Would you go down to the body or do a

18     full picture of this so that it can be seen whether it's a

19     group email.

00:31 20     Q.   There are a number of people that this has been sent to,

21     right?

22     A.   Yes.

23          MR. CARNEY:  Could you go to Page 2, please?

24     Q.   And there are additional people on this list, is that

25     right?

1    A.    Yes.

2         MR. CARNEY:  Would you please go down to the body of

3    the email, down below where the message begins, and blow up, if

4    you can -- are you able to blow it up or is that it?

5    Q.    See where it says, "Anger:  Ten Ways to Defeat it"?

6    A.    Yes.

7    Q.    Can you please read the body of this email?

8    A.    "1."

9    Q.    Beginning with "Anger:  Ten Ways to Defeat it."

00:31 10    A.    "Anger:  Ten Ways to Defeat it.  1.  Seek refuge with

11    Allah from the Devil:  Sulayman bin Sard narrated."

12    Q.    Do you know who he's referring to in "Sulayman"?

13    A.    It's -- I'm not sure exactly who it is, but it's a

14    companion of the prophet.

15    Q.    That means someone who lived in the prophet's lifetime?

16    A.    Yes.

17    Q.    And wrote down things that the prophet said?

18    A.    Not necessarily wrote them down.

19    Q.    Remembered them and passed them on orally perhaps?

00:32 20    A.    Yes.

21    Q.    And eventually they were written down?

22    A.    Yes.

23    Q.    And is this contained in a Hadith?

24    A.    Yes.

25    Q.    So could you read from this Hadith, beginning with

1    "Sulayman bin Sard"?

2    A.    "Sulayman bin Sard narrated:  I was sitting with the

3    Prophet, when two men began slandering one another.  One of

4    them was red in the face, and the veins on his neck were

5    standing out.  The Prophet said:  'I know a word which, if he

6    were to say it, what he feels would go away.'  If he said:  'I

7    seek refuge with Allah from the Devil,' what he feels would be

8    go away.

9         "If a man gets angry and says:  'I seek refuge with

00:33 10   Allah,' his anger will go away."

11   Q.    Please continue, sir.

12   A.    Recorded in Sahih al-Jami, No. 695.  "2.  Remain silent.

13   The Messenger of Allah said:  'If any of you becomes angry, let

14   him keep silent'."  Recorded in Sahih al-Jami, No. 693.

15   Q.    When you say "recorded," you're referring to a Hadith?

16   A.    There's a book, Sahih Al-Jami, which the author had

17   gathered various Hadiths and put them in.  And this is No. 693

18   in this series, sir.

19   Q.    The next one, please.

00:33 20   A.    "3.  Sit down or lie down:  'Abu Dharr was taking his

21   camels to drink at a trough that he owned, when some other

22   people came along and said to one another: 'Who can compete

23   with Abu Dharr in bringing animals to drink and make his hair

24   stand on end?'  A man said:  'I can.'  So, he brought his

25   animals and competed with Abu Dharr and ended up breaking the

1  trough.  Abu Dharr was standing when he saw this, so, he sat

2  down, then he laid down.  Someone asked him: 'O Abu Dharr, why

3  did you sit down then lie down?'  He said:  'The Messenger of

4  Allah said:  If any of you becomes angry and he is standing let

5  him sit down, so that his anger will go away.  If it does not

6  go away, let him lie down'."

7  Q.   Why don't you skip down to No. 4.

8  A.   "4.  Smile:  Anas bin Malik narrated:  'I was walking with

9  the Messenger of Allah, and he was wearing a Najrani cloak with

10 a rough collar.  A bedouin came and seized him roughly by the

11 edge of his cloak, and I saw the marks left on his neck by the

12 collar.  Then the bedouin ordered him to give him some of the

13 wealth of Allah that he had.  The Prophet turned to him and

14 smiled, then ordered that he should be given something."

15 Recorded Fath al-Bari, Volume 10, Section 375.

16 Q.   Please go to the next page and just read the headings.

17 A.   "5.  Remember the advice of the Prophet."  "6.  Remember

18 the high status of those who control themselves."

19 Q.   Number 7?  I'm sorry.  Go ahead.

00:34 20 A.   Look likes the heading might have been skipped.  But:  "8.

21 Remember that resisting anger is one of the signs of

22 righteousness."  "9.  Submit to reminders."  "10.  Remember the

23 bad effects of anger."

24 Q.   Could you read No. 10 in full, please?

25 A.   "Alqamah bin Wa'il narrated:  My father said to me:  'I

1    was sitting with the Prophet, when a man came to him leading

2    another man by a rope.  He said:  'O Messenger of Allah, this

3    man killed my brother.'  The Messenger of Allah asked him, 'Did

4    you kill him?'  He said:  'Yes, I killed him'  He asked:  'How

5    did you kill him?'  "He and I were hitting a tree to make the

6    leaves fall for animal feed, and then he insulted me, so I

7    struck him on the side of the head with an axe and killed

8    him'."  Sahih Muslim, No.  1307.

9              MR. CARNEY:  Can we go to No. 1148, please?

00:35 10   Q.   You see this is a group email sent by Tarek in 2004?

11   A.   Yes.

12             MR. CARNEY:  Can you go to the body of that email,

13   please?

14   Q.   Can you read what the message of this one was sent to the

15   group?

16   A.   "Upon breaking his" --

17   Q.   Before you do that, is that your name and email address as

18   the last person on this block?

19   A.   Yes.

00:36 20   Q.   So this would be something you received from him?

21   A.   Most likely.

22   Q.   Could you read it, please?

23   A.   "Upon breaking his fast, the Prophet would say:  'The

24   thirst is gone, the veins have been moistened, and the reward

25   is assured, if Allaah wills'."  You want me to read the Arabic

1  transliteration or --

2  Q.   No.  You can just read the English, please.

3  A.   "There are other authentic ahaadeeth which speak of the

4  virtue of the du'aa (supplication) of the fasting person, such

5  as the following:

6      "'Three prayers are not rejected: the prayer of a father

7  for his child, the prayer of a fasting person, and the prayer

8  of a traveller.

9      "Every time the fast is broken, Allaah has people whom He

10  ransoms (from the Hell-Fire).

11     "Allaah ransoms people (from the Hell-Fire) every day and

12  night - i.e., in Ramadaan - and every day and night the Muslim

13  has a prayer that is answered."

14  Q.   Thank you.

15          MR. CARNEY:  Could we please go to the next one, 1149?

16  Q.   This is another group email from 2003, is that right?

17  A.   Yes.

18          MR. CARNEY:  Could we go to the second page, please?

19  And this is another email that was sent to you as well,

00:37 20  correct?

21  A.   I believe so.

22  Q.   Could you read this one?

23  A.   "Willpower, by Ahmed Ameen.  It is impossible to achieve

24  any reform without first developing our willpower.

25          "If we want our youth to be able to keep their emotions in

1   check, refrain from overindulgence, exhibit courage in times of

2   hardship, and uphold justice in the face of oppression, then we

3   must realize that all of our advice will be of no avail to them

4   if they lack willpower.  People need to develop their willpower

5   before they can put their convictions into practice.  It takes

6   willpower for a person to do something arduous, even if he

7   thinks it is for his own benefit.  Likewise, it takes willpower

8   for him to shun temptation, even when he knows that indulging

9   such temptations will be harmful to him.  You can advise him

10   all day long if you like, but it will do no good if the one

11   receiving your advice is weak-willed.

12       "How, then, can we cultivate our willpower and strengthen

13   it?

14       "Consider a child who wants to learn to ride a bicycle.

15   When he starts off, he cannot even keep the bike standing

16   straight, let along go forward on it.  When he does get going,

17   he weaves wildly to the left and to the right and ultimately

18   ends up falling flat on the ground.  With a lot of hard work

19   and perseverance, he gets it in the end.  He learns to ride

20   smoothly and easily.  He even learns to do a few stunts.

21       "What happened?  The bicycle definitely did not change -

22   except for possibly a few dents.  It is just as willing to obey

23   its rider as it ever was.  All the changes have taken place

24   with the rider.

25       "The same can be said for all of our goals in life.  We

```
 1  have to get control of ourselves before we can tackle our
 2  environment.  The first step in this is to develop our
 3  willpower."
 4  Q.   Why don't we stop there.
 5       MR. CARNEY:  And go to 1150, please.
 6  Q.   This is another group email sent in 2004?
 7  A.   Appears to be so.
 8       MR. CARNEY:  And can we go to the body of this one?
 9  Q.   This is the last of them.  Do you see that you are on this
10  email as well?
11  A.   Yes.
12  Q.   So when you were referring in your testimony to the fact
13  that Tarek would send out these group emails, it was apparent
14  that you were one of many people that he would send these
15  emails to, isn't that right?
16  A.   Some of the emails, yes.
17  Q.   Would you read this one?
18  A.   "The Messenger of Allah (SAWS) is reported to have said:
19  'Abstain from the forbidden and you will be the most devout
20  worshippers amongst the people.  Be content with what Allaah
21  allocates for you from provision and you will be the richest of
22  people.  Be good to your neighbor and you will be a believer.
23  Love for the people what you love for yourself and you will be
24  a Muslim and do not increase in laughter because too much
25  laughter kills the heart.'  Reported by at-Tirmidhi (9/183,
```

00:39 (line 10)

1    184) in az-Zuhd, Ahmad (2/310)" -- do you want me to continue

2    with the references or --

3    Q.   Yes, please.

4    A.   "Ahmad (2/310), ibn Maajah (4217) in az-Zuhd with this

5    meaning, with a good (hasan) chain of narration."

6    Q.   Excuse me for interrupting.  Who are these people that

7    Tarek are citing?

8    A.   These are people that would have -- the people that would

9    have collected the ahaadeeth and the scholars of the earlier

00:40 10   times.

11   Q.   So this is another example of Tarek's taking some words of

12   scholars or words reflected in a Hadith and sharing them with

13   people?

14   A.   Yes.  "Yoonus ibn Ubaid" --

15   Q.   You can stop there.

16   A.   Okay.

17   Q.   Now, we talked about the fact that Tarek's views were

18   evolving during this period, isn't that right?

19   A.   Which period?

00:41 20   Q.   During the period of 2004, 2005, 2006, is that correct?

21   A.   I don't believe I talked about that.

22   Q.   You indicated that your views were moderating during this

23   period, right?

24   A.   Yes.

25   Q.   And Tarek would often have disagreements or even arguments

1    with Abousamra about Abousamra's extreme views, didn't he?

2    A.   Once again, you use the phrase "oftentimes," and I said I

3    remember a few incidents.

4    Q.   Is a few instances oftentimes?

5    A.   I wouldn't consider that oftentimes.

6    Q.   Let's take one.  Abousamra believed that voting was not

7    appropriate for a Muslim to do, correct?

8    A.   Correct.

9    Q.   And Tarek opposed that point of view, didn't he?

00:41 10   A.   I have a vague recollection of that.  I can't specifically

11   remember.  I believe he might have -- I believe we did talk

12   about that, yes.

13   Q.   Tarek said it was appropriate in a democracy to vote and

14   was not a sign of a disbeliever, correct?

15   A.   I don't want to get into the play of semantics and exact

16   phrasing.  If you want, I can relay to what I believe was

17   mentioned rather than tell you, no, that's not the exact

18   phrasing.  Would you prefer that?

19   Q.   Did Tarek say it was permitted in a democracy to vote?

00:42 20   A.   I don't recall he said that phrasing.

21   Q.   Abousamra believed that it was okay to attack Americans

22   because they paid taxes, correct?

23   A.   Yes.

24   Q.   Tarek said that wasn't correct and cited scholarly texts

25   to back it up, didn't he?

         1   A.   I don't recall if that's how it came out.

         2   Q.   Do you remember him saying that it was not appropriate --

         3   it was not inappropriate in a democracy to pay taxes?

         4   A.   I believe what he said was that --

         5   Q.   Did Tarek say that?

         6   A.   I don't recall.

         7   Q.   Did Tarek say that he disagreed with Abousamra's view

         8   that, if you paid taxes, you could be a target?

         9   A.   I don't believe that was the phrasing used.

00:43   10   Q.   Tarek did not believe that suicide bombings were

        11   appropriate if they were targeted towards civilians, correct?

        12   A.   I do not recall.

        13   Q.   Tarek's contention was that a suicide bombing could only

        14   be used in a military action, isn't that right?

        15   A.   I don't recall.

        16   Q.   Abousamra believed it could be, correct?

        17   A.   Yes.

        18   Q.   Now, you agreed with these views by this point, too,

        19   didn't you?

00:43   20   A.   We mentioned two opposing views.  Could you please specify

        21   which one?

        22   Q.   The ones of Tarek, please.

        23   A.   All I have is your word on what he said.  I can tell you

        24   my views.

        25   Q.   Did you agree with Tarek's views as I've just expressed

them?

A.   As you have expressed them -- you asked questions.  It would be better if we just -- again, I don't understand because --

Q.   I'll move on.  We don't have time to do this.

Now, Abousamra believed that killing innocents would be okay, innocent people, if it furthered the goal of the Jihad, correct?

A.   He agreed with killing innocent people in certain situations.

Q.   Tarek was of the view that it was not appropriate under Islam to just kill civilians in an effort to kill, for example, a single military person?

A.   I believe that is correct.

Q.   And you, too, were upset when there was a bombing at a hotel in Jordan; do you remember that?

A.   Yes.

Q.   And you said that that was inappropriate, to kill a number of citizens when the goal was to kill one Israeli, correct?

A.   Yes.

Q.   And Tarek agreed with that position, didn't he?

A.   I had ceased contact with the defendant at that time.

Q.   Do you remember talking to him at any point about a bombing that had killed a number of civilians that had upset you greatly?

1  A.   Yes.

2  Q.   And that was a position that Tarek advocated as well, that

3  it was inappropriate to kill civilians just to kill one

4  military person or one person?

5  A.   My memory is refreshed.  So, yes, I remember that.

6  Q.   In fact, you talked about it on the phone, didn't you --

7  or, rather, in person?

8  A.   Yes.

9  Q.   Now, yesterday the prosecutor played a portion of a

00:46  10  telephone call -- not a telephone call -- a conversation

11  between you and Tarek that you were recording, I believe, in a

12  car; do you recall that?

13  A.   Yes.

14  Q.   And the prosecutor went up to a certain page of the

15  translation and then skipped over a section and then resumed

16  the -- not translation but transcription of what was said; do

17  you recall that?

18  A.   I remember there were excerpts taken.  I'm not sure if it

19  was skipping a page or not.  But I remember there were excerpts

00:46  20  taken.  Parts were missing.

21  Q.   So sections were skipped?

22  A.   Yes.

23       MR. CARNEY:  Your Honor, I have a transcript of a

24  section of that that I would like to distribute to the jury, or

25  have Mr. Lyness distribute it, and have Mr. Bruemmer play it.

1           MR. CHAKRAVARTY:  No objection.

2           THE COURT:  Can you identify the date and so on of the

3      --

4           MR. CARNEY:  Yes, your Honor.  It's Exhibit 459,

5      January 12, 2007.

6      Q.   Mr. Abuzahra --

7           MR. CARNEY:  I've already given copies to the

8      prosecutor.

9           MR. CHAKRAVARTY:  Your Honor, just to clarify, the

00:47 10      audio portion would be Exhibit 458.  The entire recording,

11      which is labeled by date, is January 12, 2007.

12           THE COURT:  So -- okay.

13           MR. CHAKRAVARTY:  For purposes of the record, in terms

14      of documenting the exhibits, it was the government's intention

15      to provide the jury with -- in the interests of efficiency as

16      they deliberate, just the audio clips that are being played in

17      court so that they would have the audio clips and including the

18      clip that Mr. Carney wants to play as well as, if they want to,

19      listen to the entire recording.  Each --

00:47 20           THE COURT:  Right.  This 459 -- maybe I can answer it

21      by looking at it.  We had a -- I want to avoid any confusion.

22      We had a 459 yesterday, which was a transcript of the segments

23      that were played by the government.

24           MR. CARNEY:  Correct, your Honor.

25           THE COURT:  This is also called 459, but it's a

different 459 because it's only of the segment you would want
to play, right?

　　　　MR. CHAKRAVARTY:  I would recommend labeling it
something else.

　　　　THE COURT:  Let's call it A, 459A, shall we?
(Exhibit No. 459A received into evidence.)

　　　　MR. CARNEY:  Yes, your Honor.  May Mr. Bruemmer play
it?  Mr. Bruemmer informs me that it will start a tiny bit
before the portion that begins, "I've definitely gained a lot
of wisdom."

(Recording played.)

Q.　Does the word "hikmah" mean wisdom?

A.　Yes.

Q.　Is that Tarek's voice?

A.　Yes.

Q.　And the other voice is yours?

A.　Yes.

　　　　MR. CARNEY:  Please continue, Paul -- Mr. Bruemmer.

(Recording played.)

Q.　Tarek says, "And then I kept" -- first, he's referring to
the website, Tibyan Publications, and that's a website where
there are often extreme views, is that right?

A.　I believe so, yes.

Q.　And he notes in here that he stopped going to that
website, correct?

1   A.   Yes.

2   Q.   But then went back again.  And he said, "To balance out

3   the extremism that's on there, like people would say stupid

4   things like that."  He goes on to reference, at the bottom of

5   that paragraph, that he kept bringing the Fatwa.  What is a

6   "Fatwa"?

7   A.   He says "Fatawa," which is a plural of Fatwa.

8   Q.   What is Fatwa?

9   A.   It's a religious ruling.

00:51 10   Q.   What do you mean by "religious ruling"?

11           MR. CARNEY:  Maybe we're having divine contact.

12   Q.   Okay.  Please explain again what Fatawa means.

13   A.   It is a religious ruling from a scholar.

14   Q.   Is it expressing an opinion on a particular issue?

15   A.   Yes.

16   Q.   When he says "bringing the Fatawa from, like, Jihadi

17   scholars who were against it," he's referring to being against

18   this type of approach of bombing civilians just to kill one

19   schoolteacher, is that right, in context?

00:52 20   A.   Yes.

21   Q.   And he mentions people like Sulayman Alwan.  Who is he?

22   A.   The name sounds familiar, but I'm not sure exactly who.

23   Q.   Do you know if he's a scholar who issued a Fatwa against

24   this type of activity that Tarek disagreed with?

25   A.   The only way I'd know that is through Tarek's words.

1    Q.    Before we go to the next paragraph, what is "haraam"?  You

2    see the word in the next sentence?

3    A.    It's sinful; it's prohibition from God.

4    Q.    What's that?

5    A.    It's a prohibition from God.  It's something sinful,

6    something not allowed in the religion.

7    Q.    When Tarek is referring to a "haraam," he's saying that,

8    under Islam, this type of bombing is prohibited, right?

9    A.    Yes.

00:53 10          MR. CARNEY:  Mr. Bruemmer, if you can resume.

11    (Recording played.)

12          MR. CARNEY:  Stop there, please.

13    Q.    Earlier, Tarek had said, in the line right above it,

14    "Allah said Allatheena jahadoo."  What is that?

15    A.    Those that participate in Jihad.

16    Q.    And is there a verse from the Qur'an then read?

17    A.    Yes.

18          MR. CARNEY:  Please continue.

19    (Recording played.)

00:54 20          MR. CARNEY:  Excuse me.

21    Q.    What does "hamdallah" mean?

22    A.    All praise be to God.

23          MR. CARNEY:  If you can back it up.  I shouldn't have

24    interrupted so briskly.

25    (Recording played.)

1          MR. CARNEY:  Keep going please.

2          MR. BRUEMMER:  That's where -- I'll have to redo it.

3     I apologize.

4          MR. CARNEY:  Your Honor, we'll have to read the

5     balance of it, please.

6          MR. CHAKRAVARTY:  Your Honor, respectfully, this was

7     all part of, I think, Exhibit 459.  The balance was read to the

8     jury before.  I suspect that's why the clip ends.  It wasn't

9     read, excuse me.  It was played for the jury, please.

00:57 10        MR. CARNEY:  I would like it, please, to be read.

11          THE COURT:  You can read it.

12    Q.  Can you read your portion that starts with "Yeah.  So,

13    it's stuff like that," and I'll read the portion of Tarek?

14    A.  "Yeah.  So, it's stuff like that I think there's like tons

15    of other stuff that we could do that I mean it's like okay,

16    jihad, jihad but it's like..a person in a wheelchair, you're

17    not going to tell him what he's jihadi.  They think we're

18    handicapped just because the way we were born, where we were

19    born you know that I mean it's like that kind of stuff.  Like

20    look at it where did Ahmad go?  Where did he go?  Name the

21    countries that he went to you know what I mean?" (Laugh)

22    Q.  "Yes."

23    A.  "All those places and what did they tell him?"

24    Q.  "We don't need you."

25    A.  "You know what I mean?"

```
 1   Q.   "Yeah, I agree that there's definitely a much more mature
 2   way of thinking about these things and it's not just like you
 3   know, you read about the laws and that's it."
 4   A.   "No, and the -- gave up but the point is it's like we are
 5   handicapped.  It's not like, oh, it's not a physical handicap
 6   it's like we're handicapped is okay, we live in ah, the Country
 7   that right now due to GEORGE BUSH they can spy on their own
 8   citizens you know what I mean not just like oh, the MUSLIMS
 9   like every single American citizen born they have like spy and
10   all this kind of crap take away Civil Rights it's like so far
11   you know, the crap like I don't know.  Just the way it was done
12   it's absolutely idiotic you know."
13   Q.   "That is the problem, brother.  The problem with our
14   situation and it's just not related to this but to everything
15   about ISLAM is that we don't have adults.  We don't have
16   trustworthy adult examples that we can refer back to that live
17   here and know our situation.  Everything we've been reading is
18   by a scholar who's never probably been here or has been here
19   but like it's just like living in a completely different
20   world."
21               MR. CARNEY:  That concludes the transcripts.
22               THE COURT:  Yes.
23               MR. CARNEY:  I can continue on.
24               THE COURT:  You want to collect it?  Yeah, go ahead.
25   Go ahead.
```

00:58

```
 1              MR. CARNEY:  Thank you.
 2     Q.   Now, this recording was made by you obviously after you
 3     had reached a deal with the government for immunity, is that
 4     right?
 5     A.   Yes.
 6     Q.   You were wearing a recording device?
 7     A.   Yes.
 8     Q.   It was important to you to pretend that you were still
 9     Tarek's friend, right?
00:59 10    A.   It wasn't important to me.  It was important to what I had
11     to do.
12     Q.   Well, it was important for Tarek to believe that you were
13     still his friend, right?
14     A.   Yes.
15     Q.   And that the only reason you were speaking to him was
16     because you were his friend, right?
17     A.   Yes.
18     Q.   But that was a lie, wasn't it?
19     A.   Yes.
01:00 20    Q.   You pretended that this was just a conversation between
21     friends that no one else would be privy to, just two guys
22     driving along in a car talking, right?
23     A.   Yes.
24     Q.   But that was a lie, wasn't it?
25     A.   Yes.
```

```
 1   Q.   Were you good at pretending to be his friend?

 2           MR. CHAKRAVARTY:  Objection, your Honor.

 3           THE COURT:  You may answer it.

 4   A.   I don't know.

 5   Q.   Did you try hard to pretend to be his friend?

 6   A.   I haven't thought about the level of effort I put into it.

 7   Q.   What's that?

 8   A.   I haven't thought about the level of effort I put into it.

 9   Q.   You carried this on for over an hour in this conversation,

10   didn't you?

11   A.   Yes.

12   Q.   Did you give any indication that you were recording it?

13   A.   No.

14   Q.   Did you give any indication that -- and, in fact, you

15   weren't there because you wanted to be his friend and have a

16   conversation, but you wanted to be there to record it.  Did you

17   give any indication of that?

18   A.   No.

19   Q.   Tarek gave no indication that he knew he was being

20   recorded by you, did he?

21   A.   No.

22   Q.   Or that you were engaged in this lie, did he?

23   A.   No.

24   Q.   And he'd known you at this point for more than a decade,

25   hadn't he?
```

```
 1   A.   Yes.

 2   Q.   He considered you to be a friend, right?

 3   A.   Yes.

 4   Q.   You went through a similar process when you secretly

 5   recorded Abousamra, right?

 6   A.   Yes.

 7   Q.   Someone you had known for years?

 8   A.   Yes.

 9   Q.   Someone who considered you to be his friend, correct?

10   A.   Yes.

11   Q.   But, in fact, that recording, too, and the circumstances,

12   were a lie, right?

13   A.   Yes.

14   Q.   Now, in the past, you had even practiced lying, hadn't

15   you?

16   A.   Yes.

17   Q.   Mr. Abuzahra, do you have any mannerisms that give away

18   when you are lying?

19   A.   From my understanding, everybody does.  I'm not sure if I

20   have -- what mine are.

21   Q.   You know what the concept of a "tell" is?

22   A.   Yes.

23   Q.   What is that?

24   A.   You refer to it in poker but a way to tell if somebody is

25   bluffing or -- I guess bluffing, which would be considered
```

1      lying.

2      Q.   Do you tap your foot when you lie?

3      A.   I don't know.

4      Q.   Do you ring your hands a lot when you lie?

5      A.   I don't know.

6      Q.   Do you hold your hands together when you lie?

7      A.   I don't know.

8      Q.   Is there anything a stranger could determine by just

9      looking at you whether you are lying or not --

01:02 10          MR. CHAKRAVARTY:  Objection, your Honor.

11     Q.   -- because of a mannerism?

12          THE COURT:  Overruled.  You may have it.

13     A.   I don't know.

14     Q.   You don't know of any mannerism that would give you away

15     if you're lying?

16     A.   No, I do not.

17     Q.   How would someone know, if hearing you speak for the first

18     time, that you were lying?

19     A.   I don't know.

01:03 20     Q.   Now, during all these recordings you were trying to have

21     made of Tarek, the goal was to get him to say that he went to

22     Yemen for military training and thereafter to go to Iraq and

23     fight, correct?

24     A.   No.

25     Q.   You were trying to get him to make an incriminating

1    statement about going to Iraq to engage in fighting, right?

2    A.   I'm just trying to think back to what the agents told me.

3    It was just, again, to talk about the trip.  I don't believe

4    they said, This is the goal, to gain such and such, or, This is

5    the goal, to talk about the trip.

6    Q.   You know what they wanted you to say?

7    A.   I have an assumption.

8    Q.   You were following through on that assumption, right?

9    A.   Yes.

01:04 10   Q.   And that assumption was that the more you would talk about

11   it, the more that there would be an opportunity for Tarek to

12   say that he went to Yemen for military training and then to go

13   to fight in Iraq, right?

14   A.   I don't know.

15   Q.   Would that have been beneficial to your assumption if he

16   had said that?

17   A.   Beneficial for the prosecution.

18   Q.   Would that have been beneficial --

19   A.   For the prosecution.

01:04 20   Q.   -- if he said that?  If you had got him to say that?

21   A.   For the prosecution.

22        MR. CHAKRAVARTY:  Objection, your Honor.

23        THE COURT:  I think it's been answered.

24        MR. CARNEY:  All right, your Honor.

25   Q.   It would be beneficial for the prosecution if you got him

```
 1   to say that, right?

 2   A.    I believe that is the case.

 3   Q.    And you tried to, didn't you?

 4   A.    I tried to get him to talk about Yemen.

 5   Q.    You tried to steer the conversation about Yemen and

 6   military training and -- did you not?

 7   A.    I'd have to review the tapes again.  I believe -- what I

 8   can recall right now, in this split second, is it was to get

 9   him to talk about the Yemen trip.

10   Q.    When Tarek was talking about the Yemen trip, he often

11   referenced Abousamra, right?

12   A.    I don't know.

13   Q.    You talked about Abousamra during this conversation,

14   correct?

15   A.    Yes.

16   Q.    And about the fact that Abousamra was unable to find a

17   military training camp, correct?

18   A.    Yes.

19   Q.    He and you talked about the fact that after Abousamra was

20   unable to find a military training camp, he had gone to Jordan,

21   correct?

22   A.    Yes.

23   Q.    And then he had gone to Iraq to fight, correct?

24   A.    Yes.

25   Q.    And you and Tarek talked about that so that Tarek would
```

1  confirm that Abousamra, indeed, had looked for a military

2  training camp and thereafter gone to Iraq to try to fight,

3  correct?

4  A.    Can you repeat the question?

5  Q.    In your conversation with Tarek, he was able to confirm

6  that after Abousamra was unable to find military training in

7  Yemen he had gone onto Iraq to fight, correct?

8  A.    Yes.

9  Q.    And you asked him further questions so that he could

01:06 10  further confirm that that was Abousamra's intention of going to

11  Yemen, was to end up in Iraq to fight, correct?

12  A.    I don't believe that is the case.

13  Q.    And then you talked about how Abousamra was unable to hook

14  up with someone and be able to fight in Iraq; do you remember

15  that?

16  A.    That's a two-part question.  He was able --

17  Q.    Answer both parts.

18  A.    He was able to hook up with someone but unable to fight.

19  Q.    Please answer both parts.

01:07 20  A.    He was able to hook up with someone, but he was not able

21  to fight.

22  Q.    But in all of this recording of the conversation that went

23  over an hour and the other conversations that you taped --

24  we'll focus on this one so it won't be a multipart question.

25  Throughout this entire conversation, Tarek never confirmed to

1   you that he had gone to Yemen to seek military training with

2   the intention of going on to Iraq to fight, did he?

3   A.    You pointed out this transcript.  Are you talking about

4   the entire conversation or just what's presented here?

5   Q.    What's presented in the transcript there or in

6   yesterday's.

7   A.    I don't believe so.

8   Q.    Now, I want to talk briefly about your approaching the

9   FBI.  The first thing that happened was the FBI had come to

01:08  10   your house and said they would like to speak to you, correct?

11   A.    Yes.

12   Q.    This was completely out of the blue, wasn't it?

13   A.    Out of the blue for me.

14   Q.    They hadn't called you in advance and warned they would be

15   coming by?

16   A.    No.

17   Q.    You were changing the oil in a vehicle --

18   A.    Yes.

19   Q.    -- when they came?

01:08  20       And you asked them, would they mind just coming back in a

21   little while so that you could clean up after changing the oil?

22   A.    Well, I asked them -- I was at my parents' house changing

23   the oil.  I was right in the middle of it.  I had oil all over

24   my hands.  I told them, Could we just meet at my house in a

25   little bit?  For two reasons:  one, so I actually could clean

1   up; and secondly, just to keep it removed from my family.

2   Q.   You didn't want to be seen talking to the FBI?

3   A.   They knew it.  They were right there when they came.  But

4   it's just I didn't want to do it there and make it -- I'd

5   rather just have that separate.

6   Q.   When they got to the house, you invited them in?

7   A.   Before they came in, I asked them specifically.  I said,

8   If I let you in, is this giving you permission to search my

9   house or anything?  When they said no, I said, Okay, you can

01:09 10   come in.

11   Q.   You did not want them to search your house?

12   A.   Correct.

13   Q.   Now, you brought them in.  And did you sit down?

14   A.   Yes.

15   Q.   Whereabouts?

16   A.   In my living room.

17   Q.   And they said to you they wanted to ask you about the trip

18   to Yemen, correct?

19   A.   Yes.

01:09 20   Q.   You said, fine, you would be willing to speak to them?

21   A.   Yes.

22   Q.   There were two agents?

23   A.   Yes.

24   Q.   Do you remember their names?

25   A.   Yes.

1    Q.   What are they, please?

2    A.   Special Agent Chris Gianakura and Special Agent Brad

3    Davis.

4    Q.   Did they provide identification to you that they were from

5    the Federal Bureau of Investigation?

6    A.   I believe one of them showed me his credentials.

7    Q.   Any question that they were FBI special agents?

8    A.   No.

9    Q.   Now, they asked you to talk about that trip to Yemen,

01:09 10   didn't they?

11   A.   Yes.

12   Q.   And you told them that you went to Yemen because you were

13   interested in becoming an Islamic scholar, right?

14   A.   I don't remember if that's exactly what I told them.  I

15   don't know if I expressed to become an Islamic scholar, but I

16   said the purpose of the trip was to study the religion or the

17   language.

18   Q.   Did you tell the FBI that you were interested in becoming

19   an Islamic scholar?

01:10 20   A.   I don't recall.

21          MR. CARNEY:  May I approach, please?

22          THE COURT:  All right.

23   Q.   Did the government show you the FBI reports of interviews

24   with you?

25   A.   I've seen one, maybe two of them.

```
 1   Q.   They didn't show you all of them?

 2   A.   No.

 3   Q.   Did they show you them completely or parts of them?

 4   A.   Parts of them usually.

 5   Q.   Okay.  I'd ask you to read this to yourself, please.

 6   A.   (Reading).  Can I read the rest of the --

 7   Q.   May I see it?  Certainly.  Just all the way down to the

 8   bottom of the first paragraph or if you want to read the whole

 9   thing, but all I'm going to be asking you about is in that

10   paragraph that I've pointed to.

11   A.   (Reading.)

12   Q.   Is that a portion of one of the FBI reports that they

13   asked you to read before you were going to testify?

14   A.   No.

15   Q.   Does this refresh your memory about whether you told the

16   FBI agents that you were -- that at the time you went to Yemen,

17   you were interested in becoming an Islamic scholar?

18   A.   It doesn't.

19   Q.   Do you remember what you told the FBI?

20   A.   I remember I -- to the best of my recollection, I just

21   told them I was interested in studying more about the religion

22   and the rest of what's in that report.

23   Q.   And what?

24   A.   The rest of what's in that report.  I don't know if I said

25   I wanted to become an Islamic scholar, but I told them I was
```

1   interested in studying more about the religion.

2   Q.   So that you told the FBI that you were interested in going

3   to visit two Islamic schools in Yemen, correct?

4   A.   I believe so.

5   Q.   And the reason you were going to go look at the schools is

6   to see if you were interested in coming back to Yemen at a

7   later point to study at the schools, correct?

8   A.   I don't recall that level of detail.

9   Q.   Did you say you were going to Yemen to visit two Islamic

01:13 10   schools?

11   A.   I believe so.

12   Q.   And that was a lie?

13   A.   Yes.

14   Q.   And you knew it was a lie?

15   A.   Yes.

16   Q.   And you were intentionally telling them a lie?

17   A.   Yes.

18   Q.   You told them that after visiting these schools, you

19   intended to return to the United States, correct?

01:13 20   A.   Yes.

21   Q.   And then make plans in the future to come back and study

22   at one of those two schools, correct?

23   A.   I don't recall.

24   Q.   Did you say that what appealed to you about these schools

25   was the flexibility and the fact that they accepted foreigners,

```
 1   and you didn't have to make a long-term commitment?

 2   A.    Yes.

 3   Q.    And that was a lie?

 4   A.    Yes.

 5   Q.    An intentional lie that you told the FBI?

 6   A.    Yes.

 7   Q.    You said to an agent that becoming -- you were interested

 8   in becoming an Islamic scholar because it's the highest path of

 9   enlightenment as a Muslim, and you would be respected by the

10   entire community; do you remember saying that?

11   A.    No.

12         MR. CHAKRAVARTY:  What are you showing him?

13         MR. CARNEY:  Page 3.

14   Q.    Could you read what I've highlighted here, please?

15   A.    (Reading.)

16   Q.    And could you read these two sections while I'm here?

17   A.    (Reading.)

18   Q.    Have you had a chance to read that?

19   A.    Yes.

20   Q.    You told the FBI that you were interested in becoming an

21   Islamic scholar because it's the highest path to enlightenment,

22   and you would be respected by the entire community, isn't that

23   correct?

24   A.    I don't recall.

25   Q.    You don't recall saying that to the FBI?
```

1    A.    No.

2    Q.    If you had said that to the FBI, would that have been a

3    lie?

4    A.    If I said it like that, yes.

5    Q.    You said that after you returned to the United States you

6    lost interest in it, correct?

7    A.    Yes.

8    Q.    And you said this was typical of your personality because

9    you often would get involved in something very aggressively for

01:16 10   a while and then abandon it, right?

11   A.    Yes.

12   Q.    And as an example, you gave your interest in having large,

13   remote-controlled -- or radio-controlled, rather, airplanes?

14   A.    Yes.

15   Q.    And you said at one point you were very interested in

16   these radio-controlled, large airplanes but that you'd lost

17   interest now, correct?

18   A.    Yes.

19   Q.    You also told them that you understand that, after 9/11,

01:16 20   why people have prejudices against Muslims, right?

21   A.    Yes.

22   Q.    And you said to the FBI agent you yourself have a

23   prejudice against black people, and so you can understand how

24   people can be prejudiced, right?

25   A.    I don't believe it was phrased like that, no.

```
 1   Q.   Did you say to the FBI, after September 11, 2001, you
 2   understand why some people have become prejudiced against
 3   Muslims?
 4   A.   Yes.
 5   Q.   And did you then say, "I have a prejudice against
 6   blacks" --
 7   A.   No.
 8   Q.   -- "and that's probably where I get that understanding"?
 9   A.   No.
01:17 10   Q.   You didn't say that to the FBI?
11   A.   I don't believe I said it like that.  If you want, I can
12   explain, or if you want me to say just no, then no.
13   Q.   I want you to answer this question:  Did you say to the
14   FBI that you have a prejudice against blacks?
15   A.   I don't believe I did, no.
16   Q.   Who were the FBI agents again, please?
17   A.   Special Agent Chris Gianakura and Special Agent Brad
18   Davis.
19   Q.   Everything else about the Yemen trip that you told the FBI
01:18 20   that day was a lie, correct?
21   A.   I don't know what else I said about the Yemen trip, to
22   answer that question.
23   Q.   You were willing to tell a lie or multiple lies to the FBI
24   in the hope that they would believe them, right?
25   A.   Yes.
```

Q.   In return, you would get a benefit from telling a lie,
correct?

A.   Yes.

Q.   And what you were hoping was, the benefit would be that
they would leave you alone and accept what you said as being
the truth?

A.   Yes.

Q.   That would be in your best interest, correct?

A.   Yes.

01:18 Q.   So if it were in your best interest to tell a lie to the
FBI, you were willing to do it?

A.   Yes.

Q.   And if it was not in your best interest to tell the truth,
you wouldn't?

A.   Are you speaking generally or to the FBI?

Q.   To the FBI, on this occasion.

A.   When they visited me?

Q.   Yes.  Let me repeat the question.  If you did not believe
that it was in your best interest to tell the truth to the FBI,
01:19 you would lie, right?

A.   Yes.

Q.   And yesterday when you were talking to us, you said your
goal was to tell a story that "was plausible and would keep me
out of jail"?

A.   Referring to when they initially visited me, yes.

1   Q.   And so the two things that you were focusing on were, No.

2   1, the lie you told had to be plausible, right?

3   A.   Yes.

4   Q.   And it would have to be designed to keep you out of jail,

5   correct?

6   A.   Yes.

7   Q.   And you thought that, with the lie you told the FBI, you

8   had succeeded in both, right?

9   A.   I don't know.

01:20 10   Q.   Was it plausible in your mind?

11   A.   I don't know because that's the same story we told when we

12   were leaving the airport, and the state trooper --

13   Q.   Was it plausible when you sat down with the FBI and told

14   them your story?  Did you think you were telling something that

15   was plausible and that would keep you out of jail?

16   A.   Yes.

17   Q.   And that would be the benefit that you would get from

18   telling a lie, correct?

19   A.   Yes.

01:20 20   Q.   Have you ever told a lie before this to get a benefit of

21   some kind?

22   A.   Before the meeting with the FBI?

23   Q.   Yes.

24   A.   Yes.

25   Q.   Can you give us some examples?

```
 1            MR. CHAKRAVARTY:  Objection, your Honor.
 2            THE COURT:  Sustained.
 3   Q.   Well, the benefit here was great enough for you to lie to
 4   the FBI, right?
 5   A.   Yes.
 6   Q.   You know it's a federal crime to tell a lie to an FBI
 7   agent if it is material to an investigation, right?
 8   A.   I did not know it at the time.
 9   Q.   Do you know it now?
10   A.   Yes.
11   Q.   But you also knew that you had some bigger problems,
12   didn't you, bigger potential problems than just going to Yemen,
13   right?
14   A.   Such as -- I'm not sure what the question is.
15   Q.   Well, you had given money to people who might be
16   investigated by the FBI, right?
17   A.   I wasn't really thinking of that at the time.
18   Q.   You had given $2,000 to Abousamra to take to give to a
19   group that was battling or at war when he went to Pakistan,
20   right?
21   A.   No.
22   Q.   And did you know that giving money to that type of
23   organization was also a crime?
24   A.   Yes.
25   Q.   And you knew you had, in fact, given $2,000 in furtherance
```

| | |
|---|---|
| 1 | of that crime? |
| 2 | A.    No. |
| 3 | Q.    Did you give Abousamra $2,000? |
| 4 | A.    To the best of my recollection, no. |
| 5 | Q.    Oh, I'm sorry.  $500? |
| 6 | A.    Yes. |
| 7 | Q.    I apologize.  But you knew that you had given $500 in |
| 8 | committing that crime? |
| 9 | A.    Yes. |
| 01:22 10 | Q.    You also wanted to give Pippin thousands of dollars, |
| 11 | right? |
| 12 | A.    Yes. |
| 13 | Q.    In order so that he could help people find a way to find a |
| 14 | military training camp and then go on to Iraq to fight, |
| 15 | correct? |
| 16 | A.    To help at finding a military training camp. |
| 17 | Q.    With the intention thereafter of going to Iraq and fight, |
| 18 | as Abousamra did, right? |
| 19 | A.    The goal was to get to a military training camp. |
| 01:23 20 | Q.    In order -- it wasn't just to get military training.  It |
| 21 | was to get military training and then go on to Iraq? |
| 22 | A.    The money was given for the purpose of him helping us find |
| 23 | a way to get to a military training camp.  Our purpose of |
| 24 | finding a military training camp was to get to Iraq. |
| 25 | Q.    Before you went to Yemen, you withdrew $25,000? |

1    A.    Yes.

2    Q.    And that was from one of your accounts?

3    A.    Yes.

4    Q.    And, in fact, the -- another thing you had done was

5    discussed shooting the Secretary of State, right?

6    A.    Ahmad made a comment.

7    Q.    You and he discussed it, right?

8    A.    I don't know if you'd even call it a discussion.

9    Q.    Well, that would be something the FBI would be interested

01:23 10    in, wouldn't it?

11    A.    Yes.

12    Q.    That was something -- Tarek wasn't even there, was he?

13    A.    Correct.

14    Q.    You also had suggested doing an action at a shopping mall,

15    didn't you?

16    A.    I don't know who made the initial suggestion.

17    Q.    You were the only one who had been involved with Hanscom

18    Air Force in the past, right?

19    A.    Yes.

01:24 20    Q.    And you were the one who suggested doing an action against

21    Hanscom Air Force Base, right?

22    A.    As an alternative to the mall, yes.

23    Q.    That is another thing that could have been a problem with

24    the FBI, couldn't it?

25    A.    I didn't think it was.

```
 1   Q.   You had actually gone to New Hampshire in an effort to buy

 2   machine guns to transport back over state lines, to

 3   Massachusetts, right?

 4   A.   I don't think the initial intention was machine guns, but

 5   I went there to purchase weapons, I would say is the accurate

 6   --

 7   Q.   You told us yesterday that you asked Maldonado if he could

 8   get you machine guns?

 9   A.   Yes.

10   Q.   You didn't have a license to carry a gun, did you?

11   A.   No.

12   Q.   You didn't have a license to have possession of a machine

13   gun?

14   A.   No.

15   Q.   You had no authorization to use -- to take firearms and

16   cross state lines with them, did you?

17   A.   No.

18   Q.   But you knew that you had gone across state lines and

19   asked Maldonado if he could get you machine guns, correct?

20   A.   No.

21   Q.   Did you go to speak to Maldonado?

22   A.   Yes.

23   Q.   Did you ask him if he could get you handguns?

24   A.   Yes.

25   Q.   Did you ask him if he could get you automatic weapons?
```

01:24 (line 10)
01:25 (line 20)

1  A.   Yes.

2  Q.   And was the intention of you, that if he could, to bring

3  those weapons back?  That's what you were exploring, correct?

4  A.   We were exploring if he could get us weapons.

5  Q.   Get you weapons?

6  A.   Get us weapons.

7  Q.   You asked him if he could give you -- you were the only

8  person sitting in the room, right, with Maldonado?

9  A.   Yes.

01:25 10  Q.   And you're the one who asked him if he could get you

11  machine guns, correct?

12  A.   No.

13  Q.   Automatic weapons?

14  A.   Yes.

15  Q.   Are automatic weapons machine guns?

16  A.   No.

17  Q.   What's the difference?

18  A.   I believe automatic gun is a more general -- a generic

19  term.  A machine gun is a type of automatic weapon.

01:26 20  Q.   You want to make sure that you're distinguishing for the

21  jury that you were asking for automatic weapons as opposed to

22  machine guns because that makes a big difference, right?

23        MR. CHAKRAVARTY:  Objection, your Honor.

24  Argumentative.

25        MR. CARNEY:  I'm just asking the witness to clarify.

1        THE COURT:  You may answer.

2   Q.   You want the jury to know that you were asking to buy

3   automatic weapons, but not machine guns, because that makes a

4   difference to you, right?

5   A.   It doesn't make a difference to me.  My --

6   Q.   You just -- you wanted to clarify and make sure.

7   A.   I want to make sure that I convey the truth as best I can.

8   Q.   After this meeting with the FBI, you retained an attorney

9   at a later point, right?

01:26 10   A.   Yes.

11   Q.   Someone who was a former federal prosecutor, is that

12   correct?

13   A.   Eventually.  That wasn't the initial lawyer.

14   Q.   Okay.  And then you had a federal prosecutor -- a former

15   federal prosecutor, rather?

16   A.   Yes.

17   Q.   Someone with a lot of experience in making people into

18   informants?

19        MR. CHAKRAVARTY:  Objection, your Honor.

01:27 20        THE COURT:  Sustained.

21        MR. CARNEY:  I'm just asking if he knows, your Honor.

22        THE COURT:  Sustained.

23   Q.   And you determined what you had to do to get a deal,

24   correct?  I'm not asking you to reveal private conversations

25   with the lawyer.  But you did have lengthy conversation with

1   the lawyer before you came in and spoke to the FBI, right?

2   A.   Yes.

3   Q.   You did have a game plan in reaching out to the FBI,

4   right?

5   A.   I don't know if you'd call it a game plan.

6   Q.   Well, I would call it trying to get a deal, is that right?

7   A.   Yes.

8   Q.   And you got immunity for any statements that you made to

9   the FBI thereafter when you were interviewed, right?

01:27 10   A.   Yes.

11   Q.   You got immunity for any statements that you made before

12   the grand jury, right?

13   A.   Yes.

14   Q.   Where you can recite all of the crimes you committed and

15   know that you have immunity based on the testimony before the

16   grand jury because that will not be used against you, correct?

17   A.   You have to -- could you please reform the question?

18   Q.   Sure.  You got immunity before the FBI, correct?

19   A.   Yes.

01:28 20   Q.   Which meant none of the crimes that you admitted to -- let

21   me rephrase this.  You got immunity before the grand jury,

22   correct?

23   A.   It's like going into legal grounds.  I'm not aware of what

24   the rulings are.

25   Q.   Your understanding was that none of the crimes that you

1    testified about before the grand jury could be prosecuted

2    against you by the statements that you were making before the

3    grand jury, correct?

4    A.   I believe so.

5    Q.   And, finally, you got immunity to testify at this trial,

6    correct?

7    A.   If I could just clarify.  My understanding is that the

8    immunity is from federal prosecution.  I just want to clarify

9    that.

01:29 10   Q.   Okay.  So you got immunity that these folks would not

11   prosecute you for crimes that you admit committing on the

12   witness stand during this trial, right?  That's your

13   understanding?

14   A.   Yes.

15   Q.   Now, when the prosecutor asked you at the outset of your

16   testimony a question about that, he said to you, "What is your

17   obligation under the agreement," correct?

18   A.   Yes.

19   Q.   And your answer was, "To cooperate with the government in

01:29 20   this case," correct?

21   A.   Yes.

22   Q.   You didn't say your obligation was to come in and tell the

23   truth, did you?

24   A.   I did not say that.

25   Q.   Now, in order to cooperate with the government in this

1   case, you've met many times with the FBI, haven't you?

2   A.   Yes.

3   Q.   And you've met with the prosecutors, haven't you?

4   A.   Yes.

5   Q.   And gone over what your testimony would be, correct?

6   A.   Yes.

7   Q.   Now, they didn't show you every instance in the past where

8   you had spoken to the FBI, and they prepared a report of what

9   you said apparently, is that true?

01:30 10   A.   Correct.

11   Q.   In fact, even in the reports they showed you, they just

12   said, Read this, read that, read this portion, just selective

13   portions, correct?

14   A.   Portions relevant to whatever we were talking about.

15   Q.   Well, did you read the rest of the portions?

16   A.   No.

17   Q.   How do you know if they were relevant to what it was?

18   A.   I don't.

19   Q.   You were limited to what they wanted to show you, right?

01:31 20   A.   Yes.

21   Q.   Now, how many times would you say you have met with the

22   FBI at any time, at any place, for any amount of time, since

23   you reached your deal with the prosecution?  Can you estimate,

24   please?

25   A.   Dozens of times.

Q.    I'm sorry?

A.    Dozens of times.

Q.    Dozens of times?

A.    Yes.

Q.    And how many times -- well, you told us yesterday, I believe.  Just to refresh our memory, how many times do you think -- or did you say yesterday that you met with the prosecutors to go over what your testimony would be?  Did you say five to ten times?

01:31  A.    Yes.

Q.    On these five to ten times, what would be the average amount of time that you would spend at the meeting with the prosecutors?

A.    Probably about four hours.

Q.    And after you met with the prosecutors five to ten times, on an average of four hours, were you finally ready to testify?

A.    I don't know.

Q.    During your meetings, were you given advice about how to testify, how to be a good witness?

01:32  A.    I was given advice on how to testify.

Q.    Did they tell you, for example, If he asks you a two-part question, don't answer it?

A.    No.

Q.    Did they say, If you don't agree with the exact wording he says, don't answer it?

```
 1   A.    No.

 2   Q.    Did you practice cross-examination?

 3   A.    Yes.

 4   Q.    The questions I might ask?

 5   A.    Yes.

 6   Q.    You know Dan Spaulding, right?

 7   A.    Yes.

 8   Q.    Do you know he came in here and testified without being

 9   prepped by the prosecutors?

10         MR. CHAKRAVARTY:  Objection, your Honor.

11         THE COURT:  Sustained.

12   Q.   You had a choice.  You could either cooperate or be

13   indicted, right?

14   A.    I believe that was my choice.

15   Q.    The same choice that Tarek had?

16         MR. CHAKRAVARTY:  Objection, your Honor.

17         THE COURT:  Sustained.

18   Q.    And because of your cooperation with the government and

19   the statements that you are making about Tarek, you do not

20   expect to be charged with any of the crimes that you admit you

21   have committed?

22   A.    That's not correct.

23   Q.    Do you expect that you are going to be charged for any of

24   the crimes that you have committed?

25   A.    No.
```

```
 1              MR. CARNEY:  I have nothing further.
 2              THE COURT:  Mr. Chakravarty.
 3              MR. CHAKRAVARTY:  Thank you, your Honor.
 4    REDIRECT EXAMINATION BY MR. CHAKRAVARTY:
 5    Q.   Mr. Abuzahra, is there one crime that you can be
 6    prosecuted for if you lie to the jury?
 7    A.   Yes.
 8    Q.   Is that your understanding of the agreement with the
 9    government, that you cannot so lie?
01:34 10    A.   Yes.
11    Q.   What was your understanding of your obligation with
12    regards to the immunity letter that the government has given
13    you?
14    A.   At what time frame?
15    Q.   What is your understanding of that now?
16    A.   My understanding now is that I have to -- or had to
17    provide the FBI and the Assistant District Attorney's Office
18    with a complete and truthful account of anything that they
19    asked me, you know, barring any privilege -- attorney-client
01:35 20    privileges or spousal privileges.  I'd have to testify in
21    court, and I'd have to cooperate with, for example, wearing the
22    wire.
23    Q.   When we first met with you, now five years ago, did you
24    recount the --
25              MR. CARNEY:  I object.
```

1          MR. CHAKRAVARTY:  I'll rephrase, your Honor.  I

2     haven't asked the question yet but I will rephrase.

3     Q.   What were you asked to tell the government at that time?

4     A.   I was asked to tell the government about the -- basically

5     my -- you know, they wanted to know about the Yemen trip, and

6     they wanted to know my relationship and anything that happened

7     between me and the defendant and Ahmad Abousamra between 2000

8     and 2006.

9     Q.   Let's go back to some of Mr. Carney's questions on that.

01:36 10    You were asked many times about conversations that you had with

11    Ahmad Abousamra about Jihad and these topics; do you remember

12    that?

13    A.   Yes.

14    Q.   Was the defendant, Tarek Mehanna, present during these

15    conversations?

16    A.   For a lot -- for most of these times, yes.

17    Q.   What would you discuss, the three of you together?

18    A.   We would discuss the virtues of Jihad, the benefits of it,

19    the justifications for it, our desire to eventually participate

01:36 20    in it.  Later, we further discussed it in terms of how we can

21    take actual steps towards it.

22    Q.   And you were asked -- and we had to endure those poems

23    that the defendant had sent to you.  You were asked whether

24    there were humorous, joking conversations as well as whether

25    there were serious conversations.  Did you have both of those

1    types of conversations with both the defendant and Abousamra?

2    A.    Yes.

3    Q.    Specifically with regards to Jihad, did you have serious

4    conversations with the defendant and Abousamra?

5    A.    Yes.

6    Q.    Did the defendant participate in your conversations about

7    the planning of the trip to Yemen?

8    A.    Yes.

9         MR. CARNEY:  I object and ask to approach.

01:37 10         THE COURT:  All right.  I'll see you.

11   (SIDEBAR CONFERENCE AS FOLLOWS:

12        MR. CARNEY:  I've noticed, your Honor, on redirect

13   examination, the government begins going through the whole

14   direct exam again.  And I would ask that the prosecution be

15   directed to limit its redirect to either something that they

16   did not already bring out on direct exam or to ask the witness

17   to explain something that he said on cross-exam rather than:

18   Did you talk to the defendant about Jihad?  What did you say?

19   Who was there?  What was discussed?  And that way we can limit

01:38 20   it.

21        MR. CHAKRAVARTY:  Part of that is, for example, this

22   line of questioning is because Mr. Carney went into great

23   detail about emphasizing conversations that the defendant had

24   with Mr. Abousamra and very skillfully controlling the witness

25   to answer just that question and not also to be able to say he

 1   had those same conversations with the defendant.

 2        THE COURT:  Mini and maxi, I guess.  The particular

 3   question is inoffensive as to the scope of redirect.  I don't

 4   know that it is quite as restricted as you suggest.  In

 5   general, yes, it should be not simply a repeat of the direct

 6   exam.  On the other hand, it can rehabilitate points for the

 7   direct examiner that were weakened perhaps on

 8   cross-examination.  I think that's generally permitted.

 9        MR. CARNEY:  What my objection is, your Honor, is if

01:38  10   the government puts on a witness and says, We sat around a

11   room.  We planned to rob a bank.  We had a conversation about

12   robbing the bank.  He was going to drive the car.  He was going

13   to be waiting around the corner.  He was going to carry a gun.

14   He was going to get a mask, et cetera.  Then the cross-examiner

15   brings out, well, at the time of these conversations, this

16   defendant was sitting on the couch watching TV and that's it.

17   I think it's improper for the prosecutor to get up and say,

18   Well, the defendant was present in the room, wasn't he, when

19   you were having these discussions about the gun and who's going

01:39  20   to have the mask and who's going to drive the car?  It's just

21   going over again what's already come out on direct exam.

22        THE COURT:  Beside the hypothetical example, I think

23   it is correct, as Mr. Chakravarty points out, that some of the

24   questioning on cross focused on the witness' participation with

25   Abousamra, and I think --

1          MR. CARNEY:  Because their direct had focused on the

2     interaction with the defendant.

3          THE COURT:  Perhaps raising the implication that can

4     be met that it was only with Abousamra.  So the government, on

5     redirect, can address that issue.

6          MR. CARNEY:  Respectfully, your Honor, the direct

7     covered the witness' interactions with the defendant.  I

8     brought out the witness' interaction with Abousamra.  Now they

9     have both sides of the story.

01:40 10          THE COURT:  Okay.

11          MS. BASSIL:  I'd ask it not be leading, your Honor.

12     The prosecutor has a tendency on redirect to lead the witnesses

13     though it's cross-examination.

14          THE COURT:  That is a universal tendency among

15     lawyers, by the way.

16          MR. CHAKRAVARTY:  Thank you.

17          MR. CARNEY:  You can't say that about me.

18          THE COURT:  You haven't had any redirect.

19          MR. CARNEY:  That's right.

01:40 20          THE COURT:  Yes.  Be careful of that.  That last

21     question was not leading.

22          MR. CHAKRAVARTY:  Part of the -- I think the reason

23     why we fall into this, as your Honor well knows, is because

24     we're trying to frame what it is they're responding to, so I'll

25     try --

1      MS. BASSIL:  I would like this trial to be over by the

2  year-end.  Could we not have a repeat of the entire direct?

3      MR. CHAKRAVARTY:  One point while we're here in order

4  to expedite.  This is one area which your Honor sustained the

5  defendant's objection to presenting an email related to the

6  defendant that the defendant sent not to this witness about

7  suicide bombing.  That was an area where the defense explored

8  on cross-examination that the defendant -- suggesting that the

9  defendant shared the witness' view that suicide bombing was

01:41  10  impermissible against civilian targets.  I think he's opened

11  the door now.  This is --

12      THE COURT:  Well, if I'm thinking of the right thing,

13  it was because it had nothing to do with the witness.  Maybe

14  you can have a reader put it in, but I don't think it's

15  appropriate with the witness who had nothing to do with it.

16      MR. CHAKRAVARTY:  Okay.

17  .  .  .  END OF SIDEBAR CONFERENCE.)

18  Q.   Mr. Abuzahra, the discussions about planning the trip to

19  Yemen, who participated in those discussions?

01:42  20  A.   I did, the defendant, Ahmad Abousamra, and Hassan would be

21  there sometimes.

22  Q.   And who were the people who agreed to go to Yemen to get

23  terrorist training?

24      MR. CARNEY:  I object.

25      THE COURT:  Overruled.

1    A.    The defendant, myself, and Abousamra agreed to find the

2    military training, like, a Jihadi training, like, would be

3    classified as a Jihadi training camp in Yemen.

4    Q.    What were you planning to do once you received that

5    training?

6          THE COURT:  The question is ambiguous.  The witness

7    alone, the "you."  You singular?

8          MR. CHAKRAVARTY:  I'll clarify it.

9          MR. CARNEY:  That's not the basis for my objection.

01:43 10          THE COURT:  I know.  The rest of it is overruled.

11          MR. CARNEY:  We've heard this now --

12          THE COURT:  I understand.

13          MR. CARNEY:  -- for three days, your Honor.

14    Q.    With regards to what the three of you talked about, what

15    did you agree to do with regards to going -- to do with the

16    training that you received in Yemen?

17    A.    Well, the hope was that -- and the question that we asked

18    for Ahmad to relay to -- to get from Abousamra, was:  After the

19    training camp, we wanted to continue to Iraq.  And Ahmad said,

01:43 20    yes, we could do that.

21    Q.    Was that the three of you who wanted to do that?

22          MR. CARNEY:  I object.  Asked and answered.

23          THE COURT:  Well, sustained.

24    Q.    Is that a conversation you had amongst the three of you?

25          MR. CARNEY:  I object, please.  Asked and answered.

1           THE COURT:  Sustained.

2  Q.   You remember talking to the defendant at Papa Gino's about

3  Iraq?

4  A.   Yes.

5  Q.   Was Mr. Abousamra there?

6  A.   No.

7  Q.   What did the defendant and you talk about in relation to

8  Iraq at the Papa Gino's?

9  A.   How we would be able to -- again, I believe it was prior

01:44 10  to having the information from Abu Omar, Mr. Pippin.  So we

11  discussed various -- how we would be able to -- through which

12  countries we would be able to enter Iraq.

13  Q.   You were asked some questions about your interaction with

14  the defendant's brother, Tamer, after you returned; do you

15  recall that?

16  A.   Yes.

17  Q.   Did you discuss with the defendant meeting with his

18  brother after you returned from the UAE?

19  A.   Yes.

01:44 20  Q.   So just to clarify, when did you have the conversation

21  with the defendant about talking to his brother?

22  A.   In the UAE.

23  Q.   This is in February of 2004?

24  A.   Yes.

25  Q.   What did the defendant tell you to do?

```
 1   A.   He asked me to -- he said that the -- I forget the exact
 2   phrasing but basically said his brother kind of had an
 3   understanding or -- I forget the exact wording, but his brother
 4   knew why we left.  He said, when you go back, to kind of try to
 5   minimize the loose ends, sort of say, to tell him that the real
 6   reason we left was to go for studying.  The only reason he told
 7   you the other story about Jihad was because it wouldn't sound
 8   as -- like, it would make his parents upset, but they would be
 9   even more upset if they kind of found out he had left his
10   degree and he left all that kind of stuff to go to study.  He
11   was trying to hide the real reason, which was studying, even
12   though -- but the reason for that was to hide the real, real
13   reason, which was for Jihad.
14   Q.   I'm a little confused by the "real reason" versus the
15   "real, real reason."  Can you -- what was the reason for your
16   trip to Yemen?
17   A.   The reason --
18              MR. CARNEY:  I object, your Honor.
19              MR. CHAKRAVARTY:  Just to clarify this.
20              MR. CARNEY:  What was the real reason to go to Yemen?
21              THE COURT:  You may have the question.
22   Q.   You can answer.
23              MR. CARNEY:  I can answer the question.
24   A.   Can you repeat the question, please?
25   Q.   What was the real reason -- in the context of this
```

1  conversation you had with the defendant about what you should

2  tell his brother, what was the reason why you and the defendant

3  believed you were going to Yemen?

4  A.    To participate in Jihad.

5  Q.    What did he tell you that his brother knew about the trip?

6  A.    I don't recall exactly what he said his brother knew, but

7  it's -- going back to some of the testimony before, kind of

8  like where everyone kind of knew without us telling them.  They

9  had a feeling.  I forget if he said that he told his brother

01:46 10  this was the reason or not.  We kind of just -- I forget

11  exactly if his brother explicitly knew or just kind of had an

12  understanding.

13  Q.    To break it down, whatever his brother's understanding was

14  of the purpose of your trip, what did the defendant ask you to

15  tell to his brother?

16  A.    He told me to tell him that the real reason for the trip

17  was not Jihad, but it was to actually study, to find a school.

18  So the only reason he didn't say that to his brother initially

19  was because he knew that his parents would think he was an

01:47 20  idiot and it was stupid to go and leave all -- almost finishing

21  your doctorate in pharmacy.  It's stupid to leave all that to

22  go study as a -- to become a scholar or anything like that.

23  That's why he didn't tell them that reason.  And he tried to --

24  he was just putting -- tell his brother he was just putting

25  forth the illusion that it was Jihad.

1    Q.   And so what he told you to tell the brother, was that

2    consistent with what you had agreed to tell everybody else?

3    A.   It was a little bit different.

4    Q.   How is it different?

5    A.   What we -- the only -- I would say that the only addition

6    was so he wouldn't think we were stupid or something like that.

7    Q.   The purpose of telling his brother was for a different

8    purpose than for telling the other people?

9    A.   No.  The purpose was the same.

01:47 10    Q.   What was the purpose?

11    A.   So people wouldn't know the actual reason we went.

12    Q.   Was that something you discussed with the defendant and

13    Abousamra before you left?

14    A.   Yes.

15    Q.   Specifically, who did you discuss lying to?

16         MR. CARNEY:  I object.  Asked and answered.

17         THE COURT:  Overruled.

18    A.   I don't recall if we mentioned anyone specifically, just,

19    in general, that would be our story if asked.

01:48 20    Q.   So with regards to official, kind of governmental people

21    and/or --

22         MR. CARNEY:  Objection.  Leading and asked and

23    answered.

24         THE COURT:  No ahead.  You may have it.

25    Q.   I'm just trying to clarify whether you discussed

1    categories of people that you would be giving the story to or

2    whether it was just general.

3              MR. CARNEY:  Objection.  Asked and answered on direct

4    at length.

5              THE COURT:  Overruled.

6    A.   We -- I don't believe we discussed specific categories.

7    Q.   You were asked questions about whether you had practiced

8    lying.  Who did you practice lying with?

9    A.   The defendant, Ahmad Abousamra, and I believe Hassan was

01:49 10   there sometimes.  I believe Hassan was there as well.

11   Q.   Why did you practice lying?

12   A.   The idea wasn't -- it wasn't for this trip.  It was just,

13   in general, we knew that you hear stories about various groups,

14   they get caught by -- even, like, Chechnya, Russian forces,

15   wherever the case is.  So just, in general, it would be a

16   useful skill set to have.

17   Q.   With regards to lying to the FBI when they approached you

18   in August of 2006, why did you lie to the FBI then?

19   A.   It was -- I knew the purposes of my trip.  I felt if I

01:49 20   told them that -- they came to my door and I told them, Yeah, I

21   went there to go find a Jihad school, I don't think that would

22   have been in my best interest to tell that to the FBI straight

23   up without a lawyer or any kind of protection.

24   Q.   Had you discussed what you would be saying to people,

25   including the FBI, with the defendant and Abousamra?

```
 1  A.    Yes.
 2  Q.    What you said, is it consistent with what you had
 3  discussed?
 4  A.    There were some -- we had a very general story.  So parts
 5  of, like, you know, the schools are more flexible, you know --
 6  I don't remember the other part that was in the 302, but I do
 7  remember saying something about the schools being more flexible
 8  on foreigners because that's different than some of the schools
 9  in Saudi Arabia.  I don't believe we discussed that.  That was
10  something I had to add on because it was a lengthy interview,
11  what I would -- in my eyes, lengthy.
12  Q.    You had a general agreement to lie?
13            MR. CARNEY:  I object.
14            THE COURT:  Sustained.
15  Q.    How specific was your agreement to --
16            MR. CARNEY:  I object.  Asked and answered on direct
17  examination over and over.
18            THE COURT:  I haven't heard the full question.
19  Q.    The discussions that you had with the defendant and
20  Abousamra about giving this cover story, how specific was the
21  cover story?
22            MR. CARNEY:  I object.  Asked and answered on direct
23  examination numerous times.
24            THE COURT:  Overruled.
25  A.    They were very general.  The -- basically the only thing
```

we discussed, if anybody asked us, we went studying.  We went

to Dar al-Mustafa.  We went to learn about the religion, learn

about the language.  That's about as much level of detail we

went into.  We didn't go into anything further.

Q.   Did the defendant ever indicate to you that the -- his

reason for going to --

          MR. CARNEY:  I object.  Leading.

          THE COURT:  No.  Overruled.

Q.   -- his reason for going to Yemen with the two of you was

for a different reason?

A.   No.

Q.   When Mr. Abousamra discussed with you what happened in

Yemen, was he talking about just himself or what he and the

defendant were doing?

A.   I've heard the story from both sides, and I don't remember

what parts I heard from whom.

Q.   Okay.  I'm sorry.  I parsed that out too much.  When you

say "both sides," did you talk to both the defendant as well as

Abousamra about their trip to Yemen?

A.   Yes.

Q.   And when each of them spoke to you, did they distinguish

between what they personally did and what they did together?

A.   The only distinction was what happened after when Ahmad

continued on from Yemen.

Q.   And it was your understanding that the defendant did not

1     go on to Iraq?

2     A.   Correct.

3     Q.   You were asked several questions about the recordings that

4     we heard yesterday and today and actually two days ago.  Did

5     you ever explicitly say -- refer to the trip to Yemen as the

6     trip to Yemen to obtain military or terrorist training and then

7     with the plan to go on to Iraq?

8     A.   No, I don't think so.

9     Q.   Why not?

01:53 10    A.   Two reasons.  One was, it was understood, so we didn't

11    have to say it.  Two, if I did say it, it would be very odd

12    because it was understood.

13    Q.   How do you know that it was understood by the defendant?

14    A.   Because we had discussed it in great length before we had

15    actually left on the trip.

16    Q.   Is that part of the reason ostensibly for meeting with

17    him?

18              MR. CARNEY:  I object.

19              THE COURT:  Sustained.

01:53 20    Q.   The conversations about the domestic attacks that you had

21    discussed, was the defendant present -- did he participate in

22    all of those conversations except for the conversation about

23    Miss Rice?  When I say "all," the topics of conversations

24    except for the one about -- with Miss Rice.

25              MR. CARNEY:  Objection.  Asked and answered on both

```
 1   direct and cross.

 2        THE COURT:  Overruled.

 3   A.   For example, he wasn't there -- like you said, "topics."

 4   He wasn't there when I went to speak to Dan Maldonado, but he

 5   was there when we discussed -- to the best of my recollection,

 6   when we discussed Ashcroft and when we discussed Hanscom, when

 7   we discussed the mall.

 8   Q.   Did he ever dissent from these discussions?

 9   A.   Not that I can recall.

10   Q.   With regards to those discussions specifically, Mr. Carney

11   asked you about this concept of Aman, trust, as you first

12   described it, and then he put it in the context of a covenant

13   of security.  Did the defendant ever raise this concept in

14   context of those domestic discussions?

15   A.   I remember -- I remember having discussions -- it might

16   have been online; it might have been in person.  It might not

17   even have been with the defendant on -- because there's an

18   issue with getting a visa -- you know, having a visa versus

19   someone being born a citizen and not actually explicitly

20   getting the thing.  It's something that some people said, even

21   if you're born in a country, you still have that pact.  So I

22   don't recall either way about if it -- I just have these

23   memories of it so I'm not -- I don't explicitly remember him

24   bringing it up, but I don't explicitly remember it the other

25   way.  I just -- I don't know.
```

Q.   How do the laws of the land reconcile with this principle
of Aman?

A.   As long as it doesn't prevent you from practicing your
religion, then you should follow -- like, speeding laws and all
of that kind of stuff.  If it's not going against your religion
-- you know what I mean?  There's no reason not to follow them.
It's not like you have to break the laws if they don't agree
with you or if you don't find -- something like that.

Q.   You were asked about this garbage bag full of materials
that the defendant gave his brother before you left?

A.   Yes.

Q.   When he told you what was in that bag, what was your
reaction to that?

A.   My reaction was that I -- kind of similar to when he
showed up to the airport not having trimmed his beard or when
we met at his house to go to the airport, he hadn't trimmed his
beard, I said, Why wouldn't you get rid of that material
yourself?  Why would you leave that loose end?  You know,
something left behind that you don't know what's going to
happen to it?  You didn't get rid of it yourself?  I was a
little appalled that he had, you know, stuff that needed to get
rid of.  Regardless of what it was, if you need to get rid of
it, why didn't you just get rid of it yourself?

       MR. CHAKRAVARTY:  Your Honor, I'm trying to finish at
a reasonable time before the break.  I can keep going, but I

 1    don't know if your Honor wants to take a break.

 2              THE COURT:  How much more do you have?

 3              MR. CHAKRAVARTY:  I probably have five, ten minutes.

 4              THE COURT:  Go ahead.

 5              MR. CHAKRAVARTY:  Thank you.

 6    Q.    The printouts of bomb-making, is that something that you

 7    had ever experienced with the defendant or with Abousamra?

 8    A.    What do you mean by "experienced"?

 9    Q.    Had you ever seen those things with the defendant or

01:57 10   Abousamra?

11    A.    I don't believe so.

12    Q.    Did you have discussions about that?

13    A.    I don't believe so.

14    Q.    What was Abousamra's reaction when the defendant said that

15    there were that type of explosives type of materials there?

16    A.    I don't recall.

17    Q.    You were asked several questions about preparing for

18    trial, how many times you met with us.  In addition to asking

19    -- discussing the questions that we would be asking you, did

01:58 20   you also do something else during those meetings?

21    A.    Could you repeat the question?

22    Q.    I'll try to narrow it a little bit more.  With regards to

23    the recordings that we played for the jury, those were just

24    snippets or clips from those recordings, is that right?

25    A.    Yes.

1   Q.   And were some of those recordings very long, more than an

2   hour?

3   A.   I believe one of them was three hours.

4   Q.   And so did you prepare -- or did you review the

5   transcripts for those recordings?

6   A.   Yes.

7   Q.   And did you check them for accuracy to the best of your

8   understanding?

9   A.   Yes.

01:59 10        MR. CHAKRAVARTY:  Can we call up Exhibit -- I think

11   it's 1149, Mr. Oh.

12        THE COURT:  Sorry.  It's in the other computer.

13        MR. CHAKRAVARTY:  Can we go down to -- is that the

14   whole first page?  Can we go to the second page?

15   Q.   Does this appear to be one of the exhibits that Mr. Carney

16   just showed you?

17   A.   Yes.

18   Q.   If you'll recall, right here is your email address?

19   A.   Yes.

02:00 20        MR. CHAKRAVARTY:  Can we go back to the first page,

21   please?

22   Q.   And the date of this email is September 30, 2003, is that

23   right?

24   A.   Yes.

25   Q.   And this is shortly before your trip to Yemen, correct?

1   A.   Using these terms "shortly" --

2   Q.   A few months before your trip to Yemen?

3   A.   Yes.

4   Q.   But it's after the invasion of Iraq by the United States,

5   correct?

6   A.   Yes.

7   Q.   So how would you describe the intensity of your desire to

8   participate in Jihad around this time?

9   A.   At this point, we were -- we were actively seeking ways to

02:00 10   get into Iraq or to -- I don't believe to get to Yemen -- I

11   forget -- we were seeking ways to get into Iraq.

12   Q.   Again, those discussions were you, Ahmad, the defendant,

13   and Mr. Masood, correct?

14   A.   Sometimes Mr. Masood would be there.

15   Q.   The other people listed on this email, did you ever

16   discuss going to Yemen or participating in Jihad with these

17   individuals?

18   A.   I know there's two pages of emails.  On this page, I don't

19   believe we discussed with any of these people going to Yemen.

02:01 20   Q.   I'm just going to ask you about who some of these people

21   are, if you know.  Do you know who Doctor Razvi is?

22   A.   Yes.

23   Q.   Who is he?

24   A.   He's a -- I believe a heart surgeon or some kind of heart

25   doctor in the area, in the Wayland community.

1   Q.   And this actually is Hassan Masood.  So you did have a

2   conversation with him about Jihad, correct?

3   A.   I believe so, yeah.

4   Q.   Right below him is your brother, is that correct?

5   A.   Yes.  I've never had a conversation with him about it.

6   Q.   About Jihad or the trip to Yemen?

7   A.   Correct.  To clarify, I spoke to him in the past two,

8   three weeks but not prior to this.

9   Q.   At the time, back in 2003 or 2004, you didn't discuss this

02:02 10   trip with him?

11   A.   No, not at all.

12   Q.   Do you know what this email address is or that account?

13   A.   I'm familiar with the mailing list.  It looks like a

14   mailing list to some group in B.U. but I'm not sure.  I can't

15   definitely say who it is.

16   Q.   Do you know who Hossam Jabri is?

17   A.   Yes.

18   Q.   Who he is?

19   A.   He's a very active and well-respected community member in

02:02 20   the Boston Muslim area.

21   Q.   Do you know whether he's affiliated with any Muslim

22   organizations?

23   A.   I know he's very prominent in the MSA circle.  He's helped

24   bring some of the Muslim groups in the schools.  I know he's

25   active in setting up the mosque in Roxbury.  I know he has a

 1    lot of affiliations, very active in the community.

 2    Q.   The topic of the email that he sent to this list -- that

 3    the defendant sent to this list was "Willpower," right?

 4    A.   Yes.

 5    Q.   It's not the same as the topic of emails that he sent to

 6    you, the --

 7              MR. CARNEY:  I object, your Honor.

 8              THE COURT:  Sustained.

 9              MR. CHAKRAVARTY:  You can take that down.  Thank you.

02:03 10              Can we call Exhibit 459A?  This was a new clip, your

11    Honor.  It's perhaps easier if I put it on the ELMO.

12              THE COURT:  No, you can't do both.

13              MR. CHAKRAVARTY:  I don't think it's on the -- it's

14    not.

15              THE COURT:  You can't play the audio.  If you don't

16    want the audio, you can use the document camera.  All right.

17    Q.   You recognize this as part of the conversation that Mr.

18    Carney played and read portions with you?

19    A.   Yes.

02:04 20    Q.   This is the defendant who says -- I think they're

21    describing some people on Tibyan Publications at this point, is

22    that right?  Do you recall?

23    A.   I don't recall if it was Tibyan Pubs or just the kind of

24    -- the hot-headed youths in general.

25    Q.   All right.  The defendant says, "All this stuff they're

1   like these hot-headed kids who Jihad for them is like a

2   fairytale."  You say, "Dude, they're the same for us."  And

3   then it's the defendant that says, "Exactly, we were like that

4   too at one point," is that right?

5   A.   Yes.

6   Q.   What did you understand that to mean?

7   A.   We were like these hot-headed kids who Jihad for them was

8   like this fairytale.

9   Q.   Were you, in fact, like that at one point?

02:05 10   A.   I believe that's an accurate description.

11   Q.   When were you like that?  When I say "you," I mean you,

12   the defendant and Abousamra.

13   A.   Multipart.  We're going to have to break that up a little

14   bit.  Ahmad Abousamra, I would say, was like that for 2001,

15   2002, and on.  I believe me and the defendant, we kind of felt

16   like that after the invasion of Iraq, up until 2004.

17   Q.   By the time of this conversation, it's more than two years

18   after the trip to Yemen, right?

19   A.   Yes.

02:06 20   Q.   In the course of the recorded conversations, the defendant

21   said, amongst other things, that it was obvious and, you know,

22   people aren't stupid.  What did you understand that to mean?

23            MR. CARNEY:  I object.

24            THE COURT:  Sustained.

25            MR. CHAKRAVARTY:  Call up -- well, I'll continue to

1  use this.  This is from Exhibit 461.  I'll stick with the ELMO,

2  your Honor.

3  Q.   Is this a portion of the conversations you read yesterday

4  or we read yesterday?

5  A.   Yes.

6  Q.   And is this you that's saying, "No because you can also

7  just -- to say that that's just an assumption.  You know what I

8  mean?  I was just making this assumption"?  And is it the

9  defendant who laughs and then says, "But there are assumptions

02:07 10  that are fifty/fifty and then there are assumptions that are

11  like, like the sky is blue"?  Is that the defendant saying

12  that?

13  A.   I don't remember.  I mean -- I don't remember -- are you

14  asking me if I remember the specific conversation, or are you

15  just asking me about the content of the audio?

16  Q.   The content of the audio.

17  A.   To the best of my recollection, that's what was played.

18  Q.   I think we've all heard the conversation.  I'm just

19  confirming that you're saying --

02:08 20       MR. CARNEY:  I object, your Honor.

21       THE COURT:  Sustained.

22  Q.   What do you remember about this, what I just bracketed

23  right there?

24       MR. CARNEY:  I object.

25       THE COURT:  Sustained.

Q.   Do you remember the defendant saying this phrase?

          THE COURT:   Sustained.   It will be the same to any of these.

Q.   You were asked several questions about what you perceived to be in your best interest.   What do you perceive to be in your best interest right now with regards to the credibility of what you tell the jury?

A.   Can you restate the question?

Q.   You were asked several questions about what you perceive in your best interest, to be in your best interest --

A.   Yes.

Q.   -- affecting what you say.   What do you believe is in your best interest today in terms of vis-à-vis what you tell the jury?

A.   After conversations with you reviewing the agreement, after conversations with my lawyer, I believe it is in my best interest today in front of the -- my testimony, to tell the absolute truth, whether it helps you or not or whatever the case is, just to tell the truth as best I remember it.

          MR. CHAKRAVARTY:   That's all I have, your Honor.

          THE COURT:   Any recross?

          MR. CARNEY:   Very, very brief.

RECROSS-EXAMINATION BY MR. CARNEY:

Q.   Mr. Abuzahra, in response to a question just now by the prosecutor, you recounted an instance when you were at the

1    airport leaving for Yemen and you said -- you said you asked

2    Tarek why didn't he get rid of it at home, correct?

3    A.   Why didn't he get rid of it prior to -- why didn't he get

4    rid of it himself.

5    Q.   You never said that to the FBI, did you?

6    A.   I don't know if I said that to them or not.

7    Q.   You never said it to the prosecutors when they were

8    prepping you, did you?

9    A.   I don't remember if I said it.

02:10  10   Q.   Today is the very first time -- after 20 to 40 hours of

11   preparation of what your testimony would be for this trial,

12   today is the first time you ever mentioned that fact, right?

13   A.   No, I don't believe so.

14   Q.   When you testified that Tarek said, "We are really doing

15   this" -- remember that?

16   A.   Yes.

17   Q.   You never told the FBI that either, did you?

18   A.   I don't remember if I told them or not.

19   Q.   Another thing we heard for the first time, right?

02:10  20   A.   I don't know if you heard it for the first time or not.

21   Q.   Finally, my last question is:  You said to the prosecutor

22   just now, lying -- quote -- or lying is "a useful skill set to

23   have"?

24   A.   I believe that's out of context.

25   Q.   What did you mean by "lying is a useful skill set to

1  have"?

2  A.   What I meant was that we were discussing, you know,

3  performing Jihad.  At that point, we didn't have a specific

4  location.  So in terms of war, and people get captured all the

5  time, that in the context of Jihad it would be a useful skill

6  set to have.

7  Q.   Lying?

8  A.   Yes.

9  Q.   And did you develop that skill set?

02:11 10  A.   I only remember practicing it with our friends.

11  Q.   Did you develop that skill set?

12  A.   I don't know.

13          MR. CARNEY:  Thank you, your Honor.

14          THE COURT:  All right.  Thank you, Mr. Abuzahra.  That

15  completes your testimony.  We'll take the morning break at this

16  point.

17  (Recess taken at 11:20 a.m.)

18          (After the recess:)

19          THE CLERK:  All rise.

02:34 20          (The Court enters the courtroom at 11:44 a.m.)

21          THE CLERK:  Please be seated.

22          THE COURT:  Next is a reader?

23          MS. BASSIL:  Yes, your Honor.  I wanted to provide my

24  objections ahead of time, which doesn't mean I might not have

25  them if they come up, but to the best of my ability to identify

1    them ahead of time.  I would have objections to a number of

2    things.

3         So first of all, it is, I believe, Exhibit 55.  And I

4    think it's A and B.  This is a video.  Yet again, I think we're

5    now on our 20th video.  I believe it is a video about Musab

6    al-Zarqawi, and they have translated it in full.  So my

7    assumption is they're going to have somebody read page after

8    page after page of what the speech was that Zarqawi provided.

9         I think that if these videos are being shown to

02:35 10   suggest what the defendant's state of mind is, it's been

11   exhausted.  The jury -- for whatever they believe, they've

12   certainly established this point, and it's up to the jury

13   whether they accept it or not.  But yet another video, another,

14   you know, discussion, another speech.  It's enough already.

15   It's cumulative.  It's always been more prejudicial than

16   probative.  And it just goes on and on and on.  And I think at

17   this point this is really enough.

18        We are at -- hopefully towards the end of the

19   government's case.  And to waste time like this and to yet do

02:36 20   this again and again, I would suggest to your Honor, we're way

21   beyond cumulative, we're way beyond probative.

22        MR. GROHARING:  Your Honor, our intent with the video

23   is to play two portions of a 34-minute video.  The portions

24   we're playing are actually the first three minutes and the last

25   five minutes of the video.  The middle portion of the video is

1   the speech referred to by Ms. Bassil.  We're not intending to

2   have a reader read that entire speech, but we did have it

3   translated.  It will be an exhibit.

4        Not unlike some of the other video evidence that the

5   Court has seen, we want to highlight the portions of the video

6   that are focused on Abu Musab al-Zarqawi.  This is a video that

7   was found on the defendant's computer.  And after we play the

8   video, there are a number of chats where he talks about this

9   video, he provides this video to other individuals that he was

02:37 10   communicating with, and he shows his reverence for Abu Musab

11   al-Zarqawi.  It's directly relevant to his state of mind at

12   appropriate timeframes.

13        We've attempted to cut it down as much as possible to

14   save the Court and jury's time.  We have probably 10 percent of

15   the entire video that we're going to play, or maybe a little

16   bit more than that.

17        THE COURT:  And what do the video portions show?

18   Zarqawi speaking?

19        MR. GROHARING:  It shows him in Iraq planning

02:37 20   operations; meeting with other al Qa'ida, in Iraq, commanders

21   with maps and --

22        THE COURT:  Is it in Arabic?

23        MR. GROHARING:  It is, your Honor.  We have it

24   translated in English.  The video is entirely in Arabic.

25        THE COURT:  No, but I mean the parts you're going to

```
 1   be playing.  Is there an audio portion that's in Arabic?
 2              MR. GROHARING:  Yes, your Honor.
 3              THE COURT:  Untranslated?
 4              MR. GROHARING:  Translated.  Those portions are
 5   translated.
 6              THE COURT:  Are they in Part C as well, 55C?
 7              MR. GROHARING:  Yes, your Honor.  55C is a translation
 8   of the entire video.  Pages --
 9              THE COURT:  Oh, okay.  It's not just the speech.  I
10   see.  I understand now.
11              MR. GROHARING:  -- 1 through 4, which are actually
12   pages 2 through 5 -- pages 1 through 4 as they're numbered on
13   the exhibit -- there's a cover page so they're actually pages 2
14   through 5 of the exhibit -- that's the translation for 55A.
15   The translation for 55B, the second clip, is page 9 and 10.
16              THE COURT:  And what about the speech in the middle?
17              MR. GROHARING:  The speech in the middle?
18              THE COURT:  You're just offering the written -- you're
19   not going to read it?
20              MR. GROHARING:  Correct, your Honor.
21              MS. BASSIL:  We've had endless discussions about
22   Zarqawi, endless instant messages.
23              THE COURT:  Yeah.  If it ties into particular
24   transmissions of this material by the defendant, then I think
25   it's relevant.
```

1          MS. BASSIL:  I think we already had them, though, your

2     Honor.

3          THE COURT:  Well, I'll allow it.

4          MS. BASSIL:  My next issue relates to this, your

5     Honor:  The government wants to put in between Exhibits 101 to

6     210, a total of 109 exhibits, and these break down into 14

7     pictures of bin Laden; 34 pictures of the World Trade Center on

8     September 11th; four pictures of Zawahiri; 12 pictures of

9     Zarqawi; one picture which appears to be Mohammad Atta's visa.

02:39 10         These are all thumbnails.  And what this means -- and

11     I know you said this goes to cross, but what this means is that

12     these were not downloaded, and it is misleading to show them.

13     It is utterly misleading.  And the government knows they were

14     not downloaded.  They're far more prejudicial than probative.

15     They're cumulative.  They have not been sent to anybody else.

16     I think that at this point, frankly, it just -- there's no

17     reason for these.

18         They have put in endless conversations showing that

19     the defendant admired bin Laden; endless testimony about people

02:40 20     saying what he believed at the time and what they believed at

21     the time.  There just is no need for this.

22         THE COURT:  Well, let's take the first point, which is

23     that they are -- they exist on the computer, but I guess

24     there's insufficient evidence that they were selected or

25     focused on or whatever.

1            MS. BASSIL:  If you take a look at even one of them,

2     your Honor, you'll see that they're small pictures.

3            THE COURT:  Give me an example.

4            MS. BASSIL:  101.

5            THE COURT:  Yeah?

6            MS. BASSIL:  Do you see how it's a small -- and all of

7     them are like that.

8            THE COURT:  Okay.  Mr. Groharing?

9            MR. GROHARING:  That's a matter for the jury to

02:41 10   decide, your Honor.  If the defense wants to present testimony

11    regarding whether or not these images were downloaded, that's

12    something they can do during the defense case.  The fact that

13    these images were found on the defendant's computer is

14    relevant.  To the extent that there are multiple pictures, I

15    think that suggests that it's less likely that these were

16    accidentally downloaded on the defendant's computer.  And

17    again, I think that's a matter for the jury to decide.  And if

18    there's testimony about that, that's something they can

19    consider.

02:41 20         But the fact that the images were actually on the

21    computers is directly relevant to the types of materials that

22    the defendant had in this case -- and he talked about.  In a

23    number of these chats that we will read through today, he's

24    talking directly about the people featured in these images.

25    And there's ample evidence of the defendant forwarding videos

```
 1    of these particular people.

 2           So I think it's evidence directly relevant to the

 3    defendant's state of mind during relevant timeframes in this

 4    case.

 5           (Pause.)

 6           THE COURT:  I think they can all be used.  I think the

 7    number actually -- the collection of a number actually itself

 8    has some probative value, and I -- for example, to illustrate

 9    in a different kind of case, just in a child pornography

10    prosecution, showing a large collection versus an incidental

11    collection might have some probative value as to the

12    obsessiveness of the defendant or something like that.  I think

13    it has some value.

14           MS. BASSIL:  I move for a mistrial, your Honor.  In a

15    child pornography case, each and every possession of a child

16    pornography picture is a crime.

17           THE COURT:  It could be but --

18           MS. BASSIL:  This is supposed to be for his intent.

19    We are now on Day 23 of trial and all we have heard about is

20    pictures of Osama bin Laden, about Osama bin Laden.  All they

21    want to do -- this is not about the jury deciding this case on

22    the evidence; this is about scaring the jury as to the

23    defendant's point of view, all right?  And it's not fair.  He

24    cannot get a fair trial with this kind of evidence just being

25    piled on.  And it should not be allowed.  I move for a
```

1    mistrial.

2         THE COURT:  Okay.  I think it's probative enough to be

3    admitted -- or not stricken, I guess is technically the term,

4    because I think it was admitted through a prior witness.

5         Motion for a mistrial is denied.

6         MS. BASSIL:  Your Honor, the other objections I

7    have -- I'm going to run through these -- Exhibit 254.

8         THE COURT:  254?  Yeah?

9         MS. BASSIL:  This is an email that it appears it was

02:45 10   sent from the defendant to himself.  I don't know whether he

11   had just -- sometimes I send myself emails of things just so I

12   can look at them later or it's something that I want to read or

13   whatever.  It's an email of Osama bin Laden's message to the

14   American people.  It's cumulative.  It's irrelevant.  It's more

15   prejudicial than probative.

16        Yet, again, the government just simply wants to fill

17   this case with -- not with what the defendant did but with what

18   he thought.

19        MR. GROHARING:  Your Honor, it shows what types of

02:46 20   information the defendant was interested in at a relevant time.

21   A very relevant time.  This email was sent to himself in

22   November of 2004, which is after he returned from his trip to

23   Yemen, and shortly before he began his translating efforts, I

24   suppose in earnest, on Tibyan-Pubs.  I mean, the subject of the

25   email is "The complete text of Osama bin Laden's message to the

1    American people."

2         We've charged him with conspiring to provide material

3    support to al Qa'ida.  Osama bin Laden was the leader of

4    al Qa'ida at the time.  It seems directly relevant to the

5    charges in this case.

6         THE COURT:  I think it can be admitted.

7         MS. BASSIL:  Your Honor, I would object to Exhibit

8    347.  This is an email from Tarek Mehanna to Ahmad Abousamra in

9    February of 2002.  It's yet, again, a poem.  A fairly bad poem.

02:47 10   And it is about -- it would appear to be about September 11th.

11   Once again, it's cumulative.  I don't know how much more we are

12   supposed to sit through this.

13        Again, I'm going to say this:  The last I knew in this

14   country it was not illegal to possess thoughts or to write

15   thoughts.  And writing poetry -- bad poetry to me, your

16   Honor -- is more prejudicial than probative, it's cumulative,

17   and it should not be allowed to be piled on.

18        MR. GROHARING:  Again, your Honor, throughout this

19   trial the defense on cross-examination has asked repeated

02:47 20   questions of witnesses about Ahmad Abousamra's intent, trying

21   to establish that it was Ahmad Abousamra that was distributing

22   all of these materials and not the defendant.

23        This is an example of the defendant distributing

24   materials directly related to the attacks of September 11th,

25   2001, mocking the message of not forgetting September 11, 2001,

1   which was being conveyed about the real victims of the attacks.

2   This goes directly to his state of mind in September -- or I'm

3   sorry -- February 2002, and it shows that he had the state of

4   mind -- he had an interest in these topics, you know, at a very

5   early stage.  It's directly relevant to the evidence to be

6   presented in this case.

7          THE COURT:  Well, again, I think it can be admitted.

8   As to the -- I think the continuing theme of cumulative, I

9   don't think the fact that there might be other similar evidence

02:49 10   is dispositive of the question of whether it's cumulative

11   where the very accumulation might itself have some probative

12   value.  So that's why I think it's --

13          MS. BASSIL:  Your Honor, I'm sorry.  There has to be

14   some respect for the jury's time here.  And I also want to

15   point out that it is completely unfair to squeeze the

16   defendant's case into a shortened period of time because the

17   government insists on repeating the same thing over and over

18   and over again.  You have discretion to show some judicial

19   economy in this trial; it should be exercised.

02:49 20          THE COURT:  Okay.

21          MS. BASSIL:  Your Honor, Exhibit 350.  I thought we

22   had already discussed this.

23          THE COURT:  350?

24          MS. BASSIL:  Yes.

25          THE COURT:  It's not on the list I have.

1          MS. BASSIL:  All right.  Oh, I'm sorry.  It is

2     changed.

3          353, your Honor.  I believe we already went over this.

4     I think this was read the other day.  Why are we doing it

5     again?

6          THE COURT:  I don't remember it but --

7          MS. BASSIL:  I do.

8          THE COURT:  Who was it used with?

9          MS. BASSIL:  I'm not sure who it was used with, but I

02:51 10   know somebody read this:  the type of people who love bin Laden

11     and those who hate them.  It was read.

12          MR. GROHARING:  I believe portions of it were read

13     during Mr. Abuzahra's testimony.  We don't intend to read that

14     one, and I apologize for mistaking --

15          THE COURT:  Okay.  That should not be on the list?

16          MR. GROHARING:  It should not be on our list.

17          THE COURT:  Okay.

18          MS. BASSIL:  The next one I believe is 363.  This is

19     yet another picture of Osama bin Laden.  Your Honor, I mean,

02:51 20   why let me be cumulative?  I would say the same thing I've said

21     all along:  This is ridiculous.

22          MR. GROHARING:  Our response on all of these are going

23     to be the same, your Honor.  They're an additional example of

24     the defendant showing reverence for Osama bin Laden at the

25     relevant time frame.  There's not much -- it was directly

1  related to his state of mind in this case and it's relevant to

2  the charged offenses.

3          THE COURT:  I guess my response is the same.  I think

4  it can be admitted.

5          MS. BASSIL:  I'll save my mistrial motion till the

6  end.

7          THE COURT:  Okay.

8          MS. BASSIL:  507, your Honor, is a chat.  I believe

9  this is the fourth time it's been offered.

02:53 10          THE COURT:  Mr. Groharing, has this been read before?

11          MR. GROHARING:  I don't believe it's been read -- the

12  portions that I intend to read with Special Agent Solecki have

13  been read.  And we'll confirm -- or attempting to confirm --

14  but it's not our intent to reread any chat that's already been

15  addressed before.

16          MS. BASSIL:  It's all been read, your Honor.  It's all

17  been read.  And so has 516, which is the next one.  They have

18  also read not only this instant message about the same topic,

19  they have read private messages or -- I believe on Tibyan

02:53 20  Publications about the same topic.

21          MR. GROHARING:  That's a different question, your

22  Honor.  Then we're --

23          MS. BASSIL:  No.  No, they read these instant

24  messages.  And it's the same thing over and over again.

25          MR. GROHARING:  I think if the defendant has an

1   instant message conversation with someone separate from a chat

2   with either the same person or another person --

3           THE COURT:  I agree that is different.  But I'm

4   looking at 507 and it does appear to me now that I do recognize

5   something about the Cloud People and curryland and so on.

6           MS. BASSIL:  That's exactly right.  We've done this

7   one before.

8           THE COURT:  Even if it wasn't the same part -- in

9   other words, I think, you know, with these readers -- first of

02:54 10   all, it is in evidence and, therefore, I guess it's fair game

11   for final argument, but in terms of economy, to some degree

12   with the jury, repeat references to the same -- it seems to me

13   that if there was a reader that was reading this once, they

14   could have read all the parts that were relevant.

15          MR. GROHARING:  I think the reference to curryland

16   came from a different exhibit, your Honor.  The reason why --

17          MR. AUERHAHN:  It was a private message on Tibyan,

18   your Honor, where it was -- that we introduced.  This is a

19   conversation between Abu Mu'ndhir and the defendant.  That was

02:55 20   a private message that was sent on Tibyan about the Cloud

21   People assignment concerning a message to curryland.

22          MR. GROHARING:  Here I think, your Honor, it goes into

23   precautions the defendant would take to protect his

24   communications, which was certainly not the focus of that being

25   raised in previous testimony.

1          MS. BASSIL:  Your Honor, I don't know if she read it,

2    but I at least have a list of what Ms. Vallee was going to be

3    reading, the translator, and it included 507.  And, quite

4    frankly, how many times do they need to have the same thing in

5    front of the jury?  It has been read.  I recognize it.  I

6    remember -- when it talked about franchise, I remember that

7    explicitly.

8          THE COURT:  Well, yeah.  I seem to recall it as well.

9    But, again, the point is, it is in evidence, and to the extent

02:56 10   it makes -- it matters -- it can be argued.  I do think we have

11    to...

12          MR. GROHARING:  I think my concern here, your Honor,

13    is that eliminating that portion of this chat would kind of

14    take the remainder of the conversation out of context.  To cite

15    the often-quoted rule of verbal completeness from my colleague,

16    that adds to this conversation.  The fact that they're talking

17    about this, then the defendant and Abu Mu'ndhir talk about

18    security precautions that they're taking.

19          It's relevant to what they're doing.

02:56 20         MS. BASSIL:  We have had endless instant messages and

21    chats about encryption.  They really need one more?  You really

22    think this jury wants to sit through this?

23          THE COURT:  I think we can skip 507.

24          MS. BASSIL:  516 is similar, your Honor.  We've heard

25    it before; we've read it before.  This is where he's asked

about the intro to the message to the curry people.  We've read

it before.

        MR. GROHARING:  To the extent that was brought up, it

was in a different context, your Honor.  I mean, again, this

last chat and this one kind of go together.  It's the same two

individuals talking about this project and the defendant

talking about possibilities of what he can do with potentially

this video regarding translation.

        It's a video that was -- that features Ayman

al-Zawahiri, the number two at the time in al Qa'ida.  It's

directly relevant to the government's case and it shows a

willingness from the defendant to, in fact, support al Qa'ida

through his translating efforts.

        MS. BASSIL:  It's already been read.  It's already

been read.

        MR. GROHARING:  I don't think that is accurate, your

Honor.  I do not believe that this chat or the previous chat

has been read.  I think there are similar topics that have been

read.

        THE COURT:  Yeah, okay.  I don't remember this one.

You can use this one.

        MS. BASSIL:  Let me point something out also, your

Honor, frankly, that the government in a way has been

misleading about this.  This, I believe, is the video Wa-Yakoon

in which they claim the defendant had or was -- well, an

English translation was sent to him.  I kept saying the

defendant didn't edit it; Mr. Chakravarty kept saying we don't

know that he didn't.  There is no English translation of

Wa-Yakoon at all.  None exists.

It's all -- it's just completely misleading.  And

we've heard this.  We've heard this endlessly.  It doesn't

really matter whether we've heard it on Tibyan Publications

instead of this.

THE COURT:  All right.  516 can be used.

02:58  MS. BASSIL:  534, your Honor, is -- I think it just

talks about -- what it refers to, it was a tape of Zarqawi.  It

was a tape where -- actually, I think the Americans released

this footage where he fumbled a large gun.  And that's what

they're talking about.  I think it's irrelevant.  If they're

going to say it's because it shows his admiration of Zarqawi,

how much more does this jury need to hear about that?  Fourteen

pictures are not enough?  Twenty minutes of video are not

enough?  How much more?

THE COURT:  I think it can be used.

02:59  MS. BASSIL:  It's a waste of time.

THE COURT:  All right.  534 can be used.

MS. BASSIL:  548, your Honor, again, this is just,

frankly, very idle chat.  "Who is your Sheik?"  "My Sheik."

"I'm your student."  He says, "The Slaughterer is the Sheik of

us all."  This is idle chat.  Now, the Slaughterer typically,

     1  because of that movie, refers to Zarqawi, but this doesn't

     2  really say anything.

     3          THE COURT:  Who's as-Sarayri?

     4          MS. BASSIL:  Not clear.  He's no person that's -- I

     5  don't know.  He's not any of the people that were in the United

     6  States or have been referenced in this case.  He's not a

     7  coconspirator.

     8          MR. GROHARING:  He's someone who the defendant

     9  communicated with online extensively, your Honor.  I

03:00 10  don't -- I'm not sure if -- I don't believe he's listed as a

    11  coconspirator.

    12          MR. CHAKRAVARTY:  I believe there are some previous

    13  exhibits referring to a person in Egypt with whom he had

    14  communications and to whom he had sent certain jihad videos.

    15          MS. BASSIL:  Actually, I believe the person was going

    16  to send them to him and was waiting for him to come to show

    17  them.

    18          THE COURT:  Okay.  I think that can be used.

    19          MS. BASSIL:  Your Honor, 549 and 500 are the chats

03:01 20  with the same person; and, quite frankly, they're rather

    21  mysterious and they call for a lot of speculation.  It's really

    22  not quite clear what they're talking about at all.  You can

    23  look at it in one way, you can look at it in another way, but

    24  it is just not clear what the speculation is at all and what

    25  they're talking about.

1           And, you know, in cases where -- organized crime cases

2    where you actually have people that come in and say -- if this

3    person were on the stand, for example, and said, "This is what

4    I meant"; "This is what he meant"; "This is the code we used";

5    "This is how we did this" -- and they've done that.  They've

6    done that with people about "peanut butter and jelly" and so

7    forth.  But these are two strange conversations that make no

8    sense, and it's calling on the jury just to make rampant

9    speculation.

03:02 10          MR. GROHARING:  Well, first, your Honor, I think our

11   next witness, Mr. Kohlmann, will be able to provide some

12   perspective into these types of coded communications that are

13   commonly made by jihadis.  And I think it's a matter for the

14   jury to decide what the defendant meant when he was using the

15   terms that he used in this email.  It's not meant to confuse

16   the jury.  I think an argument can be made simply by using

17   communications like this, coded -- obviously, coded

18   communications, that the person making those communications is

19   trying to protect information.  It's up to the jury to decide

03:03 20   what that means as far as how it relates to this case.

21          MS. BASSIL:  I don't know how Mr. Kohlmann can say

22   what these communications are if no one has interviewed that

23   person in Egypt, even an FBI agent, to say, "This is what this

24   meant"; "This is what that meant"; "This is what that meant."

25   The only word that I think Mr. Kohlmann has ever talked about,

1   and I believe -- let me see if I can find that.  In 549 he

2   says, "You will see the people when we attend their wedding."

3            Well, now, Mr. Mehanna and his parents were going back

4   to Egypt that summer.  There were family celebrations.  There

5   were actual weddings.  And that's the only time I've ever seen

6   Evan Kohlmann talk about "wedding" as code.  But the rest of

7   this, how would he know?

8            It would be different if there were some report, there

9   was some information -- even if it was hearsay because he's an

03:03 10  expert -- that indicated what this meant, but there isn't.

11            THE COURT:  I think they could be used.

12            MS. BASSIL:  I believe 557 is the next one, I believe?

13   Am I correct?  Yes, 556 and 557.  And these are -- your Honor,

14   this is a chat.  It's a discussion of Osama bin Laden.  It's

15   the same thing all over again.  We're really going to waste

16   time reading this?  I mean, at this point -- I mean, frankly, I

17   feel if Black's Law Dictionary had the word "cumulative" in it,

18   it would be a picture of this instant message.

19            THE COURT:  Okay.  Well, as I've said, I think the

03:05 20  cumulativeness itself may have some probative value, so I'll

21   permit it.

22            MS. BASSIL:  And 557, your Honor, is really -- it's

23   the same thing, your Honor.  Ahmad Rashad talks about somebody

24   he met.  I think we've even read a portion of this.  He talks

25   about someone he met who might have been a mujahideen, and I

```
 1    think we've read a portion of this.
 2            MR. GROHARING:  I don't believe we've read a portion
 3    of this, your Honor.  Our argument is the same as it was for
 4    the previous ones.
 5            THE COURT:  I think they could be used.
 6            (Pause.)
 7            THE COURT:  I said I think they can be used.  I'm
 8    sorry.  I was waiting for your next objection.
 9            MS. BASSIL:  597, your Honor.
10            THE COURT:  597?
11            MS. BASSIL:  Yes.  597 is an instant -- it's a chat
12    between Ahmad Abousamra and the defendant.  And my concern is
13    if you look at -- it's either page 49 or 6FST418.
14            THE COURT:  Yes?
15            MS. BASSIL:  And, your Honor, if you look at the
16    bottom of the page, although the defendant doesn't say this,
17    Ahmad Abousamra says, "I just want to rape a female infidel or
18    slaughter an infidel," and I would ask that that portion go
19    out.  I think it's irrelevant; it's prejudicial.
20            MR. CHAKRAVARTY:  Your Honor, it would help
21    Mr. Groharing if he had access to the screen.  Is that
22    possible?
23            MS. BASSIL:  I'm sorry.  I can show him.
24            Okay.  You're not going to read that portion?
25            MR. GROHARING:  Your Honor, the only portion I plan on
```

```
 1   reading is on page 51, or 6SFT00420.
 2          MS. BASSIL:  I would ask that that part be excised,
 3   your Honor.
 4          THE COURT:  Yeah.  That's fine.
 5          MR. GROHARING:  No --
 6          THE COURT:  That's the --
 7          MS. BASSIL:  Even though he's not reading it.  If it's
 8   going to go to the jury, I would ask that that part be --
 9          THE COURT:  Right.  I think it's the ninth line from
10   the bottom; it begins with "Abuzahra."  It seems to me a stray
11   remark in a way, a gratuitous remark that's not in the stream.
12   So I think those three lines --
13          MS. BASSIL:  Yes.
14          MR. GROHARING:  Just so I'm clear, your Honor, what
15   page?
16          THE COURT:  Page 49, Bates 418.
17          MS. BASSIL:  It's right after the line, "They feel too
18   shy to say it to Dan himself"?  The next three lines, your
19   Honor?
20          THE COURT:  Yes.  I think -- yes.  I think it's the
21   ninth line from the bottom, and it's that line and the next and
22   the next through the "laugh out loud."  Just take it out for
23   the written exhibit.
24          MS. BASSIL:  Yes.  Thank you.
25          And then, your Honor, it's 672; there's a chat.  And
```

1    I -- what I am concerned -- perhaps the prosecutor can indicate

2    what part they're going to read.

3              MR. GROHARING:  This chat, your Honor, the first seven

4    lines on page 6SFT01860.  It's page 15 of --

5              MS. BASSIL:  That's just the part I was going to

6    object to.

7              THE COURT:  Which lines?

8              MR. GROHARING:  The first seven lines, your Honor.

9              THE COURT:  Yeah, I would sustain the objection to

03:12 10   that.  I think this is needlessly cumulative.

11             MS. BASSIL:  Thank you, your Honor.  And so that --

12             THE COURT:  I assume that town is Fallujah?

13             MR. GROHARING:  Yes, your Honor.  The incident the

14   defendant is referring to is when U.S. contractors were hung,

15   the witness --

16             THE COURT:  Right.  Right.  I think it's too truncated

17   a remark to have much probative value.

18             MS. BASSIL:  And then finally, your Honor, 677.  And

19   again, the question would be what the prosecutor intends to

03:13 20   have read.

21             MR. GROHARING:  I would intend to read the third page,

22   currently displayed.  About a third of the way down where it

23   starts with Edgar:  "Won't leave you hanging this time" to the

24   bottom.  I'm sorry.  And then the entire fourth page and the

25   first 11 lines on the fifth page.

```
 1            MS. BASSIL:  I'm sorry.  The third page beginning
 2    with -- oh...
 3            MR. GROHARING:  The conversation is all about Zarqawi.
 4    They're talking specifically about the video we were talking
 5    about earlier, your Honor.
 6            MS. BASSIL:  My concern specifically, your
 7    Honor -- well, I would object to that anyway, but my specific
 8    objection, actually, has to do with sort of describing the film
 9    in detail, and it's about an IED, I think, going off, which is
03:14 10   the bottom -- sort of the bottom third of page 93, and then it
11    continues.
12            THE COURT:  I think that can be used.
13            MS. BASSIL:  Please note my objection.
14            Your Honor, those are my objections right now.  I
15    might have some more as they come up that I just missed.
16            Again, I move for a mistrial.  I think the jury is
17    being inundated with unnecessary images, statements over and
18    over and over again.  It isn't about the defendant's state of
19    mind; it's about trying to scare the jury into a conviction not
03:15 20   on what the defendant did, but on what he believed or what he
21    wrote or what he said.  And we don't have that in this country.
22    Or I thought we didn't.
23            THE COURT:  Okay.  Well, since I think the evidentiary
24    rulings were sound, there's no grounds for a mistrial.
25            (Pause.)
```

```
 1              THE COURT:  While Paul is getting the jury, he
 2    reported to me that they gave him some feedback on my
 3    scheduling request.  And as he told me, it was virtually
 4    unanimous that they were not willing to sit in the afternoons.
 5    So it's not just one or two of them.  Apparently, they've
 6    adjusted their schedules in a regular way that they need the
 7    afternoons.
 8              MR. CARNEY:  We're grateful your Honor considered it.
 9              MS. BASSIL:  It's interesting that they can reach a
10    unanimous vote on something.
11              THE COURT:  He said "nearly unanimous," I think.
12              THE CLERK:  All rise for the jury.
13              (The jury enters the courtroom at 12:25 p.m.)
14              THE CLERK:  Please be seated.
15              THE COURT:  Jurors, thank you for your patience.  The
16    lawyers and I had a few things we had to iron out.  We've done
17    that and we're ready to resume.
18              MR. GROHARING:  Your Honor, the government would call
19    Special Agent Brian Solecki.
20                    BRIAN J. SOLECKI, duly sworn
21              THE CLERK:  Have a seat.
22              State your name and spell your last name for the
23    record.  Keep your voice up and speak into the mic.
24              THE WITNESS:  Sure.  Brian James Solecki,
25    S-O-L-E-C-K-I.
```

03:16 (line 10)
03:17 (line 20)

|     | DIRECT EXAMINATION |
| --- | --- |

1                         DIRECT EXAMINATION

2    BY MR. GROHARING:

3    Q.    Sir, how are you employed?

4    A.    I am a special agent with the Air Force Office of Special

5    Investigations.

6    Q.    How long have you been a special agent with the Office of

7    Special Investigations?

8    A.    For nearly eight years.

9    Q.    And what did you do prior to joining the Office of Special

03:17 10    Investigations?

11    A.    Prior to that I served on active duty in the Marine Corps

12    for seven years.

13    Q.    And what does a special agent with the Office of Special

14    Investigations for the Air Force do?

15    A.    We investigate felony-level crimes on the base and

16    involving DOD personnel.  And currently, I'm assigned as the

17    DOD representative to the FBI Boston Joint Terrorism Task

18    Force.

19    Q.    What are your duties for the Joint Terrorism Task Force?

03:18 20    A.    To participate and conduct counterterrorism

21    investigations.

22    Q.    Now, have you had any involvement in this case?

23    A.    Yes, I have.

24    Q.    And have you had the opportunity to review a number of

25    communications made by the defendant in this case?

```
 1   A.   Yes, I have.
 2        MR. GROHARING:  Okay.  I would like to pull up Exhibit
 3   349, please?
 4        It's been admitted, your Honor.
 5   Q.   Could you please tell me if I read this correctly -- I'm
 6   sorry.  First, is that an email sent by
 7   ibnul_khattab82@yahoo.com on Friday, 7 November 2003?
 8   A.   Yes, it is.
 9   Q.   And please tell me if I read this correctly:  "Peace be
10   upon you, brother Hamza.  Here is the book:  'Sahih Mawarid
11   al-Zam'an,' authentic Hadiths collection:  Sources for the
12   Thirsty, for Shayikh al-Albaani, which was published after his
13   death, may Allah bless his soul, in which suicide operations
14   were ruled permissible.  Cover of the book, then the page where
15   the shaykh talks about this matter."
16        Have I read that correctly?
17   A.   Yes.
18        MR. GROHARING:  May I please have Exhibit 674?
19        It's been admitted, your Honor.  Actually, with the
20   exception of one, all of these exhibits have been admitted,
21   your Honor, that I'll be discussing with Special Agent Solecki.
22        Page 2, please?  I'm sorry.  Back to page 1, please.
23   Q.   Now, is this an email -- I'm sorry.  First, are you
24   familiar with the email address ibnul_khattab82@yahoo.com?
25   A.   Yes.
```

```
 1   Q.   Whose email address is that?

 2   A.   That is the defendant's email address.

 3   Q.   Okay.  Is this a chat between the defendant and someone

 4   named Edgar on March 21, 2006?

 5   A.   Yes, it is.

 6        MR. GROHARING:  Page 2, please?

 7   Q.   And I'm going to ask you to read the portions of this chat

 8   that are attributed to the defendant in the Arabic language

 9   there.  Can you please go ahead?

10   A.   "Did you hear about this?"

11        MR. GROHARING:  Next page, please?

12   A.   "Armed insurgents freed all the inmates of an Iraqi prison

13   today in a raid that left at least 17 police and ten attackers

14   dead.

15        "Up to 100 militants armed with automatic rifles and

16   rocket-propelled grenades stormed the judicial compound in

17   Muqdadiya, a Sunni heartland about 60 miles northeast of the

18   capital.

19        "The assault began after the attackers fired a mortar

20   round into the police and court complex, police Brigadier Ali

21   al-Jabouri said.

22        "Officials said all 33 prisoners had been freed, and ten

23   of the attackers killed, in the early morning battle, along

24   with at least 17 police and a courthouse guard.  Another 13

25   policemen and civilians and 15 gunmen were wounded in the
```

1  attack.

2      "After burning the police station, the insurgents

3  detonated a string of roadside bombs as they fled, taking the

4  bodies of many of their dead comrades with them, police said."

5  Q.   "Yes, I did.  Not only that, an Iraqi army patrol was

6  called in to help and they never got there.  They were ambushed

7  on the way in, which is a sign that these brothers are very

8  sophisticated and planned it from A to Z."

9  A.   "Damn straight.  Progress, man."

03:22 10  Q.   "Praise be to Allah.  May Allah give them more and more

11  and protect their mothers and wives."

12  A.   "Progress in Iraq.  Hehe."

13          MR. GROHARING:  Can you pull up Exhibit 593, please?

14  Q.   And is this a chat between the defendant and someone --

15  and Ahmad Abousamra on April 25, 2006?

16  A.   Yes, it is.

17  Q.   Can you please read the portions in Arabic attributed to

18  the defendant?

19  A.   "Did you?"

03:22 20  Q.   "I downloaded it now.  I'm watching it now."

21  A.   "The end is the best part.  When it shows him using his

22  weapon."

23  Q.   "Still in the intro."

24  A.   "But the talk itself is same old, same old but" --

25          MR. GROHARING:  Next page, please?

1    A.    -- "the last part, after 23 minutes, I think, is cool,

2    dude.  I am mad that this video came out."

3              MR. GROHARING:  You can take that down.

4              Your Honor, at this time we would like to play Exhibit

5    55A and then 55B.  And I'd ask that 55C be displayed as well, a

6    translation of the video, on the right side of the screen.

7              THE COURT:  Okay.  So the jury follows this, there are

8    two video clips.  Exhibit 55A and -B are video clips; -C is a

9    translation of the Arabic.  And so that as Mr. Groharing said,

03:23 10   they'll be on your screen as you --

11             Actually, is this going to be side by side?

12             MR. GROHARING:  Yes, your Honor.

13             THE COURT:  Okay.  So you can see both.

14             MR. GROHARING:  Play it?

15             (Exhibit Nos. 55A and 55C are published to the Court

16   and jury.)

17   BY MR. GROHARING:

18   Q.    And, Special Agent Solecki, have you had the opportunity

19   to review this entire video?

03:27 20   A.    I have.

21   Q.    And what is contained in the middle portion of the video,

22   after this portion in the video?

23   A.    There's a speech by Zarqawi.

24             MR. GROHARING:  Your Honor, I would like to play 55B

25   at this point.

1              (Exhibit Nos. 55B and 55C are published to the Court

2       and jury.)

3              MR. GROHARING:  Your Honor, I would just ask that

4       Exhibit 55C be admitted in its entirety, the translation.

5              THE COURT:  All right.

6              (Government Exhibit No. 55C received into evidence.)

7              MR. GROHARING:  And then can I have 594, please.

8       BY MR. GROHARING:

9       Q.   And is this another chat session between the defendant and

03:32 10     Ahmad Abousamra about an hour after the session we previously

11      discussed?

12      A.   Yes, it is.

13             MR. GROHARING:  Page 2, please?

14      Q.   "He clearly says he is still head of QJ.  That means Shura

15      Council is just an umbrella organization.  It is like he

16      refuted Hudhayfah."

17      A.   "Right.  Nobody 'deposed' him."

18      Q.   "Man, that tape was awesome.  It was like almost getting a

19      wife after years of abstinence."

03:33 20     A.   "You see how they all sat around at the end and the

21      rocket" --

22      Q.   "Yup."

23      A.   -- "that said 'AQ' on it?"

24      Q.   "Oh, yeah.  Who is Aboo Naasir al-Qah?"

25      A.   "One of the four bros who escaped from Bagram, the one who

1    made the poem video."

2    Q.   "Oh, he's not the head of the Arabian Peninsula branch?

3    Who is?"

4    A.   "Not sure who is.  You know the video.  It is very

5    possible that Shaykh Z make it years ago and just told his

6    followers, 'If this happens on such and such a date, then

7    release this video.'"

8         MR. GROHARING:  Exhibit 694, please?

9    Q.   And is this a chat session between the defendant and

03:34 10   someone named Mu'awiyah on Tuesday, April 25, 2006?

11   A.   Yes, it is.

12        MR. GROHARING:  Page 2, please?

13   Q.   And could you please read the portions attributed to the

14   defendant?

15   A.   "Brother, did you hear" --

16   Q.   "No problems, brother."

17   A.   -- "about the vid?"

18   Q.   "God bless.  I saw it."

19   A.   "Hehehe.  Nice."

03:34 20   Q.   "That gives more than one indication.  Firstly, that the

21   shaykh is in a powerful position insomuch that the Americans

22   and Rawafid cannot reach him, and secondly, that he is in

23   control and he is moving in the direction of the Iraqi scene as

24   he came out fearlessly with his appearance on the video.  And

25   not fearing that, this appearance would lead to identifying or

1  detenting *[sic]* him, and this clearly indicates that he is not

2  on the run, rather, the maggots are, and that the shaykh is

3  surrounded by a deeply trustworthy group who are bent on

4  seeking victory."

5  A.   "Yes.  Hehe."

6  Q.   "I believe the evil gangsters in the White House,

7  Pentagon, the Congress and CIA are experiencing earthquakes" --

8  A.   "I believe" --

9  Q.   -- "at the moment."

03:35 10  A.   -- "they are pissing their diapers."

11  Q.   "The whole world knows they represent evil and what they

12  stand for is rotten fruits and they are to perish as their

13  stance is like the house of a spider."

14  A.   "Yeah."

15  Q.   "May Allah curse this black gangs *[sic]* and the criminals.

16  I abhor and hate them and my enmity is for them."

17  A.   "Brother, we're being watched" --

18        MR. GROHARING:  Next page, please?

19  A.   -- "for the hundredth time.  Hehehe."

03:36 20  Q.   "May Allah curse them.  Let them see we are not breaking

21  any of their filthy Constitution.  Their cursed Bill of Rights

22  allows them to be bashed."

23  A.   "Okay, brother.  But be smart.  Hehe."

24        MR. GROHARING:  Exhibit 675, please?

25  Q.   Is this a chat session between the defendant and someone

1    named Edgar on Tuesday, April 25th, 2006?

2    A.   Yes, it is.

3    Q.   And can you please read the portions attributed to the

4    defendant?

5    A.   "Did you see the picture of the shaykh?"

6    Q.   "Yeah."

7         MR. GROHARING:  Next page, please?

8    Q.   "Allah bless.  Alive and kicking."

9    A.   "Hollywood material, man.  Seriously.  Imagine him getting

03:37 10   into a brawl with Bush."

11   Q.   "No contest, man."

12   A.   "You know what kind of weapon that is, by any chance?"

13   Q.   "Mr. Ra'is can barely put a sentence together.  Nope."

14   A.   "M-249."

15   Q.   "Where is it made?"

16   A.   "US of A.  He took it" --

17   Q.   "Don't know how much, but that looks like something tough

18   to get inside Iraq."

19   A.   -- "from a dead soldier."

03:37 20   Q.   Are you familiar with an M-249, what that refers to?

21   A.   Yes, it is -- yes, I am.

22   Q.   I'm showing you --

23        MR. GROHARING:  I believe the jury has this as well,

24   your Honor?

25        THE COURT:  Yes.

BY MR. GROHARING:

Q.    Who's that a picture of?

A.    That is Zarqawi.

Q.    What is he holding?

A.    He is holding the M-249.

Q.    And what exactly is an M-249?

A.    M-249 is the squad automatic weapon used in the Marine
Corps and Army infantry squads.

MR. GROHARING:  Could I have Exhibit 677, please?

03:38 Q.    Is this a chat between the defendant and Edgar again on
Saturday, April 29th, 2006?

A.    Yes, it is.

MR. GROHARING:  Page 3, please?

Q.    "Won't leave you hanging this time.  Like a good bride, as
we say in Mexico.  Hey, you know that video from that guy who
works in the place of the two rivers but who's from the next
town over, the one named after the river/basketball player?"

A.    "Z?"

Q.    "That one."

03:39 A.    "Yeah."

Q.    "Well, in that picture of Z with the toy, I just heard
that word is out that the American boys are a little freaked
out because that toy is meant to be mounted on a vehicle.  It
can't be handheld."

A.    "Yeah, exactly."

```
     1   Q.   "Basically saying that Z is defying physics."

     2   A.   "Right."

     3   Q.   "Allah is great."

     4   A.   "Look it up.  It's called an M-249."

     5   Q.   "All I have to say, beast."

     6   A.   "May Allah keep him."

     7   Q.   "Amen."

     8   A.   "These people live for something."

     9   Q.   "For our lord."

03:39 10   A.   "Well, in a sense, every Muslim does.  But they took it to

    11   the next level and put everything else on hold:  Wealth,

    12   comfort, family, security and safety, and put the

    13   responsibilities of the Ummah, nation" --

    14          MR. GROHARING:  Next page, please?

    15   A.   -- "over and above everything else we've been sucked into.

    16   Not an easy thing to do.  And on top of that" --

    17   Q.   "No, brother.  They took it to the real level.  These days

    18   you pray the five prayers and you're 'meshallah,' 'bless you,'

    19   a 'pious' Muslim, when back in the day that just ranked you in

03:40 20   the lowest of the low."

    21   A.   "Their families disown them, they're on the top of every

    22   most-wanted list in existence, et cetera.  What would drive a

    23   man to be willing to live like this?"

    24   Q.   "CNN's Nick Robertson went to Z town last week and

    25   interviewed people.  By the way, you don't know the name of Z's
```

1    tribe, do you?"

2    A.    "Bani Hasan."

3    Q.    "Thought so."

4          Does the defendant then send a link?

5    A.    He does.

6    Q.    Is that link to a video?

7    A.    I believe so.

8    Q.    "Wow, okay.  Where did the detonation come from?"

9    A.    "Remote control.  They had gotten off to investigate and

03:40 10   disarm."

11   Q.    "From under or beside the street?"

12   A.    "You see the guy who got off" --

13   Q.    "Dude, that was ill."

14   A.    -- "and went behind the vehicle?  He was looking right at

15   it.  Tried to touch it.  Then, you know the rest."

16   Q.    "You mean in back?"

17   A.    "It was right under it.  But the guy was looking at it."

18   Q.    "Yeah.  I'm just getting that now.  Dude, that's ill."

19         MR. GROHARING:  Next page, please?

03:41 20   Q.    "Ill, ill, ill."

21   A.    Smiley face.  "Hey, they wanted to reduce troop levels."

22   Q.    "Ha!!  I wonder if there were any of those guys left."

23   A.    "If so, I doubt they were in the same shape as they were

24   before their unfortunate stop."

25   Q.    "Barbecue."

```
 1              MR. GROHARING:  678, please?

 2    Q.   Is this a chat between the defendant and Edgar on Sunday,

 3    April 30, 2006?

 4    A.   Yes, it is.

 5    Q.   "Was watching CNN a few minutes ago.  Interestingly

 6    enough, it was reported that an IED attack into Tikrit

 7    destroyed a US humvee causing casualties followed by the

 8    footage of the attack site.  Instantly recognizable from the

 9    video you sent last night.  Same street, same green median

10    strip."

11    A.   "Peace be upon you.  Really."

12    Q.   "Very interesting how U.S. media is compelled to report

13    something one [sic] word is out.  I'm sure they've seen the

14    video as well.  Peace be upon you."

15    A.   "Hey, that attack from the vid was in Ramadi."

16    Q.   "Nah, man.  It was Tikrit.  It was the exact same place."

17              MR. GROHARING:  Next page, please?

18    Q.   "Or, well, that's what CNN said.  Tikrit, Ramadi.  It's

19    not important.  It was done."

20    A.   "Many times they show footage of a different attack when

21    reporting about an attack somewhere else."

22    Q.   "Yeah, stock footage."

23    A.   "You know, an IED attack is an IED attack.  Why

24    discriminate?  Hehe."

25    Q.   "Ha."
```

```
 1            MR. GROHARING:  Exhibit 730, please?
 2    Q.   Is this a chat between the defendant and Tauqir on April
 3    29, 2006?
 4    A.   Yes, it is.
 5            MR. GROHARING:  Page 4, please?  Next page, please?
 6    Q.   Could you read the portion attributed to the defendant?
 7    A.   "You guys should have shown a dancing video at dinner."
 8    Q.   "Whirling dervishes?"
 9    A.   "I mean a dancing video."
10    Q.   "Oh, people would love that."
11    A.   "Yeah, like a beheading video while you're eating dinner."
12    Q.   "Hahaha.  I can't just imagine that.  We would definitely
13    get rid of all the pains in our MSA."
14    A.   "Check this out, but don't show it to your wife."
15    Q.   Does Tauqir then receive a jpg that titled "zq.jpg"?
16    A.   Yes.
17    Q.   "No probs there.  Don't even have one.  Zq?"
18    A.   "That's Zarqawi."
19    Q.   "God bless.  Such light."
20    A.   "Monster.  That thing he's firing."
21            MR. GROHARING:  Next page, please?
22    Q.   "I love the band ZZ Top."
23    A.   "Weighs 20 pounds.  In the vid he's holding it rock
24    steady, doesn't even move an inch in his arms.  It's meant to
25    be mounted on the ground."
```

```
 1   Q.   "He looks smaller on TV.  Dude, he's a monster."

 2          MR. GROHARING:  Exhibit 724, please?

 3   Q.   Is this a chat between the defendant and someone named

 4   Taimur on April 30th, 2006?

 5   A.   Yes, it is.

 6          MR. GROHARING:  Page 2, please?

 7   Q.   Can you read the portions attributed to the defendant?

 8   A.   "Did you see the Abu M al-Z video?"

 9          MR. GROHARING:  Next page, please?

10   Q.   "Yeah, man.  Do you know the verses when Allah says strike

11   fear into their hearts?"

12   A.   "Yeah.  Surat al-Anfal."

13   Q.   "Right.  I was reading Yahoo News the other day and it

14   says Shaykh Z being the most fearful threat.  It reminded me of

15   that verses [sic]."

16   A.   "Yeah, yo."

17   Q.   "I was, like, glory be to Allah."

18   A.   "He reminds me more of Eid al-Adha."

19   Q.   "What?"

20   A.   "Like, you know, the slaughtering of Adha."

21   Q.   "Laugh out loud.  God bless."

22          MR. GROHARING:  Exhibit 534, please?

23   Q.   Is this a chat between the defendant and someone named Abu

24   Sayyaf on May 4, 2006?

25   A.   Yes, it is.
```

```
 1            MR. GROHARING:  Page 2, please?

 2   A.    "Did you see the news about the Z blooper tape?"

 3   Q.    And does the defendant then provide a link?

 4   A.    Yes, he does.

 5   Q.    What does he say next?

 6   A.    "Idiots.  Big deal.  He's wearing sneakers and needed help

 7   unjamming the American-made gun that he took."

 8   Q.    "Laugh out loud.  American guns are known for messing up,

 9   especially in the deserts."

03:47 10 A.    "Well, the keyword is" --

11   Q.    "And about the sneakers, that's just silly."

12   A.    -- "'American.'  They are foreign to him.  He fires them

13   better than the soldiers that were trained upon them do."

14   Q.    "True."

15   A.    "And the fact that the gun was taken as a bounty of

16   war" --

17   Q.    "But I guess they want to paint him out as a super

18   terrorist capable of anything."

19   A.    -- "shows that they obviously didn't know how to use it

03:47 20 well in the first place."

21   Q.    "Laugh out loud.  Yes."

22   A.    "So nice try from the U.S., but no."

23            MR. GROHARING:  Exhibit 737, please?

24   Q.    And is this a chat between the defendant and someone named

25   Umar Kalil on Sunday, May 7, 2006?
```

```
 1   A.   Yes, it is.

 2   Q.   Would you please read the portion attributed to the

 3   defendant?

 4   A.   "Did you catch the vid of Abu Musaab last week?"

 5   Q.   "Only a short clip."

 6        Does the defendant then send a link?

 7   A.   Yes, he does.

 8   Q.   What does he say after that?

 9   A.   "You saw how they tried to mock him afterwards?"

03:48 10   Q.   "No, I did not see that part."

11   A.   "After they released it, the U.S. Army found unreleased

12   footage of the gun jamming and he needed help unjamming it, so

13   they released that footage trying to make him look stupid, you

14   know, just as a comeback."

15             MR. GROHARING:  Exhibit 548, please?

16   Q.   And is this a chat between the defendant and someone named

17   Ahmad as-Sarayri on Monday, May 8, 2006?

18   A.   Yes, it is.

19   Q.   "Who is your shaykh, my shaykh?"

03:49 20   A.   "Hehehe."

21   Q.   "I am your student."

22   A.   "The slaughterer is the shaykh of all of us."

23   Q.   "And honored."

24   A.   "Hehehe."

25   Q.   "The slaughtering shaykh."
```

```
 1    A.    "Yes.  Hehehe."

 2    Q.    "Abu Abd'Allah, our prince/emir.  Hehehe."

 3    A.    "Yes.  You are right."

 4          MR. GROHARING:  Exhibit 579, please.

 5    Q.    Is this a chat between the defendant and Ahmad Abousamra

 6    on Thursday, June 8, 2006?

 7    A.    Yes, it is.

 8    Q.    "I'm sad."

 9    A.    "Peace be upon you."

10    Q.    "Peace be upon you.  I'm very sad.  Like, his voice.  No,

11    we can't hear it anymore."

12    A.    "Yeah.  The interesting thing is" --

13    Q.    "You know, this is the most major person other than

14    Aboohfs and Aboohjr."

15    A.    "The interesting thing is these infidels are such idiots.

16    They said he was in a certain place when he got 72."

17          MR. GROHARING:  Next page, please?

18    Q.    "I know.  They are going to create 12,000 more of him."

19    A.    "No.  No.  But they've been saying that he might be hiding

20    in diyala for over a year."

21    Q.    "And this is where he has the whole time [sic]."

22          I'm sorry.  Ahmad Abousamra replies, "Oh.  You know, now

23    they have made his conclusions in -- and did a Hadith, a

24    tradition of the prophet, come to you.  Something all the

25    groups will follow.  They made the man into a giant of history.
```

1    Maybe before some people didn't respect him due to him still

2    being alive although they supported him in general.  Now his

3    words have been made with blood.

4        "I'm not joking, I'm really sad.  Unlike Abhjr or

5    Abhfs...we heard his tapes regularly full of emotions to the

6    point that it felt like you knew the man personally, and then

7    this man who you felt like was your best friend suddenly

8    murdered."

9    A.   "Do you know what the reaction of the Arab masses were?"

03:51 10   Q.   "No.  But the rafidah in Iraq were celebrating."

11   A.   "Yeah, of course."

12   Q.   "They killed him.  May Allah kill them."

13   A.   "To them, it's the equivalent of a Jew celebrating the

14   death of Hitler."

15   Q.   "Laugh out loud.  Sorry, just a funny way to put it.  What

16   was the reaction on the Arab street?  You didn't say."

17   A.   "I don't know."

18   Q.   "Oh."

19   A.   "I don't want to see so that I don't hear something that

03:52 20   makes me mad."

21   Q.   "Yeah."

22            THE COURT:  Mr. Groharing, we've reached one o'clock.

23   I think this is where we'll pause for the day.

24            All right, jurors, we'll recess and continue with this

25   tomorrow morning.  I'll see you then.

1          I'll see counsel at two, right?  Is that arranged?

2          THE CLERK:  All rise for the Court and jury.  Court

3    will be in recess.

4          (The Court and jury exit the courtroom and the

5    proceedings recessed at 1:01 p.m.)

6          (After the recess:)

7          THE CLERK:  For a hearing in the case of United States

8    versus Tarek Mehanna.

9          THE COURT:  All right.

05:09 10          MR. CARNEY:  Good afternoon again, your Honor.

11          THE COURT:  Good afternoon.  Long time no see.

12          This is a hearing on the defendant's motion to exclude

13    the testimony of Evan Kohlmann.

14          MR. CARNEY:  Your Honor, what might be useful is if I

15    provided you with an update?

16          THE COURT:  Yes.

17          MR. CARNEY:  The prosecutors and I have spoken.  I

18    believe your Honor might be aware of the change in what they're

19    proposing that Kohlmann would say.  And I would like to present

05:09 20    to the Court what my understanding is of the differences

21    between what Kohlmann's testimony will be that is offered from

22    what is in his report.  And it might be helpful if

23    Mr. Chakravarty can indicate whether I've accurately stated it.

24          It's my understanding that Evan Kohlmann will not

25    say -- will not offer an opinion that Tarek Mehanna is either a

1    terrorist or consistent with a terrorist, or an opinion that

2    Tarek Mehanna is progenitor of a homegrown terrorist network or

3    consistent with that.

4          I understand that Mr. Kohlmann will be reviewing a lot

5    of the evidence in this case, indicating what the significance

6    is, or background is, of it; he may indicate that evidence is

7    consistent with something.  But in terms of the core of his

8    testimony, it will be analyzing that evidence providing -- and

9    putting it in a historical context.

05:10 10          So with that --

11          THE COURT:  Let me just hear from the government

12    whether they agree with that summary.

13          MR. CARNEY:  And then I'm going to take another step,

14    if I could.

15          THE COURT:  Yeah.

16          MR. CHAKRAVARTY:  I agree with what the government has

17    restricted itself from eliciting, which is we're not going to

18    be eliciting the reference to homegrown terrorist that -- the

19    defendant being a part of a homegrown terrorist network, that

05:11 20    he is a homegrown terrorist, or that he's a progenitor, or

21    consistent with any of those things, as we've laid out in the

22    papers and Mr. Carney has accurately suggested.

23          His testimony, as we've laid out in the papers, will

24    be explaining both things that are in evidence and explaining

25    the significance of those pieces of information, individuals,

1    particular files, but also, the certain activities, such as in

2    this case, translating, for example.  The significance of

3    translating to al Qa'ida and other terrorist groups is

4    something which he will be expressing his opinion on based

5    on -- not saying that the defendant is -- you know, did these

6    things so he must be guilty; but, rather, that is a valuable

7    resource.

8          He will be talking about, as is laid out in the report

9    and we've summarized in the papers, other things which exist

05:11 10   outside of this case which are relevant, geopolitical context,

11   different terrorist organizations, how they've operated, modus

12   operandi and all of that.  I don't mean to rehash that, but my

13   point is that those cast the context for the particular pieces

14   of evidence that he's going to be talking about.

15         So I don't disagree with anything that Mr. Carney

16   said, but I didn't want to implicitly narrow what he said to

17   just talking about the evidence in the case.  It's also

18   evidence that he will be offering for the first time to this

19   jury who hasn't heard about some of that context.

05:12 20         THE COURT:  All right.  Well, let me say something and

21   then you can add to it.  I understand the narrowing, or the

22   attempted description here, is aimed principally at expressing

23   what is excluded rather than from completely summarizing

24   everything that might be included, which I think may be what

25   you're concerned about.

```
 1            MR. CHAKRAVARTY:  Thank you.

 2            THE COURT:  And as I understand it, what is excluded,

 3    from the government's proffer at this stage that may have been

 4    in the report, are opinions that would be specific to the

 5    defendant personally.

 6            MR. CARNEY:  Correct.

 7            THE COURT:  Is that fair?

 8            MR. CHAKRAVARTY:  It is, your Honor.

 9            MR. CARNEY:  For example, the prosecutor mentioned

05:13 10    translation.  I would expect Kohlmann would say that if

11    al Qa'ida put something out in Arabic, it's helpful if it's

12    translated to English as opposed to "the defendant's

13    translation of this document benefitted al Qa'ida directly."

14            THE COURT:  Right.

15            MR. CHAKRAVARTY:  And that's a great example, which I

16    don't disagree with; however, for example, the Ghazwah Umar

17    Hadid video, "The Expedition of Umar Hadid," the jury has heard

18    a lot about, the witness will talk about specifically that

19    video, and also, the translated version of that video -- the

05:13 20    significance of the translated version of that video -- without

21    saying because the defendant translated it and distributed it,

22    that's why -- you know, or opining about the defendant's

23    involvement in it.

24            THE COURT:  Right.  That will be the -- that will be

25    the question for the jury -- or one of the questions for the
```

1    jury, obviously.

2          MR. CARNEY:  Yes, your Honor.

3          If I may add another point.  There may be instances --

4    in fact, you could bet on it -- that I may raise an objection

5    to a specific question or how far he might be going so that

6    your Honor can make a ruling.  Also, there may be instances

7    where I believe I'm hearing something for the first time that's

8    not contained in the report.  I used, as an example with

9    Mr. Chakravarty, if Mr. Kohlmann said, "Well, I'm an expert in

05:14 10   how al Qa'ida operates in Mexico," I'll be asking to see the

11   Court at the sidebar because an expert with this degree of

12   breadth requires so much preparation that if he goes off

13   script, so to speak, off the report, into areas that are not in

14   the report, I don't believe I've had fair notice of it.

15         MR. CHAKRAVARTY:  So it's certainly not the

16   government's intention to elicit anything that hasn't been

17   disclosed.  The concern is the report was drafted with a

18   particular construct and not necessarily what the government

19   has intended to elicit from the witness at trial.  Two, three

05:15 20   hours of direct testimony, optimistically, may not be

21   accurately summarized within the 40-page -- although it may --

22         THE COURT:  Well, the report doesn't have to disclose

23   every detail of every answer, but the illustration was of a

24   topic that had not been addressed, and certainly would be

25   restricted.

1          MR. CHAKRAVARTY:  Yeah.

2          MR. CARNEY:  As your Honor saw when the witness today,

3     Abuzahra, made a comment and I asked to approach the sidebar

4     and said, "I never saw any of this in the discovery," it

5     concerned the defendant allegedly saying when he arrived in

6     Yemen, "We're finally here to do something."  The government

7     researched it, confirmed it was not in any of the discovery

8     provided, either in the discovery letter 302, grand jury

9     transcript or any other communication, and they were prepared

05:16 10     to stipulate that if the witness denied that he had only

11     recently provided this information, they would stipulate that,

12     oh, no, he just -- he only did just recently provide it.

13          So it would have to be something that's going to be a

14     significant variation for me to bring it to your attention.

15     Because I agree with your Honor, there's no way we lawyers can

16     predict with specificity everything that's going to come out of

17     a person's mouth.

18          MR. CHAKRAVARTY:  Part of the government's concern is

19     he's going to talk about al Qa'ida.  And, you know, wherever

05:16 20     the relevant portion of his testimony is may not all be within

21     the report; for example, you know, that al Qa'ida was this

22     organization that was -- that Osama bin Laden had a role in.  A

23     lot of that is kind of implicit when he describes

24     Osama bin Laden in the expert report.

25          The political situation in Saudi Arabia or Yemen or

```
 1    Iraq, those types of things are so integrated to the opinions
 2    in the report that, you know, he didn't spell all of those out,
 3    and I didn't want to have -- I don't think that's an issue of
 4    notice; it's a question of the particularity of what he's going
 5    to say about those things.  But in terms of topically -- and
 6    I'm happy to share the topics that I intend to elicit.  And I
 7    think they're, frankly, fairly put out in our papers, but I can
 8    be more granular to Mr. Carney after this.
 9               MR. CARNEY:  I would be happy to have the outline of
10    the direct exam, your Honor.
11               MR. CHAKRAVARTY:  Which, frankly, I'm tempted to do.
12    It's -- right now I have some of what I expect to elicit as an
13    answer, which I'll redact, and I'll be happy to give that to
14    you.
15               MR. CARNEY:  I don't understand that answer.
16               MR. CHAKRAVARTY:  I will give you a version of my
17    outline which I think will fairly capture the sequence of how
18    we'll go through it.
19               MR. CARNEY:  All right.  You can't do better than
20    that.
21               THE COURT:  I was just going to say that.
22               (Laughter.)
23               THE COURT:  Okay.  Well, I think we know where we are.
24    And, of course, objections to particular questions based on
25    what the testimony has been, for example, as well as what's in
```

1    the report are still obviously viable; for example -- and this

2    is just as an illustration, not because I think it will

3    necessary be an issue, but it could be -- consistent with

4    opinion, it's neither categorically excludable nor is it

5    automatically admissible.  It will depend on what the evidence

6    is and what the question is at the time.

7         So that's the kind of question I think there might be

8    a particular objection to, depending on what the evidence is.

9         MR. CARNEY:  I agree and understand.  The only

05:18 10    exception I would make is saying that the defendant is acting

11    consistent with.  That is, in my understanding, not going to be

12    solicited.

13         MR. CHAKRAVARTY:  It's not, your Honor.

14         THE COURT:  It won't be solicited?  Okay.  All right.

15    We'll see how it comes -- okay.  I'll just -- we'll see how it

16    comes.  But those are matters we may have to address as they

17    arise.

18         MR. CARNEY:  That's all I had, subject to one other

19    matter that --

05:19 20         THE COURT:  Does that resolve the issue on the

21    Kohlmann testimony, then?

22         MR. CARNEY:  I believe it does.  Yes, it does, your

23    Honor.

24         THE COURT:  All right.

25         MR. CHAKRAVARTY:  I don't mean to --

1          MR. CARNEY:  Did your Honor have anything else you

2    wanted to discuss?

3          THE COURT:  No.  I just wanted to tie that off, if

4    we've concluded the discussion of whether under Rule 702 the

5    evidence can be given.

6          MR. CARNEY:  If it would make the government feel more

7    comfortable, I'm prepared to say that I'm not asking for a

8    *Daubert* hearing on Evan Kohlmann.  I'm expecting him to be

9    called and start the train down the tracks.

05:19 10          THE COURT:  Okay.

11          MR. CHAKRAVARTY:  Thank you.

12          I don't know what other business we have, but one of

13    the things we've -- again, we recognize that either tomorrow

14    or, more likely, Monday the government intends to rest, which

15    would mean that the first witnesses from the defense,

16    especially the expert witnesses, will be testifying.

17          Based on both the disclosures and our request to

18    challenge some of the -- both the qualifications as well as

19    scope of some of the experts that the defense intends to --

05:20 20          THE COURT:  Well, as I think I indicated yesterday,

21    the defense may not have made final decisions on which experts

22    they're going to use until Kohlmann has testified.  I think it

23    would be not efficient to address people who aren't going to be

24    called.  So I think we'll just try to get to that -- but let me

25    ask in terms of order of witnesses:  Are you going to lead with

```
 1   experts --
 2           MR. CARNEY:  Yes.
 3           THE COURT:  -- or are you going to have family
 4   members?
 5           MR. CARNEY:  Experts, your Honor.  And the first
 6   expert will be Dr. Fadel.
 7           MR. CHAKRAVARTY:  Dr. Fadel.
 8           MR. CARNEY:  We're going to show the professionalism
 9   to the government that they showed us and be sure that they
10   know in -- a day or two in advance what the order of the
11   witnesses will be that we expect.  And we may be able to
12   indicate tomorrow who the second witness will be, for example.
13           MR. CHAKRAVARTY:  That would be appreciated.  The
14   issues from the government's preparation perspective is it
15   doesn't really make sense to argue over people who aren't going
16   to be called.  Let's assume -- and, you know, we recognize
17   things can change and it doesn't mean -- it may not be
18   Dr. Fadel who's the first witness.  But to have an opportunity
19   to raise a scope/702 issue before his testimony on Monday
20   morning while the jury's sitting there, I guess that's what we
21   wanted to avoid, if we could.
22           THE COURT:  We'll avoid what we can avoid.
23           MR. CHAKRAVARTY:  All right.
24           THE COURT:  Well, now -- I guess now, since that
25   witness has been identified, I guess perhaps you can confer and
```

1     see how much of a difference there might be in what you think

2     is admissible, what would be proffered and what the objections

3     might be, and maybe you can narrow any range of controversy.

4     Maybe we can address that tomorrow.

5          I will say that some time ago I went through the

6     summaries of -- given by the defense of their experts, and as a

7     general observation, I thought there was some matter that was

8     not problematic and other matter that was.  But I don't -- you

9     know, without -- I don't know particularly with respect to

05:22 10    Dr. Fadel whether that's the case or not.  I know it was

11    generally true of some of the witnesses.

12          MR. CHAKRAVARTY:  And I don't recall our particular

13    objections with regard to him.  I know that there were -- for

14    example, Professor Williams who -- in a prior well-meaning

15    iteration of their prospective list, he was going to be early

16    in their case.  I know the Court had expressed some concern at

17    the time, given the state of the disclosures and what he was

18    going to testify to.  I think this was -- he was going to

19    testify to the effect of videos in the Arab Muslim world.

05:23 20          Where if categorically -- or if there are specific

21    individuals who we don't have to prepare for, candidly, your

22    Honor, then that's what we want to -- because otherwise, we're

23    preparing now for seven, maybe eight experts on this weekend

24    while we're still kind of putting our case in.  That's what

25    we're trying to avoid.

1          MR. CARNEY:  The reason for the scheduling change,

2     your Honor, is that Fadel comes in from out of country.  So we

3     assured him he would be called, as best we can, on Monday or

4     Tuesday.

5          MS. BASSIL:  Monday.

6          MR. CARNEY:  If the case had been moving more quickly

7     and we had to call our first witness on Friday, we identified

8     Brian Williams because he's in-state.  So he has so much more

9     flexibility.  That's the reason for the change.  For a witness

05:23 10    like Brian Williams, we really won't be in a position to

11    address the content of his testimony until we hear both what

12    Kohlmann wants to say and what your Honor allows him to say.

13         THE COURT:  Apart from him, do you have some sense of

14    who the other expert -- what the order of the other experts

15    might be following Dr. Fadel?

16         MR. CARNEY:  Yes.

17         MS. PATEL:  Good afternoon, your Honor.

18         MR. CARNEY:  Our scheduler, among other things.

19    Plenty of roles.

05:24 20         MS. PATEL:  Too many.

21         Tentatively, and this is -- and I do apologize, it's

22    very -- because all of our -- they're professors, so their

23    schedules and travel schedules have been variable.  But

24    assuming the government does, in fact, close, hopefully,

25    Friday, but if not, Monday, we think it will be Professor

```
 1    Fadel, followed by Professor March, then we'll see how

 2    slow -- where we are in terms of timing.  And then it will be

 3    some mix of Durlauf -- Dr. Durlauf, Dr. -- Mr. Johnson, and

 4    Brian Williams -- Dr. Williams, and then Dr. Sageman.

 5            THE COURT:  I thought Durlauf was only a

 6    Daubert-related expert.  No?

 7            MS. PATEL:  No, your Honor.  And that will also depend

 8    on what we hear from Mr. Kohlmann tomorrow.

 9            THE COURT:  Okay.  Was there something else you wanted

05:25 10   to raise?

11            MR. CARNEY:  I wonder if I could just approach the

12    sidebar off the record with Mr. Chakravarty, please?

13            THE COURT:  Okay.

14            MR. CARNEY:  We have nothing more on the case to talk

15    about.

16            THE COURT:  Okay.  So that concludes the hearing?

17            MR. CARNEY:  Yes, it does, your Honor.  From my

18    perspective.

19            THE CLERK:  Court is in recess.

05:25 20           (The Court exits the courtroom and the proceedings

21    adjourned at 2:35 p.m.)

22

23

24

25
```

1          C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  December 1, 2011

17

18

19

20

21

22

23

24

25