UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 ) Criminal Action
v.                               ) No. 09-10017-GAO
                                 )
TAREK MEHANNA,                   )
                                 )
        Defendant.               )
                                 )



BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWENTY-EIGHT
JURY TRIAL



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, December 6, 2011
9:09 a.m.



Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2      OFFICE OF THE UNITED STATES ATTORNEY
       By: Aloke Chakravarty and Jeffrey Auerhahn,
3         Assistant U.S. Attorneys
       John Joseph Moakley Federal Courthouse
4       Suite 9200
       Boston, Massachusetts  02210
5       - and -
       UNITED STATES DEPARTMENT OF JUSTICE
6       By: Jeffrey D. Groharing, Trial Attorney
         National Security Division
7       950 Pennsylvania Avenue, NW
       Washington, D.C.  20530
8       On Behalf of the Government

9      CARNEY & BASSIL
       By: J.W. Carney, Jr., Esq.
10       Janice Bassil, Esq.
         John E. Oh, Esq.
11      20 Park Plaza
       Suite 1405
12      Boston, Massachusetts  02216
       - and -
13      LAW OFFICE OF SEJAL H. PATEL, LLC
       By: Sejal H. Patel, Esq.
14      101 Tremont Street
       Suite 800
15      Boston, Massachusetts  02108
       On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                    DIRECT   CROSS   REDIRECT   RECROSS
   WITNESSES FOR THE
3    GOVERNMENT:

4  EVAN F. KOHLMANN, resumed

5      By Mr. Carney              7                129
       By Mr. Chakravarty              103
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (The following proceedings were held in open court

2    before the Honorable George A. O'Toole, Jr., United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Boston, Massachusetts, on December 6, 2011.

6           The defendant, Tarek Mehanna, is present with counsel.

7    Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8    are present, along with Jeffrey D. Groharing, Trial Attorney,

9    U.S. Department of Justice, National Security Division.)

10          THE CLERK:  All rise for the Court.

11          (The Court enters the courtroom at 9:09 a.m.)

12          THE COURT:  Good morning.

13          THE CLERK:  Please be seated.

14          THE COURT:  We have an issue with one of the jurors

15    who phoned in, spoke to the clerk, said there was a family

16    emergency, she would not be able to be here today, could not

17    predict beyond today whether she would be available.  I don't

18    think we have any choice really but to let her go or suspend

19    the trial until we find out something.

00:00 20          MS. BASSIL:  Who is it?

21          MR. CARNEY:  May I have a moment to have some private

22    time with the client, probably in the back, to discuss this

23    with him, because it's a pretty important decision.  With your

24    permission, your Honor.

25          THE COURT:  I'll tell you which juror it is.

1          MS. BASSIL:  Yes.

2          THE COURT:  It is Juror No. 63 in Seat 13, Rachel

3   Reagan.  She's the woman from Oak Bluffs.

4          MS. BASSIL:  Oh, okay.

5          THE COURT:  All right.  So I'll give you a chance to

6   absorb that --

7          MR. CARNEY:  Can we --

8          THE COURT:  -- but keep the clock in mind.

9          MR. CARNEY:  We'll do it within five minutes.  Thank

00:01 10  you.

11         THE COURT:  All right.

12         THE CLERK:  All rise for the Court.

13         (The Court exits the courtroom and there is a recess

14  in the proceedings at 9:10 a.m.)

15         THE CLERK:  All rise for the Court.

16         (The Court enters the courtroom at 9:25 a.m.)

17         MR. CARNEY:  Thank you, your Honor.  We did have a

18  chance to speak with our client, and after discussing with him

19  the issue, the rights he has under the Constitution, his

00:16 20  options, I am reporting to the Court that he agrees that the

21  missing juror should be excused and the alternate be a

22  substitute.  I believe he's made that decision knowingly,

23  voluntarily and intelligently after ample time to discuss the

24  issue with counsel.

25         THE COURT:  Okay.

1          MR. CARNEY:  Do you have any other questions for me?

2          MR. CHAKRAVARTY:  No objection, your Honor.

3          THE COURT:  Okay.

4          MR. CARNEY:  Sorry?

5          (There is an audio interruption.)

6          THE COURT:  I believe some radio said it.

7          Well, I think that is the course to take.  I mean, it

8     is uncertain.  I'm not sure whether it would be wise to even

9     skip the day, but we're not sure whether it would be more than

00:17 10   today.  And it's the reason we have alternates.  So I think

11    we'll proceed with the 15.

12          (Pause.)

13          THE CLERK:  All rise for the jury.

14          (The jury enters the courtroom at 9:27 a.m.)

15          THE CLERK:  Please be seated.

16          THE COURT:  Good morning, jurors.

17          THE JURORS:  Good morning.

18          THE COURT:  Mr. Clerk has told you that,

19    unfortunately, one of the jurors had a family emergency and

00:19 20   will be unable to continue serving, so he's excused and we'll

21    continue with the rest of you, okay?

22          Resuming with the evidence, where are we?  Mr. Carney.

23          MR. CARNEY:  May I proceed?

24          THE COURT:  Yes, please.

25                    EVAN F. KOHLMANN, resumed

1                    CONTINUED CROSS-EXAMINATION

2      BY MR. CARNEY:

3      Q.    Good morning, Mr. Kohlmann.

4      A.    Good morning.

5      Q.    Yesterday you briefly touched on the situation in the

6      country of Yemen?  Is that correct?

7      A.    That's correct; yes.

8      Q.    And you indicated earlier that you've never been to Yemen

9      and you also don't speak Arabic, correct?

00:20 10    A.    I don't speak Arabic fluently.

11     Q.    Do you consider yourself an expert on Yemen?

12     A.    Certain aspects of Yemen.

13     Q.    You rely on news articles to get information about Yemen,

14     don't you?

15     A.    No.

16     Q.    Did you provide the government with a Yahoo News article

17     earlier this week?

18     A.    I don't recall.

19     Q.    Prior to the year 2001 al Qa'ida existed in Yemen, did it

00:20 20    not?

21     A.    It did.  Yes, that's correct.

22     Q.    After 9/11 President Saleh of Yemen came to the United

23     States, did he not?

24     A.    He did.  That's correct.

25     Q.    In November of 2001 he met with President George Bush?

1   A.   That's correct.

2   Q.   And he made a commitment to eliminate al Qa'ida from

3   Yemen?

4   A.   I believe he did.  That's correct.

5   Q.   Indeed, he was given a list of people who were considered

6   the leadership of al Qa'ida in Yemen, and he promised that he

7   would target them to either arrest them, jail them or eliminate

8   them.  Is that correct?

9   A.   I wasn't at the meeting, but that's my understanding, yes.

00:21 10   Q.   He and his government cooperated thereafter with the U.S.

11   military in conducting drone attacks in Yemen?

12   A.   That's correct; yes.

13   Q.   And by "drone attacks," we mean a pilotless plane that is

14   able to fly over an area with cameras so that the operators can

15   see below, correct?

16   A.   That's correct; yes.

17   Q.   Some of these drones are for surveillance purposes,

18   correct?

19   A.   Correct.

00:21 20   Q.   Other drones carry armaments and so can actually fire on a

21   target below?

22   A.   Correct.

23   Q.   And President Saleh and his government cooperated in

24   allowing drones to operate in Yemen.  Is that right?

25   A.   At least to a certain extent that's correct; yes.

1    Q.    There is no evidence that training camps existed in Yemen

2    after November of 2001 and before February of 2006?

3    A.    No; that's incorrect.

4    Q.    Well, the head of al Qa'ida in Yemen was being pursued

5    after November of 2001, correct?

6    A.    That's correct.

7    Q.    As was his deputy chief, correct?

8    A.    That's correct.

9    Q.    They were on the run, correct?

00:22 10   A.    That's correct.

11   Q.    And, indeed, that head of al Qa'ida in Yemen was himself

12   killed in a drone attack, was he not?

13   A.    He isn't universally -- he was never sworn as the mirror

14   of al Qa'ida; he is considered by U.S. authorities to have been

15   the rough leader of al Qa'ida, that's correct, in Yemen.

16   Q.    I don't think that was my question.  My question was:  Was

17   the leader of al Qa'ida in Yemen killed by a drone attack?

18   A.    I can't answer that with a yes-or-no answer.

19   Q.    Okay.  And al Qa'ida as an organization basically ceased

00:23 20   to operate as any organized terrorist organization.

21   A.    No; that's incorrect.

22   Q.    Now, many of the members of al Qa'ida were killed, were

23   they not?

24   A.    That's true, yes.

25   Q.    Others arrested and jailed in a Yemeni prison.  Isn't

1   that correct?

2   A.   That's correct, over a space of about two years.

3   Q.   And those prisoners were held until February of 2006,

4   weren't they?

5   A.   That -- well, the ones who were arrested.  That's correct;

6   yes.

7   Q.   They were held in a prison?

8   A.   That's correct.  In Sanaa.

9   Q.   And there was an infamous prison break in February of

00:24 10   2006.  Isn't that correct?

11   A.   That's correct; yes.

12   Q.   And it was led by the -- by a person who formerly had

13   worked with Osama bin Laden, correct?

14   A.   That's correct.

15   Q.   He basically was the head of the al Qa'ida group that was

16   in this prison, wasn't he?

17   A.   If you're referring to Abu Basir al-Wahishi, that's

18   correct; yes.

19   Q.   And what they did is, undoubtedly with assistance,

00:24 20   tunneled out of that prison to a nearby mosque.  Is that right?

21   A.   I don't know whether or not they received assistance.

22   It's likely, but it's not been proven.

23   Q.   And after this all of these folks were back in operation

24   in Yemen, were they not?

25   A.   That's correct; yes.

1    Q.    Now, I'd like to talk to you about a subject that you

2    brought up initially on Friday, and that's the concept of peer

3    review.  Do you recall that?

4    A.    Yes.  Yes, sir.

5    Q.    And you mentioned that your work has been subject to peer

6    review?

7    A.    That's correct; yes.

8    Q.    Now, what peer review means, as that's used in an academic

9    or scholarly environment, is that a written work is reviewed by

00:25 10    experts in the field --

11    A.    That's correct.

12    Q.    -- who determine if it is accurate and worthy of

13    publication as a book or an article?

14    A.    That's correct; yes.

15    Q.    You pointed out an individual in the courtroom on Friday,

16    Dr. Marc Sageman, correct?

17    A.    That's correct; yes.

18    Q.    You've known him for many years, right?

19    A.    No, I've only known him for about -- personally, I've only

00:25 20    known him for about three years.

21    Q.    You're aware of his background, aren't you?

22    A.    I am, yes.

23    Q.    He has a BA degree from Harvard, a master's degree, an

24    M.D. degree as a medical doctor, and a Ph.D.  Is that correct

25    to the best of your knowledge?

1    A.    To the best of my knowledge that's correct; yes.

2    Q.    Were you aware that he is the special advisor to the

3    deputy chief of staff for the army for intelligence in the

4    Pentagon?

5    A.    I'm aware of that now.

6    Q.    And you're aware now that he formerly worked for the CIA

7    from 1984 to 1991 as a full-time agent or employee?

8    A.    I was aware of that previously.

9    Q.    And in that capacity in working for the CIA, he had

00:26 10   postings in Afghanistan and Pakistan?

11   A.    I believe that's correct.

12   Q.    I'd love to ask you about whether you've seen "Charlie

13   Wilson's War," but if there's an objection, will it be

14   sustained?

15         MR. CHAKRAVARTY:  There will be an objection, your

16   Honor.

17         THE COURT:  Yes, it will be.

18         (Laughter.)

19   BY MR. CARNEY:

00:26 20   Q.    You would agree that he is a well-qualified expert in the

21   area of terrorism?

22   A.    On certain aspects of the area of terrorism, in my

23   opinion, anyway.

24         MR. CHAKRAVARTY:  Objection, your Honor.  I would

25   object and ask your Honor to make decisions as to what

1    testimony should be admitted as expert testimony.

2            THE COURT:  Yeah.  Yes, the objection to that question

3    is sustained and the answer is stricken.

4            MR. CARNEY:  Well, I'm not asking him if he's going to

5    be admitted as an expert, your Honor, just whether he's well

6    qualified.

7            THE COURT:  The witness's opinion about his level of

8    expertise is irrelevant.

9            MR. CARNEY:  All right.

00:27 10   BY MR. CARNEY:

11   Q.   Now, you've testified that when you publish an article you

12   send it -- or are going to publish an article, you send it to

13   dozens of people as an attachment to a mass email.  Is that

14   right?

15   A.   Well, yes, unless there's a formal process of peer review.

16   Q.   And you consider that to be a form of peer review, you've

17   testified in the past, haven't you?

18   A.   That's correct.  It's a less-formal process of peer

19   review, but it engenders the same general process, which is

00:27 20   that you're submitting a paper for review by other experts and

21   you're taking their comments and their feedback and you're

22   incorporating it into the paper.

23   Q.   Let's see if that's accurate.  The peer-review process

24   that you described earlier would be done by the publisher of a

25   book or article, right?

1  A.   That's how my book was -- that's the formal peer-review

2  process.

3  Q.   Well, let's just -- if you can answer my question "yes" or

4  "no," we'll move along more quickly.

5  A.   I didn't understand what the question was.

6  Q.   All right.  I'll repeat it.

7  A.   Yeah.

8  Q.   The process of peer review that you described earlier is

9  one where an article or a book is sent out by the publisher to

00:28 10  a group of experts for review to determine if it is accurate

11  and worthy of publication.  Is that --

12  A.   You're referring to the formal process of peer review?

13  Q.   Yes.

14  A.   Yes; that's correct.

15  Q.   Well, that's how "peer review" is defined, is it not?

16  A.   That is the formal -- you asked whether or not I

17  was -- you referred to something I'd said earlier, and I wasn't

18  clear whether you were talking about informal peer review

19  versus formal peer review.

00:29 20  Q.   When peer review is done of an article by a publisher,

21  it's intended to be sent to people who will report on that book

22  or article anonymously to the publisher, correct?

23  A.   I believe so.  That's correct; yes.

24  Q.   And the idea behind that is that the publisher will get

25  independent feedback on whether the book is accurate or well

 1  written or sensationalistic or whatever, correct?

 2  A.    That's correct.

 3  Q.    And it may well be that these peer reviewers are

 4  individuals in the same field as the author.  Isn't that true?

 5  A.    I believe they typically are, yes.

 6  Q.    And that degree of anonymity protects a colleague who

 7  wants to say "This book really is not very good and should not

 8  be published because the research is inadequate, the writing is

 9  poor, and the analysis is very sketchy"?

00:30 10  A.    Sort of.  The anonymity does not really hold up over time.

11  Q.    Well, the intent is for a colleague to speak candidly,

12  correct, to the public?

13  A.    That's the intent, yes.

14  Q.    Now, when a publisher makes an arrangement to have

15  something peer-reviewed, he has contacted the person who's

16  going to be a peer reviewer and made arrangements for the

17  person to review the book or article, right?

18  A.    That's correct; yes.

19  Q.    He asks if the person is willing to do so, right?

00:30 20  A.    That's correct; yes.

21  Q.    In some instances they even compensate someone for peer

22  review.  Isn't that right?

23  A.    Typically they always compensate people for peer review.

24  Q.    So it's a formal process.

25  A.    Like I said, in the formal process of peer review.  That's

 1    correct; yes.

 2    Q.   When you send a mass emailing with an attachment to it,

 3    you're basically telling people in the field, "This is

 4    something I'm going to publish," correct?

 5    A.   No.  "This is something" --

 6    Q.   Or, "This is something I'm going to have published."

 7    A.   "This is something I've written."

 8    Q.   And they're under no obligation to give you any feedback,

 9    correct?

00:31 10   A.   No, they're not under any obligation.

11    Q.   You don't pay them any money?

12    A.   I generally don't pay people to read papers that I'm

13    working on, no.

14    Q.   And you don't ask them to give you a formal peer review of

15    the work, do you?

16    A.   Again, it depends on the context.  If something is being

17    published in a formal peer-reviewed journal like *African*

18    *Security*, it must be peer-reviewed in a formal process.

19    Q.   Is that done by you or the publisher?

00:31 20   A.   It's done by the publisher.

21    Q.   Okay.  I'm talking about when you send out a mass email

22    saying, "Here's the latest things I've written," all right?

23    A.   Right.

24    Q.   People are under no obligation to tell you whether it's

25    the greatest thing ever written or a piece of crap, right?

1    A.    Maybe I should clarify --

2    Q.    Are they under any obligation?  Try to listen carefully to

3    my question because I'm trying to ask it carefully.

4          They're under no obligation to tell you whether it's a

5    great piece of writing or it's a piece of crap, right?

6    A.    They're not under any obligation, no.

7    Q.    Okay.  Now, you've claimed that virtually everything you

8    write is carefully reviewed by colleagues, correct?

9    A.    Either through a formal process of peer --

00:32 10   Q.    Mr. Kohlmann, have you said that virtually everything you

11   write is carefully reviewed by colleagues?

12   A.    That's correct; yes.

13   Q.    And you described this at a trial that you testified at as

14   being a form of peer review, correct?

15   A.    It's an informal process of peer -- well, it depends,

16   because some of the stuff I write is formally peer-reviewed and

17   some of it is informally peer-reviewed, so it depends on what

18   you're referring to.

19   Q.    I'm referring, Mr. Kohlmann, to the fact that you

00:33 20   testified at a trial that sending documents to colleagues is a

21   form of peer review that you use.

22   A.    That's correct.  It is.

23   Q.    Okay.  And at that trial you specifically identified

24   Dr. Mohammed Hafez as someone who does this peer review,

25   correct?

```
 1    A.    At the time he was someone who --

 2    Q.    Mr. Kohlmann, please.  I want to get through this.  At the

 3    trial did you specifically identify Dr. Mohammed Hafez as

 4    someone who did this peer review?

 5    A.    I identified him as someone who had done a peer review of

 6    something that I had sent to him.  That's correct.

 7    Q.    Did you identify him as a close colleague of yours?

 8    A.    I identified him as a colleague, yes.

 9    Q.    Okay.  Please listen to my question.  Did you identify him

10    as a close colleague of yours?

11    A.    I recall identifying him as a colleague.  I don't know if

12    I used the word "close" or not.

13              MR. CARNEY:  May I approach the witness, please?

14              THE COURT:  You may.

15              MR. CHAKRAVARTY:  What is it?

16              (Counsel confer off the record.)

17    BY MR. CARNEY:

18    Q.    Mr. Kohlmann, I would ask you to take a look at this

19    document to yourself, okay?  And then let me show you -- would

20    you read what I've highlighted here in this paragraph?

21    A.    Sure.

22    Q.    Read it to yourself, please.

23    A.    Okay.

24    Q.    Just this portion.

25    A.    (Witness complies.)
```

1    Q.    At this trial did you identify Dr. Mohammed Hafez as a

2    close colleague of yours?

3    A.    That's what the transcript indicates.  I recall

4    identifying him as a colleague.  I'm not sure if I used the

5    word "close" or not.

6    Q.    Do you have any reason to dispute this transcript?

7    A.    I don't know.  I don't know.

8    Q.    You also said he was a fluent Arabic speaker, correct?

9    A.    That's correct; he is.

00:35 10   Q.    Who had closely reviewed your work, correct?

11   A.    He had reviewed my work.  That's correct.

12   Q.    Now, about nine days later you were given an affidavit by

13   Dr. Hafez, right?

14   A.    That's correct; yes.

15   Q.    And an affidavit is a document containing information that

16   is sworn under oath, correct?

17   A.    That's correct.

18        MR. CHAKRAVARTY:  Objection, your Honor.  Can we

19   approach?

00:35 20        THE COURT:  All right.

21        (Discussion at sidebar and out of the hearing of the

22   jury:)

23        MR. CHAKRAVARTY:  Your Honor, from this setup it

24   appears that counsel is both establishing a foundation for

25   extrajudicial statements about the witness's work in the

```
 1    peer-review process or in something else, which clearly there's
 2    an affidavit here; he talked about Mr. Sageman at length in
 3    terms of establishing him as a peer.  It appears this line of
 4    questioning is now starting to embark upon what I anticipate,
 5    without knowing, what other witnesses or non-witnesses have
 6    said about this witness's prior work for the truth of the
 7    matter as to whether -- so the government is going to object.
 8           MR. CARNEY:  I'm offering it for the impact on the
 9    state of mind of the witness.  At this time the witness
10    continues to say that Dr. Hafez is a colleague who does a
11    close review of his work.  He knows that's not true.  He
12    continues to say it even in the face of an affidavit submitted
13    by someone -- by Dr. Hafez who says, "I am a professor.  I am
14    not a close colleague of Mr. Kohlmann.  I have never reviewed
15    his work."  And that affidavit --
16           THE COURT:  Well, you could call Dr. Hafez to say
17    that, but I don't think you can do it through hearsay.
18           MR. CARNEY:  I'm not offering it for its truth --
19           THE COURT:  Yes, you are.
20           MR. CARNEY:  -- but the impact on this witness's state
21    of mind.
22           THE COURT:  No.  The objection is sustained.
23           (In open court:)
24           MR. CARNEY:  So I'll need to call Mr. Hafez as a
25    witness in person?
```

```
 1              THE COURT:  The objection is sustained.  We'll move to
 2    a new area.
 3    BY MR. CARNEY:
 4    Q.   Do you continue to say that Dr. Hafez is a close colleague
 5    of yours?
 6              MR. CHAKRAVARTY:  Objection, your Honor.
 7              THE COURT:  Sustained.
 8    BY MR. CARNEY:
 9    Q.   Is he a close colleague of yours today?
10              MR. CHAKRAVARTY:  Objection, your Honor.
11              THE COURT:  You may answer that.
12              THE WITNESS:  Today?  The last time I saw Dr. Hafez
13    was at a conference about a year ago but --
14    BY MR. CARNEY:
15    Q.   Mr. Kohlmann, please.  The question is:  Is he a close
16    colleague of yours today?  You can either answer it "yes,"
17    "no," "I don't understand the question" or "I can't answer it
18    yes or no."
19    A.   It depends what you mean by "close colleague."
20    Q.   How do you define a close colleague?
21    A.   Someone who offers to -- or who asks me to work on a joint
22    project with them, like Dr. Sageman or Dr. Hafez.
23    Q.   So you consider today Dr. Hafez to be a close colleague of
24    yours?
25    A.   No, not -- I don't think "close" would be the word.  But
```

00:38 (line 10)
00:38 (line 20)

```
 1   Dr. Hafez and Dr. Sageman continue --
 2            MR. CARNEY:  Can the Court instruct the witness,
 3   please, if the question can simply be answered "yes" or "no" --
 4            THE COURT:  I think the witness may understand that
 5   because he said if it can be "yes," that's an appropriate way
 6   to answer; if it needs qualification, the witness may qualify
 7   it.
 8   BY MR. CARNEY:
 9   Q.   So you can't answer that question "yes" or "no"?
10   A.   It's not that simple.  It depends on what you mean by
11   "close colleague."
12   Q.   Let me move on to another question.  Do you continue to
13   contend today that Dr. Hafez does a close review of your work?
14   A.   No, not recently.  I haven't -- ever since about 2008 --
15   Q.   Mr. Kohlmann, "no" is the answer, right?
16   A.   I believe as of today the answer is probably "no."
17   Q.   Probably or certainly?
18   A.   Well, he's still a colleague of mine.  I just don't submit
19   papers to him on a regular basis.
20   Q.   Mr. Kohlmann, does he do a close review of your work now?
21   A.   Not recently, no.
22   Q.   Now, on Friday you said another way that you have peer
23   review is that you speak at conferences and people get to ask
24   you questions at the conference.
25   A.   I present at conferences.  That's correct.
```

00:39 (lines 10, 20)

1    Q.   And people get to ask you questions who are in the

2    audience?

3    A.   Correct.

4    Q.   And that's another example in your mind of peer review,

5    correct?

6    A.   Informal peer review, yes.

7    Q.   But not the way peer review is considered by the rest of

8    the scientific community.

9    A.   I'm not sure about that.

00:40 10         MR. CHAKRAVARTY:  Your Honor.

11   BY MR. CARNEY:

12   Q.   You're not sure about that?  Okay.

13        Now, you mentioned at other times --

14         THE COURT:  Wait a minute.

15         MR. CHAKRAVARTY:  Your Honor, there's an objection to

16   the witness being asked to elicit what the rest of the

17   scientific community feels about --

18         THE COURT:  Well, the answer will stand.

19         Go ahead.

00:40 20   BY MR. CARNEY:

21   Q.   You mentioned at other times that you submitted, on

22   occasion, an article to the journal *Foreign Affairs*, correct?

23   A.   The *Journal of Foreign Affairs*.

24   Q.   To the magazine *Foreign Affairs*.

25   A.   *Foreign Affairs*?  Sorry.  I thought you were saying the

1   *Journal of Foreign Affairs.  Foreign Affairs* you're talking

2   about, correct?

3   Q.   What is *Foreign Affairs?*  Is it a journal?

4   A.   Yeah, it is a journal, but the title is not *Journal of*

5   *Foreign Affairs.*  Sorry.  I didn't understand what you were

6   saying.

7   Q.   When I said you submitted an article to the journal

8   *Foreign Affairs*, you didn't understand what I meant?

9   A.   I thought you said *Journal of Foreign Affairs.*  I wasn't

00:41 10   sure what that was.

11   Q.   You're aware of what *Foreign Affairs* is.

12   A.   The magazine *Foreign Affairs.*  Yes, I'm familiar with

13   that.

14   Q.   Is that a journal?

15   A.   I don't know what the definition of "journal" specifically

16   is.  It depends on your definition, I guess.

17   Q.   You submitted an article to it, correct?

18   A.   I was asked to write something for *Foreign Affairs.*

19   Q.   Mr. Kohlmann, did you submit an article to it?  Yes or no?

00:41 20   A.   I guess the answer would be yes.

21   Q.   And you've previously testified that to submit an article

22   to *Foreign Affairs* requires a long process of peer review,

23   correct?  Have you said that?

24   A.   There was a process of peer review involved in that, yes.

25   Q.   Have you said that?  You said it's proofread and looked

1  over and edited by a variety of people, including their senior

2  editors, right?  You've said that, right?

3  A.   That's true, yes.

4  Q.   Now, like most publications, *Foreign Affairs* informs its

5  authors of its policies on its website, correct?

6  A.   I believe so.

7  Q.   And that policy says it welcomes unsolicited manuscripts,

8  correct?

9  A.   That's correct.

00:42 10  Q.   And it says in the policy, "We do not have fact-checkers

11  and rely on authors to ensure the voracity of their

12  statements," doesn't it?

13  A.   It may say that on their website.

14        MR. CARNEY:  May I approach, please?

15        MR. CHAKRAVARTY:  Your Honor, I'm not sure what the

16  purpose of this approach is.  It's not refreshing recollection;

17  it's not impeaching.

18        MR. CARNEY:  It qualifies the answer.  I want to see

19  if I can refresh his recollection.

00:43 20        THE COURT:  Go ahead.

21  BY MR. CARNEY:

22  Q.   Would you read this sentence to yourself that I'm pointing

23  to?  Do you see where I'm pointing?

24  A.   Yes.

25  Q.   So, in fact, the quote I gave was exactly the wording from

1    the website, wasn't it?

2    A.   It is exactly the wording from the website.

3    Q.   It also states that it reviews manuscripts on a rolling

4    basis, doesn't it?

5    A.   I didn't read that part.

6    Q.   All right.  Do you remember it saying that in the -- on

7    the website?

8    A.   I didn't submit my --

9    Q.   Did you remember reading that on the website?

00:43 10   A.   I haven't visited the website for *Foreign Affairs* in a

11   long time.

12   Q.   Would you read the first sentence, please, to yourself?

13   A.   (Witness complies.)

14   Q.   So it says it reviews manuscripts -- or accepts

15   manuscripts on a rolling basis rather than on a fixed time

16   frame.  Is that correct?

17   A.   Yeah, it says that on the website.  That's correct; yes.

18   Q.   So this rolling time frame means that they may accept a

19   manuscript and publish it months later, correct?

00:44 20   A.   That's what it says on the website.

21   Q.   And that can obviously lead to a long delay, correct?

22   A.   I don't know.  I didn't submit my manuscript through the

23   website, so I don't know.

24   Q.   If a publication has a fact-checker, then that is an

25   individual who is going to look at the article and make sure

1    the facts stated in the article are correct.  Is that true?

2    A.    Presumably, yes.

3    Q.    Publications such as the *New Yorker* are legendary for

4    having their fact-checkers.  Isn't that true?

5    A.    I have no idea.  I've never written for the *New Yorker*.

6    Q.    Are you familiar with the magazine?

7    A.    I've read the *New Yorker*, yes.

8    Q.    And are you familiar with their reputation for

9    fact-checking for accuracy?

00:45 10   A.    No, I'm not familiar with their policy about that.

11   Q.    If a publisher has fact-checkers who are going to check

12   the voracity of statements in an article submitted, then that

13   is having someone independent, like peer-review, determine if

14   the article is accurate, correct?

15   A.    I don't know.  I have no --

16   Q.    Do you know what fact-checkers do?

17   A.    I know what fact-checkers do, but I don't know if I can

18   compare them to the process of peer review.

19   Q.    Well, you said under oath in a previous trial that *Foreign

00:45 20  *Affairs* does do peer review before publication.

21   A.    Well, my piece was.  But I don't know -- I don't know

22   about others.  I know that my --

23   Q.    So normally they trust an author is accurate when the

24   author submits the publication, but in your case they wanted to

25   have someone check it to see if it was accurate because you

1    were a special case?

2              MR. CHAKRAVARTY:  Objection, your Honor.

3              THE COURT:  Sustained.

4    BY MR. CARNEY:

5    Q.   You said that it does do peer review.  You said *Foreign*

6    *Affairs* does do peer review of articles before publication.

7    A.   If I said that, I misspoke.  I was applying specifically

8    to what I had written because my only experience with *Foreign*

9    *Affairs* was submitting pieces to *Foreign Affairs* or having

00:46 10   solicited from me to have something to submit was in that case

11   that I did.  I know what happened with my presentation to

12   *Foreign Affairs* -- my two presentations to *Foreign Affairs*, and

13   then the invitation for me to write something for *Foreign*

14   *Affairs.*  But I certainly can't speak to the general process

15   because that's not -- I don't work for *Foreign Affairs.*  I

16   don't write regularly for *Foreign Affairs.*  I was asked to

17   write something for them after giving presentations in front of

18   their general committee.

19   Q.   And you said when you testified at a trial that *Foreign*

00:47 20   *Affairs* does an extensive long process of peer review before

21   publishing an article.

22   A.   Again --

23   Q.   That was just a misstatement by you.  Is that right?

24   A.   It wasn't a misstatement; it was --

25   Q.   Didn't you say, like, one minute ago, "I misspoke"?

```
 1   A.   It was applying to the process that I went through to

 2   submit my piece.  I hadn't read their website.  I certainly

 3   hadn't read the page you just showed me.  I was only familiar

 4   with the process inasmuch that I participated in it.  And I

 5   was -- again, I was asked to write something for them after

 6   making presentations in front of their executive committees.

 7   Q.   Isn't it the truth, Mr. Kohlmann, that Foreign Affairs,

 8   just like its website says, doesn't do fact-checking, relies on

 9   the voracity of its authors, and you simply said that Foreign

10   Affairs does a long process of peer review in order to make you

11   look more like an expert?

12        MR. CHAKRAVARTY:  Objection, your Honor.  Whatever we

13   know about Foreign Affairs is hearsay, your Honor.

14        THE COURT:  Well, that may be true, that the website

15   is hearsay.  But the witness has already answered the question,

16   so I see no harm in answering it again, but let's then move to

17   something new.

18        MR. CARNEY:  All right.  I'll withdraw the question.

19   BY MR. CARNEY:

20   Q.   But before we leave that article, do you remember the

21   article was one that was critical of the U.S. government

22   intelligence community?

23   A.   That's correct.  It was.

24   Q.   And in particular, how they dealt with jihadi websites?

25   A.   That's correct.
```

```
 1   Q.   And at the end of that article, at the beginning of the
 2   last paragraph, didn't you say "Deciphering these websites will
 3   require not just internet savvy but also the ability to read
 4   Arabic"?
 5   A.   That's correct.  Yes.
 6   Q.   I'd like to return very briefly to your testimony
 7   yesterday about your having a degree in Islam.  Do you remember
 8   when you said that?
 9   A.   Actually, I think I said it was a certificate.  I think
10   you said it was a degree.
11   Q.   No, remember I said in -- I showed you the transcript of
12   the radio interview and you were the one who twice said, "I
13   have a degree in Islam," right?
14   A.   I did say that as shorthand; that's correct.
15   Q.   And yesterday you said your certificate is a degree in
16   Islam.
17   A.   It is a physical degree.
18   Q.   In fact, you said, like a sheepskin that you put on the
19   wall that shows you graduated.
20   A.   No, I didn't say that.
21   Q.   Well, you said it's hanging on your wall, right?
22   A.   I didn't say it was a sheepskin.  I did say it was hanging
23   on my wall.  It's part of my diploma.  It's a secondary
24   diploma.
25   Q.   Now, every university, and Georgetown's included,
```

00:49 (line 10)
00:50 (line 20)

1    publishes a bulletin, correct?

2    A.    That's correct.

3    Q.    And this describes the programs that are offered at the

4    university?

5    A.    That's correct.

6    Q.    And Georgetown has what's called an undergraduate

7    bulletin, right?

8    A.    That's correct.

9    Q.    And to you knowledge, it talks about the certificate

00:50 10    program, correct?

11    A.    I'm only familiar with the bulletin as of 2001.  I haven't

12    read the bulletin, if there's been any changes made since then.

13    Q.    Are you aware of any changes in the certificate program

14    since it started?

15    A.    There have been some changes in some of the certificate

16    programs, but I'm honestly not familiar with the details of

17    those because I haven't been a student at Georgetown in over a

18    decade.

19    Q.    Well, let me tell you if this sounds familiar -- or ask

00:51 20    you if it sounds familiar, please.

21         MR. CHAKRAVARTY:  Objection, your Honor.

22         THE COURT:  Sustained.

23    BY MR. CARNEY:

24    Q.    Isn't it a fact, Mr. Kohlmann, that according to

25    Georgetown, certificate programs carry no special weight as

1    academic credentials outside the immediate university

2    community?

3              MR. CHAKRAVARTY:  Objection, your Honor.

4              THE COURT:  Sustained.

5    BY MR. CARNEY:

6    Q.   When you were a student was it the policy at Georgetown

7    that certificate programs carry no special weight as academic

8    credentials outside the immediate university community?

9    A.   I don't recall any such statement, no.

00:51 10   Q.   When you describe it as a degree in Islam, just to be

11   sure, that's incorrect, isn't it?

12   A.   Again, I think I covered this yesterday.  When I said it

13   was --

14   Q.   No.  Mr. Kohlmann, it's incorrect to say you have a degree

15   in Islam, isn't it?

16             MR. CHAKRAVARTY:  Your Honor, I think this was asked

17   and answered yesterday.

18             THE COURT:  Sustained.

19             MR. CARNEY:  I'm just trying to wrap up this

00:52 20   certificate talk today.

21             THE COURT:  No, we had it yesterday.  The objection is

22   sustained.

23   BY MR. CARNEY:

24   Q.   I'd like to ask you a few questions, Mr. Kohlmann, about

25   the payment you receive for being an expert for the government.

```
 1   A.   Of course.

 2   Q.   Now, being an expert witness for the United States

 3   government has been a pretty lucrative part of your career,

 4   hasn't it been?

 5   A.   I mean, if I'd really wanted to make money, I could have

 6   been a lawyer.  It hasn't been altogether that lucrative.

 7   Q.   Well, let's find out.

 8        (Laughter.)

 9   Q.   You do know, by the way, that Attorney Bassil and I are

10   court appointed in this case?

11   A.   Oh, I wasn't referring to you.

12   Q.   Oh, no, of course not.

13        (Laughter.)

14   Q.   But you're aware we're court appointed --

15   A.   Like I said, I wasn't referring to you.  I was referring

16   to myself.

17   Q.   -- and get 20 percent of our normal hourly rate?

18   A.   I should be clear, I was referring to myself.  I could

19   have become a corporate lawyer; I didn't.

20   Q.   Now, sometimes when you are an expert witness you bill by

21   the hour, correct?

22   A.   Almost invariably I think I -- except for U.S. military I

23   think I bill by the hour.

24   Q.   Sometimes you charge a flat fee for your services?

25   A.   Not inside the United States.  Not that I'm aware of.
```

```
 1    Q.    How about in Guantanamo?

 2    A.    In that case, yes, because that's U.S. military.  That's

 3    correct.

 4    Q.    Now, in the first case you testified for a federal

 5    prosecutor you charged $200 an hour.  Is that right?

 6    A.    That sounds about right.

 7    Q.    Earlier this year did you testify that at the first trial

 8    that you testified at as an expert you were paid $200 an hour?

 9    Do you remember that case?

10    A.    I believe I had been refreshed with a copy of an invoice.

11    But, again, that sounds about right.

12    Q.    In 2006 your rate went up to $225 an hour, right?

13    A.    Approximately, yes.  It's not fixed per every single case;

14    it depends on what's required and it depends on how many hours

15    are involved.

16    Q.    Did you testify that in 2006 your hourly rate was $225?

17    A.    Approximately depending on -- depending on the case.

18    That's correct.

19              MR. CARNEY:  May I approach the witness, please?

20              THE COURT:  All right.

21              (Counsel confer off the record.)

22    BY MR. CARNEY:

23    Q.    Let me show you this.  Would you read that and that?

24    A.    (Witness complies.)

25    Q.    Okay.  In 2006 you were asked "How much are you paid," and
```

         1    you said, "I'm paid by the hour.  I'm paid $225 an hour."

         2    A.   In that case.

         3    Q.   Is that what you testified to?

         4    A.   In that case.

         5    Q.   So in 2006 you were billing at $225 an hour?

         6    A.   In that case.  That's not a universal con- --

         7    Q.   In 2008 your rate went up and you said you were charging

         8    between $250 and $300 an hour?

         9    A.   That's correct.

00:56   10    Q.   By 2010 you were now charging $300 an hour?

        11    A.   Approximately.  It varies --

        12    Q.   Well, does it vary between, like, $295 and $310 an hour?

        13              MR. CHAKRAVARTY:  Objection, your Honor.

        14    BY MR. CARNEY:

        15    Q.   Well, I'm just asking.  What do you mean by "approximately

        16    $300 an hour"?

        17              THE COURT:  You may have it.

        18              THE WITNESS:  It varies depending on each case.  Each

        19    case -- the contracts are negotiated individually, so it's

00:56   20    not -- it's not a constant.  It can range anywhere from one

        21    figure to another.

        22    BY MR. CARNEY:

        23    Q.   Okay.  Can you take a look at this case?

        24    A.   Yes.

        25    Q.   Okay.  You were asked, "You are being paid $300 an hour."

1   Your answer was, "That's correct"?

2   A.   In that case.  Yes; that's correct.

3   Q.   And that was in 2010, last year, correct?

4   A.   I believe so, yes.

5   Q.   In 2011 you've testified that you now get paid $400 an

6   hour?

7   A.   Not constantly, no.  It ranges anywhere from $300 to $400

8   an hour depending on the individual contract.  Most contracts

9   are for $350 an hour.

00:57 10   Q.   When you were asked on July 1st, 2011, in the Kaziu trial

11   if you are paid for your work, you said -- you were asked, "You

12   charge $400 an hour," correct?

13   A.   In that case.  That's correct; yes.

14   Q.   So my question was:  In 2011 you get paid, now, $400 an

15   hour.  Not in every case.  There are some special cases where

16   you give a discount, perhaps.  But my point is, your rate has

17   gone, over the last five years, from 200 to 225 to 250 to 300,

18   and as of a few months ago, 400 an hour?

19   A.   My general rate is 350.  In that case I did get paid 400.

00:58 20   Q.   Well, why did you get paid 400 in that case?

21   A.   I negotiated a higher contract.

22   Q.   So you basically told them, "If you want my testimony, I

23   want $400 an hour" even though your regular rate was $350 an

24   hour?

25   A.   Not exactly.

1    Q.    And they gave in to you and did pay you $400 an hour.  Is

2    that right?

3    A.    I don't know if "giving in to me" is the way I would

4    describe it but, yes, they did agree to pay me $400 an hour.

5    Q.    Now, this is for time spent in court testifying, right?

6    A.    Part of it.  Yes; that's correct.

7    Q.    And it's spent time waiting to testify, or sitting in the

8    courtroom and watching other people testify?

9    A.    No, I generally don't get paid sitting around.

00:59 10   Q.    You, in this case, provided the prosecutors with a report

11   that was 62 pages long, correct?

12   A.    I believe I did; that's correct.

13   Q.    And this report was single-spaced?

14   A.    Yes, it was.

15   Q.    And some of this report was lifted verbatim from reports

16   you've given different prosecutors in different parts of the

17   country on entirely different cases, right?

18   A.    That's correct.  There were --

19   Q.    You just used, basically, cut and paste to put something

01:00 20   in your report?

21   A.    Not cut and paste, but there were --

22   Q.    You retyped it again?

23   A.    No, there were footnotes and there were particular pieces

24   of evidence that were --

25   Q.    There were whole sections of the report that were copied

1  verbatim from prior reports you had done, correct?

2  A.    The evidence in this case --

3  Q.    Mr. Kohlmann, please, would you answer my question?

4  Entire segments of your 62-page report given to these

5  prosecutors were copied verbatim from previous reports you had

6  done from different prosecutors in different districts, right?

7  A.    I don't know if they were verbatim, but they were

8  certainly very similar; that's correct.

9  Q.    Now, at one time you were asked to prepare a video for a

01:00 10  case that would compile video clips, audio clips, and document

11  translations from your collection, correct?

12  A.    What exactly are you referring to?  Are you referring to

13  work done for the U.S. military?

14  Q.    Yes.

15  A.    That's correct; yes.

16  Q.    And you took these videos and audiotapes and document

17  translations and put them in this compilation, correct?

18  A.    That's correct.  Yes, I did.

19  Q.    And you charged the government $20,000 to do this?

01:01 20  A.    I did.  That's correct; yes.

21  Q.    Now, you're paid by the FBI on occasion to consult with

22  them too, correct?

23  A.    I am.  That's correct.

24  Q.    And that's separate and apart from anything you're paid by

25  prosecutors, correct?

```
 1   A.   That's correct; yes.

 2   Q.   And that money is paid to you as an hourly fee, is it not?

 3   A.   By the FBI?

 4   Q.   Yes.

 5   A.   No.

 6   Q.   Is it by case?

 7   A.   It varies, really.

 8   Q.   Okay.  I'd like to focus on the years 2006 to 2010, those

 9   five years.  Can you please tell us how much you have been paid

10   in total by federal prosecutors during that period to be a

11   witness or potential witness in their cases?

12   A.   I'd have to review some documentation that I brought with

13   me.

14   Q.   Okay.  So --

15   A.   Excuse me.

16   Q.   You knew, of course, that you received a subpoena to bring

17   these financial records to court.

18   A.   That's correct.  I did.

19   Q.   And, in fact, you wanted the subpoena to be --

20          MR. CHAKRAVARTY:  Objection.

21   BY MR. CARNEY:

22   Q.   -- vacated?

23          THE COURT:  Sustained.

24   BY MR. CARNEY:

25   Q.   You did not want to provide the information, did you?
```

 1            MR. CHAKRAVARTY:  Objection.

 2            THE COURT:  Let's get to the --

 3            MR. CARNEY:  Okay.

 4    BY MR. CARNEY:

 5    Q.   You knew when you were asked to bring these records to

 6    court that you'd be asked questions about them.  Isn't that a

 7    reasonable inference you drew?

 8    A.   I didn't know, but I assumed that if you were subpoenaing

 9    me, you might want to ask me questions about them.

01:02 10    Q.   Do you know what?  You're exactly right.  The reason I

 11    subpoenaed your financial records to court is because I wanted

 12    to ask you questions about them.  Have you looked at them?

 13    A.   I have them, but they're right there.  I haven't --

 14    Q.   Did you look at them before testifying?

 15    A.   Very briefly.

 16            MR. CARNEY:  Your Honor, may he look at the records?

 17            THE COURT:  All right.

 18            (Pause.)

 19            THE WITNESS:  Excuse me.  You said 2006 on, correct?

01:03 20    BY MR. CARNEY:

 21    Q.   In essence, I'd like you to look at -- whether it's a

 22    1099, whether it's some other form of formal document, that

 23    indicates what the gross payment was to you in the year 2006,

 24    2007, 2008, 2009, and 2010, combined, of payments to you by

 25    federal prosecutors to either be a witness or a potential

```
 1  witness or assist them with the case.

 2  A.    Just to clarify, 2006 to 2010?

 3  Q.    These five years:  2006, 2007, 2008, 2009, 2010.

 4  A.    Sure.  Just one moment and I'll give you the answer.

 5  Q.    Sure.

 6         (Pause.)

 7  A.    I have been paid -- in those years I was paid

 8  approximately $520,000, $516,000 -- somewhere between $516,000

 9  and $520,000.

01:05 10  Q.    All right.  And during those same five years how much have

11  you been paid by the FBI?

12  A.    That would be approximately $50,000.

13  Q.    You've been a consultant to state and local prosecutors as

14  well.  Is that true?

15  A.    Not in trials, no.

16  Q.    What about in consultations?

17  A.    Would you define "consultation" as including a

18  presentation, like a speech?

19  Q.    No.

01:05 20  A.    Then no.

21  Q.    Okay.  You've been paid by foreign governments during

22  those five years, correct?

23  A.    That's correct; I have.

24  Q.    How much in total during those five years have you been

25  paid by foreign governments?
```

```
 1   A.   One moment and I'll tell you that too.
 2            (There is a pause.)
 3   A.   This is again 2006 to 2011?
 4   Q.   2010 would be fine.
 5   A.   Okay.  The total is $389,000.
 6   Q.   You've been -- you say on your website that you offer a
 7   host of consulting services for private corporations?
 8   A.   That's correct; yes.
 9   Q.   Have you been retained by private corporations?
10   A.   Yes, I have.
11   Q.   During those five years how much have you been paid as a
12   terrorist consultant?
13            MR. CHAKRAVARTY:  Objection, your Honor.
14            THE COURT:  Sustained.
15   BY MR. CARNEY:
16   Q.   You get paid for speaking engagements, do you not?
17   A.   I do.
18   Q.   And how much do you generally charge for a speaking
19   engagement?
20   A.   It -- usually, approximately, $1500.
21   Q.   And how much -- how often do you have a speaking
22   engagement?
23   A.   It varies.  It really depends what the opportunities are.
24   Q.   Have you testified that on average it's two or three times
25   a month?
```

1    A.    It might have been when I testified, but I was ill earlier

2    this year so I had to cancel a number of speaking engagements.

3    Q.    But normally it was two or three times a month?

4    A.    About two or three times a month, approximately.

5    Q.    You said also you are -- you appear on the NBC television

6    channel, correct?

7    A.    That's correct; yes.

8    Q.    And you have a contract for that?

9    A.    I do.

01:07 10   Q.    And that's based on your so-called terrorism expertise,

11   correct?

12   A.    That's correct.

13   Q.    And what is your annual contract currently with NBC?

14         MR. CHAKRAVARTY:  Objection, your Honor.

15         THE COURT:  Sustained.

16         MR. CARNEY:  May I be heard, please?

17         THE COURT:  Yes.

18         (Discussion at sidebar and out of the hearing of the

19   jury:)

01:08 20   MR. CARNEY:  Your Honor, this directly goes to the

21   bias of the witness.  By being perceived as a terrorism expert

22   and testifying for the government, it builds up his credentials

23   so he can get a much more lucrative contract with a TV station

24   as well as contracts with private corporations.  He parlays

25   this courtroom expert gig into substantial -- substantially

1    more money, and I submit that goes directly to his bias in

2    doing this.

3            MR. CHAKRAVARTY:  There are talking heads --

4            THE COURT:  Well, I think you have the point without

5    the number.  The numbers are relevant, particularly for the

6    government, his work for the government, quantifying that.

7    Quantifying other outside sources when -- you can still make

8    the argument that he's trading off one to boost the other

9    without the number.

01:09 10         MR. CARNEY:  It doesn't have the power without knowing

11   what that number is.

12           THE COURT:  I think the numbers are high enough that

13   you have the point that you want to make.  The objection is

14   sustained.

15           (In open court:)

16   BY MR. CARNEY:

17   Q.   What percentage of your annual income during this period

18   comes from testifying as a witness or working with federal

19   prosecutors or the FBI?

01:09 20         MR. CHAKRAVARTY:  Objection, your Honor.  This is an

21   extrapolation.

22           THE COURT:  No, you may have that question.

23           THE WITNESS:  Over that entire period?

24   BY MR. CARNEY:

25   Q.   Yes.

```
 1   A.   Probably about --
 2   Q.   I'm asking you to take your combined income for those five
 3   years, subtract what you've been paid by federal prosecutors
 4   and FBI and foreign governments, and what does that number
 5   represent as a percentage of your annual income?
 6   A.   I would say it's probably between -- around 40 percent.
 7   Q.   The 40 percent is what you're paid by the federal
 8   government and FBI and --
 9   A.   And foreign governments and U.S. military.
10   Q.   And the 60 percent is otherwise?
11   A.   That's correct; yes.
12   Q.   From your private business?
13   A.   From clients -- from private clients, from NBC, from
14   giving speeches, things like that.
15   Q.   Now, you continue to be on the staff of NEFA, don't you?
16   A.   Loosely.  I don't actively do work for them at the moment.
17   Q.   Are you on their website?
18   A.   I believe I am.  That's correct.
19   Q.   How long are you with NEFA -- or have you been with NEFA?
20   A.   I'll tell you right now.  Since July 15, 2005.
21   Q.   And "NEFA" stands for "Nine Eleven Finding Answers,"
22   correct?
23   A.   That's correct.
24   Q.   And it purports to be a nonprofit foundation that strives
25   to prevent future tragedies in the U.S. by exposing -- and
```

1    abroad -- by exposing those responsible for planning, funding

2    and executing terrorist activities with a particular emphasis

3    on Islamic militant organizations.

4    A.   That's correct.

5    Q.   Did I describe that correctly?

6    A.   That's correct; yes.

7    Q.   And when did you -- I'm sorry.  How long have you been

8    associated with NEFA?

9    A.   I've been associated with them from -- starting, again,

01:11 10    July 15, 2005.

11    Q.   And as I mentioned, you continue to be on their website?

12    A.   Yeah, I'm a consultant.  But I don't -- at the moment I'm

13    not actively doing work on their behalf.  I'm not being

14    compensated, so...

15    Q.   Do you get paid directly or indirectly in any manner by

16    NEFA?

17    A.   I have not been paid by NEFA since last May.

18    Q.   How much were you paid by NEFA prior to that?

19    A.   Prior to that I was paid on a monthly --

01:11 20          MR. CHAKRAVARTY:  Objection, your Honor.

21          THE COURT:  Sustained.  Same reason as we discussed at

22    the side.

23    BY MR. CARNEY:

24    Q.   Well, who is David Draper?

25    A.   He is, I believe, the director of strategic something for

1   NEFA.

2   Q.   Strategic operations?

3   A.   That's correct.

4   Q.   And NEFA holds itself out as a nonprofit, correct?

5   A.   I believe so.  I'm not involved with their finances, but I

6   understand them to be a 501(c)(3), yes.

7   Q.   501(c)(3) means it's a nonprofit organization?

8   A.   That's my general -- again, I'm not responsible for that

9   area of --

01:12 10   Q.   And it solicits donations, doesn't it?

11   A.   I'm not involved in that, so I don't know.

12   Q.   Well, are you aware that in 2009 David Draper was paid

13   $405,000 --

14        MR. CHAKRAVARTY:  Objection, your Honor.

15        THE COURT:  Sustained.

16   BY MR. CARNEY:

17   Q.   -- as a consultant to this organization that he's the

18   director of strategic planning?

19        THE COURT:  Mr. Carney, the objection is sustained.

01:12 20        The jurors are instructed, of course, that a question

21   is not evidence.

22   BY MR. CARNEY:

23   Q.   Now, you've testified in the past that you're not

24   interested in selling your book on the website, right?

25   A.   Selling my book on what website?

```
 1    Q.   Your website.

 2    A.   I don't recall testifying about that but --

 3    Q.   Do you remember three years ago saying, "I don't sell

 4    anything on the website.  I don't sell books"?

 5    A.   I don't sell anything on the website.

 6    Q.   Okay.

 7              MR. CARNEY:  May I approach, please?

 8    Q.   Your website is flashpoint-intel.com?

 9    A.   That's correct.

 10   Q.   Is this a screen shot of consulting services?

 11   A.   That's correct.

 12   Q.   And this is a screen shot taken 12/4/2011, last week?

 13   A.   That's correct.

 14   Q.   Is that your book on it?

 15   A.   Yeah, but I didn't put that there.  I don't know how that

 16   got there.  I don't --

 17   Q.   Does it say "Purchase online via Amazon.com"?

 18   A.   Well, yeah.  I'm not selling the book on my website.

 19   Q.   Oh, I see.  You're not selling a book on your website;

 20   you're just having a picture of the book on your website with a

 21   blurb underneath it describing the book, and a link to say view

 22   more about the book, and a link directly under the book that

 23   says, "Purchase online via Amazon.com"?

 24   A.   Yeah, because we don't sell anything on the website.

 25   Q.   Let me turn to another subject.
```

01:13 (line 10)
01:14 (line 20)

1    A.    Uh-huh.

2    Q.    Social science is supposed to be a neutral and independent

3    study of various data to reach a conclusion.  Would you agree

4    with that?

5    A.    That's a fair statement.

6    Q.    And by doing a neutral and independent study of data to

7    reach a conclusion, one hopefully will reach an impartial and

8    accurate conclusion.  Isn't that fair to say?

9    A.    I think that's fair to say, yes.

01:15 10    Q.    Now, in this case the only material you looked at was the

11    specific material provided to you by the prosecutor, correct?

12    A.    That's correct; yes.

13    Q.    He put that material on a hard drive for you to review.

14    A.    I don't believe the prosecutor put any evidence on a hard

15    drive.  I think that was a raw, preserved copy from the FBI.

16    Q.    You know that for a fact?

17    A.    I'm pretty sure I received it directly from the FBI.

18    Q.    But you don't know that, do you?

19    A.    I don't have the envelope in front of me, but typically

01:16 20    speaking, when I'm sent drives, they're not sent by the U.S.

21    Attorney's Office; they're sent from the FBI.

22    Q.    You didn't look at any of the other evidence in this case,

23    did you?

24    A.    No; that's correct.

25    Q.    You didn't see any witness statements, did you?

```
 1   A.    I'm not aware if there were any.

 2   Q.    You didn't review any 302s, which are reports, made by FBI

 3   agents, right?

 4   A.    Not in this case.  That's correct.

 5   Q.    You didn't look at grand jury testimony, did you?

 6   A.    I have never seen grand jury testimony as -- offered as

 7   evidence to me in any case.

 8   Q.    You haven't seen transcripts of what witnesses have

 9   testified to in this trial, have you?

10   A.    No.  That's correct.

11   Q.    You're aware that daily transcripts are produced by our

12   extraordinary court reporters?

13   A.    Yes, but generally speaking --

14   Q.    The best court reporters in the building?

15   A.    Generally speaking.

16   Q.    You never mess with the court reporter.

17   A.    Generally speaking, that's also not the kind of evidence

18   that I'm given to review in any case.

19   Q.    Now, you have testified as an expert in federal court in

20   criminal cases 20 times, correct?

21   A.    That's correct; yes.

22   Q.    And every single time it's been for the prosecution,

23   correct?

24   A.    That's correct; yes.

25   Q.    Have you ever declined to testify for a federal prosecutor
```

1    in a case, and refused to do so?

2    A.   I have declined to testify, yes.

3    Q.   And was that because -- or how many times have you

4    declined to testify?

5    A.   I think on one occasion, I believe.

6    Q.   And what was the reason?

7    A.   I believe that they were interested in a particular

8    organization for which I really didn't believe I had enough

9    data to write a comprehensive report on.

01:17 10  Q.   And so that's the only time you've declined?

11   A.   That I can recall offhand.

12   Q.   Now, have you ever been asked to provide assistance to a

13   defense team?

14   A.   On one occasion.

15   Q.   Well, last year when you were asked this question you said

16   that so far you'd never been approached to do work for a

17   defense team, correct?

18   A.   I believe that was correct when I said it, yes.

19   Q.   So that was correct when you said it in 2010?

01:18 20  A.   I believe so.  I'd have to see the exact timing, but I

21   believe so.

22   Q.   Well, do you remember testifying in other cases that

23   you've, in fact, been asked to testify on -- or to work with a

24   defense team on two occasions?

25   A.   There was only one serious request.  If I said --

```
 1    Q.    In that --

 2    A.    Yeah.

 3    Q.    And in regard to that serious request, you declined to

 4    work for the defense team?

 5    A.    That's correct.  I did.

 6    Q.    So your record is intact that the only time you have

 7    testified either for the federal prosecutors or for prosecutors

 8    in another country or for the military it's always been on the

 9    side of the government.  Isn't that correct?

01:19 10   A.    Internationally it's a little bit different because in

11    some international courts when you testify as an expert you're

12    not necessarily testifying on behalf of a particular side;

13    you're being called as an expert to testify just for the

14    court --

15    Q.    In every instance where you have been called as a party,

16    it's always been the federal prosecutor or the federal

17    prosecutor in a military tribunal or federal prosecutor --

18    A.    If you set aside those foreign courts?

19    Q.    I'm setting this aside, Mr. Kohlmann.

01:19 20   A.    Yes.  That's correct; yes.

21    Q.    Now, you testified that because you don't have security

22    classification -- or security clearance, rather, you are

23    limited to open-source research, correct?

24    A.    That's correct; yes.

25              MR. CHAKRAVARTY:  Your Honor, I'm not sure exactly
```

1    what the next question is, but this entire area was covered ad

2    nauseam yesterday.

3                THE COURT:   That's fine.   We'll see what the questions

4    are.

5    BY MR. CARNEY:

6    Q.   This is information that is publicly available, correct?

7    A.   Publicly to a limited extent, or to a certain extent.

8    Q.   Well, you described "open source" as information that does

9    not come from intelligence agencies.

01:20 10   A.   That is correct; yes.

11   Q.   Now, on Friday you gave some examples of what this

12   open-source material is.   Do you recall that?

13   A.   I do, yes.

14   Q.   The first thing you cited was video recordings and audio

15   recordings released by terrorist organizations.

16   A.   That's correct; yes.

17   Q.   These are items obviously released by these organizations

18   intentionally to the public, correct?

19   A.   Sometimes.

01:21 20   Q.   They are usually available on the web or for sale by

21   individuals.   Is that correct?

22   A.   Sometimes.

23   Q.   And these videos and audio recordings are propaganda, are

24   they not?

25   A.   Sometimes.   It depends on the context of how and what's

 1   being released and in what context.  It depends.

 2   Q.   Well, on the NEFA website that you've told us about that

 3   you're still associated with, they have links to videos on its

 4   website, don't they?

 5   A.   Excerpts from videos.  Yes; that's correct.

 6   Q.   And they call this propaganda videos, don't they?

 7   A.   I don't know if -- not all of them, no.

 8   Q.   They're not all called propaganda videos?

 9   A.   No.  Definitely not.

01:22 10   Q.   Would you agree that "propaganda" is defined as

11   information, ideas or rumors deliberately spread to help an

12   organization sending it or to hurt the target of the

13   organization?

14   A.   That might be one definition.

15   Q.   And, for example, the term "propaganda" can often be

16   applied to ads in political campaigns when they're trying to

17   say something bad about an opposing person or say something

18   good about themselves?

19   A.   They might.  It's a pejorative term.

01:22 20   Q.   Propaganda by its very nature is unreliable, isn't it?

21   A.   No, I would disagree with that.

22   Q.   For example, propaganda can occur when a country issues a

23   press release saying it's decisively winning a war when the

24   fact is it's getting its butt kicked.  Isn't that right?

25   A.   It's possible.

```
 1   Q.   Well, that's one instance where propaganda has been used

 2   frequently, right?

 3   A.   I'm not really an expert in that area of propaganda.  My

 4   expertise is in terrorist propaganda.

 5   Q.   It's often used to boost morale in the face of contrary

 6   evidence, right?

 7   A.   It can be.

 8   Q.   Now, you mentioned that sometimes on web forums there

 9   might be a posting that says, "Good-bye, I'm off to do jihad,"

10   right?

11   A.   That's correct.

12   Q.   That can be a completely false account placed by a

13   terrorist organization.  Isn't that right?

14   A.   It could be.

15   Q.   And there's no way for you to verify if it's accurate?

16   A.   No; that's not correct.

17   Q.   The second category of open-source material you rely upon,

18   you said, is magazines released by terrorist organizations,

19   correct?

20   A.   That's correct.

21   Q.   And this, again, can be termed propaganda intentionally

22   released by the organization to make it look good, make it look

23   victorious?

24   A.   It depends on what magazine and in what context it's being

25   released, what the intended audience is.
```

1    Q.    Have you ever seen a magazine put out by a terrorist

2    organization that makes the organization look bad?

3    A.    I have seen documents put out by terrorist organizations

4    which do make them look bad, yes.

5    Q.    Where they say, "We're losing, we should give up"?

6    A.    Sometimes they're self-critical.  I don't know if they say

7    "we're losing" or "we should give up," but there are certainly

8    documents which are self-critical, yes.

9    Q.    And indicate what they need to do to get better?

01:24 10    A.    There are usually suggested -- suggestions.  Yes; that's

11    correct.

12    Q.    Another open-source category that you rely on is postings

13    on web forums by people, correct?

14    A.    That's correct; yes.

15    Q.    You stated that you have had registered accounts on

16    virtually every single online forum used by violent extremists

17    since 2002, correct?

18    A.    That's correct.

19    Q.    Now, what forums have you not had a registered account on?

01:24 20    A.    The only forum at present that I do not have a registered

21    account on is an English-language forum known as Ansar

22    al-Mujahideen.  And, excuse me, I did not have a registered

23    account on at-Tibyan either.

24    Q.    On what?

25    A.    The at-Tibyan forum.

Q.   Now, the at-Tibyan forum is the forum that has been
frequently discussed in this trial and which has so many
postings on that material you were given, right?  Material you
were given by the prosecutors?

A.   I was shown documents from the at-Tibyan forum.  That's
correct; yes.

Q.   And you described it as a very significant web forum,
correct?

A.   That's correct.

Q.   And you didn't have access to it, did you?

A.   I didn't say I didn't have access to it; I said I didn't
have a log-in and password --

Q.   You didn't have a registered account?

A.   I didn't have a registered account; that's correct.

Q.   Now, the final category of open source you mentioned is
original interviews that you've done, right?

A.   That's correct; yes.

Q.   Now, the largest group of people who you've done
interviews of were people who fought in Afghanistan between
1996 and -- I'm sorry -- 1986 and 1995.  Is that correct?

A.   I don't know if that would be the largest -- I mean, I've
interviewed Iraqi insurgents, I interviewed Afghan veterans,
I've interviewed veterans of conflicts in --

Q.   But the single largest group.

A.   Actually, I don't think that's the case.  The single

```
 1  largest group is Iraqi insurgents.
 2  Q.   When you were asked by the prosecutor where you have gone
 3  to, you said Bosnia, Indonesia, Saudi Arabia, Qatar and Jordan.
 4  A.   That's correct.
 5  Q.   Let's take Saudi Arabia, Qatar and Jordan as three.  These
 6  are, unquestionably, Middle East countries, right?
 7  A.   That's correct.
 8  Q.   Have you lived in any of these countries?
 9  A.   I haven't lived in those countries, no.
10  Q.   Have you rented an apartment in those countries to stay?
11  A.   No, I haven't rented an apartment in those countries.
12  Q.   What's the longest continuous period that you've been in
13  Saudi Arabia?
14  A.   About a week.
15  Q.   Qatar?
16  A.   I think like two or three days.
17  Q.   Jordan?
18  A.   About a week.
19  Q.   Is it true that the reason you would go to these countries
20  was to speak at a conference?
21  A.   Part of the reason, yeah.
22  Q.   Is that the most frequent reason?
23  A.   It's a common reason.  That's correct.
24  Q.   And when you'd go there for the conference, it's fair to
25  say that you primarily interact with the conference
```

1    participants?

2    A.    And the hosts and the -- the hosting -- the governments

3    that are hosting the conferences.

4    Q.    So the participants and the governments, that's who you

5    primarily deal with when you go to these conferences?

6    A.    That's correct; yeah.

7    Q.    Now, you've claimed in the past to do field work.  Is that

8    right?

9    A.    That's correct.

01:27 10   Q.    And field work means you go to a country to interview

11   people who are indigenous or native to that country, correct?

12   A.    That's correct.

13   Q.    And that is an excellent original source of data, isn't

14   it?

15   A.    It can be depending on who you're interviewing.

16   Q.    If you interview the right people it can be invaluable,

17   right?

18   A.    If they're willing to talk and if there's a place to meet

19   with them and if they're willing to be candid, it can be.  It

01:28 20   really depends on the circumstances.

21   Q.    Field work is an essential part of social science

22   research, isn't it?

23   A.    I'd say that's probably true.

24   Q.    And you've indicated that you have never done field work

25   in your career in a country where the native language is

     1  Arabic.

     2  A.   That's correct.  Yeah; that's correct.

     3  Q.   Now, you've sometimes said that you've done undercover

     4  work, right?

     5  A.   Well, it's been described as that, yes.

     6  Q.   Well, has it been described by Evan Kohlmann that it's

     7  undercover work?

     8  A.   Potentially I used that word at some point.

     9  Q.   So Evan Kohlmann has described it as being undercover

01:29 10  work?

    11  A.   No, others have described it as that as well.  That's not

    12  the best word for it.  I think the way is that I was -- I was

    13  interviewing people who did not fully understand what -- who I

    14  was.  I didn't lie to them, though.

    15  Q.   Haven't you testified that you have done undercover work?

    16  A.   It's possible I used the word "undercover."  Again, it's

    17  not just me who uses that word.  But that's not the most

    18  appropriate word.

    19  Q.   And you gave an example of what you considered to be

01:29 20  undercover work as attending a public protest in Britain.  Do

    21  you recall that?

    22  A.   That was one example.  That's correct.

    23  Q.   And basically, you went to this public protest and watched

    24  it, and even videotaped it, right?

    25  A.   And interviewed protesters, yes.

| | |
|---|---|
| 1 | Q.   And that's what you considered to be undercover work? |
| 2 | A.   No, that was one of several examples that I had given. |
| 3 | Q.   Well, didn't you say that you put yourself at risk at |
| 4 | doing these things? |
| 5 | A.   That I did. |
| 6 | Q.   And that nobody else is doing it? |
| 7 | A.   At the time there wasn't anyone else doing what I was |
| 8 | doing. |
| 9 | Q.   And you said if anybody else -- or, rather, "If nobody |
| 01:30  10 | else does it other than me, then this information gets lost and |
| 11 | that is a travesty," correct? |
| 12 | A.   That's correct. |
| 13 | Q.   "It is a travesty not just for me, but it's a travesty for |
| 14 | academia and, you know, there has to be someone to go out and |
| 15 | get the stuff," right? |
| 16 | A.   It is important that the information becomes public. |
| 17 | That's correct; yes. |
| 18 | Q.   I'm quoting your words, right? |
| 19 | A.   I suppose so.  I don't recall those statements, though. |
| 01:31  20 | Q.   Do you want me to show it to you? |
| 21 | A.   That's fine.  I trust you. |
| 22 | Q.   Well, we'll put that aside. |
| 23 | Do you know Rita Katz? |
| 24 | A.   I do know Rita Katz. |
| 25 | Q.   Rita Katz has a group called SITE Institute, right? |

1   A.   I believe it's now called the SITE Intel Group.  Yes;

2   that's correct.

3   Q.   She was born in Iraq, correct?

4   A.   That's my understanding.  That's correct.

5   Q.   She's a native Arabic speaker, correct?

6   A.   That's correct.

7   Q.   And she has a history of infiltrating fundraisers and

8   conferences hosted by radical Islamic groups, correct?

9   A.   Not -- well, a form -- previous history.

01:31 10   Q.   She's been known to wear burqas to attend these events,

11   correct?

12           MR. CHAKRAVARTY:  Objection to the level of detail

13   about Ms. Katz, who isn't germane to this case, your Honor.

14           THE COURT:  Let me see you at the side.

15           (Discussion at sidebar and out of the hearing of the

16   jury:)

17           MR. CARNEY:  His testimony, your Honor, was that he is

18   the only person doing this undercover work.  I'm bringing out

19   the fact that he very well knows there's someone who actually

01:32 20   does do undercover work who's in the same business he is.  So

21   I'm impeaching him that he's not the heroic figure that he

22   portrays himself to be.

23           MR. CHAKRAVARTY:  You can ask that without --

24           THE COURT:  Well, okay.  You can have it.

25           MR. CARNEY:  Thank you.

```
 1              (In open court:)

 2    BY MR. CARNEY:

 3    Q.    Do you remember the question, Mr. Kohlmann?

 4    A.    If you can repeat it, please.

 5    Q.    Certainly.  Ritz Katz has gone so far as to wear a burqa

 6    to a radical Islamic group meeting.  Is that right?

 7    A.    I believe when we worked together she --

 8    Q.    Mr. Kohlmann?

 9    A.    I'm explaining.  I believe when we worked together she did

01:33 10   do something like that, but it's been a while.

11    Q.    And she speaks Iraqi-accented Arabic in order to fit in at

12    these conferences?

13    A.    That's correct.  Well, when she used to do this, that's

14    correct.

15    Q.    And her work has led to directly figuring out which Muslim

16    groups in the United States were channeling funds for

17    operations abroad.  Isn't that true?

18    A.    I don't know which groups you're talking about.

19    Q.    Do you equate someone who disguises the appearance,

01:34 20   changes the accent, goes into a group trying to blend in and

21    not be recognized in order to get information to be doing

22    undercover work --

23    A.    Well, that's what I believe I was referring to when I used

24    that word.

25    Q.    Okay.
```

```
 1   A.    But --

 2   Q.    Do you equate that to standing on the edge of a crowd and

 3   watching a public protest?

 4   A.    That was one example out of a series that I had --

 5   Q.    Mr. Kohlmann, please.

 6   A.    Right.

 7   Q.    Do you equate that to standing outside a public protest as

 8   being undercover work?

 9   A.    Well, I wasn't outside the protests; I was inside the

10   protests and I was with the protesters.

11   Q.    Inside a building or outside?

12   A.    It was outside, but it was in a corralled area where I was

13   inside an area with the protesters and I was standing next to

14   them and talking with them.

15   Q.    Watching them?

16   A.    No.  No, I was talking with them and interviewing them and

17   recording them.  They understood -- or they thought they

18   understood that I was with them, that I was part --

19   Q.    How were you recording them?

20   A.    With a video camera.

21   Q.    When you record someone with a video camera out in public,

22   do you consider that to be undercover work?

23   A.    There were other individuals --

24   Q.    Mr. Kohlmann, just try to answer this question.  Do you

25   consider that --
```

```
 1  A.    In that case it was, yes.
 2  Q.    Okay.  Now, you produced a report that we've talked about
 3  for this case, haven't we -- haven't you?
 4  A.    That's correct; yes.
 5  Q.    And in this report you have numerous footnotes, don't you?
 6  A.    That's correct; yes.
 7  Q.    And those footnotes contain the authority for statements
 8  that you are making within the report, correct?
 9  A.    That's the purpose of the footnotes, correct.
01:35 10  Q.    And some of these footnotes are in the documents that are
11  completely in Arabic, aren't they?
12  A.    That's correct; yes.
13  Q.    There are numerous citations to what are called tertiary
14  sources, correct?
15  A.    It depends on what you define as "tertiary sources."
16  Q.    Would you consider a newspaper article to be a tertiary
17  source?
18  A.    That's correct.
19  Q.    And certainly, that would be among the least reliable --
01:36 20  and my apologies to the journalists who might be in the room.
21  But it's among the least reliable --
22  A.    I would agree 100 percent.  That's correct; yes.
23  Q.    Now, let's just take a look at a couple of these.  One of
24  the footnotes appears on a -- from a website called
25  scotsman.com.  Do you recall that?
```

     1   A.   Yes, I do recall that.

     2   Q.   Another one is to the *Houston Chronicle*?

     3   A.   That's correct; yes.

     4   Q.   Another footnote you cite to is the *San Angelo Standard*

     5   *Times* in Corpus Christi, Texas?

     6   A.   That's correct; yes.

     7   Q.   You cited the *San Angelo Standard Times* in Corpus Christi,

     8   Texas, for the proposition that "39 Ways" is a popular book

     9   among terrorists.

01:37 10   A.   I used that as a supporting statement.

    11   Q.   Did you -- you cited that as support for that statement.

    12   A.   I believe I was -- that was quoting something else,

    13   though.

    14   Q.   In Footnote 260 in your report.

    15   A.   Right.  That's correct; yes.

    16   Q.   And you cited it for the proposition that "39 Ways" is,

    17   quote, a popular book, among others?

    18   A.   I believe I cited that to say that it was publicly known

    19   as a document that recruits -- as in it's widely known; it's

01:37 20   not a secret.

    21   Q.   Right.  Do you know who wrote that article?

    22   A.   Not offhand, no.

    23   Q.   Do you know his or her background?

    24   A.   I have no idea.  Again, it was --

    25   Q.   I mean, could it be someone who's, you know, a high school

 1  student interning at a newspaper?

 2  A.    In that particular case it didn't matter.

 3  Q.    You have no idea who wrote that.

 4  A.    Again, it didn't -- it wasn't -- for the point I was

 5  making it wasn't relevant.

 6  Q.    It's a footnote in your report, isn't it?

 7  A.    Yes.  But the purpose of the statement is what's in

 8  question.

 9  Q.    Okay.  Now, you do not consider yourself an expert on

01:38 10  Islam, do you?

11  A.    No, I consider myself to be a student of Islam, not an

12  expert in Islam.

13  Q.    You're not an expert on concepts of Islam, are you?

14  A.    I'm an expert on certain concepts of Islam relating to

15  transnational terrorist organizations but --

16  Q.    Are you an expert in the concept of defensive jihad as the

17  duty and obligation of every Muslim?  Are you an expert in

18  that?

19  A.    I'm familiar with it but --

01:38 20  Q.    That's not my question, Mr. Kohlmann, all right?  I'm

21  familiar with a lot of things.  I'm asking you if you are an

22  expert -- do you consider yourself an expert.

23  A.    I've offered -- I've offered expert testimony about jihad,

24  Fard al-Kifayh versus Jihad Fard al-Ain, before, but it's

25  not --

```
 1   Q.   All right.  Let's try this one more time.  I'm going to
 2   keep asking this question until you answer it "yes" or "no."
 3            MR. CHAKRAVARTY:  Your Honor, it's an objectionable
 4   question in the first place --
 5            THE COURT:  Sustained.
 6            MR. CHAKRAVARTY:  Yeah.
 7   BY MR. CARNEY:
 8   Q.   Supporting Islam is different from supporting al Qa'ida.
 9   Wouldn't you agree with that?
10   A.   I would agree 100 percent.
11   Q.   In all of the material you looked at, you never saw a
12   single instance of Tarek Mehanna giving any money to support
13   al Qa'ida, did you?
14   A.   Not that I can recall.
15   Q.   Now, you talked about certain views of al Qa'ida, correct?
16   A.   That's correct.
17   Q.   And al Qa'ida demands allegiance to their views on things,
18   do they not?
19   A.   For the most part, yes.
20   Q.   Do you know what the Islamic concept of Aman is?
21   A.   In what context?
22   Q.   Are you an expert in Aman?
23   A.   I don't consider myself to be an expert in Aman.
24   Q.   What is your understanding of what Aman is?
25   A.   You're talking about the faith, like Aman?
```

1    Q.    Aman, A-M-A-N.

2    A.    I'm not sure what you're referring to.

3    Q.    Now, you were not a registered user of Tibyan, correct?

4    A.    No, I did not have a registered account on at-Tibyan.

5    Q.    Were you aware from looking at those materials that

6    Tarek Mehanna was kicked off the Tibyan website because of the

7    moderate nature of his views?

8    A.    I'm generally aware of that, although I have not seen

9    postings to that effect.

01:40 10    Q.    I'd like to ask you some questions about videos.  It's

11    fair to say that the internet changed everything, did it not?

12    A.    Well, that's a bit of a sweeping statement, but I'll take

13    your point.

14    Q.    It's meant to be a sweeping statement.  I mean, the

15    ability to communicate through the internet is the most radical

16    development in your lifetime, isn't it?

17    A.    Again, I'll take your statement as -- I'll accept your

18    statement.

19    Q.    Now, you said --

01:41 20          MR. CARNEY:  I'm going to be going into an entirely

21    new area here.

22          THE COURT:  Keep going.

23          MR. CARNEY:  All right.  Thank you.

24    BY MR. CARNEY:

25    Q.    You said that it's very important that videos produced by

1    al Qa'ida be seen by people?

2    A.    It's essential, yes.

3    Q.    Essential for their mission, correct?

4    A.    That's correct.

5    Q.    And that these videos are often issued in Arabic, correct?

6    A.    They are issued usually in Arabic and in English.

7    Q.    Well, they're pretty useless for someone who doesn't speak

8    Arabic to see these videos.

9    A.    No, I would disagree with that.

01:42 10   Q.    You testified yesterday that translating these videos to

11   English helps al Qa'ida tremendously --

12   A.    It does.

13   Q.    -- as well as giving people an opportunity to see these

14   al Qa'ida videos.

15   A.    That's true.

16   Q.    Is that correct?

17   A.    Yes.

18   Q.    And that it is critical to the success of al Qa'ida that

19   these videos be available for people to read?

01:42 20   A.    That's correct; yes.

21   Q.    To see and to read in English, correct?

22   A.    That's correct.

23   Q.    Now, are you familiar with the NEFA website?

24   A.    I am familiar with the NEFA website.

25   Q.    And as we mentioned, you're still identified as one of the

|    |    |
|----|----|
| 1  | five people on the website home page, correct? |
| 2  | A.   I'm a consultant on their behalf, correct. |
| 3  | Q.   But are you still listed on the home page website as one |
| 4  | of the -- |
| 5  | A.   I haven't seen their website in months, but I'm assuming |
| 6  | I'm still on there. |
| 7  | Q.   Now, have you seen that website recently? |
| 8  | A.   No. |
| 9  | Q.   Are you familiar with it generally? |
| 01:43 10 | A.   Generally speaking, yes. |
| 11 |     MR. CARNEY:  Your Honor, may we call up the NEFA |
| 12 | website, please?  We have the ability to do so. |
| 13 |     MR. CHAKRAVARTY:  I'm going to object, your Honor. |
| 14 |     THE COURT:  Let me see you. |
| 15 |     (Discussion at sidebar and out of the hearing of the |
| 16 | jury:) |
| 17 |     MR. CHAKRAVARTY:  Your Honor, it's hearsay and it's no |
| 18 | way to impeach him.  The fact that he is familiar with the |
| 19 | website as it appeared months ago, was his testimony, is |
| 01:43 20 | irrelevant to NEFA, what -- the activities NEFA is doing.  If |
| 21 | it's being shown in front of the jury, then it's actually |
| 22 | evidence, and the website is being actually offered into |
| 23 | evidence based on this witness's familiarity with a website as |
| 24 | it appeared several months ago.  It's the content of the |
| 25 | website. |

1          MR. CARNEY:  The reason the prosecutor doesn't want

2     this to be shown is on the NEFA website they have 37 al Qa'ida

3     videos that you can click on and watch, and I want to show that

4     some of the videos that the prosecutor has talked about is

5     publicly -- publicly -- available on this site for someone to

6     go to, just click a button.  And we're going to watch some

7     videos, with the Court's permission.

8          MR. CHAKRAVARTY:  He can ask one question about that,

9     or two.  But you don't need to show it.

01:44 10          MR. CARNEY:  We've seen so many videos in this trial.

11     These are short videos.  And I'm only going to play four, with

12     your permission.

13          THE COURT:  Okay.  The evidence is being offered for

14     the fact of the availability?

15          MR. CARNEY:  Correct.

16          THE COURT:  Okay.  The website may contain assertions

17     which I think would be hearsay.

18          MR. CARNEY:  They're not offered for the truth.

19          THE COURT:  Right.  So I guess you would make that

01:45 20     clear to the jury.  Your point is to show what is accessible to

21     someone going to the website but not the truth of the --

22          MR. CHAKRAVARTY:  But the video itself doesn't make

23     the probative point.

24          MR. CARNEY:  I'm showing the same videos,

25     just -- exactly --

```
 1            THE COURT:  What are the videos that you want to show?
 2            MR. CARNEY:  One of them is of a training camp,
 3    another is a speech of Osama bin Laden, another one is --
 4            THE COURT:  Are they the same that we've seen or are
 5    they just the same genre?
 6            MR. CARNEY:  The exact same.
 7            MR. CHAKRAVARTY:  The videos that are the same genre
 8    that are not connected with --
 9            THE COURT:  You can disagree with the significance of
10    the point, but I think it can be made.
11            How long will this take?
12            MR. CARNEY:  Probably ten minutes.
13            THE COURT:  All right.
14            MR. CARNEY:  Because the -- I don't intend to show
15    more than a minute or two of each, and then I'll just stop and
16    move to the next.  I've identified four that have four
17    different categorizations.  I don't expect any are going to be
18    horrifying by any means.
19            MR. CHAKRAVARTY:  We haven't seen the videos.  Again,
20    this is the first we're hearing of them.
21            MR. CARNEY:  I alerted you yesterday that I was going
22    to call up the NEFA website and play videos from it.
23            MR. CHAKRAVARTY:  I bet there are a lot of videos on
24    the NEFA website.
25            THE COURT:  All right.  And when you've done this,
```

1    what's the estimate for the rest of your examination, just so I

2    have some sense?

3              MR. CARNEY:  Probably I'll be done around 12:30, if

4    not earlier.  I'm -- I have about two or three other areas to

5    go into, but I'm trying to move with alacrity.  So that's why I

6    thought we will be allowed to -- the government will be able to

7    rest today.  You have a half-hour to do a redirect.

8              MR. CHAKRAVARTY:  All right.

9              THE COURT:  Okay.

01:46 10         MR. CARNEY:  Thank you.

11             (In open court:)

12             THE COURT:  Now, does this have an exhibit number?

13             MR. CARNEY:  Yes, it does, your Honor.

14             MR. OH:  No, it doesn't.

15             MR. CHAKRAVARTY:  We haven't seen it, your Honor.

16             MR. CARNEY:  We've numbered it.

17             THE COURT:  Is this live?

18             MR. CARNEY:  Yes.

19             MR. CHAKRAVARTY:  There are logistics issues here as

01:47 20   well which presents problems.

21             THE COURT:  We have to capture for the record --

22             MR. CARNEY:  I expect to show four examples.  We have

23   them on CD and we have numbered them as prospective exhibits so

24   that we'll be able to give them to Mr. Lyness.  And what the

25   jury will be watching live will be -- is memorialized for part

1     of the record.

2          MR. CHAKRAVARTY:  We would appreciate that as well,

3     your Honor, because we haven't seen it.

4          MR. CARNEY:  The first one I would be calling up would

5     be -- what number is it, John?  Oh, 1?  The first would be --

6          THE COURT:  Let me see you again.

7          (Discussion at sidebar and out of the hearing of the

8     jury:)

9          MR. CARNEY:  This is pretty cool, huh?

01:48  10          THE COURT:  Well, there are a couple of issues, some

11     technical.  If it's a live event, there has to be a way of

12     capturing it for the record.  And I think there is, but I'm not

13     able to say technically what that is.

14          MR. CARNEY:  I could help your Honor out.

15          THE COURT:  My other thought is, this may need some

16     foundation, and maybe you need another witness to get this in.

17     This may be a defense point rather than a cross-examination

18     point.

19          MR. CARNEY:  Well, I'll ask this witness if he

01:48  20     recognizes the NEFA home page and do they contain videos on the

21     home page.  They have a button on it that you click and you see

22     that video, and we've got that exact video on the CD to

23     memorialize it for the record.  So there's nothing like live

24     testimony or the possibility of something being different.

25     It's just the novelty of doing it in real time.  But --

1          MR. CHAKRAVARTY:  Your Honor, I beg to differ, your

2     Honor.  When we haven't seen what's on the web page, where

3     there is -- you know, there could be any number of --

4          THE COURT:  Yeah.  Okay.  Let's do this:  Let's take

5     the recess.  Why don't you jointly look at the website, see

6     what it looks like today.

7          MR. CARNEY:  Sure.

8          THE COURT:  And meanwhile, let's consult with one of

9     our techies and see if there's anything they could do for us.

01:49 10         MR. CARNEY:  Okay.  Thanks.

11         (In open court:)

12         THE COURT:  We'll take the morning recess.

13         THE CLERK:  All rise for the Court and the jury.  The

14    Court will take the morning recess.

15         (The Court and jury exit the courtroom and there is a

16    recess in the proceedings at 10:59 a.m.)

17    (Court in at 11:30 a.m.)

18         MR. CHAKRAVARTY:  Your Honor, I thought it made sense

19    -- I'm sorry.  I thought it made sense just to hash out what's

02:21 20    going to happen in the next few minutes before it does,

21    hopefully.  Mindful of the fact that the witness is still on

22    the stand, we can approach sidebar if your Honor prefers, or we

23    can talk through the logistics.

24         THE COURT:  I don't think that's necessary.

25         MR. CHAKRAVARTY:  The government maintains its

 1   objection to the showing of the website and the specific --

 2   counsel has proposed -- excuse me.  I have a cough drop in my

 3   mouth, not to be rude, your Honor -- the navigating to the

 4   website, is my understanding, which they have memorialized by

 5   having a printout which would later be uploaded into the JERS

 6   system.

 7        THE COURT:  We can do it immediately, as I understand

 8   it.  There's a camera feature that, regardless of the feed, we

 9   can capture the screen.  And that's what I would propose to do,

02:22 10   one or two pages, whatever it might be that is necessary simply

11   to show where we were and what the jurors saw.

12        MR. CHAKRAVARTY:  The preservation of the record, it

13   sounds like, because of Mr. Gross' work, we're going to be able

14   to do.

15        The broader objection, your Honor, is, the more we

16   thought about it, the more we saw the stuff, the more we

17   considered the rules of evidence, and 401 in particular, it's

18   not clear -- regardless of this witness' competency, which is

19   -- holding aside that issue, the point -- the only point which

02:23 20   it seems to be that -- the existence of other videos on the

21   internet bears on this trial is the fact that there are other

22   videos available on the internet.  It surely cannot be the case

23   that every other publicly available video would be admissible

24   in this case by either party.

25        The key there is how does it advance the ball, one way

1    or the other, in terms of the two theories of the defense?  The

2    risk here, the 403 issue is, by introducing other videos or

3    evidence of other videos available on the internet, aside from

4    just the witness saying I know these are publicly available,

5    he's already testified to that.

6            The risk there is the jury starts to construe the fact

7    that publicly available videos, which the defendant may have

8    also done -- if they're publicly available, then we don't

9    necessarily have to apply the law as the Court is going to

02:24 10   instruct us as to whether the defendant has violated the

11   elements of the offenses but, rather, that the actus reus, so

12   to speak, even though that's not what the government's theory

13   of the case is, because videos have been introduced by the

14   government and the defense has now introduced the same videos

15   which are publicly available, therefore, there must not be

16   anything illegal about it.

17           That is an inappropriate question for the jury because

18   it's seeking jury nullification.  It's not getting to the

19   narrow issue, which is, what is the purpose for which the

02:24 20   defendant was offering his services and expert advice and

21   assistance and was in coordination with al Qa'ida.  Those

22   questions are not answered by playing these videos.

23           MR. CARNEY:  This isn't about nullification.  This is

24   about presenting evidence that these videos, which the

25   government has put so much emphasis on and which the witness

1   has put so much emphasis on, are, in fact, readily available by

2   a website that has not only -- is not only presenting them but

3   translating them.

4        THE COURT:  I think the question posed by the

5   government is:  And what does that prove if they are available?

6   What's the significance of the fact of their availability for

7   the issues in the case?

8        MR. CARNEY:  That the witness and the government, as

9   contended, that things done by the defendant were critical or

02:25 10   essential to getting out al Qa'ida's message.  I'm undermining

11   that by showing that al Qa'ida's message was readily available

12   on the internet, including on this site, where they posted

13   these and translated these.

14        THE COURT:  Well, on that theory, then the relevant

15   time would be 2005, 2006, wouldn't it?  Not today, that is.

16   Availability today doesn't prove that point.

17        MR. CARNEY:  NEFA has been in operation since -- the

18   entire time during this.

19        THE COURT:  I guess, if you had evidence of what they

02:26 20   had on in 2006, I would understand the logical connection.  But

21   it seems to me the availability in 2011 is not particularly

22   relevant.

23        MR. CARNEY:  It will be seen, I expect, that they have

24   been posting things for years.

25        THE COURT:  Well, I think the temporal problem is a

1    serious one for the defense point.  So I think I would sustain

2    the objection on that ground.

3              MR. CARNEY:  Your Honor, the point is that doing this

4    type of thing is essential to getting al Qa'ida's message out.

5    That's the point.  And what I'm showing is al Qa'ida's message

6    gets out by other sources, like this website.

7              THE COURT:  Well, I think if the point were made for

8    2006, it would be -- you would be over that hurdle.  But

9    showing that it's now, five years later, available doesn't

02:27 10   necessarily -- might be the same.  I don't know whether it's

11    the same.

12              MR. CARNEY:  I think it goes to the weight of the

13    evidence, your Honor, given that NEFA has been in business

14    during the entire time of this Indictment -- that the

15    Indictment is covering.

16              THE COURT:  Well, as I say, I don't know what the

17    answer is about 2006.  It might be that it was identical and

18    all the same things were available.  But at least there would

19    have to be evidence that that was the case in 2006 for it to

02:27 20   bear on the point that you want to make.

21              MR. CARNEY:  Or 2008 --

22              THE COURT:  I know the government has further

23    objections to the point to be made.  But even to that limited

24    extent, it seems to me that it's -- it's not relevant in a

25    temporal sense.

1          MR. CARNEY:  Your Honor, one of the videos is from

2     2006.

3          THE COURT:  That doesn't mean it was available in

4     2006.  I don't know.  Maybe.  But this is why I said at the

5     side, maybe you need a different witness.  Maybe you need

6     somebody from NEFA or something.  I don't know.  I think the

7     time is a serious issue.  So on that basis, I would sustain the

8     objection.

9          MR. CARNEY:  May we voir dire this witness?

02:28 10          THE COURT:  Okay.

11          MR. CHAKRAVARTY:  Seems like voir dire would only go

12     to his authentication of the material, not necessarily the

13     chronological issue of -- he doesn't even know what the videos

14     are that the defense is seeking to offer.

15          THE COURT:  Well, any witness, this witness or any

16     other, would have to be able to say what the site was in 2006.

17          MR. CARNEY:  Okay.

18          THE COURT:  Go ahead and ask him.

19     VOIR DIRE BY MR. CARNEY:

02:28 20     Q.   Mr. Kohlmann, how long have you been involved with NEFA?

21     A.   Since July 15, 2005.

22     Q.   Were you involved in setting up the website?

23     A.   No.

24     Q.   Were you aware that a website was set up?

25     A.   Yes.

1    Q.   Do you ever look at the website?

2    A.   I haven't looked at it in awhile, but I did -- I obviously

3    -- some of the material that -- from my archives ended up on

4    the website.

5    Q.   Is some of that material videos?

6    A.   Yes, that's correct.

7    Q.   Is some of that material documents of statements issued by

8    people like Osama bin Laden or Doctor Zawahiri?

9    A.   That's correct, yes.

02:29 10  Q.   Were those documents then put on the website to be

11   available?

12   A.   Yes.  But my recollection is that it was all post-2006.

13   Q.   When did this start going on?

14   A.   The first video that I believe was -- I know the first

15   video that was uploaded to the site was uploaded in mid-2006,

16   and that was a video of a protest rally in London.  The next

17   video wasn't put on the site, I think, until mid-2007.

18   Q.   When were the first documents put on the website?

19   A.   That, I don't recall.  I would -- my best recollection, it

02:29 20  would be 2008, 2007, 2008.

21          MR. CARNEY:  2007 is within the period of Indictment

22   and prior to the defendant's arrest.

23          THE COURT:  I don't know if you have any voir dire

24   questions.

25          MR. CARNEY:  The defendant was arrested in October, I

1    believe, of 2008.  And that's fully within the period of the

2    Indictment.

3              MR. CHAKRAVARTY:  Your Honor, I'm not sure exactly --

4    I don't know why, but -- I'm not sure what it was that was in

5    2007, what was published.  Maybe I could just ask Mr. Kohlmann.

6    Q.   (By Mr. Chakravarty)  What's your understanding of the

7    history of what things posted up on the NEFA?

8    A.   My recollection is that most of the stuff that was posted

9    on the site was not posted until early 2008 onwards.  I believe

02:30 10   the dates reflect that.  I know that there was a video uploaded

11   in mid-2006 because of the fact that I recorded it and it got

12   several million views.  Again, that was a video of -- an

13   original video that I recorded of a protest rally in London.

14        I don't believe there are more than two or three videos at

15   most until the -- before the end of 2007, at most.  It wasn't

16   -- because I had only -- I had only started working there as of

17   late 2005.  There just wasn't -- I was the source of a lot of

18   their video content.

19             THE COURT:  Okay.  Well, here's the ruling:  The

02:31 20   objection is sustained at least through this witness.  Maybe

21   you can develop evidence you can present in your case to get

22   this same stuff in.  I don't know.  But for now, with this

23   witness, the objection is sustained.

24             We'll resume with another topic.  We'll get the jury

25   in.

1          MR. CARNEY:  Your Honor, may I make an offer of proof

2     of what this evidence is?

3          THE COURT:  Briefly, because I think the record

4     already reflects it, but go ahead.

5          MR. CARNEY:  The offer of proof would be that NEFA has

6     put videos and translations of documents on its site since at

7     least 2006 and 2007, and including 2008, during the period of

8     this Indictment.  These videos have included statements by

9     Osama bin Laden, Doctor Zawahiri, other al Qa'ida operatives;

02:32 10     that they've included both videos and dozens of statements by

11     these people.

12          And I submit that the prosecutor's objection goes to

13     the weight of the evidence, not the admissibility.  The

14     essential point is NEFA was offering this type of material

15     during the period of Indictment, and it was not necessary for

16     Tarek Mehanna to be the source of it.

17          And I submit, your Honor, that this is probably the

18     most critical evidence that we will be offering in this trial

19     to undermine the government's theory that, as the witness has

02:32 20     testified, Tarek Mehanna was doing things critical to people

21     seeing what al Qa'ida was saying and showing.

22          THE COURT:  Yeah.  It's far from clear you won't be

23     able to get such evidence in in your case.  What I'm saying is,

24     with this witness, at this time, as cross-examination, the

25     objection is sustained.

```
 1                Okay.  So let's get the jury in and continue.

 2      (Jury in at 11:43 a.m.)

 3                THE COURT:  Okay.

 4      Q.   (By Mr. Carney)  Mr. Kohlmann, you indicated that you have

 5      been with the Nine/Eleven Finding Answers organization since

 6      2005, is that correct?

 7      A.   Since July 15, 2005, that's correct, yup.

 8      Q.   How many people were employed by the organization at that

 9      time?

02:35 10  A.   I don't know the total number.

11      Q.   What would be your approximate estimate?

12      A.   I really don't know.

13      Q.   Were you a senior person in the organization?

14      A.   I was a consultant-analyst, but I -- their base of

15      operations is in Charlestown, South Carolina, and I've only

16      been there on three or four occasions.

17      Q.   You are listed on the web page to this day as being a

18      senior investigator associated with NEFA, aren't you?

19      A.   Yeah.  I'm an investigator but --

02:35 20  Q.   You've certainly looked at their website over the years,

21      haven't you?

22      A.   That's correct, yes.

23      Q.   It's fair to say that, beginning in 2005 and continuing

24      until today, NEFA has made videos available on its website?

25      A.   Video clips, yes.
```

1   Q.   And these video clips have included excerpts from videos

2   made by Osama bin Laden, is that correct?

3   A.   That's correct, yes.

4   Q.   Excerpts from videos by Doctor Zawahiri, is that right?

5        MR. CHAKRAVARTY:  Objection, your Honor.

6        THE COURT:  Overruled.  This is --

7   A.   Doctor al-Zawahiri, yes, that's correct.

8   Q.   Thank you for correcting me.

9        And other people involved with al Qa'ida, isn't that

02:36 10 correct?

11  A.   That's correct, yes.

12  Q.   And when NEFA has put these videos on its site, they are

13  in a format so that someone can click on them and watch them,

14  correct?

15  A.   It depends.  I think it changed -- I'm not really involved

16  with that area of the mechanics of the --

17  Q.   The point of putting a video on a website is so that

18  someone who travels to that website can view the video,

19  correct?

02:36 20 A.   Yeah, that's true, yeah.

21  Q.   There's usually a big button in the middle that you put

22  your pointer on and click and that starts the video, correct?

23  A.   I believe so, yes.

24  Q.   And the videos always have sound with them, correct?

25  A.   I don't know if they always do.  Most of the time they do.

```
 1   Q.   And if there are captions on the videos on this website,

 2   there's always a translation of the -- or most of the time a

 3   translation of the video, correct?

 4   A.   I don't know if it's most of the time, but some of the

 5   time definitely, yes.

 6   Q.   And that translation is from the original Arabic to

 7   English?

 8   A.   That's correct, yes.

 9   Q.   And so by going onto this website, a person is able to

10   look at excerpts from an al Qa'ida video?

11   A.   That's correct, yes.

12   Q.   And hear what's being said about this al Qa'ida -- by this

13   al Qa'ida video in many instances?

14   A.   If there's audio, that's correct, yes.

15   Q.   In addition, since 2005, 2006, NEFA has also posted on its

16   website documents that you have provided to them, correct?

17   A.   Yes, they have.

18   Q.   And these include statements by Osama bin Laden, correct?

19   A.   That's correct.

20   Q.   They include statements by Doctor Zawahiri?

21   A.   Doctor al-Zawahiri, that's correct, yes.

22   Q.   Can you say that one more time, please?

23   A.   Al-Zawahiri.

24   Q.   Al-Zawahiri.  Okay.

25        He's the No. 2 person?
```

1    A.    Well, now the No. 1, but then the deputy commander of al

2    Qa'ida, that's correct.

3    Q.    There would be documents that would talk about Zarqawi?

4    A.    Abu Musab al-Zarqawi, yes, there were.

5    Q.    He was the head of al Qa'ida in Iraq?

6    A.    That's correct.

7    Q.    And there are other al Qa'ida members who would be present

8    on videos, right?

9    A.    Presumably so, yes.

02:38 10   Q.    The videos would include things like a training camp

11   scene, wouldn't it?

12   A.    I believe there is a video or video clip of a training

13   camp, that's correct, yes.

14   Q.    By "training camp," you mean scenes of people going

15   through calisthenics or running around with guns or things that

16   presumably occur at training camps?

17   A.    Those are the kind of activities that, generally speaking,

18   are shown in videos of training camps.

19   Q.    Now, in terms of the documents that are available on this

02:39 20   site, there's actually a link or a title that says "Featured

21   Documents" or something to that effect?

22   A.    It rings a bell.

23   Q.    And these include original documents that you, as an

24   investigator, obtained, is that correct?

25   A.    I believe so, yes.

1   Q.   In fact, without any false modesty, you were the one who

2   personally would seek out and obtain these documents as the

3   chief investigator?

4   A.   Some of them.

5   Q.   And many, many of them -- of these documents, were

6   released and allegedly are the statements of Osama bin Laden,

7   correct?

8   A.   There's a lot of documents on that site.  There are some

9   statements from Osama bin Laden.

02:40  10   Q.   And these statements always appear on the site in a

11   translated format to English, is that correct?

12   A.   That's correct, yes.

13   Q.   In fact, this is primarily a site for English-speaking

14   people; is that fair to say?

15   A.   It's supposed to be for analysts and scholars and

16   policymakers, that's correct, yes.

17   Q.   Is there any fee to go to the site?

18   A.   No.  We don't charge.

19   Q.   Do you charge or do you require people to get a password?

02:40  20   A.   Maybe for certain areas of the site, but I'm not -- not

21   for the main area of the site.

22   Q.   Is it freely available to anyone who has a computer, an

23   internet access?

24   A.   It is.

25   Q.   Now, the documents that are posted by Osama bin Laden or

1    Doctor al-Zawahiri, these are presented in full format --

2    A.    Not --

3    Q.    -- is that true?

4    A.    No, that's actually not true.

5    Q.    They're edited?

6    A.    They are edited.

7    Q.    Is that because some of them go on for dozens of pages?

8    A.    No.

9    Q.    Why are they edited?

02:41 10   A.    We decided to remove material from there that was not

11   germane or we felt was not necessarily germane to the work of

12   scholars, policymakers, academics, law enforcement.

13   Q.    And those certainly are people that would reference this

14   site, go to this site to get these original materials, wouldn't

15   they?

16   A.    They have, yes.

17   Q.    Do you believe that law enforcement can rely on the

18   accuracy of the documents that you put on this site?

19   A.    I believe that they can.

02:41 20   Q.    Do you believe that scholars can rely on the accuracy of

21   -- the authentic nature of the videos on these websites?

22   A.    I think they can.

23   Q.    Indeed, you yourself can personally attest to their

24   authenticity in many instances, can't you?

25   A.    Well, to the material that came from my archive, but there

         1    are other investigators.  So I can't say that universally.

         2    Q.   Let's limit it to the material you provided from your

         3    archive.  It's fair to say that you are very confident in its

         4    authenticity, are you not?

         5    A.   I'm confident.

         6    Q.   Now, it's fair to say, like most sites, there are

         7    additions constantly being put on a website to improve it?

         8    A.   You're saying -- well, not constantly.  I think it varies

         9    over time.

02:42   10    Q.   Occasionally, there are things added to a website?

        11    A.   You're speaking about NEFA or --

        12    Q.   Yes, sir.

        13    A.   Okay.  I don't really -- I'm not involved in posting

        14    material onto that site.  I haven't been for a very long time.

        15    So I don't really know.  I know there's new material added over

        16    time, but I'm not sure how constant that is.

        17    Q.   If there is a significant new video, an opportunity will

        18    be made to try to put it on the site, isn't it?

        19    A.   Not necessarily, no.

02:43   20    Q.   If there's an important document that scholars or law

        21    enforcement would find valuable, is there an effort to try to

        22    identify that document and post it on the site?

        23    A.   Documents, yes; video, not as much.  But documents, yes,

        24    that's definitely true.

        25    Q.   And there's no question that this material that we're

1  talking about is authentic al Qa'ida material?

2  A.   As far as I'm aware, yes, it's authentic, or at least the

3  material that I personally contributed, yes.

4       MR. CARNEY:  May we approach, please?

5  (SIDEBAR CONFERENCE AS FOLLOWS:

6       MR. CARNEY:  Your Honor, I renew my offer and submit

7  that I've now laid a sufficient foundation.  I use this as an

8  example.  Let's say that your Honor, back in the day, was

9  presiding over a murder trial in the superior court.  Normally,

02:44 10  there would be a view.  Well, it's impossible to capture on a

11  view what a scene looked like exactly on the day of the crime.

12  But a view is always allowed or photos taken after the day of

13  the crime -- in fact, well later -- to give a jury an

14  understanding of what it looked like.

15       Here, the witness has made it clear that there may be

16  videos that have been posted now that were created in 2010 or

17  2011.  That goes to the weight of the evidence.  In terms of

18  showing this jury what this NEFA website looks like in terms of

19  documents and videos, I submit the foundation has been

02:45 20  presented enough, and it comes within the relevant Indictment

21  period, that it will give the jury an idea of what people,

22  during the time frame of this Indictment, could have seen going

23  to this site.

24       THE COURT:  Well --

25       MR. CARNEY:  Deficiencies go to the weight of the

1    evidence.

2           THE COURT:  The witness has described in general terms

3    the kinds of things that he recalls from the relevant time

4    period.  That makes most of your point already.  Whether a

5    specific exhibit offered relates to that time period, we don't

6    have a foundation for.  And so -- anyway --

7           MR. CARNEY:  The foundation --

8           THE COURT:  He said that there was stuff on there.  It

9    was Osama bin Laden and the other fellow and --

02:46 10          MR. CARNEY:  I don't know why I can't say his name.

11          THE COURT:  You already have that.  Now, on proper

12   foundation, authentication, you could get a 2005 video -- but,

13   anyway, I don't want to repeat.  Things haven't changed except

14   you've made much of your point.

15          MR. CHAKRAVARTY:  If this comes up again, your Honor,

16   maybe not with this witness but another witness, we don't agree

17   with the view analogy here.  This is actually a view in a

18   different --

19          THE COURT:  We don't have to try other cases.  There

02:46 20   would have to be a foundation that what would be seen on the

21   view would be substantially similar to what --

22          MR. CARNEY:  That is what this evidence does.  It

23   shows the jury what the website page looks like and to be able

24   to see the documents or the videos.  In a case where the

25   government has played so many --

1    THE COURT:  I'm sure the jurors know what websites

2    generally look like when they have links, okay.  To say that it

3    had this link because it has one five years later, we cannot

4    say.  Somebody might eventually be able to say that, but it

5    doesn't exist now.

6    .   .   .  END OF SIDEBAR CONFERENCE.)

7    Q.   Mr. Kohlmann, I'd like to shift to another area.

8    A.   Okay.

9    Q.   You mentioned yesterday that you are familiar with the

02:47 10   document 39 Ways to Serve and Participate in Jihad, is that

11   correct?

12   A.   I am, yes.

13   Q.   Now, this document gives ways that a person can

14   participate in Jihad that do not involve going to a battlefield

15   and fight, is that correct?

16   A.   I think some of them actually reference physical violence,

17   but there are other things in there which do not necessarily

18   involve physical violence, that's correct, yes.

19   Q.   And so this is a guide, in part, for people who are not

02:48 20   going to engage in physical violence because it is suggesting

21   other ways to fulfill the duty and obligation to Jihad?

22        MR. CHAKRAVARTY:  Objection, your Honor.

23   Q.   Do you agree with that?

24        THE COURT:  Overruled.  He may answer.

25   A.   No, that's not correct.  The alternative methods are

1    non-violent ways in which one can support violent Jihad.  In

2    other words, you can support other people engaged in violent

3    Jihad.  While those methods may themselves not involve physical

4    violence, it is still about the idea of supporting violent

5    Jihad.

6    Q.   Now, you testified that this is an al Qa'ida document, is

7    that correct?

8    A.   It was originally an al Qa'ida document, yes.

9    Q.   There is no reference to al Qa'ida anywhere in this

02:49 10   document, is there?

11   A.   In the original or in the English translation?

12   Q.   In the original or English translation.

13   A.   I actually believe the original document was released

14   directly through an al Qa'ida website.  So I --

15   Q.   Which website was that?

16   A.   The exact URL?  It was the website of Sawt al-Jihad.  It

17   was the website of Voice of Jihad Magazine.  It was available

18   at various different locations including

19   pagesforfree.biz/image444.

02:49 20   Q.   In the English translation --

21        MR. CHAKRAVARTY:  I don't think he's done with his

22   answer.

23        MR. CARNEY:  I'm sorry.

24   A.   Hostforfree.com/image 555.  It was on a website -- the

25   website kept getting shut down.  It was a temporary website, so

1    it kept going on and off.

2    Q.   So there were a number of websites where someone could

3    access this document?

4    A.   The al Qa'ida -- the official al Qa'ida website, yes.

5    Q.   The English translation that was done makes absolutely

6    zero references to al Qa'ida?

7    A.   Not that I can recall.

8    Q.   There's nothing in the English translation that talks

9    about how to make a bomb or how to make a suicide vest, is

02:50 10   there?

11   A.   No.   That's correct.   That information is not in there.

12   Q.   And you've identified the al Qa'ida logo, correct?

13   A.   There's a couple of different ones, but --

14   Q.   And you've told us that a way a person could know that a

15   document was an authentic al Qa'ida document was the presence

16   of the al Qa'ida logo, is that right?

17   A.   That's correct, yes.

18   Q.   In the translation done by Tarek Mehanna, there is no al

19   Qa'ida logo, is there?

02:50 20   A.   Not on the translation, no.

21   Q.   There are plenty of references and quotations from the

22   Qur'an, correct?

23   A.   Yes, that's true.

24   Q.   There are plenty of quotations from Hadiths, correct?

25   A.   That's true.

```
 1   Q.   But no references and no logo connecting this document in
 2   his translation to al Qa'ida, isn't that true?
 3   A.   I'm not a hundred percent sure.  The only area where there
 4   might be a reference would be in the biography of the author.
 5   Q.   Have you seen that?
 6   A.   I don't -- honestly, I don't recall whether -- some of
 7   these documents have that, some don't.  I'm not sure if that
 8   particular one has the bio in there.
 9   Q.   And you don't even remember for sure what the bio says?
10   A.   Oh, I know what the bio says.  I just don't know if the
11   English-translated version that you're talking about has a copy
12   of that biography in there.
13   Q.   If it doesn't, then this translation has no reference
14   whatsoever to al Qa'ida?
15   A.   Not that I can recall -- aside from that, not that I
16   recall.
17   Q.   So aside from -- if the biography is not in there, this
18   document does not contain a reference to al Qa'ida or a logo to
19   al Qa'ida, does it?
20   A.   The translated version, the English translation?
21   Q.   Yes.
22   A.   Not that I'm aware of, not that I can recall anyway.
23   Q.   Now, you testified about the fact that there was a video
24   biography of Umar Hadeed?
25   A.   No.  I don't think I did.
```

1    Q.    Was there a video focused on the life of Umar Hadeed?

2    A.    Not that I'm aware of, no.

3    Q.    What is "The Expedition of Umar Hadeed"?

4    A.    That's not about Umar Hadeed.  The title is "The Ghazwah

5    Umar Hadeed."  But that's not -- the subject of the video --

6    it's about an operation that was named in honor of Umar Hadeed.

7    Q.    Now, on NEFA, there is the story of this operation, Umar

8    Hadeed, is there not?

9    A.    I don't know.  There might be.

02:52 10   Q.    In fact, it's translated into English, isn't that true?

11   A.    I don't know.

12   Q.    Now, you said during your testimony that the defendant,

13   Tarek, was asked to do a -- some editing of a Wa Yakoon video?

14   A.    I don't know.  Are you referring to my report?

15   Q.    Yes.  No, to your testimony.

16   A.    I don't think I ever testified to that.

17   Q.    You're aware of the fact that Tarek never did anything in

18   regard to that video?

19   A.    I'm not sure I'm aware of that either.  My only knowledge

02:53 20   of a translation of Wa Yakoon was on the hard drive that I

21   reviewed, there was a partial English translation of the video,

22   Wa Yakoon, that was in a document, a Microsoft Word document.

23   But that English translation was never -- I don't believe it

24   was ever published.  I don't believe it was ever released.  But

25   that's --

1    Q.   There's no evidence that Tarek wrote it, is there?

2    A.   I'd have to take a look at the Microsoft Word document and

3    see if there's an author listed.  I actually -- offhand, I

4    don't recall whether or not there was one.

5    Q.   Is Tarek British?

6    A.   I don't believe so.

7    Q.   Are you familiar with the fact that British citizens write

8    English words in a slightly different way?

9              MR. CHAKRAVARTY:  Objection, your Honor.

02:54 10              THE COURT:  Sustained.

11              MR. CARNEY:  He's nodding when I'm asking.

12              MR. CHAKRAVARTY:  Objection.  Beyond the scope.

13              THE COURT:  Sustained.

14    Q.   Did you see British forms of spelling in that English

15    translation?

16              MR. CHAKRAVARTY:  Objection, your Honor.

17              THE COURT:  You may answer that.

18    A.   I don't recall.

19    Q.   If there were British spellings of words in that

02:54 20    translation, would that suggest to you that it was not authored

21    by Tarek?

22    A.    Not necessarily.  I've actually seen American Jihadis from

23    Pennsylvania use British spellings in their English

24    translations because of the fact that a lot of the people that

25    read these are in the United Kingdom.  So it doesn't really --

1   one way or the other, there's really no way of knowing.

2   Q.   Do you see any document written by Tarek ever on that

3   computer that used British spellings of words?

4   A.   I don't know.  The only document --

5   Q.   Did you see anything demonstrably written by Tarek that

6   used British spellings of words?

7   A.   I really -- I don't recall.

8   Q.   Now, you've said that disseminating information by al

9   Qa'ida is essential to its success, is that right?

02:55 10   A.   That's correct, yes.

11   Q.   It's also essential because it keeps al Qa'ida in the

12   news, isn't that right?

13   A.   I think that's fair to say.

14   Q.   Haven't you said that by repeating these things that it

15   allows al Qa'ida to suggest it has significance, correct?

16   A.   That's one part of it, I think, yes.

17   Q.   And haven't you also written that one can argue that

18   absent the constant and reassuring broadcasts by al Qa'ida the

19   general public would begin to forget about Osama bin Laden and

02:56 20   the al Qa'ida agenda?

21   A.   Yes, I did write that.

22   Q.   Now, you're aware that Tarek never went to the website

23   Al-Shamukh, correct?

24   A.   I am not aware either way, although I'm assuming he hasn't

25   only because of the fact that the website has only been around

 1  since mid-2008.

 2  Q.   You never found any reference on the computer to the

 3  website Al Ansar, correct?

 4  A.   You're talking about Muntada Al Ansar as in Younis

 5  Tsouli's Muntada Al Ansar?

 6  Q.   Yes.

 7  A.   Not that I can recall, no.

 8  Q.   You didn't find Al-Fajr on Tarek's computer?

 9  A.   You mean the Al-Fajr Media Center?

02:57 10  Q.   Yes.

 11  A.   No, I don't believe so.

 12  Q.   The only reference to Al-Ekhlaas was a screen shot that

 13  had been sent to him, correct?

 14  A.   Well, I don't know whether it was sent to him or not.  I

 15  know, on the hard drive, there were image -- screen shots of

 16  Ekhlaas and Al-Hesbah.

 17  Q.   But no indication that those sites had actually been

 18  visited?

 19  A.   Beyond that, no.

02:57 20  Q.   You're aware of the fact that Tarek was arrested when he

 21  was at the airport?

 22  A.   Actually, I wasn't aware of that, but --

 23  Q.   I want you to assume that he was arrested as he was

 24  preparing to fly to Saudi Arabia and work at the King Fuad

 25  Medical City.  Did the prosecutor show you the contract that

1   Tarek had for his employment?

2   A.   Not that I can recall.

3   Q.   It's fair to say that Osama bin Laden hated the leaders of

4   Saudi Arabia, didn't he?

5   A.   The royal family, that's correct, yes.

6   Q.   The royal family that runs Saudi Arabia, correct?

7   A.   That's correct, yes.

8   Q.   Osama bin Laden was quoted as saying that he hated Saudi

9   Arabia more than he hated Israel and the United States?

02:58 10   A.   Referring to the Saudi royal family, yeah, that's correct.

11   Q.   He considered them to be apostate, correct?

12   A.   The royal family, yes, that's correct.

13   Q.   And what does the word "apostate" mean?

14   A.   It means roughly heretic.  Someone who's a deviant from

15   the faith.

16   Q.   For a person like Osama bin Laden, it was the worse thing

17   he could say about anybody?

18   A.   About the Saudi royal family, he said it repeatedly, yes,

19   that's correct.

02:58 20   Q.   I apologize.  I didn't catch what you were saying.

21   A.   I said, as far as the Saudi royal family, yes, he disliked

22   them, and he repeatedly emphasized that, yes.

23   Q.   And repeatedly called them apostates or heretics or

24   traitors to the Muslim religion?

25   A.   That's true.

1   Q.   Going there to Saudi Arabia to work, to live, to marry, to

2   raise a family, would be the last thing that a dedicated

3   follower of Osama bin Laden would ever do?

4          MR. CHAKRAVARTY:  Objection, your Honor.

5          THE COURT:  Sustained.

6   Q.   Are you aware that that's what Tarek Mehanna was doing on

7   the day he was arrested?

8          MR. CHAKRAVARTY:  Objection, your Honor.

9          THE COURT:  Sustained.

02:59 10   Q.   Thank you, Mr. Kohlmann.

11          MR. CARNEY:  That's all I have, your Honor.

12          THE WITNESS:  Thank you.

13          THE COURT:  Redirect?

14          MR. CHAKRAVARTY:  I do, your Honor.

15   REDIRECT EXAMINATION BY MR. CHAKRAVARTY:

16   Q.   Mr. Kohlmann, I apologize for making you miss your

17   congressional testimony.

18   A.   That's no problem.  Thank you.

19   Q.   You were asked some questions -- and I won't ask nearly as

03:00 20   many -- about classified information and the fact that you

21   don't use it.  Why don't you use classified information?

22   A.   For a variety of reasons, among which, No. 1, it's very

23   difficult to tell with classified information what the original

24   source is, where it's coming from, whether or not that source

25   is reliable.  Many times, classified sources are human sources

1  which are -- invariably can be unreliable especially when not

2  -- there's no context in terms of who this person is or where

3  they're coming from or how they know this information.

4      The second reason is because of the fact that I work with

5  government analysts on a frequent basis who have security

6  classifications.  And they have repeatedly told me that

7  classified information does not necessarily provide anyone any

8  great advantage in studying the groups that I study beyond open

9  source materials because many of the most important details are

03:01 10  contained in open source documents.

11  Q.   You were asked about what you have reviewed that the

12  government has given you, whether it be in this case or in

13  other cases.  What types of information have you reviewed that

14  the government has given you to review?

15  A.   In this case?

16  Q.   Both in this case as well as in other cases generally.

17  A.   Sure.  In this case, I was given a copy of the preserved

18  hard drive from the Federal Bureau of Investigation.  In other

19  cases, occasionally -- well, I'm frequently given copies of

03:01 20  hard drives.  Occasionally, I'm also provided with FBI 302

21  documents, other evidentiary materials that are seized.  But

22  most of the time it revolves around computer evidence.

23  Q.   So in addition to your online kind of investigations, do

24  you also review the stored data that the government gives you?

25  A.   Yes, yes, yes, of course.  Occasionally, I'm not given a

1    preserved copy of the hard drive.  I'm simply given individual

2    documents that have been recovered, either paper, physical or

3    virtual.  And I'm asked to opine on the significance of those

4    documents.

5    Q.   You were asked some questions about -- before we leave

6    kind of what you've reviewed, that's not the sum total of what

7    you review before you form your opinions?

8    A.   No, no, no.  In order to form my opinions, I take those

9    materials, and I compare and contrast them with other cases in

03:02 10   which I've been involved, other evidence that I've reviewed,

11   other evidence that's in my archive from having studied the

12   activity of al Qa'ida and its affiliates.  And, again, I do a

13   compare and contrast analysis looking at all those different

14   sources and coming together with:  Why is this significant?  Is

15   it significant?  How is it significant?  And that's my report.

16   Q.   You were asked about press reports.  In what circumstances

17   is media reporting helpful to you?

18   A.   Media reporting is only helpful in a limited context.  I

19   only use it as such.  Generally speaking, news articles are

03:03 20   only helpful to provide context.  In other words, if somebody

21   is arrested in a foreign country and that's simply a fact, I

22   will use a newspaper article to refer to that because that is

23   an objective fact.  Somebody has been arrested.  If there's an

24   -- if I'm trying to prove that something is publicly known, I

25   might quote a New York Times article or a Houston Chronicle

 1   article which indicates that certain facts are not secret.

 2   They're publicly known in the general public, in the media, and

 3   to everyone regardless of whether or not you have a degree in

 4   terrorism studies.

 5        But that's the only context in which I use them.  I would

 6   never use them to try to substantiate what al Qa'ida is doing,

 7   what other Jihadi movements are doing.  They're merely there

 8   for context.

 9   Q.   You were asked in the -- about your expert report that you

03:04 10   drafted for purposes of this case.  And you were asked about

 11   whether certain portions of that report were "cut and paste"

 12   into this report.  In what circumstances did you copy

 13   information from previous reports into the report that you did

 14   for this case?

 15   A.   It happens that in criminal cases, very frequently, the

 16   evidence in these types of criminal cases is very similar.

 17   Sometimes it's the same.  In a case where I have multiple

 18   pieces of evidence that are absolutely identical from material

 19   that I've reviewed in other cases, then obviously my assessment

03:04 20   of that material would be identical.  It would be the same.  If

 21   it was different, that would be problematic.  So where -- while

 22   I certainly tailor my analysis of those documents vis-à-vis a

 23   particular case to the facts of that case, if certain documents

 24   repeatedly surface in cases that I work on, the same documents

 25   over and over again, yeah, I mean, I would repeat exactly what

1    I had said before about that same document, that same video,

2    because it is, in fact, the same product, and it has the same

3    significance.

4    Q.   You were asked several questions about peer-review.  Can

5    you explain, in your words, what you do that is peer-reviewed,

6    either in an informal or in a formal way?

7    A.   Well, formally, I submit magazines -- I submit journal

8    articles.  For instance, the last thing that I published was

9    through African Security, which is a peer-reviewed publication.

03:05 10   The piece I submitted was on the Shabaab movement in Somalia,

11   S-h-a-b-a-a-b.  It was cowritten with two other authors.  We

12   submitted the initial draft to the Journal.  The Journal then

13   gave it to several other experts in the field who reviewed it,

14   who came back to us with comments, who came back to us with

15   suggestions, criticisms.

16      Then we took those suggestions and criticisms and

17   formulated a new draft, and then that was resubmitted and that

18   was re-reviewed.  We got a second round of comments back, a

19   second round of critiques.  Then we edited it once again and

03:06 20   then we resubmitted it, and eventually it was accepted for

21   publication.

22      Informal peer-review -- again, there are lots of

23   publications that deal with terrorism that don't necessarily

24   have a formal peer-review process.  But I like to make sure

25   that anything that I'm publishing, regardless of whether it's

1    in a formally peer-reviewed journal or not, I want to make sure

2    it's accurate, and I want to make sure that I'm not saying

3    anything that experts in my field would violently disagree

4    with.

5         So in order to do that, No. 1, I present my findings at

6    conferences in front of other experts, and I solicit their

7    opinions and their reactions and their critiques.  When I

8    finally do write something out of the stuff that I've been

9    presenting at conferences, I then take that material, and I

03:06 10   send it around to a list of other individuals who are engaged

11   in similar research or similar topics.  People that I know,

12   know about a particular area that I'm writing about because one

13   of the problems with formal peer-review is that sometimes these

14   materials are submitted to people who might know generally

15   about a subject.  They might know generally about terrorism,

16   but they don't know enough specific information to offer me

17   real feedback about an area like Jihadi social networking on

18   the web or a particular al Qa'ida faction in a particular

19   region.  So, you know, the problem with that is you really want

03:07 20   to get people's opinions who know about those specific areas

21   because just general reaction is not necessarily very helpful.

22   Q.   So specifically with regards to al Qa'ida and other

23   terrorist groups' use of the internet and social networking

24   forums, approximately how many, in your terms, people are there

25   who have particularly developed an expertise in that realm?

1    A.   There's approximately between 10 and 15 between Southeast

2    Asia, European, and the United States.  It's a fairly small

3    community of people because most of the people involved in this

4    are fairly young because it requires some degree of computer

5    savvy and internet savvy.

6        We often see each other at conferences.  We often speak

7    alongside of each other.  And because it's such a small group

8    of people, invariably you have to share those ideas with them.

9    You have to talk about this stuff.  That's the only way you're

03:08 10   going to learn anything.  So, yeah, for instance, the testimony

11   that I was supposed to give today down on Capitol Hill --

12        MR. CARNEY:  I object, your Honor.

13        THE COURT:  Well, if it's responsive -- I don't know

14   whether it is until I hear it.

15        MR. CARNEY:  It can't possibly be responsive to the

16   question.

17        THE COURT:  Overruled.  Go ahead.

18   A.   The other individuals who were -- are going to be

19   testifying alongside of me, I know all those individuals.  I

03:08 20   talk to them on a regular basis.  We share ideas.  For that

21   matter, if I ever post something or publish something that they

22   disagree with or they have an argument with or they want to ask

23   me about, I mean, I immediately get phone calls and emails.

24   Q.   You were asked about your undercover activities.

25   A.   Right.

Q.   First, what did you mean when you described some of the
things that you have done as "undercover"?

A.   Sure.  What I meant by that is that, again, I approached
individuals who were radical extremists, who were in favor of
physical violence.  I approached them as an individual who
might be sympathetic to their views or at least open to hearing
about their views.  And I did not disclose the fact that I was
a terrorism researcher.  I simply disclosed the fact that I had
-- I was a student of Islam.  And I engaged in various
activities under that guise.

Q.   Is that -- you described, I think, one episode about
filming.  Have you assumed that type of a role online as well?

A.   Online, offline.  I mean, online, I have repeatedly used
pseudonyms.  Online, I've repeatedly used false identities.
I've repeatedly sent information over the internet to
individuals who are violent extremists posing as someone other
than myself.  In real life, I've done the same thing.  In the
United Kingdom, I went over and I infiltrated a group of
extremists, and I hung out with them for several weeks.  And I
observed their activities, and they asked me to join them and I
declined.

     But that's what I was referring to when -- again, it's a
rough word, but it's a vernacular word.  But "undercover" is a
rough approximation for what I was describing there.

Q.   You were asked questions about your abilities to read and

1    translate in Arabic.  I think you've explained that a little

2    bit.  But how do you kind of -- as part of your investigative

3    process, how do you translate material?

4    A.   It was my assessment that learning Arabic would -- at

5    least in a formalized process, would not provide me with enough

6    expertise to be able to judge original language documents

7    written by native speakers.  So in order to do that, I felt it

8    was simply more efficient and a better approach to actually

9    have native speakers working with me who, again, are from the

03:11 10   Middle East, who are from these countries, and who would not

11   only be able to translate but would be able to understand the

12   context, the religious terminology, and other aspects because

13   very frequently this material -- Arabic is a very poetic

14   language.  And, oftentimes, this stuff is written in a poetic

15   way where, even if you're able to literally translate, you may

16   not get the full meaning of what's going on, of what's being

17   said.

18        So -- and the other problem is that Arabic is only one

19   language that we deal with.  We deal with Arabic; Urdo; Pashto;

03:11 20   Dari; very rarely, but I guess occasionally, Kurdish; Somalia.

21   I guess the point being here is that I couldn't possibly learn

22   all those languages myself and still do research, not in a way

23   that I would be able to learn them efficiently enough to be

24   able to translate documents.

25        It's much more efficient for us to simply have people who

1    are analysts at our company who are native speakers of those

2    languages.  And so in New York, we have native speakers -- we

3    have multiple native speakers of Arabic, Urdu, Pashto.  In

4    Pakistan, we have native speakers of Urdu, Pashto, Dari.

5    Pretty much every language in that region, we have people that

6    speak it.

7    Q.    Do you pay these translators?

8    A.    We have to, yes.

9    Q.    In addition to the native-language translators, do you

03:12 10   have any automated tools to assist?

11   A.    Yes.  I should add that.  As well as that, in order to

12   browse internet websites that are written in foreign languages,

13   there are a number of publicly available translation tools, one

14   of which is Google Translate.  These are obviously not perfect,

15   far from it.  But they do allow us to engage in what we call

16   triage.  We're able to look quickly at documents and be able to

17   see:  Is this document significant?  Is there something in here

18   worthy of translation?

19        If we come across documents using automated translation

03:13 20   tools that appear to have significant information, we

21   immediately draw those documents to the attention of our

22   translators, of our analysts, who speak the native language,

23   whatever document it's in.  They create a translation.  We go

24   through it.  We make sure it's accurate.  And then -- you know,

25   we then use it in our research, our analysis.

        1    Q.   You were asked several questions about how much money you

        2    make, and I think your testimony was it's approximately

        3    $520,000 by the -- by federal prosecutors between the years

        4    2006 through 2010.  Is that about right?

        5    A.   I think 2011 was my figure, but, yeah, that figure was all

        6    the way up until -- it was calculated all the way up until two

        7    weeks ago.

        8    Q.   So over the last five years, you've been making roughly

        9    105 grand from your work with the Department of Justice?

03:14  10    A.   That's correct, yes.

       11    Q.   A year, I should say.

       12    A.   A year, that's correct, yes.

       13    Q.   And from that money -- that's gross, correct?

       14    A.   That's gross, yes.

       15    Q.   From that you then pay translators; you pay your overhead?

       16    A.   I have to pay rent for my office, I have to pay for

       17    translators.  I have to pay for computer equipment.  I have to

       18    pay for internet.  I have to pay for software.  There's a lot

       19    of expense.  Even for a business that deals with internet

03:14  20    technology, there are a lot of expenses.  They're not cheap.

       21    Q.   Where is your company based?

       22    A.   Our company is based in New York City, in Manhattan.

       23    Q.   Is that where you live?

       24    A.   It is, yes.

       25    Q.   That's not cheap either.

1       Let's get to the kind of substance of what you testified

2  to and what Mr. Carney asked you about.  He asked you whether

3  you have a way of knowing -- roughly, about whether you have a

4  way of knowing whether people are telling you the truth when

5  they're online on these social network forums as to whether

6  they're actually going to the battlefield, so to speak.  And

7  you started to say that there are ways that you can verify

8  this.

9  A.   There are.

03:15 10  Q.   How do you verify some of the information that you obtain

11  on the internet?

12  A.   One of the first things we do is we look to Internet

13  Protocol addresses.  These are the origin points.  It's kind of

14  like your phone number on the internet.  If you know about

15  Internet Protocol addresses, it's pretty easy to figure out

16  where somebody is located because they actually tell you

17  exactly the geographic region in which someone is located.

18       If we contact someone who we believe is an armed fighter,

19  somebody who's physically on the battlefield or is talking

03:15 20  about being on the battlefield, one of the first thing we look

21  to is their IP address.  Where is that IP address coming from?

22  If we see an IP address repeatedly popping up in Waziristan, on

23  the Afghan-Pakistani border, the chances are extremely high

24  that that person is telling the truth because that region is a

25  no-go region for outsiders.

1       The same thing is, if we contact someone -- and we have

2   done this -- from AQAP, from al Qa'ida in Yemen, and we get a

3   response back, we look at the IP address.  Once again, in that

4   case, we got an IP address in Yemen.  The next thing we do is

5   we start trying to parse together the personal details of these

6   individuals.

7       What frequently happens is that these individuals end up

8   being killed or captured.  And it's pretty clear at that point

9   whether or not someone was telling the truth.  Out of

03:16 10  approximately 120 people who we have identified online as being

11  armed violent extremists on the battlefield, over half, 65 of

12  them, have been killed, have been killed either building bombs,

13  have been killed in missile strikes, have been killed in gun

14  battles with law enforcement.  But it's a pretty objective

15  thing at that point that that was the person and they're

16  deceased.

17  Q.   You were asked about which of these social network forums

18  you didn't have access to, and you mentioned Ansar

19  Al-Mujahideen and Tibyan Publications.  I should say which you

03:17 20  didn't have a password to.

21  A.   I didn't have a log-in and password to, that's correct.

22  Q.   What access did you have to these sites?

23  A.   Well, I had access to material provided to me secondhand.

24  At-Tibyan material was being posted all over the place.

25  Material from the at-Tibyan forum was being reposted on the

Muntada Al Ansar forum, which I did have access to.  And since

that time, I've been provided with multiple documents which

have been recovered from the at-Tibyan website, provided to me

by law enforcement both in the United Kingdom, Scotland, and

the United States, and West Yorkshire Police.

Q.   You were asked about the Nine/Eleven Finding Answers

website.  That's a nonprofit organization that you're involved

in?

A.   That's correct, yes.

Q.   With regards to the Jihad video clips that are on that

website, or have been as long as you've been aware of it, what

is the purpose of putting those on the internet?

A.   The purpose is to communicate to the general public, to

academics, to policymakers, to law enforcement, to give them a

taste of what's going on in the world of al Qa'ida and violent

extremists.  We don't -- we only publish -- or I think NEFA has

only published a handful of these excerpts specifically because

of the fact that we don't want to provide any benefit to anyone

aside from academics, policymakers, law enforcement, that kind

of crowd.  But that being said, I wouldn't encourage anyone

else to visit the website because we do log IP addresses, and

we carefully monitor everyone who's visiting our website.

Q.   Do you have banners indicating -- or are there banners on

the NEFA website that indicate what the purpose is for the

publication of the --

1    A.    Yeah.  It's pretty much broadcast loud and clear.  NEFA is

2    known among Jihadists.  It's not well-liked.

3    Q.    In fact, on your direct testimony, I think, on Friday, we

4    called up an exhibit that was from that website, correct?

5    A.    That's correct, yes.

6    Q.    The materials that you have provided to NEFA that have

7    been put onto the website, how did you obtain them -- how did

8    you obtain them, I guess?

9    A.    Well, it depends.  There was a recording placed on the

03:19 10    website of a protest rally in London.  I personally recorded

11    that video.  There was a video -- another video on there of a

12    protest rally in New York from 2007 that I personally recorded.

13    The other materials, generally speaking, were either obtained

14    from sources on the ground in Pakistan or they were obtained

15    from al Qa'ida's internet websites.

16    Q.    Was the purpose of NEFA's posting related to trying to

17    help al Qa'ida?

18    A.    No, I don't think you could say that.

19    Q.    What's NEFA's mission?

03:20 20    A.    NEFA's mission is try to prevent future acts of terrorism

21    and try to educate the public at large, academics, policymakers

22    law enforcement, and others about the threat of terrorism.

23    Again, I mean, the clips that were on there, there's only a

24    handful of clips, we were very careful not to give too much

25    video on the website because we didn't want to serve as a

1    mouthpiece for al Qa'ida.

2    Q.   You were asked about the -- what you saw on the computer

3    hard drive that the government gave you with regards to

4    Al-Ekhlaas and Al-Hesbah websites.  These are two of the

5    websites that you described earlier as being associated with al

6    Qa'ida, correct?

7    A.   That's correct, yes.

8         MR. CHAKRAVARTY:  Can we call up Exhibit 503, please?

9    Q.   So in this conversation, does Abu Mundhir say, "Still got

03:21 10   access to Ekhlaas?"  The defendant says, "With the password you

11   gave me?"  Abu Mundhir says, "Yeah."  The defendant says, "Ya."

12   Then a link is sent.  And then Abu Mundhir says, "Check it out.

13   It's on Al-Hesbah also."  Then the defendant says, "Damn

14   straight."  Is Al-Ekhlaas the website that you had previously

15   mentioned?

16   A.   Yes.  I had omitted this.  This is a reference that I had

17   come across in a chat on the computer, and it's definitely to a

18   link to Al-Ekhlaas, the forum.

19   Q.   The reference after that is to Al-Hesbah.  Is that the

03:22 20   website you were referring to?

21   A.   That is al Qa'ida's other main forum for this time period,

22   that's correct.

23        MR. CHAKRAVARTY:  Can we go to Exhibit 502 very

24   quickly?

25   Q.   Are these those two websites again?

```
 1   A.   Yes, that's correct.  Al-Hesbah, alhesbah.org and
 2   alekhlaas.net.  At the time, these were al Qa'ida's preeminent
 3   social networking forums.
 4          MR. CHAKRAVARTY:  Thanks, Paul.
 5   Q.   Finally, I want to talk about some of the questions Mr.
 6   Carney asked you about Yemen.  You're not aware of any of the
 7   witness statements in this case, is that right?
 8   A.   Aside from my own, I don't believe so.
 9   Q.   The government only provided you with the hard drive and
10   some additional posts?
11   A.   That's correct, yes.
12   Q.   When you described what you knew when you answered my
13   questions about Yemen, they weren't based on any awareness that
14   you have with regards to the significance of Yemen in this
15   case, is that right?
16   A.   I don't believe so, no.
17   Q.   So after 9/11, I think you testified on cross-examination
18   that the government of Yemen, the president, the then president
19   of Yemen, came to the United States and said they would
20   cooperate with the hunt to find al Qa'ida, is that right?
21   A.   That's correct, yes.
22   Q.   And do you know if that, in fact, happened?
23   A.   Well, they tried.
24   Q.   What was the -- what transpired as they were trying?
25   A.   They attempted to crack down on al Qa'ida, but al Qa'ida
```

1    continued to launch terrorist attacks.  In October of 2002,

2    approximately 13 months after 9/11, an al Qa'ida suicide bomb

3    team that had been trained and recruited inside of Yemen less

4    than six months before, carried out a suicide bomb attack

5    targeting a French supertanker off the coast of Aden in Yemen.

6         Two months later, in December of 2002, a Yemeni politician

7    was assassinated; and shortly thereafter, a group of American

8    Baptists, I guess, missionaries, inside of a hospital in Jibla,

9    were massacred by individuals claiming to be from al Qa'ida and

03:25 10    later determined to be al Qa'ida associates.

11         As far as I understand it, at least throughout this

12    period, there were al Qa'ida training camps, al Qa'ida

13    activity, al Qa'ida operations, attacks, taking place in Yemen.

14    Q.   At some point, there were -- I think you testified on

15    cross, there was a series of arrests of several people?

16    A.   There were, yes.  There was -- first of all, there was the

17    killing of Abu al-Harithi, H-a-r-i-t-h-i, who was, roughly

18    speaking, the commander of al Qa'ida in Yemen, although it was

19    not official.  There were arrests of other individuals, Abu

03:25 20    Basir al-Wahishi, A-b-u, B-a-s-i-r, a-l, W-a-h-i-s-h-i, Qasim

21    al-Rimi, Q-a-s-i-m, a-l, R-i-m-i, and others.

22    Q.   But there was a much publicized prison break, I think, as

23    Mr. Carney described?

24    A.   That's correct.  These same individuals then, both Mr.

25    al-Rimi and Mr. Al-Wahishi, were able to escape from prison,

1   that's correct.

2   Q.   That was in 2006?

3   A.   Approximately, yes.

4   Q.   How would you describe al Qa'ida's presence in Yemen

5   during those time frames?

6   A.   It was less than it had been before largely because of the

7   fact that many Yemenis operatives were being drawn out to go

8   fight in Saudi Arabia and in Iraq.  However, Yemen remained a

9   important area for al Qa'ida because of the fact that it was

03:26 10   one of the few places, other than Iraq, where Saudi al Qa'ida

11   members could organize in secret.  Saudi Arabia is a police

12   state.  So it was very difficult for Saudi al Qa'ida cells to

13   organize themselves or to get weapons inside of Saudi Arabia.

14        However, that kind of lack of oversight and an abundance

15   of weapons was very easily found across the border in Yemen.

16   So throughout this time, throughout the period of activity in

17   Saudi Arabia and in Iraq, you had recruits, money, weapons, and

18   other forms of support headed from Yemen to Saudi Arabia, Iraq,

19   Afghanistan, et cetera.

03:27 20             MR. CHAKRAVARTY:  That's all I have, your Honor.

21             MR. CARNEY:  May we approach, please?

22   (SIDEBAR CONFERENCE AS FOLLOWS:

23             MR. CARNEY:  Your Honor, I submit that on this

24   redirect examination, the government has opened the door to

25   allow me to play these videos.  They asked questions of the

1    witness which the witness answered in the present tense, such

2    as "we only put on a handful of clips on the website."  "We

3    don't want to be a mouthpiece for al Qa'ida."  "We don't want

4    to be helping al Qa'ida."  All of this testimony was in the

5    present tense.  I want to present the videos that are currently

6    on the website to show that it's not a handful.  There are 37

7    al Qa'ida videos.

8          And in terms of the documents, where they say, "We

9    don't want to be the mouthpiece for al Qa'ida," there are 107

03:28 10   documents exclusively related to al Qa'ida.  Forty of them are

11   by Osama bin Laden, translated documents.  Thirty-three of them

12   are Doctor al-Z.  Thirty-four of them are other al Qa'ida

13   members.  And they'll see on the website there are other

14   sections devoted to numerous other terrorist groups.

15         My point is that the fact that this witness and the

16   prosecutor were talking about this in the present tense now

17   allows me to show what the present looks like on this website.

18         MR. CHAKRAVARTY:  It doesn't change what's probative

19   to the issue in the case.  I understand it's being offered to

03:29 20   impeach the witness, then he can ask the question of parole

21   evidence to try to further impeach him on that.  On such a

22   peripheral matter, it doesn't seem to make sense.  To ask the

23   question:  Do you know whether there are 107 videos on the

24   website as it appears today seems to be impeaching this

25   witness?  But it doesn't advance the ball at all.  I don't

1    think I opened the door.  In fact, I quibble with whether he

2    said -- and how I was asking the questions.  Whether he was

3    saying, as of today, this is what is on there.  I think he's

4    already established his basis of knowledge of the website.  It

5    was not months ago, No. 1.  And, No. 2, he was asked about a

6    range of time, not about specifically, right now, this is what

7    is on the website.

8         MR. CARNEY:  If I may respond?  It's got nothing to do

9    with parole evidence.  In 33 years, I've never had an instance

03:30 10   where parole evidence has ever been relevant.

11        What this involves is the questioning of the witness

12   was in the present tense.  We don't want this to be on our

13   website.  The prosecutor concedes that I can ask him about it.

14   That concession may be the way he would want to do it, but I

15   want to be able to show the jury so they can see with their own

16   eyes what they're talking about.

17        If it wasn't important, he shouldn't have brought it

18   up in redirect.  If he wanted to limit it to 2005 or 2006, he

19   should have talked about it back then.  But I was very careful

03:30 20   to watch the tense.  The exact quotes are, "We don't want to

21   be" -- "We don't want to be a mouthpiece," and "There are only

22   a handful."  I want to show the jury that's not true.  He's

23   opened the door now.  He never should have gone near there, but

24   he did, and he's created a complete misimpression for this

25   jury.

```
 1            THE COURT:  I think a general description of the
 2    website has already been elicited by both sides.  I don't think
 3    the use of the present tense makes specific exhibits admissible
 4    without a connection to the relevant time period.  So you can
 5    -- I agree, basically, that you can question about the numbers
 6    and so on, but I don't think it's a basis for providing that
 7    Clip A should be admitted without some connection to the events
 8    of the case.
 9            MR. CARNEY:  This is the connection, your Honor.  Clip
10    A is Osama bin Laden speaking.  It will directly impeach this
11    witness that they're not acting as a mouthpiece for al Qa'ida.
12    They're saying, We don't want -- We don't want this site to be
13    a mouthpiece.  That's what they're contending.  I'm going to
14    show he's not accurate.  He's not accurate and he's not
15    truthful.
16            THE COURT:  Well, he --
17            MR. CARNEY:  You don't --
18            THE COURT:  You can get it by questioning without the
19    exhibits.
20            MR. CARNEY:  Your Honor, you've let in so many videos
21    over and over and over.  And I want to show that the same
22    videos are available and that they are acting as the mouthpiece
23    for al Qa'ida.  The only way the jury can make this
24    determination is if they see it.
25            I've indicated there are 37 on the website.  I am
```

1    offering four.  Three of them are less than two minutes.  One

2    of them is less than four minutes.  I want to offer five

3    documents, not to read them but just to show who they are by

4    and what the subject is.  It's going to take a very brief

5    amount of time, but it will convey the point to the jury that

6    what was said on redirect simply isn't true.  He opened it.

7            MR. CHAKRAVARTY:  That's a very different issue.

8            MR. CARNEY:  He opened it, and this evidence will

9    directly impeach this witness and show his bias.  Without

03:33 10   showing it, the bias doesn't come through.

11           THE COURT:  With respect to documents, if you have

12   five documents, you can show them to him and see if he can tell

13   you whether they were there in earlier iterations or they're

14   recent additions.  Depending on the answer, that might affect

15   those.  I don't know whether he can do the same thing with

16   videos.

17           MR. CHAKRAVARTY:  Videos have a post date.  And from

18   the ones that -- my memory is that they were -- they appear to

19   be posted 2009, but I saw them for all of two, three minutes.

03:33 20   So I don't know for sure.

21           MR. CARNEY:  If I can show that these were posted in

22   2006 by those tags, then would that make a difference to your

23   Honor?

24           THE COURT:  If there's reliable evidence that they

25   were contemporaneous with the time of the events of the trial,

1    that's -- that -- at least that overcomes the prior ruling.

2            MR. CARNEY:  All right.  May I have -- I'll just need

3    one minute to look at them.  I've got them all listed .

4            MR. CHAKRAVARTY:  I think that's consistent with what

5    your ruling is, but that's not the impeachment issue.  That is

6    back to they're offering it as probative evidence of a fact

7    that makes it something --

8            THE COURT:  Might be both.

9            MR. CARNEY:  I'm offering it for both.

03:34 10        MR. CHAKRAVARTY:  We still have the 403 objection, but

11   let's see what it says.

12   .  .  .  END OF SIDEBAR CONFERENCE.)

13           MR. CARNEY:  I'll need a minute if I could, please,

14   your Honor.

15           Sorry for the delay.

16           Should I come back?

17           THE COURT:  Okay.

18           MR. CARNEY:  I should have said -- I'm sorry.  May I

19   approach the sidebar?

03:40 20        THE COURT:  Yes.

21   (SIDEBAR CONFERENCE AS FOLLOWS:

22           MR. CARNEY:  We have 33 videos that predate this

23   Indictment, are either from 2009, 2008 or 2007.  There are 25

24   documents in 2009; 28 from 2008; seven from 2007; one from

25   2004; and 25 predate 2001, are 2001 or predate it.

           1              THE COURT:  Predate 2001?

           2              MR. CARNEY:  Yes.

           3              MR. CHAKRAVARTY:  The website --

           4              THE COURT:  The website didn't exist.

           5              MR. CARNEY:  Well, the date of the video, which was

           6      conveyed as the --

           7              THE COURT:  There are dates and there are dates.

           8      There are dates of the video and dates of the posting on this

           9      website.

03:41 10              MR. CARNEY:  Well, I don't know.

          11              THE COURT:  The date would be when it was available on

          12      the website.  That's what you're going to show.  If you can't

          13      show that, perhaps even because of the ambiguity of whatever

          14      the date is, then we haven't changed.  You can still question

          15      him about seeing this.  It's just a question of using the

          16      video.

          17              MR. CARNEY:  Can I --

          18              THE COURT:  You still have a chance in your own case.

          19      It's not over forever necessarily.  I don't say it's admissible

03:41 20      now for that.  We'll deal with that.  This isn't your only

          21      chance to get these things in.

          22              MR. CARNEY:  Can I show him what the website looks

          23      like so that you can see there are videos on there without

          24      playing them or documents on it without reading them?

          25              THE COURT:  Depends on the foundation.  If the witness

1    says it looks substantially the same today as it did in 2005,

2    2006, 2007.

3              MR. CARNEY:  8, 9.  My client was arrested --

4              THE COURT:  But the acts he is accused of are in the

5    2005, 2006 era.

6              MR. CARNEY:  I believe the Indictment goes beyond

7    that.

8              THE COURT:  It may, but the evidence doesn't.

9              MR. CARNEY:  No, but the Indictment -- well, what I'm

03:42 10   trying to show is things that were available during the

11   pendency --

12             THE COURT:  7 may be on the margin.  8, 9, I don't

13   think are.

14             MR. CARNEY:  He wasn't arrested on these current

15   charges, except for false statement, until November of 2009.

16   We tend --

17             THE COURT:  What is it you want to do?  You want him

18   to say this is the general format of the website?

19             MR. CARNEY:  Yeah.

03:42 20         THE COURT:  And there were some things --

21             MR. CARNEY:  Illustrative --

22             THE COURT:  -- although he can't say exactly what they

23   were.

24             MR. CARNEY:  Yes, exactly.

25             MR. CHAKRAVARTY:  And any details about --

1           THE COURT:  You can't say which ones there were.

2     There was a video, and it can be linked.  I don't know what it

3     was or whatever.

4           MR. CARNEY:  Okay.  I'll -- fine.

5     .  .  .  END OF SIDEBAR CONFERENCE.)

6           MR. CARNEY:  All set, your Honor?

7           THE COURT:  Yes.

8           MR. CARNEY:  Thank you.

9     RECROSS-EXAMINATION BY MR. CARNEY:

03:43 10    Q.   Good afternoon again, Mr. Kohlmann.

11    A.   Good afternoon.

12    Q.   Now, the website for NEFA has stayed pretty consistent

13    over the years in terms of its general format --

14    A.   No.

15    Q.   -- is that true?

16    A.   They hired a company to redo the website about three years

17    ago.

18    Q.   Okay.  That would have been around 2008?

19    A.   No.  It would have been around --

03:43 20    Q.   If this is --

21    A.   It would have been -- yeah.  It was around -- I wasn't

22    involved in this decision-making.  I wasn't involved in any of

23    this.  I think it was around November or December of 2008,

24    maybe January 2009.  I don't really recall.

25    Q.   Okay.  Now, the website has a bunch of links on it, does

1    it not?

2    A.   Yeah.  But, I mean, that would be any website.

3    Q.   If one were to look at the website, you'd see on the right

4    side propaganda videos, right?

5    A.   I honestly -- I haven't looked at the website in a long

6    time.  It was redone by a company that I'm not involved with.

7    Q.   Have you looked at it within calendar year 2011?

8    A.   No.

9    Q.   2010?

03:44 10   A.   Maybe.  I don't remember.

11        MR. CARNEY:  Could we present the website, please?

12   Q.   See if it will refresh your memory of when you looked at

13   it.

14        THE COURT:  This is only for the witness right now.

15        MR. CARNEY:  Okay.

16   Q.   Is that the NEFA website?

17   A.   I believe it is, yes.

18        MR. CARNEY:  Could you scroll down a little bit,

19   please?  Okay.

03:44 20   Q.   On the right side, there are photos underneath headings

21   that say, "Propaganda Videos," is that right?

22   A.   That's correct, there are.

23   Q.   In the center, there are "Featured Documents" and "NEFA

24   Headlines"?

25   A.   That's correct, yes.

          1  Q.   And then on the left side of the website, they have

          2  "Departments" and "Multimedia"?

          3  A.   That's correct, yes.

          4  Q.   Is this pretty much the set-up as the revised website

          5  looked when you last saw it?

          6  A.   I don't think so.

          7  Q.   When you saw the website, did it have links to videos on

          8  it?

          9  A.   It had a link to a multimedia section --

03:45    10  Q.   All right.

         11  A.   -- where there was --

         12  Q.   A multimedia section has as its first category "Propaganda

         13  Videos"?

         14  A.   That's correct.

         15  Q.   And under the "Departments," it has "Featured Documents"?

         16  A.   That's correct, yes.

         17  Q.   Now, when I was questioning you earlier, you were talking

         18  about a number of the documents that you had discovered, and

         19  you had them posted on this website, correct?

03:45    20  A.   I had contributed documents for this website, that's

         21  correct, yes.

         22  Q.   And the way -- where they would appear is under the

         23  category "Featured Documents," is that correct?

         24  A.   They were under "Featured Documents" and also "Special

         25  Reports."

1    Q.   And any videos that you would provide, that you

2    authenticated, would go under "Propaganda Videos," correct?

3    A.   No.  They were -- they were under "Multimedia," but they

4    weren't exclusively under that section.  There's, I believe,

5    two -- I contributed two videos to the category that's

6    underneath that says, "Exclusive Interview Videos."  I don't

7    know what else is underneath.  But it was, again, the stuff --

8    I contributed a variety of different items.  So it's -- it's

9    under, I think, all those categories.

03:46  10    Q.   Now, in response to questions by the prosecutor, Mr.

11    Chakravarty, you indicated that "We don't want to become a

12    mouthpiece for al Qa'ida"?

13    A.   That's correct.

14    Q.   Did I quote you accurately?

15    A.   That's accurate.

16    Q.   And that "We don't want to put things on there that will

17    assist al Qa'ida," correct?

18    A.   I would agree, yes.

19    Q.   Now, on this website currently, do you feel that the --

03:47  20    your company, NEFA, is accomplishing those goals?

21    A.   I don't believe we're assisting al Qa'ida, no.

22         MR. CARNEY:  Your Honor, I would like to show the jury

23    this website.

24         MR. CHAKRAVARTY:  Objection, your Honor.

25         THE COURT:  Sustained.  On the foundation, sustained.

 1          MR. CARNEY:  Can we go to the "Featured Documents,"

 2     please?  Could you hit "Translations, transcriptions of

 3     statements by al Qa'ida leadership," please?  And can you

 4     scroll down slightly, please?

 5     Q.   Is this typical of the format that you recall that the

 6     documents that you posted would appear as?

 7     A.   Roughly.  Again, I didn't -- I didn't post any of this

 8     stuff.  So I don't -- it's similar to what I used to do, but

 9     it's not the same.

03:48 10     Q.   Okay.

 11          MR. CARNEY:  Can you hit the first document that's

 12     entitled, "Doctor al-Zawahiri," please?  And can you scroll

 13     down, please?

 14     Q.   Do you recognize this document as being a proclamation by

 15     him?

 16     A.   I believe it is.

 17     Q.   And is this similar to the format in which the documents

 18     you presented would be appearing on the website?

 19     A.   Roughly.

03:49 20     Q.   And what that means is there's a brief introduction of the

 21     title of the document and who it's by?

 22          MR. CARNEY:  Could you scroll up so Mr. Kohlmann can

 23     see it, please?

 24     Q.   This indicates who the author is.  This indicates the

 25     title of the document, the date it was released.  It then

```
 1   describes generally that the document is a transcript of a

 2   message obtained by NEFA investigators.  The transcript is --

 3   on behalf of the NEFA Terror Watch subscription service?

 4          MR. CHAKRAVARTY:  Objection, your Honor.  This --

 5   Q.   It just has the introductory language like that?

 6          MR. CHAKRAVARTY:  It appears he's just reading the

 7   content of the document.

 8          THE COURT:  He's identifying it but go ahead.

 9   A.   I'm sorry.  Can you repeat the question?

10   Q.   What appears here is the author of the document, the title

11   of the document, the date released?

12   A.   I believe so, yes.

13   Q.   Then it has a little description of how the document was

14   obtained?

15   A.   That's correct.

16   Q.   And then it contains the English wording of the document,

17   an English translation of the document?

18   A.   An excerpted translation, yes.

19   Q.   And how many paragraphs does this appear to be?

20          MR. CARNEY:  Can you scroll down, please, John?

21   A.   Approximately 18 paragraphs.

22   Q.   Same count as I have.

23   A.   Okay.

24   Q.   And it ends with the name of the author, in this instance,

25   Doctor Shaykh Ayman al-Zawahiri.  And it identifies it as al
```

1    Qa'ida media as well, does it not?

2    A.    Actually, it says As-Sahab Media.

3    Q.    Okay.  And this is typical of the format that your

4    documents were posted on?

5    A.    I mean, roughly, yeah.  I believe this is a translation

6    that comes from one of our analysts originally, but I don't

7    know that to be sure.

8    Q.    What I'm focused on is:  This is typical of the format?

9    A.    I mean, roughly speaking, yes.  It's a pdf file with text

03:51 10  with the thing on top, roughly speaking.

11         MR. CARNEY:  Can you go back to the previous site,

12   please?

13   Q.    Now, this -- again, we're back at the web page, right?

14   A.    That's correct, yes.

15   Q.    The home page?

16   A.    That's correct, yes.

17   Q.    And you said that NEFA does not want to be the mouthpiece

18   for al Qa'ida?

19   A.    Correct.

03:51 20  Q.    All right.  I want you to count how many translation,

21   transcriptions, by al Qa'ida leadership there are on this

22   website.

23         MR. CHAKRAVARTY:  Objection, your Honor.  The timing,

24   the dates of these, are far afield from anything that the jury

25   is going to be asked to decide.

         1              THE COURT:  Go ahead.  You can have it.

         2    Q.   What we're going to do is we're going to scroll down here.

         3    Do you have any paper up there, Mr. Kohlmann?

         4    A.   Not that I can write on, no.  I don't have a writing

         5    implement either.

         6    Q.   Do you have a pen, sir?

         7    A.   No, I don't.

         8    Q.   I'd just like you to keep track of these as they go by and

         9    just note how many are by Doctor al-Z and how many are by Osama

03:53   10    bin Laden and how many are by someone else by al Qa'ida, okay?

        11    A.   Okay.

        12    Q.   This will be pretty fast.

        13              MR. CARNEY:  John, let me take over that if I could.

        14    Q.   And tell me if I'm going too fast.

        15              MR. CHAKRAVARTY:  Your Honor, could he also ask the

        16    dates since I won't have a chance to on redirect?

        17              MR. CARNEY:  The dates will take too long.  I'm just

        18    looking for the authors, your Honor.

        19              THE COURT:  Let's do without them for now and see what

03:53   20    needs to be added later.

        21    Q.   Ready, Mr. Kohlmann?

        22    A.   Yes.  Go ahead.

        23    Q.   You've got the first two?

        24    A.   Yeah.  You can keep going.  One sec, one sec, sorry.  Can

        25    you go up a page, please?  Okay.  Go down.

```
 1   Q.    Why don't you just say "go" and I'll go.

 2   A.    Okay.  Keep going.  Okay.  Keep going.  Okay.  Keep going.

 3   Okay.  Keep going.  Keep going.  Keep going.  Keep going.  Keep

 4   going.  Keep going.  Keep going.  Keep going.  I'm sorry.  Can

 5   you go up once?  Okay.  Go down.  Keep going.  Keep going.

 6   Keep going.  Keep going.  Keep going.  Keep going.  Keep going.

 7   I'm sorry.  Did you cycle down?  Did someone cycle down?  Can

 8   you go up a page?  Sorry.  Real quick.  Okay.  Keep going.

 9   Keep going.  Keep going.  Keep going.  Keep going.  Keep going.

10   Keep going.  Keep going.  Keep going.  Keep going.  Keep going.

11   Keep going.  Continue.  Keep going.  Keep going.  Keep going.

12   Keep going.  Keep going.  Keep going.  Keep going.  Keep going.

13   Keep going.  Keep going.  Keep going.  Keep going.  Keep going.

14   Keep going.  Keep going.  Keep going.  Keep going.  Keep going.

15   Keep going.  Keep going.  Keep going.  Keep going.  Keep going.

16         Am I meant to count this one because there's no link on

17   here?  The one that's in the middle, there's actually no link.

18   Q.    You can skip it.

19   A.    I can skip it, okay.

20         Okay.  Keep going.  Okay.  Keep going.  Okay.  Keep going.

21         The document that's -- the two documents that are

22   referenced on the screen here, neither one of those are public

23   statements.  They were letters recovered by the U.S.

24   Government.

25   Q.    Okay.
```

1    A.   Should I count them or no?

2    Q.   Please.  They're both by Osama bin Laden?

3    A.   I can't verify -- they were released by the U.S. military.

4    So I don't have any way of knowing that.

5    Q.   Skip them.

6    A.   Okay.

7    Q.   We'll stop there.

8    A.   Okay.

9    Q.   Can we tally them, please?

04:01 10    A.   Sure, of course.  Okay.

11    Q.   Mr. Kohlmann, how many translated statements are there by

12    Osama bin Laden, please?

13    A.   I counted 34.

14    Q.   How many translated statements are there by Doctor

15    al-Zawahiri?

16    A.   Al-Zawahiri, I counted 36.

17    Q.   And how many by other al Qa'ida leadership members or al

18    Qa'ida representatives?

19    A.   Including the Al-Fajr Media Center, correct, the

04:02 20    logistical people behind al Qa'ida?

21    Q.   Please.

22    A.   I've got 33.

23    Q.   How many does that total completely, all three categories?

24    A.   103.

25    Q.   So that, on this website, someone going to it right now

1    could see 103 statements by al Qa'ida or its representatives?

2    A.    Excerpted statements.  Again, they're not -- they're

3    edited, so --

4    Q.    Edited down to as small as 18 paragraphs?

5    A.    Some of these recordings can last for hours.

6    Q.    Okay.

7    A.    That could be a small portion of it.  It could be a

8    significant portion.  These recordings tend to go on and on and

9    on.

04:03 10    Q.    And you also said that you don't want to be the mouthpiece

11    for al Qa'ida?

12    A.    That's correct.

13          MR. CARNEY:  Can we go to the home page, please?  All

14    right.  Can you go down to "Propaganda Videos"?

15    Q.    All right.  I just want you to count the videos.

16    A.    Sure.

17          MR. CHAKRAVARTY:  Your Honor, I object.  The last

18    "pretty fast" -- we're ten minutes beyond 1:00.  We don't mind

19    staying, obviously, to get rid of -- to finish with this

04:04 20    witness.

21          MR. CARNEY:  It will be pretty fast.

22          THE COURT:  Scan through it quickly and let's see what

23    --

24    Q.    I'm just going to --

25    A.    No problem.

```
 1   Q.   Okay.  I'd say -- you know how to do it.

 2   A.   I can't.  I'm sorry.  I can't do it this fast.

 3   Q.   Ready?

 4   A.   Yeah.

 5   Q.   You don't have to write down anything.

 6   A.   I'm just doing a tally.

 7   Q.   Ready?

 8   A.   Uh-huh.  Yup.  Yup.  Yup.

 9          MR. CHAKRAVARTY:  Your Honor, we would accept whatever

04:05 10   representation defense makes about how many videos there are on

11   this website right now.

12          MR. CARNEY:  Well, I accept that.

13          THE COURT:  What's the representation?

14          MR. CARNEY:  Thirty-seven, your Honor.

15   Q.   So there are 103?

16   A.   I mean, approximately, yeah.

17   Q.   And 37 excerpts from original al Qa'ida videos?

18   A.   No.

19   Q.   Are these al Qa'ida videos on here?

04:05 20   A.   No, not all of them.

21   Q.   Where are they from?

22   A.   Some of the videos are original Pakistani Taliban videos

23   that we got from sources inside of Pakistan.  They're videos.

24   They're journalist-style videos.  They're Pakistani journalists

25   who recorded something, and then we got a copy of it.
```

```
 1    Q.    Are most of them al Qa'ida videos?

 2    A.    I don't know.  I think about two-thirds of them are from

 3    official al Qa'ida videos.  The rest is, I believe, original

 4    content.

 5    Q.    I'll accept that.

 6          MR. CARNEY:  That's all I have, your Honor.  Thank

 7    you.

 8          THE COURT:  Okay.

 9          MR. CHAKRAVARTY:  Your Honor, I don't want a

04:06 10    misapprehension to the jury as to what these things are that

11    they have not seen.  I think the timing of when we're seeing

12    this is, they've understood, right now.  This website is on,

13    and the witness -- but the period that these materials were

14    published has been back from 1994 till today.  It's like a

15    compendium of al Qa'ida material.

16          THE COURT:  We'll leave it as it is.

17          MR. CHAKRAVARTY:  No further questions, your Honor.

18          THE COURT:  Thank you, Mr. Kohlmann.

19          THE WITNESS:  Thank you, your Honor.

04:06 20          THE COURT:  Jurors, I appreciate you staying over a

21    little.  We'll see you tomorrow at 9 and continue with the

22    case.

23    (The jury was excused at 1:15 p.m.

24          MR. CHAKRAVARTY:  Yes, your Honor.  Thank you for

25    seeing us briefly.  We do expect to rest first thing in the
```

1    morning tomorrow.  Hopefully, if there's any issues with

2    exhibits -- I think we've worked them out, but we'll deal with

3    that on the record in the morning and then we'll rest.

4         And then we have listed defense experts.  The first

5    two experts who have been here for the last couple of days are

6    Doctor Fadel and Doctor March.  The government has both scope

7    concerns with them as well as legitimate Daubert issues.  All

8    of them are couched within this -- the lens with respect to all

9    of the experts for which we don't feel we've been given

04:08 10   adequate discovery to prepare for what the -- for their

11   testimony because all we have are these disclosures where they

12   say generally the topics that they will talk about without

13   citing to the basis of their opinion, without citing to any

14   materials that we have that say that this is what I've looked

15   at and this is how I've come to this conclusion and many of

16   which bear directly on what the defendant's state of mind was

17   and what his understandings of different things were.

18        Last evening, we received approximately 60 or 70

19   exhibits that they intend to introduce now for the first time

04:09 20   through these witnesses.  We haven't even had the chance to

21   both digest the authenticity of them -- some of them are not

22   self-authenticating.  The government is prepared to be very lax

23   in terms of authenticating things that we've given to the

24   defense, but it's not even evident that's what these materials

25   are, let alone that these expert witnesses are the appropriate

1    witnesses to lay that foundation or in terms of how materials

2    were extracted.

3         The concern is that if we don't do some kind of a

4    hearing before they testify -- and we understand this may have

5    to happen ad seriatim as the witnesses come in.  But given the

6    state of the disclosures about what they're expected to say --

7    now that Mr. Kohlmann is off the stand, the Court knows what

8    the scope of his testimony has been.  So there's responsive

9    testimony, which the government would allege at least three of

04:09 10   the experts are prone to being excluded altogether, or at least

11   we would urge that; and then others, including Doctor March and

12   Doctor Fadel, to have their testimony sufficiently narrowed

13   understanding that they're not necessarily responsive to Mr.

14   Kohlmann but, rather, in terms of the germane aspects of their

15   expertise and what's in their disclosures, that is also much

16   narrower, should be much narrower, than they have given, and we

17   should get much more of a basis for that opinion than we

18   currently have.

19        THE COURT:  The first anticipated witness is Doctor

04:10 20   March, is that correct?

21        MR. CARNEY:  March.

22        THE COURT:  Okay.  We'll deal with his issues in the

23   morning of this nature.  We'll have his testimony and finish.

24   If we need to do that with Doctor Fadel, we can do that as

25   well.  Then we'll figure out how to approach all the others

1   after that.  I think we do have to take it at this point one by

2   one.  We will take the time that's necessary to do it, and I

3   don't know what that will be.  We'll have the jury ready to

4   proceed.

5          Let me just say that I -- let me say I read through

6   the summary -- many of the summaries were prepared in response

7   to the report, for example, of Mr. Kohlmann, and his testimony

8   was in -- well, it was different, but that's not really the

9   point.  His testimony is what it is.  There were things in the

04:11 10   report that were not addressed in the testimony.  I would

11   agree, generally, that there's no need to rebut things that

12   weren't said.

13          One of the large areas where there was nothing said

14   was any opinions about the defendant.  I would tend to think

15   there will be a reciprocal rule with respect to the defense

16   experts.  So opinions about the defendant's subjective

17   responses to things would generally be excluded, at least for

18   the reason that they weren't -- it's not an issue raised by the

19   prosecution expert.  I don't know whether that's -- there's

04:11 20   still an issue that needs to be resolved.  I just mean to mark

21   out some general territory.

22          MR. CARNEY:  We accept that, your Honor.

23          THE COURT:  As long as I'm just giving the general

24   overview, some of the experts -- I'm not sure if it was the

25   people who will be expected to testify.  I do think Doctor

1    Sageman, for example, is one, and others, I think, talked about

2    predicting future behavior. And I think that is all -- because

3    there was no testimony as the report might have suggested there

4    would have been about predictions, predictive testimony,

5    generally does not --

6         MS. BASSIL: Your Honor, I'm prepared to revise the

7    sort of description of Doctor Sageman, and I've told the

8    prosecution that.

9         THE COURT: So those are some general areas. The one

04:12 10   objection that does concern me a little bit is the bases for

11   the opinion objection, and that, I don't want to address on the

12   fly. But I think that is perhaps a more substantial objection.

13         MR. CARNEY: May I ask your Honor a logistical

14   question? If the jury enters the room, the government will

15   announce it's going to rest. I then would be bringing a motion

16   before your Honor that I will rest on the paper. Would it be

17   possible, before the jury comes out, for the government to at

18   least confirm with you that it's going to rest? Then I will

19   make the motion --

04:13 20         THE COURT: What I've done in the past --

21         MR. CARNEY: -- and then the jury --

22         THE COURT: In some circumstances like this, we've

23   actually had the government rest outside the presence the jury

24   as an effective rest, which tees up the motion. We then stage

25   a rest for the jury. All right. It just repeats what has

1    already happened.  Same thing.

2              MR. CARNEY:  I understand.

3              MS. BASSIL:  Like a civil and a religious wedding

4    ceremony.

5              THE COURT:  That's correct.  Okay.

6    (Whereupon, at 1:22 p.m. the trial recessed.)

1          C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  December 6, 2011

17

18

19

20

21

22

23

24

25