UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,   )
                              )
                              )
       Plaintiff,       )
                              ) Criminal Action
v.                         ) No. 09-10017-GAO
                              )
TAREK MEHANNA,             )
                              )
       Defendant.       )
                              )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY TWENTY-NINE
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, December 7, 2011
9:14 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Aloke Chakravarty and Jeffrey Auerhahn,
3            Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Jeffrey D. Groharing, Trial Attorney
             National Security Division
7        950 Pennsylvania Avenue, NW
         Washington, D.C.  20530
8        On Behalf of the Government

9        CARNEY & BASSIL
         By: J.W. Carney, Jr., Esq.
10           Janice Bassil, Esq.
             John E. Oh, Esq.
11       20 Park Plaza
         Suite 1405
12       Boston, Massachusetts  02216
         - and -
13       LAW OFFICE OF SEJAL H. PATEL, LLC
         By: Sejal H. Patel, Esq.
14       101 Tremont Street
         Suite 800
15       Boston, Massachusetts  02108
         On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                 DIRECT   CROSS   REDIRECT   RECROSS

3    WITNESSES FOR THE
      DEFENSE:
4
     ANDREW F. MARCH
5
       by Ms. Patel              27
6      by Mr. Chakravarty                  103

7

8                        E X H I B I T S

9
     GOVERNMENT'S        DESCRIPTION              FOR ID   IN EVD.
10
     292A     Header description for Exhibit 292       6
11
     53       (Stricken from the record)
12
     57       Translation of Exhibit No. 57A          10
13
     358      Translation of Exhibit No. 258A         11
14
              The following exhibits were entered     12
15            en masse:  54; 55B; 363; 298, Page 2;
              408; 486; 488; 520; 523; 538; 694
16

17   DEFENDANT'S

18   1006     Tibyan post dated 3/10/05              50

19   1241A    Video of Anwar al-Awlaki              60

20   1241B    Excerpt video from Exhibit No. 1241A  60

21   1242A    IslamiCity Qur'an Search 5:1          84

22   1242B    IslamiCity Qur'an Search 8:72         84

23   1242C    IslamiCity Qur'an Search 16:91        84

24   1242D    IslamiCity Qur'an Search 17:34        84

25   1243     Book of Jihad and Expedition          94

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on December 7, 2011.

6          The defendant, Tarek Mehanna, is present with counsel.

7     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8     are present, along with Jeffrey D. Groharing, Trial Attorney,

9     U.S. Department of Justice, National Security Division.)

00:16 10          THE COURT:  Good morning.  Mr. Chakravarty.

11          MR. CHAKRAVARTY:  Your Honor, before we rest, just for

12     housekeeping purposes, I wanted to do some reconciliation with

13     regards to differences between our exhibit list and things that

14     are marked as being introduced in the JERS system.

15          Over the last couple of days, I've identified a number

16     of exhibits to the defense which we believed are in evidence.

17     And for the most part, we were -- I guess we split the baby.

18     They agreed to half of them without issue, and then half of

19     them they have some issues with.

00:17 20          The exhibits which we believe are in evidence but the

21     defense has indicated they don't have a record of it being in

22     evidence are:  Exhibits 53 -- these are, I think A, B, and C,

23     all parts of a video; Exhibit 57, all parts of a video; Exhibit

24     292A, which is an email, an intercepted email; Exhibit 358,

25     which is also an intercepted email; and Exhibit 523, which I

1    believe that they have no objection to its introduction -- it's

2    a chat.  They have no objection to the introduction as long as

3    one line has been redacted, which I executed that redaction

4    last night and submitted it for a swap.

5         So I think there are four exhibits that are at issue.

6    The government has gone through the transcript to substantiate

7    that these exhibits have been introduced.  With the exception

8    of one, 292A was not explicitly mentioned as a separate exhibit

9    from 292, which was mentioned and introduced.  292, I'm sure

00:19 10    because of Scribner's error, as things were being uploaded into

11    our system, 292 was uploaded as a translation of 292A.  So 292A

12    is actually the originally intercepted email.  As your Honor

13    will recall, Exhibit 794, which was a list of all of the

14    intercepted communications and stored communications which came

15    in through Agent Hughes, listed 292 but not 292A.  Because 292A

16    has the header information, we think it should come in to

17    explain what 292 is.

18         THE COURT:  Can I see 292?

19         MR. CHAKRAVARTY:  Yeah.

00:20 20         MS. BASSIL:  Yes, your Honor.

21         THE COURT:  Just on this one.

22         MS. BASSIL:  This one, yeah.  The way this came in was

23    to say, Here's Exhibit 292.  Do you confirm this is a

24    translation?  That's about it.  What's the relevance of this?

25    Simply because -- we're back to because it was on his computer.

1    It seems to me it should have a little more relevance.  I see

2    nothing relevant about this exhibit.  I'm not sure it came in

3    other than, Is this an email?, with no reference to it, no

4    discussion of it.

5          MR. CHAKRAVARTY:  The video that's discussed in this

6    email was, I believe, published through Agent Fierabend, and in

7    several chats they were discussing this video about Abu Anas

8    al-Shami.  I think Mr. Kohlmann testified about his

9    significance over the last couple of days.

00:20 10        THE COURT:  No.  I think that 292A is the original.

11   And so that's one; and, two, it does explain what 292 is

12   further by the inclusion of the header.  I think that's

13   important.  So I think 292A should be admitted.

14   (Exhibit No. 292A received into evidence.)

15         MR. CHAKRAVARTY:  The others that are contested are

16   Exhibits 53 and 57.  These were videos which I don't believe

17   were published in toto, but they were admitted in toto, through

18   Agent Scripture, the FBI computer forensic specialist.

19   Pursuant to the procedures, our understanding was that things

00:21 20   are in unless the defense makes a motion to strike them.  I

21   don't believe that happened with regards to these.

22         MS. BASSIL:  I'll do it now.

23         THE COURT:  Did you say that you had -- I'm looking

24   through my notes.  You have the transcripts of these relevant

25   days?

1          MR. CHAKRAVARTY:  With regards to those two, I think

2     they were officially introduced on November 7th.

3          THE COURT:  Well, with respect to the list, the JERS

4     list, there's 53A admitted on November 8th and then nothing for

5     53B, C, and D.  And the JERS list has 57A admitted on 11/28 but

6     not 57.

7          MR. CHAKRAVARTY:  And I believe that was in that

8     awkward time period between when we had originally offered the

9     exhibits into evidence that were from the computer through

00:24 10    Agent Scripture and when the kind of procedure had been

11    crystallized on November 7th, and then Mr. Lyness promptly, on

12    November 8th I think uploaded -- marked as admitted all of the

13    exhibits that were from the computer.

14          The reason why 53A may have been introduced on the

15    JERS system separately from the rest of that video -- and I

16    don't have a clear memory of this -- is if a portion of a video

17    was played but not -- the other clips then -- it's possible

18    that only a part of it was marked as admitted.

19          With regards to 57, I don't have a record that we've

00:24 20    ever played that video.  But, again, for the same reasons, that

21    it came from the hard drive and there hasn't been a motion to

22    strike, we think that that should be in because it was

23    authenticated along with -- and moved into evidence.

24          THE COURT:  Let's deal with them one at a time.  Let's

25    deal with 53.

1          MS. BASSIL:  I don't believe 53 was played, your

2     Honor.  I have no recollection of it being played.  There's no

3     reference to it in any transcript.  I do move to strike.  I

4     don't think it should be put in just because -- there was no

5     reference to it in the government's case, and they didn't play

6     it.  They already have 21 videos admitted.

7          THE COURT:  What is it?

8          MS. BASSIL:  It's a -- it's --

9          THE COURT:  This says "Al-Ramadi."

00:25 10          MS. BASSIL:  Right.  It's an hour-long video.  They

11     didn't play any of it.

12          MR. CHAKRAVARTY:  It was a video we were going to play

13     with Agent Fierabend and we ultimately didn't play.

14          THE COURT:  I don't think it should be in.  53, having

15     been recorded as in, is stricken.  None of the others were ever

16     admitted.  Take 53 out.

17     (Exhibit No. 53 stricken from the record.)

18          THE COURT:  Now, 57.

19          MS. BASSIL:  Same thing, your Honor.

00:25 20          THE COURT:  There's a -- 57A, according to the list,

21     is a translation.

22          MS. BASSIL:  Yeah, but I don't think 57 was ever

23     played, your Honor.  That's my understanding.

24          THE COURT:  But the translation is in?

25          MS. BASSIL:  Well, it's in in the extent that they

1   said, Is this your translation?, Is this your translation?, Is

2   this your translation?, but not identifying it other than by a

3   number.  What is the point of a translation if the video was

4   not shown?

5         MR. CHAKRAVARTY:  I think that is the point of Rifa'i,

6   which I believe is a eulogy.  The translation being introduced

7   is the relevant information that the jury would need to see.

8   Again, we don't need to play everything for it to be relevant

9   and helpful to the defense -- to the jury.

00:26 10         THE COURT:  I didn't quite understand that.

11         MR. CHAKRAVARTY:  So my point -- it's the same

12   argument we've made before, that simply because an

13   Arabic-language video has not been played for the jury does not

14   mean that the video is neither relevant, that it wasn't

15   sufficiently authenticated, nor the fact that -- nor does it --

16   it seems the defense is now saying that they don't think things

17   should go to the jury unless they have been played for the

18   jury.

19         MS. BASSIL:  Right, right.

00:27 20         THE COURT:  No.  I don't think that would be the case.

21         MS. BASSIL:  Well --

22         THE COURT:  It was --

23         MS. BASSIL:  It was referenced with a translator.  Did

24   you translate 57, 58, 59 -- you know, a whole raft of numbers.

25   The jury never saw the video.  The translation has no relevance

1    to the jury.  And, frankly, we saw enough videos.  And, you

2    know, whole videos are going in even though they only showed

3    clips of them.  So, you know, I see no -- it just seems to me

4    that they haven't made any kind of case for putting this in.

5    The jury didn't see it.  Why would you put in a translation of

6    something that the jury didn't even see?  Makes no sense.

7         MR. CHAKRAVARTY:  The whole point is the translation,

8    your Honor.

9         THE COURT:  Yes, okay.  The translation was admitted

00:27 10  on -- through Ms. Vallee --

11         MS. BASSIL:  Presumably so the video could be played.

12         THE COURT:  -- on the 28th.  No, I think so it could

13    explain something in evidence.  I think 57 can be admitted.

14    (Exhibit No. 57 received into evidence.)

15         MR. CHAKRAVARTY:  The last one which I believe is

16    contested is 358.  This was an email which my records indicate.

17         THE COURT:  Can you put it up?

18         MR. CHAKRAVARTY:  Yup.  Put up 358 and 358A.  So, like

19    292A, your Honor, when we uploaded this, we reversed the

00:28 20  labeling unintentionally from "A" being the original and the

21    one without the alpha as the translation.  They were correctly

22    denoted on Exhibit 794, the list of emails that were being

23    introduced through Agent Hughes.  So I think that this has been

24    properly authenticated and introduced.

25         MS. BASSIL:  Again, your Honor, it was -- it went in

1   as -- a translator was asked, Did you translate a series of

2   numbers?  349, 358, 495, 496, et cetera, et cetera, et cetera.

3   Agent Hughes, is this an email?, Is this an email?, Is this an

4   email?  I can't imagine anything more unfair to this jury than

5   loading them with thousands of exhibits and expecting them to

6   read through them.  If it wasn't important enough for the

7   government to specifically refer to it, why is it relevant?

8          THE COURT:  Well, the Arabic is in, and the English

9   was authenticated.  So I think it should be admitted, 358.

00:29 10   (Exhibit No. 358 received into evidence.)

11          THE COURT:  You said, with respect to 523, you've

12   resolved the --

13          MR. CHAKRAVARTY:  Yes.  If I may, on the record, for

14   Mr. Lyness' benefit, there were several that we have agreed on,

15   and that's one of them.  I'll go through those so that Mr.

16   Lyness can have a list of things that should be marked as

17   admitted in the JERS system.  Exhibit 54.

18          THE CLERK:  Say again.

19          MR. CHAKRAVARTY:  54; 55B; 363; 298, Page 2 only.  If

00:30 20   we need to do a swap, we'll do a swap of that.  408; 486; 488;

21   520; 523; 538; and 694.

22          THE CLERK:  These are all being admitted, and you'll

23   replace that 298, Page 2?

24          MR. CHAKRAVARTY:  Right.  And 523, we've redacted a

25   line as well.  So we'll replace that.

1          With that, I believe that our list reconciles with the

2    JERS list.

3          THE COURT:  Okay.

4          MR. CHAKRAVARTY:  With the introduction of those

5    exhibits, the government --

6          THE COURT:  For the record, they are admitted.

7    (Exhibit Nos. 54; 55B; 363; 298, Page 2; 408; 486; 488; 520;

8    523; 538; and 694 received into evidence.)

9          MR. CHAKRAVARTY:  Thank you.  And, your Honor, for

00:31 10   purposes of that, just for clarity on the record -- of the

11   record, as we've gone through and because of the procedure,

12   sometimes it's not always crystal clear whether a specific

13   exhibit was introduced on the record.  To avoid any later

14   question about that process, we've been relying on what's been

15   marked as admitted in the JERS system to signify the Court's

16   admission of the exhibit into evidence.

17         THE COURT:  Okay.  The parties have now conferred and,

18   except for those areas of dispute which I have just resolved on

19   several exhibits, I understand the parties are in agreement

00:32 20   that the list produced by the JERS system accurately reflects

21   what was admitted.

22         MR. CARNEY:  That's correct, your Honor.

23         THE COURT:  Subject only to the amendment that we've

24   just done in the last 20 minutes.

25         MR. CARNEY:  Yes, your Honor.  That's exactly

         1    accurate.

         2              THE COURT:  Okay.

         3              MR. CHAKRAVARTY:  Your Honor, there's one point that I

         4    wanted to raise on that.  I have not done a scientific audit of

         5    this, but -- not to speak on behalf of the defense, but I

         6    believe at one point -- we have an older copy of the JERS list.

         7    I don't know if this is the exact same as it is now.  But there

         8    were certain English-language -- predominantly English-language

         9    transcripts -- speaking specifically of the consensual

00:32   10    recordings -- which I believe were marked admitted on the JERS

        11    list, perhaps not all of them but some of them.  I don't know

        12    if that's changed or not.  But based on the Court's statement

        13    during the trial, my understanding was that those were only

        14    going to be marked for identification and as aids and not

        15    necessarily going back to the jury.  We have no objection to it

        16    going back to the jury, but I didn't know -- I wanted to alert

        17    the Court.

        18              THE COURT:  There certainly were some of those

        19    recordings that I gave that instruction to the jury.  Not to

00:33   20    complicate matters too much, a couple of them anyway did have

        21    some Arabic -- or some translation of Arabic terms, which may

        22    change the rule.  I don't know what the defense view is.

        23              MR. CARNEY:  Your Honor, it was our understanding that

        24    any transcripts that were just used as demonstrative aids or

        25    perhaps auditory aids while the playing would not go to the

1    jury but rather would be marked for identification.  We would

2    ask the Court to maintain that ruling.

3           MS. BASSIL:  Your Honor, I would also say that the

4    Arabic in those is primarily greetings.

5           THE COURT:  Mostly.

6           MS. BASSIL:  Mostly greetings.

7           THE COURT:  There might have been a couple of others

8    and it was minimal.  I will agree with that.  I was just being

9    super technical about it.

00:34 10           I agree with that generally.  I think what Mr.

11   Chakravarty is saying is some of them are marked on the list as

12   in.  We should identify those --

13           MS. BASSIL:  They shouldn't be.

14           THE COURT:  -- and adjust them to only identified and

15   not admitted.

16           MR. CARNEY:  Yes, your Honor.

17           MR. CHAKRAVARTY:  Which is why I raise it, your Honor.

18           MR. CARNEY:  May the parties confer, and then we can

19   discuss it with Mr. Lyness?  If we're in agreement that at the

00:34 20  time your Honor made the ruling you identified this particular

21   document as for identification only, may Mr. Lyness reflect

22   that on the record?

23           MR. CHAKRAVARTY:  That's why I raise it, your Honor.

24           THE COURT:  There were only a couple of witnesses, I

25   think --

1          MR. CARNEY:  That's correct.

2          THE COURT:  -- so it should be possible to correct

3     that.  But that is -- that was the understanding at the time.

4          MR. CARNEY:  Yes.

5          THE COURT:  And it continues to be, and the list

6     should reflect that.  There's a further amendment to the list

7     to be made.

8          MR. CARNEY:  We'll put together a list, and the

9     government can put together a list.  And I'm sure we will be

00:35 10   able to resolve this very quickly.

11          MR. CHAKRAVARTY:  With the introduction of those

12     exhibits, your Honor, the government would rest.

13          THE COURT:  Okay.  The government rests.

14          MR. CARNEY:  Your Honor, the defendant moves for a

15     directed verdict of not guilty on all counts.  I submit the

16     argument on the papers that have been filed.

17          THE COURT:  Okay.  I have the motion filed in

18     anticipation yesterday.  The motion is denied as to all counts.

19          MR. CARNEY:  We are prepared to bring -- to bring our

00:35 20   case, your Honor.

21          THE COURT:  Fine.  Now, I understand that you're

22     starting with some expert -- those experts' testimony, and I

23     further understand the first witness would be Doctor March.

24          MR. CARNEY:  Yes, that's correct.

25          MR. CHAKRAVARTY:  So the government has a request for

1    a Daubert hearing as well as a request to limit the scope of

2    Mr. March's testimony.

3         THE COURT:  Well, I have -- I'm looking at the

4    supplemental disclosure by the defendant, which is Docket No.

5    308, for the guidance as to what Doctor March will testify

6    about.

7         MR. CHAKRAVARTY:  And the government has issues with

8    certain aspects of his opinions, which I would ask that he

9    leave the room for purposes of that argument.

00:36 10         THE COURT:  If Doctor March is present, he should

11   exit.  Thank you.  We'll call you back.

12         MR. CHAKRAVARTY:  Being mindful of your Honor's

13   direction yesterday, the government does not contest that the

14   witness is qualified to talk about the intersection of Islam

15   and religion as a political matter with either demands of

16   citizenship or what I'd rather call political dynamics.

17         Specifically, he's going to talk about the concept of

18   Aman, the interpretations.  That seems fair game, and the

19   government doesn't have an objection to that.

00:37 20         THE COURT:  Just on that point, I notice the sentence

21   that you're referring to.  It is the second sentence of the

22   summary, referring to the intersection of the religion of Islam

23   with the demands of citizenship, is kind of an opaque sentence,

24   I think.

25         To the extent it means that he will discuss the

1    concept of Aman and how it is interpreted, I think it's okay.

2    So I guess my question would be, for Miss Patel, whether that

3    second sentence means anything more than that.

4         MS. PATEL:  It doesn't, your Honor.  Doctor March is

5    testifying only to five pieces of evidence that are all related

6    to Mr. Mehanna from Tibyan in an instant message.  And then

7    he's just explaining the religious meaning, people, what the

8    words mean, what's the doctrinal meaning of them, as they

9    relate to then Mr. Kohlmann's conclusion that that's al Qa'ida

00:37 10   methodology.

11        THE COURT:  I'm sorry?

12        MS. PATEL:  Mr. Kohlmann had testified that to be an

13   al Qa'ida adherent, a person supports al Qa'ida methodology.

14   So what Doctor March will do is just talk about five very

15   specific pieces of evidence, explain what the meaning -- the

16   religious meaning was, defining words, explaining the religious

17   context of the words, and that is the Aman or covenant contract

18   principle, very narrowly tailored.

19        And then he will also talk about, which is within his

00:38 20   area of expertise, what al Qa'ida believes about those same

21   issues, with evidence supporting that.  And we believe that,

22   based on Mr. Kohlmann's testimony, that would be fair --

23   totally appropriate testimony.

24        MR. CHAKRAVARTY:  Well, so there's two issues.  The

25   discussion about Aman, explaining what that is to the jury,

1    while the government doesn't agree that that is a defense to

2    the case, we understand the relevance to that.

3          THE COURT:  And the reference to specific IMs or

4    emails or --

5          MR. CHAKRAVARTY:  Yes.  If a word is referred to, just

6    as the government --

7          THE COURT:  Or the concept is embodied in it.  If it's

8    the witness' opinion that an exchange represents a discussion

9    of the principle.

00:39 10         MR. CHAKRAVARTY:  That seems fair game.  The issue is:

11   deducing the defendant's intent under 704 --

12         THE COURT:  In your head.

13         MS. PATEL:  She's shaking her head.  We will not do

14   that.

15         MR. CHAKRAVARTY:  And this is the same -- what Mr.

16   Auerhahn -- takes the words out of my mouth, which are, it's

17   one thing to say what something says on the four pages [sic] of

18   the page.  It's another thing for a political scientist from

19   Yale, who has no apparent experience in terrorism or studying

00:39 20   al Qa'ida, to be able to say what al Qa'ida doctrinally

21   believes about this covenant or any other concept.

22         THE COURT:  I guess that would be a matter for

23   foundation.

24         MS. PATEL:  We will lay the foundation.  And we would

25   also argue that it's one thing for a person, who's a terrorism

1    expert, to talk about documents, but they would have no place

2    interpreting Islamic law concepts in words that they don't even

3    understand the English meaning of.  If it came in under Mr.

4    Kohlmann, we think that Doctor March is imminently more

5    qualified to at least explain what those words mean.

6         THE COURT:  That will depend.  The backgrounds are

7    different.  I'll have to hear the foundation on that.  I

8    understand your concern, but we'll see what it appears when the

9    questions get asked.  When we get to that point, perhaps you'll

00:40 10  advise us, and we can see what the -- so the government can, if

11   appropriate, raise an objection, and we can deal with it.

12        MR. CHAKRAVARTY:  Because we don't need the music

13   right now, I also wanted to alert -- the other side of that is,

14   it's one thing to question his expertise, which we do on that

15   issue.  But the other thing is, while we don't contest that

16   through his years of scholarship on Islam, on the political

17   theory, that he has a basis to talk about Aman.  It's the

18   course of his training and experience and writings.

19        He doesn't have that same basis for an opinion, or at

00:40 20  least it hasn't been disclosed to us for Rule 16 and 703

21   reasons, with regards to al Qa'ida and what other specific --

22        THE COURT:  I understand that point, and we'll hear

23   what the qualifications seem to be from his testimony.

24        MR. CHAKRAVARTY:  Would your Honor want to discuss the

25   other experts now or get started?

1           THE COURT:  Where is the email?

2           MS. PATEL:  Doctor Durlauf would follow Doctor March.

3           THE COURT:  On the email, you had -- Durlauf and

4    Johnson are identified.  I guess if either of them are present

5    in the room, they should leave as well.

6           Let's start with Mr. Durlauf.

7           MR. AUERHAHN:  Your Honor, our objection with Mr.

8    Durlauf is multifaceted actually.  He provided an 18-page

9    affidavit which talked completely about particular aspects of

00:42 10   Mr. Kohlmann's testimony -- excuse me, Mr. Kohlmann's report,

11   which was not part of his testimony.  So the reference to this

12   18-page affidavit is completely irrelevant, it seems to me.

13          And then there's one sentence that says, "Doctor

14   Durlauf will explain how Kohlmann's conclusions are

15   methodologically inaccurate and flawed and misleading," without

16   any other disclosures as to the basis of his testimony, what

17   he's going to focus on, what his expertise is with reference to

18   a commentary with reference to Mr. Kohlmann's expertise.

19          So it seems to me that there's no basis for his

00:42 20   testimony at all, or if there is any basis, we haven't had any

21   disclosures that would be proper or necessary in advance of his

22   testimony.

23          THE COURT:  With respect to at least the first point,

24   I had exactly the same thought as I read his affidavit.  It

25   seemed directed to testimony we didn't have.

1          MS. PATEL:  Your Honor, Doctor Durlauf's testimony in

2     our view -- first of all, the affidavits were prepared in

3     anticipation, as you know, of the Daubert.  We were waiting on

4     Mr. Kohlmann's testimony to finish to determine whether or not

5     what Doctor Durlauf would say would be relevant.  We would say

6     that it is.

7          First of all, I'll say that his testimony is

8     absolutely critical for the fact-finder to understand not the

9     substance of the conclusions that Mr. Kohlmann is making but

00:43 10     the manner in which he made them.  His testimony will be very

11     short.  And I would also say that all of -- the skeleton of

12     what he's going to say is all contained in the affidavit.

13          Mr. Kohlmann testified that al Qa'ida defines an

14     adherent as a person who supports methodology and someone who

15     seeks to participate in activities directly, more frequently,

16     or indirectly.  This is in the transcript.

17          He then later, when he talks about Tibyan

18     Publications, says that it's a support group for people who

19     speak English, that al Qa'ida coordinated with Tibyan

00:43 20     Publications.  That's also part of Mr. Kohlmann's testimony.

21          All we're having Doctor Durlauf say -- nothing about

22     intent, nothing about final conclusions, but just that when an

23     expert witness makes an assertion that someone is an al Qa'ida

24     adherent -- and the way that he does that is by blanket saying

25     he's an adherent, and then Mr. Chakravarty introduced some 30

1    pieces of evidence one after the other after the other.

2          Now, it is pretty clear that in closing argument, it

3    will be the government that will argue, He defined adherent

4    this way.  Tibyan Publications was a Jihadi forum that has this

5    tie to al Qa'ida, and here's all the places where Mr. Mehanna

6    posted on Tibyan Publications.

7          We're not having Doctor Durlauf address any of the

8    substance of that, just whether an expert witness, using those

9    facts, looking at writings, Jihadi videos, any acts taken by a

00:44 10   person, what method did he use to then say that person is an al

11   Qa'ida adherent?  That's it.  It's very simple.

12         We think it's hugely important to let the jury assess

13   the weight of the expert determination.  This expert witness

14   has made one blanket conclusion after another without really

15   explaining how he got to that conclusion.  And this is a

16   science.  To be able to say that someone's behavior is or is

17   not predictive of whether they embrace a methodology is a

18   scientific conclusion.

19         To let the jury hear that without being able to think,

00:45 20   especially if the jury is from a non-scientific background,

21   just giving them a different point of view to assess the weight

22   of Mr. Kohlmann's testimony is absolutely critical to our case.

23   And we believe the government's been given ample notice of what

24   we were arguing.

25         We're using two very simple mathematical formulas.  I

1   happen to love math.  I know not everyone does.  I don't want

2   to bore people with a lecture.  I have maybe 15 to 20 minutes

3   worth of questions, maybe even less than that.

4   THE COURT:  I don't think the affidavit comes close to

5   describing the summary that you just gave.  And it is all about

6   the probability or likelihood that a given person would act --

7   would be a potential terrorist given his actions or vice versa

8   and so on.

9   MS. PATEL:  May I --

00:45 10   THE COURT:  Whether the opinion is sound is a separate

11   question, but it's simply not pertinent.  So in Daubert terms,

12   if you want to use the Daubert language, the problem is "fit."

13   It doesn't fit the evidence in the case.  It might have fit the

14   Kohlmann report, but it doesn't fit the evidence.

15   MS. PATEL:  May I make an offer of proof, your Honor?

16   THE COURT:  I think you just did.  But if you want to

17   add to it.

18   MS. PATEL:  I just do.  I just want -- I really want

19   to stress that not a single social scientist, not a single real

00:46 20   academic that has looked at Mr. Kohlmann's testimony, not just

21   in this case but in the last 30 cases he has been allowed to

22   testify, can believe that a person can make assertions without

23   explaining the way they made them.  It's like saying Diet Coke

24   causes cancer and only looking at people who have cancer and

25   saying, Oh, they drink Diet Coke and they all have cancer,

1    without looking at the broader population of all people who

2    drink Diet Coke and what percentage of them end up having

3    cancer.

4            The jury will not understand it.  They will take his

5    conclusions at face value.  They need this witness to be able

6    to assess whether he is qualified and has done the actual

7    rigorous scientific study to make the conclusion.  Without it,

8    we would say that the jury is being misled by the government.

9            THE COURT:  Well, fine.  Durlauf will be excluded.  I

00:47 10   just -- just so there's not any mistake about it, my view is,

11   on Kohlmann's testimony, it was not scientific evidence in a

12   strict sense, and it was expert -- well, I guess concededly

13   expert testimony because when the outline was given as to what

14   he would say, there was no objection to his saying it under

15   Rule 702.  But it was based on something other than

16   experimental science.

17           MS. PATEL:  May I just add that he did define social

18   science at the beginning and said that he used that in his

19   research.

00:47 20          THE COURT:  Social science is a good distance from

21   experimental science in many ways.  At any rate, it is what it

22   is.  So Durlauf is out.

23           I guess that would bring us to Johnson.

24           MR. AUERHAHN:  Generally speaking, your Honor, we

25   don't have objections to his testimony.  There are some

1    references in the disclosure to some of the items that were in

2    Mr. Vidino's report, as well as Mr. Kohlmann's report, that

3    weren't testified to.  I don't believe a discussion of that

4    would be relevant.

5           There are also a few statements, including one where

6    defense indicated Mr. Johnson will testify that the government

7    assertions about Mehanna's trip to Yemen are misleading and

8    factually implausible.  That's clearly not the role for the

9    expert.  That's for the jury to decide.

00:48 10          Other than a couple instances of that nature, we don't

11   object to his testimony.  We do acknowledge he's an expert on

12   certain aspects of the country of Yemen and Yemen culture.

13          THE COURT:  This is your witness, Mr. Carney?

14          MR. CARNEY:  It is, your Honor.  I agree with Mr.

15   Groharing.

16          THE COURT:  Testimony about Yemen --

17          MR. CARNEY:  That was off the record.

18          THE COURT:  Testimony about Yemen is fair game.

19          I don't know, now, with Durlauf -- Miss Patel said he

00:49 20   was going to be short anyway.  We'll see how that does with the

21   morning.

22          But anyway, we'll bring the jury in.  I guess the

23   government will announce its resting in front of the jury.

24   That's -- there need not be a second repeat of the motion.

25   That's formally been done.  Then we'll turn to the government's

1   [sic] case.

2          So the first witness will be Doctor March.  That will

3   be Miss Patel examining?

4          MS. PATEL:  That's correct.

5          MR. CARNEY:  May I go get him?

6          THE COURT:  Yes.  All three, I guess, can rejoin us.

7          MR. CARNEY:  Well, Mr. Durlauf may want to go home.

8          THE COURT:  He can do what he wants.  He's welcome to

9   stay if he likes.

00:50  10   (Jury in at 9:47 a.m.)

11          THE COURT:  Good morning, jurors.  Mr. Chakravarty.

12          MR. CHAKRAVARTY:  Your Honor, after several weeks,

13   considering the testimony and the exhibits that we've submitted

14   to the jury, the government rests.

15          THE COURT:  Okay.  Jurors, that statement is

16   self-explanatory.  The government has completed its

17   presentation of evidence.  We turn now to the defense for

18   evidence.

19          MS. PATEL:  Good morning, your Honor.  We call Doctor

00:51  20   Andrew March, please.

21          ANDREW F. MARCH, Sworn

22          THE CLERK:  Please be seated.  State your name and

23   spell your last name for the record.

24          THE WITNESS:  Andrew F. March, M-a-r-c-h.

25          THE COURT:  Miss Patel, will you be using your

1    computer for exhibits?

2         MS. PATEL:  Yes.  Thank you.

3    DIRECT EXAMINATION BY MS. PATEL:

4    Q.   Good morning.  Would you please introduce yourself to the

5    jury?

6    A.   Good morning.  My name is Andrew F. March.  I am an

7    associate professor at Yale University.

8    Q.   Can you tell us what you're a professor in at Yale?

9    A.   I'm a professor in the Department of Political Science.  I

00:52 10   have had adjunct appointments at the Yale Law School and the

11   Department of Religious Studies.

12   Q.   Can you tell us, prior to coming to Yale, what was your

13   educational background?

14   A.   I did a bachelor's of arts at the University of

15   Pennsylvania, majoring in political science, history, and Asian

16   and Middle Eastern studies, which is basically a major in

17   Islamic studies.

18   Q.   Did you study Arabic in the course of your studies?

19   A.   Yes, I did.

00:52 20   Q.   Why?

21   A.   I don't think it's possible to contribute any new

22   knowledge to a field of study without understanding primary

23   sources.

24   Q.   What's a primary source?

25   A.   Primary source is a source that's issued by actors and

1   agents and persons that are involved in doing things in the

2   world.

3   Q.   Did you receive any honors or awards when you were in

4   college?

5   A.   Yes, I did.  I was voted to be the USA Today All Academic

6   First Team, which I believe 25 undergraduate students from the

7   entire country would have been elected.  I received a number of

8   departmental awards for my senior honors thesis and a number of

9   university awards for research.  And then the year that I

00:53 10   graduated, I won a British Marshall scholarship to study in the

11   United Kingdom.

12   Q.   What's a British Marshall Scholarship?

13   A.   A British Marshall Scholarship is a little bit like a

14   Rhodes Scholarship.  It's the sort of less-famous cousin of the

15   Rhodes Scholarship.  It was established by the British

16   Government after World War II to thank the United States for

17   help in World War II and specifically for the Marshall Plan.

18   Thirty-six Americans every year are elected to a British

19   Marshall Scholarship, and it funds two to three years of study

00:54 20   in the United Kingdom.

21   Q.   When you were in the United Kingdom, did you do any

22   further studies?

23   A.   Yes.  I completed two degrees at the University of Oxford.

24   Q.   What were those degrees?

25   A.   My first degree was an MPhil, or a master's, in politics,

1    which I achieved on the basis of coursework and on the basis of

2    a thesis.

3    Q.    What was your thesis about?

4    A.    My master's thesis was on the relationship between the

5    Government of Uzbekistan and Islamist opposition or Islamic

6    radicals in that country after the fall of Communism.  I was

7    particularly interested in the government ideology or the

8    government justification of itself in response to political

9    Islam.

00:54 10   Q.    Did you travel in preparation for your thesis?

11   A.    Yes.  I spent time in Uzbekistan during the summer of

12   2001.

13   Q.    How much time did you spend there?

14   A.    I think about three to four weeks.

15   Q.    Then did you continue after the master's to do any more

16   educational work?

17   A.    Yes.  I stayed in Oxford after that, and I completed a

18   DPhil, which is like a Ph.D., in politics.  My doctorate was

19   based on a thesis called "Islamic Doctrines of Citizenship in

00:55 20   Non-Muslim Liberal Democracies."  It was a study of Islamic law

21   and Islamic political thought specifically on the question of

22   Muslims who live in non-Muslim lands, their rights,

23   obligations, and responsibilities towards those states and

24   governments from the standpoint of Islamic law.

25   Q.    What languages were the materials that you used to prepare

1    that thesis?

2    A.    To prepare that thesis, it was mostly Arabic.  I also used

3    some French sources, some English sources.  For my master's

4    thesis, I used Arabic and Russian-language sources.

5    Q.    Apart from Arabic, Russian, French and English, are there

6    any other languages that you speak?

7    A.    At the moment, truth be told, I'm a little bit rusty.

8    Languages are not like riding a bicycle.  It's a little bit use

9    or lose it.  But at one point or another during my educational

00:56 10   career, I've attained at least reading proficiency in Russian,

11   Serbo-Croatian, Slovak, Spanish, and Albanian, in addition to

12   Arabic.

13   Q.    Did you travel in preparation for your DPhil thesis?

14   A.    I was based in Oxford, and I spent one summer in Syria

15   where I took an advanced language course in Arabic at the

16   French Institute in Damascus.  And the following summer, I

17   spent in Cairo, Egypt, although that was primarily on my own.

18   I was doing research with written materials.

19   Q.    Did you receive any honors for your work at Oxford?

00:56 20   A.    Yes.  My dissertation was awarded the prize for best

21   dissertation in religion and politics from the American

22   Political Science Association.

23   Q.    When you returned -- did you then return to the United

24   States?

25   A.    Yes.  In 2005, I was lucky enough to get a job at Michigan

1     State University, where I taught for two years.  It was a job

2     in political theory and what they called Muslim studies, and I

3     was there for two years.

4     Q.   And then after that?

5     A.   In 2007, I was hired at Yale University.

6     Q.   Can you tell us a little bit about your publications?

7     A.   I've published one book which was based on my

8     dissertation.  It's entitled, "Islam and Liberal Citizenship:

9     The Search For an Overlapping Consensus."  It was published by

00:57 10    Oxford University Press in 2009.

11          In addition to that, I have a number of peer-reviewed

12    publications.  I think at this point I have 16 publications or

13    articles that have been accepted for publication in

14    peer-reviewed journals.  I also have a number of publications,

15    which I don't consider peer-reviewed, but are part of my

16    scholarly career; for example, articles in encyclopedias,

17    articles in book chapters, things like that.

18    Q.   What does "peer review" mean?

19    A.   What peer review means is, if you are particularly a book

00:58 20    or a journal and you want to publish something, you take that

21    piece of material, whether it's an article or a book

22    manuscript, and you send it out to people blind, which means

23    that the people that are reviewing it -- in the case of

24    journals.  In the case of books, it's slightly different.  In

25    the case of journals, the people reviewing are not supposed to

 1    have any idea who you are.

 2         So journals can send out a draft paper to anywhere

 3    from two to sometimes five people.  They review it.  Again, you

 4    don't know who they are, and they don't know who you are.  And

 5    then only communicate with the editor, and they say whether

 6    this is worthy for publication based on scholarly standards.

 7    Q.   What's the point of that process?

 8    A.   The point of that is to make sure that you have

 9    objectivity so people aren't publishing on the basis of their

00:58 10    name, or their friends.  It's also because nobody can be an

11    expert in everything.  Journal editors are not experts in

12    everything that their journal publishes.  So they need to rely

13    on the authority of other people who are authorities in their

14    field.

15    Q.   Can you tell us about your lecturing and teaching

16    experience?

17    A.   I have taught -- this is my fifth year teaching at Yale,

18    again, both at the Department of Political Science, as well as

19    I have courses that are listed in law and religious studies.  I

00:59 20    teach courses on Islamic Law, Islamic Political Thought.  I

21    teach courses on other things like Religion and Political

22    Theory or Ancient Philosophy or the Tea Party, anything I'm

23    interested in at that particular moment.

24         I also have been teaching on a series of trainings of

25    Harvard University.  Harvard University has a research program

1    in Humanitarian Law.  One of the things that they do is they

2    train humanitarian professionals that are working in conflict

3    zones.  Suppose you're working for a humanitarian outfit in

4    Somalia or Afghanistan or Pakistan or Sudan.  And you're

5    dealing with an area that you have to deal with Islamist groups

6    or radical Islamist militants or you have been obstructed or

7    you -- you're in an area where Islamist militants are acting.

8    They frequently want to know what is the doctrine or the

9    Islamic legal approach to war or perhaps just simply the

01:00 10   political and ethical thought of groups like al Qa'ida or al

11   Qa'ida-inspired groups.

12           So I think I've done three or four trainings with them

13   right now:  in Jordan and in Bangkok, Thailand.  What I do is I

14   teach and Introduction to Islamic Law, an Introduction to the

15   Islamic Laws of War, an Introduction to the Al Qa'ida Doctrines

16   of War, and then an overview of opposition to al Qa'ida, sort

17   of the present Islamic views of warfare which are set out in

18   opposition to those of al Qa'ida or the Taliban or the Shabaab

19   in Somalia or other similar groups.

01:00 20   Q.   Have you written or published anything about al Qa'ida,

21   the organization, or any leaders of al Qa'ida?

22   A.   I have published one paper.  In fact, it just came out

23   yesterday for those of you that are interested in Christmas

24   presents.  It was an edited volume.  So I actually don't regard

25   this peer-reviewed publication in the same way as I would in a

1    journal article.

2         But it was book that just came out yesterday from

3    Palgrave Macmillan, which is a scholarly press.  My chapter in

4    that volume was called "Anwar al-Awlaki Against the Islamic

5    Legal Tradition."  I understand that Anwar al-Awlaki has been

6    discussed a bit at this trial.  He was the Yemeni-American

7    Islamic scholar who was -- I believe he's been described as the

8    or a head of al Qa'ida in Yemen in the Arabian Peninsula.

9         This papers seeks to show how he sought to present

01:01 10   Islamic law and the Islamic obligations to Western

11   American-Muslims and precisely why that is, in my opinion and

12   on the basis of my research into classical and contemporary

13   Islamic legal sources, a rejection of the Islamic legal

14   tradition.

15        MS. PATEL:  Can we pull up Exhibit 1240, please, just

16   to the witness and the attorneys?

17   Q.   Doctor March, do you recognize this document?

18   A.   That's my CV.

19        MS. PATEL:  Your Honor, we'd like to admit Doctor

01:02 20   March's CV into evidence.

21        MR. CHAKRAVARTY:  We'd object, your Honor.  The jury

22   has heard his qualifications.  The government doesn't object to

23   his qualifications, but the CV going into the jury is hearsay.

24        THE COURT:  All right.  On objection, it's excluded.

25   Q.   What is your connection to this case, Doctor March?

1   A.   I was asked by the defense to review materials for

2   discovery to give my expert opinion on certain areas related to

3   Islamic law, Islamic thought, in the content of certain

4   materials.

5   Q.   Were you paid for your work on this case?

6   A.   I have been paid, although I should note that this is not

7   what I do for a living.  And I only agreed to testify after I

8   spent some time reviewing materials.

9   Q.   How did you go about forming your opinions?

01:03 10   A.   I tried to read as much as I could.  I read a lot of the

11   IM, the instant messaging chats.  I read a lot of the materials

12   that were found in discovery that were taken from various

13   message boards and certain videos and things like that.

14   Q.   Did you write a report?

15   A.   I did not.

16   Q.   Were you asked to write a report?

17   A.   No, I was not.

18        MS. PATEL:  Can I use the ELMO, your Honor?

19        THE COURT:  I'm sorry?

01:03 20        MS. PATEL:  The ELMO.  Just to the witness.  Thank

21   you.

22   Q.   Do you recognize what's on the screen?

23   A.   Yes, I do.

24   Q.   What is this?

25   A.   That is a copy of the Qur'an, the Muslim holy book, and it

 1   says that it is translated or the meaning of it is translated

 2   into English.

 3        MS. PATEL:  Your Honor, we've marked this Exhibit

 4   1242.  We'd like to admit it, please.

 5        MR. CHAKRAVARTY:  We'd object, your Honor.

 6        THE COURT:  Let me see you at the side with the

 7   exhibit.

 8   (SIDEBAR CONFERENCE AS FOLLOWS:

 9        MS. PATEL:  It's an ancient document.

01:04 10        THE COURT:  It's not offered for its truth, though,

 11  anyway.

 12       MS. PATEL:  No.

 13       MR. CHAKRAVARTY:  But it's --

 14       MS. PATEL:  And I think it's relevant.

 15       MR. CHAKRAVARTY:  But that's what remains to be seen.

 16  The government believes it's not relevant.  This case is not

 17  about -- is about whether the defendant committed the criminal

 18  act.  It's like sending the U.S. Code book back to the jury.

 19  And that's the 403 objection.  This is confusing.  It suggests

01:04 20  to the jury that what's in here is somehow probative of some

 21  issue that they're going to --

 22       THE COURT:  What is the point of the offer?

 23       MS. PATEL:  Your Honor, he is a Salafi-Muslim that's

 24  come in through -- again and again through every witness in the

 25  government's case.  They all said that Salafi-Muslims abide by

1    the letter of the law, the letter of the Qur'an in almost all

2    instant messages, Tibyan posts, emails, audio conversations,

3    reference passages, either directly or indirectly, to either

4    Qur'an or Qur'anic concepts.  To says that it's not relevant,

5    but videos that are on the computer that they can't even say

6    the defendant watched or didn't watch is, it defies logic.

7         MR. CHAKRAVARTY:  They're asking this jury, which I

8    assume is predominantly non-Muslim, to interpret what is in

9    this book.

01:05 10        MS. PATEL:  No.  The government is asking them to do

11    is interpret it without the aid of --

12        THE COURT:  There have been pieces of evidence that

13    refers to specific verses or so on.  That's all in evidence.

14    It seems to me, if there's anything in particular, it can be

15    pointed to in that way.  The wholesale admission of it is --

16        MS. PATEL:  We also --

17        THE COURT:  -- distracting, it seems to me.

18        MS. PATEL:  We would say that, as your Honor noted in

19    the government's case in chief, that the probative value need

01:06 20    be minimal, and there is no prejudicial effect to a book that's

21    referenced again and again through a thousand government

22    exhibits.

23        THE COURT:  The possibility, as I say, of distraction,

24    of thumbing through it to find things that neither party has

25    talked about, it seems to me, if there's something particularly

1    relevant, the parties can show it, if there's a particular

2    section or verse that can be cited.

3            MR. CHAKRAVARTY:  I believe 1242A, B, C, and D are

4    specific verses from the Qur'an, which the witness is going to

5    authenticate and say are relevant.

6            MS. BASSIL:  Your Honor, the government has put in

7    hundreds of exhibits that were only mentioned by number,

8    expecting the jury to go back there and read them.

9            MS. PATEL:  This was --

01:06 10           MS. BASSIL:  How can that not be more distracting than

11   this?

12           MS. PATEL:  If everything in the computer comes in

13   that was in his possession, shouldn't this come in because it

14   was in his room?

15           THE COURT:  The objection to the book as a whole is

16   sustained.  If there are individual verses, we'll deal with

17   that.

18   .  .  .  END OF SIDEBAR CONFERENCE.)

19   Q.   Are you familiar with a document called the -- a book, I'm

01:07 20   sorry, called the Qur'an?

21   A.   I am.

22   Q.   Can you tell me how you're familiar with it?

23   A.   The Qur'an is the Muslim holy book.  It's regarded as

24   God's literal direct revelation to mankind of his speech, and

25   it's known by anybody that has been alive in the past certain

1    number of years.

2    Q.   Can you explain the significance of the Qur'an in Islam?

3    A.   The Qur'an, again, is God's -- regarded by religious

4    Muslims as God's direct revelation to mankind.  I think it's

5    sometimes helpful to pose a certain kind of comparison.  A lot

6    of us are from Judeo-Christian traditions and think that the

7    Qur'an is something like the equivalent of the Bible.  In a

8    way, that's true.  I think it's not entirely right theological.

9         I think a lot of Muslims would regard the Qur'an a

01:08 10  little bit more the way Christians regard Jesus.  Many

11   Christians refer to Jesus as the logos, or the word.  Jesus is

12   God's way of being made corporeal, or flesh on earth.  It's my

13   understanding that a lot of Muslims, because they regard the

14   Qur'an as God's speech, as a part of his essence, that it's

15   literally the way that God has demonstrated his grace or made

16   himself manifest on earth, which is why the Qur'an is only the

17   Qur'an, strictly speaking, when it's in Arabic.  There are

18   translations of the Qur'an, but those are just interpretations.

19   So the Qur'an itself is that sort of perfect articulation of

01:08 20  God's speech in Arabic.

21   Q.   Are there other documents that are important in Islam?

22   A.   Yes.  From the earliest generations of Islam, Muslims

23   gathered together the historical memory of the sayings and

24   doings of the Prophet Muhammad, and those are referred to as

25   the Hadith.  In a way, again, these comparisons are not

1    entirely accurate.  But it's a little bit more like perhaps the

2    gospels or certain aspects of the Old Testament.  Everybody

3    knows that these are the human recollections, perhaps divinely

4    inspired, but they are written down after the fact, based on

5    the collective communal memories.

6         And Muslims regard both the Qur'an and the Hadith as

7    part of revelation.  This is God's revelation to man, and both

8    are fully authoritative for belief or creed as well as

9    behavior.

01:09 10   Q.   Can you tell me if I've spelled this correctly?  Is the

11   spelling of the Qur'an, Q-u-r-'-a-n?

12   A.   Yes.

13   Q.   And Hadith is H-a-d-i-t-h?

14        THE COURT:  I'll expose this to the jury as well.

15        MS. PATEL:  Yes, please.  Thank you.

16   A.   Yes.  So the Hadith really means something like speech or

17   report.  It's -- sometimes it's more properly to talk about a

18   single Hadith report.  Collectively, this is also sometimes

19   referred as the Hadith, or the Sunna, or the authoritative

01:10 20   behavior of the prophet.

21   Q.   S-u-n-n-a?

22   A.   That's correct.

23   Q.   Can you tell us what Fiqh is?

24   A.   Fiqh, or F-i-q-h, is Islamic law or Islamic jurisprudence.

25   What it represents is the effort, the striving, of the Muslim

1    community, and particularly Islamic scholars, to derive

2    authoritative rules of behavior -- behavior and practice from

3    particularly the Qur'an and the Hadith, although there are some

4    other ways of deriving ethical norms or legal norms.

5    Q.    Have you studied the Qur'an and the Hadith and Fiqh as

6    part of your work?

7    A.    Yes, I have.

8    Q.    In what capacity?

9    A.    In my capacity of studying Islamic law, particularly the

01:11 10   Islamic law as it relates to relations with non-Muslims.

11   Q.    What would you say -- I'm sorry.  Have you focused on

12   particular subjects within these three areas?

13   A.    Well, it depends on the subject, of course.  So there are

14   different areas of behavior and practice, everything from

15   prayer to pilgrimage to ritual purity to marriage to criminal

16   law, commercial law, all the way up to the laws of war.  And,

17   really, in each of these different areas, the way that I begin

18   personally is not by going straight to the Qur'an or the Hadith

19   but beginning with treatises that are written by Muslim

01:11 20   scholars or other kinds of Muslim thinkers and trying to

21   discern the range of opinions and then to go backwards and what

22   evidence are they using from the sources of revelation.

23   Q.    Can you tell us what Aman is?

24   A.    Aman, or A-m-a-n, is a very, very basic concept in Islamic

25   law as it relates to the laws of war and to life in a

1    non-Muslim land.  The word means something like security.  But

2    what it means technically is the contractual basis on which

3    Muslims regard themselves as living in a non-Muslim land.

4            So if you go to another country -- suppose that your

5    country is at war with another country.  Suppose the United

6    States is at war with Canada.  And I want to go salmon fishing

7    or something like that.  I want to get a visa, and I want to

8    know that I'm going to go to Canada, and I'm going to be

9    secure.  But I also want them to know that I'm not there to

01:12 10   fight.  So today we look at that as a visa or we simply assume

11   that fighting is done by people in militaries.

12           But for the Islamic tradition, the Islamic scholars

13   traditionally asked, If Muslims live in non-Muslim lands,

14   either because they were born there, they migrated or those

15   lands were conquered, the Islamic scholars want to know:  On

16   what basis do they live here?  And their answer to that

17   question is:  We live here on the basis of a certain kind of

18   social contract.  We live here on the basis of a social

19   contract of mutual security.  And, for shorthand, they refer to

01:13 20   that as Aman.

21   Q.   You use the word "contract."  Is that a concept that

22   appears in the Qur'an, the Hadith, or in Fiqh?

23   A.   Yes, multiple times.

24   Q.   How so?

25   A.   In many, many areas -- there's usually three words in

1    particular that the Qur'an uses to refer to contracts or

2    covenants.  If I may spell them out, in Arabic, it would be

3    '-A-q-d, or 'Aqd; '-A-h-d, or 'Ahd; or M-i-t-h-a-q, or Mithaq.

4    And there are many, many verses.  Again, many.  There's -- I'm

5    not actually sure off the top of my head how many verses there

6    are that use these three words.  But there are numerous verses

7    in the Qur'an which extort Muslims as a basic matter of

8    religious duty to obey contracts that they enter into even with

9    non-Muslims.

01:14 10   Q.   Have you studied the concept of Jihad as part of your

11   work?

12   A.   Yes, I have.

13   Q.   Can you explain what you've studied?

14   A.   Well, Jihad is a word, and Jihad is -- what it means is

15   it's derived from the idea of striving or struggle.  So very

16   often, it's the word that's used for warfare.  But it's

17   particularly used for warfare that has a religious purpose or

18   is religiously legitimate.  However, it's also used for other

19   -- any kind of strong effort or devotion of the self in the

01:14 20   cause of religion.

21   Q.   Can you give us, just very briefly, historically, why does

22   this concept of contract and Jihad appear in the Qur'an?

23   A.   Because the Qur'an, even though, of course, Muslims

24   believe it to be the word of God that predates, in a way, it's

25   own revelation, the Qur'an itself was revealed gradually during

 1    the lifetime of the Prophet Muhammad.

 2          And Muhammad lived in a number of different scenarios.

 3    When he first received his revelation, he lived amongst his own

 4    community, and these were polytheists; these were pagans.

 5    These were not even Jews or Christians in his birth city of

 6    Mecca.  So there's a series of passages that deal with how he

 7    should relate to his kinsmen, how he should invite them or call

 8    them to Islam, but also as he experienced persecution, there

 9    was another way of talking about their relations, that they

01:15 10    will always try to persecute you.

11          At one point, either 12 or 10 years -- I always

12    mistake this.  I believe 12 years into his revelation, the --

13    Muhammad migrated to another city called Yathrib, which we

14    today know as Medina.

15    Q.   I'm sorry.  Can you spell that, please, for the --

16    A.   Yes.  Y-a-t-h-r-i-b.  But we know this today as Medina,

17    which is just short for something, Medinatul Nebi, or the City

18    of the Prophet.  And there, he became a statesman.  He became

19    sort of a coalition builder.  He was asked by a number of

01:16 20    tribes, including Jewish tribes, to take on the role of leader.

21    And he engaged in a series of wars with his former kinsmen.  So

22    there you see relations with non-Muslims being described often

23    in war-like terms.

24          Muslims, as part of their religious duty at the time

25    of the prophet, were often asked, as part of their religious

1    commitment, to join a warfare.  But at the same time, there was

2    oftentimes when the prophet would not wage war, when he would

3    make treaties or he would make covenants with the non-Muslims

4    or he would pardon after the fact or he would create new kinds

5    of political arrangements.  All of these concepts appear.  Some

6    of them -- some of the concepts related to contract appear in

7    the context of warfare, and some of them don't seem to have

8    that context.

9    Q.   Did you, when you reviewed discovery, review discovery

01:17 10   about the concept of Jihad?

11   A.   Yes.

12   Q.   Did you review discovery about the concept of Aman?

13   A.   Yes, I did.

14   Q.   Did you review any discovery about this idea of contracts?

15   A.   Yes, I did.

16        MS. PATEL:  May we have Exhibit 1006, please, John?  I

17   believe this has already been admitted.

18        THE COURT:  This is admitted?

19        MS. PATEL:  Is that right?

01:17 20        MR. CHAKRAVARTY:  I don't believe it's been admitted.

21        MS. PATEL:  I was wrong.  It's not been admitted.  So

22   only to the witness.

23   Q.   Do you recognize this document, Doctor March?

24   A.   Yes, I do.

25   Q.   Can you describe what it is?

 1    A.    That is a series of posts, a series of online discussions

 2    on the Tibyan Publications website.  And it is --

 3              THE WITNESS:  Can you make it larger, please?  A

 4    little bit larger?

 5    A.    -- between a member, Abu Sabaayaa, whom I understand to be

 6    Tarek Mehanna, and another defendant [sic] who calls himself

 7    TerrorThreat.

 8    Q.    Speaker, you mean, rather than defendant?

 9    A.    Another poster right here.  Sorry.

01:18 10    Q.    Have you reviewed this document in the course of your work

 11    in this case?

 12    A.    Yes, I have.

 13              MS. PATEL:  Your Honor, we'd like to offer Exhibit

 14    1006 into evidence.

 15              MR. CHAKRAVARTY:  Your Honor, we object and would like

 16    to be seen.

 17              THE COURT:  Okay.

 18    (SIDEBAR CONFERENCE AS FOLLOWS:

 19              MR. CHAKRAVARTY:  The reason I asked to approach is --

01:19 20    this, and I think there are two or three more Tibyan posts --

 21              MS. PATEL:  Four total.

 22              MR. CHAKRAVARTY:  -- four total, which involve the

 23    defendant's statements.  Two, I think, are from this older

 24    version of the Tibyan site, which has the complete thread, and

 25    then two are just the statement of Abu Sabaayaa.

 1          The government doesn't have an authentication issue

 2     even though it's not clear how this witness knows, but the

 3     issue is:  These are defendant's statements.  And if they are

 4     being offered, as it appears that there are, to demonstrate the

 5     defendant's awareness of this concept of Aman and the fact that

 6     he is affirming the concept of Aman, then that is for the truth

 7     of the matter.

 8          MS. PATEL:  We're just explaining the words, the

 9     religious concepts.  There's Arabic words that are in there.

01:19 10   He's just going to be a guide for the jury to understand what

 11    it means.

 12         MR. CHAKRAVARTY:  It presumes evidence is in, and then

 13    he's explaining what the evidence is.  This witness isn't --

 14    the only way these come in is to presumably shed light on what

 15    the defendant's state of mind was, which is not what this

 16    witness' competence is.  In fact, under 704, it would be

 17    prohibited.

 18         MS. PATEL:  No, that's not true.

 19         THE COURT:  I don't think it's hearsay.  I don't think

01:20 20   it's offered for the truth of the assertion that --

 21         MS. PATEL:  It just goes to state of mind.

 22         THE COURT:  -- any affirmative statement that is

 23    limited to what it asserts but simply the fact of a discussion

 24    and what the terms mean in the discussion and what that might

 25    say about -- anyway -- about the philosophy or whatever of the

1    defendant.

2              MR. CHAKRAVARTY:  Is that true for all --

3              THE COURT:  I would think so.  If there were a

4    statement that said, I didn't speak to Abousamra about this --

5              MS. PATEL:  No, that's not --

6              THE COURT:  -- and it was offered to prove that he

7    didn't speak to Abousamra about it, that would be hearsay.  If

8    it's, What are our obligations under our covenant, I don't

9    think that's asserted for its truth.  First of all, that's a

01:21 10   question.  But the point is that a discussion of philosophy,

11   for lack of a better term, or theology, whatever it might be,

12   is not necessarily a statement that's offered to prove what it

13   asserts.

14             Now, there may be statements in there that do assert

15   facts and -- but that's not the purpose it's offered for.  We

16   can instruct the jury that that's not to be taken as a

17   historical -- as evidence of historical events, that it

18   recounts -- I may be confusing it.  In other words, if the

19   speakers say something has happened, it's not offered to prove

01:22 20   that that's true.

21             MS. PATEL:  These are all theological --

22             THE COURT:  It's offered to prove that people talk

23   this way and it means something.

24             MR. CHAKRAVARTY:  But "talk this way" is different

25   than saying that the defendant believes this.  That seems to be

1   the --

2           THE COURT:  Well --

3           MS. PATEL:  He can't say that.

4           THE COURT:  There's an invasion of the jury's province

5   problem there, but that will depend on how actually he answers

6   the question.

7           On that subject, I do notice he's in his professor

8   mode and he's teaching a lot, which is fine.  But he may get

9   overly enthusiastic about something which you would agree --

01:22 10         MS. PATEL:  I will reign him in.  No offense, but I

11  love not coming up here too much.

12          MR. AUERHAHN:  Your Honor, if that's your ruling,

13  there should at least be a limiting instruction --

14          THE COURT:  That's what I'm saying.  I can do that.

15          MR. AUERHAHN:  -- the truth of what the defendant

16  stated as his statement of belief.

17          THE COURT:  Right.  Well, I don't -- you know, the

18  lawyers understand this, but laypeople may not understand it as

19  well.  An assertion, I believe the following should not be

01:23 20  taken as true.  Statement of the following, "Aman means this,"

21  can be interpreted by them as his belief, and they can take it

22  as evidence of his belief.  So it's a little -- I'll tell them.

23  I'm not sure how much good it will do.

24  .  .  .  END OF SIDEBAR CONFERENCE.)

25          THE COURT:  Jurors, this is an IM exchange, I guess,

1    or a posting -- I guess it's a web forum posting.  It's

2    admitted as evidence of the occurrence of the exchange; that

3    is, people said the following things.  They may have some

4    meaning, and the witness may comment on some of the meaning.

5    It's not affirmative evidence of factual matters that may be

6    asserted in them.  For example, if one of the participants

7    said, I just had lunch, it could be evidence that there was an

8    exchange about lunch, but you couldn't take it as proof that he

9    had had lunch.  The affirmative statements are -- don't prove

01:24 10   the facts that they asserted, an exchange occurred.  It is what

11   it is and people can interpret.

12        MS. PATEL:  Yes, your Honor.  With that, we'd like to

13   admit Exhibit 1006 and publish to the jury.

14        THE COURT:  The document will be admitted.

15   (Exhibit No. 1006 received into evidence.)

16        MS. PATEL:  May the jury have it?  Thank you.  If we

17   could go, please, to Page 2, Posting No. 33, and if you could

18   expand the font a little.  Thank you.

19   Q.   Doctor March, did you have occasion to review this passage

01:25 20   in the course of your work?

21   A.   Yes, I did.

22   Q.   Can you identify to the left here what name appears in the

23   passage?

24   A.   Abu Sabaayaa.

25   Q.   What is the date above that?

1    A.    March 10, 2005.

2    Q.    Would you mind reading for us just these two paragraphs?

3    A.    "Well, both issues are linked, you see?  If we were to

4    conclude that every American is responsible for what the

5    American government is doing, then it can be said that it is

6    permissible to retaliate against any American for what the

7    American government is doing, as we would consider the American

8    government and the American people to be one and the same.

9         "However, if we conclude that not every American is to

01:25 10    be held responsible for what their government is doing, which

11    is the conclusion that I happen to come to, then it cannot be

12    said that any American can be killed in retaliation for what

13    their government is doing because this would constitute

14    injustice.  A law says in the Qur'an:  'And no bearer of

15    burdens shall bear another's burden...', and:  'A law does not

16    forbid you to deal justly and kindly with those who have not

17    fought against you on account of religion and did not drive you

18    out of your homes.  Verily, Allah loves those who deal with

19    justice.  It is only as regards to those who fought against you

01:26 20    on account of religion and have driven you out of your homes

21    and help you to drive you out, that Allah forbids you to

22    befriend them.  And whosoever will befriend them, then such are

23    the wrongdoers."

24    Q.    Now, restricting your comments only with respect to this

25    paragraph, can you tell us:  What is the religious significance

```
 1   of what is written here?
 2   A.   Yes.  So suppose I were teaching this in a class or
 3   suppose I was going to be writing about this as a scholar, what
 4   I would say is what this first paragraph is responding to is a
 5   view --
 6          MR. CHAKRAVARTY:  Objection, your Honor.  Just to
 7   clarify, are we talking about the emboldened paragraph of
 8   liturgical writing, or are we talking about what the
 9   defendant's statements were?
10          MS. PATEL:  Your Honor, I think we're talking about
11   the paragraph beginning from "well" to "same."
12          MR. CHAKRAVARTY:  The government would object to that.
13          MS. PATEL:  We would restrict --
14          THE COURT:  Overruled.  He may answer it.
15   A.   So if I were teaching this, if I were writing about this
16   as a scholar, what I would say is that the part that says, "If
17   we were to conclude that every American is responsible," that
18   what is being quoted here is a view about targeting in war that
19   is associated with al Qa'ida.
20          Al Qa'ida will frequently say that one reason why
21   civilians may be targeted -- not only killed accidentally but
22   targeted is because their government is doing things that they
23   approve of that harm Muslims and principles of war or
24   principles of retaliation, they're actually culpable.
25          The second paragraph, I would say, is an effort to, in
```

1    Islamic legal or moral terms, argue against the al Qa'ida

2    position and say that in matters of warfare, it's necessary to

3    make a distinction between those who are culpable because they

4    are -- they have military power and those who merely happen to

5    live in a -- in the same country.

6          If I could make one possible scholarly point, which is

7    my own interpretation, which I don't think would be obviously.

8          THE COURT:  That goes beyond the question.  Put

9    another question.

01:28 10        MS. PATEL:  Sure.

11   Q.   Can you address the two passages of the Qur'an that are

12   written here and explain the religious significance of those as

13   they relate to this passage?

14   A.   "And no bearer of burden shall bear another's burden."  My

15   understanding of this is that most Islamic scholars, most

16   commentators on the Qur'an, have interpreted this in

17   theological terms, that they say that you can't be -- God will

18   not hold you accountable in the afterlife for things that your

19   family did or your parents did or your kinsmen did and that God

01:29 20   will only hold you responsible for things that you do.  And

21   what I then interpret this to be is an effort to bring in a

22   theological point and apply it as extra evidence against the

23   war doctrine of al Qa'ida.

24         The second passage is very, very important passage in

25   the Qur'an that deals with relations with non-Muslims.  There

1   are a number of passages in the Qur'an which say that Muslims

2   may never be friends with non-Muslims.  More moderate scholars

3   or more moderate believers will frequently point to this

4   passage from Chapter 60, Verses 8 to 9, to say that it is

5   permissible to have friendly, convivial relationships with

6   non-Muslims who are not actually engaging in harm.

7           So what I see is, this verse, which is traditionally

8   interpreted to justify friendly social relationships with

9   non-Muslims being invoked against the al Qa'ida war doctrine.

01:30 10        MS. PATEL:  Let's turn now to the next passage, which,

11  Mr. Oh, is No. 35 on Page 5 of Exhibit 1006.

12          THE WITNESS:  Down, I believe.

13  Q.   Have you reviewed this passage in the course of your work?

14  A.   Yes, I have.

15          MS. PATEL:  If we could just scroll to the left a

16  little.

17  Q.   Can you identify who the member is that has posted this

18  passage?

19  A.   Abu Sabaayaa.

01:30 20  Q.   What is the date above the member name?

21  A.   March 10, 2005.

22  Q.   Would you read for us, please, the second paragraph of

23  this?  And this is just in an efficiency of time, just the

24  second paragraph, please.

25  A.   "In America, not all able-bodied men are expected to go

1    out and fight when there is a war.  Of the millions and

2    millions of able-bodied men in America, only a small percentage

3    of them are enlisted in the Armed Forces.  Therefore, we cannot

4    label them all fighters as it was possible to do in the past.

5    This is why there was no specific revelation detailing how to

6    determine who is a fighter and who isn't:  because that is

7    something that changes from era to era."

8    Q.   Can you tell us what the religious reference is here when

9    it says "no specific revelation" in the fourth line?

01:31 10   A.   This is something that you might pass over quickly but, in

11   fact, has a fairly technical Islamic legal significance.

12   Q.   Let me pause for a minute.  Do you believe that someone

13   reading this that does not have Islamic law background, would

14   understand that?

15   A.   I think they might understand the gist, but I think there

16   are some very, very interesting things that are going on here.

17   Q.   Can you please explain?

18   A.   Yes.  For certain kinds of Muslims, particularly more

19   conservative, sometimes called Salafi-Muslims, the first two

01:31 20   sources of law, the Qur'an and Hadith, are given an

21   extraordinary amount of significance.  There are some schools

22   of law which will try to draw in comparative analysis or

23   analogy or reason or welfare.  Salafi-Muslims, in particular,

24   like to point to specific passages in the Qur'an and the Hadith

25   by way of settling the dispute.  One question that is asked in

1    Islamic law is:  Who's targetable in war?  Who can you kill?

2    We, of course, ask the same question.

3         The significance of pointing to a specific revelation

4    would be to say:  God would have resolved once and for all who

5    is a fighter.  So if something happens during the lifetime of

6    the prophet, when perhaps he killed people that we would today

7    regard as civilians, what's being said here is that that's not

8    a specific revelation that establishes once and for all that

9    all able-bodied men are, in fact, military targets.

01:32 10        What is being argued here is that the legal concept of

11   a legitimate target is itself something that changes from era

12   to era.  What is a legitimate target in one concept is not

13   necessarily a legitimate target in the other context.

14        What this means to say is that al Qa'ida doctrine,

15   which seeks to draw from certain examples of the prophet to say

16   that it's permissible to kill civilians on grounds of

17   precedent.  The argument, the technical legal argument here is

18   that that evidence is not for all times and places.  And in a

19   different time and place, who is a legitimate target will

01:33 20   change.

21        MS. PATEL:  Can we turn now to No. 39, which appears

22   on Page 10.

23   Q.   Have you seen this before?

24   A.   Yes, I have.

25   Q.   Can you identify the member name on the left side?

1    A.    Abu Sabaayaa.

2    Q.    And the date above that?

3    A.    March 10, 2005.

4    Q.    Would you mind just reading this short passage for us?

5    A.    "(Sigh) I think this debate has lost its momentum.  Many

6    of your points that you just brought up have been addressed in

7    previous posts in this same thread, so I'm not going to waste

8    time repeating myself.  However, I will respond to the tax

9    issue.  I don't know if you live in the West, but everyone in

01:34 10    America has to pay taxes, myself included.  Taxpayers don't

11    really get to decide whether or not their money goes to the

12    military.  That's just the way it is.  Using that same logic, I

13    should be killed for supporting the war."

14    Q.    Again, can you tell us the religious significance of this

15    tax discussion?

16    A.    Yes.  One very, very common al Qa'ida argument is that

17    another reason why --

18              MR. CHAKRAVARTY:  Your Honor, nonresponsive.  He's

19    asked for the religious significance of this text.  He's

01:34 20    talking about al Qa'ida.

21              THE COURT:  Sustained.

22    Q.    Can you tell us just the religious significance of this

23    document as you see it?

24    A.    I see this as an attempt to make an Islamic

25    legal-religious argument about what makes somebody targetable

1    in war.  It has been argued in Islamic law that paying taxes to

2    a government that kills Muslims makes somebody culpable because

3    they're, in fact, involved in that harm.  This is an argument

4    that says, You can't make somebody targetable merely on grounds

5    of paying taxes because this doesn't discriminate.  This

6    doesn't distinguish between the people who are actually morally

7    culpable and everybody who just happens to live in a state

8    where everybody has to pay their taxes.

9    Q.   Have you studied al Qa'ida's position on this topic?

01:35 10   A.   Yes, I have.

11   Q.   Does al Qa'ida's position support the argument written

12   here?

13   A.   No.

14        MS. PATEL:  Can we please turn to Exhibit 1241?  And

15   only for the witness and the attorneys, your Honor, please.

16   Q.   Do you recognize this page?

17   A.   Yes.

18   Q.   Can you identify what it is?

19   A.   This, I believe, to be an avatar, or a logo, from al

01:35 20   Qa'ida in the Arabian Peninsula.

21        MS. PATEL:  Can we turn now to 1241B, only for the

22   witness and for the attorneys?

23   Q.   Can you identify who that individual is?

24   A.   Yes.  That is Anwar al-Awlaki.

25   Q.   Have you ever written about this individual?

A.    Yes, I have.

Q.    What was the subject of your paper?

A.    Again, the title of my paper was, "Anwar al-Awlaki Against the Islamic Legal Tradition."  And the paper was an attempt to characterize Awlaki's war doctrines and how they represent a deviation from the Islamic legal tradition.

MS. PATEL:  We ask permission, your Honor, to admit this into evidence and play a two-minute clip.

MR. CHAKRAVARTY:  Is this 1241B?

01:36  MS. PATEL:  1241B.

MR. CHAKRAVARTY:  The government has no objection, your Honor.

THE COURT:  You just identified two exhibits.

MS. PATEL:  Yes, sorry.

THE COURT:  Are you offering both of them or just the second one?

MS. PATEL:  1241A is Part I.  It was cut because of the length.  So 1241A, yes, we would offer that.  And then 1241B is the one that's up right now.

01:37  THE COURT:  Okay.  There's no objection to either?  I just want to be clear on this.

MR. CHAKRAVARTY:  No objection to either, but my understanding is only the second one is going to be played.

MS. PATEL:  Yes.

MR. CHAKRAVARTY:  Actually, with the one that's not

1    going to be played, I do have an objection, just because it's

2    not going to be played, and it would be a distraction to the

3    jury.

4         MS. PATEL:  It's only to identify the beginning of the

5    video.  It was just cut into three pieces.

6         THE COURT:  Is 1241A also a video?

7         MS. PATEL:  No.  I'm sorry?  Was it also --

8         THE COURT:  A video?

9         MS. PATEL:  It is.

01:37 10         THE COURT:  Or just a screen shot from a video?

11         MS. PATEL:  It's also a video.  It continues for 20

12    minutes.

13         MR. CHAKRAVARTY:  If that's not the part that this

14    witness is going to be talking about, then I don't know why the

15    jury needs to see it.

16         MS. PATEL:  I'm happy to play the first ten seconds of

17    it just to identify what it is and where it came from.

18         THE COURT:  I think they both can be admitted, 1241A

19    and B.

01:38 20    (Exhibit No. 1241A received into evidence.)

21    (Exhibit No. 1241B received into evidence.)

22         MS. PATEL:  Can we play 1241B beginning at 4:29?  I'm

23    sorry.  Hang on for one second, John.

24    Q.   Can you tell us -- before we play this, can you introduce

25    to the jury who this individual is?

1    A.    This is Anwar al-Awlaki, whom I understand had a very high

2    leadership role in al Qa'ida in the Arabian Peninsula, if not,

3    in fact, being the leader.

4    Q.    Can you tell us a little bit about his history?

5    A.    He was born in New Mexico and lived -- to Yemeni parents

6    and lived for many years in the United States.  Was a prayer

7    leader and a religious scholar in the United States.  And then

8    his views became increasingly militant and extremist, and he

9    went back to Yemen where he led the al Qa'ida propaganda war,

01:38 10   or participated in the al Qa'ida propaganda war from Yemen, and

11   was recently killed in a United States drone strike.

12   Q.    At the very top of this page, there are -- there's a logo

13   to the left.  Can you identify that logo?

14   A.    I think it says, "I Pledge Allegiance."  And I believe

15   that to be a logo related to al Qa'ida in the Arabian

16   Peninsula.

17   Q.    And on the right, there is an Arabic word.  And can you

18   identify what that is?

19   A.    The word on the right says "Al-Malahem," and on the

01:39 20   English it says, "Al-Malahem Media."  And I understand this to

21   be identified, again, the media wing of al Qa'ida in the

22   Arabian Peninsula.

23          MS. PATEL:  Can we now play beginning at 4:27?

24   (Video played.)

25   Q.    Can you explain to us the religious significance of the

1    portion of video we just watched?

2    A.   Awlaki is making two distinct arguments for the

3    permissibility of targeting American civilians.  The first is

4    an argument that it's impossible to distinguish.  If you have a

5    target and there happen to be civilians amongst them, and you

6    can't differentiate, then it's permissible to attack the

7    target.

8         The first argument, however, is actually that

9    Americans have it coming individually.  They're a legitimate

01:42 10   target themselves because they support the government through

11   democracy and through paying taxes.

12   Q.   What is the second argument he's making?

13   A.   I'm sorry.  The first argument chronologically he made was

14   the one about taxes and democracy.  The second argument

15   chronologically was the one about the inability to make

16   distinction.  If you're attacking a target and you know that

17   there are enemy fighters there and they happen to have

18   civilians, it doesn't mean you don't attack the target.  So

19   those are two separate arguments:  one, that American civilians

01:43 20   deserve it.  They have it coming because they pay taxes and

21   they elect their government; and, second, because it's

22   impossible to make a distinction.

23   Q.   Did you see this very issue addressed in the discovery you

24   reviewed?

25   A.   Yes, I did.

1          MS. PATEL:  Can we please turn to Exhibit 1237?  Not

2     to the jury just yet.

3     Q.   Do you recognize this document?

4     A.   Yes.

5     Q.   What is this?

6     A.   This, again, is a series of posts from the Tibyan website.

7          MS. PATEL:  If we can scroll down to No. 22, please.

8     Q.   Have you read or seen this before?

9     A.   Yes, I have.

01:43 10        MS. PATEL:  May we admit Exhibit 1237 into evidence,

11    your Honor?

12         MR. CHAKRAVARTY:  Your Honor, mindful of the sidebar,

13    my concern about this particular exhibit is, I think the jury

14    may have already seen it another exhibit number.  It looks

15    awfully familiar.

16         THE COURT:  The redundancy is not important, I guess.

17         MR. CHAKRAVARTY:  I'm not objecting to it.  I'm just

18    --

19         THE COURT:  I'll admit it under the same condition.

01:44 20   Again, it's for the fact of the conversation, not the truth of

21    matters of fact that might be asserted here.

22    Q.   Can you identify on the left box who is the member who's

23    posted this No. 22?

24    A.   Abu Sabaayaa.

25    Q.   To your knowledge, do you know who Abu Sabaayaa is?

1    A.    I believe that to be Tarek Mehanna.

2    Q.    What is the date above the name Abu Sabaayaa?

3    A.    March 9, 2005.

4         MS. PATEL:  This one is a little bit on the long side.

5    John, if you wouldn't mind --

6    Q.    If you could just read the first part of this, and then

7    we'll scroll to the next page.

8    A.    "Right.  The Americans live in a democracy - this is a

9    common argument that is used to justify things like this, and

01:44 10   this is what I have a problem with:  that simply because the

11   person is an American, and America is at war with Muslims, then

12   that means you can kill him.  I used to believe this, but after

13   long reflection and thought, I have come to the conclusion (and

14   Allah knows best) that this is an incorrect concept.  I'm not a

15   scholar, so it is useless for me to go through and present to

16   you all of the Shar'ee evidences that I have analyzed after

17   coming to the conclusion.  But I will argue it here from a

18   logical point of view."

19   Q.    I'm going to stop you right there for one moment.  Can you

01:45 20   explain what the "Shar'ee evidences are?

21   A.    Shar'ee is an adjectival form of the word.  Everybody

22   knows the word "Shur'a."  So Shur'a is the Islamic law.

23   Shar'ee means -- it's the adjective.  So it means Shur'a-like

24   or the proofs -- the divine holy proofs for making an argument

25   from Islamic laws or Islamic ethics.

1    Q.    Can you continue, please?

2    A.    "The argument that they live in a democracy, their

3    government is fighting the Muslims, so therefore each and every

4    American is responsible for the actions of their government can

5    easily be refuted.  Remember when the war in Iraq first

6    started.  Was there a single country on Earth, Western or

7    otherwise, in which there were not massive anti-war

8    demonstrations condemning the war as well as the Bush

9    administration?  Some of the biggest anti-war demonstrations

10   took place right here in the U.S. itself, as well as the other

11   countries that are part of the U.S. coalition (Spain, the U.K.,

12   Italy, etc.)  Also, if you look at this past U.S. election,

13   almost half of Americans voted for Kerry (which, in U.S.

14   politics, translates as anti-war).  So, after looking at these

15   two realities with a just mind, one can no longer use the

16   argument that the Americans live in a democracy (which they

17   don't), therefore every single American in the world, civilian

18   or military, can be killed on the spot.  No - rather, those who

19   fight us should be fought.

01:46 20         "Those who fight us, not those who carry the same

21   nationality as those who fight us.

22         "Things are no longer as simple as the fataawaa that

23   use the democracy argument as a justification make them out to

24   be.  We need to combine the knowledge of the Shar'ee evidence

25   with the understand" -- I think he means "understanding" --

1    "and knowledge of world events and realities.  If we do so in

2    this case, mentioned above, we will see that your argument no

3    longer applies simply because it has been unquestionably proven

4    that not all Americans and Westerners support the wars that

5    their governments have initiated against the Muslims."

6            You want me to continue?

7    Q.   Yes, I think so, to the end, please.

8    A.   "And your statement that Americans are leaders of Kufr,

9    this is a very general statement.  I agree with you that all

10   non-Muslim Americans are kuffaar, but are all of them the

11   leaders of Kufr?  I don't think so.  There are many kind and

12   just people amongst them, and, as I mentioned to you above, not

13   all of them support the fight against the Muslims.  One

14   American that I know personally was practically begging me to

15   come to an anti-war rally with him.  Since I don't agree with

16   demonstrations of this type, I didn't go.  But you see my

17   point:  I cannot label this American as one of the leaders of

18   Kufr, nor do I think I should kill him - he's an American, yes,

19   but he is clearly against the wars being perpetrated against

20   the Muslims.  Rather, I think that a more useful way to deal

21   with someone like this would be to call him to Islam through

22   words and actions.

23           "If you reflect off the verses of Qur'an and the

24   statements of the Messenger of Allah, you will find that, as

25   they say, every situation has its proper way of being dealt

1   with.  But to just put a blanket ruling on people simply

2   because of their nationality...maybe that was applicable at a

3   certain point in history, but I don't think it is applicable

4   any more.  And Allah knows best.

5   Q.   With the jury's indulgence -- they have heard this

6   before -- I wonder if you could give us the religious

7   explanation of what that passage means.

8   A.   I think it's quite self-explanatory.  I think that what's

9   going on here is that there is a religious argument that

01:48 10  Americans are targetable because they're non-believers, because

11  they're not Muslims and that presumptively don't have a

12  protection of security and because of what their governments

13  are doing.

14  Q.   Let me stop you there.

15  A.   Yes.

16  Q.   When you say "there is that argument," who holds that

17  argument to your knowledge?

18  A.   Amongst others, al Qa'ida propagandists.

19  Q.   Please continue.

01:49 20  A.   And this is a religious argument against that, that says

21  merely being a non-Muslim does not make you an enemy worthy of

22  being fought.  And merely being a citizen of a country that is

23  fighting non-Muslims, does not make you an enemy worthy of

24  being fought.

25  Q.   What is the significance of the line, "If you reflect off

1    the verses of the Qur'an and the statements of the Messenger of

2    Allah"?

3    A.   Well, again, the Qur'an and Hadith, or the Sunna, are the

4    two first sources of Islamic law.  And this is an attempt to

5    makes an Islamic legal argument based on revelation that are

6    religious commitments based on the most authoritative sources

7    ought to say that -- ought to lead us to reject the opinions

8    being canvassed here.

9    Q.   Is this a statement supportive of the Awlaki position that

01:49 10   we just heard on the video?

11   A.   No.  It's a direct refutation of the Awlaki video.

12   Q.   Do you believe this statement is propaganda for Awlaki's

13   position?

14           MR. CHAKRAVARTY:  Objection.

15           THE COURT:  Sustained.

16           MS. PATEL:  Let's move to Post No. 29 on Page 7,

17   please.

18   Q.   And I'm just going to read the two paragraphs here.  The

19   first is:  "Wow...killing school" -- I'm sorry.  First, could

01:50 20   you identify for me on the left here who is the person who

21   posted this?

22   A.   Abu Sabaayaa.

23   Q.   Do you know who Abu Sabaayaa is?

24   A.   I believe it to be Tarek Mehanna.

25   Q.   What's the date above the name?

1    A.   March 9, 2005.

2         MS. PATEL:  I'm going to read two short passages from

3    here.  "Wow...killing school teachers...quite a victory for

4    Islam.  This is the problem.  Just because he's British doesn't

5    mean he is to be killed."

6         If you can scroll down a little more, please.

7         "There were Westerners present.  I never denied this.

8    But what made them legitimate targets for being attacked?  Just

9    because they are Westerners?  Were those people making war

01:50 10   against Muslims?"

11   Q.   Can you explain the religious significance of those two

12   statements?

13   A.   Yes.  There are religious arguments that claim that being

14   an unbeliever makes one presumptively legitimately targetable,

15   and being part of a war effort, whether that's perhaps

16   supporting British Government or even on some interpretations

17   supporting the Saudi Government might make one a legitimate

18   target.

19        MS. PATEL:  Can we go to Exhibit 1238, please?

01:51 20   Q.   Can you identify this document?

21        MS. PATEL:  This is not in evidence yet, your Honor.

22   A.   Yes.

23        MS. PATEL:  Could you scroll up to the top, please?

24   Q.   To your knowledge, where is this document from?

25   A.   The Tibyan Publications website.

1    Q.   Have you seen this before?

2    A.   Yes, I have.

3    Q.   Who is the author on the left-hand side?

4    A.   Abu Sabaayaa.

5    Q.   What is the date of this post?

6    A.   April 9, 2007.

7    Q.   So it would be correct to say that this is two years after

8    the two posts we just reviewed?

9    A.   Yes.

01:51 10        MS. PATEL:  May I please admit into evidence Exhibit

11   1238?

12        MR. CHAKRAVARTY:  No objection.

13        THE COURT:  On the same conditions.

14        MR. CHAKRAVARTY:  On the same.  I assume you're doing

15   the same instruction.

16   Q.   Would you please read for us the two paragraphs here?

17   A.   "Alaykum as-Salam:  Contrary to popular belief, there are

18   no two opinions on the 'ahd issue, as anyone with half a brain

19   will see that the 'ahd of peace between the nations of Kufr and

20   the Muslims have been nullified.  Rather, there are brothers

21   who have no idea what they themselves mean when they say 'there

22   is no 'ahd,' thinking a state of war with the kuffar is a green

23   light to unrestrictedly cheat, deceive, steal, and break

24   promises and agreements with your adversaries.

25        "This is a new interpretation that has absolutely no

1    basis in the Qur'an, Sunnah, or jigma' of the scholars, and is

2    caused by a lack of understanding of Islam and its rulings.  In

3    fact, the Sirah of the Prophet and the Salaf prove exactly the

4    opposite of this, and this is why there is not a single scholar

5    who has ever interpreted this the way I see it being

6    interpreted here - that there can be absolutely no agreements,

7    pacts, or covenants of any shape or size with Ahl al-Harb."

8    Q.   At the very top of this passage, there is the word "'Ahd"

9    which we had written here under "contract."  Can you explain

01:53 10    what that means religiously?

11    A.   Yes.  Again, this is one of the three most common words

12    that's used in the Qur'an and Islamic law if we're talking

13    about a contract or covenant.  What's being referred to here is

14    the idea that there would be a contract or a covenant of

15    security.

16    Q.   What is the religious significance of this passage?

17    A.   The significance of this passage is quite -- it's actually

18    deceptively complex.  I think it's more complex, in fact, than

19    it meets the eye.  So what's often argued by al Qa'ida is that

01:53 20    the covenant of security or the agreement is between particular

21    non-Muslim countries and all Muslims.

22          So the argument that we saw with Awlaki is that, if

23    non-Muslims are at war with any Muslims, then they're at war

24    with all Muslims.  And that view is being refuted in this

25    passage.  In fact, there's some very, very strong language

1   that's being used here.  What, in fact, in essence is being

2   said is that there's two different kinds of contract.  There's

3   contract between a particular country and particular foreign

4   Muslims, which has nothing to do with the contract of security

5   between a government and its citizens.

6   Q.   When it says at the end, that "there can be absolutely no

7   agreements, pacts, covenants of any shape or size with the Ahl

8   al-Harb," can you explain what that means?

9   A.   Yes.  So there is a certain view which says that

01:54 10   non-Muslims, merely by virtue of being non-Muslims, will always

11   have an enmity or a hatred for Islam and Islam will always be

12   able to wage war against them and that these pacts or covenants

13   are only very, very temporary or entered into disingenuously.

14        What's being said is that that view is, in fact, a new

15   view which has no basis in Islam.  In fact, the language here

16   is deceptively strong.  So when it's written here, "This is a

17   new interpretation," that sounds to us very bland, you know,

18   very polite.  In fact, this is an extremely weighty charge.

19   The idea of new interpretation I take to be an English

01:55 20   translation of a -- of the Arabic word Biddah, or new

21   interpretation, which in certain Salafi communities is an

22   extremely weighty charge.  It means that what you are, in fact,

23   doing is taking something that has been resolved and

24   established by revelation, by God, by the prophet, by the

25   earliest Muslims, and you are, for no good religious reason,

1    subjecting this to arbitrary innovation.  It's particularly in

2    the Salafi community, it's an extremely weighty charge.  And I

3    take this text to be leveling that charge against the al Qa'ida

4    doctrine.

5           MS. PATEL:  Can we turn to Exhibit 1239, please?

6    Q.   Have you seen this document before?

7    A.   Yes, I have.

8    Q.   Where is this document from?

9    A.   The Tibyan Publications website.

01:56 10   Q.   Can you identify the author on the left?

11   A.   Abu Sabaayaa.

12   Q.   Who do you know that to be?

13   A.   Tarek Mehanna.

14   Q.   What is the date of this post?

15   A.   April 10, 2007.

16          MS. PATEL:  Your Honor, may we admit Exhibit 1239 into

17   evidence?

18          MR. CHAKRAVARTY:  Same conditions.

19          THE COURT:  Same conditions.

01:56 20   Q.   Would you read for us just the part from "interestingly"

21   to "them"?

22   A.   Including the Arabic?

23   Q.   Including the Arabic, please.

24   A.   "Interestingly, a similar scenario was addressed by

25   ash-Shafi'i in 'al-Umm'."

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  We can skip the Arabic.

3          THE WITNESS:  Can I continue with the English?

4          THE COURT:  If you want the witness to tell us that

5     the English is a translation of the Arabic, he can do that if

6     he's able.

7     A.   I have looked at the Arabic, and I have looked at the

8     English, and I have no objection to the translation that's

9     being offered in this text.

01:57 10   Q.   Could you read just the English portion.

11    A.   "And if a group of the Muslims enter into Dar al-Harb in

12    security, and Ahl al-Harb take some of those Muslims as

13    prisoners, it is not allowed for the others to fight Ahl

14    al-Harb until they (Muslims) end their agreement of peace with

15    them.  And if they end it and warn them of this, and break off

16    their peace between them, they can then fight them.  However,

17    as for those who are still under the agreement of security,

18    they are not allowed to fight them.' ... even in Dar al-Harb,

19    and with Ahl al-Harb."

01:57 20   Q.   We've talked about this before so I'll just ask you:  Is

21    this consistent with the video statement that we saw put out by

22    the al Qa'ida representative?

23    A.   No.  It's a direct refutation of the video put out by

24    Awlaki.

25    Q.   Is there any additional religious significance to this

1    passage?

2    A.   There's a huge amount of religious significance.  In fact,

3    I would suggest that without an understanding of Islamic law,

4    it might be hard to understand how strongly a position is being

5    argued for here.  First of all, where it says "Dar al-Harb,"

6    what that, in fact, means is the land of war.  The Ahl al-Harb

7    are the people of war.  And where it says "in security," that

8    is a reference to this Aman.  We've heard a lot about Aman.

9    That's what it means.  It's a binding religious contract.

01:58 10        What, in fact, is being said here is, even if you're

11   in a legitimate war and even if the enemy takes your prisoners

12   that, you know -- Jimmy Carter, even one of our most passivist

13   presidents, tried to liberate the prisoners in Iran during the

14   Revolution.  What is being argued here is that even if it is

15   legitimate to do this --

16        MR. CHAKRAVARTY:  Objection.  Your Honor, just for

17   purposes of organization, I think it's appropriate for the

18   witness to stop when I object.

19        The government doesn't object to the witness answering

01:58 20   the question that was posed, but bringing in -- injecting other

21   historical events, that's what the government's objection is.

22        THE COURT:  It's part of the reason for the

23   explanation.  It may be done.  Why don't you start again.

24   Q.   Start from the beginning.

25   A.   What I take to being argued here is that, even if you're

1    in a legitimate war and even if you can fight the enemy and if

2    the enemy takes your prisoners, of course, as a whole, you can

3    fight to free your prisoners.

4         However, what's being argued is that those specific

5    Muslims who are perhaps residents or citizens of a country or

6    have a contract of security, they can't take part in this.

7    They can't take part in this in any way because their contract

8    of mutual security with the non-Muslim entity trumps that.  And

9    in this emphasis outside the quote, "even in Dar al-Harb and

01:59 10   even with Ahl al-Harb," is, in fact, saying that, even when you

11   have people that are unequivocally your enemies, even in a real

12   war.  So if that's the case then, then imagine how much more

13   that's the case if you're not looking around and regarding

14   people as your enemies?  If you're a citizen here and you have

15   this contract, how much more it is the case -- is it the case

16   that you can't just pick up your gun or start fighting just

17   because you want to?

18   Q.   And you had addressed a historic analogy with respect to

19   Jimmy Carter.  Could you finish your thought on that, please?

02:00 20   A.   Again, this isn't an area of expertise, but I think the

21   idea that --

22        MR. CHAKRAVARTY:  This is why the government objected,

23   your Honor.

24        THE COURT:  No.  I think it's using an anecdote to

25   illustrate the point.

1    A.   I think the idea that a country might try to fight to free

2    its prisoners is fairly -- is not limited to Islamic law or

3    Islamic thought.  It's a fairly common view.

4         But if I could just make one more point about the

5    religious significance --

6    Q.   Hold on.

7    A.   What's being done here --

8    Q.   What's the additional religious significance of the

9    passage?

02:00 10   A.   This scholar that's being quoted from is Shafi'i, and he

11   was writing in the Ninth Century, or in the 800s.  And in the

12   800s, you didn't have democracy.  You didn't have human rights.

13   You didn't have the sense -- you didn't have the United

14   Nations.  You didn't have the sense that non-Muslims could be

15   potentially your friends, could potentially be your

16   co-citizens.  The presumptive state of relationship was

17   warfare.

18        So what is being done here is saying, even in that

19   situation, even where we assume that the Muslim community at

02:01 20   that time could fight, that even then, when the situation was

21   much, much worse, that this contract of mutual security trumped

22   the imperative to fight.

23   Q.   Is that --

24        THE COURT:  Miss Patel, you want to finish within the

25   minute -- I have a brief hearing at 11:00 in another session

```
 1   that I have to do.  So I'd like to break.  If you want to

 2   finish with this --

 3           MS. PATEL:  I can ask one more question, and then I'm

 4   at a stopping point.

 5   Q.   Is the message conveyed here consistent with what -- the

 6   speech that Awlaki gave in the video that we saw?

 7   A.   No.  It's a direct refutation of it.

 8           THE COURT:  Okay.  We'll take the morning recess.

 9   (Recess taken at 10:59 a.m.)

10           (After the recess:)

11           THE CLERK:  All rise.

12           (The Court enters the courtroom at 11:29 a.m.)

13           MR. CHAKRAVARTY:  Your Honor, in the moments that we

14   had, we've resolved the issue for which we thought we needed

15   your assistance.

16           THE COURT:  Splendid.

17           MR. CARNEY:  They wanted to ask if a witness can sit

18   in.  I indicated I didn't have a problem with someone sitting

19   in.

20           THE COURT:  Okay.  So we could get the jury.

21           (Pause.)

22           THE CLERK:  All rise for the jury.

23           (The jury enters the courtroom at 11:31 a.m.)

24           THE CLERK:  Be seated.

25   BY MS. PATEL:
```

02:12 (line 10)
02:32 (line 20)

1    Q.   Dr. March, just before the break we looked at several

2    Tibyan posts.  Can you tell us whether there are particular

3    passages in the Qur'an that address the issues we've been

4    talking about?

5    A.   Yes.  I think the primary issue here that we've been

6    talking about is the question of contract.  There are other

7    areas in the Qur'an that talk about warfare in relation with

8    non-Muslims, but the primary thing at stake here is the issue

9    of a contract.

02:34 10   Q.   And are there segments of the Qur'an that you have studied

11   that relate to that issue?

12   A.   Yes.

13         MS. PATEL:  We can take this exhibit down.

14   Q.   When you do your work, where do you access the Qur'an?

15   A.   Well, I have a number of printed versions of Qur'an, some

16   in Arabic some into different translations, English, Albanian,

17   other languages.  But I often will use the internet because I

18   often will try to read the Arabic and then compare it to a

19   number of different English-language interpretations.

02:35 20         And there are a number of very good websites which

21   collect a number of the most important English translations.

22   So you can go to a verse -- and if you want a particular verse,

23   and you call that verse up, and you can just scroll through

24   different translations.  And I find that to be very useful.

25         MS. PATEL:  Can we please have Exhibit 1242A for

1      identification only.

2      Q.   Dr. March, do you recognize what's on this screen?

3      A.   Yes, I do.

4      Q.   What is this?

5      A.   This is the Islamicity.com website.  This is a website

6      which has a number of other things related to news from the

7      Muslim world, but it also has full-text versions of the Qur'an

8      with translations and also with recitation.

9      Q.   And can you identify just at the very top what chapter and

02:36 10   verse number is exhibited here?

11     A.   This is the fifth chapter of the Qur'an, and the first

12     verse.

13     Q.   And have you seen this before?

14     A.   Yes, I have.

15     Q.   Do you believe that this relates to what we have been

16     talking about in your prior testimony?

17     A.   Yes, I do.

18          MS. PATEL:  Your Honor, may we please admit Exhibit

19     1242A.

02:36 20        MR. CHAKRAVARTY:  Your Honor, my understanding is the

21     next four exhibits are all clips of the Qur'an.  The government

22     objects to the -- the interpretation of the religion is not

23     what is at issue here.  We understand these are narrowed, we

24     understand the witness can testify to anything, but the jury is

25     not being asked to decide what the religion says.

1          MS. PATEL:  Your Honor, I would only ask to admit them

2     with the foundation that they do pertain to the Tibyan post.

3          THE COURT:  They may be admitted.

4          You don't need to repeat the objection on each of

5     them.

6          MS. PATEL:  One other logistic matter, your Honor.  We

7     would like for this verse to be recited.  There is an audio

8     capacity in which it can just be played right on this website

9     or I could ask Dr. March to read it, but I know that creates

02:37 10     issues.

11          THE COURT:  Why should it be recited in a language

12     that none of us understands?  The jury and I, that is.

13          MS. PATEL:  May we approach?  May we approach?

14          THE COURT:  Okay.

15          (Discussion at sidebar and out of the hearing of the

16     jury:)

17          MS. PATEL:  For the same reason that videos -- we can

18     say, you know, a picture is worth a thousand words, whatever,

19     the video doesn't constitute testimony about the video.  The

02:37 20     way the Qur'an is recited is poetic, and we would maintain that

21     apart from just the raw English translation, there is something

22     in the language, the way that it's heard, that's important for

23     the jury to hear in its native form.

24          THE COURT:  And will he comment on that?

25          MS. PATEL:  Yes.  Yeah.

1          THE COURT:  What would he say?

2          MS. PATEL:  Well, he would be able to explain what it

3     is.  But he could also talk about the significance of why

4     something needs to be presented and read in its native

5     language, not as translated.  He just testified, your Honor,

6     that there are many different translations of the same text

7     because there are different interpretations.  So we would

8     maintain that the original way that it's written is relevant

9     even if the jury doesn't understand it.

02:38 10         THE COURT:  I guess that's an odd proposition, that

11    something should be put in even if the jury doesn't understand

12    it.

13         MS. PATEL:  It's oral.  It's the way that it's read

14    that's important because so much of the steam from the

15    government's case has been -- it's a perception issue.  It all

16    sounds like it's illicit and it's not; it's religious.  There's

17    also no harm in allowing them to hear it.

18         MR. CHAKRAVARTY:  My issue is that the enunciation,

19    the inflexion of reading something is not an issue that is

02:38 20   germane to any issue that the jury is going to decide,

21    especially not Qur'anic verses which are not -- they're not

22    justifying a theory of the case.  We're not painting them to be

23    something that they're not.  It seems like it's an exercise

24    just in --

25         MR. CARNEY:  May I add a point, your Honor, please?

 1    The government played a number of videos that had nashids in

 2    them, for example, and made it sound like that's something that

 3    is true of jihadi videos or jihadi presentations.  I think that

 4    just permitting even a single one would just show the jury this

 5    is a thing throughout the Islamic --

 6              THE COURT:  All right.  That's a decent compromise.

 7    You could do the first one and then we'll skip the rest.

 8              MS. PATEL:  Thank you.

 9              MR. CHAKRAVARTY:  We haven't heard these.  We assume

02:39 10    they're -- how long are they?

11              MS. PATEL:  They're links you got.  They're 15

12    seconds.

13              MR. CHAKRAVARTY:  We didn't get the --

14              MS. PATEL:  The link?  You just click it.

15              MR. CHAKRAVARTY:  How long is it?

16              MS. PATEL:  15 seconds, if that.

17              THE COURT:  Okay.

18              (In open court:)

19              MR. CHAKRAVARTY:  We received these in hard copy, not

02:40 20    in this live internet version, so I don't know how it's going

21    to be captured.

22              THE COURT:  I'm sorry?

23              MR. GROHARING:  I don't know how it's going to be

24    captured for --

25              THE COURT:  Is this live?  Oh, I see.  This is not

1    preserved on a CD?

2             MS. PATEL:  No, your Honor.  It's not.

3             MS. BASSIL:  We can.

4             THE COURT:  Okay.  So --

5             THE CLERK:  1242A is the one you're playing?

6             MS. PATEL:  Correct.

7             THE CLERK:  Can you tell me when you start so I can

8    record it?

9    BY MS. PATEL:

02:40 10   Q.   Dr. March, do you see -- do you see Arabic text on this

11   page?

12   A.   Yes.

13   Q.   And do you see an icon at the very bottom of it next to

14   the Facebook tab?

15   A.   Yeah.

16   Q.   What is that?

17   A.   Those are three different Qur'anic reciters that you could

18   choose to listen to the Qur'an being recited in.

19             MS. PATEL:  May we enter into evidence, your Honor,

02:41 20   Exhibit 1242A?

21             THE COURT:  Yes.

22             MS. PATEL:  Thank you.

23             (Defense Exhibit No. 1242A received into evidence.)

24             MS. PATEL:  Mr. Oh, could you please click Basit?

25             (Clip of Exhibit No. 1242A published to the Court and

1    jury.)

2    BY MS. PATEL:

3    Q.   Can you explain, Dr. March, why that was sung?

4    A.   It just happens to be the way in which the Islamic

5    tradition prefers to recite the Qur'an.  I think it's a -- it's

6    part of the emotional experience of listening to God's word.

7    It's appropriate to recite it in that way.  It's referred to as

8    Tawhid.

9    Q.   Are you familiar with what nashids are?

02:42 10   A.   Yes.

11   Q.   What are those?

12   A.   Nashids are hymns, or they're songs that are just sort of

13   spoken or chanted without musical accompaniment.

14   Q.   Can you tell --

15        MS. PATEL:  If we can scroll down, Mr. Oh, to the

16   middle.

17   Q.   Can you read for us what this -- I'm sorry.  Where --

18   actually, where in the Qur'an is this passage from?

19   A.   Chapter 5, Verse 1.

02:42 20   Q.   And have you found this to tie in to the Tibyan posts that

21   we were talking about earlier?

22   A.   Yes.  The first clause, or sentence, in this verse is

23   very, very frequently cited by Islamic jurists in justifying

24   the view that Muslims are bound by contracts that they make

25   with non-Muslims.  So this is the opening of a chapter.  And

1    the first thing it says --

2    Q.   Actually, could you just read for us the entire

3    translation?

4    A.   "O, you who have attained to faith be true to your

5    covenants."  Then it goes on to regulate dietary matters.

6    Q.   So can you explain just that first -- the first two

7    sentences?

8    A.   "O, you who have attained to faith be true to your

9    covenants."  So what it's saying is a basic aspect of being a

02:43 10   Muslim, of becoming a believer, joining the prophet Mohammed,

11   is to accept as a religious obligation that you have to uphold

12   your promises and your agreements.

13   Q.   And is this a topic that you found in the four Tibyan

14   posts that we reviewed earlier?

15   A.   Yes.  The whole idea that -- the reason -- one of the main

16   reasons why obligations of warfare can be trumped by other

17   obligations is because of the concept of upholding contracts.

18   It's a fundamental religious obligation.

19        MS. PATEL:  Can we go to 1242B?

02:44 20   Q.   Do you recognize this website?

21   A.   Yes, I do.  This is the same website.

22   Q.   And what is the chapter and the verse listed at the top?

23   A.   This is Chapter 8, Verse 72.

24        MS. PATEL:  If we could scroll down to the English

25   translation.

1   Q.   Is this -- is a portion of this passage something that you

2   thought related to the Tibyan posts?

3   A.   Actually, I think the entire verse does.  This is one of

4   the most important verses for understanding Muslim attitudes

5   towards warfare and relations with non-Muslims.

6   Q.   Can you read it for us in English, please?

7   A.   "Behold, as for those who have attained to faith" -- which

8   means those who have become Muslims -- "and have forsaken the

9   domain of evil and are striving hard, with their possessions

02:44 10   and their lives in God's cause, as well as those who shelter

11   and succour them, these are truly the friends and protectors of

12   one another.  But as for those who have come to believe without

13   having migrated - you are in no ways responsible for their

14   protection until such a time as they migrate to you.  Yet, if

15   they ask you for succour against religious persecution, it is

16   your duty to give them the succour except against a people

17   between whom and yourselves there is a covenant, for God sees

18   all that you do."

19   Q.   What is the word "covenant" as it's in Arabic above?  And

02:45 20   if you could transliterate that into an English spelling that

21   would be helpful.

22   A.   It's actually mithaq, M-I-T-H-A-Q.  And I think it was the

23   third word that I had given in Arabic as a word that's often

24   used to talk about contract or covenant.

25   Q.   Can you explain how this passage relates to the discovery

1  that you've reviewed?

2  A.   Yes.   There is two major issues at stake here.   One is the

3  basic idea that Muslims have a religious obligation to help

4  fellow Muslims.   So the idea that if Muslims are being

5  persecuted or harmed or massacred in a foreign country, Muslims

6  may often point to this verse in particular to say that we are

7  called upon to help our fellow Muslims through a variety of

8  ways, but possibly including warfare.

9         However, the verse straight from the Qur'an

02:46 10  immediately modifies and limits that obligation and says that

11  even your obligation to come to the rescue of fellow Muslims is

12  constrained and limited by contracts that you have with

13  non-Muslims, and note this includes non-Muslims that may, in

14  fact, be doing bad things to Muslims within their own

15  territory.   So in that sense, it's deeply religiously

16  significant on those -- at least those two fronts.

17  Q.   Does this relate to the concept of jihad?

18  A.   Yes.

19  Q.   How?

02:46 20  A.   Well, in the Arabic, the word "jihad" in a different form

21  is used.   Where it says here in English "who have" -- "who are

22  striving hard," that's a translation of the verbal form of

23  jihad, but the idea that part of striving hard is being loyal

24  to fellow Muslims and doing things in the world to make their

25  lives better is part of what's understood as jihad.

1          MS. PATEL:  Can we go to Verse 1691, which is Exhibit

2    1242C.

3    Q.   Again, do you recognize this website?

4    A.   Yes, this is the same website, Islamicity.com.

5    Q.   And do you recognize the verse at the top?

6    A.   Yes, I do.

7    Q.   What verse is that?

8    A.   It's from Chapter 16, Verse 91.

9    Q.   Do you agree with the English translation as it's

02:47 10   presented here?

11   A.   Yes.

12   Q.   Would you mind reading that?

13   A.   "And be true to your bond with God whenever you bind

14   yourselves by a pledge, and do not break your oaths after

15   having confirmed them and having called upon God to be witness

16   to your good faith.  Behold, God knows all that you do."

17   Q.   Is this an issue that you found raised in the discovery

18   that you reviewed?

19   A.   Yes, absolutely.

02:47 20   Q.   Can you explain the religious significance of this

21   passage?

22   A.   The religious significance of the passage is that the idea

23   of having a contract with anybody, Muslim or non-Muslim, is not

24   about a written piece of paper or something that you can

25   introduce in a court of law; it's something that many Muslims

 1   believe they will be called to account for on the day of

 2   judgment.  So if they break the promise, if they violate

 3   somebody else's rights, this is something that they have to

 4   worry about when they stand face to face with God.

 5             MS. PATEL:  Can we go to 1242D.

 6   Q.   Again, this is a website that you recognize?

 7   A.   Yes.  It is Islamicity.com.

 8   Q.   And what is the chapter and verse quoted here?

 9   A.   Chapter 17, Verse 34.

02:48 10   Q.   Do you agree with the English translation presented below?

 11   A.   Yes.

 12   Q.   And can you read that for us, please?

 13   A.   "And do not touch the substance of an orphan, save to

 14   improve it, before he comes of age.  And be true to every

 15   promise for verily you will be called to account for every

 16   promise which you have made."

 17   Q.   Did you find this issue raised in the discovery that we've

 18   discussed today?

 19   A.   Yes, I did.

02:49 20   Q.   Can you explain the religious significance of it?

 21   A.   Again, it's the same religious significance, that the idea

 22   of making a promise, even a tacit one, is regarded as having

 23   enormous moral and religious significance.  It is not entered

 24   into lightly.

 25   Q.   Apart from the Qur'an, were there any passages in the

1    Hadith which we spoke about before that relate to the discovery

2    that you've reviewed in this case?

3    A.    Yes.

4    Q.    And what passage would that be?

5    A.    Well, the Hadith are the collections of the sayings of the

6    prophet Mohammed.  And unlike the Bible, which is organized

7    according to the gospel of John, Matthew, Mark and Luke, it is

8    organized according to sections, so topics.  It's organized

9    much like a compendium of Islamic law.  So it might begin with

02:49 10    the Book of Ritual Purity or the Book of Prayer or the Book of

11    Fasting.  And like the books of Islamic law, there is a

12    separate book called the "Book of Jihad and Expeditions," which

13    catalogs and collects all of the sayings and doings that the

14    earliest generations of Muslims remembered the prophet Mohammed

15    having said or done related to the subject of warfare.

16         MS. PATEL:  And just -- just I wanted to just make

17    sure, your Honor, that Exhibits 1242A, -B, -C and -D are all

18    admitted into evidence?

19         THE COURT:  All right.

02:50 20         (Defense Exhibit Nos. 1242B, 1242C, and 1242D received

21    into evidence.)

22         MS. PATEL:  Can we go to Exhibit 1243, please, just

23    for the witness?

24    BY MS. PATEL:

25    Q.    Do you recognize this website?

1    A.    Yes, I do.

2    Q.    What is this?

3    A.    This is the -- you see it's from the University of

4    Southern California.  And this is an electronic catalog of the

5    entire corpus of one particular important collection of the

6    Hadith translated into English.

7    Q.    And just to be clear, how -- if you were to translate the

8    Hadith into books, how many books are you talking about?

9    A.    I don't remember.  You mean books as in physical volumes?

02:50 10   Q.    Physical volumes.

11   A.    Oh, it depends on how you catalog.  Sometimes it could be

12   six to eight, sometimes, depending on the print.  But I have a

13   couple of volumes that are just in Arabic on my shelf, and I

14   believe it's six to eight volumes.

15   Q.    And where is this particular cite from?  What is the

16   center?  Can you describe what that is?

17   A.    Actually, I don't know much about this.  The Center for

18   Muslim-Jewish Engagement, I actually don't know a lot about

19   this, but I know this is a longstanding site that used to be

02:51 20   hosted by the Muslim Students Association of the University of

21   Southern California.

22   Q.    Just below --

23         MS. PATEL:  I'm sorry.  May we introduce into evidence

24   Exhibit 1243?

25         MR. CHAKRAVARTY:  Objection, your Honor.

```
 1              THE COURT:  I think on that foundation, the objection
 2    would be sustained.
 3    BY MS. PATEL:
 4    Q.   Do you consult this site to access the Hadith?
 5    A.   Yes.
 6    Q.   And what all is available on the site?
 7    A.   The entire collection.  So there are two most
 8    authoritative collections of the Hadith:  One is called -- is
 9    the collection by a scholar named Bukhari, and the other is by
02:52 10    a scholar named Muslim.  And this is the translation --
11    Q.   Sorry.  May I stop you?  Would you mind just spelling
12    those two, please?
13    A.   B-U-K-H-A-R-I is Bukhari, and Muslim is M-U-S-L-I-M.
14              And this is a translation of the collection of fully
15    authenticated Hadith reports by Muslim.
16    Q.   And have you reviewed this particular translation?
17    A.   Yes, I have.
18    Q.   Do you find it to be a fair and accurate representation of
19    what you know this Hadith says in Arabic?
02:52 20    A.   Yes.
21    Q.   In Arabic?
22    A.   Yes.
23              MS. PATEL:  May we now admit Exhibit 1243 in evidence?
24              MR. CHAKRAVARTY:  Objection, your Honor.
25              THE COURT:  Overruled.
```

1          MR. CHAKRAVARTY:  Your Honor, I think that there's

2     materials in this Hadith referring to the Korean War, the

3     Second World War.  I assume those were not written by the

4     companions of the prophet.

5          THE COURT:  Well, the foundation is established for

6     its submission.  You may examine that on cross.

7          (Defense Exhibit No. 1243 received into evidence.)

8          MS. PATEL:  May we publish to the jury, your Honor?

9          THE COURT:  You mean 1243, correct?

02:53 10          MS. PATEL:  Yes.

11          If we could scroll down to Chapter 4, please, Mr. Oh.

12     BY MS. PATEL:

13     Q.   Can you identify for us what is listed here as Chapter 4?

14     A.   Yes.  Well, this is Chapter 4 of a book which really means

15     a collection on jihad and expedition.  So what this means is

16     that in the basic religious materials, the subject of jihad is

17     a basic aspect of religious study, that everybody that studies

18     the Hadith has to study everything that's in them including the

19     rules of war.  And these are divided up into subsequent

02:53 20     chapters.

21          And at a very early chapter, Chapter 4, is known as

22     the prohibition on breach of faith.  And this breach of faith

23     is the translation of a word, which in English would be

24     G-H-A-D-R, pronounced ghadr, which means breach of faith, or

25     perfidy, or betraying a trust that you've already made a

1    promise about.

2    Q.    And did you find a passage in this chapter relevant to the

3    discovery that you have reviewed in this case?

4    A.    Yes.

5    Q.    Which passage is that?

6    A.    Well, these are all variations on a similar Hadith.  So

7    what the early Muslim scholars said, you know, let's say 100 or

8    150 years after the prophet, is we don't know everything that

9    people say he says is true.  So what -- when they collected

02:54 10   reports that seemed to corroborate one another, because they

11   were all very similar, they put these down on authentic.  So

12   these are all individual things which seem to make a very, very

13   similar point even if the language is slightly different.

14   Q.    Is there one in particular that you find pertains to the

15   Tibyan post that we addressed earlier?

16   A.    Yes.  The first one, Number 4301.

17   Q.    Would you read that for us, please, in English?

18   A.    "It has been narrated on the authority of Ibn Omar that

19   the Messenger of Allah, may peace be upon him, said when Allah

02:54 20   will gather together on the day of judgment, all the earlier

21   and later generations of mankind, a flag will be raised to mark

22   off every person guilty of breach of faith, and it will be

23   announced that this is the perfidy of so-and-so, son of

24   so-and-so, to attract the attention of people to his guilt.

25   Q.    Can you explain the religious significance of that

```
 1   passage?
 2   A.   Yes.  What it's saying is if you are guilty of this
 3   grievous religious transgression of breaking an oath or
 4   betraying somebody, on the day of judgment God is going to
 5   stick a flag in you as an example to everybody else.
 6        MS. PATEL:  Take it down.  Thank you.
 7   Q.   A few more questions for you.  Have you, in the course of
 8   your work on this case, reviewed a document called the "39 Ways
 9   to Jihad"?
10   A.   Yes, I have.
11   Q.   Do you believe, in your expert opinion, based on Islamic
12   law that that document is a violent jihadi document?
13        MR. CHAKRAVARTY:  Objection, your Honor.  It's not
14   even in the scope of the disclosure.
15        THE COURT:  That's true.  Sustained.
16   BY MS. PATEL:
17   Q.   Is it accurate when -- is doing jihad synonymous with
18   violence?
19   A.   No.
20   Q.   Can you explain?
21   A.   "Jihad" is a word that means effort or striving.  So if we
22   can imagine the word "jihad" like a big circle, and all kinds
23   of things are within that circle, using violence is a circle
24   within that.  It's a small subset of that.  But there can be
25   all kinds of things that -- activities that are called "jihad"
```

1    that are not -- that don't involve the use of violence.

2    Q.    Are there any Muslims that reject the idea of jihad?

3    A.    The idea of jihad?  No.

4    Q.    Are there any interpretations of Islam that you know of

5    that reject jihad?

6    A.    No.

7         MS. PATEL:  Can we please turn to Exhibit 618?  This

8    is already in.

9         THE COURT:  Whose computer is this on?

02:57 10        MR. BRUEMMER:  It's on mine, your Honor.

11   BY MS. PATEL:

12   Q.    Could you identify for us at the very top the date of

13   this -- I'm sorry.  Have you seen this message before?

14   A.    Possibly.  I don't remember.  I don't remember it.  I

15   think I've seen it as part of discovery.

16        MS. PATEL:  Can we skip to page 4 for identification?

17   Q.    Can you take a moment and see if you've seen this before?

18   A.    Yes, I've seen this.

19        MS. PATEL:  Could we skip back to page 1, please?

02:57 20   Thank you.

21   Q.    Can you just identify at the top the date of this

22   particular message?

23   A.    Thursday, March 23, 2006.

24   Q.    And who are the two individuals identified at the top

25   here?

1    A.   Sayf Maslool and Ali Aboubakr.

2    Q.   Are you familiar with who those two individuals are?

3    A.   My understanding is that "Sayf Maslool" is a handle used

4    by Tarek Mehanna.

5         MS. PATEL:  Could we go to page 4, please?

6    Q.   Would you just tell me if what I'm reading at the bottom

7    is correct?  Ali Aboubakr says, "What?  What?"

8         "Dude.  Shaykh Yasir Qadhi just wrote me a tazkiyyah,"

9    recommendation.

02:58 10       Can you identify who -- do you know a person named

11   Yasir Qadhi?

12   A.   Yes, I do.

13        MR. CHAKRAVARTY:  Objection to this line of

14   questioning, your Honor.  Again, there's no reference in the

15   disclosure with regard to Mr. Qadhi.

16        THE COURT:  Let me see you at the side.

17        (Discussion at sidebar and out of the hearing of the

18   jury:)

19        MS. PATEL:  Your Honor, our understanding of the

02:59 20   discovery is to put the government on notice, oftentimes in a

21   sentence or two, of what a witness is going to testify.

22        THE COURT:  Right.  There is no question that this was

23   not specifically referred to, but what I wanted to find out was

24   what it relates to, so in case it was part of that general

25   disclosure.

1          MS. PATEL:  We did disclose to them, on the other

2     hand, that we were going to use -- he was just going to

3     identify who Yasir Qadhi was.  His name came up several times

4     in trial.  It's about five questions.  He knows him personally.

5          THE COURT:  Who is he?

6          MS. PATEL:  He's an individual who runs the al-Maghrib

7     Institute which Tarek Mehanna participated in.  And there's

8     maybe about ten references throughout the trial to who he is,

9     and the evidence has been admitted already.

02:59 10          THE COURT:  And what's he going to say about it if

11     that's already --

12          MS. PATEL:  There have been intonations that he is

13     affiliated with al Qa'ida.  And this witness can speak to the

14     al-Maghrib Institute and who he is.

15          MR. CHAKRAVARTY:  To the extent that it appears in a

16     chat, that's the only way he has been --

17          MS. PATEL:  Well, that's how the jury is going to

18     interpret it.

19          MR. CARNEY:  If I may interject?  We had people who

03:00 20     were witnesses who were supposedly just going to read

21     documents, and in the middle of reading a document they'd make

22     tangents, if they were asked, "Do you know who this person is?

23     Who is he?  What's his significance?"

24          The fact that we're doing it with a chat that's in

25     evidence with an expert just to explain --

1          MR. AUERHAHN:  Excuse me.  May the witness just step

2     off the stand for a minute?

3          THE COURT:  Yes.  He may step out.  We'll draw this

4     out.

5          I mean, I think if it's just to identify who he is,

6     that seems -- but if he's going to expand his opinion about an

7     association with whatever the fellow's name is --

8          MS. PATEL:  Yasir Qadhi.

9          THE COURT:  -- has with some group and then explains

03:00 10     that -- that is, I think -- could be an expert opinion, I

11     guess, but it's certainly not disclosed.

12          MS. PATEL:  We'll just identify who he is and what

13     he's affiliated with and that's it.  He started the institute

14     and it's --

15          MR. CHAKRAVARTY:  It's the fact that he's --

16     apparently, what is probative of affiliations, is that he's not

17     an al Qa'ida member, which was never advanced by the

18     government.

19          THE COURT:  Right.  I don't think he can describe

03:01 20     that.  That's a conclusion.  Maybe it could be an expert

21     conclusion.

22          MR. CARNEY:  I hope we're not going to be having to

23     come up here every time the witness mentions something because

24     we're not going to get through him.  If he knows the person and

25     can describe what his background is --

1          THE COURT:  If it's simply to identify him and that

2     had some meaning with respect to other witnesses that can be

3     argued to the jury and the jury can remember it and make that

4     connection, that's not even expert testimony.  I mean, I don't

5     have any problem with that.  If he wants to give a different

6     opinion now about something, then that should have been

7     disclosed in the letter.  That's all I'm saying.

8          MS. PATEL:  Understood.

9          MR. CHAKRAVARTY:  That's our only issue.

03:02 10          MS. PATEL:  Dave Brubeck.  Who's the fan?

11          THE COURT:  Dave Brubeck's 91st birthday was

12     yesterday, and this is also the 50th anniversary, this month,

13     of the issuance of "Time Out."  This is "Time Out."

14          MR. CARNEY:  Should we take five?

15          THE COURT:  We just did.

16          (In open court:)

17     BY MS. PATEL:

18     Q.    Dr. March, do you know Yasir Qadhi?

19     A.    Yes, I do.

03:02 20     Q.    Who is he?

21     A.    He is a graduate student right now in religious studies at

22     the University of -- at Yale University.  He was, in one class,

23     a student of mine.  However, he is also a very, very well-known

24     speaker and teacher of Islam in the American Muslim community.

25     Q.    And is he affiliated with any institute?

1   A.   Yes, he is affiliated with something called the Maghrib

2   Institute, which is an institute devoted towards teaching

3   Hadith and Islam to young American Muslims.

4          MS. PATEL:  Can we scroll to the second -- I'm sorry.

5   Page 5 of this instant message?

6   Q.   Ali Aboubakr says, "Yea," and Tarek Mehanna says, "For

7   Madinah University."  And Aboubakr says, "No waaaaaay," and

8   Sayf Maslool says, "Hahaha.  Yeaaah."

9          Can you explain what Madinah University is?

03:03 10  A.   Madinah University is a state university in the Kingdom of

11   Saudi Arabia in the city of Medinah.  And I believe it has

12   multiple faculties of study.

13   Q.   And are there institutes of study in Saudi Arabia?

14   A.   Yes.

15   Q.   The last set of questions I have for you is related to

16   your work, Dr. March.  As a professor have you translated

17   Arabic texts into English as part of your work?

18   A.   Yes.

19   Q.   Have you posted those translations online?

03:04 20  A.   Excerpts.

21   Q.   Do you have colleagues that translate Arabic texts into

22   English?

23   A.   Yes.

24   Q.   And do they post them online?

25   A.   At times.

```
 1    Q.   Do you discuss those texts with other like-minded

 2    academics?

 3    A.   Yes.

 4    Q.   And do you discuss the topic of jihad as part of your

 5    work?

 6    A.   Yes.

 7    Q.   Do you watch jihadi videos?

 8    A.   I have.

 9    Q.   Do you talk about the idea of covenants in Aman with other

10    academics?

11    A.   Yes, I do.

12    Q.   Have you given lectures on them?

13    A.   I have.

14    Q.   Do you have books in your home or office that talk about

15    jihad?

16    A.   Yes.

17    Q.   Have you ever been charged with a federal crime for

18    those activities?

19               MR. CHAKRAVARTY:  Objection, your Honor.

20               THE COURT:  Sustained.

21               MS. PATEL:  That's all I have, your Honor.

22                          CROSS-EXAMINATION

23    BY MR. CHAKRAVARTY:

24    Q.   Dr. March, good afternoon.

25    A.   Good afternoon.
```

1   Q.   You've done all of your academic work related to jihad and

2   translations.  Was it ever your intent to support terrorist

3   organizations?

4   A.   No.

5           MS. PATEL:  Objection.

6           THE COURT:  It may stand.

7   BY MR. CHAKRAVARTY:

8   Q.   So let's start a little bit about you.  Your very

9   impressive credentials I'm not going to belabor, but your

03:05 10   involvement in this case, approximately when were you contacted

11   by the defense?

12   A.   I would need to be reminded.  This is December.  Possibly

13   May of 2011?  I'd need to be reminded.

14   Q.   And you described that you received certain materials in

15   discovery?

16   A.   Yes; that's correct.

17   Q.   Do you know what those were, volume-wise or --

18   A.   I remember receiving a file including the IM chats.  I

19   remember receiving the video of Umar Hadid.  In the first batch

03:06 20   of discovery I believe that was the bulk of it.  I think there

21   were some extracts -- there were files that had different

22   things extracted from different websites and things like that.

23   Q.   Do you know whether you received all of the evidence that

24   the jury has seen?

25   A.   I do not know.

1    Q.   Did you ask to see everything?

2    A.   I made it clear that I would be happy to look at anything

3    that was available and that would be of interest.

4    Q.   Of interest to the defendant, right?

5    A.   Actually, of interest to me.

6    Q.   So in assessing the opinions that you've described today

7    about what specific phrases and meanings were of a writer in a

8    web forum, for example, you've relied on both the exhibits that

9    we just talked about today as well as some other things that

03:07 10    you've looked at outside of court?

11   A.   Yes.

12   Q.   Okay.  What's the volume of those other things that you

13   looked at outside of court?

14   A.   "Volume" in what sense?

15   Q.   In terms of how many other communications have you seen?

16   A.   Well, do you mean how many different files or how many

17   different individual conversations?  Can you please be more

18   specific?

19   Q.   Yes.  How many conversations?

03:07 20   A.   Can you be more specific?

21   Q.   Approximately how many times -- how many memorialized

22   conversations in any form -- in email, in instant message chat

23   sessions --

24   A.   Okay.

25   Q.   -- a Tibyan Publications web posting -- how many of those

```
 1   episodes did you read in order to formulate your opinion about
 2   what somebody was thinking?
 3   A.   So the IM, the instant messages, I believe is about 2,000
 4   pages, 2,073 pages.  Again, I would need to be reminded.  I did
 5   not read those word for word.  I read a fair number of them,
 6   and, of course, that's 2,000 pages, so how many different
 7   individual conversations is that?  And then, you know, perhaps,
 8   you know, maybe two dozen other files that were extracted from
 9   different websites and things like that.
10   Q.   So there's the IMs, the websites.  And anything else?
11   A.   Conversation-wise?  Well, there's IMs.  There's posts
12   online.  There may have been some emails.  I think in terms of
13   conversations that pretty much --
14   Q.   So emails are subsumed within some of those other
15   documents that you referred to?
16   A.   Yes.
17   Q.   How about other recorded conversations, oral
18   conversations?
19   A.   I have not heard any videos of oral conversations.
20   Q.   Okay.  Did you -- were you sent videos as well?
21   A.   I was sent -- I believe the only video that I received was
22   the "Expedition of Umar Hadid."
23   Q.   Were you told a little bit about the case by the defense?
24   A.   Told a little bit about the case?  Yes, I was.
25   Q.   Well, what were you told -- not word for word, but what
```

1    subject matters were you told about the case by the defense?

2    A.   I was told what kind of case it was.  I was told what law

3    it was being --

4         MS. PATEL:  Objection, your Honor.  This is privileged

5    and work product material.

6         THE COURT:  Not if it was considered by an expert.

7    Overruled.

8         THE WITNESS:  I was told what the law in question was.

9    I was told -- I was shown the -- is "proffer" the word --

03:09 10   BY MR. CHAKRAVARTY:

11   Q.   Yes.

12   A.   -- by the government?  Proffer?

13        I was shown some of those original documents to get a

14   sense of what the law was, what the charges were, what the kind

15   of evidence was that was at stake, yes.

16   Q.   And did they tell you why they wanted to call you?

17   A.   They originally called to ask whether that -- given the

18   kind of material that was at stake, whether I felt I had any

19   expertise that would be useful.

03:09 20   Q.   And you indicated you did?

21   A.   Not at the beginning.  I was actually -- at the beginning

22   I was quite skeptical.  At the beginning I was quite reluctant.

23   I didn't think I had any expertise.  I didn't think that this

24   was something that I had a lot to contribute to.

25   Q.   Okay.  And is part of the rationale for that this is a

1    case involving material support to terrorism and you are a

2    political theorist who discusses religion and law?

3    A.   No, that wasn't my rationale for thinking about this.  My

4    rationale for thinking was that -- I didn't know what kinds of

5    evidence was on offer.  I didn't know whether I could offer

6    anything of useful -- so the first thing I said was --

7    Q.   I think you answered my question.  Thank you.

8    A.   Okay.

9    Q.   Now, let's focus on what your expertise is and that you

03:10 10   originally didn't think it was applicable but now you do.  You

11   are a political theorist, correct?

12   A.   True.

13   Q.   Well, you're not a --

14   A.   Academics -- I mean, when you say "a political theorist,"

15   it's a little bit -- it's not like saying that you're an

16   attorney.  I am a professor and I have a number of different

17   fields that I contribute to, and I regard myself as having some

18   expertise within --

19   Q.   So in a variety of different multidisciplinary kinds of

03:11 20   social sciences?

21   A.   No, it wouldn't be social science.

22   Q.   So you don't do social --

23   A.   I don't use that word lightly.

24   Q.   Okay.  So you're certainly not a religious scholar, are

25   you?

1    A.    I have published in religious studies journals; I

2    have -- I'm the editor of the Oxford Encyclopedia of Islamic

3    Law, which is part of their religious line, is what they call

4    it; I've had classes that have been cross-listed with the Yale

5    religious studies department, which means that they regard me

6    as qualified to teach some of their students.

7    Q.    So you are a religious scholar.

8    A.    You know, again, religious scholar -- could you please

9    explain what you think -- what you mean by that?

03:11 10   Q.    I'm asking what you mean by it.

11   A.    Right.  I have expertise in certain areas of Islamic law,

12   certain areas of Islamic political thought, certain areas of

13   religion, certain areas of political theory.  But, again, I

14   don't use the word "expertise" or "scholar" lightly.  I think I

15   would prefer to describe the particular areas in which I feel

16   comfortable talking.

17   Q.    You're not a practicing Muslim, are you?

18   A.    No.

19   Q.    So you're looking at Islam from a kind of outside-in

03:12 20   perspective?

21   A.    That's correct.

22         MS. PATEL:  Objection.  Relevance.

23         THE COURT:  Overruled.

24   BY MR. CHAKRAVARTY:

25   Q.    Are you an expert in Sharee'ah law?

A.   I have a considerable amount of expertise in certain areas

of Sharee'ah law.  So I don't -- again, I don't use the word

"expertise" lightly.  And Sharee'ah law includes everything

regarding the rules of prayer and the rules of worship to the

rules of criminal law and contracts.  And I have -- I have

looked at a certain subset of those areas and I teach classes

in Islamic law, but I would not claim to be an expert in all of

Sharee'ah, but I think very few people do.

Q.   And Sharee'ah law is essentially the law of Islam; it's

what's binding upon Muslims, correct?

A.   Correct.

Q.   And, of course, at Yale your current position is an

associate professor in the political science department,

correct?

A.   That's my tenure home, correct.  That's my official

permanent position.

Q.   But you like to write about other things and you like to

present papers on other topics, correct?

A.   Other than?

Q.   Other than political science.

A.   Yes.  And political science, again, is one of those fields

that's understood very broadly.  It's not like chemistry or

biology where it's very clear.  Political science, you know,

relates to all kinds of things that might be related to

politics.  And political theory is a subset which is more a

1    branch of the humanities than the social sciences.  I don't do

2    quantitative analysis.  I don't do, you know, statistical

3    regressions or things like that.

4    Q.   Right.  You theorize.  Political theory is about --

5    A.   I study thought; I study text.

6    Q.   Okay.  And, for example, in many of your writings you talk

7    about John Rawls.  He was the classic political theorist,

8    wasn't he?

9    A.   He was a modern political theorist.  He taught at Harvard

03:13 10   until his death I think a little over ten years ago.  So he

11   would not be a classical political theorist; he would be

12   regarded as kind of a post-World War II Anglo-American

13   political philosopher.

14   Q.   Okay.  But he had nothing to do with Islam, right?

15   A.   No.

16   Q.   And so at the end of the day you do have some academic

17   interests in this case, don't you?

18   A.   Yes.

19   Q.   And that's why you're here.

03:14 20   A.   Can you repeat -- please repeat that.

21   Q.   Isn't that why you're here?

22   A.   What's why I'm here?

23   Q.   Because of your academic interests in this case?

24   A.   No.

25   Q.   Why are you here?

```
 1   A.   I was here because I was asked to review material, and I

 2   consider it a certain patriotic duty that if I'm called by the

 3   federal court to give information that relates to some

 4   expertise that I think is somewhat rare, then I think I ought

 5   to provide that.  It actually comes at some of the cost of

 6   academic work.

 7   Q.   So let's clarify that relationship.  It's the defense who

 8   called you, right?

 9   A.   Yes.

10   Q.   Not the federal court in the sense of the --

11   A.   Correct.

12   Q.   In some countries -- I think you were here when --

13   A.   That's correct.

14   Q.   -- Mr. Kohlmann testified and other people testified

15   that --

16   A.   That's correct.

17   Q.   -- in some countries experts come in and they testify on

18   behalf of the court.

19   A.   That's correct.

20   Q.   They're mutual and impartial.  But you are clearly in the

21   defense camp in this case, right?

22   A.   Clearly in the defense camp?  I have been working with the

23   defense.  But if the prosecution had come to me with materials,

24   that I thought that those materials, based on my expertise and

25   knowledge -- that I thought that I could be helpful, I would
```

1    have absolutely no problem working for any side in an American

2    courtroom.

3    Q.    Thank you.  Maybe we'll consider that in a case where it's

4    relevant.

5    A.    I understand it can be of some benefit to me.

6    Q.    So you did get paid somewhat?

7    A.    Right.

8    Q.    How much did you get paid?

9    A.    To this point I believe I've received $2,000.

03:15 10   Q.    All right.  And how much do you expect to get paid?

11   A.    I think probably that much again.

12   Q.    And have you testified in a federal criminal case before?

13   A.    This is my first time.

14   Q.    Congratulations.

15   A.    Thank you.

16         (Laughter.)

17   Q.    When you prepared and you reviewed these 2,000-plus pages

18   of chats and several of the other documents that you reviewed,

19   did you take any notes; did you write anything down to kind of

03:15 20   synthesize what you thought was significant?

21   A.    Yes, I did.

22   Q.    Okay.  Do you have those with you?

23   A.    No, I do not.

24   Q.    Where are they?

25   A.    They're on my computer.

1    Q.   All right.  Did you provide those to the defense?

2    A.   I may have at some point provided notes.  I mean, I talked

3    to them and I said, "I've looked at these kinds of things.

4    This is what I think is interesting."  What I said from the

5    beginning is the core concept that you're going to want to know

6    is did this American Muslim debate the concept of Aman.

7    Q.   If I could stop you.

8    A.   Yes.

9    Q.   I'm asking about your notes.

03:16 10   A.   Right.  Well, the notes were oral as well as written.

11   Q.   Okay.  So why didn't you provide the notes to the defense

12   to help them kind of both understand what you were going to say

13   as well as so they could give it to us?

14   A.   Right.  Because I already signed an -- what was the

15   agreement?  Please remind me that when you sign a -- is it a

16   non-disclosure agreement?  I already agreed to provide my

17   expert testimony.  So it was after I reviewed -- again, I

18   reviewed -- I want to make this very clear.

19        I reviewed the evidence before I agreed to work with

03:16 20   the defense.  So I didn't go out looking for a defense team to

21   work with for an ideological or monetary reason.  I was

22   approached.  I said, "Before I commit to this, I'm going to

23   have to look at some material."  I looked at the material to my

24   satisfaction.  There was something that I thought that I could

25   contribute.

1    Q.   All right.  But you chose not to share that with the rest

2    of us, those notes?

3    A.   It wasn't I didn't choose; I wasn't asked to share.  I

4    didn't choose to share with the defense; the defense asked me.

5    Again, you yourself said that we don't --

6    Q.   Let me ask the questions.  This isn't your classroom.

7         Now, you were here for the last several days watching

8    Mr. Kohlmann testify, right?

9    A.   The last two days, yes.

03:17 10   Q.   And were you getting paid to sit here and watch his

11   testimony?

12   A.   Actually, probably not because I haven't submitted my

13   timesheets, and I've been told there's a limited number of

14   hours that I've been approved for.  So I actually probably will

15   not submit those hours.

16   Q.   All right.  So, again, still getting back to what you did

17   before you formulated your opinions in this case, did you talk

18   to the defendant?

19   A.   No, I did not.

03:17 20   Q.   Did you see any of his communications back in 2004 or 2003

21   or 2002 or 2001?

22   A.   I only saw things that were part of the official

23   discovery.  So if they were from those then I may have, but I

24   don't have a positive recollection of seeing anything from

25   those years.

Q.   Again, you recall those instant message chat sessions were
all between February or January of 2006 and August of 2006?

A.   That's correct.  The at-Tibyan posts range from 2005 to
2007.

Q.   And those are some of the posts that you were commenting
on about --

A.   Yes, sir.

Q.   -- what Abu Sabaayaa said about Aman?

A.   That's correct.

Q.   Were you aware that he was under FBI scrutiny at the time
of those posts?

A.   Yes.

Q.   You would agree that if somebody thinks that they're being
watched by the FBI, that they might alter what they say
publicly?

A.   Oh, now, you asked me whether I knew that those posts were
recorded under FBI scrutiny.  You didn't ask me whether I knew
that he knew.

Q.   I asked you whether you were aware that he was under
that --

A.   Yes.  But your second question was whether -- something
about his state of mind.  I don't know if he knew he was under
FBI scrutiny.

Q.   You would agree that if he did know, it would affect what
somebody might say publicly?

1    A.    Yes.

2    Q.    Do you know if he felt that his phones were being tapped

3    and his emails were being read?

4    A.    I didn't know that.

5          MS. PATEL:  Objection, your Honor.  Outside the scope

6    of direct.

7          THE COURT:  Well, the answer may stand.

8    BY MR. CHAKRAVARTY:

9    Q.    Now, most of your work involving Islam is designed to

03:19 10    frame the issues, especially in contemporary society, where

11   Muslims -- particularly certain doctrines or certain values

12   within Muslim communities -- might come into conflict with what

13   is otherwise in the West referred to as kind of a liberal

14   democracy?

15   A.    A large part of my work, yes, is exactly about that.

16   Q.    At least I understood what you wrote.  That's a good

17   thing.

18          And one of the ways that you do -- that you're trying

19   to help that intersection is to provide some level of

03:20 20    understanding by going overseas -- I think you said to Bangkok

21   and Jordan, perhaps -- to try to explain to different

22   individuals who are dealing with that conflict what Muslims are

23   thinking.

24   A.    No, those are two separate issues.  So there's the issue

25   of Islam in America, and then there's the issue of Islamic law

1  as it pertains to the rules of war.  So my motivation for

2  writing my book was very -- a very emotional motivation that

3  I -- after 9/11 I wanted to know what was this all about and

4  what are the ways in which people can live together and can

5  talk together.  And --

6  Q.   The --

7  A.   --- the Jordan and Thailand stuff is a separate project.

8  Q.   Okay.  So that's not connected to your interpretation of

9  Islamic law?

03:20 10  A.   Yes, it is.  But it's different from how you framed the

11  original project about liberal citizenship.  So the stuff in

12  Jordan and Bangkok relates to teaching humanitarians -- they

13  could be from any country in the world -- what are the Islamic

14  laws of war, why does al Qa'ida think it's okay to target

15  civilians, and what are the Muslim responses to that.

16       So that's slightly different from my academic work

17  where I talk about what's sometimes called an "overlapping

18  consensus" or how there can be an agreement between, let's say,

19  an American or Western conception of justice and Islamic

03:21 20  ethics.

21  Q.   So in that work you go to talk to both sides of a

22  particular conflict.  Is that right?

23  A.   Not really.  Most of my work, to be quite honest, is done

24  in writing.  I don't do a lot of field interviews.  I don't do

25  a lot of field research.  I think that there's a huge problem

1    with that if you are Western and not Muslim, to build up the

2    amount of trust where you can view reliably those kinds of

3    things.  So I prefer to deal with written things that are

4    written for an intra-Muslim audience.  So a lot of my work is

5    just about reading as opposed to interviews.

6    Q.   Okay.  And with regards to -- when you say

7    "intra-Muslim" --

8    A.   Yes, internal.  Muslims talking to Muslims.

9    Q.   Okay.  So there are various Muslim organizations.  Who are

03:22 10   your clients for that kind of thing?  What types of --

11   A.   I don't have clients.

12   Q.   Okay.  So who do you provide those written work products

13   to?

14   A.   I don't provide written works.  I publish things

15   academically.  So I might do some research and I will publish

16   it and it will go on my CV.  If you're referring to the

17   Jordan-Thailand stuff, so there's a program at Harvard called

18   "Humanitarian Law" -- excuse me -- "Humanitarian Policy and

19   Conflict Research."

03:22 20   Q.   That is about Islam, I'm talking about.

21   A.   Yes, okay.  So I haven't actually, unfortunately, written

22   anything for them yet.  I have done some PowerPoints for them.

23   I should actually get around to writing because then I can get

24   academic credit for it.  But I've given them some PowerPoints

25   which gives an intro to Islamic law:  What are the sources of

1    Islamic law, how does Islamic law work; an intro to the

2    classical rules of Islamic warfare; an intro to the al Qa'ida

3    radical views of Islamic warfare; and then a PowerPoint on a

4    certain kind of more traditional or moderate response to that.

5         So I have PowerPoints but I haven't -- I have never

6    gotten paid for that.  I traveled -- I never received an

7    honorarium.  They pay my travel expenses but I never --

8    Q.   I didn't ask you those questions.  I'm trying to figure

9    out what it is that you do with Thailand and Jordan in terms

03:23 10   of assisting -- and it sounds like you've done PowerPoints and

11   you hope to write more to assist a project at Harvard that will

12   hopefully help bridge that gap?

13   A.   The gap is really for humanitarian -- so, you know, let's

14   say we've got this conflict in Somalia.  And there's a lot of

15   people from around the world who see this as a humanitarian

16   catastrophe and they want to go feed people.  And they don't

17   understand why a group like the Shabaab doesn't think that

18   they're just there to help and why the Shabaab might not want

19   them to be there.  So they come and they're confused.

03:23 20        They're humanitarians.  They're doctors; they're

21   humanitarian professionals.  So they -- this organization at

22   Harvard will organize -- it's been in Jordan twice; it's been

23   in Thailand once.  And they come from all over.  And they learn

24   about international law, international humanitarian law, the

25   Geneva Conventions, all kinds of things.  And Islamic law is

1   just one subset of that.

2   Q.   Okay.  And then with that information they then go --

3   humanitarians go to try to provide services in those war-torn

4   areas.  Is that right?

5   A.   Well, they're already providing services.  It's more about

6   understanding.  It's more about figuring out how they should

7   maybe think about what they do in Muslim countries.

8   Q.   Okay.  So, for example, let's talk a little bit about

9   Somalia.  In Somalia you described al-Shabaab, Mujahideen,

03:24 10   which is an organization --

11   A.   Yes.

12   Q.   -- in Somalia which is interfering with the distribution

13   of humanitarian aid, right?

14   A.   Correct.

15   Q.   And this project that you're working on is designed to

16   help alleviate the obstacle to the disbursement of that

17   humanitarian --

18   A.   No, sir.  That's incorrect.  That's well beyond my pay

19   grade to ask the Marines to help the Shabaab to get the

03:24 20   humanitarian aid in.  My job -- humanitarians get confused.

21   They're not scholars of Islamic law.

22   Q.   Excuse me one moment.

23   A.   Yes.

24   Q.   I do want to learn more about this and I don't want to

25   belabor it, but I think we're talking past each other.

1   A.   Sure.

2   Q.   I'm not clear what it is that the Harvard project does

3   with regards to --

4   A.   It enhances knowledge.  It teaches people what's the

5   international law, sometimes what's the American law, and

6   sometimes, in this small case, what would be the -- what would

7   be the Islamic law.  But it's purely for understanding.  It's

8   not about going and talking to, you know, militants or anything

9   like that.  It's all about helping them understand the world

03:25 10   that they work in.

11   Q.   And do you recognize that in the last year the Supreme

12   Court has clarified that if you provided that type of

13   humanitarian assistance to al-Shabaab or the Mujahideen, that

14   would be breaking the law?

15   A.   That is absolutely correct, which is why that program

16   doesn't go near Shabaab with a 10-foot pole -- a 100-foot pole.

17   Q.   And that's also one of the reasons you're here today,

18   isn't it?

19   A.   Can you please clarify that question?

03:25 20   Q.   That's one of the reasons you're here today.

21   A.   What is the reason, though?

22   Q.   The reason being that American law prohibits that type of

23   service, even humanitarian service, to al-Shabaab or

24   Mujahideen?

25   A.   Are you referring to the *Holder versus Humanitarian Law*

1  *Project* decision?

2  Q.   I'm asking you whether you are aware whether that is what

3  the law is in terms of its relationship with this program.

4  A.   I think you would want to be more -- before I answer that,

5  I think you'd want to be more careful.  I think you'd want to

6  say what exactly would be illegal.  It's not my job to

7  pronounce on what --

8  Q.   You're not a lawyer, right?

9  A.   I'm not a lawyer.

03:26 10  Q.   And we're not asking you what is legal.

11  A.   That's right.

12  Q.   I'm not asking you what your understanding is of this

13  project that you're working on --

14  A.   Right.

15  Q.   -- and how it's implicated by federal law.

16  A.   They do --

17  Q.   That's not an open-ended question.  I'm asking, according

18  to your understanding, is it against the law to provide

19  humanitarian aid to al-Shabaab and the Mujahideen?

03:26 20  A.   Yes.

21  Q.   Now, you've been talking about the al Qa'ida brand of

22  ideology --

23  A.   Yes, sir.

24  Q.   -- and then other Muslim ideology.  But, in fact, there's

25  a wide spectrum of belief and differences within the Islamic

1  world.

2  A.   That's exactly right.

3  Q.   And there are socioeconomic differences, there are

4  demographic differences, there's ethics differences all across

5  the Muslim world.  And specifically we're talking about, I

6  guess, ideological differences with regards to interpretation

7  of the Qur'an, Sunnah and everything else?

8  A.   Yes.  That's exactly right.

9  Q.   So you would agree with me that within Sunni Islam, one of

03:27 10  the popular -- the most populous sect of Islam, for lack of a

11  better phrase -- there are individuals who identify themselves

12  as Salafi?

13  A.   Yes.

14  Q.   And I think you've mentioned them already.  And a variety

15  of Salafis, at least as it manifests in the United States, is

16  what's known as Salafi-Jihadis?

17  A.   Yes, sir.

18  Q.   There are also Muslims who affiliate with -- who are often

19  called the brothers, or the ikhwaans, and they're frequently

03:28 20  associated with a broader ideological bent of the Muslim

21  Brotherhood.  Is that also correct?

22  A.   Yes.

23  Q.   And those groups are different -- their ideology is

24  different, their political motivations are different -- even

25  though they're both Muslim?

1   A.   That's correct.

2   Q.   And they -- in varieties of forms, in each there are

3   terrorist organizations that are affiliated with each of those

4   brands of ideology that may not see eye to eye.  Is that fair

5   to say?

6   A.   Yes, that's fair to say.

7   Q.   And you would consider al Qa'ida as a Salafi-Jihadi

8   organization, wouldn't you?

9   A.   By and large --

03:28 10   Q.   Predominant ideology?

11   A.   By and large.  See, the Salafi bit really gets into

12   theological matters.  And, you know, if you think you have

13   al Qa'ida operating in areas like Somalia or certain rural

14   parts of Pakistan, I don't believe that a lot of people

15   involved in that have a very sophisticated commitment to the

16   Salafi theological position.

17   Q.   Okay.  That's because al Qa'ida wants to kill people,

18   right?

19   A.   Yes.

03:29 20   Q.   And that's not a classically Muslim thing to do, is it?

21   A.   Killing people?

22   Q.   Yup.

23   A.   Can you be more specific?

24   Q.   So Islam, as it manifests in the 21st century, is not a

25   religion of killing, is it?

1   A.   I don't know what a religion of killing would be.  What's

2   a religion of non-killing?

3   Q.   A religion of --

4   A.   So there's the Quakers who are pacifists; Catholics are

5   not pacifists.

6   Q.   Well, so those are religions of non-killing.

7   A.   Right.  So besides the Quakers, I don't know of any

8   religion which is absolutely pacifist.

9   Q.   So you're saying, then, that Islam is a violent religion?

03:29 10   A.   No, I'm not saying that.  I'm saying it's a non-pacifist

11   religion.

12   Q.   And there are circumstances within Islam where force of

13   arms needs to defend with faith?

14   A.   Yes.

15   Q.   And that's frequently known as a form of jihad?

16   A.   Yes.

17   Q.   And in some circumstances that is a collective duty upon

18   all Muslims to engage in jihad?

19   A.   On classical interpretation of Islamic law, that would be

03:30 20   the normal terminology.

21   Q.   And then in some circumstances it's an individual

22   obligation, what's called fard'ayn, in order to engage in

23   jihad?

24   A.   That is another term that's often used in Islamic law.

25   Q.   And with regards to al Qa'ida's use of the term "jihad"

1   and other Islamic religious constructs, within the organization

2   there are different interpretations of what is permissible and

3   what's impermissible.  Isn't that fair to say?

4   A.   Yes.  It's my understanding that there are debates

5   about -- particularly about targeting and things like that.

6   Q.   You've written about that kind of stuff before, right?

7   A.   I've written a little bit about that.  The al-Awlaki piece

8   has a little bit of that, and I've taught a little bit about

9   that.

03:30 10   Q.   You're familiar with the term "takfir"?

11   A.   Yes.

12   Q.   And this is an even more kind of extreme, intolerant brand

13   of Islam which --

14   A.   No; that's incorrect.

15   Q.   Okay.  So --

16   A.   "Takfir" is a verb.  "Takfir" means to excommunicate, to

17   anathematize.  It's a process; it's not a sort of strand of

18   Islam.

19   Q.   So there are people who are affiliated, associated, or

03:31 20   labeled as Takfiris because they propound this theory, this

21   process of excommunicating individuals because their behavior

22   has been deemed by the person, the orator, as having done

23   something against the faith?

24   A.   That's close.  It's not exactly right.

25   Q.   Okay.  Well, how would you describe it?

1    A.   Well, takfir -- so from the name kuffaar -- everybody has

2    heard the word "kuffaar."  It means unbelief.  A Kufta is an

3    unbeliever.  "Takfir" is the verb which means to call somebody

4    else an unbeliever.  So every school of Islamic law deals with

5    this.  So takfir is not a separate thing that belongs to a

6    separate school.

7    Q.   Well --

8    A.   What I think you're talking about is a Takfiri --

9    Q.   -- why don't you tell me what takfir is in your words.

03:31 10   A.   What takfir is in my words?

11   Q.   Yes.

12   A.   It's calling somebody else an unbeliever.

13   Q.   And you'd agree with me that Salafi-Jihadi ideology is a

14   very small minority within the Muslim world?

15   A.   Yes.

16   Q.   You'd agree with me that there are very few Muslims in the

17   United States who agree with that ideology?

18   A.   Yes.

19   Q.   You would agree with me that there are some Americans who

03:32 20   do support al Qa'ida and other terrorist groups?

21   A.   Define "support."

22   Q.   Well, being mindful of prior discussions here before the

23   Court, who engage in activities in order to benefit the

24   organization.

25   A.   I have no knowledge of that.

1  Q.   You don't believe that anybody has supported al Qa'ida

2  who's an American?

3  A.   I don't know.  I don't formulate beliefs just based on

4  hearsay.

5  Q.   And you would agree with me that Salafi-Jihadi, their

6  mentality and their ideology has in many ways justified various

7  acts of terror that have befallen the United States?

8  A.   Justified in words --

9  Q.   A righteousness within Islamic discourse of engaging in

03:33 10  certain acts.

11  A.   Yes; that's correct.

12  Q.   In fact, we just watched a video where Anwar al-Awlaki --

13  A.   That's correct; yes.

14  Q.   And September 11th was a classical example of that, wasn't

15  it, that there were numerous scholars, so to speak, who said

16  that the attacks on America were completely justified within

17  Islam?

18  A.   There were also non-scholars that said that and there were

19  non-Salafi-Jihadi scholars who said that.  So that position --

03:33 20  as a scholar and as a teacher I wouldn't be able to use that

21  position to authoritatively identify somebody within the

22  Islamic spectrum.  That would not be enough information.  It

23  wouldn't be enough data.

24  Q.   So you can't say whether there were individuals, some of

25  whom are held out as scholars, who supported the attacks on

1    9/11?

2    A.   Yes, some scholars did.

3    Q.   That's all I was asking.

4         All right.  Let's turn to this Doctrine of Aman which

5    you've testified about.  Now, what does "Aman" literally

6    translate to?

7    A.   "Security."

8    Q.   Okay.  So by itself -- it depends on the word.  If it

9    appears by itself, it doesn't necessarily mean a compact

03:34 10   between an individual, a Muslim and a country; it's the context

11   in which it comes up, and that determines that that's what is

12   being talked about.

13   A.   That's correct.

14   Q.   And you also mentioned that there's a phrase 'ahd and

15   'aqd?

16   A.   Those are words.

17   Q.   Words.  Excuse me?

18   A.   Yes.

19   Q.   And what do each of those mean?

03:34 20   A.   Contract, compact, covenant.

21   Q.   So these are synonyms, essentially.  If in context,

22   they're being used to talk about this covenant.

23   A.   Right.  And there's the third, mithaq.

24   Q.   Mithaq.  Thank you.  And these are generally accepted

25   amongst all the -- at least the Sunni schools of thought,

1    right?

2    A.    Yes.  They're in the Qur'an, so it's very hard to deny

3    them.

4    Q.    But there is disagreement within the Islamic scholarly

5    community as to what the scope is of the compact between a

6    Muslim who is in a country which is -- which has allowed them

7    to lawfully come into the country?

8    A.    "Scope" would not be the word that I would use.

9    Q.    What word would you use?

03:35 10   A.    So the areas of disagreement within Islamic law are what,

11   in fact, makes the contract null and void.  And, in fact, it's

12   a quite startling point that there's no real -- there's no real

13   agreement about this.  So there's no real debate about the

14   scope because everybody pretty much agrees that it means you

15   can't harm them.  You can't harm their life, property, honor or

16   law.  So that's -- the scope is not really where the

17   disagreement is.  And I think that came up in some of the items

18   in the direct.

19   Q.    So you say they can't harm them.  It's not that you can't

03:36 20   attack the country; you can't harm the country.  That's what's

21   prohibited by Aman?

22   A.    That's correct.  That's correct.

23   Q.    Are there disagreements related to when such an Aman is

24   applicable; for example -- and this is what I meant when I was

25   referring to scope -- if I was in a country in the Middle East

1    and I intended to visit the United States --

2    A.    Yes.

3    Q.    -- and I have -- I need to get a visa --

4    A.    Yes.

5    Q.    -- and the United States gave me a visa so I can enter the

6    United States.  Would I be covered under this Doctrine of Aman?

7    A.    According to?

8    Q.    I'm asking you.

9    A.    No, but according to whom?

03:37 10    Q.    Is there an agreement or disagreement as to --

11    A.    There's an agreement on the part of pretty much everybody

12    except al Qa'ida ideologues.  So could I give you an example?

13    Q.    No, just answer the question.  Amongst whom -- who

14    construes that to be a valid implication of Aman and who

15    doesn't view that as to being a valid implication to Aman?

16    A.    All of the scholars I have read, with the exception of

17    Ayman al-Zawahiri -- and I read a book of his in English that

18    was made full text available through the NEFA Foundation

19    website, and I've used this for teaching -- he's the only

03:37 20    scholar that I've read that argues that visas are not valid

21    contracts.

22    Q.    Everybody else, including al Qa'ida --

23    A.    Everybody that I've -- no.  No, he is al Qa'ida.

24    Q.    No, I understand that.

25    A.    I haven't read other al Qa'ida people on this issue

1    besides Zawahiri.

2    Q.   So you don't know whether -- but you're saying -- I'm

3    trying to isolate, aside from Dr. --

4    A.   Yes.

5    Q.   -- as my colleague likes to refer to him, Dr. Al-Z, aside

6    from him you're not aware of anyone else who has disagreement

7    as to the scope of when an Aman applies?

8    A.   By "scope" you mean the point at which it applies?

9    Q.   Yes.

03:38 10   A.   I have not read anybody else that explicitly and at length

11   argues why visas are not the equivalent of the classical Aman

12   contract.

13   Q.   Okay.  And Dr. Ayman al-Zawahiri, the leader of al Qa'ida,

14   is the only person you know that believes that it doesn't

15   apply?

16   A.   No.  I don't know who else believes anything.  I said he's

17   the only person that I've read.

18   Q.   Okay.  He's the only person that you've read?

19   A.   I'm sure a lot of people believe it.  I think a lot of

03:38 20   people that are influenced by him and al Qa'ida do believe that

21   as well.

22   Q.   And even within the classical or the non-al Qa'ida

23   interpretation of Aman, there are a variety of different

24   circumstances, as you had alluded to, in which scholars or

25   other students of this area agree or disagree as to when the

1    Aman is broken?

2    A.   So there is some vagueness as to when it's broken.

3    There's one point on which there doesn't seem to be any

4    disagreement, which is that a non-Muslim country attacking

5    other non-Muslims does not break the contract.  That is a

6    position that's only endorsed by al Qa'ida.  But even other

7    Salafi-Jihadi thinkers will argue that Britain or America

8    attacking Afghanis does not break our contract because it's a

9    direct contract.  And that's what makes al Qa'ida so distinct

03:39 10   in all of this.

11   Q.   Okay.  But as you said, you don't know what individuals

12   believe; you know what scholars who you've read believe because

13   of what they've told you, right?

14   A.   If there's somebody that I haven't met, I don't know what

15   they believe.

16   Q.   Well, you haven't met the defendant, have you?

17   A.   That's correct.

18   Q.   So the meat of your testimony today has been this concept

19   of Aman and distinguishing al Qa'ida's interpretation of Aman

03:40 20   and other non-al-Qa'ida-related Muslims, correct?

21   A.   (No verbal response.)

22   Q.   And your position is basically it's against Islamic law to

23   attack the United States if you are beholden to the United

24   States under this agreement of Aman?

25   A.   That's correct.

|      |                                                                     |
| ---- | ------------------------------------------------------------------- |
| 1    | Q.   And somebody who's allowed to come into the United             |
| 2    | States -- a Muslim who's allowed to come into the United States     |
| 3    | by the United States -- should be permitted -- or should be         |
| 4    | considered to be working -- operating under this Treaty of          |
| 5    | Aman?                                                                |
| 6    | A.   That's correct.                                                 |
| 7    | Q.   Does that apply to people who are born in the United           |
| 8    | States as well, who were born Muslim?                               |
| 9    | A.   Yes.                                                            |
| 03:41 10 | Q.   Is there any disagreement about that?                      |
| 11   | A.   No.                                                             |
| 12   | Q.   There's no disagreement about --                               |
| 13   | A.   I'm sorry.  Disagreement amongst whom?                         |
| 14   | Q.   There's no disagreement amongst -- the same groups of          |
| 15   | people we're talking about -- Muslim scholars or other              |
| 16   | theologians or other people who study the thing that you're         |
| 17   | here to talk about -- there's no disagreement, you're saying,       |
| 18   | amongst that community as to whether somebody who's born in the     |
| 19   | United States, who never voluntarily came to the United States,     |
| 03:41 20 | whether he would be beholden to the same Doctrine of Aman?      |
| 21   | A.   That's correct.                                                |
| 22   | Q.   Okay.  And so you would agree with me that some people --      |
| 23   | some Muslims who are in the United States -- have violated that     |
| 24   | Aman.  Wouldn't you say that?                                       |
| 25   | A.   Like Nidal Hassan or --                                       |

1   Q.   Well, how about the thousands of Muslims in American

2   jails.  Haven't they violated Aman?

3   A.   I have no idea.

4   Q.   Well, they've harmed the United States.  They've broken

5   the law of the United States, haven't they?

6   A.   Again, I think this is beyond the realm of my knowledge.

7   I don't presume to know that.

8   Q.   So if it was against a commandment in the Bible to kill,

9   then there should be no people in jail for killing anybody.

03:42 10   Isn't that fair to say?

11   A.   No, I don't think that's fair to say.  I mean, why does

12   the Bible say that if people never thought to kill?  The Bible

13   says that --

14   Q.   I'm not sure I even understand your question but --

15   A.   Right.  I mean, the point is that people sin.  People

16   regard that as a sin.  I don't know any Christian that believes

17   that premeditated murder is a good thing to do.

18   Q.   And it's prohibited by the religion.

19   A.   Yes.

03:42 20   Q.   And yet people do it errantly, outside of the bounds of

21   their religion?

22   A.   Yes.

23   Q.   Now, you've written how some jihadi, or people promoting

24   the notion of fighting, especially against America and the

25   West, they often sidestep this concept of this contract in

1    order to pursue their propaganda?

2    A.   Yes.  That's one of the things I observed, is that they

3    don't like talking about it because it's so comfortable.

4    Q.   Right.  They pay lip service to it.

5    A.   No, they don't even pay lip service.  So like al-Zawahiri

6    will pretend that the thing never really existed.  He doesn't

7    have a very good argument as to when the contract is suspended;

8    he just sort of thinks that all Muslims ought to be doing this.

9    Q.   Correct.  And you're familiar with Abu Layth al-Libby?

03:43 10  A.   Abu Layth al-Libby, yes.

11   Q.   And you've written about his opinions on this?

12   A.   Was he cited in my al-Awlaki paper?

13   Q.   Well, you should know --

14   A.   Yes.  I'm trying to -- I know I've read that, and I

15   believe that he was cited in the paper "Al-Awlaki Against the

16   Islamic Legal Tradition."

17   Q.   And he pays -- he goes through -- at least ostensibly,

18   through some liturgical analysis for what justifies certain

19   al Qa'ida attacks.  Is that fair to say?

03:44 20  A.   I don't think "liturgical" is the right word.  Doesn't

21   that mean sort of a ceremony within a church or something like

22   that?

23   Q.   Well, what I mean to suggest is that there's some

24   insincere religious discussion that justifies the -- not that

25   all liturgical discussion is insincere, I should add -- but

1    justifies attacks on individuals.

2    A.   You're asking me to judge his sincerity?

3    Q.   No; I'm asking you to judge the substance of his

4    conversation, whether he uses Islamic constructs in order to

5    advance al Qa'ida's mission.

6    A.   He gives -- he has given -- the text that I'm familiar

7    with is an argument about the concept of human shields in

8    Islamic law and whether human shields can be legitimate

9    collateral damage when you're attacking a legitimate target.

03:45 10    That's the only thing that I've read by him.

11    Q.   Let's talk a little bit about Mr. Al-Awlaki, who we just

12    discussed.  Now, do you know when those videos were made that

13    we just watched?

14    A.   I should know this.  Probably 2009, possibly 2010.  So I

15    think I don't know exactly.

16    Q.   And you're aware that Mr. Al-Awlaki actually produced a

17    document called "44 Ways to Make Jihad" -- "Support Jihad," I

18    should say?

19    A.   That's correct.  He found five new ones.

03:46 20    Q.   He found five new ones.

21         What you're referring to is he found five more than

22    the 39 ways to serve and participate in jihad?

23    A.   Correct.

24    Q.   And one of those five new ways was translating jihad

25    literature into other languages, wasn't it?

1    A.   Correct.

2    Q.   And Awlaki said, "As I stated in the previous point, most

3    of the jihad literature is in Arabic.  Brothers and sisters who

4    speak a foreign language in addition to Arabic should translate

5    the most important works into their languages.  Every movement

6    of change is preceded first by an intellectual change.  It is

7    said that the time of Salahudeen was preceded by an upsurge in

8    writings about Jihad.  We are seeing this happen today.  This

9    revival of Jihad needs to take place amongst Muslims of every

03:46 10   tongue."  Do you recall that?

11   A.   I do not -- I would not have been able to recall that

12   offhand.

13   Q.   If we could turn to do more reading, which hopefully we'll

14   finish today.  But before I do, I wanted to ask you a little

15   bit about what people have written about you.

16        Some people in the -- at least what I found on the

17   internet, characterized you as an apologist for radical Islam.

18   Have you heard that before?

19        MS. PATEL:  Your Honor, may we approach sidebar?

03:47 20       THE COURT:  Yes.

21        (Discussion at sidebar and out of the hearing of the

22   jury:)

23        MS. PATEL:  Your Honor, I can't see how it's relevant.

24        MR. CHAKRAVARTY:  Well, I think what people have

25   said -- he knows that people have been critical of his

1    ideology -- I think is as relevant to him as it was when

2    Mr. Kohlmann was cross-examined at length about what

3    Mr. Sageman -- Dr. Sageman and others thought about his works.

4         THE COURT:  No.

5         MR. CHAKRAVARTY:  Okay.

6         THE COURT:  The objection is sustained.

7         (In open court:)

8    BY MR. CHAKRAVARTY:

9    Q.   Dr. March, are you familiar with the book the "Clash of

03:48 10   Civilizations"?

11   A.   I'm familiar with it.  I haven't read it.

12   Q.   Then I won't ask you about it.

13        All right.  Let's go to these exhibits.

14        MR. CHAKRAVARTY:  Can we call up Exhibit 1006?

15        THE COURT:  Who's got this?

16        MR. BRUEMMER:  I have it, your Honor.

17        MR. CHAKRAVARTY:  If we have them, we'll do it, your

18   Honor.

19        THE COURT:  Okay.

03:49 20       MR. CHAKRAVARTY:  Can we go to page 5?

21   BY MR. CHAKRAVARTY:

22   Q.   This is one of the posts we just read?

23   A.   (Nonverbal response.)

24   Q.   And this is one of the passages that I think Ms. Patel

25   went through with you.  The first sentence says, "In America,

1    not all able-bodied men are expected to go out and fight when

2    there is a war."  Did I read that correctly?

3    A.   Yes, sir.

4    Q.   And the second sentence says, "Of the millions and

5    millions of able-bodied men in America, only a small percentage

6    of them are enlisted in the armed forces," correct?

7    A.   Yes, sir.

8         MR. CHAKRAVARTY:  Could you go to Exhibit 1237,

9    please?

03:50 10   Q.   And again, these are all part of threads which we went

11   through earlier today and the jury has seen before.  And in

12   this one the defendant said, "In contrast, a man such as Paul

13   Johnson, who was helping in the maintenance and repair of

14   American Apache helicopters, this is to anyone who has sight

15   with which they could see or a brain with which they can think,

16   a totally different story."  And in the context -- you've read

17   this post -- he's talking about killing individuals who are

18   overseas.  Killing Americans, I should say, who are overseas.

19   The writer of this is justifying the killing of Paul Johnson,

03:51 20   isn't he?

21   A.   No, sir.

22   Q.   He's not saying that Paul Johnson was someone who, to

23   anyone who has sight, or can see, is a justifiably -- was

24   justifiably killed?

25   A.   No, sir.  It says "is a totally different story."

1    Q.    Okay.

2              MR. CHAKRAVARTY:  Can you go to 1238?

3    Q.    In this post the defendant says, "Contrary to popular

4    belief, there are no two opinions on the 'ahd issue.  As anyone

5    with half a brain will see that the 'ahd of peace between the

6    nations of kuffaar and the Muslims has been nullified."  Have I

7    read that correctly?

8    A.    Yes, sir.

9              MR. CHAKRAVARTY:  Would you go to 1238.  I'm sorry.

03:52 10   That was 1238.  Would you go to Exhibit 432?

11   Q.    This is also a Tibyan post which says, "I came across the

12   al-Jazeera's website today."  You're familiar with al-Jazeera

13   as an Arabic language media outlet?

14   A.    Yes, sir.

15   Q.    "They collected all of Osama's and Ayman's videos and

16   audios that were sent to them since 9/11 and made a home page

17   for them.  Enjoy."  Did I read that correctly?

18   A.    Yes, you did.

19   Q.    There's no religious discussion in this post, is there?

03:52 20   A.    There's no religious discussion that I could see.

21              MR. CHAKRAVARTY:  433, please?

22   Q.    In this post the defendant says, "Abu Anas al-Shami is

23   seen standing behind Abu Mus'ab in this video."  Did I read

24   that correctly?

25   A.    Yes, sir.

1    Q.    Is there any religious discussion in this post?

2    A.    Not that I can tell.

3    Q.    Do you know who Abu Anas al-Shami is?

4    A.    No.

5    Q.    Do you know who Abu Mus'ab is?

6    A.    I believe that's a reference to Zarqawi.

7    Q.    And do you know that the video that they're referring to

8    is the beheading video of Nicholas Berg?

9    A.    No, I do not know that.

03:53 10          MR. CHAKRAVARTY:  Go to Exhibit 434, please.

11   Q.    "Man, the Shaykhayn 'Usamah and Abu Mus'ab both in the

12   same week.  Somebody please send Bush some diapers."

13          Do you know who Shaykh 'Usamah is in this context?

14   A.    I assume that's a reference to bin Laden.

15   Q.    Okay.  And Abu Mus'ab is the same Zarqawi that you

16   referred to earlier?

17   A.    I would assume.

18          MR. CHAKRAVARTY:  Go to 435, please.

19   A.    "Diapers" has no religious significance, as far as I could

03:53 20   tell.

21          (Laughter.)

22   Q.    Thank you.  "Does anyone have the first videotaped message

23   released by Osama bin Laden after the 9/11 attacks, the one

24   that was broadcast by al-Jazeera TV on the day the U.S. began

25   attacking Afghanistan?  Thanks in advance."

1        Again, no religious references here.  Is that right?

2   A.   No particular religious references.

3   Q.   And these posts are actually almost a year after the March

4   2005 post that you referred to with the -- regarding the Riyadh

5   attacks.  Isn't that right?

6   A.   Almost a year.  So those were -- those were March 2005 or

7   October 2005.  It's after any of them.

8   Q.   Right.  And this says January 2006, right?

9   A.   Yes.

03:54 10        MR. CHAKRAVARTY:  Could we go to 436, please?  I'm

11   sorry.  438, please.

12   Q.   Now, in this one the defendant says, "I do not know of

13   condemning the Sharm el-Sheik bombings but he did condemn the

14   attacks on the tourist bus in Cairo.  In any case, akhi, just

15   because one may support and respect Osama bin Laden does not

16   mean that by default he has to support and agree with every

17   single attack or operation that happens in the world."

18        Did I read that correctly?

19   A.   Yes, you did.

03:55 20   Q.   Are you familiar with the bombing at Sharm el-Sheik?

21   A.   I'm sure there was a bombing in Sharm el-Sheik.

22   Q.   And do you remember what -- Osama bin Laden's condemnation

23   of those attacks?

24   A.   No.

25        MR. CHAKRAVARTY:  Can we have Exhibit 439, please?

1  Q.   "They wanted to reduce troop levels."  Is there any

2  religious connotation to that?

3  A.   Not that I can tell.

4        MR. CHAKRAVARTY:  440, please?

5  Q.   "Wa allahu a'lam.  Shutting down at this time will kind of

6  give an obvious red flag as to who we are so it would be better

7  not to shut down, wa 'Alaykum as-Salam."

8        Again, aside from the two greetings in Arabic, there's

9  nothing religious in that, right?

03:56 10  A.   Not that I could tell.

11  Q.   Now, you mentioned Nidal Hassan as somebody who's attacked

12  America and violated Aman?

13  A.   Yes.

14  Q.   And that's because he was actually a soldier in the

15  American military -- excuse me.  He was in the American

16  military, he had a rank, and then he shot up Fort Hood,

17  correct?

18  A.   That's correct.

19  Q.   And you're aware that he communicated with -- or attempted

03:56 20  to communicate with Anwar al-Awlaki before he did so?

21  A.   I heard reports of this in the media.

22  Q.   Okay.  And he attempted to do that based on what you know

23  through the internet, correct?  He didn't go to Yemen, did he?

24        MS. PATEL:  Objection, your Honor.

25        THE COURT:  Sustained.

1      MR. CHAKRAVARTY:  Can we go to Exhibit 1241B and go to

2    the ten-minute mark?

3    Q.   We've watched this video earlier.  We were talking

4    about --

5    A.   Is this the same file?

6    Q.   It was the same file that we watched the video clip of.

7         Before I start asking you questions here --

8         MR. CHAKRAVARTY:  Can you try to figure out the ten

9    minute -- is that ten minutes?

03:57 10   Q.   The clip that we watched earlier, that was involving Umar

11   Farouk Abdulmutallab, the so-called underwear bomber, correct?

12   And Anwar al-Awlaki acknowledged that he had been a teacher of

13   that individual, correct?

14   A.   I don't think we reviewed that part.

15        MS. PATEL:  Objection, your Honor.  Not relevant.

16        THE COURT:  Overruled.

17   BY MR. CHAKRAVARTY:

18   Q.   In fact, the clip that we were talking about, that Anwar

19   al-Awlaki was talking about that you were asked to opine about,

03:58 20   it was that operation he was referring to, right?

21   A.   Right.  At the beginning he mentioned Umar Farouk and at

22   the end he mentioned Umar Farouk, and then he had his trial and

23   discussion.  I don't recall any first-person statements about

24   his relationship with Omar Farouk in that.

25   Q.   But you do agree that it's on this video?

1   A.   I saw the reference to Omar Farouk in this video.

2   Q.   Right.  Did you watch this entire video?

3   A.   I have a long time ago.  I don't remember everything

4   that's on it.

5   Q.   Well, as long as we're talking about -- so -- give me one

6   moment.

7            (Pause.)

8   Q.   Mr. Awlaki, in the same video, then, discusses what

9   appears on the screen regarding Nidal Hassan.  He was asked in

03:59 10   this interview about what his feelings were about the

11   justification of this attack, correct?

12   A.   I can only see what I see on this screen shot.  And it

13   seems he's being asked about the repercussions of the Nidal

14   Hassan operation on al-Awlaki.

15   Q.   And Hassan, as you described, would be in violation of

16   Aman for doing what he did?

17   A.   Correct.

18            MR. CHAKRAVARTY:  So can we play a clip of this?  And

19   I'll pause it myself.

03:59 20            (Video clip of Exhibit No. 1241B published to the

21   Court and jury.)

22   BY MR. CHAKRAVARTY:

23   Q.   So --

24            MS. PATEL:  Objection, your Honor.  Here or at the

25   side?  Here?

1        THE COURT:  Just briefly.

2        MS. PATEL:  Mr. Hassan is not charged with any crime

3    and he denies anything to do with Mr. Awlaki.  There's no

4    foundation and it's factually incorrect.  He's not charged with

5    terrorism.

6        THE COURT:  Well, okay.  I don't think that's a reason

7    why the witness can't answer, so overruled.

8    BY MR. CHAKRAVARTY:

9    Q.   With regards to -- it establishes that Mr. Awlaki at this

04:01 10   time was in Yemen, correct?

11   A.   It says that.

12   Q.   It says that.  And this is a video that you just testified

13   to and was introduced through you, correct?

14   A.   Yes, sir.

15   Q.   And earlier you saw references to Umar Farouk, and you

16   were talking about Awlaki was talking about the underwear

17   bomber?

18   A.   Yes, sir.

19   Q.   You were asked about Exhibit 618 --

04:01 20       MR. CHAKRAVARTY:  Can we call up 618?  Can we go to

21   the next page?  Next page again?  One more?

22   Q.   Down here it says, "Shaykh Yasir Qadhi just wrote me a

23   recommendation."  And you said you're personally familiar with

24   Mr. Qadhi?

25   A.   Yes, sir.

1    Q.   He's a bit of a famous character as well, right?

2    A.   Yes, he has some notoriety.

3    Q.   In fact, you wrote about an interview you had with him,

4    haven't you?

5    A.   Yes, I have.

6    Q.   So you're aware that Yasir Qadhi also taught Mr. Umar

7    Farouk Abdulmutallab?

8            MS. PATEL:  Objection, your Honor.

9            THE COURT:  Sustained.

04:02 10   BY MR. CHAKRAVARTY:

11   Q.   Were you interviewed by the *New York Times* earlier this

12   year?

13   A.   I think it was last year.  It may have been last year.

14   Q.   You were interviewed last year?  The front page of the *New*

15   *York Times* magazine, March 2011?

16   A.   2011, so yes.

17   Q.   And the title of the document -- the article says, "Why

18   Yasir Qadhi Wants to Talk About Jihad"?

19   A.   Yes.  Andrea Elliot was the author of that.

04:03 20   Q.   That's accurate.

21           Do you remember reading that Qadhi was concerned that

22   Mr. --

23           MS. PATEL:  Objection.

24           THE COURT:  Sustained.

25           We've reached one o'clock.  I think we should pause at

```
 1   this point.

 2          MR. CHAKRAVARTY:  Your Honor, in the interest of the

 3   witness, if we go two more minutes, I may be done.  I don't

 4   know how long the rehabilitation is.

 5          MS. PATEL:  I won't redirect.  I would like for him to

 6   go home.

 7          THE COURT:  All right.  We'll do two more minutes.

 8          MR. CHAKRAVARTY:  Your Honor, there's one area that

 9   we're going to need to go into very briefly in the morning.  I

10   apologize to the witness and to the Court.

11          THE COURT:  All right.  We'll recess and reconvene

12   tomorrow morning.

13          THE CLERK:  All rise for the Court and jury.  The

14   Court will be in recess.

15          (The jury exits the courtroom at 1:01 p.m.)

16          (Discussion at sidebar and out of the hearing of the

17   jury:)

18          MR. CARNEY:  I just wanted to ask your Honor a

19   question about closing argument, which I know is not imminent.

20          MR. AUERHAHN:  We're going to do it tomorrow, right?

21          (Laughter.)

22          MR. CARNEY:  I'm wondering if within whatever time

23   limit your Honor sets, if Attorney Bassil and I can split the

24   time.  I've had it done in the past by other judges and I

25   know --
```

1          THE COURT:  You split the time too, usually.

2          MR. CARNEY:  As you saw in the opening, even though

3     the government went half an hour longer than my opening was, I

4     don't think it will be a problem, that we can, well within

5     whatever time your Honor allots, divide it up, so that we're

6     certainly not seeking to get additional time.

7          Off the record.

8          (Discussion off the record.)

9          MR. AUERHAHN:  I guess as long as there's -- you know,

04:05 10    there's no repetition.  I mean, there can be.

11          THE COURT:  Yeah.  Yeah.

12          MR. CARNEY:  No, it would be totally different.

13          THE COURT:  I would assume that's the reason for it,

14     they would divide up the areas.

15          MR. AUERHAHN:  And styles.

16          THE COURT:  I don't think there's a problem with that.

17          MR. CARNEY:  Thank you very much.

18          (The Court exits the courtroom and the proceedings

19     adjourned at 1:03 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  December 7, 2011

17

18

19

20

21

22

23

24

25