UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    ) Criminal Action
v.                                  ) No. 09-10017-GAO
                                    )
TAREK MEHANNA,                      )
                                    )
          Defendant.                )
                                    )



BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY THIRTY
JURY TRIAL



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, December 8, 2011
9:22 a.m.



Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By: Aloke Chakravarty and Jeffrey Auerhahn,
3            Assistant U.S. Attorneys
         John Joseph Moakley Federal Courthouse
4        Suite 9200
         Boston, Massachusetts  02210
5        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
6        By: Jeffrey D. Groharing, Trial Attorney
             National Security Division
7        950 Pennsylvania Avenue, NW
         Washington, D.C.  20530
8        On Behalf of the Government

9        CARNEY & BASSIL
         By: J.W. Carney, Jr., Esq.
10           Janice Bassil, Esq.
             John E. Oh, Esq.
11       20 Park Plaza
         Suite 1405
12       Boston, Massachusetts  02216
         - and -
13       LAW OFFICE OF SEJAL H. PATEL, LLC
         By: Sejal H. Patel, Esq.
14       101 Tremont Street
         Suite 800
15       Boston, Massachusetts  02108
         On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

WITNESSES FOR THE
 DEFENSE:

ANDREW F. MARCH, resumed

     By Mr. Chakravarty (Cont'd)          26

GREGORY JOHNSEN

     By Mr. Carney                36
     By Mr. Groharing                      85

1       (The following proceedings were held in open court

2   before the Honorable George A. O'Toole, Jr., United States

3   District Judge, United States District Court, District of

4   Massachusetts, at the John J. Moakley United States Courthouse,

5   One Courthouse Way, Boston, Massachusetts, on December 8, 2011.

6       The defendant, Tarek Mehanna, is present with counsel.

7   Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8   are present, along with Jeffrey D. Groharing, Trial Attorney,

9   U.S. Department of Justice, National Security Division.)

09:17 10       THE CLERK:  All rise.

11       (The Court enters the courtroom at 9:22 a.m.)

12       THE CLERK:  For a continuation of the Mehanna trial.

13   Please be seated.

14       THE COURT:  Good morning.

15       MR. CHAKRAVARTY:  Good morning, your Honor.  Thank you

16   for seeing us before the first witness takes the stand.

17       I wanted to alert the Court to issues that the

18   government thinks will require some argument.  And while

19   Dr. March is almost done as a witness, we're anticipating

09:22 20   issues that will come up with the next couple of witnesses

21   today.  So there are three, kind of, categories of issues that

22   I thought it made sense to alert the Court to.

23       The first involves experts generally in terms of

24   discovery, scope of opinions.  A related issue to that is

25   scheduling for purposes of *Daubert* hearings, either evidentiary

1    or non-evidentiary, with regards to successive witnesses.  I

2    don't think that will apply to Mr. Johnsen and I don't --

3              THE COURT:  I thought we talked about Mr. Johnsen.

4              MR. CHAKRAVARTY:  We did.

5              THE COURT:  Am I imagining that?

6              MR. CHAKRAVARTY:  No.  No, we did.  We did.  That's

7    what I'm saying, for Mr. Johnsen it doesn't apply.

8              THE COURT:  Right.

9              MR. CHAKRAVARTY:  I'm alerting the Court because

09:23 10   obviously your Honor wants to go ad seriatim.  When it's ripe,

11   then we'll deal with it.

12             THE COURT:  Right.

13             MR. CHAKRAVARTY:  Mr. Fadel -- Dr. Fadel is scheduled

14   to be reached later today.  And while his qualifications in

15   terms of talking about Islamic law are not going to be

16   challenged, the scope of what his proposed testimony is beyond

17   that.  So I guess it's a *Daubert*/scope issue that we should

18   address before he, obviously, testifies.  And redundancy and

19   overlap with Dr. March's testimony.

09:23 20             So the question is:  Do you want to hear that now or

21   do you want to hear that at the break or some other time?  We

22   may be --

23             THE COURT:  Well, I guess I'm not sure how substantial

24   the objections are and how much time I'll need for it.  I mean,

25   I will -- I would think that the adjustments that have been

1    made already would continue to be made so that, for example,

2    predictions or predictability issues, probability issues would

3    not be part of what's offered.  I think we have kind of fallen

4    into the rule of no opinions about subjective assessment of the

5    defendant.  So if those are the nature of the objections, I

6    think maybe they're already resolved.

7            MR. CHAKRAVARTY:  The government understands those.

8    The broader issue with Dr. Fadel is the defense, over the last,

9    I think, two days, maybe three, has noticed some 70 exhibits,

09:24 10    approximately, that they seek to introduce through the witness.

11            THE COURT:  Right.

12            MR. CHAKRAVARTY:  As was highlighted by Dr. March's

13    testimony, these expert witnesses have been provided with a

14    number of documents, apparently, that were produced in

15    discovery.  They've relied in part on those documents to

16    formulate their opinions about what specific exhibits

17    are -- what the meaning of the author is in those specific

18    exhibits.  That author happens to be the defendant.

19            The government has not been provided notice of what

09:25 20    those exhibits are -- or what those materials have been that

21    the witnesses have relied upon, and consequently when, for

22    example in Dr. Fadel's case, 60 or 70 exhibits are then given

23    to us to say we are going to introduce these through a witness

24    who is presumably not competent to authenticate and do all the

25    rest, the government recognizes that there is an asymmetry

1    there, and we're not going to belabor the issue by bringing in

2    agents to authenticate these things.

3          But there's not an asymmetry with regards to expert

4    disclosures with regards to Rule 16 and 703.  And it's

5    precisely for this reason.  Because the defense is now -- has

6    already used it for prejudicial effect with the government when

7    their witnesses have reviewed materials, which the government

8    is not aware of what those are; they've formulated an opinion

9    about the meaning of specific exhibits, which it's then that

09:26 10  very same expert is used to introduce for the first time those

11   new exhibits.  It's a different story if there's an exhibit

12   already in evidence that the witness is testifying about

13   because it's already in evidence, he's seeing it, it's

14   something obviously we have used.  That's a very different

15   circumstance than introducing a brand-new exhibit and opining

16   about the significance of that.

17         The expert disclosure is clear to say Dr. Fadel will

18   discuss the meaning of government exhibits in which Mehanna

19   talks about his religious beliefs.  First, the government has

09:26 20  problems with the witness describing the defendant's religious

21   beliefs, understanding that's maybe a semantic issue between

22   what is in the four corners of a government exhibit document.

23   But what they've now proposed is hundreds, and I have three

24   binders full of exhibits, many of which are a hundred

25   pages -- one of which is an over-100-page-long Tibyan post

1    thread; another is, you know, some 50-odd pages long, some of

2    which is duplicative of information that the jury already has.

3    In addition to the overwhelming cumulative nature of it, this

4    is why we wanted this stuff.  This is why we asked, you know,

5    with specificity the basis of their opinions.

6           This is not new information.  Nothing has transpired

7    during trial that would have prevented the defense from

8    providing this information to us.  And we've all been busy.

9    We've all been actively engaged in this trial.  It's not meant

09:27 10   to besmirch counsel, but before a witness gets on the stand and

11   says what is, I'm sure, very powerful testimony to suggest what

12   the defendant's state of mind was about something in the

13   relevant time period, arguably -- although much of what they

14   have offered, the government would argue, is completely

15   irrelevant and is, frankly, probably a strategic decision to

16   put idle chatter or other irrelevant information to show that

17   the defendant talked about things other than jihad, other than

18   the al Qa'ida mission, which the government would argue is also

19   inadmissible for other reasons, but not for the disclosure

09:28 20   issues.

21          The disclosure issues frame the government's relevancy

22   and hearsay objections, though.  When the defense is trying to

23   offer a defendant's statement, the government recognizes when

24   it's not offered for the truth of the matter, as your Honor has

25   done so far, if it's offered for a relevant state of mind

1   that's germane to the jury, we offer it for such.  But unlike

2   when the government offers that, there's no hearsay -- explicit

3   hearsay exception for it, and it's for the defense to explain

4   to proffer why each specific exhibit overcomes that barrier,

5   that this is something germane to the jury's assessment of the

6   relevant state of mind at a specific time related to the

7   indictment.

8        The *Cianci* case, a First Circuit case, your Honor,

9   *Buddy Cianci*, made clear that the Court's role in that is to be

09:29 10   careful with it, and the government hasn't alleged that you've

11   overstepped that.  But there is a function there where the

12   defendant's statement that's being offered, even if it's just

13   for state of mind, has to be closely related to what the facts

14   are that are at issue.  So when we're talking about 70-some-odd

15   exhibits, and I dare not guess how many are relevant versus not

16   relevant -- a lot of what the government argues are irrelevant

17   or 403 excludable -- they can't cross that threshold.  And to

18   the extent they can cross the threshold, the government argues

19   that's precisely the type of information that should have been

09:29 20   disclosed earlier.

21        I hasten to add that one of the reasons why

22   Mr. Kohlmann and Mr. Vidino did reports was to specifically

23   identify which chats they would be referring to, and then

24   putting them in context of the opinions.  The government, in

25   some respects, suggests that that is required with regards

1    to introducing -- if they're going to be introducing a chat and

2    explaining what the significance is with relation to a specific

3    piece of evidence.

4         In this case, obviously, Dr. March, for whatever --

5    you know, he created, he either did not produce to the defense

6    or we haven't received anything from the defense, this is why

7    there's 26.2 and there's other reciprocal discovery demands.

8    Again, the government recognizes there's an asymmetry, but, you

9    know, we've asserted our right to reciprocal discovery for a

09:30 10   reason, and it's not just to be annoying or just because it's

11   the rare case where we have a defense case.

12        Here there are a lot of exhibits and a lot of

13   testimony which are at issue based on the fact of their

14   disclosures and, frankly, the government thinks that they've

15   just been delinquent.

16        One other issue on the -- on the --

17        THE COURT:  And so what is your request?

18        MR. CHAKRAVARTY:  So the request is to not permit

19   Dr. Fadel from addressing new exhibits; to comment on what

09:31 20   the -- what he believes is significant with relation to the

21   author's -- the meaning of the author's writing with relation

22   to Islamic law or Sharee'ah.

23        THE COURT:  All right.  Ms. Bassil?

24        MS. BASSIL:  Yes, your Honor.

25        Your Honor, the government is fully aware of this:

1    Everything that Dr. Fadel may relate to was provided to us by

2    the government, all right?  They provided us -- it's

3    essentially Tibyan posts, all right?  They provided us with all

4    of these posts.  I'm not going to use 70 pages of thread.  I

5    only sent them the entire thread because, you know, it's the

6    entire piece.  Just like they've highlighted one or two lines

7    from an instant message but included the entire instant

8    message.

9          So what I would tell you is that the government has

09:31 10   had this information, they've had it for years before we did,

11   and it's not a surprise, all right?  I am probably going to

12   review with Dr. Fadel perhaps five or six of the Tibyan posts,

13   and they are not -- what he is going to review them about is in

14   terms of comparing them to al Qa'ida philosophy.

15          The government has made these sweeping

16   generalizations, through Mr. Kohlmann, that al Qa'ida believes

17   this, and this is exactly what it is, and then they've thrown

18   up instant messages and Tibyan posts, and they're asking the

19   jury to say the defendant is an aberrant because of this.  It's

09:32 20   far too broad.  Dr. Fadel can testify to the specifics of what

21   al Qa'ida's beliefs are based on Islamic religion and theology.

22   Essentially, he will -- and he is not going over the issue of

23   Aman, because Dr. March covered that, so I cut that out.  But

24   it will be specifically -- there are certain concepts that are

25   part of Islamic religion law and theology that al Qa'ida has

1   taken, and essentially you can call it corrupted or perverted.

2   He's going to review those and he's going to review writings in

3   terms of the comparison to that.

4          He's not going to talk about the defendant's state of

5   mind or profile or anything like that.  What we're doing is

6   exactly what the government did.  There are no new materials

7   here.  We provided the government with -- in full, more than we

8   needed to.  And the other exhibits are essentially instant

9   messages which I am probably not going to use.  I gave them to

09:33 10   the government as an abundance of caution, that Dr. Fadel may

11   refer to there was an instant message on this topic.  But I put

12   them there just in case he referred to them.  I may not even

13   use them.  And they're already in evidence.  The government put

14   them in.  This is nothing new.

15          I also might add, you know, we would get lists of

16   hundreds of exhibits, hundreds of these readers the night

17   before.  And as far as cumulative, do I really need to talk

18   about cumulative in this trial?  The government's evidence has

19   been nothing but cumulative.  If they said something once, they

09:33 20   said it ten times.  So there is really nothing cumulative about

21   this.

22          I am not going to be repeating what Dr. March

23   repeated.  Now, certainly a couple of things are going to sound

24   similar because he has to explain some things, but he is not

25   going to be talking about the issue of Aman.  That was

1  carefully reviewed by Dr. March.

2         And Dr. Fadel is fully qualified to do this.  He's a

3  professor of law.  He's actually a lawyer.  And he has

4  extensive experience and study in, you know, theology and

5  writings both in al Qa'ida as well as -- you know, from

6  medieval scholars all the way up to the present.

7         So, your Honor, we have provided them with all of the

8  discovery.  It's nothing new to them.  Nothing new at all.

9  They obviously went through all the Tibyan posts in order to

09:34 10  select the ones they wanted to put in.  And, quite frankly,

11  they selected ones that they thought supported their position,

12  their Tibyan posts, that are inconsistent with al Qa'ida's

13  views.  And these are the ones we want to talk about.  It is

14  only a way of providing a contrast to the government's case as

15  well as to what Mr. Kohlmann had to say.

16         We have specific experts on narrow issues here, and I

17  don't think that there's any issue of lack of disclosure or

18  Rule 16 or anything of that nature.  We are not required to

19  file a report; we are required to file a notice.  We looked at

09:35 20  notices given in federal courts all across this country, and

21  our notices are by far way more extensive than any court has

22  ever required.  And I even revised them after Mr. Kohlmann in

23  order to address those issues.

24         THE COURT:  Well, I see it sort of as a separate

25  issue, and that is, this is the defendant's case-in-chief.  And

1    there was a time when the parties were to identify their

2    prospective exhibits, and the defense filed a list of

3    prospective exhibits.

4              MS. BASSIL:  Yes.

5              THE COURT:  Are these part of it?

6              MS. BASSIL:  I have to ask --

7              THE COURT:  The numbering would seem to indicate

8    they're not.

9              MS. BASSIL:  We all agreed, and the government knew.

09:36 10   And government added exhibits.

11             THE COURT:  That happens.  And it becomes a question

12   of degree, I think.

13             MS. BASSIL:  Yes.  But we couldn't identify exhibits

14   necessarily ahead of time because we had to wait for what

15   Mr. Kohlmann was going to say.  All of our defense focused in

16   response to Mr. Kohlmann.

17             THE COURT:  I think the -- as I just said, I think

18   it's a matter of degree.  We do not rigidly enforce the

19   pretrial exhibit disclosures necessarily, and parties are able

09:36 20   to respond to events in the trial and to -- but it seems to me

21   if there's a principal expert witness who's expected to

22   testify, that at least some significant body of the exhibits he

23   would refer to could be identified pretrial.

24             If it is the case that you're most interested in five

25   Tibyan Publications posts, then maybe the government can focus

          1     on that and see what disadvantage it seems to continue to bear

          2     under those circumstances.

          3             MS. BASSIL:  I will also say, your Honor --

          4             THE COURT:  So I think it may be -- we may be able to

          5     resolve this by limiting, and maybe consistent with what you

          6     have in mind to put in evidence, the volume so that we don't

          7     have a whole volume that has to be responded to.

          8             MS. BASSIL:  Can I say the government also received

          9     essentially -- let me give you a little background.  The

09:37    10     government actually received the posts we're going to use a

         11     while ago, but because of the disk the government provided to

         12     us -- and by the way, the program they told us to buy to open

         13     the disk was $185 and it didn't work and it was the wrong

         14     program; we then were able to open it.  But we couldn't -- it

         15     took a long time to get it into the same format, you know,

         16     where it shows the Tibyan header and so forth.

         17             And so the government was given quite a while

         18     ago -- actually, I don't even know when.  They were given --

         19             When did we give them --

09:38    20             There were original exhibits, your Honor, which we

         21     gave to the government, we gave them notice, but it was based

         22     on the way we were able to open the CD.  And it's the same

         23     material.  Now, we were able, after a lot of effort, to get

         24     them into a more reasonable-looking format, but it's the same

         25     exact post.

1           THE COURT:  Well, okay.

2           MR. CHAKRAVARTY:  Just to clarify on that, I believe

3    this weekend we received --

4           MS. BASSIL:  They received them before.

5           MR. CHAKRAVARTY:  -- 1179 to 1237.

6           THE COURT:  Well, there's receiving and there's

7    receiving.  I don't want to prolong this too much because I

8    would like you to see if you could narrow the scope and it

9    might be resolvable.

09:38 10           MR. CHAKRAVARTY:  That seems to make sense.

11           THE COURT:  But there is disclosure and there's

12   disclosure.  There's bulk disclosure and then there's

13   identification of witnesses -- exhibits to be used with

14   particular witnesses in support of their testimony --

15           MS. BASSIL:  We didn't get that, your Honor.  We

16   didn't get that.

17           THE COURT:  -- in particular, experts, so --

18           MS. BASSIL:  We got rafts -- I'm sorry.

19           THE COURT:  -- somewhere in the middle.

09:39 20           We have a little time to resolve that.  Let's see

21   where that is.

22           MS. BASSIL:  Your Honor, I can tell you that we would

23   get rafts of disclosures and three exhibits would be used, all

24   right?  So as far as disclosure from the government, it didn't

25   happen that way.  And I apologize for interrupting you.

1          But I will say that.  And I believe it was -- either

2     it was at the very beginning of this trial or before the

3     beginning of this trial we indicated to the government posts

4     from Tibyan.  And as I said, because we couldn't open the disk

5     the way they did, we couldn't -- we couldn't sync them until

6     very recently.  It took 45 minutes to be able to print out each

7     post in the format that the government already had.

8          THE COURT:  Okay.  At any rate, if the realistic issue

9     relates to five Tibyan posts and segments thereof, then maybe

09:39 10   that's not as much a disadvantage to the government.

11          MR. CHAKRAVARTY:  I'd be happy to discuss that at the

12    break.

13          THE COURT:  So let's see if you can resolve that by

14    negotiation.

15          MR. CHAKRAVARTY:  If I could clarify just for record

16    purposes, your Honor, and this is not meant to be tit for tat,

17    but obviously the government had provided all of its exhibits

18    before trial to the defense.  To the extent we were identifying

19    which exhibits were going to be referenced by a specific

09:40 20   witness, we did produce that as soon before -- as early before

21    the witness appeared as we could.  And in that case we did do

22    dribs and drabs.  But to say we just didn't notice them with

23    what those are I think is an overstatement.

24          But moving on, there is -- there are a couple of other

25    expert witnesses for whom either a *Daubert* hearing --

full-blown evidentiary hearing we believe is necessary, and/or
at least an argument on those witnesses.  Obviously, they are
not going to be reached today, but for scheduling purposes,
understanding that today may be the last day that you had an
afternoon open --

THE COURT:  It's filling up.  I've already made some
commitments for this afternoon, taking advantage of the time
that I've had.

MR. CHAKRAVARTY:  We should have --

THE COURT:  And let me just say on that score,
tomorrow morning -- you know that I was supposed to be at a
committee meeting today and tomorrow -- I have to phone in to
the committee meeting at 8:30 to discuss some business that is
of importance to the First Circuit and so that I can vote on
it.  I think that will take no more than an hour and a half.
But we will delay the beginning of trial till about ten o'clock
so that I can do that tomorrow.  I say that because it pushes
back the likelihood of a new expert even further, I think.

MR. GROHARING:  If I could very briefly, your Honor,
I'll just talk about a couple of the experts.  Professor
Williams -- and the Court's already indicated that it believes
that a hearing would be necessary for his testimony the last
time we talked about him.  And the government obviously agrees
with that.  But we haven't been provided any additional
information since the last discussion of Professor Williams.

1          Obviously, we don't think his testimony is relevant or

2    helpful at all in this case, but to the extent the defense

3    still believes it is, we think there should be a *Daubert*

4    hearing to flush out what his testimony would be, what the

5    basis -- the reason why he's relying on it for his opinions.

6          We were hopeful that would happen this afternoon, but

7    that doesn't seem possible at this point.

8          THE COURT:  I don't think so.

9          MR. GROHARING:  Perhaps tomorrow afternoon if --

09:42 10          THE COURT:  Maybe.  Let's see how things go.  I know

11   I'm not unique in this.  We all have other cases.  But I have a

12   lot of them.

13          MR. GROHARING:  Maybe if we could confirm that, in

14   fact, there will be a hearing, your Honor, then we could figure

15   out the scheduling piece later.

16          THE COURT:  I don't know whether we're going to need a

17   hearing or just argument on the disclosure.

18          MS. BASSIL:  I revised the disclosure in light of

19   Mr. Kohlmann.  I am happy to sit down with the government --

09:42 20          THE COURT:  Is there a new one that I haven't seen?

21          MS. BASSIL:  Yeah.  I thought it was -- it was filed

22   under seal.  But I do have a new one, and I'm happy to sit down

23   with the government and see if we could work out something in

24   terms of what he should testify to or not.  I'm happy to try to

25   reach a compromise.

```
 1            THE COURT:  I'm looking at the one that was filed
 2   December 6th.
 3            MS. BASSIL:  Yes.  I emailed it to the government.
 4            THE COURT:  And the other one was --
 5            MS. BASSIL:  It should say "revised."
 6            THE COURT:  The other one was a pretrial one, I guess.
 7            MS. BASSIL:  Right.  It should say "revised."
 8            THE COURT:  There was a relatively brief one that the
 9   government complained about, and then there was a more expanded
10   version which was still pretrial, and now there's this.  Is
11   that --
12            MS. BASSIL:  Right.
13            THE COURT:  Okay.  So let me look at this.
14            MS. BASSIL:  I did it in light of Mr. Kohlmann.
15            THE COURT:  Okay.
16            MR. GROHARING:  I don't think it's advanced the ball
17   any as far as what his testimony would be and how relevant, but
18   obviously --
19            THE COURT:  All right.  Well, let me take a look at
20   it.
21            MR. GROHARING:  -- we can have that discussion at a
22   later point.
23            Dr. Sageman as well, your Honor.  His most recent
24   disclosure -- the defense has taken off the references to the
25   social blog, essentially by deleting "social blog," but leaving
```

```
 1    in the substance of his testimony.  The government has

 2    significant problems with the scope of Dr. Sageman's testimony,

 3    and along the same lines as Mr. Chakravarty mentioned a few

 4    moments ago, the lack of disclosures from the defense.

 5          At this point we have a Google search that Ms. Bassil

 6    forwarded.  That was the discovery of the underlying basis of

 7    Dr. Sageman's opinion.  And I don't know what jurisdictions

 8    Ms. Bassil's referring to as far as expert disclosures, but

 9    this by far falls short of what's required.

09:44 10          When experts testify, provide an expert opinion -- in

11    this case Dr. Sageman says he's relying on studies and

12    scholars.  We have no indication of what those studies are, who

13    those scholars are, really any of the bases for his testimony.

14    He's written a couple of books, but it's not incumbent upon the

15    government to go read books and then figure out what he's

16    citing in and then figure out how that applies to his testimony

17    in this case.

18          The disclosures are still -- and this is after

19    repeated, repeated requests from the government -- woefully

09:45 20   deficient by any measure.  And so I don't think additional

21    discussion with the defense would be productive in this regard.

22    I think we need to have a hearing where Dr. Sageman can

23    testify, we can understand the basis of his opinions, the scope

24    of his opinions, not something that was put together by

25    attorneys but his own words what his opinions will be and then
```

 1     how he forms those opinions.

 2          We're available to do that at any point, your Honor,

 3     dependent on what his schedule is.  But I don't think it's

 4     productive for us to sit down at this point.  We've tried to do

 5     that and it really hasn't advanced the ball.  And as we're

 6     getting farther and farther along -- and we're talking about

 7     rather substantial testimony from Dr. Sageman.  If you look at

 8     the most recent disclosure -- I believe it's as many as ten

 9     pages -- we obviously have issues with much of that.

09:45 10          But a lot of testimony, I'd assume, is based on a lot

11     of study and different scholars, and we've had no opportunity

12     to even review that because we don't know what it is.  And the

13     defense expects to call him as early as Monday now.  It looks

14     like that's unlikely with the schedule, but certainly early

15     next week.  And it's putting the government at a great

16     disadvantage to not be prepared to cross-examine him.  That's

17     not what the rules are designed to permit.

18          So we would ask that we have a hearing and we flush

19     this out as soon as possible.

09:46 20          THE COURT:  Well, we probably -- from the travel

21     vouchers that I've been seeing, he's not here, is he?

22          MS. BASSIL:  He's not here, your Honor.

23          THE COURT:  He'll be here on Monday?

24          MS. BASSIL:  Yes.  And I disclosed exactly the basis

25     of his opinion.  The government has his books.  They've read

them.  And I've disclosed what his studies are.  There is no

mystery here.  I've given a ten-page notice of what his studies

are, what he is -- you know, and what the basis of his

testimony is.

THE COURT:  Okay.

MS. BASSIL:  It's not a mystery.

THE COURT:  Again, I haven't read the new disclosure.

So I think before we go any further on this, let me read those

that are pertinent and then we can have a further discussion

09:47 about scheduling.  But it may well be on Monday -- if it seems

appropriate to have a voir dire or -- then perhaps Monday would

be when we would do it.  But we'll -- because he won't be here

before Monday, I don't think.

MS. BASSIL:  Well, your Honor, I may say that, in all

fairness, if Mr. Kohlmann didn't deserve a *Daubert* hearing, I

sincerely suggest that Dr. Sageman does not.

MR. GROHARING:  Your Honor, the defense waived --

MS. BASSIL:  Only because you weren't going to give us

one.

09:47 THE COURT:  I want to resume with the jury while we're

using their time.

MR. CHAKRAVARTY:  There's one final point.  And,

again, we don't have to hear it now, but it makes a difference

in terms of timing.  The defense has served upon us today, and

they gave us notice yesterday, that they would be

1    asking -- they served subpoenas for two FBI agents to come

2    in -- I think one of the two to come in tomorrow -- to testify

3    about what they say are inconsistent statements with one of the

4    government's cooperating witnesses, Kareem Abuzahra.

5    Specifically, I think the statement was -- Mr. Carney asked

6    Mr. Abuzahra whether he had ever said that he was prejudiced

7    towards black people and the witness denied that.

8            There is an FBI 302 which indicates that the witness

9    had told FBI Agent Brad Davis and Chris Giankura that he is

09:48 10    prejudiced to black people.  But, in fact, when we notified the

11    agents that they may be necessary to testify about this issue,

12    they said, "Actually, he didn't tell us that.  That's how we

13    kind of understood it and memorialized it in this 302."

14            Regardless, the government thinks that this is such a

15    collateral matter and would serve only to inflame the jury and

16    appeal to the emotional aspects of assessing the witness's

17    credibility.  This is not a material inconsistency, number one;

18    number two, it didn't even happen.  The FBI agents would not

19    testify, based on our voir dire of them, that that's accurate.

09:48 20            THE COURT:  Okay.  You flagged the issue.  I don't

21    want to deal with it at this point.  I want to resume with the

22    jury.

23            MR. CHAKRAVARTY:  All right.  But the subpoena is due

24    for tomorrow, and as you know, for a Touhy request it's going

25    down to the Assistant Attorney General down in Washington to

1   assess.  My hope was to be able to use the workday in order to

2   have people know what they need to be doing for tomorrow.

3          One of the witnesses, I believe, is not even in

4   this -- he's not available; he's on vacation.

5          THE COURT:  Okay.

6          MR. CARNEY:  I had a couple of matters I wanted to

7   bring to your attention, but I will not do it now.  But one of

8   them is a request for a hearing on a non-expert-related matter,

9   and it might be at the close of business today before the jury

09:49 10   at one o'clock, if I could address you for two minutes to alert

11   you as to what the issue is.

12          The other thing I wanted to ask is Professor March is

13   going to be very short, close to completion, then Gregory

14   Johnsen will be offered.  The parties have no issues regarding

15   scope of testimony or exhibits.  There's one document that the

16   government may want to offer, I'm going to object to it on

17   hearsay grounds.  It may be the only evidentiary dispute during

18   the testimony.

19          Shall I bring it to your attention now?

09:50 20          THE COURT:  What is it?

21          MR. CARNEY:  It is a document prepared by the state

22   department that's called a travel warning.

23          MR. GROHARING:  The witness is present in the

24   courtroom, your Honor.  I'd just ask that Mr. Johnsen leave

25   before we discuss it.  I think my response may be relevant to

```
 1   his potential testimony.
 2           THE COURT:  All right.  Let's postpone it.  We have
 3   the jurors lined up.  Before he testifies we'll address it.
 4           MR. CARNEY:  Okay.  I just -- I wanted to alert you.
 5           THE COURT:  Okay.  All right.
 6           THE CLERK:  All rise for the jury.
 7           (The jury enters the courtroom at 9:50 a.m.)
 8           THE CLERK:  Please be seated.
 9           THE COURT:  Good morning, jurors.
09:51 10         THE JURORS:  Good morning.
11           THE COURT:  We had a couple of things to resolve.
12   We're ready to resume with Dr. March.
13                   ANDREW F. MARCH, resumed
14                 CONTINUED CROSS-EXAMINATION
15   BY MR. CHAKRAVARTY:
16   Q.   Good morning, Doctor.
17   A.   Good morning.
18   Q.   I won't keep you very much longer this morning.
19        Incidentally, you indicated yesterday that you had written
09:52 20   a book.  What's the name of the book?
21   A.   "Islam and Liberal Citizenship -- The Search for an
22   Overlapping Consensus."
23   Q.   And when did you publish that?
24   A.   2009.
25   Q.   And you described yesterday the process of peer review.
```

```
 1    And that book was peer-reviewed?

 2    A.   Yes.

 3    Q.   And amongst the peer-reviewers was Dr. Mohammad Fadel?

 4    A.   I wouldn't know that.  Only the editor of the press would

 5    know that.  That's why it's blind peer-reviewed.

 6    Q.   I see.  Do you know Dr. Mohammed Fadel?

 7    A.   I do know Dr. Mohammed Fadel.

 8    Q.   Is he in the courtroom today?

 9    A.   He's right over there.

09:53 10   Q.   And you recognize that he's also going to be a witness in

11    the case?

12    A.   Yes, sir.

13    Q.   So you talked at length yesterday about Aman, and I think

14    I may have confused you with regards to one of the exhibits and

15    the questions that I asked you?

16         MR. CHAKRAVARTY:  So I'm going to call up Exhibit 420,

17    please.

18         THE COURT:  This is from?

19         MR. BRUEMMER:  Me, your Honor.

09:53 20        MR. CHAKRAVARTY:  Yeah, from our computer.

21    BY MR. CHAKRAVARTY:

22    Q.   Now, just to resituate the jury, you had explained that

23    there was this notion of Aman or 'ahd or 'aqd or --

24    A.   Mithaq.

25    Q.   -- mithaq -- thank you -- which is this notion of a pact,
```

 1  a security compact, which is a doctrine within the vast

 2  majority of Muslim theological scholarship.  Is that fair to

 3  say?

 4  A.   Yes.

 5  Q.   And is it also the case that in some circumstances

 6  Sharee'ah requires this notion of defensive jihad, or jihad

 7  against an outside -- kind of a non-Muslim invading force that

 8  has attacked a Muslim country, there's this doctrine of jihad

 9  that applies in those circumstances?

09:54 10  A.   Yes; that would be a defensive jihad.

11  Q.   And you've said before, have you not, that it's okay in

12  Islamic law to fight U.S. soldiers in Iraq and Afghanistan and,

13  in fact, most scholars say that this is a duty, in fact.  Is

14  that right?

15  A.   In Islamic law it's permissible law for those who are in

16  those countries to fight outside invaders.

17  Q.   So my question to you was:  You've said, have you not,

18  that if it's okay in Islamic law to fight U.S. soldiers in Iraq

19  and Afghanistan, most scholars say this is a duty, in fact?

09:54 20  A.   Right.  Where you say it's okay to fight, you need a

21  subject to that sentence.

22  Q.   Okay.  I'm just asking you whether you said most scholars

23  say this is a duty, in fact.

24  A.   Yes.

25  Q.   And it is, in fact, a duty, isn't it --

1    A.    Yes.

2    Q.    -- for Islam?

3          All right.  So going back now to Exhibit 420, I think I

4    highlighted this paragraph, and I asked you whether the author

5    of this paragraph was indicating that it was proper to kill

6    Paul Johnson, and you said you could not arrive at that

7    conclusion by reading this paragraph.  So I'm now going to

8    highlight the larger paragraph, because I don't want to confuse

9    you on the question.

09:55 10         "Similarly, any American or other Westerner who is in the

11   peninsula doing any type of work that is not contributing to

12   the war effort against the Muslims, such as maintainers of oil

13   fields, civil engineers, et cetera, then I also do not agree

14   with targeting them and killing them simply because they are

15   Americans.  I support their expulsion, not their killing.

16        "In contrast, a man such as Paul Johnson was helping in

17   the maintenance and repair of American Apache helicopters.

18   This is, to anyone who has sight with which they can see or a

19   brain with which they can think, a totally different story."

09:56 20         Now, let me ask you the question again.  Based on your

21   reading of this paragraph isn't it clear that the author is

22   saying that it's permissible to kill Paul Johnson because he

23   was helping -- he was maintaining and repairing American Apache

24   helicopters?

25   A.    I wouldn't say that it's exactly clear.  What I would say

```
 1   that it's exactly what it says, that it's a different story and
 2   requires a different type of analysis.  But it is saying it is
 3   absolutely impermissible to kill civilians, and then the issue
 4   of people that are involved in military activities, that that's
 5   a separate question that needs different kind of ethical and
 6   legal analysis.
 7   Q.   That wasn't my question.  You know that Paul Johnson was a
 8   civilian, right?
 9   A.   I don't know Paul Johnson.
10        MR. CHAKRAVARTY:  If we could go to the next page,
11   please?
12   Q.   And do you still have that same scholarly distinction when
13   the defendant says, "Those who fight us, not those who carry
14   the same nationality as those who fight us," is that confusing
15   to you as to whether the defendant said that he feels it's
16   Islamically proper to attack people who are fighting Muslims?
17   A.   See, again, that's not a sufficient amount of data for me
18   to answer --
19   Q.   Dr. --
20   A.   -- because you need a subject to that sentence.
21   Q.   Can you please just answer my question and not go into a
22   broader explanation, and Ms. Patel will have that opportunity
23   to ask you about a broader explanation.
24        I'm just asking you:  Is this as confusing to you as the
25   first sentence?
```

1   A.   I'm trying to be truthful to the jury, and I can't say

2   something that I don't believe is truthful.  If I were teaching

3   this, what I would say is that --

4   Q.   Well, I want you to be truthful as well -- everybody in

5   the courtroom wants you to be truthful -- but we also want you

6   to be responsive.

7   A.   Yes.

8   Q.   So my question to you is:  Is this sentence confusing to

9   you?

09:57 10       MS. PATEL:  Objection, your Honor.  He's not allowing

11   the witness to be responsive to the question.

12       THE COURT:  Overruled.

13       You may answer the question.

14       THE WITNESS:  What it's saying is it's permissible for

15   somebody to fight in response to those who fight us; it doesn't

16   say who can do this.

17   BY MR. CHAKRAVARTY:

18   Q.   Okay.

19   A.   That's using the passive voice.

09:57 20       MR. CHAKRAVARTY:  Can we go to 8, please?

21   Q.   All right.  In this portion of the statement there's a

22   quote of somebody else who had been posting that the defendant

23   was responding to, and the other person says, "And another

24   point, if you agree with the killing of Paul Johnson, then your

25   argument comes back to you since the Ummah and many of the

1   Salafi scholars objected harshly towards it and it caused a lot

2   of trouble for the mujahideen, which resulted in the martyrdom

3   of Ameer Abu Haajar.  So if that's the case, your arguments

4   regarding what the Muslims generally think about the attacks

5   are of no use and should be left aside," to which the defendant

6   responds, "Actually, most of the Muslims I know had no problem

7   with his killing, they just disagreed with the manner in which

8   he was killed.  He was directly involved with the American

9   military by fixing their Apaches.  So the attack can clearly be

09:58 10   justified for those searching for the truth."

11       My question to you, Dr. March, and please listen

12   carefully --

13   A.   Yes.

14   Q.   -- is this confusing to you as to what the author intended

15   with regards to whether it was appropriate to kill Paul

16   Johnson?

17       MS. PATEL:  Objection, your Honor.  Asking about the

18   author's intent which was subject to --

19       THE COURT:  No.  Overruled.

09:59 20       You may answer it.

21       THE WITNESS:  What the statement below the block quote

22   says is, "Most of the Muslims I know had no problem with his

23   killing."

24   BY MR. CHAKRAVARTY:

25   Q.   I read the statement, sir.  I'm asking you whether it's

1   confusing, in your expert opinion, about deducing what the

2   author is thinking and saying.

3   A.    There is ambiguity, sure.

4   Q.    Okay.  Okay.  Thank you.  That answers --

5   A.    It could mean multiple things.

6   Q.    Well, that answers my question.  Thank you.

7         MR. CHAKRAVARTY:  We'll go to 419, please.  Could we

8   go to page 2?  I'm sorry.  Go back to page 1.

9   Q.    And this is the same Abu Sabaayaa that you were talking

09:59 10  about yesterday?

11  A.    Yes.

12  Q.    What does Abu Sabaayaa mean?

13  A.    So it depends.  I need to see it in Arabic.  If the first

14  letter is a sheen as opposed to a sud, I believe it would be

15  something related to the father of children, but somebody could

16  perhaps correct me.  I don't have a translator here.  I'm not

17  sure if that's accurate.

18  Q.    I'm not either.

19        MR. CHAKRAVARTY:  But could we go to page 2?

10:00 20  Q.    The defendant says, "If we are speaking about the American

21  military presence in the peninsula or any other hostile forces

22  or people, then I wholeheartedly agree with applying the above.

23  However what we saw with the two Riyadh attacks did not fall

24  under this categorization.  The intended targets and the

25  victims were never proven to have been involved in any hostile

1    acts against the Muslims.  As far as we know from all the

2    available reports, they were mostly Muslim migrants who were

3    working odd jobs, and it is highly unlikely that American

4    military forces would house their troops among these people,

5    unlike the case with the attack of '96 where U.S. Marines

6    military barracks were struck killing over a dozen Marines,

7    because the brothers struck a compound that housed, you guessed

8    it, Marines, not migrant workers.  There is a contrast between

9    these recent Riyadh attacks which did not cause the deaths of

10:01 10   any known American military personnel and, for example, the

11   killing of Paul Johnson, who was admittedly working on Apache

12   helicopter repairs."

13       Does this help clarify for you the defendant's position

14   with regards to feeling that it was appropriate to kill people

15   who were helping the American military?

16   A.   I'm a scholar of Islamic law; I'm not a scholar of

17   psychology.  I can explain this to you in terms of Islamic

18   legal doctrine, perhaps with some comparison to the Geneva

19   Conventions.  I can't talk to you about feelings.

10:01 20   Q.   Thank you.  So the answer is no, it doesn't help

21   crystalize that for you?

22   A.   It helps crystalize some of his views on Islamic legal

23   doctrine, not on his feelings.

24           MR. CHAKRAVARTY:  Okay.  Can we go to page 5, it looks

25   like?

1   Q.   And, again, this is a post by Abu Sabaayaa, and he's

2   responding to his friend Abu Dujana who says, "Some scholars

3   say this.  That's correct.  Others don't.  I refer you to

4   Shaykh 'Abdullah bin Naasir ar-Rasheed's awesome book 'Intiqaad

5   al-I'tiraad.'  From the necessities of this view, however, that

6   the apostate government can offer treaties of this sort is the

7   prohibition of killing Jews in occupied Palestine, prohibition

8   of killing soldiers in Iraq, prohibition of killing Russian

9   soldiers in Chechnya and so on because the governments of all

10:02  10   of those respective countries have offered treaties to those

11   countries and to their soldiers.  This is how I see it.

12   Correct me if I'm mistaken."

13        And so the defendant responds, "No, that would not

14   necessitate the prohibition of killing those whom you mentioned

15   because they are clearly making war on the Muslims of those

16   respective lands, and as I mentioned, this causes their pact to

17   be broken and null."

18        Did I read that correctly?

19   A.   Yes, sir.

10:02  20            MR. CHAKRAVARTY:  Thank you for your time, Doctor.

21            THE WITNESS:  Thank you.

22            MS. PATEL:  No redirect, your Honor.

23            THE COURT:  All right.  Thank you, Dr. March.  You may

24   step down.

25            (The witness is excused.)

```
 1              MR. CARNEY:  Your Honor, the defendant calls Gregory
 2     Johnsen.
 3                      GREGORY JOHNSEN, duly sworn
 4              THE CLERK:  Please be seated.
 5              State your name and spell your last name for the
 6     record, keep your voice up and speak into the mic so everyone
 7     can hear you.
 8              THE WITNESS:  Gregory Johnsen, last name spelled
 9     J-O-H-N-S-E-N.
10:03 10                      DIRECT EXAMINATION
11     BY MR. CARNEY:
12     Q.   Good morning, Mr. Johnsen.
13     A.   Good morning.
14     Q.   Could you tell the members of the jury where you were
15     born.
16     A.   I was born in Nebraska.
17     Q.   Where do you currently live?
18     A.   I live in Princeton, New Jersey.
19     Q.   And what kind of work do you do there?
10:04 20     A.   I'm currently a Ph.D. candidate in the Department of Near
21     Eastern Studies in Princeton University.
22     Q.   Could you give us a little bit about your educational
23     background beginning with your college?
24     A.   Certainly.  I graduated with a BA in history from Hastings
25     College.  While I was an undergrad I studied abroad at the
```

1    American University in Cairo in 2000.

2    Q.    Where is the American University in Cairo?

3    A.    At that point it was located downtown in -- very near to

4    Tahrir Square, which is where the center of protests that we've

5    seen in Egypt over the past year have taken place.  After I

6    graduated from college I joined the Peace Corps, and I was in

7    Jordan for 18 months, from -- in 2001 and 2002 until we were

8    evacuated.  After that I was --

9    Q.    Can you just tell us -- or remind us what the Peace Corps

10:04  10   is?

11   A.    Certainly.  It's a United States government program where

12   volunteers from the U.S. are sent abroad to a variety of

13   different countries in which to work with the individuals in

14   those countries to help them out.  It was a program started by

15   President Kennedy.  I, as I mentioned, served in Jordan, and

16   served as an English teacher there.

17   Q.    What did you do next?

18   A.    After I left the Peace Corps, after the close of service I

19   was a Fulbright Fellow in Yemen in 2003 and 2004.  After I

10:05  20   finished my Fulbright Fellowship there I studied and attained a

21   master's degree in Near Eastern Studies at the University of

22   Arizona.  And after that I applied to and was accepted to a

23   joint Ph.D. program in history and Middle Eastern studies at

24   NYU, and then I transferred after the first year, to follow my

25   advisor, to Princeton University.

1    Q.   Have you obtained a master's degree?

2    A.   I have, yes.

3    Q.   And in what subject?

4    A.   In Near Eastern Studies.

5    Q.   Can you tell us briefly what is meant by Near Eastern

6    Studies?

7    A.   Absolutely.  It's a department and a phrase that is fairly

8    synonymous with Middle Eastern Studies, and so often they're

9    used interchangeably.  It tends to refer to the countries in

10:06 10   North Africa:  Morocco, Libya, Tunisia, Algeria and Egypt, as

11   well as the countries we tend to think of in the Middle East,

12   so Jordan, Syria, Yemen, Saudi Arabia.  It also often involves

13   Iran, Turkey and Israel.

14   Q.   Did you have a special area of focus in your studies in

15   the master's degree as well as your Ph.D.?

16   A.   Yes.  I specialize and I focus on Yemen.  And

17   particularly, contemporary Yemen and al Qa'ida within Yemen.

18           MR. CARNEY:  Could we please call up Exhibit 749,

19   which is in evidence, your Honor.

10:06 20           THE COURT:  And the government's computer?

21           MR. CARNEY:  Yes, your Honor.  Thank you.

22           THE COURT:  I see what it is.  Thank you.

23   BY MR. CARNEY:

24   Q.   Now, this map has been displayed in the past.  Can you

25   just help us by referencing what's appearing on this map?

```
 1   A.   Certainly.  This is a picture, a map of the country of
 2   Yemen.
 3   Q.   And where, generally, is it located in the Arab Peninsula?
 4   A.   It's located on the southern tip of the Arabian Peninsula,
 5   so right south of Saudi Arabia, and it's across the Gulf of
 6   Aden from Somalia, and the Horn of Africa is quite close to it.
 7   Q.   And this country and al Qa'ida are your focus of your
 8   studying?
 9   A.   Yeah.  This is something that I've been working on since
10   before I was a Fulbright Fellow in 2003, that I've been
11   focusing on for nearly a decade now, yes.
12   Q.   What is required to get a Ph.D. at Princeton University?
13   A.   Right.  So basically what happens is that for your first
14   two years you take coursework, which at Princeton is something
15   where you tend to read a lot of Arabic text, you spend time
16   with the professors.  Princeton requires that you have a major
17   research language -- mine is Arabic -- and that you have
18   reading proficiency in one other European language as well as
19   one other Near Eastern language.  Mine are French and Persian.
20   Those are the exams that I took to pass out of the reading
21   requirements.
22       At the end of the two years, in addition to the language
23   exams that you take, you're also required to pass what is
24   commonly referred to as general exams.  So these are exams that
25   are administered by a professor in a particular field.  And so
```

I did three of these with three professors at Princeton
University, and I passed and have moved on to what's called the
dissertation stage.  And this is the time when an individual
will focus on one particular subject and work on writing his
dissertation, which is the stage I'm currently in.

Q.    Is there another name for the general exams?

A.    Oral exams are sometimes used, at least at Princeton.
"Generals" is sort of the student shorthand for the exam.

Q.    At other universities are they called "orals"?

A.    Yes, they are.

Q.    When you complete your dissertation, what happens to it?

A.    When I complete the dissertation I'll hand it off to the
committee that I've assembled and they will discuss it.  They
will meet, they will read it, and then assuming, hopefully,
that it passes, then I will have attained my Ph.D., my
doctorate.

Q.    And will you then be "Dr. Johnsen"?

A.    I will.  I'll make sure people call me that, yes.

        (Laughter.)

Q.    You'll have to wait awhile.

A.    Right.

Q.    You mentioned that you went on a Fulbright Fellowship.  Is
that the only fellowship you've received?

A.    No, it's not.

Q.    Let's begin with Fulbright.

1    A.    Sure.

2    Q.    Could you explain to us what a Fulbright Fellowship is?

3    A.    Absolutely.  It's a competitive fellowship that the United

4    States government gives to -- often to recent college graduates

5    to allow them to get a jumpstart on research.  And so what you

6    do is you put together a proposal, you sort of outline what it

7    is that you want to look at in a particular country.  Often,

8    you need to obtain letters of support from individuals or

9    institutions within that country, demonstrate some sort of

10:10 10  language proficiency, that when you get there, you'll be able

11   to do the research that you've indicated that you want to carry

12   out.

13   Q.    Where did the Fulbright Fellowship allow you to study?

14   A.    It allowed me to study at language schools within Sana'a,

15   which is the capital of Yemen, and it provided the financial

16   support for me to live and do research in Yemen for the 11

17   months that I was there.

18   Q.    What period of time were you in Yemen as a Fulbright

19   Fellowship --

10:11 20  A.    I was there in 2003-2004.  So I got there in the fall of

21   2003 and I stayed through August of 2004.

22   Q.    Did you receive an extension?

23   A.    I did receive an extension.  Usually, it ends about May or

24   June.  The initial grant is often for nine months.  I applied,

25   and was awarded, an extension to continue my work there for an

1   additional three months.

2   Q.    Have you received any other fellowships?

3   A.    Yes, I have.  So when I attended the University of

4   Arizona, both years there were funded by a U.S. government

5   program known as FLAS, which stands for "Foreign Language and

6   Area Studies."  This is also a competitive fellowship that the

7   university administers to students that it wants to attract.

8        In the summer of 2005 I received a fellowship from the

9   American Institute for Yemenese Studies which is the

10:11 10   organization that facilitates research for Americans working in

11   Yemen.  When I went to NYU I received what's called a McCracken

12   Fellowship which pays for the Ph.D.  When I went to Princeton,

13   I received the same offer, which basically pays for your -- all

14   of your coursework, all the dues is paid, and then you receive

15   a fellowship, a stipend on top of that, which allows you to

16   live.

17        I just -- as in August of this year, I returned from Cairo

18   where I had what's known as a Fulbright-Hays Fellowship, which

19   is similar to the Fulbright but it's a more advanced

10:12 20   fellowship.

21   Q.    When you were studying pursuant to the Foreign Language

22   and Area Studies, was there a particular focus in terms of

23   language?

24   A.    Yes.  My Foreign Language and Area Studies Fellowship was

25   for the study of Arabic.

1    Q.    And where did you live when you were having this

2    fellowship?

3    A.    So there are Foreign Language and Area Studies grants that

4    allow you to study Arabic in the United States, and there's

5    also summer grants that allow you to study -- to study abroad.

6    When I had the two academic-year fellowships, because I was

7    obviously enrolled at the University of Arizona, I was living

8    in Tucson, Arizona, studying Arabic.

9    Q.    In the summer of 2005 --

10:13 10   A.    Right.

11   Q.    -- where did you study?

12   A.    In the summer of 2005 I had the fellowship from the

13   American Institute for Yemenese Studies and I was in Sana'a

14   University continuing research that I had done in 2003-2004, as

15   well as studying Arabic there.

16   Q.    Have you written for any encyclopedias?

17   A.    Yes, I have.

18   Q.    Can you tell us how that comes about?

19   A.    Right.  So what happens, basically, in that situation is

10:13 20   that an editor of the encyclopedia, what they do is they

21   identify experts within a particular field and then they send

22   out invitations and they say, "We would like you to write on a

23   particular topic."  And so I've written on topics pertaining to

24   Yemen.  And so they solicit opinions and they then send out the

25   invitations, which is basically the process.

1    Q.    How many different encyclopedias have you been asked to

2    write for?

3    A.    I've been asked to write for a number.   Unfortunately,

4    because, given my focus on Yemen, there's often more work than

5    there is time to do it, I believe I've accepted two different

6    encyclopedia entries.

7    Q.    Do you recall the names of those?

8    A.    Yes.   One was on an individual Shaykh Abd al-Majid

9    al-Zindani, who is a cleric in Yemen who is currently still

10:14 10   alive; the second is on the City of Sana'a, so sort of an

11   encyclopedia entry on the history of that city.

12   Q.    Are you in the process of writing a book?

13   A.    I am in the process of writing one book and working on the

14   dissertation, yes.

15   Q.    Is it the great American novel or something in your field?

16   A.    No.   I wish it was the great American novel.   It's a book

17   on al Qa'ida in Yemen.   So it traces the history of the

18   organization in Yemen, as well as up to the present day what's

19   happening.

10:14 20   Q.    When do you expect to complete the book?

21   A.    The book will be submitted to the editor in the next week,

22   and it should be published -- it's scheduled for publication in

23   September of 2012.

24   Q.    Do you have any teaching experience in your field?

25   A.    I do.   I've been what, at least at Princeton University,

is known as a preceptor.  And so these are individuals that in

other places they're sort of known as teaching assistants.  And

at Princeton how it works is that there are two -- there's

three meetings for the course every week.  The professor runs

two, often in a lecture style; and in the third meeting of the

week, then a preceptor will lead the class discussion.  So I've

done that at two different courses at Princeton.  I've also

taught and lectured at what's known as the CIA University.

Q.   What is that?

A.   This is something that the CIA runs for some of its new

agents, new trainees, individuals.  I don't often know where

the people in the course are coming from, but they are all

working for the U.S. government.  And they -- once again,

similar to the encyclopedia, they solicit outside experts to

come in and talk about a particular expert.  So when I lecture

there and when I teach there I do so on al Qa'ida in Yemen.

Q.   And what does "CIA" stand for?

A.   CIA stands for Central Intelligence Agency.

Q.   And is that the primary intelligence agency of the United

States?

A.   I believe it is.  It's also one of many intelligence

agencies in the U.S.

Q.   Where is it located?

A.   It's located in Langley, Virginia, to the best of my

knowledge.

1    Q.   Have you served as a consultant to any government

2    agencies?

3    A.   Yes.  I've served as a consultant and advised numerous

4    different governmental and non-governmental agencies both in

5    the United States, as well as the Foreign and Commonwealth

6    Office in the U.K.; the Secret Intelligence Service in Canada.

7    In the U.S. I often talked to the State Department, to the FBI,

8    National Intelligence Council and so forth.  For instance, when

9    the current U.S. ambassador, prior to him taking up his post,

10:17 10   the State Department asked --

11   Q.   The ambassador to whom?

12   A.   That's Ambassador Gerald Feierstein.

13   Q.   Ambassador to whom?

14   A.   To Yemen.

15        And so prior to him leaving the U.S. to take up his post

16   to be ambassador to Yemen, the State Department asked several

17   outside experts to come in and brief him.  And, for instance, I

18   was the one tasked with briefing him on al Qa'ida in Yemen.

19        Often, congressional or senate staff will get in touch

10:17 20   with me prior to a senator or a congressman taking a trip to

21   Yemen.  They'll ask for my advice.  They'll ask who they should

22   meet for [sic], ask for me to give them a rundown on what's

23   taking place in the country.

24   Q.   Have you advised the Federal Bureau of Investigation, the

25   FBI?

A.    Yes.  Both informal and in formal settings in both Yemen
and in the United States, agents have taken me out to dinner,
solicited my opinion.  There have been numerous phone calls,
numerous emails asking for what it is that I think about a
particular topic, things of that nature, yes.

Q.    And have you consulted to the United States State
Department?

A.    Yes, I have, on numerous occasions.  And, again, in both
what I would describe as formal and informal settings.

Q.    What is the National Counterterrorism Center?

A.    This is an organization that was set up in the wake of
September 11th really to attempt to break down some of the
barriers between the FBI and the CIA and other intelligence
agencies, sort of as a clearinghouse, at least as I understand
it and as it's been explained to me.

Q.    Have you consulted with that agency?

A.    Yes, I have.  So they often run retreat conferences, and
they've asked me to speak on al Qa'ida in Yemen a number of
different times.  They've had me down to their headquarters to
lecture and to talk and give my opinions and advice about where
I see al Qa'ida in Yemen developing, the history of the
organization and so forth.

Q.    Have you addressed the United States Department of
Defense; specifically, the undersecretary of defense for
strategy?

1    A.    Yes, I have.  We've had -- there are often, for example,

2    again, outside experts that are brought in to discuss

3    particular topics.  They often try to get a wide range

4    so -- with the U.S. Department of Defense, as you're referring

5    to, I was brought in, again, for my knowledge and expertise on

6    al Qa'ida in Yemen.

7    Q.    What is the National Intelligence Council?

8    A.    This is, again, another organization that, obviously,

9    works on intelligence.  And they, like many of the other

10:19 10    organizations, have asked me to come in and to speak about

11    al Qa'ida in Yemen, the history of the organization and Yemeni

12    politics, generally.

13    Q.    What is the U.S. Special Forces Command?

14    A.    This is a command center that's located in Tampa, Florida,

15    very close to what's known as CENTCOM.  The U.S. Military, at

16    least as I understand it, divides the globe into particular

17    regions.  CENTCOM handles what's often referred to as the

18    Middle East, and the Joint Special Operations Command is next

19    to them.  So they've had me down to Tampa, again, to talk about

10:20 20    al Qa'ida in Yemen, talk about some of the ways that I see

21    fissures within the organizations that the U.S. could use to

22    potentially disrupt and defeat the organization.

23    Q.    Are there other circumstances where you have made

24    presentations in your area of expertise?

25    A.    Yeah.  I'm often brought in, as I said, for a variety of

1     governmental and non-governmental organizations.  There are

2     often roundtables where -- for instance, there are basically

3     two type of roundtables that I participate in:  one is sort of

4     Yemen-specific where they'll bring in five or six different

5     Yemen experts.  I'm often tasked -- in fact, I'm always tasked

6     with al Qa'ida in Yemen on those roundtables.

7          And then there are the sort of broader roundtables that

8     governmental organizations will convene.  And these are -- say

9     you have an expert on al Qa'ida in Iraq or you have somebody on

10:21 10   al Qa'ida in Saudi Arabia or bin Laden or Ayman al-Zawahiri.

11    And in those settings, then I'm tasked with, again, talking

12    about al Qa'ida in Yemen.

13    Q.   Have you ever testified in Court for a federal prosecutor?

14    A.   I have not, no.

15    Q.   Have you ever testified previously in court for a defense

16    counsel?

17    A.   I have not, no.

18    Q.   Have you ever testified in court ever?

19    A.   No.

10:21 20   Q.   Have you ever testified before Congress?

21    A.   Yes, I have.

22    Q.   Tell us a circumstance.

23    A.   Certainly.  So after what's been known as the Underwear

24    Bomber who attempted to down a plane on Christmas Day 2009,

25    this is really the moment where Yemen sort of burst into the

national consciousness here in the United States.  The Senate

Committee on Foreign Relations convened a hearing on Yemen on

January 20, 2010, and I was asked to prepare a written

testimony as well as to answer questions from the senators

present there.

Q.   Mr. Johnsen, do you speak any other languages besides

English?

A.   Yes.  I work in Arabic and I have a reading proficiency,

as I mentioned, in Persian and in French.

Q.   Is Arabic viewed as a language that has different dialects

or different focuses?

A.   Absolutely.  It has a wide variety of dialects, so much so

that, you know, people in Morocco can have trouble

understanding people in Yemen and vice-versa.  And even within

Yemen there's a great variety of dialects, particularly in the

spoken language, and it becomes something where there are often

amusing situations when one individual will misinterpret or

misunderstand someone else even though they carry, again, in

Yemen, the same citizenship.

Q.   Do you have two proficiencies in Arabic?

A.   Yes.  So in the written language, modern standard Arabic

as it's often referred to, yes.  So that's the language that --

the text that I often deal with, newspaper articles and so

forth, are written in.  And then the interviews that I conduct

in Yemen are done in the colloquial dialect.  That's often

known as San'ani, which is the adjective from the capital of

Yemen, Sana'a, where I spent the most amount of my time.

Q.   Is that often called "Yemeni"?

A.   Yeah, it's -- it's -- in shorthand it's often referred to

as "Yemeni" because it's the dialect of Yemen that is most

commonly spoken and that most people understand.

Q.   How important is it to your study of Yemen that you speak

Arabic in your opinion?

A.   In my opinion it's essential.  I like to think of what I'm

doing as sort of putting together a puzzle.  And so you have to

take different pieces from different things in order to

construct something that makes sense.  And if you're only using

English, or if you're only using French or one of these other

languages, then you really don't have the opportunity to see

everything else that's coming in.  And the puzzle -- you're

trying to make sense of reality.

     So the business that I'm in, what it is that I study, I

try to look at what's happening in Yemen and make sense of it

so we all sort of have a better understanding of what's

happening, why that's happening, and how it is that the U.S.

can do a better job of interacting with Yemen, defeating

al Qa'ida and so forth.

     So if you're only using a few puzzle pieces, or only the

puzzle pieces in English, then the picture that you're

presenting to people is -- really doesn't bear that close a

1     resemblance to reality.

2          So it's absolutely essential, in my opinion.  And

3     Princeton University wouldn't allow me to go on to write a

4     dissertation if I hadn't passed the language exams.

5     Q.    Can translators be an adequate substitute for speaking and

6     writing and reading Arabic?

7     A.    In my opinion, at least in the work that I do, no.

8     Translators can only, obviously, translate so much.  Some of

9     them come from different backgrounds and there's often -- you

10:25 10     often have to sort of read between the lines.  I sort of talk

11     about it as putting on a Yemeni decoder ring.  And so often

12     it's not just knowledge of the language that's important, it's

13     the context in which those words are being spoken.  And so you

14     have to know who's talking to whom, what it is that they're

15     referring to.

16          And at the same time, if you walk around -- say, someone

17     who looks like myself who obviously stands out in Yemen and you

18     need a translator to go along with you and to talk to different

19     people, that sends a particular sort of message to the people

10:25 20     that you're talking to as opposed to someone who's able to

21     confer with them and discuss with them in the language in which

22     they speak.

23     Q.    There's been testimony in this trial that an alleged

24     expert uses Google translation.  Are you familiar with that?

25     A.    I'm familiar with Google Translate.  I've never used it.

                1          MR. GROHARING:  Objection.  This is beyond the notice

                2    that the defense provided and there was no notice that the

                3    expert would be providing any opinions on Google Translate or

                4    any other software.

                5          MR. CARNEY:  I'm just asking if he's familiar with it

                6    and what it is and whether it can serve as a substitute.

                7          THE COURT:  You may have it.

                8    BY MR. CARNEY:

                9    Q.   Are you familiar with what Google Translate is?

    10:26 10    A.   Yes, I am.

               11    Q.   What is it, please?

               12    A.   It's -- as I understand it, it's a computer program that

               13    if you have an Arabic text, for instance, you can have the

               14    Google Translate translate that text.  Most scholars and most

               15    analysts that I know are very distrustful of Google Translate

               16    because it's a computer program.  It doesn't have a lot -- it

               17    doesn't have the flexibility that the human mind has.  And so

               18    it will often translate words that it thinks -- it will

               19    translate names as sort of nouns or as words as opposed to the

    10:27 20    names that they are.

               21          And the translation that's done -- I've seen the product,

               22    although I haven't used it -- and it's not one that

               23    academics -- academics that I know, academics at Princeton nor

               24    myself, would be comfortable using.

               25    Q.   How many times have you been to Yemen?

1    A.   I've been to Yemen on four separate occasions.

2    Q.   When was the first time you've been there?

3    A.   The first time was 2003-2004 as a Fulbright Fellow; after

4    that in the summer of 2005 as a fellow for the American

5    Institute for Yemenese Studies; following in the summer of 2006

6    when I was the program coordinator chaperone for a State

7    Department program, "Critical Languages"; and then the final

8    time, the last time that I've been to Yemen, was in the summer

9    of 2009.

10:27 10    Q.   How long did you stay on each of these four visits?

11    A.   So on the first visit I was there for roughly 11 months.

12    I think 11 months and a couple of weeks.  The second time I was

13    there for the entire summer, which was May to August, the end

14    of May to the beginning-middle part of August.  It was the same

15    in 2006.  It was the entire summer.  And then in 2009 I was

16    there for five, six weeks.

17    Q.   How important do you believe it is for your study of Yemen

18    that you actually go to the country?

19    A.   Again, this is something that's incredibly important.

10:28 20    There's no substitute for it.  I mean, what we have is -- if

21    you look at Yemen from the United States, it looks very black

22    and white.  But it's almost sort of like looking at an icecap,

23    right?  Like you can see the first little bit that's above the

24    water but you can't see the 90 percent.  And I think that's --

25    that's underneath the water.

1       And I think that's the great thing about going to Yemen is

2    it's almost like putting on sort of scuba gear and going down

3    and examining everything that you couldn't see from the United

4    States.  I mean, things look a particular way from several

5    thousand miles away, and when you get down on the ground you

6    can see the nuances there.

7       And so, again, my work I don't think would be respected --

8    it wouldn't be cited, I wouldn't be asked to do and speak to

9    some of the groups to whom I speak, if I wasn't -- if I didn't

10:29 10   have that experience on the ground.  That experience on the

11   ground is what allows me to form opinions that people rely on.

12   Q.   When you go to Yemen for a several-month period, what type

13   of housing do you live in?

14   A.   It depends.  So I've stayed in the American Institute for

15   Yemenese Studies, in the hostel there, which is sort of an old

16   Yemeni house.  In Yemen they have these tower houses that are

17   made out of these mud bricks that have beautiful alabaster

18   windows.  So I've stayed there.  I stayed -- when I was the

19   coordinator chaperone for the State Department program I stayed

10:29 20   with the students in the language center.

21      I've also rented a private residence that I used for most

22   of the time when I was a Fulbright Fellow, and that's -- which

23   was right in downtown Sana'a on 26th of September, which is

24   near the Yemen parliament building.  So there's been a wide

25   range of places.  I've also stayed with different friends in

1    less -- in houses that often have no electricity, or no running

2    water, things of that nature.

3    Q.   Can you give the jurors a range of the people that you

4    would interact with when you're living in Yemen?

5    A.   Absolutely.  So I've talked with people at the highest

6    levels of government down to sort of day laborers.  So I've had

7    interviews with people like the Yemeni foreign minister,

8    individuals within the Yemeni military, many of the Yemeni

9    tribes I speak to; I have good friends who are Yemeni

10:30 10   journalists.  And most of the friends that I spend the vast

11   majority of my time with are sort of the day laborers, the

12   individuals who by western standards wouldn't be considered

13   very well educated but I found them to be, you know, incredibly

14   wise and very good friends, as well as guides to the country,

15   because these are the people who are living there.  They know

16   what's happening on the ground.

17       And so both in a personal -- from a personal point of view

18   because they're my friends, obviously, as well as from a

19   professional point of view, talking to a wide range of

10:31 20   individuals and from all different segments of society has,

21   once again, been something that has allowed me to just sort of

22   triangulate what it is I'm thinking and saying, because you

23   can't take just sort of one piece and then magnify it and hope

24   to present the reality of Yemen; I think you have to talk to

25   different people, and so that's what I have attempted to do.

1   And Yemen's just -- I mean, quite frankly, Yemen is a great

2   place to do that.

3   Q.   So you find value in speaking to people who might not have

4   an advanced education but have a lot of experience and judgment

5   and wisdom?

6   A.   Absolutely.  These are the people who do the vast majority

7   of the living and dying there in Yemen.  And they're the people

8   who it's, you know, most helpful to talk to.  And they're also

9   the people I found to be some of my closest friends several

10:32 10   years on, yes.

11   Q.   In addition to the military, have you interviewed or

12   interacted with people who are former fighters?

13   A.   Yes.  I've spoken with people who fought in Afghanistan

14   back in the 1980s, people who had been former members of

15   al Qa'ida and so forth, yes.

16   Q.   How important is it to the study of Yemen and,

17   particularly, what's going on there with al Qa'ida, to make

18   this range of connections to people who are in Yemen and whom

19   you can speak to when you're in Yemen in their language?

10:32 20   A.   It's -- I mean, it's critical.  Again, there's just no

21   substitute for this.  You can't -- in my opinion it would be

22   irresponsible to claim to be able to speak about Yemen without

23   going there, without talking with some of the people, without

24   having a very good understanding of what's going on.  And it's

25   something that not only within Yemen, but outside of Yemen,

1  people would not respect.

2      And so one of the things that I'm proudest of, or that at

3  least if you'll permit me a little bit of vanity, when -- is

4  when Yemenis --

5  Q.   It won't be the first time in this trial.

6          (Laughter.)

7  A.   -- is when Yemenis ask my opinion about what's happening

8  in the country, or when a Yemeni newspaper asks to interview me

9  about my research in Arabic or so forth, and that, I think, at

10:33 10  least for me as an academic who studies the country, tells me

11  that I'm sort of on the right track.  Yes, I don't understand

12  everything about this country, but the Yemenis themselves are

13  willing to have a discussion with me about what's happening

14  about contemporary politics, about al Qa'ida.  And all of that

15  has been -- that back-and-forth has been just incredible.

16      And there's no way to do that -- given sort of internet

17  penetration into Yemen, the spotty cell phone service and so

18  forth, there's no way to do that from, say, Princeton, New

19  Jersey, to Sana'a, Yemen.  You actually have to be on the

10:34 20  ground there to make these relationships.  And these are -- I

21  mean, these are individuals; they're people.  And so you need

22  to have a personal relationship with these individuals.  You

23  need to develop this over time, which at least for me, is why

24  it's so, I think, important that I've been to Yemen several

25  times.  Because I've been able to develop personal

```
 1  relationships with these individuals.
 2       And there's a level of trust that goes along with that.
 3  They've seen the things that I write.  They know what it is
 4  that I do.  And so I think they're willing to open up to me in
 5  a way that they weren't willing to open up with me, say, the
 6  first time that I met them or the first time that I sat down
 7  with them.  And getting people's true feelings and their deeper
 8  feelings, again, in the work that I do, I mean, there's
 9  just -- you either have that or you sort of guess at it.  And
10  if you guess at it, you can get into all sorts of mistaken
11  assumptions.
12  Q.   How far is Princeton from Manhattan?
13  A.   It's -- well, I only know on the train.  It's about an
14  hour and ten minutes on the train.
15  Q.   What reading material have you focused on since the year
16  2000 to keep up to date with events in Yemen?
17  A.   Sure.  There's been a variety of books, academic books,
18  that have been published on Yemen, a few more popular books,
19  Edmund Hull, the former ambassador to Yemen who was there right
20  after 2001-2003, has a new memoir out.  There's a variety of
21  newspaper articles that I keep up with sort of in the English
22  language.  But the vast majority of material that I rely on,
23  and this is why I sort of -- I guess this gives you a peek into
24  my daily life.
25       When I wake up, and with my coffee in the morning, usually
```

1  what I'll do is go on the internet and read through a variety

2  of the Yemeni newspapers in Arabic.  So that is something that,

3  again, for someone like myself who spends all of their time

4  thinking and working on Yemen, that's something that I just

5  have to do.  It's one of the things that you have to keep up

6  with.  And so I read -- I go through those Yemeni newspapers.

7  And I will often spend -- because I spend a lot of time on

8  al Qa'ida in Yemen, I'll also often go to some of the chat

9  forums, the Islamic forums, to see if al Qa'ida in Yemen has

10:36 10  released a new video, for instance, which yesterday they just

11  released a new video.

12  Q.   Mr. Johnsen, I'd like you to focus on the period of 1990

13  to 2001.  I know you could probably speak until one o'clock on

14  the subject of what was Yemen like during this period, but I'd

15  like you to take no more than four minutes to give the jury an

16  overview.  And I'll be watching the clock.

17  A.   Yeah, this will be tough.  Yeah.

18       (Laughter.)

19  Q.   I know.  Four minutes to talk -- to give them the best

10:37 20  overview of the country of Yemen you can, beginning now.

21  A.   Now?  Wow.  Okay.  I'll try.  Yemen is an incredibly

22  diverse place, both geographically and as far as the people go.

23  It's very, very poor.  And many of the roads still aren't

24  paved.  When you get outside of Sana'a it feels like you're

25  going back in time.  It's just incredible what you see.

1       You see a lot of guns.  People are always carrying guns.

2  Poverty is very, very apparent there.  Many times the water

3  pipes don't work.  Electricity is nonexistent in many places,

4  and the places where it does work, people often have to do

5  without.

6       On the political front, in 1990 North Yemen and South

7  Yemen unified.  And this was a former socialist country and a

8  very tribal country.  That unification did not go very well.

9  In 1994 there was a civil war.  The state threatened to break

10:38 10  apart.  The north was victorious and -- how am I doing, okay?

11  Okay -- and unity was preserved.

12       We all know that there was the USS Cole attack, an

13  al Qa'ida attack, in 2000, and then the September 11th attacks

14  in 2001.  I think I did three minutes.

15  Q.   Could you describe typical clothing worn?

16  A.   Right.  So it differs depending on where you are in the

17  country.  But the traditional dress is sort of a long robe with

18  a jacket thrown over this.  And often -- they're jackets sort

19  of like the one I'm wearing now, and they can be in a wide

10:38 20  variety of styles, from things like this to houndstooth.  Lots

21  of people wear camouflage jackets thrown over their robes.

22  There are places where they wear what's known as a futah, which

23  is sort of this towel that's wrapped around, almost like a

24  skirt, that you see a lot of different Yemenis wearing.

25       In the north, one of the things that you notice that's

```
 1   very distinctive is they'll have this large curved dagger known
 2   as a jambiya that's stuck in their belt, and you have a very,
 3   very wide belt.  And this is something --
 4   Q.   Kind of like Raiders of the Lost Ark?
 5   A.   Oh, a little bit, yeah.
 6        And so there's that dagger, and then you also have -- and
 7   that sort of differentiates, in most cases, northern tribesmen
 8   from southerners, but one of the things that's almost a
 9   constant across the country is how many people carry guns, own
10   guns.  Gun ownership is just sort of a way of life which
11   also -- the first time I got there -- really jumped out to me.
12   I was like, wow, you know, even from Nebraska, I mean, still
13   having this many guns, and how many of my friends own multiple
14   guns, was a bit shocking to me.
15   Q.   What type of guns will people just walk around with?
16   A.   You'll often see people walking around with AK-47s, with
17   different machine guns.  There's a great quote from 2002 when a
18   former prime minister Abdul Karim al-Eryani, who's an
19   individual I know personally, he actually -- he did his Ph.D.
20   at Yale back in the '60s, went back to Yemen.  He's one of sort
21   of the old wise men of Yemeni politics.  And he talks about the
22   difference in weaponry between what the government has and what
23   the -- and what Yemenis have.
24        And so he -- the quote was, and I'm paraphrasing, you
25   know, What do you have as a tribal shaykh?  You know, you have
```

1   a lot of machine guns, you might have some RPGs, maybe you have

2   a tank in your front yard.  But the government we have -- we

3   have planes.

4       And I think this really gets at what Yemen is like.  You

5   know, you do have places -- I mean, the government has

6   attempted to get some of the tribal shaykhs to turn in things

7   like the tanks in their front yard, and when I was there in

8   2004 I believe a shaykh actually did turn his back in.  But

9   it's a place where the amount and the type of weapons is, for

10:41 10   an American like myself -- and I've been in Cairo and I've been

11   in Jordan, but it's so much different in Yemen.  It's quite

12   astounding.

13  Q.   I'd like to focus on the period exclusively from 1990

14  until 9/11 --

15  A.   Okay.

16  Q.   -- in 2001.

17       Did al Qa'ida have a presence in Yemen during this time?

18  A.   Yes.  So in 1990 Osama bin Laden was in Saudi Arabia.  And

19  he worked with Yemenis to set up training camps across the

10:41 20   country, in the north and so forth.  What he wanted to do is

21  what they did in Afghanistan.  In Afghanistan, the Arab

22  fighters were really focused on defeating the Soviet Union, and

23  bin Laden saw the socialists in South Yemen as the same thing.

24       So al Qa'ida set up some camps, some networks.  These

25  were -- I mean, there wasn't a great structure because this was

1    just in the beginning phases of al Qa'ida.  Bin Laden wasn't

2    present in Yemen; he was in Saudi and then in Sudan.  But there

3    certainly was an active presence.

4         And the first al Qa'ida attack took place in Aden.  It's

5    the southern port city of Yemen.  So way in the south in 1992.

6    After the civil war in '94 there were some al Qa'ida fighters

7    that helped the president, President Ali Abdullah Salih,

8    preserve union, not because they necessarily agreed with him

9    but because the President Abdullah Salih and al Qa'ida and

10:42 10   other Islamists all had the same enemy, and that was the

11   socialists.  So you saw this sort of wide alliance of forces

12   fighting them.

13        After that, once Salih had won, he needed their services a

14   little bit less, and so there was not really a falling-out, but

15   sort of a tacit nonaggression pact for a while.  There was the

16   USS Cole attack, as we mentioned, in 2000, and then September

17   11th which really sort of changed things in Yemen, obviously,

18   as it changed things around the world.

19   Q.   The president of Yemen in 1990 was Salih?

10:43 20   A.   Yes.

21   Q.   Can you spell his name for me?

22        MR. CARNEY:  And, your Honor, may I use the ELMO,

23   please?

24   Q.   Could you spell it for me, please?  Just the last name?

25   A.   Just the last name?  The last name, Salih, is spelled

1    S-A-L-I-H.  You'll often see it spelled with an E instead of an

2    I.  Individuals like myself, academics, there's a particular

3    way to transliterate Arabic, so we represent it with an I.

4    Q.   Is it spelled correctly there?

5    A.   Yes, it is.

6    Q.   Okay.  How long was President Salih in office as president

7    of Yemen?

8    A.   So President Salih first came to office in North Yemen,

9    before unification, in 1978.  And so he has been president from

10:44 10   1978 up to unification.  And then when unification happened, he

11   remained president, head of technically what was the

12   presidential council, through the civil war, through September

13   11th.  And, in fact, he just technically signed an agreement a

14   few weeks ago that said that he would step down.  So he's been

15   president from 1978 to 2011.  It remains to be seen whether

16   he's actually gone or not.

17   Q.   How would you describe the relationship between al Qa'ida

18   and the president of Yemen up until 2001?

19   A.   Right.  This -- how I've described it and how I would

10:44 20   continue to describe it is really sort of a tacit nonaggression

21   pact.  Yemen is a fairly wild place; the central government

22   doesn't have complete control over some of the areas.

23   Al Qa'ida was one group that was operating there.  Yemen had

24   allowed many of these fighters to come back after Afghanistan,

25   not because it necessarily liked the fighters, but because the

1    enemy of its enemy was its friend, and so since Salih was

2    opposed to the socialists, al Qa'ida was opposed to the

3    socialists, then Ali Abdullah Salih was able to manipulate and

4    use Islamist fighters against the socialists.

5    Q.   Did President Salih prior to 9/11/2001 permit al Qa'ida to

6    have training camps in Yemen?

7    A.   "Permit" is -- I mean, he didn't crack down on the

8    training camps.  But as president of Yemen, he only had sort of

9    so much political capital.  And to use it on something like

10:45 10   al Qa'ida as opposed to the tribes which are really the support

11   base that the president is relying on would have, at least at

12   that time, and up to about the Cole -- and there were still

13   some issues I think between the Cole and then between September

14   11th -- yeah, the president sort of -- I mean, he just ignored

15   them, used them when he could.  But it wasn't a major focus.

16   It wasn't something that he spent a lot of his time thinking

17   about.

18   Q.   Did things change in Yemen between President Salih and

19   al Qa'ida after 9/11?

10:46 20   A.   Yeah, absolutely.  A little bit of background might be

21   helpful, if I'm permitted.  Just a little bit.

22        So in 1990 Yemen was on the U.N. Security Council.  They

23   voted against the authorization of the use of force in Iraq.

24   And that hurt Yemen very, very badly.  About a million workers

25   were expelled from Saudi Arabia, the Yemeni rial, the currency

there, just collapsed overnight.  And so Yemen's economy really

took a beating.

     And so when September 11th happened, President Salih was

very much aware of the last time that he had crossed the United

States.  And so he really, really wanted to make sure that

Yemen was on the right side of this war.  Essentially, what

then-President Bush had said, "You're either with us or against

us."  And President Salih worked in a variety of different ways

to make sure that President Bush and the U.S. knew that Salih

was with him.  That was really -- as former ambassadors to

Yemen have said, that moment was the game changer for President

Salih.

Q.   Did President Salih travel to the United States in 2001?

A.   Yes, he did.  So he had his --

Q.   What month was that?

A.   That was in November of 2001.

Q.   Of course, two months after the attack?

A.   Right.  That was the earliest that he could get a meeting.

He'd had a number of different people working on trying to get

him a meeting as soon as possible.

Q.   Did he meet with President Bush?

A.   Yes, he did.

Q.   After that meeting with President Bush, did President

Salih announce a commitment that he would make regarding Yemen

and al Qa'ida?

A.   Absolutely.  He was very clear that his intentions were to eradicate the organization within Yemen.  He knew that if he didn't do it, the United States was going to do it.  So he was absolutely clear on that point.

Q.   Was President Salih given specific information by U.S. intelligence?

A.   Yeah.  He was given the names of leaders within the organization there in Yemen to go after.

Q.   What actions were taken by President Salih after his meeting with President Bush?

A.   Right.  So very shortly after he got back to Yemen, one of the first things that the president did was order a series of raids across the country, one out in Ma'rib, which is in the center part of the country; some others in Shabwa and Abyan, which are in the south, but very mountainous, very difficult terrain.  And these were to go after exactly the leaders that the U.S. had told him were active within al Qa'ida in Yemen.

Q.   Were any arrests made?

A.   No.  These -- the raids did not go well.  So in Shabwa, the target -- the leader of al Qa'ida in Yemen wasn't home when they showed up.  In Ma'rib, in the Village of al-Husn, the two individuals that Yemen was after, there was a fight between the tribesmen who were giving them refuge and the Yemeni military, and in the midst of the fight the two al Qa'ida suspects sort of escaped out the back.

1    Q.    Did President Salih then authorize his government to

2    cooperate with American drone strikes?

3    A.    Yeah.  What we saw was --

4    Q.    Can you first tell us what is meant by a "drone strike"?

5    A.    Right.  A drone is often also referred to as an unmanned

6    aerial vehicle.  So some sort of vehicle that can fly in the

7    sky.  Many times they're weaponized.  They have missiles that

8    can be remote-controlled to carry out a strike.

9          President Salih -- after the failure of the December raids

10:50 10   there was increased cooperation with the U.S. that eventually

11   led up, in November of 2002, to a U.S. drone strike that killed

12   the leader of al Qa'ida, a man named Abu Ali al-Harithi.

13   Q.    What was the impact on al Qa'ida in Yemen by President

14   Salih in November 2001 beginning with the steps of raids,

15   attempted arrests and cooperating with drone strikes?

16   A.    Right.  So it put al Qa'ida and Yemen in a position they'd

17   never been in before.  So up until September 2001, this is an

18   organization that had been able to move around the country very

19   freely.  They didn't really have to worry about their personal

10:50 20   safety.  There had been some -- a series of arrests after the

21   USS Cole.  But September 11th was really the moment that that

22   all changed, and they went from an organization that had a

23   refuge, or what one ambassador has termed as a warehousing

24   factory in Yemen, a place they could always go and stay, to a

25   place where they were constantly harassed and on the run.

Q.   Mr. Johnsen, based on your study, your experience, your
presence in Yemen and all of these factors that you've related
to us up to now, is there any evidence that you know of that
any training camps were being operated by al Qa'ida after 2001
and until 2006?

A.   No, there's not.

Q.   Were other al Qa'ida people, in addition to the person
you've mentioned, killed by drone attacks or captured?

A.   Yes.  So along with the head of al Qa'ida in Yemen who was
killed in that November 2002 strike, there were other
individuals in the car who were killed with him as well; there
were other al Qa'ida fighters who were killed in Yemeni
government raids; the Yemeni government was able to arrest a
number of the leaders of al Qa'ida.  There was just a massive
campaign throughout Yemen where a number of people ended up
either killed or imprisoned.

Q.   Was al Qa'ida totally eliminated in Yemen?

A.   So the November 2002 strike really broke the back of
al Qa'ida.  They had been on the run up to that point.  That
was the strike -- it was a decapitation strike.  It killed
their leader and they didn't know what to do after that.  They
had been struggling to reorganize even when he was in charge.
And now with him dead, the organization really just crumbled.

Q.   Was there a particular prison in Yemen where al Qa'ida
members who were arrested were kept?

A.   Yes.  I mean, there were several prisons.  There was one
major one in Sana'a.  It's known as the Political Security
Organization Prison.  It's on the outskirts of Sana'a.  It's
almost -- I have described it before, think of like a Star
Trek-like battleship, and it has that sort of long, cylindrical
center and then a couple of angled wings that spread out from
it.  And this is one of the major prisons in Sana'a where some
Al Qa'ida prisoners were kept.

Q.   In February of 2006 did something happen in regard to that
prison?

A.   Yeah.  In February of 2006 there was a prison break in
which 23 al Qa'ida suspects tunneled out of their cell.  And
what happened was that Yemen had continued to arrest a lot of
people and so there was prison overcrowding.  So these people
had been moved from that main wing that I talked about, that
sort of Star Trek battleship, all the way over to the edge, to
the wall, into sort of a temporary prison.

     And they were able to tunnel out of there into a
neighboring mosque where they said their morning prayers and
then walked out the front door to freedom.  And this is the
moment where al Qa'ida in Yemen really returned.  This is sort
of their up from the ashes; their resurrecting themselves was
this moment in February of 2006.

Q.   Was there an identified leader of al Qa'ida within the
prison?

A.    Yes, there was.  One of the major leaders was an
individual named Nasir al-Wuhayshi.

Q.    And who was he?

A.    He was an individual who had been Osama bin Laden's
secretary from 1998 all the way up through the Battle of Tora
Bora in 2001.  And this is a guy that we know from stuff in the
narrative press, from people that were there in Afghanistan who
have since talked about it.  He was always next to bin Laden.
So I tend to think of this as almost a master apprentice sort
of relationship.

     So after Tora Bora, Wuhayshi went to Iran, was arrested,
extradited back to Yemen.  And in prison he sort of rebuilt the
network that had collapsed after al-Harethi's death.  And this
is a guy who implemented the blueprints that bin Laden used in
Afghanistan in the late 19- -- in, excuse me, the 1990s.  He
implemented them in Yemen.

     So it's this prison break from February 2006, and this
guy, Nasir al-Wuhayshi's leadership, that has changed Yemen
from what it was into the country that we're all worried about
today with a very active al Qa'ida presence.

Q.    So it's fair to say that al Qa'ida was now back in
business?

A.    Absolutely.

Q.    What is the current status of al Qa'ida in Yemen today,
2011?

A.   It's -- for someone like myself, I think for many of the

people in the U.S. government, and judging by my email and

phone calls and invitations, they're incredibly worried about

this.  Al Qa'ida is an organization in Yemen that at the moment

is gaining strength.  Nasir al-Wuhayshi learned from the

mistakes that they made back in Yemen from, you know, what

happens if your leader is killed and the organization crumbles.

He very much wanted to avoid the same fate this second time.

And so al Qa'ida in Yemen has grown from this prison break

in 2006 to an organization that has proved itself capable of

launching attacks on the U.S., both with the Christmas Day

Bomber, as well as the parcel plots last year.  And so it's a

very worrying threat and a situation that, unfortunately, is

getting much worse.

Q.   Mr. Johnsen, I'd like to turn to a completely different

subject concerning Yemen.

MR. CARNEY:  With the Court's permission?

THE COURT:  Well, we are about five minutes of eleven.

Maybe it's an appropriate time, if you're changing topics, to

take the morning recess.

MR. CARNEY:  I have one more section that will go well

beyond five minutes.

THE COURT:  That's what I mean.  Maybe we should take

the break at this point.

MR. CARNEY:  If your Honor thinks so, I agree.

1          THE COURT:  All right.  Yes.  We'll take the morning

2     recess.

3          THE CLERK:  All rise for the Court and the jury.

4     We'll take the morning recess.

5          (The Court and jury exit the courtroom and there is a

6     recess in the proceedings at 10:57 a.m.)

7     (Court and jury in at 11:27 a.m.)

8     Q.   Mr. Johnsen, I'd like to switch over to a different

9     subject area concerning Yemen.  Is Yemen noted for anything

11:28 10    related to education?

11    A.   Yes, absolutely, it is.  It's particularly noted for the

12    register of Arabic that's spoken there.  And so, quite often,

13    professors in American universities will advise their students

14    who were studying Arabic, or who are studying Arabic, to travel

15    to Yemen.  And there's a couple of reasons for this.  One, it's

16    closer to the classical Arabic that many people study.

17         At the same time -- and I've lived for extensive periods

18    in Cairo and in Jordan and in Yemen, and so I've been able to

19    sort of compare and contrast the different places.  One of the

11:29 20    things that Yemen really has going for it as a place to study

21    Arabic is that so few people there speaks English.  So this

22    allows you to really spend a lot of time practicing the

23    language.  And this has been recognized not only by people like

24    myself and by the professors but also, for instance, say, the

25    State Department.

1       So the Critical Languages Program that I was sort of

2  chaperoning, coordinating on the ground in Yemen, those were

3  for intermediate and advanced students, as opposed to the other

4  Arab countries which many of them sent beginner students.  So

5  they recognized Yemen, as within the Arabic-speaking world, a

6  unique space to go to study and a place that really, if you

7  have some Arabic knowledge, some proficiency, this is where you

8  want to go to really try to advance as far as you can.

9       In addition to the Arabic, it's also known as a place to

11:29 10  go to study with particular shaykhs, particularly for many

11  Muslims students from around the world often will travel to

12  Yemen to study at some of the different institutes and schools

13  there.

14  Q.   Do these schools have any focus on Islamic law or

15  jurisprudence?

16  A.   Yes, many of them do.  Many of the schools will focus on

17  Hadith, as we heard about earlier.  Many will focus on Islamic

18  law.  Many will focus on jurisprudence.  I mean, the history of

19  Islamic education and the number of topics in which to study to

11:30 20  continue to advance your knowledge of Islam is really quite

21  extensive.  And people in Yemen have been studying these for a

22  number of different years -- excuse me, for quite awhile, and

23  there are a number of different shaykhs who are well respected

24  the world around for their particular specialty.

25       And so it's -- I mean, in some ways it's similar to what I

did as a student.  I went to a particular place because of the

professor that was there who worked on what it is that I worked

on.  And you see the same thing in Yemen.  You see students

going there to check it out, to work with the professor, or the

shaykh in this case, who's a specialist in what it is that they

want to learn.

Q.   Is there any advantage to someone who wants to focus on

the Qur'an or Hadiths or statements of scholars from hundreds

of years ago to attend a school that teaches this type of

11:31   classical Arabic?

A.   Yeah, absolutely.  This type of Arabic is much different

from what's spoken on the street, much different than what's

printed in the newspapers.  And you really do need years of

technical training to acquire a proficiency in this.  These are

things that, in our courses at Princeton -- in Princeton, for

instance, we work on, you know, some difficult texts from the

11th and 12th centuries.  And these take a long time to go

through, and they take a long time to parse.

     You really need that sort of specialized knowledge, and

11:32   you need to be in a place where you can have access to that on

not just entering into a classroom and sitting and getting it

for a couple of hours but living in that situation.  And I

think that's a major factor as well.

Q.   How rigorous is the teaching offered at the schools you're

describing?

1   A.   Well, it depends on the school.  These are not -- it's not

2   sort of set up in the institutional structure that we think of

3   here in the United States.  So it varies a great deal from

4   place to place.  And often you really have to be on the ground

5   to sort of see what any particular school offers, to see what

6   the shaykh there is teaching, how regimented, how rigorous it

7   is.

8   Q.   Are these schools located in different parts of the

9   country?

11:32 10   A.   Yeah.  There are schools and institutes all over the

11   country of Yemen.  And Yemen is quite expensive.  I took a bus

12   trip from the capital city, which is -- you know, it's sort of

13   in the western section, in the north, but more to the central.

14   And I traveled all the way to Hadramawt, and that was a very

15   extensive bus ride.  It was like 15 hours or something to get

16   there.  So there's a travel that's required to go from place to

17   place, but they're located in every corner of the country.

18   Q.   Are you familiar with the Arabic word "mu'skir"?

19   A.   I am, yes.

11:33 20   Q.   Can you pronounce it, please?

21   A.   Mu'skir.

22   Q.   What is the colloquial meaning of mu'skir?

23   A.   This is a very flexible term that's used in a lot of

24   different ways.  So it can be used to describe, say, a military

25   camp.  For instance, the First Armored Division has a camp in

1    Sanaa, right above Sanaa University, in Yemen, obviously.  This

2    is referred to as mu'skir.  Also, I've had friends from church

3    in the Middle East who refer to, like, a vacation bible school

4    in the desert as mu'skir.  So it's one of those words that,

5    when used in common speech, becomes quite flexible, like many

6    of the words that we have in English.

7    Q.    Are people who are not from Yemen allowed to attend these

8    schools?

9    A.    Yes.  In fact, many of the students at different schools

11:34 10   are from countries from around the world.

11   Q.    Who funds the schools?

12   A.    Well, I mean, this is something that, again, really

13   depends on the school that you're talking about.  And so you

14   can't really generalize.  You have to -- again, we think of it

15   -- like, say I wanted to attend Princeton.  I get on the

16   internet and sort of look that up.  That's really not something

17   you can do for many of these schools in Yemen.  You actually

18   have to be on the ground to find out what's happening.

19   Q.    Are the schools different from school to school?

11:34 20   A.    Absolutely.

21   Q.    The faculty, philosophy, coursework, accommodations?

22   A.    Yeah.  There's a wide range of these schools.  And, again,

23   it depends on what the -- what the particular shaykh is at any

24   of these schools and what it is that he's doing.  And the

25   school really takes on the impression of that individual in

1    most cases.

2    Q.   I'd like to ask you about three schools in particular,

3    please.  Are you familiar with Dar al-Mustafa?

4    A.   Yes, I am.

5    Q.   Could you spell it, please?

6    A.   Yes.  Transliterated -- I assume English, right?

7    Q.   Yes.

8    A.   Sorry.

9    Q.   Let's try it in Arabic.  I can't even say the Arabic.

11:35 10   A.   So the first word, D-a-r, and then a space; the second

11   word, a-l, hyphen, M-u-s-t-a-f-a.  Dar al-Mustafa.

12   Q.   There's an "A" on the end?

13   A.   Right, yeah.

14   Q.   And are you familiar with Dar al-Hadith?

15   A.   There are a few Dar al-Hadiths.

16   Q.   Are you familiar with one in Ma'rib?

17   A.   In Ma'rib, yes, I am.

18   Q.   How do you spell that, please?

19   A.   Again, the first word is the same, Dar, D-a-r; second

11:36 20   word, a-l, hyphen; H-a-d-i-t-h, Dar al-Hadith.

21   Q.   And Ma'rib is spelled what, please?

22   A.   It's usually transliterated as M-a-r-i-b.

23   Q.   Are you familiar also with a third school, Dar al-Hadith,

24   in Dammaj?

25   A.   Yes, I am.

```
 1   Q.   How do you spell Dammaj?

 2   A.   Dammaj is transliterated D-a-m-m-a-j.

 3   Q.   Where is Dar al-Mustafa located?

 4   A.   This is in the city of Tarim, which is in the east of the

 5   country, out in Hadramawt.

 6   Q.   What is the approximate size of this school to the best of

 7   your knowledge?

 8   A.   Are you talking student population or geographical

 9   location?

11:37 10  Q.   Students.

11   A.   Students, it's -- this varies widely from time to time

12   depending on the number of students that are there.  I've

13   visited the school.  I've spent time in the library, talked to

14   the director.  For instance, when I was a Fulbright fellow

15   there, one of the Fulbright students was actually taking

16   courses at the school.

17        So the students, I would say, at least from the time that

18   I was there, which was in 2003, 2004, there were a few hundred

19   students.  But, you know, many of them go out; they come back,

11:37 20  and so it's really hard to get any sort of a firm count.

21   Q.   Do the schools adopt a philosophy that reflects the

22   thinking of its leader?

23   A.   Yes, in this case, absolutely.

24   Q.   In 2003 and 2004, are you aware of who the leader was or

25   the -- I don't know what term you would call him -- at Dar
```

al-Mustafa?

A.    Yeah.  I had a conversation with him.  My mind is blanking
on the name, but I remember talking with him, yeah.

Q.    What was his philosophy in terms of running the school?

A.    Well, I mean, mostly he -- one of the things that he
really wanted to do is -- he had students from around the
world, and so he wanted to advance knowledge.  There's a saying
within Islam that many of the students -- that you often hear.
It says, "Seek knowledge even unto China."  This is something
that a lot of students take very, very seriously, and the
director of the school did as well.  And so I mean the vast
majority of their time is spent on sort of these traditional
topics of Islamic education.

Q.    What was the school's reputation for teaching classical
Arabic and teaching Islamic law and jurisprudence in February
of 2004?

A.    It had a very good reputation.  Again, this is a place
where one of the -- Yemen is not a place where a lot of
Fulbright fellows go.  So 2003, 2004, when I was there, there
were three of us.  And one of the females, who was Muslim, was
taking courses there.  And she did that because she felt this
was one of the best places to go to study her religious
heritage as well as to improve her Arabic.

Q.    To your knowledge, did this school have any connection
with al Qa'ida?

A.   No.  In fact, this is a school that al Qa'ida has called

out by name as a school that's diametrically opposed to the

political goals of al Qa'ida.  There's some documents that al

Qa'ida put out that refer to the school in a very unflattering

way.

Q.   Let's talk about the second school, Dar al-Hadith, in

Ma'rib.

A.   Right.

Q.   Are you familiar with that school?

A.   Yes, I am.

Q.   Could you tell us where that is located and what the

student body is in terms of the numbers?

A.   Right.  This is a school that's located out in Ma'rib,

which is a very -- it's a desert-type area.  And so it's -- I

mean, "school" is a little misleading, right?  Because we think

of sort of a centralized place with maybe a couple of wings for

classrooms.

     And this is -- these type of schools are much different.

They have a variety of different, you know, mud structures and

so forth.  They're very rudimentary to -- for someone coming

from the West or from an American background.

     As to the number of students, this, again, fluctuates a

great deal.  But this is something where the students there

were attracted by the leader, an individual often referred to

as Abul Hasan al-Ma'ribi.  He's actually an Egyptian.

Q.   What was his philosophy in running Dar al-Hadith in
Ma'rib?
A.   Right.  So he's someone who's often referred to as a
Salafi, which is a word that's come up a great deal.  But he
adheres to a type of Salafism that isn't Salafi-Jihadi.

And so this is a school that is, again, not affiliated
with al Qa'ida.  It's a school of sort of -- at least it's a
school that practices and that often teaches political
passivism within Yemen, not getting involved in politics, not
taking a stand, things of that nature.

Although this is slight -- this started to change slightly
in 2006 when the leader got involved in the Yemeni presidential
elections.  But that was a major break, this 2006 instance
where he endorsed President Ali Abdel al-Salih for re-election.
Q.   Is this another school that has an outstanding reputation
for teaching classical Arabic and Islamic law and
jurisprudence?
A.   Yeah.  Many of the students, like its name suggests, Dar
al-Hadith -- and I know that Hadith has come up previously in
this, sayings of the Prophet Muhammad.  This is a place that
really focuses on that and on teaching Arabic.  And, again,
this is a very particular register of Arabic that you need
training in.  And, yes, this place has an international
reputation.
Q.   The third school I'd like to ask you about is Dar

1    al-Hadith in Dammaj.  Could you describe where that's located

2    and the approximate size of the student body?

3    A.   Right.  So if we're following along sort of from the

4    map --

5              MR. CARNEY:  Can we have the map put on display,

6    please, your Honor?  I believe it's ready to go.

7    A.   Right.  So if you look in Tarim, out in sort of the

8    eastern part.  It's tough to see, but it's in the middle out in

9    sort of the panhandle.  And then you go all the way back where

11:43 10   the little notch comes up.  And just to the left of that is

11   Ma'rib.  That's where the second school is.  Then if you go all

12   the way up to the northwest corner, you see Sa'ada, and that's

13   where the third school is located, in a village outside of

14   Sa'ada.

15   Q.   If I can --

16   A.   So you have sort of -- if you're going by the map, you go

17   from the east all the way to the northwest corner in sort of a

18   -- well, I guess like a little tour across the country, if you

19   will.

11:43 20   Q.   Have I circled Ma'rib and Sa'ada?

21   A.   Yeah.  And Tarim is to the right on the map, in the east.

22   Right, exactly there, yeah.  So those are the general locations

23   that we're talking about.

24   Q.   And that third school at Dammaj, does that also have an

25   international reputation for classical Arabic and Islamic law

1    and jurisprudence?

2    A.    Yes.  This is a place that attracts students from --

3    again, from all over the world and particularly from the

4    Islamic world, that students go there to study, obviously.

5    Q.    Finally, based on your experience, your knowledge, your

6    dealing with the people and attendance at these schools, do any

7    of these three schools have a reputation for being a feeder

8    source for al Qa'ida, whether in Yemen or elsewhere?

9    A.    Right.  So, for instance, the guy who runs the school --

11:44 10   or who ran -- he passed away in July of 2001 -- an individual

11   named Shaykh Muqbil al-Wadi.  He ran the school in Dammaj.  And

12   he would say -- in fact, I'm paraphrasing the quote, but

13   essentially he said, Of all the people in the world, Osama bin

14   Laden is the one I can never forgive.  He was someone who had a

15   great deal of animosity towards different Islamic sects, and he

16   was diametrically opposed to Osama bin Laden.

17   Q.    Thank you, Mr. Johnsen.

18        MR. CARNEY:  Your Honor, I pass the witness.

19   CROSS-EXAMINATION BY MR. GROHARING:

11:45 20   Q.    Good morning, sir.

21   A.    Morning.

22   Q.    Now, you testified that there's been an increased interest

23   in Yemen lately in the United States?

24   A.    That's correct.

25   Q.    And I believe you used the term "burst into the national

1  consciousness"?

2  A.   Yes, I did.

3  Q.   And that was after the attack of the -- who you described

4  as the Underwear Bomber?

5  A.   Yes, the Christmas Day bomber, on Christmas Day 2009.

6  Q.   Who was that?

7  A.   This is an individual named Omar Farooq Abdul Mutallab.

8  Q.   And there's actually been a lot of interest in Yemen by

9  the United States and, in particular, al Qa'ida's presence in

11:46 10  Yemen for a number of years?

11  A.   This is interest that waxes and wanes.

12  Q.   Okay.  There has been an interest for a number of years,

13  correct?

14  A.   I mean, again, it waxes and wanes.  At times, there's a

15  lot of interest.  At other times, there's no interest at all.

16  Q.   There's been a time when there's been no interest at all

17  from --

18  A.   Very little interest, yes.

19  Q.   We'll get to that a little bit later.

11:46 20  A.   Okay.

21  Q.   Now, as far as your briefing people regarding Yemen, you

22  weren't doing that in 2003, 2004, right?  That's something

23  that's been more recent based on your continued experience

24  there?

25  A.   Right.  I would say that --

1  Q.   Just yes or no.  It's been more recent, correct?

2  A.   Yes.  Sorry.

3  Q.   And when you were there in 2003 and 2004, you were

4  studying, correct?

5  A.   I was carrying out research.

6  Q.   And that research was into the Civil War in Yemen?

7  A.   That's correct.

8  Q.   You weren't researching al Qa'ida as an organization,

9  correct?

11:47 10  A.   No.  I was doing that as well.

11  Q.   What was the topic of the research you were working on for

12  your fellowship?

13  A.   Right.  The topic of the Fulbright Fellowship was:  The

14  Yemeni Civil War, 1962 to 1970, in Popular Consciousness, I

15  believe.

16  Q.   Okay.  It wasn't al Qa'ida's presence in Yemen or the

17  history of al Qa'ida or anything?

18  A.   I was writing articles about that as well.

19  Q.   You were writing articles.

11:47 20       Now, in that capacity, I believe you indicated that you

21  spent most of your time in Sanaa?

22  A.   I was based in Sanaa, but I did a great deal of traveling.

23  Q.   How much time did you spend in Ma'rib?

24  A.   In Ma'rib, I was there, I think, on four different

25  occasions for a period of, I don't know, four to five days on

1    those four different occasions.  I mean, total, four to five

2    days.

3    Q.   You talked about Yemen.  And I believe you said certain

4    parts of Yemen are -- I think you described them as a wild

5    place with no government control?

6    A.   I wouldn't say no government control or I don't believe I

7    said that.  I would say the central government has little

8    control in some of these places.

9    Q.   Well, some of the tribal leaders had tanks, right?

11:48 10   A.   Yes.

11   Q.   Their own tanks?

12   A.   Yes.

13   Q.   Okay.  And, obviously, they had a lot of weapons as well?

14   A.   That's correct.

15   Q.   They decided what happened in their lands, correct?

16   A.   I think that's a little too simple.  I would say that the

17   tribes felt pressure from the government.  The government felt

18   pressure from the tribes.  And it's a very dynamic situation.

19   There's interaction back and forth.  The government tries to

11:49 20   influence the tribes.  The tribes press back against the

21   government.  So it's not sort of the simple thing:  President

22   Salih says something.  It takes place.

23   Q.   Well, fair to say, prior to September 11, 2001, there was

24   very little pressure put on the tribes to remove al Qa'ida or

25   to crack down on the presence of members of al Qa'ida in

1   certain locations, correct?

2   A.   In certain locations, I think that's -- generally

3   speaking, yes.

4   Q.   Fair to say President Salih has not been a long-time

5   friend of the United States and supported the United States,

6   correct?

7   A.   He's had a difficult relationship with the U.S., yes.

8   There's been times where he's been quite close and times where

9   he's been very much on the outside looking in.

11:49 10   Q.   And his interests very much revolves around his

11   perseverance as well as the United States support to Yemen, is

12   that fair?

13   A.   I think, yeah.  His interest is in maintaining power or

14   has been up until very recently.

15   Q.   It doesn't have anything to do with him agreeing with

16   democracy or principles espoused in the United States, correct.

17   A.   Not necessarily.  He's one who wants to maintain power

18   however that's possible.

19   Q.   Fair to say he does what's good for President Salih?

11:50 20   A.   Yes, I think that's fair to say.

21   Q.   At times, it was good for him to cooperate with the United

22   States, correct?  He felt it was good for him to cooperate with

23   the United States at times?

24   A.   Yeah.  You're talking -- I guess I would like to have sort

25   of a chronological date to pin this to since it's been so much

1    back and forth.

2    Q.   Well, I think you're making my point.  At times, he would

3    cooperate with the United States throughout his tenure, right?

4    A.   Yeah.  There have been times where what I would call game

5    changers happen that changed his calculation.

6    Q.   And at times he would not want to cooperate with the

7    United States?

8    A.   I don't believe there have been many of those times since

9    September 11th.

11:50 10   Q.   Okay.  We'll go through those periods in detail in a bit.

11   A.   Okay.

12        MR. GROHARING:  Can you please pull up Exhibit 690?

13   Q.   Are you familiar with internet chats?

14   A.   Like instant message?

15   Q.   Correct.

16   A.   Yeah.  I'm familiar with them.

17   Q.   I would just like -- can you tell if this is a chat that

18   took place on March 30 of 2006?

19   A.   That's what it says on the screen.

11:51 20   Q.   And the email addresses are ibnul_khattab82@yahoo.com and

21   then a person named Mu'awiyah?

22   A.   Mu'awiyah, yeah, that's what I read as well.

23        MR. GROHARING:  Can you go to Page 3, please?

24   Q.   Okay.  I'll read the portions that are attributed to

25   Mu'awiyah and if you could read the portions that are in

Arabic, there.

A.   You mean the Arabic name, Al-Fiqir ila Allah?  You just

want me to read those portions, the English?

Q.   The English text after the Arabic name you just mentioned,

starting with, "Join the club."

A.   I'm sorry.  That one is a little cut off.  Thank you.

"Join the club, akhi brother."

Q.   "Which club lol?"

A.   "The 'I want to get out of here' club."

11:53 Q.   "Brother, we are planning collective migration with some

brothers here."

A.   "To where?"

Q.   "Yemen, Allah willing."

A.   "Hehe."

Q.   "There are some Yemeni brothers."

A.   "Great."

Q.   "From powerful tribes and of our creed."

A.   I believe that should be "place."  Can I read it as

"place"?

11:53 Q.   Sure.

A.   "The place to go is Ma'rib.  I was there."

Q.   And now "Ma'rib," is that the Ma'rib you were referring to

a few minutes ago?

A.   I believe so, yes.

Q.   "Lol.  Yes, they are Ma'ribi."

1   A.   "Years ago."

2   Q.   "Wow.  Tell me about it, brother."

3   A.   "Heh.  Where do I start?"

4   Q.   "How is the place?"

5        MR. GROHARING:  Next page, please.

6   A.   "It's like."

7   Q.   "And the people?"

8   A.   "Afghanistan, very, very old school, tribal place, mud

9   huts, et cetera."

11:54 10   Q.   "Yes.  This what the brothers are saying."

11   A.   "Many mujahideen live there."

12   Q.   "They say it is anarchy."

13   A.   "Yeah.  The government has no control."

14   Q.   "No government anywhere to be sighted?"

15   A.   "Yeah."

16   Q.   Now, that text -- or that chat referred to "Ma'rib."  Is

17   that conversation consistent with what you saw in Ma'rib when

18   you were there?

19   A.   Not knowing anything about either of the speakers, I would

11:54 20   say it's consistent of someone who goes to a place, Ma'rib, and

21   doesn't particularly understand the dynamics that underlie

22   what's happening there.  They are describing what it is that

23   they see:  the mud huts and the mujahideen who fought in

24   Afghanistan in the '80s.

25   Q.   Fair to say Ma'rib is one of the areas where the

1    mujahideen who fought in Afghanistan returned to?

2    A.   The mujahideen who fought in Afghanistan returned to all

3    different places in Yemen.  There were fighters from Abyan,

4    from Sheba, from Sa'ada, from Sanaa.  I've sat and talked with

5    these people.  You can find them all over the country.

6    Q.   And Ma'rib is one of those places?

7    A.   Ma'rib is a place in the country, yes.

8         MR. GROHARING:  Exhibit 696, please.

9    Q.   Is this another chat session?

11:55 10   A.   I assume so.

11   Q.   Was it on May 22, 2006?

12   A.   Yes, that's what it says.

13        MR. GROHARING:  Page 2, please.

14   Q.   Again, if you could read the portions attributed to the

15   person who's identified in Arabic.

16        "So brother tell me about Ma'rib."

17   A.   "Heh.  It's a wild land.  Very tribal.  Full of bandits."

18   Q.   "Have you seen tribe infighting there?"

19   A.   "And al Qa'ida."

11:56 20   Q.   "You mean thieves with regards to bandits?"

21   A.   "When I was there, there was no such fighting.  Yes,

22   thieves, also a lot of foreigners, Egyptians, from Jama'at

23   al-Jihad, the Jihad group, who escaped Egypt in the '80s and

24   came here.  But they're all fugitives and underground."

25        MR. GROHARING:  Okay.  Next page, please.

1    Q.   "Are they living there without any hindrance?"

2    A.   "No, they are all being hunted by the government."

3         MR. GROHARING:  You can take it down.

4    Q.   Now, I want to talk about some of the mujahideen you

5    talked about from Afghanistan.

6    A.   Okay.

7    Q.   Now, I believe you've written that as many as 4,000

8    mujahideen from Afghanistan ended up in Yemen after that

9    conflict was done, is that correct?

11:57 10   A.   Yeah.  This is often a common number of individuals that's

11   discussed.  But the ranges on these for different scholars who

12   look at it ranges quite widely.

13   Q.   So my question was:  You've written that 4,000 mujahideen

14   returned to Yemen after that conflict, is that correct?

15   A.   Yeah.  Generally, as an estimate, anywhere from the late

16   1980s up through the 1990s, yeah.

17   Q.   And these were mujahideen who fought with Osama bin Laden

18   and those forces against the Soviets, is that correct?

19   A.   Not necessarily.  A lot of the fighters who went there

11:58 20   weren't necessarily aligned with Osama bin Laden.  They were

21   going there to fight the Soviets, with the backing of countries

22   like Yemen, the U.S., Saudi Arabia.

23   Q.   They were on the same side of the conflict as Osama bin

24   Laden?

25   A.   And the U.S., for that matter.

1    Q.    Now, many of these fighters weren't Yemenis.  They were

2    from all over the place who returned to Yemen, correct?

3    A.    It's hard to put percentages.  But Yemen has a reputation

4    of, yes, many of the Egyptians, for instance, who couldn't go

5    back to Egypt were welcome back to Yemen.  So there were

6    Yemenis as well as others.

7    Q.    So, now, President Salih used these men to his benefit

8    during the Civil War?

9    A.    He used many of the fighters who had been in Afghanistan,

11:58 10   yes, as he used tribes and everyone else he could to his

11   benefit.

12   Q.    And, now, a lot of these same individuals became

13   integrated in the Yemeni Government as well?  They had jobs in

14   the Yemeni Government, became integrated into society in Yemen?

15   A.    Well, let me -- can I ask a clarifying question?

16   Q.    Please.

17   A.    Are we talking about Yemenis, or are we talking about

18   people with non-Yemeni citizenship?

19   Q.    Both.

11:59 20   A.    So non-Yemenis, no.  They weren't integrated into the

21   system.  Many of the fighters who had been in Afghanistan, many

22   of them came back -- I mean, fighting in Afghanistan is

23   something that in the 1980s President Salih encouraged them to

24   do.  The United States encouraged them to do.  Saudi Arabia

25   encouraged them to do.  So when they came back, they went off

1    and they did their duty and they returned.  And many of them

2    went back to their tribes, went back to their family.  Some of

3    them went on to get jobs in the Yemeni Government.

4    Q.   Now, this will go a lot more quickly if, when I ask you a

5    question, if you can focus on what I'm asking and limit your

6    response to that.  You know a lot of information about Yemen.

7    I'm not going to dispute that.  But a lot of this information

8    is not responsive to the questions.  So if you would, if you

9    can, when I ask you a question, try to focus on what I'm asking

12:00 10   and respond to the question.  Would you do that?

11   A.   Yeah.  I'm trying my best.  I'm sorry.

12   Q.   I appreciate that.

13        Now, these individuals in many cases were also given land.

14   They were rewarded for their participation, and then President

15   Salih, who was supportive of their efforts, gave many of them

16   land in Yemen to live on?

17   A.   Many of the Yemenis?  I don't think I would describe it as

18   many of the Yemenis, no.  Some prominent shaykhs who the

19   president needed for domestic politics were given land.

12:00 20   Q.   Okay.  I want to talk a little bit more about al Qa'ida in

21   Yemen.  I believe you've indicated that there's a long history

22   of al Qa'ida presence in Yemen, and it's waxed and a waned a

23   little bit over the years.  But for now, over a decade, there's

24   been a significant presence in Yemen for al Qa'ida, correct?

25   A.   Moving backwards from 2011 back a decade?

1    Q.    Yes.  And well beyond, I guess, 2001.

2    A.    There was a significant period of time in which there was

3    no organizational or infrastructural presence of al Qa'ida in

4    the country.

5    Q.    Okay.  No organizational structure.  You're not talking

6    about no presence of al Qa'ida?  You're talking about the

7    structure or --

8    A.    No.  I'm talking about -- I guess I would differentiate

9    between al Qa'ida, the organization, and people who might hold

12:01 10   sympathetic views to al Qa'ida.

11   Q.    And who are former members or associates of al Qa'ida?

12   A.    Not necessarily.

13   Q.    Okay.  Now, Osama bin Laden has a tie to Yemen?

14   A.    His father was from Hadramawt.

15   Q.    He often talked about his connection to Yemen?

16   A.    Yes.  He talked about -- yes, his connection to Yemen,

17   yes.

18   Q.    Are you familiar with Osama bin Laden's bodyguards?

19   A.    Some of them.  Some of them I've spoken to, yes.

12:02 20   Q.    What percentage of them came from Yemen?

21   A.    That's really difficult to know.  I would say a large

22   percentage, but specific number, I couldn't give.  And I would

23   doubt anybody could.

24   Q.    Do you know why he selected a large percentage of his

25   bodyguards from men that were from Yemen?

1   A.   I can't testify to Osama bin Laden's thinking, but I can

2   -- I think there are a couple of different theories that have

3   been proposed, yes, as to why they were.

4   Q.   Okay.  What are you aware that, as far as what he said, as

5   to why he selected Yemenis for his bodyguards?

6   A.   Well, there are a couple of reasons.  So, one, is because

7   he wanted to sort of balance off some of the Egyptians within

8   the organization who had primary positions.  And another is

9   because he really felt that it was important to have people

12:03 10   from the Arabian Peninsula, Yemen and Saudi Arabia, which is

11   where many of his bodyguards came from.

12   Q.   And, now, as far as percentages within al Qa'ida, there's

13   a significant percentage of Yemeni members of al Qa'ida; is

14   that fair to say?

15   A.   What point of al Qa'ida are you talking about, I guess?

16   Are you talking, like, 2001, or are you talking today in Yemen?

17   Q.   Let's start with al Qa'ida 2001.

18   A.   There was a significant portion of Yemenis.  I wouldn't

19   call them a majority within al Qa'ida, no.

12:03 20   Q.   What percentage would you attach to that?

21   A.   That's difficult.  I want to be -- I mean, you know, I'm

22   an expert on al Qa'ida in Yemen as opposed to al Qa'ida

23   broadly, and I want to keep my testimony very limited.  And so

24   most of the time what I do is only talk about al Qa'ida within

25   Yemen and the Yemenis who had experience there.  So I can talk

1    briefly about that if you'd like.

2    Q.    Okay.  But you will agree with me that 2001, significant

3    connection between al Qa'ida, al Qa'ida Central, as some call

4    it --

5    A.    Right.

6    Q.    -- and Yemen, correct?

7    A.    Yes.  Osama bin Laden had sent people back to Yemen in the

8    summer of 2001.  There were -- yes, there was a connection.

9    Q.    And I believe you testified that Osama bin Laden was very

12:04 10   involved in setting up camps?

11   A.    In the 1990s.

12   Q.    In the 1990s.

13   A.    Right, prior to going to Sudan, yes.

14   Q.    Created an organizational structure in Yemen?

15   A.    He financed it.  Abu Ali al-Harithi, the individual who

16   was killed in the drone strike, was the individual who set up

17   most of the camps and who built most of the infrastructure.

18   Q.    He was the leader of al Qa'ida in Yemen for a number of

19   years, right?

12:04 20   A.    Yes.

21   Q.    And he led probably hundreds of other members of al

22   Qa'ida, or at least associates of al Qa'ida, during that time

23   frame?

24   A.    He -- hundreds might be a bit strong.  But he was someone

25   who certainly helped direct the organization then, yes.

```
 1   Q.   And there were camps set up, training camps?

 2   A.   Again, I'm sorry.  What period are we talking about?

 3   Q.   During the period, on direct, when you testified there

 4   were camps set up.

 5   A.   Yes, in the 1990s, yes, he set up camps.

 6   Q.   What type of training could you receive at these camps?

 7   A.   You could receive a wide variety of things.  I mean, from

 8   weapons training -- so, for example, their first attack in Aden

 9   in 1992, they trained for it in a camp in Sa'ada where they had

10   some instructors who gave them information in setting up the

11   explosives.

12   Q.   What would you estimate the number of trainees were that

13   went through these camps over the years?

14   A.   Over the years, if we're talking about from the 19 -- from

15   1990 to about 2000, I would estimate it to be fairly low.

16   Under 200, that would be my estimate.

17   Q.   They receive instruction on bomb-making and --

18   A.   It really depends on the camp that we're talking about

19   here and the particular time because, you know, what happened

20   in the Civil War is then they were fighting with the Yemeni

21   Government as opposed to working on some of these things.  And

22   then after that there was a bit of falling out.  That's why

23   context, I guess, is so important.

24   Q.   Have you been to these camps?

25   A.   No.  When I went, they weren't there.
```

1    Q.    Have you seen photos of these camps?

2    A.    I have, yes.

3    Q.    Video images?

4    A.    Video images from the 1990s, no.

5    Q.    Okay.  During this time, the bottom line was that al

6    Qa'ida had the ability to train in Yemen?

7    A.    Yes, in the 1990s, yeah.

8    Q.    Now, after September 11th, the United States conducted air

9    strikes in Afghanistan.  I assume you're familiar with those?

12:07 10    A.    Yes.

11    Q.    Some of those air strikes targeted training camps?

12    A.    Yes, they did.

13    Q.    And that caused training camps in Afghanistan to be shut

14    down by al Qa'ida?

15    A.    To the best of my knowledge, but I'm not an expert on

16    Afghanistan.

17    Q.    You do have some passing familiarity with the United

18    States and their conflict with al Qa'ida?

19    A.    Yes.

12:07 20    Q.    And you're familiar with the fact that United States

21    targeted al Qa'ida training camps?

22    A.    Yes.  That's what's been reported in the media, yeah.

23    Q.    You're familiar with the fact that al Qa'ida then shut

24    down their training camps and stopped using them the way they

25    used to?

A.    I'm -- my understanding -- and, again, not an expert in

Afghanistan -- but that those particular camps were shelled,

and so they couldn't be shut down because they were kind of

bombed to kindling.

Q.    Okay.  Or they got out of where they were so they wouldn't

be bombed.

Are you aware there was some concern in Yemen that the

United States would also target training camps in Yemen, al

Qa'ida training camps?

A.    Well, what happened in Yemen is, I think, a little bit

different because no one there knew September 11th was coming.

So it took them by surprise as far as, you know, they were as

shocked as anyone else when the September 11th attacks took

place.

Q.    My question was related to the United States' response to

those attacks.

A.    At the time, I remember hearing discussions of the U.S.

bombing Yemen as well as bombing Pakistan and Afghanistan.

There was a lot of things being talked about.

Q.    What I asked you is whether or not, in Yemen, there was a

concern that the United States would not only target

Afghanistan and Pakistan, but they would also target Yemen.

A.    They would target Yemen, yeah.  Sorry.  That was slightly

different, I think, than targeting the training camps in Yemen.

There was a concern that they would target Yemen, yes,

1  absolutely I would agree with that.

2  Q.   As well as training camps in Yemen?

3  A.   I don't know.  I'm not sure that -- I mean, the concern

4  that I know of is the official U.S. Government concern.  Sorry.

5  The official Yemeni Government concern, which is about Yemeni

6  territory being attacked.  The al Qa'ida -- sorry.  That's what

7  I was trying to get out with what I explained about this coming

8  as a shock to al Qa'ida.  I mean, I was just -- I'm not trying

9  to be difficult.  I'm just trying to make that distinction

12:09 10  because the Yemeni Government has a different mind-set than

11  does al Qa'ida in Yemen.

12  Q.   I imagine, at least to some degree, as far as the al

13  Qa'ida members in Yemen that you just testified about on direct

14  as well as cross, they were present?

15  A.   Yes, they were.

16  Q.   At that time, they were operating camps?

17  A.   This is 2001?

18  Q.   2001 time frame.

19  A.   After the USS Cole, there had been some significant --

12:10 20  some significant arrests made by the Yemeni Government, and

21  there had been a period of decline leading up to 2001.  There

22  was still al Qa'ida presence, but I'm not sure about the

23  training camps.  There's no evidence of the training camps

24  being operated between the USS Cole and between September 11th.

25  Q.   Fair to say that that's out of a concern that if you were

1    at a training camp you might be a target?  There might be a

2    missile strike to take out a training camp either --

3    A.    I don't think it was the missile strike concern.  I think

4    it was the pressure of the Yemeni Government and the arrests.

5    Q.    Or you might be arrested?

6    A.    Yeah.  After the USS Cole, yeah, there were a lot of

7    Yemeni arrests.

8    Q.    Exposing yourself in a place like a training camp might be

9    a good way to get you arrested?

12:10 10   A.    I think there are a number of good ways to get arrested in

11   Yemen.

12   Q.    I'm just asking you if that's one of them.

13   A.    That could potentially be one.

14   Q.    But al Qa'ida -- and you're an expert on al Qa'ida in

15   Yemen -- still needed to train, right?

16   A.    Not necessarily.  So the evidence that we have from the

17   attacks that took place, these are guys who are holed up in

18   safe houses where they're trying to not make any waves.

19        For instance, what I was talking about earlier, when

12:11 20   someone like Fawaz al-Rabi'i came back from Afghanistan, he

21   brought with him a cell back in the summer of 2001 that had

22   already done all their training in Afghanistan.  So they just

23   set up their cell, and then they tried to avoid attention in

24   order to carry out their attacks.

25   Q.    Those folks were already qualified to --

        1   A.    Right.

        2   Q.    -- make bombs, that kind of thing?

        3   A.    I mean, some of them knew from the attacks that they tried

        4   to take place they clearly weren't that qualified.

        5   Q.    They had training?

        6   A.    They had done some training, yes.

        7   Q.    Okay.  You mentioned safe houses.  What's the purpose of a

        8   safe house?

        9   A.    Well, what we know -- so I can talk about specific -- the

12:12  10   specific examples if that would be helpful.

       11   Q.    What's your understanding of what a safe house is?

       12   A.    From the material that I've reviewed that al Qa'ida has

       13   put out, it's to avoid detection by the Yemeni Government.

       14   Q.    And safe houses aren't unique in Yemeni.  They exist in

       15   other countries as well, right?

       16   A.    Presumably.

       17   Q.    Are you aware that sometimes training takes place in safe

       18   houses now?

       19   A.    I've seen no evidence of training that was taking place in

12:12  20   the safe houses.

       21   Q.    In Yemen, or are you talking al Qa'ida?

       22   A.    I'm talking in Yemen where I'm trying to limit my

       23   testimony.

       24   Q.    So is it your position -- your testimony, then, that al

       25   Qa'ida ceased training altogether after the training camps were

1  closed?

2  A.   I would say my position is this:  that after September

3  11th, the game changed for al Qa'ida.  And in a place where

4  they'd had a certain degree of mobility, they no longer had

5  that mobility.  So instead of worrying about training, they

6  were forced to reorganize, restructure themselves on the run.

7  So it's a very hairy organization, one that's worried about

8  personal safety, and when they were able to carry out attacks,

9  they're just one-off attacks.

12:13 10  Q.   They hadn't given up, right?

11  A.   No, they hadn't given up.

12  Q.   Their activities were disrupted?

13  A.   Yes, absolutely.

14  Q.   Now, I want to talk about the USS Cole attack and the

15  response in Yemen.  Are you familiar with the investigation of

16  the USS Cole?

17  A.   Excuse me.  I'm familiar -- yes.  I've talked to the

18  ambassador who was involved in the investigation.  I've talked

19  to other people.  I didn't personally participate in it.

12:13 20  Q.   As an expert on al Qa'ida in Yemen, this was an al Qa'ida

21  attack, correct?

22  A.   Yes, it was.

23  Q.   So it certainly falls within your area of stated

24  expertise, I would imagine?

25  A.   Yes.

```
 1    Q.   That investigation -- I assume you're aware that the
 2    Yemenis had complaints about how the FBI conducted the
 3    investigation, correct?
 4    A.   Yeah, as did the U.S. ambassador.
 5    Q.   And who was that ambassador?
 6    A.   That was Ambassador Barbara Bodine.
 7    Q.   She's someone who you talked to during your time there?
 8    A.   My time in Yemen?  No.
 9    Q.   Correct.  Or perhaps afterwards?
10    A.   Yes, I've met her since.
11    Q.   And you talked to her about her experiences in Yemen, I
12    imagine?
13    A.   Yes.
14    Q.   Fair to say she didn't see eye to eye with the FBI in
15    Yemen?
16    A.   I think that's fair to say, yes.
17    Q.   Her interests and the FBI's weren't necessarily aligned at
18    the time?
19    A.   I mean, they both worked for and represented the U.S.
20    Government.  So in that way, they were.  But I don't think that
21    both sides -- again, this is for someone outside -- both sides
22    saw the best way to bring those larger goals to fruition.
23    Q.   She was focused on trying to forge a relationship with
24    President Salih and the country of Yemen?
25    A.   I mean, I can't speak to her thinking, but --
```

1   Q.   Part of her role as ambassador, that was what --

2   A.   Yes.  U.S.-Yemeni relations are, I think, at the top of

3   the list for -- or U.S. and X country are at the top of the

4   list for any U.S. ambassador in any country.

5   Q.   The FBI was concerned with trying to figure out who killed

6   17 Americans in Yemen, right?

7   A.   I assume so, yes.  That's why they were there for the

8   investigation.

9   Q.   The FBI came there with a large presence?

12:15 10   A.   My understanding is.  Larger, at least, than Ambassador

11  Bodine, from the published works, felt was necessary.

12  Q.   And Ambassador Bodine was very concerned about any

13  acknowledgement that there was al Qa'ida in Yemen or large

14  presence of al Qa'ida in Yemen, correct?

15  A.   That's not my understanding of her position, no.  But,

16  again, I would hate to misrepresent her position since it's

17  hers.

18  Q.   So are you aware of her position or are you not aware of

19  it?

12:16 20   A.   I'm aware from conversations, but I wouldn't want to put

21  words into anyone's mouth but my own.

22  Q.   She's not here.  So just do the best you can.  If you can

23  recall what her position was or what her actions were in this

24  area since it is within your stated area of expertise, I'd

25  appreciate if you'd try to answer it.

1   A.   Right.  My understanding of Ambassador Bodine's position

2   at the time was that she wanted to carry out the investigation

3   in a way that was not disruptive to U.S.-Yemeni relations.

4   Q.   And part of that was a concern about the level of al

5   Qa'ida presence and activity in Yemen that she had?

6   A.   I don't think so.  I think it was more that she was

7   concerned that some of the FBI agents who were coming in didn't

8   have a very good understanding of the environment in which they

9   were operating.  And so, I mean, this is what I was trying to

12:17 10   get at earlier from how Yemen looks from the U.S. versus how it

11   looks on the ground.  And so she was someone who saw sort of

12   the whole iceberg had been sort of under water looking at it.

13   And the FBI agents, I believe she felt, were only looking at a

14   small portion.

15   Q.   The portion they were looking at was trying to conduct an

16   investigation to figure out what happened, who was responsible,

17   and an attempt to locate those individuals?

18   A.   That's my understanding of their investigation, yeah, to

19   solve the USS Cole attack and bring the perpetrators to

12:17 20   justice, yes.

21   Q.   Regarding the level of cooperation which you talked a

22   little bit about before, are you aware that interview requests

23   at that point -- the FBI had to pass requests for interviews of

24   Yemeni citizens through Yemeni officials?

25   A.   I'm aware that, for instance, President Salih went on Al

1   Jazeera and, you know, bragged about some of the

2   noncooperation.  So I don't know the exact details of all the

3   interview requests, but I know that there were tensions between

4   the President Salih and the FBI, yes.

5   Q.   And so before you testified that after the Cole there was

6   a period of cooperation, I believe you testified, from the

7   Yemenis regarding efforts to track down al Qa'ida and such,

8   right?

9   A.   There were certainly, yeah.  Fahd al-Qusa' was arrested.

12:18 10   Abu Jendal Nasir al-Bahri was arrested, who, you know, later

11   helped Ali Soufan and the FBI put -- link al Qa'ida to the

12   September 11th attacks.

13   Q.   Right.  And at the same time, though, President Salih was

14   -- it was a delicate balance for him?

15   A.   I think, after the Cole, from the Cole to September 11th,

16   yeah, there was balancing by President Salih, certainly.

17   Q.   On one hand, he wanted to please the United States to

18   continue to get aid and to make sure we weren't focused --

19   A.   There was very little aid in 2000 because Yemen was still

12:18 20   suffering from its position in 1990.

21   Q.   Correct.  And fair to say Yemen relies on the United

22   States, as well as the United Nations, for a significant amount

23   of aid?

24   A.   No, I don't think that's fair to say.  I think that Yemen

25   relies a great deal on countries within the GCC, the Gulf

1  Cooperation Council, particularly Saudi Arabia, who puts much

2  more money into the country than the United States.  The United

3  Emirates puts a great deal of money into the country, as does

4  Qatar, Kuwait, and so on.

5  Q.   Do I understand your testimony correctly that Yemen was

6  not reliant on the United States and wasn't concerned about the

7  United States' assistance as far as funding goes?

8  A.   What I'm saying is that U.S. assistance pales in

9  comparison to the assistance that Yemen gets from other actors.

12:19 10  And so these actors that Yemen gets a lot of money for [sic]

11  are more important than the U.S. from whom Yemen gets,

12  relatively speaking, much less assistance.

13  Q.   And the delicate balance is President Salih does want to

14  please the U.S., but there are people in Yemen who aren't

15  supportive of the United States?  They don't want him to please

16  the United States too much?

17  A.   Yeah.  I think it's a -- I would go along with it's a --

18  if we're talking about the period from the Cole attack to

19  September 2011, yeah, there was a lot of balancing going on,

12:20 20  not just from outside pressure from President Salih but also

21  from his own personal characteristics.

22  Q.   Okay.  Now, what happened to the Yemenis that were

23  convicted of these attacks?

24  A.   So, for instance, Jamal al-Badawi, who's someone who's

25  been convicted of these attacks; as well as Fahd al-Qusa',

who's been convicted of the attacks; Jamal al-Badawi, I

believe, was initially convicted to ten years.  There had been

a prison break where he escaped in early 2003.  He was later

rearrested.  Then they had sentenced him to death.  Then he

escaped in 2006.  They recaptured him once again.  That was

commuted.  He was let go.  And so to the best of my knowledge,

there was a bit of a shell game that was going on.  And I

believe now Jamal al-Badawi is not in prison, but I would have

to double-check.

12:21   Fahd al-Qusa', someone else --

Q.   Let's focus on Badawi.

A.   Okay.

Q.   So now, notwithstanding his involvement in the attacks on

the USS Cole, he's walking around a free man in Yemen?

A.   To the best of my knowledge, he is, yes.

Q.   Are you aware the United States has indicted him?

A.   Yes.

Q.   Are you aware that Yemen has not agreed to extradite Mr.

Badawi to the United States?

12:21 A.   I'm not aware that there's ever been an official

government refusal, but I know that Yemen has not.

Q.   You're aware the United States asked?

A.   No, I was not aware that they officially asked.  I was

aware that -- I had heard from some diplomats that they sounded

out, but I wasn't aware of them officially asking because the

1    Yemeni officials and the government that I had spoke to had

2    said other things.

3    Q.    Okay.  Let's move to Fahd al-Qusa'.  He was also involved

4    in the Cole attack, correct?

5    A.    Yes.  He was someone who was, I believe, supposed to

6    videotape the attack, or at least that's the story that's

7    emerged since, yes.

8    Q.    And what happened to him?

9    A.    So he was arrested -- actually, I believe the FBI has

12:22 10   interviewed him.  Fahd al-Qusa' has spoken about this in

11   interviews since.  He was held for a few years and was then

12   released.

13   Q.    Are you familiar with the Ramadan Release Program in

14   Yemen?

15   A.    I don't believe it's referred to that, but I think what

16   you're referring to is Hamoud al-Hitar's Program of Religious

17   Dialogue.

18   Q.    Please explain that for the jury.

19   A.    Sure.  This was a program that started in late 2002 when

12:23 20   Yemen had, as I testified to earlier, conducted a number of

21   arrests.  And the problem with sort of throwing this massive

22   sort of net out and bringing everybody back is sort of the same

23   problem that the U.S. has had with Guantanamo Bay, that it

24   doesn't really know who it has.  So some of the guys might be

25   guilty and some might not.

1        So Yemen instituted a program.  It's often referred to as

2    the Religious Dialogue Council in which a judge -- in this case

3    Hamoud al-Hitar and couple of other scholars -- sit down and

4    talk with the individuals and attempt to adjust their views and

5    show why al Qa'ida, for instance, isn't -- why what al Qa'ida

6    says is not consistent with the Qur'an.

7        That program was eventually stopped, I believe, December

8    10, 2005.  But Saudi Arabia has used a similar program using

9    the Yemeni model.  That's sort of a broad overview of the

12:24 10   program.

11   Q.   It's fair to say that lots of Yemenis then are released

12   and do not serve -- or didn't serve prison sentences because of

13   this program?

14   A.   It's fair to say 364 Yemenis were released through this

15   program.

16   Q.   Okay.  It sounds like you're quite familiar with the

17   program?

18   A.   Yes.  I've interviewed the judge a number of times as well

19   as individuals who have been through the program.

12:24 20   Q.   Fahd al-Qusa', you're aware he was one of the people that

21   was released?

22   A.   The Yemeni Government has never released the names of the

23   individuals, and so I've only had confirmation from individuals

24   I spoke with, and I've not spoken with Fahd al-Qusa'.

25   Q.   You're aware he's no longer in jail?  He was --

A.    I'm aware he was released, but my understanding is that he

was released after the end of the program, when the program was

no longer in existence.  So I don't know the reasons Fahd

al-Qusa' was released.

Q.    Are you aware that he's under Indictment in the United

States?

A.    Yes, I am.

Q.    Are you aware that the Yemeni Government did not extradite

him to the United States despite a request from the United

States?

A.    I wasn't aware of the request.

Q.    What's he doing now?

A.    He is currently a commander in al Qa'ida in the Arabian

Peninsula, who often gives interviews.

Q.    So he's still in al Qa'ida?

A.    He's an active member of al Qa'ida, yes.

Q.    The Cole, you mentioned Harithi being in charge of al

Qa'ida in Yemen.  He didn't conduct the attack on the USS Cole,

did he?

A.    No.  What we have is the --

Q.    He didn't conduct the attack, right?

A.    I believe he was involved in it, yes.

Q.    He was involved in the attack?

A.    This is what al Qa'ida documents suggest.

Q.    These are people that were operating under the control of

1    the organization, his organization in Yemen?

2    A.   Well, I mean, it's -- how I would classify -- can I -- can

3    I sort of explain what I'm thinking?

4    Q.   Please.

5    A.   Okay.  Thanks.  So what I would -- what al Qa'ida did is

6    they sort of had this what bin Laden called centralization of

7    decision-making, decentralization of execution.  And so one of

8    the guys who sort of was thought of as the mastermind is

9    Nashiri, who was outside of Yemen.  Then there is a team made

12:26 10   up of Al-Badawi, al-Qusa', al-Harithi was involved, who were

11   carrying out the orders.  So they had sort of a broad

12   directive, but it's up to the guys who were on the ground to

13   carry out the attack.

14   Q.   Okay.  Same organization?

15   A.   Al Qa'ida, yes.

16   Q.   So I want to ask you about other al Qa'ida activity in

17   Yemen, both before or after the Cole attacks.

18   A.   Okay.

19   Q.   Are you familiar with an attack on the Jibla Hospital?

12:26 20   A.   Yeah.  That wasn't an al Qa'ida attack.

21   Q.   Who was the attacker?

22   A.   This was a small cell that carried out the attack in

23   Jibla, and they also assassinated a socialist politician in

24   Sunnah, both on the last few days in December of 2002.

25   Q.   Now, are you -- do you know who Ibrahim al-Thawr is?

     1   A.    Thawr?

     2   Q.    Thawr, T-h-a-w-a-r.

     3   A.    Yes.  He was a suicide bomber, I believe, for al Qa'ida.

     4   Q.    Nebras, he's also referred to?

     5   A.    I'm sorry?

     6   Q.    He's also referred to as Nebras?  Have you heard that?

     7   A.    I've heard Nebras.  I'd have to go back.  There's a number

     8   of kunyas that these individuals use.

     9   Q.    Now, Nebras was one of the suicide bombers in the Cole

12:27 10   attack, right?

    11   A.    To the best of my recollection, yeah.

    12   Q.    Are you aware that Kamel, who you just talked about in the

    13   Jibla attack, Abdul Razak --

    14   A.    Kamel.

    15   Q.    -- was friends with and associates with Nebras' brother?

    16   A.    I mean, there's -- I wasn't aware of that connection, but

    17   there's a lot of individuals who are linked by family within

    18   Yemen to different people.

    19   Q.    Now, what about -- are you aware that he's associated with

12:28 20   Fawaz al-Rabi'l?

    21   A.    We're talking about Ibrahim al-Thawr, right?

    22   Q.    No.

    23   A.    Who are we talking about?

    24   Q.    We're talking about Abdul Razak Kamel.

    25   A.    Linked in which way?

1    Q.    That he was associated with Fawaz al-Rabi'l.  Do you know

2    who that is?

3    A.    Yes, I do.  Fawaz -- yeah.  I'm aware that there are

4    allegations.  I haven't seen anything that would convince me

5    that they were, you know -- because -- I mean, the time line

6    gets tricky because Fawaz al-Rabi'l is coming back to Yemen in

7    the summer of 2001.

8    Q.    Fair to say when you were studying in Yemen in 2003 and

9    2004, you weren't participating in the investigation of the

12:28 10    Jibla Hospital attack?

11    A.    That's fair to say, yeah.  I wasn't a part of that

12    investigation.

13    Q.    Did you ever talk to the FBI agents who conducted that

14    investigation or the Yemeni officials who conducted that --

15    A.    I talked to Yemeni officials, yeah, as well as Yemeni

16    journalists, yeah.

17    Q.    Have you talked to FBI officials who participated in that

18    attack?

19    A.    No.

12:29 20    Q.    Have you reviewed the materials, including Mr. Kamel's

21    statement that he made, regarding the attack?

22    A.    I've looked at the statement that he made.  Some of the

23    statements that Lisa Wedeen has uncovered from previous years

24    that were made by these individuals who carried out both the

25    Jibla as well as the assassination of Jarallah Umar.  But I

1    haven't reviewed any of the FBI material, no.

2    Q.    Are you familiar with the attack on the Limburg?

3    A.    Yes, I am.

4    Q.    When did that take place?

5    A.    That took place in late 2002, October 2002, I believe.

6    Q.    That was an al Qa'ida attack --

7    A.    Yes, that was.

8    Q.    -- you agree?  October of 2002?

9    A.    That's correct.

12:29 10    Q.    Fourteen months after September 11, 2002?

11   A.    Yes.

12   Q.    Now, was Harithi, the head of al Qa'ida at the time, was

13   he involved in that attack?

14   A.    Yes, he was.

15   Q.    What happened in that attack?

16   A.    So what happened is that the individuals had been in a

17   safe house in Al Mukalla, lying low.  They were watching

18   members of their network being rounded up around the country,

19   many of them thrown in jail.  They put a lot of pressure on

12:30 20   al-Harithi as well as on al-Nashiri because Harithi wanted to

21   bring him into the plot to carry out this attack.  They were

22   told over and over, Wait, wait, wait, wait, wait.

23        Finally, an individual named Yahya al-Mujali, who's a

24   member of al Qa'ida, was killed in Sanaa in a Yemeni Government

25   raid.  Two of his brothers, Arif and Hameq Mujali, were

         1   involved in this cell that eventually carried out the attack.

         2   And so after that, they really pressed to be able to carry it

         3   out and they were.

         4   Q.   They conducted the attack, right?

         5   A.   Yes, they did.

         6   Q.   Did you observe the trial?

         7   A.   No, I did not.

         8   Q.   Are you familiar with that investigation?

         9   A.   You mean the Yemeni investigation of that?

12:31 10   Q.   Any investigation.

        11   A.   I'm familiar with the Yemeni side, yeah.

        12   Q.   But not the U.S. side?

        13   A.   I did not know that -- I mean, it was not -- it was a

        14   French-flagged oil tanker that was attacked.  But in addition

        15   to sort of the U.S. being aware of it as an al Qa'ida attack,

        16   but I wasn't aware of any specific U.S. investigation into

        17   this, no.

        18   Q.   Or participation in the investigation?

        19   A.   I mean, I'd heard that the U.S. was participating but not

12:31 20   in the lead role.

        21   Q.   Now, there were 15 al Qa'ida operatives prosecuted for --

        22   I'm going to talk about some other attacks as well -- for their

        23   role in that attack or a series of other attacks that happened

        24   in the same time frame?

        25   A.   There were several.  I don't know the exact numbers.  I

1    would have to go back and look at my notes.

2    Q.   Who were the suicide bombers of the Limburg attack?

3    A.   I don't recall their names offhand.  I have it -- it's in

4    my bag over there.  I could look it up.

5    Q.   Members of al Qa'ida?

6    A.   Yes, they were.

7    Q.   Now, there was another attack that -- or another attempted

8    attack that focused on several embassies in Yemen.  Are you

9    familiar with that?

12:32 10    A.   I'm familiar with some of the plots.  You'd have to be

11    more specific about what exactly you're referring to.

12    Q.   Between March and May of 2002, members of al Qa'ida

13    plotted against the American, British, Germany, Cuban, and

14    French embassies in Yemen.

15    A.   Yeah.  What you're referring to is this -- it was three

16    people.  It was Fawaz al-Rabi'i, Yahya and Arif Mujali, all of

17    whom I've mentioned earlier.  They carried out a series of --

18    they essentially placed bombs around different places in Sanaa

19    and many of these bombs exploded.  No one was killed.  And at

12:33 20    the end, they put out this statement saying, you know, What you

21    need to do is you need to release 173 prisoners.  And then they

22    signed it, Sympathizers of al Qa'ida.  And they gave a deadline

23    of 30 days.  They said, If this isn't done, then we're going to

24    follow through on these threats.  So instead of just the bombs

25    exploding and no one being killed, then a number of people will

1   be killed.  They were never able to follow through on those

2   specific threats.

3   Q.   They were members of al Qa'ida?

4   A.   Yes.  Fawaz al-Rabi'i and the two Mujali brothers, yes.

5   Q.   They were part of Harithi's organization?

6   A.   Yes.

7   Q.   There was another plot that was targeting the American

8   ambassador.  Are you familiar with that plot?

9   A.   Ambassador Hull you're referring to, Edmond Hull.

12:33 10  Q.   Correct.  August 9, 2002.

11  A.   Yeah.  I think there were a few plots that have come out.

12  But, yeah, he writes about this in his memoirs that have just

13  come out.

14  Q.   So a few al Qa'ida plots were focusing on the United

15  States ambassador to Yemen --

16  A.   Yes.

17  Q.   -- in 2002.  And some of these individuals of the 15 we

18  talked about before were prosecuted for their role in that

19  plot?

12:34 20  A.   Yes.  I mean, they were prosecuted, yeah.

21  Q.   This was a joint trial where all those offenses were

22  prosecuted at the same time?

23  A.   Sort of put in together, yeah, into a big porridge, which

24  makes it a little difficult to sort of splice -- or parse out

25  all of them out now.

```
 1   Q.    There were 15 defendants.  All were accused of being
 2   members of al Qa'ida, and these were all al Qa'ida attacks, is
 3   that fair?
 4   A.    Well, I mean, many of the attacks or purported attacks
 5   didn't take place but there were plots, yeah.
 6   Q.    Plots.  They were trying to attack --
 7   A.    Yes.
 8   Q.    -- people in Yemen.
 9         One of those was the an attack on the Hunt -- a helicopter
10   belonging to the Hunt Company.  Are you familiar with that
11   attack?
12   A.    Yes, I am.
13   Q.    That was in November of 2002?
14   A.    2002.  It was the same day al-Harithi was killed.
15   Q.    It's fair to say it wasn't al-Harithi that was attacking
16   the Hunt helicopter?
17   A.    Right.  So what happened at the time was al-Harithi was
18   out in Ma'rib having a meeting, and Fawaz al-Rabi'i and, I
19   believe, five or six individuals were stationed outside the
20   airport, and they eventually fired a manpad missile as well as
21   some machine guns at the Hunt Oil helicopter.
22   Q.    This was part of that same network, that same
23   organization, al Qa'ida in Yemen, in the time frame, right?
24   A.    Uh-huh.
25   Q.    These were people that worked for Harithi but not Harithi
```

1    himself that actually conducted this attack?

2    A.   He didn't conduct it, but he was aware of it.

3    Q.   Part of his organization?

4    A.   Yeah.  But it's an organization on the run.  So it's--

5    there's communication -- it's the same sort of philosophy that

6    we talked about earlier with bin Laden.

7    Q.   They're trying to stay alive, but they're still trying to

8    kill people.

9         There were also attacks -- plots against judicial

12:36 10   officials and prosecutors in Yemen as well.  Are you familiar

11   --

12   A.   There were threats made against them, yes, threats often

13   that sort of as the defendant was being led away or something,

14   he would yell out a threat.

15   Q.   There were actually people prosecuted for these plots?

16   A.   Yes.  The Yemeni Government brought charges against them.

17   Q.   I'm not referring to a random threat.  I'm referring to a

18   plot where people actually planned and conspired to attack

19   members -- both judicial officials and prosecutors in Yemen?

12:36 20   A.   I think there was -- if memory serves, there was one judge

21   and two prosecutors who were targeted in these plots you're

22   referring to, yeah.

23   Q.   These are members of al Qa'ida in Yemen that were plotting

24   to kill judicial officials and prosecutors in Yemen?

25   A.   Well, that's a little tough.  I don't think I'd go that

1    far because the problem that you have is, some of these people,

2    like Fawaz al-Rabi'i and others, they have family members who

3    aren't members of al Qa'ida.  And so it becomes very difficult

4    to sort of look back and say, Well, what is sort of a revenge

5    plot, and what's a plot that's being directed by al Qa'ida?

6          Now, we know certain ones because al Qa'ida has talked

7    about them.  But it can be difficult to sort of look at all

8    violence and say all of this is al Qa'ida and leave out the

9    rest of Yemen.  And Yemen is a very complicated country.

12:37 10   Q.   Okay.  For this plot, though, they were tried together

11   with all the other plots that we just --

12   A.   This was one of the charges brought up, yeah.

13   Q.   Who took over for Harithi after he was killed?

14   A.   So there was a meeting, and they were really two

15   individuals who sort of came up.  One was a guy that we've

16   talked about a little bit earlier, Fawaz al-Rabi'i.  Muhammed

17   Hamdi al-Ahdal was another individual who sort of stepped into

18   the role.  But neither of them were really able to fill the

19   shoes of al-Harithi, which is why his death was so detrimental

12:38 20   to the organization.

21   Q.   Other members of al Qa'ida had a meeting and --

22   A.   I don't think there was one meeting.  There was a series

23   of discussions, yeah.

24   Q.   Okay.  Are you familiar with a term "Shura"?

25   A.   Shura Council?

```
 1    Q.    Right.

 2    A.    Yeah.

 3    Q.    Is that commonly referred to as a meeting of senior

 4    members of al Qa'ida?

 5    A.    Yeah.  I'm not sure if we can say that what happened in

 6    Yemen post al-Harithi was an actual Shura.  We don't have an

 7    evidence from that, and that's a fairly technical term.  The

 8    evidence we have indicates a series of looser conversations

 9    where they gravitated towards these two individuals to move on

12:38 10   from al-Harithi's death.

11    Q.    2002, November, al-Harithi gets killed, and all the other

12    members of al Qa'ida and their associates are figuring out what

13    to do to survive; what's best for the organization, is that

14    fair?

15    A.    Yeah.  I sort of look at it, if you're plotting it on a

16    map, so you go from 2001, that's the game changer and al Qa'ida

17    sort of decreases.  It's on the run.  It's trying to carry out

18    attacks.  Then al-Harithi's death in 2002 sort of breaks the

19    back, and there's the sharp drop-off that we have.

12:39 20   Q.    One of the individuals you mentioned was Hamdi al-Ahdal?

21    A.    Ahdal, yes.

22    Q.    He wasn't captured until a year later?

23    A.    November of 2003, that's correct.

24    Q.    So notwithstanding the sharp drop-off you just mentioned,

25    a year later he was still on the run in Yemen?
```

A.   A year later he was captured.  So, yeah, what happened is
-- I mean, it takes time, right?  So they break the back of the
organization.  The organization can't really do anything.  And
they eventually round them up a year later.

Q.   So they're still running around trying to do things
presumably?

A.   Well, al-Ahdal was at his wedding when he got arrested.
He was in Sanaa.

Q.   Members of al Qa'ida get married just like everyone else,
right?

A.   Yeah, to the best of my knowledge.

Q.   Based on your expertise, getting married doesn't stop
someone from continuing their Jihadi --

A.   Right.  But the point is, is that he was in Ma'rib back in
2001, and he had been harassed out of there until he got back
to Sanaa where he tried to sort of blend in and that didn't
work.

     It was the same thing with Fawaz al-Rabi'i.  They went out
to Ma'rib trying to find refuge.  They found that it was much
different than what it had been, and so they were arrested as
well.

Q.   Okay.  Now, on March 4, 2004 -- are you familiar with an
individual named Abdul Rouf Nasib?

A.   I've heard the name.

Q.   What do you know about him?

```
 1   A.   I just -- I've heard the name.  I'd have to have my memory
 2   refreshed.  There's lot of Arabic names when you're studying al
 3   Qa'ida and Yemen.
 4   Q.   It's fair to say you haven't memorized the names of every
 5   member al Qa'ida in Yemen?
 6   A.   I think that's fair to say.  I don't know all the names of
 7   members of al Qa'ida.  I don't think anybody now, with the
 8   exception of Nasir al-Wihayshi or Qasim al-Raymi, knows now.
 9   Q.   Lots of folks there.  You learned about some of them.
10   But, obviously, a lot of these individuals don't advertise
11   their association with al Qa'ida, is that fair?
12   A.   Yeah.  I mean, I think it's fair to say there are members
13   of al Qa'ida whose identity we don't know.  I think that's
14   fair, yes.
15   Q.   Now, you mentioned -- I want to make sure I use the same
16   term that you used.  I believe you said al Qa'ida was
17   eliminated in 2002 on direct.
18   A.   I don't believe I said that.  I said, I believe -- my
19   recollection is, I said the organization was crumbling after
20   the drone strike that killed al-Harithi.  That was the thing
21   that broke the organizational -- or the organization's back.
22   Q.   If you misspoke and did say "eliminated" during direct,
23   that's not accurate?  That's not your opinion?
24   A.   My opinion is that after the drone -- the drone strike in
25   November 2002 was the strike that broke the back of al Qa'ida
```

1    in Yemen.  After that, the organization which had been on the

2    run previously, then was even that much more harried and

3    harassed, to the point where al-Ahdal and al-Rabi'i were

4    arrested within the year.

5    Q.   They were trying to hold on --

6    A.   They were trying, yes.

7    Q.   Are you familiar with an arrest on February 16, 2005, in

8    Sanaa where five al Qa'ida members were arrested?

9    A.   I know that periodically there were -- I'm not familiar

12:43 10   with the one that you're talking about.  I'd have to have some

11   more detail, some names.

12   Q.   You were saying periodically there were --

13   A.   Periodically -- yeah.  So what happened, you know, between

14   this time is that organizationally, yeah, most of the guys in

15   Yemen who are more -- who would self-select as al Qa'ida, they

16   were more drawn to the fighting in Iraq than they were to this

17   dying Jihad at home.  There's not really an infrastructural

18   base for al Qa'ida in Yemen here.

19        So that doesn't mean that there aren't people who are

12:43 20   sympathetic.  We certainly know that there are some of these.

21   But the organization as such, no, there were no infrastructure.

22   The sort of infrastructure was restarted in February of 2006

23   with that prison break.

24   Q.   Well, there was a trial of 15 members of al Qa'ida that we

25   talked about before.  Fair to say that wasn't 100 percent of

1   the membership of al Qa'ida in Yemen at the time, right?

2   A.   That's fair to say, yes.

3   Q.   There were a great number of members of al Qa'ida over the

4   years in Yemen?  You --

5   A.   Over the years, yeah.

6   Q.   Lots of connections in Yemen to people in al Qa'ida?

7   A.   "Lots" might be a little problematic as a term.  There are

8   certainly connections that -- you know, between certain Yemenis

9   and al Qa'ida, yeah, absolutely.  But, I mean, in the grand

12:44 10  scheme of things, when we're talking about it, it's a pretty

11  small percentage of the population.  Yemen is a country of 25

12  million.  It's not like lots of the 25 million are affiliated

13  with al Qa'ida.

14  Q.   But, as you said, there were 4,000 --

15  A.   This --

16  Q.   -- veterans of the Afghan mujahideen, that fight, that

17  came to Yemen?

18  A.   Right, exactly.  But the point is they're not al Qa'ida.

19  They're not all al Qa'ida.

12:44 20  Q.   Some of them are al Qa'ida.  Some of them went out and did

21  other things?

22  A.   Right.

23  Q.   Certainly, some of them maintained connections with Osama

24  bin Laden.  We've talked about some of them.

25       We haven't tracked down or the Yemeni Government or United

1    States or anyone else hasn't tracked down every member of al

2    Qa'ida that went back there?

3    A.    I don't believe so, no.

4    Q.    Now, so it's fair to say that their presence was

5    diminished then; their capabilities perhaps were diminished,

6    but they were still an al Qa'ida presence in Yemen in 2003,

7    2004 time frame?

8    A.    No.  So I would say that, again, from November 2002, the

9    drone strike that sort of killed the leader, then, if you

12:45 10    imagine like an infrastructure like a physical structure, that

11    structure is crumbling.  And then by November 2003, that

12    structure has sort of ceased to be.  And then in February of

13    2006, they resurrect that structure back up after the prison

14    break.  That's how I analyze the situation.

15    Q.    We'll get to the prison break in a little bit.

16          Are you familiar with someone named Hadi Yukum?

17    A.    Yes.  I've read the name, yes.

18    Q.    Who's that?

19    A.    This is an individual that President Salih has referred to

12:46 20    as someone -- I'm paraphrasing -- but that the Saudis are crazy

21    about arresting.

22    Q.    Why are they crazy about arresting him?

23    A.    My recollection is that the Saudis thought he was al

24    Qa'ida, and President Salih claimed he was a gun salesman, gun

25    merchant.

Q.   Are you aware that some consider him as a leader in al
Qa'ida in Yemen?
A.   Some being?  Some in the Yemeni Government, some in the
Saudi Government, some in the U.S. Government?
Q.   Well, any of the above, I suppose.
A.   No.  I guess I don't look at a lot -- you know, I have
what's available to people through WikiLeaks or stuff, but I
look at a lot of what al Qa'ida puts out.  And there's no
evidence in the material I've reviewed from al Qa'ida that
people were viewing him -- people within al Qa'ida were viewing
him as a leader.
Q.   Now, in addition to actual members of al Qa'ida,
associates of al Qa'ida, there are also a number of supporters
of al Qa'ida and extremists in Yemen, is that fair to say?
A.   Again, a number is, you know, a difficult term.  As
academics we like to try to be as precise as possible.  There
were certainly, I think, supporters, or people who would give
aid.  The problem is that many of these people aren't
self-identifying as al Qa'ida, so they wear -- just like we do
here, they wear multiple identities.  They might be appealing
as a tribesman or they might be appealing as, you know, a
member of this extended family.  And it's often difficult, not
being present at those conversations, to know did this person
think they were giving help to someone who was a member of a
tribe, or did they think they were giving help to someone who's

1    a member of al Qa'ida?

2    Q.    So you wouldn't -- if you were trying to find somebody

3    who's a member of al Qa'ida, like when you were doing your

4    interviews, you wouldn't go around just asking if anyone knows

5    anyone from al Qa'ida, right?

6    A.    No.  That would not be a very good idea, I don't think.

7    Q.    You'd have to have some kind of a connection, right, if

8    you wanted to actually link up with someone who was al Qa'ida?

9    A.    Well, I never interviewed anyone who was in al Qa'ida at

12:48 10   the moment.  Not active members.  I talked to people who had

11   been, say, released through this prison program who had been

12   former members, things of that nature.  Obviously, I didn't

13   want to get in trouble with the U.S. or anyone for, you know,

14   doing anything like that, so I didn't.

15   Q.    But I believe, as you've testified, it's fair to say there

16   were a number of these al Qa'ida and al Qa'ida sympathizers

17   around.  Some were on the run and some weren't very open about

18   what they were doing.  Is that fair?

19   A.    I'm sorry.  You'll have to repeat that.

12:49 20   Q.    There were a number of these types of individuals around,

21   in Yemen, present, either members of al Qa'ida, associates of

22   al Qa'ida, or supporters of al Qa'ida, who basically from 2002,

23   the killing of al-Harithi until now, there was a presence of

24   these types of folks in Yemen?

25   A.    Yeah.  Well, it's something where, you know, people who

1    are sympathetic to many of the goals that al Qa'ida's had, you

2    know, in 2004, 2005, these guys are headed off to Iraq.  I

3    mean, do people like this exist in Yemen?  Yeah, I would say

4    so.

5    Q.   So some members of al Qa'ida, associates of al Qa'ida,

6    supporters, went to Iraq to fight once the United States

7    invaded Iraq in 2003.  That's fair?

8    A.   And not just supporters of al Qa'ida.  I mean, this is

9    where we get into some of the other things where the presence

12:50 10  of a non-Muslim military invasion in the Muslim world attracted

11   a -- attracted people from Yemen who wouldn't fight at home.

12   Q.   And significant numbers of fighters from Yemen left to go

13   to Iraq?

14   A.   Significant?  I'm not sure what that -- you would have to

15   be more specific.

16   Q.   What would you estimate the number?  Do you have an

17   estimate?

18   A.   I would estimate in the low hundreds, would be my

19   estimate.  Because the Government of Yemen really put a lot of

12:50 20  restrictions on people.  So if you were a Yemeni under the age

21   of 35, you couldn't fly alone to Jordan or Syria because those

22   are the frontline states where people go to get into Iraq.  And

23   so the Yemeni Government clamped down on that.

24   Q.   And there was also a rise at the time in Saudi Arabia of

25   attacks by al Qa'ida-related individuals to interests in Saudi

1    Arabia, is that correct?

2    A.    Yeah.  If at the time you're referring to, 2003 to 2006,

3    yes, there was an active branch of al Qa'ida in Saudi Arabia.

4    Q.    So some of the members and associates of al Qa'ida and

5    their supporters went to Iraq, perhaps some went to Saudi

6    Arabia?

7    A.    There's no evidence of any going to Saudi Arabia.

8    Q.    So your opinion is that none of the members --

9    A.    No.  I'm saying there's no evidence I've seen from the

12:51 10   internal documents that we have, and from statements that al

11   Qa'ida has put out, that people in Yemen who wanted to be

12   members of al Qa'ida when there wasn't the infrastructure in

13   Yemen went to Saudi Arabia to join up with al Qa'ida -- what

14   was known as al Qa'ida in the Arabian Peninsula at that time in

15   Saudi Arabia.

16   Q.    Okay.  Now, is it fair to say that in 2002, 2003, 2004,

17   Yemen was a dangerous place for U.S. Government personnel?

18   A.    I don't think that's fair to say.  I was there as a

19   Fulbright Fellow in Yemen in 2003-2004.  And when Yemen became

12:52 20   a dangerous place later, they closed the Fulbright program and

21   they closed the Critical Language Program from the State

22   Department.  And so at that time the U.S. Government was -- I

23   mean, there wasn't a freeze on funding for people like myself

24   to go there.

25   Q.    So you wouldn't describe it as dangerous for U.S.

1    Government personnel?

2    A.   Well, I mean, I think you have to put this in context,

3    right?  So 2003-2004 is not like 2008-2009 because, you know,

4    Fulbright's operating there, the government is comfortable with

5    people like myself being in the country, traveling around the

6    country.  In 2008-2009 it's a much different situation.  The

7    embassy's attacked by a group of seven people at the end of

8    2008.  It's -- I mean, they're just different.

9    Q.   You're familiar with State Department and the warnings

12:53 10   they put out?

11   A.   Yes, I'm aware of those.

12   Q.   Restrictions?  Are you familiar with warnings they put out

13   while you were there?

14   A.   I would periodically get warnings that the State

15   Department put out in Yemen.

16   Q.   That's something that -- as a U.S. citizen -- the State

17   Department lets U.S. citizens know of security alerts and

18   concerns, and they get that message out to people that are in

19   foreign countries?

12:53 20   A.   I believe there's -- I don't think "hierarchy" is the

21   right word, but there's levels of these warnings, is my

22   understanding.

23   Q.   When you were there from 2003 to 2004, are you familiar

24   with warnings that were put out by the State Department?

25   A.   There were -- I'm familiar that -- some I was given.  But,

1    again, this is something where I was free to travel around the

2    country; it wasn't restricted in anyway.  And they weren't

3    closing down the Fulbright program like they did later.  So, I

4    mean, this is the sort of levels that I'm talking about.

5    Q.   Okay.

6         MR. GROHARING:  May I approach, your Honor?

7         THE COURT:  All right.

8    Q.   You recognize that document?

9    A.   No, not right offhand, I don't.

12:54 10   Q.   Do you recognize what type of document it is?

11   A.   I mean, it appears to be a printed email.

12   Q.   Are you looking at a document with an "800" on the bottom

13   right corner?

14   A.   Yes.

15   Q.   Do you think -- that appears to be an email?

16   A.   Doesn't -- that at the top -- it says "Wayback Machine"?

17   All right.  Sorry.  It looked like how my emails print out when

18   I print them out.  I apologize.

19   Q.   Well, are you familiar with what that document is?

12:55 20   A.   It says a "travel warning" on the top.

21   Q.   And who issues the travel warning?

22   A.   The U.S. State Department.

23   Q.   Okay.  Is that something in your travels over the past

24   decade or so you're familiar with?

25   A.   Yes.  I received them as a matter of course, whether in

```
 1   the Peace Corps or in Yemen.
 2   Q.   And that travel warning was issued on May 23rd of 2003,
 3   correct?
 4   A.   That's what it says, yes.
 5   Q.   And it was issued by the State Department?
 6   A.   Yes.
 7   Q.   And in the warning, the State Department authorized return
 8   of nonemergency employees and adult family members of the U.S.
 9   Embassy in Yemen to leave immediately, is that correct?
10   A.   Wait.  It says, "Has authorized the return of nonemergency
11   employees and adult family members of the U.S. Embassy
12   effectively immediately."  So my reading of that is that they
13   were out and now they can come back?  Is that an incorrect
14   reading?
15   Q.   Please read the next sentence.
16   A.   Okay.  "The security threats that" -- starting there?
17   Q.   Yes.
18   A.   Okay.  "The security threats to all American citizens in
19   Yemen remains high due to credible reports that terrorists have
20   planned attacks against U.S." --
21        MR. CARNEY:  May we approach, please?
22             THE COURT:  Yes.
23   (SIDEBAR CONFERENCE AS FOLLOWS:
24             THE COURT:  Is this the document you say you do not
25   object to?
```

1          MR. CARNEY:  Yes.  But I intentionally gave Mr.

2     Groharing leeway to ask about whether -- ask the witness about

3     whether he was aware of this subject, and travel advisories, et

4     cetera.  But I'm asking to draw the line at actually reading

5     this document because it's --

6          THE COURT:  Does somebody have it?

7          MR. CARNEY:  -- not something -- it's obviously not

8     something he's ever read.  It's just a hearsay document, so --

9          THE COURT:  Okay.

12:57 10         MR. CARNEY:  I gave him, you know, I thought a little

11    leeway --

12         THE COURT:  So --

13         MR. CARNEY:  -- but reading the document.

14         THE COURT:  -- the objection is hearsay?

15         MR. CARNEY:  Yes, your Honor.

16         MR. GROHARING:  The warning itself is not being

17    offered for the truth of the matter asserted.  To the extent

18    that there's substance within the warning, it's his area of

19    expertise.  I want to ask him what effect that has on his

12:58 20    opinion of Yemen.  There are a number of these.  The next one

21    I'm going to show him specifically mentions al Qa'ida activity

22    in Yemen right during the time frame he's talking about.

23         MR. CARNEY:  Since he's never seen this, it's only

24    relevant if it is the truth.

25         THE COURT:  Well, it could be an event, okay?  A

1    notice could be an event.  It does contain statements which are

2    statements of fact; for example, the security threat to all

3    American citizens in Yemen remains high.  That in particular is

4    a statement of fact.  So I don't think the document can come

5    in.  Perhaps if he's able to -- he may be not able to -- say

6    that there were a number of travel advisories concerned about

7    safety or something like that.

8            MR. CARNEY:  I don't have a problem with that.

9            MS. BASSIL:  Obviously, the State Department didn't

12:59 10  care about the Fulbright Scholars.

11           THE COURT:  I'm not so sure of that.

12           But anyway, we're almost at 1:00, so maybe we'll take

13   this opportunity to break.  How much more do you have with him?

14           MR. GROHARING:  Not an awful lot but enough not to

15   press on.

16           THE COURT:  Okay.  We'll stay and deal with a couple

17   of things when we send the jury out.

18           MR. CARNEY:  If Mr. Groharing were to rest right now,

19   I would have no redirect.

12:59 20      THE COURT:  That's very encouraging.

21           MR. CARNEY:  I just wanted to let you know.

22           THE COURT:  Okay.

23   .  .  .  END OF SIDEBAR CONFERENCE.)

24           THE COURT:  Jurors, we've hit 1:00.  We're going to

25   stop now.  Tomorrow morning I have a matter that I have to

1   attend to first thing in the morning, so we won't be able to

2   start until 10:00 tomorrow morning.  So you can adjust your

3   travel schedule.  We'll try to keep going efficiently tomorrow

4   as well.  But it will be a bit little later start so I can --

5   basically, I'm attending a national meeting by remote that I

6   have to be part of.

7        So enjoy the rest of today and we'll see you tomorrow.

8   We'll stay briefly with the lawyers.

9        (The jury was excused at 1:00 p.m.)

01:01 10       THE COURT:  We're not where we thought we would be.

11  Let me just say this:  Both sides have, on occasion, admonished

12  witnesses to try to stay focused in their answers, and

13  responsive.  And I, bouncing off that, would encourage the

14  examinations on both sides -- this is a general observation --

15  to be focused to what is essential and get us back, because

16  we've really slowed down here.  Okay.  That's just the thought

17  for the day here.

18       MR. CARNEY:  To be candid, well, when Mr. Groharing

19  asked the witness to just answer the question, I almost stood

01:02 20  up and said, I would join in that request, but I thought it

21  would be --

22       THE COURT:  Well, okay.  This is an environment that

23  lawyers are familiar with and people in other walks of life are

24  not as familiar with and they may behave, understandably, the

25  way they behave in their native environment.  And so the

1    lawyers, I -- but it's not just controlling the witnesses.

2    That's not just what I meant.  I meant, there are points being

3    made that are worth making but not bolded and underlined.

4    Anyway -- okay.

5           MR. CARNEY:  I do have a matter that I need to bring

6    to the Court's attention.  I'm going to be requesting an

7    evidentiary hearing on a matter that has -- that I've been

8    informed occurred during the testimony of Kareem Abuzahra.

9    Your Honor recalls he was the final civilian witness called

01:02  10    before Evan Kohlmann.  He's the person who the government

11   contends went to Yemen with the defendant and Abousamra but

12   then got an email and returned to the United States.  He was on

13   the stand four days, with his testimony ending on December 1st.

14          I've been informed -- and I give credit to the

15   government for giving me this information -- but I've been

16   informed that when Abuzahra completed his first day of

17   testimony, and from time to time after that, Abousamra [sic]

18   received communications from people at the University of Lowell

19   that led him to believe that his testimony, as reported in the

01:03  20   media, had caused people at the university to view him as a

21   potential security threat and that his job working for the

22   University of Massachusetts at Lowell would be in jeopardy.

23          He called the FBI to get assistance in this regard,

24   and wanted the FBI, I believe, to communicate to UMass.

25          THE COURT:  Is that a 302 you're looking at?

1           MR. CARNEY:  No.  I'm looking at an email, your Honor.

2           THE COURT:  Okay.

3           MR. CARNEY:  I do not have a 302 on this.

4           I communicated this to several individuals at the FBI,

5     including an FBI victim specialist, and the two case agents,

6     Special Agent Heidi Williams and Task Officer Tom Daly.  In

7     addition, the United States Attorney's Office apparently, after

8     this -- and I'm not positive of the date -- was contacted by

9     Marty Meehan, chancellor of UMass Lowell.  And I'm not privy to

01:05 10     everything that was said in that conversation.

11           The reason I think an evidentiary hearing is necessary

12     is to establish what Abousamra was --

13           THE COURT:  Abuzahra.

14           MR. CARNEY:  Abuzahra.  I'm sorry.

15           -- what Abuzahra was told by people when he expressed

16     his concern; for example, We'll contact UMass Lowell.  We'll

17     speak to people.  We'll make sure you keep your job.  We'll

18     help you out.  I don't know what was said.  But the fact that

19     this began on November 28th, on the first day of his testimony,

01:05 20     and then I'm notified for the first time on December 6th, after

21     he's completed his testimony, meant that this isn't a subject

22     that I could inquire of him while he was on the stand.

23           THE COURT:  I understand.  As far as your

24     information -- and maybe we'll hear more from somebody from the

25     government -- but the word you used was "communications you

1    received."  Were those oral?  Were they emails?  What were

2    they?  Were the mixed?  Do you know?

3              MR. CARNEY:  I don't mind --

4              THE COURT:  Obviously --

5              MR. CARNEY:  I don't mind handing you the email I

6    received because --

7              THE COURT:  No.  No, the communications that Abuzahra

8    got from people at Lowell -- UMass Lowell, were they oral?

9    Were they emails?  The point being, the emails might be

01:06 10   available.

11             MR. CARNEY:  I believe they were oral.  And I'm not

12   suggesting that either the United States Attorney's Office or

13   the FBI did anything improper; in fact, I suspect people tried

14   to bend over backwards.  I certainly know -- and would expect

15   Special Agent Williams and Task Force Officer Daly and everyone

16   on this prosecution team to bend over backwards to do the

17   appropriate thing in their eyes.  What I'm concerned about is

18   the message that would be conveyed to Abuzahra and how he would

19   interpret that as a promise, reward and inducement --

01:07 20            THE COURT:  I understand.

21             MR. CARNEY:  -- that would affect his testimony while

22   I was cross-examining him.  And that's what I'm bringing to

23   your attention.

24             THE COURT:  Okay.  What's the government's view?

25             MR. CHAKRAVARTY:  And I sent that email to Mr. Carney.

1       The government recognized that potential argument by

2   the defense, but it doesn't seem to me that an evidentiary

3   hearing is the appropriate -- if any further follow-up is

4   necessary, it seems to me that it's re-calling the witness so

5   that he could then be asked about that.  I hasten to add, the

6   government doesn't necessarily believe that this is a

7   disclosable event in the sense that a promise, reward or

8   inducement was made.

9           THE COURT:  Right.  I understand.

01:07 10        Well, okay.  Reacting to this, I do think some further

11  exploration, so we know exactly what happened, is appropriate.

12  Now, maybe it's a mix of the two suggestions.  Maybe we make

13  him available and permit a voir dire just to see whether

14  there's anything worth putting in front of the jury.

15          MR. CHAKRAVARTY:  Well, I mean, doesn't that --

16          THE COURT:  Yes, it is the same thing.  But, I mean,

17  you could either ask him cold and nobody knows what he's going

18  to say, or you could test it out and then see whether it's

19  worth presenting to the jury.

01:08 20        MR. CHAKRAVARTY:  The --

21          THE COURT:  And, you know, I don't know how expansive

22  an evidentiary hearing Mr. Carney has in mind, but it could

23  have -- the term could encompass something beyond simply a voir

24  dire of the witness.

25          MR. CHAKRAVARTY:  I guess the government's concern is

1   the effect of doing the voir dire would essentially give

2   Mr. Carney additional information as to whether he wants to

3   re-call the witness for purposes of testimony at trial.  The

4   government doesn't see the need to do that in a bifurcated

5   fashion because we feel like we have represented what, at

6   least, our state of knowledge is about that.  If we're wrong,

7   then that will be exposed on --

8           THE COURT:  Well, how about this, then?  Instead of a

9   voir dire, how about an opportunity for Mr. Carney to interview

01:08 10   the witness?

11          MR. CARNEY:  My focus is not so much on the witness

12   because --

13          THE COURT:  Well, it will be because it's what he

14   appreciated was done for him rather than what was actually

15   done.  I mean, if somebody did him a favor and he didn't

16   realize it, it wouldn't have the effect that you would want to

17   show; on the other hand, if nobody did a favor and he thought

18   they were --

19          MR. CHAKRAVARTY:  Two points of clarification:  He

01:09 20   never asked for a favor and no favor was done for him.

21          THE COURT:  I know.  But my point simply is the gist

22   of this whole thing is promise, rewards and inducements and so

23   on and so forth, so what he understood them to be.  And so an

24   interview might answer that.

25          MR. CARNEY:  The problem with that, your Honor, if I

```
 1   may be so bold, I don't find Kareem Abuzahra to be a credible
 2   witness.  I would find FBI Special Agent Heidi Williams to be a
 3   credible witness, Task Force Agent Tom Daly to be a credible
 4   witness.  And I would prefer to rely on what they say the
 5   conversation was rather than on what Abuzahra says the
 6   conversation was.
 7            MR. CHAKRAVARTY:  And to that point, we made the
 8   disclosure of what they said happened.  And I guess that's
 9   the -- to the extent that counsel needs further
10   cross-examination, that's the witnesses.  In terms of the facts
11   of what happened, we feel we've adequately --
12            THE COURT:  Is there a 302?
13            MR. CHAKRAVARTY:  No, there's just this email which I
14   sent yesterday.
15            THE COURT:  And does the email say what the agents
16   would say if they were asked?
17            MR. CHAKRAVARTY:  Yes.  It's one sentence,
18   essentially, which Mr. Carney --
19            THE COURT:  So it doesn't really.
20            MR. CHAKRAVARTY:  Not as expansively as obviously it
21   would be at an evidentiary hearing.
22            THE COURT:  What about interviewing the agents on this
23   point?
24            MR. CARNEY:  That would be --
25            THE COURT:  I'm just trying to do the easiest thing,
```

1   at first, anyway.

2          MR. CARNEY:  That would be a useful first step.  As I

3   say, throughout the entire manner in which they've acted during

4   this trial, I have no question that I will hear the straight --

5          THE COURT:  Okay.  Why don't you do that on this point

6   and we'll see what happens.

7          Now, is that enough for now on that?  We can follow up

8   on it if --

9          MR. CARNEY:  Well, I believe I may also have to speak

01:11 10   to the person in the United States Attorney's Office who spoke

11   to Chancellor Marty Meehan to know what was conveyed to

12   Meehan -- I take that back.  If those conversations only

13   occurred after Abuzahra's testimony was complete, then --

14          THE COURT:  They couldn't have affected it.

15          MR. CARNEY:  -- they couldn't have affected it.  So I

16   don't see a need to do that.

17          THE COURT:  Okay.  So we'll -- to be continued.

18          MR. CARNEY:  Yes, your Honor.

19          THE COURT:  Now, speaking of FBI agents, the point

01:11 20   that was raised earlier, it seems to me that there's no point

21   in calling an FBI agent to give information that will not be

22   what the defense is looking for, though it might be suggested

23   that what was written in the -- in impeachment -- that what was

24   written in the 302 was more accurate than what the testimony

25   would be.  But I don't think -- particularly on this very

1    collateral issue.  So I think that if that was a motion to

2    preclude that testimony, I would grant that motion.

3         I may note that the issue of any potential bias was

4    brought up.  The jurors get the picture whether it was formal

5    evidence or not.  To bring him back for something which doesn't

6    sound like directly establishing the point anyway, it's

7    actually the contrary, I don't think it's worth all the

8    arrangements and disruptions that would have to be followed to

9    do that.

01:12 10        MR. CARNEY:  May I be heard on that, please, your

11   Honor?  I do view it as a more important piece of evidence than

12   your Honor is suggesting it is because of this:  When I tried

13   to confront Abuzahra with inconsistent statements, he kept

14   saying, I don't remember.  For example, Aren't you the one who

15   came up with the plot regarding the shopping mall?  I don't

16   remember.  Aren't you the one who said that we should consider

17   Hanscom Air Force Base?  I don't remember.  And so he kept

18   dodging everything.

19        This is a rare instance where I asked him flat out,

01:13 20   Didn't you tell the FBI that you know what prejudice is against

21   Muslims because you, yourself, told the FBI that you're

22   prejudiced against black people?  No, I never said that.

23        I have a 302 which makes it explicitly clear that

24   that's what he said.  There can be no finagling with it, no

25   uncertainty, no ambivalence.  Kareem Abuzahra said exactly what

1    I reported to you and it's reflected in that report.

2         Even if an agent said, I don't remember what he told

3    me, I believe I get that 302 into evidence by the rule of prior

4    recorded testimony.  It was a document made by the FBI agent on

5    the date, or very close to the date, when the statement was

6    made.  He looked at it because he had to sign it.  And he

7    signed it because he knew at that time it was correct.

8         And so I can independently put in the 302 as prior

9    recorded testimony even if the witness today says, I don't

01:15 10   remember it.  If he wants to --

11        THE COURT:  Well, that's not what the representation

12   was about what the witness would say.  I'm not resolving the

13   credibility question, but the testimony would be, I think, as

14   Mr. Chakravarty said earlier, He didn't say that.  We

15   interpreted it, whatever, something like that.  So it was a

16   little bit more than not remembering; it was a different

17   version.

18        At any rate, I understand the point.  Two things:

19   Rule 403, I think, is just too collateral, and it's a matter

01:15 20   that the jurors have already heard something about; and, two, I

21   doubt that the matter could get into the evidence in the way

22   you suggest, so...

23        MR. CARNEY:  It makes it look like I was coming up

24   with something --

25        THE COURT:  No, I think --

1        MR. CARNEY:  -- to disparage the witness, you know, in

2    an emotional, volatile, important way about credibility, and

3    the witness denied it.  So if I'm sitting here as if -- if I

4    can just finish a second.  If I'm sitting in the jury, are they

5    thinking, Wow, what a low blow by Carney, asking the witness if

6    he said he's prejudiced against blacks.  Boy, that's low.  And

7    we heard directly from the witness that that's not true.

8        I want a special agent to get up and read what he

9    wrote in his report that is unequivocal.  I mean, there's no

01:16 10    ambiguity whatsoever.  And I believe --

11        THE COURT:  Okay.

12        MR. CARNEY:  -- that under prior recorded testimony I

13    can get that report in against the United States.

14        THE COURT:  That's a different point which we haven't

15    argued yet.  But at any rate, with respect to the testimony

16    issue, the government's objection is sustained as to that.  I

17    mean -- just --

18        MR. CHAKRAVARTY:  Your Honor, just, again, to

19    hopefully preempt this other point of trying to offer this

01:16 20    302 -- and it was a tactical risk that every trial attorney has

21    when they want to impeach with a good-faith basis, that they're

22    going to be able to either prove it up or choose to prove it up

23    later.

24        In this case the witness, Mr. Abuzahra, specifically

25    tried to explain his answer.  He said, I didn't say it like

```
 1    that, and if you'll allow me to explain, I will.  And, again,

 2    as a tactical matter Mr. Carney chose not to allow him to

 3    explain and he's stuck with an answer -- with something, you

 4    know, where he shouldn't be allowed --

 5         THE COURT:  Okay.  The record is what it is.  And if

 6    you're arguing about this later, so be it.  But anyway, for now

 7    the answer is no.

 8         MR. CARNEY:  So I cannot call that agent?

 9         THE COURT:  For that purpose.  I don't know if there

01:17 10    were other -- I mean, that was the only area of testimony that

11    was suggested.

12         MR. CARNEY:  Yes, your Honor.  Can I offer his report

13    as past recollection?

14         THE COURT:  As I say, we haven't addressed that issue.

15    I doubt that it is, but I'll consider that a little bit.  I

16    doubt it.

17         MR. CARNEY:  I will need him to be here to acknowledge

18    when he wrote this report, it was --

19         THE COURT:  We heard what the proffer was.  If you

01:17 20    want to talk to him -- anyway, I doubt it.

21         MR. CHAKRAVARTY:  And also, 302 is an amalgam of not

22    only one individual's memory; it's a summary --

23         THE COURT:  I don't think the nature of the document

24    satisfies the prior recorded statement of the witness as

25    opposed to the --
```

1          MR. CARNEY:  Oh, no.  It's a prior recorded statement

2     of the agent.

3          THE COURT:  Right.

4          MR. CARNEY:  Not of the witness but of the agents.

5          THE COURT:  No.  No, I don't doubt there could be some

6     impeachment of the agent if he were to testify.  I've factored

7     that in.  It still is way too remote.

8          MR. CARNEY:  May I ask the government if they spoke to

9     the second agent whose name was on the report?

01:18 10          MR. CHAKRAVARTY:  Yes.  And there was a general

11     agreement with regards to what transpired.

12          MR. CARNEY:  You know, I've been a lawyer a long time,

13     and when there's something as explicit as that in a 302, no

14     special agent of the FBI would write in there that the witness

15     I'm speaking to said the reason he knows prejudice against

16     Muslims is because he, himself, is prejudiced against blacks.

17     There's no way that the FBI would put that in a report of a

18     cooperating witness if it wasn't the truth.

19          THE COURT:  Okay.

01:19 20          MR. CARNEY:  In fact, they'd have to agonize about it

21     and say, Do we have to put it in here because it makes our guy

22     look bad, and they chose to do so.

23          THE COURT:  The issue is resolved.  So we'll see you

24     about 10:00 tomorrow.

25          THE CLERK:  All rise for the court.

1    (Whereupon, at 1:18 p.m. the trial recessed.)

1                C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4   Dahlstrom, RMR, CRR, Official Reporters of the United States

5   District Court, do hereby certify that the foregoing transcript

6   constitutes, to the best of our skill and ability, a true and

7   accurate transcription of our stenotype notes taken in the

8   matter of Criminal Action No. 09-10017-GAO-1, United States of

9   America v. Tarek Mehanna.

10

11  /s/ Marcia G. Patrisso
    MARCIA G. PATRISSO, RMR, CRR
12  Official Court Reporter

13  /s/ Cheryl Dahlstrom
    CHERYL DAHLSTROM, RMR, CRR
14  Official Court Reporter

15

16  Date:   December 8, 2011

17

18

19

20

21

22

23

24

25