UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
                                   )
          Plaintiff,               )
                                   ) Criminal Action
v.                                 ) No. 09-10017-GAO
                                   )
TAREK MEHANNA,                     )
                                   )
          Defendant.               )
                                   )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY THIRTY-ONE
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, December 9, 2011
10:13 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
3             Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
6         By: Jeffrey D. Groharing, Trial Attorney
              National Security Division
7         950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
8         On Behalf of the Government

9         CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
10            Janice Bassil, Esq.
              John E. Oh, Esq.
11        20 Park Plaza
          Suite 1405
12        Boston, Massachusetts  02216
          - and -
13        LAW OFFICE OF SEJAL H. PATEL, LLC
          By: Sejal H. Patel, Esq.
14        101 Tremont Street
          Suite 800
15        Boston, Massachusetts  02108
          On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

1                                I N D E X

2                      DIRECT   CROSS   REDIRECT   RECROSS

3      WITNESSES FOR THE
         DEFENSE:

4

5      GREGORY JOHNSEN (Cont'd)

6        by Mr. Carney                                    18
         by Mr. Groharing                      4

7      MOHAMMAD H. FADEL

8        by Ms. Bassil                 23

9                              E X H I B I T S

10

11     DEFENDANT'S

12     1178      Map of 16th Century Islam                 35

13     1182      Tibyan Publication post on Bank loans,
                 4/8/07                                    71

14     1183      Tibyan Publication post on Bank loans,
                 4/9/07                                    75

15     1263      Tibyan Publication post, 3/6/05
       (Pg. 1)                                             81

16     1255      Tibyan Publication post on Takfir,
                 1/30/07                                   96

17     1256      Tibyan Publication post on Pakistan
       bombing 1/30/07                                     89

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on December 9, 2011.

6          The defendant, Tarek Mehanna, is present with counsel.

7     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

8     are present, along with Jeffrey D. Groharing, Trial Attorney,

9     U.S. Department of Justice, National Security Division.)

00:19 10          THE COURT:  Good morning, jurors, counsel.  Mr.

11     Johnsen.  Go ahead.

12     CONTINUED CROSS-EXAMINATION BY MR. GROHARING:

13     Q.   Mr. Johnsen, I want to ask you about some of your

14     testimony yesterday.  But before I do, I'd like to ask you to

15     avoid some of the lengthy discussion that we had yesterday, and

16     to make the most efficient use of the court's time, if you'd

17     agree -- I'm going to ask you questions, and I'm going to ask

18     you whether or not you agree with what I say or whether you

19     disagree with that.  I would ask if you would just indicate yes

00:20 20     that you agree with what I've asked you or no, if that's what

21     the question calls for.  Would you agree to do that?

22     A.   To the best of my ability, certainly.  We're talking about

23     a time that's --

24     Q.   I think this is a good example.  "Yes" would be a good

25     answer to that question or "no."

1          MR. CARNEY:  Your Honor, I would make the same request

2     of the witness, please.

3          THE COURT:  Well, okay.  Let me just -- as I've done

4     with other witnesses who have been asked this same question, to

5     the extent an answer can be fairly answered yes or no, that's

6     fine, even though there might be more that could be said.  To

7     the extent that a truthful answer requires some qualification,

8     you should let us know that it requires some qualification.

9          THE WITNESS:  May I just say something real quick?

00:21 10     Sorry.  It's just -- it's 20 years in a country of 25 million

11     people.  It's very complicated.  So I will absolutely try to

12     give you yes-or-no answers to the best of my ability.

13     Q.   Thank you very much.

14          Now, yesterday -- and I want to make sure that I

15     understand this, and I want to make sure that the jury

16     understands this.  You testified about a period from 1990

17     through 2001 where Osama bin Laden and members of al Qa'ida

18     were involved in setting up infrastructure and training camps

19     in Yemen.  Do you remember that testimony?

00:21 20     A.   Yes, I do.

21     Q.   You described that as a period of heightened activity, I

22     believe, for al Qa'ida in Yemen; does that sound right?

23     A.   No.  Heightened activity does not.

24     Q.   Heightened activity in the sense of setting up training

25     camps, movement to Yemen, that kind of thing, establishment of

1      an infrastructure in Yemen.

2      A.   Yes, establishment of an infrastructure, yes.

3      Q.   Okay.  And then you said that September 11th happened, and

4      that was a game changer, I think is the word you used.

5      A.   Yes.

6      Q.   At that point, members of al Qa'ida began being rounded up

7      and arrested and essentially went on the run, is that fair?

8      A.   Yes.

9      Q.   Okay.  And you talked about the -- a drone strike that

00:22 10   took out the leader of al Qa'ida in Yemen in November of 2002?

11     A.   Correct.

12     Q.   Do you recall talking about that --

13     A.   Yes, I do.

14     Q.   -- that drone strike?

15          You described it as a decapitation strike?

16     A.   That was one of the descriptions, yes.

17     Q.   You would agree with me that it was an effective strike in

18     the sense that it decapitated the leader of al Qa'ida in Yemen?

19     A.   Yes.

00:22 20   Q.   And I believe you said that at that point -- and let me

21     know if this is not your accurate testimony or if you misspoke

22     yesterday.  But you said that the November 2002 strike really

23     broke the back of al Qa'ida.  They had been on the run up to

24     that point.  That was the strike, it was a decapitation strike.

25     It killed their leader, and they didn't know what to do after

1    that.  They had been struggling to reorganize even when he was

2    in charge.  And now with him dead, the organization really

3    crumbled.  Does that sound right?

4    A.    Yes.

5    Q.    You stand by that testimony?

6    A.    Yes.  The organization started to crumble even more so

7    after the strike in 2002, that's correct.

8    Q.    You testified yesterday about the fact that you write a

9    lot?

00:23 10    A.    That's correct.

11    Q.    You publish articles?

12    A.    Yes, I do.

13    Q.    And you provide your opinion in those articles?

14    A.    Yes, I do.

15    Q.    Are you familiar with an article you wrote in -- on April

16    12, 2010?

17    A.    Could you remind me of the title?

18    Q.    It's called, "An Act of Futility.  Obama wants to

19    assassinate the radical Yemeni cleric Anwar al-Awlaki.  The

00:24 20    thing is, his murder would do more harm than good."

21    A.    Yes, I'm aware of that.

22    Q.    Anwar al-Awlaki at that point was a member of al Qa'ida in

23    the Arabian Peninsula?

24    A.    There was some debate as to his exact membership within

25    the organization.  It was suspected.

1   Q.   No doubt he was a member of al Qa'ida?

2   A.   It was suspected there was some -- there was some

3   ambiguity.

4   Q.   He was putting out propaganda on behalf of the

5   organization, right?

6   A.   By that point, it was still unclear whether he was --

7   whether he was a member.  There were links, but membership is a

8   very technical term within al Qa'ida in the Arabian Peninsula.

9   Q.   Well, you're an expert?

00:24 10   A.   That's correct.

11   Q.   Is it your testimony that he was not a member?

12   A.   No.  My testimony is that there was ambiguity and that

13   membership means swearing what's called a Bay'ah or an oath of

14   allegiance to Nasir al-Wihayshi.  And there wasn't firm

15   evidence that he had done this.

16   Q.   Fair to say he was speaking out espousing the views of al

17   Qa'ida and providing support for al Qa'ida publicly at that

18   point?

19   A.   By 2010, he was, yes.

00:25 20   Q.   I want to get back to this article where you were

21   advocating that the United States should not target him, right?

22   That was kind of the premise of this article?

23   A.   That's slightly misleading.  The premise of the article,

24   and my argument all along --

25   Q.   Yes or no.  Was the premise --

1   A.   That was slightly misleading.

2   Q.   And I certainly don't mean to mislead you.  I'm reading

3   the title.

4   A.   Right.  I don't write the titles.

5   Q.   You didn't right "An Act of Futility"?

6   A.   No, I did not, not the title.  I wrote the article.

7   Q.   Someone else decides what to call your article?

8   A.   That's commonly what's practiced, yes.

9   Q.   I want to ask you about some specific texts that -- you

00:25 10   wrote everything that's actually in the article?

11   A.   In the article, yes.

12   Q.   Every word that's in here, you're responsible for?

13   A.   Yeah.

14        MR. CARNEY:  Your Honor, I object to the relevance of

15   what's happening in 2010 or 2011.

16        MR. GROHARING:  It's about to become relevant, your

17   Honor.

18        THE COURT:  Well, let's see.  Okay.  Go ahead.

19   Q.   And did you say, in fact, referring to a missile strike on

00:26 20   Anwar al-Awlaki, "This has been done before to little effect.

21   In November 2002, a CIA drone killed Kamal Derwish, a Qa'ida

22   suspect with joint U.S.-Yemeni citizenship.  Derwish was killed

23   because he was riding in a car with Abu Ali al-Harithi, a man

24   one U.S. diplomat at the time called 'The Godfather of al

25   Qa'ida in Yemen.'  Ultimately, their deaths meant little.  Al

1    Qa'ida was hobbled for a while, but eventually resurrected

2    itself stronger and more durability than its previous

3    incarnation."  Those are your words, right?

4    A.   Yes, they are.

5    Q.   That al Qa'ida was hobbled?

6    A.   Yes.

7    Q.   English is your native language?  You speak a number of

8    languages, right?

9    A.   Yes.  English is my native language.

00:27 10   Q.   And the word "hobbled" certainly doesn't mean the same

11   thing as "crumbled," correct?

12   A.   No, it does not.

13   Q.   I want to talk a little bit more about what happened with

14   al Qa'ida in Yemen after that point.  You testified yesterday

15   that -- notwithstanding the increased efforts, there were a

16   number of attacks in Yemen after September 2001?

17   A.   Could you be more specific with the number of attacks?

18   Q.   Do you recall testifying about attacks in Yemen?

19   A.   There were attacks after September 11, 2001, in Yemen,

00:27 20   that's correct.

21   Q.   Okay.  And the organization was on the run, is what you

22   testified to?

23   A.   Yes.

24   Q.   Members of al Qa'ida were on the run?

25   A.   Yes.

1    Q.    And a number of them were rounded up?

2    A.    Yes.

3    Q.    Now, in -- you testified that in 2006 there was a jail

4    break?

5    A.    That's correct.

6    Q.    And it was at that point that al Qa'ida ultimately

7    established a leadership structure in Yemen and became more

8    effective, correct?

9    A.    They reestablished, resurrected themselves.

00:28 10   Q.    And, ultimately, they became quite active again in Yemen?

11   A.    Yes, they did.

12   Q.    When they resurrected themselves, they took members from

13   prison as well as other members and supporters that were

14   present either in Yemen or somewhere around the world that

15   joined them in their continued efforts against targets in Yemen

16   and in the region?

17   A.    It was a very slow process initially, but, yes, they

18   acquired new members.

19   Q.    And they ultimately became, first, al Qa'ida in Yemen and

00:29 20   now al Qa'ida in the Arabian Peninsula?

21   A.    Eventually.  There were some other incarnations of names

22   along the way.

23   Q.    There was a little back and forth because there were

24   people in Saudi Arabia as well that were establishing an al

25   Qa'ida branch, and, ultimately, the al Qa'ida members in Saudi

1    Arabia joined with those in Yemen?

2    A.    That's a little misleading as well.

3          MR. CARNEY:   I --

4    A.    I would be happy --

5          THE COURT:   Wait, wait a minute.   Mr. Carney has, I

6    think, an objection.

7          MR. CARNEY:   Yes, sir.   I have an objection to inquiry

8    about al Qa'ida now or 2010 or in a period that is not focused

9    on 2001 until 2006.   After 2006, I submit it's not relevant to

00:29 10   this case.

11          MR. GROHARING:   Well, the defendant is certainly

12   continuing to act, it's the government's contention, in support

13   of al Qa'ida after 2006.   So --

14          THE COURT:   Well --

15          MR. GROHARING:   The organization and parts of the

16   organization's ongoing efforts are certainly relevant.   I only

17   have a few more questions.

18          THE COURT:   I think the present generally is not

19   relevant.   To the extent that some arc of development might be

00:30 20   relevant, I guess you can have a span of years.   But generally,

21   I think, beyond 2007 is not relevant.

22   Q.    Well, fair to say that al Qa'ida in Yemen -- and you're an

23   expert on al Qa'ida in Yemen, correct?

24   A.    (Nodding.)

25   Q.    They have been very aggressive in producing and publishing

1    propaganda?

2    A.   From what point?

3    Q.   Well, once they were established --

4    A.   This is after 2006?

5    Q.   After 2006.  After the jail break.  They became

6    established.  Infrastructure in Yemen.  After that point, they

7    became aggressive in their use of propaganda?

8    A.   In early 2008, they established the media wing al-Malahem.

9    From that point, from January 2008 on, they became very

00:31 10   aggressive.

11   Q.   And the purpose of that propaganda was to recruit new

12   members?

13             MR. CARNEY:  I object, your Honor.

14             THE COURT:  Sustained.

15   Q.   Are you familiar with the purpose of propaganda efforts of

16   al Qa'ida in Yemen?

17             MR. CARNEY:  I object, your Honor.

18             THE COURT:  Well, it was the date that was the

19   problem.

00:31 20             MR. CARNEY:  Yes.  And I believe he's talking about

21   after January of 2008.

22             THE COURT:  Right.  That's why the objection was

23   sustained.

24             MR. CARNEY:  I'm objecting again to this --

25             THE COURT:  Right.

1          MR. CARNEY:  You've already --

2          THE COURT:  I'm effectively doing that.

3          MR. CARNEY:  Excuse me.

4          MR. GROHARING:  Could we just go to the sidebar

5     briefly?

6          MR. CARNEY:  I've had problems like this before, your

7     Honor.

8     (SIDEBAR CONFERENCE AS FOLLOWS:

9          MR. GROHARING:  He's an expert on al Qa'ida in Yemen.

00:32 10    This is a specific example perhaps.  He can testify about the

11    importance of propaganda in general as an expert on al

12    Qa'ida in Yemen.  I have a couple more questions.  I want to

13    ask him about the importance of propaganda and al Qa'ida uses

14    of it.  It's well within his area of expertise.

15         THE COURT:  Well, if that -- if the emphasis that he

16    would give or that you would give him by the questions is 2008

17    on, then all we know is that in that period, 2008 on, they had

18    an emphasis on propaganda.  If, more generally, he would say,

19    throughout their existence from 1990 or from 2001 or pick any

00:33 20    other date that would be more relevant to the dates involved in

21    the case, that would be a different matter.  But you

22    specifically focused him on post events.  So it could be true

23    that they have emphasized propaganda in 2008 but did not before

24    that.  He's got to be able to say they did it before that.

25         MR. AUERHAHN:  It's not just the issue of al Qa'ida in

1    Yemen's emphasis on propaganda but his, as an expert on

2    analyzing an al Qa'ida affiliate, beliefs that propaganda is a

3    very important tool of al Qa'ida, which, seems to me,

4    consistent with what Kohlmann said and inconsistent with some

5    of the representations of what some of their experts are going

6    to say, as a general matter, the importance of propaganda.

7         MR. CARNEY:  I wonder if I could weigh in on this?

8    Number 1, your Honor, it's beyond the scope of the direct

9    examination because I never discussed propaganda.

00:33 10         THE COURT:  Nobody ever observes that rule.

11         MR. CARNEY:  Second of all the --

12         MR. GROHARING:  He's an expert of al Qa'ida.  Excuse

13    me, J.

14         MR. CARNEY:  Secondly, your Honor, he is not proffered

15    as an expert in propaganda.

16         THE COURT:  Well, no, but he is -- no.

17         MR. CARNEY:  Nor is he knowledgeable about the impact

18    of propaganda.

19         THE COURT:  He said he's an expert on al Qa'ida in

00:34 20    Yemen.  To the extent that what they do is propaganda, I think

21    it's probably within what he's described as --

22         MR. CARNEY:  He may be able to describe what

23    propaganda he would be aware of, but he's not an expert on what

24    impact that propaganda would have on people.

25         MR. GROHARING:  It's their use of the propaganda, your

1    Honor.

2              MS. BASSIL:  Let me add --

3              THE COURT:  The problem was, I think that it was --

4    the questions were directing him to a period which is beyond

5    the period that we're concerned with.  If it can be --

6              MS. BASSIL:  Let me add --

7              THE COURT:  -- brought back to the relevant period,

8    then you can have it.

9              MS. BASSIL:  I want to add a practical note to this.

00:34 10   When Jay stood up and said this was in 2008 and it really isn't

11   relevant, everybody on the jury nodded.  This jury has heard

12   enough.  These cross-examinations --

13             MR. CARNEY:  They were agreeing with his Honor.  I

14   notice a number of people nod when he speaks.

15             MS. BASSIL:  It's time to move on.

16   .  .  .  END OF SIDEBAR CONFERENCE.)

17             MR. GROHARING:  May I continue, your Honor?

18             THE COURT:  Yes.

19   Q.   Again, Mr. Johnsen, you are here as an expert on al Qa'ida

00:35 20   in Yemen, correct?

21   A.   I believe so, yes.

22   Q.   And in that expertise, you've been able to study the use

23   of propaganda by al Qa'ida in Yemen, is that correct?

24   A.   Yes.

25   Q.   And, in fact, al Qa'ida in Yemen uses that propaganda

```
 1    aggressively?
 2    A.    Aggressively, yes.
 3    Q.    And you've said that the more successful and vocal the
 4    group is, the more recruits who want to join; do you recall
 5    making that statement?
 6    A.    You have to remind me on where I made it.
 7          MR. GROHARING:  May I approach, your Honor?
 8          THE COURT:  You may.
 9    A.    Yes.
10    Q.    Are you familiar with that article, sir?
11    A.    Yes, I am.
12    Q.    Did you, in fact, make that statement?
13    A.    Yes.  Not -- sorry.  Yes.
14    Q.    Again, could you just remind the Court what was that
15    statement?  I believe it's in bold letters on the page there.
16    A.    You want me to read the bold or the highlighted?
17    Q.    The bold, please.
18    A.    "The more successful and vocal the group is, the more
19    recruits who want to join."
20    Q.    Thank you.
21          MR. GROHARING:  That's all I have, your Honor.
22          MR. CARNEY:  May I have one moment, please?
23          THE COURT:  Okay.
24          MR. CARNEY:  Your Honor, I have one question.  May I
25    ask it from here?
```

 1            THE COURT:  Go ahead.

 2    REDIRECT EXAMINATION BY MR. CARNEY:

 3    Q.    Mr. Johnsen, is there --

 4            THE COURT:  No.  Go ahead.

 5    Q.    Mr. Johnsen, is there any evidence of al Qa'ida training

 6    camps in Yemen from November of 2001 until February of 2006?

 7    A.    No, there is not.

 8            MR. CARNEY:  Thank you.  Thank you, your Honor.

 9            THE COURT:  Sir, thank you.  You may step down.

00:37 10            MS. BASSIL:  Your Honor, our next witness would be

11    Doctor Mohammad Fadel.

12            MR. CHAKRAVARTY:  Your Honor, there are a couple of

13    issues.

14            THE COURT:  Let me see you briefly at the side.  We

15    may have to --

16    (SIDEBAR CONFERENCE AS FOLLOWS:

17            THE COURT:  We had talked yesterday about the

18    government's submission and so on and we left it that we would

19    see whether there could be an accommodation of minds.

00:38 20            MS. BASSIL:  We focused Mr. Chakravarty on the

21    specific pieces within the threads I was going to use.

22            THE COURT:  Has that been successful?

23            MR. CHAKRAVARTY:  Well, the government disagrees it's

24    been successful.  It was appreciated.  But there was no

25    commitment to say we're not going to be introducing 70 posts.

1    It was, rather, I'm going to focus on a few things, and if I

2    need to, then I'll go to others.

3            THE COURT:  Let's start with the few things.  So we're

4    limited to the "few things."

5            MR. CHAKRAVARTY:  Which are Tibyan posts.  The

6    government's position is Tibyan posts which are about the

7    validity of Jihad, that target that kind of thing, that seems

8    fair game.  That's relevant state of mind.  I think it's

9    cumulative and duplicative, but that's a separate issue.

00:38 10         But there are other Tibyan posts about the citizenship

11   amongst the five or six that the defense seeks to offer through

12   the witness.  Citizenship, about --

13           THE COURT:  I don't understand that, the value of

14   citizenship.  Is this Aman, are we talking about?

15           MS. BASSIL:  No.

16           THE COURT:  What is the value of citizenship?

17           MS. BASSIL:  It's a couple of things.  The value of

18   citizenship has to do with Muslims who run for office, someone

19   who puts the United States flag on a CD of a Qur'an.

00:39 20         THE COURT:  Is this within the scope of the

21   pretrial --

22           MS. BASSIL:  Yes.

23           THE COURT:  -- supplemental?

24           MS. BASSIL:  Yes.  It's in contrast to the sort of

25   views al Qa'ida has.  So it's -- like Doctor March did it, but

1    it's on other subjects.

2         MR. CHAKRAVARTY:  I don't think it is within here.

3    Actually, I say citizenship.  There's citizenship, voting,

4    justification for takfir for those who don't pay the annual

5    zakat or tithes.  There were discussions about a scholar who

6    the jury has not heard anything about.  There are just

7    discussions about what he thinks is a good -- being a good

8    Muslim.

9         The government's position is they weren't not only not

00:40 10   disclosed, but this witness is an Islamic -- he's a religious

11   expert in Islam.  He talks about the history of Islam, which is

12   part -- I'm not sure that's relevant at all.  But holding that

13   aside, just going through the resume, there's nothing

14   indicating he knows anything about al Qa'ida.  There's no

15   scholarly research on al Qa'ida.  And to the extent he's going

16   to talk about, as March kind of back-doored it, I know al

17   Qa'ida without --

18        THE COURT:  That might be true.  That might be a

19   limitation.

00:40 20        MS. BASSIL:  Let me explain who he is.  He teaches at

21   the University of Toronto Law School.  He's an expert in

22   Islamic law, religion and theology jurisprudence and writings,

23   religion.  And as part of that, he certainly reads and is very

24   familiar with statements by al Qa'ida and how those relate to

25   sort of al Qa'ida's religious justifications and where those

1    have been distorted by al Qa'ida.  And that's what he's going

2    to talk about, and he's going to contrast or compare writings

3    that the defendant has posted.

4         MR. CHAKRAVARTY:  That's exactly the type of

5    disclosure.  The basis of that opinion, we don't have.  In his

6    resume, there's zero al Qa'ida --

7         THE COURT:  Okay.  I don't think that's a particular

8    problem.  I'll allow that.  My concern is the number of

9    exhibits.

00:41 10         MS. BASSIL:  Very few exhibits, all right?  And what I

11    will say about this, I'm perfectly willing -- I included the

12    whole thread out of an abundance of caution.  I am certainly

13    willing to redo the exhibits that go to the jury and just put

14    in that particular piece.  I'm perfectly willing to do that.

15         THE COURT:  Okay.  I think we can go ahead.

16         MS. BASSIL:  Thank you.

17         THE COURT:  Let me just clarify one thing.  I asked

18    about the supplemental disclosure.  That is distinguished from

19    the revised one filed yesterday.  The operative disclosures

00:42 20    will be the supplemental ones.  To the extent that the revised

21    ones add material that were not disclosed pretrial, that is not

22    going to be permitted.  So the focus --

23         MS. BASSIL:  It's in response to Kohlmann.

24         THE COURT:  The operative expert disclosure on the

25    scope will be the October 18th filings.  Just so you know --

1          MS. BASSIL:  I want to make an offer of proof on that.

2     The Court has always known that our experts were based on what

3     Kohlmann was going to say and that we certainly didn't know

4     exactly what he was going to say.

5          THE COURT:  Well, I don't think that you can disclose

6     a scope and then revise it substantially.  Minor revisions.

7          MS. BASSIL:  I was told to revise Sageman.

8          THE COURT:  Not the second one; the first one.  But,

9     anyway, the pretrial disclosures serve the purpose of Rule 16,

00:43 10     and those will be the basis for the scope of the inquiry.

11          MR. CHAKRAVARTY:  Your Honor's -- I think the mutual

12     understanding with regards to the fact of not commenting on the

13     defendant's state of mind and --

14          THE COURT:  Right, right.

15          MR. CHAKRAVARTY:  Those pretrial disclosures.

16          THE COURT:  Right.

17     . . .  END OF SIDEBAR CONFERENCE.)

18          MS. BASSIL:  Your Honor, we call Doctor Mohammad Fadel

19     to the stand, please.

00:44 20          MOHAMMAD H. FADEL, Sworn

21          THE CLERK:  Please be seated.  State your name.  Spell

22     your last name for the record.  Keep your voice up and speak

23     into the mic so everyone can hear you.

24          THE WITNESS:  Mohammad Hossam, H-o-s-s-a-m, Fadel,

25     F-a-d-e-l.

1          THE COURT:  Will you pull the microphone a little

2     closer to you, sir, so that we're sure we're hearing you well.

3          THE WITNESS:  Is that okay?

4          MS. BASSIL:  Speak up just a little bit.

5          THE WITNESS:  Certainly.

6     DIRECT EXAMINATION BY MS. BASSIL:

7     Q.   Will you tell the jury your full name and occupation?

8     A.   Mohammad Hossam Fadel.  I'm an associate professor of law

9     at the University of Toronto Faculty of Law where I teach

00:45 10    varies classes, including Business Organizations; Trusts; The

11    Law of International Business and Finance Transactions; and

12    Religion, Liberalism and the State, The Case of Islam.

13          I was formerly a practicing attorney in New York City.

14    I continue to be a member of the bar in good standing in New

15    York.

16    Q.   Will you tell the jury your educational and professional

17    background beginning with your graduation from college?

18    A.   I graduated from the University of Virginia College of

19    Arts and Sciences in 1998 with a degree of high honors, high

00:45 20    honors in Government and Foreign Affairs.  I then studied

21    Arabic for a year at the American University of Cairo, pursuant

22    to what's known as a Casa Fellowship.  Then I returned to the

23    United States, where I began a Ph.D. program at the University

24    of Chicago.  I completed that -- I was awarded my Ph.D. in

25    1995.

1    Q.    What were you awarded your Ph.D. in?

2    A.    Near Eastern Languages and Civilizations.  I wrote my

3    dissertation on a topic on medieval Islamic law dealing with

4    deregulation of courts.

5          Subsequent to completing my Ph.D., I began my J.D., my

6    doctorate of law degree, at the University of Virginia Law

7    School in the fall of 1996.  I graduated in 1999 with honors.

8    And then I did two clerkships with different federal courts.

9    And then I began private practice at a law firm in New York

00:46 10   with the name of Sullivan and Cromwell.  I stayed there for

11   five years -- almost five years as a corporate associate.

12   Q.    And then you left being a lawyer and became an academic?

13   A.    Well, I'm always a lawyer.  I'm still a lawyer.  I no

14   longer practice law.  But I am an academic lawyer now.

15   Q.    What is your rank at the Faculty of Law at the University

16   of Toronto?

17   A.    As of July 2011, I became an associate professor, which

18   means I receive tenure.  So I was promoted from assistant

19   professorship to associate professor.

00:46 20   Q.    Of the classes you teach, do any of them focus on Islam or

21   the role of religion?

22   A.    Yes.  I teach a seminar called Liberalism, Religion and

23   the State in the Case of Islam.  That is a class in what I like

24   to call applied political philosophy.  We look at how various

25   liberal political philosophers think about the role of religion

1    in a democratic state with a particular focus on John Rawls.

2           What we then do is study various freedom of religion

3    cases in different liberal jurisdictions, including the United

4    States, Canada, and Western Europe, and we look at the issues

5    that have come up with respect to Muslim minorities living in

6    Western democracies.

7    Q.    In teaching and in -- well, in teaching on this subject,

8    do you stay abreast of communications by al Qa'ida and other

9    Muslim terrorist groups?

00:47 10   A.    I do.  It's not the primary focus of my research, but it's

11   something that, obviously, I run into all the time in the work

12   that I do.

13   Q.    Do you speak, read, and write Arabic?

14   A.    Yes, I do.  I speak Egyptian colloquial fluently.  I speak

15   classical Arabic fluently.  I read classical Arabic fluently.

16   Q.    What is your scholarly area of expertise?

17   A.    My scholarly area of expertise is Islamic law.  I've

18   written numerous articles in Islamic legal history, covering

19   topics dealing with judicial procedure, rule of law, family law

00:48 20   in the modern world and in the premodern world.  I've written

21   articles on issues dealing with the role of women's rights in

22   premodern Islamic law.

23           My current area of research focuses almost entirely on

24   intersections between Islam and liberalism, primarily areas of

25   overlap and overlaps of tension.  And in areas of tension, I've

1   written -- so then I've written on issues regarding female

2   citizenship, modern Islamic reform movements, issues dealing

3   with --

4   Q.   Speak up a little.

5   A.   Sorry.  I've written on primarily issues that arise out of

6   Islamic law and its relationship with liberal citizenship.

7   Q.   Do you have a scholarly area of expertise in Islamic

8   theology and theological history?

9   A.   Yes.  One of my more recent articles, called "The True,

00:49 10   the Good and the Reasonable" deals with the theological

11   resources available in Orthodox Islam to promote a conception

12   of -- an Islamic-based conception of citizenship.  So I'm very

13   familiar with the premodern Islamic theological tradition.

14   Q.   Now, you said that you've published.  Have you published

15   in peer-reviewed journals?

16   A.   Yes.  I've published numerous articles in peer-reviewed

17   journals from the time I was a graduate student until the

18   present day.  My first peer-reviewed journal was a translation

19   and commentary on a medieval work of Hadith.  There's been a

00:49 20   lot of discussion of Hadith.  Hadith is a very technical

21   science.  My very first article was on that subject.  But as

22   I've said, I write widely on a variety of areas in

23   peer-reviewed journals.

24   Q.   By the way, did you peer-review Andrew March's book?

25   A.   Yes, I did.

1  Q.   Did he know at the time that you were one of his peer

2  reviewers?

3  A.   No, he did not.

4  Q.   Have you also written chapters for scholarly books?

5  A.   Yes.  Again, I've written several chapters for scholarly

6  books.

7  Q.   Without giving us the exact title, can you just give us

8  the general range of topics?

9  A.   Again, I've written on Islamic family law in the liberal

00:50 10  setting.  I've written on certain theological doctrines that

11  were developed in the modern world which are intended to create

12  more -- a more inclusive sense of community.  I've written on

13  also narrow -- very narrow technical theological topics as

14  well.

15  Q.   Have you published any articles for scholarly

16  encyclopedias?

17  A.   Again, I've written numerous articles, too many to

18  recount, for various different scholarly encyclopedias.  I do

19  think the one that's worth highlighting is, about two years ago

00:50 20  I was commissioned to write a lengthy article on the history of

21  the Islamic law of international conflict for the Max Planck

22  International Encyclopedia of Public Law.

23  Q.   Can you summarize your lecturing and teaching experience?

24  A.   It's very hard to summarize my lecturing experience

25  because it's too extensive.  But in terms of teaching, prior to

1    law school, I taught Arabic in various different programs.  I

2    taught Arabic at Notre Dame as an adjunct instructor.  I taught

3    Arabic at the Middlebury Summer Language Institute.  I taught

4    Arabic as an instructor at the University of Virginia.  I also

5    taught, as an adjunct instructor, in the Department of

6    Government --

7    Q.    You've got to slow down and speak up.

8    A.    Sorry.  Before I went to law school, I taught Arabic as an

9    adjunct instructor at Notre Dame University for one semester.

00:51 10    I then taught Arabic at Middlebury College, Summer Arabic

11    Program, for the summer of 1993.  Then I taught as an

12    instructor full time at the University of Virginia, Arabic, in

13    the year 1994 and 1995.  Then I taught as an adjunct instructor

14    in the Department of Government and Foreign Affairs at the

15    University of Virginia in Medieval Islamic Political Theory.

16         Then I went to law school.  I did not teach again

17    until 2006.  So I've already mentioned about the courses I

18    teach at the University of Toronto Law School.  I've also

19    taught Islamic Law intensive classes at Notre Dame Law School

00:52 20    and University of Virginia Law School.  And I also taught an

21    intensive course on Islamic Finance at the National University

22    of Singapore two summers ago.

23    Q.    Are you a United States citizen?

24    A.    Yes, I am.

25    Q.    Why are you teaching in Canada?

1    A.   I happened to receive a very good offer at a very good law

2    school.

3    Q.   Have you given any papers or presented on the issues of

4    Jihad?

5    A.   Yes, I have.  A couple of years ago, I was invited to a

6    workshop at Syracuse Law School.  They have a center there for

7    National Security Law.  I gave a paper there about the status

8    of the law of Jihad in the modern period and the legally

9    problematic nature of that doctrine.

00:53 10   Q.   Have you appeared on various media outlets or media

11   programs?

12   A.   Yes, I have.  I appear routinely on various news programs

13   in Canada, and just a few -- just a few days ago, I was on an

14   NPR show.

15   Q.   Have you testified in court -- have you been -- have you

16   testified in a court before?

17   A.   Yes, I have.

18   Q.   Where was that?

19   A.   I testified in the Eastern District of Virginia either in

00:53 20   2006 or 2007.  I testified in Canada on two different occasions

21   in criminal cases.

22   Q.   In Canada, were you asked to testify by the -- was there

23   any situation where you were asked to testify by the court

24   itself as opposed to the prosecutor or the defense?

25   A.   I don't -- I don't know the details of Canadian procedural

1   law.  But, in general, Canadian law requires the expert to

2   affirm that they're giving the evidence for the benefit of the

3   court.  But in both -- well, in one case, I was solicited by

4   the Crown.  That's what they call the government in Canada.  In

5   one case, I was solicited by the defense.  Then in another

6   civil case, I recently gave -- I guess about a year ago, I gave

7   a long affidavit on the status of polygamy in Islamic law to

8   assist a court in British Columbia.

9   Q.   What is your connection to this case or your involvement

00:54 10   in this case?

11   A.   I was contacted several months ago, I believe probably in

12   June.  I was given, I think, a copy of the Complaint, some

13   affidavits, some things relating with bail hearings.  I

14   reviewed those.  And I reviewed a couple of -- I think maybe

15   some IMs.  I don't recall exactly.  But I was contacted by the

16   defense team and asked if I would look at these things and if I

17   had anything of value to contribute.

18   Q.   What have you reviewed?

19   A.   A lot of material.  I reviewed over 2,000 pages of IMs,

00:55 20   hundreds of pages of Tibyan postings.  I've reviewed Mr.

21   Mehanna's personal blog entries, and I think I might have seen

22   some emails.  I'm not entirely sure.

23   Q.   Is it your opinion that a full understanding requires an

24   understanding of Islamic theology, history and law?

25          MR. CHAKRAVARTY:  Objection, your Honor.

1          THE COURT:  Sustained to the form of the question.

2     Q.   Let me rephrase that.  Doctor Fadel, did you feel you had

3     something to offer in this case?

4     A.   Yes, I did.

5     Q.   Could you explain why you felt you had something to offer?

6     A.   Yes, because I think much of the material in evidence

7     involves technical discussions --

8          MR. CHAKRAVARTY:  Objection, your Honor.  The witness

9     doesn't know what the evidence is.  He's testifying to the

00:55 10    materials he's received from the defense.

11    Q.   Have you reviewed transcripts of this trial?

12    A.   Yes, I have.

13    Q.   Are you aware of what the evidence is?

14    A.   Yes.

15    Q.   Most of it?

16    A.   Generally speaking, yes.

17    Q.   Would you --

18         THE COURT:  Go ahead.

19    Q.   Would you please continue?

00:56 20    A.   Yes.  Much of the evidence entails technical discussions

21    of Islamic theology and law, and so I felt that I could aid the

22    Court and the jurors to understand that material better if I

23    explained what it meant.

24    Q.   Would you tell the jury what theology is, what Muslim

25    theology is?

1    A.    Muslim theology is the study of doctrines that a Muslim

2    and really all human beings are required by their creator to

3    believe.  So it's a doctrine of truth.

4         There are sort of basic doctrines that all Muslims are

5    expected to believe:  namely, the oneness of God; that the

6    Prophet Muhammad is his last messenger; that God sends prophets

7    to humanity to teach them right from wrong; God relieves his

8    will in holy books that contains his instructions to humanity;

9    and that after we die God will resurrect us and hold us

00:56 10   accountable on the day of judgment.

11   Q.    What are -- can you explain to the jury what is the

12   intersection between Islamic religion and Islamic law?

13   A.    Yes.  Because a court doctrine of Islamic theology is that

14   God reveals laws to human beings through prophets.  Islamic

15   law, in a very important sense, a religious law or revealed

16   law.  So Muslims believe that the rules that govern human

17   beings lives, in a very important sense, come from God's will.

18   So there's always an intersection between belief and a specific

19   rule.  So there's an element when somebody says, for example,

00:57 20   prayer -- a Muslim must pray five times a day, that's both a

21   theological rule because we have to believe it; as a Muslim,

22   we're required to believe that to be true.  But we're also

23   required to do it.  So the action part, the conduct part, is

24   the law part.  The belief part is the theology part.  So

25   there's belief and there's conduct.

1    Q.   Is there a definitive opinion or authority in Islamic

2    doctrine of religion and law?

3    A.   Generally speaking, no.  Islam does not have a final

4    arbiter on matters either of theological doctrine or legal

5    practice.  Islam does not have an organized church.

6    Q.   How is it determined what's right and what's wrong?

7    A.   Through a tradition of debate and disputation.  And that

8    tradition of debate and disputation has gone on for almost

9    1,400 years.

00:58 10    Q.   I'm going to ask you -- well, what is a Fatwa, then?

11    Isn't that an opinion?

12    A.   A Fatwa is an opinion by a qualified interpreter of his

13    belief of what God wants.  It's only an opinion.  It's

14    nonbinding.  It only binds you if you believe it to be true.

15         MS. BASSIL:  Your Honor, I'm going to be putting a

16    number of words up.  Can we use the screen?

17    Q.   You said -- I'm sorry.  You said that this is an opinion

18    given by a religious figure?

19    A.   A qualified religious figure, yes.

00:59 20    Q.   Are you familiar with Osama bin Laden issuing Fatwas?

21    A.   Yes, I am.

22    Q.   Are those -- was he a qualified religious person to give

23    such an opinion?

24    A.   In the opinion of most trained people, he would not have

25    qualified as a proper person giving a Fatwa.

1         MR. CHAKRAVARTY:  Objection, your Honor.  I think the

2    witness was asked whether he believed that.

3    A.   No, I do not believe --

4         THE COURT:  I think that was what he was asked.  I

5    didn't understand the question that way.  If you want to

6    clarify it, Miss Bassil.

7    Q.   It's my understanding that Osama bin Laden issued Fatwas?

8    A.   That's correct.

9    Q.   Was he a legitimate person to have done that?

00:59 10   A.   In my opinion, no.

11   Q.   Now, I am going to ask you to do something, all right?

12   I'm going to give you four minutes, all right?  Mr. Carney gave

13   Mr. March four minutes.  I'm going to give you four minutes to

14   give the jury a history of Islam from 610 to the present.

15        MR. CHAKRAVARTY:  Your Honor, I would object to the

16   relevance of the history.

17        THE COURT:  Overruled.  He may do it.

18   Q.   Can you do it?

19   A.   I'm going to try.  Islam is an Abrahamic religion meaning

01:00 20   that it's part and parcel of -- it descends from the Patriarch

21   Abraham.  So the Prophet Muhammad is considered by Muslims to

22   be a direct descendent of the Prophet Abraham through his son

23   Ismail from his servant girl Hajar.

24        So the Qur'an affirms all the Old Testament prophets.

25   It affirms the prophethood of Jesus.  It also mentions some

1    other Arabian prophets that the Bible does not.

2            After the death of the Prophet Muhammad, Islam

3    expanded dramatically:  east, west, north, and south, very

4    quickly forming a global and dynamic civilization with cities

5    throughout much of the ancient world.  It continued more or

6    less to expand until the 19th Century when the gap between

7    Europe and the Muslim world became vast, and subsequently

8    Muslims came under European Colonial domination.

9    Q.   I think you did it in less than four minutes.

01:01 10          MS. BASSIL:  Could we have Exhibit 1178, please?

11          THE COURT:  Is this your -- is this in evidence or

12   agreed to?

13          MR. CHAKRAVARTY:  It's new.  The government's

14   objection is relevance, your Honor.

15          MS. BASSIL:  It's a map, your Honor.

16          THE COURT:  All right.  Other than that -- that will

17   be overruled.  So we'll admit that.  1178.

18   (Exhibit No. 1178 received into evidence.)

19   Q.   What does this map depict?

01:01 20  A.   This map just depicts the geographical extent of the

21   Islamic world around the time of the 16th Century.

22   Q.   Which part is Islamic?

23   A.   More or less everything there except for the part in

24   Spain.

25   Q.   And the parts in green are not?

1    A.   The parts in green -- I'm sorry.  The parts in green are

2    not, no.

3    Q.   Now, you said that, as I understand it, Muhammad preached

4    in -- he preached in Saudi Arabia; that's where it started,

5    correct?

6    A.   Yes, in what's now known as Saudi Arabia.

7    Q.   At the beginning of Islam, what happened to the early

8    Muslims?

9    A.   The early Muslim community was subject to great

01:02 10  persecution.  The persecution was so intense that eventually

11   they were forced to leave their home town known as Mecca.

12   Q.   Where did they go?

13   A.   They went to the city that's now called Medina.  That

14   event is called Hijra, or immigration.

15        MS. BASSIL:  Your Honor, I'm going to go back to the

16   ELMO.

17   Q.   That's Hijra, correct?

18   A.   Correct.

19   Q.   Now, when you showed us that -- when we looked at that map

01:02 20  of where Islam was, was this referred to as sort of the Golden

21   Age of Islam?

22   A.   You could say that.

23   Q.   What was going on in Islam compared to Europe?

24   A.   Right.  With the establishment of this new civilization,

25   we had a efflorescence of cultural activity.  Cultural works

1    were being translated into Arabic from all the ancient

2    civilizations:  Greek, Latin, as well as from Sanskrit and

3    Persian.  And so a new sort of synthesis of global cultures was

4    arising and spreading throughout the Islam world:  sciences,

5    literature, philosophy, et cetera, mathematics.  This age was

6    sort of very important for the transition and pulling the

7    ground for modern civilization.

8    Q.   In terms of what was going on in Europe, what period was

9    that known as?

01:03  10   A.   It's more or less that period of time corresponding with

11   what we call in Europe the Dark Ages, when Europe was just

12   beginning to emerge from the collapse of the Roman Empire.

13   Q.   Now, this Islamic world that -- where we had looked at in

14   the map, when did that end?

15   A.   Again, I'm saying more or less around the 19th Century.

16   By that time, Muslim states had more or less lost their ability

17   to defend their independence against the rising power of

18   European powers.

19   Q.   What was the Ottoman Empire?

01:04  20   A.   The Ottoman Empire was the most important Islamic empire

21   in the western part of the Islamic world.  So it extended

22   throughout North Africa, the Middle East, and also into Eastern

23   Europe, at its heyday.  But by the 19th Century, it had come to

24   be called the Sick Man of Europe and was in retreat.

25   Q.   After World War I, was the territory of the Ottoman Empire

1    carved up?

2    A.    Yes.   The Ottoman Empire was part of the central powers in

3    World War I.   They were defeated, and upon their defeat, the

4    territories of the Ottoman Empire were divided into numerous

5    nation states under the protection either of Great Britain or

6    France.

7    Q.   Were they colonies of Great Britain or France?

8    A.    They were technically known as protectorates, but the

9    people who lived there sort of felt they were colonized and

01:05 10    resented it.

11    Q.   Were those protectorates again broken up or changed after

12    World War II?

13    A.    Not exactly the protectorates from the Ottoman Period.

14    But when we look at -- the Ottomans did not rule the entire

15    Islamic world.   You can basically say that the rest of the

16    Islamic world had been outside of the Ottoman Empire, had been

17    divided into various numerous small states.

18    Q.    Now, you used the term "Hijra."   Does that have a meaning

19    in Islamic theology and law today?

01:05 20    A.    Yes, it does.   Hijra, although it was a historical event

21    describing the migration of the early Muslim community from

22    Mecca to Medina, later on came to be a very important

23    theological and legal doctrine.

24    Q.   And did you see examples of this theological and legal

25    doctrine in Tarek Mehanna's writings?

```
 1   A.   Yes, I did.

 2   Q.   What did you see?

 3   A.   I saw --

 4        MR. CHAKRAVARTY:  Objection, your Honor.  Summarizing

 5   instances of --

 6        THE COURT:  Overruled.  You may have it.

 7        MR. CHAKRAVARTY:  I also add, your Honor, there's no

 8   mention of Hijra in the October 18th disclosure.

 9        THE COURT:  Overruled.  Go ahead.

01:06 10  A.   I saw numerous references to the concept of Hijra,

11   particularly whether Muslims living in the United States should

12   migrate to a Muslim country.

13   Q.   Now, are you familiar with the Salafi aspect of Islam?

14   A.   Yes, I am.

15   Q.   We've had a lot of discussion about it.  Can you explain

16   what it is?

17   A.   Yes.  The Salafi school of Islam is basically a

18   theological movement that began in the 18th century, or that's

19   when it became prominent, in the 18th century.  Its most

01:06 20  important champion was a theologian that lived in Eastern

21   Arabia named Mohammed Abdel Wahab.  He formed an alliance with

22   an Arabian tribe known as the al-Saud.  So the

23   theological-political alliance later gave birth to what's known

24   today as the Kingdom of Saudi Arabia, where this alliance

25   remains firmly intact.
```

1    Q.    Al-Saud became the royal family, correct?

2    A.    That's correct.  Now, that movement, its detractors call

3    it the Wahabi movement.  They call themselves Salafis in honor

4    of the earliest three generations of Muslims, who all Muslims

5    acknowledge -- who all Sunni Muslims acknowledge as the best

6    Muslims.  They're called the Salafi Fustar (ph), the pious

7    ancestors.  So what distinguished them from other Muslim groups

8    was their insistence that all Muslim doctrine and practice has

9    to be routed in the opinions of the first three generations of

01:07 10   Islam.

11   Q.    And how -- you said that it started -- it was a theology

12   or an aspect of Islam that began as a 18th Century movement.

13   Did it come to other parts of the world from Saudi Arabia?  And

14   when did that happen?

15   A.    Yes, it did.  It spread in various places.  It wasn't --

16   it wasn't just Mohammed Abdel Wahab.  Even before him, there

17   were some kinds of reformers like Shokani who lived in Yemen.

18   A group of theologians who began to emphasize returning to

19   revelation, Qur'an and Sunna, as opposed to the subsequent

01:08 20   tradition, as a source of networks.

21          So a network of the scholars that were in support of

22   this theological movement developed, and their influence spread

23   in Arabia but also, interestingly enough, in the Indian

24   Subcontinent.

25   Q.    Did it come to the United States?

1   A.   Yes, it did.

2   Q.   When?

3   A.   It came primarily in the last decade of the 20th Century.

4   Q.   In the 1990s?

5   A.   Yes.

6   Q.   How did it come to the United States?

7   A.   It came to the United States largely as a result of the

8   fact that Saudi Arabia continues to promote this brand of Islam

9   in its universities.  American Muslims up to -- for the first,

01:08 10   let's say -- I don't want to get into too detailed a history of

11   American Islam, but you could say, for the first generation of

12   immigrate Muslims to the United States, it was a very

13   unsophisticated kind of Islam.

14        Over time, more and more American Muslims decided that

15   it was very important to have a more systematic and rigorous

16   understanding of their religion.  Saudi Arabia was a very

17   convenient place to study.  Saudi Arabia offered scholarships

18   to their universities.  It was modern, it was comfortable.

19   Lots of Americans went there, studied Salafism, came back, and

01:09 20   began to teach it.

21   Q.   Did Saudi Arabia send books and teachers and money for

22   centers here in the United States?

23   A.   Yes, they did.

24   Q.   What is the position of Salafism with respect to rulers?

25   A.   Again, it's complicated.  But the traditional position of

1    the Salafis has been one of almost absolute deference to

2    rulers.

3    Q.   So, in part, was this the reason why the Saudi Royal

4    Family supported this?

5    A.   I think that would be a safe inference.

6    Q.   Now, the religious teachings of Salafism, I understand,

7    are to go back to the source, to go back to the Qur'an and the

8    Hadiths, correct?

9    A.   That's correct.

01:10 10   Q.   What are -- are there -- is there a very basic tenet to

11   it?

12   A.   Well, I think the most important thing to understand about

13   Salafism is its concern, one might say obsession, with

14   doctrinal purity.  They want -- so theology is much more

15   important to them than practice.  I don't want to say that they

16   don't care about what people do, but, more fundamentally, it's

17   important for people to believe what they're supposed to

18   believe.  So Salafism starts with theology and is very

19   concerned in teaching Muslims the proper doctrine about

01:10 20   everything.

21   Q.   What are the Five Pillars of Islam?

22   A.   The Five Pillars of Islam are:  first, to testify that

23   there's no God except God, monomorphism, and that Mohammed is

24   his messenger; the second one is to pray five times a day; the

25   third one is to give charity; the fourth one is to fast during

1    the month of Ramadan between dawn to dusk; and then the fifth

2    one is to do pilgrimage to Mecca if one has the ability.

3    Q.    Is Salafism or are Salafis political?

4    A.    Again, generally, the answer is no because their general

5    view is that politics should be left to the rulers and that

6    individual Muslims should just cultivate knowing the proper

7    truth, theological truth, and living the most pious lives

8    possible.

9    Q.    Are Salafis -- is Salafi a terrorist by definition?

01:11 10   A.    Absolutely not.

11   Q.    What is -- we've seen -- I'm going to ask you about some

12   words we've seen.  What is Da'wah?

13   A.    Da'wah is the process of inviting others to Islam and

14   teaching Muslims how to be better Muslims.

15   Q.    When you say "inviting others to Islam," is Islam a

16   religion that encourages converts?

17   A.    Yes.  Islam believes itself to be a universal religion,

18   and it's an obligation on Muslims collectively to teach Islam

19   to others so they have an opportunity to become Muslims.

01:12 20   Q.    I'm going to ask you -- and I'm going to really try to

21   pronounce this correctly, Kafir?

22   A.    Kafir.

23   Q.    Kafir.  I'm going to ask you to explain Kafir and Kuffar.

24   What is Kafir?

25   A.    Kafir just means a person who has not accepted Islam.

1    Kuffar is the plural.  So it means non-Muslim.

2    Q.    Is it ever used in a disdainful or sort of slang kind of

3    way?

4    A.    Yes.  It can be used derogatorily.

5    Q.    When it's used derogatorily, how is it used?

6    A.    Well, it's used to -- I guess to say, This person is not a

7    Muslim; so, therefore, his religion is bad.  He's not as good

8    as us, right?  And we need to sort of get him on board kind of

9    thing.  That's one way.

01:12 10         But the circumstances in which it can be used in a

11   derogative fashion are really too broad to bring up here.  It

12   can also be used just purely as a technical term, to say that

13   these rules apply to Muslims.  They don't apply to non-Muslims.

14   It really depends on the context, whether the speaker intends

15   it in a derogatory fashion or in a technical sense that you

16   find in Islamic law books.

17   Q.    We have seen the term or heard the term apostate.  What

18   does that mean in terms of Islam?

19   A.    An apostate is somebody who renounces Islam after having

01:13 20   once believed in it.

21   Q.    What is an apostate ruler?  We've also seen that.

22   A.    A apostate ruler is a term of political -- modern Islamic

23   political thought that has emerged among certain theological

24   trends in the Islamic world.  They accuse various Muslim

25   regimes of having committed apostasy because they do not rule

1    by Islamic law.

2    Q.   Can you give an example?

3    A.   The former president of Egypt, Hosni Mubarak, certainly;

4    the deceased former -- deceased leader of Libya, Moammar

5    Gadhafi.  Those would be examples of apostate rulers in the

6    opinions of some Muslims.

7    Q.   Now, who or what determines whether someone is an apostate

8    or an apostate ruler?

9    A.   Right.  These are two separate questions.  In the easiest

01:14 10   case, where somebody who is formerly a Muslim or someone who

11   used to believe in Islam, announces, Formally, I no longer

12   believe in Islam.  Then that's an express case of apostasy and

13   there's no problems.  That's a very rare case, however.

14        The real issue, particularly in the modern community,

15   is whether or not individuals who claim to be Muslim have

16   committed an act of apostasy by way of conduct even if they're

17   unintending to be apostates.

18        So regimes, even like of the former president of

19   Egypt, Mubarak, or Gadhafi, themselves never claimed to

01:14 20   renounce Islam, right?  So it's an accusation essentially.

21   Today, apostasy is usually hurled as an accusation, certainly

22   not as a legal finding, because in most Muslim countries,

23   apostasy is not a crime.

24   Q.   Does that mean someone who is a convert but no longer --

25   I'm sorry.

1          When it was a crime -- when was it a crime to be an

2     apostate?

3     A.   Well, in theory, in premodern Islamic law, apostasy was a

4     capital crime.  It's very hard to know to what extent this was

5     applied with any kind of rigor.  The more practical example of

6     apostasy was essentially people switching sides in war.  That

7     was the core example of apostasy.  In fact, if we look at the

8     Middle Ages, in the Crusader Wars, treaties that would be

9     entered into between Muslim states and the Crusader states who

01:15 10    have provisions for what they called renegades or apostates.

11    People would convert out of convenience, to join the other side

12    for a political gain.  And then at the end of the war, they

13    would want to re-embrace their former religion.  So apostasy

14    really arose in the Middle Ages to deal with those kinds of

15    situations.

16    Q.   Does it mean that someone who is a convert but no longer

17    chooses to be a Muslim can be killed today?

18    A.   There are certainly some Muslims who believe that.  I

19    think the trend among modern Muslims is to deny that and say

01:16 20    that apostasy really should just be viewed as a kind of treason

21    in the battlefield and not a theological issue.

22    Q.   We've seen the word and heard the word "Ummah."  What is

23    an Ummah.

24    A.   "Ummah" just means community.  So in Islam, the believers,

25    people who adhere to Islam, form a brotherhood of belief, and

1    the name for that is Ummah.

2    Q.   When you say they form a brotherhood of belief, does the

3    Ummah have geographical boundaries?

4    A.   The Ummah has tangible geographical boundaries insofar as

5    the Muslim community has a tangible physical existence.  But

6    it's really much more of a spiritual bond, and so Muslims treat

7    each other as brothers and sisters in a spiritual sense.  And

8    so by adhering to the religion of Islam, Islam imposes upon

9    them certain mutual duties of support and obligations just by

01:17 10   virtue of sharing the same religion.

11   Q.   Are you familiar with the concept of Jihad as it relates

12   to Islamic law and history?

13   A.   Yes, I am.

14   Q.   And can you tell us what that concept is as it relates to

15   Islamic law and history?

16   A.   Yes.  Jihad, in that form, is a noun.  It's derived from

17   an Arabic verb which means to struggle.  Generally, it means to

18   struggle for something positive or good.  In the technical

19   sense, it means -- when I say "in the technical sense," I'm

01:17 20   talking about in Islamic law.  In Islamic law, it is used as

21   the term for international -- for war -- international

22   conflict, excuse me.  In Islamic moral discourse, it can be

23   used to describe somebody who's engaged in excessive ritual

24   observance in an effort to get closer to God.  So somebody can

25   do Jihad in the sense of trying to draw near to God, but that's

1   in the context of pious rhetoric.  In the context of Islamic

2   law, it means international conflict.

3   Q.   In terms of the Qur'an and early words of Mohammed and The

4   Companions, did Jihad have a historical meaning?

5   A.   Jihad in the Qur'an is largely used in the moral sense of

6   struggling for a good purpose.  Now, of course, protecting the

7   community was the highest form, the highest kind of good

8   purpose.  So it was used to describe the Muslims who were

9   fighting the polytheists at the time that were trying to

01:18 10   destroy the early community.  So Jihad came to be used as the

11   paradigm of international conflict.

12        However, the Qur'an actually uses the term "Qital,"

13   which is a different term, Q-i-t-a-l, to specifically refer to

14   fighting.  Because Jihad, as I said, is a more generic sense of

15   struggling to do good, fighting militarily for a religious

16   cause is, of course, a paradigmatic example of struggling for

17   something good.  But the more narrow term for fighting in the

18   Qur'an is Qital, not Jihad.

19   Q.   During the last ten-year period of Mohammed's life, was

01:19 20   the Qur'an focused on laws of war?

21   A.   I wouldn't say it was necessarily focused on it, but it

22   was a very important topic.  After the prophet and the early

23   community migrated to Medina, the pagans in Mecca didn't leave

24   them alone.  And basically a war broke out between the two

25   sides, which only came to an end in the ninth year of the Hijra

1    when the Muslims triumphed over their enemies in Mecca.

2    Q.   Was a system of law developed from this?

3    A.   Yes.  The Qur'an, from time to time, revealed rules

4    governing this conflict.  Muslim jurists in later centuries

5    developed a fairly sophisticated body of governing the rules of

6    warfare based on the rules in the Qur'an, the practice of the

7    prophet, and the practice of the early community.

8    Q.   Now, under the -- according to this body of law, who has

9    the authority to declare a war or a Jihad?

01:20 10   A.   Again, it depends on the kind of war.  But if it's a war

11    of choice, where the state is not -- where it's not an act of

12    self-defense, then only the legitimate ruler can declare a

13    Jihad.

14    Q.   Can an individual declare Jihad?

15    A.   In ordinary circumstances, absolutely not.

16    Q.   In popular culture today, Jihad seems to mean violent

17    terrorist extremism, al Qa'ida blowing up buildings.  Can you

18    explain this?

19    A.   Well, I think it's complicated because, as I was

01:20 20   suggesting in my earlier answer, there are different kinds of

21    war that are recognized in Islamic law.  The first kind of

22    Jihad is known as, we could say, a defensive war.  In a

23    defensive war, anybody -- everybody who is the victim of an

24    attack by an invading non-Muslim force is under an individual

25    obligation to defend the territory from the invading

1    non-Muslims.  In that circumstance, where it's a defensive

2    posture, no permission is needed.

3    Q.   Is that common to other countries in war?

4    A.   I presume that most states have their own conception of

5    legitimate self-defense, yes.  Now --

6    Q.   How did al Qa'ida change this?

7    A.   Well, what al Qa'ida did was it appropriated the concept

8    of defensive war, which entails this individual obligation upon

9    Muslims to fight, and then tried to argue that Muslims in the

01:21 10   present world are under continuous assault all the time,

11    everywhere, essentially creating a globalized theater of

12    conflict in which every Muslim everywhere was under a duty to

13    fight at all times.

14    Q.   Did that -- did that idea that Muslims were -- everywhere

15    were to fight at all times, did that increase after September

16    11th?

17    A.   Again, that's very complicated.  I think the initial

18    reaction of most Muslims, at least most Muslims that I know,

19    was of revulsion and shock and horror, and the idea that

01:22 20   Muslims were under an individual obligation to fight seemed

21    quite absurd.  I think most people thought that Osama bin

22    Laden's declaration of war and declaration in 1998 that

23    individual Muslims were under such an obligation, was not very

24    persuasive.

25           Events after 9/11, however, because of the global war

1    on terror and certain actions that were taken in pursuant of

2    that, have led more Muslims to give credence to the truth of

3    the 1998 Fatwa.

4    Q.   Where were you on September 11th?

5    A.   It was my second day at work.  I was walking to work, and

6    I happened to be crossing at the North Tower when the first

7    plane hit.  So I was sort of an eyewitness.  I was immediately

8    under the first plane when it hit.

9    Q.   Now, is there an individual obligation on every Muslim to

01:23 10   do Jihad?  And by that I mean actually go out to the

11   battlefield.

12   A.   Again, it depends.  If you happen to live in a Muslim town

13   and that Muslim town comes under attack by a non-Muslim enemy,

14   then according to Islamic law, you had an obligation to defend

15   the town.  Otherwise, you did not.  So in the ordinary

16   circumstance, all things being equal, it would be exceptional

17   to conclude that any individual Muslim has an obligation under

18   Islamic law to involve himself in fighting.

19   Q.   What about this -- where did this concept come from that

01:23 20   Muslims from outside -- let's use as your example a town is

21   attacked.  Muslims within the town must defend, correct?  Where

22   does the concept come from that Muslims outside the town must

23   come and help fight?

24   A.   Yeah.  That's a result of a concept in Islamic law called

25   a communal duty.  So the idea is that if a Muslim town comes

1   under attack and the individual Muslims in that locality are

2   unable to ward off the invaders, then Muslims living nearby

3   have to come to their aid.

4          So, in theory, because of this idea of communal

5   obligation of self-defense, the people who become obligated to

6   go help repel the invasion could continually grow in space and

7   time until enough people are amassed that can repel the

8   invaders.

9   Q.   In the context of Muslim law and theology, can a Muslim

01:24 10   fulfill his or her obligation to Jihad in nonviolent ways?

11  A.   Yes.  According --

12  Q.   Go ahead.

13  A.   According to Islamic law and theology, even in a

14  circumstance where there is an invasion, one might not

15  necessarily have to actually go out to the front lines and

16  fight.  One can participate by, for example, treating the

17  wounded, providing supplies, et cetera.

18  Q.   Could a Muslim -- I'm going to give you a hypothetical

19  question.  Could a Muslim who believes the United States has

01:25 20  committed aggression in the Muslim world, for example, by

21  invading Iraq, could they engage in Jihad without actively

22  going to Iraq and fighting?

23  A.   From the religious perspective, yes.

24  Q.   I want to turn to what's been in this case a great deal,

25  the 39 Ways.  Are you familiar with this document?

1    A.    Yes, I am.

2    Q.    Did you read it in English and in Arabic?

3    A.    Yes, I did.

4    Q.    When you read it in the original Arabic, did you see

5    anything that indicated that the writer was a member of al

6    Qa'ida or that al Qa'ida was involved in that document?

7    A.    No, I did not.

8    Q.    Now, can you explain the significance of the 39 Ways in

9    light of Islamic law and theology?

01:26 10  A.    Yes.  In light of Islamic -- in light of Islamic law and

11   theology, the 39 Ways essentially regurgitates the moral

12   virtues that are associated with Jihad and the different ways

13   that a Muslim can participate in Jihad on the assumption that

14   they're not really going to fight.

15   Q.    Would you describe it as a training manual?

16   A.    I think that would be a very unreasonable description of

17   it.

18   Q.    Why?

19   A.    Because it doesn't indicate any way to do anything.  It's

01:26 20  not operational.  So, for example, it tells you that you should

21   support the mujahideen, without defining who they are, by

22   giving them money.  But it doesn't tell you how you can do so.

23   It tells you that you should, for example, travel to a place

24   where Jihad is, but it doesn't suggest any practical ways of

25   getting there.

1          And then it suggests other means perhaps that are in

2     the capacity of an individual reader to do it, but those, I

3     don't think, could objectively be called as training for

4     anything; for example, jogging, taking care -- excuse me, you

5     know, not sleeping with the wives of people who are on the

6     front line.  It doesn't really seem to rise to the level of

7     training for a war.

8     Q.   Is the 39 Ways -- does that speak of defensive or

9     offensive Jihad?

01:27 10     A.   The 39 Ways expressly refers to defensive Jihad.

11     Q.   How does the 39 Ways -- can you -- how does that relate to

12     past documents in Islamic law and theology?

13     A.   I'm sorry.  I don't understand the question.

14     Q.   Bad question.  In the 39 Ways, did you see references to

15     Hadiths and the Qur'an?

16     A.   Yes.  I did a tally, and I think there were at least 40

17     verses of the Qur'an cited in that book and 42 Hadiths of the

18     prophet, all of which, you know, any reasonably literate Muslim

19     would have come across in his or her religious education.

01:28 20     Q.   Are you a Muslim?

21     A.   Yes, I am.

22     Q.   In the 39 -- I would ask you:  Did the 39 Ways provide

23     anything new --

24     A.   No.

25     Q.   -- to Muslim theology and law?

1   A.   No.

2   Q.   Now, have you reviewed other literature about Jihad?

3   A.   Yes, I have.

4   Q.   Were you asked to review other literature for a case in

5   Canada?

6   A.   Yes, I did.

7   Q.   How would you describe those materials you reviewed in

8   comparison to the 39 Ways?

9        MR. CHAKRAVARTY:  Objection, your Honor.

01:28 10        THE COURT:  Sustained.

11   Q.   Would you -- how would you describe the 39 Ways in terms

12   of propaganda or its visceral calling?

13        MR. CHAKRAVARTY:  Objection, your Honor.

14        THE COURT:  Sustained.

15   Q.   How would you describe the 39 Ways?

16   A.   It's a generic work that describes the virtue of Jihad and

17   the virtue that one can obtain by participating in different

18   things that are nonlethal.

19   Q.   Now, there are sections of the 39 Ways that call for

01:29 20   fighting, are there not?

21   A.   That makes references to a generic battlefield somewhere.

22   Q.   When you say "a generic battlefield somewhere," what do

23   you mean?

24   A.   What I mean is, again, it simply affirms the generic

25   virtue of fighting in a Jihad.  It doesn't tell you:  Go to

1    Iraq.  It doesn't tell you:  Go to Somalia.  It doesn't tell

2    you to go to Palestine.  It doesn't tell you anything about

3    anywhere.  So it's not concrete.  It's simply generic.  And

4    that's what I mean that it simply reiterates what every Muslim

5    already knows:  that Jihad is a good thing.  It doesn't speak

6    on any concrete circumstances.

7          Again, I think the point that's important, if I can

8    contrast Jihad to something like the Five Pillars --

9          MR. CHAKRAVARTY:  Objection, your Honor.

01:30 10          THE COURT:  I think it's gone beyond the question.

11   Q.   Can you contrast Jihad to the Five Pillars?

12   A.   Yeah.  The Five Pillars of Islam are something that every

13   Muslim must do.  When you wake up in the morning, you have to

14   pray.  There's a morning pray.  Jihad is what's known as

15   contingent obligation.  It only exists if the facts in the

16   outside world requires it.  So a work that incites to Jihad

17   would have to focus on the fact that would convince a Muslim

18   that they have to go out and fight.  The 39 Ways is shockingly

19   long on abstract rhetoric and very short on concrete facts.

01:30 20   Q.   What is religious rhetoric?

21   A.   Religious rhetoric is the language and symbols that are

22   used in religious discourse, in preaching, for example, to

23   inspire people.

24   Q.   Could you compare the 39 Ways to this concept of religious

25   rhetoric or inspiration?

1    A.   Yes.  I would consider 39 Ways to be a piece of religious

2    rhetoric.

3    Q.   Now, could you -- have you seen pro-Jihadi propaganda

4    issued by al Qa'ida and other terrorist groups?

5    A.   Yes, I have.

6    Q.   How would you compare that to 39 Ways?

7         MR. CHAKRAVARTY:  Objection, your Honor, to "Jihadi

8    propaganda."

9         THE COURT:  I'm sorry?

01:31 10         MR. CHAKRAVARTY:  The scope of the witness' disclosure

11    was on Islam.

12         THE COURT:  I think that's true in this case.

13    Sustained.

14    Q.   Now, you've reviewed the documents written or concerning

15    Tarek Mehanna?

16    A.   Yes, I have.

17    Q.   Can you just categorize sort of the types of documents

18    that exist?

19    A.   They are the internet messenger chats.  They're the Tibyan

01:32 20    posts.  There are his postings on his own blog that I reviewed.

21    I might have seen a few emails.  But primarily I focused on the

22    chats and the posts.

23    Q.   Did you --

24         THE COURT:  Excuse me.  If you're going to get into

25    the area where we're going to maybe refer to some specific

1    ones, I think we'll take a morning recess.  We'll take about a

2    15-minute recess.

3    (Recess taken at 11:27 a.m.)

4              (After the recess:)

5              THE CLERK:  All rise for the Court and the jury.

6              (The Court and jury enter the courtroom at 11:46 a.m.)

7              THE CLERK:  Please be seated.

8    BY MS. BASSIL:

9    Q.   Dr. Fadel, I want to turn to Mr. Mehanna's writings on

01:53 10   Tibyan Publications.  Are you familiar with Tibyan

11   Publications?

12   A.   I was not familiar with it before you showed it to me, but

13   I am now.

14   Q.   And have you read many of the postings on Tibyan

15   Publications and postings by other people?

16   A.   Yes, I did.

17   Q.   Did Mr. Mehanna write only about jihad on Tibyan

18   Publications?

19   A.   No, he wrote about scores and scores and scores of topics.

01:54 20   Q.   And what do you mean by that?

21             MR. CHAKRAVARTY:  Objection, your Honor.

22             THE COURT:  Overruled.

23             THE WITNESS:  He wrote about the most mundane aspects

24   of being a Muslim, like whether you should sleep on your right

25   side or your left side or your stomach; how, when you recite

1    your prayers, should it be loud, should it be soft; what kind

2    of male could serve as a proper marriage guardian for a girl

3    who wanted to get married.  So there were just scores of really

4    ordinary -- talking about completely mundane, ordinary things

5    from the perspective of Islam.

6    BY MS. BASSIL:

7    Q.   I'm sorry.  I'm sorry; I have to ask:  Does Islam really

8    tell you whether to sleep on your right side or on your left

9    side?

01:54 10   A.   Well, for certain people who are very keen on following

11   the example of the prophet Mohammed, they want to do everything

12   in their lives the way he did it.  So in the Hadiths there are

13   reports that he would like to sleep in a certain way.  And so

14   for those people, particularly Salafis, they are very keen to

15   try to do everything in the way the prophet did it.

16   Q.   All right.  Now, when you looked at the post by

17   Tarek Mehanna, did he refer to sort of religious rulings -- I'm

18   sorry, "rulings" isn't the right word -- but did he refer to

19   theology?

01:55 20   A.   Yes, he did.

21   Q.   How so?

22   A.   Well, he -- in his postings, he consistently formulated

23   positions based on a certain method of interpretation.

24          MR. CHAKRAVARTY:  Objection.

25          THE COURT:  What's the objection?

```
 1              MR. CHAKRAVARTY:  At this point he's saying "he
 2     formulated his opinions based on."
 3              THE COURT:  Oh, okay.
 4              MS. BASSIL:  I'll rephrase it.
 5              THE COURT:  Yes, fine.
 6     BY MS. BASSIL:
 7     Q.   If you could rephrase that.  What do the postings reflect
 8     in terms of religious theology?
 9     A.   The postings reflected a person who was writing in the
01:56 10    Salafi tradition.
11              MR. CHAKRAVARTY:  Objection, your Honor.  He's
12     characterizing the defendant.
13              THE COURT:  No, I think he's characterizing the
14     written texts, which is different.
15     BY MS. BASSIL:
16     Q.   What is the Salafi tradition of writing?
17     A.   The Salafi tradition of writing is to cite verses from the
18     Qur'an and Hadiths of the prophet Mohammed and opinions of the
19     early community when justifying a particular practice or
01:56 20    belief.
21     Q.   Is there a right answer?
22     A.   I think Salafis believe there is.  Many Muslim theologians
23     of other traditions believe that these matters are not amenable
24     to correct answer.
25     Q.   Now, from the writings that you reviewed by Mr. Mehanna,
```

1    were you able to determine how serious he was about his

2    scholarship?

3              MR. CHAKRAVARTY:  Objection, your Honor.

4              THE COURT:  Sustained to that.

5              MS. BASSIL:  I'll rephrase that.

6    BY MS. BASSIL:

7    Q.   Were you able to determine how serious the writings were

8    about Islamic law and theology?

9              MR. CHAKRAVARTY:  Objection.

01:57 10           THE COURT:  That's the same thing.  Sustained.

11   BY MS. BASSIL:

12   Q.   Now, let me start with this:  Are you familiar with the

13   positions of al Qa'ida on certain topics of law and theology?

14   A.   Yes, I am.

15   Q.   And were the writings that you reviewed consistent with

16   those positions?

17   A.   No, they were not.

18   Q.   All right.  I'm going to start with the first one.  What

19   would you describe as the central position of al Qa'ida?

01:57 20   A.   The central position of al Qa'ida with respect to the law

21   of jihad is that all Muslims are under an obligation -- an

22   individual obligation -- to fight Americans wherever and

23   whenever they can find them, and nationals of countries that

24   are allied with Americans wherever and whenever they can find

25   them, including stealing their property.  So killing them and

1  stealing their property and destroying their property wherever

2  and whenever they can find them, as well as the nationals of

3  countries allied with the Americans.

4  Q.   And when did that philosophy -- or when did that statement

5  first appear?

6  A.   As far as I know, Osama bin Laden gave a fataawa in 1998

7  in which he made this opinion explicit and said it was the

8  command of God directed toward all individual Muslims.

9          MR. CHAKRAVARTY:  Objection, your Honor.  May we

01:58 10  approach?

11          THE COURT:  All right.

12          (Discussion at sidebar and out of the hearing of the

13  jury:)

14          MR. CHAKRAVARTY:  Your Honor, I recognize your Honor's

15  position that he can talk about al Qa'ida because it's subsumed

16  within kind of Islamic history.  The concern here is --

17  especially because of the lack of notice as to what the basis

18  of his understanding is of how he knows about al Qa'ida -- is

19  this:  What the witness just said is al Qa'ida believes X, the

01:59 20  defendant believes something different than X.  That's using

21  the defendant's statements for the truth of the matter.  It's

22  one thing to say what al Qa'ida believes for the truth of the

23  matter; it's another thing to say what the defendant believes

24  for the truth of the matter.

25          Now essentially what he's doing is looking at a

1   universe of data, which we don't know what that data is -- it

2   was presumably discovery that we've provided the defense, and

3   the jury doesn't know either -- and he's assessed and

4   synthesized from that data that this defendant's beliefs are,

5   as a matter of fact, contrary to al Qa'ida's beliefs.

6          MR. AUERHAHN:  Even if it's identifications of a

7   specific chat, if it's being offered to show that he disagreed

8   with al Qa'ida, which is clearly what it's being offered for,

9   it's being offered for the truth of the statement, then that's

01:59 10   in the chat, which is hearsay.

11          MR. CHAKRAVARTY:  This is the back door that they're

12   using experts to somehow --

13          MS. BASSIL:  No --

14          THE COURT:  I don't think that's necessarily so true.

15   I do think, perhaps, we should have a little more foundation

16   for his basis of familiarity.

17          MS. BASSIL:  I'm happy to do that.

18          THE COURT:  He said it very summarily but, perhaps --

19   because, for example, if it was simply based on his study of

02:00 20   discovery materials, then I think that might not be sufficient.

21   If he has in his professional life kept up with it, that's a

22   different story.

23          MS. BASSIL:  Sure.  I can do that.  But I don't want

24   to hear, "Objection.  It's outside of the scope."  And I would

25   like to point out, your Honor, that we had people who were

1   "readers" when suddenly they were testifying to their expertise

2   about Fallujah and opening links and so forth.  So this idea

3   that our notice is to be used as a verbatim transcript is

4   really unfair, and it becomes even more unfair because the

5   government wasted weeks of time and now we're at the end of

6   this case and we're being pressured time-wise.  I don't think

7   it's fair.

8           THE COURT:  Coming back to the hearsay problem, I

9   don't think it's necessarily hearsay.  It may depend on

02:00 10   particular texts to say --

11          MS. BASSIL:  It does not go to the --

12          THE COURT:  I don't know.  I guess we'll have to see

13   what they are.

14          MS. BASSIL:  It does not go to the ultimate issue.

15          MR. CHAKRAVARTY:  If -- you know, Mr. Groharing makes

16   a good point.  If, you know, the only valid -- only probative

17   value of him saying that what the defendant said was

18   inconsistent with al Qa'ida is either for what the defendant

19   believed or whether he had the requisite intent to commit the

02:01 20   crime, it's classic 704(b) opining as to the defendant's state

21   of mind.

22          THE COURT:  Well, he can't give that opinion.  I agree

23   with that.  To contrast the gist of an expression with the gist

24   of another expression I think he may be able to do.  That's why

25   we may have to judge it --

1          MS. BASSIL:  Occasionally he slips up and I try to

2     rephrase it.  But it -- the government has spent six, seven

3     weeks putting up instant messages to show what al Qa'ida said,

4     having Mr. Kohlmann talk about them.  They've done it.  This is

5     our turn.

6          THE COURT:  Well, everything's not entirely

7     symmetrical, but we'll leave it at that.

8          MS. BASSIL:  It should be symmetrical.

9          THE COURT:  Go ahead.

02:02 10          (In open court:)

11     BY MS. BASSIL:

12     Q.   Dr. Fadel, let's step back a bit.  Could you relate to the

13     jury how you know through your professional work what some of

14     these tenets are by al Qa'ida?

15     A.   Well, as I mentioned earlier, I wrote a very extensive

16     encyclopedia entry on the law of jihad and its history for the

17     Max Planck Encyclopedia of Public International Law.  In the

18     course of that I learned about the historical doctrines -- or I

19     researched the historical doctrines of jihad and classical

02:03 20     Islamic sources and modern Islamic sources.

21          It's very easy to get al Qa'ida's view on jihad.  It's

22     available on Frontline, PBS, I think, for anyone to read.  And

23     there is the 1996 fataawa in which Osama bin Laden declared war

24     on the United States, and there's the 1998 fataawa in which he

25     expounded his opinion that all Muslims are under a legal

1    obligation, and an individual legal obligation, to kill

2    Americans and plunder their wealth whenever and wherever they

3    can.  So it's not rocket science.

4    Q.   After you wrote the article for the encyclopedia, did you

5    keep up with statements by al Qa'ida or their positions as they

6    may have evolved?

7    A.   Well, I only -- I finished that article quite recently, in

8    2009, and I don't follow every single statement al Qa'ida says

9    or does.  I think that their statement is there -- they haven't

02:03 10   retracted it as far as I know -- and so that represents their

11   doctrine.

12   Q.   All right.  Now I would like to turn to Exhibit 420.

13           THE COURT:  This is the government's computer?

14           MR. BRUEMMER:  Yes, your Honor.

15           MS. BASSIL:  Yes, your Honor.

16           And if we could blow up the bottom part?  From here.

17           MR. CHAKRAVARTY:  Your Honor, we went over this post

18   with Dr. March.  It seems to be a duplicative area of

19   testimony.

02:04 20           THE COURT:  Well, go ahead.

21           MS. BASSIL:  Thank you.

22           THE COURT:  Overruled.

23   BY MS. BASSIL:

24   Q.   Dr. Fadel, this is a post.  Are you familiar with this

25   post?

1   A.   Yes, I am.

2   Q.   And "Abu Sabaayaa" is the name that Tarek Mehanna used?

3   A.   That's what I was told.

4   Q.   All right.  And this is dated March 9, 2005?

5   A.   That's what it says.

6   Q.   All right.  Now, in this post -- could you read this post

7   where it starts with "right"?  Or let me read it.

8   A.   Okay.

9   Q.   "Right.  The Americans live in a democracy.  This is a

02:05 10   common argument that is used to justify things like this, and

11   this is what I have a problem with:  that simply because the

12   person is an American, and America is at war with the Muslims,

13   then that means that you can kill him."

14        MS. BASSIL:  Can you turn to the next page?

15   Q.   "I used to believe this, but after long reflection and

16   thought, I have come to the conclusion, and Allah knows best,

17   that this is an incorrect concept."

18        Can you explain -- can you contrast this -- first of

19   all, can you describe this issue of democracy with respect to

02:05 20   al Qa'ida's tenets?

21   A.   Yes.  As one can imagine, the 1998 fataawa of

22   Osama bin Laden was considered quite shocking.  And most

23   Muslims found it -- I would say the overall majority of Muslims

24   found it to be implausible on its face.  So one of the

25   arguments that was formulated in defense of this fataawa was

1    the idea, Well, Americans are in a democracy.  And because

2    they're in a democracy they elect their own leaders and they

3    are, therefore, morally responsible for the policies that

4    America undertakes.  So it's, therefore, just that they should

5    be targeted for the sins that the American government has

6    visited upon Muslims.  That was the argument.

7    Q.   And was there anything in that argument also about paying

8    of taxes?

9    A.   Yes.  That was another theory that al Qa'ida --

02:06 10   Q.   Whose theory?

11   A.   -- al Qa'ida theorists justified in support of the 1998

12   fataawa.  They said that Americans -- America would not be able

13   to wage war against Muslims unless the American government had

14   money.  The American government gets money from taxes -- taxes

15   paid by American citizens; therefore, American citizens are

16   aiding and abetting wars against Muslims so, therefore, they're

17   legitimate targets.

18        Those were the two primary targets, as far as I know,

19   that were used to justify the 1988 -- 1998 fataawa.

02:07 20   Q.   And what -- this posting by Tarek Mehanna, can you

21   contrast that posting to this tenet by al Qa'ida -- or this

22   belief by al Qa'ida?

23   A.   Yes.  This particular posting of Mr. Mehanna expressly

24   repudiates the first justification of the 1998 fataawa; namely,

25   that because Americans live in a democracy, it's legitimate

1   from the perspective of Islamic law to target them in war.

2   Q.   And there's also a line on here -- I think Dr. March

3   talked about it, or perhaps he was cross-examined with it --

4   "Those who fight us, not those who carry the same nationality

5   as those who fight us."

6        Can you explain what that line means and contrast

7   it -- I'm sorry.  Can you contrast that line to the philosophy

8   of al Qa'ida?

9   A.   Yeah.  Again, the philosophy of al Qa'ida is to try to

02:07 10   justify an all-out unlimited war.  This line suggests a much

11   more limited kind of conflict and that Muslims have to be

12   extremely careful about who they target which is, again,

13   contrary to the position of al Qa'ida in which one doesn't have

14   to worry -- all one has to worry about is the nationality of

15   the target.

16        MS. BASSIL:  Now, if we could turn to Exhibit 423,

17   please?  If we could make that first block bigger?

18   Q.   Now, what was written here -- this is March 10, 2005?

19   A.   It appears so, yes.

02:08 20   Q.   And again, this was by Abu Sabaayaa who, as you understand

21   it, was Tarek Mehanna?

22   A.   Yes.

23   Q.   And it says, "Was there a single country on earth, Western

24   or otherwise, in which there were not massive anti-war

25   demonstrations?"  And he discusses anti-war demonstrations.

 1   And the last line he says, "So after looking at these two

 2   realities with a just mind, one can no longer use the argument

 3   that America lives in a democracy, which they don't, therefore,

 4   every single American in the world, civilian or military, can

 5   be killed on the spot."

 6        Could you contrast that writing to the tenet of

 7   al Qa'ida that you described?

 8   A.   Yes.  It appears to be an express repudiation of the

 9   central premise of the 1998 fataawa; namely, that Muslims were

02:09 10   under an individual obligation before God to kill Americans

 11   anywhere and everywhere they could find them.

 12        MS. BASSIL:  Could we have, Mr. Oh, Exhibit 1263?  I'm

 13   sorry.  Could we have Exhibit 1182?  We found it.  Thank you.

 14        THE COURT:  Is this in evidence?

 15        MR. CHAKRAVARTY:  It's not in evidence, your Honor.

 16        MS. BASSIL:  That's correct.  This is part of the

 17   documents the government gave us, your Honor.

 18        THE COURT:  All right.  So this is -- in the first

 19   instance I'll show it just to the witness?

02:10 20        MS. BASSIL:  Well, I believe we can show it to

 21   everyone, your Honor.

 22        THE COURT:  Well, it's not yet in evidence.

 23        MR. CHAKRAVARTY:  It's not in evidence.

 24        MS. BASSIL:  I move it into evidence.

 25        MR. CHAKRAVARTY:  This is a post about bank loans.

1            THE COURT:  Oh, well --

2            MR. CHAKRAVARTY:  It may be within the witness's

3    expertise, but it is not relevant to this case.

4            MS. BASSIL:  Well, it is relevant, your Honor.  What's

5    relevant is --

6            THE COURT:  Okay.  If there's no objection to its

7    authenticity, I'll admit it and overrule the relevance

8    objection.

9            MS. BASSIL:  Thank you.

02:11 10            (Defense Exhibit No. 1182 received into evidence.)

11            MS. BASSIL:  If we could --

12            THE COURT:  What's the number again?

13            MS. BASSIL:  Sorry.

14            THE COURT:  What's the number again?

15            MS. BASSIL:  1183, your Honor.  -82.  Sorry.  1182.

16            THE COURT:  Okay.

17            MS. BASSIL:  And if you could just blow up the whole

18    thing so that --

19            Oh, John.  If you could just blow up the whole thing.

02:11 20    BY MS. BASSIL:

21    Q.   All right.  Dr. Fadel, do you see this post on April 8,

22    2007?

23    A.   Yes, I do.

24    Q.   And at first there's a quote by someone else, correct?

25    A.   That is correct.

1    Q.   And that post refers to taxes and revenue of the

2    government making somebody combatants in the war against Islam?

3    A.   That's correct.  Specifically, banks.

4    Q.   And how does that fit in with al Qa'ida's beliefs?

5    A.   Yes.  This poster -- this person, Abu Faaris, his posting

6    suggests that banks are a legitimate target of war because they

7    provide so many tax -- so much tax revenue to the United States

8    government that they're effectively but-for causes, for the

9    ability of the United States to wage war; so, therefore, they

02:12 10    can be targeted and attacked.

11    Q.   And would you compare the response by Tarek Mehanna to

12    this belief and how that is consistent or inconsistent with

13    al Qa'ida's positions?

14         MR. CHAKRAVARTY:  Objection, your Honor.

15         THE COURT:  Overruled.

16         THE WITNESS:  Yes.  The reply says that really it's

17    irrelevant how many -- how much taxes banks pay to the United

18    States government because from the practice of the prophet we

19    know -- we know with certainty that Muslims are under an

02:13 20    obligation to abide by their commitments to all kinds of

21    non-believers, whether they are at war with us, whether they

22    are the leaders of unbelief, or the sweet 70-year-old lady who

23    lives next door.

24    BY MS. BASSIL:

25    Q.   Could you read -- the first line he says -- the writing

1    states, "Beautiful:  A do-it-yourself fatwaa."  And then the

2    second paragraph, could you read that?

3    A.    I'm sorry.  What's the first thing you want me to comment

4    on?

5    Q.    Where it starts "unfortunately."

6    A.    Okay.  I'm confused now.  Do you want me to comment on

7    "Beautiful:  A do-it-yourself fataawa"?

8    Q.    If you'd like.  Can you comment on that and what that

9    means in terms of the writing in comparison to al Qa'ida?

02:13 10   A.    Well, it's not with respect to the comparison of

11   al Qa'ida.  What -- this language is criticizing Abu Faaris

12   making a -- reaching a dramatic conclusion without any kind of

13   valid religious evidence in support of that conclusion.  And so

14   it's highly critical of basically this arbitrary attempt to

15   justify violence without any solid evidence that it would be

16   permissible in Islam.

17   Q.    And would you read the next paragraph?

18   A.    All right.  "Unfortunately, this, as well as all of the

19   other posts on this thread that support this opinion,

02:14 20   completely sidesteps all of the clear-cut dalil," which means

21   evidence, "that the prophet made it mandatory to abide by all

22   agreements with the kuffar," non-believers, "whether they are

23   muharibin," meaning waging war, "the heads of kufr," meaning

24   the leaders of unbelief, "or the sweet 70-year-old lady who

25   lives next door, assuming, of course, that we all are agreed

 1  that the words of the prophet are the undisputable authority."

 2  Q.   And the next paragraph?

 3  A.   "And in regards to the opinion that a country officially

 4  being known as a democracy automatically entails that its

 5  citizens wholeheartedly support all of the policies of their

 6  government simply on account of their living in that country,

 7  there has been ample evidence in the past few years that this

 8  is a very simplistic world view that is no longer in tune with

 9  the current reality of the world, particularly, the Western

02:15 10  societies.

11       "I know this ruins everything, as we would no longer

12  have the easy and convenient 'kill 'em all' solution to our

13  problems.  But let's be mature.  We have to take the Shar',"

14  meaning revelation, "and apply it to what is reality, not what

15  we want reality to be.  It's like one person trying to convince

16  another on a summer afternoon in the middle of the desert that

17  the sun is in the sky with that person stubbornly insisting

18  that there is no sun in the sky."

19  Q.   Now, in this writing there's a reference, and in quotes,

02:15 20  "an easy and convenient 'kill 'em all' solution to our

21  problems."  Who espouses a "kill 'em all" solution?

22  A.   Al Qa'ida.

23       MS. BASSIL:  Now could we turn to potential Exhibit

24  1183?

25       THE COURT:  All right.  Again --

 1          MS. BASSIL:  I would move this into evidence, your

 2   Honor.

 3          THE COURT:  -- if the objection is only relevance --

 4   if the only objection is relevance, I'll overrule it.

 5          MR. CHAKRAVARTY:  And the other is hearsay which I

 6   also assume --

 7          THE COURT:  All right.  Consistent with our

 8   previous --

 9          MR. CHAKRAVARTY:  And this particular one, again, it

02:16 10   appears we also discussed with Mr. March, so the fact that it's

 11   duplicative and overlapping.

 12          THE COURT:  Okay.  Those objections are overruled and

 13   I'll admit it.

 14          MR. CHAKRAVARTY:  Your Honor, with regard to the

 15   hearsay -- and I don't mean to belabor this, but maybe at some

 16   point, if any, the government would ask for a limiting

 17   instruction just to remind the jury what is not being offered

 18   for the truth of the matter.

 19          (Defense Exhibit No. 1183 received into evidence.)

02:17 20   BY MS. BASSIL:

 21   Q.   Dr. Fadel, did you review this post on April 9, 2007?

 22   A.   I approved -- I reviewed this April 9th post, not on April

 23   9th, but I did review it.

 24   Q.   All right.  And this post refers to an 'ahd.  What's

 25   an -- what is 'ahd?

1    A.   'Ahd.

2         MR. CHAKRAVARTY:  Objection, your Honor.  This is

3    exactly what Dr. March was called to testify about.

4         THE COURT:  I understand.  Overruled.

5         THE WITNESS:  It means "covenant."  And typically, in

6    Islamic law it refers to a covenant of peace between a Muslim

7    state and a non-Muslim state.

8    BY MS. BASSIL:

9    Q.   And I'm not going to go over this in detail.  Did you sit

02:18 10   through some of the testimony of Dr. March?

11   A.   A little bit of it on cross -- not on direct, just on

12   cross, and the last day of his cross.

13        MS. BASSIL:  And if you could scroll down, John?  Keep

14   going.  And if you could go to the next page?

15   Q.   In reviewing this post did you -- was there a discussion

16   of the embassy bombings in Tanzania?

17   A.   I don't think this one has it.  There is a post where

18   there's a discussion of the Tanzania bombing, but I don't think

19   it's this one.

02:18 20   Q.   This one -- and it's your understanding that Abu Sabaayaa

21   is Tarek Mehanna and he wrote this post.  Is that correct?

22   A.   That's correct.

23   Q.   All right.  And this post, is this basically on the

24   subject of pacts and treaties?

25   A.   Yes, it is, except it's a little more complicated than

1   that.

2   Q.   What else does it refer to that is inconsistent with

3   al Qa'ida?  And I don't want you to get into pacts and treaties

4   because we heard about that from Dr. March.

5   A.   Yes.  Here it repudiates the idea that because America is

6   at war with Muslims, that it's permissible for Muslims living

7   in a non-Muslim country like the United States to breach their

8   individual promises to America.  For example, I am Muslim.  I

9   live in -- well, Canada.  So Canada is an ally of the United

02:19 10  States.  I borrow a loan from a Canadian bank to buy my home.

11  According to al Qa'ida, it's perfectly permissible for me to

12  then defraud that bank and not pay that loan back.  This post

13  says that that's a sin if I did that.

14        MS. BASSIL:  Now, if we could go to Exhibit 419, Paul?

15  I'm sorry.  Could we go to 423 first?  And if we could make

16  that a little bit -- if we could make it -- and that would be

17  the next page.  Make that bigger?

18  Q.   Now, are you familiar with this post, that's already in

19  evidence, on March 10, 2005?

02:20 20  A.   Yes, I am.

21  Q.   And you understand Abu Sabaayaa to be Tarek Mehanna?

22  A.   Yes, I do.

23  Q.   Would you read the very last paragraph of that post?

24  A.   Yes.  "And finally, I advise many of the younger brothers

25  who are living in the West who spend" -- I think if you could

1    move the arrow -- "who spend most of their time reading into

2    these issues -- i.e., about jihad -- which don't even directly

3    affect them, to utilize their time more wisely in reading and

4    reflecting off of the book of Allah and the meanings of his

5    words, strengthening your imaan," faith, "and to begin to

6    actively call those millions and millions of disbelievers

7    around you to this deen," religion, "for this is more useful

8    than reading volumes about the rulings on events taking place

9    thousands of miles from where you are sitting."

02:21 10   Q.   How is that paragraph inconsistent with al Qa'ida's

11   beliefs?

12   A.   Well, it contains an implicit rejection of a notion of a

13   global battlefield in which Muslims are under a supreme

14   obligation to fight, namely, and kill Americans whenever and

15   wherever they can; in fact, it suggests that it's not a healthy

16   concern to be over-concerned with events going on thousands of

17   miles away and instead, they would be better off, as Muslims,

18   to try to learn more about Islam and be better Muslims and call

19   non-Muslims to Islam.

02:21 20        MS. BASSIL:  And could we have Exhibit 419, please?

21   And if we could have the first part of this post highlighted.

22   Q.   And are you familiar with this post by Abu Sabaayaa?

23   A.   Yes, I am.

24   Q.   And this is dated March 8, 2005?

25   A.   Yes.

1    Q.   And would you read this post?  Well, what was posted by

2    Abu Sabaayaa?

3    A.   "Another question for thought:  Even if they were

4    Americans or Westerners who were killed in those attacks, is

5    every single disbeliever on the land of al-Jazeerah," meaning

6    the Arabian Peninsula, "to be killed regardless of whether or

7    not they are actively engaged in war against the Muslims?  Does

8    the Hadith," saying of the prophet, "say 'kill' every mushrik,"

9    polytheist, "in the Arabian Peninsula or does it say expel them

02:23 10   from it?  There's a difference."

11   Q.   And could you contrast that statement with the beliefs

12   suggested by al Qa'ida?

13   A.   I don't know exactly what al Qa'ida says on this position,

14   but I assume, again, that the generality of the language in

15   1998 would apply.

16        MR. CHAKRAVARTY:  Objection.

17        THE COURT:  I think the first part of the question

18   answered it.  He doesn't know.

19   BY MS. BASSIL:

02:23 20   Q.   And in this, at least what you were referring to as

21   al Qa'ida's position, the 1998 fataawa of killing every

22   American, is that in contrast to expelling people from the

23   Arabian Peninsula?

24   A.   Yes, it would be.  The apparent meaning of the 1998

25   fataawa doesn't make an exception for Americans on the Arabian

1    Peninsula.

2    Q.   Is there any history in Islamic history and theology

3    concerning expelling people from lands of -- where Muslims are

4    in the majority or lands of Islam?

5    A.   Well, the Arabian Peninsula, according to most Muslim

6    jurists, has a special status.  And so some jurists believe

7    that non-Muslims are not allowed to reside permanently in the

8    Arabian Peninsula.  And so without getting into all the details

9    about that, the dispute here is whether or not you can use

02:24 10    violence to expel non-Muslims who are otherwise peaceful and in

11    the Arabian Peninsula.  And this posting suggests that you

12    can't.

13    Q.   You can?

14    A.   You can't use violence.

15    Q.   I'm sorry.  You can't use violence; you can use expulsion?

16    A.   Yes.

17          MS. BASSIL:  Could we go to Exhibit 1263, John?

18          This would be just the first page, Mr. Chakravarty,

19    1263.  Just the very first page.  We'll deal with correcting it

02:25 20    later, but I'm just referencing you.

21          MR. CHAKRAVARTY:  I'm not sure what is being admitted

22    here.  The first page of 1263 or --

23          MS. BASSIL:  All I'm doing is trying to help

24    Mr. Chakravarty locate --

25          THE COURT:  Okay.  You're limiting the offer to the

```
 1    first page?

 2              MS. BASSIL:  I'm trying to be nice.

 3              THE COURT:  All right.  You're limiting the offer to

 4    the first page?

 5              MS. BASSIL:  Not at this time, your Honor, but I am

 6    referencing the first page.

 7              MR. CHAKRAVARTY:  Which is my confusion.  Is she

 8    offering the whole exhibit or just the first page?

 9              MS. BASSIL:  I will offer just the first page, if that

02:26 10   makes a difference.

11              THE COURT:  Okay.

12              MR. CHAKRAVARTY:  Your Honor, the way that the defense

13    has provided the exhibit, these are different versions of a lot

14    of the conversations which the jury has seen.  If counsel

15    represents that 1263 is the entire thread, then the government

16    has no objection to the entirety of 1263 coming in.

17              MS. BASSIL:  I will put in just the first page, your

18    Honor.

19              THE COURT:  Okay.

02:26 20              (Defense Exhibit No. 1263 received into evidence.)

21    BY MS. BASSIL:

22    Q.   Dr. Fadel --

23              THE COURT:  1263 -- well, 1263 --

24              MS. BASSIL:  We'll correct it later.

25              THE COURT:  -- becomes the first page of what you had
```

 1   marked.

 2          MS. BASSIL:  Yes.  Yes.  Thank you.

 3          And if we could blow up the bottom part?  I'm sorry.

 4   I'm looking for the Abu Sabaayaa.  Thank you.

 5   BY MS. BASSIL:

 6   Q.   All right.  Dr. Fadel, are you familiar with this post

 7   dated March 7, 2005?

 8   A.   Yes, I am.

 9   Q.   And could you read this post?  And this is by Abu

02:27 10   Sabaayaa?

 11   A.   "Just because he doesn't gree with the bombings doesn't

 12   mean he is a government scholar or a stooge of the government.

 13   As far as I know, there was no revelation from above the

 14   heavens confirming the bombings to be right or wrong.

 15          "It's okay to not agree with the bombings.  We're not

 16   like the Madaakhilah who declare the other people to be

 17   misguided simply because they have different opinions on

 18   certain issues.

 19          "Actually, now that I think about it, Shaykh Ibn

02:27 20   Jibreen also had a fataawa denouncing the bombings."

 21   Q.   I wanted to ask you, first of all, about what is

 22   al Qa'ida's position on bombings?

 23   A.   That they're fine.

 24   Q.   All right.  And can you contrast this post to al Qa'ida's

 25   position?

1    A.   Well, I think what this post -- the import of this post is

2    that there's no religious basis to conclude that these bombings

3    are permissible from Islamic law.  So that one cannot conclude

4    that a scholar, particularly a religious scholar, who condemns

5    them is, therefore, a stooge of the Saudi Arabian government.

6    Q.   All right.  And in your knowledge as a scholar, are you

7    familiar with scholars who supported the Saudi Arabian

8    government?

9    A.   Yes.

02:28 10    Q.   And are you familiar with a scholar known as Bin Baz?

11    A.   Yes, I am.

12    Q.   Let me just spell it out for the jury.

13         (Writing displayed to jury.)

14    Q.   And who was Bin Baz?

15    A.   Bin Baz was the mufti --

16    Q.   What's a mufti?

17    A.   I'm sorry.  "Mufti" is a religious scholar who's qualified

18    to give a fataawa.  And he was the chief mufti -- one of the

19    most-senior muftis -- in the Kingdom of Saudi Arabia for many

02:28 20    years until his death.

21    Q.   And what was -- what did he say about bombings?

22    A.   Well --

23    Q.   I'm sorry.  What did he say about the United States?

24    A.   In the early '90s, or I guess in 1990, after Saddam

25    Hussein invaded Kuwait and Saudi Arabia wanted to invite U.S.

1    troops to defend the kingdom against Saddam Hussein, there was

2    a lot of controversy as to whether or not allowing American

3    soldiers in the peninsula be permissible.  And Bin Baz gave a

4    religious opinion of fataawa saying it was permissible --

5    religiously permissible for the Americans to come and defend

6    the kingdom.

7    Q.   Now, let me ask you:  the issue of American bases in

8    Saudi Arabia.  Does al Qa'ida have a position on that?

9    A.   Yes.

02:29 10    Q.   What is that position?

11    A.   They think it's categorically sinful and must be fought

12    militarily.

13    Q.   And al Qa'ida's position, Doctor, are you aware of

14    whether there -- I think you talked about it's sinful and it

15    has a religious aspect to it.  Did al Qa'ida espouse any sort

16    of political aspect to United States bases in Saudi Arabia?

17    A.   Yes.  They announced again in 1996, and then in 1998, that

18    American bases had to be driven out of the Arabian Peninsula.

19    Q.   All right.  And did you see references in postings by

02:30 20    Tarek Mehanna to Bin Baz?

21    A.   Yes.

22    Q.   And what were those references?

23    A.   They were admirable.

24         MR. CHAKRAVARTY:  Objection, your Honor.

25         THE COURT:  No, that may stand.

BY MS. BASSIL:

Q.   And were the references contradictory to al Qa'ida's view of Bin Baz?

A.   I don't know al Qa'ida's view of Bin Baz particularly.

Q.   I'm sorry.  Never mind.

     I want to turn to a topic that I call "collateral damage."  And that is al Qa'ida's position on killing civilians, including Muslims.  Are you familiar with that position?

A.   Yes, I am.

Q.   And how are you familiar with it?

A.   Because of my research.

Q.   Okay.  And what is your understanding of al Qa'ida's position on collateral damage?

A.   Okay.  Well, first I would like to make clear that al Qa'ida doesn't recognize the concept of collateral damage with respect to Americans because in the 1998 fatwaa, they conclude that all Americans are culpable, so they're essentially legitimate targets.  So the issue of collateral damage does not come up with individual Americans.  The issue of collateral damage comes up, however, with Muslims who are killed in the course of an al Qa'ida operation.

Q.   Let me stop you for a minute.  Could you explain to the jury what "collateral damage" is?

A.   "Collateral damage" is the idea in the law of war that you

intend to target a certain military target which is considered

legitimate in the laws of war, but then in the course of

targeting that you also kill targets incidentally that would

not be legitimate had you intentionally targeted them from the

beginning.

Q.   Can you give an example?

A.   Suppose that the United States bombs a military airfield

in Iraq in the course of the campaign against Saddam Hussein

and there happens to be some civilian personnel on the airbase.

That would be collateral damage.

Q.   And the civilians would be collateral damage?

A.   The civilians would be collateral damage.  It would not be

considered a violation of the laws of war.

Q.   Now, you mentioned that al Qa'ida doesn't believe -- they

don't view Americans as collateral damage?

A.   That's correct.

Q.   What about Muslims, civilian Muslims?

A.   Yes.  Now, the fact that many of their operations kill

Muslims creates a big problem for al Qa'ida because, according

to al Qa'ida, they're defending Muslims, so they have to come

up with some theory, some justification for why it's okay for

those Muslims to be killed.

    So they generally have two different theories.

Q.   And what are those?

A.   The first theory is called the human shield theory; the

1    second theory is the apostate theory.

2    Q.   What is the human shield -- where is the human shield

3    theory -- where do these theories come from?

4    A.   The human shield theory comes from a debate in medieval

5    Islamic jurisprudence that deals with the problem of necessity

6    or -- and targeting in the law of war.

7    Q.   Can you explain what a human shield is and how that -- how

8    they talked about that?

9    A.   Yeah.  The original case would involve the following

02:33 10   scenario:  You have a non-Muslim army that's invading Islamic

11   territory, and as they march they have Muslim prisoners in

12   their ranks, and so they take the Muslims and they put them at

13   the front lines so that it's impossible for the Muslim garrison

14   defending the border to shoot the enemy -- the enemy army

15   without killing Muslims who are not legitimate targets.

16   Q.   And so what was the discussion in medieval books of law?

17   A.   Well, medieval jurists tried to essentially figure out

18   under what circumstances it would be permissible for Muslims to

19   attack an enemy that was guarding themselves behind Muslim

02:33 20   human shields.  And so they tried to develop various criteria

21   under which it would be okay to do that as opposed to doing

22   other things like, for example, ransoming the Muslim prisoners.

23   Q.   And you said there was a second theory.  What was the

24   second theory?

25   A.   The second theory was that of an apostasy; namely, the

1    Muslims who were killed, even though they weren't the target,

2    it's okay, it's not a crime from the perspective of al Qa'ida

3    that they died, because they were apostates anyway.

4    Q.   So al Qa'ida used this theory of both human shield and

5    apostates?

6    A.   That's correct.

7    Q.   To justify what?

8    A.   To justify various attacks that they undertook in which

9    there was indiscriminate violence which killed scores of

02:34 10   Muslims and maybe some Americans -- maybe a few, maybe a lot.

11   It didn't matter -- but they killed lots of Muslims in the

12   course of these attacks.  An example would be the embassy

13   bombing in 1998 in Tanzania.

14   Q.   And there were Muslims who were killed in that attack?

15   A.   Yes.  Many more Muslims than Americans.

16   Q.   Now, I would like to turn to Exhibit 1256.

17        MS. BASSIL:  And again, your Honor, this would be a

18   new exhibit, and I would ask to put this into evidence.

19        MR. CHAKRAVARTY:  It's a 108-page thread.  We haven't

02:35 20   seen this before.  Obviously, the government -- the objections

21   are the hearsay and the relevancy objections.

22        THE COURT:  All right.  Well, if this is the same,

23   we've already talked about those.  If that's the objection,

24   then I will admit it.

25        Let me just remind the jury about the limitation on

1    some of these.  I told you about the difference between

2    accepting a written statement as evidence of facts asserted in

3    the statement as opposed to evidence of the fact that the

4    statement was made, simply as a thing to be examined in a

5    sense, rather than as an assertion to be believed.  That's the

6    basis on which they're admitted.

7              (Defense Exhibit No. 1256 received into evidence.)

8              MS. BASSIL:  Thank you.  Mr. Oh, can we turn to page

9    66?  And if you could make that bigger?

02:36 10    BY MS. BASSIL:

11    Q.   Dr. Fadel, are you familiar with this post by Abu

12    Sabaayaa -- I'm looking for a date on it.

13              MS. BASSIL:  If you could -- yeah.

14    Q.   It would appear the date before it is 1/30/2007.  Are you

15    familiar with this post?

16    A.   Yes, I am.

17    Q.   And Abu Sabaayaa, again, is Mr. Mehanna's name, the name

18    he used?

19    A.   As was told to me.

02:36 20    Q.   All right.  And the heading says, "Re: Pakistan Bombing

21    Kills 14 Policemen Including Senior Officers."  Are you

22    familiar with that subject heading?

23    A.   Yes, I am.

24    Q.   And how are you familiar with it?

25    A.   I'm familiar with it because I read these postings in the

```
 1    course of the materials that were given to me.
 2    Q.   All right.  And did you research anything concerning this
 3    subject matter or were you familiar with it already?
 4    A.   I only read what was there.
 5    Q.   All right.  Could you -- first of all, what did you
 6    consider significant in this posting?
 7    A.   Well, it's a reply to somebody who purports to be
 8    Ja'far al-Ansariy.  Mr. Ansariy is trying to suggest that the
 9    bombing in 1998 of the U.S. Embassy in Tanzania was Islamically
10    legitimate.  And so his theory is that these are embassies of
11    kufr, embassies of disbelievers, and these are considered
12    territories of the nations themselves.  So it's not really an
13    attack on a Muslim country like Tanzania; it's, rather, an
14    attack on the United States itself --
15    Q.   And this is Mr. Ansariy?
16    A.   This is Mr. Ansariy's proposed theory, yes.
17              -- and that the Muslims who lived there --
18              MS. BASSIL:  Your Honor, I'm sorry.  I'm not sure the
19    jury has this.
20              THE JURORS:  We don't.
21              THE COURT:  You don't?  That may be my fault.  Let me
22    just look.  It is my fault.
23              Do you have it now?  Okay.
24              MS. BASSIL:  Thank you.
25    BY MS. BASSIL:
```

Q.   Mr. Ansariy is proposing -- his question and his post

reflects al Qa'ida's position?

A.   It would be consistent with the 1998 position that you can

attack Americans anywhere and everywhere.

Q.   All right.  And what is the significance of the posting by

Abu Sabaayaa?

A.   Well, I think there are a couple of things here.  First,

the question itself gives two theories justifying the bombing:

first, that the embassy is not really in a Muslim country, it's

because the embassy is on U.S. territory, technically; and then

second, any Muslims who were working there and died -- because,

as I mentioned earlier, the number of Muslims who died in the

bombing far exceeded Americans -- it was okay to kill them

because they were apostates.  And they were apostates in the

mind of this questioner because they were actively assisting

the United States.

     This notion that doing any kind of assistance to the

United States constitutes apostasy, again, I think is a core

doctrine of al Qa'ida and that -- and its supporters.

     The reply suggests that that's not true; you can't be

so quick to assume that Muslims who worked in the U.S. Embassy

in Tanzania were apostates because the kind of loyalty or

assistance to the United States that is required before one

becomes an apostate has to be something really grave and

substantial, not necessarily something so simple as working in

1    the U.S. Embassy.

2    Q.   And can you tell the jury what is the sort of concept of

3    Islamic law in theology around the issue of a Muslim being

4    killed?

5    A.   It's strictly forbidden.  It's a grievous sin that can

6    send one to hell.

7    Q.   Now, I want to go back for a moment to -- I believe it's

8    Exhibit 420.  Yes, 420.  I think it's 420.  Yes.

9         MS. BASSIL:  If you could blow up that block?  Thank

02:40 10  you.

11    Q.   And are you familiar with this post contrasting Paul

12    Johnson?

13    A.   Yes, I am.

14    Q.   And can you explain -- first of all, the jury has seen

15    this post, I think, several times, in which Abu Sabaayaa

16    states, "In contrast to a man such as Paul Johnson who was

17    helping in the maintenance and repair of American Apache

18    helicopters, this is, to anyone who has sight with which they

19    can see or a brain with which they can think, a totally

02:40 20  different story."

21         Is this posting about Paul Johnson consistent with

22    al Qa'ida, inconsistent with al Qa'ida's position --

23    A.   Well --

24    Q.   -- first of all?

25    A.   -- I think it's inconsistent.

1    Q.    How so?

2    A.    Because here it suggests that Paul Johnson, because of

3    what he is doing, he becomes potentially culpable, whereas

4    al Qa'ida's position is that you're culpable simply for being

5    an American.

6    Q.    All right.  And Paul Johnson -- what is your understanding

7    of what he did?

8    A.    Is that he directly maintained weapons of war; namely,

9    Apaches.  Apache attack helicopters.

02:41 10   Q.    All right.  And in terms of the posting, where does that

11   put Paul Johnson or what does that make him?

12   A.    Well, the posting suggests that Paul Johnson fell on the

13   side of combatant from the perspective of Islamic law of war,

14   rather than non-combatants, which would be immune from

15   targeting.

16         MS. BASSIL:  Now, if we could go back to the previous

17   post, page 66?  All right.

18   Q.    And going back to that, you said that this posting is

19   inconsistent with al Qa'ida?

02:42 20   A.    Yes, it is.

21   Q.    And can you describe this posting in terms of the view of

22   jihad, of its scope, compared to al Qa'ida?

23   A.    Well, this isn't really about jihad or its scope; it's

24   about what kind of acts constitute apostasy.  So every Muslim

25   agrees --

```
 1              MR. CHAKRAVARTY:  Your Honor, I think that answered
 2     the question.  Can't we have another question?
 3              THE COURT:  No, go ahead.
 4     BY MS. BASSIL:
 5     Q.    How does it have to do with apostasy, and can you link
 6     that up to the issue of jihad?
 7     A.    Yes, I can.
 8     Q.    Please do.
 9     A.    Every school of Islamic theology and law agrees that at a
02:42 10     certain point in time a Muslim can do actions that aid and abet
11     the enemy to such an extent that they abandon Islam, right?
12     Al Qa'ida takes sort of a strict liability view of this so that
13     any act that helps the Americans is sufficient to constitute
14     apostasy.
15              Now, what's significant about that from the
16     perspective of jihad -- because, as I said earlier, in Islam
17     it's absolutely forbidden for another Muslim to intentionally
18     kill another Muslim.  Therefore, if you're going to kill
19     Muslims, you need to have a justification.  A very strong
02:43 20     justification is to say, "Well, they're not Muslims; they're
21     apostates."  So evidence of the fact that they're aiding and
22     abetting Americans is used by al Qa'ida to say, "Well, they're
23     apostates so we don't have to worry about killing them."
24     Q.    I would like to turn to another sort of issue, or view of
25     al Qa'ida, or philosophy of al Qa'ida, and I'm going to refer
```

1    to it as "takfir."  Are you familiar with that subject?

2    A.   Yes, I am.

3    Q.   And how are you familiar with that subject as it relates

4    to al Qa'ida?

5    A.   Again, "takfir" means, basically, excommunication.  It's

6    to declare somebody who claims to be a Muslim to be a

7    non-Muslim.  And we touched on that with the previous exhibit

8    because what the question was suggesting, he was doing an act

9    of takfir.  He was declaring that the Muslims who worked for

02:44 10   the U.S. Embassy in Tanzania had become non-Muslims by virtue

11   of their act of aiding and abetting the United States.

12        So takfir is a very important strategy that al Qa'ida

13   uses in its war because it expands the domain of legitimate

14   targets because they can say, "These people are apostates

15   because of their actions; so, therefore, we can attack them."

16        MS. BASSIL:  And if we could have Exhibit 1255,

17   please, page 3?

18        THE COURT:  Again, this is a --

19        MR. AUERHAHN:  This is a new one.

02:45 20        THE COURT:  A not-yet admitted exhibit?

21        MS. BASSIL:  Yes, your Honor.  I would ask to admit

22   this exhibit.

23        And if you could scroll --

24        MR. CHAKRAVARTY:  Same objection.

25        THE COURT:  All right.  It will be admitted.

1              (Defense Exhibit No. 1255 received into evidence.)

2              MS. BASSIL:  Could you scroll down, please?  And go to

3     the last paragraph.

4     BY MS. BASSIL:

5     Q.    Dr. Fadel, could you -- did you review this post?

6     A.    Yes, I did.

7     Q.    And did you find this last paragraph on page 3 to be

8     significant?

9     A.    Yes, it is.  It's very significant.

02:45 10     Q.    Would you read it to the jury and explain this in

11     comparison to al Qa'ida's positions?

12     A.    Okay.  "As for declaring a specific person who does this

13     to be a Kaafir," non-Muslim, "this is a whole other topic of

14     discussion, as the rules and conditions for making takfir

15     muharibin," i.e., declaring an individual to be a disbeliever,

16     "are many, and it is not for ignoramuses like us to do this

17     without these very precise and specific conditions being

18     present and without us having in-depth knowledge and

19     understanding of the matter.  And Allah," God, "knows best."

02:46 20     Q.    So how would that -- how does that compare to al Qa'ida's

21     position?

22     A.    Yes.  As I mentioned earlier, al Qa'ida takes a very

23     strict view of the kinds of actions that can lead to one

24     becoming an apostate.  So any kind of assistance to the

25     Americans, even without a subjective intent to be harming

1    Islam, in their view, counts as apostasy.

2         In this case what the poster is doing is laying out

3    theoretical conditions for what constitutes apostasy, but then

4    saying, "We are not capable of making a factual determination

5    with respect to any single Muslim whether or not, in fact, they

6    satisfy the conditions of apostasy."  So it lays out the

7    theoretical rules but then says, "We are not in a position to

8    know whether or not an individual Muslim is an apostate."  This

9    is very significant because it suggests that you can't use the

02:47 10   excuse of apostasy to target other Muslims.

11   Q.   And does this -- does this have a basis in sort of Islamic

12   theological doctrine?

13   A.   Yes, it does.

14   Q.   Would you tell the jury what that is.

15   A.   In many cases in Islamic theology, theologians are

16   concerned with articulating what the proper belief or doctrine

17   is or norm is.  But then they are hesitant -- they express

18   reservations -- about making categorical judgments as to

19   whether or not specific people have satisfied the conditions --

02:47 20   the factual conditions that would require application of a

21   particular rule.

22   Q.   And I would like to turn to another issue concerning

23   al Qa'ida which would be sort of -- I'll call it "participation

24   in non-Muslim lands."  And by that I mean as citizens or

25   naturalized citizens, all right?  Are you familiar with

1    al Qa'ida's position on that?

2    A.    Yes, I am.

3    Q.    And how are you familiar with it?

4    A.    Again, through my reading and study.

5    Q.    And what is al Qa'ida's position on Muslims participating

6    as citizens in non-Muslim lands?

7              MR. CHAKRAVARTY:  Objection, your Honor.  Limited to

8    the scope of the disclosure, and I don't see that anywhere.

9              (Pause.)

02:49 10              THE COURT:  Let me see you at the side.

11              (Discussion at sidebar and out of the hearing of the

12   jury:)

13              THE COURT:  I don't see it in the disclosure.

14              MS. BASSIL:  Fine.  I'll make it a subtopic of takfir,

15   which it is.  It's a subtopic of takfir -- I just broke it

16   out -- and I'm happy to do that.

17              THE COURT:  Okay.

18              (In open court:)

19   BY MS. BASSIL:

02:50 20   Q.    Dr. Fadel, let me remove this as a separate topic and talk

21   about it in terms of takfir.  Does al Qa'ida have a position

22   with respect to takfir and apostasy concerning participation in

23   non-Muslim lands?

24              MR. CHAKRAVARTY:  Objection, your Honor.

25              THE COURT:  Sustained.

BY MS. BASSIL:

Q.   Does al Qa'ida -- when you were talking about apostasy and al Qa'ida's position on apostasy, how does that reflect on people being citizens in a place like America?

        MR. CHAKRAVARTY:  Objection, your Honor.

        THE COURT:  Sustained.

BY MS. BASSIL:

Q.   Does al Qa'ida accept the idea that a Muslim can be an American?

A.   No.

Q.   And how do you -- where -- how do you know that?

A.   Because that would entail supporting the United States through a minimum of taxation, so you would be culpable and you could be killed.  So you can't be a Muslim and be -- you can't be a Muslim and an American at the same time, in al Qa'ida's view, implicitly because if you're an American, you're a legitimate target, but if you're a Muslim you can't be a legitimate target.  So it's an empty set, so to speak.

        So if a Muslim claims to be a Muslim and an American, you've got to resolve that contradiction one way or the other, and I think under the 1998 fataawa it's resolved in the way that's against Muslims; i.e., they can't be proper Muslims if they are Americans.

        MS. BASSIL:  All right.  And I would turn to Exhibit 1257, please, your Honor?  And it would be page 2 and 3.

1          MR. CHAKRAVARTY:  I object for -- to the topic of

2     this.  I think it relates to the citizenship issue.

3          THE COURT:  Sustained.

4          MS. BASSIL:  Well, your Honor, I think -- may we be

5     heard at sidebar?  I think Mr. Chakravarty is misrepresenting

6     this.

7          (Discussion at sidebar and out of the hearing of the

8     jury:)

9          MS. BASSIL:  Your Honor, my notice says right here:

02:53 10    "Dr. Fadel will provide the jury with an understanding of many

11    of the defendant's writings and translations and" --

12          Could you guys stop, please.

13          -- "an understanding of their correct context" --

14          THE COURT:  Where are you reading?

15          MS. BASSIL:  I'm reading right here on the bottom of

16    page 12.

17          THE COURT:  Okay.

18          MS. BASSIL:  -- "and an understanding of their correct

19    context within the history and law of Islam."

02:53 20          And what I am asking him is about his writings and

21    translations -- particularly his writings here -- and his

22    understanding of their correct context.  The history and law of

23    Islam includes what al Qa'ida is saying about these things.

24          THE COURT:  Well, that disclosure does not bring in

25    the whole of Islam, I don't think.  But at any rate, this

1    citizenship issue is identified in the disclosure with respect

2    to Dr. March, and he did testify about them, and that's

3    specifically identified here.  So there are really two bases:

4    One is they're not disclosed specifically enough, which is the

5    basis for the objection; but I note in addition we've had it

6    through Dr. March.  So it seems to be redundant.

7         MS. BASSIL:  All right.  Well, your Honor, I would

8    like to refer to -- if you'd look at -- this is the page 3 of

9    this.  And what I really want to refer to is his issue of

02:54 10   admiration of America and what it's for and his view of

11   America; in other words, what he says in this is -- you have to

12   read the post.

13        (Pause.)

14        THE COURT:  Whose admiration?

15        MS. BASSIL:  Well, it goes back.  It's actually a

16   person who put an American flag on his CD of the Qur'an.

17        (Pause.)

18        MS. BASSIL:  It's just that paragraph that's got the

19   pink highlight.

02:55 20   MR. CHAKRAVARTY:  What the defendant is saying about

21   what somebody else did in terms of his representation of

22   patriotism or love of America is not germane to any of the

23   issues that --

24        MR. CARNEY:  It goes directly to the defendant's state

25   of mind.

1          MR. CHAKRAVARTY:  It goes to what the defendant would

2     say --

3          THE COURT:  No.

4          MS. BASSIL:  It goes to his state of mind and it's

5     contrary to al Qa'ida.

6          THE COURT:  You can have it.

7          MS. BASSIL:  That's all I was going for.  Thank you.

8          (In open court:)

9     BY MS. BASSIL:

02:55 10    Q.   Dr. Fadel, are you familiar --

11         MS. BASSIL:  Am I okay?

12         THE COURT:  I think so.

13    BY MS. BASSIL:

14    Q.   Dr. Fadel, are you familiar with this post?

15    A.   Yes, I am.

16    Q.   And this paragraph refers to someone who is expressing

17    some sort of support for America, correct?

18    A.   A Muslim expressing some support for America, yes.

19    Q.   All right.  And was -- and was there an objection to this

02:56 20    by someone on the post?

21    A.   Yes.  I guess the person who started the thread believed

22    that that entailed an act of apostasy.  The particular act was

23    putting a U.S. flag on top of the Qur'an.

24    Q.   Okay.  And what was -- what was the post by Abu Sabaayaa

25    and just that paragraph -- if you could read just that

1    paragraph and explain it in terms of al Qa'ida's position on

2    such acts or beliefs.

3    A.   Yes.  "You also have to ascertain exactly what is intended

4    by this apparent admiration of America.  Is it for the good

5    things that it has to offer (the organization, the relative

6    ease of life, the fairness and general justice that is present

7    in such countries in comparison with the miserable situation of

8    the Arab world, et cetera)?  If this is the case, this brother

9    is to be wisely taught how to manifest his wala' and bara', and

02:57 10   this is especially important and crucial since he seems to be

11   calling others to engage in his nonsense.  But you cannot say

12   he is a kafir, a non-believer.  If he loves America for the

13   kuffaar contained therein, this is a whole other story."

14        MR. CHAKRAVARTY:  Your Honor, I rise just to -- there

15   were some Arabic terms there and they're not translated, and if

16   the witness can --

17        THE COURT:  Yes.  Yes.  Wala' and bara'.

18        THE WITNESS:  Oh, I'm sorry.  "Wala'" means loyalty

19   and "bara'" means disavowal.

02:57 20   BY MS. BASSIL:

21   Q.   Can you explain that?

22   A.   Yes.  Wala' means loyalty.  The idea is that Muslims are

23   loyal to Islam and God and they disavow all others, right?  And

24   so this is a theological concept whose details are a matter of

25   great dispute among all Muslims.  But to a certain extent all

1    Muslims have to show loyalty, affection and love for Muslims

2    and have to separate themselves, to a certain extent, from

3    non-Muslims.  And so the question is what's the proper dividing

4    line.

5    Q.   And what does this post indicate to you concerning

6    al Qa'ida's position on apostasy -- or on America and apostasy?

7    A.   Well, again, it's consistent with the idea that even the

8    simplest act of showing admiration for the United States

9    violates this basic theological premise of absolute loyalty to

02:58 10   the Muslim community.  This post says, "No, you have to look at

11   it because loyalty is of different shades and degrees.  Yes, at

12   some point in time a Muslim, if he's too excessive in his love

13   for America, could leave the folds of Islam, but not everything

14   that he does in respect of admiration of America constitutes an

15   act of apostasy."

16        So, again, it's a very careful kind of answer, and

17   what's important is that it negates the idea that you can

18   simply target Muslims who happen to be American citizens on the

19   assumption that they are apostates.

02:59 20   Q.   I would like to turn to the subject of suicide actions, or

21   suicide bombings.  Are you familiar with the legal and

22   theological view of such actions?

23        MS. BASSIL:  We can take this down.

24   A.   Yes, I am.

25   Q.   And are you familiar with al Qa'ida's position on suicide

1    actions?

2    A.    Yes, I am.

3    Q.    And how are you familiar with al Qa'ida's position on

4    suicide actions?

5    A.    Just through my reading and research.

6    Q.    And can you -- and are suicide actions related to the

7    concept of martyrdom?

8    A.    They are tangentially related.  Yes, they are.

9    Q.    First, can you explain the concept of martyrdom and its

03:00 10    meaning in Islamic theology, history and law?

11    A.    Yes.  Martyrdom, in Arabic, is called "shahada."

12    Q.    I want to spell that.

13    A.    Sorry.

14    Q.    Hold on.

15    A.    Do you want me to just spell it orally?

16    Q.    I want to write it down.  It helps me.

17    A.    All right.

18    Q.    All right.  How do you spell that?

19    A.    S-H-A-H-A-D-A.

03:00 20    Q.    That means?

21    A.    Witnessing.

22    Q.    Witnessing?

23    A.    Witnessing.  Like what I'm doing today.

24    Q.    And how does that come to mean martyrdom?

25    A.    Because a martyr is somebody who dies witnessing to the

1   truth of Islam.

2   Q.   Okay.  And what does that -- can you explain that -- is

3   martyrdom unique to Islam?

4   A.   The concept of martyrdom generically, I think, can be

5   found in a variety of different human cultures, including our

6   own.

7   Q.   And where do you see it in our own?

8   A.   Well, I think we see the fact that we award medals to

9   fallen soldiers for acts of heroism; we have a special

03:01 10   cemetery, Arlington National Cemetery, to honor our veterans;

11   we glorify fallen heros; we memorize statements like "Give me

12   liberty or give me death," "I regret that I have but one life

13   to give for my country."

14   Q.   Who said that?

15   A.   Nathan Hill, I think, before he was hung by the British

16   during the Revolutionary War.

17   Q.   Do other countries also have this concept of martyrdom?

18   A.   I think if you do a little bit of reading, in ancient

19   Greek and ancient Roman literature which forms the basis of

03:01 20   Western civilization you will see in those cultures that they

21   honored their fallen warriors greatly and it was considered

22   virtuous to die for one's country.

23   Q.   In Islam the honoring of martyrs, is that limited to

24   fighting?

25   A.   No, it is not.

1    Q.   All right.  What is martyrdom in Islam?  Who are martyrs?

2    A.   Well, generally speaking, anybody who dies in a proper

3    state of faith, witnessing God, is considered a martyr.  So the

4    prophet is reported to have said one time -- because he heard

5    people talking about martyrdom and they seemed to think that

6    you could only become a martyr by dying on the battlefield and

7    he said that was wrong.  "Most of the martyrs in my community,"

8    meaning the Muslim community, "will die on their beds."

9    Q.   And when did the recognition of martyrdom begin in Islam?

03:02 10   A.   It began with the very earliest days of Islam because, as

11   I mentioned briefly earlier in the day, when the prophet

12   Mohammed began to preach Islam, they were subject to

13   persecution by the pagan Arabs at the time.  Several early

14   Muslims were killed and were tortured to death, so the concept

15   of martyrdom arose very early in Islam as a way of recognizing

16   their sacrifices and that God would reward them for the

17   suffering that they underwent for the truth.

18        MS. BASSIL:  Your Honor, I'm about to get into the

19   Islamic position on suicide, so...

03:03 20        THE COURT:  Yeah, okay.  We're at one o'clock.  Let me

21   just see counsel for one minute.

22        (Discussion at sidebar and out of the hearing of the

23   jury:)

24        THE COURT:  We're at the end of the week.  I was just

25   wondering if there's something that I might say to the jurors

1     about where we are.  Will I be able to tell them -- can I tell

2     them that the evidence will finish next week?

3          MS. BASSIL:  I would love to -- well, let me say this,

4     your Honor:  I probably have a half an hour more of him, okay?

5     I know that the crosses, quite frankly, have been

6     extraordinarily long.  And then we have -- Sejal, can you help

7     me with this?

8          MS. PATEL:  Brian Williams.

9          MS. BASSIL:  Who is very short.  We have three very

03:04 10   short experts who should all fit within a morning, all right,

11    without question, and that would be Brian Williams, the

12    linguist, who is about five minutes.

13         MS. PATEL:  And Mark Spencer is a half-hour, tops.

14         MS. BASSIL:  The tech guy.

15         And then the last big witness would be Marc Sageman.

16    And I think he's going to take two days, so --

17         THE COURT:  I don't want to raise their hopes, but I

18    want to reassure them, if I can do that, because they are

19    getting a little nervous about the following week.  I can also

03:04 20   say nothing.

21         MR. CARNEY:  I would ask your Honor to consider saying

22    that we're actually making great progress toward the end of

23    this trial.  To be candid, the decision of whether the

24    defendant will testify as a witness is his, and we've

25    emphasized that to him, and I'm not in a position to tell the

1    Court because I have not been told.  So I can assure you that I

2    would like to get that issue resolved.

3         There's a limit as to how much I can talk here at the

4    sidebar on this subject.

5         THE COURT:  That's fine.  I wasn't actually thinking

6    that I would hear about that but --

7         MR. CARNEY:  Well, I'm just --

8         THE COURT:  I was thinking of the others.

9         MR. CARNEY:  I didn't want you to think that it's

03:05 10   certain that we will rest after Sageman.

11        THE COURT:  Fine.  Fair enough.

12        MR. CARNEY:  But he is the only --

13        THE COURT:  But are there any other lay witnesses?

14        MR. CARNEY:  Well, there is one other witness, and we

15   actually need to request a ruling from your Honor.  There was

16   someone who's only in a position to testify by a audio -- by

17   videoconferencing from Saudi Arabia.  He's the person --

18        THE COURT:  That's the one that there's been an

19   exchange of briefing on?

03:06 20        MR. CARNEY:  Yes, your Honor.

21        THE COURT:  I agree with the government's view.  I

22   think that the strong presumption -- and the rule -- is that

23   the testimony be taken in open court, which I take to mean

24   physical presence.  Depositions are an exception on occasion,

25   but they're pre-approved and conditions are set for them.  I

1    don't think it's appropriate to do it by videoconference.

2              MR. CARNEY:  If I may just not only object to the

3    ruling, but I believe that the deposition mode is more often

4    applied to a situation where the government wants to present a

5    witness by videoconferencing because of the defendant's right

6    to have a face-to-face confrontation with a witness.  If it's

7    the defendant attempting to secure testimony in this form,

8    there is no confrontation issue because the government doesn't

9    have a right for confrontation.

03:07 10              So if your Honor is making a definitive ruling that

11    under no circumstances can a defendant have a witness by audio

12    conferencing, then I'm going to object to that.

13              THE COURT:  Well, I don't make it that broadly; I make

14    it that this defendant may not do it for this witness under

15    these circumstances having in mind -- I think it's Rule 26,

16    from memory, of the criminal rules.

17              MR. CARNEY:  I just -- I thought the record should be

18    clear on what you're saying.

19              THE COURT:  Fair enough.

03:07 20              MR. CARNEY:  So with that, I don't believe there are

21    any other defense witnesses.

22              THE COURT:  All right.

23              MR. CHAKRAVARTY:  We have positions on the length and

24    who should be called which we can address outside of --

25              THE COURT:  Yes.  I know that.

1       MR. CHAKRAVARTY:  I wouldn't go so far as to say what

2  your Honor is going to tell them, that we're making great

3  progress.

4       THE COURT:  You don't think I could say that?

5       MR. CHAKRAVARTY:  I don't think -- just because they

6  know it's been slow and I don't see -- but because we haven't

7  had a lot of the basis of what these witnesses' opinions are,

8  there's been zero discovery in terms of actual raw materials,

9  we are doing some of that discovery as we're doing our

03:08 10  cross-examination.  You know, it's inelegant, it's not how we'd

11  prefer to do it, but we need to be able to do that -- like the

12  cross-examination, we need to be more proficient about it, but,

13  you know, part of that -- I don't know that that's going to go

14  away just because, you know, we want to finish the trial.

15  That's everyone's concern.

16       So predicting that we're going to, you know, bang

17  through three or four witnesses in the next four days, I think,

18  is optimistic.  Everybody wants to do that, and we will do

19  whatever we can and maybe we could talk more about that, but I

03:09 20  think we've talked all we can and we've made multiple

21  disclosures --

22       THE COURT:  Well, my own impression, even on the track

23  record that we've had, is that if that's the number and

24  identity of the witnesses -- putting aside the defendant

25  himself, which would be a different story, but the remaining

1    experts, and even having in mind the government's last couple

2    of crosses, because that reaches your point, I think -- I think

3    it's still probably within that estimate.

4         MR. CARNEY:  May I ask the Court to consider asking

5    the government a question?  They have some people in the

6    bullpen, and I wondered if the government is anticipating

7    calling, for example, Lorenzo Vidino as a rebuttal expert,

8    because that's going to be -- Kohlmann --

9         MR. CHAKRAVARTY:  Vidino has always been there to kind

03:10 10   of police as far as Sageman goes.  Sageman's disclosure, as far

11   as our understanding, is going to be tailored to basically

12   Kohlmann's kind of type of testimony; however -- and this we

13   can argue later, not while everyone is sitting here --

14   Mr. Groharing and I talked before, and we have serious concerns

15   about what the disclosure is, what the basis of his opinions

16   are with regards to that, not whether he can testify --

17        THE COURT:  Who?

18        MR. CHAKRAVARTY:  Sageman.

19        THE COURT:  Right.

03:10 20        MR. CHAKRAVARTY:  And that will help narrow --

21        THE COURT:  Well, but one thing I said --

22        MR. CHAKRAVARTY:  -- things and make us more

23   efficient.

24        THE COURT:  But one thing I said earlier today will

25   apply to him, and that is, the October 18th is the operative

1   disclosure.  There are some issues with that, perhaps, as well,

2   but not as many as the new matter that was presented in the

3   revised disclosure.

4          MR. CARNEY:  I wondered if the government had anyone

5   else besides Vidino who's a possible --

6          THE COURT:  If Vidino were to be called, can you

7   estimate how long he'd be?

8          MR. CHAKRAVARTY:  It would be pure rebuttal, so it

9   would be if -- I guess a day.  I should add, your Honor, when

03:11 10   Sageman testifies, to the extent Mr. Kohlmann is around and

11   available, he may come back to watch the testimony.  We

12   wouldn't call both.  It would be one or the other.

13          MS. BASSIL:  Can we ask Mr. Kohlmann why

14   everyone -- no one appeared before Congress and everyone

15   submitted in writing and he misrepresented where he was?

16          THE COURT:  Okay.  Thank you.

17          (In open court:)

18          THE COURT:  Jurors, I just was conferring to see how

19   we're doing, and we're doing okay in terms of the evidence.

03:11 20          (Laughter.)

21          THE COURT:  It's impossible to make any precise

22   predictions but -- so I won't give you, you know, what I think

23   the remainder of the length of the trial will be, but it's

24   going along.  I'll leave it at that and assure you that

25   we're -- I think we're in good shape.  No promises, but we're

1    doing it, okay?  So just as we broke for the weekend, I thought

2    it would be nice to try to give you a sense of that, okay?

3          So enjoy the weekend, we'll see you on Monday and

4    continue with the evidence.

5          THE CLERK:  All rise for the Court and the jury.  The

6    Court will be in recess.

7          (The jury exits the courtroom at 1:08 p.m.)

8          THE CLERK:  Everyone can be seated.  We're still in

9    session.

03:13 10         THE COURT:  What do I have?  Mr. Carney?

11         MR. CARNEY:  Your Honor, I've submitted to the Court

12   two documents, and let me explain what they are.  The first is

13   a transcript excerpt of Kareem Abuzahra's testimony.  The

14   record would reflect it's Volume 25, pages 57 to 58.  The

15   second document is an FBI 302 reflecting an interview by two

16   agents with Kareem Abuzahra.  I have put a blue flag on the 302

17   paragraph that is relevant.  It's a multipage document, and the

18   blue flag indicates the paragraph that I'm focused on;

19   similarly, I put a flag on the transcript -- to the portion I'm

03:14 20   referring to.

21         I know I alerted you to this yesterday.  I'm not going

22   to simply belabor everything, but I think it's important enough

23   for me to ask your Honor to reconsider, and I would like to

24   just make certain points.

25         THE COURT:  Go ahead.

1          MR. CARNEY:  First of all, if you look at the

2     statement by Abuzahra in the 302, it is direct and unambiguous.

3     It states, "After September 11, 2001, Abuzahra understands why

4     some people have become prejudiced against Muslims.  Abuzahra

5     has a prejudice against blacks and that is probably where he

6     gets his understanding."  This statement is contained in a 302

7     that is attested to as accurate by two special agents of the

8     FBI.

9          The trial transcript that I gave your Honor is equally

03:15 10   unambiguous, I submit, because when I began talking about

11    this -- and the witness tries to duck it, at the top of page 58

12    I asked -- I broke it down and asked him specifically, "Did you

13    say to the FBI after September 11, 2001, you understand why

14    some people have become prejudiced against Muslims?

15          "ANSWER:  Yes.

16          "QUESTION:  And did you then say, 'I have been

17    prejudiced against blacks and that's probably where I get that

18    understanding'?

19          "ANSWER:  No."

03:16 20        As your Honor can see, I'm trying to quote as

21    carefully as I can the statement in the 302 and the -- and put

22    it into the -- as direct a question as I could to the witness.

23          The inconsistency between the 302 and the witness's

24    trial testimony goes directly to the witness's credibility.

25    With respect, I nonetheless do not accept the representations

1    by the two agents who wrote that report that they misunderstood

2    Kareem.  I don't accept that representation.

3         I believe that I can get that report in as a prior

4    recorded statement under the rules of criminal procedure; in

5    other words, I can show that at the time the report was written

6    it was very close in time to the date that Mr. Abuzahra made

7    this statement.  Indeed, if one looks at the report, it's the

8    day after.  I believe I can show that the agents reviewed this

9    report, and at the time they signed and submitted this report

03:17 10   they believed everything in it was true.

11         If so, I submit it's admissible as a prior recorded

12    statement of these agents and, therefore, it is as admissible

13    to impeach Kareem as it would be if the agents took the stand

14    and testified to what's in this report.

15         The failure to allow me to introduce this evidence

16    permits this lie by Kareem at trial to go unimpeached.  Such a

17    lie goes directly to his credibility.  The refusal to permit me

18    to show the prior inconsistent statement also has the effect in

19    this case of affecting my credibility, because to ask a witness

03:18 20   a question as I did, that is, as potentially devastating to his

21    credibility without having a firm basis for asking it, would be

22    viewed or could be viewed by the jurors as really a sleazy

23    tactic on my part, that I wanted to imply that Abuzahra has

24    prejudice against blacks simply to diminish him in the eyes of

25    the jury and that I have no good-faith basis to ask the

1    questions.

2         It's not about disparaging Abuzahra because of his

3    character in terms of his beliefs.  I mean, I note that you've

4    let the prosecution introduce evidence that my client made

5    disparaging comments about Christians, about Jews, about gays,

6    about American soldiers and about women to show his state of

7    mind.  My purpose for introducing this prior inconsistent

8    statement of Kareem is going directly to his truthfulness and

9    his credibility.

03:19 10         Kareem Abuzahra, I submit, is the most important

11   witness in the government's case.  His credibility is central

12   to the government's burden of proof, and it becomes central,

13   therefore, to the defendant's right to have a trial -- a fair

14   trial.  And that right to a fair trial should allow me to

15   impeach Abuzahra about a direct lie that he told under oath at

16   this trial.

17         And I would ask your Honor to reconsider and allow me

18   to call these special agents so that I can lay the foundation

19   for the introduction of a prior recorded statement, if not,

03:19 20   having them acknowledge that Kareem told them the direct

21   opposite of what he stated in the courtroom.

22         THE COURT:  Mr. Auerhahn?

23         MR. AUERHAHN:  Thank you, your Honor.

24         First of all, this is a collateral matter and the

25   defense should not be allowed to put on a witness concerning a

1    collateral matter.  Second of all, in focusing exactly on the

2    302 and the testimony, the 302 doesn't say that Mr. Abuzahra

3    said he was prejudiced against blacks; it says he has a

4    prejudice against blacks.  It's not in quotes.

5         And I have the utmost respect for Mr. Carney's

6    abilities as well as his credibility, but he made a strategic

7    mistake when he asked a specific question as if it were in

8    quotes when it's not in a 302.

9         The witness described -- gave an example, and from

03:20 10   that example the agents drew a conclusion.  And this statement

11   about his prejudice is a conclusion.  It's not in quotes; it's

12   not what he said.  And then when Mr. Carney chose to ask him

13   about it, the witness's answer at the bottom of page 57 was, "I

14   don't believe it was phrased like that, no."  And then

15   Mr. Carney pressed him, including in quotes, "'I have a

16   prejudice against blacks.'  Did you say that?"  And he said no.

17   And that is absolutely, positively true.  He never mouthed

18   those words.

19        As a matter of fact, when Mr. Carney pressed him

03:21 20   again, "You didn't say that to the FBI?" he said, "I don't

21   believe I said it like that.  If you want, I can explain.  Or

22   if you want me to just say no, then no."  He tried to explain

23   that it was not an accurate direct quote, but Mr. Carney

24   decided he didn't want that.  He didn't want to get to the

25   truth of whatever Mr. Abuzahra had said and what conclusions

1    the agents had drawn from that.

2           So if he puts the agents on the stand, he's going to

3    be impeaching the agents with the way in which they wrote the

4    302 and not Mr. Abuzahra concerning what it is he testified to

5    during this trial.  And that clearly is not a proper reason to

6    put those witnesses on the stand, to try to, through the back

7    door, throw some dirt at Mr. Abuzahra when, in truth, as

8    Mr. Carney has been arguing, he's impeaching the agents and the

9    manner in which they wrote the report.

03:22 10        But Abuzahra's testimony was absolutely truthful and

11   it was the way in which Mr. Carney chose to ask a question that

12   made it truthful, and he tried to explain but was not given the

13   chance.

14        MR. CARNEY:  Your Honor, after asking Mr. Abuzahra,

15   "Did you make the following statement," and I said, "quote/end

16   quote," I then gave him another opportunity.  And I direct your

17   Honor to lines 13, 14 and 15.

18        "QUESTION:  I want you to answer this question:  Did

19   you say to the FBI that you have a prejudice against blacks?

03:23 20        "ANSWER:  I don't believe I did, no."

21        So that took it out of the realm of a quotation but

22   into the realm of "Did you say you have a prejudice against

23   blacks?"  The FBI report says "Abuzahra has a prejudice against

24   blacks."  That's not in quotation marks.  Neither is any

25   statement by Abuzahra in this entire report in quotation marks

1    and, indeed, it's rare in a 302 that there would ever appear

2    quotation marks.

3         I think that it's splitting hairs in a manner that's

4    not reflected in the rules of evidence that permit a defendant

5    to show that a witness made a prior inconsistent statement by

6    what it says, what it fails to say, or that it's different from

7    what a witness said on a prior occasion.  The only way I can

8    show this is by presenting these officers, and it's probably

9    one of the most bread-and-butter techniques used in every

03:24 10   criminal trial.  And I would urge the Court to reconsider.

11         THE COURT:  When we argued -- when it was argued

12   yesterday, the substance of the testimony and the 302 were

13   referred to, and the transcript now of each -- or the

14   transcript on the copy of the 302 are substantially similar to

15   what was argued yesterday.  Providing the actual text does not

16   really alter the considerations that I had yesterday when I

17   ruled on the matter, and I adhere to the ruling.

18         Let me just say in addition to the ambiguity about

19   whether it was inconsistent and so on, and the question of

03:24 20   whether a couple of steps removed it could come in as a

21   recorded statement of the agents, I would also point out that

22   the underlying question whether he has a prejudice against

23   blacks is an irrelevant question for this case.  There might be

24   cases where that is a highly relevant matter, but there's no --

25   prejudice against a particular group that is not a group at

1    issue in the case seems to me to have no evidentiary value

2    except really casting aspersions on the witness.

3         So the probative value of the original question is

4    practically nil, if not nil, and so this contretemps about

5    whether it was true or not is also a very minor and collateral

6    matter.  So under Rule 403 I would exclude the evidence, as I

7    said yesterday.

8         MR. CARNEY:  I would just add a footnote, then, if I

9    may?  I note that the government did not object to the question

03:25 10   as being irrelevant.

11        THE COURT:  I note that.

12        MR. CARNEY:  And I am offering the evidence because

13   under oath he told a lie to the jury --

14        THE COURT:  Okay.

15        MR. CARNEY:  -- in response to a direct question by

16   me.

17        That's what the significance is.  I don't care what he

18   says on the stand.  If he's asked a direct question and he

19   intentionally lies about it, then the jury should hear it.

03:26 20        THE COURT:  We could go on forever.  I would just say

21   that he did try to explain it and was not -- legitimately, was

22   held within the bounds of the particular question.

23        At any rate, if you want these somehow identified for

24   the record, figure out a way to do it.

25        MR. CARNEY:  Yes, your Honor.  I will.

1          MR. CHAKRAVARTY:  Your Honor, not to belabor this

2     issue, if we could take just a few moments at the end of the

3     week to talk a little bit about -- to elaborate on our

4     conversation we had at side with regard to witnesses for

5     next --

6          THE COURT:  Yes, go ahead.

7          MR. CHAKRAVARTY:  The government's position is that

8     the schedule of witnesses after Dr. Fadel -- he's still in the

9     courtroom -- there's, I think, a Dr. Williams, who the

03:27 10     government objects to his testimony in toto; and then

11     Dr. Sageman who the government does not challenge his

12     qualifications with regards to *Daubert*, but the scope, as we

13     articulated before, we think needs to be specifically narrowed.

14          And while your Honor has given, I think, clear

15     guidelines in terms of the general subject matter area, which

16     is fair game, the frustration that the government has in

17     preparing for its cross-examinations has been that while we

18     have been notified of subject matters about which the witnesses

19     would be testifying, the underlying bases for their opinions

03:27 20     and what they relied upon in their research, that has been

21     sorely lacking.  And what that has yielded is both a probing

22     cross-examination where we're attempting to establish the basis

23     of knowledge that the witness may have.  That takes up a lot of

24     time, obviously.  It's boring.  It's not necessarily probative

25     or -- the probative value is not necessarily apparent when it's

1    being done so it's, frankly, inefficient.

2          But where we're being prejudiced by that phenomena I

3    think has been shown by some of the witnesses who have preceded

4    Dr. Fadel, although I trust with Dr. Fadel that will not

5    happen.  I will try to make sure that doesn't happen.  But when

6    it was clear that the witnesses are preparing writings, they've

7    been given materials by the defense which we don't know what

8    those materials are, so we have no way to challenge the

9    credibility or "You saw this but did you see this post," we

03:28 10   have no way of kind of drawing that contrast, and underlying

11   learned treatises or other kind of research materials that they

12   have relied upon, including Dr. Fadel, the defendant revealed

13   today, prior courtroom testimony, none of that type of

14   information has been produced.  So that we can't be precise in

15   terms of drawing contrasting either substantive impeachment or

16   bias impeachment or prior inconsistent statements about the

17   nature of what they're going to be testifying to.

18          With Dr. Sageman this comes to a head because he has

19   been in the field generally of terrorism and its variety of

03:29 20   incarnations for, I think Ms. Bassil has talked about, over 30

21   years, and who she describes as the foremost expert in this

22   area.  With that kind of a broad range of expertise, the fact

23   that he's written a lot about the subject, we have no basis to

24   conclude what he is relying on in order to come up with the

25   relevant conclusions in this case.

1          You know, there are scholars such as Dr. Fadel who

2     have been studying areas for a long period of time.  And while

3     there's very little question that there's an interrelationship

4     and in the course of their study they'll find some document

5     that might be relevant, it's much less clear that attorneys who

6     are preparing to do a cross-examination using disclosures under

7     703 and Rule 16, and I should add 26.2, where writings,

8     statements, reports, what -- they're the synthesis of their

9     vast experience and applying it to the case is precisely why we

03:30 10    need that discovery and why we have produced that discovery to

11    the defense.

12          And this isn't -- this is where, you know, I stood up

13    yesterday to talk about the asymmetry.  This is a case where

14    the whole point of an expert witness is -- this is not, you

15    know, trial by ambush.  We have experts, they have experts, the

16    battle of the experts, and then let the jury decide who they

17    find credible or where the differences are.

18          In this circumstance where we don't have the bases of

19    opinion, we're really handcuffed in doing that.  And, you know,

03:30 20    we tolerate, that's the nature of the business, but that's

21    what's impeding the government's ability to be more precise and

22    focused in terms of how its cross-examination is going to go.

23          And I mentioned 26.2.  Both Dr. March, as well as

24    Mr. Johnsen, referred to notes and other things that they have

25    prepared in the course of their preparation.  Obviously,

1    they're scholars.  It stands to reason that they would prepare

2    that.  I haven't yet had the opportunity to ask Dr. Fadel the

3    same question.  But that's the type of material that

4    customarily -- certainly the government would produce.  And

5    Rule 26.2 doesn't discriminate.

6          This isn't a case where, as a strategic matter, the

7    defense can actively, you know, cry willful blindness or claim

8    not to have custody or control of something for which they have

9    contracted an expert for a specific task.  We're not asking for

03:31 10   his thesis dissertation notes; we're asking for what you

11   prepared in preparation for this trial.

12         It's that kind of stuff which we don't have and we're

13   entitled to.  And we understand that that would allow us to be

14   armed more for cross-examination, and that's the purpose for

15   the rule.  We understand that right doesn't emerge until direct

16   examination, you know -- it's classic *Jencks* -- even though we

17   customarily produce early so that we can be refined.  We're

18   asking for that now.  And we have in the past, and we're again

19   asking for that, especially with regards to Dr. Sageman because

03:32 20   the risk there is he's going to be a long witness in any event.

21   We don't want him to be longer than necessary and we don't want

22   to keep going to the sidebar every time that we think there's a

23   question either beyond the scope or without a sufficient

24   foundation.  The more we get now, the more we can streamline

25   whatever the cross is.

1          MS. BASSIL:  Your Honor, I think the government fails

2     to understand how one prepares to cross-examine an expert

3     witness.  And in the 33 years I've been doing it, I get their

4     writings, I look -- now you look on the internet, you see what

5     they've said, and you prepare your cross-examination.  Our

6     experts have been given discovery provided by the government.

7     Nothing else and nothing more.

8          Now, they have areas of expertise.  They know their

9     areas.  They have read things.  The government is well aware,

03:33 10     and I cite it in that first disclosure, that Dr. Sageman did a

11     study, that he's been -- you know, that he's relying on his

12     field of study.  They have his books.  If I were to disclose

13     more, I would give them his book.  They already have it.

14          The fact is that disclosing underlying learned

15     treatises, it's my understanding, is only if you want to put

16     the learned treatise in.  Dr. Fadel, for example, talked about

17     medieval Islamic theology.  This is what he studies.  We didn't

18     have to turn over every medieval Islamic theology book that he

19     studied.

03:33 20          In the same way Dr. Sageman -- yes, he's been studying

21     this for a long time.  He has a library where he studies all

22     kinds of political movements.  And these don't necessarily form

23     his opinion, but they certainly form his expertise.  You know,

24     everything you read kind of confirms what you're thinking or

25     maybe makes you discard what you've been thinking.

1        But the fact is that the government has been given

2   notice of Dr. Sageman, and the fact that his studies are

3   published really gives them a greater advantage than you would

4   in any other expert.

5        We did not have Mr. Kohlmann's notes.  We had his

6   report which, quite frankly, although he might have cited to an

7   instant message here or there, was long on sweeping

8   generalizations and very short on specific bases.  And I

9   don't -- your Honor, we've given them notice.  The rule really

03:34 10   does not require any more.  And the discovery we've given these

11   experts has been the discovery from the government.  And, in

12   addition, Dr. Sageman has been reading the transcripts of the

13   trial testimony, and that's really about it.

14        He hasn't given us anything more; we haven't given him

15   anything more.  You know, I can tell you that I was thinking of

16   giving the government -- a RAND report came out yesterday.  I

17   don't know if he's going to reference it or not.  If he is

18   going to, I will give them a copy of it.  But other than that,

19   what he's really testifying to is the history of terrorism, all

03:35 20   right -- and, you know, Mr. Kohlmann did not put out a basis

21   for his knowledge of al Qa'ida; he gave a sweeping history.

22   Mr. Sageman -- Dr. Sageman will testify to that.  Some of that

23   is just personal knowledge, in fact, because he was actually

24   there.

25        He will -- and he will testify to his methodology.

1    And the government is well aware of this.  They're well aware

2    that Chapter 1 of his last book talks about the methodology of

3    studying terrorism.  You know, if they want me to make a copy

4    of that chapter, I'm happy to do it.  But, you know, this is

5    not in the dark.  This is not unknown.  And, you know, it's all

6    out there.  We gave them our -- we gave them the CDs.  It

7    includes the bibliographies.  It's all out there.

8          THE COURT:  Do you have any statements that would

9    qualify under Rule 26.2 as *Jencks* material?

03:36 10          MS. BASSIL:  I really -- I'm not clear what they're

11   referring to by that, quite obviously.

12          THE COURT:  Well, so you often get a report or a

13   summary from the witness as to what he's going to opine.

14          MS. BASSIL:  Well --

15          THE COURT:  Are there communications from the

16   witnesses as to what they would say?

17          MS. BASSIL:  No.  I mean, we've had emails about

18   meeting, and when we're going to meet, and so forth and so on.

19   What I try to do -- and you don't want to allow this latest

03:36 20   disclosure -- was I tried to reflect, based on Mr. Kohlmann,

21   you know, sort of -- you know, we have always said that

22   Dr. Sageman's testimony was dependent on what Mr. Kohlmann

23   said, all right?  Partly because there was this issue of

24   profiling, and that I did exclude it after Mr. Kohlmann

25   testified.  I am not aware of any rule that prohibits an expert

1    from testifying to matters within his expertise.  I don't --

2          THE COURT:  I'm focusing on whether you have anything

3    that summarizes all or part of his opinions that would qualify

4    as *Jencks* material.

5          MS. BASSIL:  I will have to look at that, your Honor.

6    I would have to look at the emails and just make a decision

7    about that.  But we also -- frankly, your Honor -- I'd have to

8    look at that, your Honor, and I really don't want to make a

9    commitment to that because I also, quite frankly, want to

03:37 10  research the issue of work product and I'm not prepared to

11   argue that today.

12         THE COURT:  Well, I think the rule is fairly clear as

13   to what has to be disclosed.

14         MR. AUERHAHN:  Your Honor, I just want to make a

15   point.  Like, for example, yesterday when Mr. Johnsen testified

16   he had notes.  We never got those notes.  He talked about

17   reports that he had access to.  We never got those reports.

18   And we should have gotten both of those under the reciprocal

19   discovery rules.

03:38 20        MS. BASSIL:  We had no reports from Mr. Johnsen, your

21   Honor.

22         MR. AUERHAHN:  But he had notes and we should have

23   gotten those.

24         THE COURT:  Yeah.  They don't have to have been

25   delivered, actually, because obviously the government has to

1    inquire of law enforcement agencies whether they have any

2    relevant materials, whether or not they've been communicated to

3    the government.  That's one of the obligations they have under

4    *Brady* and other things.  But anyway --

5         MS. BASSIL:  We received no notes from Mr. Kohlmann.

6         THE COURT:  -- I think some exploration of whether

7    there are statements within the scope of Rule 26.2 is an

8    appropriate inquiry, whether or not it was in the form of a

9    communication.

03:38 10        MS. BASSIL:  Right.  We received no notes from

11   Mr. Kohlmann.

12        THE COURT:  The "received" part may be irrelevant.

13        MS. BASSIL:  I don't understand.  They're asking for

14   notes, and we didn't get any notes.

15        THE COURT:  No.  No.  But the statement, for purposes

16   of Rule 26.2, according to the rule, is a written statement the

17   witness makes or signs or otherwise adopts or approves.  It

18   doesn't say, "and is communicated to the attorney," for

19   example.

03:39 20        MS. BASSIL:  I see what you're saying, your Honor.

21   All right.  I would have to look.  I would have to look.  I

22   really would.

23        THE COURT:  Okay.

24        MR. GROHARING:  I don't want to belabor the point with

25   Dr. Sageman, your Honor, but I do want to make some points

1    about disclosure.  The information that he -- defense claims

2    he's -- excuse me -- relying upon is very, very broad, and

3    here's just a couple of examples.  Data collection from court

4    cases.  There's no indication of which court cases he's relying

5    upon.  Interviews, generally.  There's no indication of

6    interviews of whom.  Knowledge of individuals who fought in the

7    Afghan-Soviet war and the Afghan Civil War.  There's no

8    indication of who these individuals are.  Generally,

9    open-source material, then material from al-Jazeera.  No

03:39 10   indication of what material in particular from al-Jazeera.

11   News reports.  Again, no indication of what news reports.

12        And he says -- the defense says reliance, studies and

13   research by other established scholars in related fields of

14   Middle Eastern studies, Islamic studies and terrorism studies.

15   There's no indication of what any of these studies or research

16   are.

17        THE COURT:  What are you reading from?

18        MR. GROHARING:  These are my notes, your Honor, that I

19   made from the defense disclosure.

03:40 20        THE COURT:  Oh, your notes?  All right.  I see.

21        MR. GROHARING:  There's also an indication that he

22   worked on a few-year study of terrorists funded by the United

23   States Air Force Research Laboratories.  My understanding is

24   that's a classified study.  We don't -- we haven't had --

25        THE COURT:  Well, if you're referring to the revised

1    report, which I think that at least is in, that's not the

2    reference.

3              MR. GROHARING:  That was both reports.

4              THE COURT:  Is that in both?  The Air Force --

5              MR. GROHARING:  The Air Force study has been

6    consistent in each of the disclosures.

7              THE COURT:  I thought that was new.  Anyway --

8              MS. BASSIL:  Your Honor, Mr. Kohlmann referred to open

9    sources.  We didn't know what the open sources were.  He

03:41 10   started talking about studying 120 people who said they were

11   leaving and 65 were dead.  We had no idea what he was talking

12   about or what study or where that came from.  He was quoting

13   al-Jazeera.  He was quoting all kinds of things.  These weren't

14   in his reports, nor were they anything but open sources.

15             THE COURT:  Okay.  Well, I think we have to have a

16   longer attention to this Sageman issue.  I want to get

17   through -- he's not until after the --

18             MS. BASSIL:  He's the last witness.

19             THE COURT:  Well, what you had previously

03:41 20   characterized as three relatively short witnesses, so I think

21   we have some time to do that.  And it may be that we can find

22   some time Monday afternoon to do that.  I'm not sure.  I just

23   looked.  We have a bunch of things on Monday afternoon.  But

24   maybe we could have some time as well.  I don't know.

25             MR. GROHARING:  The concern, your Honor, is obviously

1    this is voluminous material that we don't even know what it is

2    yet.  We're probably talking about hundreds, if not thousands,

3    of pages of material that we're going to have to digest the

4    night before he testifies if we were to want to even start to

5    review the material he's relying upon.

6              MS. BASSIL:  Well, yes, there's thousands of pages of

7    discovery.  We've mastered them.  I assume you have.

8              MR. GROHARING:  We didn't provide it the night before

9    trial.

03:42 10           MS. BASSIL:  This is the government's discovery I'm

11   talking about.  That's what I'm talking about.  That's what he

12   got.  And we did get it three days before trial.

13             THE COURT:  I think we've gone as far as we can today,

14   but we will address it sometime, necessarily, before he

15   testifies.

16             THE CLERK:  All rise for the Court.  Court is in

17   recess.

18             (The Court exits the courtroom and the proceedings

19   adjourned at 1:38 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  December 9, 2011

17

18

19

20

21

22

23

24

25