UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   ) Criminal Action
v.                                 ) No. 09-10017-GAO
                                   )
TAREK MEHANNA,                     )
                                   )
          Defendant.               )
                                   )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY THIRTY-TWO
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Monday, December 12, 2011
9:18 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript


APPEARANCES:

```
 1
            OFFICE OF THE UNITED STATES ATTORNEY
 2          By: Aloke Chakravarty and Jeffrey Auerhahn,
                 Assistant U.S. Attorneys
 3          John Joseph Moakley Federal Courthouse
            Suite 9200
 4          Boston, Massachusetts  02210
            - and -
 5          UNITED STATES DEPARTMENT OF JUSTICE
            By: Jeffrey D. Groharing, Trial Attorney
 6               National Security Division
            950 Pennsylvania Avenue, NW
 7          Washington, D.C.  20530
            On Behalf of the Government
 8
            CARNEY & BASSIL
 9          By: J.W. Carney, Jr., Esq.
                 Janice Bassil, Esq.
10               John E. Oh, Esq.
            20 Park Plaza
11          Suite 1405
            Boston, Massachusetts  02216
12          - and -
            LAW OFFICE OF SEJAL H. PATEL, LLC
13          By: Sejal H. Patel, Esq.
            101 Tremont Street
14          Suite 800
            Boston, Massachusetts  02108
15          On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2                      DIRECT   CROSS   REDIRECT   RECROSS

3
   WITNESSES FOR THE
4    DEFENSE:

5  MOHAMMAD H. FADEL, resumed

6       By Ms. Bassil (Cont'd)      4                126
        By Mr. Chakravarty                 47                 139
7

8                        E X H I B I T S

9

10  DEFENDANT'S          DESCRIPTION              FOR ID   IN EVD.

11  No. 1260     "A Grave and Mistaken Understanding that
                 Must Be Corrected" by Abu Sabaayaa          13
12
    No. 1009     Photograph of defendant's room             25
13
    No. 1262     Photograph of defendant's room             26
14
    No. 1204     IM between Sayf Maslool and Ali Abu Bakr
15               dated 2/27/06                               27

16  No. 1210     IM between Umm Muhammad and Tarek Mehanna
                 dated 5/12/06                               32
17
    No. 1218     IM between Abu Sulayman ash-Shami and
18               Tarek Mehanna dated 2/25/06                 37

19  No. 1226     IM between Edgar and Tarek Mehanna dated
                 3/8/06                                      38
20
    No. 1236     IM between Sayf Maslool and Taimur dated
21               4/3/06                                      46

22

23

24

25
```

```
 1              (The following proceedings were held in open court
 2     before the Honorable George A. O'Toole, Jr., United States
 3     District Judge, United States District Court, District of
 4     Massachusetts, at the John J. Moakley United States Courthouse,
 5     One Courthouse Way, Boston, Massachusetts, on December 12,
 6     2011.
 7              The defendant, Tarek Mehanna, is present with counsel.
 8     Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn
 9     are present, along with Jeffrey D. Groharing, Trial Attorney,
10     U.S. Department of Justice, National Security Division.)
11              THE CLERK:  All rise for the Court and the jury.
12              (The Court and jury enter the courtroom at 9:18 a.m.)
13              THE CLERK:  Be seated.
14              THE COURT:  Good morning, jurors.
15              THE JURORS:  Good morning.
16              THE COURT:  Good morning.
17              MR. CARNEY:  Good morning, your Honor.
18              THE COURT:  Dr. Fadel?
19                      MOHAMMAD H. FADEL, resumed
20                      CONTINUED DIRECT EXAMINATION
21     BY MS. BASSIL:
22     Q.   Good morning, Dr. Fadel.
23     A.   Good morning.
24     Q.   When we left off on Friday we were starting to talk about
25     sort of suicide martyrdom operations.  Do you recall that?
```

1    A.    Yes, I do.

2    Q.    And al Qa'ida's view of those and their statements on

3    those, correct?

4    A.    Yes, I do.

5    Q.    Okay.  And I had -- I was at the point I was going to ask

6    you to tell the jury what is the Islamic position in theology

7    and law on suicide?

8    A.    That it's a sin, a major sin, if not an act of apostasy.

9    Q.    And can you explain what that means in terms of the

00:23 10   battlefield according to Islamic law and theology?

11   A.    Well, it gets more complicated in the battlefield

12   situation.  So in medieval Islamic law, in the context of a

13   battlefield, jurists discussed the following situation:

14   Suppose a soldier finds himself confronting the enemy in a

15   situation where it seems hopeless that he will survive if he

16   continues fighting.  Is it okay for him, consistent with the

17   Islamic prohibition against suicide, to throw himself into the

18   enemy ranks in the hope that he could cause some material

19   losses to the enemy?

00:24 20        It's a complicated question, but jurists came out on both

21   sides of it.  Some of them said that if the soldier believes

22   that by sacrificing himself on the field of battle he can gain

23   a military advantage for his army, then it's permissible to do

24   it and it's excluded from the prohibition against suicide.

25   Q.    And how has -- has al Qa'ida changed this concept?

1    A.   Yes.  Al Qa'ida has changed this concept and radically

2    expanded it.  Instead of the limited situation in the classical

3    law where the exception applies to a soldier who finds himself

4    in inhospitable battlefield circumstances, they now use that to

5    justify a soldier, or a mujahid, strapping a bomb on himself,

6    for example, and then going and taking -- using his body as a

7    weapon and killing himself on the theory that that is just --

8    that's causing damage to the enemy.

9         It's different than the medieval case because in the

00:25 10    medieval case the assumption was always that the soldier was

11    dying at the hands of the enemy.  In the al Qa'ida case, the

12    Muslim mujahid is actually killing himself.

13    Q.   And is there a difference between -- in medieval Islamic

14    theology and law that the soldier -- the enemy has been brought

15    to the soldier, he's there, as opposed to al Qa'ida where he's

16    going to the enemy?

17    A.   Yes.  I mean, that's the principal distinction.  In

18    premodern Islamic law it was an exception that was borne of

19    emergency circumstances.  The soldier has been surrounded by

00:25 20    the enemy, and his two choices are either fight to the death or

21    surrender, whereas al Qa'ida wants -- actually, encourages the

22    Muslim mujahid to intentionally kill suicide -- to use suicide

23    as a tactic against the enemy even though there are no exigent

24    circumstances that would otherwise cause his death.

25    Q.   And can you explain al Qa'ida's concepts in terms of

1    suicide bombing with respect to civilians?

2    A.   Yes.   Again, there the question turns on the status of the

3    civilian and whether or not they're collateral damage.   So I

4    would go back to the 1998 fataawa of Osama bin Laden and

5    al Qa'ida which asserted that all Americans were legitimate

6    targets.

7         So in the case of suicide bombings against Americans, they

8    didn't really have to worry about whether or not the target was

9    military or not because all Americans, by definition, were

00:26 10   legitimate targets; otherwise, you have the problem of

11   targeting.   If it's a situation where there are Americans and

12   Muslims, for example, you would have to be able to apply a

13   distinction -- a principle of distinction.   But, again,

14   al Qa'ida, as we talked about on Friday, suggests that either

15   the Muslims there are apostates, in which case you don't have

16   to worry about it, or they could be viewed as human shields, in

17   which case the suicide bomber is not morally culpable for

18   killing them.

19   Q.   Is there a premise behind al Qa'ida's change in this sort

00:27 20   of Islamic law?

21   A.   Well, I think they rely on two things:   First, they rely

22   on the idea of analogy, that there's really not that much of a

23   difference between a soldier who, when faced with overwhelming

24   odds against him on the battlefield, throws himself into enemy

25   ranks, which a lot of Muslim jurists accepted, and somebody who

 1    just does so from the very beginning, because the odds are so

 2    stacked against them.  So it bleeds into an idea of necessity,

 3    the idea being that Muslims don't have the kinds of advanced

 4    battlefield weaponry that they could use to confront invaders

 5    sort of in a traditional fixed-lines battle, so they have to

 6    use this method because that's the only method that's available

 7    to them.

 8    Q.    And did you review writings by Mr. Mehanna that were

 9    consistent with -- was he consistent with al Qa'ida's position?

00:28 10   A.    I didn't see any writings that were directly on point.

11    Q.    Okay.  And did you see writings concerning the bombing of

12    14 policemen in Pakistan?

13    A.    Yes, I did.

14    Q.    And what was --

15          MS. BASSIL:  Can we have Exhibit 1260, please?  And

16    page 66.

17          THE COURT:  Now, again, this is something that has not

18    yet been entered.  Is that right?

19          MS. BASSIL:  Your Honor, I thought this one was.  I

00:28 20   believe this was, your Honor.

21          I have one page, your Honor.  I'll put it on the ELMO.

22    That would be faster.

23          THE COURT:  It doesn't answer my question about its

24    status with respect to the jury.

25          MS. BASSIL:  Your Honor, I believe it was entered into

```
 1  evidence.
 2          THE COURT:  What's the number?  What's the number?
 3          MS. BASSIL:  I had it as 1260.
 4          THE COURT:  No, I don't think we have a 1260 in
 5  evidence.
 6          MS. BASSIL:  May we have 1186, please?  Yes, this is
 7  it.
 8          THE COURT:  What number is this?
 9          MS. BASSIL:  1256, your Honor.  I would ask that this
10  go into evidence.
11          THE COURT:  That is in evidence.
12          MS. BASSIL:  Thank you.  I thought it was.
13          And if you could blow up this quote right here?  I'm
14  sorry.  Go further.  And down to here.  Correct.
15  BY MS. BASSIL:
16  Q.   Dr. Fadel, looking at the bottom paragraph on this Exhibit
17  1256, does this reflect in -- Mr. Mehanna's views on this idea
18  of suicide bombing?
19  A.   Yes.
20          MR. CHAKRAVARTY:  Objection, your Honor.  What the
21  defendant's views --
22          MS. BASSIL:  I'm sorry.  Let me rephrase that.
23          THE COURT:  Rephrase that.
24  BY MS. BASSIL:
25  Q.   How is this posting consistent or inconsistent with
```

00:30 (line 10)
00:31 (line 20)

1   al Qa'ida's views on suicide bombing targeting random

2   individuals or people?

3           THE COURT:  We can't see the whole thing so it's not

4   clear who -- which author is --

5           MS. BASSIL:  If we could go from the beginning of the

6   page and I'll go through it.  The top of the page, please?

7   BY MS. BASSIL:

8   Q.   Now, this is a post by Abu Sabaayaa.  Is that correct?

9   A.   Yes.

00:31 10   Q.   And I believe this is 1/30/07.  Do you see it on the

11   right-hand side?

12   A.   Yes.

13   Q.   All right.  And it refers to Pakistan bombing kills 14

14   policemen including senior officers.  Is that correct?

15   A.   Yes.

16   Q.   And the block in quotes is from someone else.  That is

17   from someone else who had posted something, correct?

18   A.   Yes.

19   Q.   And the rest of the language is, as you understand it,

00:32 20   Abu Sabaayaa, or Tarek Mehanna's, response to this?

21   A.   Yes.

22   Q.   All right.

23           MS. BASSIL:  And if we could just scroll down the

24   page?  And if we could stop right there.

25   Q.   So my question to you was:  Is this writing consistent or

1    inconsistent with al Qa'ida's position on suicide bombing?

2    A.   It's inconsistent with it insofar as it proposes an

3    extremely high threshold of necessity before something like a

4    suicide bombing of this nature could be justified.  So

5    basically, it's stating that one has to use a very high

6    standard of discrimination.  And al Qa'ida, as I suggested

7    earlier, does not accept the idea that you have to have a high

8    standard of discrimination among your victims.

9    Q.   All right.  Now, you're aware that Mr. Mehanna was

00:33 10   involved with the translation of the "Expedition of Umar

11   Hadeed"?

12   A.   That's what's been told to me, yes.

13   Q.   Did you view the movie?

14   A.   Yes, I have.

15   Q.   And did the movie involve a lot of statements by suicide

16   bombers?

17   A.   It's -- on the face of it, yes.

18   Q.   And is his translation of this consistent or inconsistent

19   with al Qa'ida's position?

00:33 20   A.   It's very hard to say for sure because in all the

21   videos -- in all the videos of the operations there, they're

22   all directed against military targets.

23   Q.   Are any of them directed against civilians?

24   A.   Not as far as I could tell.

25   Q.   Now, I want to ask you about al Qa'ida's position on

1  jihad.

2        MS. BASSIL:  You can take this down.

3  Q.   And are you familiar with their position concerning an

4  individual obligation to jihad?

5  A.   Yes.

6  Q.   And what is that?

7  A.   Their view, as set forth in the 1998 fataawa, was that all

8  Muslims are under an individual obligation to wage military

9  jihad against Americans anywhere and everywhere.  That includes

00:34 10  killing them, if possible, and seizing their property and

11  destroying it whenever possible.

12  Q.   And is there anything in al Qa'ida's position about going

13  to front lines or going to fight?

14  A.   Yes.

15  Q.   And what is that?

16  A.   They believe the whole world is a front line.  So

17  according to the 1998 fataawa, for example, if you are a Muslim

18  in the United States, you don't have to go to Iraq to fight

19  jihad; you can just attack Americans inside the United States.

00:34 20        MS. BASSIL:  And could you pull up Exhibit, if you

21  would, 1260?  The date would be 7/9/06.  Hopefully I have the

22  right number.

23        THE COURT:  Well, again, if this is 1260, it's not yet

24  in evidence.

25        MS. BASSIL:  That's correct, your Honor.  I would ask

1    that this be put into evidence.

2         MR. CHAKRAVARTY:  The government objects to this one,

3    your Honor.

4         THE COURT:  Well, on the same bases as prior

5    objections to Friday's exhibits?

6         MR. CHAKRAVARTY:  Yes.  Yes, your Honor.

7         THE COURT:  Okay.  Those objections are overruled.

8    I'll admit it.

9         (Defense Exhibit No. 1260 received into evidence.)

00:35 10    MS. BASSIL:  Thank you.

11   BY MS. BASSIL:

12   Q.   And again, Dr. Fadel, is it your understanding -- this is

13   posted 7/09/06; this was written by Abu Sabaayaa -- that this

14   would be a writing by Tarek Mehanna?

15   A.   Actually, my understanding is this is the post of

16   Abu Sabaayaa.  I'm not sure whether this is an original

17   translation of his or just a posting of his because I think at

18   the end of it it's attributed to another author, I think Abu

19   Basir at-Tartusi.  I'm not sure.  So it's not clear whether

00:35 20   it's his original writing or translation or just linking to a

21   translation.  But he posted it.

22   Q.   He posted it.

23        MS. BASSIL:  Can we go to the last page of this?  I

24   just want to show this.  I wanted to show the author's -- the

25   person who wrote it.

1    Q.    Is that on the first page or the last page?

2    A.    I think it's the second page, actually.

3           MS. BASSIL:   The second page, please?   If you could

4    scroll down?   If you could go back to the first page.

5    Q.    What was it -- it is your understanding that this document

6    was posted by Abu Sabaayaa?

7    A.    Yes.

8    Q.    What is the significance of this document?

9    A.    This document's significance -- well, there's lots of

00:36 10    important things in this document.   First of all, it takes a

11   very critical stance toward the tactics of the, quote/unquote,

12   mujahideen and their refusal to accept the kinds of restraints

13   that Islamic law imposes on how to conduct war.

14          The second thing it does, it denies the idea that jihad

15   means only going out and fighting in some sort of military

16   conflict.   It reemphasizes the importance of ordinary religious

17   struggle to be the best person that you can, and that's also a

18   part of jihad.

19   Q.    Now, it says -- the title -- "A Grave and Mistaken

00:37 20   Understanding That Must Be Corrected."   What is the grave and

21   mistaken understanding?

22   A.    The grave and mistaken understanding is that the,

23   quote/unquote, mujahideen claim that because they are

24   mujahideen they are infallible and their interpretations of

25   Islam and all Muslims must defer to what they believe Islamic

 1  law means.

 2       MS. BASSIL:  And if we could -- John, if we could

 3  scroll down a bit so the third paragraph is there?

 4  Q.  Dr. Fadel, could you read the first sentence of where it

 5  starts with, "For a long time"?

 6  A.  "For a long time, I have been noticing a mistaken attitude

 7  held by some of the youth who carry zeal and enthusiasm for the

 8  affairs of jihad, where you would see them - out of emotion,

 9  fanaticism and ignorance - rejecting every statement - even if

00:37 10  correct - that goes against that which the people of the front

11  lines and jihad are upon.  In their eyes, the truth is that

12  which the people of the front lines and jihad are upon, even if

13  they might do that which is in opposition to the Book of

14  Sunnah," the "book" being the Qur'an.

15       "It is unacceptable to them for it to be said of a

16  fighting mujahid that he made a mistake, and that the correct

17  opinion is such-and-such.  It is as if they are saying that the

18  mujahideen are infallible and can never make mistakes, whether

19  they have knowledge or do not have knowledge.  They do not

00:38 20  accept any statement or opinion - even if true and correct -

21  from anyone who is not fighting - even if he is from the people

22  of taqwa," meaning righteousness, "and knowledge - against he

23  who is fighting, even if he is prone to ignorance and

24  mistakes."

25  Q.  And could you explain to the jury what that paragraph

1    means?

2    A.   Essentially what that paragraph is saying is that Muslims

3    have to take an independent stance toward judging the actions

4    of the so-called mujahideen in the field; that it's not the

5    case that because someone is engaged in a jihad, even if it's

6    legitimate, that they automatically have the true understanding

7    of Islam and that they can't engage in things that are crimes

8    according to Islam, and that in all cases Muslims have to make

9    their judgments on the basis of what God has instructed them in

00:39 10   revelation.

11   Q.   And what is al Qa'ida's view of the mujahideen and their

12   actions?

13   A.   I can't answer that.  I don't have a basis for that.

14   Q.   Now, if --

15        MS. BASSIL:  If you would turn to the next page,

16   please?  And if you would scroll down.  Thank you.

17   Q.   It says -- it says, "Here are some of their sayings on

18   this issue."  Do you see that?

19   A.   Yes.

00:39 20   Q.   And are the --

21        MS. BASSIL:  If you could keep scrolling?

22   Q.   What follows, are these Hadiths concerning jihad and

23   mujahideen?

24   A.   Well, they're actually the opinions of people from the

25   early generation of Muslims, that what I mentioned earlier on

1   Friday, the pious ancestors, the Salafi Saleh, the first three

2   generations of Islam.  So these are all considered to be very

3   well-known scholars from the first three generations of Islamic

4   history; and, therefore, very authoritative from the

5   perspective of Salafis.

6   Q.   Now, were you aware that Tarek Mehanna was banned or

7   removed from Tibyan?

8   A.   That was brought to my -- yes, I was.

9   Q.   And did you look at the post as to why he was removed or

00:40 10   when he was removed?

11   A.   Yes, I did.

12   Q.   And what was your understanding as to why he was banned?

13          MR. CHAKRAVARTY:  Objection, your Honor.  I don't know

14   which post she's referring to.  This calls for speculation from

15   this witness as well as --

16          THE COURT:  Well, I think that's true.  Sustained on

17   that basis.

18          If you have a particular text you want to refer to,

19   you could do that.

00:41 20          MS. BASSIL:  Well, your Honor, I believe that if he

21   could testify from his memory, he doesn't have to cite to a

22   particular post.

23          THE COURT:  Let me see you briefly.

24          (Discussion at sidebar and out of the hearing of the

25   jury:)

1          THE COURT:  I seem to recall we have seen an exchange

2     on this.

3          MS. BASSIL:  Right, we have.  I honestly just don't

4     remember the number on it, but he reviewed it.  And all I'm

5     going to ask him is, you know, what was your understanding, and

6     he's going to say he was banned because of his views.  The

7     government has suggested it was because he was rude, which is

8     not the case.

9          MR. CHAKRAVARTY:  Well, first of all, we did try to

00:42 10     suggest that, but your Honor wouldn't let us introduce the gist

11     of that.  But what his view is --

12          THE COURT:  Yeah.  If somebody said, "We're banning

13     you because," and he read that they said that --

14          MS. BASSIL:  Yes, he can testify from his memory.

15          THE COURT:  -- and he then formed a conclusion about

16     what they really meant, I don't think that's something he can

17     say.  That's why if you had their own words --

18          MS. BASSIL:  Well, I think I could --

19          THE COURT:  I'm not sure that he can add his

00:42 20     commentary to it.

21          MS. BASSIL:  I can ask him if the posts indicated that

22     he was being rude for his views.

23          MR. CHAKRAVARTY:  Directly going for the truth of the

24     matter in that circumstance?  If that's the rationale for why

25     he's being kicked off, then the post is being offered for the

1    truth.  If it's already in evidence, that's one thing, but I

2    don't recall ever seeing a post saying this is why you're being

3    booted off.

4         MS. BASSIL:  I'll take a minute and find the actual

5    post that's already in evidence.  I was trying to sort of move

6    it along.

7         THE COURT:  Right.

8         MR. AUERHAHN:  I just wanted to add that when we tried

9    to get in a post that talked about being rude and sarcastic

00:43 10   when Mr. Spaulding was on the stand, your Honor wouldn't allow

11   it in.

12        THE COURT:  Well, I do think that if somebody in a

13   post says, "We're doing this because," that is a statement

14   offered for its truth and there would have to be a hearsay

15   basis -- exception basis for allowing it.

16        MS. BASSIL:  Unless it's already in evidence, in which

17   case for all purposes --

18        THE COURT:  That's true.

19        MR. CHAKRAVARTY:  But this witness's competency to

00:43 20   adduce what the rationale is --

21        THE COURT:  No, I agree with that.  So in terms of the

22   witness's testimony.

23        (In open court:)

24   BY MS. BASSIL:

25   Q.   Dr. Fadel, did you review posts in which people disagreed

1  with Mr. Mehanna?

2  A.   Yes.

3  Q.   Were there many posts in which they disagreed with him?

4  A.   There were certainly a number.  I don't know how to

5  quantify "many."  But there was heated debate.

6  Q.   Now, I want to turn to the instant messages that you

7  received.  Did you review all of the instant messages?

8  A.   I certainly attempted to.  I can't say that I read every

9  single word with the same degree of attention.  Some were more

00:44 10  interesting than others.

11  Q.   What did you find significant in these writings?

12  A.   Well, there are -- a lot of different themes show up, many

13  of them personal, including, you know, his desire to get

14  married, his desire to move to a Muslim country, his desire to

15  work in a Muslim environment, and also, his understanding of

16  jihad, his understanding of the situation of Muslims in the

17  west.  So lots of different things come up.

18  Q.   Now, when you said "his desire to live in a Muslim

19  country," you had mentioned the other day the concept of

00:44 20  hijrah, or migration.  Is that -- is his desire -- is that tied

21  to Islamic theology?

22  A.   Yes, it is.

23  Q.   And could you explain that to the jury?

24  A.   Yes.  In general, in Islamic theology, it's not preferable

25  for Muslims to live outside of the Muslim majority area because

1  it's easier to be a Muslim in a society that's governed by

2  Muslim norms.  So even if one considers it permissible to live

3  as a Muslim in a non-Muslim country, if one finds it

4  practically impossible to live as a good Muslim in that

5  non-Muslim country, then it becomes obligatory to immigrate, or

6  move, to a Muslim country where one can live as a Muslim.

7  Q.   Is it easier to live as a Muslim in a Muslim country?

8  A.   Yes.

9  Q.   How so?

00:45  10  A.   Well, for example, take something like daily prayer.

11  Muslims are required to pray five times a day.  In the United

12  States, or Canada, for that matter, it might be very hard to do

13  that because typically you'll be a minority in the workplace,

14  so it will be hard to take time from your work to pray.  There

15  aren't mosques.  To go to a mosque in the United States or

16  Canada involves a dedicated effort because usually it's very

17  far away from where you happen to be.  But if you're in a

18  Muslim country, typically there will be mosques on every street

19  block, so it will be easy to pray, for example.

00:46  20  Q.   And is there a different day of rest for Muslims?

21  A.   Yes.  Although we don't technically call it "a day of

22  rest," the day we have obligatory congregational prayers is

23  Friday at noon.  Friday is usually a day off in the Muslim

24  world where, of course, it's a working day in the Western

25  world.  So it's easier to observe your Friday prayer, which is

1    a central ritual in Islam.

2    Q.   Now, you also mentioned that you saw in the instant

3    messages something about wanting to work for Muslims in a

4    Muslim environment?

5    A.   Yes.

6    Q.   Can you explain that?

7    A.   That's part and parcel with, one, the desire to immigrate,

8    to live in a Muslim country, because of the need to live in a

9    proper Muslim environment; but secondly, part of it was also

00:47 10   the desire to benefit Muslims.  As I mentioned briefly on

11   Friday an Islam --

12        MR. CHAKRAVARTY:  Your Honor, object to the

13   characterizations.  A desire to do certain things is different

14   than his interpretation of reading a writing.

15        THE COURT:  Well, that's correct.  But I think this

16   answer is all right as well, so you may continue.

17   BY MS. BASSIL:

18   Q.   You may continue.

19   A.   Okay.  I forgot where I was.

00:47 20        As I was saying, the IMs indicate a desire to work in a

21   Muslim country because, as I was saying, on Friday, Islam has

22   this idea of a spiritual brotherhood among believers.  And so

23   if Muslims have a need for certain services like, for example,

24   scientific services, then there's the idea that I should help

25   them by providing my skills and abilities and talents to help

1      them, whereas people, for example, in the United States, have

2      plenty of scientifically skilled people and so I'm not as

3      needed here.  But in Saudi Arabia, for example, I might be a

4      lot more needed.

5      Q.   Okay.  And did you -- in reviewing the instant messages

6      did you see writings that were, for lack of a better word, sort

7      of shocking?

8      A.   Well, yes.  I mean, I think that there were a lot of

9      things that would hardly qualify as politically correct.

00:48 10     Q.   And what is your understanding of the concept of these

11     instant messages?

12     A.   Well, again, instant messages are a very private form of

13     communication.  My understanding is that these were chats that

14     took place -- oftentimes with Mr. Mehanna in his own room, the

15     privacy of his own bedroom -- with other young men his own age,

16     presumably also very private circumstances.  So one has to bear

17     in mind that there's a difference between private communication

18     and public communication that one writes on a forum that's

19     intended to go and persuade others.

00:49 20     Q.   Did you see a difference in the writings between the

21     instant messages and posts on the Tibyan forum?

22     A.   I think the writings on the Tibyan forum are consistent

23     with the scholarly method of argumentation, trying to be

24     logical, trying to be rational, whereas many of the posts on

25     the IM just appear to be off-the-cuff remarks, not necessarily

        1    meant to be taken seriously.

        2    Q.   Now --

        3         MR. CHAKRAVARTY:  Objection to that last point, your

        4    Honor.  Move to strike.

        5         THE COURT:  Yes, I'll strike the last characterization

        6    of the chats.

        7    BY MS. BASSIL:

        8    Q.   Were you able to review instant messages from 2007-2008?

        9    A.   I do not think so.

00:50  10    Q.   Now, I'd like to talk about the books, documents and

       11    videos that were in Mr. Mehanna's possession.  Did you review

       12    the books that were in his bookcase that -- by photograph?

       13    A.   Yes, I did.

       14         MS. BASSIL:  Could we have Exhibit 1009, please?

       15         THE COURT:  I don't have this in as 1009, but I think

       16    it was one of the government's exhibits.

       17         MR. CHAKRAVARTY:  Your Honor, my understanding is it's

       18    a different photograph but it's similar to one the

       19    government --

00:50  20         MS. BASSIL:  I have two, your Honor.

       21         THE COURT:  Is there any objection to new exhibits

       22    that are similar photographs to what the government put in?

       23         MR. CHAKRAVARTY:  No, we have no objection.

       24         THE COURT:  Okay.

       25         MS. BASSIL:  1278, your Honor.  That would be the next

1  number.

2          THE COURT:  Next after what?

3          MS. BASSIL:  After 1277.

4          THE COURT:  No, but you referred to 1009.

5          MS. BASSIL:  I did.  I did.  And I thought that was

6  1009.

7          THE COURT:  Well, I thought you were using 1009, the

8  government doesn't object to 1009.  So we'll admit it.

9          MS. BASSIL:  Oh, that's fine.

00:51 10          (Defense Exhibit No. 1009 received into evidence.)

11          MS. BASSIL:  All right.  Could you possibly blow that

12  up or move it forward, please?  Could you get it a little

13  bigger, please?

14  BY MS. BASSIL:

15  Q.   Were you able to get a sense of what types of books these

16  were?

17  A.   It's not clear from this picture, but there were some

18  pictures that I reviewed that showed the titles more clearly.

19  So many of the collections of books that Mr. Mehanna had on his

00:51 20  shelf were standard collections of Hadith books, Hadiths being

21  stories of the prophet Mohammad, that you would find in any

22  sort of collection of Islamic theology.  Also, there were some

23  other books of Tafsir, 'Eisa -- Jesus -- nothing that struck me

24  as terribly unusual.

25          MS. BASSIL:  And if we could have -- this would be

 1   proposed Exhibit 1262.

 2           MR. CHAKRAVARTY:  Same no objection.

 3           THE COURT:  All right.

 4           (Defense Exhibit No. 1262 received into evidence.)

 5   BY MS. BASSIL:

 6   Q.   And were you able to see a little more clearly the books

 7   in this photograph?

 8   A.   Yeah.  Like, for example, here, I guess you guys can't see

 9   it, but that's Sahih Muslim which is --

00:53 10          THE COURT:  You can make a mark on the screen.

11           THE WITNESS:  Oh, I can?  With what?

12           THE COURT:  No, just touching the screen.

13           THE WITNESS:  See, I'm technologically challenged.

14           But the Sahih Muslim, which is a, you know, standard

15   collection of Hadith works, this is -- looks to be a commentary

16   on Sahih al-Bukhari.  Sahih al-Bukhari is also a fundamental

17   collection of Muslim Hadiths, and that's a commentary on it,

18   although it's hard for me to determine who the author of it is.

19   But just looking at the editions, these look to be all centered

00:53 20   editions that you can find in any bookstore in the Arab world.

21   BY MS. BASSIL:

22   Q.   And by the way, when you reviewed the instant messages,

23   did you see indications of Mr. Mehanna's reverence or -- did

24   you see anything about books?

25   A.   Yes.  There were many IMs in which there was a discussion

```
 1    of books and the great love that he had for books.
 2    Q.   And if you could look on the side here --
 3         MS. BASSIL:  Your Honor, I have a couple of instant
 4    messages that I would like -- I have given them new numbers
 5    just because it was the easiest way to do it.  I believe we
 6    sent them to the government with new numbers.  And I would pull
 7    up instant message 1204, page 3.  If you could go to the very
 8    bottom.
 9         MR. CHAKRAVARTY:  May I have one moment, your Honor?
00:54 10       MS. BASSIL:  Would you pull it way up to the top,
11    please?  No.  No, the other way.
12         MR. CHAKRAVARTY:  Is this 1203?
13         MS. BASSIL:  I'm sorry.  It should be 1204.  I'm
14    sorry.
15         MR. CHAKRAVARTY:  No objection.
16    BY MS. BASSIL:
17    Q.   Do you see a line here?  It says -- what's your
18    understanding -- is your understanding --
19         THE COURT:  Wait a minute.  Just so we're keeping the
00:56 20    record straight, this is 1204?
21         MS. BASSIL:  Yes, your Honor.
22         THE COURT:  Now admitted without objection.
23         MS. BASSIL:  Thank you.
24         (Defense Exhibit No. 1204 received into evidence.)
25    BY MS. BASSIL:
```

1    Q.    Sayf Maslool is -- your understanding is that is a name

2    that Tarek Mehanna used?

3    A.    Yes.

4    Q.    And it says here, "You want to hear Shaykh Bin Baz cry?"

5    A.    Yes.

6    Q.    What does that mean?

7    A.    Well, a couple of things.  First of all, Shaykh Bin Baz,

8    as I said on Friday, had been one of the leading scholars of

9    Saudi Arabia.  He was the scholar that gave the fataawa that

00:56 10    said it was okay for the Americans to come and set up bases in

11    Saudi Arabia to help defend the kingdom against Saddam Hussein

12    in 1990.

13         The other significant thing here is the status of crying

14    as a religious matter.  It's considered a very good thing for

15    people to cry in the matter -- in connection with religious

16    devotion because it shows the depth of their piety.  So here

17    the message is suggesting that -- admiration for Bin Baz and

18    his piety through his weeping.

19    Q.    And there's a website on the bottom here with

00:57 20    www.Binbaz.org.  Did you review some videos that were on the

21    defendant's computer that related to scholars?

22    A.    I was sent a couple of video links.

23    Q.    And what were they?

24    A.    They were discussions with some well-known Salafi scholars

25    on various topics, including the hijrah of the prophet on the

1    occasion of the Islamic new year, and another topic which I

2    can't remember right now.

3    Q.   Are there common videos, in your knowledge, on YouTube of

4    various scholars?

5    A.   Yeah.

6         MR. CHAKRAVARTY:  Objection, your Honor, to videos on

7    YouTube.

8         THE COURT:  You may answer it.

9         THE WITNESS:  Yes.  I think it's safe to say that

00:58 10  lectures or videos of religious sermons, speeches, discourses

11   is available everywhere on YouTube, and the internet, for that

12   matter.

13   BY MS. BASSIL:

14   Q.   Now --

15        MS. BASSIL:  May I have Exhibit 1211, please, page 2?

16   And if you could go down to the bottom of the page.

17   Q.   Are you familiar with, first of all, the Arabic?  What

18   does that say?

19   A.   "Al-Faqir Ila Allah."

00:58 20  Q.   And what does that mean?

21   A.   "The one in extreme need of God."

22   Q.   All right.  And are you familiar with this posting here?

23   A.   Yes, I did review it.

24   Q.   And what does it mean?  What's it about?

25   A.   Yeah.  Again, what it's about here is an argument that

1   al-Faqir Ila Allah is having with, I think, Ahmad Abousamra.

2   And Ahmad --

3   Q.   Let me stop you for a minute.  The Arabic, are you aware

4   that's the -- Tarek Mehanna's?

5   A.   I was informed of that, yes.

6   Q.   And Umm Muhammad is Daniel Maldonado?

7   A.   Yes, as far as I -- again, that's what was told to me.

8   Q.   All right.  And if you could explain that passage?

9   A.   Yeah.  Mr. Mehanna was having an argument -- not

00:59 10   necessarily having an argument.  He was upset with Abousamra,

11   and I think Mr. Spaulding, because of their negative attitudes

12   towards certain scholars of Saudi Arabia, particularly, Ibn

13   Baaz, Ibn 'Uthayneen and al-Albaanee.

14       Abousamra was calling them, essentially, apostates for

15   their refusal to denounce the rulers of Saudi Arabia and

16   support jihad.  And basically, this conversation reflects that

17   disagreement -- the disagreement that Mr. Mehanna had with

18   Mr. Abousamra.

19   Q.   And what was Mr. Mehanna's -- when you say "disagreement,"

01:00 20   what does this say about Mr. Mehanna's indication of these

21   scholars?

22   A.   Well, this language here exactly is a paraphrase of what

23   Abousamra was saying.  I think somewhere else we get Mehanna's

24   position.  But basically, Mehanna was defending the Salafi

25   scholars against the criticisms of Mr. Abousamra.

1   Q.   And Mr. Abousamra's view that these scholars should have

2   spoken out -- should have spoken in praise of jihad?

3   A.   Yes.  And should have denounced the rulers of

4   Saudi Arabia.

5   Q.   Is that the point of view that was held by al Qa'ida?

6   A.   Yes.

7   Q.   And what was al Qa'ida's position towards Bin Baz?

8   A.   I don't know about their particular position toward

9   Bin Baz.

01:01 10   Q.   What was their position toward people -- towards someone

11   who had authorized -- or said it was religiously permissible

12   for the United States to have bases in Saudi Arabia?

13   A.   They disagreed with that vehemently.

14        MS. BASSIL:  And if we could have Exhibit 1210,

15   please?  First page?  And if you could go down, please, to the

16   bottom.

17   Q.   Now, this is an instant message.  Is it your understanding

18   the Arabic is the same person, Mr. Mehanna?

19   A.   Yes.

01:01 20   Q.   And Umm Muhammad is also -- continues to be

21   Daniel Maldonado?

22   A.   That's my understanding, yes.

23   Q.   And this post, does this indicate -- on the post here

24   there's a discussion and translation of what -- are these

25   books?

```
 1   A.   Yes, they are.

 2   Q.   And what is your understanding of this post?

 3        MR. CHAKRAVARTY:  Objection, your Honor.  This isn't

 4   in evidence; second, this particular post seems to be not

 5   relevant at all.  But there are a lot of instant messages which

 6   counsel's given us notice of which are not in evidence, and

 7   this witness is characterizing the content of what the

 8   defendant intended by certain things that are phrased within

 9   the four corners of the post.

10        MS. BASSIL:  I'll rephrase, your Honor, and ask to put

11   this into evidence.  And I'll rephrase the question.

12        MR. CHAKRAVARTY:  We object, your Honor.  This is

13   hearsay.

14        THE COURT:  No, overruled.  It may be admitted.

15        MS. BASSIL:  Thank you, your Honor.

16        THE COURT:  So this is, what, 1211?

17        MS. BASSIL:  Yes, your Honor -- 1210, your Honor.

18        (Defense Exhibit No. 1210 received into evidence.)

19   BY MS. BASSIL:

20   Q.   Dr. Fadel, would you just -- would you read this,

21   please -- would you read this bottom that I've put the green

22   mark against?  Would you read that to the jury, please?

23   A.   Starting with "nothing too fancy"?

24   Q.   Yes.

25   A.   "Nothing too fancy.
```

 1          "Umm Muhammad:  Check this out.

 2          "Umm Muhammad:  'Sharh 'Aqeedat Al Imam Al Mujadid,'

 3    Explanation of Imam al-Mujadid's Creed; 'Sharh Usul Athalatha,'

 4    Explanation of the Three Principles; 'Al Qawa'id Al Arba'a,'

 5    The Four Rules; 'Sharh Kashf Ashubuhat,' Explanation of

 6    Suspicion Removal" --

 7          Can I provide my own translation?  That's not a very good

 8    one.

 9    Q.   If you'd like.

10    A.   Explanation of the Confusing Points.

11          "'Fath'h Al Majeed Ma' Al Qawlil Mufeed,' Al Majiid's

12    Conquest with Useful Sayings; 'Usul Al Iman,' The Principles of

13    Faith; 'Usul as Sitta,' The Six Principles."

14    Q.   So what is Umm Muhammad -- what is he doing here?

15    A.   Well, there's a discussion here of various books.

16          MR. CHAKRAVARTY:  Your Honor, this is not the

17    defendant's statement.

18          THE COURT:  Yes, sustained.

19    BY MS. BASSIL:

01:04 20    Q.   What are these -- what you've just read, are those books?

21    A.   Yes, they are books.

22          MS. BASSIL:  And could we go to the next page, please?

23    Q.   All right.  And do there continue to be listings of books?

24    A.   Yes.

25          MS. BASSIL:  And if we could go down, please?

```
 1  Q.    And if you could just read from here on?

 2  A.    Okay.  "Umm Muhammad:  That's all the books I have of him.

 3        "Al-Faqir Ila Allah:  You've got those all in Masr, Egypt?

 4        "Umm Muhammad:  Yup.

 5        "Umm Muhammad:  Adurar, The Treasures I had to get ordered

 6  from Saudi.

 7        "Al-Faqir Ila Allah:  You gotta show me which stores you

 8  got those from so I can shop there.

 9        "Umm Muhammad:  12 volumes.

10        "Al-Faqir Ila Allah:  Hehe.

11        "Al-Faqir Ila Allah:  Yeah, I remember.

12        "Al-Faqir Ila Allah:  You told me.

13        "Umm Muhammad:  Yeah.

14        "Umm Muhammad:  I will get you the pocket one,

15  insha'Allah, God willing.

16        "Umm Muhammad:  Half all those books are on it.

17        "Al-Faqir Ila Allah:  I have all those but if the store is

18  carrying his stuff, then it must also carry other good stuff."

19  Q.    Thank you.  Now, I want to ask you now --

20        MS. BASSIL:  We can take that down.

21  Q.    -- did you review Tarek Mehanna's scholarly abilities, or

22  his abilities to communicate and translate in Arabic?

23  A.    To the extent --

24        MR. CHAKRAVARTY:  Objection, your Honor.  This line of

25  questioning goes to the assessment of the defendant's abilities
```

1   which this witness is not competent to testify about.

2          THE COURT:  Well, I don't know.  I think you may have

3   to fine-tune the question.

4          MS. BASSIL:  All right.

5   BY MS. BASSIL:

6   Q.   Dr. Fadel, you speak, read and write fluent Arabic?

7   A.   That's correct.

8   Q.   Classical as well as modern?

9   A.   Yes.

01:06 10   Q.   And is classical Arabic a difficult subject to learn?

11   A.   Yes, it is.

12   Q.   And in reviewing Mr. Mehanna's classical Arabic, were you

13   able to see errors in it?

14   A.   Yes.

15          MR. CHAKRAVARTY:  Your Honor --

16          THE COURT:  Let me see you at the side.

17          (Discussion at sidebar and out of the hearing of the

18   jury:)

19          THE COURT:  When did he review his classical Arabic?

01:06 20          MS. BASSIL:  Well, it's not that he -- I'm sorry.

21   What I was going to show him is instant messages where he

22   translated a few things and he's got it wrong, and that's

23   really what I'm going to show.  This is relevant because it

24   goes to the issue that he wanted to go to school, that he

25   wanted to learn.  The government asked people questions -- when

1   they questioned civilian witnesses, they asked them if

2   Mr. Mehanna's Arabic was fluent and if he -- basically implying

3   that he didn't need to go to school.  So I am going to be

4   putting that in through this witness, and it's in the instant

5   messages.

6           THE COURT:  Give me an example.

7           MS. BASSIL:  Okay.  One example is he's asked to

8   translate something by someone -- just in an instant message --

9   and he gets it completely wrong.

01:07 10         THE COURT:  What do you mean he's asked to translate?

11  Like a line in a message?

12          MS. BASSIL:  Yes, someone says, "What's this mean?"

13  and he gets it completely wrong.  Another example is he mixes

14  up sort of the plural and the singular when he's talking about

15  something.

16          THE COURT:  How many examples do you have?

17          MS. BASSIL:  I have, like, four.  I was going to use

18  two, maybe?  Two or three.

19          MR. CHAKRAVARTY:  First, the whole line of his

01:08 20  linguistic skills seems to be far afield from this witness's

21  expertise, which is Sharee'ah law, Islamic law.  To the extent

22  that he has proficiency in Arabic, to go through an instant

23  message chat when the English words are spelled incorrectly,

24  there are abbreviations, the whole point that he just made is

25  these are informal --

1           THE COURT:  I guess you could make that argument.

2           If there are only a couple of examples.

3           MS. BASSIL:  Thank you.

4           (In open court:)

5           MS. BASSIL:  Can we have 1218, please, page 1?

6           And, your Honor, I would ask to put this into

7    evidence.  It may already be in evidence.

8           MR. CHAKRAVARTY:  Same objection, your Honor.

9           MS. BASSIL:  And if we could go down --

01:09 10           THE COURT:  All right.  This is 1218?  Admitted.

11           (Defense Exhibit No. 1218 received into evidence.)

12   BY MS. BASSIL:

13   Q.   Did you review this instant message, Dr. Fadel?

14   A.   Yes.

15   Q.   And what is your understanding -- strike that.

16        This instant message refers to a translation?

17   A.   Yes.

18   Q.   And what is the translation?  What is the topic?

19   A.   Well, Mr. Mehanna -- assuming it's al-Faqir Ila Allah, is

01:09 20   having a discussion with another gentleman named Abu Salayman

21   ash-Shami concerning the proper translation of an Arabic

22   phrase, "al-Ghurr al-Mayaameen," and they seem to be puzzling

23   over the proper translation of it, and they don't get very far

24   in getting it right.

25           MS. BASSIL:  And if we could go to the bottom of the

1    page?

2    Q.   This is Mr. Mehanna's translation?

3    A.   I think, actually, that's Abu Salayman.

4    Q.   All right.

5         MS. BASSIL:  And if we could keep going?  And go back.

6    Go back to the first page.

7    Q.   And did Mr. Mehanna get this translation correct?

8    A.   No.

9         MS. BASSIL:  Now, I would ask -- let's see -- 1226,

01:10 10   page 3.

11        Your Honor, I would ask to put this into evidence.

12        MR. CHAKRAVARTY:  Same objection, your Honor.

13        THE COURT:  Okay.  I'll admit it over the same

14   objection.

15        MS. BASSIL:  Thank you.

16        (Defense Exhibit No. 1226 received into evidence.)

17   BY MS. BASSIL:

18   Q.   Dr. Fadel, have you reviewed this instant message?

19   A.   Yes.

01:11 20   Q.   And I want to ask you to read this and I will -- if you

21   could read Edgar and I would read Mr. Mehanna?

22   A.   Yes.

23   Q.   And if you could start with "hey"?

24   A.   "Hey.  Do you know what this word means, ''bilaad'?"

25   Q.   "Lands."

1    A.    "I thought so."

2    Q.    "Singular."

3          And you're going to read that.

4    A.    "Oh, ''bilaad.'  I thought 'majmou3' was ''bilaad.'"

5    Q.    "Both are correct, although 'buldan' is generally used to

6    refer to two lands."

7          Was that a correct translation?

8    A.    No.  "Buldan" is always plural; it can never refer to two

9    lands.

01:12 10   Q.    What was your -- and based on reviewing, did you see other

11   errors like that in the instant messages?

12   A.    There were some error -- other errors of translation,

13   other errors that were just conceptual because the author

14   didn't understand the proper concepts that were being

15   discussed.

16   Q.    Is the study of Arabic and Islam a lifelong study?

17   A.    Yes, it is.

18   Q.    Is there a religious -- is there a -- is there an

19   obligation in Islamic law and theology to study Islam?

01:12 20   A.    Generally speaking, yes.

21   Q.    What is that?

22   A.    Well, again, it's a little complicated, but there's an

23   individual obligation on every single person to know what he or

24   she needs to live as a good Muslim, then it's considered a good

25   thing to pursue higher knowledge.

1    Q.    Now, did you also look at -- did you also see that

2    Mr. Mehanna had books that were -- books by Abdullah Azzam, for

3    example, or an interview with Osama bin Laden, those types of

4    things?

5    A.    Yes.

6    Q.    And did he also have mixtures of other books there as

7    well?

8    A.    Yes.

9    Q.    Are you familiar with the book, "A Young Muslim's Guide to

01:13 10   the Modern World"?  Was that in his library?

11   A.    Yes, it was.

12   Q.    What is that book?

13   A.    That's a book written by Dr. Seyyed Hossein Nasr who is an

14   Iranian professor of religious studies at Georgetown

15   University.  Dr. Nasr is a Shiite; he's also a Sufi.  And

16   that's a book on philosophy and how Muslims should -- how young

17   Muslims, in particular, should understand modern philosophies

18   and their relationship to Islamic theology.

19   Q.    Now, when you say -- and I don't want to belabor this, but

01:14 20   very quickly for the jury, what is the difference between

21   Shiite and Sunni?

22   A.    Shiites essentially have a very different conception of

23   religious authority which they feel descends sort of

24   theologically through the family of the prophet.  They believe

25   in something called an infallible imaan to whom all religious

1    questions should be addressed, whereas Sunnis reject that.

2    They deny that there's any kind of charismatic religious

3    authority, for lack of a better term, after the prophet dies.

4    And so after the prophet dies what we're left with is the

5    Qur'an and the prophet's teachings.  We study them -- we're all

6    equally capable of studying them -- but according to the

7    Shi'ah, the prophet's family has a special role in teaching

8    religion until the end of time.

9    Q.   Are there disputes between Shiites and Sunnis?

01:14 10   A.   Yes, there are.

11   Q.   And do those become political in the Mideast, for example?

12   A.   Yes, they do.

13   Q.   Now, did you also look at --

14        MS. BASSIL:  Could we have 1262 back up, please?

15   Q.   Did you also look at the titles on these tape recordings?

16   A.   As they were indicated by the photos that were given to

17   me.

18   Q.   All right.  And what were the -- what kinds of tapes were

19   these?

01:15 20   A.   They were mostly of relatively conservative Salafi

21   preachers.

22   Q.   Can you give an example of -- were some -- were there more

23   of one preacher than another?

24   A.   One name that sticks in my mind is Mohammed Hassan.

25   Q.   And who is that?

```
 1   A.    He's a well-known Egyptian Salafi preacher.   A

 2   televangelist, you can sort of describe him as.

 3   Q.    H-A-S-S-A-N?

 4   A.    Yes.

 5   Q.    Okay.  And were these political or apolitical?

 6   A.    They were apolitical, dealing primarily with the kinds of

 7   religious virtues that are common -- the common subject of

 8   discourse in Islam.

 9   Q.    What kind of topics?

10   A.    I can't remember exactly.  If it's possible to refresh my

11   recollection by the specific pictures, I would be happy to tell

12   the jury.

13   Q.    Now, did you also see tapes by someone named Ahmad

14   Amr-Khaled?

15   A.    Amr-Khaled.

16   Q.    Who is that?

17   A.    Yes.  There were some tapes of Amr-Khaled, who is, again,

18   a quintessential modern televangelist, or the equivalent of a

19   televangelist in Egypt today.  Amr-Khaled is not really

20   associated with the Salafi movement; he's more of a modernist.

21   You know, he wears a suit and tie, doesn't have a beard.  He's

22   a former accountant, graduate of the American University of

23   Cairo.

24   Q.    And what kind of tapes does he put out -- or did the

25   defendant have?
```

1    A.    He had tapes from various different preachers.

2    Q.    All right.  And were they political or apolitical?

3    A.    They were apolitical.

4    Q.    Now, did you see books or documents that were more

5    explicit in Mr. Mehanna's library about jihad and about

6    fighting?

7    A.    Yes, I seem to recall that he had several books of

8    Abdullah Azzam.

9    Q.    All right.  And you also were aware -- or did you see that

01:17 10   he had videos -- downloaded videos that were speeches of

11   bin Laden graphic with violence and so forth?

12   A.    I did not watch any of those videos myself, but it is my

13   understanding that he did have those videos.

14   Q.    You did watch the "Expedition of Umar Hadeed"?

15   A.    Yes, with the exception of the "Expedition of Umar

16   Hadeed."

17   Q.    What is significant about his possession of these videos?

18            MR. CHAKRAVARTY:  Objection, your Honor.

19            THE COURT:  Sustained.

01:17 20   BY MS. BASSIL:

21   Q.    Did you see inconsistencies in his collection of books and

22   videos and so forth?

23   A.    Well, if it was an eclectic --

24            MR. CHAKRAVARTY:  Objection, your Honor.

25            THE COURT:  Sustained.

```
     1    BY MS. BASSIL:

     2    Q.    How would you describe his library?

     3    A.    Eclectic.

     4    Q.    What do you mean by that?

     5    A.    It has -- no single theme, necessarily, explains all the

     6    books and videos in the collection, although it's slanted

     7    toward a conservative Salafi view of religion.

     8    Q.    Are his views -- were the defendant's views internally

     9    consistent?

01:18 10          MR. CHAKRAVARTY:  Objection, your Honor.

    11          THE COURT:  Sustained.

    12    BY MS. BASSIL:

    13    Q.    Did his views, based on your review of the documents,

    14    remain consistent over time?

    15          MR. CHAKRAVARTY:  Objection, your Honor.

    16          THE COURT:  Sustained.

    17    BY MS. BASSIL:

    18    Q.    Now, Dr. Fadel, you reviewed -- why did you feel it was

    19    important to review as much of the instant messages as you

01:18 20    could, the tapes, the books, the Tibyan posts and so forth?

    21          MR. CHAKRAVARTY:  Objection, your Honor.

    22          THE COURT:  Sustained.

    23    BY MS. BASSIL:

    24    Q.    Dr. Fadel, did you feel it was important to review all of

    25    the defendant's material?
```

1          MR. CHAKRAVARTY:  Objection, your Honor.

2          THE COURT:  Sustained.

3          MS. BASSIL:  May I be heard on that?

4          THE COURT:  Yeah.

5          (Discussion at sidebar and out of the hearing of the

6     jury:)

7          MS. BASSIL:  I can reframe it, your Honor, but the

8     point of this was that Mr. Kohlmann, as you know, only looked

9     at what was on the hard drive and nothing else, and I just want

01:19 10   to frame it that this person looked at more than that.

11         MR. CHAKRAVARTY:  She's established the fact that he's

12    looked at more and that his methodology, I guess, is better

13    than Kohlmann, in that respect.  But either way, his assessment

14    of whether he gets a better picture of the defendant is outside

15    his expertise and is invading the jury's province.

16         THE COURT:  I think you can get the bare facts of what

17    he looked at or didn't look at without assessing his giving an

18    assessment.

19         (In open court:)

01:20 20   BY MS. BASSIL:

21    Q.   Dr. Fadel, you looked at a large amount of material.  Is

22    that correct?

23    A.   Yes, I did.

24    Q.   And in assessing someone's views -- in assessing views or

25    positions compared to al Qa'ida, was it necessary to review

```
 1   materials of this sort?
 2            MR. CHAKRAVARTY:  Objection, your Honor.
 3            THE COURT:  Sustained.
 4   BY MS. BASSIL:
 5   Q.   In reviewing these materials, did that assist you in
 6   determining the consistency of writings compared to -- in
 7   comparison to al Qa'ida's views?
 8            MR. CHAKRAVARTY:  Objection, your Honor.
 9            THE COURT:  Sustained.
10   BY MS. BASSIL:
11   Q.   Did you feel it necessary to look at all these materials?
12   A.   Yes.
13   Q.   Why?
14            MR. CHAKRAVARTY:  Objection, your Honor.
15            THE COURT:  Sustained.
16            MS. BASSIL:  Could we have Exhibit 1236, please, page
17   2?
18            Your Honor, I would like to admit this into evidence.
19            MR. CHAKRAVARTY:  One moment, your Honor.
20            (Pause.)
21            MR. CHAKRAVARTY:  Objection, relevancy.
22            THE COURT:  I'm sorry.  Relevancy?
23            All right.  Overruled.  I'll admit it.  1236.
24            (Defense Exhibit No. 1236 received into evidence.)
25   BY MS. BASSIL:
```

01:21 (line 10)
01:22 (line 20)

1    Q.   Dr. Fadel, I'd like to end with reading this.

2    A.   All right.

3    Q.   And if you would read the Taimur and I will read Sayf

4    Maslool.  And is it your understanding that Sayf Maslool is

5    Tarek Mehanna?

6    A.   Yes.

7    Q.   And if you could start with right there, "Bro."

8    A.   "Bro, I got to ask you something.  You there?"

9    Q.   "Yeah."

01:23 10  A.   "What do you want to accomplish in this life in terms of

11   your career and stuff?  If you don't want to tell, it's all

12   good."

13   Q.   "Well, I'd like to make my career involved with Islam

14   somehow, like teaching, et cetera."

15   A.   "Oh, cool.  May Allah make it easier for you.  Like I have

16   so much I want to do, insha'Allah, Allah willing."

17              MS. BASSIL:  I have no further questions.

18                         CROSS-EXAMINATION

19   BY MR. CHAKRAVARTY:

01:23 20  Q.   Good morning, Dr. Fadel.

21   A.   Thank you.  Good morning to you.

22   Q.   You've been here for -- since last Monday.  Is that right?

23   A.   I was originally told I would be testifying last Monday.

24   Q.   Well, we were all optimistic.

25   A.   Not as much as I am.

1        MR. CHAKRAVARTY:  Can we just go back to 1236 very

2    quickly, Mr. Oh?  Can we go to page 2, please?

3    Q.   Just that same post that you read with Ms. Bassil, the

4    portion that I just highlighted, Sayf Maslool says, "I know one

5    brother" -- let me start up here.  Excuse me.  In this post

6    Taimur is talking about potentially going to law school.  Is

7    that right?

8    A.   I think something like that.  Actually, can I correct

9    myself?  He's talking about studying philosophy in order -- his

01:25 10    preparation for law school.

11    Q.   Okay.  And Taimur wants to do better in law school and

12    studying philosophy may help him do better in law school?

13    A.   That appears to be his belief.

14    Q.   It's Sayf Maslool that says, "I know one brother who did

15    this.  He used to be Salafi then started getting into all that

16    junk and completely lost it."  Did I read that correctly?

17    A.   Yes, you did.

18    Q.   All right.  Dr. Fadel, you're a law professor and a

19    lawyer, correct?

01:25 20    A.   Yes, I am.

21    Q.   And just to clarify, you know a lot about Islam, and we

22    thank you for some of your education, but you're not a

23    religious leader in the sense of clergy, correct?

24    A.   Absolutely not.

25    Q.   So can you just explain how a law professor, or an Islamic

1    Sharee'ah scholar, differs from a religious scholar like some
2    of the people that you've been referring to?
3    A.    Yes.  My training is purely as an academic.  So I enrolled
4    in a Ph.D. program at the University of Chicago.  I took
5    various courses there, primarily in Arabic literature and
6    Islamic thought and Islamic history.  And then when I began to
7    work on my dissertation, I conceived of a proposal.  My
8    proposal dealt with a very technical topic of Islamic law;
9    namely, a courtroom procedure.
01:26 10       I then went and spent a year in Egypt.  I studied with
11    what's called a "shaych," a scholar, a specialist in Islamic
12    law.  I would go to his house three days a week.  I would read
13    a book of jurisprudence of substantive law.  You know, and so I
14    would sit at his feet, I would read the book and he would
15    explain it to me.  I did that for a year.  And then I would
16    just read purely legal texts.
17       Now, because I do that as an academic, I don't claim to
18    have any religious authority, so I wouldn't ask Muslims to come
19    to me to seek their religious advice, nor would I voluntarily
01:27 20    seek to give them religious advice.
21    Q.    So you're looking at it from an academic point of view?
22    A.    That's absolutely correct.
23    Q.    And with regards to some of the -- your testimony, mostly
24    on Friday, you discussed the prevailing view of al Qa'ida as
25    well as --

```
 1   A.   Yes.

 2   Q.   -- that kind of mainstream Muslims?

 3   A.   Yes.

 4   Q.   And you drew some contrasts there, correct?

 5   A.   Yes.

 6   Q.   And you would agree with me that the vast majority of the

 7   world's Muslims are not supportive of al Qa'ida?

 8   A.   That's correct.

 9   Q.   And specifically, in North America, there are very few

01:28 10   Muslims who advocate or support al Qa'ida's goals and

11   objectives.  Is that right?

12   A.   That's correct.  Although, I would like to be more

13   precise --

14   Q.   Is it correct -- then I'll ask you another question.

15        And you've written extensively on how Muslims can be

16   better involved with the civic discourse in Western countries?

17   A.   Absolutely.

18   Q.   And you believe that?

19   A.   Absolutely.

01:28 20   Q.   And that there are political opportunities, that there are

21   civic institutions, there are other ways in which Muslims can

22   be active to better protect their civil rights and to better be

23   integrated into society?

24   A.   Absolutely.

25   Q.   And that's something that you feel very passionate about?
```

 1    A.    Absolutely.

 2    Q.    Particularly, since September 11th, you think that the

 3    civil rights of Muslims in particular has eroded given the

 4    added attention to Homeland Security and disproportionate

 5    scrutiny upon Muslims.  Is that fair?

 6    A.    Yes.

 7    Q.    You're also -- you'd agree with me that there's a

 8    phenomenon -- or you're familiar with a phenomenon frequently

 9    called Islamophobia?

01:29 10    A.    Yes, I am.

11    Q.    And that, kind of generally, is the fear of Muslims?

12    A.    Yes.

13    Q.    And that's something that affects the Western society?

14    A.    Yes.

15    Q.    And you'd agree with me that there are burgeoning Muslim

16    civic organizations that are just now developing a

17    sophistication in terms of dealing with public relations and

18    dealing with getting the message out to represent accurately

19    the feeling of American and North American Muslims?

01:29 20    A.    They're trying.

21    Q.    They're trying?

22    A.    Yes.

23    Q.    And, you know, they've made some stumbles along the way,

24    but the North American Muslim community is actually about a

25    generation old.  I mean, I'm sure there are people before, but

```
 1   the massive influx has occurred since the '60s or '70s.  Is

 2   that right?

 3   A.   Yes, I would agree it's institutionally immature.

 4   Q.   Are you familiar with the Muslim American Society?

 5   A.   Yes, I am.

 6   Q.   And this is one of those Muslim advocacy organizations

 7   that is trying to pick up the mantle?

 8   A.   One of several.

 9   Q.   There are many?

01:30 10   A.   Yes.

11   Q.   Council for American Islamic Relations?  That's another

12   one.

13   A.   Yes.

14   Q.   Muslim Advocates.  Is that another one?

15   A.   I'm a board member of that; yes.

16   Q.   You're very familiar with that one.

17        Are you familiar with a person named Mahdi Bray?

18   A.   Yes.

19   Q.   And he's the leader of the Muslim American Society Freedom

01:30 20   Foundation, correct?

21   A.   Yes.  Yes.

22             MS. BASSIL:  May we be heard?

23             I would object to the relevance of this.

24             THE COURT:  Overruled.

25   BY MR. CHAKRAVARTY:
```

```
 1    Q.   And these, amongst others -- and there are a legion, other
 2    groups -- are trying to engage in dialogue, engage in peaceful
 3    and democratic ways of improving the lot of Muslims in North
 4    America.  Is that fair to say?
 5    A.   Yes.
 6    Q.   Now, Friday you also testified to the fact that there are
 7    differences within Islam, and today as well, including stark
 8    differences of the difference between a Shiite Muslim and a
 9    Sunni Muslim, correct?
01:31 10    A.   Yes.
11    Q.   And so there are as wide a range of interpretations of
12    what is correct and proper within the faith as there are people
13    who are Muslims.  Is that fair?
14    A.   I wouldn't quite say there's an Islam for every Muslim,
15    but there is a wide diversity of opinions.
16    Q.   And what I mean to suggest is that Islam has a strict code
17    of conduct and has certain rules, but how it's applied to any
18    individual is an individual choice.
19    A.   That's correct.
01:31 20    Q.   And your choices on that may be different than the
21    defendant's choices?
22    A.   Absolutely.
23    Q.   And a lot of that is based on how much you are aware of
24    what the Qur'an, Hadiths, the other -- the scholars have said
25    about particular issues, correct?
```

```
 1   A.   Yes.  It is, in large part, a matter of education.

 2   Q.   And a large part of it is applying that education to one's

 3   unique individual circumstances.  Is that fair to say?

 4   A.   Fair enough.

 5   Q.   And there are varying degrees of conservatism within

 6   faith?

 7   A.   Yes, and liberalism.

 8   Q.   Literalism, I should say.

 9   A.   Liberalism.

10   Q.   Liberalism?  Okay.  So the two poles?

11   A.   Yes.

12   Q.   So conservatism and liberalism?

13   A.   Yes.

14   Q.   And what you're describing when you discuss, you know, a

15   conservative or an orthodox view, a literal view versus a

16   liberal view, you're describing a belief system, not

17   necessarily what an individual's specific thoughts are on a

18   particular issue.

19   A.   Yes.

20   Q.   And unless you've discussed with that particular person

21   what their thought is on a particular issue, you can only

22   really project what your understanding is of that person's

23   belief system onto that person.

24   A.   Not necessarily.  If a person has written a lot, then I

25   don't need to talk to him.
```

    1   Q.   All right.   So "not necessarily," I think, answers the

    2   question.

    3        So if I were a Salafi, and you knew that, you would carry

    4   some preconceived notions as to what my belief system is.   Is

    5   that correct?

    6   A.   Correct.

    7   Q.   Including the fact that I respect the first three

    8   generations of companions of the prophet -- of the first three

    9   generations of Muslims, and that's who I'm trying to emulate?

01:33 10   A.   Yes.

   11   Q.   And there are other kind of preconceived notions which,

   12   putting a label on, whether you're an Ikhwani or somebody who's

   13   affiliated or respectful of the Islam brotherhood, there would

   14   be a different set of associations.   Is that fair to say?

   15   A.   Fair to say.

   16   Q.   Now, you were asked about Salafism -- you explained a

   17   little bit about the history, but you weren't asked about a

   18   particular subgroup within -- amongst the Salafis called

   19   "Salafi-Jihadis."   Are you familiar with that term?

01:34 20   A.   Yes.

   21   Q.   And are you aware that Salafi-Jihadis have been defined,

   22   at least by Gilles Kepel, as those who combine respect for the

   23   sacred texts in their most literal form with an absolute

   24   commitment to jihad whose number one target had to be America,

   25   perceived as the greatest enemy of the faith?

```
 1              MS. BASSIL:  Objection.

 2              THE COURT:  You may answer it.

 3              THE WITNESS:  I mean, Mr. -- the authority you cited

 4    is free to define it any way he or she wishes.

 5    BY MR. CHAKRAVARTY:

 6    Q.   Well, he's --

 7    A.   That's a definition.  I mean, I don't agree or disagree

 8    with the definition.  We can have a definition and we can work

 9    with it.

10    Q.   Okay.  So since he's the one that first coined this

11    definite phrase, I figured I would use his.

12              MS. BASSIL:  Objection.

13              THE COURT:  Yeah, strike that.  That was a comment.

14              MR. CHAKRAVARTY:  I'll ask a question.

15    BY MR. CHAKRAVARTY:

16    Q.   So using that definition, that is a different belief

17    system than the Salafi belief system that you described which

18    is sympathetic to the Saudi muftis, or the -- I think you

19    mentioned Bin Baz?

20    A.   Yes, that would be a different subgroup of Salafism.

21    Q.   Are you familiar with the term Madaakhilah, or Madkhali?

22    A.   Okay.  Madaakhilah.  Sorry.

23    Q.   Thank you for correcting my pronunciation.

24    A.   Yeah, that's a term of opprobrium, a term of, you know,

25    sort of a -- for lack of a better term, a word to show
```

01:34 (line 10)
01:35 (line 20)

1    disrespect.  That Salafi-Jihadis, people who are sympathetic to

2    al Qa'ida, use it to disparage scholars like Bin Baz and Ibn

3    'Uthayneed and al-Albaanee, so they accuse them of being

4    Madaakhilah.

5    Q.   And as you pointed out, that's a pejorative term?

6    A.   It's a pejorative term, yes.

7    Q.   And thank you for mentioning the three scholars who are

8    frequently referred to as the Madkhali, or the Madaakhilah

9    trinity:  Bin Baz, 'Uthayneed and Albaanee, correct?

01:36 10   A.   Al-Albaanee, yes.

11   Q.   So you spoke about the basis of your opinions.  And just

12   to kind of synthesize them, one, you described different

13   concepts within Shari'ah law, and you explained some of your

14   training on -- your academic experience in terms of learning

15   Sharee'ah law.  Is that fair to say?

16   A.   Yes.

17   Q.   And then another -- you described -- at different times

18   Ms. Bassil asked you whether certain views were kind of

19   mainstream Muslim views, or I think you described what most

01:36 20   Muslims say, or at least most Muslims that you know, and that's

21   your kind of personal experience and your experience as a

22   scholar dealing with other scholars of these issues, correct?

23   A.   Correct; yes.

24   Q.   And then you also -- the third area that you opined on was

25   what al Qa'ida says?

1    A.    Yes.

2    Q.    And you pointed to the Frontline special on al Qa'ida as

3    well as the '96 and '98 Fatwaas of Osama bin Laden.

4    A.    Actually, I think I asserted -- talked about just those

5    Fatwaas.  I said that they were available on the Frontline

6    website.

7    Q.    Okay.  So you're relying, then, on those two

8    Fatwaas -- those two statements of Osama bin Laden?

9    A.    Yeah, by way of example.  But I read other things as well.

01:37 10    Q.    But you don't study al Qa'ida, per se, do you?

11    A.    It's not the central focus of my academic work, no.

12    Q.    I mean, you don't read any kind of terrorism classes or

13    anything like that, do you?

14    A.    I don't, except that I do a lot of work on Islamic law of

15    war.  So part of Islamic -- part of writing and speaking about

16    the Islamic law of war involves necessarily having some

17    familiarity with groups that are on the margins of Islamic

18    discourse on war.

19    Q.    Okay.  And when you say "on the margins" you're talking

01:37 20    about people who -- like al Qa'ida, who, in your opinion, are

21    inconsistent with what Islamic law says about conflict, about

22    killing, about violence?

23    A.    Yes.

24    Q.    All right.  And you -- and so when you're talking about

25    al Qa'ida, that's the basis of your experience in talking about

1    your -- those two Fatwaas and your research on the kind of the

2    law of war.  Have you done anything else on al Qa'ida?

3    A.   Yes.  For example, I haven't been able to finish it

4    because of my involvement in this case, but I've been asked to

5    write a review essay of a new recent work of a scholar at the

6    London School of Economics called "Just War - Jihad and the War

7    on Terror" in which the author gives a full --

8    Q.   I don't need to hear more about that.

9         MS. BASSIL:  Your Honor, may he finish his answer?

01:38  10         THE COURT:  I'm not sure it was relevant to the

11   question.  Go ahead.

12   BY MR. CHAKRAVARTY:

13   Q.   So that's something that you intend to do going forward?

14   A.   I've taken lots of notes and done the research, I just

15   haven't had time to write it.

16   Q.   And when you were describing what generally Muslims

17   believe -- or North American Muslims believe -- you were

18   speaking in general statements, not necessarily looking at poll

19   data or looking at particular pockets of belief.  Is that fair?

01:39  20   A.   I speak doctrinally, all right?

21   Q.   Doctrinally?  Okay.  Thank you.

22        So you were given numerous materials by the defense before

23   coming to testify in this case, many of which you've kind of

24   summarized at large.  Is that also a doctrinal kind of

25   summation of what you have looked at?

```
 1   A.   I wouldn't describe that -- no, no.

 2   Q.   All right.  Do you know how much of the discovery

 3   materials you were given?

 4   A.   I thought I was given it all.

 5   Q.   Did you review any of the trial testimony?

 6   A.   Pardon me?

 7   Q.   Did you review any of the trial testimony?

 8   A.   Yes, I did.

 9   Q.   Which parts of the trial testimony did you review?

10   A.   The live witnesses.

11   Q.   All of the live witnesses?

12   A.   I think so.

13   Q.   You mentioned you looked at the instant message chats --

14   A.   Yes, I did.

15   Q.   -- and the Tibyan Publications posts.

16        Did you look at emails as well?

17   A.   I think there were a couple of emails.  I can't remember

18   them.

19   Q.   Did you review the materials on the defendant's computer?

20   A.   I don't know.

21   Q.   Did you review the consensually monitored recordings?

22   A.   Some of them.

23   Q.   Did you review the recorded telephone calls?

24   A.   Some of them.

25   Q.   Many of the instant message chats were hours-long
```

1    conversations.  Is that fair to say?

2    A.   I didn't look at the time.  There were -- it took hours to

3    get through them, so I imagine it took hours to type them up.

4    Q.   And there are timestamps on --

5    A.   Yes, there are.

6    Q.   And several of them went for pages and pages?

7    A.   I know.

8    Q.   And you were asked to talk about -- just a few of them,

9    about issues that don't relate to jihad.  Is that fair to say,

01:41 10   the ones that you --

11   A.   Yes.  I mean, my memory's not as sharp as it was, so I

12   can't remember exactly what counsel asked me, but I think

13   that's correct.

14   Q.   But you recognize that there were dozens of communications

15   where the defendant expressed his views, or Sayf Maslool or

16   Al-Faqir Ila Allah?

17   A.   I would say he said things.

18   Q.   He said a lot of things about the killing of U.S. soldiers

19   and Osama bin Laden and Ayman al-Zawahiri and Abu Musab

01:41 20   al-Zarqawi?

21             MS. BASSIL:  Objection.

22             THE COURT:  Overruled.

23             THE WITNESS:  Yes, he did.

24   BY MR. CHAKRAVARTY:

25   Q.   He described reverently certain terror attacks, didn't he?

```
 1    A.   I wouldn't say necessarily "reverently."

 2    Q.   You saw that he distributed videos describing the killing

 3    of U.S. soldiers repeatedly, didn't he?

 4    A.   Links were passed around.  I didn't open them.

 5    Q.   So now in going through these hours and hours of materials

 6    that you reviewed, did you take notes?

 7    A.   I would take notes from time to time.

 8    Q.   And did you generate any kind of synthesis of that or

 9    report or anything for the defense?

10    A.   I did have -- I would sometimes, from time to time, send

11    them short memos.

12    Q.   Just about what your findings were?

13    A.   Yes.

14    Q.   How many hours would you say you've worked on this case?

15    A.   Okay.  As of the end of October I billed 60 hours.

16    Q.   Okay.  And how much are you getting paid?

17    A.   I'm getting paid what the court pays me, which is $250 an

18    hour.

19    Q.   Are you done with your billing or do you --

20    A.   No, I'm trying to think -- I'm behind.  And I just

21    prepared my November bill and that was, I think, 44 hours.

22    Q.   And then you'll have a December bill as well.  Is that

23    right?

24    A.   Yes, I will.

25    Q.   Now, I looked through your resumé and it really is very
```

1    impressive, but I hinted at this earlier; I didn't see many

2    references to terrorism or al Qa'ida.  You knew you were going

3    to come to testify in a case involving providing material

4    support to terrorism, correct?

5    A.   Yes.

6    Q.   And you provided this resumé to counsel to give to us

7    and -- is that correct?

8    A.   Well, I didn't try to shape my resumé for this trial.

9    Q.   Okay.  So this is your standard academic resumé?

01:44 10   A.   Yes.

11   Q.   And it's 16 pages long, correct?

12   A.   I'm not sure.

13   Q.   And the only references I saw to the issues related to

14   this case are right after 9/11 -- you described you were in New

15   York at the time, actually saw the event -- there were a series

16   of panel discussions in New York --

17           MS. BASSIL:  Objection, your Honor.

18   Q.   -- that you just talked at?

19           THE COURT:  Well, to the form of the question

01:44 20   sustained, at least.

21   BY MR. CHAKRAVARTY:

22   Q.   So right after 9/11 you talked about 9/11 and the impact

23   on Muslims in several panel discussions.  Is that fair to say?

24   A.   That's fair to say.

25   Q.   And you wanted to ensure that civil liberties were

1    protected as the United States goes about trying to deal with a

2    problem which they hadn't fully appreciated, which was

3    terrorism.  Is that fair to say?

4              MS. BASSIL:  Objection, your Honor.

5              THE COURT:  Overruled.

6              You may answer.

7              THE WITNESS:  That was one thing that I was concerned

8    about.

9    BY MR. CHAKRAVARTY:

01:45 10   Q.   Aside from that, I didn't see any other entries on your

11   resumé.  Is it accurate to say you haven't done scholarly work

12   on al Qa'ida or terrorism?

13   A.   Again, I would have to sort of correct you on that because

14   on my resumé you'll see several references to the Islamic law

15   of war.  And so insofar as I deal with the Islamic law of war,

16   I deal with al Qa'ida, right, whether directly or indirectly.

17   Q.   And when you do that, you're talking about doctrinally;

18   you're not talking about the organization of al Qa'ida?

19   A.   I'm not a political scientist; I'm not a sociologist.  I'm

01:46 20   just talking about legal doctrine -- legal and theological

21   doctrine.

22   Q.   And what is the source of al Qa'ida's legal and

23   theological origin?

24   A.   Well, it's basically -- it's unprecedented.  I don't know

25   what to say.  It's a radical extension of traditional Islamic

1    concepts of self-defense.  As I tried to say on Friday, what

2    they did, as you see the 1998 fataawa, is take the concept of

3    defense of --

4    Q.    Dr. Fadel, if I may, I asked you what the source was, not

5    what the interpretation is.  So what is the source of

6    al Qa'ida's religious and theological doctrine?

7    A.    It is a radical rewriting of Islamic laws' doctrine of

8    self-defense.

9    Q.    So who do they point to?  Who do they identify as the

01:46 10   scholars?

11   A.    Basically, themselves.

12   Q.    So you don't know of any references that --

13   A.    No.  I mean, they make references.  They make references

14   to premodern scholars, but it's like in the common law where

15   you cite a precedent and then you try to extend it to a new

16   case.  So that's their kind of reasoning.  They take premodern

17   precedence on defensive war and apply it in a radically new

18   way.

19   Q.    Okay.  Let's --

01:47 20          MR. CHAKRAVARTY:  If we could call up Exhibit 25,

21   please?

22   Q.    Now, this is one of the documents that you talked about on

23   Friday, correct?

24   A.    Yes.

25   Q.    And you looked at this in the Arabic as well as this

 1   version, the English version?

 2   A.   Yes, I did.

 3   Q.   And you know Muhammad bin Ahmad as-Salim?

 4   A.   As-Salim?  No, I don't know who he is.

 5   Q.   Okay.  So you're not aware that he was the editor of *Sawt*

 6   *al-Jihad* magazine?

 7   A.   No, I do not.

 8   Q.   Do you know that *Sawt al-Jihad* magazine --

 9        MS. BASSIL:  Objection, your Honor.  He said he

01:48 10   doesn't know who he is.

11        THE COURT:  Yeah, overruled.

12        Go ahead.

13   BY MR. CHAKRAVARTY:

14   Q.   Did you that *Sawt al-Jihad* magazine was the official

15   communique of al Qa'ida and the Arabian Peninsula?

16   A.   I did not know that.

17        MR. CHAKRAVARTY:  Can we go to page 5, please?

18   Q.   You described many things about jihad.  And in this

19   document does it read, "Therefore, the entire world has

01:48 20   announced its war on terrorism, or rather, on jihad, and its

21   opposition to it and its various forms from being utilized by

22   the Muslims."

23        Did I read that portion correctly?

24   A.   Yes, you did.

25        MR. CHAKRAVARTY:  Can we go to page 7?

1    Q.   And this portion, which is Way Number 1, it says, "Make

2    your intention for jihad, having the inner intention to fight,

3    the true inner intention which leads one to seek and to answer

4    the call of jihad whenever the caller calls."

5         Did I read that correctly?

6    A.   Yes, you have.

7              MR. CHAKRAVARTY:  Go to page 11, please?

8    Q.   And in this passage it says, "And when the word 'jihad' is

9    mentioned, it refers to qital, as Ibn Rushd said, and when the

01:49 10   word 'jihad' is mentioned, it means physically fighting the

11   disbelievers with the sword until they submit or give the

12   Jizyah by their hands while they are in a state of

13   humiliation."

14        Have I read that more or less correctly, barring the

15   Arabic pronunciation?

16   A.   Yes, you did.

17   Q.   And you described qital on Friday, correct?

18   A.   Yes.

19   Q.   You said that was probably a more accurate way to describe

01:49 20   violence used in defense of Islam?

21   A.   Yes.

22   Q.   And, in fact, to Footnote 7 down here, it says "fighting."

23   And that's an accurate definition?

24   A.   Yes.

25   Q.   So is it fair to say that in this document the use of

```
 1    jihad is not some kind of inner striving but it's explicitly

 2    discussing fighting for Islam?

 3    A.    It includes that for sure, yes.

 4    Q.    You were asked whether this document was training

 5    material, and you said that it didn't show anybody how to do

 6    anything.  Is that correct?

 7    A.    That's correct.

 8               MR. CHAKRAVARTY:  Go to page 45.

 9    Q.    Did you read this portion, the "Electronic Jihad" portion?

10    A.    Yes, I did.

11    Q.    And this portion basically describes two methods in which

12    somebody can participate in what they call "electronic jihad,"

13    using discussion boards to do several things and then different

14    hacking methods, correct?

15    A.    Yes, it does.

16    Q.    And some of the things that it discusses on the messaging

17    boards says inciting to jihad and mentioning its virtues,

18    defending the mujahideen, awakening the idea of jihad, and

19    putting out researches and knowledge-based articles related to

20    jihad, is that -- and then one more, going after those who

21    oppose jihad.  Is that more or less accurate?

22    A.    That's correct.

23    Q.    And then in the next part, it actually describes hacking

24    methods.  And let me read this and ask if I've read it

25    correctly.  "As for the hacking methods, then this is what is
```

1    truly deserving of the term 'electronic jihad,' since the term

2    carries the meaning of force, to strike and to attack.   So

3    whoever is given knowledge in this field, then he should not be

4    stingy with it in regards to using it to serve jihad.   He

5    should concentrate his efforts on destroying any American

6    websites, as well as any sites that are anti-jihad and

7    mujahideen, Jewish websites, modernist and secular websites."

8         Did I read that correctly?

9    A.   Yes, you did.

01:51 10   Q.   So it's encouraging the use of kind of hacking techniques

11   against specifically American websites, correct?

12         MS. BASSIL:  Objection.  He can say what's in the

13   document but not its conclusion.

14         THE COURT:  Sustained.

15         MR. CHAKRAVARTY:  Can we go to Exhibit 649, please?

16   BY MR. CHAKRAVARTY:

17   Q.   You were discussing earlier today the defendant's love of

18   books, correct?

19   A.   Yes.

01:52 20   Q.   And first, this portion of the chat does the

21   defendant -- is the defendant asked who Shaykh Isa al-Awshin is

22   and the defendant says, "Of course.  He was one of the editors

23   of Sawt al-J magazine, and he got slain."  Is that what the

24   defendant says?

25   A.   Yes.  Well, it says he was one of the editors of Sawt al-J

1    magazine, nothing about -- oh, he got slain.  Yes.

2         MR. CHAKRAVARTY:  Go to the next page, please?  One

3    more?  One more?  Sorry.  Next page?  And next page?  Next

4    page?  I'm sorry.  My pagination was off.  Next page, please?

5    Next page?  Next page?  Go back to page 9, please?

6    Q.   This is a conversation where the defendant says, "He is

7    starting to see things the right way.  I lent him the 'State of

8    the Ummah' CD, and after he saw it he told me things are much

9    clearer now."

01:54  10       Are you familiar with the "State of the Ummah" CD?

11   A.   Only based on what I heard in this courtroom.

12   Q.   So you never watched it?

13   A.   No.

14   Q.   You don't know what bin Laden calls for in that video?

15        MS. BASSIL:  Objection, your Honor.  He said he's not

16   familiar with --

17        THE COURT:  Sustained.

18        MR. CHAKRAVARTY:  Next page, please?  Next page?  Next

19   page?  Next page?  Next page?

01:54  20  Q.   Now, in this chat the defendant says, "That bookstore

21   where it was published, you see the name?"  And Dan Spaulding

22   says, "Yes, in Yemen."  And the defendant says, "Shukri and

23   Abu Sabaayaa went there."  You're familiar with Abu Sabaayaa as

24   the screen name for the defendant on the Tibyan Publications

25   website?

1   A.   Yes.

2   Q.   Are you familiar that Shukri is Ahmad Abousamra?

3   A.   If you say so.

4   Q.   Okay.  So you don't know?  Okay.

5        "Shukri and Abu Sabaayaa went there to that specific

6   bookstore and some brothers told them that the hard-core

7   Madaakhilah in Yemen, they refer to it as Satan's bookstore."

8   Satan's bookstore.

9   A.   Okay.

01:55 10   Q.   And "Madaakhilah" is the phrase that you referenced

11   earlier as a pejorative term referring to the Saudi scholars --

12   the Saudi Salafi scholars.  Is that fair to say?

13   A.   Basically, the apolitical strand of Salafism, yes.

14   Q.   And this is the defendant referring to them as

15   "Madaakhilah," correct?

16   A.   Yes.  Well, I'm not sure who the "them" is.  Somebody --

17   the hard-core Madaakhilah, I don't know who those are.

18   Q.   And whoever those people are are calling the bookstore

19   that the defendant went to as Satan's bookstore, correct?

01:55 20   A.   Yes.

21        MS. BASSIL:  Can I have the page number?

22        MR. CHAKRAVARTY:  It's on the page.  It's page 14.

23        MS. BASSIL:  No, can I see the page it refers to?

24   Thank you.

25        MR. CHAKRAVARTY:  Okay.  Thank you, Paul.

```
 1   BY MR. CHAKRAVARTY:

 2   Q.   Now, we've been going through so many pages --

 3          MS. BASSIL:  Could we read the rest of that, the next

 4   two lines?

 5          MR. CHAKRAVARTY:  She can do that on redirect, your

 6   Honor.

 7          THE COURT:  Yeah, I think it can be done on redirect.

 8          MS. BASSIL:  This is misleading, your Honor.  I think

 9   the next two lines will make it clear why this is misleading.

10          THE COURT:  Well, let me see it.  Let me see you at

11   the side and I'll look at it.

12          MR. CHAKRAVARTY:  Your Honor, if it will expedite

13   things, I'll read it.

14          THE COURT:  Okay.

15          MR. CHAKRAVARTY:  Can you call it up again?

16   BY MR. CHAKRAVARTY:

17   Q.   The next two lines are, "...instead of its original name,

18   al-Idreesi," and then Dan Spaulding says, "They are

19   ridiculous," correct?

20   A.   Yes.

21          MR. CHAKRAVARTY:  Thank you, Paul.

22   Q.   Now, you were asked about several posts that the defendant

23   wrote on the Tibyan Publications website, correct?

24   A.   Yes, I was.

25   Q.   And are you familiar with Tibyan Publications from prior
```

1    to your involvement in this case?

2    A.    No.

3    Q.    And are you familiar generally with the Salafi-Jihadi

4    websites?

5    A.    No.

6    Q.    So you were given a subset of posts from Tibyan

7    Publications, and you have talked about a few of them in court

8    over Friday and today.  Is that correct?

9    A.    I think I was given whatever was recovered.  I was asked

01:57 10   to look at specific ones, and I think I looked at a little bit

11   more.

12   Q.    Okay.  So when you say "whatever was recovered," you're

13   saying however many were obtained from those websites?

14   A.    Yeah.

15   Q.    So you're aware that there were, you know, several

16   gigabytes' worth of data that were taken from Tibyan

17   Publications, correct?

18   A.    I'm not aware, but it doesn't sound implausible.

19   Q.    So you recognize that that would be thousands of pages of

01:58 20   material?

21           MS. BASSIL:  Objection, your Honor.

22           THE COURT:  Overruled.

23   BY MR. CHAKRAVARTY:

24   Q.    Did you review thousands of pages of --

25           MS. BASSIL:  We were not given thousand of pages of

1    Tibyan.  We only got what the government gave us.  It's unfair

2    to imply that we had access to anything more.  The site was

3    shut down.

4         THE COURT:  The objection is overruled.

5         Go ahead.

6    BY MR. CHAKRAVARTY:

7    Q.   And did you actually go into the website server database,

8    the SQL server database, to extract posts?

9    A.   I only reviewed what was recovered.

01:58 10   Q.   You recognize that the defense had all the posts, correct?

11   A.   Whatever was given to the defense was given to me.

12   Q.   So that was, then, thousands of pages of Tibyan

13   Publications?

14   A.   I don't know.  Like I said, I did not review every single

15   one.  They gave me a flash drive with Tibyan posts.  They told

16   me, "Please review these."  It was long pages -- I think four

17   pages of dates and specific file numbers.  I looked at all of

18   those and then I looked at some others on my own.

19   Q.   So --

01:59 20   A.   It was a sampling.  It was not -- it was not like with the

21   IMs where I went through every single page.

22   Q.   But IMs -- you had all of the IMs?

23   A.   I don't know anything about the comprehensiveness of what

24   was delivered on the flash drive to me.

25   Q.   Which was what I was trying to get to, whether you had all

1    of them or just the ones that defense gave you.

2    A.    I have no way of knowing.

3    Q.    In what form did you have them?  Were they on PDF files?

4    A.    No, they were in a very awkward format of text.  It was

5    very difficult to read, and from time to time I would find ones

6    and I would ask them to convert it into html so it would be

7    easier to read.  And it was a very cumbersome process.

8    Q.    Well, I apologize for that, but it's part of the business,

9    I guess.

01:59 10        Now, you would agree that even in the posts that you read

11   on Friday, that the defendant is very careful about who he

12   believes is an appropriate target of killing --

13             MS. BASSIL:  Objection.

14   BY MR. CHAKRAVARTY:

15   Q.    -- in Islam?

16             MS. BASSIL:  May we be heard at sidebar?

17             THE COURT:  All right.

18             (Discussion at sidebar and out of the hearing of the

19   jury:)

02:00 20        MS. BASSIL:  It was my understanding that this

21   witness -- no witness has been allowed to go into what the

22   defendant believed.  We can talk about what the postings

23   indicate vis-à-vis al Qa'ida or jihad --

24             MR. CHAKRAVARTY:  I'll rephrase the question.

25             THE COURT:  Okay.

1          (In open court:)

2     BY MR. CHAKRAVARTY:

3     Q.   Doctor, I asked that question inelegantly.  You testified

4     about your understanding and the significance that you ascribed

5     to specific posts on the Tibyan Publications that were written

6     by Abu Sabaayaa related to who's a legitimate target of

7     killing.

8     A.   That's correct.

9     Q.   And those posts reflected a supreme respect for Muslim

02:01 10    blood.  Is that fair to say?

11          MS. BASSIL:  Objection.

12          THE COURT:  I'm sorry.  Was there a --

13          MS. BASSIL:  Form of the question.  Objection.  I

14    don't know what --

15          THE COURT:  Overruled.

16          You may have it.

17          THE WITNESS:  Yes, that's a fundamental guiding

18    principle in Islamic law of war, that you avoid shedding Muslim

19    blood.

02:01 20    BY MR. CHAKRAVARTY:

21    Q.   And they also reflected -- those posts reflected that

22    a -- somebody who is either a member of or assisting the

23    American military in -- who's attacking or invading a Muslim

24    country is also a legitimate target?

25    A.   That's correct.

1   Q.   And that includes whether it would be in Saudi Arabia or

2   Iraq or anywhere else where there were U.S. military forces.

3   Is that fair to say?

4   A.   I would disagree with the last portion of your question.

5   It's not -- he doesn't address the idea that -- excuse me.  The

6   writings do not address the status of American military

7   personnel, let's say, in Japan.

8   Q.   Which is not a Muslim country, correct?

9   A.   Which is not a Muslim country.  But your question was

02:02 10   whether they could be targeted anywhere.

11   Q.   Okay.  And so they could only be targeted in Muslim

12   countries?

13   A.   No, it's those that are fighting us.  So if there's a

14   Muslim -- if there's American soldiers in a Muslim country

15   peacefully, then presumably that would be a different story.

16   Q.   And so in Saudi Arabia -- the American presence in

17   Saudi Arabia was a peaceful presence, wasn't it?

18   A.   That's a matter of dispute according to --

19   Q.   Well, was America conducting combat operations in

02:02 20   Saudi Arabia?

21   A.   Yes, but that's the matter of -- that's what's been

22   debated in Saudi Arabia, whether it's legitimate or not.

23   That's the problem.

24   Q.   Right.  But as a matter of fact, America was not

25   conducting combat operations in Saudi Arabia?

1    A.    Again, that's -- this is a matter of characterization.

2    Some people in Saudi Arabia characterize it as an occupation.

3    Q.    Well, I'm just getting to the point of is America

4    attacking Saudi Arabia at any time?

5    A.    No, America did not attack Saudi Arabia.

6    Q.    It was just a military presence there, correct?

7    A.    That's correct.

8    Q.    And Paul Johnson, who you referred to several times in the

9    posts that we read on Friday, he was a contractor -- from what

02:03 10   you read, he was a contractor who was assisting the Apache

11   attack helicopters that the Americans were using in

12   Saudi Arabia, correct?

13   A.    Correct.

14   Q.    So he was not attacking Saudi Arabia, correct?

15   A.    On your definition of "attacking," yes.

16   Q.    Yes, he was not attacking Saudi Arabia under my

17   definition, correct?

18   A.    Yes.  But it's a little more complicated than that, but...

19   Q.    You're an expert.  We're hoping that you can distill

02:04 20   things and make things easier for us.  But what is complicated

21   about whether Paul Johnson was attacking Saudi Arabia?

22             MS. BASSIL:  Objection, your Honor.  This is

23   misleading.

24             THE COURT:  Overruled.

25             THE WITNESS:  Because the underlying issue for many

1    Muslims, particularly in the Arabian Peninsula, is whether or

2    not the presence there was, in fact, legitimate.  For those who

3    believe that it was illegitimate, they then had to ask the

4    question:  Is he a civilian or is he a combatant?

5    BY MR. CHAKRAVARTY:

6    Q.   I understand.  But none of that goes to whether Paul

7    Johnson was -- I'm not talking about the legitimacy of a

8    target, but he wasn't personally attacking any Muslims,

9    correct?

02:04 10   A.   Well, that's not the rule in the law of war, that the

11   soldier has to be personally attacking; it's enough that they

12   are part of the army.

13   Q.   Okay.  So if you're a part of an army that is attacking

14   Muslims, then you are a fair target under the Islamic law of

15   war?

16   A.   As far as I understand it, yes.

17        MR. CHAKRAVARTY:  I'm going to go into another area.

18        THE COURT:  All right.  We'll take the morning recess

19   at this point.

02:05 20        THE CLERK:  All rise for the Court and jury.  The

21   Court will take the morning recess.

22        (The Court and jury exit the courtroom and there is a

23   recess in the proceedings at 11:01 a.m.)

24   (Court in at 11:21 a.m.)

25        MR. CHAKRAVARTY:  Your Honor, instead of wasting the

1  jury's time, I did want to raise this in between the

2  transition.

3        THE COURT:  You mean instead of wasting their time

4  with them here.

5        MR. CHAKRAVARTY:  Correct.  I understand.  Just very

6  quickly, the witness has explained that he has sent

7  correspondence to the defense about the subject matter of his

8  testimony, and the government asks for it.

9        THE COURT:  Yeah.  Let me just say I have read very

02:25 10  quickly the submission the defense made, and I -- so this came

11  up quickly the other day, and now I've read it quickly this

12  morning.  I am inclined to agree with the defense, that Jencks

13  material does not include expert notes.  I haven't looked at

14  the cases.  I'd be interested if the government has any case

15  that says it is.

16        I think the government's argument was based largely on

17  the language of the rule and the absence of any patent

18  exception in Rule 26.  But it seems to me, first of all, that

19  the main interest of the Jencks Act and practice under it is

02:25 20  directed at lay factual witnesses and possible contradictions

21  or inconsistencies in their testimony that would be exposed by

22  the statements and not with the special case of expert

23  witnesses.

24        I think -- I think my -- the defense view, which I'm

25  inclined to agree with, is aided by the existence of a separate

1   disclosure obligation with respect to experts as we have

2   encountered in many occasions in this case.  The Rule 16

3   standards are pretty undefined and certainly in contrast to the

4   civil obligations.  But there is at least a separate obligation

5   under Rule 16.

6       It's not impossible to read the two rules as meaning

7   that Jencks encompasses experts, but I think the sensible and

8   practical view would be that it does not require that an

9   expert's notes and even communications with counsel do not

02:27 10  qualify as the kind of statement the Jencks Act is aiming at.

11  I would be inclined to agree that it's not -- now, if you can

12  find me a case that says the opposite, I will obviously

13  entertain it.

14      MR. CHAKRAVARTY:  We'll put that on the list, I guess,

15  of things to do.

16      THE COURT:  I bet you won't and only because I think

17  this is not the kind of problem that statistically would arise

18  very much.

19      MR. CHAKRAVARTY:  I understand that, your Honor.  One

02:27 20  of the reasons for that probably is that the Rule 16

21  disclosures are more extensive in terms of saying what the

22  witness is going to say and the basis of his opinion.

23      THE COURT:  That's a different problem, which we're

24  going to come to.

25      MR. CHAKRAVARTY:  That's why we perceive this as

1    compounded.  So even if in the regular case -- and I'm not

2    saying it is the rule -- that 26.2 doesn't apply to experts.

3    But if that is the case, then here it's compounded because the

4    703 disclosures and the Rule 16 disclosures were not the

5    witness' statements but rather were purely attorney summations

6    without that underlying basis.

7         The other point on that, your Honor, just to end, is

8    he's referred to notes in terms of emails, which the government

9    would recognize as potentially being more informal than a

02:28 10   report, but if a particular tasking was given to generate a

11   report or something that he deliberated on, that would, I

12   think, more clearly fall within both the Rule 16, 703, as well

13   as 26.2.

14        THE COURT:  Okay.  I don't think -- we can debate the

15   contours of this.  I just illustrate -- I think that even a

16   report like Kohlmann's report, if the government hadn't

17   provided it voluntarily, wouldn't be disclosable under Rule

18   26.2.  I mean, just to dramatize it, an extensive report like

19   that.  The government chose to provide its summary under Rule

02:28 20   16 by giving the fulsome report.  That's fine.

21        But, anyway, so I think Rule 16 is what governs.  It

22   has its issues, and we'll be coming back to those with respect

23   to maybe this witness but certainly other witnesses.  All

24   right.  Let's get the jury.

25        MR. CHAKRAVARTY:  Your Honor, there's -- as Mr. Lyness

1    is going out, if this witness finishes today, which we all hope

2    it will happen -- I think it's realistic -- the government has

3    a Daubert objection to Mr. Williams.

4         THE COURT:  Yes.  We'll entertain that, obviously,

5    before he gets called.

6         MR. CARNEY:  I'd also be requesting the opportunity to

7    update your Honor on what we were talking about on Friday

8    regarding the communications with Abuzahra that occurred during

9    trial.

02:30 10    (Jury in at 11:27 a.m.)

11    CONTINUED CROSS-EXAMINATION BY MR. CHAKRAVARTY:

12    Q.   Doctor Fadel, when we left, we were talking about those

13    circumstances where it's permissible to target American

14    military, and we talked about, in some circumstances, those who

15    were in Saudi Arabia.  Would you also agree with me that

16    American military who are fighting Muslims in Iraq are

17    legitimate targets?

18    A.   From the perspective of Islamic law and war?

19    Q.   Yes.

02:32 20    A.   Yes.

21         MR. CHAKRAVARTY:  Go to Exhibit 410, please, Page 5.

22    Q.   There was a series of posts related to -- I think we've

23    mentioned the Paul Johnson clip several times.  The jury has

24    seen a lot of it.  Miss Bassil asked you about one page.  I'm

25    going to ask you about certain other pages that are already in

1    evidence.

2        First, there's a word here, "Qiblah."  What does that

3    mean?

4    A.   Qiblah is the direction of prayer.  So the Qiblah of

5    Muslims is Mecca.  It's the direction that you face when you

6    pray.

7    Q.   I'll read this portion.  "So I would still like for you to

8    explain to me how these attacks harmed the Saudi government

9    because I can only see how they harmed those who pray toward

02:33 10   our Qiblah, and as a result, the true crusaders had a field day

11   exploiting this by repeatedly pointing out in the press that

12   the mujahideen are succeeding only in killing other Muslims."

13       Would you agree with me that in this context the Qiblah is

14   a more poetic reference where it's not necessarily specifically

15   talking about facing Mecca but rather referring to a path?

16   A.   No, absolutely not.

17   Q.   You're saying that here it is referring to facing Mecca?

18   A.   Well, in Islam literature, another term for Muslims is the

19   people of the Qiblah.  It's just another way of saying Muslims.

02:33 20   Q.   So it's a -- the writer is describing how this harmed

21   Muslims?

22   A.   Yes.

23           MR. CHAKRAVARTY:  Can we go to 419, Page 6?  Go to

24   Page 5 very quickly.

25   Q.   This is Abu Sabaayaa, correct?

 1    A.    Yes.

 2    Q.    And he says, "No, that would necessitate the prohibition

 3    of killing those whom you mentioned, because there are clearly

 4    making war on the Muslims of those respective lands, and as I

 5    mentioned, this causes their pact to be broken and null."

 6          You would agree with me that if people were making war on

 7    Muslims of respective lands, then that would be legitimate

 8    under the Islamic law of war to attack those people?

 9    A.    Could you rephrase?  That was a very complicated question.

02:35 10    Q.    Is it permissible under Islamic law to attack people who

11    are invading Muslim lands?

12    A.    Yes.  In some cases, it would be an obligation to defend

13    yourself.

14          MR. CHAKRAVARTY:  Next page, please.

15    Q.    "Yes, anyone who was in any way helping in the fight

16    against the Muslims, whether they are wearing camo gear or

17    Levi's jeans, is to be fought regardless of whether or not they

18    think they have a pact, because their act of hostility (no

19    matter how small or large) is an automatic nullifier of that

02:35 20    pact as the Islamic Sharee'ah, as well as the human fitrah

21    imply."  Did I read that correctly?

22    A.    Yes, you did.

23          MS. BASSIL:  Your Honor, I object.  This witness did

24    not testify about Aman.

25          THE COURT:  Overruled.

1    Q.    "Similarly, any American or other Westerner who is in the

2    Peninsula doing any type of work that is not contributing to

3    the war effort against Muslims (such as the maintainers of oil

4    fields, civil engineers, etc), then I also do not agree with

5    targeting them and killing them simply because they are

6    Americans.  I support their expulsion, but not their killing.

7         "In contrast, a man such as Paul Johnson was helping in

8    the maintenance and repair of American Apache helicopters.

9    This is, to anyone who has sight with which they can see or a

02:36 10   brain with which they can think a totally different story."

11        You would agree with me in this post the writer agrees

12   that Paul Johnson was a legitimate target under Islamic law?

13   A.    That seems to be a reasonable interpretation of it.

14             MR. CHAKRAVARTY:  Go to Exhibit 423, please, Page 3.

15   Q.    This is also part of the post which I think Miss Bassil

16   referred to as 1263.  Do you recall reading that entire dozens

17   of pages?

18   A.    I'd have to look at it so I could tell you if I recall it

19   or not.  My eyesight doesn't allow me to see it at that level.

02:36 20   Q.    This is Exhibit 423, just an excerpt of that longer post.

21   In it, the defendant writes, "My beloved brother Abu Dujanah

22   and I just had a related conversation, and we agreed to post it

23   here for its clarity and insha' Allah for it being an example

24   of an effort to have a polite and respectful debate without any

25   hard feelings."

1    A.    Yes, I recall reading this chat.

2    Q.    This was a chat which was appended to a post on Tibyan

3    Publications, correct?

4    A.    That's correct.

5    Q.    And you had described earlier your understanding of al

6    Qa'ida's views about various issues, is that right?

7    A.    Yes.  That was based on their official Fatwa.

8    Q.    Based on the 1998 and the 1996 Fatwa, you had formulated

9    your assessment of what al Qa'ida's views are?

02:37 10   A.    That's correct.

11   Q.    So you're not here to say what other people's views about

12   al Qa'ida are, right, what they believed about al Qa'ida,

13   correct?

14   A.    Yes.

15   Q.    So in this portion of this chat, the defendant says,

16   "There's more to informing the kuffar that they are not allowed

17   on the peninsula than Arabic internet statements which many

18   Muslims themselves don't read," to which Abu Dujanah responds:

19   "Nope.  What about Osama's requests?"

02:38 20        The defendant says, "This is understood by many to mean"

21   -- and Abu Dujanah clarifies, Osama's requests "on videotape,

22   many or much of which is translated."

23        The defendant responds, "this is understood by many to

24   mean the MILITARY, not schoolteachers, etc.  In fact, this is

25   what his words are.  That the presence of the military is

 1    disposed.  He never mentioned your average Joe Kaafir working

 2    at an oil firm."  Did I read that correctly?

 3    A.    Yeah.  I think it's "despised" for the purposes of --

 4    Q.    There's a typo there?

 5    A.    Yes, it's a typo.

 6    Q.    You pointed out some of the typos in the Arabic

 7    translations.  There were also typos in the English throughout

 8    the instant message chats that you saw?

 9    A.    Yes.  They're informal.

02:39 10    Q.    They're informal communications.

 11          MR. CHAKRAVARTY:  Next page, please.

 12    Q.    Now, Abu Dujanah is a name which the jury is familiar

 13    with.  Are you aware of who he is?

 14    A.    No, I'm not.

 15    Q.    You don't know that he was --

 16          MR. BASSIL:  Objection.  He says he's not familiar.

 17          THE COURT:  He can remind him.

 18    Q.    Do you know that he's one of the individuals --

 19          MR. BASSIL:  Objection, objection.

02:40 20          THE COURT:  No, overruled.

 21    Q.    -- with whom the defendant discussed this translation

 22    materials for Tibyan Publications?

 23          MR. BASSIL:  Objection.

 24          THE COURT:  You may answer whether you're aware.

 25    A.    I'm not.  There are lots of names in the chats.  I can't

1    remember every single name in every single chat.

2    Q.   That's understandable.  So you're also not aware that he

3    reached out to Abu Dujanah as he was going over on his trip to

4    Yemen?

5              MR. BASSIL:  Objection.

6              THE COURT:  Sustained to that.

7    Q.   So in this portion of the chat, the defendant says, "Yes,

8    that's true, but regardless, after analyzing both arguments,

9    this is the conclusion I came to.  I may be wrong of course,

02:40 10  but I had the other opinion for years.  So I'm not disagreeing

11   out of bigoted blindness.  It just seems to me that when I look

12   at the actions of the prophet and try to apply it to today, I

13   don't see a similarity between what he did and what I am

14   arguing against.  Technically speaking, yes, the blood of all

15   of these kuffar is, in its asl mubaah."  What does "asl" mean?

16   A.   This is getting into technical issues of Islamic law, but

17   asl means the default state in the law.

18   Q.   What does "mubaah" mean?

19   A.   Means that there's no legal liability associated with

02:41 20  shedding it.

21   Q.   "But we need to look at how the Messenger applied this

22   ruling even when he did Jihad at-Talab."  What does "Jihad

23   at-Talab" mean?

24   A.   That means sort of offensive operations.

25   Q.   As opposed to defensive Jihad?

1    A.    Yes, defensive operations.

2    Q.    Defensive would be in defending a Muslim land from a

3    foreign invader?

4    A.    We have to be careful that -- it means slightly different

5    things than modern conceptions, but, yes, generally speaking,

6    that's --

7    Q.    "He generally didn't invade the kuffar without any warning

8    and start killing randomly as far as I know so there was a

9    process.  It wasn't just" -- and then Abu Dujanah interjects,

02:42 10   "Yeah, there is a dispute over whether it's obligatory to do

11   that or not."  The defendant says, "Their blood is mubaah so

12   let's make a slaughter."  Abu Dujanah says, "I agree."

13   A.    Can I interrupt, please?

14   Q.    Yes.

15   A.    Because the way you read that, it's misleading, because

16   "it wasn't just their blood is mubaah so let's make a

17   slaughter."

18   Q.    Well, what --

19   A.    Because that completes the sentence.  You made it sound

02:42 20   like it was a new sentence.

21   Q.    Okay.  I was just trying to read the --

22   A.    I understand.  That's what makes the IMs a very difficult

23   format.

24   Q.    It says, "It wasn't just their blood is mubaah so let's

25   make a slaughter."  So in this portion of the communication,

1    the person who is writing with the Arabic script Faqir

2    al-Allah, is describing that there is a target selection

3    process.  It's not just random killing.

4    A.    That's correct.

5    Q.    Everything -- Abu Dujanah agrees.  "Everything was done

6    for a wisdom."  And Abu Dujanah says, "He chose the best

7    targets, not any other old target, etc.  I agree.  This is from

8    the fiqh and the wisdom gained."

9         And so the defendant then says, "Right.  So this is why I

02:43 10   said if the targets were involved in fighting the Muslims in

11   any way, then I am all for what happened.  But if we are just

12   targeting them because they are kuffar" -- and then down a

13   little bit, "I say illegitimate because of the pact issue."

14   Did I read that correctly?

15   A.    Yes.

16   Q.    So he's saying that targets need to be carefully selected,

17   correct?

18   A.    That's correct.

19   Q.    And on the previous page of the same chat, he describes

02:43 20   Osama's request as being related to military targets?

21   A.    I'm sorry.  Say that one more time.

22   Q.    I'll help you a little.  Let's go back to Page 3.  In here

23   it says -- Abu Dujanah says, "What's about Osama's request?"

24   The defendant says, "This is understood by many to mean the

25   MILITARY, not schoolteachers, etc."

A.    Yes.

     MR. CHAKRAVARTY:  Go to Exhibit 438, please.

Q.    Again, this is another post by the defendant, this one on Tibyan Publications.  And he says, "In any case, akhi, just because one may support and respect Osama bin Laden, does not mean that by default he has to support and agree with every single attack or operation that happens in the world."  Did I read that correctly?

A.    Yes.

Q.    It's not uncommon, is it, that people have disagreements within Islam with regards to how to interpret a specific doctrine?

A.    That's correct.

Q.    In fact, that's part of the debate process that's -- that has come with Islam since -- I think you said from the beginning?

A.    That's right.  It's part of the debate process.

     MR. CHAKRAVARTY:  Thank you, Paul.

Q.    Now, on the Tibyan Publications website, did you see some of the translation work that the defendant had done aside from, "Expedition of Umar Hadeed"?

A.    I saw materials that appeared to be translated.  I have no idea if he translated them or not.

Q.    And you saw materials such as the -- such as, "Such Are the Messengers Tested," something written by Abu Musab Zarqawi?

1    A.    I don't recall seeing that in the Tibyan postings but

2    possible.  I don't recall it.

3    Q.    Do you remember seeing him translating a work by Doctor

4    Ayman al-Zawahiri?

5    A.    No, I don't recall that.

6    Q.    The Expedition of Umar Hadeed video, you saw that this was

7    a publication of al Qa'ida in the Land of Two Rivers, is that

8    correct?

9    A.    It was a video, yes.

02:46 10   Q.    Sorry.  A video publication which clearly said where it

11   was from?

12   A.    It did purport to be from that, yes.

13   Q.    It said it was translated by the brothers at Tibyan

14   Publications, right?

15   A.    It did say that.

16   Q.    It said it was from the media wing of al Qa'ida, correct?

17   A.    I don't remember precisely what it said.

18   Q.    You were asked -- one of the posts the defendant

19   referenced, Wala' and Bara'?

02:46 20   A.    Yes.

21   Q.    Which you loosely translated as, I think, as loyalty and

22   disavowal?

23   A.    Yes.

24   Q.    This is basically the doctrine of determining who one

25   should be -- a Muslim should be loyal to and who they should

```
 1   have enmity for?
 2   A.   I used "disavowal" precisely.  So there's disagreement
 3   about what it means, right?  And so there are different --
 4   that's why I used the more generic term "disavowal" because
 5   there are certain things that Muslims must disavow.  What
 6   precisely that is is a matter of dispute.
 7            MR. CHAKRAVARTY:  Can we call up Exhibit 14A?  This is
 8   one of the documents that was in the defendant's room.
 9   Translation, I should add.  Sorry.
02:47 10   Q.   This is a document called, "Wala' Wal Bara'."  Is that the
11   phrase that we're talking about?
12   A.   Yes.
13   Q.   And it's translated here as loyalty and enmity.  You
14   recognize Imam Shaykh Ayman al-Zawahiri?
15   A.   I know the name, yes.
16   Q.   You recognize him to be the now leader of al Qa'ida?
17   A.   That's what they say, yes.
18   Q.   Just to read the first sentence, "In the end we call our
19   Muslim nation and particularly its youth mujahideen to be
02:47 20   patient and sure, to be patient in bearing the burdens of
21   religion, especially its glorious peak.  Jihad in the path of
22   Allah."  And then there's more scripture that comes after that;
23   is that fair to say?
24   A.   Yes.
25   Q.   You were asked about suicide and how impermissible that is
```

1    in Islam except under certain conditions on a battlefield; is

2    that fair to say?

3    A.    Yeah.  Well, the dispute is whether or not that's suicide

4    but, yeah.

5    Q.    Suicide, as such, is prohibited, yet killing yourself in

6    the battle is something to be revered as a martyr?

7    A.    Not exactly.  The traditional doctrine is that placing

8    yourself in circumstances that will lead to certain death

9    ordinarily is prohibited as an extension of the prohibition

02:48 10   against suicide.  But if you do it for a military advantage,

11   even knowing that there will be certain death caused by the

12   enemy that that doesn't count as suicide.

13   Q.    And it's scenes of that type of self-destruction that were

14   depicted in the Expedition of Umar Hadeed video; is that fair

15   to say?

16   A.    Yes.

17   Q.    And they were targeting American military personnel in

18   Iraq, correct?

19   A.    Certainly by implication.  You didn't see directly

02:49 20   American soldiers or anything.  You saw targets blowing up in

21   the distance, and the claim was these are American military.

22             MR. CHAKRAVARTY:  Can we go to Exhibit 349, please?

23   Q.    Are you familiar with the defendant's email address as

24   ibnul_khattab82@yahoo.com?

25   A.    Yes.

1    Q.   And this message, the translation is, "Peace be upon you,

2    brother Hamza.  Here is the book 'Sahih Mawarid Al-Zam'an'

3    [Authentic Hadiths collection:  Sources for the Thirsty] for

4    Shayikh Al-Albani which was published after his death, may

5    Allah bless his soul, in which suicide operations were ruled

6    permissible.  Cover of the book, then the page where the

7    shayikh talk about this matter."  Did I read that translation

8    correctly?

9    A.   Yes.

02:49 10   Q.   Not -- not necessarily your translation, but it's a -- I

11   read that properly?

12   A.   Yes.  You read the English correctly, yes.

13        MR. CHAKRAVARTY:  Can we go to Exhibit 253, please?

14   A.   Can I read the Arabic since it's there?

15   Q.   I'm not asking you about the accuracy of the translation.

16   A.   Okay.  You read the English properly.

17   Q.   Thank you.

18   A.   Yes.

19   Q.   That's all I asked.

02:50 20   A.   Okay.  I wasn't sure.

21   Q.   So this is a document that the defendant appears to have

22   emailed to almuwahhid@hotmail.com.  Are you familiar with that

23   email address?

24   A.   No.

25   Q.   Are you aware of a person named Ehsanul Sadequee who

1    assisted the defendant on his translations?

2    A.   No.

3         MR. CHAKRAVARTY:   Can we go to Page 2?

4    Q.   Is this document entitled, "The Ruling Regarding Killing

5    One's Self to Protect Information"?  And is this authored by

6    Abdul-Azeez al-Jarboo and Doctor Ayman al-Zawahiri, the leader

7    of al Qa'ida?

8    A.   According to this document, yes.  I'm not familiar

9    independently with the book.

02:51 10   Q.   Let me ask you about this concept of the ruling regarding

11   killing one's self to protect information.  That is not the

12   same as attacking somebody on the battlefield, correct?

13   A.   No.

14        MR. CHAKRAVARTY:   Can we go to Exhibit 351?

15   Q.   This is a post by the defendant to -- looks like a couple

16   of different websites, and there's a blind copy to Ahmad

17   Abousamra.  You recognize that Ahmad Abousamra is a

18   coconspirator in this case?

19   A.   I understand that, yes.

02:51 20   Q.   In this post, the defendant says, "I noticed that your

21   sites are filled with fataawa forbidding the use of 'amaliyyat

22   istishhaadiyyah (martyrdom operations), or what is commonly

23   referred to as 'suicide bombings.'

24        "However, in Volume 2, Page 119 of Saheeb Mawaarid

25   ath-Thimaan, after explaining the popular hadeeth of Abee

1  Ayyoob al-Ansaari, regarding the saying of Allaah Tabaaraka wa

2  Ta'aala:  'Walaa tulqoo bi aydiykum ilat-tahlukah,' Shaykh

3  al-Albaani (raheemahullaah)," and then there's more Arabic

4  said.

5       Then there's a quote.  "And in this popular story is

6  evidence for what is known today as suicide operations which

7  some of the youth of Islam go about doing to the enemies of

8  Allah.  For this act to be permissible are certain conditions,

9  and they are for this action to be solely done for the face of

02:52 10  Allah and to give victory to the religion of Allah, not for

11  showing off or reputation or bravery and being depressed from

12  life."

13       Then the defendant writes, "Is it possible that you could

14  include this on your site or at least in the next editions of,

15  'Terrorism, Suicide Bombings and the Hijackings in Islamic Law'

16  or 'In the Defense of Islam'?"  And then it's signed, "Your

17  brother Tariq."  Did I read that correctly?

18  A.   Yes.

19  Q.   So in this email, the author is asking that a

02:52 20  justification for certain suicides be added to a website?

21  A.   He's asking that the opinion of al-Albani on the

22  conditions in which it's permissible be added, yes.

23            MR. CHAKRAVARTY:  Can we go to 412, please, Page 4?

24  Q.   This is one of the defendants' translations on Tibyan

25  Publications, and it ends, "And because of the word the

```
 1   battalions of suicide fighters will remain, because of it the
 2   word of disbelief will fall underneath the feet of the
 3   mujahideen as Allah has made the word of those who believe the
 4   lowest and the word of Allah the highest until the day of
 5   judgment and this is the significance of the word."  Did I read
 6   that correctly?
 7   A.   Yes.
 8           MS. BASSIL:  Could it be made clear this is not Abu
 9   Sabaayaa's writing?  This is a posting of someone else's
10   writing.
11           MR. CHAKRAVARTY:  I thought I prefaced by saying that
12   this is a translation by the defendant.
13           Can we go to Page 1, please?
14   Q.   It is, "The Importance of the Word, by At-Tibyan
15   Publications," correct?
16   A.   That's correct.
17           MR. CHAKRAVARTY:  Go to the 592, please.  Strike that.
18   Go to 22A, please.  Sorry, 222A.
19   Q.   This is a translation of a document found in the
20   defendant's room.
21           MS. BASSIL:  Objection.
22           THE COURT:  Well, let's have a question.  I guess you
23   can identify it.  If it's in evidence, it's been identified for
24   the record.
25   Q.   Is the title of this document, "The Necessity of Jihad and
```

1    the Virtue of Martydom, The First Matter, Suicide Operations

2    From a Legal Perspective"?

3            MS. BASSIL:  Objection, your Honor.  This is a summary

4    translation.

5            MR. CHAKRAVARTY:  I don't believe so, your Honor.

6            THE COURT:  Well, it's reported as in evidence.

7            MR. CHAKRAVARTY:  We have it in evidence as well, your

8    Honor.

9    Q.   So is this a document about suicide operations from a

02:55 10   legal perspective?

11   A.   I don't know.  I haven't seen the document.  There's just

12   the title, "The Necessity of Jihad and the Virtue of Martydom."

13   Q.   And then, according to this translation, do you see nine

14   different circumstances in which it's permissible?

15           MS. BASSIL:  Your Honor, may we approach sidebar?

16           THE COURT:  Okay.

17   (SIDEBAR CONFERENCE AS FOLLOWS:

18           MS. BASSIL:  Your Honor, this was something -- this

19   was -- if you remember, the government had a screen shot of a

02:55 20   couple of websites.  This is al-Maribi's website.  There's no

21   evidence -- and they pulled stuff to translate, all right?

22   There's no evidence the defendant read it, and it's simply a

23   screen shot.  To pull this out of context as though it's his

24   writing is unfair and misleading.

25           THE COURT:  Yeah.  I don't remember what this exhibit

1   is.

2          MR. CHAKRAVARTY:  I can show the non-translated

3   exhibit.  This was something that he had downloaded onto a CD,

4   his computer.

5          THE COURT:  But the translation was done by a

6   translator?

7          MR. CHAKRAVARTY:  The translation was done by a

8   translator.  That's why I'm talking about the translation

9   because it goes to the --

02:56 10        THE COURT:  What's the point?  What do you want with

11   the witness?

12         MR. CHAKRAVARTY:  Just that the defendant -- excuse

13   me, the witness has said that the defendant's position -- or

14   the writings that he read about the defendant's position on

15   suicide were contrary to that of al Qa'ida.  And there are

16   writings that the defendant has collected or -- and something

17   he's translated which propound that al Qa'ida's position --

18         THE COURT:  You want to ask him whether this is

19   consistent or inconsistent with al-Qa'ida?

02:56 20        MR. CHAKRAVARTY:  I was wary of asking that question

21   in that way.

22         MS. BASSIL:  That's what -- the whole point of this as

23   opposed to -- my point is, even if this was a CD, what was on

24   the CD was a screen shot, not this particular document.  They

25   pulled it off the screen shot.

1          MR. CHAKRAVARTY:  I'm not sure --

2          MS. BASSIL:  If he had a screen shot of CNN on a CD

3    and they pulled off the --

4          THE COURT:  I guess there are screen shots and there

5    are screen shots.  There's the initial and then there's

6    follow-ups.

7          MR. CHAKRAVARTY:  This was the initial screen shot.

8    This is the thing that was in evidence.  It was translated.

9    You can click on things --

02:57 10          THE COURT:  The screen shot itself shows this?  You

11   don't have to go someplace to see it?

12         MR. CHAKRAVARTY:  Right.

13         THE COURT:  He's got a picture of the Arabic version

14   of this?

15         MR. CHAKRAVARTY:  Correct.

16         THE COURT:  Okay.  And?  With this witness?

17         MR. CHAKRAVARTY:  Your Honor, I will move on.  It's

18   not worth the sidebar, frankly.  It's just one more --

19         THE COURT:  Well, as a general matter --

02:57 20          MR. CHAKRAVARTY:  If it's in evidence, I should be --

21         THE COURT:  Showing him stuff so that he can be asked

22   about something so he can add something to the evidence is one

23   thing.  If you're asking him to just read stuff that's already

24   in evidence --

25         MR. CHAKRAVARTY:  It also contradicts some of his

```
 1    conclusions about --
 2              THE COURT:  That's fine.
 3              MS. BASSIL:  Ask him.
 4              THE COURT:  With the witness and not just --
 5              MS. BASSIL:  We're just kind of rehashing the direct.
 6              THE COURT:  Reprise, I think is the word.
 7              MS. BASSIL:  Not rehash.
 8    .  .  .  END OF SIDEBAR CONFERENCE.)
 9              MR. CHAKRAVARTY:  Just for clarification, can we go to
02:58 10   222.  It's the Arabic.
11    Q.   Mr. Fadel, does this appear to be a screen shot of a
12    website?
13    A.   Yes.
14    Q.   Just looking at that screen shot, does it comport to the
15    translation that we just talked about?
16    A.   You have to pull it up for me.  I'm sorry.  My sight.
17    (Reading).
18    Q.   Doctor Fadel?
19    A.   I'm just reading it.
03:00 20   Q.   Still reading?
21    A.   Yeah.  Sorry.  Okay.
22    Q.   Takes quite a while to read even a few lines of Arabic, is
23    that right?
24    A.   Well, I mean, I read a little more slowly than I read
25    English.
```

```
      1   Q.   And you've reviewed thousands of pages in this case?

      2   A.   Yes, I have.

      3   Q.   So if somebody were translating a lengthy document or a

      4   video, it would take a lot of time to translate that

      5   effectively, wouldn't it?

      6   A.   Yeah.  Translation takes a lot of time.

      7   Q.   It's an important -- you've studied long to become

      8   proficient in Arabic, correct?

      9   A.   Yes, I have.

03:00 10   Q.   And you've taught it for several years?

     11   A.   Yes, I did.

     12   Q.   It's an important skill to have, that everybody doesn't

     13   have your level of proficiency, correct?

     14   A.   No.

     15   Q.   Now, did you have access to this document before you --

     16   A.   I don't recall seeing it.

     17   Q.   No, you don't.  S you only got some of the documents then

     18   that the government produced to the defense, is that correct?

     19   You didn't get this one?

03:01 20   A.   I don't remember getting this one.

     21   Q.   If you got this one, would this have affected your opinion

     22   on whether the defendant's writings were consistent with al

     23   Qa'ida's position with regard to suicide?

     24   A.   No, because this doesn't say anything of content.

     25   Q.   I'm just asking whether it --
```

```
 1   A.    No.
 2   Q.    How about the Doctor Ayman al-Zawahiri article about --
 3             MS. BASSIL:  Your Honor, may he finish his answer,
 4   please?
 5             THE COURT:  No.  I think it was all right to limit it
 6   to the yes or no.
 7   Q.    The Ayman al-Zawahiri document on killing oneself to
 8   protect information, would that have affected your opinion?
 9   A.    No.
10   Q.    Now, Doctor Fadel, you're very well-respected law
11   professor.  But, in fact, in this case, you were eager to
12   participate for the defense in this case, weren't you?
13   A.    I don't know what "eager" means.
14   Q.    You were interested in testifying on behalf of the
15   defense?
16   A.    I reviewed the initial documents, and I decided that my
17   participation would be beneficial.
18   Q.    And it wasn't just the money.  And you're getting paid
19   handsomely for your time; is that fair to say?
20   A.    Again, I don't know what "handsomely" means.  Normally, I
21   don't -- I don't ordinarily participate as an expert witness.
22   I've never -- in the times that I have, I've never put in this
23   much time.  So it was quite unexpected.
24   Q.    What other subject matters have you testified in as an
25   expert witness?
```

```
 1   A.   Just in criminal cases or generally?

 2   Q.   Generally.  I think you mentioned polygamy was one of

 3   them.

 4   A.   I testify in matters dealing with usually Islamic family

 5   law, whether in an immigration situation or family dissolution.

 6   I gave an expert affidavit in a recent case in the --

 7   Constitutional case in Canada regarding the status of polygyny

 8   and Islamic law.  But I have also testified in these terrorism

 9   or terrorism-related cases.

03:03 10  Q.   In fact, in the Constitutional case that you referred to

11   in Canada, you were called as an impartial expert, correct?

12   A.   The court called me, but as I said, I think in Canada --

13   actually the government called me.  But the government stated

14   that under Canadian law you act as a -- you act for the courts.

15   Q.   But in this case, you're decidedly acting for the

16   defendant, correct?

17   A.   I was retained by the defense, that's correct.

18   Q.   You don't have any duties of loyalty to the court?  You

19   have a --

03:03 20  A.   I don't know if that's the truth.  I think I have a duty

21   of candor to the court.

22   Q.   That is true.  Truthfulness is obviously --

23   A.   Yes.

24   Q.   But in terms of who's setting the agenda for what you were

25   going to testify about, that was the defense, correct?
```

```
 1              MS. BASSIL:  Objection.

 2              THE COURT:  Overruled.  You may answer.

 3    A.   I wouldn't say that.  I mean, I told them what I read and

 4    what I saw and what I understood.

 5    Q.   So you have been, though, critical of U.S. Government

 6    policy with regards to counterterrorism efforts, haven't you?

 7              MS. BASSIL:  Objection.

 8              THE COURT:  Overruled.

 9    A.   Yes.

10    Q.   You don't agree with what both the Bush Administration has

11    done and some of what the Obama Administration has done,

12    correct?

13    A.   That's too much of a blanket statement, but there are

14    things that I object to, yes.

15    Q.   One of the recent things that you've objected to is Anwar

16    Awlaki's killing in Yemen?

17    A.   Yes.

18    Q.   You were highly critical of that event?

19    A.   Yes.

20    Q.   You've been critical of how much money America spends on

21    counterterrorism, Homeland Security?

22    A.   Yes.

23    Q.   You've also said that a Muslim living in the United States

24    does not have to follow the secular law if it violates Sharia

25    law?
```

```
 1    A.    Well, that's a complicated question.

 2    Q.    Well, have you said that?

 3    A.    Not in so many words, no.

 4    Q.    You have a blog; is that fair to say?

 5    A.    Yes.

 6    Q.    And you have a link to the blog -- on the blog to a

 7    document called, "Cooperate in Furtherance of Righteousness and

 8    Godliness, Not in Sin and Aggression.  Muslim Citizenship in

 9    the Context of the War on Terrorism"?

10    A.    Yes.

11    Q.    You read that recently?

12    A.    Yes.

13    Q.    In it, on Page 2, do you say, "From an Islamic

14    perspective, a Muslim is under an obligation to refrain from

15    complying with secular rule if compliance with that rule would

16    cause him to violate a rule of Sharia, a principle that is

17    expressed in Islamic law by the maxim:  'There is no obedience

18    if obedience entails sin'"?

19    A.    Yes.

20    Q.    How many ways -- as a law professor, you teach the law --

21    incidentally, what type of law do you teach?  Do you teach

22    American law, Sharia law or Canadian law?

23    A.    I teach -- that's a complicated thing.  I teach Business

24    Organizations; I teach The Canon of Business Corporations Act,

25    with a lot of American cases; and American -- Citations to
```

1    American Statutes.  When I teach International Business

2    Transactions, we have cases from multiple jurisdictions and

3    international bodies; Trusts, it's largely the law of the

4    Commonwealth.  And then in my seminar, we do case law from the

5    EU, from the United States, from Canada.  So it's a -- you

6    know, law school is very theoretical.

7    Q.    All around the world.  It is theoretical.

8          One of the ways that law professors operate is they teach

9    classes during the day, and they write, frequently law-review

03:07 10   articles or other kind of journal entries in their spare time,

11   correct?

12   A.    That's correct.

13   Q.    That's why you have a 16-page resume.  You're very

14   prolific; is that fair to say?

15   A.    Not as much as I'd like to be but, yes.

16   Q.    Maybe after this, you will be able to rejoin that.

17         But one of the things you do is you advocate for how the

18   law should develop; is that fair to say?

19   A.    That's correct.

03:07 20   Q.    That's kind of a unique province of the legal scholarship

21   of law reviews and other types of legal journals, correct?

22   A.    Yes.

23   Q.    It's fair to say that you think the laws in America with

24   regards to counterterrorism should be changed?

25   A.    Yes.

```
 1    Q.    You agree that Muslim advocacy organizations are trying in
 2    part to do just that?
 3    A.    Very baby steps, yes.
 4    Q.    And your organization, Muslim Advocates, is one of those
 5    that is trying to increase the dialogue and trying to be -- to
 6    make things better in terms of how the legal -- the legal
 7    framework affects Muslims in particular?
 8    A.    Not just Muslims in particular but, generally speaking,
 9    for all Americans, yes.
03:08 10  Q.    Now, this rationale of -- well, one of the ways that
11    you've voiced your expressed disagreement with American law in
12    this regard is the laws regarding the provision of material
13    support to terrorist organizations, is that right?
14    A.    Yes.
15    Q.    You disagree with how that law has been interpreted in the
16    United States, correct?
17    A.    Yes.
18    Q.    And you've written about that on a couple of occasions?
19    A.    Yes.
03:08 20  Q.    You were very disappointed with a recent Supreme Court
21    finding regarding that law, correct?
22    A.    If you're referring to Holder?
23    Q.    Is that the Supreme Court law that --
24    A.    Yes.  I wrote an article criticizing that decision, yes.
25    Q.    And you recognize that the law at play in that case is one
```

```
 1   of the laws at play in this case?

 2   A.   Yes.

 3   Q.   You don't -- you're not a big fan of that law, are you?

 4   A.   Not that Supreme Court case decision, no.

 5   Q.   Now, the Muslim advocacy organizations that have -- that

 6   have railed against some of the U.S. counterterrorism measures,

 7   they are not consistent with al Qa'ida's position on what to do

 8   with regards to U.S. counterterrorism efforts; is that fair to

 9   say?

03:09 10  A.   Yes.

11   Q.   So advocacy organizations choose to use peaceable

12   democratic institutions to change the law, and al Qa'ida uses

13   violence, correct?

14   A.   Yes.

15        MR. CHAKRAVARTY:  Go to Exhibit 241, Page 2 -- Page 1,

16   first.

17   Q.   Is this a website that -- again, from the defendant's

18   computer, which says, "Why MAS has elements of Riddah."  Is

19   Riddah translated loosely as apostasy?

03:10 20  A.   Yes.

21        MR. CHAKRAVARTY:  Page 2.

22   Q.   Does this read:  "This is a warning to all those brothers

23   and sisters who participate in" -- and it's cut off on the

24   right-hand side for all of these lines -- "in events.  There is

25   good behind MAS and there is also great evil.  The [blank] that
```

1    they unite the Muslims and in some cases it can be very

2    beneficial depending on what they teach.  However, a close

3    analysis of their Aqeedah quickly puts them on the side of the

4    Ahl al-Baatil (the people of falsehood).  For instance, they

5    believe voting is power.  They proudly openly condemn the

6    terrorism of the mujahideen and they are very patriotic

7    particularly for America."  And then it quotes the president of

8    Muslim American Society.

9         It's fair to say that the author of this posting is more

03:11 10   consistent with al Qa'ida's philosophy than with --

11                MS. BASSIL:  Objection.

12    Q.    -- with a --

13                MS. BASSIL:  This is not posted by the defendant.

14                THE COURT:  Well, that objection is overruled.  But go

15    ahead.

16    Q.    You're saying this is not consistent with al Qa'ida's view

17    with regards to Muslim advocacy organizations?

18    A.    Lots of Salafis believe that democracy is a heresy, but

19    they are not part of al Qa'ida.

03:11 20                MR. CHAKRAVARTY:  Go to Exhibit 605.

21    Q.    You recognize, Doctor Fadel, that the defendant is not

22    charged with being part of al Qa'ida, correct?

23    A.    I'm not sure.  I'm not sure of the scope of the large.

24                MS. BASSIL:  Objection.

25                THE COURT:  Well, that answer may stand.  Let's have a

```
 1   question.
 2         MR. CHAKRAVARTY:  Go to the next page, please.  And
 3   next page, next page.
 4   Q.   In this post -- instant message communication between the
 5   defendant and Ahmad Abousamra, the defendant says, "I hate
 6   them."  And Abousamra says, "Yo, but seriously, that Syrian
 7   guy's points regarding how messed up Muslims are in the West,
 8   it's like he read my mind.  Like who?  Like Mahdi Bray?"  The
 9   defendant says, "Like Mahdi Gay.  Man, I usually don't speak
10   about individuals but this guy..."
11         Do you understand Mahdi Bray to be the head of the Muslim
12   American Society Freedom Foundation?
13   A.   Yes.
14         MR. CHAKRAVARTY:  Next page, please.  Next page.  Go
15   back one more.
16   Q.   In the same communication, does the defendant say,
17   "Exactly.  That's what I was saying before."  The defendant
18   says, "I read" -- Abousamra says, "I read in al-Qurtubee or
19   somewhere else."  The defendant says, "The filthiest nation and
20   this is their level of Wala', loyalty."  Abousamra says, "The
21   Jews are better than the Muslims in this regard."  And the
22   defendant says, "You remember what verse?"  Abousamra says,
23   "Since they historically never abandon a captive.  I think it
24   was the verse:  'You ransom them although their eviction was
25   forbidden to you."
```

 1          The defendant then changes the subject and says, "You hear

 2   how the shaykh will release a new statement about

 3   slaughtering?"  Abousamra says:  "Yeah."

 4          THE CHAKRAVARTY:  The next page.

 5          MS. BASSIL:  Objection, your Honor.  What's the

 6   relevance of this?

 7          THE COURT:  I assume we're getting to a question.

 8          MR. CHAKRAVARTY:  We're going to get to a question.

 9   Q.    Then the defendant says, "I hope he does slaughtering of

03:14 10   an infidel in it as a tribute."  This is June of 2006, this

11   communication.

12          Doctor Fadel, is this communication consistent with

13   somebody who is trying to get involved with the civic process

14   of Muslim American Society?

15          MS. BASSIL:  Objection.

16          THE COURT:  Overruled.

17   A.    I don't know because the context is too -- it's a private

18   conversation.  I don't know just from reading a position on

19   civic participation.

03:15 20   Q.    Okay.  You were able on direct to describe what -- just

21   from reading specific chats, what the author meant, but you're

22   not able to figure this one out?

23   A.    Because this doesn't talk about civic participation.

24          MR. CHAKRAVARTY:  Let me go to Exhibit 685.  Go to the

25   next page, please.  Next page.  Next one.

```
 1   Q.   In this one, the defendant sends a link to Ihab, and then
 2   Ihab says -- the link, by the way, is to masnet.org.  Are you
 3   familiar with that being the website of the Muslim American
 4   Society?
 5   A.   It looks like it, yes.
 6   Q.   Ihab says, "Send armies over, one person.  Where are the
 7   days of Mo'tasin Billah?"  What is "Mo'tasin Billah"?
 8   A.   It's referring to a very old incident in Abbasid
 9   Caliphate.
```
`10`
```
     Q.   Sayf Maslool says, "Yeah, compare with that."  Ihab says,
11   "Mercy."  Then Sayf Maslool says, "A Disney movie."  Ihab,
12   "lol.  I like the explanation on torture by the way."  Then the
13   defendant says, "We should send it to MAS."
14        Is this reflective of the author, or whoever says, "We
15   should send it to MAS," as being critical of Muslim American
16   Society's position with regards to the response to what's
17   happening to Muslims?
18   A.   I think it shows a certain amount of disrespect toward
19   MAS, yes.
```
`20`
```
          MR. CHAKRAVARTY:  Go to Exhibit 600.
21   Q.   This is a conversation between the defendant and Ahmad
22   Abousamra.  And Abousamra says, "May Allah destroy CAIR," which
23   do you recognize as the acronym for Council of American-Islamic
24   Relations?
25   A.   Yes.
```

1    Q.   And the defendant says, "What did those suckers say?"

2    Abousamra says, "Something about how they hope with his death."

3    The defendant says, "May they not be cared for."  Abousamra

4    says, "Terror will decrease in Iraq."  The defendant then says,

5    "Heh, well."

6             MR. CHAKRAVARTY:  Next page.

7    Q.   The defendant says, "They are living on another planet, it

8    seems."  And Ahmad Abousamra says, "Islamic army did work

9    against some raafidah that were celebrating lol in honor of the

03:18 10   shaykh."  The defendant says, "Really?  God bless."  The

11   defendant says -- Abousamra says, "I think his martyrdom will

12   lead to unification of the group."  The defendant says, "Good.

13   It's nice to see such loyalty, wala'."

14        This is June 9, 2006.  Are you aware that Abu Musab

15   al-Zarqawi was killed the day before by American forces?

16   A.   That's consistent with my recollection.

17   Q.   He was the leader of al Qa'ida in Iraq at that time?

18   A.   As far as I know.

19   Q.   Would you agree with me that this communication, this

03:19 20   exchange, is reflective of the author's agreement with Abu

21   Musab al-Zarqawi and disagreement with CAIR?

22   A.   I think -- no.  Agreement and disagreement are --

23   Q.   That's okay.

24             MR. CHAKRAVARTY:  Can we go to 734?

25   Q.   Now, in the course of your review of materials from the

1    defendant's computer, did you have a chance to review a video

2    called "Juthath"?

3    A.    Yes.

4    Q.    Juthath literally translates --

5            MS. BASSIL:  Objection, your Honor.  He says he didn't

6    review it.

7            THE COURT:  Sustained.

8    Q.    What does Juthath -- what's the translation of Juthath --

9            MS. BASSIL:  Objection.

03:19 10           THE COURT:  Sustained.

11   Q.    Is this a chat with a person named Taqir on July 11, 2006?

12   A.    Yes.

13   Q.    The defendant say, "Bro, you want to see something?"

14           MS. BASSIL:  I object to this.  If you want to

15   approach sidebar, we can.  But I would object to any

16   questioning on this instant message.

17           THE COURT:  Let me see you.

18   (SIDEBAR CONFERENCE AS FOLLOWS:

19           MS. BASSIL:  It's already been read.

03:20 20           THE COURT:  So what do you want to ask?

21           MR. CHAKRAVARTY:  The next page.  The defendant is

22   advocating what's depicted on Juthath over a statement from

23   CAIR.

24           MS. BASSIL:  Your Honor, just because -- I mean,

25   CAIR -- you can't set it up that CAIR is the opposite of al

1  Qa'ida; and so if he disrespects CAIR he, therefore, is a

2  member of al Qa'ida.  That's not an equal -- you know, it's not

3  an equal equation.  We've been over this before.

4          THE COURT:  I think this is getting --

5          MR. CHAKRAVARTY:  They're painting a picture that the

6  defendant was a social advocate who was merely expressing

7  views.  The whole point is he is critical of those agencies

8  that --

9          THE COURT:  I think you can get that without

03:21 10  necessarily going through the entire thing.  For example, you

11  would show him the text and say, Does he make another

12  disparaging remark about --

13          MR. CHAKRAVARTY:  That's all I was going to do.

14          THE COURT:  You can do that without reading the whole

15  thing.

16          MR. CHAKRAVARTY:  Fair enough.

17  .  .  .  END OF SIDEBAR CONFERENCE.)

18          MR. CHAKRAVARTY:  Go to Page 2, please.

19  Q.   The defendant says, "Okay, get ready, and it ain't a

03:22 20  statement from CAIR."  Then he continues, "This is sick as in

21  sick."  Is it fair to say that this is another disparaging

22  remark about CAIR?

23  A.   Yes.

24  Q.   You don't know what it is that he's referring to, the

25  video that he's talking about?

```
 1   A.   No.
 2        MR. CHAKRAVARTY:  Can we go to Exhibit 778A?
 3   Q.   Did you have an opportunity to review this email exchange
 4   between the defendant and a woman that he was interested in
 5   marrying?
 6   A.   Yes, I did.
 7   Q.   It has several portions.  It talks about his family
 8   biography, personality.
 9        MR. CHAKRAVARTY:  Next page, please.
10   MS. BASSIL:  Your Honor, again, I object to this.
11        THE COURT:  Well, we'll have to wait for a question.
12   Q.   And then future plans.
13        MS. BASSIL:  I object, your Honor.  And I object to
14   any of this being read or discussed.  We've been through this.
15        THE COURT:  Again, I don't know what the question is.
16   I agree that it should not be read, but let's have a question
17   about it if there is one.
18        MS. BASSIL:  I'd ask the screen be taken down in front
19   of the jury, your Honor.
20        THE COURT:  Well, it's in evidence.
21        MR. CHAKRAVARTY:  It's in evidence.
22   Q.   Doctor Fadel, you described the concept of Hijra, correct?
23   A.   Yes, I did.
24   Q.   And Hijra is the migration of a Muslim from one land to
25   another, correct?
```

```
 1    A.    That's correct.
 2    Q.    Is it always from a land where they feel they cannot
 3    practice their faith to a land where they feel they can?
 4    A.    As far as I understand, yes.
 5    Q.    So you're aware that Osama bin Laden and Ayman al-Zawahiri
 6    engaged in Hijra from their respective lands, Saudi Arabia and
 7    Egypt, to go to Afghanistan?
 8    A.    I guess one could describe it as that.
 9    Q.    If they described it as that, would that be accurate?
03:24 10    A.    I did not know they described it as Hijra, no.
11    Q.    Would it be an accurate use of the phrase?
12    A.    I don't -- I'm not sure if it would be because presumably
13    in Egypt you can be a Muslim, and in Saudi Arabia, you can be a
14    Muslim.  They migrated so they could wage war on these various
15    countries.  So I wouldn't call it Hijra.
16    Q.    And you described the difficulties in being a Muslim in
17    the United States in terms of actually practicing your faith?
18    A.    In the eyes of some or many Muslims, yes.
19    Q.    But, now, you're Muslim, and in the United States or in
03:25 20    Canada, do you feel like you cannot practice your faith?
21              MS. BASSIL:  Objection.
22              THE COURT:  Sustained.
23    Q.    Is there a limitation on Muslims engaging in five prayers
24    a day?
25              MS. BASSIL:  Objection.
```

```
 1              THE COURT:  Sustained.
 2    Q.   In this post, 778A, would you agree that the author is
 3    describing the process of Hijra?
 4    A.   Yes.
 5              MR. CHAKRAVARTY:  Can we have this published?
 6              MS. BASSIL:  Well, again, your Honor, what is the
 7    relevance of this?  We've already gone through this.
 8              THE COURT:  Well, go ahead.
 9    Q.   And the author writes, "As any monotheist should, I am
10    counting the days until I can step on a plane out of this
11    country for good."  And that is an expression of that
12    manifestation for desire to engage in Hijra, is that correct?
13    A.   Yes.
14              MS. BASSIL:  Your Honor, I object to this being
15    posted, and I would ask it not be in front of the jury, and I
16    want to be heard on this.
17              THE COURT:  It's already been in evidence.
18              MS. BASSIL:  I would like to be heard.  I ask it be
19    taken down while we discuss this.
20              THE COURT:  All right.
21    (SIDEBAR CONFERENCE AS FOLLOWS:
22              MS. BASSIL:  Your Honor, what is the point of this?
23    This expert is about theology and Islamic law and the
24    defendant's postings.  It's not about his entire life.  It's
25    not about his intent, all right?  That's what the government is
```

1    doing.

2          THE COURT:  Right.  What's the question that goes with

3    this?

4          MR. CHAKRAVARTY:  There's two.  One is:  The purpose

5    of Hijra can be different for different people.  It's not

6    always -- the process isn't the same for --

7          THE COURT:  All right.

8          MR. CHAKRAVARTY:  For him, the government's argument

9    is the purpose of the author of Hijra, as evidenced by the same

03:27 10    statement, is to -- or was at least in 2004, to go to Yemen to

11    get training and "interview" for a company.  And then he was

12    rejected because they didn't vouch -- the purpose of his

13    migration is not any kind of a migration of human beings, which

14    -- and it's -- again, now it's confined to the document, the

15    significance of the document and --

16          THE COURT:  Why does it matter what this witness says?

17          MR. CHAKRAVARTY:  It helps explain that the -- this

18    concept of Hijra is a kind of process of migration as opposed

19    to traveling somewhere for a purpose, a purpose, an Islamic

03:27 20    purpose.  In this case, the government argues the Islamic

21    purpose was to engage in Jihad, which is a legitimate reason to

22    engage in Hijra.  It's why al-Qa'ida engaged in Hijra.

23          MS. BASSIL:  Al Qa'ida never said they engaged in

24    Hijra to go to Afghanistan.

25          THE COURT:  I think this is outside the -- sustained.

1          MS. BASSIL:  Thank you.

2     . . .  END OF SIDEBAR CONFERENCE.)

3  Q.   Doctor Fadel, you were asked about numerous Tibyan

4  Publications posts, and you gave your assessment of the -- how

5  consistent the author's belief appeared to be with al Qa'ida or

6  not al Qa'ida.

7  A.   Well, the writings --

8  Q.   The writings themselves.

9  A.   Yes.

03:28  10  Q.   Not the defendant -- have you met with the defendant?

11  A.   No, I have not.

12  Q.   You're not here to say what he intended on any specific

13  occasion, correct?

14  A.   I'm not a fact witness.

15  Q.   Would the fact that the author of some of those writings

16  traveled to Yemen to get terrorist training -- would that

17  affect your opinion?

18          MS. BASSIL:  Objection.

19          THE COURT:  Sustained.

03:29  20  Q.   Do you recall when the time period of those Tibyan posts

21  were?

22  A.   I believe they were 2005, 2006, 2007.

23  Q.   Did you see any in 2003 and 2004?

24  A.   Not that I can recall.

25  Q.   So these -- all the communications you saw post-date the

1   relevant time period?

2           MS. BASSIL:  Objection.

3           THE COURT:  Sustained.

4   Q.    What's the earliest message that you saw?

5   A.    I can't say for sure.  I'm saying I think early 2005.

6   Q.    Now, Doctor Fadel, I just wanted to wrap up with something

7   I found online yesterday as I was preparing for the

8   cross-examination.  You're not an easy person to cross-examine.

9   You're obviously very informed.  But I did notice that you were

03:30 10   tweeting from the court or at least after the court.  Do you

11   have a Twitter account?

12   A.    I do have a Twitter account, but I can't tweet in court

13   because I don't have my BlackBerry.

14   Q.    So after court, were you tweeting messages about these

15   proceedings?

16   A.    I don't think so.

17   Q.    You didn't send messages that related to the prior

18   testimony as well as your own testimony?

19   A.    I think I might have forwarded a blog entry that was sent

03:30 20   to me.

21   Q.    So you felt it was really important to send a message

22   describing your testimony on Twitter, is that right?

23   A.    No.  It was -- I just -- it was on my Facebook page or

24   something.  I don't remember the details.  I just sometimes

25   forward things without thinking very much.

        1   Q.   But this is -- your testimony here is something you're

        2   proud of, correct?

        3   A.   It's public.  It's something I do.  I usually -- I usually

        4   post on my Facebook and Twitter what I am doing.

        5   Q.   And you want your fans to know -- your followers to

        6   know --

        7   A.   I don't have fans.

        8        MS. BASSIL:  Objection.

        9   Q.   You want the people who follow you on Twitter to know

03:31  10   where you are?

       11        MS. BASSIL:  I'm a fan.

       12   A.   Pardon?

       13   Q.   You want your followers to know where you are and what

       14   you're doing?

       15        MS. BASSIL:  Objection.

       16        THE COURT:  Overruled.  You may answer.

       17   A.   People know that I'm in Boston.  They're curious to know

       18   what I'm doing here.  So it's in the public record.  So I let

       19   them know.  That's it.

03:31  20   Q.   You sent more than one.  You sent several posts about

       21   these proceedings, haven't you?

       22   A.   I don't know.  Maybe -- it can be confusing because the

       23   way Facebook is set up, I have a personal page, and I have an

       24   author page.  They're connected to Twitter.  I'm not sure

       25   exactly how it works.  Somebody else did it for me.  So you

1    send something to one, it get automatically sent to another.

2    I'm not really sure.  There could be multiple messages on my

3    Twitter feed, but they're essentially maybe more or less the

4    same thing.  But they weren't authored by me.  They were just

5    forwarded articles.

6    Q.   But you want people to know what it is that you're doing,

7    correct?

8    A.   I always post my articles, yeah.  I mean --

9    Q.   That's good for your career?

03:32 10   A.   It's not for my career.  It's because I'm interested in

11   disseminating my ideas publicly.

12   Q.   Do you think it's appropriate for a sitting witness to

13   talk about his testimony?

14          MS. BASSIL:  Objection.

15          THE COURT:  Sustained to that.

16   A.   I didn't --

17          THE COURT:  Sustained.

18   Q.   The objection is sustained.

19          MR. CHAKRAVARTY:  That's all I have, your Honor.

03:32 20   REDIRECT EXAMINATION BY MS. BASSIL:

21   Q.   Doctor Fadel, do you know people who disagree with Mahdi

22   Bray and the Muslim American Society?

23   A.   Yes.

24   Q.   And do you know people who disagree with CAIR?

25   A.   Yes.

1    Q.   And, in fact, is the Muslim American Society and CAIR

2    typically older people?

3    A.   Yes.

4    Q.   Does disagreeing with CAIR mean that you agree with

5    everything posted by al Qa'ida?

6    A.   No.

7    Q.   The prosecutor showed you a lot of instant messages.  What

8    do the instant messages show to you?

9    A.   Immaturity.

03:33 10   Q.   What do you mean by that?

11        MR. CHAKRAVARTY:  Objection, your Honor.

12        MS. BASSIL:  He brought it up.

13        THE COURT:  Overruled.  He may answer.

14   Q.   What do you mean by that?

15   A.   Precisely just -- ill-considered comments, not really

16   clear, just sort of rude trash talking that unfortunately is

17   too prevalent among youth in our culture.

18   Q.   You were asked if you disagreed, I think, with the -- with

19   a particular case; the prosecutor asked you about that?

03:34 20   A.   Yes.

21   Q.   Would you explain what you meant by that?

22   A.   Well, I disagreed with the holding in Holder.

23   Q.   What's Holder?

24   A.   Holder --

25        MR. CHAKRAVARTY:  I think he can answer generally, I

1   guess, what it is, but the government has a problem with

2   getting --

3           THE COURT:  No, I don't think this is narrative for

4   the witness.

5           MS. BASSIL:  Sorry, your Honor?

6           THE COURT:  I don't think this is a proper area for

7   the witness.

8           MS. BASSIL:  All right.  I'll move on then.

9   Q.   Mr. -- the prosecutor read something from one of your

03:34 10   blogs about cooperating; do you recall that?

11   A.   Yes, I did.

12   Q.   Can you explain what you meant by that?

13   A.   What I meant by that was I was trying to argue that

14   American-Muslims need to develop a concept of what I call

15   critical citizenship in which they reconcile their moral

16   obligations as Muslims with their moral obligations as

17   citizens.

18   Q.   Could you explain -- the prosecutor asked you if you

19   believed or you had written that people should reject American

03:35 20   law if it contradicts with Islamic law.  Did you write that?

21   Could you explain that?

22   A.   Generally, in Islamic theology, no person can obey a

23   sinful command.  It's the same thing, like, in the American

24   military law, you can't obey -- you have a duty to disobey an

25   unlawful command.  So it's the same idea in Islamic law.

1    So there are certain circumstances where a Muslim might

2  find himself in a situation where he believes that compliance

3  with the law would cause him to commit a sin.  So I was trying

4  to address the situation.

5  Q.  Can you give an example ?

6  A.  Well, for example, if one believes that paying taxes to

7  support an unjust war is a sin, what are the kinds of things

8  you can do as a Muslim to try to -- what are the morally

9  responsible things to do?  I was trying to argue that you have

03:36 10  to think about this question as a U.S. citizen and avail

11  yourself of the opportunities in American law to try to change

12  that situation to resolve a moral contradiction.

13  Q.  Did you advocate:  Just don't pay your taxes?

14  A.  No.

15  Q.  Now, the prosecutor also asked you if you had written

16  something disagreeing with the killing of Anwar al-Awlaki?

17  A.  I don't remember --

18  Q.  What was that about?

19  A.  I don't remember writing an article exactly.  I might have

03:36 20  posted on it -- I think I blogged on it, actually, in which I

21  thought it was a very bad idea.

22  Q.  Why did you think it was a bad idea?

23  A.  Well, that's very complicated.  But essentially, I think

24  again it goes to the disproportionate response of the U.S.

25  Government to religious rhetoric.

```
 1   Q.   You said -- the prosecutor asked you if you disagreed or

 2   you were critical of how much money was being spent by the

 3   United States -- was it in Iraq or in war?

 4   A.   The war on terror, generally.

 5   Q.   Were you critical?

 6   A.   Yes, I was because there was an economic study that showed

 7   that the amount of money that the United States spends on the

 8   Department -- on Homeland Security would only be rationally

 9   justified if there were a 9/11 every single year.

10   Q.   Now, you were asked about a document, and I'm not quite

11   sure of the exhibit number.

12          MS. BASSIL:  I can post it on the ELMO, your Honor.  I

13   believe it already has an exhibit number.  I just didn't catch

14   it.  If we can post this?

15          THE COURT:  Do you know what the exhibit --

16          MS. BASSIL:  Do you know what exhibit it was?  351.

17   Q.   First of all, what was -- can you tell the jury what was

18   the date on this?

19   A.   February 2003.

20   Q.   So this was earlier than the Tibyan posts?

21   A.   That's correct.

22   Q.   I think -- did you read something on Friday or today about

23   how -- there was something about writing where views had

24   evolved?

25   A.   Yes.  I think the prosecutor showed me a posting where
```

that language was used this morning.

Q.   Now, this refers -- this letter refers -- or this email

refers -- there was a reference to al-Albani; do you recall

that?

A.   Yes, I think in that email.

Q.   Who was al-Albani?

A.   He was really one of the major pillars of Salafism in the

20th Century.  I guess one of its giants.

Q.   Was he political or apolitical?

A.   He was apolitical.

Q.   Did he write or talk specifically about suicide in the

battlefield?

A.   I'm not familiar with his writings on that issue, but,

generally, he didn't -- he advised Muslims to avoid political

issues.

Q.   Now, I want to ask you some questions about Exhibit 25,

which is 39 Ways.

        MS. BASSIL:  Your Honor, I'm just going to use the

ELMO on that because it's a little easier for me to handle.

Q.   You were asked first about electronic -- I don't know if

you were asked first, but you were asked about electronic

Jihad --

A.   Yes.

Q.   -- which would have been Page 45; do you recall that?

A.   Yes.

```
 1   Q.   This document doesn't tell you how to hack into websites,
 2   does it?
 3   A.   No, it doesn't.
 4   Q.   And does it tell you how to post on forums?
 5   A.   No.
 6   Q.   Does it tell you what forums to go to?
 7   A.   No.
 8   Q.   Or where -- or how to find them?
 9   A.   No.
03:40 10  Q.   Now, for example, one of the conditions -- one of the --
11   Page 40, Way 27, this says, "Learn to swim and ride horses," as
12   one of the ways to, I think, prepare or participate in Jihad.
13   Is there an Islamic tradition or theology or history concerning
14   swimming and riding horses?
15           MR. CHAKRAVARTY:  Objection, your Honor.  Scope.
16           THE COURT:  Overruled.  You may have it.
17   A.   Yes.  There's a Hadith of the Prophet Muhammad in which he
18   says teach your children swimming, horseback riding and
19   archery.
03:41 20  Q.   Is another way, 28, "Learn first aid," as a way to serve
21   and participate in Jihad?
22   A.   Well, again, I mean, there were reports at the earliest
23   community people would help the soldiers on the front line by
24   giving them water and bandages, et cetera.
25   Q.   And "Learn the Fiqh of Jihad."  What does that mean?
```

```
 1    A.    Essentially learning the law of armed conflict.
 2    Q.    Is this what you've been talking about for the past two
 3    days?
 4    A.    Yes.
 5    Q.    Is your specialty the law of armed conflict?
 6    A.    It's one of the areas of my research, yes.
 7    Q.    Is another one of the ways, No. 37, "Abandon luxury"?
 8    A.    Yes.
 9    Q.    Can you explain, is there a religious or historical
03:42 10   context to this?
11    A.    Yes, asceticism.  Are you living a simple life is an
12    important value in Orthodox Islam.
13    Q.    Another way, 38, "Boycott the goods of the enemy."  Is
14    there a context for that in Islamic law and history?
15    A.    Well, again, the idea is not to support your enemies.  An
16    easy way to do that is not to trade with them.
17    Q.    Number 10, "Pay Zakah."  I'm not getting that right, am I?
18    Can you pronounce that for me?
19    A.    Zakah.
03:43 20   Q.    What is Zakah?
21    A.    Zakah -- it's part of that -- it's one of the Five Pillars
22    of Islam and the obligation on every Muslim of means to
23    basically pay around 2.5 percent of their excess wealth
24    annually to the poor.
25    Q.    Where does that come from?
```

1   A.   The Qur'an.

2   Q.   Number 11 is "Cooperate in treating the wounded."  Is

3   there a basis for that in Islamic law and history?

4   A.   Yes.  Again, I mean, whether they're mujahids or

5   non-mujahids, obviously, you have an obligation to take care of

6   the sick and the wounded.

7   Q.   It also says, "Praise the mujahideen and mention their

8   accounts and call the people to follow in their footsteps."

9   Does that have a basis in Islamic law and theology?

03:44 10   A.   I mean, again, the idea is, if they are mujahideen,

11   they're doing good, and so you should recognize their good.

12   Q.   And the Hadiths, are they accounts of battles fought by

13   Mohammed and The Companions?

14   A.   Not in the first instance, no.

15   Q.   All right.  Are there later Hadiths that are?

16   A.   Well, some Hadiths cover everything.  Like, we talked

17   Friday about how you're supposed to sleep.  That's reported in

18   the Hadith.  But the Hadith could also recount what the prophet

19   did at a certain battlefield, for example.

03:45 20   Q.   Number 19 says, "Supplicate for them."  That's one of the

21   ways to participate and serve in Jihad.  What does that mean,

22   to "supplicate"?

23   A.   That means to say prayers to God to support them.

24   Q.   Is there a basis for that in Islamic law and history?

25   A.   Well, in practice, oftentimes at public prayers, there's a

1    boilerplate -- sorry.  There's a boilerplate supplication at

2    the conclusion of the sermon for God to support the mujahideen

3    generically.

4    Q.   So generically.  Was that prayer said before al Qa'ida

5    ever existed?

6    A.   Yes.

7    Q.   How long has that prayer been said?

8    A.   As far as I know, from the earliest parts of Islam.

9    Q.   So for 1,400 years, there's been a prayer, Pray for the

03:46 10   mujahideen?

11   A.   Yes.

12   Q.   Way 24 says, "Stay connected with the scholars and

13   preachers and inform them of the situation of the mujahideen."

14   Is there -- what does that mean, first of all, "stay connected

15   with the scholars and preachers"?

16   A.   That means maintain a close relationship with, you know,

17   pious figures generally, people who know their religion, right,

18   and preach religion to the people.

19   Q.   And is there a basis in Islamic law and history for the

03:46 20   mujahideen sort of being connected with scholars and preachers?

21   A.   Well, again, if the idea of the mujahid is that he is

22   fighting to defend the religion, then he needs to know

23   something about the religion.  So they need to be in some way

24   connected to people who know something about the religion.

25   Q.   Were there scholars and clerics who accompanied mujahideen

1  to battles?

2  A.   Sure.  In Islamic history?

3  Q.   Yes.

4  A.   Yes.

5  Q.   Why would they do that?

6  A.   Well, I guess lots of different reasons.  One is to boost

7  morale.  One is to help teach them the rules of conflict.  In

8  some cases, they might have been soldiers themselves.

9  Q.   Now, is there also -- I'm sort of looking -- here it is.

03:48 10  Rule -- I'm sorry, 35, "Stand in opposition to the

11  disbelievers."  Do you see that as a way to participate in

12  Jihad?

13  A.   Yes.

14  Q.   What does that mean?

15  A.   Well, it means that Muslims who are living with

16  non-Muslims have an obligation to speak about the truth of

17  Islam; and particularly if those disbelievers are waging

18  aggression against Muslims, they have an obligation to defend

19  them.

03:48 20  Q.   Does that have a basis in Islamic law and history?

21  A.   Yes.  As I mentioned before, Islam conceives of Muslims

22  forming a worldwide spiritual brotherhood in which, you know,

23  you have certain duties of loyalty, love and affection and

24  support.

25  Q.   Now -- so is it fair to say that the 39 Ways had a number

1  -- a large number of ways that had nothing to do with fighting?

2  A.   Yes.

3  Q.   Is that the majority, the minority?

4  A.   I would say it's the majority, yes.

5  Q.   When there -- when the 39 Ways had comments that involved,

6  for example, going for Jihad yourself, was it specific?  You

7  know, Here's where you go?  Here's the street you go on?

8  Here's the bus you take?

9  A.   No.

03:49 10  Q.   How was it phrased?

11       MR. CHAKRAVARTY:  Objection, your Honor.  Just again,

12  beyond --

13       THE COURT:  Sustained.

14  Q.   Is there any specifics in this document about what to do?

15       MR. CHAKRAVARTY:  Objection, your Honor.

16       THE COURT:  Sustained.

17  Q.   How would you describe 39 Ways in terms of its -- in --

18  first of all, is 39 Ways to Serve and Participate in Jihad the

19  type of document that you have seen in sort of Islamic history

03:50 20  and law?

21       MR. CHAKRAVARTY:  Objection, your Honor.

22       THE COURT:  You may answer that.

23  A.   In some ways, yes.

24  Q.   How?

25  A.   It would fall under what I would call exhortational

1    literature.

2    Q.   What does that mean, "exhortational"?

3    A.   In which it discusses the virtues or the good qualities of

4    a certain kind of act, right.  And so it speaks at a high level

5    of generality and abstraction about what an act -- why we know

6    an act is a good thing, and what are the ways that one can get

7    the virtue of that act.

8    Q.   The prosecutor asked you about you testifying in Canada

9    before, correct?

03:50 10   A.   Generally, yes.

11   Q.   And you said that you testified in some criminal cases.

12   What were you asked to do?

13   A.   In one case, there was a terrorism prosecution in Canada,

14   and there was an issue --

15        MR. CHAKRAVARTY:  Objection, your Honor, to the

16   details.

17        THE COURT:  Sustained.

18   Q.   Have you reviewed literature in other cases?

19   A.   Yes.

03:51 20   Q.   And the 39 Ways, you said you described this as

21   exhortational?

22   A.   Yes.

23   Q.   Would you describe it as a training manual?

24   A.   No.

25        MS. BASSIL:  I have no further questions.

1          MR. CHAKRAVARTY:  Your Honor, just a couple.  I'll do

2    it from here to prove it's going to be a couple.

3    RECROSS-EXAMINATION BY MR. CHAKRAVARTY:

4    Q.   You would agree that the 39 -- for the 39 Ways, that there

5    are several ways suggested in which a reader can support the

6    mujahideen?

7    A.   Yes.

8    Q.   When you say "exhortational," "exhort" means to call

9    people to engage in some kinds of action, correct?

03:51 10    A.   In a generic sense, yes.

11          MR. CHAKRAVARTY:  That's all I have.

12          THE COURT:  All right, Doctor Fadel.  Thank you.  You

13    may step down.  You may resume your life.

14          I think we're close enough that we won't start with a

15    new witness.  I will stay with the lawyers for a minute after

16    we excuse the jurors.  Jurors, we'll see you tomorrow morning

17    and continue on.

18    (The jury was excused at 12:48 p.m.)

19          THE COURT:  The government might at least start, if

03:53 20    not finish, addressing the issue of Professor Williams.  Is he

21    here?

22          MR. GROHARING:  He is here, your Honor.

23          THE COURT:  He should be excused then.

24          MR. GROHARING:  I'm not sure if you want to hear from

25    us first, your Honor.

1          THE COURT:  I guess I'd like to hear -- since some of

2     these -- I know some of the pretrial summaries -- the parties'

3     intentions with respect to some of the pretrial summaries has

4     changed in some ways.  I guess I'd like to hear from the

5     defense what it is you think Doctor Williams should or can say.

6          MS. BASSIL:  Okay.  Your Honor, what I was going to

7     have Doctor Williams testify to was -- I was going to have --

8     ask him to testify to the beginnings of sort of these videos,

9     which is actually contrary to what Mr. Kohlmann said in terms

03:54 10   of the history of these sort of Jihadi videos being made.  And

11    I was -- so what he was going to talk about is that they

12    actually came out of Chechnya, and he was going to talk about

13    their use in Chechnya.  And then I was going to ask him about

14    the filming of them and how they were distributed and where he

15    sort of first became involved with them.  And I was going to

16    ask him some questions about Chechnya and about the conflict in

17    Chechnya, his interviewing of mujahideen and prisoners of war

18    in Chechnya and, I believe, in Afghanistan.  And then I was

19    going to ask him about the value of videos as a propaganda

03:55 20   tool.

21         Now, I would point out that Mr. Kohlmann testified

22    that -- he said that one of the more effective ways he talked

23    about is al Qa'ida posting videos, and he talked about how

24    people who saw them would send messages back where they would

25    write back saying, I would like to join.  How can I do this?

1   This was not in Mr. Kohlmann's report, nor was it in the

2   summary the government provided.  I feel that we can discuss,

3   and Doctor Williams would discuss, the issue of videos in terms

4   of sort of recruitment and propaganda.

5         I'm going to ask him about the use of videos

6   increasing with the invasion of Iraq, that they went up in --

7   the numbers went up.  And I'm going to ask him about the ways

8   in which videos were distributed.  Doctor -- Mr. Kohlmann said

9   that they were posted on al Qa'ida websites, and he went on

03:56 10  about these forums and talking about Al Ansar and so forth and

11  Tibyan Publications.

12        Doctor Williams, which -- Doctor Williams will talk

13  about that there are Jihadi videos all over YouTube.  And, in

14  fact -- I'm not going to show videos, but we have screen shots

15  of some of the same videos that the government showed that are

16  on YouTube.  And what, in particular, I'm going to ask him

17  about is whether the videos served as a recruitment tool for

18  people to fight or for soliciting money.  He will testify --

19  and the government knows this.

03:56 20        He's very familiar with the level of internet use and

21  electricity in Afghanistan.  He was there.  He lived there for

22  periods of time.  In Afghanistan and Pakistan, less than 2

23  percent of the population have access to the internet.  So --

24  and they are the largest numbers of recruits in al Qa'ida by

25  country.

1        And what I'm going to ask him about is whether there's

2   been any official studies, whether there's been any studies

3   which tie the showing or watching of videos to actually going

4   to fight.  And he is not only going to say there is no study,

5   but he's going to explain why such a study would be basically

6   impossible.

7        I'm also going to ask him whether he's aware -- and he

8   is -- of videos and video games which shows United States

9   troops killing Muslims, accompanied by music and being shown on

03:57 10   YouTube.  The other thing about the screen shots on YouTube is

11   it shows the number of hits, which indicates how popular they

12   are.  I'm going to ask him if he's aware of -- for example, I

13   think it's, like, maybe 8,000 people that saw a video that the

14   government showed here.  You know, are they aware of how many

15   people went on to fight or donate money to al Qa'ida.  Of

16   course, they can't.

17        This is in direct contradiction really to Mr.

18   Kohlmann's sweeping generalizations and overall view that these

19   videos were critical to al Qa'ida in both solicitation of funds

03:58 20   and in recruitment.

21        Doctor Williams will also testify to the other reasons

22   for videos being made, which actually includes sort of a

23   history of videos being made in the Arab world.  There were

24   videos made, for example, of -- there were videos of Salah

25   ad-Din, sort of recreated Jihadi videos.  There's videos of --

1    a very popular Egyptian video, the Battle of Badr, which was a

2    battle that Mohammed was in.

3            He's going to talk about that sort of background and

4    history and that another reason for these videos is not just --

5    is not recruitment and solicitation but also sort of a way of

6    providing sort of some sense of heros, of winning.

7            I think Doctor Fadel said that Arabs have lost

8    basically -- the Muslim world has lost essentially every fight

9    since the Ottomans took over, something along that nature, and

03:59 10   what these videos provide.  So he's going -- that's basically

11   what he's going to testify to.

12           He's well qualified to do it.  He has written some

13   things on videos.  He writes a lot about Afghanistan and

14   Pakistan.  He has lived there for long periods of time.  And he

15   also has written -- he's written a manual for the United States

16   Army on Afghanistan.  He has worked and has -- he has worked

17   and provided information, I believe, for the U.S. Army.  He's

18   been an advisor and contractor to the CIA.  He's well-qualified

19   to discuss these issues and explain how they work.

03:59 20           MR. GROHARING:  That description is not much different

21   than what was provided before, your Honor.  And I believe your

22   Honor's agreed that it was doubtful whether there was anything

23   that he would have that's admissible -- anything that Doctor

24   Williams would say that would be admissible.

25           It's not clear how any of it is relevant.  Whether or

1    not these videos are effective isn't something the jury has to

2    figure out.  It's what the defendant's intent was when he was

3    translating portions of these videos and then disseminating

4    them or adding the English translation of them.

5            To say he possessed some of these materials -- and

6    that goes to his state of mind.  That's relevant as well, but,

7    again, it doesn't matter whether or not ultimately these videos

8    were successful propaganda materials for al Qa'ida.  It seems

9    that we could get bogged down for a long time trying to figure

04:00 10   out whether or not the propaganda videos are or are not

11   successful.

12           Also, I don't think, contrary to what the defense has

13   said, that Doctor Williams does have this expertise.  If you

14   look at his resume, his writings don't seem to indicate

15   anything about the study of Jihadi videos.  So it's not clear

16   what he will be basing his opinion on, what type of study are

17   we talking about, what type of review that he's done where he

18   could make any of these conclusions.

19           Again, comparing these to other video games and videos

04:01 20   online of U.S. forces that are put to music, I don't think is a

21   worthwhile exercise in front of the jury.  It doesn't really

22   shed light on anything that's at issue in this case.

23           MS. BASSIL:  I wasn't going to show any, just so you

24   know.

25           MR. GROHARING:  In neither event, it wouldn't seem to

1   be relevant to the facts at issue in this case.  I don't really

2   think that the defense has added anything that would kind of

3   advance the relevance of Doctor Williams' testimony.  I think

4   there are significant concerns about what the basis of these

5   opinions are and whether or not he has expertise that would

6   help the jury to decide any facts in this case.  I don't think

7   his testimony is helpful in that respect, and I don't think it

8   should be considered.

9        If it is going to be considered, I think we should be

04:02 10   allowed to explore the basis of his opinions with him prior to

11   his testimony.

12        MS. BASSIL:  Your Honor, he's being offered really to

13   directly rebut Mr. Kohlmann.  Mr. Kohlmann's expertise on

14   videos was that he collected them and watched them.  And I

15   would refer directly to the transcript where Mr. Kohlmann was

16   saying how important and valuable the internet was.  He said,

17   "So the question is:  How does al Qa'ida then manage to make

18   contacts with individuals who are seeking to join it?"  And

19   jumping ahead, he says, "You have them posting videos,

04:02 20   magazines, communicating."  He talked over and over again about

21   the importance of these videos.  He described these videos.

22   The government's shown 21 videos.  Why have we gone into videos

23   if they're not significant?  It seems to me that Doctor

24   Williams' testimony is important in placing the videos in a

25   correct context.  They've been overblown, and it is a direct

1    rebuttal to Mr. Kohlmann.

2         THE COURT:  Well, I think I agree with the government

3    that the success results of the videos as recruitment is not an

4    issue.

5         MS. BASSIL:  Well, what I would --

6         THE COURT:  It's whether any activity by the defendant

7    in particular was pursuant to a conspiracy to provide material

8    support or was an attempt to provide material support even if

9    the attempt, for example, was a failure because no one even

04:03 10   watched them.  So I think the outcome is not an issue for the

11   jury, and the testimony about it would not, in the Daubert

12   language, be helpful -- or the language of the rule, I guess.

13        MS. BASSIL:  Are they material support, all right?

14   The government is saying material support based on what Mr.

15   Kohlmann said about their impact.

16        THE COURT:  Right.  But the question whether they're

17   material support or not is directed at the activity at issue --

18   put in issue by the Indictment and not the success of the

19   video.  So whether they're an effective recruitment tool --

04:04 20        MS. BASSIL:  But Mr. Kohlmann was allowed to testify

21   they were an effective recruitment tool.  He was allowed to

22   testify that people went based on this, which provided directly

23   the issue to the jury that this is material support because

24   they were -- it was an effective tool.

25        I'm not saying that he's going to say that it is or it

1    isn't.  He's going to say there's no way to determine it, and

2    that is in direct rebuttal to Mr. Kohlmann who said they are an

3    effective tool.  They are material support.  We heard that over

4    and over again.

5         THE COURT:  Well, if he says -- well, I don't think

6    that's direct contradiction.

7         Just a couple of other observations, I mean, I don't

8    want to hear -- I don't think we need to hear in the case much

9    about Chechnya or other conflicts.  I don't know how important

04:05 10    the history is.  It seems to me it's not very important about

11    how they were developed.  Maybe you can tell me why because I

12    understood you to say that would be direct contradiction of

13    Kohlmann.  And it might be a minor point.  But I don't think

14    it's worth calling him just for that.  What's -- what

15    difference does an inaccuracy in the history of the

16    development -- what does that mean for us?

17         MS. BASSIL:  For one thing, it's contradicted Mr.

18    Kohlmann as the premier expert on this issue of videos.  He's

19    simply wrong.  Mr. Kohlmann has been wrong about a number of

04:05 20    things.  And I think it's basically impeachment, all right?

21    But that's not the bulk of this.

22         And, your Honor -- so it seems to me that these videos

23    need to -- as I said, the videos should be put in a context,

24    and our view is that the defendant, either translating or

25    linking them to other people or receiving them, is not material

support.  One of the reasons for that has to be, you know, what

was the purpose of these videos?  And I think that Doctor

Williams can provide an alternative purpose to what Mr.

Kohlmann said.

THE COURT:  What would he say the alternative purpose

was?

MS. BASSIL:  He would say they were partly to make al

Qa'ida look better because they had actually hit kind of a

slump after September 11th and after Zarqawi was targeting

civilians in Iraq, okay, which was about 2004 or 2005.

He would also say that they would provide -- they

provided sort of a -- they provided information because, in

fact, the Western press was really not covering what was going

on in the East.  I mean, other witnesses have talked about

that.

He would say that they provided for young Muslims a

sense of winning something as opposed to always losing and

provided a sense of people who were actually fighting and being

soldiers, being sort of brave.  You know, he's not going to

ignore that there was probably some propaganda value in it, but

there's no way to determine -- there's no way to quantify that.

So I think all of this is in direct contradiction to

Mr. Kohlmann, who just waxed on and on and on about how

important these videos were and how they were material support

for al Qa'ida.  In fact, he even used the term, I think, they

1    were "in coordination" with al Qa'ida.  So I think it's very

2    important that the jury be able to hear the other side of these

3    videos.  This is critical to our case.  It's critical to being

4    able to look at not just the one-sided view presented by the

5    government.

6              MR. GROHARING:  Your Honor, frankly, the list that the

7    defense just went through is all consistent with what Mr.

8    Kohlmann said, I believe.

9              MS. BASSIL:  He didn't say this.

04:08 10         MR. GROHARING:  All of these various purposes and uses

11   of videos.  It doesn't seem like it would even contradict his

12   testimony.  Certainly wouldn't add anything new for the jury

13   that's relevant to this case.

14             THE COURT:  Well, I guess I think that's true.  In

15   other words, even the list that you just ticked off:  producing

16   materials for dissemination, which make al Qa'ida look better,

17   which provide information on useful -- to its purposes,

18   boosting morale and so on, those all could be understood as

19   material support.  So it seems to me --

04:08 20         MS. BASSIL:  He can explain -- sorry.

21             THE COURT:  So that -- it doesn't -- I guess that's

22   why I agree with what Mr. Groharing just said.  It doesn't

23   really contradict the government's theory.

24             MS. BASSIL:  It does contradict the government's

25   theory, and it contradicts what Mr. Kohlmann said.  If the

1    government is worried about redundancy, please, your Honor,

2    we've had such a hugely redundantly direct case.  I think it

3    would be very unfair --

4            THE COURT:  No.

5            MS. BASSIL:  It has been redundant.

6            THE COURT:  I'm not interested in the redundancy on

7    this issue.  I just don't see it being -- I mean, I understand

8    the point -- the argument about success rate.  I just don't

9    think it's germane.

04:09 10         MS. BASSIL:  Of course, it's germane, your Honor.  At

11   the very least, the fact that Mr. Kohlmann can get up there and

12   say this is a recruiting tool, there are people who have left.

13   He said that 120 people left, and we've tracked them and 65 are

14   dead, which, by the way, there is no such study; that Doctor

15   Williams can testify, look, you can't quantify this.  This is

16   an overexaggeration.

17           It's very important for the jury to be able to hear

18   that.  And it directly contradicts the government's points of

19   view.  It directly contradicts Mr. Kohlmann over and over

04:09 20  again.  He said -- he's asked:  "How does al Qa'ida use the

21   internet?"  He talks about how effective the videos are, how

22   important the videos are, how they're recruiting tools, how

23   they're also used to solicit money.  And it's in the

24   Indictment, your Honor, this issue of the videos, all right?

25           So it seems to me that we should be able to talk about

 1   essentially what the values of these videos are and what they

 2   mean.  Doctor Williams certainly has experience about these

 3   videos.  He's very familiar with them.  But, you know, Kohlmann

 4   went on endlessly.  In fact, his report, at least half -- I

 5   would say about ten pages of his report is a discussion of

 6   various videos.  And at the end, the government asked him, in a

 7   series of lists, What about this video; what about this video;

 8   what about this video?

 9           It is unfair to imply -- it is unfair to imply that --

04:11 10   it's unfair to imply that these videos are great recruiting

11   tools.  And here it is in the Indictment.  The government

12   alleged "Mehanna agreed with Abousamra that the best

13   recruitment tool was to distribute inspirational media."  So

14   that's the government's accusation.  We're showing that it's

15   not a recruitment tool.

16           MR. GROHARING:  Back to my first point, your Honor,

17   regarding the defendant's intent.  And nothing that Doctor

18   Williams is going to say is going to shed any light on the

19   defendant's intent.

04:11 20           MS. BASSIL:  I'm not talking about his intent.  I'm

21   not talking about the defendant.

22           THE COURT:  That's the issue in the case, though.

23           In sum, I agree with the government.  I think that the

24   proffered testimony of Doctor Williams would not be helpful to

25   the jury on a matter of fact in issue within the meaning of

```
 1  Rule 702.

 2          So, now, I understand for the order of witnesses, Mr.

 3  Spencer and --

 4          MS. BASSIL:  Yes.

 5          THE COURT:  And Mr. -- Doctor Connolly or --

 6          MS. BASSIL:  Yes.

 7          THE COURT:  And then Doctor Sageman?

 8          MS. BASSIL:  That's correct.

 9          THE COURT:  The first two, I think you told me the

10  other day, would be relatively brief.

11          MS. BASSIL:  Right.  Doctor Sageman, my understanding

12  -- and I can talk to him, but my understanding was he was not

13  planning to fly in until tomorrow because we just didn't know

14  how long this would take.  I can talk to him about changing his

15  flight but --

16          THE COURT:  Well, I mean, if the other two are that

17  brief, I think we would get to him.

18          MS. BASSIL:  I can talk to him.

19          THE COURT:  All right.  See what we can find out.

20          MR. GROHARING:  We do have concerns with Doctor

21  Sageman.

22          THE COURT:  Is there anybody else that could be -- you

23  talked maybe there were some others that could be used.

24          MR. CARNEY:  Other witnesses?

25          THE COURT:  Yeah.
```

1          MR. CARNEY:  Well --

2          THE COURT:  This may be a change of circumstances.

3     Let me ask you just to think about that question without

4     answering it off the cuff so you're not committing to anything.

5          MR. CARNEY:  Well, I was hoping to have some time to

6     discuss with the Court the issue that came up regarding

7     Abousamra -- Abuzahra being given promises and inducements in

8     the middle of his testimony by the government.

9          THE COURT:  Yeah.  So we can do that tomorrow if we

04:13 10    have some time?

11          MR. CARNEY:  Well, I'd like to speak to you about it

12    now for a couple of minutes if I could.

13          THE COURT:  Okay.

14          MR. CARNEY:  When we were here on Friday and I brought

15    this issue to the attention of the Court, your Honor asked if

16    the FBI agents involved had written any 302s.  The answer then

17    was no, and I think today the answer remains no because I

18    haven't seen any 302.  So I don't have any official account of

19    what happened.

04:14 20         The parameters are that after Abuzahra's first day of

21    testifying and continuing on several occasions thereafter while

22    he was testifying, he was in contact with, at the least, the

23    two FBI case agents and a victim advocate for the FBI about

24    Abuzahra's concern about being fired from his position.  People

25    were claiming that, based on the testimony offered at the

1    trial, he appeared to be a security threat, and he should be

2    fired from his job.

3         Inducements were given to him; promises were given to

4    him as I read the material.  For example, We'll convey that

5    you're not a security threat, and we'll convey you've been

6    cooperating with us and giving him an inducement before he's

7    even been cross-examined to testify ultra favorably to the

8    government.

9         I asked for a voir dire hearing so that I could call

04:15 10  the witnesses, the FBI agents and others, so we can find out

11    what actually happened.  Your Honor, I think, sensibly

12    suggested why don't we sit down and talk.  So we met at 1:00 or

13    shortly after 1:00 on Friday.  The two case agents were there;

14    Mr. Chakravarty was there; and a legal counsel for the FBI was

15    there.  Others may have been there, but those are the

16    principals.  Attorney Bassil was there.

17         At the outset, Mr. Chakravarty said he was extending

18    this courtesy, as he described it, so that I can find out what

19    the FBI would say so it could help me when I re-call Abuzahra.

04:16 20  I said to Mr. Chakravarty, I have no intention of re-calling

21    Mr. Abuzahra.  I don't think he's a credible or truthful

22    witness, but I do think that the FBI will be.

23         Mr. Chakravarty then said, Oh, we're conditioning your

24    interviewing the FBI witnesses on your not calling them as

25    witnesses.  I said, What if I find out things from them that

1   would be helpful to the defense?  I still can't call them as

2   witnesses because of this procedure we're going through?  He

3   indicated yes.  I said, Well, I'm sorry I wasted people's time

4   because I'm here to find out the truth about what happened.  I

5   believe calling these FBI witnesses will be important to

6   establish that, and I'm not waiving my right to call them as

7   witnesses simply because I'm finding out what they would have

8   said.  So the meeting terminated without advancing the ball in

9   the slightest.

04:16 10        So I'm renewing my request that the Court conduct a

11  voir dire where I'm able to call the people who are involved in

12  this, such as Special Agent Heidi Williams, Task Force Member

13  Tom Daly, a third person from the FBI who's not identified by

14  name but indicated had communications with Abuzahra; Chancellor

15  Martin Meehan of the University of Massachusetts at Lowell, who

16  apparently contacted the U.S. Attorney's Office.

17        I've asked who was contacted by -- in the U.S.

18  Attorney's Office by Meehan, and I've not -- I've been told it

19  was not Carmen Ortiz.  It was not Jack Pirozzolo.  But I've not

04:17 20  been told who it is.  And I'd like to call these witnesses so

21  we can find out exactly what was done in regard to Abuzahra.

22        This began on November 28th.  He testified for four

23  days.  I was not informed of this until December 6th, after he

24  was off the stand.  So this wasn't even something I could raise

25  with the witness while he was still on cross-examination or on

1    recross-examination.  It only was conveyed to me after he was

2    done and gone.

3         So that's why, right now, I want to find out from the

4    percipient witnesses what exactly happened and what the exact

5    chronology is.  And the only vehicle I can do that by is either

6    conducting a voir dire or, I suppose, calling them blind, which

7    I think is very unfair to have me call witnesses where I don't

8    know exactly what they're going to say just because they're not

9    going to tell me what they're going to say.  A voir dire is

04:18 10    necessary, and I'm requesting one, please.

11         MR. CHAKRAVARTY:  The government disagrees with the

12    characterization that Mr. Carney ascribes to the interaction

13    but not, in the broad strokes, the sequence of events.

14         After the defendant -- the witness, excuse me -- was

15    testifying, the government became aware of the sequence of the

16    fact that he had -- during his testimony or during the time

17    period during his testimony, he had raised this concern about

18    consequences to him from his employer.

19         He did not -- and this is where the narratives begin

04:19 20    to differ.  He did not ask for any special favors.  He did not

21    ask for the FBI or for the U.S. Attorney's Office to intervene

22    on his behalf.  However, in an abundance of caution, because

23    that happened while the witness was testifying, the government

24    disclosed that to the defense for the purpose which Mr. Carney

25    alludes to.  So that you --

1       MR. CARNEY:  I object.  Was he still on the stand on

2   December 6th?

3       MR. CHAKRAVARTY:  No, no.  He was not on the stand on

4   December 6th.

5       MR. CARNEY:  Wasn't that the date I got notified?

6       MR. CHAKRAVARTY:  Yes, it was.  My point is this:  If

7   he had known prior to December 6th, while the witness was still

8   testifying, then he would have been in a position to inquire of

9   the witness as to what his state of mind was of whether he

04:19 10   perceived that he had received any promises, rewards or

11   inducements.  That's the operative testimony that the defense

12   would have been able to pursue if they had learned this

13   information as it occurred.

14       There were no promises made to the witness.  There

15   were no inducements.  There was not an assurance that the

16   government, either the FBI or the U.S. Attorney's Office, would

17   contact UMass Lowell.  But as the testimony proceeded and after

18   his testimony, actually, he had indicated that he was going to

19   -- he was being called into a meeting with the university

04:20 20   officials.

21       As that occurred and the U.S. Attorney's Office

22   learned more about the circumstances of the interaction with

23   him, again, in an abundance of caution, we disclosed that to

24   the defense so they could choose whether they would, either

25   before the government rested, have the government re-call Mr.

1    Abuzahra for purposes of impeachment on that issue, which seems

2    the salient, germane issue which has arisen.  And the

3    government would argue it's sufficiently collateral, especially

4    in the absence of a specific promise, reward or inducement.

5         But, more importantly, once the defense made clear, as

6    it did to us on Friday, that the defense has no intention of

7    ever calling Abuzahra back, for credibility reasons or for

8    whatever reasons, then it seems that the only reason why there

9    should be any exploration of this issue would be to determine

04:21 10  whether the FBI agents who interacted with the witness extended

11   a promise, reward or inducement.

12        For that purpose, if something is not memorialized,

13   the defendant essentially was asking for a deposition of the

14   FBI agents on Friday.  There's neither a procedure in the rules

15   for that, nor was that required based on what -- the extent of

16   disclosure which disclosed what the issue was that was germane

17   to the cross-examination of the witness.

18        In any event, once the defense made it clear that they

19   didn't want to call Abuzahra under any circumstances, it wasn't

04:21 20  the government's intention to prevent the defense from calling

21   the case agents on that issue.  If they choose to, they choose

22   to.  However, what a case agent says about an interaction with

23   the cooperator does not -- should not be permitted as

24   impeachment, as a prior inconsistent statement or as a

25   perception of what the cooperator was thinking.  Only the

1   witness can opine as to that.  He hasn't been impeached on that

2   in order to be contrasted with some kind of collateral parole

3   evidence, and this, the government would argue, is a collateral

4   matter.  And for that reason, simply calling as trial witnesses

5   the FBI case agents would not advance the ball to whatever the

6   defense thinks would be germane to its case.

7           More importantly, the chancellor of the university or

8   the U.S. Attorney or the special agent in charge of the FBI are

9   even further removed from what the cooperator -- the witness

04:22 10  who was testifying, whose testimony they are seeking to impeach

11  with this whole episode.  None of their -- none of those three

12  -- the chancellor, the U.S. Attorney or the FBI special agent

13  in charge -- could possibly be used to impeach that witness.

14          In short, there were no communications to the witness

15  to suggest that the government would do anything for him.  The

16  one episode which would lead to the inference that the witness

17  may have perceived something was after the university contacted

18  the witness, the university -- perhaps simultaneously -- I'm

19  not sure of the same time -- around the time same, they also

04:23 20  contacted the FBI, and the FBI articulated to the university

21  that which was a public record at the time, which was that the

22  witness had severed ties with the group, the defendant's group,

23  back in 2004; that the witness had been cooperating with the

24  FBI since 2006.

25          And the primary issue which the university had was:

1    Is there a security risk to the university based on the

2    witness' contact with the defendant back pre- 2004?  And the

3    FBI had articulated to the university that there was no such

4    risk, and it recapped that conversation to the witness but made

5    clear not to promise the witness anything, not to suggest that

6    the witness -- that the government would contact the university

7    on his behalf.  And after his testimony, the FBI then passed

8    the ball to the U.S. Attorney's Office to say, Look, if

9    anything is going to happen with regard to this issue, it will

04:24 10    have to be the U.S. Attorney's Office that decides that.

11         The government has made clear to the defense, and it's

12    now making to the government, the U.S. Attorney's Office has no

13    intention to pursue this matter until after the conclusion of

14    the trial.  We're not going to contact the chancellor's office

15    there.  The chancellor did attempt to contact our office just

16    as it did speak with the FBI special agent in charge.  The call

17    has -- there's been no communication aside from traded messages

18    between our office and the chancellor's office.

19         With regards to the FBI special agent in charge's

04:25 20    communication with the chancellor, he articulated that there's

21    no security threat to the University of Massachusetts and that

22    there's -- they could not comment further on an ongoing trial

23    matter.

24         So there's a bit of a mountain out of a mole hill.

25    It's understandable as to why the defense is pursuing this so

far.  But the solution here is the same solution as would have

occurred if we knew about this and disclosed it immediately on

November 28th.  The defense should be able to ask Abuzahra

questions about his perception of promises, rewards or

inducements.  The defense has now twice indicated they have no

desire to do so.  That's where we are.

THE COURT:  Well, the matter of an extension of a

promise or inducement could be proved through the person to

whom it was extended, but it could also be proved by the person

who did the extending, and it's not necessary to have the

witness.

It strikes me as a small point, but I think we can

have a voir dire of any government agent who communicated with

the witness on the subject and find out what was said.

MR. CHAKRAVARTY:  Your Honor, to that the government

would just say, Why are we doing a voir dire instead of calling

the witness --

THE COURT:  Because we may not call the witness at

all.

MR. CHAKRAVARTY:  That was the government's hope, and

that's why we made them available to the defense.  But the

defense made clear that they're going to do both.  So it's

really a discovery fishing expedition.

THE COURT:  I don't know that they can do both if

there's no evidence to be given.

1          MR. CHAKRAVARTY:  We've given the disclosure, granted,

2     in an attorney letter, but it's a disclosure as to the events.

3     Essentially, we're being compelled to memorialize the

4     interaction.

5          MR. CARNEY:  I'd rather hear from the people who had

6     firsthand knowledge.

7          THE COURT:  I don't think it will take that long.

8     We'll have a voir dire of anyone who communicated directly with

9     Mr. Abuzahra about the matter.  That excludes anybody who was

04:26 10   not involved in direct, whether in the government or out of the

11    government and at the university.  I don't see how any of those

12    people, if they -- well, even if they communicated something to

13    him, it's not an inducement by the government.  All right.  So

14    we'll have a brief voir dire on that.

15         MR. CARNEY:  I think that the voir dire should go

16    beyond that witness, your Honor, because what normally

17    happens --

18         THE COURT:  No.  The only question is whether the

19    witness had an appreciation from something the government said

04:27 20   to him.  That's the scope of an inducement question.

21         MR. CARNEY:  Or what the government would do in the

22    future.

23         THE COURT:  Because of something somebody said to him,

24    not -- the government doesn't have to disclose things that the

25    witness might have imagined.  It does have to disclose promises

1   or inducements it has extended.  And so the question can be --

2   you want to look at it from the extender side, we'll look at

3   whoever was in a position by communicating with the witness to

4   extend.  And if there's something there, we'll see how material

5   it is.

6           One of the reasons for the voir dire is I'll get to

7   see a little bit better whether this is excludable under 403 as

8   too collateral.  It is --

9           MR. CARNEY:  I would like permission to call Martin

04:28 10   Meehan, the chancellor of UMass Lowell, because he may have

11   been in communication with Abuzahra.

12           THE COURT:  It doesn't matter if he was because he's

13   not the government.

14           MR. CARNEY:  But he may be relating what the

15   government told him.  For example --

16           THE COURT:  No.  I won't include him in the voir dire.

17   Call him up and see what he says, but we're not -- we'll have

18   whatever agent or agents tomorrow.  We can do that first thing

19   before the witnesses.

04:28 20           MR. CARNEY:  The chancellor at UMass Lowell, he

21   contacted the office.  It's reasonable to believe that he spoke

22   to Abuzahra.

23           THE COURT:  I don't know whether it is or isn't.  But

24   unless it was an inducement extended by the government, it's

25   not part of our issue even if -- well, whatever was said.  So,

         1    no.

         2           MR. CHAKRAVARTY:  Your Honor, just to clarify, the

         3    third person from the FBI who had contact with the witness was

         4    a victim witness specialist who had contact with him after his

         5    testimony was completed.  The government would argue that --

         6           THE COURT:  I think that's probably right.  It would

         7    have to have affected his testimony when it was given.

         8           MR. CHAKRAVARTY:  So it will be case agents, and

         9    they're here.

04:29   10           THE COURT:  Okay.  We'll be in recess.

        11           MR. GROHARING:  I don't mean to belabor the point

        12    about Doctor Sageman.  I do --

        13           THE COURT:  Before he testifies?

        14           MR. GROHARING:  Yes, your Honor.  And what I don't

        15    want to do is delay proceedings here.  And to the extent we

        16    have the jury in place, delay that by having to conduct a

        17    hearing.  And to the extent that you can make a decision at

        18    this stage that would impact his travel plans so at least we

        19    can at least plan the best that we can to avoid --

04:30   20           THE COURT:  I don't think I would make a decision that

        21    would affect his travel plans.  In other words, I don't think

        22    he would be excluded entirely.  I think there are some issues

        23    with what was disclosed.  Some of which we may have already

        24    dealt with in previous categorical ways about predictions and

        25    indicators and things like that.

```
 1              MR. GROHARING:  Based on the most recent
 2      disclosures -- I know we're going back to the October 18th
 3      disclosures -- that point hasn't seemed to resonate with the
 4      defense.  The most recent disclosure, they no longer included
 5      the social blog, but there are multiple references to the
 6      social discursive network which sounds a lot like the social
 7      blog.
 8              It seems to me that the defense has some impression
 9      that they're going to elicit this testimony from Doctor
04:30 10 Sageman, which was our understanding that those topics were not
11      going to be -- we tailored Mr. Kohlmann's opinion around
12      discussing those types of questions, and we thought that that
13      was going to be the same with the defense.
14              Regardless, we have significant concerns about the
15      data that Doctor Sageman has relied upon.
16              THE COURT:  We'll deal with that sometime, tomorrow --
17      before he testifies, tomorrow, I guess.  If it means we have to
18      take the jury out, we'll do that.
19              MR. GROHARING:  Okay.
04:31 20 (Whereupon, at 1:27 p.m. the trial recessed.)
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3           We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  December 12, 2011

17

18

19

20

21

22

23

24

25