UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,      )
                              )
        Plaintiff,             )
                              ) Criminal Action
v.                            ) No. 09-10017-GAO
                              )
TAREK MEHANNA,                 )
                              )
        Defendant.            )
                              )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY THIRTY-THREE
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, December 13, 2011
9:18 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2       OFFICE OF THE UNITED STATES ATTORNEY
      By: Aloke Chakravarty and Jeffrey Auerhahn,
3          Assistant U.S. Attorneys
      John Joseph Moakley Federal Courthouse
4       Suite 9200
      Boston, Massachusetts  02210
5       - and -
      UNITED STATES DEPARTMENT OF JUSTICE
6       By: Jeffrey D. Groharing, Trial Attorney
         National Security Division
7       950 Pennsylvania Avenue, NW
      Washington, D.C.  20530
8       On Behalf of the Government

9       CARNEY & BASSIL
      By: J.W. Carney, Jr., Esq.
10          Janice Bassil, Esq.
         John E. Oh, Esq.
11       20 Park Plaza
      Suite 1405
12       Boston, Massachusetts  02216
      - and -
13       LAW OFFICE OF SEJAL H. PATEL, LLC
      By: Sejal H. Patel, Esq.
14       101 Tremont Street
      Suite 800
15       Boston, Massachusetts  02108
      On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2                    DIRECT   CROSS   REDIRECT   RECROSS

3   WITNESSES FOR THE
      DEFENSE:
4

5   MARK SPENCER

6     by Ms. Patel            5                      55
      by Mr. Chakravarty             41

7   THOMAS F. CONNOLLY

8     by Ms. Bassil          57
      by Mr. Auerhahn               79
9

10  THOMAS DALY

    Voir dire
11    By Mr. Carney          94

12  HEIDI WILLIAMS

13  Voir dire
      By Mr. Carney         131
14

15                          E X H I B I T S

16

17  GOVERNMENT'S        DESCRIPTION              FOR ID   IN EVD.

    VD-001   Emails between Messrs. Chakravarty and
18           Carney dated 12/9/04                  131

19  VD-002   Email to Mr. Carney from Mr. Chakravarty
             Dated 12/6/11                         131
20

21

22                        (Cont'd)

23

24

25

1              E X H I B I T S

2

  DEFENDANT'S          DESCRIPTION              FOR ID   IN EVD.
3

4  1278-   Documents recovered from defendant
   1279    at airport                                      34
5

   1151-   Images found on defendant's computer            40
6  1177

7  1283    Marked-up copy of transcript of Umar            63
           Hadeed video
8

   1281    Screen shot from Umar Hadeed video              67
9

10 1280    Screen shot from Umar Hadeed video              68

11 1284    Marked-up translated document                   77

12

13

14

15          (The following proceedings were held in open court

16 before the Honorable George A. O'Toole, Jr., United States

17 District Judge, United States District Court, District of

18 Massachusetts, at the John J. Moakley United States Courthouse,

19 One Courthouse Way, Boston, Massachusetts, on December 13,

20 2011.

21          The defendant, Tarek Mehanna, is present with counsel.

22 Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn

23 are present, along with Jeffrey D. Groharing, Trial Attorney,

24 U.S. Department of Justice, National Security Division.)

25          THE COURT:  Good morning, jurors.  Counsel.

1          MR. CARNEY:  Good morning, your Honor.

2          THE COURT:  Who's next?  Miss Patel.

3          MS. PATEL:  Good morning, your Honor.  We'd like to

4     call Mark Spencer, please.

5          THE CLERK:  Sir, you want to step up to the box,

6     please.

7          MARK SPENCER, Sworn

8          THE CLERK:  Please be seated.  State your name and

9     spell your last name for the record.  Keep your voice up and

00:00 10     speak into the mic.

11          THE WITNESS:  Mark Spencer, S-p-e-n-c-e-r.

12     DIRECT EXAMINATION BY MS. PATEL:

13     Q.   Good morning, Mr. Spencer.

14     A.   Good morning.

15     Q.   Would you please tell the jury where you work?

16     A.   I'm the president of Arsenal Consulting, a computer

17     forensics consulting firm in Chelsea, Massachusetts.

18     Q.   What does a computer forensics consulting firm do?

19     A.   We preserve, analyze, and report on electronic evidence.

00:01 20     Q.   What was your educational background before you worked at

21     Arsenal?

22     A.   I have a bachelor of arts in criminal justice from UMass

23     Boston and graduated from the Massachusetts Criminal Justice

24     Training Council's Reserve Intermittent Training Academy for

25     part-time police officers.

1    Q.    Do you have any certifications?

2    A.    I do.  I have a variety of certifications that show

3    aptitude in computer forensics in general, as well as

4    particular tools.  I'm EnCase certified, AccessData certified,

5    ProDiscover certified.  These are all computer forensics tools.

6    I'm also certified by the Digital Forensics Certification

7    Board, which is an organization funded by the National

8    Institute of Justice.  And I'm also QualysGuard certified.

9    Q.    What's the significance of those certifications?

00:02 10    A.    Again, those certifications are meant to test and

11    demonstrate aptitude either in computer forensics in general or

12    in terms of the use of a particular tool.

13    Q.    Do you lecture or teach in this area?

14    A.    I do.  I've taught at Bunker Hill since 2008, Computer

15    Forensics in particular.  I've been a faculty member of the

16    Computer Security Institute since 2003, until the middle of

17    this year.  And I present and teach often at industry events

18    and for attorneys.  I'd say, since 2001, I've taught or

19    presented over 60 times.

00:02 20    Q.    What sorts of cases does Arsenal Consulting typically work

21    with?

22    A.    Primarily civil cases involving corporate litigation.  The

23    types of cases we work on have to do with anything from

24    document forgery, unauthorized monitoring, evidence spoliation.

25    But by far, the most popular type of case we work on is

1    intellectual property theft.

2    Q.   And do you have experience with criminal cases?

3    A.   We do.  It's a very small part of what we do, but we have

4    worked on criminal cases in the past.

5    Q.   Prior to coming to Arsenal, did you work anywhere where

6    you worked with criminal cases?

7    A.   Yes.  Prior to working for Arsenal, I worked for First

8    Advantage Litigation Consulting in their Computer Forensics

9    Division.  Similar to Arsenal, very few of our cases involved

00:03 10   criminal work, but a small number did.  Prior to that, I worked

11   for EvidentData, another computer forensics consulting firm.

12   Prior to EvidentData, I was employed by the Suffolk County

13   D.A.'s Office in Boston, Mass.

14   Q.   What did you do at the Suffolk County District Attorney's

15   Office?

16   A.   I was responsible for information security and assisting

17   with computer forensics.

18   Q.   Let's turn our attention to this case.  When did we retain

19   your services in this case?

00:03 20   A.   January 21, 2010.

21   Q.   Could you explain to the jury what you were tasked to do

22   in January of 2010?

23   A.   In January, we were tasked with the review of forensic

24   images obtained from Tarek Mehanna's home over the course of

25   2006, 2008, and 2009.  Over time, that evolved.  We were tasked

1   with analysis related to forensic images obtained in the U.K.

2   as well as other searches involving internet service providers.

3   Q.   Was some of this data in Arabic?

4   A.   Yes.

5   Q.   How did you work with that?

6   A.   Whether it was because of file type or because of search

7   terms, if we came across Arabic that we thought might be

8   relevant, we would hand that off to an Arabic translator.

9   Q.   Let's begin with the items that came from the Mehanna

00:04 10   home.  Can you just give us a very quick inventory of the

11   hardware that you looked at that came from the Mehanna home?

12   A.   There were three forensic images obtained from Tarek

13   Mehanna's laptop.  Those have been referred to in this case as

14   Dell 2006, Dell 2008 and Dell 2009.  There was also a desktop

15   computer.  There was a floppy disk which came with Dell 2009;

16   CDs, quite a few CDs.  And I believe that's it from the Mehanna

17   home.

18   Q.   Who were the users of the computers or the forensic images

19   of the computers that you looked at?

00:05 20   A.   Dell 2006, Dell 2008, and Dell 2009, which we could also

21   refer to as the "Mehanna laptop," the users over time were

22   Ahmed Mehanna, Tarek Mehanna, admin and second account.  Those

23   were user accounts on that computer.

24        MS. PATEL:  May I use the ELMO, your Honor?

25        THE COURT:  Is it on?

1          MS. PATEL:  Not yet.

2          THE COURT:  Is it on locally to you?

3          MS. PATEL:  Now it is.

4    Q.   Okay.  I'm sorry.  Could you tell me again who were the

5    users of the Dell 2006, Dell 2008, and Dell 2009 from the

6    Mehanna home?

7    A.   Ahmed Mehanna.  It wasn't spelled -- that's correct.

8    Q.   Continue.

9    A.   Tariq.

00:06 10   Q.   T-a-r-i-q?

11   A.   Correct.  "Mehanna," that's another user name.

12   Q.   Okay.

13   A.   "Tariq" is one user name.

14   Q.   I'm sorry.  Yes.

15   A.   "Mehanna" is another; "second account," "admin."  That's

16   it.

17   Q.   So can you tell by looking at the evidence on Dell 2006,

18   2008 and 2009, who was sitting at the keyboard when any

19   particular item comes on the computer?

00:07 20   A.   If you're referring to a physical person, then, generally

21   speaking, no.  We call that putting someone in the seat.  And

22   that can be done in particular circumstances, and the ways that

23   we tend to do that are by using contextual information; for

24   example, was somebody logged into their Fantasy Football

25   account at the same time that they're doing something else

1    that's relevant on the computer; witness accounts, that the

2    person was in front of the computer; sometimes security

3    systems, we have a video footage of someone walking into a

4    cubicle or even sitting at a computer.

5            In terms of what user account was associated with

6    something on the computer, often we can make that connection.

7    It depends on the particular circumstance.

8    Q.   In this case, was there any video footage?

9    A.   Yes.

00:08 10    Q.   I'm sorry.  Video footage of someone sitting at a

11    computer?

12    A.   Not that I'm aware.

13    Q.   For the Dell computers -- I'm just going to call them the

14    "Dell computers" if that's okay -- could you explain why

15    there's a 2006, a 2008 and a 2009?

16    A.   These were forensic images obtained over time during

17    multiple searches.

18    Q.   To be clear, that's of the same computer, is that right?

19    A.   Correct.

00:08 20    Q.   Could you give us a list of what is -- what broadly is on

21    that computer?

22    A.   Very broadly speaking, documents, images, music, program

23    files, videos.  Again, that's very broadly speaking, but that's

24    the type of information on the computers.

25    Q.   Were you here when the government agents from the computer

1    forensics team testified?

2    A.    I believe so, yes.

3    Q.    And do you remember their descriptions of active and

4    inactive space?

5    A.    To some extent, yes.

6    Q.    Could you give us a very brief description of active and

7    inactive space?

8    A.    Active space is also known as allocated space or live

9    space.  Basically, that's where your live files are.  All your

00:09 10   files and folders that you see as a user, they live in active

11   space.

12         Inactive space is the part of the computer where files

13   and folders that have been deleted exist, at least for some

14   time.  Also, information that was never intentionally stored by

15   the operating system or the applications on it can exist in

16   inactive space.

17   Q.    What happens to files in inactive space?

18   A.    Over time, files that exist in inactive space, they can be

19   damaged.  Sometimes that damage occurs to the content of the

00:10 20   files themselves.  Sometimes that damage is to the metadata

21   related to those files.  So what I mean by "metadata" is, for

22   example, the file name of a file.  Over time, as you use your

23   computer, you may still be able to get an image out of your

24   inactive space, but the file name that was associated with it

25   may have gone away or vice versa.  It could be you can find the

1  file name for something that you deleted and was in inactive

2  space, but over time, the content was overwritten so you can no

3  longer get the content back.

4  Q.    Can you tell us what "web browser cache" is?

5  A.    Web folder cache refers to, generally, a file or a folder

6  where a web browser stores -- quietly stores, because a user is

7  often unaware, elements of a web page as you view it.  In

8  theory, that speeds up your browsing experience because the

9  next time you go to that web page, it's going to load some

00:11 10  components from your computer instead of pulling them across

11  the internet.

12  Q.    So were you here when I held up the Boston Globe, and I

13  showed it to the government agents?

14  A.    Yes.

15  Q.    And do you agree with -- I believe it was Special Agent

16  Swindon, or Scripture, that an image at the bottom of that page

17  for an article that a user may not have looked at could

18  automatically be saved to a computer?

19  A.    That's -- the question is a little confusing.

00:12 20  Q.    Okay.  Well, let me rephrase it then.  Do you agree

21  when --

22  A.    The user may or may not have looked at the image.

23  Q.    So a user may not have looked at it, but the image could

24  save in the web browser cache?

25  A.    That's correct.

1    Q.    Turning to the Mehanna computers, can you tell us how much

2    total in gigabytes there was on each of the three forensic

3    images?

4    A.    Dell 2006, Dell 2008, and Dell 2009 had 20 gigabyte hard

5    drives.  That's about 60 gigabytes total.

6    Q.    So for a noncomputer savvy person like myself, can you

7    explain, if we were to print all that out, how much volume are

8    we talking about?

9    A.    There's a study from the University of California,

00:12 10   Berkeley, which equates a gigabyte of electronic information

11   with a pickup truck full of books.  That's a very rough analogy

12   because it really depends on what type of data you're talking

13   about.

14         So in this scenario, with 60 gigabytes of data, we

15   would be talking about approximately 60 pickup trucks full of

16   books.

17   Q.    That's just in the Dell 2006, 2008 and 2009 computers?

18   A.    That's correct.

19   Q.    We also heard prior testimony in the government's case

00:13 20   that it would be impossible to review all of that data.  Do you

21   agree with that assessment?

22   A.    It's theoretically possible for someone to review all of

23   that information.  I would say it's practically impossible.  If

24   you expand the amount of information passed just the Mehanna

25   laptop in this case to all the electronic information in this

1    case, there's over 700 gigabytes of information just in

2    forensic images alone.  So there's a little bit of math here,

3    but if -- 700 gigabytes of electronic information is the

4    equivalent of 70 million pages, which is a rough approximation

5    and it took someone two minutes to review each page of

6    information, that would be over 250 years for someone to

7    actually review every one of those pages.

8    Q.   You said approximately 250 years, is that right?

9    A.   Again, referring to all of the forensic images in this

00:14 10  case.

11   Q.   What was the earliest date of any file that you found on

12   the Dell 2006 computer?

13   A.   The earliest active file on the Dell 2006 computer was

14   dated January 2006.  The earliest user activity that we

15   recovered from that machine was January 2005.

16   Q.   How could there be activity recorded before there was a

17   file saved on the computer?

18   A.   There was a prior installation of Microsoft Windows on

19   that laptop.  The primary user was one that did not exist in

00:15 20  the latter or current version of Microsoft Windows, which was

21   Ahmed Mehanna.  And that user activity for that account started

22   in January of 2005.

23   Q.   Are you aware that Ahmed Mehanna is Tarek Mehanna's

24   father?

25   A.   I am.

1    Q.   I'd like to use now a chalk that I have shared already

2    with the government.  If we can just talk very briefly about

3    the images that you looked at of the Dell 2006 computer.  Can

4    you tell us, is this a chart that you're familiar with?

5    A.   I am.

6    Q.   Can you tell us, from the Dell 2006 computer, how many

7    government exhibits that were images were introduced as

8    evidence?

9    A.   Okay.  Just to be clear here, we're referring to images as

00:15 10   in pictures that we look at that were on the forensic images of

11   Dell 2006, 2008 and 2009.  So for Dell 2006, there were 158

12   government exhibits of images or pictures.

13   Q.   How many of those 158 came from the inactive part of the

14   computer?

15   A.   151.

16   Q.   And how many of those have thumbnail dimensions?

17   A.   95.

18   Q.   Can you tell the jury what thumbnail dimensions are?

19   A.   Thumbnails are generally defined as a very small image.

00:16 20   It typically has dimensions of 200-by-200 pixels or less.

21   That's just a technical way of saying they're small images.

22   The vast majority of images found in web folder cache are of

23   thumbnail dimension size.

24        So when we come across thumbnails, it's interesting to

25   us in the sense that if we're talking about web folder cache,

1  these are images that have been saved quietly by the browser as

2  opposed to the user taking any type of overt action to store

3  them on their computer.

4       MS. PATEL:  May we have Exhibit 72, please?  Thank

5  you.

6       THE COURT:  From the government's computer?

7       MS. PATEL:  I think.  Yes, if that would be okay with

8  you.  Thank you.

9  Q.   Do you recognize this exhibit, Mr. Spencer?

00:17 10  A.   I do.

11  Q.   Can you explain why this -- the bottom part of it looks

12  grainy like this?

13  A.   This image appears to be partially overwritten.

14  Q.   What does that mean?

15  A.   Some people would -- another term you could use is

16  "corrupt."  Basically, what can happen to an image in inactive

17  space over time is that part of the content can be overwritten.

18  You can recover some but not all.  So this appears to be an

19  image where part of the image was recovered from inactive

00:18 20  space.

21       MS. PATEL:  Can we have Exhibit 121, please?

22  Q.   Can you explain why the bottom part of that picture is

23  gray?

24  A.   I would say for the same reason.  That appears to be a

25  partially overwritten image, recovered from inactive space.

1          MS. PATEL:  You can take that down.  Thank you.

2     Q.   Can you explain the significance to us of why those two

3     documents appear to be incomplete or messed up or corrupted,

4     whatever word we want to use?

5     A.   The significance would be simply that they're not

6     complete.  They're not intact.

7     Q.   What does that say about the context of those documents?

8     A.   In a vacuum, it just says that those files are incomplete.

9     Q.   Can you give us an example from the physical world,

00:18 10    noncomputers, to how we would be able to interpret those

11    documents?

12    A.   One analogy you might use -- I'm referring to inactive

13    space in documents or images recovered from inactive space --

14    might be:  If there's a Dumpster behind your apartment and I

15    walked over that Dumpster and pulled out a photo that was

16    crumbled and ripped, if, when I pull that photo out and I look

17    at it, I'm not going to know who took the photo.  I may not

18    know what that photo depicts.  I may not know what happened to

19    it in between when the photo was taken and when it ended up in

00:19 20    the Dumpster.  I may not know who threw it into the Dumpster.

21         The reason I'm, in part, that I'm using that analogy

22    is because inactive space is also generally associated with the

23    recycle bin on Microsoft Windows.  So that analogy may make

24    sense.

25         MS. PATEL:  Can I have the ELMO again, your Honor,

1      please?

2      Q.    Turning our attention to the 2008 forensic image, can you

3      tell us how many government image exhibits came from the 2008

4      computer?

5      A.    Eight.

6      Q.    And how many of those were in inactive space?

7      A.    Seven.

8      Q.    How many had thumbnail dimensions?

9      A.    One.

00:20 10   Q.    And, finally, 2009, how many government exhibits came from

11     -- image exhibits were government exhibits in the 2009

12     computer?

13     A.    Three.

14     Q.    And how many of those were from inactive space?

15     A.    One.

16     Q.    And how many had thumbnail dimensions?

17     A.    Three.

18           MS. PATEL:  Can we go, please, to Exhibit 779C?

19     Q.    There's obviously been a lot of electronic evidence in

00:20 20   this case.  So I'm just going to ask you very few questions

21     about just a few things.

22           MS. PATEL:  779C.  Thank you.

23     Q.    Mr. Spencer, do you recognize this document?

24     A.    I do.

25     Q.    Is this the Sawt al-Jihad document?

1   A.   Yes.

2   Q.   Did we ask you to do forensic analysis about where this

3   document came from on the Mehanna computer?

4   A.   Yes.

5   Q.   And can you tell us -- explain what you did to perform

6   that analysis?

7          MR. CHAKRAVARTY:  Objection, your Honor.  Can we be

8   heard?

9          THE COURT:  All right.  I'll see you.

00:21 10   (SIDEBAR CONFERENCE AS FOLLOWS:

11          MR. CHAKRAVARTY:  Your Honor, obviously, this witness

12   is a computer forensics expert.  The government understands

13   what they do because we've heard a lot of testimony, and the

14   government has no objection to allowing the other side to do

15   this.  This seems to be a specific examination or a test that

16   the witness has done that the government has received no notice

17   of, no analysis of, no way to confirm or deny any of what the

18   witness is about to talk about with regards to whatever he's

19   going to say about this.

00:22 20          The truth is, we don't know what he's going to say

21   about anything.  We've just been given exhibits that he is

22   going to talk about, but I don't know what he's going to say

23   about them.  It's clear from Miss Patel that this was some type

24   of specific examination or testing which is designed to --

25          MS. PATEL:  Your Honor, these are the government

1    exhibits.  Their agents would have done the very same, I would

2    hope, analysis where on the Dell computer it came from.  I'm

3    just going to ask him where did it come from.  Did Mr. Mehanna

4    ever open it?  That's all.

5          MS. BASSIL:  We've also told the government on many

6    occasions this file was never unzipped.

7          MS. PATEL:  In fact, I think it's in a pleading.

8          MS. BASSIL:  It is in a pleading.

9          MR. CHAKRAVARTY:  How do we know that?

00:23 10          MS. BASSIL:  We've told you.  You've heard it many

11   times.

12          MS. PATEL:  And it's in a filing.

13          MR. CHAKRAVARTY:  This witness is going to testify

14   apparently to the metadata related to this.

15          MS. PATEL:  He is going to explain how he figured out

16   where it was.

17          MR. CHAKRAVARTY:  Shouldn't we get the data to be able

18   to --

19          MS. PATEL:  You have four forensic agents that should

00:23 20   have done that.  I mean, I'm not clear.  It would be different

21   if it were a defense exhibit that they've never seen before,

22   but it's a government exhibit that's been talked about multiple

23   times now.  It's been introduced into evidence.  All we're

24   doing is having the counterpart to the government agent tell us

25   whether or not -- where it came from on the computer.

1          THE COURT:  I don't know that I've seen the -- because

2     I don't think it's been as much in controversy as some of the

3     other expert witnesses' disclosure on Spencer.

4          MR. CHAKRAVARTY:  It was basically he's going to be a

5     computer forensic expert.

6          MS. BASSIL:  That was the disclosure we got on their

7     computer forensic people.

8          MR. CHAKRAVARTY:  As well as their report?

9          THE COURT:  So it was general?

00:24 10        MS. BASSIL:  And so was theirs.

11         MR. CHAKRAVARTY:  Our disclosure was general, but we

12     also gave you --

13         MS. BASSIL:  Only on the U.K. people.

14         MR. CHAKRAVARTY:  That's not true.  We gave the

15     forensic examination reports on the CART specialists as well.

16     I should add, they didn't testify to a specific analysis of

17     whether something was opened or not.  They said this stuff was

18     on the computer.  This is where it was on the computer.

19         MR. CARNEY:  Your Honor, we have told the government

00:24 20   time and time again that we would be offering this evidence.

21     This is the only witness that it would be offered through.  We

22     said explicitly, The evidence will show Tarek never opened

23     this.  The government could turn to one of its many forensic

24     experts and say, Did Tarek ever open this?  They may be able to

25     reach the same conclusion.  It was -- please.  It was sent to

1    him as a -- it went into his computer, and it just sat there.

2    It's the equivalent of receiving an envelope that's never

3    opened.

4         MS. BASSIL:  I also objected to this coming in.  And

5    my objection was that there was no evidence it had been

6    unzipped.  You said that goes to the weight of it, not the

7    admissibility of it.  They've had notice from day one.

8         MR. CHAKRAVARTY:  There's an affirmative obligation,

9    if you're going to choose to prove up something, to provide

00:25 10   notice pursuant to the rules of discovery, as to an examination

11   was done.  The defendants have done nothing for discovery, and

12   they're able to introduce whatever expert testimony they want.

13   This is not social science.  This is a discrete scientific

14   process that this witness engaged in.

15        THE COURT:  It sounds like the offer is limited, and

16   I'll allow it.

17        MS. PATEL:  Thank you.

18   .  .  .  END OF SIDEBAR CONFERENCE.)

19   Q.   Mr. Spencer, can you explain what forensic analysis you

00:25 20   did on this exhibit?

21   A.   We were asked to provide context on this magazine.  It's

22   actually a variety of issues of a magazine.  We reviewed the

23   Kohlmann report, which mentioned that this magazine was found

24   on Dell 2006.  So our contextual analysis basically centered

25   around:  Where did it come from?  What happened to it?  What

1    user account was it related to on Dell 2006?

2    Q.   Can you share with us your findings?

3    A.   We found that this -- these issues of Sawt al-Jihad were

4    all contained within a Microsoft help file.  So many issues

5    were contained within one file.  That one Microsoft help file

6    itself was contained in a compressed file, a RAR file, which I

7    think has been mentioned earlier in this case.

8         We then performed forensic analysis to identify if

9    there was any evidence that this -- the issues of this magazine

00:27 10   had ever been opened or the compressed file that they came in

11   had ever been opened.

12        I should backtrack a little bit.  We found that the

13   RAR file, the compressed file in which these issues arrived,

14   they came from an instant message conversation with an Ahmed

15   Rashad, or Ahmed Rashad, and then were downloaded onto Dell

16   2006.

17        Our analysis, in terms of what happened to it on Dell

18   2006, involved both search terms and review of Microsoft

19   Windows registry entries.  Essentially, we were trying to

00:27 20   identify if it was opened and how many times.  Our analysis --

21   Q.   Were you able to determine whether this document was ever

22   opened by the user of Dell 2006, 2008 or 2009?

23   A.   We focused specifically on Dell 2006, and we found no

24   evidence that would suggest that this -- either the issues of

25   the magazine had been opened or the compressed file itself.

1    Q.   Can you give us an example in the physical world of what

2    that conclusion means?

3    A.   Well, assuming somebody was accused of reading this

4    magazine.

5              MR. CHAKRAVARTY:  Objection, your Honor.

6              THE COURT:  Overruled.  Go ahead.

7    A.   Assuming someone was accused of reading this magazine, a

8    physical analogy might be:  If you received a box from someone

9    you know that had magazines in it, but you didn't open the box.

00:28 10   You just left it in your driveway, and you were accused of

11   reading those magazines.

12             MS. PATEL:  We're going to turn now, your Honor, just

13   for the witness, to Exhibit 1278.  This has not yet been

14   admitted into evidence.

15             THE COURT:  Is this in your computer?

16             MS. PATEL:  Yes.  We are -- we're just using Mr.

17   Spencer here as a reader for just the next two exhibits.

18             MR. CHAKRAVARTY:  Your Honor, this witness is an

19   expert witness on computer forensics.  The next two witnesses

00:29 20   [sic] appear to be outside of his expertise or lane.

21             MS. PATEL:  The government had many readers that

22   didn't have expert --

23   (SIDEBAR CONFERENCE AS FOLLOWS:

24             THE COURT:  Let me see you at the side.

25             MS. PATEL:  Those were recovered by the government,

1    Customs and Border Patrol, documents given to us in discovery.

2    And we're simply using -- because Mr. Tabbara was not allowed

3    to testify, we're just using him as a reader.  He's not going

4    to say anything other than just reading, like the government

5    agents did.

6              THE COURT:  Well -- okay.

7              MR. CHAKRAVARTY:  First is the authentication issue,

8    which --

9              THE COURT:  That is the first issue.  We saw this

00:30 10   through somebody else, and it was not admitted, if I recall.

11             MS. BASSIL:  I don't think so.

12             THE COURT:  No?

13             MR. CHAKRAVARTY:  I'm not sure.  I don't think so.

14             THE COURT:  Some Saudi document I thought -- anyway,

15   that doesn't matter.  Somebody's got to say what it is.  I

16   don't know that he can say what it is.

17             MS. PATEL:  He can't say what it is, but we would say

18   that given it came from Customs and Border Patrol that -- it

19   was authenticated by the government, government's case in

00:30 20   chief, when they had all the agents come up and testify that

21   they retrieved documents from Mr. Mehanna when they arrested

22   him at the airport.

23             MS. BASSIL:  He can read "General Employment

24   Contract."

25             THE COURT:  That may authenticate it as a thing that

1    they got from him.  It didn't necessarily authenticate it as a

2    general employment contract.

3            MS. BASSIL:  We can call Mr. Chakravarty to the stand

4    because he's the one who sent it to us as his employment

5    contract from Saudi Arabia.

6            MS. PATEL:  I would be delighted to do that.

7            THE COURT:  I think -- somebody has to say what it is.

8            MR. CARNEY:  May I be heard briefly?  When Mr. Mehanna

9    was arrested, things were seized from him.

00:31 10          THE COURT:  Right.

11            MR. CARNEY:  Throughout this trial, the Court has

12    ruled that if things are, for example, on his computer, it's

13    relevant.

14            THE COURT:  Right.

15            MR. CARNEY:  The government has presented evidence

16    about where the defendant was going:  to Saudi Arabia.  And

17    there have been illusions, for example, even with Kohlmann,

18    about Saudi Arabia, and through the civilian witnesses, that

19    Tarek was going to get a job to work there.  So that if he has

00:31 20  this document in his possession, it's authenticated as the

21    document he has.

22            THE COURT:  Well, as an object, that might be true.

23    But you want it for more than its objectness.  You want it for

24    its meaning.  In order to have meaning, it has to be a

25    particular kind of object, the contents of which have meaning

1    for the point you want to make, which is that he had a job

2    offer.

3              MR. CARNEY:  I think this is an exception to the

4    hearsay rule in that it is a document --

5              THE COURT:  We're not at hearsay yet.  In other words,

6    it has to be -- if the question is what things were taken from

7    him in the search, you could identify it as a thing that was

8    taken in the search, just like his handkerchief.  If you want

9    to give some more meaning to it that it proves not just that

00:32 10   something was taken from him but that he had a job prospect,

11   then the job prospect piece of the evidence has to emerge from

12   the acceptance of a description of this as more than just

13   something taken from him.  It has its own independence as a

14   contract, so on and so forth.  That would be missing.

15             MR. CARNEY:  As an except to the hearsay, a contract

16   has independent significance as a contract document.

17             THE COURT:  We don't even know it's a contract.  It

18   says so.  But it's not a self-authenticating document.

19             MR. CARNEY:  Well, I disagree.  If it says "contract"

00:33 20   and it has -- it is full with language consistent with a

21   contract, and it is signed by a person who's material to this

22   case, I submit that in this circumstance it comes in as an

23   independent document found with the defendant.  Any deficiency

24   that the government brings up would go to the weight, not the

25   admissibility of this.

1          Look at all the documents your Honor admitted simply

2     because they were in the possession of the defendant:  books

3     that were on the shelf.  There was no evidence that he read

4     them or no evidence that he had gone through them or anything

5     other than this was in his possession; this was in his

6     possession.

7          THE COURT:  Well, I'm just reviewing Rule 902, which

8     is the rule regarding self-authentication.  I don't think this

9     falls within any of those.  It would be subject to Rule 901,

00:34 10    which is there has to be evidence sufficient to show it is what

11    it claims to be.  And I don't think we have that.

12         MR. CARNEY:  We would have been able to authenticate

13    this with the witness who was the person who hired him from

14    University.

15         And I guess this is the other thing that I have to

16    bring up.  In a trial where the Court has let in hundreds and

17    hundreds of exhibits because they were connected to the

18    defendant, they were either someplace on his hard drive,

19    someplace in his bedroom, et cetera, this is a situation where

00:35 20    the government knows the defendant was hired to work at this

21    hospital.  They arrested him because they knew he was on his

22    way to go to work there.  They interviewed his parents.  They

23    knew he was going on his way to work there.  That's the

24    contract he had in his possession, going to this place to work.

25         There is a final exception to the hearsay rules that

1   says, in order for the defendant to be able to present his

2   case, he can't be prevented from offering evidence which the

3   government knows is an authentic document.  You know, it is so

4   unfair -- and I don't say this lightly.  It is so unfair when

5   someone is facing the prospect of spending life in prison and

6   the government knows this document is authentic and they seized

7   it and they know why it's being offered, to raise a

8   hypertechnical objection like this goes to the very heart of

9   whether the government is interested in the defendant having a

00:36 10   fair trial.

11         MR. CHAKRAVARTY:  If I may respond to that.  The

12   government is not objecting to it as purely unauthentication,

13   as a technicality.  The issue is that if this were central to

14   the defense theory of the case, then you would think that this

15   would have been one of the exhibits, that the defense would

16   have notified us of before trial.  It wasn't.  In fact, it was

17   notified to us for the first time last night.

18         To suggest that, if this was a central aspect of the

19   case aside from noticing the witnesses, this would have been

00:36 20   notified earlier so that the witnesses, the CBP witnesses who

21   may have had interactions with him at the time of his arrest,

22   would have been able to further authenticate and say this is

23   something we obtained from him.

24         The government is waiving -- as we have throughout the

25   case, we are waiving those hypertechnical authentication issues

1   with regard to chain of custody and bringing things in, all of

2   which we spent over a week of jury time establishing -- because

3   there were no stipulations.

4           At this stage, the concern now is that without any

5   authentication witness, without anyone to say what this is,

6   where it was found, anything else, the jury is going to get the

7   misapprehension that this is somehow important.  I understand

8   that the defense may feel it is important for some reason.  The

9   government has not alleged that the defendant was trying to

00:37 10  flee the United States to go to Saudi Arabia.  And that's what

11  the purpose of this --

12          MS. BASSIL:  Why did you --

13          THE COURT:  One at a time.

14          MR. CHAKRAVARTY:  That is an inference which I think

15  the defense is understandably mindful of that they don't want

16  the jury to have, and so they're trying to preempt it.  But

17  that's where I think that both notice and establishing the

18  authenticity of this matters.  It's not an empty technicality.

19  The government --

00:38 20         MR. CARNEY:  You know --

21          MR. CHAKRAVARTY:  If this is something your Honor

22  fully feels is relevant and overcomes the 403 barriers, the

23  government is prepared to stipulate to the fact that when the

24  defendant was leaving for Saudi Arabia that he had a job offer

25  from Saudi Arabia.

1          MS. BASSIL:  So --

2          MR. CHAKRAVARTY:  Further evidence both that --

3          THE COURT:  If you're willing to go that far, what's

4     the problem with the exhibit?

5          MR. CHAKRAVARTY:  First, it's confusing.  It's not

6     clear where it is from.  And it suggests that, if he had a job

7     and these were the terms of the job and the lucrative aspect of

8     the job and these details, that somehow there was an offer,

9     acceptance, all the rest.

00:38 10          MR. CARNEY:  But the point is:  You know it's true.

11     You gave this document to us.  You know exactly what it is.

12          THE COURT:  What's the significance of it to the

13     defense?

14          MR. CARNEY:  Because --

15          THE COURT:  Other than to counter the flight -- no pun

16     intended -- the fleeing from prosecution argument?

17          MS. BASSIL:  The government also asked Mr. Kohlmann --

18     they sort of asked him about extradition treaties for Saudi

19     Arabia.

00:39 20          MR. CARNEY:  That was excluded.

21          MS. BASSIL:  It was clearly an implication that he was

22     going for a wrong reason when they knew otherwise.  They did.

23          THE COURT:  That seems -- I guess it seems a small

24     point on both sides.

25          MR. CARNEY:  Well, it's important to the defense, that

1    he had this in his pocket, saying good-bye to his parents,

2    heading over to Saudi Arabia for this job.  In fact, at earlier

3    hearings, on bail, I believe this document was proffered during

4    a bail hearing to illustrate that this is where he was going.

5         And so, you know, the number of times we've got, as

6    late as 10:00 at night, a list of three dozen exhibits that are

7    going to be coming in through a witness the following day has

8    occurred over and over.  But you haven't heard us squealing

9    about it.

00:40 10       MR. CHAKRAVARTY:  That was a very different scenario.

11   Those are exhibits which we have previously notified you we --

12        MR. CARNEY:  We had them.  We knew them.

13        MR. CHAKRAVARTY:  It's a brand-new exhibit.  This kind

14   of negotiation could have happened earlier.  The government

15   concern is, if this comes in or if the stipulation comes in,

16   then the fact that we wouldn't be able to repatriate the

17   defendant becomes relevant.  That's why I asked that question

18   of Mr. Kohlmann, which your Honor wouldn't allow.

19        Then I would ask that, if the exhibit comes in or if

00:40 20   the defense accepts our stipulation to the fact that he was

21   going to Saudi Arabia, then we should also be able to take

22   judicial order that there is no extradition treaty from Saudi

23   Arabia.

24        THE COURT:  Well, all of that goes to whether -- to a

25   potential reason why he was arrested when he was arrested, as

1    opposed to before, which is also not particularly relevant for

2    the jury.  So the whole controversy is more or less besides the

3    point, I guess.

4              The problem is, that with all offer and counteroffer

5    and stipulation and so on, we're spending a lot of time

6    distracting the jury -- that's why -- I don't know what --

7              MS. PATEL:  Keep in mind, your Honor, also, that the

8    government will certainly argue that Mr. Abousamra fled to

9    Syria.  I'm certain they will.  And that's why this Saudi

00:41 10   Arabia issue is very important for state of mind.

11             MR. CARNEY:  I have a compromise.  I'd ask that this

12   document be admitted as a document found in the defendant's

13   pocket when he was getting on a plane to Saudi Arabia because

14   it goes to his state of mind.  This document may not actually

15   be true, but he's carrying a document that seems to indicate to

16   him that he has a job waiting for him in Saudi Arabia.  So

17   let's add it to state-of-mind evidence because a person

18   carrying this document would rightfully believe he's going to

19   be working.

00:42 20             MR. CHAKRAVARTY:  State of mind that he's going to

21   Saudi Arabia, if that is relevant then --

22             MR. CARNEY:  It is.

23             MR. CHAKRAVARTY:  -- then we should be able to

24   introduce the fact that there's no extradition treaty.

25             THE COURT:  I'll tell you what.  I'll admit the

1    documents without having them read to the jury.  I just don't

2    think we need to emphasize them to that degree.

3              MR. CARNEY:  Thank you.

4    .  .  .  END OF SIDEBAR CONFERENCE.)

5              THE COURT:  Okay.

6              MS. PATEL:  Okay.  We can -- I believe we're going to

7    take this -- may I question him on this, your Honor?

8              THE COURT:  I don't know that there's anything he can

9    say about it.

00:43 10              MS. PATEL:  Okay.  So we can take it down.

11             THE COURT:  We'll admit, pursuant to our discussion at

12   the sidebar, 1278 and 1279.

13             MS. PATEL:  Yes.

14   (Exhibit Nos. 1278-1279 received into evidence.)

15   Q.   Mr. Spencer, do you remember hearing testimony in the

16   government's case about encryption programs that Mr. Mehanna

17   may or may not have had on his computer?

18   A.   Yes.

19   Q.   I want to ask you some questions about some of those.  Are

00:43 20   you familiar with a program called TOR, T-O-R?

21   A.   I am.

22   Q.   Can you tell us what that is?

23   A.   TOR is an onion-routing application and system.  Its

24   purpose is to increase the privacy and the security of an

25   internet-connected user.

1   Q.   Is this program free or can you buy it?

2   A.   It's open source so it's freely available.

3   Q.   Do you agree, when Special Agent Scripture testified, that

4   that program was not illegal?

5   A.   I agree.

6   Q.   And are you aware of any FBI report or testimony that

7   mentions whether the program was ever actually used on the

8   Mehanna computer?

9   A.   No.

00:44 10   Q.   Are you familiar with Privoxy, P-r-i-v-o-x-y?

11   A.   I am.

12   Q.   Can you tell us what that is?

13   A.   Privoxy is a noncaching web proxy.  Basically, it sits

14   between the internet and your web browser.  It filters out

15   stuff.  What people tend to use Privoxy for is scrubbing ads.

16   Let's say you're browsing your favorite newspaper's website.

17   Privoxy will sit in the middle of that website and your

18   computer, one of the things it will do is scrub out all the ads

19   so you don't see them.  It's often installed with TOR.

00:45 20   Q.   Is that either free or for sale?

21   A.   It's freely available.

22   Q.   Are you aware of any FBI testimony that talks about

23   whether Privoxy was ever actually used on the Mehanna laptop?

24   A.   No.

25          MR. CHAKRAVARTY:  Objection, your Honor.

1        THE COURT:  It may stand.

2   Q.   Are you familiar with a program called Window Washer?

3   A.   I am.

4   Q.   Can you explain what that is?

5   A.   Window Washer is a commercial product of Webroot Software.

6   Its purpose is to clean up a Windows computer.  So it has the

7   capability of deleting both files and Windows information.

8   Q.   Is that free or something people can buy?

9   A.   It's a commercial product.  You could buy it.

00:45 10  Q.   Are you aware of whether that program was ever used on the

11  Mehanna laptop?

12  A.   I'm aware that it was installed.

13  Q.   Okay.  Are you familiar with Trillian?

14  A.   Yes.

15  Q.   What's that?

16  A.   Trillian is an ad-supported instant messaging client.

17  Basically, it allows you -- say, you have four or five

18  different accounts on different instant messaging services.

19  You could combine them all into your Trillian chat client.  The

00:46 20  most common version is ad-supported so it's freely available.

21  There's also a professional version you can buy.

22  Q.   Do you know whether that program was used on the Mehanna

23  computer?

24  A.   Yes.

25  Q.   You were present in the courtroom when Special Agents

1    Swindon and Scripture of the FBI testified, is that right?

2    A.   Yes.

3    Q.   Do you remember that it was the CART team Agent Swindon

4    who acquired and processed the data in this case, not all of

5    it, I guess, but the Dell computer anyway?

6    A.   I believe that's so, yes.

7    Q.   Do you recall that Special Agent Scripture said he further

8    processed the data?

9    A.   Yes.

00:47 10   Q.   Do you remember the agents who then analyzed the data?

11   A.   My understanding is Special Agents Daly and Williams.

12   Q.   Do you know whether they have any forensic computer

13   training?

14        MR. CHAKRAVARTY:  Objection, your Honor.

15        THE COURT:  Sustained.

16   Q.   Do you think that computer forensics training is important

17   to assessing electronic evidence?

18        MR. CHAKRAVARTY:  Objection, your Honor.

19        THE COURT:  Overruled.  He may answer that.

00:47 20   A.   The issue is a little bit more complicated.  Essentially,

21   electronic evidence has context, just like physical evidence in

22   the real world that you might come across.  So the context is

23   basically the story of a piece of electronic evidence.

24        So if we use a photo as an example, if you have a

25   photo and you've pulled it out of, let's say, a trash Dumpster

1   or on a computer inactive space.  You know it came from that

2   Dumpster or the inactive space on that computer.  But if you

3   are in a vacuum and you don't have the further story on that

4   electronic evidence, you won't know where it came from.

5   Potentially, you may not know what it depicts.  You may not

6   what user account is associated with it.  You may not know what

7   happened to it on that computer, which could include how did it

8   end up in inactive space.  These are just some of the questions

9   that you may have about that piece of electronic evidence if

00:48 10   that context is not provided to you.

11        So maybe to more succinctly answer that question, the

12   computer forensics expertise is important to develop that

13   context.

14   Q.   Now, we've seen lots of images so far as exhibits.  In

15   addition to what we have already seen, were there other

16   thumbnail images on the Dell 2006, 2008 and 2009 computers?

17   A.   Yes.

18        MS. PATEL:  Can we please have Exhibit 1151 from Mr.

19   Oh?

00:49 20        MR. CHAKRAVARTY:  Your Honor, the government's

21   objection to the next several exhibits is relevance.

22        MS. PATEL:  Your Honor, as we've previously heard, if

23   it's on Mr. Mehanna's computer, it's relevant because it goes

24   to his state of mind.  It was there.  These images --

25        THE COURT:  I'll see you at the side briefly.  I don't

1    think this will take long.

2    (SIDEBAR CONFERENCE AS FOLLOWS:

3         THE COURT:  The list goes through 1177 or something?

4         MS. PATEL:  We're just going to go one second each

5    picture.

6         THE COURT:  What are they?

7         MS. PATEL:  They are other thumbnail images that lived

8    in the same place as the government's 160 or so exhibits.

9         THE COURT:  Content-wise, what are they?

00:49 10        MS. PATEL:  They are not 9/11 and Osama bin Laden.

11        MR. CHAKRAVARTY:  Sports heros, sports players,

12   Shakira.

13        THE COURT:  What's the point?

14        MS. PATEL:  That goes to state of mind.  There's been

15   a lot of evidence in this case that's all Mr. Mehanna ever

16   looked at or did, that he downloaded these hundreds of

17   pictures.  The jury had no context about what else is on the

18   computer.  It's a very small part that the government has

19   showed them.  We think it's important that the computer -- that

00:50 20   that's not all he did.

21        THE COURT:  All right.

22        MR. CHAKRAVARTY:  No criminal, that's all they did is

23   the crime.

24        THE COURT:  You can argue that.  I'll -- I'll allow

25   them.

1    . . .  END OF SIDEBAR CONFERENCE.)

2          MS. PATEL:  May I have Exhibit 1151?

3          THE COURT:  All right.  So pursuant to the ruling,

4    we'll admit 1151 through, I think, 1177.

5          MS. PATEL:  That's correct.

6    (Exhibit Nos. 1151-1177 received into evidence.)

7          THE COURT:  Now we can, just for the record --

8          MS. PATEL:  May the jury have it, also, your Honor?

9    Q.   Mr. Spencer, do you recognize this image?

00:51 10   A.   I do.

11   Q.   Where did you recover this image?

12   A.   This image was recovered or carved from inactive space on

13   Dell 2006.

14         MS. PATEL:  Can we have 1152?

15   Q.   Can you explain why -- I'm sorry.  This image, also, where

16   was this recovered from?

17   A.   Inactive space on Dell 2006.

18   Q.   Why is it so small?

19   A.   This image has thumbnail dimensions.

00:51 20   Q.   1153, where was this recovered?

21   A.   Again, inactive space on Dell 2006.

22   Q.   1154, where was this recovered?

23   A.   Inactive space, Dell 2006.

24   Q.   1155, where was this recovered?

25   A.   Inactive space, Dell 2006.

1    Q.    1156, 1157, 1158, 1159, 1160, 1161, 1162, 1163, 1164,

2    1165, 1166, 1167, 1168, 1169, 1170, 1171, 1172, 1173, 1174,

3    1175, 1176, 1177, were images 1151 through 1177 all from

4    unallocated or deleted space?

5    A.    On Dell 2006, yes.

6          MS. PATEL:  No more questions, your Honor.

7    CROSS-EXAMINATION BY MR. CHAKRAVARTY:

8    Q.    Mr. Spencer, there were a number of images on that Dell

9    2006 computer.  The ones we just went through are some of these

00:53 10   images in the inactive space, correct?

11   A.    That's correct.

12   Q.    But there are, in fact, hundreds, if not thousands, of

13   images within that inactive space, right?

14   A.    That's correct.

15   Q.    That's space that's unallocated by the file registry of

16   the computer, meaning it's not using that space so some data

17   that had been previously in active space is now in the rubbish

18   bin, as you described earlier?

19   A.    That's correct, with one caveat, which is, there's also

00:53 20   data which was never stored in active space.  We refer to that

21   as data which has never intentionally been stored.  That can

22   also end up in inactive space.

23   Q.    Is there any indication that that occurred in this case?

24   A.    You can't ascertain -- if you recover an image without

25   context from inactive space, the likelihood is that those

1    images existed in some way in the active space.  But without

2    being able to identify exactly where they came from, you can't

3    rule out that they may have come from, for example, the memory

4    on the computer.

5    Q.   All right.  The bottom line is, inactive space, this

6    distinction that the defense has asked you to draw, that's on

7    the computer; it's data that has been on the computer and was

8    on the computer when you looked at it?

9    A.   That's correct.

00:54 10   Q.   It's how it got onto the computer that you can't draw very

11   many conclusions about with regards to materials that are in

12   inactive space, right?

13   A.   Generally speaking, that's correct.

14        MR. CHAKRAVARTY:  Miss Patel, can I look at the chalk

15   that you used?  Your Honor, may I have the ELMO, please?

16   Q.   This is the chalk that Miss Patel put up for you.  Did you

17   prepare this?

18   A.   No.

19   Q.   But you've confirmed these numbers?

00:55 20   A.   Yes.

21   Q.   Let's first clarify that this is only talking about

22   images, which we're talking about the little thumbnails like of

23   Shakira and the Danica Patrick and the other people we just

24   looked at.  You're talking about those images.  That's the only

25   thing that you quantified on this chart, correct?

1    A.    That's correct.

2    Q.    So if there were 158 government exhibits, you're only

3    talking about the images that were considered, which have been

4    introduced as government exhibits, correct?

5    A.    Right.  That's what this chart reflects.

6    Q.    This doesn't include all the videos?

7    A.    No.

8    Q.    Those were actually in active space, weren't they?

9    A.    If I recall correctly, the majority of them were, yes.

00:56 10    Q.    And he had a "My Videos" folder on his computer; do you

11    remember that?

12    A.    That's correct.

13    Q.    He had different video -- he had a folder that he

14    specifically named "Iraq" and "Afghanistan"; do you remember

15    that?

16    A.    I believe that's correct.

17    Q.    And he had another folder called "My Work"; do you

18    remember that?

19    A.    I do, yes.

00:56 20    Q.    And then "Translations" was another portion of his hard

21    drive?

22    A.    Yes.

23    Q.    A folder that he created?

24          Did you also see the folder that said "39 Ways"?

25    A.    I believe so, yes.

1    Q.    So all of his videos and translation information, that was

2    in active space, correct?

3    A.    For the most part, yes.

4    Q.    And I think there was also some Nasheeds that go along

5    with that?  MP3 files I should add?

6    A.    Yes.

7    Q.    And then the instant message chats that have been captured

8    through the Trillian program, those were also in active space,

9    weren't they?

00:57 10    A.    I believe so.  All the Trillian chats that were offered as

11    exhibits were active files, yes.

12    Q.    So the only thing you're talking about here in this chart

13    is these little thumbnails or other pictures, images, that were

14    on the computer that I think we've shown many of them to the

15    jury just by quickly clicking through them, is that right?

16    A.    That's correct.  This also includes larger images than

17    thumbnails, but it does reflect images specifically.

18    Q.    For example, when the defendant went to Ground Zero, there

19    was a picture of him holding his finger up, that was also on

00:57 20    the computer.  You didn't consider that -- that's not a

21    thumbnail, correct?

22    A.    That's not a thumbnail.

23    Q.    But it was on the computer?

24    A.    Correct.

25    Q.    With regards to the images that you -- the government has

1    introduced that were -- let's use the 95 number from the 2006

2    computer.  This is -- amongst these 95 images are the images

3    of, you know, over 30 pictures of September 11th, correct?

4    A.   I think you're referring to 30 images of the World Trade

5    Center.

6    Q.   World Trade Center, I'm sorry, being struck on September

7    11th.

8    A.   Yes.

9    Q.   There were over a dozen pictures of Osama bin Laden?

00:58 10   A.   That sounds accurate, yes.

11   Q.   And several pictures of Abu Musab al-Zarqawi and other

12   mujahideen?

13   A.   Yes.

14   Q.   And those were thumbnails or other smaller images in the

15   inactive space, correct?

16   A.   Correct.

17   Q.   I think one of them you were pointing out today was Doctor

18   Ayman al-Zawahiri, the leader of al Qa'ida, correct?

19   A.   I'm not familiar with the content of that photo.

00:58 20   Q.   -- who he is.

21        But there was an individual, and part of it was kind

22   of, as I think you called, overwritten?

23   A.   Yes.

24   Q.   In terms of your explanation for why something is a

25   thumbnail, I think Miss Patel asked you whether this is data

1    that typically is put onto a computer as somebody is surfing

2    the internet, and there's something on the screen, and it gets

3    passively downloaded onto the computer through the web browser,

4    is that accurate?

5    A.    Essentially, yes.

6    Q.    So in that scenario, somebody would have to surf to that

7    website where this image is contained.  It appears somewhere on

8    the website.  If I went to the boston.com website, there are a

9    number of images.  In order for me to see them on my computer,

00:59 10   they have to be downloaded passively to my computer, correct?

11   A.    Correct.

12   Q.    But I navigated to boston.com.  That was something I had

13   either clicked on or I put that into the navigation bar?

14   A.    Correct.  There's a minor caveat, which is often

15   associated with malware, which would be, say, pop-ups.  But,

16   generally speaking, yes, you need to navigate to a web page to

17   have remnants from that web page on your computer.

18   Q.    You didn't find any malware on this computer, did you?

19   A.    We found malware.  However, we didn't find malware that we

01:00 20   would consider serious or relevant.

21   Q.    That wasn't the way that all this information got onto the

22   computer, correct?

23   A.    No.

24   Q.    To draw the distinction between how something passively

25   gets put onto the computer because you surf to a web page, in

1    other circumstances, the user can actually click on an image or

2    a video or something else on the internet and actively download

3    it using the browser?

4    A.    That's correct.

5    Q.    Browsers have logs of what has been downloaded, correct?

6    A.    Yes.

7    Q.    Well, let's talk about specifically.  The 2006 hard drive

8    that the defendant had, he had used Mozilla Firefox to download

9    several files, isn't that correct?

01:01 10   A.    That's correct.

11   Q.    They included files like the Jihad videos?

12   A.    Correct.

13   Q.    And there was a file called "Irhaby 007"; do you remember

14   that?

15   A.    That specific file name, I do not.  But I'm familiar with

16   the log file.

17   Q.    There were bin Laden speeches and copies of the Umar

18   Hadeed video and the wayakoon.doc, different versions of 39

19   Ways.  And there were also files downloaded from the Al-Ekhlaas

01:01 20   website.  Does that sound familiar?

21   A.    The Al-Ekhlaas entries, I don't recall.  If you have

22   that --

23              MR. CHAKRAVARTY:  Can we just call up Exhibit 793,

24   please?

25              MS. PATEL:  Your Honor, I object.  Can I be heard?

1          THE COURT:  All right.  I'll see you at the side.

2     (SIDEBAR CONFERENCE AS FOLLOWS:

3          MS. PATEL:  In the interests of the Court's time and

4     efficiency, I have narrowly tailored the direct to just images.

5     That's why that chalk says, "Image Statistics."  I think this

6     is well outside the scope of direct, going to the inventory of

7     all the government exhibits.  The witness only testified about

8     images.  We didn't go into the video stuff.  We're not

9     disputing it's on the computer, but I don't see why we have to

01:02 10   belabor, Mr. Chakravarty's favorite word, the point.

11          MR. CHAKRAVARTY:  I'm not going to belabor it but --

12          THE COURT:  Belaboring is in the eye of the beholder.

13          MR. CHAKRAVARTY:  The one doing the laboring.

14          He's an expert.  He's looked at the materials.  I have

15     the right to cross-examine as they have the right to

16     cross-examine ours.

17          THE COURT:  There may come a point that's too far, but

18     we're not there yet.

19          MR. CHAKRAVARTY:  And I don't mean to --

01:02 20   .   .   .  END OF SIDEBAR CONFERENCE.)

21     Q.   Mr. Spencer, this is Exhibit 793.  Do you recognize this

22     as the downloads.rdf file from the Firefox browser from the

23     defendant's computer in 2006?

24     A.   Yes, I recognize this.

25     Q.   An it's 37 pages long, and it lists the date and time and

1    the file name and the path of the files that the defendant

2    downloaded, correct?

3    A.    Yes.

4    Q.    Now, I wanted to clarify one other thing from --

5         MR. CHAKRAVARTY:  If I can have the ELMO again.

6    Q.    You cited to these users.  In fact, for the 2006 -- she

7    asked you about the 2006, 2008, 2009, because they were the

8    same computer presumably, about who were the listed users

9    according to the forensic data.  But, in fact, for the 2006

01:04 10  computer, isn't it true that the only user in the system

11   registry was Tariq?

12   A.    That was the one active user account.  The inactive user

13   account was the Ahmed Mehanna.

14   Q.    That was the account that the -- Mehanna was the original

15   name on the initial Windows installation that was replaced in

16   January of 2006?

17   A.    That's correct.

18   Q.    So after January of 2006, there was one user on that

19   account, correct?

01:04 20  A.    One user account, that's correct.

21   Q.    So these -- all these other accounts, these are from the

22   2008 and 2009 versions of the computer, the hard drive?

23   A.    Yes.

24   Q.    And the hard drive was actually substantially different in

25   2008 and 2009 than it appeared in 2006; is that fair to say?

1    A.    Yes.

2    Q.    All of those Jihad videos were gone?  Did you see any on

3    the 2008, 2009 hard drive?

4    A.    Not that I recall.

5    Q.    And the Trillian program didn't capture his instant

6    message chats anymore; do you recall that?

7    A.    I don't recall seeing Trillian chats.

8    Q.    You were asked about some of the security software that

9    was on the defendant's computer.  Do you recall one of them was

01:05 10   TOR, the onion router program that you mentioned?

11   A.    Yes.

12   Q.    Do you recall the instant message chats where the

13   defendant describes how to use the onion router?

14   A.    I'm familiar with those chats in a broad sense.  In terms

15   of our forensics analysis, we didn't read through all the

16   content of the chats.  We would identify them and then provide

17   them to counsel.

18   Q.    Okay.  So you relied on counsel to ask you to do specific

19   tasking with regard to what forensic processes to do on the

01:06 20   computer?

21   A.    Yes.

22   Q.    You used an example, the examination of the Sawt al-Jihad

23   compendium of the magazines.  That was something counsel asked

24   you to do?

25   A.    That's correct.

1    Q.   You described earlier how context is important to

2    determine whether something is used, whether -- how something

3    got onto the computer.  So that you would agree with me that if

4    those chats actually described the defendant using the TOR

5    program and telling other people how to use the TOR program,

6    that would be relevant to your determination as to whether he

7    did, in fact, use the TOR program?

8    A.   Yes.

9    Q.   And the same goes for Privoxy; is that fair to say?

01:06 10   A.   Yes.

11   Q.   And Privoxy and TOR also allow users anonymity on the

12   internet; is that fair to say?

13   A.   That's correct.

14   Q.   Now, Mr. Spencer just a little bit about your background.

15   You haven't been in law enforcement except for your time at the

16   Suffolk D.A.'s Office, is that correct?

17   A.   That's correct.

18   Q.   Did you also intern at one point for Mr. Swindon?

19   A.   No.

01:07 20   Q.   You never interned for him?  Do you know the government's

21   computer experts?

22   A.   I'm familiar with them, yes.

23   Q.   How big is your company?  How many people?

24   A.   We have two full-time employees.

25   Q.   So you did the predominant computer forensic analysis in

1    this case?

2    A.   Actually, no.  We have -- we also have part-time

3    employees.  We had, at any one time, up to four employees

4    working on this project, this case.  Over time, we had five

5    employees who were subject to the protective order.

6    Q.   And so did those people -- do those people have the same

7    credentials as you?

8    A.   No.

9    Q.   So did you personally do the forensic analysis here, or

01:08 10   did you ask your employees to do that?

11   A.   We all performed forensic analysis.

12   Q.   Well, specifically with regard to the 2006 hard drive, did

13   you examine that hard drive?

14   A.   I examined parts of that hard drive, yes.

15   Q.   So you're testifying as a witness to kind of describe what

16   your entire company did, not what you personally did?

17   A.   A mixture.

18   Q.   Was your work or your company's work -- was it

19   peer-reviewed?  Did anybody check it or examine it?

01:09 20        MS. PATEL:  Objection, your Honor.

21        THE COURT:  Sustained.

22   Q.   What types of procedures do you employ to ensure that

23   you're conducting appropriate work?

24   A.   We use -- we follow methodology that we've used in the

25   past.  When they exist, we use industry best practices.  We

1    have multiple tools that do very similar things.  So if we find

2    -- if there's documents or data that is particularly relevant

3    in some way, we'll use a variety of tools to confirm a finding.

4    Q.   Did you do that in this case?

5    A.   Yes.

6    Q.   What did you use?

7    A.   What did we use in terms of tools?

8    Q.   Yeah, tools to verify what your results were.

9    A.   AccessData Forensic Toolkit, Guidance Software EnCase,

01:10 10   Digital Detective's NetAnalysis, CacheBack, PhotoRec.

11   Q.   PhotoRec?

12   A.   P-h-o-t-o-R-e-c.

13        THE COURT:  As long as you're spelling, CacheBack is

14   C-a-c-h-e?

15        THE WITNESS:  Correct.

16   A.   Adroit, A-d-r-o-i-t.  There may be others.

17   Q.   Why did you use all those different systems?  Did you not

18   trust your results?

19   A.   In terms of priority, triage, we consider this case to be

01:10 20   one of our most important.  So there really was no particular

21   issue of do we trust a tool or not.  It was more an issue of we

22   need to essentially analyze aggressively all the information on

23   this case that we've been asked to.  So we would use different

24   tools to do different things; but in some cases, we would use

25   different tools to do the same thing.

1    Q.   Some of those tools are the same that you heard that the

2    government experts use in their regular procedures?

3    A.   Yes.

4    Q.   In fact, in this case, they used Forensic Toolkit for most

5    of this analysis, correct?

6    A.   As far as I know, yes.

7    Q.   So you mentioned your company took this very seriously,

8    your role in this case, and we appreciate that.  How much did

9    you get paid?

01:11 10   A.   We've billed over a thousand hours on this case, which

11   will be approximately $325,000.

12   Q.   All for your testimony this morning?

13   A.   I would not characterize it that way.

14        MR. CHAKRAVARTY:  Thank you.

15        THE COURT:  Miss Patel?

16   REDIRECT EXAMINATION BY MS. PATEL:

17   Q.   Why did you bill a thousand hours to this case, Mr.

18   Spencer?  Can you please explain?

19   A.   There's a couple issues which I -- a couple primary

01:12 20   issues.  One would just be the vast volume of electronic data.

21   In terms of forensic images alone, there's 19 forensic images

22   of hard drives that we received on this case; 35 forensic

23   images of other types of electronic media, CDs, thumb drives,

24   et cetera.  There's a third pool of data, which we would call

25   the results from other searches, meaning outside of the Mehanna

1    home and outside of the U.K., there's other searches that were

2    performed, and that information was given to us for review.

3    There's also work product that we received from counsel.  I

4    believe that was the FBI's work product for the most part.

5    There's also a fifth category, which would be reports from

6    other experts that we were asked to review and confirm

7    findings.

8    Q.   Is it fair to say there's a lot of evidence in this case?

9    A.   I think that's fair to say.  The 700 gigabytes of

01:13 10   information I mentioned before is related to the forensic

11   images alone.  That doesn't take into account the other data,

12   the other pools of data I just mentioned.

13         We also -- the second issue that I think is fairly

14   important here in terms of time is our scope was very, very

15   broad on this case.  Initially, we were tasked with reviewing

16   nearly everything, I would say, and over time, the scope of the

17   search was refined.  In some cases, what we were asked to take

18   off the table, we would later be asked to put back on the table

19   in terms of forensic analysis.

01:14 20   Q.   You testified that you have one other full-time employee?

21   A.   That's correct.

22   Q.   Does she have forensics background?

23   A.   Yes.

24   Q.   Can you just give us a very brief description of what her

25   background is?

1    A.    My other full-time employee at this time has a computer

2    science background, computer science degree from Boston

3    University, as well as an AccessData certification for the

4    Forensic Toolkit product essentially and has taken a

5    significant volume of industry training.  By "industry," I mean

6    computer forensics.

7    Q.    And did any of your work or analysis on this case from

8    your firm go through your eyes before you were presenting it?

9    A.    I sent nearly all of the emails to counsel, hundreds of

01:14 10   emails, since January 21, 2010, and I reviewed all of those.

11   Q.    No offense to me, but would you hire me at your firm?

12   A.    No.

13   Q.    Why not?

14          MR. CHAKRAVARTY:  Objection, your Honor.

15          THE COURT:  Sustained.

16          MS. PATEL:  That's all I have.

17          MR. CHAKRAVARTY:  Nothing further.

18          THE COURT:  All right, sir.  Thank you.  You may step

19   down, Mr. Spencer.

01:15 20          MS. BASSIL:  Your Honor, at this time I would call

21   Doctor Thomas Connolly.

22          THE WITNESS:  Step up here, please.

23          THOMAS F. CONNOLLY, Sworn

24          THE CLERK:  Please be seated.  State your name.  Spell

25   your last name for the record.  Keep your voice up and speak

1    into the mic so everyone can hear you.

2         THE WITNESS:  My name is Thomas F. Connolly,

3    C-o-n-n-o-l-l-y.

4         MS. BASSIL:  Thank you.

5    DIRECT EXAMINATION BY MS. BASSIL:

6    Q.    Are you -- what do you do?

7    A.    I'm a professor of English.

8    Q.    Where are you a professor of English?

9    A.    At Suffolk University.

01:16 10    Q.    How long have you taught there?

11    A.    Since 1986.

12    Q.    Is there other work you've done during that time period,

13    1986 to 1996?

14    A.    Yes.  I'm also regularly employed at the Tufts University

15    Graduate School as a professor in their graduate program.

16    Q.    What is the graduate program?

17    A.    It's -- I teach Ph.D. candidates and master's candidates

18    in drama.

19    Q.    Do you have a Ph.D.?

01:16 20    A.    Yes, I do.

21    Q.    Now.  What is your Ph.D. in?

22    A.    Drama, from Tufts University.

23    Q.    Do you also have a master's degree?

24    A.    Yes.  I have a master's degree in English from Boston

25    University and an English B.A. from Suffolk University.

1    Q.    Are you published in your field?

2    A.    Yes.  I have published three books, numerous articles,

3    many, many reference articles, and other scholarly

4    publications.

5    Q.    Can you tell the jury just quickly what are the three

6    books that you've published?

7    A.    My most recent book is called the *Genus Envy:*

8    *Nationalities, Identities, and the Performing Body of Work*.  I

9    have a book called *George Jean Nathan and the Making of Modern*

01:17 10    *American Drama Criticism*, and a book called *British Aisles:*

11    *Studies in English and Irish Drama and Theatre from Medieval*

12    *through Modern Times*.

13    Q.    Are those books published by an academic press?

14    A.    Yes.  All three were published by academic publishers.

15    Q.    How did you come to publish these books?

16    A.    Each of these were -- I was asked by the publishers to

17    submit a manuscript.

18    Q.    When you submitted your manuscript, was it peer-reviewed?

19    A.    Yes.

01:17 20    Q.    Was it blindly peer-reviewed?

21    A.    Yes.

22    Q.    How did that work?

23    A.    I received a letter from a publisher after I had given a

24    conference paper.  I'll talk about the *George Jean Nathan* book.

25    I gave a paper at the American Society For Theatre Research

1    conference about the drama critic George Jean Nathan.  About a

2    month later, I got a letter from Fairleigh Dickinson University

3    Press asking me if I had a book-length manuscript about this

4    drama critic.  I replied that I did, and it would be ready for

5    submission in a few months.

6            I submitted it and I waited almost a year, and I got

7    two anonymous reviews of my manuscript, both which were

8    favorable.  And the press proceeded to publish it.

9    Q.   Have you published papers in academic journals?

01:18 10   A.   Yes, I have.

11   Q.   About how many, would you say?

12   A.   Dozens.  And I've gone through the same process there.  I

13   -- lately I've been asked to submit articles, and I get an

14   anonymous review sheet telling me about any changes that need

15   to be made in the manuscript or things that are good about it

16   or things they wish I would talk about more.  The process is

17   always -- it takes several months and it's always anonymous.

18   Q.   Have you presented at any academic conferences?

19   A.   Yes, many, many times in the United States and in Europe.

01:19 20   Q.   Now, have you acted as a consultant with any media

21   outlets?

22   A.   Yes.  The New Yorker magazine, the British Broadcasting

23   Corporation, NPR, CBS.

24   Q.   In your work, do you review literature both American and

25   from the United Kingdom?

1    A.    Yes, I do.  I frequently teach survey courses in

2    literature ranging from Chaucher's Middle English to

3    Contemporary English.  I regularly teach courses in Modern

4    British Drama, 19th Century British Drama, 18th Century British

5    Drama, so that I have to read British English all the time.

6    Q.    Are you familiar with different usages of words and

7    different spellings between United Kingdom English and American

8    English?

9    A.    Yes, yes, I am.

01:20 10   Q.    Were you asked to perform -- how did you come to get

11   involved in this case?

12   A.    I was asked to offer my testimony as an expert, and I was

13   given a video and a transcript and to make a comparison between

14   the subtitles in the video and the transcript.  And I watched

15   the video through, and then stopping it and starting it, I went

16   through it one sentence at a time.

17   Q.    Was this video the Expedition of Umar Hadeed?

18   A.    Yes.

19         MS. BASSIL:  Your Honor, at this time, I would like to

01:20 20   offer Exhibit 1282, which is just the blank translation.

21         MR. AUERHAHN:  I believe that's already been

22   introduced.

23         MS. BASSIL:  I didn't think it had been, but -- I

24   didn't think it had been.

25         THE COURT:  I'm sorry.  What's the number?  1282?

1          MS. BASSIL:  Yes.  If you have a number, I would be

2     happy to take it.

3          MR. AUERHAHN:  I have no objection.  I think it's the

4     same as one that we introduced.

5          THE COURT:  Okay.  I see.  I don't even have it on my

6     list.

7          MS. BASSIL:  I couldn't find it.

8          THE COURT:  Is this not updated, Paul?

9          MS. BASSIL:  I would be happy to take it.

01:21 10          THE COURT:  All right.  So he has it.  I don't.  I

11     have the old version:  paper.  Anyway --

12          MR. AUERHAHN:  That's Government Exhibit 340.

13          MS. BASSIL:  340?  If we could have 340, Mr. --

14          THE COURT:  I want to be clear, are you then offering

15     it or not offering it in light of the fact --

16          MS. BASSIL:  It's already an exhibit.  I'm going to

17     refer to Exhibit 340.

18          THE COURT:  Fine.  So we want the government's

19     computer.

01:21 20          MS. BASSIL:  If you could just make the top a little

21     bigger so we could really see what it is.  Doctor Connolly, can

22     you see this document?

23     A.   Yes.

24     Q.   And is this the document that you were provided?

25     A.   Yes.

1    Q.    You said you compared this document to the actual video?

2    A.    Yes.

3    Q.    And how did you do that?

4    A.    I had the transcript in front of me and, watching the

5    video, stopping and starting it, I made comparisons between the

6    subtitles that were on the screen and what was on the paper.

7    Q.    Did you see differences between what was on the screen and

8    what was on the paper?

9    A.    Yes, I did.

01:22 10         MS. BASSIL:  At this time, your Honor, I'd like to

11   offer Exhibit -- this would be 1282 then.  And I've given the

12   government a copy of this.

13            MR. AUERHAHN:  No objection, your Honor.

14            THE COURT:  What is this?

15            MS. BASSIL:  1283, I'm told.

16            THE COURT:  What is it?

17            MS. BASSIL:  Your Honor, it's Mr. Connolly's marked-up

18   copy of the same document.

19            THE COURT:  All right.  There's no objection?

01:22 20         MR. AUERHAHN:  No, your Honor.

21            THE COURT:  Admitted, 1283.

22   (Exhibit No. 1283 received into evidence.)

23            MS. BASSIL:  If we could use the ELMO, your Honor.

24   And if we could -- can I make that bigger?

25   Q.    Let me go through this.  Doctor Connolly, I see red marks

1    here.

2    A.    Yes.

3    Q.    What do those indicate?

4    A.    That's my writing where I noted differences between what

5    was in the subtitles and what was on the paper.

6    Q.    All right.  And I see that what you did is you circled

7    certain words, and there were words that were different.

8    A.    Yes.

9    Q.    Are the red words what was on the subtitles?

01:23 10   A.    Yes.

11   Q.    I see that there are some differences, small differences

12   in words.  The word "happiness," you said was "joy" in the

13   subtitle?

14   A.    Yes.

15   Q.    And what did you see here?  You have "transgressors" and

16   "transgressing."  Can you explain that?

17   A.    Yes.  The word "transgressors" was not in the subtitles,

18   and what was there was "transgressing false deities, these

19   infidels."

01:24 20   Q.    Going down the page, there was one other difference, and

21   you noted that there was no hyphen on the subtitle?

22   A.    Yes.

23   Q.    On Page 2 of this document, I see that you noted other

24   differences?

25   A.    Yes.

1    Q.   And can you briefly go through these?  Over here it says

2    -- you circled the word "causing"?

3    A.   Yes.  On the subtitle in the video, it uses the word

4    "inflicting."

5    Q.   Over here, was there a change in the entire phrase?

6    A.   Yes, yeah.

7    Q.   Can you tell the jury?

8    A.   Yes.  It does not -- the subtitle does not have "so that

9    we cause damage to the enemy to a greater extent by the will of

01:24 10   Allah."  It says "so that we can cause a heavy slaughter upon

11   the enemy and damage them to a greater extent by the will of

12   Allah."

13   Q.   And then there continues to be changes on the document, is

14   that correct?

15   A.   Yes.

16   Q.   Right here, on this translation, it says, "Two good

17   endings."  And what was it on the document?  I'm sorry.  What

18   was it on the video?

19   A.   Where?

01:25 20   Q.   I'm right here.

21   A.   I'm sorry.  I can't find it.

22   Q.   Can you see it now?

23   A.   Yes, yes.  "Beautiful."

24   Q.   That's what was on the video?

25   A.   The video, yes.

1    Q.   Here, if you see -- you have circled -- you had circled

2    the word "polytheism"?

3    A.   Yes.

4    Q.   What was on the video?

5    A.   "Shirk."

6    Q.   Over here you have circled -- it says, "As in it is the

7    way"?

8    A.   Yes.

9    Q.   What was on the video?

01:26 10   A.   "For that is the way to salvation."

11   Q.   And you continued to circle a number of things that were

12   different, is that correct?

13   A.   Yes.

14   Q.   Over here it says, "You have no excuse."  What did you

15   note that was different on the video?

16   A.   In the video, it's not capitalized like that.  There's no

17   emphasis.

18   Q.   I notice here you have some numbers along the way?

19   A.   Yes.

01:26 20   Q.   39:44.  What are those numbers?

21   A.   That's the timing on the video so that I was keeping track

22   of exactly where they were on the video as opposed to the

23   paper.

24   Q.   And on Page 3, you saw -- you, again, made corrections or

25   changes that you saw between the video and the translation, is

1    that correct?

2    A.    Yes, yes.

3    Q.    And I want to point your attention to here.

4    A.    Yes.

5    Q.    Would you explain this to the jury?

6    A.    Yes.  One of the words is highlighted in yellow and that's

7    "realise."  On the -- the subtitles reads, "Then you would

8    realise" --

9    Q.    I'm sorry.

01:27 10    A.    "Then you would realise that there is nothing hindering

11    you from it."  Realize here is spelled r-e-a-l-i-s-e, which is

12    a British spelling.

13    Q.    Let me show you a screen shot.

14          MS. BASSIL:  Your Honor, this would be Exhibit 1284

15    [sic].  The government has no objection to this.

16          THE COURT:  All right.

17    (Exhibit No. 1281 received into evidence.)

18    Q.    Is this a screen shot from the video?

19    A.    Yes.

01:27 20    Q.    And this is where the word "realize" is spelled

21    R-e-a-l-i-s-e?

22    A.    Yes.

23    Q.    What is significant about that?

24    A.    That's British English.  In America, we spell it

25    R-e-a-l-i-z-e.

1  Q.   And this is the video, the Expedition of Umar Hadeed, is

2  that correct?

3  A.   Yes.

4  Q.   And you were provided with this translation from Mr.

5  Mehanna's computer, correct?

6  A.   As far as I know, yes.

7  Q.   Now, going back to Page 3, I note you also showed that

8  there were other differences.  And then you have here "long

9  lines of martyrdom."  Do you see that?

01:28 10  A.   Yes.

11  Q.   What was on the video?

12  A.   "Queues," Q-u-e-u-e-s.

13  Q.   I'm going to show you a screen shot again from the

14  Expedition of Umar Hadeed.  Do you recognize that screen shot?

15  A.   Yes.

16      MS. BASSIL:  Your Honor, this would be Exhibit 1280.

17  The government has no objection.

18      THE COURT:  Okay.

19  (Exhibit No. 1280 received into evidence.)

01:29 20  Q.   This is the word you're referring to?

21  A.   Yes.

22  Q.   Q-u-e-u-e-s.  What does that mean?

23  A.   Well, lines.  But it's normal -- it's a normal word in

24  British English but it's quite unusual, extraordinary, for an

25  American to say that.  It would be an affectation of trying to

1    imitate somebody from England.

2    Q.   On the next page, Page 4, I see that you had a number of

3    corrections on that as well, or differences --

4    A.   Differences.

5    Q.   -- between the translation and the video, is that correct?

6    A.   Yes.

7    Q.   You have a lot of writing here.  Could you explain to the

8    jury what the difference was that you saw between the

9    translation and the actual video?

01:29 10    A.   Yes.  Where the green bracket is, "Allah is the greatest

11    and all is our Honour."  Honour is spelled H-o-n-o-u-r rather

12    than H-o-n-o-r.  And "honour" is, again, British English.

13    O-U-R is normal for British English with words ending in O-R in

14    American English.  But it's not normal at all for American

15    English.

16    Q.   Let me see if I have this.  You have said the first one, I

17    believe, was the word "realise"?

18    A.   Yes.

19    Q.   And that was spelled R-e-a-l-i-s-e --

01:30 20    A.   Yes.

21    Q.   -- on the video --

22    A.   Yes.

23    Q.   -- is that correct?

24         And the American way of spelling "realize" is what?

25    A.   R-e-a-l-i-z-e.

1    Q.   And then the next one that we looked at was the word

2    "queue"?

3    A.   Yes.

4    Q.   Q-u-e-u-e?

5    A.   Yes.

6    Q.   And what does that mean -- what do Americans use for this?

7    A.   Lines, standing in line.  The British would say "queuing

8    up."

9    Q.   The next one you said was honour, h-o-n-o-u-r?

01:31 10   A.   Yes.

11   Q.   How is the American spelling of that?

12   A.   H-o-n-o-r.

13   Q.   On Page 5, again, there were a number of differences

14   between the video --

15   A.   Yes.

16   Q.   -- and the translation, is that correct?

17   A.   Yes.

18   Q.   You noted all of these, did you not?

19   A.   Yes.

01:31 20   Q.   I note that there's -- it looks like there's a number of

21   differences on the phrase "all praises for Allah"?

22   A.   Yes.

23   Q.   Can you explain that to the jury?

24   A.   Yes.  In the transcript here, it's written "praise be to

25   Allah."  But in the subtitles "all praise is for Allah."  Each

1    time in the subtitles you read "all praise is for Allah," not

2    "praise be to Allah."

3    Q.   And based on your education and training, your review of

4    English -- of American literature and drama and drama and

5    literature from the United Kingdom, do you have an opinion as

6    to the type of person who did the final translations on this

7    video?

8              MR. AUERHAHN:  Objection, your Honor.

9              THE COURT:  Sustained.

01:32 10   Q.   Do you have an opinion as to the -- I'm sorry, the

11   education of the person who did the final translation on the

12   video?

13             MR. AUERHAHN:  Objection, your Honor.

14             THE COURT:  Sustained.

15   Q.   Did an American do the final translation on this video?

16   A.   No.

17             MR. AUERHAHN:  Objection, your Honor.

18             THE COURT:  Sustained as phrased.

19   Q.   Based on your education, training, your study of American

01:32 20   and United Kingdom literature and your review of the subtitles

21   in this case and on that video and your review of the

22   translation, do you have an opinion as to the use of United

23   Kingdom's spelling and words on the subtitles in the Expedition

24   of Umar Hadeed?

25             MR. AUERHAHN:  Objection, your Honor.  The question is

1    way too vague.

2           THE COURT:  I'm not clear what the question is.

3    Q.   The question is:  Did someone who did the translating,

4    were they educated in the United Kingdom?

5           MR. AUERHAHN:  Objection.

6           THE COURT:  Sustained.

7    Q.   Can you determine how this person was educated or where

8    they came from?

9           MR. AUERHAHN:  Objection.

01:33 10        THE COURT:  You may answer whether you can determine

11   that.

12   A.   Yes.

13   Q.   What did you determine?

14          MR. AUERHAHN:  Objection, your Honor.

15          THE COURT:  He may answer.

16          MR. AUERHAHN:  May we approach sidebar?

17          THE COURT:  Well, okay.

18   (SIDEBAR CONFERENCE AS FOLLOWS:

19          MR. AUERHAHN:  Your Honor, first of all, there's

01:34 20   evidence that more than one person worked on this particular

21   video project.  So it's creating a false impression based on

22   the facts that are not in evidence and not accurate.

23          THE COURT:  I think that's a matter for cross.

24          MR. AUERHAHN:  Okay.

25   .  .  .  END OF SIDEBAR CONFERENCE.)

1    Q.   Do you have an opinion as to whether the subtitles were

2    written by someone who was American trained or English trained?

3    A.   Yes.

4    Q.   What is that?

5    A.   The person who wrote those subtitles was either trained in

6    the United Kingdom to speak English or was taught English by a

7    teacher trained in British English.

8    Q.   What is your understanding of Mr. Mehanna's education?

9         MR. AUERHAHN:  Objection.

01:34 10         THE COURT:  Sustained.

11   Q.   Doctor Connolly, were you asked to look at another

12   translation?

13   A.   Yes.

14        MS. BASSIL:  This would be Exhibit 782, already in

15   evidence.

16   Q.   Did you review this translation?

17   A.   Yes, I did.

18   Q.   In this translation someone -- it says, "Dear brother, I

19   have translated it.  Some sentences will not be grammatically

01:35 20   correct," correct?

21   A.   Yes.

22   Q.   And I would ask you --

23        MS. BASSIL:  I'm going to ask you if we could make

24   this bottom piece bigger, the bottom half, right here.

25   Actually, if we could blow up that line, that's great.

1   Q.   Did you see this word, "organisation"?

2   A.   Yes.

3   Q.   Is that a particular type of spelling?

4   A.   Yes.  Again, that's British English.  In American English,

5   it would be spelled o-r-g-a-n-i-z-a-t-i-o-n.

6        MS. BASSIL:  And if we could go to the next page.  And

7   if we could blow up this bottom, from here.

8   Q.   Again, did you see British, or U.K., spelling in this part

9   of the document?

01:36 10  A.   Yes.  "Recognised" is spelled with an "S," and in American

11  English, it's spelled with a "Z."

12  Q.   What about here?

13  A.   "Organisation," again, here it's spelled with an "S,"

14  which is British English; and in American English, we spell it

15  with a "Z."

16  Q.   And here?

17  A.   "Honour," again, as in the previous document, it's

18  h-o-n-o-u-r, which is British English.  In the United States,

19  we spell it h-o-n-o-r.

01:37 20  Q.   And here?

21  A.   Again, organization with an "S" instead of a "Z."

22       MS. BASSIL:  If we could go to the next page, please.

23  And if we could blow up the first paragraph.

24  Q.   Again, can you explain to the jury the significance of

25  that word?

1    A.    Yes, "honourable."  It's the same.   The O-U indicates

2    British English.   In American English, it would be

3    h-o-n-o-r-a-b-l-e.

4         MS. BASSIL:  Also, if we could go to the last

5    paragraph on this page, please.

6    Q.   If you can see that, what -- I just made a big mess of it.

7    There we go.

8         Did you notice an error, grammatical error?

9    A.   Yes.   This translation consistently used this pronoun

01:38 10   incorrectly.   T-h-e-r-e was used all the way through it instead

11   of t-h-e-i-r, the possessive pronoun.

12        MS. BASSIL:  Could we go to the next page, please?

13   And if we could blow up the second line.   That would be great.

14   Q.   Again, did you see that same error?

15   A.   Yes.   The second word, t-h-e-r-e, should be t-h-e-i-r.

16   And it's -- a few words later, the mistake is there again.

17        MS. BASSIL:  Can we go to the next paragraph, please?

18   Yes, if we could blow up the second paragraph.

19   Q.   Did you see a British spelling in this paragraph?

01:39 20   A.   Labourers, l-a-b-o-u-r-e-r-s.   Again, the O-U in British

21   English, which in American English would be just an "O."

22   Q.   So in American English, it would be l-a-b-o-r-e-r-s?

23   A.   Yes.

24        MS. BASSIL:  And if we could go a little bit further

25   down the page, please.   And if we could have this paragraph

1    bigger.

2    Q.   Again, did you see the same grammatical mistake?

3    A.   Yes.  The t-h-e-r-e should be t-h-e-i-r.

4         MS. BASSIL:  If we could go to the next page, please.

5    And if we could blow up this part.

6    Q.   Did you see this phrase, "Allah is my reckon and he is the

7    best of reckon"?

8    A.   Yes.

9    Q.   What is your understanding of this word?

01:40 10  A.   This makes no sense in either British or American English.

11   I assume it's meant to be Allah is my "reckoning," but I looked

12   in various dictionaries, dictionaries going back to the 18th

13   Century.  There's -- this is a nonexistent usage.  I don't know

14   where the writer got this construction.

15        MS. BASSIL:  Thank you.  If we could have the next

16   paragraph.

17   Q.   Again, is this British spelling?

18   A.   Yes, again, that's -- yes.  That's used twice in British

19   spelling.

01:40 20  Q.   It's used a third time?

21   A.   Three times in the paragraph.

22        MS. BASSIL:  If we could go to the last paragraph,

23   please.

24   Q.   And the word "publicise" on this?

25   A.   Yes.  That's another example of British English.  In

1    American English, it would have a "Z."

2    Q.    So "publicise" there?

3    A.    Yes.

4    Q.    How would that be spelled in American English?

5    A.    P-u-b-l-i-c-i-z-e.

6    Q.    Did you continue to see grammatical errors with the use of

7    the word "there" throughout the document?

8    A.    Yes, throughout the document.

9          MS. BASSIL:  If we could go to Page 8, please.  And if

01:41 10   we could go to the bottom paragraph.

11   Q.    Did you see this "rule from the cow boys"?

12   A.    Yes.

13   Q.    What was your -- what was your comment on this?

14   A.    This is someone who doesn't -- this is just a misspelling.

15   Neither in the United Kingdom nor in the United States does

16   anyone spell "cowboys" as two words.

17         MS. BASSIL:  If we could have Page 9, please.  And if

18   we could blow up this middle paragraph.

19   Q.    And the word here, "savour"?

01:42 20   A.    Yes.  That's another example of British English.

21   Q.    How would it be spelled in American English?

22   A.    S-a-v-o-r.

23         MS. BASSIL:  And if we could remove that, that would

24   be fine.

25         Your Honor, I'd like to admit the marked-up copy as

1    Exhibit 1284.

2              MR. AUERHAHN:  No objection, your Honor.

3              THE COURT:  The marked copy of this second one?

4              MS. BASSIL:  Yes.

5              THE COURT:  Okay, fine.

6    (Exhibit No. 1284 received into evidence.)

7              MS. BASSIL:  1284.  And if I could use the ELMO, your

8    Honor.

9    Q.    Doctor Connolly, these are the words that I've been

01:43 10   writing down.  And on the side here is United Kingdom usage, is

11   that correct?

12   A.    Yes.

13   Q.    And on the other side is American usage, is that correct?

14   A.    Yes.

15   Q.    Now, this translation that had been -- we had previously

16   looked at.  Based on your expertise in English and American

17   literature, United Kingdom literature, are you able to provide

18   an opinion as to the person who did -- who wrote this

19   document --

01:43 20   A.    Yes.

21   Q.    -- as to their education in writing this document?

22   A.    Yes.  This is a person who was not educated in American

23   English.  This is not a native speaker of American English.

24   Q.    Do you have an opinion as to whether this person, whether

25   English was their native language?

1    A.    I strongly doubt it.

2              MR. AUERHAHN:  Objection.

3              THE COURT:  Sustained to that.  The jury will

4    disregard that last answer.

5              MS. BASSIL:  I have no further questions.

6              THE COURT:  Do you have --

7              MR. AUERHAHN:  Take a break?

8              THE COURT:  Do you have a time estimate?

9              MR. AUERHAHN:  More than just a couple minutes.

01:44 10              THE COURT:  Okay.  We'll take the morning recess.

11    (Recess taken at 11:03 a.m.)

12              (After the recess:)

13              THE CLERK:  All rise for the Court and the jury.

14              (The Court and jury enter the courtroom at 11:28 a.m.)

15              THE CLERK:  Please be seated.

16              MS. BASSIL:  Your Honor, for the record, I just wanted

17    to correct an exhibit number.

18              THE COURT:  Okay.

19              MS. BASSIL:  And that is, I had erroneously stated

02:08 20    that a particular photograph was 1284.  This should be Exhibit

21    1281.

22              THE COURT:  Oh, okay.

23              MS. BASSIL:  All right?  So I just wanted to correct

24    that for the record.

25              THE COURT:  And so the later 1284 was 1284?

1          MS. BASSIL:  Yes.

2          THE COURT:  Okay.

3          MR. AUERHAHN:  May I, your Honor?

4          THE COURT:  Please.

5                        CROSS-EXAMINATION

6    BY MR. AUERHAHN:

7    Q.   Good morning, sir.

8          MR. AUERHAHN:  Could we bring up 782, please?  On both

9    screens, your Honor, please?

02:09 10        THE COURT:  It should be.

11          MR. AUERHAHN:  Thank you.

12   BY MR. AUERHAHN:

13   Q.   Now, sir, were you told that this particular exhibit was

14   found on the defendant's computer during a search in 2006?

15   A.   I believe so.

16   Q.   Okay.  And it's fair to say that in looking at this

17   document, there's no way for you to tell whether or not this is

18   a first draft, a second draft or a third draft, correct?

19   A.   Correct.

02:09 20  Q.   Okay.  And if it's a second draft or a third draft -- or,

21   as a matter of fact, even if it's a first draft -- strike that.

22          If it's a second or third draft, you have no way of

23   knowing whether the first draft was done by someone who's

24   British?

25   A.   I wouldn't be able to talk at all about a first or second

        1   draft.

        2   Q.   Okay.  And it's your belief that if this is multiple

        3   drafts, at least one of the drafts was --

        4         MS. BASSIL:  Objection, your Honor.  He did not say it

        5   was his belief it was multiple drafts.

        6   BY MR. AUERHAHN:

        7   Q.   No.  I said that it's your --

        8         THE COURT:  Just start the question again.

        9   BY MR. AUERHAHN:

02:10  10   Q.   I said it's your belief if this is a result of multiple

       11   drafts, then at some point in time someone who's British had a

       12   role in drafting this document?

       13         MS. BASSIL:  Your Honor, the witness said he didn't

       14   know if there were multiple drafts.

       15         THE COURT:  Yeah.  It's a conditional.

       16         Go ahead.  You may have it.

       17         Do you understand the question, sir?

       18         THE WITNESS:  No, I don't.

       19         THE COURT:  All right.  Put it again.

02:10  20   BY MR. AUERHAHN:

       21   Q.   So first you couldn't tell us if this is a result of

       22   multiple drafts.  We agree on that?

       23   A.   No one could.

       24   Q.   Thank you.  If it were the -- I'm asking you a

       25   hypothetical.  If it were the result of multiple drafts, your

1    belief is that at some point in time someone who is British had

2    a role in drafting this document?

3    A.   Yes.

4         MR. AUERHAHN:   All right.   Could we go to page --

5    Q.   Well, first, before we do that, sir, what's a lorry?

6    A.   It's a truck in British English.

7    Q.   Okay.   And so someone from the United Kingdom wouldn't

8    normally write "truck"; they'd write "lorry"?

9    A.   Yes.

02:11 10        MR. AUERHAHN:   Okay.   Can we go to page 4 of this

11   exhibit, please?

12   Q.   And do you see on the third line where it says "from truck

13   drivers"?

14   A.   Yes.

15   Q.   Okay.   So that's an indication to you that someone who

16   spoke American English had a role in this document?

17   A.   Yes.

18   Q.   So based on that, you didn't come to the conclusion that

19   there's more than one author involved in this particular

02:11 20   document?

21   A.   No, but "truck" is also used transatlantically.

22   Q.   Okay.   But "lorry" is more common in the United Kingdom?

23   A.   Well, it's also informal.

24   Q.   Sir, "lorry" is more common in the United Kingdom?

25   A.   Yes.

1          MR. AUERHAHN:  And could we bring up Exhibit 512,

2     please?

3     Q.   Okay.  I'm going to read to you and ask you a question.

4     "Do you have the Hollywood film Wa-Yakoon ad Deen?"  The other

5     person answers, "Yes."

6          "Okay."

7          "Starring the Slicer."

8          "Can you just go through that and edit what needs to

9     be edited?"

02:12 10          "What do you mean?"

11          "Press accept.  You'll see."

12          "Accept what?"

13          "Abu Mu'ndhir, waiting for the person to accept the

14     file  'WaYakoon.doc.'  Please wait for response or cancel the

15     file transfer."

16          So, sir, are you aware that this particular -- or at

17     least some version of WaYakoon.doc was received in an instant

18     message between Abu Mu'ndhir and another person?

19     A.   No, I'm not.

02:12 20     Q.   Well, do you understand what this is --

21          MS. BASSIL:  Objection.

22          THE COURT:  Go ahead.

23          If the objection was to the last question, it's

24     overruled.  The answer may stand.

25          Next question.

1    BY MR. AUERHAHN:

2    Q.   Do you know that the person -- that this person is the

3    defendant?

4    A.   No, I do not.

5    Q.   Okay.  And do you see here where it says "WaYakoon.doc"?

6    A.   Yes.

7    Q.   Okay.  And that's what this document was called also,

8    Wa-Yakoon, correct, Exhibit --

9    A.   When you say "this document," what are you talking about?

02:13 10   Q.   Exhibit 782, which you analyzed.

11   A.   Yes.

12   Q.   Now, do you know whether or not the WaYakoon.doc was

13   Exhibit 782 or some other version of the Wa-Yakoon video?

14   A.   No, I don't.

15   Q.   You have no way of knowing that?

16   A.   No.

17   Q.   And defense counsel didn't give you any chats to review as

18   part of your analysis?

19   A.   I was only given one copy.

02:13 20   Q.   Now, if --

21        MR. AUERHAHN:  You can take that down, Paul.  Thank

22   you.

23   Q.   Now, if -- the differences in the spellings you pointed

24   out, one isn't right and one isn't wrong; it's just different

25   styles, correct?

1    A.    Yes.

2    Q.    Okay.  So if an author was collaborating with someone in

3    the United Kingdom who did a first draft of the document, when

4    he receives the first draft he can either leave the English

5    version or change it to American, correct?

6              MS. BASSIL:  Objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  Could you ask it again, please?

9    BY MR. AUERHAHN:

02:14 10   Q.    In other words, you're in the United States, you're

11   collaborating on a document with someone from the United

12   Kingdom and he does the first draft, so he naturally uses words

13   with British spellings and then sends it to you to edit.  Do

14   you understand me so far?

15   A.    Yes.

16   Q.    You can leave the British spelling in because, after all,

17   it's not wrong --

18   A.    Well, it's not quite that simple.  It would depend on who

19   the audience is.

02:15 20   Q.    Excuse me, sir.  The way it works, I finish a question and

21   then you answer it.  You can either say "yes" or "no," or say

22   "I can't answer that," okay?

23              So my question is:  You're collaborating with someone

24   in the United Kingdom who sends you a first draft containing

25   British spellings of words.  You can leave those British

1    spellings because, after all, they're not incorrect.  Isn't

2    that true?

3    A.   I can't answer that.

4    Q.   And it's fair to say that if the version that was received

5    by the defendant had British spellings, he could have chosen to

6    leave those into the final product?

7    A.   I can't answer that.

8    Q.   Now, sir --

9         MR. AUERHAHN:  Can we bring up Exhibit 379, please?

02:15 10   Q.   Do you recognize this document?

11   A.   Yes.

12   Q.   And it's fair to say this appears to be the same as 782

13   but without that heading at the top about "Note to Your

14   Brother"?

15   A.   I assume so.  It looks pretty close.

16   Q.   And, sir, were you told that this document was found on

17   Waseem Mughal's computer?

18        MS. BASSIL:  Objection.

19        THE COURT:  Sustained.

02:16 20   BY MR. AUERHAHN:

21   Q.   Sir, do you know -- well, the evidence in the case is it

22   was found on --

23        MS. BASSIL:  Objection.

24        MR. AUERHAHN:  I apologize, your Honor.

25        Would you take that down, please?

BY MR. AUERHAHN:

Q.   Now, sir, Exhibit 340 -- now, this is the "Expedition of Umar Hadeed."  This is the document you analyzed and compared to the video?

A.   Uh-huh.

Q.   Do you know what Tibyan Publications was?

A.   I beg your pardon?

Q.   Do you know what Tibyan Publications was?

A.   No.

Q.   Do you know who ultimately released the Umar Hadid video?

A.   No.

Q.   Do you know whether or not a number of administrators, moderators and translators on the organization that released Umar Hadid were British?

A.   No.

        MS. BASSIL:  Objection.

        THE COURT:  No, that answer may stand.

BY MR. AUERHAHN:

Q.   Now, with reference to Exhibit 340, similar to the questions I asked you before on the Wa-Yakoon, do you know whether this is a first draft, a second draft or a third draft?

A.   No.

Q.   And you also have no way of knowing whether or not someone collaborated with the ultimate author on this particular project?

1    A.    No.

2    Q.    Okay.  And were you told that this was not found on the

3    defendant's computer but was found on a floppy disk in 2009?

4    A.    Could you ask that again, please?

5    Q.    Were you told that this was not found on the defendant's

6    computer but found on a floppy disk in 2009?

7    A.    No.

8    Q.    Okay.  And with reference to this particular draft, do you

9    know whether or not the author started from scratch or received

02:18 10   a version from someone else?

11   A.    I can't answer that.

12         MR. AUERHAHN:  Now, could we bring up Exhibit 415,

13   please?

14   Q.    Now, do you see here where someone named Muraabit sends a

15   video link to Abu Sabaayaa known as Umar Hadid?  Do you see

16   that?

17   A.    I see some of the things you're referring to but not all

18   of them.

19   Q.    Okay.  Well, here's Aboo Mahmoud Muraabit.  Do you see

02:19 20   that?

21   A.    Uh-huh.

22   Q.    And you see the link to the video Umar Hadid?

23   A.    Yes.

24   Q.    Okay.  You see that.  Do you know who Muraabit was?

25   A.    No.

1    Q.   Do you know whether or not the GUH video was a project by

2    one person or more than one person?

3            MS. BASSIL:  Objection.

4            THE COURT:  You may answer it.  You may answer.

5            THE WITNESS:  No.

6    BY MR. AUERHAHN:

7    Q.   Okay.

8            MR. AUERHAHN:  Would you bring up Exhibit 514, please?

9    Page 2?

02:20 10   Q.   Okay.  Abu Mu'ndhir:  "Can't download that stuff right

11   now."

12           MS. BASSIL:  Objection, your Honor.

13           THE COURT:  Yeah, I think with this witness,

14   sustained.

15           MR. AUERHAHN:  Okay.

16   BY MR. AUERHAHN:

17   Q.   Sir, would it make a difference to your analysis as to

18   whether or not it was -- whether or not someone from an

19   American background wrote these translations if you knew

02:20 20   whether or not someone from the United Kingdom was also

21   involved in the translation project?

22   A.   Could you rephrase that, please?

23   Q.   Yes.  In other words, you've identified certain British

24   uses of words and came to the conclusion that an American did

25   not write -- or finalize the version you're looking at.  So my

1    question is:  Would it affect your analysis if you learned that

2    someone else, potentially someone from the United Kingdom,

3    participated in the drafting of these written documents?

4              MS. BASSIL:  Objection, your Honor.  There's no

5    evidence of that.

6              THE COURT:  No, overruled.

7              You may answer the question.

8              THE WITNESS:  Yes, I suppose.

9    BY MR. AUERHAHN:

02:21 10   Q.   Okay.  So where Abu Mu'ndhir says, "Even GUH, which I

11   worked on."  Do you see that on the bottom?

12   A.   Yes.

13   Q.   And GUH is the "Expedition of Umar Hadeed."  So this

14   appears to be a statement by Abu Mu'ndhir indicating that he

15   worked on it.

16             MS. BASSIL:  Objection, your Honor.  We don't know

17   what he worked on.

18             THE COURT:  Well, at any rate.  Yes, the objection is

19   sustained.

02:22 20   BY MR. AUERHAHN:

21   Q.   Would it have been important to your analysis to know that

22   someone named Abu Mu'ndhir worked -- claimed to have worked on

23   this project?

24             MS. BASSIL:  Objection, your Honor.  He could have

25   worked on the video portion.  We don't know.

1          THE COURT:  Well, you may answer the question.

2          THE WITNESS:  I can't answer that.

3     BY MR. AUERHAHN:

4     Q.   Well, wouldn't you want to know whether Abu Mu'ndhir was

5     British?

6     A.   I was only looking at one specific translation.

7     Q.   So the fact that someone who might be British could have

8     been involved in this project was not allowed to interfere with

9     your conclusion about who drafted it?

02:22 10          MS. BASSIL:  Objection.

11          THE COURT:  Overruled.

12          You may answer that.

13          THE WITNESS:  Could you ask me that again, please?

14     BY MR. AUERHAHN:

15     Q.   All right.  Sir, wouldn't it be important to you to know

16     if more than one person worked on this project?

17     A.   No.

18     Q.   Well, if one of those people was from the United Kingdom,

19     that wouldn't affect your opinion?

02:23 20     A.   I was only looking at a document that was put in front of

21     me, and I was judging that as a document itself and determining

22     whether it was written in British English or American English.

23     And what I did was determine that it was written in British

24     English.

25     Q.   So with -- strike that.

1        MR. AUERHAHN:  Could we have Exhibit 700, please?

2    Page 2, 4, 6, 7.

3    Q.   Do you see this section here where the defendant says,

4    "The Umar Hadid video, Abu Sabaayaa translated it"?  Do you see

5    that?

6    A.   Yes.

7    Q.   Do you know who Abu Sabaayaa is?

8    A.   No.

9    Q.   So we have two chats here, one where Abu Mu'ndhir says "I

02:24 10   worked on it" and one where someone says Abu Sabaayaa worked on

11   it.

12        MS. BASSIL:  Objection, your Honor.  This is

13   argumentative.  This is closing argument, not questions.

14        THE COURT:  No, you may have it.

15   BY MR. AUERHAHN:

16   Q.   Sir, my question is:  Was this important information to

17   you in determining who was involved in translating these

18   projects?

19   A.   I didn't have this information.

02:24 20   Q.   Exactly.  So is there some reason why you didn't want to

21   let the facts get in the way of your opinion?

22        MS. BASSIL:  Objection.

23        THE COURT:  Sustained.

24        MR. AUERHAHN:  No further questions, your Honor.

25        MS. BASSIL:  No questions, your Honor.

1           THE COURT:  All right, Professor Connolly.  Thank you.

2    You may step down.

3           (The witness is excused.)

4           THE COURT:  Let me see counsel at the side for a

5    moment.

6           (Discussion at sidebar and out of the hearing of the

7    jury:)

8           THE COURT:  I think we have two pieces of business

9    without the jury before the next witness begins, and so I would

02:25 10    propose to excuse them now and we'll do those.  I would like to

11    do the voir dire we talked about yesterday first, and then move

12    to addressing issues regarding Dr. Sageman's testimony.  I

13    don't know whether that will -- how long that will take, but I

14    think if it didn't take till one o'clock, whatever time would

15    be left would be pretty short, and we may as well start fresh

16    in the morning.

17           MR. CARNEY:  I think that's a good idea.

18           THE COURT:  Okay.  So I'll excuse them.  Are we ready

19    to go with the FBI?

02:25 20           MR. CHAKRAVARTY:  Yes, they're here.

21           THE COURT:  Okay.

22           (In open court:)

23           THE COURT:  Jurors, there are a couple of matters that

24    the lawyers and I have to do without you, so I think it's going

25    to take enough time that it will probably get us close enough

 1   to one that we won't begin the next witness.  So consider this

 2   an early discharge.  We'll let you go a little early.  We'll

 3   resume with the evidence tomorrow morning, okay?

 4         We're in good shape.  Again, I want to keep assuring

 5   you of that, okay?  So enjoy the rest of the day and we'll see

 6   you tomorrow morning.

 7         We'll stay in session.

 8         THE CLERK:  All rise for the jury.

 9         (The jury exits the courtroom at 11:46 a.m.)

02:26 10       THE CLERK:  Please be seated.

11         THE COURT:  Okay.  As we discussed yesterday, I will

12   permit a focused voir dire regarding communications with the

13   witness Abuzahra about potential promises or inducements from

14   the government.

15         Mr. Carney?

16         MR. CARNEY:  Yes, your Honor.  May I move that

17   witnesses from the FBI who possibly would have relevant

18   information be sequestered?

19         THE COURT:  Fine.

02:27 20       MR. CHAKRAVARTY:  I believe there's only two:  the

21   case agents.  So your preference as to whether it be Agent Daly

22   or --

23         MR. CARNEY:  Please.

24         MR. CHAKRAVARTY:  Daly first?

25         MR. CARNEY:  Agent Daly first.

          1              (Heidi Williams is sequestered.)

          2                    THOMAS DALY, duly sworn

          3         THE CLERK:  Please be seated.  State your name and

          4    spell your last name for the record.

          5         THE WITNESS:  Thomas Daly, D-A-L-Y.

          6         MR. CARNEY:  Thank you, your Honor.

          7                    VOIR DIRE EXAMINATION

          8    BY MR. CARNEY:

          9    Q.   Good morning, Mr. Daly.

02:28    10    A.   Good morning.

         11    Q.   How are you employed, sir?

         12    A.   I am a sergeant with the Lowell, Massachusetts, police

         13    department.

         14    Q.   How long have you been with the Lowell police?

         15    A.   I've been with the Lowell police since 1994.

         16    Q.   How long have you been a sergeant?

         17    A.   I think since around October of 2003.

         18    Q.   Are you currently on assignment at a different location?

         19    A.   Yes.

02:28    20    Q.   Where is that, please?

         21    A.   I'm with the Boston FBI's Joint Terrorism Task Force.

         22    Q.   Could you describe what that task force is?

         23         MR. CHAKRAVARTY:  I don't think we need a description

         24    of that, your Honor.  If we can just focus on --

         25         THE COURT:  No, go ahead.  You may have it.

1          THE WITNESS:  It's a group of agencies that -- law

2    enforcement agencies and others that work together in the

3    Boston FBI office to investigate terrorism-related matters.

4    BY MR. CARNEY:

5    Q.   Did you have a role investigating this case?

6    A.   I did.

7    Q.   And what was that role?

8    A.   I was a case agent in this case.

9    Q.   And what does the word -- or the phrase "case agent" mean?

02:29 10  A.   Let me see how I would describe that.  Agent Williams and

11    I both kind of took the lead in investigating this case.

12    Q.   By referring to Special -- by referring to Agent Williams,

13    are you referring to Special Agent Heidi Williams?

14    A.   Yes.

15    Q.   And she is with the FBI?

16    A.   She is, yes.

17    Q.   During the course of this investigation did you get to

18    know Kareem Abuzahra?

19    A.   I did.

02:29 20  Q.   And how did that happen?

21    A.   I believe it began with the proffer interview back in

22    2006.

23    Q.   How many times between 2006 and November of 2011 would you

24    say that you had contacts with Kareem Abuzahra?

25          MR. CHAKRAVARTY:  Objection, your Honor.

1          THE COURT:  Sustained.

2     BY MR. CARNEY:

3     Q.   Did you ever speak to him in person during that period?

4     A.   Yes.

5     Q.   Approximately how many times in person?

6          MR. CHAKRAVARTY:  Objection, your Honor.

7          THE COURT:  Sustained.

8     BY MR. CARNEY:

9     Q.   Do you feel you got to know him well?

02:30 10    A.   In a work-related environment, yes.

11    Q.   Is November 28, 2011, the first date that Kareem Abuzahra

12    testified in this trial to your knowledge?

13    A.   It is.

14    Q.   Were you present that day in the court?

15    A.   Yes.

16    Q.   His testimony ended that day at approximately one o'clock.

17    Is that right?

18    A.   Approximately, yes.

19    Q.   Later that day did he call you?

02:30 20    A.   I don't believe so.

21    Q.   When was the next time you saw him?

22    A.   In the morning.  Tuesday morning.  I'm sorry.  Tuesday

23    morning.

24    Q.   And would that be November 29?

25    A.   Yes.

1    Q.   Did you speak to him before he resumed his testimony?

2    A.   Yes.

3    Q.   Where did that conversation occur?

4    A.   In my car.

5    Q.   How did it happen to be in your car?

6    A.   I picked him up and drove him to the courthouse.

7    Q.   Had you done that the day before?

8    A.   Yes.

9    Q.   Is that a routine with just this witness or with all the

02:31 10   witnesses?

11   A.   In varying degrees we help witnesses get to the

12   courthouse.  He was the only one that I picked up in the

13   morning on the way in.

14   Q.   Did you pick him up and drop him off every day he

15   testified?

16   A.   I did not drop him off.

17   Q.   Just bringing him to court?

18   A.   Yes.

19   Q.   Did you have a conversation with him that morning in the

02:31 20   car?

21   A.   Yes.

22   Q.   Did it concern his employment at the University of

23   Massachusetts at Lowell?

24   A.   Yes.

25   Q.   Was that the first time you had had a conversation with

1    him about his job?

2    A.   Over all that time --

3    Q.   Yes.

4    A.   -- since I've known him?

5         I think it was part of the interviews, where he worked

6    and that type of stuff, but...

7    Q.   Had he ever previously expressed a concern to you about

8    keeping his job?

9    A.   I don't believe so.

02:32 10   Q.   Did he bring up a concern with you that morning about his

11   job?

12   A.   Yes, he did.

13   Q.   What did he say, please?

14   A.   He was concerned about what the people he worked with

15   thought about him related to his previous day's testimony.

16   Q.   What did you say?

17   A.   At that time I just listened to him.

18   Q.   What did he say next?

19   A.   He said that he was -- I believe this was -- at that time

02:33 20   he said that he had been contacted by someone from his work.  I

21   believe his boss's boss, is how he referred to it.

22   Q.   Excuse me.  You believe it was whom?

23   A.   His boss's boss.

24   Q.   His boss's boss had contacted Mr. Abuzahra?

25   A.   Yes, in some way.  I don't know how.  And relayed that he

1    needed to call her before he returned to work.

2    Q.    Did he give you this person's name?

3    A.    I'm not sure if I knew it or if he gave it to me.

4    Q.    What is that person's name?

5    A.    It's Patty McCafferty.

6    Q.    Can you spell the last name, please, or do the best you

7    can?

8    A.    I would have to guess, but I think it's M-C-A-F-F-E-R-T-Y

9    [sic].

02:33 10    Q.    Do you know what her title is?

11    A.    I believe she's the vice chancellor at the University of

12    something.

13    Q.    Could it be the University of Massachusetts at Lowell?

14    A.    Oh, yes.

15    Q.    And is the chancellor there Martin Meehan?

16    A.    Yes.

17    Q.    What did Mr. Abuzahra tell you, if anything more, about

18    his conversation with Ms. MacPhee [sic]?

19    A.    I don't know how that notification took place, but I don't

02:34 20    think anything else other than that.

21    Q.    Did you ask him what she had said?

22    A.    No.  I think he told me that he needed to contact her

23    before he returned to work.

24    Q.    Did he indicate or did she -- did he indicate any reason

25    why he had to contact her?

1   A.   No, not -- I don't remember him indicating any reason why

2   he had to contact her.

3   Q.   Did you discuss further with him why the vice chancellor

4   might want to be contacting him?

5   A.   Why she might be contacting him?

6   Q.   Yes.

7   A.   In response to him saying that he was contacted by her, I

8   said, "I was also contacted by her."

9   Q.   When had you been contacted by her?

02:35 10   A.   Sometime in the afternoon of -- Monday afternoon following

11   court.

12   Q.   Okay.  Let's complete talking about the conversation with

13   Mr. Abuzahra first.

14   A.   Okay.

15   Q.   This was occurring on Tuesday morning when you were on

16   your way to court?

17   A.   Yes.

18   Q.   Did you mention to him that you'd been contacted by the

19   vice chancellor?

02:35 20   A.   Yes.

21   Q.   And what did you say to him?

22   A.   I said, "I was also contacted by the vice chancellor."

23   Q.   Please continue with how your conversation ensued in the

24   car.

25   A.   This was two weeks ago, so forgive me.  I can't remember

1    verbatim what was said but --

2    Q.    Did you take any notes?

3    A.    No.  I was driving.

4    Q.    You didn't think this was a conversation worthy of taking

5    notes about?

6    A.    I was driving, but, no, I didn't think of it as a very

7    remarkable conversation.

8    Q.    So you're having a conversation with a witness who's on

9    the stand who might be considered the central witness in the

02:36 10   case about a concern he has with his job and you spoke to his

11   boss's boss, and this was a minor conversation, in your mind?

12   A.    I think he was concerned about what the people at work

13   thought about him, not -- he didn't express any concern for his

14   continued employment.

15   Q.    Why did you draw the conclusion that he was more concerned

16   about the people he worked with than the people he worked for?

17   A.    Because I think he said that he was concerned about what

18   the people thought of him at work.

19   Q.    Are those his exact words?

02:37 20   A.    No.

21   Q.    What else did he say about why he thought people at work

22   would be concerned about him?

23   A.    Well, I think because of some of the things that he

24   testified to the previous day.

25   Q.    Is that what he said?

1    A.   I don't know exactly the words.  I mean, again, this was

2    two weeks ago, so I don't remember how he said it.

3    Q.   Well, you said that you drew the conclusion that he was

4    more concerned about his coworkers and what they would think of

5    him than his employer and whether they would have concerns

6    about --

7    A.   I would assume what his employer thought of him as well.

8    Everybody at the -- that he came in contact with or knew him at

9    the university.

02:37 10   Q.   Well, I want to focus on that morning in your car, what

11   was it that Abuzahra said that made you think his coworkers

12   were concerned about him; for example, did he reference anyone,

13   had anybody said anything or called him or left him a message

14   or IM'd him or emailed him?  How did he get that impression

15   after the first day of testimony that his coworkers were

16   concerned about him?

17   A.   I'm not sure if it was that day or not, but he did say at

18   some point a coworker had contacted him -- I don't know how

19   that person contacted him.  A male coworker, I believe -- and

02:38 20   said that people were concerned about some of the things that

21   he had said -- testified to.

22   Q.   Was that conversation -- or that part of the conversation

23   on Tuesday, November 29th, with you?

24   A.   I don't remember.  I mean, I think it was, but I couldn't

25   say that for certain.

1    Q.   What other conversation did you have him -- with him in

2    the car?

3    A.   I talked to him -- well, I did -- in response to him

4    saying that he had been contacted by his boss, I said I had

5    also been contacted by his boss.

6    Q.   How did you establish it was the same boss?

7    A.   The boss's boss -- I believe he mentioned her name.  I

8    mean, I can't say that for certain, that he mentioned her name

9    because -- again, I believe it was his boss's boss.  I didn't

02:39 10   know that she was his boss.  And anyway, when she contacted me,

11   I just knew somehow that she was, you know, the vice chancellor

12   at the university.  She would be above, I guess, anybody at the

13   university.

14   Q.   Did he say that she had contacted him as well --

15   A.   I believe he did, yes.

16   Q.   -- in this conversation?

17   A.   I believe, to the best of my memory -- there were a couple

18   of days -- I drove him in every morning.

19   Q.   He testified a total of four different days?

02:40 20   A.   Yes.

21   Q.   Okay.  I'm focusing on the first day.

22   A.   Yes.

23   Q.   Did he bring up to you that this vice chancellor had

24   called him?

25   A.   I believe he did.  I mean, as best I can remember he did

1    that day, yes.

2    Q.   All right.  And what did she say to him, according to

3    Abuzahra?

4    A.   To call before he returned to work.

5    Q.   Did he say he asked her why is that?

6    A.   He did not.

7    Q.   Did he have any further conversation with her?

8    A.   Not to my knowledge.

9    Q.   What did he say to you about that conversation besides

02:40 10   what she said?

11   A.   About that --

12   Q.   Did he express a concern about why she would want him to

13   call her?

14   A.   I don't remember him expressing a concern that she wanted

15   him to call, no.

16   Q.   Did he bring it up first, the call from her, or did you

17   bring it up first, the call to you?

18   A.   He brought it up first.

19   Q.   What was his tone of voice when he was saying this?

02:41 20   A.   I can't -- normal tone of voice, I guess.

21   Q.   He wasn't a little nervous?

22   A.   Not that I can remember.

23   Q.   Did he ask you why you thought she might be asking him to

24   call before he returns to work?

25   A.   I don't remember him asking me that, no.

1    Q.   So all he said was, "I got a call from the vice chancellor

2    saying I should call before I come back to work"?

3    A.   I'm not sure he referred to her as the vice chancellor.  I

4    think it was the boss's -- his boss's boss or something.

5    Q.   And he didn't express any concern about why that was being

6    required of him?

7    A.   Not that I remember.

8    Q.   What did -- first, when did your conversation with her

9    take place?

02:42 10    A.   Monday afternoon sometime.

11    Q.   Approximately what time?

12    A.   It was sometime after court back at the FBI office.  I'm

13    not sure.  I mean, I couldn't tell you the time.

14    Q.   Did she call you on your office line or your cell phone?

15    A.   I believe she called me on my cell phone.

16    Q.   Do you know how she got that number?

17    A.   Yes.

18    Q.   How?

19    A.   Well, I'm pretty sure she got it from Lieutenant Melissa

02:42 20    Mullen at the UMass Lowell Police Department.

21    Q.   Is that someone you've had professional contact with in

22    the past?

23    A.   Yes.

24    Q.   In your role as a Lowell police officer?

25    A.   Yes, as a Lowell police officer and the JTTF.

1    Q.    I'm sorry?

2    A.    Yes.

3    Q.    And in the context of being a JTTF?

4    A.    I mean, while I was in the JTTF, yeah.

5    Q.    When she called you, did you have a conversation with her?

6    A.    Yes.

7    Q.    What did she say and what did you say?

8    A.    She said that the people were concerned about -- at the

9    university were concerned about the testimony that

02:43 10   had -- Mr. Abuzahra had given that day.

11   Q.    Did she get more specific about who was concerned?

12   A.    She -- I don't know if she got more specific than that.

13   Q.    Did she mention that Mr. Abuzahra had testified that he

14   planned to go to Iraq and engage in fighting?

15   A.    No, she didn't mention specifics of his testimony.

16   Q.    Did she in any way reference Abuzahra's idea to

17   assassinate or shoot Condoleezza Rice or John Ashcroft?

18   A.    No.

19        MR. CHAKRAVARTY:  Object to the characterization, your

02:44 20   Honor.

21        THE COURT:  Well, for these purposes --

22        MR. CHAKRAVARTY:  I understand that.  I believe that

23   question was asked for the gallery's purposes, not necessarily

24   for this inquiry.

25        THE COURT:  Well, whatever.

1           THE WITNESS:  No.

2    BY MR. CARNEY:

3    Q.   Did she mention that?

4    A.   No.

5    Q.   Do you recall her mentioning anything about a shopping

6    mall or a Hanscom Air Force Base?

7    A.   I do not.

8    Q.   Do you recall her mentioning at all Abuzahra's going to

9    New Hampshire to get automatic weapons?

02:44 10   A.   I do not.

11   Q.   Did she identify who were the people who had contacted her

12   that were upset about Abuzahra coming back to work?

13   A.    I believe one of them was -- and I'm not sure if there

14   were others -- was Patty McCafferty, the vice chancellor,

15   because she told her -- she told me that she gave her my

16   number.

17   Q.   Remind me who it is you're having this conversation with?

18   A.   Lieutenant Melissa Mullen.

19   Q.   Did you ever speak to the vice chancellor?

02:45 20   A.   Yes, I did.

21   Q.   Before or after speaking to the lieutenant?

22   A.   After.

23   Q.   All right.  Can you tell me the rest of your conversation

24   with the lieutenant?

25   A.   Yes, as best as I remember.

1    Q.    Can you give me that full name again, please?

2    A.    Melissa Mullen.

3    Q.    Okay.  So, please continue relating that entire

4    conversation.

5    A.    You know, they were concerned that there would be a threat

6    at the university because of some of the testimony that he gave

7    that day.  So I said that if I knew of a threat, I would tell

8    her about one.  I didn't know of one.  I told her I could not

9    tell her that there was no threat.  I don't think I could say

02:46 10   that.

11    Q.    Say that again?

12    A.    I said that I could not tell her that there was no threat.

13    I couldn't tell anybody that somebody's not a threat.  I could

14    only say that I don't know about one; that he had been

15    cooperative in the investigation and that he had severed -- I

16    need to take a drink of water -- severed ties with the group of

17    people he was involved with back in -- sometime in 2004.

18    Q.    And why did you tell them all this information -- tell her

19    all this information?

02:47 20   A.    I guess in response to her being concerned that there was

21    a threat.

22    Q.    Did you expect that she would pass on this information to

23    someone?

24    A.    Did I do it because I wanted her to pass it on or did I

25    think that she would?

1    Q.   Did you expect that she would pass that information on to

2    someone?

3              MR. CHAKRAVARTY:  Objection, your Honor.

4              THE COURT:  You may answer.

5              THE WITNESS:  I believed she would probably pass it on

6    to somebody, yes.

7    BY MR. CARNEY:

8    Q.   And to whom would she pass it on to?

9    A.   I don't know, but I would imagine people in the police

02:47 10   department or faculty at the university.

11   Q.   Did the lieutenant mention who specifically had contacted

12   her?

13   A.   She may have, but I don't know who that was.

14   Q.   Did she mention the vice chancellor by name?

15   A.   Yes, she did.  She did mention her by name.

16   Q.   So that's one person who called the lieutenant.

17   A.   Yeah.  I'm not sure that she personally spoke to her or if

18   somebody relayed it to her.  I'm not sure how that took place.

19   But she told me that the vice chancellor would be calling me.

02:48 20   Q.   Did you expect that the lieutenant would relate her

21   conversation with you to the vice chancellor?

22   A.   In some way, yes, whether directly or indirectly.

23   Q.   Did you expect that that would have an impact on whether

24   concerns about Kareem would be satisfied?

25   A.   Probably not.  They probably wouldn't be satisfied because

1    I couldn't say that he wasn't a threat.

2    Q.   Why did you tell those facts to her, to the lieutenant,

3    that he'd been -- that you couldn't say he was a threat and

4    other information you told her?

5    A.   I couldn't say that he was -- I couldn't say -- you're

6    saying that I couldn't say that he was not -- or he was -- he

7    was not a threat?

8    Q.   Did you tell her that he had stopped associating with this

9    other group in 2004?

02:49 10   A.   Yes.

11   Q.   Why did you tell her that?

12   A.   I'm not sure.  Those three things are what came to mind

13   when she asked me that and I told her --

14   Q.   Why did you tell her that he stopped associating with the

15   group in 2004?

16   A.   Maybe because I believed that was in the -- that was

17   already in the public, so it was something that I could tell

18   her.

19   Q.   Did you believe that that would calm her?

02:49 20          MR. CHAKRAVARTY:  Objection, your Honor.  This

21   witness's state of mind is not at issue.

22          THE COURT:  You may answer it.

23          THE WITNESS:  I don't know if that would calm her or

24   not.

25   BY MR. CARNEY:

1    Q.   You told her that he had disavowed his anti-American

2    views?

3    A.   No, I did not say that.

4    Q.   Did you ever say that to anyone?

5    A.   No.

6         MR. CARNEY:  May I have a moment, your Honor, please?

7         (Pause.)

8    Q.   What else did you tell her, the lieutenant, besides he'd

9    been cooperating since 2006, you can't say that he -- that

02:50 10   there was a threat, and he had no longer associated with people

11   since 2004?  What else did you tell the lieutenant?

12   A.   I guess that there was no -- that I didn't know of a

13   threat.

14   Q.   Was there anything else you said to her?

15   A.   I'm trying to remember if I told her or the vice

16   chancellor that he shouldn't talk about his testimony

17   or -- while he was testifying.

18   Q.   Now, why was it that you gave all this information to the

19   lieutenant?

02:51 20   A.   It was in response to her saying that he was a -- they

21   were concerned that he was a threat.

22   Q.   By giving her your opinions or statements in this manner,

23   you knew you'd be helping Mr. Abuzahra to keep his job,

24   wouldn't you?

25   A.   No.

1    Q.   Well, if he were perceived as a threat, he wouldn't keep

2    his job, would he?

3    A.   I don't know.

4    Q.   What would you expect?

5    A.   I don't know what the rules of them -- how they can hire

6    and fire people, so I don't know that.

7    Q.   Did you feel it was helpful to Mr. Abuzahra to say that he

8    hadn't associated with the group since 2004?

9    A.   I don't know if that was helpful or not.

02:52 10   Q.   Did you think it was?

11   A.   I don't think I thought about it.

12   Q.   Do you think Mr. Abuzahra would view that as helpful, if

13   that information --

14           MR. CHAKRAVARTY:  Objection.

15           THE COURT:  Sustained to that.

16   BY MR. CARNEY:

17   Q.   -- was conveyed to his employer?

18           THE COURT:  Yeah, sustained to that.

19   BY MR. CARNEY:

02:52 20   Q.   When you said that he had been cooperating with the

21   government since 2006, did you expect that that would be

22   helpful to Mr. Abuzahra?

23   A.   Again --

24           MR. CHAKRAVARTY:  Objection to what his understanding

25   of what --

 1            THE COURT:  Yeah, sustained.

 2            MR. CARNEY:  I'm trying to explore this witness's

 3     state of mind and motivation.

 4            THE COURT:  Right.  And that's not particularly

 5     relevant.

 6     BY MR. CARNEY:

 7     Q.   Would you think that Mr. Abuzahra would view this as

 8     something helpful for you to say to his employer?

 9            MR. CHAKRAVARTY:  He's just rephrasing the same

02:53 10     question.

11            THE COURT:  Well, not quite, but it's equally

12     objectionable.  Sustained.

13            MR. CARNEY:  Well, I'm trying to establish --

14            THE COURT:  The purpose of this was to find out what

15     promises or inducements had been made as a matter of fact to

16     Mr. Abuzahra.  We've strayed a little bit as to what might have

17     been said and so on.  I want to focus on what the

18     communications were, if any.

19            MR. CARNEY:  Okay.

02:53 20     BY MR. CARNEY:

21     Q.   Did you have any other discussion on that phone call with

22     the lieutenant?

23     A.   Not that I can remember, no.

24     Q.   Did she say anything else to you besides what we've talked

25     about right here?

1    A.    Not that I can remember.

2    Q.    Is it fair to say that she was the very first person that

3    brought up this subject of Kareem Abuzahra's concern about his

4    employment to you?

5    A.    No, she didn't bring up his concern.

6    Q.    Who was the first person to contact you?

7    A.    You just said that if she brought up Kareem Abuzahra's

8    concern for his employment.  She didn't ask me that.

9    Q.    Okay.  Then is she the first person you spoke to after

02:54 10   court recessed on November 28 who brought up Mr. Abuzahra?  And

11   I'm including Mr. Abuzahra himself.

12   A.    Yeah, I didn't talk anything about his employment with him

13   on Monday afternoon.

14   Q.    Okay.  Was she the first person that spoke to you about

15   Mr. Abuzahra after his first day of testimony?

16   A.    I don't know that.  I mean, I couldn't say that for

17   certain.

18   Q.    I'm just trying to establish a chronology.  So that the

19   chronology would be you spoke to the lieutenant?

02:55 20   A.    Yes.

21   Q.    Then you spoke to the vice chancellor?

22   A.    Yes.

23   Q.    Then the next day you spoke to Mr. Abuzahra?

24   A.    Yes.

25   Q.    Okay.  So have you completed everything that was discussed

1    in the first call, which was between you and the lieutenant,

2    Melissa Mullen?

3    A.   Yes, to the best of my recollection.  Yes.

4    Q.   When was the next time you had a discussion about

5    Mr. Abuzahra with anyone?

6    A.   A little later that -- I'm not sure how much longer when

7    the vice chancellor called.  It was on my cell phone.  I was in

8    the office, so I'm not sure if she left a message or not, but I

9    had her number, so from that somehow, and called her from a

02:55 10   regular hard line.

11   Q.   Would that have been Monday afternoon?

12   A.   Yes.

13   Q.   November 28th?

14   A.   Yes.

15   Q.   What was the conversation between you and the vice

16   chancellor?

17   A.   Very similar to that with Lieutenant Mullen.  She said

18   that people -- and I don't know who -- said they were concerned

19   after reading the -- some tweets, I believe, from the Free

02:56 20   Tarek site as to what Mr. Abuzahra had testified to.

21   Q.   Did she get more specific about what these concerns were?

22   A.   I think she just said they said that he had testified that

23   he had done some pretty bad things.

24   Q.   Was it any more specific than "bad things"?

25   A.   Not to -- not that I can remember, no.

1    Q.   Was she more specific about whom had contacted her?

2    A.   Not that I can remember.  I don't remember her saying who

3    had contacted her.  When you say -- about these tweets?

4    Q.   Pardon me?

5    A.   About the tweets?

6    Q.   Who had contacted her about the tweets, for example?

7    A.   I don't know.

8    Q.   Did she indicate whether it was coming from students,

9    faculty, staff or outsiders?

02:57 10    A.   I don't remember.  I would think -- she didn't mention

11    students that I can remember.  I don't know.

12    Q.   Did she mention it was one person or more than one person;

13    in other words, complaints or complaint, concerns or concern?

14    A.   I'm not certain.  For some reason I think it was more than

15    one person but...

16    Q.   After she said that, what was said next?

17    A.   I told her the same things that I told Lieutenant Mullen.

18    Q.   Which were what?

19    A.   That I couldn't -- if there was a known threat I would

02:58 20    tell her, you know -- I would have told her, but I didn't -- I

21    could also not say that he wasn't a threat, that he had -- and

22    I'm not sure in what order I had said this, but that he had

23    stopped associating with these people in -- the group he was

24    involved with in 2004 and that he was cooperating since

25    sometime in 2006.

1    Q.    What did she say in response?

2    A.    I'm not sure if she just said there was some -- you know,

3    at some point in that conversation that there were some bad

4    things, again, that he had said in the trial.  And I said, "I

5    don't think he could" -- you know, "I can't comment further

6    with something that -- where there's a witness testifying."

7    Q.    Where she brought up bad things for a second time --

8    A.    I'm not sure if that was the second time.

9    Q.    -- the second time did she bring it up with more

02:59 10   specificity than she did the first time?

11   A.    Not that I recall at all.

12   Q.    Did she give you any indication that she had been in touch

13   with Mr. Abuzahra?

14   A.    No.

15   Q.    Did she tell you whether or not she had left a message for

16   him to contact her?

17   A.    I don't believe so.

18   Q.    Did she tell you whether she planned to meet with

19   Mr. Abuzahra at some point?

02:59 20   A.    I don't believe so.

21   Q.    Did you tell her anything else after this, during this

22   phone call?

23   A.    Not that I can recall, no.

24   Q.    Did you refer her to the United States Attorney's Office?

25   A.    No.

1    Q.   Did you tell her if there's to be any future contact, how

2    that should occur?

3    A.   I did not.

4    Q.   Was there anything else of significance in this

5    conversation with the vice chancellor?

6    A.   I think other than that I couldn't tell her anything else.

7    Q.   After these two conversations with the lieutenant and the

8    vice chancellor, did you report this to anyone in your office?

9    A.   Yes.

03:00 10    Q.   To whom did you speak in your office?

11    A.   I believe I talked to a number of people, but I'm pretty

12    sure it was that day that I talked to the supervisor, Jamie

13    Marinelli.

14    Q.   Is he here now?

15    A.   He is, yes.

16              MR. CARNEY:  I would ask that he be asked to step out.

17              THE COURT:  Yes, he should leave the room.

18              (James Marinelli is sequestered.)

19              MR. CARNEY:  Could we generally ask any of the FBI who

03:01 20    Mr. Daly might have spoken to to step out?

21              MR. CHAKRAVARTY:  Your Honor, the government doesn't

22    mind sequestration, although what happened within the FBI after

23    the fact cannot possibly bear on the issue of what promises --

24              THE COURT:  Well, we certainly can't determine the

25    issue, that's for sure.  We are taking a little bit of time

1    getting to the point here, Mr. Carney.

2              MR. CARNEY:  I'll speed it up.

3              THE COURT:  Again, the crux of this is Abuzahra's

4    appreciation of what the government might be doing for him.

5    And the tact that you've taken is to find that from the

6    communicator's side as opposed to the person communicated to,

7    but let's get to the communications.

8    BY MR. CARNEY:

9    Q.   So who's the person that you just mentioned that you spoke

03:02 10   to?

11   A.   My supervisor, Jamie Marinelli.

12   Q.   Could you say that?

13   A.   James Marinelli.  James.

14   Q.   Marinelli?

15   A.   Yes.

16   Q.   And what is his title?

17   A.   I believe he's the acting supervisory special agent for

18   the squad.

19   Q.   Did you relate to him your conversations?

03:02 20   A.   Yes.

21   Q.   And what did he say?

22             MR. CHAKRAVARTY:  Your Honor, what he said is not

23   relevant to this inquiry.

24             THE COURT:  Yeah.  Sustained.

25   BY MR. CARNEY:

1    Q.   Did he tell you what he was going to do with the

2    information?

3    A.   I don't think that he told me he was going to do anything

4    with it.  I mean, I don't remember him saying he was going to

5    do anything with it.

6    Q.   Did you have any conversation with anyone in the United

7    States Attorney's Office?

8    A.   Yes.

9    Q.   That day?

03:03 10   A.   Well, sometime later that night; yes.

11   Q.   And who did you speak to?

12   A.   All three of the -- Mr. Auerhahn, Mr. Chakravarty, and I

13   believe Mr. Groharing were over at our office later that night.

14   Q.   Did they come to your office, I take it?

15   A.   Yes.

16   Q.   Was that unusual?

17   A.   No.  They had to review some documents over there.

18   Q.   And what was your conversation with the prosecutors?

19   A.   I told them --

03:03 20   Q.   And just to set the date, this is November 28, the first

21   day of Abuzahra's testimony?

22   A.   Yes.

23        MR. CHAKRAVARTY:  Your Honor, our conversations, what

24   we knew, when we knew it, only bears on the issue of promises,

25   rewards or inducements, and that has not yet been exposed by

1    this inquiry.  I think that's what we need to focus on.

2              THE COURT:  Yeah, I think we should get --

3              MR. CARNEY:  Since the government waited until

4    December 6th to notify me, I'm curious why I didn't get a call

5    that night --

6              THE COURT:  Yeah.

7              MR. CARNEY:  -- or the next morning.

8              THE COURT:  There may be some interesting questions

9    there, but they're secondary -- or at least subsequent to the

03:04 10   main event, which is what might have been said to the witness.

11   So let's get to that.

12             MR. CARNEY:  But I need to focus on this conversation

13   with the government because it may be necessary for me to call

14   the government prosecutors.

15             THE COURT:  Well, that will depend on what got said to

16   the witness, though.  That's why I want to get to the

17   main -- and then maybe work back to some of this if it seems

18   important.

19             MR. CARNEY:  Well, respectfully, your Honor, I'm

03:04 20   trying to --

21             THE COURT:  Well, if nothing ever got said to the

22   witness and he wasn't influenced, then nothing else matters.

23   If he was, then maybe something else matters.

24   BY MR. CARNEY:

25   Q.   What was the conversation with the prosecutors on November

1    28th?

2              MR. CHAKRAVARTY:  Objection, your Honor.

3              THE COURT:  Sustained.

4    BY MR. CARNEY:

5    Q.   Did you tell them what had occurred?

6              MR. CHAKRAVARTY:  Objection, your Honor.

7              THE COURT:  Sustained.

8    BY MR. CARNEY:

9    Q.   Did they indicate to you what should be done?

03:05 10          MR. CHAKRAVARTY:  Same objection.

11             THE COURT:  Sustained.

12   BY MR. CARNEY:

13   Q.   When was the next time you had a conversation with anyone?

14   A.   I believe it was the next morning.

15   Q.   And was this when you were giving him a ride again?

16   A.   Yes.

17   Q.   Now, you had already told him the previous day about your

18   conversation with the vice chancellor, right?

19   A.   No, I think we're on Tuesday, right?

03:05 20   Q.   We're now on Tuesday?

21   A.   Well, you said the next day after having the conversation.

22   Q.   Right.  I'm focused on Tuesday.  You had already

23   told -- oh, no.  On Tuesday.  You're correct.

24             Did you give him a ride on Wednesday?

25   A.   Yes.

1    Q.   So that the previous day you had told him about your

2    conversation with the vice chancellor, right?

3    A.   Yes.

4    Q.   And that conversation you had related to the prosecutors

5    on Tuesday, November 29th, right?

6    A.   I don't know if I relayed that to them.  I don't remember

7    relaying it to them.

8    Q.   You don't remember relaying that conversation to them?

9    A.   No.

03:06 10    Q.   What conversation did you have with Abuzahra on Wednesday,

11    November 30th?

12    A.   Nothing that I can, you know, remember.

13    Q.   Did he bring up the subject again?

14    A.   He may have brought up the subject that he was concerned

15    about what the people at work thought about him again.

16    Q.   And what specifically did he say to have you draw that

17    conclusion?

18    A.   Maybe that he was concerned about what the people at work

19    thought about him.  But, you know, I don't know how he said it.

03:07 20    Q.   What did you say in response?

21    A.   I don't think at that time I said anything.

22    Q.   Did you try to settle his nerves?

23    A.   No.  I mean, I could see why people would be concerned at

24    work with what he had said, so...

25    Q.   Is that what you said?

1    A.   I don't think I told him that.

2    Q.   Well, what did you say to kind of calm him down?  This was

3    prior to his third day of testimony, right?

4    A.   This was prior to his third day of testimony, yes.

5    Q.   Did you tell him that you'd spoken to the lieutenant?

6    A.   On Tuesday.

7    Q.   What's that?

8    A.   On Tuesday I told him that.

9    Q.   And --

03:07 10    A.   I believe it was Tuesday.  I mean, I'm pretty certain it

11    was Tuesday.

12    Q.   Did you tell him on Wednesday that you had spoken to

13    anybody else including the prosecutors?

14    A.   No.  No.

15    Q.   Did you say anything else to kind of calm him down about

16    his job?

17    A.   Not that I can remember, no.

18    Q.   Did you tell him that you didn't think anything would

19    happen?

03:08 20    A.   No.  That wouldn't be true because I didn't know what

21    could or couldn't happen to him.

22    Q.   Did you write a report on this?

23    A.   No.

24    Q.   Why not?

25    A.   I didn't think I was required to.

1    Q.   When are you required to write a report?

2            MR. CHAKRAVARTY:  Objection, your Honor.

3            THE COURT:  You may answer that.

4            THE WITNESS:  I guess if I interview somebody or

5    something investigative is done or something like that.

6    BY MR. CARNEY:

7    Q.   Did you have any other conversation with him about his

8    work or your conversations with others on that Wednesday?

9    A.   On that Wednesday after court with -- again, with

03:09 10   Lieutenant Mullen.

11   Q.   What did you say to him?

12   A.   Her.

13   Q.   Her.  I'm sorry.

14   A.   She had left a message to call her, so I returned her

15   call.

16   Q.   And what did the conversation focus on?

17   A.   She said that -- at this point she did say that his job

18   was in jeopardy, and I'm not sure what she said exactly.  That

19   I think she wanted to know if there was anything that he did in

03:10 20   relation to this at the university.

21   Q.   And what did you say?

22   A.   I said that I could not discuss it and, you know, I'm a

23   witness in this case as well so I shouldn't -- you know, I

24   couldn't comment.

25   Q.   Did she elaborate on why she thought his job was in

1    jeopardy?

2    A.   I don't remember her saying why.  I think I may have just

3    assumed because of what had -- you know, what they had

4    previously said that they were concerned about what he had

5    testified to.

6    Q.   Did you presume that she would speak to anyone after her

7    conversation with you?

8    A.   She may have, but I don't think I thought about it.

9    Q.   Did she give you any indication of that?

03:10 10   A.   I think she probably would have had to tell whoever had

11   asked her to call me.

12   Q.   Did you ever have at any time any contact during this

13   period with Mr. Abuzahra's attorney?

14   A.   No.

15   Q.   Did you know who it was?

16   A.   I know who his attorney was when we started this

17   investigation.

18   Q.   Who was that?

19   A.   It was Brad Bailey.

03:11 20   Q.   Did you know that he continued to be his attorney?

21   A.   I think I probably knew that, that he --

22   Q.   Were you present when he came to move to quash a subpoena

23   that we had given his client?

24   A.   Yes, I was.  Yes.

25   Q.   So you knew that before Mr. Abuzahra even testified that

1      Attorney Bailey was still his attorney?

2      A.   Up to that point, yes.  If he continued to represent him,

3      I mean...

4      Q.   And that motion to quash occurred on November 28th, is

5      that right, before he testified?  Please don't look at the

6      lawyers.

7      A.   I'm looking over at you, sir.  I believe that's correct,

8      that it was before he testified.  Yes, it was.

9      Q.   Did you ever hear from Attorney Bailey on this subject?

03:12 10    A.   No.  No.

11     Q.   Did you give Mr. Abuzahra a ride the fourth day of his

12     testimony?

13     A.   Yes.

14     Q.   And was there any conversation about his job and his

15     concerns at that point?

16     A.   It was either that day or the day before he had said he

17     had gotten an email from a female that worked at the college

18     who said she was supportive of, you know, "Jeez, it must be" --

19     "I feel for you being under scrutiny, you know, in this

03:12 20    situation."  You know, I don't think she said -- I think she

21     was just kind of generally supportive.

22              MR. CARNEY:  May I have a moment, please, your Honor?

23              (Pause.)

24     Q.   Did you ever tell Mr. Abuzahra that there was nothing you

25     could do for him, but when the trial was over if a call was to

1    be made to the authorities at UMass Lowell, it would be made by

2    the U.S. Attorney's Office?

3    A.   I never told him that.  I don't believe I ever told him

4    that.

5    Q.   Is your memory exhausted about what you said?

6    A.   I don't believe I ever said that.  I never told him that.

7         MR. CHAKRAVARTY:  Your Honor, to clarify, I'll hand

8    these up to the Court.  The government made two email

9    disclosures to the defense that prompted this hearing.  This

03:14 10    witness did not make these statements, but the other witness

11    did.  But for your Honor's benefit as well, so that you have

12    what we have, I would offer these as an exhibit.

13         MR. CARNEY:  Fine, your Honor.

14         THE COURT:  Do you have the ID numbers?

15         MR. CHAKRAVARTY:  These don't have to be trial

16    exhibits.

17         THE COURT:  The hearing is part of the trial, so I

18    don't care if you start a different schema -- give it a

19    five-digit number or whatever you want to do, I don't care --

03:14 20    they should be somehow identifiable for the record, that's all.

21         MR. CARNEY:  May I proceed?

22         THE COURT:  Go ahead.

23         MR. CARNEY:  Oh, there's one other email that I think

24    would be relevant --

25         (Pause.)

1      MR. CARNEY:  Your Honor, on your copy there should be

2   a third email that Mr. Chakravarty was responding to, from me

3   to him?  Do you have that copy?

4      THE COURT:  I seem to have one from Mr. Chakravarty to

5   you of December 6th.  I don't know whether this is all the

6   same.  No.  Then there's one December 9th with a reply.  Is

7   there something --

8      MR. CARNEY:  Do you have my email to him on December

9   9th at 4 p.m.?

03:15 10      THE COURT:  Yes.

11      MR. CARNEY:  And his response at 4:17?

12      THE COURT:  Yes.

13      MR. CARNEY:  All right.  That's what I wondered, your

14   Honor.  Thank you.

15   BY MR. CARNEY:

16   Q.   On the fourth day when you drove him to court, did you

17   have any further conversation with him about it?

18   A.   Nothing that -- about his job, you're talking about?

19   Q.   About his job or any concerns he may have had.

03:16 20   A.   Not that I can remember.  I may have, but I can't say that

21   I did.

22      MR. CARNEY:  Thank you, Mr. Daly.

23      That's what I have, your Honor, for this witness.

24      THE COURT:  Any questions?

25      MR. CHAKRAVARTY:  I don't think I have anything for

        1   this witness, your Honor.

        2           THE COURT:  All right, sir.  Thank you.  You may step

        3   down.

        4           THE WITNESS:  Thank you.

        5           (The witness is excused.)

        6           MR. CARNEY:  Heidi Williams, please?

        7           THE CLERK:  We're going to make the first email

        8   VD-001 --

        9           THE COURT:  "VD" for voir dire.

03:17  10           THE CLERK:  -- marked for identification, and VD-002

       11   marked for identification.

       12           (Government Exhibit Nos. VD-001 and VD-002 marked for

       13   identification.)

       14                   HEIDI WILLIAMS, duly sworn

       15           THE CLERK:  Please be seated.  State your name and

       16   spell your name for the record, keep your voice up and speak

       17   into the mic so everyone can hear you.

       18           THE WITNESS:  Heidi Williams, W-I-L-L-I-A-M-S.

       19                   VOIR DIRE EXAMINATION

03:18  20   BY MR. CARNEY:

       21   Q.   How are you employed, ma'am?

       22   A.   I am a special agent with the FBI.

       23   Q.   How long have you been in that position?

       24   A.   Seven and a half years.

       25   Q.   You're a case agent in the case at bar?

1    A.   Yes.

2    Q.   You know the witness Kareem Abuzahra?

3    A.   I do.

4    Q.   And you recall that his first day of testimony was

5    November 28th of this year?

6    A.   Yes.

7    Q.   Were you involved in giving him a ride to court?

8    A.   No.

9    Q.   Was that exclusively, to your knowledge, Mr. Daly?

03:18 10   A.   Yes.

11   Q.   Did you learn that Mr. Abuzahra had expressed concern

12   concerning his job?

13   A.   Yes, I did.

14   Q.   And I'm focusing on a period after he testified that first

15   day.

16   A.   Yes.

17   Q.   When did you learn it?

18   A.   That he expressed concern?

19   Q.   Yes.

03:19 20   A.   Do you mean that he expressed concern that he would lose

21   his job or concern that people at work thought negatively of

22   him?

23   Q.   Both.

24   A.   At first he only expressed that people at work -- he was

25   worried what people at work thought of him because he received

1    several phone calls from people at work.  So that was either

2    Monday or Tuesday I learned that.

3    Q.   Was that the first conversation you had with him about

4    this?

5    A.   Yes.

6    Q.   Where did that take place?

7    A.   I don't remember if it happened -- if he called Monday

8    night or if I spoke to him prior to his testimony Tuesday

9    morning.

03:19 10   Q.   When he said he received several phone calls, did he

11   describe the content of those phone calls?

12   A.   Broadly.

13   Q.   And what specifically did he say?

14   A.   That he received a couple of phone calls from people at

15   work who were expressing surprise at the things that he had

16   said in court.

17   Q.   And to the best of your memory, that was either Monday

18   evening by telephone or Tuesday morning in court?

19   A.   Correct.

03:20 20   Q.   Where would you meet him Tuesday morning?

21   A.   Well, he was waiting upstairs -- actually, no.  Wait.  I

22   correct that.  I think that Sergeant Daly brought him to the

23   FBI office, where we transported him over to court.

24   Q.   Was your conversation, then, at the FBI office or in the

25   car or in the courthouse?

1    A.    He never actually came up into the office.  There's a

2    Finagle Bagel down in the lobby where we would wait.  So it may

3    have been in the Finagle Bagel while we were waiting to come

4    over here.

5    Q.    What did you say in response to his comment?

6    A.    I don't remember the words that I used.  This was not a

7    new concern of his.  Since Mr. Mehanna was arrested for the

8    first time and the complaint became public, he'd expressed

9    concerns because people in the community, the Muslim community

03:21 10   in particular, had called him a traitor and they were

11   ostracizing his wife and his parents.  So it wasn't a new

12   concern that, you know, people were saying negative things

13   about him.

14   Q.    Was it a new concern that it was being said at work?

15   A.    Yes.

16   Q.    And was that in reaction, did he say, to the publicity

17   covering his first day's testimony?

18   A.    Can you repeat that?

19   Q.    Was the concern based on his testimony on the first day?

03:21 20   A.    Yes.

21   Q.    You said that he also expressed a concern at some point

22   about whether he would lose his job because of what his

23   superiors would say or think.

24   A.    Yes.

25   Q.    Was that expressed on Tuesday morning also?

```
 1    A.    No.

 2    Q.    When was that first mentioned?

 3    A.    I don't think he became aware of that fully until the

 4    following Monday.  So he finished testifying on Thursday.  It

 5    would have been the Monday after that.

 6    Q.    So he wouldn't have been aware that Tuesday of concerns

 7    expressed by a lieutenant with the Lowell campus police?

 8    A.    He didn't express them to me.

 9    Q.    Or he wouldn't have been concerned about having a call

10    made by the vice chancellor of the University of Massachusetts

11    at Lowell?

12    A.    Again, I think he thought -- I don't want to say what he

13    thought, but that wasn't expressed to me.

14    Q.    Were you aware that the lieutenant and the vice chancellor

15    had talked to Tom Daly?

16    A.    Yes.

17    Q.    And that Tom Daly had spoken to Kareem about this on

18    November 29th?

19    A.    Yes.

20    Q.    So Kareem was aware of these phone calls from the

21    lieutenant and the vice chancellor?

22    A.    He didn't express that much concern -- or that -- any

23    concern about that to me.  He was concerned about what his

24    coworkers thought of him.

25    Q.    When did he first bring up the concern about the job?
```

1    A.    I think he took it a little more seriously -- and again, I

2    knew a lot more information than he did about his job status,

3    but I think he took it more seriously on Wednesday afternoon.

4    That's when he learned that he would have to go in for a

5    meeting prior to reporting to work on Monday morning

6    with -- and I don't know if at that time that he said it was a

7    director of human resources or if it was the vice chancellor,

8    but there was some administrative meeting that would have to be

9    held prior to his showing up for work on Monday.  So I think he

03:23 10    was a little bit more concerned.  It evolved at that point.

11    Q.    Why did you draw the conclusion that he was a little more

12    concerned?

13    A.    Well, the nature of his concern changed from --

14    Q.    Did he seem upset or nervous in describing this?

15    A.    I mean, you've met him.  He always seems a little -- I

16    guess an agitated level.  He's also at that, you know, elevated

17    level.  So it didn't seem out of character.

18    Q.    But he was upset, right, about the possible impact that

19    his testimony could have on his job, right?

03:24 20    A.    Again, the primary concern was still how to socialize with

21    people at work, at least when he spoke to me.

22    Q.    Did he ask you to call the university?

23    A.    No.

24    Q.    Did you tell him whether you would call the university?

25    A.    No.

1    Q.   Or that the bureau would call the university?

2    A.   No.

3    Q.   Did you indicate that the U.S. Attorney would be willing

4    to call the university?

5    A.   I indicated that on the Monday after he finished

6    testifying.  I didn't say that they would be willing; I said in

7    the context of a -- he said that he felt like he was going to

8    be terminated within a week or two.  And I said, "Is there any

9    way that that decision could be postponed because nothing can

03:25 10   be done on your behalf -- if anything could be done, it

11   wouldn't be able to be done until after trial."  And I have no

12   idea what could have been done, but I said at that point if the

13   U.S. Attorney's Office could make a call, it couldn't come for

14   several weeks.

15   Q.   Well, you knew what could be done, right?

16   A.   I still have no idea what could be done.

17   Q.   You didn't think that the U.S. Attorney's Office could

18   call UMass Lowell and speak on his behalf?

19   A.   I don't know if they can or can't.

03:25 20   Q.   You've never had that experience?

21   A.   No.

22   Q.   But you told him that if there was going to be a call made

23   by the U.S. Attorney's Office, it would have to be after the

24   trial was done, correct?

25   A.   I told him if a call could be made, it would have to be

1    after the trial was done, yes.

2    Q.   Which, of course, means after his testimony was concluded?

3    A.   Well, his testimony was already concluded when I told him

4    that.  That would be the following Monday.

5    Q.   Did you have any contact with anyone at UMass Lowell?

6    A.   No.

7    Q.   What was the first time you had a discussion with anyone

8    from the U.S. Attorney's Office about this?

9    A.   Monday, November 28th.

03:26 10   Q.   The first day of his testimony?

11   A.   Yes.

12   Q.   And what did you tell them?

13   A.   What I told you.

14        MR. CHAKRAVARTY:  Objection, your Honor.  Same

15   objections as --

16        THE COURT:  Well, the answer she gave can stand.

17   BY MR. CARNEY:

18   Q.   And what did they tell you that they could do for Kareem?

19   A.   At that time it wasn't discussed.

03:26 20   Q.   Not a thing was said?

21   A.   I mean, we weren't discussing what we could do or what we

22   couldn't do.  At that point he was concerned socially what was

23   happening to him.  I'm not aware that the U.S. Attorney's

24   Office or the FBI could go out in the community and tell them

25   to behave accordingly.

1          MR. CARNEY:  All right.  Thank you, Agent.  That's all

2     I have.

3          THE COURT:  Any questions?

4          MR. CHAKRAVARTY:  No.

5          THE COURT:  Thank you.  You may step down, Agent.

6          (The witness is excused.)

7          THE COURT:  I'm sorry.  Anything else?

8          MR. CARNEY:  Not from these witnesses, your Honor.

9     I'm waiting to hear back from Martin Meehan, whom I've called

03:27 10     to ask --

11          THE COURT:  Well, I think I indicated yesterday that

12     that was beyond the scope of what I was interested in hearing.

13     As I said repeatedly, the question is what might have affected

14     the mind of the witness as he testified by way of an assurance

15     of benefit from anybody on the government's side.

16          MR. CARNEY:  I think your Honor described it too

17     narrowly.  It's not assurance but expectation, and there's a

18     huge difference in terms of --

19          THE COURT:  Well, it depends on -- I agree with that.

03:27 20     It could depend on how you seek to establish the point and

21     through which witness.  I mean, he could testify about

22     expectation; they could testify about assurance.  So it may

23     depend on which direction you're looking through the tube on.

24          MR. CARNEY:  All right.  For now I'm going to think

25     about this and I'll report back to you tomorrow.

1          THE COURT:  Thank you.  I think that's a good idea all

2     around.

3          MR. CARNEY:  But I would like to keep both Williams

4     and Daly onboard in case we call them as witnesses.

5          THE COURT:  All right.  Well, they're here, I think,

6     every day anyway.

7          MR. CHAKRAVARTY:  And they'll continue to be here.

8     The government's position your Honor knows, and we will

9     continue to think about it but --

03:28 10          THE COURT:  Consider them potential witnesses with

11     respect to this.

12          MR. CHAKRAVARTY:  You're telling us to?

13          THE COURT:  Yes.  Right.

14          MR. CHAKRAVARTY:  All right.  That being said --

15          THE COURT:  For whatever that means.  They're not on

16     the stand now.

17          MR. CHAKRAVARTY:  Right.  And our position is that

18     they, neither Mr. Abuzahra, should necessarily be called based

19     on this testimony; however, if the defense has a remedy, it

03:28 20     would be through, obviously, calling the witness Abuzahra,

21     which the government would not stand in the way of their

22     ability, as they have the ability to do, obviously, to call the

23     witness.

24          With regards to scheduling, your Honor, are we going

25     to go right into Sageman?

1          THE COURT:  Well, we don't have much time left.  I

2    don't know how long -- but again, I don't know how much time we

3    need to do this.  I mean, again, I'm regarding the applicable

4    disclosure, the October 18th so-called supplemental disclosure.

5    Again, as I think we've discussed, I think there's a good bit

6    of that which we have, I think, by consensus agreed is not

7    going to be a part of the evidence.  I believe indicators and

8    prediction and so on.

9          MR. GROHARING:  I think it might be helpful, your

03:29 10   Honor -- that seems to be a very large portion of what -- the

11   opinion the defense was going to elicit from Dr. Sageman.

12   Perhaps if the defense can spell out what's left in

13   crystal-clear terms --

14          THE COURT:  Well, let me --

15          MR. GROHARING:  -- it would form our discussion a

16   little bit.

17          THE COURT:  Let me try it this way:  Let me tell you

18   by looking at this what is okay and what may be debatable and

19   so on.  And we can go paragraph by paragraph, if you have the

03:30 20   document.

21          MS. BASSIL:  I do.

22          THE COURT:  First of all, the first paragraph is about

23   CV and background.  That's, I assume, unremarkable, although

24   the government has some objection to, I guess, saying whether

25   he has a clearance or something?

        1           MR. GROHARING:  Yes, your Honor.  And we have a motion

        2    pending in that regard.

        3           THE COURT:  Right.  What's the harm in him saying

        4    that?

        5           MR. GROHARING:  Well, the argument is that he has

        6    access to additional information he's not testifying about

        7    here --

        8           THE COURT:  By the way, is he here?

        9           MS. BASSIL:  Yes, your Honor.

03:30  10           THE COURT:  He should step out.

       11           MS. BASSIL:  He did just step out.

       12           THE COURT:  Or maybe he just did.  He just did.  Okay.

       13    All right?

       14           MR. GROHARING:  And the defense alluded to this during

       15    Mr. Kohlmann's testimony, but the argument is that he has

       16    access to classified information and that he viewed that

       17    information in some way to corroborate his findings.

       18           THE COURT:  And he won't be able to refer to it here,

       19    is what you're --

03:31  20           MR. GROHARING:  We don't even know what it is.

       21           THE COURT:  Is he relying on anything?

       22           MS. BASSIL:  Here's the story, your Honor.

       23           THE COURT:  That is specific, as opposed to general

       24    information --

       25           MS. BASSIL:  Right.  It's not specific.  What he would

1    testify to is -- you know, he does certain studies, he has a

2    lot of thoughts and hypotheses, and they're formed by many

3    things.  I mean, he studied, you know, political social

4    movements.  He has access to classified information; he uses it

5    to inform himself, test his hypotheses.

6         He also will testify that classified information is

7    useful and that the idea that it is useless, which is what

8    Mr. Kohlmann said, is frankly absurd.  He won't go into what it

9    is, but he will say that everything informs his opinions.

03:32 10    Everything.  His 33 years, his years as a forensic

11    psychiatrist, everything.

12         THE COURT:  Well, I guess at some level of generality,

13    if it is just a part of his background, it's okay.  To the

14    extent it implies that he's relying on something the jurors

15    won't see --

16         MS. BASSIL:  No.

17         THE COURT:  -- as support, then I think that it would

18    be --

19         MR. GROHARING:  Why else would it be relevant, your

03:32 20    Honor?

21         THE COURT:  Just part of his general experience?

22         MS. BASSIL:  Right.  It's also relevant because --

23         THE COURT:  Perhaps acceptance by others as qualified.

24         MR. GROHARING:  The only reason that Mr. Kohlmann

25    testified to it was because on cross-examination Mr. Carney

1    asked him about it with reference to --

2           THE COURT:  Well, as long as it's very general and

3    it's not emphasized and it's not argued --

4           MS. BASSIL:  That's correct.

5           THE COURT:  -- as particular support for his opinions

6    here --

7           MS. BASSIL:  It won't be.

8           THE COURT:  -- then I think it's just general

9    background, can be done.

03:32 10        MR. GROHARING:  And we'll get into it a little bit

11   more later, but I think that's part of the problem, is we don't

12   know what he's relying on to support his opinions.  To the

13   extent he's relying on any of this, we should have access to it

14   so we could test those opinions.

15          THE COURT:  Okay.  The next paragraph is -- I mean,

16   there's some --

17          MS. BASSIL:  Yeah.  He's not going to testify --

18          THE COURT:  I don't mean to be a critic here, but

19   there's some meat and there's some non-meat, I guess.

03:33 20        MS. BASSIL:  My summarization of that paragraph, your

21   Honor, is he will talk about al Qa'ida.

22          THE COURT:  He can talk about al Qa'ida, its

23   structure, its lack of top-down, all of that; that's fine.

24          MS. BASSIL:  That's basically what --

25          THE COURT:  That's the same area as -- I guess he can

 1    vouch for his books as part of his background.

 2         The next topic -- the topic sentence of the next

 3    paragraph is he will explain how terrorism networks have

 4    evolved since 9/11.  As a topic that seems okay.  The balance

 5    of the paragraph, however, begins to get into indicators and

 6    such, which I think is not permitted, or not even offered, I

 7    guess.  So I don't know how much of that paragraph is intended,

 8    but the general topic of how terrorism networks have evolved, I

 9    guess, assuming his qualification, which I do, he will be

03:34 10   allowed to say.

11         I have to say, I think most of the rest of it is about

12    predictors.  Well, let me slow down on that.  Let me -- through

13    page 9 -- the first full paragraph on page 9 -- and then there

14    is some of -- actually, this sounds a little bit like

15    Dr. Fadel's testimony, talking about jihad as a collective

16    duty.

17         MS. BASSIL:  He's not going to go over that.

18         THE COURT:  So that paragraph, the near enemy, the far

19    enemy, we've had a good bit of that.

03:34 20        MS. BASSIL:  No.  He's going to talk about Abdullah

21    Azzam, but he's not really going to go into any detail about

22    things that have already been talked about.

23         THE COURT:  All right.  He can talk about Azzam as a

24    historical matter and whatever.  Substantive matter, I guess.

25         MS. BASSIL:  Right.

1          THE COURT:  The next paragraph, the way it's phrased

2     here, it's an opinion about the defendant specifically, and

3     we've generally been excluding those opinions.  I don't know

4     whether that's an issue.

5          MS. BASSIL:  I'm kind of lost on what page you're on.

6          THE COURT:  I just flipped from 9 to 10.

7          MS. BASSIL:  Okay.

8          THE COURT:  I don't know what the first paragraph

9     means, but it looks pretty fuzzy to me.  The next paragraph,

03:35 10    talking about the internet and its characteristics.

11         MR. GROHARING:  We want to just flush that out a

12    little bit.  This idea of protest being used by a sociologist,

13    the defendant, and --

14         MS. BASSIL:  Yes.

15         THE COURT:  I didn't think he was a sociologist.

16         MS. BASSIL:  Oh, yes, he is.  He has a Ph.D. in

17    sociology.

18         THE COURT:  I thought he was offered as a

19    counterterrorism expert.

03:36 20    MS. BASSIL:  And part of that includes his Ph.D. in

21    sociology.

22         THE COURT:  Well, what --

23         MS. BASSIL:  That's part of what his counterterrorism

24    work is.  That's the whole premise --

25         THE COURT:  Okay.  Well, what's the sociological

1    opinion?

2           MS. BASSIL:  The sociological opinion -- he won't talk

3    about the defendant.  He will talk about the fact that there

4    have been social protest movements throughout history and in

5    the United States, and that what can happen is a splinter -- a

6    group can splinter off and become violent, and that's what he

7    studies.

8           MR. GROHARING:  But this is the blob that he's talking

9    about.

03:36 10           MS. BASSIL:  I don't see why he can't talk about that.

11   This is his study.  This is what he does.  This is his theory

12   on counterterrorism, which has been accepted and adopted.  It's

13   in Army regulations.  He lectures on this every --

14           MR. GROHARING:  That's not accurate, your Honor.  I

15   would like to flush out Dr. Sageman if he is going to be

16   allowed to testify about this.

17           THE COURT:  Yeah, I doubt it.  I think this

18   is -- first of all, I'm not -- well -- I'm not sure it's

19   specialized knowledge.

03:37 20           MS. BASSIL:  Well, no --

21           THE COURT:  One might note that there was a peaceful

22   social protest movement about the Vietnam, for example, a

23   favorite topic of Mr. Carney's, and that there were some fringe

24   elements who -- like the Weather Underground, who were violent,

25   okay?

1           MS. BASSIL:  Correct.

2           THE COURT:  That's sort of common.  I don't know that

3      that's specialized knowledge.

4           MS. BASSIL:  No, but it is specialized knowledge as

5      it's applied to terrorism.  He was the first person to do this.

6      He was the first person to write this up.  He was the first

7      person to talk about this.  And he did it by -- look, he spent

8      the last ten years trying to isolate and -- you know, trying to

9      isolate who are people who are going to become operatives.

03:37 10     This is what he does.

11          THE COURT:  No, but this is the indicators business.

12          MS. BASSIL:  No, I know.  No, I'm not saying that.

13     But I'm just saying from his background.  And based on that he

14     has come up with a theory, and his theory is, you know, related

15     to -- his theory is related to things like forums, chat forums,

16     and so forth and so on.  I mean, he has looked at what he calls

17     sort of a social discourse of community, all right?  And then

18     he's going to explain that from that there is a small

19     percentage of people who then can become violent or can become

03:38 20     terrorists.

21          This is in direct contradiction to what Mr. Kohlmann

22     talks about, that people watch videos or people are connected

23     on the internet, and then they call up somebody and the next

24     thing you know they're in Bagdad.  So Dr. Sageman will talk

25     about that this is not the common occurrence or the manner in

         1    which Mr. Kohlmann testified to.  This is part of his theory.

         2    He's developed it over ten years.  He's written a book on it.

         3    I don't see why it wouldn't come in.

         4              THE COURT:  Can you show me the theory in the

         5    disclosure?

         6              MS. BASSIL:  Yes.

         7              MR. GROHARING:  It's the blobs.

         8              MS. BASSIL:  Yes.  "He will testify about how the

         9    internet" --

03:39   10              THE COURT:  I think that's what I expected.  That's

        11    why I asked the question.

        12              MS. BASSIL:  It starts on page 7 -- the bottom of page

        13    7 -- "Terrorism does not emerge out of a vacuum" --

        14              THE COURT:  Right.  That is the blob.

        15              MS. BASSIL:  -- it goes through 8, and it goes to

        16    page 9.

        17              MR. GROHARING:  So notwithstanding the events --

        18              THE COURT:  Out.

        19              MS. BASSIL:  I'm sorry, your Honor?

03:39   20              THE COURT:  Out.

        21              MS. BASSIL:  Well, your Honor --

        22              THE COURT:  That's exactly what I was referring to

        23    when we flipped ahead.  Beginning with the bottom paragraph on

        24    7 up to the -- we got to the top, you know, run-over paragraph

        25    on page 9, and then I turned to the --

1          MS. BASSIL:  Will he be allowed to talk about, you

2     know, protest social movements?

3          THE COURT:  Well --

4          MS. BASSIL:  -- as opposed to terrorism?

5          MR. GROHARING:  What would be the relevance of that,

6     your Honor?

7          THE COURT:  One, I'm not sure of the relevance.  As a

8     general matter, I'm not sure that it's, as I've said,

9     specialized knowledge if he's just going to use some well-known

03:40 10   examples.

11          MS. BASSIL:  He can give you expert examples.  He can

12    give you well-known examples.  He can give you anything you

13    want.

14          THE COURT:  But the template is there are movements

15    involving lots of people, some of whom turn violent and you

16    could illustrate it with the Vietnam protest, you can

17    illustrate it with the Abolitionists, you can illustrate it

18    with the French Revolution.  You could illustrate it with lots

19    of things.  I don't know how that adds to the jury's

03:40 20   understanding about the issues in the case.

21          MS. BASSIL:  I think it adds a lot to -- I think it

22    adds a lot for this reason:  The government, quite frankly, has

23    done the best they could to sort of frighten the jury with

24    picture after picture and video after video and implying that

25    terrorism is just around the corner.  What Dr. Sageman can do

1    is put this in a valid historical and sociological context so

2    that this is not unique, this is not terrorism is about to

3    strike again.  He can put this in an appropriate historical

4    context.

5           One of the things that has come up in this case is

6    that there is never -- there's not context.  The government

7    throws stuff on from the client's computer.  It turns out

8    thumbnails are in inactive space.  That's the context.  There's

9    been a lot of issues like that where there's no context.  What

03:41 10   Dr. Sageman will provide, like Dr. Fadel did, like Dr. Marsh

11   did, is context.  And I think that that is beyond what an

12   average juror would know.

13          THE COURT:  Well, okay.  I'm not persuaded.  So the

14   substance, as reflected, and from the bottom of page 7 to the

15   top of page 9, would be excluded.  And I think --

16          MS. BASSIL:  He's not going to talk about Mr. Mehanna.

17          THE COURT:  Right.

18          MS. BASSIL:  All right.

19          THE COURT:  I think before we return to that, we were

03:42 20   at page 10.  The second full paragraph says he will testify

21   about the social dynamics of the social blob.  I think

22   that's --

23          MS. BASSIL:  He will testify about the -- I'm sorry.

24          THE COURT:  Some evidence about the characteristics of

25   the internet and his observations in his studies, I think, are

1   okay.  The anonymous, semi-anonymous, egalitarian nature, those

2   are things we've heard about, and he could perhaps talk about

3   that.

4          MR. GROHARING:  But my concern there, your Honor, is

5   that we're going to get close to the blobs.  If he's talking

6   about --

7          MS. BASSIL:  No, he's going to talk about the

8   internet.

9          THE COURT:  Well, we'll police it.  We'll police it.

03:42 10          MR. GROHARING:  I don't know that we need an expert to

11   say that people talk on the internet in ways that --

12          THE COURT:  We may not.  Right.

13          MS. BASSIL:  It's more than that.

14          MR. GROHARING:  Well, that's the concern.  More than

15   that is the blob.

16          MS. BASSIL:  No, it's not.

17          THE COURT:  All right.  Well, we'll control it.

18          To the extent that -- I'm not sure I understand the

19   next paragraph.  To the extent that it's an attempt at some

03:43 20   sort of either probability or sort of numerical assessment, I'd

21   have to hear how it was reliable, and I doubt that it is.

22          MS. BASSIL:  He will talk about scientific

23   methodology, your Honor, which --

24          THE COURT:  Having in mind that the question is not at

25   any given point whether the defendant was likely to become a

1   violent terrorist --

2           MS. BASSIL:  Uh-huh.

3           THE COURT:  -- the question is whether on the

4   government's evidence as an historical matter he did things

5   that constitute the offenses charged.  So probability is not a

6   part of the case.

7           MS. BASSIL:  Well, it is as to comments on

8   Mr. Kohlmann, all right?  Mr. Kohlmann does not use scientific

9   methodology.  He does not use comparative analysis.  He does

03:44 10  not have a valid scientific opinion.  And to that extent, I

11  think Dr. Sageman can talk about how one should study a subject

12  or how he has studied a subject.

13          THE COURT:  Well, we'll --

14          MR. GROHARING:  It seems as though these challenges

15  should have been made perhaps during a *Daubert* hearing for

16  Mr. Kohlmann, to raise these issues.  To call an expert to --

17          THE COURT:  Well, that general issue was raised.  I

18  just am not clear what he might say about this.

19          MS. BASSIL:  He's not really going to talk about the

03:44 20  "39 Ways," your Honor.  I think there's two questions about it.

21  He is going to talk about the person who wrote the original

22  Arabic, and he will talk about whether it's a training manual.

23          MR. GROHARING:  I think we're --

24          THE COURT:  Well, this is -- okay.  Go ahead.

25          MR. GROHARING:  I was going to say I think we're

```
 1   getting, again, back into the indicators that your Honor's

 2   already --

 3          MS. BASSIL:  Mr. Kohlmann testified it was a training

 4   manual.  That was not in his report.  I counted 53 instances

 5   where Mr. Kohlmann went beyond the scope of his report.  It

 6   seems to me that Dr. Sageman is allowed to provide an answer

 7   that contradicts Mr. Kohlmann.  You can call it impeachment,

 8   whatever you want, but that's what he's going to say.

 9   Mr. Kohlmann said it was a training manual; he's going to say

03:45 10   it wasn't.

11          MR. GROHARING:  Well --

12          THE COURT:  Say it wasn't on what basis?

13          MS. BASSIL:  What was Mr. Kohlmann's basis?  He didn't

14   have a basis; he just said it.

15          THE COURT:  Well --

16          MS. BASSIL:  You know, I mean, he said a lot of

17   things.  He said that the "State of the Ummah" received rave

18   reviews in an Afghanistan training camp.  Tell me what the

19   basis of that was.  Was it a newspaper article in the *Kabul*

03:46 20   *Star*, a must see?  I mean --

21          THE COURT:  Well, it sounds like the basis is he got

22   away with it --

23          MS. BASSIL:  No.

24          THE COURT:  -- so we should get away with it.  And

25   sometimes that's true.
```

1          MR. GROHARING:  The defense chose not to ask

2     Mr. Kohlmann what his basis was for it.

3          THE COURT:  Well, to the extent this is a

4     probabilistic computation --

5          MS. BASSIL:  No, what he can say is --

6          THE COURT:  -- then I think it's not --

7          MS. BASSIL:  -- it's not a training manual.  He's seen

8     training manuals; it's not a training manual.  He has a basis

9     for saying it's not a training manual.

03:46 10          THE COURT:  Well, we may just have to wait and see

11     what is attempted under that.

12          The next paragraph, then, has a bunch of bullet

13     points, is said to be a response to something that Kohlmann had

14     in his report but he did not testify to.

15          MS. BASSIL:  That's correct.  The only thing he

16     testified to -- let me just see.  He talked about coded

17     language.  Kohlmann did testify to that.

18          THE COURT:  Well, to the extent the report -- the

19     Kohlmann report talked about a profile, there was not a

03:47 20     profile.  So if these bullets were understood to be a

21     counter-profile, then I think they don't meet the evidence.

22          MS. BASSIL:  Well, he can -- it seems to me Kohlmann

23     talked about coded language and he wasn't talking about it in

24     terms of a profile or not.  He testified to it.  So I believe

25     Dr. Sageman can offer an alternative.

 1          THE COURT:  Yeah.  Some of these things as integral

 2     pieces themselves as opposed to support for a profile might be

 3     admissible; for example, Salafi-Jihadi is not Takfiri.  That is

 4     something, I suppose, he can talk about, for example, and coded

 5     language is another one, but not as is set out in the report as

 6     support for a profile.

 7          MS. BASSIL:  No, I meant as a separate topic.

 8          THE COURT:  All right.

 9          MR. GROHARING:  The paragraph above, your Honor, about

03:48 10   the 10,000 terrorists on chat forums and this is no indication

11     of propensity of becoming a terrorist, I don't think that's

12     based on your past --

13          THE COURT:  That's probably either just obvious or

14     blob, one of the two.

15          MS. BASSIL:  It doesn't say there are 10,000

16     terrorists.  It says --

17          THE COURT:  They're not, right.

18          MS. BASSIL:  Right.

19          THE COURT:  I mean, the first couple of paragraphs are

03:48 20   tautologies, I guess.

21          MR. GROHARING:  The possession of extreme ideological

22     materials is not a measure of someone's radicalization.  I

23     assume he's not going to testify to that?

24          MS. BASSIL:  No, I don't think Mr. Kohlmann testified

25     to that.  I mean, I know the government's going to argue that.

 1     It seems to me it's argument one way or the other, fair or not,

 2     but --

 3              THE COURT:  Right.  Yeah.  That is argument.

 4              MS. BASSIL:  Yeah.

 5              THE COURT:  Okay.  I think we've kind of narrowed

 6     this -- the scope.  So we'll begin with Dr. Sageman.

 7              MS. BASSIL:  Yes.  And I'll go over with him what's

 8     not going to be talked about.

 9              MR. GROHARING:  Two more bullets we haven't gotten to

03:49 10     yet -- these both seem to be out.  They're inconsistent with

11     your Honor's previous rulings -- having a grievance against the

12     West, and those are real --

13              MS. BASSIL:  I'm sorry.  Where are you?  I didn't see

14     where you're referring to.

15              MR. GROHARING:  The last two bullets on page 11.

16              MS. BASSIL:  He's not going to talk about it in that

17     form.  He will talk about what al Qa'ida grievances were.

18     Basically, you know, he's not going to --

19              THE COURT:  As expressed?

03:49 20     MS. BASSIL:  I'm sorry?

21              THE COURT:  As they expressed them?

22              MS. BASSIL:  Yes.  Yes, as they expressed them and as

23     he understood them and as he knew them.

24              MR. GROHARING:  It seems like he's doing a comparative

25     analysis of the defendant's statements and al Qa'ida's

```
 1   grievances.

 2           MS. BASSIL:  That's not his area.  That's what

 3   Dr. March and Dr. Fadel did.

 4           MR. GROHARING:  All right.

 5           MS. BASSIL:  He could talk about it, but we realize

 6   there's been so much discussion of it, we're not going to do

 7   that.

 8           THE COURT:  Okay.  All right.  So what's your -- so

 9   assuming we begin with him, what's your time estimate?

10           MS. BASSIL:  Well, if I don't get interrupted a lot

11   and there aren't a lot of sidebars, I think I could do it in an

12   hour, hour and a half tops.

13           THE COURT:  We might finish him tomorrow?

14           MS. BASSIL:  It depends on the cross-examination and

15   it depends --

16           THE COURT:  The word was "might."

17           MS. BASSIL:  Right.

18           THE COURT:  We might?

19           MS. BASSIL:  Right.  Right.

20           THE COURT:  Okay.

21           MS. BASSIL:  I am going to do everything I can -- and

22   I believe that I can finish his direct, all right?  Don't hold

23   me to this --

24           THE COURT:  No, I won't.

25           MS. BASSIL:  -- but I hope that I will finish his
```

1    direct before the break or shortly after.

2            THE COURT:  I'm just trying to get an idea, that's

3    all.  I'm just trying to see where we are.

4            MS. BASSIL:  But, again, it depends on objections and

5    sidebars and so forth.

6            THE COURT:  Okay.

7            MR. CHAKRAVARTY:  That raises the issue, not whether

8    the defendant is going to testify, but should we have a

9    charging conference?  Should we schedule a charging conference?

03:51 10         THE COURT:  We'll start to think about it.

11           MR. CHAKRAVARTY:  Fair enough.

12           THE COURT:  I don't know that I've had any requests

13   from the defense.  Do I?

14           MR. CARNEY:  You will tomorrow, your Honor.

15           THE COURT:  Okay.

16           MR. CARNEY:  I'm not going to deal with boilerplate,

17   just the nuances of --

18           THE COURT:  Yeah.  I will give -- you probably have

19   already found samples of my instructions.

03:51 20         MR. CARNEY:  I have them in my own collection.

21           THE COURT:  Yeah.  So, yeah, the evaluation of the

22   evidence and all of that stuff you don't have to submit.

23   Burden of proof, I think everybody knows what that is.  So,

24   yeah, the statutes and the elements and things like that are of

25   principal interest to us.

1          MR. CARNEY:  Can I ask your Honor to remind me of

2     something?  I know I've tried at least two jury trials with

3     your Honor.  Do you send a written copy of your instructions to

4     the jury?

5          THE COURT:  That's evolved.  I don't as a matter of

6     course.  I prepare a written form for myself.  I do not

7     slavishly read the copy that is in front of me because I think

8     that interferes with the teaching opportunity, so I use it more

9     as a template, although there are some places where it's

03:52 10   necessary to be precise and I pay a little more attention to

11    it.  But for that reason, the text that I have prepared is not

12    an accurate reflection of what I actually say to the jury.

13         Our court reporters have become so good that it is

14    possible to produce an accurate and certified copy of my

15    instructions relatively soon after I have actually given them.

16    I don't volunteer it to the jury, but if they ask, I can

17    provide them with the transcript of what I've actually said.

18         MR. CARNEY:  If it would be of any value, I'm prepared

19    to submit a motion asking that the Court give the instructions

03:53 20   in written form to the jury.  The reason for that is both my

21    experience and Attorney Bassil's experience in a dozen cases in

22    the last three years in the superior court where judges have

23    sent a written copy to the instructions to the jury has had a

24    dramatic effect.  Number one, there are almost no questions

25    asked by the jurors.  And so, instead of their belaboring on

1   things that they could answer right away, it's just remarkable

2   that there are no questions.  And on the whole, verdicts, both

3   pro and con to the defense, seem to come a bit sooner than they

4   are when the jurors aren't given the instructions.  It was

5   helpful.  That's our view.

6          THE COURT:  Well, I interpret that as a request that

7   the transcript be provided without waiting for a request.

8          MR. CARNEY:  Correct.  And then they would not have

9   the instructions until we have a certified transcript, which

03:54 10   may be a day or a day and a half, or it could be even --

11         THE COURT:  Oh, no, it will be a matter of hours, if

12   that.  First of all, the instructions -- it will be only the

13   instructions.  So, you know, it omits other events that day,

14   like argument, and so on and so forth.  So it would be a focus

15   on the instructions.  And so it's a subset of the full day.

16         MR. CHAKRAVARTY:  We'll think about it, if you don't

17   mind, your Honor, and let you know during the charging

18   conference.

19         THE COURT:  Frankly, in this case I think it's

03:54 20   inevitable they will ask for it.  So to compress the time and

21   volunteer it.

22         Just briefly on this, it is my -- this may also be

23   well known.  It is my practice to instruct the jury on the

24   substance of the charges before final argument, then have

25   arguments, and then I do the evaluation of the evidence after

1    that.  But I think it is helpful for them in hearing the

2    arguments to have been instructed already as to the elements of

3    the crimes, and so on and so forth, and some of the terms of

4    art that they'll be hearing about.

5              MR. CARNEY:  Excellent.

6              THE COURT:  So I start arguments and I finish.

7              MR. CARNEY:  I recognize that we have not completed

8    our case, but would it be possible to find out if the

9    government is anticipating rebuttal witnesses?

03:55 10          MR. CHAKRAVARTY:  Based on our just-conversation and

11   based on Ms. Bassil's prediction of where Dr. Sageman will go,

12   I would say there's less than a 50 percent chance that we would

13   present a witness.

14             THE COURT:  Okay.  All right.  Good.  Thank you.

15   We'll be in recess.

16             THE CLERK:  All rise for the Court.  The Court will be

17   in recess.

18             (The Court exits the courtroom and the proceedings

19   adjourned at 1:16 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  December 13, 2011

17

18

19

20

21

22

23

24

25