UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,    )
    )
        Plaintiff,    )
    ) Criminal Action
v.    ) No. 09-10017-GAO
    )
TAREK MEHANNA,    )
    )
        Defendant.    )
    )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY THIRTY-FOUR
JURY TRIAL


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, December 14, 2011
9:10 a.m.


Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         OFFICE OF THE UNITED STATES ATTORNEY
           By: Aloke Chakravarty and Jeffrey Auerhahn,
 3             Assistant U.S. Attorneys
           John Joseph Moakley Federal Courthouse
 4         Suite 9200
           Boston, Massachusetts  02210
 5         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 6         By: Jeffrey D. Groharing, Trial Attorney
               National Security Division
 7         950 Pennsylvania Avenue, NW
           Washington, D.C.  20530
 8         On Behalf of the Government

 9         CARNEY & BASSIL
           By: J.W. Carney, Jr., Esq.
10             Janice Bassil, Esq.
               John E. Oh, Esq.
11         20 Park Plaza
           Suite 1405
12         Boston, Massachusetts  02216
           - and -
13         LAW OFFICE OF SEJAL H. PATEL, LLC
           By: Sejal H. Patel, Esq.
14         101 Tremont Street
           Suite 800
15         Boston, Massachusetts  02108
           On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                     DIRECT   CROSS   REDIRECT   RECROSS

3    WITNESSES FOR THE
        DEFENSE:

4

5    MARC S. SAGEMAN

6        By Ms. Bassil            13
         By Mr. Groharing                91

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The following proceedings were held in open court
 2    before the Honorable George A. O'Toole, Jr., United States
 3    District Judge, United States District Court, District of
 4    Massachusetts, at the John J. Moakley United States Courthouse,
 5    One Courthouse Way, Boston, Massachusetts, on December 14,
 6    2011.
 7              The defendant, Tarek Mehanna, is present with counsel.
 8    Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn
 9    are present, along with Jeffrey D. Groharing, Trial Attorney,
00:-1110   U.S. Department of Justice, National Security Division.)
11              THE CLERK:  All rise.
12              (The Court enters the courtroom at 9:10 a.m.)
13              THE CLERK:  Please be seated.  For a continuation of
14    the Mehanna trial.
15              MR. GROHARING:  Your Honor, I want to briefly address
16    the classified issue we talked about yesterday and we talked
17    about previously.  I think Dr. Sageman should probably leave
18    for this discussion.  I don't expect it to be long.
19              THE COURT:  All right.
00:-1120   MS. BASSIL:  I don't know.  You may want to hear from
21    him but --
22              MR. GROHARING:  Before we get to that point --
23              THE COURT:  All right.
24              (Dr. Sageman is sequestered.)
25              MR. GROHARING:  -- I had an opportunity to talk to
```

1    Dr. Sageman yesterday and -- in an attempt flush out some of

2    his opinions and the bases for his opinions.  And Dr. Sageman,

3    during our interview, indicated that he relies on classified

4    information for the basis of his opinion.  And more in the

5    sense of he can't parse it out, that there's so much

6    information that he has access to, that to some degree he's, of

7    course, relying on that information.  We talked about this with

8    counsel.  Counsel gave the example of a doctor who's testifying

9    as an expert who's done multiple surgeries.  There's no way to

00:-10   10   tell which surgery -- you know, the knowledge they benefitted

11   from, so you can't really parse it out.

12        The problem here is we don't have access to that

13   underlying information.  We have no way to test his opinions.

14   He was unable to tell us what classified information he was

15   relying upon, and not necessarily because he would have been

16   unwilling, but we obviously couldn't do that in a setting --

17   defense doesn't even have a security clearance, so we couldn't

18   even flush that out with him.  So we really have no way --

19        THE COURT:  But is it because -- he can't tell you

00:-10   20   because it's not specific enough in his mind for him --

21        MS. BASSIL:  That's right.  That's right.

22        MR. GROHARING:  There were specific examples where we

23   would be talking about particular points and he would say,

24   "Well, I have access to NSA information.  I have access to

25   communications where I've been able to" --

1        THE COURT:  Well, I think that's out.  I think that

2    would be out; in other words, either direct evidence or by

3    implication that he has some secret that he can't share with us

4    and that's how he knows something.

5        MS. BASSIL:  Right.  And I told Mr. Groharing those

6    were not subjects I was getting into.  And he's really not

7    giving an opinion, if you think about it.  Mr. Kohlmann didn't

8    really give an opinion about the defendant.  He's not really

9    giving an opinion about the defendant; he's educating the jury

00:-09 10    both on al Qa'ida and scientific methodology and the sort of

11    way in which al Qa'ida uses or doesn't use the internet and

12    communications and so forth.

13        To the extent that he adopts scientific methodology,

14    he has used classified information to tell him he's going down

15    a blind alley, he should be looking at this other area for his

16    research.  He's always researching.  He's always in the process

17    of researching and writing.

18        MR. GROHARING:  Another example, I asked him about --

19    he's going to testify about the organization of al Qa'ida, that

00:-08 20    it's not top-down, that it's bottom-up.  He said he bases his

21    understanding of this largely on a 2006-2010 Air Force study

22    that he was part of.  That's not something that we have.  It

23    hasn't been disclosed.  We have no way to test his opinion in

24    that regard.

25        It's unfair for the defense to be able to build up his

1    qualifications on direct -- and he's going to talk about all

2    these projects that he's been involved with.  Even if those

3    projects don't necessarily directly relate to his testimony

4    here, the implication clearly is that he's had access to lots

5    of information, he's done all these interesting things; and,

6    therefore, his testimony should have more value.  We have no

7    way to test his opinion.

8            MS. BASSIL:  Let me say the Air Force study, your

9    Honor, is primarily -- is devoted towards the issue of

00:-08 10   indicators, which is exactly a subject we're not getting into,

11   all right?  And what I would also say is it was Mr. Kohlmann

12   who, quite frankly, answered in an idiotic manner that

13   classified information was useless.  So to that extent he will

14   say it is useful.  It's useful in scientific methodology.  But

15   it was Mr. Kohlmann who went on and on and on about how

16   classified information was of no value whatsoever.

17           MR. GROHARING:  Your Honor --

18           MS. BASSIL:  And I'm not going to go into this in an

19   extensive amount by any means.

00:-07 20      MR. GROHARING:  I would refer everyone to the court

21   transcript and Mr. Carney's questions.  They were clearly

22   designed to elicit the significance of classified information,

23   and then he went to follow up, "And isn't it true that

24   Dr. Sageman got access" -- "wouldn't it be important that he

25   got access to all of the materials of the Osama bin Laden

1     compound?"  "Wouldn't it be important that, in his job as an

2     advisor to the Chairman of Joint Chiefs, that he has access to

3     classified information?"  Clearly that line of questioning was

4     designed to bolster their own expert's opinion.

5         MS. BASSIL:  I'm not going to ask him about that.

6         THE COURT:  Well, I think to the extent there's an

7     implication that he knows a secret and, therefore, his opinion

8     is worth more, that should not be given.  I agree with that.

9     The reason I allowed -- or overruled the government's objection

00:-06 10     to the mention of "access" was simply in a sense of giving him

11     general professional qualifications, street cred', if you will,

12     that he has access to -- you know, in his work he's had access

13     to classified stuff.

14         To say that my opinions are bolstered by secret

15     information that I can't share with you but I'll insist --

16     there's support for my theory, that would be going too far.

17         MR. GROHARING:  The problem, your Honor, is that's the

18     implication.  And repeatedly last night when --

19         THE COURT:  Well, if it happens, we'll shut it down.

00:-06 20         MR. GROHARING:  But if I even go, for example, on

21     cross -- if I start asking him questions and challenging the

22     basis of his opinions, he, very likely, will respond, "I can't

23     answer because I'd have to disclose classified information."

24         THE COURT:  We'll deal with that --

25         MR. GROHARING:  Here we have this guy who's imminently

```
 1   qualified --

 2          THE COURT:  Right.  We'll deal with that if it arises.

 3   I suppose the ultimate sanction could be striking the testimony

 4   if it gets too far in that direction.

 5          MS. BASSIL:  I might point out that it was the

 6   government who filed a motion in the beginning of this case

 7   that we should not be able to ask questions that would elicit

 8   the answer, "This is classified information."  That was their

 9   motion in limine.  So, you know, they filed it.

10          MR. GROHARING:  Your Honor agreed with us.  That's the

11   law.  There's a notice requirement.

12          THE COURT:  I think the rules are clear.  He can do it

13   as a general background to establish his professional --

14          MS. BASSIL:  Exactly.

15          THE COURT:  -- standing, but he cannot refer to

16   classified information as the basis for support of any of his

17   opinions.  And if he does, then we'll take corrective action.

18          MR. GROHARING:  I would ask that your Honor instruct

19   him prior to his testimony.

20          MS. BASSIL:  You can, if you want.

21          MR. GROHARING:  I cannot call him as a government

22   witness to satisfy my discovery obligations.  I'm confident in

23   saying that based on what he said.  The defense hasn't

24   satisfied theirs.  So I think -- and that's another reason to

25   also instruct him that he shouldn't even mention "classified."
```

00:-05 (line 10)
00:-05 (line 20)

1    I think it's improper for even laying that foundation because

2    it's obvious to me based on our conversation last night where

3    this is going.

4            THE COURT:  Well, I would ask Ms. Bassil to have a

5    conversation with him along those lines and --

6            MS. BASSIL:  I was very careful about that, your

7    Honor.  And quite frankly --

8            THE COURT:  Well, remind him this morning before he

9    testifies.

00:-04 10            MS. BASSIL:  I have to say, quite frankly, I was

11   shocked by Mr. Kohlmann's answers.  The obvious answer to

12   Mr. Carney would have been, "No, I don't have access to

13   classified information.  Yes, it might be helpful."  Instead,

14   he decided to go off on this frolic of how useless it was.  It

15   was kind of a shocking statement to me, quite frankly.

16           MR. GROHARING:  Well, we saw from the line of

17   questioning where it was going.

18           THE COURT:  Is it your intention to ask Dr. Sageman

19   whether classified information is useful?

00:-03 20           MS. BASSIL:  I would ask him that.  If you say I

21   can't, I won't.

22           THE COURT:  Yeah, I don't think you should.

23           MS. BASSIL:  All right.

24           MR. GROHARING:  And I would also ask if he could be

25   instructed that he cannot provide any opinion that relies on

1   classified information at all.  That means to make clear to

2   him --

3              THE COURT:  Well, that's what we've been talking

4   about.  Yes, I agree with that.

5              MS. BASSIL:  But he's not really providing opinions,

6   your Honor.  Not --

7              THE COURT:  Well, we'll see -- I think what I've said

8   is clear enough.  If it needs further attention, we'll deal

9   with it.

00:-03 10          MS. BASSIL:  All right.

11             THE COURT:  So would you have a word with him as we're

12  bringing the jury in?

13             MS. BASSIL:  Sure.

14             (Pause.)

15             MR. GROHARING:  To save ground, your Honor, one issue

16  I didn't bring up, the defense intends to ask Dr. Sageman about

17  some particular issues relating to Yemen; particularly, his

18  understanding of whether or not there were eulogies that were

19  posted by al Qa'ida or al Qa'ida affiliates regarding fighters

00:-02 20  in Yemen during the relevant time frame.

21             That's not a notice.  I'm going to object when it

22  comes up.  I don't know if it's better to take it up now rather

23  than sidebar.  I asked last night and Ms. Bassil refused to

24  tell me what he was going to say regarding Yemen.  This

25  morning, right before we started, she let me know.

```
 1              THE COURT:  Well, the notice did say he was going to

 2     talk about al Qa'ida.  So if he's talking about al Qa'ida in

 3     Yemen, I guess that would be within the scope.

 4              MS. BASSIL:  I'm sorry, I wasn't in the room when

 5     Mr. Groharing was arguing --

 6              MR. GROHARING:  If she wants to take it up at sidebar,

 7     I think it will be more clear once the testimony develops.  But

 8     I think it's beyond the scope of --

 9              MS. BASSIL:  I didn't hear this.

10              THE COURT:  I don't know.  I think it probably isn't.

11              That's all right.  I argued your side for you.

12              MS. BASSIL:  Thank you.  Jay was telling me to sit

13     down, so it works for me.

14              (Pause.)

15              THE CLERK:  All rise for the jury.

16              (The jury enters the courtroom at 9:21 a.m.)

17              THE CLERK:  Be seated.

18              THE COURT:  Good morning, jurors.

19              THE JURORS:  Good morning.

20              THE COURT:  Ms. Bassil?

21              MS. BASSIL:  Yes, your Honor.  I call Dr. Marc Sageman

22     to the stand.

23                   MARC S. SAGEMAN, duly sworn

24              THE CLERK:  Please be seated.

25              State your name, spell your last name for the record,
```

00:-02 (line 10)

00:00 (line 20)

1   keep your voice up and speak into the mic so everyone can hear

2   you.

3          THE WITNESS:  My name is Marc S. Sageman,

4   S-A-G-E-M-A-N.

5                       DIRECT EXAMINATION

6   BY MS. BASSIL:

7   Q.   And you are a doctor?

8   A.   Yes, I am.

9   Q.   Where do you live?

00:00 10   A.   I live in Rockville, Maryland, in the Washington, D.C.,

11   suburb.

12   Q.   I notice you have a slight accent.  Where are you from?

13   A.   I'm from France.  I grew up in France, and I came here

14   when I was 14.

15   Q.   Are you a United States citizen?

16   A.   Yes, I am.

17   Q.   What do you do for work?

18   A.   I'm sorry?

19   Q.   What do you do for work?

00:00 20   A.   I'm a consultant on terrorism and counterterrorism.

21   Q.   And where are you a consultant for terrorism and

22   counterterrorism?

23   A.   Mostly for the U.S. government.

24   Q.   I'd like to talk about your educational background for the

25   jury.  Where did you go to school?

1   A.   I went to Harvard University here in Cambridge,

2   Massachusetts.  I graduated in 1973.  Then I went to a dual

3   program, an M.D.-Ph.D. program.  So I got an M.D., and Ph.D. in

4   political sociology.

5   Q.   Why did you get a M.D. and a Ph.D. in political sociology?

6   A.   I was interested in international health.  And I felt that

7   it was half medicine and half politics, and so I felt I should

8   get a degree in both.

9   Q.   All right.  And what did you do after graduating from

00:01 10   medical school?

11   A.   At first I did a residency in surgical pathology because

12   that's the academic side of medicine, trying to study the

13   disease process to try to understand tropical disease.

14   Q.   Were you interested in tropical disease?

15   A.   Yes, very much so.  This was my goal.  And that's why I

16   did both degrees, because I felt international health, which is

17   mostly tropical disease, involved both politics and medicine.

18   Q.   What did you do after your medical residency?

19   A.   I joined the Navy because the Navy had the best practical

00:02 20   program in tropical medicine.  They have three hospitals:  in

21   Manilla, Cairo, and Panama.  But before going on to further my

22   training I decided to spend a few years with the troops, and I

23   decided to become a flight surgeon.  So I went to Pensacola,

24   Florida, for flight school and became a flight surgeon.

25   Q.   And where were you assigned?

1  A.    I was assigned at Fatima -- Okinawa, Japan -- where I was

2  a senior medical officer.

3  Q.    And where did you go after that?

4  A.    After that I went to the Naval Air Development Center

5  where I was in charge of human research for the Navy.  So the

6  people -- for instance, ejection seats.  Research:  How the

7  human body can tolerate the stop of acceleration.  And I was in

8  charge of the human centrifuge of pilots.

9  Q.    And when did you leave the Navy?

00:03 10  A.    I left the Navy, 1984.

11  Q.    And where did you go?

12  A.    I joined the CIA, Central Intelligence Agency.

13  Q.    And why did you leave the Navy and join the CIA?

14  A.    When I was in Japan -- that was a crisis -- a genocide in

15  Cambodia.  And so we had a flood of refugees, the Boat People,

16  as they were called, in 1979 to 1982.  I'm a child of a

17  Holocaust survivor.  Genocide is a very sensitive issue for me.

18  And I knew that the U.S. military was doing nothing to try to

19  prevent the genocide in Cambodia.  Only the CIA was funding and

00:03 20  supporting the anti-Khmer faction in Thailand.  So I joined the

21  agency in order to basically try to prevent this genocide from

22  occurring.

23  Q.    And what did you do at the CIA?

24  A.    Well, first I trained -- I spent a year training to be a

25  case officer.  After --

Q.   What is a case officer?

A.   A case officer -- probably very similar to the FBI -- is a person in charge of spies.  In a sense, I think, in the popular language, I was a spy master.

Q.   So you were a spy master?

A.   That's correct.

Q.   Like the books?

A.   Well, I think it's somewhat exaggerated.  Don't believe everything you read in the books.

Q.   When did you join the CIA?

A.   In 1984.

Q.   And so you said you trained for a year?

A.   Yes.

Q.   And then what did you do?

A.   I was in Washington trying to recruit foreign assets.

Q.   What does that mean, to recruit foreign assets?

A.   You want to recruit spies.  It's much easier to recruit spies in your own country and not from out of the country or from in jail.

Q.   When you recruit spies in your own country, is that to send them somewhere?

A.   Well, most of them are foreigners, so they return to their country.  They have access to information, and we try to steal that information from foreign countries, yes.

Q.   And did you also -- were you preparing to go overseas?

A.   Yes, I was.  I was undercover.  I was what's called an "unofficial cover officer" because of my background.  And I was going to go to a denied area, and I was preparing for that assignment.

Q.   What is it -- you were going to a denied area?  What does that mean?

A.   An area where we have either no formal representation in that country or that it is so hostile that we call it a "denied area."

Q.   That means that it's denied to the United States?  That's the idea?

A.   That's correct.

Q.   And where were you going?

A.   I can't tell that.  Sorry.

Q.   I'm sorry.

      After a year where were you assigned?

A.   After a year I was assigned to the Afghan Task Force in the summer of 1986.

Q.   And was this an assignment that was given to you or that you requested?

A.   Both.

Q.   Why did you request it?

A.   Well, if you remember, at that time the Soviet Union had invaded Afghanistan, after Christmas 1979.  And in the span of about four years they managed to kill 10 percent of the

population.  That's 1.5 million out of 15 million Afghan

population.  To me, that was equivalent to a genocide.  Since I

was interested in tropical medicine, this was the equivalent of

a large epidemic, so that's exactly what I wanted to do.

Q.   Now, in addition to 10 percent of the population being

killed, were there also refugees?

A.   Yes, very much so.  A third of the population was

refugees.  You had three million refugees in Pakistan, two

million refugees in Iran, and within the country nobody really

knows how much because the UNHCR, which is the agency at the

U.N. which counts refugees, only counts external refugees to

the country.  So the countryside was devastated and they

swelled up the cities, and so we don't really know how many

internally displaced people, or internal refugees, there were

at the time.

Q.   What was your personal role in Afghanistan -- in the

Afghanistan-Soviet war?

A.   Let me try to give you the unclassified version of my

role.

Q.   All right.

A.   A lot of things are still --

MR. GROHARING:  Your Honor, may we approach?

THE COURT:  All right.

(Discussion at sidebar and out of the hearing of the

jury:)

1          MR. GROHARING:  We're five minutes into it and we've

2     already had two examples.  It's directly --

3          MS. BASSIL:  I'll talk to him again.

4          What?  You know what he did.  I mean, he was a spy.  I

5     will talk to him.  If you want to take a short break or if you

6     want to call him up to sidebar, your Honor, and tell him to

7     stay away from those words.  It's fine with me.

8          MR. AUERHAHN:  I think the Court needs to instruct him

9     directly, because obviously whatever Ms. Bassil said to him was

00:08 10    a waste.

11         MS. BASSIL:  Excuse me?  Is this your witness?

12         If you would like to have him come up to sidebar, I

13    would be fine with that, your Honor.

14         THE COURT:  All right.

15         MS. BASSIL:  Dr. Sageman, can you come up here for a

16    moment?

17         THE COURT:  Dr. Sageman, for reasons that it isn't

18    necessary to lay out, you have to avoid any references to

19    classified or unclassified sources; that is, making the

00:08 20    distinction between classified and non-classified.

21         THE WITNESS:  I understand.  But, you know, some of

22    the questions I cannot answer; for instance, one question that

23    you asked, what country I was supposed to go to --

24         MS. BASSIL:  Yeah.

25         THE WITNESS:  -- that's still classified.  I'm sorry.

 1            MS. BASSIL:  I didn't know that.

 2            MR. GROHARING:  This is the perfect reason why I

 3    raised the issue, your Honor.  Clearly, the defense may get

 4    into information that potentially is classified.  They don't

 5    know what's classified.

 6            MS. BASSIL:  It's not relevant to the case.

 7            MR. GROHARING:  It's so intertwined that he can't even

 8    testify without separating it.

 9            THE COURT:  Well, okay.  But --

00:09 10           THE WITNESS:  I'll try my best.

11            MS. BASSIL:  Yes.

12            THE COURT:  If you think that your answer requires you

13    to make a reference to classified or unclassified as a category

14    of documents, then I'd suggest you ask that we have a

15    conference.

16            THE WITNESS:  All right.  Great.

17            MR. GROHARING:  The other point we discussed, your

18    Honor, is that Ms. Bassil was going to instruct the witness

19    that he could not testify to anything that's based on

00:09 20   classified information.

21            MS. BASSIL:  Obviously.

22            MR. GROHARING:  Obviously, that point is settled for

23    the first couple of answers, but I would like you to reiterate

24    that for the witness.

25            THE COURT:  Yes.  That will depend on the questioning,

1   I think.  So let's leave it as it is for now.  If there's a

2   doubt in your mind --

3          THE WITNESS:  Okay.  Thanks.

4          (In open court:)

5   BY MS. BASSIL:

6   Q.   When did -- when did you go overseas with respect to that

7   assignment?

8   A.   After eight months in Washington, I went overseas in May

9   1987.

00:10 10   Q.   And what were you in charge of?  What was your role there?

11   A.   At that time -- I have to give you a little bit of a

12   context for me to understand -- to show you.

13   Q.   Can you speak up a little bit?

14   A.   Yes.  I'm sorry.  I usually speak very softly.

15          But at that time the Afghan mujahideen had increased.  By

16   1986 it really was a large amount of money, actually.  It

17   became the most expensive covert action program in the history

18   of the agency.

19   Q.   Let me stop you see for a minute.  You said it became the

00:11 20   most expensive covert operation.  What's a covert operation?

21   A.   A covert action -- everything at the CIA is a covert

22   operation.  But a covert action specifically is a paramilitary

23   activity abroad.  So it's not really stealing documents or

24   anything like that; it's very much supporting a local

25   insurgency.

1    Q.    Okay.  So you were supporting --

2    A.    We were supporting --

3    Q.    -- the mujahideen in Afghanistan against the Soviets?

4    A.    That's correct.  That's correct.  And the amount of money

5    became so big, and the sophistication of the weapons we gave to

6    the mujahideen reached a threshold that Congress wanted to make

7    sure that the weapons actually -- and the money and the

8    support -- went to the mujahideen as opposed to being skimmed

9    off by the Pakistanis, who were intermediaries.

00:12 10        So my job was basically running the unilateral program.  I

11   was a case officer of the major mujahideen commanders in

12   Afghanistan including Ahmad Shah Massoud, who was my agent.

13   Q.    Who was Massoud?

14   A.    Ahmad Shah Massoud became a legend.  He was the most

15   prominent commander in Afghanistan resisting the Soviet

16   invasion.

17   Q.    And where were you stationed?

18   A.    I was stationed in Islamabad, about --

19   Q.    Where is that?

00:13 20   A.    Islamabad is the capital of Pakistan.  It's about -- well,

21   at that time it was two and a half hours away on a very

22   terrible road between Islamabad and Peshawar.  Now they've

23   built a highway, so you can almost go there in a little bit

24   more than an hour.

25        But I spent a lot of time in Peshawar in -- at the

1  Afghan-Pakistani border meeting the commanders who came out of

2  Afghanistan to talk to me.

3  Q.   And as I understand it, the United States supported the

4  mujahideen in their fight against the Soviets?

5  A.   That's correct; yes.

6  Q.   And when did the Soviets withdraw?

7  A.   The Soviets withdrew at ten o'clock in the morning on

8  February 15, 1989.

9  Q.   All right.  What happened to Afghanistan after the Soviets

00:13 10  withdrew?

11  A.   It became basically a civil war.  It was a free-for-all,

12  where all the major commanders were really kind of fighting

13  each other for territory.

14  Q.   How much longer did you stay in that area after the

15  Soviets withdrew?

16  A.   I stayed about four, five months.  I left in June of 1989.

17  Q.   What kind of expertise did you acquire from this

18  experience?

19  A.   Well, I didn't acquire much experience as a physician.  I

00:14 20  basically ran an insurgency.  I became very familiar with

21  Islamic militants, who were -- most of the people were fighting

22  against the Soviets at the time.  I lived with them.  I shared

23  meals with them.  I acquired expertise in politics, the Near

24  East, especially South Asia, the history, the culture of

25  Afghanistan and Muslim fundamentalists, and a lot about

1    insurgency and terrorism.

2    Q.    And did you leave the CIA at some point?

3    A.    Yes; I left in 1991.

4    Q.    And why did you leave?

5    A.    Well, at that point the Soviet Union disintegrated.  I

6    think our job was done, and so I went back to civilian life.  I

7    went back to medicine.

8    Q.    After you left the CIA, did you continue to do some work

9    for them as an instructor?

00:15 10  A.    Much later.

11   Q.    Much later.  All right.  So you went back to being a

12   physician?

13   A.    Yes.

14   Q.    And what did you specialize -- what did you do as a

15   physician?

16   A.    I became a psychiatrist.  I became a forensic

17   psychiatrist.

18   Q.    What's a forensic psychiatrist?

19   A.    Forensic psychiatry is an interface between psychiatry and

00:15 20  law.  Sometimes the law asks science to clarify some issues

21   that deal with legal issues.  In civil cases, for instance, the

22   extent of damages, liability issues; and in criminal cases,

23   competencies or criminal responsibility.

24   Q.    So you would evaluate people, for example, on insanity

25   defenses?  Would that be an example?

1    A.    Yes, I would.

2    Q.    And in the course of that work, did you interview people

3    who were charged with murder?

4    A.    Yes; that was most of my cases.  I testified a lot at

5    death penalty trials.

6    Q.    About how many people did you interview who were charged

7    with murder?

8    A.    About a few hundred.  Between three and five hundred.

9    Q.    Now, do you have a license to practice medicine?

00:16 10    A.    Yes, I do.

11    Q.    Where?

12    A.    Right now my license is in the state of Maryland.

13    Q.    All right.  And have you been board certified?

14    A.    I'm sorry?

15    Q.    Have you been board certified?

16    A.    Yes, I've been board certified in psychiatry and neurology

17    and forensic psychiatry, yes, a subspecialty.

18    Q.    What did you do aside -- aside from consulting and working

19    as a forensic psychiatrist, did you do any teaching?

00:17 20    A.    Yes, very much so.  I taught both at the medical school

21    and at the graduate school of arts and sciences at the

22    University of Pennsylvania where I was a faculty member.

23    Q.    What did you teach?

24    A.    At the medical school I taught law and psychiatry for six

25    years.  This was a 40-week course for senior residents all

1    over -- from all over the city of Philadelphia.  We had some

2    residents who came and took my course.

3         And for the graduate school of arts and sciences, I taught

4    social psychology issues.  So I taught about perpetrators --

5    basically, small group perpetrators.  For instance, at the time

6    of 9/11 I was teaching a seminar called the "Moral Psychology

7    of Holocaust Perpetrators."  But I didn't just teach about

8    terrorism -- genocide or killers, but also the psychology of

9    trauma.

00:18 10   Q.   Okay.  And were you involved at all in the Solomon Asch

11   Center for the Study of Ethnopolitical Conflict?

12   A.   Yes; I was a founding member.  This was --

13   Q.   What is that?

14   A.   This is a center that was created through funding by the

15   Carnegie Corporation in 1996 at the University of Pennsylvania

16   for the study of ethnopolitical conflict.  And because of my

17   background, I felt I would be a good fit.  So I was one of the

18   founding members of that center.  And there we basically

19   discussed the causes, how to analyze, try to understand

00:18 20   political conflict that involved both ethnic groups, such as

21   terrorist groups, or religious strife.

22   Q.   Did you continue to maintain an interest and follow

23   developments in the Middle East?

24   A.   Yes, I did.

25   Q.   Now, did the focus of your work change after September

1    11th?

2    A.   Very much so.  This was one of the turning points of my

3    life.

4    Q.   Why did it change your work?

5    A.   Well, at first I felt really quite guilty.  You know, you

6    heard a lot about Afghanistan at that time, and I was wondering

7    whether the guys who did 9/11 were the guys I trained.

8    Q.   All right.  And so because of that, what did you do?

9    A.   Well, it turns out that there were no Afghans in

00:19 10   al Qa'ida, and so, Well, if they're not my guys, who are they?

11   So I decided to use -- to employ the scientific method that we

12   use in medicine and in sociology to the study of who the people

13   are to al Qa'ida, at first.

14   Q.   Would you explain to the jury what the scientific method

15   is?

16   A.   Over the course of the last century we've used statistics

17   and methodology to try to understand what's true or not true.

18   Before that, up to about the nineteenth century, everything was

19   the common wisdom, what your teachers told you.  And the

00:20 20   scientific method is basically testing that, either through

21   experiments or through observation.

22       What you basically do is that you're trying to have a

23   hypothesis and look for evidence that would refute it because

24   you can never confirm something.  You know, a confirmation is

25   basically trivial.  It just means that your prejudice is

1  probably correct.  The science is that you always look for

2  evidence that would undermine your hypothesis.  And if that's

3  the case, then you already know this is not the answer and

4  you're looking -- you basically restrict the field of unknown

5  to advance.  So basically, that's what I did.

6  Q.   So how did you apply this to the issue of terrorists and

7  terrorism?

8  A.   Well, as I said, at first I wanted to know who these

9  people were, so I started building a database from open-source

00:21 10  material to see, you know, what we understood of terrorists.

11  At that time most people thought that terrorists were people

12  who were poor, ignorant, easily brainwashed, depressed.  And

13  looking at the people who did 9/11 and people like them, my

14  first database was just 25 people.  I realized --

15  Q.   Can you explain how you built that database?

16  A.   Yes.  I collected good newspaper accounts at that time.

17  And I used several database:  one was LexisNexis; the other was

18  Factiva; and the third was a government database available to

19  universities which was World News Network, which is now the

00:22 20  Open Source Center.  It used to be FBIS before.

21       And then I also looked in some -- I'm a forensic

22  psychiatrist, and spent a lot of time looking at trial

23  transcripts.  I realized in trial transcripts you have -- it's

24  full of information about defendants.  And one of the trials --

25  the trial was the '98 embassy bombing -- was on the internet.

1  It was put on the internet.  It was tried in the first half of

2  2001.  And that really gave a lot of information about the

3  people I was studying.

4     I like trial transcripts as well because it gives you two

5  sides of a story.  You have both the prosecution claims and you

6  have the defense claim, and you have to -- so it's more

7  balanced than just having what government or prosecutors say,

8  which is usually what gets in the newspapers.

9  Q.   All right.  Now, when you had this database, it was 25

00:23 10  people.  Is that correct?

11  A.   Originally, yes.

12  Q.   Originally.  And what were you -- what did you do with it?

13  A.   Well, I was surprised by my finding.  Most of the people

14  at that time were upper middle class; they were fairly

15  well-educated.  They had a future before them.  So all of this

16  was really very counterintuitive.  So why do those people kill

17  themselves and kill other people?  I mean, it's still very much

18  a question mark.

19     And so I started lecturing at my university about my

00:23 20  finding, and some people heard about it -- well, one of my

21  students who had been invited to a conference at the National

22  Academy of Science told them, "Well, you should really listen

23  to this guy."  And so the National Academy of Science invited

24  me to present my data.

25  Q.   And when you presented -- when did you present your data

1   to the National Academy of Science?

2   A.   I did so in May of 2003.  But at that point I had expanded

3   my data to about 70 cases because I was going to be judged by

4   my peers.  And, you know, just having 25 cases, in science

5   that's not very much.  So I thought with 70 cases, I felt I was

6   a little bit more comfortable.

7   Q.   When you say "cases," what do you mean?  What are these

8   cases?

9   A.   Cases are usually people who have been convicted or killed

00:24 10   themselves in terrorist operations.

11   Q.   All right.

12   A.   Al Qa'ida-linked, because there are many terrorists.  But

13   al Qa'ida-linked.

14   Q.   All right.  Now, how did this affect your forensic

15   psychiatry practice?

16   A.   Well, at that point I was spending a lot of my own time

17   building this database.  This was not funded by anybody.  But

18   at that point by 2003 it didn't really affect it much.  It was

19   when I was -- from the National Academy of Science, Phil

00:25 20   Zelikow was there, and he invited me to be the first scholar to

21   testify before the 9/11 Commission, which I did.

22   Q.   So you spoke at the 9/11 Commission?

23   A.   Yes, I did.  And that was in, I believe, July of 2003.  I

24   was in the first panel of scholars, the second session.

25   Q.   And were you also invited to lecture at the American

1   Psychological Association?

2   A.   Yes.  Phil Zimbardo, who was the president of the American

3   Psychological Association, asked me to give a lecture at a

4   presidential panel of the annual convention of 2002, I believe.

5   Q.   On the basis of these lectures, did you write a book?

6   A.   Yes.  The University of Pennsylvania press came to me and

7   asked me could I turn my series of lectures into a book, and so

8   I did.

9   Q.   And is this the book?

00:26 10   A.   Yes, the first book:  *Understanding Terror Networks*.

11   Q.   All right.  And could you explain to the jury -- well,

12   before we get to that, let me ask you a couple of other

13   questions.  After -- did your research become known through

14   your presentation at the 9/11 Commission, the National

15   Association -- the National -- what was the science?  National

16   Academy of Science --

17   A.   National Academy of Science.

18   Q.   -- and the American Psychological Association?

19   A.   Yes.  By 2004, when the book came out, there was a lot of

00:26 20   review and a lot of -- it really triggered a lot of

21   conversation within the field.

22   Q.   All right.  And by the way, when you say you were invited

23   by the University of Pennsylvania to write the book, was the

24   book peer-reviewed?

25   A.   Of course.

1    Q.   And was it blind peer-reviewed?

2    A.   At that time, yes.

3    Q.   And do you write articles, by the way?

4    A.   Yes, of course I do.

5    Q.   What kind of journals or -- where do you publish them?

6    A.   Probably some, for instance, in terrorism, political

7    violence, some policy papers, the annual Academy of Political

8    Sciences.  Basically, they invited papers.

9    Q.   How many papers do you think you've published?

00:27 10   A.   Over 30.

11   Q.   Over 30?  And are they all peer-reviewed?

12   A.   Yes, most of them are peer-reviewed.  Yeah, they're all

13   peer-reviewed.  But in terms of -- I think we're trying to

14   get -- a blind peer-review, about half of them were blind

15   peer-reviewed.

16   Q.   And how many people are available to blind peer-review

17   your papers on terrorism and terrorism-related subjects?

18   A.   I'm not sure I can answer that.  My first book was

19   peer-reviewed by a very prominent sociologist who had written

00:28 20   about violence but nothing about terrorism.

21   Q.   Mr. Kohlmann said there were only 10 to 15 people in the

22   United States, Asia and Europe who were capable of reviewing

23   his articles.  Is that true about your articles?

24   A.   I wish I only had 10 peers.  But, no, there are far more.

25   There are hundreds.

1    Q.   Now, did you also begin to consult with government

2    agencies?

3    A.   Yes.  Starting around 2004 I was invited by many

4    government agencies to come and consult with them to share with

5    them the methodology that I used.  And after a while I was

6    spending three or four days at the Army-Navy Club in

7    Washington, D.C., and since I wasn't seeing my family, I

8    decided that we were going to all move to Washington so I could

9    see -- so I could be with them.

00:29 10   Q.   What government agencies did you consult with?

11   A.   You name it.

12   Q.   You name it.

13   A.   Well, let's start with the Defense Department.  I think I

14   probably lectured at most combatant commanders, so EUCOM,

15   SOUTHCOM, NORTHCOM --

16   Q.   There's a lot of initials here.  Can you kind of tell us

17   the full name?

18   A.   EUCOM is European Command; CENTCOM is Central Command, so

19   those are people who are in charge of the Middle East; European

00:30 20   Command is Europe; SOCOM, which is Special Operation Command;

21   NORTHCOM, which is a command that protects North America, so

22   U.S. and Canada.  Various offices within the Defense

23   Department:  SO/LIC, Special Operations/Low-Intensity Conflict.

24   Gosh, I mean --

25   Q.   What about the Department of Homeland Security?

1    A.    The Department of Homeland Security two major divisions:

2    Science and Technology, Human Affairs and Policy.  I consulted

3    with both.  And essentially, Science and Technology funded some

4    of my research as well.

5    Q.    How about the CIA?

6    A.    Yes, I did consult with the CIA.

7    Q.    When you say "consult," what do you mean?  Or let me move

8    on.

9          Have you also consulted with the Federal Bureau of

00:31 10   Investigation?

11   A.    Yes, very much so.

12   Q.    The National Security Agency?

13   A.    Yes.

14   Q.    The State Department?

15   A.    Yes.

16   Q.    Congress?

17   A.    Yes.

18   Q.    Which portions of Congress?

19   A.    Both the House and the Senate.  Various committees and

00:31 20   subcommittees on both.

21   Q.    Have you consulted with the White House?

22   A.    Yes.

23   Q.    And what aspect of the White House?

24   A.    The National Security Council mostly.

25   Q.    Do you have any long-term consultations with government

1    agencies?

2    A.    Yes.  Basically, starting in 2005 the National Laboratory

3    retained me to consult on a project to build a model of how

4    people become terrorists.  I spent the summer of 2005 there.

5    Q.    Where is the National Lab?

6    A.    There are ten national labs.  Those are the people who

7    build atomic bombs.  The Sandia National Lab is in Albuquerque,

8    New Mexico, and I also consulted with the Los Alamos National

9    Lab, also in New Mexico.

00:32 10   Q.    Did you consult with the Secret Service?

11   A.    Yes.  A year later the Secret Service retained me.  They

12   wanted me to help them protect the President of the United

13   States from group violence.  The Secret Service is very good at

14   defending the president, and they have a very good strategy.

15   So they wanted to develop strategy for group violence.  And I

16   spent a year there.

17   Q.    Did you work for the New York Police Department?

18   A.    Yes, I did.

19   Q.    What did you do there?

00:32 20   A.    I was the scholar resident -- the one and only scholar

21   resident -- of the police department because they lost their

22   money.  So there is no more scholar residents.  That's the only

23   reason.

24        David Cohen, the deputy commissioner, called me when I was

25   in Australia at the time, and asked me to come and help them

protect the city.  And they had a specific problem.  Basically,

a lot of people that they were monitoring were just making a

lot of noise as if they were young jihadists.  And they --

after years of monitoring them, they realized that they weren't

doing anything.

        MR. GROHARING:  Objection, your Honor.

        THE COURT:  Sustained.

BY MS. BASSIL:

Q.   How long did you work for the New York Police Department?

A.   A year.  About a year.

Q.   And do you consult currently for the United States Army?

A.   Yes.  After the Fort Hood massacre, the deputy chief of

staff of the Army called me and asked me to come and help them

prevent another such tragedy.  And I've been there for over two

years.

Q.   When you talked about the -- what is the Fort Hood

massacre?

A.   Major Nidal Hasan killed 13 people in Fort Hood on

November 5th, 2009, wounded 37 others.  And this was by an army

officer.  And so people accused the army of having a lot of

insiders -- an insider threat -- and they wanted to know the

extent of it and how to prevent another such tragedy.

Q.   And to your knowledge has the person in the Fort Hood

massacre been charged with any terrorism acts?

        MR. GROHARING:  Objection, your Honor.

```
 1              THE COURT:  Sustained.
 2    BY MS. BASSIL:
 3    Q.   Have you conducted -- have you continued -- I'm just going
 4    to ask you very generally at this point, all right?  Have you
 5    continued to conduct other research?
 6    A.   Yes, I have.
 7    Q.   And have you studied -- did you study a particular group
 8    in Tokyo?
 9    A.   Yes.  As I said, the Department of Homeland Security
10    funded me to look at bioterrorism.  And so I reviewed all of
11    the bioterrorist groups in the last century.  And the most
12    serious of them was Amn Shinrikyo.  I wrote a report for
13    Homeland Security.  And in order for me to kind of look at Amn
14    Shinrikyo, I went to Tokyo.
15              MR. GROHARING:  Objection, your Honor.  I don't know
16    how this is relevant to this case.
17              MS. BASSIL:  It's just research he had done.
18              THE COURT:  Right.  I think that may have completed
19    the answer, though.
20              MS. BASSIL:  Right.
21    BY MS. BASSIL:
22    Q.   And this was published, was it not?
23    A.   Yes, it was published.
24    Q.   Now, did you write another book?
25    A.   Yes, I did.
```

1    Q.   And when was that published?

2    A.   That was published in 2008.

3    Q.   And what was the name of that book?

4    A.   *Leaderless Jihad*.

5    Q.   And was that book peer-reviewed?

6    A.   Very much so, yes.

7    Q.   Now, have you given -- you said that you testified at the

8    9/11 Commission in Washington, D.C.  Have you testified in any

9    other official commissions or investigations of terrorism?

00:36 10   A.   Yes, I testified at the Beslan Commission in Moscow in

11   February 2005.

12   Q.   What was the Beslan Commission?

13   A.   This was a horrible tragedy of September 2004 where a

14   school of children were attacked and besieged by Chechen

15   terrorists.  And they killed about 300 kids.

16   Q.   And you testified in that commission?

17   A.   Yes, I did.

18   Q.   Now, have you been invited to give lectures on terrorism

19   at various universities?

00:36 20   A.   Yes, almost too many to count at this point.

21   Q.   Can you give the jury a few of them?

22   A.   Well, my alma mater, Harvard; MIT here locally; Columbia

23   University; University of Chicago; University of California at

24   Berkeley; University of Pennsylvania; NYU.  Gosh.  University

25   of Michigan, Duke, University of North Carolina.

1    Q.    Have you been invited to lecture on terrorism at foreign

2    universities?

3    A.    Yes, even a larger number than here.  In about 20

4    countries.

5    Q.    Can you give us the names of a few?

6    A.    University of Australia; Germany; France; Belgium; Italy,

7    even; Spain; the Netherlands; Belgium; Britain; Canada;

8    Singapore; Turkey; Saudi Arabia.

9    Q.    Have you been invited to lecture at -- with foreign

00:38 10   allies' intelligence services on terrorism?

11   A.    Yes.  Most of the countries I went to to lecture at the

12   universities, I often met with the local security services.

13   Q.    And have you received any awards or honors for your work?

14   A.    Well, besides being invited to two major commissions, the

15   9/11 Commission and the Beslan Commission, most of my contracts

16   are basically awards based on my work.

17   Q.    Now, have you testified in court before?

18   A.    Yes, I have.

19   Q.    And in what capacity?

00:38 20   A.    As a forensic psychiatrist.

21   Q.    Have you testified in court before in terrorism cases?

22   A.    No, I have not.

23   Q.    I want to go back to your first book, *Understanding Terror

24   Networks*.  Could you explain to the jury what this book was?

25   A.    This book was basically five different studies.  The first

study was the history of the movement that gave rise to 9/11;

the second was a study of the ideology that people did this

for; the third book was a statistical analysis of 170

terrorists worldwide at that time.  And that's where I

basically refuted the conventional wisdom of our understanding

of terrorism.  They didn't have any psychological problem.

They were upper middle class.  They were fairly well-educated.

They were married.  They had children.

Q.   How did you find out that information?

A.   Well, this is information -- when, you know, people are

born and where they're born, you know, that's basically -- you

can find that in almost any newspaper, any account.  But I

tried to really be careful because there's unreliable

information, which is why I usually take trial transcripts and

information at trials to build this database.

Q.   Did you analyze any particular plots in determining -- in

sort of preparing this book?

A.   Yes.  I mean, the fourth study was how do people become

terrorists.  And so I looked at two plots:  One was Millennium

Bomber plot, Ahmed Ressam --

       MS. BASSIL:  Your Honor, if we could use the ELMO on

this?  I want to write it down.

Q.   Hold on.

A.   Okay.

Q.   And that's Ressam?

1    A.    That's correct.

2    Q.    And this was, you said, the Millenial plot,

3    M-I-L-L-E-N-I-A-L plot *[sic]*?

4    A.    That's right.

5    Q.    Where was it?

6    A.    He was arrested in the state of Washington, but he wanted

7    to bomb LA airport, LAX, for the millennium.  So in late

8    December 1999.

9    Q.    And what was the second plot that you studied?

00:41 10   A.    The second plot was a 9/11 plot.  There I went to Hamburg

11   to interview people who knew the four major leaders of that

12   plot.  Three of them were pilots, and the fourth was Ramzi bin

13   al-Shibh.  I spent 30 hours interviewing Ramzi bin al-Shibh's

14   best friend.

15   Q.    Can you spell it?

16   A.    Ramzi bin al-Shibh?

17   Q.    Yes.

18   A.    R-A-M-Z-I; bin, B-I-N; Al, A-L; and Shibh, S-H-I-B-H.

19   Q.    And who was that?

00:42 20   A.    Ramzi bin Al-Shibh is now in Guantanamo and he's probably

21   going to stand trial.  He was the one who coordinated the 9/11

22   attack.

23   Q.    And you said you interviewed him for about 30 hours?

24   A.    No, I did not interview him.

25   Q.    Oh, sorry.

1    A.   I interviewed his best friend, Shahid Nichols (ph), for 30

2    hours.  And I interviewed other people.  I went to Al Quds

3    Mosque where they hung out in Hamburg and tried to reconstitute

4    the plot:  how it emerged over time, chronologically how people

5    became terrorists.  That's my interest.

6    Q.   Do you speak Arabic?

7    A.   No, I don't.

8    Q.   Did that interfere with your work?

9    A.   No.  I found that in the West most people speak either

00:43 10   French, English or German.  And even Spaniards -- I understand

11   some Spanish.  I did not go to Italy.

12   Q.   Is your work primarily concerning people in the West?

13   A.   The second book.  The first book was not, but the second

14   book was, yes.

15   Q.   Now -- and was there a fifth study in your first book?

16   A.   Yes.  The fifth study was trying to use social network

17   analysis to try to understand the evolution of networks such as

18   the 9/11 plot and to really understand how to attack those

19   networks.  So I saw that some of this network had large hubs;

00:43 20   for instance, Ramzi bin Al-Shibh was a large hub, and if you

21   take out that hub you probably --

22   Q.   Slow down, please.

23   A.   I'm sorry.  I get passionate about my work.

24   Q.   First let me start with what is social network analysis?

25   A.   Social network analysis is a graphic analysis.  It's

1    really graph theory to try to understand networks, how people

2    do things.  And my analysis was a dynamic, chronological

3    analysis of this network, how it grew over time.  And the idea

4    is how to best attack it.

5    Q.   And what did you determine about the networks involving

6    terrorism?

7              MR. GROHARING:  Objection, your Honor.

8              THE COURT:  Let me see you briefly.

9              (Discussion at sidebar and out of the hearing of the

00:44 10   jury:)

11             MR. GROHARING:  I think it sounds like we're going to

12   start getting into the blob area at this point, which we

13   discussed at length yesterday.

14             MS. BASSIL:  No.  This is his first book which didn't

15   have the blob.  And what he's going to say is that he

16   determined that there were -- I'm not going to get this

17   right -- Arab, East African -- and I forget the third one.

18   That's what the networks were.  It has nothing to do with the

19   blob.

00:45 20             MR. GROHARING:  I think we have enough background

21   established.  I think we can start to get into the substance of

22   his testimony.

23             MS. BASSIL:  I think I should be entitled to do -- I

24   think I should be entitled to -- this is an important expert,

25   and I think I should be entitled to bring out his

1    qualifications and his background in full.

2            MR. GROHARING:  We've been at it for almost 40

3    minutes.

4            THE COURT:  All right.  No, go ahead.

5            MS. BASSIL:  Thank you.

6            (In open court:)

7    BY MS. BASSIL:

8    Q.   And what did you determine were the three major networks?

9    A.   How people were connected with -- in basically three large

00:46 10   clumps, three large networks.  Some of them were North African,

11   and that was part of the Ahmed Ressam network.  Others came

12   from the Middle East -- I call it the Arab network -- and this

13   was very much -- the 9/11 plot was very -- a part of 9/11.  And

14   you -- then you had a network that was a disconnect from the

15   other two, and it was in an East Asian network; namely,

16   Indonesia and Malaysian network.  So the three clumps hung out

17   with each other but not with the others.

18   Q.   All right.  Now, was -- let me ask you:  Have you been a

19   peer-reviewer --

00:46 20   A.   I'm sorry?

21   Q.   -- yourself?

22        Have you peer-reviewed yourself?

23   A.   Yes.  Yes, of course.

24   Q.   Did you peer-review Evan Kohlmann's book?

25            MR. GROHARING:  Objection, your Honor.  Relevance.

1           THE COURT:  Sustained.

2   BY MS. BASSIL:

3   Q.    Now, what is comparative analysis?

4   A.    Comparative analysis in the social sciences is that you're

5   trying to understand a phenomenon.  And so in order to

6   understand a phenomenon, like, for instance, how does one

7   become a terrorist, you have to compare it to people who have

8   both similarities with you and differences with you.  So you

9   have to compare to people who do not become terrorists but are

00:47 10   just like the first one.  So they hung out together.  So why

11   does one turn to violence and others do not turn to violence?

12   And you analyze both the similarities and the differences, and

13   then you generate an explanation and you test the explanation

14   on other samples, on other count's population.

15   Q.    Do you know Evan Kohlmann's work?

16   A.    Yes.

17   Q.    Does he do comparative analysis?

18           MR. GROHARING:  Objection, your Honor.  This is not a

19   proper basis for --

00:48 20           MS. BASSIL:  I think it is, your Honor.

21           MR. GROHARING:  An expert providing an opinion on

22   another expert?

23           THE COURT:  Overruled.

24           You may have it.

25   BY MS. BASSIL:

 1    Q.    Does he do comparative analysis?

 2    A.    No, he does not.  He just accumulates cases.

 3    Q.    Have you ever used any of his work?

 4    A.    No.

 5    Q.    Okay.  Now, has your thinking continued -- evolved from

 6    your first and second book?

 7    A.    Well, from my first book to my second book, yes, and from

 8    my second book to now, yes.

 9    Q.    All right.  Now, have you done -- I'm only going to ask

00:48 10    you one question and I just want a yes-or-no answer, all right?

11    Do you have access to classified information?

12    A.    Yes, I do.

13    Q.    And I want to ask you about whether you have conducted

14    field work.

15    A.    Yes.  Most of my work is based on field work.

16    Q.    What kind of field work have you done?

17    A.    Whenever an attack or a big plot is found, I usually go to

18    the field where the people are from to try to understand how

19    did those people decide to do this.  And it's -- so I'm trying

00:49 20    to understand the context, the background.  I'm trying to see

21    where they lived, who they talked to.  Is there anything in the

22    environment that would make them do this?  I'm trying to

23    also -- I'm also especially trying to understand how they met

24    each other.

25          It's critical because terrorism is often a collective

enterprise.  So I'm trying to say, Well, if this guy lived here

and the other guy lived across town, how did they meet?  And

all those are really very, very important issues in order to

try to piece together the chronology of a plot.  So I spent a

lot of time in the Netherlands, a lot of time in Madrid, a lot

of time in Hamburg.  I spent quite a bit of time in London, in

various neighborhoods --

Q.    Let me stop you for a minute.  Why did you spend a lot of

time in Madrid?

00:50  A.    Madrid had a horrible bombing of their commuter train on

March 11, 2004.  It killed 191 people.  And this was still the

largest terrorist attack on European ground.  And so I tried to

understand the perpetrators, how they came together.  And I

basically took about half a dozen trips to Madrid, went to the

various neighborhoods where they came from.

I think you had almost like 20 perpetrators, but about a

dozen carried bombs into the train, left them in the train.  So

I tried to understand who they were, how they got together and

how they evolved over time to really commit this horrible act.

00:51  Q.    And why did you go to the Netherlands?

A.    The Netherlands has a group called the Hofstad Group.  One

of the members of the Hofstad Group, Mohammed Bouyeri, killed

Theo van Gogh.

Q.    I'm sorry.  Who?

A.    Theo van Gogh.  Hofstad Group.  "Hofstad" means "high

1    court."

2        And so I went both to the Hague and Amsterdam to try to go

3    to the neighborhood, try to understand really what happened.

4    When I do that, I often meet with the policemen who

5    investigated the case.  When there has been a trial, I meet

6    with both the defense attorney and the prosecutors; I meet with

7    internal intelligence agencies.

8        See, what I do is I often lecture to them about my work

9    and we start having conversation.  And after that, they often

00:52 10   are the ones who take me to the neighborhood and say, Well, we

11   arrested this guy here, this was his accomplice, and so on.  So

12   I'm trying to get the ground truth, in a sense, to look at it

13   in great detail.

14   Q.   Do you talk to local police officers who were involved in

15   investigations?

16   A.   Yes, I try to talk to the investigators themselves.  Not

17   the analysts but the actual operational officers.

18   Q.   Where else have you gone for field work?

19   A.   I went to London.

00:52 20   Q.   Why did you go to London?

21   A.   Brixton was the place where Richard the shoe bomber came

22   from, and I stayed at Brixton, the neighborhood.  So this was a

23   very -- this was a neighborhood that generated various plots.

24        I went to Wolfenstow which was, I guess, the origin of

25   basically two plots in Britain:  One was 7/21/2005 attempted

bombing of the underground, and the other was the overt case

which was the attempt to blow up seven aircraft in the air

through liquid bombs.  They were arrested in August 2006.  And

what was surprising is that they had -- those two networks had

the storefront right across the street from each other and they

knew each other.  I mean, this is not something that you would

get just from reading the internet and so on.  You almost have

to go there.  And, my God, they are right next to each other.

Q.   Where else did you do field work?

00:53  A.   I went to Canada, the Toronto 18 case.  So I went to

Toronto several times.  And there the journalist covering the

trial took me around, as well as the police informant, Mubin

Shaikh, who was giving me an insider view of what happened in

the two plots that are called "Toronto 18 plots."  So I spent

time there.  I went to Ottawa to understand why a plotter that

was linked to a British case, a crevice case, lived and how he

became a terrorist.

Q.   Did you go to Paris?

A.   Yes, I spent a lot of time in Paris.

00:54  Q.   What happened in Paris?

A.   In the summer of 1995 there was a series of 13 bombings

and shootings by the GIA that paralyzed France.  It lasted

about three months.  And I was trying to understand this

phenomenon.  I actually wrote a manuscript, a large manuscript,

on this.

```
 1   Q.   And why is it important to use scientific methodology in
 2   this study?
 3   A.   Because it turns out there are so few terrorists, there
 4   are so few people who turn to violence.
 5              MR. GROHARING:  Objection, your Honor.
 6              THE COURT:  Overruled.
 7              MR. GROHARING:  Could I be heard at sidebar?
 8              THE COURT:  All right.
 9              (Discussion at sidebar and out of the hearing of the
10   jury:)
11              MR. GROHARING:  This is specifically excluded area.
12   He just started his answer, "There are so few terrorists."
13   He's going to provide testimony that, you know, the amount of
14   people who are actually doing things are a very small amount.
15   Clearly that's where they're going with this.
16              MS. BASSIL:  Yes.
17              THE COURT:  No, I think if --
18              MS. BASSIL:  No.
19              THE COURT:  I don't think that's necessarily the case.
20              MS. BASSIL:  No, we're not going there.  We're not
21   going there.
22              MR. GROHARING:  If I heard him correctly he said
23   "there are so few terrorists."
24              MS. BASSIL:  That's correct.
25              MR. AUERHAHN:  "Who turn to violence."
```

00:55 (line 10)
00:56 (line 20)

```
 1              MS. BASSIL:  No, he didn't say that.  He didn't say
 2    that.
 3              THE COURT:  Go ahead.
 4              MR. AUERHAHN:  Why don't you ask him?
 5              MS. BASSIL:  Perhaps you should.
 6              MR. AUERHAHN:  Your Honor, before we leave sidebar,
 7    perhaps we should look at the transcript because I heard him
 8    say there are so few terrorists who turn to violence.
 9              THE COURT:  No, I took it, so far as it went, about a
10    comment about his methodology.
11              MS. BASSIL:  Correct.
12              THE COURT:  And not the substance of what we talked
13    about.
14              MS. BASSIL:  That's correct.
15              THE COURT:  The percentages or --
16              MS. BASSIL:  Correct.
17              THE COURT:  -- probabilities.
18              MR. GROHARING:  I think the problem, your Honor, is
19    it's designed this way.  As he talks about his methodology he's
20    throwing in results of his methodology, he's throwing in
21    particularly social blob-type opinions and indicators and no
22    probability.
23              THE COURT:  Well, I don't think it's happened yet.
24              MS. BASSIL:  No.  And I've been very careful to stay
25    away from indicators.
```

```
 1          THE COURT:  Okay.

 2          (In open court:)

 3  BY MS. BASSIL:

 4  Q.   Now, based on the work that you've done, Dr. Sageman, have

 5  your findings -- have your studies been adopted by government

 6  agencies?

 7          MR. GROHARING:  Objection, your Honor.  I apologize,

 8  but we probably need to address it at sidebar.  I think it will

 9  be very quick.

10          THE COURT:  All right.

11          (Discussion at sidebar and out of the hearing of the

12  jury:)

13          MS. BASSIL:  Your Honor, I allowed him to interview

14  Dr. Sageman last night for an hour and a half in order to

15  prevent this, all right?  And so apparently it was useless and

16  I'll never do it again.

17          MR. GROHARING:  Well, just so we're all clear, I don't

18  think what counsel said about this witness --

19          THE COURT:  Get to the objection.

20          MR. GROHARING:  It goes back to my original point:

21  These opinions -- materially, in large part, these opinions are

22  classified.  He indicated that in the interview yesterday.

23  There's no way to test this.  The fact is that his opinions in

24  that regard are based on classified information -- some of

25  them, I believe, have been classified --
```

```
 1              MS. BASSIL:  I'm not asking him about that.
 2              THE COURT:  To say that they have been implemented
 3    doesn't say that to the jury.
 4              MS. BASSIL:  No.  And this is about his books, that's
 5    all, which are public and published.
 6              MR. GROHARING:  No.
 7              MS. BASSIL:  Yes.
 8              THE COURT:  Well, do you have anything beyond an
 9    affirmative answer, yes, people have incorporated it?
10              MS. BASSIL:  Yeah, I'm just going to ask him which
11    agencies.  That's it.  I'm not going to ask him anything else.
12              MR. GROHARING:  His work at NYPD and his other work in
13    the Air Force study has not been released.
14              THE COURT:  The jury doesn't know that.
15              MS. BASSIL:  And I'm not asking him about it.
16              THE COURT:  So they can't give it any significance.
17              (In open court:)
18    BY MS. BASSIL:
19    Q.   Dr. Sageman, has the work in your two books been adopted
20    by the intelligence community?
21    A.   Yes, to a large extent.
22    Q.   All right.  Now, what was your role in this case?
23    A.   Your office called me about three months ago.
24    Q.   And what have you reviewed to be prepared to testify
25    today?
```

```
 1   A.   Well, I mean, one of the conditions of me being involved
 2   in the case was for me to have the whole discovery material.  I
 3   like to pick and choose my evidence.  When you do research, you
 4   have to look at everything, because basically, what you're
 5   looking at is just confirming evidence of what your gut feeling
 6   may be.  And that's really with science.  You don't just look
 7   at one part of the evidence which you gave me because, in a
 8   sense, it could be biased.  So I like -- I mean, I hear your
 9   argument but I want to look -- I trust but verify.  So I want
10   to look at the whole of evidence to really see whether your
11   argument has merit.  But my role here is really to educate the
12   jury about the background of this case.
13   Q.   What did you look at?
14   A.   Well, I looked at everything that was on the computer.  I
15   didn't look at the hard drive, I didn't look at the computer,
16   but I looked at the chats, I looked at the emails, I looked at
17   the various threads in there, I looked at what he downloaded, I
18   looked at all his conversations with his friends and with his
19   colleagues on various jihadi websites, I looked at the grand
20   jury testimony, I looked at the FBI 302s.
21   Q.   What are 302s?
22   A.   When the FBI interviews someone, they write up the
23   interview, and I guess it's Government Form 302.  So I think
24   that's the jargon among us, is it's a 302.  But it's not the
25   exact interview; this is a summary of the interview itself.  So
```

       1   it's not verbatim.  And the FBI 302s were not just about the

       2   defendant, but all the friends and all the other people that --

       3   most of the witnesses that you probably -- that you saw had

       4   been interviewed prior to that by the FBI.

       5   Q.   Did you -- I'm sorry.

       6   A.   Those are very important.

       7   Q.   Did you also review trial transcripts as the case has been

       8   going on?

       9   A.   Yes, I've been reviewing the trial transcripts since day

01:02 10   one.

      11   Q.   And what was the significance of the instant messages?

      12        MR. GROHARING:  Objection, your Honor.  It's beyond

      13   the scope.

      14        THE COURT:  No, I don't think it's beyond the scope.

      15   It's a pretty broad question.

      16   BY MS. BASSIL:

      17   Q.   Were the instant messages significant to you in evaluating

      18   this case?

      19   A.   Yes, of course.  I mean, basically --

01:02 20        THE COURT:  Let me see you for a minute.

      21        (Discussion at sidebar and out of the hearing of the

      22   jury:)

      23        MS. BASSIL:  That was a poorly worded question.  I'm

      24   sorry.

      25        THE COURT:  Well, what are you thinking?  The

```
 1  objection.  This sounds like it's going towards an opinion

 2  about the defendant based on the chats.

 3          MS. BASSIL:  No.  No.  And it was a poorly worded

 4  question on my part.  Essentially --

 5          THE COURT:  Because what we talked about is his

 6  testimony being related to the flatness of al Qa'ida as an

 7  organization and so on and so forth.

 8          MS. BASSIL:  Right.  Right.  Right.

 9          THE COURT:  I don't know what the chats have to do

10  with that.

11          MS. BASSIL:  Well, what I was going to bring out from

12  him is that he saw the chats as sort of trash talk, which Dr.

13  Fadel testified to as well.

14          MR. GROHARING:  See, this is the problem.

15          THE COURT:  That's beyond the scope, I believe.

16          MR. GROHARING:  But, see, this couldn't be any more

17  clear that it's beyond the scope.

18          THE COURT:  So could we get to the al Qa'ida stuff?

19          MS. BASSIL:  Yeah, that's fine.

20          (In open court:)

21  BY MS. BASSIL:

22  Q.   Dr. Sageman, I'd like to turn to al Qa'ida.

23  A.   Yes?

24  Q.   Have you reviewed all al Qa'ida plots,

25  al Qa'ida-affiliated plots and al Qa'ida-inspired plots in the
```

1    West since 1993?

2    A.    Yes, I have.

3    Q.    Now, I specifically used three categories.  Are those your

4    categories?

5    A.    Yes, they are.

6    Q.    Could you explain to the jury what's an al Qa'ida plot,

7    al Qa'ida affiliated and al Qa'ida-inspired?

8    A.    The way the press refers to terrorism, they all refer them

9    to al Qa'ida.  And it turns out that it's not all al Qa'ida.

01:04 10          MR. GROHARING:  Objection, your Honor.

11          THE COURT:  I'm not sure that began responsively.  Why

12    don't you re-ask the question.

13          MS. BASSIL:  Okay.

14    BY MS. BASSIL:

15    Q.    What is an al Qa'ida-affiliated plot?

16          MR. GROHARING:  Your Honor --

17          THE COURT:  No, that's not -- no.  Overruled.

18          THE WITNESS:  An al Qa'ida affiliated plot is a plot

19    directed by a foreign terrorist organization that is not

01:05 20    al Qa'ida, but they are affiliated.  That organization is

21    affiliated with al Qa'ida, such as al Qa'ida in the Arab

22    peninsula, Lashkar-e-Taiba and so on.  They're not all

23    al Qa'ida plots.  Al Qa'ida plots are al Qa'ida-central plots.

24    BY MS. BASSIL:

25    Q.    What are al Qa'ida-inspired plots?

A.    Those people have absolutely no connection, physical

connection, with the foreign terrorist organization, but they

do conduct terrorist attacks in the West; for instance, the

Madrid bombing, the Hofstad Group were al Qa'ida-inspired.

There's no evidence that they had any connection with al Qa'ida

or another terrorist organization.

Q.    Now, what happened in 1993 that started -- that you

started your review then?

A.    This was the first World Trade Center bombing, and it was

01:06 the first instance of global neojihadi terrorism in the West.

Q.    Okay.  Now, I'm going to ask you to explain that.  This is

global neojihadi terrorism, correct?

A.    That's correct, yes.

Q.    And what does that mean?

A.    Well, let's start with the word "neojihadi."  I'm a little

bit stuck to try to describe my work.  My work is neutral, so I

also give lectures to Muslim -- in front of Muslim audiences;

in front of foreign governments, like Saudi Arabia and Turkey.

And the first thing they tell me -- and it's a fair criticism

01:07 of my work.  They say, "This is not jihad.  Because jihad is

world bound, you can only do jihad under certain circumstances.

And if you do jihad, you're bound by rules.  This is not

jihad."

        Fine.  But the kids, or the young people who do this type

of terrorism, they call themselves "jihadi."  You know, they

basically hijacked this term.  And I'm sure that you heard the difference in the back so I'm not going to belabor the point.

But what I like to do is if I don't use the word "jihad," nobody understands what I'm talking about, and if I use the word "jihad" I really antagonize 1.5 billion people.  So I basically take the prerogative of an academic and I call it it's like jihad, neojihad.  And I agree it's not elegant, but it's the best I can do.  And I always have an open mind for people who have a better term for this.

01:07   It's global because it targets the West.  Most of those groups are internal groups that go after their own government.  So the Egyptian terrorist group, they go after their own government -- or they used to go after their own government, Mubarak at that time.  The Pakistani groups go after their own government very often.  And Algerian groups, again, their own government, and so on.

But here there was an argument in Khartoum, which I'll get to probably a little bit later, where all these groups realize that they had failed -- for 25 years they tried to overthrow
01:08   their own government, they failed -- and people started arguing that the reason they failed was that the West was propping up their own government.  They were puppets of the West.  And so they called the West the "far enemy."

So they decided to switch strategies.  And instead of going after their own government, they were going to expel the

1    West from the Middle East.  And to do so they were going to

2    target the West.

3    Q.    All right.

4    A.    So this really started -- that's why it's global.  And so

5    I'm kind of looking at those neojihadi movements targeting the

6    West in the West, and it's terrorism.

7    Q.    So prior to that you might have called it something like

8    "internal neojihadi"?

9    A.    Well, in my first book I called it the global Salafi

01:09 10   jihad.  And so I kind of, you know, withdrew that term because

11   I thought that the criticisms of that term were fair, and so I

12   decided to use the word "global neojihadi terrorism."

13   Q.    Now, I'd like to talk about al Qa'ida.  Where did it

14   begin?

15   A.    The first meeting -- the founding meetings of al Qa'ida

16   were late August-early September of 1988 in Peshawar.

17   Q.    In Afghanistan?

18   A.    No.  Peshawar, Pakistan.

19   Q.    Pakistan?  All right.  And who was at the sort of first

01:10 20   meeting?

21   A.    There were about 20 people including Osama bin Laden.

22   There were some Iraqis, some Syrians, some Egyptians.

23   Q.    Now, this was while the Soviet-Afghanistan war was still

24   going on.  Is that correct?

25   A.    Yes, it was still going on.

```
 1   Q.   Was this towards the end of the war?

 2   A.   Yes.  The Soviet had started to withdraw.  They started

 3   withdrawing on May 15, 1988.

 4   Q.   Now, where is Peshawar?  Aside from being in Pakistan,

 5   where is it?

 6   A.   Peshawar is the largest city closest to the border with

 7   Afghanistan.

 8   Q.   And in Afghanistan -- what is the religion of people in

 9   Afghanistan?

01:10  10   A.   They're Muslims.

11   Q.   Are they Salafi?

12   A.   No.  No, they're not Salafi.

13   Q.   The jury has heard a great deal about foreign fighters.

14   When the Arabs came to Afghanistan, was there any kind of

15   conflict between them and the Afghanis?

16   A.   Yes, very much so.

17   Q.   Over what?

18   A.   Well, you know, the commanders I talked to were fairly

19   irritated with them and they called them Mohabi (ph), which was

01:11  20   a derogative term because -- and this referred to Abdul

21   al-Wahhab, the founder of the Saudi regime.  There was a

22   religious political alliance in the late eighteenth century.

23       So those people basically came in and were telling

24   Afghans, "You guys are bad Muslims.  You don't know how to

25   pray.  You don't know what the hell you're talking about,"
```

because most Afghans are -- are not Salafis, they're not even

Deobandis, which is another closer form to them.  They were

part of Sunni Islam but they were part of the Qadiriya and

Naqshbandiya, which are two orders of Islam.

Q.   Who were the mujahideen?

A.   The mujahideen were basically regular Afghans, many of

them refugees in refugee camps in Pakistan who went back to

their village to resist Soviet occupation of Afghanistan.

Q.   Did you know them?

A.   Well, I worked with them for three years --

Q.   All right.  And --

A.   -- very closely.

Q.   What were they using to resist the Soviets before the

United States got involved?

A.   Well, at first mostly stones and old rifles, World War I

rifles, Lee-Enfield .303.

Q.   And what did the United States do?

A.   Well, we started out slowly.  I think our first budget to

help them in 1980 was $20 million, and that doubled, you know,

as time went on.  But we tried to provide them with weapons

where they had a fighting chance.  They were being massacred by

the Soviets, by the new technology.  So at first we provided

them with AK-47, Kalashnikov, as people called them, and with

time they were still being defeated, mostly because of close

air support, by helicopter support in their battle.  So we

1   basically had to eliminate this close air support and we --

2   Q.   What do you mean by that?  The Russians had helicopters?

3   A.   Yes.  MI-24s, which were really devastating to the Afghan

4   resistance.  So we had to provide a mix of weapons that could

5   eliminate the close air support.  And so we kind of looked

6   around the world for anti-aircraft weapons.  And most of them

7   failed, and so we decided in 1986 to provide them with Stinger

8   missile, shoulder-fired surface-to-air weapons.

9   Q.   And what were those able to do?

01:14 10        MR. GROHARING:  Your Honor, I think we're getting far

11   afield.

12        THE COURT:  I think we're getting a little bit away

13   from the topic.

14   BY MS. BASSIL:

15   Q.   Was this -- was the Soviet-Afghanistan war seen as a

16   jihad?

17   A.   Yes, it was.

18   Q.   A real jihad?

19   A.   A real jihad.  A defensive jihad.  You had foreign

01:14 20   infidels, the Russians, invading a Muslim country.  It was

21   declared jihad within the country.  The senior cleric was

22   Sibghatullah Mojaddedi, who declared it a jihad, and this was

23   supported by Sheikh Bin Baz, the mufti of Saudi Arabia.

24   Q.   What's mufti?

25   A.   The muftis, the head cleric in Saudi Arabia in 1979.

```
 1   Q.    Did you know Abdullah Azzam?

 2   A.    Yes, I did.

 3   Q.    And who was he?

 4   A.    Abdullah Azzam is a Palestinian cleric.  He studied in

 5   Al-Azhar, got his Ph.D. in theology, and taught in Jizan,

 6   Saudi Arabia.  After the invasion of Afghanistan, he went to

 7   Islamabad, was part of the faculty of the university there, but

 8   he went there to be close to support the mujahideen and --

 9   Q.    Where is Islamabad?

10   A.    Islamabad is where all the embassies were.  Islamabad is

11   where I lived.  It's the capital of Pakistan.

12   Q.    All right.  And please continue.

13   A.    So he tried to gather support for the Afghans who were

14   fighting.  And at first he was proselytizing during Hajj, which

15   is the annual pilgrimage to Mecca.  That's one of the five

16   duties that Muslims have to perform during their lifetime, if

17   they can.  And there he had an audience of several million

18   people where he was preaching, that they have to support the

19   Afghan mujahideen.  And people started coming around 2004 and

20   2005, and he had to kind of provide housing and services to

21   organize them in humanitarian support of the mujahideen.  So

22   they --

23   Q.    Let me stop you there.  Did he come to the United States

24   to preach this and request support?

25   A.    Yes, he did, several times.  And he went throughout the
```

01:15  (line 10)
01:16  (line 20)

1    West.  But that was after 2005 when he actually was already

2    fairly well established.

3    Q.   Now, did he -- no, he was dead by 2005.

4    A.   I'm sorry.  1985.  1985.  I'm sorry.  Yes.

5    Q.   Now, you said that initially he was -- you were talking

6    about humanitarian aid.  What was the humanitarian aid that was

7    part of the Abdullah Azzam's work?

8    A.   One of the ways the Soviets terrorized the Afghan

9    population was to install land mines everywhere, small, little

01:17 10   toy-like land mines.

11                MR. GROHARING:  Objection, your Honor.  Relevance.

12                THE COURT:  Yes, I think this is -- yes.  Sustained.

13   Outside the notice as well.

14                MS. BASSIL:  Not really, your Honor.  Not based on

15   what Mr. Kohlmann testified to that was outside of his report.

16                THE COURT:  Well, let's...

17   BY MS. BASSIL:

18   Q.   Are you familiar with Abdullah Azzam's writings?

19   A.   Yes, I am.

01:18 20   Q.   What writings are you familiar with?

21   A.   He wrote two fairly popular books, *Join the Caravan* and

22   *Defensive Muslim Land,* and also he wrote the editorial

23   newsletter bulletin that he published in Peshawar.

24   Q.   Did he view the West as perpetrating a war on Islam?

25   A.   No, he did not.

1    Q.    Did he propose or suggest attacking the West after the

2    Soviets withdrew from Afghanistan?

3    A.    No, he did not.

4    Q.    What did he propose after the Soviets withdrew?

5    A.    Well, he was suggesting that you should continue jihad,

6    and what he meant was defensive jihad.  So there were areas

7    around the world where Muslims were fighting non-Muslims in

8    Indonesia, in the Southern Philippines, in Palestine.  Bosnia

9    was not yet a problem, nor was Chechnya, but those would be

01:19 10   also viewed as defensive jihad.

11    Q.    Did he ever write, to your knowledge, or approve of

12    suicide bombing?

13    A.    No, he did not.

14    Q.    Were there any suicide bombings in the Soviet-Afghanistan

15    war?

16    A.    No.

17    Q.    Did you know Osama bin Laden?

18    A.    No, I did not.

19    Q.    Did you know what his role was in Afghanistan?

01:19 20   A.    Yes.

21    Q.    What was it?

22    A.    Basically, he founded the service bureau that was created

23    by Abdullah Azzam.  So at first he was in support of

24    humanitarian work, and as he became close to the Egyptian

25    terrorists who sought refuge in Peshawar, he distanced himself

1    from Abdullah Azzam and started creating his own camp,

2    al-Masada, which is a small camp near Jajj/Ali Kheyl, and that

3    camp was attacked April 1987.

4    Q.    Before we get to that, I want to ask you a question.

5    There have been statements to the effect that Azzam was the

6    teacher of bin Laden.  What is your understanding of that?

7    A.    Well, he was very influential, like a father figure up to

8    about 1987, and the two very much worked very closely together.

9    But after that bin Laden went to his separate way and Azzam

01:20 10  continued to have the same ideas he did before.

11   Q.    What happened to Azzam?

12   A.    Azzam was murdered, with his two sons, on November 24,

13   1989.

14   Q.    Are you familiar with Azzam Publications, a website?

15   A.    Yes.

16   Q.    And what is it -- or what was it?

17   A.    Azzam Publications was basically a website created in the

18   late '90s by Ahmed Babar, and went off of the internet in 2002.

19   Q.    Did bin Laden fight in Afghanistan?

01:20 20  A.    Well, he did fight that one little battle of Jajj/Ali

21   Kheyl, a skirmish of 30 people.  And he did fairly well.  But

22   unlike the legend, the camp, al-Masada, was overtaken by the

23   Soviets that destroyed it, but the Soviets had no interest in

24   occupying it; they just wanted to destroy everything along the

25   logistic supply into Afghanistan, so they withdrew.  And the

1  Afghan Arabs came back and they claimed victory.  There were a

2  lot of Arab journalists there, and they basically spun the

3  story as a great victory.

4  Q.   And how many Arabs -- how many Arab fighters were there in

5  Afghanistan in the Soviet-Afghanistan war?

6  A.   It's really very hard to tell.  You know, a lot of people

7  came to Peshawar to do the humanitarian support.  A few wanted

8  to fight.  And they were matched with major commanders of the

9  seven major parties fighting the Soviets.  And the majority

01:22 10  came there to get their jihadi credentials.  So they would come

11  from Saudi Arabia, land in Peshawar, take a cab to Peshawar,

12  don on basically Afghan clothes, get, you know, a pakol hat,

13  get an AK-47, cross the border, have a picture taken of them,

14  and then come back with a picture returning to Saudi Arabia

15  showing the picture of their jihadi credentials.  So it's

16  really very hard to tell.  I think that most of the estimates

17  range from 700 to about 10,000.

18  Q.   That's a pretty big range.

19  A.   Well, that shows our lack of knowledge.

01:22 20  Q.   Okay.  Now, after the Soviets withdrew from Afghanistan,

21  what happened to bin Laden?

22  A.   Bin Laden stayed around for a few months, but by 1989 he

23  returned to Saudi Arabia.

24  Q.   And what was he doing in Saudi Arabia in 1989?

25  A.   He was basking in his own glory.

1    Q.    How so?

2    A.    Well, as I said, journalists were there, so the story of

3    Jajj/Ali Kheyl really spread like wildfire throughout the

4    Middle East, and he was basically the toast -- Muslims don't

5    drink wine, so it's the toast of orange juice, perhaps -- of

6    the Middle East.   He was -- he basically brought pride to the

7    Middle East because finally the Afghans -- the Afghan Arabs do

8    not do any fighting, it was all Afghans who did the fighting.

9    They basically hijacked the glory of the Afghans in claiming to

01:24 10    have been that pushback the Soviets.   And so he went from

11    mosque to mosque, being acclaimed as a hero.

12    Q.    Did he have -- did bin Laden have a role in the Gulf War

13    when Saddam Hussein invaded Kuwait in August of 1990?

14    A.    He tried to.

15    Q.    Explain that.

16    A.    As soon as there was an invasion, he asked for an audience

17    before the king and the crown prince, and he succeeded.   And he

18    basically offered the services of his Afghan Arabs and Afghan

19    mujahideen to come to Saudi Arabia and defend Saudi Arabia

01:24 20    against a potential invasion of Saudi Arabia by Saddam Hussein

21    from Kuwait.

22    Q.    What did the king do?

23    A.    The king thanked him profusely and sent him away and then

24    turned around and invited the United States and its allies to

25    come and defend the kingdom.

1    Q.   And was this a problem for bin Laden, that he had been

2    rejected by the king and that the United States had been

3    brought in?

4    A.   Well, he rightly felt that he had been dissed by the king,

5    and he was very upset and made a lot of very uncomplimentary

6    noise about the royal family at the time, but also, claiming

7    that infidels could not come to the holy land.  And so it

8    became such a problem that he was put under house arrest.

9    Q.   How long was he under house arrest in Saudi Arabia?

01:25 10   A.   Almost a year.  He was in house arrest in Jeddah.

11   Q.   And where did he -- did he leave Saudi Arabia?

12   A.   Yes, he left Saudi Arabia under pretext -- there was a

13   huge civil war at that time.  After the Soviets withdrew from

14   Afghanistan there was a civil war where it degenerated -- to

15   command his fighting commander [sic].  So he said he was going

16   to go to Kabul and try to arrange some kind of peaceful

17   resolution to the Afghan conflict, but instead he went straight

18   to Khartoum.

19   Q.   Where is Khartoum?

01:26 20   A.   Khartoum is in the Sudan.

21   Q.   Can you, for the jury, sort of give them a location of

22   Sudan?

23   A.   Sudan is West of Saudi Arabia, but just south.  It's a

24   neighboring country of Egypt.  So most of the Egyptian

25   terrorists who could not go back to their country welcomed the

1    new site, Khartoum, because from there they could launch

2    attacks into Egypt.

3    Q.   Can you explain the admiration of bin Laden by Muslims?

4    A.   Well, the fact that some young Muslims, foreign Muslims,

5    came in support of their Afghan brothers, fighting a Western

6    country like Russia, and defeating it, was a source of great

7    pride to the Muslim world after two centuries of humiliation

8    after humiliation.  This was a turning point.

9    Q.   Can you tell the jury what kind of organization al Qa'ida

01:27 10   was in terms of its structure in the very beginning?

11   A.   Well, in the very beginning Osama bin Laden was chosen as

12   the amere, which means "the head" --

13   Q.   The head.

14   A.   -- of the organization.  He was supposed to make all the

15   decisions.  And everybody who was in that organization did not

16   pledge allegiance to the organization but to bin Laden

17   personally.  They swore baya, which is an oath of loyalty.  We

18   had the same concept during futile -- in the Western world.

19   So --

01:27 20   Q.   Were there --

21   A.   So he would make all the decisions himself.  To help him

22   with the decisions was a council named Shura, consists of about

23   a dozen members to advise him, and under that -- under the

24   Shura were four committees at the time.  And the major --

25   Q.   What were the committees?

1    A.    The committees were -- one was administration, which was

2    basically financial support for the people of al Qa'ida, that

3    they actually received a monthly salary.  It was to raise money

4    as well.  They had a military committee, the head of which was

5    Abu Banjshiri at the time.  And they were basically planning

6    military operations.  They had religious committee where they

7    issued fataawas, and they had a public relations and media

8    committee.  That was the fourth.

9    Q.    Was there a recruiting committee?

01:28 10   A.    No, there's no recruiting.  Al Qa'ida always relied on

11   volunteers to join it.

12   Q.    Now, were people actually hired and employed by al Qa'ida

13   formally?

14   A.    Yes.  I mean, you basically had people clean houses,

15   drivers, and so on.  They also received a salary.

16   Q.    Did they have a health plan?

17   A.    Oh, of course they had a health plan.  Of course.  It was

18   a minimal health plan.

19   Q.    Now, what was the role of the Egyptians in the early days

01:29 20   of al Qa'ida?

21   A.    The Egyptians had tremendous influence, but for me to

22   really tell you about this influence, I have to go a little bit

23   backwards to tell you about the origin of the Egyptian

24   terrorists who came to --

25   Q.    Well, can you talk about Zawahiri?

1    A.   Zawahiri was part of that.  Basically, it was a movement

2    that started in Egypt, the Egyptian Islamic groups at the time,

3    student movements mostly, that became opposed to the Camp David

4    Accord and decided to kill Anwar Sadat, who was the president

5    of Egypt.  They succeeded in October 1981.  And many of them

6    were rounded up.  And the leaders -- the 300 leaders were

7    basically -- underwent a fairly large trial.  The Egyptians

8    were fairly lenient.  The people who were not involved, not the

9    top leadership, were basically let go after three years of

01:30 10   prison.

11         But within prison you had a lot of rivalry that arose.

12   And so you had the group, Egyptian Islamic group and al-Jihad

13   group, which was al-Zawahiri's group that, you know, fought

14   with each other in the prison.  And when they were released

15   they were basically persecuted by the Egyptian authorities and

16   so they fled the country.  Many of them ended up in

17   Saudi Arabia, some of them ended up in Yemen, but many of them

18   went to Peshawar.

19   Q.   All right.  And did any of them end up in Sudan with

01:31 20   Osama bin Laden?

21   A.   Well, they were in Peshawar for three or four years until

22   the Pakistanis cracked down and kicked them out, and so

23   everybody went to Khartoum in 1991-1992.

24   Q.   Now, were there Saudis -- what was the composition of

25   al Qa'ida in the beginning -- sort of the beginning days in

1    terms of Egyptians, Yemenis, Saudis?

2    A.    Well, besides bin Laden, much of the leadership of

3    al Qa'ida was Egyptian.  And there was a tremendous jealousy by

4    other groups, especially groups from -- within the Arabian

5    Peninsula, vis-a-vis the Egyptians.

6    Q.    Now, what occurred between 1996 and 2001 with al Qa'ida?

7    A.    Well, in 1996 they were kicked out of the Sudan and about,

8    I would say, 150 people went back to Afghanistan, to Jalalabad,

9    where they had been invited by Eunice Hollis.

01:32 10    Q.    And when they went back to -- this is to Afghanistan?

11    A.    Yeah, Jalalabad is in Afghanistan.

12    Q.    And what occurred in Afghanistan during that time period,

13    '96 to 2001 or so?

14    A.    Well, by 1996 there was a new group called the Taliban

15    that had conquered about two-thirds of Afghanistan, and

16    bin Laden basically made a pact with Mullah Omar, the head of

17    the Taliban, basically recognizing Mullah Omar as head of the

18    Muslim community in exchange for sanctuary in Afghanistan.

19    Q.    Did al Qa'ida expand in that period?

01:33 20    A.    Yes.  This was really the time period, especially between

21    1998 and 2001, where al Qa'ida expanded dramatically.

22    Q.    And what did it grow to?  From what to what?

23    A.    It depends on who you want to listen to.  I think the

24    people, the core al Qa'ida; namely, the people who really swore

25    baya to bin Laden or one of bin Laden's representatives.  I

1    don't think we're talking, you know, a thousand people.  It's

2    just a few hundred people.  Now, people who were allied

3    with -- did things with al Qa'ida, there were a few more.

4    Q.   Were training camps built during that time period in

5    Afghanistan by al Qa'ida?

6    A.   Yeah, there were a dozen -- about a dozen training camps.

7    They were not al Qa'ida training camps.  Those training camps

8    were very few, but al Qa'ida funded all the training camps

9    because they had the money.  So there was a lot of rivalry, as

01:34 10    we know now, in the late 1990s among, you know, people with

11    large egos.  And they didn't really want to swear loyalty to

12    bin Laden, but bin Laden was funding all those camps.

13    Q.   Did -- when did -- what was the first al Qa'ida attack?

14    A.   According to them -- and we didn't notice -- I think it

15    was 1992, in a hotel in Sana'a, Yemen, when Marines were

16    stationed there.  And they basically bombed the hotel.  I don't

17    think there were any U.S. injuries, but we didn't really

18    notice, nor did we know at the time.  Later on, after we

19    captured a lot of people, they were telling us this was

01:34 20    actually the first al Qa'ida attack.

21    Q.   When did al Qa'ida begin to appear in sort of Western

22    news?

23    A.   I think the East African bombings of August 1998 is really

24    what brought al Qa'ida to the Western news map.  I mean, some

25    journalists had heard of it before, but it didn't really get

much traction, just two embassy bombings definitely spread the

word that al Qa'ida was around.

Q.    Whose embassies were bombed?

A.    The U.S. embassies.  They were bombed in Nairobi, Kenya,

and Dar es Salaam, Tanzania.

Q.    And can -- are you -- can you tell the jury how was the

decision made to bomb those embassies in al Qa'ida?

A.    Well, at that time, you know, bin Laden was the ultimate

person who decided whether to go ahead or not, but -- so in

al Qa'ida you always -- at that point you had centrality of

decision, but in terms of executing the plots, it was very much

decentralized.  And --

Q.    What do you mean by that?

A.    Well, local al Qa'ida members who were supposed to carry

out the plots had a lot of autonomy to decide how to do it.

The only thing about the two embassy bombings, that they had to

occur at the same time.  So they had to coordinate the timing.

But otherwise, how they were going to do it was basically up to

them.

Q.    What about the funding of materials for the bombing?

A.    This was all al Qa'ida.

Q.    Can you explain the view espoused by bin Laden that

justified these bombings?

A.    Against the U.S.?

Q.    Yes.

1  A.   Well, there are several justifications.  One of

2  the -- well, first of all, go after the head of the snake, as

3  he puts it; namely, the U.S. is the head of the West and,

4  therefore, let's cut off the head of the snake.

5       But in terms of trying to justify killing civilians, there

6  have been two arguments -- basically two arguments.  One is

7  that if you pay taxes to the U.S. government, you're guilty, or

8  if you elect the U.S. government you're still complicit to the

9  government, therefore, you're still guilty and you are going

01:37 10  to -- you are a legitimate target.  This is definitely not

11  accepted by even very militant Muslims.

12  Q.   Why the U.S., though?  Why attack the West?

13  A.   Well, as I mentioned before, this was a discussion that

14  took place in Khartoum:  "Why did we fail to overthrow our own

15  regime in the Middle East?"  And their answer was because the

16  West, the U.S. specifically, but France as well, were propping

17  up local tyrants.  And in order to get rid of those tyrants

18  you, first of all, had to expel the West, the Western

19  influence, from the Middle East, and therefore, they thought

01:38 20  that the U.S. were cowards and it wouldn't take much to have us

21  cut and run.

22  Q.   Did the fact that the United States had been in Somalia in

23  1993 and withdrawn help support that issue?

24       MR. GROHARING:  Your Honor, I think we covered all of

25  this with Dr. Fadel.  It's cumulative.  I don't think any of

```
 1   these matters are --
 2        THE COURT:  I think it is a little cumulative.  I'll
 3   tell you what.  We're at eleven o'clock.  Why don't we take the
 4   morning recess and resume after that.
 5        THE CLERK:  All rise for the Court and jury.  The
 6   Court will take the morning recess.
 7        (The Court and jury exit the courtroom and there is a
 8   recess in the proceedings at 11:01 a.m.)
 9   (Court and jury in at 11:28 a.m.)
10   Q.   Doctor Sageman, before the break, we were talking about al
11   Qa'ida attacks as being decided by bin Laden and decided
12   centrally; do you recall that?
13   A.   Yes.
14   Q.   Did that change after September 11th?
15   A.   Yes, it did.
16   Q.   How did it change?
17   A.   After September 11, we went to Afghanistan, destroyed the
18   camps and basically scattered al Qa'ida all around the world.
19   And so followers lost contact with leadership of al Qa'ida.
20   And so you couldn't really have any more this type of, you
21   know, strong communication between leaders and followers.
22   Q.   Were there -- did there continue to be plots ordered or
23   under the control of al Qa'ida after September 11th?
24   A.   Yes, there were.
25   Q.   Just briefly, could you tell us where they were and when?
```

02:07 (line 10)
02:08 (line 20)

1    A.    I concentrated in the West.  So there have been, in

2    Europe, in the United States -- yeah, Europe, United States.

3    Q.    All right.  What were the plots in the United States after

4    September 11th?

5    A.    Well, the Richard Reid, shoe bomber.

6    Q.    Was that ordered or essentially decided by al Qa'ida?

7    A.    Yes.

8    Q.    Now, the London bombing, the 2005 London bombing of the

9    transit system, was that decided under the control of al

02:09 10   Qa'ida?  Was that an al Qa'ida decision?

11   A.    Yes.

12   Q.    Now, I just want to ask you briefly about other terrorist

13   groups, and I just briefly want to ask you about the Egyptian

14   Islamist group that you had started to talk about.  As I

15   understand, it split into two, is that correct?

16   A.    That's correct.

17   Q.    Which group was Zawahiri with?

18   A.    He was with the Al-Jihad faction.

19   Q.    What was the name of the other group?

02:10 20   A.    The Egyptian Islamic Group, Gama'a Islamiyya in Egyptian;

21   Gama'a Islamiyya in Arabic.

22   Q.    What happened to the Gama'a Islamiyya Group?

23   A.    The Gama'a Islamiyya basically had a cease-fire with the

24   Egyptian authority starting the summer of 1997.

25   Q.    Did that continue?

1   A.   Yes, it did continue until the present.

2   Q.   Now, I'd like to talk for a minute about internet forums,

3   all right?  And how would you describe the use of the internet

4   by al Qa'ida?

5   A.   Well, it changed over time.

6   Q.   All right.  What was it in the beginning?

7   A.   At the beginning, you basically had three sites, and they

8   weren't really controlled by al Qa'ida.  Al-Neda was one of the

9   three sites in the 1990s.  Azzam.com was the other one.  And

02:11 10   KavKaz, that was controlled by al-Uyayri, was the third one.

11   At that time, they weren't using the internet.  It's really

12   young kids from the periphery, like Younis Tsouli, who

13   initiated a lot of the other sides.  And al Qa'ida piggybacked

14   on that around 2004, 2005.

15   Q.   Does al Qa'ida use the internet as a recruiting tool?

16   A.   No, it does not.  It uses it to disseminate information.

17   Q.   Are you aware of the film State of the Ummah?

18   A.   Yes, I am.

19   Q.   When was that created?

02:11 20   A.   In late 2000, early 2001.

21   Q.   At the time, how was that distributed?

22   A.   That was distributed in videotapes, you know, the old form

23   of VHS, videotapes, and that was distributed at mosques.

24   Q.   Were you aware whether it was shown or not in training

25   camps in Afghanistan?

1    A.    I wasn't there.

2    Q.    What is the access to internet in Afghanistan and

3    Pakistan?

4    A.    Minimal at best, maybe less than 5 percent in Afghanistan.

5    Pakistan, the Northwest Frontier Province, in the FATA, which

6    is a Federally Administered Tribal Area, again, very low

7    internet penetration.  The rest of the Pakistan, much higher in

8    the cities, like Islamabad.

9    Q.    Where did the highest number of volunteers come from to al

02:12 10   Qa'ida?

11   A.    It depends when.

12   Q.    Before 2001.

13   A.    Before 2001, it was mostly from the Middle East.  We saw a

14   few Westerners.

15   Q.    And after 2001?

16   A.    Well, al Qa'ida was not recruiting.  People had very

17   difficult time getting in touch with al Qa'ida.

18   Q.    How did they get in touch with al Qa'ida?

19   A.    Well, basically it was chance meetings in Pakistan, and

02:13 20   Westerners were able to meet some of the intermediaries in

21   Pakistan starting late 2003.

22   Q.    Were there any meetings or recruitments through mosques in

23   Europe?

24   A.    No, not really.

25   Q.    Now, when -- were you aware of whether the State of the

1    Ummah received rave reviews at training camps in Afghanistan?

2    A.   Again, I wasn't there.

3    Q.   Now, I'd like to ask you a question.  Are there other

4    terrorist groups that have formed a sort of NATO of Jihad with

5    al Qa'ida?

6    A.   That's nonsense.  That's not how this organization work or

7    is structured.  No.  You have informal ties, and you have a lot

8    of rivalries.  And sometimes they may cooperate in some

9    operation, but most of the time they don't.

02:14 10   Q.   Are you familiar with Tibyan Publications?

11   A.   Yes, I am.

12   Q.   Were you familiar with it before this case?

13   A.   Oh, yes.

14   Q.   How would you describe Tibyan Publications?

15   A.   It's a large website entry both as repository of films,

16   document, information, some Jihadi, some more mainstream, and

17   several threads where people can discuss things with each

18   other.

19   Q.   And would you -- you said some Jihadi things.  Would you

02:14 20   describe it in some ways as a news outlet and discussion

21   outlet?

22   A.   Yes, that would be a fair description.

23   Q.   Did Tibyan Publications coordinate, to your knowledge,

24   with al Qa'ida?

25           MR. GROHARING:  Objection, your Honor.

```
 1              THE COURT:  Rephrase it.
 2     Q.   What was -- to your knowledge, was Tibyan Publications a
 3     recruiting tool for al Qa'ida?
 4              MR. GROHARING:  Objection, your Honor.
 5              MS. BASSIL:  Your Honor, this is what Mr. Kohlmann
 6     testified to.  It's fair to explore.
 7              THE COURT:  You may have it if you can answer the
 8     question.
 9     Q.   Can you answer the question?
02:15 10    A.   Yes.  That's not how people join al Qa'ida.  It's not the
11    recruitment.
12    Q.   How do people join al Qa'ida?
13    A.   People kind of volunteer in a sense.  They go.  They try
14    to meet.  It's really a bottom-up phenomenon.  You don't really
15    have an al Qa'ida representative going elsewhere trying to
16    physically recruit people, nor do you have any of that on the
17    website.  What a lot of those websites do is that they kind of
18    call you to join the cause, to join the fighting.  But they --
19    there's really no recruitment in a sense.  And the way -- so
02:16 20    people may join the fight, this global new Jihad, without being
21    member of Jihad or other terrorist organization.
22    Q.   Can they join it without fighting?
23    A.   Of course, they can:  support it.
24    Q.   Now, we have seen a number of videos in this trial.  Can
25    you tell the jury what function creating videos served for al
```

```
 1   Qa'ida?

 2   A.   I think it's to spread the word of the -- you know, of the

 3   cause.   It's most of -- it's both a news --

 4   Q.   Can you speak up and slow down?

 5   A.   Okay.   It's both a news information because, basically, if

 6   you are sympathetic to Muslims fighting against the West, in

 7   Iraq or Afghanistan, you don't really get much information from

 8   traditional news.   The information you get is really very

 9   biased.   So a lot of -- so they kind of look for an alternative

10   source of information.   And that's what a lot of the videos and

11   a lot of the announcements are.   It's really kind of to let

12   people know what they are doing.

13   Q.   Did the U.S. invasion of Iraq in 2003 have an effect on al

14   Qa'ida?

15   A.   Al Qa'ida Central, the traditional al Qa'ida?

16   Q.   Yes.

17   A.   It did --

18   Q.   How so?

19   A.   -- indirectly.   Well, it made it more popular, very, very

20   much more popular.

21   Q.   The formation of al Qa'ida in Iraq, are you familiar with

22   that?

23   A.   Yes.

24   Q.   How did that happen?

25   A.   Well, it was a peripheral group, a group that was led by
```

```
 1    Abu Musab al-Zarqawi, that after about a year and a half in
 2    fighting in Iraq, he had his own organization:  Tawheed wal
 3    Jihad.  He decide to join al Qa'ida.  He petitioned and he was
 4    accepted at the end of 2004.  And that's kind of what we call
 5    al Qa'ida in Iraq, but they call the al Qa'ida organization in
 6    the Land of the Two Rivers.
 7    Q.   Now, you mentioned that the videos in some ways were
 8    information.  Were mainstream groups, Al Jazeera, CNN,
 9    providing information about the Mideast?
02:18 10    A.   Yes.
11    Q.   What was the role of the mainstream news organizations in
12    providing people to -- and providing people to fight in the
13    Mideast?
14              MR. GROHARING:  Objection, your Honor.
15              THE COURT:  I'm not sure --
16              MS. BASSIL:  It's a bad question.  Let me try to
17    rephrase it.
18              THE WITNESS:  I didn't understand it.
19    Q.   I'm sorry.  I'll try again.
02:19 20         Were mainstream news organizations also providing
21    information about the Mideast?
22    A.   Yes, they were.
23    Q.   Did those mainstream news organizations have an impact on
24    people wanting to join al Qa'ida or join the fighting in Iraq?
25    A.   Yes.
```

```
 1              MR. GROHARING:  Objection, your Honor.

 2              THE COURT:  No.  Overruled.  He may have it.

 3    Q.    How so?

 4    A.    Yes, even more of an impact.

 5    Q.    Even more of an impact than what?

 6    A.    Than the videos from the al Qa'ida affiliate.  Let me

 7    explain that a little bit because people really want to join

 8    the fight or go there out of moral outrage.  And the moral

 9    outrage was very much portrayed in the Western media as opposed
02:19 10    to the kind of glorification of what a Jihadi is in the al

11    Qa'ida videos.  So it's Abu Ghraib, you know, all those

12    horrible pictures of Abu Ghraib.  It was very much the rape and

13    killing of that little girl and the family and then burning

14    down the house, which was widely reported in the West, not so

15    much in their media.  They discussed it in their forums, but

16    the videos and so on, this was very much Western outlet.

17    Q.    Now, are you familiar with 39 Ways to Participate and

18    Serve in Jihad?

19    A.    Yes, I am.
02:20 20    Q.    Would you describe that as a training manual?

21    A.    Oh, no, of course not.

22    Q.    In your work with United States Army and other government

23    agencies, have you seen training manuals?

24    A.    Yes.

25    Q.    Can you tell the jury, were training manuals stolen from
```

```
 1   the United States?

 2   A.   Yes, they were.

 3   Q.   Can you tell the jury about that?

 4   A.   Yes.   There was a sergeant in Special Forces, Ali al Saoud

 5   Mohamed, who was there between 1986 and 1989, stole several of

 6   the manuals, translated them, and this became the encyclopaedia

 7   of Jihad.   Those were the training manuals.   They were found in

 8   Manchester.   They were found in various places in the late

 9   1990s.   That's what we call training manuals.

10   Q.   Are you familiar with the person who wrote the original

11   Arabic 39 Ways to Participate and Serve in Jihad?

12   A.   Yes.   I believe that's Isa al-Awshin.

13   Q.   Who is he?

14   A.   Isa al-Awshin was a cleric.   I think he just got his

15   doctorate in Islamic jurisprudence in the late '90s, started

16   teaching.   When the invasion of Afghanistan happened 2001, he

17   wanted to join but was turned away and instead connected with

18   Yusuf al-Uyayri, who was head of al Qa'ida in the Arabian

19   Peninsula at the time.   This was 2002.   And in 2003, early, he

20   created online magazines, Sawt al-Jihad, and he was killed in

21   2004.

22   Q.   This is Uyayri?

23   A.   No.   This is Isa al-Awshin.

24   Q.   Was he a member of al Qa'ida?

25   A.   Not that I know of.
```

1    Q.    Now, have there been any scientific studies on the impact

2    of watching videos and committing acts of terrorism?

3    A.    Scientific studies, no.

4    Q.    Now, I want to ask you:  Do you -- when I asked if he was

5    a member of al Qa'ida, in the early days of al Qa'ida, you said

6    people swore allegiance personally to bin Laden, correct?

7    A.    That's correct.

8    Q.    And then you talked about a period where there was no

9    communication.  How does -- how do you know if someone is a

02:23 10    member of al Qa'ida today, for example?

11    A.    Often in the eulogy or in their debriefs or interrogation,

12    they tell you that.  It says that he swore bayat to either bin

13    Laden or representative of bin Laden or is a member of al

14    Qa'ida.  It's often through eulogy afterwards.  Even members of

15    al Qa'ida don't know who the other members of al Qa'ida are.

16    And the people are just fellow travelers and, really, members

17    don't really know whether other people are members of al

18    Qa'ida.  This is a secret ceremony.

19    Q.    Do you read the eulogies of al Qa'ida members?

02:23 20    A.    Sometimes, yes.

21    Q.    In reading the eulogies of al Qa'ida members, do they

22    often list where they trained?

23    A.    They list where they went and they met other people and,

24    yes, they often do.

25    Q.    Were you familiar with eulogies between 2001 and 2006

1    concerning people who trained in Yemen?

2         MR. GROHARING:  I renew my objection, your Honor.

3         THE COURT:  Overruled.

4    A.   Yes.  I've been looking at both eulogies and

5    interrogation.  I don't really see any evidence that anybody

6    was training in Yemen between --

7    Q.   I couldn't hear you.  Can you speak up?

8    A.   -- that anybody was training in Yemen between, say, about

9    2003 to 2006.

02:24 10   Q.   Now, are you familiar with nasheeds or songs that are

11   produced on al Qa'ida videos or audios?

12   A.   Yes, I've heard some.

13   Q.   What can you tell the jury about their significance to al

14   Qa'ida?

15   A.   They're just songs.

16   Q.   All right.  Are translating, editing and distributing

17   media absolutely necessary in order for al Qa'ida to get its

18   message out to recruit and to receive financial support?

19   A.   No, because that's not how people join al Qa'ida.  I mean,

02:25 20   there were basically two ways of joining, as I said, between

21   1998 and 2001.  That was the first real wave of large people

22   coming to Afghanistan to train, and some of them were very few

23   were selected to join al Qa'ida.  This was before the internet

24   became famous.

25        And the second wave was triggered by the war in Iraq

```
 1   between 2003 and 2005.  And most of the people of that wave
 2   came from the Middle East, from places that they didn't really
 3   have much internet connections.  So this is not what -- this is
 4   Al Jazeera that produce the images, that produce the moral
 5   outrage, and they wanted to go and join Zarqawi's organization
 6   to fight against U.S. and allied forces in Iraq.
 7   Q.   What do you mean by people joining out of "moral outrage"?
 8   Have you looked at this phenomenon?
 9            MR. GROHARING:  Objection, your Honor.
10            THE COURT:  Sustained.
11   Q.   What do you mean by people joining out of "moral outrage"?
12            THE COURT:  Sustained.
13   Q.   How does the internet play a role with al Qa'ida?
14   A.   Well, I think it distributes the al Qa'ida message.  It
15   used to be distributed by Al Jazeera, but after they became
16   very disappointed when Al Jazeera edited one of their video,
17   they decide to release it on their own.  And they created a
18   whole network of al Qa'ida sites on the internet to be able to
19   distribute As-Sahab.  It's called the Al-Fajr Network, Dawn
20   Network.
21        And at that time, they had seven different sites, and from
22   those sites, people then tell people where they can go and
23   download some videos or messages in some of the more secular
24   sites, and -- I shouldn't use "secular" but more of Western
25   language, other language than Arabic, because the seven sites
```

1    are in Arabic.  So right now it's Ansar Al Mujahideen that kind

2    of distributes a lot of those videos.  But it's really kind of

3    places where young people just discuss the situation.  That's

4    where they find information.

5    Q.   Has the internet been successful in allowing al Qa'ida to

6    increase since its use of it?

7    A.   No.  Al Qa'ida has decreased dramatically to the point

8    that it's almost vanishing at present.

9    Q.   Has the internet been used in the Mideast in other ways?

02:27 10  A.   I'm not sure what you mean.

11          MR. GROHARING:  Objection, your Honor.

12          THE COURT:  Well, okay.  I think -- yes, sustained.

13          MS. BASSIL:  I'll rephrase it.

14   Q.   Has distribution of these videos through these internet

15   sites helped to increase al Qa'ida's force or their funds?

16          MR. GROHARING:  Objection, your Honor.

17          THE COURT:  You may answer it.

18   A.   Definitely not.  Al Qa'ida is basically vanishing right

19   now.  It's bankrupt.

02:28 20        MS. BASSIL:  Thank you.  I have no further questions.

21          MR. GROHARING:  May I proceed, your Honor?

22          THE COURT:  Yes, please.

23   CROSS-EXAMINATION BY MR. GROHARING:

24   Q.   Good morning, sir.

25   A.   Good morning, sir.

```
 1    Q.   I'm sure the jury and everyone appreciates your
 2    background, sir.  I'm going to try to ask you questions that
 3    are more focused on this particular case in most respects to
 4    try to keep your testimony focused.
 5             MS. BASSIL:  Objection, your Honor.
 6             THE COURT:  Go ahead.
 7    Q.   Regarding this case, you're being paid by the defense in
 8    this case, right?
 9    A.   Actually, I'm paid by the court.
02:29 10   Q.   You've paid by the government but working for the defense?
11    A.   Yes.
12    Q.   And to date, you've billed around $30,000 for your time?
13    A.   No.  I haven't billed.  Already submitted a bill that was
14    for about 50 hours of my time.  I haven't submitted a bill for
15    this time.
16    Q.   But your estimate yesterday when we spoke was that you
17    would submit bills that would get you around the $30,000 range
18    for your services?
19    A.   That's right.  It's $250 an hour, and it was about 100
02:30 20   hours; up to, yesterday, 120.  So you can do the math.  It's
21    $250 an hour.
22    Q.   120 times 250 is what?
23    A.   It's about 30,000 total time, yes.
24    Q.   Sir, you don't speak Arabic, I believe you indicated on
25    direct exam?
```

```
 1   A.   That's correct.

 2   Q.   How does that impact your ability to study terrorism?

 3   A.   Well, I study this form of terrorism in the West.  Most

 4   people speak either, English, French, German, and I get by with

 5   Spanish.  That kind of constitute most of the West.  But when I

 6   do interview in the Middle East, they also speak either English

 7   or French.

 8   Q.   Would you agree that there are a lot of materials

 9   regarding to this study that are in Arabic, though?

10   A.   That's correct.  And I have a translation from the

11   government.

12   Q.   Do you feel confident in relying upon those translations

13   to do your work?

14   A.   Yes, because when I can check the translation, for

15   instance, when they are in the French, I look at the French

16   cases, they are basically identical to my translations.

17   Q.   But there are people that are competent to translate

18   documents from Arabic to either French or to English or to

19   other languages, and you rely on that competence and then take

20   the results of that and apply that to your studies?

21   A.   No.  Most of my interviews are either in English, French

22   or German.

23   Q.   Your interviews for sure.  But as far as Arabic materials,

24   if there are Arabic materials relevant to your studies --

25   A.   Yes.
```

1    Q.    -- you rely on translations of those?

2    A.    That's correct.

3    Q.    And this is actually the first time you've testified in a

4    terrorism case, I believe you indicated on direct?

5    A.    That's correct.

6    Q.    Before today, you've never been certified by a court as a

7    terrorism expert in a trial, correct?

8    A.    I was qualified twice but I never testified.

9    Q.    Are you referring to the Rana case?

02:32 10   A.    Yes.

11   Q.    In that case, you were qualified to talk about LET,

12   correct?

13   A.    No.  I was going to testify about many other things.  LET

14   was only part of my testimony.

15   Q.    Okay.  Now, I want to ask you:  On direct, you talked

16   about the fact that you never used Mr. Kohlmann's work.  How

17   important is the issue of proper citation to you?

18   A.    It's very important.

19   Q.    Indeed, you were once accused of plagiarizing your cites,

02:32 20   and you responded very aggressively to those -- that

21   insinuation, right?

22   A.    I did not.  The person who said was plagiarized denied it.

23   Q.    I'm sorry?

24   A.    The fellow who I was supposed to have plagiarized the work

25   is now at Monterrey, and he wrote to the person who claimed

1    that I plagiarized and said that is not the case.

2    Q.    Your publisher actually, though, printed a retraction and

3    said that it would be properly cited in future versions of your

4    book?  There was a big dispute about certain passages you

5    contained -- I believe it was in your second book --

6    A.    Yes.

7    Q.    -- whether or not they were properly cited?

8    A.    No.  Those were correctly cited.  My second book had the

9    wrong bibliography published.  That's what I mean.  But, no,

02:33 10   the plagiarism case has died by its own --

11   Q.    I want to ask you about the importance of proper citation

12   and why you would cite authority when you're writing an

13   article.

14   A.    I think I do that.

15   Q.    And you would agree with me that it is, in fact, important

16   when you're writing an article that's going to be disseminated

17   to a wide audience that you properly cite those that you rely

18   upon in that article?

19   A.    And I do so.

02:34 20   Q.    It's because sometimes you're not able to do all of the

21   work for an article, and you need to rely on some other work --

22   A.    No, I do everything myself.  I don't rely on anybody else.

23   Q.    Others might have done some study that you want to cite in

24   an article or something along those lines?

25   A.    Yes, I do that and I cite them.

1    Q.   I believe you indicated your books have a bibliography

2    where you list numerous cites to people who you've looked at

3    their work and you've cited to some degree in your books?

4    A.   That's correct.

5    Q.   Do you recall writing the article, *A Strategy For Fighting*

6    *International Islamist Terrorists*?

7    A.   Could you show it to me?  I've written so many.

8         Yes.  This was -- yes.

9    Q.   Sir, that's an article that you wrote with Richard Clarke?

02:34 10   A.   No, I did not.  I wrote by myself.  Richard Clarke was the

11   editor of the volume.

12   Q.   He edited your work?

13   A.   I suspect he may have but I don't know.

14   Q.   You're familiar with this article, though?

15   A.   I think I wrote it for the annual Political Science

16   Association, yes.

17   Q.   In that article, you stated that "The same support and

18   validation that young people use to derive from face-to-face

19   peer groups are now found worldwide in online forums which

02:35 20   promote the image of terrorist heros, promote extremist ideas,

21   links users to the virtual social movement, give them guidance

22   and instruct them in tactics.  See Kohlmann 2008, this volume."

23   Do you recall citing that particular citation?

24   A.   Probably, in the same volume, yeah.

25   Q.   Would you like a chance to review it?

```
 1    A.    The Kohlmann article?  Yes.

 2    Q.    Well, the actual cite to Kohlmann.

 3    A.    Well, this was really kind of more campaign type of, you

 4    know -- this is advice for the government.  So this is not a

 5    full-fledge article where you actually develop your argument.

 6    And everybody within that volume tried to be nice to each other

 7    and say the other guy said and this guy said.  It was -- it's a

 8    policy article.

 9    Q.    You cited, though, to Mr. Kohlmann, though, correct?

02:36 10    A.    That article in that volume.

11    Q.    Can you please read for the jury what that article was

12    that you cited to?

13    A.    Homegrown Terrorists, Theory and Cases in the War.

14          MS. BASSIL:  May we approach sidebar?

15          THE COURT:  All right.

16    (SIDEBAR CONFERENCE AS FOLLOWS:

17          MS. BASSIL:  I deliberately stayed away from this

18    whole area, all right, because my understanding is we weren't

19    getting into it.

02:37 20          MR. GROHARING:  I'm just --

21          THE COURT:  Homegrown terrorism?

22          MS. BASSIL:  Homegrown terrorism, radicalization, you

23    know.

24          THE COURT:  The title is a bit of a problem.  The fact

25    that --
```

1            MR. GROHARING:  I think the point's been taken.  I'm

2      ready to move on.

3            MS. BASSIL:  You know --

4            THE COURT:  Next point.

5      .  .  .  END OF SIDEBAR CONFERENCE.)

6      Q.   Sir, after you cited Mr. Kohlmann for this article, you

7      actually presented this material to the U.S. Senate Committee

8      on Homeland Security and Government Affairs?

9      A.   I don't think that's what I presented.

02:37 10            MR. GROHARING:  May I approach, your Honor?

11            THE COURT:  You may.

12     Q.   Could you read that note, please?

13     A.   "Much of the material in this article was present by Marc

14     Sageman as testimony for the U.S. Senate Committee on Homeland

15     Security and Government Affairs on June 27, 2007."  I could not

16     have referred to Kohlmann's article.  It was written after my

17     testimony.

18     Q.   Now, you would agree with me that -- and I believe you've

19     indicated before that proper citation is essential to your

02:38 20     work?

21     A.   Yes.

22     Q.   In this instance, you relied on Mr. Kohlmann's work?

23     A.   No, I did not.  I testified, much of that material, a year

24     before Mr. Kohlmann wrote that article.

25     Q.   For purposes of this article, though, you cited his

```
    1   material?

    2   A.    I was being nice.

    3   Q.    So sometimes you cite for other than serious scholarly

    4   reason then?

    5   A.    This is a policy paper.  This is not serious academic

    6   work.

    7   Q.    So sometimes you do serious academic work, and sometimes

    8   it's more less serious work?

    9   A.    You have to dumb it down for politicians.

02:39 10   Q.    I'll leave that one alone.

   11         Now, you have worked to some degree with Mr. Kohlmann over

   12   the years, though, correct?

   13   A.    No.  I did two things with him.

   14   Q.    What were those two things?

   15   A.    We presented a case at the U.N.  I believe it was -- I

   16   think it was 2009 perhaps.  It was late 2008, 2009.  We

   17   presented a PowerPoint together.

   18   Q.    So you presented together to the United Nations?

   19   A.    Yes, a small kind of committee.  It was really a

02:39 20   conference at the United Nations.  He presented factual data.

   21   I presented the theory.

   22   Q.    Did you collaborate together on that project?

   23   A.    For about an hour.

   24   Q.    You also both spoke at an IPAC conference in March 2009?

   25   You were both panelists; do you remember that?
```

1   A.   You'd have to refresh my memory.  I don't remember that.

2   You have to understand, I've done about 500 of these

3   conferences.  And IPAC was not one of the large one as I

4   remember.

5   Q.   Some of these conferences, though, Mr. Kohlmann has

6   appeared with you as a present --

7   A.   No.  Those were the two, I think.  He was with me the

8   third time.  I was in Saudi Arabia.  But that's basically all I

9   remember, that we were together.

02:40 10   Q.   Are you familiar with a conference in Riyadh?

11   A.   That's the one I just mentioned.  The third time I was in

12   Saudi Arabia, I remember that he was in the conference.  We did

13   not appear together.  We appeared on consecutive days at

14   different panels.

15   Q.   Okay.  And that's all the work that you've done with Mr.

16   Kohlmann?

17   A.   That's correct.

18   Q.   Have you traded emails with Mr. Kohlmann over the years?

19   A.   Since 2008.  He had referred to a document that I was

02:41 20   interested in, in his book.  So I wanted to have a copy of the

21   document.  Provided that for me.  And I also wanted to have the

22   full videos of -- the suicide video of the overt case and he

23   had those.  Mr. Kohlmann is very good at getting information.

24   Q.   Sometimes he would have information that you didn't have?

25   A.   Well, I had part of the information, but I wanted to have

```
 1    a copy, and I couldn't get a copy otherwise.

 2    Q.   So he would be a source of information for you?

 3    A.   Those two times, yes.

 4    Q.   Now, did you maintain contact with Mr. Kohlmann regarding

 5    other matters?

 6    A.   We were cordial with each other.  I've seen him testify in

 7    one case in Europe.

 8    Q.   Did you ever work together on something?

 9    A.   No, just that one hour, for that one presentation at the

02:42 10    U.N.  We did drink a few glasses of wines together.

11         MR. GROHARING:  May I approach, your Honor?

12         THE COURT:  All right.

13    Q.   Do you recognize that document?

14    A.   I think this may have been -- this is from me, actually,

15    to him.  I'm presenting a theory of basically the outline of

16    what we wanted to do at the U.N., but it turns out that we

17    never really finished.  That may be something that he provide

18    to you from me.  As you see, the theory is mine, and he

19    provides information.

02:42 20    Q.   What you're referring to is something entitled, *Hacking Al

21    Qa'ida, the Intersection of Social Networking, Technology and

22    Terrorism*, right?

23    A.   Right.

24    Q.   In fact, you and Mr. Kohlmann had discussed writing a book

25    on this topic?
```

A.    That's a book.  But, as I say, it was about an hour after

several glasses of wine.  So I kind of send him this email with

a little outline of what we were going to do, and then we

didn't do anything.  This was in late 2008, early 2009.

Q.    Just so that the jury understands this correctly, late

2008, 2009?

A.    I was living in New York at the time and so was he.

Q.    Okay.  So you met and discussed the possibility of writing

a book together?

A.    Over a few glasses of wine.

Q.    And after that, you produced what I would describe as a

template for a potential book; is that a fair description?

A.    An outline, and I incorporate that in my work, and he's

basically not part of my research.

Q.    It's one, two -- three pages long?

A.    That's correct.  It's an outline.

Q.    And it was a potential project that kind of never went

anywhere?

A.    That's correct.

Q.    And you and Mr. Kohlmann actually traded drafts of this?

A.    Not much.  It didn't really go very far.  It was just an

outline, and then I realized he wasn't a good collaborator for

me.

Q.    Okay.

        MR. GROHARING:  May I approach again, your Honor?

```
 1   Q.   Sir, is your email address marcsageman@comcast.net?

 2   A.   Uh-huh.

 3   Q.   Now, do you recognize this email?

 4   A.   Gosh, I mean, this is early 2009.

 5   Q.   About the time that you were collaborating with Mr.

 6   Kohlmann about the possibility of writing a book?

 7   A.   That's right.  Three lines?

 8   Q.   Do you remember the email?

 9   A.   No, I don't, but thanks for refreshing my memory.  Three

02:44 10   lines?  An email of three lines?

11   Q.   An email was:  "Take a look."  Do you know what it's

12   referring to?

13   A.   No.

14        MS. BASSIL:  Your Honor, may we approach sidebar,

15   please?

16        THE COURT:  All right.

17   (SIDEBAR CONFERENCE AS FOLLOWS:

18        MS. BASSIL:  You know, it's one thing to impeach a

19   witness with things that I could have gotten on the internet,

02:45 20   whether I did or not, you know, or articles that he wrote.  But

21   it's another to impeach him with things I've never seen.

22        THE COURT:  Happens all the time in impeachment.

23        MS. BASSIL:  I provided them with everything I was

24   going to use ahead of time.

25        MR. GROHARING:  It's not an exhibit.
```

```
 1          THE COURT:  What is it?

 2          MR. GROHARING:  It's an email that -- actually

 3    attached to the email was the document that Mr. Sageman just

 4    talked about.  And I would assume that counsel would have asked

 5    about his communication.

 6          THE COURT:  What's the date of it?  Well, you can

 7    inquire generally about the relationship.

 8    .  .  .  END OF SIDEBAR CONFERENCE.)

 9    Q.   So now that you've had some time to think about it, do you

02:46 10    remember that email exchange between you and Mr. Kohlmann?

11    A.   No, I do not remember.  It was an insignificant,

12    three-line email at the time that we were going to give that

13    common presentation, PowerPoint presentation, of about nine

14    slides to a small conference at the U.N.

15    Q.   And this -- would it surprise you that the document we

16    just talked about was an attachment to that email from Mr.

17    Kohlmann?  Does that sound right?

18    A.   No.  That sounds like my outline that I --

19    Q.   So Mr. Kohlmann sent you a version of this that -- he had

02:46 20    provided his input on it, apparently.  And did you respond:

21    "Evan, that's pretty good.  I did not know that Nixonesque has

22    made it to the Oxford English Dictionary, which is my

23    reference.  I suspect that, as we write, this will change.

24    It's a good start, and we should meet again for drinks and

25    discussion."
```

```
     1    A.    As I said, it's over drinks and it didn't go anywhere

     2    because I wasn't very impressed by what he was providing.

     3    Q.    Okay.  But --

     4    A.    This was the start of -- we were exploring a potential

     5    relationship, and it didn't pan out.

     6    Q.    I want to talk to you about the State of the Ummah video

     7    that you talked about on your direct exam.  That was an

     8    As-Sahab production, right?

     9    A.    That's correct.  I think it was the first one.

02:47 10   Q.    The seminal production of As-Sahab?

    11    A.    Yes, the only one where they had real footage.

    12    Q.    And it was a two-hour production?

    13    A.    About that, a little bit less.

    14    Q.    Close to two hours?

    15    A.    Close to two hours, not quite, but, yes.

    16    Q.    And you testified that that was not shown in camps in

    17    Afghanistan?

    18    A.    I said I did not know.  I wasn't there.

    19    Q.    You said that based on your review that it was not

02:48 20   shown --

    21    A.    I said --

    22    Q.    -- that it was not shown in the camps?

    23    A.    I said I wasn't there.  That was my answer.  I think you

    24    can check it.  I think the jury probably remembers.

    25    Q.    That you weren't there or that it wasn't there?
```

```
 1    A.    I said I wasn't there.  I couldn't know.

 2    Q.    So you don't know whether or not this video was shown in

 3    camps in Afghanistan?

 4    A.    That's correct.

 5    Q.    Some of what you would do to determine whether or not it

 6    was shown is probably to review trial transcripts?

 7    A.    If somebody was in a camp and mentioned at some point that

 8    they saw this video, I'd say, well, probably they did see it.

 9    But I haven't seen any evidence of it.  I don't recall any

02:49 10   evidence right now, and I wasn't in the camps so I don't know.

11    I said I wasn't there.  I don't know.

12    Q.    But I believe you testified about the reaction in the

13    camps to the video, didn't you?

14    A.    No.  I said I wasn't there.  I mention again.  I wasn't

15    there, was the answer of my second.  I put again, comma, I

16    wasn't there.  I don't think you heard me.

17    Q.    Well, just so we're clear, I guess -- and perhaps I'm

18    confused.  Maybe it's because there's a conflict between what

19    -- the disclosure that we were provided that talked about --

02:49 20        MS. BASSIL:  Objection.

21             THE COURT:  Just get to the question.

22             MS. BASSIL:  Objection.

23             THE COURT:  Just ask him a question.

24    Q.    I just want to be clear on what your opinion is on what

25    your reaction was to -- the reaction or lack of reaction to the
```

1    State of the Ummah video in guest houses in Afghanistan.

2    A.    Well, as I said, I wasn't there so I did not know.  But I

3    was really kind of wondering how Mr. Kohlmann knew.  He wasn't

4    there either.

5    Q.    But the suggestion was that he had no way to know, wasn't

6    it?

7    A.    Well, he had no way to know.  Neither do I.  I wasn't

8    there.  Therefore, I didn't answer the question.

9    Q.    Are you familiar with the case of Yassein Taher?

02:50 10    A.    Remind me what it is.

11    Q.    You wrote about him in your book.  He's one of your

12    subjects.

13    A.    Can you show me the name because I probably pronounce it

14    differently from you.

15    Q.    Y-a-s-s-e-i-n --

16    A.    I need to see it because, being French, I do not spell in

17    English.  Which one?  It's one of my cases?

18    Q.    Are you familiar with the "Lackawanna 6"?

19    A.    Yes, but -- that's right.

02:51 20    Q.    They are six individuals that you studied, right?

21    A.    No, because they never did anything.  They're not part of

22    my terrorist group.  There is no violence.  They just went

23    abroad, and they realized that they were in the wrong place.

24    One guy shot himself in the foot to come back.

25    Q.    Sir.  You don't need to go into detail about --

```
 1    A.    But the point is they're not part of my sample because

 2    they never turned to violence.  They're not terrorists.  They

 3    did not turn to violence.

 4    Q.    My point was:  You're -- I was trying to --

 5    A.    I'm familiar with the Lackawanna 6, but as I said, I did

 6    not study them in detail because they did not turn to violence.

 7    I only look at people who turn to violence.  Then I build

 8    another sample, people who did not turn to violence.  But

 9    Lackawanna 6 was not part of that sample.

02:52 10    Q.    I want to ask you about his case.  I assume you didn't

11    review trial transcripts from his case?

12    A.    No, because he did not turn to violence.  My interest is

13    political violence.

14    Q.    Sir, yes or no.

15    A.    No.

16    Q.    You did or didn't.

17          Are you familiar with the al-Balul case?

18    A.    Which one?

19    Q.    Al-Balul?

02:52 20    A.    Can you show me the spelling?

21    Q.    He was prosecuted at Guantanamo Bay for his support of al

22    Qa'ida?

23    A.    In the West?

24    Q.    Well, are you familiar with Mr. al-Balul?

25    A.    Can you show me the spelling?  Again, I kind of look -- I
```

```
 1    read the names, and I don't really kind of verbalize them to me
 2    -- to myself.
 3    Q.   His last name is spelled a-l --
 4    A.   Can you write it down so I can see it?  I'm sorry but, you
 5    know, not being a native English speaker, when I spell, I kind
 6    of spell from the French, back to the English, back to the
 7    French.  And I count the same way.  I count in French.
 8         I have heard of this case.  I am not -- I did not review
 9    it.
02:53 10    Q.   So that's not a case where you actually had the
11    opportunity -- or you didn't take the opportunity to review
12    transcripts?
13    A.   No, not in that case.  I wasn't aware that he was in the
14    West.  My study is very much al Qa'ida or al Qa'ida affiliate
15    or al Qa'ida inspired in the West.
16    Q.   He was actually prosecuted for producing the State of the
17    Ummah video; are you aware of that fact?
18    A.   No, I did not know who produced it.
19    Q.   That's the same video you talked about on direct exam,
02:53 20    right?
21    A.   I saw the video.
22    Q.   So in all your work reviewing transcripts, you didn't
23    learn who produced the video?
24    A.   I'm not sure that these transcripts are available to the
25    public if he was prosecuted in Guantanamo.
```

```
 1    Q.    Have you been on the Military Commission's website?

 2    A.    Yes.

 3    Q.    Have you attempted to download transcripts from that

 4    website?

 5    A.    I didn't realize they had transcripts.  I know that they

 6    have the summaries, and I have downloaded a few of summaries.

 7    But this guy, because he wasn't one of the guy I was interested

 8    in, I did not download anything from him, no.

 9    Q.    Okay.

02:54 10          MR. GROHARING:  May I approach, your Honor?

11    Q.    If you could just read to yourself, sir --

12          MS. BASSIL:  Well, your Honor, what is he -- is he

13    refreshing his recollection?  What is he doing?

14    A.    I've never seen this.

15          MR. GROHARING:  I'm starting -- yes, first I'll try to

16    refresh his recollection.

17          THE COURT:  Let's have a failure of recollection

18    first.

19          MR. GROHARING:  I thought he had testified --

02:54 20    Q.    Sir, are you aware of any testimony in any cases or

21    anything that's been publicized about the reaction to the State

22    of the Ummah in training camps in Afghanistan?

23    A.    No.

24    Q.    Could you please read --

25          MS. BASSIL:  Objection, your Honor.
```

1          THE COURT:  Well, let's see -- no.  He can go ahead

2    and see if that refreshes the witness' recollection.

3          MS. BASSIL:  He hasn't said his memory has failed.  He

4    said he's not aware of it.

5    A.   I want to see what this -- you only show me that viewing.

6    Q.   You want to see -- what?  The transcript?

7    A.   No, no.  I want to see what -- they saw something; they

8    viewed something.  I'm not sure what they viewed.  It's a video

9    but which video?

02:56 10   Q.   Okay.  Well --

11   A.   They viewed something and then they shared.

12   Q.   You don't know whether it's the Cole video or not?

13   A.   No.

14   Q.   The State of the Ummah?

15        Now, you testified about the State of the Ummah video as

16   an expert on direct?

17   A.   Yes.

18   Q.   Notwithstanding your stated expertise, it appears that you

19   are unaware of who actually produced that video, is that

02:57 20   correct?

21   A.   No.  The questions to me --

22   Q.   Just yes or no, sir.  You're not aware of who produced it?

23   A.   That's correct.

24   Q.   And notwithstanding the fact that that person was tried, a

25   public trial was held, you haven't reviewed the transcripts of

1    that trial to learn more about what he did or anything in that

2    case?  Yes or no.

3    A.    That's correct.

4          MS. BASSIL:  Can I see that document if you're through

5    with it?

6          MR. GROHARING:  Sure.

7    Q.    Are you aware that Mr. Kohlmann attended that trial?

8    A.    No.

9    Q.    So you're not aware that he was sitting there while that

02:57 10    witness testified to the impact of that video in the camps?

11    A.    I know that he's a favorite witness for the prosecution,

12    so he may have.

13    Q.    Your personal editorials aside, sir, are you aware or are

14    you not aware that he observed those proceedings?

15    A.    No.

16    Q.    Again, observing proceedings is something that experts do

17    to learn more information about terrorism?

18    A.    Usually, they get the trial transcripts.

19    Q.    Fair to say that face-to-face observance of proceedings

02:58 20    would also illuminate your opinions on terrorism cases?

21    A.    Yeah, but 450 an hour, I don't think anybody can afford to

22    do that.

23    Q.    Again, sir, I'm not asking you complicated questions.

24    A.    No.

25    Q.    I don't need your editorializing.  What we need is direct

```
 1    answers to my questions.
 2    A.    I don't know any expert that actually just goes and
 3    attends trial for the sake of attending trials.
 4    Q.    One of the many things you can do?
 5    A.    It's one of the many things people can do, but most people
 6    get the transcripts.
 7    Q.    And you have attended trials in the past?
 8    A.    Yes.
 9    Q.    So like Mr. Kohlmann in this case, attending the al-Balul
02:58 10   trial, the person who prepared the video you just talked about,
11    you've also done things similar to that in other cases, where
12    you've gone and watched testimony relevant to your research?
13    A.    That's right.
14    Q.    You would agree with me that al Qa'ida uses the media for
15    propaganda purposes?
16    A.    Yes.
17    Q.    And al Qa'ida's view, they think this is an effective
18    tool?  They devote significant resources to it?
19    A.    I'm not so sure.  I've seen some emails from al Qa'ida
02:59 20   leadership bemoaning that this was not very affective.
21    Q.    But at least the -- many of the leadership felt the need
22    to establish a media committee, a public relations committee --
23    A.    Yes.
24    Q.    -- to get out the message, as you talked about on direct?
25    A.    That's correct.
```

1    Q.   I want to just walk through State of the Ummah with you.

2    I assume you've watched the entire video?

3    A.   Yes.

4    Q.   All almost two hours of the video?

5    A.   151 minutes, I believe.

6    Q.   Sounds like you're quite familiar with it?

7    A.   I've watched it, yes.

8    Q.   And it starts by identifying a problem, right?

9    A.   It may have been.

03:00 10   Q.   Number 1, the problem?

11   A.   I didn't memorize -- I watched the video.  I didn't

12   memorize the video, so I don't really know.  Most of those

13   videos are very boring.  So you watch a few, and after that,

14   they all kind of get mixed up.  I'm not an expert on videos

15   and, therefore, I just watched it.

16   Q.   You're an expert on many things, but on al Qa'ida

17   propaganda videos is not one of them?

18   A.   Well, the effect of them, yes, but not the videos

19   themselves.

03:00 20   Q.   Okay.  Now, the video, though, even if you don't recall

21   what the particular titles were, particular words that were

22   used, the general idea was that senior members of al Qa'ida

23   identified a problem, and the problem was the persecution of

24   Muslims worldwide.  Does that ring a bell?

25   A.   Yes, actually it does.  Thanks.

1   Q.   Osama bin Laden and Ayman Zawahiri are speaking at length

2   about the problem?

3   A.   I think so, yes.

4   Q.   They even have clips of Abdul Azzam who you talked about

5   before?

6   A.   At the beginning, yes.

7   Q.   According to your testimony -- he probably wouldn't agree

8   with that -- but al Qa'ida basically hijacked some of his views

9   and used them for his purposes, is that fair?

03:01 10   A.   Actually, I think that's a fair statement.  I agree with

11   you.

12   Q.   And so they first go and identify the problem and show

13   lots of clips of Muslims being persecuted worldwide,

14   transgressions of the West in many cases?

15   A.   Yes.

16   Q.   And it's fair to say that the focus of the problem is the

17   West?

18   A.   On that video, yes.

19   Q.   And when I say "the West," I mean the United States and --

03:01 20   A.   Number 1, absolutely.

21   Q.   Number 1 enemy for sure of al Qa'ida?

22   A.   Completely.

23   Q.   And they then identify a solution to the problem?

24   A.   Yes.

25   Q.   Do you remember that part of the video?

```
 1   A.    I think so.

 2   Q.    And throughout the video, you see images of the USS Cole

 3   being attacked?

 4   A.    Over and over again.

 5   Q.    Over and over again.  And this is a success for al Qa'ida?

 6   It's billed as a success in the video?

 7   A.    Yes.

 8   Q.    And you also see training camps in Afghanistan?

 9   A.    Yes.

03:02 10   Q.    Lots of images about the things you can expect to do if

11   you go to Afghanistan?

12   A.    That's correct, yes.

13   Q.    It's clearly disseminating the message that there's a

14   problem and part of the solution is to come here and join

15   against the fight to help solve this problem?

16   A.    Yes.

17         MS. BASSIL:  Objection.

18         THE COURT:  Overruled.

19   A.    I said yes.

03:02 20   Q.    Yes.  And this is a -- the idea behind that at least was

21   to recruit new members or supporters of al Qa'ida, is that

22   fair?

23   A.    I think that was the intent, yes.

24   Q.    And this is not limited to just core al Qa'ida, as you

25   describe it, but all the different affiliates of al Qa'ida also
```

```
 1    have media wings and use propaganda as well, sort of a model

 2    that they've established?

 3    A.    Now I think it's becoming a pattern, yes.

 4    Q.    And al Qa'ida, at least most members of al Qa'ida, view

 5    propaganda efforts as important to their mission?

 6    A.    Yes.

 7    Q.    And for a lot of reasons today, they're not very

 8    successful in many respects, the up -- the interests of the

 9    United States, the ongoing attacks?  Their capabilities have

 10   been degraded?

 11   A.    Very much so.

 12   Q.    But fair to say it hasn't stopped them from producing

 13   propaganda entirely?

 14   A.    Greatly diminished, but they're still producing it.

 15   Q.    Notwithstanding the fact they're on the run, they still

 16   turn out these videos to attempt to reach an audience for

 17   support?

 18   A.    Yes, a few, not as many as before but a few, yes.

 19   Q.    One of the people who does this, or did this, was Anwar

 20   Awlaki; he's a good example?

 21   A.    He wasn't al Qa'ida.  He was al Qa'ida in the Arabian

 22   Peninsula.

 23   Q.    One of the affiliates of al Qa'ida?

 24   A.    One of the affiliates for al Qa'ida.  It's a different

 25   production, different production companies, and -- but Awlaki
```

1    is one of the most popular video preachers, yes.

2    Q.   And so -- and he had returned to Yemen in 2004?

3    A.   About that time, yes.

4    Q.   And after returning to Yemen in 2004, he stepped up his

5    efforts and his publications railing against the West, is that

6    fair?

7    A.   After he was released from prison, he did that; before,

8    not so much.  I learned a lot from Awlaki.  I watched a lot of

9    his videos.  He's wonderful in terms of historical video.

03:05 10   That's why he's so popular, because he --

11              MS. BASSIL:  May we have a question, please?

12              MR. GROHARING:   Interesting.

13    Q.   Please continue.

14    A.   The point is --

15              THE COURT:  Let's have a focused question, please.

16    Q.   So in a recent article, you wrote that "Almost all

17    English-speaking subjects who have been arrested in connection

18    to violent terrorism on behalf of al Qa'ida had some of

19    Awlaki's lectures on their computer"?

03:05 20   A.   That's correct, yes.

21    Q.   Fair to say that he supported al Qa'ida through his

22    efforts for al Qa'ida in the Arabian Peninsula as well as just

23    generally?

24    A.   After he was discharged from prison, around 2007, 2008,

25    and definitely by 2009, but not so much before 2006.

```
 1   Q.   But al Qa'ida in the Arabian Peninsula, like all the

 2   affiliates, like Al Qa'ida Central, all viewed propaganda as a

 3   proper tool for al Qa'ida?

 4   A.   That's correct.

 5   Q.   He's a good example of that?

 6   A.   Yes.

 7   Q.   In fact, some of his efforts directly connected him with

 8   individuals who attempted to perform terrorist acts?

 9   A.   Completely, yes.

03:06 10   Q.   Abdul Mutallab is one of these people?

11   A.   Yes, very much so.

12   Q.   He responded to Anwar Awlaki's call, his propaganda, and

13   reached out to him?

14        MS. BASSIL:  Objection.

15        THE COURT:  Overruled.

16   A.   In July of 2009, yes.

17   Q.   And, ultimately, he's just -- if you'll remind the jury,

18   he's what's commonly referred to as the "underwear bomber"?

19   A.   That's correct.

03:07 20   Q.   Now, another individual that you've written about in the

21   context of Jihadi videos is Ahmad Omar Siad Shaykh.  Are you

22   familiar with that person?

23   A.   Yes.

24   Q.   And Mr. Shaykh actually was involved in the abduction of

25   Daniel Pearl?
```

```
         1   A.   Yes.  That's what's alleged, yeah.

         2   Q.   And he, prior to going to Pakistan, watched documentaries

         3   on Bosnia?

         4   A.   That's correct.

         5   Q.   And --

         6   A.   You got that from my book.

         7   Q.   On Page 7.

         8   A.   Yes.  Thank you.  I'm glad that at least one person reads

         9   me.

03:07   10   Q.   So he's another example of someone who watched a Jihadi

        11   video and then went on to connect with al Qa'ida or a related

        12   organization?

        13   A.   Yeah.  I think that video probably could be -- and that

        14   was in 1993, I think.

        15   Q.   Now, fair to say that notwithstanding all of your

        16   experience -- and we've heard an awful lot of it on direct --

        17   you're obviously not aware of everything that Mr. Kohlmann is

        18   aware of?

        19   A.   Yes, of course.

03:08   20   Q.   Different experts have different piles of information that

        21   they rely upon?

        22   A.   Yes.

        23   Q.   And you don't know all of Mr. Kohlmann's activities as far

        24   as the trials that he's observed or perhaps the interviews he's

        25   conducted of terrorists and those types of things?
```

```
       1    A.    Well, I know Mr. Kohlmann.  I know how he interviews.

       2    Q.    You've spent quite a bit of time with him over the years,

       3    at least talked shop?

       4    A.    Well, when we talk shop, yes.

       5    Q.    You're familiar generally with his work?

       6    A.    Yes.

       7    Q.    But you don't know all the specifics of everything that he

       8    does, is that --

       9    A.    That's correct.

03:09 10    Q.    And he has a significant expertise in studying Jihadi chat

      11    rooms and involvement in Jihadi chat rooms, correct?

      12    A.    I don't know.

      13    Q.    Well, based on your conversations, that's something he

      14    spends a lot of time doing?

      15    A.    We don't really discuss -- well, the chat room, yes, we do

      16    discuss that.  We don't discuss the chats and instant

      17    messaging, which is, I thought, what you were asking.

      18    Q.    Chat rooms, he spends time on these internet forums?

      19    A.    Yes.

03:09 20    Q.    And has communications with potential Jihadis or actual --

      21    people who are doing things, and that's part of his work?

      22    A.    Yes.

      23    Q.    You don't spend the time to -- you're not involved in

      24    internet chat forums, really?

      25    A.    No.
```

1    Q.   You do sometimes, though, get information that's obtained

2    from people that are in internet chat forums and learning

3    information in there?

4    A.   Yes.  Sometimes I commission them to do that, yes.

5    Q.   So you ask other people to do that on your behalf?

6    A.   Yes.

7    Q.   But you don't have a password, for example, to any of the

8    forums?

9    A.   No, but sometimes I get the full transcript of the

03:10 10   communication.

11   Q.   You've never gone to, like, Tibyan Publications and

12   chatted with people?

13   A.   Did I?  Maybe one of my former computer -- I mean, as soon

14   as you do that, you're tagged and, you know, I try to avoid

15   that.  I try to avoid getting, also, viruses on my computer,

16   which is very frequent on those sites, yes.

17   Q.   Fair to say, to the extent you've done that kind of thing,

18   it's been pretty minimal?

19   A.   Yeah.  I'm too old for that.

03:10 20   Q.   Sometimes you get things from the Open Source Center that

21   produces something out of a report or something generated from

22   activity on an internet chat room?

23   A.   That's one of my sources, yes.

24   Q.   People like Evan Kohlmann sometimes learn information

25   that's helpful to you based on their work on these chat rooms?

```
 1   A.    Yes, very much, yes.

 2             MR. GROHARING:  May I just have one moment, your

 3   Honor?

 4   Q.    Now, during your direct exam, you talked about a document

 5   called 39 Ways?

 6   A.    Yes.

 7   Q.    You're familiar with that document, I assume?

 8   A.    Yes.

 9   Q.    You've read it?

03:11 10   A.    Yes.

11   Q.    All the pages of the document?

12   A.    It's not very long.

13   Q.    I want to talk to you first about the author of that

14   document.  And that was a man named Isa al-Awshin?

15   A.    Yes.

16   Q.    Now, are you aware that that document was originally

17   released on the Al-Neda website in 2003?

18   A.    I don't know the origin of it.  I take your word for it.

19   Q.    Okay.  So the Al-Neda website, just to remind the jury,

03:12 20   that's one of the websites that you indicated were used by al

21   Qa'ida?

22   A.    Yes.

23   Q.    So that document, if it was released on Al-Neda, it was

24   released on an al Qa'ida website, for lack of a better word?

25   A.    Yes.
```

1    Q.   You were here for a portion of Mr. Kohlmann's testimony,

2    but did you hear him testify to that?

3    A.   I don't recall.  He was really, you know, telling about

4    his background at that time.  I wasn't there for two days.

5    Q.   Fair to say that experts oftentimes spend a lot of time

6    talking about their backgrounds, including Mr. Kohlmann?

7    A.   Well, I mean, that's part of your credentials, yes.

8    Q.   So, now, Mr. al-Awshin released this document on the

9    Al-Neda website in 2003.  You talked a bit about the

03:13 10    significance of al Qa'ida recognizing people being part of al

11    Qa'ida, that kind of thing, on direct.  Do you remember that

12    testimony?

13    A.   Yeah.

14    Q.   Now, when Mr. al-Awshin died, are you aware that his

15    eulogy was posted on the Muntada Al Ansar website?

16    A.   I know he had a eulogy.  I think I read the eulogy.  But I

17    don't know where it was from.  I got it from the Open Source

18    Center.

19    Q.   Just so I understand this correctly, on your direct -- in

03:13 20    your direct testimony, you talked about the significance of al

21    Qa'ida producing eulogies and how that's something --

22    A.   Yes.

23    Q.   You're aware of this eulogy?

24    A.   I think I read it.

25    Q.   Yet you haven't done anything to figure out where it came

1    from, what website it was posted on, whether it was an al

2    Qa'ida website?

3    A.    I'm interested in the information itself.  I did not,

4    that's right.

5    Q.    But your testimony a few moments ago was that there's some

6    significance whether or not al Qa'ida claims people as members,

7    correct?

8    A.    No.  The question to me was:  How do I know that a member

9    is al Qa'ida or not?  And I said sometimes a eulogy says it,

03:14 10   sometimes interrogation of the person.

11   Q.    A significant factor is a eulogy?

12   A.    A eulogy sometimes, yes.

13   Q.    And so the fact that al Qa'ida published the eulogy of Isa

14   al-Awshin would be significant to your testimony, right?

15   A.    Yes.

16   Q.    And you don't know whether they did because you haven't

17   looked to see where the actual eulogy was published?

18   A.    No.  I knew that it was an al Qa'ida eulogy of al-Awshin.

19   Q.    I'm sorry?

03:14 20   A.    I knew it was an al Qa'ida eulogy of al-Awshin, but that

21   doesn't mean -- in the text of the eulogy, said this is a

22   brother who joined our organization and so on.  I don't

23   remember that this was in the eulogy.

24   Q.    Okay.  I want to just talk to you about some of what al

25   Qa'ida in the Arabian Peninsula said about Mr. Awshin after he

 1    died.

 2    A.   Okay.

 3          MS. BASSIL:  Objection.  Hearsay.

 4          THE COURT:  Sustained.

 5          MR. GROHARING:  Well, I want to ask him to the extent

 6    this impacts his opinion.  He testified on direct about the

 7    significance of al Qa'ida eulogizing people.  This is an

 8    example of al Qa'ida eulogizing people.

 9          THE COURT:  Let me just see you briefly.

03:15 10   (SIDEBAR CONFERENCE AS FOLLOWS:

11          THE COURT:  So you have the text of the eulogy, is

12    that it?  I'm not clear what you want to do.

13          MR. GROHARING:  I want to ask him about what al Qa'ida

14    in the Arabian Peninsula put out after Isa al-Awshin's death

15    and ask him how that impacts his opinion.

16          MS. BASSIL:  It's being offered for the truth.  It's

17    hearsay.

18          THE COURT:  What point here does it go to?  He said he

19    agrees that al-Awshin was --

03:16 20         MS. BASSIL:  No, he didn't.

21          MR. GROHARING:  I thought he did.

22          THE COURT:  I think he just did.

23          MR. AUERHAHN:  He changed his mind.

24          MR. GROHARING:  I can ask him that first.  If he says

25    yes, I agree, then I don't have any more questions on it.

```
 1              THE COURT:  I think that's fairly clear.  I think he
 2      just said that he claimed him as his brother.
 3              MS. BASSIL:  I don't think he was talking about him.
 4      I think he was talking about eulogies in general.  It should be
 5      clarified.
 6              THE COURT:  All right.  I don't think we need
 7      extensive reading from the eulogy.
 8              MR. GROHARING:  It's only a line or two.
 9              MS. BASSIL:  But it's being offered for the truth,
03:16 10     your Honor, it's hearsay.
11              MR. GROHARING:  Whether or not he was aware of it is
12      important.
13              MS. BASSIL:  This is something you could refresh his
14      recollection with.  He said he read it.  He doesn't remember it
15      in detail.
16              THE COURT:  Let me see the two sentences.
17              MR. GROHARING:  The topic is, "In order to never
18      forget our martyrs, the biography of the first editor of Sawt
19      al-Jihad magazine," that's all I want to -- they published
03:17 20     that.
21              MS. BASSIL:  This isn't his eulogy.  This is Evan
22      Kohlmann's line out of his eulogy.
23              MR. GROHARING:  No.  It's in an email.  That is
24      exactly --
25              MS. BASSIL:  It's double hearsay.
```

```
 1                MR. GROHARING:  I'm not admitting the document.
 2                THE COURT:  It's not that major a point.
 3                MR. GROHARING:  It's not.  I think it can be cleared
 4     up --
 5                THE COURT:  Let's be economical.
 6     .  .  .  END OF SIDEBAR CONFERENCE.)
 7     Q.   Doctor, I just want to clarify.  I think on -- your
 8     testimony is that you do consider Isa al-Awshin a member of al
 9     Qa'ida now, is that accurate?
03:18 10 A.   No.  I don't know whether he was.  I say I don't know
11     whether he swore bayat or not either to bin Laden or one of his
12     representative, indirectly sworn, and that's really an al
13     Qa'ida -- I think he was a fellow traveler with a friend of
14     al-Uyayri and started Sawt al-Jihad.
15     Q.   Okay.  I just want to ask you:  Are you familiar with al
16     Qa'ida in the Arabian Peninsula, the fact that they put out a
17     eulogy for Isa al-Awshin?
18     A.   Yes, I am.
19     Q.   And in the eulogy --
03:18 20      MS. BASSIL:  Objection.
21                THE COURT:  Overruled.  Go ahead.
22     Q.   They announce, "In order to never forget our martyrs, the
23     biography of the first editor of Sawt al-Jihad magazine."
24     A.   Uh-huh.
25     Q.   What's a martyr?  Could you remind the jury?
```

```
 1    A.   A martyr?

 2    Q.   In the context of al Qa'ida in the Arabian Peninsula.

 3    A.   It's a person who died for the cause.

 4    Q.   What cause are you referring to?

 5    A.   They call it the Jihad, but, basically, it was killed by

 6    Saudi Administer of the Interior Forces.

 7    Q.   The cause is al Qa'ida's Jihad, though, in that context?

 8    A.   The fight against the Royal Family, the al-Sauds.

 9    Q.   He's someone who, based on your testimony, was either a

10    member of al Qa'ida, was associated with al Qa'ida, or

11    certainly provided support to al Qa'ida?

12    A.   Yes.  But that doesn't mean he's a member of al Qa'ida.

13    Q.   That's good.

14         MR. GROHARING:  That's all I have, your Honor.

15         THE COURT:  All right.  Any redirect?

16         MS. BASSIL:  Yes, a couple of things.

17    REDIRECT EXAMINATION BY MS. BASSIL:

18    Q.   Doctor Sageman, Mr. Groharing asked you about Anwar Awlaki

19    and the person who's name I can't pronounce but they call sort

20    of the Underwear Christmas Bomber?

21    A.   Umar Farooq Abdul Mutallab.

22    Q.   I'll leave that to you.

23         Were both Anwar Awlaki and that person in Yemen at the

24    same time?

25    A.   Yes.
```

```
 1    Q.    Did they meet face to face?

 2    A.    Yes.

 3    Q.    Mr. Groharing also showed you a transcript from Guantanamo

 4    Bay.  Are those public transcripts?

 5    A.    I haven't been able to get them.

 6    Q.    Can anyone just sit in a courtroom in Guantanamo Bay?

 7    A.    I don't think so.

 8    Q.    Finally, how would you describe your approach to studying

 9    the phenomenon of terrorism in contrast to Mr. Kohlmann?

03:20 10              MR. GROHARING:  Objection.  Relevance.

11              THE COURT:  No.  He may have it.

12              MR. GROHARING:  Beyond the scope of cross.

13              THE COURT:  Overruled.  He may answer it.

14    A.    Well, I can't rely on Mr. Kohlmann's works because it's

15    unreliable.

16              MR. GROHARING:  Objection, your Honor.

17              THE COURT:  I think that is nonresponsive.

18              MR. GROHARING:  I ask that it be stricken.

19              THE COURT:  It will be stricken.  The jury will

03:21 20    disregard that.

21    Q.    I want you to contrast your work to his work.

22    A.    Well, I use a scientific method, which means I build a

23    large database.  I'm looking, you know -- since right now, I'm

24    looking at specifically political violence.  I'm looking to

25    people who became violent and all the people who hung out with
```

1    them who did not turn violent.  And I try to look at similarity

2    and differences.  I generate an explanation.  And then I test

3    that explanation on different independent databases in order to

4    kind of either support or refute it.

5    Q.   How does that contrast to Mr. Kohlmann's work?

6    A.   He tells stories.

7              MS. BASSIL:  I have no further questions.

8              THE COURT:  Anything else?

9              MR. GROHARING:  Nothing further, your Honor.

03:22 10            THE COURT:  Doctor Sageman, thank you.  You may step

11   down.

12             THE WITNESS:  Thank you very much.

13             THE COURT:  May I see counsel at the side, please.

14   (SIDEBAR CONFERENCE AS FOLLOWS:

15             MS. BASSIL:  Yes.  You want us to say the magic words?

16             THE COURT:  I don't necessarily.  I want to know where

17   we are.  Let me outline what I've been thinking in terms of the

18   global --

19             MS. BASSIL:  The global neo Jihad?

03:22 20            THE COURT:  Neo global trial.

21             MS. BASSIL:  Yes.

22             THE COURT:  If the evidence were to be concluded at

23   this point, we still have some business to do.  My thought was

24   to excuse the jury for tomorrow and have them come back on

25   Friday and get everything we need to do done tomorrow and then

```
 1   give you all plenty of time to plan your closings and then have

 2   arguments and charge beginning Friday morning.

 3            MR. CARNEY:  I think that's excellent.

 4            THE COURT:  Normally, I don't like doing cases on

 5   Friday, but that's when they're felon in possession cases and

 6   there's going to be a snap decision.  I don't think we have to

 7   worry about that.

 8            MR. AUERHAHN:  We don't have to worry about that.

 9            THE COURT:  So that was my thinking.  If there's

03:23 10  something you want to contribute to my understanding of where

11   we are --

12            MS. BASSIL:  We're resting.

13            THE COURT:  You want to confirm that the defendant has

14   chosen not to testify?

15            MR. CARNEY:  Yes, your Honor.

16            THE COURT:  You don't have to do it elaborately.  I

17   just want to make sure.

18            MR. CARNEY:  Your Honor, I've had an opportunity to

19   speak to the defendant on several occasions about this.  I have

03:23 20  indicated to him that he does have a constitutional right to

21   testify.  He's aware of that.  Based on my discussions focused

22   explicitly on this, I believe he has knowingly, intelligently,

23   and voluntarily made a waiver of his right to testify.

24            THE COURT:  He has a right both ways, of course.

25            MR. CARNEY:  Yes, your Honor.
```

| | |
|---|---|
| 1 | THE COURT: But he chooses not to testify? |
| 2 | MR. CARNEY: Yes, your Honor. And I most recently |
| 3 | spoke to him yesterday afternoon, and it was a definitive |
| 4 | decision. He indicated to me, your Honor -- I'm also not |
| 5 | calling Task Force Member Daly or Special Agent Williams. And |
| 6 | I let them know that this morning also. |
| 7 | THE COURT: All right. Then I may announce -- you |
| 8 | will announce, I guess, to the jury. I gather there's no |
| 9 | rebuttal? |
| 03:24 10 | MR. CHAKRAVARTY: Give us one moment to just confirm, |
| 11 | please. I don't think so. |
| 12 | No rebuttal. |
| 13 | THE COURT: You'll rest publicly. We don't even have |
| 14 | to ask about that. That's just -- then I'll tell the jury the |
| 15 | schedule. |
| 16 | . . . END OF SIDEBAR CONFERENCE.) |
| 17 | THE COURT: Miss Bassil. |
| 18 | MS. BASSIL: Yes, your Honor. I'm proud to announce |
| 19 | that we rest our case. |
| 03:25 20 | THE COURT: Okay. Jurors, the significance of that |
| 21 | announcement is that the evidence in the case has now been |
| 22 | presented to you. We're ready to proceed to the next stages of |
| 23 | the case, which are some instructions from me about the legal |
| 24 | principles that apply to the issues that you've heard about and |
| 25 | the way you'll deliberate and, of course, closing statements, |

1    or sometimes called final arguments, by the lawyers.

2          There is a little legal business for us to do, the

3    lawyers and I, before getting to that stage.  So what we're

4    going to do is, we'll finish for the day here today.  For your

5    purposes, we're going to skip tomorrow.  You have tomorrow off.

6    And return Friday morning at 9.  By that time, we will have

7    done what we need to do, and we'll go directly into these last

8    phases.

9          So on Friday, you'll begin deliberating in the case.

03:26 10   You'll recall that I said when deliberations begin, your day

11   will go to a full day, from a 9-to-1 day, and will last as long

12   as is necessary for you to complete your deliberations in the

13   case.  So we're now approaching the point where you will be

14   able to discuss the case among yourselves officially as a jury

15   and resolve the issues.  So that's where we are.

16         So enjoy the rest of today.  Enjoy tomorrow.  And

17   we'll see you ready to work on Friday morning.  We're in

18   recess.

19         Actually, let's just talk about a schedule for a

03:27 20   minute.

21   (The jury was excused at 12:50 p.m.)

22         THE COURT:  I just wanted to talk about our schedule

23   then tomorrow.  The only thing I have on is a -- I think I have

24   a brief status conference at 2:00, which is not going to take

25   very long.  I don't know that I've seen requests for jury

```
 1   instructions from anybody.
 2          MR. CARNEY:  I will be submitting ours this afternoon
 3   in addition to a request for a special verdict form.
 4          THE COURT:  I would be happy to entertain any
 5   suggestions about the verdict form.  I have an open mind.  I
 6   don't know one way or the other but --
 7          MR. CARNEY:  I'm aware of your standard instructions,
 8   and including on subjects such as conspiracy, scrutinizing
 9   testimony of witnesses, arrangement, the defendant not
10   testifying.  I'm satisfied with both what I've seen personally
11   in your past trials and what I know of your instructions.  So
12   the proposed instructions you will be getting, your Honor, are
13   strictly limited to the charges and what an appropriate
14   instruction would be.
15          THE COURT:  That's fine.
16          MR. CARNEY:  I can alert you to one issue that's kind
17   of unusual.  The material support charges allege that they were
18   occurring during a conspiracy period that went from 2001, we'll
19   say January 1 of 2001, until the date of the return of the
20   Superseding Indictment, which I believe was April of 2010.
21   Material support law has changed over those years.
22          THE COURT:  Yes.
23          MR. CARNEY:  And it is our position that the version
24   of the material support law which was in effect at the
25   beginning of the conspiracy is the version of the material
```

1   support law that applies to this case because there would be ex

2   post facto questions at the least raised if, later on during a

3   conspiracy, the government changed the law to make it easier to

4   be proven by the prosecutor.  I've got a memo in that regard,

5   and, frankly, I've not seen that issue raised in any other

6   case.

7           THE COURT:  That will be filed today as well?

8           MR. CARNEY:  Yes, your Honor.  I've actually got it.

9   I'll file it electronically once I proof it.

03:30 10           THE COURT:  Okay.

11           MR. CARNEY:  Also, your Honor, I have filed a motion

12   to strike coconspirator testimony.  May I suggest that that be

13   something that is addressed tomorrow?  Because I suspect the

14   government just got it this morning.

15           I also intend to renew the motion for required finding

16   on various grounds.  And unlike the halfway point, I'll be a

17   little bit more fulsome.

18           THE COURT:  I think, because we'll just be getting the

19   requests this afternoon, that rather than start right at 9, I'd

03:31 20   like a little time to look at some of these things, I think if

21   we assemble about 11 tomorrow to talk about whatever issues

22   there are, including the contents of the charge.

23           MR. CARNEY:  Thank you.

24           MR. CHAKRAVARTY:  We will need some time to deal with

25   some of the issues that Mr. Carney raises just to -- we have --

1    I have the instructions here, but they primarily focus on just

2    the charges, but there are some other instructions which the

3    government -- which we don't think your Honor -- you may have

4    given in the past, but it's your standard panoply.  So we're

5    suggesting some language that might be helpful.

6         With regards to the other issues, we can deal with

7    them in the morning.  But they're dense, and because the

8    material support statutes -- the three charges that involve

9    material support, there's a lot of overlap, I'm sure your Honor

03:31 10  will want an opportunity to streamline it so you're giving

11   instructions, for example, on conspiracy, as few times as

12   possible.

13        THE COURT:  Fine.  We can talk about it further

14   tomorrow.  It seems to me -- I haven't really parsed it, but it

15   seems to me that with respect to the conspiracy charge, some of

16   the charges require an overt act and some don't.  I just

17   mention that.  We'll have to explain that to the jury.  Okay.

18        We'll see you tomorrow at 11.

19        MR. CARNEY:  Your Honor, can I just bring one other

03:32 20  matter briefly, please?  Do you have a sense of what you would

21   limit us to in closing argument?

22        THE COURT:  I was going to ask you that actually, and

23   then I said I'll wait till tomorrow after you've absorbed some

24   of this other stuff.  But I'm happy to -- it's been a long

25   case.  On the other hand, you can overwhelm the jury with too

1    long.  I was thinking an hour, but --

2            MS. BASSIL:  An hour and a half?

3            THE COURT:  Well -- or, actually, I began with an

4    hour.  Then I went to 75 minutes in my thinking.

5            MR. CARNEY:  Actually, I was requesting 75 minutes.

6            THE COURT:  That way I was thinking the government

7    could have an hour for its primary argument and 15 minutes for

8    its rebuttal, and then the defense could have a total of 75.

9    That will be not too great a burden on the jury, I don't think.

03:33 10   That will get them the case by this time probably if we start

11   it early.

12           MR. AUERHAHN:  We obviously haven't finished drafting

13   our closing argument.  Right now, it's a little bit longer than

14   that, but we're working to cut it.  I don't know if you're one

15   of those judges who, at 61 minutes, starts making noises.

16           THE COURT:  It's a rule of reason.

17           MR. AUERHAHN:  Thank you.

18           THE COURT:  That's not an invitation.

19   (Whereupon, at 12:55 p.m. the trial recessed.)

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  December 14, 2011

17

18

19

20

21

22

23

24

25