UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   ) Criminal Action
v.                                 ) No. 09-10017-GAO
                                   )
TAREK MEHANNA,                     )
                                   )
          Defendant.               )
                                   )



BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

DAY THIRTY-FIVE
JURY TRIAL



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Friday, December 16, 2011
9:16 a.m.



Marcia G. Patrisso, RMR, CRR
Cheryl Dahlstrom, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2      OFFICE OF THE UNITED STATES ATTORNEY
       By: Aloke Chakravarty and Jeffrey Auerhahn,
3         Assistant U.S. Attorneys
       John Joseph Moakley Federal Courthouse
4       Suite 9200
       Boston, Massachusetts  02210
5       - and -
       UNITED STATES DEPARTMENT OF JUSTICE
6       By: Jeffrey D. Groharing, Trial Attorney
         National Security Division
7       950 Pennsylvania Avenue, NW
       Washington, D.C.  20530
8       On Behalf of the Government

9      CARNEY & BASSIL
       By: J.W. Carney, Jr., Esq.
10        Janice Bassil, Esq.
        John E. Oh, Esq.
11      20 Park Plaza
       Suite 1405
12      Boston, Massachusetts  02216
       - and -
13      LAW OFFICE OF SEJAL H. PATEL, LLC
       By: Sejal H. Patel, Esq.
14      101 Tremont Street
       Suite 800
15      Boston, Massachusetts  02108
       On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2

3     CLOSING ARGUMENT BY MR. AUERHAHN ................PAGE 40

4     CLOSING ARGUMENT BY MS. BASSIL .................PAGE 91

5     CLOSING ARGUMENT BY MR. CARNEY .................PAGE 108

6     REBUTTAL BY MR. CHAKRAVARTY ....................PAGE 139

7     JURY INSTRUCTIONS BY THE COURT .................PAGES 7, 152

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The following proceedings were held in open court
 2    before the Honorable George A. O'Toole, Jr., United States
 3    District Judge, United States District Court, District of
 4    Massachusetts, at the John J. Moakley United States Courthouse,
 5    One Courthouse Way, Boston, Massachusetts, on December 16,
 6    2011.
 7              The defendant, Tarek Mehanna, is present with counsel.
 8    Assistant U.S. Attorneys Aloke Chakravarty and Jeffrey Auerhahn
 9    are present, along with Jeffrey D. Groharing, Trial Attorney,
10    U.S. Department of Justice, National Security Division.)
11              THE CLERK:  All rise for the Court.
12              (The Court enters the courtroom at 9:16 a.m.)
13              THE CLERK:  For a continuation of the Mehanna trial.
14    Please be seated.
15              THE COURT:  Good morning.
16              MR. CARNEY:  Good morning, your Honor.
17              MR. CHAKRAVARTY:  Good morning.
18              THE COURT:  Mr. Carney?
19              MR. CARNEY:  I'm just waiting for your Honor.
20              THE COURT:  Thank you very much.  That's very old
21    school of you.
22              There are a couple of items -- I was told there's an
23    issue about two exhibits?
24              MR. CHAKRAVARTY:  Your Honor --
25              THE COURT:  312 and 324?
```

00:30

1          MR. CHAKRAVARTY:  -- yes.  The understanding is

2     that -- between the parties that English-language transcripts

3     were aids for the jury and are not going to go back to the jury

4     deliberation room.

5          Exhibits 312 and 324 are translations of primarily

6     Arabic-language telephone calls, and consequently, it's our

7     understanding that those -- because they're not merely aids but

8     they are the only way that the jury will be able to understand

9     what was on those calls -- would go back to the jury.  That's

00:31 10    Exhibits 312 and 324.  They were authenticated and introduced.

11          I would add that 324 was actually published to the

12     jury; 312 was not published to the jury.

13          MS. BASSIL:  Yes, your Honor.  My understanding was

14     that transcripts were not going back to the jury.  324 was

15     played; 312 was never played.  So I would suggest to the Court

16     that where 312 was never played, there's no reason why a

17     translation of it would go to the jury.  They never heard the

18     phone call at all.

19          THE COURT:  Well, if they want to hear it, they will,

00:32 20    I guess.  I mean, they can play it.  No, I think the rule was,

21     as stated, that if it was all English, or almost all English

22     with an occasional Arabic phrase, some of which became very

23     familiar to the jury anyway, the transcripts would not go, but

24     to the extent that it was necessary to translate something that

25     on the tape was Arabic -- and I've looked at these two.  I

1    think there's enough there that those should be in evidence.

2    So 312 and 324 I understand are in and will stay in, was the

3    controversy.

4         The other matter is the clerk just gave you a verdict

5    form.  You'll see it.  I resolved the issue contrary to the

6    defense argument.  I think a general verdict is sufficient.

7         Subject to that issue, are there any other issues with

8    the form of the verdict slip?

9         MR. CARNEY:  No, your Honor.  And we've also reviewed

00:33 10   the amended indictment and agreed that it's accurate.

11        THE COURT:  Okay.

12        MR. CHAKRAVARTY:  No issues with the indictment or the

13   jury slip.

14        One, because this is my last opportunity to ask it, I

15   think with regards to these transcripts that are going back to

16   the jury with regards to the consensual recordings and the

17   telephone calls, in the list that the defense sent us last

18   night, it looked like there are only two of the consensually

19   recorded transcripts that were being excluded from the admitted

00:33 20   exhibits, but I think there should be four.

21        And just to tally with Mr. Lyness, I believe 455, 457,

22   459 and 461 are the transcripts of the consensual recordings.

23   I think there are only two on the list that defense said, and

24   that may have just been inadvertent.

25        THE COURT:  That are not going back?

```
 1                MR. CHAKRAVARTY:  That are not going back, correct.

 2                THE COURT:  Did you hear the numbers?

 3                MS. BASSIL:  Does it really matter?

 4                THE COURT:  They're coming out, anyway, so I guess

 5       that's --

 6                Did you get the numbers?

 7                THE CLERK:  No, I was getting these.

 8                THE COURT:  Would you state the numbers again?

 9                MR. CHAKRAVARTY:  455, 457, 459 and 461.  Those have

00:34 10      been ID'd and previously admitted and they're coming out.

11                MR. LYNESS:  455, 457, 459 and what was the other

12       number?

13                MR. CHAKRAVARTY:  4-6-1.

14                THE COURT:  Those are the transcripts of the body

15       wire, basically?

16                MR. CHAKRAVARTY:  The body wire.

17                THE COURT:  Okay.  Those are the preliminaries that I

18       had.  If there's nothing else, we'll bring out the jury.

19                THE CLERK:  All rise for the jury.

00:36 20           (The jury enters the courtroom at 9:22 a.m.)

21                THE CLERK:  Be seated.

22                THE COURT:  Good morning, jurors.

23                THE JURORS:  Good morning.

24                THE COURT:  I've two major responsibilities in a trial

25       such as this.  The first is almost over, and that is to preside
```

1    over the case to make whatever procedural or evidentiary

2    rulings are necessary in the course of the trial.  And you've

3    seen we've been doing that.  The other major responsibility is

4    at this stage of the proceedings to give you what we call these

5    instructions in the principles of law that pertain to the

6    matters you've heard about and about which you will have to

7    make some decisions.

8              So I'm going to give you these instructions about the

9    law that applies to these matters.  And you can think of this

00:37 10    as sort of a short course in all the law you will need to know

11    in order to decide the issues in this case.  You don't have to

12    resort to any other ideas you may have from other sources about

13    what the law is or might be with respect to these issues, but

14    take it that what I will tell you is a complete and accurate

15    summary of the principles of law that are to be applied in the

16    case.

17             It's my duty to set forth these principles fully and

18    accurately, without regard to any personal or private views I

19    might have about the wisdom or prudence of these principles, or

00:38 20    whether there might be different or additional ones that could

21    be applied, but rather, to tell you what the law is with

22    respect to these matters.

23             And you have a similar duty to accept and faithfully

24    apply the principles sensibly, also without regard to any

25    personal or private views you might have about the wisdom or

1  prudence of the principles or whether there might be different

2  or additional ones that could be applied, but accept it that

3  these are the principles that apply to these matters.  Consider

4  the instructions, as I say, sensibly, as a whole, and apply

5  them faithfully.

6           Now, I'm going to talk about two general areas, and

7  I'm actually going to divide my time in doing it.  First, now,

8  I'm going to talk about the principles that relate to the

9  particular offenses, or crimes, that are charged by the

00:39 10  indictment in this case; that is, I will tell you what the

11  government is required to prove in order to convict the

12  defendant of the charges that are made against him.

13           After I've done that, the lawyers will have their

14  opportunity to present their closing statements to you.  I

15  think it will be helpful for you in listening to the closing

16  statements to have understood from me what the principles are

17  that relate to the proof of the charges.  After the lawyers'

18  closing statements, then I'll have some more to say to you

19  about the manner in which you'll think about the evidence,

00:39 20  discuss it, and come to some judgments about it.

21           Now, because some of the offenses that are at issue in

22  this case are rather involved, let me begin by giving you a

23  kind of introduction to federal criminal law.  As I'm sure you

24  probably understand, federal criminal law consists of laws

25  enacted by Congress that define certain acts as criminal.  In

1    enacting a criminal statute, Congress specifies what act or

2    acts constitute the particular crime.  And where at a trial it

3    is shown that the defined conduct has occurred, in fact, the

4    crime has been committed, and where the defined conduct has

5    not, in fact, occurred, the crime has not been committed.

6         Typically, the language of a federal criminal statute

7    follows a common pattern or formula like this:  Whoever does

8    such and such shall be punished.  Let me give you a silly

9    hypothetical example to illustrate the grammar of federal

00:41  10    criminal statutes.  The statute might say, "Whoever knowingly

11   eats ice cream without using a napkin shall be punished."  I

12   deliberately use a silly example because I want you to focus on

13   the structure of things rather than the substance.  So we might

14   call that crime "knowingly eating ice cream without a napkin."

15        In seeking to determine whether someone has committed

16   the crime, we would look at whether the evidence established

17   what the person had done, whether the person had done those

18   things necessary as outlined in the statute to constitute the

19   crime.  And in this example there would be three things that

00:41  20   would have to be shown:  The person knowingly ate ice cream

21   without a napkin.  If those three things were established, then

22   the government would have proved the crime.  If all of them are

23   not established -- one or more is not established -- then the

24   crime has not been proven.

25        Now, I'm going to tell you we call those necessary

facts to be proven "the elements of the offense."  And I'm

going to tell you what the elements of each of the charged

offenses are in just a minute, but I want to extend the example

in just a couple of ways to illustrate some other things about

the structures of these statutes.

Sometimes Congress may want to be sure that a

particular term used in a statute is understood in a particular

way, and so it may include a full or partial definition of that

term; for example, in our little illustration, the statute

00:42  might say, "The term 'ice cream' shall include any frozen

confection containing cream, eggs and sugar, regardless of

flavor, but shall not include frozen yogurt."  So when Congress

provides a specific definition, then that definition is what

controls for the purposes of the statute.  When Congress does

not provide a specific definition of terms in the statute, the

general rule is that words are to be understood in accordance

with their ordinary and usual meaning.

Now, sometimes, even when Congress has not included a

definition, the courts, in applying the statute, will have

00:43  developed and applied a definition, and you'll see that occurs

in some cases, particularly both in the illustration and in

real statutes, with respect to the term "knowingly."  And I'll

explain that later.

Now, sometimes a criminal statute will provide for

alternate ways in which the offense could be committed.  To

1    return to our example, the statute might say, "Whoever

2    knowingly eats ice cream without a napkin, or provides ice

3    cream to another without also providing a napkin, shall be

4    punished."  In this formulation there are two ways the statute

5    might be violated:  First, it could be proved that the person

6    knowingly ate ice cream without a napkin; and, secondly, it

7    could be proved that the person provided ice cream to someone

8    else without providing a napkin.  Either would suffice to

9    constitute the crime if proven.  But in such a case because the

00:44 10    verdict of the jury must always be unanimous as to the elements

11    of the offense, it would be necessary for the jury all to agree

12    that one or the other version had been proven beyond a

13    reasonable doubt, and to be unanimous as to that.

14         As another point, sometimes a federal criminal statute

15    will contain what we call a "jurisdictional element."  As I'm

16    sure you know, the federal government has those powers that are

17    granted to it by the Constitution.  The federal government's

18    power to enact a criminal statute is limited to those matters

19    within its proper jurisdiction; for example, the Constitution

00:45 20    grants the federal government power to regulate interstate

21    commerce, and so it can enact criminal laws that pertain to the

22    regulation of interstate commerce.

23         But eating ice cream might not have any national or

24    interstate interest, and so in order to reach particular

25    conduct that may be federal or non-federal, the Congress may

1    prescribe what we call a "jurisdictional element" to bring it

2    within the federal jurisdiction.  And so the statute might say,

3    as some federal statutes do, "Whoever, having obtained ice

4    cream that has traveled in interstate commerce, eats that ice

5    cream without a napkin, commits the offense."  So tying it to

6    the federal power is sometimes a jurisdictional element, and in

7    at least one of these statutes you will see one of those.

8         So I use this sort of oversimplified stick-figure kind

9    of illustration because I want you to see the patterns that can

00:46  10    occur in the statutes that are at issue in this case.  And I

11    hope that this now will prepare you to hear and understand the

12    instructions about those particular statutes.

13        Before I get to them, there's one other general matter

14    that I want to address, and that relates to the difference

15    between a substantive offense and a conspiracy offense and the

16    law that generally applies to conspiracies.

17        The law recognizes a distinction between what we call

18    a "substantive crime" and a "crime of conspiracy."  A

19    substantive crime occurs when a person alone or with others

00:46  20    commits the exact act or acts declared to be a crime by the

21    statute.  So in our little example, knowingly eating ice cream

22    without a napkin would be a substantive crime if a person

23    committed those acts.

24        It can also be a crime to conspire or agree with one

25    or more other persons to work together to commit a substantive

1   offense, and that's the crime of conspiracy.  When proven,

2   conspiracy is a separate crime from the substantive offense.

3   It might be the objective of the conspiracy.  Four of the seven

4   counts in this indictment present allegations of the crime of

5   conspiracy in various forms under various statutes.  In each

6   case, the conspiracy is alleged to have had as its object the

7   commission of certain identified substantive crimes.  So let me

8   give you these instructions generally about the crime of

9   conspiracy that will apply to the several counts subject to

00:48 10   some further refinement as we talk about each count.

11        A criminal conspiracy is an agreement by two or more

12   persons to act together to do an unlawful act or to accomplish

13   an unlawful purpose.  By "unlawful," I mean something the law

14   forbids.  As I've said, joining in a criminal conspiracy is a

15   separate and distinct crime from any crime which may be the

16   object of the conspiracy.  The gist of the crime of conspiracy

17   is the actual agreement by the conspirators to disobey the law

18   and, thus, accomplish their unlawful purpose.

19        In order to prove the crime of conspiracy, it is not

00:48 20   necessary for the government to prove that the conspiracy

21   succeeded, whether the objective was achieved, or the intended

22   substantive crime actually committed.  What must be proved is

23   the fact of the agreement and a defendant's intentional

24   participation in that agreement or conspiracy.

25        So to prove the crime of conspiracy, the government

must prove at least two -- at least the following two

propositions beyond a reasonable doubt:  first, that there was

an agreement as specified in the relevant count of the

indictment, and not some other agreement, that existed between

or among at least two people; and, second, that the defendant

intentionally joined in that agreement with the intention of

helping to achieve its unlawful purpose.  So the existence of

an agreement and the defendant's intentional participation in

that agreement:  Those are the two elements of conspiracy,

generally.

In some cases, and I'll detail this later, it may be

necessary for the government also to prove a third element;

namely, that some member of the conspiracy took some

affirmative step towards fulfillment of the purpose of the

objective of the conspiracy.  That will vary with the

particular statute at issue.

So to prove a conspiracy, the government must prove an

agreement actually existed.  It's not enough to show that

people behaved similarly or that they're associated in some way

with each other.  Proof that people associated with each other

does not, by itself, show that they had agreed to commit any

particular acts, although, of course, you may consider the fact

and manner of an association in determining whether there was a

conspiracy between the people, but the evidence must show that

the members of the alleged conspiracy in some way came to an

1    actual understanding or agreement among themselves that they

2    would work cooperatively and jointly to accomplish a joint

3    unlawful plan.  There must have, in fact, been some kind of

4    agreement.

5         It's not necessary for you to find that on any

6    particular occasion the members of the conspiracy all got

7    together and entered into some express or formal agreement; the

8    agreement may have been tacit, or unspoken.  Sometimes the way

9    people conduct themselves may permit an observer to infer from

00:51 10   their conduct that they have, in fact, agreed to work together

11   to accomplish an objective.

12        Similarly, it's not necessary for the government to

13   prove that the coconspirators agreed to every specific detail

14   of their conspiracy, or they agreed specifically how exactly

15   they would go about accomplishing the purpose.  It is

16   sufficient if it's shown that the members of the conspiracy

17   came to a common understanding to act in a joint or cooperative

18   way to violate the law.

19        Indeed, because criminal conspiracies may be secretive

00:51 20   by their very nature, you might consider that an agreement to

21   pursue a criminal purpose may not necessarily be formed in the

22   same open way that an agreement would be formed among people

23   who are pursuing lawful pursuits.

24        It's not necessary to show that each member of a

25   conspiracy knew or dealt with all the other participants.  In a

1    secret or surreptitious agreement the participants -- some of

2    the participants may purposely keep their distance from one

3    another.  Various members may play different, and not

4    necessarily equal, roles.  One member may or may not know

5    exactly how other members will go about fulfilling their

6    respective parts in the conspiracy while still knowing that

7    there are others who are working toward the objective of the

8    agreement.

9         Now, the indictment in the various counts sets forth

00:52 10   the time periods during which the various conspiracies charged

11   are alleged to have existed.  It's not necessary for the

12   government to prove that a defendant was a member of the

13   conspiracy during the entire period alleged in the indictment;

14   it is sufficient to prove that he was a member of the

15   conspiracy at some point during its existence.  The indictment

16   uses the phrase "in or about" in alleging times.  The

17   government's not required to prove events occurred exactly on

18   the dates alleged; it is sufficient if the proof is that the

19   events occurred reasonably near the dates as alleged.

00:53 20        Now, if you conclude a conspiracy existed, you must

21   consider whether the defendant knowingly and intentionally

22   joined that conspiracy.  A person acts knowingly and

23   intentionally if he acts voluntarily, of his own will or

24   volition, and not because of a mistake or accident.  In order

25   to prove a defendant guilty of the crime of conspiracy, the

1    government must prove the defendant had both the intent to join

2    in the conspiracy -- to become part of the agreement -- and the

3    intent that the underlying criminal purpose of the conspiracy

4    be accomplished.

5         Innocent association with others -- merely being

6    present, for example, when others are committing a crime -- is

7    not enough to convict a person of knowing and intentional

8    participation in a conspiracy.  I've talked about "intention."

9    What a person intends is a matter of what's in the person's

00:54 10   mind.  Sometimes a person may say what he intends, but

11   sometimes what a person intends may be a matter of inference.

12   Obviously, there's no way to look directly into somebody mind

13   to see what's on the screen in there as an intention.  Proof of

14   knowledge or intent, therefore, is often a matter of inference

15   from the way a person acts or behaves through a course of

16   events, as well as from all other pertinent circumstances as

17   you may find them in the evidence.  So you may consider, and

18   you may infer, though you are not required to do so, that a

19   person ordinarily intends the natural and probable consequences

00:55 20   of what he does.

21        Note that there is a difference between a person's

22   intent and a person's motive.  Intent refers to the state of

23   mind with which a person performs an act, whether they act as

24   purposeful and intended.  Motive refers to the reason why a

25   person may do an intentional act.  A person's motive as opposed

1    to intent is not material to whether a crime has been

2    committed.  And intentionally committing a wrongful act cannot

3    be justified by a good motive.

4         So these instructions now about the crime of

5    conspiracy will apply generally to the several conspiracy

6    counts in the indictment.  Let me now turn to those several

7    charges and let me summarize quickly the crimes that are

8    charged in each of the seven counts.

9         Let me just say here, you will have a shortened

00:56 10   version of the indictment sufficient to set forth for you what

11   is charged in each of the counts.  This is for your reference

12   so you'll know what the charges are.  The indictment, of

13   course, is not evidence.  It doesn't prove anything.  It's

14   simply a way of proposing the question.  But this will tell you

15   what the question is:  Has the defendant committed the crime

16   alleged in Count 1, 2, and so on.  And you'll have that for

17   reference.

18         So you'll see, when you look at that, that Count 1

19   charges the defendant with the crime of conspiracy, conspiring

00:56 20   with Ahmad Abousamra and others to provide material support or

21   resources to a designated foreign terrorist organization,

22   namely, al Qa'ida.

23         Counts 2 and 3 are related.  Count 2 charges the

24   defendant with a conspiracy with Abousamra and others to

25   provide, or alternately, to conceal material support or

1    resources, intending for such support or resources to be used

2    in preparation for or in carrying out either of two specified

3    crimes; that is, specified in the indictment, either a

4    conspiracy to kill in a foreign country or the murder of a U.S.

5    national in a foreign country.

6         By the way, as a matter of construction, when the

7    indictment uses the word "and," it is generally taken as being

8    capable of being understood as "and/or."  So if you see "and"

9    in the indictment, it can mean either "and" or "or."

00:57 10        So Count 2 charges the conspiracy.  Count 3, related

11   to the Count 2, charges the defendant with the substantive

12   offense of providing or concealing material support or

13   resources, intending them to be used for preparation in the

14   identified crimes.

15        Count 4 charges the defendant with a conspiracy with

16   Abousamra and others to murder a person or persons outside of

17   the United States.  Count 5 charges a conspiracy with Abousamra

18   and others to make false statements in a matter that is within

19   the jurisdiction of the executive branch of the federal

00:58 20  government; specifically, the Federal Bureau of Investigation.

21        Counts 6 and 7 are related to Count 5, that conspiracy

22   to make false statements, because Count 6 and 7 each allege a

23   specific instance of a false statement made to the FBI.

24        That's a summary of the charges.  So let me go through

25   each one of them and tell you what the elements are that need

1    to be proven to prove the defendant guilty of these offenses.

2         Count 1 of the indictment charges that between

3    approximately 2001 and June 17, 2010, which is the date of the

4    indictment, the defendant being a United States national,

5    conspired with Abousamra and others to provide material support

6    and resources to al Qa'ida, a designated terrorist

7    organization, all in violation of Title 18 of the United States

8    Code, Section 2339B.  That section makes it a crime to provide

9    material support or resources to a foreign terrorist

00:59 10   organization or to conspire with one or more persons to do so.

11        So for you to find the defendant guilty of the crime

12   of conspiracy, which is alleged in Count 1, the government must

13   prove two propositions beyond a reasonable doubt:  First, that

14   the conspiracy specified in Count 1 of the indictment existed,

15   including the objective of the conspiracy, between the

16   defendant and at least one other person; and second, that the

17   defendant willfully joined in the conspiracy with the intention

18   of helping to achieve its unlawful purpose.  Those are the

19   fundamental elements of conspiracy.

00:59 20        Now, the unlawful object of the conspiracy, what we

21   might call the "underlying offense," is alleged to be the

22   crime -- the substantive crime -- of providing material support

23   or resources to a designated foreign terrorist organization.

24   So to understand whether the conspiracy charge is proved,

25   whether the defendant was part of a conspiracy to do that, you

1    have to understand what it means to do that and what the

2    elements of that underlying substantive offense are.  Now, the

3    defendant is not charged with the substantive offense, but with

4    conspiring to commit the substantive offense, but you still

5    need to know what the elements of that are.

6         So to prove the substantive offense of providing

7    material support or resources to a foreign terrorist

8    organization, it would be necessary for the government to prove

9    the following things:  that a person, one, knowingly, two,

01:00 10   provided material support or resources to a particular

11   organization -- here, al Qa'ida -- or knowing either, A, that

12   al Qa'ida had, in fact, been designated by the Secretary of

13   State as a foreign terrorist organization, or, B, that

14   al Qa'ida engaged or engages in terrorist activity, or, C, that

15   it has engaged or engages in terrorism.  And it must know one

16   of those three things.  Additionally, the government would have

17   to prove the defendant was a United States national when he

18   participated in the conspiracy.  That's an illustration of a

19   jurisdictional element, as I was talking about earlier.

01:01 20   Now, a person acts knowingly, as I've said, if he acts

21   voluntarily and purposefully with an awareness of the pertinent

22   actual facts and not out of ignorance or mistake or accident.

23   To provide material support is to furnish or supply.

24        "Material support and resources" is an important term

25   in the statute.  It includes services, money, training, expert

advice and assistance or personnel.  "Material support and

resources" does not include medicine or religious materials.

The material support or resources need not themselves be

directly related to terrorist activity; for example, not part

of the evidence in this case, but just to illustrate,

furnishing office space to a terrorist organization, otherwise

an innocent act, could suffice as material support within the

meaning of the statute provided all the other elements were

established.

"Training," as used in the statute, means instruction

or teaching designed to impart a specific skill as opposed to

general knowledge.  "Expert advice or assistance" means advice

or assistance derived from scientific, technical or other

specialized knowledge.  In this case to convict the defendant

of conspiring to provide material support and resources in the

form of expert advice or assistance, that expert advice or

assistance would have to have been provided after October 26,

2001.

Services may be a form of material support and

resources.  "Services" is not a defined term in the statute; it

is to be given its ordinary and usual meaning.  To convict a

defendant of having conspired to provide services, such

services would have to be provided after December 17th, 2004.

"Personnel" means one or more persons, possibly including the

defendant himself, to work under the foreign terrorist

1    organization's direction or control, or to otherwise organize,

2    manage, supervise or direct the operations of the organization.

3            Now, this is important.  Persons who act independently

4    of a foreign terrorist organization to advance its goals or

5    objectives are not considered to be working under the

6    organization's direction or control.  A person cannot be

7    convicted under this statute when he's acting entirely

8    independently of a foreign terrorist organization.  That is

9    true even if the person is advancing the organization's goals

01:04  10   or objectives.  Rather, for a person to be guilty under this

11   count, a person must be acting in coordination with or at the

12   direction of a designated foreign terrorist organization, here,

13   as alleged in Count 1, al Qa'ida.

14           You need not worry about the scope or effect of the

15   guarantee of free speech contained in the First Amendment to

16   our Constitution.  According to the Supreme Court, this statute

17   already accommodates that guarantee by punishing only conduct

18   that is done in coordination with or at the direction of a

19   foreign terrorist organization.  Advocacy that is done

01:05  20   independently of the terrorist organization and not at its

21   direction or in coordination with it does not violate the

22   statute.

23           Put another way, activity that is proven to be the

24   furnishing of material support or resources to a designated

25   foreign terrorist organization under the statute is not

1    activity that is protected by the First Amendment; on the other

2    hand, as I've said, independent advocacy on behalf of the

3    organization, not done at its direction or in coordination with

4    it, is not a violation of the statute.

5        Now, the government alleges that the conspiracy

6    charged in Count 1 involved the intended provision of more than

7    one form of material support and resources.  To convict the

8    defendant under the statute you must unanimously agree as to

9    the manner in which the defendant conspired to provide material

01:06 10  support and resources, if he did so.  You need not find that he

11   provided support and resources in all the ways the government

12   has alleged.  It is sufficient if you agree that he did so in

13   one way, but you must all agree to that one way.

14       As noted above, the government must prove that the

15   defendant knew he was providing, or conspiring to provide,

16   material support or resources to al Qa'ida and also knew one of

17   the following:  that al Qa'ida was, in fact, a designated

18   foreign terrorist organization, or that it had engaged or was

19   engaging in either "terrorist activity" or "terrorism."  These

01:07 20  are defined terms.  "Terrorism" means premeditated, politically

21   motivated violence perpetrated against non-combatant targets by

22   sub-national groups or clandestine agents; and "terrorist

23   activity" means any activity which is unlawful under the laws

24   of the place where it is committed or which, if it had been

25   committed in the United States, would be unlawful under the

laws of the United States, and which involves an assassination or the hijacking or sabotage of any aircraft, vessel or vehicle.

In sum, to prove the defendant guilty under Count 1, the government must prove each of the following elements beyond a reasonable doubt:  that the agreement specified in the indictment existed between at least two people to provide material support or resources to al Qa'ida in violation of the statute; and, second, that the defendant willfully joined in that agreement with the intention of helping to achieve its unlawful purpose.

In Count 2 the defendant is accused of conspiring to provide or conceal material support and resources to terrorists in violation of Section 2339A of Title 18 of the U.S. Code.  In particular, he is charged with conspiring with Abousamra and others to provide material support and resources, as I've defined those terms, or to conceal or disguise the nature, location, source or ownership of material support and resources, knowing and intending that such material support and resources were to be used in preparation for and in carrying out either of two identified crimes:  first, conspiracy to kill, kidnap, maim or injure a person in a foreign country in violation of Section 956 of Title 18 of the code; or the extraterritorial, that is, in a foreign country, homicide of a U.S. national, in violation of Section 2332 of the U.S. Code --

1    of Title 18 of the U.S. Code.  "Title 18" is the body of

2    criminal law in the United States Code.

3         Now, I've again given you the law of conspiracy, and

4    the same two elements apply:  You must show the existence of

5    the conspiracy and the defendant's intentional participation in

6    the conspiracy alleged in the indictment.  And like Count 1, we

7    have to look at the underlying substantive offense that is

8    alleged to be the objective of the conspiracy to see whether

9    the conspiracy, as alleged, has been proven or not.

01:10 10       So let's look at the underlying offense which is the

11   substantive offense prohibited by Section 2339A of Title 18.

12   And that statute says that "Whoever provides material support

13   or resources, or conceals or disguises the nature, location,

14   source or ownership of material support or resources, knowing

15   or intending that they are to be used in preparation for or in

16   carrying out a violation of" -- and then it lists a number of

17   statutes, but I've identified the two that are at issue here,

18   anybody who does that or attempts or conspires to do that,

19   commits the offense.

01:10 20       So a person can violate this statute in either of two

21   alternate ways:  The first way is to provide material support

22   and resources knowing and intending that they be used for the

23   forbidden purpose; and the second is by concealing or

24   disguising the nature, location, source or ownership of

25   material support and resources, again, knowing and intending

1    that they be used in a forbidden way.

2         So a person can violate the statute either by

3    providing the material support or by concealing the material

4    support with the necessary intentions.  And as I've told you

5    before, if there are alternate theories, the government must

6    prove either or both to you so that you unanimously agree.  Six

7    of you can't think it's one and six think it's the other, and

8    so on; it has to be a unanimous agreement as to which has been

9    proven.

01:11 10       Now, I've explained "material support" and "resources"

11   in connection with Count 1.  I won't repeat that.  Same

12   definition.  Since the objective of the conspiracy as alleged

13   in Count 2 is the commission of a crime under Section 956 or

14   Section 2332, let me tell you what has to be proven under those

15   so you'll understand whether the conspiracy went to those

16   purposes.

17        A conspiracy to kill in a foreign country under

18   Section 956 of Title 18 requires proof of the following

19   elements:  the existence of a conspiracy to murder, kidnap or

01:12 20  maim somebody outside the United States; second, a person's

21   willful joining and participation in the conspiracy, intending

22   to help achieve its objective; third, that person's

23   participation in the conspiracy occurred while the person was

24   within the jurisdictions of the United States; and, fourth,

25   that an overt act, or an affirmative act or step, was taken by

1     at least one of the coconspirators within the United States.

2     So the conspiracy has in its objective the murder, kidnapping

3     or my maiming of somebody outside the United States, that a

4     person willfully joined in it intending to achieve its

5     objective while within the United States, and then an overt act

6     was committed within the United States.

7            Now, an overt act -- and this is a case where there's,

8     in a conspiracy, the requirement of an affirmative overt act.

9     An overt act is a step or action taken during the life of a

01:13 10   conspiracy by one of the conspirators that is a step toward

11    accomplishing the objective of the conspiracy.  The overt act,

12    or the step toward achieving the objective, need not be

13    criminal in and of itself and may, in fact, be wholly innocent.

14    So that's the 956 offense that's charged in Count 2.

15           The second one, under Section 2332, refers to the

16    extraterritorial homicide of a U.S. national, and that would

17    require proof of the following elements, again, as a

18    conspiracy:  the existence of a conspiracy, the object of which

19    was to murder U.S. nationals in a foreign country; second, the

01:14 20   person's knowing and intentional participation in that

21    conspiracy intending to achieve that objective; and the

22    person's participation in the conspiracy while outside of the

23    United States, in contrast to the other one which required

24    participation while in the United States; and, fourth, the

25    commission of an overt act by one of the conspirators

specifically to accomplish the objective of the conspiracy here

as alleged, particularly, an overt act to accomplish the murder

of a U.S. national.

"Murder" is the unlawful killing of a human being with

malice of forethought.  "Malice of forethought" means the

specific intent to cause death, specific intent to cause

grievous bodily harm, or knowledge of a reasonably prudent

person that in circumstances a particular act was very likely

to cause death.  A national of the United States is a citizen

of the United States or a person owing personal allegiance to

the United States.

So as to Count 2, the conspiracy to commit that

offense, again, the elements of the conspiracy are the

existence of the conspiracy, the defendant's willful and

knowing participation in it.  And the objective of the

conspiracy, as alleged in Count 2, has to be one of those two

identified statutes.

Count 3 is a substantive offense that is similar to

the conspiracy offense alleged in Count 2, and Count 3 alleges

that from in or about the spring of 2002 and continuing until

about February of 2007 the defendant knowingly provided

material support or resources, or concealed and disguised the

origin, the source, location, et cetera, or attempted to do so

knowing that they were intended to be used in preparation for

the offenses as I've defined them under Section 956 and Section

2332.  So this is the substantive version of the conspiracy

alleged in Count 2.

Again, there are alternate ways of proving it, either

by providing material support or concealing and, again, I

remind you that either theory could be accepted, but it has to

be accepted unanimously.

Now, Count 3, which charges the substantive offense,

also charges that it could be committed in different ways.  A

substantive offense can be committed directly by the person

himself doing the things that constitute the crime, but there

are some other ways in which the offense can be proved, and a

substantive offense can be proved against a person.  One is, in

addition to being guilty of the completed crime, the government

could prove the person guilty of an attempt to commit the

crime.

A person can be convicted of an offense, a substantive

offense, including this one, not only when he succeeds in

completing it, but when he attempts to do so but does not

complete it.  To prove an attempt -- the crime of attempt --

the government must prove, first, the defendant intended to

commit the completed crime; and, second, that he engaged in a

purposeful act that under the circumstances he believed to be

amounted to a substantial step toward the commission of the

completed crime consistent with his criminal intents.

A substantial step is an act in furtherance of the

1   commission of the crime.  It's more than mere preparation and

2   it's less than the last act necessary to complete the crime.

3   So the "substantial" indicates the fact of attempt.

4          Now, it's not a defense to the unsuccessful completion

5   of a crime that is attempted that it was either factually or

6   legally impossible to commit the crime; in other words, a

7   person has committed the crime of attempt if he satisfies the

8   elements:  that he had the intent to commit the crime and he

9   took a substantial step toward it, even if he doesn't finish

01:18 10   it, and even if it was impossible for him to finish it.  So a

11   classical example of this fact of a factual impossibility is a

12   person tries to steal money from an empty safe.  It will be

13   impossible to complete the crime because there was no money in

14   the safe, but the attempt, by cracking open the safe, was

15   enough to convict the person of attempted larceny.

16          An alternate method of proof, another alternate method

17   of proof, available under Count 3 is proof by aiding and

18   abetting.  The government may prove a person guilty of a crime

19   either by proving the person directly or personally committed

01:19 20   the acts that constituted the crime, or by proving the

21   defendant willfully and intentionally assisted another person

22   or persons to commit those acts.  And that's what's called

23   "aiding and abetting the commission of the crime by the other

24   person."

25          In order to prove someone guilty of an offense by

aiding and abetting, the government must prove that some person

committed the crime and that the defendant consciously shared

that person's knowledge of the crime, intended to help bring it

about, and took part in the endeavor in some way seeking to

make it succeed.

It's important to keep in mind that it is not an

offense for a person simply to be in the presence of somebody

who's committing a crime or to know that somebody else is

committing a crime.  Even if you know somebody's committing a

crime and take no steps to prevent it, you're not necessarily

guilty of aiding and abetting.  To be guilty by aiding and

abetting, you must intend to help bring about the crime and

take part in the endeavor in some way.

And there is one more method by which Count 3 could be

proven, and that is if the offense was committed by a

coconspirator of the defendant's.  Count 2 alleges that the

defendant was in a conspiracy to commit the offenses

identified.  Count 3 is that the defendant committed the

identified offenses.  If you find that he was part of the

conspiracy, then you could find him guilty of the substantive

offense as well if you find the following things:  that

somebody else who was a coconspirator committed the substantive

offense in Count 3; that that person and the defendant were

both members of the same conspiracy as alleged in Count 2; and

if you found that to be true, that the coconspirator committed

1    the substantive crime in furtherance of the conspiracy -- was

2    within the scope of the conspiracy to do that; that the

3    defendant was a member of the conspiracy at the time that the

4    coconspirator committed the act, and had not withdrawn from the

5    conspiracy; and, lastly, that the defendant could reasonably

6    have foreseen that his coconspirator would have committed the

7    substantive offense.

8         I refer to whether the defendant had withdrawn from

9    the conspiracy.  A person may withdraw from a conspiracy by an

01:22 10   affirmative act, but passivity or inaction is not sufficient to

11   amount to a withdrawal from a conspiracy that a person has

12   knowingly and intentionally joined.

13        So to recap, there are four ways that a person might

14   be found guilty of the substantive offense in Count 3, and that

15   is, providing or concealing material support to terrorism, in

16   summary, and that is by doing it himself, by attempting to do

17   it, by aiding and abetting somebody who did it, or because of

18   the commission of the crime by a then-coconspirator of the

19   defendant's.  Those are alternate ways by which the government

01:22 20   might prove that offense.  But, again, as I say, if there are

21   alternate choices, you must be unanimous as to the proof as to

22   any one of them.

23        In Count 4 the government alleges that the defendant

24   was part of a conspiracy to kill in a foreign country.  This

25   offense is based on Section 956 of Title 18.  I've previously

told you about 956 as an objective of the conspiracy in Count

2.  So I've already told you what those elements are.  Let me

just recap them for you.  Conspiracy to kill in a foreign

country under 956 requires proof that there was a conspiracy to

murder, kidnap or maim somebody outside the United States; that

the defendant willfully joined and participated in the

conspiracy intending to help achieve its objective; the

defendant's participation in the conspiracy occurred while he

was within the jurisdiction of the United States; and that

01:23 there was an overt act committed by at least one of the

coconspirators in the United States during the life of the

conspiracy.  If the government proves all those matters, then

it will have proved the conspiracy alleged in Count 4.

Count 5 also charges a conspiracy.  This conspiracy is

alleged to be one with Abousamra and others to make false or

fraudulent statements to the United States in the course of the

business of the executive branch.  This conspiracy is alleged

in the indictment to have existed from about 2003 to the date

of the indictment, June 17, 2010.

01:24 For you to find the defendant guilty of a conspiracy

as alleged in this count, the government must prove three

things:  the existence of the conspiracy as alleged in the

particular count; second, the defendant's willful and

intentional joinder in that conspiracy with the purpose to

achieve its objective; and, third, the commission of an overt

1    act or a substantial step towards achieving the objective of

2    the conspiracy.

3          Now, here the objective of the conspiracy is alleged

4    to be the unlawful making of false statements.  Section 1001 of

5    Title 18 states that whoever in a matter within the

6    jurisdiction of the executive branch of the government of the

7    United States knowingly and willfully falsifies, conceals or

8    covers up by any trick, scheme or device a material fact, or

9    makes any materially false, fictitious or fraudulent statement

01:25 10   or representation, commits the offense.

11          So to convict a person under this false statement

12   statute, the government must prove beyond a reasonable doubt a

13   person knowingly and willfully made a false statement, the

14   person made the statement voluntarily and intentionally, the

15   statement was material, and that the person made the statement

16   in the course of a matter within the jurisdiction of the

17   executive branch of the federal government, and here it is

18   alleged to be the Federal Bureau of Investigation.

19          A false statement is an assertion that is untrue when

01:26 20   made and known by the person making it to be untrue.  A false

21   statement is material if it has a natural tendency to influence

22   or be capable of affecting or influencing a governmental

23   function.  The statement need not have actually influenced the

24   actions of the governmental official, and government agents

25   need not have been actually deceived by it in order for it to

be material; it is the tendency or the nature of the statement by which you're to judge whether it was material or not.

The phrase "in the matter within the jurisdiction of the executive branch"; namely, the Federal Bureau of Investigation, means a matter or situation which the FBI had the power or authority to participate in.

Now, if you find the defendant guilty of this offense, conspiring to make false statements, if you find him guilty of that, then there's an additional matter for you to consider, and that is whether the government has proven beyond a reasonable doubt that this offense of conspiracy to make false statements involved international terrorism.

An offense involves international terrorism if, first, the offense involves violent act or acts dangerous to human life that are a violation of the criminal laws of the United States, or of any state, or that would be a criminal violation if committed within the jurisdiction of the United States or any state; second, that it appears to be intended to intimidate or coerce a civilian population or to influence the policy of a government by intimidation or coercion, or to affect the conduct of a government by mass destruction, assassination or kidnapping; and, third, that it occurs primarily outside the territorial jurisdiction of the United States, or transcends national boundaries in terms of the means by which the acts are accomplished, the persons they appear intended to intimidate or

1   coerce, or the locale in which the perpetrators operate or seek

2   asylum.

3          So you're to consider whether the offense of

4   conspiring to make false statements, if it occurred, occurred

5   in a context that involved international terrorism.  That's a

6   separate consideration.  It's not an element of the conspiracy

7   charge; it's a separate element after you've found the

8   conspiracy, if you do.  So that's Count 5.  That relates to a

9   conspiracy to make false statements.

01:28 10          Each of Count 6 and 7 are substantive offense

11   allegations of particular false statements.  Count 6 charges

12   that on or about December 16, 2006, the defendant made false

13   statements to the FBI about the then-current whereabouts and

14   activities of Daniel Maldonado.

15          In Count 7, the government alleges that on or about

16   December 16, 2006, the defendant made false statements to the

17   FBI about the purpose and intended destination of a trip he had

18   taken in February 2004 to Yemen, and about whether he had

19   received any assistance from anyone in connection with that

01:29 20   trip.

21          So I've told you what the government must prove to

22   find the defendant guilty of making false statements.  Again,

23   those are the defendant knowingly and willfully made the

24   statement, that the statement was false, that it was material

25   and it was made as to a matter within the jurisdiction of the

1    executive branch, specifically, the Federal Bureau of

2    Investigation.

3           If you conclude the defendant is guilty of making a

4    false statement in either of the instances alleged in Count 6

5    and 7, then you are to consider the same question with respect

6    to international terrorism that arises under Count 5; that is,

7    if he's guilty of making the false statement, and you've

8    concluded that, then you turn to the question whether the

9    offense involved international terrorism as I've defined that.

01:30 10          So those are the elements of the offenses that

11   pertain.  You can see they're complicated.  Don't worry, we're

12   going to give you a transcript of these instructions so that

13   you can review them and think about them more carefully.  We

14   don't expect you to absorb it all at once, in one oral reading.

15   We'll provide that to you.

16          That's the conclusion of the first part of my

17   instructions.  We'll now turn to the closing statements by

18   counsel.  And when they're finished, I'll have some more to say

19   to you about your deliberations.

01:30 20          The order of presentation of closing arguments is that

21   the government presents its statement first, followed by the

22   defendant.  The government then has an opportunity for a brief

23   rebuttal, if it chooses.

24          So for the government, Mr. Auerhahn.

25          MR. AUERHAHN:  Thank you, your Honor.

1            THE COURT:  Will you be using any of the equipment?

2            MR. AUERHAHN:  Yes.  If we could have Mr. Bruemmer's

3      computer, please.

4            Good morning, ladies and gentlemen.  This has been a

5      long trial and you have heard a great deal of evidence.  First,

6      I want to thank you for your service as jurors.  You serve the

7      most important role in the criminal justice system because you,

8      and only you, decide the facts in this case.  And in applying

9      the facts of the law, as the judge explains them, you and only

01:32 10  you will decide whether the defendant, Tarek Mehanna, is guilty

11     of the seven counts in which he is named in the indictment the

12     grand jury returned.

13           As the judge explained to you in preliminary

14     instructions when this trial began, the charges fall into two

15     groups.  The first group of four charges can loosely be

16     described as the terrorism charges.  The second group of three

17     charges can be described as the false statement charges.

18     However, these groups are not distinct.  The charges are all

19     related to each other.  As I will explain to you as I go

01:33 20  through this closing statement, the evidence proving these

21     charges overlaps.

22           I will divide my statements into four or five

23     sections.  First, I will discuss the defendant's trip to Yemen

24     in 2004 with Ahmad Abousamra.  This trip was an attempt to

25     provide support to foreign terrorists by providing themselves

1    as personnel to fight American forces in Iraq.  If there were

2    no other evidence of any actions by the defendant, this trip

3    alone would be sufficient to prove the defendant guilty of

4    Counts 1 through 4.

5         Second, I will discuss many of the activities in which

6    the defendant was engaged after his return from Yemen, actions

7    the defendant did with an intent to provide a different kind of

8    support to terrorists in general, and to al Qa'ida, and the

9    effort to recruit others.

01:34 10         Third, I will focus on some of the specific lies that

11   are alleged in Counts 6 and 7, and the overarching conspiracy

12   to lie that is contained in Count 5.  These lies are also

13   evidence of his efforts to advance the objectives of Count 1

14   through 4, as well as more narrowly, an effort to conceal

15   material support he and Abousamra presided or attempted to

16   provide.

17        This is an independent basis of a liability to Count

18   3, as the judge just told you, providing or attempting to

19   provide material support to terrorists or conceal support.

01:34 20  This also establishes that he aided and is, therefore, guilty

21   of the other terrorism offenses as well.

22        Finally, I will talk about Tarek Mehanna's motivations

23   and actions.  Although, as I have stated, the charges and

24   evidence overlap, each charge has a distinct element, as the

25   judge has explained to you.  Some charge a substantive offense;

1    that is, the defendant did something.  Others charge an

2    agreement to commit a crime:  The defendant agreed to do

3    something.  Finally, one also charges an attempt to commit a

4    crime.

5         Throughout my closing I will discuss the testimony of

6    the cooperating witnesses as well as the statements of the

7    defendant in the chats and the emails and the consensual

8    recordings.  These different sources of evidence all

9    corroborate each other and prove beyond a reasonable doubt that

01:35 10    the defendant is guilty of all the charges.

11         I will not talk a lot about many of the photographs

12    and videos and, of course, I will not refer to all of the chats

13    that were read.  Those exhibits help set the background, or

14    canvas, on which the picture of the defendant can be drawn;

15    that is, a man who was motivated by and admired the leaders of

16    al Qa'ida and their successful attacks against the United

17    States and her interests, and who desire to help fight against

18    and kill American servicemen overseas, whether he could do it

19    himself or convince others to do so.

01:36 20         I will refer to many exhibits because it is the

21    evidence that proves the defendant's guilt.  Because there is

22    so much evidence, I am not embarrassed to say, I will rely on

23    my notes as a crutch.

24         On February 1, 2004, three men boarded a plane at

25    Boston Logan's Airport.  They went with the singular purpose:

1   Their collective agreement was to go to Yemen to find

2   paramilitary training so they could use that training to go to

3   Iraq and fight and kill U.S. servicemen.  When questioned by

4   TSA officials, state police, CBP officials, they stuck to the

5   story they had agreed to tell:  They were going to Yemen to

6   check out schools.  They covered for each other and they

7   assisted each other in furtherance of their common objectives.

8          In discussing Yemen, I want to start with the

9   testimony of Jason Patrick Pippin, a/k/a Abu Omar, a/k/a Abu

01:36 10   Muthanna, for several reasons:  First, he only met

11   Ahmad Abousamra.  You've heard a lot about what Abousamra said

12   and did which you can appropriately consider when evaluating

13   the guilt or innocence of the defendant.  So it is helpful to

14   see the details of the interrelationship between the defendant

15   and Abousamra, and how Abousamra, his coconspirator, spoke for

16   and acted with the defendant.  Second, other than the defendant

17   Ahmed Abousamra, Pippin has the most detail about what they

18   were looking for in Yemen -- or should I say who they were

19   looking to find and why.

01:37 20          In the fall of 2003, while living in California,

21   Pippin got a visit from Ahmad Abousamra, someone he only met

22   online.  Abousamra told Pippin he wanted to go to Yemen to

23   receive paramilitary training so that he could go to Iraq and

24   fight against American forces.  An admission of a desire to

25   commit murder overseas.

1        Abousamra knew, or learned, Pippin had received such

2   training in Pakistan, from LET, Lashkar e-Tayyiba, in the '90s.

3   Abousamra shared with Pippin his own experiences in Pakistan

4   when he tried to get training in 2002 to get into Afghanistan

5   to fight U.S. servicemen there.  Abousamra told Pippin he had

6   gone to Peshawar, sought out Afghan war veterans and attempted

7   to get into Pakistan, but was turned back because he didn't

8   have any training and because he was an Arab.

9        Abousamra told Pippin he had like-minded friends who

01:38 10   were also Salafi-Jihadi, Abu Sabaayaa and Kareem, but he was

11   vague on whether they were going with him.  Pippin explained

12   that they chose Yemen because many Afghan veterans from other

13   countries had settled in Yemen after leaving Afghanistan

14   because they could not return home.

15        You'll recall that Evan Kohlmann and the defense

16   expert, Gregory Johnsen, stated the same fact concerning the

17   presence of Afghan veterans in Yemen in the '90s at a time when

18   Pippin was there.

19        Now, what exactly did Pippin tell Abousamra?  Pippin

01:39 20   told Abousamra that when he was in Yemen in the late '90s he

21   stayed in Ma'rib, at the house of the brother-in-law of the

22   head of the school in Ma'rib.  The head of the school, Abul

23   Hassan, was not Salafi-Jihadi; however, the relative at whose

24   house the relative was staying was.  In fact, he was an

25   Egyptian and Afghan veteran.

1      Pippin believed that Afghan veteran would have

2   contacts with al Qa'ida members who could find training camps.

3   Pippin described the man as a very large Egyptian in his 40s

4   who owned a perfume shop.  Note that fact.  Pippin also gave

5   him a second contact, a teacher in another part of Yemen who

6   was also Salafi-Jihadi and might have the right connections to

7   al Qa'ida.

8      On January 12, 2007, Kareem Abuzahra met with and

9   recorded a conversation with the defendant.  Exhibit 458.

01:39 10   Mehanna, for the very first time, told Abuzahra about what

11   happened in Yemen.  Abuzahra asked, "How was Yemen?"

12      "MEHANNA:  Oh, yeah.  I never told you about Yemen.

13      "ABUZAHRA:  No, we never -- we didn't have much of a

14   chance to talk when you came back.

15      "MEHANNA:  We pretty much got screwed, man.  We pretty

16   much got screwed.  Well, they showed me a picture of Abu Omar,"

17   referring to the FBI interview when they showed him the DMV

18   photo from California of Abu Omar, or Pippin.

19      "ABUZAHRA:  How'd you know it was him?

20   "MEHANNA:  They said he lived in California.  Blonde

01:40 20   hair, obviously."

22      Abuzahra knew that they had never met him, so asked,

23   "How did you know him?"  And Mehanna gave the answer,

24   suggesting that Abousamra gave him the details about his

25   meeting with Pippin.

1          Mehanna then went on to describe to Abuzahra what

2     happened in Yemen.  And I will discuss these details shortly,

3     but first I want to pause for a moment.  This conversation is

4     significant for another reason.  This part of this conversation

5     also establishes that, as alleged in Count 7 and the conspiracy

6     in Count 5, the defendant lied, and agreed to lie, to the FBI.

7          In December 2006 he told the agents of the JTTF that

8     he did not know Pippin, a/k/a Abu Omar.  That was a lie.  He

9     lied when he told them no one helped them in advance of their

01:41 10   trip.  He lied when he told them he did not even know anyone in

11    California.

12          In January of 2007 the defendant then described to

13    Abuzahra some of the details about the information from Pippin

14    and what they did with it.  The details Mehanna gave to

15    Abuzahra are entirely consistent with the testimony you heard

16    from Jason Patrick Pippin in this courtroom.  Further,

17    Mehanna's words establish that he did not go to Yemen for

18    language or religious classes, but as Abousamra told Pippin, to

19    find someone who could help them get to Iraq to find American

01:41 20   soldiers.

21          Mehanna reminded Abuzahra that Pippin, quote, "He just

22    gave us the names so we had to find them.  We had to go around

23    and literally ask people, you know, 'Do you know this person?

24    Where is he?'  And they're like, 'Yeah, they're in a town

25    called Shihir.'  'Oh, really?  Where's Shihir?'  'Two hours

away.  If you go to Shihir and he's not there, you wanna go to

Sanaa.'  'Where's Sanaa?'  'Twelve-hour bus.'

"And we went all over the country.  We got stopped

like four times by these like bandit tribes."

Abuzahra asked, "Were they government officials?"

"MEHANNA:  No, no, no, they were tribes.

"So finally, the only guy we found was an Egyptian.

We found, him right?  He's in Ma'rib where Abu Hassan's school

was."

01:42    Recall that when the defendant was interviewed by the

FBI in December 2006, the defendant identified the various

towns in Yemen that he had visited, but purposely lied to the

FBI and never mentioned Ma'rib.  Had he been to Ma'rib?  Well,

he says so in this recorded conversation.

But that's not the only proof that he had been to

Ma'rib and lied to the FBI.  On March 30, 2006, Exhibit 690,

Mehanna told Mu'awiyah, "The place to go is Ma'rib.  I was

there two years ago.  It's like Afghanistan.  Very, very old

school.  Tribal place, mud huts.  Many mujahideen live there.

01:43    The government has no control."  But he never told the FBI he

went to Ma'rib, and he certainly didn't tell them that there

were many mujahideen there.

On May 22, 2006, Exhibit 696, Mehanna and Mu'awiyah

again discussed Ma'rib.  Mehanna said, "It's a wild land, very

tribal, full of bandits and al Qa'ida.  A lot of foreigners,

1    Egyptians from Jama'at al-Jihad who escaped Egypt in the '80s

2    and came there but they were all fugitives and underground."

3    He never told the FBI he went to Ma'rib, and he most certainly

4    never told the FBI that it's a wild land full of al Qa'ida, nor

5    that that was precisely what he hoped to find:  al Qa'ida.

6         During the recorded conversation with Abuzahra on

7    January 12, 2007, the defendant also told Abuzahra about how he

8    reacted to the disappointing news he received in Yemen that

9    there was no one that could help him get training and get them

01:43 10    into Iraq to fight.

11         "MEHANNA:  I was in a very bad psychological state

12    because Abu Omar kind of got our hopes up.  'Oh, they'll

13    definitely help you get there.'  And everyone -- half of them

14    are in jail, half of them are on Hajj, and the only guy we

15    find, he's Egyptian who's on the friggin' run."

16         Abuzahra asked, "How did you find him?"  And Mehanna

17    explained that they went to Ma'rib and, quote, "We go to Ma'rib

18    with the plan of going to Abul Hassan's school and asking about

19    this guy, and hopefully someone will find us."

01:44 20         Then, by chance, they were told by someone about the,

21    quote, "Egyptian, and he used to own a perfume shop," just as

22    Pippin had said.  "I was, like, 'Take us to him right now.'

23    Just by chance he said that."

24         Abuzahra asked, "Where did you get that name from,

25    someone you met before or was that some, um" -- Mehanna

1    responded, "Abu Omar gave it to us," Pippin.

2        Mehanna's words:  "I was in a very bad psychological

3    state because Abu Omar kind of got our hopes up.  'Oh, they'll

4    definitely help you get there.'"

5        I read that again so I can ask you:  Is there any

6    contorted explanation that would support a finding that Mehanna

7    went to Yemen for school?

8        Mehanna continued:  "There were a couple of names."

9    Mehanna told Abuzahra about going to a house that, quote, "It's

01:45 10   not even a house; it's a mud hut.  The place is prehistoric.

11   So we're like, 'Where's your father?'  He's like, 'We haven't

12   seen him in three years, since September 11th.'  I was like,

13   'Great.'"

14       Mehanna then describes how the driver had left them,

15   so they asked if they could enter the house.  They sat down and

16   admitted the true reason why they had come there.  Quote, "We

17   told them exactly why we were here.  So then he's like, 'Okay.

18   I'll be right back.'  He goes for, like, ten minutes, comes

19   back out with his AK-47, and his father's behind him," in

01:45 20   hiding, as the defense expert said with reference to al Qa'ida

21   in Yemen.

22       "His father walks out behind him, his huge brother,

23   long hair, long beard, turban.  So we sat and talked to him and

24   stuff, and he just said, like, 'All that stuff is gone.  Ever

25   since the planes hit the Twin Towers, and, you know, forget

1    about it.'  So that was it at that point."

2         "ABUZAHRA:  Yeah, but he said -- he's like just, 'Go

3    home'?

4         "MEHANNA:  Yeah.  I didn't snap at him, but afterwards

5    I told him, 'This is it?  You know, I've left my life behind,

6    you know, because Abu Muthanna didn't know what the heck he was

7    talking about?'"

8         Again:  "All that stuff is gone since the planes hit

9    the Twin Towers."  Is he talking about schools that are

01:46 10   renowned the world over for language and religion that were

11   still in Yemen after 9/11 or is he talking about camps which

12   the defense expert testified were now gone post 9/11?

13        "I didn't snap at him, but afterward I told him, 'This

14   is it?  You know, I left my life behind, you know, because Abu

15   Muthanna didn't know what he was talking about?'"

16        Again, did he leave his life behind to spend a week or

17   two at language or religious schools or to fight jihad?  In all

18   of this discussion, which exactly mirrors the information

19   Pippin provided to Abousamra and that Pippin told to you from

01:46 20   the witness stand, there's no mention or discussion of any

21   desire to attend religious or language schools, nor is there

22   any indication that the defendant's purpose was any different

23   than Abousamra's.  And recall the defense had conceded from day

24   one that Abousamra went to Yemen for training and to Iraq to

25   fight Americans.

1       Where in Mehanna's description to Abuzahra of what he

2  and Abousamra did in Yemen is even the suggestion that he and

3  Abousamra had different purposes or went to different places or

4  had different experiences in Yemen?  If Mehanna had gone for

5  language schools, but simply tagged along with Abousamra while

6  Abousamra searched for Pippin's al Qa'ida connections, why

7  didn't he say to Abousamra, "All I wanted was a language school

8  and look at the trouble you guys got me into.  I never should

9  have gone at the same time as you"?

01:47 10       But he didn't say that because he didn't just tag

11  along; he and Abousamra had the same desire:  to fight and kill

12  Americans in Iraq.  Doesn't this recorded conversation also

13  confirm that, as Pippin and Abuzahra said, "The story about

14  going to a language or Arabic schools, specifically, Dar

15  al-Mustafa, or any other, for that matter, was nothing more

16  than their cover story"?  And all of the other witnesses who

17  had varying degrees of information about the trip to Yemen,

18  didn't all of them tell you that they were never told that

19  Abousamra and Mehanna separated as they looked for different

01:48 20  things in Yemen, or that either of them ever stated or

21  suggested that they had gone for different purposes?

22       Before I talk about some of the information from the

23  other witnesses, I want to mention one point about the

24  so-called cooperating witnesses.  In his opening, defense

25  counsel told you that individuals whose photos were displayed

1    by Mr. Chakravarty in his opening would come in and testify.

2    Here their photos are again.

3         According to defense counsel, every one of these

4    people did something:  went to a training camp, went to a

5    foreign country to fight or did have direct contact with

6    al Qa'ida or gave money to them.  All of these people did

7    something, and counsel stated, "They all have immunity so

8    nothing will happen to them."

9         What on earth was he talking about?  Every one of

01:49 10  these people?  What did young Aboubakr do?  Did he ever get on

11   a plane to receive training?  Did he ever translate al Qa'ida

12   media?  He's not even correct when it comes to Maldonado who

13   did fight, who did have contact with al Qa'ida.  He didn't get

14   immunity; he's serving a ten-year sentence.  These so-called

15   cooperating witness were served a subpoena that ordered them to

16   come to this courtroom, and Judge O'Toole issued an order, on

17   application of the United States, compelling them to answer

18   questions.

19        Part of the order is protection that anything they say

01:49 20  cannot be used against them.  Although we recall it, using

21   shorthand, an "immunity order," in fact, it is no such thing.

22   No one is immunized for any crimes; it simply means that

23   nothing they say can be used against them.  But most

24   importantly, the only thing that will get them in trouble is

25   lying.  Then they can be prosecuted for perjury.  There is an

1    even bigger hammer over Abuzahra's head.  If he lies,

2    everything he told the United States can be used to prosecute

3    him.

4            Very similar to the description by Mehanna in the

5    recorded conversation with Abuzahra, Hassan Masood testified to

6    having received similar information from Mehanna about he and

7    Abousamra having traveled around the country of Yemen trying to

8    find the person who could help them.  Mehanna told Masood that

9    they were supposed to find someone who could get them into a

01:50 10  training camp, but they failed.

11           Masood knew about the contact in California, but he

12   did not know his name.  Mehanna also told Masood, just as he

13   told Abuzahra in the recorded conversation, that eventually

14   they found a relative of the person they were looking for, but

15   that person told them the camps weren't around anymore.  Even

16   Spaulding, who seemed to remember -- who couldn't seem to

17   remember a lot in response to my questions, even what he had

18   said the previous day, testified that Abousamra discussed

19   visiting schools, not for their Arabic or their language

01:50 20  curriculum but for the purpose of finding someone who could

21   give him a contact to help him find training.  When Abousamra

22   talked about it to Spaulding, as he did to other witnesses, he

23   spoke in terms of what he and Mehanna had done; he did not

24   state or suggest or indicate that Mehanna's purpose was

25   different from his own.

1       Abousamra was very specific with Spaulding, that he

2   wanted to get training so he could go to fight Americans in

3   Iraq.  While Mehanna, according to Spaulding, was less

4   specific, Mehanna did tell Spaulding that he did not continue

5   to Iraq with Abousamra because he thought it would be a waste

6   of time and he was disillusioned with what happened in Yemen.

7   This mirrors what he told Abuzahra about being in a bad

8   psychological state.

9       Now, if Mehanna had gone to Yemen to study classical

01:51 10   Arabic or religious studies, why the disillusionment, as he

11   told Spaulding, and what does this have to do with continuing

12   on to Iraq?  Obviously, because Mehanna and Abousamra's

13   purposes were the same and they failed to achieve the objective

14   of finding training in Yemen, which is precisely what he told

15   Abuzahra on January 12, 2007.  "I was in a very bad

16   psychological state because Omar kind of got our hopes up.

17   'They'll definitely help you get there.'"

18       His hopes of getting there was ultimately to get to

19   Iraq to fight.  These are the words of the defendant:

01:52 20   admitting to an intent to fight.  Admitting to an intent with

21   Abousamra to kill.

22       As I said, other witnesses told you the same thing.

23   Mehanna told Maldonado that they failed to connect with anyone

24   who could help them find training.  They failed in their effort

25   to find training and then go into Iraq to fight Americans.

1    Maldonado testified that Mehanna never said anything to

2    Maldonado about wanting to go to Yemen to study Arabic or a

3    language -- I'm sorry.  Arabic or Islam.

4         Masood also told -- was told that they intended to go

5    to Iraq to fight Americans after receiving training in Yemen.

6    Masood testified that Mehanna specifically told him that

7    Muslims had an obligation to fight against the invasion of Iraq

8    by U.S. forces.

9         Look at the chronology.  Both men, Mehanna and

01:53 10   Abousamra, left the UAE together and entered Yemen together on

11   February 4th.  They traveled around Yemen together, and they

12   left Yemen together on February 11th, arriving in the UAE

13   together the same day.  On February 12th, Abousamra left the

14   UAE with the intention of going on to Iraq.  February 15th

15   Mehanna left the UAE and returned to Boston later the same day.

16        Hassan Masood testified that upon his return, Mehanna

17   told Masood that Abousamra was going to find a way to get into

18   Iraq; he had not given up.  When Mehanna arrived in the United

19   States, as he told Masood and as the records of their passport

01:53 20   show, Exhibits 476 and 477, he knew that Abousamra was no

21   longer in Yemen.  And as he told Masood, Abousamra was already

22   on his way to or in Iraq.  However, when questioned by the CBP

23   officials and asked where his traveling companion was, he said

24   he was still in Yemen.

25        Now, why did Mehanna do that?  First, for the same

reason he later lied to the FBI about their purpose in Yemen:

to advance their conspiracies and attempt to provide material

support.  But he lied for a different reason.  He lied because

he was part of a criminal agreement to lie to law enforcement,

as alleged in Count 5, regardless of his own purpose in going

to Yemen.  Thus, his guilt on Count 5 is established by these

lies independent of the issue of why he went to Yemen.

        I'm not suggesting for a moment that there is any

conclusion except that he went to Yemen to receive training and

then going to Iraq in furtherance of the conspiracy as alleged

in Count 1, 2 and 4, and the attempt to provide support as set

forth in Count 3; however, even if you found his reason for

going to Yemen was different than Abousamra's, he's still

guilty of these same offenses.

        First, he lied as part of his agreement with Abousamra

and Abuzahra to lie; second, he lied to conceal or disguise the

support that Abousamra was attempting to provide.  During the

judge's instructions, note that he said "conceal or disguise

language is included in Count 2 and 3."  And finally, he was

aiding and abetting the crimes being committed by Abousamra.

        The instructions from the judge included the fact that

one who aids another to commit a crime is guilty as well.

Pippin recognized that fact when he admitted on

cross-examination that he was providing information to

Abousamra so that Abousamra could receive military training and

then go to Iraq to fight and kill American servicemen.  Pippin
admitted that if he had gone to Yemen with Abousamra, he would
have traveled around Yemen and introduced him to the people
whose names he had given him.

       In his opening, defense counsel stated that the timing
of the trip was good for Mehanna because his parents were away
and it was the semester break.  Well, as you have seen from the
records of defendant's school, Exhibit 799, it was not semester
break but just shy of three weeks after classes had resumed
when he went to Yemen, and two more weeks before he returned.
He returned over a month after classes started.

       If he were going to Yemen to study, does it make any
sense that he would leave after his semester at pharmacy school
had started?  What was the urgency?  Why not go during
vacation?  But if he's going for jihad and might never return,
his class schedule at pharmacy school was not a consideration.
The time was convenient because his parents weren't home and
would not be able to stop him.

       Every witness testified that there was a circle of
friends with whom the defendant and Abousamra would discuss
jihad.  Even Spaulding testified there was a small circle with
whom they would discuss the obligation for jihad, although
Abousamra was less careful than the defendant.

       Exhibit 655, February 28, 2006, Spaulding:  "I always
practice a little hiding of my beliefs around those I really

1   don't know; there is only a few people that I trust enough to

2   be completely open with."

3           "MEHANNA:  The only people I trust are you and Ahmad.

4           "SPAULDING:  I also trust Ali," referring to Ali

5   Aboubakr.

6           "MEHANNA:  Well, the younger they are, the bigger

7   their mouths are."

8           Further, every witness testified that Mehanna in

9   particular would not openly discuss the trip to Yemen.

01:57 10   Aboubakr said it was taboo.  Spaulding said the discussions of

11  the details of the trip would be limited to a particularly

12  small close -- circle of close friends.  If he went for

13  studying, why was there concern about discussing it?  Maldonado

14  testified that there was concern that the trip to Yemen would

15  cause him problems because the trip was intended to connect him

16  to training and jihad.  That's obviously the truth.  There is

17  no other logical explanation for all the secrecy surrounding

18  Mehanna's trip to Yemen.  And Mehanna was very concerned about

19  people knowing about the trip.

01:57 20          Exhibit 655, February 28, 2006, with Spaulding:

21          "MEHANNA:  Do you know the thing about where Muqbil is

22  from, how those bros went there?  People that those bros don't

23  even know, know about that, which is not good."

24          Muqbil is a reference to Shaykh Muqbil from Yemen.

25  Obviously, the two bros that went there are Mehanna and

Abousamra.  What else did he say?  "People knowing is not

good."  Why is it not good for people to know he went to study

and just study?

Mehanna also specifically stated that, "The fact that

Bob," a reference to the FBI, "can ask a given number of people

who might very well include hypocrites who can give him this

info, is not good."  Why would he be concerned that people

might talk to the FBI if all he did was go study?  Obviously,

he didn't want people, or the FBI, to know because he went for

training and jihad.

And by the way, why all the code if he only went to

study?  Spaulding testified that Mehanna was very concerned

about an individual named Ahmad Abu Dawoud and his interest in

Mehanna's Yemen trip.  You'll recall the chats with Spaulding

about Abu Dawoud, Exhibit 664, July 7, 2006.

"MEHANNA:  Abu D knows about Abu Sab and Abu Fadl's

trip to the YMCA.

"SPAULDING:  Does he know about al-Fadl's additional

field trips to P-Town?"

"Abu Sab" is obviously Abu Sabaayaa, and Mehanna is

talking in the third person.  Again, why the code if he went to

learn?  "Al-Fadl" is Abousamra and "YMCA" is more code for

Yemen.

Spaulding's reference to "al-Fadl's additional trips

to P-Town" is a coded reference to Abousamra's two trips to

1    Pakistan in an effort to get into Afghanistan to fight.  The

2    two trips -- the trips to Pakistan by Abousamra, and the one by

3    Abousamra and Mehanna to Yemen, are all spoken of in the same

4    way because they were all for the same purpose:  Jihad;

5    therefore, there was concern for people knowing about it.

6    Trips for studying Arabic or language would not be discussed in

7    this manner.

8         Mehanna goes on to tell Spaulding, "Sab's never

9    confirmed with Abu D if this was true.  He just said, 'What the

01:59 10  heck is he talking about?'"  But Abu D isn't stupid.

11        "SPAULDING:  Does al-Fadl know?

12        "MEHANNA:  I don't want to freak him out."

13        Mehanna had a similar discussion with Ahmad Rashad on

14   April 15, 2006, Exhibit 562.  When Rashad told Mehanna that

15   "Abu Dawoud, he knows your story," Mehanna told Rashad that "I

16   didn't tell anyone about it, but people that I never heard of

17   know about it."  He also asked Rashad, "Who told you?  It's for

18   my own safety.  Man, I got to know who knows.  It's for my own

19   safety."  Again, why is this a matter of a safety if Mehanna's

02:00 20  trip was to visit Arabic or religion schools?

21        On February 25, 2007, Kareem Abuzahra express a

22   similar concern about who knew about their trip to Yemen.  It

23   is clear from the conversation that the concern was that people

24   knew they went to Yemen for training; the trip was in

25   furtherance of their plan to participate in jihad.

1          "ABUZAHRA:  Well, see, the problem now we have that I
2     see, that Danny -- I don't know what he knows.  And this is
3     where you have to help me out.
4          "MEHANNA:  Dan knows everything.
5          "ABUZAHRA:  You told him everything?
6          "MEHANNA:  I didn't tell him jack; Ahmad told him."
7          Here the defendant essentially authenticates
8     Maldonado's testimony about the fact that Abousamra explicitly
9     told him why Mehanna and Abousamra went to Yemen; that is, for
02:01 10   training and jihad.
11          "ABUZAHRA:  See, the problem is this:  My wife,
12    generally speaking, knows; my parents, generally speaking,
13    know; my brothers, generally speaking, know, but I never told a
14    single person whatever happened, and any time they bring it up,
15    I always say 'just to study.'
16          "MEHANNA:  I don't think Ahmad sat down and said,
17    'Look, we went to this place to fight.'  I think he just told
18    them, 'We went to this place.'  And Ahmad specifically, 'I got
19    into this place.'  'Why were you there?'  I don't think Ahmad
02:01 20   sat down and had to explain things to him."
21          What did the defendant say?  "I don't think Ahmad sat
22    down and said we went to this place to fight," and quoting
23    Abousamra, "I got into this place."  Once again, Mehanna makes
24    it clear that we, he and Abousamra, went to Yemen for the same
25    purpose to fight, and Abousamra alone continued on to Iraq.

1        "ABUZAHRA:  Did Ahmad tell him why or is he just

2    assuming?

3        "MEHANNA:  I don't think so.  You don't really, like,

4    have to sit down and explain these things to people like Dan.

5    It's kind of like -- it's like I was in Afghanistan.  It was

6    kind of like, 'What were you doing there?'"

7        A lot can be left unsaid, but people know the reason

8    they went.

9        On January 12, 2007, Mehanna expressed similar concern

02:02 10   to Abuzahra about what Hassan Masood knew.

11        "ABUZAHRA:  What I'm worried about is Hassan.  He was

12    in like he was --

13        "MEHANNA:  Oh, yeah, they asked me, 'Who drove you

14    guys to the airport?'  Well, let's assume they don't know he

15    took us.  I told them I don't remember who took you, and he's,

16    like, 'Really?  You don't remember?'

17        "ABUZAHRA:  It's not the issue of that, but like

18    he -- he basically knew everything.  And who else knows?  I'm

19    sure you guys talked to Danny and the other Dan.  Did you tell

02:02 20   them anything or would you just kind of --

21        "MEHANNA:  I didn't tell them any details but we

22    just -- they're not idiots, you know."

23        Abuzahra returned to the question of who knew the real

24    purpose of their trip to Yemen during the conversation on

25    February 25, 2007.

1          "ABUZAHRA:  Do your parents know everything?

2          "MEHANNA:  Everything in terms of like when we left?

3          "ABUZAHRA:  Yeah.

4          "MEHANNA:  Nobody doesn't know, man.

5          "ABUZAHRA:  No, no, but, like, I'm saying, my parents,

6      my wife, my brothers.

7          "MEHANNA:  Like I didn't sit down and give them an

8      itinerary of, 'I did this and I did that,' but generally,

9      overall they know I didn't go there to graze goats."

02:03 10        He didn't go there to graze goats, and he didn't go to

11     study Arabic or religion.

12         Abuzahra then asked Mehanna what Abousamra had told

13     his parents.

14         "ABUZAHRA:  I'm saying, was it just an assumption or

15     did he actually tell his dad?

16         "MEHANNA:  You don't tell your parents 'I'm going to

17     fight jihad'; you just tell them, 'I'm leaving,' and they know

18     why you left.

19         "ABUZAHRA:  No, no, no, but he probably didn't even do

02:03 20    that.  But, I mean, when he came back did he ever?

21         "MEHANNA:  I don't know, man.  I don't know.

22         "ABUZAHRA:  Yeah, no, because you can also -- you can

23     say there's an assumption, you know what I mean?  Was it just

24     making this assumption?

25         "MEHANNA:  But there is -- there are assumptions that

are 50/50 and then there are assumptions that are like, like

the sky is blue.  Nobody told you it's blue, but you can see

very well that it's blue."

More than beyond a reasonable doubt:  "You don't tell

your parents you're going to fight jihad."

Abuzahra expressed his concern.  "The only people I'm

concerned about are people that I know because it's like --

because if Ahmad told somebody something specifically, 'I went

to Yemen to go to a training camp,' if Ahmad said that to

somebody --

"MEHANNA:  No, I don't think Ahmad said that to

anyone.  Like I said, the only -- the farthest it goes is just,

like, okay, you know they know that you know we went to this

place, and there they're just making an automatic deduction

from this.  I don't think it's that kind of situation where

Ahmad had to sit down and explain, 'Look, we went there for

this, get it through your mind.'  I don't think it was like

that.

Abuzahra stated a concern that Abousamra told someone

specifically, "I went to Yemen to go to a training camp."

Mehanna responded that he did not believe Abousamra explained

to anyone explicitly "we" went there for this.  Abuzahra uses

the word "I," giving Mehanna the opportunity to separate

himself from Abousamra.  But why lie to Abuzahra who knew the

truth?  Mehanna spoke in terms of "we."  "We went for this";

that is, to Yemen for a training camp.  There should be no

doubt, reasonable or otherwise, the defendant and Abousamra

went to Yemen for the same purpose, and that purpose was to get

training with the agreed intention to continue to Iraq to fight

and kill American servicemen.

That fact alone makes the defendant, Tarek Mehanna,

guilty of four of seven counts of the indictment.  And if you

further find that he lied and agreed to lie about the purpose

to the FBI and to law enforcement, that makes him guilty of six

of the seven counts.

When the defendant returned from Yemen, he neither

gave up his desire to fight jihad nor his desire to support

al Qa'ida.  He now did so in a different manner than on the

front lines of battle.  In every organization or corporation --

take, for example, a car manufacturer -- there's those who work

on the assembly line making the product:  there are those who

work in the front office or human resources doing the hiring,

or in advertising seeking new employees and advertising their

product.  Al Qa'ida is no different.  They have those who fight

on the front lines, those who run the organization, those who

work in the media department, and those who make the media

available to a wider audience.

That is the new role Mehanna took on, in the media

department.  It sounds so benign, "media department," but it

isn't benign.  As you heard, al Qa'ida Central has as Sahab,

1    The Cloud, as an official media department.  Each of the

2    al Qa'ida affiliates had a separate media department.  Evan

3    Kohlmann and Dr. Sageman both testified to this.  There's

4    nothing benign about efforts to recruit more fighters, more

5    suicide bombers and more support.

6           The defendant was a recruiter, in a large sense.  And

7    he was also a recruiter one-on-one with individuals he tried to

8    influence.  He utilized the tools that al Qa'ida provided,

9    including the videos such as "State of the Ummah."  Remember

02:07 10   the chats from Exhibit 296 between the defendant and Abu Dujana

11   from July of 2004 that was read by Detective Dearsley from New

12   Scotland Yard.  The defendant identified "State of the Ummah"

13   as his favorite video.  "That's what started it all."

14          And Mehanna also worked to provide al Qa'ida more

15   material for further recruiting.  According to Maldonado, the

16   jihadi videos they watched together were intended to inspire

17   and incite.  Ali Aboubakr similarly understood that the jihadi

18   videos were intended to inspire them to reach the level of the

19   mujahideen and to fight jihad.

02:07 20          Aboubakr testified that he looked up to Mehanna and

21   quickly learned what Mehanna wanted to hear:  The way to get

22   Mehanna's approval was to state a desire to fight jihad.

23   Aboubakr admitted he was embarrassed by the beliefs he used to

24   have, and when asked whether those beliefs were taught by

25   Mehanna he stated, "There was certainly help along the way."

1    Aboubakr was interested in 9/11 and the mujahideen, but he read

2    books such as the 9/11 Commission Report.  See Exhibit 629

3    dated May 14, 2006.

4         And when Aboubakr told Mehanna he read *The Oath*, a

5    book by a surgeon of Chechnya -- Exhibit 617, March 22, 2006 --

6    Mehanna sent Aboubakr links to "Diverse Operations in Iraq" and

7    "Fatima's Fiancé," about a suicide bomber, as well as the GUH

8    video, and a tribute to the 9/11 hijackers.

9         Mehanna was careful in how he would seek to

02:08 10   indoctrinate people into the Salafi-Jihadi mindset.  As Mehanna

11   explained to Daniel Spaulding on July 4, 2006, "Obviously, I'm

12   not going in with my 'I Love Shaykh Osama' shirt on.  You got

13   to get that concept into them slowly and wisely, lay down the

14   basic...  Then when the time is right, switch it over.  But you

15   go in there day one with the guns blazing, you won't accomplish

16   anything."

17        From the witness stand Spaulding reluctantly explained

18   that jihad was a controversial topic so you can't just start

19   talking about jihad and the obligation:  necessity to fight.

02:09 20   Spaulding testified that the jihadi videos were part of the

21   process of creating enthusiasm for jihad and the mujahideen.

22   Again, both experts agreed that the intent of the videos was to

23   recruit new members.

24        In addition, Mehanna used the al Qa'ida tools in

25   combination with the progression of scholars with different

levels of radicalism.  On February 1, 2006, Mehanna explained
to Spaulding how he was working on Abu Dawoud who was "starting
to see things the right way."  This was before they became
suspicious of Abu Dawoud.  Mehanna also told Spaulding that he
was "working on Hamza P and Insaf myself."  Mehanna further
told Spaulding that "I lent him 'State of the Ummah' CD.  After
he saw it, he told me things are clearer now."

        Spaulding was a good student who followed the example
of his teacher Mehanna.  On January 31, 2006, Spaulding told
Mehanna he had been working on him and Insaf.  "Those Anwar
al-Awlaki lectures go a long way."  You remember the video of
Awlaqi which the defense played during the testimony of
Dr. Marsh.

        This was part of their one-on-one recruitment of
others as personnel for al Qa'ida and terrorists.  But the
defendant was also involved in recruitment more globally
through the internet.  Several witnesses testified about
"Tibyan Publications."  Spaulding testified that the defendant
was valued and appreciated for his translation services in
online forums such as Tibyan, and Mehanna was providing
material support in the form of services and expertise.

        Spaulding testified that Tibyan had an extremist
jihadi slant, and Maldonado described TP as being dedicated to
jihad.  Similarly, several witnesses, including Pippin and
Kohlmann, testified that it was a forum dedicated to jihad.

1    Pippin testified that most of the materials being translated

2    were coming from two websites, and Evan Kohlmann identified

3    those two al Qa'ida websites.

4        TP was also a place where supporters of jihad worked

5    together in order to promote these subjects by producing

6    translations of al Qa'ida propaganda, guide books, and other

7    materials.  Kohlmann testified that Tibyan came to the

8    attention of al Qa'ida, and they thereafter coordinated with

9    al Qa'ida.  Dr. Sageman described it a little differently.  He

02:11  10   testified that people like Tsouli set up websites, and in

11   2004-2005, al Qa'ida piggybacked on these sites, precisely the

12   time when Mehanna was involved as a translator and

13   administrator of Tibyan.

14       Tibyan released materials such as the "Expedition of

15   Umar Hadeed" that was translated by the defendant as a

16   production of the media department of al Qa'ida in Iraq.

17   Again, even Dr. Sageman testified generally that the videos

18   were "to spread the message of al Qa'ida."

19       During his opening, defense counsel giving you "the

02:12  20   rest of the story" stated that Mehanna was kicked off Tibyan

21   because he was too moderate.  Well, let's discuss that for just

22   a moment.  First, all of the chats you've seen, all of the

23   Tibyan posts and private messages, where's a single one that

24   says he was booted for being too modest?  Perhaps, you ask,

25   it's the discussion that defense counsel read more than once

about you can't kill all Americans simply because they're

taxpayers.  Okay.  Let's look at that one more carefully.

First, "moderate" seems to be a relative, not an absolute,

term.

On March 9, 2005, Exhibit 420, someone named "Terror

Threat" quotes the defendant.  "Similarly, any American or

other Westerner who was in the peninsula doing any type of work

that is not contributing to the war effort against

Muslims...then I do not agree with targeting them and killing

them simply because they are Americans.  In contrast, a man

such as Paul Johnson was helping in the maintenance and repair

of American Apache helicopters.  This is, to anyone who has

sight with which they can see or a brain with which they can

think, a totally different story."

I won't read Terror Threat's posts, but the

defendant's response to Terror Threat when he says, "The

Americans live in democracy.  This is a common argument that is

used to justify things like this, and this is what I have a

problem with, that simply because the person is an American,

and America is at war with Muslims, then that means you can

kill him.  I used to believe this, but after long reflections

and thought, I have come to the conclusion that this is an

incorrect concept."

"I used to believe this."  He admits that he used to

believe that because America is at war with Islam, that means

1  you can kill every American.  Perhaps the defendant was

2  referring to what he believed in 2003, when he and Abousamra

3  and Abuzahra were discussing the feasibility of domestic

4  attacks.

5       The defendant goes on to make clear when it comes to

6  U.S. servicemen in a Muslim country -- precisely what he is

7  charged with conspiring to do in this indictment -- fighting

8  them is correct.  Those who fight us, not those who carry the

9  same nationality as those who fight us.  See also Exhibit 419

02:13 10  wherein the same discussion takes place.

11       Referring to fighting against those outsiders in the

12  Arabian Peninsula, Mehanna states, "If we are speaking about

13  the American military presence in the peninsula, or any other

14  hostile forces or people, then I wholeheartedly agree."

15  Mehanna also specifically stated his support for "the case with

16  the attack of '96 when U.S. marine military barracks were

17  struck killing over a dozen Marines."

18       Mehanna supported the killing of not just the men and

19  women in uniform, but also anyone -- even a civilian -- who

02:14 20  aids the war effort, like Paul Johnson, a civilian contractor

21  who was kidnapped and beheaded by al Qa'ida in the Arabian

22  Peninsula.  This is moderation?

23       We're reminded of Exhibit 685, a chat between the

24  defendant and Ihab on June 28, 2006, wherein they were

25  discussing a scholar and Mehanna's previously expressed

1    statements concerning the statements of the scholar.  Mehanna

2    explains, "At that time I remember saying the killing of the

3    innocent is unlawful, but I never said who is considered

4    innocent," and then he inserts a smiley face.  Killing of

5    servicemen was supported by Mehanna; killing of civilians who

6    helped the war effort is also proper and was supported by

7    Mehanna.

8         And Paul Johnson was a contractor in Saudi Arabia, a

9    country that was never invaded by the United States, but where

02:15 10   U.S. servicemen were placed to protect the kingdom against

11   Saddam Hussein, who had just taken over Kuwait.

12        The charges in the indictment concern the defendant's

13   agreement to kill U.S. servicemen overseas, and his agreement

14   and attempt to provide material support to further such crimes,

15   and his agreement to provide material support to al Qa'ida.  It

16   does not require proof and agreement or desire or attempt to

17   kill everyone who's in America regardless of where they reside

18   or what they are doing.

19        After the many 2004 posts about the subject where

02:15 20   Mehanna was so -- allegedly called a moderate, Mehanna was not

21   kicked off Tibyan; in fact, his role as translator for Tibyan

22   had yet to begin.  The discussion in Exhibit 420 was in March

23   of 2005.  The next month, Aboo Khubayb al-Muwahid invited

24   Mehanna to join Tibyan as a translator, Exhibit 414, the same

25   Aboo Khubayb, whose true name was Ehsanul Sudequee from

1  Atlanta, who was chatting with Younis Tsouli, a/k/a Irhaby007,

2  when New Scotland Yard kicked in Tsouli's door in October 2005,

3  just about seven months later.

4      Tsouli, who in October 2005 was building a You-Bomb-It

5  website to post varying versions al Qa'ida media in different

6  formats.  Tsouli was building this site on the same server

7  space that hosted the mirror, the Tibyan website, Irhaby007.CA.

8  Mehanna accepted Sadequee's invitation, and the same day, April

9  4, 2005, Aboo Khubaby al Muwahhid introduced Mehanna to the TP

02:16 10  community as a translator.  And then the floodgates opened.

11      Exhibit 253, an email three days later from Mehanna to

12  Khubayb, with "The ruling regarding killing oneself to protect

13  information" written by two men, including Ayman Zawahiri, then

14  number two in al Qa'ida, evidence of his desire and intent and

15  agreement to support al Qa'ida.  And this was one of the

16  projects Sadequee listed in the message asking Mehanna to join

17  the translation effort.

18      Exhibit 248, an email from Mehanna to Sadequee on

19  April 21, with the attached "Such are the messengers tested" by

02:17 20  Abu Musab al-Zarqawi, the shaykh of the slaughterers, the

21  leader of al Qa'ida in Iraq.  On May 8, 2006, during a chat

22  with Ahmad as-Sarayri, Mehanna referred to Zarqawi and stated,

23  "The slaughterer is the shaykh of us all."

24      And you will also recall the real sadness Mehanna and

25  his conspirators, such as Abousamra, felt and expressed in June

1  of 2006 when Zarqawi was killed, although the defendant's

2  friend Edgar took comfort in the fact that Zarqawi had been

3  martyred and had earned the 72 virgins in paradise.

4          During the chat with Edgar on June 8, 2006, Mehanna

5  admitted, "What makes me sick is me."  Edgar responded, "Your

6  life isn't over, Akhee.  Hope for the best and prepare,

7  prepare, prepare," to which Mehanna responded, as he often did,

8  "Take it easy online," inserting a wink, smiley face.

9          On April 22, 2005, Mehanna sent another email to

02:18 10  Sadequee with two photos of Zarqawi to be included in the

11  video.  These photos were, in fact, later included in the video

12  that was released by Tibyan on behalf of al Qa'ida.  And there

13  were more emails in May, and into June, containing other

14  projects that later became official releases by Tibyan.

15          Also in June 2005, Mehanna started posting excerpts of

16  "39 Ways to Serve and Participate in Jihad," a document

17  authored by an al Qa'ida leader.  In August 2005, Tsouli and

18  Waseem Mughal chatted about the release of an AQ video and

19  audio, and they also discussed the request from al Qa'ida in

02:18 20  Iraq to contact Tibyan, and "ask the guys to work on

21  translating *Tharwat al-Sanaan*," al Qa'ida's official online

22  book.

23          In October 2005 Mehanna received a private message

24  from another administrator, Abu Mahmoud al-Muraabit, who is

25  also known as Sbualy and Abu Mu'ndhir.  The message contained

1    the as-yet unreleased original Arabic version of the

2    "Expedition of Umar Hadeed," also known as the GUH video, which

3    the defendant and Abu Mu'ndhir later edited and subtitled and

4    released as a production of the media department of al Qa'ida

5    in Iraq.

6          A week later, on October 10, 2005, Muraabit Mu'ndhir

7    sent another message to Mehanna and told him, "The Cloud People

8    asked if you could translate the message to Curryland from

9    al-Doctoor.  As you know, "The Cloud" is as-Sahab, the official

02:19 10    media of al Qa'ida; "Curryland" is a code for "Pakistan," and

11    "al-Doctoor" is Dr. Ayman al-Zawahiri; again, direct evidence

12    of Mehanna's agreement to provide support to al Qa'ida.

13          In April 2005, with the encouragement and assistance

14    of Abu Mu'ndhir and Ibn Umar of Tibyan, Mehanna completed the

15    translation of "39 Ways."  It was released as an at-Tibyan

16    Publication.  Why did the defendant do all this translation and

17    editing and distribution?  Evan Kohlmann explained the

18    importance of the media effort to al Qa'ida organizations.

19    Both Kohlmann and Mr. Johnsen, the defense expert on Yemen,

02:20 20    stated the importance of propaganda to the efforts to obtain

21    new recruits.

22          Mr. Johnsen admitted that in talking about al Qa'ida

23    in Yemen, he had written, "The more successful and vocal the

24    group is, the more recruits want to join."  Kohlmann also

25    testified about the wider audience.

1          It is obvious that these terrorist organizations

2     believe that media is important.  In truth, did you need an

3     expert to tell that, that organizations advertise?  And

4     obviously, al Qa'ida believes media is important because

5     al Qa'ida and each of its affiliates, as I've already said,

6     each have a media wing.

7          But the defendant also talked about why he worked on

8     editing and translating and distributing.  It was to provide

9     material support in the form of himself as personnel as part of

02:20 10   the media wing, to provide service and expert assistance, and

11    to try and provide others as personnel.

12         Exhibit 523, during a chat with Abu Mu'ndhir on April

13    9, 2006, just after finishing "39 Ways," the defendant,

14    referring to "39 Ways," said, "I hope the book makes an

15    impact."

16         Exhibit 536, "Mehanna:  I am kind of worried that many

17    brothers read this stuff about over there that we do, and that

18    subconsciously think they've done their part, like read the

19    "Ruling of Martyrdom Operations," and then go eat pizza."

02:21 20   Exhibit 50, a chat between the defendant and Abu

21    Mu'ndhir.

22         "ABU MU'NDHIR:  We're pretty popular so we have to

23    continue this.

24         "MEHANNA:  Yup, maybe one day there will be an

25    at-Tibyan brigade.

1           "ABU MU'NDHIR:  That's what me and Khubayb were

2     talking about.  We just need an arm wing now."

3           If you recall, "Khubayb" is Sudequee.  Abu Mu'ndhir

4     and Sadequee and the defendant used military terms like

5     "brigade" and "armed wing" because their motive is to help

6     al Qa'ida obtain fighters.

7           And concerning the work he did on the GUH video on

8     January 31, 2006, during a chat with Daniel Spaulding,

9     Spaulding told the defendant that another website was making

02:21 10     money on his project, the TP release, by selling copies of the

11     GUH video.  Mehanna stated, "Who cares, man, as long as the

12     message gets out."  And what was the message of GUH?  Martyrdom

13     operations against U.S. forces in Iraq and the call by the

14     martyrs to other young Muslims to come and join the fight in

15     Iraq.

16           I want to spend just a short amount of time discussing

17     lies from the JTTF, or Joint Terrorism Task Force, on December

18     12, 2006, both the lies that relate to the trip to Yemen as set

19     forth in Count 7, and in particular, those that relate to

02:22 20     Maldonado, the basis of Count 6.

21           The evidence of the lies about Maldonado could not be

22     more straightforward.  On December 12, 2006, Maldonado called

23     Mehanna.  During the call, Mehanna acknowledged that he knew

24     where Maldonado was because he looked up the country code.

25     Mehanna's toll records, Exhibit 742, show you the calls were

1    from Somalia, country code 252.

2          Of all the people on the planet who Maldonado could

3    have called, the one person he chose was Mehanna.  That should

4    tell you a lot.  There's no question that Maldonado, who

5    admitted he was the defendant's best friend, knew the defendant

6    was someone who was committed to fighting jihad.  Maldonado

7    testified that he was disappointed that Mehanna didn't come.

8    But did the defendant not go to Somalia because he didn't want

9    to participate in jihad or the opportunity just simply wasn't

02:23 10   there?

11          During the call with Maldonado, Exhibit 301 and 303,

12   Mehanna certainly asked a lot of questions about the details of

13   how to get to Somalia; the name of the airline, even asking

14   Maldonado how to spell it; cost of a flight; whether he needed

15   a visa; where Maldonado was; what he was doing, which

16   demonstrated a real interest.  But when did he have a chance to

17   come?  Within a week the Ethiopians invaded and the door

18   closed.

19          The day after the call from Maldonado on December 13,

02:23 20   2006, during a recorded conversation with Kareem Abuzahra and

21   Ahmad Abousamra, the defendant told his friends that Dan moved

22   to Somalia and had called Mehanna.  Mehanna also told his

23   friends that "I looked up the country code on the internet and

24   I saw Somalia."  Three days later Mehanna was interviewed by

25   members of the Joint Terrorism Task Force.  He was asked about

the trip to Yemen, and he lied.  He lied about why he went to

Yemen.  He lied about why Abousamra went to Yemen.  He lied

about why Abousamra went to Iraq.  He lied about whether he

knew anyone in California, and he lied about whether anyone

helped them in advance of their trip.

       Some of these specific lies are alleged in Count 7,

and some are more generally relevant to the conspiracy alleged

in Count 5.  And as stated before, some are relevant to proving

his concealment of the support that Abousamra tried to provide,

as well as his assistance to the other conspiracies.

       Mehanna was also interviewed about Maldonado.  There's

no question he knew Maldonado was not in Egypt, yet he lied and

said that's where he was.  He lied when he said he had spoken

with Maldonado a couple of weeks earlier from Egypt.  Maldonado

was in Somalia and they had spoken three days earlier.  You

heard the phone call.  He lied when he said Maldonado was

working on a website.  He knew Maldonado was in Somalia

receiving training and involved in fighting.  Some of these

lies are proved by the calls from Maldonado, and some are

proved by statements Mehanna made to witnesses, as well as

statements on a recorded conversation with Abuzahra.

       On February 25, 2007, Mehanna explained to Abuzahra

that Maldonado had used cryptic language during the call.  "He

just said in a way, he was like, 'I'm making peanut butter and

jelly sandwiches.'  I even told him, I was like, 'Dan, don't

1    say stuff like that on the phone because it's a definite that,

2    you know, they're watching me and you.'  I told him, 'Don't say

3    stuff like that.'  I told him, 'Just turn things around.'  I

4    told him, 'All I want to do is get married.  If you can get me

5    married there, find me a Somali wife and a place to live and

6    eat, that's all I want.'"

7         So don't be fooled by Mehanna's changing the subject

8    to wife and marriage.  Mehanna admitted to Abuzahra that he

9    raised that subject "just to turn things around."

02:25 10         That's the same tactic he used during a chat with

11   Aboubakr on March 22, 2006.  If you recall when Aboubakr said,

12   "Let's go donate blood over the summer," as Aboubakr testified

13   meaning, "Let's go fight," they talked about the difficulty of

14   keeping that kind of information from their parents.  Mehanna

15   admitted, "I tried, and they found out about it.  So it's not

16   easy to keep them out of the picture."  Mehanna then asked

17   Aboubakr, "But seriously, if I try to go again, you would come?

18   Aboubakr said, "Yeah, dude.  I'm serious."  And then Mehanna

19   talked about going to Yemen to live and to find an apartment

02:26 20   and a wife, masking the true purpose of their chats just as he

21   admitted he had done in his call to Maldonado.

22         Back to the conversation February 25th when Abuzahra

23   asked Mehanna, "Well, my question -- if they tell Dan what this

24   PB&J means, what's Dan going to say?"

25         "MEHANNA:  I don't know.  Like there wasn't any

1    specific thing, just meant in general like I'm here fighting."

2         Mehanna knew where Maldonado was and he understood

3    what he was doing.  He understood in general he was fighting.

4    He also knew he had a big problem.

5         "My other problem is this:  that when the FBI asked me

6    where Dan was, I told them he was still in Egypt, and he called

7    me the day before from Somalia, so that's very bad.  I don't

8    know how the heck I'm going to explain that one, what to do

9    with the phone call, man.  That's a big problem."

02:27 10      He also knew that what he had done, which was lie to

11   the FBI, was a crime.  He's right.  It's charged in Count 6.

12   Mehanna told Abuzahra, "He never specifically said on the phone

13   he's -- "I never said on the phone that you're in Somalia."

14        "I don't ever remember if he said the word 'Somalia'

15   on the phone or not, but that's a problem, because, like, lying

16   to them in and of itself is a crime."

17        Before I leave this discussion of the lies, I want to

18   make one final point.  All those questions defense counsel

19   asked Special Agent Davis who testified about the December 2006

02:27 20 interview about what did you know already about the trip to

21   Yemen and where Maldonado was and what he was doing, as the

22   judge explained to you, those questions are irrelevant because

23   materiality means, objectively speaking, could they have

24   influenced the investigation, not that they, in fact, disrupted

25   the investigation.

1          Mehanna lied because he had important information he

2     did not want the FBI to have.  And again, ladies and gentlemen,

3     when considering why he lied about the trip to Yemen, he didn't

4     do it just because he was a member of a conspiracy to lie.  He

5     also was intent on concealing Abousamra's attempt to provide

6     material support and to aid other crimes in which Abousamra was

7     involved.

8          You heard a lot about various concept of Islamic

9     religion such as Aman, as well as the obligation to defend

02:28 10   Muslim lands from invaders.  None of that is relevant to your

11    decision of whether or not the defendant committed a criminal

12    act under U.S. law.  This case is not about the Islamic nation

13    in the year 1500; this case is about the actions and agreement

14    and intent of the defendant, Tarek Mehanna, in the period after

15    approximately 2001.

16         The question before you is whether the defendant

17    knowingly violated one or more U.S. criminal statutes.  The

18    question is not whether the defendant was a member of al

19    Qa'ida, but whether he agreed to provide material support to

02:28 20   it.  The question is not whether he agreed with everything al

21    Qa'ida did or its leader said, but whether he agreed to provide

22    material support to it.  That's Count 1.

23         At a certain level al Qa'ida is not relevant to any of

24    the other counts except insofar as al Qa'ida was part of the

25    terrorists to whom the defendant agreed to provide support as

1    alleged in Count 2, or attempted to provide support in Count 3.

2            The defendant himself provided a response to all this

3    effort by the defense to show how Tarek Mehanna disagreed with

4    al Qa'ida on certain issues.  First, Mehanna read the message

5    of Osama bin Laden as a message targeting military.

6            If you recall Exhibit 423, March 11, 2005, when he

7    posted his chat with Abu Dujanah.  In addition, in the same

8    chat, he again admits, "I had that opinion for years."  In any

9    event, even if he did disagree with some of the actions or

02:29 10  views of al Qa'ida, does this mean that a person will not agree

11   to provide support to al Qa'ida simply because he does not

12   agree with all matters?

13           What did the defendant himself say about this?  On

14   April 11, 2006, "In any case, Akhee, just because one may

15   support and respect Osama bin Laden, does not mean by default

16   he has to support and agree with every single attack or

17   operation that happens in the world."

18           He provided a similar explanation to Taimur on

19   February 27, 2006.  Referring to Osama bin Laden, the defendant

02:30 20  stated, "I don't agree with everything he does.  Every human

21   makes mistakes, so you don't agree with everything anyone

22   does."

23           THE COURT:  Mr. Auerhahn, be conscious of the time,

24   please.

25           MR. AUERHAHN:  Okay.  Now, as I stated earlier,

1   defense counsel painted a picture for you of a man that his

2   parents wanted him to become but not the man he had become.

3   Who is Tarek Mehanna?  The defense suggested that Mehanna was

4   all about religion and prayer and scholars and learning.  No

5   one has denied he was a scholar, and at a certain level very

6   interested in his traditions; however, in those hundreds of

7   pages of chats so much of what interested and motivated him was

8   jihad and mujahideen and the damage they inflicted on U.S.

9   soldiers, particularly Iraq, the same place he and Abousamra

02:31 10   wanted to go to join the fight.

11       As Mehanna told Insaf on May 12, 2006, "These

12   infidels, many of them are at war with a Muslim country.  It's

13   on my mind 24-7."  He admired and sent links to some of the

14   most radical jihadi scholars, such as Anwar al-Awlaki.  For

15   example, he sent the link to Rashad concerning Awlaki's

16   interpretation of "Constants on the Path to Jihad."  He sent

17   the same link to Umar Kalil.

18       Mehanna most admired those who combined the best

19   characteristics as a mujahid and a scholar.  Mehanna viewed the

02:31 20   leaders of al Qa'ida as modern-day companions of the profits.

21   He described Osama bin Laden and Ayman Zawahiri and Abu Musab

22   Zarqawi in this manner in a chat on June 13, 2006.

23       In April someone named Mu'awiyah told Mehanna, "Akhee,

24   may our end be in martyrdom.  This world is accursed."  Mehanna

25   did not disagree but warned his friend, "Remember, I am being

1   watched."

2          These chats demonstrate, as previously discussed,

3   Mehanna was not a martyr.  He had no interest in peaceful

4   demonstrations.  As he stated in a TP post, "I don't agree with

5   demonstrations of this type."  As he told Taimur, "RPGs,"

6   rocket-propelled grenades, "speak louder than words."

7          The defendant was concerned about possible arrests but

8   did not give us his desire to go to the front lines.  On April

9   2, 2006, Rashad told him about someone he met who was a veteran

02:32 10   of jihad.  Mehanna was suspicious of the man and warned Ahmad

11   Rashad to be careful, but could not resist asking, "If it's

12   possible to meet him, I would like to speak to him.  He might

13   help."

14          Abousamra also had not given up his desire to go to

15   the front lines, and even suggested that they try Pakistan

16   again.  On April 1, 2006, he told Mehanna, "I was thinking

17   about calling Abu M from P-Town."  And this was obviously a

18   reference to the man Abousamra met in Pakistan named "Abu

19   Majid," the man who Abousamra hoped would get him into a

02:33 20   training camp and, ultimately, into Afghanistan to fight.

21          Abousamra explained that "I just need to get his

22   number."  Apparently, Abousamra misplaced Abu Majid's number

23   and told Mehanna, "Maybe I can get it from Verizon."

24   Unfortunately for Abousamra, he, unlike the federal government,

25   didn't have subpoena power.  You have received the toll records

1    from Verizon, and they show the calls to Pakistan as well as

2    the records to Pakistan Airlines, which also lists Abu Majid's

3    name and number.  Unfortunately for Abousamra, he reported back

4    he couldn't get the tolls [sic].

5         On April 24, 2006, Abousamra told Mehanna, "I'm

6    thinking if the HNN thing for learning works, we might as well

7    study, even if it's not guaranteed."  Mehanna did not

8    understand Abousamra's cryptic statement about HNN.  Abousamra

9    clarified, "At least we can find some over there, HSN's uncle."

02:33 10    You will recall that Hassan Masood's uncle was the founder of

11    Lashkar e-Tayyiba, or LET.

12         Now Mehanna understood and said, "Oh, I'd rather not.

13    Unless it is something relatively certain, it is not worth it."

14    He still wanted to go, but not unless they had some assurances

15    that their efforts would be successful.

16         I want to spend just the last few minutes reading some

17    of the exchange of emails between Duaa, the potential bride,

18    and Mehanna, Exhibit 778 and 779 -- I'm sorry, 778 and 777.

19         Duaa's question to her potential husband:  "As for my

02:34 20    husband, frankly, I'm not trying to grow old with him or live

21    with him for 20, 30 years; I don't seek to become one of those

22    old couples who end up looking alike after being together so

23    long.  To be honest, in my little dream world, ideally after we

24    have our fourth child, I want him to go off and I don't want to

25    see him ever again."  Wow.

1           "I refuse to marry a man who loves his family more

2      than he loves the obligations upon him and more than he loves

3      the Ummah.  I have been proposed to by several brothers on the

4      method who have been disappointing in that, despite their

5      professed love for jihad, they give more priority to, say,

6      raising children that grow up to be scholars.  There are also

7      many brothers who aren't doing anything at all in terms of

8      physical or logistical preparation, and they make supplication

9      to Allah to make them of the noble mujahideen and the martyrs

02:35  10   without striving to even facilitate that for themselves to

11     whatever degree possible at the moment.  Both are unacceptable

12     to me."

13           Here's how the defendant responds:  "I'm counting the

14     days until I can step on a plane out of this country for good.

15     Your conditions are exactly the conditions that I put forth for

16     any woman I would want in my life, and they were engraved in my

17     heart years before I even heard of you.  In fact, just so you

18     are aware how serious I am in this regard to the third

19     condition that you mentioned, without getting into much detail,

02:35  20   know that a short while back I went for an interview and was

21     rejected by that company.  I was sent back because I had no

22     references to vouch for me, as they don't just hire anyone off

23     the street.  So in summary, I hope you're assured as to whether

24     my future plans are in tune with yours."

25           He cryptically referenced his efforts to join the

"company," which is a reference to al Qa'ida, and assured her

his desires to fight jihad and die a martyr were genuine.  In

an email to Duaa dated September 20, 2006, referring to Yemen,

he told her, "Do not tell your mother I was there as it had to

do with that job interview.  If you already told her, then

please let me know ASAP so I can tell you a reason just in

case."

Note first he doesn't want Duaa to tell her mother

about Yemen.  If he went to study, why not?  If he went to

Yemen to study, would he not urge Duaa to tell her mother that

he had studied classical Arabic at one of the finest and

well-renowned schools in Yemen to impress her with his

credentials as an Islamic scholar?

Mehanna explains why he doesn't want his potential

future mother-in-law to know, because it had to do with that

"job interview," as he said in the earlier response to her

questions, "with that company," which, of course, is a

reference to his having tried to fight with al Qa'ida.  He had

told his potential bride, but didn't want her mother to know.

And he also said, "So I can tell you a reason."  Not the

reason, but "tell a lie like I told everyone else."

Tarek Mehanna never abandoned his desire to fight

Americans in Iraq or Afghanistan, and he never regretted his

efforts to go to Iraq with Abousamra in 2004.  As he told

Abuzahra during the recorded conversation on January 12, 2007,

1    when he spoke about their trip to Yemen to find training camps,

2    "I don't know, man.  I don't regret doing this at all, but one

3    thing I definitely learned was don't be like -- like a little

4    kid with a new toy just, like, trusting what anyone tells you

5    and that's it.  Just go and just leave everything behind.  You

6    know, Abu Muthanna had a few names, and that was cool."

7         When Abuzahra expressed his view that what he did was

8    wrong, Mehanna disagreed.

9         "ABUZAHRA:  Yeah, well, we're stuck here, but it's

02:37 10   like the thing is okay.  Like, if you think of it, what we did

11   was completely kind of like..."

12        Mehanna corrects him.  "The way we did it was wrong;

13   not what we did."  Mehanna had no regrets.  Finally, he had

14   done what he had been urging others to do for years:  He got up

15   from the seat in front of his computer and he went off to fight

16   jihad against the Americans.  But that's what I'm saying.  The

17   way we did it was very hasty and very immature but not the idea

18   of it.  "I can't disagree with something like that and I didn't

19   regret it for a second.  I mean, how could you?  Honestly?

02:38 20   Man, like honestly."

21        "ABUZAHRA:  Do you regret the guy couldn't get us any

22   good names?

23        "MEHANNA:  But still, those were the best two weeks of

24   my life.  Like I just for once, I'm not, like, sitting on my

25   butt being a hypocrite telling people to do something I'm not

```
 1    doing.  From that point of view it couldn't get any better than
 2    that."
 3           In discussing the evidence in this case, I have tried
 4    to weave together the testimony of the witnesses with the
 5    stored chats and emails and recorded statements of the
 6    defendant.  But I suggest to you, ladies and gentlemen, that if
 7    you strip away the witness's testimony and focus on the words
 8    of the defendant, you will find beyond a reasonable doubt that
 9    the defendant went to Yemen for training and jihad, intending
10    and agreeing to fight and kill U.S. servicemen.  He agreed and
11    attempted to provide support to terrorists and to al Qa'ida,
12    and he agreed to and did lie to law enforcement, and he is
13    guilty as charged.  Thank you.
14           And I apologize, Judge, for going too long.
15           THE COURT:  We'll take a brief recess, about 15
16    minutes, and then we'll resume.  And, please, no discussion of
17    the matter during recess.
18           THE CLERK:  All rise for the Court and jury.  The
19    Court will take a brief recess.
20           (The Court and jury exit the courtroom and there is a
21    recess in the proceedings at 11:25 a.m.)
22    (Court and jury in at 11:46 a.m.)
23           THE COURT:  Are you using these tripods?
24           MS. BASSIL:  I am, your Honor.  And I will also need
25    the ELMO and screens turned on.
```

1          THE COURT:  Let me just tell the jurors that I think

2     the defense counsel are dividing the argument.  Miss Bassil

3     will be first, followed by Mr. Carney.

4          MS. BASSIL:  That's correct.

5          Good morning.  Well, we're finally here.  It's taken a

6     long time.  I really want to thank each and every one of you.

7     I know this has been hard:  the early morning drives, some of

8     you came a pretty far distance, and then going to your jobs

9     afterwards.  And you've had pretty good humor about it even

03:02 10    though the trial has been a lot longer than we thought it would

11    be.

12         As the judge indicated, Jay and I are going to split

13    up this argument.  I'm going to talk a shorter period of time.

14    And we don't get the last word.  The prosecutors do.  So if we

15    forget something, please, it's not because it's not important.

16    We just didn't have time.

17         I want to talk about our case, what you heard most

18    recently, and the experts that we called.  Why did we call

19    experts to the stand to testify?  We have no burden in this

03:03 20    case.  We don't have to prove anything to you.  The burden is

21    on the government to prove that Tarek Mehanna is guilty beyond

22    a reasonable doubt.

23         He is innocent.  The judge will talk to you about the

24    presumption of innocence.  When I was in law school, I had a

25    professor that used to talk about it and describe it as a

1    cloak, a cloak of innocence.  And I always liked that image.  I

2    always thought of it like a cloak, tied at the neck, buttons

3    down the front.  And the prosecutors can remove that only with

4    evidence, solid evidence, that proves beyond a reasonable

5    doubt.

6            We have pictures of people.

7            THE COURT:  You want the ELMO?  You'll have to give me

8    the stage directions.

9            MS. BASSIL:  Those are our people.  Tarek Mehanna is

03:04 10   in the middle, and he's surrounded by the witnesses we called.

11           So why do we call experts?  Because we needed to.  You

12   didn't have a context in this case.  You didn't have a place to

13   put this information.  Let me give you an example.  If you saw

14   your boss, or an older man, with a beautiful young girl, you

15   might think a few things.  But if you knew it was his

16   granddaughter, you wouldn't.  You wouldn't jump to a

17   conclusion.

18           And that's a lot of what the prosecutors did here.

19   They cherry-picked pieces of evidence.  They threw up a piece

03:04 20   of a chat here, a photograph there, instant messages.  They

21   threw up one piece of a Tibyan post but not another.  They

22   never gave you the whole story of who Tarek Mehanna was and

23   what he was about.  And that distorted the facts in this case.

24   They can't fool you.  You've spent too much time here.  I

25   certainly hope they can't scare you.

1         We called experts because we wanted you to understand.
2    And we had said this in the beginning:  Don't worry about these
3    names; don't worry about these concepts.  You'll learn them.
4    And I'll bet you have.  We wanted you to hear words and
5    understand what words like "Jihad" and "martyrdom" meant and,
6    yes, "Osama bin Laden" and even "al Qa'ida," because these are
7    words.  We didn't want you to be scared by them even though
8    that's what the prosecution wanted.  I was scared by those
9    words until I learned what all of them meant.
03:05 10        Context is everything, everything, in this case.
11   Proof beyond a reasonable doubt is not fear.  It's not
12   guesswork.  It's thoughtful consideration of solid evidence, of
13   facts, of proof.
14        Let's look at these witnesses.  Let's start with
15   something very simple:  the computer, the computer.  What did
16   the government give you?  Well, what was actually on his
17   computer was tiny pictures, tiny pictures, thumbnail pictures.
18   That's the true size of the pictures they blew up.  Why did
19   they show picture after picture of the World Trade Center and
03:06 20  of Osama bin Laden?  To square you?  To make you think that
21   this is what Tarek Mehanna was obsessed with?  To let you think
22   that it's okay to convict him?  Heck, he had bad pictures on
23   his computer.
24        Look at what Mark Spencer said, our computer expert.
25   He said they are thumbnails.  They weren't even downloaded.

1    They were in the space in his computer that is inactive.  When

2    he went on a website, whether it was CNN or NBC or the New York

3    Times or the Boston Globe, if it was on that page, it was

4    downloaded.

5         Do any of you read things on a computer?  Do you

6    know -- did you know until this trial -- that things you didn't

7    put in your computer go in there?  Take a look at the instant

8    messages if you want.  There are hundreds of links to CNN and

9    the BBC and the New York Times and other mainstream media.  And

03:07 10   where there were pictures on the page he opened, it went in his

11   computer.  That's their size.  That's their true significance.

12        And look at what else Mark Spencer said:  The magazine

13   by al Qa'ida that Evan Kohlmann made so much about?  It was

14   sent to Tarek, but he never even opened it.  He never unzipped

15   the file.  And they knew it.  They knew it and they wanted to

16   fool you.

17        Let's look at the other experts, what the government

18   wants you to think and what the truth was that they gave you.

19   They say Tarek went to Yemen to attend military training camp

03:08 20   with the intention of going to Iraq to kill U.S. soldiers.

21   Gregory Johnsen said there were no training camps in Yemen from

22   November of 2001 until February 2006 when al Qa'ida resurged

23   with a prison break.  At the time that Tarek was there, the

24   back of al Qa'ida had been broken.  The leader had been killed.

25   Doctor Sageman confirmed there were no sightings.  He read al

1    Qa'ida obituaries.  There were no sightings that people had

2    training in Yemen during that time period.  Training was in

3    Pakistan or people went directly to Iraq.

4           Look at Gregory Johnsen.  He's a Fulbright Scholar.

5    He speaks Arabic; he speaks Persian; he speaks French.  He

6    spent years in Yemen.  He did fieldwork.  He knows the people.

7    He knows the land.  He knew what was going on.  He's taught at

8    the CIA Academy, the National Counterterrorism Center, the

9    Department of Defense.  He briefed the U.S. ambassador to

03:09 10   Yemen.  His opinion is trusted and respected by people who

11   needed that information.  And he's never even testified in

12   court before.  He's not a witness for hire.

13          They say Tarek's claim that he went to Yemen to look

14   at schools was a cover story because his Arabic was so good he

15   didn't need any help.  Well, you heard Doctor Fadel.  It's a

16   life-long study if you want to be a religious man.  By the way,

17   his Arabic and his translations weren't that great.

18          They threw up instant messages that Tarek talked about

19   Yemen and said there were people there with guns and camouflage

03:10 20   jackets, wanting you to jump to the conclusion that it was a

21   military camp.  Gregory Johnsen told you how Yemen is a country

22   where people are armed, tribal leaders.  Some of them have

23   tanks parked in their front yard.  Is that amazing?  It's just

24   an amazing thing.  And if it were a military camp, why would

25   Tarek even mention it, that people carry guns and wore

1    camouflage jackets?  It would be expected.  It wouldn't be

2    worth mentioning.

3         Remember the picture of Shaykh Muqbil's library that

4    Tarek sent to people in an email.  What did he say in the

5    email?  "Notice the simple and humble environment.  Make Allah

6    make knowledge beloved to us and make easy for us the path to

7    attaining it and acting by it."  And Gregory Johnsen told you

8    about Muqbil.  And his student was Shaykh Hassan, the school

9    Tarek went to.  And what did Gregory Johnsen tell you about

03:11 10  him?  He was Salafi.  He was apolitical.  He rejected Osama bin

11   Laden's money, and he rejected Osama bin Laden.  He said, "Of

12   all the people in the world, Osama bin Laden is the one I can

13   never forgive."

14        Jason Pippin gave them the name of a man who he

15   thought might have been a mujahideen.  He mentioned the name of

16   the group the man belonged to.  And Doctor Sageman told you

17   that was the pacifist group.  That was the group that had

18   rejected al Qa'ida.

19        They say Tarek translated the Expedition of Umar

03:11 20  Hadeed, and it was of critical and useful support to al Qa'ida.

21   Doctor Connolly showed you that whoever did that final version

22   on those subtitles was from the United Kingdom, the words like

23   "queue," the words spelled in the British way.  It was not

24   someone born and raised in the United States, in the suburbs.

25        And Doctor Connolly was a professor, an author.  He

1    was peer-reviewed.  He is respected.  He was not a witness for

2    hire.  And they attacked him.  It was a small point.  But what

3    were they afraid of?  That you would understand the context of

4    these things?  And the most important context of all is what

5    Tarek Mehanna wrote, translated, and posted.

6          Now, the government gave you 40 witnesses and 29 days

7    of testimony, almost six weeks.  And they never sat down, they

8    never brought anybody in who told you this is what al Qa'ida

9    believes in.  This is who they are.  Why not?  Is it because

03:12 10   they didn't want you to think about it?  Was it enough for them

11   that Tarek -- because he expressed admiration for bin Laden,

12   that he had pictures of him, that he smiled at the World Trade

13   Center, that that's all you needed to know?  Is that evidence?

14   Is that proof beyond a reasonable doubt that he provided

15   material support to terrorism?  Or is it simply someone

16   expressing their political opinion in a free country?

17          Let's look at the context provided by Doctor March and

18   Doctor Fadel.  Doctor March, master's and doctorate from

19   Oxford, spoke a million languages including Arabic and Russian.

03:13 20   And he had written a book about the rights and obligations of

21   Muslims living in a non-Muslim land.  He had never testified in

22   court before.  And when the government said, Why are you here?

23   He said I consider it my patriotic duty.  If I can help give

24   information, give context, this is what I want to do.

25          And he talked about one of the most important points

1    in this case, something Mr. Auerhahn never mentioned:  Aman, a

2    protection for both Muslims and non-Muslims.  And Tarek

3    believed in this openly and passionately.  He wrote about it

4    before and after the dates of those instant messages.  Daniel

5    Spaulding said, He convinced me of it when I was -- when I had

6    more extreme views.  Abuzahra, Maldonado, Masood, they all said

7    Tarek believed in this.

8           It's a pact of security.  It's a treaty between a

9    Muslim and the country that he lives in.  It cannot be broken,

03:14 10    not even by war.  If you are a citizen of the United States, a

11    Muslim, you cannot break that treaty even.  If Muslims are

12    attacked by the United States, you cannot kill American

13    soldiers, you can't, not as long as you receive the protection

14    and security of the United States.  And there was never a hint

15    that Tarek was going to renounce his citizenship or say I don't

16    belong to the United States.  Never a hint.  His ticket to

17    Yemen was round trip.

18           Plain and simple:  Aman is the rule that would prevent

19    Tarek Mehanna from attacking fellow Americans within the United

03:15 20    States or outside of it.  He simply could not go to Iraq to

21    kill American soldiers.  Oh, he agreed that when Muslims were

22    invaded -- Chechnya, Afghanistan, even Iraq -- they could fight

23    against people who invaded them.  But he could not, and he told

24    the people on Tibyan this.  And they were very unhappy with it.

25    And he became unpopular and disliked so much that he was thrown

1    off.

2         Let's talk for a minute about Doctor Fadel.  He's a

3    scholar.  He has a Ph.D.  He's a law professor at the

4    University of Toronto.  He's fluent in Arabic, Classic and

5    Medieval.  He knows the history of Islam.  And he told you that

6    Osama bin Laden and al Qa'ida had taken the rules, the law, the

7    theology, and distorted and corrupted it, a law that had

8    existed for 1,400 years.

9         Now, bin Laden, he was in some ways a mythic figure.

03:16 10   He was a man -- you heard Doctor Sageman, some reporters wrote

11   up this tiny battle he was in, and all of a sudden, he was the

12   hero of the ages, that he -- he was a hero figure when Arabs

13   had lost everything for 200 years.  So, yes, Tarek Mehanna

14   expressed admiration for him, but he didn't mean that he agreed

15   with him.  He said, Just because you can respect Osama bin

16   Laden doesn't mean you have to agree with him.

17        I want to show you a chart.  Miss Patel is going to

18   put it up also on the screen so that you can look at it.  I

19   know the print is a little small, so that's why it's also on

03:17 20   your screen.  But let's just look at this quickly.  Does Tarek

21   Mehanna support the views of al Qa'ida?  What were those views?

22   Americans and allies should be killed everywhere and anywhere.

23   Whether they're civilian or military, it doesn't matter.  Did

24   Tarek agree with that?  No.

25        Paying taxes and living in a democracy makes you a

combatant in war.  That's why al Qa'ida can kill you anywhere.
Did he agree with that?  No.  Non-Muslims can be killed if they
are in Muslim lands.  They're fair targets.  Tarek didn't agree
with that.  He wrote about all of this.

You do not have to honor any agreement with
non-Muslims because they are at war against Muslims.  He said,
Absolutely not.  You follow through on your contracts.  You
follow through on your commitments.

An important point:  Suicide bombings can be used at
any time.  Collateral damage, the killing of civilians, is
acceptable.  Tarek said no.

Anyone who does not agree with us is an apostate and
he is excommunicated.  We don't have to pay attention to them.
Tarek said, I can't stand this.  I can't stand this business of
takfir and making this one an apostate and that one.  It's for
the clerics to do this, not ordinary people, not even Osama bin
Laden.  So, no, he didn't agree with that.

And they said, Everyone is obligated to fight in a
military action.  And you know that Tarek did not agree with
that.

What were Tarek's views?  What did he write about?
Muslims can only fight in self-defense and only against those
who fight them.

This business of taxes and democracy is a
misunderstanding of America.  I pay taxes.  You want to kill

1    me, too?

2        Non-Muslims are protected by a promise of security.

3    Pacts and agreements are to be honored no matter what.

4        Suicide actions are only on the battlefield and only

5    as a last resort and civilians may not be killed.  You heard

6    Doctor Sageman, there were no suicide bombings in the

7    Soviet-Afghanistan war.

8        You cannot declare someone an apostate because they

9    disagree with you.  And there are many other ways to help

03:19 10   fellow Muslims without fighting.

11       Here's what it boils down to:  The only idea that

12   Tarek Mehanna had in common with al Qa'ida is that Muslims had

13   the right and the obligation to defend themselves when they

14   were attacked in their own lands.  And we believe that.  When

15   the British came to reassert their hold over America -- let's

16   face it, we were a colony -- we fought back.  We rebelled.  We

17   defended our land.

18       Remember what Doctor Fadel said:  Martyrdom is nothing

19   knew.  Nathan Hale, whose statue is outside of the CIA

03:20 20   headquarters, said, "I regret I have but one life to give for

21   my country."

22       How do we know this is what Tarek Mehanna believed?

23   Because he wrote it on Tibyan.  This was password protected.

24   No government agent got on there.  How do we know he believed

25   it?  Because he was kicked off for it.  Did the government tell

1    you that he was removed from Tibyan?  No, we did.  Why didn't

2    they tell you?  Is this a game?  This is not a game.  It's

3    someone's life.  That's context.  That's real meaning.

4         These instant messages that they barraged you with?

5    You heard Doctor Fadel:  trash talk.  How many of you have

6    posted things on Facebook, sent a text, sent an email, that

7    maybe you hope no one else is ever going to see?  And don't

8    forget, we only have instant messages for a short period of

9    2006.  We don't know what Tarek said in 2007, in 2008, 2009.

03:21 10   We do know that he matured.  We do know that study and

11   scholarship became more important to him, more important than

12   talking trash, Jihadi talk and watching Jihadi videos, studying

13   Qur'an and Hadiths, buying and collecting books.  This is what

14   became important.

15        Now, let's talk about the expert the government called

16   and a bit about credibility.  Evan Kohlmann.  Did you find him

17   credible?  He's a great collector of videos, and as Doctor

18   Sageman said, a good storyteller.  He goes on chat forums.  He

19   watches videos.  And he testifies over and over again but only

03:22 20   for the prosecution and only for the fee that he demands.  He

21   doesn't have a Ph.D.  He doesn't publish academically.  He

22   doesn't do fieldwork.  He doesn't speak the language.  He's

23   never been to Pakistan or Afghanistan or any of those places.

24        Remember what Gregory Johnsen said, It is my ability

25   to talk to people in their native language, my experience on

1    the ground that allows me to form opinions that people can rely

2    on.

3          Evan Kohlmann was long on sweeping generalizations and

4    short on facts.  He said, Translating and editing and

5    distributing videos is critical to al Qa'ida.  Based on what?

6    On what study?  On what information?  The website he uses, the

7    Nine/Eleven Finding Answers, had more Jihadi videos on it than

8    Tarek Mehanna had on his computer.  You think the only people

9    that go there are academics?

03:23 10          Did you hear one person say that videos recruit for al

11   Qa'ida?  That there is evidence of that?  That there is proof

12   of that?  That there are studies of that?  Not even Evan

13   Kohlmann said that.

14          I would compare Evan Kohlmann to our experts and

15   suggest that he comes up very short.  He became hostile and

16   argumentative and petty.  He insisted that classified

17   information is useless.  And, of course, he knows this how?

18   Since he can't see it?  Who has relied on Evan Kohlmann?  Not

19   the CIA, not the Army, not the Secret Service.  He doesn't even

03:23 20   have the lowest level of security clearance.  What does that

21   tell you?

22          He's made an extraordinarily good living in the terror

23   game.  I calculated his income was close $800,000 over five

24   years between testifying and lecturing.  And that was only 40

25   percent of his income.  The full amount was 2 million.

1    Testimony is a cash cow for him.  He can come in.  He's given

2    one piece of evidence.  He can cut and paste a report he's

3    written before.  And he can spout generalities and

4    exaggerations.  Where is his study?  Where is his basis?  Where

5    is his training?

6           You know, you are halfway to being as qualified as he

7    is.  If you sat in front of your computers for a number of

8    years, you probably could become an expert on this.  Just be

9    aware of all the pictures that might float into your computer,

03:24 10    into your inactive space.  And you'd better pray that when you

11    go on vacation, the government doesn't break into your house

12    and steal your hard drive.

13           And, finally, Doctor Mark Sageman, there is an expert.

14    He's written two books respected and adopted by the

15    intelligence community and the counterterrorism community.  He

16    spent the last ten years trying to figure out who are these

17    terrorists.  He was in the CIA, running the war in Afghanistan

18    because he couldn't bear the genocide.  He knew Abdullah Azzam.

19    He was there.

03:25 20           And he didn't sit back on his credentials.  When

21    September 11th happened, he went back to work.  He was afraid

22    that the people he had trained, were they his people; were they

23    his guys?  And he spent the last ten years researching,

24    studying, traveling, interviewing, applying science to this.

25    He studied every plot, every attack.  He talked to neighbors

1   and prosecutors, defense attorneys, policemen, because he knew

2   what you know now:  Context is everything.

3        And we know why he's a real expert.  Look at who

4   listen to him:  New York Police Department, the Secret Service,

5   the FBI.  The White House comes to him to assess threats to the

6   President.  The Army comes to him to assess threats to the

7   military.  He is the person our government goes to when they

8   want to know who is a terrorist and who is just talking.

9        Ask yourselves:  Do you think Marc Sageman would have

03:26 10   testified if he thought Tarek Mehanna supported terrorism when

11   he's never testified for the defense before?  Why make such a

12   fuss about scientific methodology?  Because it's the only way

13   to learn and to accurately understand.  Ask a question; search

14   for answers; reject the easy.  That's what the government wants

15   you to do.  We're asking you to think about this.  Be more

16   thoughtful.  Base your decision on objective facts.

17        And Doctor Sageman told you there are no studies, no

18   proof, that watching videos means people commit acts of

19   terrorism.  Al Qa'ida might be making them, but they're --

03:26 20   they're bankrupt, and they're close to dying out.  Nasheeds are

21   just songs, he said.  Internet forums are not a recruiting

22   tool.  He said it's the mainstream media, when CNN and ABC and

23   NBC, when they put up -- when they show pictures of Abu Ghraib,

24   when they talk about a 14-year-old who was murdered and her

25   family murdered and her house burned down, that was -- al

1    Qa'ida didn't even cover that.

2           He told you 39 Ways was not a training manual.  Doctor

3    Fadel told you it's full of Hadiths and quotes from the Qur'an.

4    It's a religious discussion of ways to participate in Jihad

5    when you aren't going.  What did Doctor Fadel say?  A standard

6    prayer was:  Pray for the mujahideen.  Before Afghanistan,

7    before any of this.  Doctor Fadel said there is nothing in 39

8    Ways that mentions al Qa'ida.  Doctor Sageman said the original

9    writer was not al Qa'ida.

03:27 10          There are no emails, instant messages, recorded calls,

11   anything, anything -- think about this -- that says or shows

12   that somebody at al Qa'ida said to Tarek Mehanna, Would you

13   translate this for us?  There is nothing.

14          You heard Doctor Sageman tell you what training

15   manuals were.  They've been stolen from the U.S. Army.  Did you

16   see a single link to those manuals on Tarek's computer or a

17   reference to them?  Nothing.  Doctor Sageman told you

18   translating it is not essential.  That magazine that Mr.

19   Auerhahn showed you the instant message about, Tharwat

03:28 20   Al-Sanam, it was never even translated to English.

21          Doctor Sageman told you people joined al Qa'ida before

22   there were videos, before there was an internet.  And after

23   there was, they came from countries where there was little

24   electricity, let alone internet connections.

25          People joined al Qa'ida, he said, after the United

1    States invaded Iraq.  Remember, Iraq was the first and only

2    country the United States has invaded that did not attack us

3    first.  It was a Muslim country, and it spurred people to go.

4         Al Qa'ida may continue to make videos, but Doctor

5    Sageman said they're fewer and fewer.  It's basically vanishing

6    now, he said.  It's bankrupt.

7         Now, we know Tarek isn't charged with being a

8    terrorist.  He's charged with providing material support to al

9    Qa'ida.  But, remember, it's the government who said, the very

03:29 10   first thing they said, bin Laden put a call for help and Tarek

11   answered.  Did he?  Or did he independently advocate for what

12   he believed in?  For what his religious study and his faith

13   told him?  That when Muslims are attacked, they can and should

14   defend themselves.

15        The government didn't want you to understand this

16   context.  They just wanted you to be scared.  You've all spent

17   too much time.  You all know too much.  You're too smart for

18   that.

19        So that's why we put on the experts.  And those

03:29 20   experts, what they had to say, each and every one of them

21   provided doubt as to whether the government has proven its

22   case.  Those people, they are reasonable doubt.

23        MR. CHAKRAVARTY:  Your Honor, may we be seen at

24   sidebar before Mr. Carney starts?

25        THE COURT:  All right.

```
 1    (SIDEBAR CONFERENCE AS FOLLOWS:

 2         MR. CHAKRAVARTY:  Your Honor, Miss Bassil asked the

 3    jurors to believe that Mr. Sageman testified because he

 4    believed that the defendant was not a terrorist clearly crossed

 5    the line of both proper argument and evidence as well as

 6    explicitly crossed the threshold of what he was explicitly not

 7    allowed to opine on.

 8         We're requesting a curative instruction in addition to

 9    the regular one that what the lawyers say is not evidence.  To

10    reiterate, it's not their task to determine whether the

11    defendant is a terrorist but rather to determine the charges in

12    the indictment, which is whether he provided material support

13    to terrorists.

14         THE COURT:  Well, okay.  I agree that the remark was

15    inappropriate, but I think the general instruction at the end

16    to put the arguments in proper perspective will be sufficient.

17         MS. BASSIL:  Thank you.

18         THE COURT:  Are you using those?

19         MR. CARNEY:  Yes, your Honor.

20         THE COURT:  Okay.  Everybody is using them.  All

21    right.

22         MR. CARNEY:  Modern approach.

23         Good morning.  I've been a lawyer a long time, but

24    this is by far the longest case I've ever had as a trial.  I

25    suspect that you can say the same thing.  And so I appreciate
```

1   perhaps more than other people the sacrifices that you've made

2   to be here.  You know you could have got out of jury duty.

3   It's not a secret.  Just answer some of those questions that

4   you were asked in a different way, and it's go on with your

5   life.

6          But each of you made the commitment to do that, and on

7   behalf of Tarek and his family and myself, and I'm sure I speak

8   for everybody, thank you so much for the sacrifice that you've

9   made, the time you've given up, especially at this holiday

03:32 10   period.  You've, of course, got more to do and maybe the most

11   important part of what you've got to do.  But I just wanted to

12   make sure you knew before you go any further how appreciative

13   we are for everything you've done up to this point.

14          You might recall at the beginning of the case, during

15   my opening statement, I asked the question:  Who is Tarek

16   Mehanna?  And I showed you some pictures of him growing up, and

17   I'm not going to show them to you again.  But you remember what

18   they were:  Typical American kid, born in the United States,

19   growing up, sitting on Santa's lap, learning how to play

03:33 20   baseball, playing electric guitar like he's in a band, all

21   those kind of things.

22          We put a lot of information in about Tarek through all

23   the witnesses who knew him so well.  I'm not going to repeat

24   and belabor that.  But what are some of the most important

25   things?  You recall that when he was in high school, as a

 1   senior, he kind of rediscovered his religion:  Islam.  He
 2   wanted to know more about it.  He also wanted to know more
 3   about his heritage as a Muslim.
 4        And so he began having these meetings with friends on
 5   Friday nights.  They'd go to the mosque, then they'd get
 6   together.  What kind of kid spends these meetings primarily
 7   talking about the religion?  Talking about the Qur'an and
 8   something that he read in it?  Asking people, Can next week we
 9   talk about this particular Hadith?  I bet people who were at
03:34 10   the courtroom for the first time during this trial have no idea
11   what a Hadith is.  But imagine the next time that word comes up
12   in your company and you go, oh, Hadith?  What do you want to
13   know?  Because now you do know.
14        And what happened when Tarek learned about his
15   heritage is about all the oppression that has occurred to
16   people just because they're Muslim.  The genocide that occurred
17   just because they were Muslim, not a thousand years ago, 20
18   years ago, in Bosnia, the ethnic cleansing of wiping out
19   Muslims just because they are Muslims.
03:35 20        The government called six witnesses who the prosecutor
21   called cooperating witnesses.  We'll talk about that word in a
22   little bit.  But all six of them presented by the government
23   said they thought when 9/11 happened it was justified.  One of
24   them used the words "The United States deserved it."  This
25   isn't something that Tarek came up with alone.

1          You heard from these witnesses how the invasion of

2     Iraq affected them, how the embargo in Iraq had led to the

3     deaths of hundreds of children because they couldn't get the

4     necessary medicine.  You heard how they talked about the rape

5     of the girl that's been mentioned, that in Iraq, United States

6     soldiers, a rogue group, no doubt about it, raped a 14-year-old

7     girl, then killed her and killed her parents and then set the

8     house on fire to cover it up.

9          Janice showed you some pictures from Abu Ghraib where

03:36 10     the United States, guarding those prisoners, did these

11     atrocities designed to humiliate people and put those photos on

12     the internet.  Is anyone surprised why a Muslim who would view

13     those people as brothers and sisters, fellow Muslims, would be

14     upset?  Would we be upset if the situation were reversed?  You

15     can answer that question in your own mind, and it will give you

16     a lot of insight into why Tarek and his friends believed what

17     they did about what was happening to their brothers and

18     sisters.

19          Let me read you a quote.  "But if you say, you can

20     still pass the violations over, then I ask, hath your house

21     been burnt?  Hath your property been destroyed before your

22     face?  Are your wife and children destitute of a bed to lie on,

23     or bread to live on?  Have you lost a parent or a child by

24     their hands, and yourself the ruined and wretched survivor?

25     If you have not, then you are not a judge of those who have.

1    But if you have, and can still shake hands with the murderers,

2    then you are unworthy of the name of husband, father, friend,

3    or lover, and whatever may be your rank or title in life,

4    you have the heart of a coward and the spirit of a sycophant."

5         Thomas Paine, during the Revolutionary times, one of

6    the patriots in this revolution, in this country, speaking to

7    his fellow colonists about the British.  Undoubtedly, had the

8    war turned out differently than it did, or if the British had

9    caught this patriot, he would have been hung.  But this is what

03:39 10    we were saying about the British and about what people should

11    do to resist what the British were doing.

12         You did hear endlessly presented by the prosecutor

13    harsh words, crude words, angry words, by those six witnesses

14    and by Tarek.  And you also heard them say how, over the years,

15    they matured, as they said Tarek matured, and how they grew up,

16    how they looked at the world differently and how they regretted

17    those harsh words.  I don't say this to excuse the words that

18    were said but just to explain why they were said.

19         But Tarek is not on trial for having made those

03:39 20    statements.  The hundreds and hundreds of instant messages that

21    he would have with friends, when he would say things that are

22    obviously embarrassing to have publicly stated in a courtroom.

23    He's not on trial on that, although -- at least that's not what

24    the Indictment says, although you might be hard-pressed to know

25    that from the evidence presented repetitively by the prosecutor

trying to assassinate Tarek's character.  But he, like his
friends, matured from that time when they were in their early
20s.

What I want to focus on are the charges.  Judge
O'Toole told you that the lead allegation is that Tarek
provided material support.  And Judge O'Toole told you that the
ways that are alleged include providing personnel, including
the defendant himself; money, training, service, or expert
advice and assistance.  I want to touch on each of these.

The first is personnel.  You can provide yourself as
material support, and the government's allegation is Tarek
Mehanna went to Yemen to receive military training in a
training camp with the specific intent to go on to Iraq.
That's what the allegation is about what Tarek did and why he
did it.

Now, how do you, ladies and gentlemen, figure out if
that's, in fact, the truth?  Or whether the truth is what Tarek
told people, as Ali Aboubakr testified here, that he went to
Yemen to look at schools?  How do you as jurors figure it out?
Let's say you put your detective hats on.  Well, you look at
all the surrounding evidence to see which view is supported.
For example, look who Tarek was, a person who every one of
these five witnesses who knew him well said, he was always
trying to figure out what does the Qur'an say?  What do the
Hadiths say?  Here, I want to read this text.  I want to

1    translate this classical Arabic text.  I want to discuss it.  I

2    want to interpret it.  There are people in every religion who

3    do that.  And Islam, Tarek was going to be one of them.  So the

4    idea that he would want to go to Yemen to look for a school or

5    schools that he wanted to study at, once he was done getting

6    his Ph.D., fits completely like hand in a glove of who this man

7    was.

8              Janice touched upon the concept of Aman, this tenet,

9    this holding, of Islam that says, If you are a citizen of a

03:43 10   country that allows you to practice your religion, you are

11   forbidden by the law of Islam to attack anyone from that

12   country, whether you're in the country now or whether you're in

13   another country where that -- where soldiers are.

14             You heard Daniel Spaulding talk about this.  Abuzahra

15   and Abousamra disagreed.  They said, Aman doesn't apply.  But

16   Tarek convinced Daniel Spaulding that it did apply.  There was

17   no concept of breaking the pact.  If Tarek felt so strongly

18   about his religion -- and remember the people who would say,

19   for Tarek, it's all about what does it compel me to do?  What

03:44 20   does it forbid me to do?  What does it permit me to do?  Aman

21   definitely forbade him to go to Iraq and fight U.S. soldiers.

22             How could a people whose whole life, whose whole

23   being, is so caught up in believing his religion, turn around

24   and violate a fundamental precept like that?  Does he sound

25   like the kind of person or is that the kind of situation where

1    he would do that?

2         Remember what Professor March said:  The only way that

3    you can get around Aman is if you renounce your United States

4    citizenship, if you formally say and take the steps, I am no

5    longer a United States citizen.  And not a single person, not a

6    single chat, not a single phone call, not a single anything,

7    ever suggested that Tarek even considered that for a

8    nanosecond, renouncing his United States citizenship.  Is that

9    consistent with the government's theory?

03:45 10       How about going to the country?  Abousamra had gone to

11   Pakistan twice.  Tarek didn't go with him.  Abousamra, after

12   going to Yemen, did go on to Iraq.  Now, we heard from Abuzahra

13   why he decided to turn around.  His father apparently had a

14   heart attack, he was told, and he wanted to be with him.  And

15   his two-month-old daughter, she needed his signature on an

16   important legal document.  So Abuzahra turned around and went

17   back.  Abousamra continued on to Iraq.  If that were Tarek's

18   reason for going to Yemen, then answer me:  Why didn't he just

19   continue on with Abousamra if that was his intent?

03:46 20       When his friend, Dan Maldonado, called him from

21   Somalia and said, Please come here, Somalia, it's great, it's

22   perfect, you'll love it, did Tarek go to Somalia?  Maldonado

23   did everything he could to get Tarek to come over, and Tarek

24   didn't.

25         What about the fact that -- of schools in Yemen?  Is

this a made-up fact?  Remember Jason Pippin said he went to

Yemen to attend these schools for exactly the same reason that

Tarek was:  to study Classical Arabic and Islamic law and

jurisprudence.  Now, to be candid, I don't think either of my

kids would have put these schools on their list of top five

they want to attend given how it was described by Pippin.  But

for someone who's really into this, it's heaven.

And what about Gregory Johnsen, the expert?  He said

exactly the same things.  These schools are so renowned for

teaching this that the State Department recommends that people

go there to study these things.

Now, what about Yemen itself?  You've heard there were

no training camps there from November of 2001 to February of

2006.  Don't you think that the federal government, with all

its resources -- the FBI, the CIA, satellites, spies,

everything they've got -- if there had been a single training

camp in Yemen during that time period, from November of 2001 to

February of 2006, don't you think the government would come in

here and presented somebody who would say, Oh, yeah, there was

a training camp there?  But we didn't hear it.

What was Yemen to Tarek?  It was a free trip, paid for

by Abuzahra, so that he could go to Yemen and check out the

schools, be away for about two weeks, and then come back to the

United States and resume college.  And that's exactly what he

did.  In fact, remember the conversation that Ali Aboubakr had

1      with Tarek.  Tarek said, These schools are so amazing.  When

2      you're done with college, Ali, let's go to Yemen and study.  We

3      can eat, pray, read.  It will be great.  Let's go.  Remember

4      the enthusiasm that Ali talked about that was in Tarek's voice

5      about going to Yemen, going back to Yemen to go to these

6      schools?

7              When you look at all of these other facts, does that

8      sound like the government has proven beyond a reasonable doubt

9      that the reason Tarek went to Yemen was with the specific

03:49 10   intention to go to a training camp and thereafter to Iraq to

11     fight U.S. soldiers, or does it point in the opposite

12     direction?

13             What do we have in this case?  We have Kareem

14     Abuzahra.  He says that Tarek went in order to go to fight in

15     Iraq.  Kareem Abuzahra, I submit, is the most important

16     government case -- government witness in this case.  I submit

17     that you have to believe Kareem beyond a reasonable doubt if

18     you're going to find Tarek guilty of providing material support

19     for going to Iraq because without his testimony, there's not

03:50 20   even a suggestion, I submit.

21             And let's look at Mr. Abuzahra.  In fact, what I'd

22     like to do at this point is look at all six of the witnesses

23     presented by the government -- I'll call them the civilian

24     witnesses -- because it gives you such insight into our

25     government, into the prosecution, into how this case was built.

1          Okay.  Kareem Abuzahra.  What do we know about him?

2    He's someone who has long been committed to wanting to fight in

3    Iraq or elsewhere.  We know that when Abousamra went to

4    Pakistan, Kareem gave him 500 bucks to pass on to al Qa'ida

5    there.  We know that Kareem was serious about going to Iraq to

6    fight.  He quit his job.  He left the video.  Wouldn't you like

7    to have been a fly on the wall when the wife, with young

8    children, including a two-month-old, is told to look at a video

9    and it's, Hi, honey, I'm in Iraq.  I don't know if I'm coming

03:51 10   back.

11          And let's look at what Kareem said on the stand, and

12   not even bashfully, not even regretfully, about how he is

13   willing to lie.  I asked him:  When do you lie?  Well, if it's

14   in my interest to lie, I lie.  We heard some pretty remarkable

15   things.  He practiced lying.  He would lie to his friends, and

16   he was such a good liar that no one would be able to tell he

17   was lying.

18          The FBI asks to interview him unexpectedly.  No

19   problem.  Lying comes so easily to Abuzahra that he sits down

03:52 20   with the FBI, tells them a nice story, and it's a complete,

21   total lie.  I asked him:  Why did you do that?  He said, Well,

22   I wanted to tell a plausible story so I could stay out of jail.

23   You'd lie to the FBI?  Well, if it's not in my interest to be

24   truthful, then I'm going to lie.

25          How about this:  He told us that he prepped for his

1    court testimony by meeting with the prosecutors five or ten

2    times, an average of four hours each time.  So we're talking

3    about, in order for Kareem Abuzahra to come in here and tell

4    the truth, he's got to spend between 20 and 40 hours with this

5    crew to make sure he knows the truth.  That's their main

6    witness right there.

7         Look what Kareem did.  He's open.  Hey, I went to

8    Yemen, and then I was going to go to Iraq.  Had I not got a

9    word from my family, I probably would have gone to Iraq.

03:53 10    Remember, I asked him about the shopping mall.  I said, This

11    shopping mall attack, that was your idea, wasn't it, Kareem?

12    Pause.  I don't remember.  All right.  I'll show you your grand

13    jury testimony.  It was your idea to shoot up a shopping mall?

14    I don't remember.

15         It was your idea to target Hanscom Air Force Base?

16    Pause.  I don't remember.  You're the only one in this crew who

17    had any contact with Hanscom Air Force Base because you had

18    gone on it to do some motorcycle training, right?  Yeah.  You

19    knew where the guard shack was?  You know everything -- not

03:54 20    everything but a lot about the base.  It was your idea?  Show

21    him an FBI report.  I don't remember.

22         You're the one who came up with, Hey, why don't we

23    shoot Condoleezza Rice or Attorney General Ashcroft, when Tarek

24    wasn't even there?  No, I think that one time Tarek was there.

25    Did you tell the FBI previously that Tarek wasn't there?  I

1    don't remember.

2         How about this:  He's not ashamed to say, yeah, I went

3    to New Hampshire to meet with Maldonado to see if I could get

4    automatic weapons.  And even if the guns had bodies on them,

5    that wasn't a problem because I wouldn't have the guns that

6    long.

7         Okay.  This guy Kareem is admitting all of these

8    crimes.  And what happens?  What does the government give him?

9    They offer to give him a pass.  I don't care what the

03:55 10   prosecutor wants to call it, how he's going to say, oh, there's

11   this technical thing where we're only saying we're not going to

12   use his testimony against him.  Well, we haven't given him

13   complete freedom from prosecution.  Really?  They made this

14   arrangement with him in 2006.  You think it's about time that,

15   if Kareem is going to be charged, if he is going to be charged,

16   that we'd have seen it?  No.  What happened is:  Kareem got the

17   message and then he got the deal.  Can you trust that person?

18        Then Kareem agreed to wear a wire.  Imagine going to

19   your friends.  Imagine going to people that you know well and

03:56 20   being able to record the conversations and lie so well that

21   people don't suspect it?  And they sent him to keep talking to

22   Tarek, to get Tarek to say, I went to Yemen in order to go to

23   Iraq to engage in fighting.  And then he'd bring the tape back,

24   and they'd send him back again.  And then he'd bring the tape

25   back, and they'd send him back again.  As Kareem admitted, I

knew what they wanted me to get him to say.  And I said, And
you never were able to get him to say it, were you, in all
these phone calls?  No, I wasn't.  Is Kareem Abuzahra someone
you are going to trust?

Let's look at the second most important witness:
Hassan Masood.  Here's a guy who has seen where the rubber
meets the road when you're dealing with the federal government
because, remember, his father, who was the Imam in a mosque, I
think -- well, I don't remember exactly what town.  But he was
the Imam.  He's like the Rabbi.  He's like the Monsignor.  And
because of an error he made on an Immigration document, he was
prosecuted.  He was indicted.  And remember what I asked
Hassan:  Who are your father's prosecutors?  Mr. Chakravarty,
Mr. Auerhahn.  And after the father pleaded guilty, he was
gone.  Do you think Hassan needed to have any more example of
the power of the federal government?

But it doesn't even stop there.  What does Hassan say?
He said he testified at an Immigration hearing, and at that
hearing he lied under oath to the judge.  And I asked him why
he did it.  It's so that I could get a benefit; and if I can
get a benefit, I am willing to lie under oath to a federal
judge.  I appreciate his candor.  He got the message.  He got
the deal.  Are you going to trust him?

And isn't it interesting that Hassan is still with us.
And has there even been a peep about the prosecutors indicting

1  someone who admits that he lied under oath to a judge?  Do you

2  think someone who says, Yeah, I did that, do you think you

3  might find that person indicted for a crime?  No.  You join the

4  team, you get a pass.  You say what they want you to say, you

5  walk.  You don't even get charged.

6       Danny Maldonado, he was someone who left the United

7  States to go to Egypt with his wife and three young children,

8  and he lived in Egypt for a year.  Then he moved to Somalia.

9  And he told you why.  Somalia was an Islamic country, at peace,

03:59 10  and he wanted to live there.  And he moved there with his wife

11  and children.  Tarek said, Hey, man, I don't think you want to

12  go to Somalia.  You know, it's still a volatile area.  But he

13  went there because it was going to be a good place to raise his

14  family.

15       And a few months after he got there, Ethiopia invades,

16  war breaks out, and Danny Maldonado was pressed into service to

17  the Army.  Now, this was a Muslim-run country, headed by the

18  Islamic Courts Union, not by al Qa'ida.  This is not Danny

19  Maldonado fighting the United States.  This is not Danny

04:00 20  Maldonado fighting for al Qa'ida.  He's fighting for the

21  country that he's living in.  What happens after the fighting

22  continues?  Danny's wife dies of malaria.

23       And so what's the situation now with Danny Maldonado?

24  He is a widow.  He's got three young children.  Remember what

25  he said.  The government decides if I can hug my children.

1    What would you do for the government if the government decided

2    if you can hug your young children?  Dan's got four years left.

3    I don't blame him.  He could say that Tarek Mehanna was

4    involved with the Kennedy assassination if, in turn, he could

5    hug his children.  Are you going to be able to trust him?

6            Ali Aboubakr, he's just angry that he's here.  He's

7    anxious to get going to medical school.  He's angry at Tarek

8    for having brought him in here.  But still he came in and

9    confirmed, yes, Tarek not only told me about going to see

04:01 10  schools in Yemen, Tarek told me, When you're done graduating,

11   let's go back and go to those schools.  What about Ali

12   Aboubakr?  Same thing.  He gets the message.  He's on the team.

13           Jason Pippin, wasn't it interesting what he talked

14   about when the FBI went to see him in Finland and how he

15   described basically being held captive in the United States

16   Embassy in Finland by the FBI who went to see him.  Remember

17   how the prosecutors brought out -- the first thing they did is

18   apologize to him for what had happened to him previously.

19   Pippin is now in Canada, has family in the United States.

04:02 20  Pippin is someone who's admitted, I went to get training

21   myself.  I went to Pakistan to fight.  I did all this stuff.

22   But he got the message.  He got the deal.  Can you trust

23   everything he says?

24           And, finally, Daniel Spaulding, if I had to identify a

25   witness in this whole trial who's most like Tarek Mehanna, it's

         1    Dan Spaulding.  Let's talk a little bit about him.  He's

         2    someone who came to Islam not as a child but someone who sought

         3    out a religion and chose Islam.  And so he was very interested

         4    in learning about it.

         5         What was notable about Dan Spaulding?  He came in here

         6    without being prepped for 20 or 40 hours by the prosecutor.

         7    Did you see a little anger in the prosecutor's voice with Mr.

         8    Spaulding?  You wouldn't meet with us.  Well, I'm working two

         9    jobs.  I'm married.  I have kids.  I live in New Hampshire.  My

04:03   10    life's kind of busy.  You wouldn't meet with us.  Well, didn't

        11    that suggest that maybe Danny Spaulding is really, truly

        12    telling the truth when he says what his memory is?

        13         And he remembers about Kareem and the shopping mall

        14    and that Tarek said that the shopping mall idea would violate

        15    Aman.  It could not be done.  A Muslim who's allowed to

        16    practice his religion in the United States could not kill

        17    anybody in a shopping mall.  You would be violating Islam.  And

        18    Tarek also said, And that idea is so outlandish.  That's what

        19    Dan Spaulding said.

04:04   20         Remember, I asked Dan a series of questions.  Dan, did

        21    Tarek ever say he supported al Qa'ida?  Never.  Did he ever

        22    say, in your presence, in all of these sessions al Qa'ida is

        23    doing an important job?  No.  Or that we should join al Qa'ida?

        24    Never.  Or we should advance their cause for al Qa'ida?  No.

        25    Or that we should coordinate with al Qa'ida?  No.  Tarek never,

1    ever said that in these small groups together, talking, where

2    Dan Spaulding was present.  All six of these witnesses got a

3    pass.

4           And what about Mr. Big?  What about Abousamra?  He's

5    allowed to leave the United States and never come back.

6           You saw by these witnesses the pressure that the

7    United States Government can put on individuals and squeeze

8    them until they get the message and reward them when they get

9    the deal.  Are those the witnesses you can trust?  Are those

04:05 10   the people that you are going to believe when you're deciding

11   this case?

12          And look what happened to poor Dan Spaulding.  After

13   Tarek was arrested, he got the message all right.  What quote

14   did he put on the web forum?  What did Danny Maldonado [sic]

15   put?  Let me read it to you.  Someone on a web forum was

16   talking about the pressure that can be put and is being put on

17   Muslims all across the United States, surveillance, harassment,

18   everything.  And someone said, "Can't you just keep your hands

19   clean?  Kamar, do you live in the United States or have you

04:06 20   ever had to deal with the Feds?  As someone who has, I can tell

21   you it has nothing to do with playing nice and keeping your

22   hands clean.  They are evil and malicious people who will go as

23   far to get people to bear false witness against you if they

24   want to arrest you."

25          And what happened to Dan Spaulding?  He got the

1   message.  He got it so loud and clear that he renounced Islam.

2   How scared would you have to be to decide that you are going to

3   renounce your religion?  If you answer that question, you'll

4   understand the pressure these witnesses were put under.

5         Can you perhaps infer that Tarek resisted that

6   pressure?  Can you perhaps infer why he's sitting here and not

7   there?  Now, why would Tarek be concerned about what people

8   think when they learn that he went to Yemen and Abousamra went

9   to Yemen and then went to Iraq?  Because he doesn't want to

04:07 10   come to the attention and receive the kind of focus that people

11   in the community were focusing -- were receiving.

12         And so is he ambiguous about what happened in Yemen?

13   Is he trying not to talk about Yemen?  Is he trying to change

14   the subject about Yemen?  Everything Tarek said that the

15   prosecutor mentioned is consistent with Tarek going to Yemen to

16   look at those schools and, finally, not sitting in front of a

17   computer but doing something that will actually help him on the

18   road to being a scholar.  And he was thrilled.  Yeah, he was

19   dragged all across the country accompanying Abousamra.

04:08 20         And then the prosecutor says, Well, look at the

21   statement that Tarek said to a woman he was interested in

22   dating.  One, two, three, four, five, six, seven -- eight

23   experts on the jury about whether men puff up their background

24   in order to impress women.  Okay.  Tarek's not the first and

25   he's not the last.  Look, even, what he said.  I went and

1       interviewed with a company and was rejected.  We know that's

2       not even true.  But when you're kind of sweet on someone or

3       want to be sweet on someone, Hey, I was interviewed but I was

4       rejected.  Oh, great, let's get together.  Gentlemen of the

5       jury, I know I am not defending our gender, but sometimes

6       you've got to speak the truth.

7            Okay.  Did Tarek Mehanna reach an agreement to help

8       Abousamra and Abuzahra go to Iraq?  No.  It was completely

9       unnecessary.  Abousamra knew how to get there.  Did Tarek pay

04:09 10    for the trip?  No.  Abuzahra paid for the trip, he told us.

11      Did Tarek give any money?  No.  Any directions?  No.  Did he

12      fly to California to get some tip?  No.  Did he give money,

13      $5,000, to someone who would help?  No.

14           Tarek went along because he got a free trip to Yemen

15      and he could do what he wanted to do in Yemen while the other

16      two guys did what they planned to do.  Imagine this:  Two

17      people are walking down the street.  They join up.  One says,

18      Hey, where are you going?  I'm going to a store.  Oh, I'll walk

19      with you.  Oh, yeah.  What are you doing?  I'm going further

04:10 20    down the street.  I'm going to rob a bank.  Oh, okay.  All

21      right.  I'll walk with you.  Does going to some place with

22      someone, accompanying someone for your own reason, mean that

23      you are helping them or supporting them or supplying personnel?

24      Tarek never agreed to either go to Iraq and fight or help them

25      go to Iraq and fight.

1        Now, what about this claim by the prosecutor that,

2    well, Tarek was helping to recruit people in his own group and

3    around the world.  Let's look a little more closely at that.

4    How many people agreed to join al Qa'ida because Tarek

5    translated a document?  How many people did we have testify to

6    that here?  How many people said, Tarek showed me a video, and

7    I decided, hell, I'm on the next bus to Fallujah?  Not a single

8    person in this whole group except Abousamra, who was a

9    long-time believer in this, did anything.  None of them.  Where

04:11 10 are they now?  I'm completing my Ph.D. program.  I'm getting

11   ready to attend medical school.  Oh, I'm teaching in Canada.

12   They're all doing things, except Dan Maldonado, who's just

13   holding on, you know, finishing up his sentence.

14       Not a single one of these people was recruited or

15   influenced to do anything by Tarek Mehanna.  How about anyone

16   else in the world?  How about bringing someone in from England

17   or anywhere in the world to say, I was influenced by Tarek?

18   What does it tell you that they couldn't get a single person?

19       How about this recruitment claim, good plan, good

04:12 20 plan.  Abousamra goes to Fallujah, the hottest battle zone in

21   Iraq.  Hey, I'm here.  Okay.  I'm young.  I'm fit.  I speak

22   Arabic.  And I am ready to go to the front lines.  Great

23   recruiting plan, huh?  He has to turn around after two weeks

24   and go home.

25       The videos.  What did we hear from the witnesses about

1    why they watched videos?  Did they say, Because it would want

2    me to go to Iraq and get killed or wear a suicide vest.  Man,

3    it was.  What did we hear from the witnesses?  Three reasons:

4    Number 1, it gave us the other side's view so that we can learn

5    what other people were saying that we weren't getting in the

6    United States.

7         The second reason:  We liked watching Muslims win for

8    a change.  You know, I don't know if this is going to get me in

9    trouble.  But it would be like, I suppose, a Native American

04:13 10   watching a movie on General Custer and saying, Hey, it was nice

11   to be on a winning side for once.  And it's kind of what these

12   Muslim kids felt.

13        And then, finally, one of the witnesses said, We liked

14   violent movies.  Sometimes we would get together.  We wouldn't

15   watch these videos.  We'd watch regular movies but we liked

16   violent movies, and that's why they watched these videos.

17        The prosecution showed hundreds of chats, and Tarek's

18   strongest words were always in response to the rape of that

19   14-year-old girl.  It's clear, looking at all of them, that's

04:14 20   what he was outraged about.

21        What I love to see on this jury is its diversity in

22   all respects, but one of those respects is age.  There are

23   jurors on your group who I know text and IM and are familiar

24   with that and what's said on texting and what people send to

25   each other on texting and what they say about friends, never

1    mind enemies, and all the crazy, nutty things that are said

2    when people are texting back and forth just two people.  I hope

3    you will be able to explain to the other jurors why Doctor

4    Fadel calls IMs trash talk.

5         Is there any evidence that Tarek gave any money to

6    provide material support?  I don't think we even heard that

7    referenced by the prosecutor.  Do any training?  Not a word.

8         Let me talk for a moment about a material false

9    statement.  The word I want you to focus on, please, is

04:15 10   "material."  And I submit to you that the commonsense

11   interpretation is:  Will it affect an investigation given where

12   the investigation was?  Why was the FBI interviewing Tarek?  I

13   submit because they wanted to get leverage on him.  They'd

14   already done a sneak and peek.  They'd already broken into the

15   home of him and his brother and his parents and copied every

16   computer that was there.  They'd already wiretapped his phones.

17   They'd already sent someone in wearing a wire to record

18   conversations with him.  But it wasn't enough.  They needed

19   more leverage on Tarek.  Tarek didn't lie about Yemen, although

04:15 20   other people did.

21        But in this long interview -- and I don't know if you

22   would remember a TV show Columbo.  At the end of the interview,

23   when the FBI is finishing up, it's, like, Oh, one more thing.

24   You know Danny Maldonado?  Yeah.  You know where he is?  Egypt.

25   Who wouldn't on the spur of the moment say something -- say,

1    hey, gee, I don't want to get my friend in trouble.  But was

2    that a material factor in the investigation or was that what I

3    would suggest the gotcha question.  Okay.  We've now

4    interviewed Tarek and we know he's not being truthful?  Why?

5    They either had an agent obviously in Somalia or they were

6    tapping this phone call because three days later the agents had

7    come to Tarek after Tarek had the phone call with Maldonado.  I

8    don't know if I said that correctly, but what I mean is that

9    Tarek spoke to Maldonado, and three days later the FBI are on

04:16 10    his doorstep asking him about where's Maldonado.

11        I'll tell you.  Let's say that you jurors were

12    interested in learning where is Janice Bassil.  All right.  I'm

13    seeing about three-quarters of you taking a peek, making sure

14    she's still there.  And I say to you:  She's back at the

15    office.  Okay?  If your investigation is involved in where is

16    Janice Bassil, is my statement going to affect your

17    investigation?  Are any of you going to sit there and say, Oh,

18    darn, I thought she was sitting at the table over there, pretty

19    in pink.  But apparently she's at her office, and this is some

04:17 20    imposter, you know?  What is it?

21        I mean, there have been a number of times when I

22    submit -- I don't say this lightly -- that the prosecutor has

23    not appreciated your intelligence, your common sense, who you

24    are as people.  And when the FBI had the gotcha question, they

25    felt they could put pressure on Tarek.  And that's just what

1  they did.

2          Let me talk about two other things regarding this

3  material support:  service to al Qa'ida.  Janice already

4  touched upon it.  I loved her analogy of, you know, the

5  grandfather -- the boss who's walking with his granddaughter or

6  daughter and how people jump to conclusions.  Look how the

7  government jumped on this -- on their conclusions.

8          Janice has already gone through how Tarek disagreed

9  with almost every view of al Qa'ida except one, and that one

04:18 10  was:  An invading army should leave a Muslim country.  Did

11  Tarek believe that because he believed in al Qa'ida, or did

12  Tarek believe that because of his religion, because that is

13  what the Qur'an teaches?

14          The government talks about the Umar Hadeed video.

15  There's no evidence or instant message or any indication that

16  Tarek was asked to translate it.  You notice what Professor

17  Connolly said, It was obviously written by someone in Britain.

18          Wa Yakoon.  The government, once again, brings up,

19  Tarek was asked to work on this video.  But he didn't.  And

04:19 20  just because you ask someone to do something is not the

21  equivalent of doing it.

22          And, finally, 39 Ways.  You'll get to look at 39 Ways.

23  I bet when you first heard that mentioned in the opening, it

24  was kind of interesting:  39 Ways, it's a training manual for

25  people who want to engage in this kind of fighting.  And so

1    maybe they're going to say how to create a suicide vest to bomb

2    -- blow yourself up and other people or maybe how to sneak up

3    on someone and stab them with a knife or something else that

4    would be in a training manual.  I think you already realize how

5    disappointed you're going to be.

6           Way No. 38, learn how to swim and practice archery.

7    Oh, good.  Rule No. 22, be nice to widows.  Okay, good.  And

8    you go through all of these things.  And what it really is?

9    It's a document not written by someone with al Qa'ida but

04:20 10   someone who knows of the Muslim obligation and duty to

11   participate and serve in Jihad that is addressed to the people

12   who know that they are not ever going to find themselves on a

13   battlefield.

14          Awful lot of people like to watch war movies, and they

15   know they are never going to sign up for the service.  For the

16   Muslims in this situation, this tells them what else they can

17   do to fulfill their religious obligation.  It's not a training

18   manual.  It's more of a religious document, filled with quotes

19   from the Qur'an and the Hadiths.

04:21 20         Plus, you know, how else can you support Jihad?  Well,

21   if you're Muslims in a Muslim country and you've been invaded,

22   we saw a 40th way that you can participate in Jihad.  Invite

23   the mujahideen to the White House.  Remember that video we saw?

24   Ronald Reagan surrounded by these guys in turbans saying, Well

25   -- I can't do an imitation but, you know, I just want to say

how important the work that they're doing, and the United

States is a hundred percent behind you folks.  And the guys

there, who, of course, don't speak English, are just sitting in

the White House with the President of the United States and on

camera.  That was the 40th way to do it.

THE COURT:  Mr. Carney.

MR. CARNEY:  I don't mean to make light of it.

THE COURT:  Be aware of the time.

MR. CARNEY:  I am looking at the time.

04:22 10    I guess the clearest evidence that the government

refuses to accept is that Tarek's views were such that he was

even kicked off Tibyan.  He was booted so that his password

would no longer work.  If you want to know whether he was

providing service to al Qa'ida, that's all you need to know.

Finally, expert advice and assistance.  Translating

Arabic to English.  If a person is in the United States and has

a computer connected to the internet, you can see Osama bin

Laden's speeches.  You can watch al Qa'ida videos or any kind

of videos if they're in the Arabic, but you can't understand

04:23 20   them.  And there's no suggestion that it is illegal to watch

these videos or read these documents in the slightest.  It's

not.  You just -- you can do it because it's one of the

freedoms we have in this country.

But the federal government doesn't want you to read

it.  It's like one of the witnesses said:  Our government is

1   acting like Iran or China or Libya before Gadhafi fell.  When

2   those countries don't want their citizens to hear other views

3   in the world, like about the United States and how great we are

4   and the freedoms we have, what do they do?  They shut down the

5   internet because they don't want people to see it.

6          It's the same thing as preventing people from

7   translating a document that's legal to read, legal to see.  And

8   they're saying, Oh, you're providing help to a terrorist

9   organization by translating it.  What are they so afraid of?

04:24 10        And then the government -- here again, tell me if this

11   is a little insulting to your intelligence.  They call a

12   witness, Evan Kohlmann, who's going to say, Translating videos

13   and translating Osama bin Laden speeches and translating al

14   Qa'ida documents are critical to getting the al Qa'ida word

15   out.  And then remember how we went through all that time with

16   me saying -- Kohlmann saying, Next, next, next, because he was

17   counting on his agency's website, NEFA, how many videos they

18   had.  I don't remember the exact numbers, but they had more

19   than 30 al Qa'ida videos on their website that you could just

04:24 20   click on, translated.  They had 30 speeches or communiques by

21   Osama bin Laden, translated.  They had over 30 by his second in

22   command, who's now first in command, translated.  They had 30

23   by other al Qa'ida people.  What level of hypocrisy are we

24   dealing with?  That Tarek does one video and one document, but

25   Kohlmann can have 120 on the website and that's okay?  There's

1    no inconsistency there?

2          Members of the jury, the government said, in essence,

3    you don't even have to rely on the witnesses.  They knew I'd

4    have a couple of things to say about the witnesses, about

5    whether they are truthful and trustworthy.  So I ask you to

6    take up Mr. Auerhahn's challenge.  Disregard the testimony of

7    the six witnesses and see if the rest of the evidence proves

8    their case beyond a reasonable doubt.

9          Now, what would you look for if you wanted to see some

04:25 10   corroboration that the government is right?  Well, I've got it

11   right up here.  Let's look at some things.  Sorry.  It's

12   blocking your view, your Honor.  And I'm talking faster.

13          THE COURT:  Yes, please.

14          MR. CARNEY:  Okay.  Let's -- here's corroboration.  Is

15   it true that Tarek went to Pakistan?  No.  Is it true that he

16   went to Iraq?  No.  Is it true that he went to Somalia?  No.

17   Is it true that prior to going to Yemen he had expressed no

18   interest in Arabic and jurisprudence?  No.  He did express

19   interest.  Were there training camps in Yemen that they could

04:26 20   go to?  Nope.  Is there any evidence that Tarek ever had direct

21   contact with al Qa'ida?  No.  Is there any evidence whatsoever

22   that he ever gave money to al Qa'ida?  No.  Is it true that he

23   agrees with al Qa'ida on all of their issues?  Was he kept on

24   Tibyan?  Is 39 Ways a training manual?  Is it true that Tarek

25   didn't believe in Aman?

1          Now, I've made eleven checks in the "no" box.  Let me

2     tell you this:  If all of these boxes, or even most of them,

3     were checked "yes," you know what the government would say?

4     This is proof beyond a reasonable doubt.  And you know what?

5     They would be right.  If all of these boxes were checked "yes"

6     for this kind of corroboration that you would expect to have in

7     this case, if their allegations were true, you would have every

8     right saying, looking at this corroboration, that's proof

9     beyond a reasonable doubt.  So what impact does it have on you,

04:28 10    jurors, that they're all checked "no"?

11          I'll use my last minute to tell you what I think is

12    the most important phrase in this case, that the Congress and

13    the United States Supreme Court and Judge O'Toole, pretty good

14    company, all talk about "independent advocacy" and that if you

15    are independently advocating for something, it doesn't fall

16    within the statutes.  It is not material support if you are

17    independently advocating.  It's about the First Amendment.

18          Government showed hundreds of IMs of things that were

19    said, dozens of videos of things that were watched, so many

04:29 20    documents that people had seen.  Well, folks, that's what the

21    freedom of speech is about.  I'm not asking you to accept

22    Tarek's beliefs.  I'm not.  But I am asking you to accept his

23    right to independently advocate them.

24          And I'll end with this:  It's a little ironic that on

25    the day the front page of the Globe says, "We are leaving

1    Iraq," that one of the last items of unfinished business is the

2    trial of this man for saying, in 2003, we shouldn't have been

3    in Iraq in the first place.

4         When the founding fathers created our Constitution,

5    they were brilliant.  They were going to make the United States

6    not make the mistakes that other countries had made.  You were

7    going to have the freedom of religion in the United States.

8    You were going to have the freedom of speech in the United

9    States.  And you were going to have a trial by jury.  So that

04:30 10   unlike virtually every other country in the world at that time,

11   where, if the prosecutor says someone is guilty, he's guilty.

12        What the founding fathers said is:  We're not going to

13   do that and especially in a highly-charged case.  We're not

14   going to let the government make the decision.  We're going to

15   give the power to you, the citizens, the jurors.

16        And I submit to you they believed, the founding

17   fathers, that you would have the independence, the wisdom, and

18   the courage to speak the truth.  And I submit to you that if

19   you return a verdict in this case confirming with one voice

04:31 20   that the government has not proven its case beyond a reasonable

21   doubt, those founding fathers will leap to their feet and say,

22   We were right.  We gave the power to the right people because

23   then you will be able to do justice in this case by finding

24   Tarek not guilty.  Thank you very much.

25        THE COURT:  Jurors, it's about 1:15.  We have had a

1    buffet lunch brought into the jury room for you.  We'll take a

2    break now for about a half an hour so you can have lunch.  Then

3    we'll come back.  We have a couple more -- the government has

4    rebuttal, and then I have some more instructions.  That will

5    take -- don't get too anxious about it.  It will take about a

6    half an hour, I think, not much more than that.  I don't want

7    to continue on through the lunch period.  So we'll take a break

8    for lunch.  Please, no discussion of the substance of the case

9    during lunch.

04:32 10         Enjoy the lunch.  The time is coming very soon when

11    you'll begin the deliberations but not yet.  So we'll be back

12    at about quarter of 2.

13    (Luncheon recess taken at 1:17 p.m.)

14    (Court and jury in at 2:00 p.m.)

15         THE COURT:  All right.  For the government's rebuttal,

16    Mr. Chakravarty.

17         MR. CHAKRAVARTY:  Thank you, your Honor.  Thank you,

18    ladies and gentlemen.  We're finally at that moment.  And I do

19    thank you on behalf of everyone on the government's trial team

05:16 20    and echo what the defense has said and the judge has said.

21    This has been a long trial, at a very awkward time in

22    everyone's lives.  So we appreciate the attention.

23         I'm going to take the last few minutes, and it will

24    not be -- as you all know, I can talk for a long time.  This is

25    not going to be one of those moments.

1          This is going to be my chance to refocus you on what

2     the law and the evidence is in this case and to address some of

3     these distractions which Mr. Carney and Miss Bassil just

4     presented to you, which may bear on political issues, may bear

5     on the relationship of Muslims to the federal government, may

6     affect what the law should be.  Those things are irrelevant.

7          What matters here is the Indictment and the facts that

8     support the allegations in the Indictment.  It's the evidence,

9     not speculation as to what other reasons or what other

05:17 10    motivations may have compelled the defendant to do what he did.

11    But one thing is clear:  that if he had been successful in

12    completing what he had conspired to do, with Abousamra, with

13    Abuzahra, with the folks at "Tibyan Publications" and others,

14    that on this day when people are coming back from Iraq who have

15    served the United States, there might be a few fewer of them.

16    That's what this case is about.

17          It's not about disagreeing with the government.  It's

18    not about disagreeing with the war in Iraq or the policies that

19    the United States might have in the Muslim world.  It's about

05:17 20    actively supporting those who were taking up arms to kill them.

21    The Constitution doesn't protect that.  These federal laws that

22    you have in front of you are the laws enacted specifically to

23    prevent that.

24          That's what the defendant conspired to do.  That's why

25    he's here.  It's not because he's the last man standing or

1    because six other witnesses came in because we talked to them.

2    Ask yourselves about those six witnesses.  All these great

3    promises that the government offered to them.  Listen to --

4    remember their stories.  They were parts of a tapestry that

5    interlinked and not just to what they were saying amongst

6    themselves but what the defendant said in his own words, on

7    those consensual recordings and on the chats and on phone calls

8    and everything else.  This is one seamless story that is the

9    truth.  That's what a verdict means, and that's what you're

05:18 10    asked to find:  the truth, the facts, not what the law should

11    be, not what the political message of this verdict will be,

12    but, rather, did the defendant do the things that he's charged

13    with doing?

14         At the beginning of this trial, I told you what the

15    evidence would be.  I told you the sources of the evidence,

16    told you these lawful searches, the other ways that the

17    government had collected the evidence.  And I submit to you

18    that after over a month that has come to pass.  That cloak that

19    Miss Bassil talked about, that cloak of innocence, that covers

05:19 20    all of us in this country, has been lifted from this defendant.

21    He no longer can hide in the secrecy of his conspiracy, can

22    hide in the encryption and the coded language that got him

23    through the last ten years.  We now know what he did.

24         And he didn't do it by himself.  There's no

25    independent advocacy here, ladies and gentlemen.  Did he go to

1    Yemen by himself?  Did he and Abousamra walk down the street,

2    as Mr. Carney asked you to believe, and Abousamra said, I'm

3    going to go rob that bank, and he said, I just wanted to go to

4    Dunkin' Donuts?  Is that what we're talking about here, ladies

5    and gentlemen?

6         They quoted Thomas Paine.  Thomas Paine is the author

7    of *Common Sense*.  That is the most vital asset that you all

8    have in assessing both what the arguments of counsel are as

9    well as what the evidence is in this case.  And that common

05:20  10   sense, ladies and gentlemen, if you apply it to this case, will

11   suggest to you that after months of talking about participating

12   in Jihad, about trying to get training, about talking about

13   shooting up a mall or doing other domestic attacks -- who talks

14   about that, ladies and gentlemen?  At what level do you have to

15   get to where you can even contemplate let's go shoot something

16   up?  He wasn't absenting himself from those conversations.  He

17   was participating in those conversations.  It doesn't matter

18   who brought it up.  It was the three of them.  It was always

19   the three of them.

05:20  20        And so when Abousamra says he wants to go rob a bank,

21   ladies and gentlemen, what's the normal reaction there?  Well,

22   okay.  You go about your business.  I'm not going to go do

23   that.  That's not what happened in this case.  The defendant,

24   they all met at his house that night, Super Bowl Sunday.  And

25   after talking about it and after planning it, after going

1  across the country to meet with Abu Omar about finding specific

2  people who they were going to go ask about when they were in

3  Yemen so they could hook up with the people who were

4  participating in Jihad, it's only after all that that they got

5  on a plane and went halfway across the world for that common

6  purpose.

7        And what did they find when they got there?  They

8  found what the defense experts themselves told you was there:

9  that al Qa'ida had gone underground, that it wasn't easy to get

05:21 10  training.  Mr. Auerhahn read to you some of those consensual

11  recordings where the defendant said the exact same thing.  When

12  he told the people in Ma'rib why he was there, the truth about

13  why he was there, what did they say?  First, they came out with

14  an AK-47.  And then they said, All that stuff is gone after

15  9/11, after the planes hit those towers.

16        It's not schooling.  It's not trying to find a wife.

17  It's not tourism.  There's one reason why the defendant and

18  Abousamra went on to Yemen.  Ladies and gentlemen, the

19  defendant's words, there are assumptions, some that are 50/50,

05:22 20  and some that are, like, the sky is blue.  No one told you that

21  it was blue, but you can see very well that the sky is blue.

22  Ladies and gentlemen, the sky is blue about the trip about

23  Yemen.  There should be no doubt as to what the truth is about

24  why the defendant went there.  It was the same reason that

25  Abousamra went there, and in those consensual recordings or any

1   other time where they talked about it, you'll never once see

2   the defendant varying from that.  You'll never once see him

3   saying he was going for one reason and I was going for another.

4   That's provision -- or attempt to provide material support to

5   terrorists.

6        Let's also talk about his translation activities, the

7   things that he did online.  There's a big difference here that

8   the defense makes between Evan Kohlmann, who is a paid

9   terrorism expert -- this is what he does for a living.  He does

05:23 10   research on these things.  Of course, he has videos.  He has

11   videos because this is how -- you've heard both Doctor Sageman

12   and Mr. Kohlmann say, This is how al Qa'ida spreads its

13   message.  This is how it communicates to the world.  It has the

14   logos on it.  It says it's from al Qa'ida.  This is how they

15   operate.

16        The defendant himself was inspired by these videos.

17   In that letter to his would-be girlfriend, which I encourage

18   you to read when you're in deliberating, the defendant said,

19   Then one day in Ramadan in 1999 a friend of mine showed me a

05:23 20   video from Chechnya that he had obtained from a brother who had

21   strove there, participated in Jihad there.  This pointed me in

22   the right direction.  Since then, it's been an uphill struggle

23   to purify myself.

24        He knew the videos worked because that's what inspired

25   him.  And in a conspiracy, ladies and gentlemen, it's what he

1    believed and his conspirators believed that is important, not

2    whether any individual went over to Iraq to fight because of

3    the defendant's translations, not whether he was ever able to

4    personally convince somebody to get on a plane and go do

5    something.  It's whether that's what his objective was.  It's

6    whether that's what his intent was.  That's what's different

7    between when the defendant translates something that's produced

8    by al Qa'ida, it's translated for al Qa'ida, it's distributed

9    on behalf of al Qa'ida, that means that the defendant knows

05:24 10    that he is coordinating with al Qa'ida to produce this message

11    and get it out there, not -- we don't have to prove that

12    somebody responded to that call like he did.  That's

13    coordination with, and that's the burden that we have proven in

14    this case, ladies and gentlemen.

15         The Umar Hadeed video is an example of that.  The Umar

16    Hadeed video, which there is no doubt that the defendant

17    translated.  In his own statements in the chats, he said, Abu

18    Sabaayaa translated it.  You saw one earlier where he's talking

19    to Daniel Spaulding about the fact that people are charging for

05:25 20    his translation.

21         And translation is an important expertise.  It is an

22    important skill.  We had translators come in and testify from

23    that stand about their translations, about how important it is.

24    Doctor Sageman mentioned it.  Evan Kohlmann mentioned it.  It

25    is a service to those people just as it is to al Qa'ida because

1    that's what's spreads the message.  That's what you need to get

2    the message out.

3         When the people at "Tibyan Publications," which, as

4    you all know, many of whom are in the United Kingdom, when they

5    collaborated with and they sent things to request the defendant

6    to translate it, he didn't say, Oh, this is for al Qa'ida.  I

7    don't want to do that.  What he said was, Okay.  And he

8    translated them and then published them.  And they were

9    released by al Qa'ida in the Land of Two Rivers media wing.

05:25 10    That is how the defendant viewed himself.  That's what we have

11    to prove in a conspiracy.  What was the defendant thinking --

12    what was his intent when he did those things?

13         You know that Evan Kohlmann's intent was not to

14    support al Qa'ida.  You now know that the defendant's intent

15    was to support the mission of al Qa'ida.  That doesn't mean you

16    have to support everything in al Qa'ida.  He's not charged with

17    his ideology, the checklist that Mr. Carney went through.  Did

18    he believe this?  Is that consistent with al Qa'ida?  Did he

19    believe this?

05:26 20         People believe many things.  He's not charged with

21    beliefs.  He's charged with doing certain things that are

22    against federal criminal law.  He's not charged with agreeing

23    with what al Qa'ida believed about voting, and he's not charged

24    with contemplating about how broad this doctrine of Aman

25    reaches, what terrorist acts it reaches.

1          What he's charged with is what was his intent when he

2     engaged in activities, going to Yemen and engaging in the

3     translation work and the dissemination and the video editing

4     that was providing an important value to al Qa'ida.  That's

5     precisely what the statute prohibits.  And as the judge

6     explained to you before, and he'll conclude with the final

7     instructions, it's that law that applies, not the version of

8     the law that the defense just proposed to you.  It's the law

9     that's written down on this verdict slip.

05:27 10          And so if we're talking about a checklist, this is the

11     checklist that matters, ladies and gentlemen.  This is the

12     checklist which you'll see in a moment that reads each of the

13     statutes that are at play here, and it gives you an option of

14     not guilty or guilty.  This is based in the facts that you've

15     seen over the last months.

16          We didn't come in and summarize and try to insult your

17     intelligence by suggesting that the defendant is a bad person.

18     This is not about his character.  It's not about his ideology.

19     It's not about what he would have been.  It's about what he did

05:27 20     and finding him accountable for it.

21          This Aman idea, let's put this to bed for once and for

22     all.  There are many doctrines in religion.  It doesn't mean

23     that people always follow those doctrines.  Thou shalt not lie,

24     thou shalt not kill.  People still do those things.  But the

25     Aman doctrine that the defense has tried to raise with you as

1    some kind of defense, is not a legal defense in any way.  In

2    fact, it was the defendant that, regardless of that doctrine,

3    who not only believed that that pact was broken, he was more

4    than happy to agree with the beheading of Paul Johnson.  He was

5    somebody who should have been living under that contract.  But

6    the defendant didn't believe that he deserved to live under

7    that contract because he was providing support to the American

8    soldiers.  And if you provide support to American soldiers, in

9    the defendant's eyes, then you are killing Muslims and you

05:28 10    deserve to be killed.  That's what he was going over to Yemen

11    for.  That's why he was publishing those things on "Tibyan

12    Publications," because if one person reacted to what he had

13    done and he answered that call, then, finally, this defendant

14    would be doing something.  He would be, in his words, getting

15    off his butt and not being a hypocrite anymore, not doing what

16    he always talked about.

17         That's what this case is about, ladies and gentlemen.

18    It's about the fact that he agreed to do the things that he had

19    always talked about, which was participating in Jihad against

05:29 20    U.S. soldiers, not random civilians, not people in other --

21    people unrelated to that objective of the conspiracy.  It was

22    U.S. soldiers that he was against.

23         I submit to you that the defendant's experts all

24    corroborated the government's case.  Sure, they came in for a

25    variety of reasons.  But Doctor Connolly basically confirmed

that this was a collaboration, that the translations were a
collaboration between the United Kingdom, the "Tibyan
Publications" folks, and the defendant.

Doctor Fadel and Doctor March corroborated to you that
it was a motivation, not an intention, but it was a motivation
of the defendant to support Jihad because it was an obligation
when Muslim land was invaded.

Doctor Sageman corroborated -- confirmed to you that
the use of media is important to al Qa'ida.  We heard about
Anwar al-Awlaki.  Doctor March also talked about him.  What did
that guy do?  That guy did nothing more than what the defendant
did.  He translated and he published media.  And he died for it
because he was supporting people who were killing American
soldiers.  You don't have to pick up a gun to do that, ladies
and gentlemen.  You can do what the defendant did.

And Johnsen -- or Mr. Johnsen, I should say -- this
was the Yemen expert, he told you exactly what the defendant's
words corroborated, which are that when he went to Yemen they
searched the country, and they couldn't find what they were
looking for.  They were disappointed because of the contact
that Abu Omar from California had given them didn't pan out.
The defendant wasn't talking about education at that point.  If
he did, why would he have been so disappointed?

And then, finally, Mr. Spencer, the computer expert,
Miss Bassil showed you a bunch of thumbnails and pictures.

1    That's not what this case is about.  It was never what this

2    case was about.  We didn't show you pictures of 9/11 to scare

3    you.  We showed you what was on the defendant's computer before

4    he engaged in these crimes or while he was engaging in these

5    crimes, the relevant pictures.  Who has 30 pictures of the

6    planes crashing into the Towers?  Is that Aman there?

7         Ladies and gentlemen, this is a person who, during

8    that time, had megabytes of data in his "My Work" folders, in

9    his "My Video" folders, in his "39 Ways" folder.  Those are in

05:31 10   his active space.  Those are not just vestiges of some

11   mysterious website that he went to.  That's the work that he

12   was doing that he felt was making a difference in the war

13   against us versus them.  To him, "us" was the Muslim world.

14   "Them" was the United States.

15        And the way he was going to participate in that fight

16   was to either go to the battlefield himself, by providing

17   himself and Abousamra and others as personnel, or by providing

18   the services and the expertise that was necessary to get other

19   people to go there and fight what he was unable or too cowardly

05:32 20   to do himself.

21        Final point about the witnesses, you can disregard all

22   of the government's witnesses.  I suggest to you you shouldn't

23   because the way that they told their stories and their

24   motivations for telling the stories are all plainly clear to

25   you.  I submit to you they didn't exaggerate.  They told you

1    what they knew.  And what they knew was -- and they never

2    wavered on this.  Even Daniel Spaulding said this -- that it

3    was the defendant and Abousamra who went to Yemen for those

4    purposes.  That never changed.

5         But even disregarding all of that, think of the

6    defendant's words himself, and those consensual recordings

7    spell out that the defendant knew what he had done.  He knew

8    what he had done was against the law.  And he knew that he

9    couldn't cover it up any longer.

05:33 10        Justifying those crimes by saying there was some

11   religious obligation or he's a scholar, that's not a defense.

12   That might play in mainstream or in the media or in politics,

13   but this case is not about Muslims versus the federal

14   government.  It's about what this defendant did, besmirching

15   the name of Islam in order to do what he felt was the right

16   thing to do.  It's about taking the law into his own hands.

17   It's about going over and trying to support those who are

18   actively taking up arms to kill American soldiers.  That's

19   against the law in most every country, but it most certainly is

05:33 20  in this country.  It's something that these material support

21   statutes were designed to prevent and to prosecute.  And the

22   punishment for that is not your concern.  That will be the

23   judge's.  Your job is simply to assess the evidence that's been

24   presented to you and determine whether that evidence bears out

25   what the Indictment says.

1          And I submit to you, ladies and gentlemen, that the

2     defendant now sits there as a guilty person, and I ask you to

3     spend as much time as you need to deliberate on that evidence,

4     share your thoughts, listen to the consensuals, assess all of

5     the evidence.  And when you do, ladies and gentlemen, I'm

6     confident that you will check each of these boxes "guilty"

7     because, after you read each of these charges and you assess

8     what the elements are of these offenses, as the judge gives

9     them to you, you'll find that the defendant is, in fact,

05:34 10     guilty.  And I ask you to return that verdict.  Thank you.

11          THE COURT:  Jurors, you have been very patient and

12     attentive.  I ask you to bear with me just for a few more

13     minutes while I finish the instructions.  This part of my

14     instructions is nowhere near as long as the first part, and

15     we'll have you deliberating soon.

16          I want to talk now about how you might go about

17     assessing your -- assessing the evidence in the case and

18     fulfilling your responsibility to make some decisions that are

19     presented.  There are sort of two aspects to the way you

05:35 20     conduct your deliberations.  First, you've heard all this

21     evidence over the course of the weeks of the trial.  And one

22     thing you have to do is decide what the evidence shows, what it

23     has proved to you or not.  Consider what the facts are as you

24     find them from the available evidence and then having

25     determined the facts, see what those facts mean in light of the

1    principles regarding the offenses that I gave you in the

2    earlier part of the instructions.  So you take the -- settle

3    the facts and apply the principles of law and see what the

4    answer is.

5         It's often said that jurors such as yourselves are the

6    sole and exclusive judges of the facts of the case.  You

7    determine the weight, the value, the effect of the evidence

8    that you've heard and seen, and where there are factual

9    disputes, you try to decide on the evidence what conclusions

05:36 10    you should draw about the facts.

11         You must determine the facts of the case without fear

12    or favor, based solely on a fair consideration of the evidence.

13    Now, that proposition means two things.  First of all, of

14    course, you're to be completely fair-minded and impartial,

15    swayed neither by prejudice nor sympathy, by personal likes nor

16    dislikes toward anybody involved in the case, but simply to

17    judge the true meaning of the evidence fairly and impartially.

18         And the second important point is:  Your judgment must

19    be based on the evidence that has been presented in the course

05:36 20    of the case.  You may not go beyond the evidence by speculating

21    or guessing what other things might also be true that were not

22    shown, but your responsibility is to resolve the issues so far

23    as you can by your consideration of the evidence that has been

24    presented.  Your conclusions should be those that the evidence

25    directs you to.

1    If there should be issues your thinking about and the

2  evidence is insufficient or inconclusive as to those so that

3  you're not able to draw a firm conclusion, then you have to

4  leave the conclusion undrawn.  You may draw those conclusions

5  that the evidence supports and leads your minds to.

6    Now, I'm going to talk a little bit more about the

7  evidence in a minute, but let me first remind you what is not

8  evidence.  I told you at the beginning that the lawyers'

9  summaries of the evidence, both before the case, in their

05:37 10  openings, when they're predicting what the evidence will be,

11  and now in the closings, when they try to recall it for you,

12  those summaries are not part of the evidence.  They are an

13  attempt to marshall the evidence for you so you'll understand

14  it, obviously, in a way consistent with their view of the case.

15  But to the extent you're collective appreciation of the

16  evidence differs in any way from the way the lawyers have

17  argued it or predicted it, it's your collective appreciation

18  that controls, not what the lawyers say the evidence is.  What

19  the lawyers say cannot add to or subtract from the evidence.

05:38 20  You have heard the evidence, and it's your judgment on that

21  that matters.

22    I told you at the beginning, and you've seen it

23  happen, that I would be presiding over the questions of

24  evidence as they've come out, ruling on evidence, to admit or

25  exclude it.  I remind you that there's no significance for your

1    purposes from any of the rulings either admitting or excluding

2    evidence.  Those considerations are wholly separate from the

3    kinds of decisions you'll have to make, and you should find no

4    significance to the evidence rulings.

5         I've reminded you already this morning that the

6    Indictment is not evidence.  It's simply a frame so you can see

7    what the proposed charges are that you have to test against the

8    evidence in the case.

9         Now, some of the things that are evidence.  You have a

05:39 10   large number of exhibits in the case in a variety of forms.

11   Some are documents; some are audio recordings; some are videos;

12   some are pictures.  You will have access to all the exhibits

13   that have been admitted in evidence, and you may consider those

14   exhibits and give them whatever weight, value or significance

15   you think they are fairly entitled to receive.  The judgment is

16   entirely yours.

17        We are now able to have the exhibits presentable to

18   you in a digital form.  You have no doubt seen the screen on

19   the wall in the jury room.  Now you're going to get to use it.

05:39 20   It's a new system.  This is actually, in this courtroom, the

21   second time we've used it, maybe the third.  It's called the

22   Jury Evidence Recording System.  And the parties put all their

23   exhibits in digital form into a drive, and it's fed into the

24   monitor.

25        You will have complete control over it.  When you

1    activate the touch screen when you go in, you'll see a prompt

2    for a tutorial.  There's about a four-minute tutorial that

3    teaches you how to use it.  It's very simple.  I'm sure you'll

4    know.  I don't know if any of you have iPads or Tablets, but

5    it's very much like the using of one of those, and you can

6    scroll through things and zoom in and so on and so forth.  You

7    have complete control.  There is an index.  You will also have

8    a paper index that will give you a listing of the exhibits.

9    And so you'll have the exhibits in that form, and you can look

05:40 10    at them in that way.

11         We will also give you binders which have the paper

12    exhibits, the documents, as opposed to the videos and so on, in

13    the binders if you find it more convenient to resort to the

14    paper files rather than the video files.  But you'll have

15    either, and you can use either as you see fit.

16         Now, let me remind you that some of the exhibits,

17    particularly some of the chats, were admitted under a

18    limitation that they could be considered as evidence that a

19    particular event occurred, for example, that someone said a

05:41 20    particular thing on an occasion, but not as evidence of the

21    truth of any affirmative assertion contained in it.

22         So to illustrate that again, evidence that a person

23    said, "I'm unhappy," for example, under this limitation could

24    be used to consider the fact that the person said she was

25    unhappy but not necessarily to prove the fact that she was, in

1   fact, unhappy.  So it's the event of the saying rather than the

2   truth of the assertion.  And I remind you of that limitation.

3   You may have made notes of it when I made it, and I ask you to

4   observe that.

5          You have some audio recordings.  You'll recall the

6   audio were played here, and you had some transcripts that

7   helped you follow the audio.  I told you then, and I remind

8   you, that it's the recordings themselves that are the exhibits.

9   So you will have -- insofar as the recordings are in English,

05:42 10   you will have only the audio.  You will not have the

11   transcripts in the jury room because those are not part of the

12   exhibits.  There are some audio recordings which include

13   Arabic, which has to be translated, and we'll give you

14   transcripts of those so that you can have an idea what the

15   Arabic says, but only in that limited way will you have

16   transcripts.

17          And, of course, in addition to the exhibits and the

18   recordings and so on, you have the testimony of the witnesses

19   who appeared here in the courtroom to answer the questions that

05:42 20   were put to them.  You ought to give the testimony of each

21   witness whatever weight, whatever value or significance, in

22   your judgment, it is fairly entitled to receive.

23          With respect to each witness, you should think about

24   the testimony and decide how much value or meaning it ought to

25   have to fair-minded people like yourselves who are looking for

the truth.  You may find, as you think about the evidence from

any particular witness that you find credible, reliable,

meaningful just about everything the witness has said, perhaps

just about nothing the witness has said or perhaps something in

between.  Maybe there are some things from the same witness you

find credible and reliable and other things from that witness

you are more skeptical or doubtful of.  There's no automatic

rule.  You don't have to accept any given witness' testimony in

total or reject it in total.  You should think about the

testimony itself and accept what is meaningful and reliable and

reject what is not.

       Let me suggest that some principle considerations in

evaluating witnesses' testimony involve three aspects:

perception, memory and narration.

       Perception.  How good were the witness' observations

or perceptions in the first place?  What were the circumstances

under which the witness participated in things, observed things

and so on?  And how did those circumstances affect, if they

did, the witness' ability to later on reliably tell you what

had happened?

       Memory.  How accurate and reliable is the witness'

recollection of events?  People have varying abilities to

remember things accurately and to recall them, and you may take

that into account.  Sometimes the way things happen, the

circumstances surrounding an event may affect the ability of

1    people to remember things accurately and reliably.  For

2    example, sudden, unexpected events may be perceived and

3    remembered in a different way from events that unfolded in an

4    orderly and logical pace.

5         Narration.  How reliable, how accurate, is the witness

6    in narrating or telling here in the courtroom what happened?

7    Is the testimony truthful?  Is it complete?  Is the witness

8    careful in describing things?  Is the witness, him or herself,

9    confident or uncertain about the testimony?  Is the witness'

05:45 10   testimony consistent with itself or does it vary?

11        Now, sometimes when a witness testifies to something

12   here in a courtroom in the course of the trial, the witness

13   will be asked whether on some prior occasion the witness hadn't

14   said something different or inconsistent with the trial

15   testimony.  If you conclude that a witness had said

16   inconsistent things here and elsewhere, you can -- you may

17   consider what implication that inconsistency has for your

18   acceptance of the witness' testimony.  For example, you might

19   conclude that the witness is not reliable because the witness'

05:45 20   testimony varies from time to time.

21        Keep in mind, however, that it is unlikely that a

22   person will always say the same thing in exactly the same way

23   on different occasions.  And if you find an inconsistency, you

24   should ask yourself whether it is a significant one or an

25   insignificant one.  Does it really relate to a matter of

1    importance or to a relatively unimportant detail?  But you may

2    take account of variance or inconsistency in witnesses'

3    testimony in assessing not only the particular point of

4    inconsistency but the entire testimony by the witness.

5         You may also take into account any partiality or bias

6    that a witness might have toward one side or the other.  Does

7    the witness have any reason, motive, interest, in the outcome

8    of the case or anything else that would lead the witness to

9    favor one side or the other in the testimony?

05:46 10         Now, a tendency to favor one side or the other might

11   be deliberate, an intentional effort to favor one side, or it

12   might be unconscious, arising out of some affiliation or

13   affinity with one side or the other.  Again, such tendencies

14   could affect the reliability of the testimony, and you ought to

15   consider whether there has been any such effect with respect to

16   the testimony you've heard.

17        Again, keep in mind that in every case there are

18   people who have an association or connection with one side or

19   the other, and it's not automatic, of course, that people must,

05:47 20  therefore, be distrusted.  But potential bias or partiality,

21   conscious or unconscious, by a witness is a factor you can

22   think about in evaluating the evidence.

23        Now, there has been testimony, as you've heard in the

24   closing statements, from a witness, Mr. Maldonado, who was

25   convicted of a crime after pleading guilty pursuant to a plea

1    agreement that he entered into with the government.  That

2    agreement is in evidence for you to review.  You've heard that

3    the government made certain concessions to the witness in

4    return for his entry of a guilty plea, such as not bringing

5    other charges that might have been brought and agreeing to a

6    sentence that was perhaps lower than what might otherwise have

7    been imposed.  There was also evidence the witness might have

8    been given other consideration by the government, such as with

9    respect to his place of incarceration or other matters.

05:48 10          It's legitimate for the government to enter into plea

11    agreements of this kind, and you may accept and rely on the

12    testimony of a person who testifies after entering into such an

13    agreement and base your conviction in substantial part on

14    acceptance of that testimony if you decide that you are

15    convinced by it and it warrants conviction.

16          However, you should bear in mind that such a witness

17    who has entered into an agreement with the government in return

18    for a reduced charge or a lower sentence may have a motive to

19    tell the government what he thinks it wants to hear.  And,

05:48 20    accordingly, you should consider such evidence with great care

21    and caution.

22          After your careful and cautious consideration of the

23    evidence, you may decide it is not reliable and reject it, or

24    you may decide it is reliable and accept it, in whole or in

25    part.  That judgment is yours.

1         You've also heard testimony from witnesses who have

2    been granted immunity from the use of their testimony at the

3    government's request in order to have their testimony available

4    here at trial.  An order of immunity provides that no testimony

5    given here by the witness may subsequently be used against him

6    in any criminal prosecution.

7         Again, the government is permitted to seek immunity

8    orders in order to obtain testimony from witnesses who may

9    themselves be susceptible to possible criminal prosecution.

05:49 10   Again, the witness -- the testimony of a witness who has been

11   given immunity should be examined by you with greater care than

12   the testimony of ordinary witnesses.  You should scrutinize it

13   closely to determine whether or not it is colored in a way to

14   advance the witness' own interests rather than simply to tell

15   the truth.  Again, after your careful assessment of such

16   evidence, you may reject it or accept it, a judgment left

17   entirely to you.

18        Some evidence in this case was obtained by means of

19   various investigative techniques such as searches, electronic

05:50 20   interceptions, consensual recordings.  The government is

21   permitted to use such investigative techniques and the use is

22   regulated by strict procedures of advanced judicial approval.

23   If the techniques had been improperly used, the evidence would

24   not have been permitted to have been presented in the case.

25        You ought to consider the evidence from each witness

1    not only by itself, in isolation, as if that witness were the

2    only person to testify, but in the context of all the evidence

3    you've heard.  Don't break the evidence into such small pieces

4    that it becomes artificial in a sense.  Think of the bulk of

5    the evidence, and as you examine pieces of it, think of how it

6    relates to other pieces of the evidence.

7           For example, you might see -- might be testimony,

8    might be something else.  There's a piece of evidence that

9    originally you're a bit skeptical of.  Then you might hear

05:51 10  other evidence that leads you to reexamine what your initial

11   impression of what the evidence first was, and you begin to

12   trust it more.  The opposite might happen, of course, too.  You

13   might accept something that sounds pretty good at first.  Then

14   as you hear more from other pieces of evidence, you might begin

15   to doubt what you first had accepted.  So, again, think of the

16   evidence sensibly as a whole and make sound judgments about it.

17          You may make inferences from the evidence.  We say

18   that a fact in a case like this can be proved by either two

19   kinds of evidence:  direct evidence of the fact or

05:51 20  circumstantial evidence of the fact.  Direct evidence is when

21   there is a piece of evidence which, if accepted, tends directly

22   itself to prove the proposition.  Often, it's simply an

23   assertion, but it could be many things.

24          Suppose it's a simple assertion.  Suppose somebody

25   said, "It's raining out."  You can decide whether the person

had any basis for knowing what the weather was like outside,

whether they could be trusted to tell you accurately what the

weather was.  But if it passes those kinds of tests of

reliability, then you could accept it and believe, as a result

of accepting it, that it was raining out.  That would be

directly proving the proposition.

Now, suppose instead of somebody saying what the

weather is, somebody came into the courtroom now wearing a

raincoat that was all wet and folding up an umbrella as they

shook the drops off the umbrella.  There would be no direct

assertion about what the weather was, but you had some data,

some information from which you might draw an inference because

in your common experience wet raincoats and umbrellas is

consistent with a weather pattern that is rain.  And so you

might say, Aha, based on that, I infer or conclude that it's

raining out.

An inference is simply a conclusion that you might

draw from available information that you have found to be

reliable.  I point that out because sometimes you'll hear

people say, "That's just circumstantial evidence.  That doesn't

prove anything."  That goes too far because circumstantial

evidence can prove things if properly used.  And if you think

about it, we probably rely on circumstantial evidence routinely

through the day.  You walk into the kitchen and see the tea

kettle steaming on the stove.  You know enough not to put your

1    finger on the burner because you've drawn an inference about

2    what's going on there.

3            So you can use it.  You must be careful that the

4    inferences that you would draw are those that are generally

5    supported by the information that you're basing the inference

6    on.  An inference or proof by circumstantial evidence or

7    inferring cannot be an excuse for guessing or speculating.  And

8    if there are alternate inferences that are available, say there

9    are some facts that might mean this or they might mean that,

05:53 10   you can't just pick one.  You have to be persuaded that there

11   is an inference that is superior to other inferences based on

12   the data and information you have.

13           And, of course, to the extent that you rely in a

14   criminal case on inference by circumstantial evidence, in the

15   end, your conclusions still must be those that convince you

16   beyond a reasonable doubt.

17           As I reminded you at the outset of the trial, the

18   defendant is presumed to be innocent of the crimes he is

19   charged with unless and until the government has proved by the

05:54 20   evidence that he is guilty and proved that beyond a reasonable

21   doubt.  The burden of proof rests with the government.  A

22   defendant assumes no burden to prove that he is innocent.

23           A defendant in a criminal case has a right guaranteed

24   by the Bill of Rights in our Constitution to choose not to

25   testify in the case.  There may be many reasons why a defendant

1    would choose to invoke and exercise that right.  You may not

2    under any circumstances draw any inference or presumption

3    against a defendant from his decision to invoke that right and

4    decline to testify.  You should not discuss the matter.  You

5    are to decide the issues in the case solely from your

6    consideration of the evidence that has been given in the case.

7           A defendant is, of course, entitled to present

8    evidence other than his own testimony.  It is important for you

9    to keep in mind, however, that by presenting evidence, a

05:55 10    defendant does not assume any burden or obligation to prove

11    that he's not guilty or, to put it more colloquially, to

12    explain things.

13           A defendant's evidence is subject to the same

14    standards of scrutiny and evaluation that you give to all

15    evidence, but the burden of proof never shifts from the

16    government.  The question is never which side has convinced me,

17    but, rather, has the government convinced me beyond a

18    reasonable doubt that the defendant is guilty?  If the answer

19    to that question is yes, the government is entitled to your

05:56 20    verdict of conviction.  If the answer is no, then the defendant

21    is entitled to be and must be acquitted.

22           The burden placed upon the government to prove a

23    defendant's guilt beyond a reasonable doubt is a strict and

24    heavy burden, but it is not an impossible one.  It does not

25    require the government to prove a defendant's guilt beyond all

possible, hypothetical or speculative doubt.  There are
probably very few, if any, things in human affairs that can be
proved to absolute certainty, and the law does not require
that.

But the evidence must exclude in your minds any
reasonable doubt about the defendant's guilt of the crime he is
accused of.  A reasonable doubt may arise from the evidence
produced or from a lack of evidence.  If you conclude the
evidence may reasonably permit either of two conclusions with
respect to a particular charge -- one, that the defendant is
guilty as charged and the other that the defendant is not
guilty -- then you must in that case find him not guilty.

Reasonable doubt exists when, after you've considered,
compared, and weighed all the evidence, using your reason and
your common sense, you cannot say that you have a settled
conviction that the charge is true.  Conversely, we say that a
fact is proved beyond a reasonable doubt if, after careful
consideration of all the evidence, you are left with a settled
conviction that the charge is true.  A reasonable doubt is not
speculation or supposition or suspicion.  It is not an excuse
to avoid an unpleasant duty.  And it is not sympathy.

While the law does not require proof that overcomes
every conceivable or possible doubt, it is not enough for the
government to show the defendant's guilt is probable or likely
even if it seems a strong probability.  The government must

1    establish each element of an offense charged by proof that

2    convinces you and leaves you with no reasonable doubt and thus

3    satisfies you that you can, consistently with your oath as

4    jurors, base your verdict on it.  Again, if you are so

5    convinced, then it is your duty to return a verdict of guilty.

6    If, on the other hand, you have a reasonable doubt about

7    whether the defendant is guilty of the crime charged, you must

8    give the defendant the benefit of that doubt and find him not

9    guilty.

05:58  10        Your verdict must be a unanimous one, as I've said

11    before, whether it is guilty or not guilty.  And where there

12    are alternate theories of conviction under a count, you must be

13    unanimous as to the theory on which you base the verdict.

14        Let me just see counsel at the side.

15    (SIDEBAR CONFERENCE AS FOLLOWS:

16        THE COURT:  This is your opportunity.  This is an

17    opportunity.

18        MR. CARNEY:  I want to take full advantage.  I object

19    to the Court, on Count 1, not limiting the law as to how it

05:59  20    existed on January 1, 2001.  And I would make the same

21    objection to Count 2.

22        As to Count 3, I object that the Court did not limit

23    the law to how it existed on April 1, 2002.

24        I object to the Court not giving an instruction on the

25    meaning of the phrase "in coordination with" and "FTO" or

1  "terrorists."

2       I object to the Court not giving our instructions on

3  the First Amendment, including Proposed Instructions No. 5, 6

4  or 7.

5       I object, in regard to Proposed Instruction No. 8

6  regarding murder, that the Court did not include defense of

7  another.

8       I object to Proposed Instruction -- in regard to

9  Proposed Instruction 9 and 10 regarding false statement or

06:00 10  false statements, that the Court did not instruct on false

11  statements, that they had to involve or were intended to

12  involve -- were intended to promote, rather, the federal crime

13  of terrorism.

14       I object that the Court did not give my supplemental

15  proposed instruction that the government has a burden of

16  proving that the defendant did not act as an independent

17  advocate.

18       Finally, your Honor, I object that the Court did not

19  give the version of the special verdict slip that we proposed

06:00 20  or something comparable.

21       THE COURT:  Okay.  I think we thoroughly covered those

22  matters.  You call them again to my attention, but I reaffirm

23  the rulings I gave earlier.

24       MR. CARNEY:  I understand.  Your Honor has said in the

25  -- noted in the past that counsel's obligated to do this.

1          THE COURT:  I believe that's the case.

2          MR. CARNEY:  And so with respect, I'm doing it.

3          THE COURT:  Okay.

4          MR. CARNEY:  And I rest on any arguments I said

5    earlier.

6          MR. CHAKRAVARTY:  Nothing from the government.  I want

7    to clarify one thing, that at the charging conference counsel

8    had cited to two amendments, 2001 and 2004 amendments, but the

9    dates that you just said don't necessarily comport to that.

06:01 10   Just for clarification of the record, can we establish whether

11   it was kind of a variation of the same theme?  I don't recall a

12   specific request for those instructions before.

13          THE COURT:  Go ahead.  It's your point.

14          MR. CARNEY:  What I'm suggesting is that the date be

15   either the first date -- rather, the first possible date of the

16   conspiracy but in every instance prior to the amendment of the

17   law.

18          And I used in one instance, I believe, where the

19   government alleged that the conspiracy began on or about the

06:02 20   spring of maybe 2002, that I interpret the first day of spring

21   as being April 1st.  So okay.  It is April 1st.  That's what

22   I'm saying.

23          THE COURT:  No.  It's March 21st.

24          MR. CARNEY:  Is it really?  I don't think it makes a

25   difference.

```
 1              THE COURT:  Two things as long as you're here.  By

 2    now, I'm sure that the first part of my instructions have been

 3    transcribed and so on.  The second part will take awhile.  I

 4    don't know whether you have any views as to whether it's okay

 5    to send the first part in while we wait for the second part, or

 6    do you want to wait until they're all finished and send them

 7    both together?

 8              MR. CARNEY:  The defense will leave it completely up

 9    to you.

10    MR. AUERHAHN:  Might as well give them what's

11    available now.

12              THE COURT:  They are so topically distinct.  Some

13    people prefer the whole thing to go all at once.

14              MR. CARNEY:  Whatever way your Honor thinks is best,

15    we agree with.

16              THE COURT:  I will probably keep the jury here until

17    about 4:30.

18              MR. AUERHAHN:  Do you bring them back in the courtroom

19    at the end of the day?

20              THE COURT:  Yes.  And my practice is to assemble every

21    day in the morning, at 9, record that they've all returned, ask

22    them if they have obeyed the instruction to avoid discussion

23    and ask them to continue on.

24              MR. CARNEY:  Just while we're here, if counsel is

25    within 15 minutes of the courthouse --
```

1          THE COURT:  That's fine.  If you can be here within 15

2     minutes, that's fine.

3          MR. CARNEY:  I think both of us are not physically --

4          THE COURT:  All right.  We'll finish up then.  I think

5     you know who the alternates are.

6     .  .  .  END OF SIDEBAR CONFERENCE.)

7          THE COURT:  Now, jurors, just a few final comments.  I

8     won't and -- I guess I can't, and I won't, tell you how to

9     actually conduct your deliberations.  That's something for you

06:04 10   to settle among yourselves including the selection of a person

11    to act as foreman of the jury.  I leave that to jurors.  You've

12    spent a lot of time with each other now.  Maybe you have

13    someone in mind who has good executive ability and could

14    preside over the deliberations.  That person really does that,

15    I guess, makes things orderly, also will sign the verdict slip

16    when you've reached a unanimous verdict as to the various

17    counts.  The foreman will also have the responsibility to

18    communicate with us, if it's necessary, to pose a question

19    pertaining to the law that applies.

06:04 20        I've given you the instructions.  You will have a

21    transcript of what I've said to you, and it may not be

22    necessary for you to ask any questions.  I hope it's clear

23    enough that you don't have to.  Sometimes it happens that the

24    jury is a little uncertain about a particular principle of law

25    and wants clarification.  If that happens, you'll see there are

1    some slips in there that the foreman can write out the

2    question, and we'll try to answer it.

3         We cannot and will not answer questions about the

4    evidence, the meaning of the evidence, the facts of the case,

5    or anything other than the principles of law.  All those

6    matters of evaluation of the evidence and what the facts are

7    and what they mean are entirely your province, and we can have

8    nothing to say about it.  Jurors are sometimes tempted to ask

9    for a little help with resolving a factual dispute they might

06:05 10    be having.  We can give you no such help.  We can answer

11    questions to clarify any point of law if you're confused about

12    it.

13         The last thing before you begin to deliberate is we

14    must separate from the fifteen of you three who are the

15    alternate jurors.  A jury, by law, must consist of 12 people.

16    We started with 16.  Unfortunately, one of the group had to --

17    could not make it for the full length because of family

18    circumstances.  And that's what happens in a lengthy trial.  We

19    want to be sure we have 12 people at the end, so we over

06:06 20    impanel at the beginning.

21         So I will now reduce the jury, as we say, from the 15

22    to the 12, by separating those who have been, by the method

23    that is applicable to these matters, determined to be the

24    alternate jurors.  Those jurors will be still kept available in

25    case something happens during the deliberations of the jury.

1    It may be necessary to call an alternate juror into service.

2         The alternate jurors are:  Juror in Seat No. 6, Ms.

3    Wong; juror in Seat No. 2, Miss Sorrento; and juror in Seat No.

4    9, Mr. McBean.  If those three jurors would step out, the clerk

5    -- and I think -- the clerk will just take you outside for a

6    moment.  The rest of you now are the deliberating jury and will

7    conduct the deliberations in the case.

8         So as soon as -- now, as I said, some of the materials

9    will take a little while to be delivered to you.  The

06:07 10    electronic feed should happen almost instantly.  There will be

11   some paper.  We want to make sure everybody's looked at it and

12   assured that it's the right thing going back.  That will take a

13   minute or two before you get it.  You will have all your notes

14   that you've taken, your personal notes, to use during your

15   deliberations.  Be respectful of each other's note-taking

16   abilities and memories and deliberate with a mind towards

17   hearing each other out, considering the evidence seriously as a

18   group and, if you can, coming to an agreement.

19        Do you want to take them out?  Jurors, if you would

06:08 20    now withdraw, deliberate upon the evidence, and return with

21   your verdict.

22   (The jury was excused to commence their deliberations.)

23        THE COURT:  And we will be in recess.

24   (Recess taken at 2:53 p.m.)

25        THE CLERK:  All rise for the Court and the jury.

```
 1              (The Court and jury enter the courtroom at 4:41 p.m.)
 2              THE CLERK:  Be seated.
 3              THE COURT:  All right, jurors.  That's enough for
 4       today, I think.  You've had a long day.  You've heard a lot and
 5       you've begun your work, so we'll call it quits for the weekend.
 6              It's very important now that you avoid any discussion
 7       whatsoever, as a deliberating jury, about anything involved in
 8       the case.  Don't even give it any consideration.  I'm sure
 9       there's lots of things you can turn your attention to this
07:57 10 weekend.
11              What we will do on Monday morning is come back, as you
12       have, into the jury room.  When everybody's here at nine
13       o'clock, or as soon as we can, we'll come into the courtroom,
14       record for the record that everybody's returned and is prepared
15       to continue deliberating, and then send you back in.  And at
16       that point you can resume discussion.  So don't start
17       discussing as you arrive until that point on Monday morning.
18              So have a very pleasant weekend and we'll see you
19       Monday and continue with the deliberations, okay?
07:57 20         I just have a logistical matter with the lawyers, and
21       then we'll excuse the jury.
22              (The jury exits the courtroom at 4:43 p.m.)
23              THE COURT:  I didn't particularly want to deal with
24       this this afternoon, but just as I came down they handed me a
25       note which says, "May we get testimonies from individual
```

1    witnesses?"  I assume they mean the transcripts.  So we're not

2    going to discuss it now; I just wanted to let you know it's

3    here.  We can talk about it Monday morning and decide what

4    answer to give, all right?

5           Okay.  Have a good weekend.  We'll see you Monday

6    morning.

7           MR. AUERHAHN:  Your Honor, can we approach for just

8    one second, just very quickly.

9           (Discussion off the record.)

07:59 10        THE COURT:  Okay.  We're out of here.

11          THE CLERK:  We'll be in recess.

12          (The Court exits the courtroom and the proceedings

13   adjourned at 4:45 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          We, Marcia G. Patrisso, RMR, CRR, and Cheryl

4    Dahlstrom, RMR, CRR, Official Reporters of the United States

5    District Court, do hereby certify that the foregoing transcript

6    constitutes, to the best of our skill and ability, a true and

7    accurate transcription of our stenotype notes taken in the

8    matter of Criminal Action No. 09-10017-GAO-1, United States of

9    America v. Tarek Mehanna.

10

11   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
12   Official Court Reporter

13   /s/ Cheryl Dahlstrom
     CHERYL DAHLSTROM, RMR, CRR
14   Official Court Reporter

15

16   Date:  December 16, 2011

17

18

19

20

21

22

23

24

25