## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Criminal No. 09-10017-GAO |
| | ) | |
| TAREK MEHANNA | ) | |

## DEFENDANT'S MEMORANDUM ON THE APPROPRIATE SENTENCE UNDER 18 U.S.C. §§ 3553 AND 3661

Defendant Tarek Mehanna, through undersigned counsel, submits the instant Sentencing Memorandum for the Court's consideration and requests a sentence, as calculated and reviewed pursuant to Title 18, United States Code, §§ 3553(a) and 3661, that is sufficient but not greater than necessary to achieve the statutory goals of sentencing. Counsel respectfully submits the following Memorandum to assist the Court in fashioning Mr. Mehanna's sentence.

Respectfully submitted,

TAREK MEHANNA
By his attorneys,

CARNEY & BASSIL

*Janice Bassil*
Janice Bassil
BBO# 033100

*J. W. Carney, Jr.*
J. W. Carney, Jr.
BBO# 074760

Sejal H. Patel
B.B.O. # 662259

John E. Oh
B.B.O. # 675916

Carney & Bassil
20 Park Plaza, Suite 1405
Boston, MA 02116
617-338-5566

Dated: April 9, 2012

## TABLE OF CONTENTS

**Headings**                                                                                        **Page**

Memorandum…………………………………………………………….. 6

I. Outline…………………………………………………………………… 6

    A.        Introduction……………………………………………………  6

    B.        Statement of Facts………………………………………………  7

    C.        Procedural Sentencing Framework…………………………..  8

II. Application of 18 U.S.C. § 3553(a)'s Sentencing Factors……………… 9

    A.   Nature and Circumstances of the Offense and the History and
          Characteristics of Tarek Mehanna concerning the offense…………. 9

        1.        Yemen …………………………………………………..  10

        2.        Translations, videos and postings………………………..  14

        3.        Lack of harm……………………………………………..  18

    B.   History and Characteristics of Tarek Mehanna…………………… 19

        1.        Tarek Mehanna's Family…………………………………… 19

        2.        Tarek Mehanna's Education………………………………..  20

        3.        Tarek Mehanna's Religious and Cultural Interests…..…….. 20

        4.        The impact of September 11th……………………………… 22

        5.        Who is Tarek Mehanna…………………………….……… 24

    C.   Need for Sentence Imposed to Reflect Seriousness of Offense,
          Promote Respect for the Law, Provide Just Punishment, Afford
          Adequate Deterrence, Protect the Public from Further Crimes, and
          Provide Tarek Mehanna with Needed Training, Medical Care, or
          other Correctional Treatment in the Most Effective Manner………. 27

        1.        Just punishment requires an examination of sentences in
                similar to avoid sentencing disparity and to promote respect
                for the law…………………………………………….……… 27

2.      No Mandatory Minimum……………………………………….. 40

3.      Tarek Mehanna Poses a Very Low Risk of Recidivism………40

4.      Incarceration is More Significant for a "First Offender" than
        Upon a Repeat Offender………………………………………42

5.      Severely Long and Harsh Terms of Incarceration Significantly
        Reduce the Likelihood that a Defendant will be able to Pursue
        a Viable, Relatively Conventional Life after Release……….. 43

6.      Collateral Consequences of Imprisonment…………………... 49

III. Conclusion……………………………………………………… 50

Certificate of Service………………………………………… 52

Exhibits:

Exhibit A:      Letters from Tarek Mehanna's father, mother and brother

Exhibit B:      Letter from Tarek Mehanna

Exhibit C:      Letters from the Community

Exhibit D:      Defendant's Objections to Presentence Report

Exhibit E:      *U.S. v. Amawi* Sentencing Transcript

Exhibit F:      *U.S. v. Hassoun* Sentencing Transcript

Exhibit G:      Table of Life Sentences

Exhibit H:      Table of Massachusetts Cases

Exhibit I:      "Terrorist Trial Report Card: September 11, 2001 – September 11,
                2011," Center on Law & Security, NYU School of Law

Exhibit J:      *U.S. v. Sadequee* Sentencing Transcript

Exhibit K:      *U.S. v. Ahmed* Sentencing Transcript

Exhibit L:      Shane, Scott, "Beyond Guantanamo, a Web of Prisons for
                Terrorism Inmates," New York Times, December 10, 2011

Exhibit M:      Gawande, Atul, "Hellhole," The New Yorker, March 30, 2009

<u>**MEMORANDUM**</u>

**I. Outline**

    **A. Introduction**

This Sentencing Memorandum is submitted on behalf of Defendant Tarek Mehanna in connection with his sentencing on April 12, 2012 at 10:00 am. For the reasons set forth below, we respectfully move that the Court impose a sentence of 63-78 months.

We set forth an analysis of each of the factors listed in 18 U.S.C. § 3553(a) that apply to sentencing – including Mr. Mehanna's specific offense conduct, his background and history, the need for deterrence and the prospect of recidivism, the impact on innocent third parties, and the direction of the Congress to avoid sentencing disparities with similarly-situated defendants. A 63-78 month sentence would best achieve the five objectives enumerated in § 3553(a)(2), as it would reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. Such a sentence would also satisfy § 3553(a)'s "parsimony clause," which requires that the sentence be "sufficient but not greater than necessary" to accomplish those stated goals of sentencing.

The reasons supporting a 63-78 month sentence include the following:

(1)  Mr. Mehanna's very low risk of recidivism, which the § 3A1.4 terrorism enhancement does not reflect;

(2)  The particular nature and circumstances of Mr. Mehanna's specific offense conduct;

(3)  The comparison of Mr. Mehanna's conduct to others charged with similar offenses and to the co-conspirators in this case;

(4)   Mr. Mehanna's history and characteristics, to which the letters attached attest, has been exemplary, non-violent, and principled, with the most frequent descriptions of him as "kind," "thoughtful," "patient" and "caring." Mr. Mehanna submits letters from his parents and brother (Exhibit A), himself (Exhibit B) and from the community (Exhibit C).

(5)   The devastating effect that incarceration of Mr. Mehanna would have on innocent third parties, specifically his family and community, who will suffer in his absence.

(6)   The severity of conditions under which Mr. Mehanna has been held and expects to be held upon being sentenced.

As set forth below, analyzed pursuant to the corresponding § 3553(a) criteria, these factors provide a compelling basis for a 63-78 month sentence.

### B. Statement of Facts

The Court presided over a nine-week trial in which the facts were fully aired. The Court has also been provided with the Presentence Report completed by the Probation Department. In that report, the defendant took issue with many of the so-called facts the government provided in its statement of relevant conduct. Rather than reiterate the same facts yet again, the defendant refers the Court to the PSR. For convenience sake and in order to have a complete document, the defendant has appended his statement of relevant facts and opposition to the government's statement of relevant conduct in an attachment to this memorandum. *See* Exhibit D.

### C. Procedural Sentencing Framework

In *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007), the Supreme Court re-affirmed the sentencing regime announced in *United States v. Booker*, 534 U.S. 220 (2005), which requires district courts to consider the advisory Guidelines but also permits district courts to tailor a sentence in light of the other statutory concerns set forth in 18 U.S.C. § 3553(a). Under § 3553(a), district courts are directed to impose the minimally sufficient sentence to achieve the statutory purposes of punishment – justice, deterrence, incapacitation, and rehabilitation – by imposing a sentence sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(d). *Kimbrough*, 128 S.Ct. at 570; 18 U.S.C. § 3553(a). This "parsimony provision" is "an overarching provision," representing a cap above which a district court is statutorily prohibited from sentencing – even when a greater sentence is recommended by the advisory Sentencing Guidelines, which, per § 3553(a), are statutorily subordinate to the parsimony principle. *See Kimbrough,* 128 S.Ct. at 570.

Thus, after properly calculating the advisory range under the Sentencing Guidelines, a factor which serves as only the "starting point" or "initial benchmark," district courts must then consider each of the § 3553(a) factors to impose a sentence sufficient but not greater than necessary, to fulfill the purposes of sentencing. *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007). The Supreme Court has explained that district courts may not presume the advisory Guidelines range to be reasonable. *Id.* at 596. Further, the advisory Guidelines range is to be given no greater weight than any other § 3553(a) factor. *Id.* at 602. The Supreme Court has rejected an appellate rule requiring extraordinary circumstances or the use of the mathematical formula to justify a

sentence outside the guidelines range. *Id.* at 595. The district court "must adequately explain the chosen sentence...to promote the perception of fair sentencing." *Id.* at 598 and this justification must be "sufficiently compelling to support the degree of the variance." *Id.* at 598.

District courts are afforded sentencing discretion because they are "in a superior position to find facts and judge their import under § 3553(a) in the individual case." *Gall*, 128 S.Ct. at 598. The district court "judge sees and hears evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Id.*

Furthermore, under 18 U.S.C. § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of the person convicted of an offense" that this Court may "consider for the purposes of imposing an appropriate sentencing." Thus, "when a party raises a specific, non-frivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects the party's position." *Rita v. United States,* 127 S.Ct. 2456, 2468 (2007). Mr. Mehanna presents the following for the court's consideration relative to the factors outlined in 18 U.S.C. §§ 3553(a) and 3661.

## II.     Application of the 18 U.S.C. § 3553(a) Sentencing Factors

### A. Nature and Circumstances of the Offenses and the History and Characteristics of Tarek Mehanna

In considering the nature and circumstances of the offenses and the history and characteristics of Mr. Mehanna, it is important to recognize that the facts of this case took place during the most volatile times of the war in Iraq. Most of what Mr. Mehanna wrote and spoke about was his reactions to the news of the war in Iraq and other conflicts, not

only what he learned from mainstream news sources but also from the Internet. It is therefore important for the court to consider not only case specific facts regarding Mr. Mehanna and his conduct but to consider pertinent world news to put this conduct in proper context.

The defendant acknowledges that the jury found that he went to Yemen to seek military training based on the conviction in Count Seven. This act also provided the basis for the defendant's convictions in Counts One, Two, Three, Four, and Five. Because the government intertwined Mr. Mehanna's activities in translating, posting and sending videos to others, it is impossible to know if the jury unlawfully convicted Mr. Mehanna for his speech related activities protected by the First Amendment. The government argued that such actions were not free speech but material support. The government opposed a special verdict slip which would have clarified this and as such, it should not be allowed to benefit from this lack of clarity. The defendant asserts that based on the jury's verdict, only his trip to Yemen was unlawful. This is important for many reasons.

### 1. Yemen

First, the trip to Yemen occurred eight years ago when Mr. Mehanna was 21 years old. He was the youngest of the three men, including Ahmed Abousamra, who was clearly and repeatedly described as the most outspoken, charismatic and vehement of the three. It was Abousamra, not Mr. Mehanna, who had twice gone to Pakistan seeking military training. Even Hassan Masood was caught up in Abousamra's fervor and sought to accompany him to Pakistan. Kareem AbuZahra provided the funding for Jason Pippin to provide Abousamra with information about Yemen and for the airfare of the three travelers. Like many American Muslim young men, Mr. Mehanna led a sheltered life. As

a Muslim, he did not drink, date, attend clubs or concerts, or live in a dormitory away

from his family. His trip to Yemen was an adventure proposed by Abousamra and paid

for by AbuZahra.. But for AbuZahra's funding, Mr. Mehanna would never have gone to

Yemen. By contrast, in *United States v. Amawi*, 06-CR-719-JGC, Northern District of

Ohio, Western Division, the government argued that Amawi deserved a life sentence

because, in part, he was "not an experimental young teenager trying this sort of idea out

for the first time." Transcript of Sentencing Proceedings before Hon. James G. Carr, U.S.

District Court, Northern District of Ohio, Western Division, October 20, 2009 at p. 34.

*See* Exhibit E for relevant part.

It is not clear how much Mr. Mehanna was involved in the planning of the Yemen

trip once there. Whatever information Jason Pippin had provided to Abousamra, there

was no actual plan. The travelers had no specific address, person, location, date or time to

meet. The government did not prove any specific connection to a training camp or to a

battlefield. As Gregory Johnson testified, Al-Qaeda was essentially defunct in Yemen by

2004. Jason Pippin had last been there in 1998 and the information he provided to

Abousamra seemed little more than a vague hope that Abousamra might locate someone.

Second, Mr. Mehanna, unlike other defendants who have been sentenced for

obtaining training overseas, received no special training. He did not obtain skills in

explosives or marksmanship. *Contrast United States v. Jayyousi*, 657 F. 3d 1085 (llth Cir.

2011) (Jose Padilla, "the dirty bomber," posed a heightened risk of recidivism because he

received Al-Qaeda training).

Third, Mr. Mehanna did not go on to Iraq as Abousamra did. This is a critical fact.

It did not take much more than a bus ride to get to Iraq. If Mr. Mehanna had truly sought

to kill Americans overseas, he would have gone with Abousamra. Instead, he parted ways from Abousamra, stayed in the United Arab Emirates a few more days and went home. He returned to his family and to school.

Fourth, once Mr. Mehanna returned home, he made no further efforts in this direction. He traveled to Egypt in 2006 with his family and did not seek to find a training camp or go to Iraq. He did not go to Somalia with Daniel Maldonado even though he knew in the summer of 2006 that Maldonado was leaving for what was at that time, a country run by Islamic law. Finally, he did not join Maldonado in Somalia after Maldonado called him in December 2006, beseeched him to come and join the fighting and provided Mr. Mehanna with advice on the best route to arrive. He never became in any sense of the word "operational." He never planned or prepared for any operation. Mr. Mehanna adamantly denies any plot to attack a shopping mall or a military base and adamantly denies that he ever discussed this with AbuZahra. Daniel Spaulding, a witness called by the prosecution, testified that Mr. Mehanna was opposed to such an attack because it would violate Islamic law or *aman*. The government offered no recording, no email, no instant message, and no reference directly or indirectly by anyone concerning such a plot. In fact, the government never charged Mr. Mehanna with this supposed plot and did not mention it in the long lists of overt acts in the indictment.

Fifth, Mr. Mehanna returned home and committed himself to his schooling, his family and his community. He looked for a wife to marry. He did not separate himself from his friends and family and devote himself to planning and preparing for a violent attack. He did not surround himself exclusively with a group of people dedicated to one point of view. He taught at an Islamic Center in Roxbury run by a person who became a

government informant and who adamantly opposed jihad. He gave sermons on Friday at local universities that were solely about Islam with no political overtones. He taught basic and mainstream Islamic tradition, prayer and history at an Islamic school for young children. He went to the Al Maghrib Institute in New Jersey which presented mainstream Muslim concepts with no overtones of politics or jihad. He obtained a recommendation from the head of Al Maghrib to apply to the University of Medina in Saudi Arabia in order to study Islam. This University is strict in its policies and it does not tolerate political discussions concerning jihad.

Mr. Mehanna obtained a Ph.D, did internships in local hospitals, and made plans for his post-graduation career. He knew that he wanted to live in an Arab country, preferably in the Gulf. He obtained well-paying and prestigious employment at the King Fahd Medical City in Saudi Arabia, the largest center in the Mideast. He was hired to set up the first pharmaceutical division at the hospital for diabetes - a disease particularly rampant in the Arab world and from which Mr. Mehanna's mother suffers. Not only did the center give him employment, it also provided him with housing and other benefits. He would have worked primarily with Americans, both Muslim and non-Muslim, at the hospital and thus could have achieved the balance he longed for. He could have been accepted as a practicing Muslim in a country that stopped for prayer five times a day. He could have dressed as he chose, worn a beard and not have been viewed as an oddity. He could have married a Muslim woman who would have worn a head covering and raised children who would have been comfortable as Muslims. He could have also spent his free time, if he chose, studying with the many Islamic scholars living in Saudi Arabia. In a conversation with Bilaal McCloud, an informant used by the government to secretly tape

record conversations, Mr. Mehanna spoke about his excitement at working in a new

hospital facility, his desire to travel throughout Saudi Arabia, his opportunity to study

with scholars who resided there, and his desire to make the Hajj pilgrimage.

He left the United States to work as a pharmacist and to help other Muslims

suffering from a chronic deadly disease. He did not leave to become a terrorist, or as the

government suggests, to live in a country that did not have an extradition treaty. Further,

Saudi Arabia is one of, if not the most, restrictive country in the Arab world. There is no

political dissent. There is no freedom of speech. There has not been a terrorist attack

there since 2003 after Saudi officials cracked down on potential suspects as well as

clerics who were fomenting dissent. Osama bin Laden once stated that the only country

he hated more than Israel or the United States was Saudi Arabia. This is not a place an

extremist would go to live, work, and raise a family.

### 2. Translations, Videos and Postings

Mr. Mehanna does not believe that his speech-related activities were unlawful. It

is important, however, to look at their content in order to assess their role in sentencing.

Mr. Mehanna translated a video that had been produced by Al-Qaeda, entitled the

Expedition of Umar Hadeed. He did so as an act of independent advocacy and not at the

direction of or in coordination with Al-Qaeda or any other terrorist group. Cf. *Holder v.

Humanitarian Law Project*, 130 S. Ct. 2705 (2010). The government produced no direct

link, no email, no instant message or other correspondence in which Mr. Mehanna was

personally and directly asked by a member of Al-Qaeda to translate this video. Ever since

*Buckley v. Valeo*, 431 U.S. 1 (1976) (per curiam) and more recently, in *Citizens United v.

Federal Election Commission*, 130 S. Ct. 876 (2010), the Supreme Court has construed

independent advocacy broadly while construing "in coordination with" narrowly. For example, the Supreme Court has differentiated individual expenditures from "controlled or coordinated expenditures," which are treated as contributions. *Buckley,* 431 U.S. at 46 n. 53. The Senate Report contained an example of an independent expenditure, the purchase of a billboard advertisement "not at the request or suggestion of the candidate or his agent's [sic]"; on the other hand, "if the advertisement was placed in cooperation with the candidate's campaign organization, then the amount would constitute a gift by the supporter and an expenditure by the candidate[.]" *Id.* at n. 53. Mr. Mehanna's translation, which was not posted at the request of a foreign terrorist organization, cannot be considered in coordination with that organization. Mr. Mehanna is an individual much farther removed from Al-Qaeda than a Super PAC is from any political candidate. Super PACs, which arose after *Citizens United,* "can accept unlimited contributions and make unlimited expenditures aimed at electing or defeating federal candidates. Super PACs may not contribute directly to federal candidates or parties." "*Super PACs" in Federal Elections: Overview and Issues for Congress,* Congressional Research Service Report (December 2, 2011) (available at http://www.fas.org/sgp/crs/misc/R42042.pdf). *See also* 11 C.F.R. § 109.20 and 11 C.F.R. § 109.21 (defining "coordinated" communications and contributions). Mr. Mehanna should be afforded at least the free speech rights of a Super PAC.

The value of this video that Mehanna translated is open to debate. The government's expert, Evan Kohlmann, testified that this video was important to Al-Qaeda as a recruiting tool and the government described this video as a tool to recruit others to terrorism. Yet the government did not produce a shred of evidence, data, or

empirical study that showed that this video, let alone any other videos, was responsible for recruiting anyone to fight in Iraq or other countries. The Soviet-Afghanistan war recruited many Muslim fighters from all over the world when videos and the internet did not exist. The majority of recruits that fought against coalition forces in Iraq and Afghanistan came from Afghanistan and Pakistan, two countries where less than 5% of the country has access to the internet. Defense expert, Dr. Marc Sageman, testified that there are no empirical studies, no data, and no scientifically based research which provides a basis to conclude that videos result in recruits to terrorism. The fact that videos have been found on the computers of others convicted or charged with terrorism does not and cannot mean that terrorist groups actually recruited them through these videos.

It is also important to focus upon the types of videos that the defendant watched, translated and provided links to for others. While the videos were disturbing in their violence, none of them can be described as an "operational video." Mr. Mehanna did not search for, download or send videos with subjects such as how to build a suicide vest or how to rig an explosive device.

As the Court knows, Mr. Mehanna strongly disagreed with most Al-Qaeda beliefs and many of their actions. He believed based on his own study and review of the Koran and scholars that the killing of innocent civilians through the use of bombs was forbidden. He believed that civilians who were in Muslim countries to teach or participate in civilian life were not to be harmed. He believed that as an American, he could not and would not take up arms against America, either overseas or in the United States, against civilians or armed forces. He recognized the pact between himself and the United States as a citizen that allowed him to grow up peacefully and his family to prosper. He strongly

and vociferously opposed the wars in Iraq and Afghanistan. However, he did not agree with the major tenet of Al-Qaeda – that the West must be attacked and conquered in order to end Muslim suffering.

Mr. Mehanna's beliefs matured over time and by 2006-2007, he was writing about the need for Muslims to study and learn about their religion and culture. He criticized people on web forums for focusing on battles across the world that had little to do with them personally. At the same time, he expressed himself crudely at times in instant messages about deaths of American soldiers and about his admiration for Bin Laden. That inconsistency is the hallmark of a young mind searching for answers and for a way to make sense of the world he saw around him. As the Court knows, his views became so moderate and contrary to those of Al-Qaeda that he was expelled from the Tibyan Publications web forum.

Mr. Mehanna not only disagreed with many aspects of Al-Qaeda's views, he also came to disagree with Abousamra's extremism. He complained to Daniel Maldonado about Abousamra, Spaulding and Masood's willingness to declare other people disbelievers or "takfir." He was upset when Abousamra ridiculed younger Muslims at a dinner about their moderate political beliefs.

Mr. Mehanna believed that his translations, his postings and his view of information on the internet were protected activities by the First Amendment. Even when Mr. Mehanna and a correspondent referred to the FBI as "Bob" or when he suggested that they not discuss certain issues, he always followed this up with a statement that they were being unnecessarily secretive because they were not doing anything illegal in expressing their opinions. Watching jihadi videos is not illegal. Sending videos to others is not

illegal. The videos in this case are available today on YouTube. The State of the Ummah was broadcast on Al Jazeera, the largest television network in the Middle East. However distasteful, expressing admiration for Osama bin Laden is not illegal. Espousing unpopular political views, even the views of Al-Qaeda, is not illegal. *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2730 (2010).

### 3. Lack of Harm

No harm occurred to a single individual as a result of Mr. Mehanna's actions in this case. No individual was placed at risk by his actions. This was not a case where the government intervened in order to prevent a bomb going off or a defendant pushed the detonator to a fake bomb supplied by the FBI. Mr. Mehanna was left in the general population for years during this investigation, providing services to people at hospitals and pharmacies and teaching Islam to college students and young children at Islamic Centers. By the fall of 2006, the government had Mr. Mehanna's 2006 hard drive and the full cooperation of Kareem AbuZahra. By December 2006, it had the recording of Daniel Maldonado's telephone call from Somalia, Mr. Mehanna's interview with the FBI about Maldonado which formed the basis for the false statements charge, and the recordings between Abousamra, Maldonado and AbuZahra concerning their trip to Yemen. In short, the government had all of the evidence it used at trial by December 2006, and yet did not arrest Mr. Mehanna until May 2008. If he were truly so dangerous and deserving of a lengthy prison term, the government would not have left him free to pursue any activities for nearly a year and a half. As in *United States v. Hassoun*, in which the defendant was convicted of numerous material support charges, "[t]he interceptions and investigation continued for many, many years. He was questioned and never charged with a crime. The

government knew where Mr. Hassoun was, knew what he was doing and the government did nothing. This fact does not support the government's argument that Mr. Hassoun poses such a danger to the community that he needs to be imprisoned for the rest of his life." *See* Exhibit F, *United States v. Hassoun*, 04-CR-60001-MGC, Transcript of Sentencing Proceedings before Hon. Marcia G. Cooke, U.S. District Court, Southern District of Florida, January 22, 2008 at p. 8. Hassoun received a 15 year, 8 month sentence.

### B. History and Characteristics of Tarek Mehanna

### 1. Tarek Mehanna's Family

Tarek Mehanna is one of two sons of Ahmed Mehanna and Souad Mehanna. Mr. Mehanna's parents have been married for over thirty years. Dr. Ahmed Mehanna is a well- respected and beloved professor at the Massachusetts College of Pharmacy. Mrs. Mehanna ran a day care center out of her home until her son, Tarek, was arrested. The family is extremely close. Both adult sons lived in the family home. They followed in their father's footsteps and obtained degrees in pharmacy, with Tarek Mehanna going on to obtain a doctorate.




Tarek Mehanna's parents emigrated from Egypt to the United States in 1981, and became U.S. citizens. They did so in order to raise a family in a country where they could enjoy the freedom to practice their religion and the freedom to express their opinions. They were very happy with their life in this country. The family returned in the summers to Alexandria where they had extended family.



While the family enjoyed their stays in Egypt, it was a relief to come home. When September 11th occurred, Ahmed Mehanna spoke at Lincoln-Sudbury High School with his family in the audience, denouncing the attack.

### 2. Tarek Mehanna's Education

Tarek Mehanna attended public schools throughout his childhood and graduated from Lincoln Sudbury High School. He chose to attend the Massachusetts College of Pharmacy and studied for eight years to obtain his undergraduate degree and Ph.D. A grueling eight years of study is now lost. With felony convictions, Mr. Mehanna can never be licensed to work in this field.

### 3. Tarek Mehanna's Religious and Cultural Interests

When Tarek Mehanna was a teenager, he was interested in "grunge" bands (e.g., Nirvana and Pearl Jam) and played guitar in one. He was well liked at school and enjoyed his American life. But he also was a Muslim. His family had always practiced their faith

and it was certainly not acceptable that he engage in other American behaviors that are typically associated with coming of age. He became more curious about what it meant to be Muslim and began to study his history, culture and religion. Salafism, which embodies a more strict interpretation of Islam, had spread from Saudi Arabia to the United States and other countries. This more rigid "black and white" view of the world appealed to Tarek Mehanna as it did to many other young people. He talked to friends from the mosque and attended Muslim classes. He began to read and study Islam.



He learned of the modern history of Islam and that his religion, which had spread to most of the world in its first centuries, had been defeated again and again by Western powers. There was great shame in the history of the decline of Islam, except for one moment in the modern world - the Soviet-Afghanistan war. The myth around this war extolled the defeat of a world superpower by Muslims on horseback. Men with rifles defeated tanks and helicopters. The sheer bravery of the mujihadeen made them heroes in the Muslim world - a world which had not seen heroes for a very long time. The myth of Osama bin Laden as a brave, pious warrior was created by Western journalists. Mr. Mehanna wanted to learn more about the Muslim world and the information was confusing. While mainstream American media discussed United Nations sanctions

against Iraq, only Al Jazeera showed children dying and the human cost associated with

this political policy. He went to the internet to learn more about this human rights issue

and tried to sort out truth from falsehood.

A former high school teacher of Tarek, Bill Schechter, described his curiosity best

in a letter to the Court as follows:

> When I taught Tarek, he was an adolescent who just beginning to open
> his eyes to the wider world around him. He was interested in the past and
> hungry to understand all the theories and interpretations of how we developed
> as a people and a country. Though he was not at that time the proficient student
> he would become, he distinguished himself by his intellectual curiosity and his
> by his willingness to question and to listen to all points of view. Growing up in a
> largely white, Christian suburb must have made it difficult for Tarek to find
> and forge his identity as a Muslim American. At that time, Sudbury was not as
> ethnically diverse as it is today. This was not an issue he talked about, but I do
> know that pursuing the perennial coming-of-age question, "Who am I?"
> preoccupies all adolescents. It can be particularly confounding, confusing and
> challenging for those who belong to minority groups. As a Jew who spent most
> of his life in predominantly Christian institutions, I can say that my own
> search for identity did not always proceed with equanimity or take place on level
> ground. Yes, this was turbulence, and, at times, overreaction.

(*See* Letters from the community attached herein as Exhibit C).

### 4. The Impact of September 11, 2001

In response to the September 11, 2001 terrorist attacks on our country, the Bush

administration launched its "global war on terror" which included arresting Muslims as

material witnesses without supporting evidence, investigating mosques and questioning

individuals who had done nothing more than practice their faith. Muslims were afraid of

their own government and a hostile American public.

The international aspect of this war involved at first invading Afghanistan, where

Osama bin Laden was believed to reside under the protection of the Taliban. Mr.

Mehanna, while unhappy that innocent civilians were caught in the cross fire, understood

the need to locate the person who had attacked America. It was the war in Iraq which

shocked him to his core. Like many people, Muslim and non-Muslim, he could see no

justification for this attack. Iraq had not attacked the United States and the wholesale

bombing was killing thousands of Iraqi children and civilians. He became angry at the

government for this unjustified war and he railed against it.

A longstanding family friend, Mazen Ramadan, expressed this best when he

wrote the Court:

> Tarek is one of the best people I've met in my life. Despite all
> the charges he was convicted of, interestingly enough, he
> remains one of the best people I've known. He's always made a
> sincere effort to be the best he can be – as a Muslim, as a friend, a son
> a brother, a student, a community member, and a teacher.
>
> I'm not writing this letter on Tarek's behalf as a friend, but as one who
> understands what he went through as a young Muslim. I see many of our
> youth struggle and discuss the same ideas and concepts Tarek struggled
> with and discussed. The difference is now we are prepared to help and
> guide the younger generations because we went through the struggle
> ourselves.
>
> I'd like you to take a moment to imagine the current state of Muslims in
> Massachusetts alone. Our Islamic Centers are cultural melting pots and
> adults often mix culture and politics with religion. In this state we have
> about 40+ mosques, Islamic centers, and prayer halls. At the same time,
> we've only had 2 resident scholars (Imams) in the entire state for the last
> few years! Furthermore, these Imams are immigrants who live sheltered
> lives and lack an understanding of our society. What happens to our youth
> who become inclined towards faith? Where do they go to learn Islam?
> Who can teach them?
>
> Most end up on the internet where they learn from scholars in Saudi Arabia,
> Egypt and Yemen. Some scholars are mainstream, others walk a dangerous path.
> It's very hard for some to distinguish between the two because some scholars
> present a moderate view of Islam and slowly pull people into a more radical
> version. Many question or adopt these ideas, but go onto correct their beliefs as
> they further their studies. I myself have come across this phenomenon, but was
> fortunate because I was more seasoned and had the intellect and ability to access
> mainstream sources to challenge these ideas.

Frankly, I have little doubt that Tarek went through a phase where his views as a Muslim were questionable at best. Yet, at the same time, I know for a fact that he continued to develop and grow these views and he moved out of that questionable phase into what mainstream Muslims believe and follow. I've witnessed him (first-hand) grow as an individual, and develop his ideas to a point where he would challenge extremist scholars and speaks out against those brainwashing so many of your youth. He did so from a position of knowledge, understanding, strength and experience.

**5. Who is Tarek Mehanna**

Some time ago in a bail hearing, the government tried to argue that there were two Tarek Mehannas. The prosecution could not reconcile the letters sent on his behalf with the statements he made in his instant messages, translations and postings in opposition to the war in Iraq.

These letters have been submitted to this Court. In them, he is repeatedly described as gentle, caring, kind and loving. One woman, Faten Ramadan, described him as follows:

Tarek is a role model for my sons and all young men and adolescents in our community. He is the most gentle, caring and loving human being I have ever had the pleasure to know. When I think of Tarek, I immediately visualize his big tender smile on his serene face. Tarek is an honorable example of honesty and fairness in dealing with others following the teaching of true Islam. He is both proud and humble. Mostly he is very respectful and tolerant.



Many commented on the sincerity of his beliefs, and his immense contribution to community activities. Dr. Mohammad Siddique and his wife Zakia Siddiqui wrote about Tarek and his family as follows:

> Over the years, we have seen Tarek demonstrating the same qualities of compassion, caring and tolerance for others as practiced by his father. When meeting at family gatherings, we have found Tarek to be polite, courteous and gentle-natured. He has repeatedly demonstrated kindness, generosity and open-mindedness by volunteering his time in various inter-faith Islamic activities. While teaching at the Al'Huda Academy in Worcester, MA, Tarek was held in high esteem by his colleagues, staff and students for his polite manners, generous treatment toward others, and trustworthiness. He is looked up to as a role model of good character for young Muslims in our community, who teaches peaceful Islamic principles in day to day life and service to humanity We have always felt proud of Tarek for his exemplary behavior, righteousness and kindhearted nature.

Osama Kazmi wrote to the Court about Tarek's volunteer work at the Islamic Center as follows:

> Tarek was always looked up to as a respected mentor for the youth. He was someone to turn to whenever the burden of being a young Muslim growing up in a post-9/11 environment became too much to bear. He would never have attained that that position at a moderate, liberal institutions such as the Islamic Center of Boston, had he espoused any violent views.
>
> Tarek did not feel the need to hide his opinions, he knew his freedom of speech was protected by the First Amendment of the US Constitution. He sympathized with oppressed peoples of all religions and cultures. He never ever attempted to justify the targeting of innocent civilians; and all who know him can truthfully testify to this, provided they're not speaking under duress.

Doaa Mohamed wrote to the Court about Tarek's work at the Alhuda Academy where he taught young Muslim children as follows:

> Dr. Tarek Mehanna is well known in our Worcester Islamic Center and in Alhuda Academy, where he used to teach the sons and daughters of my friends. All of the kids he has taught love him very much and constantly describe him as gentle and fun. He has been a role model and mentor to many of the kids and young adults he has come to know, all of whom he has encouraged to be well-behaved, respectful to their parents, and attentive to their studies. He is known and respected for his

good moral character, his honesty, and his devoutness to his work and his religion. He is truly one of the most generous and responsible people that my family has come to know.

As a mother, I can honestly say that my friends and I see Dr. Tarek Mehanna as someone who is a positive influence on our children and the young people in our community. He has given much to not only the Muslim community, but also to everyone who he knows in his academic and professional settings with his good character and his helpful nature. He is well-loved and very trusted by many. I am confident that he will continue to be an upstanding community member and human being. I hope that you take this into consideration and give Dr. Tarek Mehanna the lowest possible sentence.

Patricia Ward, a mother who had placed her child in Mrs. Mehanna's care, has

corresponded with Tarek throughout his detention:

In our discussions on war and politics, we've had our share of disagreements, and the discussions have been rousing, intellectual and challenging. I find Tarek unfailingly honest and considered in his opinions. He is by no means "fanatic," and I do not find his opinions unsettling or disturbing. I can certainly say beyond any doubt that he would never support violence against civilians. His moral code is very clear.

In general, whether discussing politics or family or art, I find Tarek to be responsive, engaged, and thoughtful. He is a great listener, which again speaks to his generosity, given how easily a person might succumb to self-involvement in such circumstances. But in fact, if he ever does confess to frustration or fear, he is careful not to overwhelm, and even will apologize for burdening me. I find this remarkable and it touches me very much. He seems always concerned more for others than for himself,

There are not two Tarek Mehannas. The government simply refused to recognize

that as a Muslim, Mr. Mehanna, truly felt the pain of fellow Muslims suffering from the

war in Iraq and elsewhere. His caring and concern for others is what led him to want to

do more for Muslims he did not know. As a young man with little experience and not

much maturity, he went to Yemen on an ill-conceived adventure, accompanied by two

people eager to find training camps. That same young man, sobered by this experience,

returned, determined to finish his degree and to work and live in a Muslim country. He

wrote, translated and posted because he believed that words were lawful and that words

can sometimes change the world. There is one Tarek Mehanna before this Court – a

mature man dedicated to his faith, education, family and community.



**C. The Need for a Sentence to Reflect the Seriousness of the Offense,
Promote Respect for the Law, Provide Just Punishment, Afford Adequate
Deterrence, and Protect the Public from Further Crimes**

**1. Just Punishment Requires an Examination of Sentences in Similar Cases
to Avoid Sentencing Disparity and to Promote Respect for the Law.**

A review of hundreds of terrorism cases reveals that the sentences vary widely,

ranging from time-served to life in prison. It is clear that life sentences are reserved for

those defendants whose behavior was profoundly violent and capable of causing severe

harm. *See* attached table as Exhibit G. There has been only one terrorism case in this

district: Richard Reid, the "shoe bomber," who received a life sentence for attempting to

detonate an explosive on an airplane. No defendant has been convicted in this district for

charges similar to Mr. Mehanna's. *See* attached table as Exhibit H.

A study of all terrorism convictions by the New York University Center on Law

and Security reveals that the average sentence for material support offenses is 14

years. *See* Exhibit I. The wide-ranging sentences given in these cases, as the United

States District Court for Minnesota has recognized, is significant when determining an

individualized sentence: "In short, while participation of any sort in a terrorist enterprise is a deplorable step, and is appropriately dealt with harshly under federal law, the nature of that participation will of course vary, and not every participant will merit equal punishment…In sum, when the record is reduced to those facts that have been sufficiently proven to play a role in a sentencing in the American criminal justice system, this Court simply finds nothing to suggest that Warsame merits a sentence at the higher end of those imposed on convicted terrorists." *United States v. Warsame*, 651 F.Supp.2d 978, 981-982 (D. Minnesota 2009) (sentencing him to 92 months for a conviction under 18 U.S.C. § 2339B). Like Warsame, Mehanna is simply not on the same level as convicted terrorists such as Richard Reid, Faisal Shahzad (Times Square attempted car bomber), and Terry Nichols (Timothy McVeigh's co-defendant), all of whom received life sentences. *See* Exhibit G.

It is also clear that guilty pleas result in sentences of 10 to 15 years. The government has accomplished this by dropping charges until the defendant is left with a charge that carries as maximum sentence of 10 or 15 years. The sentencing enhancement is still applied, but it is irrelevant because of the statutory maximum. This was done, for example, with Daniel Maldonado, who plead guilty to a single charge that carried a ten-year maximum sentence. While going to trial places a defendant in a different position than one willing to plead guilty, there cannot be a penalty for asserting the right to a jury trial. Insisting on a trial should not carry two-to-three-to-four times the sentence imposed after a guilty plea.

This case is unique because there are no comparable cases. There are instances in which individuals went to Pakistan, found and received training. In virtually all of those

cases, the individuals returned to plan for, prepare and sometimes commit acts of violence. There are no cases in which individuals went overseas for training, did not find any, returned and were charged with terrorism. There are no cases in which individuals were charged solely with speech-related activities. Mr. Mehanna summarizes cases below and identifies the distinctions that warrant a lesser sentence than the ones imposed in those cases. A review of cases in which appellate courts remanded for re-sentencing also provides some guidance.

### a. Amawi, Mazloum and El-Hindi (the Toledo, Ohio Case)

In *United States v. Amawi, Mazloum, and El-Hindi,* 06-CR-719-JGC, Northern District of Ohio, Western Division, the Court after a two-day hearing, sentenced each defendant according to their individual characteristics and history, taking their individual conduct into account. In that case, the defendants became involved with a cooperating witness who provided them with training and plans to go overseas to Iraq. The government requested life sentences for all three defendants, who were convicted after trial. Instead, the court sentenced each defendant to a term far less than life.

Mazloum received a sentence of 8 years. Mazloum wanted to train in explosives and conduct ambushes. He went to a shooting range with the other defendants, offered his brother as a recruit and ordered a paint ball set to practice. He even pushed the cooperating witness to speed up the training. Mazloum did not go overseas, but he had every intention to go to Iraq to fight against the United States military. The Court found as important factors that he stopped engaging with the other defendants after a period of time. While he legally did not withdraw from the conspiracy, his interest in it waned and

he did not involve participation in violence. The Court believed a sentence of 8 years was sufficient and the risk of recidivism slight.

Here, Mr. Mehanna did not train in any way in the United States. His interest clearly waned after his trip to Yemen and even more so after 2006. By 2007, he had been removed from Tibyan and had turned his focus to his schooling.

El Hindi received a sentence of 13 years. He was a religious elder to younger Muslims. He had many jihadi videos and spoke ferverently of his hatred for Israel and the United States. He posted violent and hateful statements on internet forums including asking God to kill Jews and Americans. He had a slide show of IED explosions from the Islamic Army of Iraq which he sent to the cooperating witness. In sentencing him to 13 years, the Court stated:

> I think there is a difference between, for whatever reason, saying I hope the insurgency prevails; I hope they drive the Americans out of the Middle East forever. Clearly a difference between that, protected speech in this country, not popular, but so what; and saying, you know Maybe I'll go over there and help, that's how strongly I feel about it. That's when you begin to cross the line.

Amawi received a sentence of 20 years. Amawi was in Jordan in 2005. He had a large collection of jihadi videos, which Evan Kohlmann, the ubiquitous government expert, described as "world class in quantity and quality." He also researched the acquisition of weapons and manuals related to bomb making and explosives. He regularly communicated with others, including a Syrian jihadist with direct connections to the Mujihadeen. During the undercover investigation, he attempted to acquire an explosive substance requested by the Syrian. The trial judge noted at sentencing that he repeatedly expressed a desire to injure American soldiers and engage in conflict. He endorsed the concept of martyrdom and became enraptured with images of killings of Americans. The Court, however, noted that Amawi turned down an opportunity to become operational.

He was offered a job as a translator in Iraq where he could have gone on to fight. The Court also found significant mitigating factors in that Amawi did not make contacts to go to Iraq for a period of approximately 8 months after his return from Jordan until his arrest. The Court felt that a sentence of 20 years was a sufficient personal deterrent. The Court noted that it warned people that talk about killing Americans anywhere in the world can result in a serious prison term. The Court also noted the lack of real harm.

Here, Mr. Mehanna did possess jihadi videos, but none that were operational. He expressed no desire himself to kill American soldiers and instead wrote about the concept of *aman* and the pact of security that he honored as a religious Muslim. He spoke to Daniel Spaulding about it several times. Further, if the Court wants to send a message about chatter or fantasy, this prosecution has already succeeded in sending out a clear message. Daniel Spaulding testified at trial that he viewed Mr. Mehanna's arrest as a "wake up call" eventually causing, in part, his renunciation of Islam.

### b. Ehsanul Sadequee and Syed Haris Ahmed

These two individuals' cases have similar facts but not identical charges as the ones brought against Mr. Mehanna. *See United States v. Ehsanul Sadequee*, 06 CR-00147-WSD, Northern District Georgia, *United States v. Syed Harris Ahmed*, Docket No. 06-CR-147-WSD, Northern District Georgia. They are important cases for comparison, particularly because the government did not charge Sadequee or Ahmed with all the counts that it easily could have brought. In the case of Sadequee, the government recommended a sentence far below the guidelines.

Sadequee received a sentence of 17 years. Sadequee traveled overseas for training. Sadequee tried to join the Taliban in 2001 and was active on forums including

Tibyan Publications where he was an administrator and translator. While he was in Bangladesh, he communicated with another co-conspirator, Younis Tsouli (who was referenced in Mr. Mehanna's trial). He was accused of videotaping landmarks as potential targets around Washington D.C. and sending these videos to Tsouli. He also supported a group that sought to establish Al-Qaeda in Northern Europe and supported an individual who had explosives in his apartment when he was arrested. Sadequee was found guilty of several counts of providing material support and conspiracy to provide material support. His guideline sentence called for life in prison. The government sought a 20 year sentence stating that it served the deterrence purpose for both the defendant and others.

Sadequee reiterated his beliefs in Islam at his allocution. In pronouncing a sentence of 17 years, the Court told Sadequee that his conduct was "calculated and dangerous, cunning and disturbing." *United States v. Sadequee*, Docket No. 06-cr-00147-WSD, Transcript of Sentencing Proceedings before Hon.William S. Duffey, Jr., U.S. District Court, Northern District of Georgia, Atlanta Division, December 14, 2009, at p. 43. *See* attached as Exhibit J. The government claimed in Mr. Mehanna's trial that Sadequee and Tsouli were known and convicted terrorists. Surely, Mr. Mehanna deserves a sentence less than people the government proclaims to be cyber-terrorists who actually plotted to destroy United States landmarks. The Court found that he "presented a real and visible threat to those who seek to live life according to the values of their cultures in free and peaceful communion with their neighbors…Your conduct was calculated and while occasionally halted, it always progressed forward." *See* Exhibit J, p. 44.

Ahmed received a sentence of 13 years. Ahmed engaged in various communications with Sadequee and others about jihad including exchanges of websites and publications that promoted jihad, trained with paintball guns in the North Georgia mountains, traveled to Canada and discussed a plan to obtain training in Pakistan. He and Sadequee made 62 videos of United States landmarks as targets in order to show their commitment to jihad and thus be accepted for training overseas. Ahmed went to Pakistan on a one way ticket but did not enter a training camp. He returned to the United States and lied to federal agents about his purpose in going to Pakistan. Upon his return, he continued to engage in internet communications. He also conducted online research regarding explosives, methods to defeat SWAT teams and ways to encrypt messages. Ahmed warned his co-conspirators that law enforcement was monitoring them and advised precautions. He encouraged them to read indictments in terrorism cases. After he was interviewed by the FBI, he warned Sadequee not to return from overseas.

The government stated at sentencing that they tried Ahmed on a single charge of material support, stating as its reason that Ahmed did not take up arms against anyone. The Guidelines placed Ahmed's conduct at a life sentence but the statutory maximum for his charge was 15 years. Ahmed was charged with four counts concerning material support but only one was tried before a judge in a bench trial. The remaining charges were dismissed. It is not known why Ahmed did not face all charges or why he was not charged with false statements. His conduct is remarkably similar to that alleged by Mr. Mehanna along with some more serious actions.

In its sentencing memorandum, the government requested a 15 year sentence. The defendant, representing himself at sentencing did not object to this. At sentencing, the

Court (Duffy, William, J.) spoke at length about his view of Ahmed and described him as "a myopic, self-interested person who seeks to achieve what you want to achieve at the cost of other people." *United States v. Syed Harris Ahmed*, Docket No. 06-CR-147-WSD, Transcript of Sentencing Proceedings before Hon. Williams S. Duffey, Jr., U. S. District Court, Northern District of Georgia, Atlanta Division, December 14, 2009, at p. 61. *See* Exhibit K. In sentencing the defendant to 13 years, the Court stated: "I am convinced now more than ever that you personally need to be deterred. And I am certain that others like you – we don't know where they are, but we know that they eventually emerge – to let them know that what you wanted to do and what you plan you put into place and the steps that you took are going to be dealt with harshly and severely, and it's not worth the risk." *Id.* at p. 66.

Ahmed and Sadequee were two individuals who sought training overseas but did not succeed. They made false statements to the FBI about the purposes of their trips. They came home and took far more serious actions than Mr. Mehanna, including filming landmarks as targets for terrorist attacks to prove their commitment and continuing to seek operational information through the internet and other co-conspirators. At the very least, this Court should view their sentences as the upper range to sentence Mr. Mehanna.

**c. Zeinab Taleb-Jedi**

Taleb Jedi was a registered agent for a federal designated terrorist organization that opposed the government in Iran. She traveled to the organization's camp in Iraq in 2004 where she taught English classes, translated documents and was assigned to the Political Department. Taleb-Jedi was charged with providing material support. This charge was dismissed and she pleaded guilty to violation of an executive order and

received a sentence of time served (one to two days upon arrest) and supervised release for a period of one year. This is the only case in which an individual was prosecuted for speech related activities and travel to an FTO camp.

### d. Other defendants charged with speech related activities

Saleh Elahwal and Javed Iqbal were charged with eleven terrorist related charges when they made arrangements for the Hezbollah television station to be seen in New York. Each pleaded guilty to one count of material support. Elahwal received a sentence of 7 months and Iqbal a sentence of 69 months. *United States v. Javed Iqbal, Saleh Elahwal* Docket No. 06-Cr-1054-RMB, Southern District, New York.

### e. Jose Padilla and co-defendants

Kifah Jayyousi, Adham Amin Hassoun and Jose Padilla were all charged in the United States District Court for the Southern District of Florida with conspiring to kill overseas and providing material support to a terrorist organization. They were all convicted after a trial. *United States v. Padilla et al.,* 04-CR-60001-MGC. The evidence at trial established that Padilla traveled to Pakistan and trained with Al-Qaeda. Jayyousi published a newsletter, "The Islam Report," and solicited funds for the defense of the Blind Sheik who was convicted of conspiring to blow up the World Trade Center. Hassoun sent Padilla money to go to Egypt where he connected with other terrorists. The sentencing guidelines placed Jayyousi and Hassoun at life imprisonment and Padilla at 360 months to life. The government requested a life sentence for each defendant.

The Court sentenced Padilla to 208 months - a significant departure from the sentencing guidelines. In doing so, the Court factored in that Padilla's actions did not involve an act of terrorism directed to the United States; he did not personally kill maim or kidnap anyone; a variance was necessary to avoid unwarranted sentencing disparity;

Padilla did not complete Al-Qaeda training; and the nature of his pretrial detention was extreme. The 11th Circuit reversed the sentence as unreasonable in part because the Court did not take into account Padilla's significant criminal record including a murder as a juvenile. *United States v. Jayyousi*, 657 F. 3d 1085 (2001). Padilla also posed a heightened risk of future dangerousness due to his training and thus he was considered "far more sophisticated than an individual convicted of an ordinary street crime." Alvarez, Lizette, "Sentence for Terrorist is too Short, Court Rules," New York Times, September 19, 2011 (available at http://www.nytimes.com/2011/09/20/us/jose-padillas-prison-sentence-too-short-appeals-court-says.html). He has not been resentenced as of this date.

Adham Amin Hassoun was sentenced to 15 years and 8 months. The Court found at sentencing that he was a devout Muslim. He had also never been arrested or convicted of a crime. His fellow employees and employer described him as smart, compassionate and caring. The plight of Muslims throughout the world pained and moved him, motivating him to violate the statutes in his case. The Court noted that he had immigrated to the United States, married and had a family. He had worked with many employees of many different religions and ethnicity and there was never any evidence of conflict. The Court noted the length of time he was investigated and not arrested which indicated that the government did not believe him to be particularly dangerous. The government did not appeal his sentence.

Kifah Jayyousi received a sentence of 12 ½ years. The Court found at sentencing that Mr. Jayyousi was a devout Muslim. He had lived in the United States for 30 years, served in the Navy and had become a citizen. He was married with a family. He had

obtained a Ph.D and worked in the United States and abroad on sophisticated engineering projects with possible access to sensitive and confidential information. Many people wrote letters of support. Like Mr. Mehanna, he was a person willing to discuss religion with others without conflict. The Court found it significant that he stopped his involvement in the conspiracy before his arrest. He had been intercepted and investigated for over several years; yet the government made no effort to intervene. The government did not appeal his sentence.

### f. Guantanamo Detainees

Even persons convicted in the Guantanamo Bay military commissions received sentences well below life. Salim Hamdan, the driver for Osama bin Laden in Afghanistan, was convicted after trial and sentenced to time served (approximately five years). David Hicks, who pleaded guilty to material support to Al-Qaeda in Afghanistan following the September 11, 2001 attacks, received a seven-year sentence (which amounted to an additional seven months served in Australia upon his release after five years at Guantanamo Bay). Omar Khadr, who hurled a grenade that killed a US soldier and planted road side bombs in Aghanistan, received an eight year sentence. The only person to receive a sentence of life after a trial was Ali Hamza al-Bahlul, who helped Al-Qaeda produce propaganda and handled media relations for bin Laden and refused to participate in his trial. He was convicted in November 2008 of multiple counts of conspiracy, solicitation to commit murder and providing material support for terrorism, and is serving a life sentence at Guantanamo.

### g. Mehanna's Conduct in this Case

The difference between all of the above-named defendants and Mr. Mehanna is that Mr. Mehanna did not *do* anything that could be legitimately considered a meaningful, concrete step towards an unlawful, terrorism-related goal. This fact is a serious failing of our conspiracy laws where the alleged overt act sufficient for conviction can be as nominal as a single hiking trip, the possession of graphic videos depicting the casualties of war, or posts on the Internet. This fact illustrates that as opposed to the above defendants who were similarly charged and tried, Mr. Mehanna did nothing even close to their conduct.

Mr. Mehanna did not attend any terrorist training camp. He did not give money to a terrorist organization. He did not purchase or attempt to purchase any type of firearms. He neither had nor attempted to have any association with a designated terrorist organization. He did not surveil any prospective target, let alone identify any target for any unlawful purpose. In fact, he publicly dissuaded American Muslims from taking that sort of action.

Sentences in terrorism cases span from a few years to life in prison. This is because the conduct involved in each case also spans broadly. Being convicted of a terrorism-related offense is not a mandate for a life sentence as the sentencing guidelines may suggest. After *Booker,* there can be no rubber-stamped sentences. Each defendant must be assessed individually. Mr. Mehanna's alleged conduct in this case, when compared with the conduct outlined above, simply does not fall at the high end of any sentencing calculation. To find otherwise would create an unlawful sentencing disparity.

**h. Co-Defendants' Conduct in this Case**

The Court should consider the treatment by the government of the witnesses who were similarly situated to Mr. Mehanna in this case. As the Court is aware, all of the civilian witnesses who testified against Mr. Mehanna were labeled as co-defendants. Most of them were not even punished, let alone charged, despite their commission of far more serious acts than Tarek Mehanna.

Jason Pippin received military training in Pakistan. He provided Abousamra with a name of a possible contact in Yemen and received $5,000 for this information. There was some discussion that he intended to go to Yemen with Tarek Mehanna and the others.

Kareem AbuZahra had provided money to Abousamra in 2002 when he went to Pakistan to give to a terrorist organization. He gave Abousamra $5,000 to give to Pippin. He went to Yemen but left and upon leaving, gave both Mehanna and Abousamra money. He paid for their tickets. He suggested a plot to attack a shopping mall and Hanscom Air Force Base. He met with Maldonado to request guns to further his plans. He spoke with Abousamra about killing Condoleezza Rice and John Ashcroft. Despite all of these actions, far more serious and far reaching than any committed by Tarek Mehanna, he was not charged with a single crime. It is likely that had the FBI seized his computer, similar (if not more inflammatory) instant messages and emails, which so concerned the government with respect to Mehanna, would have been found.

Hassan Masood provided Abousamra with contacts to his relatives in Pakistan, who were involved in Lashkar-e-Taiba, a foreign terrorist organization. He intended to go to Pakistan with Abousamra in 2002, but his parents took away his passport. He lied

repeatedly under oath at immigration hearings about whether he supported jihad. He too was not charged by the government.

Daniel Maldonado actually participated in military training with Al-Qaeda and engaged in jihad. He received a ten-year sentence when he pleaded guilty to a crime that carried a ten-year maximum. He was not charged with providing material support to terrorism even though he had monitored and posted on jihadi web forums.

Finally, Spaulding and Aboubakr wrote highly inflammatory posts in support of jihad on the internet. Aboubakr expressed support of jihad, his admiration of Bin Laden, and his desire to fight in Chechnya.

The government, of course, may choose whom it charges with criminal activity. But it cannot describe Mr. Mehanna as so dangerous and so in need of a lengthy sentence when it so easily allows individuals like Jason Pippin, Hassan Masood and Kareem AbuZahra free to live in society without any reservations.

### 2. No Mandatory Minimum

There is no statutory mandatory minimum sentence to be applied in this case. Certainly, if Congress intended that all terrorism convictions be treated alike, it could have passed such legislation. A lack of mandatory minimums indicates that Congress recognized the need for individualized sentencing based upon the individual and the crime.

### 3. Tarek Mehanna Poses a Very Low Risk of Recidivism

Mr. Mehanna is 29 years old. Unlike many federal defendants, he has absolutely no prior adult or juvenile criminal convictions or arrests. These factors, along with the

recidivism findings of the United States Sentencing Commission, demonstrate that Mr.

Mehanna is unlikely to recidivate and poses very little risk of harm to the public in future.

In *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb 3, 2005), the

district court acknowledged that 18 U.S.C. § 3552(a)(2) required it to consider at

sentencing the likelihood that a particular defendant might offend again. In that case, the

defendant fell within criminal history category III, but was 65 years old at the time of

sentencing. *Nellum*, 2005 WL 300073, at *3. To determine the likelihood of his

recidivism, the district court consulted "*Measuring Recidivism: The Criminal History*

*Computation of the Federal Sentencing Guidelines*," a report issued by the United States

Sentencing Commission. *Id.* (available at

*http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_C*

*riminal_History.pdf*). In its report, the Sentencing Commission concluded that the chance

of recidivism for a middle-aged person with a criminal history category III to be 19.8%.

*Id.* The court ultimately found it appropriate to consider this relatively low risk of

recidivism when crafting Nellum's sentence. *Id.* at 3, 5. In addition to the Sentencing

Commission's recidivism report referenced in *Nellum*, the Sentencing Commission issued

a report entitled "*Recidivism and the First Offender*" available at: *http://www.ussc.gov/*

*Research_Publications/Recidivism/200405_Recidivism_First_Offender.pdf*. In that

report, the Sentencing Commission determined that **93.2%** of offenders who had never

before been arrested did *not* recidivate. *Id.*

A defendant's total lack of criminal history, like Mehanna's, should thus be an

even more significant factor that a court takes into account at sentencing. Mr. Mehanna,

like almost all defendants with zero criminal history points, should be assigned to

criminal history category I. However, U.S.S.G. § 3A1.4(b) directs that Mr. Mehanna automatically be placed in criminal history category VI without taking into account his non-existent criminal history. This particular enhancement is inappropriate. Mr. Mehanna's *true* criminal history points and his *true* criminal history reflect his *truly* low likelihood of recidivism based upon his actual and not unfairly enhanced criminal history category. Probation Officer Sinclair also suggested in her report that the Court reconsider this enhancement as it may well overstate the defendant's criminal history. *See* PSR at p. 37.

People with no criminal record have the lowest rate of recidivism. Applying the Sentencing Commission's "First Offender" statistics to this case, the Sentencing Commission finds that there is a **93.2%** likelihood that Mr. Mehanna will ***not*** recidivate.

### 4. Incarceration is More Significant for a "First Offender" than Upon a Repeat Offender

Mr. Mehanna also asks the court to acknowledge that prison time is more significant for a "first offender" then it is upon an offender who has previously spent significant time in prison. This is a proper factor to consider under 18 U.S.C. § 3553(a). In *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006), the Court held that a 78 month prison term would mean more to Baker, convicted of child pornography, than to a defendant who had been previously imprisoned. *Id.* The Seventh Circuit also noted this factor is consistent with 18 U.S.C. § 3553's directive that this sentence reflect the need for "just punishment" and "adequate deterrence." *Id.*

In *United States v. Willis*, 479 F.Supp.2d 927 (E.D.Wis. 2007), the district court sentenced Willis to one year and one day of imprisonment instead of the 120 months recommended by the sentencing guidelines, in part, on a finding that the "sentence

provided a substantial punishment for someone like [Willis], who had never before been

to jail and who engaged in no violence." *Willis*, 479 F. Supp. 2d at 937. Likewise, in

*United States v. McGee*, 479 F. Supp. 2d 910 (E.D. Wis. 2007), the district court imposed

a sentence for heroin distribution below the advisory Guidelines range, in part, because

McGee "had never before been to prison and '[g]enerally a lesser period of imprisonment

is required to deter a defendant not previously subject to lengthy incarceration than it is

necessary to deter the defendant who has already served serious time yet continues to re-

offend.'" *McGee*, 479 F. Supp. 2d at 912 (*quoting United States v. Qualls*, 373 F. Supp.

2d 873, 877 (E.D. Wis. 2005)). Mr. Mehanna asks this Court to take into account that he

has *never* before been imprisoned for any length of time.

### 5. Severely Long and Harsh Terms of Incarceration Significantly Reduce the Likelihood that a Defendant Will Be Able to Pursue a Viable, Relatively Conventional Life After Release

A sentence of no more than 63-78 months imprisonment would sufficiently reflect

the seriousness of Mr. Mehanna's offense conduct, promote respect for the law, and

provide just punishment for his offense. In that context, the conditions of confinement to

which Mr. Mehanna has been and will be subjected to throughout the term of his sentence

constitutes a critical factor. These unusually harsh conditions make each day of Mr.

Mehanna's incarceration more onerous and, in effect, constitute greater punishment than

ordinary defendants suffer in ordinary cases. The restrictions have been "significantly

more onerous than the conditions faced by the ordinary pretrial detainee." *Warsame*, 651

F.Supp.2d at 982. As the district court found in *Warsame*, this Court should also treat

Mehanna's "difficult time in [jail] as comparable to a longer period of time served in

federal prison." *Id.* In *Stewart*, the 2nd Circuit upheld the district court's consideration of

the defendant's, Sattar's, solitary confinement and its conclusion that "the severity of the

conditions of confinement would increase the severity of the punishment and the amount

of deterrence associated with a given term of imprisonment in light of the particular

conditions of confinement under which Sattar is incarcerated." *United States v. Stewart*,

590 F.3d 93, 144 (2nd Cir. 2009).

     Mr. Mehanna has been in solitary confinement for the nearly two years before

trial and through today (and as an aside, it should be noted that Mr. Mehanna had has no

disciplinary problems in prison despite the harsh conditions of solitary confinement). He

is confined to a cell approximately eight feet by ten feet. He remains in the cell alone for

23 hours a day 5 days per week. For the remaining 2 days per week, he is restricted to his

cell for 24 hours each day. He is permitted to leave his cell for one hour of recreation at

no specified time. He may make telephone calls, take a shower or get some exercise in

that same window of time which can be at 5 am or at any time in the prison's discretion.

He is allowed to see his parents behind glass for half an hour twice a week. *See Stewart*,

590 F.3d at 143 (describing the severity of Sattar's conditions including "being kept in a

cell for 23 hours a day and under constant surveillance.").

     Upon sentencing, he will likely be transferred to a Supermax prison or a

Communication Management Unit (C.M.U.) which operate at federal prisons in Terre

Haute, Indiana and Marion, Illinois. The units hold approximately 80 inmates. Visitors

have no physical contact with inmates and there is a strict monitoring of mail, email and

telephone calls. "Since 2006, the Bureau of Prisons has moved many of those convicted

in terrorism cases to two special units that severely restrict visits and phone calls." Shane,

Scott, "Beyond Guantanamo, a Web of Prisons for Terrorism Inmates," <u>New York</u>

Times, (December 10, 2011). *See* Exhibit L. The alternative is the extremely harsh and

isolating conditions at Supermax facilities such as in Florence, Colorado. These facilities

have been the source of concern for human rights activist and media. *See, e.g.,* "Out of

Sight, HRW Briefing on Supermaximum Prisons" (hereinafter "*HRW Briefing"),* at p. 1,

available at *http://www.hrw.org/reports/2000/supermax/.*

The harsh conditions of administrative detention facilities have been cited by

several courts in determining sentences. *See Bell v. Wolfish*, 441 U.S. 520 (1979); *United*

*States v. Gallo*, 653 F. Supp. 320, 336 (E.D.N.Y. 1986); *United States v. Behr*, 2006 WL

1586563 (S.D.N.Y 2006). *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.

1997) (harsh conditions of confinement constitute valid ground for departure).

The Supreme Court has stated that conditions of confinement in a supermax

facility "impose atypical significant hardship under any plausible baseline." *Wilkinson v.*

*Austin*, 545 U.S. 209, 223 (2005). Human Rights Watch has observed that in Supermax

facilities, "[t]he conditions of confinement are unduly severe and disproportionate to

legitimate security and inmate management objectives; impose pointless suffering and

humiliation; and reflect a stunning disregard of the fact that all prisoners - even those

deemed the 'worst of the worst' - are members of the human community." *See HRW*

*Briefing* at p. 1.

The conditions in the Supermax facility have been described by one commentator

as follows:

> Supermax conditions are harsher in maximum-security facilities. While
> conditions in different facilities vary, several features remain constant. In general,
> inmates live in cells eight feet by ten feet in area. Stark concrete cells are
> equipped with a metal sink and toilet, but no shower. Food is passed to the inmate
> through a small, locked slot in the solid door. Metal flaps may be placed around
> the door to complete the sense of isolation. If there is a window, it is small and

often placed high in the cell so that it is difficult for the inmate to peer out. The light is always on, although it may be dimmed. Cells are monitored constantly.

Inmates are usually permitted to leave the cell for up to one hour, three times a week, for a shower and exercise. Guards chain an inmates' hands to their waists and shackle their feet through the slot in the door before opening the cell door. Once the inmate leaves the cell, he is constantly guarded by two or three officers and has no contact with other inmates. These brief encounters, while shackled, are the only physical human contact the inmate is afforded. Exercise usually occurs alone in a small locked cages or cement bunkers; exercise areas contain no equipment.

Bishop, Maximilenne, "Supermax Prisons: Increasing Security of Permitting Persecution?" Arizona Law Review, Vol. 47:461, at 467-468 (internal citations omitted).

Beyond the physical restrictions a supermax facility imposes, the physiological and psychological effects of solitary confinement are well documented. For example, as reported in The New Yorker, "[a] U.S. military study of almost a hundred and fifty naval aviators returned from imprisonment in Vietnam, many of whom were treated even worse than [Sen. John] McCain, reported that they found social isolation to be as torturous and agonizing as any physical abuse they suffered." Gawande, Atul, "Hellhole," The New Yorker, March 30, 2009, at p. 3 (hereinafter "Hellhole"), available at http://www.newyorker.com/reporting/2009/03/30/090330fa_fact_gawande, see Exhibit M.

The article added that:

[a]nd what happened to them was physical. EEG studies going back to the nineteen-sixties have shown diffuse slowing of brain waves in prisoners after a week or more of solitary confinement. In 1992, fifty-seven prisoners of war, released after an average of six months in detention camp in the former Yugoslavia, were examined using EEG-like tests. The recordings revealed brain abnormalities months afterward; the most severe were found in prisoners who had endured either head trauma sufficient to render them unconscious or, yes, solitary confinement. Without sustained social interaction, the human brain may become as impaired as one that has incurred a traumatic injury.

*Id.*

Stuart Grassian, M.D., a former Professor at the Harvard Medical School of Psychiatry for more than 25 years and an expert on solitary confinement, reports that "[i]t has indeed long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning[.]" Grassian, Stuart, M.D., "Psychiatric Effects of Solitary Confinement," 22 WASH. U. J.L. & POL'Y 325, 327 (2006) (hereinafter "Grassian-Psychiatric Effects").

According to Dr. Grassian, "[a]fter even a relatively brief period of time in such a situation [as solitary confinement] an individual is likely to descend into a mental torpor or 'fog,' in which alertness, attention, and concentration all become impaired." *Id.* at 331. Elaborating, Dr. Grassian explains that:

> [a]n adequate state of responsiveness to the environment requires both the ability to achieve and maintain and attentional set and the ability to shift attention. The impairment of alertness and concentration in solitary confinement leads to two related abnormalities: the inability to focus, and the inability to shift attention. The inability to focus (to achieve and maintain attention) is experienced as a kind of dissociative stupor - a mental "fog" in which the individual cannot focus attention, and cannot, for example, grasp or recall when he attempts to read or to think.

*Id.*

Dr. Grassian concludes that "the use of solitary confinement carries major psychiatric risks." Grassian, Stuart, M.D., "Psychpathological Effects of Solitary Confinement," Am. J. Psychiatry, 140:11, November 1983, 1450, 1454. Similarly, Dr. Haney, a Professor of Psychology at the University of California at Santa Cruz and a lawyer, reports that "there is not a single published study of solitary or supermax-like confinement in which non-voluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, which failed to result in

negative psychological effects." Haney, Craig, "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," <u>Crime and Delinquency</u>, Vol. 49, No. 1, 124-156 at 132 (Jan. 2003).

Moreover, the quality of life – or, more appropriately, the lack thereof – under a supermax regime cannot fully be appreciated by resort to mere sterile description of logistics, physical space, schedules, or constraints on movement and activity. Even diagnoses are insufficient to drive home the extent to which Supermax incarceration imposes punishment well beyond that experienced by ordinary inmates in ordinary institutions.

Mr. Mehanna also asks this Court to consider research that indicates that imposition of a lengthy sentence can actually *promote* recidivism. The JFA Institute conducts justice and corrections research for effective policy-making. *http: www-jfa-associates.com*. It works in partnership with federal, state, and local government agencies, as well as philanthropic organizations to evaluate criminal justice practices and design research-based policy solutions. *Id.* The JFA reports:

> Enduring years of separation from family and community – deprived of material possessions, subjected to high levels of noise and artificial light, crowded conditions and/ or solitary confinement, devoid of privacy, with reduced options, arbitrary control, disrespect, and economic exploitation – is maddening and profoundly deleterious. Anger, frustration, and a burning sense of injustice, coupled with the crippling processes inherent in imprisonment, significantly reduce the likelihood that prisoners are able to pursue a viable, relatively conventional life after release.

JFA Institute, "Unlocking America, Why and How to Reduce America's Prison Population," p. 10 (Nov. 2007) (available at *http://www.jfa-associates.com/publications/srs/UnlockingAmerica.pdf*).

It is clear that the extreme conditions of Mr. Mehanna's lengthy confinement satisfy the deterrence purposes of § 3553(a)(2)(A). The isolation, deprivation, and dehumanization resulting from the conditions of Mr. Mehanna's imprisonment are compelling factors in determining the length of a sentence that is "sufficient, but not greater than necessary" to accomplish the goal of sentencing, including punishment and recognition of the seriousness of the offense.

Even prior to *Booker*, courts held that presentence confinement conditions could in appropriate cases constitute a permissible basis for a downward departure. *See United States v. McCarty*, 264 F.3d 191 (2nd Cir. 2001); *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997) (harsh conditions of confinement are valid grounds for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1996). *See also United States v Brinton,* 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo*, 299 F.Supp.2d 201 (S.D.N.Y. 2004); and *United States v. Francis*, 129 F. Supp. 2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D. N.J. 1997).

Mr. Mehanna's conditions of imprisonment will likely be the harshest available within the United States. Mr. Mehanna ask this court to also consider the harshness of his imprisonment upon him and the devastating effect a longer prison term will have upon him.

### 6. Collateral Consequences of Imprisonment

It is also important to note that Mr. Mehanna's parents and brother all live in the Boston area. They have visited Mr. Mehanna in prison twice a week for every week he has been in jail. He will be moved thousands of miles away from them after the

imposition of this sentence. The expense, travel difficulties, and prison logistics will effectively prohibit his family from visiting or speaking to him on any regular basis while he is incarcerated.

There is no question that incarceration imposes alienation between inmates and their families. This is a common collateral consequence. However, as this court knows from the Mehanna family's daily attendance at trial and at all pretrial hearings, this drastic separation from his parents and brother will impose greater hardship on all of them than the typical criminal defendant and the typical defendant's family suffer.

### III. Conclusion

Mr. Mehanna requests that the Court impose a sentence that is "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a), and one that reflects a fair and sound application of the Guidelines. A sufficient sentence and one which would send a message of deterrence to others is 63-78 months. As Omar Abdala stated in his letter of support:

> I can think of no better moderating influence to these youth than a man who has been through the process, went right to the edge of joining international Jihad (Tarek certainly had the capacity to continue his search for Jihad in Yemen, Iraq, across the red sea in Somalia, etc), then made a conscious decision that this was the wrong path, returned to reform and refocus his life and eventually come to a new understanding of what Jihad means to him which is more centered on building and service rather than destruction.

Respectfully submitted,

TAREK MEHANNA
By his attorneys,

CARNEY & BASSIL

*Janice Bassil*
Janice Bassil
BBO# 033100

*J. W. Carney, Jr.*
J. W. Carney, Jr.
BBO# 074760

Sejal H. Patel
B.B.O. # 662259

John E. Oh
B.B.O. # 675916

Carney & Bassil
20 Park Plaza, Suite 1405
Boston, MA 02116
617-338-5566

Dated: April 9, 2012

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or before the above date.

/s/ J. W. Carney, Jr.

J. W. Carney, Jr.
