# Carney & Bassil

A Professional Corporation

## Attorneys at Law

J. W. CARNEY, JR.
JANICE BASSIL
ROSANNE KLOVEE
LINDSAY GOLDSTEIN
RICHARD GEDEON
KATHRYN HAYNE BARNWELL
JOHN E. OH

20 Park Plaza
Suite 1405
Boston, MA 02116

TEL. (617) 338-5566
FAX (617) 338-5587

www.CarneyBassil.com

*of counsel*
HANK BRENNAN
JAMES BUDREAU
JAMES M. DOYLE
SEJAL H. PATEL

March 14, 2012

Jennifer D. Sinclair
U.S. Probation
One Courthouse Way
Boston, MA 02108

**Re: United States v. Tarek Mehanna**

Dear Ms. Sinclair,

Thank you for your report on our client Tarek Mehanna. We have a number of objections and list them as follows, identifying the relevant paragraphs:

(10) <u>Related Cases: Daniel Maldonado</u>

The defendant objects to the assertion that the prosecution of Daniel Maldonado in Texas is a related case. Maldonado pled guilty after he went to Somalia and participated in armed conflict between the Ethiopian forces and the Islamic Courts Union. The defendant knew Maldonado when the latter lived in New Hampshire. Tarek Mehanna had nothing to do with Maldonado's criminal activities. In fact, as related during the trial, Mehanna tried to persuade Maldonado *not* to go to Somalia. Further, when Maldonado requested that Mehanna come to Somalia and engage in fighting with him, Mehanna refused. This is supported by Maldonado's trial testimony when he was called by the government, and by recorded telephone conversations between him and Mehanna.

(13) - (64) The defendant objects to the statement of relevant facts which the government provided to you. Although the government obtained convictions on all charges after 34 days of trial, it used the rubric of "relevant conduct" to "spin" the facts. The government omitted information that the court must consider for a balanced and accurate account of "relevant conduct" and mixed in facts that are not reflected in the pretrial or trial proceedings. Finally, the government's version of the facts constitutes distortion, mischaracterization or direct contradiction of testimony by their own witnesses at trial.

The defendant submits the following Statement of Relevant Conduct, which is more accurate, using your given titles:

<u>Radicalization of Tarek Mehanna and Others</u> (13) - (19)

Mehanna's interest and commitment to Islam began in his teenage years. He read, studied, and memorized sections of the Qu'ran and the hadiths, which are stories and descriptions of the actions of the prophet Mohammed and his earliest followers. Mehanna's religious growth is documented throughout his emails, instant messages and tape recordings. Mehanna repeatedly discussed his eagerness to visit bookstores in New York and Egypt to buy religious books not available elsewhere. He listened to tape recordings and internet streamed audio of religious scholars. He attended conferences and weekend study groups at the Al-Maghrib Institute, which focused solely on Islam. The government mischaracterizes the defendant's religious commitment as simply about jihad by ignoring the testimony from their own case in chief, scores of trial exhibits and expert testimony in contradiction of such a blanket claim. <u>See</u> Gov't Stmt at pp. 2-5.

Mehanna did not recruit others to violent jihad. The government's portrayal of Mehanna's conversations with other Muslim youth as "recruitment" is simply absurd. Mehanna knew many young Muslim men. Their families attended the same mosque and as a result, these boys had known each other for years. Mehanna was friends with Abousamra, Masood and Abu Zahra, all of whom became more pious over time. As explained at the trial, Muslims do not date; they do not drink alcohol; they do not use drugs; and they do not go to clubs or concerts. Their social lives were heavily restricted. They identified with each other as minority groups do. They debated and discussed religious and political issues. Camaraderie among minority groups cannot possibly be deemed "relevant offense conduct" for purposes of sentencing.

It was entirely uncontested at trial that Mehanna publicly opposed central tenets of al Qa'ida. The government neglected to state in its factual recitation that in many trial exhibits, Mehanna staunchly and publicly opposed al Qa'ida's unlimited attack on the West. Moreover, Mehanna encouraged others to adopt his point of view – hardly the "recruiter" to terrorism that the government paints him to be. Dr. Andrew March of Yale University and Dr. Mohammad Fadel of the University of Toronto unequivocally testified that Mehanna's writings boldly contravened al Qa'ida's message.

Mehanna believed that as an American citizen, he had a religious obligation not to harm Americans. He believed that Muslims living in Iraq and Afghanistan (and other Muslim countries) had the right to defend themselves against an invasion of Muslim lands by foreigners. Muslims and non-Muslims alike believed that the invasion of Iraq was unjustified and that the Iraqi people had the right to defend their land. Mehanna shared that belief and thus, he thought that the killing of Muslims in Afghanistan and in Iraq by coalition forces, including the United States, was morally wrong.

Mehanna did not believe that he, as an American citizen, could kill Americans. Mehanna believed unequivocally that he was under a pact with the United States whereby he could not hurt Americans. This pact is called in Arabic an *aman*. Mehanna repeatedly expressed the view

2

that civilians, who were in Muslim countries for peaceful purposes, like schoolteachers, were not legitimate targets of violence and should not be hurt. He believed that it was wrong to hurt innocent civilians. The government ignores the plain fact that Mehanna always wrote about the rules of engagement during war and only during war. He had no animus against Americans outside the context of war. His debating the legitimacy of and casualties from war is entirely legal.

The government offered no contradicting expert witness or trial exhibit which showed Mehanna so much as wavering from his stance on the rules of engagement. In fact, Tibyan Publications, an Islamic electronic forum, terminated Mehanna as a forum contributor due to his staunch opposition to al Qa'ida views.

In 2006, Mehanna wrote in one instant message to Ali Abu Bakr, a government cooperating witness, that he had been following Osama Bin Laden for over six years and that "he's the reason I started practicing." However, it is specious for the government to so literally attribute Mehanna's religious awakening solely to Bin Laden based upon this single online statement in a casual internet chat. The evidence bore out the many ways in which Mehanna heightened his piety by reading Islamic scholarship, improving his Arabic, and engaging in debate about Islam. Mehanna admired Bin Laden in selective ways, as did *all* of the government cooperators and many others. But Mehanna also took stances exactly opposite Bin Laden on fundamental al Qa'ida issues. Like so many significant omissions in the government's statement, Mehanna's staunch opposition of al Qa'ida views is significantly absent.

<u>Efforts to Train for and Participate in Violent Jihad (20) - (22)</u>

There was no evidence that Mehanna trained for violent jihad. One witness claimed that prior to leaving for Yemen, they took a walk in the Blue Hills. This hardly qualifies as rigorous training, contrary to the more relevant examples presented in other terrorist cases, such as military drills and firearms training.

There was no evidence at trial that Mehanna ever went "operational" or caused any physical harm to anyone. Mehanna had five years and five opportunities to "go operational," but he never did. He neither went to nor attempted to go to Pakistan, while Abousamra went there twice. Mehanna did not go on to Iraq with Abousamra after they left Yemen in 2004. Mehanna made no effort to go to a war zone or find military training when he went to Egypt in the summer of 2006. Mehanna never went to Somalia to join Daniel Maldonado. He knew about that trip before Maldonado went. He resisted Maldonado's urgings to join him, even when Maldonado gave Mehanna specific directions as to what airline and airport to use.

The government's cooperating witnesses received full immunity and freedom despite admitting direct, operational participation in numerous terrorism crimes. Because of the nature of conspiracy law, Mehanna was held legally responsible for the acts of others even though he did not take such actions himself. The jury may have found him guilty of conspiracy, but the relevant offense conduct and sentence should be tailored to account for the co-conspirators' different levels of culpability.

3

Abousamra went to Pakistan twice seeking military training. Mehanna did not go with him. He did not give Abousamra any money as Abu Zahra did. He did not assist Abousamra with possible contacts or means to get into Pakistan as Masood did. It was Abousamra who sought out old contacts. It was Abousamra who was desperate to go overseas to obtain training and fight. Mehanna shared no such commitment.

The government has from the beginning of the case attempted to portray Mehanna as weaving some kind of spell over others to bring them into a terrorist cell. This is a fantasy of the government's own making and an unwarranted exaggeration of friendships among a group of young men of similar age and religious interest. Maldonado converted to Islam before he ever met Mehanna or Abousamra. He became a Salafi when he lived in Chicago, and he located the website Clear Guidance and information about jihad on his own. Maldonado repeatedly described Mehanna's focus as strengthening his faith and religion. Every witness's testimony, statements, and instant messages make clear that Abousamra was the radical, extreme, and vitriolic one, not Mehanna.

Daniel Spaulding, who was Abousamra's brother-in-law, testified at trial that Maldonado introduced him to his views about jihad. He testified that rather than a small circle of people who kept Mehanna's and Abousamra's secrets, they were people with whom Abousamra would be more forthright. It was a group of friends that "would come and go." Spaulding was clear that Mehanna was not providing support to al Qa'ida. Mehanna expressed his views on the need for Muslims to defend themselves against invading armies. Spaulding testified at trial:

Q.   You don't ever recall Tarek Mehanna say that al Qa'ida is doing an important job, do you?

A.   I don't recall him making a statement to that effect, no, sir.

Q.   You don't ever recall Tarek Mehanna saying, We need to support al Qa'ida, do you?

A.   Again, I don't recall words specifically to that effect.

Q.   You never remember Tarek Mehanna saying, We should join al Qa'ida, do you?

A.   I certainly don't have any recollection of that, sir.

Q.   You don't remember Tarek Mehanna ever saying that, We've got to do something to advance the cause of al Qa'ida, do you?

A.   I don't recollect any statements to that effect.

Q.   You don't know of any instance where Tarek Mehanna was directed by al Qa'ida to do something, do you?

A.   I have no knowledge of that, no, sir.

Q.   There was no instance that you know of where Tarek Mehanna was in contact with someone from al Qa'ida coordinating something with al Qa'ida, are you?

A.    I have no knowledge of that, sir, no.

Q.   There were no overseas-based influences that you knew of that were directing or coordinating with Tarek Mehanna, isn't that true?

4

A.    Not that I'm aware of, no, sir.

Q.    Now, certainly, sometimes Tarek would comment favorably
      when watching a Jihadi video, right?

A.    Correct.

Q.    You actually told the FBI that you thought Tarek was
      really a lot of "bluster," was a term you used?

A.    I don't recall if I told that to the FBI or not, sir.

Q.    Is "bluster" a word you use?

A.    I have used it before, sir, yes.

Q.    Would it be applicable to say that there were a lot of
      times when Tarek was a lot of bluster?

A.    Yeah. We all were at that time, sir, yes.

Q.    What does "bluster" mean?

A.    Just kind of venting and saying stuff, but there's no
      actual substance to it.

Q.    It's fair to say that Tarek believed that the way he could
      support Jihad was through prayer, right?

A.    Yes, sir.

Q.    Through speaking in favor of getting invading armies out
      of a Muslim country, right?

A.    Yes, sir.

Q.    He believed in translating documents from another language
      so that people in America could read the other point of view --

A.    Yes, sir.

(Tr. 11-22-11 at p. 140).

Contemplating and Pursuing Domestic Attacks (22) - (26)

Mehanna never contemplated or pursued domestic attacks.

The government did not accurately describe Mehanna's alleged involvement in domestic
attacks. Mehanna never participated in any such attack and he believed that a central precept of
Islam – *aman* - forbade him from doing so. The government knows this because it neither
charged these acts as a crime nor even listed them as overt acts in the indictment. This insidious
allegation always appears beside Mehanna's name in the media and yet, there is no truth to it.

There is no evidence of Mehanna's participation in any domestic attack. No emails refer
to it in veiled or unveiled ways. Such alleged participation cannot be found in any of the instant
messages. It cannot be validated by any recorded phone conversation or other discussion in Abu
Zahra's presence. Of the millions of images on the computers, there was not even a half-
destroyed thumbnail image of a shopping mall, of Hanscom Air Base, or of any other domestic
"target."

These allegations come from the words of one and only one person – Kareem Abu Zahra.
Abu Zahra testified that he went to Daniel Maldonado to obtain guns and that Maldonado said

that the guns "would have bodies on them." Abu Zahra testified that he went to Maldonado because he knew that Maldonado had been a gang member. Maldonado denied all of this. Maldonado testified that he never said anything about guns with bodies on them, and Maldonado had never been a gang member.

The claim that there was a discussion of attacking Hanscom Air Force Base was again a completely uncorroborated and specious accusation by Abu Zahra. Abu Zahra was familiar with Hanscom because he had taken a motorcycle riding course there. Abu Zahra's accusation magically surfaced shortly before trial, even though FBI agents and the AUSAs had previously interviewed him dozens of times.

The government alleged that Mehanna and co-conspirators discussed potentially killing John Ashcroft. In a report filed by the FBI on November 2, 2006, Abu Zahra stated that only he and Abousamra discussed Ashcroft. (KAJ00136). At the trial, and as acknowledged by the government, it was only Abu Zahra and Abousamra who discussed Condoleezza Rice. Mehanna cannot be held responsible for discussions held by others outside of his presence about attacking buildings and government officials when he had no knowledge of these discussions. Abu Zahra himself settled the issue that there was no conspiracy to carry out any domestic attack:

> Q.   Yesterday you talked about discussions about actions
>        involving Condoleezza Rice, John Ashcroft, a shopping mall, and
>        Hanscom Air Force Base, right?
> A.   Yes.
> Q.   And I'd like to have you make one thing crystal clear: At
>        no time was there ever an agreement among you and Tarek and
>        Abousamra to actually carry out any of those things you were
>        talking about?
> A.   Correct.
> Q.   There was never at any time an agreement among the three
>        of you to actually go out and do them, was there?
> A.   There was not.

(Tr. 11-30-11 at p. 80).

The government's omission of these facts is yet another example of how the government has presented to you the "relevant" conduct that it wishes it had developed at trial. It is important to contrast Mehanna's actual, relevant conduct with Abu Zahra's conduct in this case. Abu Zahra funneled thousands of dollars directly to fund terrorist activity. Abu Zahra admitted to planning domestic terrorist attacks. He left a "martyrdom" video for his family when he was departing for Yemen. There is absolutely no doubt that Abu Zahra would have been guilty of multiple counts of material support to terrorists and to a foreign terrorist organization, of conspiracy to kill, of conspiracy to commit false statements, and of quite possibly other charges that the government could see fit to bring. A prosecution of Abu Zahra would have been totally secure without thumbnail images, guesswork, and innuendo. The government, however, let Abu Zahra go completely free despite the serious violations of the law that he committed. The government's rhetoric in its statement of relevant conduct is hyperbolic, unsubstantiated, and emotional,

perhaps because in its effort to prosecute Mehanna, it let the real terrorists go free. The government's ire in this case is not about what Mehanna did but about what he did not do - turn into an informant.

Trip to Yemen (27) - (33)

Mehanna traveled to Yemen, but the government offers no reasonable explanation as to why he did not continue on to Iraq. With due deference to the jury's verdict, we point to an uncontested fact with respect to Mehanna's trip to Yemen: Mehanna *came back* to the United States rather than continuing on to Iraq with Abousamra.

Mehanna did not know Jason Pippin. Abousamra contacted and met with Pippen. Abu Zahra paid for Mehanna's airfare to Yemen. Without Abu Zahra's financial assistance, Mehanna would not have gone.

Mehanna did miss some classes at school while he was in Yemen. However, he neither withdrew from the school nor abandoned his academic program. Upon his return, he resumed his education until he graduated with his doctorate in 2008.

The government stated that before he left, Mehanna gave his brother a bag to destroy with information containing how to make a bomb. No such bag was ever found. The defendant's brother was not called as a witness by the government, nor was he interviewed by any agents. There is no reference to such materials in any chats, emails or recorded conversations.

Abu Zahra left Mehanna and Abousamra in the United Arab Emirates stopover, and returned to the United States. He testified at trial that he gave them money. Abu Zahra did not testify that he provided anyone with a backpack, a shaver, and a belt. Even if he did swap backpacks with Abousamra, none of these items qualifies as "equipment."

Mehanna later described his experiences in Yemen to several people. However, the government conflates these various conversations, omitting the context. In an instant message with Ali Abu Bakr, Mehanna (using the screen name Sayf Maslool) described a school he stayed at in Yemen as follows:

Sayf Maslool: so anyway
Sayf Maslool: there's a school there
Sayf Maslool: that is very good
'Ali Abu Bakr: is that the one that shaykh muqbils students run or something
Sayf Maslool: hehe - yes.
Sayf Maslool: he is Masri
Sayf Maslool: and his name is Abul-Hasan
Sayf Maslool: like you
'Ali Abu Bakr: haha mashaAllah
Sayf Maslool: I met his son
'Ali Abu Bakr: abulhassans?
Sayf Maslool: yeah

Sayf Maslool: Abul-Hasan himself was on Hajj when I was there
Sayf Maslool: but, they all walk around the camp
Sayf Maslool: with camo jackets and AK-47s
'Ali Abu Bakr: maaan, no way
Sayf Maslool: way.

'Ali Abu Bakr: haha thats awesome
Sayf Maslool: It's more of a camp
Sayf Maslool: than it is a school
Sayf Maslool: u basically live with like, 300 other brothers
Sayf Maslool: eat, pray, study, with them
Sayf Maslool: etc

Mr. Gregory Johnsen, a Princeton expert on Yemen, testified that Yemen is a primitive country divided by tribal affiliations. He testified that people routinely carry assault rifles, such as AK-47's, on Yemeni streets. Mr. Johnsen said that he carried guns and rifles himself when he was in Yemen. If Mehanna were at a training camp and not at a school, it would make no sense that he would write to Abu Bakr with amazement that people carried guns. It makes more sense that Mehanna was describing his incredulity that people carried assault rifles as part of a typical way of life, including at a school.

The schools Mehanna described are primitive, often little more than a camp-like site with some mud buildings or tents in which students study and live. Further, Mr. Johnsen explained that the Arabic word *mu'skir* for camp is used interchangeably with the name for school:

Q.    What is the colloquial meaning of mu'skir?
A.    This is a very flexible term that's used in a lot of
      different ways. So it can be used to describe, say, a military
      camp. For instance, the First Armored Division has a camp in Sanaa, right above
      Sanaa University, in Yemen, obviously. This
      is referred to as mu'skir. Also, I've had friends from church
      in the Middle East who refer to, like, a vacation bible school
      in the desert as mu'skir. So it's one of those words that,
      when used in common speech, becomes quite flexible, like many
      of the words that we have in English.

(Day 30 12-8-11 at p. 77).

Mehanna described one occasion when he was in Yemen and his bus was stopped by bandits. On another occasion, in 2006, in an instant message, Mehanna (using the screen name al-Faqir ila Allah) was asked to tell a correspondent, Mu'awiyah (who did not testify at trial), to describe Marib, an area in Yemen. Mehanna responded as follows:

Mu'awiyah: so akhi tell me about marib
al-Faqir ila Allah: heh
al-Faqir ila Allah: it's a wild land

8

al-Faqir ila Allah: very tribal
al-Faqir ila Allah: full of bandits
Mu'awiyah: have you seen tribe infighting there?
al-Faqir ila Allah: and al Qa'idah

It is unclear from this instant message whether Mehanna was referring to the Marib that he personally viewed then or whether he was combining his past experience with the later knowledge he gained about al Qa'ida's presence in Yemen by 2006. Gregory Johnsen was quite clear that at the time Mehanna went to Yemen in 2004, there was no al Qa'ida presence. The resurgence of al Qa'ida in Yemen did not occur until February 2006.

In a conversation recorded by Kareem Abu Zahra, Abousamra repeatedly stated that his travel to Iraq was his own idea and his own decision. Similarly, Abousamra's earlier trips to Pakistan were his decision alone and Mehanna was never mentioned in association with those trips. Abousamra went to Pakistan after discussions with Hassan Massoud but there was no evidence that he told Mehanna about them. In fact, it is not clear that Mehanna and Abousamra were even particularly good friends when Abousamra went to Pakistan.

<u>Continued Conspiracy through Translation Services</u> (34)

The government's claim that Mehanna's independent translations constituted material support for al Qa'ida and other terrorist groups is wrong as a matter of law and of fact. Although the government charged these actions as material support, the jury did not specify the means by which it determined that Mehanna provided material support to terrorism. The jury could have found that Mehanna provided material support by going to Yemen, by lying to the FBI and/or by his activities in speech and writing. The government opposed the use of a special verdict slip which would have delineated the manner by which the jury reached its verdict. Since there was no special verdict form, there is no support for the government's claim that the jury found that Mehanna's free speech activities violated the law.

The government maintains that Mehanna provided material support to al Qa'ida by translating documents and posting them on the internet. This is conduct that is protected by the First Amendment. It is independent advocacy under *Holder v. Humanitarian Law Project*, 103 S. Ct. 2705 (2010). Mehanna's translations and distributions constituted independent advocacy because the government never proved that they were in coordination with al Qa'ida or terrorists.

There was no evidence that Mehanna had any knowing or direct contact with any member of al Qa'ida. The government never proved a direct link between al Qa'ida and Mehanna. Mehanna wrote on Islamic forums. In this virtual world, anyone may know another person online who knows someone in al Qa'ida. In its opening statement, the government stated that Osama Bin Laden put out a call for "*help across the world*" and that Mehanna "answered that call." The government effectively seeks to eviscerate any sort of "independent advocacy" by stating that this "call" alone forges a direct link between Mehanna and al Qa'ida.

There is no case which states that translations and communications with others expressing political and religious views constitutes material support of terrorism. The

government has portrayed Mehanna as reaching through cyberspace like some super villain. The actual facts are that Mehanna wrote on two forums: Clear Guidance and Tibyan Publications. Many people who wrote on these forums believed in jihad - some more violent in their rhetoric than others. But at no time did the government prove that these forums contained operational information as other websites were known to do. For example, these forums contained no descriptions about how to make suicide vests or what type of poisons to find and use. The contributors on these forums wrote and shared ideas, which are protected under the First Amendment.

Mehanna was fluent in English and Arabic and translated documents. Tibyan Publications included a small number of people with similar fluency. Translations were completed and posted. At no time was there any established direct link between Mehanna and an al Qa'ida member in which he completed a translation at the behest of al Qa'ida.

Mehanna translated "The Expedition of Umar Hadid," which carried an al Qa'ida logo. There was no evidence, however that any member of al Qa'ida contacted him to work on this translation. The final version of the video indicated that someone who spoke British English completed the translation. There was no evidence as to whether "The Expedition of Umar Hadid" was a successful recruiting tool. There was no information and there were no statistics which indicated that anyone decided to join al Qa'ida or commit any terrorist activity after watching this video.

Mehanna also translated "39 Ways to Serve and Participate in Jihad." ("39 Ways"). He wrote and translated this document independently for those people who did not intend to fight. The government states that Congressional testimony, private think tanks, and Arabic language broadcasters call "39 Ways" instrumental in encouraging terrorism. But it provided no evidence of this at trial other than the self-serving testimony of Evan Kohlmann. As defense expert Dr. Mohammad Fadel testified, most of the "39 Ways" come straight from the Qu'ran.

There was no evidence Mehanna digitally edited any material. He did not distribute materials as a service to al Qa'ida but rather as part of his independent advocacy for Muslims. He did not translate the Abu Anas video. He did not translate or edit the Wa Yakoon video. He did not perform other creative tasks. He made one suggestion that a video show some footage of fighters. He did not know how to edit or insert graphics or animated clips.

The government cites to various individuals who had the "39 Ways" on their computer. First, the government has provided no information or evidence about these supposed individuals other than that the document was sent to Sohail Qureshi. Mr. Qureshi's computer was filled with thousands of similar documents - so many that the United Kingdom computer experts could not list all of them. "39 Ways" was posted and is still available on the internet. There was no evidence or discovery provided about other individuals.

Mehanna forwarded to others links to videos and speeches. He did so as independent advocacy and not in coordination with al Qa'ida. As the Supreme Court stated in *Holder v. Humanitarian Law Project*: "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the

foreign terrorist organization's direction and control." *Holder, supra* at 2721. "In particular, we in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations." *Holder, supra* at 2730.

<u>Translation, editing and other internet activities</u> (35) - (43)

Mehanna's limited online or off-line contact with other individuals does not constitute criminal relationships involving conspiracy to provide material support.

The government also noted the use of secrecy and code words as evidence of some plot to support al Qa'ida. It is commonly known that all American Muslims were concerned about surveillance by federal authorities. Mehanna and his friends used wholly unsophisticated phrases like "peanut butter and jelly" for jihad and "Bob" or "Brian" for the FBI. These codes hardly require top echelon cryptologists to crack. American Muslims know they are monitored, even when they have done nothing wrong and even when they cooperate with law enforcement. For example, in October 2011, the media revealed that an Imam in Brooklyn who had fully cooperated with the New York Police Department was being secretly monitored. In August 2011, the Associated Press published a lengthy report of its investigation into the NYPD and the CIA monitoring activities in Muslim neighborhoods and mosques.

<u>Tibyan Publications</u> (44) - (47)

Mehanna translated materials for Tibyan Publications. He did not do so as a direct request by al Qa'ida. The government cited to an instant message between Tariq Al Dour and Wassim Mughal, two men convicted of terrorist activities in the United Kingdom, about translating activities. In that exchange, Mughal stated that al Qa'ida needed help in translations and asked if Tibyan Publications could assist in this. However, Mehanna did not translate an al Qa'ida magazine, "The Camel's Hump," as requested by one of the Tibyan administrators.

The government states that the internet is critical to al Qa'ida, and its use for recruitment has increased in the last eight years. This presumably came from the government's so-called "expert," Evan Kohlmann, who has no advanced degrees, no legitimate qualifications, and testifies only for the government earning fat fees. Defense expert Dr. Marc Sageman testified that videos are insignificant recruiting tools. In recent testimony before the Congressional Homeland Security Committee, Brian Jenkins from the Rand Corporation testified that the success of al Qa'ida's use of the media was overblown and exaggerated. He stated:

> It appears that while Internet strategies aimed at creating at least weak ties among a large number of online participants offer opportunities to terrorist enterprises like al Qaeda, such strategies also appear to have inherent weaknesses. They may create virtual armies, but these armies remain virtual. They rely on individual initiative to carry out terrorist actions, but they offer online participants the means to vicariously participate in the campaign and please God without incurring any personal risk. Online jihadist forums may be providing an outlet that distracts jihadists from involvement in real world operations. This may be a

particular weakness of the jihadist movement, which recognizes fervent commitment evidenced by making disruptive threats, urging others to carry out attacks, creating terror, rather than limiting participation to physical terrorist attacks. If 90 percent of the struggle *is* communications, according to al Qaeda, then online jihadism cannot be disparaged. For the virtual warrior, the opportunity to display one's convictions, demonstrate one's intentions and prowess through boasts, threats, and fantasy attacks on the Internet counts as achievement. al Qa'ida's own pronouncements tend to equate the declaration of intentions with their achievement. They include among their accomplishments what they intend to do. For many young men who grew up with the Internet, there is no sharp line dividing the real world from the virtual world — the virtual world *is* the real world. Online jihadism, then, may be a distraction from the real thing — not a call to arms, but a psychologically rewarding videogame.

Individual participation in an online group as opposed to joining a real group may further undermine action. While some individuals display the resolve to carry out attacks without the reinforcement of peers, the history of terrorist plots suggests that peer pressure plays an important role in driving a conspiracy toward action. On the Internet, one can turn off the conspiracy at any time. Online jihadism is readily accessible but it also offers easy off-ramps.

(Testimony before Congress, December 6, 2011)

The government greatly exaggerates when it states that Mehanna saw himself as the media wing of al Qa'ida. Mehanna has never said any semblance of these words. A correspondent jokingly made this reference in a single instant message. The writer then said it was a joke. Mehanna did not respond.

Further, Mehanna has absolutely no control over who chooses to publish articles about his case. It is unwarranted and unfair to hold Mehanna responsible for what someone overseas wrote about him. As the government knows, the poem Mehanna wrote, "Make Martyrdom What You Seek," was written when he was 16 years old, and he won an MIT Poetry Slam prize for it. Others have written about Mehanna's case, including ex-CIA agents, law professors and local journalists. A suburban lawyer from Weston called a radio show to object to the repeated use of images of the World Trade Center during the trial. In other words, this is all part of free press. People are free to read, comment, and publish on this or any other public trial.

Mehanna's possession of videos that were unpopular and graphic was protected First Amendment conduct. The government references videos repeatedly in its statement of relevant conduct. Possessing these videos, viewing them, and distributing them are not illegal acts.

The videos the government cites are all publicly available for anyone to access. *The State of the Ummah* may have been published by al Qa'ida, but Al-Jazeera television showed it in full. It appears to this day on You Tube. *The Martyrs of Bosnia* may have been distributed by Azzam Publications, but it too is freely available today on a number of websites, including You Tube.

Azzam Publications was shut down in the fall of 2001, long before the defendant's trip to Yemen in 2004 and his translation activity in 2006.

The government states that many of the videos that Mehanna and others watched were graphic. This much is true. But then the government asserts that the videos were produced and distributed to "inspire, recruit, and inform." This was the opinion provided by the government's expert, Evan Kohlmann. Mr. Kohlmann provided no proof that these videos inspired, recruited, or informed anyone. Defense expert Dr. Marc Sageman has studied al Qa'ida recruitment on behalf of the United States Government, and he testified that al Qa'ida did not recruit through these videos. He testified that there is no evidence that such videos are successful recruiting tools. The majority of al Qa'ida volunteers come from countries like Afghanistan and Pakistan where internet access is available to less than 5% of the population.

<u>One on One Recruitment of Others</u> (48)

As stated above, Mehanna opposed the views espoused by al Qa'ida. He did agree that the United States and coalition forces should not be in Iraq and Afghanistan engaged in a war against an indigenous Muslim population who had not attacked the United States. As demonstrated repeatedly at trial, Mehanna disagreed with other views espoused by al Qa'ida.

Mehanna had a group of friends, who shared similar interests. He did not radicalize them or persuade them towards his point of view. He did talk about moving to Yemen or other Mideast countries after he finished his education out of a desire to live a life where the population was Muslim and where he could practice his religion and culture freely and openly. When he was arrested, he had obtained a job at the King Fahd Medical Center in Saudi Arabia to establish a diabetes clinic - where he could help other Muslims. The government's effort to tie this mature decision to a nefarious motive is disingenuous.

<u>Providing Assistance to Others Engaged in Crimes</u> (49) - (53)

Mehanna had little contact with the others the government referenced in their statement and he did not provide assistance to them. His relationship with these individuals was established at trial as follows:

<u>Jason Pippen</u> – Mehanna posted a few times when Jason Pippin did. But Mehanna did not know Pippen's real name, and he never met or spoke to Pippen.

<u>Tariq Al-Daour</u> – Mehanna posted back and forth with Tariq Al-Daour and discussed meeting him during a stop-over at a London airport. But Mehanna never met Al-Daour. Al-Daour tried to involve Mehanna in a credit card scam, but Mehanna refused to participate, as the government well knows. An email from Henry Miller, Al-Daour's attorney, to Mehanna inquired about an instant message in the Al-Daour investigation. Miller wrote to Mehanna:

> 3 May 04: Tariq is clearly asking you about possible credit card fraud. But from your responses this is something that you were never involved with and didn't go any further.

Waseem Mughal – There was no evidence Mehanna corresponded with Waseem Mughal.

Omar Hammami – Mehanna did not know Hammami "very well." He met Hammami once with Maldonado socially in the summer of 2006 in Egypt. At that meeting, Maldonado expressed his interest in going to Somalia. Mehanna warned him against doing so and told him that he needed to think of his children and his wife's compromised health. When Maldonado called Mehanna from Somalia urging him to come, Mehanna did not go and made repeated excuses that angered and disappointed Maldonado and presumably, Hammami.

After Maldonado disappeared and later was arrested, Mehanna and Hammami exchanged emails about Maldonado's arrest. Hammami did not become a leader in Al-Shabaab until much later and Mehanna had no knowledge or control over what Hammami did with his life.

Mehanna received a total of seven emails from Hammami after Maldonado was arrested. At that time, no one knew where Maldonado or his family was. Hammami and Mehanna speculated about who might have betrayed Maldonado, but this idle rumor-swapping was the extent of their contact.

Ehnsanul Sadequee – Sadequee was a translator on Tibyan as Mehanna and many others were. Mehanna had no control over what Sadequee did or who read what he translated.

False Statements and Obstruction of Justice (60) - (61)

Mehanna's statements about his Yemen trip and about Daniel Maldonado did not obstruct any federal investigation.

**A. Yemen**

Mehanna was convicted of making false statements about his trip to Yemen. The government's claim that these statements wreaked havoc on a government investigation is another exaggerated spin. Mehanna did not have to speak to the investigators and did not provide them with much detail about the Yemen trip. By the time Mehanna talked to the FBI in December 2006, the FBI already had a detailed story of the trip from Kareem Abu Zahra.

The government's accusation that Mehanna's statements allowed Abousamra time to flee before the charges were brought is an outrageous accusation and one not borne out by the evidence. Abousamra had been on a watch list since 2002. The government had the information about his entry into Iraq and his efforts to seek military training on two prior occasions when he went to Pakistan. The government stopped Abousamra on his way out of the United States on December 26, 2006 and simply let him go. By that time, the government had the complete cooperation of Abu Zahra and a recording of Abousamra discussing the trip to Yemen.

**B. Maldonado**

The FBI knew the moment Mehanna said that Maldonado was in Egypt that he had lied to them. The agents had recorded the conversation between Mehanna and Maldonado when Maldonado called from Somalia. Hammami background comments were evident as well. Mehanna's statement did not and could not have changed any investigation of Maldonado or Hammami.

<u>Attempts to Subvert the Judicial Process</u> (62)

It is the government, not Mehanna, who offends the integrity of the judicial process. Mehanna exercised his constitutional right to a jury trial in his case, and his behavior every day in court was that of a model citizen and inmate. He showed his belief in the judicial process and put his faith in his counsel and in the jury system. He and his family consented to searches of their home. Stunningly, his parents even allowed a consent search immediately after the FBI arrested Mehanna at the airport and his mother fainted. The government itself showed cynical disregard for the judicial process by repeatedly showing photographs of the World Trade Center on September 11th, photographs of Osama Bin Laden and other terrorist leaders, and videos of fighting in Iraq in order to prejudice the jury. Tellingly, the government did not refer to any of these videos or photographs in its closing argument.

In one of its more egregious statements, the government claims that after being told he would be charged criminally, Mehanna attempted to leave the country. The government knows that Mehanna left after he applied for and received a prestigious, well-paying job in his field. He made no secret of it. Had the court permitted testimony from his employer via Skype, the jury would have heard how impressed the King Fahd Hospital was with Mehanna and how shocked they were to learn of his arrest. They supported him fully and were willing to testify to that effect at trial.

Perhaps the government's willingness to distort and omit truth is the true subversion of the jury process. It is the government's willingness to bargain away public safety to people who unabashedly admit to terrorist crimes that is the true subversion of justice.

(63) Victim Impact

The defendant objects that additional points are added for victim impact. There was no actual harm which occurred as a result of Mehanna's actions. Abousamra, the absent co-defendant, traveled on to Iraq after he went to Yemen with Mehanna. Abousamra sought to fight U.S. soldiers. Mehanna did not and returned home. As stated above and repeatedly throughout the trial, Mehanna did not believe that he could or would harm U.S. soldiers. Islam forbade it. Further, the commentary to U.S.S.G. 3A1.2 states that it should not be applied in these circumstances:

> This guideline applies when specified individuals are victims of the offense. This guideline does not apply when the only victim is an organization, agency, or the government.

There were no specified individuals or actual victims named in the case or in the indictment, but rather U.S. forces as a government organization. This enhancement should not be applied in these circumstances. There is no case which automatically applies this enhancement to terrorism cases. A review of *all* First Circuit cases shows that this enhancement is *only* applied when there is a specific individual who has been placed at risk, such as an arresting officer. *See United States v. Dixon*, 449 F. 3rd 194 (1st Cir. 2006) (enhancement applied where the defendant told investigators that he would like to kill two district attorneys and the attorney general and specified them by name).

Further, Mehanna's trip to Yemen occurred in February 2004 and thus, the 2003 Sentencing Guidelines (enacted in November 2003) apply. The enhancement under U.S.S.G. 3A1.2 in 2004 was 3 points and not 6. To assign the defendant additional points based on a later enhancement is a violation of the ex post facto clause of the United States Constitution. The 6 point enhancement is also not warranted by applying Chapter two of the guidelines, offenses against the person. An examination of all of the offenses against the person listed in Chapter Two of the guidelines apply to harm to specified individuals. As such it is not appropriate and a misreading of 3A1.2 to apply that enhancement here.

(64) Obstruction of Justice

As described in the above statement of facts, the defendant acknowledges that the jury found him guilty of lying to the FBI. The defendant objects to the conclusion that he obstructed any investigation. A two level increase should not be applied here. See, *United States v. Biheiri*, 356 F. Supp. 2d 589 (E.D.VA 2005), (there was no actual obstruction of a federal investigation where the agents who interviewed the defendant knew that his statements were false. As such, there was no enhancement for obstructing the investigation of a federal crime of terrorism.)

(74) Terrorism Enhancement

There are many cases where judges have refused to apply this enhancement. To date, none of have been overruled.  The defendant objects to this enhancement for the following reasons:

**1. Application of U.S.S.G. § 3A1.4 Results in Impermissible Double Counting.**

A district court engages in "double counting" when "precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *United States v. Farrow*, 198 F.3d 179, 193 (6th Cir. 1999). Double counting is impermissible unless "it appears that Congress or the Sentencing Commission intended to attach multiple penalties to the same conduct." *Id.* at 194.

The contention that U.S.S.G. § 3A1.4 applies to Mr. Mehanna's convictions demonstrates one of the chief flaws in this enhancement. In *United States v. Crocker*, Case No. 04-CR-10097 W.D. Tennessee), the PSR propounded the same 12-level enhancement after the defendant was convicted of possessing chemical weapons, in violation of 18 U.S.C. § 229(a). The applicable guideline for this offense is U.S.S.G. § 2M1.6 and, as applied to Crocker, resulted in an offense

level of 42 because the offense was committed with intent to injure the United States. *Crocker*, Sentencing Transcript, p. 26 (relevant portions of the transcript are attached here as Exhibit C). As to the 12-level enhancement, the Honorable James D. Todd stated:

> How could you ever have a 2M6.1 offense committed with intent to injure the United States that would not also have a 3A1.4 twelve-level enhancement for a crime intended to promote federal terrorism? I can't think of one – I can't think of a crime where if you had one, you wouldn't have the other.

> It seems to me there may be some odd case where you could think of where you     could have a 2M6.1(a)(1) without 3A1.4, but it's not this case. It seems to me in  this case, this offense was committed with intent to injure the United States. It's a base level 42. It seems double counting to then add 12 more levels because this felony was intended to promote a federal crime of terrorism.

> And a federal crime of terrorism is described in 18 U.S.C. 2332[b]g, which I read it earlier. By the federal crime of terrorism means an offense that is calculated to influence or affect the conduct of government by intimidation or coercion and or to retaliate against government conduct. It seems to me that is substantially what 2M6.1 is, and offense to injure the United States. So I think it's a double counting.

*Id.* at pp. 26, 39. Judge Todd therefore sustained the defendant's objection to the 12-level enhancement. *Id.* at 39.

Applying Judge Todd's analysis to this case, application of the 12 level enhancement also results in impermissible double counting. Each of the counts of conviction relates to a federal crime of violence related to terrorism. The defendant objects to imposition of this enhancement.

**2. Application of U.S.S.G. § 3A1.4 is Unworthy of Deference from this Court as it is an Enhancement the Sentencing Commission Developed Only as a Result of Congressional Directive and is not Based upon Empirical Data.**

In 1994, Congress enacted the Violent Crime Control and Law Enforcement Act of 1994. Section 120004 of that Act "direct[ed] the [Sentencing] Commission to provide an appropriate enhancement for any felony that involves or is intended to promote international terrorism. Guidelines Manual, Appendix C, Amendment 526. Specifically, the act directed the Commission as follows:

SENTENCING GUIDELINES INCREASE FOR TERRORIST CRIMES

> The United States Sentencing Commission is directed to amended its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, **unless such involvement or intent is itself an element of the crime.**

Public Law No. 103-322 (emphasis added).

17

The Sentencing Commission promptly deleted the previous upward departure provision in U.S.S.G. § 5K2.15 (which allowed district court's discretion to depart upward if the defendant committed the offense in furtherance of a terrorist action) and replaced it with U.S.S.G. § 3A1.4. This new enhancement not only created an upward adjustment, it created a minimum offense level of 32 if the offense involved or was intended to promote international terrorism, and required a criminal history category of VI, regardless of the defendant's actual criminal history.

The Sentencing Commission did not give any reason for selecting this particular offense level or for imposing a criminal history category of VI in every case. The Commission also did not mention how or even if this adjustment addressed Congress' express limitation that the Commission was to provide for an enhancement in such cases "unless such involvement or intent is itself and element of the crime." The next year, the Sentencing Commission amended the enhancement again, also by congressional directive, to apply the enhancement more broadly to include "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g). *See* Guidelines Manual, Appendix C, Amendment 539.

A judge's ability to draw any useful direction from a guideline depends first upon whether the Sentencing Commission, in promulgating or amending that guideline, did so in an "exercise of its characteristic institutional role." *Kimbrough v. United States*, 128 S.Ct. 558, 575. Section 3A1.4 simply does not warrant any deference. This enhancement was not enacted based upon empirical evidence of pre-Guidelines sentencing practice, and was not enacted in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *See Rita v. United States*, 127 S.Ct. 2456, 2464-65. This Court must conclude that this enhancement would "yield a sentence 'greater than necessary' to achieve § 3553(a)'s purposes" in this case, and either find it inapplicable or apply a downward variance to eliminate its affect upon the advisory guidelines calculations. *See Kimbrough, supra* at 575.

### 3. Application of U.S.S.G. § 3A1.4 Substantially Over-represents Tarek Mehanna's Criminal History.

If the court were to apply U.S.S.G. § 3A1.4, the enhancement would substantially increase his criminal history category from level I to level VI. Thus, while Mehanna actually has zero criminal history points, application of U.S.S.G. § 3A1.4 takes him from the lowest criminal history category to the highest based solely on this enhancement. The enhancement therefore does not accurately represent Mr. Mehanna's true criminal history.

Section 4A1.3(b)(1) of the Guidelines allows this court to depart downward from the suggested sentencing range if the defendant's "criminal history category substantially over-represents the seriousness of [his] criminal history or the likelihood that [he] will commit other crimes." In *United States v. Fletcher*, 15 F.3d 553 (6th Cir. 1994), the court specifically recognized the validity of a downward departure on this basis.

Many circuits have employed U.S.S.G. § 4A1.3 as a basis for a downward departure where a criminal history category overstates the seriousness of the defendant's record. *See, e.g., United States v. Shoupe*, 35 F.3d 835, 838 (3rd Cir. 1994) (holding the Sentencing Commission recognized the imprecision inherent in the criminal history classification, thus promulgating §4A1.3 "to give the sentencing judge's discretion to depart from the prescribed range where it

18

misrepresents a defendant's criminal history or likelihood of recidivism"); *United States v. Gayles*, 1 F.3d 735, 739 (8th Cir. 1993) (holding the court "may depart downward from an otherwise applicable sentencing range when reliable information shows that the defendant's criminal history category significantly over represents the seriousness of defendant's past criminal conduct"); *United States v. Summers*, 893 F.2d 63, 68 (4th Cir. 1990) (affirming finding that the criminal history category overrepresented the seriousness of the record, thus justifying departure); *United States v. Bowser*, 941 F.2d 1019, 1023 (10th Cir. 1991) (same); *United States v. Collins*, 915 F.2d 618, 621-22 (11th Cir. 1990); *United States v. Abbott,* 30 F.3d 71, 73 (7th Cir. 1994); *United States v. Spencer*, 25 F.3d 1105, 1113 (D.C. Cir. 1994); *United States v. Rivers*, 50 F.3d 1126, 1131 (2nd Cir. 1995).

Unlike other provisions of the guidelines, such as USSG 4A1.3(b)(2), the terrorism enhancement does not prohibit a downward departure. In *United States v. Aref*, 2007 WL 804814 (N.D. NY 2007), the trial judge departed from the guidelines in a terrorism case finding that a criminal history of VI substantially over represented the seriousness of the defendant's criminal history and sentenced the defendant to 180 months instead of the guideline range of 292-360 months.

A category VI designation substantially overstates the seriousness of Mr. Mehanna's criminal history and the likelihood of him committing future crimes. The seriousness of his record is completely overstated as his placement in criminal history category VI occurs only through application and operation of this enhancement – not because of his own personal criminal history or record. The tremendous increase in Mehanna's criminal history category is simply not reflective of actual criminal history.

**4. There are many additional factors which should be considered in either not applying the 3A1.4 enhancement or departing from it.**

In addition to the legal arguments cited above, the defendant submits that the following factors should be taken into account in the application of the 3A1.4 enhancement:

(a) A life sentence here or a decades-long sentence would negate any distinction between Mehanna's conduct and the actions of the most serious terrorism offenders. Those sentences have been reserved for defendants who have caused actual harm as in the Embassy bombings (Ahmed Khalfan Ghailani) or the World Trade Center attack (Zacarias Moussaoui), or those who were "operational" and whose failure to cause harm was a matter of happenstance, e.g., Richard Reid (the shoe bomber), Umar Farouk Abdulmutallab (the underwear bomber), Faisal Shahzad (the Times Square bomber). Life sentences have also been imposed for those defendants who participated in "sting operations" believing that they were going to blow up something, such as the pipelines to JFK airport (Kareem Ibrahim, Abdul Kadir, Russell Defreitas).

(b) No actual harm occurred or came close to occurring in this case. In an interview on public radio, US Attorney Carmen Ortiz acknowledged that the prosecution of Tarek Mehanna was a "preventative prosecution." In other words, he was not prosecuted for what he did so much as what the government thought he might do. Given that he went to Yemen, returned in 2004,

and took no overt or operational action in the following four years, the government's beliefs were not based in reality.

(c) Mehanna was 20 years old when he went to Yemen. He never followed through on going to Iraq as Abousamra did nor did he go to Somalia to fight when invited by Maldonado. It appears that the trip to Yemen was not well-planned or sophisticated. Their so-called contact in Yemen was not an actual terrorist but someone who had fought in the Afghanistan war against the Soviet Union. The "plan" in the case at bar consisted of looking for someone by his height, possible occupation and possible area of residence, and asking for his help in finding a military training camp.

(d) Mehanna has endured harsh pretrial confinement in Plymouth where he has been in solitary confinement 23 hours a day and will most likely be assigned to the supermax prison in their "Muslim" unit in Florence, Colorado. In a study conducted of a supermax prison in California, a psychologist noted a number of disturbing phenomena:

> First, after months or years of complete isolation, many prisoners begin to lose the ability to initiate behavior of any kind – to organize their own lives around activity and purpose … chronic apathy, lethargy, depression and despair often result. In extreme cases, prisoners may literally stop behavior, becoming essentially catatonic.

New Yorker Magazine, March 30, 2009, "Hellhole", Atul Gawande, p. 40.

(e) The distortion created by this enhancement further compels justification for a departure. In *United States v. Benkhala*, 501 F. Supp. 2nd 748 (E.D.VA 2007), the court granted a departure and noted "after applying § 3A1.4, Defendant's criminal history is maximized at category VI. For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." Moreover, the Introductory Commentary to Chapter Four of the Sentencing Guidelines, entitled "Criminal History and Criminal Livelihood," states that "A defendant's record of prior criminal behavior is directly relevant to those purposes. A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment."

(69) Use of the highest adjusted offense level

There is no true distinction between Counts 1 through 4. While Mehanna has been convicted of Counts 1, 2A, 2B, 3 and 4, they represent but one course of conduct charged under four different statutes, all of which are closely interrelated. All were based on Mehanna's travel to Yemen and his writings and internet postings. Indeed, one of the main reasons the court gave in denying the defendant's request for a special verdict form was that it could not separate out the offense conduct alleged in the conspiracy counts or the substantive count of material support. Under the principles of parsimony, the defendant's base offense level should be capped by Count 1, which is level 26.

The defendant objects to use of the 2011 Guidelines on Counts 2, 3 and 4. The underlying offense is 2A1.5, conspiracy or solicitation to commit murder. The indictment asserts that the conspiracy to kill, in violation of 18 USC 956, concerns the defendant's trip to Yemen, as described in more detail in Count 3. The same is true for Count 4. Mehanna's trip to Yemen occurred in 2004, when the 2003 Sentencing Guidelines were in effect. Under the indictment charging this crime, the government only refers to actions which took place between 2002 (actions by Mehanna's co-defendant Abousamra) and actions which took place in February, 2004 (the trip to Yemen).

The 2003 Guidelines for section 2A1.5 provide a base offense level of 28. This is the appropriate level and to assign a base level of 33 would violate the ex post facto law of the United States Constitution. See, *Miller v. Florida*, 482 U.S. 423, 429 (1997) (sentencing guidelines which increased punishment after the crime was committed were deemed a violation of ex post facto prohibition in the United States Constitution. Included in the bar to such violations are "every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.")

In addition, the defendant submits that USSG 2X1.1 applies to this case. 2X1.1(b)(2) provides for a decrease of three levels if the central crime is a conspiracy.

(116) The defendant objects to the calculation, and submits that a more accurate characterization of Mehanna's conduct should be scored accordingly:

| | |
|---|---|
| Base Offense Level: | 28 |
| Victim Related Adjustment | 0 |
| Terrorism Enhancement | 0 |
| Adjusted Offense Level | 28 |

The defendant also objects that a deduction for role in the offense was not considered. Witness after witness described Abousamra, Mehanna's co-defendant, as the person who was highly invested in the most extremist talk and behavior. An unindicted co-conspirator and witness against the defendant, Kareem Abu Zahra, discussed domestic plots and acknowledged that the defendant did not agree with them. Daniel Spaulding, another unindicted co-conspirator and witness for the government, testified that Mehanna did not believe that attacks on American soil were permissible under Islamic law. Further, Mehanna wrote and posted his belief that innocent civilians were protected under Islamic law. Mehanna translated one video which was made by al Qa'ida but there was no direct link between him and any al Qa'ida member. At best, this constituted independent advocacy. Mehanna also translated speeches by two al Qa'ida members, but again, his work was minimal compared to other unindicted co-conspirators. As such, the defendant should receive a 2 point reduction for minor role.

| | |
|---|---|
| Departure for minor role | -2 |

Total offense level:                          26

The defendant objects that he did not receive a three point reduction under USSG 2X1.1(b)(2), which provides for one in a conspiracy where the underlying offense was not completed. The defendant never received military training, and he did not go on to Iraq after he had been in Yemen but instead returned home. He did not attempt to kill American soldiers or US nationals overseas. He was not stopped because he was arrested or intercepted. Rather, he chose not to continue with Abousamra. Two years later, when asked to join the fighting in Somalia, the defendant also declined.

Departure for conspiracy                 -3

Total offense level:                          23

Criminal History Level                    I

Guideline Range:                            46-57 months

Finally, the defendant objects that there was not more information about the support and love he has from his family and the Muslim community, and not at least some description of Mr. Mehanna's life and background, which put the convictions in context. The defendant's parents provided this information to you during two interviews with them, and the PSR should include these critical details.

Very truly yours,

Janice Bassil

J. W. Carney, Jr.

22