## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 09-10017-GAO |
| | ) | |
| TAREK MEHANNA | ) | |

### STATEMENT OF RELEVANT OFFENSE CONDUCT

The United States of America, by Carmen M. Ortiz, United States Attorney, and Aloke Chakravarty and Jeffrey Auerhahn, Assistant United States Attorneys for the District of Massachusetts, and Jeffrey Groharing, Trial Attorney for the Counterterrorism Section of the United States Department of Justice, hereby submits the following summary of relevant offense conduct regarding the above-captioned defendant.   The Government reserves the right to update this statement.

### Charges of Conviction

On December 20, 2011, after an approximately nine-week trial involving almost 50 witnesses and hundreds of exhibits, a jury found that Tarek Mehanna ("the defendant") conspired to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count One);  conspired to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (Count Two); provided and attempted to provide material support to terrorists, in violation of 18 U.S.C. § 2339A(a) (Count Three); Conspired to kill in a foreign country, in violation of 18 U.S.C. § 956(a) (Count Four); conspired to make materially false, fictitious and fraudulent statements, and provide false information and documents containing false information, and conceal material information, concerning matters within the jurisdiction of the executive branch of government of the United States in violation of 18 U.S.C. §371 (Count Five); and that he provided materially false

information to the executive branch in matters involving international terrorism in violation of 18

U.S.C. § 1001(a)(2) in two separate instances (Counts Six and Seven).  The facts of each of these

counts overlap with other, and therefore the relevant facts are not further segregated herein by count

or specific sentencing guidelines provisions.

## FACTUAL SUMMARY

1.      **Radicalization of self and others**

In approximately 2000, the defendant discovered what he called his "religious path."  During

Ramadan the previous winter, he had watched a jihad video about mujahideen (those engaged in

jihad) fighting in Chechnya; he later confided (in a chat that was saved on his computer) that Osama

bin Laden was the reason that he started practicing [his faith] that year.  He also later told a potential

wife that unlike other Muslim youth, he did not go through different phases of religious belief, but

rather, that his practice of Islam was always about the, "absent obligation," jihad.

The defendant came to believe and profess that violence was an appropriate means to express

dissatisfaction with and to effect change of United States policies towards Muslims in places such

as Afghanistan, Iraq, and Chechnya.  The defendant collected and consumed extensive documentary

and media materials about jihad; including doctrinal, scholarly pronouncements and discussions,

political documentation and jihad videos.  Among others, the defendant obtained a videocassette

featuring Usama bin Laden called *State of the Ummah*, published by As Sahab, *al Qa'ida's* media

wing, and a video called the *Martyrs of Bosnia*, distributed by Azzam Publications, a United

Kingdom-based media outlet which, *inter alia*, distributed jihadist propaganda and whose principals

have been accused or convicted of engaging in terrorism-related offenses. As the defendant

radicalized, he was repeatedly solicited by *al Qa'ida*, through its leaders' statements, to travel

2

overseas to train with them and to provide material support to the organization and to those who had joined in its cause.

As he started to forge his path, the defendant began to outwardly demonstrate signs of his religiosity, which attracted him to a select few other Muslim youth in the Boston area.  In and around 2001, the defendant, Hassan Masood, Kareem Abuzahra, Ahmad Abousamra, and occasionally others began to meet regularly, and discussed their views on religion, global events, and on violent jihad.  The group formed a close-circle of friends who would discuss these items more actionably than they would with broader groups of friends, even other Salafi Muslims. The views of the members of the circle were shaped by a strict Salafi Jihad interpretation and the defendant articulated his belief that the United States was responsible for oppression and killing of Muslims.  He and his co-conspirators encouraged this belief in each other and they agreed that violent jihad, including conducting violent attacks against Americans and American allies, was justified, and in some cases compelled, by their religious interpretation.  The defendant and the other members of the circle would frequently bring religious doctrine and materials to validate their positions.  At the time of the September 11, 2001 attacks on the United States, the defendant and his conspirators were proud of the attacks.  He later told a coconspirator that, when he and Ahmad Abousamra saw the videos of the planes hitting the Twin Towers on a television at a Dunkin' Donuts, they could barely suppress a smile.

The reach of the conspirators based in Massachusetts also extended to like-minded individuals through the internet.  The defendant and other conspirators developed relationships through cyberspace, with other promoters of violent jihad.  They shared terrorist propaganda, religious justification for support of terrorism, and developed a network with whom they could

collaborate and plan how they could provide support to terrorists.

For example, through January 2004, the defendant and his conspirators had forged relationships entirely on-line with individuals such as Jason Pippin (Abul Muthanna/Abu Omar), Tariq al-Daour (Abu Dujanah), Waseem Mughal (Ismyy) and Omar Hammami (Al Mizzi), through discussions started through internet web forums such as Clearguidance.com.

The defendant and his fellow local conspirators, together with the conspirators they had met on-line, discussed and conducted research to determine what options they had available to them as means to accomplish their perceived duties and criminal objectives. They viewed *al Qa'ida* as the vanguard of those who were actually doing what others should do, and revered and respected what *al Qa'ida* did (in particular) on September 11, 2001, as well as *al Qa'ida's* other terrorist acts against the United States. In order to encourage and support one another and others to engage in violent jihad and martyrdom, the defendant and others often watched jihadi videos like *State of the Ummah*. The group would frequently discuss the desire to participate in violent jihad, and would watch videos and other media related to jihad, frequently depicting violence by mujahideen against perceived oppressors. Many of these videos and media were graphic, containing images of terrorist acts, beheadings, and other disturbing images. The jihad videos and other media were produced and distributed to inspire, recruit, and inform. The defendant collected, possessed, showed, and distributed these jihad videos on several occasions. The volume of jihad videos and other jihad related materials that the defendant collected, distributed and discussed was extensive. The defendant and his conspirators strove to keep their plan to support *al Qa'ida* and others engaged in terrorism secret, reminding members not to discuss it with anyone outside of the conspiracy, using coded phraseology, and policing entry into a close circle of friends.

4

With the others in the circle, the defendant discussed various ways to target Americans with violence, specifically singling out U.S. soldiers as the most appropriate targets of attacks, because the conspirators viewed the soldiers as the primary oppressors of Muslims. He also expressed the view that civilians who in any way aided the military were also appropriate targets, whether they be in Iraq, Afghanistan, or Saudi Arabia. The conspirators explored various ways to obtain paramilitary training provided by terrorist groups which would prepare them to personally participate in violent jihad. The defendant's radicalization and intentions to participate and motivate others to participate in violent jihad are memorialized, among other places, in his email, online postings and hundreds of stored chat sessions and other documents found on his computer which was seized by the FBI. In addition to depicting the extent to which the defendant intended to and conspired with others to support terrorism, these communications demonstrated a defendant who was kafir [non-Muslim]- phobic, misogynstic, homophobic, antisemitic, and someone who condemned moderate Muslims who relied on the political process to effect change.

2.    **Efforts to train for and participate in violent jihad**

Between 2000 and 2002, the defendant and his other conspirators agreed to take action to support the taking up of arms in defense of Muslims by striking back against the United States. The defendant frequently discussed different ways in which they could participate in violent jihad to support groups like *al Qa'ida* and others who were 'rising up' against Americans. They began researching different ways in which they could accomplish their objectives. The group's first efforts to participate in violent Jihad were focused on areas where other Muslim fighters, mujahideen, were already engaged. The defendant and his co-conspirators contemplated places where they could get terrorist training which they felt was important to have in order to be accepted by terrorists engaging

in jihad, and also to link up with those who were engaged in jihad.  The defendant and conspirators'
ambitions were  to participate in violent jihad against Americans.

The defendant and his co-conspirators explored the possibility of traveling to Afghanistan
via Pakistan in order to engage in attacks against United States and allied forces following the
coalition invasion of Afghanistan in the fall of 2001.  One of the group, Hassan Masood, who was
known to be the nephew of the  founder of designated foreign terrorist organization Lashkar e Taiba
(LeT) in Pakistan, was consulted as to what assistance he could provide.  Since obtaining a visa for
a non-Pakistani was difficult, especially after September 11, 2001, Masood told the group that they
should say that they were going to attend a wedding, and to bring with them a false wedding
invitation.  In furtherance of the conspirators' prior discussions, in Spring 2002, Abousamra traveled
to Pakistan to get such training, but later said that he had failed to get it because he was not
Pakistani.  Abousamra reported back to the defendant and the other conspirators, and explained that
he had retained a contact from Pakistan, who the conspirators called "John" (a euphemism for his
true-name, phonetically Abdulmajid or Abu Majid), who had helped introduce him to terrorist
organizations.  After returning to the U.S., Abousamra continued to maintain contact with the
individual in Pakistan to see if an opportunity would arise to join, making contact with "John" in the
presence of the defendant and other conspirators.  Abousamra traveled to Pakistan again near the
end of 2002 to obtain terrorist training.  Again, this trip was supported by the defendant and other
conspirators.  One of the co-conspirators provided money, approximately $500, to Abousamra to
provide to the mujahideen fighters.  Abousamra met with terrorists and was permitted to hold a
weapon, but was denied entry to a training camp because he was of Arab descent and would attract
official scrutiny.   The conspirators shared the objective to provide material support to those who

were fighting against American forces.  Several years later, in  2006, the defendant and Abousamra

discussed how they may be able to reconnect with Abdulmajid and the defendant suggested getting

Abousamra's old telephone records to find his phone number.  They also discussed trying again

through Hassan Masood's uncle (the leader of the terrorist organization LeT).

3.    **Contemplating and pursuing Domestic Attacks**

When Abousamra returned from his second trip to Pakistan in 2002, he told the defendant

and other conspirators that Abdulmajid had suggested that he should return to the United States and

take action inside the United States to support jihad.  After Abousamra's trips to obtain training in

Pakistan were unsuccessful, the group began discussing the possibility of conducting domestic

terrorist attacks to further their objectives.  The defendant and co-conspirators discussed or explored

the possibility of various domestic attacks as potential means to participate in jihad.

Sometime in 2003, after the United States' invasion of Iraq, the defendant and conspirators

discussed a potential attack on a shopping mall.  The defendant and conspirators participated in

several discussions about the plan.  The plan involved a coordinated attack with small arms at a

shopping mall where occupants of the mall would be funneled to choke-off points.  The plan

contemplated the use of automatic weapons.  The defendant and conspirators discussed the potential

need for other individuals to assist in their plan.  They also discussed a plan to attack first responders

and emergency personnel who were responding to the scene because they did not want to be taken

alive.  As part of the discussion, one of the conspirators, Abuzahra, went to visit Daniel Maldonado

in New Hampshire to explore the possibility of obtaining weapons from Maldonado, who the

conspirators knew had access to guns.  Maldonado showed him his own legal firearm, but told

Abuzahra that he could only get more handguns rather than automatic weapons, and if he did, they

7

would likely have been linked to other crimes, and/or be identifiable by their serial numbers. Abuzahra returned to Abousamra and the defendant and reported this information to them. The defendant, Abousamra and Abuzahra decided to abandon the shopping mall plan because it wasn't going to work.

The defendant and conspirators also discussed a potential attack at Hanscom Air Force Base. The site was attractive because it was a U.S. military target. They discussed entering the main gate, eliminating the guards at the guard shack and then having free access to the base.

On another occasion the defendant and conspirators discussed potentially killing then-Attorney General John Ashcroft, who was a symbol of evil because of his perceived oppression of Muslims. On another occasion, Abousamra and Abuzahra discussed potentially killing then-National Security Advisor Condolezza Rice, who they viewed as largely responsible for the war in Iraq. Abousamra also suggested bombing various buildings in Boston that had lax security or were otherwise vulnerable. Although the conspirators had material on bombmaking, they recognized that they could not get access to the materials needed to build a large bomb.

These overt acts are integral to the motive and evidence of the defendant and co-conspirators' shared intent to use violence to settle their perceived grievances against the United States, and to support the objectives of terrorist organizations such as *al Qa'ida*..

4.      **Trip to Yemen to obtain terrorist training and to kill American soldiers**

Ultimately, the defendant and his co-conspirators abandoned the idea of conducting domestic attacks in favor of a plan to travel to Iraq, where the U.S. had invaded in 2003, and where they could engage in attacks against American service members. The defendant, Abousamra, and Abuzahra then conducted research to attempt to locate a suitable place to obtain the training that would provide

them with instruction and follow-on connections to enter Iraq in order to join others who were conducting attacks against the United States and coalition forces.

As part of their planning, the trio identified one of their online contacts, Jason Pippin, who they knew as Abu Omar and Abul Muthanna, a veteran of a LeT training camp, who had also spent time in Yemen. In late 2003, in furtherance of the conspiracy, Abousamra traveled to California to meet with Pippin to obtain information and directions on how to find terrorist training and how to connect to *al Qa'ida*. Abousamra reported back to the defendant the specific individuals and places in Yemen who may be able to provide them with a route to get training. Pippin explained that there were many Arab Afghan veterans who had located in Yemen who, Pippin believed, might still have ties to the mujahideen and *al Qa'ida*.

The defendant, Abousamra and Abuzahra made travel arrangements to go to Yemen. They trained physically by hiking. The defendant asked that the tickets for the trip to be sent to his home and they arranged to meet at this home on the day of the trip. The defendant prematurely abandoned his employment and his academic pharmacy program to go on the trip. On February 1, 2004, the three met at the defendant's home and the defendant gave to his brother for destruction a bag containing, *inter alia*, information on how to make a bomb. Hassan Masood drove them to the airport in what was a somber ride. Abuzahra had previously recorded a video to give to his children and family so that they would have something to remember him if he did not return. On February 1, 2004, from Boston's Logan Airport, the trio departed for Yemen, through London and the United Arab Emirates. During the journey the defendant expressed fulfillment that he was actually doing what they had previously only talked about, that is, participating in jihad. In an e-mail to his brother during the journey, the defendant told him not to listen to anyone who thought what he was doing

was ill-advised as he did not care what they thought.

After receiving an e-mail from his family, Abuzahra turned around in Abu Dhabi, United Arab Emirates and returned to the United States. He gave the defendant and Abousamra some money and a backpack, shaver and belt, for their continued journey. The provision of money and equipment to the defendant and Abousamra in these circumstances constituted provision of material support to the terrorists. The defendant and Abousamra continued to Yemen, where they stayed for over a week. The defendant described his experience there variously, describing being at a camp where people carried AK-47s and wore camouflage, a place full of bandits and *al Qa'ida*, and where he was ultimately unable to find what he was looking for, that is, training and/or *al Qa'ida* members who could help him get into Iraq to fight Americans. The defendant and Abousamra traveled extensively around Yemen attempting to locate the individuals that Pippin had identified to them, specifically a man named Abdullah Al Ahdal, and also brother-in-law of Abul Hassan al Maribi. The defendant and Abousamra ultimately traveled to the city of Ma'rib, where they went to a perfume shop that Pippin had told them to go to find Abul Hassan's brother-in-law. There, they sought and met individuals to whom they told the true purpose of their journey. After being greeted with an AK-47 pointed at them because, as the defendant later explained, they could be spies, they were told that "since the towers fell" on September 11, 2001, "all of that stuff [training camps] was gone." The defendant returned to the United States without receiving the training that he was looking for, nor going on and being able to fight American soldiers. He later described how upset he was that they failed in their efforts, especially because he had "left [his] life behind" to pursue this goal of fighting jihad against Americans.

Of the three co-conspirators who sought to travel to Iraq, only Abousamra was successful,

and he did so without the training that they sought as a precursor. Abousamra spent approximately

a week or more in Fallujah at a time when there was heavy fighting with U.S. and coalition forces.

He said that he specifically went to Fallujah to find someone or some group that would help him get

into the fight against the Americans.

Upon their return from the 2004 trip to Yemen, the defendant and Abousamra brought more

people into the loop about their trip and helped persuade them to have the same world-view. Daniel

Maldonado and Daniel Spaulding became confidantes of the defendant and Abousamra, and, as

Abuzahra distanced himself from them, the defendant and Abousamra brought the two Daniels

closer to their violent extremist beliefs.  Although, as a general matter, the defendant and Abousamra

were secretive about the trip and kept the circle small, several people learned the nature of their trip,

and of Abousamra's previous attempts in Pakistan.

After the trip to Yemen, the defendant characterized the attempt, while frustrating, as the best

two weeks of his life, and stated that he did not regret it. He also said that he had attempted to

interview with 'the company', a terrorist organization such as *al Qa'ida*, but because he was not

sufficiently vouched-for, they would not take him. He later confided to a co-conspirator that he was

proud of what he had done and that he was finally not being a hypocrite "telling people to do

something I'm not doing."  Although he had failed, at least he was no longer "sitting on my butt"

in front of his computer screen, engaged exclusively in online jihad.

5.     **Continued conspiracy, attempt and provision of support to *al Qa'ida* and other
       terrorists through translation services, digital editing, distribution and recruitment
       efforts, including one-on-one efforts to recruit others.**

The defendant's failure to get training and go to Iraq to fight Americans as he planned did

not deter him from continuing in the conspiracy and attempts to take action to support  *al Qa'ida*

11

and terrorists.  After the defendant returned from Yemen, he looked for other means to support his objectives, and found them in the internet, and in one-on-one recruiting efforts.  The defendant's turn to support activities on the internet came at a crucial time to *al Qa'ida* and related organizations' use  of the internet as a critical component to their existence and their recruiting strategies.  In 2004-2005, *al Qa'ida* began relying on the internet as the primary vehicle for dissemination of propaganda and as a decentralized recruitment platform.

### A.    Translation, editing and other internet and media Jihad

The defendant used his considerable language proficiency to translate, edit and distribute jihad media for, as a service directed to, and on behalf of *al Qa'ida*.  The defendant's services dramatically increased the accessibility of these materials, which were intended to encourage others to participate in violent Jihad in support of *al Qa'ida* and other terrorists. The type of work the defendant conspired, attempted to, and performed for *al Qa'ida*'s campaign was and is essential to *al Qa'ida's* existence, recruitment, and method of operation.  The importance of the internet's media distribution network to *al Qa'ida* has increased in the past 8 years.  The defendant's participation in the media campaign was a continuation of his efforts to further the objectives of the conspiracy to provide services, expert advice and assistance, training, and personnel (himself and others) to *al Qa'ida*.

The defendant's internet-based terrorism support activities were broad, but together with his co-conspirators, he translated, digitally edited and distributed materials as a service to *al Qa'ida* and those who were engaged in acts of terrorism, especially those who were combating U.S. forces around the world.  The importance of such media materials generally is that it is an essential form of recruitment, communication and reason for being of *al Qa'ida* , especially in the evolving face

of a movement seeking to radicalize English-speaking youth. *Al Qa'ida*, and all of its affiliated organizations have media wings; the defendant saw himself as a member of the media wing of *al Qa'ida*.  In the Summer and Fall of 2010, the inaugural and subsequent issues of the *Inspire* English language magazine of *al Qa'ida in the Arabian Peninsula* acknowledged  the defendant by requesting his release from incarceration.  Prior to his death in the airstrike that killed Anwar al Awlaki, Samir Khan the editor of that magazine, disseminated the defendant's pro-jihad statements online, including a copy of the defendant's poem, *Make Martyrdom what you Seek*.  In the Fall 2010 issue, Khan explained that the defendant's arrest for lying to the FBI was the reason Khan fled the United States for Yemen when he did.

The defendant, highly regarded for his Arabic language skills, agreed to participate as a translator for Tibyan publications, an internet web forum, which, *inter alia*, became a vehicle through which *al Qa'ida* distributed media.  Specifically *al Qa'ida* requested co-conspirators from Tibyan publications to translate specific pieces of media on their behalf. Some of these requests were sent to the defendant.  The defendant translated materials on Tibyan publications written by *al Qa'ida* leader Dr. Ayman al Zawahiri and *al Qa'ida in Iraq* leader Abu Musab al Zarqawi, materials written by the former editor of the *al Qa'ida in the Arabian Penninsula* newsletter, and materials depicting *al Qa'ida* leaders such as Usama bin Laden and Abu Musab al Zarqawi.  The defendant's translation of one video has a banner indicating that it was a production of the media department and was translated by brothers at Tibyan publications and was released by *al Qa'ida in the land of the two rivers*, that is, Iraq.

The defendant was solicited to perform many translations, and he agreed to assist as translator or editor on many individual projects.  Notably, the defendant translated and helped edit

a violent *al Qa'ida* propaganda video called the *Expedition of Umar Hadeed*, also known as GUH, which is identified as a production of *al Qa'ida in the land of the two rivers*. The video includes, *inter alia*, interviews with men, who are going on suicide missions, calling on young Muslim men all over the world to join in the fight against the Americans. The video was an important recruiting video for *al Qa'ida* and was released broadly. After the release the video, he told a coconspirator that he hoped that the video would make an impact and assist *al Qa'ida* in getting their message out.

The defendant also translated and digitally edited a manual called *39 Ways to Serve and Participate in Jihad*, which as the name suggests, describes the preparatory process to have the proper foundation to participate in jihad, as well as various ways for those who do not engage in fighting to support jihad and the mujahideen. The book, which was written by Isa al Awshin, the former editor of *Sawt al Jihad*, the newsletter of *al Qa'ida in the Arabian Penninsula*, describes, *inter alia*, the need for Electronic Jihad. As described within the document, many of the *39 Ways* are preparatory and supportive steps to violent jihad, which was the goal being taught by the document. The defendant translated and published this document, which is one of the most influential jihad recruitment materials over the past several years. Numerous news agencies, Congressional testimony, private think tanks, and Arabic-language broadcasters have characterized the document as popular and instrumental in encouraging home-grown militant cells across the world. The document has been located on computer hard drives of numerous individuals charged with and convicted of terrorism-related offenses around the world. Some of these individuals specifically requested the English translation, and were arrested, convicted or otherwise intercepted en route to engaging in acts of violence. For example, Sohail Qureshi, of the United Kingdom, specifically asked for *39 Ways* from Tibyan publications shortly before he was arrested on terrorism

offenses as he was bound for Afghanistan to participate in jihad.  In other cases, *39 Ways* was an instrumental part of the process that led criminal defendants to implement its teachings.  Although the defendant translated and published the document back in 2005, it remains influential to violent jihadists around the world as demonstrated by numerous cases within the past three years.  For example, the document was consulted by defendants in the North Carolina case with lead defendant Daniel Patrick Boyd; United Kingdom resident Bilal Zaheer Ahmed possessed the document when he solicited murder; many individuals in England who were charged with possession of terrorist propaganda possessed the document;  Canadian Saad Gaya, who was a conspirator in the Toronto 18 case had a copy of the document on his hard drive; the two Germans, Robert Baum and Christian Emde who were arrested at the port in Dover, England for terrorist-related preparation, had the document; Mohammed Zaki Amawi, a defendant convicted in Ohio on material support charges had a Microsoft word version of the document.

        The defendant had also accepted or otherwise embarked on additional projects, all with the purpose that these projects would lead people to 'take action' rather than merely to digest the information and believe that thinking or advocating for such ends was a sufficient discharge of one's religious obligations.  For those who did not know about his efforts to go fight, he lamented being perceived as hypocritical (among those who were unaware of his own failed attempts), for failing to take up arms that he encouraged others to do.

        In addition to translation and distribution of materials which the defendant had a role in creating, he also distributed and encouraged the consumption of numerous other pieces of media which were produced by and/or encouraged material support to *al Qa'ida* and other terrorist groups. For example, the defendant collected and distributed dozens of jihad videos produced by the various

media wings of *al Qa'ida* and its affiliates. In addition, documents which were written by or on behalf of *al Qa'ida* leaders were distributed and/or discussed by the defendant online. The defendant distributed videos and other media related to beheadings, mutilation of soldiers, terrorist attacks, eulogies to martyred terrorists, and speeches of *al Qa'ida* leadership and other terrorists. The volume of and time devoted to these activities was extraordinary.

Many of the defendant's online translation and media-related activities in support of terrorists and *al Qa'ida* , expressions of intent to support terrorists and *al Qa'ida* , and references to his own efforts to participate in fighting against Americans and her interests, were revealed through stored and intercepted computer communications, including the defendant's communications and those from the at-Tibyan Publications website, a website which became a clearinghouse for some of the most influential pro-*al Qa'ida* publications, an archive of Clearguidance.com, as well as stored communications on co-conspirators' computers from the United Kingdom.

During this same time frame, the defendant and his co-conspirators exhibited a consciousness of law enforcement and intelligence community surveillance. The defendant and co-conspirators employed variously the use of Internet Protocol concealers, proxy servers, digital encryption, file-sharing services, digital information destroyers, coded language, password protected access and name ciphers as techniques to avoid detection or to destroy evidence of their conspiracy or activities. The defendant also did research on other terrorism cases including by reviewing the indictment of others who used the internet to support terrorists such as the individuals who operated Azzam Publications. The defendant frequently used similar counter-surveillance techniques during other forms of communication, but would also instruct his co-conspirators not to have potentially inculpatory communications over a medium that could be intercepted, and would often employ

coded, or substitute terminology, such as "peanut butter and jelly" [jihad], "P-Town" [Pakistan], "YMCA" [Yemen], "Bob" or "Brian" [FBI] to reference potentially inculpatory or suggestive concepts.  The defendant also told individuals that he was being watched, and to destroy materials that he had given them in the past, and he himself disposed of evidence that he possessed prior to becoming certain that he was under FBI scrutiny.

### B.    Administration of Tibyan Publications and collaboration with other conspirators around the world

After Clearguidance.com ceased to become the premier English-language Salafi jihad forum, in approximately 2005, the defendant joined and became a moderator on the at-Tibyan Publications web forum.  The forum included a discussion portion of the forum, as well as a distribution outlet for certain media.  The website was hosted, in part, on domain space purchased by Younis Tsouli (Irhaby007).  In late 2005, Tsouli was charged with terrorism offenses in the United Kingdom; he, along with the defendant's associates Waseem Mughal and Tariq al-Daour were later convicted. The defendant and five other individuals appeared to have moderator privileges on the Tibyan forum.  The defendant was invited to become a translator on the site, accepted, and was later introduced as a translator by Ehnsanul Sadequee, who was later convicted of terrorism charges in Georgia.  The defendant used the forum portion of the site to publish translations of the different steps of the *39 Ways to Serve and Participate in Jihad*, *ad seriatim*, over a period of time, before compiling all of the items and creating a .pdf version with digital graphics and higher production quality.  The .pdf version later appeared on the document download portion of the website.

The Tibyan website came to the attention of *al Qa'ida* during the time the defendant was active on the site, and *al Qa'ida* and Tibyan coordinated their media efforts. The translators at Tibyan publications were asked to translate materials on behalf of *al Qa'ida*  and *al Qa'ida  in Iraq*.

17

For example, the translators, and the defendant in particular were asked by As Sahab (which means the clouds), the media wing of *al Qa'ida* , to translate a video of a message from *al Qa'ida* leader Dr. Ayman al Zawahiri to the people of Pakistan.  The translators, and the defendant in particular, was asked to translate several videos by *al Qa'ida in Iraq*, such as the Wa Yakoon video and the Abu Anas video.  These media were clearly labeled as products of *al Qa'ida* in Iraq.  The defendant also performed many other production tasks, such as creative suggestions on how to compose or digitally edit specific media (by, for example, inserting animated graphics, short video clips, or photographs), the prioritization of various translation projects, and participated in editing of works that he did not initially translate.  The defendant and his co-conspirators frequently collaborated on various translation projects, but all did not always collaborate together on every project.  In 2006, the defendant had stored numerous translation projects on his computer.

The defendant translated and edited the *Expedition of Umar Hadid* (GUH) video, which was the only video released on Tibyan publications that claims to be authored and released by *al Qa'ida in Iraq*.  Along with speeches of al Qa'ida leaders, the video depicts, recruits and encourages, *inter alia*, suicide bombers in Iraq to attack U.S. forces.  The original Arabic language video was sent to Tibyan Publications from *al Qa'ida in Iraq*, forwarded to the defendant before its official release, and subtitled and edited with additional graphic content, and republished.  The defendant played a major role in the translation and editing of the video, and collaborated with others to do so from around the world.  The defendant acknowledged translating the video in several communications. The defendant also participated in forum discussions on Tibyan Publications.  The defendant consistently justified and encouraged the targeting of U.S. military personnel and those who support them as legitimate targets of violence under the principle of Jihad.

18

During the period that the defendant played an active role in administrating it, Tibyan publications became the premier Salafi Jihadi web forum and clearinghouse for English language *al-Qa'ida* support information of its time.

### C.      One-on-one recruitment of others

In addition to his online recruitment through Tibyan Publications, the defendant also worked on a number of individuals who he knew personally in an effort to win them over to the Salafi-jihadi mindset, and encourage them to participate in jihad against the United States. The defendant used various tools, including jihadi videos, the works of radical scholars, and interpretations of religious text that supported the radical views of *al Qa'ida*. The defendant also directed similar efforts of others, such as Daniel Spaulding, to do the same, and coordinated his efforts with Spaulding in targeting certain individuals. The defendant succeeded in radicalizing others, who came to view the United States as the enemy and American soldiers as targets. The defendant also discussed going overseas with some of these individuals to participate in jihad, participate in Hijra (migration away from the land of the disbeliever), and to return to Yemen where he had attempted to obtain training in 2004.

### 6.      Agreeing to provide assistance to others engaged in crimes during the course of the conspiracy:

While subsumed within the conspiracies for which the defendant stands charged, the defendant at various times either provided assistance to, or agreed to do so, to various related crimes committed by other co-conspirators other than those described elsewhere herein such as the Abousamra and Abuzahra's various acts of attempted provision of material support.

Tariq al Daour

Tariq al-Daour, a co-conspirator, also operated a credit-card fraud scheme. He solicited the

19

defendant's assistance in the scheme. The defendant agreed to help al-Daour use Discover cards, which were not common in the United Kingdom. Al-Daour used the proceeds from his credit-card fraud scheme, in part, to fund internet domain space hired by Younis Tsouli (irhaby007) to host and distribute *al Qa'ida* and other jihadist forums and resources. In addition, the defendant solicited money from al-Daour, knowing that such funds were obtained through fraudulent means, while the defendant and Abousamra were en-route to Yemen in 2004 to obtain terrorist training. Al Daour was convicted of offenses related to his credit-card conduct in the United Kingdom.

Ehnsanul Sadequee

The defendant had worked with Sadequee (Abu Khubayb al Muwahhid) on the Tibyan publications forum, where Sadequee would coordinate with the defendant on various translation projects. Among them were the defendant's translation of Dr. Zawahiri's *the Ruling on Killing Oneself to Protect Information*, *39 Ways*, *Such are the Messengers Tested*, by Abu Musab al Zarqawi, and several others. The translated *Such are the Messengers Tested* was later made into a video; the July 21, 2005 would-be follow-on transit system bombers in the United Kingdom listened to the video shortly before their attempted acts of terrorism. Based on his communications with co-conspirators, the defendant believed that, in addition to Sadequee's online activities with Abu Mundhir and other co-conspirators, he had left the United States to go fight on the front lines in jihad; the defendant had contemporary knowledge of terrorism offenses for which Sadequee was ultimately convicted of terrorism offenses in U.S. District Court in Atlanta, Georgia.

Omar Hammami

The defendant knew Hammami very well, saying he knew him as Al-Mizzi on an internet web forum. The defendant met with Hammami and Maldonado in Egypt in August 2006, when the

pair discussed with the defendant their intentions to go to Somalia. When Maldonado called the defendant from Somalia in December 2006, both he and Hammami solicited the defendant to join them as they trained with the armed wing of the Islamic Courts Union, and with members of *al Qa'ida*. The defendant re-established contact with Omar Hammami in 2008, after Maldonado had been arrested and details about potential informers in his case had been disclosed. Hammami, by that time, was known worldwide as Abu Mansoor al-Amriki, an American who had become a leader in Al Shabaab, becoming a spokesman for the terrorist organization. Al Shabaab formally associated with *al Qa'ida* and vice versa. Through e-mail, the defendant provided Hammami with details about his and other supporters' investigation into who a likely government informer had been in Maldonado's criminal case. Hammami provided his own information to assist the defendant in identifying the informer. Sharing information, the two narrowed their idea of who it might be. The purpose of identifying the informer was, as Hammami put it, so "you can hunt him down." In 2007, Hammami was indicted in the Southern District of Alabama and he remains a fugitive today. In 2011, Hammami was designated as a Specially Designated Global Terrorist by the U.S. Department of Treasury.

<u>Daniel Maldonado</u>

The defendant and Abousamra played a significant role in the radicalization of Daniel Maldonado to seek violent jihad. While Maldonado's journey to Houston, Egypt and Somalia were not apparently done at the direction of the defendant or other co-conspirators, his desire to participate in jihad was planted and cultivated by the defendant and Abousamra. The defendant and Abousamra's indoctrination of Maldonado from 2003 to 2006 led to his desire to participate in jihad, and ultimately to his criminal conduct. While in Somalia in late 2006, Maldonado obtained terrorist

training from *al Qa'ida* and called the defendant to invite him to join him there to do what they had discussed doing. Maldonado asked the defendant to tell Abousamra and Spaulding and invited them to go over to Somalia to join them. The defendant told them and explained the circumstances of the call. Maldonado was convicted of receiving terrorist training from a terrorist organization (*al Qa'ida*) in federal court in Houston, Texas.

**7.     Obstructing international terrorism investigations by conspiring to and providing false material information**

The defendant and his coconspirators repeatedly provided false information to law enforcement that significantly obstructed and impeded international terrorism investigations. The investigations so obstructed and impeded included not just the investigation of Mehanna and Abousamra in connection with their trip to Yemen in 2004 (Count Seven), and other activities in support of terrorism, but also investigations of Maldonado and Omar Hammami, and their activities in Somalia (Count Six).

**A.     False statements and obstruction of Mehanna/Abousamra investigation**

The defendant and his coconspirators agreed to and did provide materially false information to the government. First, they developed a cover story and used certain code words in an attempt to shield their illegal activities from suspicion, and to conceal their attempts to provide material support to *al Qa'ida* and other terrorists. Part of the false information the defendant and conspirators provided was related to their cover story for the nature and purpose of their 2004 trip to Yemen. The defendant and Abousamra had in fact conducted internet research, spoke with Pippin, and identified the Dar al Mustafa as a school that they could tell authorities that they intended to attend, all the while knowing that this was false information.

On February 1, 2004, at Logan Airport in Boston, as they began their journey that was

intended to end in Iraq, the defendant and his co-conspirators first made false statements to the Transportation Security Administration, Massachusetts State Police and Customs and Border Protection personnel at Logan airport as to the purpose of their trip to Yemen.  The defendant and his traveling companions falsely said they were going to check out schools. The defendant and Abousamra also lied to Customs officials about the money that they were carrying out of the country -- in fact the three travelers had merely divided up and structured the money for purposes of evading the currency reporting requirements of Title 31.  They also concealed the fact that the purpose of their export of money was to provide material support to terrorists, including their own costs to join terrorists as personnel.

The defendant, just as Abuzahra and Abousamra did, lied to customs officials again when he re-entered the country in February 2004 when he falsely responded to CBP officers that the purpose of his trip to Yemen was to attend two specific schools (Dar al Mostafa and Dar al-Aqhaf), rather than a paramilitary training camp, and he concealed any other activities he had done while in Yemen.  He also lied to the CBP officer when he said that Abousamra was then still in Yemen, when in fact, the defendant had left Yemen on the same day as Abousamra; the defendant knew that Abousamra was in fact on his way to Iraq.

The defendant again lied to the FBI on December 16, 2006, when he falsely stated that he had intended to attend religious schools.  Abuzahra and Abousamra offered similar lies when they were interviewed in August and December 2006 respectively.  The defendant also lied about where he went in Yemen when asked, concealing his journey to Mar'ib, where he traveled to get connected to those offering terrorist training, or who could connect him to *al Qa'ida*. He also lied about the assistance Jason Pippin had provided to them in advance of the trip.  Further, he lied about the

purpose of Abousamra's trip to Iraq and the cities he visited.  The false statements were material to the function of the respective agencies of the executive branch of government, and substantially obstructed and impeded investigations.  The defendant's and co-conspirators' false statements were made in investigations involving international terrorism, and obstructed and impeded those investigations.  The investigations so obstructed included the investigations of the defendant and the defendant's co-conspirators.

The defendant's lies in December 2006 about his trip to Yemen, prevented the investigators from, *inter alia*, learning about the specifics of where the defendant and Abousamra went in Yemen, who they sought, who they met with, and any additional detail the defendant might have received from Abousamra about similar information from Abousamra's experiences in Iraq, as well as any assistance they received from Pippin in advance of the trip.  While some, but not all, of this information was later learned from other sources, the defendant intended to and did significantly obstruct and impede international terrorism investigations.  In addition, Mehanna's false information helped delay the conclusion of the investigation, and allowed his coconspirator Abousamra time to quickly flee before charges were brought.  Abousamra remains a fugitive in Syria, with whom the United States does not have an extradition treaty.  The defendant waited until 2008 to attempt to leave the country when he was intercepted en route to Saudi Arabia, which also has no extradition treaty with the United States.

### B.    False statements and obstruction of Maldonado/Hammami investigations

In the December 16, 2006 interview with the FBI, the defendant also lied about his then-recent contact with Daniel Maldonado, and his knowledge about Maldonado's whereabouts and activities.   The defendant had in fact had a series of telephone conversations with Maldonado on

December 12, 2006 in which the defendant asked for specific instructions and logistics about how he could join Maldonado in Somalia, where Maldonado was then obtaining military training from a terrorist organization.  The defendant lied to the FBI about the fact that he knew Maldonado was in Somalia, that he knew that Maldonado was receiving terrorist training from individuals engaged in jihad, that Maldonado was involved in fighting, and the fact that he recently had contact with Maldonado over the telephone.  The defendant also concealed from the FBI that he had communicated with Hammami during these same telephone calls, so he knew Hammami's whereabouts and activities, that he had Maldonado's telephone number, and knew logistics information about how to enter Somalia and join the Shabaab.  The defendant's false statements were made in investigations involving international terrorism, were material to, and substantially obstructed and impeded those investigations.  The FBI investigations which were obstructed and impeded included the independent investigations of the defendant and his associates, including Maldonado, and Hammami, in several different federal districts.

The defendant's lies in December 2006, prevented the investigators from, *inter alia*, then learning about the specifics of the conversation with Maldonado and Hammami in August 2006, prior to their leaving Egypt for Somalia, details the defendant could have provided concerning his conversations with Abousamra, Spaulding and others concerning his telephone calls with Maldonado in December 2006, and the meaning and context of everything that was said in those calls.  While some, but not all, of this information was later learned from other sources, the defendant intended to and did significantly obstruct and impede these terrorism investigations. Among other things, Mehanna could have provided specific information concerning the (then current) whereabouts of Hammami, who in 2007, was indicted in the Southern District of Alabama.

Hammami remains a fugitive today.

      8.      **Attempts to subvert the judicial process**

Throughout the investigation and prosecution of this matter, the defendant has remained defiant to the judicial process.  For example, the defendant acknowledged to his friends that he had lied to FBI investigators when asked about Daniel Maldonado.  They had planned to and had practiced such lying during the course of their conspiracy.  In another example, after being told that he would be charged criminally, the defendant attempted to leave the country.  The defendant collaborated with Hammami to identify the potential government witness(es) in Maldonado's case, and also talked about the fate that should befall those who cooperated with government authorities. The defendant also repeatedly expressed a lack of respect for the American judicial system in word and deed.  In one instance during these proceedings, for example, the defendant refused to stand for the court.

Should the Probation department request additional facts with respect to any issue, the government is available to provide any requested supplement or citation.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: /s/ Aloke S. Chakravarty
ALOKE S. CHAKRAVARTY
JEFFREY AUERHAHN
Assistant U.S. Attorneys

JEFFREY GROHARING
Trial Attorney - Counterterrorism Section

Date: January 18, 2012