UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) No. 09-cr-10017-GAO |
| TAREK MEHANNA, | ) **Oral Argument Requested** |
| Defendant. | ) |

# REPLY OF TAREK MEHANNA
## IN SUPPORT OF HIS MOTION UNDER 28 U.S.C. § 2255
## TO VACATE SENTENCE OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

The government's brief asserts no compromise of national security, no risk to witnesses or confidential investigations should Mehanna's counsel see the Kohlmann Information under a protective order, nor even a production burden. Yet the proposition of that brief is that this Court can—indeed that the Court *should*—resolve the motion without Mehanna's counsel seeing the Kohlmann Information and providing to the Court arguments as to its significance.

The record shows that the government informed another district court that the Kohlmann Information contains *Giglio* material; that a distinguished attorney agrees; and that the information goes at least as far as the bias of an expert witness who stood at the center of one of two theories presented to the jury, and contributed mightily to the other. Mehanna has shown "good cause" for the Court to order disclosure of the Kohlmann Information to his counsel, and the government has not met its "substantial" burden of showing cause for *ex parte* review. The *ex parte* approach requested by the government would be unfair to Mehanna, is contrary to law, and is unwarranted by the circumstances of this case. The Court should direct the parties to enter into an appropriate protective order so that Mehanna's counsel may review the Kohlmann Information and file a supplemental brief under seal.

I.   ARGUMENT

   A.   **The Court Should Order the Government to Disclose the Kohlmann Information to Mehanna's Counsel.**

Briefing from Mehanna's counsel addressing the content of the Kohlmann Information would confront the materiality question explicitly, by relating that content to a vast trial record and to the theories the government presented to the jury. The government would have the Court rule without the assistance of Mehanna's counsel. It never explains why this course is necessary, or even prudent.

So far as Mehanna knows, this case presents none of the usual difficulties that disclosure in criminal cases may raise. No confidential informant is involved. No witness would be endangered or confidential law enforcement investigation exposed. The government identifies no security risk that might flow from disclosure to Mehanna's counsel. It also identifies no burden— on itself or on this Court. The government has produced the Kohlmann Information to defense counsel in other terrorism prosecutions, and (apparently) was able to identify it and submit it to this Court under seal. The government does not suggest that a ruling in this unusual case would set a general precedent, or impose broad new burdens on courts to conduct threshold level *Brady* review.

The government rests solely on its current view that the evidence is not material. Gov. Opp. 13–14. This view is contradicted by the government's previous public statement that the Kohlmann Information contains *Giglio* material, *see* Mehanna Br. Ex. A at 2, and by Attorney Dratel, *see* Dratel Decl. ¶¶ 8–10, 12, 15, 20, 23. Mehanna turns to it below.

In § 2255 proceedings, the Court may permit discovery "for good cause." Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 6(a). "Good cause" exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief[.]" *Bracy v. Gramley*, 520 U.S. 899, 908–909 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (interpreting identical language of Rule 6(a) of the Rules Governing Section 2254 Proceedings

for the United States District Courts). In his § 2255 brief, Mehanna has made a *prima facie* case supporting this discovery. He requested access to the Kohlmann Information. *See* Gov. Opp. 13 (acknowledging request). The Court should grant his request.

### 1. The Government Has Not Justified an *In Camera*, *Ex Parte* Ruling on Materiality.

*Ex parte* review is "presumptively doubtful." *United States v. Claudio*, 44 F.3d 10, 14 (1st Cir. 1995) (citation omitted). Alarmed by the use of *ex parte* material without cause, the First Circuit warned in *Claudio* that where "the government seeks a ruling that certain information … should not be disclosed because, for example, it is claimed to be … outside the scope of *Brady*," it bears "the burden of justification[.]" *Id.* To overcome the presumption against *ex parte* review, the government must make "a particularized showing of substantial cause[.]" *Id.* (noting that defendant's argument "that the government can *never* affirmatively use information in court *and* withhold it from the defense … may overstate the matter; but not by much"). Here, the government makes no showing of cause for *ex parte* review, substantial or otherwise. That alone should compel the Court to order disclosure.

*United States v. Prochilo* is not to the contrary, for it deals with the very different question of pre-trial discovery of exculpatory material. 629 F.3d 264, 266–267 (1st Cir. 2011).[1] In responding to pre-trial discovery requests for *Brady* material, the government "is primarily responsible for deciding what evidence it must disclose[.]" *Id.* at 268 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 59–60 (1987)).[2] One can readily see why this is a practical necessity. Either the government or the Court must make the initial determination of whether government files contain exculpatory material. On a pre-trial record, the court is unfamiliar with the facts of

---

[1] *Prochilo* concerned a witness whom the trial court ultimately *excluded*. 629 F.3d at 266. Here, the withheld material concerns a crucial witness, and the record includes both the government's admission that the material falls within the scope of *Giglio* and an affidavit from a person who has seen it attesting to its materiality.

[2] *Ritchie* also concerned a challenge to a trial court's refusal to order pre-trial disclosure of potentially exculpatory materials. 480 U.S. at 43–44.

the case; prosecution files may contain material that impairs judicial impartiality prior to trial; and the burden on courts of considering the prosecution's entire file before a trial record exists would be intolerable. Thus courts are generally "reluctant to undertake pretrial review of *Brady* requests." 6 Wayne R. LaFave et al., Criminal Procedure § 24.3(b) (3d ed. 2007). *Post*-trial, where the question is whether the Constitution requires disclosure "in the context of the entire record," *Kyles*, 514 U.S. at 460 (citation omitted), *Claudio* places the burden of showing substantial cause for *ex parte* review on the government, 44 F.3d at 14.

The classified status of the Kohlmann Information is not a factor here. The conspicuous absence of *any* government statement concerning a security risk associated with disclosure, and the government's production of this information to defense counsel in other cases show that there is no security risk in disclosing the material to Mehanna's counsel. The government may request (and Mehanna would readily agree to) a protective order under the Classified Information Procedures Act, 18 U.S.C. App. 3 §§ 3–4, ("CIPA").[3]

### 2. Ordering Disclosure of the Kohlmann Information to Mehanna's Counsel Is in the Interests of Justice.

*In camera*, *ex parte* review compromises the adversary system and places the Court in an uneasy position. *United States v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012) (*in camera*, *ex parte* proceedings prevent the court from "neutrally deciding disputes with an open record based on the adversarial process," and instead force the court to act as "standby counsel for the defendants.") (citations omitted). Such proceedings prejudice defendants because their counsel, "who are in

---

[3] By seeking ex parte review without invoking CIPA, the government apparently seeks to escape CIPA's balancing of the government's security interests against a defendant's right to disclosure. *See United States v. Aref*, 285 F. App'x 784, 793 (2d Cir. 2008) ("[W]hen evidence is classified due to its national security import, … [t]he Due Process inquiry is a balancing test[.]"); *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) ("On issues of discovery, the court can engage in balancing.") (citing *United States v. Pringle*, 751 F.2d 419, 426-27 (1st Cir. 1984)); *see also United States v. Hanjuan Jin*, 791 F. Supp. 2d 612, 620 (N.D. Ill. 2011) ("[As part of its] analysis in determining whether to grant the Government's motion for a protective order under CIPA Section 4[,] … the Court will balance the Government's need to keep the classified information secret against the Defendant's interest in disclosure."). The government has offered no evidence of any need to keep the Kohlmann Information secret from Mehanna's counsel.

the best position to know whether information would be helpful to their defense," are prevented from "assist[ing] the court in its assessment of the information's helpfulness." *United States v. Mejia*, 448 F.3d 436, 458 (D.C. Cir. 2006). Even as to classified information, federal courts have recognized that *in camera*, *ex parte* proceedings run contrary to the values of the adversary system, and should be used only as a last resort. *Military Audit Project v. Bush*, 418 F. Supp. 876, 878 (D.D.C.) (*in camera*, *ex parte* proceedings are "alien to our entire jurisprudence" and, even in the case of classified information, "[i]t is the duty of a judge wherever possible to resolve rights of citizens … in an adversary context exposed to public view with all the protections fair hearing and due process provide"), *supplemented*, 418 F. Supp. 880 (D.D.C. 1976).

The government's brief illustrates the dangers of *ex parte* review. It argues that *in camera*, *ex parte* review is appropriate, in part, because the Kohlmann Information "contains no material impeachment information in this case that had not already been produced in discovery." Gov. Opp. 14.[4] It does not identify what it produced in discovery that it believes is cumulative of the Kohlmann Information. It does not even identify the standard applicable to proving cumulativeness. A cumulativeness determination carries great weight because it relieves the government of its obligation, imposed by the Constitution, to produce information that may otherwise be materially exculpatory. *See Conley v. United States*, 415 F.3d 183, 192 (1st Cir. 2005) (quoting *United States v. Cuffie*, 80 F.3d 514, 518 (D.C. Cir. 1996)) (impeachment evidence is "immaterial because of its cumulative nature *only if* the witness was already [or could have been] impeached at trial by the *same kind of evidence*.") (emphasis and alteration in original)); *id.* (crediting trial court's finding that evidence was not cumulative where it "opened an entirely new … line of cross examination"). The government asks the Court to affirm its determination of cumulativeness *ex parte*. To do so would require the Court—without knowledge of the discovery produced in this case—to both step into the shoes of defense counsel *and* rule on the argument it

---

[4] It does not indicate why information that it believes it has already produced to Mehanna requires the extraordinary protection of *ex parte* review.

believes defense counsel would have made. This is a basis for the Court to order disclosure, not a basis to deny Mehanna's motion *ex parte.*

The threat posed to the adversary system by *ex parte* review is tolerable only when "[t]he risk presented by participation of counsel outweighs the utility of counsel, or adversary process[.]" *Weberman v. Nat'l Sec. Agency*, 668 F.2d 676, 678 (2d Cir. 1982) (citation omitted). The government asserts no risk arising from participation by Mehanna's counsel.

### B. The Kohlmann Information Is Material.

#### 1. The Government's Admissions and Disclosures in Previous Prosecutions Show the Materiality of the Kohlmann Information.

The government begins with two implausible propositions. The first is that the United States Attorney for the District of Connecticut—after learning of the Kohlmann Information, and more than a year after it disclosed Kohlmann as a testifying expert in the prosecution's case—either mistakenly or carelessly described the Kohlmann Information as "information falling with the purview of *United States v. Giglio*" in a public filing one week before it *withdrew* Kohlmann as a witness. Mehanna Br. Ex. A at 2; Dratel Decl. ¶ 10. The government has provided this Court no facts to support the facially improbable suggestion that the United States Attorney acted without basis.

The second proposition is that the government's disclosures of the Kohlmann Information in other cases were, in effect, whimsical. Despite being under no order to produce the Kohlmann Information, at least three prosecutors, in four separate terrorism cases, have chosen to "produce[] it anyway[.]"[5] Gov. Opp. 13; *see* Dratel Decl. ¶¶ 9–13. The only discovery rule applicable to documents "relating to bias" of the government's expert, *see* Gov. Opp. 17, is Fed. R. Crim. P. 16(a)(1)(E), which requires the government to produce documents "*material* to preparing the defense," (emphasis added). The government provides no explanation for why it

---

[5] Mehanna's lead counsel formerly held a secret clearance, which expired in the ordinary course, after the cases necessitating the clearance resolved.

would produce *classified* information without believing that it was obligated to do so. But that is its theory here.

The government next contends that "courts have uniformly" deemed the Kohlmann Information immaterial. Gov. Opp. 14. This contention is misleading. Despite the government's use of Kohlmann as an expert witness in dozens of cases over the course of a decade, the Kohlmann Information apparently was unknown outside of the FBI until 2014. Dratel Decl. ¶¶ 12, 17–18 ("I do not believe … that such previous non-disclosure was based on any joint or even individual decision(s) by the Assistant United States Attorneys involved in those cases for the past dozen years. I have reason to believe that those attorneys were unaware of the Kohlmann Information at the relevant times."). Mehanna is aware of no instance, and the government cites none, in which a court ruled on the materiality of the Kohlmann Information prior to 2014. Beginning in 2014, the government disclosed the Kohlmann Information voluntarily in four cases without asking the courts to rule on whether *Brady* obligated it to do so. *See id.* at ¶¶ 9–14. In *Ahmad*, the government prevented the court from ruling on the materiality of the Kohlmann Information by withdrawing Kohlmann as a witness before the court could rule on the pending *Daubert* motion. Dratel Decl. ¶ 10; *United States v. Ahmad*, 3:04-cr-00301-JCH-1 (D. Conn), Dkt. No. 186 (*Daubert* motion).

Even if courts had so ruled, what is material to one prosecution may be immaterial to another. It is a question of the differing indictments, evidence, testimony, and witnesses. For example, in *Mustafa*, Kohlmann was not a material witness, *see United States v. Kabir*, 5:12-cv-00092-VAP (C.D. Cal.) Dkt. No. 499-3 (transcript of Kohlmann testimony in *Mustafa*, which concerned the general history of conflict in the Middle East), whereas here, as the government's brief implicitly concedes, Kohlmann's testimony was central, Gov. Opp. 17 (arguing that Kohlmann provided the only testimony "about al-Qa'ida's *actual* links to Tibyan"); *see also* Mehanna Br. 9–25 (describing the materiality of Kohlmann's testimony). It is also a question of timing. In this Court, Kohlmann was the lynchpin of the government's coordination theory. Mehanna Br. 9–25. Unaware of the Kohlmann Information, the Court could not control its impact prior to

trial.  Had the information been disclosed—even if only to the Court—perhaps the government would have withdrawn Kohlmann as a witness, as happened in *Ahmad*.  Dratel Decl. ¶ 10.  Perhaps the defense could have mounted a *Daubert* challenge, as in *Hasbajrami*.  *Id.* at ¶ 14.  Perhaps the Court could have limited the scope of Kohlmann's testimony so that the information could be said not to have materially impacted the verdict.  At minimum, the information would have been available for cross examination.  Without reviewing the material and comparing it to the unique trial record in this case, there is no way to say.  One can say that these various pre-trial remedies, available in all of the cases in which the government disclosed the Kohlmann Information, were unavailable to Mehanna, because his trial team did not have the information.

The government cites *United States v. Mustafa*, 04 CR 395 (S.D.N.Y.).  Gov. Opp. 14.  But there, the government *voluntarily* disclosed the Kohlmann Information and the defense was allowed limited cross-examination on its content.  Dratel Aff. ¶¶ 9, 19; Gov. Opp. Ex. B at ¶ 11.  The dispute in *Mustafa* concerned how the classified information would be used at trial, not the government's disclosure obligation.  Dratel Aff. ¶ 19; Gov. Opp. Ex. B at ¶¶ 11–14.

The government also cites *United States v. Kabir*, CR 12-00092(B)-VAP (C.D. Cal.).  Gov. Opp. 14.  There, the court denied defendant's request for pre-trial disclosure of the Kohlmann Information.  Gov. Opp. Ex. C at 3.  The court held that "the government has met its obligations under *Brady* and *Giglio*" because "the defendants have in their possession *sufficient* information with which to impeach Kohlmann's credibility."  *Id.* (emphasis added) (citing *Skinner v. Cardwell*, 564 F.2d 1381, 1389 (9th Cir. 1977)).  This is not the law in the First Circuit, which noted in *Conley* that the analysis under *Giglio* is "*not* a sufficiency of the evidence test."[6]  *Conley*, 415 F.3d at 189 (emphasis in original).

---

[6] *Kyles* also held that *Brady*'s materiality inquiry "is not a sufficiency of the evidence test."  514 U.S. at 434.  The *Kabir* court erred by applying *Skinner*'s standard for determining a violation of the Sixth Amendment's Confrontation Clause—a standard more favorable to the government—instead of the materiality test under *Giglio*.  Gov. Opp. Ex. C at 3; *compare Strickler v. Greene*, 527 U.S. 263, 300–301 (1999) (Fifth Amendment requires new trial where "the evidentiary suppression undermines our confidence that the factfinder would have reached the same result") *with Skinner*, 564 F.3d 1381 (Sixth Amendment is satisfied where "the jury had *sufficient* information to appraise the bias and motives of the witness") (emphasis add-

## 2. The Government Implicitly Concedes the Materiality of Kohlmann's Testimony.

The government's brief mounts a powerful indictment of Mehanna. But this is his point. The government's narrative relies on conduct that was only criminal at all if the jury credited Kohlmann's testimony. For example:

- The government relies on Mehanna's translation of *39 Ways*. Gov. Opp. 6–7. Mehanna's translation was criminal only if coordinated with al Qa'ida. Kohlmann provided the *only* evidence at trial that Mehanna translated *39 Ways* in coordination with al Qa'ida. Mehanna Br. 14–15.

- The government relies on Mehanna's partial translation of *Such are the Messengers Tested*. Gov. Opp. 7. This translation was criminal only if coordinated with al Qa'ida. Kohlmann provided the *only* evidence at trial that Mehanna translated *Messengers* in coordination with al Qa'ida. Mehanna Br. 14–15.

- The government relies on Tr. Ex. 415, a message to Mehanna attaching the *Umar Hadid* video to prove that Mehanna had access to the video before al Qa'ida released it. Gov. Opp. 7. Kohlmann provided the *only* evidence of the video's release date and therefore the only evidence that Mehanna had it before it was publicly available. Mehanna Br. 16.

- The government asserts that "Tibyan was *actually* working with al Qa'ida." Gov. Opp. 9 (emphasis in original). "Tibyan" was a website, not a person, and Younis Tsouli was the only actual Tibyan user the government identified as coordinating with al Qa'ida.[7] Mehanna Br. 13. Kohlmann provided the *only* evidence of a link between Tsouli and Tibyan users. *Id.* at 13–14.

---

ed); *see also United States v. Acosta-Colon*, 741 F.3d 179, 197 (1st Cir. 2013) (holding that *Brady* claims are evaluated "under the Due Process Clause of the Fifth and Fourteenth Amendments, not the Sixth Amendment's Confrontation Clause").

[7] The government also asserts that "Mehanna knew Tsouli through their mutual associates[.]" Gov. Opp. 9. Its citations do not support the assertion. The record contains no evidence that

The government does not contest that Kohlmann was the sole source for arguments the government pressed on the jury that:

- *any* Tibyan user ever translated *anything* at the request of al Qa'ida or Younis Tsouli;
- Mehanna could have known about any connection between al Qa'ida and Tibyan when he posted *39 Ways*, the translation central to the government's case;
- *39 Ways* was an al Qa'ida training manual; and
- the provenance of the Tibyan version of *Umar Hadid* could be proven from its content.

*See id.* at 11–18. Nor does the government dispute that Kohlmann provided critical evidence that Mehanna planned a "martyrdom operation;" that Kohlmann commented on the significance of *49* exhibits taken from Mehanna's computer; and that Kohlmann was a centerpiece of its closing argument. *See id.* at 9–11, 18–19. It bases its assertion that the Kohlmann Information is not material, not on Kohlmann's role in this case as required by *Kyles*, but on its mischaracterization of the law, as explained below.

### 3. The Government's Sufficiency Analysis Is Irrelevant to the *Brady* Inquiry at Bar.

On direct appeal, the First Circuit affirmed on the basis of the sufficiency of the evidence. *United States v. Mehanna*, 735 F.3d 32, 46 (1st Cir. 2013). Its review "eschew[ed] credibility judgments" and instead analyzed "the facts and all reasonable inferences therefrom in the light most favorable to the jury's verdict." *Id.* at 42. It held that the record contained a "*sufficient* evidentiary predicate for the convictions." *Id.* at 46 (emphasis added). It did not mention Kohlmann by name in this analysis. *Id.*

The government argues that this holding forecloses Mehanna's *Brady* claim because sufficient evidence supported conviction without Kohlmann's testimony. Gov. Opp. 3 (arguing that the First Circuit found the evidence "ample"). This is the same argument that the First Circuit

---

Mehanna ever communicated with Tsouli or had any personal relationship with him. Mehanna Br. 14.

rejected in *Conley*. There, the government asserted that withheld impeachment evidence concerning a key witness was "immaterial under *Brady*" because there was "sufficient evidence for the jury to convict" without considering that witness's testimony. 415 F.3d at 193. The First Circuit held that "Supreme Court and Circuit precedent *clearly foreclose this argument*. The question is not whether Petitioner would more likely than not have received a different verdict with the [withheld information], but whether in [its] absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (emphasis added) (citing *Kyles*, 514 U.S. at 434).

While the evidence supporting the First Circuit's sufficiency holding in Mehanna's case "offers a reason that the jury *could* have" discounted the Kohlmann Information, it "gives us no confidence that it *would* have done so." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (emphasis in original). It "merely leaves us to speculate" about what evidence "the jury would have believed." *Id.* This is because in focusing only on some evidence that may support a verdict, and in viewing that evidence in the light most favorable to the government, a sufficiency analysis does not consider "the context of the entire record" as required under *Brady*. *Kyles*, 514 U.S. at 460 (citation omitted). The First Circuit stated as much in *Mehanna*, where it "readily agree[d] that the record contain[ed] some evidence supporting the defendant's alternative narrative," but did not consider that evidence, which bore no relevance to the sufficiency analysis before it. 735 F.3d at 47. This Court must do so now as part of its evaluation of whether the government's failure to disclose the Kohlmann Information "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

The government's argument that evidence of Mehanna's "belie[f]" that "al-Qa'ida was coordinating with Tibyan" was "ample," *i.e. sufficient*, to support conviction reprises the same sufficiency theory. [8] Gov. Opp. 17. But here, its argument illustrates the error apparent in re-

---

[8] Even if the record contained evidence that Mehanna "believed" that some Tibyan users coordinated with al Qa'ida, that evidence alone could not support conviction absent evidence that *he* coordinated with al Qa'ida. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010) (stating that the material support statutes "do[] not prohibit being a member of one of the desig-

viewing only a portion of the record to determine materiality. The government *does not challenge* the centrality of Kohlmann's testimony in this case. It implicitly concedes that Kohlmann provided the only testimony "about al-Qa'ida's *actual* links to Tibyan," but argues that the Court may ignore the credibility of this critical testimony. *Id.* (emphasis in original). To accept this argument, the Court must find that the only evidence of "*actual* links" between Mehanna and al Qa'ida, Gov. Opp. 17, is immaterial in a prosecution for provision of material support "for al Qa'ida," Dkt. No. 386, 61:3–6 (Gov. Opening).

### 4. Mehanna's Vigorous Cross-Examination of Kohlmann Enhances the Materiality of the Withheld Information.

The government relies on *United States v. Paladin*, 748 F.3d 438 (1st Cir. 2014), to argue that because Mehanna "had available" and used "many avenues for impeach[ing]" Kohlmann at trial, "additional impeachment information … would not have created a reasonable probability of a different verdict." Gov. Opp. 16. *Paladin* merely holds that additional impeachment evidence is not material "*where that evidence is cumulative.*" 748 F.3d at 466. It does not hold that withheld impeachment evidence is immaterial where a trial witness was vigorously crossed. To the contrary, "where a witness is central to the prosecution's case, the defendant's conviction demonstrates that the impeachment evidence presented at trial likely did not suffice to convince the jury that the witness lacked credibility[, and therefore] the suppressed impeachment evidence 'takes on an even greater importance.'" *Horton v. Mayle*, 408 F.3d 570, 581 (9th Cir. 2005) (quoting *Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir. 2002)). Thus, even if the star witness's credibility is "eroded" during cross-examination, evidence that introduces "a new source of potential bias" remains material. *United States v. Rivera Pedin*, 861 F.2d 1522, 1530 (11th Cir. 1988) (citation omitted).

---

nated groups or vigorously promoting and supporting the political goals of the group. … What [they] prohibit[] is the act of giving material support…") (quoting *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000)). Kohlmann alone provided this crucial link between Mehanna and al Qa'ida. Mehanna Br. 13–17.

### 5. Impeachment Evidence May Form the Basis of a *Brady* Claim.

The government next asserts that "[i]nformation that relates only to a witness's 'general credibility' is arguably collateral and therefore seldom if ever material in the *Brady* sense." Gov. Opp. 17. *Paladin* holds nothing that bears any resemblance to this remarkable assertion, which directly contradicts decades of Supreme Court precedent. Evidence of bias is "always relevant as discrediting the witness and affecting the weight of his testimony." *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974) (citation omitted). A defendant therefore has a constitutional right to impeach a key witness's credibility. *Id.*; *Bagley*, 473 U.S. at 676 (evidence of bias "falls within the *Brady* rule."); *Giglio*, 405 U.S. at 154 (holding that due process requires new trial where impeaching evidence was suppressed); *Conley*, 415 F.3d at 188–189 (suppression of material impeachment evidence violates due process and requires new trial).

In *Paladin*, a drug prosecution, a confidential informant named Vega testified that he bought drugs from the defendant. *Id.* at 442. Vega also testified that after the summer of 2009, he himself stopped selling drugs except for controlled buys directed by the government. *Id.* The government neglected to produce information from a second witness, Andino, who said he had engaged in a drug transaction with Vega in December 2009.[9] *Id.* at 443. Struggling to decipher the trial court's ruling, the First Circuit "read the district court's oral decision as concluding … that the Andino proffer was collateral" because it went to Vega's credibility rather than the underlying facts of the case. *Id.* at 448. But the First Circuit declined to reach the issue, holding that any potential error was harmless due to the "weakness of the suppressed evidence and its cumulativeness[.]"[10] *Id.*

---

[9] Paladin *declined* the district court's invitation to hold an evidentiary hearing on the subject, leaving the court to speculate as to whether the withheld evidence was impeaching at all. *Id.* at 445. Andino's account was consistent with Vega's work for the government. *Id.*

[10] The *Paladin* court held that the evidence was cumulative because "it is ultimately the same kind of evidence already in the record," including evidence that Vega had lied about being a drug dealer. 748 F.3d at 446–47.

The government incorrectly extrapolates from this brief discussion the conclusion that "general credibility" evidence is usually collateral. Gov. Opp. 17. Its confusion arises from *Paladin*'s reference to the "well established" *evidentiary* rule on "specific contradiction," which prevents a party from "present[ing] extrinsic evidence to impeach a witness by contradiction on a collateral matter." *United States v. Beauchamp*, 986 F.2d 1, 3–4 (1st Cir. 1993). The result of the rule is that "when a *witness testifies* to a collateral matter … the examiner may not disprove it by extrinsic evidence." *Id.* (emphasis added). The rule has no place here for two reasons. First, the defense would have used the Kohlmann Information not to present extrinsic evidence, but to cross examine Kohlmann himself. Second, the purpose of the rule is to preserve judicial resources by preventing "specific contradiction" of irrelevant facts. Impeaching the "general credibility" of a material witness is exactly the opposite scenario.[11] The government does not assert that Kohlmann's testimony was irrelevant, nor could it. *See* Mehanna Br. 9–25.

To the contrary, even where "certain details" of key witness's testimony are corroborated by other witnesses, where "the most damning part" is not, impeachment evidence "might well have altered the outcome of the trial." *Horton*, 408 F.3d at 580; *see Robinson v. Mills*, 592 F.3d 730, 734–38 (6th Cir. 2010) (suppression of bias evidence for witness who provided uncorroborated, material testimony required *habeas* relief). Kohlmann provided sole-source testimony concerning crucial elements of the government's case, including Mehanna's "*actual* links" to al Qa'ida. Gov. Opp. 17; *see* Mehanna Br. 9–25. Any suppressed impeachment evidence relating to Kohlmann's bias takes on great importance because it may have impacted the jury's assessment of his credibility, undermining confidence in the verdict.

## II. CONCLUSION

Mehanna respectfully requests that the Court order the relief sought in his opening brief.

---

[11] Even if the rule could apply to a witness's "general credibility," to use it here the government would had to have shown that Kohlmann's three days of testimony were "not relevant in the litigation to establish a fact of consequence[.]" *Beauchamp*, 986 F.2d at 4 (citation omitted).

By his attorneys,

*/s/ Julie Silva Palmer*
P. Sabin Willett, BBO #542519
*sabin.willett@morganlewis.com*
Julie V. Silva Palmer, BBO #676788
julie.palmer@morganlewis.com
Amanda Veronica McGee, BBO #678883
amanda.mcgee@morganlewis.com
Rhonda Jo Yacawych, BBO #560183
rhonda.yacawych@morganlewis.com
Arcangelo S. Cella, BBO #690438
arcangelo.cella@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
617-341-7700

Dated:  January 4, 2016

**CERTIFICATE OF SERVICE**

I, Julie V. Silva Palmer, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 4, 2016.

*/s/ Julie Silva Palmer*
Julie V. Silva Palmer