UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                               )
UNITED STATES OF AMERICA,       )
                               )
          Plaintiff,            )
                               ) Criminal Action
v.                              ) No. 09-10017-GAO
                               )
TAREK MEHANNA,                  )
                               )
          Defendant.            )
                               )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**MOTION HEARING**


John J. Moakley United States Courthouse
Courtroom No. 22
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, July 13, 2016
2:02 p.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty, Assistant U.S. Attorney
 3        John Joseph Moakley Federal Courthouse
          Suite 9200
 4        Boston, Massachusetts  02210
          On Behalf of the Government
 5
          MORGAN, LEWIS & BLOCKIUS LLP
 6        By: Julie V. Silva Palmer, Esq.
               Arcangelo Silvio Cella, Esq.
 7        One Federal Street
          Boston, Massachusetts  02110
 8        - and -
          BINGHAM MCCUTCHEN LLP
 9        By: Peter Sabin Willett, Esq.
          150 Federal Street
10        19th Floor
          Boston, Massachusetts  02110
11        On Behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE CLERK:  All rise.

(The Court enters the courtroom at 2:02 p.m.)

THE CLERK:  The United States District Court for the District of Massachusetts.  The court is in session.  Be seated.

For a motion hearing in the case of *United States v. Tarek Mehanna*, 09-10017.  Will counsel identify yourselves, please.

MR. CHAKRAVARTY:  For the government, your Honor, Aloke Chakravarty.

MS. SILVA PALMER:  Good afternoon, your Honor.  Julie Silva Palmer for the defendant, Tarek Mehanna.

MR. WILLETT:  Good afternoon, your Honor.  Sabin Willett with Ms. Silva Palmer.

MR. CELLA:  Good afternoon, your Honor.  Arcangelo Cella with Ms. Palmer.

THE COURT:  So as you know, I suggested that in light of something the circuit had said about the alternate possibilities of proof, that it might be possible to resolve the petition on that narrow issue.  You've now briefed it. Thank you for the briefs.  They're excellent.  And so I would ask you now to address that point.

MS. SILVA PALMER:  May I?

Good afternoon, your Honor.  Before I get to the legal

argument, I think everyone makes -- we'd like to address the

government's best-case scenario head on, and in that scenario,

the government argues that Kohlmann was independent of the

Yemen theory when he was, in fact, at the heart of the Yemen

theory.

And to illustrate, I'd ask you to imagine the jury in

the jury room.  It had just retired after closing arguments and

hearing the charge, and it's considering whether the government

proved beyond a reasonable doubt that when Mehanna traveled to

Yemen he sought a training camp, or was he looking for a

school?  What was his intent?

There was no direct evidence in the record, as the

First Circuit observed, that answered that question.  And the

jury had to consider all the evidence, including evidence it

heard only from Kohlmann.  Now, relying only on that evidence,

in its closing argument the government argued that Mehanna

worked for al-Qa'ida.  A proffered witness, a disinterested

witness, he had advised media networks in general, and as an

expert he had a special aura of reliability.

The jury knew that Mehanna went to Yemen and they're

trying to figure out why he went.  The expert says that he

worked for al Qa'ida; what does that say about his intent in

traveling to Yemen?  That testimony cannot be immaterial, and

for that reason, Kohlmann was not only material, he was central

to the Yemen theory.

1          Moving on to the legal argument, we want to make three

2     points:  The first is that *Griffin* does not apply to this case.

3     The government acknowledges that the *Brady* standard applies and

4     not the standard under *Griffin*, but it applies the logic of

5     *Griffin* in its argument, and that's an invitation for error.

6          The real test in this context is whether in the

7     context of the entire record the absence of expressed evidence

8     undermines confidence in the outcome of the trial; the test is

9     not whether there was enough left in the record to convict when

00:03 10     you take the tainted witness to the side.  We can't answer that

11     question directly without seeing the withheld evidence, but we

12     can say that Kohlmann's testimony was material.

13          Second, I would like to address the *Conley* case which

14     is directly on point here, and it shows that the government's

15     arguments clearly were closed.  Applying the standard, *Mehanna*

16     has to show that Kohlmann impacted the trial in a way that

17     undermines confidence in the verdict.  The government's already

18     conceded that Kohlmann provided the only actual link to

19     al Qa'ida in the case, and Kohlmann alone allowed the

00:04 20     government to argue that Mehanna worked for al Qa'ida.  That

21     testimony was not corroborated.

22          And in the trial the government used that testimony in

23     that way.  It repeatedly argued to the jury that the jury could

24     infer intent on Yemen based on that testimony.  It can't now

25     cordon off Kohlmann and consider just what was left, because

1    what Kohlmann said had an impact on what the jury considered.

2          And then the third point, your Honor, is that applying

3    the correct standard, Mehanna is entitled to some relief even

4    if the Court finds that Kohlmann was not material on the Yemen

5    theory, and the reason for that is that there were seven

6    counts, and the analysis is a little bit different for each

7    count because each count has different elements.

8          So in the first point, on *Griffin*, as I said, the

9    government cites the *Brady* standard and concedes that this is

00:04 10   not a sufficiency argument, but it's applying *Griffin* for its

11   logic and the sufficiency rule.  And if there can be any doubt

12   that it's relying upon *Griffin*, it explicitly says so in page

13   17 of its brief.

14         *Griffin* and *Brady* are opposite.  The purpose -- under

15   *Griffin*, we're looking to see whether there's any evidence in

16   the record at all that could support a guilty verdict, and the

17   reason for that is because we assume that there's been a fair

18   trial and they make -- they make all inferences in favor of the

19   verdict and ignore credibility judgments because we assume that

00:05 20   the jury is competent in factfinding.

21         The purpose of the *Brady* line of cases is the

22   opposite.  In the *Brady* case, we're trying to determine if the

23   trial process itself was unfair.  The question is -- in order

24   to determine whether the process was unfair, we'd consider

25   whether the evidence that was withheld was material.

1      The inquiry considers the whole record to see how the

2  government's error undermined -- whether it undermined

3  confidence in the verdict.  And in order to undermine

4  confidence, the defendant doesn't have to show that he was

5  innocent, he doesn't have to show that there were otherwise

6  insufficient evidence in the record to convict, and he doesn't

7  have to show that he would have been acquitted if the

8  government had disclosed the evidence; the question is

9  whether -- are we still confident in light of the evidence that

00:06 10  the defendant would have been found guilty beyond a reasonable

11  doubt.

12      Now, we don't apply a sufficiency analysis in a *Brady*

13  case because the underlying assumptions that the trial was

14  unfair -- or that the trial was fair in a sufficiency case,

15  that assumption doesn't apply in a *Brady* case so there's no

16  need to be differential to the trial process because it might

17  have been tainted.  And this is why the government doesn't cite

18  any *Brady* cases that apply the sufficiency doctrine.

19      *Conley* v. *United States*, which we cite in our brief,

00:06 20  is a great illustration of how sufficiency doesn't apply in a

21  *Brady* case.  That case was a perjury case.  The government

22  accused the defendant of lying about what he saw at the scene

23  of a battery.  There was no direct evidence.  The government

24  presented three witnesses:  Two of those witnesses had

25  credibility problems, and a third witness was presented as

1    disinterested.

2          The jury returned a guilty verdict, and the First

3    Circuit affirmed that verdict on the sufficiency doctrine.

4    Following the appeal, the defendant brought a 2255 based on the

5    government's failure to disclose evidence concerning the third

6    disinterested witness.  The government argued in *Conley* that

7    the testimony of the two witnesses alone provided sufficient

8    evidence for the jury to convict even without the disinterested

9    witness's testimony.  The First Circuit said that that argument

00:07 10    was clearly foreclosed because even if you cordon off that

11    witness, that witness said things that could have impacted the

12    jury's determination.

13          Applying *Conley* here, there is some remarkable

14    parallels that have gone unanswered by the government in its

15    brief.  The government doesn't address this case at all.  On

16    direct appeal, the First Circuit said that there was sufficient

17    evidence in the record to convict based on Yemen.

18          The government is urging the Court to put Kohlmann to

19    the side and rule that there was enough based on what the First

00:08 20    Circuit said to convict without considering Kohlmann.  *Brady*

21    requires consideration of how Kohlmann impacted the verdict,

22    not whether there was enough left when you put the testimony to

23    the side.

24          The First Circuit in *Mehanna*'s case observed that

25    there was no direct evidence of intent and affirmed on the

grounds that there was sufficient evidence on the Yemen theory.

Ultimately, as the First Circuit recognized, the jury heard

evidence on both theories, that he intended to find a camp and

that he intended to find a school.  And as we've just

discussed, Kohlmann played a critical role in that

determination.

The lay witnesses that the government put on all had

credibility problems.  They had testified inconsistently, they

had changed -- some changed testimony over time, they were

testifying pursuant to immunity deals, one had admitted to

lying under oath.  Kohlmann allowed the government, like in

*Conley*, to put on a disinterested witness.  And here the effect

is arguably greater than it was in *Conley* because Kohlmann was

an expert and he carries a greater aura of reliability as an

expert.  And just as Kohlmann urged the jury, Kohlmann's

testimony did impact the outcome.

Finally, your Honor, *Mehanna* doesn't need to prove

that Kohlmann impacted the outcome -- I'm sorry -- that

Kohlmann was material to Yemen in order to be entitled to

relief, and the reason for that is this:  There were seven

counts at trial.  Six of them involved the Yemen theory.

Counts 1 to 3 went to the jury on a general verdict.  And the

theory submitted to the jury for those three counts was that --

it was either Yemen or the advocacy theory, as you're well

aware.  We don't know what the jury found on those three counts

1  because they returned a general verdict and there's no way to

2  know which theory they chose.

3       Count 1 had an al Qa'ida element.  And that was the

4  only count in the entire case that had an al Qa'ida element.

5  And we can't presume from the remaining counts that the jury

6  would have found an al Qa'ida element on Count 1 from what they

7  found in the other counts.

8       And that's all I have, your Honor.

9       THE COURT:  Just on the last -- are you arguing as to

00:11 10  Count 1 only the translation theory applied to Count 1?

11       MS. SILVA PALMER:  No, on Count 1 it could have -- the

12  jury's verdict could have been based on Yemen or it could have

13  been based on the translation theory.  And the government has

14  essentially conceded -- and it's impossible to refute that

15  Kohlmann was essential to the translation theory.  So because

16  we don't know whether the jury's verdict depended on Yemen or

17  depended on advocacy where it was a general verdict, we don't

18  know if the jury relied on the advocacy theory to find that

19  count.

00:11 20       THE COURT:  Okay.  Let me come back to your main

21  point, I think, which is that Kohlmann's testimony was material

22  to the Yemen theory.  Kohlmann said very little about Yemen,

23  right?  He said something --

24       MS. SILVA PALMER:  He said some things about Yemen.

25       THE COURT:  There are camps there and so on, and that

1   was controverted by the defense.  It doesn't really matter

2   whether there were actually camps there, does it?

3          MS. SILVA PALMER:  It could have to the jury.  We

4   don't know what they considered.  There's no way to know what

5   the jury considered.  Maybe --

6          THE COURT:  The offense was going there with an

7   intent.  If it was a mistake, the defendant would still be

8   culpable, wouldn't he?

9          MS. SILVA PALMER:  It could have been.  And under the

00:12 10   sufficiency argument, that is the analysis that you'd apply.

11   But here we don't know whether the jury found that testimony

12   persuasive or not.  We don't know if the jury would have said

13   there's no Yemen -- there's no al Qa'ida in Yemen, and for that

14   reason, we doubt that that was his intent in going there.  They

15   were trying to figure out what his intent was, and in doing

16   that, they considered all the evidence; they didn't consider

17   just the government's best case.

18          THE COURT:  Okay.  But besides that, you also argue

19   that Kohlmann's testimony about the online work also impeaches

00:13 20   the jury verdict on the Yemen theory?

21          MS. SILVA PALMER:  Yes.

22          THE COURT:  Why?

23          MS. SILVA PALMER:  The reason is because Kohlmann said

24   this translation that Tarek Mehanna produced -- the government

25   said Tarek Mehanna produced -- was coordinated with al Qa'ida.

1    Kohlmann provided the sole-source testimony, the only link

2    between al Qa'ida and Mehanna in the entire case.  He said

3    Mehanna worked for al Qa'ida.

4         THE COURT:  Can you point me to that?  Is that in your

5    brief?  Maybe it's in your brief.

6         MS. SILVA PALMER:  Yes.  Yes, it is in the brief.

7         Can you get me that cite, please?

8         THE COURT:  If it's in the brief, I'll find it.

9         MS. SILVA PALMER:  It's in the brief.

00:13 10        Kohlmann's testimony allowed the government to say

11   when Tarek Mehanna translated these documents, he was working

12   for al Qa'ida.  There was no other connection to al Qa'ida in

13   the case.  He was the only actual link, as the government

14   termed it, in its brief.

15        If the jury's considering the question of did he go to

16   al Qa'ida seeking a camp or did he go to al Qa'ida intending to

17   find a school, and keep in mind --

18        THE COURT:  You mean Yemen.

19        MS. SILVA PALMER:  I'm sorry.

00:14 20        The only question on the Yemen theory was his intent

21   in going there, the jury considering weighing the question of

22   whether he went seeking a camp or he went seeking a school.

23   And the government says, Well, you can figure out what his

24   intent was when he did this because when he came back, he

25   started working for al Qa'ida.

1         That's a dramatic weight on the side of intending to

2    find an al Qa'ida training camp.  If he was just going there to

3    find a school, that theory's a little bit more plausible if he

4    didn't come home and start working for al Qa'ida.

5         THE COURT:  Okay.

6         MS. SILVA PALMER:  Thank you, your Honor.

7         MR. CHAKRAVARTY:  Your Honor, let me just pick up on

8    that point.  The defense in the case on the Yemen theory was

9    that he was going for innocent purposes, for a school, language

00:15 10   training, something else.  It did not differentiate whether it

11   was an al Qa'ida training camp versus some other training camp.

12   So my sister claims that the prejudice that may have emerged

13   from Mr. Kohlmann's testimony about al Qa'ida somehow could

14   have infected the purpose for which the defendant was going to

15   Yemen is completely incongruous.

16        The jury was not going to determine whether he went to

17   a training camp that was not al Qa'ida.  The defense offered no

18   evidence that it was some other training camp.  So this notion

19   that this spillover prejudice applied from Kohlmann's testimony

00:15 20   to the Yemen camp is, frankly, unsustainable.

21        The government has disputed some of the things which

22   the defendant claims were given in this case and unrefutable --

23   the fact that he was an essential witness, even to the

24   translation theory; that he was the only witness to the actual

25   link to al Qa'ida.  I won't belabor those except to say that we

1   dispute those and we articulated why -- but that highlights the

2   fact that the defendant has not met its burden of proof at this

3   post-trial, post-conviction, post-appeal, post-denial of cert

4   proceeding where they have to do more than just speculate what

5   a jury may have considered, but rather, actually demonstrate

6   that there was a frailty that if Kohlmann was further

7   impeachable, then this pillar of the government's case, the

8   Yemen theory, which I'll get to in a moment as to why it was so

9   obviously independent of the translation and other testimony

00:16 10   for which Kohlmann was called -- and he wasn't the exclusive

11   witness -- but they haven't met their burden.  They haven't

12   articulated one statement that Kohlmann said that was critical

13   to that theory.

14           Going to the next point of the one area of testimony

15   that Kohlmann had of relevance to the Yemen theory was a -- was

16   factual testimony elicited for the first time on

17   cross-examination.  Essentially, Kohlmann was being put up and

18   offering defense witness testimony, not testimony being offered

19   to prove an element of the case by the government.  So -- and

00:17 20   now they're claiming that the purpose of that testimony was

21   solely for the purpose of then impeaching that testimony.

22           He became the defense expert on whether there were

23   camps in Yemen.  Surely that cannot be prejudicial if, in fact,

24   that were relevant -- and the government argues that it wasn't

25   relevant at all whether there were actual camps -- but to the

extent it was an issue at all, it was a defense issue.  They

were trying to create a strong issue as to whether al Qa'ida

existed and further to impeach Kohlmann's testimony, which as

your Honor pointed out, was further advanced -- that theory was

further advanced by their own experts.  I think they called two

experts, Mr. Johnsen as well as Mr. Sageman, to refute this

issue that they created themselves on cross-examination.

But to put a finer point on why Kohlmann's testimony

could not be material to the Yemen points, not only did he not

testify about it, but I specifically asked him on redirect

examination after this phantom issue about Yemen had been

raised on cross, as to whether he had consulted any of the

witness statements, whether he was aware of any testimony or

information about the defendant's trip to Yemen, and he said

no.

And there was zero evidence that he knew anything to

either corroborate victim testimony or witness testimony or

some of the coconspirators who was the core of the Yemen case.

It was percipient witnesses, it was people who shared the

intent and actually went on the journey with him, it was his

own statements.  The evidence regarding the Yemen trip was

overwhelming.  And so then I'll come back to where we started,

which is *Griffin*.

In light of that overwhelming testimony about the

Yemen trip, this isn't the sufficiency matter, but it is hard

1       to imagine a circumstance in which Kohlmann's testimony could

2       potentially be material to overwhelming evidence, especially

3       given that it would be impeaching of Kohlmann's general

4       credibility as opposed to a specific fact that he said about

5       Yemen or about the Yemen trip intent.  Your Honor carefully

6       policed the 704 rule, and he didn't opine as to Mr. Mehanna's

7       requisite intent.

8            But with overwhelming evidence showing that the Yemen

9       trip occurred for these illicit purposes as enunciated in

00:19 10     Counts 1 through 4, further impeachment of him could not have

11      impacted that basis of conviction.  And if nothing else, when

12      the First Circuit says that the courts are not well equipped to

13      intrude into that jury chamber, as the defense invites you to

14      do, to speculate as to what facts ultimately went in their

15      calculus, but in this case where there are two factually

16      distinct theories, which each are supportable by facts in law,

17      as the First Circuit has found, then a conviction on the

18      factual basis for the Yemen theory is certainly sufficient and

19      it -- the defense hasn't met any burden to suggest that

00:20 20     Kohlmann's testimony could have impacted that aside from the

21      rhetoric of saying, Well, it must have because this was an

22      al Qa'ida case, and if he talked about al Qa'ida, then it must

23      have infected it.

24           And at the end of the day when you go down into the

25      record and you look at what they have offered to suggest that

that actually is what happened here and that there was a

material -- there could be something that was material, there's

just nothing there.

　　　　　For that reason, the motion should be denied.

　　　　　MS. SILVA PALMER:  May I?

　　　　　THE COURT:  Yes.

　　　　　MS. SILVA PALMER:  Thank you, your Honor.

　　　　　I would like to hone in on something Mr. Chakravarty

just said.  He's saying that the intent on -- the intent

question for the jury on the Yemen theory was did he go for

innocent purposes or did he not go for innocent purposes?  And

that's my point.  My point is that the jury's much more likely

to find that he didn't go for innocent purposes.  If he came

home from Yemen and started working for al Qa'ida, working for

al Qa'ida is not an innocent purposes.

　　　　　THE COURT:  Well, are you saying that precisely,

because I'm sort of trying to gauge -- when you say "working

for al Qa'ida," are you making a specific point, are you saying

generally acting in ways that gave support to foreign

terrorists --

　　　　　MS. SILVA PALMER:  No, I'm making a specific point

about al Qa'ida; this is not a question about advocacy and --

　　　　　THE COURT:  Putting that aside then, wasn't there

overwhelming evidence of his interest in and support for jihad

in general?

1          MS. SILVA PALMER:  He can have interest and support

2     jihad in general.

3          THE COURT:  Well, an activity too.

4          MS. SILVA PALMER:  Right.  That's not a criminal

5     activity.  The fact that he --

6          THE COURT:  Well, no, I'm talking about the criminal

7     part of it.  In other words, the defense is sharing -- are you

8     saying that it's critical that the beneficiary of his efforts

9     have been al Qa'ida specifically or jihad generally in the

00:22 10   region?

11          MS. SILVA PALMER:  Oh, I think I understand the

12     distinction you're making.  Whether he sought an al Qa'ida

13     training camp or just any training camp?  Is that what

14     you're --

15          THE COURT:  And when he was working on the 39 Steps,

16     the "39 Ways."

17          MS. SILVA PALMER:  The "39 Ways" is a great example.

18     If he's working on --

19          THE COURT:  Does that have to -- are you making the

00:22 20   point that it's not shown sufficiently that that was for

21     al Qa'ida?

22          MS. SILVA PALMER:  Right.  Kohlmann --

23          THE COURT:  It's not shown sufficiently that it was

24     jihadi support work?

25          MS. SILVA PALMER:  What I'm saying is that there's a

1    distinction, and "39 Ways" is a great example.  If he was just

2    translating "39 Ways" because he's a guy interested in that

3    sort of material, that's one -- that's an innocent activity.

4    If, on the other hand, he's doing that because al Qa'ida has

5    asked him to translate in order to further their efforts,

6    that's a criminal activity.

7            And the "39 Ways" is a great point of how -- it's a

8    great example of how Kohlmann's testimony infected the trial.

9    Kohlmann said that that was a terrorist training manual, the

00:23 10   defendant's witnesses said that was a standard religious text.

11   So when he's -- when Kohlmann's saying these things about what

12   he's doing, he's working directly for al Qa'ida, he's willing

13   to do that when he comes home, that --

14           THE COURT:  I don't think you're quite getting it.

15           MS. SILVA PALMER:  I'm sorry.

16           THE COURT:  So let me -- al Qa'ida as opposed to

17   Lashkar-e-Taiba, for example?  In other words, are you being

18   specific to work for a particular terrorist organization as

19   opposed to -- and in particular, Kohlmann's evidence work in

00:23 20   general for the support of jihad, whoever might be willing to

21   listen?

22           MS. SILVA PALMER:  I'm making the al Qa'ida

23   distinction because that's the only thing that makes that

24   conduct criminal.  So what the government is saying -- what the

25   government argued at trial was that he went to Yemen in order

to support al Qa'ida, and when he came back from Yemen, he

continued his work by continuing to work for al Qa'ida.  And

that testimony -- Kohlmann was the only source of the argument

that Mehanna worked for al Qa'ida when he returned.

So according to the government's logic, he went there

to support al Qa'ida, he returned and continued to work for

al Qa'ida.  That piece was a critical factor in determining his

intent when he went to Yemen in the first place.  And that's

what the government argued to the jury.

THE COURT:  Okay.  Thank you.  Unless you have another

point.  I didn't mean to cut you off.

MS. SILVA PALMER:  I guess, your Honor, I do have

another point.  And I urge you not to get distracted by this

training camp issue, about whether they were in Yemen or not.

It is a factor that Kohlmann testified on that is favorable to

us.  It doesn't matter whether Kohlmann was providing defense

testimony or not.  What Kohlmann said there was that there are

camps in Yemen, and the defendant's witness said the opposite.

But that's not the critical factor, whether there were

camps there.  The critical factor is that Kohlmann said that

*Mehanna* worked for al Qa'ida, and that can't help but impact

the jury's choice between an innocent intent to travel to Yemen

and a criminal intent.

THE COURT:  Okay.  So in the initial briefing there

was an issue as to whether the defense should see the material

1    that's at issue at the bottom of this, and I think the

2    government's position was it wasn't necessary for anybody to

3    look at it, but the government was willing to submit it in

4    camera for the Court to look at.

5            When we were here in May, I thought maybe there was a

6    targeted issue that could avoid a broader controversy.  I think

7    we're in the broad controversy now, as the discussion of the

8    record indicates, so I think to complete the information that

9    is available and perhaps bears on this ultimate issue as to

00:26 10   whether there's a *Brady* violation, I think it's time for me to

11   look at that material.  So we'll make arrangements through

12   Mr. Chakravarty to have that submitted to the Court in camera.

13           Am I correct that it's classified material?  Is that

14   right?

15           MR. CHAKRAVARTY:  It is.  And I think I've actually

16   already made it available to the classified information

17   security officer.

18           THE COURT:  Okay.  We have a mutual challenge.

19           MR. WILLETT:  Your Honor, Sabin Willett with

00:26 20   Miss Palmer.  Can we get access to it as well?

21           THE COURT:  Not yet.  Not yet.  I don't say no

22   forever, but for now I'm going to look at it first.

23           MR. WILLETT:  Thank you.

24           THE COURT:  Obviously, this is all reserved, including

25   my review of that and whatever else may follow.  Okay.  Thank

```
 1    you.

 2              THE CLERK:  All rise for the Court.

 3              (The Court exits the courtroom at 2:30 p.m.)

 4              THE CLERK:  Court will be in recess.

 5              (The proceedings adjourned at 2:30 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                 C E R T I F I C A T E

2

3       I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4  the United States District Court, do hereby certify that the

5  foregoing transcript constitutes, to the best of my skill and

6  ability, a true and accurate transcription of my stenotype

7  notes taken in the matter of Criminal Action No.

8  09-10017-GAO-1, United States of America v. Tarek *Mehanna*.

9

10  /s/ Marcia G. Patrisso
    MARCIA G. PATRISSO, RMR, CRR

11  Official Court Reporter

12
    Date:  8/4/16

13

14

15

16

17

18

19

20

21

22

23

24

25