UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 09-10017-GAO

UNITED STATES OF AMERICA,

v.

TAREK MEHANNA,
Defendant.

OPINION AND ORDER
June 21, 2018

O'TOOLE, D.J.

The defendant, Tarek Mehanna, has moved, pursuant to 28 U.S.C. § 2255(b) and 18 U.S.C. App. 3, § 2, for discovery concerning certain classified information he claims should have been disclosed to him prior to his criminal trial under the discovery obligations imposed upon the government by the Fifth Amendment to the Constitution, as explicated chiefly in Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and Kyles v. Whitley, 514 U.S. 419 (1995). The defendant's motion also prays for such further relief as may be warranted as a consequence of the requested discovery, including most significantly, an order vacating and setting aside his criminal judgment and setting a new trial pursuant to 28 U.S.C. § 2255.

After a lengthy trial, the defendant was convicted of conspiracy to provide material support to a designated foreign terrorist organization, al-Qa'ida, in violation of 18 U.S.C. § 2339B (Count One of the Second Superseding Indictment), conspiracy in violation of 18 U.S.C. § 2339A to provide material support to terrorists knowing or intending its use to be in violation of 18 U.S.C. §§ 956 and 2332 (Count Two), providing or attempting to provide material support to terrorists knowing or intending its use to be in violation of 18 U.S.C. §§ 956 and 2332, also in violation of

18 U.S.C. § 2339A (Count Three), and conspiracy to kill persons in a foreign country in violation of 18 U.S.C. § 956 (Count Four). He was also charged with three counts of conspiracy to make and making false statements in violation of 18 U.S.C. §§ 371 and 1001 (Counts Five through Seven).[1] He was convicted by a jury of all counts. The judgment of conviction and the sentence imposed were affirmed by the Court of Appeals. United States v. Mehanna, 735 F.3d 32 (1st Cir. 2013).

As the circuit court noted, to prove the defendant guilty under Counts One through Four, the government relied on "two separate clusters of [the defendant's] activities." Id. at 41 & n.1. The first evidentiary narrative proposed that the defendant conspired with others and affirmatively attempted "to provide himself as an al-Qa'ida recruit." Id. at 43. The government offered evidence that in early 2004 the defendant and others conspired to travel to Yemen hoping to find a terrorist training camp where he could receive paramilitary training so that he could eventually join al-Qa'ida in Iraq in fighting and killing American soldiers. The second evidentiary narrative proposed that beginning in 2005 the defendant provided service to the "media wing" of al-Qa'ida by translating from Arabic into English various jihadi propaganda materials intended to be published on the internet to promote the recruitment of new followers. To a substantial extent, the government relied on different evidence to support the two narratives, although it purported to connect them by proposing that the defendant's failure to connect with al-Qa'ida through the Yemen trip led him to undertake later translation activity as a substitute way to participate in the cause.

During its investigation, the government had seized the defendant's computer from his residence. The contents of his computer produced a large volume of evidence of the defendant's

---

[1] The three false statement counts are not relevant to the present issues.

activities and communications with others that was very useful to the government's case under both narratives. With respect to the translation narrative, the evidence at trial included not only examples of translation work product, but also, significantly, the defendant's own communications with others about that activity, contained in instant messaging and chat-room exchanges. The government also offered the testimony of Evan Kohlmann, a self-styled "international terrorism consultant." (Trial Tr. vol. 26, 90, Dec. 2, 2011 (dkt. no. 409).) Kohlmann testified over the course of three trial days about al-Qa'ida and, as particularly relevant to the government's theory, the activities of its "media wing." Among other things, his testimony, if accepted, would have enabled the jury to connect various drafts, videos, and messages found on Mehanna's computer with al-Qa'ida propaganda strategies, and the testimony thus helped build a case for material support under the translation narrative.

Kohlmann's testimony did not have any direct bearing on the Yemen trip evidentiary narrative, with one small exception. Experts for the defense, Marc Sageman and Gregory Johnsen, testified that after the attack on the World Trade Center on September 11, 2001, the United States pressured the government of Yemen to crack down on al-Qa'ida, and as a result terrorist training camps that had been operating there were closed. Johnsen testified that there was no evidence of such camps in Yemen between the end of 2001 and early 2006. (Trial Tr. vol. 30, 70, Dec. 8, 2011 (dkt. no. 413).) Sageman testified that there had been no training camp activity in Yemen from 2003 to 2006. (Trial Tr. vol. 34, 89, Dec. 14, 2011 (dkt. no. 417).) This evidence was offered in support of the argument that, because the camps had closed, the defendant could not in fact have received terrorist training there in 2004, so that pursuit of such training could not reasonably be found to have been the purpose of his trip. In anticipation of that evidence being elicited in the defense case, defense counsel asked Kohlmann on cross-examination: "There is no evidence that

training camps existed in Yemen after November of 2001 and before February of 2006?," to which Kohlmann replied, "No; that's incorrect." (Trial Tr. vol. 28, 9, Dec. 6, 2011 (dkt. no. 411).) This, the defendant now claims, creates an important dispute as to the Yemen trip narrative between the government's expert, Kohlmann, and the defense experts as to whether training camps actually were active in Yemen in 2004 when the defendant visited that country. Perhaps that is so, although Kohlmann's testimony on the point was relatively scant and unelaborated, unlike Johnsen's. In light of the limited testimony on the particular point by Kohlmann, whether there was an actual substantial conflict on this point between his position and that of the defense experts is debatable. In any event, any actual conflict was minor and, critically, ultimately irrelevant. At issue was the defendant's *intention* in traveling to Yemen. What mattered was whether he went to Yemen intending to get training so he could join al-Qa'ida in fighting Americans in Iraq. That the intention may have rested on a mistake of fact about the practical possibility of receiving training there is, as a matter of substance, beside the point.[2]

To impeach the overall reliability of Kohlmann's testimony, the defense elicited a wide range of unflattering facts: that he was essentially an autodidact; that he had exaggerated his

---

[2] The Court of Appeals noted:

> [T]he defendant posits that the Yemen trip could not have constituted a substantial step toward the commission of the crime because there was no al-Qa'ida presence in Yemen in February 2004. Notwithstanding these importunings, we need not decide whether or when al-Qa'ida pulled up stakes and quit Yemen. Even if we assume arguendo that al-Qa'ida retreated before the defendant's trip, the existence of a substantial step would not be called into question. Such a departure would, at most, have created a factual impossibility; and as we previously have explained, "factual impossibility is not a defense to . . . liability. . . for inchoate offenses such as conspiracy or attempt."

Mehanna, 735 F.3d at 53 (quoting United States v. Dixon, 449 F.3d 1943, 202 (1st Cir. 2006)).

academic credentials; that he misleadingly claimed his work had been "peer reviewed"; that, though claiming to have expertise in the study of Islamic terrorism, he was not able to read, write, or speak Arabic; that he had only been to a few Middle Eastern countries, and then usually only briefly to attend conferences; that he had testified as an expert twenty times for the government, but had declined to provide assistance the only time he was asked by a defendant; that his cumulative fees for providing assistance to federal prosecutors were in excess of $500,000 and for foreign governments were almost $400,000; and that in addition to testifying, he also has served as a "consultant" for the FBI, for which he was paid around $50,000. (See generally Trial Tr. vol. 27, Dec. 5, 2011 (dkt. no. 410); id., vol. 28, Dec. 6, 2011.)

The defendant now claims that he was denied an adequate opportunity to impeach Kohlmann because the government failed to disclose additional impeachment information that was in its possession. The information at issue, referred to in the motion papers (with a subtle Robert Ludlum inflection) as the "Kohlmann Information," is classified within the meaning of the Classified Information Procedures Act. 18 U.S.C. App. 3, § 1(a). Beginning in 2014, the government has produced that same information to other defendants as potential impeachment information within the standard Giglio understanding of that term in cases in which Kohlmann was a prospective witness. The present motion is supported by the affidavit of an experienced lawyer who has represented defendants in a number of national security or terrorism cases, including those recent cases in which the information has been disclosed. He asserts his opinion that the information would have had significant impeachment value in the trial of the defendant's case.

"Impeachment evidence must be material before its suppression justifies a new trial." Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005) (citing Wood v. Bartholomew,

516 U.S. 1, 5 (1995) (per curiam)). "The suppression of impeachment evidence is 'material' when a reasonable probability exists 'that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.'" Id. (quoting Strickler v. Greene, 527 U.S. 263, 289 (2005)). Put alternately, such a "reasonable probability" may be found to exist if the nondisclosure of the information "undermines confidence in the verdict." Id. (citing Kyles, 514 U.S. at 434). Materiality is judged by "the strength of the impeachment evidence and the effect of its suppression in the context of the entire record." Id. at 189 (citing United States v. Bagley, 473 U.S. 667, 683 (1985); United States v. Agurs, 427 U.S. 97, 112 (1976)). That strength is assessed both intrinsically and in relation to other evidence in the record. Suppressed impeachment evidence may be assessed as immaterial "if the evidence is cumulative or impeaches on a collateral issue." Id. at 189 (citations omitted).

For present purposes, it can be generously assumed, arguendo, that the "Kohlmann Information" would be material with respect to Kohlmann's testimony concerning the translation narrative. However, it cannot, whatever its content, be material to the Yemen trip narrative because Kohlmann's testimony had no substantial value for the government's proof of the defendant's guilt under that evidentiary theory. And consequently, even the utter destruction of Kohlmann's credibility would have had no weakening effect on the prosecution case regarding the trip to Yemen.

As noted above, much of the inculpatory evidence about the defendant's desire to join violent jihad actively and his hoped-for opportunity to do so in the first instance by traveling to Yemen was in the form of his own words in his communications with others, including especially his co-conspirators. The trial testimony of co-conspirators and others also supported the government's theme. Particularly damning was the testimony of Kareem Abu-Zahra. Abu-Zahra

traveled with Mehanna and his co-defendant Ahmad Abousamra on the trip to Yemen,[3] and he testified in detail about the trio's plans. In the present proceedings, counsel for the defendant seek to build up Kohlmann as the government's "star witness." (See, e.g., Mem. of Law in Supp. of Tarek Mehanna's Mot. under 28 U.S.C. § 2255 to Vacate Sentence or, in the Alternative, for a New Trial 1 (dkt. no. 486).) Mehanna's experienced criminal trial counsel knew better. "Kareem [Abu-Zahra], I submit, is the most important . . . government witness in this case," he told the jury in his closing argument. "I submit that you have to believe Kareem beyond a reasonable doubt if you're going to find Tarek guilty of providing material support for going to Iraq."[4] (Trial Tr. vol. 35, 117, Dec. 16, 2011 (dkt. no. 419).) He then proceeded to attack Abu-Zahra's credibility.

Abu-Zahra testified that, after the U.S. invasion of Iraq, he and other religious young Muslim men in Massachusetts became radicalized, horrified that America was killing their fellow Muslims. He testified that he and Mehanna discussed various ways they might strike back, including the assassination of prominent American political figures or an attack on a shopping mall or a government facility. Importantly to the government's case, he testified that the explanation that the three travelers to Yemen were going there to find a school where they could pursue Islamic and Arabic studies was a "cover story" they agreed to tell if they needed one. After later agreeing to cooperate with the FBI in exchange for immunity from prosecution, Abu-Zahra surreptitiously recorded conversations with Mehanna that had substantial inculpatory implications.

Another key government witness for the Yemen trip narrative was Jason Pippin. Pippin, an American convert to Islam, testified that in the mid-1990s he had traveled to Pakistan where he

---

[3] Abu-Zahra aborted his own journey before reaching Yemen, and returned home from the United Arab Emirates.
[4] The reciprocal implication of that argument was that if the jury did believe Abu-Zahra, they would be justified in returning a verdict of guilty.

underwent paramilitary training at a camp run by Lashkar-e-Taiba, a terrorist organization based in Pakistan. Pippin had also spent some time studying at a religious school in Yemen. Having learned of this, Abousamra traveled to California to seek Pippin's help in finding a contact in Yemen who could lead the co-conspirators to a training camp there. Pippin did have a possible contact; he directed Abousamra to go to a particular village and seek out a tall Egyptian who maintained a perfume shop. Pippin also testified that he had suggested the cover story to Abousamra that the three were innocently seeking a religious school to attend, and he identified a particular school the travelers could cite.

In a conversation with the defendant later recorded by Abu-Zahra, Mehanna described in some detail how he and Abousamra found the place in Yemen to which Pippin had directed them, and asked for the Egyptian perfume seller. They were told that all the camps were gone. (Trial Exs. 458D, 459 at CA00383–CA00386.) In the recorded conversation, the defendant recounted how crushed he was with the news. This was, of course, very damning evidence in his own words. Schools were there; the defendant and Abousamra had actually visited one. It was the camps that were gone. If the cover story had been true, there would have been no basis for his disappointment.

The foregoing references to the trial evidence are simply brief illustrations of the strength of the government's case on the Yemen trip narrative and the insignificance of Kohlmann's testimony with respect to it. After similarly summarizing the government's evidence on this theory, the Court of Appeals concluded:

> The evidence we have summarized sufficed to ground a finding, beyond a reasonable doubt, that the defendant traveled to Yemen with the specific intent of providing material support to al-Qa'ida, knowing or intending that this support would be used in a conspiracy to kill persons abroad. It likewise sufficed to ground a finding that the defendant attempted to provide such material support, knowing or intending that it would be used in a conspiracy to kill persons abroad. Finally, it sufficed to ground a finding that the defendant, while in the United States, conspired

with others in a plan to kill persons abroad. The evidence was, therefore, ample to
convict on the four terrorism-related counts.

Mehanna, 735 F.3d at 46. And, as the Court of Appeals has held, the sufficiency of the case regarding the trip to Yemen alone supports the defendant's conviction under Griffin v. United States, 502 U.S. 46 (1991). Id. at 50, 51. The most thoroughgoing impeachment of Kohlmann imaginable would have done nothing to weaken that case. In other words, there is no reasonable probability that the result of the trial would have been different if the so-called "Kohlmann Information" had been disclosed to the defense. See Conley, 415 F.3d at 188 (quoting Strickler, 527 U.S. at 289). For this reason, the government's failure to disclose the material, viewed in the context of the entire record, does not undermine confidence in the outcome of the defendant's trial. See id. (citing Kyles, 514 U.S. at 434).

Therefore, in the specific circumstances of this case, there is no reason to inquire further into the matter of the "Kohlmann Information." The defendant's present Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (dkt. no. 485) is accordingly DENIED, as is the defendant's Rule 6 Motion for Discovery (dkt. no. 510).) The petition is DISMISSED.

No certificate of appealability shall issue as there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge